**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **STATE OF ILLINOIS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-cv-6260** |
| **CITY OF CHICAGO,** | **Judge Robert M. Dow, Jr.** |
| **Defendant.** | |

## INDEPENDENT MONITORING REPORT 5

The Independent Monitor Margaret A. Hickey and the Independent Monitoring Team submit the attached Independent Monitoring Report 5.

Dated April 11, 2022

/s/Margaret A. Hickey
Margaret A. Hickey
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
mhickey@schiffhardin.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that, on April 11, 2022, she caused a true and correct copy of the foregoing **Independent Monitoring Report 5** to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

/s/Margaret A. Hickey
Margaret A. Hickey
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
mhickey@schiffhardin.com

**Independent Monitoring Team** | Chicago Police Department Consent Decree

# INDEPENDENT MONITORING REPORT 5

*Reporting Period July 1, 2021, through December 31, 2021*

April 11, 2022

**Independent Monitoring Team** | Chicago Police Department Consent Decree

## Message from the Monitor and the Deputy Monitor



Monitor Maggie Hickey

The Consent Decree's reforms reflect the City of Chicago's (City's), the Chicago Police Department's (CPD's), and the Office of the Illinois Attorney General's (OAG's) commitment to "constitutional and effective law enforcement." ¶2. As reflected in this report, the City of Chicago (City), the Chicago Police Department (CPD), and other relevant City entities have continued to make progress toward the implementation of reforms across the Consent Decree. Some of these improvements have included major changes to new and existing policies and training materials, often reflecting community input and best practices.

As detailed in the Consent Decree and explained throughout this report, additional reforms are necessary, including more revisions to policies and training materials. But constitutional and effective policing and the Consent Decree require more than a simple checklist: the CPD and other relevant City entities must become learning organizations, capable of identifying new and existing challenges and implementing corresponding solutions. *See, e.g.*, ¶¶41, 89, 156, and 609. As a result, the CPD's policing efforts must be data-driven, transparent, and legitimized throughout the CPD and Chicago's communities. At minimum, this will require the City and the CPD to significantly improve and demonstrate its commitment to (1) community engagement and (2) data collection, management, and analysis.



Chief Rodney Monroe, Ret.

And there is no shortcut. First, community trust cannot be gained in a day or a six-month reporting period. It will take a permanent commitment. Second, the gaps in the CPD's data collection and systems cannot be improved without a comprehensive plan, improved technology, and dedicated resources—including the hiring and retention of qualified supervisors, analysts, and auditors. A sufficient data system will take time to develop, acquire, and implement.

Fortunately, the Consent Decree provides the framework for the City and the CPD to prioritize building and maintaining community trust, confidence, and partnerships for short and long-term community and officer safety. *See, e.g.*, ¶6. Any superficial attempts to cut corners are likely to cause further delay. While it reflects an admirable goal, the CPD's recent emphasis on its "Positive Community Interaction" initiative, for example, does not have the fundamental data or community inputs required to ensure or demonstrate constitutional or effective policing (or compliance with the Consent Decree).

Likewise, through its reform efforts, the CPD has identified significant issues with existing foot-pursuit data. To accurately capture data moving forward, the CPD is developing new foot-pursuit forms and review processes for officers and supervisors. To be effective, the CPD must ensure that these efforts are consistent with (1) the CPD's long-term goals of overhauling its technology and data-integration systems and (2) the Consent Decree's requirements of ensuring accurate, reliable, transparent, and efficient data collection, management, and analysis. *See, e.g.*, ¶¶568, 606, and 609. Such data collection will enable the City and the CPD to ultimately demonstrate full and effective compliance with the Consent Decree and effectively allocate resources for the safety of Chicago's communities and CPD's officers.

Finally, some resistance to police reform has been from those who believe crime reduction is separate from, or even opposed to, reform efforts. But constitutional and effective policing—and the Consent Decree—requires the CPD and its officers to reduce crime *as community partners*, which requires building, maintaining, and rigorously protecting community trust and confidence. In their continued efforts to build trust and confidence, the CPD, City, and the OAG recently agreed that the CPD's search-warrant practices will be monitored under the Consent Decree. *See, e.g.*, ¶¶53–55. We believe that this agreement reflects their continued commitment to expediently provide the constitutional and effective policing that Chicago's communities and CPD officers deserve.

# Monitoring Under the Consent Decree

In August 2017, the Office of the Illinois Attorney General (OAG) sued the City of Chicago (City) in federal court regarding civil rights abuses by the Chicago Police Department (CPD). The lawsuit led to a Consent Decree, effective March 1, 2019.[1] The same day, the federal court appointed Maggie Hickey as the Independent Monitor. Ms. Hickey leads the Independent Monitoring Team, which monitors the City of Chicago's progress in meeting the Consent Decree's requirements.

Paragraph 2 of the Consent Decree sets out its overall purpose, which has guided and will continue to guide our monitoring efforts:

> **2.** The State, the City, and the Chicago Police Department . . . are committed to constitutional and effective law enforcement. In furtherance of this commitment, the Parties enter into this Agreement to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety. In addition, this Agreement seeks to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely. This Agreement requires changes in the areas of community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management.[2]

---

[1]  For more information on the Consent Decree, see the Background section below. More information is also available on the Independent Monitoring Team's website (cpdmonitoringteam.com/) and on the Illinois Attorney General Office's Consent Decree website (chicagopoliceconsentdecree.org/about/).

[2]  We cite the relevant paragraphs of the Consent Decree throughout this Independent Monitoring Report. The Consent Decree is available on the Independent Monitoring Team's website: cpdmonitoringteam.com/wp-content/uploads/2020/08/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf. *See also Resources*, CHICAGO POLICE CONSENT DECREE ("Consent Decree Approved by the Court on January 31, 2019"), chicagopoliceconsentdecree.org/resources/.

**Table of Contents**

Executive Summary ............................................................... 1

Roadmap ........................................................................... 26

Background ........................................................................ 27

Compliance Activities and Assessments ........................... 38

    I. Community Policing ................................................. 45

    II. Impartial Policing .................................................. 53

    III. Crisis Intervention ............................................... 59

    IV. Use of Force ........................................................ 69

    V. Recruitment, Hiring & Promotions ........................ 78

    VI. Training .............................................................. 82

    VII. Supervision ....................................................... 86

    VIII. Officer Wellness and Support ............................. 92

    IX. Accountability and Transparency .......................... 98

    X. Data Collection, Analysis & Management ............. 110

    XI. Implementation, Enforcement & Monitoring ...... 115

Conclusion and Looking Ahead to
Independent Monitoring Report 6 .................................. 116

Appendix 1 Community Policing
Compliance Assessments, by Paragraph ......................... 117

Appendix 2 Impartial Policing
Compliance Assessments, by Paragraph ......................... 200

Appendix 3 Crisis Intervention
Compliance Assessments, by Paragraph ......................... 272

Appendix 4 Use of Force
Compliance Assessments, by Paragraph ......................... 434

Appendix 5 Recruitment, Hiring & Promotions
Compliance Assessments, by Paragraph ......................... 615

Appendix 6 Training
Compliance Assessments, by Paragraph ......................... 645

Appendix 7 Supervision
Compliance Assessments, by Paragraph ......................... 778

Appendix 8 Officer Wellness and Support
Compliance Assessments, by Paragraph ......................... 838

Appendix 9 Accountability and Transparency
Compliance Assessments, by Paragraph ......................... 922

Appendix 10 Data Collection, Analysis & Management
Assessments, by Paragraph ........................................... 1051

Appendix 11 Implementation, Enforcement & Monitoring
Compliance Assessments, by Paragraph ......................... 115

Attachment A: Office of the Illinois Attorney General
Comments March 2022 ...................................................... 12

Attachment B: City of Chicago
Comments March 2022 ................................................... 1345

**\*\*\***

Readers of the electronic pdf can click sections above to jump to the corresponding sections of the report.

# Executive Summary

As the Independent Monitoring Team (IMT), we assess the City of Chicago's (City's) compliance with the requirements of the Consent Decree. Specifically, we assess how relevant City entities—including the Chicago Police Department (CPD); the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General, including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC)—are complying with the Consent Decree.[3]

This is Independent Monitoring Report 5.[4] Here, we update the Court and the public on the monitoring efforts during the fifth reporting period: from July 1, 2021, through December 31, 2021.[5] Among other things required by the Consent Decree, the report includes following:

- an updated compliance or status assessment from the previous reporting period;

- a compliance or status assessment for each new paragraph we identified for this reporting period in our Monitoring Plan for Year Three;

- a summary of the principal achievements and challenges facing the City's compliance with the Consent Decree; and

- an updated projection of upcoming work for the City, the Office of the Illinois Attorney General (OAG), and the IMT. *See* ¶661.[6]

---

[3] As a party to the Consent Decree, the City is ultimately responsible for compliance. *See* ¶720. Unless otherwise specified, our references to the City typically include its relevant entities. *See* ¶736.

[4] We provided a draft of this report to the City and the OAG on January 30, 2022, as required by ¶¶661–65.

[5] The Consent Decree generally prevents the IMT from making any public statements or issuing findings regarding any non-public information or materials outside of these reports (*see* ¶672). Because the Consent Decree will be in effect for a minimum of five years, this is the fifth of at least 10 semiannual Independent Monitoring Reports. Each year, we file a Monitoring Plan that sets out what we will assess during the year, and we file two semiannual Independent Monitoring Reports. The Independent Monitoring Plans and Reports are available on the IMT's website. *See Reports and Resources*, https://cpdmonitoringteam.com/reports-and-resources/.

[6] In October 2021, we filed the Monitoring Plan for Year Three, which outlined the projected monitoring efforts under the Consent Decree for Year Three (July 1, 2021, through June 30, 2022). The IMT's Monitoring Plan for Year Three is available on the IMT's website. *See Reports*, INDEPENDENT MONITORING TEAM (October 29, 2021), https://cpdmonitoringteam.com/overview/reports-and-resources/.

We note that the Consent Decree is a complex document that resulted from long and substantive negotiations between the City and the OAG. Throughout the reporting period, and in this report, we have aimed to address the nuances of the agreement fairly and accurately.

The monitoring process contains some tensions that we address in both our monitoring efforts and this report. For example, there has been—and likely will continue to be—a tension between the City's need to make compliance efforts quickly and the need to ensure that its efforts are effective and sustainable. Because the Consent Decree prioritizes both goals, we do too. We recognize that if the City rushes to meet a deadline by creating a policy without, for example, the requisite community involvement, that may unintentionally delay the date the City reaches compliance if the City must later re-engage the community, re-draft the policy, and potentially re-train personnel. We have attempted to address this tension in our analysis for each relevant paragraph in this report.

We know that many readers will be most interested in learning where the IMT has found the City, the CPD, and the other relevant entities to be in compliance or not in compliance with the requirements of the Consent Decree. But in reviewing this report, it is important to keep at least three things in mind regarding the scope and significance of our compliance assessments.

First, this report represents a six-month assessment of the City's compliance efforts from July 1, 2021, through December 31, 2021. It does not reflect all the efforts of the City, the CPD, or the other relevant City entities to date. While we report on the compliance efforts within defined reporting periods (*see* ¶661), we stress that work is ongoing by the City, its relevant entities, the OAG, the IMT, and Chicago's communities. In many cases, relevant City entities have continued to develop policies and train personnel after December 31, 2021, and before the date we submit this report. In this report, we have not assessed efforts made after December 31, 2021. We will do so in the monitoring report for the sixth reporting period (January 1, 2022, through June 30, 2022).

Second, we assess compliance at three levels: (1) Preliminary, (2) Secondary, and (3) Full. The Consent Decree requires the City and its entities to reach Full compliance and maintain that compliance for one to two years. *See* ¶¶714–15. These compliance levels allow us to share our assessments of the City's progress throughout the life of the Consent Decree with the Court; the City and its relevant entities; the OAG; and the public. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the reform in practice. There are, however, many paragraphs that do not include policy or training elements. In those circumstances, the three levels may follow a different trajectory, such as (1) whether the City or its relevant entities have established the

framework and resources to achieve the reform, (2) whether the City or its relevant entities have effectively communicated the reform to relevant personnel, and (3) whether the City or its relevant entities have appropriately implemented the reform.

Third, because of the nuances of each Consent Decree requirement and each level of compliance, the City and its relevant entities must—in a timely manner—provide the IMT with evidence, including access to personnel, records, and data to establish that they have reached each level of compliance during the applicable reporting period.

Under the Consent Decree, the City, the CPD, or other relevant entities are not in compliance with any of the requirements of the Consent Decree until the IMT determines that the City provided the IMT with sufficient proof that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement—which in many cases it has—the City still has the additional burden of providing sufficient proof of its efforts with sufficient time for the IMT and the OAG to review the information.

To reflect the City's and its relevant entities' progress through the Consent Decree process, we have added four subcategories for each of the three levels of compliance (Preliminary, Secondary, or Full):

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced per ¶720, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts are not completed within a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not yet met a lower level of compliance.

## Major Developments and Principal Accomplishments and Challenges Impacting Compliance

In the Consent Decree, the City committed "to ensuring that police services are delivered to all of the people of Chicago in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of all of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety." The City also committed "to providing CPD members with the resources and support they need, including improved training, supervision, and wellness resources." ¶6.

To fulfill these commitments, it is paramount that the CPD increase ownership of reform across its operations. Specifically, compliance with the requirements of the Consent Decree relies heavily on increasing the communication and integration of efforts between the Office of Constitutional Policing and Reform and the CPD's Operations (*i.e.*, the Office of the First Deputy Superintendent).

In the fifth reporting period, the City, the CPD, and Chicago faced ongoing challenges, including COVID-19 variants, rises in certain violent crimes, and significant attrition of officers and non-sworn personnel. We continue to have concerns regarding the CPD's commitment to have constitutional policing and reform efforts lead its crime-fighting strategies. While the CPD has developed plans to approach Consent Decree reforms, these plans have yet to comprehensively integrate compliance efforts with community policing, impartial policing, community engagement, and its crime-fighting strategies.[7]

Still, in the fifth reporting period, many City entities and CPD divisions have demonstrated significant progress toward achieving at least Preliminary compliance across all sections of the Consent Decree. The City and the City's entities have now reached at least Preliminary compliance with over 70% of monitorable paragraphs through the fifth reporting period. Compliance figures are detailed further below and throughout each section of this report. But in isolation, these figures only tell part of the story regarding the City's overall achievements and ongoing challenges to date. Executive Summary Figure 1, below, provides a sample of principal achievements and challenges across the 10 topic areas of the Consent Decree.

---

[7]  For example, CPD's Office of Constitutional Policing and Reform recently presented the IMT and the OAG with a draft of a new "Roadmap toward Operational Compliance" planning document. While we appreciate the strategic thinking and thoughtful effort that went into crafting the plan, we remain concerned about the lack of meaningful participation by the CPD's Office of the First Deputy Superintendent (which includes the Bureau of Patrol, the Bureau of Detectives, the Bureau of Crime Control Strategies, and the Bureau of Counter-terrorism).

Executive Summary Figure 1.    Sample of Principal Achievements & Challenges

| Section | Sample of Principal Achievements | Sample of Principal Challenges |
|---|---|---|
| Community Policing | • Established and implemented "Whole School Community Safety Plans," as a result of intensive community collaboration and engagement directed, in part, by community-based organizations. | • Insufficient staffing in the Office of Community Policing<br>• Defining, supervising, and tracking the quality of "Positive Community Interactions." |
| Impartial Policing | • Piloted a supplemental language service, LanguageLine to provide better supports during officer interactions involving people with limited English proficiency. | • Lack of attention and resources toward tracking and assessing whether law enforcement decisions are impartial.<br>• The CPD's community engagement efforts continue to frustrate members of Chicago's communities. |
| Crisis Intervention | • Are moving forward with the CPD's two-day Crisis Intervention Team Refresher Training<br>• Allocated significant resources toward the Crisis Assistance Response Engagement (CARE) Program. | • Creating a true specialized response to calls for service with a mental health component. |
| Use of Force | • Major Developments in the Utility of the Force Review Division:<br>  ▪ Began to review **all** firearm pointing incidents and did so for the first time in the Force Review Division's 3rd Quarterly Report<br>  ▪ Began to identify all incidents involving Level 3 Uses of Force (starting in the 2nd Quarterly Report)<br>  ▪ Began documenting de-briefings and the subsequent counseling with unit supervisors.<br>• Began, in response to community input, requiring officers to physically intervene when they see excessive force (rather than just verbally).<br>• Devoted significant attention toward the development of an improved foot-pursuit policy. | • Challenges created by deploying members of the Force Review Division<br>• While the City and the CPD devoted significant resources toward the development of an improved foot-pursuit policy, more needs to be done, including the completion and implementation of a sufficient foot-pursuit data plan. |
| Recruitment, Hiring & Promotions | • Provided additional testing opportunities and resources to help candidates through the process | • Like many departments around the country, the CPD faces considerable challenges with recruitment, hiring, and retention. |
| Training | • Significantly improved in the resources allocated toward and quality of certain CPD trainings.<br>• The CPD's Training and Oversight Committee has been responsiveness to the Force Review Division's recommendations regarding training needs identified by patterns and trends. | • Continued impact of COVID-19 on the CPD's ability to train officers.<br>• Challenges with efficiently tracking training attendance, as well as ensuring trainers are appropriately qualified and providing training materials consistently. |

| Section | Sample of Principal Achievements | Sample of Principal Challenges |
|---|---|---|
| Supervision | • Developed the in-service supervisor training curriculum.<br>• Allocated resources toward pilots in the same districts: Unity of Command and Span of Control, Performance Evaluation System, and Officer Support System. | • Inability to meet the 10 officers to one Sergeant ratio for all field units on each watch in each of CPD's patrol districts has prevented the CPD from having the supervision, support, and accountability systems necessary to implement Consent Decree requirements and best practices. *See, e.g.*, 360.<br>• Missing a comprehensive staffing study |
| Officer Wellness | • Staffed the Professional Counseling Division with 11 licensed clinicians with plans to more than double the minimum required number of licensed clinicians under the Consent Decree. | • Implementation of the Officer Support System has stalled due to lagging supervision ratios and measurable results. |
| Accountability & Transparency | • Reached an agreement with the Fraternal Order of Police (FOP), the city's largest police union, toward a new contract. The deal, which was announced in July of 2021, and approved by the City Council in September 2021, was the culmination of four years of negotiations and comprises an eight-year deal—retroactive to 2017 and ending in 2025. The deal includes back pay for officers as well as new accountability requirements. *See* ¶711.<br>• COPA, the Police Board, OIG, and the Deputy PSIG have demonstrated significant compliance through five reporting periods, with the Police Board demonstrating Full compliance with most of its corresponding paragraphs and the OIG and Deputy PSIG demonstrating Full compliance with all of its corresponding paragraphs. | • BIA's ability to transparently develop and implement compliant policies has lagged behind the progress made by other City entities and other departments within CPD. |
| Data Collection, Analysis & Management | • Engaged the Public Safety Administration to assist with various data requirements.<br>• Allocate significant attention toward identifying data issues with the CPD's foot-pursuit data. | • Lack of a comprehensive assessment of the CPD's current information collection mechanisms and data management technology (*see* ¶606), has and will continue to delay the CPD's compliance efforts across the Consent Decree and ability to demonstrate constitutional and effective policing.<br>• Staffing challenges to recruit and retain data analysts has impacting all reform efforts.<br>• Inability to make any progress toward regularly reviewing citywide and district-level data regarding reportable uses of force to, for example, "assess the relative frequency and type of force used by CPD members against persons in specific demographic categories, including race or ethnicity, gender, age, or perceived or known disability status" (¶572). |

In the following subsections, we provide additional details regarding several key developments and efforts:

- Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance"

- CPD's Community Engagement, Trust Building, and Recent Emphasis on "Positive Community Interactions"

- Personnel Changes and Staffing

- Improved Efficiency regarding Compliance Productions

- Data Challenges

## Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance"

On March 25, 2022, the City, the CPD, and the OAG entered into a Stipulation to the Consent Decree regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance.[8] While this Stipulation was entered in the sixth reporting period, it was the culmination of work that began much earlier and continued through in the fifth reporting period.

For example, the Parties originally disagreed regarding the application of the Consent Decree to the CPD's search warrant practices. Under the Stipulation, however, the Parties now agree that ¶¶ 53–55 of the Consent Decree apply to—but are not limited to—Chicago Police Department ("CPD") search warrants:

> 53. CPD will, consistent with this Agreement, ensure that its policies and practices prohibit discrimination on the basis of any protected class under federal, state, and local law, including race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military status, source of income, credit history, criminal record, or criminal history. CPD's policies and practices will prohibit retaliation consistent with Section 6-101 of the Illinois Human Rights Act (eff. Jan, 1, 2015) and Section 2-160-100 of the Municipal Code of Chicago (amended Oct. 11, 2017).
>
> 54. CPD will continue to require that all CPD members interact with all members of the public in an unbiased, fair, and respectful

---

[8]   *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timelin.._.pdf.

> *manner. CPD will require that officers refrain from using language or taking action intended to taunt or denigrate an individual, including using racist or derogatory language.*
>
> *55. CPD will prohibit officers from using race, ethnicity, color, national origin, ancestry, religion, disability, gender, gender identity, sexual orientation, immigration status, homeless status, marital status, parental status, military discharge status, financial status, or lawful source of income when making routine or spontaneous law enforcement decisions, except when such information is part of a specific subject description.*

As clarified by the Stipulation, the City and the CPD must demonstrate that the search-warrant practices (1) are not unlawfully discriminatory or retaliatory and (2) occur in an unbiased, fair, and respectful manner. Specifically, the CPD must implement sufficient policies, training, data collection, supervision, and accountability systems to ensure that the CPD's planning for, internal approval processes for, execution of, and after-action review of search warrants are carried out in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois and are in accordance with best practices.[9]"

Further, in light of the challenges to implementing the Consent Decree—as reflected in our previous monitoring reports—the Court and the IMT do not believe that the City will achieve full and effective compliance with the Consent Decree within five years of its effective date (March 1, 2024). As a result, the Stipulation also includes that "the City agrees to endeavor to achieve full and effective compliance by the end of the 16th reporting period (June 30, 2027), eight years after the effective date of the Consent Decree." To that end, we will also provide our

---

[9] The Parties further agree that the City and CPD must also continue to fulfill other Consent Decree requirements during the planning for, internal approval processes for, execution of, and after-action review of search warrants. The following is a non-exhaustive list of paragraphs that CPD must continue to comply with during the execution of warrants: ¶¶ 32 (regarding developmentally appropriate interactions with youth and children), 35 (regarding *Miranda* warnings for juveniles), 36 (regarding the use of handcuffs or other restraints on juveniles), 37 (regarding training on problem-solving tactics and effective communication/interpersonal skills), 156 (regarding use-of-force policies and training; supervision; and accountability systems), 157 (regarding the collection, analysis, and use of information on the use-of-force and de-escalation techniques by CPD members), 162 (regarding providing people with the opportunity to comply with lawful orders), 164 (regarding only using force that is objectively reasonable, necessary, and proportional), 189 (regarding pointing a firearm), 238 (regarding the need to record video and audio of law enforcement activities), 352 (regarding effective supervision requirements for all supervisors), 509 (regarding related Central Management System requirements), 546 (regarding annual report requirements), and 550 (regarding annual and quarterly report requirements).

comprehensive assessment—and along with corresponding responsibilities in the Consent Decree—after the eighth reporting period (June 30, 2023).

Likewise, the Parties also clarified to how the IMT will reporting on further progress:

> Given the City's and the CPD's intention to reach full and effective compliance with the Consent Decree in 2027 and the ongoing efforts to mitigate the impact of COVID-19, the Parties also agreed that the Monitor will track specific deadlines and recurring obligations differently: The specific deadlines will continue to be extended by 64 days, but recurring obligations will return to the appropriate cadences (e.g., monthly, quarterly, annually). For each paragraph and requirement, the Parties and the IMT will—following the text of the Consent Decree— collaborate to ensure recurring requirements are scheduled to enable the City, CPD, and other City entities to reach compliance as efficiently as possible and in accordance with the purposes of each requirement (e.g., effective and regular training or data analysis).

As reflected throughout this report, we believe that these changes will permit the City, the CPD, the OAG, and the IMT to focus on the most efficient paths toward effective and sustainable compliance.[10]

## CPD's Community Engagement, Trust Building, and Recent Emphasis on Positive Community Interactions

As in the first four reporting periods, we continued to have concerns about the CPD's efforts and approaches to engaging Chicago's communities throughout the fifth reporting period. Since the first reporting period, we have raised concerns about the CPD's insufficient community engagement during its policy development procedures, as well as its lack of comprehensive and layered community engagement and policing strategies.

Although the above concerns persist, we saw some improvement and appreciate the CPD's efforts to reach communities in new ways. The City and the CPD also continued to meet regularly with members of the Coalition regarding the CPD's

---

[10] The Stipulation also clarified the process for the Court to find the City in full and effective compliance regarding any of the material requirements in the Consent Decree. *See* ¶715. Specifically, the Court "may accept the IMT's determination that the City has met 'Full compliance' in a semiannual report and may retroactively start the relevant one- or two-year compliance period at the date the IMT filed the corresponding semiannual report." *Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022),

First Amendment policy and use-of-force policies.[11] While the Coalition continues to have concerns regarding the pace of these discussions and their outcomes, we are encouraged that meaningful progress has resulted from these discussions, and the City, the CPD, and the Coalition will continue to meet in 2022.

In response to feedback, the City and the CPD have also made meaningful changes to policies, trainings, and practices. In response to community input since our last monitoring report, for example, the CPD now requires officers to physically intervene when they see excessive force (rather than just verbal intervention). The CPD also intends to go beyond the requirements of the Consent Decree and begin reviewing all firearm-pointing incidents in 2022 (rather than just those related to a corresponding arrest or investigatory stop).

While we appreciate the CPD's continued online community engagement efforts such as "deliberative dialogues," the CPD must establish and maintain "clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies" within the reporting period. ¶160. We encourage the City to continue to pilot and implement innovative strategies to engage Chicago's diverse communities.

Despite the CPD's efforts to engage communities on specific policies, opportunities for community input continue to occur late in the policy development process for many policies under revision and only during public comment phases. When Chicago's community members are invited to provide input only at the later stages of the policy development process, they are prevented from contributing during the formative stages and, in some instances, are effectively prevented from meaningfully participating at all. *Compare* ¶54 ("In developing or revising policies and training referenced in this section, CPD will seek input from members of the community and community-based organizations with relevant knowledge and experience through community engagement efforts."). What's more, it is still unclear whether and how community comments and feedback are incorporated into policies under revision. Now, more than three years into the Consent Decree, we do not have a clear understanding of the CPD's process for meaningfully considering community input.

---

[11] In March 2018, the Parties to the Consent Decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')." The Coalition "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits." *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

We continue to be concerned about how the CPD understands and discerns the differences and nuances among community engagement, community partnerships, community relationships, community policing, and community service. It is still unclear—after over two years of asking for clarification on the issue—how the CPD proposes to merge its existing Chicago Alternative Policing Strategy (also known as CAPS) with its Neighborhood Policing Initiative (also known as NPI).[12] Moreover, it is also unclear how these programs align with or complement the CPD's other community-focused efforts such as the district-level Community Policing Strategic Plans, the activities of the Community Safety Team, or the CPD's new goal of 1.5 million Positive Community Interactions in 2022.[13] Furthermore, the CPD has yet to clearly articulate how these programs support an overall philosophy of community policing. *See* ¶¶8–11.

The new focus on "Positive Community Interactions" (PCIs) provides the most recent example of how even well-intended efforts to build trust may ultimately undermine existing systems to establish and build trust. Specifically, on January 4, 2022, various news outlets reported that the CPD was aiming to have at least 1.5 million, police-initiated, PCIs in 2022.[14] We previously understood that PCIs were one initiative within the CPD's broader portfolio of community policing strategies and community engagement efforts to strive toward the guiding principles of the Community Policing section of the Consent Decree. *See* ¶¶8–11.[15]

However, in its current form, the CPD appears to be overemphasizing PCIs as its primary community-policing initiative. As a result, the CPD will be prioritizing the *quantity* of interactions over the *quality* of interactions. Combined with the CPD's inability to meaningfully record, review, or learn from these interactions, the CPD seriously risks increasing negative interactions, damaging public trust, and under-

---

[12] *See How CAPS Works*, Chicago Police Department, https://home.chicagopolice.org/community-policing-group/how-caps-works/; Zac Clingenpeel, *Neighborhood Policing Initiative program expands to Grand Crossing, Englewood and Gresham districts*, Chicago Sun-Times (May 7, 2021), https://chicago.suntimes.com/2021/5/7/22424992/neighborhood-policing-initiative-program-expands-grand-crossing-englewood-and-gresham-districts

[13] *See District Strategic Plan*, Chicago Police Department, https://home.chicagopolice.org/community-policing-group/district-strategic-plans/.

[14] *See, e.g.*, Tom Schuba, *CPD leaders told to pump up arrests, solve more murders — or face demotion, sources say after private meeting with mayor, top cop*, Chicago Sun-Times (January 5, 2022), https://chicago.suntimes.com/news/2022/1/5/22869450/police-cpd-lori-lightfoot-david-brown-arrest-increase-crime-quota-demotion-clearance-rate-murder.

[15] The guiding principles include, for example, that "frequent positive interactions between police and members of the public," "build and promote public trust and confidence in CPD," and "ensure that its community policing philosophy is a core component of its provision of police services, crime reduction strategies and tactics, training, management, resource deployment, and accountability systems." *Id*.

mining its ability to ensure it is providing constitutional and effective policing. Specifically, we have three interrelated and fundamental issues with the CPD's current PCI program and corresponding emphasis:

1. **Insufficient Definition of a PCI**

   At the time of this report, the CPD does not have a clear definition of what constitutes—and does not constitute—a PCI. The *Community Policing Mission and Vision* policy (G02-03) states the definition of a "positive community interaction (PCI)," as a "brief, spontaneous, high visibility interaction that is positive, informative, helpful, or constructive in nature." The policy's definition of PCI is not, however, exclusive of other officer actions and could conceivably encompass all interactions with community members. *See* ¶54 (requiring that all police interactions with community members be conducted in an "unbiased, fair, and respectful manner.").

   While the CPD is working to update this definition in a new policy, the explicit PCI goal and current vagueness of this definition—along with the lack of tracking or accountability mechanisms discussed further below—incentivizes officers to self-servingly interpret and report all interactions as PCIs.

   The current definition also does not clarify whether a positive interaction may include, result from, lead to, or be in any way connected with law-enforcement actions, such as a stop, search, citation, or even arrest. While we believe that the CPD should ensure officers conduct law-enforcement actions with procedural justice (*i.e.*, treating people with dignity and respect; giving individuals a chance to be heard during encounters; making decisions fairly and transparently based on facts; and conveying goodwill and trustworthiness), officers should record interactions in a way that, as appropriate, allows the City, the CPD, and the community to monitor and distinguish between interactions that include law-enforcement actions and those that do not.

2. **Missing Data Collection, Supervision, and Accountability Mechanisms**
   The CPD does not currently have the ability to comprehensively record, track, review, or supervise PCIs for accuracy, quality, or effectiveness at reaching the CPD's goals (including the inability to identify whether a reported interaction was positive or negative—or even occurred).

   As referenced above, in addition to a clear definition, we believe the success of the PCI initiative will depend on the CPD's ability to effectively collect, manage, and analyze PCIs. G02-03 requires officers to notify the OEMC of each PCI. G02-03, however, does not specify any data or variables that officers are required to transmit to the OEMC after a PCI has occurred. As a result, the OEMC's data will only indicate that an officer reported a PCI.

As a result, the CPD is currently limited in its ability to assess the nature, type, circumstances, or quality of the interactions or their circumstances. Even if CPD officers reported 1.5 million PCIs in 2022, the current reporting process does not provide sufficient information to indicate whether any of the interactions were in-fact positive from the Community member's perspective. Indeed, there will be no verification, other than the fact that there was an OEMC notification, that an interaction even occurred. Without a more robust supervision and reporting process, the CPD will not be able to reward officers for positive interactions, coach officers on missed opportunities, or hold officers accountable for false reports.

The issues noted above with the PCI definition may also create confusion with other reporting requirements and negatively impact the quality of existing data. For example, G02-03 distinguishes "community engagements" from PCIs as longer and planned interactions, and G02-03 requires officers to record community engagements into the CPD's Community Engagement Management System (CEMS). The lack of clear lines between these two interactions may undermine the CPD's efforts to accurately monitor the progress of both initiatives. *See* ¶45 ("By January 1, 2020, and annually thereafter, District Commanders will review their district's policing strategies, with input from the District Advisory Committees and the Office of Community Policing, to ensure the strategies are consistent with the principles of community policing. . . .").

Moreover, because the PCI definition does not identify whether an interaction may involve law-enforcement actions, there is significant concern that interactions that should otherwise be thoroughly recorded as law-enforcement actions may only be minimally recorded as PCIs. For example, an officer who conducts an investigatory stop may erroneously record the interaction as a PCI—which only requires a notification to the OEMC—rather than following the requisite reporting requirements for an investigatory stop.

If our understanding of the new PCI initiative's potential impact on CPD data is accurate, then it is hard to overstate how damaging the PCI initiative could be to the CPD's (1) existing supervision, accountability, and transparency mechanisms and (2) ability to maintain and build public trust and confidence.

3. **Missing Transparency and Community Input**

The current PCI initiative does not have a process of validating feedback from community members regarding their interpretation of reported PCIs (*i.e.*, whether community members perceived the interaction as positive, neutral, or negative).

The current PCI initiative does not consider community perspectives or input. As a result, officers may record an interaction as positive even if involved community members adamantly consider the interaction to be negative. In fact, the current PCI initiative allows officers to report a PCI even if an interaction was objectively negative. While a community member's opinion of an interaction may not be dispositive, it is clearly relevant and should be considered. We strongly recommend that the CPD consider ways to incorporate efforts to gather and consider community input on PCIs.[16]

Given the definitional, data, and supervision concerns referenced above, the CPD will be unable to determine the value or harm of its 1.5 million PCIs. It is our understanding from a recent CPD CompStat meeting, for example, that PCIs have increased dramatically in many of the CPD districts that have historically included the most police contacts. These PCIs could reflect that the CPD is intentionally conducting community outreach to build trust where it is needed the most. Alternatively, the increased PCIs could reflect increased law-enforcement actions under a new, misleading name. We do not know of any methods that the CPD currently has to reliably interpret this data.

The CPD is right to focus on encouraging, creating opportunities for, training on, and tracking PCIs. For the same reasons, the CPD, its officers, and Chicago's communities deserve a PCI program that is clearly defined, accurately tracked, sufficiently supervised, and transparent.

As a result of the above issues, the current PCI initiative actually risks *negatively impacting* existing supervision, accountability, and transparency mechanisms and *undermining* efforts to maintain and build public trust. We have recommended that the CPD halt the 1.5 million PCI goal until the CPD is able to resolve these outstanding issues. While the CPD may be able to quickly address some of these issues in a new or updated policy, many of these issues likely require more significant changes.

The CPD must better determine, articulate, and share (1) its *purpose* for tracking and promoting PCIs, (2) what goal it hopes to accomplish by reaching 1.5 million PCIs in 2022, and (3) its methods for measuring and determining whether that purpose and goal are met. As it stands, even if the CPD successfully reaches 1.5 million PCIs in 2022, *it will not yield any evidence of compliance with any requirement of the Consent Decree*.

Everyday police interactions are paramount to building trust, and we appreciate the CPD's emphasis on encouraging positive interactions between police officers

---

[16] We understand, for example, that the CPD is moving forward with its pilot of the My90 community contact survey (*see* our feedback on the My90 survey dated October 28, 2021), and there may be useful ways to combine the PCI initiative with the My90 survey.

and community members. We also agree that, if properly implemented, PCIs may contribute to the achievement of these goals. However, in its current form, the CPD appears to be overemphasizing PCIs as its primary community policing initiative. As a result, the CPD will be prioritizing the quantity of interactions over the quality of interactions. Combined with the CPD's inability to meaningfully record or review these interactions, the CPD seriously risks increasing negative interactions, damaging public trust, and undermining its ability to ensure it is providing constitutional and effective policing.

The thoughtful implementation of the CPD's PCI goal would encourage officers to have quality positive interactions with the communities they serve. Paragraph 17, for example, clarifies that "the overall effectiveness of CPD's department-wide and district-level crime reduction strategies will be determined by a reduction in crime and not by the number of arrests, stops, or citations." Similarly, the CPD should not incentivize officers to create an arbitrary amount of interactions with community members without quality controls, supervision, feedback mechanisms, or ways to prevent or even deter false reporting. Without more, the CPD risks expending significant resources on an initiative that undermines trust within and outside of the department.

## Personnel Changes and Staffing Issues

Many of the City's and CPD's efforts and achievements in the first four reporting periods continued into the fifth reporting period. The City Department of Law, the CPD's Office of Constitutional Policing and Reform, the Legal Affairs Division, and the Research and Development Division (¶¶677–78), continued to be fully engaged in the monitoring process. The City and the CPD also maintained channels of communication with the IMT and the OAG and continued dialogue, problem-solving, and brainstorming about requirements and challenges regarding the requirements of the Consent Decree.

The CPD has, however, struggled to complete and provide its comprehensive staffing study. *See, e.g.,* ¶¶343 and 356. Still, as with many police departments across the country, the CPD has continued to struggle with recruiting and retaining personnel.[17] Such vacancies may ultimately impact community and officer safety and will continue to prevent the CPD from implementing the systems necessary to ensure constitutional and effective policing, such as reaching sufficient span of control and unity of command requirements (*see* ¶¶356–68). We have significant concerns about the lack of consistent staffing and retention levels within the City and

---

[17]  More Chicago police officers retired between January and June of 2021 than retired in all of 2018. *See, e.g.,* Frank Main, Fran Spielman, *Chicago police retirements this year already top all of 2018, could end up among highest ever,*" CHICAGO SUN-TIMES (June 18, 2021), https://chi-cago.suntimes.com/city-hall/2021/6/18/22538601/chicago-police-department-retirements-soar-ray-lopez-john-catanzara.

the CPD in areas crucial to the efficient implementation of the requirements of the Consent Decree. The City and the CPD must continue to make efforts to maintain staffing at appropriate levels at all times in those key departments.

During the first four reporting periods, the IMT identified several staffing and resource needs, in addition to the need for additional sworn supervisors. Due in part to the shortage of supervisors and a reported need to diversify the ranks, in July 2021 Superintendent David Brown reinstated the controversial merit promotion system, a practice that was discontinued in 2019.

We recognize that City and CPD resources are limited, but as ¶¶700 and 706 note, the City is responsible for "providing necessary support and resources to CPD to enable CPD to fulfill its obligations under this Agreement."[18] As referenced above, the City and the CPD have already added some resources to their compliance efforts.

In our previous reports, we recommended that the City and the CPD increase resources and staffing to various departments and divisions. In response, the CPD has increased staffing in, among other divisions, the Research and Development Division, the Force Review Division, and the Legal Affairs Division. But maintaining consistent levels of sufficient staffing has been a challenge.[19] The Research and Development Division, for example, received additional personnel but, at the end of the fifth reporting period, remained understaffed.

As the Consent Decree process continues, the City and the CPD must ensure that such divisions are sufficiently staffed on a continuous basis. While we understand that ongoing challenges continue based on limited resources, we reiterate the need for increased resources and staffing and the Consent Decree's requirement for the City to "hire, retain, or reassign current City or CPD employees to form a unit with the appropriate knowledge, skills, and abilities necessary to facilitate compliance with this agreement." ¶263. In the fifth reporting period, we continue

---

[18]   The 2020 Litigation Report is publicly available online: https://www.chicago.gov/content/dam/city/sites/public-safety-and-violenc-reduction/pdfs/City's%20Report%20on%202020%20Litigation%20(With%20Appendices).pdf at 4 ("The City settled 90 cases for a total of $20.7 million in settlement payouts in 2020. The City also paid $19.8 million after juries awarded damages to the plaintiffs in two Litigated Cases. In total, the City paid $40.5 million in financial settlements and to satisfy jury awards in 90 Settled and two Litigated Cases in 2020."

[19]   The Research and Development Division frequently works with the IMT to develop compliance documents and policies. Increases in staffing in this department can reduce bottlenecking with limited personnel. As discussed further in the Use of Force section below, the Force Review Division is critical to several Consent Decree requirements. The Legal Affairs Division must frequently work with the IMT to provide compliance documents, policies, and efforts. Specifically, the Legal Affairs Division reviews every document that the IMT receives.

to see the need for increased resources and staffing in the following areas (*see* ¶¶677–78):

❖ **Force Review Division.** The CPD has made the Force Review Division responsible for many key reform efforts. Unfortunately, as a result of the increased responsibilities, the Force Review Division is understaffed. Further, the CPD has repeatedly deployed members of the Force Review Division to meet patrol needs, further undermining the Force Review Division's efforts and creating conflicts of interest where the Force Review Division must review its own personnel.

❖ **The Audit Division**. This division is crucial to the City's and the CPD's ability to sustain reforms and change culture over the long term. The Audit Division aims to provide quality, independent and objective assessments of the operations, processes, and internal controls within the CPD. The division also aims to demonstrate compliance with the Consent Decree. Throughout the fifth reporting period, however, the Audit Division was chronically understaffed. We encourage the City to invest in recruiting and hiring qualified auditors and social scientists to fully staff this division moving forward. Moreover, it is our understanding that the Audit Division has produced reports that directly relate to Consent Decree reforms, which we have yet to receive from the City as compliance records.

❖ **Education and Training Division.** The CPD's Education and Training Division is, in many ways, at the heart of many Consent Decree requirements. The CPD is one of the largest police departments in the country, and training personnel requires a massive effort. Our discussions with CPD personnel regarding training efforts, records, and plans strongly suggest that the Training Division needs additional support. As the City and the CPD continue to move into Preliminary compliance for many paragraphs, the City and the CPD will need to increase training efforts and resources.

❖ **Crisis Intervention Teams.** While many of the requirements regarding Crisis Intervention do not apply until later reporting periods, the Consent Decree requires significant efforts regarding the Crisis Intervention Teams in the immediate future. The CPD has added staff to the Crisis Intervention Teams, but several of our meetings and site visits suggest that the Crisis Intervention Teams would still benefit from additional staff.

❖ **Strategic Initiatives Division.** The Strategic Initiatives Division is crucial to the City's and the CPD's successful reform endeavors, as it performs many of the CPD's data and analytics efforts. As the City and the CPD move into Secondary compliance for some paragraphs, and look toward eventual Full compliance, they will need to drastically increase their data collection, management, and analytical capabilities to document their operational successes. As is clearly

stated in ¶720, the City bears the burden of demonstrating its compliance with the requirements of the Consent Decree and the most efficient way to achieve that is through valid, reliable, and best practice data collection, management, analysis, and reporting. See our assessment of ¶606 in Appendix 10 (Data Collection, Analysis, and Management) for a more detailed discussion of the IMT's concerns about the CPD's data deficiencies and challenges.

❖ **The Reform Management Group.** The project managers in the Reform Management Group—both sworn and nonsworn—are crucial to the successful implementation and documentation of Consent Decree requirements. However, throughout the entirety of the Consent Decree process, we have seen consistent turnover in these key project management positions, which hinders the IMT's need for consistent and accurate information.

## Improved Efficiency Regarding Compliance Productions

The City maintained the progress that we saw regarding record productions from the third and fourth reporting periods. The City and some of its entities also made considerable efforts to avoid large record productions in the last two weeks of the reporting period.

Near the end of the fifth reporting period, the City and many of its entities provided lists of its productions or planned productions. This demonstrated noticeable improvements, including the entities' intentional efforts to provide organized productions to prove compliance with each paragraph and requirement of the Consent Decree. We appreciate these improvements, which have continued early in the sixth reporting period. While the City, the CPD, the OAG, and the IMT continue to have disagreements regarding certain compliance efforts, we have noticed improved candor and transparency regarding lagging compliance efforts. This will ultimately enable the City and the CPD to plan for and reach compliance more efficiently.

## Serious Data Challenges Exemplified by Existing Foot-Pursuit Data

As the City and the CPD move into Secondary compliance for some paragraphs and look toward eventual Full compliance, they will need to drastically increase their data collection, management, and analytical capabilities to document their operational successes. *See* Appendix 10 (Data Collection, Analysis, and Management).

The lack of a comprehensive assessment of the CPD's current information collection mechanisms and data management technology (*see* ¶606), has and will continue to delay the CPD's compliance efforts across the Consent Decree and ability to demonstrate constitutional and effective policing.

For example, in the fourth reporting period, the City brought to our attention some serious data challenges at the CPD. Specifically, the IMT was alerted to the fact that there are serious issues of data quality regarding foot pursuits because the way in which foot-pursuit data is captured leads to incorrect reporting. This continues to raise concerns—not only with the CPD's foot pursuit training and practices, but with the data collection, management, and analysis that is critical to ensuring transparency and informing policing policy, training, and practices for the safety of CPD officers and communities.

The data issues around foot pursuits are related to a larger set of issues around the CPD's temporary foot-pursuit policy that began when the IMT formally recommended that the CPD adopt a foot-pursuit policy in March 2021 (*see* ¶172). In April 2021, the City invoked ¶631, which allows for the City to issue a temporary policy if "extraordinary circumstances demand." We note that foot pursuits were included as a major concern in the U.S. Department of Justice's civil rights investigation's findings in 2017 that led to the Consent Decree.

In short, the IMT and the OAG engaged in countless discussions with the City and the CPD on its temporary foot-pursuit policy during May and June of 2021, continuing into the fifth reporting period. These discussions were intended to reach an approved, final policy on foot pursuits by the Consent Decree deadline of September 3, 2021. The CPD did not meet the Consent Decree deadline of adopting a foot-pursuit policy by September 3, 2021 (extended from July 1, 2021, due to COVID-19). Amid these discussions, the CPD disabled its foot-pursuit data dashboard and notified the IMT that the data feeding the dashboard was likely inaccurate.

Throughout the last two reporting periods, the IMT repeatedly requested the City and the CPD provide an explanation regarding what transpired with the foot pursuit dashboard data, including what led to the data issues, whether the data issues have been corrected, and what efforts the City and the CPD have made to correct the data that has been provided to the IMT in previous reporting periods and reported on in previous reports.

On December 23, 2021, the City, the CPD, the OAG, and the IMT reached an agreement on the policy—Special Order S03-14, *Foot Pursuits*. While the foot-pursuit policy has taken more time than anticipated to finalize, given the importance of the issue as it relates to community trust, inherent risk, and the need to evolve to the best policy for the City, this is time well spent. The City will have a better and more instructive policy that embodies the CPD's pursuit of the "sanctity of life." We also note that while the language of the policy was agreed upon by the Parties

and IMT, our "no objection notice" depends upon the CPD clearly articulating a data plan for foot pursuits, which they have not yet produced.[20]

The CPD accepted public feedback on Special Order S03-14, *Foot Pursuits*, into the sixth reporting period. After public comments are integrated and with an improved policy in place, the City and the CPD can then better collect, manage, and analyze data to review and revise the foot-pursuit policy, as necessary, to ensure that the policy and the corresponding training and practices are data driven.

Given the extent of the data issues, the CPD shifted focus from cleaning past data to accurately and reliably capturing data moving forward. To do this, the CPD will be incorporating two new foot-pursuit forms. In the short term, the CPD will be better able to collect foot-pursuit data, such as any corresponding injuries to officers and community members. As emphasized by several internal focus groups, however, there is significant frustration within the CPD regarding the addition of a new form, with many officers concerned about the repetitive and confusing nature of existing forms. As a result, there are concerns that the inefficiency of the CPD's forms will improperly influence officers' decisions, further complicating data analysis in the future.

While the Consent Decree requires the City and the CPD to accurately report on, collect, manage, and analyze data regarding its police practices, the Consent Decree does not require officers to fill out duplicative and inefficient forms. In fact, the Consent Decree requires the CPD to "review and, as necessary, revise departmental forms relating to[ for example] use of force" to "improve the accuracy, reliability, and efficiency of its data collection." ¶609.

On the other hand, solutions to the CPD's data issues requires allocating significant resources toward overhauling the CPD's data systems to integrate existing data and streamline accurate data collection. In the meantime, the CPD has yet to finish its initial comprehensive assessment of its data systems per ¶606. The CPD has indicated that it is in the process of expediting these efforts and hopes to incorporate a data system that is able to, among other things, link and auto-populate forms for officers to increase data accuracy, efficiency, and utility. We greatly look forward to the City's and the CPD's continued efforts toward improving its data systems.

---

[20] This finding will be formally reflected in our next Independent Monitoring Report, which will cover January 1, 2022 through July 1, 2022.

# Compliance Assessments and Deadlines

At the end of the fifth reporting period, we assessed 523 paragraphs and provided status updates for 12 additional paragraphs (537 paragraphs total).[21] Along with all the paragraphs in Independent Monitoring Report 4, we provided assessments for 30 additional paragraphs in Independent Monitoring Report 5.

At the end of the fifth reporting period, the City reached or maintained Preliminary compliance with 277 paragraphs, Secondary compliance for 77 paragraphs, and Full compliance for 23 paragraphs. The City did not reach any level of compliance for 127 paragraphs and remained under assessment for Preliminary compliance for an additional 20 paragraphs. As reflected in Executive Summary Figure 2 below, we found that the City achieved at least Preliminary compliance with 377 paragraphs.

Executive Summary Figure 2:  Consent Decree Compliance by December 31, 2021



Of course, some requirements in the Consent Decree demand more effort to comply with than others. The number of requirements—and the amount of work required under each requirement—can vary substantially within each paragraph, topic area, and reporting period. Moreover, some of the paragraphs that have requirements in the fifth reporting period also include requirements that do not apply until later reporting periods. As a result, we have either not assessed or not finished assessing some of the requirements in the paragraphs relevant to the fifth reporting period.

The City and the OAG agreed to specific deadlines to ensure that the City was making significant efforts to comply with the Consent Decree in a timely manner. As we are in Year Three of the Consent Decree, however, our focus will naturally shift from preliminary deadlines to measurements of effective and sustained practices.

---

[21]  Two Impartial Policing paragraphs, ¶¶79–82, which did not contain requirements in the fourth reporting period. Specifically, while interrelated with the requirements of ¶¶79 and 80, ¶82 does not contain a substantive requirement for the City, and ¶81 contains conditional requirements that may never apply and did not apply in the fourth reporting period. For the purpose of this report, we have provided status updates for these paragraphs.

[22]  As referenced above, we have provided status updates for ¶¶81 and 82.

By the end of Year Three of the Consent Decree (the end of the sixth reporting period), we will report on the City's efforts to comply with all requirements and monitorable paragraphs in the Consent Decree. Specifically, in the fifth reporting period, the City and the CPD only had one specific deadline: the requirement to implement a foot-pursuit policy by September 1, 2021, which they did not meet. *See* our assessment of ¶172 in Appendix 4 (Use of Force). The other deadlines included recurring timelines, such as regular policy review, training, and reporting requirements.

Executive Summary Figure 3 and Figure 4, respectively, show the City's compliance and deadline status through five reporting periods. As a result of our focus on underlying efforts, we must also track and report on areas where the City or the CPD have lost levels of compliance. *See* Executive Summary Figure 5.

# Consent Decree Compliance by December 31, 2021

Executive Summary Figure 3:   Compliance Status through Five Reporting Periods
Consent Decree Paragraphs: 523



**First Reporting Period**
Paragraphs w/ Any Level of Compliance (15)
Paragraphs Not in Compliance (52)
(*including under assessment*)
Total: 67

**Second Reporting Period**
Paragraphs w, Any Level of Compliance (48)
Paragraphs w/ Deadlines Not in Compliance (81)
(*including under assessment*)
Foundational Paragraphs Under Assessment (88)
Total: 216

**Third Reporting Period**
Paragraphs w/ Any Level of Compliance (154)
Paragraphs Not in Compliance (120)
Paragraphs under Assessment for Preliminary Comp. (41)
Total: 315

**Fourth Reporting Period**
Paragraphs w/ Any Level of Compliance (266)
Paragraphs Not in Compliance (215)
Paragraphs under Assessment for Preliminary Comp. (26)
Total: 507

**Fifth Reporting Period**
Paragraphs w/ Any Level of Compliance (380)
Paragraphs Not in Compliance (123)
Paragraphs under Assessment for Preliminary Comp. (20)
Total: 523

Executive Summary Figure 4:    Consent Decree Deadlines before December 31, 2021



**First Reporting Period Deadlines (50)**                    **(March 1, 2019 – August 31, 2019)**

| | |
|---|---|
| Met Deadline | (13) |
| Missed Deadline | (37) |
| Achieved by August 31, 2019 | (+4) (17) |
| Remaining Unmet Requirements | (33) |

**Second Reporting Period Deadlines (74)**                **(September 1, 2019 – February 29, 2020)**

| | |
|---|---|
| Met Deadline | (22) |
| Missed Deadline | (52) |
| Achieved by February 29, 2020 | (+4) (26) |
| Remaining Unmet Requirements | (48) |

**Third Reporting Period Deadlines (43)**                  **(March 1, 2020 – December 31, 2020)**

| | |
|---|---|
| Met Deadline | (17) |
| Missed Deadline | (26) |
| Achieved by December 31, 2020 | (+2) (19) |
| Remaining Unmet Requirement | (24) |

**Fourth Reporting Period Deadlines (51)**                 **(January 1, 2021 – June 30, 2021)**

| | |
|---|---|
| Met Deadline | (26) |
| Missed Deadline | (25) |
| Achieved by June 30, 2021 | (+2) (28) |
| Remaining Unmet Requirement | (23) |

**Fifth Reporting Period Deadlines (1)**                   **(July 1, 2021 – December 31, 2021)**

| | |
|---|---|
| Met Deadline | (0) |
| Missed Deadline | (1) |
| Achieved by December 31, 2021 | (+0) |
| Remaining Unmet Requirement | (1) |

Executive Summary Figure 5
Lost Levels of Compliance in the Fifth Reporting Period



|  | Fourth Reporting Period (January 1, 2021 – June 30, 2021) | Fifth Reporting Period (July 1, 2021 – December 31, 2021) |
|---|---|---|
| **Paragraphs** | **Previous Compliance** | **Current Compliance** |
| Community Policing ¶13 | Secondary Compliance → | Preliminary Compliance |
| Community Policing ¶14 | Secondary Compliance → | Preliminary Compliance |
| Community Policing ¶15 | Secondary Compliance → | Preliminary Compliance |
| Use of Force ¶201 | Preliminary Compliance → | No Compliance |
| Training ¶291 | Preliminary Compliance → | No Compliance |
| Training ¶294 | Preliminary Compliance → | No Compliance |
| Training ¶315 | Preliminary Compliance → | No Compliance |
| Training ¶316 | Preliminary Compliance → | No Compliance |
| Training ¶336 | Preliminary Compliance → | No Compliance |
| Accountability & Transparency ¶336 | Preliminary Compliance → | No Compliance |
| Accountability & Transparency ¶530 | Preliminary Compliance → | No Compliance |

# Roadmap

We wrote this report to be as accessible and readable as possible. This report is long because the compliance efforts in the fifth reporting period required significant attention. As the IMT continues to move forward with its monitoring efforts and as we address additional requirements, the monitoring reports will also continue to grow in length. For this reason, we have provided the following roadmap to help readers understand what they can expect from each section of this report.

We begin this report with a **Background** section that provides background about the Consent Decree and the IMT. This section will help those who have not read or would like to reacquaint themselves with the background information from our previous reports and Monitoring Plans.

The next section, **Compliance Activities and Assessments**, provides the following information regarding the fifth reporting period:

❖ An overview of the IMT's assessment process and priorities for the fifth reporting period, including deadlines and status updates;

❖ A summary of the IMT's activities;

❖ A summary of the City's achievements and challenges; and

❖ For each topic of the Consent Decree, a summary of relevant compliance efforts, a more specific analysis for each Consent Decree paragraph with a deadline before June 2021, and if applicable, a summary of efforts regarding the corresponding paragraphs that do not have specific deadlines.

Finally, the last section, **Conclusion and Looking Ahead to Independent Monitoring Report 6**, provides concluding remarks and a projection of the upcoming work by the IMT, the OAG, the City, the CPD, COPA, the City Office of Inspector General, the Police Board, and the City's other relevant entities in the sixth reporting period.

# Background

This is the IMT's fifth semiannual Independent Monitoring Report.[23] The report provides the IMT's monitoring activities and findings for the fifth reporting period—from July 1, 2021, through December 31, 2021. In July 2020, the IMT outlined its efforts in its public Monitoring Plan for Year Three.[24]

Specifically, consistent with the requirements of the Consent Decree, we address the following information throughout the sections of this report:

❖ The IMT's efforts during the reporting period;

❖ A description of each Consent Decree requirement that applied during the reporting period;

❖ The IMT's compliance findings for each corresponding requirement;

❖ A summary of the City's principal achievements and the challenges facing the City's ability to achieve complete compliance with the Consent Decree;

❖ The IMT's corresponding recommendations regarding the City's future efforts to achieve compliance; and

❖ A projection of the IMT's, the OAG's, and the City's upcoming work during the next reporting period (July 1, 2021 through December 31, 2021).

This is the fifth monitoring report of many. Per ¶661 of the Consent Decree, the IMT will continue to issue semiannual reports until the Consent Decree ends— which is after the City has reached full and effective compliance for one to two years. *See* ¶¶693 and 714–15.

## The Chicago Police Consent Decree

In December 2015, the U.S. Attorney General launched a broad civil rights investigation into the CPD's policing practices. The U.S. Department of Justice released the results of its investigation in January 2017, finding a longstanding, pervasive

---

[23] We provided a draft of this report to the City and the OAG on January 30, 2022, as required by ¶¶661–65. Per ¶663, the OAG and the City then provided written responses on February 12, 2021, and February 15, 2022, respectively. On March 11, 2022, the IMT provided an updated draft to the Parties. The Parties provided feedback on March 28, 2021, and March 26, 2021, respectively. *See* Attachment A (OAG comments) and Attachment B (City comments).

[24] The IMT's Monitoring Plan for Year Two is available on the IMT's website. *See Reports and Resources*, INDEPENDENT MONITORING TEAM (July 3, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/07/2020_07_03-Monitoring-Plan-for-Year-Two-filed.pdf. The City filed its fifth status report (¶680) with the Court on March 3, 2022.

"pattern or practice" of civil rights abuses by the CPD.[25] Two separate class-action lawsuits followed: *Campbell v. City of Chicago* and *Communities United v. City of Chicago*.[26]

In August 2017, the OAG sued the City in federal court, seeking a Consent Decree that would address the US Department of Justice's (DOJ's) findings and recommendations. The case was assigned to federal Judge Robert M. Dow, Jr. The OAG then sought input from community members and Chicago police officers and negotiated the Consent Decree with the City.

In March 2018, the Parties to the Consent Decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')." The Coalition "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[27]

The OAG and the City then sought proposals for an Independent Monitoring Team (IMT) after posting a draft Consent Decree on the Chicago Police Consent Decree website.[28] Judge Dow approved and signed a modified version of the Consent Decree on January 31, 2019. The Consent Decree requires action by the CPD and many other City entities. On March 1, 2019, which was the effective date of the Consent Decree, and after a competitive selection process, Judge Dow appointed Maggie Hickey, a partner in the Schiff Hardin law firm, as the Independent Monitor. Ms. Hickey, as the Independent Monitor, reports directly to Judge Dow.[29]

---

[25] DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopolice consentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-PO-LICE-DEPTREPORT.pdf.

[26] *See Campbell v. Chicago*, N.D. Ill. Case No. 17-cv-4467 (June 14, 2017), and *Communities United v. Chicago*, N.D. Ill. Case No. 17-cv-7151 (October 4, 2017).

[27] *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

[28] More information about the IMT selection process is available on this website, which the OAG maintains. *See Independent Monitor*, CHICAGO POLICE CONSENT DECREE, http://chicagopolice consentdecree.org/independent-monitor/. Other resources, including Consent Decree documents, court filings, and reports, are also available on this website. *See Resources*, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/resources/.

[29] Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he "help[s] facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree." About, CHICAGO POLICE CONSENT DECREE, http://chicagopolice consentdecree.org/about/. As the special master, Judge Coar also reports directly to Judge Dow.

## The Independent Monitoring Team

As the IMT, we (1) monitor the City's, the CPD's, and other relevant City entities' progress in meeting the Consent Decree's requirements and (2) offer assistance to the City, the CPD, and other relevant City entities to implement the changes that the Consent Decree requires.

Monitor Maggie Hickey and Deputy Monitor Chief Rodney Monroe, Ret., lead the IMT. The IMT's nine Associate Monitors, in turn, oversee the 10 topic areas of the Consent Decree. Our legal team, analysts, subject matter experts, Community Engagement Team, and community survey staff provide support in several ways: by reaching out to and engaging with Chicago communities; by providing general administrative support; and by collecting and analyzing policies, procedures, laws, and data, including conducting interviews and writing reports.

Our full organizational chart is in Background Figure 1 on the next page, and our team structure is in Background Figure 2 on the following page.

Background Figure 1. Independent Monitoring Team Organizational Chart[30]



[30]  Near the end of the fifth reporting period, Associate Monitor Noble Wray, the Associate Monitor for Supervision, left the Independent Monitoring Team. *Chief Hassan Aden (Ret.) is now the Associate Monitor for Supervision. Also, in the sixth reporting period, Dennis Rosenbaum stepped down as the Associate Monitor for Impartial Policing but remains on the IMT as a subject-matter expert. **Denise Rodriguez became the new Associate Monitor for Impartial Policing in March 2021. *See Associate Monitors*, INDEPENDENT MONITORING TEAM, https://cpd-monitoringteam.com/about-us/associate-monitors/.

## Background Figure 2. Independent Monitoring Team Members

| Monitoring Team Leadership | | |
|---|---|---|
| Independent Monitor | | Maggie Hickey |
| Deputy Monitor | | Rodney Monroe |

| Associate Monitors | | |
|---|---|---|
| Community Policing | | Stephen Rickman |
| Impartial Policing | | Dennis Rosenbaum/Denise Rodriguez |
| Crisis Intervention | | Julie Solomon |
| Use of Force | | Paul Evans |
| Training; Recruitment, Hiring Promotion | | Theron Bowman |
| Supervision | | Noble Wray/Hassan Aden |
| Officer Wellness & Support | | Cassandra Deck-Brown |
| Accountability & Transparency | | Harold Medlock |
| Data Collection, Analysis & Management | | Tom Christoff |

| Community Engagement Team | | |
|---|---|---|
| Member | | Joe Hoereth |
| Member | | Laura McElroy |
| Member | | Elena Quintana |
| Member (and Associate Monitor for Community Policing) | | Stephen Rickman |
| Member (and Associate Monitor for Impartial Policing) | | Denise Rodriguez |
| Community Surveys | | Joe Hoereth & Other Experts |

| Subject Matter Experts and Legal Team | | |
|---|---|---|
| Project Director | | Laura Kunard |
| Lead Attorney | | Anthony-Ray Sepulveda |
| Attorney, Recruitment, Hiring, & Promotions; Training | | Mir Ali |
| Attorney | | Derek Barella |
| Attorney, Supervision | | Alex Becker |
| Officer Wellness & Support | | Brandi Burque |
| Attorney, Use of Force; Data Collection, Analysis & Management | | Meredith DeCarlo |
| Use of Force; Data Collection, Analysis & Management | | Terry Gainer |
| Attorney, Community Policing; Impartial Policing | | Ariel Hairston |
| Attorney, Crisis Intervention | | Brian Hamilton |
| Attorney | | Kyle Jacob |
| Community Policing; Crisis Intervention | | Bruce Johnson |
| Training | | Blake McClelland |
| Attorney, Officer Wellness and Support | | Sarah Oligmueller |
| Community Policing | | Hildy Saizow |
| Attorney, Supervision; Officer Wellness; Accountability & Transparency | | Kylie Wood |
| Supervision; Recruitment, Hiring & Promotions | | Tom Woodmansee |

| Monitoring Team Support | | |
|---|---|---|
| Analyst for Accountability & Transparency | | Bridgette Bryson |
| Analyst for Officer Wellness & Support | | Jessica Dockstader |
| Project Manager, Analyst for Use of Force | | Vivian Elliot |
| Analyst for Community Policing | | Tammy Felix |
| Analyst for Data Collection, Analysis & Management | | Shelby Hickman |
| Analyst for Supervision | | Monique Jenkins |
| Analyst, Independent Monitoring Team Support | | Mariana Oliver |
| Deputy Project Manager, Analyst for Training and Recruitment | | Keri Richardson |
| Analyst for Training and Recruitment | | Valerie Schmitt |
| Analyst for Crisis Intervention | | Gentry Schaffer |
| Analyst for Impartial Policing; Accountability & Transparency | | Christopher Sun |

# The IMT's Community Engagement Team Activities

The IMT's Community Engagement Team plays a critical role by monitoring levels of trust and sentiment among the stakeholders to the Consent Decree – the members of Chicago's communities. The IMT's Community Engagement Team includes experienced Chicago community members, experts in police-community relations, lawyers, and academic scholars. These members work together to meaningfully engage Chicago's communities and ensure that community members participate throughout the monitoring process. The Community Engagement Team also works closely with the Monitor, Deputy Monitors, and Associate Monitors to assess the community components of compliance with the Consent Decree.

The IMT's Community Engagement Team's work is vital to create sustainable change at the City and the CPD and to measure compliance with specific policy, training, and procedural changes required by the Consent Decree. The City and the CPD do not function effectively when they lack trust from the communities they serve. In its 2017 report, the DOJ found that the impacts of the "CPD's pattern or practice of unreasonable force fall heaviest on predominantly black and Latino neighborhoods."[31] The DOJ also found that people in many neighborhoods in Chicago lack confidence that "their police force cares about them and has not abandoned them, regardless of where they live or the color of their skin."[32]

Effective policing requires both (1) procedural and cultural change and (2) improved relationships between the City and the CPD and the communities they serve. The Community Engagement Team encourages improved relationships based on respect, trust, and partnership and emphasizes how relationships may be strengthened by transparency and accountability.

The IMT's Community Engagement Team performs two key tasks regarding the Consent Decree monitoring process: (1) gathering input from Chicago residents about their concerns about CPD policies and practices, and (2) providing information to the Chicago community about the IMT's activities and findings.

We sought to hear sentiments from a broad range of Chicagoans during this reporting period. In July 2021, for example, we held a Virtual Listening Session to gather community input about the CPD's new foot-pursuit policy. About 50 people

---

[31] DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopo-liceconsentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-PO-LICE-DEPT-REPORT.pdf.

[32] *Id.* at 15.

attended and shared their thoughts and concerns with Independent Monitor Maggie Hickey, Associate Monitor Paul Evans, and members of the IMT's Community Engagement Team.

Background Figure 3:          IMT Virtual Listening Session Flyer (July 20, 2021)



We also issued periodic newsletters, emails, and press releases—in July, and October—to update community stakeholders on our monitoring activities.[33] *See* Background Figure 4, below.

---

[33] The IMT's newsletters are available online. *See, e.g.*, *Help Reform the Chicago Police Department - Community Newsletter*, INDEPENDENT MONITORING TEAM (April 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/05/April-2020_IMTCommunityNewsletter-7.pdf; *Federal Court Listening Sessions – Community Newsletter*, INDEPENDENT MONITORING TEAM (August 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/12/IMT-Newsletter-Issue-3-August-2020.pdf; *Independent Monitoring Team Conducts Community Survey – Community Newsletter*, INDEPENDENT MONITORING TEAM (November 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/12/IMT-Newsletter-Issue-4-November-2020.pdf.

Background Figure 4: IMT Newsletter



**COMMUNITY NEWSLETTER**

**Monitor Hickey Files 4th Report Assessing Chicago Police Department's Reform Efforts**

Maggie Hickey, Independent Monitor

Independent Monitor Maggie Hickey filed the fourth monitoring report last week with Judge Robert M. Dow, Jr. in the U.S. District Court for the Northern District of Illinois. The report highlights the City of Chicago's reform efforts during the fourth reporting period: January 1, 2021, through June 30, 2021.

The Chicago Police Department made progress in each category of compliance during this reporting period. The number of paragraphs in full compliance rose from 1 to 19. Paragraphs in secondary compliance increased from 32 to 65 and the number of paragraphs in preliminary

Throughout this reporting period, the Community Engagement Team attended many community meetings across Chicago, including meetings with the Coalition (*see* ¶669) and community-based organizations. We summarize some of the Community Engagement Team's efforts in Background Figure 5 below.

Background Figure 5: IMT Community Engagement Efforts



| 259 | 8 | 1 | 1,262 |
|---|---|---|---|
| Hours on Community Engagement | Meetings with the Coalition (¶669) | IMT Virtual Community Meeting | Email Newsletters sent to community members |

# Community Focus Groups

Per ¶¶645–46, the IMT conducts "reliable, representative, and comprehensive" survey of a broad cross-section of members of the Chicago community regarding CPD" every other year. Accordingly, the IMT conducted a large-scale probability sample survey in Year One of the Consent Decree. The survey included the responses of over 1,000 Chicagoans, as well as an additional group of over 350 young Black men, age 18–25, which is the population subgroup with the most frequent

contact with the CPD. Results of this survey were summarized in the IMT's Community Survey Report, filed in August 2020.[34] We are currently conducting another community survey and will report on those findings later this year.

Because the IMT believes that hearing community voices consistently throughout the monitoring process is crucial, we will undertake special studies of Chicago's communities during the years we are not conducting the ¶¶645–51 community surveys.

The IMT's first special study is a series of focus groups with Black and Latino males and females first to help provide context and deeper understanding of the survey results, which indicated that young Black men, and to a lesser extent Latino men, reported experiencing police using force at much higher rates than the survey respondents in general.[35] Of particular interest for further study was that they indicated having had a gun pointed at them at extremely disproportionate rates (19 times more often).

Between December 2020 and June 2021, the IMT conducted focus groups with over 100 participating Black and Latino males between the ages of 15 and 35. Focus groups with women of color began in March 2021 and are ongoing.

The IMT will produce a public special report on our findings from the focus groups. Some common themes and sentiments, however, are apparent from a preliminary review of focus group data from the young Black and Latino male focus groups. To a great extent the focus groups confirmed the results of the surveys. However, the focus groups provide a deeper understanding of the roots of such perceptions, many of them rooted in specific examples of negative experiences, but also in the participants' associations of CPD officers with general themes of corrupt actions, overly aggressive behavior, and having slow or no responses when called. Many respondents also indicated that they feel nervous around police, feel fear of the police, and feel unsafe in their presence.

---

[34] *See, e.g.*, *Independent Monitor Conducts Community Survey*, Independent Monitoring Team (August 26, 2020), Independent Monitor Conducts Community Survey (cpdmonitoring-team.com).

[35] *See, e.g.*, *Community Survey*, Independent Monitoring Team (August 26, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/08/2020_08_26-Community-Survey-Filed.pdf. In our survey report, we chose to refer to particular groups consistently, such as Black Chicagoans, Latino Chicagoans, and White Chicagoans. We concluded that these terms most accurately account for the targeted population for the survey: Chicagoans. We recognized that there are other commonly used terms, such as "African Americans," but we concluded that Black Chicagoans is a more inclusive term because it focuses on presence in Chicago rather than nationality. Likewise, we understand that some people may prefer "Latinx" or "Hispanic" to "Latino." For the purposes of the survey, we followed the Consent Decree and the United States Census Bureau. *See* ¶4; *About Race*, US Census Bureau. US Census Bureau (last revised, October 16, 2020), https://www.census.gov/topics/population/race/about.html.

Nearly all focus group participants indicated that they do not trust or only some-what trust the police to treat them with respect or to respond in a fair manner. While some participants indicated there may be some "bad apples" among offic-ers, the mistrust was directed to officers in general or the CPD as a whole. For many participants, this distrust was rooted in accounts of their own negative ex-perience with officers. *See* Background Figure 6.

Background Figure 6: IMT Focus Groups



### Independent Monitoring Team Holds Focus Groups

Over a seven-month period, the Independent Monitoring Team held more than 100 Focus Groups with Black and Latino Males between the ages of 15 years to 35 years old. These special studies provide context and deeper meaning of the IMT's biannual surveys of community sentiments regarding the CPD.

Many of the individuals interviewed reported that they feel nervous around police, feel fear of the police, and feel unsafe in their presence. Nearly all focus group participants indicated that they do not trust or only somewhat trust the police to treat them with respect or to respond in a fair manner.

The Independent Monitoring Team began conducting focus groups with women of color in March 2021. Those interviews are ongoing. The IMT will produce a special report on the Focus Groups findings in 2022.

Over two-thirds of participants who discussed a question about gun pointing indi-cated they had experienced an officer point a gun at or witnessed an officer point-ing a gun at someone else, some of whom referenced more than one such inci-dent. Many respondents felt the pointing was unnecessary, expressing that they thought officers were either demonstrating authority or displaying a false sense of fear during the incident.

The IMT looks forward to completing our conversations with focus group partici-pants, analyzing the data, and producing our special report on what we learn.

## Get Involved

The Community Engagement Team works to connect with neighborhoods, com-munity groups, religious organizations, activists, advocates, and residents across the city. The Community Engagement Team encourages community members to participate in meetings and to promote these sessions through their social and other networks. We regularly update the Community Involvement section of the IMT website with details on upcoming community meetings and events. If your

neighborhood or community group would like to invite a Community Engagement Team member to a meeting, please email us at contact@cpdmonitoringteam.com or fill out a feedback form on our website (https://cpdmonitoringteam.com/feedback-form/).

We encourage community members to provide input on CPD policies. When the CPD modifies or creates applicable policies, it will post them on its website so that community members can provide input: https://home.chicagopolice.org/reform/policy-review/.

Community members may also participate in the monitoring process in the following ways:

❖ Attend our public meetings listed on our website;
❖ Complete an input form on our website; and
❖ Reach out to the IMT or members of our Community Engagement Team (see below).

## Contact the Independent Monitoring Team

Community members can reach out to the entire IMT via email:

❖ contact@cpdmonitoringteam.com

Community members can also contact individual members of our Community Engagement Team:

❖ Elena Quintana (Elena.Quintana@cpdmonitoringteam.com)

❖ Joe Hoereth (Joe.Hoereth@cpdmonitoringteam.com), and

❖ Laura McElroy (Laura.McElroy@cpdmonitoringteam.com)

❖ Steve Rickman (Stephen.Rickman@cpdmonitoringteam.com)

❖ Denise Rodriguez (Denise.Rodriguez@cpdmonitoringteam.com)

Learn more at the Contact Us page on our website (https://cpdmonitoringteam.com/contact-us/).

Community members can also use the Feedback Form on our website to provide input (https://cpdmonitoringteam.com/feedback-form/).

# Compliance Activities and Assessments

This section provides an overview of compliance efforts for the fifth reporting period. We begin by explaining our priorities for the fifth reporting period that we described in our Monitoring Plan for Year Three. We include an overview of the assessment process and the deadlines within the fifth reporting period. We then provide summaries for the period, including summaries of our activities and of the City's achievements and challenges. Finally, we summarize the relevant compliance efforts for each topic area of the Consent Decree; provide a more specific analysis for each Consent Decree paragraph with a deadline before December 2021; and summarize status updates for other paragraphs.

## The IMT's Methodologies during the Reporting Period

While most of this report addresses the City's efforts to meet the Consent Decree's requirements, the following subsection details the IMT's methodologies and activities in the fifth reporting period (July 1, 2021, through December 31, 2021).

In the fifth reporting period, we continued to meet regularly with representatives from the City, the City's relevant entities, the OAG, and members of Chicago's communities, including members of the Coalition (*see* ¶669). This included weekly meetings with the CPD, settlement conferences, site visits, and regular meetings with the Superintendent.

At the beginning of the Consent Decree process, the City; the CPD; COPA; the Chicago Police Board; the City Office of Inspector General, including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC) worked to create constant and open lines of communications.

Building on the efforts made in the previous reporting periods, these communications continued throughout the fifth reporting period. The communications included regularly scheduled meetings (¶668, ¶669) and regular teleconferences for each Consent Decree topic area. Because of COVID-19, our teleconferences, Zoom, and Teams meetings continued throughout this reporting period. We continued to use secure data-sharing systems.

Specifically, we met consistently with, among others, members of the CPD, COPA, the City Office of Inspector General, the Police Board, and the OEMC, and reviewed thousands of City documents.[36]

---

[36] The OAG has engaged in much of the same work and provided separate feedback to the City and the CPD.

A significant portion of our conversations involved discussing our methodologies for assessing the City's compliance with the Consent Decree. *See, .e.g.*, ¶655. For the IMT, these discussions highlighted the importance of maintaining flexibility in our methodologies throughout the monitoring process. This flexibility will ensure that our monitoring efforts continue to meet the letter and spirit of the Consent Decree, as the Parties and the IMT develop necessary information, learn from previous efforts, and identify unanticipated hurdles. *See, e.g.*, ¶717. Changed circumstances, particularly during a worldwide pandemic, may require the IMT to consider fewer, more, or alternative sources of information. As a result, our methodologies may adjust based on ongoing consultation with the Parties, as we continue to identify and consider new information and data that is relevant to the Consent Decree. We endeavor to supplement our methodologies with additional specificity throughout this report. During this reporting period, like all prior reporting periods, the IMT spent many hours discussing the methodologies with the Parties prior to implementation and prior to conducting its audits and reviews for this report, acknowledging their concerns, and making adjustments for clarity.[37]

Finally, in addition to making these efforts, the IMT continued to adhere to several specific and ongoing requirements of the Consent Decree. Background Figure 7, below, summarizes our compliance with the Consent Decree's deadlines for the IMT in the fifth reporting period.

---

[37] In its response to an earlier draft of this report, the City included several comments related to the methodologies. *See* Attachment B. Many of these comments reflect a position that the three levels of compliance for certain paragraphs should match policy, training, and implementation, respectively. The language of the Consent Decree, however, does not permit this trajectory in all instances. *See, e.g.*, ¶¶39–40 and 365–66. In fact, the City has previously requested different trajectories for other paragraphs. *See, e.g.*, ¶169 and 170. Ultimately, while we are bound to the language of the Consent Decree, we will continue to provide our methodologies in each reporting period, accept feedback, and revise, as appropriate, to ensure the City and the CPD are in the best position to reach full and effective compliance with the Consent Decree as efficiently and transparently as possible. *See, e.g.*, ¶717.

Background Figure 7:          IMT Deadlines in the Fifth Reporting Period

| ¶s | Requirement | Deadline | Fifth Reporting Period Deadlines | Met or Missed |
|---|---|---|---|---|
| 627–37 | Review of CPD Policies and Procedures | Various, Ongoing | Corresponds with policy deadlines | Met (ongoing) |
| 638–41 | Review of Implementation Plans and Training Materials | Various, Ongoing | Corresponds with plan and training deadlines | Met (ongoing) |
| 642–44 | Compliance Reviews and Audits | Various, Ongoing | Occur during each reporting period | Met (ongoing) |
| 652–55 | Review Methodologies | 45 Days (and every year) | November 16, 2021 | Met (ongoing) |
| 656 | Technical Assistance and Recommendations | Ongoing | Ongoing | Met (ongoing) |
| 668 | Maintain Regular Contact with the Parties | Ongoing | Monthly | Met (ongoing) |
| 669 | Monitor will Participate in Meetings with the Coalition | Quarterly | Quarterly | Met (ongoing) |
| 670–71 | Communication with the Parties, Collective Bargaining Representatives, and the Public | Ongoing | Ongoing | Met (ongoing) |

# Fifth Reporting Period Priorities

We set out our priorities for the fifth reporting period in our Monitoring Plan for Year Three.[38] Specifically, we prioritized (1) the paragraphs in the Consent Decree with a deadline before December 31, 2021, and (2) the requirements agreed to by the Parties to the Consent Decree (the City and the OAG) and the IMT, regardless of whether the Consent Decree established a deadline for these paragraphs. Most of the paragraphs in these two categories contain requirements for the CPD.

These two categories of priorities, however, do not fully describe all of our efforts in the first five reporting periods. While we monitored the compliance efforts that corresponded with the paragraphs above, some paragraph deadlines fall after the fifth reporting period but still required the City and its entities to take steps during the fifth reporting period. Similarly, many of our efforts are ongoing—regardless of deadlines—but are too premature to report here.

---

[38] The IMT's Monitoring Plan for Year Two is available on the IMT's website. *See Reports and Resources*, INDEPENDENT MONITORING TEAM (July 3, 2019), https://cpdmonitoringteam.com/wp-content/uploads/2020/07/2020_07_03-Monitoring-Plan-for-Year-Two-filed.pdf. Given the varying workloads of separate departments and personnel, the City and its relevant entities may make compliance efforts earlier than anticipated. When appropriate, we may also assess those efforts in our monitoring reports earlier than anticipated.

Thus, the IMT and the Parties have engaged in compliance and monitoring efforts in addition to those described in this report.

## Paragraphs with Deadlines

In our first five monitoring reports, we assessed all paragraphs with deadlines before December 31, 2021. All deadlines are determined by the Consent Decree. The City and the OAG agreed to these deadlines. The IMT did not—and cannot—unilaterally create or change deadlines for the fifth reporting period, nor for any other reporting period.

## Paragraphs without Deadlines

Many paragraphs in the Consent Decree do not contain deadlines, but after consulting with the Parties, the IMT assesses paragraphs that did not have deadlines in prior reporting periods. In Year One, these paragraphs involved foundational policy and practice requirements that are fundamental to the success of the Consent Decree. As a result, in the Monitoring Reports for Year One, the IMT included compliance updates for "Foundational Paragraphs." Because the City is now in its second year under the Consent Decree, moving forward, most paragraphs in each monitoring report will receive a compliance assessment.

In the fifth reporting period, we added assessments for additional paragraphs without deadlines. As a result, paragraphs that are not in compliance do not necessarily reflect a missed deadline. Through the fifth reporting period, we were monitoring compliance with those paragraphs to match the pace of the five-year goal described in the Consent Decree. As explained above, in the sixth reporting period, the Parties entered a stipulation, which extends the pace of the Consent Decree to eight years.[39]

## Assessing Compliance

Overall, in accordance with ¶¶661–62 and 642, the IMT assesses how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: **(1) Preliminary compliance**, **(2) Secondary compliance**, and **(3) Full compliance**. The CPD and other City entities will not be "in compliance" with a requirement until they reach Full compliance for the requisite length of time required by the Consent Decree—either one or two years. *See* ¶714. We

---

[39]  *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timelin.._.pdf.

will assess the City's compliance on all appropriate levels for the paragraphs presented in this report.

❖ **Preliminary compliance** refers principally to the development of acceptable policies and procedures that conform to best practices (as defined in ¶730) and to the incorporation of requirements into policy (¶642). The IMT will assess the development of policies, procedures, rules, and regulations reasonably designed to achieve compliance. To attain Preliminary compliance, the City must have policies and procedures designed to guide officers, City employees, supervisors, and managers performing the tasks outlined in the Consent Decree. These policies and procedures must include appropriate enforcement and accountability mechanisms, reflect the Consent Decree's requirements, comply with best practices for effective policing policy, and demonstrate the City and its relevant entities' ability to build effective training and compliance.

❖ **Secondary compliance** refers principally to the development and implementation of acceptable and professional training strategies (¶642). Those strategies must convey the changes in policies and procedures that were established when we determined Preliminary compliance. Secondary compliance also refers to creating effective supervisory, managerial, and executive practices designed to implement policies and procedures as written (¶730). The IMT will review and assess the City's documentation—including reports, disciplinary records, remands to retraining, follow-up, and revisions to policies, as necessary—to ensure that the policies developed in the first stage of compliance are known to, are understood by, and are important to line, supervisory, and managerial levels of the City and the CPD. The IMT will be guided by the ADDIE model of curriculum development to assess training and will consider whether there are training, supervision, audit, and inspection procedures and protocols designed to achieve, maintain, and monitor the performances required by the Consent Decree.

❖ **Full compliance** refers to adherence to policies within day-to-day operations (¶642). Full compliance requires that personnel, including sergeants, lieutenants, captains, command staff, and relevant City personnel routinely hold each other accountable for compliance. In other words, the City must "own" and enforce its policies and training. The IMT will assess whether the City's day-to-day operations follow directives, policies, and training requirements. When measuring Full compliance, we will note whether supervisors notice, correct, and supervise officer behavior and whether appropriate corrections occur in the routine course of business. In this phase, we will review whether compliance is reflected in routine business documents, demonstrating that reforms are being institutionalized. In addition, we will determine whether all levels of the chain of command ensure consistent and transparent compliance.

These levels of compliance guide the IMT in its review of all paragraphs in the Consent Decree. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Throughout this report, we provide our compliance assessments and descriptions of the status of current compliance based on efforts within the fifth reporting period. Under the Consent Decree, the City, the CPD, and other relevant City entities are not in any level of compliance until we find that they comply. As a result, a finding that the City is not in compliance with a requirement does not mean that the City has not made efforts—even significant efforts—to achieve compliance toward that requirement.

In accordance with ¶¶661–62 and 642, we assess how the City, the Chicago Police Department (the CPD), and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training rather than to create a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are complying. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its actions.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the fifth reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the City's evidence, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the City's evidence, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the City's evidence, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance, or the City has not met a lower level of compliance.

# I. Community Policing

## Guiding Principles

The IMT assessed whether the City complied with applicable Community Policing paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> ***8.*** *Strong community partnerships and frequent positive interactions between police and members of the public make policing safer and more effective, and increase public confidence in law enforcement. Moreover, these partnerships allow police to effectively engage with the public in problem-solving techniques, which include the proactive identification and analysis of issues in order to develop solutions and evaluate outcomes.*

> ***9.*** *To build and promote public trust and confidence in CPD and ensure constitutional and effective policing, officer and public safety, and sustainability of reforms, the City and CPD will integrate a community policing philosophy into CPD operations that promotes organizational strategies that support the systematic use of community partnerships and problem-solving techniques.*

> ***10.*** *CPD will ensure that its community policing philosophy is a core component of its provision of police services, crime reduction strategies and tactics, training, management, resource deployment, and accountability systems. All CPD members will be responsible for furthering this philosophy and employing the principles of community policing, which include trust and legitimacy; community engagement; community partnerships; problem-solving; and the collaboration of CPD, City agencies, and members of the community to promote public safety.*

> ***11.*** *The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest.*

# Summary of Compliance Efforts and Assessments

## Community Policing in the Fifth Reporting Period

In the fifth reporting period, the City and the CPD made progress toward compliance with various requirements of the Community Policing section of the Consent Decree. For some requirements, however, the City and the CPD's progress has either slowed or stalled due to, among other things, limited resources and changing priorities. For example, in nine paragraphs—or nearly 25% of this section—the CPD and the City reported delays due to "balancing workloads."[40]

During this reporting period, we continued to review and comment on policies and training materials related to the Community Policing section. We also reviewed corresponding training, such as the School Resource Officer Refresher training. The IMT also observed two of the Mayor's public safety cabinet meetings and interviewed key City and CPD personnel. For example, the IMT interviewed a sample of District Commanders, covering their understanding and application of community engagement and their role in the development and review of the district-level strategic plans.

Importantly, during public safety meetings during the fifth reporting period, the City and the CPD demonstrated an understanding of the complexity of addressing community safety issues and a basic tenant of community policing: the need for multi-disciplinary approaches to address the root causes of social disorder and crime.

The City and the CPD have also invested considerably in retooling its engagement processes. During this reporting period, for example, the City established the first ever Community Safety Coordination Center to coordinate resources, staff, funding, and information to engage residents and organizations across Chicago's communities. In a public safety cabinet presentation, the City unveiled a public-health-inspired model to address root causes of violent crime and social disorder, leveraging and coordinating public and private resources, exemplifying core principles of community policing. The City's efforts have included establishing by-laws, expanding membership for District Advisory Councils, and modifying processes for its strategy development and review. The City and the CPD also continued broadening its Neighborhood Policing Initiative, which enhances community-policing outreach at the district-level. The partnership-driven approach is also demonstrated in the deployment of District Coordination Officers, the assignment of

---

[40] During the first four reporting periods, the City's and the CPD's productions and data regarding Community Policing were noticeably more robust than in this reporting period.

community liaisons to engage and work with marginalized communities, and the ongoing training of officers in community policing concepts and practices.

Perhaps most notably, the City, the CPD, and the Chicago Public Schools (also known as CPS) established and implemented "Whole School Community Safety Plans" as a result of intensive community collaboration and engagement directed, in part, by community-based organizations. During this reporting period, Chicago Public Schools worked directly with community-based organizations to assist in outreach and were able to effectively engage community members to reach a consensus about School Resource Officer programming, setting an example for the City and the CPD. The Whole School Community Safety Plans provided guidance to reduce the number of onsite School Resource Officers in some schools and implement a more multi-disciplinary approach to school safety. Because of the finalized School Resource Officer selection and screening criteria—and expansive training for School Resource Officers—the CPD is now developing one of the most advanced School Resource Officer programs in the nation.

Despite these and other investments, community stakeholders have expressed frustration with community input opportunities, especially in shaping policies that have significant community impact, such as those regarding the use of force. As we have noted in previous reports, the CPD's outreach efforts often do not effectively seek input from or engage with marginalized groups most impacted by policing services.

Still, while not yet meeting expectations of many community stakeholders, the CPD did make extensive investments in attempting to improve its community engagement strategies and practices including improvements in the community engagement processes for developing district strategies, retooling and expanding District Advisory Committee memberships, and an increased capacity to track and evaluate community events. Early in the next reporting period the City and the CPD will release detailed data and analysis of these events and engagements.

However, the City and the CPD continue to face challenges regarding youth-related Consent Decree requirements. The City and the CPD have struggled with building a consensus on how to expand the CPD's options when interacting with youth. As a result, the City and the CPD have yet to develop or revise policies governing the CPD's interactions with youth or the corresponding decision-making and service options for addressing those interactions.

Specifically, the City and the CPD have yet to work out alternatives to arrest and referral to juvenile court, including optimal ways to connect at-risk youth to needed services. Recently, the City closed the Juvenile Intervention and Support Center (JISC), which aimed to provide social intervention services to youth from targeted parts of the City. While this may indicate that the future delivery of ser-

vices will be part of a broader plan covering police interactions with youth, deflection practices and clearly articulated policies for pre-arrest options for youth are core elements for advancing police reform.

## Updated Compliance Levels for the Fifth Reporting Period:

Overall, the IMT assessed the City's compliance with 35 Community Policing paragraphs in the fifth reporting period (¶¶13–20 and 22–48). The City and the CPD maintained Preliminary compliance for 25 paragraphs (¶¶13–15, 18–20, 22–25, 27, 29, 31, 34–41, and 45–48), met Preliminary compliance with one paragraph (¶42), maintained Secondary compliance with one paragraph (¶30), met Secondary compliance for three paragraphs (¶¶26, 28, and 43), and met Full compliance with one paragraph (¶44). The City did not reach Preliminary compliance in the four other paragraphs (¶¶16–17 and 32–33). *See* Community Policing Figure 1 below.

Community Policing Figure 1:        Compliance Progress for Community Policing Paragraphs at the End of the Fifth Reporting Period (December 31, 2021)



This includes the City losing levels of compliance with three paragraphs (¶¶13, 14, and 15). *See* Community Policing Figure 2.

Community Policing Figure 2:
Lost Levels of Compliance in the Community Policing Section



## Community Policing Progress through Five Reporting Periods

The City and the CPD spent considerable time in previous reporting periods building a policy framework for its proposed community-policing practices, including the mission, vision, roles, and responsibilities of its Office of Community Policing. The CPD has also expanded the Neighborhood Policing Initiative over each of the last several reporting periods, and liaison officers have been assigned to each District, which houses the Chicago Alternative Policing Strategy (also known as CAPS) program.[41]

Over time, the City and the CPD have expanded the scope of district-wide crime-reduction and community-engagement strategies, using focus groups, working groups, and listening sessions to gauge community input on major policy formulations. Some community stakeholders and District Advisory Committee members have continued to raise concerns that their voices are often not heard and that the CPD does not seriously consider their feedback. The City and the CPD should continue to consider partnering with community-based organizations to directly help with engagement efforts, which may prove more effective than City- or CPD-organized focus groups or listening sessions.

The City and the CPD leadership will need to make critical decisions and investments to advance reform efforts regarding at-risk youth interactions with police and the justice system—and meet the related Consent Decree requirements.

Through five reporting periods, the City and the CPD have committed several reforms from the Community Policing section into various policies and written guidance. Community Policing Figure 3, below, provides a sample of those policies.

---

[41] The CPD is currently addressing the challenges of integrating these liaisons into each District's Community Policing Office.

Community Policing Figure 3:
Sample of New or Revised Policies
related to the Community Policing Section
(between March 1, 2019, and December 31, 2021)[42]

|  | | Policy # | Issue Date |
|---|---|---|---|
| ❖ | *Community Policing Mission and Vision General Order* | G02-03 | 12/31/2021 |
| ❖ | *Pre-Service Training Special Order* (NEW) | S11-10-02 | 12/29/2021 |
| ❖ | *In-Service Training Special Order* (NEW) | S11-10-03 | 12/29/2021 |
| ❖ | *School Resource Officers and Investigations at Chicago Public Schools Special Order* | S04-01-02 | 12/17/2021 |
| ❖ | *Neighborhood Policing Initiative* (NEW) | D21-04 | 6/30/2021 |
| ❖ | *The Community Policing Office Special Order* | S02-03 | 6/30/2021 |
| ❖ | *Crime Victim Assistance Special Order* | S02-01-03 | 6/10/2021 |
| ❖ | *CPD's Community Policing Advisory Panel (CPAP) Quarterly Report Standard Operating Procedure* (NEW) | n/a | 1/1/2021 |
| ❖ | *District Advisory Committee* | S02-03-14 | 12/31/2020 |
| ❖ | *Bridging the Divide Special Order* | S02-03-12 | 12/31/2020 |
| ❖ | *Officer Friendly Program Special Order* | S02-03-11 | 12/31/2020 |
| ❖ | *Community Policing Business Public-Safety Initiative* | S02-03-13 | 12/31/2020 |
| ❖ | *Social Media Outlet: Twitter Special Order* | S02-03-10 | 12/31/2020 |
| ❖ | *Trespass Affidavit Special Order* | S02-03-09 | 12/31/2020 |
| ❖ | *Gun Turn-In Special Order* | S02-03-08 | 12/31/2020 |
| ❖ | *G.R.E.A.T. Program Special Order* | S02-03-07 | 12/31/2020 |
| ❖ | *D.A.R.E. Program Special Order* | S02-03-06 | 12/31/2020 |
| ❖ | *Ride Along Program Special order* | S02-03-04 | 12/31/2020 |
| ❖ | *Community Concerns* | S02-03-03 | 12/31/2020 |
| ❖ | *Beat Community Meetings* | S02-03-01 | 12/31/2020 |
| ❖ | *Preliminary Investigations* | G04-01 | 12/30/2020 |
| ❖ | *Juveniles and Minors Under Department Control* | S06-04 | 2/29/2020 |

---

[42]   Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

Through five reporting periods, the City and the CPD have also developed or updated training materials to incorporate requirements from the Community Policing section. Community Policing Figure 4 provides a sample of training materials related to Community Policing that were developed or revised since the start of the Consent Decree.[43]

Community Policing Figure 4:
Sample of New or Revised Trainings Materials
related to the Community Policing Section
(between March 1, 2019, and December 31, 2021)[44]

| New or Revised Community Policing Related Training Materials (between March 1, 2019, and December 31, 2021) | Date |
| --- | --- |
| ❖ *School Resource Officer Refresher Training (2021–2022)* (NEW) | 2021 |
| ❖ *Strategies for Youth Training (Policing the Teen Brain)* | 2021 |
| ❖ *Neighborhood Policing Initiative Training* (NEW) | 2021 |
| ❖ *School Resource Officer Initial Training (2019–2020)* | 2019 |

## Looking Ahead to the Sixth Reporting Period

In the fifth reporting period, the City and the CPD made progress toward compliance with various requirements of the Community Policing section of the Consent Decree. Moving forward, we are hopeful that the City and the CPD can provide sufficient resources toward reforms related to the Community Policing section, including developing and implementing related policies, training, supervision mechanisms, and evaluation processes.

---

[43] As detailed in Appendix 1 (Community Policing), the City and the CPD may still need to demonstrate that they effectively provided all these trainings to the requisite personnel.

[44] Some of these trainings may not have been provided to 95% of personnel at the time of this report.

As referenced above, the City and the CPD have made progress in this section by developing new or revised policies and training materials. The Consent Decree requires, however, additional policy changes. For example, at the end of the fifth reporting period, the City and the CPD continued developing the following new or revised policies:

- ❖ *Office of Community Policing Performance Management Standard Operating Procedure* (NEW)
- ❖ *Field Arrest Procedures General Order*        G06-01-01
- ❖ *District Strategic Plans Special Order*        S02-03-02
- ❖ *Interactions with Youth General Order* (NEW)        G02-05
- ❖ *Prohibition of Sexual Misconduct* (NEW)        G02-05

The Consent Decree also requires additional training development, and at the end of the fifth reporting period, the City and the CPD continued developing the following new or revised training materials:

- ❖ Processing Juveniles eLearning and Bulletin (in-service)
- ❖ Community Policing In-Service Training
- ❖ Juvenile Processing Training (recruits)

We look forward to reporting on these finalized policies and training materials, as well as evidence that the City and the CPD have implemented these reforms into practice.

***

Specific compliance assessments, by paragraph, for the Community Policing section are included in Appendix 1.

# II. Impartial Policing

## Guiding Principles

The IMT assessed compliance with applicable Impartial Policing paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **49.** The Parties agree that policing fairly, with courtesy and dignity, and without bias is central to promoting broad community engagement, fostering public confidence in CPD, and building partnerships between law enforcement and members of the Chicago community that support the effective delivery of police services.

> **50.** In conducting its activities, CPD will provide police services to all members of the public without bias and will treat all persons with the courtesy and dignity which is inherently due every person as a human being without reference to stereotype based on race, color, ethnicity, religion, homeless status, national origin, immigration status, gender identity or expression, sexual orientation, socio-economic class, age, disability, incarceration status, or criminal history.

> **51.** CPD will ensure its members have clear policy, training, and supervisory direction in order to provide police services in a manner that promotes community trust of its policing efforts and ensures equal protection of the law to all individuals.

## Summary of Compliance Efforts and Assessments

### Impartial Policing in the Fifth Reporting Period

In the fifth reporting period, the City and the CPD revised several policies relevant to the Impartial Policing section of the Consent Decree. The CPD has also been piloting a supplemental translation service, called LanguageLine, which officers can deploy in the field to provide better supports during officer interactions with people with limited English proficiency. Unfortunately, the City's and the CPD's progress in the Impartial Policing section continues to stall from insufficient community-engagement and data collection, analysis, and response.

In the fifth reporting period, we conducted bi-weekly check-ins with members of CPD responsible for the Impartial Policing section, including the Office of Community Policing. Throughout the reporting period, the IMT continued to review CPD policies and trainings regarding the requirements of this section, including materials on topics such as sexual misconduct, hate crimes, impartial policing, and protection of human rights. In addition, the IMT met with members of the Office of Community Policing—including the Language Access Coordinator (or LAC), the Americans with Disabilities Act Liaison—to discuss progress and corresponding compliance initiatives.

In this reporting period, the Office of Community Policing organized virtual "community conversations" around various policies and held informal meetings with community groups. Members of the Office of Community Policing was analyzed the qualitative and quantitative data collected from these conversations and meetings to identify key themes. In many cases, however, they were unable to bring in community leaders, advocates, and subject-matter experts to have a dialogue about impartial-policing issues. We continue to encourage the CPD to create community working groups to oversee progress on specific topics in the Impartial Policing section.[45] By the end of the reporting period, the CPD was unable to provide sufficient evidence that it has established a sustainable community-engagement process that ensures meaningful community input from "members of the community and community-based organizations with relevant knowledge and experience." ¶52.

Overall, the City and the CPD did not make significant progress in many areas of Impartial Policing. As reflected in the Community Policing section above, we attribute much of this delay to staffing issues and changing priorities—often changing away from compliance with the requirements of these sections. For example, he CPD greatly reduced the staffing in the Office of Community Policing to implement an "all hands on deck" approach to fight crime. The CPD's community policing efforts, however, are ultimately critical to the City's and the CPD's overall crime-reduction. *See, e.g.*, ¶¶8 and 17. Focusing on specific crime-control strategies at the expense of community and impartial policing undermines each effort. This is particularly true if crime-control strategies damage community relations. To fully address these issues, the City and the CPD must incorporate comprehensive strategic planning that incorporates community and impartial policing principles.

Officers make many decisions that can be subject to bias and can result in disparities in the delivery of service and enforcement. The CPD must be equipped to monitor these decisions as part of the reform process and report progress on multiple

---

[45] We are open to the use of other community engagement methods besides working groups, so long as the CPD can justify these other methods as more appropriate and effective for particular organizations or stakeholders.

public-facing dashboards. Likewise, the CPD has been unable to effectively integrate impartial policing concepts into all requisite training. We continue to stress the importance, for example, of providing officers with an opportunity to practice the interpersonal skills central to effective impartial policing.

Similarly, many of the Impartial Policing requirements of the Consent Decree are best achieved by staff members who have strong data analytic and research skills. Unfortunately, the CPD has been unable to hire or retain enough personnel with the analytic skills to collect, manage, and analyze data to create a learning organization that able to identify and immediately respond to existing and emerging problems. *See* Data Collection, Analysis, and Management Section. How the City and the CPD collect, manage, and evaluate data remains a hurdle that, until addressed, will prevent the meaningful reform contemplated in the Consent Decree.

## Updated Compliance Levels for the Fifth Reporting Period

In this fifth reporting period, we assessed the City's compliance with all 31 of the Impartial Policing paragraphs (¶¶52–82)—with two of those paragraphs containing conditional requirements that did not apply to this reporting period (¶81–82).[46] The City maintained Preliminary compliance for nine paragraphs (¶¶52, 57, 61, 65–66, 70–71, 73, and 76), moved into Preliminary compliance for one paragraph (¶78), and maintained Secondary compliance for one paragraph (¶67). The City failed to reach Preliminary compliance for the remaining 18 paragraphs assessed (¶¶53–56, 58–60, 62–64, 68–69, 72, 74–75, and 77–80). *See* Impartial Policing Figure 1 below.

Impartial Policing Figure 1: Compliance Progress for Impartial Policing Paragraphs at the End of the Fifth Reporting Period (December 31, 2021)



Paragraphs in **Preliminary**, **Secondary**, or **Full** Compliance (10) (1) (11)
Paragraphs that have not met Preliminary compliance (18)
Paragraphs Under Assessment for Preliminary compliance (0)

---

[46]    Specifically, because ¶¶79–82 are interrelated, we assessed their compliance together. Paragraph 82, however, does not contain a substantive requirement for the City. Likewise, ¶81 contains conditional requirements that may never apply and, at the time of this report, do not apply.

## Impartial Policing Progress through Five Reporting Periods

Through five reporting periods, the City and the CPD have committed a few reforms from the Impartial Policing section into various policies and written guidance. Impartial Policing Figure 2, below, provides a sample of those policies.

Impartial Policing Figure 2:
Sample of New or Revised Policies
related to the Impartial Policing Section
(between March 1, 2019, and December 31, 2021)[47]

|  | Policy # | Issue Date |
|---|---|---|
| ❖ Hate Crimes and Related Incidents Motivated by Bias or Hate | G04-06 | 6/22/2021 |
| ❖ Prohibition on Retaliation | G08-05 | 12/30/2020 |

Through five reporting periods, the City and the CPD have also developed or updated training materials to incorporate requirements from the Impartial Policing section. Crisis Intervention Figure 3 provides a sample of those training materials.[48]

Impartial Policing Figure 3:
Sample of New and Revised Trainings Materials
related to the Impartial Policing Section
(between March 1, 2019, and December 31, 2021)[49]

**New or Revised Impartial Policing Related Training Materials (between March 1, 2019, and December 31, 2021)**

- ❖ Non-Bias Training

- ❖ Procedural Justice 3 Training Materials

- ❖ Sexual Assault Training and Knowledge Test

- ❖ 2021 Two-Day De-Escalation, Response to Resistance, and Use of Force Training

---

[47] Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

[48] As detailed in Appendix 2 (Impartial Policing), the City and the CPD may still need to demonstrate that they effectively provided all these trainings to the requisite personnel.

[49] Some of these trainings may not have been provided to 95% of personnel at the time of this report.

## Looking Ahead to the Sixth Reporting Period

In the fifth reporting period, the City and the CPD continue to struggle to make significant progress with the Impartial Policing section of the Consent Decree. Moving forward, we are hopeful that the City and the CPD can provide sufficient resources toward reforms related to the Community Policing and the Impartial Policing sections.

The City and the CPD have, however, been developing new and revised policies and written guidance to make progress in this section. At the end of the fifth reporting period, the City and the CPD continued developing, for example, the following new or revised policies:

| | |
|---|---|
| ❖ Draft revised General Order G02-01, Protection of Human Rights | G02-01 |
| ❖ Draft revised G02-04, Prohibition Regarding Racial Profiling and Other Bias Based Policing | G02-04 |
| ❖ Current G09-01-06, Use of Social Media Outlets | G09-01-06 |
| ❖ Limited English Proficiency Policy | S02-01-05 |
| ❖ Interactions with TIGN | G02-01-03 |
| ❖ Prohibition of Sexual Misconduct | G08-06 (Previously G08-05) |
| ❖ Interactions with Religious Communities Policy | G02-01-05 |
| ❖ Interactions with People with Disabilities | S02-01-01 |
| ❖ Community Engagement in Policy Development, G01-03-01 | G01-03-01 |
| ❖ Body Worn Camera Policy | S03-14 |
| ❖ Initiation and Assignment of Investigations into Allegations of Misconduct (previously titled Specific Responsibilities Regarding Allegations of Misconduct) (NEW) | G08-01-02 |

The Consent Decree also requires additional training development, and at the end of the fifth reporting period, the City and the CPD continued developing, for example, the following new or revised training materials:

- ❖ OEMC Language Access Training, TNG 19-004
- ❖ OEMC Diversity Awareness Training
  [Introduction to Implicit Bias and Inclusion: Building an Inclusive Organizational Culture]
- ❖ CPD Interactions with People with Disabilities Training
- ❖ CPD Deaf/Hard of Hearing Training Bulletin Task File
- ❖ CPD Hate Crimes eLearning, G04-06

We look forward to reporting on these finalized policies and training materials, as well as evidence that the City and the CPD have implemented these reforms into practice.

Finally, in the sixth reporting period, the City, the CPD, and the OAG agreed to include the CPD's search warrant practices under the Consent Decree.[50] We will forward to reviewing and reporting on the corresponding policies, training materials, and data in future reports.

***

Specific compliance assessments, by paragraph, for the Impartial Policing section are included in Appendix 2.

---

[50] *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timelin.._.pdf.

# III. Crisis Intervention

## Guiding Principles

The IMT assessed compliance with applicable Crisis Intervention paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **83.** *CPD officers often serve as first responders to individuals experiencing a behavioral or mental health crisis. These individuals may exhibit symptoms of known, suspected, or perceived behavioral or mental health conditions, including, but not limited to, mental illness, intellectual or developmental disabilities, or co-occurring conditions such as substance use disorders. The Parties acknowledge that having a mental illness, an intellectual or developmental disability, or co-occurring condition does not mean an individual necessarily is in crisis, or that having a behavioral or mental health condition would necessarily be the reason for any crisis that requires police involvement. However, it may need to be considered or warrant heightened sensitivity to ensure an appropriate response. Therefore, individuals in the groups listed above will be collectively referred to as "individuals in crisis" for the purposes of this Agreement.*

> **84.** *A person may be a suspected individual in crisis based on a number of factors, including, but not limited to, self-reporting; information provided by witnesses, family members, or individuals requesting service; CPD's previous knowledge of the individual; or an officer's direct observation.*

> **85.** *CPD officers will interact with individuals in crisis with dignity and respect. The use of trauma-informed crisis intervention techniques to respond appropriately to individuals in crisis will help CPD officers reduce the need to use force, improve safety in police interactions with individuals in crisis, promote the connection of individuals in crisis to the healthcare and available community-based service systems, and decrease unnecessary criminal justice involvement for individuals in crisis. CPD will allow officers sufficient time and resources to use appropriate crisis intervention techniques, including de-escalation techniques, to respond to and resolve incidents involving individuals in crisis. To*

*achieve these outcomes, the City and CPD will implement the requirements set out below.*

*86. The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest for individuals in crisis.*

# Summary of Compliance Efforts and Assessments

## Crisis Intervention in the Fifth Reporting Period

During the fifth reporting period, the CPD, the Office of Emergency Management and Communication (OEMC), and the Chicago Council on Mental Health Equity (also known as the CCMHE) worked to address requirements in the Crisis Intervention section of the Consent Decree related to policy, training, and community engagement.

During this reporting period, we continued to monitor the City's and its relevant entities' compliance efforts. For example, we met with district commanders, Crisis Intervention Team patrol officers, Crisis Intervention Team sergeants, Crisis Intervention Team training personnel, the Crisis Intervention Team District Operations and Community Support team (CIT DOCS), and the Chicago Council on Mental Health Equity subcommittee chairs. Bi-weekly and monthly calls with the City, the OEMC, and the CPD continued throughout the fifth reporting period. We also observed the OEMC's 8-hour Mental Health and Crisis Intervention Team Awareness Training that all telecommunicators receive, along with both the CPD's 40-hour Basic Crisis Intervention Team Training and the CPD's 8-hour Crisis Intervention Team Refresher training. The IMT also received a briefing on the City's Crisis Assistance Response Engagement (CARE) pilot program.

While staffing challenges persist, the CPD has dedicated significant leadership efforts and resources toward compliance efforts within the Crisis Intervention Section. The Crisis Intervention Team program and mission also continues to be led by a dedicated leader, and the CPD has placed new leaders at the district level to set and implement district strategy (*i.e.*, CIT DOCS).[51]

As a result, the City and the CPD have demonstrated continued progress toward achieving compliance for several paragraphs in the Crisis Intervention Section. For example, the CPD has resumed the in-person, 40-hour Basic Crisis Intervention Team training, which instructs officers on how to safely de-escalate and, when appropriate, divert individuals in mental-health crisis to treatment.

---

[51] We recommend that the CPD assign a dedicated person for each district across Chicago and perhaps more than one person in larger districts. *See* ¶91.

The CPD is also moving forward with its two-day Crisis Intervention Team Refresher Training, designed to refresh officers' Basic Crisis Intervention Team training skills. This Refresher training is critical because a significant number of Crisis Intervention Team officers have not received any refresher training since receiving their Basic Crisis Intervention Team training. For many officers, this training was eight or more years ago. As a result, we have recommended that the CPD consider having officers who have not received the training in more than five years re-take the updated 40-hour Basic Crisis Intervention Team training and then transfer to the Refresher Training schedule.

Moreover, the CPD's CIT DOCS is increasingly operational, but continues to be understaffed. For example, most members of the CPD's Crisis Intervention Team DOCS team cover multiple districts. CIT DOCS will play an important role in the overall Crisis Intervention Team strategy, and we forward to seeing how its role evolves to meet Chicago's needs.

As referenced above, the City has also launched portions of its Crisis Assistance Response Engagement (CARE) program. This is an alternative response pilot program designed to reduce the need for a criminal-justice response to individuals experiencing a mental-health crisis. The CARE program includes three types of responses:

- (1) **pre-response**, which staffs mental-health professionals in the City's 911 Call Center to provide support to callers, call takers, dispatchers, and response teams;

- (2) **alternate response**, where the 911 Call Center will dispatch mental-health professionals with first responders to respond to persons in crisis; and

- (3) **post-response**, which links residents with appropriate community-based services and uses alternate drop-off sites for persons in behavioral health crisis.

This program goes a long way toward diverting individuals in crisis away from a criminal justice response. *See, e.g.*, ¶86. These efforts are highly commendable, and we look forward to seeing continued progress, as well as data supporting these efforts.[52]

In other areas, additional work is necessary for the City and the CPD to achieve higher levels of compliance. For example, the CPD has regressed in its data collection and analysis. *See, e.g.*, ¶121. Near the end of the third reporting period, the CPD's data analyst working on data analysis related to this section resigned, and

---

[52] It will be critical for the City and the CPD reliably track and assess the outcome data to measure the CARE pilot program's effectiveness and adjust, as necessary.

at the end of this reporting period, the CPD had yet to select or onboard a replacement. This means that the CPD's data reporting and analysis has stagnated throughout the fourth and fifth reporting periods.

Relatedly, the City and the CPD still do not have a Crisis Intervention Team Officer Implementation Plan or a Crisis Intervention Plan. *See* ¶¶108 and 122. While the IMT appreciates delaying these reports until they are supported by more robust strategies and reliable data, the City and the CPD's progress will continue to be delayed without these important reports.

Moreover, during this reporting period, the CPD also continued to review and revise Crisis Intervention Team-related policies, several of which are expected to be finalized in the next reporting period. In previous periods, the City and the CPD went through considerable effort to develop Crisis Intervention Unit Standard Operating Procedures (SOPs). The IMT and the OAG reviewed these procedures and provided extensive feedback. This reporting period, the City decided to differentiate between the policy for all officers and the policy specific to the Crisis Intervention Unit. As a result, many components of the unit-specific SOP's were incorporated into one department-wide directive: S05-14, *Crisis Intervention Team Program*. This delayed Preliminary compliance on numerous paragraphs because the CPD still needed to make additional changes to both the Crisis Intervention Unit SOPs and S05-14 at the end of the reporting period.[53]

Finally, this reporting period, the City also nearly completed a thorough review process that included input from the Chicago Council on Mental Health Equity. Notwithstanding the issues discussed below, this reporting period, the overall review process was much more comprehensive than previous policy reviews, and the CPD increased its efforts to obtain public comment and improved its engagement with the Chicago Council on Mental Health Equity.

While we recognize the unique challenges that come with a large committee (comprised of over 50 entities), the Chicago Council on Mental Health Equity is included in Consent Decree paragraphs that serve an essential role in successfully developing a system of care for persons experiencing mental health crisis. *See, e.g.*, ¶¶128–31. The Chicago Council on Mental Health Equity is made up of dedicated, thoughtful, and experienced individuals with valuable insight. The City and the CPD should ensure that the Chicago Council on Mental Health Equity is given an opportunity to use its skills and resources to help *design* solutions that best meet the needs of the community.

---

[53] The CPD has also developed a "policy update" eLearning course to educate members on department-wide changes caused by the Consent Decree's Crisis Intervention section, which is commendable.

Both the Chicago Council on Mental Health Equity's subcommittee and full-committee meetings have produced feedback—including expressing process and substance-related concerns—which should be considered and responded to. These concerns include, but are not limited to, proactive versus reactive engagement, as well as adequate amount of time, education of members, and provisions for dialogue on the recent policy reviews.[54] Some Chicago Council on Mental Health Equity members also expressed concerns about lacking the necessary background to understand the intent or operational practice of the policies they were reviewing, or that there was a lack of process for the committee to engage in a meaningful discussion about their policy questions and concerns. There also remains strong concern about the lack of engagement from Chicago's neighborhood residents and from people with lived experience.

These are concerns that the City needs to take seriously to gain the community's trust and improve the feedback processes in future reporting periods.[55] We continue to strongly recommend that the CPD complete a feedback loop with Chicago Council on Mental Health Equity members regarding their suggested revisions and that this feedback loop be implemented before finalizing and enacting policies. A process that incorporates such a feedback loop shows respect and consideration for the Chicago Council on Mental Health Equity. We look forward to the CPD responding and, where appropriate, incorporating their valuable feedback into finalized policies.

---

[54]  Despite these concerns, the IMT credits the City for conducting a full-body vote rather than voting only by subcommittee members during this reporting period, a change from previous reporting periods.

[55]  As we have previously raised, adopting bylaws for the Chicago Council on Mental Health Equity would go a long way in addressing many of these concerns.

## Updated Compliance Levels for the Fifth Reporting Period

During this reporting period, the IMT assessed the City's compliance with 64 Crisis Intervention paragraphs: ¶¶87–110 and 113–52. The City maintained Preliminary compliance for 23 paragraphs (¶¶105–06, 113–14, 117–19, 121, 128–31, 133–36, 141, 146–51), moved into Preliminary compliance for five paragraphs (¶¶98, 100, 102, and 126–27), maintained Secondary compliance for 12 paragraphs (¶¶89, 90, 92, 96–97, 99, 116, 132, 139–40, 144, and 152), achieved Secondary compliance for one paragraphs (¶138), maintained Full compliance for two paragraphs (¶¶142 and 145), and achieved Full compliance with one paragraph (¶¶143). The City failed to reach Preliminary compliance in the remaining 20 paragraphs assessed during the fourth reporting period (¶¶87–88, 91, 93–95, 101, 103–04, 107–10, 115, 120, 122–25, and 137). *See* Crisis Intervention Figure 1.

Crisis Intervention Figure 1:     Compliance Progress for Crisis Intervention Paragraphs at the End of the Fifth Reporting Period (December 31, 2021)



Paragraphs in **Preliminary**, **Secondary**, or **Full** Compliance     (28)  (13) (3)  (44)
Paragraphs that have not met Preliminary compliance     (20)
Paragraphs Under Assessment for Preliminary compliance     (0)

## Crisis Intervention Progress through Five Reporting Periods

Through five reporting periods, the City and the CPD have made significant progress towards annually reviewing Crisis Intervention-related policies and seeking input from the Chicago Council on Mental Health Equity. The City and the CPD have committed reforms from the Crisis Intervention section into various policies and written guidance. Crisis Intervention Figure 2, below, provides a sample of those policies.

Crisis Intervention Figure 2:
Sample of New or Revised Policies
related to the Crisis Intervention Section
(between March 1, 2019, and December 31, 2021)[56]

| | Policy # | Issue Date |
|---|---|---|
| ❖ *Recruit Training* | S11-10-01 | 11/17/2021 |
| ❖ *Pre-Service Training* | S11-10-02 | 11/17/2021 |
| ❖ *In-Service Training* | S11-10-03 | 11/17/2021 |
| ❖ *Annual Crisis Intervention Team Policy Review* | CIU S.O. 21-02 | 6/4/2021 |
| ❖ OEMC CAD Enhancement - *Crisis Intervention Team Check Box Training* | TNG 20-015 | 12/30/2020 |
| ❖ *Crisis Intervention Team Program* | S05-14 | 11/4/2020 |
| ❖ OEMC - *Crisis Intervention Team Program Policy* | TNG 21-004 | 10/7/2020 |
| ❖ OEMC - *Crisis Intervention Team Call Auditing Policy* | | 10/7/2020 |
| ❖ OEMC - *Audit and Employee Review of Crisis Intervention Team Calls* | | 10/7/2020 |
| ❖ OEMC - *Glossary for OEMC Quarterly Reports* | | 10/7/2020 |
| ❖ OEMC - *Mental Health Training Policy* | TNG 21-005 | 10/7/2020 |
| ❖ OEMC *Training Guidelines Policy* | TNG 20-016 | 9/24/2020 |
| ❖ OEMC - *Crisis Intervention Team Certified Officers Data Flowchart* | | 9/3/2020 |
| ❖ *Persons Subject to Involuntary or Voluntary Admission* | S04-20-02 | 2/2/2020 |
| ❖ *Persons on Unauthorized Absence from a State-Operated Mental Health Center* | S04-20-03 | 2/2/2020 |
| ❖ *Mental Health Transport and Related Duties Matrix* | S04-20-04 | 2/2/2020 |
| ❖ *Arrestees in Need of Mental Health Treatment* | S04-20-05 | 2/2/2020 |
| ❖ *Recognizing and Responding to Individuals in Crisis* | S04-20 | 2/2/2020 |

The City and the CPD have also recently made additional progress with corresponding training, which had previously been affected by the COVID-19 pandemic.

---

[56] Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

For example, the CPD has fully developed and started implementing of its Crisis Intervention Team Refresher class and the updated Basic Crisis Intervention Team class. As referenced above, the CPD has been operating without a refresher training for several years, with a significant number of its officers having received Basic Crisis Intervention Team training over eight years ago. This has undermined the CPD's efforts to have a specialized response to individuals in crisis.[57]

Still, through five reporting periods, the City and the CPD have developed or updated training materials to incorporate requirements from the Crisis Intervention section. Crisis Intervention Figure 3, below, provides a sample of those training materials.[58]

Crisis Intervention Figure 3:
Sample of New or Revised Trainings Materials
related to the Crisis Intervention Section
(between March 1, 2019, and December 31, 2021)[59]

| | Date |
|---|---|
| ❖ OEMC *Crisis Intervention Team Refresher Training* | 2021 |
| ❖ *Crisis Intervention Team Basic Training* | 2020 |
| ❖ *Crisis Intervention Team Refresher Training* | 2020 |
| ❖ *Crisis Intervention Team Advanced Youth Training* | 2020 |

---

[57]  In its comments to an earlier draft of this report, the City requested additional clarification regarding the IMT's concerns. *See* Attachment B (City of Chicago Comments). In short, based on the CPD's refresher training schedule at the end of the fifth reporting period, an officer could go 12 years without a refresher training and still be considered part of the CPD's "specialized" response. In their comments, however, the City and the CPD "agree that the refresher training for CIT-Certified Officers will strengthen the program." We also note that, in the sixth reporting period, the City, the CPD, the OAG, and the IMT appear to be making significant progress regarding the short- and long-terms goals of the CPD's Crisis Intervention Program. It is our hope that the City and the CPD will further define their training philosophy for Crisis Intervention—including a transparent and effective application of a voluntary, specialized model—and then set benchmarks to achieve it. We look forward to continued progress and to reporting on that progress in the sixth reporting period.

[58]  As detailed in Appendix 3 (Crisis Intervention), the City and the CPD may still need to demonstrate that they effectively provided all these trainings to the requisite personnel.

[59]  Some of these trainings may not have been provided to 95% of personnel at the time of this report.

## Looking Ahead to the Sixth Reporting Period

Significant City and CPD compliance efforts are continuing into the sixth reporting period. At the end of the fifth reporting period, the City and the CPD continued developing, for example, the following new or revised policies:

| | |
|---|---|
| ❖ *Crisis Intervention Team Program* | S05-14 |
| ❖ *Crisis Intervention Team Program Coordinator* | CIU S.O. 21-01 |
| ❖ *Mental Health - Crisis Intervention Report* | CPD-15.520 |
| ❖ *Mission, Organization, and Functions of the Crisis Intervention Unit* | CIU S.O. 20-01 |
| ❖ *Crisis Intervention Team Training Schedule, Attendance, Eligibility, and Recruitment* | CIU S.O. 20-02 |
| ❖ *CIU Crisis Intervention Plan* | CIU S.O. 20-03 |
| ❖ *CIU District-Level Strategy for Crisis Intervention Team* | CIU S.O. 20-04 |
| ❖ *CIU Crisis Intervention Team Officer Implementation Plan* | CIU S.O. 20-05 |
| ❖ *District-Level Strategy for Crisis Intervention Team* | CPD-15.605 |

It is our hope that many of these policies can be finalized in the sixth reporting period. We note, however, that at the end of the fifth reporting period, we continued to have material concerns regarding various drafts. For example, various paragraphs in the Crisis Intervention section relate to the CPD's ability to have Certified Crisis Intervention Team Officers who can provide a "timely response" to calls for services identified as involving individuals in crisis. *See, e.g.*, ¶¶108–09 and 120. The word "timely," however, remains undefined in relevant CPD policies, which will inhibit the CPD's ability to evaluate resources, performance, or success.

Still, at the end of the fifth reporting period, the City and the CPD also continued developing, for example, the following new or revised training materials:

    ❖ *Crisis Intervention Team Policy Updates* (eLearning)

    ❖ *OEMC Crisis Intervention Team Refresher Training*

As with other sections of the Consent Decree, the City and the CPD will need comprehensive and reliable data to best inform policy, training, strategy, and operational success. Data has been and continues to be a significant challenge for the CPD and its efforts in the Crisis Intervention section, among others. The CPD has been operating without a data analyst for the Crisis Intervention-related efforts during the last two reporting periods.[60] Key requirements (*e.g.*, data captured by

---

[60] The previous analyst resigned shortly after she started but was making good progress in setting up foundational systems to build reliable data reports.

the new Crisis Intervention Team report or reliably tracking Crisis Intervention Team Officers' response ratios) cannot be accomplished without additional resources and a functional data platform.

In the next reporting period, we hope to report on increased levels of compliance related to policy, training, and plan development.

\*\*\*

Specific compliance assessments, by paragraph, for the Crisis Intervention section are included in Appendix 3.

# IV. Use of Force

## Objectives[61]

The IMT assessed compliance with applicable Use of Force paragraphs in accordance with the Consent Decree's corresponding objectives:

> **153.** CPD's use of force policies, as well as its training, supervision, and accountability systems, must ensure that: CPD officers use force in accordance with federal law, state law, and the requirements of this Agreement; CPD officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; when using force, CPD officers only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and any use of unreasonable or unnecessary force is promptly identified and responded to appropriately.

> ***

> **155.** CPD officers have the authority to use force, but that authority is limited by the law and Department policy. The provisions of this Agreement seek to facilitate compliance with the law and Department policy regarding the use of force to reduce the circumstances in which using force is necessary, and to ensure accountability when CPD officers use force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances.

## Summary of Compliance Efforts and Assessments

### Use of Force in the Fifth Reporting Period

In the fifth reporting period, the City and the CPD largely maintained the levels of compliance in the Use of Force section that they reached in previous reporting periods. As detailed in this report, the CPD did, however, make additional progress with the some requirements. The City and the CPD continued their efforts to engage the community in revising the CPD's use-of-force policies.

---

[61] The Use of Force section of the Consent Decree includes "objectives" rather than "guiding principles."

This reporting period, the IMT reviewed several new or revised policies intended to address the Consent Decree's requirements regarding the Use of Force section. The City and the CPD made significant progress, for example, toward adopting a permanent foot-pursuit policy. Likewise, with the Court's guidance, we assisted the City, the CPD, and the OAG in developing a new, foot-pursuit policy to replace the temporary one the City and the CPD adopted last reporting period. *See, e.g.* ¶630 (describing the resolution process for Consent Decree-related policies).

The City and the CPD also failed to adopt the permanent policy by the Consent Decree's September 3, 2021 deadline. While the CPD made the path to a permanent foot-pursuit policy more difficult than it could have been, the work toward a revised foot-pursuit policy has been significant.[62] And during the fifth reporting period, the IMT and the OAG issued no-objection notices to a foot-pursuit policy.[63] In developing the new policy, the City and the CPD conducted community engagement and posted the policy for public comment shortly after the close of the fifth reporting period.

At the end of the fifth reporting period, however, more work was necessary. For example, the City and the CPD needed to develop an IMT-approved data plan in 2022, as a condition of our no-objection notice. The City and the CPD's data issues have continued to hamper the CPD's ability to evaluate its use-of-force policies, training, and operations in general and its recent focus on foot pursuits in particular. *See* ¶¶572–73 and 606.[64] Until the City and the CPD adequately prioritize their data issues their progress in the Use of Force section (among others) will stall. This

---

[62] This resolution was preceded by years of resistance from the CPD to adopting a policy—followed by the CPD's adoption of a temporary policy for exigent circumstances in the fourth reporting period, which bypassed OAG and IMT review. *See, e.g.*, DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPT.REPORT.pdf.

[63] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[64] One reason these deficiencies persist is the City and the CPD's failure to conduct the comprehensive assessment contemplated in ¶606 of its "current information collection mechanisms and data management technology," and to formulate a plan to begin to address the requirements of ¶¶572–73.

will require the City and the CPD to, among other things, consistently devote sufficient resources to address its data and supervision efforts, including adequately staffing the Force Review Division (also known as the FRD).[65]

We also attended meetings between the City, the CPD, the OAG, and the Coalition regarding the CPD's policies on the First Amendment and the use of Oleoresin Capsicum (OC) Spray and Tasers. We appreciate the progress made by the City and the CPD to incorporate feedback into those policies.

We also reviewed critical training materials concerning use of force, including draft materials for the CPD's recruit training on use of force, Law Enforcement Medical and Rescue Training (LEMART), and its 2022 annual in-service training on *De-escalation, Response to Resistance, and Use of Force*. We also observed the CPD's 2021 annual in-service training on *De-escalation, Response to Resistance, and Use of Force* to evaluate how effectively the approved written materials were being taught to officers.

As in prior reporting periods, we met every two weeks with the City, the CPD, and the OAG to address the Use of Force requirements in the Consent Decree, including ongoing record productions from the City and the CPD. We also continued to review reports published by the Force Review Division.

Finally, we remain impressed by the professionalism of the CPD's Force Review Division and its efforts to observe, address, and publicly report on patterns and trends relating to uses of force, foot pursuits, and firearm pointing incidents—even with inadequate resources. Unfortunately, however, the Force Review Division's lack of adequate resources in the fifth reporting period negatively impacted its operations. The Force Review Division fell behind on its reviews during the fifth reporting period because of insufficient staffing. In the meantime, the CPD continues to give the Force Review Division new and important responsibilities regarding the observation and analysis of patterns and trends in the CPD's practices.

After the end of the fifth reporting period, we learned that the CPD had also been deploying its limited Force Review Division personnel into the field. This practice is troubling and runs contrary to the lessons learned and recommendations from our *Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*.[66] In addition to undermining the City and the CPD's efforts to demonstrate reform, identify trends, improve practices, and increase transparency and accountability, deploying Force Review Division personnel creates significant

---

[65]    The Force Review Division has had several names throughout the Consent Decree, and its name may continue to evolve as the CPD expands the scope of its responsibilities.

[66]    *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

concerns regarding supervision and force review. As a result, it is imperative that the City and the CPD address its staffing issues to allow its existing and developing processes to best serve the CPD, its officers, and Chicago's communities.

## Updated Compliance Levels for the Fifth Reporting Period

During this reporting period, the IMT assessed the City's compliance with 92 Crisis Intervention paragraphs. At the end of the fifth reporting period, the City maintained Preliminary compliance for 36 paragraphs (¶¶153, 157–59, 161–62, 167, 174, 177–78, 191, 200, 206–07, 209–15, 221–26, 228–35, and 245) and achieved Preliminary compliance for five paragraphs (¶¶179, 243–44, and 247–48). The City maintained Secondary compliance for 23 paragraphs (¶¶154, 164–65, 169, 173, 175–76, 181, 183–90 192–97, and 246), achieved Secondary compliance for 7 paragraphs (¶¶182, 202–03, 218–20, and 227), and maintained Full compliance for one paragraph (¶170). The City's Preliminary compliance for 17 paragraphs remained under assessment at the end of the fifth reporting period (¶¶156, 160, 163, 166, 171–72, 198–99, 201, 204, 208, 236–41), and the City failed to reach any level of compliance with the remaining three paragraphs (¶¶168, 205, and 216). *See* Use of Force Figure 1 below.

Use of Force Figure 1:    Compliance Progress for Use of Force
Paragraphs at the End of the Fifth Reporting Period (December 31, 2021)



This includes the fact that the City also lost at least one level of compliance with one paragraph (¶201). *See* Use of Force Figure 2 below.

Use of Force Figure 2:
Lost Levels of Compliance in the Use of Force Section



## Use of Force Progress through Five Reporting Periods

The CPD has made significant progress with its use-of-force policies, training, and analysis of data since the start of the Consent Decree.

Through five reporting periods, for example, the City and the CPD have committed reforms from the Use of Force section into various policies and written guidance. Use of Force Figure 3, below, provides a sample of those policies. While we have had and continue have concerns with the CPD's corresponding community engagement efforts and strategies, the CPD has and continues to make meaningful efforts toward improving its corresponding community engagement and efforts to receive input. *See* ¶160.

Use of Force Figure 3:
Sample of New or Revised Policies
related to the Use of Force Section
(between March 1, 2019, and December 31, 2021)[67]

| | Policy # | Issue Date |
|---|---|---|
| ❖ *First Aid Kit Order, Law Enforcement Medical and Rescue Training (LEMART) Policy* | U06-02-23 | 7/22/2021 |

Updated the policy changing the LEMART requirement from "optional" to "mandatory," consistent with CPD practice.

❖ *Department Approved Weapons and Ammunition*     U04-02     5/07/2021
Adds additional requirements (*e.g.*, officers must be "currently certified" and must comply with applicable laws related to the storage of firearms).

❖ *Department Review of Use of Force*     G03-02-08     1/27/2021
Aligned terminology with the Consent Decree terminology, and other Use of Force directives. Further detailed the responsibilities of the Force Review Division and Force Review Board.

❖ *Use of Force*     G03-02     12/31/2020
Updates terminology in alignment with other Use of Force directives, following revisions based on input from the Use of Force Working Group and other community input (e.g., further defining standards, responsibilities, and prohibitions for use of force).

❖ *Force Options*     G03-02-01     12/31/2020
Updates terminology in alignment with other Use of Force directives and clarifies the purpose of the directive and standards for levels of resistance.

❖ *Incidents Requiring the Completion of a Tactical Response Report*     G03-02-02     12/31/2020
Updates terminology in alignment with other Use of Force directives and further defines and clarifies the purpose and use of Tactical Response Reports (TRRs), supervisory responsibilities for reviewing use-of-force incidents, and the incident review process.

---

[67] Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

|  | Policy # | Issue Date |
|---|---|---|

❖ *Firearms Discharge Incidents Involving Department Members*     G03-02-03     12/31/2020
Updates terminology in alignment with other Use of Force directives, clarifies administrative duty assignments, and adds trauma-informed techniques and implicit bias to post-shooting training.

❖ *Taser Use Incidents*     G03-02-04     12/31/2020
Updates terminology in alignment with other Use of Force directives and further defines the standard for when Taser use is authorized and when it is prohibited.

❖ *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*     G03-02-05     12/31/2020
Updates terminology in alignment with other Use of Force directives.

❖ *Canine Use Incidents*     G03-02-06     12/31/2020
Updates terminology in alignment with other Use of Force directives and establishes a prohibition on canine response to protests.

❖ *Firearm Discharge and Officer-Involved Death Incident Response and Investigations*     G03-06     12/31/2020
Establishes a prohibition on retaliation in reporting use-of-force incidents, clarifies medical attention standards, and clarifies the responsibilities on using restraints/handcuffs.

❖ *Baton Use Incidents*     G03-02-07     12/31/2020
Updates terminology in alignment with other Use of Force directives.

❖ *Prohibition on Retaliation*     G08-05     12/30/2020
Adds language related to supervision, reporting, forms of retaliation, and retaliation specific to First Amendment activity.

❖ *Reporting the Response to Crowds, Protests, and Civil Disturbances* (NEW)     D20-08     11/02/2020
Requires documentation by supervisors of information concerning crowds and the nature of the police response and use of force during protests.

❖ *Control Devices and Instruments*     U04-02-02     2/28/2020
Clarifies language regarding training, CPD-issued Taser devices and personal OC devices.

❖ *Department Vehicles*     U02-01     2/28/2020
Clarifies standards for motor vehicle operations safety, accountability related to motor vehicle license suspension or revocation, and corresponding training requirements.

❖ *Firearm Pointing Incidents* (NEW)     D19-01     10/01/2019
Clarifies requirements for engaging in, reporting, documenting, and reviewing firearm-pointing incidents, including that officers are to point a firearm at a person only when objectively reasonable under the totality of the circumstances.

Through five reporting periods, the City and the CPD have developed or updated training materials to incorporate requirements across the Use of Force section. For example, because of the Consent Decree, the CPD now develops and delivers use-of-force in-service training *every year*, which includes training on de-escalation

and force mitigation. Use of Force Figure 4, below, provides a larger sample of those training materials.[68]

Use of Force Figure 4:
Sample of New or Revised Trainings Materials
related to the Use of Force Section
(between March 1, 2019, and December 31, 2021)[69]

|  | Date |
|---|---|
| ❖ *Annual Carbine Training* | 2021 |
| ❖ *Foot Pursuit Training Bulletin* (NEW) | 2020 |
| ❖ *In-Service Use of Force 2020* (NEW) | 2020 |
| ❖ *Custodial Escort and Custody Training* (NEW) | 2020 |
| ❖ *Positional Asphyxia Training Bulletin*, ETB 20-01 (NEW) | 2020 |
| ❖ *Foot Pursuits Review training* (NEW) | 2020 |
| ❖ *Force Review Unit Firearm Pointing Incident Review training* (NEW) | 2020 |
| ❖ *Weapons Discipline Training Bulletin (Firearms Pointing Incidents Training Bulletin)* (NEW) | 2019 |

The CPD has also built up the Force Review Division (also known as the FRD) in the time since the Consent Decree became effective. The Force Review Division now reviews use-of-force incidents, firearm-pointing incidents, and foot pursuits to identify and allow the CPD to address patterns and trends.

Finally, while significant challenges remain, the CPD has made progress in its public reporting of use-of-force data. For example, the CPD makes relevant data available to the public via its Use of Force Dashboard.[70] The Force Review Division also publishes quarterly reports that contain analysis of and conclusions about the CPD's use-of-force data, including data collected via Tactical Response Reports (TRRs). The Force Review Division also analyzes and reports on firearm-pointing incidents and foot pursuits.

---

[68]  As detailed in Appendix 4 (Use of Force), the City and the CPD may still need to demonstrate that they effectively provided all these trainings to the requisite personnel.

[69]  Some of these trainings may not have been provided to 95% of personnel at the time of this report.

[70]  *See Use of Force Dashboard*, CHICAGO POLICE DEPARTMENT (2015 to present), https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

## Looking Ahead to the Sixth Reporting Period

In the fifth reporting period, the City and the CPD continued making progress toward compliance with the Use of Force section of the Consent Decree, particularly related to policy and training requirements. Community engagement, data, and staffing challenges continue to present significant hurdles to further levels of compliances.

Nonetheless, at the end of the fifth reporting period, the City and the CPD were also continuing to develop new and revised policies and written guidance to make progress in this section. At the end of the fifth reporting period, the City and the CPD continued developing, for example, the following new or revised policies:

- ❖ *Foot Pursuits*                                                 G03-07
- ❖ *Use of Force Policy Suite*                              (various)
- ❖ *First Amendment Rights Policy*                     G02-02
- ❖ *Body Worn Cameras*[71]                                 S03-14
- ❖ *Community Engagement in Policy Development* (NEW)   G01-03-01

At the end of the fifth reporting period, the City and the CPD also continued developing, for example, the following new or revised training materials:

- ❖ *In-Service Supervisors Training* (NEW)
- ❖ *2022 In-Service Use of Force Training* (NEW)
- ❖ *Foot Pursuit Training* (NEW)
- ❖ *Recruit Use of Force Training* (Force Options Suite)
- ❖ *Law Enforcement Medical and Rescue Training*

Further and to the CPD's credit, the CPD agreed to go beyond the requirements of the Consent Decree and review all firearm pointing incidents—and not just when there is a corresponding arrest or Investigatory Stop Report. For consistency, this change should be reflected in the *Firearm Pointing Incidents* policy (D19-01).

Likewise, the CPD also began requiring the Designated Exempt Level Incident Commander who responds to Officer Involved Shooting or any Level 3 Use of Force to respond to a series of questions (13) in the TRR-I form (issued April 2021), which the Force Review Division will now publishes in its Quarterly Reporting (starting in second quarter of 2021). As above, these duties should be added to the *Firearm*

---

[71] We note, however, that body-worn-camera failures continue to be one of largest de-briefing points, and we recommend expediting reforms to this policy to better address these issues.

*Discharge and Officer Involved Death Incident Response Investigation* policy (G03-06).

On the other hand, there are other policy and training requirements related to the Use of Force section, however, where progress has stalled. For example, the CPD must still revise its *Baton Use Incidents* policy (G03-02-07) to require aid to be provided per ¶216. The CPD must also provide written guidance and training for supervisors on how to effectively use the district-level dashboards and how to provide constructive feedback from use-of-force incidents. *See, e.g.*, ¶253.

The City and the CPD must also continue to address many of the unresolved reporting, planning, data, and training issues identified in our *Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*.[72]

In the fifth reporting period, the City and the CPD dedicated—and continues to dedicate—significant efforts to identifying and addressing data issues, particularly regarding foot pursuits. As we noted in the fourth reporting period, until the CPD can appropriately collect, manage, and analyze data related to the Use of Force section, among others, the City and the CPD cannot sufficiently demonstrate whether the CPD's practices have improved. This will, in turn, prevent the City and the CPD from becoming a true learning agency, capable of reviewing and revising policies and training in a way that is data driven and specific to the needs of Chicago's communities and CPD officers. To be effective, such efforts must continue past the sixth reporting period, but we hope to be able to provide positive updates in our next monitoring report.

***

Specific compliance assessments, by paragraph, for the Use of Force section are included in Appendix 4.

---

[72] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

# V. Recruitment, Hiring & Promotions

## Guiding Principles

The IMT will assess compliance with the Recruitment, Hiring, and Promotions paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *249. Having a department that recruits, hires, and promotes officers who are qualified to meet the increasingly complex needs of law enforcement and that reflects a broad cross section of the Chicago community in which it serves is critical to accomplishing the following goals: running a professional police force; building community trust and confidence; increasing legitimacy and acceptance of CPD's supervision and accountability systems; and reducing perceptions of bias.*

> *250. The provisions of this Agreement are designed to ensure that CPD attracts, hires, retains, and promotes individuals who are equipped to perform their jobs safely, effectively, and in accordance with the law, CPD policy, and the terms of this Agreement. Further, this Agreement is designed to ensure that CPD promotes individuals who are capable of: providing effective supervision; guiding officers under their command on lawful, safe, and effective policing; and holding officers accountable for misconduct.*

> *251. The City and CPD's recruitment, hiring, and promotions policies and practices will show a commitment to attracting, hiring, and promoting qualified candidates at all ranks that reflect a broad cross section of the Chicago community the Department serves.*

> *252. The Parties acknowledge that the City and CPD are currently subject to the City of Chicago Police Department Hiring Plan for Sworn Titles ("Hiring Plan"), dated May 14, 2014, which may be subject to change in the future.*

# Summary of Compliance Efforts and Assessments

## Recruitment, Hiring, and Promotions in the Fifth Reporting Period

In the fifth reporting period, the City and the CPD continued to develop their policies that govern the CPD's recruitment, hiring, and promotions processes. The City and CPD also worked on identifying the entities and roles of those involved in these processes and developing an ongoing assessment of their policies.

The City also made progress toward the requirements of this section by creating IAP 07-01, *CPD Sworn Member Recruitment and Hiring*; IAP 07-02, *CPD Sworn Member Promotions*; and HR CPCD INPC01, *Police Promotions Committee*. These policies assign responsibilities to specific City entities regarding policies and procedures necessary for implementing the City and CPD's recruitment, hiring, and promotion processes. However, the City still needs to consider and, as appropriate, incorporate feedback for these policies from the IMT and the OAG.

Throughout this reporting period, the City, the CPD, the OAG, and the IMT continued to engage in discussions regarding the CPD's recruitment efforts for various positions; hiring and promotional examinations; job descriptions and qualifications; and transparency and awareness around corresponding processes. While hiring continued to be a challenge in 2021, we encourage the CPD to continue developing plans and policies to improve recruiting across its ranks.

## Updated Compliance Levels for the Fifth Reporting Period

Independent Monitoring Report 5 provides compliance assessments of the same 12 paragraphs the IMT addressed in Independent Monitoring Report 4, and the City and the CPD achieved or maintained at least Preliminary compliance with each of these paragraphs during this reporting period.

Specifically, the City maintained Preliminary compliance for one paragraph (¶264), achieved Preliminary compliance for seven paragraphs (¶¶253–54, 256, 258–60, and 262), maintained Secondary compliance for one paragraph (¶261), achieved Secondary compliance for two paragraphs (¶¶255 and 263), and achieved Full compliance for one paragraph (¶257). *See* Recruitment Figure 1 below.

Recruitment Figure 1: Compliance Progress for Recruitment, Hiring & Promotions
Paragraphs at the End of the Fifth Reporting Period (December 31, 2021)

| | |
|---|---|
| Paragraphs in **Preliminary**, **Secondary**, or **Full** Compliance | (8) (3) (1) (12) |
| Paragraphs that have not met Preliminary compliance | (0) |
| Paragraphs Under Assessment for Preliminary compliance | (0) |

## Recruitment, Hiring, and Promotions Progress through Five Reporting Periods

Through five reporting periods, the City recently incorporated requirements of this section into policies and written guidance. Recruitment Figure 2, below, provides a sample of those policies.

Recruitment Figure 2:
Sample of New or Revised Policies
related to the Recruitment, Hiring, and Promotions Section
(between March 1, 2019, and December 31, 2021)[73]

| New or Revised Recruitment, Hiring, and Promotions Related Policies (between March 1, 2019, and December 31, 2021) | Policy # | Issue Date |
|---|---|---|
| ❖ *Recruitment and Hiring Consultant Engagement* (NEW) | SOP 03-01 | 12/31/21 |
| ❖ *Revision, Assessment, and Publication of Class Specifications for CPD Sworn & Civilian Class Titles* (NEW) | HR CPCD INCS01 | 12/31/21 |
| ❖ *Police Promotions Committee* (NEW) | HR CPCD INPC01 | 12/31/21 |
| ❖ *Sergeant and Lieutenant Expert Assessment Standard Operating Procedure* (NEW) | SOP 03-02 | 12/31/21 |

## Looking Ahead to the Sixth Reporting Period

In the fifth reporting period, the City and the CPD continued making progress toward compliance with the Recruitment, Hiring, and Promotions section of the Consent Decree. Recruitment and retention, however, continue to be a challenge for the CPD—and for departments around the country.

---

[73]  Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

The City, however, demonstrated progress with this section near the end of the reporting period. And in addition to the policies referenced above, at the end of the fifth reporting period, the City and the CPD were also continuing to develop new and revised policies and written guidance to make progress in this section:

❖ CPD Sworn Member Recruitment and Hiring (NEW)     IAP 07-01
❖ CPD Sworn Member Promotions (NEW)                 IAP 07-02

While this is the smallest section of the Consent Decree, the City's and the CPD's recruitment, hiring, and promotions efforts are critical to every section of the Consent Decree and the short and long-term success of Chicago's policing efforts.

*** 

Specific compliance assessments, by paragraph, for the Recruitment, Hiring, and Promotions section are included in Appendix 5.

# VI. Training

## Guiding Principles

The IMT will assess compliance with the Supervision paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **265.** *CPD will enhance its recruit training, field training, in-service training, and preservice promotional training so that they are sufficient in duration and scope to prepare officers to comply with CPD directives consistently, effectively, and in accordance with the law, CPD policy, best practices, and this Agreement.*

> **266.** *CPD training will reflect its commitment to procedural justice, de-escalation, impartial policing, and community policing.*

> **267.** *CPD training will convey CPD's expectations that officers perform their jobs diligently and safely, and have an understanding of, and commitment to, the constitutional rights of the individuals they encounter.*

> **268.** *The training required under this Agreement is set out in this section and, for specific topic areas, in the Community Policing, Impartial Policing, Crisis Intervention, Use of Force, Officer Wellness and Support, and Accountability and Transparency sections.*

## Summary of Compliance Efforts and Assessments

### Training in the Fifth Reporting Period

In the fifth reporting period, the City and the CPD continued to develop their policies, directives, and plans that govern the CPD's training and training-evaluation processes. To that end, and throughout this reporting period, the City, the CPD, the OAG, and the IMT continued to engage in discussions regarding the CPD's training and training evaluation efforts for various positions and transparency and awareness around corresponding processes.

Specifically, the City made progress toward the requirements of the Training section by submitting for review, and to some extent implementation, the *2022 Training Plan*, the *Needs Assessment* for the *2022 Training Plan,* and critical Training Directives, S11-10 and S11-11. These policies, plans, and directives assign responsibilities to specific City entities regarding policies and procedures necessary for implementing the City and CPD's training processes.

As in previous reporting periods, we again emphasize our request that the City and the CPD produce a finalized training plan with sufficient time for the IMT to review *before* training begins to allow the CPD to make informed and strategic modifications to its training before implementation.

## Updated Compliance Levels for the Fifth Reporting Period

Independent Monitoring Report 5 provides compliance assessments of the same 65 paragraphs. During this reporting period, the City and the CPD were able to achieve or maintain at least Preliminary compliance with 48 of these paragraphs. Specifically, in the fifth reporting period, the City maintained Preliminary compliance for 24 paragraphs (¶¶272–76, 278, 280, 283, 299, 305–07, 317, 319, 320, 321, 323, 328, 331–32, 335, 337–38, and 340), achieved Preliminary compliance for 22 paragraphs (¶¶277, 279, 282, 284–85, 289, 292, 295–97, 300, 303–04, 308–10, 324, 326–27, 329, and 333–34), maintained Secondary compliance with one paragraph (¶322), and achieved Secondary compliance for two paragraphs (¶¶270–71). The City failed to reach Preliminary compliance for 16 paragraphs (¶¶281, 286–88, 290–91, 294, 301, 311–16, 336, and 339. *See* Training Figure 1 below.

Training Figure 1:                    Compliance Progress for Training
Paragraphs at the End of the Fifth Reporting Period (December 31, 2021)



Paragraphs in **Preliminary**, **Secondary**, or **Full** Compliance (46) (3) (49)
Paragraphs that have not met Preliminary compliance (16)
Paragraphs Under Assessment for Preliminary compliance (0)

This includes the fact that, as a result of providing insufficient evidence to maintain compliance, the City also lost at least one level compliance with six paragraphs (¶¶291, 294, 315–16, 336, and 339). *See* Training Figure 2 below.

<span style="color:#2E74B5">Training Figure 2:</span>
<span style="color:#2E74B5">Lost Levels of Compliance in the Training Section</span>



## Training Progress through Five Reporting Periods

Through five reporting periods, the City and the CPD have incorporated require-ments of the Training section into policies and written guidance. <span style="color:#2E74B5">Training Figure 3</span>, below, provides a sample of those policies.

<span style="color:#2E74B5">Training Figure 3:</span>
<span style="color:#2E74B5">Sample of New or Revised Policies</span>
<span style="color:#2E74B5">related to the Training Section</span>
<span style="color:#2E74B5">(between March 1, 2019, and December 31, 2021)[74]</span>

| New or Revised Training Related Policies (between March 1, 2019, and December 31, 2021) | Policy # | Issue Date |
|---|---|---|
| ❖ *Training Oversight Committee* | S11-11 | 12/10/21 |
| ❖ *Recruit Training* | S11-10-01 | 12/29/21 |

---

[74]  Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, <span style="color:#2E74B5">https://home.chicagopolice.org/in-side-cpd/department-directives-system-dds/</span>.

| New or Revised Training Related Policies (between March 1, 2019, and December 31, 2021) | Policy # | Issue Date |
|---|---|---|
| ❖ *Pre-Service Training* | S11-10-02 | 12/29/21 |
| ❖ *In-Service Training* | S11-10-03 | 12/29/21 |
| ❖ *Department Training* | S11-10 | 12/29/21 |
| ❖ *Returning Service Officer* | E04-05 | 12/30/21 |

Through five reporting periods, the City and the CPD have developed or updated many training materials to incorporate requirements across the Consent Decree section. Many of these trainings are reflected in the corresponding sections of this report.

## Looking Ahead to the Sixth Reporting Period

In the fifth reporting period, the City and the CPD continued making progress toward compliance with the Training section of the Consent Decree. Some of these efforts were continuing at the end of the fifth reporting period. For example, the City and the CPD were continuing to develop the *Field Training and Evaluation Program* policy (S11-02) and the 2022 Training Plan.

Likewise, as reflected throughout the section of this report, the City and the CPD were working to developed and revise several training materials and curricula. This includes, for example, training regarding Active Bystandership, Gender-Based violence, and 2022 Supervisor in-service training.

Finally, the CPD has also been planning to improve and automate its training tracking system, which will greatly improve the CPD's ability to demonstrate compliance and effectively track and manage its training efforts.

\*\*\*

Specific compliance assessments, by paragraph, for the Training section are included in Appendix 6.

# VII. Supervision

## Guiding Principles

The IMT will assess compliance with the Supervision paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **341.** Effective supervisors, who lead by example and actively engage with the subordinates under their direct command, play a critical role in ensuring lawful, safe, effective, and community-centered policing. To achieve this outcome, the Parties agree to the requirements set out below.

> **342.** The provisions of this Agreement are designed to ensure that CPD supervisors provide the effective supervision necessary for members to perform their duties lawfully, safely, and effectively and for members to improve and grow professionally. Further, the provisions of this Agreement are designed to allow supervisors to spend time monitoring and training members under their direct command so as to provide adequate opportunities to prevent, promptly identify, and promptly correct adverse officer behavior. This meaningful supervision will facilitate the establishment and re-enforcement of a culture of community policing, community and officer safety, and accountability throughout the Department.

> **343.** CPD should have the staffing necessary to promote lawful, safe, effective, and community-centered policing; provide effective supervision; ensure officer safety and accountability; and implement the terms of this Agreement.

> **344.** Immediate supervisors of all ranks are responsible for supervising, managing, and overseeing, as appropriate, the day-to-day work activities of members under their direct command.

> **345.** Supervisors of all ranks are accountable for the performance of subordinate members directly observed or under their direct command.

> **346.** Effective supervisors will: a. engage in activities and conduct that support the mission and goals of the Department, including those set forth in this Agreement; b. model appropriate

*conduct, including abiding by high standards of integrity and adhering to the United States Constitution and other laws, CPD policy, and the terms of this Agreement; and c. consistently demonstrate professionalism, courtesy, and respect towards all people with whom they interact.*

# Summary of Compliance Efforts and Assessments

## Supervision in the Fifth Reporting Period

Much of the City's and the CPD's efforts in the Supervision section of the Consent Decree rely on the concepts of unity of command and span of control. Unity of command requires that the same sergeant supervise the same group of police officers. Each group of 10 or fewer officers will have a single, identifiable supervisor who will share the same start time and day-off group and will patrol the same geographic location every day. Span of control limits the number of officers any one sergeant can supervise daily. The goal of span of control is to create a consistent ratio of 10 officers to 1 sergeant. This is a fundamental change from the current model of shift (watch) scheduling.

The Unity of Command and Span of Control Pilot Program was launched to implement these concepts to enable more effective and efficient supervision, mentoring, officer support, and policing. The Unity of Command and Span of Control Pilot program began in the 6th District during the second reporting period. In the fourth reporting period, the CPD expanded the pilot into the 4th and 7th districts. In early 2022, the CPD also intends to begin the Performance Evaluation System and Officer Support System Pilot Programs—which are also critical to the Supervision section and other sections of the Consent Decree.

The City and the CPD made significant progress with a number of Supervision paragraphs during the fifth reporting period by finalizing four key policies:

(1) *Unity of Command and Span of Control Schedule – Pilot Program*, D20-02

D20-02 addresses various requirements of the Consent Decree, such as clearly defining unity of command and span of control, acknowledging staffing requirements, and identifying a visual data tracking mechanism.

(2) *Performance Evaluation System Pilot Program*, D21-09

D21-09 provides an outline for supervisors to recognize and document the job performance of CPD personnel under their command while incorporating specific quantitative and qualitative performance metrics.

(3) *Officer Support System (OSS) Pilot Program*, D20-04

D20-04 is designed to assist supervisors in proactively supporting sworn members of the Department and to support the well-being of members in a non-disciplinary manner.

(4) *Performance Recognition System*, E05-02

E05-02 provides an assessment tool for assisting Department supervisors in recognizing and documenting the job performance of members under their command.

The development of these four key policies enabled the City and the CPD to achieve or maintain Preliminary compliance with several Consent Decree paragraphs. However, the City and the CPD did not achieve additional levels of compliance because training materials and technology systems are still in the process of being developed and will ultimately need to be implemented department-wide.

We reviewed several training materials specifically designed to support policies and other supervisory responsibilities. These trainings included the *2022 In-Service Supervisors Training*, the *Pre-Service Promotional Training*, and the *Performance Evaluation System Pilot Training*.

In addition to reviewing various policies and trainings throughout the fifth reporting period, the IMT attended meetings with the City, the CPD, and the OAG at least twice a month to discuss various topics associated the requirements of the with Supervision section. During these meetings, the City and the CPD provided the IMT with updates about compliance progress. Further, the IMT conducted site visits in October 2021 to hear directly from CPD personnel concerning the implementation of Unity of Command and Span of Control program within the three pilot districts. The IMT also observed the *Pre-Service Sergeants Training* during the reporting period.

The IMT appreciates the CPD's continued efforts to implement the Unity of Command and Span of Control pilot programs in the 4th, 6th, and 7th districts. However, the implementation continues to face the same challenges highlighted in the previous reporting periods. In the fourth reporting period, we noted that the City and the CPD took large steps toward compliance with various Supervision paragraphs by finalizing the *Supervisory Responsibilities* policy (G01-09), expanding the Unity of Command and Span of Control pilot program from one district (the 6th district) to three districts (the 4th, 6th, and 7th districts), and making great efforts in developing the *Performance Evaluation System Pilot Program* policy (D21-09).

Still, we expressed concerns about the implementation of the Unity of Command and Span of Control program, which faced challenges due to staffing shortages

that prevented the pilot districts from consistently meeting the 10-to-1 officer-to-supervisor ratio required by ¶360 of the Consent Decree. We learned that officers were not being consistently overseen by the same supervisors, as envisioned by the pilot program. We also heard frustrations from officers regarding the staffing shortages, which not only hampered compliance with the program, but also created situations in which understaffing could have reduced officer safety. In the fifth reporting period, these challenges remain, and will need to be meaningfully addressed to effectively implement this program.

Insufficient staffing continues to prevent the districts from achieving the requisite 10-officers-to-1-supervisor ratio, leading to frustrations among officers and sergeants in these districts. The City and the CPD need to critically review their capacity to comply with the program and evaluate the changes that may be made to reach the goals set out by the pilot program and the Consent Decree. Because the goal is to eventually expand this pilot program across Chicago, the CPD should focus resources and planning on how it may eventually expand the program and effectively implement the Unity of Command and Span of Control principles department wide. As we noted last reporting period, it is also be important for the City and the CPD to utilize appropriate data systems and dashboards to track compliance with the pilot program and identify areas for continued improvement.

The CPD has chosen to also begin implementing the pilots for the Performance Evaluation System and Officer Support System Pilot Programs in the same districts as the Unity of Command and Span of Control program. We believe that it makes sense to think of these pilots and efforts together, because they all rely on effective supervision. As a result, however, the difficulties in fulfilling the requirements with the Unity of Command and Span of Control program will also cause difficulties in achieving the goals of these other pilot programs.

Finally, the CPD has also convened a Unity of Command and Span of Control Pilot Program Evaluation Committee, which is to meet at least quarterly to discuss implementation progress and share feedback from CPD personnel. This committee will play an important role in the program's effective implementation. The CPD has also recently added similar tasks to this committee for the Performance Evaluation System and Officer Support System Pilot Programs. The IMT hopes that the committee will anticipate and address some of the possible challenges to ensure a smoother implementation process.

## Updated Compliance Levels for the Fifth Reporting Period

Overall, we assessed the City's compliance with 20 Supervision paragraphs during the fifth reporting period (¶¶348, 350, 352–56, 360–364, 368, and 370–76). In the fifth reporting period, the City and the CPD maintained Preliminary compliance for those nine paragraphs (¶¶348, 350, 353–355, 360, 364, and 368) and achieved

Preliminary compliance for 11 paragraphs (¶¶352, 361–363, and 370–376). The City did not reach any level of compliance with one paragraph (¶356). *See* Supervision Figure 1 below.

Supervision Figure 1: Compliance Status for Supervision Paragraphs at the End of the Fifth Reporting Period (June 30, 2021)

| | |
|---|---|
| Paragraphs in Preliminary, Secondary, or Full Compliance | (19) |
| Paragraphs that have not met Preliminary compliance | (1) |
| Paragraphs Under Assessment for Preliminary compliance | (0) |

## Supervision Progress through Five Reporting Periods

Through five reporting periods, and as referenced above, the City and the CPD have committed several reforms from the Supervision section into various policies and written guidance. Supervision Figure 2, below, provides a sample of those policies.

Supervision Figure 2:
Sample of New or Revised Policies
related to the Supervision Section
(between March 1, 2019, and December 31, 2021)[75]

| | Policy # | Issue Date |
|---|---|---|
| ❖ *Officer Support System (OSS) – Pilot Program* | D20-04 | 12/30/2021 |
| ❖ *Performance Evaluation System – Pilot Program* | D21-09[76] | 12/10/2021 |
| ❖ *Unity of Command and Span of Control Schedule – Pilot Program* | D20-02 | 12/10/2021 |
| ❖ *Supervisory Responsibilities* | G01-09[77] | 5/10/2021 |

---

[75] Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

[76] Early versions of the *Performance Evaluation System – Pilot Program* Directive were numbered D21-03 and D02-09. The finalized version of the policy, which was submitted this reporting period, is D21-09. For consistency, we refer to the *Performance Evaluation System – Pilot Program* Directive as D21-09 throughout this report.

[77] Early versions of the *Supervisory Responsibilities* General Order were numbered G01-07 and G01-08. The finalized version of the policy, which was submitted in the fourth reporting period, is G01-09. For consistency, we refer to the *Supervisory Responsibilities* General Order as G01-09 throughout this report.

Through five reporting periods, the City and the CPD have also developed or updated training materials to incorporate requirements from the Supervision section. Supervision Figure 3 provides a sample of training materials related to Supervision that were developed or revised since the start of the Consent Decree.[78]

Supervision Figure 3:
Sample of New or Revised Trainings Materials
related to the Supervision Section
(between March 1, 2019, and December 31, 2021)[79]

| ❖ Emotional Intelligence for Supervisors Pre-Service Training | 2021 |
| ❖ Performance Evaluation System Pilot Training | 2021 |
| ❖ Performance Evaluation System eLearning | 2021 |
| ❖ Pre-Service Promotional Training | 2021 |
| ❖ In-Service Supervisors Training | 2021 |
| ❖ Officer Support System Training for Supervisors | 2021 |

## Looking Ahead to the Sixth Reporting Period

The IMT looks forward to the implementation of the pilot programs and the ability to observe trainings during the sixth reporting period. The effective implementation of these pilot programs will help to provide proof-of-concept for district-wide reforms. Additionally, we will review supervisory logs, which outline supervisor activity and tasks throughout each shift. This information, along with upcoming site visits, will provide the IMT with a better understanding of the practical application of many related Consent Decree requirements. Further, the IMT looks forward to the development of data tracking mechanisms that will provide robust information about the efficacy of the pilot programs' implementation. While a relatively small section of the Consent Decree, many of the CPD's reform efforts, including updated policies and training, ultimately rely on the CPD's ability to ensure consistent and effective supervision across each district.

***

Specific compliance assessments, by paragraph, for the Supervision section are included in Appendix 7.

---

[78] As detailed in Appendix 7 (Supervision), the City and the CPD may still need to demonstrate that they effectively provided all these trainings to the requisite personnel.

[79] Some of these trainings may not have been provided to 95% of personnel at the time of this report.

# VIII. Officer Wellness and Support

## Guiding Principles

The IMT assessed compliance with applicable Officer Wellness and Support paragraphs in accordance with the Consent Decree's "Guiding Principles." These guidelines "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *377. In fulfilling their duties, CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy. There is growing recognition that psychological and emotional wellness are critical to officers' health, relationships, job performance, and safety. The City and the CPD have an obligation to help CPD members cope with the consequences that come from their service to the public.*

> *378. The City and the CPD's obligation to CPD members includes providing adequate support systems to treat members experiencing mental health, substance abuse, and other emotional challenges.*

> *379. The City and the CPD's obligation to CPD members also includes equipping them in a manner that enables them to do their jobs as safely as reasonably possible. CPD will ensure that the safety of its members is not jeopardized by equipment and technology that is outdated, broken, or in need of repair or replacement.*

> *380. The City and the CPD will implement the following requirements in order to achieve a healthy, effective, and constitutionally compliant police force.*

## Summary of Compliance Efforts and Assessments

### Officer Wellness and Support in the Fifth Reporting Period

In the fifth reporting period, the City and the CPD continued to make progress toward compliance with several requirements in the Officer Wellness and Support section. The City and the CPD have been intentional about establishing programs that promote mental-health and wellness, including support systems that seek to enhance the longevity of careers, promote a keen awareness for personal growth and development, and enhance officer safety.

Recognizing that officer health and wellness is multi-faceted, the specific topical areas in the Officer Wellness and Support section intersect with various other sections of the Consent Decree. The integration of these topics will be critical for the CPD's long-term goals towards compliance. For example, while a specific training course may touch upon various topics, the CPD should strive to reinforce concepts of employee wellness whenever possible.

As stated in the guiding principles (*see* ¶377–80), CPD personnel are exposed to significant danger, stress, and human tragedy. CPD personnel should receive adequate support systems to help them cope with the consequences that come from their service. Additionally, the City and the CPD must provide these supports to help achieve healthy, effective, sustainable, and constitutional police practices. To ensure these supports are high quality, and in line with best practices, routine evaluations of these programs, including the referral practices and process evaluations, are critical. Similarly, the division providing support to CPD personnel must adhere to high standards and provide consistent and reliable services. The CPD must continue to prioritize the knowledge, skills, and abilities of those providing counseling to the CPD membership, as well as their certifications, training, and selection processes.

During the fifth reporting period, the IMT met with the Professional Counseling Division personnel. Specifically, we met with the Professional Counseling Division Director, clinicians, chaplains, peer-support officers, and the drug and alcohol counselors. The IMT also observed in-service training on officer wellness and reviewed several policies and trainings regarding officer wellness and support. These materials included the *Chaplains Unit Standard Operating Procedure (SOP)*, the *Peer Support 8-Hour Refresher Training* materials, and the *Employee Assistance Program (EAP) Pre-Service Promotional Training* materials.

At the end of the fifth reporting period, the Professional Counseling Division was staffed with 11 licensed clinicians. This was also in addition to the Professional Counseling Division's Director and Assistant Director, who provide a variety of wellness services to officers through various programs. In future reporting periods, the Professional Counseling Division plans to hire *11 additional clinicians* and add two additional office spaces to maximize the services provided to CPD personnel and ensure representation throughout the district.

To ensure the CPD is providing efficient and effective wellness services to CPD personnel, the City and the CPD must obtain and implement appropriate technology solutions. Such systems are needed to accurately track services and to obtain and analyze honest feedback from CPD personnel who utilize those services. Without the ability to track such items, the CPD lacks the capacity to empirically assess or demonstrate its successes and identify areas of improvement. Recently, the

CPD informed us that they have obtained a technology solution, iCarol.[80] We look forward to seeing the implementation of this technology.

## Updated Compliance Levels for the Fifth Reporting Period

Overall, the IMT assessed the City's compliance with 36 Officer Wellness and Support paragraphs in the fifth reporting period (¶¶381–402, 404, and 406–18). We assessed all of these in previous reporting periods.

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with 17 paragraphs (¶¶388, 394–400, 402, 404, 407–11, 414, and 418), reached Preliminary compliance with two paragraphs (¶¶412–13), maintained Secondary compliance with 13 paragraphs (¶¶381–87, 390–93, 401, and 406), and failed to reach Preliminary compliance with four paragraphs (¶¶389 and 415–17). *See* Officer Wellness Figure 1 below.

Officer Wellness Figure 1:  Compliance Progress for Officer Wellness Paragraphs at the End of the Fifth Reporting Period (December 31, 2021)

| | |
|---|---|
| Paragraphs in **Preliminary**, **Secondary**, or **Full** Compliance | (19) (13) (32) |
| Paragraphs that have not met Preliminary compliance | (4) |
| Paragraphs Under Assessment for Preliminary compliance | (0) |

## Officer Wellness and Support Progress through Five Reporting Periods

Since the inception of the Consent Decree on March 1, 2019, the City and the CPD have developed and implemented several policies and trainings related to Officer Wellness and Support. The following Officer Wellness and Support policies have been implemented under the Consent Decree (between March 1, 2019, and December 31, 2021).

---

[80]  *See About*, ICAROL, https://www.icarol.com/about/.

Officer Wellness Figure 2:
Sample of New or Revised Policies
related to the Officer Wellness Section
(between March 1, 2019, and December 31, 2021)[81]

|  | Policy # | Issue Date |
|---|---|---|
| ❖ *Chaplains Unit Standard Operating Procedure* | 20-01 | 10/1/2021 |
| ❖ *Traumatic Incident Stress Management Program (TISMP) Directives* (NEW) | E06-03 | 3/17/2021 |
| ❖ *Professional Counseling Division (PCD) Policy* (NEW) | E06-01 | 5/17/2020 |
| ❖ *Professional Counseling Division (PCD) Standard Operating Procedure* | 19-01 | 5/17/2020 |
| ❖ *Officer Support Plan* (NEW) | New | 2/10/2020 |
| ❖ *Firearms Owner's Identification Card (FOID) Standard Operating Procedure* | 19-01; E01-17 | 12/20/2019 |

Additionally, since the inception of the Consent Decree, the City and the CPD have worked to implement new and revised trainings related to Officer Wellness and Support. The following Officer Wellness and Support trainings have been developed under the Consent Decree (between March 1, 2019, and December 31, 2021).[82]

Officer Wellness Figure 3:
Sample of New or Revised Trainings Materials
related to the Officer Wellness Section
(between March 1, 2019, and December 31, 2021)[83]

| New or Revised Officer Wellness Related Training Materials (between March 1, 2019, and December 31, 2021) | Date |
|---|---|
| ❖ *Firearms Owner's Identification Card (FOID) Training* | 2/14/2020 |
| ❖ *EAP Pre-Service Promotional Training* | 12/2/2021 |
| ❖ *Chaplains Unit Training Deck: Overview of SOP 20-01* (NEW) | 11/1/2020 |
| ❖ *Peer Support Program Training (40 Hours)* | 8/19/2020 |

---

[81]  Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/in-side-cpd/department-directives-system-dds/.

[82]  As detailed in Appendix 8 (Officer Wellness and Support), the City and the CPD may still need to demonstrate that they effectively provided all these trainings to the requisite personnel.

[83]  Some of these trainings may not have been provided to 95% of personnel at the time of this report.

| New or Revised Officer Wellness Related Training Materials (between March 1, 2019, and December 31, 2021) | Date |
|---|---|
| ❖ *2021 In-Service Wellness Training* | 6/14/2021 |
| ❖ *Peer Support 8 Hour Refresher* (NEW) | 12/2/2021 |
| ❖ *EAP Recruit Training* | 2/3/2021 |
| ❖ *Peer Support for Public Safety Summary of Training Subjects* | 8/19/2020 |
| ❖ *Peer Support Training and Consultation Program Synopsis* | 8/19/2020 |
| ❖ *Training Experts Materials* (NEW) | 8/26/2020 |
| ❖ *Stress Management & Resilience Course* (NEW) | 9/24/2020 |
| ❖ *EAP Training* | 5/6/2020 |

While these trainings have been implemented, the IMT has not seen sufficient records for every training to show that at least 95% of personnel have completed the trainings. We look forward to evidence that the trainings have been completed in future reporting periods.

Additionally, as reflected in the below chart, the *Employee Assistance Program (EAP) Recruit Training* (¶¶412 and 414) and the Traumatic Incident Stress Management Program (also known as TISMP) Clinicians Training (¶¶407–09) were still in development at the end of the fifth reporting period. The EAP Recruit Training will provide recruits with stress management, addiction treatment, officer wellness, and support services training. Including these topics in trainings for recruits during their academy training ensures that they are presented with the realities of policing early in their career. But more importantly, it offers personal accountability measures, knowledge of available and evolving resources, and an understanding of the priority of officer wellness via self-care and organizational support.

## Looking Ahead to the Sixth Reporting Period

Since the inception of the Consent Decree, the City and the CPD have made significant progress under the Officer Wellness and Support sections. To date, the CPD has made efforts to review and revise officer-wellness policies, lesson plans, strategies, and trainings to ensure that quality trainings are presented to the CPD membership in the most timely and efficient manner.

At the end of the fifth reporting period, the City and the CPD's efforts were ongoing. For example, the CPD continues to develop *Traumatic Incident Stress Management Program Clinicians Training*. We note, however, that many of the trainings for this section have only been for sworn CPD personnel. We look forward to learning more about how the CPD plans to provide supports to non-sworn members.

Further, while the City and the CPD have made significant progress towards compliance with the Officer Wellness and Support section of the Consent Decree, they still have considerable work to complete. For example, pursuant to ¶¶415–17, the City and the CPD must develop a policy (1) to direct the completion of a department-wide equipment and technology audit, (2) to create a plan to prioritize and address equipment and technology needs within 90 days of the audit, and (3) to develop a schedule for future periodic audits.

By conducting a quality audit of both equipment and technology, the CPD will be able to determine:

(1) the precise accounting of specific units distributed to personnel;

(2) the available surplus to be used as spares for equipment that needs repair, temporary, or permanent replacement;

(3) the condition of the units' working condition or inoperable equipment;

(4) the lifespan of the equipment and technology;

(5) a replacement schedule for equipment;

(6) a non-disruptive process for replacing multiple units that may require a department wide distribution; and

(7) a budget strategy that could be used to purchase those items that will need to be replaced in the future.

Likewise, the lack of technology solutions is preventing the City and the CPD from adequately collecting necessary data related to the officer wellness services. These technology solutions are necessary for the City and the CPD to manage and assess the officer-wellness services that are offered or needed. The City and the CPD will also need to train the Professional Counseling Division personnel to appropriately analyze data on the Traumatic Incident Stress Management Program compliance.

The CPD's Officer Wellness and Support efforts have been admirable and continued progress is critical. We hope to be able to provide positive updates in our next monitoring report regarding additional policy development, training attendance records, and data solutions.

*** 

Specific compliance assessments, by paragraph, for the Officer Wellness and Support section are included in Appendix 8.

# IX. Accountability and Transparency

This is the Accountability and Transparency section of the Independent Monitoring Team's (IMT's) fifth semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago (City) and its relevant entities' Accountability and Transparency compliance efforts from July 1, 2021, through December 31, 2021.

## Guiding Principles

The IMT assessed compliance with applicable Accountability and Transparency paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *419. Holding public servants accountable when they violate law or policy is essential to ensuring legitimacy and community confidence.*

> *420. A robust and well-functioning accountability system in which CPD members are held to the highest standards of integrity is critical to CPD's legitimacy and is a priority of CPD. A culture of accountability also promotes employee safety and morale, and improves the effectiveness of CPD operations. Organizational justice also plays an important role in ensuring that CPD members have confidence in the legitimacy of the system that holds them accountable.*

> *421. In order to foster public trust and receive critically important community feedback, and promote confidence in CPD, the City and CPD will ensure the process for submitting and pursuing complaints that allege violations of CPD policy or the law by CPD members is open and accessible for all individuals who wish to file complaints.*

> *422. Meaningful community involvement is imperative to CPD accountability and transparency. Nothing in this Agreement should be construed as limiting or impeding community participation in CPD's accountability system, including the creation and participation of a community safety oversight board. OAG and the City acknowledge the significant work many of Chicago's community organizations have undertaken and are continuing to undertake, including work alongside CPD, in the area of police*

*reform and accountability, and OAG and the City know this critical work will continue.*

**423.** *The City, CPD, and COPA will ensure that all complaints of misconduct, whether from internal or external sources, are thoroughly, fairly, timely, and efficiently investigated in accordance with this Agreement; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all CPD members who commit misconduct are held accountable pursuant to a disciplinary system that is fair, timely and consistent, and provides due process.*

# Summary of Compliance Efforts and Assessments

## Accountability and Transparency in the Fifth Reporting Period

The Accountability and Transparency section of the Consent Decree requires reform efforts from many City entities. The reach of the section is vast—implicating several City entities—and is motivated by the guiding principles at the outset of the Section (¶¶419–423), the first of which states "[h]olding public servants accountable when they violate law or policy is essential to ensuring legitimacy and community confidence." ¶419.

The Accountability and Transparency section of the Consent Decree explicitly sets obligations for several City entities: the Chicago Police Department (CPD) and the CPD's Bureau of Internal Affairs (BIA), the Office of the Inspector General's (OIG) Deputy Inspector General for Public Safety (Deputy PSIG), the Civilian Office of Police Accountability (COPA), and the Police Board. In addition, some of the requirements of the Accountability and Transparency section call for action by the City at large.

While all entities are working toward improving a common goal of increased accountability and transparency, these entities work toward this goal in different manners as appropriate for each entity, and as indicated by the Consent Decree. These entities have found success in complying with the requirements set out in the Accountability and Transparency section at different paces and to varying degrees. The Deputy PSIG, for example, reached Full compliance with all requirements pertaining to the Deputy PSIG in the fourth reporting period and maintained that Full compliance during the fifth reporting period. COPA and the Police Board have developed and followed plans that have allowed them to consistently gain compliance with various requirements of this section in the past few reporting periods. The CPD has followed a less methodical path toward compliance with the Accountability and Transparency requirements, and because of this, has fallen behind in complying with Accountability and Transparency paragraphs.

## Updated Compliance Levels for the Fifth Reporting Period

Overall, the IMT assessed the City's compliance with 133 Accountability and Transparency paragraphs. With the combined efforts of all the City entities noted in this section, the City moved into Preliminary compliance with 46 paragraphs in the fifth reporting period (¶¶424–29, 432, 436, 439, 441, 447–49, 452, 454–57, 462, 467, 471–72, 474–76, 482–83, 493, 496–97, 499–500, 502, 504, 506–07, 515, 518, 522, 523–24, 540–42, and 551). The City also moved into Secondary compliance with two paragraphs (¶¶430 and 550) and reached Full compliance with one paragraph (¶555). The City maintained Preliminary compliance with 10 paragraphs (¶¶431, 437, 470, 473, 477, 525, 532, 548–49, and 553) and Secondary compliance with three paragraphs (¶¶442, 498, and 511). The City also maintained Full compliance with 16 paragraphs (¶¶533–39, 554, 556–59, 561–63, and 565). The City did not reach any level of compliance with 53 paragraphs (¶¶433–34, 438, 440, 443–45, 450–51, 453, 459, 460–61, 463–66, 468–69, 478–81, 484–92, 494–95, 501, 503, 505, 508–09, 512–14, 516–17, 519, 526–30, 545–47, and 552.[84] The City remained under assessment for Preliminary compliance with two paragraphs (¶¶435 and 543).

*See* Accountability Figure 1 below.

Accountability Figure 1:    Compliance Progress for Accountability & Transparency Paragraphs at the End of the Fifth Reporting Period (June 30, 2021)



This includes the fact that the City also lost a level compliance with one paragraph (¶530). *See* Accountability and Transparency Figure 2 below.

Accountability Figure 2:
Lost Levels of Compliance in the Accountability and Transparency Section



---

[84]    For one of these paragraphs, ¶530, the City fell out of compliance. It had previously achieved Preliminary compliance with this paragraph in the third reporting period.

### Accountability and Transparency Progress through Five Reporting Periods and Looking Ahead to the Sixth Reporting Period

Given the variable nature of the Accountability and Transparency Section requirements for each City entity, we provide a summary of each entities' efforts in turn, below.

#### The Chicago Police Department (CPD)

In the fifth reporting period, the CPD found some success in reaching compliance levels with some Accountability and Transparency requirements. The root of these accomplishments lay in two notable efforts (1) the finalization of a suite of policies aimed at codifying a variety of Accountability and Transparency requirements in Department-wide General Orders and Special Orders; and (2) BIA's refined quarterly and annual reports. These efforts allowed the CPD to move into compliance levels for various paragraphs. However, the CPD and BIA face an uphill climb toward refining their systems and approach to work toward compliance more consistently.

We monitored the CPD's progress in the fifth reporting period in a variety of ways, including but not limited to attending frequent meetings with BIA to obtain updates on efforts and ask questions, reviewing draft policies and training materials, observing BIA and Accountability Sergeant Onboarding Training, conducting site visits to gain insight from Accountability Sergeants, BIA trainers, and BIA investigators.

As noted above, the CPD has not found rhythm in its efforts toward compliance with the Accountability and Transparency section. Often it seems the CPD has yet to develop and thereafter follow a clear, attainable path that will bring the CPD into compliance with requirements in this section. Most illustrative of the CPD's lack of plan for compliance is the number of draft policies and trainings that the CPD and BIA have provided for review. Despite receiving timely IMT and OAG feedback, the CPD and BIA have finalized only a small portion of those materials. Creating and submitting these draft policies and training undoubtedly required a lot of personnel and time. Unfortunately, these efforts have resulted in little notable progress in complying with the Consent Decree, because the CPD and BIA have not followed through with revising and eventually finalizing these materials. The Consent Decree requires that the CPD and BIA submit draft policies and trainings and engage in a collaborative review and revision process until the IMT and OAG have no objection to the drafts. *See* ¶627–28. Thereafter the CPD and BIA finalize and

implement these materials.[85] We encourage the CPD and BIA to focus on the quality of a few policies and trainings at a time, revising those trainings and policies as required by the Consent Decree. Follow through from draft to final product for policies, procedures, plans, and training will help the CPD reach additional levels of compliance.

In the final months of the fifth reporting period, the CPD and BIA began to demonstrate a more focused and methodical approach toward compliance—and this allowed them to reach some level of compliance for several paragraphs. Instead of aiming to draft or revise a plethora of policies or trainings, the CPD focused in on revising and refining five discrete department-wide policies:

1. G08-01, *Complaint and Disciplinary System*;
2. G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*;
3. G08-01-03, *Conflict of Interest*;
4. S08-01, *Complaint and Disciplinary Investigators and Investigation*; and
5. S08-01-04, *Post-Investigation Log Number Procedures*.

Dedicating significant attention to this discrete set of policies allowed the CPD and BIA to consistently engage with the Independent Monitoring Team (IMT) and the Office of the Attorney General (OAG) to revise and refine the policies. As a result, the CPD and BIA were able to more quickly revise and resubmit drafts of these polices. Once the CPD and BIA became more attentive of these draft policies and the comments the IMT and the OAG provided on those policies, the CPD's and BIA's revisions became more meaningful and impactful.

Ultimately, the CPD submitted these policies for public comment, and on the final day of the reporting period, finalized and implemented these policies. The finalization of these policies brought the CPD into Preliminary compliance with several Consent Decree paragraphs. Together these policies begin to lay a foundation for CPD's administrative investigations of alleged misconduct of CPD employees—setting out clear guidelines, expectations, and processes. Some of the more notable elements of these policies include:

- The CPD raised the minimum standards required for an officer to become an investigator. *See* S01-01, Section VI.
- The CPD clearly outlined the CPD's disciplinary process. *See* G08-01.

---

[85] Policies and procedures required by the Consent Decree must also be posted for public comment for a period of at least 15 days. *See* ¶633. In addition, the Accountability and Transparency section requires that "To the extent permissible by law, within 60 days of its implementation, each CPD policy and directive, including those created pursuant to this Agreement, will be posted online and otherwise made publicly available. Any exception will be limited to documents that must remain confidential to protect public safety, and as approved by the Superintendent." ¶545.

- The CPD clarified that a sworn affidavit is not required to conduct a preliminary investigation into a complaint. *See* G08-01, Section V.H.
- The CPD provided detailed instructions regarding the proper initial steps of an initial investigation and the reporting of misconduct to COPA. *See* G08-01-02, Section IV.C.
- The CPD set out a standard for communication and follow up with any individual who makes a complaint regarding a CPD employee's misconduct. *See* S08-01-04, Section V.

Our only criticism of the accomplishment is the timing of the underlying efforts. The CPD produced initial drafts of three of the five of these policies in 2020, with G08-01-02 first being produced in January 2020. Often, several months would pass after we provided comments and feedback before we would receive a revised draft of one of these policies. But, as the close of the fifth reporting period drew nearer, the CPD became focused on these policies not only quickly turning back revisions, but also asking the IMT and the OAG to provide expedited review. While the IMT has and will provide expedited review to accommodate the CPD's goals at times, we will not continue to allow the CPD's procrastination to force such expedited reviews that, if occurring too often, can reduce the quality of revisions and suggestions for improvement on policies or training materials. We understand that the CPD and BIA are motivated by the end of the reporting period, however the CPD and BIA will find the most success under the Consent Decree by becoming motivated by reform year-round.

The CPD and BIA also made significant progress in producing consistent and thorough quarterly and annual reports. Paragraph 550 of the Consent decree requires that the CPD electronically publish quarterly and annual reports that contain a variety of data points. The demands of ¶550 are significant and require the CPD and BIA to accurately record, synthesize, and report a variety of information related to complaints received and investigations undertaken in a meaningful and digestible way. In the fourth reporting period, BIA produced its first and second quarterly reports which we believed to be strong first attempts at these reports. Additionally, the second quarterly report showed improvement over the first report.

BIA built upon these strong efforts in the fifth reporting period. They provided the quarterly report for the fourth quarter of 2020.[86] This quarterly report was further improved compared to the reports provided in the fourth reporting period. This report also demonstrated that BIA has developed a standard or template for compiling these reports. This provides the reader with a format that is consistent from quarter to quarter, allowing the public to become accustomed to the presentation of data and easily compare the reports throughout time. Finally, we note that the

---

[86] The quarterly report for the Fourth Quarter 2020, is available online: https://home.chicagop-olice.org/wp-content/uploads/BIA-Q4-2020-Quarterly-Report-Final-08-July-2021.pdf.

quarterly report for the fourth quarter provides data responsive to all requirements listed in ¶550.

In addition to the quarterly report for the Fourth Quarter 2020, BIA also produced its first Annual Report in the fifth reporting period.[87] The Annual Report is a strong first attempt at an annual report. Like the quarterly reports, the Annual Report is well organized and easily digestible. We believe these quarterly and annual reports are notable steps toward improving transparency with the public regarding accountability efforts undertaken by the CPD. We expect that the CPD and BIA will build upon these efforts providing further improved and timelier annual and quarterly reports in the future.

Although the CPD's efforts under the Accountability and Transparency section were not without challenges, we are hopeful that the CPD has found a rhythm and will be able to develop a realistic, attainable, and progressive plan to further address the requirements of the Consent Decree. In particular, we will look for efforts in further revising various policies in a focused and expeditious manner. We also hope the CPD will begin developing and revising trainings related to the policies it has developed and implemented under the Consent Decree thus far.

### Deputy Inspector General of Public Safety (Deputy PSIG)

In the fourth reporting period, the Deputy PSIG reached Full compliance with all Consent Decree requirements relevant to the Deputy PSIG. In the fifth reporting period, the Deputy PSIG continued to make strong and consistent efforts necessary to maintain Full compliance with all paragraphs. Early in the fifth reporting period, the Deputy PSIG provided documentation and engaged in conversations that demonstrated that the Deputy PSIG had developed a plan to maintain Full compliance. Throughout the fifth reporting period, the Deputy PSIG adhered to the plan set out.[88]

During the fifth reporting period, the IMT regularly met with the Deputy PSIG to discuss the Deputy PSIG's plan for and progress in maintaining Full compliance. We also received and reviewed several records that provided evidence of continued Full compliance.

---

[87] BIA's 2020 Annual report is available online: https://home.chicagopolice.org/wp-content/uploads/BIA_2020_Annual_Report_Final-3.pdf.

[88] In the fifth reporting period, the Deputy PSIG stepped down. Since then, the Interim Acting Deputy PSIG has ensured that efforts compliance with the Consent Decree continue. The change in leadership caused no interruption in maintaining the previously achieved Full compliance with all relevant paragraphs of the Consent Decree. This indicates that the policies and practices implemented by the Deputy PSIG run deep and are not dependent upon a single individual holding the Deputy PSIG position.

Having previously implemented policies and systems that guide efforts related to the Deputy PSIG's obligations under the Accountability and Transparency section of the Consent Decree, the Deputy PSIG stayed the course and maintained Full compliance with all relevant paragraphs.

We expect that the OIG and the Deputy PSIG will continue efforts that will allow it to remain at this level of compliance, because the OIG and the Deputy PSIG have implemented processes that guide it toward compliance.

## Civilian Office of Police Accountability (COPA)

In the fifth reporting period, COPA continued making progress toward compliance with Accountability and Transparency requirements. COPA previously developed and has consistently worked from a detailed plan to ensure their policies and procedures are revised and comply with the requirements of the Consent Decree. COPA also developed a training plan that is detailed and attainable. Following the plan, COPA has moved into Secondary compliance for many Consent Decree paragraphs. Although the IMT met with COPA less this period due to the change from a bi-weekly meeting schedule to a monthly meeting schedule, they continued to show extreme dedication to the Consent Decree. COPA ensured that progress toward compliance never slowed during the fifth reporting period.

During the fifth reporting period, the IMT worked closely with COPA to review and revise various policies. We met with COPA multiple times throughout the reporting period to obtain updates on efforts and ask questions. The IMT also attended COPA's Intake Training, and a portion of the onboarding training that was focused on procedural justice. These trainings demonstrated COPA's dedication to the requirements of the Consent Decree. We expect to audit the Forensic Experiential Trauma Interview (FETI) training in the sixth reporting period.

Further demonstrating COPA's efforts toward accountability and transparency, COPA continued working with the COPA Community Policy Review Working group.[89] This working group consists of volunteers from across the Chicago community who are dedicated to working with COPA to produce exemplary and community-experience informed products. The group reviews COPA policies and documents related to efforts under the Consent Decree. COPA ensures that the group is involved throughout the development of the policy and not just at the end of

---

[89] The OAG, the City, and the IMT have agreed to a stipulation that mandates that COPA will solicit feedback on the draft policies relevant to the Consent Decree from a working group that consists of community stakeholders and thereby approved by the IMT. *See Stipulation Regarding the Policy and Training Review Process for the Civilian Office of Police Accountability (COPA)*, *Illinois v. Chicago*, Case No. 17-cv-6260 (January 30, 2020), https://cpdmonitoring-team.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for._.pdf. The IMT has approved the members from COPA's Community Policy Review Working Group.

the revision process. By regularly engaging this group, COPA has produced policies and procedures that provide detailed direction to its personnel and important information about COPA's practices to the community.

During the fifth reporting period COPA experienced a vacancy in leadership, and the Interim Chief Administrator ensured that COPA continued to build on previous efforts and achieve additional levels of compliance throughout her tenure.[90] During this time COPA developed an outstanding policy on major incident responses that leaves no questions as to the role COPA plays in officer involved shootings. COPA's strong efforts throughout the fifth reporting period demonstrated how far COPA has come since the onset of the Consent Decree and instilled confidence that COPA will continue on a steady path toward compliance.

As noted above, COPA has utilized a methodical approach in its efforts toward compliance with the Accountability and Transparency section. Building from progress made in reporting periods, COPA continued to improve its training program for its staff developing new training blocks of instruction, as well as ensuring that 99 percent of staff were properly trained on already-approved blocks of instruction. These efforts have propelled COPA into Secondary compliance for many Consent Decree paragraphs. Additionally, COPA has worked meticulously on developing strong policies that are transparent, detailed, and often set requirements beyond the minimum set out by the Consent Decree.

Due to the dedication of COPA and its staff, as well as the meticulous planning efforts they have continued to show, we believe that COPA will continue working toward Secondary compliance in a methodical manner for many Consent Decree paragraphs. We also anticipate COPA will soon move into Full compliance with several paragraphs. We hope to continue working closely with the appropriate COPA staff members during productive calls and meetings. We look forward to the progress COPA will make in the sixth reporting period through the policies and training blocks that they plan to deliver.

### The Chicago Police Board

In the fifth reporting period, the Police Board continued making the progress toward fulfilling Accountability and Transparency requirements. The Police Board has continued to ensure that their policies, procedures, and training are revised and in compliance with the requirements of the Consent Decree. Additionally, they have continued to ensure that the appropriate individuals attend meetings, which helps facilitate discussion and ensure a free flow of information. These productive meetings have been an invaluable tool for Police Board and the IMT as the Police Board has worked toward compliance. Even though we met with the Police Board

---

[90] Chief Kersten was appointed and, after the close of the fifth reporting period, confirmed as the COPA Chief Administrator.

only on a monthly basis, these meetings were extremely effective, not performative, and were used to demonstrate and ensure the progress never slowed. Police Board continued to show their dedication to the requirements and spirit of the Consent Decree.

During the fifth reporting period, the IMT worked with the Police Board to continue to refine their training and methodologies ensuring that their discovery and hearing processes are efficient and timely. Additionally, the Police Board was able to further solidify the requirements of ¶565 by providing documentation regarding the Quarterly meetings held during the first three quarters of 2021. It was evident that the COPA Chief, Deputy Inspector General for Public Safety, and the Police Board President and Vice Present met regularly and had substantive discussions regarding their individual agency's work within and outside of the Consent Decree.

Our meetings this reporting period with the Police Board continued to be collaborative and the Police Board continued to seek the IMT's suggestions for improving training, policies, and processes. Although we did not attend any Police Board trainings this reporting period, we were able to review training materials and provide the Police Board with comments and feedback.

Moving forward, we expect the Police Board will continue to work toward Full compliance for many Consent Decree requirements that implicate the Police Board.

### Other City Entities

As noted above, the City of Chicago often works toward and accomplishes compliance through the efforts of COPA, the Deputy PSIG, the CPD, and the Police Board. However, other City entities occasionally undertake efforts relevant to compliance with Accountability and Transparency section paragraphs. Below we highlight some of these efforts that occurred during the fifth reporting period.

The City of Chicago Department of Law produced the Report on Chicago Police Department 2020 Litigation ("Litigation Report") on the final day of the fifth reporting period.[91] This Litigation Report is related to the requirements set out in ¶¶548–49. Although the 2020 Litigation Report did not meet the timing require-

---

[91] The 2020 Litigation Report is publicly available online: https://www.chicago.gov/content/dam/city/sites/public-safety-and-violence-reduction/pdfs/City's%20Report%20on%202020%20Litigation%20(With%20Appendices).pdf. We encourage the City to ensure that these annual Litigation Reports are prominently featured online to allow community members to easily access this well-organized and illuminating report.

ment set out in ¶548 (requiring that the report be published "within 180 days following the expiration of each calendar year"),[92] the Litigation report is comprehensive and well organized. The aggregate data is illuminating and should serve as motivation for reform for City leaders, community members, and CPD personnel alike. Moving forward we expect that the City will continue to provide such a comprehensive litigation report but will do so in a more expedited manner as required by ¶548.

This reporting period, the Mayor's Office submitted evidence of efforts relevant to a couple of paragraphs in the Accountability and Transparency section. These submissions related to the selection process for the COPA Chief (¶525), and the selection of Police Board members (¶532). Upon review of the materials, we raised concerns related to both.

Related to the COPA Chief selection documents, we received a copy of the selection process after the process was implemented. Receiving these documents after the process was implemented did not allow the IMT and OAG to provide feedback on the process beforehand. Additionally, we raised concerns that the selection process was not followed as drafted. While we understand that the Selection Process was intended as an interim process until the July 2021 Ordinance establishing the Civilian Oversight Commission took effect, we noted the lack of clarity surrounding the selection process could inadvertently undermine confidence in the selection.

In a similar vein, the Mayor's Office submitted a written Selection Process and Police Board Candidate Screening Questions. These materials were submitted for the first time after two individuals were chosen to fill Police Board vacancies. Again, this prevented the City, the IMT, and the OAG from engaging in a collaborative review process regarding the selection process and supporting materials. Upon review of the Selection Process, we raised concerns that there was little mention of the selection criteria for Police Board members which was previously created. Additionally, we did not receive evidence that the Selection Process, as written, was followed in the recent selection of Police Board members.

Frankly, the IMT was disappointed that the City and the Mayor's Office forewent receiving feedback relevant to processes that implicate the requirements of ¶¶525 and 532. The concern is not only that additional input could have resulted in more robust processes, but also that the City implemented systems that, at the close of the fifth reporting period, remained unclear to the IMT. The lack of clarity contravenes principles that underlie the Accountability and Transparency Section of the Consent Decree. In addition, the post-hoc production of materials used in the selection process set an undesirable example for all City entities subject to Consent Decree requirements. While we appreciate the complexities in managing a vast

---

[92]  This deadline is extended by 64 days due to COVID-19.

array of responsibilities, we also believe that the City and the Mayor's Office can better adhere to the Consent Decree process and overall improve transparency around the work the City undertakes.

Finally, at the end of the fifth reporting period, the City submitted an Interagency Policy, IAP 11-01, *Community-Policy Mediation Pilot Program Policy* and supporting materials. Although labeled as an "Interagency Policy," this document is better understood as a description of a potential program. Upon submitting this document, the City indicated that all relevant agencies had agreed to the Policy and that the City intends to launch the Mediation Pilot in the sixth reporting period. We look forward to receiving timely updates regarding the successes and challenges of the pilot program. Further we urge the City to assess and evaluate the pilot program in real time to avoid delayed progress that can often plague pilot programs.

While the City often works toward and achieves compliance through the entities previously discussed, we do not overlook the work of the City at large and other City entities in working toward compliance. We urge all entities of the City to hold themselves to high standards to improve accountability and transparency processes as called for by the Consent Decree, and to even strive to set and reach higher standards than those set out by the Consent Decree.

\*\*\*

Specific assessments, by paragraph, for the Accountability and Transparency section are included in Appendix 9.

# X. Data Collection, Analysis & Management

## Guiding Principles

The IMT assessed compliance with applicable Data Collection, Analysis, and Management paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> ***566.*** *Data can empower CPD to engage in the type of critical self-examination essential to instilling and maintaining constitutional policing. CPD can leverage data to ensure constitutional policing by: systematically collecting enough data to have a broad-based understanding of officers' interactions with the public; auditing the data to ensure it accurately reflects those interactions; analyzing the data to identify trends or areas of concern; developing tailored support and interventions to address behavior that is or may become problematic; and assessing the effectiveness of attempts to modify officers' behavior.*

> ***567.*** *In addition to enhancing CPD's capacity for internal accountability, CPD can use data to promote accountability to the public by regularly publishing data it collects.*

## Summary of Compliance Efforts and Assessments

### Data Collection, Analysis, and Management in the Fifth Reporting Period

In the fifth reporting period, the City and the CPD made incremental progress to address the Consent Decree's requirements regarding the Data Collection, Analysis, and Management section. For example, the CPD took steps toward implementing a next-generation early interventions system, called the Officer Support System (also known as OSS). This included revising a policy for its Officer Support System Pilot Program. By the end of the reporting period, however, the CPD did not identify the measurement tools it would use to evaluate the pilot program or identify and address any technical or design issues with the Officer Support System.

Similarly, the City and the CPD provided a report prepared by an outside consultant in an effort to address the comprehensive data assessment required by ¶606, but a significant amount of work remains to reach any level of compliance with that paragraph. Because all sections of the Consent Decree will require reliable data to

demonstrate compliance, the City and the CPD must devote sufficient resources and attention to addressing critical issues with data collection, analysis, management, and evaluation.

This reporting period, the IMT reviewed several new or revised policies intended to address the Consent Decree's requirements regarding the Data Collection, Analysis, and Management section. To assist with our evaluation of the Officer Support System Pilot Program policy and training, we attended a meeting with representatives of the CPD's collective bargaining units and conducted a site visit in the Fifth District.

We also continued discussions with the CPD regarding decision-point analysis and repeatedly pressed the City and the CPD to take steps toward "assess[ing] the relative frequency and type of force used by CPD personnel against persons in specific demographic categories, including race or ethnicity, gender, age, or perceived or known disability status," as required by ¶¶572 and 573—and to at least identify a unit to conduct the analyses. The City and the CPD did not make progress on these issues in the reporting period.

As in prior reporting periods, we met with the City, the CPD, and the OAG about issues relating to the Data section of the Consent Decree, including documents and information requested from, and materials produced by, the City and the CPD. We also continued to review reports published by the Force Review Division.

After acknowledging that some of the data it had released publicly was not accurate—including data about foot pursuits—the CPD also reviewed its public Use of Force Dashboard and drafted a policy to attempt to ensure the data that it releases publicly is valid.

In short, the CPD continues to struggle with data collection, analysis, and management. In some instances, the CPD's issues appear to stem from an insufficient commitment of resources. For example, despite the Force Review Division's best efforts, it fell back into a backlog of cases this reporting period due to staff shortages. In other instances, the CPD's lack of progress seems to result from inattention to or an unwillingness to engage with the issues, as with the lack of progress concerning the demographic assessments required by ¶¶572–73, or regarding decision-point analysis or any appropriate alternative.

## Updated Compliance Levels for the Fifth Reporting Period

Overall, the IMT assessed the City's compliance with 37 Data Collection, Analysis, and Management paragraphs. At the end of the fifth reporting period, the City maintained Preliminary compliance for nine paragraphs (¶¶569–71 and 577–82), achieved Preliminary compliance for 19 paragraphs (¶¶583–96, 598, 601–04),

maintained Secondary compliance with three paragraphs (¶¶574–75 and 609), and achieved Secondary compliance for one paragraph (¶608). The City remained under assessment for Preliminary compliance with one paragraph (¶606) and failed to reach any level of compliance with four paragraphs (¶¶572–73, 576, and 607). *See* Data Figure 1 below.

Data Figure 1:   Compliance Progress for Data Collection, Analysis & Management Paragraphs at the End of the Fifth Reporting Period (December 31, 2021)



Paragraphs in **Preliminary**, **Secondary**, or **Full** Compliance   (28)  (4)  (32)
Paragraphs that have not met Preliminary compliance   (4)
Paragraphs Under Assessment for Preliminary compliance   (1)

## Data Collection, Analysis, and Management Progress through Five Reporting Periods

The CPD has made significant strides with its tracking and analysis of use-of-force data since the effective date of the Consent Decree, and the IMT gives credit to the Force Review Division for that accomplishment.

The one exception is with respect to the analysis required by ¶¶572–73, the relative use of force against persons in specific demographic categories, which we note was a concern presented in the Department of Justice's (DOJ's) findings that led to the creation of the Consent Decree.[93] At the end of the fifth reporting period, the CPD still had not identified a unit to conduct this analysis. Still, when the CPD identified flaws in its publicly reported data, it took steps to fix the issue.

In contrast, the City and the CPD continue to lag behind on addressing foundational data issues that affect all sections of the Consent Decree. In the fourth reporting period, the CPD achieved Preliminary compliance for ¶608 which relates to the Information Systems Development Group (also known as the ISDG), which is comprised of CPD leaders from across the department who are responsible for moving the CPD's overall data strategies forward.

But the CPD has not yet completed the comprehensive data assessment required by ¶606, which is critical for an understanding of its data deficiencies and addressing them in a Data Systems Plan, the implementation of which is a key responsibility of the Information Systems Development Group.

---

[93]   DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopolice consent decree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-PO-LICE-DEPT REPORT.pdf.

Still through five reporting periods, the City and the CPD has developed or revised policies related to the requirements of the Data Collection, Analysis, and Management section. Data Collection, Analysis, and Management Figure 2, below, provides a sample of those policies.

Data Figure 2:
Sample of New or Revised Policies
related to the Data Collection, Analysis, and Management Section
(between March 1, 2019, and December 31, 2021)[94]

|  |  | Policy # | Issue Date |
|---|---|---|---|
| ❖ | *Department Approved Weapons and Ammunition* | U04-02 | 05/07/2021 |
| ❖ | *Control Devices and Instruments* | U04-02-02 | 02/28/2020 |
| | | | |
| ❖ | *Use of Force* | G03-02 | 12/31/2020 |
| ❖ | *Force Options* | G03-02-01 | 12/31/2020 |
| ❖ | *Incidents Requiring the Completion of a Tactical Response Report* | G03-02-02 | 12/31/2020 |
| ❖ | *Firearms Discharge Incidents Involving Department Members* | G03-02-03 | 12/31/2020 |
| ❖ | *Taser Use Incidents* | G03-02-04 | 12/31/2020 |
| ❖ | *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents* | G03-02-05 | 12/31/2020 |
| ❖ | *Canine Use Incidents* | G03-02-06 | 12/31/2020 |
| ❖ | *Baton Use Incidents* | G03-02-07 | 12/31/2020 |
| ❖ | *Department Review of Use of Force* | G03-02-08 | 1/27/2021 |
| ❖ | *Prohibition on Retaliation* | G08-05 | 12/30/2020 |
| ❖ | *Foot Pursuit Reviews Standard Operating Procedure* | 2020-001 | |
| ❖ | *Performance Recognition System* | | |
| ❖ | *Audit Division Standard Operating Procedures* | | |
| ❖ | *Force Review Board (FRB), Standard Operating Procedure* | 2020-002 | |
| ❖ | *Information Systems Development Group Policy* | S09-01-01 | |

## Looking Ahead to the Sixth Reporting Period

Despite a long road ahead, the CPD has made progress in its public reporting of data relevant to the Consent Decree. It principally does so via public dashboards,

---

[94]    Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, Chicago Police Department, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

including its Use of Force Dashboard and its Accountability Dashboard. The Force Review Division also publishes quarterly reports which contain analysis of and conclusions about the CPD's use of force data, including data collected via Tactical Response Reports (TRRs). The Force Review Division also analyzes and reports on firearm-pointing incidents and foot pursuits. In this reporting period, the CPD made progress toward ensuring that its publicly reported data is accurate.

At the end of the fifth reporting period, the City and the CPD were also developing other policies and training materials that should aid the CPD's ability to collect data. These included, for example, the following policies:

❖ *Data Analysis and Communication* (NEW)    S09-12-01
❖ *Body Worn Cameras*    S03-14
❖ *In-Car Video Systems*    S03-05
❖ *Officer Support System (OSS) – Pilot Program*    D20-04

Likewise, the CPD's current training-development efforts should also help improve data collections, such as the following:

❖ Officer Support System Training for Supervisors
   (previously: Officer Support System (OSS) Pilot Program)
❖ In-Service Supervisors Training (NEW)
❖ 2022 In-Service Use of Force Training (NEW)
❖ Foot Pursuit Training (NEW)
❖ Incorporate updates/changes related to foot-pursuit data improvements

Moving forward, we expect the City and the CPD to make progress toward conducting the comprehensive data assessment outlined in ¶606. We also expect the City and the CPD to make progress to address ¶¶572–73. These efforts will better inform the City, the CPD, the OAG, the IMT, and the public on the City and the CPD's path toward full and effective compliance with the Consent Decree.

***

Specific assessments, by paragraph, for the Data Collection, Analysis & Management section are included in Appendix 10.

# XI. Implementation, Enforcement & Monitoring

This is the last section of the Independent Monitoring Team's (IMT's) fifth semiannual Independent Monitoring Report. It includes our status updates for the City of Chicago's (City's) and its relevant entities' efforts from July 1, 2021, through December 31, 2021, regarding the implementation, enforcement, and monitoring obligations of the Consent Decree.

As we identified in our Monitoring Plan for Year Three, the City has certain obligations that fall outside the 10 topic areas. While these paragraphs do not fall within the specific topic areas discussed above, these obligations are critical to the success of the reform efforts across all 10 topic areas of the Consent Decree. For this reason, the IMT is providing updates on the City's efforts under the following paragraphs: ¶¶677–80, 683–86, 700, 706, 711, and 720.

Specific compliance status updates, by paragraph, for the Implementation, Enforcement, and Monitoring section are included in Appendix 11.

# Conclusion and Looking Ahead to Independent Monitoring Report 6

We have concluded our monitoring efforts for the fifth reporting period (July 1, 2021, through December 31, 2021). The City met additional Consent Decree requirements during this reporting period while facing a number of challenges, including the COVID-19 pandemic; rising violent-crime rates; and many leadership changes. Despite sustained and emerging challenges, the Parties and the IMT continue to work together to improve policies, training, and practices.

To date, we are encouraged by the reform efforts made by many hard-working City personnel, including the significant compliance progress made by the CPD's Research and Development Division; COPA; the Chicago Police Board; the OIG, including the Deputy PSIG; and the OEMC.

The IMT's next semiannual report, Independent Monitoring Report 6, will cover the reporting period from June 1, 2021, through December 31, 2021. As with previous reports, we will continue to work with the City and the OAG to address the paragraphs we assessed in the first, second, third, fourth, and fifth reporting periods. We will also continue to engage with Chicagoans to determine whether these reforms are being felt in their communities.

# Appendix 1
# Community Policing
# Compliance Assessments, by Paragraph

# Appendix 1
# Community Policing
# Compliance Assessments, by Paragraph

| | | | |
|---|---|---|---|
| ¶13 | ¶23 | ¶32 | ¶41 |
| ¶14 | ¶24 | ¶33 | ¶42 |
| ¶15 | ¶25 | ¶34 | ¶43 |
| ¶16 | ¶26 | ¶35 | ¶44 |
| ¶17 | ¶27 | ¶36 | ¶45 |
| ¶18 | ¶28 | ¶37 | ¶46 |
| ¶19 | ¶29 | ¶38 | ¶47 |
| ¶20 | ¶30 | ¶39 | ¶48 |
| ¶22 | ¶31 | ¶40 | |

# Community Policing: ¶13

*13. In 2017, the Superintendent accepted CPAP's recommendations, and CPD began to implement some of the recommendations, namely, the creation of the Office of Community Policing, which reports directly to the Superintendent and is responsible for overseeing the implementation of CPD's community policing efforts. CPD will, within 90 days of the Effective Date, develop a plan, including a timeline, for implementing CPAP's recommendations, consistent with the requirements set forth in this Agreement.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* (NEW: LOST COMPLIANCE) |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance. They did not, however, maintain Secondary compliance with the requirements of ¶13 because the CPD did not provide sufficient evidence to assess the CPD's efforts to comply with this paragraph.

To assess Secondary compliance, the IMT reviewed the CPD's efforts to (1) convey accurate status updates and implementation challenges to the CPAP recommendations and (2) implement the remaining CPAP recommendations. For Full compliance, we will monitor the CPD's efforts to evaluate the effectiveness of its implementation efforts.

As we have outlined in our previous reports covering earlier reporting period, the CPD's plan to implement CPAP recommendations covers the following:

(1)      community partnerships;
(2)      restorative justice;
(3)      youth outreach;
(4)      community policing strategies;
(5)      annual strategy review and feedback;
(6)      quarterly reports;
(7)      community policing staffing and training;
(8)      selection of Chicago Alternative Policing Strategy (CAPS) officers;
(9)      coordination of City services;
(10)     victims' resources; and
(11)     community policing evaluations.

*Progress before the Fifth Reporting Period*

In the last reporting period, the CPD maintained Preliminary and Secondary compliance, because the CPD developed a plan, including a timeline, for implementing the CPAP's recommendations and demonstrated its ability to track the implementation efforts for the CPAP recommendations. During the second reporting period, the CPD created a new procedure outlining the CPAP Quarterly Report development process.

*Progress in the Fifth Reporting Period*

Despite the CPD's progress in previous reporting periods, the CPD failed to publish any *CPAP Quarterly Reports* during the fifth reporting period. In previous reporting periods, the CPD produced its published *CPAP Quarterly Reports* as evidence of the CPD's efforts to convey accurate status reports and challenges to implementation of the recommendations. The Reports track and describe the implementation status of the 14 projects developed to implement the CPAP recommendations.

The CPD's significant delay in publishing the *CPAP Quarterly Reports* concerns the IMT. Not only did the CPD not publish any Reports, but the CPD failed to provide the IMT with any evidence of its implementation efforts during this reporting period. We strongly encourage the CPD to devote the resources need to publish the *CPAP Quarterly Reports* in a timely manner.

Moreover, as we discussed in our last report, the CPD must demonstrate that it has developed a process to evaluate the effectiveness its implementation of the CPAP recommendations. Such evaluation will likely be tied to the CPD's efforts to comply with ¶47.[1] That paragraph requires the CPD to annually evaluate its efforts to build community partnerships and use problem-solving techniques to reduce crime and improve quality of life. Many of those efforts align with CPAP recommendations. *See* our analysis of the CPD's efforts regarding ¶47 below.

Moving forward, to meet Secondary compliance, the CPD must provide evidence that it developed and published *CPAP Quarterly Reports* for the last three quarters in 2021. The CPD must produce future *CPAP Quarterly Reports* in a timely manner. For Full compliance, the IMT will assess the CPD's efforts to develop an appropriate process to assess effectiveness of implementation of tasks relating to CPAP recommendations.

---

[1] The CPAP Project Plan—and included tasks—overlap with actions that the City and the CPD must implement for other Consent Decree paragraphs.

## Paragraph 13 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Preliminary | |

# Community Policing: ¶14

**14.** *Within 180 days of the Effective Date, CPD will review and, to the extent necessary, revise all relevant policies to clearly delineate the duties and responsibilities of the Office of Community Policing and any other offices or entities that report to the Office of Community Policing.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* (NEW: LOST COMPLIANCE) |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance but remain under assessment for Secondary compliance, resulting from a court granted extension on completion of the community policing in-service training. To maintain Secondary compliance, the City and the CPD must complete delivery of the required training, submit documentation, and provide evidence that the CPD is developing supervisory practices to ensure these policies are implemented as written—specifically, the implementation of various Office of Community Policing programs.

In this reporting period, we monitored the CPD's efforts to supervise the implementation of these policies (OCP Policies), assessing, for example, whether the CPD's evaluation process, as outlined in the Community Policing Biennial Policy Review procedure, is effective at ensuring the policies are implemented. For Full compliance, we will assess the effectiveness of that process to ensure the policies are effective. That assessment will likely overlap with our assessment of the CPD's effort to comply with ¶47.[2]

*Progress before the Fifth Reporting Period*

In the previous reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶14 because the CPD trained OCP staff on the various policy changes made as part of this paragraph's requisite review. We also monitored the CPD's efforts to address concerns regarding the supervisory oversight required to implement the OCP Policies. For example,

---

[2] We note that many of the policies address other Consent Decree requirements. Therefore, we assess the CPD's efforts to supervise its compliance with those requirements in our review of the specific paragraph. For example, one of the relevant Office of Community Policing policies is the District Advisory Committee policy, S02-03-04, which relates to the requirements of ¶25. We will assess the CPD's specific efforts to oversee effective implementation of that directive in our assessment of ¶25.

Special Order S02-03-14, *District Advisory Committee*, provides for regular meetings between district personnel and their District Advisory Committee. We observed the CPD's efforts to determine the best solutions to ensure S02-03-14 was being implemented. We also reviewed the CPD's Community Policing Biennial Policy Review policy, which guides the Office of Community Policing's review of its policies to ensure they achieve the CPD's desired outcomes.

*Progress in the Fifth Reporting Period*

While the CPD has reviewed and revised aspects of its community policing policy framework in prior reporting periods, during this reporting period, progress stalled. Specifically, the CPD has not sufficiently demonstrated its ability to review the implementation of the policies to ensure the changes are reflected in member conduct and program engagement. In conversation with the OCP, we learned that the CPD is developing additional standard operating procedures for some of the community policing programs covered in the OCP policies. However, other than an updated version of the CPD's General Order G02-03, *Community Policing Mission and Vision* policy, we did not receive any records reflecting the CPD's efforts to supervise the implementation of the updated OCP policies.

To maintain Secondary compliance, the IMT expects the CPD to complete and document relevant trainings and demonstrate its efforts to supervise compliance with the OCP policies to ensure the policy changes are implemented in CPD practices. For Full compliance, the IMT will assess the effectiveness of the CPD's evaluation efforts to evaluate whether those processes, as outlined in the Community Policing Biennial Policy Review procedure and other directives, are effective at ensuring the OCP policies are implemented, as written.

### Paragraph 14 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Preliminary | |

# Community Policing: ¶15

*15. With the assistance of the Office of the Community Policing, CPD will ensure its command staff develops crime reduction and problem-solving strategies that are consistent with the principles of community policing. To achieve this outcome, CPD will: a. within 180 days of the Effective Date, provide CPD's command staff methods and guidance, in writing, for ensuring that department-wide and district-level crime reduction strategies are consistent with the principles of community policing; b. require CPD's command staff to review department-wide and district-level crime reduction strategies implemented under their command, as appropriate, in order to ensure they incorporate problem-solving techniques and are consistent with the principles of community policing; and c. designate the Deputy Chief of the Office of Community Policing to review and provide written feedback on implemented department-wide and district level crime reduction strategies, excluding operational strategies that are determined on a day-to-day or short term basis, to ensure they are community oriented and consistent with the principles of community policing.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* (NEW: LOST COMPLIANCE) |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance, but did not maintain Secondary compliance because the CPD did not provide records reflecting their effort to engage in the requisite review for all of its crime-reduction strategies. The CPD failed to adhere to its internal deadlines for completing, reviewing, and posting its department-wide and district-level strategies.

In this reporting period, we monitored the CPD's efforts to engage in ¶15 review when developing crime-reduction strategies and problem-solving techniques. We also monitored the CPD's efforts to evaluate and refine its processes to ensure that they result in strategies consistent with community policing.

*Progress before the Fifth Reporting Period*

In the previous reporting periods, the City and the CPD reached and maintained Preliminary compliance and achieved Secondary compliance with this paragraph. The CPD provided records reflecting an improved internal process for reviewing its

Bureau Strategic Plans and District Strategic Plans. Based on those improved internal processes, the Bureau Strategic Plans and District Strategic Plans focused additional attention to the following:

- Aligning strategy development and problem-solving with the community policing "Scanning, Analysis, Response, and Assessment (SARA)" model;

- Incorporating greater specificity and strategic thinking into the strategy development process;

- Aligning the process with the ¶45 process requirements, including directions to allocate personnel and resources to assist strategy implementation and identify primary contacts for marginalized groups within their district;

- Transitioning the Community Conversations to a virtual platform; and

- Including the Deputy Chief and the Chief of Operations in the review and approval process.

We recognize the CPD's effort to improve the strategy development and internal review processes in previous periods, but these processes have not yet addressed some of these processes' shortcomings that relate directly to community policing principles. For example, throughout the Strategic Plan development process, the CPD has struggled to engage a broad cross-section of community members for their input on these strategies. Engaging a broad cross-section of community feedback and seeking input from communities with the most police contact are ways to garner public trust, a critical component of community policing. The CPD's ability to effectively evaluate these strategies' impact on crime reduction and enhancing community trust may depend on its efforts to provide updated written guidance regarding the reviews outlined here.

*Progress in the Fifth Reporting Period*

Similar to previous reporting periods, the CPD used its strategic planning templates to conduct community conversations in each policing district. The CPD held these conversations virtually and asked participants to focus on two questions:

- What are your biggest crime problems?

- What are your community engagement priorities?

The conversations occurred in two sessions focusing on each question and lasting about 45-minutes each. At the end of both conversations, participants returned to the main room to report out the major problems and the priorities identified.

The CPD failed to document completion and review of the district-wide strategies during this reporting period. The CPD attributes the delays in these reviews to the Department shifting of resources to meet other pressing operational demands. Because of these delays, the CPD command staff, including the Deputy Chief of the Office of Community Policing, could not review department wide and district-level strategies. Furthermore, the CPD did not finalize the strategic plans before the end of the reporting period. The CPD expects to complete the plans early in the next reporting period.

In sum, the CPD maintained Preliminary compliance but lost Secondary compliance. To regain Secondary compliance in the next reporting period, the CPD must adhere to its own deadlines for completing, reviewing, and posting its department-wide and district-level strategies.

Furthermore, we hope to receive records reflecting the demographics of those participating in community conversations to help determine if marginalized groups are adequately represented. The IMT urges the CPD to ensure that adequate resources are available to meet the strategy development and review deadlines.

The CPD will not achieve Full compliance until it can demonstrate that its written guidance and supervisory practices around its review of its crime-reduction and problem-solving strategies are sufficiently consistent with principles of community policing. Aligning with principles of community policing includes, in part, receiving input that is representative of a cross-section of community members and evaluating the development and review methods to measure the effectiveness of the engagement processes and the impact of the strategies in achieving community safety and engagement goals.

### Paragraph 15 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Preliminary | |

# Community Policing: ¶16

**16.** *CPD Bureau of Patrol Area Deputy Chiefs and District Commanders will regularly review district efforts and strategies for building community partnerships and using problem-solving techniques.*

**Compliance Progress**　　　　　(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**　　Regularly　　　　☐ **Met**　☑ **Missed**

**Preliminary:**　　*Not in Compliance*
**Secondary:**　　*Not Yet Assessed*
**Full:**　　*Not Yet Assessed*

In this reporting period, the City and the CPD did not meet Preliminary compliance with ¶16, because the review of district efforts and strategies for building community partnerships and using problem-solving techniques have not been codified into policy.

The IMT monitored the CPD's efforts to finalize a policy that incorporates this paragraph's requirements, including guidance regarding what data the Deputy Chief and District Commander should be reviewing, how regularly they should be reviewing, and how to document the review.

## Progress before the Fifth Reporting Period

The previous reporting period was the first time the IMT assessed the City's and the CPD's efforts to comply with ¶16. We determined that the City and the CPD did not meet Preliminary compliance because the CPD had not fully codified the requisite reviews into policy. The CPD's draft Special Order S02-03-02, *District Strategic Plans*, incorporated some language regarding this requirement, but the policy lacked sufficient guidance to help facilitate meaningful and timely reviews of each district's community partnerships.

We also reviewed finalized District Strategic Plans, but those records did not reflect a review of district efforts and strategies for building community partnerships and using problem-solving techniques. While we acknowledge that the CPD is working to incorporate this paragraph's review process into policy, the CPD has struggled to document its process for creating and sustaining community partnerships. We encouraged the CPD to consider codifying how best to collect data regarding these partnerships so that the review described in this paragraph is meaningful.

*Progress in the Fifth Reporting Period*

During this reporting period, the CPD continued reviewing and revising the policy that provides guidance for the command level review of district efforts and strategies for building community partnerships and using problem solving techniques. Early in the next reporting period, the CPD expects to provide the IMT with a further revised version S02-03-02, including additional guidance for how command staff should conduct these reviews.

In sum, the City and the CPD did not meet Preliminary compliance because the requirements of this paragraph have not been codified into policy. Moving forward, to achieve Preliminary compliance, the IMT expects the CPD to provide additional guidance regarding command staff's review of community partnerships, recognizing that those relationships are dynamic and will likely require more check-ins than what the CPD contemplates in its annual Strategic Planning process. For Secondary compliance, we will assess whether the CPD's process includes sufficient supervisory oversight to ensure the review process effectively determines whether each district's efforts and strategies are effective at building community partnerships and using problem-solving techniques.

## Paragraph 16 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Community Policing: ¶17

**17.** *The overall effectiveness of CPD's department-wide and district-level crime reduction strategies will be determined by a reduction in crime and not by the number of arrests, stops, or citations.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD did not achieve Preliminary compliance with this paragraph, because they did not provide evidence that the CPD has codified a process by which the CPD can assess the effectiveness of crime reduction strategies, relying not on the number of arrests, stops, or citations, but instead by reductions in crime.

To assess compliance, we monitored the CPD's efforts to incorporate this paragraph's requirement into policy, including guidance regarding the process by which the CPD would assess the effectiveness of the strategies. We also monitored the CPD's efforts to conduct such assessments based on appropriate data.

### Progress before the Fifth Reporting Period

In the previous reporting period, the City and the CPD did not meet Preliminary compliance because it did not incorporate an evaluation process into policy. The City and the CPD provided several directives, asserting that they incorporate this paragraph's requirements: General Order G01-01, *Vision, Mission Statement, and Core Values*; Special Order S02-03-02, *District Strategic Plans*; special operating procedure (SOP) *Community Safety Teams*, and SOP *Critical Incident Response Team*. Although these various policies include the language found ¶17, none provide the process for which the CPD will accomplish this requirement.

### Progress in the Fifth Reporting Period

Unfortunately, our assessment remains the same this reporting period because the City and the CPD did not provide any evidence that the CPD revised or developed a new directive that establishes the process by which the CPD will assess the effectiveness of policing strategies that focuses on crime reduction and not the number of arrests as the measure of effectiveness. The CPD reports that it is revis-

ing S02-03-02 to incorporate additional language specific to this paragraph's requirements. We look forward to reviewing the reviewed policy during the next reporting period.

In sum, the City and the CPD did not achieve Preliminary compliance with this paragraph because they did not delineate in policy a process by which the CPD can assess the effectiveness of crime reduction strategies based on reduction in crime, not the number of arrests, stops, or citations. Moving forward, the IMT will assess the CPD's efforts to explicitly include the practice of assessing strategy and program effectiveness that relies on crime reduction outcomes.

### Paragraph 17 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Community Policing: ¶18

*18. The City will establish and coordinate regular meetings, at minimum quarterly, with representatives from City departments, sister agencies, and CPD to collaborate on developing strategies for leveraging City resources to effectively and comprehensively address issues that impact the community's sense of safety, security and well-being. The City departments and agencies will include, but not be limited to, the Department of Streets and Sanitation, the Department of Buildings, the Chicago Fire Department, the Department of Business Affairs and Consumer Protection, the Department of Planning and Development, the Office of Emergency Management and Communication People with Disabilities, the Department of Public Health, the Department of Family and Support Services, the Chicago Public Schools, the Chicago Housing Authority, and the Chicago Park District. If after two years the City concludes that less frequent meetings would be more effective, it may propose an alternative schedule subject to Monitor approval.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:** Quarterly  ✓ Met ☐ Missed

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City maintained Preliminary compliance by meeting the basic requirement of conducting quarterly meetings. These meetings include the requisite cabinet participants and reflect inter-agency coordinated planning. The City did not achieve Secondary compliance because its records did not reflect implementation of the planned interagency initiatives or reports on progress and outcomes of initiatives presented at previous cabinet meetings.

To assess compliance, the IMT monitored the City's efforts to engage in quality collaboration with its various departments and sister agencies, paying particular attention to the City's efforts to track and evaluate the progress of its strategies for addressing the community's sense of safety, security, and well-being. The IMT expected records showing that these cabinet meetings included a review of actions assigned, actions taken, and progress made on strategies developed in earlier meetings. Specifically, the IMT monitored whether the City developed an evaluation process by which the City could assess the effectiveness of the strategies.

*Progress before the Fifth Reporting Period*

In the previous reporting period, the City maintained Preliminary compliance with this paragraph. The City did not, however, achieve Secondary compliance or the corresponding deadline, because the City did not provide records documenting its effort to assess the effectiveness of the cabinet's strategies.

Still, we observed cabinet meetings where attendees discussed various efforts that their agencies took to promote community safety. The agencies also discussed ways to work collaboratively to promote community safety. For example, cabinet members identified a Chicago neighborhood to focus a concentration of City services, ranging from environmental improvements to services for high-risk families and summer jobs. Agencies like the CPD and the CPS described their activities and engagements in that same neighborhood. Most of the agencies participated actively and meaningfully in these discussions. However, we did not observe much of any discussion about the action items from previous meetings or status updates regarding the strategies developed in previous meetings.

*Progress in the Fifth Reporting Period*

During this reporting period, the meetings operated much like how they have been since inception. The City held two public safety cabinet meetings, the most recent occurred on December 6, 2022. During that meeting the CPD updated the other members on the CPD's community safety framework. The community safety framework employs a public-health inspired model that focuses on attacking the root causes of social disorder and crime. The CPD explained how it intends for the framework to guide violence reduction, prevention investments, and programmatic decision-making. The CPD reported 463,000 positive interactions, and over 149,000 community contacts. The CPD also noted improved homicide clearance rates. The CPD's community safety framework overlapped, in part, with the City's Summer Safety Strategy. The Summer Safety Strategy was developed by the Mayor's Office and targets "hyper-local" level revitalization and systemic transformation in four, City-identified at-risk communities experiencing high levels of violence.

Conceptually, these cabinet meeting discussions reflect collaboration on developing strategies for leveraging City resources to comprehensively address community safety issues. But measuring effectiveness of these concepts is a critical component of reform. We will need to see more evidence that the cabinet was assessing the quality and effectiveness of its implemented strategies. However, from our observations of the meetings, the cabinet hardly discussed, if at all, status updates on strategies and tasks raised during the previous meeting. We understand that the strategies are works in progress, but the cabinet will need to develop a practice of checking-in on the status of projects and efforts from meeting to meeting, as

well as a process for evaluating the effectiveness of the strategies at addressing the issues that impact the community's sense of safety, security, and well-being.

In sum, the City has maintained Preliminary compliance because it continues to hold the cabinet meetings on a quarterly basis, a basic paragraph requirement. Moving forward, the City needs to continue with these public safety cabinet meetings quarterly and provide meetings records, including minutes, attendee lists, and action items that demonstrate efforts to follow-up on action items covered in prior meetings. To achieve Secondary compliance, the City needs to operationalize the planning covered at these meetings, track progress, and establish an evaluation process to assess impact of their coordinated and collaborative interventions.

### Paragraph 18 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Community Policing: ¶19

**19.** *CPD will ensure that officers are provided with information regarding the communities they serve, including their assets and challenges, community groups and leaders, and business, residential, and demographic profiles.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance because the CPD did not provide support that it developed a process to update their resource guides and that the information officers receive is informed, in part, by community input.

To assess compliance, we monitored whether the CPD sought input from community stakeholders in developing and revising the district resource guides and whether district members receive and access the guides. We also began monitoring the CPD's effort to develop a plan to track and assess the usefulness of the district guides, determine which resources officers most often refer community members to, and which are not as active.

### Progress before the Fifth Reporting Period

During the previous reporting period, we monitored the CPD's efforts to incorporate this paragraph's requirement into policy. We reviewed the CPD's Special Order S02-03, *The Community Policing Office*, and Department Notice D21-03, *Neighborhood Policing Initiative Pilot Program*, and determined that the directives effectively codified this requirement. We also reviewed the CPD's standard operating procedure regarding the Community Policing District Resource Guide, which provides more guidance regarding how the Office of Community Policing will collect community information. Because the CPD finalized S02-03 and D21-03 and developed a process by which the Office of Community Policing can collect and distribute community information, the City and the CPD met Preliminary compliance.

### Progress in the Fifth Reporting Period

During this reporting period, the CPD continued to distribute district resource guides and progress other efforts to provide officers with helpful neighborhood information. However, the CPD did not provide records to support those efforts but intends to provide some in the next reporting period.

In sum, the City and the CPD maintained Preliminary compliance with this paragraph, but did not achieve Secondary compliance because they provided no evidence demonstrating the CPD's efforts to solicit community input for the resource guides and to develop processes for updating resource guides. In addition to those efforts, for Full compliance, the IMT will monitor how the CPD tracks and assesses the use of these guides, including which resources officers most often refer community members to, and which are not as active.

### Paragraph 19 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Community Policing: ¶20

**20.** *Within 180 days of the Effective Date, CPD will develop and institute a policy prohibiting the transport of individuals with the intent to display or leave them in locations where known rivals or enemies live or congregate.*

**Compliance Progress**    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the IMT determined that the City and the CPD maintained Preliminary compliance and took meaningful steps to achieve Secondary compliance. The CPD informed the IMT that it will rely on a COVID-19 extension granted by Judge Dow to complete its 2021 In-Service annual trainings, which includes coverage of this paragraph's requirements, by early 2022. The City and the CPD did not provide any other records demonstrating that members attended the training courses, nor did we receive any evidence that the CPD has developed supervisory practices to ensure policy implementation.

To assess compliance, we monitored the CPD's efforts to train officers on this requirement. Specifically, we expected to review records indicating that members received the *2021 In-Service Use of Force* training, which includes guidance on this requirement, or some other evidence that the CPD has developed supervisory practices to ensure members implement this paragraph's requirements. Such supervisory practices should consider the CPD's data-collection efforts related to transports to evaluate how the CPD tracks transports to ensure members comply with this requirement.

*Progress before the Fifth Reporting Period*

In the previous reporting period, the City and the CPD maintained Preliminary compliance for this paragraph but did not achieve Secondary compliance because we did not receive sufficient evidence of the CPD's supervisory oversight practices used to ensure members implement CPD's General Order G04-01, *Preliminary Investigations*. However, we reviewed the CPD's 2021 Two-Day *De-Escalation, Response to Resistance, and Use of Force* training. The training includes guidance regarding this paragraph's requirements. Understanding that the CPD will have opportunities to improve upon the training in future iterations, the IMT provided comments on the latest version but did not object to the CPD using that version to train its officers on critical skills and practices before the end of 2021.

*Progress in the Fifth Reporting Period*

During this reporting period, the CPD explained that many officers received the 2021 Use of Force in-service training, but not all. The CPD asserts the COVID-19 extension to complete the 2021 Use of Force in-service training by early 2022. The CPD did not provide any other records demonstrating developed supervisory practices to ensure policy implementation.

In sum, the City and the CPD maintained Preliminary compliance, and made some progress by initiating training that covers this paragraph's requirement. However, we are still accessing the CPD's efforts to data collection efforts to track the CPD transports to ensure members comply with this request. Moving forward, to meet Secondary compliance, the CPD must show that members received the requisite training and that the CPD has a process to track transports to determine compliance with this requirement. For Full compliance, the CPD must demonstrate that its supervisory practices are effective to ensure compliance and implementation of this requirement.

### Paragraph 20 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Community Policing: ¶22

*22. CPD will encourage and create opportunities for CPD members to participate in community activities and have positive interactions with the community, including those that extend beyond the context of law enforcement duties.*

## Compliance Progress                (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with this paragraph because of its continued progress in implementing the Neighborhood Policing Initiative program, including the hiring and deployment of district coordination officers and assignment of liaison officers to work with affinity groups. However, the CPD did not make progress toward Secondary compliance during this period. The CPD notes its lack of progress citing overall efforts to balance workloads and address competing priorities.

To assess compliance, the IMT monitored the CPD's efforts to expand its Neighborhood Policing Initiative (NPI) to the remaining CPD districts and to address concerns raised in Northwestern University's preliminary evaluation report. The report provided suggested improvements to the NPI:

- shift resources to increase staffing levels of officers in the program;

- increase consistency by keeping officers with the program and not pulling officers to resume other calls;

- increase resources and compensate community ambassadors; and

- define the "community ambassador" roles more clearly.

We also assessed the CPD's efforts to train NPI personnel and develop other supervisory practices to ensure the relevant written guidance is implemented as written.

### Progress before the Fifth Reporting Period

The previous reporting period was the first interval that we assessed the City and the CPD's efforts to comply with this paragraph. We determined that the City and the CPD met Preliminary compliance by codifying mechanisms and programming to ensure members have opportunities to participate in community activities and

have positive interactions with the community. We reviewed General Order G02-03, *Vision, Mission Statement, and Core Values*, the Special Order S02-03, *Community Policing Office,* Department Notice (D21-03), *Neighborhood Policing Initiative*, and Northwestern University's preliminary study of the NPI program. We also interviewed several District Commanders regarding their community engagement efforts.

The CPD has offered programming intended to increase positive interactions with community members for years. However, because those programs have had their limitations—we encouraged the CPD to expand and reimagine its standing options to boost more positive interactions between police and community members. Now, the newly developed NPI is one of the CPD's core strategies for expanding non-enforcement and positive community interactions. The CPD intends for the NPI to enhance public safety and equitable policing.

*Progress in the Fifth Reporting Period*

During in this reporting period, the CPD continued expanding its NPI. The CPD's expansion efforts included hiring and deploying district coordination officers and assigning liaison officers to work with affinity groups. These steps contribute to members participating in community activities and increasing positive community contacts.

A few days after the end of the reporting period, news reports noted that the CPD aims to have over a million police-initiated "positive community interactions" (PCIs) in 2022.[3] At the CPD's invitation, we provided preliminary feedback regarding the current implementation of PCI. We cautioned the CPD from valuing quantity over quality in these interactions. Specifically, the CPD should clearly define PCI so that members understand what sorts of interactions or activities qualify as PCIs and what does not. We also encouraged the CPD to develop data collection, supervision, and accountability measures around the PCIs. Recording, tracking, reviewing, and supervising PCIs for accuracy and quality will help inform the CPD on the effectiveness of these interactions. Finally, we expressed concerns that the PCIs do not account for the impressions of the community member involved in the police interaction. We look forward to continuing discussions with the CPD regarding PCIs and other efforts to encourage positive police interactions with community members.

---

[3] *See, e.g.*, Tom Schuba, *CPD leaders told to pump up arrests, solve more murders — or face demotion, sources say after private meeting with mayor, top cop,* CHICAGO SUN-TIMES (January 5, 2022), https://chicago.suntimes.com/news/2022/1/5/22869450/police-cpd-lori-lightfoot-david-brown-arrest-increase-crime-quota-demotion-clearance-rate-murder.

In sum, the CPD maintained Preliminary compliance but did not achieve Secondary compliance. Moving forward, to achieve Secondary compliance, the IMT expects the CPD to further operationalize and integrate NPI into CPD operations, and complete relevant training.

### Paragraph 22 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Community Policing: ¶23

*23. CPD has established and will continue and build upon a variety of community partnerships and engagement strategies designed to encourage positive community interactions, such as Bridging the Divide, Officer Friendly, and youth mentorship and engagement programs.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During this reporting period, the City and the CPD maintained Preliminary compliance, but did not achieve Secondary compliance because they did not provide evidence of the CPD's efforts to expand community partnerships and engagement strategies designed to encourage positive community interactions

To assess compliance, the IMT monitored the CPD's efforts to document its coordinated efforts to build relationships with community partners, including ongoing outreach efforts. We also assessed the CPD's efforts to ensure members central to the implementation of these requirements received adequate training and to collect and document data regarding its collaborative work and partnerships with community organizations, groups, and community members.

### Progress before the Fifth Reporting Period

In the previous reporting period, the City and CPD met Preliminary compliance by codifying this paragraph into CPD Special Order S02-03, *Community Policing Office* (S02-03), General Order G02-03, *Vision, Mission Statement, and Core Values*, and Department Notice D21-03, *Neighborhood Policing Initiative*. In an early reporting period, the CPD updated 14 policies relating to community partnerships and programming, including programs like "Officer Friendly," "D.A.R.E," and "Bridging the Divide." The CPD's goal for these programs and others is, in part, to provide opportunities for CPD members to have positive interactions with community members.

### Progress in the Fifth Reporting Period

In this reporting period, the CPD has been working on drafting a new special order that defines community partnerships and provides guidance on how to develop, implement, track, and assess community partnerships. The CPD reports that it expects to submit a draft policy for review in the next reporting period. The CPD also

reports that after finalizing the draft directives, the CPD will begin to train relevant community policing staff members. However, the CPD did not provide sufficient evidence supporting these efforts. The CPD expressed that it made less progress on this paragraph due to balancing workload demands.

In sum, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance because the CPD did not provide evidence supporting its progress in expanding community partnerships and expansions strategies to encourage positive community interactions. Moving forward, the IMT expects the CPD to complete their new special order governing community partnership documentation and to provide evidence of partnership expansion efforts, including evidence of supervisory oversight of the programs and training efforts.

### Paragraph 23 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Community Policing: ¶24

*24. Each district will identify and maintain collaborative partner-ships with community stakeholders to serve the specific needs of the community. District representatives will meet, as appropriate, with residential, business, religious, civic, educational, youth, and other community-based groups to proactively maintain these relationships and identify and address community problems and needs.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**     *Not in Compliance*
**Full:**     *Not Yet Assessed*

The IMT finds that the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance because of a lack of documentation of partnership efforts and training of staff to track, maintain, and expand those partnerships.

During this reporting period, we assessed the CPD's efforts to train District Coordination Officers and Community Ambassadors and to develop appropriate supervision for these teams to ensure this paragraph's requirements are implemented into practice.

### Progress before the Fifth Reporting Period

In the previous reporting period, the City and the CPD met Preliminary compliance with this paragraph by incorporating guidance specific to this paragraph into *Community Policing Office* policy (S02-03), the *Neighborhood Policing Initiative* (NPI) department notice (D21-03), and the *Vision, Mission Statement, and Core Value*s policy (G02-03) that requires collaborative partnerships to serve specific needs of the community. These directives include roles for both District Coordination Officers and Community Ambassadors. The Community Ambassadors are CPD selected volunteers who are "local residents and leaders representing a wide spectrum of neighborhood groups, organizations, and interests." The Ambassadors will work with officers to increase officers' understanding of community issues, stakeholders, and other community dynamics. Most importantly, they will facilitate the partnership building and dialogue between the CPD and these community groups.

*Progress in the Fifth Reporting Period*

In this reporting period, as previously noted, the CPD is working on special orders that will help facilitate the documentation of partnership maintenance and building. The additional hiring and assignment of liaison staff and DCO's and the expansion of DCO's into other districts may also facilitate tracking, growing, and expanding the number of partnerships. The CPD will also develop and provide training to CP staff in each district once policy directives are completed.

In sum, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance because of a lack of documentation of partnership efforts and training of staff to track, maintain, and expand those partnerships. Moving forward, the IMT expects the CPD to complete the special orders to facilitate partnership documentation, complete any required training, and provide evidence of efforts to grow and expand community partnerships.

### Paragraph 24 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Community Policing: ¶25

**25.** *CPD will meet with members of the community from each beat and District Advisory Committee members at least once every two months. These community meetings will be scheduled in consultation with the community, be used to identify problems and other areas of concern in the community, and provide an opportunity to discuss responses and solutions through problem-solving tactics and techniques.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Every Two Months        ☐ **Met**    ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During this reporting period, the City and the CPD maintained Preliminary compliance but failed to achieve Secondary compliance due continued shortfalls in DAC membership, not holding all required Beat meetings, and a lack of complete records on these proceedings.

During this reporting period, we assess the CPD's efforts to address the issues identified in the CPD Audit of District Beat Meetings and the District Advisory Committees (or DACs). We also monitored the CPD's efforts to hold their Beat Meetings and District Advisory Committee meetings in-person and virtually.

*Progress before the Fifth Reporting Period*

In the previous reporting period, the City and the CPD maintained Preliminary compliance, but did not meet Secondary compliance because many districts were not yet in a position to meet with their District Advisory Committee every two months. Focusing on the CPD's effort to codify this paragraph's requirements into policy, we reviewed a CPD Audit of District Beat Meetings and the District Advisory Committees (or DACs) that highlighted a number of issues related to staffing, training, diversity and inclusion of membership, regularity of meetings, and lack of facilitators for Beat Meetings. We also received updates during our regular calls with the CPD regarding its efforts to address these issues and reviewed records reflecting the CPD's efforts to improve the District Advisory Committee program and the various Beat and District Advisory Committee meetings that the CPD held in 2021. We acknowledge those efforts and continue to monitor their effectiveness at addressing the programmatic gaps identified in the CPD's audit report.

District Advisory Committees and Beat Meetings are key components to a successful CPD community policing strategy and play an integral role in addressing important Consent Decree requirements. District Advisory Committees, for example, review their District's Strategic Plans and provide input on important policies. Regularly scheduled and facilitated Beat Meetings also provides a space for community members to raise concerns about community safety issues that are affecting their neighborhoods. Considering the importance of these community engagements, the CPD must prioritize addressing the gaps identified in the CPD's Audit report as soon as possible.

*Progress in the Fifth Reporting Period*

During this reporting period, the CPD spent considerable time revitalizing the DACs. The CPD specifically identified Chairs for all its DACs and stepped up the recruitment of new members. The CPD is also working to understand how the DACs will function in the future considering passage of a new police oversight ordinance that now requires DAC members to be elected. The CPD is working on a transition plan that will minimize interruption of DAC activity, and keep current interested members involved in some capacity. IMT was provided some documentation on DAC and Beat meeting activity but clearly still working to expand and develop a more representative membership.

As noted in prior reporting, DACs and Beat meetings are key components to a successful CPD community policing strategy and play an integral in addressing important CD requirements. Considering the importance of these community engagements, the CPD must continue to prioritize enhancing the functionality of DACs and hold bimonthly Beat meetings throughout all districts. The CPD reports further compounding these efforts will be the possible appointment council members by the Mayor early in 2022.

In sum, the City and the CPD maintained Preliminary compliance but failed to achieve Secondary compliance due continued shortfalls in DAC membership, not holding all required Beat meetings, and a lack of complete records on these proceedings. Moving forward, the CPD must continue to prioritize improvements in DAC and Beat meeting functionality and addressing paragraph requirements, and transition to Mayoral council appointees and rules as established in the City ordinance.

## Paragraph 25 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

# Community Policing: ¶26

*26. CPD's Office of Community Policing will designate CPD members, as needed, to serve as points of contact for organizations to assist with access to police services, including those serving communities that have experienced previous challenges with access to police services, such as LGBTQI individuals, religious minorities, immigrants, individuals with disabilities, homeless individuals, and survivors of sexual assault and domestic violence. The designated CPD members will provide feedback to the Deputy Chief of the Office of Community Policing about the issues or potential policy recommendations raised by community-based organizations or the community to improve access to police services.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *In Compliance* (NEW)
**Full:** *Not Yet Assessed*

In this reporting period, the CPD and City achieved Secondary compliance by hiring the "liaisons" and providing initial training. Additional trainings are also underway and to be continued in the next reporting period.

During this reporting period, we assessed the CPD's efforts to staff citywide liaison positions, train the selected members on their responsibilities, and develop supervisory practices that ensure the policy is implemented as written.

### Progress before the Fifth Reporting Period

In the previous reporting period, we assessed the City and the CPD's efforts to comply with this paragraph for the first time. We determined that the City and the CPD met Preliminary compliance with this paragraph because it codified ¶26's requirements into Special Order S02-03, *Community Policing Office*. We reviewed S02-03 which identifies roles and responsibilities for CPD members who will assist community members access police services and includes the requirement that these "points of contact" or "liaisons" will engage with organizations to assist in providing services to the community. We also reviewed the CPD's *Neighborhood Policing Initiative* (NPI) department notice (D21-03). We also discussed the CPD's efforts to implement the NPI. We reviewed the CPD's Office of Community Policing Civil Rights Unit Liaison Proposal, liaison position descriptions, and a proposed training curriculum for them.

According to the CPD, it will take a two-tier approach to this paragraph's requirements, providing Citywide liaisons that will serve as 1) points of contacts for the affinity groups stipulated in ¶26 and 2) will provide District-level liaison officers assigned to lead their District's in conducting outreach and organizing engagements to build strong relationships with their assigned affinity group. Key efforts activities planned include:

- Serve as a point of contact between CPD and members of affinity groups in the community.

- Identify chronic conditions, concerns, and challenges of members of these affinity groups, and work with them on finding solutions; and

- Recommend and provide feedback to district commanders, City-wide liaisons, and CPD command.

The CPD reports that staffing these positions is underway and that training for these assignments is planned.

*Progress in the Fifth Reporting Period*

The CPD reports that they have implemented their plan to hire "liaisons" or points of contact of the various communities that have experienced previous challenges with access to police services. The CPD indicated that the "liaisons" received a full day of training in July 2021 and additional specialized trainings to be continued through the next reporting period. These Liaisons as part of their training will be integrated into the umbrella services provided through each District's Community Policing Office.

The IMT finds that the City and the CPD achieved Secondary compliance for this paragraph. Moving forward, to maintain, Secondary compliance the CPD will need to provide evidence that "Liaisons" continue with training, and that supervisory mechanisms are in place. For Full compliance, the CPD needs to establish assessment processes to determine effectiveness and impact.

## Paragraph 26 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary |

# Community Policing: ¶27

**27.** *CPD will facilitate relationships with youth by establishing regular meetings to serve as opportunities to provide input to CPD about the issues affecting their lives and their communities. CPD will partner with community-based organizations to identify strategies to include participants that represent a racially, geographically, and socio-economically diverse cross-section of Chicago youth, including, but not limited to, at-risk youth and youth who have been arrested, incarcerated, or otherwise involved in the criminal or juvenile legal systems.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, the CPD maintained Preliminary compliance but failed to achieve Secondary compliance after providing no evidence of partnering with community-based programs to provide ongoing dialogue with cross sections of youth regarding the life challenges confronting them.

During this reporting period, we monitored the CPD's efforts to develop supervisory practices to ensure the General Order G02-03, *Vision, Mission Statement, and Core Values* is implemented as written. We also assessed the CPD's efforts to evaluate the effectiveness of its efforts to facilitate relationships with Chicago youth.

*Progress before the Fifth Reporting Period*

The previous reporting period was the first time we assessed the City and the CPD's efforts to comply with this paragraph. The City and the CPD met Preliminary compliance because CPD's General Order G02-03, *Vision, Mission Statement, and Core Values*, incorporates this requirement into its guidance. We assessed the CPD's efforts to incorporate this paragraph's requirements into policy. We reviewed multiple versions of G02-03. In response to our concerns that the draft G02-03 did not provide enough specificity regarding procedures for regular meetings with at-risk youth groups and youth advisory groups, the CPD revised G02-03 to clarify those procedures. We recognize the CPD's effort and progress in restructuring processes and services for youth who encounter the CPD; however, rethinking these processes needs to include mechanisms for ongoing dialogue between CPD, youth, and youth-serving agencies.

*Progress in the Fifth Reporting Period*

During this reporting period, the CPD reported working with Youth Advisory Councils to expand their relationship with Youth. The CPD acknowledged minimal progress in developing partnerships with community-based organizations to engage youth from diverse backgrounds in discussions about how best to address the community safety and quality of life issues from their perspective. The IMT is aware of the many various youth programming providing for member interactions with youth. However, the paragraph requirements are more explicit and require regularity and documentation of these outreach efforts that include partnering with community-based organizations. While this required outreach and engagement with youth previously codified into policy (G02-03), the CPD provided no evidence of implementation.

In sum, the CPD maintained Preliminary compliance but failed to achieve Secondary compliance providing no evidence of partnering with community-based programs to provide ongoing dialogue with cross sections of youth regarding the life challenges confronting them. Moving forward, the IMT will be looking often evidence of CPD forging partnerships to greatly expand their meaningful interactions with youth to achieve Secondary compliance.

### Paragraph 27 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| **FOURTH REPORTING PERIOD** | **FIFTH REPORTING PERIOD** | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Community Policing: ¶28

*28. CPD will, with the assistance of the Office of Community Policing, institute a public awareness campaign to inform the public, at least once a year, about: (a) CPD policies most relevant to police interactions with the public, including, but not limited to: use of force, body-worn cameras, and Tasers; (b) steps for filing a complaint against CPD or a CPD member; and (c) the public's rights when stopped, arrested, or interrogated by police. CPD's public awareness campaign may include presentations, trainings, written guides, or web-accessible videos.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**  At Least Once a Year   ☑ **Met**   ☐ **Missed**

**Preliminary:**  *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**  *In Compliance* (NEW)
**Full:**  *Not Yet Assessed*

During this reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance by finalizing and launching a new campaign. The agency sought community stakeholder input by partnering with a Marketing and Advertising class at DePaul University. About 25 graduate level students participated in the effort to design the new campaign.

*Progress before the Fifth Reporting Period*

In the previous reporting period, the City and the CPD maintained Preliminary compliance with ¶28 but did not achieve Secondary compliance because the directive that the CPD asserts incorporates this paragraph's requirements, a standard operating procedure titled *Public Awareness Campaign*, was still in the Consent Decree review process.

Over the past year, the CPD's Office of Communications and News Affairs partnered with a graduate-level advertising class at DePaul University to create a campaign that uses a wider range of modalities as suggested by the IMT. Through the partnership, the graduate students developed four possible campaigns that addressed a range of issues, including police use of force, police accountability, and community members' rights when police stop, question, or arrest a person. The CPD and a representative of the Civilian Office of Police Accountability reviewed and selected one of the campaigns entitled, "Know Your Rights." The selected campaign proposed using social media, local media, billboards on local roadways, buildings, and potentially public transportation to inform community members.

The graduate students suggested that the CPD partner with the Chicago Transit Authority to share campaign topics on bus shelters and trains. These ads would include a Quick Response (QR) code to link readers to the CPD website that will have more in-depth information on the campaign topics. The selected campaign also calls for the CPD to use billboards Citywide, focusing more heavily on the West and Southside zip codes to reach those communities with the most interactions with police. The CPD intended to institute the campaign during the fifth reporting period, which is consistent with the Consent Decree requirement to complete the campaign at least once a year.

*Progress in the Fifth Reporting Period*

For the 2021 campaign, CPD partnered with DePaul University's, marketing and advertising program, to engage current students in development of the campaign. Ads were developed and will be shown on various social media platforms and will also be posted on the CPD website. The ad campaign this year focuses on knowing your rights. We also reviewed the second public awareness campaign that ran from December 13, 2021, through the end of the fifth reporting period, December 31, 2021. The ads included a Quick Response (QR) code that linked readers to the CPD website, where they could read a question-and-answer format about the topics required by ¶28; CPD policies on use of force and body-worn cameras; steps for filing a complaint; and rights when stopped, arrested, or interrogated by police. The DePaul University students intended for the campaign to utilize a wider range of communication channels to reach a broader audience, but CPD only shared the campaign digitally via social media, its website, and through the local media. The ads will also be translated into Spanish. The CPD paid to promote the ads on Facebook and Twitter and targeted zip codes on the South and West Sides, along with the CPD's 19th District.

Moving forward the IMT would expect the CPD to expand the modalities of the campaign to ensure a larger audience sees the content.

Additionally, we monitored the CPD's ability to supervise members to ensure this requirement continues annually, and its efforts to assess its public awareness campaign metrics to determine effectiveness.

The CPD followed the IMT's recommendation to codify the *Public Awareness Campaign* into a policy to ensure the campaign continues on an annual basis. The CPD incorporated ¶28 into Directive G02-03, *Community Policing Mission and Vision*, which was submitted during the fifth reporting period for review. The policy revision remains in review and comment. The CPD also finalized an SOP requiring public awareness campaigns on an annual basis. Ads will not be finalized and shown until the next reporting period.

In sum, the CPD achieved Secondary compliance by launching its public awareness campaign during this reporting period. Moving forward, and to achieve Full compliance, the IMT expects the campaigns to cover other topics outlined in paragraph requirements, allow time for more community stakeholder input, and execution on an annual basis.

### Paragraph 28 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Community Policing: ¶29

*29. Fair, unbiased, and respectful interactions between CPD members and victims of crime provide an opportunity to strengthen community trust and foster public confidence in CPD. CPD will continue to require that CPD members interact with victims of crime with courtesy, dignity, and respect. CPD will continue to require that CPD members inform victims of crime of the availability of victim assistance and resources, including providing written notices of victim's rights, when applicable. CPD will also have such victim assistance information readily available on its public website and at all district stations.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**     *Not in Compliance*
**Full:**     *Not Yet Assessed*

The IMT recognizes the progress made by the CPD in improving victim service. At the end of the fifth reporting period, the City and the CPD have maintained Preliminary compliance but did not achieve Secondary compliance by not completing the program training.

In this reporting period the IMT monitored the CPD's efforts to ensure each district has the resources needed to inform crime victims of available resources, completed training curriculum, and their efforts to initiate staff training.

*Progress before the Fifth Reporting Period*

During the previous reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance because we did not receive records reflecting the CPD's efforts to finalize S02-01-03—although the current version of S02-01-03 became effective on December 30, 2020. The CPD hired additional staff and began developing training to implement the Crime Victim Assistance policy.

*Progress in the Fifth Reporting Period*

During this reporting period, the CPD's progress continued in implementing requirements of this paragraph and recently hired victim advocates who focus on domestic violence cases city-wide. The CPD also initiated a pilot for a violent crime victim services program. The CPD also reports that they continue to engage the Crime Victim Advisory Council comprised of community partners. The CPD reports

that the Victim Assistance policy (S02-01-03) updates has received full approval and the eLearning module for the training needs to be completed.

In sum, the IMT recognizes the progress made by the CPD in improving victim services. The CPD has maintained Preliminary compliance but failed to achieve Secondary compliance. Moving forward to achieve Secondary compliance, the IMT expects the CPD to complete training, and expand these victim services city-wide.

### Paragraph 29 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Community Policing: ¶30

**30.** *CPD will prominently display signs both in rooms of police stations or other CPD locations that hold arrestees or suspects and near telephones which arrestees or suspects have access to. These signs will state: a. that arrestees and suspects have the right to an attorney; b. that if an arrestee cannot afford an attorney, one may be appointed by the court for free; and c. the telephone numbers for the Cook County Public Defender, and any other organization appointed by the Cook County Circuit Court to represent arrestees.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In this reporting period, the CPD showed little progress in attaining Full compliance, providing no evidence of certifying compliance with the signage requirements in this paragraph.

During this reporting period, we assessed the CPD's effort to develop supervisory practices that will ensure G06-01 is implemented as written, ensuring prominence and accuracy of signage. To help demonstrate Full compliance with ¶30, District Commanders could annually review signage in their station and certify in writing compliance with this paragraph—although, this is just one approach the CPD may consider. The CPD may also want to consider surveying a sampling of arrestees to confirm awareness of signage.

### Progress before the Fifth Reporting Period

In the previous reporting period, the City and the CPD maintained Preliminary compliance and met Secondary compliance, as the IMT observed signage in locations that hold arrestees or suspects in eight Districts (1, 4, 6, 16, 17, 18, 19, and 20). The signs clearly stated the information outlined in this paragraph and appeared in multiple languages, including Spanish, English, Polish, and Mandarin. These signs provide arrestees and suspects with information, and also provide officers with a regular reminder of arrestee rights. Officer awareness of arrestee

rights aligns with one of our Special Report recommendations that the CPD aims to provide officers with refresher training on arrestee rights and related topics.[4]

The City and the CPD met Preliminary compliance in the third reporting period, because CPD's General Order G06-01, *Processing Persons Under Department Control*, incorporated this paragraph's requirements.

*Progress in the Fifth Reporting Period*

In this reporting period the CPD showed little progress in attaining Full compliance. The CPD provided no evidence of certifying compliance with the signage requirements in this paragraph. The IMT has suggested options including certification by district commanders of compliance or surveying a sample of arrestees for signage awareness.

Moving forward and to achieve Full compliance the IMT expects the CPD to establish and implement procedures to ensure ongoing compliance with this paragraph.

### Paragraph 30 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

---

[4]  *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

# Community Policing: ¶31

**31.** *CPD will provide arrestees access to a phone and the ability to make a phone call as soon as practicable upon being taken into custody.*

## Compliance Progress            (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶31 but did not achieve Secondary compliance.

To assess Secondary compliance, the IMT monitored the CPD's efforts to implement supervisory practices to ensure the policy is up-to-date and implemented as written. However, the City and the CPD did not provide the IMT with evidence that they put together supervisory practices to ensure consistent implementation of G06-01-04, *Arrestee and In-Custody Communications*. Specifically, the CPD has not implemented procedures to track the time between when an arrestee is taken into custody and when the arrestee is provided access to a telephone.

### Progress before the Fifth Reporting Period

In the previous reporting period, the IMT noted our concerns with the lack of attention given to ensuring proper implementation of General Order G06-01-04, which requires timely telephone access for arrestees. Illinois amended state law to guarantee an arrestee the right to a telephone call within three hours after arrival at the first place of custody. This issue continues to be a subject of community concern, debated by City officials and community stakeholders.

### Progress in the Fifth Reporting Period

In this reporting period, the CPD provided no evidence of progress in developing and instituting timeframes and processes for arrestee access to telephones.

To reach Secondary compliance the CPD must demonstrate supervisory oversight by devising ways to track time between when an arrestee is taken into custody and when the arrestee is provided the access to a telephone.

## Paragraph 31 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Community Policing: ¶32

*32. Within 180 days of the Effective Date, CPD will review and revise its current policies relating to youth and children and, within 365 days, will revise its training, as necessary, to ensure that CPD provides officers with guidance on developmentally appropriate responses to, and interactions with, youth and children, consistent with the provisions of this Agreement and as permitted by law.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD failed to achieve Preliminary compliance for this paragraph because they did not finalize the Children and Youth policy.

To assess compliance, the IMT continued to assess the CPD's efforts to review and revise its youth-related directives and trainings. We reviewed initial drafts of the Interactions with Youth Policy (G02-05) and the Mayor's Office briefing regarding Chicago's youth deflection, diversion, and reform efforts.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD developed, updated, and finalized up to 18 general orders, special orders, and directives relating to youth interaction in the third reporting period. The City and the CPD conducted extensive peer-agency research; conducted some community engagement to garner input from young residents, their parents, and community stakeholders; and conducted engagement with outside consultants to develop a new model for police interactions with youth.

The CPD did not, however, complete its work on the core policy covering CPD Interactions with Youth (G02-05). Once completed, the emerging model will ultimately guide officers in making decisions to determine when to deflect a youth after a police interaction and avoid arrest, when to arrest and refer for services in place of prosecution, and when to move forward without deflection or diversion.

The IMT acknowledges the challenge and difficulties in finalizing the core policy covering CPD interactions with youth and notes the City's and the CPD's progress in broadening services for referred youth, including greater use of community-

based service agencies, and stronger management controls in response to issues raised in a 2020 audit by the Office of the Inspector General.

*Progress in the Fifth Reporting Period*

During this reporting period, the City and the CPD continued their work on drafting a Children and Youth policy. Much of the discussion according to CPD addressing the challenges facing youth deflection, which will require structural change for the CPD. Requirements concerning revising training to ensure that CPD provides officers with guidance on developmentally appropriate responses were also not addressed for all members. Developmentally appropriate responses were provided to members receiving SRO training but that represents a very small percentage of the member population. The City and the CPD anticipate finalizing the Children and Youth policy in the next reporting period followed by training of all members on this new policy.

In sum, because of not completing the Children and Youth policy, the City and the CPD failed to achieve Preliminary compliance for this paragraph. Moving forward to achieve Preliminary compliance, the CPD is required to complete and finalize the Children and Youth Policy. The IMT is also hopeful that the CPD will train all members to the finalized policy in the next reporting period.

### Paragraph 32 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Community Policing: ¶33

*33. When interacting with youth and children, CPD will, as appropriate and permitted by law, encourage officers to exercise discretion to use alternatives to arrest and alternatives to referral to juvenile court, including, but not limited to: issuing warnings and providing guidance; referral to community services and resources such as mental health, drug treatment, mentoring, and counseling organizations, educational services, and other agencies; station adjustments; and civil citations.*

---

**Compliance Progress**                    (Reporting Period: Jul. 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD failed to achieve Preliminary compliance with ¶33 because they did not finalize the Children and Youth policy.

During this reporting period, the IMT received updates on progress in developing the *Interactions with Youth Policy* (G02-05) and the CPD's efforts to begin developing the requisite training needed for implementation.

### Progress before the Fifth Reporting Period

In the last reporting period, the IMT assessed the CPD's efforts to determine the best guidance regarding alternatives to arrest options. The IMT reviewed drafts of the *Interactions with Youth Policy* (G02-05) and the Mayor's Briefing on Chicago's youth deflection, diversion, and reform efforts.

We acknowledged the challenges in implementing the requirements of this paragraph, including potential legal and administrative barriers. This added discretion for members will require more supervisory monitoring and member training once approved and enacted. The IMT raised a concern about ensuring parents of youth deflected are notified of the contact and are provided access to youth services, and that the CPD should track youth contacts in a way to capture deflection and diversions.

### Progress in the Fifth Reporting Period

As previously noted, during this reporting period, the City and the CPD continued its work on its *Children and Youth* policy, which covers procedures and processes relating to interactions with youth and members including encouraging members

to exercise discretion to use alternatives to arrest and alternatives to referral to juvenile court. The City and CPD also closed the JISC, a jointly operated Center to provided services to arrested juveniles and pledged that their new policy will provide for a new service model.

Because the City and the CPD have not finalized the *Children and Youth* policy, the City and the CPD have not achieved Preliminary compliance. Moving forward, to achieve Preliminary compliance the City and CPD will have to finalize the *Children and Youth* policy in a manner that meets both ¶¶32 and 33 requirements.

### Paragraph 33 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Community Policing: ¶34

**34.** *CPD will clarify in policy that juveniles in CPD custody have the right to an attorney visitation, regardless of parent or legal guardian permission, even if the juvenile is not going to be interviewed.*

---

**Compliance Progress**          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During this reporting period, the City and the CPD did not achieve Secondary compliance by not completing and delivering eLearning modules covering paragraph requirements.

To assess Secondary compliance, the IMT monitored the CPD's efforts to train members on this specific direction and to create supervisory practices designed to ensure members are implementing the policy as written. During this reporting period, the IMT reviewed draft S06-04, eLearning modules covering juvenile processing, and signage notifying juveniles of their right to an attorney regardless of parental consent.

### Progress before the Fifth Reporting Period

In the third reporting period, the CPD met Preliminary compliance because the CPD had finalized its Special Order S06-04, *Processing of Juveniles and Minors under Department Control*, which clarifies juveniles' right to an attorney visitation. The CPD submitted the requisite training materials to the S06-04 policy but did so at the end of the fourth reporting period.

### Progress in the Fifth Reporting Period

In the fifth reporting period, the CPD began revising an eLearning module for ¶¶34–36, which will provide specific guidance on implementation of those paragraphs. The CPD, however, has "paused" revisions, pending changes in juvenile policies and processes. Secondary compliance is predicated upon training/guidance of implementation of policy, the CPD eLearning modules, and the signage notifying juveniles of their right to an attorney regardless of parental consent.

The CPD did not achieve Secondary compliance during his reporting period by not completing revisions and delivering eLearning materials for addressing the imple-

mentation of the requirements of this paragraph. Moving forward, to achieve Secondary, the CPD needs to complete and deliver eLearning modules covering this paragraph's requirements.

### Paragraph 34 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Community Policing: ¶35

**35.** *If a juvenile has been arrested CPD will notify the juvenile's parent or guardian as soon as possible. The notification may either be in person or by telephone and will be documented in any relevant reports, along with the identity of the parent or guardian who was notified. Officers will document in the arrest or incident report attempts to notify a parent or guardian. If a juvenile is subsequently interrogated, CPD policy will comply with state law and require, at a minimum, that: a. Juvenile Miranda Warning will be given to juveniles before any custodial interrogation; b. the public defender's office may represent and have access to a juvenile during a custodial interrogation, regardless of parent or legal guardian permission; c. CPD officers will make reasonable efforts to ensure a parent or legal guardian is present for a custodial interrogation of a juvenile arrestee under 15 years of age in custody for any felony offense; and d. juveniles in custody for felony offenses and misdemeanor sex offenses under Article 11 of the Illinois Criminal Code will have their custodial interrogation electronically recorded.*

## Compliance Progress        (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance, but did not achieve Secondary compliance because they did not move forward with developing the requisite training materials (*i.e.*, draft training bulletin and e-learning modules) that incorporate the requirements of this paragraph.

During this reporting period, the IMT monitored the CPD's efforts to finalize training materials and deliver training to CPD members. The IMT suggests that the CPD also develop assessment tools to determine ongoing compliance with this policy directive.

*Progress before the Fifth Reporting Period*

In the previous reporting period, the IMT assessed the CPD's efforts to finalize and deliver training to CPD members. The CPD did not provide the IMT with any additional documentation regarding this paragraph. Thus, there was insufficient evidence that CPD has finalized and delivered training. In the third reporting period, the CPD achieved Preliminary compliance by finalizing its Special Order S06-04,

*Processing of Juveniles and Minors under Department Control*, which codifies this paragraph's requirements.

*Progress in the Fifth Reporting Period*

During this reporting period, the CPD reported that it did not move forward with the training that included a draft training bulletin and e-learning incorporating the requirements of this paragraph. The CPD indicated that the decision not to move forward in addressing these paragraph requirements due to pending changes in juvenile processing procedures.

In sum, the CPD did not achieve Secondary compliance during this reporting period. Moving forward, to achieve Secondary compliance, the IMT expects the CPD to finalize changes to its juvenile processing procedures and complete the required training to implement the requirements of this paragraph.

### Paragraph 35 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Community Policing: ¶36

*36. When determining whether or not to apply handcuffs or other physical restraints on a juvenile, CPD officers will consider the totality of the circumstances, including, but not limited to, the nature of the incident and the juvenile's age, physical size, actions, and conduct, when known or objectively apparent to a reasonable officer, and whether such restraints are necessary to provide for the safety of the juvenile, the officer, or others.*

**Compliance Progress**                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**      *In Compliance (THIRD REPORTING PERIOD)*
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

During the fifth reporting period, the City and the CPD maintained Preliminary compliance, but did not achieve secondary compliance because they did not move forward with the required training to implement the paragraph requirements due to pending changes in juvenile processing procedures.

In this reporting period, the IMT assessed the CPD's efforts to train members on this policy and to create supervisory practices designed to ensure members are implementing the policy as written.

*Progress before the Fifth Reporting Period*

During the previous reporting period, the CPD did not provide the IMT with any records regarding this paragraph. The CPD did not complete the training materials or deliver training to CPD members. The IMT acknowledged that the CPD was nearing completion of training bulletins and eLearning materials covering the requirements of this paragraph, and that these requirements may also be addressed or referenced in the *Interactions with Youth* policy (G02-05) and the corresponding training.

In the third reporting period, the City and the CPD met Preliminary compliance with ¶36 by implementing an updated the *Processing of Juveniles and Minors Under Department Control Policy* (S06-04), which codifies this paragraph's requirements.

*Progress in the Fifth Reporting Period*

During this reporting period, the CPD reported that it did not move forward with the required training to implement the paragraph requirements due to pending changes in juvenile processing procedures.

Moving forward, to achieve Secondary compliance the IMT expects the CPD to finalize changes to the juvenile processing procedures and complete the required training to implement the paragraph requirements.

### Paragraph 36 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

## Community Policing: ¶37

*37. Consistent with the requirements set forth in the Training section of this Agreement, CPD will incorporate the philosophy of community policing into its annual in service training for all officers, including supervisors and command staff, by providing training on the following topics: a. an overview of the philosophy and principles of community policing, consistent with this Agreement; b. methods and strategies for establishing and strengthening community partnerships that enable officers to work with communities to set public safety and crime prevention priorities and to create opportunities for positive interactions with all members of the community, including, but not limited to, youth, people of color, women, LGBTQI individuals, religious minorities, immigrants, individuals with limited English proficiency, homeless individuals, and individuals with disabilities; c. problem-solving tactics and techniques; d. information about adolescent development and techniques for positive interactions with youth; and e. effective communication and interpersonal skills.*

### Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**      *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**      *Under Assessment*
**Full:**      *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance, and remain under assessment for Secondary compliance resulting from a court granted COVID pandemic related extension to March 2, 2022 to complete the delivery of the in-service community policing training and provide evidence for completion of that training.

In this reporting period, the IMT assessed the CPD's efforts to finalize the COP in-service training, conduct a rigorous evaluation of its training, implement improvements based on those assessments, and provide significant oversight to ensure officer behavior is reflective of this training.

*Progress before the Fifth Reporting Period*

In the previous reporting periods, the IMT reviewed the COP in-service training curriculum and reviewed the court-approved suite of community policing training from the Seattle, New Orleans, and Albuquerque police departments.

The CPD completed work on developing and finalizing the COP training after producing and revising several iterations based on OAG and IMT feedback. The approved training includes elements covering:

- Overview of COP principles, including historical perspectives of police/community relations;

- Importance of forming community partnerships and collaborations;

- The S.A.R.A. model;

- Adolescent development and positive interactions with youth; and

- De-escalation and communication skills.

The training employs some scenario-based methods and will be evaluated for officer knowledge retention and understanding.

*Progress in the Fifth Reporting Period*

In this reporting period the CPD finalized its COP In-service curriculum and reportedly began instituting training. Although the CPD reported that up to 95% of members received COP in-service training during, the CPD has not provided evidence that enough personnel have competed this training during this reporting period.

In sum, The CPD remains under assessment for Secondary compliance resulting from a court granted extension relating to the COVID-19 pandemic to March 2, 2022. To achieve Secondary compliance, the IMT expects records indicating that the sufficient percentage of personnel have completed the approved community policing training.

### Paragraph 37 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Community Policing: ¶38

*38. Through inter-governmental agreements between CPD and Chicago Public Schools ("CPS"), CPD has assigned officers to work in CPS schools. In the event that CPD and CPS decide to continue this practice, officers assigned to work in CPS schools will be appropriately vetted, trained, and guided by clear policy in order to cultivate relationships of mutual respect and understanding, and foster a safe, supportive, and positive learning environment for students.*

---

**Compliance Progress**                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance because in-service training was not completed in a timely manner and sufficient documentation for the vetting and selection process was not provided.

In this reporting period, the IMT assessed the CPD's efforts to provide the annualized in-service training for SROs closer to the beginning of the school year and provide additional documentation regarding the vetting and selection process. The IMT interviewed SRO and principal team.

*Progress before the Fifth Reporting Period*

In the fourth reporting period, the IMT reviewed IGA/MOUs for the past two years and the CPD's and CPS's *Whole School Safety Plan* (SRO 01-02). In previous reporting periods, the CPD, in conjunction with CPS, reengineered the selections and vetting process for SROs. The selection is no longer arbitrary but consultative and extends beyond the District Commander. The CPD and the CPS hoped to fully implement the new vetting process before the current school year. Officers interested still submit forms that include background with youth experience and a statement of interest in working with youth. Before selection, the candidates may now be interviewed by principals who share any thoughts or concerns. The vetting is now more competitive and requires a higher disciplinary threshold for the assignment. The CPD will again rely on the National Association of School Resource Officers (NASRO) coupled with a CPS supplement to train new SROs and conduct the SRO refresher in-service training.

*Progress in the Fifth Reporting Period*

In this reporting period, the CPD in conjunction with the Chicago Public Schools (CPS) continued to make progress in appropriately vetting, training, and finalizing policy that provides opportunities for SROs to cultivate relationships of mutual respect and understanding, and to contribute to a safe, supportive, and positive learning environment for students. Interviews with select SROs revealed an embracing and understanding of this role. While not all SROs will choose to amplify their role as envisioned by this paragraph, the 40-hour initial training and the 8-hour annualized training is now being provided to SROs. The policy framework coupled with the vetting and selection process and the subsequent training provided to the CPD SRO members makes them among the most vetted and best trained in law enforcement.

Specifically, the CPD reports finalizing and updating S04-01-02, *School Resource Policy* and the annualized training. The in-service training is occurring in two stages with the first stage delivered in this reporting period and the latter stage scheduled for the next reporting period. The CPD has also not submitted other supportive documentation regarding the vetting and selection process.

In sum, despite the significant strides taken in addressing requirements of this paragraph, the CPD did not achieve Secondary compliance because in-service training was not completed in a timely manner and insufficient documentation for the vetting and selection process was not provided. Moving forward, to achieve Secondary compliance, the CPD needs a training schedule that provides the annualized in-service training for SROs close to the beginning of the new year, and additional documentation about the vetting and selection process.

### Paragraph 38 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Community Policing: ¶¶39–40

**39.** *Before the 2019-2020 school year begins, in consultation with CPS and considering input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders, CPD will develop and implement screening criteria to ensure that all officers assigned to work in CPS schools have the qualifications, skills, and abilities necessary to work safely and effectively with students, parents and guardians, and school personnel. Only CPD officers who satisfy the screening criteria will be assigned to work in CPS schools.*

**40.** *Before the 2019-2020 school year begins, in consultation with CPS and considering input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders, CPD will develop a policy that clearly defines the role of officers assigned to work in CPS schools. This policy will be reviewed by the Monitor by the end of 2019. Any suggested revisions by the Monitor that are adopted by CPD will be implemented by CPD before the 2020-2021 school year. The policy will reflect best practices and will include, but not be limited to: a. the duties, responsibilities, and appropriate actions of officers assigned to work in CPS schools and school personnel, including an express prohibition on the administration of school discipline by CPD officers; b. selection criteria for officers assigned to work in CPS schools; c. the requirement that officers assigned to work in CPS school receive initial and refresher training; and d. the collection, analysis, and use of data regarding CPD activities in CPS schools.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance (THIRD REPORTING PERIOD)* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained its Preliminary compliance but has not yet achieved Secondary compliance because they were unable to schedule all the required in-service training before or shortly after the onset of the current school year.

During this reporting period, the IMT assessed the CPD's efforts to complete the in-service trainings for returning and newly appointed SROs. See ¶42.

*Progress before the Fifth Reporting Period*

In the previous reporting period, the IMT continued to assess the CPD's efforts to develop and implement (1) screening criteria for SROs (¶39) and (2) a policy that clearly defines the role of SROs (¶40). This assessment included a review of whether the CPD consulted with community stakeholders and considered their input.

The IMT reviewed revisions of the draft SRO policy (S04-01-02), the CPD/CPS intergovernmental agreements, CPS annual reports, and CPS "*Whole School Safety Plan*." Additionally, the IMT observed SRO community focus groups. The CPD has developed an SRO in-service refresher training that captures most policy revisions and other considerations. However, the CPD did not provide the IMT evidence that SRO trainings and the National Association of School Resource Officers (NASRO) trainings for new officers were implemented during this reporting period. According to the CPD, however, it plans to provide SROs with part of the refresher training (8 hours) before the start of the 2021–2022 school year, completing the second part of the training (8 hours) later in the school year.

The draft SRO policy (S04-01-02) represented vast improvements over previous iterations. This policy will be subject to possibly frequent change given the annual requirement for review by the IMT and the changing community sentiments. The current version includes:

- New selection process

- Updated selection criteria

- Additional training requirements

- Updated roles and responsibilities

- Streamed line complaint policy

Early on, the CPD sought community input on the SRO policy and program, including conducting a series of focus groups and establishing an SRO working group. After receiving community complaints about the working group's participation process, the CPD hosted a new series of SRO focus groups comprised of 19 community members, CPD personnel, and CPD staff. This outreach effort produced another set of recommendations, most of which emphasized non-enforcement roles. Public interest in the SRO program was evident last year when the CPD received 20,000 comments on the draft SRO policy posted to its website. A majority of the comments called for the elimination of the program in its entirety. Local School Councils, however, voted to keep SROs with 55 votes for SROs and 17 votes against SROs.

During this reporting period, the CPS advanced the concept of the "*Whole School Safety* Plan" with the support of the CPD. This Plan allows for each school to consider the reduction or elimination of the SRO program. At the start of the school year, the CPD raised issues with having only one SRO in a school. It is our understanding that the City and the CPD were able to resolve this issue. We hope that this experience will better inform future procedures and discussions between the CPD, the Chicago Public Schools, and Chicago's communities.

*Progress in the Fifth Reporting Period*

During this reporting period, the CPD, in conjunction with CPS, initiated implementation of the "*Whole School Safety Plan*" producing instances where one officer instead of two were assigned to some schools. The IMT continues to recognize the dynamic aspects in determining the extent and reach of the SRO program and the role the program will play in the expanded concept of "whole school safety." The IMT awaits information regarding the implementation of this concept and any recommended adjustments or changes.

The CPD continued to finalize and update the *School Resource Officers (SROs) and Investigations at Chicago Public Schools (CPS)*, S04-01-02, developed the SRO job description and notices, and initiate the in-service training. CPD and CPS reported greater collaboration in selection and shaping SRO roles.

In sum, the City and the CPD maintained Preliminary compliance but has not yet achieved Secondary compliance. Moving forward, to achieve Secondary compliance, the CPD must schedule all the required in-service training before or shortly after the onset of the school year.

## Paragraphs 39 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

## Paragraphs 40 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Community Policing: ¶41

> *41. CPD will, within 60 days of the completion of the 2019-2020 school year, and on an annual basis thereafter, review and, to the extent necessary, revise its policies and practices regarding officers assigned to work in CPS schools to ensure they are responsive to the needs of the Department, CPS, and its students. This evaluation will include input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders. Any revisions to CPD's policies and procedures regarding officers assigned to schools will be submitted to the Monitor and OAG in accordance with the requirements of Part C of the Implementation, Enforcement, and Monitoring section of this Agreement.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:** Annual          ☑ **Met**   ☐ **Missed**

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance by finalizing revisions to the most current iteration of the SRO policy but did not achieve Secondary compliance.

In this reporting period, the IMT assessed the CPD's efforts to finalize the latest iteration of the SRO policy and implement trainings that align with any additional policy changes. See ¶42. The IMT also monitored the CPD's efforts to work closely with the CPS to anticipate potential changes to the policy as schools consider the different and more customized school safety options. We also interviewed SROs and principles on their program perspectives.

### Progress before the Fifth Reporting Period

In the previous reporting period, the IMT reviewed the Special Order S04-01-02, *School Resource Officers (SROs) and Investigations at Chicago Public Schools (CPS)*, CPS's "Whole School Security Safety Plan," IGA/MOUs between CPS and the CPD, and observed SRO focus groups. We determined that the current iteration of reflected substantial change, and the CPD continued to make revisions that addressed IMT and OAG concerns regarding data collection and program evaluations. We also acknowledged the changing nature of the considerations shaping this policy and anticipated additional changes in the coming reporting periods, and that

the CPD should plan to make additional changes based on ongoing community stakeholder and community member input. Finally, we noted that future roles of the SROs will likely evolve based on the whole school safety planning approach.

*Progress in the Fifth Reporting Period*

In this reporting period as noted, the CPD in conjunction with CPS further limited SRO placements and instituted the "*Whole School Safety*" plan. The highly scrutinized SRO program was subject to intense community reviews by community stakeholders who were tasked with developing SRO placement alternatives. Out of these collaborative discussions the "*Whole School Safety*" plan emerged offering a more multi-disciplinary approach to school safety. The IMT expects the CPD and the CPS to produce an annual evaluation of the SRO program that will include input from CPD members, including officers assigned to CPS schools, school personnel, families, students, and community stakeholders. Any revisions to CPD policies regarding SROs will need to be submitted to the IMT and OAG in accordance with the Consent Decree review process.

In sum, the CPD maintained Preliminary compliance by finalizing revisions to the most current iteration of the SRO policy but did not achieve Secondary compliance. Moving forward, to achieve Secondary compliance, the CPD needs to complete training that covers policy revisions and put in place mechanisms to continue ongoing assessments of the program.

### Paragraph 41 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Community Policing: ¶42

*42. CPD officers assigned to work in CPS schools will receive specialized initial and annual refresher training that is adequate in quality, quantity, scope, and type, and that addresses subjects including, but not limited to: a. school-based legal topics; b. cultural competency; c. problem-solving; d. the use of de-escalation techniques, use of restorative approaches, and available community resources and alternative response options; e. youth development; f. crisis intervention; g. disability and special education issues; and h. methods and strategies that create positive interactions with specific student groups such as those with limited English proficiency, who are LGBTQI, or are experiencing homelessness.*

*The training will be developed and delivered in accordance with the requirements of the Training section of this Agreement.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Annual      ☑ **Met**    ☐ **Missed**

**Preliminary:**      *In Compliance* (NEW)
**Secondary:**      *Not Yet Assessed*
**Full:**      *Not Yet Assessed*

In the fifth reporting period, the City and the CPD achieved Preliminary compliance for this paragraph by finalizing its SRO in-service training curriculum.

During this reporting period, the IMT assessed the CPD's effort to finalize the SRO refresher training and to deliver that training to SRO officers, in part, before and during the current school year. The IMT also monitored the CPD's efforts to establish a process to ensure annualized updates of this training based on evaluative materials and ongoing community stakeholder input.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the IMT reviewed drafts of SRO in-service training curricula, community input on SRO training, the 40-hour National Association of School Resource Officers (NASRO) training, the CPS supplemental training curricula, and the draft *SRO* policy (S04-01-02).

The CPD invested significant time and effort to develop drafts of this curriculum, which incorporates best practices, elements of the industry standard NASRO train-

ing, community input, and requirements of ¶42. Community perspectives primarily focused on having more meaningful non-enforcement contacts, accountability, and de-escalation, and mediation training. The NASRO training serves as the basis for much of the refresher training, which stresses the triad model where SROs provide counseling/mentorship, instruction on "street law" and safety tips, and school-safety functions when required. The refresher training also covered CPS components and the specific requirements from the IGA/MOU for SROs between the CPD and CPS, including restorative justice. The CPD plans to provide SROs with part of the refresher training (eight hours) before the start of the 2021–2022 school year, completing the second part of the training (eight hours) later in the school year.

*Progress in the Fifth Reporting Period*

During this reporting period, the CPD achieved Preliminary compliance with this paragraph by developing and finalizing curriculum for its in-service refresher training, as required by the paragraph. The training is comprehensive in scope and addresses all the required elements outlined in the paragraph. The CPD was able to deliver the first half of this training during this reporting period with the remainder scheduled for the next reporting period.

In sum, the CPD achieved Preliminary compliance for this paragraph by finalizing its SRO in-service training curriculum. Moving forward, to achieve Secondary compliance the CPD will be required to deliver the in-service training prior to or close to the onset of the school year.

### Paragraph 42 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Community Policing: ¶43

*43. The curricula, lesson plans, and course material used in initial training provided before the 2019-2020 school year will be reviewed by the Monitor by the end of 2019. Any suggested revisions by the Monitor that are adopted by CPD will be implemented by CPD before the 2020-2021 school year.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**      *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**      *In Compliance* (NEW)
**Full:**      *Not Yet Assessed*

In the fifth reporting period, the City and the CPD achieved Secondary compliance by reviewing and finalizing the SRO training curriculum and delivering a portion of the training to incoming SRO members.

During this reporting period, the IMT reviewed the finalized version of the SRO training curriculum and assessed the CPD's efforts to deliver training to incoming SRO members. The IMT also monitored the CPD's efforts to establish an annualized review process for the training curriculum.

In the third reporting period, the IMT assessed the CPD's efforts to complete the CD training review process for the initial SRO training in time to implement the updated training before the 2020-2021 school year. The CPD, however, did not provide the up-dated version before the end of the third reporting period.

### Progress before the Fifth Reporting Period

In the previous reporting period, the IMT reviewed the last iteration of the SRO training and the 40-hour National Association of School Resource Officers (NASRO) training, from which much of the SRO training is drawn from. The IMT also observed community focus groups regarding SROs. The IMT provided the CPD with feedback on the revised curriculum materials, but the CPD was unable to finalize the curriculum during this reporting period. Therefore, before this reporting period, the City and the CPD maintained Preliminary compliance with ¶43 but did not meet Secondary compliance.

During this reporting period, the SRO training curriculum was finalized and delivered to incoming SRO members. The completion of the review and revisions to curriculum results in the CPD achieving Secondary compliance. Moving forward, to achieve full compliance the IMT expects the CPD to establish a process for the annual review and update of the curriculum, and to assess efficacy.

## Paragraph 43 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Preliminary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Secondary

# Community Policing: ¶44

*44. Before the 2019-2020 school year begins, CPD will undertake best efforts to enter into a memorandum of understanding with CPS, to clearly delineate authority and specify procedures for CPD officer interactions with students while on school grounds, consistent with the law, best practices, and this Agreement.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *In Compliance* (NEW) |

During the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance and achieved Full compliance with ¶44 by finalizing and executing an IGA/MOU for the 2021-2022 school year.

To determine Full compliance, the IMT assessed whether the CPD and CPS demonstrated a consistent and annualized effort to update the IGA/MOU to reflect changing community sentiments, feedback on program performance, and other considerations.

### Progress before the Fifth Reporting Period

In previous reporting periods, the IMT reviewed current and past IGA/MOU agreements, the draft SRO policy (S04-01-02), and community input on SRO roles and responsibilities. To determine Secondary compliance, the IMT assessed the CPD's efforts to delineate authority and procedures for SRO interactions with students.

The IMT previously concluded that the City and the CPD maintained Preliminary and Secondary compliance with ¶44. The CPD and CPS have produced IGA/MOUs for two consecutive years that reflect current policy and other considerations. The most recent iteration greatly reflects community stakeholder input and concerns. The IMT understands the dynamic nature of the SRO programs and anticipates further changes that may require updates to the IGA/MOU.

### Progress in the Fifth Reporting Period

In this reporting period, the CPD and the CPS again developed an MOU that continues to address elements covered in previous agreements but now include one SRO options for schools. For five reporting periods, the CPD and the CPS have had in place MOUs governing the operations of the SRO program.

The continued practice of the CPD and the CPS working together and annually entering a MOU consistent with law, and best practices and reflecting extensive community input results in a Full compliance assessment.

### Paragraph 44 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Full | |

# Community Policing: ¶45

*45. By January 1, 2020, and annually thereafter, District Commanders will review their district's policing strategies, with input from the District Advisory Committees and the Office of Community Policing, to ensure the strategies are consistent with the principles of community policing. This review will include, but not be limited to: a. reviewing available district resources and personnel assignments; b. identifying methods to support their district's ability to effectively problem-solve, including collaborating with City departments, services, and sister agencies; and c. identifying district-level CPD members, as needed, to assist members of the community with access to police and City services, including community members who have experienced previous challenges, such as LGBTQI individuals, religious minorities, immigrants, individuals with disabilities, individuals in crisis, homeless individuals, and survivors of sexual assault and domestic violence.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Annual      ☑ **Not Yet Applicable**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance but have not achieved Secondary compliance because the CPD did not complete and document reviews and posting of reports during this reporting period.

During this reporting period, the IMT assessed the CPD's efforts to refine its strategy development process to demonstrate a greater connection between plans from year-to-year and revamp its community engagement processes. We monitored whether the CPD considered approaches employed by CPS in soliciting community input by involving community-based organizations for school safety planning. IMT also interviewed a sampling of District commanders about the strategy development and review process. Lastly, monitored the CPD's efforts to complete the reorganization of the District Advisory Committee program to include greater consultation with community stakeholders.

*Progress before the Fifth Reporting Period*

During the previous reporting period, the IMT assessed the CPD's efforts to include this paragraph's requirements into policy. During the fourth reporting period, the IMT reviewed the District Strategic Plans policy (S02-03-02), the Community Policing Office policy (S02-03), and Strategic Planning Quarterly reports. The IMT noted concerns about the CPD's failure to provide documentation of these processes, which made it challenging to include a full review of these processes as part of the IMT assessments. We strongly encouraged the CPD to make more timely submissions in future reporting periods.

Nonetheless, the 2021 Plans were much richer in detail and reflected greater customization by district, which is a marked improvement over the prior year's Plans. The CPD expanded the district development forms significantly to address early concerns about the lack of attention given to staffing resourcing considerations.

The IMT also stated concerns regarding the strategy development and the review process. In the posted strategies for public review, there was little connection between the recommended actions, actions taken, and status from one report to another. The lack of information limits residents' ability to form judgments about CPD's progress in addressing crime priorities, engagement goals, lessons learned, and persistent safety-related issues.

The strategy review process remained problematic because the community input underrepresents the populations experiencing the most police contact as reported by the CPD in the prior reporting periods. The current format only allowed for limited analysis and understanding of the community safety issues facing a given community. The CPD was encouraged to consider an engagement model successfully used by CPS to formulate school safety plans employing community-based organizations to manage the engagement process, which includes listening sessions, deliberative discussions, resulting in community recommendations.

As noted in the third reporting period, a CPD audit revealed serious issues with the operations of the District Advisory Committee (or DAC) program. Many District Advisory Committees did not meet membership requirements, and the composition of District Advisory Committees generally failed to reflect the communities they represent. District Advisory Committees are an important element in the strategy review process, and the fact that many are dysfunctional invalidate their review role. The CPD began making efforts to address these issues, but significant work remains.

*Progress in the Fifth Reporting Period*

In this reporting period, The CPD continued to make investments in its District's strategic planning development process. The improvements made for 2021 and 2022 includes the following:

- Reducing crime section of the planning template now aligns with the SARA problem solving model (Scanning, Analysis, Response, Assess)

- Section two of the planning template requires greater specificity and strategic thinking about community engagement activities for various populations

- Districts must explain how response strategies will empower the community to take a leadership role in addressing the identified priority problem.

Districts also hosted two community conversations as before but added a third meeting to target affinity groups. Additional CPD leadership were also added to the plan review process including Area Deputy Chief and the Chief of Operations. The conversations observed by IMT were generally well facilitated and encouraged wide range of discussion. The CPD was not able to complete the strategic development process including the required documented reviews and postings before the end of this reporting period.

While many improvements were made in the strategic development process, we still believe community input underrepresents the populations experiencing the most police contact. The CPD should consider an engagement model successfully employed by CPS using community-based organizations to help manage the engagement process. The review process will also remain flawed until the DAC committees become fully functional. The IMT recognizes the efforts and improvements made in DAC functionality but there remains much work to do.

The City and the CPD maintain Preliminary compliance but have not achieved Secondary compliance. The CPD's failure to complete development within CPD guidelines, and document reviews during this reporting period, remain an issue. Moving forward, to achieve Secondary compliance, the IMT expects the CPD to complete the strategy development process within its own established guidelines, continue improving the representativeness and functionality of DACs, and provide the documentation for the review processes.

## Paragraph 45 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Community Policing: ¶46

*46. Within 180 days of the Effective Date, and as appropriate thereafter, CPD will solicit, consider, and respond to input, feedback, and recommendations from the community in each district about its policing efforts and strategies. Such practices may include, but are not limited to, direct surveys, community meetings, beat community meetings, and engagement through social media. CPD will identify strategies for soliciting input from individuals that reflect a broad cross-section of the community each district serves.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance due to incomplete review processes and a lack of sufficient input from marginalized groups in the development process.

During this reporting period, the IMT monitored the CPD's efforts to fully staff the District Advisory Committees with representative membership operating under finalized by-laws. We also monitored the CPD's efforts to further refine the strategy development process to improve community conversations, and their use of other available engagement tools, such as social media and recent police interactions surveys.[5]

### Progress before the Fifth Reporting Period

In the second reporting period, the CPD reached Preliminary compliance because they took significant efforts to engage the community in each district around the CPD's policing efforts and strategies. The CPD's approach was multifaceted, soliciting feedback from community members in each district through "Community Conversations," community surveys on CPD policies, policy revision working groups, and ongoing Beat meetings. Preliminary compliance was maintained in the third reporting period, but Secondary compliance was not achieved because the

---

[5]     After the fourth reporting period, the City and the CPD presented information regarding their partnership with an independent vendor to develop a pilot program for police-contact surveys. This survey could prove instrumental to various Consent Decree requirements and CPD operations. We are greatly encouraged by that presentation and look forward to reviewing and reporting on its continued development and implementation.

CPD has not developed methods to effectively engage a broader and more representative group of community members.

In the fourth reporting period, the IMT assessed the CPD's efforts to improve and address the concerns that we raised regarding the insufficient targeted outreach, community meeting design, and use of working groups.

The IMT reviewed the 2020 4th Quarter Performance Report, the 2021 1st Quarter Performance Report, and the corresponding Office of Community Policing feedback. Additionally, the IMT reviewed 2021 Bureau and District-wide strategies and interviewed four district commanders and an area commander.

The CPD's engagement efforts in the previous reporting period included community input for 2021 strategies. The CPD conducted 44 "Community Conversations," 25 working groups, and 19 focus groups covering a range of topics, including the SRO and Use of Force policies and trainings. These meetings were held virtually due to the COVID-19 pandemic. The planning cycle calls for a community meeting to be held in the prior year, which resulted in no CPD Community Conversations in this reporting period.

The CPD continued to hold virtual Beat meetings and District Advisory Committee meetings during this reporting period, but these meetings did not occur routinely.

The IMT commends the CPD's efforts to find the most effective and efficient ways to capture community input on strategy development, CPD policies and training, and ongoing CPD practices. Current engagement tools include the following:

- Elucd: A social media web-based survey system that uses non-traditional sampling techniques to gauge community perceptions of trust and safety;

- Community Conversations: Community meetings opened to all District residents to come together to discuss trust-building crime reduction priorities and ways to address them;

- Working Groups: Select group community members supported by CPD staff to work through policy and other significant issues throughout a series of meetings, resulting in a set of recommendations.

- Focus Groups: Select group of community members supported by CPD staff holding sessions on more specific aspects of CPD policy, training, and operations issues;

- Listening Sessions: Where residents are encouraged to share experiences about their interactions with CPD members and views on CPD policies, strategies, tactics, and trainings;

- Deliberative Discussions: Where the CPD meets with select community stakeholders to learn their perspective and respond to these stakeholders; and

- Ongoing but increasingly expanding uses of social media platforms.

During the fourth reporting period, the CPD continued to evaluate their community engagement approaches, including strategy development and broadening participation to generate more informed input. The CPD provided more documentation on the strategy review process and notes from select District Advisory Committee meetings. However, the strategic development and review process remained incomplete without fully operational DACs to review and provide input to the District-wide strategies. The CPD did provide evidence that they were addressing issues about District Advisory Committee operations, including re-working by-laws, and developing District Advisory Committee member recruiting strategies to populate these committees with members more representative of the communities they serve. We also encouraged the CPD to consider additional methods of community engagement, like developing a police interactions survey for civilians to provide input regarding their recent experience with officers.

*Progress in the Fifth Reporting Period*

During this reporting period, as previously noted, the CPD invested considerably in improving the strategic development process. The result was a much more comprehensive planning template reflecting more strategic thinking and problem-solving approaches. The community engagements while improved still seem to fall short of adequately reaching high police contact populations. Community stakeholders also generally expressed dissatisfaction with engagement efforts asking more opportunities to provide meaningful input into the CPD policy and practices. The CPD also provided survey tools to assess citizen satisfaction with police interactions and offered IMT offered numerous suggestions for improvements. The CPD reports that it may develop special orders to further ensure enforcement of paragraph requirements.

The City and the CPD maintained Preliminary compliance with this paragraph. Moving forward, to achieve Secondary compliance the CPD needs to complete work on additional guidance and demonstrate a more comprehensive and strategic approach to community engagement. As previously noted, the CPD may consider approaches used by CPS that include working more closely with community-based organizations to help enhance outreach and make better connections with members of marginalized groups.

## Paragraph 46 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Preliminary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

# Community Policing: ¶47

*47. Within 180 days of the Effective Date, CPD will develop procedures to annually evaluate the effectiveness of the Department's efforts and strategies for building community partnerships and using problem-solving techniques aimed at reducing crime and improving quality of life. CPD will determine any necessary adjustments based on its annual evaluation.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**     Annual          ☐ **Met**    ☑ **Missed**

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance with the CPD indicating that balancing workloads demands was a reason for the lack of progress.

During this reporting period, the IMT monitored the CPD's efforts to include partnership-related activity and development in their monthly reporting. Specifically, we assessed whether the CPD used clearer evidence that the data reported is used to inform decisions to adjust strategies, tactics, and resource allocations. We also assessed the CPD's efforts to consider other evaluation tools that may help them determine the effectiveness of their strategies and techniques, like recent contact surveys.[6]

*Progress before the Fifth Reporting Period*

In the third reporting period, the City and the CPD met Preliminary compliance with ¶47 by finalizing their Office of Community Policing performance management standard operating procedure and their monthly reporting district community policing data. The CPD initiated the Community Engagement Management System (also known as CEMS) to track positive interactions, community activities, and Elucd.[7] The data gathered for each District serves as the basis for a monthly

---

[6]   After the fourth reporting period, the City and the CPD presented information regarding their partnership with an independent vendor to develop a pilot program for police-contact surveys. This survey could prove instrumental to various Consent Decree requirements and CPD operations. We are greatly encouraged by that presentation and look forward to reviewing and reporting on its continued development and implementation.

[7]   Elucd is a web-based survey approach that gauges public sentiments regarding trust and community safety. *See* ELUCD, https://elucd.com/.

discussion, focusing on two districts. The data helps the CPD better understand the trends in community policing, disseminate community policing best practices, and identify additional opportunities for the Office of Community Policing to better support the District's community policing efforts.

In the previous reporting period, the IMT reviewed the Community Engagement Management System meeting notes that the CPD produced. The CPD did not use data variations to inform any needed adjustments in resource allocations, policing strategies, and tactics. Further, as noted in prior reports, the Community Engagement Management System alone does not adequately capture partnership activity and development.

A review of the meeting notes revealed variation in the level of detail provided from meeting to meeting. CPD participation often only included officers at the sergeant level. At times, the meeting notes lacked a series of action steps to be recommended to District commands as a result of the data review. The reviews do not cover partnership activities and development as required by ¶47.

The IMT documented concerns regarding the sole reliance on Elucd to measure community sentiments regarding perceptions of trust and community safety. These are core measures that drive much discussion in the monthly meetings. We also expressed concerns about whether web-based methodologies can capture true community sentiments and those additional methodologies, including more traditional kinds of surveys and focus groups may better pinpoint the sources of change in sentiments and perceptions. Specifically, we encouraged the CPD to consider administering surveys to civilians who have had recent contact with the police to gather their input with respect to the interaction.

In the fourth reporting period, the IMT concluded that the City and CPD, did not achieve Secondary compliance because they did not demonstrate the tracking and evaluation of existing and developing partnerships and did not demonstrate the linking of performance data to informed changes in policing strategies and tactics, including any changes in resource allocations.

*Progress in the Fifth Reporting Period*

During this reporting period, the CPD indicated no additional activity relating to achieving Secondary compliance. The CPD indicated that balancing workload demands was a reason for the lack of progress. The CPD did indicate their intent to develop a special order for the CPD performance management meetings.

In sum, the City and the CPD maintained Preliminary compliance but has not made progress toward achieving Secondary compliance. Moving forward, to achieve Secondary compliance, the CPD need to complete the special order for performance

management meetings and track and put in place an evaluation of existing and developing partnerships and linking performance data to inform changes policy, strategies, and tactics.

### Paragraph 47 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Community Policing: ¶48

**48.** *CPD will create opportunities to highlight, reward, and encourage officer, supervisory, and district performance on furthering community partnerships, engaging in problem-solving techniques, effective use of de-escalation, exemplary and effective supervision, and implementing community-oriented crime prevention strategies.*

## Compliance Progress · (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with this paragraph but did not achieve Secondary compliance citing balancing workloads as a reason for the lack of progress.

During this reporting period, the IMT monitored the CPD's efforts to include more detailed guidance on identifying officer behavior, actions deserving of rewards, and the nature of those rewards. We also assessed the CPD's efforts to evaluate after one year of having a reward matrix in place to assess the impact of this awards-based policing.

### Progress before the Fifth Reporting Period

In the previous reporting period, the IMT reviewed drafts and final versions of the *Community Mission, Vision* policy (G02-03) and the *Community Policing Office* policy (S02-03), including this paragraph's requirements.

The IMT acknowledged the codification of ¶48's requirements but sought further evidence of how these requirements will be consistently and effectively implemented. There should be enough incentives and positive reinforcement of exemplary community policing officer behavior to help transform into a community policing department and the reengineering of CPD culture. The IMT concluded that the City and the CPD met Preliminary compliance with this paragraph.

### Progress in the Fifth Reporting Period

The CPD indicated no efforts to implement the policy language addressing the requirements of this paragraph. The CPD indicated that balancing workloads was a reason for the lack of progress.

In sum, the City and the CPD maintained Preliminary compliance with this paragraph. The CPD indicated no efforts to implement the policy language addressing the requirements of this paragraph. The CPD indicated that balancing workloads was a reason for the lack of progress. Moving forward, to achieve Secondary compliance, IMT expects CPD to demonstrate how these requirements can be consistently and effectively implemented.

### Paragraph 48 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Appendix 2
# Impartial Policing
# Compliance Assessments, by Paragraph

# Appendix 2
## Impartial Policing
## Compliance Assessments, by Paragraph

| | | | |
|---|---|---|---|
| ¶52 | ¶60 | ¶68 | ¶76 |
| ¶53 | ¶61 | ¶69 | ¶77 |
| ¶54 | ¶62 | ¶70 | ¶78 |
| ¶55 | ¶63 | ¶71 | ¶79 |
| ¶56 | ¶64 | ¶72 | ¶80 |
| ¶57 | ¶65 | ¶73 | ¶81 |
| ¶58 | ¶66 | ¶74 | ¶82 |
| ¶59 | ¶67 | ¶75 | |

# Impartial Policing: ¶52

> **52.** *In developing or revising policies and training referenced in this section, CPD will seek input from members of the community and community-based organizations with relevant knowledge and experience through community engagement efforts.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance for ¶52. The City and the CPD failed to meet Secondary compliance as they did not provide sufficient documentation in the fifth reporting period reflecting their efforts to refine their community engagement processes to ensure the CPD is meaningfully considering community input from those with relevant knowledge and experience.

To assess community engagement, the IMT continues to examine several dimensions: (1) outreach; (2) meetings, interactions, and problem-solving; (3) follow-up and sustainability of partnerships, community policing, and problem-solving activities; and (4) general police-community interactions regardless of context. During this reporting period, the CPD's community engagement on Impartial Policing topics was limited because the CPD focused its attention on other important areas, like foot pursuits and crime fighting. For a more detailed discussion of the CPD's efforts to establish these methods, please refer to our third monitoring report. We also discuss the CPD's community engagement efforts related to the specific policy and training requirements of this Section in our current assessment of paragraphs where ¶52 would apply.

During this reporting period, we assessed the CPD's efforts to involve qualified CPD personnel in planning and executing community engagement tasks. We also assessed the CPD's efforts to engage community members and organizations with relevant knowledge and experience regarding impartial policing.

We continue to emphasize the importance of community engagement in policy development and training and the need for the City and the CPD to create mechanisms for continued engagement with constitutionally protected classes and their advocates. In prior reports, we have acknowledged the CPD's effort to engage certain segments of the community, but we have also underscored the limitations of these efforts and the need to engage a cross-section of community members and organizations with relevant knowledge and experience.

We also continue to bring attention to the personnel restrictions that have limited the effectiveness of the Office of Community Policing (OCP). Although OCP has been allowed to hire four Liaisons near the end of the fifth reporting period, the stark reality is that the number of individuals assigned to this unit has been dramatically reduced since the start of 2020. Thus, we continue to strongly encourage the CPD to strengthen OCP and support their managers by (i) giving the Office the latitude and authority to engage at all levels and (ii) staffing these Offices with enough personnel to stabilize and institutionalize the various elements of community engagement as required by the Consent Decree.

We also continue to recommend additional engagement by high-ranking members of the CPD in sensitive areas where the CPD has struggled to build trust with community advocates. *See, e.g.*, ¶62.

### 1. Outreach

The OCP did some outreach in fifth reporting period as it began to seek input on several policies. These include G02-01, *Protection of Human Rights* (¶53 and ¶54), and G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing* (¶55 and ¶56). Late in the fifth reporting period, OCP reached out to more than 30 organizations, seeking their feedback through several different methodologies. However, we did not receive any records to document outreach during this reporting period.

### 2. Meetings, Interactions, and Problem Solving

In this reporting period, OCP organized virtual "community conversations" around its policy G02-01, *Protection of Human Rights.* Three meetings are scheduled in December, 2021. In addition, OCP has had various informal meetings with groups, such as faith-based organizations that provided input on CPD's policy, G02-01-05, *Religious Interactions.*

In terms of problem-solving, OCP was able to analyze the qualitative and quantitative data collected previously to identify key themes, but in many cases, they were unable to bring in community leaders, advocates, and subject-matter experts to have a dialogue about these issues.

We continue to encourage the CPD to create working groups that can oversee progress on specific topics or multiple topics in the Impartial Policing section. Sending policy and training materials to specific organizations for review and comment is another viable model of engagement if it is appropriately handled and includes appropriate follow-up.

We are cognizant of the fact that the Consent Decree Coalition has drafted a Memorandum of Agreement between the City and the Coalition that seeks to create 12 separate working groups "to facilitate the drafting and implementation of CPD policy and practice." While the IMT supports the concept of working groups, the IMT will not take a position on this particular proposal at this point in time.

### 3. Follow-up and Sustainability

The IMT continues to assess whether the CPD's community engagement includes sufficient follow-up and efforts to sustain meaningful partnerships and problem-solving activities with community members. As noted earlier, CPD has exhibited some ability to summarize emergent themes from focus groups sessions and surveys and drawing some policy implications. Sharing this information with community leaders and continuing the dialogue with them in a more systematic way will help to build transparency and trust.

We have not witnessed any examples where CPD has followed our recommendation to prepare brief public reports, based on community input, that describe emerging themes from different topics and how the CPD plans to address each one. As envisioned, these reports would also specify where in policy or training the CPD has addressed, or plans to address, the theme. The CPD could share the report with the community participants before making them public as part of the CPD's "share-back" process.

Regarding sustainability, we continue to monitor the CPD's ability to form meaningful partnerships with stakeholders around the topics identified by the CPD and the Consent Decree. This will require the CPD to refine and institutionalize its community engagement framework, and we have been advised that OCP is planning to do so in 2022. Whether the CPD uses working groups or other community engagement models, we continue to encourage the City to pursue ¶52 in a systemic, strategic, long-term manner, with an organized effort to gather input from subject-matter experts and advocates.

### 4. General Police-Community Interactions

Paragraph 52 requires that CPD "seek input from members of the community and community organizations with relevant knowledge and experience." Reaching beyond community leaders, advocates, and service providers, we continue to bring attention to the thousands of calls that CPD officers respond to every single day and how each of these community members should have a voice in evaluating police services. Thus, the IMT will continue to recommend that the City seek to reli-

ably and systematically gather feedback for policy and training purposes by out-sourcing and sustaining a valid contact survey.[1] With this wealth of data, the CPD can begin to engage relevant SMEs and community organizations in developing or refining policy and training.

While CPD did not submit any official documentation in this reporting period on this paragraph, CPD is developing a policy on obtaining community input and fi-nalizing a 2022 community engagement plan and expects to submit it in the sixth reporting period.

***

In sum, the CPD maintained Preliminary compliance but failed to reach Secondary compliance because the CPD did not provide sufficient evidence that it has estab-lished a sound and sustainable community engagement process that ensures meaningful community input from "members of the community and community-based organizations with relevant knowledge and experience." ¶52. The CPD's model would need to ensure that specific groups, as well as the general public, have the opportunity to be heard, and that the data are being used effectively in the review of policy and training.

The IMT looks forward to reviewing and collaborating with CPD on the pending materials in future reporting periods to assess further levels of compliance with ¶52. The City and CPD will achieve Full Compliance when the CPD creates mecha-nisms for sustained, targeted community engagement. The model should include a system of performance measurement that will (1) give Chicago communities an ongoing voice in evaluating police services in every police district and (2) provide the CPD with a reliable feedback loop that is used to shape police behavior, reduce all forms of bias on the street, and ultimately build public trust. This would include an expansion of community engagement to protected classes that may have been missed so far.

### Paragraph 52 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

---

[1] For additional context, see our assessments for ¶¶53–57, below.

# Impartial Policing: ¶53

*53. CPD will, consistent with this Agreement, ensure that its policies and practices prohibit discrimination on the basis of any protected class under federal, state, and local law, including race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military status, source of income, credit history, criminal record, or criminal history. CPD's policies and practices will prohibit retaliation consistent with Section 6-101 of the Illinois Human Rights Act (eff. Jan. 1, 2015) and Section 2-160-100 of the Municipal Code of Chicago (amended Oct. 11, 2017).*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance with this paragraph as no updated submissions from CPD address requirements of this paragraph in the reporting period. The IMT continues to emphasize that ¶¶53 through 56 are at the heart of the Consent Decree. They require that the CPD ensures (through policy, training, supervision, and accountability) that its officers do not engage in bias-based policing, in either their actions or their words. CPD officers are prohibited from discriminating against any constitutionally protected classes of people and are expected to treat all people equally. Expressions of bias are prohibited in "routine or spontaneous law enforcement decisions" (¶55); denigrating language (¶54); retaliation (¶53); and using stereotypes about dress, transportation, or language (¶56).

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of these paragraphs into policy (pursuant to the ¶¶626–41 review process) and engage the community as required by ¶52.

*Progress before the Fifth Reporting Period*

During previous periods, the IMT reviewed revised versions of CPD policies that they assert incorporate these paragraphs' requirements including G02-01, *Protection of Human Rights* (¶53 and ¶54), and G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing* (¶55 and ¶56). However, the City and CPD has yet to complete the Consent Decree process for these policies on these directives.

In previous reporting periods, we reviewed several policies that the CPD asserted incorporate requirements in ¶¶53–56. The following policies have completed the review process (¶¶626–41) and have become effective:

(1) General Order G08-05, Prohibition on Retaliation (eff. December 30, 2020), designed to prohibit retaliation by a CPD member against another CPD member or a member of the public, and

(2) Special Order S02-01-03, Crime Victim Assistance (eff. December 30, 2020), designed to provide CPD members with guidance regarding service and assistance to victims of crime.

However, to achieve Preliminary compliance, other policies must complete the review process and these policies must be based on adequate community engagement (¶52). During this reporting period, we continued the review process started in the fourth reporting period for the following:

- Paragraphs 53 and 54: G02-01, *Protection of Human Rights*

- Paragraphs 55 and 56: G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing*.

These policies did not complete the ¶¶626–41 review process during this reporting period. Although we saw some improvements based on IMT and OAG feedback in the fourth reporting period, our reviews during the fifth reporting period continue to identify deficiencies.

Regarding G02-01, on July 12, 2021, we provided four main recommendations:

(1) the policy should explicitly prohibit CPD members from retaliating against community members who file complaints against them;

(2) the policy or related documents should include additional guidance on CPD's plans to assess whether it has been effective at prohibiting discrimination or preparing officers to police in a procedurally just manner;

(3) the policy should include stronger language to deter misconduct, including references to discipline; and

(4) the policy should be based on community engagement with individuals and community-based organizations with relevant knowledge and experience.

For G02-04, which is the centerpiece of the CPD's effort to prohibit bias-based policing, we have seen improvement, but more work is needed. We provided several recommendations on August 13, which included the following:

(1) the policy should include age as a factor that officers may not use to make routine or spontaneous law enforcement decisions, especially in light of IMT research showing the severe impact of CPD's actions on youth of color;

(2) the "examples of spontaneous law enforcement decisions" should include "searches" because they are frequent police actions that present an opportunity for officers to exhibit bias; and

(3) the policy should be based on community engagement with individuals and community-based organizations with relevant knowledge and experience, so careful documentation of such engagement is needed.

In addition to G02-01 and G02-04, we reviewed the CPD's revised Special Order S04-19 *Search Warrants*, and as noted in fourth reporting period, we consider search warrants relevant to Impartial Policing paragraphs of the Consent Decree (especially 53 and 54). The Parties have since agreed to that effect.[2] The CPD should consider how best to gather, analyze, and make basic data about search warrants publicly available. And part of that process should be incorporated into policy, including S04-19, to ensure that responding officers and supervisors gather critical information.

In sum, the City and the CPD did not meet Preliminary compliance with ¶¶53–56 because they have not completed the ¶¶626–41 review process for G02-01 and G02-04. We have learned that CPD has initiated a community engagement process around G02-01 that will be completed during the sixth reporting period. We credit the CPD for initiating this process, which began with a virtual webinar on November 15th. Over a two-month period, the OCP is offering several ways for the public to get involved to provide input on this policy: virtual public comments on the *Human Rights* policy, a public input form (an onlne survey), Community Conversations (two virtual meetings with a maximum of 200 participants), and Deliberative Dialogues (virtual meetings with community organizations that have knowledge and lived experience). We look forward to seeing the results of this process.

In assessing Secondary compliance, we will evaluate the CPD's efforts to (1) incorporate the requirements of ¶¶53–56 into training, (2) evaluate said training, and (3) implement the training with CPD personnel. Assessing Full compliance will ultimately turn on the CPD's ability to measure what matters and document im-

---

[2] *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timelin.._.pdf.

provements in officers' street-level behavior and decision making including engaging in specific remedies to prevent bias-based policing and measuring changes in members' level of bias or impartial policing as a result of these remedies.

*Measuring What Matters*

The IMT will continue to emphasize the fundamentals of police reform and the critical importance of measuring what matters for organizational success. After policy revisions, the City and CPD will need to focus on creating sustainable systems of community engagement, training, supervision, accountability, auditing, and performance assessment that are characteristic of evidence-based learning organizations. These systems will need to include methods to monitor the level of bias exhibited in police behavior and take corrective action as needed. For Full compliance, the IMT and the CPD must be able to ascertain whether the reforms have been impactful and are making a difference in the CPD's organizational culture and officers' daily interactions with the public.

We have yet to see whether CPD's "Performance Evaluations" and "Officer Support Systems (OSS)," contain the metrics needed for Impartial Policing. Again, we have asked the CPD and the new Public Safety Administration (PSA) to participate in virtual site visits on performance measurement associated with Impartial Policing, but such meetings have yet to materialize.

Again, we recommend that the CPD and the PSA review the metrics by which they evaluate police performance and give considerable attention to developing, implementing, and monitoring levels of impartial policing. We continue to emphasize the importance of measurement for changing organizational performance: What gets measured gets done and will be considered important. What is not measured is not considered a priority and, thus, gives officers the freedom to act as they please in these domains. CompStat is a good example of holding commanders accountable for specific outcomes, but the crime-fighting metrics used for CompStat need to be expanded.

As we noted in our prior reports, police officers make decisions that may or may not reflect impartial policing, including the decision to stop a car or pedestrian; to treat various community members with respect and dignity; to issue a warning or citation; to conduct a search; to make an arrest; to use some level of force; to thoroughly investigate crimes, or to make a complete and accurate report of incidents involving a police response.

Previously, we have reported dramatic racial disparities in stopping and using force against Black Chicagoans, especially young Black males. We have also expressed concern about the various methods of policing in Black and Latino neighborhoods to control crime and the pressure on officers who work there to make traffic stops,

arrests, citations, drug seizures, and execute search warrants of homes. Furthermore, we have no confidence in the CPD's program of corrective action, called Positive Community Interactions (PCI), which requires officers to document their positive encounters with the public and produce district reports on these contacts. The PCI system of reporting can easily be abused and does not adequately compensate for the high volume of traffic stops and other enforcement activities in Chicago's neighborhoods of color. Furthermore, our citywide survey shows that the majority of Chicagoans do not believe that CPD is providing fair treatment to Black Chicagoans or other marginalized groups.

Thus, we continue to encourage the City and CPD to monitor its own enforcement activity for possible bias and provide a public dashboard on existing disparities for transparency purposes. We continue to recommend that the City and CPD find ways to reliably measure the things that matter to the public (*i.e.*, procedural justice) and create feedback loops that will continuously improve officers' performance on these dimensions.

As we noted in our last report, there are two fundamental ways to measure police performance in the field: Reviewing body-worn camera footage and asking community members about their experiences with the CPD. The analysis of body-worn camera data is a topic covered elsewhere in this report. For Impartial Policing, the essential data system that is currently missing involves asking community members about how they were treated by CPD officers.

Thus, we continue to strongly recommend that the City and the CPD explore the options for developing and sustaining a valid contact survey, managed by an independent agency, that measures procedural justice by all CPD officers during all encounters. During this reporting period, the CPD has proposed to work with a group called MY90 to introduce an online contact survey that was scheduled to be pilot tested in November. On October 28th, IMT provided the CPD and MY90 with extensive feedback on their proposed survey.

While we are encouraged by this initiative, we expressed several concerns and made several recommendations: (1) the pilot test should include a more representative sample of police contacts and not be limited to a sample selected by CPD officers involving "positive community interactions;" (2) officers should distribute contact cards with officer's identification and a link to the online survey; (3) CPD should create a policy regarding this survey and the requirement that officers distribute cards for all contacts, and not selectively; and (4) CPD should conduct regular audits to ensure that the cards are being distributed consistently. IMT also recommended that the survey be expanded to measure all four dimensions of procedural justice and on not just one dimension.

As a result of this feedback, as well as feedback received from OAG and the Coalition, the City has decided to postpone the launch of the pilot until 2022. We look

forward to reviewing a revised survey instrument, revised methodology, and draft policy.

Eventually, this data system, along with body-worn camera data and various police reports, can be used to (1) build a system of performance evaluation for individual officers; (2) build a system of accountability for district and unit commanders; and (3) measure the level of fair and impartial policing exhibited toward constitutionally protected classes of people. Inside the organization, this would involve ensuring that the systems of training, supervision, accountability, investigations, auditing, and program evaluation reflect best practices and are evidence-based.

If the City and the CPD are genuinely interested in gathering systematic data to measure CPD's legitimacy and use of procedural justice, we strongly encourage them to begin listening to community members who have had recent police contact. Such data can be collected at the district, shift, unit, and individual officer levels to assess whether procedural justice principles are guiding police actions on the streets of Chicago.

Finally, in the interest of impartial policing and transparency, we continue to recommend that the CPD develop a public dashboard that provides a breakdown of key police decisions by demographic characteristics of the community member and other defining features of protected classes. We acknowledge that the CPD and the City Office of Inspector General are in the process of building various dashboards, and we encourage them to expand this work to CPD Stops, Citations, Searches, and Arrests. This could include ANOVs and misdemeanor arrests, where police have enormous enforcement discretion that could be influenced by the demographics of the subject or the neighborhood.

### Proper Data Analytics Staffing

The CPD will be unable to "measure what matters" to the organization or to the public without proper staffing. The CPD appears to be in dire need of personnel who have critical data analytic and research skills, which dramatically restricts the CPD's ability to produce hard evidence regarding its performance. Furthermore, the few individuals within the CPD who are tasked with data production are overwhelmed with the volume of requests both internally and externally.

We recommend that CPD determine the number of data analysts (with relevant qualifications) assigned to specific units and assess the adequacy of staffing levels given the growing demand for data management in the CPD. These individuals are not only essential for the proper collection, analysis, and reporting of data required by the Consent Decree, but they are essential if the CPD seeks to become a respected data-driven learning organization. The CPD must be able to quickly generate reports and evaluate the agency's responsiveness to various segments of the

community, ranging from sexual assault victims to hate-crime victims to persons facing a mental-health crisis. This would include public-facing dashboards.

The IMT has emphasized many other areas where data science is needed within the CPD, including the assessment of training programs, early warning systems, use-of-force statistics, and procedural justice statistics from everyday interactions. Again, we emphasize that the CPD's auditors and data scientists should not simply serve at the back end of the organization - compiling data from existing reports – they should also be at the front end helping to design new systems of measurement that are currently absent in CPD's accountability systems.

In sum, CPD should carefully examine its capacity to collect, clean, organize, analyze, visualize, and report good data, both for reform purposes and future organizational performance. To achieve this goal, CPD should consider the employment of additional civilians with college and graduate school degrees that include training in data design, analysis, and reporting. Assigning police officers to these positions who do not have the proper training or experience is problematic. Unfortunately, only about 7% of CPD's current workforce is civilian (in contrast to 30% of the Los Angeles Police Department).

*Progress in the Fifth Reporting Period*

In this reporting period, the IMT commented on a revised G02-01, produced June 11, 2021, at the beginning of the fifth reporting period. While improved, the revised policy does not address IMT's concerns (¶53) that G02-01 should explicitly reference the prohibition on CPD officers from retaliating against complainants to make clear that such behavior is unacceptable; and it does not provide any guidance regarding the CPD's overarching process to "ensure that its policies and practices prohibit discrimination" as required by this paragraph. Other concerns and recommendations pertaining to G02-01 and G02-04 were described earlier.

The IMT looks forward to the results of the community engagement process that was initiated late in fifth reporting period around G02-01 and G02-04. Similarly, we look forward to additional revisions to these policies to address the requirements in this paragraph in future reporting periods. Finally, the City and the CPD will need to find ways to reliably measure the things that matter to the public and that are needed to achieve policing without bias as required by ¶¶53–56. Specifically, the CPD and the City will need to collect, analyze, and report data on the quality of police services as well as disparities in police actions for constitutionally protected classes, and use such data to create feedback loops within the organization designed to improve officer's performance on these dimensions.

## Paragraph 53 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Impartial Policing: ¶54

**54.** *CPD will continue to require that all CPD members interact with all members of the public in an unbiased, fair, and respectful manner. CPD will require that officers refrain from using language or taking action intended to taunt or denigrate an individual, including using racist or derogatory language.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance for ¶54, because the policy that codifies this paragraph's requirement is still under ¶¶626–41 review. Please refer to ¶53 for an expanded analysis of the way we plan to assess the City and CPD's efforts to comply with ¶¶53–56.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of these paragraphs into policy (pursuant to the ¶¶626–41 review process) and engage the community as required by ¶52.

As mentioned in ¶53, during previous periods, the IMT reviewed revised versions of CPD policies that they assert incorporate these paragraphs' requirements including G02-01, *Protection of Human Rights* (¶53 and ¶54), and G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing* (¶55 and ¶56). However, the City and CPD has yet to complete the Consent Decree review process for these policies.

As discussed in ¶53, the IMT provided analysis, comments, and recommendations related to G02-01 and G02-04 in this reporting period but the revised policy still requires additional revision to meet the requirements of this paragraph.

The IMT looks forward to additional revisions to G02-01 and other policies to address the requirements in this paragraph in future reporting periods.

### Paragraph 54 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Impartial Policing: ¶55

**55.** *CPD will prohibit officers from using race, ethnicity, color, national origin, ancestry, religion, disability, gender, gender identity, sexual orientation, immigration status, homeless status, marital status, parental status, military discharge status, financial status, or lawful source of income when making routine or spontaneous law enforcement decisions, except when such information is part of a specific subject description.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance for ¶55 because the policy that codifies this paragraph's requirement is still under ¶¶626–41 review. Please refer to ¶53 for an expanded analysis of the way we plan to assess the City and CPD's efforts to comply with ¶¶53–56.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of these paragraphs into policy (pursuant to the ¶¶626–41 review process) and engage the community as required by ¶52.

In the fourth reporting period, the IMT reviewed a revised version of CPD's G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing*, which it asserts incorporates this paragraph's requirements. However, the City and CPD had yet to complete the Consent Decree review process for this policy by the end of the fifth reporting period.

At the beginning of this reporting period, the IMT commented on G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing* as the CPD works towards compliance on this paragraph. While improved, the IMT holds that the revised directive needs to include mention of "age" as a factor that should be prohibited when making "routine or spontaneous law enforcement decisions" to comply with the entirety of the Impartial Policing paragraphs of the Consent Decree, not just the requirements of this paragraph.[3] Best practices also suggest that an anti-bias policy should include reference to "age" as a factor that one could be

---

[3]    See ¶¶50 and 53(requiring the CPD to (i) provide police services to all members of the public without bias and without reference to stereotypes based on many factors, including age and (ii) ensure its policies and practices prohibit discrimination on the basis of protected classes, including age).

biased against.[4] Other IMT concerns about G02-04 were discussed earlier. In addition, the IMT still has concerns about the level of community engagement related to development and refinement of this directive.

Moving forward, we will continue to engage in the review process to ensure the CPD has policies that incorporate the requirements of these paragraphs. In assessing Secondary compliance, we will evaluate the CPD's efforts to (1) incorporate these requirements into training, (2) evaluate said training, and (3) implement the training with CPD personnel. Assessing Full compliance will ultimately turn on the CPD's ability to measure what matters and document improvements in officers' street-level behavior and decision making including engaging in specific remedies to prevent bias-based policing and measuring changes in members' level of bias or impartial policing as a result of these remedies.

### Paragraph 55 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

---

[4]    See also *Law Enforcement Policy Center's Bias-Free Policing,* The International Association of Chiefs of Police (January 2020) (modeling a policy that includes "age" as part of the "specified characteristics" upon which one could base a bias), https://www.theiacp.org/sites/default/files/2020-06/Bias-Free%20Policing%20January%202020.pdf.

## Impartial Policing: ¶56

> **56.** *CPD will provide guidance, through training and supervision, that reinforces to officers that substitutes or stereotypes for the demographic categories listed above in Paragraph 55, such as manner of dress, mode of transportation, or language ability, is prohibited when making routine or spontaneous law enforcement decisions, except when such information is part of a specific subject description.*

### Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The City and the CPD did not meet Preliminary compliance for ¶55 because the policy that codifies this paragraph's requirement is still under ¶¶626–41 review. Please refer to ¶53 for an expanded analysis of the way we plan to assess the City and CPD's efforts to comply with ¶¶53–56.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of these paragraphs into policy (pursuant to the ¶¶626–41 review process) and engage the community as required by ¶52.

At the end of the fourth reporting period, the IMT began to review a revised version of CPD's G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing*, which it asserts incorporates this paragraph's requirements. However, the City and CPD has yet to complete the Consent Decree review process for this policy.

As mentioned in ¶55, at the beginning of this reporting period, the IMT commented on G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing*, as the CPD works towards compliance on this paragraph. The IMT suggests the inclusion of "searches" as an example of "spontaneous law enforcement decisions" to illustrate when officer interactions with individuals could include bias. Other IMT concerns about G02-04 were discussed earlier. In addition, the IMT still holds that CPD needs to include more community engagement related to development and refinement of this directive.

Moving forward, we will continue to engage in the review process to ensure the CPD has policies that incorporate the requirements of these paragraphs. In assessing Secondary compliance, we will evaluate the CPD's efforts to (1) incorporate these requirements into training, (2) evaluate said training, and (3) implement the training with CPD personnel. Assessing Full compliance will ultimately turn on the

CPD's ability to measure what matters and document improvements in officers' street-level behavior and decision making including engaging in specific remedies to prevent bias-based policing and measuring changes in members' level of bias or impartial policing as a result of these remedies.

### Paragraph 56 Compliance Progress History

| FIRST REPORTING PERIOD SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SECOND REPORTING PERIOD SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | THIRD REPORTING PERIOD MARCH 1, 2020 – DECEMBER 31, 2020 |
|---|---|---|
| COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Status Update |
| FOURTH REPORTING PERIOD JANUARY 1, 2021 – JUNE 30, 2021 | FIFTH REPORTING PERIOD JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: None | COMPLIANCE PROGRESS: None | |

## Impartial Policing: ¶57

**57.** *CPD will continue to prohibit CPD members from posting, displaying, or transmitting content that is disparaging to a person or group based on race, religion, sexual orientation, or any other protected class on personal social media accounts.*

### Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance by having an implemented directive on this paragraph, G09-01-06, *Use of Social Media Outlet*, that has completed the Consent Decree review process but the CPD has not met Secondary compliance because they did not submit any records reflecting the CPD's efforts (1) to complete a feedback loop with certain community organizations or (2) to train members on G09-01-06 in this reporting period.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of this paragraph into policy (pursuant to the ¶¶626–41 review process), engage the community as required by ¶52, and translate the policy into training.

In previous reporting periods, the CPD completed the ¶¶626–41 review process for G09-01-06, the CPD's social media policy. We also acknowledged that the CPD sought input from Communities United, but the CPD did not incorporate many of their suggested edits. The training required by ¶57 was not developed.

Because the City and the CPD did not submit any records this period reflecting their efforts to comply with this paragraph, we cannot assess whether they moved into Secondary compliance during this period. To maintain Preliminary compliance, the CPD must submit records reflecting its efforts to comply with ¶52 in developing G09-01-06. For Secondary compliance, we will evaluate the CPD's efforts to develop and implement training for members on the G09-01-06. The training assessment will be linked to compliance with ¶¶72 and 74 and will require ¶52 community engagement.

The IMT looks forward to working with the CPD as they develop training materials related to this paragraph to meet Secondary compliance.

## Paragraph 57 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Impartial Policing: ¶58

*58. Within 90 days of the Effective Date, CPD will clarify in policy that CPD officers will permit members of the public to photograph and record CPD officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy. The policy will also provide that officers may take reasonable action to maintain safety and control, secure crime scenes and accident sites, protect the integrity and confidentiality of investigations, and protect the safety of officers or others.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, the City and the CPD have not met Preliminary compliance with ¶58, because the CPD has not provided community members with a meaningful opportunity to provide feedback regarding this paragraph's requirements, nor has CPD finalized the relevant policies to meet compliance with this paragraph, including the completion of the ¶¶626–41 review process.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of this paragraph into policy (pursuant to the ¶¶626–41 review process) and engage the community as required by ¶52.

In earlier reporting periods, we reviewed G02-01, *Human Rights and Human Resources*, as well as S03-14, *Body Worn Cameras*, but both directives still required additional revisions to meet requirements of this paragraph. In addition, the IMT recommended some form of community engagement in the policy development processes for these directives. *See* ¶52. The CPD has yet to produce records reflecting such engagement.

As of the end of the reporting period, the CPD did not produce revised policies for G02-01 or S03-14 based on IMT comments.

To achieve Preliminary compliance, the CPD must engage the community as required by ¶52 regarding ¶58's requirements and complete the ¶¶626–41 policy review process for G02-01 and S03-14. Moving forward, we will assess Secondary and Full compliance based on the CPD's efforts to train officers on these requirements and ensure the policies and training are implemented in practice.

## Paragraph 58 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Impartial Policing: ¶59

*59. Consistent with the requirements in the Accountability and Transparency section of this Agreement and CPD policy, CPD will require that CPD members immediately report to a CPD supervisor all incidents where they observe other CPD members who have engaged in misconduct, including discrimination, profiling, or other bias-based policing.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period we have assessed the City's and the CPD's efforts to comply with ¶59. We find that the City and the CPD did not meet Preliminary compliance with this paragraph because the CPD has yet to develop, revise, and finalize a policy as described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of this paragraph into policy (pursuant to the ¶¶626–41 review process) and engage the community as required by ¶52.

### Progress before the Fifth Reporting Period

As mentioned in ¶53, during previous periods, the IMT reviewed revised versions of CPD policies that they assert incorporate the requirements of ¶59, including G02-01, *Protection of Human Rights* (¶53 and ¶54), and G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing* (¶55 and ¶56). Other paragraphs related to Accountability and Transparency may be implicated as well, as noted below. However, the City and CPD has yet to complete the Consent Decree review process for these policies. A new community engagement process was initiated in December of 2021 for directives G02-01 and G02-04, but has yet to be completed.

### Progress before the Fifth Reporting Period

In this reporting period, the CPD did not submit any documents or policies related to the requirements of this paragraph. However, there are directives in revision by CPD related to Accountability and Transparency paragraphs that should incorporate requirements of this paragraph. The IMT continues to contend that comprehensive policies that address multiple, inter-related paragraphs across sections of

the Consent Decree remains the most efficient use of CPD resources to address requirements of the Consent Decree.

In addition, CPD has indicated a desire to include topics related to this paragraph as part of its new Community Engagement Plan being implemented in December of 2021 and January of 2022 (*See* ¶53). However, we caution them against trying to cover too many topics within this timeframe and within these virtual meetings.

The IMT looks forward to working with the CPD to develop and finalize policies that meet the requirements of this paragraph in future reporting periods.

### Paragraph 59 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Not Applicable | None | |

## Impartial Policing: ¶60

**60.** *Within 365 days of the Effective Date, CPD will develop and implement a policy guiding officers' interactions with members of religious communities. The policy will include, but not be limited to, instruction on interacting and searching individuals with garments or coverings of religious significance.*

### Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The IMT finds that the City and the CPD have not met Preliminary compliance because the CPD's new policy, G02-01-05, *Religious Interactions*, has not completed the ¶¶626–41 policy review process.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of this paragraph into policy (pursuant to the ¶¶626–41 review process) and engage the community as required by ¶52.

*Progress before the Fifth Reporting Period*

In the previous reporting periods, we assessed the CPD's effort to engage faith-based community members and organizations in the development of G02-01-05 and incorporate this feedback into the policy development process. The CPD has continued to make real progress by being responsive to faith-based organizations, and as a result, the policy is nearly finalized.

*Progress in the Fifth Reporting Period*

On October 21, 2021, the City and the CPD provided a further revised G02-01-05, dated September 10, 2021. Throughout this review process, the CPD has significantly improved G02-01-05, addressing various concerns raised by the IMT, the Office of the Illinois Attorney General (OAG), and faith-based organizations. Thus, on November 19th, IMT sent a no objection notice to the City regarding G02-01-05. However, on this same date, the OAG expressed some additional concerns about the policy, including the need for consistent use of terms and language throughout the document. Hence, the ¶¶626–41 review process has yet to be completed.

In this reporting period, CPD was also able to document and produce to the IMT how it has utilized this feedback from faith-based organizations and surveys to improve the draft policy. This practice demonstrates meaningful community input on a policy as required by ¶52 and the direct impact on the policy development process. The IMT commends CPD on these efforts and strongly encourages using these practices moving forward to meet requirements of ¶52 on all Consent Decree paragraphs.

To achieve Preliminary compliance in future reporting periods, the City and CPD must complete the ¶¶626–41 review process. Moving forward, we will assess the CPD's efforts to train its members on the new policy, including community engagement, and ensure adequate supervisory oversight is in place to ensure the policy is implemented into practice.

### Paragraph 60 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

## Impartial Policing: ¶61

*61. Within 180 days of the Effective Date, CPD will review and, as necessary, revise its policies guiding CPD members' interactions with transgender, intersex, and gender nonconforming individuals, including protocols for arrests, pat downs and searches, transportation, and detention, in order to ensure that, at a minimum: a. terms are properly defined; b. CPD members address individuals, using the names, pronouns, and titles of respect appropriate to the individual's gender identity as expressed or clarified by the individual; c. CPD members refer to individuals in documentation by the name and gender identity as expressed or clarified by the individual, in addition to the information provided on the individual's government-issued identification; d. where same-sex pat downs or searches are required by law or CPD policy, CPD members will respect the gender identity as expressed or clarified by the individual and not rely on proof of the individual's gender identity, such as an identification card, except when a pat down is immediately necessary and waiting for an officer of the same gender would compromise officer or public safety; e. absent exigent circumstances, a transgender, intersex, or gender nonconforming individual is not transported or detained with individuals of a different gender, and that when determining the gender of that individual, CPD members will respect the gender identity as expressed or clarified by the individual and not rely on proof of the individual's gender identity, such as an identification card; and f. CPD members are prohibited from inquiring about intimate details of an individual's anatomy, or medical history, except as necessary to serve a valid law enforcement purpose.*

### Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶61 because the CPD has completed the ¶¶626–41 review process for General Order G02-01-03, *Interactions with Transgender, Intersex, and Gender Nonconforming (TIGN) Individuals* and meaningfully engaged with community-based organizations with relevant knowledge and experience in revising the policy. *See* ¶52.

However, the City and the CPD did not achieve Secondary compliance with this paragraph as there were no training materials produced in this reporting period

related to this paragraph. Part of our Secondary compliance review process includes not only the content of the materials but also the quality of training evaluations associated with the training. We also seek updates from the CPD regarding any changes in practices related to G02-01-03 and the related General Order G06-01-01, *Field Arrest Procedures*. The IMT also monitors the CPD's supervisory oversight methods (*e.g.*, discipline, coaching, and other interventions) employed to ensure the policy is implemented as written.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of this paragraph into policy (pursuant to the ¶¶626–41 review process) and engage the community as required by ¶52.

In the previous reporting periods, we assessed the CPD's efforts to engage community members and organizations with relevant knowledge for input on G02-01-03 policy revisions. In the fourth reporting period, the City achieved Preliminary compliance by finalizing the directive and completing the public comment period. The final revised version of G02-01-03 became effective on the last day of the fourth reporting period.

As mentioned in Independent Monitoring Report 4, over the past two years, the community engagement process around G02-01-03 has been exemplary, and we encourage the CPD to use that process as a model for its efforts to comply with ¶52. The CPD and TIGN Working Group engaged in difficult conversations, overcame obstacles, listened to each other, and ultimately found common ground, which resulted in a robust directive that met the requirements of the paragraph and incorporated lived experiences of those that it will impact in the community. As the TIGN working group noted, "We are hopeful that – if properly implemented and actually followed – this policy will reduce instances of officer harassment of transgender and gender-non-conforming individuals, make those people safer, and possibly lead to creating trust of police by those communities."

In sum, the City and the CPD met Preliminary compliance. The CPD will need to develop good training and internal accountability measures to ensure that the policy is well implemented in practice. *See* ¶765. In addition, the TIGN Working Group expressed a desire to continue providing feedback as the CPD develops training related to this policy, and the CPD has agreed to this arrangement. We look forward to following these developments as we assess Secondary compliance during the sixth reporting period.

For Secondary Compliance, we will assess the CPD's ability to train its officers once the training materials are finalized. For Full Compliance, we will monitor whether the policy and training have been sufficiently implemented such that the CPD can demonstrate a positive impact on how CPD officers interact with TIGN individuals. Measuring the impact of the policy and training may involve a review of (1) police reports to ensure that CPD members are completing them as proscribed in G02-

01-03 and (2) contact survey responses from people who have had recent contact with a CPD officer.

### Paragraph 61 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Impartial Policing: ¶62

*62. CPD will require that officers comply with CPD policies related to officer response to allegations of sexual assault, sexual abuse, stalking, and domestic violence. All officers will receive in-service training every three years to ensure CPD's response to allegations of gender-based violence, including dispatch response, initial officer response, and on-scene and follow-up investigation, is both effective and unbiased.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Recurring Schedule:** | Every Three Years (December 31, 2022) | ✓ **Not Yet Applicable** |
| **Preliminary:** | *Not in Compliance* | |
| **Secondary:** | *Not Yet Assessed* | |
| **Full:** | *Not Yet Assessed* | |

The City and the CPD did not meet Preliminary compliance because the records provided for training, including Special Order S11-10, *Department Training Records Maintenance*, training curricula, and community engagement documents, have not completed the ¶¶626–41 review process.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of this paragraph into policy (pursuant to the ¶¶626–41 review process) and engage the community as required by ¶52.

*Progress before the Fifth Reporting Period*

In the previous reporting periods, we have commented on CPD's difficulty engaging the community in its policy development process. Community engagement continues to be a significant stumbling block to the CPD's compliance with this paragraph, although some progress has been made. CPD has not followed through on its plan to create a working group to allow organizations with knowledge and expertise to have a voice in this reform process, and several respected organizations have expressed reluctance to partner with CPD because of a history of problematic relationships and lack of priority given to gender based violence by the CPD.

However, we want to acknowledge the work that CPD has done to build or introduce several training programs that are relevant to ¶62. As noted previously, the CPD introduced an eight-hour online training titled, *Trauma-informed Response to*

*Sexual Assault.*[5] Then CPD drafted an eight-hour online training titled, *The Psychology of Domestic Violence*.[6] After initial reviews and recommended changes, the IMT is now satisfied with the content of these trainings.[7]

Finally, and most relevant to ¶62, the CPD received a grant from the U.S. Department of Justice, Office of Violence Against Women (OVAW) that includes proposed training on responses to gender-based violence. However, we have cautioned that the CPD must seek input from community members and organizations with relevant experience and knowledge during the development of this training (¶52).

In response, the CPD has partnered with the National Police Foundation (NPF) to develop and deliver this training with particular attention to Pars. 52 and 62. From August through October of 2021, NPF sought to engage local stakeholders to identify CPD training needs around gender-based violence. A dozen virtual or in-person focus groups were completed, including meetings with survivors, advocates, prosecutors, and CPD officers (including Domestic Violence Liaison officers). We look forward to seeing the NPF's summary of these results and the implications for both policy and training. Based on IMT's virtual site visit with NPF and CPD, the preliminary findings appear to suggest there is a need for more training on how to identify the aggressor, how to conduct victim-center investigations, how to communicate with empathy, how to write reports that are complete and accurate, and how to locate/utilize interpreter services.

*Progress in the Fifth Reporting Period*

The City and the CPD assert that they are taking steps to reconcile relations with local gender-based violence advocates to ensure their significant role in these reforms efforts. *See* ¶52.

In terms of policy, training, and service delivery, we continue to encourage the CPD to create a special unit comprised of officers and civilians with specialized knowledge and skills focused solely on sexual assault, sexual abuse, stalking, and domestic violence. This type of unit could help to ensure that the voices of local gender-based violence experts are heard and provide a single point of contact, as recommended by experts. Furthermore, a sex crimes unit would help to ensure CPD's compliance with this paragraph by effectively investigate crimes of gender-based violence. As we have noted before, the CPD is unique among larger police departments in that it does not have a sex crimes unit.

---

[5] Although this training program was developed by the Illinois Law Enforcement Training and Standards Board (LETSB).

[6] However, the CPD did not submit this training for compliance with ¶62.

[7] IMT submitted a no objection letter to *The Psychology of Domestic Violence* training on November 9, 2021.

We have noted previously that CPD does not have a policy on gender-based violence, *per se*. Instead, the CPD has dozens of directives and forms related to the topic. We recommended consolidating and extracting information of particular importance to these crimes into a single directive. The CPD has, however, so far rejected that recommendation.

We believe it will be difficult for the CPD to "require that officers comply with CPD policies related to officer response to allegations of sexual assault, sexual abuse, stalking, and domestic violence" (¶62) if the policies do not provide clear and concise direction given that the guidance spans over 20 directives and forms. In developing a general policy (or policies), we encourage the CPD to take a suggestion from Chicago gender-based violence advocates by adopting the *Response-to-Sexual-Assault-Report Review Checklist* developed by the International Association of Chiefs of Police (IACP).[8]

Ultimately, the CPD will need to evaluate whether the training is effectively guiding CPD members' response to allegations of gender-based violence. As such, we recommend that the CPD create and implement a plan for collecting data that it can use to evaluate whether the training is making a difference with officers, victims, and offenders, both in terms of fairness and effectiveness.

To promote transparency, enhance legitimacy, and build public trust, we also continue to recommended that CPD publish an annual report on the characteristics of these events (*e.g.*, types of sexual assault) and the investigatory outcomes so that everyone may consider the implications for preventative strategies, victim services, justice/deterrence, CPD policy, and CPD training.

The City and the CPD did not achieve Preliminary compliance because the policy codifying the training requirement, S11-10, has not completed the ¶¶626–41 review process, we have not received records reflecting the CPD's efforts to engage community members and organizations in developing the training, and we have not reviewed any additional training materials guiding the CPD's response to gender-based violence. To achieve Preliminary compliance with ¶62, we will review future documentation of CPD's efforts to engage stakeholders on gender-based violence and the CPD's proposal, with stakeholder support, that clarifies how the CPD will ensure that officers comply with CPD policies related to officer response to allegations of sexual assault, sexual abuse, stalking, and domestic violence. As we recommended, we believe that one or two overarching policies on the topics

---

[8]  International Association of Chiefs of Police (IACP) offers five checklists for reports on gender-based violence. *See Response to Sexual Assault Report Review Checklist*, INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, https://www.theiacp.org/resources/document/response-to-sexual-assault-report-review-checklist.

will be necessary to ensure CPD officers are complying with policies regarding gender-based violence.

Secondary compliance will depend on the quality of the training lesson plans, the level of community engagement in developing the training, the quality of the training delivered, and the evaluations used to measure effectiveness.

### Paragraph 62 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Impartial Policing: ¶63

**63.** *Within 180 days of the Effective Date, CPD will develop and implement a policy that prohibits sexual misconduct by CPD members. The policy will be consistent with best practices and applicable law and will provide definitions of various types of sexual offenses, including those that are not criminal in nature.*

## Compliance Progress           (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have not met Preliminary or Secondary compliance with ¶63 because the CPD has not yet completed the required ¶¶626–41 review process for General Order G08-05, *Prohibition of Sexual Misconduct*.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of this paragraph into policy (pursuant to the ¶¶626–41 review process) and engage the community as required by ¶52. The IMT has assessed Preliminary compliance based on the quality of directive G08-05 and the extent of community engagement in its development.

The CPD did not meet Preliminary compliance in previous reporting periods for the same reasons noted above. In addition, in previous reporting periods, the IMT expressed concern that CPD had not sufficiently engaged community members on the development of this policy.

During this reporting period, the CPD produced a revised G08-05 on October 6, 2021. The CPD engaged community leaders and victim advocates and sought feedback on this draft during a meeting on October 14, 2021, observed by IMT. We have also received independent comments from community organizations involved. After reviewing the revised draft of G08-05 and listening to community feedback, the IMT provided additional comments to the City on November 19, 2021.

The CPD has taken steps to address some of our earlier comments in Independent Monitoring Report 4 regarding engaging the community around this policy. However, it remains unclear how the information from the supplemental documents produced—including lesson plans, other department policies, model policies, community surveys, and focus group findings—influenced the refinement of G08-05.

In addition, the IMT and community advocates have substantive comments related to the policy that still need to be addressed prior to considering preliminary compliance. For example, the policy should contain: additional information regarding how supervisors will be held accountable for the duties listed; how this policy applies to CPD members at all ranks; a more complete list of prohibited sexual behaviors (e.g. groping or assaulting sex workers); and how investigative procedures would differ for sexual misconduct incidents involving minor victims. Reference to officer wellness programs in this policy should focus on the victims rather than the offenders. We also recommend that the policy include an explicit reference to victims' rights attorneys and victim advocacy groups that can provide assistance to survivors. Additional recommendations are included in our November 19 assessment.

In future reporting periods, the IMT looks forward to seeing a revised G08-05 that addresses our remaining concerns and those of the community.

### Paragraph 63 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Impartial Policing: ¶64

*64. Within 180 days of the Effective Date, CPD will review and, to the extent necessary, revise its language access policy to provide meaningful access to CPD programs and services for individuals who have a limited ability to speak, read, write, or understand English. CPD will ensure that its language access policy provides timely and meaningful access to police services for individuals with limited English proficiency ("LEP"). CPD will also require that qualified and Department-authorized interpreters are used in accordance with CPD policy, including for the provision of Miranda warnings. CPD will publish its language access policy on its website and, consistent with the requirements of Paragraph 28 of the Community Policing section of this Agreement, make the policy available to community-based group serving LEP communities in Chicago.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance with ¶64 because the CPD's language access policy, Special Order S02-01-05, *Limited English Proficiency*, is still undergoing the ¶¶626–41 review process and the City did not produce a revised version in the fifth reporting period.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of this paragraph into policy (pursuant to the ¶¶626–41 review process) and engage the community as required by ¶52. The IMT has assessed Preliminary compliance based on the quality of directive S02-01-05 and extent of community engagement in its development.

### Progress before the Fifth Reporting Period

During the previous reporting periods, the IMT reviewed and commented on drafts of S02-01-05 and monitored the CPD's efforts to implement targeted community engagement for input on revising the policy. We also reviewed the City's Language Access Coordinator's actions and the CPD's Language Access Coordinator's status reports, recommendations, and implementation plans. Those records reflect an excellent roadmap of changes that we hoped the CPD would incorporate in the next iteration of S02-01-05.

In addition, throughout the various reviews of S02-01-05, we noted significant improvements to the policy. However, a few significant concerns remain unresolved. First is the lack of analysis by CPD of the received community feedback. Although we saw summaries of the themes that emerged from the focus groups and community surveys, the CPD did not provide an analysis of how these themes were used, if at all, to inform the latest revisions to S02-01-05. It is unclear to us whether any of the communities' recommendations or input influenced S02-01-05's development.

Further, the IMT was concerned that S02-01-05 lacks a mechanism or process for verification and certification for Department-Authorized interpreters. These processes are necessary to ensure Department-Authorized interpreted are qualified, meaning they have the skills and proficiencies needed to provide interpretations. For example, S02-01-05 provides for a "non-certified" "multilingual Department member," rather than requiring a "Department-authorized interpreter." The paragraph requires that the CPD ensures qualified and Department-authorized interpreters are used, and therefore the previously reviewed draft of S02-01-05 does not align with the requirements of this paragraph.

*Progress in the Fifth Reporting Period*

In this reporting period, the City and CPD have continued to work on revisions to S02-01-05. While a revised version of this directive that incorporates community feedback was not produced in the fifth reporting period, the IMT attended a site visit on October 20, 2021 that included significant discussion of the LanguageLine pilot, a mobile application that can provide immediate translation services in a variety of languages including those required in the Consent Decree, and attendance from the CPD Language Access Coordinator.

As of October 20, over 1,600 officers had received training on the availability and capabilities of LanguageLine and CPD had activated almost 2,000 devices that could use this service in the field. In addition, usage statistics from the application indicated that officers made over 500 requests for translation for 40 spoken languages as well as American Sign Language translation. Almost half of the requests were for Spanish translation services. The IMT appreciates the kind of usage data that is available through LanguageLine as it should inform Department interpreter needs for the future, although CPD will need to ensure that the program is being used consistently, without bias, across different communities with limited English proficiency.

The City's and the CPD's ability to provide meaningful access to CPD services for individuals with limited English proficiency will depend, in part, on their ability to track language access needs data across different units and districts. In other words, access to language services should be based on a needs assessment, which

in turn, should be based on good data from the CPD and the Office of Emergency Management and Communications. Thus, we continue to encourage the CPD to codify tracking procedures on persistent and emerging translation needs within Chicago communities and incorporate them in S02-01-05.

While the IMT recognizes the immense value of LanguageLine availability and use to the CPD to meet requirements of this paragraph, the IMT continues to recommend that CPD utilize LanguageLine as a supplemental service when "qualified and Department-authorized" interpreter services are unavailable, have a finalized S02-01-05 guide the use of this service, and that subsequent training is based on the finalized policy. Until these actions have been taken, we are concerned that the use of such services will be applied inconsistently across districts to those who need it during interactions with CPD. For these reasons, we recommend that CPD conduct an audit of LanguageLine usage by CPD members, per ¶65.

In future reporting periods, we will continue to monitor the CPD's effort to seek input from community members and organizations with relevant experience and knowledge in revision S02-01-05. Evidence of such engagement should include an analysis of how the CPD used community input to inform S02-01-05 policy revisions. We will also assess the CPD's efforts to finalize S02-01-05 according to the ¶¶626–41 review process. Once S02-01-05 is finalized and implemented, we will monitor the CPD's efforts to train its members in how to provide community members with meaningful access to the City's limited English proficiency programs and services. Moving forward, we will review the CPD's process of verifying and certifying that Department-Authorized interpreters have the necessary skills and proficiencies and evaluate the CPD's success with the citywide rollout of LanguageLine's InSight application.

### Paragraph 64 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Impartial Policing: ¶65

**65.** *Within 180 days of the Effective Date, the City will designate a language access coordinator who will coordinate with CPD and review CPD's compliance with its language access policy and Section 2-40 of the Municipal Code of Chicago. The City's language access coordinator will assess the effectiveness and efficiency of CPD's policies on an ongoing basis and will report to the Superintendent or his or her designee any recommendations to revise policy, if necessary.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City has maintained Preliminary compliance but has yet to achieve Secondary compliance because the Language Access Coordinator (LAC) has yet to establish a system of review to "assess the effectiveness and efficacy of CPD's policies on an ongoing basis."

To evaluate Preliminary Compliance, the IMT assessed whether the City and CPD established and hired a language access coordinator, which they accomplished in the second reporting period. To evaluate Secondary Compliance, we monitored the CPD's efforts to develop a system of data collection to assess LEP needs and services, including changes to CPD reports and CPD policy.[9] We will also review the City's or CPD's efforts to evaluate/audit the delivery of language access services to ensure complete and impartial coverage.

During previous reporting periods, we credited the City's and the CPD's LAC for developing a working relationship within the Department, although it appears that CPD's LAC will take a lead role in many of the tasks needed to achieve compliance with ¶65 as well. CPD's LAC has offered a number of proposals to enhance the CPD's responsiveness to the needs of individuals with limited English proficiency and has already improved drafts of the CPD's language access policy (S02-01-05), which is still under ¶¶626–41. Furthermore, the CPD's LAC developed a website geared towards individuals with limited English proficiency and posted materials,

---

[9] For example, the CPD should require officers to report whether (1) language services were needed, (2) for which language the services were needed, (3) whether interpreter services were provided, and (4) if so, by whom. After the CPD develops procedures for language access data collection, we expect the CPD to incorporate those procedures into S02-01-05. *See* ¶64.

ranging from feedback and complaint forms to victim assistance, in five different languages.[10]

In addition, in the fourth reporting period, the CPD and the City began the process of developing standard operating procedures for both LACs. These standard operating procedures begin to clarify the roles and responsibilities relevant to this paragraph and other related Consent Decree requirements. In the meantime, the responsibilities of the CPD's LAC are delineated in S02-01-05.[11]

Lastly, the CPD's LAC developed a Language Access Plan in the fourth reporting period that examined current CPD provisions of language access services as a means for the LAC to examine how the policies and trainings are translating in practice. The Language Access Plan also provided goals and objectives for the CPD to meet the demands of Chicago residents who have limited English proficiency. The Language Access Plan did not, however, provide the process of data collection and the metrics by which the CPD's LAC will assess the effectiveness and efficacy of the CPD's policies as required by this paragraph. Effectiveness measures should include impartial policing. In other words, the data should allow for an assessment of whether language access services are being made available to all communities with substantial LEP populations.

*Progress in the Fifth Reporting Period*

While the CPD maintained Preliminary Compliance with this paragraph, the City did not produce any materials for assessment for additional levels of compliance in this reporting period. However, the CPD's LAC developed a Language Access Plan that provides a clear roadmap of where CPD intends to make progress with regard to language access. In addition, the IMT received an update on LAC actions during a site visit on October 20, 2021, indicating that LanguageLine was being quickly rolled out, with more than 100 short presentations to CPD members. However, a Language Access policy had yet to updated to reflect these changes.

In assessing Secondary compliance in future reporting periods, we will monitor the CPD's efforts to develop a system of data collection to assess LEP needs and services, including changes to CPD reports and CPD policy. This system is necessary to LAC's ability to evaluate the CPD's compliance with S02-01-05 and Section 4-40 of the Municipal Code of Chicago and to assess the effectiveness and efficiency of CPD's policies as they relate to the provision of impartial and timely access to high-

---

[10] *See Language Access Policy of the Chicago Police Department*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/community-policing-group/language-access/.

[11] The language access policy indicates that CPD's LAC is expect to "establish a monitoring program to ensure compliance with the LEP policy, including the: implementation of the policy; assignment, and use of multilingual Department members; and necessity of translating Department forms, publications, and distribution materials."

quality LEP services. We look forward to a more complete assessment of LanguageLine implementation as well as a status report on language interpreter services provided by CPD members.

## Paragraph 65 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Impartial Policing: ¶66

*66. Within 365 days of the Effective Date, OEMC will provide training to its police communication supervisors, call-takers, and dispatchers (collectively, "tele-communicators") that is adequate in quality, quantity, type, and scope, and that addresses procedures consistent with CPD policy for responding to calls requiring language access services.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the Office of Emergency Management and Communications (OEMC) maintained Preliminary compliance with this paragraph. They did not achieve Secondary compliance because the OEMC may need to update its training to ensure the procedures (1) are consistent with the CPD's S02-01-05, which is still undergoing the ¶¶626–41 review process, and (2) are responsive to the data collection needs that provide the foundation for improved limited English Proficiency services in Chicago.

To evaluate Preliminary compliance, the IMT examined whether OEMC developed a training directive to meet requirements of this paragraph and in alignment with current CPD policy S02-01-05. To evaluate Secondary compliance, the IMT examined implementation and evaluation of said training.

During the previous reporting period, we assessed the OEMC's efforts to review and revise its Training Notice No. TNG 19-004, *Limited English Proficiency*. The OEMC did not provide a revised version of training that addresses our remaining concerns as described in previous reporting periods.

During this reporting period, OEMC produced a revised Training Notice 19-004 on October 13, 2021. As mentioned in previous paragraphs, CPD is actively revising S02-01-05; thus, trainings to meet requirements of this paragraph need to include alignment with the finalized policy to ensure the training is fully "consistent with CPD policy."

In addition, OEMC's revised training did not substantively address IMT comments from initial review on March 29, 2020, such as providing more guidance to dispatchers when responding to calls requiring language services.

Also, ¶66 indicates three sets of OEMC roles to receive training in language-access services, including communication supervisors, call-takers, and dispatchers. The

provided training bulletin only encompassed the latter two roles while providing no training content intended specifically for supervisors. For the IMT to consider this bulletin for further compliance with this paragraph, all roles need tailored content specific to each named positions in this paragraph and the expectations of those roles to address the requirements of this paragraph through trainings.

The City and the OEMC maintained Preliminary compliance but have not met Secondary compliance. Moving forward, we will assess the OEMC's efforts to update TNG 19-004 to address our comments, changes to S02-01-05, and any feedback that the CPD receives from relevant community stakeholders. After finalizing an updated TNG 19-004, we will assess the OEMC's implementation and evaluation of the training.

### Paragraph 66 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Impartial Policing: ¶67

> **67.** *Within 180 days of the Effective Date, and as necessary thereafter, CPD will translate its language access policy into any non-English language spoken by a limited or non-English proficient population that constitutes 5% or 10,000 individuals, whichever is less, in Chicago, as outlined in Section 2-40-020 of the Chicago Municipal Code. CPD will publish translated versions of its language access policy on its website.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Secondary compliance with this paragraph because the CPD's Language Access Plan sufficiently provides for a schedule and system to consistently review language access data to determine whether additional translations are necessary and to make revisions as needed to Special Order S02-01-05, *Limited English Proficiency*.

The City and the CPD have not met Full compliance because we have not had an opportunity to assess whether the day-to-day operations and supervisory oversight is sufficient to determine that the translations' review schedule and system of review for S02-01-05 have been institutionalized. We have not had that opportunity because there have been no opportunities for the CPD to put the review process in practice considering that S02-01-05 is still under ¶¶626–41 review.

In previous reporting periods, the City and the CPD met Preliminary compliance because the CPD translated its Special Order S02-01-05 into Spanish, Polish, Chinese, and Arabic. In the third reporting period, the City and the CPD met Secondary compliance by providing evidence that it has the managerial practices in place to confirm that the languages selected for translations represent all groups that meet the criteria outlined in this paragraph. The CPD approved its Language Access Coordinator's *Language Access Plan* during the fourth reporting period. The Plan outlines an annual schedule and system to review language access data to determine if additional translations are needed.

During this reporting period, the City and CPD did not produce any materials related to additional levels of compliance for this paragraph.

CPD has maintained Secondary compliance and has made good efforts to begin the process of institutionalizing the translations review and revision process. However, we will need to continue our assessment to determine whether the record

of those operations reflects a consistent adherence to the process. Since we have not assessed the CPD's efforts through the full annual review process, as the Plan was only finalized this reporting period, we cannot yet say the City and CPD have reached Full compliance. Moving forward, we will continue to monitor the CPD's efforts to adhere to the translation and review process outlined in the Language Access Plan, including the CPD's efforts to translate S02-01-05 once it is finalized. We look forward to any updates on the "non-English proficient population that constitutes 5% or 10,000 individuals, whichever is less, in Chicago" as a result of the 2020 Census.

## Paragraph 67 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Impartial Policing: ¶68

*68. Before January 1, 2020, CPD will review and, to the extent necessary, revise its policies and practices for ensuring effective communication and meaningful access to CPD programs, services, and activities for individuals with physical, mental, or developmental disabilities. These policies will identify specific procedures and responsibilities applicable to circumstances in which CPD officers encounter persons with intellectual or developmental disabilities, autism, dementia, blindness, deafness, hearing loss, and mobility disabilities, including, but not limited to: a. properly defining terms related to individuals with disabilities and the disability community; b. providing reasonable accommodations, to the extent safe and feasible, in order to facilitate CPD officer encounters with individuals with a disability; c. the arrest and transport of individuals with disabilities or who require the assistance of ambulatory devices; and d. using qualified and Department-authorized interpreters, consistent with CPD policy, to communicate with people who are deaf, hard of hearing, or who have a speech impairment, including for the provision of Miranda warnings.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance regarding this paragraph because the CPD has not finished revising its policies for ensuring effective communication and meaningful access to CPD services for individuals with physical, mental, or developmental disabilities.

To assess Preliminary compliance, the IMT assessed compliance based on the quality of directive S02-01-01, *People with Disabilities,* and extent of community engagement in its development.

### Progress before the Fifth Reporting Period

In previous reporting periods, the City and the CPD did not meet Preliminary compliance because the CPD had not started or completed the ¶¶626–41 review process regarding Special Order S02-01-01, *People with Disabilities.* The IMT's primary concerns regarding the submitted policy is that it could benefit from clearer and

more precise language regarding use and certification of interpreters for deaf and hard of hearing individuals as specified in ¶68(d).

*Progress in the Fifth Reporting Period*

In this reporting period, there were no productions by the CPD related to compliance of this paragraph. That said, the IMT has been informed that in early 2022, CPD, in partnership with the Mayor's Office of People with Disabilities, will launch two advisory committees focused on people with disabilities. The CPD is still working on the composition of these committees but early indications suggest that CPD is thoughtfully including a diverse set of voices and organizations as it relates to individuals with disabilities. Both committees will review latest drafts of S02-01-01. Once CPD finalizes the policy, the committees will support development of training on the policy.

IMT is pleased to see that CPD is thoughtfully incorporating community input in the development and training around its disabilities policy. Moving forward, we will assess the CPD's efforts to finalize S02-01-01. We will also continue to assess the CPD's efforts to engage relevant disability communities and their advocates, considering the concerns we raised in the previous monitoring report regarding the limitations to the focus group model. After the CPD finalizes S02-01-01 and any other policies related to this paragraph, we will assess the CPD's efforts to train its members on the updated policies, including the extent to which training aligns with the CPD's efforts to comply with ¶69.

## Paragraph 68 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Impartial Policing: ¶69

**69.** *Before January 1, 2020, CPD will develop a training bulletin that provides CPD members guidance on interactions with people with disabilities, including: a. recognizing and responding to conduct or behavior that is related to an individual's disability, including qualifying medical conditions such as Alzheimer's disease and diabetes; b. providing effective communication and minimizing barriers to communication, including by incorporating sign language and other modes of communication used by people who are deaf, hard of hearing, or who have a speech impairment during police-community interactions; c. attending to the specific needs of individuals with disabilities, such as mobility devices, prosthetics, and service animals; and d. recognizing and responding to identified abuse, neglect, or exploitation of individuals with disabilities, including making any notifications required by CPD policy or the law.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance during this reporting period because the CPD has not finished developing its training bulletins on interactions with people with disabilities

To assess Preliminary compliance, the IMT assessed whether the CPD had finalized training bulletins on topics specified in this paragraph.

During the last reporting period, the CPD produced the following draft training bulletins: (1) *People with Disabilities*; (2) *Autism and Police Response*; (3) *Interacting with the Deaf Community; (4) What is a Service Animal?*; (5) *Understanding Diabetes, (6) A Law Enforcement Perspective*; and *Alzheimer's Disease and Related Dementias*. The ADA Liaison was meaningfully involved in the bulletin-development process, providing initial content for the general training bulletin on individuals with disabilities. However, the guiding policies for these training bulletins, most notably Special Order S02-01-01, *People with Disabilities,* had not been finalized, and thus the IMT could not assess if these bulletins aligned with S02-01-01. We also monitored the CPD's continuing efforts to engage community members and organizations with relevant knowledge and experience in developing and revising the relevant training bulletins. Since S02-01-01, which guides officers' interactions with individuals with disabilities, is still under review, the IMT urged the

CPD to refrain from finalizing these training bulletins until they can reflect the most accurate and up-to-date guidance.

During this reporting period, the CPD did not produce any additional productions related to this paragraph. The CPD did indicate that they plan to resume revisions and submissions related to this paragraph once they finalize S02-01-01 as recommended by the IMT.

Special Order S02-01-01, *People with Disabilities,* has not been finalized, and thus the IMT could not assess if these training bulletins aligned with the policy. We have encouraged the CPD to refrain from finalizing these training bulletins until they can reflect the most accurate and up-to-date guidance from CPD's policy or Special Orders.

### Paragraph 68 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

## Impartial Policing: ¶70

> **70.** *Within 180 days of the Effective Date, CPD will designate at least one member as an Americans with Disabilities Act ("ADA") liaison who will coordinate CPD's efforts to comply with the ADA and: a. regularly review the effectiveness and efficiency of CPD's policies and training as they relate to individuals with disabilities and report to the Superintendent, or his or her designee, any recommended revisions, if necessary, to ensure compliance with the law and this Agreement; b. serve as a resource to assist CPD members in providing meaningful access to police services for individuals with disabilities; and c. act as a liaison between CPD and individuals with disabilities.*

**Compliance Progress**          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance regarding ¶70 because the CPD designated an ADA Liaison in the third reporting period. However, the CPD did not meet Secondary Compliance for the current reporting period.

To evaluate Preliminary compliance, we assessed the CPD's efforts to designate an ADA Liaison. To evaluate Secondary compliance, we assessed the CPD's efforts to integrate the ADA Liaison into CPD processes and practices specific to this paragraph as well as CPD policies that codify the role of the ADA Liaison.

In previous reporting periods, we acknowledged that the CPD's designated ADA Liaison is qualified for the role, having 27 years of police experience, including experience with ADA issues while at the CPD. The CPD also provided S02-01-01 and two standard operating procedures covering the ADA Liaison's role and responsibilities. However, all of these productions were still in revision due to S02-01-01 not being final.

In this reporting period, the CPD did not produce any materials related to additional levels of compliance for this paragraph. That said, the IMT did hold a virtual site-visit with the ADA coordinator on November 4, 2021 to discuss progress on related paragraphs. The current ADA coordinator is fulfilling many of the expectations of the position as it relates to requirements of related Consent Decree paragraphs.

For example, during the site visit, the coordinator mentioned that CPD has a cell in a lock-up facility for individuals with disabilities. However, operationally, it has

rarely been used due to needing repair. The coordinator identified that the functional assessment of the cell has never been a part of audit inspections of the lock-up facility. As a result, the coordinator worked to include criteria and inspection of the cell for individuals with disability on the regular audit form for the future.

The City and the CPD maintained Preliminary compliance because the ADA Liaison's activities and efforts align with the requirements outlined in this paragraph. Moving forward, for Secondary compliance, we will assess the CPD's effort to finalize the relevant policies and procedures codifying the ADA Liaison's role and responsibilities. We will also assess the CPD's effort to implement supervisory oversight to ensure that the policies and procedures are implemented and effective. Finally, we will look for the collection of data on the effectiveness of CPD's polices and training regarding CPD's responses to individuals with disabilities. The CPD will need to a method for determining whether these individuals are being treated with dignity and respect by CPD personnel and receiving the services they need.

### Paragraph 70 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

## Impartial Policing: ¶71

**71.** *Within 180 days of the Effective Date, CPD will develop a policy for transporting arrested or detained individuals that requires CPD officers to notify OEMC of the start and end of a transport and whether the individual is a juvenile or adult.*

**Compliance Progress**  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance regarding ¶71 because the CPD implemented a policy addressing the requirements in this paragraph. *See* General Order G04-01, *Preliminary Investigations* (effective December 30, 2020).

To assess Preliminary compliance, the IMT assessed compliance based on the quality of directive G04-01 and extent of community engagement in its development. To assess Secondary compliance, the IMT assessed training materials developed based on the policy.

During previous reporting periods, we assessed the CPD's efforts to review and revise G04-01 and related policies that reinforce the requirements of this paragraph. Because this paragraph is a relatively straightforward requirement, we were satisfied with the CPD's limited method of community engagement.

In this reporting period, we had planned to assess the CPD's efforts to train officers on this requirement and develop supervisory practices to ensure G04-01 is implemented as written. However, the City and the CPD did not provide any records reflecting their efforts to train officers on this requirement.

The City and the CPD maintained Preliminary compliance because the implemented G04-01 codifies the requirement that officers notify the Office of Emergency Management and Communications (OEMC) of the start and end of a transport and whether the individual is a juvenile or an adult. Moving forward, for Secondary Compliance, we will assess the CPD's efforts to train members on these requirements. For Full Compliance, we will assess whether the CPD has sufficiently implemented the requirement by evaluating the CPD's efforts to assess whether officers are complying with the requirements of ¶71 and adjust policy and training to address any concerns regarding their effectiveness.

## Paragraph 71 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Impartial Policing: ¶72

*72. The Parties recognize that training is a necessary component of impartial policing. CPD will integrate the concept of impartial policing into related CPD training courses when appropriate, including, but not limited to, use of force courses, weapons training courses, and Fourth Amendment subjects courses.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance with ¶72 during the fourth reporting period because the CPD did not provide a training plan, policy, or training curricula that adequately incorporates the concept of impartial policing into related CPD training courses.

To assess Preliminary compliance, the IMT assessed whether, and how CPD training materials meaningfully integrate the concept of impartial policing. This includes, the amount of time devoted to topics such as impartial policing, procedural justice, and de-escalation. To assess Secondary compliance, the IMT assessed the integration and delivery of these topics into trainings.

*Progress before the Fifth Reporting Period*

In previous reporting periods, we assessed the CPD's efforts to review its training courses to determine which ones are related to impartial policing and create a plan to integrate the concept of impartial policing into those related courses. We also noted that the policies in the Impartial Policing section should be finalized before the CPD can integrate the concepts into related training, but that is a work in progress.

*Progress in the Fifth Reporting Period*

In this reporting period, the CPD produced several training directives relevant to ¶72 and 74. Namely, the CPD produced S11-10, *Department Training*; S11-10-01, *Recruit Training*; S11-10-02, *Pre-Service Training*; and *In-Service Training*, S11-10-03 (collectively "Training Directives"). Although IMT has indicated no objection to S11-10-01 for a set of paragraphs, we have expressed serious concerns about CPD efforts to integrate Impartial Policing into its Training Directives or Training curricula.

In review of these materials, we stated that CPD has not given sufficient attention and guidance on the subject of integrating impartial policing concepts into CPD training courses as required by ¶¶72 and 74. Throughout the revised Training Directives provided in the fifth reporting period, the CPD states that lesson plans and course materials must include the guiding principles of procedural justice, de-escalation, impartial policing, and community policing (*see* ¶266). That guidance is a good start, but effective incorporation of impartial policing concepts will require more than simply noting these guiding principles in training materials.

The CPD has yet to develop a course that effectively integrates the skills training necessary for impartial policing. To address this gap, the CPD could include guidance in S11-10 (or a separate directive) on how to achieve this requirement. For in-service training, effectively incorporating impartial policing into training requires adequate attention to developing officers and course instructors' interpersonal communication skills. We continue to recommend that the CPD develop a standalone training to ensure the officers are developing these necessary skills. Substance from that standalone training can then be incorporated into additional trainings.

We have yet to review related CPD training materials that demonstrates meaningful integration. In most cases, the amount of time devoted to impartial policing, procedural justice, and de-escalation has been very limited. More attention must be paid to de-escalation and the prevention of force and the development of trust through interpersonal communication skills. These skill sets must be front and center rather than treated as peripheral add-ons.

We continue to emphasize that CPD training could benefit from incorporating proven adult education strategies such as modeling, repetitive practice, and individualized feedback. Role-play scenarios give officers the opportunity to practice their communication skills. This concern goes towards the Development and Implementation phase of the ADDIE model. Without first addressing the Analysis phase, the CPD will likely continue having difficulties developing training materials that meaningfully incorporate the concept of impartial policing. Thus, we continue to recommend that the CPD take the time to (i) reflect on their pedagogical strategy for integration of impartial policing and de-escalation, (ii) identify the flaws in their current approach, and (iii) consider alternative strategies.

We remain concerned that instructors for classes where integration is required lack knowledge on the subject, are not dedicated to impartial policing or procedural justice, and are not experienced in teaching difficult or uncomfortable subjects. Therefore, we encourage the CPD to make a concerted effort to retain the core of their procedural justice trainers. These trainers can help co-teach the related trainings and, ideally, partake in a larger effort to create a higher standard of teaching at CPD.

Similar to instructor development, the CPD could benefit from devoting sufficient resources to ensure that the virtual trainings are thoughtful and well developed. As we have discussed before, we discourage the CPD from becoming overly dependent on training bulletins and asynchronous online trainings that do not allow for dynamic interactions and skill development.

The City and the CPD did not achieve Preliminary compliance because the CPD did not develop a training plan or policy that describes CPD's process of integrating impartial policing across a variety of courses, nor did they provide training curricula illustrating full-scale integration. If the CPD is willing to provide a plan for integration, it should be based on a needs assessment that includes input from protected classes and their advocates regarding any potential training gaps. Moving forward, we will assess the CPD's focus on the Development, Implementation, and Evaluation phases of training. Ultimately, successful integration may require a commitment of additional resources to the Training Division regarding instructor development and additional guidance regarding training on impartial policing.

Full compliance will depend on the CPD's ability to demonstrate that it sufficiently and effectively incorporated the concept of impartial policing into related CPD training courses. In other words, the CPD will need to measure effectiveness, in part, by assessing the quality of the training delivered, changes in members' attitudes and behavior prior to leaving the training session, and changes in behavior while on the job. The CPD will need an evaluation system where it or its partners can quickly analyze survey and test data and quickly feed the analysis back to Training Division administrators and instructors to allow for immediate adjustments in particular classes and for long-term planning. This type of evaluation system does not currently exist.

### Paragraph 72 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Impartial Policing: ¶73

> **73.** *The Parties acknowledge that CPD has developed, with the aid of subject-matter experts, a three-part course called Procedural Justice, which covers certain impartial policing subjects including the principles of procedural justice, the importance of police legitimacy, and the existence of and methods for minimizing the impact of implicit bias. By the end of the year 2020, all officers, including supervisors, will complete the Procedural Justice course.*

### Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD met Preliminary compliance with this paragraph because it ensured that all officers, including supervisors, completed the Procedural Justice (PJ) courses. As it turns out, only 88% of the CPD members had completed the third PJ (PJ-3) course before the fifth reporting period. As a result, the CPD and the Anti Defamation League (ADL) Midwest, the provider of the initial PJ courses for CPD, were forced to develop a curriculum on "Inclusive Policing" that is available to officers who did not receive the original PJ-3.[12] In this reporting period, IMT reviewed the training materials and we are satisfied with the content, thus CPD has remained in Preliminary Compliance. However, the CPD did not achieve Secondary Compliance.

To assess Preliminary compliance, we assessed the CPD's efforts to ensure its members completed the training. We also reviewed the materials and observed classes to assess the quality of its content. To assess Secondary compliance, the IMT assessed how the CPD implemented the training of PJ courses and assessed the results of those trainings.

### Progress before the Fifth Reporting Period

From 2018 to early 2021, the CPD offered a three-part procedural justice training as part of the CPD's in-service program. The course embodied concepts of impartial policing. Based on our review of the materials, we found that the procedural justice training offered a strong introduction to the concepts for all officers. We observed the procedural justice training, and Parts I and II were taught largely by CPD instructors who exhibited a solid understanding of how procedural justice can

---

[12]   ADL no longer has proprietary ownership over the original PJ-3 course, so they needed to develop a new course. The Inclusive Policing class is also called PJ-3 Training 2021-2022.

be applied to police work. The CPD out-sourced Part III's instruction to the Anti-Defamation League (ADL) Midwest. The ADL provided a solid 4-module training on implicit bias and strategies for managing it to 11,500 officers.

*Progress in the Fifth Reporting Period*

On October 22, 2021, the IMT submitted its evaluation of the new PJ-3 training materials and reported no objection. However, we offered several recommendations for future partnerships with outside partners, including quicker and more extensive access to any evaluation data controlled by these partners, and the inclusion of student quizzes to keep students engaged. Also, we recommended the uniform delivery and evaluation of training scenarios, which are essential for student learning.

However, Secondary compliance can be achieved if the IMT concludes that the Inclusive Policing PJ-3 class was well delivered and properly evaluated in 2022. Full Compliance will require that CPD provide data to indicate that CPD members are engaging in procedurally just behaviors on the streets. Thus, we encourage CPD to use its new contact survey to measure these outcomes.

Unfortunately, once the three-part procedural justice training is complete, the CPD has indicated no plans to continue this type of coursework in the near future. Moving forward, we will assess the CPD's efforts to use the foundation established with this Procedural Justice course as it works to comply with ¶¶72 and 74. We continue to encourage the CPD to retain a core set of highly skilled procedural justice trainers (and others with expertise in de-escalation, cultural competency and related topics) who can provide specific trainings on interpersonal communication skills and the appropriate police responses to constitutionally protected classes (*see* ¶74 assessment for more details).

## Paragraph 73 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Impartial Policing: ¶74

**74.** *Consistent with the requirements set forth in the Training section of this Agreement, CPD will incorporate the concept of impartial policing into its annual in-service training for all officers, including supervisors and command staff, by providing training on the following topics: a. CPD's anti-bias and impartial policing policies, including, but not limited to, the policies referenced in this section unless otherwise required; b. refreshers of topics covered in Procedural Justice; c. appropriate use of social media; d. cultural competency training that prepares officers to interact effectively with people from diverse communities including, but not limited to, people of color, LGBTQI individuals, religious minorities, and immigrants; e. recognizing when a person has a physical, intellectual, developmental or mental disability, including protocols for providing timely and meaningful access to police services for individuals with disabilities; and f. the specific history and racial challenges in the City of Chicago.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance with this paragraph because the CPD has not codified the paragraph's requirements into policy and did not meet Secondary compliance as it has not drafted In-service training that adequately incorporates Impartial Policing.

To assess compliance, we reviewed the CPD's efforts to comply with this paragraph, noting that we will use the ADDIE model (Analysis, Design, Development, Implementation, and Evaluation) to assess CPD's training programs. Preliminary compliance is judged on the basis of Analysis and Design—*i.e.*, whether the CPD developed a training plan for the required in-service impartial policing training. Secondary compliance focuses on the Development, Implementation, and Evaluation phases of training.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD submitted a draft version of Special Order S11-10, *Department Training*, reflecting its efforts to codify ¶74's requirements.

However, the S11-10 did not describe the topics that the annual in-service impartial policing training will cover and S11-10 was still under ¶¶626–41. Both factors resulted in this paragraph not being in compliance in previous reporting periods.

*Progress in the Fifth Reporting Period*

In this reporting period, the CPD produced one training directive relevant to ¶74 - *In-Service Training*, S11-10-03. As noted in the IMT November 16, 2021 review of the training, the CPD has not given sufficient attention and guidance on the subject of integrating impartial policing concepts into CPD training courses as required by ¶¶72 and 74. Granted, CPD states that lesson plans and course materials must include the guiding principles of impartial policing. That guidance is a good start, but effective incorporation of impartial policing concepts will require more than simply mentioning these guiding principles in training materials. The IMT needs to see compelling evidence of how Impartial Policing and related topics required by ¶74 are deeply integrated into the lesson plans for the in-service training.

Because the CPD's efforts to incorporate the concept of impartial policing into its trainings have been insufficient, we continue to recommend that the CPD develop a standalone course on interpersonal communication and impartial policing, incorporating the topics described in this paragraph. In our view, developing a course dedicated to impartial policing principles and interpersonal communication skills will allow CPD members to (1) receive an introductory refresher on the critical importance of interpersonal skills developed in the procedural justice training courses; (2) practice perishable "hard" communication skills involving procedural justice and de-escalation; and (3) understand the needs of vulnerable and constitutionally protected classes and how to respond appropriately to them. In addition to developing the course, we continue to recommend that the CPD retain its best trainers with expertise in procedural justice, de-escalation, and bias, and recruit others from the CPD and the community who are knowledgeable on cultural diversity issues to lead the instruction of this standalone training.

We again emphasize the need to incorporate proven adult education strategies such as modeling, repetitive practice, and individualized feedback. Role-play scenarios allow officers to practice their communication skills. Along these lines, we discourage the CPD from becoming overly dependent on training bulletins and asynchronous online trainings that do not allow for dynamic interactions and the refinement of interpersonal skills.

To ensure effective training, we again emphasize the need for comprehensive and systemic evaluations involving surveys, knowledge tests, and observations by supervisors and community members. These evaluation results can be used to make needed revisions to the trainings. Rather than taking a piece-meal approach, we

again recommend developing and codifying into the CPD's training program an overarching training evaluation process.

The IMT will continue to monitor the CPD's efforts to codify the requirements of this paragraph into policy. The IMT will also examine whether CPD has a sufficient number of trainers with specific educational backgrounds, skills, and understanding of procedural justice, impartial policing, and de-escalation strategies and tactics. Also, the IMT will examine whether CPD has employed a sufficient number of qualified analysts to ensure that the In-service and other training programs can be properly evaluated.

### Paragraph 74 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Impartial Policing: ¶75

> **75.** *OEMC currently provides diversity awareness training to all new telecommunicators which, among other things, addresses the existence of and methods for minimizing the impact of implicit bias. OEMC will continue to provide training on this topic to all new tele-communicators and, beginning in 2020, will provide all tele-communicators with refresher training every two years on this topic that is adequate in quantity, quality, type, and scope.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**   Every Two Years        ☑ **Not Yet Applicable**

**Preliminary:**   *Not in Compliance*
**Secondary:**   *Not Yet Assessed*
**Full:**   *Not Yet Assessed*

The City did not reach Preliminary compliance. While OEMC has provided the IMT with a draft of their Diversity Awareness Training to meet requirements of this paragraph, it is still under revision and review.

To assess Preliminary compliance, the IMT assessed whether the OEMC had a finalized training on topics specified in this paragraph.

In previous reporting periods, we assessed the OEMC's efforts to codify this paragraph's requirements into policy. We reviewed multiple versions of the Diversity Awareness Training and noted OEMC's collaboration with the Mayor's Office of Equity and Racial Justice on the development of the training. However, the IMT had concerns about practical applications of the training to the work of OEMC telecommunicators.

During this reporting period, the IMT reviewed another iteration of the *Diversity Awareness Training*. On December 31, 2021, the IMT provided additional comments related to this training. The updated slide deck address a number of our previous concerns related to application of concepts to the work of OEMC telecommunicators. Overall, the current training, if executed properly, will provide a solid introduction to implicit bias and a foundation for future training on related topics. Some of the remaining IMT comments center on instructional time devoted to discussion and reflection.

In addition, the IMT has yet to receive a lesson plan or an evaluation plan related to this training material that could address many of these remaining questions. The IMT will also need to understand the methods of delivery (whether virtual or

in-person), and how the instructors expected to present this material, to fully assess OEMC's efforts related to compliance with this paragraph.

The City and the OEMC did not meet Preliminary Compliance because they did not finalize a directive codifying this paragraph's requirements during this reporting period; however, the IMT notes the considerable progress made on the training since last submission. Moving forward, we will assess the OEMC's efforts to address our concerns regarding the Training materials and the related standard operation procedure. We will then assess the OEMC's efforts to ensure all telecommunicators receive the Training and refresher training.

### Paragraph 75 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Impartial Policing: ¶76

**76.** *By January 1, 2020, CPD will review and, to the extent necessary, revise its policies and procedures to ensure that allegations and complaints of hate crimes, as defined by federal, state, and local law, are comprehensively investigated.*

### Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and CPD maintained Preliminary Compliance with this paragraph but did not achieve Secondary Compliance in this reporting period. During the last reporting period, the City and the CPD met Preliminary compliance for this paragraph because they finalized General Order G04-06, Hate Crimes. This policy became effective on June 22, 2021.

To assess Preliminary compliance, the IMT assessed whether the CPD had a finalized policy that addresses topics specified in this paragraph. To assess Secondary compliance, the IMT assessed whether CPD had developed and implemented a training on this paragraph.

During the fourth reporting period, CPD developed a supplemental Standard Operating Procedure (SOP) that was responsive to both community and IMT concerns about hate crime investigations.[13] Specifically, the CPD's hate-crime survey revealed that more than six in 10 victims who reported a hate crime incident to the CPD responded that they did not receive any follow-up from the CPD. As a result, CPD developed an SOP to clarifying the role of supervisors to ensure a complete and timely investigation of the crime, while at the same time being sensitive to the needs of the crime victim. This SOP is helpful, but we did not see any evidence in this SOP or the hate crime policy indicating that CPD will seek to educate the community about what constitutes a hate crime and how to report it.

In this reporting period, the CPD provided an eLearning training titled Hate Crimes Refresher for review under this paragraph. The version the IMT reviewed in this reporting period included many revisions the IMT requested previously such as inclusion of various hate crime laws and their applicability, as well as clarifying the roles of officers in preliminary investigations. However, the IMT still remains concerned that there does not seem to be any cross-section of community members and organizations that provided input on this training as required by ¶52.

---

[13]   This Standard Operating Procedure (SOP) is titled *Hate Crimes – Responses, Reporting, Investigating and Outreach.*

Looking forward, for Secondary compliance, we will assess the CPD's efforts to train its officers on the guidance provided in G04-06 and the related standard operating procedures as well as finalizing the eLearning. Assessing Secondary compliance will overlap with our assessment of ¶77.

### Paragraph 76 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

## Impartial Policing: ¶77

**77.** *CPD will ensure that all officers receive in-service training every two years on methods, strategies, and techniques for recognizing and responding to hate crimes, including CPD's procedures for processing reports and complaints.*

**Compliance Progress**          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Every Two Years          ☑ **Not Yet Applicable**

**Preliminary:**    *Not in Compliance*
**Secondary:**    *Not Yet Assessed*
**Full:**    *Not Yet Assessed*

The City and the CPD have not met Preliminary compliance because the directive that the CPD asserts codifies the requirements is still under ¶¶626–41 review.

During this reporting period, we assessed the CPD's efforts to codify this paragraph's requirements into policy and we provide an assessment of hate-crime training.

In previous reporting periods, the CPD submitted a draft Special Order S11-10, *Department Training*, which provides that officers will receive in-service training every two years on topics regarding hate crimes. We noted that S11-10 does not provide the same level of specificity required by this paragraph and recommended that the CPD reconcile that inconsistency.

During the fifth reporting period, the CPD produced another training directive relevant to ¶74 and ¶77—*In-Service Training*, S11-10-03. But as noted in our November 16, 2021 memo, the CPD did not give sufficient attention to the integration of impartial policing and biased policing concepts into CPD training courses as required by ¶72 and ¶74. Based on that version, the effective incorporation of impartial policing concepts, including hate crime, will require more than simply mentioning these guiding principles in training materials. These topics must be deeply integrated into the lesson plans for the In-service training. On December 30, 2021, the last day of the fifth reporting period, the City produced a revised version of S11-10-03.

In addition, to be responsive to ¶77, the CPD has provided a Hate Crimes eLearning Refresher Training. The IMT provided feedback on these training materials on July 12, 2021. On September 22, 2021, the City and the CPD provided revised Training materials, and IMT reviewed them on October 22, 2021. The CPD addressed many of our prior concerns, but we did not see sufficient records to show that, in developing these materials, the CPD sought input from a cross-section of community

members and community-based organizations with knowledge and experience relevant to hate crimes. *See* ¶52.

Also, this Hate Crimes eLearning is directed at all CPD members, which is satisfactory, but we have recommended that the Civil Rights Unit and Area Detective Investigators receive additional training to clarify their specific roles in these investigations, including following-up with victims that has been neglected in the past.

The CPD has improved its knowledge test for the Hate Crimes eLearning to measure student learning, but we encourage them to add questions that assess officers' ability to comfort and encourage cooperation from hate crime victims, especially those who may be reluctant to report, such as people with limited English proficiency who may need interpretive services.

The City and the CPD did not meet Preliminary Compliance for ¶77 because the policy codifying its requirements and the Hate Crime eLearning remain under review. We will continue to assess the CPD's efforts to comply with the community engagement requirements of ¶52 as it revises the Refresher Training. For Secondary Compliance, we will assess the CPD's efforts to develop quality training that is both interactive and followed by rigorous evaluation metrics.

### Paragraph 77 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Impartial Policing: ¶78

*78. Within 180 days following the expiration of each calendar year of the term of this Agreement, CPD will publish an annual report summarizing reported hate crimes and non-criminal incidents motivated by hate during the previous calendar year ("CPD Hate Crime Report"). The CPD Hate Crime Report will provide information regarding the total number of reported hate crimes and non-criminal incidents motivated by hate, organized by type of crime, classification of bias motivation, and disposition of hate crime investigations in each district.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Recurring Schedule:** | Annual (August 30, 2021*) | ☐ **Met** ☑ **Missed** |
| | *Extended from June 28, 2021, due to COVID-19 | |
| **Preliminary:** | *In Compliance* (NEW) | |
| **Secondary:** | *Not Yet Assessed* | |
| **Full:** | *Not Yet Assessed* | |

The City and the CPD met Preliminary compliance in this reporting period by including the annual reporting requirements of this paragraph in the finalized General Order G04-06, *Hate Crimes*. However, the City and CPD remain out of Secondary compliance because the previously produced reports in 2019 and 2020 do not include the required information specified in this paragraph and the CPD has yet to produce the 2021 report.

To assess Preliminary compliance, the IMT reviewed whether the requirements of this paragraph are codified in policy. For Secondary compliance, the IMT assessed the Hate Crime reports to determine whether the reports addressed this paragraph's requirements and the quality of data that the CPD used to develop the report.

*Progress before the Fifth Reporting Period*

In previous reporting periods, we received the *Hate Crime in Chicago: 2019 Annual Report* and *Hate Crime in Chicago: 2020 Annual Report*. Neither of these reports included important disposition data as required by ¶78 and as requested by the IMT. The 2019 and 2020 reports did not include important information regarding the disposition of hate crime investigations. The only disposition data included in the 2019 and 2020 Reports was whether the hate crime incident was "Bona Fide," "Undetermined," or "Unfounded." However, the IMT and the public expected additional disposition data, such as whether the CPD conducted a follow-up investigation; whether a suspect was identified, arrested, charged with a hate crime and

convicted; and whether the investigation remains open. Also, we continued to encourage the CPD to break down these dispositions by the protected classes to ensure the public that CPD's decisions and actions do not reflect any bias.

*Progress in the Fifth Reporting Period*

In this reporting period, the City and CPD finalized G04-06, which included annual reporting requirements of this paragraph. While the IMT provided a no objection to this policy on December 23, 2020, the CPD had not completed public comment on the policy as required by ¶52. On July 21, 2021, the City provided a package of materials that included the posting of the policy to the CPD website as well as comments received. As a result, the City and CPD achieved Preliminary compliance with this paragraph.

Regarding Secondary compliance, the City and CPD have not yet produced the *2021 Hate Crimes Report*. The deadline for such report falls in the sixth reporting period and the IMT will assess Secondary compliance with this paragraph in the sixth reporting period; however, the outstanding issues noted above regarding the 2019 and 2020 keep the City and CPD out of Secondary compliance in this reporting period.

In sum, the City and CPD met Preliminary compliance because of the finalized G04-06 policy that included requirements for annual reporting for this paragraph. However, the City and CPD continue to be out of Secondary compliance because the published 2019 and 2020 Hate Crime reports did not include important data on the disposition of hate crime investigations and the IMT received no revisions to the previous reports during this reporting period.

To achieve Secondary compliance in sixth reporting period, the CPD will need to submit a new 2021 annual report that includes dispositional data and ensure the subsequent reports also include dispositional data. Furthermore, we encourage the CPD to engage community members and organizations with relevant knowledge who can provide feedback regarding the hate crimes data collection efforts and the information included in the annual report and dashboard.

### Paragraph 78 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

## Impartial Policing: ¶¶79–82

**79.** By April 1, 2020, and every year thereafter, CPD will conduct an assessment of the relative frequency of all misdemeanor arrests and administrative notices of violation ("ANOVs") effectuated by CPD members of persons in specific demographic categories, including race and gender.

**80.** Prior to conducting this assessment, CPD will share its proposed methodology, including any proposed factors to be considered as part of the assessment, with the Monitor for review and approval. The Monitor will approve CPD's proposed methodology provided that the Monitor determines that CPD's methodology comports with published, peer-reviewed methodologies and this Agreement. Upon completion of the assessment, CPD will identify any modifications to CPD's practices to address the findings in the assessment and develop a timeline for implementation, subject to Monitor review and approval. Upon completion of the assessment, CPD will publish the underlying data, excluding personal identifying information (e.g., name, address, contact information), via a publicly accessible, web-based data platform.

**81.** If at any point, the City's obligations under the August 6, 2015 Investigatory Stop and Protective Pat Down Settlement Agreement ("ACLU Agreement") terminate, CPD will include all stops effectuated by CPD members that were subject to the ACLU Agreement in the assessment required by this Part.

**82.** Nothing in this Part will be interpreted to require CPD to analyze statistical data beyond that currently collected and maintained in electronic databases unless otherwise required under this Agreement. In instances in which race or gender data is not maintained in an electronic database, CPD may use geographic data in its assessment. For purposes of this paragraph, information contained solely in a scanned PDF document or other image of a document, and not otherwise collected and maintained in an electronic database, is not considered data maintained in an electronic database.

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| Recurring Schedule: | Annual (June 3, 2021*) | ☐ Met | ☑ Missed |
|---|---|---|---|

*Extended from April 1, 2021, due to COVID-19

| | ¶¶79/82 | ¶¶80/82 |
|---|---|---|
| **Preliminary:** | *Not in Compliance* | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance for ¶¶79 or 80 because we could not approve the proposed methodology as required by this paragraph and no report was prepared.[14]

To assess preliminary compliance, the IMT assesses the methodology CPD will use to comply with requirements of ¶¶79 and 80 for administrative notices of violation (ANOVs) and misdemeanor arrests.

In previous reporting periods, we monitored the CPD's efforts to assess misdemeanor arrest and administrative notices of violations (ANOVs), focusing mostly on the CPD's proposed methodologies. We did not approve the CPD's preliminary methodology, as required by ¶80.

During this reporting period, we continued to inquire about the CPD's efforts to revise the methodology based on our earlier feedback. The City and the CPD did not provide any records reflecting their efforts to comply with these requirements.

As noted in our last report, the CPD's report on misdemeanor arrests and ANOVs was drafted in 2020 (absent IMT approved methodology) but because of internal CPD disagreements over how to present the findings, including large racial disparities, the report was never released. The CPD decided to outsource this project. However, nearly two years later, the CPD has yet to identify a research partner to assist with this project. The IMT will assess the qualifications and independence of any outside organization hired by the City to perform the functions required by ¶¶79–82.

As the IMT has emphasized repeatedly, this annual report is important as it provides transparency regarding low-level enforcement practices, where officers have the most discretion, and will shed light on disparities by race, age, and gender.[15]

---

[14]   Paragraph 81 does not require a compliance assessment at this time since the ACLU Agreement remains in effect. If, however, the ACLU Agreement is terminated, ¶81 will be activated and IMT will expect the same data and apply the same standards. Independent of ¶81, the IMT reserves the right to request investigatory stops data to assess outcomes specified in the Consent Decree regarding impartial policing and other reforms.

[15]   When officers have limited discretion (*e.g.*, deciding whether to stop someone who runs a red light at 80 miles per hour or arrest someone they observe shooting another person), policing

ANOVs and misdemeanor arrests raise critical issues about constitutionally guaranteed freedoms. Americans have a Fourth Amendment right not to be stopped, questioned, and searched without sufficient justification. Within the context of impartial policing, these enforcement actions can lead to unequal treatment. Good data and careful documentation are essential to monitor disparities and identify patterns over time.

In sum, the City and the CPD did not meet Preliminary compliance with these paragraphs because we could not approve the proposed methodology, as CPD did not revise it to address our concerns, nor has the CPD developed a plan to address the remaining concerns, including a plan and timeline to eventually automate the collection and electronic storage of ANOVs demographic data (*e.g.*, race, age, and gender). Moving forward, we will monitor the CPD's efforts to revise its methodology for approval. After we approve the methodology, we will assess the CPD's efforts to conduct the ¶79 assessment and publish the findings.

### Paragraph 79–82 Compliance Progress History[16]

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

---

bias is much less likely to appear. But for lower-level violations of the law, where officers can decide whether or not to take enforcement action, race and other characteristics are more likely to play a role.

[16]   As above, ¶81 does not require a compliance assessment at this time since the ACLU Agreement remains in effect. If, however, the ACLU Agreement is terminated, ¶81 will be activated and IMT will expect the same data and apply the same standards. Independent of ¶81, the IMT reserves the right to request investigatory stops data to assess outcomes specified in the Consent Decree regarding impartial policing and other reforms.

# Appendix 3
# Crisis Intervention
# Compliance Assessments, by Paragraph

# Appendix 3
# Crisis Intervention
# Compliance Assessments, by Paragraph

| ¶87 | ¶103 | ¶121 | ¶137 |
|------|------|------|------|
| ¶88 | ¶104 | ¶122 | ¶138 |
| ¶89 | ¶105 | ¶123 | ¶139 |
| ¶90 | ¶106 | ¶124 | ¶140 |
| ¶91 | ¶107 | ¶125 | ¶141 |
| ¶92 | ¶108 | ¶126 | ¶142 |
| ¶93 | ¶109 | ¶127 | ¶143 |
| ¶94 | ¶110 | ¶128 | ¶144 |
| ¶95 | ¶113 | ¶129 | ¶145 |
| ¶96 | ¶114 | ¶130 | ¶146 |
| ¶97 | ¶115 | ¶131 | ¶147 |
| ¶98 | ¶116 | ¶132 | ¶148 |
| ¶99 | ¶117 | ¶133 | ¶149 |
| ¶100 | ¶118 | ¶134 | ¶150 |
| ¶101 | ¶119 | ¶135 | ¶151 |
| ¶102 | ¶120 | ¶136 | ¶152 |

# Crisis Intervention: ¶87

*87. The Crisis Intervention Team ("CIT") Program will continue to be responsible for CPD's crisis intervention response functions, including, but not limited to: a. developing CIT strategy and initiatives; b. supporting officers in the districts who respond to incidents involving individuals in crisis; c. engaging the community and community stakeholders to raise awareness of the CIT Program and issues involving individuals in crisis; d. coordinating among City agencies that respond to individuals in crisis; e. recruiting officers to apply for CIT training; f. developing and delivering CPD's Basic CIT Training and other CIT training, including Advanced CIT (e.g., youth, veterans) and refresher trainings, in accordance with the requirements of the Training section of this Agreement; g. delivering roll call trainings and mental health awareness initiatives; h. compiling and retaining the reports identified in Part F of this section and collecting and maintaining the appropriate CPD data related to incidents involving individuals in crisis to support and evaluate the effectiveness of the CIT Program and CPD's response to incidents identified as involving individuals in crisis, including identifying any district-level and department wide trends; i. coordinating data and information sharing with OEMC; and j. communicating with and soliciting feedback from crisis intervention-related community stakeholders, Certified CIT Officers, and OEMC call-takers and dispatchers regarding the effectiveness of CPD's CIT Program.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD did not achieve any level of compliance with ¶87.

To achieve Preliminary compliance with ¶87, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." To achieve Preliminary compliance with ¶87, the City

and the CPD must develop and finalize policies that incorporate ¶87's requirements.

### Progress before the Fifth Reporting Period

As noted in the last report, the City and the CPD made significant progress toward compliance with ¶87 by putting some related policies through the policy review process required by ¶¶626–41 (these policies are also addressed in other relevant paragraph assessments below). During the third reporting period, we provided the CPD with recommended revisions to the CPD's standard-operating procedures, several of which were not adequately revised. We discuss these inadequate revisions in more detail below. However, by the end of the fourth reporting period, several standard-operating procedures designed to memorialize the specific requirements of ¶87 were not finalized and published for community input.

### Progress in the Fifth Reporting Period

However, in the fifth reporting period, the CPD made significant revisions to these policies to distinguish between department-wide directives and standard-operating procedures that are relevant only to the Crisis Intervention Unit. As part of this redesign, the CPD substantially expanded the *Crisis Intervention Team (CIT) Program* policy (S05-14), which the City and the CPD originally submitted on July 28, 2021. Specifically, the CPD expanded S05-14 to include policies that were previously included in SOPs. Consequently, the current version of S05-14—which the City and the CPD submitted on December 28, 2021—continued to be under review at the end of the fifth reporting period.

Further, as reflected throughout this section, ¶87 is an overarching paragraph and compliance efforts for this paragraph affect compliance for several other paragraphs in the Crisis Intervention section.

Going forward, to achieve Preliminary compliance with ¶87, the City and the CPD must develop and finalize policies that incorporate ¶87's requirements. To achieve Secondary compliance, the City and the CPD will also need to provide comprehensive training for Area-level CIT District, Operations, and Community (CIT DOCS) Sergeants who are responsible for nearly all of ¶87's requirements. To date, efforts have focused on Preliminary compliance, and the City and the CPD have not provided records demonstrating comprehensive training with a consistent approach across the CIT DOCS Sergeants. Because there are many critical components under ¶87, the IMT strongly recommends an implementation plan outlining how each of the components will be accomplished and measured.

Finally, we reiterate our recommendation that the CPD expand the community engagement efforts for directives and SOPs, training, and operational practices related to crisis response. The public comment period for the directives have yielded few comments and, at the end of the reporting period, the SOPs were not published for public comment. The IMT seeks evidence that the CPD is sufficiently seeking and considering public comments and incorporating those comments into its policies, training, and operational practices, as appropriate.

Because substantial feedback was provided by the Chicago Council on Mental Health Equity with the policy review process this reporting period, the IMT will be carefully considering efforts to report back to the Chicago Council on Mental Health Equity which comments were included, which were not, and why. The CPD should consider how public comments and community feedback will both advance its overall community-engagement goals and will build trust among a wide range of advocacy and treatment providers.

### Paragraph 87 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶88

> **88.** *The CIT Program will serve to meet the objectives of: a. improving CPD's competency and capacity to effectively respond to individuals in crisis; b. de-escalating crises to reduce the need to use force against individuals in crisis; c. improving the safety of officers, individuals in crisis, family members, and community members; d. promoting community-oriented solutions to assist individuals in crisis; e. reducing the need for individuals in crisis to have further involvement with the criminal justice system; and f. developing, evaluating, and improving CPD's crisis intervention-related policies and trainings to better identify and respond to individuals in crisis.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD did not meet any level of compliance with ¶88.

To achieve Preliminary compliance with ¶87, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms." To achieve Preliminary compliance with ¶88, the City and the CPD must develop and finalize policies that incorporate ¶88's requirements.

### Progress before the Fifth Reporting Period

In previous reporting periods, the City and the CPD made significant progress toward compliance with ¶88 by putting related policies through the policy review process that were designed to memorialize the specific requirements of ¶88.

### Progress in the Fifth Reporting Period

In the fifth reporting period, the CPD made significant revisions to these policies to distinguish between the department-wide directives and the SOPs that are rel-

evant only to the Crisis Intervention Unit. As part of this redesign, the *Crisis Inter-vention Team (CIT) Program* policy (S05-14), which was originally submitted to the IMT on July 28, 2021, was substantially expanded to include policies that were previously included in SOPs. Consequently, the current version of S05-14 that was submitted to the IMT on December 28, 2021, is presently under review and has not been finalized.

Further, the text of ¶88 mostly relates to outcome-based metrics, which are tied to the successful implementation of other paragraphs in the Crisis Intervention section. Currently, the data dashboards that the CPD has developed relate to par-ticular paragraph requirements (*e.g.*, ¶108 relates to the CIT response rates). The CPD should also focus on developing valid measures of ¶88's concepts, which re-quire both answers to complex research questions and a more-exact approach in measuring progress related to ¶88. Initial data from the CIT Report will ultimately be useful in the development process. In addition, as with ¶87 above, we reiterate our recommendation that the CPD expand the community input process for crisis response.

Moving forward, to achieve Preliminary compliance, the CPD must finalize S05-14. For Secondary compliance with this paragraph, the IMT will assess whether the City is collecting, tracking, and maintaining data as required. The CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's suc-cess under ¶88. For the IMT to assess Full compliance, the CPD must indicate what factors will contribute to achieving compliance and how those factors, and the CPD's progress toward compliance, will be measured. The IMT is seeking outcome-based metrics to establish a floor by which progress toward operational compli-ance can then be assessed.

Further assessment levels will require an assessment of, and an agile response to, those metrics. We look forward to discussing the CPD's approaches to measure-ment during the next monitoring period.

### Paragraph 88 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Crisis Intervention: ¶89

> **89.** *The CIT Program, through the CIT Coordinator, will annually review and, if necessary, revise its policies and practices to ensure the program's compliance with the objectives and functions of the CIT Program.*

---

**Compliance Progress**                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Annually            ☑ **Not Yet Applicable**

**Preliminary:**          *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**            *In Compliance* (THIRD REPORTING PERIOD)
**Full:**                 *Not Yet Assessed*

During the fifth monitoring period, the CPD maintained Preliminary and Secondary compliance with ¶89.

To achieve Preliminary compliance with ¶89, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶89 by evaluating whether the CPD has qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree and the requirements of ¶89.

In the third reporting period, the CPD received a no objection on Special Order S05-14, *Crisis Intervention Team (CIT) Program,* which included ¶89's requirements. Additionally, the policy detailed the manner and scope of review expected for a comprehensive assessment on an annual basis, which provides a training mechanism for reviewers.

In the fifth monitoring period, the CPD's S05-14 was substantially revised, and at the end of the reporting period, the review process was still underway. Further, much of the CIT Program's operation is contained within SOPs that were reviewed in the fourth monitoring period. The CPD reports they intend to re-submit the SOP's in the sixth monitoring period.

In this reporting period, the Chicago Council on Mental Health Equity reviewed all of the CIT related policies. On December 2, 2021, the City held a special meeting with Chicago Council on Mental Health Equity's members to review their comments on these policies, but that meeting was canceled due to an allegation

that the meeting agenda was not posted pursuant to the Open Meetings Act. That allegation was later determined to be unfounded.

The meeting was rescheduled for two days later over concerns regarding Chicago Council on Mental Health Equity members' scheduling conflicts. A quorum was reached at the rescheduled meeting and the Chicago Council on Mental Health Equity members voted on whether to forward their comments to the CPD for review and revision. The Chicago Council on Mental Health Equity voted to move forward all but two of the policies. The meeting ran over time and they were unable to get through the remaining two policies. Further, there was unresolved conflict with one of the policies and a request was made to return discussion to that policy at the next meeting.

In the next monitoring period, the IMT will determine whether the reviews (and potential revisions) occurred in a manner consistent with the process identified in the Consent Decree, including a response by the CPD to each suggested revision voted on by the Chicago Council on Mental Health Equity. Should the CPD review both SOPs and directives in accordance with Consent Decree requirements, we would find the CPD to have substantially complied with the requirements of this paragraph so long as a more-robust public comment period and response also occurs. A feedback loop should be incorporated into both the CCMHE and the public comment period such that the CPD provides feedback regarding why the community's comments were or were not incorporated.

To achieve Full compliance with ¶89, the CPD must demonstrate the annual review process expands public and community comment, and that all feedback is appropriately considered with a feedback loop developed. Additionally, internal evaluation data and openly sharing relevant data with the community and key stakeholders improves transparency and encourages feedback while also demonstrating whether the policies are achieving their intended operational purpose. As appropriate, the CPD will consider whether new policies may need to be developed in response to operational deficiencies, changes in programs, or the launch of new programs (e.g., CARES).

## Paragraph 89 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Crisis Intervention: ¶90

**90.** *The City and CPD will ensure that the CIT Program is provided with: a. the resources and access to data and information necessary to fulfill the objectives and functions of the CIT Program; and b. a qualified, centralized staff, including supervisors, officers, and civilian employees, that is necessary to oversee the department-wide operation of the CIT Program, carry out the overall mission of the CIT Program, and perform the objectives and functions of the CIT Program.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

During the fifth monitoring period, the City and the CPD maintained both Preliminary and Secondary compliance with ¶90.

To achieve Preliminary compliance with ¶90, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶90 by confirming records sufficient to show that the City and the CPD are responding to the identified needs and objectives of the CIT program and though interviews with relevant CPD personnel, such as District Commanders, the CIT Coordinator, CIT DOCS personnel and CIT Patrol Officers and Sergeants.

*Progress before the Fifth Reporting Period*

The elements of ¶90 were adequately found in the previous version of Special Order S05-14, *Crisis Intervention Team (CIT) Program*. A substantially revised S05-14 is presently under review, but it now lacks critical components of ¶90, including "a. the resources and access to data and information necessary to fulfill the objectives and functions of the CIT Program; and b. a qualified, centralized staff, including supervisors, officers, and civilian employees." The most recent version of S05-14 identifies "dedicated district level resources" but does not include "centralized" staff.

The IMT believes the directive must be revised to ensure full allocation of the resources necessary, district and centralized, to support the objectives and functions of the CIT program. For example, two concerns affecting compliance with ¶90 include 1) the CIT Program has been without a data analyst, a key function to the program's success, for the last two reporting periods, and 2) the CIT Coordinator has been promoted to Deputy Chief and presently has a broader scope of responsibilities outside of the CIT program.

Moreover, the revised S05-14 was reviewed by the Chicago Council on Mental Health Equity this reporting period. Comments were provided to which the CPD still needs to respond. As discussed in other paragraphs (*e.g.,* ¶91), SOPs related to the CPD's district-level approach provide more detail regarding the CPD's specific approaches to how resources, data, and information will be utilized to support the success of the CIT program.

*Progress in the Fifth Reporting Period*

The IMT has reviewed evidence that some of the centralized roles have been filled by qualified staff. The IMT was impressed, for example, with the CIT Program's core-training team. However, as indicated previously, the CPD's designated data analyst—a crucial position—resigned just before the end of the fourth reporting period, and to date, the CPD has been unable to confirm that a new data analyst has been hired or onboarded. During the fifth reporting period, the CPD has also not maintained dedicated staff to clean and analyze data regarding the objectives and functions of the CIT Program.

In addition to not having a data analyst required by ¶120 and ¶121, the CPD also needs data metrics and outputs necessary to inform if adequate resources have been dedicated. Without adequate "data and information," the IMT is unable to assess whether staff or additional resources are needed.

Full compliance with ¶90 will require the CPD to demonstrate they are able to reliably assess whether the objectives and functions of the CIT Program are being met and manage the department-wide operations accordingly. The CPD will need to determine how it intends to assess whether it has the necessary resources and data to fulfill the objectives and functions of the CIT Program. This will also require sufficient operational data that was not available during the fifth monitoring period. Going forward, we look forward to working with CPD on receiving the necessary data and the corresponding analyses.

Last, the scope of the current CIT Coordinator's responsibilities will need to be evaluated. The current CIT Coordinator's promotion to District Commander over Training during the third reporting period caused her duties to expand beyond that of the CIT Program, which contradicts the requirements of ¶¶90 and 115. The CIT

Coordinator's responsibilities will need to be evaluated during the next reporting period.

### Paragraph 90 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Crisis Intervention: ¶91

*91. Additionally, the City and CPD will ensure that the CIT Program has sufficient, dedicated district-level resources, consistent with the needs of each district identified by the District Commander and the CIT Coordinator, and approved by the Chief of the Bureau of Patrol, as needed to carry out the overall objectives and functions of the CIT Program at the district-level, which include, but are not limited to: a. supporting officers in the district with incidents involving individuals in crisis; b. delivering CIT Program-approved roll call trainings and mental health awareness initiatives; c. establishing relationships between the district and local service providers and healthcare agencies; d. referring and, when appropriate, connecting individuals in crisis with local service providers; e. engaging with the community to raise awareness of the CIT Program and issues involving individuals in crisis; and f. providing administrative support to the coordinator of the CIT Program.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD did not meet any level of compliance with ¶91.

To achieve Preliminary compliance with ¶91, the City and the CPD must develop and finalize policies that incorporate ¶91's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

*Progress before the Fifth Reporting Period*

During the fourth monitoring period, the CPD provided a revised draft version of Special Order SO20-04, *District-Level Strategy for Crisis Intervention Team (CIT)* Program. The Components of ¶91 were memorialized in this draft version.

*Progress in the Fifth Reporting Period*

However, in the fifth reporting period, the CPD opted to distinguish between department-wide directives relevant to the entire CPD and SOPs relevant only to the Crisis Intervention Unit. As a part of this redesign, ¶91's requirements were fully included into the revised CPD's S05-14, *Crisis Intervention Team Program*, which is presently under review.

While we await a finalized version of S05-14, we note that CPD has taken significant steps in developing the CIT District Operations and Community Support (CIT DOCS) resources. There has been much improvement. For example, a process is in place through the completion of the newly required CIT report for officers to refer high frequency utilizers of police services to the CIT DOCS unit. The IMT looks forward to a briefing on utilization rates in the next reporting period. The unit has also been making identification of themselves to the districts they serve, providing roll call introductions, introductions at the Basic and Refresher CIT trainings and providing overviews of the CIT program. Deficiencies however are noted below. The IMT looks forward to seeing data supporting district-level needs and trends.

The CPD will need to first memorialize the components of ¶91 into a finalized policy. Additionally, the CPD will need to determine how it intends to assess whether or not it has "sufficient, dedicated district-level resources, consistent with the needs of each district identified by the District Commander and the CIT Coordinator." Presently, the CPD is without a data analyst required not only by ¶¶120 and 121, but also to support data metrics and outputs necessary to inform if adequate resources have been dedicated to each district. Without adequate data, the IMT is unable to assess whether sufficient district level resources are provided. Moreover, ¶91 outlines specific objectives that can be utilized to support assessment of ¶91, and at the end of the reporting period, the CPD produced a plan to help outline some initial district level strategies. While the IMT commends the CPD for its progress towards providing a CIT DOCS Strategy Plan and quarterly progress update, both the strategy and corresponding update could be developed further. The IMT recommends that the CPD engage in a more-robust effort during future monitoring periods. Such an effort would include seeking from the Chicago Council on Mental Health Equity more detail, measurable outcomes, and priority feedback relating to community engagement and program strategy. It is crucial to have data supporting the needs of the districts to assist with targeting strategies to address those needs. Secondary compliance will be assessed on the CPD reliably assessing each district's unique needs, and data demonstrating how those needs are being met.

Moving forward, the CPD needs to finalize S05-14 to achieve Preliminary compliance with ¶91. For Secondary compliance, the CPD will need to provide evidence that district-level personnel are adequately trained and that district commanders

understand the appropriate assessment of the CIT district needs. Data supporting use of district level resources by patrol officers will also be evaluated in addition to data supporting the linkage of individuals in crisis to local service providers and robust community engagement.

## Paragraph 91 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶92

**92.** *Certified CIT Officers are officers who receive specialized training in responding to individuals in crisis. Certified CIT Officers retain their standard assignment and duties but may also take on specialized crisis intervention duties and are prioritized to respond to calls in the field identified as involving individuals in crisis, as assigned.*

---

**Compliance Progress**              (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶92.

To achieve Preliminary compliance with ¶92, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶92 by evaluating whether the CPD has qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree and the requirements of ¶92. In addition, the IMT reviewed the City's and the CPD's level of data collection, tracking, analysis, and management as required under the Consent Decree. The IMT "triangulate[s]" the data by comparing multiple data sources, yielding a more robust understanding of the requirements of ¶92.

*Progress before the Fifth Reporting Period*

As noted in our last report, the CPD has memorialized the Crisis Intervention Team in Special Order S05-14, *Crisis Intervention Team (CIT) Program*. Additionally, the CIT Program has adequately trained Certified CIT Officers based on our review of training material and observation of the CIT Basic Training. Through policy and training, we have been historically confident that the CPD has reinforced the importance of Certified CIT Officers responding to individuals in crisis.

While we are satisfied with how the CPD has historically viewed the specialized nature of the Certified CIT Officers, the CPD is in the early stages of developments

with moving from a strictly voluntary model to a partially mandated model where all patrol officers are provided the 40-hour CIT basic curriculum. Several agencies across the nation use a train-all model, which has some distinct benefits, although the model has potential shortcomings when an advanced voluntary specialized response is not incorporated into the overall model. Primarily, a train-all model negates the specialized nature of the Certified CIT Officers, who by design have volunteered for the CIT based on their desire to serve those living with mental-health conditions and have the demonstrated skill set to perform the duties of a specialized response. In communities where a "train all" model has been deployed, it is best practice to elevate a specialized cadre of volunteer officers with demonstrated skill set to respond to higher level calls for service involving a mental-health component. Without this, a specialized response is difficult. Community members requesting CIT officers can be met with officers not well suited for the often unique needs of these calls, which undermines the purpose of a specialty response, and what community members rightfully anticipate. Since persons with untreated mental health conditions are sixteen times more likely to be killed by law enforcement, specialized response is crucial.

*Progress in the Fifth Reporting Period*

The CPD provided us with a CIT training model that includes three tiers: (1) volunteer officers; (2) recently promoted sergeants, lieutenants, and field training officers; and (3) mandatorily-assigned officers. The IMT is concerned with the latter tier (mandatorily assigned officers) because the mandatory nature of their assignment suggests they may lack the volunteer officers' proactive desire and skill set to serve the mental health community. In addition, we have concerns that the CIT training model considers officers voluntary unless they explicitly opt out after training. The IMT observed the Basic CIT training course where officers were publicly called on to say whether they would like the CIT application to voluntarily be a CIT officer, or if they would like to submit a "to: from:" to opt out of being a certified officer "which would be reviewed by the Deputy Chief." This was done in the first hour of the 40-hour Basic CIT training, prior to any of the officers receiving any substantive training. In sum, the IMT is concerned with this process, including requesting a public response in class; possible chain of command review that puts officers in a difficult position to opt out; and that officers are asked to make this decision at the beginning of the 40-hours, as opposed to the end of the week when there is full understanding of the program, and what they are signing up to do.

The revised S05-14 does not address the process by which class attendees will be informed of the duties of a CIT officer, including what they would be signing up for, nor the process for how and when applications will be solicited and reviewed. The overall philosophy of the CIT program in relation to specialized response will need

to be addressed by the CPD. We look forward to continued discussions and development in the next reporting period.

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶92.

While the CPD has maintained Preliminary and Secondary compliance with ¶92, we strongly suggest that the CPD ensure the following to keep this tiered model's fidelity to a specialized response: (1) the CPD should require mandated officers to "opt in" as a volunteer officer after careful explanation about what that means operationally as opposed to "opt out," and to do so at the end of the 40-hours of training so that officers have context knowledge for the program, and (2) the CPD should avoid listing those mandated officers who do not opt in to be a specialized response so that these officers do not count toward required response ratios, and do not undermine the program and what community members expect to receive when requesting a CIT officer. The IMT will be considering these factors to reach higher levels of compliance.

### Paragraph 92 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Crisis Intervention: ¶93

> **93.** *To be eligible for consideration as a Certified CIT Officer, applicants must have at least 18 months of experience as a CPD officer and no longer be on probationary status. CPD will assess each applicant's fitness to serve as a Certified CIT Officer by considering the applicant's application, performance history, and disciplinary history.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

During the fifth monitoring period, the City and the CPD did not meet any level of compliance with ¶93.

To achieve Preliminary compliance with ¶93, the City and the CPD must develop and finalize policies that incorporate ¶93's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

*Progress before the Fifth Reporting Period*

In the last monitoring period, the CPD provided the IMT with Special Order SO20-02, *CIT Training Schedule, Attendance, Eligibility, and Recruitment*. This Special Order was never finalized because it required further revisions on the guidance for assessing the CIT applicants.

*Progress in the Fifth Reporting Period*

However, in the fifth reporting period, the CPD opted to distinguish department-wide directives relevant to the entire CPD, and those relevant only to the Crisis Intervention Unit. As a part of this re-design, ¶93's requirements were incorporated into the CPD's S05-14, *Crisis Intervention Program*, which was produced this reporting period, and which is presently under review.

The CPD had previously proposed that officers be deemed ineligible to become a Certified CIT officer if they (1) have received a sustained misconduct complaint

resulting in a suspension of more than seven days within the preceding 12 months, or (2) have three or more sustained misconduct complaints resulting in suspension within the past five years.

The IMT raised concerns regarding these low eligibility thresholds, which would result in very few officers being ineligible to serve in this specialized role. In response, during this monitoring period, the CPD provided the IMT with a substantially revised version of S05-14, *Crisis Intervention Team (CIT) Program*. That directive revised a portion of the eligibility criteria, lowering the sustained misconduct complaint suspension period from seven to three days, thereby ensuring a higher standard of eligibility assessment. While the paragraph does not delineate minimum qualifications, we believe it is incumbent on the City to provide standards that would more adequately exclude officers who have demonstrated they are unlikely to be a good match for a specialized role serving vulnerable populations. This is especially important as the CPD continues to transition to a mandatory CIT model. The IMT appreciates this reconsideration of the eligibility standard and looks forward to the CPD continuing to demonstrate thoughtful consideration to ensure the best candidates are fulfilling this importance service.

The City and the CPD have not met Preliminary compliance with ¶93, because the collaborative revision process was ongoing at the end of the fifth monitoring period, and policy memorializing the requirements of ¶93 have not yet been finalized.

To achieve Secondary compliance with ¶93, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶93. For the IMT to assess Full compliance, the CPD must indicate what factors will contribute to achieving compliance and how those factors, and the CPD's progress toward compliance, will be measured. The CPD's process should track metrics related to a CIT Officer's disciplinary history and performance history which would remove officers from a daily Certified CIT Officer roster when the CIT Officer does not meet ¶93's requirements.

### Paragraph 93 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶94

**94.** *Under the direction of the CIT Coordinator, supervisors and instructors teaching crisis intervention-related topics will assist in identifying and recruiting qualified officers with apparent or demonstrated skills and abilities in crisis de-escalation and inter-acting with individuals in crisis to apply to receive CIT training.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

During the fifth monitoring period, the City and the CPD did not meet any level of compliance with ¶94.

To achieve Preliminary compliance with ¶94, the City and the CPD must develop and finalize policies that incorporate ¶94's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

During the last monitoring period, the CPD provided the IMT with CIU Special Order SO20-02, *CIT Training Schedule, Attendance, Eligibility, and Recruitment*, which sufficiently contains the requirements of ¶94. However, in the fifth reporting period, the CPD opted to distinguish between department-wide directives relevant to the entire CPD, and those relevant only to the Crisis Intervention Unit. As part of this redesign, a portion of ¶94's requirements were incorporated into the CPD's revised S05-14, *Crisis Intervention Program*, which was produced this reporting period and which is presently under review.

The requirements for this paragraph are not satisfactorily memorialized within the revised S05-14 directive. The draft S05-14 fails to include supervisors into the responsibility for assisting with recruiting qualified candidates for the CIT role as required by this paragraph, and instead positions this responsibility under the Crisis Intervention Team Training Section (CITTS). Supervisors in the field overseeing patrol officers are uniquely positioned to help actively recruit officers with the skill set to serve in this role with vulnerable populations. As such, the IMT strongly recommends that this be memorialized into policy. The City and the CPD will achieve Preliminary compliance with ¶94 when S05-14 is revised and finalized.

## Paragraph 94 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶95

*95. Certified CIT Officers, at a minimum, must complete the specialized 40-hour Basic CIT Training ("Basic CIT Training") and receive CIT certification by the Illinois Law Enforcement Training and Standards Board before being identified as a "Certified CIT Officer." To maintain the Certified CIT Officer designation, officers must receive a minimum of eight hours of CIT refresher training ("CIT Refresher Training") every three years and maintain the eligibility requirements established by the CIT Program.*

### Compliance Progress      (Reporting Period: Jul. 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

During the fifth monitoring period, the City and the CPD did not meet any level of compliance with ¶95.

To achieve Preliminary compliance with ¶95, the City and the CPD must develop and finalize policies that incorporate ¶95's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

In the fifth reporting period, the CPD opted to distinguish between department-wide directives relevant to the entire CPD and SOPs that are relevant only to the Crisis Intervention Unit. As part of this redesign, ¶95's requirements were incorporated into the CPD's revised S05-14, *Crisis Intervention Program*, which was produced this reporting period and which is presently under review.

Moreover, during this monitoring period the City and the CPD launched the CIT Refresher Training while also continuing to provide the 40-hour Basic CIT training. The City and the CPD should be commended for this. However, as indicated in previous paragraphs, the specialized nature of the CIT officer, as intended in the spirit of this consent decree and best practice, is undermined by the CPD's move towards a mandated CIT model. This is especially true when many officers received their CIT training years ago, with no refresher training since.

The CIT officer's eligibility thresholds are also low. The training record system that the CPD currently uses has limitations in producing reliable tracking of training certifications as required under ¶95.

The IMT looks forward to the City and the CPD's progress toward exploring a specialized CIT program that prioritizes the specialized nature of CIT designation.

The City and the CPD will achieve Preliminary compliance with ¶95 when S05-14 is revised and finalized. The achieve Secondary compliance, the CPD will need to demonstrate that it has a reliable training certification system, including ongoing provision of the Basic 40-hour CIT training demonstration that 95% of current CIT officers have received the required refresher training.

### Paragraph 95 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Not Applicable | None | |

# Crisis Intervention: ¶96

**96.** *CPD's Basic CIT Training is an in-depth, specialized course that teaches officers how to recognize and effectively respond to individuals in crisis. In addition to the crisis intervention-related topics covered in the training provided to all officers, the Basic CIT Training will address signs and symptoms of individuals in crisis, suicide intervention, community resources, common mental health conditions and psychotropic medications, the effects of drug and alcohol abuse, perspectives of individuals with mental conditions and their family members, the rights of individuals with mental conditions, civil commitment criteria, crisis de-escalation, and scenario-based exercises.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained preliminary and Secondary compliance with ¶96.

To achieve Preliminary compliance with ¶96, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶96 by reviewing training development, implementation, and evaluation in accordance with ¶286 of the Consent Decree, which incorporates the following evaluation criteria: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation. In addition, the IMT confirmed records sufficient to show that the City and the CPD are responding to the identified needs and objectives of the CIT program though interviews with relevant CPD personnel, such as the District Commander, the CIT Coordinator, the CIT DOCS team and CIT Patrol officers and Sergeants.

*Progress before the Fifth Reporting Period*

In the third reporting period, the CPD provided Special Order S05-14, *Crisis Intervention Team (CIT) Program*, which states that the Crisis Intervention Team Training Section is responsible for developing, reviewing, and revising the CIT curricula, as well as the administration and delivery of the Basic CIT Training. The IMT submitted a no objection on November 24, 2020. In the fourth reporting period, the CPD submitted SO-02 *CIT training, scheduling, attendance, eligibility, and recruitment,* which contained the requirements of ¶96. This Special Order was still under review when the CPD determined that many of the components of SO-02 would be moved into a substantially revised S05-14, *Crisis Intervention Team (CIT) Program*. However, ¶96's requirements were not adequately memorialized in the revised S05-14. The CPD needs to determine where it will now memorialize the requirements of ¶96 and proceed with finalizing this directive. The IMT believes in good faith this will occur so compliance will not be taken away in this reporting period. However, Full compliance will not be achieved until ¶96's requirements are adequately memorialized in policy, as it was in the draft version of SO-02.

The IMT observed the curricula revision process in the third reporting period and found the CIT Unit included key community stakeholders to gather comments and recommendations for improving the training. Overall, we found these efforts to be consistent with ¶96's requirements.

*Progress in the Fifth Reporting Period*

During this monitoring period, the IMT observed the updated training to verify that delivery is in-line with the approved lesson plans and presentation material. We found that ¶96's required topics were included in the curriculum and were given sufficient attention during the training. The training itself is overall well done. Additionally, the CPD invited Chicago Council on Mental Health Equity members to observe the training and provide feedback, which several members provided.

The CPD maintained Preliminary and Secondary compliance with the requirements of this paragraph in the fifth monitoring period. Moving forward, to support full and effective compliance, the CPD will first need to memorialize into policy ¶96's requirements. The CPD will also need to submit evidence of the CCMHE participant feedback and how, if applicable, Chicago Council on Mental Health Equity feedback from attendance at the training was incorporated. Additionally, ongoing compliance will be tied to utilizing officer evaluations of the training, and district needs assessments to inform revisions to the training.

## Paragraph 96 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Crisis Intervention: ¶97

**97.** *CPD's CIT Refresher Training is a specialized, advanced training to further develop and expand Certified CIT Officers' skills in recognizing and appropriately responding to calls for service that involve individuals in crisis. The CIT Refresher Training will include a review of the concepts, techniques, and practices offered in the Basic CIT Training as well as relevant and/or emerging topics in law enforcement responses to individuals in crisis, general and specific to CPD. Additionally, the CIT Refresher Training may cover the content included in the in-service crisis intervention training.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**     *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶97.

To achieve Preliminary compliance with ¶97, the IMT reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements such as requiring that policies be "plainly written, logically organized, and use clearly defined terms," and policies and procedures be submitted to the IMT and OAG to allow the parties to engage in a collaborative revision process.

The IMT assessed Secondary compliance with ¶97 by reviewing training development, implementation, and evaluation in accordance with ¶286 of the Consent Decree, which incorporates the following evaluation criteria: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation. In addition, the IMT confirmed records sufficient to show that the City and the CPD are responding to the identified needs and objectives of the CIT program though interviews with relevant CPD personnel, such as the District Commander, the CIT Coordinator, CIT DOCS, CITTS, and CIT Patrol officers and Sergeants.

*Progress before the Fifth Reporting Period*

As noted in our last report, the CPD finalized Special Order S05-14, *Crisis Intervention Team (CIT) Program*, which states that the Crisis Intervention Team Training

Section is responsible for developing, reviewing, and revising the Crisis Intervention Team curricula, as well as the administration and delivery of the refresher training. In the fifth reporting period, a substantially revised S05-14 was submitted for review and maintains the same language noted above.

*Progress in the Fifth Reporting Period*

The CPD began delivering the refresher training in the last reporting period. The IMT observed the training this monitoring period and confirmed the refresher training curriculum includes ¶97's requirements. However, we note that a substantial portion of the training is dedicated to officer wellness topics (Officer Exposure to Trauma; Self Care Issues, Practices and Resources; Employee Assistance Programs (EAP)). While these are critically important topics, the City should consider moving these topics to annual in-service training that ensures all officers, not just CIT Certified Officers, are receiving this critically important information.

Further, since a substantial portion of officers receiving this refresher training underwent their original Basic CIT training over eight years ago without any refresher training since, maximizing the time spent on refreshing crisis-intervention related topics is of the utmost importance. To strengthen the integrity of the CIT program and knowledge retention, the IMT encourages the CPD to consider sending officers who have not received the Basic 40-hour CIT in over five years, with no refresher, to attend the Basic 40-hour training again. This would bring officers up to speed with best practices and policy/program changes. It may also afford the CPD to move into the Refresher training cadence every three years. With the IMT continuing to observe the trainings virtually in light of the ongoing COVID-19 pandemic, training group activities (*e.g.*, Scenario Based Role Play and officer discussion on field-related problems with CIT) were difficult to hear. The IMT appreciates the time dedicated to scenario-based role play. The IMT also looks forward to receiving the themes that are being observed during the "CIT Troubleshooting" and the "CIT Group Problem Solving" portions of the training. This is very important to measuring and improving the overall CIT program.

However, it is also important to note some of the comments the IMT heard while observing the training, which included the following: concerns about OEMC not having an updated list of CIT officers on duty; officers not knowing where to take people in crisis; and that there needs to be more community outreach about the program. Moreover, there was also an officer discussion on both incentivizing and maintaining officer interest in the program. Officer suggestions included the following: incentive Pay; shift preference; extra points on promotional exam; FTO consideration; a desire to have the program be taken more seriously by the CPD; having a different title (Corporal). a special room for de-compression after stressful CIT related calls for service, with time allocated to make use of it; paid overtime for e-learning.

In our last report, we recommended that the CPD invite members of the Chicago Council on Mental Health Equity and other community representatives to observe the training's delivery and to provide feedback to the CPD regarding the same. Members were invited to attend the refresher training during this reporting period, and to provide feedback. This is a commendable step by the CPD.

Full compliance with the requirements of ¶97 will require the CPD to train all Certified CIT Officers, while also collecting meaningful feedback from both officers and non-CPD personnel. The IMT has yet to receive any information about the number of people from the community who have attended the training, what feedback was provided, and what the city intends to do with the feedback. The community's feedback, combined with officer feedback, would be an invaluable tool for the next 3-year iteration of refresher training.

Last, a significant number of years have passed since "certified" officers were originally trained suggests more of a training model than a specialized program model. We strongly suggest the CPD prioritize officers to receive the refresher training based on when they received the 40-hour basic training. For instance, a data dashboard shown to the IMT indicates a significant percentage of "Certified" CIT officers were trained more than 8 years ago and have not received any formal refresher training since. This lack of formal refresher training results in a diluted, non-best practice model. This means that officers are unable to refresh their skills while still being considered a specialized response. The CPD should triage officers by how recently they have received training, such that those officers with the most outdated training on crisis response will receive the refresher training first. This will help ensure that the CIT officers' training reflects the recent advances in knowledge, best practices, and community expectations. The IMT will continue to assess the CPD's process for ensuring best practices are followed in prioritization of refresher training.

Triaging officers in the manner suggested above, from those with the longest amount of time that has passed since receiving any CIT related training while better balancing the dedicated refresher hours to focus more fully on Refresher topics and not so heavily on officer wellness related topics is advisable. This is particularly true when in the early stages of re-educating a large portion of department members on Crisis Intervention topics and on expansive program changes.

## Paragraph 97 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Crisis Intervention: ¶98

**98.** *Certified CIT Officers may satisfy the in-service training requirements, as outlined in Part H, by completing the CIT Refresher Training.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The IMT assessed the City and the CPD's efforts with ¶98 for the first time in the fifth reporting period. By the end of the period, the City and the CPD achieved Preliminary compliance with ¶98.

To achieve Preliminary compliance with ¶98, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

During the fifth reporting period, the IMT reviewed S11-10-03, *In-Service Training* and concluded that the CPD had adequately memorialized ¶98's requirements. The IMT accordingly issued a no objection during this reporting period and, as a result, Preliminary compliance has been achieved. Additionally, CPD has memorialized this requirement in the newly revised S05-14, which is still under review.

The CPD has achieved Preliminary compliance during this reporting period by memorializing ¶98's requirements into S11-10-03, *In-Service Training*.

### Paragraph 98 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Not Applicable | Preliminary | |

# Crisis Intervention: ¶99

**99.** *Within 365 days of the Effective Date, the CIT Program staff, in coordination with the Education and Training Division will develop the CIT Refresher Training. The CIT Program staff will review and revise the CIT Refresher Training as necessary to ensure that Certified CIT Officers receive up-to-date training. The CIT Program will seek input from the Advisory Committee in the development of the refresher training.*

---

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶99.

To achieve Preliminary compliance with ¶99, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶99 by evaluating the City's and the CPD's level of data collection, tracking, analysis, and management as required under the Consent Decree. The IMT "triangulate[s]" the data by comparing multiple data sources, yielding a more robust understanding of ¶99's requirements.

*Progress before the Fifth Reporting Period*

The CPD has Special Order S05-14, *Crisis Intervention Team (CIT) Program*, which states that the Crisis Intervention Team Training Section is responsible for developing, reviewing, and revising the Crisis Intervention Team curricula and delivering the refresher training.

During the last reporting period, the CPD began delivering the Refresher Training, which the IMT observed this monitoring period. *See* ¶97 assessment, above. The CPD achieved Secondary compliance through initiating the Refresher Training. Additionally, the IMT recommended that the CPD invite members of the Chicago Council on Mental Health Equity and other community representatives to observe the training's delivery and to provide feedback to the CPD regarding the same.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD produced a substantially revised S05-14, which is presently under review but maintains this same language as the previous S05-14 that memorialized the requirements of ¶99.

Additionally, Chicago Council on Mental Health Equity members were invited to attend the Refresher Training during this reporting period, and to provide feedback. This is a commendable step by the CPD. We look forward to receiving the feedback provided.

As indicated previously, because a significant number of years that have passed since "certified" officers were originally trained suggests more of a training model than a specialized program model. We strongly suggest that the CPD prioritize officers to receive the refresher training based on when they received the 40-hour basic training. For instance, the IMT reviewed a data dashboard s indicating a fairly significant percentage of Certified CIT officers were trained more than 8 years ago and have not received any formal refresher training since. This lack of formal refresher training results in a diluted, non-best practice model. This means that officers are unable to refresh their skills while still being considered a specialized response. To strengthen the integrity of the CIT program and knowledge retention, the IMT encourages the CPD to consider sending officers who have not received the Basic 40-hour CIT in over five years, with no refresher, to attend the Basic 40-hour training again. This would bring officers up to speed with best practices and policy/program changes. It may also afford the CPD to move into the Refresher training cadence every three years.

Full compliance with the requirements of ¶99 will require CPD to train all Certified CIT Officers and collect meaningful feedback from officers as well as non-CPD personnel. Community feedback, combined with officer feedback, would be an invaluable tool when planning the next 3-year iteration of refresher training.

While the CPD has maintained Preliminary and Secondary compliance with ¶99, to achieve Full compliance it should triage officers by how recently they have received training, such that those officers with the most outdated training on crisis response will receive the refresher training first. This will help ensure that CIT officers' training reflects the recent advances in knowledge, best practices, and community expectations. The IMT recommends triaging officers in the manner suggested above, while better balancing the dedicated refresher hours to focus more on Refresher topics and less on officer wellness related topics. This is especially true when in the early stages of re-educating a large portion of department members on Crisis Intervention topics and expansive program changes.

The IMT will continue to assess the CPD's process for ensuring best practices are followed in prioritization and delivery of refresher training.

## Paragraph 99 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Crisis Intervention: ¶100

**100.** *All Certified CIT Officers who completed the Basic CIT Training before the development of the CIT Refresher Training must complete their first CIT Refresher Training within four years of the date that the CIT Refresher Training is developed. All Certified CIT Officers who complete Basic CIT Training on or after the date that the CIT Refresher Training is developed must complete their first CIT Refresher Training within three years of receiving the Basic CIT Training.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Recurring Schedule:** | Moving | ✓ **Not Yet Applicable** |

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

During the fifth monitoring period, the City and the CPD met Preliminary compliance with ¶100.

To achieve Preliminary compliance with ¶100, the City and the CPD must develop and finalize policies that incorporate ¶100's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

*Progress before the Fifth Reporting Period*

In the fourth monitoring period, the IMT reviewed a revised draft version of the Crisis Intervention Unit (CIU) Special Order SO 20-02, *CIT Training Scheduling, Attendance, Eligibility, and Recruitment*, which memorializes the requirements of ¶100. However, S020-02 was not finalized during the last reporting period, which prevented the CPD from achieving Preliminary compliance with ¶100.

*Progress in the Fifth Reporting Period*

In the fifth monitoring period, the CPD substantially revised S05-14, *Crisis Intervention Team Program* and subsumed components of CIU S.O. 20-02 into the revised S05-14 directive, which was produced this reporting period, and which is

presently under review. The components of ¶100 are incorporated into S05-14. The CPD has also memorialized this requirement into S11-10-03, *In-service Training,* which received a no-objection this reporting period, thereby achieving Preliminary compliance.

The draft version of both CIU S.O. 20-02 and S04-15 indicate that the CPD will establish an electronic CIT certification expiration date. Upon that date, the CIT officer will have needed to receive the CIT Refresher Training to avoid being removed from the Certified CIT Officers list prioritized for dispatch. Due to limitations in their current electronic system, training records can only be updated quarterly to remove officers who no longer meet the eligibility requirements for certified CIT Officers. To achieve Secondary compliance, the CPD will need to demonstrate a functioning system for assigning this expiration date and having effective and timely notification to OEMC. The IMT notes that a functioning system should help remind officers that their expiration date is approaching.

The City and the CPD achieved Preliminary compliance with ¶100 since S11-10-03, *In-Service Training*, was finalized and enacted. The City and the CPD have also incorporated ¶100 into the current draft of S05-14, *Crisis Intervention Team Program,* which is presently under review. Going forward, Secondary compliance will require the CPD to demonstrate a functioning system for assigning the CIT certification expiration date and having effective and timely notification of the same to the OEMC.

### Paragraph 100 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

## Crisis Intervention: ¶101

*101. Certified CIT Officers who fail to complete the CIT Refresher Training within three years of taking their most recently required CIT Training, whether the Basic CIT Training or a prior CIT Refresher Training, will be deemed out of compliance with the CIT Program's CIT Refresher Training requirement. CPD will confirm on a quarterly basis that Certified CIT Officers remain in compliance with the CIT Refresher Training requirement. Any Certified CIT Officer found to be out of compliance during the quarterly review may not continue to be identified by CPD as a Certified CIT Officer and may not continue to be prioritized to respond to calls for service involving individuals in crisis. Each quarter, CPD will inform OEMC of officers who are out of compliance with the CIT Refresher Training requirement. An officer out of compliance with the CIT Refresher Training requirement must complete the most recently offered version of the CIT Refresher Training before CPD may resume identifying the officer as a Certified CIT Officer and before OEMC may resume prioritizing that officer to respond in the field to calls involving individuals in crisis.*

### Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:** Quarterly    ☑ **Not Yet Applicable**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During the fifth monitoring period, the City and the CPD did not meet any level of compliance ¶101.

To achieve Preliminary compliance with ¶101, the City and the CPD must develop and finalize policies that incorporate ¶101's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

*Progress before the Fifth Reporting Period*

In the fourth monitoring period, the IMT reviewed a revised draft version of Crisis Intervention Unit (CIU) Special Order S.O. 20-02, *CIT Training Scheduling, Attendance, Eligibility, and Recruitment*, which memorialized the requirements of ¶101. However, CIU S.O. 20-02 was not finalized during the last reporting period, which prevented the CPD from achieving Preliminary compliance with ¶101. In the fifth monitoring period, the CPD substantially revised S05-14, *Crisis Intervention Team Program,* and subsumed components of CIU S.O. 20-02 into the revised S05-14 directive, which was produced this reporting period, and which is presently under review. The components of ¶101 are incorporated into S05-14.

*Progress in the Fifth Reporting Period*

The draft version of both CIU S.O. 20-02 and S05-14 indicates that the CPD will establish an electronic CIT certification expiration date. Upon that date, the CIT officer will have needed to receive the CIT refresher training to avoid being removed from the Certified CIT Officers list prioritized for dispatch. Due to limitations in their current electronic system, training records can only be updated quarterly to remove officers who no longer meet the eligibility requirements for certified CIT Officers. To achieve Secondary compliance, the CPD will need to demonstrate a functioning system for assigning this expiration date and having effective and timely notification to OEMC. The IMT notes that a functioning system should help remind officers that their expiration date is approaching

The IMT expects the City and the CPD to achieve Preliminary compliance with ¶101 once the CPD's S05-14, *Crisis Intervention Program* has been finalized. Going forward, Secondary compliance will require the CPD to demonstrate a functioning system for assigning the CIT certification expiration date and having effective and timely notification of the same to OEMC.

### Paragraph 101 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶102

**102.** *All newly assigned Field Training Officers ("FTOs") and pro-moted Sergeants and Lieutenants will continue to receive the Basic CIT Training. To be considered Certified CIT Officers, FTOs, Sergeants, and Lieutenants must meet the eligibility criteria and training requirements established by the CIT Program and this Agreement.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

During the fifth monitoring period, the City and the CPD met Preliminary compliance with ¶102.

To achieve Preliminary compliance with ¶102, the City and the CPD must develop and finalize policies that incorporate ¶102's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

### Progress before the Fifth Reporting Period

In the fourth monitoring period, the IMT reviewed a revised draft version of Crisis Intervention Unit (CIU) Special Order S.O. 20-02, *CIT Training Scheduling, Attendance, Eligibility, and Recruitment*, which memorialized the requirements of ¶102, but was never finalized.

Additionally, in the third reporting period, the CPD had made progress on developing its new CIT dashboard, which includes data specific to ¶102. However, the CPD has regressed in its data collection and analysis. Their former data analyst resigned at the end of the third reporting period, and the CPD has not yet hired or onboarded a new one. Consequently, robust data reporting and analysis remains stagnant. The IMT's review of this dashboard will be an important part to future compliance assessments with Consent Decree requirements.

*Progress in the Fifth Reporting Period*

However, in the fifth monitoring period, components of CIU S.O. 20-02 were subsumed into a revised directive S05-14, which is presently under review. Additionally, ¶102 was memorialized under, S11-10-02 Pre-Service Training, which received a no objection.

The CPD achieved Preliminary compliance with ¶102 when it memorialized requirements under S11-10-02 *Pre-Service Training*. To achieve Secondary compliance with ¶102, the CPD will need to develop a system to track whether newly assigned Field Training Officers ("FTOs") and promoted Sergeants and Lieutenants complete the requisite training and meet the CIT Program's eligibility requirements.

### Paragraph 102 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Crisis Intervention: ¶103

**103.** *The CIT Program staff responsible for the CIT training curriculum will, where it would add to the quality or effectiveness of the training and when feasible and appropriate, encourage and seek the participation of professionals and advocates who work with individuals in crisis, and persons with lived experiences of behavioral or mental health crisis, including those with involvement in the criminal justice system, in developing and delivering CPD CIT trainings.*

## Compliance Progress                 (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During the fifth monitoring period, the City and the CPD did not meet any level of compliance with ¶103.

To achieve Preliminary compliance with ¶103, the City and the CPD must develop and finalize policies that incorporate ¶103's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

*Progress before the Fifth Reporting Period*

In the fourth monitoring period, the IMT reviewed a revised draft version of Crisis Intervention Unit (CIU) Special Order S.O. 20-02, *CIT Training Scheduling, Attendance, Eligibility, and Recruitment*, which memorialized the requirements of ¶103. However, in the fifth monitoring period, components of CIU S.O. 20-02 were subsumed into the CPD's substantially revised directive S05-14, *Crisis Intervention Program*, which was produced this reporting period, and which is presently under review.

*Progress in the Fifth Reporting Period*

As noted in our prior report, the CPD has incorporated the input of mental health professionals, stakeholders, and people with lived experience into the development and delivery of the CIT Basic 40-hour Training and Refresher Training. The

CPD previously convened a working group to review curricula and provide feedback on training. Additionally, professionals and people with lived experience are involved in the CIT trainings as both instructors and participants. In our last report, we recommended that the CPD invite members of the Chicago Council on Mental Health Equity and other community representatives to observe the training's delivery and to provide feedback to the CPD regarding the same. Chicago Council on Mental Health Equity Members were invited to attend both and provide feedback on the Basic CIT and the Refresher Training during this reporting period. This is a commendable step by the CPD.

This reporting period, the IMT observed both the 40-hour CIT Training and the CIT Refresher Training and finds them to be overall well done. However, we note that a substantial portion of the Refresher training is dedicated to officer wellness topics (*e.g.*, Officer Exposure to Trauma; Self Care Issues, Practices and Resources; Employee Assistance Programs (EAP)). While these are critically important topics, the City should consider moving these topics to annual in-service training to ensure all officers, not just the CIT Certified Officers, are receiving this critically important information. Additionally, since a substantial portion of officers receiving this refresher training underwent their original Basic CIT training over eight years ago without any refresher training since, maximizing the time spent on refreshing crisis intervention related topics is of the utmost importance.

Upon finalizing S05-14, the IMT expects the CPD to achieve both Preliminary and Secondary compliance based on its efforts to-date. For Full compliance, we will continue to assess how the CPD incorporates the input of professionals and people with lived experience, including the feedback received by participants who have observed the training and officer evaluations. Additionally, we will assess how the CPD has furthered its outreach to include additional perspectives.

### Paragraph 103 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶104

**104.** *CPD will develop policies regarding the criteria for ongoing participation as a Certified CIT Officer, consistent with this Agreement.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

During the fifth monitoring period, the City and the CPD did not meet any level of compliance with ¶104.

To achieve Preliminary compliance with ¶104, the City and the CPD must develop and finalize policies that incorporate ¶104's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

### Progress before the Fifth Reporting Period

In last monitoring period, the CPD provided the IMT with Special Order SO20-02, *CIT Training Schedule, Attendance, Eligibility, and Recruitment*, which memorialized the requirements of ¶104. However, in the fifth monitoring period, components of CIU S.O. 20-02 were subsumed under a recently revised *Crisis Intervention Program* policy (S05-14), which was still under review at the end of the reporting period.

### Progress in the Fifth Reporting Period

The CPD had previously proposed that officers be deemed ineligible to become a Certified CIT officer if they (1) have received a sustained misconduct complaint resulting in a suspension of more than seven days within the preceding 12 months, or (2) have three or more sustained misconduct complaints resulting in suspension within the past five years.

The IMT raised concerns regarding these low eligibility thresholds which would result in very few officers being ineligible to serve in this specialized role. In response, during this monitoring period, the CPD provided the IMT with a substantially revised version of S05-14 wherein it revised a portion of the eligibility criteria

by lowering the sustained misconduct complaint suspension period from seven to three days, thereby ensuring a higher standard of eligibility assessment. While the paragraph does not delineate minimum qualifications, we believe it is incumbent on the City to provide standards that would more adequately exclude officers who have demonstrated they are unlikely to be a good match for a specialized role serving vulnerable populations. This is especially important as the CPD continues to transition to a mandatory CIT model. The IMT appreciates this reconsideration of the eligibility standard and looks forward to the CPD continuing to demonstrate thoughtful consideration to ensure the best candidates are fulfilling this importance service.

The City and the CPD have not met Preliminary compliance with ¶104 because the collaborative revision process was ongoing at the end of the fifth monitoring period. The CPD has developed eLearning materials intended to educate all officers on the CIT program, including policy changes which affect the entire department. This eLearning covers ¶104, which will be necessary for reaching higher levels of compliance. To reach secondary compliance, the CPD will need to demonstrate 95% completion of the e-learning and develop outcome-based metrics to establish a floor by which progress toward operational compliance can be assessed. The CPD must also complete its development and implementation of criteria for initial and ongoing service as a CIT officer. The IMT will review records that demonstrate the City, the CPD, and the other relevant entities have qualified personnel serving as CIT officers. For the IMT to assess Full compliance, the CPD must indicate which factors will contribute to achieving compliance and how those factors, and the CPD's progress toward compliance, will be measured.

### Paragraph 104 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶105

**105.** *CPD will continue to maintain an up-to-date list of Certified CIT Officers, including their unit of assignment.*

### Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

During the fifth monitoring period, the CPD maintained Preliminary compliance with ¶105.

To achieve Preliminary compliance with ¶105, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms." In addition, the IMT assesses whether the City has qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree. The IMT also assesses the City on resource allocation, staffing capacity, and efforts to fill any vacant positions.

Going forward, to achieve Secondary compliance, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶105. Further assessment levels will require an assessment of those developed metrics.

*Progress before the Fifth Reporting Period*

The CPD has Special Order S05-14, *Crisis Intervention Team Program*, which clearly states that the Training Division is responsible for updating officer training records regarding the completion of Basic, Advanced, and Refresher CIT trainings. The CPD and the OEMC also continue to utilize multiple approaches for informing the OEMC telecommunicators which CPD members are CIT certified. For example, the OEMC personnel can access the roster of CIT officers available on a per-shift basis. Additionally, watch supervisors can provide a list of CIT officers to the OEMC utilizing a separate dataset. In a Refresher course observed by the IMT, officers expressed concern regarding the accuracy of officers on patrol designated as CIT certified.

In previous reports, we noted that Secondary compliance would depend on the development of a system plan to ensure that officers who violate the eligibility

criteria or who allow their training to lapse are undesignated in the CLEAR/eLearning systems. In response, the CPD provided CIU S.O. 20-02, *CIT Training Schedule, Attendance, Eligibility, and Recruitment*, in the fourth reporting period. This special order indicated that the CPD will establish an electronic CIT certification expiration date. Upon that date, the CIT officer will have needed to receive the CIT Refresher training to avoid being removed from the list of Certified CIT Officers prioritized for dispatch. Additionally, CIU S.O. 20-02 states that the Commander – CIT Program Coordinator or designee is responsible for disqualifying members who meet other ineligibility criteria.

*Progress in the Fifth Reporting Period*

This system process has been substantially memorialized in the revised S05-14, designating the CIT Program Coordinator to be responsible for the disqualification process. However, this revised S05-14 has not yet been finalized.

To achieve Secondary compliance, the CPD will need to finalize the substantially revised version of S05-14 and demonstrate a system that can identify and remove ineligible officers from the list of Certified CIT officers. The CPD must develop a systems plan to ensure that officers who violate the Certified CIT Officer eligibility criteria, or who allow their training to lapse, are undesignated in the CLEAR/eLearning systems and who is responsible for maintain an up-to-date list of Certified CIT Officers..

### Paragraph 105 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶106

**106.** *CPD will require that, when available, at least one Certified CIT Officer will respond to any incident identified as involving an individual in crisis. Certified CIT Officers will continue to be prioritized for dispatch to incidents identified as involving individuals in crisis, as assigned. CPD will review and revise the appropriate policies to ensure that, in situations in which a Certified CIT Officer is not available to respond to a call or incident identified as involving an individual in crisis, the responding officer engages in crisis intervention response techniques, as appropriate and consistent with CPD policy and their training, throughout the incident. Responding officers will document all incidents involving an individual in crisis in a manner consistent with this Agreement.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

During the fifth monitoring period, the City and the CPD maintained Preliminary compliance with ¶106.

To achieve Preliminary compliance with ¶106, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms." In addition, the IMT assesses whether the City has qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree. The IMT also assesses the City on resource allocation, staffing capacity, and efforts to fill any vacant positions.

The CPD has developed an eLearning intended to educate all officers on the CIT program, including policy changes which affect all officers. This eLearning covers ¶106, which will be necessary for reaching higher levels of compliance. Moreover, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶106. The IMT is seeking to review outcome-based metrics that establish a floor by which progress toward operational compliance can be assessed. Progress toward Full compliance can only be measured if the IMT understands what the CPD is measuring. Further assessment levels will require an assessment of those developed metrics.

*Progress before the Fifth Reporting Period*

We previously noted that the CPD possessed sufficient directives containing the requirements of ¶106 (*e.g.*, S04-20, *Recognizing and Responding to Individuals in Crisis*) as well as possessed a comprehensive Crisis Intervention Report for documenting incidents involving an individual in mental health crisis.

*Progress in the Fifth Reporting Period*

CPD officers have not received the training components necessary to achieve Secondary compliance with ¶106. For instance, non-CIT officers have not received updated training on responding to calls involving individuals in mental health crisis, although the CPD has made substantial strides in expanding the curricula and time dedicated to this function. These efforts are commendable and necessary if the CPD is to "engage in crisis intervention response techniques." Further, the CPD has yet to train all officers on completing the Crisis Intervention Report. This lack of training causes the crisis intervention data to be unreliable because, historically, officers completed the prior form infrequently. The training on completing the Crisis Intervention Report should ensure that all officers understand its terms. The CPD has developed an eLearning intended to educate all officers on the CIT program, including policy changes which affect all officers.

This eLearning covers ¶106, which will be necessary for reaching higher levels of compliance. In addition, Full compliance cannot be achieved unless the CPD can collect reliable data to evaluate the incident and conduct trend analysis. Assessing the frequency of non-CIT officers requesting a CIT officer's response may also be informative in meeting the requirement of this paragraph, which requires that, when available, at least one Certified CIT Officer will respond to any incident identified as involving an individual in crisis. Finally, the IMT will need to assess the CPD's dispatch prioritization of CIT officers. Ongoing assessment of prioritization of dispatch of CIT officers will need to be assessed. As indicated previously, the CPD has regressed in its data collection and analysis. Its former data analyst resigned at the end of the third reporting period, and the CPD has yet to hire or onboard anyone to fill this role. This has stagnated the CPD's robust data reporting and analysis.

To achieve Secondary compliance with ¶106, the CPD will need to train all officers in crisis intervention response, which includes training on completing the CIT Report. The IMT will review records that demonstrate the City, the CPD, and the other relevant entities have qualified personnel serving as CIT officers. The CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶106. For the IMT to assess Full compliance, the CPD must indicate what factors will contribute to achieving compliance and how those factors, and the CPD's progress toward compliance, will be measured.

## Paragraph 106 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

# Crisis Intervention: ¶107

**107.** *Within 180 days of the Effective Date, and quarterly thereafter, CPD will collect and analyze the number of calls for service identified as involving individuals in crisis for every watch in each district to evaluate the number of Certified CIT Officers needed to timely respond. The number of Certified CIT Officers on each watch in every district will be driven by the demand for crisis intervention services for the particular watch and district.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Quarterly                ☐ **Met**    ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During the fifth monitoring period, the CPD did not achieve any level of compliance with ¶107.

To achieve Preliminary compliance with ¶107, the City and the CPD must develop and finalize policies that incorporate ¶107's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." In addition, the IMT will assess the CPD's level of data collection, tracking, analysis, and management as required under the Consent Decree.

### Progress before the Fifth Reporting Period

During the fourth monitoring period, the CPD provided a revised draft of Special Order SO20-05, *CIT Officer Implementation Plan.* However, SO20-05 required additional revisions before it could be finalized. For example, we have requested the CPD define the term "timely respond" to determine the number of CIT officers needed in a particular district and watch. Upon the necessary revisions, the CPD will be in Preliminary compliance with ¶107.

*Progress in the Fifth Reporting Period*

During the fifth reporting period, the CPD regressed in its data collection and analysis. Its former data analyst resigned at the end of the third reporting period, and the CPD has yet to hire or onboard anyone to fill this role. This has stagnated the CPD's robust data reporting and analysis. The CIT Unit analyst is responsible for creating a statistical model to determine the demand for crisis intervention services. However, with the analyst vacancy, the IMT has not received a comprehensive explanation of the analyst's metrics (including the model's variables). This will be a necessary component for Secondary compliance.

In the interim, the CPD could perform simpler assessments which would provide a preliminary understanding of whether current CIT deployment reflects the demand for services. For instance, if 5% of all CIT calls occur in a district, we should expect (roughly) 5% of all CIT officers to be in that same district. This is a straightforward analysis and would provide a good foundational set of data to inform "demand for services."

It is our understanding that the CPD agrees that more needs to be done to comply with ¶107 and aims to provide supplemental materials in the sixth reporting period.

The IMT's review of this dashboard will be an important part to future compliance assessments with Consent Decree requirements. During the fifth reporting period, the CPD has not yet defined "timely" nor had dedicated staff to clean and analyze data related to the analyses required by ¶107.

### Paragraph 107 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Crisis Intervention: ¶108

**108.** *Within 180 days of the Effective Date, CPD will develop an implementation plan ("CIT Officer Implementation Plan") based on, at a minimum, its analysis of the demand for crisis intervention services for each watch in each district. The CIT Officer Implementation Plan will identify the number of Certified CIT Officers necessary, absent extraordinary circumstances, to meet the following response ratio targets: a. a sufficient number of Certified CIT Officers to ensure that Certified CIT Officers are available on every watch in each district to timely respond to at least 50% of the calls for service identified as involving individuals in crisis, absent extraordinary circumstances ("initial response ratio target"); and b. a sufficient number of Certified CIT Officers to ensure that Certified CIT Officers are available on every watch in each district to timely respond to at least 75% of the calls for service identified as involving individuals in crisis, absent extraordinary circumstances ("second response ratio target").*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fifth monitoring period, the CPD did not achieve any level of compliance with ¶108.

To achieve Preliminary compliance with ¶108, the City and the CPD must develop and finalize policies that incorporate ¶108's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." In addition, the IMT will assess the CPD's level of data collection, tracking, analysis, and management as required under the Consent Decree.

*Progress before the Fifth Reporting Period*

During the fourth monitoring period, the CPD provided a revised draft of Special Order SO20-05, *CIT Officer Implementation Plan*. However, SO20-05 required additional revisions before it could be finalized. For example, we have requested that

the CPD define the term "timely respond" to determine the number of CIT officers needed in a particular district and watch. Upon the necessary revisions, the CPD will be in Preliminary compliance with ¶108.

*Progress in the Fifth Reporting Period*

During the fifth reporting period, the CPD has regressed in its data collection and analysis. Its former data analyst resigned at the end of the third reporting period, and the CPD has not yet hired or onboarded a new one. Consequently, robust data reporting and analysis remains stagnant. The CIT Unit analyst is responsible for creating a statistical model to determine the demand for crisis intervention services. However, with the analyst vacancy, the IMT has not received a comprehensive explanation of the analyst's metrics (including the model's variables). This will be a necessary component for Secondary compliance. In the interim, the CPD could perform simpler assessments that would provide a preliminary understanding of whether current CIT deployment is reflective of the demand for services. For instance, if 5% of all CIT calls occur in a district, we should expect (roughly) 5% of all CIT officers to be in that same district. This is a straightforward analysis and would provide a good foundational set of data to inform "demand for services." Also, both the CPD and the City have gone another reporting period without a CIT Officer Implementation Plan required under ¶108. While the IMT appreciates delaying these reports until they are supported by reliable data and a more robust strategy, the CPD should focus on the actions necessary to produce these reports.

Defining "timely response," memorializing ¶108 in policy, and taking steps toward data reliability are all necessary for compliance assessment.

The IMT's review of the CPD's dashboard is necessary to assess whether that data being used to prepare the CIT Officer Implementation Plan is reliable. Moreover, it is an important part of future compliance assessments with Consent Decree requirements. During the fifth reporting period, the CPD has not had dedicated its staff to cleaning and analyzing analyses data required by ¶108, nor has it used the analyses data to inform the CIT Officer Implementation Plan

To achieve Preliminary compliance with ¶108, policy must be finalized, and the City and the CPD must demonstrate that they are tracking and maintaining data as required by ¶108, such as collecting and analyzing the demand for crisis intervention services for each watch in each district. The IMT will also make reasonable efforts to ensure that the data is reliable. To achieve Secondary compliance with ¶108, the CPD must demonstrate that the CIT Officer Implementation Plan is complete and includes the number of Certified CIT Officers necessary to satisfy the requisite response ratios.

## Paragraph 108 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶109

**109.** *The CIT Officer Implementation Plan will further identify the steps that are necessary to meet and maintain the initial response ratio target by January 1, 2020, and the second response ratio target by January 1, 2022 and the strategies, methods, and actions CPD will implement to make progress to timely achieve and maintain these response ratio targets.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Deadline:** | March 6, 2022* | ☑ **Not Yet Applicable** |
| | *Extended from March 6, 2022, due to COVID-19 | |
| **Preliminary:** | *Not in Compliance* | |
| **Secondary:** | *Not in Compliance* | |
| **Full:** | *Not in Compliance* | |

In the fifth monitoring period, the CPD did not achieve any level of compliance with ¶109.

To achieve Preliminary compliance with ¶109, the City and the CPD must develop and finalize policies that incorporate ¶109's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." In addition, the IMT will assess the CPD's level of data collection, tracking, analysis, and management as required under the Consent Decree.

*Progress before the Fifth Reporting Period*

During the fourth monitoring period, the CPD provided a revised draft of Special Order SO20-05, *CIT Officer Implementation Plan*. However, the SO20-05 required additional revisions before it could be finalized. For example, we have requested the CPD define the term "timely respond" to determine the number of CIT needed in a particular district and watch. Upon the necessary revisions, the CPD will be in Preliminary compliance with ¶109.

*Progress in the Fifth Reporting Period*

However, during the fifth reporting, the CPD has regressed in its data collection and analysis. Its former data analyst resigned at the end of the third reporting period, and the CPD has not yet hired or onboarded a new one. Consequently, robust data reporting and analysis remains stagnant. The CIT Unit analyst is responsible for creating a statistical model to determine the demand for crisis intervention services. However, with the analyst vacancy, the IMT has not received a comprehensive explanation of the analyst's metrics (including the model's variables). This will be a necessary component for Secondary compliance. For the moment, the CPD could perform simpler assessments, which would provide a preliminary understanding of whether current CIT deployment reflects the demand for services. For instance, if 5% of all CIT calls occur in a district, we should expect (roughly) 5% of all CIT officers to be in that same district. This is a straightforward analysis and would provide a good foundational set of data to inform "demand for services" and subsequently the steps necessary to achieve the IRRT and SRRT.

Further, both the City and the CPD have gone another reporting period without a CIT Officer Implementation Plan required under ¶108. While the IMT appreciates delaying these reports until they can be supported with reliable data and a more robust strategy, the CPD should focus on what actions are needed to produce these reports.

The IMT's review of the CPD's dashboard is necessary to assess whether the data being used to prepare the CIT Officer Implementation Plan is reliable. Moreover, it is an important part of future compliance assessments with Consent Decree requirements. During the fifth reporting period, the CPD has not dedicated its staff to cleaning and analyzing analyses data required by ¶108, nor has it used the analyses data to inform the CIT Officer Implementation Plan.

Defining "timely response," memorializing ¶109 in policy, and taking steps toward data reliability are all necessary for compliance assessment.

To achieve Preliminary compliance with ¶109, policy must be finalized, and the City and the CPD must demonstrate that they are tracking and maintaining data as required by ¶109, such as collecting and analyzing the demand for crisis intervention services for each watch in each district. The IMT will also make reasonable efforts to ensure that the data is reliable. To achieve Secondary compliance with ¶109, the CPD must demonstrate that the CIT Officer Implementation Plan is complete and includes the number of Certified CIT Officers necessary to satisfy the requisite response ratios.

## Paragraph 109 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶110

**110.** *Within 180 days of completing the CIT Officer Implementation Plan, and annually thereafter, CPD will submit a report to the Monitor and the Office of the Attorney General ("OAG") regarding the progress the Department has made to meet: (a) the response ratio targets ("Implementation Plan Goals") identified in the Implementation Plan and (b) the number of Certified CIT Officers identified as necessary to achieve the response ratio targets. The Monitor and OAG will have 30 days to respond in writing to CPD's progress report. The Monitor and CPD will publish CPD's report and the Monitor's and OAG's response, if any, within in 45 days of the date CPD submitted the progress report to the Monitor and OAG.*

---

**Compliance Progress**          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**     Moving          ☑ **Not Yet Applicable**

**Preliminary:**     *Not in Compliance*
**Secondary:**     *Not in Compliance*
**Full:**     *Not in Compliance*

In the fifth monitoring period, the City and the CPD did not meet any level of compliance with ¶110.

To achieve Preliminary compliance with ¶110, the City and the CPD must develop and finalize policies that incorporate ¶110's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

*Progress before the Fifth Reporting Period*

During the fourth monitoring period, the CPD provided a revised draft of Special Order SO20-05, *CIT Officer Implementation Plan*. However, the SO20-05 required additional revisions before it could be finalized. For example, we have requested that the CPD define the term "timely respond" to determine the number of CIT officers needed in a particular district and watch. Upon the necessary revisions, the CPD will be in Preliminary compliance with ¶110.

*Progress in the Fifth Reporting Period*

During the fifth reporting period, the CPD regressed in its data collection and analysis. Its former data analyst resigned at the end of the third reporting period, and the CPD has not yet hired or onboarded a new one. Consequently, the CPD's robust data reporting and analysis has stagnated. The CIT Unit analyst is responsible for creating a statistical model to determine the demand for crisis intervention services; therefore, without the analyst, the IMT has not received a comprehensive explanation of the analyst's metrics (including the model's variables). Also, both the City and the CPD have gone another reporting period without a CIT Officer Implementation Plan required under ¶110. While the IMT appreciates delaying these reports until they can be supported by reliable data and a more robust strategy, the CPD should focus on what actions are needed to produce these reports.

The IMT's review of the CPD's dashboard is necessary to assess whether the data being used to prepare the CIT Officer Implementation Plan is reliable. Moreover, it is an important part to future compliance assessments with Consent Decree requirements. During the fifth reporting period, the CPD has not dedicated its staff to cleaning and analyzing data related to the analyses required by ¶108, nor has it used the analyses data to inform the CIT Officer Implementation Plan. Defining "timely response," memorializing ¶110 into policy, and taking steps toward data reliability are all necessary for compliance assessment.

To achieve Preliminary compliance with ¶110, the City and the CPD must finalize policy and demonstrate that they are tracking and maintaining data as required by ¶110, such as collecting and analyzing the demand for crisis intervention services for each watch in each district. The IMT will also make reasonable efforts to ensure that the data is reliable. To achieve Secondary compliance with ¶110, the CPD must demonstrate that the CIT Officer Implementation Plan is complete and includes the number of Certified CIT Officers necessary to satisfy the requisite response ratios. Moving forward, once the CPD achieves Preliminary compliance, then Secondary compliance will depend on the CPD providing a comprehensive initial report to the IMT and OAG by the end of the next monitoring period.[1]

---

[1] Paragraphs 111 and 112, which we will assess for the first time in the sixth reporting period, requires the CPD to, among other things, ensure that it maintains "a sufficient number of Certified CIT Officers on duty on every watch of each district to help ensure that a Certified CIT Officer is available to timely respond to each incident identified as involving individuals in crisis, absent extraordinary circumstances." During the fifth reporting period, the CPD regressed in its data collection and analysis. Its former data analyst resigned at the end of the third reporting period, and the CPD has not yet hired or onboarded a new one. Consequently, the CPD's robust data reporting and analysis has stagnated. The CIT Unit analyst is responsible for creating a statistical model to determine the demand for crisis intervention services; therefore, without the analyst, the IMT has not received a comprehensive explanation of the analyst's metrics (including the model's variables). Also, both the City and the CPD have gone another

## Paragraph 110 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

reporting period without a CIT Officer Implementation Plan required under ¶111. While the IMT appreciates delaying these reports until they can be supported by reliable data and a more robust strategy, the CPD should focus on what actions are needed to produce these reports.

The IMT's review of the CPD's dashboard is necessary to assess whether the data being used to prepare the CIT Officer Implementation Plan is reliable. Moreover, it is an important part of future compliance assessments with Consent Decree requirements. During the fifth reporting period, the CPD has not dedicated its staff to cleaning and analyzing data related to the analyses required by ¶108, nor has it used the analyses data to inform the CIT Officer Implementation Plan. Defining "timely," memorializing in policy, and data reliability are all crucial components for compliance assessment.

Of critical importance, both the CPD and the City have gone another reporting period without the CIT Officer Implementation Plan required under ¶¶108-112. While the IMT appreciates delaying these reports until they are supported by reliable data and a more robust strategy, the CPD should focus on what actions are necessary to produce these reports. The requirements of ¶112 are moot without a reliable CIT Officer Implementation Plan.

# Crisis Intervention: ¶113

> **113.** *CPD will require that responding Certified CIT Officers will take the lead in interacting with individuals in crisis, once on scene, when appropriate and with supervisory approval, if required by CPD policy. If an officer who is not a CIT-Certified Officer has assumed responsibility for the scene, the officer will seek input from the on-scene Certified CIT Officer on strategies for resolving the crisis, when it is safe and practical to do so.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**     *Under Assessment*
**Full:**     *Not Yet Assessed*

In the fifth monitoring period, the CPD maintained Preliminary compliance with ¶113.

To achieve Preliminary compliance with ¶113, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." In addition, the IMT assesses whether the City has qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree. The IMT also assesses the City on resource allocation, staffing capacity, and efforts to fill any vacant positions.

The CPD has S04-20, *Recognizing and Responding to Individuals in Crisis*, which clearly states that officers assigned to incidents with mental-health components will request a Certified CIT-trained officer to assist, if available. We note that the CPD policy does not require the Certified CIT Officer to take the lead in interacting with individuals in crisis.

During the fourth monitoring period, the CPD produced two sets of training material: (1) Illinois State mandated Recruit Training on *Mental Illness and Non-Normative Behavior/Recruit Crisis Intervention Training* and (2) the *CIT eLearning covering: A Review of Department policies and the CIT Program*. The IMT reviewed and provided comments on both trainings.

We believe both trainings provide sufficient guidance on members' responsibilities under ¶113 and we look forward to both trainings being re-submitted and finalized during the next reporting period. The recruit training will be provided to all new recruits, and the eLearning training will be provided to all current CPD officers. The

CPD intends to provide evidence of attendance upon completion. While not yet finalized, we believe the content of these trainings represents a dramatic improvement in equipping all new and current officers with the requirements covered under ¶113.

Going forward, to achieve Secondary compliance with ¶113, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶113 and that all officers have received the training. Further assessment levels will require an assessment of those developed metrics.

### Paragraph 113 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Crisis Intervention: ¶114

**114.** *Certified CIT Officers will receive ongoing feedback from the CIT Program and unit supervisors regarding their responses to incidents identified as involving individuals in crisis.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

In the fifth monitoring period, the CPD maintained Preliminary compliance with the requirements of ¶114.

To achieve Preliminary compliance with ¶114, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." In addition, the IMT assesses whether the City has qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree. The IMT also assesses the City on resource allocation, staffing capacity, and efforts to fill any vacant positions.

Going forward, to achieve Secondary compliance, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶114. Further assessment levels will require an assessment of those developed metrics.

### Progress before the Fifth Reporting Period

The CPD's Special Order S05-14, *Crisis Intervention Team (CIT) Program*, states that area-level personnel within the CIT Unit will provide advice, guidance, and feedback on incidents involving people in crisis and follow-up on mental and behavioral health-related events beyond the preliminary investigation.

### Progress in the Fifth Reporting Period

However, in the fifth reporting period, CPD's Special Order S05-14, *Crisis Intervention Team (CIT) Program* underwent significant revisions. Under the newly revised S05-14, the CIT DOCS unit are responsible for "providing members with feedback." However, this draft version neglects to include supervisors (*i.e.*, members' shift sergeant and lieutenant) into the responsibility for providing feedback as required

by this paragraph. Supervisors in the field overseeing patrol officers are uniquely positioned to help provide crucial feedback to CIT officers as they serve in this role with vulnerable populations.

The IMT has yet to receive sufficient evidence that area-level personnel are in place, and along with supervisors, have been adequately trained to review incidents, and are able to consistently identify areas for critical feedback. To achieve Secondary compliance, the CPD will need to provide evidence that area-level personnel, including supervisors, have received training on reviewing incidents and providing feedback to the Certified CIT Officers (as well as providing feedback to the CIT Program in general). For Full compliance, the CPD will need to show that it is completing the necessary reviews and that personnel, training, and policy trends are being identified and addressed as appropriate.

To maintain Preliminary compliance in the next reporting period, the language from ¶114, to include supervisors, will need to be included in the revised S05-14 policy. To move into higher levels of compliance, the IMT will need to assess evidence that unit supervisors (*i.e.*, members' shift sergeant and lieutenant) are providing ongoing feedback after interactions with people in mental-health crisis. For the IMT to be confident that this is occurring, the CPD will also need to demonstrate that enough unit supervisors have received the 40-hour Basic CIT training. Unit supervisors should be provided refresher training on the responsibilities found in ¶114. While the eLearning training being developed to deliver to all CPD officers includes a detailed review of relevant policy changes, the training provided no supervisor-specific training on the process of reviewing reports and evaluating officer responses to calls involving a person in mental health crisis (*see* ¶119).

Further Full compliance, the IMT will assess whether the CPD is completing the necessary reviews and that personnel, training, and policy trends are being identified and addressed as appropriate.

### Paragraph 114 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶115

> **115.** *CPD has designated and will maintain a Certified CIT Officer, at the rank of Lieutenant or above, with the sole responsibility to act as a Crisis Intervention Team Program Coordinator ("CIT Coordinator"). The CIT Coordinator will work to increase the effectiveness of CPD's CIT Program, improve CPD's responses to incidents involving individuals in crisis, and facilitate community engagement between CPD and crisis intervention-related stakeholders.*

## Compliance Progress       (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the CPD did not meet any level of compliance with ¶115.

To achieve Preliminary compliance with ¶115, the City and the CPD must develop and finalize policies that incorporate ¶115's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

*Progress before the Fifth Reporting Period*

In the fourth reporting period, the CPD produced SO21-01, *CIT Program Coordinator*, which addressed most of ¶115's requirements. However, in the fifth monitoring period, components of SO21-01 were subsumed under the CPD's revised department-wide directive S05-14, *Crisis Intervention Team Program,* which was produced this reporting period, and which is presently under review.

*Progress in the Fifth Reporting Period*

Paragraph 115 requires the CPD to "designate and … maintain a Certified CIT Officer, at the rank of Lieutenant or above, with the **sole** responsibility to act as a Crisis Intervention Team Program Coordinator." In the previous two monitoring periods, the current designated CIT coordinator was promoted to Deputy Chief overseeing the training division. This has resulted in the CIT coordinator having a

significant expansion of duties. While the CIT coordinator has done a good job maintaining oversight, far too many CIT programs across the country have weakened or fallen apart without a dedicated coordinator with the sole responsibility to the CIT Program. The CPD is especially at risk of this happening given its size. Presently, the revised S05-14 does not designate this important function of "sole" responsibility.

Additionally, the IMT previously recommended that the CPD make several revisions to SO21-01 to reach Preliminary compliance. For example, SO21-01 lists three topics the CIT Program Coordinator should annually review with the Deputy Chief, Training, and Support Group. We suggested that the CPD add a fourth topic to read as follows: "Observation and review of evaluations for these trainings to inform recommendations." The CPD intends to produce in the sixth monitoring period the unit-specific SOPs, including SO21-01. The IMT looks forward to receiving the further revised SO21-01 that incorporates the IMT's prior comments.

Once S05-14 if finalized, memorializing ¶115's requirement of having the CIT Coordinator with a "sole" responsibility, Preliminary compliance will be achieved. The IMT expects that the CPD will operationally address this in the next reporting period, ensuring that the CIT coordinator does not have additional responsibilities outside of the CIT Program as required by ¶115. Future levels of compliance will hinge on this.

### Paragraph 115 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶116

> **116.** *The CIT Coordinator will receive initial and refresher profes-*
> *sional development training that is adequate in quality, quantity,*
> *type, frequency, and scope to prepare the CIT Coordinator to take*
> *on the role and responsibilities of the CIT Coordinator, in addition*
> *to the Basic CIT training.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

During the fifth monitoring period, the CPD maintained Preliminary and Secondary compliance with ¶116.

To achieve Preliminary compliance with ¶116, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." The IMT also assessed the CPD's prior version and recently revised version of S05-14, *Crisis Intervention Team Program*. To evaluate Secondary compliance with ¶116's requirements, the IMT assessed the CIT Program Coordinator's training and experience background.

### Progress before the Fifth Reporting Period

While a substantially revised S05-14, *Crisis Intervention Team (CIT) Program* directive is presently under review, the requirements of ¶116 are sufficiently memorialized in the last iteration of this Special Order. Moreover, the CPD achieved Secondary compliance because the current CIT Program Coordinator has both adequate training and the requisite background to fulfill the role.

### Progress in the Fifth Reporting Period

However, as noted previously in this report, the current CIT Program Coordinator has been promoted to Deputy Chief over the Training Division and is now assuming multiple roles, which contradicts ¶115's requirement that the CIT Program Coordinator be the "sole responsibility" of the "designated" Certified CIT Officer. Full compliance will depend on the anticipated transition to a new CIT Program Coor-

dinator in the next reporting period. This newly designated CIT Program Coordinator must meet the requirements of both ¶115 and ¶116, as well as the ongoing evaluation of the minimum training and professional background standards for a CIT Program Coordinator. For example, we have advised the CPD in previous monitoring periods on the importance of a CIT Program Coordinator's on-the-street experience as a CIT officer being part of his or her Crisis Intervention Training. This experience adds to the foundational effectiveness of any coordinator who oversees the CIT program. Street context knowledge is of critical importance, as it is for any supervisory role within the CPD. "Professional development training that is adequate in quality, quantity, type, frequency, and scope," will be required for any new CIT Program Coordinator to maintain compliance status.

The IMT looks forward to the finalization of the newest iteration of S05-14, the onboarding of a CIT Coordinator with on-the-street CIT experience, along with substantial professional development training whose sole responsibility is the CIT Program. The IMT will continue to assess ¶116 considering best practice standards.

### Paragraph 116 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Crisis Intervention: ¶117

*117. The responsibilities of the CIT Coordinator will include, at a minimum: a. developing and managing a uniform CIT Program strategy; b. researching and identifying best practices to incorporate into CPD response to individuals in crisis; c. reviewing and, when necessary to meet the requirements of this Agreement, enhancing the CIT training curricula; d. selecting and removing Certified CIT Officers from the CIT Program consistent with the requirements of this Agreement; e. overseeing crisis intervention-related data collection, analysis, and reporting; f. developing and implementing CPD's portion of any Crisis Intervention Plan; g. supervising CIT Program staff; h. participating in the Advisory Committee; i. encouraging the public recognition of the efforts and successes of the CIT Program and individual Certified CIT Officers; and j. regularly communicating and interacting with relevant CPD command staff to recommend improvements to Department crisis intervention-related strategies, staffing and deployment, policies, procedures, and training.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During the fifth monitoring period, the CPD maintained Preliminary compliance with ¶117.

To achieve Preliminary compliance with ¶117, the City and the CPD must develop and finalize policies that incorporate ¶117's requirements. These policies must be "plainly written, logically organized, and use clearly defined terms," and the policies and procedures should be submitted to the IMT and OAG to allow the parties to engage in a collaborative revision process.

To achieve Secondary compliance with ¶117, the CPD must develop training plans and curricula that address ¶117's requirements. In particular, the CPD must develop training that prepares the CIT Coordinator for how the Coordinator is expected to execute his or her duties.

*Progress before the Fifth Reporting Period*

In our prior report, we noted that S05-14, *Crisis Intervention Team (CIT) Program* clearly states that the CIT Coordinator is responsible for the activities required by ¶117, thereby achieving Preliminary compliance. However, we noted that the CIT Coordinator is operating without a comprehensive operation manual for how the Coordinator is expected to execute his or her duties.

*Progress in the Fifth Reporting Period*

As described in other assessments with this Section, the CPD's substantially revised S05-14 subsumed content from the previously submitted SOPs. The CPD intends to submit revised versions of the Crisis Intervention Unit-specific SOPs in the sixth reporting period. To achieve secondary compliance, the CPD will need to develop training that provides the CIT Coordinator with a comprehensive operation manual for how the Coordinator is expected to execute his or her duties as outlined in ¶117. For the IMT to assess Full compliance, the CPD must indicate what factors will contribute to achieving compliance and how those factors, and the CPD's progress toward compliance, will be measured.

## Paragraph 117 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

## Crisis Intervention: ¶118

*118. By January 1, 2020, CPD will require that, after responding to an incident involving an individual in crisis, the assigned CPD officer completes a CIT Report, or any similar form of documentation CPD may implement. The CIT Report, or similar documentation, at a minimum, will include: a. the nature of the incident; b. the date, time, and location of the incident; c. the subject's age, gender, and race/ethnicity; d. whether the subject is or claims to be a military veteran, if known; e. the relationship to the subject, if any and if known, of the individual calling for service; f. whether the subject has had previous interactions with CPD, if known; g. whether the subject is observed or reported to be experiencing symptoms of a mental illness, intellectual or developmental disability, co-occurring condition such as a substance use disorder, or other crisis; h. the behaviors observed during the incident, including whether the subject used or displayed a weapon; i. the name(s) and star (i.e., badge) number(s) of the assigned CPD officer(s) and whether any of the assigned officers are Certified CIT Officers; j. the name(s) and star (i.e., badge) number(s) of any supervisor responding to the scene; k. the skills, techniques, or equipment used by the responding CPD officers; l. whether a reportable use of force was documented on a Tactical Response Reports ("TRR"), or whatever similar form of documentation CPD may implement, for the incident ; m. a narrative describing the CPD officer's interaction with the subject, when no other CPD report captures a narrative account of the incident; and n. the disposition of the incident, including whether the individual was transported to municipal or community services, transported to a hospital, subject to a voluntary or involuntary commitment, or arrested.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶118.

To achieve Preliminary compliance with ¶118, the City and the CPD developed and finalized policies that incorporated ¶118's requirements. The CPD's policies were required to be "plainly written, logically organized, and use clearly defined terms," and the policies and procedures submitted to the IMT and OAG allowed the parties to engage in a collaborative revision process. In particular, the IMT examined the City and the CPD's S04-20, *Recognizing and Responding to Individuals in Crisis*, which was finalized in the third reporting period. To achieve Secondary compliance with ¶118, the City and the CPD must finalize their eLearning materials. Moreover, at least 95% of officers must receive and pass this eLearning for the CPD to achieve Secondary compliance.

Preliminary compliance was achieved in the third reporting period when ¶118's requirements were memorialized into S04-20, *Recognizing and Responding to Individuals in Crisis*, which clearly states that officers must complete a CIT Report when they determine that a call for service has a mental-health component.

The IMT reviewed an eLearning that the CPD created, which addresses policy changes including requiring the completion of a CIT report on any mental health related call for service. Previously, it had only been required of CIT officers in certain situations (*i.e.*, when no other report was completed).

Secondary compliance will be achieved once 95% of officers have received and passed the eLearning. Subsequent levels of compliance will require operational integrity that 95% of officers are completing the CIT Report, thereby informing reliable data collection.

### Paragraph 118 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶119

**119.** *CPD will require that a supervisory member reviews and approves completed CIT Reports, or any similar form of documentation CPD may implement to document incidents involving an individual in crisis, before submitting them to the CIT Program.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶119.

To achieve Preliminary compliance with ¶119, the City and the CPD developed and finalized policies that incorporated ¶119's requirements. The CPD's policies were required to be "plainly written, logically organized, and use clearly defined terms," and the policies and procedures submitted to the IMT and OAG allowed the parties to engage in a collaborative revision process. In particular, the IMT examined the City and the CPD's S04-20, *Recognizing and Responding to Individuals in Crisis*, which was finalized in the third reporting period. To achieve Secondary compliance with ¶119, the City and the CPD must finalize their eLearning materials. Moreover, at least 95% of officers must receive and pass this eLearning for the CPD to achieve Secondary compliance.

### Progress before the Fifth Reporting Period

The CPD enacted S04-20, *Recognizing and Responding to Individuals in Crisis*, which clearly states that supervisors will "review and if appropriate, approve the completed Crisis Intervention (CIT) Report submitted for their approval." The IMT notes that ¶119 requires approval, not just "if appropriate," and this requirement will be considered in subsequent compliance assessments.

The IMT reviewed the CPD's eLearning, which addresses the IMT's recommended policy changes, including policy changes resulting from ¶119. The IMT noted that the eLearning covers little information specific to supervisors, including how they are expected to conduct the reviews required by ¶119.

### Progress in the Fifth Reporting Period

The CPD has made substantial progress in developing its eLearning and in-service course for all CPD members on the Crisis Intervention program and responding to

individuals in crisis. This e-learning is presently under review but addresses policy changes included in ¶119.

Secondary compliance will be partially achieved once 95% of the CPD officers and supervisors have received and passed the eLearning. However, to achieve Secondary compliance with ¶119, supervisors will still require training on how to conduct the reviews of CIT Reports and similar documentation.

Full compliance will require operational integrity that the CIT reports are indeed being reviewed and approved before they are submitted to the CIT Unit, thereby informing reliable data collection.

### Paragraph 119 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶120

*120. CPD will collect, analyze, and report data regarding the number and types of incidents involving individuals in crisis and responses of CPD officers to such events to assess staffing and deployment of Certified CIT Officers and department-wide responses to individuals in crisis. The CIT Program will review the data contained within the submitted CIT Reports, or any similar form of documentation CPD may implement, to evaluate the overall response and effectiveness by CPD officers and identify any district-level and department-wide trends regarding responses to incidents identified as involving individuals in crisis.*

## Compliance Progress        (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD did not achieve any level of compliance with ¶120.

To achieve Preliminary compliance with ¶120, the City and the CPD must develop and finalize policies that incorporate ¶120's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

The requirements of ¶120 are found in several directives and forms which, when viewed together, largely memorializes the CPD's responsibilities for collecting, analyzing, and reporting data. However, the CPD's SO20-05, *CIT Officer Implementation Plan*, previously submitted in the fourth reporting period, memorialized ¶120's requirements but was never finalized.

During this reporting period, SO20-05 was subsumed into a substantially revised version of S05-14, *Crisis Intervention Team Program*, which also does not adequately incorporate ¶120's requirements.

Once the revised version of S05-14 has addressed the IMT's outstanding comments, incorporating ¶120's requirements therein, and has been finalized, the City and the CPD will have achieved Preliminary compliance with ¶120. Moving forward, Secondary compliance with ¶120 will require adequate methodologies for

reviewing data related to the *CIT Officer Implementation Plan*, as well as data collected from the *Crisis Intervention Report*. The CPD will need to verify the Crisis Intervention Report's data, including its integrity, reliability, and comprehensiveness. Based on conversations with the CPD, we are aware that the previous Crisis Intervention Reports were relatively rare documents given the number of crisis calls. The CPD will seek to ensure that officers are completing the updated CIT Report as required by policy. Full compliance will require the CPD to demonstrate that district-level and department-wide trends are (1) being identified and (2) being comprehensively addressed.

### Paragraph 120 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶121

> ***121.*** *CPD will identify and assign a sufficient number of data an-alysts to collect and analyze data related to the CIT Program and CPD's response to incidents involving individuals in crisis.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD maintained Preliminary compliance with ¶121.

To achieve Preliminary compliance with ¶121, the CPD was required to identify the number of data analysts that it believed was sufficient to address the CIT Pro-gram's data needs consistent with ¶121's requirements. Secondary compliance with ¶121 will depend on whether the CPD has maintained enough data analysts to the CIT Program and whether sufficient resources have been allocated to these positions.

### Progress before the Fifth Reporting Period

The CPD has memorialized ¶121's requirements into the substantially revised S05-14, *Crisis Intervention Team Program*, which was produced this reporting period, and which is currently under review.

However, the CPD's designated data analyst, a crucial centralized position, re-signed in the fourth reporting period. To date, this data analyst position has not been filled, as the CPD has yet to hire or onboard anyone to fill the vacancy. The CPD had previously assigned one analyst to the CIT Unit to collect and analyze data regarding the CIT Program and the CPD's response to incidents involving individu-als in crisis.

### Progress in the Fifth Reporting Period

The CIT Unit is in the process of integrating district-level resources to collect and analyze district-specific data, including the requirement that officers complete the CIT report on all calls involving a mental health component. The data contained in this report will be instrumental to the overall CIT program, and for the new CIT Analyst.

The CPD, prior to the analyst vacancy, determined that one analyst was sufficient to satisfy ¶121's requirements; while this position remains vacant, it is difficult to assess whether a single analyst is indeed sufficient. Our compliance assessments will depend on finalizing the CIT dashboard and integrating the data from the unit and district levels. Based on the quality of this work, the CPD will then need to conduct ongoing assessments to determine if more analysts are necessary for Full compliance. It is crucial that a new analyst is onboarded in order for the CPD to achieve Secondary compliance.

### Paragraph 121 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶122

*122. Within 365 days of the Effective Date, and on an annual basis thereafter, the City will publish a written Crisis Intervention Plan. The development of the Crisis Intervention Plan will be based on the regular review of aggregate data and a sample of incidents conducted by CPD and OEMC. The CIT Coordinator will consider quantitative crisis-intervention data, qualitative data on officers' and community members' perception of the effectiveness of the CIT Program, CPD member feedback regarding crisis intervention-related training, actual incident information, staffing and deployment analysis of available Certified CIT officers, research reflecting the latest in best practices for police responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee. OEMC will consider the response to, identification of, and dispatch of calls for service involving individuals in crisis by OEMC tele-communicators, research reflecting the latest in best practices for tele-communicator responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**     Annual          ☐ **Met**   ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During the fifth monitoring period, the City did not reach any level of compliance with ¶122.

Paragraph 122 requires annual submission of the Crisis Intervention Plan. Preliminary compliance will hinge on both the enactment of S05-14, *Crisis Intervention Team Program,* and the required submission of the Report.

### Progress before the Fifth Reporting Period

In the previous monitoring period, the IMT reviewed a draft version of the *Crisis Intervention Plan*, Crisis Intervention Unit Special Order SO20-03, which clearly identified the steps necessary to complete the CPD's portion of the *Crisis Intervention Plan*.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD's standard operating procedure S020-03 was subsumed under the substantially revised S05-14 *Crisis Intervention Team Program,* which memorialized many components of ¶122. However, key components were missing. For example, the functions of the OEMC identified in ¶122 were not memorialized.

Additionally, both the CPD and the City have gone another reporting period without submitting a CIT Officer Implementation Plan or a Crisis Intervention Plan, as required by ¶¶108 and 122. While the IMT appreciates delaying these reports so that they can be supported by reliable data and a more robust strategy, the CPD should focus on what actions it needs to take to produce these reports annually. Despite these shortcomings, it is important to note that the City has made substantial strides in the scope of the Crisis Intervention Plan's evaluation, as well as the transparency of data included in the same.

One such improvement was the City's incorporation of information on primary and secondary CIT officer response, which provided more transparency on response-ratio requirements. The report also identified deficiencies in officers hitting the "on scene" key, which makes it difficult to reliably assess when a CIT officer arrives on scene, whether that arrival is primary or secondary, and how long into the call arrival occurs. Finally, the report broke down response ratios by CIT officers across districts and watches. Public trust relies on transparency, even when deficiencies are present, and we would expect this transparency to continue in future iterations of the Report.

Moreover, the City's *Crisis Intervention Plan* must continue to include information and feedback from all actors within the City's crisis response system, including the CPD, the Chicago Council on Mental Health Equity, the Chicago Fire Department, the OEMC, and the Chicago Department of Public Health. In the most recent draft, each entity identifies its accomplishments, which continue to be substantial.

As previously indicated in this report, the CPD's designated data analyst, a crucial centralized position, resigned in the fourth reporting period, and to date, the City has not hired or onboarded anyone else to fill this position. The data analysis required to meet ¶122's requirements cannot be achieved without a dedicated analyst in place.

While the Crisis Intervention Plan was again not submitted this reporting period, the IMT can attest to the significant strides the City has made toward improving crisis services to the citizens of Chicago. For example, thirty-two organizations that provide mental health services to Chicagoans have been allocated $8 million in grants to expand behavioral health services to individuals who are homeless and those living with or affected by mental and behavioral health conditions. Services

including team-based care, trauma-informed care, co-responder, non-law enforcement models, multi-disciplinary-team responses, and a significant expansion of the CIT program either have all been recently launched or are pending launch. The Chicago Council on Mental Health Equity's robust work, which is voluntary and unpaid, is also commendable. There is exceptional professional and lived experience in the Chicago Council on Mental Health Equity, whose work is vital to the City Response.

The IMT appreciates the City and its partner agencies for their methodical and comprehensive approach to collecting information to evaluate the City's mental health response system.

Finally, since the *Crisis Intervention Plan* is a City Requirement, which encompasses both CPD and OEMC, the IMT encourages the City to address all components of ¶122 in policy, including the responsibilities of the OEMC. The CPD's S05-14, *CIT Program*, does not include OEMC responsibilities. Preliminary compliance will be achieved once all components of ¶122 are memorialized into policy.

## Paragraph 122 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶123

*123. The purpose of the Crisis Intervention Plan will be to evaluate the City's identification of and response to incidents involving individuals in crisis and recommend any changes to staffing and deployment, policy, or training to ensure consistency with CPD and OEMC policy, this Agreement, and best practices. CPD will implement the Crisis Intervention Plan in accordance with the specified timeline for implementation. The Crisis Intervention Plan will: a. report the number, type, and outcome of incidents involving individuals in crisis, the number of Certified CIT Officers available and on duty in each district and on each watch, the percentage of calls for service involving individuals in crisis for which Certified CIT Officers were the first officers to respond to the scene for each watch in every district, and the response times for calls for service involving individuals in crisis for each watch in every district; b. evaluate the CIT Program's compliance with the objectives and functions identified above; c. identify strategies to ensure that CPD has a sufficient number of Certified CIT Officers to meet its response ratio targets for calls for service involving individuals in crisis; d. describe any additional resources, including program staff or equipment, the CIT Program needs to perform its functions; e. identify safety issues and trends regarding interactions between individuals in crisis and officers; f. identify deficiencies and opportunities for improvement in identifying and dispatching calls for service involving individuals in crisis; g. recognize and highlight CIT Program and Certified CIT Officer successes, including successful individual officer performance; h. develop response strategies for repeat calls for service involving individuals who are frequently in crisis; i. recommend any changes to crisis intervention-related strategies, policies, and procedures; j. recommend any changes to CPD and OEMC trainings related to individuals in crisis, including any case studies and teaching scenarios; and k. include a timeline and plan for implementing recommended changes.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During the fifth monitoring period, the City did not reach any level of compliance with ¶123.

Paragraph 123 requires annual submission of the Crisis Intervention Plan. Preliminary compliance will hinge on both the enactment of S05-14, *Crisis Intervention Team (CIT) Program*, and the required submission of the Report.

### Progress before the Fifth Reporting Period

In the previous monitoring period, the IMT reviewed a draft version of Crisis Intervention Unit Special Order SO20-03, *Crisis Intervention Plan*, which clearly identified the steps necessary to complete the CPD's portion of the *Crisis Intervention Plan*.

### Progress in the Fifth Reporting Period

However, in the fifth reporting period, the CPD's standard operating procedure SO20-03 was subsumed under the substantially revised S05-14 *Crisis Intervention Plan,* which memorialized many components of ¶123. However, key components were missing. For example, the functions of the OEMC identified in ¶122 were not memorialized.

Additionally, both the CPD and the City have gone another reporting period without submitting a CIT Officer Implementation Plan or a Crisis Intervention Plan, as required by ¶¶108 and 122. While the IMT appreciates delaying these reports until they can be supported by reliable data and a more robust strategy, the CPD should focus on what actions it needs to take to produce these reports annually. Despite these shortcomings, it is important to note that the City has made substantial strides in the scope of the Crisis Intervention Plan's evaluation, as well as the transparency of data included in the same.

One such improvement was that the City's incorporation of information on primary and secondary CIT officer response, which provided more transparency on response-ratio requirements. The report also identified deficiencies in officers hitting the "on scene" key, which makes it difficult to reliably assess when a CIT officer arrives on scene, whether that arrival is primary or secondary, and how long into the call arrival occurs. Finally, the report broke down response ratios by CIT officers across districts and watches. Public trust relies on transparency, even when deficiencies are present, and we would expect this transparency to continue in future iterations of the Report.

Moreover, the City's *Crisis Intervention Plan* must continue to include information and feedback from all actors within the City's crisis response system, including the CPD, the Chicago Council on Mental Health Equity, the Chicago Fire Department,

the OEMC, and the Chicago Department of Public Health. In the most recent draft, each entity identifies its accomplishments, which continue to be substantial.

As previously indicated in this report, the CPD's designated data analyst, a crucial centralized position, resigned in the fourth reporting period, and to date, the City has not hired or onboarded anyone else to fill this position. The data analysis required to meet ¶123's requirements cannot be achieved without a dedicated analyst in place.

While the Crisis Intervention Plan was not submitted again this reporting period, the IMT can attest to the significant strides the City has made toward improving crisis services to the citizens of Chicago. For example, thirty-two organizations that provide mental health services to Chicagoans have been allocated $8 million in grants to expand behavioral health services to individuals who are homeless and those living with or affected by mental and behavioral health conditions. Services including team-based care, trauma-informed care, co-responder, non-law enforcement models, multi-disciplinary-team responses, and a significant expansion of the CIT program either have all been recently launched or are pending launch. The Chicago Council on Mental Health Equity's robust work, which is voluntary and unpaid, is also commendable. There is exceptional professional and lived experience in the Chicago Council on Mental Health Equity, whose work is vital to the City Response.

The IMT appreciates the City and its partner agencies for their methodical and comprehensive approach to collecting information to evaluate the City's mental health response system.

Finally, since the *Crisis Intervention Plan* is a City Requirement, which encompasses both CPD and OEMC, the IMT encourages the City to addressing all components of ¶123 in policy, including the responsibilities of the OEMC. The CPD's S05-14, *CIT Program*, does not include OEMC responsibilities. Preliminary compliance will be achieved once all components of ¶123 are memorialized into policy.

### Paragraph 123 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶124

> **124.** *The data included in the Crisis Intervention Plan will not in-clude any personal identifying information.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fifth monitoring period, the City and CPD did not meet any level of compliance ¶124.

To achieve Preliminary compliance with ¶124, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." To achieve Preliminary compliance with ¶124, the City and the CPD must develop and finalize policies that incorporate ¶124's requirements.

During the fourth monitoring period, the CPD provided the IMT with SO20-03, *Crisis Intervention Plan*, which included ¶124's requirements but was never finalized.

However, in the fifth monitoring period, SO20-03 was subsumed under a substantially revised S05-14, *Crisis Intervention Team (CIT) Program*, which did not memorialize ¶124's requirements.

Preliminary compliance will be achieved when ¶124's requirements are memorialized into policy and enacted. We look forward to the City fulfilling their requirement to submit a Crisis Intervention Plan annually, and upon finalizing the Plan, we believe the City and CPD will achieve Secondary and Full compliance with this paragraph.

## Paragraph 124 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶125

**125.** *The CIT Coordinator will have CPD's portion of the Crisis Intervention Plan reviewed and approved by the Chief of the Bureau of Patrol within 60 days of the plan's completion.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fifth monitoring period, the City and CPD did not meet any level of compliance with ¶125.

To achieve Preliminary compliance with ¶125, the IMT assessed the City's and the CPD's data collection, tracking, analysis, and management as required under the Consent Decree. The IMT also reviewed the Crisis Intervention Unit Special Order SO20-03, *Crisis Intervention Plan*, which the City and the CPD did not finalize during the fifth monitoring period.

### Progress before the Fifth Reporting Period

In previous reporting periods, the IMT reviewed a draft version of Crisis Intervention Unit Special Order SO20-03, *Crisis Intervention Plan*, which clearly stated the requirement for the CPD's portion of the *Crisis Intervention Plan* to be reviewed and approved by the Chief of the Bureau of Patrol.

### Progress in the Fifth Reporting Period

During this monitoring period, the CPD standard operating procedure SO20-03 was subsumed under the substantially revised S05-14, *Crisis Intervention Team (CIT) Program*. The requirements of ¶125 were memorialized into S05-14, although the designated person to review and approve the Plan is identified as the Executive Director, Office of Constitutional Policing and Reform.

In the fifth monitoring period, the City and CPD did not meet any level of compliance with ¶125. To achieve Preliminary compliance with ¶125, the City and the CPD must develop and finalize policies that incorporate ¶125's requirements. The S05-14 *CIT Program* must be finalized to achieve Preliminary compliance with ¶125.

Secondary and Full compliance will depend on continuous evidence that the CPD's portion of the Crisis Intervention Plan was indeed reviewed and approved by the Executive Director, Office of Constitutional Policing and Reform.

### Paragraph 125 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶126

*126. Consistent with the requirements set forth in the Training section of this Agreement, all officers will receive in-service training, every three years, regarding responding to individuals in crisis that is adequate in quality, quantity, and scope for officers to demonstrate competence in the subject matter. This in-service training will include, but not be limited to, the following topics: a. a history of the mental health system; b. how to recognize and respond to individuals in crisis, including, but not limited to, identifying types of mental health conditions, signs and symptoms of mental health conditions, common treatments and medications, and common characteristics, behaviors, or conduct associated with individuals in crisis; c. the potential interactions officers may have on a regular basis with individuals in crisis, their families, and service providers, including steps to ensure effective communication and avoid escalating an interaction with an individual in crisis; d. techniques to safely de-escalate a potential crisis situation; e. the circumstances in which a Certified CIT Officer should be dispatched or consulted; and f. local resources that are available to provide treatment, services, or support for individuals in crisis, including available pre- and post-arrest diversion programs, and when and how to draw upon those resources.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fifth monitoring period, we assessed the City and CPD's efforts with ¶126 for the first time. By the end of the reporting period, they met Preliminary compliance with ¶126.

To achieve Preliminary compliance with ¶126, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." The City and the CPD developed S11-10-03 *In-Service Training,* which incorporated ¶126's requirements and was finalized this reporting period.

During this monitoring period, the IMT reviewed a draft version of S11-10-03, *In-Service Training,* which memorialized ¶126's requirements. The City and the CPD achieved Preliminary compliance because S11-10-03 was finalized during the reporting period. Moreover, while the CPD produced a substantially revised S05-14, *Crisis Intervention Team (CIT) Program this reporting period*, which is presently under review, that directive, in relevant part, only states that the Crisis Intervention Team Training Section (CITTS) will "provid[e] expertise and support to the Training Division with inservice . . . training." This does not sufficiently identify the "quantity, quality, and scope" of training all officers will receive, including the subjects identified in ¶126. However, those subsections are captured under S11-10-03. The CPD may want to consider fully including the requirements of ¶126 into S05-14 as well in order to not remain hinged on changes that may or may not occur under the Training Section of the Consent Decree.

In the fifth monitoring period, the City and CPD met Preliminary compliance with ¶126. Future compliance will be demonstrated by 95% of all officers receiving the training, assessing officer evaluations of the training, and outcome metrics the CPD will develop to assess the effectiveness of the training. Additionally, as appropriate, the IMT encourages the CPD to invite members of the Chicago Council on Mental Health Equity to observe this portion of the training to provide feedback.

### Paragraph 126 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Not Applicable | Preliminary | |

# Crisis Intervention: ¶127

**127.** *All new recruits will receive training that is adequate in quantity, quality, and scope regarding responding to individuals in crisis. It will include, but not be limited to, training on the subjects identified above.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During the fifth monitoring period, the City and the CPD met Preliminary compliance with ¶127.

To achieve Preliminary compliance with ¶127, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." The city achieved Preliminary compliance with ¶127 by developing and finalizing S011-10-01, *Recruit Training* that incorporate ¶127's requirements.

### Progress before the Fifth Reporting Period

In the fourth reporting period, the CPD submitted recruit training related to responding to individuals in crisis. Overall, the content of the training was well done, but there was still room for improvement. For example, the IMT recommended that the recruit training's scenario-based training emphasize scenarios that end in de-escalation without the use of force, which is how most service calls conclude.

### Progress in the Fifth Reporting Period

During this monitoring period, the IMT reviewed a draft version of S11-10-01, *Recruit Training*, which clearly memorialized ¶127's requirements. Just before the end of the reporting period, the IMT gave a no objection and finalized S11-10-01.

Moreover, while the CPD produced a substantially revised S05-14, *Crisis Intervention Team (CIT) Program* this reporting period, which is presently under review, that directive, in relevant part, only states that the Crisis Intervention Team Training Section (CITTS) will "provid[e] expertise and support to the Training Division with recruit…training." This does not sufficiently identify the "quantity, quality,

and scope" of training recruits will receive, including the subjects identified in ¶126.

In the fifth monitoring period, the CPD met Preliminary compliance with ¶127 by finalizing S11-10-01, *Recruit Training*, which incorporates ¶127's requirements.

Future compliance will hinge on demonstrating that the training has been delivered and that recruit feedback is incorporated into future training material.

The CPD may want to consider fully including the requirements of ¶127 into S05-14, as well in order to not remain hinged on changes that may or may not occur under the Training Section of the Consent Decree.

Additionally, as appropriate, the IMT encourages the CPD to invite members of the Chicago Council on Mental Health Equity to observe this portion of the recruit training to provide feedback.

Outcome metrics the CPD will develop to assess the effectiveness of the training will also be assessed.

### Paragraph 127 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Crisis Intervention: ¶128

*128. The City will have a crisis intervention response advisory committee ("Advisory Committee") with subject matter expertise and experience that will assist in identifying problems and developing solutions and interventions designed to improve outcomes for individuals in crisis who require City services. The Parties acknowledge that the City has formed the City-wide Mental Health Steering Committee and that the City may draw upon those resources to satisfy the requirements of this Agreement.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City maintained Preliminary compliance with ¶128.

To achieve Preliminary compliance with ¶128, the IMT assesses whether the City has qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree. Specifically, the IMT examines whether the City has created the requisite Advisory Committee with appropriate expertise and experience. The IMT also assessed the City on resource allocation, staffing capacity, efforts to fill any vacant positions and improved processes designed to build trust, improve transparency, and seek greater consensus building. Going forward, further levels of compliance will depend on substantive reviews by the Chicago Council on Mental Health Equity on data, policies, training, community engagement, and operational practices that help to inform the "identification of problems and developing solutions and interventions designed to improve outcomes for individuals in crisis."

### Progress before the Fifth Reporting Period

Over the course of the Consent Decree, the Advisory Committee that is responsive to the requirements of ¶128 has evolved from the Crisis Intervention Advisory Committee (CIAC) into the Chicago Committee on Mental Health Equity at the beginning of 2020. The CIAC narrowly focused on police responses, whereas the Chicago Council on Mental Health Equity has expanded its mission to the City's broader crisis response systems. The Chicago Council on Mental Health Equity is largely comprised of representatives from the CIAC, and therefore the IMT does not have any concerns about the Chicago Council on Mental Health Equity members' qualifications. Nor do we have concerns about the maintenance of institutional knowledge being transferred to the new committee.

*Progress in the Fifth Reporting Period*

During this monitoring period, the City met the requirements of ¶128 and 137 by inviting the Chicago Council on Mental Health Equity to review and submit feedback on twelve Crisis Intervention directives (S04-20; S04-20-02; S04-20-03; S04-20-04; S04-20-05; S05-14; S.O. 20-01; S.O. 20-02; S.O. 20-03; S.O. 20-04; S.O. 21-01; S.O. 21-02). Options for alternative means of providing feedback were also given for Chicago Council on Mental Health Equity members who could not be present at the meeting(s). This was an important step for inclusion of feedback, making the process more transparent, and giving participants a voice. We note deficiencies in this process below, however, the City and the CPD should be commended for their more robust approach to policy review by the Chicago Council on Mental Health Equity this reporting period.

As noted in the last report, there were prior concerns regarding subcommittee recommendations not being reviewed or not being voted on by the entire board. While the draft bylaws have not yet been finalized, the voting process on substantial issues was far more inclusive during this monitoring period. For example, upon Chicago Council on Mental Health Equity review of CIT policies, due to this more inclusive voting process, a majority vote gained approval for there to be a delay in the call for the full body vote to move revisions to the policies forward until some process concerns were adequately addressed. This allowed for more transparency and opportunity to gain consensus and improve trust.

The IMT notes that the meeting scheduled to review feedback and vote on recommendations was canceled at the last minute when there was an allegation that the City failed to post the agenda 24-48 hours, as required by the Open Meetings Act (OMA). While the meeting was rescheduled two days later, this still created undue constraints for individuals who had prioritized their attendance at the first meeting and could no longer attend the rescheduled meeting. It also exacerbated the process concerns that were previously discussed.

The IMT held a focus group with subcommittee chairs this reporting period. The Chicago Council on Mental Health Equity subcommittee chairs' concerns largely focused on four areas. First, they are concerned that some members lack context or experience with police directives, and therefore do not have sufficient understanding to provide legitimate feedback; yet, these same members are being asked to vote on something they do not adequately understand. Second, they are concerned that there is insufficient participation of people with lived experience. Third, they believe that additional staff resources are required to assist this voluntary, unpaid committee with the Chicago Council on Mental Health Equity's important, and time-consuming, work. Last, they are concerned that the meetings often feel reactive as opposed to proactive. That is, as if the City has already de-

veloped the outcomes and only needs the Chicago Council on Mental Health Equity to rubber stamp it rather than including the Chicago Council on Mental Health Equity into proactively building the consensus to develop outcomes together.

The IMT notes that the Chicago Council on Mental Health Equity is a group of esteemed professionals and key community members who have the experience and credibility to be a crucial force in developing effective crisis response systems.

Importantly, the IMT understands the inherent challenges that come with leading a group of this size. The IMT appreciates the City's significant work during this reporting period to address some of the concerns that have been previously reported. For example, while there were still legitimate concerns raised with the most recent review of the CIT policy suite, the City did a much better job, compared to the first monitoring period, in providing the time necessary for productive review.

The comments provided by the Chicago Council on Mental Health Equity on the CIT policy suite were robust, and ultimately all but two directives were moved forward for review and consideration by the CPD. It is incumbent on the CPD to review these comments and to report back to the Chicago Council on Mental Health Equity what was and was not incorporated, with an explanation as to why certain Chicago Council on Mental Health Equity feedback was not incorporated, as required by ¶130 and 131. The City and the CPD must continue to gain trust by listening and responding to legitimate concerns and continuing to improve the process.

Committee members have voiced concerns over how the City and the CPD intend to seek feedback from neighborhood stakeholders, as well as how individual communities will know when there are meetings or public postings of policies to encourage engagement by community members. Further, as discussed in previous reports, the way community input is solicited because of the OMA needs additional consideration to better promote engagement (e.g., the city requires community members to submit comments 24 hours before the meetings start, which may deter community input and erode community trust).

To assist in compliance with ¶128, this reporting period the City invited members of the Chicago Council on Mental Health Equity to attend the CPD and the OEMC mental health related training, which is commendable. This experiential observation and feedback creates transparency and invites ongoing improvements.

At the end of this monitoring period, there was another key leadership change announced, with one of the co-chairs of this body moved out of this role. This is the second change in co-chair leadership since the start of this consent decree.

Although the Chicago Council on Mental Health Equity is still unable to meet in person due to the COVID-19 pandemic, the IMT has participated in nearly all sub-committee and full committee virtual meetings.

In the fifth monitoring period, the City maintained Preliminary compliance with ¶128. Once the Bylaws are enacted, formalizing the structure of this important body, the City will move into Secondary compliance. Going forward, further levels of compliance will depend on substantive reviews by the Chicago Council on Mental Health Equity on data, policies, training, community engagement, and operational practices informing recommendations on response to individuals in crisis.

It is important to restate the significant improvements that have occurred this reporting period, including inviting members of the Chicago Council on Mental Health Equity to observe and provide feedback on the OEMC and the CPD training; a substantially more robust process for policy review and revision; and engaging in a full board vote rather than only subcommittee vote.

In the next reporting period, the IMT looks forward to receiving the CPD's review of the Chicago Council on Mental Health Equity comments on the CIT policy suite and a feedback loop for what was included in policy revision and what was not. The IMT also still awaits the Chicago Council on Mental Health Equity's bylaws to confirm that the committee's voting processes are consistent with best practices. Additionally, the IMT recommends that the Chicago Council on Mental Health Equity bylaws include provisions for more meaningful community engagement. The draft bylaws still contained restrictive language regarding community member opportunity to ask questions or give feedback.

### Paragraph 128 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶129

> ***129.*** *The Advisory Committee, at a minimum, will meet quarterly to review and recommend improvements to the City's overall response to individuals in crisis, with consideration to areas such as coordinated crisis response; data collection and evaluation; community engagement and awareness; service outreach and prevention; and the CIT Program.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**  Quarterly      ☑ **Met**  ☐ **Missed**

**Preliminary:**  *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**  *Not in Compliance*
**Full:**  *Not Yet Assessed*

In the fifth monitoring period, the City maintained Preliminary compliance with ¶129.

To achieve Preliminary compliance with ¶129, the IMT assessed the City's level of data collection, tracking, analysis, and management as required under the Consent Decree. Specifically, the IMT examined whether the City created the requisite Advisory Committee with appropriate expertise and experience, and whether the Chicago Council on Mental Health Equity meetings are occurring at least quarterly. Going forward, further levels of compliance will depend on substantive reviews by the Chicago Council on Mental Health Equity on data, policies, training, community engagement, and operational practices informing recommendations on overall response to individuals in crisis.

*Progress before the Fifth Reporting Period*

Over the course of the Consent Decree, the Advisory Committee that is responsive to the requirements of ¶129 has evolved from the Crisis Intervention Advisory Committee (CIAC) into the Chicago Council on Mental Health Equity at the beginning of 2020. The CIAC narrowly focused on police responses, whereas the Chicago Council on Mental Health Equity has expanded its mission to the City's broader crisis response systems. The Chicago Council on Mental Health Equity is largely comprised of representatives from the CIAC, and therefore the IMT does not have any concerns about the Chicago Council on Mental Health Equity members' qualifications. Nor do we have concerns about the maintenance of institutional knowledge being transferred to the new committee.

*Progress in the Fifth Reporting Period*

During this monitoring period, the City met the requirements of ¶128 and 137 by inviting the Chicago Council on Mental Health Equity to review and submit feedback on twelve Crisis Intervention directives (S04-20; S04-20-02; S04-20-03; S04-20-04; S04-20-05; S05-14; S.O. 20-01; S.O. 20-02; S.O. 20-03; S.O. 20-04; S.O. 21-01; S.O. 21-02). Options for alternative means of providing feedback were also given for Chicago Council on Mental Health Equity members who could not be present at the meeting(s). This was an important step for inclusion of feedback, making the process more transparent, and giving participants a voice. We note deficiencies in this process below, however, the City and the CPD should be commended for their more robust approach to policy review by the Chicago Council on Mental Health Equity this reporting period.

As noted in the last report, there were prior concerns regarding subcommittee recommendations not being reviewed or not being voted on by the entire board. While the draft bylaws have not yet been finalized, the voting process on substantial issues was far more inclusive during this monitoring period. For example, upon Chicago Council on Mental Health Equity review of CIT policies, due to this more inclusive voting process, a majority vote gained approval for there to be a delay in the call for the full body vote to move revisions to the policies forward until some process concerns were adequately addressed. This allowed for more transparency and opportunity to gain consensus and improve trust.

The IMT notes that the meeting scheduled to review feedback and vote on recommendations was canceled at the last minute when there was an allegation that the City failed to post the agenda 24-48 hours, as required by the Open Meetings Act (OMA). While the meeting was rescheduled two days later, this still created undue constraints for individuals who had prioritized their attendance at the first meeting and could no longer attend the rescheduled meeting. It also exacerbated the process concerns that were previously discussed.

The IMT held a focus group with subcommittee chairs this reporting period. The Chicago Council on Mental Health Equity subcommittee chairs' concerns largely focused on four areas. First, they are concerned that some members lack context or experience with police directives, and therefore do not have sufficient understanding to provide legitimate feedback; yet, these same members are being asked to vote on something they do not adequately understand. Second, they are concerned that there is insufficient participation of people with lived experience. Third, they believe that additional staff resources are required to assist this voluntary, unpaid committee with the Chicago Council on Mental Health Equity's important, and time-consuming, work. Last, they are concerned that the meetings often feel reactive as opposed to proactive. That is, as if the City has already de-

veloped the outcomes and only needs the Chicago Council on Mental Health Equity to rubber stamp it rather than including the Chicago Council on Mental Health Equity into proactively building the consensus to develop outcomes together.

The IMT notes that the Chicago Council on Mental Health Equity is a group of esteemed professionals and key community members who have the experience and credibility to be a crucial force in developing effective crisis response systems.

Importantly, the IMT understands the inherent challenges that come with leading a group of this size. The IMT appreciates the City's significant work during this reporting period to address some of the concerns that have been previously reported. For example, while there were still legitimate concerns raised with the most recent review of the CIT policy suite, the City did a much better job, compared to the first monitoring period, in providing the time necessary for productive review.

The comments provided by the Chicago Council on Mental Health Equity on the CIT policy suite were robust, and ultimately all but two directives were moved forward for review and consideration by the CPD. It is incumbent on the CPD to review these comments and to report back to the Chicago Council on Mental Health Equity what was and was not incorporated, with an explanation as to why certain Chicago Council on Mental Health Equity feedback was not incorporated, as required by ¶130 and 131. The City and the CPD must continue to gain trust by listening and responding to legitimate concerns and continuing to improve the process.

Committee members have voiced concerns over how the City and the CPD intend to seek feedback from neighborhood stakeholders, as well as how individual communities will know when there are meetings or public postings of policies to encourage engagement by community members. Further, as discussed in previous reports, the way community input is solicited because of the OMA needs additional consideration to better promote engagement (e.g., the city requires community members to submit comments 24 hours before the meetings start, which may deter community input and erode community trust).

To assist in compliance with ¶129, this reporting period the City invited members of the Chicago Council on Mental Health Equity to attend the CPD and the OEMC mental health related training, which is commendable. This experiential observation and feedback creates transparency and invites ongoing improvements.

At the end of this monitoring period, there was another key leadership change announced, with one of the co-chairs of this body moved out of this role. This is the second change in co-chair leadership since the start of this consent decree.

Although the Chicago Council on Mental Health Equity is still unable to meet in person due to the COVID-19 pandemic, the IMT has participated in nearly all sub-committee and full committee virtual meetings.

In the fifth monitoring period, the City maintained Preliminary compliance with ¶129. Once the Bylaws are enacted, formalizing the structure of this important body, the City will move into Secondary compliance. Going forward, further levels of compliance will depend on substantive reviews by the Chicago Council on Mental Health Equity on data, policies, training, community engagement, and operational practices informing recommendations on response to individuals in crisis.

The IMT notes that the Chicago Council on Mental Health Equity reviewed twelve policies during this reporting period, but the only relevant compliance records related to the Chicago Council on Mental Health Equity's feedback was regarding S05-14. The IMT expects to receive compliance records on the remaining policies, including evidence of the feedback loop back to the Chicago Council on Mental Health Equity on all twelve policies. This will not only allow the CCMHE to see that their feedback was taken seriously by the CPD but will also provide an important foundation for the next annual round of policy revisions.

It is also important to note that the Chicago Council on Mental Health Equity continues to provide feedback, verbally and in writing, that has yet to be adequately addressed in policy and strategy, or addressed in ongoing quarterly meetings. The feedback's themes include:

- Providing tangible means for community engagement. The IMT will continue to assess active and meaningful community engagement efforts and recommends that the CPD seek guidance from the Chicago Council on Mental Health Equity on minimum thresholds and specific recommendations. Subcommittee chairs could also assist the CPD in leading this effort.

- Collaborative approaches to alternative response models. The CPD's written response to Chicago Council on Mental Health Equity feedback demonstrates a siloed-response model, with the CPD defaulting responsibility to the City by saying they do not have control over what the City does. This ignores the CPD's significant role, including in policy, to support alternative models. We recommend that the CPD take a secondary role to clinicians on–scene, unless police engagement is required. These should be coordinated policy considerations held jointly between the City and the CPD. Additionally, when the Chicago Council on Mental Health Equity requested more information on the CARES program and the policy directive supporting it, the CPD's response was to default to it being the responsibility of the City. For these alternative response programs to succeed, police policy is going to play a crucial role.

It is important to restate the significant improvements that have occurred this reporting period, including inviting members of the Chicago Council on Mental Health Equity to observe and provide feedback on the OEMC and CPD training; a substantially more robust process for policy review and revision; and engaging in a full board vote rather than only subcommittee vote.

In the next reporting period, the IMT looks forward to receiving the CPD's review of the Chicago Council on Mental Health Equity comments on the CIT policy suite and a feedback loop for what was included in policy revision and what was not. Moreover, the IMT anticipates adequate consideration being given to the Chicago Council on Mental Health Equity's feedback on community engagement, as well as increased communication between the City and the CPD. The IMT also still awaits the Chicago Council on Mental Health Equity's bylaws to confirm that the committee's voting processes are consistent with best practices. Additionally, the IMT recommends that the Chicago Council on Mental Health Equity bylaws include provisions for more meaningful community engagement. The draft bylaws still contained restrictive language regarding community member opportunity to ask questions or give feedback.

### Paragraph 129 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶130

*130. The City will request that the Advisory Committee provide guidance on crisis response-related policies, procedures, and training of City agencies, including CPD and OEMC, and assist the City in developing and expanding current strategies for responding to individuals in crisis, including reducing the need for police-involved responses to individuals in crisis and developing municipal and community resources, such as pre- and post-arrest diversion resources and alternative response options (like drop-off centers, mobile crisis teams, a central nonemergency crisis line). The City will further request that in providing the guidance detailed above the Advisory Committee will consider specific strategies for responding to children and youth when they experience a behavioral or mental health crisis.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City maintained Preliminary compliance with ¶130.

To achieve Preliminary compliance with ¶130, the IMT assess the City's level of data collection, tracking, analysis, and management as required under the Consent Decree. Specifically, the IMT examines whether the City has made the requisite requests of the Advisory Committee and that the Advisory Committee is providing the requisite guidance in return. Going forward, further levels of compliance will evaluate the City's and the CPD's efforts to engage with the community and depend on substantive reviews by the Chicago Committee on Mental Health Equity on data, policies, training, and operational practices informing recommendations on overall response to individuals in crisis.

*Progress before the Fifth Reporting Period*

Over the course of the Consent Decree, the Advisory Committee that is responsive to the requirements of ¶130 has evolved from the Crisis Intervention Advisory Committee (CIAC) into the Chicago Council on Mental Health Equity at the beginning of 2020. The CIAC narrowly focused on police responses, whereas the Chicago Council on Mental Health Equity has expanded its mission to the City's broader crisis response systems. The Chicago Council on Mental Health Equity is largely

comprised of representatives from the CIAC, and therefore the IMT does not have any concerns about the Chicago Council on Mental Health Equity members' qualifications. Nor do we have concerns about the maintenance of institutional knowledge being transferred to the new committee.

*Progress in the Fifth Reporting Period*

During this monitoring period, the City met the requirements of ¶130 and 137 by inviting the Chicago Council on Mental Health Equity to review and submit feedback on twelve Crisis Intervention directives (S04-20; S04-20-02; S04-20-03; S04-20-04; S04-20-05; S05-14; S.O. 20-01; S.O. 20-02; S.O. 20-03; S.O. 20-04; S.O. 21-01; S.O. 21-02). Options for alternative means of providing feedback were also given for Chicago Council on Mental Health Equity members who could not be present at the meeting(s). This was an important step for inclusion of feedback, making the process more transparent, and giving participants a voice. We note deficiencies in this process below, however, the City and the CPD should be commended for their more robust approach to policy review by the Chicago Council on Mental Health Equity this reporting period.

As noted in the last report, there were prior concerns regarding subcommittee recommendations not being reviewed or not being voted on by the entire board. While the **draft bylaws** have not yet been finalized, the voting process on substantial issues was far more inclusive during this monitoring period. For example, upon Chicago Council on Mental Health Equity review of CIT policies, due to this more inclusive voting process, a majority vote gained approval for there to be a delay in the call for the full body vote to move revisions to the policies forward until some process concerns were adequately addressed. This allowed for more transparency and opportunity to gain consensus and improve trust.

The IMT notes that the meeting scheduled to review feedback and vote on recommendations was canceled at the last minute when there was an allegation that the City failed to post the agenda 24-48 hours, as required by the Open Meetings Act (OMA). While the meeting was rescheduled two days later, this still created undue constraints for individuals who had prioritized their attendance at the first meeting and could no longer attend the rescheduled meeting. It also exacerbated the process concerns that were previously discussed.

The IMT held a focus group with subcommittee chairs this reporting period. The Chicago Council on Mental Health Equity subcommittee chairs' concerns largely focused on four areas. First, they are concerned that some members lack context or experience with police directives, and therefore do not have sufficient understanding to provide legitimate feedback; yet, these same members are being asked to vote on something they do not adequately understand. Second, they are concerned that there is insufficient participation of people with lived experience.

Third, they believe that additional staff resources are required to assist this voluntary, unpaid committee with the Chicago Council on Mental Health Equity's important, and time-consuming, work. Last, they are concerned that the meetings often feel reactive as opposed to proactive. That is, as if the City has already developed the outcomes and only needs the Chicago Council on Mental Health Equity to rubber stamp it rather than including the Chicago Council on Mental Health Equity into proactively building the consensus to develop outcomes together.

The IMT notes that the Chicago Council on Mental Health Equity is a group of esteemed professionals and key community members who have the experience and credibility to be a crucial force in developing effective crisis response systems.

Importantly, the IMT understands the inherent challenges that come with leading a group of this size. The IMT appreciates the City's significant work during this reporting period to address some of the concerns that have been previously reported. For example, while there were still legitimate concerns raised with the most recent review of the CIT policy suite, the City did a much better job, compared to the first monitoring period, in providing the time necessary for productive review.

The comments provided by the Chicago Council on Mental Health Equity on the CIT policy suite were robust, and ultimately all but two directives were moved forward for review and consideration by the CPD. It is incumbent on the CPD to review these comments and to report back to the Chicago Council on Mental Health Equity what was and was not incorporated, with an explanation as to why certain Chicago Council on Mental Health Equity feedback was not incorporated, as required by ¶130 and 131. The City and the CPD must continue to gain trust by listening and responding to legitimate concerns and continuing to improve the process.

Committee members have voiced concerns over how the City and the CPD intend to seek feedback from neighborhood stakeholders, as well as how individual communities will know when there are meetings or public postings of policies to encourage engagement by community members. Further, as discussed in previous reports, the way community input is solicited because of the OMA needs additional consideration to better promote engagement (e.g., the city requires community members to submit comments 24 hours before the meetings start, which may deter community input and erode community trust).

To assist in compliance with ¶130, this reporting period the City invited members of the Chicago Council on Mental Health Equity to attend the CPD and the OEMC mental health related training, which is commendable. This experiential observation and feedback creates transparency and invites ongoing improvements.

At the end of this monitoring period, there was another key leadership change announced, with one of the co-chairs of this body moved out of this role. This is the second change in co-chair leadership since the start of this consent decree.

Although the Chicago Council on Mental Health Equity is still unable to meet in person due to the COVID-19 pandemic, the IMT has participated in nearly all sub-committee and full committee virtual meetings.

In the fifth monitoring period, the City maintained Preliminary compliance with ¶130. Going forward, further levels of compliance will evaluate the City's and the CPD's efforts to engage with the community and depend on substantive reviews by the Chicago Council on Mental Health Equity on data, policies, training, and operational practices informing recommendations on overall response to individuals in crisis.

The IMT notes that the Chicago Council on Mental Health Equity reviewed twelve policies during this reporting period, but the only relevant compliance records related to the Chicago Council on Mental Health Equity's feedback was regarding S05-14. The IMT expects to receive compliance records on the remaining policies, including evidence of the feedback loop back to the Chicago Council on Mental Health Equity on all twelve policies. This will not only allow the CCMHE to see that their feedback was taken seriously by the CPD but will also provide an important foundation for the next annual round of policy revisions.

It is also important to note that the Chicago Council on Mental Health Equity continues to provide feedback, verbally and in writing, that has yet to be adequately addressed in policy and strategy, or addressed in ongoing quarterly meetings. The feedback's themes include:

- Providing tangible means for community engagement. The IMT will continue to assess active and meaningful community engagement efforts and recommends that the CPD seek guidance from the Chicago Council on Mental Health Equity on minimum thresholds and specific recommendations. Subcommittee chairs could also assist the CPD in leading this effort.

- Collaborative approaches to alternative response models. The CPD's written response to Chicago Council on Mental Health Equity feedback demonstrates a siloed-response model, with the CPD defaulting responsibility to the City by saying they do not have control over what the City does. This ignores the CPD's significant role, including in policy, to support alternative models. We recommend that the CPD take a secondary role to clinicians on–scene, unless police engagement is required. These should be coordinated policy considerations held jointly between the City and the CPD. Additionally, when the Chicago Council on Mental Health Equity requested more information on the CARES

program and the policy directive supporting it, the CPD's response was to default to it being the responsibility of the City. For these alternative response programs to succeed, police policy is going to play a crucial role.

In the next reporting period, the IMT looks forward to receiving the CPD's review of the Chicago Council on Mental Health Equity comments on the CIT policy suite and a feedback loop for what was included in policy revision and what was not. Moreover, the IMT anticipates adequate consideration being given to the Chicago Council on Mental Health Equity's feedback on community engagement, as well as increased communication between the City and the CPD. The IMT also still awaits the Chicago Council on Mental Health Equity's bylaws to confirm that the committee's voting processes are consistent with best practices. Additionally, the IMT recommends that the Chicago Council on Mental Health Equity bylaws include provisions for more meaningful community engagement. The draft bylaws still contained restrictive language regarding community member opportunity to ask questions or give feedback.

### Paragraph 130 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶131

*131. Within 365 days of the Effective Date, the City will request that the Advisory Committee identify and evaluate in writing any opportunities to develop or enhance crisis response-related policies, procedures, and training of City agencies, including CPD, OEMC, and the Chicago Fire Department, and increase municipal and community resources and alternative response options, including rapid-access clinics, drop-off centers, mobile crisis teams, a central non-emergency crisis line, other pre- and post-arrest diversion efforts, and strategies targeted at children and youth. The City will also request that the Advisory Committee identify and evaluate the steps necessary to develop non-criminal justice responses to individuals in crisis, including, but not limited to, a behavioral health unit to provide alternative non-criminal justice responses to individuals in crisis. In evaluating potential community resources and strategies, the Advisory Committee will identify challenges and opportunities for improvement, if any, and make recommendations. The City will address the feedback and recommendations identified by the Advisory Committee, including identifying recommendations that it will adopt, and the plan for implementation, in the Crisis Intervention Plan. The City will respond to each of the recommendations made by the Advisory Committee. The response will include a description of the actions that CPD has taken or plans to take with respect to the issues raised in the recommendations. If the City declines to implement a recommendation, it will explain the reason(s) for declining.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance (SECOND REPORTING PERIOD)*
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

In the fifth monitoring period, the City maintained Preliminary compliance with ¶131.

To achieve Preliminary compliance with ¶131, the IMT assessed the City's level of data collection, tracking, analysis, and management as required under the Consent Decree. Specifically, the IMT examined whether the City has made the requisite requests of the Advisory Committee, which is now referred to as the Chicago Council on Mental Health Equity, and that the Chicago Council on Mental Health Equity

is providing the requisite guidance in return. Going forward, further levels of compliance will depend on the Chicago Council on Mental Health Equity's substantive reviews on data, policies, training, community engagement, and operational practices informing recommendations on responses to individuals in crisis.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the City requested that the Crisis Intervention Advisory Committee (CIAC) (now the Chicago Council on Mental Health Equity, *see analysis for* ¶128) provide recommendations on the CPD's and the OEMC's policies, procedures, and training. In addition, the CIAC provided recommendations for improving the City's broader mental-health-response system. These recommendations were universally accepted by the City. In its draft *Crisis Intervention Plan* submitted in the third monitoring period, the City provided updates on its implementation of some—but not all—of these recommendations. We understand that the City may not include every recommendation in the first *Crisis Intervention Plan*, but we look forward to further discussions between the City and the Chicago Council on Mental Health Equity to understand how the entirety of CIAC's recommendations will be addressed.

*Progress in the Fifth Reporting Period*

During this monitoring period, the City did not produce the next iteration of the *Crisis Intervention Plan*, which is required to be produced annually under ¶122. Therefore, the City is unable to reach any further compliance level for ¶131.

The Chicago Council on Mental Health Equity, being the most recent iteration of the City's advisory committee, is still a relatively new body and has a broader focus on citywide crisis-response systems. The IMT has observed each of the Chicago Council on Mental Health Equity virtual meetings and maintains that the Chicago Council on Mental Health Equity represents a sound opportunity for the City to develop and implement a comprehensive citywide crisis response system. There is robust leadership by the City in this effort, with dedicated experts from the field leading subcommittee work. There is still some confusion by newer members about their role and function, and some legitimate concerns with processes that must be addressed in the future (*see analysis for ¶¶128-129*). In addition, the City is still navigating the function of the Open Meetings Act (OMA), and it is expected that there will be a learning curve on both fronts. Going forward, we will continue to assess the Chicago Council on Mental Health Equity meetings and subcommittee meetings, along with direct input from the subcommittee chairs provided under ¶¶128-129.

The IMT also recommends that the Chicago Council on Mental Health Equity by-laws include provisions for meaningful community engagement. We are concerned, as are members of the Chicago Council on Mental Health Equity, about the quality of interactions with the greater community and with robust representation of individuals with lived experience.

Additionally, as discussed in previous reports, the way community input is solicited because of the OMA needs additional consideration to better promote engagement. For example, the city requires community members to submit comments 24 hours before the meetings start. This may, however, deter community input and erode community trust, therefore the Chicago Council on Mental Health Equity should reconsider this approach. The draft bylaws still contained restrictive language regarding community member opportunity to ask questions or give feedback. The IMT has submitted formal comments back to the city, and we look forward to reviewing the final draft of the bylaws.

The City invited members of the Chicago Council on Mental Health Equity to observe the OEMC and the CPD Mental Health related training during this reporting period, which is commendable. We look forward to the City making this a regular practice moving forward.

The IMT also encourages the City to provide a robust data presentation to the Chicago Council on Mental Health Equity in an effort to build knowledge content for the Chicago Council on Mental Health Equity and to support the Chicago Council on Mental Health Equity in providing additional recommendations for crisis response as required under ¶131.

The City has launched the CARE alternative response pilot program this reporting period, which is also commendable. However, key members of the Chicago Council on Mental Health Equity, although supportive, expressed being unaware of the process that went into developing such key programs that speak directly to ¶131.

In the fifth monitoring period, the City maintained Preliminary compliance with ¶131. To achieve Secondary compliance with ¶131, the City must receive, address, and respond to feedback and recommendations on relevant policies that incorporate ¶131's requirements. Going forward, further levels of compliance will depend on substantive reviews by the Chicago Council on Mental Health Equity on data, policies, training, community engagement, and operational practices informing recommendations on overall response to individuals in crisis.

In the next reporting period, the IMT looks forward to receiving the CPD's review of the Chicago Council on Mental Health Equity comments regarding the CIT policy suite and providing feedback to the Chicago Council on Mental Health Equity about which parts of their feedback were incorporated into revisions and which were not, and why not. The IMT also still awaits the Chicago Council on Mental Health

Equity's bylaws to confirm that the committee's voting processes are consistent with best practices.

To achieve further compliance, the City must provide a comprehensive response to each of the Chicago Council on Mental Health Equity's recommendations and describe its decision-making process about each recommendation, as required by ¶131.

It is important to note that the City just finished a policy review process with the Chicago Council on Mental Health Equity. Valuable feedback was given by the professionals and persons with lived experience that make up the Chicago Council on Mental Health Equity. As required under ¶¶130–31 this feedback must be reviewed and responded to, which is a crucial part of building trust and strengthening directives, training, and operational practices.

We believe the City is on the right path and is considering complicated issues while also taking important steps to be inclusive in its policy revision process and relevant training observation. We look forward to reviewing the final draft of the bylaws, which should support continued efforts to promote inclusion and transparency. Dedicating a Chicago Council on Mental Health Equity meeting to presenting the CIT Dashboard to the Chicago Council on Mental Health Equity members would be a useful step toward compliance with ¶131.

### Paragraph 131 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶132

*132. The Advisory Committee will be chaired by the Mayor's Office. The Mayor's Office will invite individuals who have personally experienced a behavioral or mental health crisis, people with experience working with individuals in crisis, and experts with knowledge in law enforcement responses to individuals in crisis. At a minimum, the Mayor's Office will invite individuals from the following groups: first responders; the CIT Coordinator; OEMC; county and city hospitals, health care providers, and mental health professionals; the Cook County State's Attorney's Office; the Cook County Public Defender's Office; at least one academic research entity; community behavioral and mental health professionals; advocacy groups for consumers of behavioral and mental health services; behavioral and mental health service providers; homeless service providers; substance abuse service providers; persons with lived experiences of behavioral or mental health crises; and other similar groups.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORT PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City maintained Preliminary and Secondary compliance with ¶132.

To achieve Preliminary compliance with ¶132, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." In addition, the IMT assesses whether the City has qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree. The IMT also assesses the City on resource allocation, staffing capacity, and efforts to fill any vacant positions. Specifically, the IMT examines whether the City has created the requisite Advisory Committee with appropriate expertise and experience.

Going forward, the IMT will monitor the City's efforts to finalize the Chicago Council on Mental Health Equity's bylaws and evaluate the continuing, robust participation from the Chicago Council on Mental Health Equity members, including people with lived experience.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the IMT recommended that the Chicago Council on Mental Health Equity gather a greater representation of people with lived experience; however, active participation remains low, and the City should consider additional ways to improve participation.

The Chicago Council on Mental Health Equity continues to be made up of individuals with exceptional talent and experience who have dedicated significant time and resources to assist the City to improve crisis response.

*Progress in the Fifth Reporting Period*

During this monitoring period, as previously indicated, there was another key leadership change announced, with one of the co-chairs of this body – a representative from the Mayor's Office of Public Safety – moved out of this role. The IMT will assess in the next reporting period the qualifications of the City's appointment to fill this vacant role.

The remaining Chicago Council on Mental Health Equity Co-Chair – a Deputy Commissioner of Behavioral Health – is well qualified to meet the requirements of ¶132. The IMT believes that he has the necessary background, experience, and commitment to the Chicago Council on Mental Health Equity process. Additionally, the Chicago Council on Mental Health Equity membership includes representatives from each of the groups listed in ¶132. There is ongoing concern about the low representation of people with lived experience. Active participation continues to be low, and the City should consider additional ways to improve participation of people with lived experience. There are many professionals serving on this committee who would be a good resource to assist with recruiting additional lived experience.

In the fifth monitoring period, the City maintained Preliminary and Secondary compliance with ¶132. To assess Full compliance, the IMT will monitor the City's efforts to finalize the Chicago Council on Mental Health Equity's bylaws and evaluate the continuing robust participation from the Chicago Council on Mental Health Equity members, including people with lived experience. The IMT will also monitor the leadership response to subcommittee chair concerns as addressed in ¶128-29, and its efforts to fill the now-vacant co-chair position.

## Paragraph 132 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Crisis Intervention: ¶133

***133.*** *CPD policy will provide that a crisis response may be necessary even in situations where there has been an apparent violation of law.*

## Compliance Progress <span>(Reporting Period: July 1, 2021, through Dec. 31, 2021)</span>

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City and the CPD maintained Preliminary compliance with the requirements of ¶133.

To achieve Preliminary compliance with ¶133, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." In addition, the IMT assesses whether the City has qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree. The IMT also assesses the City on resource allocation, staffing capacity, and efforts to fill any vacant positions. Moreover, ¶133's requirements must also be adequately memorialized into policy.

Going forward, to achieve Secondary compliance, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶133. Further assessment levels will require an assessment of those developed metrics.

### Progress before the Fifth Reporting Period

The CPD memorialized the requirements of ¶133 into Special Order S04-20, *Recognizing and Responding to Individuals in Crisis,* which received a no objection in the third reporting period. The CPD produced a newly developed eLearning and a revised 2021 annual in-service training (De-escalation, Response to Resistance, and Use of Force), both of which were reviewed by the IMT in the third reporting period. While there is room for improvement, a no-objection was issued in the third reporting period.

*Progress in the Fifth Reporting Period*

The CPD has Special Order S04-20, *Recognizing and Responding to Individuals in Crisis*, which states that a crisis intervention response may be necessary even in situations where there has been apparent violation of law. Additionally, the directive provides tips and techniques for recognizing a person who may be in mental-health crisis and includes requirements for responding to such calls for service.

While the policy contains some concepts related to recognizing mental health conditions and call response, the training components necessary to achieve Secondary compliance have yet to be delivered. For example, non-CIT officers have not received updated training on responding to calls involving people in mental health crisis. This will be necessary if they are to "provide a crisis response." The CPD has made strides in strengthening the content of crisis response in their revised 2021 annual in-service training (De-escalation, Response to Resistance, and Use of Force), but the training has not yet been received by all officers. Additionally, the CPD has developed an e-Learning to address policy changes affecting all officers that also helps move the city toward Secondary compliance, but that is still under review and has not yet been delivered to all officers.

In the fifth monitoring period, the City and the CPD maintained Preliminary compliance with ¶133's requirements. To achieve Secondary compliance, the CPD must deliver the necessary crisis response training(s). Going forward, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶133. Further assessment levels will require an assessment of those developed metrics.

Full compliance with the requirements of ¶133 will require reliable data on calls involving people in mental health crisis. This will require consistent completion of the *Crisis Intervention Report* (*see* ¶118) and will require an audit of crisis calls once reliable data is available. We will assess this in future monitoring periods once CPD delivers the training necessary for Secondary compliance.

### Paragraph 133 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶134

> **134.** *CPD policy will encourage officers to redirect individuals in crisis to the healthcare system, available community resources, and available alternative response options, where feasible and appropriate.*

## Compliance Progress · (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City and the CPD maintained Preliminary compliance with the requirements of ¶134.

To achieve Preliminary compliance with ¶134, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." Going forward, to achieve Secondary compliance, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶134. Further assessment levels will require an assessment of those developed metrics.

### Progress before the Fifth Reporting Period

The CPD memorialized the requirements of ¶134 into Special Order S04-20, *Recognizing and Responding to Individuals in Crisis,* which received a no objection in the third reporting period. The CPD produced a newly developed eLearning and a revised 2021 annual in-service training (De-escalation, Response to Resistance, and Use of Force), both of which were reviewed by the IMT in the third reporting period. While there is room for improvement, a no-objection was issued in the third reporting period.

### Progress in the Fifth Reporting Period

The CPD has Special Order S04-20, *Recognizing and Responding to Individuals in Crisis*, which requires officers responding to a call involving an individual in crisis to provide that individual with the document "Mental Health Incident Notice." We have reviewed the Mental Health Incident Notice and believe it sufficiently directs

community members to the healthcare system, available community resources, and available alternative response options.

However, while the policy contains the requirements of ¶134 and the CPD has a responsive data collection tool, the training components necessary to achieve Secondary compliance have yet to be delivered. For instance, non-CIT officers have not received updated training on the mental health system, nor have they received training on "available alternate response options." Such training will be necessary for Secondary compliance with ¶134.

The IMT notes that the CPD's pilot alternative response program, Crisis Assistance Response Engagement (CARE) was launched. This is commendable, but requires additional policy considerations for the CPD, who will need to demonstrate increased communication between the City and the CPD. Additionally, utilization of the MHIN will also need to be demonstrated.

In the fifth monitoring period, the City and the CPD maintained Preliminary compliance with the requirements of ¶134. To achieve Secondary compliance, the CPD must deliver the necessary crisis response training(s). Going forward, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶134. Further assessment levels will require an assessment of those developed metrics. Moreover, the IMT will also consider policy that is developed in relation to the new CARE alternative response program.

Full compliance with the requirements of ¶134 will require reliable data on calls involving people in mental health crisis. This will require consistent completion of the *Crisis Intervention Report* (*see* ¶118), utilization of the MHIN and will require an audit of crisis calls once reliable data is available. We will assess this in future monitoring periods once CPD delivers the training necessary for Secondary compliance.

### Paragraph 134 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶135

**135.** *CPD will ensure that the language used in policies, procedures, forms, databases, and trainings to communicate about incidents involving individuals in crisis is appropriate, respectful, and consistent with industry recognized terminology. CPD will seek input from community stakeholders, including the Advisory Committee, for recommendations to identify appropriate and respectful terminology.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City and the CPD maintained Preliminary compliance with ¶135.

To achieve Preliminary compliance with ¶135, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." Going forward, to achieve Secondary compliance, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶135. Further assessment levels will require an assessment of those developed metrics.

### Progress before the Fifth Reporting Period

In the third reporting period, the CPD developed an eLearning and in-service course for all CPD members on the Crisis Intervention program and responding to individuals in crisis.

### Progress in the Fifth Reporting Period

The CPD has Special Order S05-14, *Crisis Intervention Team (CIT) Program*, which states that language used in the policies, procedures, forms, databases, and training materials to communicate about incidents involving individuals in crisis should be appropriate, respectful, and consistent with professional terminology.

In addition, Special Order S04-20, *Recognizing and Responding to Individuals in Crisis*, clearly communicates the CPD's commitment to interacting with individuals in crisis with dignity, respect, and the utmost regard for the preservation of human life and the safety of all persons involved. Under the "Procedures" section of the directive, officers are instructed that they are required to interact with individuals in crisis with dignity and respect. Finally, the CPD policies and trainings have been reviewed by members of the Chicago Council on Mental Health Equity, thereby accomplishing the second part of ¶135. However, the review process was just completed at the end of this monitoring period, and the IMT looks forward to receiving an update on which recommendations were included in the revised policies. It is apparent from the policies, procedures, forms, databases, and training materials that we have reviewed that the CPD is committed to reinforcing respectful dialogue when discussing people in crisis.

However, the CPD has not provided updated training on using appropriate and respectful communication when interacting with people in mental health crisis. Although we believe that the CPD has certainly taken sufficient steps to ensure that respectful language is used in policies, procedures, and databases, updated training will ensure that members use respectful language on forms and when "communicat[ing] about individuals in crisis." Such training will be necessary for Secondary compliance. Moreover, the CPD Event Code presently uses outdated and inappropriate language (*e.g.*, DISTME). The phrase "disturbance mental" is utilized and will need to be updated. With the onboarding of a new Computer Aided Dispatch (CAD) system in 2023, the CPD should be encouraged to consider alternate event codes for mental health related calls for service.

In the fifth monitoring period, the City and the CPD maintained Preliminary compliance with ¶135. To achieve Secondary compliance, the CPD must deliver the necessary crisis response training(s). Going forward, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶135. Further assessment levels will require an assessment of those developed metrics.

Full compliance with the requirements of ¶135 will require reliable data on calls involving people in mental health crisis. This will require consistent completion of the *Crisis Intervention Report* (*see* ¶118) and will require an audit of crisis calls once reliable data is available. We will assess this in future monitoring periods once the CPD delivers the training necessary for Secondary compliance.

## Paragraph 135 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶136

**136.** *CPD will develop and implement policies, procedures, and protocols regarding the collection, maintenance, and use of information related to an individual's medical and mental health to facilitate necessary and appropriate communication while adequately protecting an individual's confidentiality. To develop these policies, procedures, and protocols, CPD will seek input from community stakeholders, including the Advisory Committee.*

---

### Compliance Progress　　　　　　(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City and the CPD maintained Preliminary compliance with ¶136.

To achieve Preliminary compliance with ¶136, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

*Progress before the Fifth Reporting Period*

In the fourth reporting period, the IMT reviewed Special Order S04-20, *Recognizing and Responding to Individuals in Crisis*, which provides guidance about verbal, behavioral, and environmental cues that may allow an officer to recognize a person in mental health crisis and guidance for officers to collect and use information during the on-scene encounter. S04-20 also includes the requirement for officers to complete a *Crisis Intervention Report* for all calls involving a mental-health component. The report requires data related to individual cases, but the data will also be used in aggregate to identify overall trends in the CPD's mental health response approach. The earlier version of Special Order S05-14, *Crisis Intervention Team (CIT) Program*, clearly identified the responsible parties for following up on mental and behavioral health-related events and for referring and, when appropriate, connecting individuals in crisis with local service providers. The information collected by the draft *CIT Report* appears capable of assisting area-level resources in conducting such follow up.

---

*Progress in the Fifth Reporting Period*

However, during the fifth monitoring period, key components of these SOP's were subsumed under a significantly revised S05-14, which is still under review. The associated SOPs are still under review and the CPD does not intend to resubmit those until the sixth reporting period. The newly revised S05-14 is missing key components of ¶136. For instance, ¶136 requires "individual's medical and mental health… and in the draft S05-14, "medical" is missing. Additionally, the requirements to "*seek input from community stakeholders, including the Advisory Committee*" is also missing from the revised S05-14. "*Policies, procedures and protocols*" is also required by ¶136, and the revised directive only reads "*policies and practices*." The requirements of ¶136 remain incorporated into several CPD directives that require collection, maintenance, and use of an individual's medical and mental health information. However, the IMT strongly recommends that S05-14 be revised to include ¶136's requirements, thereby fully capturing the paragraphs requirements into one directive.

As indicated previously, the City and the CPD initiated a much more thorough review of the various directives and SOPs by the Chicago Council on Mental Health Equity this reporting period. While concerns were raised in previous sections of this report about the process, which the City is actively working to address, the City and the CPD did a much better job with this process than in the first monitoring period's original review. This is commendable. The IMT looks forward to the expansion of additional "community stakeholders" in subsequent rounds of revisions, including more robust notification of public postings of directives to seek broader input.

In the fifth monitoring period, the City and the CPD maintained Preliminary compliance with ¶136.

Secondary compliance will hinge on several factors. Because the requirements of ¶136 were previously incorporated into policy, the CPD has maintained Preliminary compliance with the requirements of ¶136 this reporting period. However, some of those requirements that were included in the previous S05-14, and which served as the basis for achieving Preliminary compliance, are now missing from the substantially revised version of S05-14 presently under review. The IMT will reconsider Preliminary compliance should the requirements of ¶136 not be finalized in the sixth reporting period. Demonstration that the comments and feedback of the Chicago Council on Mental Health Equity and relevant community stakeholders, including those open through the public posting will also need to be adequately addressed. Because ¶136 requires review and input of "policies, procedures, and protocols", and not just "policies", compliance will also hinge on the finalization of the CIT unit specific SOPs, which the Chicago Council on Mental Health Equity recently reviewed at the end of this monitoring period. These Unit

Specific SOP's go into further depth on the "procedures and protocols" of the CIT Unit. We strongly recommend that the City and the CPD adequately respond to feedback from both the Chicago Council on Mental Health Equity and "community stakeholders" per ¶131. Secondary compliance will require comprehensive training for officers on policy, procedures, and protocols, including the mandatory completion of the CIT Report, which are required by ¶136. The City and the CPD have developed an eLearning to achieve this requirement and we expect they will achieve Secondary compliance in the next reporting period. Additionally, training for area-level resources on how to conduct such follow-up will also be considered. However, we credit the CPD for taking the above-referenced steps to date.

### Paragraph 136 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶137

**137.** *Within 180 days of the Effective Date, CPD will review and revise its crisis intervention-related policies as necessary to comply with the terms of this Agreement. CPD will consider any recommendations or feedback provided by the Advisory Committee when revising its policies.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During the fifth monitoring period, the City and the CPD did not meet any level of compliance with ¶137.

To achieve Preliminary compliance with ¶137, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." To achieve Preliminary compliance with ¶137, the City and the CPD must develop and finalize policies that incorporate ¶137's requirements.

### Progress before the Fifth Reporting Period

In the fourth reporting period, the City produced draft Crisis Intervention unit specific standard operating procedures. As noted in our assessments of other paragraphs, the CPD has made a good-faith effort to ensure that the Consent Decree's requirements are incorporated into CIT-related policies and that a responsible party is listed for each requirement. In the fifth reporting period, the City opted to subsume key consent decree requirements, which were previously covered under the draft standard operating procedures, into a substantially revised Special Order S05-14, *Crisis Intervention Team (CIT) Program*. The city intends to produce revised standard operating procedures in the sixth reporting period. Moreover, the CPD has sought feedback from the Chicago Council on Mental Health Equity into draft policies.

*Progress in the Fifth Reporting Period*

During this monitoring period, the CPD produced a substantially revised Special Order S05-14, *Crisis Intervention Team (CIT) Program* which partially incorporated ¶137's requirements. The language used in this draft Special Order is more restrictive than ¶137's language. For example, the directive limited the recommendations and feedback by the Chicago Council on Mental Health Equity only to "identifying appropriate and respectful terminology," a far narrower scope than required. While some CPD directives that fulfill Consent Decree requirements have been published, the CPD intends to enumerate other requirements in "crisis intervention-related" standard operating procedures that the City plans to produce in the sixth reporting period. At the end of this reporting period, the CPD nearly completed the requirement that the Chicago Council on Mental Health Equity review and provide feedback on each of these associated policies. Because ¶137 requires review of "crisis intervention-related policies," this would include the associated unit specific SOPs. The CPD did a far more comprehensive job on this policy review requirement than in the second reporting period, and the CPD should be commended for this. The feedback and recommendations provided by the Chicago Council on Mental Health Equity, which were robust, will need to be considered and responded to.

In the fifth monitoring period, the City and the CPD did not meet any level of compliance with ¶137. To achieve Preliminary compliance with ¶137, the CPD must finalize policies that incorporate ¶137's requirements.

Once the CPD has finalized each relevant crisis intervention-related policy, including S05-14 and the associated standard operating procedures, we anticipate that the CPD will be in Preliminary compliance with the ¶137.

We appreciate the CPD's efforts to accomplish the task of policy review in a comprehensive fashion. The IMT looks forward to the CPD giving the Chicago Council on Mental Health Equity's feedback and recommendations the attention that they deserve, which includes a feedback loop back to the Chicago Council on Mental Health Equity. For future annual revisions, the IMT recommends a more robust communication plan for soliciting broader community feedback, a concern shared not only by the IMT, but also by members of the Chicago Council on Mental Health Equity.[2]

---

[2] In its comments to an earlier draft of this report, the City asserts that Full compliance "should be achieved" with the revision of all "CIT policies and procedures." Attachment B. The IMT notes, however, that ¶137 is broader than merely revising "crisis-intervention related policies." The CPD must also consider the feedback provided by the Chicago Council on Mental Health Equity. The IMT anticipates that the City and the CPD will have achieved Full compliance with ¶137 once they have demonstrated the existence of a feedback loop between the CPD and the Chicago Council on Mental Health Equity.

## Paragraph 137 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Crisis Intervention: ¶138

**138.** *OEMC call-takers will continue to identify calls for service involving an individual known, suspected, or perceived to be in crisis.*

### Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**  *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**  *In Compliance* (NEW)
**Full:**  *Not Yet Assessed*

During the fifth monitoring period, the City and the OEMC achieved Secondary compliance with ¶138.

To achieve Preliminary compliance with ¶138, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶138 by reviewing training development, implementation, and evaluation in accordance with ¶286 of the Consent Decree, which incorporates the following evaluation criteria: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the IMT reviewed an updated draft version of the OEMC's *Crisis Intervention Team Program* standard operating procedure, which clearly articulates the call-takers' responsibility to identify calls for service involving an individual known, suspected, or perceived to be in crisis. Call-takers are required to complete a series of "CIT triage questions" that help them determine whether a mental health component is known, suspected, or perceived, which would require a CIT response. The standard operating procedure also instructs call-takers that if there is any doubt about whether a call includes a possible mental health component, the steps listed in the standard operating procedure "can and should apply." This SOP was given a no objection in the fourth reporting period.

*Progress in the Fifth Reporting Period*

During this monitoring period, the IMT observed the eight-hour training in crisis intervention that all OEMC telecommunicators receive, which includes a module on mental health response (*see* ¶¶142–46). The IMT notes that the OEMC tele-communicators have received sufficient training on how to identify calls involving an individual known, suspected, or perceived to be in crisis and found that the new standard operating procedure is incorporated into training, meeting the requirements of ¶138.

The strengths of the training included describing the change in language from "Mental" to "Mental Health component." NAMI discussed trauma, and the importance of self-care given the high stress role of telecommunicators. The training included a person with lived experience who did a great job explaining her illness and her wellness. She had been handcuffed, involuntarily committed, and shared her experience with this while also discussing her life accomplishments including her college education, etc. The training included a review of CIT Policies—covering the OEMC drop down boxes, what automatically triggers a CIT drop down box to appear (e.g. calls that include suicidal ideation or threat). The new requirement to ask about Weapons, Medications, Violent Tendencies, Triggers, etc. While the training included listening to two audio calls with discussion afterwards, live scenario-based training permitting the practice of these important skills would be a good addition to the training. Communication and De-escalation Strategies-Things to say and not say, for example "I can see this makes you really upset. I'm sorry you are feeling that way. I'd like to listen to you to help me understand how you are feeling" were all covered. Overall, the eight-hour training was very well done.

The OEMC intends to launch its CIT Refresher course in the sixth reporting period, and the IMT looks forward to observing that training.

In the fifth monitoring period, the City and the OEMC achieved Secondary Compliance with ¶138. Further levels of compliance will depend on broader system operation, such as ongoing performance and reliable data as evidenced by the results of OEMC's ongoing audits. Additionally, subsequent levels of compliance will require adequately training 95% of OEMC employees and providing proof that those employees are complying with the relevant directives.

The IMT acknowledges that the OEMC has made strides toward establishing the importance of call-takers being able to identify crisis-related calls.

## Paragraph 138 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Crisis Intervention: ¶139

> ***139.*** *OEMC will continue to code all incidents identified as poten-*
> *tially involving an individual in crisis in a manner that allows for*
> *subsequent data analysis necessary for the evaluation of CPD*
> *and OEMC responses to individuals in crisis and the development*
> *of the plans required by this section of the Agreement.*

## Compliance Progress                     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City and the OEMC maintained Preliminary and Secondary compliance with ¶139.

To achieve Preliminary compliance with ¶139, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶139 by reviewing training development, implementation, and evaluation in accordance with ¶286 of the Consent Decree, which incorporates the following evaluation criteria: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

### Progress before the Fifth Reporting Period

In the fourth reporting period, the IMT reviewed an updated draft version of the OEMC's *Crisis Intervention Team Program* standard operating procedure. The standard operating procedure clearly identifies the way telecommunicators are required to code incidents by utilizing a "Z-code" to denote a mental health component when closing an event in their computer system. The "Z-code" is assigned by CPD officers who are on scene in response to a call for service that OEMC telecommunicators have coded a "mental health disturbance." The standard operating procedure also explains how to complete a set of "CIT triage questions" that allow for subsequent data analysis. This SOP was given a "no objection" in the fourth reporting period.

The IMT received and reviewed data from the OEMC, and we believe the data is sufficient to conduct the necessary trend analysis required in the development of the *CIT Officer Implementation Plan* and the *Crisis Intervention Plan*. Moreover, the data collected by the OEMC, in coordination with data provided by responding CPD officers, allows the OEMC to conduct the necessary audits of telecommunicators' decision-making regarding CIT officer dispatch.

*Progress in the Fifth Reporting Period*

During this monitoring period, the IMT observed the eight-hour training in crisis intervention that all OEMC telecommunicators receive, which includes a module on mental health response (*see* ¶¶142–46). The IMT notes that the OEMC telecommunicators have received sufficient training on how to identify calls involving an individual known, suspected, or perceived to be in crisis and found that the new standard operating procedure is incorporated into training, meeting the requirements of ¶139.

The OEMC telecommunicators have also received sufficient training on how to code incidents involving a person in a mental-health crisis and on how to complete the CIT triage questions. Because the SOP has been enacted and incorporated into training, the OEMC maintains Preliminary and Secondary compliance with ¶139.

In the fifth monitoring period, the City and the OEMC maintained Preliminary and Secondary compliance with ¶139. Further levels of compliance will depend on broader system operation, such as ongoing performance and reliable data as evidenced by the results of OEMC's ongoing audits. Additionally, subsequent levels of compliance will require adequately training 95% of OEMC employees and providing proof that those employees are complying with the relevant directives. The City launched the alternative response Crisis Assistance Response Engagement (CARE) pilot program this reporting period. This is commendable. However, call takers have been confused on how to distinguish between z -coded events and events falling into the pilot project purview. While this is expected with any new program, the IMT looks forward to progress on coding differentiation in the next reporting period.

The IMT acknowledges that the OEMC has made strides in establishing the importance of coding calls involving persons in mental-health crisis. However, as discussed in calls with the OEMC, the IMT strongly recommends that the OEMC improve the way the "weapons present" question captures data. Presently, this question is captured in the dispatcher's notes section which are available to officers should they take the time to review this information on the in-vehicle display. This information is crucial to responding officers, as the type of "weapon" can impact force outcomes. For example, if a person is armed with a butter knife as a weapon, responding officers may approach that situation differently than if a person had a

gun. Standardizing this crucial information in a more accessible manner, rather than in a narrative "notes" section, is important. It is also important that this information be audited to also broadcast over the air. Police fatalities of persons in mental health crisis often occur because responding officers lacked important information.

### Paragraph 139 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Crisis Intervention: ¶140

**140.** *OEMC police communication dispatchers will continue to prioritize Certified CIT Officers for dispatch to incidents that involve an individual known, suspected, or perceived to be in crisis. If a Certified CIT Officer is not available to timely respond, OEMC will continue to dispatch an available officer to avoid compromising response time. OEMC dispatchers will dispatch a Certified CIT Officer, when available, if the responding officer requests assistance from a Certified CIT Officer.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City and the OEMC maintained Preliminary and Secondary compliance with ¶140.

To achieve Preliminary compliance with ¶140, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶140 by reviewing training development, implementation, and evaluation in accordance with ¶286 of the Consent Decree, which incorporates the following evaluation criteria: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

### Progress before the Fifth Reporting Period

In the fourth reporting period, the IMT reviewed an updated draft version of OEMC's *Chicago Police Department Crisis Intervention Team Program* standard operating procedure. The standard operating procedure clearly states the requirement for telecommunicators to prioritize Certified CIT officers for dispatch to incidents that involve an individual known, suspected, or perceived to be in crisis. The standard operating procedure also articulates the requirement to dispatch a non-CIT officer if a CIT officer is not immediately available and the requirement to dispatch a CIT officer if requested by a non-CIT officer.

The OEMC telecommunicators receive district and watch information from the CPD watch lieutenants and the CPD CLEAR database about which Certified CIT officers are working on a given shift. (*See* ¶141.) As noted previously, officer feedback has indicated there are challenges in the accuracy of officers on patrol designated as CIT certified, which is the responsibility of CPD to ensure accuracy in order for OEMC to prioritize dispatch of CIT officers.

Progress in the Fifth Reporting Period

During this monitoring period, the IMT observed the eight-hour training in crisis intervention that all OEMC telecommunicators receive, which includes a module on mental health response (*see* ¶¶142–46). The IMT notes that the OEMC telecommunicators have received sufficient training on how to identify calls involving an individual known, suspected, or perceived to be in crisis and found that the new standard operating procedure is incorporated into training, meeting the requirements of ¶140. The OEMC telecommunicators have also received sufficient training in prioritizing Certified CIT officers for dispatch to such incidents. If a CIT officer is not immediately available, the OEMC data demonstrates that one will be dispatched as an assist when that CIT officer becomes available.

In the fifth monitoring period, the City and the OEMC maintained Preliminary and Secondary compliance with ¶140. Further levels of compliance will depend on broader system operation, such as ongoing performance and reliable data as evidenced by the results of OEMC's ongoing audits. Additionally, subsequent levels of compliance will require adequately training 95% of OEMC employees and providing proof that those employees are complying with the relevant directives.

The IMT acknowledges that the OEMC has made strides toward establishing the importance of call-takers being able to identify crisis-related calls.

## Paragraph 140 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Crisis Intervention: ¶141

**141.** *CPD will provide OEMC with an updated list of current and active Certified CIT Officers and their assignment at least every week. At the beginning of each watch, CPD will continue to identify for OEMC the Certified CIT Officers on duty for each watch and in each district so that OEMC dispatchers know which Certified CIT Officers to prioritize for dispatch to incidents involving an individual known, suspected, or perceived to be in crisis.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City and the CPD maintained Preliminary compliance with ¶141.

To achieve Preliminary compliance with ¶141, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." Going forward, to achieve Secondary compliance, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶141. Further assessment levels will require an assessment of those developed metrics.

*Progress before the Fifth Reporting Period*

In the third reporting period, the CPD achieved Preliminary compliance by memorializing the requirements of ¶141 into Special Order S05-14, *Crisis Intervention Team (CIT) Program*, which contained the requirements of ¶141 as they relate to the CPD's responsibilities. During the fourth reporting period, the IMT reviewed a process flowchart demonstrating the two separate ways in which the CPD provides the OEMC with updated lists of current and active Certified CIT Officers and their assignments daily. Specifically, data is transmitted by (1) manually inputting training records into the CPD's CLEAR and eLearning systems and (2) asking the CPD watch supervisors to identify the CIT officers from the eLearning application and to send a roster to the OEMC daily for each district and watch.

The OEMC has access to the CPD's data systems, allowing the OEMC to obtain an updated list of all current and active Certified CIT Officers (including their assignments) should they require one. The combination of these systems therefore acts as the CPD's official list.

*Progress in the Fifth Reporting Period*

During this monitoring period, the City and the CPD submitted a substantially revised S05-14, *Crisis Intervention Team (CIT) Program*. While ¶141's requirements had been met in the earlier version of S05-14, thus achieving Preliminary compliance, the revised version of S05-14 has changed the requirement that the CPD provide OEMC with an updated list of current and active Certified CIT Officers and their assignment "at least every week" to "no less than quarterly." The IMT expects the City to address this change during the current revision process to maintain Preliminary compliance. Additionally, the CPD has yet to develop a systematic plan to ensure that officers who violate the eligibility criteria or who allow their training to lapse are undesignated in the CLEAR and eLearning systems and are not prioritized for dispatch. For instance, the CPD might create an automatic notification of ineligibility based on the number of days lapsed since their last training. Additionally, for those who exceed the ineligibility thresholds (see ¶93 and ¶104), the CPD should create a policy that requires personnel to crosscheck the CIT roster against any sustained finding to determine whether the finding renders the officer ineligible. While S05-14 notes that "each quarter, the Commander of the Strategic Initiatives Division[3] is responsible for inform[ing] OEMC of officers who are out of compliance with the CIT Program eligibility requirements," this does not constitute a systematic plan because it provides no significant guidance on what, precisely, the Commander is supposed to do.

Officers in the Basic CIT training that the IMT observed this reporting period raised concerns about the reliability of the data OEMC has been given regarding who is CIT certified and on duty. The City reports technology limitations in their training tracking system which may result in inaccuracies in the weekly transmission of certified CIT officers to OEMC. The city has indicated the present capability of their tracking system is to be able to track a quarterly report of who has fallen out of compliance. This will be monitored over time.

In the fifth monitoring period, the City and the CPD maintained Preliminary compliance with ¶141, with the expectation that the change in language from the previous S05-14 to the new S05-14 still under review will be updated to reflect the requirement of ¶141. To achieve Secondary compliance, the CPD must develop a

---

[3]   According to the CPD's last updated organizational chart in the reporting period (dated 12/16/20), a Commander oversees the Strategic Initiatives Division, not a Deputy Chief as indicated by the policy. The CPD should resolve this inconsistency.

systematic plan to ensure the reliability that officers who violate the eligibility criteria or who allow their training to lapse are undesignated in the CLEAR and eLearning systems and are not prioritized for dispatch. Persons responsible for this plan will need to be trained on the processes and expectations for doing so, however persons cannot be trained in the absence of a systematic plan. Full compliance will then depend on demonstration of the system's success should a CIT officer become ineligible.

## Paragraph 141 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶142

*142. Within 90 days of the Effective Date, OEMC will ensure that all current active tele-communicators have received mental health and CIT awareness training ("OEMC Training"). OEMC will provide the OEMC Training to new tele-communicators before tele-communicators complete their training and begin answering calls independently.*

### Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | ***In Compliance*** (FIRST REPORTING PERIOD) |
| **Secondary:** | ***In Compliance*** (FIRST REPORTING PERIOD) |
| **Full:** | ***In Compliance*** (FOURTH REPORTING PERIOD) |

In the fifth monitoring period, the City and the OEMC maintained Full compliance with ¶142.

To achieve Preliminary compliance with ¶142, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶142 by reviewing training development, implementation, and evaluation in accordance with ¶286 of the Consent Decree, which incorporates the following evaluation criteria: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

Full compliance with ¶142 is assessed by confirming that 95% of employees have received the requisite training.

*Progress before the Fifth Reporting Period*

In the first reporting period, the City and the OEMC achieved Preliminary and Secondary compliance with the requirements of ¶142 by demonstrating that all current active telecommunicators have received mental-health and CIT-awareness training. The OEMC has also memorialized this requirement into CIT and Mental Health Awareness policy, which clearly states the requirement for all telecommunicators to receive the mental health and CIT awareness training.

*Progress in the Fifth Reporting Period*

The City and the OEMC continue to maintain compliance with the requirements of ¶142 based on its demonstration that all current active telecommunicators have received mental-health and CIT awareness training.

In the fifth monitoring period, the City and the OEMC maintained Full compliance with ¶142. The efforts by the OEMC to ensure policy, training, and operational compliance for this paragraph are commendable, thus achieving and maintaining Full compliance. Moving forward, the IMT will continue to audit OEMC member training records to ensure that the requirements of ¶142 continue to be fulfilled. Specifically, the OEMC must demonstrate that it is adequately training 95% of OEMC employees and providing proof that those employees are complying with the relevant directives.

## Paragraph 142 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Crisis Intervention: ¶143

**143.** *The OEMC Training will be at least an eight-hour course taught jointly by qualified OEMC staff and a mental health clinician or advocate.*

---

**Compliance Progress**    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**    *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**    *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**    *In Compliance* (NEW)

In the fifth monitoring period, the City and the OEMC reached Full compliance with ¶143.

To achieve Preliminary compliance with ¶143, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶143 by evaluating the City's and the OEMC's efforts to engage with the community, including the Chicago Council on Mental Health Equity, regarding requisite policy, training, and operations development and implementation, as referenced in the Consent Decree (¶¶10, 12, 49, 52, 115, 129, 511, 531, 633). Additionally, the IMT assessed whether the City and the OEMC have qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree and the requirements of ¶143.

### Progress before the Fifth Reporting Period

During the fourth reporting period, the OEMC finalized their *Mental Health Training* directive, which clearly memorializes ¶143's requirements. In the first monitoring period, members of the IMT observed the OEMC's delivery of the eight-hour training. The OEMC staff and external instructors (including mental-health clinicians and advocates) were well qualified to deliver their presentations.

### Progress in the Fifth Reporting Period

During this monitoring period, the IMT observed the revised eight-hour training in crisis intervention that all OEMC telecommunicators receive, which includes a module on mental health response (*see* ¶¶142–46). The IMT notes that the OEMC

telecommunicators have received sufficient training on how to identify calls involving an individual known, suspected, or perceived to be in crisis and found that the new standard operating procedure is incorporated into training, meeting the requirements of ¶143.

The strengths of the training included describing the change in language from "Mental" to "Mental Health component." The external instructors included representatives from the National Alliance on Mental Illness and from people with lived experience. In the fifth monitoring period, the IMT observed the 8-hour training again, and found the training to be well done. NAMI discussed trauma, and the importance of self-care given the high stress role of telecommunicators. The training included a person with lived experience who did a great job explaining her illness. She shared her experience of being handcuffed and involuntarily committed while also discussing her life accomplishments, such as graduating from college. The training included a review of CIT Policies—covering the OEMC drop down boxes, what automatically triggers a CIT drop down box to appear (e.g. calls that include suicidal ideation or threat); the new requirement to ask about Weapons, Medications, Violent Tendencies, Triggers, *etc*. While the training did include listening to two audio calls with discussion afterwards, live scenario-based training permitting the practice of these important skills would be a good addition to the training. Communication and De-escalation Strategies – things to say and not say, such as "I can see this makes you really upset. I'm sorry you are feeling that way. I'd like to listen to you to help me understand how you are feeling" were all covered.

The OEMC has also incorporated a contingency plan for if there are not enough new telecommunicators hired to warrant their own eight-hour training. In such situations, the OEMC sends the new hires to CPD's 40-hour CIT training. Afterwards, the new hire receives a two-hour training relevant to telecommunicators. When this training is complete, new telecommunicators are eligible to answer calls independently (*see* ¶142). However, once the OEMC has enough capacity to conduct the eight-hour training, the new hire will also be required to attend this training. The IMT believes this is a reasonable approach to satisfying the intent of ¶143.

In the fifth monitoring period, the City and the OEMC reached Full compliance with ¶143. The OEMC produced evidence of those individuals who attended the eight-hour training since the last submission. In future reporting periods, the CPD should ensure the evaluation forms used reflect the correct, full title of this training. The CPD should also ensure that attendance records show if the individuals are all new hires, or returning from leave. The CPD should state whether any of the individuals taking the training had previously attended the 40-hour Basic CIT training according to the OEMC plan, while awaiting enough new telecommunicators to conduct

the eight hour training. Last, the OEMC should consider prioritizing call taker attendance at the 40- hour Basic CIT training as an added mechanism to further their training and to better understand what is being taught in the CPD training.

The IMT will evaluate for a period of two years evidence that training is reliably being provided to all telecommunicators, including new hires, and continues to be provided by qualified personnel. Additionally, the IMT will evaluate the City's and the OEMC's efforts to incorporate community and Chicago Council on Mental Health Equity feedback, along with training evaluations and trend analysis into ongoing revisions of the 8-hour training. The IMT indicated a more robust scenario-based exercise process would enhance this training, and we will be looking for this in future revisions. Other designated OEMC paragraphs will address accountability for ensuring the required training is operationally successful, including ¶¶138–140, 147, and 149.

The IMT acknowledges that the OEMC has made strides toward establishing the importance of call-takers being able to identify crisis-related calls.

### Paragraph 143 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Full | |

# Crisis Intervention: ¶144

**144.** *The OEMC Training will cover, at a minimum, the following topics: identification of individuals in crisis; telephonic suicide prevention strategies; crisis and stress management, de-escalation, and scenario-based exercises; interactions with individuals with mental illness; information that should be gathered and shared with the responding officer or Certified CIT Officer when the call-taker suspects that the call involves an individual in crisis; the types of calls that may require the dispatching of a Certified CIT Officer or a coordinated crisis response of first responders reflective of established policy for intake and dispatch; and the procedures for dispatching a Certified CIT Officer.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City and the OEMC maintained Preliminary and Secondary compliance with ¶144.

To achieve Preliminary compliance with ¶144, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶144 by reviewing the City's and the OEMC's level of data collection, tracking, analysis, and management as required under the Consent Decree. The IMT "triangulate[s]" the data by comparing multiple data sources, yielding a more robust understanding of ¶144's requirements.

### Progress before the Fifth Reporting Period

During the fourth reporting period, OEMC's *Mental Health Training* directive was finalized, which clearly requires the topics listed in ¶144 to be included in their training. Additionally, members of the IMT observed the OEMC's delivery of the eight-hour training and confirmed that the training contained each of the necessary components. The training curriculum was also reviewed by members of the Chicago Council on Mental Health Equity. The OEMC staff and outside instructors (including mental health clinicians and advocates) were qualified relative to their

presentations, including representatives from NAMI and people with lived experience.

*Progress in the Fifth Reporting Period*

During this monitoring period, the IMT observed the revised eight-hour training in crisis intervention that all OEMC telecommunicators receive, which includes a module on mental health response (*see* ¶¶142–46). The IMT notes that the OEMC telecommunicators have received sufficient training on how to identify calls involving an individual known, suspected, or perceived to be in crisis and found that the new standard operating procedure is incorporated into training, meeting the requirements of ¶144.

The strengths of the training observed by the IMT included describing the change in language from "Mental" to "Mental Health component." NAMI discussed trauma, and the importance of self-care given the high stress role of telecommunicators. The training included a person with lived experience who did a great job explaining her illness. She shared her experience of being handcuffed and involuntarily committed while also discussing her life accomplishments, including her college education, etc. The training included a review of CIT Policies—covering the OEMC drop down boxes, what automatically triggers a CIT drop down box to appear (e.g. calls that include suicidal ideation or threat); the new requirement to ask about Weapons, Medications, Violent Tendencies, Triggers, *etc*. While the training did include listening to two audio calls with discussion afterwards, live scenario-based training permitting the practice of these important skills would be a good addition to the training, more comprehensively covering the requirement of ¶144 which include "scenario-based exercises." Communication and De-escalation Strategies-Things to say and not say, like "I can see this makes you really upset. I'm sorry you are feeling that way. I'd like to listen to you to help me understand how you are feeling" were all covered. Overall, the eight-hour training was very well done.

In the fifth monitoring period, the City and the OEMC maintained Preliminary and Secondary compliance with ¶144, which requires the OEMC training to include …"the types of calls that may require the dispatching of a Certified CIT Officer *or a coordinated crisis response* of first responders reflective of established policy for intake and dispatch." The City has launched the new CARES pilot program, qualifying as a *coordinated crisis response*. We commend the City for this step. With any new program, there will likely be a learning curve. The OEMC plays a key role in identifying and dispatching a coordinated crisis response. While expected, there is confusion on when and how to dispatch alternative crisis response programs. These processes will need to be incorporated into training. The IMT looks forward to the City's progress as these programs continue to grow.

Full compliance requires the OEMC to produce evidence that all telecommunicators, including any new hires since the last submission, have received the required training as outlined in the OEMC's procedures , written above, and that supplemental training is developed and delivered on when and how to dispatch alternative crisis response programs. Once Full compliance is achieved, the IMT will evaluate for a period of two years evidence that all topics identified under ¶144 is reliably being provided to all telecommunicators, including new hires. The City's and the OEMC's efforts to incorporate community and Chicago Council on Mental Health Equity feedback, along with training evaluations and trend analysis into ongoing revisions of the 8-hour training will be assessed as it relates to the topics covered under this training. The IMT indicated a more robust scenario-based exercise process would enhance this training. Other designated OEMC paragraphs will address accountability for ensuring the required training is operationally successful. *See* ¶¶138-40, 147, and 149.

The IMT acknowledges that the OEMC has made strides toward establishing the importance of call-takers being able to identify crisis-related calls.

### Paragraph 144 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Crisis Intervention: ¶145

> **145.** *Any training on mental health and CIT awareness that has already been provided to tele-communicators may fulfill the OEMC Training requirement of this Agreement, if the previously provided training satisfies the criteria for the OEMC Training described in this Agreement.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |

During the fifth monitoring period, City and the OEMC maintained Full compliance with ¶145.

To achieve Preliminary compliance with ¶145, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶145 by reviewing the City's and the OEMC's level of data collection, tracking, analysis, and management as required under the Consent Decree. The IMT "triangulate[s]" the data by comparing multiple data sources, yielding a more robust understanding of ¶145's requirements.

In continuing to assess Full compliance, the IMT will monitor ongoing performance, reliable data, and whether the City and the CPD have qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree.

*Progress before the Fifth Reporting Period*

In the fourth reporting period, the City and the OEMC met Full compliance with ¶145 because they are not intending to submit previous training as evidence of compliance with the OEMC's training requirements.

In other words, the requirements of ¶145 are somewhat moot because, rather than relying on previously delivered mental health and CIT awareness training to fulfill the training requirements found in ¶¶142–44, the OEMC has provided the required eight-hour training as a single training block. To maintain compliance with

¶145, the City and the OEMC will have to continue to follow through and provide the requisite training.

*Progress in the Fifth Reporting Period*

During this monitoring period, the IMT observed the eight-hour training in crisis intervention which includes a module on mental health response (*see* ¶¶142–46). The IMT notes that the OEMC telecommunicators have received sufficient training on how to identify calls involving an individual known, suspected, or perceived to be in crisis and found that their policies are incorporated into training.

In the fifth monitoring period, City and the OEMC maintained Full compliance with ¶145 because they are not intending to submit previous training as evidence of compliance with the OEMC's training requirements, rather utilize their eight hour training to fulfill compliance. To maintain compliance with ¶145, the City and the OEMC will continue to provide the requisite training. Going forward, the IMT will continue to assess the OEMC based on their delivery of the eight-hour training as prescribed in ¶142–44.

### Paragraph 145 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Crisis Intervention: ¶146

**146.** *All tele-communicators will receive at least annual refresher training on mental health and CIT awareness that is adequate to refresh the tele-communicators' skills on identifying, dispatching, and appropriately responding to calls for service that involve individuals in crisis.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:** Annual ☐ **Met** ☑ **Missed**

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

In the fifth monitoring period, the City and the OEMC maintained Preliminary compliance with ¶146.

To achieve Preliminary compliance with ¶146, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." Going forward, to achieve Secondary compliance with ¶146, the OEMC will need to develop metrics that, when tracked, will adequately demonstrate the OEMC's success under ¶146. Further assessment levels will require an assessment of those developed metrics.

### Progress before the Fifth Reporting Period

During the fourth reporting period, the OEMC finalized the *Mental Health Training* directive, which clearly states the requirement for all telecommunicators to receive annual refresher training on mental health and CIT awareness, per ¶146. Moreover, the directive identifies the topics to be included in the refresher training, including skills on identifying, dispatching, and appropriately responding to calls for service that involve individuals in crisis.

### Progress in the Fifth Reporting Period

The OEMC had not yet delivered the required Refresher Training during this reporting period. However, it intends to begin this training in the sixth reporting period. The IMT notes that the OEMC telecommunicators have received sufficient

training on how to identify calls involving an individual known, suspected, or perceived to be in crisis and found that the new standard operating procedure is incorporated into training, meeting the requirements of ¶146.

The City and the OEMC invited members of the Chicago Council on Mental Health Equity to observe the OEMC 8 hour training during the monitoring period. The IMT awaits evidence of the comments that were provided; however it is commendable that the City is inviting members of the Chicago Council on Mental Health Equity to observe all CIT-related trainings. This is important for expanding knowledge and gaining trust for ongoing productive engagement of the role/function of the Chicago Council on Mental Health Equity, as outlined in ¶¶128–32. The OEMC intends to invite the Chicago Council on Mental Health Equity members to observe the Refresher training as well.

In the fifth monitoring period, the City and the OEMC maintained Preliminary compliance with ¶146. To achieve Secondary compliance, the City and OEMC must produce sufficient documentation demonstrating the Chicago Council on Mental Health Equity and community stakeholder input has been incorporated, as well as evidence that the refresher training has been delivered to 95% of all telecommunicators.

The requirement to provide training to all telecommunicators was severely impacted by COVID-19 restrictions on the size of gatherings, including gatherings for professional training; however, in-person training has now resumed, and the OEMC has committed to ensuring that all telecommunicators receive the necessary training.

### Paragraph 146 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶147

> **147.** *OEMC will evaluate all mental health and CIT awareness trainings for telecommunicators on at least an annual basis to ensure that the trainings meet OEMC needs, comply with this Agreement, incorporate best practices, and ensure that the training is effective for personnel and for the individuals in crisis served. OEMC will consider recommendations and feedback from the CIT Coordinator and the Advisory Committee when conducting its evaluation.*

---

## Compliance Progress · (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:** At Least Annually  ☐ **Met**  ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City and the OEMC maintained Preliminary compliance with ¶147.

To achieve Preliminary compliance with ¶147, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." Going forward, to achieve Secondary compliance with ¶147, the OEMC will need to develop metrics that, when tracked, will adequately demonstrate the OEMC's success under ¶147. Further assessment levels will require an assessment of those developed metrics.

### Progress before the Fifth Reporting Period

During the fourth reporting period, the OEMC finalized the *Mental Health Training* directive, which clearly states the requirement for all telecommunicators to receive training on the eight-hour mental health and CIT awareness training and annual refresher training, per ¶146. Moreover, the directive identifies the topics to be included in the eight hour and refresher training, including skills on identifying, dispatching, and appropriately responding to calls for service that involve individuals in crisis.

*Progress in the Fifth Reporting Period*

During this monitoring period, the City and the OEMC invited members of the Chicago Council on Mental Health Equity to observe the OEMC 8 hour training. The IMT awaits evidence of the comments that were provided; however, it is commendable that the City is inviting members of the Chicago Council on Mental Health Equity to observe all CIT-related trainings. This is important for expanding knowledge and gaining trust for ongoing productive engagement of the role/function of the Chicago Council on Mental Health Equity, as outlined in ¶¶128–32. The OEMC has not yet delivered the required Refresher Training, although plans exist to start delivery in the sixth reporting period. The IMT looks forward to observing the delivery of this training.

Currently, the OEMC conducts performance audits related to crisis intervention calls. This is a valid measurement of behavior and can inform future training needs.

In the fifth monitoring period, the City and the OEMC maintained Preliminary compliance with ¶147. To achieve Secondary compliance, the OEMC must ensure that the person responsible for conducting the evaluations is qualified to make revisions and has insight into current best practices. The OEMC must also require that recommendations from the Chicago Council on Mental Health Equity will be incorporated into the trainings, where appropriate. The IMT has yet to receive documentation indicating how Chicago Council on Mental Health Equity feedback was incorporated on the 8-hour training. The IMT looks forward to the same with the Refresher training. Training evaluation trends for both trainings will also be assessed.

The IMT acknowledges that the OEMC has made important strides in standardizing the audits, and we look forward to working with the OEMC as trends begin to emerge.

### Paragraph 147 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶148

> **148.** *OEMC will develop and implement its portion of the Crisis Intervention Plan.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

In the fifth monitoring period, the City and the OEMC maintained Preliminary compliance with ¶148.

To achieve Preliminary compliance with ¶148, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." Going forward, to achieve Secondary compliance, the OEMC will need to develop metrics that, when tracked, will adequately demonstrate the OEMC's success under ¶148. Further assessments levels will require an assessment of those developed metrics.

### Progress before the Fifth Reporting Period

During the fourth reporting period, the OEMC finalized its policy *Mental Health Training* that includes the requirement to develop and implement its portion of the *Crisis Intervention Plan* on an annual basis.

### Progress in the Fifth Reporting Period

During this monitoring period, the City did not produce the next iteration of the *Crisis Intervention Plan*, as required annually by ¶122. Therefore, the OEMC is unable to reach any further compliance level for ¶148.

While the IMT appreciates delaying these reports until they can be supported by a more robust strategy and reliable data, additional the City and the CPD should focus on accomplishing the necessary steps to produce these important reports.

In the fifth monitoring period, the City and the OEMC maintained Preliminary compliance with ¶148. Subsequent levels of compliance will depend on the OEMC demonstrating ongoing implementation of the goals as listed in the *Crisis Intervention Plan*.

## Paragraph 148 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶149

**149.** *OEMC supervisors, on an ongoing basis, will audit and provide feedback to calltakers and dispatchers regarding their ability to identify, dispatch, and respond appropriately to calls for service involving individuals in crisis.*

---

### Compliance Progress        (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City and the OEMC maintained Preliminary compliance with ¶149.

To achieve Preliminary compliance with ¶149, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." Going forward, to achieve Secondary compliance, the OEMC will need to develop metrics that, when tracked, will adequately demonstrate the OEMC's success under ¶149. Further assessments levels will require an assessment of those developed metrics

### *Progress before the Fifth Reporting Period*

During the fourth monitoring period, the OEMC finalized its *Crisis Intervention Program* policy, which includes the requirement to audit and provide feedback to call takers and dispatchers regarding their ability to identify, dispatch, and respond appropriately to calls for service involving individuals in crisis.

### *Progress in the Fifth Reporting Period*

The OEMC has taken important steps in standardizing its audit protocols and are requiring 10 calls involving a mental health component to be audited daily. As part of this, the OEMC provided the IMT with a revised version of its SOP, *Mental Health Event Audit*, to which the IMT gave a no objection on June 4, 2021.

Based on IMT recommendations, the OEMC made changes to assist with it being used as a training tool. For instance, we recommended the OEMC maintain consistency between the information reflected in the *Mental Health Event Audit* policy and its corresponding spreadsheets. This includes ensuring that all data elements

identified in the policy are captured in the respective spreadsheet. Similarly, the IMT recommended that all spreadsheet columns match those identified in the *Mental Health Event Audit* policy. Last, we suggested that the OEMC merge data sets that are repeated across the spreadsheets, as doing so could avoid confusion.

In the fifth monitoring period, the City and the OEMC maintained Preliminary compliance with ¶149.

The OEMC should be commended for making these changes, and we believe it will provide sufficient guidance to act as a training tool for supervisors, thereby satisfying criteria for Secondary compliance. Subsequent levels of compliance will depend on IMT reviewing OEMC's audit results and the underlying cases as well as trend analysis.

### Paragraph 149 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶150

*150. The Parties acknowledge that OEMC currently meets regularly with CPD and the City-wide Mental Health Steering Committee. OEMC will continue to meet regularly with CPD, in addition to appropriate members of the Advisory Committee, including service providers and advocates, to review and assess data and information regarding the identification of, the dispatch of, and response to calls for service involving individuals in crisis by OEMC telecommunicators.*

---

**Compliance Progress**          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**       *Not in Compliance*
**Full:**            *Not in Compliance*

In the fifth monitoring period, the City and the OEMC maintained Preliminary compliance with ¶150.

To achieve Preliminary compliance with ¶150, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." Going forward, to achieve Secondary compliance, the OEMC will need to develop metrics that, when tracked, will adequately demonstrate the OEMC's success under ¶150. Further assessments levels will require an assessment of those developed metrics

### Progress before the Fifth Reporting Period

During the previous reporting period, the IMT recommended that the OEMC have a more robust involvement with the Chicago Council on Mental Health Equity. In response, the OEMC assigned a dedicated staff representative to participate in Chicago Council on Mental Health Equity meetings.

### Progress in the Fifth Reporting Period

During this reporting period, the OEMC met quarterly with the CPD and the Chicago Council on Mental Health Equity. The OEMC's regular meetings with the CPD focus on evaluating data to ensure unity in the overall crisis-response system. However, improved collaboration is necessary. Both the Chicago Council on Mental

Health Equity and the IMT have shared concerns with siloed systems, evidenced most recently in the CPD's written response to the Chicago Council on Mental Health Equity's request for more information on the CPD's policy relating to the Alternative Response Pilot (CARE). In its written response, the CPD defaults responsibility to the City saying they do not have control over what the City does. While there is some truth to this, the CPD has a significant role, in collaboration with the City to achieve success with the CIT program and new alternative response pilot.

The IMT strongly encourages a robust data presentation to the full Chicago Council on Mental Health Equity committee in the next reporting period.

The OEMC has had substantial leadership staffing changes, and reliability of having the same person engaged in the Chicago Council on Mental Health Equity as the primary point person is cause for concern. However, the OEMC recently hired and onboarded the new identified person, and it is hopeful that this will begin to develop consistency in this necessary relationship building.

Members of the Chicago Council on Mental Health Equity were also invited this monitoring period to attend the OEMC's eight-hour training. The IMT looks forward to receiving the Chicago Council on Mental Health Equity feedback from the OEMC. In addition, the OEMC plans to begin its annual policy review process in the next reporting period. The IMT will assess advanced notice of the process, along with consideration of the Chicago Council on Mental Health Equity's concerns during previous CPD and OEMC policy review. A corresponding feedback loop back to the Chicago Council on Mental Health Equity will be considered, along with its public comment period. Since there were substantially-new policies developed last year, the IMT will consider how operational practice under these new policies is proceeding, and what changes may need to be made during this next round of policy revisions.

In the fifth monitoring period, the City and the OEMC maintained Preliminary compliance with ¶150. Subsequent levels of compliance will depend on the OEMC continuing their regular meetings with the CPD and bridging siloed systems; having more active engagement with the Chicago Council on Mental Health Equity; observing the annual policy, training, and data review and feedback process with the Chicago Council on Mental Health Equity, as required in ¶150; and providing evidence to the IMT that the meetings contribute to the City's overall crisis response approach. The IMT highly encourages a robust data presentation to the full Chicago Council on Mental Health Equity committee in the next reporting period.

## Paragraph 150 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶151

**151.** *Within 180 days of the Effective Date, and annually thereafter, OEMC will review and revise its intake and dispatch policies and protocols as necessary to meet the requirements of this Agreement. OEMC will consider any recommendations or feedback provided by the Advisory Committee when revising its policies.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Annually      ☐ **Met**   ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City and the OEMC maintained Preliminary compliance with ¶151.

To achieve Preliminary compliance with ¶151, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

### Progress before the Fifth Reporting Period

During the fourth reporting period, the OEMC finalized its directive, *Mental Health Training*. While this directive memorialized the requirements that the OEMC is to review the training on an annual basis and incorporate recommendations from the Chicago Council on Mental Health Equity, this SOP fell short of fully incorporating ¶151's requirements, which focus on intake and dispatch policies and protocols. The IMT recommended that the OEMC include the exact requirements of ¶151 into the directive.

### Progress in the Fifth Reporting Period

During this monitoring period, the City and the OEMC invited members of the Chicago Council on Mental Health Equity to observe the OEMC crisis intervention training. The IMT awaits evidence of the Chicago Council on Mental Health Equity's comments that were provided to the OEMC; however, it is commendable that the

City is inviting members of the Chicago Council on Mental Health Equity to observe all CIT-related trainings, as this helps members of the CCMHE understand what is being taught, and how policy informs protocol and training as required under 151.

In the fifth monitoring period, the City and the OEMC maintained Preliminary compliance with ¶151. The OEMC plans to begin its required annual policy and protocol review process in the next reporting period. During the annual revision process this upcoming reporting period, the exact language of the consent decree must be incorporated into the revised policy, as the SOP used for Preliminary compliance fell short of fully incorporating the requirements of ¶151, which focuses on intake and dispatch policies and protocols.

Subsequent levels of compliance for this paragraph will assess advanced notice of the review and revision process, along with consideration of the Chicago Council on Mental Health Equity's concerns during previous CPD and OEMC policy review. A corresponding feedback loop back to the Chicago Council on Mental Health Equity on policy and protocol recommendations will be considered, along with its public comment period. Since there were substantially new policies and protocols developed last year, the IMT will consider how operational practice under these new policies is proceeding, and what changes may need to be made during this next round of policy revisions based on that. The OEMC to date has had minimal leadership involvement in the CCMHE. The IMT has recommended to the OEMC that a quarterly CCMHE meeting be designated for the OEMC to educate the CCMHE on their policies and protocols, as well as what they are seeing in trend analysis. This foundational information will go a long way toward helping CCMHE members understand the role and function of the policies and protocols for identifying calls involving a mental health component and dispatch of CIT officers and/or alternate crisis response.

### Paragraph 151 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Crisis Intervention: ¶152

*152. OEMC will ensure that the language used in policies, procedures, forms, databases, trainings, and by tele-communicators to communicate about calls involving individuals in crisis is appropriate, respectful, and consistent with industry-recognized terminology. OEMC will seek input from the Advisory Committee for recommendations to identify appropriate and respectful terminology.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City and the OEMC maintained Preliminary and Secondary compliance with ¶152.

To achieve Preliminary compliance with ¶152, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶152 by reviewing training development, implementation, and evaluation in accordance with ¶286 of the Consent Decree, which incorporates the following evaluation criteria: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

*Progress in the Fifth Reporting Period*

During the fourth reporting period, the OEMC finalized its directive, *Mental Health Training*, which clearly states the requirements of ¶152. The OEMC has made a concerted effort to ensure that language used in the policies, procedures, forms, databases, trainings, and by telecommunicators to communicate about calls involving individuals in crisis is appropriate, respectful, and consistent with industry-recognized terminology. Additionally, we have observed members of the OEMC using respectful language and this has been reinforced in trainings we have observed. Therefore, the OEMC has met Preliminary and Secondary compliance with this paragraph.

*Progress in the Fifth Reporting Period*

During this monitoring period, the IMT observed members of the OEMC, during their eight hour training, using respectful language involving individuals in crisis. The OEMC has made a concerted effort to ensure that language used in the policies, procedures, forms, databases, trainings, and by telecommunicators is appropriate, respectful, and consistent with industry-recognized terminology.

Currently, the event code used by the OEMC, but originating through the CPD does not reflect best practices (e.g., DISTME). The phrase "disturbance mental" is utilized and will need to be updated. This will need to be addressed for future compliance. With the onboarding of a new Computer Aided Dispatch (CAD) system in 2023, the OEMC and the CPD will be encouraged to consider alternate event code(s) for mental health related calls for service. The OEMC and the CPD should consider what event code change they would recommend utilizing best practice language.

In the fifth monitoring period, the City and the OEMC maintained both Preliminary and Secondary compliance with ¶152. For Full compliance, the IMT anticipates that results from the OEMC's audits will help to ensure that industry-recognized language is used and updated when appropriate.

### Paragraph 152 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Appendix 4
# Use of Force
# Compliance Assessments, by Paragraph

# Appendix 4
# Use of Force
# Compliance Assessments, by Paragraph

| | | | |
|---|---|---|---|
| ¶153 | ¶177 | ¶201 | ¶225 |
| ¶154 | ¶178 | ¶202 | ¶226 |
| ¶156 | ¶179 | ¶203 | ¶227 |
| ¶157 | ¶181 | ¶204 | ¶228 |
| ¶158 | ¶182 | ¶205 | ¶229 |
| ¶159 | ¶183 | ¶206 | ¶230 |
| ¶160 | ¶184 | ¶207 | ¶231 |
| ¶161 | ¶185 | ¶208 | ¶232 |
| ¶162 | ¶186 | ¶209 | ¶233 |
| ¶163 | ¶187 | ¶210 | ¶234 |
| ¶164 | ¶188 | ¶211 | ¶235 |
| ¶165 | ¶189 | ¶212 | ¶236 |
| ¶166 | ¶190 | ¶213 | ¶237 |
| ¶167 | ¶191 | ¶214 | ¶238 |
| ¶168 | ¶192 | ¶215 | ¶239 |
| ¶169 | ¶193 | ¶216 | ¶240 |
| ¶170 | ¶194 | ¶218 | ¶241 |
| ¶171 | ¶195 | ¶219 | ¶243 |
| ¶172 | ¶196 | ¶220 | ¶244 |
| ¶173 | ¶197 | ¶221 | ¶245 |
| ¶174 | ¶198 | ¶222 | ¶246 |
| ¶175 | ¶199 | ¶223 | ¶247 |
| ¶176 | ¶200 | ¶224 | ¶248 |

# Use of Force: ¶153

*153. CPD's use of force policies, as well as its training, supervision, and accountability systems, must ensure that: CPD officers use force in accordance with federal law, state law, and the requirements of this Agreement; CPD officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; when using force, CPD officers only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and any use of unreasonable or unnecessary force is promptly identified and responded to appropriately.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**      *Not in Compliance*
**Full:**          *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶153.

To assess Preliminary compliance with ¶153, the IMT reviewed the CPD's Use of Force policies to ensure they are in accordance with law and the Consent Decree and address use of de-escalation appropriately. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶153, the IMT is reviewing the CPD's use of force training materials and records for completion of training as it relates to the requirements of the Consent Decree.

To assess Full compliance with ¶153, the IMT is assessing application of Use of Force policies by department personnel, to include supervisors, and accountability measures. For this assessment, the IMT is reviewing supervision at a district level, by the Force Review Division (FRD), CPD command staff, and COPA to determine if supervision and accountability systems are effective.

In the last reporting period, the CPD achieved Preliminary compliance through its updated *De-escalation, Response to Resistance, and Use of Force* policy suite (effective April 15, 2021) and its community engagement efforts related to ¶153's requirements. We reviewed the CPD's plan to continue to engage and receive feedback on its Use of Force policies and noted our plans to continue to monitor these efforts in future monitoring periods. The IMT also began reviewing Secondary and Full compliance for ¶153 in the fourth reporting period. For training, the

CPD shared its annual *De-Escalation, Response to Resistance, and Use of Force* curriculum. The IMT provided recommendations to the CPD to further refined the materials to ensure students are engaged and learning the communication skills necessary to impartial policing, to improve training evaluation and assessment tools, and to extend the length of the training to maintain high-quality delivery and execution and to ensure that participants' communication skills have been enhanced. Furthermore, in reviewing Secondary compliance, the IMT noted that the CPD needs to pay attention to its Use of Force supervision and accountability requirements and systems. In particular, as noted in the prior reporting period, the City needs to appropriately support the work of the FRD, as well as make clear to all officers that Use of Force requirements of the Consent Decree are the responsibility of every CPD officer. The FRD was in the process of developing a dashboard for all district and supervisory personnel to see data and information about deficiencies in Use of Force policy compliance via the review of tactical response reports (TRRs).

In the fifth reporting period, to continue to assess Secondary and Full compliance with ¶153, the IMT reviewed FRD's quarterly reports, CPD's Use of Force Dashboard, and COPA's allegations and findings on excessive force. We also monitored the CPD's progress with the FRD dashboard for supervisors and its efforts to launch the dashboard (*e.g.*, train supervisors on its utility and provide guidance or policies on expectations for its use).

For Full compliance, the CPD is making progress towards ensuring officers use force in accordance with law and the requirements of the Consent Decree. The IMT observed in this reporting period that the CPD's continued focus on de-escalation, particularly in TRRs, has resulted in fewer de-briefing points by the FRD. Additionally, Use of Force incidents reported in TRRs decreased, with a 38.75 percent reduction in 2021 compared to 2020. COPA reported that there were 124 pending excessive force investigations as of December 22, 2021 and year-to-date concluding findings on excessive force to be as follows:

- 73 Exonerated

- 35 Unfounded

- 75 Not Sustained

- 59 Sustained

As noted in previous reporting periods by the IMT, it is critically important for front line supervisors to play a greater role in addressing deficiencies when reviewing TRRs. Accountability and Supervision for use of force incidents will benefit from the proposed Supervisory Dashboard that the FRD is currently developing. It is expected to provide data directly to front line supervisors regarding use of force for

their subordinates. As important as the dashboard, will be the training and expectations that the CPD establishes for the dashboards.

In conclusion, the CPD remains in Preliminary compliance for ¶153. The CPD's focus and work on de-escalation is noteworthy. The observed reduction in TRRs may be related to increased de-escalation focus combined with fewer arrests. Moving forward, the CPD's 2022 In-service Supervisory Refresher Training and focus on accountability and supervision, combined with the Supervisory Dashboard, presents an opportunity for the CPD to set its supervisory and accountability expectations and achieve Secondary compliance in the next reporting period. The IMT will continue to monitor these efforts in the next reporting period, including monitoring the CPD's efforts to continue to document the actions taken to correct officers' actions.

### Paragraph 153 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶154

*154. CPD adopted revised use of force policies on October 16, 2017 ("October 2017 Policies"). The October 2017 Policies incorporated multiple best practices that were not reflected in CPD's prior use of force policies. Building on these improvements, CPD will maintain the best practices reflected in the October 2017 Policies and make additional improvements to its policies consistent with the terms of this Agreement.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶154.

To assess Preliminary compliance with ¶154, the IMT reviewed the CPD's Use of Force policies and Foot Pursuit policy to ensure they reflect best practices and delineate who is responsible for identifying best practices, and for maintaining Advanced Law Enforcement Accreditation from the Commission on Accreditation for Law Enforcement Agencies (CALEA) standards. Foot pursuits account for a significant portion of use of force incidents and, thus, relates to ¶154. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies and Foot Pursuit policy.

To assess Secondary compliance with ¶154, the IMT is reviewing the CPD's Use of Force and Foot Pursuit training materials and records for updates related to improvements to maintain best practices and completion of training as it relates to the requirements of the Consent Decree.

To assess Full compliance with ¶154, the IMT is assessing ongoing efforts by the CPD to identify best practices (including person responsible and internal processes to adhere to best practices, and to make necessary updates per CALEA certification requirements).

In the last reporting period, the CPD achieved both Preliminary and Second compliance. The CPD engaged the IMT, OAG, and the community (including the Use of Force Working Group) on its Use of Force policies during the fourth reporting period and since the Consent Decree took effect. These discussions revolved around incorporating best practices for Use of Force into policy enhancements. The CPD issued its most recent Use of Force policies on December 31, 2020, which became effective April 15, 2021. In addition, the CPD had attained and maintained CALEA

accreditation, indicating compliance with national policy standards, including for use of force. Finally, the CPD had issued a temporary foot pursuit policy on May 26, 2021.

To evaluate Secondary compliance, in the last reporting period IMT reviewed CPD's 2020 Use of Force training sources and completion. The training meets the requirements of this paragraph, and 96% of CPD officers had completed the training.

In this reporting period, the CPD has made notable progress with community input on policies relevant to ¶154, particularly for foot pursuits, First Amendment Rights, and use of force. With some amendments to these policies the CPD is better positioned to attain Full compliance for continuous evaluation and improvements to the Use of Force policies to align with national best practices and the Consent Decree. However, negotiations remain with the Coalition for some use-of-force policies, and at the end of the fifth reporting period, the CPD had not issued final foot pursuit and First Amendment Rights policies.

Moving forward, we will regularly review Preliminary compliance and discuss the Use of Force policies with the CPD to ensure the CPD maintains best practices and makes additional policy improvements consistent with the Consent Decree, including required community engagement. We will also continue to review Secondary compliance yearly, requiring the CPD to meet the aforementioned criteria for ¶154.

### Paragraph 154 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Use of Force: ¶156

*156. CPD's use of force policies and training, supervision, and accountability systems will be designed, implemented, and maintained so that CPD members: a. act at all times in a manner consistent with the sanctity of human life; b. act at all times with a high degree of ethics, professionalism, and respect for the public; c. use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; d. use sound tactics to eliminate the need to use force or reduce the amount of force that is needed; e. only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; f. only use force for a lawful purpose and not to punish or retaliate; g. continually assess the situation and modify the use of force as circumstances change and in ways that are consistent with officer safety, including stopping the use of force when it is no longer necessary; h. truthfully and completely report all reportable instances of force used; i. promptly report any use of force that is excessive or otherwise in violation of policy; j. are held accountable, consistent with complaint and disciplinary policies, for use of force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances, or that otherwise violates law or policy; and k. act in a manner that promotes trust between CPD and the communities it serves.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD remained under assessment for Preliminary Compliance with ¶156.

To assess Preliminary compliance with ¶156, the IMT reviewed the CPD's Use of Force policies to ensure policies and systems meet the requirements of this paragraph. Paragraph 156 addresses many sections of the Consent Decree, including short- and long-term efforts. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies and Foot Pursuit policy.

In the last reporting period, the CPD remained under assessment with ¶156. While the City and the CPD had made significant compliance efforts with Use of Force policies and training since the start of the Consent Decree, related policies—including those related to training, supervision, and accountability systems—remained works in progress. During the prior reporting period the CPD continued

dialogue with the Use of Force Working Group on the requirements of ¶156 and as a result noted that it planned to make further revisions to the April 15, 2021 version of G03-02 *De-escalation, Response to Resistance, and Use of Force* policy to continue its commitment to dignified respectful treatment. These changes were anticipated to be effective in early 2022. Regarding training, the CPD's Use of Force training for recruits and in-service officers reflected the requirements of ¶156 and mandates of the State of Illinois. However, the IMT expressed the need for the CPD to pay additional attention to its Use of Force supervision and accountability requirements and systems. The CPD was creating a dashboard for supervisors to aid in these efforts, which the IMT viewed as critical for Secondary compliance for ¶156.

In this reporting period, the IMT continued to monitor Preliminary compliance with ¶156, specifically the CPD's finalization of the updated Use of Force policies following community engagement and input in 2021. Over the past reporting period, the CPD engaged the community in discussions on multiple policies, including Tasers, OC Spray, foot pursuits, and First Amendment Rights. While these policies have yet to be finalized, the IMT believes the CPD's engagement this reporting period was thoughtful and resulted in the CPD adjusting these policies. Some of the community requests for these policies go beyond what the Consent Decree requires. The CPD continues, however, to need to make additional progress related to ¶156(j).

Related to Secondary compliance and training for ¶156, the first and second FRD quarterly reports in 2021 showed a significant number of debriefing points for de-escalation, highlighting the continued need for and emphasis on de-escalation in-service training. Further, the IMT needs to review scenarios for qualifications of lethal and non-lethal force.

Critical to Secondary compliance with ¶156 is for the CPD to pay additional attention to its Use of Force supervision and accountability requirements and systems. In particular, the IMT has stressed the importance of accountability systems for front line supervisors who are viewing TRRs and body-worn camera footage but failing to identify and document failures to comply with policies, despite viewing the same footage as the FRD. For the aforementioned debriefing points that FRD identified in the first half of 2021, there is a lack of initial review occurring by front line supervisors for these identified issues, where no action is being taken. Further, the FRD Third Quarter report states, "The FRD identified 30 instances during the second quarter in which field supervisors identified and addressed at least one deficiency or training opportunity prior to the TRR being flagged by the FRD. This calculates to a rate of 5.9% of reviewed TRRs. This is up 3.1 percentage points from previous quarter." Supervisors and the FRD are looking at the same materials and there are dramatic differences between action taken by street supervisors compared to FRD. This accountability issue must be addressed.

To address these concerns raised by the IMT, the CPD continued to promote its forthcoming Supervisory Dashboard during this reporting period. The CPD has expressed that the dashboard will provide front line supervisors with important data concerning use of force for their subordinates. For example, during a biweekly meeting with the CPD and the OAG on December 2, 2021, the Deputy Chief indicated their intention for front line supervisors to identify deficiencies and training needs as they occur. This is something the Deputy Chief currently teaches to newly promoted lieutenants. The CPD acknowledged that Sergeants and Lieutenants who consistently miss deficiencies that are subsequently pointed out by the FRD will be held accountable. CPD leadership expressed its intent to push accountability down throughout the organization and much depends on their Supervisory dashboard. As of the conclusion of 2021, the CPD had yet to complete the dashboard for supervisors to aid in these efforts.

In conclusion, the City and the CPD remain under assessment for Preliminary compliance with ¶156. The IMT will continue to monitor progress with updates to the CPD Use of Force policies and Foot Pursuit policy, and attention to Use of Force supervision and accountability requirements and systems.

## Paragraph 153 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Under Assessment | |

# Use of Force: ¶157

> *157.* CPD will collect and analyze information on the use of force by CPD members, including whether and to what extent CPD members use de-escalation techniques in connection with use of force incidents. CPD will use this information to assess whether its policies, training, tactics, and practices meet the goals of this Agreement, reflect best practices, and prevent or reduce the need to use force.

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶157.

To assess Preliminary compliance with ¶157, the IMT reviewed the CPD's Use of Force policies and revisions to the TRR, TRR-R, and TRR-I forms to see if they are designed to capture de-escalation and other data in an extractable format.

To assess Secondary compliance with ¶157, the IMT is reviewing the CPD's Use of Force training materials and records, focusing on training specific to de-escalation/force mitigation techniques, and related to reporting use of these techniques in TRRs.

In the last reporting period, the CPD achieved Preliminary compliance with ¶157. To assess Preliminary compliance, we reviewed data collected by the CPD, and specifically, the FRD. The CPD created a Use of Force Dashboard that allows for public accessibility of information contained on TRRs. The FRD updated the TRR and the TRR-R to allow for tracking and identifying officers' use of de-escalation tactics, as well as produced guides that provide guidance for officers about how to document de-escalation appropriately. It also proposed creating a Supervisory dashboard to improve data sharing regarding use of force directly to supervisors.

In this reporting period, the IMT has reviewed all FRD quarterly and annual reports shared by the CPD. The IMT commends the FRD for its continued focus on de-escalation reporting. For each TRR review, the FRD examines the thoroughness of TRR narratives for details on de-escalation actions by the CPD officer and identifies debriefing points for corrective action or trends and issues. For identified trends related to de-escalation reporting, the FRD has made recommendations each year to the CPD's Training Oversight Committee and those recommendations have been approved and implemented. In addition, the FRD continues to improve the TRR-R forms to make sure it is addressing all aspects of use of force, including de-

escalation. As a result of these efforts, the FRD has seen a decrease in debriefing points for incomplete TRR narratives regarding de-escalation actions by an officer throughout 2021.

Use of Force Appendix Figure 1:
Number of De-briefing Points Where De-Escalation Was Not Properly Articulated in a TRR Narrative, 2021 Force Review Division Data

| CPD Force Review Division's 2021 Quarterly Reports | | |
|---|---|---|
| Quarter 1 Report (Jan. 1, 2021 – Mar. 31, 2021) | Quarter 2 Report (Apr. 1, 2021 – Jun. 30, 2021) | Quarter 3 Report (July 1, 2021 – Sep. 30, 2021) |
| 334 | 157 | 106 |

While the number of de-briefing points has decreased, it is important to note this still remains one of the top TRR reporting issues. Thus, the CPD must continue the focus with front line supervisors taking the lead on enforcing de-escalation actions and reporting, in order to meet Secondary compliance.

In sum, the IMT finds the City and the CPD continues to make notable progress towards Secondary compliance by continuing to emphasize de-escalation. It will take time to engrain the need for articulation and capturing of de-escalation in reporting. The more data that the CPD captures, the greater its need and capacity for sophisticated analyses (*e.g.*, what are the strategies that work best which may be underutilized). The IMT believes it is critical that data collected inform the training that takes place on the street. Moving forward, the IMT looks to assess Secondary and Full compliance with ¶157.

## Paragraph 157 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶158

*158. CPD's use of force policies must comply with applicable law and this Agreement, reflect the objectives described above, and promote trust between CPD and the communities that it serves.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**      *Not in Compliance*
**Full:**           *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶158.

To assess Preliminary compliance with ¶158, the IMT reviewed the CPD's Use of Force policies, related to community engagement, and plans and efforts by the CPD to address suggestions from the community.

To assess Secondary compliance with ¶158, the IMT is reviewing the CPD's Use of Force training materials and records, focusing on whether training complies with applicable law and the Consent Decree, promotes use of force behavior that promotes trust with the community, and how training reflects input/changes from community feedback.

In the last reporting period, the CPD achieved Preliminary compliance with ¶158 through continued discussions surrounding its Use of Force policies with the IMT and OAG to ensure the policies comply with applicable law and the Consent Decree. The CPD had adopted recommendations from the IMT and the OAG that reflect the objectives of the Consent Decree. The CPD has also sought community input on its Use of Force policies through open community meetings, online community input prior to the issuing of revised Use of Force policies, and a Use of Force Working Group. Engagement included continuous dialogue with the working group through the end of the fourth reporting period and resulted in changes to Use of Force policies. At the conclusion of the period, the IMT believed that while CPD's community engagement efforts had improved since when the Consent Decree became effective, it continued to be an area it struggles with and needs more attention.

In this reporting period, the IMT monitored continued Preliminary compliance with ¶158, paying particular attention to the CPD's efforts to build trust by thoughtfully engaging the community in the Use of Force policies, Foot Pursuit policy, and First Amendment Rights policy. The CPD engaged in numerous dialogues with the Coalition on these policies, as well as solicited input from commu-

nity members through webinars, deliberative dialogues, and online. The IMT observed these engagements and reviewed reactions by the community CPD's engagement effort. There remains a distrust of the CPD's engagement efforts, where the community expressed, they feel the CPD is merely lecturing on policy changes, rather than engaging in dialogue to seek input. On December 31, 2021, the CPD shared General Order G01-03-01, *Community Engagement in Policy Development* with the IMT for review. The CPD has also established a process for conducting community engagement, which establishes level of engagement based on the interest of the community. Through these efforts the CPD has maintained Preliminary compliance with ¶158.

In this reporting period, the IMT also assessed Secondary compliance with ¶158 by reviewing the CPD's *2021 De-Escalation, Response to Resistance, and Use of Force In-Service Training.*[1]

Moving forward, the IMT will continue to monitor the CPD's efforts to build trust with community it serves regarding its Use of Force policies. The IMT believes that establishing a process for community engagement is equally important as CPD having a process for follow-up with community input. Additionally, in the next reporting period, the IMT continue to review Secondary and Full compliance with ¶158 to include reviewing examples of the new policy in practice.

### Paragraph 158 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

---

[1] In its comments on our assessment of this paragraph, the City asked us to consider indicating that Secondary Compliance is "under assessment" based on the approval and administration of the CPD's 2021 Use of Force in-service training, pending proof of CPD attendance. *See* Attachment B. However, the requirements of ¶158 are not limited to the CPD's annual Use of Force in-service training. Moreover, at the end of the reporting period, the CPD is still developing revisions to key policies, including those related to First Amendment Rights, Tasers, Batons, and OC Spray).

# Use of Force: ¶159

**159.** *CPD will conduct an annual review of its use of force policies consistent with accreditation requirements of the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). In addition, every two years, CPD will conduct a comprehensive review of its use of force policies to assess whether CPD's use of force policies meet the requirements of this Agreement, incorporate best practices, address observed trends and practices, as necessary, and reflect developments in applicable law.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| **Recurring Schedule:** | Annual | ☐ **Met** | ☑ **Missed** |
|---|---|---|---|
| | Every Two Years | ☐ **Met** | ☑ **Missed** |

| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
|---|---|
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶159.

To assess Preliminary compliance with ¶159, the IMT reviewed the CPD's policies and standard operating procedures (SOPs) related to completion of CALEA accreditation. We also reviewed the data sources/elements that are to be assessed during the comprehensive Use of Force policy review.

To assess Secondary compliance with ¶159, the IMT is reviewing the CALEA and CPD reports and training sources to assess whether training requirements are detailed, with attention to de-escalation efforts and the CPD's training adjustments based on findings of use of force patterns and reviews. We will also review the forthcoming comprehensive review upon its completion by the CPD.

In the last reporting period, the CPD achieved Preliminary compliance with ¶159 through its annual review for maintaining its Advanced Law Enforcement Accreditation through the CALEA. During the fourth reporting period, we also continued assessing Secondary compliance. The IMT and OAG discussed and reviewed CPD's plans for its annual Use of Force report, which is intended to fulfill the biannual comprehensive review and CALEA compliance requirements of ¶159 moving forward. In this reporting period, the IMT continued assessing Secondary compliance to determine whether training requirements related to ¶159 are detailed, with attention to de-escalation and adjustments in training based on the findings of CPD's biannual comprehensive review of its Use of Force policies. The Consent Decree has been in effect for more than two years, and the CPD has yet to complete

a comprehensive review of its use-of-force policies to assess whether they meet the requirements of the Consent Decree, incorporate best practices, address observed trends and practices, as necessary, and reflect developments in applicable law. This review will be separate from the annual FRD report and contain greater detail as we described in IMR-4. As of the conclusion of this monitoring period, the CPD has informed the IMT that its Research and Development Unit continue to work on this review. In addition, the CPD needs to clearly demonstrate its compliance with CALEA standards annually. In conclusion, the City and CPD maintained Preliminary compliance with ¶159 this reporting period and is under assessment for Secondary compliance as it is developing its first annual comprehensive Use of Force review.

## Paragraph 159 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶160

**160.** *CPD will establish and maintain clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies. CPD will regularly review the input received, including during the biennial review process.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD made progress toward Preliminary compliance but is under assessment for the requirements of ¶160.

To evaluate Preliminary compliance, we are reviewing the CPD's community engagement efforts related to its Use of Force policies, including its new foot pursuit policy. In assessing community engagement, we examine (1) outreach; (2) meetings and interactions and problem-solving and decision making; (3) follow-up and sustainability of partnerships, trust, community policing, and problem-solving activities; and (4) general police-community interactions regardless of context.

In the prior reporting period and since the Consent Decree took effect, the CPD was in continuous discussion with the IMT, the OAG, and the community (including the Use of Force Working Group) on its Use of Force policies. As we detailed in our prior two reports, the CPD began consulting with the Use of Force Working Group in June 2020 and while the IMT thought the CPD's community engagement efforts with the Use of Force Working Group in 2020 were inadequate, the processes and engagement improved somewhat during the last reporting period as the CPD continued its discussions with the Working Group in the first half of 2021. There were to be some substantive changes as a result of discussions between the CPD and Working Group, but those changes have not yet been reflected in policy and training.

Additionally, during the last reporting period, the City and the CPD enacted an interim Foot Pursuit policy in May 2021. The current interim policy did not include initial feedback from the community. However, following issuance of the interim policy, the CPD began seeking community feedback on the draft policy via public comment via the CPD website, public input form via the CPD website that captured anonymous feedback to questions around the foot pursuit policy, two virtual community webinars, and a series of deliberative dialogues.

In this monitoring period, the IMT observed and reviewed CPD's expanded community engagement efforts in our review of Preliminary compliance with ¶160. We observed several community engagement activities for policy development related to the Foot Pursuit policy to include webinars, additional deliberative dialogues, and review of online community input. The IMT also observed discussions with the Coalition concerning the *First Amendment Rights* policy. Relatedly, the IMT is aware that the CPD is moving forward with its pilot of a community contact survey (My90); the IMT offered extensive feedback on this concept throughout the monitoring period and participated in discussions with the vendor.

During this period, on December 31, 2021, the IMT and OAG received General Order G01-03-01, *Community Engagement in Policy Development*, for review. This policy establishes a process for how and when the CPD engages the community in policy development and further provides a point system for the level of engagement. Specifically, the policy establishes eight ways the CPD intends to engage the community and four methods of how they intend to follow-up with the community. The IMT believes this policy is a major step forward with establishing a process for community engagement.

In conclusion, the City and CPD remain under Preliminary assessment with ¶160. The IMT applauds the CPD's policy on community engagement in policy development, but withholds Preliminary compliance awaiting community feedback on policies related to Use of Force.

## Paragraph 160 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Under Assessment | |

# Use of Force: ¶161

*161. CPD recently adopted de-escalation as a core principle. CPD officers must use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible. CPD officers are required to de-escalate potential and ongoing use of force incidents whenever safe and feasible through the use of techniques that may include, but are not limited to, the following: a. using time as a tactic by slowing down the pace of an incident; b. employing tactical positioning and re-positioning to isolate and contain a subject, to create distance between an officer and a potential threat, or to utilize barriers or cover; c. continual communication, including exercising persuasion and advice, and providing a warning prior to the use of force; d. requesting assistance from other officers, mental health personnel, or specialized units, as necessary and appropriate; and e. where appropriate, use trauma-informed communication techniques, including acknowledging confusion or mistrust, or using a respectful tone.*

## Compliance Progress                 (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**    *In Compliance (FOURTH REPORTING PERIOD)*
**Secondary:**      *Under Assessment*
**Full:**           *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶161 and remains under assessment for Secondary compliance.

To assess Preliminary compliance with ¶161, the IMT reviewed the CPD's Use of Force policies and TRR forms to ensure they address de-escalation requirements and reporting. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶161, the IMT is reviewing CPD training materials and records, specific to de-escalation/force mitigation techniques, related to reporting use of these techniques in TRRS, and revisions/updates in policy.

To assess Full compliance with ¶161, the IMT is reviewing FRD reports, TRRs, video footage, and CPD dashboards, as well as conducting interviews with CPD personnel, to determine whether the CPD has sufficiently implemented its policy and training related to de-escalation. The IMT is examining data and information on trends and patterns in de-escalation, and subsequent corrective actions taken by the CPD.

In the prior reporting period, the IMT continued to review the CPD's Use of Force policies and community engagement efforts related to ¶161's requirements. The CPD engaged with the Use of Force Working Group on de-escalation, which resulted in policy changes. The CPD also revised its TRR and TRR-Review (TRR-R) forms to gather more information on de-escalation. Through these efforts the CPD reached Preliminary compliance with ¶161. However, in the fourth reporting period, IMT stressed the importance of thoughtful and active engagement with the community. As a result, the CPD shared with the IMT that it would be making additional changes to the April 15, 2021 G03-02 *De-escalation, Response to Resistance, and Use of Force* policy based on community input, to reaffirm the affirmative duty to de-escalate.

For Secondary compliance, in prior reporting periods we reviewed and determined that the 2020 annual Use of Force in-service and 2021 supervisory in-service training include information on force mitigation principles and de-escalation principles, with an emphasis on documenting these actions in the TRR forms. As of March 4, 2021, 96% of CPD officers had completed this training. The supervisory training had yet to occur. In IMR-4, the IMT noted the most significant de-briefing point the FRD continued to identify was a failure to document de-escalation in the narrative of the TRR, re-enforcing the importance of annual Use of Force in-service training on these policy requirements. We also reminded the CPD of feedback provided on the revised draft training materials in May 2021: specifically, the training could be further refined to ensure students are engaged and learning the communication skills necessary to de-escalation and impartial policing.

In this reporting period, the IMT continued to monitor Secondary compliance with ¶161, specifically for training to supervisors regarding their responsibilities for de-escalation review and reporting. In 2021, the CPD continued to provide training related to de-escalation to meet the requirements of ¶161 in its *2021 De-Escalation, Response to Resistance, and Use of Force In-Service Training.* This training continues to emphasize de-escalation in both reporting and scenarios. Due to the COVID-19 pandemic the CPD received an extension to complete this training by March 2022. However, the CPD had yet to complete delivery of the 2022 supervisory in-service training (previously planned as the 2021 supervisory in-service training) to emphasize to supervisors the concept of de-escalation and the importance of providing detailed explanations of force mitigation efforts in documentation.

The IMT has regularly monitored de-escalation in action for the CPD to support its assessment of Full compliance with ¶161, examining how updated policies and training in this paragraph are impacting the actions of Department members. Specifically, we have reviewed reports produced by the FRD in 2020 and 2021. The FRD has placed a major emphasis on de-escalation, requiring every de-escalation check box to have a corresponding explanation in the narrative. During our virtual

site visit with the CPD on November 9, 2021, Lt. Stack of the FRD stated that TRRs are improving both anecdotally and numerically because of the CPD's focus on de-escalation reporting.

In conclusion, the CPD and City remain under assessment for Preliminary and Secondary compliance with ¶161. The IMT continues to await CPD's completion of the Supervisory dashboard which will allow supervisors to examine their subordinates' use of force. The data hopefully will assist members and supervisors in addressing shortcomings, including with respect to de-escalation.

### Paragraph 161 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶162

*162. Consistent with CPD's commitment to preventing and reducing the need for force, CPD officers will allow individuals to voluntarily comply with lawful orders whenever safe and feasible (e.g., allowing individuals the opportunity to submit to arrest before force is used).*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *Under Assessment*
**Full:** *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶162.

To assess Preliminary compliance with ¶162, the IMT reviewed the CPD's Use of Force policies and community engagement efforts related to Consent Decree requirements.

To assess Secondary compliance with ¶162, the IMT is reviewing training sources and records to determine whether the CPD has sufficiently trained on its Use of Force and First Amendment Rights policies, to include prior and current training related to handling protests and civil unrest.

In prior monitoring reports, the IMT reviewed CPD Use of Force policies which describe the requirements of ¶162, including requiring de-escalation when safe and feasible. We also noted concerns about CPD actions during the protests of 2020 related to officers allowing individuals to voluntarily comply with lawful orders. The CPD addressed related reporting requirements in its updated Department Notice D20-08, *Reporting the Response to Crowds, Protests, and Civil Disturbances* (effective November 20, 2020) and requisite forms. The CPD achieved Preliminary compliance due to these policies in the fourth reporting period.

In this reporting period, the IMT continued to assess Preliminary and Secondary compliance with ¶162.

For Preliminary compliance, as stated in prior reports, the CPD has a policy in place for daily operations regarding the requirement for CPD officers to allow individuals to voluntarily comply with lawful orders whenever safe and feasible. The primary remaining issue is application of ¶162 to responses to protests, which was highlighted during protest events in summer 2020 where the CPD experienced a dramatic increase in reported Baton and OC Spray use. In November 2020, the CPD updated Department Notice D20-08, *Reporting the Response to Crowds, Protests,*

*and Civil Disturbances*. During 2021, the CPD worked with the IMT, OAG, Coalition, and the Court to draft and revise General Order G02-02 *First Amendment Rights*. The IMT believes the latest draft of this policy that it reviewed in late 2021 to be significantly improved. Additionally, the CPD also developed forms to document force and all efforts to have protestors voluntarily comply with directives to ensure proper documentation of the same.

For Secondary compliance, the CPD provided training related to the daily application of ¶162 in its *2021 De-Escalation, Response to Resistance, and Use of Force In-Service Training.* Due to the COVID-19 pandemic the CPD received an extension to complete this training by March 2022. Specific to application of ¶162 to response to protest, the CPD has previously delivered protest training to specialized units as they are most likely to be deployed first to respond to protests. However, given the problems the CPD encountered in 2020, the IMT believes additional training on the updated policy and corresponding forms is necessary for all officers regarding protests.

The IMT has begun to monitor how updated policies and training related to this paragraph are impacting the actions of CPD officers, in an effort to assess Full compliance with ¶162. Notably, in 2021, the CPD saw a reduction in force as reported by TRRs, 3,318 in 2021 compared to 4,260 in 2020. It is important to recognize that this coincides with significant drops in arrests (90,606 arrests in 2019, 52,326 arrests in 2020, and 34,033 in 2021), which directly impacts the number of incidents where force may be used. However, these reductions may be a result of the CPD's continued emphasis on de-escalation.

In conclusion, the City and the CPD maintained Preliminary compliance and is under assessment for Secondary compliance with ¶162. Moving forward, the IMT will continue to assess the CPD's progress with ratification and department-wide training on its First Amendment Policy for protests and reporting, which will be necessary for Secondary compliance.

### Paragraph 162 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶163

> **163.** *CPD officers may only use force for a lawful purpose. CPD of-*
> *ficers are prohibited from using force as punishment or retaliation,*
> *such as using force to punish or retaliate against a person for flee-*
> *ing, resisting arrest, insulting an officer, or engaging in protected*
> *First Amendment activity (e.g., lawful demonstrations, protected*
> *speech, observing or filming police activity, or criticizing an officer*
> *or the officer's conduct).*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD made progress toward, but re-main under assessment for, Preliminary compliance with ¶163.

To assess Preliminary compliance with ¶163, the IMT is reviewing the CPD policies and procedures related to handling demonstrations. Related policies include the CPD's Use of Force policies, First Amendment policy, and Foot Pursuit policy. The IMT is also assessing the CPD's efforts to actively engage the community and ob-tain feedback on these policies.

In prior reporting periods, the IMT determined that G03-02, *De-escalation, Re-sponse to Resistance, and Use of Force*, issued on December 31, 2020, addresses ¶163 in Section III.B.5, which prohibits using force as punishment, retaliation, or in response to the lawful exercise of First Amendment rights. The CPD also issued forms and directives to assist in the proper documentation of various aspects of the Consent Decree, including the Use of Force section. The IMT also discussed criticism of the CPD using force for retaliation and, more specifically, in response the lawful exercise of First Amendment rights during protests in 2020. We noted the shortcomings in prior CPD policies related to retaliation during protests, which the CPD has addressed in its Use of Force policies, effective April 15, 2021, and Department Notice D20-08, *Reporting the Response to Crowds, Protests, and Civil Disturbances*, effective November 2, 2020, which requires documentation by su-pervisors of information concerning crowds and the nature of the police response and use of force during protests. During the fourth reporting period, the CPD also issued an interim foot pursuit policy G03-07, *Foot Pursuits*, which addresses retal-iation. Given the temporary nature of the foot pursuit policy and the need for fur-ther community engagement, the City and CPD remained under assessment with ¶163 in the last reporting period.

In this reporting period, the IMT monitored the CPD's progress to finalize two major policies relevant to ¶163, the First Amendment policy and the foot pursuit policy. The IMT observed the efforts of the CPD to engage the community with webinars and deliberative dialogues on the foot pursuit policy. The IMT, OAG, CPD, and the court, with input from the Coalition, also engaged in multiple rounds of review and dialogue to revise and finalize both policies. See ¶172 for more detail on the development of the foot pursuit policy and prior monitoring reports for more detail on the development of the First Amendment policy.

The IMT reviewed the 2022 In-service Supervisory Training curriculum, which provides good instruction on addressing retaliation and how supervisors need to deal with it. It is important that the parties reach agreement on both policies and the CPD issue them to ensure proper training on policy changes as soon as possible.

In conclusion the City and the CPD remain under assessment for Preliminary and Secondary compliance with ¶163. Moving forward, we will continue to assess the CPD's progress with compliance by reviewing completion of the foot pursuit policy and whether adequate training is provided relating to the prohibition of force as punishment, retaliation, or in response to the lawful exercise of First Amendment rights, with special attention to responses to protests. Further, moving forward for Full compliance, the IMT will review data and information related to disciplinary outcomes as they relate to the 2020 protests or foot pursuits (*e.g.*, did COPA issue a summary report or has COPA issued recommendations for foot-pursuits cases).

### Paragraph 163 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Under Assessment | |

# Use of Force: ¶164

**164.** *CPD officers must only use force when it is objectively reasonable, necessary, and proportional under the totality of the circumstances.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD remained in Preliminary and Secondary compliance with ¶164.

To assess Preliminary compliance with ¶164, the IMT reviewed the CPD's Use of Force policies and community engagement efforts related to Consent Decree requirements. To assess Secondary compliance with ¶164, the IMT reviewed the CPD's in-service *2021 De-Escalation, Response to Resistance, and Use of Force In-Service Training* materials and records to determine whether the CPD has sufficiently trained on its use-of-force policies.

To assess Full compliance, the IMT is reviewing CPD reports, the CPD's use of force dashboard, COPA findings, and legal settlements and judgements, as well as conducting interviews with CPD officers to determine whether the CPD has sufficiently implemented its policy and training related to ¶164.

In the prior reporting period, the IMT found the CPD in Preliminary compliance with ¶164, following the CPD's continued discussions with the Use of Force Working Group and issuance of revised Use of Force policies on December 31, 2020, which went into effect on April 15, 2021. Additionally, the 2020 In-Service training covered the conditions when force may be utilized, and as a result, the CPD reached in Secondary compliance. The IMT noted at the close of the fourth reporting period that to maintain Preliminary compliance, the City and the CPD must continue to review and revise its Use of Force policies, including establishing and maintaining clear channels for community input. To maintain Secondary compliance, the City and the CPD must, as appropriate, develop, revise, and provide corresponding training.

During this reporting period, the IMT continued to monitor Preliminary and Secondary compliance with ¶164.

To assess Full compliance, the IMT is looking to see whether the CPD has sufficiently implemented its policy and training related to ¶164. During this reporting period, the IMT review data from the FRD indicating that two cases were identified

between January 1 and June 30, 2021, as excessive uses of force and were referred to COPA. COPA is responsible for determination on the force standard. In conversation with COPA, they continued to express their determination to have findings that will specify the specific violations. The IMT continues to monitor the COPA dashboard, particularly for cases that have been completed.

The IMT also continues to review the CPD's Use of Force Dashboard, paying attention to incidents where force was used and found not to be in compliance with CPD policy.

In conclusion, the City and the CPD remain in Preliminary and Secondary compliance with ¶164. Moving forward, to maintain Preliminary compliance, the City and the CPD must continue to review and revise its Use of Force policies, including establishing and maintaining clear channels for community input. To maintain Secondary compliance, the City and the CPD must, as appropriate, develop, revise, and provide corresponding training. For Full compliance, moving forward the IMT looks for a system or approach that holistically displays uses of force, in which outcomes are addressed and data includes information on where all cases where originate from.

### Paragraph 163 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Use of Force: ¶165

*165. CPD officers are prohibited from using deadly force except in circumstances where there is an imminent threat of death or great bodily harm to an officer or another person. CPD officers are not permitted to use deadly force against a person who is a threat only to himself or herself or to property. CPD officers may only use deadly force as a last resort.*

## Compliance Progress　　　(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD remained in Preliminary and Secondary compliance with ¶165.

To assess Preliminary compliance with ¶165, the IMT reviewed the CPD's Use of Force policies and community engagement efforts related to Consent Decree requirements. To assess Secondary compliance with ¶165, the IMT reviewed the CPD's in-service *2021 De-Escalation, Response to Resistance, and Use of Force In-Service Training* materials and records to determine whether the CPD has sufficiently trained on its use-of-force policies, specific to use of deadly force.

To assess Full compliance, the IMT is reviewing CPD reports, TRRs, video footage, the CPD's use of force dashboard, and COPA findings, as well as conducting interviews with CPD officers and City personnel, to determine whether the CPD has sufficiently implemented its policy and training related to ¶165. This includes reviewing the number of deadly force incidents, process for submitting cases to COPA for determination of appropriateness, and COPA's findings.

In the prior reporting period, the IMT found the CPD in Preliminary compliance with ¶165, following the CPD's continued discussions with the Use of Force Working Group and issuance of revised Use of Force policies on December 31, 2020, which went into effect on April 15, 2021. Additionally, the 2020 in-service training covered the conditions of deadly force, and as a result of required completion rates, the CPD reached in Secondary compliance. The IMT noted at the close of the fourth reporting period that to maintain Preliminary compliance, the City and the CPD must continue to review and revise its Use of Force policies, including establishing and maintaining clear channels for community input. To maintain Secondary compliance, the City and the CPD must, as appropriate, develop, revise, and provide corresponding training.

During this reporting period, the IMT continued to review data and reports on deadly force incidents. In 2021, officers discharged their weapons 47 times, according to the CPD's Use of Force Dashboard.

The IMT is also reviewing data from the FRD on deadly force. Street deputies who complete the TRR-I must now indicate whether a shooting involves specific circumstances related to the Consent Decree. As a result, the FRD now identifies in its quarterly reports how many Level 3 incidents occurred. In the FRD's second quarter report for 2021, there were 6 incidents of firearm discharges with 8 actual discharges. In 3 cases, medical aid was provided. In the FRD third quarter report for 2021, there were 8 incidents of firearm discharges with 11 members discharging. In 5 of the incidents medical aid was provided and in 3 of the incidents the subject fled.

In addition, the IMT is reviewing material, reports, and videos that are on COPA's website related to deadly force. In 2021, COPA adjudicated 8 cases regarding firearms, two of which were sustained incidents of shootings with hits and six were not sustained shootings with no hits. In this reporting period, the IMT also had further discussion with COPA regarding identifying with specificity the nature of a sustained violation and whether it was pertinent to the actual use of force, or if the sustained finding was related to other conduct relative to the incident. COPA is working to providing this data.

In conclusion, the CPD remains in Preliminary and Secondary compliance with ¶165. The IMT continues to have reservations about the nature and thoroughness of deadly force investigations and looks forward to working with all the parties to ensure that investigations are conducted in a timely and thorough manner. The inability to look at investigative reports from COPA and the CPD will continue to be a problem for Full compliance. The IMT has also requested access to the Force Review Board reports and all reports that the IRT or any other body may have submitted to shed light on firearm discharges, in addition to available information from COPA.

### Paragraph 165 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Use of Force: ¶166

**166.** *CPD officers are prohibited from using deadly force against fleeing subjects who do not pose an imminent threat of death or great bodily harm to an officer or another person.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**          *Under Assessment*
**Secondary:**          *Not in Compliance*
**Full:**          *Not Yet Assessed*

In the fifth reporting period, the CPD remained under assessment for Preliminary compliance with ¶166.

To assess Preliminary compliance with ¶166, the IMT is reviewing the CPD's Use of Force policies and foot pursuit policy, and community engagement efforts related to Consent Decree requirements in this paragraph.

To assess Secondary compliance with ¶166, the IMT is reviewing the CPD's training materials and records to determine whether the CPD has sufficiently trained on its use of force and foot pursuit policies.

In the prior reporting periods, the CPD engaged the Use of Force Working Group is discussions regarding non-lethal force on fleeing subjects and foot pursuits. The CPD moved language regarding these prohibitions into General Order G03-02, *De-escalation, Response to Resistance, and Use of Force*, which now indicates deadly force will not be used against a fleeing person unless the person poses an imminent threat (Section IV.D.1.a). The CPD issued revised Use of Force policies on December 31, 2020, which went into effect on April 15, 2021. Further, during the fourth monitoring period, as required by ¶172, on March 5, 2021, the IMT recommended that the CPD adopt a foot pursuit policy based on our assessment of CPD data and information. On May 26, 2021, the CPD issued a temporary policy G03-07, *Foot Pursuits*, which became effective June 11, 2021. The IMT noted multiple concerns regarding the temporary, draft policy. The CPD revised its policy, which includes prohibitions against deadly force against fleeing suspects in Section VI.B.8. At the end of the last reporting period, the department was obtaining department and community input on this policy, which is necessary for Preliminary compliance with ¶166.

In this reporting period, the IMT continued to assess Preliminary compliance with ¶166, specifically as it relates to the development and adoption of a Foot Pursuit policy. The CPD is currently operating under a temporary foot pursuit policy and has been in dialogue with the IMT, OAG, community, and other stakeholders regarding a new policy. Areas being discussed for the policy include conditions of a

pursuit, prohibition on pursuits, separation and communication, supervision, and documentation. See ¶172 for more detail on the development of the foot pursuit policy.

Paragraph 166 deals with use of deadly force, but the fleeing suspect aspect of this paragraph has been a primary focus. The IMT has used data to assist in analyzing the nature of the foot pursuit issue. Unfortunately, CPD data for foot pursuits has not been reliable (see ¶168 for more detail). As a result, the CPD pulled down its Foot Pursuits dashboard during this reporting period. The FRD has continued to report data on foot pursuits that end in some degree of force, which provides some information.

Use of Force Appendix Figure 2: Foot Pursuit Incidents Involving a Use of Force

|  | FRD Quarter 1 Report (Jan. 1, 2021 – Mar. 31, 2021) | FRD Quarter 2 Report (April 1, 2021 – Jun. 30, 2021) | FRD Quarter 3 Report (July 1, 2021 – Sep. 30, 2021) |
|---|---|---|---|
| Number of Foot Pursuits with a TRR | 198 | 100 | 131 |
| Firearm Pointing during a Foot Pursuit | 181 | 200 | 231 |
| Weapon Recovery from a Foot Pursuit | 83 | 125 | 124 |
| Suspect Injury during a Foot Pursuit | 139 no injury 59 minor | 64 no injury 36 minor/alleged | 85 no injury 32 minor 1 major |

To aid in our review of use of force against fleeing subjects moving forward, the IMT recommends that future FRD quarterly reports include data on discharges during a foot pursuit.

The IMT continues to monitor the outcomes of firearm discharges referred to COPA and subsequent outcomes. See ¶184 for more detail.

In conclusion, the City and CPD remain under assessment for Preliminary compliance with ¶166. In the next reporting period, the IMT will continue to assess Preliminary compliance through the completion of the foot pursuit policy. We will also assess Secondary compliance by reviewing CPD's progress in delivering the annual in-service training and training on the foot pursuit policy.

## Paragraph 166 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Under Assessment |

# Use of Force: ¶167

> **167.** *CPD officers will operate their vehicles in a manner that is consistent with CPD policy and training and with the foremost regard for the safety of all persons involved. CPD will periodically include instruction regarding sound vehicle maneuvers in its in-service training regarding use of force. As appropriate, CPD will provide supplemental training guidance regarding dangerous vehicle maneuvers that should be avoided.*

### Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

The CPD maintained Preliminary compliance with ¶167 in the fifth reporting period but did not reach Secondary compliance.

To assess Preliminary compliance with ¶167, the IMT reviewed the CPD's Use of Force policies and vehicle pursuit policy to ensure it addresses requirements specific to this paragraph.

To assess Secondary compliance with ¶167, the IMT is reviewing the CPD's process and policies to identify drivers in need of remedial training and whether such training has occurred, as well as training that was provided to all officers.

In the prior reporting period, the IMT observed CPD's Monthly Traffic Accident Review. This is a monthly meeting of the Traffic Review Board to review traffic accidents. The board addressed the issues required by the Consent Decree, including reviewing the length of pursuit, speed of pursuit, road conditions, reason for pursuit, and whether a supervisor becomes involved in the incident. For each review, the Board determined whether the officer was in or not in compliance with policy. During this meeting, a number of officers were referred for remedial training, and reprimands were issued particularly for supervisors who failed to engage within three minutes. The IMT noted that the CPD has appropriate policies, practices, and processes for holding officers accountable to violations with policy for vehicular operations; thus maintained Preliminary compliance with ¶167.

The IMT also reviewed CPD's 2021 in-service training curriculum which includes instruction (module 4) on how to conduct a motor vehicle stop and a portion on vehicular eluding and pursuit. However, to achieve Secondary compliance, the IMT noted that the CPD must periodically include traffic safety in its training and demonstrate how officers are identified and receive remedial training when not following policy.

In this reporting period, the IMT continued to assess Secondary compliance with ¶167. As stated earlier, to make this assessment we are examining the CPD's process and policies to identify drivers in need of remedial training and whether such training has occurred, as well as training that was provided to all officers.

A media report in 2021[2] indicated problems with motor vehicle pursuits in 2019. Specifically, in 2019, there 270 pursuits categorized as follows:

- 180 resulted in crashes

- 3 resulted in pedestrian deaths

- 3 resulted in deaths other than the pursued

- 2 resulted in deaths of individuals being pursued

- 112 resulted in a supervisor's order of termination, and 56 of those ordered to be terminated resulted in crashes and 1 of them resulted in a person being killed.

The IMT has been reviewing activities, data, and actions of the Traffic Review Board to address these problems with motor vehicle pursuits. Our observations to date have shown us that past board reviews paid particular attention to the role of supervisors in pursuits. The IMT has submitted a written request for monthly Traffic Review Boards reports to conduct a deeper review of the nature of the board's findings, recommendations for training, and any corrective action that emanates from the Board.

The IMT also is looking for all information regarding serious accidents, including serious accidents that have been referred to COPA. During this reporting period, the IMT reviewed a number of serious fatal accidents in 2021 involving department motor vehicles on COPA's website. In 2021, COPA made determinations on 45 motor vehicle fatal cases, to include 23 cases sustained, 10 cases exonerated, and not sustained. These finding are outcomes, but do not necessarily identify the specific infraction that occurred on a sustained complaint.

Additionally, during this reporting period, the IMT reviewed in-service training regarding high-risk motor vehicle stops and motor vehicle eluding and pursuits, both

---

[2]  *See, e.g.*, Fran Spielman, *Lightfoot refuses to answer questions on exposed emails, says hackers demanded ransom*, CHICAGO SUN-TIMES (May 10, 2021), https://chicago.suntimes.com/city-hall/2021/5/10/22429053/lori-lightfoot-email-hacker-ransom-city-hall-jones-day-ddos-secrets-clop.

of which are include in the training. However, the training session that we observed lack detail on motor vehicle pursuits. The 2020 CPD Annual Training report indicates the following training occurred related to ¶167:

- One 8-hour In-Service Driver Refresher: 163 officers completed this training voluntarily

- One 8-hour Re-Training Class for Vehicular Driving: 12 officers completed this class as directed by the Traffic Safety Board for being involved in preventable accidents

- An eLearning Course on Motor Vehicle Pursuits and Eluding Vehicle Incidents: 11,830 officers (97%) completed this training

In conclusion, the City and the CPD remain under Assessment for Secondary compliance with ¶167. The IMT awaits updated statistics to gauge the current state of the problem and whether the updated policies are resulting in appropriate supervision and training to address the problems. Moving forward, the IMT is also interested in any patterns/trends that may be available on vehicle pursuits. The IMT has requested Traffic Board reports to aid in this review.

### Paragraph 167 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶168

**168.** *Starting no later than January 1, 2019, CPD will track and analyze the frequency with which CPD officers engage in foot pursuits of persons attempting to evade arrest or detention by fleeing on foot, regardless of whether the foot pursuit is associated with a reportable use of force incident. CPD will track foot pursuits associated with reportable use of force incidents through TRRs or any similar form of documentation CPD may implement.*

**Compliance Progress**          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, the City and the CPD made progress toward but did not achieve Preliminary Compliance with ¶168.

To assess Preliminary compliance with ¶168, the IMT is assessing policies and practices to enable the CPD to capture and analyze appropriate data related to foot pursuits, as required by this paragraph.

In the prior reporting period, the City and the CPD did not maintain Preliminary or Secondary compliance due to the failure to capture and analyze foot pursuit data. In prior reporting periods, the IMT had assessed that the City and the CPD had met Preliminary and Secondary compliance for this paragraph's requirements based on the fact that the OEMC has processes in place that capture foot pursuits; that the CPD's FRD reviews all TRRs that are foot pursuit-related and result in the use of force; and that the FRD's tracking and analysis of pursuits was sound. However, in the fourth reporting period, the IMT was alerted to the fact that there were serious issues of data quality regarding foot pursuits. Specifically, the way in which foot pursuit data were captured may be incorrect. This raised several concerns for the IMT—we were concerned with not only the higher percentage of uses of force during foot pursuits, but also the serious data quality issues within the City. The IMT repeatedly requested the City and the CPD to provide an explanation regarding what transpired, what led to the data issues, whether they have been corrected, and requested details on the City's attempt to correct the data that has been provided to the IMT in previous reporting periods and reported on in previous reports.

In this reporting period, the CPD remains not in compliance with ¶168. The data issues identified and concerns expressed raised by the IMT in the prior reporting period have yet to be resolved.

The CPD understands these concerns and has stated it is making efforts to identify and rectify the problems. The CPD has developed a new Data Review Policy that the IMT and OAG are reviewing, which will hopefully address data issues in the future. Unfortunately, the CPD has failed to submit a description of the technical problem as requested by the IMT and OAG, nor has it made any effort to correct the data that were used for review in prior reporting periods. Further, the CPD foot pursuit dashboard was taken down due to these data issues.

The FRD has conducted some analysis during this reporting period on foot pursuits using TRRs that are submitted after foot pursuits occur. This includes data regarding weapons recovered from foot pursuits, firearms pointed during pursuits, and injured officers or suspects during a pursuit. The FRD also issued debriefing points for deficiencies that are observed during foot pursuits, to include separation from partners, poor communication, and improper handling of firearms. While this data from the FRD provides important information on foot pursuits associated with a use of force, it does not provide the thorough and comprehensive tracking and analysis of all foot pursuits required by the Consent Decree and IMT.

In conclusion, the City and the CPD remains not in compliance with ¶168, until the CPD reinstates the foot pursuit dashboard and assures it now has reliable data, identifies causes for the data inaccuracies, and addresses past IMR analysis if they prove to be incorrect. Moving forward, the IMT will continue to reevaluate the paragraph in light of the data issues explained above, and will pay specific attention to: (1) the manner in which the OEMC counts officers participating in foot pursuits, and whether it counts multiple officers on a single pursuit as multiple pursuits, resulting in a larger total number of foot pursuits, causing a skewing of the actual number of foot pursuits resulting in uses of force; and (2) the data compiled by the CPD's FRD, that the IMT reviews regarding uses of force as noted in TRRs. The IMT will be closely monitoring the situation and reviewing their progress continuously as the CPD issues and trains on its final Foot Pursuit policy in 2022.

### Paragraph 168 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Use of Force: ¶169

**169.** *For foot pursuits associated with reportable use of force incidents, by January 1, 2020, CPD will review all associated foot pursuits at the headquarters level to identify any tactical, equipment, or training concerns.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶169.

To assess Preliminary compliance with ¶169, the IMT reviewed the CPD's Use of Force policies and FRD SOP, to ensure it addresses the requirements for a headquarter level entity to review foot pursuits with associated reported use of force incidents. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶169, the IMT reviewed the training sources and records related to review of foot pursuits, including reviewing the nature of debriefings and supplemental training following the identification of patterns and trends. Specifically, the IMT reviewed the FRD's processes regarding debriefings, which are similar to brief remedial training sessions. Also, in the fifth reporting period, the FRD resumed its weekly staff trainings and provided attendance records for those trainings which the IMT reviewed.

To assess Full compliance, the IMT is assessing whether the CPD has sufficiently implemented its foot pursuit review policy, protocols, and training and if the Force Review Division and the CPD are appropriately recommending and acting on tactical, equipment, and training concerns.

During the last reporting period, the FRD and the OOC submitted reports that identified tactical and training concerns related to foot pursuits, in particular in districts with high percentages of chases. Additionally, per ¶172, on March 5, 2021, the IMT recommended that the CPD adopt a foot pursuit policy. The CPD was required to adopt a foot pursuit policy by September 3, 2021, and thus needed to make subsequent tactical and training revisions.

In this reporting period, the IMT continued to assess Full compliance with ¶169 by monitoring efforts by the FRD to review foot pursuits. The data issues encountered

in ¶168 do not impact this paragraph, as the data FRD pulls and analyzes from TRRs.

The IMT continued to review the annual and quarterly reports developed by the FRD, paying specific attention to de-briefing points emanating from reviews of pursuits with TRRs. The FRD continues to issue de-briefing points on issues, such as partner separation, communication, and weapons handling. For example, in the first three quarters of 2021, the FRD reported the following:

Use of Force Appendix Figure 3:     Foot Pursuit Data in 2021, Q1–Q3

|  | FRD Quarter 1 Report (Jan. 1, 2021 – Mar. 31, 2021) | FRD Quarter 2 Report (Apr. 1, 2021 – Jun. 30, 2021) | FRD Quarter 3 Report (July 1, 2021 – Sep. 30, 2021) |
|---|---|---|---|
| Foot Pursuits with a TRR | 198 | 100 | 131 |
| Foot Pursuits with Level 1 Force | 122 | 56 | 82 |
| Foot Pursuits with Level 2 Force | 76 | 44 | 49 |
| Foot Pursuits with Level 3 Force | 0 | 0 | 0 |
| Pursuits with no debriefing point | 184 | 91 | 126 |
| Debriefing for partner separation | 9 | 2 | 3 |
| Debriefing for radio communication | 4 | 5 | 2 |

In conclusion, the City and the CPD maintained Preliminary and Secondary compliance with ¶169. Moving forward, the IMT notes that the new Foot Pursuit policy may generate new training needs that will need to be addressed to maintain Secondary compliance. The IMT will not assess Full compliance until issuance of the final Foot Pursuit policy and additional training takes place on the new policy.

### Paragraph 169 Compliance Progress History

| FIRST REPORTING PERIOD SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SECOND REPORTING PERIOD SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | THIRD REPORTING PERIOD MARCH 1, 2020 – DECEMBER 31, 2020 |
|---|---|---|
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Secondary |

| FOURTH REPORTING PERIOD JANUARY 1, 2021 – JUNE 30, 2021 | FIFTH REPORTING PERIOD JULY 1, 2021 – DECEMBER 31, 2021 |
|---|---|
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary |

# Use of Force: ¶170

*170. CPD recently issued a foot pursuit training bulletin. By July 1, 2019, CPD will develop and issue a supplemental foot pursuit training bulletin that reflects best practices from foot pursuit policies in other jurisdictions. The supplemental training bulletin will be subject to review and approval by the Monitor and OAG. The supplemental training bulletin will: a. identify risks and tactical factors officers should consider prior to initiating and during the course of a foot pursuit; b. provide guidance to officers regarding radio communications during a foot pursuit; c. instruct officers to avoid, to the extent practical, separating from other officers in the course of a foot pursuit; d. provide guidance on circumstances when alternatives to a foot pursuit may be appropriate; and e. inform officers that they must follow supervisors' instructions in the course of a foot pursuit, including instructions to alter tactics or discontinue the pursuit.*

## Compliance Progress               (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |

In the fifth reporting period, the City and the CPD maintained Preliminary, Secondary, and Full compliance with ¶170.

To assess Preliminary compliance with ¶170, the IMT determined whether the CPD developed and issued a foot pursuit bulletin.

To assess Secondary compliance with ¶170, the IMT and OAG reviewed the training bulletin and underlying sources to determine whether it reflects best practices from foot pursuit policies in other jurisdictions and compiles with the requirements in this paragraph of the Consent Decree.

To assess Full compliance with ¶170, the IMT reviewed training sources and records to assess comprehension of the foot pursuit actions by officers and supervisors (including separation from and responsibility to one's partner). We also reviewed FRD reports, TRRs, video footage and COPA cases involving foot pursuits to assess the extent to which officers follow the training bulletin, such as officer separation or firearm retention issues, and the extent that district supervisors address noncompliance with the foot pursuit training bulletin.

In the prior reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶170 and reached Full compliance. More specifically,

the City, the CPD, the OAG, and the IMT had many discussions regarding the ongoing compliance efforts regarding CPD foot pursuits. The 2019 Training Bulletin was not sufficient for these ongoing efforts—particularly as the City and the CPD continued to develop the *Foot Pursuit* policy and corresponding training, which will differ from the *Training Bulletin*. As a result, this paragraph was considered a one-time requirement—although ¶170 will continue to inform how the CPD should instruct officers regarding foot pursuits.

In conclusion, the City and CPD achieved Full compliance with ¶170 in the fourth reporting period and maintained it during the fifth reporting period. The IMT will continue to measure CPD's ongoing policy, training, and implementation efforts under other paragraphs.

### Paragraph 170 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Secondary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Use of Force: ¶171

**171.** *CPD will provide scenario-based training regarding foot pursuits and the supplemental foot pursuit training bulletin during the first annual use of force training required by this Agreement.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Under Assessment* |

In the fifth reporting period, the City and CPD remained under assessment for Preliminary compliance with ¶171.

To assess Preliminary compliance with ¶171, the IMT reviewed the CPD's annual Use of Force training to determine whether it has incorporated scenario-based training regarding foot pursuits and assessed whether the CPD looked at examples of how other jurisdictions may have done so.

In the prior reporting period, the CPD issued a temporary emergency policy (citing ¶631), G03-07, *Foot Pursuits*. The new policy required further consultation with the IMT, the OAG, and the community. Additionally, to evaluate Preliminary compliance, the CPD's annual *De-Escalation, Response to Resistance, and Use of Force In-Service Training* needed to re-enforce new requirements or restrictions for foot pursuits through scenario-based training.

In this reporting period, the CPD engaged in numerous discussions with the IMT, OAG, community, Coalition, and Court surrounding the foot pursuit policy. On December 23, 2021, the CPD, OAG, and IMT reached an agreement on the policy—General Order G03-07, *Foot Pursuits*. To achieve Preliminary compliance with ¶171, the CPD needs to finalize this new policy. We acknowledge that this version of the policy addresses scenario-based training.

Related to Secondary compliance, the IMT has reviewed the *2021 De-Escalation, Response to Resistance, and Use of Force In-Service Training* and the training proposed for 2022. The current training has one scenario that includes a foot pursuit. Due to concerns expressed by both community members and officers during CPD focus groups on foot pursuits, the IMT stresses that the CPD must commit to developing foot pursuit scenario-based training (eLearning and in-service training) that reflects the new policy and changes to existing policy. Additionally, the scenarios should address issues such as partner separation, communication, weapon transition and handling, and levels of force, based on data reported by the FRD, as well as the most difficult positions officers may be placed in and how officers deal with or avoid such situations.

In conclusion, the City and the CPD remain under Preliminary assessment with ¶171. In the next reporting period, the IMT will continue to assess the CPD's progress on ¶171 as it issues its foot pursuit policy and begins to train on the new policy.

### Paragraph 171 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Under Assessment | |

# Use of Force: ¶172

> **172.** *By no later than January 1, 2021, the Monitor will complete an assessment of CPD data and information to determine whether CPD should adopt a foot pursuit policy. If the Monitor recommends that CPD should adopt a foot pursuit policy, CPD will adopt a foot pursuit policy no later than July 1, 2021. Any foot pursuit policy adopted by CPD will be subject to review and approval by the Monitor and OAG.*

### Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Deapline:** September 3, 2021*        ☐ Met   ☑ Missed
*Extended from July 1, 2021, due to COVID-19

**Preliminary:**        *Under Assessment*
**Secondary:**          *Not in Compliance*
**Full:**               *Not in Compliance*

In the fifth reporting period, the City and CPD remained under assessment for Preliminary compliance with ¶172.

To assess Preliminary compliance with ¶172, the IMT is reviewing the CPD's foot pursuit policy and efforts to garner appropriate community input on the policy. The IMT is also assessing the ability of the CPD and OEMC to establish appropriate foot pursuit data reporting systems.

In the prior reporting period, on March 5, 2021, the IMT recommended that the CPD adopt a foot pursuit policy based on our assessment of CPD data and information (see prior monitoring reports). Because of our recommendation, the CPD was required to adopt a foot pursuit policy by September 3, 2021, and "[a]ny foot pursuit policy adopted by CPD will be subject to review and approval by the Monitor and OAG."

On June 11, 2021, the CPD issued a temporary policy, though the IMT and OAG had previously noted multiple concerns to the City and CPD regarding the temporary, draft policy. The draft did not provide clear expectations for CPD officers and supervisors, allow the CPD to enforce such expectations, or provide the public with notice on the CPD's expected practices and procedures. Furthermore, the City and CPD did not receive community input on the policy, which the IMT finds necessary in order to receive compliance under the Consent Decree.

Since then, the CPD has worked with the IMT and OAG to revise its interim policy and began obtaining department and community input on this policy. On June 2, 2021, the CPD conducted a public webinar on its new temporary foot pursuit policy. In addition, in June 2021, CPD conducted "deliberative dialogues" with community organizations on the policy.

In this reporting period, the CPD did not meet the Consent Decree deadline of adopting a foot pursuit policy by September 3, 2021 (extended from July 1, 2021, due to COVID-19). To support our review of the CPD's draft policies, the IMT reviewed best practices and policies from other departments across the nation and foot pursuit related data in FRD reports (*e.g.*, number of injuries, weapons recovered, weapons pointed, and arrest).

The IMT also reviewed the various positions of numerous community and department personnel provided via e-mail, webinars, and deliberative dialogue. We participated in numerous discussions with the CPD, OAG, Coalition, and Court surrounding foot pursuit best practice from various jurisdictions, including some subject to Consent Decrees. These dialogues were vigorous and passionate, and included strong opinions that were at extremes odds with each other. The IMT heard from families who have lost loved ones.

On December 23, 2021, the CPD, the OAG, and the IMT reached an agreement on a permanent policy—General Order G03-07, *Foot Pursuits*. While the foot pursuit policy has taken more time than anticipated to finalize, given the importance of the issue as it relates to community trust and the need to evolve to the best policy for Chicago, the IMT views this as time well spent. The City will have a better and more instructive policy that embodies the CPD's pursuit of the "sanctity of life." We also note that while the language of the policy was agreed upon by the Parties and IMT, our "no objection" depends upon the CPD clearly articulating a data plan for foot pursuits, which they had not yet produced by the end of the reporting period.

In conclusion, the City and the CPD made notable progress this reporting period for the development of a foot pursuit policy. Moving forward, to achieve Preliminary compliance with ¶172, the CPD needs to issue this final policy and share the policy with the community for public comment. Further, the CPD must address our previously raised concerns regarding the reliability of foot pursuit data prior to achieving Secondary compliance.

## Paragraph 172 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Under Assessment | |

# Use of Force: ¶173

> **173.** *Following a use of force, once the scene is safe and as soon as practicable, CPD officers must immediately request appropriate medical aid for injured persons or persons who claim they are injured.*

## Compliance Progress                   (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶173.

To assess Preliminary compliance with ¶173, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph regarding requesting medical aid following a use of force. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies. To assess Secondary compliance with ¶173, the IMT reviewed the CPD's Use of Force training sources and records to determine whether the CPD has sufficiently trained on its latest policies.

In the prior reporting period, the CPD achieved Secondary compliance through completion of the 2020 Use of Force in-service training for more than 95% of CPD officers. This training addresses requirements of ¶173 related to requesting medical aid for injured persons following a Use of Force incident.

In this reporting period, the IMT began assessing Full compliance with ¶173 by reviewing FRD reports and COPA reports and videos. In our review of FRD reports since their inception, officers failing to request medical aid for individuals who have been subjected to force has not been an identified issue (debriefing points) by the FRD. In our review of COPA reports and videos, officers consistently request medical assistance where there are obvious injuries. It is much more difficult to assess compliance where subjects complain of injuries but there are no visible injuries. Thus, the IMT looks to obtain data from COPA, BIA, or the City's Law Department on whether there are complaints for not providing medical assistance.

The IMT looks to assess this paragraph more deeply in future reporting periods, and has requested information from BIA, COPA, and the City's Law Department that may aid in this review. To date, the IMT has found it very difficult to discern the way agencies store their information on this matter. Other potential data sources that we are exploring include OEMC and ambulance dispatch records.

In conclusion, the City and the CPD remain in Preliminary and Secondary compliance with ¶173. Moving forward, the IMT will continue to assess Full compliance, to include reviewing additional sources of data, including anticipated data on requests for medical aid in the CPD's Use of Force Dashboard.

## Paragraph 173 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary |

# Use of Force: ¶174

**174.** *Before January 1, 2021, CPD will ensure that all CPD officers receive Law Enforcement Medical and Rescue Training ("LEMART"). The LEMART training provided to CPD officers will incorporate scenario-based elements. Before January 1, 2021, CPD will equip all CPD officers engaged in patrol activities who have completed LEMART training with an individual first aid kit ("IFAK") (as defined in current CPD policy, U06-02-23).*

Compliance Progress   (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶174.

Since the CPD had already begun its significant training on LEMART, the IMT assessed this paragraph to be in Preliminary compliance by adjusting our methodologies in the fourth monitoring period – essentially considering training as evidence of Preliminary compliance and policy as evidence of Secondary compliance.

In the prior reporting period, the City and the CPD reached Preliminary compliance with ¶174. However, the CPD failed to meet the extended March 5, 2021 deadline.

In the last reporting period, to assess training, the IMT reviewed LEMART course materials, observed a live course, and reviewed training attendance and equipment records to determine whether the CPD has sufficiently provided LEMART training and the number and percentage of officers who have under-gone training and received kits. The training appropriately covered the requirements of ¶174 regarding instruction to officers on requesting medical aid and using IFAK kits. During the training, all officers logged into the website to verify their attendance and confirm they received their distributed IFAK kits at the end of the course. Additionally, as of June 30, 2021, 97% of CPD members completed LEMART training. However, the IMT could not determine how many department members were issued IFAK kits from the data the CPD provided.

In the fifth reporting period, IMT looked to continue assessing Secondary compliance to determine whether the CPD has sufficiently implemented LEMART policy and completed training IFAK distribution requirements. Due to the COVID-19 pandemic the CPD received an extension to complete this training by March 2022.

In conclusion, the City and the CPD remained under assessment for Secondary compliance with ¶174. LEMART training during the COVID pandemic continues to be a challenge for the CPD because it is labor intensive requiring all officers to be trained. The IMT awaits the latest training numbers from the CPD for completion of LEMART training to assess Secondary compliance in the next reporting period.

### Paragraph 174 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶175

> **175.** *Starting January 1, 2021, in use of force incidents involving CPD officers, CPD will require CPD officers to provide life-saving aid consistent with their LEMART training to injured persons as soon as it is safe and feasible to do so until medical professionals arrive on scene. CPD will replenish IFAKs, and the contents thereof, used by CPD officers as necessary to ensure officers have the equipment necessary to render aid consistent with their LEMART training. Subsequent to January 1, 2021, CPD will ensure that any officer regularly engaged in patrol activities who has no prior LEMART training receives LEMART training within one year of beginning his or her regular patrol activities.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Ongoing                    ☐ **Met**  ☑ **Missed**

**Preliminary:**    *In Compliance (FOURTH REPORTING PERIOD)*
**Secondary:**    *In Compliance (FOURTH REPORTING PERIOD)*
**Full:**    *Under Assessment*

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶175.

To assess Preliminary compliance with ¶175, the IMT reviewed CPD policy requiring officers to provide life-saving aid consistent with LEMART training, regarding replenishing IFAKs, and ensuring that any officer regularly engaged in patrol activities receive LEMART training within one year of beginning patrol activities.

To assess Secondary compliance with ¶175, the IMT reviewed LEMART course materials, and reviewed training attendance and equipment records to determine whether officers are appropriately trained on the requirements of ¶175.

To assess Full compliance with ¶175, the IMT will determine whether the CPD has sufficiently implemented its policy and training, specifically regarding the provision of life saving aid during incidents and if there is a process for distributing and replenishing IFAK kits.

In the fourth reporting period, the CPD achieved Preliminary compliance, through General Order G03-02, *De-Escalation, Response to Resistance, and Use of Force*, which notes that CPD members are required to provide medical aid in Section V.B, as well as through G03-06, *Firearm Discharge and Officer-Involved Death Incident Response and* Investigation, for related requirements for the involved member, reviewing supervisor, and responding CPD members.

However, the requirements regarding replenishing IFAKs and receiving LEMART training within one year of beginning patrol duties were not documented in CPD policy.

Following the IMT's review of LEMART course materials, live training, and training attendance and equipment records, the CPD achieved Secondary compliance. Related to rendering aid, the in-service Use of Force training and LEMART training both educate officers on this requirement. For training regarding replenishing IFAKs, the CPD provided a variety of documents on April 23, 2021, as evidence that it trains its officers on how to replenish IFAKs. Finally, for training of recruits, the CPD provided the IMT and the OAG with a spreadsheet showing that all recruits were trained in LEMART in 2020 and noted that all recruits receive LEMART training. Thus, the CPD meet the requirement of ensuring receipt of this training prior to beginning patrol activities.

In this reporting period, the CPD has yet to complete LEMART training. Due to the COVID-19 pandemic the CPD received an extension to complete this training by March 2022. To achieve Full compliance, the CPD needs to complete delivery of LEMART training, as well as provide documentation demonstrating processes and status of replenishing IFAK kits.

Additionally, the IMT reviewed the FRD annual and quarterly reports in 2020 and 2021, where the provision of life saving aid during use of force incidents was not identified as an issue (or debriefing point). However, the IMT recommends the CPD add a debriefing point on the TRR-R form specific to rendering aid. The IMT also reviewed COPA videos on use of force incidents and verified that officers rendered aid.

In conclusion, the City and the CPD remain in Preliminary and Secondary compliance with ¶175. Moving forward, the IMT will continue to assess Full compliance, to include reviewing use of force incidents to evaluate the degree of operational compliance. The IMT also needs data from the CPD on the distribution of IFAKs.

### Paragraph 175 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Use of Force: ¶176

**176.** *CPD officers must recognize and act upon the duty to intervene on the subject's behalf when another officer is using excessive force.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance (SECOND REPORTING PERIOD)*
**Secondary:**       *In Compliance (FOURTH REPORTING PERIOD)*
**Full:**            *Under Assessment*

In the fourth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶176.

To assess Preliminary compliance with ¶176, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph regarding the duty to intervene. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶176, the IMT reviewed the CPD's Use of Force training sources and records to determine whether the CPD has sufficiently trained on its latest policies.

To assess Full compliance with ¶176, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training. This includes reviewing the number of incidents where force was used against a person who is handcuffed or otherwise restrained; and whether the CPD has a process that differentiates force against a person who is handcuffed or otherwise restrained and identifies and forwards those cases COPA. We are also reviewing a random sampling of such incidents, including review of reviewing supervisor and FRD's findings on each case as to whether it was in compliance with policy.

In the second reporting period, the CPD achieved Preliminary compliance with ¶176. The CPD engaged the Use of Force Working Group on the requirements of this paragraph, which resulted in a change in G03-02, *De-Escalation, Response to Resistance, and Use of Force*.

In the last reporting period, the CPD achieved Secondary compliance with ¶176. The IMT reviewed the development, implementation, and evaluation of the 2020 Use of Force in-service training specific to the duty to intervene, and determined this requirement is covered within training. As of March 4, 2021, 96% of CPD officers had completed the 2020 Use of Force in-service training.

In this reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶176. On November 1, 2021, the IMT observed the CPD's

annual in-service training, during which the CPD trainer make a vigorous case for intervention to his fellow officers.

To assess Full compliance with ¶176, the IMT reviewed FRD reports for excessive force incidents. The FRD has identified force cases where officers did not intervene during uses of excessive force. The CPD must make it clear such acts will not be tolerated. COPA does not have a category that would identify this violation.

In conclusion, the City and the CPD remain in Preliminary and Secondary compliance with ¶176. The IMT believes the tone of the in-service and supervisory trainings is laying groundwork for a lack of tolerance for not intervening during excessive use of force incidents. This emphasis and training must be followed by action if it should occur. Ultimately, there needs to be lack of tolerance at the front-line supervisory level, not just an identification of such cases by FRD personnel.

### Paragraph 176 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Use of Force: ¶177

> *177. Consistent with CPD policy that force must be objectively reasonable, necessary, and proportional, CPD officers must generally not use force against a person who is handcuffed or otherwise restrained absent circumstances such as when the person's actions must be immediately stopped to prevent injury or escape or when compelled by other law enforcement objectives.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Under Assessment* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶177.

To assess Preliminary compliance with ¶177, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph regarding use of force against a person who is handcuffed or otherwise restrained. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶177, the IMT is reviewing the CPD's Use of Force training sources and records to determine whether the CPD has sufficiently trained on its latest policies.

To assess Full compliance with ¶177, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training. This includes reviewing the number of incidents where force was used against a person who is handcuffed or otherwise restrained; whether the CPD has a process that differentiates force against a person who is handcuffed or otherwise restrained and identifies and forwards those cases COPA; as well as reviewing a random sampling of such incidents, including review of reviewing supervisor and FRD's findings on each case as to whether it was in compliance with policy.

The CPD achieved Preliminary compliance with ¶177 in the last reporting period. The IMT found that the CPD received requisite community input for G03-02-01, *Response to Resistance and Force Options*, and finalized the policy. Based on feedback from the community, the CPD's December 31, 2020 revised G03-02-01 policy clarified the "necessary" aspect of use of force by clarifying the "minimum amount force."

In this monitoring period, the IMT assessed Secondary compliance with ¶177, focusing on whether the CPD has trained on policy revisions in its annual *2021 De-Escalation, Response to Resistance, and Use of Force In-Service Training*. The CPD will also need to provide training on de-escalation before use of force on restrained individuals.

For Full compliance, the IMT began reviewing incidents where force was used against a person who is handcuffed or otherwise restrained. Use of force against a person who is handcuffed or otherwise restrained is Level 2 force and as such must be responded to by a supervisor and reviewed by the FRD. In 2021, the FRD reported the 32 force incidents against an individual who was handcuffed or otherwise restrained in 2021, to include:

- First Quarter 2021: 9 incidents

- Second Quarter 2021: 3 incidents

- Third Quarter 2021: 20 incidents

The CPD also noted that for these incidents, none showed deficiencies and no cases were referred to COPA.

In conclusion, the City and the CPD remained in Preliminary compliance with ¶177. Moving forward, Secondary compliance will require the identification of cases (TRRs) where officers used force against a person who is handcuffed or otherwise restrained for the IMT or the review and declaration by CPD that no such cases exist.

## Paragraph 177 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶178

> **178.** *CPD officers are prohibited from using carotid artery restraints or chokeholds (or other maneuvers for applying direct pressure on a windpipe or airway, i.e., the front of the neck, with the intention of reducing the intake of air) unless deadly force is authorized. CPD officers must not use chokeholds or other maneuvers for intentionally putting pressure on a person's airway or carotid artery restraints as take-down techniques.*

Compliance Progress                   (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Under Assessment* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶178.

To assess Preliminary compliance with ¶178, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph regarding use of carotid artery restraints or chokeholds. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶178, the IMT reviewed the CPD's Use of Force training sources and records to determine whether the CPD has sufficiently trained on its latest policies.

To assess Full compliance with ¶178, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training. This includes the FRD's review of such incidents in quarterly and annual reports (all deadly force incidents, shootings, head strikes, and chokeholds).

In the last reporting period, the CPD achieved Preliminary compliance with ¶178. The CPD and Use of Force Working Group engaged in extensive discussions over the prohibition of carotid artery restraints or chokeholds. The Working Group recommended and strongly advocated for their strict prohibition. While the CPD did not accept the Working Group's recommendation, it revised G03-02, *De-Escalation, Response to Resistance, and Use of Force*, effective April 15, 2021, with stronger language about carotid artery restraints or chokeholds not being allowable unless it is an act of last resort when necessary to protect against an imminent threat to life and includes further examples of prohibited actions in the neck area.

Further, on February 22, 2021, the Governor of Illinois signed House Bill 3653, Police and Criminal Justice Reform Bill, into law as Public Act 101-0652 (Safety, Accountability, Fairness and Equity – Today, SAFE-T Act), which expanded the prohibition of chokeholds to include any restraint above the shoulders that risks asphyxiation, unless deadly force is justified. The IMT determined in this reporting period that the CPD's current policy reflects the changes in Illinois state law.

In this reporting period, the IMT also assessed Secondary compliance with ¶178 by observing the CPD's Use of Force in-service training on November 1, 2021. During the training, the instructor covered ¶178 and made clear the prohibitions of carotid artery restraints or chokeholds. Further, in the course of discussion with the CPD there was added emphasis that chokeholds are not taught at the Academy as an authorized use of force. As of the conclusion of this reporting period, just shy of 95% of department members had completed this training; thus, the IMT expects the CPD to reach Secondary compliance with ¶178 in the next reporting period.

During this period, the IMT also began assessing Full compliance with ¶178 by reviewing FRD quarterly reports. The second quarter report for 2021 did not address chokehold incidents. The FRD's third quarter report did address chokehold incidents and reported none had occurred. Since reviewing all FRD reports from the past three years, the IMT is only aware of one chokehold incident.

In conclusion, the City and the CPD achieved Secondary compliance with ¶178 this reporting period. Since April 1, 2021, the CPD has established a process for capturing all Level 3 use of force incidents, including carotid artery restraints. There were no reported restraints in the FRD reports from April 1, 2021 to September 30, 2021. The IMT will continue to monitor these incidents for Full compliance moving forward and looks to determine if other entities (*e.g.*, BIA, COPA, or the City's Law Department) have received complaints.

### Paragraph 178 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶179

**179.** *CPD's use of force policies must guide officers on all force techniques, technologies, and weapons that CPD officers are authorized to use. CPD's use of force policies must clearly define and describe each force option and the circumstances under which use of such force is appropriate to address potential types of resistance.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶179.

To evaluate Preliminary compliance, the IMT is reviewing the CPD's Use of Force policies and community engagement efforts related to ¶179's requirements for guidance to officers on all force techniques, technologies and weapons that officers are authorized to use.

In 2020 and through the prior reporting period, the CPD continued to engage the community on its Use of Force policies. The Use of Force Working Group raised concerns with the use and prohibitions of Tasers and OC Spray, which they continued to discuss in the fourth reporting period. Due to on-going dialogue regarding these force options, the CPD remained under assessment with ¶179 in IMR-4.

In this reporting period, the IMT continued to assess Preliminary compliance, specifically the CPD's community engagement efforts related to the force options requirements of ¶179.

All of the CPD's Use of Force policies are effective and meet the requirements of ¶179. However, General Order G03-02-04, *Taser Use Incidents,* and General Order G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents* remain in unresolved dialogue with the community. During this reporting period, the CPD continued to engage the Coalition in dialogue regarding these two policies. The IMT and OAG participated in these dialogues, where much of the discussion centered on First Amendment rights. For example, there are outstanding policy issues regarding the use of OC Spray (*e.g.*, regarding the use of OC Spray on passive resisters in protests and passive resisters in vehicles). Further, the IMT notes that the policies still fail to incorporate the requirements of ¶205 and ¶216 for requiring officers to provide medical aid. While these policies have yet to be finalized, the IMT believes the CPD's engagement this reporting period was

thoughtful and resulted in the CPD adjusting these policies. Community requests for these policies go beyond what the Consent Decree requires.

In conclusion, the City and the CPD achieved Preliminary compliance with ¶179. The CPD is engaged on the requirements of this paragraph with the community and needs to complete these efforts in the next reporting period to maintain Preliminary compliance. Moving forward, the IMT will continue to assess CPD's community engagement efforts related to the force options requirements of ¶179.

### Paragraph 179 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Preliminary | |

# Use of Force: ¶181

**181.** *CPD will continue to require that only officers who are currently certified may be issued, carry, and use firearms.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**      *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**       *In Compliance* (THIRD REPORTING PERIOD)
**Full:**                 *Under Assessment*

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶181.

To assess Preliminary compliance with ¶181, the IMT reviewed the CPD's policies to ensure they address requirements specified in this paragraph regarding issuance, carry, and use of firearms. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶181, the IMT reviewed the CPD's training sources and records to determine whether the CPD has sufficiently trained officers on firearm use. We also reviewed records showing the percentage of officers who qualified at the range and possessed the requisite FOID card).

To assess Full compliance with ¶181, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training and ensures that officers are certified to issue, carry, and use firearms (including CPD active FOID cards and CPD qualifications).

In the prior reporting period, to assess Full compliance, the IMT attempted to audit firearms certification records for all officers and review the results of those records. The CPD did not provide sufficient materials and records to complete this audit during this reporting period. The IMT has requested records of firearm certification for CPD members and documentation demonstrating that when officer attend firearms qualification they have a FOID card.

In this reporting period, the IMT continued to assess Full compliance with firearm certifications and issuance of firearms. The CPD's 2020 Annual Training Report indicates that 11,921 officers (97%) took an eLearning course prior to qualification. In order for the IMT to properly assess Full compliance it needs data or records showing that all officers who are issued, carry, and use firearms are *certified* (*e.g.*, it is unclear to the IMT how the CPD tracks and addresses issuance of firearms for injured or sick officers).

In conclusion, the City and the CPD maintained Preliminary and Secondary compliance with ¶181. Moving forward, the IMT looks forward to assessing Full compliance upon receipt of firearm certification records for all officers.

### Paragraph 181 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Use of Force: ¶182

**182.** *CPD will require officers to consider their surroundings before discharging their firearms and take reasonable precautions to ensure that people other than the target will not be struck.*

## Compliance Progress        (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶182.

To assess Preliminary compliance with ¶182, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph regarding officer precautions before discharging a firearm. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶182, the IMT reviewed the CPD's training sources and records to determine whether the CPD has sufficiently trained officers on firearm use. We also reviewed records showing the percentage of officers who qualified at the range and possessed the requisite FOID card).

To assess Full compliance with ¶182, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training. This includes a review of data on firearm discharges, nature of the incident, and whether this section was an issue.

In the prior reporting period, the CPD achieve Preliminary compliance with ¶182, following receiving requisite community input on General Order G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures.* The policy, effective April 15, 2021, includes specific language in Section III, meeting the requirements of ¶182 regarding the condition on the discharge of a firearm. Additionally, the CPD demonstrated it has a process in place to capture data related to the conditions under which an officer discharges his/her firearm via the TRR-I form, which is completed by the street deputy.

In this reporting period, the IMT continued to review training relevant to ¶182. On November 1, 2021, we reviewed training on de-escalation. De-escalation training applied to all uses of force and firearms, including the responsibility to issue a warning if safe and feasible.

To begin assessing Full compliance in this period, the IMT reviewed FRD quarterly reports and COPA's dashboard for firearm discharges. We are also awaiting requested reports from the CPD's Force Review Board.

The CPD was responsive to the IMT's requests in the fourth reporting period to provide data on all level 3 reportable uses of force, to include accounting for their number and including an initial assessment by the street deputy as to the possible implication of certain paragraphs of the Consent Decree. Beginning April 1, 2021, the FRD began capturing and reporting data on all level 3 incidents, and Street Deputies assessed whether the discharge involved the possibility of nearby people being at risk.

In the second quarter of 2021 (April 1, 2021 to June 30, 2021), the FRD reported six firearm discharge incidents with 8 department members. For these incidents, the Street Deputy determined that there was no danger to crowds or individuals nearby. In the third quarter of 2021 (July 1, 2021 to September 30, 2021), the FRD reported 8 firearm discharge incidents with 11 department members. For these incidents, the Street Deputy determined that there was no danger to crowds or individuals nearby.

In conclusion, the City and the CPD achieved Secondary compliance with ¶182. Moving forward, to assess Full compliance the IMT will require access to documents from the CPD and COPA on discharge cases to make an informed determination.

### Paragraph 182 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Use of Force: ¶183

> **183.** *CPD will require officers to issue a verbal warning prior to the use of any reportable force, including the use of firearms, when it is safe and feasible to do so.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**          *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**          *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**          *Under Assessment*

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶183.

To assess Preliminary compliance with ¶183, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph regarding verbal warning prior to use of any reportable force. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶183, the IMT reviewed the CPD's training sources and records to determine whether the CPD has sufficiently trained officers, specifically with an emphasis on the importance of verbal warnings if safe and feasible.

To assess Full compliance with ¶183, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training, to include reviewing CPD data and findings on how many times verbal warnings were given.

As noted in our last report, to evaluate Preliminary compliance with ¶183, we focused our review on whether the City and the CPD received the requisite community input for its Use of Force policies. In 2020, the community and Use of Force Working Group recommended that officers issue verbal warnings prior to discharging a weapon and recommended that officers identify themselves as law enforcement unless doing so creates imminent risk of death. They also recommended that officers use hand signals or visual cues to provide warnings in event that a person is hearing impaired. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021.

In the prior reporting period, the CPD achieved Preliminary compliance due to its continued community engagement regarding the Use of Force policies. While specific recommendations from the community relevant to this paragraph were not incorporated into the April 15, 2021 policies, the CPD actively discussed with the

Working Group their feedback and concerns and made a number of other related policy changes as a result. Further, in Section III.A of G03-02-01, *Response to Resistance and Force Options*, details policy requirements for continual communication to include, emphasizing the use of verbal control techniques to avoid or minimize confrontations prior to, during, and after the use of physical force, in addition to the requirement of providing a warning prior to the use of physical force. Finally, Section III.C of General Order G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures* also clearly specifies that a sworn member, when safe and feasible, will "issue a verbal warning prior to, during, and after the discharge of a firearm or use of force."

The CPD also achieved Secondary compliance in the prior reporting period. More than 95% of CPD officers had completed the 2020 Use of Force in-service training, which appropriately addresses ¶183's requirements related to issuing verbal warnings. We also noted that we will continue to monitor Secondary compliance with ¶183, focusing on whether the CPD has trained on policy revisions in the next annual Use of Force training.

In this reporting period, the IMT determined that the CPD maintained Secondary compliance due to ongoing *2021 De-Escalation, Response to Resistance, and Use of Force In-Service Training* that includes instruction on ¶183.

To begin assessing Full compliance in this period, the IMT reviewed the CPD's Use of Force Dashboard, COPA's dashboard for status and outcomes of cases, and media reports (for general accounts of officer discharges).

The CPD was responsive to the IMT's requests in the fourth reporting period to provide data on all level 3 reportable uses of force, to include accounting for their number and an initial assessment by the Street Deputy as to the possible implication of certain paragraphs of the Consent Decree. Beginning April 1, 2021, the FRD began capturing and reporting data on all level 3 incidents. During the first three quarters of 2021, the FRD issued more than 500 deficiencies on failing to articulate de-escalation in the narrative.

In conclusion, the City and the CPD maintained Secondary compliance with ¶183. Moving forward, the IMT will require access to more documentation from the CPD and COPA to make an informed decision regarding verbal warnings prior to use of any reportable force.

## Paragraph 183 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Use of Force: ¶184

**184.** *When CPD officers discharge firearms, they must continually assess the circumstances that necessitated the discharge and modify their use of force accordingly, including ceasing to use their firearm when the circumstances no longer require it (e.g., when a subject is no longer a threat).*

| Compliance Progress | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶184.

To assess Preliminary compliance with ¶184, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph regarding discharge of a firearm. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶184, the IMT reviewed the CPD's training sources and records to determine whether the CPD has sufficiently trained officers, specifically with an emphasis on the importance of constant assessment when using deadly force with a firearm.

To assess Full compliance with ¶184, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training. This includes reviewing data on firearm discharges, nature of the incident and whether this section was an issue (*e.g.*, any instance where an officer may have discharged more than 3 rounds in one incident), and disciplinary actions to reinforce the policy.

In the prior reporting period, the CPD achieved Preliminary compliance following receiving requisite community input for its Use of Force policies. In 2020, the community and Use of Force Working Group recommended that firing into buildings, through doors, windows, or other openings should not be allowed under any circumstances. The Working Group also recommended that officer marksmanship training should reflect this prohibition. While specific recommendations from the community relevant to this paragraph were not incorporated into the latest policies, effective April 15, 2021, the CPD actively discussed with the Working Group their feedback and concerns and made a number of other policy changes as a re-

sult. Further, Section II.E-F of G03-02-01, *Response to Resistance and Force Options*, details policy requirements for members to continually assess situations and modify force.

The CPD also achieved Secondary compliance in the prior reporting period. More than 95% of CPD officers had completed the 2020 Use of Force in-service training, which appropriately addresses ¶184 requirements related to continually assessing the circumstances that necessitate the discharge of a firearm. We also noted that we will continue to monitor Secondary compliance with ¶184, focusing on whether the CPD has trained on policy revisions in the next annual Use of Force training.

In this reporting period, the IMT determined that the CPD maintained Secondary compliance due to ongoing *2021 De-Escalation, Response to Resistance, and Use of Force In-Service Training* that includes instruction on ¶184.

To begin assessing Full compliance in this period, the IMT reviewed the CPD's Use of Force Dashboard, FRD quarterly reports, COPA's dashboard and reports, and media reports (for general accounts of officer discharges), and efforts of the Force Review Board.

Beginning April 2021, the FRD began capturing and reporting data on all level 3 reportable uses of force. Street Deputies assess whether force should have been modified. During the second quarter of 2021, there were six firearm discharge incidents with eight department members. The Street Deputies found that officers could not have modified their actions or ceased firing.

Additionally, the CPD reported on this Use of Force Dashboard, the following firearm discharges in recent years: 47 in 2021, 57 in 2020, 34 in 2019, 43 in 2018, and 45 in 2017.

In conclusion, the City and the CPD maintained Preliminary and Secondary compliance with ¶184. Moving forward, the IMT will require access to more documentation from the CPD and COPA to make an informed decision regarding firearm discharges.

## Paragraph 184 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary |

# Use of Force: ¶185

*185. CPD will continue to prohibit officers from firing warning shots.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Full:** *Not in Compliance*

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶185.

To assess Preliminary compliance with ¶185, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph regarding prohibiting officers from firing warning shots. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶185, the IMT reviewed the CPD's training sources and records to determine whether the CPD has sufficiently trained officers, specifically with an emphasis on not firing warning shots.

To assess Full compliance with ¶185, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training. This includes reviewing CPD data on how many times officers fired warning shots.

The CPD achieved Preliminary compliance with this paragraph in the second reporting period with its Use of Force policies. In the fourth reporting period, the CPD achieved Secondary compliance. We reviewed the development, implementation, and evaluation of the 2020 Use of Force in-service training, eLearning materials, and recruit force options training specific to firearms and deadly force. These trainings cover instruction on the requirements of ¶185. As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training. Due to the COVID-19 pandemic, the City received an extension for completing the 2020 Use of Force in-service training, which was to be completed by March 4, 2021. Finally, during the prior reporting period, because of feedback from the IMT to develop a process to track data related to level 3 reportable use of force incidents, the CPD also established a process to track and examine the nature of firearm discharge incidents and determine the nature of the event via the TRR-I form.

In this reporting period, the IMT began assessing Full compliance by examining data from the CPD's Use of Force Dashboard, video, and reports from COPA's website, and FRD quarterly reports. Beginning this reporting period, the FRD began

reporting data on all level 3 reportable uses of force. During the second quarter of 2021, the FRD reported six firearm discharge incidents by eight department members. The responding Street Deputies determined none of discharges to be warning shots. In the first quarter of 2021, the FRD reported 8 firearm discharge incidents by 11 department members and the responding Street Deputies determined none of discharges to be warning shots.

In conclusion, the City and the CPD maintained Secondary compliance with ¶185. Moving forward, the IMT will require access to more documentation from the CPD and COPA to make an informed decision regarding firing warning shots.[3]

## Paragraph 185 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

---

[3]    In its comments on our assessment of this paragraph, the City asked us to consider indicating that Full Compliance is "under assessment." We have reviewed and will continue to review the information that the City, the CPD, and COPA have made available thus far. As we explain, however, the City would need to provide additional records and data for us for our assessment.

# Use of Force: ¶186

*__186.__ CPD officers must not fire at moving vehicles when the vehicle is the only force used against the officer or another person, except in extreme circumstances when it is a last resort to preserve human life or prevent great bodily harm to a person, such as when a vehicle is intentionally being used to attack a person or group of people. CPD will continue to instruct officers to avoid positioning themselves or remaining in the path of a moving vehicle, and will provide officers with adequate training to ensure compliance with this instruction.*

## Compliance Progress               (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶186.

To assess Preliminary compliance with ¶186, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶186, the IMT reviewed the CPD's training sources and records to determine whether the CPD has sufficiently trained officers, specifically with an emphasis use of force and moving vehicles.

To assess Full compliance with ¶186, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training. This includes reviewing CPD data on how many times officers fired at moving vehicles.

In the prior reporting period, the CPD achieved Preliminary compliance following review of the CPD's Use of Force policies by the IMT, OAG, and community. The Use of Force Working Group provided comments related to ¶186. Specifically, the Working Group recommended language for limiting firing at or into motor vehicles. While these recommendations were not incorporated into the latest policies, effective April 15, 2021, the CPD actively discussed with the Working Group their feedback and concerns and made other policy changes as a result. Section II.D.6 of G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*, prohibits firing at or into a moving vehicle.

The CPD also achieved Secondary compliance in the prior reporting period. The IMT reviewed the development, implementation, and evaluation of the 2020 Use of Force in-service training and recruit force options training specific to firearms and deadly force. Both trainings cover instruction on the requirements of ¶186 and more than 95% of CPD officers had completed the in-service training.

Finally, during the last reporting period, as a result of feedback from the IMT to develop a process to track data related to level 3 reportable use of force incidents, the CPD established a process to track and examine the nature of firearm discharge incidents and determine the nature of the event via the TRR-I form. In addition, the IMT recommended the inclusion of deadly force statistics in the FRD's quarterly reports and the CPD agreed to do so.

In this reporting period, the IMT began assessing Full compliance by reviewing FRD quarterly reports to determine whether department members were sufficiently trained on prohibitions from firing at a moving vehicle. In the second quarter of 2021, the FRD reported six firearm discharge incidents, none of which were at a motor vehicle. In the third quarter of 2021, the FRD reported nine firearm discharge incidents. Of those incidents, a Street Deputy identified one incident on August 13, 2021, as being at or into a motor vehicle.

Finally, in November 2021, the City's Policy Board held an evidentiary hearing for a patrol officer charged with violating the CPD's prohibition against shooting at a moving vehicle during an incident on October 4, 2018.[4] On January 20, 2022, the City's Police Board found the officer guilty and ordered that he be suspended for two years.[5] The officer had previously been stripped of police powers in October 2018 and placed in a no-pay status in February 2021. COPA had recommended in 2020 that the officer be fired. In addition to the suspension, the Police Board ordered the officer to complete full re-training on the use of deadly force, including scenario-based elements and interactive exercises. The IMT considers the City, the CPD, and the City's other entities' responses to individual incidents—including disciplinary actions—as part of the broader picture in evaluating whether the CPD has sufficiently implemented its policy and training.

In conclusion, the City and the CPD maintained Secondary compliance with ¶186. Moving forward, the IMT will require access to more documentation from the CPD

---

[4] *See, Police Discipline*, CHICAGO POLICE BOARD, https://www.chicago.gov/city/en/depts/cpb/provdrs/police_discipline.html.

[5] *See* Chip Mitchell, *A Chicago panel is letting a cop keep his job after a 'clearly unreasonable and unnecessary' shooting*, WBEZ CHICAGO (January 21, 2022), https://www.wbez.org/stories/chicago-cop-to-keep-his-job-after-clearly-unreasonable-and-unnecessary-shooting/5c5b4dd8-c23d-4d89-a130-abbad061079d.

and COPA to make an informed decision regarding firearm use and moving vehicles.[6]

### Paragraph 186 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

---

[6]  In its comments on our assessment of this paragraph, the City asked us to consider indicating that Full Compliance is "under assessment." We have reviewed and will continue to review the information that the City, the CPD, and COPA have made available thus far. As we explain, however, the City would need to provide additional records and data for us for our assessment.

# Use of Force: ¶187

**187.** *CPD will prohibit officers from firing from a moving vehicle unless such force is necessary to protect against an imminent threat to life or to prevent great bodily harm to the officer or another person.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶187 and made progress toward Full compliance.

To assess Preliminary Compliance, the IMT employs our Policy Methodology and Data Methodology, including reviewing the CPD's Use of Force policies to ensure they address the requirements specified in ¶187. We also evaluate the CPD's efforts to obtain and address community engagement and input on the policy that addresses ¶187's requirements.

To assess Secondary Compliance, we employ our Training Methodology, including determining whether the CPD has sufficiently trained on its Use of Force policies. We also review the number of officers who have completed Use of Force in-service training.

To assess Full Compliance, the IMT evaluates whether the CPD has sufficiently implemented its policy and training, including by reviewing data on firearm discharges. Sources of that data may include, but are not limited to, completed TRRs, FRD reports, Use of Force data dashboards, supervisory audits, and interviews with CPD officers.

The City and the CPD reached Preliminary and Secondary compliance with ¶187 in the fourth reporting period. The IMT found that the CPD's policies sufficiently address ¶187's requirements—specifically, Section II.D.7 of G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*. In addition, the CPD demonstrated its commitment to actively engage the Working Group and community in dialogue regarding the Use of Force policies and its recommendations.

The IMT found the City and CPD in Secondary compliance by providing adequate training via the 2021 Use of Force in-service training, and by putting into place a process to track firearm discharges via a supplement to the TRR-I form.

In the fourth reporting period, the IMT noted that the CPD's Use of Force Dashboard indicated 25 firearm discharges. The IMT was unable to determine the exact nature of the violations that COPA sustained for the 7 shooting cases in the previous year.

In the fifth reporting period, we reviewed the FRD's Quarterly Reports for Q2 and Q3 2021.[7] These reports contain data gathered using the new TRR-I supplement, which was implemented on April 1, 2021. According to the FRD reports, among the firearm discharge incidents examined by the Force Review Board during Q2 and Q3 of 2021, street deputies reported no instances of officers firing shots from a moving motor vehicle.

As in prior reporting periods, the IMT remains unable to determine the exact nature of the violations that COPA sustained for the shooting cases during the fifth reporting period; COPA publicly reports the only the "primary category" of concluded investigations on its dashboard.[8]

During the fifth reporting period, the CPD also came close to reaching 95% attendance for its 2021 De-Escalation, Response to Resistance, and Use of Force in-service training. Because of the COVID-19 extension, the CPD has until March 5, 2022, to complete the delivery of its 2021 in-service training.

The City and the CPD maintained Preliminary and Secondary compliance with ¶187 in the fifth reporting period. The FRD's Q2 and Q3 reports, which include the new TRR-I data, represent an important step toward Full compliance, but additional data—including data from COPA on cases involving firearms discharges and motor vehicles—is needed. We look forward to examining more data and information regarding firearm discharges in the next reporting period, including additional FRD quarterly reports. We also look forward to verifying that at least 95% of officers received the 2021 De-Escalation, Response to Resistance, and Use of Force in-service training.

---

[7]    *See Chicago Police Department Force Review Division 2021 Q2 Report*, CHICAGO POLICE DEPARTMENT (OCTOBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Force-Review-Division-2021-Q2-Report.pdf; *Chicago Police Department Force Review Division 2021 Q3 Report*, CHICAGO POLICE DEPARTMENT (DECEMBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Q3-2021-13-Dec-21.pdf.

[8]    *See Concluded Investigations*, CIVILIAN OFFICE OF POLICE ACCOUNTABILITY, https://www.chicagocopa.org/data-cases/data-dashboard/closed-investigations/.

## Paragraph 187 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Use of Force: ¶188

> **188.** *By January 1, 2019, CPD will develop a training bulletin that provides guidance on weapons discipline, including circumstances in which officers should and should not point a firearm at a person. CPD will incorporate training regarding pointing of a firearm in the annual use of force training required by this Agreement in 2019.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶188 and made progress toward Full compliance.

To assess Preliminary Compliance with ¶188, the IMT determined whether the CPD developed and issued the requisite training bulletin. To assess Secondary Compliance, the IMT determined whether the training bulletin complied with ¶188's requirements and whether the IMT and the OAG approved the bulletin.

To assess Full Compliance, the IMT employs our Training Methodology, including a review of training attendance records and data for 2019 and 2020, as well as progress made by the CPD to educate and operationalize the Weapons Discipline Training Bulletin (such as whether the annual Use of Force training sufficiently addresses FRD's recommendations regarding pointing incidents). In addition, to permit assessment of Full compliance, the CPD will need to demonstrate an ability to sufficiently analyze all pointing incidents, including those not documented in ISRs or arrest reports.

The City and the CPD reached First and Secondary compliance in the second reporting period and have since maintained that status based on the CPD's subsequent Use of Force in-service training.

In the fifth reporting period, we reviewed the FRD's Quarterly Reports for Q2 and Q3 2021.[9] According to those reports, there were 693 Firearm Pointing Incident Reports (FPIRs) corresponding to 605 unique events in Q2 2021 and 813 firearm pointing incidents corresponding to 683 unique events in Q3 2021.

---

[9] *See Chicago Police Department Force Review Division 2021 Q2 Report*, CHICAGO POLICE DEPARTMENT (OCTOBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Force-Review-Division-2021-Q2-Report.pdf; *Chicago Police Department Force Review Division 2021 Q3 Report*, CHICAGO POLICE DEPARTMENT (DECEMBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Q3-2021-13-Dec-21.pdf.

In the middle of the third quarter, the FRD began reviewing all FPIRs, including FPIRs that did not have an ISR or arrest report associated with the incident, and in total reviewed 101 of the 133 incidents that did not have an associated ISR or arrest during the third quarter. Of those 101 incidents, the FRD identified 18 incidents for referral to the Fourth Amendment Stop Review Unit to make a final determination as to whether an ISR should have been completed.[10]

The IMT has long requested that the CPD review all firearm pointing incidents, including those not associated with an arrest or ISR. Because of how frequently they occur (approximately 15-20% of the total number of FPIRs), this review is critical to the credibility of the CPD's analysis of firearm pointing overall. We applaud the CPD's efforts to begin this review.

During the fifth reporting period, the CPD also came close to reaching 95% attendance for its 2021 De-Escalation, Response to Resistance, and Use of Force in-service training. Because of the COVID-19 extension, the CPD has until March 5, 2022, to complete the delivery of its 2021 in-service training.

The City and the CPD maintained Preliminary and Secondary compliance with ¶188 in the fifth reporting period and have continued to make progress toward Full compliance. The IMT looks forward to directly reviewing a sample of firearm pointing incidents. We also look forward to continuing to monitor FRD's review of firearm pointing incidents that are not associated with arrest reports or ISRs, as well as FRD's continued identification of patterns and trends associated with those and all firearm pointing incidents. In particular, we appreciate FRD's identification of other reports in which pointing incidents have been documented when there is no associated ISR or arrest report, such as the Traffic Stop Statistical Study Card (blue card) or the General Offense Case Report, and we look forward to learning more about the additional steps that the CPD will take to ensure that firearm pointing incidents are properly documented. We also look forward to verifying that at least 95% of officers received the 2021 De-Escalation, Response to Resistance, and Use of Force in-service training.

## Paragraph 188 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Secondary | Secondary |

---

[10] Page 12 of the Q3 report states "there were 20 such instances," but the number is 18 elsewhere. *Chicago Police Department Force Review Division 2021 Q3 Report*, CHICAGO POLICE DEPARTMENT (DECEMBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Q3-2021-13-Dec-21.pdf.

## Paragraph 188 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary |

# Use of Force: ¶189

**189.** *CPD will clarify in policy that when a CPD officer points a firearm at a person to detain the person, an investigatory stop or an arrest has occurred, which must be documented. CPD will also clarify in policy that officers will only point a firearm at a person when objectively reasonable under the totality of the circumstances.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶189.

To assess Preliminary Compliance, the IMT employs our Policy Methodology and Data Methodology, including reviewing the CPD's Use of Force policies to ensure they address the requirements specified in ¶189. We also evaluate the CPD's efforts to obtain and address community engagement and input on the policy that addresses ¶189's requirements.

To assess Secondary Compliance, we employ our Training Methodology, including determining whether the CPD has sufficiently trained on its Use of Force policies. We also review the number of officers who have completed Use of Force in-service training.

To assess Full Compliance, the IMT evaluates whether officers understand the firearm-pointing policy, particularly with respect to the requirements of ¶189. Along with other sources of information, the IMT reviews FRD reports for its findings on patterns and trends, recommendations for follow-up training, and referrals to COPA. The City and the CPD have maintained Preliminary compliance with ¶189 since reaching it in the first reporting period. In the fourth reporting period, The City and the CPD reached Secondary compliance because a sufficient number of CPD personnel received appropriate training as part of the 2020 Use of Force in-service training. Also, in the fourth reporting period, the CPD committed to formulating a plan to review all firearm pointing incidents, which had been a longstanding IMT recommendation.

In the fifth reporting period, we reviewed the FRD's Quarterly Reports for Q2 and Q3 2021.[11] According to those reports, there were 693 Firearm Pointing Incident

---

[11] *See Chicago Police Department Force Review Division 2021 Q2 Report*, CHICAGO POLICE DEPARTMENT (OCTOBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Force-Review-

Reports (FPIRs) corresponding to 605 unique events in Q2 2021 and 813 firearm pointing incidents corresponding to 683 unique events in Q3 2021.

In its Q2 2021 report, the FRD reported making one referral to COPA for a possible policy violation in connection with a firearm pointing incident, which included allegations of "failure to perform any duty." By comparison, FRD made two referrals to COPA in Q1 of 2021. FRD's Q3 2021 report makes no mention of referrals to COPA in connection with firearm pointing incidents.

In the middle of the third quarter, the FRD began reviewing all FPIRs, including FPIRs that did not have an ISR or arrest report associated with the incident, and in total reviewed 101 of the 133 incidents that did not have an associated ISR or arrest during the third quarter. Of those 101 incidents, the FRD identified 18 incidents for referral to the Fourth Amendment Stop Review Unit to make a final determination as to whether an ISR should have been completed.[12]

The IMT has long requested that the CPD review all firearm pointing incidents, including those not associated with an arrest or ISR. Because of how frequently they occur (approximately 15-20% of the total number of FPIRs), this review is critical to the credibility of the CPD's analysis of firearm pointing overall. We applaud the CPD's efforts to begin this review.

During the fifth reporting period, the CPD also came close to reaching 95% attendance for its 2021 De-Escalation, Response to Resistance, and Use of Force in-service training. Because of the COVID-19 extension, the CPD has until March 5, 2022, to complete the delivery of its 2021 in-service training.

The City and the CPD maintained Preliminary and Secondary compliance with ¶189 in the fifth reporting period and made progress toward Full compliance. The IMT looks forward to directly reviewing a sample of firearm pointing incidents. We also look forward to continuing to monitor FRD's review of firearm pointing incidents that are not associated with arrest reports or ISRs, as well as FRD's continued identification of patterns and trends associated with those and all firearm pointing incidents. In particular, we appreciate FRD's identification of other reports in which pointing incidents have been documented when there is no associated ISR or arrest report, such as the Traffic Stop Statistical Study Card (blue card) or the General Offense Case Report, and we look forward to learning more about the additional steps that the CPD will take to ensure that firearm pointing incidents are properly

---

Division-2021-Q2-Report.pdf; *Chicago Police Department Force Review Division 2021 Q3 Report*, CHICAGO POLICE DEPARTMENT (DECEMBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Q3-2021-13-Dec-21.pdf.

[12] Page 12 of the Q3 report states "there were 20 such instances," but the number is 18 elsewhere. *Chicago Police Department Force Review Division 2021 Q3 Report*, CHICAGO POLICE DEPARTMENT (DECEMBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Q3-2021-13-Dec-21.pdf.

documented. We also look forward to learning more about the 18 pointing incidents that the FRD has referred to the Fourth Amendment Stop Review Unit to make a final determination as to whether an ISR should have been completed, as well as any such referrals in the future.[13] Additionally, we look forward to verifying that at least 95% of officers received the 2021 De-Escalation, Response to Resistance, and Use of Force in-service training.

### Paragraph 189 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

---

[13] In its comments on our assessment of this paragraph, the City asked us to consider indicating that Full Compliance is "under assessment." We have reviewed and will continue to review the information that the City, the CPD, and COPA have made available thus far. As we explain, however, the City would need to provide additional records and data for us for our assessment.

# Use of Force: ¶190

**190.** *Beginning July 1, 2019, CPD officers will, at a minimum, promptly after the incident is concluded, notify OEMC of investigatory stop or arrest occurrences in which a CPD officer points a firearm at a person in the course of effecting the seizure. The notification will identify which CPD beat(s) pointed a firearm at a person in the course of effecting the seizure. The City will ensure that OEMC data recording each such notification is electronically linked with CPD reports and body-worn camera recordings associated with the incident, and all are retained and readily accessible to the supervisor of each CPD beat(s) identified in the notification.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶190.

To assess Preliminary Compliance, the IMT employs our Policy Methodology and Data Methodology, including reviewing the CPD's Use of Force policies and OEMC's policies to ensure they address the requirements specified in ¶190. We also evaluate the CPD's efforts to obtain and address community engagement and input on the policy that addresses ¶190's requirements.

To assess Secondary Compliance, we employ our Training Methodology, including determining whether the CPD has sufficiently trained on its Use of Force policies. We also review the number of officers who have completed Use of Force in-service training.

To assess Full Compliance, the IMT evaluates whether the CPD and OEMC have sufficiently implemented their policy and training and to ensure that OEMC records for firearm pointing notifications are properly linked to Police Computer Aided Dispatch (PCAD) reports and body worn camera videos. One way to test whether the notifications are occurring would be to sample incidents that are likely to involve a firearm pointing but for which no pointing was reported (such as reports of a person with a firearm or shots fired that result in an arrest); similarly, body worn camera videos should be reviewed to determine whether required notifications occur, and video is properly linked. Other sources of information would include the FRD's various reported findings with respect to firearm pointing incidents (including policy violations, proportion of cases with associated body worn camera video, and the proportion of cases for which documentation is lacking

(such as an arrest report or ISR). The IMT may also consider records from BIA, COPA, and the City's Law Department concerning firearm pointing incidents that are not reported to OEMC.

The City and the CPD have maintained Preliminary compliance with ¶190 since reaching it in the second reporting period. In the fourth reporting period, The City and the CPD reached Secondary compliance because a sufficient number of CPD personnel received appropriate training as part of the 2020 Use of Force in-service training. We have previously noted that the CPD's ability to attain Full compliance will depend on its ability to account for all firearm pointing incidents and achieve greater compliance with body-worn camera use.

In the fifth reporting period, we reviewed the FRD's Quarterly Reports for Q2 and Q3 2021.[14]

In the middle of the third quarter, the FRD began reviewing all FPIRs, including FPIRs that did not have an ISR or arrest report associated with the incident, and in total reviewed 101 of the 133 incidents that did not have an associated ISR or arrest during the third quarter. Of those 101 incidents, the FRD identified 18 incidents for referral to the Fourth Amendment Stop Review Unit to make a final determination as to whether an ISR should have been completed.[15]

The IMT has long requested that the CPD review all firearm pointing incidents, including those not associated with an arrest or ISR. Because of how frequently they occur (approximately 15-20% of the total number of FPIRs), this review is critical to the credibility of the CPD's analysis of firearm pointing overall. We applaud the CPD's efforts to begin this review.

The FRD reports that available body-worn-camera footage for pointing incidents continues to exceed 95%, even though body-worn-camera issues continue to account for a large percent of FRD recommendations. In Q2 of 2021, FRD reported just 15 firearm pointing incidents where no body-worn-camera footage was available, meaning footage was available for 97.4% of incidents. In Q3 of 2021, body-worn-camera footage was available for 95.8% of incidents.

---

[14]   *See Chicago Police Department Force Review Division 2021 Q2 Report*, Chicago Police Department (October 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Force-Review-Division-2021-Q2-Report.pdf; *Chicago Police Department Force Review Division 2021 Q3 Report*, Chicago Police Department (December 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Q3-2021-13-Dec-21.pdf.

[15]   Page 12 of the Q3 report states "there were 20 such instances," but the number is 18 elsewhere. *Chicago Police Department Force Review Division 2021 Q3 Report*, Chicago Police Department (December 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Q3-2021-13-Dec-21.pdf.

In Q2 of 2021, The FRD's most common recommendation (at 80%) was for late activation of body worn camera, and body worn camera usage recommendations accounted for 88% of recommendations overall.

In Q3 of 2021, The FRD's most common recommendation (at 69%) was for late activation of body worn camera, and the second most common (at 11%) was for no activation of body worn camera. Overall, body worn camera usage recommendations accounted for 83% of recommendations.

The City and the CPD maintained Preliminary and Secondary compliance with ¶190 in the fifth reporting period and made progress toward Full compliance. The IMT looks forward to directly reviewing a sample of firearm pointing incidents. We also look forward to continuing to monitor FRD's review of firearm pointing incidents that are not associated with arrest reports or ISRs, as well as FRD's continued identification of patterns and trends associated with those and all firearm pointing incidents. In particular, we appreciate FRD's identification of other reports in which pointing incidents have been documented when there is no associated ISR or arrest report, such as the Traffic Stop Statistical Study Card (blue card) or the General Offense Case Report, and we look forward to learning more about the additional steps that the CPD will take to ensure that firearm pointing incidents are properly documented.

## Paragraph 190 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Use of Force: ¶191

> **191.** *OEMC will notify an immediate supervisor of the identified beat(s) each time the pointing of a firearm is reported. Notified CPD supervisors will ensure that the investigatory stop or arrest documentation and the OEMC recordation of the pointing of a firearm are promptly reviewed in accordance with CPD policy. CPD supervisors will effectively supervise the CPD members under their command consistent with their obligations set forth in the Supervision section of this Agreement.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance and made progress toward Secondary compliance with ¶191.

To assess Preliminary Compliance, the IMT employs our Policy Methodology and Data Methodology, including reviewing the CPD's Use of Force policies and OEMC's policies to ensure they address the requirements specified in ¶191. We also evaluate the CPD's efforts to obtain and address community engagement and input on the policy that addresses ¶191's requirements.

To assess Secondary Compliance, we employ our Training Methodology, including determining whether the CPD has trained a sufficient number of officers, whether officers understand the firearm pointing policies and procedures. We also review supervisor-specific training.

To assess Full Compliance, the IMT evaluates whether the OEMC is making the required notifications and whether the CPD has sufficiently implemented its policy and training. Along with other sources of information, we will review FRD data on supervisor advisements and recommendations, which provide insight into whether supervisors are identifying deficiencies and training opportunities. We will also review a sample of firearm pointing incidents to assess whether supervisors respond appropriately.

The City and the CPD have maintained Preliminary compliance with ¶191 since reaching it in the second reporting period. In the fourth reporting period, the City and the CPD also made progress toward Secondary compliance with ¶191 via its 2020 Use of Force in-service training. We noted, however, that training specific to supervisors was still needed because the FRD had reported that supervisors were proactively taking action in only 5 percent of pointing incidents warranting action.

The IMT also expressed our belief that further training on body-worn-camera use was needed for compliance with ¶191.

Additionally, in the fourth reporting period, we stated that the CPD should consider a process in which supervisors identify and record any issues with firearm pointing incidents shortly after review because the onus of enforcing the CPD's directives cannot and should not fall only on the Force Review Division. Finally, we noted that we looked forward to the CPD's anticipated development of a supervisory dashboard.

In the fifth reporting period, we reviewed a revised draft of the CPD's supervisory in-service training materials, which we believe will adequately address supervisors' responsibilities in connection with ¶191 once the training is finalized and delivered.

The IMT also reviewed the FRD's Quarterly Reports for Q2 and Q3 2021.[16] The reports note that a revision to the Firearm Pointing Incident Report allows supervisors to indicate when they recognize a training opportunity and take corrective action at the time an incident occurs. In Q2, this reportedly occurred in only eight instances (or 4.8% of the time). In Q3, there were only four reported instances where supervisors recognized a training opportunity and addressed the issue (or 2% of the time). By way of comparison, FRD made 186 recommendations regarding FPIRs in Q2 and 281 in Q3.

In the fifth reporting period, the FRD continued to develop a dashboard to allow field supervisors to gain a better understanding of deficiencies and training opportunities, make comparisons with other units, and analyze trends so supervisors can address them. The dashboard has not yet been made available for IMT review.

The City and the CPD maintained Preliminary compliance with ¶191 in the fifth reporting period and continued to make progress toward Secondary compliance. To achieve Secondary compliance, the CPD will need to deliver its supervisory in-service training. We also expect field supervisors to take on a greater responsibility for identifying issues and training opportunities, and taking corrective action, at the time that a firearm pointing incident occurs.

---

[16] *See Chicago Police Department Force Review Division 2021 Q2 Report*, CHICAGO POLICE DEPARTMENT (OCTOBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Force-Review-Division-2021-Q2-Report.pdf; *Chicago Police Department Force Review Division 2021 Q3 Report*, CHICAGO POLICE DEPARTMENT (DECEMBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Q3-2021-13-Dec-21.pdf.

## Paragraph 191 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Use of Force: ¶192

*192. A designated unit at the CPD headquarters level will routinely review and audit documentation and information collected from all investigatory stop and arrest occurrences in which a CPD officer pointed a firearm at a person in the course of effecting a seizure. The review and audit will be completed within 30 days of each such occurrence. This review and audit will: a. identify whether the pointing of the firearm at a person allegedly violated CPD policy; b. identify any patterns in such occurrences and, to the extent necessary, ensure that any concerns are addressed; and c. identify any tactical, equipment, training, or policy concerns and, to the extent necessary, ensure that the concerns are addressed. The designated unit at the CPD headquarters level will, where applicable, make appropriate referrals for misconduct investigations or other corrective actions for alleged violations of CPD policy. At the completion of each review and audit, the designated unit at the CPD headquarters level will issue a written notification of its findings and, if applicable, any other appropriate actions taken or required to an immediate supervisor as described above.*

## Compliance Progress　　　(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**　　Ongoing　　　　　　☐ **Met**　☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶192 and made progress toward Full compliance. Due to staff attrition, the FRD was unable to meet the 30-day review deadline during the fifth reporting period.

To assess Preliminary Compliance, the IMT employs our Policy Methodology and Data Methodology, including reviewing the CPD's Use of Force policies to ensure they address the requirements specified in ¶192.

To assess Secondary Compliance, we employ our Training Methodology, including reviewing the CPD's training regarding its firearm pointing incident policy and procedures for FRD, and determining whether a sufficient number of officers have completed the training.

To assess Full Compliance, the IMT evaluates training, community, and data sources, including footage from body worn cameras, pointing data, and FRD review

schedules and completion records to determine whether the CPD has sufficiently implemented its policy and training. We also examine whether concerns are adequately identified (both detected and evaluated), and whether the processes in place "ensure that concerns are addressed" at both the organizational and individual level.

The City and the CPD have maintained Preliminary compliance with ¶192 since reaching it in the second reporting period. In the fourth reporting period, the City and the CPD achieved Secondary compliance with ¶192 via the CPD's 2020 Use of Force in-service training and training that it delivered to FRD staff. We noted that the CPD also made progress toward Full compliance in the fourth reporting period.

In the fifth reporting period, the IMT reviewed the FRD's Quarterly Reports for Q2 and Q3 2021.[17] The IMT also attended a virtual site visit with FRD's leadership. The reports and visit reveal that the Force Review Division made the following progress in the required areas for ¶192:

A. *Complete the review and audit within 30 days of each occurrence.* While the FRD was able to meet the 30-day deadline for all firearm pointing incident reviews in Q2 and Q3, because of staff attrition, it was only able to do so by the end of Q3 by utilizing voluntary overtime. By the end of the reporting period, the FRD had again fallen behind—despite best efforts—because of an ongoing staff shortage.

B. *Identify whether the pointing of the firearm at a person allegedly violated policy.* In the second quarter of 2021, the CPD reported one referral to COPA for policy violations made by the Force Review Division, and none in the third quarter. The most common recommendation debriefing points for Force Review Division Firearm Pointing Reviews continue to be related to body-worn camera use.

C. *Identify any patterns and ensure such concerns are addressed.* In the middle of the third quarter, the FRD began reviewing all FPIRs, including FPIRs that did not have an ISR or arrest report associated with the incident, and in total reviewed 101 of the 133 incidents that did not have an associated ISR or arrest during the third quarter. Of those 101 incidents, the FRD identified 18 incidents for referral to the Fourth Amendment Stop Review Unit to make a final determination as to whether an ISR should have been completed. The IMT has long requested that the CPD review all firearm pointing incidents, including those

---

[17] *See Chicago Police Department Force Review Division 2021 Q2 Report*, CHICAGO POLICE DEPARTMENT (OCTOBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Force-Review-Division-2021-Q2-Report.pdf; *Chicago Police Department Force Review Division 2021 Q3 Report*, CHICAGO POLICE DEPARTMENT (DECEMBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Q3-2021-13-Dec-21.pdf.

not associated with an arrest or ISR. Because of how frequently they occur (approximately 15-20% of the total number of FPIRs), this review is critical to the credibility of the CPD's analysis of firearm pointing overall. We applaud the CPD's efforts to begin this review.

D. *Identify tactical, equipment, training, or policy concerns and to the extent necessary ensure that the concerns are addressed*. The Q3 2021 report includes a breakdown of training actions completed by unit following the FRD's recommendation that training occur in connection with a FPIR. The report notes that unit supervisors have discretion in the training that is conducted. The majority of the time (64%, or 126 instances), the training action that is taken is to review Department directives. There were only four instances of the action that the FRD characterizes as the best practice, which is for a supervisor to recognize a training opportunity and take corrective action at the time an incident occurs.

The City and the CPD maintained Secondary compliance with ¶192 in the fifth reporting period and continued to make progress toward Full compliance.

The FRD requires additional personnel in order to meet its 30-day deadline for firearm pointing incident reviews.

We also expect field supervisors to take on a greater responsibility for identifying issues and training opportunities, and taking corrective action, at the time that a firearm pointing incident occurs.

The IMT looks forward to the establishment of the Supervisory dashboard that will supply front line supervisors with FRD data. In particular it will be interesting to see how pointing data, which is collected by beat as opposed to by officer, is included.

We also look forward to continuing to monitor FRD's review of firearm pointing incidents that are not associated with arrest reports or ISRs, as well as FRD's continued identification of patterns and trends associated with those and all firearm pointing incidents.

### Paragraph 192 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Use of Force: ¶193

**193.** *CPD will ensure that the designated unit at the CPD headquarters level responsible for performing the duties required by this Part has sufficient resources to perform them, including staff with sufficient experience, rank, knowledge, and expertise.*

## Compliance Progress　　　(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶193.

To assess Preliminary Compliance, the IMT employs our Policy Methodology and Data Methodology, including reviewing the CPD's Use of Force policies to ensure they address the requirements specified in ¶193.

To assess Secondary Compliance, we employ our Training Methodology, including reviewing the CPD's training regarding its firearm pointing incident policy and procedures for FRD, and determining whether a sufficient number of officers have completed the training.

To assess Full Compliance, the IMT evaluates whether the CPD has sufficiently implemented its policy and training, including a review of FRD quarterly reports and data on FRD staffing levels and expertise to assess the capacities and capabilities of the FRD. The IMT also monitors FRD training and whether the FRD's firearm pointing review unit has sufficient personnel to address their workload and consistently meet the 30-day review deadline. The IMT will also review a sample of pointing incidents to determine whether policy has been complied with and accurately categorized.

The City and the CPD have maintained Preliminary compliance with ¶193 since reaching it in the second reporting period and maintained Secondary compliance since reaching it in the third reporting period. In the fourth reporting period, the FRD continued to demonstrate its commitment to ensuring its staff have sufficient knowledge and expertise through continued in-service training. With respect to Full compliance, we noted during our site visit in the fourth reporting period that the FRD was understaffed by at least 13 officers.

In the fifth reporting period, the CPD indicated its intent to expand the responsibilities of FRD to include search warrants and committed to allowing the IMT to

review the changes and criteria for staffing the unit in light of the added responsi-bilities.[18]

With that expanded scope of responsibilities in mind, the IMT has reviewed FRD's staffing levels and anticipated needs. During a November 18, 2021 conference call, FRD's Commander anticipated needing one additional Sergeant and 10 police of-ficers; the Q2 2021 FRD Quarterly Report suggests the need will be as follows: 1 Lieutenant, 6 Sergeants, and 40 police officers. We note that FRD is understaffed even for its current scope of responsibilities and has been missing its 30-day fire-arm pointing incident review deadline and accumulating a backlog for its review of TRRs.

The IMT also considered the training that FRD personnel completed in the fifth reporting period, which included weekly discussions of pertinent issues at staff meetings.

The City and the CPD maintained Secondary compliance with ¶193 in the fifth re-porting period. The FRD requires additional personnel in order to meet its 30-day deadline for firearm pointing incident reviews and to take on its proposed new duties with respect to search warrants.

### Paragraph 193 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

---

[18]    The CPD may also change the name of the FRD to match its expanded scope of responsibilities.

# Use of Force: ¶194

> **194.** *CPD officers will not be required to notify OEMC of the pointing of a firearm at a person when the CPD officer is a SWAT Team Officer responding to a designated SWAT incident, as defined in CPD Special Order S05-05, or an officer assigned to a federal task force during the execution of federal task force duties.*

## Compliance Progress　　　　(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶194.

To assess Preliminary Compliance, the IMT employs our Policy Methodology and Data Methodology, including reviewing the CPD's Use of Force policies to ensure they address the requirements specified in ¶194.

To assess Secondary Compliance, we employ our Training Methodology, including reviewing the CPD's training regarding its firearm pointing incident policy and procedures for FRD, and determining whether a sufficient number of officers have completed the training.

To assess Full Compliance, the IMT evaluates whether the CPD has sufficiently implemented its policy and training, including whether notifications that are not required are tracked and if ¶194's exemptions to the general firearm pointing reporting requirements result in complaints or other issues.

The City and the CPD have maintained Preliminary compliance with ¶194 since reaching it in the third reporting period. In the fourth reporting period, the City and the CPD achieved Secondary compliance with ¶194 via the CPD's 2020 Use of Force in-service training.

In the fifth reporting period, the CPD's FRD provided a letter to the IMT dated December 16, 2021, that states as follows:

> *In 2021 the Force Review Division found no Firearm Pointing Incidents that were erroneously reported by Department Members assigned to SWAT team member assigned to a SWAT incident as defined in Department Special Order: S05-05-Special Weapons and Tactics (SWAT) Incidents.*

The CPD's FRD did not separately address whether any such exempted notifications were made by an officer assigned to a federal task force during the execution of federal task force duties.

The CPD has indicated that beginning in 2022, the FRD will begin documenting whether any exempted firearm pointing notifications occur in its quarterly reports.

In the middle of the third quarter, the FRD began reviewing all FPIRs, including FPIRs that did not have an ISR or arrest report associated with the incident, and in total reviewed 101 of the 133 incidents that did not have an associated ISR or arrest during the third quarter. Of those 101 incidents, the FRD identified 18 incidents for referral to the Fourth Amendment Stop Review Unit to make a final determination as to whether an ISR should have been completed.[19]

The IMT has long requested that the CPD review all firearm pointing incidents, including those not associated with an arrest or ISR. Because of how frequently they occur (approximately 15-20% of the total number of FPIRs), this review is critical to the credibility of the CPD's analysis of firearm pointing overall. We applaud the CPD's efforts to begin this review.

As the FRD's role expands to cover search warrants, the IMT recommends that the CPD consider whether to continue to exempt SWAT from its general firearm pointing reporting requirements.

The City and the CPD maintained Preliminary and Secondary compliance and reached Full compliance with ¶194 in the fifth reporting period.

The IMT looks forward to reviewing information in the FRD's quarterly reports about whether exempted notifications are occurring beginning in 2022. We also look forward to continuing to monitor FRD's review of firearm pointing incidents that are not associated with arrest reports or ISRs, as well as FRD's continued identification of patterns and trends associated with those and all firearm pointing incidents. In particular, we appreciate FRD's identification of other reports in which pointing incidents have been documented when there is no associated ISR or arrest report, such as the Traffic Stop Statistical Study Card (blue card) or the General Offense Case Report, and we look forward to learning more about the additional steps that the CPD will take to ensure that firearm pointing incidents are properly documented. In addition, the IMT looks forward to exploring further whether the

---

[19]  Page 12 of the Q3 report states "there were 20 such instances," but the number is 18 elsewhere. *Chicago Police Department Force Review Division 2021 Q3 Report*, CHICAGO POLICE DEPARTMENT (DECEMBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Q3-2021-13-Dec-21.pdf.

exemptions will remain viable in light of the expansion of the FRD's role to cover review of search warrants.[20]

## Paragraph 194 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

---

[20]   The CPD may also change the FRD's name to reflect the expanded scope of its responsibilities.

# Use of Force: ¶195

> **195.** *CPD officers will not be required to notify OEMC of any un-holstering or display of a firearm or having a firearm in a "low ready" position during the course of an investigation, unless the firearm is pointed at a person.*

## Compliance Progress            (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶195.

To assess Preliminary Compliance, the IMT employs our Policy Methodology and Data Methodology, including reviewing the CPD's Use of Force policies—particularly Department Order D19-01, *Firearm Pointing Incidents*, effective November 1, 2019—to ensure they address the requirements specified in ¶195.

To assess Secondary Compliance, we employ our Training Methodology, including reviewing the CPD's training regarding its firearm pointing incident policy and procedures for FRD, and determining whether a sufficient number of officers have completed the training.

To assess Full Compliance, the IMT evaluates whether the CPD has sufficiently implemented its policy and training, including whether notifications that are not required are tracked and if ¶195's exemptions to the general firearm pointing reporting requirements result in complaints or other issues.

The City and the CPD have maintained Preliminary compliance with ¶195 since reaching it in the third reporting period. In the fourth reporting period, the City and the CPD achieved Secondary compliance with ¶195 via the CPD's 2020 Use of Force in-service training.

In the fifth reporting period, the CPD indicated that beginning in 2022, the FRD will begin documenting in its quarterly reports whether any "erroneous" firearm pointing notifications occur. The IMT is not aware of any mechanisms by which the CPD is already tracking whether firearm pointing notifications are made in circumstances where they are not required pursuant to ¶195.

Also, in the middle of the third quarter, the FRD began reviewing all FPIRs, including FPIRs that did not have an ISR or arrest report associated with the incident, and in total reviewed 101 of the 133 incidents that did not have an associated ISR or

arrest during the third quarter. Of those 101 incidents, the FRD identified 18 incidents for referral to the Fourth Amendment Stop Review Unit to make a final determination as to whether an ISR should have been completed.[21]

The IMT has long requested that the CPD review all firearm pointing incidents, including those not associated with an arrest or ISR. Because of how frequently they occur (approximately 15-20% of the total number of FPIRs), this review is critical to the credibility of the CPD's analysis of firearm pointing overall. We applaud the CPD's efforts to begin this review.

The City and the CPD maintained Preliminary and Secondary compliance with ¶195 in the fifth reporting period.

The IMT looks forward to reviewing information in the FRD's quarterly reports, beginning in 2022, about whether notifications are occurring that are not required by ¶195. We also look forward to continuing to monitor FRD's review of firearm pointing incidents that are not associated with arrest reports or ISRs, as well as FRD's continued identification of patterns and trends associated with those and all firearm pointing incidents. In particular, we appreciate FRD's identification of other reports in which pointing incidents have been documented when there is no associated ISR or arrest report, such as the Traffic Stop Statistical Study Card (blue card) or the General Offense Case Report, and we look forward to learning more about the additional steps that the CPD will take to ensure that firearm pointing incidents are properly documented.

## Paragraph 195 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

---

[21] Page 12 of the Q3 report states "there were 20 such instances," but the number is 18 elsewhere. *Chicago Police Department Force Review Division 2021 Q3 Report*, CHICAGO POLICE DEPARTMENT (DECEMBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Q3-2021-13-Dec-21.pdf.

# Use of Force: ¶196

> *196. The City will ensure that all documentation and recordation of investigatory stop or arrest occurrences in which a CPD member points a firearm at a person, including OEMC data, is maintained in a manner that allows the Monitor, CPD, and OAG to review and analyze such occurrences. Beginning January 1, 2020, the Monitor will analyze these occurrences on an annual basis to assess whether changes to CPD policy, training, practice, or supervision are necessary, and to recommend any changes to the process of documenting, reviewing, and analyzing these occurrences. CPD will either adopt the Monitor's recommendations or respond in writing within 30 days. Any dispute regarding the whether the Monitor's recommendations should be implemented will be resolved by the Court.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    December 31, 2021    ☑ **Met**    ☐ **Missed**

**Preliminary:**    *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Full:**    *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶196.

Paragraph 196—along with a few other paragraphs in the Consent Decree—is written to highlight the IMT's actions or reviews but ultimately relates to City responsibilities.

To assess Preliminary Compliance, the IMT employs our Policy Methodology and Data Methodology, including reviewing the CPD's Use of Force policies—particularly Department Order D19-01, *Firearm Pointing Incidents*, effective November 1, 2019—to ensure they address the requirements specified in ¶196.

To assess Secondary Compliance, we employ our Training Methodology, including reviewing the CPD's training regarding its firearm pointing incident policy and procedures for FRD, and determining whether a sufficient number of officers have completed the training.

To assess Full Compliance, the IMT evaluates whether the CPD has sufficiently implemented its policy and training, including following practices for maintaining and reviewing documentation, recordation, and data regarding firearm pointing incidents. We also evaluate whether the CPD produces data that allows the IMT to identify patterns and trends at the district, shift, and beat level in a timely fashion

for all current pointing incidents (including those not associated with an ISR or arrest report) and how the CPD responds to recommendations regarding trends and patterns.

The City and the CPD have maintained Preliminary and Secondary compliance with ¶196 since reaching those levels in the second and third reporting periods, respectively.

In the fourth reporting period, the IMT noted our longstanding recommendation to review all firearm pointing incidents, including those that did not have an associated ISR or arrest report. We also discussed our recommended revisions to the dashboards to include detailed data at the beat level, allowing for identification of geographic areas with high levels of firearm pointing incidents. We explained that capturing and analyzing data at the beat level will enable the CPD to identify patterns and trends that may be rectified through, for example, training or increased supervisor engagement. We also noted that the CPD was planning to conduct an audit to assess the effectiveness of debriefings conducted by district supervisors.

In the fifth reporting period, the IMT reviewed the FRD's Quarterly Reports for Q2 and Q3 2021.[22] In the middle of the third quarter, the FRD began reviewing all FPIRs, including FPIRs that did not have an ISR or arrest report associated with the incident, and in total reviewed 101 of the 133 incidents that did not have an associated ISR or arrest during the third quarter. Of those 101 incidents, the FRD identified 18 incidents for referral to the Fourth Amendment Stop Review Unit to make a final determination as to whether an ISR should have been completed.[23]

The IMT has long requested that the CPD review all firearm pointing incidents, including those not associated with an arrest or ISR. Because of how frequently they occur (approximately 15-20% of the total number of FPIRs), this review is critical to the credibility of the CPD's analysis of firearm pointing overall. We applaud the CPD's efforts to begin this review.

We note, however, that the FRD requires additional personnel in order to meet its 30-day deadline for firearm pointing incident reviews.

---

[22] *See Chicago Police Department Force Review Division 2021 Q2 Report*, CHICAGO POLICE DEPARTMENT (OCTOBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Force-Review-Division-2021-Q2-Report.pdf; *Chicago Police Department Force Review Division 2021 Q3 Report*, CHICAGO POLICE DEPARTMENT (DECEMBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Q3-2021-13-Dec-21.pdf.

[23] Page 12 of the Q3 report states "there were 20 such instances," but the number is 18 elsewhere. *Chicago Police Department Force Review Division 2021 Q3 Report*, CHICAGO POLICE DEPARTMENT (DECEMBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Q3-2021-13-Dec-21.pdf.

The FRD Quarterly reports also note that a revision to the Firearm Pointing Incident Report allows supervisors to indicate when they recognize a training opportunity and take corrective action at the time an incident occurs. In Q2, this reportedly occurred in only eight instances (or 4.8% of the time). In Q3, there were only four reported instances where supervisors recognized a training opportunity and addressed the issue (or 2% of the time). By way of comparison, FRD made 186 recommendations regarding FPIRs in Q2 and 281 in Q3.

In the fifth reporting period, the FRD continued to develop a dashboard to allow field supervisors to gain a better understanding of deficiencies and training opportunities, make comparisons with other units, and analyze trends so supervisors can address them. The dashboard has not yet been made available for IMT review.

Similarly, we look forward to reviewing the outcome of an audit the CPD has been planning to assess the effectiveness of debriefings conducted by district supervisors.

In the fifth reporting period, we also reviewed a revised draft of the CPD's supervisory in-service training materials, which we understand the CPD intends to deliver in 2022. The CPD has also taken down its firearm pointing dashboard as of the writing of this report, which is an important tool for the CPD to demonstrate compliance with ¶196.

The City and the CPD maintained Preliminary and Secondary compliance with ¶196 in the fifth reporting period and made progress toward Full compliance by beginning to implement the IMT's recommendation that the FRD review all firearm pointing incidents, including those not associated with an ISR or arrest report.

We look forward to reviewing the CPD's ongoing efforts to address our recommendations, including (1) the introduction or revision of its dashboards and (2) measures to enable and encourage field supervisors to take on a greater responsibility for identifying issues and training opportunities, and taking corrective action, at the time that a firearm pointing incident occurs.

We also look forward to continuing to monitor FRD's review of firearm pointing incidents that are not associated with arrest reports or ISRs, as well as FRD's continued identification of patterns and trends associated with those and all firearm pointing incidents. In particular, we appreciate FRD's identification of other reports in which pointing incidents have been documented when there is no associated ISR or arrest report, such as the Traffic Stop Statistical Study Card (blue card) or the General Offense Case Report, and we look forward to learning more about the additional steps that the CPD will take to ensure that firearm pointing incidents are properly documented.

## Paragraph 196 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Preliminary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Secondary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Secondary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Secondary

# Use of Force: ¶197

**197.** *CPD will continue to require that only officers who are currently certified may be issued, carry, and use Tasers.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Full:** *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶197.

To assess Preliminary compliance with ¶197, the IMT reviewed the CPD's policies that to reflect the requirements of the Consent Decree, including *Uniform and Property* U04-02-02, *Control Devices and Instruments*, General Order G03-02-04, *Taser Use Incidents*, and Special Order S11-03-01, *Annual Prescribed Weapon Qualification Program and Taser Recertification*. It is our understanding that the CPD is at work on revisions to its *Taser Use Incidents* policy, per conversations between the Parties and the Coalition. Those conversations were ongoing throughout this reporting period.

We note that when the CPD makes changes or updates to existing policies, appropriate training must follow. We look forward to assessing updated training for officers when the *Taser Use Incidents* policy is updated.

The IMT seeks a data source with which to clearly assess the CPD's Full compliance. The data base should include all officers who are certified Taser users, the date of their certification, length of their certification, and requirements of their certification, searchable by reporting period. We also plan to review FRD records and TRRs regarding Taser use to cross check against the list of certified officers. We look forward to the CPD's continued progress on the requirements of ¶197.

### Paragraph 197 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Use of Force: ¶198

**198.** *CPD will instruct officers that Tasers can cause serious injury or death and, as a result, officers should use Tasers only after balancing relevant factors including the threat presented by the subject, the risk of injury if a Taser is used, and the seriousness of the suspected offense. Consistent with this standard, CPD officers should not use Tasers against persons who are reasonably perceived to be non-violent, unarmed, and suspected of low-level offenses, such as property-related misdemeanors, quality of life offenses, moving or traffic violations, or municipal code violations.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶198.

To evaluate Preliminary compliance with ¶198, we continued to focus our review on whether the City and the CPD received the requisite community input for General Order G03-02-04, *Taser Use Incidents*. Throughout this reporting period, the CPD engaged in discussions with the Coalition (*see* ¶169). While the CPD's community engagement efforts have improved since the Consent Decree became effective, it continues to be an area that the CPD struggles with and needs much more work as described in the assessment of ¶160. As a result of their discussions with the Coalition, the CPD noted it will be making a number of changes to G03-02-04, which include some specifically related to ¶198. We await the next draft of this policy to review and look forward to the CPD finalizing it and training their officers on the revised policy.

We also reviewed the FRD's Quarterly Reports and the CPD's Use of Force Dashboard. We note that, according to the CPD's Use of Force Dashboard, Taser usage has seen a significant reduction in recent years.

Use of Force Appendix Figure 4.
Data from CPD's Use of Force Dashboard re: Taser Use

| YEAR | REPORTED TASER INCIDENTS |
|------|--------------------------|
| 2016 | 474 |
| 2017 | 383 |
| 2018 | 207 |
| 2019 | 202 |
| 2020 | 149 |
| 2021 | 112 |

We look forward to reviewing the updated version of General Order G03-02-04, *Taser Use Incidents* in the next reporting period.

### Paragraph 198 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|------------------------|-------------------------|------------------------|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|-------------------------|------------------------|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Under Assessment | |

# Use of Force: ¶199

**199.** *CPD will clarify in policy that flight alone, without any other basis for reasonable articulable suspicion or probable cause, does not justify use of a Taser against a subject.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶199.

To evaluate Preliminary compliance with ¶199, we continued to focus our review on whether the City and the CPD received the requisite community input for General Order G03-02-04, *Taser Use Incidents*. Throughout this reporting period, the CPD engaged in discussions with the Coalition (*see* ¶169). While the CPD's community engagement efforts have improved since the Consent Decree became effective, it continues to be an area that the CPD struggles with and needs much more work as de-scribed in the assessment of ¶160. As a result of their discussions with the Coalition, the CPD noted it will be making a number of changes to G03-02-04, which include some specifically related to ¶199.

We await the next draft of this policy to review and look forward to the CPD finalizing it and training their officers on the revised policy.

### Paragraph 199 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Under Assessment | |

# Use of Force: ¶200

> **200.** *When safe and feasible to do so, CPD officers must give verbal commands and warnings prior to, during, and after deployment of a Taser. When safe and feasible to do so, CPD officers will allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use a Taser, unless doing so would compromise the safety of an officer or another person.*

## Compliance Progress   (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**   *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**   *Under Assessment*
**Full:**   *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶200 and remained under assessment for Secondary compliance.

To evaluate Preliminary compliance with ¶200, we reviewed General Order G03-02-04, *Taser Use Incidents*. The CPD's community engagement and discussions with the Coalition (*see* ¶669) continued throughout this reporting period. While the CPD's community engagement efforts have improved since the Consent Decree became, it continues to be an area that the CPD struggles with and needs much more work as described in the assessment of ¶160.

As a result of community discussions, the CPD has issued proposed changes to the Taser policy, General Order G03-02-04, *Taser Use Incidents*. Section III.B, entitled Authorized Manner of Use subsections 1 and 2 include the exact language required by this paragraph. We look forward to the CPD finalizing this policy.

We also reviewed the FRD's Quarterly Reports and the CPD's Use of Force Dashboard and note (see data table in ¶198) that Taser use incidents have declined over the last six years. We also note that the FRD is reviewing Taser incidents; during this reporting period, there were 54 Taser deployments (as of December 15, 2021), and in its 2021 2nd Quarterly Report, reports one debriefing for an officer failing to give a warning prior to Taser use.

The CPD remains under assessment for Secondary compliance as the CPD seeks to provide sufficient training on the requirements of ¶200.

## Paragraph 200 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶201

**201.** *CPD will strongly discourage the use of Tasers in schools and on students. CPD will require officers to consider the totality of the circumstances, including a subject's apparent age, size, and the threat presented, in assessing the reasonableness and necessity of using a Taser in a school.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* **(NEW: LOST COMPLIANCE)** |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD did not maintain Preliminary compliance with ¶201. To evaluate Preliminary compliance with ¶201, we reviewed whether the City and the CPD received the requisite community input for General Order G03-02-04, *Taser Use Incidents*. The CPD continued discussions with the Coalition (*see* ¶669) throughout this reporting period. As a result of these discussions, the CPD has drafted a number of changes to G03-02-04, which includes establishing a more restrictive standard on the use of Tasers against active resistors (Section II.E.1), which applies to Taser use in schools and on students.

The CPD has not, however, made changes to "strongly discourage" the use of Tasers in schools and on students in the *School Resource Officer* policy as we recommended in IMR-4. The *School Resource Officers* policy (S04-01-02) was finalized with an effective date of 27 December 2021. To obtain Secondary compliance, the CPD will need to provide sufficient training on these relevant policies.

### Paragraph 201 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Under Assessment | |

# Use of Force: ¶202

> **202.** *CPD officers will treat each application or standard cycle (five seconds) of a Taser as a separate use of force that officers must separately justify as objectively reasonable, necessary, and proportional. CPD will continue to require officers to, when possible, use only one five-second energy cycle and reassess the situation before any additional cycles are given or cartridges are discharged. In determining whether any additional application is necessary, CPD officers will consider whether the individual has the ability and has been given a reasonable opportunity to comply prior to applying another cycle.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶202. To evaluate Preliminary compliance with ¶202, we reviewed on General Order G03-02-04, *Taser Use Incidents*, which became effective on April 15, 2021.

Section II.F of G03-02-04 clearly states that officers must "Justify Separate Uses of Force. An initial Taser application and each subsequent application of Taser energy (either re-energizing a discharged cartridge with the ARC switch or discharging a second cartridge) must be individually justified and documented on the Tactical Response Report (TRR) as a separate use of force."

The Parties and the Coalition continued to meet and discuss Taser issues throughout this reporting period; we appreciate these community engagement efforts. While the CPD's community engagement efforts have improved since the Consent Decree became effective, it continues to be an area that the CPD struggles with and needs much more work as described in the assessment of ¶160.

In IMR-4, we noted that for Secondary compliance, the CPD would need to demonstrate its ability to identify TRRs with multiple applications and the IMT will review the number of incidents when multiple energy cycle events occur. During this reporting period the FRD Quarterly Reports indicate a vehicle to assess multiple cycle events.

For example, the FRD's 2021 2nd Quarterly Report indicates 25 Taser discharges, 13 of which indicated only one discharge cycle, the remaining 12 were multiple cycle discharges. Further, all 25 were reviewed by a Lieutenant who determined

the Taser discharges to be within policy. Overall, FRD made 3 recommendations for improvements.

The same FRD report identifies 1 instance in which an officer failed to correctly document the number of energy cycles in the correct location on the TRR. We appreciate the FRD's attention to detail when reviewing TRRs and including it in the Quarterly Reports.

The FRD 2021 3rd Quarterly Report indicates 22 incidents Tasers use incidents, 16 of which indicated one energy cycle and 7 of which indicated multiple cycles. In all instances the reviewing supervisors found the uses to be in compliance with CPD policy. The following recommendations were made in 3rd Quarterly Report:

- In 2 incidents officers failed to properly document the number of energy cycles in the proper place on the TRR form

- In 1 incident the officer discharged their Taser from an ineffective distance

- In 3 incidents the officer dropped their Taser to ground following the discharge

In all of the above incidents, the officers involved were "re-enrolled in the Taser refresher training course offered by the Training and Support Group," according to FRD's 2021 3rd Quarterly Report.

To maintain Secondary compliance, the CPD must maintain its levels of appropriate training regarding Taser use. For Full compliance, the IMT will review and analyze a sampling of incidents of multiple Taser applications; we look forward to the CPD's continued progress on this paragraph.

### Paragraph 202 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Use of Force: ¶203

**203.** *CPD will require that if the subject has been exposed to three, five-second energy cycles (or has been exposed to a cumulative 15 total seconds of energy) and the officer has not gained control, officers switch to other force options unless the officer can reasonably justify that continued Taser use was necessary to ensure the safety of the officer or another person, recognizing that prolonged Taser exposure may increase the risk of death or serious injury.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**     *In Compliance* (NEW)
**Full:**     *Not Yet Assessed*

In the fifth reporting period, the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶203. To assess compliance, the IMT reviewed the CPD's applicable policy, FRD's Quarterly Reports and CPD's Use of Force Dashboard, specifically the data regarding Taser use.

CPD's policy G03-02-04*, Taser Use Incidents*, which became effective on April 15, 2021, includes the requirements of ¶203. Specifically, Section III.B.7. of G03-02-04 clearly states that "if the subject has been exposed to three, five-second energy cycles (or has been exposed to a cumulative 15 total seconds of energy) and the member has not gained control of the subject, switch to other force options unless the member can reasonably justify that continued Taser use was necessary to ensure the safety of the member or another person," echoing the language and requirements of ¶203. The policy also includes a "NOTE," which states "Prolonged Taser exposure under certain circumstances may increase the risk of serious injury or death."

To assess Secondary compliance, we reviewed the CPD's in-service training curricula and observed the 2021 use of force in-service training, entitled *De-escalation, Response to Resistance, and Use of Force: Procedures* in November 2021 both online and at the CPD Academy, which addressed Taser use.

We note that the FRD's Quarterly Reports include data on Taser use and debriefings with officers. For example, the reports detail the numbers of Taser use incidents and the types of debriefing points recommended, such as to address accidental discharges, Taser cycles over 5 seconds, and "crossfire."

We look forward to additional progress on ¶203 in the next reporting period.

## Paragraph 203 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Use of Force: ¶204

**204.** *CPD officers must: a. determine the necessity, objective rea-sonableness, and proportionality of Taser use based on the totality of the circumstances, including the subject's apparent age, size, physical and mental condition, disability, and impairment; b. not use Tasers in drive-stun mode unless the subject is an assailant and other force options are not readily available or would otherwise be ineffective; c. when practicable, avoid the use of Tasers when it is reasonably evident that a deployment may cause serious physical injury, including if the subject is elevated above the ground, if the subject is operating or riding any mode of transportation, or if the subject may be less able to catch or protect themselves in a fall; d. not use Tasers in any environment that contains potentially flam-mable, volatile, or explosive material; e. not use Tasers on a subject who is at a greater risk of serious injury or death from Taser use, including, but not limited to, children, pregnant individuals, and the elderly, unless the subject is an assailant and other force options are not readily available or would otherwise be ineffective; f. target the Taser in probe mode at the lower center mass and avoid the head, neck, and genitalia; g. not activate more than one Taser at a time against a subject, unless an officer already attempted to use a Taser against the subject but the probes did not make contact with the subject; and h. keep Tasers in a weak-side holster.*

---

**Compliance Progress**  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD made progress toward, but re-main under assessment for, Preliminary compliance with ¶204.

To evaluate Preliminary compliance with ¶204, we reviewed General Order G03-02-04, *Taser Use Incidents*. The CPD continued discussions throughout this report-ing period on Taser issues with the OAG, the IMT, and the Coalition. While the CPD's community engagement efforts have improved since when the Consent De-cree became effective, it continues to be an area that the CPD struggles with and needs much more work as described in the assessment of ¶160. As a result of these discussions, the CPD noted it will be making a number of changes to G03-02-04, which includes strengthening the prohibited acts when targeting a person's body during Taser use (Section III.B.3).

We will continue to assess Preliminary compliance for ¶204 in the sixth reporting period, seeking the issuance of a revised G03-04-02 to reflect these policy changes resulting from community engagement with the Coalition and other community members.

### Paragraph 204 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Under Assessment | |

# Use of Force: ¶205

**205.** *CPD officers must request medical aid for a person subjected to a Taser application. CPD officers must place any person subjected to a Taser application in a position that does not impair respiration, as soon as it is safe and feasible to do so. CPD officers must render life-saving aid to injured persons consistent with their training until medical professionals arrive on scene. Only trained medical personnel may remove Taser probes from a subject.*

Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD did not yet achieve Preliminary compliance with the requirements of ¶205.

To evaluate Preliminary compliance with ¶205, we reviewed General Order G03-02-04, *Taser Use Incidents,* which has been under discussion throughout this monitoring period with community stakeholders. The CPD has indicated some changes they will be making to this policy based on those robust discussions and sent a draft for discussion, but this revised policy was not finalized during this reporting period.

We will continue to assess Preliminary compliance with ¶205 in the sixth reporting period, seeking the finalization and issuance of revised G03-04-02 to reflect these policy changes resulting from community engagement. We note that Section V.B of the CPD's main use of force policy, G03-02, *De-Escalation, Response to Resistance, and Use of Force*, states that Department members *will* render life-saving medical aid:

> [A]s soon as it is safe and feasible to do so, members will provide life saving aid consistent with their Department training, including the Law Enforcement Medical and Rescue Training (LEMART) training, to injured persons until medical professionals arrive on the scene.

However, as we noted in our last report (IMR-4), this required language is still not present in G03-02-04, *Taser Use Incidents*, and should be included in the updated draft. We look forward to assessing the CPD's progress with ¶205 in the next reporting period.

## Paragraph 205 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Use of Force: ¶206

**206.** *CPD will conduct Taser inspections on a periodic basis to perform information downloads, ensure Tasers are operable, and perform necessary maintenance or repairs.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**     *Under Assessment*
**Full:**     *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶206. The IMT notes that Uniform and Property U04-02-02, *Control Devices and Instruments* (effective February 29, 2020) clearly states:

> District commanders/unit commanding officers will ensure that Taser inspections are conducted on a quarterly basis. During inspections, district commanders/unit commanding officers will ensure: a. a Taser discharge data report is downloaded for each Taser assigned to the unit. b. a Taser Data Reconciliation Report (CPD-21. 969) is completed. c. Tasers assigned to the unit are operational and any Tasers requiring maintenance or repairs are hand-carried during 2nd watch by a sworn member to the Taser Repair Center,

It also contains a "NOTE," which states, "If necessary, Taser inspections can be conducted more often."

The IMT seeks further information about how and when the CPD conducts Taser inspections and how those inspections are documented. We look forward to assessing the CPD's continued progress with ¶206 in the next reporting period.

### Paragraph 206 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶207

> **207.** *CPD officers may use OC devices only when such force is objectively reasonable, necessary, and proportional under the totality of the circumstances, and consistent with the objectives above.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶207. To evaluate Preliminary compliance with ¶207, we reviewed G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, which became effective on April 15, 2021; the policy addresses all the requirements of ¶207.

As we detail throughout this section on OC devices, we remained concerned about the CPD's efforts to train officers appropriately on these requirements, including supervisors. We note that the planned 2022 in-service Supervisory Refresher training does not address use of force in the context of protest activity; we believe it should. Until the CPD demonstrates evidence of thorough officer training on the use of OC spray and the First Amendment, they will not achieve Secondary compliance.

The IMT also reviewed FRD's Quarterly Reports, the CPD's Use of Force Dashboard, and listened in on lengthy discussions with the OAG, the IMT, the Coalition, and the Court, regarding the CPD's First Amendment policy. We look forward to the CPD's continued progress with this paragraph.

### Paragraph 207 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶208

**208.** *CPD officers may only use OC devices for crowd dispersal when such force is necessary, objectively reasonable, and proportional to the threat presented to public safety. CPD will continue to require that the Superintendent or his or her designee provides authorization before OC devices are used for noncompliant groups, crowds, or an individual taking part in a group or crowd.*

**Compliance Progress**     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶208. To evaluate Preliminary compliance with ¶208, we focused our review on G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents* and G02-02, *First Amendment Rights*. The IMT also spent hours listening to conversations among the Parties and the Coalition regarding OC spray in the context of First Amendment activities.

On April 15, 2021, the CPD's revised G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, became effective. Sections II.C.3 and 4 state:

> *3.     A Personal OC device is an authorized force option against passive resisters only under the following conditions: a. Occupants of a motor vehicle who are passively resisting arrest only after obtaining authorization from an on-scene supervisor the rank of sergeant or above. b. Noncompliant groups, crowds, or an individual taking part in a group or crowd and only after obtaining authorization from the Superintendent or his or her designee.*

> *4.     Special weapons that dispense the Capsaicin II powder agent or larger volumes of chemical agents are authorized force options against active and passive resistors that are part of a noncompliant groups, crowds, or an individual taking part in a group or crowd only under the following conditions: a. when the chemical agent is used only for area saturation, and b. only after obtaining authorization from the Superintendent or his or her designee.*

On April 13, 2021 the CPD issued an updated policy G02-02, *First Amendment Rights*, but it did not mention the use of OC spray in that context. On December 8,

2021, the CPD provided a revised draft of G02-02 for discussion. While the updated version of the policy has not been finalized and issued, it does appropriately mention OC spray in the context of First Amendment activities. We anticipate that when the revised G02-02 policy is finalized and issued, the CPD will achieve Preliminary compliance with this paragraph.

To assess Secondary compliance with this paragraph, the IMT continues to seek evidence of appropriate training for officers, particularly for supervisory ranks. We note that the planned 2022 Supervisory Refresher training does not emphasize the requirements around OC devices, and we recommend that the requirements of this paragraph and related OC paragraphs be included.

### Paragraph 208 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Under Assessment | |

# Use of Force: ¶209

**209.** *When safe and feasible to do so, CPD officers must issue verbal commands and warnings to the subject prior to, during, and after the discharge of an OC device. When safe and feasible to do so, CPD will require officers to allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use an OC device, unless doing so would compromise the safety of an officer or another person.*

### Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD maintained Preliminary compliance with ¶209. To assess compliance, the IMT reviewed G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, which became effective on April 15, 2021. Section III.A. 1 and 2 articulate the requirements of ¶209:

> *III.    CONDITIONS ON THE USE OF PERSONAL OC DEVICES OR OTHER CHEMICAL AGENTS*
>
> *A.    Authorized Manner of Use. When it is safe and feasible to do so, a member who is discharging a Personal OC device or other chemical agent will:*
>
> *1.    give verbal commands and warnings prior to, during, and after discharge, including informing other Department members on the scene of the discharge.*
>
> *2.    allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use a Personal OC device or other chemical agent, unless doing so would compromise the safety of a Department member or another person.*

The IMT also reviewed FRD's Quarterly Reports, and the data presented therein. And as we note in ¶211 below, CPD data indicate that OC spray usage is trending downward. During this reporting period (between July 1, 2021 and December 15, 2021), FRD data indicate there were a total of 5 OC spray discharges but did not conduct debriefings or issue recommendations related to OC spray. We note that the FRD has conducted mandatory debriefings with officers for "failure to warn," but not related to OC spray.

Finally, our review of the CPD's 2021 in-service use of force training course curriculum and observations of the course delivery indicate that the requirements of this paragraph were included. We note, however, that the planned 2022 Supervisory Refresher training does not emphasize the requirements around OC devices, and we recommend that the requirements of this paragraph and related OC paragraphs be included. We continue to stress the need for training for all officers on OC spray in the context of protests, unrest, and crowd control.[24]

We look forward to continued progress on ¶209 in the next reporting period.

### Paragraph 209 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

---

[24] In its comments on our assessment of this paragraph, the City asked us to consider indicating that Secondary Compliance is "under assessment" based on the approval and administration of the CPD's 2021 Use of Force in-service training, pending proof of CPD attendance. *See* Attachment B. However, the requirements of ¶158 are not limited to the CPD's annual Use of Force in-service training. Moreover, at the end of the reporting period, the CPD is still developing revisions to key policies, including those related to First Amendment Rights, Tasers, Batons, and OC Spray).

# Use of Force: ¶210

**210.** *Each individual application of an OC device (e.g., each spray of an officer's personal OC device) by a CPD officer must be objectively reasonable, necessary, and proportional under the totality of the circumstances, and consistent with the objectives above.*

## Compliance Progress
*(Reporting Period: July 1, 2021, through Dec. 31, 2021)*

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶210. To assess compliance, the IMT reviewed relevant CPD policy, FRD's Quarterly Reports, the CPD's Use of Force Dashboard, a sampling of TRRs, and observed the CPD's 2021 in-service training course *De-escalation, Response to Resistance, and Use of Force: Procedures* in November 2021 both online and at the CPD Academy.

We note that CPD's policy G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, which became effective on April 15, 2021, includes the requirements of this paragraph in II.C: "When Use is Authorized. Department members' use of Personal OC devices or other chemical agents must be objectively reasonable, necessary, and proportional to the threat, actions, and level of resistance offered by a subject, under the totality of the circumstances" and II.E.: "Justify Separate Uses of Force. An initial application of a Personal OC device or other chemical agent and each subsequent application must be individually justified and documented on the Tactical Response Report (TRR) as a separate use of force."

Our review of the CPD's 2021 in-service training course curriculum and observations of the course delivery indicate that the requirements of this paragraph were not included. Again, we stress the importance of training on OC spray use in the context of protests, unrest, and crowd control. CPD's policy addressing First Amendment activity is currently being updated and should be incorporated into future training.

And as we note in ¶211 below, CPD data indicate that OC spray usage is trending downward. During this reporting period (between July 1, 2021 and December 15, 2021), FRD data indicate there were a total of 5 OC spray discharges but did not conduct debriefings or issue recommendations related to OC spray.

The IMT recognizes that the CPD's current TRR can capture the number of times OC spray may have been discharged, similar to how it captures multiple applications of Tasers. The IMT requested to review TRRs that reflect multiple applications and looks forward to continued review of such records in the next reporting period.

### Paragraph 210 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Use of Force: ¶211

*211. CPD officers must assist subjects exposed to application of an OC device with decontamination and flushing when it is safe and feasible to do so. CPD officers must request the appropriate medical aid for a subject after the discharge of an OC device if the subject appears to be in any physical distress, or complains of injury or aggravation of a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, or a heart ailment).*

### Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**       *Under Assessment*
**Full:**            *Not Yet Assessed*

In the fifth reporting period, the CPD maintained Preliminary Compliance and achieved Secondary compliance with ¶211. To assess compliance, the IMT reviewed relevant CPD policy, FRD's Quarterly Reports, the CPD's Use of Force Dashboard, and observed the CPD's 2021 in-service training course *De-escalation, Response to Resistance, and Use of Force: Procedures* in November 2021 both online and at the CPD Academy.

We note that CPD's policy G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, which became effective on April 15, 2021, states the requirements of this paragraph in IV.B.2., which states that an officer discharging OC spray will "request the appropriate medical aid, including contacting emergency medical services (EMS) from the Chicago Fire Department, if the subject appears to be in any physical distress or complains of injury or aggravation of a known pre-existing medical condition (*e.g.*, asthma, emphysema, bronchitis, or a heart ailment)."

To assess Secondary compliance, our review of the CPD's 2021 in-service training course curriculum and observations of the course delivery indicate that the requirements of this paragraph were not included.

Our review of FRD data presented in its Quarterly Reports reveals instances in which officers reported rendering aid after deploying OC spray. Specifically, the FRD 2021 2nd Quarterly Report indicates 3 discharges of OC spray resulting in 2 incidents in which individuals were taken to hospitals and 1 other incident in which the officer involved attempted to assist the subject with decontamination and flushing.

We also note that according to the CPD's Use of Force Dashboard data, OC spray use is generally trending downward (with the exception of 2020).

Use of Force Appendix Figure 5.
Data from the CPD's Use of Force Dashboard re: OC Spray Use.

| YEAR | REPORTED OC SPRAY USES |
|------|------------------------|
| 2015 | 104 |
| 2016 | 42 |
| 2017 | 36 |
| 2018 | 18 |
| 2019 | 38 |
| 2020 | 64 |
| 2021 | 14 |

We look forward to assessing continued progress on ¶211 in future reporting periods.

### Paragraph 211 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Use of Force: ¶212

**212.** *CPD officers may only use department-issued or approved OC devices.*

---

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶212. CPD policy U04-02-02 *Control Devices and Instruments* states: "Department members are not approved to carry or use any type of personal OC device different from that which is prescribed" in Section IV.C.

To assess Secondary compliance, we aim to review the CPD's measures to ensure officers are carrying authorized OC devices (*e.g.,* training records and periodic inspections at roll call). We did not have access to such records during the fifth reporting period to conduct this assessment and look forward to receiving them in the next reporting period.

### Paragraph 212 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶213

**213.** *CPD officers must not use impact weapons (e.g., baton, asp, improvised impact weapons) to intentionally strike a subject in the head or neck, except when deadly force is justified.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**    *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**      *Not in Compliance*
**Full:**           *Not Yet Assessed*

In the fifth reporting period, the CPD maintained Preliminary compliance with the requirements of ¶213 and did not achieve Secondary compliance. To assess compliance, the IMT reviewed relevant policy, the CPD's Use of Force Dashboard, and the FRD's Quarterly Reports.

As we noted in the last reporting period, the updated G03-02-07, *Baton Use Incidents* policy went into effect on April 15, 2021, and Section II.D.1 clearly states the requirements of this paragraph: "Head and Neck Strikes: Members will not use batons to intentionally strike a subject in the head or neck except when deadly force is justified."

All strikes to the head or neck are Level 3 uses of force and require a COPA response. Commencing in the 2021 2nd Quarterly Report, FRD details all Level 3 uses of force individually; no baton head strikes were reported in the FRD's 2nd or 3rd Quarterly Reports of 2021.

We continue to recommend, as we did in our Special Report, that the CPD provide "adequate training for all officers on new or revised policies, including use of force, de-escalation, batons, and personal OC spray." We also note that the planned 2022 in-service Supervisory Refresher training does not include the necessary material on baton use in First Amendment contexts.

We look forward to assessing the CPD's progress with ¶213.

### Paragraph 213 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶214

*214. When safe and feasible to do so, CPD officers must give verbal commands and warnings prior to, during, and after using an impact weapon.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance (FOURTH REPORTING PERIOD)*
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

In the fifth reporting period, the CPD maintained Preliminary compliance with the requirements of ¶214 but did not achieve Secondary compliance. To assess compliance, the IMT reviewed the FRD's Quarterly Reports and the CPD's Use of Force Dashboard, as well as participated in the City's community engagements and discussions on the First Amendment and use of force.

As we have noted in previous reports, CPD officers' baton use significantly increased in the summer protests of 2020 (see chart below), so the CPD must focuses on protocols to document when officers issue warnings to disperse. As CPD data indicates, baton use averaged 39 instances for the last few of years, with the exception of 2020, when the summer protests drove reported baton use up to 177. The CPD needs to focus on training on baton use specific to protest and crowd control contexts that emphasize the CPD's changes to its First Amendment policy

Use of Force Appendix Figure 6.

| YEAR | REPORTED INSTANCES OF BATON USE |
|------|--------------------------------|
| 2016 | 37 |
| 2017 | 39 |
| 2018 | 41 |
| 2019 | 39 |
| 2020 | 177 |
| 2021 | 30 |

While the CPD remains in Preliminary compliance with the requirements of ¶214, we look forward to the CPD training its officers on proper baton use in the near future.

## Paragraph 214 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Use of Force: ¶215

*215. CPD officers must receive training on proper use of an impact weapon before being permitted to carry such weapon.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *Under Assessment*
**Full:** *Not Yet Assessed*

In the fifth reporting period, the CPD maintained Preliminary compliance with the requirements of ¶215. To assess Preliminary compliance, the IMT reviewed relevant policies. We also reviewed the FRD's Quarterly Reports, the CPD's Use of Force Dashboard noting baton use, and the CPD's 2021 in-service training curriculum.

To assess Secondary compliance, we reviewed the CPD's ongoing baton training program, which is noted in Section V.C.2.g of U04-02-02, *Control Devices and Instruments*: "Sworn Department members hired on or after 27 September 2004 have received expandable baton training during recruit training at the Training Division." The CPD remains under assessment for Secondary compliance.

Finally, we look forward to receiving more information on how the City and the CPD intend to respond to our recommendations and prepare and respond to crowds, given that we have repeatedly noted the need for additional training for all officers, given the findings of our Special Report that discusses the CPD's use of batons and indicates the need for additional training on their use.

### Paragraph 215 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶216

**216.** *CPD officers must request appropriate medical aid for a subject who experiences an impact weapon strike when the subject appears to be in any physical distress or complains of injury, or when the subject sustained a strike to the head from an impact weapon or a hard, fixed object. CPD officers must render life-saving aid to the subject consistent with the officers' training until medical professionals arrive on scene.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD made progress toward, but did not achieve, Preliminary or Secondary compliance with ¶216.

To evaluate Preliminary compliance with ¶216, we reviewed the CPD's relevant force policies, including G03-02-07, *Baton Use Incidents* (effective April 15, 2021) to ensure that they meet the requirements of ¶216. We note that Section V.B of the CPD's main use of force policy, G03-02, *De-Escalation, Response to Resistance, and Use of Force*, states that Department members *will* render life-saving medical aid:

> [A]s soon as it is safe and feasible to do so, members will provide life saving aid consistent with their Department training, including the Law Enforcement Medical and Rescue Training (LEMART) training, to injured persons until medical professionals arrive on the scene.

However, as we noted in our last report (IMR-4), this required language is still not present in G03-02-07, *Baton Use Incidents*, and should be included. We look forward to assessing the CPD's progress with ¶216 in the next reporting period.

### Paragraph 216 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 — AUGUST 31, 2019 | SEPTEMBER 1, 2019 — FEBRUARY 29, 2020 | MARCH 1, 2020 — DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 — JUNE 30, 2021 | JULY 1, 2021 — DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Use of Force: ¶218

*218. CPD members must report and document any reportable use of force. Beginning January 1, 2019, a reportable use of force will be defined as any use of force by a CPD member included in any of the following three levels: a. A level 1 reportable use of force is the use of any force by a CPD member to overcome the active resistance of a subject that does not rise to a level 2 or level 3 reportable use of force. This would include force that is reasonably expected to cause pain or an injury, but does not result in injury or complaint of injury. The following techniques are level 1 reportable uses of force when applied in response to active resistance: pressure point compliance techniques; joint manipulation techniques; wristlocks; armbars; and any leg sweep, weaponless defense techniques, or takedown that does not result in injury or complaint of injury. It is not a reportable use of force for a CPD member to escort, touch, or handcuff a person with no or minimal resistance. b. A level 2 reportable use of force is the use of any force by a CPD member that includes use of a less-lethal weapon or that causes an injury or results in a complaint of an injury, but that does not rise to a level 3 reportable use of force. Force options in this level include: discharge of an OC device; discharge of a Taser; impact weapon strikes to any part of the body other than the head or neck; use of impact munitions; any physical apprehension by a canine; any reportable use of force against a handcuffed subject; and any leg sweep, weaponless defense technique, or takedown resulting in an injury or complaint of injury. c. A level 3 reportable use of force is when a CPD member does any of the following: uses any force that constitutes deadly force, such as discharging a firearm or using an impact weapon to strike a person's head or neck; uses a chokehold or other maneuver for intentionally putting pressure on a person's airway or carotid artery; uses any force that causes the death of any person; or uses any force that causes injury to any person resulting in admission to a hospital.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *In Compliance* (NEW)
**Full:** *Not Yet Assessed*

During the fifth reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶218.

To assess Preliminary compliance, the IMT reviewed the applicable policy and notes that the levels of force outlined in this paragraph (i.e., the change from 4 levels of force to 3 levels of force) continue to be echoed in the CPD's General Order G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (effective April 15, 2021).

To assess Secondary compliance, the IMT reviewed the 2021 in-service use of force training curriculum and observed in person a session of the CPD's in-service course, entitled *De-escalation, Response to Resistance, and Use of Force: Procedures* in November 2021. We also reviewed the curriculum for the CPD's proposed 2022 in-service training for supervisors during this reporting period, which also addresses the requirements of this paragraph. While training for supervisors is critically important to institutionalizing the reporting and documenting of uses of force at the CPD, we note that supervisors have been required to respond to the same types of incidents in the past, so the training should serve to reinforce those supervisory behaviors.

We look forward to tracking the delivery of the 2022 in-service use of force training and assessing this paragraph for full compliance when appropriate.

### Paragraph 218 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary |

# Use of Force: ¶219

> **219.** *Whenever a CPD member engages in a reportable use of force, the member must complete a TRR, or any similar form of documentation CPD may implement, prior to the end of his or her tour of duty. In addition to completing the TRR, officers must also document the reason for the initial stop, arrest, or other enforcement action per CPD policy. CPD may allow members requiring medical attention a reasonable amount of additional time to complete the required documentation. CPD may allow supervisors to complete the TRR for members who are unable to complete the report due to injury or in other extraordinary circumstances.*

**Compliance Progress**          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**   *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**   *In Compliance* (NEW)
**Full:**   *Not Yet Assessed*

During the fifth reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶219.

To assess Preliminary compliance, the IMT reviewed the applicable policy including the CPD's General Order G03-02-02 *Incidents Requiring the Completion of a Tactical Response Report* (effective April 15, 2021) along with analysis of other records and information provided during the reporting period, such as the FRD's Quarterly Reports. To assess Secondary compliance, the IMT reviewed the 2021 in-service use of force training curriculum and observed in per-son a session of the CPD's in-service course, entitled *De-escalation, Response to Resistance, and Use of Force: Procedures* in November 2021.

The IMT closely tracks and reviews the FRD's Quarterly Reports, which describe "narrative deficiencies" in some TRR forms filled out by CPD officers and the mandatory debriefings designed to address those narrative deficiencies. The FRD's Quarterly Reports indicate that narrative deficiencies are occurring less often over time. For example, the FRD 2021 1st Quarter Report indicates addressing 74 narrative deficiencies in TRRs, while the FRD 2021 2nd Quarter Report indicates addressing only 35 and the FRD 2021 3rd Quarter Report narrative indicates addressing 22 "narrative deficiencies" in TRRs.

In attending the in-service *De-escalation, Response to Resistance, and Use of Force: Procedures* training session in November, the IMT observed that after instructors led participating officers through a scenario, they required the officers to

submit TRRs (for the purpose of training) that address requirements of this paragraph, i.e., the reason for the initial stop, arrest, or other enforcement action per CPD policy.

Maintaining Secondary compliance will depend upon the CPD continuing to feature TRRs in their training courses to reinforce their importance and to continue to reduce the narrative deficiencies in the TRR reports reviewed by the FRD. Training will also need to continue to focus on the problems and issues identified in the OIG's and the IMT's reports regarding the City's and the CPD's responses to the protests of 2020, which documented the failure of officers to fulfill reporting responsibilities. We look forward to assessing the CPD's continued progress with ¶219.

### Paragraph 219 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Use of Force: ¶220

> **220.** *In completing the TRR, or whatever similar documentation CPD may implement, CPD members must include a narrative that describes with specificity the use of force incident, the subject's actions, or other circumstances necessitating the level of force used; and the involved member's response, including de-escalation efforts attempted and the specific types and amounts of force used. The narrative requirement does not apply to CPD members who discharged a firearm in the performance of duty or participated in an officer-involved death in the performance of duty. Any CPD member who observes or is present when another CPD member discharges a firearm or uses other deadly force must complete a written witness statement prior to the end of his or her tour of duty. CPD members will note in their TRRs the existence of any body-worn camera or in-car camera audio or video footage, and whether any such footage was viewed in advance of completing the TRR or any other incident reports. CPD members must complete TRRs, or whatever similar documentation CPD may implement, and other reports related to the incident, truthfully and thoroughly.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

During the fifth reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶220.

To assess Preliminary compliance, the IMT reviewed the applicable policy including the CPD's General Order G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (effective April 15, 2021), along with analysis of other records and information provided during the reporting period, such as the FRD's Quarterly Reports, and the CPD's Use of Force Dashboard.

To assess Secondary compliance, the IMT reviewed the 2021 in-service use of force training curriculum and observed in person a session of the CPD's in-service course, entitled *De-escalation, Response to Resistance, and Use of Force: Procedures* in November 2021. We note that the in-service training includes scenarios in which participating officers are required to complete TRRs requiring clear articulation of all de-escalation strategies used in the interaction.

Further, the IMT has closely tracked and reviewed the FRD's Quarterly Reports, which describe trends in TRRs as well as officer "debriefing points," which are conversations in which the FRD provides guidance to officers on how to better articulate force mitigation efforts on future reports, for example. We continue to see hundreds of instances of this per quarter and encourage the FRD to continue its regular cadence of reviews and debriefings about this officer reporting failure. Specifically, FRD's 2021 1st Quarterly Report notes 340 debriefings for "force mitigation not articulated," the 2021 2nd Quarterly Report notes 160 debriefings, and the 2021 3rd Quarterly Report notes 106 debriefings. The numbers of necessary debriefings seem to be falling and we hope to see that trend continue.

Our review indicates that officers are consistently checking the boxes on TRR forms that indicate whether body-worn camera or in-car camera video exists for the incident. Relatedly, the TRR form includes boxes to be checked if officers viewed BWC footage prior to completing the TRR report and we note that the FRD has issued few if any debriefings for failing to check these boxes. The FRD has placed particular emphasis on insisting that all de-escalation boxes that are checked on the TRR form have corresponding explanations in the narrative section, i.e., if there are 3 boxes of de-escalation techniques checked, there must be in depth corresponding narrative details for each, otherwise an officer would receive a debriefing. The debriefing points sometimes also include not only what an officer did to de-escalate a situation, but also what an officer did not do, such as utilize time or communication effectively.

Throughout this reporting period, the FRD focused on de-escalation which resulted in improved performance. The FRD's efforts coupled with the CPD's in-service training on use of force resulted in the CPD achieving Secondary compliance for ¶220. We look forward to continued progress on this paragraph.

### Paragraph 220 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶221

> **221.** *Any CPD member who engages in a reportable use of force must immediately report the incident to OEMC. OEMC is required to notify the involved member's immediate supervisor and the Watch Operations Lieutenant of the district of occurrence.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶221 but failed to regain the Secondary compliance they lost in the fourth reporting period due to the force reporting failures as documented in both the IMT's and the OIG's reports on the City's responses to the protests of 2020.

To assess compliance, the IMT reviewed relevant policy and training curriculum documents, and the FRD's Quarterly Reports. The IMT reviewed the CPD's curriculum for its 2022 in-service Supervisory Refresher training; at Hour 7 the training addresses reporting procedures and the importance of documenting uses of force by filling out TRRs properly, but the curriculum does not focus on use of force in the context of First Amendment activities or protests. We reiterate that the force reporting failures of 2020 need to be addressed adequately through training and reinforced through supervision.

While the CPD remains in Preliminary compliance with the requirements of ¶221, we look forward to continued progress on this paragraph. The CPD will regain Secondary compliance if it adequately trains its officers that protests do not negate an officer's responsibility to report force.

## Paragraph 221 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Secondary |
| **FOURTH REPORTING PERIOD** | **FIFTH REPORTING PERIOD** | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶222

*222. A CPD supervisor will immediately respond to the scene when a level 2 or level 3 reportable use of force occurs ("responding supervisor"). CPD supervisors may, at their discretion, respond to the scene when a level 1 reportable use of force occurs, but they are not required to do so.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶222 but have not yet achieved Secondary compliance.

To assess compliance with this paragraph, the IMT reviewed data and information from the CPD's FRD and reviewed the CPD's 2022 in-service use of force course for supervisors. In addition, the IMT interviewed supervisors about their knowledge and understanding of this paragraph's requirements.

While our conversations with supervisors suggested that they are well aware of their responsibilities to respond to use of force scenes after being notified by OEMC, the FRD's Quarterly Reports note that some supervisors are failing to respond. Specifically, FRD's 2021 1st Quarter Report notes 15 debriefings with supervisors who failed to report, the 2nd Quarter Report notes 11 debriefings, and the 3rd Quarter Report notes 8 debriefings they conducted to address these failures.

Our review of the 2022 in-service use of force course for supervisors indicates that the course addresses the requirement for supervisors to respond to the scenes of level 2 and level 3 use of force incidents. Supervisory response to ensure the integrity of the force investigation is critical for the CPD; the IMT is concerned about the lack of immediate supervision in these cases (34 incidents total as noted in the FRD reports) and believe it necessitates further training on the requirements of ¶222.

The CPD remains in Preliminary compliance for this paragraph. We anticipate that as the 2022 training for supervisors takes place and properly emphasizes these responsibilities, the CPD will achieve Secondary compliance.

## Paragraph 222 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶223

*223. For level 2 and level 3 reportable use of force incidents, the duties of the responding supervisor will include, at a minimum: a. identifying known available witnesses to the use of force to the extent reasonably possible and documenting their identities and statements in a written report, except in incidents for which the Civilian Office of Police Accountability ("COPA") receives administrative notifications and responds to the scene; b. coordinating with COPA, as appropriate; c. gathering and preserving evidence related to the use of force; d. requesting the assignment of an evidence technician to photograph persons involved in the incident, including any injuries sustained; e. ensuring that members and subjects receive appropriate medical care; f. making notifications as required by CPD policy; and g. reviewing reports regarding the incident for legibility and completeness.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD maintained Preliminary compliance but has not yet achieved Secondary compliance.

To assess compliance with this paragraph, the IMT reviewed the 2022 In-Service Supervisory Refresher Training and the FRD's Quarterly Reports.

Our review of the CPD's 2022 In-Service Supervisory Refresher Training addresses the required duties of the responding supervisors as outlined in this paragraph. This in-service supervisory refresher training was originally scheduled for 2020 but was delayed and is now scheduled to take place in 2022. We look forward to the delivery of this important training. In addition to the training curriculum, the CPD has also developed a guidance handbook for supervisors to assist them with the processes and procedures around their required duties. We appreciate these efforts but note that we had hoped these important supervisor reminders would have come sooner in the monitoring process.

Our review of the FRD's Quarterly Reports indicates that the single biggest issue among supervisors with regard to the requirements of ¶223 remains their failure to request an evidence technician when necessary. Specifically, the FRD 1st Quarter Report indicates 93 debriefings on this topic occurred, the 2nd Quarter Report indicates 28 debriefings, and the 3rd Quarter Report indicates 26 debriefings.

While the CPD remains in Preliminary compliance with ¶223, the IMT notes that supervisor training is overdue and we encourage the CPD to focus on the recurring issues regarding the requirements of this paragraph as they deliver training in 2022.

## Paragraph 223 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶224

**224.** *In addition, for level 2 and level 3 reportable use of force incidents involving an injury or complaint of injury for which COPA does not have jurisdiction, the responding supervisor will undertake reasonable efforts to identify and interview additional witnesses beyond those that are known and available.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**      *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**        *Under Assessment*
**Full:**             *Not Yet Assessed*

In the fifth reporting period, the CPD maintained Preliminary compliance with ¶224, but has not yet achieved Secondary compliance.

To assess compliance for this paragraph the IMT reviewed relevant documentation, including the FRD's Quarterly Reports, CPD's use of force dashboard, and the curriculum for the 2022 In-Service Supervisor training.

Our review of the 2022 curriculum for the in-service supervisor training indicates it addresses this requirement. We also note that the revised TRR form (issued December 2020) also includes the requirement to identify witnesses and document those efforts.

We look forward to the CPD conducting the necessary training to cover these topics; we anticipate the CPD achieving Secondary compliance after training is complete and the IMT reviews attendance records.

### Paragraph 224 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶225

**225.** *A supervisor who used force or ordered force to be used during a reportable use of force incident will not perform the duties assigned to the responding supervisor for that incident.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**    *Under Assessment*
**Full:**    *Not Yet Assessed*

In the fifth reporting period, the CPD maintained Preliminary compliance with the requirements of ¶225 but did not achieve Secondary compliance.

To determine compliance, the IMT reviewed FRD's Quarterly Reports, the CPD's use of force dashboard, the 2022 in service supervisory training curriculum, and emails and alerts related to the requirements of this paragraph.

Our review indicates that some supervisors who used force or ordered force to be used during a reportable use of force incident are reviewing cases that they should not be reviewing. In the CPD's latest updates and changes to its TRR form, validators were supposed to prevent ineligible supervisors from completing the form or approving the form. The CPD is working to rectify this technical glitch.

These issues were also indicated in the FRD's Quarterly Reports, with the 2021 1st Quarter Report indicating 17 incidents required debriefings, the 2nd Quarter Report indicating 10 incidents required debriefings, and the 3rd Quarter Report indicating five incidents required debriefings. In spite of the technical glitches, CPD supervisors should have been aware that it was not appropriate for them to review cases in which they were involved in a use of force or ordered another officer to use force. CPD senior management alerted supervisors about this prohibition via email during this reporting period.

The CPD remains in Preliminary compliance with these requirements; we look forward to the delivery of the supervisory training that addresses these issues in 2022.

## Paragraph 224 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶226

> **226.** *CPD will continue to require the responding supervisor to document information collected and actions taken in performing his or her investigatory duties in the supervisor's portion of the TRR, or in any other similar form of documentation CPD may implement.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:** *Under Assessment*
**Full:** *Not Yet Assessed*

In the fifth reporting period, the CPD maintained Preliminary compliance with the requirements of ¶226 but did not achieve Secondary compliance.

To determine compliance, the IMT reviewed FRD's Quarterly Reports, the CPD's use of force dashboard, and the 2022 in service supervisory training curriculum.

Our review of the Supervisory In-Service Training Refresher course indicates it does a good job of outlining and explaining the duties of responding supervisors. The CPD also plans to provide a Guidance handout along with the training. This training has been postponed since 2020, and is now scheduled to take place in 2022.

FRD's Quarterly Reports identify a number of recurring issues regarding these requirements, including reviewing supervisors completing a review of an officer of the same rank and supervisors failing to request an evidence technician. Supervisors would benefit from training to rectify these recurring issues.

While the CPD remains in Preliminary compliance with the requirements of ¶225, we look forward to the delivery of the 2022 supervisor training to achieve Secondary compliance.

### Paragraph 226 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶227

> **227.** *Any CPD member who becomes aware of information indicating that a reportable use of force occurred but was not reported must immediately notify his or her supervisor.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**     *In Compliance* (NEW)
**Full:**     *Not Yet Assessed*

In the fifth reporting period, the CPD maintained Preliminary compliance and achieved Secondary compliance.

To determine compliance, the IMT reviewed FRD's Quarterly Reports, documentation on COPA's website, and the 2021 in service use of force training curriculum. The IMT also observed a session of the 2021 in-service use of force training in which the instructor made a compelling case to the officers in class about the potential vulnerability of officers and their families who fail to report or prevent excessive force.

We remain concerned about the possibility of future failures to report force because both the IMT's Special Report and the OIG's report on the protests indicate that unreported use of force was a significant issue.[25] We appreciate the emphasis on this issue in the 2021 in-service training through which the CPD achieved Secondary compliance and look forward to in-service training that reinforces these issues in 2022. For the CPD to move toward Full compliance, the IMT will be reviewing documentation from other sources including BIA, COPA, and the City's Law Department.

---

[25] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf; *Report on Chicago's Response to George Floyd Protests and Unrest* , OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (February 18, 2021), https://igchicago.org/2021/02/18/oig-finds-that-chicagos-response-to-george-floyd-protests-and-unrest-included-breakdowns-in-the-mass-arrest-process-unfulfilled-use-of-force-reporting-obligations-and-operational-structure/.

## Paragraph 227 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
None

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

# Use of Force: ¶228

*228. Supervisors play a critical role in ensuring that force is used legally, consistent with CPD policy, and in a manner that will promote community confidence in the Department. Supervisor reviews and investigations of uses of force are essential to identify necessary individual and departmental corrective action.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD remained in Preliminary compliance with the requirements of ¶228 but did not achieve Secondary compliance.

To assess compliance, the IMT reviewed FRD Quarterly Reports, the 2022 in service Supervisory Refresher training, the CPD's Use of Force Dashboard, and led discussions with members of CPD leadership during our biweekly calls.

Our review of the CPD's In-Service Supervisory Refresher training reveals that the training focuses on the need for front line supervisors to point out training needs and deficiencies when they investigate Use of Force incidents and emphasizes the CPD's processes for supervisors to do so.

We remain concerned, however, that while front line supervisors and members of the FRD have access to the same reports and BWC videos, the results of their observations differ greatly. For example, the FRD 2021 3rd Quarter Report states, "the FRD identified 30 instances during the second quarter in which field supervisors identified and addressed at least one deficiency or training opportunity prior to the TRR being flagged for review by the FRD. This calculates to a rate of 5.9% of reviewed TRRs. This is up 3.1 percentage points from the previous quarter."

Further, the 3rd Quarter Report indicates that "During the Third Quarter, the Force Review Division completed 508 Tactical Response Report Reviews. Of those reviews, 50.7%, or 258, resulted in recommendations and/or advisements to involved members or supervisors."

We also note a significant increase in complaint logs to COPA sought by unit and district supervisors from the FRD 2021 2nd Quarter Report (21) to the FRD 2021 3rd Quarter Report (42).

In conclusion, the IMT stresses that the CPD needs to emphasize effective frontline supervision, clearly addressing these deficiencies through training. The CPD

remains in Preliminary compliance and the IMT looks forward to the CPD's additional training on these issues which will move them toward Secondary compliance.

### Paragraph 228 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶229

**229.** *All reportable uses of force by CPD members must be reviewed by CPD supervisors.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

During the fifth reporting period, the CPD maintained Preliminary compliance but did not regain the Secondary compliance it lost in the fourth reporting period for the requirements of ¶229.

To assess compliance with this paragraph, the IMT relied on several data sources, including the FRD's Quarterly Reports, the CPD's Use of Force Dashboard, our observations of the CPD's community engagement on its First Amendment policy, the 2022 in-service Supervisory Refresher Training, and interviews with supervisors.

The CPD lost Secondary compliance in the last reporting period due to the documented failures of use of force reporting during the 2020 summer protests; regaining Secondary compliance will depend on the CPD working to address the shortcomings exposed by both the IMT's and the OIG's reports on the City's responses to the protests through appropriate training, especially for supervisors.

The proposed 2022 In-Service Supervisory Refresher Training does not, however, address uses of force during protests and the reporting issues that need to be rectified.

Records indicate that CPD supervisors routinely review and investigate TRR reports appropriately, but they cannot review uses of force that are not reported. We encourage the CPD to put procedures in place for future protests that will address the issues that arose during the 2020 protests; we believe training will make supervisors more conscious of reporting requirements.

The CPD remains in Preliminary compliance and the IMT looks forward to reviewing additional training that clearly addresses reporting failures.

## Paragraph 229 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Use of Force: ¶230

**230.** *After a reportable use of force has occurred, required TRRs have been completed, and, in the case of level 2 and level 3 incidents, a responding supervisor has documented any investigatory information collected, the incident will be reviewed and evaluated by a CPD supervisor at least the rank of Lieutenant, and in all instances at least one rank level above that of the highest-ranking member who engaged in the reportable use of force, or by a command staff member, when designated ("reviewing supervisor").*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD maintained Preliminary compliance but did not achieve Secondary compliance with ¶230.

To assess compliance, the IMT reviewed the planned 2022 in service Supervisor Refresher Training, FRD Quarterly Reports, and an eLearning to address recurring issues.

Our review of the 2022 in service Supervisor Refresher Training indicates that the curriculum addresses the requirements of this paragraph, but we note that this training is overdue as it was originally scheduled to take place in 2020.

In conclusion, while the CPD remains in Preliminary compliance with the requirements of ¶230, the fact that the FRD reported 70 instances of inappropriate reviews in the in the first three Quarterly Reports of 2021 demands the CPD's attention from a training standpoint. We look forward to reviewing the delivery of the 2022 in service Supervisor Refresher Training.

### Paragraph 230 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶231

*231. The reviewing supervisor will conduct an investigation into the reportable use of force incident by reviewing all information reasonably available regarding the incident, including written reports, video or audio recordings, and, in the case of level 2 and level 3 reportable use of force incidents, witness statements, photographs (if available), and other evidence or information collected by the responding supervisor. After advising the subject of his or her right not to answer questions and other applicable rights, and only if the subject voluntarily consents to an interview, the reviewing supervisor will interview the subject solely about the reportable use of force. In addition, the reviewing supervisor will visually inspect the subject and document any injuries observed.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance (FIRST REPORTING PERIOD)* |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD maintained Preliminary compliance but remains under assessment for Secondary compliance with ¶231.

To assess compliance, the IMT reviewed the planned 2022 in service Supervisor Refresher Training, FRD Quarterly Reports, and a sampling of TRR forms.

Data from the FRD reports indicate some improved reviewing supervisor performance on the requirements of this paragraph. For example, the instances of undocumented Miranda warnings fell from 9 in the first quarter of 2021 to 0 in the third quarter and the instances of undocumented visual inspection fell from 11 in the first quarter of 2021 to 0 in the third quarter of 2021.

We note that the proposed 2022 in service Supervisor Refresher training curriculum touches on many issues related to supervisory responsibilities and the review of TRRs. The IMT looks forward to reviewing the delivery of this training in the next reporting period.

## Paragraph 231 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶232

> **232.** *For all reportable uses of force, the reviewing supervisor will determine, based on the information reviewed, if the use of force requires a notification to COPA and will assess whether the use of force was in compliance with CPD policy (except for incidents involving deadly force or an officer-involved death). The reviewing supervisor will also review the TRR, or any similar form of documentation CPD may implement, for sufficiency and completeness.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**      *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**        *Under Assessment*
**Full:**             *Not Yet Assessed*

In the fifth reporting period, the CPD maintained Preliminary compliance and is under assessment for Secondary compliance with the requirements of ¶232.

To assess compliance with these requirements, the IMT reviewed the FRD's Quarterly Reports, the CPD's Use of Force Dashboard, and the planned 2022 in-service Supervisor Refresher training.

Data reported by the FRD during this reporting period indicates that supervisors are referring cases to COPA with more frequency. Specifically, the number of cases reported to COPA by CPD district and unit personnel increased from 21 cases in the 2nd Quarter of 2021 to 42 cases in the 3rd Quarter of 2021, which we find encouraging. More specifically, during the IMR-5 reporting period through December 15, 2021, FRD reports that of the 789 TRRs filed, 130 or 16.5% of them were referred to COPA.

We have stressed the importance of the overdue in-service Supervisory Refresher Training throughout this report, and the requirements of this paragraph underscore that need. All supervisors will certainly benefit from the 2022 in-service Supervisory Refresher Training and we look forward to its delivery.

### Paragraph 232 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶233

> **233.** *For all reportable use of force incidents, the reviewing supervisor will: provide timely, constructive feedback, where appropriate, to the officer who engaged in the reportable use of force, the officer's supervisor, or both; recommend additional training and/or support as necessary based on the incident; take appropriate action, including referring uses of force that may violate law or CPD policy to COPA.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD maintained Preliminary compliance with the requirements of ¶233 but remains under assessment for Secondary compliance. To assess compliance, the IMT reviewed the FRD's Quarterly Reports, the CPD's Use of Force Dashboard, the changes to the TRR and the TRR-R forms, and the curriculum for the upcoming 2022 Supervisory Refresher training course.

The CPD has continued to adapt the TRR-R form, which now focuses on CPD reviewing supervisors identifying deficiencies. The CPD is creating a process to ensure that district and unit supervisors document their actions and provide the necessary feedback to their officers. We note that the CPD Audit Division is in the process of reviewing the feedback system to determine its effectiveness. We look forward to reviewing the Audit Division's findings. Past audit reports have revealed that supervisors infrequently provided feedback, but the revised TRR-I form directs supervisors to address feedback, which we appreciate.

The 2022 In-Service Supervisory Refresher Training dedicates the first few hours to conducting "Difficult Conversations," which will provide guidance to supervisors in talking with their officers about deficiencies. We appreciate this approach and look forward to reviewing the delivery of the training.

### Paragraph 233 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶234

> **234.** *CPD will continue to require the reviewing supervisor to document in a Tactical Response Report – Investigation ("TRR-I"), or in any other similar form of documentation CPD may implement, his or her detailed assessment of compliance with CPD policy, any constructive feedback, and any required or recommended action. In addition, the reviewing supervisor will include in the TRR-I or in any other similar form of documentation CPD may implement, the identities of CPD members on scene during the incident who are reasonably believed to have relevant knowledge or information regarding the reportable use of force.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**   *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**    *Under Assessment*
**Full:**          *Not Yet Assessed*

In the fifth reporting period the CPD maintained Preliminary compliance but remains under assessment for Secondary compliance. To assess compliance, the IMT reviewed the FRD's Quarterly Reports, the CPD's Use of Force Dashboard data, and the TRR and TRR-I forms.

As we noted in our last report, the TRR-I form was recently updated; the current TRR-I, which was revised in April 2021, provides boxes to include documentation on "constructive feedback" including noting review of streaming video, review of department directives, and individual debriefing with a supervisor.

These recent changes to the CPD's use-of-force policies and department forms necessitates that the CPD deliver the 2022 Supervisory Refresher Training and that it addresses the requirements of this paragraph before the CPD will achieve Secondary compliance.

### Paragraph 234 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶235

> **235.** *All district-level supervisory review documentation regarding a reportable use of force incident must be completed within 48 hours of the incident, unless an extension is approved by a command staff member.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**      *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**       *Under Assessment*
**Full:**              *Not Yet Assessed*

In the fifth reporting period, the CPD maintained Preliminary compliance but did not achieve Secondary compliance with the requirements of ¶235.

To assess compliance, the IMT reviewed the FRD's Quarterly Reports, the curriculum for the 2022 in-service Supervisory Refresher training and had numerous conversations with CPD personnel on biweekly calls.

The CPD has adapted the TRR form so that it captures investigations longer than 48 hours, but a technical glitch resulted in this validator not working correctly (this is in addition to the failures we mentioned relevant to ¶225). The FRD performed a manual search to identify the numbers below. At a biweekly meeting in November 2021, the IMT was assured the glitch issue had been resolved.

The FRD data in Quarterly Reports indicate the following:

- In the 1st Quarterly Report of 2021, there were no mentions of incidents in which investigations exceeded 48 hours without approval

- In the 2nd Quarterly Report of 2021, there were 14 debriefings with supervisors for investigations exceeding 48 hours without approval

- In the 3rd Quarterly Report of 2021, there were 2 debriefings with supervisors for investigations exceeding 48 hours without approval

The IMT looks forward to the delivery of the 2022 in-service Supervisory Refresher training, which addresses the requirements of ¶235 in its curriculum. We anticipate the CPD achieving Secondary compliance after the training delivery is complete.

## Paragraph 235 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Use of Force: ¶236

> **236.** CPD will continue to develop, implement, and maintain a system of video recording officers' encounters with the public with body-worn cameras. The use of body-worn cameras will be designed to increase officer accountability, improve trust and CPD legitimacy in the community, and augment CPD's records of law enforcement-related activities.

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**    *Under Assessment*
**Secondary:**    *Not Yet Assessed*
**Full:**    *Not Yet Assessed*

In the fifth reporting period the City and the CPD have not yet achieved Preliminary compliance and remain under assessment. To assess compliance, the IMT reviewed a revised draft of Special Order S03-14, *Body Worn Cameras* (dated March 29, 2021). As we noted in our last report, given the impact of body worn cameras on community trust, the City and the CPD will not reach Preliminary compliance until they gather community input.

The IMT continues to await the Supervisory dashboard to understand how it will reflect BWC compliance issues, and we await the creation of an effective and efficient system in which front-line supervisors monitor and address deficiencies of all sorts, including BWC deficiencies. Once the Supervisory dashboard is operational, we expect that supervisors will be reminded to pay close attention to their officers' BWC usage. The IMT seeks to review and understand any discipline resulting from repeated BWC-related failures, of which there are hundreds according to the 2020 FRD Annual Report (which reported 416 BWC-related debriefings).

We note that the FRD reports only measure BWC usage during use of force events, not all encounters between community members and CPD officers. CPD officers' use of BWC during uses of force appears to be heading in right direction, with fewer debriefings reported by FRD between the first and second quarters of 2021 (174 and 67 respectively).

The IMT also await the delivery of appropriate training on Special Order S03-14, *Body Worn Cameras*, after it incorporates community feedback, which will move the CPD toward Secondary compliance.

## Paragraph 236 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Under Assessment |

# Use of Force: ¶237

> **237.** *CPD will continue to require all officers assigned to patrol field duties to wear body-worn cameras and microphones with which to record law-enforcement related activities as outlined in the Illinois Law Enforcement Officer-Worn Body Camera Act (50 ILCS 706/10-1 et seq.), with limited exceptions, including, but not limited to, when requested by a victim or witness of a crime, or interacting with a confidential informant. CPD will develop and implement a written policy delineating the circumstances when officers will not be equipped with body-worn cameras.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD remains Under Assessment, pending the requisite community engagement on the BWC policy, Special Order S03-14 *Body Worn Cameras* (dated March 29, 2021). As we noted in our last report, given the impact of body worn cameras on com-munity trust, the City and the CPD will not reach Preliminary compliance until they gather community input. We encourage the CPD to hear community concerns about cameras and privacy.

We note that in the proposed draft of S03-14 *Body Worn Cameras*, Section II Policy, subsection C specifies that units with regular contact with the public will have cameras and puts the onus on supervisors to determine which officers may not need cameras because they do not have regular contact with the public.

This paragraph requires, however, the City and the CPD to develop and implement a policy that delineates "when officers will not be equipped with body-worn cameras" (emphasis added). The current policy is unclear as to who is required to wear a body worn camera, how it is assigned and documented, and whether officers who are not regularly "assigned to patrol field duties" but are assigned to patrol field duties in special circumstances, such as protest or unrest situations are required to equip with body-worn cameras.

We look forward to the CPD's continued progress toward finalizing the *Body Worn Cameras* policy and the necessary training.

## Paragraph 237 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Under Assessment |

# Use of Force: ¶238

*238. CPD will continue to maintain a policy regarding body-worn camera video and audio recording that will require officers to record their law-enforcement related activities, and that will ensure the recordings are retained in compliance with the Department's Forms Retention Schedule (CPD-11.717) and the Illinois Law Enforcement Officer-Worn Body Camera Act. At a minimum, CPD's body-worn camera policy will: a. clearly state which officers are required to use body-worn cameras and under which circumstances; b. require officers, subject to limited exceptions specified in writing, to activate their cameras when responding to calls for service and during all law enforcement-related activities that occur while on duty, and to continue recording until the conclusion of the incident(s); c. require officers to articulate in writing or on camera their reason(s) for failing to record an activity that CPD policy otherwise requires to be recorded; d. require officers to inform subjects that they are being recorded unless doing so would be unsafe, impractical, or impossible; e. address relevant privacy considerations, including restrictions on recording inside a home, and the need to protect witnesses, victims, and children; f. establish a download and retention protocol; g. require periodic random review of officers' videos for compliance with CPD policy and training purposes; h. require that the reviewing supervisor review videos of incidents involving reportable uses of force by a subordinate; and i. specify that officers who knowingly fail to comply with the policy may be subject to progressive discipline, training, or other remedial action.*

## Compliance Progress       (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD remains Under Assessment, pending the requisite community engagement on the BWC policy, Special Order S03-14, *Body Worn Cameras* (dated March 29, 2021). As we noted in our last report, given the impact of body worn cameras on community trust, the City and the CPD will not reach Preliminary compliance until they gather community input.

To assess compliance for this paragraph, the IMT reviewed the most current draft of S03-14 and the FRD's Quarterly Reports.

We note that in the proposed draft, S03-14 *Body Worn Cameras*, Section II Policy, subsection C specifies that units with regular contact with the public will have cameras and puts the onus on supervisors to determine which officers may not need cameras because they do not have regular contact with the public.

This paragraph requires, however, the City and the CPD to develop and implement a policy that delineates "when officers will not be equipped with body-worn cameras" (emphasis added). The current policy is unclear as to who is required to wear a body worn camera, how it is assigned and documented, and whether officers who are not regularly "assigned to patrol field duties" but are assigned to patrol field duties in special circumstances, such as protests or unrest situations are required to equip with body-worn cameras.

We look forward to the CPD's continued progress toward finalizing the *Body Worn Cameras* policy and the necessary training.

### Paragraph 238 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Under Assessment | |

# Use of Force: ¶239

**239.** *CPD officers must comply with the body-worn camera policy. CPD will impose progressive discipline, training, or other remedial action on officers who do not comply with the body-worn camera policy, as permitted by applicable law.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD remain under assessment for, Preliminary compliance with ¶239. To assess compliance, the IMT reviewed Special Order S03-14, *Body Worn Cameras*, the FRD's Quarterly Reports and participated in many conversations with CPD officials during biweekly meetings and during the IMT's virtual site visit to inquire about progressive discipline. As we noted in IMR-4, the current draft of that policy includes the word "knowingly" before "fails to comply," in section II.F, which is not in keeping with the requirements of this paragraph.

The IMT continues to monitor the arbitration surrounding discipline on BWCs and the CPD's responses to that arbitration.

The IMT seeks specific examples of "progressive discipline" as required by this paragraph. We have repeatedly inquired about "progressive discipline," including during our virtual site visits for this monitoring period and have yet to receive a clear or satisfactory answer about whether any "progressive" discipline related to body worn cameras has been imposed. At best, we have received mixed messages from CPD leadership about whether the arbitration prevents discipline on BWC issues or whether other general policies may be used to enforce CPD's current BWC policy.

The IMT understands that the CPD has required eLearning on BWC compliance and the FRD has conducted hundreds of debriefings with officers regarding their BWC deficiencies. As we noted in ¶236, the FRD reports only measure BWC usage during use of force events, not all encounters between community members and CPD officers. CPD officers' use of BWC during use of force incidents appears to be heading in right direction, with fewer debriefings reported by the FRD between the first and second quarters of 2021 (174 and 67 respectively). We have seen no evidence of progressive discipline, however.

The IMT awaits the launch of the Supervisory Dashboard, which may shed some light on these issues. We look forward to clarifying in future reporting periods how and whether the CPD imposes progressive discipline as ¶239 requires.

### Paragraph 239 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Under Assessment | |

# Use of Force: ¶240

**240.** *Any CPD officer required to wear a body-worn camera must: a. visually and physically inspect the body-worn camera and ensure that it is the member's assigned camera, fully charged, and operational at the beginning of each tour of duty; and b. notify a supervisor as soon as practical if, at any time, the member's assigned body-worn camera becomes inoperable (including when either or both of the audio or video recording functions is inoperable) or is damaged.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD remained under assessment for Preliminary and Secondary compliance with ¶240. To assess compliance with these requirements for the first time, the IMT re-viewed a draft of CPD policy S03-14 *Body Worn Cameras*. The draft of Special Order S03-14 contains language responsive to this requirement, tracking closely with the language of this paragraph and clearly articulating, for example, that damaged cameras will be replaced promptly in order to ensure that officers have properly functioning cameras. The CPD remains under assessment, however, because S03-14 was not finalized and issued during this reporting period.

We look forward to reviewing the finalized policy in the next reporting period.

## Paragraph 240 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Under Assessment | |

# Use of Force: ¶241

*241. CPD will ensure that any CPD officer who reports an inoperable or damaged body-worn camera is promptly provided with a temporary or replacement body-worn camera, which will in no event be later than the beginning of the member's next tour of duty.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *Under Assessment*
**Secondary:**     *Not Yet Assessed*
**Full:**     *Not Yet Assessed*

In the fifth reporting period, the CPD remains under assessment for the requirements of ¶241, pending the requisite community engagement on the BWC policy, Special Order S03-14, *Body Worn Cameras* (dated March 29, 2021). As we noted in our last report, given the impact of body worn cameras on com-munity trust, the City and the CPD will not reach Preliminary compliance until they gather community input. To assess compliance, the IMT reviewed the draft of S03-14, which addresses the requirements of this paragraph in Section VIII Operational Procedures, subsection 2c.

We anticipate the CPD will achieve Preliminary compliance with this paragraph after community input has been gathered and incorporated into the policy and the policy is finalized. We look forward to additional progress in the next reporting period.

### Paragraph 241 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Under Assessment | |

# Use of Force: ¶243

*243. CPD's pre-service and in-service training must provide officers with knowledge of policies and laws regulating the use of force; equip officers with tactics and skills, including de-escalation techniques, to prevent or reduce the need to use force or, when force must be used, to use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and ensure appropriate supervision and accountability.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**       *Not Yet Assessed*
**Full:**            *Not Yet Assessed*

In the fifth reporting period, the CPD achieved Preliminary compliance with the requirements of ¶243. To assess compliance, the IMT reviewed relevant policy, the FRD Quarterly Reports, and in-service training curricula. The CPD describes in policy the requirements of ¶243 in General Order G03-02, *De-escalation, Response to Resistance, and Use of Force*. Specifically, it states in Section X, Use of Force Training: "At a minimum, Department members will receive annual training on the laws and Department policies regulating the use of force, including, but not limited to, de-escalation, force options, and appropriate supervision and accountability."

The IMT acknowledges the CPD's efforts to equip officers with knowledge of policy and law related to using force, tactics and skills and particularly appreciates the focus on de-escalation during this reporting period. The IMT believes ensuring appropriate supervision and accountability remains an area requiring training. The CPD has made many changes to the TRR and the TRR-R forms in recent years without any formal training for supervisors on those changes.

The proposed 2022 in-service Supervisory Refresher Training focuses on the duties of front-line supervisors, but as we have noted elsewhere in this report, front-line supervisors point out a very small percentage of officer deficiencies and training opportunities as compared with FRD personnel, despite having access to same material. Specifically, the FRD 2021 3rd Quarterly Report indicated that front-line supervisors pointed out deficiencies and training opportunities in approximately 5% of TRRs whereas the FRD noted deficiencies and training opportunities in 50%.

The long-awaited Supervisory Dashboard may be of some assistance, but only if the CPD establishes and communicates expectations for its use. Accountability must become the responsibility of front-line supervisors. We look forward to the delivery of the 2022 in-service Supervisory Refresher training as the CPD works toward Secondary compliance.

## Paragraph 243 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 — AUGUST 31, 2019 | SEPTEMBER 1, 2019 — FEBRUARY 29, 2020 | MARCH 1, 2020 — DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 — JUNE 30, 2021 | JULY 1, 2021 — DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Preliminary | |

# Use of Force: ¶244

**244.** *CPD's training regarding the use of firearms, Tasers, OC devices, impact weapons, and other force options that CPD currently authorizes or may authorize in the future will be consistent with its commitment to de-escalation as a core principle. Any initial training, qualification, or requalification regarding these force options will incorporate scenario-based elements, including scenarios in which officers achieve resolution without employing force. CPD's training regarding these force options will also provide specific guidance to officers regarding required procedures and techniques after each of these force options are used, including procedures and techniques for limiting a subject's injuries.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD achieved Preliminary compliance for the requirements of ¶244 and is under assessment for Secondary compliance. To assess compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶244's requirements. CPD General Order G03-02, *De-escalation, Response to Resistance, and Use of Force*, describes the requirements for Use of Force training. We also reviewed the 2021 Use of Force In-Service Training and videos used in recruit training that feature examples of de-escalation in real situations.

The IMT looks forward to attending and observing upcoming firearms training to understand the scenarios used in that type of training as well as reviewing upcoming in-service training on force options and de-escalation.

### Paragraph 244 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Preliminary | |

# Use of Force: ¶245

**245.** *CPD will provide all current CPD officers with in-service use of force training on at least an annual basis, and more frequently when necessitated by developments in applicable law and CPD policy. CPD will coordinate and review all use of force training to ensure quality, consistency, and compliance with federal and state law, CPD policy, and this Agreement.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Recurring Schedule:** | Annual (March 5, 2022*)  ☑ **Not Yet Applicable** |
| | *Extended from December 31, 2021, due to COVID-19 |
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD maintained Preliminary compliance but remained Under Assessment for Secondary compliance with ¶245. To assess Secondary compliance, the IMT observed the 2021 in-service training, and note that the PowerPoint slide presentation featured the latest revisions to relevant CPD policies.

To achieve Secondary compliance, the CPD must produce attendance records for the 2021 in-service training, for which they have until March to accomplish due to the COVID-19 extension. We anticipate the CPD to achieve Secondary compliance if 2021 training is complete by March 5, 2022.

We note that that the CPD is also preparing for 2022 in-service training and we look forward to that. The IMT will also evaluate the CPD's ability to quickly address its new foot pursuit policy via timely and effective training. We view training on this aspect of the CPD's operations to be crucial, given our continuing concerns about the CPD's responses to protests.

### Paragraph 245 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Use of Force: ¶246

*246. The annual use of force training will include the following topics: a. CPD policies and Fourth Amendment law governing the use of force; b. proper use of force decision-making that utilizes a critical thinking framework in which officers gather relevant facts; assess the situation, threats, and risks; consider CPD policy; identify options and determine the best course of action; and act, review, and reassess the situation; c. role-playing scenarios and interactive exercises that illustrate proper use of force decision-making; d. ethical decision-making and peer intervention, principles of procedural justice, the role of implicit bias, and strategies for interacting with individuals in crisis; e. de-escalation techniques and tactics to prevent or reduce the need for force, including exercising persuasion and advice, and providing a warning; stabilizing the situation through the use of time, distance, or positioning to isolate and contain a subject; and requesting additional personnel to respond or make use of specialized units or equipment; the proper deployment of CPD-issued or -approved weapons or technologies, including firearms and Tasers; f. use of force reporting, investigation, and review requirements, including documenting reportable use of force incidents; and g. other topics as determined based on the training needs assessment required by this Agreement.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Annual (March 5, 2022*)   ☑ **Not Yet Applicable**
                            *Extended from December 31, 2021, due to COVID-19
**Preliminary:**         *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**           *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**                  *Not Yet Assessed*

In the fifth reporting period, the CPD maintained Preliminary and Secondary compliance with the requirements of ¶246. To assess compliance, the IMT reviewed all applicable use-of-force policies and use of force training curricula, as well as observed use of force training both in person and online. As we noted in ¶245, the CPD must complete its 2021 training by March 2022.

The IMT notes that recruit training and in-service use of force training curricula and lesson plans have consistently improved over time. We also note, however, that the CPD has major challenges in training regarding the appropriate and lawful use of force during protests and the new foot pursuit policy. The CPD's ability to provide effective training for these areas and other areas that may arise will determine when the CPD will achieve Full compliance. Again, we stress that along with

training, supervision and accountability are paramount to achieving Full compliance. We look forward to continued progress on ¶246.

## Paragraph 246 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Use of Force: ¶247

*247.* CPD will also provide initial training on all of the topics identi-
fied above, as well as others, to all recruits as part of its recruit
training curriculum.

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**  Ongoing       ☑ **Met**   ☐ **Missed**

**Preliminary:**  *In Compliance* (NEW)
**Secondary:**  *Under Assessment*
**Full:**  *Not Yet Assessed*

In the fifth reporting period, the CPD achieved Preliminary compliance and re-
mains under assessment for Secondary compliance with the requirements of
¶247. To assess compliance, the IMT reviewed Special Order S11-10-01 *Recruit
Training* (issued December 10, 2021), which contains all required elements of
¶247. We also reviewed the CPD's relevant use of force and de-escalation policies,
as well as recruit training lesson plans and curricula, which address all the required
elements as noted in ¶246. The CPD did not receive, however, letters of no objec-
tion from the IMT and the OAG for the *Recruit Force Options* training course during
this reporting period; therefore, they remain under assessment.

We look forward to the CPD's continued progress toward Secondary compliance
in the next reporting period.

### Paragraph 247 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Use of Force: ¶248

**248.** *Supervisors of all ranks, as part of their initial pre-service pro-motional training and other identified supervisory training, will receive training on the following: a. conducting use of force reviews or investigations appropriate to their rank; b. strategies for effectively directing officers in de-escalation principles and acting to intervene on the subject's behalf when any use of force is observed that is excessive or otherwise in violation of policy; and c. supporting officers who report objectively unreasonable or unreported force, or who are retaliated against for attempting to prevent objectively unreasonable force.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD achieved Preliminary compliance with and remains under assessment for Secondary compliance with the requirements of ¶248. To assess compliance, the IMT reviewed relevant policy, the curriculum for the 2022 in-service Supervisory Refresher Training, FRD's *Quarterly Reports*, and the CPD's *Annual Training Report*.

CPD's S11-10-02, *Pre-Service Training* (issued 29 December 2021), contains all elements required by ¶248 in Section III(A)(5).

Our review of the 2022 in-service Supervisory Refresher Training revealed that it features support for supervisors, emphasizes their responsibilities in use of force review, reporting, and investigations, and allocates time to address retaliation and assisting officers who report objectively unreasonable or unreported force.

The IMT looks forward to the delivery of the 2022 in-service Supervisory Refresher Training and reviewing the attendance records which will move the CPD toward Secondary compliance.

### Paragraph 248 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Appendix 5
# Recruitment, Hiring & Promotions
# Compliance Assessments, by Paragraph

# Appendix 4
# Recruitment, Hiring & Promotions
# Compliance Assessments, by Paragraph

| | | | |
|---|---|---|---|
| ¶253 | ¶256 | ¶259 | ¶262 |
| ¶254 | ¶257 | ¶260 | ¶263 |
| ¶255 | ¶258 | ¶261 | ¶264 |

# Recruitment, Hiring, and Promotion: ¶253

**253.** *The City and CPD will ensure that its recruitment, hiring, and promotion policies and practices are lawful, fair, and consistent with best practices, anti-discrimination laws, and the terms of this Agreement.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have achieved Preliminary compliance on this paragraph.

The IMT sought to review policy and data sources, including developed guidance for CPD members related to recruitment, hiring, and promotion.

During the previous reporting period, we reviewed the *Department Recruitment, Selection, and Hiring Plan* policy. We found that the City and the CPD did not achieve Preliminary compliance. We noted that we did not receive records of any other written materials that explain how the CPD will address how their "policies and practices are lawful, fair, and consistent with best practices, anti-discrimination laws" as required.

The City and the CPD submitted the following records to support Preliminary compliance during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on December 30, 2021)

- *CPD Sworn Member Promotions*, IAP 07-02 (produced on December 30, 2021)

- *Police Promotions Committee*, HR CPCD INPC01 (produced on December 31, 2021)

IAP 07-01 "allocates certain responsibilities to the City entities responsible with roles in CPD's sworn member hiring and recruitment efforts: (1) the CPD, (2) the Office of Public Safety Administration, (3) the Department of Human Resources, and (4) the Department of Law ("Law Department"). It directs each agency to issue internal guidance (e.g., policies, procedures, and/or training) as needed to implement their responsibilities under this Policy. The goal is to provide clear guidance on the policies and procedures necessary for implementing the agency's responsibilities in recruitment and hiring processes, including allocating responsibilities to personnel as necessary for proper implementation.

IAP 07-01 also states the following:

> To ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety; to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely; and to ensure that the Law Department can conduct the law business of the City and protect the rights and interest of the City, the City will take the necessary steps to engage a qualified consultant.

This "qualified consultant" will evaluate whether the CPD's recruitment and hiring policies and practices comply with the law, are transparent, and are consistent with the Consent Decree, as required by ¶258. The scope of the consultant's assessments covers ¶259(a–g) requirements. Work is intended to

> ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety; to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely; and to ensure that the Law Department can conduct the law business of the City and protect the rights and interest of the City.

IAP 07-01 also requires the Department of Human Resources to review, update, and publish the job descriptions for each sworn member title code, specifying the current duties, responsibilities, and minimum qualifications for each position, as required by ¶255.

Finally, IAP 07-01 requires the Department of Human Resources to review and update the job descriptions for each sworn member title code, specifying the current duties, responsibilities, and minimum qualifications for each position. It requires each hiring exam, and its administration process, be reviewed no less frequently than every four years. The IMT suggest changing this exam review process to every three years to correspond with ¶258 requirements.

IAP 07-02 allocates certain responsibilities to the city entities with roles in CPD's sworn member promotions efforts: (1) the CPD, (2) the Office of Public Safety Administration, (3) the Department of Human Resources, and (4) the Department of Law ("Law Department"). *See* ¶254.

IAP 07-02 requires the Department of Human Resources to review promotional examinations to ensure they are fair, validated, and properly administered. *See* ¶256. It further requires each promotional exam, and its administration process, be reviewed no less frequently than every four years. The IMT recommends the City and the CPD change the frequency of this periodic review to every three years to correspond with requirements of ¶261.

This policy further requires the City and the CPD to engage a qualified expert to assess the CPD's promotions process for the ranks of Sergeant and Lieutenant, and commits the Law Department to take the necessary steps to hire an expert ("Expert") to conduct an independent assessment ("Sergeant and Lieutenant Assessment"). This assessment is meant to ensure that the City and CPD's policies and practices comply with the law, are transparent, and are consistent with the Consent Decree. *See* ¶261. It requires that the assessment address each requirement specified in ¶261 (a–f), the expert develop the Sergeant and Lieutenant Implementation Plan within 60 days of the completion of the Sergeant and Lieutenant Assessment (*see* ¶262), and the CPD share the results of the assessment and its implementation plan with the Monitor for review and approval. Within 60 days of receiving the Monitor's approval, the CPD must begin to implement the plan.

Finally, IAP 07-02 requires an "Ongoing City Assessment," which examines CPD's promotional practices on an ongoing basis. Under this policy directive, the Department of Human Resources will assemble and lead a committee ("*Police Promotions Committee*") consisting of at least one qualified member from each of the following agencies: the Department of Human Resources, the Law Department, the Public Safety Administration, and the CPD. *See* ¶253. The Committee must assess whether the CPD's promotional practices related to sworn CPD personnel are lawful, fair, and consistent with best practices, anti-discrimination, and the terms of the Consent Decree. *See* ¶253.

HR CPCD INPC01, *Police Promotions Committee*, establishes the Department of Human Resources' procedures for the *Police Promotions Committee*, as referenced in IAP 07-02, CPD Sworn Promotions, details Promotions' Committee. It delineates duties and responsibilities, staffing, access to information, initial meeting, meeting to review promotional practices, and written assessments. Overall, the Promotions Committee is intended to ensure that the CPD's promotional practices related to sworn CPD personnel are lawful, fair, and consistent with the best practices, anti-discrimination, and the terms of the Consent Decree.

Collectively, the presence of these policies demonstrates Preliminary compliance with this paragraph. Secondary compliance may be achieved when records demonstrate that each aspect of all policies are fully implemented and executed to ensure ¶253 requirements are met.

### Paragraph 253 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

## Recruitment, Hiring, and Promotion: ¶254

> **254.** CPD will provide clear guidance on its policies and procedures for recruiting, hiring, and promoting police officers and will clearly allocate responsibilities for recruitment, hiring, and promotion efforts for each position.

**Compliance Progress**     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance on this paragraph during this reporting period.

The IMT sought to review policy sources, data sources, and job sources including a review of the developed job descriptions and requirements for each sworn member.

During the previous reporting period, we reviewed the *Department Recruitment, Selection, and Hiring Plan* policy. We found that the City and CPD did not achieve Preliminary compliance. We noted that this policy does not provide policy guidance on implementing the policy or demonstrate how the CPD provides clear guidance on its policies or allocates responsibilities, as required.

The City and the CPD submitted the following records to support Preliminary compliance during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on December 30, 2021)

- *CPD Sworn Member Promotions*, IAP 07-02 (produced on December 30, 2021)

IAP 07-01 allocates certain responsibilities to the City agencies responsible with roles in the CPD's sworn member hiring and recruitment efforts: (1) the CPD, (2) the Office of Public Safety Administration, (3) the Department of Human Resources, and (4) the Department of Law ("Law Department"). It directs each agency to issue internal guidance (e.g., policies, procedures, and/or training) as needed to implement their responsibilities under this Policy. The goal is to provide clear guidance on the policies and procedures necessary for implementing the agency's responsibilities in recruitment and hiring processes, including allocating responsibilities to personnel as necessary for proper implementation.

IAP 07-02 allocates certain responsibilities to the City agencies with roles in CPD's sworn member promotions efforts: (1) the CPD, (2) the Office of Public Safety Administration, (3) the Department of Human Resources, and (4) the Department of Law ("Law Department"). *See* ¶254.

Collectively, the presence of these policies demonstrates Preliminary compliance with this paragraph.

### Paragraph 254 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Recruitment, Hiring, and Promotion: ¶255

*255. To further this goal, the City and CPD will publish job descriptions for each sworn member title code, specifying the current duties, responsibilities, and minimum qualifications for each position.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have achieved Preliminary and Secondary compliance during this reporting period. Full compliance is not yet assessed.

Policy, data, and jobs methodologies were applied to assess Preliminary compliance. These methodologies assessed whether the CPD and the City have developed processes to develop and publish job descriptions and requirements. We also reviewed job descriptions and evaluated whether they incorporated key concepts.

During the previous reporting period, we compared the job descriptions that were submitted as compliance proofs with the job descriptions published online as well as survey templates for each sworn classification. We found that the City and the CPD did not achieve Preliminary compliance. We suggested the CPD define and memorialize this process in a policy to ensure its perpetual adoption in order to meet Preliminary compliance.

The City and the CPD produced the following records as proofs of compliance during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on December 30, 2021)

- *CPD Sworn Member Promotions*, IAP 07-02 (produced on December 30, 2021)

- *Police Promotions Committee*, HR CPCD INPC01 (produced on December 31, 2021)

- *Revision, Assessment, and Publication of Class Specifications for CPD Sworn & Civilian Class Titles*, HR CPCD INCS01 (produced December 31, 2021)

IAP 07-01 also requires the Department of Human Resources to review, update, and publish the job descriptions for each sworn member title code, specifying the current duties, responsibilities, and minimum qualifications for each position, as required by ¶255.

HR CPCD INCS01 provides guidelines for assessing, revising, and publishing Class Specifications for all Sworn and Civilian Class Titles within the CPD. It outlines how, pursuant to IAP 07-02, the Department of Human Resources is responsible for reviewing, updating, and publishing the sworn and civilian job descriptions.

To demonstrate further compliance with ¶255, the City submitted a link to published sworn job descriptions, revised in September 2021. The excellent revisions reflect improvements to incorporate concepts such as demonstrating competence and procedural justice practices, use of de-escalation, and other Consent Decree-related concepts.

Collectively, these documents demonstrate Preliminary and Secondary compliance with this paragraph during this reporting period.

The City and the CPD deserve high praise for their work revising and publishing the sworn job descriptions. This work shows great progress towards Full compliance with ¶255.

### Paragraph 255 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Secondary | |

# Recruitment, Hiring, and Promotion: ¶256

**256.** *The City and CPD will continue to review any hiring and promotional exams to ensure they are fair, validated, and properly administered.*

**Compliance Progress**                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**          *In Compliance* (NEW)
**Secondary:**           *Not in Compliance*
**Full:**                      *Not Yet Assessed*

The City and the CPD achieved Preliminary compliance with ¶256 during this reporting period.

The IMT applied policy, data, and job methodologies to determine whether the CPD and the City have developed policies and procedures to ensure fairness validity and proper administration of hiring and promotional exams.

In the previous reporting period, the IMT assessed this paragraph for the first time. The IMT assessed instituted policies from the Department of Human Resources, and we found that the City and the CPD did not achieve Preliminary compliance. We noted that to meet Preliminary compliance the City and the CPD must develop a written policy, budget, or official guidance to solidify the City and the CPD's strategy for sustained compliance.

The City and the CPD produced the following records as proofs of compliance during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on December 30, 2021)

- *CPD Sworn Member Promotions*, IAP 07-02 (produced on December 30, 2021)

IAP 07-01 "allocates certain responsibilities to the City entities responsible with roles in CPD's sworn member hiring and recruitment efforts: (1) the CPD, (2) the Office of Public Safety Administration, (3) the Department of Human Resources, and (4) the Department of Law ("Law Department"). It directs each agency to issue internal guidance (e.g., policies, procedures, and/or training) as needed to implement their responsibilities under this Policy. The goal is to provide clear guidance on the policies and procedures necessary for implementing the agency's responsibilities in recruitment and hiring processes, including allocating responsibilities to personnel as necessary for proper implementation.

IAP 07-02 requires the Department of Human Resources to review promotional examinations to ensure they are fair, validated, and properly administered. *See*

¶256. It further requires each promotional exam, and its administration process, be reviewed no less frequently than every four years. IMT recommends the City and the CPD change the frequency of this periodic review to every three years to correspond with ¶261 requirements.

Collectively, these policies demonstrate Preliminary compliance with this paragraph.

### Paragraph 256 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

## Recruitment, Hiring, and Promotion: ¶257

**257.** *CPD will inform officers of the role of the Office of the Inspector General ("OIG") in overseeing the hiring and promotions processes.*

### Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**       *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**            *In Compliance* (NEW)

The City and the CPD have achieved Full compliance The City and the CPD have achieved Full compliance with the requirements of ¶257 during this reporting period.

Policy, data, and training methodologies were applied to assessing compliance status. The IMT sought to determine whether the CPD has sufficiently and fully developed and implemented a sustainable process to inform CPD officers of the OIG role.

In the previous reporting period, the IMT assessed documents the City and the CPD produced to demonstrate compliance. We found that the City and the CPD achieved Preliminary and Secondary compliance. The documents showed that 98% of CPD personnel had received the mandated training by April 7, 2021.

The City and the CPD submitted the following document to establish compliance with this paragraph:

- CPD OIG eLearning Records

The CPD submitted records showing that 98% of all CPD officers have received the e-learning training. The records further show that 12,407 of the 12,604 eligible candidates have received training. Of the 197 who were not in compliance, 99 of them are recruits who, according to the CPD, will be scheduled to complete the eLearning before they complete their recruit training.

This is the second consecutive period of sustained reporting period of Secondary compliance. The CPD has demonstrated a process for ensuring new officers receive the training. As a result, Full compliance is achieved.

Sustaining Full compliance requires the CPD to continue to demonstrate they have fully developed and implemented a sustainable process to inform CPD officers, especially police academy recruits, of the OIG role.

## Paragraph 257 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Full |

# Recruitment, Hiring, and Promotion: ¶258

**258.** *By December 31, 2020, and at least every three years thereafter, CPD will assess its recruitment and hiring processes to ensure that its policies and practices comply with the law, are transparent, and are consistent with this Agreement.*

**Compliance Progress**    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Every Three Years    ☑ **Not Yet Applicable**

**Preliminary:**    *In Compliance* (NEW)
**Secondary:**    *Not Yet Assessed*
**Full:**    *Not Yet Assessed*

The City and the CPD achieved Preliminary compliance with ¶258 during this reporting period. Secondary compliance has not yet been assessed. The compliance deadline has been moved to March 5, 2022, due to COVID-19.

To assess Preliminary compliance, the IMT reviewed policy, data, and jobs information to review the CPD's plan to conduct assessment covering required areas as specified in this paragraph.

During the previous reporting period, we reviewed a draft Assessment Scope from a third-party expert. We found that the City and the CPD did not achieve Preliminary compliance and explained that Preliminary compliance requires a CPD policy to regularly assess recruitment and hiring processes in accordance to ¶¶258 and 259 requirements.

The City and the CPD produced the following records as proofs of compliance during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on December 30, 2021)

- *CPD Sworn Member Promotions*, IAP 07-02 (produced on December 30, 2021)

- *Police Promotions Committee*, HR CPCD INPC01 (produced on December 31, 2021)

- Draft Scope document from third-party expert

- *Recruitment and Hiring Consultant Engagement*, Law Department Standard Operating Procedure 03-01

IAP 07-01 states the following:

> *To ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety; to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely; and to ensure that the Law Department can conduct the law business of the City and protect the rights and interest of the City, the City will take the necessary steps to engage a qualified consultant.*

This "qualified consultant" will evaluate whether the CPD's recruitment and hiring policies and practices comply with the law, are transparent, and are consistent with the Consent Decree, as required by ¶258. The scope of the consultant's assessments covers ¶259(a–g) requirements. This works is intended to

> *ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety; to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely; and to ensure that the Law Department can conduct the law business of the City and protect the rights and interest of the City.*

Finally, IAP 07-01 requires the Department of Human Resources to review and update the job descriptions for each sworn member title code, specifying the current duties, responsibilities, and minimum qualifications for each position. It requires each hiring exam, and its administration process, be reviewed no less frequently than every four years. The IMT suggest changing this exam review process to every three years to correspond with ¶258 requirements.

IAP 07-02 requires the Department of Human Resources to review promotional examinations to ensure they are fair, validated, and properly administered. *See* ¶256. It further requires each promotional exam, and its administration process, be reviewed no less frequently than every four years. The IMT recommends the City and the CPD change the frequency of this periodic review to every three years to correspond with requirements of ¶261.

Finally, IAP 07-02 requires an "Ongoing City Assessment," which examines the CPD's promotional practices on an ongoing basis. Under this policy directive, the

Department of Human Resources will assemble and lead a committee ("*Police Promotions Committee*") consisting of at least one qualified member from each of the following agencies: the Department of Human Resources, the Law Department, the Public Safety Administration, and the CPD. *See* ¶253. The Committee must assess whether the CPD's promotional practices related to CPD personnel are lawful, fair, and consistent with best practices, anti-discrimination, and the terms of the Consent Decree. *See* ¶253.

The Draft Assessment Scope from third-party expert proposes and discusses an initial five-phase project scope and provides a high-level twelve-month timeline to fulfill the ¶258 requirements. The City has stated that the consultant has been retained, and the first assessment is now scheduled to be completed by June 30th, 2022.

The Law Department Standard Operating Procedure 03-01, Recruitment and Hiring Consultant Engagement is City Department of Law policy which allocates responsibility for engaging the expert to the Department of Law. It documents the procedure the Department of Law will use to fulfill these responsibilities, and Section I.1 requires the *Assessment and Recruiting and Hiring Implementation Plan* to be completed at least every three years.

Collectively, these policies demonstrate Preliminary compliance. The compliance deadline has been extended from December 31, 2021, to March 5, 2022 due to COVID-19. The IMT looks forward to conducting a full review of the City and the CPD's efforts to comply with this paragraph during the sixth reporting period.

### Paragraph 258 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Recruitment, Hiring, and Promotion: ¶259

*259. The recruitment and hiring assessment will identify and consider: a. the core set of characteristics and capabilities of qualified recruits; b. methods for consideration of discriminatory or biased behavior by the applicant against a member of a protected class in hiring decisions; c. barriers and challenges to successfully completing the recruit application process; d. Department strategies for attracting and hiring qualified applicants that reflect a broad cross section of the Chicago community; e. input, which could consider surveys, from successful and unsuccessful applicants, recruits and other CPD members, community members, community-based organizations, legal and law enforcement professionals, and internal and external subject matter experts regarding the strengths and weaknesses of the recruitment and hiring processes; f. recommendations for any modifications to the current recruitment and hiring processes that would enable CPD to satisfy the requirements of this section; and g. a plan for implementing any recommended modifications with a timeline for implementation.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance with this paragraph during this reporting period. The IMT has not yet assessed Secondary compliance.

The IMT looked for policy, data, and jobs and information to review the CPD's plan to conduct an assessment covering required areas as specified in this paragraph.

During the previous reporting period, we reviewed a draft Assessment Scope from a third-party expert. We found that the City and the CPD did not achieve Preliminary compliance. We explained that Preliminary compliance requires a CPD policy to regularly assess recruitment and hiring processes in accordance with ¶¶258 and 259 requirements.

The City and CPD produced the following records as proofs of compliance during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on December 30, 2021)

- *CPD Sworn Member Promotions*, IAP 07-02 (produced on December 30, 2021)

- Draft Scope document from third-party expert

- *Recruitment and Hiring Consultant Engagement*, Law Department Standard Operating Procedure 03-01

IAP 07-01 states the following:

> *To ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety; to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely; and to ensure that the Law Department can conduct the law business of the City and protect the rights and interest of the City, the City will take the necessary steps to engage a qualified consultant.*

This "qualified consultant" will evaluate whether the CPD's recruitment and hiring policies and practices comply with the law, are transparent, and are consistent with the Consent Decree, as required by ¶258. The scope of the consultant's assessments covers ¶259(a–g) requirements. This work is intended to

> *ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety; to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely; and to ensure that the Law Department can conduct the law business of the City and protect the rights and interest of the City.*

IAP 07-02 allocates certain responsibilities to the City entities with roles in CPD's sworn member promotions efforts: (1) the CPD, (2) the Office of Public Safety Administration, (3) the Department of Human Resources, and (4) the Department of Law ("Law Department"). *See* ¶254.

IAP 07-02 requires the Department of Human Resources to review promotional examinations to ensure they are fair, validated, and properly administered. *See*

¶256. It further requires each promotional exam, and its administration process, be reviewed no less frequently than every four years.

The Draft Assessment Scope from third-party expert proposes and discusses an initial five-phase project scope and provides a high-level twelve-month timeline to fulfill the ¶258 requirements. The City advises that consultant has been retained and the first assessment is now scheduled to be completed by June 30th, 2022.

The Law Department Standard Operating Procedure 03-01, Recruitment and Hiring Consultant Engagement is a City Department of Law policy which allocates responsibility for engaging the expert to the Department of Law. It documents the procedure the Department of Law will use to fulfill these responsibilities, and Section I.1 requires the *Assessment and Recruiting and Hiring Implementation Plan* to be completed at least every three years.

Collectively, these policies demonstrate Preliminary compliance.

### Paragraph 259 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

## Recruitment, Hiring, and Promotion: ¶260

**260.** *CPD will implement the plan above in Paragraph 259 in accordance with the specified timeline for implementation.*

**Compliance Progress**            (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance during this reporting period.

To achieve Preliminary compliance, the CPD must provide policy and data sources that substantiates their plan to conduct the required assessment within the specified timeline. The assessment method, criteria, plan, and process is examined in those policy and data sources.

In the previous reporting period, the City and the CPD did not submit compliance proofs before the end of the reporting period to assess any level of compliance.

The City and the CPD produced the following records as proofs of compliance during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on December 30, 2021)

- *CPD Sworn Member Promotions*, IAP 07-02 (produced on December 30, 2021)

IMT also considered the following records submitted for other paragraphs:

- *Recruitment and Hiring Consultant Engagement*, Law Department Standard Operating Procedure 03-01

IAP 07-01 states the following:

> *To ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety; to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely; and to ensure that the Law Department can con-*

> *duct the law business of the City and protect the rights and in-*
> *terest of the City, the City will take the necessary steps to engage*
> *a qualified consultant.*

This "qualified consultant" will evaluate whether the CPD's recruitment and hiring policies and practices comply with the law, are transparent, and are consistent with the Consent Decree, as required by ¶258. The scope of the consultant's assessments covers ¶259(a–g) requirements. This work is intended to

> *ensure that the City and CPD deliver services in a manner that*
> *fully complies with the Constitution and laws of the United States*
> *and the State of Illinois, respects the rights of the people of Chi-*
> *cago, builds trust between officers and the communities they*
> *serve, and promotes community and officer safety; to ensure*
> *that Chicago police officers are provided with the training, re-*
> *sources, and support they need to perform their jobs profession-*
> *ally and safely; and to ensure that the Law Department can con-*
> *duct the law business of the City and protect the rights and in-*
> *terest of the City.*

Finally, IAP 07-01 requires the Department of Human Resources to review and update the job descriptions for each sworn member title code, specifying the current duties, responsibilities, and minimum qualifications for each position. It requires each hiring exam, and its administration process, be reviewed no less frequently than every four years. The IMT suggests changing this exam review process to every three years to correspond with ¶258 requirements.

The Law Department Standard Operating Procedure 03-01, Recruitment and Hiring Consultant Engagement is an City Department of Law policy which allocates responsibility for engaging the expert to the Department of Law. It documents the procedure the Department of Law will use to fulfill these responsibilities, and Section I.1 requires the *Assessment and Recruiting and Hiring Implementation Plan* to be completed at least every three years.

Collectively, these policies demonstrate Preliminary compliance.

### Paragraph 260 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Recruitment, Hiring, and Promotion: ¶261

*261. Within 18 months of the Effective Date, and at least every three years thereafter, CPD will obtain an independent expert assessment of its promotions processes for the ranks of Sergeant and Lieutenant to ensure that its policies and practices comply with the law, are transparent, and are consistent with this Agreement. The independent expert will review the existing Hiring Plan, and any relevant collective bargaining agreements in order to conduct the assessment of the Sergeant and Lieutenant promotions processes. The Sergeant and Lieutenant promotions assessment, at a minimum, will identify: a. the processes by which CPD selects candidates for promotion to Sergeant and Lieutenant who possess a core set of competencies, characteristics, and capabilities and, when applicable, who are effective supervisors in compliance with CPD policy and this Agreement; b. methods for consideration of each candidate's disciplinary history in the selection process; c. Department strategies for promoting qualified applicants who reflect a broad cross section of the Chicago community; d. the frequency with which CPD should hold promotional exams; e. opportunities to increase transparency and officer awareness about the promotions process and promotions decisions, including, but not limited to, identifying criteria for promotions; and f. recommendations for any modifications to the current promotions processes, which would enable CPD to address the requirements of this section.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**  Every Three Years  ☑ **Not Yet Applicable**

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *In Compliance* (THIRD REPORTING PERIOD)
**Full:** *Not Yet Assessed*

The City and the CPD maintained Preliminary and Secondary compliance with this paragraph in the fifth reporting period.

Because this paragraph requires promotions processes assessments every three years, the next period to fully assess compliance ends November 3, 2023.

In the previous reporting period, the City and the CPD did not submit a Scope Statement by the end of the reporting period. They did, however, maintain Preliminary and Secondary compliance because ¶261 has a three-year period requirement.

The City and the CPD produced the following records as proofs of compliance during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on December 30, 2021)

- *CPD Sworn Member Promotions*, IAP 07-02 (produced on December 30, 2021)

- *Independent Sergeant and Lieutenant Expert Engagement*, Law Department Standard Operating Procedure 03-02,

IAP 07-02 requires the Department of Human Resources to review promotional examinations to ensure they are fair, validated, and properly administered. *See* ¶256. It further requires each promotional exam, and its administration process, be reviewed no less frequently than every four years. The IMT recommends the City and the CPD change the frequency of this periodic review to every three years to correspond with requirements of ¶261.

This policy further requires the City and the CPD to engage a qualified expert to assess the CPD's promotions process for the ranks of Sergeant and Lieutenant, and commits the Law Department to take the necessary steps to hire an expert ("Expert") to conduct an independent assessment ("Sergeant and Lieutenant Assessment"). This assessment is meant to ensure that the City and CPD's policies and practices comply with the law, are transparent, and are consistent with the Consent Decree. *See* ¶261. It requires that the assessment address each requirement specified in ¶261 (a–f), the Expert develop the Sergeant and Lieutenant Implementation Plan within 60 days of the completion of the Sergeant and Lieutenant Assessment (*see* ¶262), and the CPD share the results of the assessment and its implementation plan with the IMT for review and approval. Within 60 days of receiving the IMT's approval, the CPD must begin to implement the plan.

Law Department Standard Operating Procedure 03-02, *Independent Sergeant and Lieutenant Expert Engagement*, designates the Law Department with responsibility for selecting and hiring the Expert to conduct the Sergeant and Lieutenant Assessment of the CPD's promotions processes for the ranks of Sergeant and Lieutenant following the requirements set forth in the ¶261. The Public Safety Reform Division will implement this responsibility on behalf of the Department of Law, and Section I.1 requires the Expert to complete the Sergeant and Lieutenant Assessment every three years. This process must be initiated by November 1, 2022 with

Expert engagement completed by April 30, 2023 and at least every three years thereafter.

These policies collectively demonstrate Preliminary compliance during this reporting period.

### Paragraph 261 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Recruitment, Hiring, and Promotion: ¶262

*262. Within 60 days of the completion of the independent expert's promotions assessment, CPD will develop an implementation plan to respond to any recommendations identified in the assessment, including any recommended modifications to the promotions processes and a timeline for implementation. Upon completion, CPD will share the results of the assessment and its implementation plan with the Monitor for review and approval. Within 60 days of receiving the Monitor's approval, CPD will begin to implement the plan.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have achieved Preliminary compliance with this paragraph during this reporting period.

The IMT assessed Preliminary compliance by reviewing policies and data to determine whether the CPD has developed the policy to create, adopt, and implement an implementation plan from the independent assessment recommendations. To assess Secondary compliance the IMT will determine whether the CPD has identified requisite criteria, such as a job-task analysis.

In the previous reporting period, the IMT assessed the initial project timeline and seven proofs associated with recommendations from the DCI assessment. We found that the City and the CPD did not achieve Preliminary compliance as the documents submitted do not amount to a cohesive plan. We noted that in order to reach Preliminary compliance, the CPD needed to develop a policy that binds the organization to create an implementation plan from independent assessment recommendations.

The City and the CPD produced the following records as proofs of compliance during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on December 30, 2021)

- *CPD Sworn Member Promotions*, IAP 07-02 (produced on December 30, 2021)

This policy further requires the City and the CPD to engage a qualified expert to assess the CPD's promotions process for the ranks of Sergeant and Lieutenant, and

commits the Law Department to take the necessary steps to hire an expert ("Expert") to conduct an independent assessment ("Sergeant and Lieutenant Assessment"). This assessment is meant to ensure that the City and the CPD's policies and practices comply with the law, are transparent, and are consistent with the Consent Decree. *See* ¶261. It requires that the assessment address each requirement specified in ¶261 (a–f), the Expert develop the Sergeant and Lieutenant Implementation Plan within 60 days of the completion of the Sergeant and Lieutenant Assessment (*see* ¶262), and the CPD share the results of the assessment and its implementation plan with the Monitor for review and approval. Within 60 days of receiving the Monitor's approval, the CPD must begin to implement the plan.

The City and the CPD have indicated that the City has retained a consultant to create the first implementation plan for ¶262. These policies collectively indicate Preliminary compliance is achieved.

Secondary compliance may be achieved when records demonstrate that the implementation plan is completed, shared, and approved.

### Paragraph 262 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Recruitment, Hiring, and Promotion: ¶263

> **263.** *Within 365 days of the Effective Date, CPD will identify and publish, both internally and externally, for the ranks of Captain and Commander, the duties, eligibility criteria, knowledge, skills, and abilities considered to select qualified candidates who are effective supervisors in compliance with CPD policy and this Agreement.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**       *In Compliance* (NEW)
**Full:**            *Not in Compliance*

The City and the CPD achieved Preliminary and Secondary compliance with the requirements of ¶263 during the fifth reporting period.

The CPD has demonstrated that sufficient resources have been allocated to identify the requisite criteria for Captain and Commander ranks. Proofs provided during previous reports and during the fifth reporting period for ¶263 indicate the CPD completed a job task analysis and implemented a system to publish revised job descriptions both internally and externally.

In the previous reporting period, the IMT assessed the CPD's updated Captain and Commander job descriptions and selection methods. We noted that this compliance determination was still under assessment and explained that Preliminary compliance includes CPD demonstrating that it has allocated sufficient resources to identify the requisite criteria.

The City and the CPD produced the following records as proofs of compliance during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on December 30, 2021)

- *CPD Sworn Member Promotions*, IAP 07-02 (produced on December 30, 2021)

- *Police Promotions Committee*, HR CPCD INPC01 (produced on December 31, 2021)

- *Revision, Assessment, and Publication of Class Specifications for CPD Sworn & Civilian Class Titles*, HR CPCD INCS01 (produced December 31, 2021)

Collectively, these documents demonstrate Preliminary and Secondary compliance with this paragraph during this reporting period.

The City and the CPD deserve high praise for their work revising and publishing the Captain and Commander job descriptions. This work reflects great progress towards Full compliance with ¶263.

The IMT informed the City and the CPD in the second reporting period that to achieve Full compliance, they should establish a "feedback loop" with candidates to revise and improve future processes." Compliance proofs submitted during this reporting period did not substantiate the presence and adoption of that critical methodological step. The CPD should ensure that step is included to close the communication loop with CPD personnel.

### Paragraph 263 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Secondary | |

# Recruitment, Hiring, and Promotion: ¶264

**264.** *Within 365 days of the Effective Date, CPD will develop strategies to increase transparency and awareness about the promotions process for the ranks of Captain and Commander, including, but not limited to, criteria for promotions and promotion decisions.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD has maintained Preliminary compliance with ¶264 paragraph in the fifth reporting period.

Documents substantiating compliance with this paragraph may include strategic plans, CPD policies, communication materials, meetings, and communications within CPD, incorporation of required criteria for promotions into policy statement, and other internal communication to attain effective outreach and transparency.

In the previous reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance. The IMT reviewed updated Captain and Commander job descriptions and selection methods. We noted that these documents alone are insufficient to meet the threshold of Secondary compliance.

The City and the CPD produced the following records as proofs of compliance during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on December 30, 2021)

- *CPD Sworn Member Promotions*, IAP 07-02 (produced on December 30, 2021)

In prior reporting periods, the CPD developed a communications plan to increase transparency and awareness about the promotion process for the ranks of captain and commander. The CPD submitted revised captain and commander job descriptions that became effective in September 2021.

Collectively, these policies substantiate Preliminary compliance during this reporting period.

To assess Secondary Compliance, the IMT will review policy, training, and data sources in applying a Training methodology, including observing meetings and communications within CPD; assess incorporation of required criteria for promotions into policy statement; and review internal communication strategic plans to evaluate effective outreach and transparency.

### Paragraph 264 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Appendix 6
# Training
# Compliance Assessments, by Paragraph

# Appendix 6
# Training
# Compliance Assessments, by Paragraph

| | | | |
|---|---|---|---|
| ¶270 | ¶289 | ¶308 | ¶326 |
| ¶271 | ¶290 | ¶309 | ¶327 |
| ¶272 | ¶291 | ¶310 | ¶328 |
| ¶273 | ¶292 | ¶311 | ¶329 |
| ¶277 | ¶294 | ¶312 | ¶331 |
| ¶278 | ¶295 | ¶313 | ¶332 |
| ¶279 | ¶296 | ¶314 | ¶333 |
| ¶280 | ¶297 | ¶315 | ¶334 |
| ¶281 | ¶299 | ¶316 | ¶335 |
| ¶282 | ¶300 | ¶317 | ¶336 |
| ¶283 | ¶301 | ¶319 | ¶337 |
| ¶284 | ¶303 | ¶320 | ¶338 |
| ¶285 | ¶304 | ¶321 | ¶339 |
| ¶286 | ¶305 | ¶322 | ¶340 |
| ¶287 | ¶306 | ¶323 | |
| ¶288 | ¶307 | ¶324 | |

# Training: ¶270

> **270.** The TOC, or other similarly-structured oversight entity, will continue to review and oversee the Department's training program and will be chaired by the First Deputy Superintendent, or other high-ranking member of CPD's command staff. The TOC will also include, in some capacity, personnel from various units of the Department that are responsible for overseeing patrol field operations; administering training; providing legal advice; coordinating and exercising supervision over disciplinary matters; managing data, technology, and information systems; overseeing and coordinating the community relations strategy; and reviewing reportable use of force incidents. It will meet at least once a month and continue to record meeting minutes.

**Compliance Progress**  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**   Monthly   ☑ **Met**   ☐ **Missed**

**Preliminary:**   *In Compliance* (NEW)
**Secondary:**   *In Compliance* (NEW)
**Full:**   *Not Yet Assessed*

The City and the CPD achieved Preliminary and Secondary compliance with the requirements of ¶270 during this reporting period.

The IMT reviewed policy and data sources to determine whether the requirements of this paragraph are written into policy and if the structure of TOC is clearly outlined and understandable to CPD personnel. Assessing Secondary compliance required reviewing records to determine whether meetings occurred as required with required representatives in attendance and determining whether meetings are held monthly as required with meeting minutes produced following each meeting.

*Progress before the Fifth Reporting Period*

During the previous reporting period the IMT reviewed the meeting minutes for the first four months of the reporting period (January 2021 through April 2021). Their *Training Oversight Committee* policy (S11-11), states that the Training Oversight Committee is required to meet monthly. We found that the CPD was not able to maintain Preliminary compliance or achieve Secondary compliance with ¶270 as we did not receive sufficient information from the meeting minutes that would meet compliance. We explained that the CPD and the City will need to meet these

requirements of the meeting attendance and frequency, as well as the involve-ment of the Training Oversight Committee to achieve compliance with this para-graph.

*Progress in the Fifth Reporting Period*

Compliance proofs produced during this evaluation include policy S11-11, TOC meeting materials for the fifth reporting period, and a site visit which occurred on October 27 of 2021. TOC meeting materials include minutes and agenda from meetings in May through October, and a virtual vote on needs assessment. Mate-rial productions substantiate requirements are met for Secondary compliance.

### Paragraph 270 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Secondary | |

# Training: ¶271

*271. Within 180 days of the Effective Date, and on an annual basis thereafter, CPD's Education and Training Division will, under the supervision of the TOC, conduct a needs assessment, which will, among other things identify and consider: a. information collected from use of force reviews, discipline and civilian complaints, and reports of officer safety issues; b. input from CPD members of all ranks and their respective collective bargaining units, if applicable; c. input from members of the community; d. recommendations from CPD oversight entities, including, but not limited to COPA, the Deputy Inspector General for Public Safety ("Deputy PSIG"), and the Police Board; e. changes in the law, to the Illinois Law Enforcement Training and Standards Board requirements, and to CPD policy, if any; f. court decisions and litigation; g. research reflecting the latest in training and law enforcement best practices; h. information obtained from evaluation of training courses, instructors, and FTOs; and i. member reaction to, and satisfaction with, the training they received.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | | |
|---|---|---|---|
| **Recurring** | Annual (October 31, 2021*) | ✓ **Met** | ☐ **Missed** |
| | Extended from August 28, 2021, due to COVID-19 | | |
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) | | |
| **Secondary:** | *In Compliance* (NEW) | | |
| **Full:** | *Not Yet Assessed* | | |

The City and the CPD maintained Preliminary compliance and achieved Secondary compliance with the requirements of ¶271 in this reporting period.

The IMT reviewed policy and data sources to assess Preliminary compliance. Applicable policy must mandate the conduct of an annual training needs assessment. To assess Secondary compliance, the IMT reviewed the Needs Assessment, information from the TOC and Education and Training Division, and documentation related to information gathering efforts relevant to this paragraph. This data allowed the IMT to determine whether the needs assessment sufficiently meets paragraph ¶271 requirements and addresses all required subparagraphs.

During the previous reporting period the IMT reviewed the *2021 Training Plan*, which contained a "Needs Assessment" chapter. According to that chapter, the Training Plan incorporates recommendations from the specified group in the consent decree. The Needs Assessment chapter of the plan offered no substantive

proof or details of the deliberative process of how the various inputs were considered in rendering the derived courses. We found that the City and the CPD maintained Preliminary compliance but did not receive Secondary compliance. We noted that achieving Secondary compliance requires documentation related to information gathering efforts relevant to this paragraph.

To demonstrate compliance with ¶271, the CPD submitted training directive S11-10, TOC meeting materials, the Needs Assessment for the 2022 Training Plan, the 2022 Training Plan and Needs Assessment responses.

Training directive S11-10 section VII(A)(7)(a) (29 December 2021) identifies all of subparagraph (a-i) requirements except (f). However, the Training Needs Assessment does include feedback from the law department in that area. The June 2021 TOC meeting minutes reflect a discussion on the Needs Assessment. Additional documents reflecting a virtual vote on the Needs Assessment are also included in the production materials. Submitted proofs include documents from the multiple entities identified in subparagraphs (a) through (i) and reflect the CPD's efforts to receive a broad cross section of feedback. While feedback sources include a community survey, it is not clear if survey participants include a broad and diverse cross section of the Chicago community. The IMT recommends CPD amend training directive S11-10 to include the requirement of subparagraph (f) and add more detailed information to the survey to determine whether the results are representative of the City's diversity. Nevertheless, Preliminary and Secondary compliance are achieved.

### Paragraph 271 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

## Training: ¶272

*272. Within one year of the Effective Date, and on an annual basis thereafter, the Education and Training Division will develop—and the TOC will review and approve—a written Training Plan for CPD's recruit, field, in-service, and pre-service promotional training to ensure that CPD members are trained to safely, effectively, and lawfully carry out their duties in accordance with the law, CPD policy, best practices, and this Agreement. CPD will implement the Training Plan in accordance with the specified timeline for implementation. The Training Plan will: a. identify training priorities, principles, and broad goals consistent with this Agreement; b. prioritize the needs identified during the needs assessment and identify those needs that will be addressed by the plan; c. include a plan and schedule for delivering all CPD training as necessary to fulfill the requirements and goals of this Agreement; d. identify subject areas for CPD training; e. determine the mandatory and elective courses, consistent with this Agreement, to be provided as part of the In-Service Training Program; f. develop a plan to inform officers about the In-Service Training Program, its course offerings, and its requirements; g. determine which aspects of the In-Service Training Program can be delivered in a decentralized manner, including e-learning, and which training requires more intensive, centralized delivery, to ensure effective delivery and comprehension of the material; 79 h. address any needed modification of the Field Training and Evaluation Program to fulfill the requirements and goals of this Agreement; i. identify necessary training resources including, but not limited to, instructors, curricula, equipment, and training facilities; j. determine the content, consistent with this Agreement, to be provided as part of pre-service promotional training for Sergeants, Lieutenants, Captains, and command staff; k. develop a plan to implement and utilize a centralized electronic system for scheduling and tracking all CPD training; l. develop a plan to implement and utilize a system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities; and m. identify community-based organizations that represent a broad cross section of the City to participate, as feasible, practical, and appropriate, in the development and delivery of the curriculum regarding subjects including, but not limited to, procedural justice, de-escalation, impartial policing, and community*

*policing, and make efforts to encourage such participation by such organizations.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Annually      ☑ **Not Yet Applicable**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶272 during this reporting period.

The IMT reviewed policy and data sources including the Training Plan, to assess Preliminary compliance. The IMT reviewed the CPD's *2022 Annual Training Plan* to ensure it sufficiently meets the requirements of this paragraph and that those requirements are executed, including all of the specifications in subparagraphs.

During the previous reporting period the IMT found that the draft *2021 Training Plan* was fairly comprehensive, but it still did not adequately address subparagraphs (f) (h), (j), and (m) of ¶272. We recommended that the CPD produce a finalized training plan *before training begins* so as to allow the CPD to make informed and strategic modifications to its training when confronted with unanticipated challenges. Doing this and incorporating the necessary sections fully into the *Training Plan* will allow them to reach Secondary compliance.

The City and the CPD submitted the following records to demonstrate Secondary compliance:

- *2022 Annual Training Plan*

- 19 November 2021 TOC Approval Vote on 2022 Training Plan

- Community Policing course surveys

The IMT also examined the *Needs Assessment* for the *2022 Training Plan* and Training Directives S11-10 and S11-11. Training Directive S11-10 VII(A)(7)(b) directs the Deputy Chief of the CPD's Training Support Group to prepare and submit annually the *Training Plan* but does not mandate TOC review and approval. S11-11 III(A)(1)(b) requires the TOC review and oversee the Department's Training Plan but does not mandate ¶272 (a)-(m) requirements. The *Training Plan* itself on pages 5 and 6 do spell out these subparagraph requirements but only "describes the findings from the annual needs assessment, the key stakeholders involved in CPD

training and oversight; and planned training for 2022.[1] There is no direct "policy" imperative to meet every ¶272 (a)-(m) requirement.

The CPD Training Directives have greatly matured since the first reporting period. Although the Training Plan arguably describes itself as having followed ¶272 boundaries, IMT suggests that the CPD clearly, carefully, and fully incorporate ¶272 requirements into one or more of the prominent training directives—S11-11 and/or S11-10. Policy revisions frequently occur as demonstrated during this reporting period. The CPD must ensure that essential elements of policies are recorded and remain intact through revision processes.

Overall, the CPD has developed a superb Training Plan that demonstrates Preliminary compliance and addresses most of the IMT's prior concerns. Clarifying the previously mentioned policy issues by the deadline will result in Secondary compliance.

### Paragraph 272 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

---

[1]  2022 Training Plan *Overview*, page 5.

## Training: ¶273

> **273.** *With oversight from the TOC, CPD will develop and implement recruit, field, in service, and pre-service promotional training curricula and lesson plans that comport with CPD's Training Plan and that address the requirements and goals of this Agreement.*

### Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary Compliance during this reporting period. Secondary compliance was not achieved.

To assess Preliminary and Secondary compliance, the IMT reviewed training curricula, lesson plans, special orders, TOC meeting documents, and other policy, training, and data sources. These sources are needed to determine if the CPD has sufficiently developed training, curricula, and lesson plans in alignment with the requirements of this paragraph.

During the previous reporting period the IMT sought proofs of continued application of a controlling policy and minutes from Training Oversight Committee's meetings that depict Training Oversight Committee oversight and address the Consent Decree requirements. We found that insufficient documents were produced to assess the extent to which the training curricula and lesson plans comport with CPD's Training Plan and address Consent Decree requirements. We found that The City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance during this reporting period. We explained that the CPD and the City will need to produce these policy documents to achieve Secondary compliance.

The City and the CPD submitted the following records to demonstrate Secondary compliance:

- TOC minutes

- 2022 Training Plan

Additionally, the IMT reviewed Training Directive S11-11.

The TOC minutes cover meetings in May through October 2021. The 18 May 2021 TOC agenda item 5, "New Training Proposals," included," Active Bystandership for Law Enforcement." No records were submitted to indicate if the TOC reviewed and approved the curricula and lesson plans.

The 2022 Training Plan states "[t]he CPD Training and Support Group (TSG), pursuant to this training plan and with oversight from the TOC, will ensure that recruit, field, in-service, and pre-service promotional training curricula and lesson plans are developed and implemented as outlined in this plan."

S11-11 requires TOC to oversee and approve the Training and Support Group development of training curricula, lesson plans, and course materials that are:

a.  consistent across subjects;

b.  of sufficient quality to adequately communicate the intended subject matter to Department members; and

c.  in accordance with the law, policy, best practices, and the consent decree.

Collectively, these records establish Preliminary compliance.

Typically, produced lesson plans and curricula along with applicable policy and TOC meeting materials allow for the assessments required by this paragraph. 17 August 2021 TOC minutes indicate 2021-2022 SRO training was discussed and approved by the TOC. 2022 Training Plan (page 58) indicates that, "In August 2021, SROs received the first of two days of training . . . ." However, the Training Plan itself was not approved until November. Produced documents should allow IMT to determine that the Needs Assessment, Training Plan TOC approval, course curriculum development and TOC approval and training delivery occur in sequential steps that demonstrate adherence to requirements in this paragraph.

No evaluative or follow-up documents were produced that demonstrate that the CPD has sufficiently developed, implemented, and delivered training in alignment with requirements. Secondary compliance requires these post-policy proofs.

CPD should provide records reflecting the content presented to the TOC for review and approval. Curricula, lesson plans, and other course materials submitted to support compliance should reflect ¶273 requirements.

### Paragraph 273 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Training: ¶274

*274. Under the supervision of the TOC, CPD's Education and Training Division, pursuant to the Training Plan, will develop and approve training curricula, lesson plans, and course materials that are (a) consistent across subjects; (b) of sufficient quality to adequately communicate the intended subject matter to CPD members; and (c) in accordance with the law, CPD policy, best practices, and this Agreement.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**      *In Compliance (THIRD REPORTING PERIOD)*
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with the requirements of ¶274 during this reporting period.

To assess Preliminary and Secondary compliance, the IMT reviewed training curricula, lesson plans, special orders, TOC meeting documents, and other policy, training, and data sources. These sources are needed to determine if the CPD has sufficiently developed training, curricula, and lesson plans in alignment with the requirements of this paragraph.

During the previous reporting period the IMT sought proofs of continued application of a controlling policy that depicts the Training Oversight Committee's supervision of the Education and Training Division's in areas specified in the consent decree. We received insufficient documents to assess the extent to which the training documents and materials address Consent Decree requirements. We found that the City and the CPD maintained Preliminary compliance during this reporting period, but they did not reach Secondary compliance.

The City and the CPD produced the following records to demonstrate Secondary compliance this reporting period:

- TOC minutes

- 27 October 2021 TOC site visit

- 2022 Training Plan

The IMT further reviewed S11-11.

S11-11 III(A)5 has the requisite language for Preliminary compliance.

The TOC minutes cover meetings in May through October 2021. The 18 May 2021 TOC agenda item 5, "New Training Proposals," included," Active Bystandership for Law Enforcement." No records were submitted to indicate if the TOC reviewed and approved the curricula and lesson plans.

The 2022 Training Plan states, "The CPD Training and Support Group (TSG), pursuant to this training plan and with oversight from the TOC, will ensure that recruit, field, in-service, and pre-service promotional training curricula and lesson plans are developed and implemented as outlined in this plan."

S11-11 III(A)(5) requires TOC oversee and approve the Training and Support Group development of training curricula, lesson plans, and course materials that are:

a. consistent across subjects;

b. of sufficient quality to adequately communicate the intended subject matter to Department members; and

c. in accordance with the law, policy, best practices, and the consent decree.

Collectively, these records establish Preliminary compliance.

Typically, produced lesson plans and curricula along with applicable policy and TOC meeting materials allow for the assessments required by this paragraph. 17 August 2021 TOC minutes indicate 2021-2022 SRO training was discussed and approved by the TOC. 2022 Training Plan (page 58) indicates that, "In August 2021, SROs received the first of two days of training . . . ." However, the Training Plan itself was not approved until November. Produced documents should allow IMT to determine that the Needs Assessment, Training Plan TOC approval, course curriculum development and TOC approval and training delivery occur in sequential steps that demonstrate adherence to requirements in this paragraph.

No evaluative or follow-up documents were produced that demonstrate that the CPD has sufficiently developed, implemented, and delivered training in alignment with requirements. Secondary compliance requires these post-policy proofs.

CPD should provide records reflecting the content presented to the TOC for review and approval. Curricula, lesson plans, and other course materials submitted to support compliance should reflect ¶274 requirements.

## Paragraph 274 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Training: ¶275

> **275.** *The TOC will oversee the integration of the concepts of procedural justice, de-escalation, impartial policing, and community policing into CPD training, including, but not limited to use of force, weapons training, and Fourth Amendment subjects, as appropriate.*

**Compliance Progress**              (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary compliance during this reporting period.

Assessing Preliminary and Secondary compliance requires reviewing plans processes, TOC minutes, directives, and other policy, training, and job sources, including lesson plans and curricula, to determine whether the CPD has fully implemented TOC oversight of key concepts' integration that also are consistent with CPD training plans. Plans, policies, and oversight efforts must substantiate the TOC review and training oversight ensures training has integrated concepts of procedural justice, de-escalation, impartial policing, and community policing.

In the previous reporting period, we sought proofs of continued application of a controlling policy, curricula, lesson plans and course material that sufficiently integrate the required concepts an into CPD training. We found that insufficient documents were produced to assess the compliance with ¶275 requirements. The City and the CPD maintained Preliminary compliance during this reporting period but did not reach Secondary compliance. We noted that the City and the CPD will need to produce these documents to achieve Secondary compliance.

The City and the CPD submitted the following records to demonstrate Secondary compliance this reporting period:

- TOC minutes

- 27 October 2021 TOC site visit

- 2022 Training

Additionally, the IMT reviewed S11-10 and S11-11.

## Paragraph 275 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

## Training: ¶276

> **276.** *The TOC will oversee continued development and integration of instructional strategies that incorporate active learning methods such as problem-solving, scenario-based activities, and adult learning techniques—in addition to traditional lecture formats—into training delivery.*

**Compliance Progress**            (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| Preliminary: | *In Compliance* (FOURTH REPORTING PERIOD) |
| Secondary: | *Not in Compliance* |
| Full: | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance during this reporting period.

Assessing Preliminary and Secondary compliance includes reviewing policy, training, and job sources, including TOC review criteria, and plans.

In the previous reporting period, we evaluated the *2021 Training Plan* and Training Directives S11-10, S11-10-01 and S11-11. We found that while policy and the Training Plan clearly outline the expectation of ¶276 compliance, this needed to include Training Oversight Committee review criteria and plans that ensure integration and delivery of instructional strategies into course instruction. The City and the CPD achieved Preliminary compliance during this reporting period but did not reach Secondary compliance.

The City and the CPD submitted the following records to demonstrate Secondary compliance:

- Training Directive S11-11

- October 2021 TOC

Additionally, the IMT reviewed TOC meeting minutes and the 2022 Training Plan. S11-11 III(A)(9) requires the TOC focus on "overseeing the continued development and integration of instructional strategies that incorporate active learning methods such as problem-solving, scenario-based activities, and adult learning techniques, in addition to traditional lecture formats, into training delivery."

According to the 2022 Training Plan, "the development and incorporation of active learning methods into newly developed or revised curriculum also is a priority." At 70. "The TSG is responsible for providing the TOC with a presentation when newly developed or revised curriculum."

While policy and the Training Plan clearly outline the expectation of ¶276 compliance, Secondary compliance has not been met. Proofs of Secondary compliance should include Training Oversight Committee review criteria and plans and a process that ensures integration and delivery of instructional strategies into course instruction.

Full compliance requires the CPD to fully develop a systematic method for the Training Oversight Committee to sustain regular instructional strategies review and oversight following ¶276 requirements.

### Paragraph 276 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Training: ¶277

> **277.** *Where it would add to the quality or effectiveness of the training program, the Education and Training Division will seek the assistance of outside expertise, as feasible, practical, and appropriate, either in developing or reviewing CPD curricula and lesson plans, or reviewing pilot versions of CPD courses.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶277. Assessing Preliminary compliance requires reviewing policies, procedures, plans, and criteria for selection of SMEs. Policy and job methodologies are applied to determine if CPD has plans, policies, and standards for receiving, continuing, and terminating SME assistance and expertise including that of outside experts. Secondary compliance efforts require CPD to sufficiently take steps to implement a plan to receive SME assistance, including that of outside experts.

During the previous reporting period, we reviewed Training Directives S-11-10 and S11-11. S-11-10 Section (IV)(A)3 of proposed draft S11-10 tracks ¶277 language and would meet the requirements for Preliminary compliance. We found that this was not finalized and approved by the end of the reporting period. Additionally, the CPD has not articulated or enacted processes to hire, retain, evaluate, and terminate outside experts, nor has it established a criterion for the selection and retention of outside experts. For these reasons, the City and the CPD did not achieve Preliminary compliance during this reporting period.

The City and the CPD submitted the following records to demonstrate Preliminary compliance during this reporting period:

- Training Directives S11-10 and S11-11

- 27 October 2021 TCAC site visit

In assessing compliance for the current reporting period, we reviewed Training Directives S-11-10 and S11-11. S-11-10 Section (VII)(A)(3) (29 December 2021) tracks ¶277 language and meets the requirements for Preliminary compliance.

As we cited in our last report, CPD has not articulated or enacted processes to hire, retain, evaluate, and terminate outside experts, nor has it established a criterion for the selection and retention of outside experts. As suggested in our last report,

the CPD should include these steps in the controlling policy to reach Secondary compliance.

## Paragraph 277 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Training: ¶278

> **278.** *The TOC will continue to oversee a process that effectively incorporates material changes in relevant case law, statutes, and the CPD policy into recruit, field, in-service, and preservice promotional training in a timely and effective manner.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**     *Not in Compliance*
**Full:**     *Not in Compliance*

The City and the CPD maintained Preliminary compliance during this reporting period.

To assess Preliminary compliance, IMT reviewed policy, jobs, and training sources including plans, policies, procedures, training materials, and TOC minutes and directives for evidence of plans and policies wherein TOC oversees a process for incorporating material changes in case law, statutes, and the CPD policy into training.

During the previous reporting period, we assessed the Training Oversight Committee meeting minutes from January through April 2021 and the *2021 Training Plan.* We found that there was no discussion of a process of incorporating material changes in relevant case law, statutes, and the CPD policy into training. The City and the CPD maintained Preliminary compliance but did not reach Secondary compliance during the past reporting period.

The City and the CPD submitted the following records to demonstrate Secondary compliance this reporting period:

- TOC Agendas and Meeting Minutes for May, June, and July 2021

- Training Needs Forms

- 27 October 2021 TOC meeting site visit

IMT also considered training directive S11-11 and the 2022 Training Plan.

We found that the CPD achieved Preliminary compliance because Special Order S11-11 Section lll(A)(12) reflects the procedural requirements of ¶278. We previously explained that the CPD must produce records reflecting that monthly Training Oversight Committee meetings are occurring to discuss material changes, including agendas, minutes, and other supporting documents, in order to achieve additional levels of compliance.

The CPD submitted, and IMT assessed, Training Oversight Committee meeting minutes from May through October 2021 and the *2022 Training Plan*. A review of the minutes revealed no discussion of either an act or process of incorporating material changes in relevant case law, statutes, and the CPD policy into recruit, field, in-service, and preservice promotional training. No submitted records included plans, policies or procedures that described the ¶278 mandated "process." Therefore, the City and the CPD did not achieve Secondary compliance.

This "process" could in fact already be in place but is not sufficiently described. If CPD intends to use the TOC meetings and deliberations as core elements of this process, it would benefit the CPD to include a process map and actual examples of the steps involved in timely and effectively moving a relevant change in case law or policy through the process to become the focus of recruit, field, in-service and/or promotional training.

Full compliance can be achieved after Secondary compliance after the Training Oversight Committee sustains oversight of process for incorporating material changes in case law, statutes, and the CPD policy into training in accordance with requirements.

### Paragraph 278 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Training: ¶279

**279.** *All training materials disseminated to CPD members and displayed at CPD facilities will reflect current CPD policy.*

**Compliance Progress**　　　　　(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance with ¶279 during this reporting period.

Assessing compliance requires examining policy, training, and job sources including policies and procedures. Preliminary compliance requires CPD to have a policy that centralizes awareness of training materials disseminated to CPD members and displayed at every CPD facility and a methodology to review and ensure those materials reflect current CPD policy.

During the previous reporting period, the IMT reviewed the proposed draft Special Order S11-10 (issued on May 14, 2021). We noted that there were proposed additions to S11-10 that were not approved as of the end of the previous reporting period. The City and the CPD's compliance efforts for Preliminary compliance remained under assessment for ¶279 during the last reporting period.

The City and the CPD produced training directive S11-10 (29 December 2021) as proof of Preliminary compliance with this paragraph. No additional proofs of compliance were received.

S11-10 VIII.A reflects the ¶279 language, thereby bringing the CPD into Preliminary compliance.

To demonstrate Secondary compliance, the CPD must establish a process to ensure that training materials disseminated to CPD members and displayed at every CPD facility reflect current CPD policy. While some document control may be ascertained with the requirement that the Graphic Arts and Print Shop, Public Safety Administration, ensures the production of all training materials reflect TSG approved content, additional auditing or site inspection processes should also be considered.

## Paragraph 279 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Preliminary |

# Training: ¶280

**280.** *CPD will develop, implement, and utilize a centralized electronic system for scheduling and tracking all CPD training to allow the Education and Training Division to effectively plan and manage training schedules and instructor assignments for all training.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary compliance during this reporting period.

Assessing Preliminary compliance requires reviewing policy and data sources including policies and procedures. This review is designed to determine whether the CPD has a centralized electronic system for scheduling and tracking all CPD training to allow the Education and Training Division to effectively plan and manage training schedules and instructor assignments for all training. This review also discerns if CPD has developed policies for the ETD to use the system as required.

During the previous reporting period, the IMT reviewed, Current and proposed Training Directives, meeting notes and communications, a demonstration video, and materials for how the capabilities of Acadis align with Consent Decree paragraphs. We found that the language in the existing training policy meets requirements and the City and the CPD maintained Preliminary compliance. We noted that Secondary compliance requires the CPD to use a centralized electronic system for scheduling and tracking all CPD training to allow the Education and Training Division to effectively plan and manage training schedules and instructor assignments for all training.

The City and the CPD did not submit any proofs to substantiate maintained Preliminary compliance during this reporting period. The IMT did, however, review Training Directives S11-10 and S11-11 for compliance with this paragraph. According to S11-10 XIII, "The Training Division will utilize a centralized electronic system for scheduling and tracking all Department members' training, and a centralized electronic file system for assessing the content and delivery of all Department training." This language meets the policy requirements of this paragraph. Therefore, Preliminary compliance is maintained.

Secondary compliance requires the CPD to use a centralized electronic system for scheduling and tracking all CPD training to allow the Education and Training Division to effectively plan and manage training schedules and instructor assignments for all training. Full compliance requires CPD's continuous and ongoing use of a centralized electronic system for scheduling and tracking all CPD training and the Education and Training Division effectively plans and manages training schedules and instructor assignments for all training using this system.

### Paragraph 280 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Training: ¶281

**281.** *The City will be responsible for providing appropriate training facilities that offer adequate access to safe and effective training.*

## Compliance Progress       (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance during this reporting period.

The IMT reviewed policy sources that demonstrate that the City and the CPD have developed plans and other written guidance to provide appropriate training facilities according to the requirements of ¶ 281.

The paragraph requirements were assessed for the first time in this reporting period.

The City and the CPD submitted the following records to demonstrate Preliminary compliance during this reporting period:

- Evidence of progress on new public safety training facility

To demonstrate Preliminary compliance with this paragraph, the City directed the IMT to the project website, https://jpstc-chicago.com/. The website details that the City is providing for a new training facility for citywide first responders, including police officers. Details on the project and its progress to date, including photographs, can be found on the website. Also included in this submission is a memo from the City's Department of Assets, Information, and Services, the City's lead agency on the project, providing additional detail. As detailed in the memo, the main training building was over one-third complete as of November 2021.

Additional records depicting survey results from training facility users on adequacy, and the City and the CPD's response thereto and a formal policy statement committing the City and the CPD to ¶281 requirements would help substantiate Preliminary compliance.

Secondary compliance can be substantiated with policies, procedures, plans, evaluations, and training materials that indicate the City and the CPD have begun the implementation of plans to provide appropriate training facilities including allocating sufficient resources. Full compliance may be achieved after CPD provides evi-

dence that adequate, safe, and effective training is conducted in their facilities according to requirements of ¶281. Policies, procedures, plans, processes, and demonstrations of system operations may all be used to substantiate compliance.

### Paragraph 280 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Not Applicable | None | |

# Training: ¶282

**282.** *All CPD training instructors must be appropriately qualified for their instructional roles and use only approved curricula and lesson plans. CPD will actively recruit and retain qualified instructors to ensure that CPD has sufficient qualified instructors to meet the needs of the Department and requirements of the Training Plan.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD has reached Preliminary compliance during this reporting period.

Assessing Preliminary compliance requires reviewing policy, data, job, and training sources, including policies, procedures, qualifications, and training plans. This assessment involves reviewing plans for CPD to determine and review appropriate instructor qualifications and to ensure instructors use only approved lesson plans and criteria and curricula. The CPD must also have an instructor recruiting and retention strategy to ensure there are sufficient qualified instructors to meet CPD needs and Training Plan requirements. The controlling policy or procedure should include required qualifications for instructors.

During the previous reporting period, the IMT reviewed the *2021 Training Plan*; current and draft Training Directives S11-10, S11-10-01, and S11-11; and FRD Decentralized Instructor Training. We found that they did not reach Preliminary compliance because the draft policy S11-10 has not been finally approved as of end of the fourth reporting period.

The City and the CPD produced training directive S11-10 (29 December 2021) to prove Preliminary compliance with this paragraph for this reporting period.

S11-10 V.C. says, "All Department training instructors must be appropriately qualified and trained for their instructional roles and use only approved curricula and lesson plans." S11-10 V.F further states, "The Training Division will actively recruit and retain instructors to ensure sufficient qualified instructors to meet the needs of the Department and requirements of the Training Plan." Together, these policy statements allow CPD to reach Preliminary compliance.

The CPD must have a strategy to determine and review appropriate instructor qualifications and ensure they use only approved lesson plans and curricula; the

CPD has an instructor recruiting and retention strategy to ensure there are sufficient qualified instructors to meet CPD needs and Training Plan requirements.

Full compliance requires CPD systematically determine and review appropriate instructor qualifications and ensures instructors use only approved lesson plans and curricula. The CPD's periodically refined instructor recruiting and retention strategy must ensure there are sufficient qualified instructors to meet CPD needs and Training Plan requirements.

### Paragraph 282 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Training: ¶283

*283. As appropriate to accomplish the requirements and goals of this Agreement, CPD will incorporate experts and guest speakers to participate in the development and instruction of relevant courses, as feasible, practical, and appropriate, including, but not limited to: a. CPD members of all ranks; b. members of the community; c. legal and law enforcement professionals, such as judges, prosecutors, and public defenders; d. crime victims; and e. subject matter experts.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**  *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**  *Not in Compliance*
**Full:**  *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance during this reporting period.

Assessing Preliminary compliance requires reviewing CPD policy, lesson plans, training plan, and training schedules to determine whether the CPD has developed a strategy to comply with these requirements.

In the previous reporting period, the IMT reviewed the *2021 Training Plan* (Appendix G); Training Directives S11-10, S11-10-01, and S11-11; and FRD Decentralized Instructor Training. We found that the training directive S11-10 Section has the requisite language for Preliminary compliance. To reach Secondary compliance, we noted that the CPD must articulate processes to hire, retain, evaluate, and terminate outside experts and guests, as well as establish a criterion for their selection and retention.

The City and the CPD did not provide any proofs of compliance with this paragraph during this reporting period. The City indicated that maintaining Preliminary compliance was their goal during this reporting period. IMT reviewed S11-10 (29 December 2021) for the requisite ¶283 language. S11-10 VII A.3 has the requisite language, fulfilling the requirements for Preliminary compliance.

Secondary compliance requires CPD demonstrate that it has sufficiently taken steps to evaluate and acquire experts to develop and instruct courses. Full compliance maybe achieved after sustained Secondary compliance where CPD sufficiently evaluates and acquires experts to initially and periodically develop and instruct courses in accordance with the requirements of this paragraph.

## Paragraph 283 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Training: ¶284

*284. CPD will require that all new and current Education and Training Division instructors and curriculum developers are certified by the Illinois Law Enforcement Training and Standards Board and, as appropriate to their roles, receive initial and annual refresher training on subjects including, but not limited to, effective teaching, adult-learning techniques, and curriculum development. CPD will further require that instructors are trained in the specific subject matter they are assigned to teach and are also cross-trained in other related subjects so that they are equipped to deliver effective interdisciplinary instruction. Instructor training will also include peer review.*

## Compliance Progress         (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**    *In Compliance* (NEW)
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

The City and the CPD achieved Preliminary compliance during this reporting period.

Assessing Preliminary compliance with this paragraph requires examining CPD policy, lesson plans, training plans, and training schedules to determine whether the CPD has developed a strategy to comply with these requirements.

In the previous reporting period, the IMT reviewed the CPD training policy and found that they did incorporate ¶284 language into draft policy S11-10 Sections. However, the City and the CPD have not achieved Preliminary compliance because this policy was proposed and not finalized as of the end of the fourth reporting period. We noted that to reach Secondary compliance, the CPD must develop these documents and implement a plan to ensure all instructors are ILETSB certified.

The City and the CPD produced Training Directives S11-10, S11-10-02 and S11-10-03 as compliance proofs. S11-10 V. A-G contains the requisite language for Preliminary compliance.

Meetings with the City during this reporting period revealed that ILETSB does not have an "instructor qualification" course. There are requisites for instructing an ILETSB course. The City worked with the IMT and OAG to craft language sufficient to meet the spirit of this paragraph.

Secondary compliance status will require CPD implement a plan to ensure all instructors are properly credentialed. Full compliance will require Secondary compliance status and all instructors credentialed according to ¶284 standards on an ongoing basis.

### Paragraph 284 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Training: ¶285

> **285.** *The Education and Training Division will conduct annual instructor performance reviews. Performance reviews will include classroom observations, member feedback, and in-person meetings with instructors to discuss performance and areas of improvement. These performance reviews will be considered in assessing whether instructors may continue to serve in that role.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶285.

Assessing Preliminary compliance required examining policy and procedures to determine if the City and the CPD have developed policies and procedures to conduct annual instructor performance reviews according to the requirements of ¶285.

These paragraph requirements were assessed for the first time in this reporting period.

The City and the CPD produced training directives S11-10 to substantiate Preliminary compliance during this reporting period. S11-10 V.J. has the requisite language that exactly mirrors language in ¶285.

Secondary compliance may be achieved by producing policies and procedures, plans, training materials, and communication materials that substantiate they have established and implemented a process to conduct annual instructor performance reviews according to the requirements of ¶285. A training methodology that includes reviewing the City's, the CPD's, and the other relevant entities' training development, implementation, and evaluation (¶286) also applies. The IMT will rely upon the "ADDIE model" of curriculum development and implementation as our evaluation standard, which typically incorporates the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation. Each of these five elements is considered an essential component of effective training. Training evaluation includes student and trainee evaluations—both formative and summative evaluations—as well as measurements of how specific training goals are implemented at the organizational level. We will also assess whether training is evidenced-based and conforms to best practices, as applicable. We will also use this

model to measure the effectiveness of the trainers (¶¶283–85). When applicable, we will also assess whether the City, the CPD, and the other relevant entities adequately sought, received, and incorporated community input and participation. The IMT will also seek to verify sufficient attendance records, including hours attended.

Full compliance may be achieved by demonstrating through policies, procedures, plans, processes, and demonstrations of systems operations, reports, and audits, that CPD has fully implemented annual instructor performance reviews according to the requirements of this paragraph.

### Paragraph 285 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Not Applicable | Preliminary | |

# Training: ¶286

*286.* *The review and analysis of the content and delivery of training will enable CPD to determine whether the training provided to members effectively prepares them to police fairly, safely, and in accordance with the law, CPD policy, best practices, and this Agreement.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not reach any level of compliance during this reporting period.

In assessing Preliminary compliance, the IMT reviewed policies and procedures that indicate the City and the CPD have developed acceptable policies and procedures, and plans to conduct an analysis and review of the content and delivery of training according to the requirements of this paragraph.

These paragraph requirements were assessed for the first time in this reporting period.

The City and the CPD did not produce any documents to substantiate any level of compliance during this reporting period. The City indicated their position is that this paragraph does not state any assessable requirement. We respectfully disagree.

Secondary compliance will require policy and procedure, planned, training materials, communication materials, and meeting minutes, including but not limited to the TCAC and the TOC, substantiate whether the CPD has established and implemented a process to analyze and review the content and delivery of training according to the requirements of this paragraph. Full compliance may be achieved when records indicate and substantiate that the City and the CPD have conducted an analysis and review of the content and delivery of training and the CPD has determined if training is effective in preparing members according to the requirements of this paragraph.

## Paragraph 286 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Not Applicable | None | |

# Training: ¶287

> ***287.*** *Pursuant to its Training Plan, CPD will develop and implement a process that provides for the collection, analysis, and review of course and instructor evaluations to document the effectiveness of existing training and to improve the quality of future instruction and curriculum. This process will include member feedback on the training they have received and analysis of the extent to which such training is reflected in how members perform. The Education and Training Division will consider this information in conducting its annual needs assessment.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not In Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD failed to reach Preliminary compliance during this reporting period.

Assessing Preliminary compliance required examining policy procedure, evaluation criteria, data collection, and analysis. The review is designed to ascertain if the Training Plan or related policies require CPD to develop and implement a process for collection, analysis and review of course and instructor training evaluation, including number feedback and analysis of the extent to which such training is reflected in how members perform and how this information will be used in needs assessment.

In the previous reporting period, the IMT reviewed the *2021 Training Plan* as well as the current and draft Training Directives S11-10, S11-10-01, and S11-11 for proof of compliance. The language in the Purpose section of the policy indicated the need for input from department members and other stakeholders. While we acknowledged the attempt to include the necessary language, there were no documents provided that contained the requisite language for Preliminary compliance.

The City and the CPD submitted training directives S11-11 (December 10, 2021) and S11-10 (December 29, 2021) as proofs of Preliminary compliance with this consent decree paragraph.

S11-10 VII.A.7b says, "The Training Plan identifies activities and outcomes to be measured by developing a process that provides for the collection, analysis, and

review of course and instructor evaluations. This process measures the effectiveness of existing training and improves the quality of future instruction and curriculum." S11-11 III.A.1.b mirrors that exact language.

¶287 also requires, "This process will include member feedback on the training they have received and analysis of the extent to which such training is reflected in how members perform. The Education and Training Division will consider this information in conducting its annual needs assessment." This language does not appear in either of the documents offered as supporting compliance proofs during this period. This the bar to reach Preliminary compliance is not achieved.

To achieve Secondary compliance, the City and the CPD must demonstrate that they have implemented a process for course and instructor training evaluation, including member feedback and analysis of the extent to which such training is reflected in how members perform. This information is then used in the training needs assessment to determine whether the CPD has demonstrated that training is having the intended impact. Full compliance may be achieved when policies lesson plans training plans training schedules and evaluation instruments are components of a sustained evaluation process that meets the requirements of this paragraph.

### Paragraph 287 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Training: ¶288

**288.** *The Education and Training Division will develop and implement a process to maintain audits, reviews, assessments, or evaluations of the sufficiency or effectiveness of the training programs.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**          *Not in Compliance*
**Secondary:**          *Not Yet Assessed*
**Full:**          *Not Yet Assessed*

The City and the CPD did not seek nor reach Preliminary compliance during this reporting period.

Assessing Preliminary compliance requires reviewing policy, procedure, review plans, and processes to for Training Division controlling policies. These policies should guide ETD to develop and implement a process to maintain audits, reviews, assessments, or evaluations of the sufficiency or effectiveness of the training programs.

During the previous reporting period, we reviewed the submissions for plans and controlling policies for the Education and Training Division to develop and implement the required process. There were no controlling policies substantiating compliance that were submitted, therefore the City and the CPD did not achieve Preliminary compliance. We explained that assessing compliance in the future, the IMT will continue to review policy, procedure, plans, and processes to determine whether the they have established the required process in accordance to the consent decree.

The City and the CPD did not produce any compliance proofs during this reporting. The City instead indicated that CPD intends to work towards memorializing the requirements of this paragraph in policy in the sixth reporting period.

Secondary compliance may be achieved when the ETD has established process to maintain audits, reviews, assessments, or evaluations of the efficiency or effectiveness of the training programs.

## Paragraph 288 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

# Training: ¶289

*289. CPD will develop and implement testing policies and procedures to ensure that any member testing that is administered is reliable and fair. To achieve this purpose, both knowledge-based and performance-based tests will be designed, developed, administered, and scored according to best practices. All tests will assess the knowledge and skills required for successful job performance and will align with the materials delivered in training.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD has demonstrated Preliminary compliance with this paragraph during this reporting period.

Assessing Preliminary compliance requires reviewing plans for CPD to develop testing policies and procedures consistent with requirements of this paragraph. Assessment sources include policies, procedures, plans, and processes.

During the previous reporting period, the CPD did not produce any compliance proofs for this paragraph by the submission deadline. As a result, Preliminary compliance is not achieved. We explained that in future compliance assessments, the IMT will review CPD policy, procedure, plans, and processes that develop testing policies and procedures consistent with the requirements of the paragraph

The City and the CPD submitted training directive S11-10 (29 December 2021) to prove Preliminary compliance with this paragraph during this reporting period.

S11-10 VI.D.1-3 mirrors the language established in ¶289 therefore reaches the Preliminary compliance threshold.

Secondary compliance may be reached after CPD has established a process to ensure that testing that is administered is reliable and fair, and uses both knowledge based and performance-based tests that are designed, developed, administered, and scored according to best practices. All tests are designed to assess the knowledge and skills required for successful job performance and align with materials developed in training. Assessment sources include policy, procedure, plans and process, and testing materials.

## Paragraph 289 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Training: ¶290

***290.*** *CPD will develop, implement, and utilize a centralized electronic file system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities. This system will allow the Education and Training Division to electronically track and maintain complete and accurate records of all training provided to CPD members, including curricula, lesson plans, training delivered, member feedback, assessments, and other training materials. This system will, at a minimum: a. maintain training records for each member of the Department; b. record the course description, duration, curriculum, date, location, and the members who completed the training; and c. identify members who did not complete required training and describe remedial training actions that were taken.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance during this reporting period.

Assessing Preliminary compliance would require reviewing policy and plans for the CPD to develop, implement and utilize a centralized electronic file system. Assessment sources would include policies, procedures, plans, and processes.

During the previous reporting period, we reviewed proposed draft policy S11-10, the Training Plan, Education and Training Division plans, and Acadis meeting notes. We found that there were missing policy requirements necessary for Preliminary compliance. We noted that in future compliance assessments, the CPD should demonstrate Preliminary compliance and depict the system's deployment and usage as consistent with consent decree requirements.

The City and the CPD did not provide any proofs of compliance during this reporting period. The City has indicated that CPD intends to work towards memorializing the requirements of this paragraph in policy in the sixth reporting period.

Achieving Secondary compliance will require CPD to establish an electronic file system in accordance with requirements of this paragraph. Assessment sources would include policies, procedures, plans and processes, and demonstrations of system operations.

## Paragraph 290 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Training: ¶291

**291.** *The Education and Training Division will document all training provided to or received by CPD members, whether required or not. Members will sign an acknowledgement of attendance or digitally acknowledge completion of training.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* (NEW: LOST COMPLIANCE) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not maintain Preliminary compliance with ¶291 during this reporting period.

Assessing Preliminary compliance requires reviewing policy and plans for CPD to document all CPD training. Assessment sources would include policy, procedure, and training records.

In the previous reporting period, the CPD implemented S11-10-01, *Training Notification and Attendance Responsibilities* and were undergoing additional revisions to policy. The CPD achieved Preliminary compliance as the policy sufficiently addressed the requirements of the consent decree paragraph. We explained that training, attendance, and other records documents will need to be reviewed in future reporting periods to assess Secondary compliance.

The City and the CPD did not submit any documents to establish proof of compliance during this reporting period. Therefore, Preliminary compliance is not achieved. The City has indicated that CPD will work towards memorializing the requirements of this paragraph in policy during the sixth reporting period.

Secondary compliance may be achieved when CPD demonstrates that it has sufficiently established a process to document all CPD training. Assessment sources would include policy, procedure, training records, and training attendance records.

### Paragraph 291 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | None | |

# Training: ¶292

*292. The Education and Training Division will, on an annual basis, report on training to the TOC and the Superintendent. At a minimum, this report will: a. contain a description of each course, including a summary of the subject matter; b. state the duration, date, location, and number of persons by rank who completed the training; c. identify whether the training was part of the recruit, in-service, or pre-service promotional training program; d. state whether the training was centralized or decentralized, and delivered in person or through electronic means; e. list whether the training was mandatory, elective, or remedial; and f. document the members who did not complete required training and any remedial training actions taken.*

## Compliance Progress         (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Annually         ✓  **Not Yet Applicable**

**Preliminary:**    *In Compliance* (NEW)
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

The City and the CPD achieved Preliminary compliance during this reporting period.

Assessing Preliminary compliance requires determining if CPD has implemented a policy requiring annual reporting on training as specified in paragraph 292. Assessment sources would include policy, procedure, processes, and plans.

In the previous reporting period, the IMT reviewed current and draft Training Directives S11-10 and S11-11, Training Oversight Committee minutes, a transmittal letter to the Superintendent and the *2020 Annual Training Report* to assess compliance. We found that the City and the CPD did not reached Preliminary compliance with this paragraph. While the draft policy sections had the required language for Preliminary compliance, this draft policy was not yet finally approved. We noted that the City and the CPD will need to fully adhere to the requirements of the consent decree paragraphs in future compliance assessments.

The City and the CPD submitted training directives S11-10 (29 December 2021) and S11-11 (10 December 2021) as proofs of Preliminary compliance during this reporting period. S11-11 III.A.1.c, "The Annual Training Report," and S11-10 VII.A.7.c, captures the language of ¶292, thus meeting Preliminary compliance requirements. The City and the CPD indicated Preliminary compliance as their target for this paragraph in the fifth reporting period.

## Paragraph 292 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Training: ¶294

**294.** *CPD will ensure that upon graduation from the Academy, recruits demonstrate a firm grasp of the basic technical and tactical skills, critical thinking, problem-solving, and interpersonal skills that form the basis for safe and effective policing. In order to do so, CPD will rely on appropriate evaluation tools to measure recruits' skills and qualifications.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**   *Not in Compliance* (NEW: LOST COMPLIANCE)
**Secondary:**   *Not in Compliance*
**Full:**   *Not Yet Assessed*

The City and the CPD did not achieve Preliminary compliance during this reporting.

Preliminary compliance requires CPD policy, procedures, and directives demonstrate recruits are required to adhere to the requirements of this paragraph and that policy fully aligns with training goals.

During the previous reporting period, we reviewed materials to determine whether they addressed key requirements of this paragraph including the *Recruit Procedural Manual*, *Physical Skills Rules and Regulations Manual*, Exam Questions and Evaluation Forms. We found that the City and the CPD achieved Preliminary compliance with this paragraph as the CPD had written the recruit requirements of ¶294 into policy. We noted that for future compliance assessments, the CPD will need to demonstrate the validity of its evaluation tools in determining recruits' firm grasp of requisite skills and qualifications upon graduation, as required by ¶294.

The City and the CPD did not submit any documents as compliance proofs during this reporting period. CPD indicated that due to balancing workload demands, CPD intends to work towards submitting materials that demonstrate Secondary compliance in the sixth reporting period.

The City and the CPD previously achieved Preliminary compliance status by writing ¶294 requirements into directive TSG 21-05. Secondary compliance requires CPD to demonstrate the validity of its evaluation tools in determining recruits' firm grasp of requisite skills and qualifications upon graduation, as required by ¶294.

## Paragraph 294 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | None |

# Training: ¶295

***295.*** *The Parties acknowledge that CPD, through its Recruit Curriculum Working Group, revised and updated the content and delivery of its recruit training curriculum in 2017. CPD will further modify the amount, content, and delivery of its recruit training to comport with its Training Plan and the requirements and goals of this Agreement.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have achieved Preliminary compliance with the requirements of ¶295 during this reporting period.

Assessing Preliminary compliance involves reviewing CPD policy and plans for modifying recruit training. Assessment sources include policy, procedure, training curricula, plans, and delivery.

During the previous reporting period, we reviewed the Training Plan. We found that the City and the CPD did not achieve Preliminary compliance. The plan indicated recruit training module and hours but did not address other requirements for ¶295. We noted that in future assessments of compliance the City and the CPD will need to address this and establish a verifiable process to modify recruit training.

The City and the CPD provided training directive Special Order S11-10-01 (30 December 2021) and the 2022 Training Plan as substantive proof of compliance with paragraph 295 requirements during this reporting period.

According to S11-10-01 III.D, "The Training Division will modify the amount, content, and delivery of its recruit training to comport with the Department Training Plan, any other department requirements, and based on recommendations from the Training Oversight Committee (TOC)." This language tracks ¶295 requirements for Preliminary compliance.

Secondary compliance will require CPD establish a verifiable process to modify recruit training. Policies, procedures, training curricula, plans, and delivery are among the document proofs CPD may submit. In assessing Full compliance, we will determine if CPD has sufficiently modified recruit training to align with requirements to training plan and ¶295 mandates.

## Paragraph 294 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Training: ¶296

**296.** *CPD will ensure that the Academy is sufficiently staffed to effectively train recruits. CPD will further ensure that, except in extraordinary circumstances, courses are scheduled with sufficient advance time for instructors to be notified of the class and to properly prepare and deliver quality instruction.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance with ¶296 during this reporting period.

Assessing Preliminary compliance requires reviewing CPD policy and plans for ensuring adequate staffing levels in the Academy. Assessment sources include policy, procedure, processes, staffing levels, training schedules, and materials for instructors.

During the previous reporting period, we reviewed policy, procedure, processes, staffing levels, training schedules, materials for instructors. The CPD did not submit any documents or plans demonstrating adequate staffing levels in the academy, therefore, Preliminary compliance was not achieved.

The City and the CPD produced training directive S11-10-01 as proof of compliance with this paragraph. S11-10-01 III.E. mirrors the language in ¶296, reaching the threshold for Preliminary compliance.

Assessing Secondary compliance requires reviewing policy, procedure, processes, staffing levels, training schedules, materials for instructors and other submissions to determine if the CPD has established a process to ensure adequate academy staffing levels. Full compliance can be achieved if policy, procedure, processes, staffing levels, training schedules, materials for instructors, communication/notification and other materials submitted demonstrate that the CPD maintains sufficient academy staffing levels and courses are scheduled with sufficient advance time in accordance with ¶296 requirements.

## Paragraph 296 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Training: ¶297

*297.* *CPD will require end-of-course training evaluations of recruits that ensure they graduate with the requisite knowledge and skills to engage in policing activities safely, effectively, and lawfully.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance with the requirements of ¶297 during this reporting period.

Assessing Preliminary compliance with ¶297 requires determining whether the CPD has written the requirements of the paragraph into policy. Assessment sources include policy and procedures.

During the previous reporting period, we reviewed materials to determine whether they addressed key requirements of this paragraph including the *Recruit Procedural Manual*, *Physical Skills Rules and Regulations Manual*, Exam Questions and Evaluation Forms. We found that the City and the CPD did not achieve Preliminary compliance. The CPD has not provided a clear policy statement or documentation that substantiates that the CPD conducts an end-of-course skills evaluation, as well as the State knowledge/certification test, which will be required to demonstrate Preliminary compliance.

The City and the CPD produced training directive S11-10-01 (10 December 2021) is the only compliance proof during this reporting period. S11-10-01 III.F grants the Deputy Chief, Training and Support Group, with the responsibility to require end of course training evaluations of recruits that ensure recruits graduate with the requisite knowledge and skills to engage in policing activities safely, effectively, and lawfully. This language mirrors ¶297 requirements, thus reaches the threshold for Preliminary compliance.

Secondary compliance requires constructing and administering a validated end-of-course knowledge and skills evaluation to ensure they can police safely, effectively, and lawfully. Full compliance can be achieved when end-of-course evaluations demonstrate efficacy in identifying recruits with the requisite knowledge and skills to engage in policing activities.

## Paragraph 297 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Training: ¶299

>**299.** *CPD will revise, as necessary and appropriate, the Field Training and Evaluation Program to comport with CPD's Training Plan and this Agreement.*

**Compliance Progress**   (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶299 during this reporting period.

Assessing Preliminary compliance requires reviewing CPD policy and plans for reviewing and revising fuel training and evaluation program component. Assessment sources include policies, procedures, plans, and other policy, job, and training sources.

During the previous reporting period, we reviewed documents and plans for reviewing and revising the Field Training and Evaluation Program. CPD's *Field Training and Evaluation Program* included language guiding the periodic revisions to the program. We found that the City and the CPD achieved Preliminary compliance. We noted that to reach Secondary compliance, the CPD will need to establish a process to review and revise the Field Training and Evaluation Program as necessary.

The City and the CPD submitted training directive S11-02 (10 December 2021) to substantiate proof of sustained Preliminary compliance with this paragraph. No additional documents were submitted. The City and the CPD did not reach Secondary compliance during this reporting period.

S11-02 VI.F says, "periodic revisions to the FTEP will be made based on the Department Annual Needs Assessment report, the Department Training Plan, the Annual Training Summary Report, and recommendations from the Training Oversight Committee." Because this language tracks ¶299, CPD meets the requirements for Preliminary compliance.

Assessing Secondary compliance requires reviewing policy, procedure, plans, and other submissions to determine if CPD has established a process to review and revise the Field Training and Evaluation Program as necessary.

Full compliance can be achieved if policy, procedure, plans, training plans, and other Field Training program documents demonstrate that the CPD has sufficiently

and systematically reviewed and revised Field training and evaluation program in accordance with ¶299 requirements.

### Paragraph 299 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Training: ¶300

**300.** *The Field Training and Evaluation Program will follow recruit training and be at least 12 weeks in duration and include at least three training cycles. The Field Training and Evaluation Program will not designate probationary police officers ("PPOs") as "field qualified," as defined by this Agreement, until they have successfully completed the entire program.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The City and the CPD achieved Preliminary compliance with ¶300 during this reporting period.

Assessing Preliminary compliance requires reviewing CPD policy and plans for reviewing and revising fuel training and evaluation program component. Assessment sources include policies, procedures, plans, and other policy, job, and training sources.

During the previous reporting period, we reviewed a draft of Special Order S11-02 *Field Training and Evaluation Program.* We found that the City and the CPD did not achieve Preliminary compliance. We noted that the CPD has made significant progress in advancing towards Preliminary compliance, however The CPD did not establish a policy to memorialize the requirements of ¶300. We explained that to achieve Preliminary compliance CPD must demonstrate that the policy, procedure, processes, and measures are clearly documented.

The City and the CPD submitted training directive S11-02 (10 December 2021) to demonstrate compliance with this paragraph.

The IMT reviewed three different areas of amended policy S11-02 to ascertain Preliminary compliance status. S11-02 III provides the definition of "Field-Qualified." It reads as follows:

> [A]fter the probationary police officer has completed all cycles required under the Field Training and Evaluation program and, in the Field Training Officers experience, the Probationary Police Officer has progress consistently in bridging the knowledge and skills learned in the academic phase and the practical application in the field to merit consideration to work with officers who are not Field Training Officers. A field qualified Probationary Police

> *Officer is still in probationary status and is not allowed to work alone in a 10-99 capacity.*

S11-02 VIII.A.2 mandates each PPO complete a minimum of three 28-day cycles. S11-02 VIII.B.2.e, g, and h establishes the evaluative criteria, requires completion of a Cycle Summary Report at the end of a PPO's first and second training cycle, and the completion of a Final Summary Report at the end of a PPO's third training cycle. These three subparagraphs collectively contain the language required to meet Preliminary compliance. Secondary compliance was neither sought nor achieved during this reporting.

To meet Secondary compliance, the CPD must demonstrate that it has implemented the approved policy, directive, and standard operating procedure reflecting training imperatives of this paragraph. A training methodology that includes reviewing the City's, the CPD's, and the other relevant entities' training development, implementation, and evaluation (¶286) also applies to Secondary compliance requirements. IMT will rely upon the "ADDIE model" of curriculum development and implementation as our evaluation standard, which typically incorporates the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation. Each of these five elements is considered an essential component of effective training. Training evaluation includes student and trainee evaluations—both formative and summative evaluations—as well as measurements of how specific training goals are implemented at the organizational level. We will also assess whether training is evidenced based and conforms to best practices, as applicable. We will also use this model to measure the effectiveness of the trainers (¶¶283–85). When applicable, we will also assess whether the City, the CPD, and the other relevant entities adequately sought, received, and incorporated community input and participation. The IMT will also seek to verify sufficient attendance records, including hours attended.

The Field Training and Evaluation Program training records should correspond with policy and procedural requirements.

### Paragraph 300 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Training: ¶301

**301.** *CPD will review and revise as necessary its FTO selection policies and procedures to establish and implement a program that effectively attracts and retains qualified FTOs.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance with ¶301 during this reporting period.

Assessing Preliminary compliance requires the City and the CPD to have policies and plans that mandate reviewing and revising its FTO selection policies and procedures to follow requirements of ¶301. Preliminary assessment sources include policy, plans, procedures, processes, reports, and other policy, data, job, and training sources.

These paragraph requirements were assessed for the first time in this reporting period.

The City and the CPD submitted training directive S11-02 (10 December 2021) to demonstrate compliance with this paragraph.

The City and the CPD indicated that S11-02 VII contains the requisite language to achieve Preliminary compliance status. The IMT reviewed that section and the entire policy. S11-02 VII.A through B discusses incentives and priorities given to FTOs to ensure they are properly trained and equipped. While it mandates incentives, it does not prescribe reviewing and revising as necessary FTO selection policies and procedures, as mandated by ¶301. As a result, the City and the CPD have failed to demonstrate Preliminary compliance.

Secondary compliance may be achieved after the City and the CPD have reviewed and revised its FTO selection policies and procedures and implemented an FTO program that follows the requirements of this paragraph. Secondary assessment sources include policy, procedure, processes, training schedules, FTO, PPO and other evaluations, reports, NOJOs, job descriptions, and personnel allocation records that show course completion for PPOs.

## Paragraph 301 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Not Applicable | None | |

# Training: ¶303

*303. FTOs will receive initial and refresher training that is adequate in quality, quantity, scope, and type, and that addresses subjects including, but not limited to management and mentoring, community policing, effective problem-solving techniques, ethics, diversity, field communication, and any recent substantive changes made to the recruit training curriculum. FTOs will receive refresher training on an annual basis as part of the In-Service Training Program outlined in this Agreement. FTOs will be promptly notified of any substantive changes to policies and practices that affect their roles as mentors and trainers of PPOs.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Annual          ☑ **Not Yet Applicable**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance during this reporting period.

To assess Preliminary compliance, IMT must determine whether the CPD has written the requirements of the paragraph into policy. This should include guidance on how changes to training curriculum will be addressed. Assessment sources include training curricula, lesson plans, training plans, policy, and other relevant data sources.

During the previous reporting period, we reviewed the draft *2021 Training Plan*; draft Training Directives S11-10, S11-10-01, and S11-11; and the Refresher Revised Lesson Plan. We found that the City and the CPD did not achieve Preliminary compliance because they did not fully and accurately track ¶303 language as a policy statement. Additionally, no section of the lesson plan appears to address recent substantive changes made to the recruit training curriculum. These would be needed in future compliance assessments.

The City and the CPD submitted three training directives to demonstrate Preliminary compliance with this paragraph during this reporting period. Those directives include S11-02 (10 December 2021), S11-10-02, and S11-10-03. No documents were produced to seek nor substantiate Secondary or Full compliance.

S11-02 VIII.B.1, S11-02 VIII.B.2.a note, and S11-02 VIII.B.2.d commits the City and the CPD to all aspects of ¶303 except the requirement for FTOs to receive refresher training on an annual basis as part of the In-Service Training Program. That requirement is covered by S11-10-03 III.J.2. Collectively, these policies affirm Preliminary compliance status during this reporting period.

Secondary compliance may be achieved after the CPD has sufficiently taken steps to evaluate FTO proficiency in managing and mentoring PPO's, and maintain documentation of FTO training and evaluation. Secondary assessment sources include policy, procedure, processes, training schedules, training and evaluation records, and other policy, data, jobs, and training sources. Full compliance may be realized one CPD has sufficiently, systematically, and consistently evaluated FTO proficiency in managing and mentoring PPOs, and maintains documentation of FTO training and evaluations.

### Paragraph 303 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Training: ¶304

**304.** *FTOs will be required to maintain and demonstrate their proficiency in managing and mentoring PPOs, as well as modeling and teaching, by their example, procedural justice, de-escalation, impartial policing, and community policing. The Education and Training Division will maintain documentation of the training of FTOs. The Bureau of Patrol will maintain documentation of the evaluations of FTOs.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have achieved Preliminary compliance during this reporting period.

Assessing Preliminary compliance requires reviewing CPD plans and policies for evaluating FTO proficiency in managing and mentoring PPOs, teaching key principles, and maintaining documentation of FTO training and evaluation. Preliminary assessment sources include training curriculum, lesson plans, training plans, and policy as well as data and job sources.

In the previous reporting period, the IMT assessed Special Order S11-02, *Field Training and Evaluation Program (FTEP). We found that the City and the CPD did not achieve Preliminary compliance.* We noted that there was no requirement that Field Training Officers maintain and demonstrate their proficiency in managing and mentoring Probationary Police Officers. Additionally, the Field Training and Evaluation section of the *2021 Training Plan* did not include any of the missing policy language absent from Special Order S11-02. These will be necessary in addressing Preliminary compliance.

The City and the CPD produced training directive S11-02, Field Training and Evaluation Program, as proof of Preliminary compliance with this paragraph. The CPD sought to demonstrate Preliminary compliance status. No additional documents were produced to seek nor substantiate Secondary or Full compliance.

S11-02 VIII.B.2.b-c requires the FTO mentor his or her assigned PPO and facilitate the proper field performance and teach by example, emphasizing procedural justice, de-escalation, impartial policing, and community policing.

S11-02 VIII.J.2 requires the City and the CPD document all training of FTOs consistent with the department directive titled "Department Training."

and S11-02 VIII.I.7. requires the Field Training and Evaluation Section (FTES) Bureau of Patrol, "conduct and maintain documentation of the Field Training and Evaluation Program Critique Survey quarterly and share feedback with the Training and Support Group, the Training Oversight Committee, and as necessary to FTOs and FTO supervisors, including but not limited to..."

Taken together, these S11-10 subparagraphs exhibit the requisite language to meet Preliminary compliance status.

Secondary compliance may be achieved after the CPD has sufficiently taken steps to evaluate FTO proficiency in managing and mentoring PPO's and maintained documentation of FTO training and evaluation. Secondary assessment sources include policy, procedure, processes, training schedules, training and evaluation records, and other policy, data, jobs, and training sources.

### Paragraph 304 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Training: ¶305

**305.** *CPD will revise the Field Training and Evaluation Program to ensure that no more than one PPO is assigned to an FTO during each training cycle. The City will provide CPD with the necessary support and resources to designate a sufficient number of FTOs to meet the requirements of this Agreement. Officers performing FTO duties in a temporary capacity are considered FTOs under this Agreement so long as they meet the requirements set forth for FTOs in this Agreement, except for the selection requirements.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance status during this reporting period. They provided no documentation to substantiate higher compliance levels.

Assessing Preliminary compliance requires reviewing CPD plans and policies for evaluating FTO proficiency in managing and mentoring PPOs, teaching key principles, and maintaining documentation of FTO training and evaluation. Assessment sources include training curricula, lesson plans, training plans, and policies.

In the previous reporting period, the IMT assessed ¶ 305 for the first time. We found that the City and the CPD achieved Preliminary compliance. We explained that the Training Directives incorporated the requirements of this paragraph to demonstrate Preliminary compliance. We noted that in future compliance assessments, all corresponding field training program documentation, including policies and plans must demonstrate that all revisions are completed and implemented.

The City and the CPD produced training directive S11-02, Field Training and Evaluation Program, as proof of Preliminary compliance with this paragraph. The CPD sought to demonstrate Preliminary compliance status. No additional documents were produced to seek nor substantiate Secondary or Full compliance.

Secondary compliance may be demonstrated when FTEP training plans, policies, field training program documentation, and other policy, data, jobs, and training sources indicate requirements of this paragraph are being met.

## Paragraph 305 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Training: ¶306

> **306.** *CPD will ensure that PPOs in the Field Training and Evaluation Program train with different FTOs during each of their training cycles.*

**Compliance Progress**                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**          *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**            *Not in Compliance*
**Full:**                 *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance during this reporting period.

Assessing Preliminary compliance involves reviewing CPD plans and policies for alignment with the requirements of this paragraph and evaluating FTO proficiency in managing and mentoring PPOs, and maintaining documentation of FTO training and evaluation.

In the previous reporting period, the IMT assessed ¶ 306 for the first time. We found that the City and the CPD achieved Preliminary compliance. We explained that Special Order S11-02 *Field Training and Evaluation Program* mandates Probationary Police Officers will train with a different Field Training Officer during each training cycle, which is sufficient to achieve Preliminary compliance. We noted that in future compliance assessments, the CPD must adopt and implement procedures that ensure compliance with this paragraph's requirements.

The City and the CPD produced training directive S11-02, Field Training and Evaluation Program, as proof of Preliminary compliance with this paragraph. The CPD sought to maintain Preliminary compliance status. No additional documents were produced to seek nor substantiate Secondary or Full compliance.

S11-02 VIII.A.3 require PPOs to "train with a different FTO during each of their training cycles." This matches the language in ¶306, bringing this paragraph into Preliminary compliance.

Secondary compliance may be achieved by demonstrating the requirements of this paragraph are met. Secondary assessment sources may include policy, procedure, processes, training schedules, and training evaluation records. Full compliance maybe achieved when CPD has sufficiently, systemically, and consistently evaluated FTO proficiency in managing and mentoring PPOs, and maintains documentation of FTO training and evaluations, and record affirm the requirements of this paragraph are fully implemented.

## Paragraph 306 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Training: ¶307

*307. CPD will ensure that PPOs awaiting assignment to an FTO will not be placed on assignments in the field without adequate supervision. CPD will track and document all instances of PPOs placed in field assignments prior to starting the Field Training and Evaluation Program.*

**Compliance Progress**                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance (FOURTH REPORTING PERIOD)*
**Secondary:**      *Not in Compliance*
**Full:**           *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance during this reporting. Secondary compliance was neither sought nor substantiated. The City and the CPD's compliance progress status is unchanged from the previous reporting period.

Assessing Preliminary compliance requires reviewing CPD policy and plans to revise the FTEP to meet requirements. Those reviews include looking at policy, processes, PPO/FTO assignments, FTEP related material, and other policy, data, jobs, and training sources.

In the previous reporting period, the IMT assessed ¶ 306 for the first time. We found that the City and the CPD achieved Preliminary compliance. We explained that the learning management system has the capability to track and document all instances of Probationary Police Officers placed in field assignments prior to starting the Field Training and Evaluation Program. We noted that in future compliance assessments, the CPD must demonstrate that the Field Training and Evaluation Program revisions are completed and implemented.

The City and the CPD produced training directive S11-02, Field Training and Evaluation Program, as proof of Preliminary compliance with this paragraph. The CPD sought to maintain Preliminary compliance status. No additional documents were produced to seek nor substantiate Secondary or Full compliance.

The IMT reviewed S11-02 and found S11-02 VI.D. contains the requisite language for Preliminary compliance with ¶307. As a result, Preliminary compliance is maintained.

Secondary compliance may be achieved if policies, processes, assignments, FTEP related materials, and other policy, data, job, and training sources indicate the requirements of this chapter are fully met.

## Paragraph 307 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Training: ¶308

> ***308.*** *The Field Training and Evaluation Program will continue to require that FTOs document PPO progress and performance each day in the Daily Observation Report, at the end of each of the first two cycles in the Cycle Summary Report, at the end of the third cycle in the Final Summary Report and, if necessary, at the end of any additional cycles in the Remedial Summary Report. FTOs will identify and document in those reports areas for PPO improvement.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**      *In Compliance* (NEW)
**Secondary:**      *Not Yet Assessed*
**Full:**      *Not Yet Assessed*

The City and the CPD achieved Preliminary compliance during this reporting.

Assessing Preliminary compliance requires reviewing CPD plans and policies for ensuring FTOs document PPO's progress and performance as specified in this paragraph. Assessment sources may include policy, training plans, and observation reports.

During the previous reporting period, we reviewed S11-02 *Field Training and Evaluation Program* and the Learning Management System. We found that the City and the CPD did not achieve Preliminary compliance. Their policy did not require Field Training Officers identify and document in those repots areas for Probationary Police Officer improvement. In future compliance assessments, the CPD will need to address this and demonstrates that the Field Training Officer training on Special Order S11-02 is completed and a full training cycle is completed.

The City and the CPD produced training directive S11-02, Field Training and Evaluation Program, as proof of Preliminary compliance with this paragraph. The CPD sought to demonstrate Preliminary compliance status. No additional documents were produced to seek nor substantiate Secondary or Full compliance.

S11-02 VIII.B.2.e-j and S11-02 VIII.B.3 tracks the language from ¶308, therefore meeting the Preliminary compliance threshold for this paragraph.

Secondary compliance can be attained with plans and policies for insuring FTOs document PPOs progress and performance as specified in this paragraph. FTO and supervisor training on policy and a full training cycle must, at minimum, be completed. Secondary assessment sources include policy, training plans, and observation reports.

## Paragraph 308 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Training: ¶309

**309.** *In each Cycle Summary Report, the FTO will assess whether the PPO should progress to the next cycle of training based on the PPO's performance and compliance with the Field Training and Evaluation Program standards.*

**Compliance Progress**    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD has achieved Preliminary compliance with ¶309 during this reporting period.

Assessing Preliminary compliance requires IMT review CPD plans and policies for ensuring FTO document PPOs progress and performance as specified in the paragraph. Assessment sources include policy, training plans, and observation reports.

During the previous reporting period, we reviewed S11-02 *Field Training and Evaluation Program* and the Learning Management System. We found that the City and the CPD did not achieve Preliminary compliance. It was unclear from the policy whether the Field Training Officer must decide to advance the Probationary Police Officer to the next cycle within the Cycle Summary Report. We noted that the CPD must clearly prescribe the Cycle Summary Re-port contents and the information the Report should capture in policy in order to reach Preliminary compliance.

The City and the CPD produced training directive S11-02, Field Training and Evaluation Program, as proof of Preliminary compliance with this paragraph. The CPD sought to demonstrate Preliminary compliance status. No additional documents were produced to seek nor substantiate Secondary or Full compliance.

S11-02 VIII.B.2.g.an h., and S11-02 VIII.D.4. reflects the policy language required to achieve Preliminary compliance.

Assessment of Secondary compliance will require IMT review Field Training Reports, i.e. Cycle Summary reports, which were not submitted by the end of this reporting period. The City and the CPD will meet Secondary compliance when Field Training Officer training on policy is finalized and a full training cycle has completed with ¶309 required documentation. Full compliance can be realized when Field Training Officer training on policy and methodology is completed and multiple consecutive training cycles meeting these requirements are successfully completed.

## Paragraph 309 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Training: ¶310

**310.** *A PPO must be deemed "field qualified" in order to complete the Field Training and Evaluation Program. For a PPO to be deemed "field qualified," all end-of-cycle reports must be completed by the FTO and reviewed and approved by the necessary supervisors.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance with ¶310 during this reporting period.

Preliminary compliance requires policy and data sources, processes and FTEP-related materials to demonstrate CPD has plans and policies requiring PPOs to be field qualified before completing the FTEP. Secondary compliance requires policies, processes, FTEP related materials, and data, jobs, and training sources demonstrate that FTO and supervisor training on policy is completed and a full training cycle is completed meeting the requirement of this paragraph.

During the previous reporting period, we reviewed Special Order S11-02 and found that the City and the CPD did not achieve Preliminary compliance. There was no clearly defined process in which a Field Training Officer deems a Probationary Police Officer "field-qualified." We noted that the IMT will need to review Field Training and Evaluation Program-related materials in future compliance assessments.

The City and the CPD produced training directive S11-02, Field Training and Evaluation Program, as proof of Preliminary compliance with this paragraph. The CPD sought to demonstrate Preliminary compliance status. No additional documents were produced to seek nor substantiate Secondary or Full compliance.

The IMT identified S11-02 III, S11-02 VIII.B.1-7, S11-02 VIII.D.4., S11-02 VIII.E.4., and S11-02 VIII.G.1., as key sections that reflect the policy language required to achieve Preliminary compliance.

Deconstructing ¶310, it first indicates that "a PPO must be deemed "field qualified" in order to complete the Field Training and Evaluation Program." S11-02 III. provides a definition of "field qualified," and delineates that it succeeds completion of all required FTEP cycles.

¶310 then conditions "field qualified" status upon completion of all end-of-cycle reports reviewed and approved by the "necessary supervisors." S11-02 VIII.B.2.g.

and h. mandates the FTO complete a Cycle Summary Report at the end of the PPO's first and second training cycles and a Final Summary Report at the end of the third cycle. S11-02 VIII.D.4 requires the "Evaluating Sergeant" ensure that the assigned FTO indicated that the PPO met the minimum competency in each key performance characteristics in the Cycle and Final Summary Report and that the FTO indicated that the PPO was field qualified in the FSR.

S11-02 VIII.E.4 binds the "Designated District Lieutenant" to "ensure completeness of, and if appropriate approve, the Final Summary Report when submitted by the evaluating Sergeant, including reviewing and approving any document recommendations (e.g. "field-qualified" or remedial training)." S11-02 VIII.G.1. mandates the executive officer in each district "ensure the assigned field training officers and evaluations sergeants are performing the duties as outlined in this directive.

These S11-02 subsections, woven together, form the policy web that substantiates Preliminary compliance with ¶310 during this reporting period.

To advance its Preliminary and Secondary compliance assessments, the IMT must review Field Training and Evaluation Program-related materials including Field Training Reports, including but not limited to, Cycle Summary Reports and Daily Observation Reports. CPD must also provide finalized Field Training Officer and supervisors training on policy, and training records demonstrating that 95% of eligible CPD members have been trained for at least a full training cycle.

### Paragraph 310 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Training: ¶311

> **311.** *FTOs may recommend specific remedial field or classroom training for a PPO. Any recommendation for remedial training will be provided as promptly as possible to the necessary supervisors and must be documented in the PPO's training record, including, but not limited to, the Final Summary Report or Remedial Summary Report. Recommendations for remedial training must be reviewed by the necessary supervisors and, if approved, recommended training must be completed by the PPO before the PPO completes the Field Training and Evaluation Program.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**   *Not in Compliance*
**Secondary:**   *Not Yet Assessed*
**Full:**   *Not Yet Assessed*

The City and the CPD did not meet the requirements for Preliminary compliance during this reporting period.

Assessing Preliminary compliance requires reviewing CPD plans and policies to ensure remedial training is provided promptly and is documented as this paragraph required. Preliminary compliance assessment sources include policy, training plans and FTEP-related materials.

During the previous reporting period, we reviewed Special Order S11-02 and we found that the City and the CPD did not achieve Preliminary compliance. This policy did not address the specific training and progression of Probationary Police Officers as explained in the paragraph requirements. In future assessments, the CPD must demonstrate that its policies and plans ensure remedial training is provided promptly and is documented.

The City and the CPD produced training directive S11-02, Field Training and Evaluation Program, as proof of Preliminary compliance with this paragraph. The CPD sought to demonstrate Preliminary compliance status. No additional documents were produced to seek nor substantiate Secondary or Full compliance.

The IMT identified S11-02 VIII.B.4-5 as key sections that reflect the policy language required to achieve Preliminary compliance.

S11-02 VIII.B.5 specifically addresses a scenario where a recruit is not responding to training. In this instance, an FTO is directed to notify the evaluation sergeant and designated district lieutenant (S11-02 VIII.B.5.a), submit a To-From-Subject Report through the chain of command to the Chief, Bureau of Patrol, or designee

(S11-02 VIII.B.5.b), and document this fact in the DOR, CSR, or FSR at least seven days prior to the start of the next period, if feasible (S11-02 VIII.B.5.c).

Additional training cycles may be added at any time during the probationary cycle. PPOs must complete all additional training before he or she is deemed field qualified and complete the Field Training and Evaluation Program (S11-02 VIII.A.8).

The assigned FTO must complete a Remedial Summary Report on a recruit that goes through a remedial training cycle. That report establishes if a PPO is "field qualified" (S11-02 VIII.B.4).

To meet Preliminary compliance, the CPD must demonstrate that its policies and plans ensure "any recommendation for remedial training is provided as promptly as possible to the necessary supervisors" and is documented as required in the paragraph. While S11-02 requires supervisor notification, it does not stipulate a time-bound requirement, such as "immediately," "by the end of the shift," or "within 72 hours." Preliminary compliance fails solely due to the omission of this time bound requirement indicated in ¶311.

Secondary compliance additionally requires the CPD demonstrate that Field Training Officer and supervisors training on applicable policy is completed and all ¶311 requirements are met and maintained for a full training cycle.

### Paragraph 311 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Training: ¶312

*312. The Field Training and Evaluation Review Board, or other entity with similar responsibilities, will review a PPO's performance at the request of an assigned FTO or supervisor and have the power to recommend separation, re-training by the Academy, or additional field training. A request for review by the Board must be made, and the Board must convene, if a PPO is not deemed "field qualified" at the end of any remedial training cycle. The Field Training and Evaluation Review Board will provide all such referrals and recommendations for action to the Chief of the Bureau of Patrol.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance during this reporting period.

To meet Preliminary compliance, the CPD's plans and policies must require that the Field Training and Evaluation Review Board review a Probationary Police Officer's performance as required in this paragraph.

During the previous reporting period, we reviewed documents from Review Board deliberations, two Remedial Training Notifications, S11-02, and S11-02-01, *Field Training Evaluation Review Board*. We found that the City and the CPD did not achieve Preliminary compliance. To meet Preliminary compliance, the CPD's plans, and policies must require that the Field Training and Evaluation Review Board review a Probationary Police Officer's performance.

The City and the CPD produced training directive S11-02, Field Training and Evaluation Program, as proof of Preliminary compliance with this paragraph. The CPD sought to demonstrate Preliminary compliance status. No additional documents were produced to seek nor substantiate Secondary or Full compliance.

S11-02 VII.B.5 directs an FTO's action when that FTO determines a PPO's performance needs to be reviewed by the Field Training and Evaluation review Board. S11-02 VII.C.3 and S11-02 VIII.D.10 directs a supervisor's action when that supervisor determines a PPO's performance is deficient in any category or needs to be reviewed by the Field Training and Evaluation review Board.

Nothing in S11-02 binds the Field Training and Evaluation Review Board, or other entity with similar responsibilities, to review a PPO's performance at the request

of an assigned FTO or supervisor, as required by ¶312. S11-02 also is silent on the requirement for the Field Training and Evaluation Board to provide referrals and recommendations of PPOs not deemed "field qualified" for action to the Chief of the Bureau of Patrol. As a result, Preliminary compliance is not attained.

Looking ahead to Secondary compliance, the CPD must demonstrate that Field Training Officers, supervisors and Field Training and Evaluation Program Review Board training on the applicable policy is completed and this paragraph's requirements achieved for a full recruit training cycle. Full compliance can be ascertained when Field Training Officer, supervisors and Field Training and Evaluation Program Review Board training on policy and methodology is completed and multiple consecutive training cycles meeting these requirements are successfully completed.

### Paragraph 312 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Training: ¶313

> ***313.*** *CPD will create a mechanism for PPOs to provide confidential feedback regarding their field training, including the extent to which their field training was consistent with what they learned at the Academy; whether their FTOs did or did not provide effective guidance and instruction; and suggestions for changes to recruit training based upon their experience in the Field Training and Evaluation Program.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance during this reporting period.

To assess Preliminary compliance, IMT must review CPD plans and policies to allow PPOs to provide confidential feedback regarding their field training. Preliminary assessment sources include policy, training plans, FTEP related materials, and data collection instruments.

During the previous reporting period, the CPD made further progress toward compliance. IMT reviewed survey reports, the policies, and plans from the CPD. We found that these documents did not include any of the survey questions necessary to demonstrate Preliminary compliance. The CPD will need to articulate a policy and a mechanism for confidential recruit feedback to reach Preliminary compliance.

The City and the CPD produced training directive S11-02, Field Training and Evaluation Program, as proof of Preliminary compliance with this paragraph. The CPD sought to demonstrate Preliminary compliance status. No additional documents were produced to seek nor substantiate Secondary or Full compliance.

S11-02 VIII A.9 requires PPOs to critique the FTEP quarterly by completing the FTEP Critique Survey and forwarding it directly and confidentially to the FTEP Section, Bureau of Patrol. The policy doesn't specify the parameters for that feedback thus, without reviewing the actual Critique Survey, it is impossible to determine If the nature of the feedback matches ¶313 requirements. Therefore, Preliminary compliance is not achieved. The City and the CPD should amend S11-02 to include 313 required language or include the Survey in the production documents to demonstrate it prompts and permits the required feedback.

Secondary compliance can be demonstrated by completion of Field Training Officer, supervisors and recruit training or orientation on the policy and completion of a full recruit training cycle using the prescribed feedback process. The IMT will assess policy, training plans, Field Training and Evaluation Program-related materials, and data collection instruments rate Secondary compliance with the requirements of this paragraph.

### Paragraph 313 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Training: ¶314

**314.** *The Education and Training Division and Bureau of Patrol will review, consistent with their scope of responsibility within the Field Training and Evaluation Program, aggregate PPO feedback on a quarterly basis; document their responses, including the rationale behind any responsive action taken or decision to take no action; and share such feedback with the TOC and, as necessary, FTOs and FTO supervisors.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:** Quarterly ☐ **Met** ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance during this reporting period.

Assessing Preliminary compliance requires reviewing CPD plans and policies to aggregate PPO feedback on a quarterly basis and document their responses as specified in this paragraph. Preliminary compliance assessment sources include policy, training plans, FTEP related materials, and data collection instruments.

During the previous reporting period, we assessed this paragraph for the first time. We found that the City and the CPD did not achieve Preliminary compliance as these documents did not include all the required language for this paragraph.

To meet Preliminary compliance with this paragraph, the City and the CPD must demonstrate that it has plans and policies to aggregate Probationary Police Officer feedback on a quarterly basis, document their responses, and share such feedback as specified in this paragraph. The City offered Training Directive S11-02 as proof of compliance with ¶314.

S11-02 VIII A.9 requires PPOs to critique the FTEP quarterly by completing the FTEP Critique Survey and forwarding it directly and confidentially to the FTEP Section, Bureau of Patrol. S11-02 VIII.I.7 requires the Field Training and Evaluation Section, Bureau of Patrol, to "conduct and maintain documentation of the Field Training and Evaluation Program Critique Survey quarterly and share feedback with the Training and Support Group, the Training Oversight Committee, and as necessary to FTOs and FTO supervisors…"

S11-02 does not require CPD to "document their responses to the PPO feedback, including the rationale behind any responsive action taken or decision to take no action; and share such feedback" as required. The policy seems to require sharing PPO feedback but is silent to the ETD and BoP feedback sharing requirements. Preliminary compliance is not reached due to this omission.

To reach Secondary compliance status, the Education and Training Division, the Bureau of Patrol, Field Training Officers, Field Training Officer supervisors, and Training Oversight Committee training or orientation on the applicable ¶314 compliant policy must be completed and a full recruit training cycle completed. Full compliance requires that the Education and Training Division, the Bureau of Patrol, Field Training Officers, Field Training Officer supervisors, and Training Oversight Committee training or orientation on policy is completed; Probationary Police Officer feedback is reviewed, documented, and shared as specified in this agreement.

## Paragraph 314 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Training: ¶315

> *315. CPD will create a mechanism for FTOs to provide feedback regarding the quality of the Field Training and Evaluation Program, including suggestions for changes to FTO training, the PPO evaluation process, and recruit training. The Education and Training Division and Bureau of Patrol will review, consistent with their scope of responsibility within the Field Training and Evaluation Program, FTO feedback on a quarterly basis and, as necessary and appropriate, share such feedback with the Training Oversight Committee, FTOs, and FTO supervisors.*

## Compliance Progress                (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Deadline:**          Quarterly                    ☐ **Met**   ☑ **Missed**

**Preliminary:**     *Not in Compliance* **(NEW: LOST COMPLIANCE)**
**Secondary:**       *Not in Compliance*
**Full:**                 *Not Yet Assessed*

The City and the CPD failed to maintain Preliminary compliance during this reporting period.

Assessing Preliminary requirement compliance requires determining you have the requirements of this paragraph are written into policy. Preliminary compliance assessment sources include FTEP-related documentation and other policy and data sources.

During the previous reporting period, the CPD provided policy that brought the department into Preliminary compliance. We noted that to achieve Secondary compliance, the CPD's quarterly surveys must include more substantive questions for soliciting feedback on Probationary Police Officer evaluations. We also explained that they should provide proofs that the Education and Training Division and the Bureau of Patrol have reviewed and shared feedback.

The City and the CPD sought to maintain Preliminary compliance during this reporting. They did not produce any documents to substantiate Preliminary compliance. IMT did review training directive S11-11 for ¶315 compliance language.

S11-11 III.A.13 binds the Training Oversight Committee to review annually the Field Training and Evaluation Program and recommend to the Superintendent of Police the implementation of any necessary changes to policies or procedures related to the program by considering feedback and recommendations from FTOs and PPOs, referrals and recommendations made by the Field Training and Evalua-

tion Review Board to the Office of Operations, and best practices. It doesn't require this process to include "feedback regarding the quality of the Field Training and Evaluation Program, including suggestions for changes to FTO training, the PPO evaluation process, and recruit training." It doesn't require the Education and Training Division and Bureau of Patrol review, consistent with their scope of responsibility within the Field Training and Evaluation Program, FTO feedback on a quarterly basis and, as necessary and appropriate, share such feedback with the Training Oversight Committee, FTOs, and FTO supervisors.

In the absence of substantive proof of compliance with this paragraph, CPD has failed to maintain Preliminary compliance during this reporting period.

Several additional proofs are required to demonstrate Secondary compliance, including a sample of quarterly surveys. Substantive questions soliciting feedback on Probationary Police Officer evaluations are needed. Field Training Officer surveys from each previous and contiguous quarter are needed to demonstrate the quarterly feedback is captured as required. Proofs that the Education and Training Division and the Bureau of Patrol have reviewed each quarter's feedback and shared, as appropriate with the Training Oversight Committee, Field Training Officers and Field Training Officer supervisors are needed.

Full compliance can be demonstrated by the Education and Training Division, the Bureau of Patrol, Field Training Officers, Field Training Officer supervisors, and Training Oversight Committee training or orientation on policy is completed and multiple consecutive full recruit training cycles meeting ¶315 requirements are successful completed as required.

### Paragraph 315 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | None | |

# Training: ¶316

*316. The TOC will annually review the Field Training and Evaluation Program and consider best practices in this area as well as feedback and recommendations from FTOs and PPOs. Additionally, the TOC will review referrals and recommendations by the Field Training and Evaluation Review Board to the Bureau of Patrol. Based on this information, the TOC will recommend to the Superintendent the implementation of any appropriate changes to policies or procedures related to the Field Training and Evaluation Program.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Annually              ☑ **Not Yet Applicable**

**Preliminary:**    *Not in Compliance* (NEW: LOST COMPLIANCE)
**Secondary:**     *Not in Compliance*
**Full:**          *Not Yet Assessed*

The City and the CPD did not maintain Preliminary compliance during this reporting period.

Maintaining Preliminary compliance requires CPD demonstrating that the requirements of this paragraph are written into policy. Assessment sources included policy, data, and training sources.

During the previous reporting period, the CPD maintained Preliminary compliance and made efforts toward Secondary compliance. The IMT suggested that the CPD provide additional documents to assist in fully assessing Secondary compliance.

The City and the CPD indicated the intent to maintain Preliminary compliance during this reporting period. No documents or compliance proofs were submitted. The IMT reviewed Training Directive S11-11 for evidence of policy compliance with this paragraph. S11-11 does not document ¶316 requirements.

Looking forward, Secondary compliance assessment will include annual reviews and recommendations provided to the Superintendent. The Field Training and Evaluation Program Review Board, the Education and Training Division, the Bureau of Patrol, Field Training Officers, Field Training Officer supervisors, and Training Oversight Committee training or orientation on thee compliant policy must be completed and a full annual training cycle compliant with ¶316 requirements completed. The CPD also must produce documentation substantiating the referrals and recommendations received.

## Paragraph 316 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

# Training: ¶317

> ***317.*** *Regular in-service training is critical to ensure that CPD officers continue to hone important policing skills and remain up-to-date on changes in the law, CPD policy, technology, community expectations, and developments in best practices. In-service training should, as appropriate, reinforce CPD's commitment to procedural justice, de-escalation, impartial policing, and community policing.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with this paragraph during this reporting period.

Assessing Preliminary compliance requires confirming that the requirements of this paragraph are written into policy.

During the previous reporting period, the CPD maintained Preliminary compliance and made efforts toward Secondary compliance. The IMT reviewed documents the CPD produced to demonstrate compliance with this paragraph and found that the City and the CPD did not achieve Secondary compliance. We noted that to meet Secondary Compliance they must demonstrate that training lesson plans and curricula across all appropriate in-service training and evaluations demonstrate requirements of this paragraph.

The City and the CPD indicated that their compliance target for this paragraph is to maintain Preliminary compliance in the fifth reporting period. No documents were submitted to substantiate any level of compliance. The IMT did however review Special Order S11-10-03, "In-Service Training."

S11-10-03 III.B.1-4 establishes the ¶317 required topics as mandatory for in-service training on an annual basis. This Special Order went out for public comment on 10 December 2021. The public comment period closed on 27 December 2021 and this policy was finalized and issued before the end of this reporting period, meeting the requirements for Preliminary compliance.

To meet Secondary compliance, the CPD must demonstrate that training lesson plans and curricula across all appropriate in-service training and evaluations demonstrate requirements of this paragraph.

## Paragraph 317 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Training: ¶319

> **319.** *CPD will implement the In-Service Training Program to comport with the Training Plan and the requirements and goals of this Agreement.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with the requirements of ¶319 during this reporting period.

To assess Preliminary compliance, IMT reviewed policies that require implementation of In-Service Training that is consistent with the Training Plan and Consent Decree requirements. Secondary compliance requires actually implementing and operating the In-Service Training program in a manner to comply with requirements in ¶317-329 and consistent with ¶272 requirements. This paragraph does not require a separate review of the ¶272, ¶273, ¶317–18, and ¶320–29 requirements as applied to IST. Instead, the results of those individual paragraph reviews can be considered in assigning a compliance rating to this paragraph.

During the previous reporting period, we reviewed documents the CPD produced to demonstrate compliance with this paragraph. We noted that to achieve Secondary compliance, the In-Service training courses must be consistent with the Training Plan and Training Needs Assessment and instructors must be qualified, lesson plans must be acceptable and include elements of consent decree.

The City and the CPD submitted the 2022 Training Needs Assessment, and the 2022 Training Plan as proofs of compliance during this reporting period.

IMT, in reviewing the requirements of the paragraph, views it as a health check on the overall In-Service Training program. The extent to which it has been implemented, is consistent with the Training Plan (¶272 e, f, g, i, k, l, m) and ¶317-329 requirements are achieved and reflected in the compliance rating. Preliminary compliance requires policies that require implementation of In-Service Training that is consistent with the Training Plan and Consent Decree requirements.

During this reporting period, the CPD received the following compliance ratings:

| ¶ | Title | Compliance Rating in the Fifth Reporting Period |
|---|---|---|
| 272 | Training | Preliminary |
| 317 | Training | Preliminary |
| 318 | Training | N/A |
| 320 | Training | Preliminary |
| 321 | Training | Preliminary |
| 322 | Training | Secondary |
| 323 | Training | Preliminary |
| 324 | Training | Preliminary |
| 326 | Training | Preliminary |
| 327 | Training | Preliminary |
| 328 | Training | Preliminary |
| 329 | Training | Preliminary |

In general, Preliminary compliance requirements are met in each relevant paragraph, indicating Preliminary compliance with this one as well.

Secondary compliance requires actually implementing and operating the In-Service Training program in a manner to comply with requirements in ¶317–29 and consistent with ¶272(e), (f), (g), (i), (k), (l), (m) requirements. Secondary compliance in all of these paragraphs and subparagraphs is *prima facia* evidence of Secondary compliance in this paragraph.

### Paragraph 319 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Training: ¶320

*320. The In-Service Training Program will require that all non-probationary police officers who are active duty and available for assignment, including supervisors and command staff, receive, at a minimum, the following amount of in-service training each year: a. 16 hours by the end of 2018; b. 24 hours by the end of 2019; c. 32 hours by the end of 2020; and d. 40 hours by the end of 2021, and in each subsequent year.*

**Compliance Progress**   (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Deadline:** | March 5, 2022* | ☑ **Not Yet Applicable** |
| | *Extended from December 31, 2021, due to COVID-19 | |
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) | |
| **Secondary:** | *Under Assessment* (NEW: LOST COMPLIANCE) | |
| **Full:** | *Not Yet Assessed* | |

The City and the CPD maintained Preliminary compliance during this reporting period.

To assess Preliminary compliance requires affirming the requirements of this paragraph are written into policy. Secondary compliance requires affirming through training records and other training and data sources that at least 95% of eligible personnel received training within the designated time period.

During the previous reporting period, the CPD maintained Preliminary compliance and achieved Secondary compliance. We noted that the City and the CPD may achieve Full compliance when Secondary compliance has been demonstrated and sustained for at least two consecutive reporting periods.

The City and the CPD submitted 2022 Training Plan and a memo regarding 95% completion of in-service training (produced informally on December 31, 2021) as compliance proofs during this reporting period. Additionally, IMT reviewed Training Directive S11-10.

The deadline for the current reporting period has been extended to March 5, 2022 due to COVID-19.

Page 27 of the 2022 Training Plan states, "The CPD's 2022 Annual In-Service Training Program will include 40 hours of mandatory courses that all police officers in a non-probationary status before July 1, 2022 must complete." This statement included in the Training Plan which is Preliminary compliant with ¶272 supports Preliminary compliance with this paragraph.

Furthermore, the City and the CPD issued an amended version of S11-10 that rescinded the "22 January 2021" version on 14 May 2021. The latest version of S11-10 was issued on 10 December 2021. That version rescinded the "22 January 2021 Version of S11-10 and 24 September 2020 Version of S11-10-01." Because it doesn't rescind the 14 May 2021 version, it is now unclear which version is meant to be the current operative one. S11-10 (13 May 2021) III.D. mandates non-probationary officers annually receive 40 hours of in-service training, as required by ¶320. This requirement meets the standard for Preliminary compliance. This requirement is not included in the 10 December 2021 version. S11-10-03 III.A (10 December 2021) also has the required language. IMT recommends the City and the CPD examine and resolve this version control issue with S11-10.

Secondary compliance could not be finally assessed due to the extended deadline across multiple reporting periods and a pending document submission for "Evidence documenting 95% completion of training." Secondary compliance status is designated "Under Assessment" during this reporting period.

### Paragraph 320 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Preliminary | |

# Training: ¶321

**321**. *CPD's In-Service Training Program will include specific courses that will be mandatory for every officer in that training year.*

---

**Compliance Progress**         (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Deadline:** | March 5, 2022* | ☑ **Not Yet Applicable** |
| | *Extended from December 31, 2021, due to COVID-19 | |
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) | |
| **Secondary:** | *Under Assessment* | |
| **Full:** | *Not Yet Assessed* | |

The City and the CPD maintained Preliminary compliance during this reporting period.

To assess Preliminary compliance requires affirming the requirements of this paragraph are written into policy. Secondary compliance requires affirming through training records and other training and data sources that at least 95% of eligible personnel received training within the designated time period.

During the previous reporting period, the CPD maintained Preliminary compliance but did not achieve Secondary compliance. The IMT reviewed the updated training records and found that only 86% of the department was trained in LEMART by the deadline. We noted that to reach Secondary compliance the CPD will need to submit records for the 2021 course list including lesson plans and training attendance records to demonstrate that at least 95% attendance.

The City and the CPD produced the *2022 Training Needs Assessment, 2022 Training Plan*, and a memo regarding the 95% completion of in-service training as compliance proofs during this reporting period. The CPD indicated that another proof representing "Evidence documenting 95% completion of training (IMR6)," is forthcoming in the next reporting period.

Additionally, the IMT reviewed Training Directive S11-10-03. No additional documents were submitted to substantiate Secondary compliance.

Page 27 of the 2022 Training Plan states, "The CPD's 2022 Annual In-Service Training Program will include 40 hours of mandatory courses that all police officers in a non-probationary status before July 1, 2022 must complete." Those courses include De-escalation, Response to Resistance and Use of Force, Crisis Intervention, Constitutional Policing, Gender-Based Violence, and Active Bystandership for Law Enforcement. This statement included in the Training Plan, which is Preliminary

compliant with ¶272 requirements, supports Preliminary compliance with this paragraph. S11-10-03 III.A (10 December 2021) also has the required language.

Secondary compliance could not be finally assessed due to the extended deadline across multiple reporting periods and a pending document submission for "Evidence documenting 95% completion of training." Secondary compliance status is designated "Under Assessment" during this reporting period.

Looking ahead, to reach Secondary compliance in accordance with the IMT's updated methodology, CPD will need to submit all training records for the 2021 course list including lesson plans for IMT review, and training attendance records to demonstrate that at least 95% of all eligible personnel attending each required training.

### Paragraph 321 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Training: ¶322

**322.** *CPD's In-Service Training Program may also offer specific courses as elective subjects. The elective subjects will be selected and approved by the TOC in accordance with the Training Plan. The TOC will solicit and consider officer requests and will rely on the Education and Training Division's needs assessments when selecting and evaluating elective subjects.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary and Secondary compliance during this reporting period.

Preliminary compliance requires CPD document the requirements of this paragraph into written policy. Secondary compliance requirements, drawn from TOC meeting notes, special orders, and training plans, require CPD to document and demonstrate elective and mandatory subjects are approved by TOC and that TOC considered officer requests.

During the previous reporting period, the CPD maintained Preliminary compliance and achieved Secondary compliance. The IMT found that the CPD documents partially reinforced the Training Oversight Committee's role in adhering to these requirements. We noted that the CPD must furthermore demonstrate they have fully implemented and established a full process to reach Full compliance.

The City and the CPD produced the 2022 Training Needs Assessment, 2022 Training Plan, and Memo regarding 95% completion of in-service training (produced informally on December 31, 2021), and TOC Meeting Materials for the fifth reporting period as compliance proofs during this reporting period. The IMT reviewed S11-11 as well.

S11-11 III.A.11 identifies the TOC as responsible for "selecting and approving specific horses as elective subjects through the In-Service Training Program. The selection and approval will be in accordance with the training plan. The Training Oversight Committee will solicit and consider officer requests and will rely on the Training and Support Group needs assessments when selecting and evaluating elective subjects."

The 2022 Training Needs Assessment included input, feedback, and requests from CPD officers. The TOC approved the Needs Assessment in a vote on June 28, 2021. The "Memo re 95% completion of in-service training" formally notified IMT that

the deadline for the current reporting period has been extended to 5 March 2022 due to COVID-19.

The 2022 Training Plan lists a variety of elective courses. Tables 7 through 17 lists a variety of course features, including both course titles, whether they are elective or mandatory, and compiles police officer survey results for the Needs Assessment. Tables 1 through 4 demonstrates CPD and community influence on mandatory and elective course selections.

Taken together, these documents show that the City and the CPD maintained Preliminary and Secondary compliance during this reporting period.

To demonstrate Full compliance, CPD must further demonstrate they have fully implemented and established a full process that aligns with requirements of ¶322. That includes providing proofs that courses listed as elective were actually offered. This may be established in the Training Summary Report and/or with attendance proofs for each elective topic.

## Paragraph 322 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Training: ¶323

> **323.** *As part of the In-Service Training Program, mandatory and elective courses will be apportioned as follows: a. in 2018, CPD will require that each officer receive at least 16 hours of in person mandatory courses; b. in 2019, CPD will require that each officer receive at least 16 hours of in person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the TOC; c. in 2020, CPD will require that each officer receive at least 24 hours of in-person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the TOC; d. starting in 2021, and every year thereafter, CPD will require that each officer receive at least 24 hours of in-person mandatory courses with the remaining 16 hours to be provided either as mandatory or elective courses, as determined by the TOC; and e. this Agreement does not require CPD to provide more than 40 hours of annual department-wide in-service training.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Deadline:**      March 5, 2022*      ☑ **Not Yet Applicable**
*Extended from December 31, 2021, due to COVID-19

**Preliminary:**      *In Compliance* (THIRD REPORTING PERIOD)

**Secondary:**      *Under Assessment*

**Full:**      *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance during this reporting period. Secondary compliance remains under assessment.

Assessing Preliminary compliance with this paragraph requires CPD demonstrate that the requirements of this paragraph are written into policy. Secondary compliance requires demonstrating through training records, training attendees, and lesson plans, that at least 95% of eligible personnel achieved the training requirements.

During the previous reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance. The IMT reviewed. We noted that they may achieve Secondary compliance if course attendance meets or exceeds 95%.

The City and the CPD produced the 2022 Training Plan and Memo regarding 95% completion of in-service training as compliance proofs during this reporting period. They indicated that another proof representing "Evidence documenting 95% completion of training (IMR6)," is forthcoming in the next reporting period.

Additionally, IMT reviewed Training Directive S11-10-03. No additional documents were submitted.

S11-03 III.A declares "all non-probationary police officers who are active duty and available for assignment, including sworn supervisors and command staff, will receive, at a minimum, 40 hours training which includes 24 hours mandatory courses and 16 hours of either mandatory or elective courses, as determined by the Training Oversight Committee (TOC) and the training requirements established by the Illinois Enforcement Training and Standards Board."

The 2022 Training Plan establishes that "In 2022, mandatory and elective training courses will be delivered as part of the following CPD training programs: Annual In-Service Training Program; Crisis Intervention Team Program, Domestic

Preparedness Program, Tactical Training Program, Law Enforcement Medical and Rescue Training Program, Weapons Discipline and De-escalation Program, Peak Performance Driving Program, eLearning Training Program, Video Services Training Program, Career Development Program, and Investigative Development Program." Mandatory courses include De-escalation, Response to Resistance and Use of Force, Crisis Intervention, Constitutional Policing, Gender-Based Violence, and Active Bystandership for Law Enforcement.

Collectively, these documents prove Preliminary compliance during this reporting period. Secondary compliance requires CPD demonstrate that at least 95% of officers received the ¶323 required mix of training. CPD's forthcoming document, "Evidence documenting 95% completion of training (IMR6)," is expected to satisfy that requirement. For now, Secondary compliance remains under assessment.

The CPD may achieve Secondary compliance if course attendance meets or exceeds 95%. That cannot yet be established this reporting period. Full and sustained implementation of ¶323 requirements as demonstrated by training records, training attendees and lesson plans, will result in Full compliance with this paragraph.

## Paragraph 323 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |

## Paragraph 323 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| Preliminary | Preliminary | |

# Training: ¶324

> **324.** *Various sections of this Agreement contain in-service training requirements which require CPD to provide some or all of its members with training on specific topics. CPD retains the discretion to determine the sequencing, scheduling, and location of such training, unless otherwise specified by this Agreement, provided that: all in-service training identified herein will begin no later than the 2021 calendar year; is adequate in quantity, quality, type, and scope; and is consistent with the terms of this Agreement.*

## Compliance Progress               (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**      *In Compliance* (NEW)
**Secondary:**       *Not Yet Assessed*
**Full:**            *Not Yet Assessed*

Preliminary compliance requires CPD policy, training plans, training records, lesson plans, and other data sources demonstrate requirements of this paragraph are written into policy. Secondary compliance requires training and data sources, training plans, lesson plans, training curricula, instructor selections and training sources across all in-service training demonstrate the requirements of this paragraph.

In the previous reporting period, the IMT assessed this paragraph for the first time. We found that the City and the CPD did not achieve Preliminary compliance. We noted that the *2021 Training Plan* does not by policy adopt or incorporate consent decree requirements.

The City and the CPD produced the 2022 Training Plan and S11-10-03 as compliance proofs during this reporting period. They indicated that another proof representing "Evidence documenting 95% completion of training (IMR6)," is forthcoming in the next reporting period. The training deadline for this reporting period has been extended to 5 March 2022.

S11-10-03 II.E states," The Deputy Chief, Training and Support Group, in coordination of the Training Oversight Committee (TOC) will determine the sequencing, scheduling, and location of all in-service training and will ensure that such in-service training is adequate in quantity, quality, type, and scope. This language meets the requirement for Preliminary compliance.

Sections of this Agreement that require members receive in-service training on specific topics including the following:

| Consent Decree Section | Consent Decree Reference Paragraph(s) |
|---|---|
| Community Policing | 37 |
| Impartial Policing | 72–5 |
| Crisis Intervention | 126 |
| Use of Force | 243–46 |
| Officer Wellness and Support | 414 |
| Accountability and Transparency | 527–28 |

Meeting Secondary compliance requires demonstrating that all required training has commenced and training plans, lesson plans, training schedules, course curriculum, evaluations demonstrate the training is "adequate in quantity, quality, type, and scope. Data depicting the percentage attendance in each ¶324 area will help substantiate Secondary compliance.

Secondary compliance requires training lesson plans, instructor selections, training schedules and curricula across all in-service training demonstrate requirements. Full compliance can be achieved when CPD has fully implemented the requirements of the paragraph and training delivery has been initiated within the specified timeline and conditions.

### Paragraph 324 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Training: ¶326

> **326.** *Training provided through the In-Service Training Program may take place at the Academy or in a decentralized manner, including at the district or unit level, so long as the training is: a. developed by the Education and Training Division; b. reviewed by the TOC and approved by the Education and Training Division before training is delivered; and c. taught by instructors pursuant to the requirements provided above Part D of this section.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance during this reporting.

To achieve Preliminary compliance, CPD policy, training plans, training records, lesson plans, and other policy and data sources must demonstrate the requirements of this paragraph are written into policy.

In the previous reporting period, the IMT assessed this paragraph for the first time. We found that the City and the CPD did not achieve Preliminary compliance. We noted that the *2021 Training Plan* does not by policy adopt or incorporate consent decree requirements.

The City and the CPD sought Preliminary compliance during this reporting period. To demonstrate compliance with this paragraph, the City and the CPD produced the following documents:

Finalized S11-10-03 In-Service Training [produced informally on December 30, 2021].

S11-10-03 II.B, F, and G prescribes requirements that are consistent with this paragraph. S11-10-03 II.G cross-references S11-10, it too must have Preliminary compliance status to properly support requirements of this paragraph. Preliminary compliance therefore is achieved as a result.

Secondary compliance requires CPD to deliver training following requirements of ¶326, as demonstrated through training plans, lesson plans, course curriculum, training schedules and other training and data sources and in concert with ¶282-285 instructor selection and development requirements. Full compliance can be achieved when CPD has fully implemented the requirements of the paragraph and training delivery has been initiated within the specified timeline and conditions.

## Paragraph 326 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
| --- | --- | --- |
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| --- | --- | --- |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Training: ¶327

> **327.** *Courses offered by CPD to fulfill the portion of the In-Service Training Program not required to be delivered in person may be provided through e-learning or other electronic means, so long as they are reviewed and approved by the TOC and are consistent with this Agreement. In considering e-learning courses for approval, the TOC will ensure that instructional objectives can be sufficiently achieved through e-learning. Following the completion of any e-learning course provided as part of the In-Service Training Program, CPD will test participants on their comprehension of the underlying subject matter.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance with the requirements of ¶327 during this reporting period.

The City and the CPD sought to achieve Secondary compliance during this reporting period. Preliminary compliance requires CPD policy, lesson plans, TOC meeting notes, and other policy and data sources demonstrate the requirements of this paragraph are written into policy. Secondary compliance requires CPD policy, lesson plans, TOC meeting notes, and related evaluation instruments to demonstrate that CPD has indeed established a process and has implemented the requirements of this paragraph.

In the previous reporting period, the IMT assessed this paragraph for the first time. We reviewed the CPD eLearning on use of force policy changes. We found that the document proofs required to demonstrate compliance with this paragraph were not provided.

The City and the CPD produced the following document to prove compliance with this paragraph:

- Finalized S11-10-03 In-Service Training [produced informally on December 30, 2021]

- TOC Meeting Materials for the fifth reporting period

- Psychology of domestic violence eLearning

The City and the CPD has advised the following document, relevant to compliance during this reporting period, will be produced during the match reporting period:

- Evidence documenting 95% completion of training (the sixth reporting period)

CPD will be administering 8 hours of eLearning this year per Consent Decree requirements, via the Psychology of Domestic Violence course which has been approved via the 641 review and approval process and was approved by the TOC. This course includes testing as required by this paragraph.

S11-10-03 commits ¶327 requirements to CPD policy, thus achieving Preliminary compliance. As the below table shows, the document proofs required to demonstrate Secondary compliance with ¶327 are largely not provided. The TOC minutes reflecting action on the proposed eLearning course are not included in the production. As a result, Secondary compliance is not met. Full compliance is not assessed this reporting period.

| ¶327 Requirement | Met by CPD? |
|---|---|
| ¶327 requirements written into policy | S11-10-03 |
| List of courses offered by CPD to fulfill the portion of the In-Service Training Program not required to be delivered in person | Psychology of Domestic Violence |
| Reviewed and approved by the Training Oversight Committee (Training Oversight Committee minutes) | Not provided |
| Consistent with CD requirements (No objection notices on eLearning course) | Not provided |
| Training Oversight Committee ensures that instructional objectives can be sufficiently achieved (Training Oversight Committee minutes) | Not provided |
| Following the completion of any e-learning course provided as part of the In-Service Training Program, CPD will test participants on their comprehension of the underlying subject matter. (Curriculum or actual exams) | Test not provided. |

Secondary compliance may be achieved when CPD policy, lesson plans, attendance records, training plans, and other training and data sources demonstrate that CPD has established and implemented the requirements of this chapter.

## Paragraph 327 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Training: ¶328

**328.** *CPD will develop and implement a process for addressing non-compliance with training requirements to ensure that all officers who are active duty and available for assignment, including supervisors and command staff, successfully complete all required training programs within the time frames set out in this Agreement.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance (FOURTH REPORTING PERIOD)*
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance during this reporting period.

Preliminary compliance requires policy and data sources demonstrate the requirements of this paragraph are written into policy. Secondary compliance requires training and data sources including CPD policy, lesson plans, attendance records, and training plans demonstrate that CPD has established a process and implemented the requirements of this paragraph.

During the previous reporting period, the City and the CPD reached Preliminary compliance but did not achieve Secondary compliance. We noted that the submitted documents established a process for addressing non-compliance with training requirements. We explained that the CPD must submit additional documents including training deviation investigation, and investigation results.

The City and the CPD produced the following document to demonstrate Preliminary compliance during this reporting period:

- Finalized S11-10 Department Training

S11-10 XII establishes the Training Deviation Process, thus meeting Preliminary compliance requirements. No documents were submitted to seek no substantiate Secondary compliance.

To further substantiate that the process is fully implemented to meet Secondary and eventually Full compliance, CPD must submit additional documents demonstrating that each step of the process is functional and operates as described in policy. The number of training deviation investigations should approximate the number of personnel who did not attend required training.

## Paragraph 328 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Training: ¶329

*329. Officers, including supervisors and command staff, returning to active duty after taking a leave of absence of a year or more must complete all mandatory training content required as part of the In-Service Training Program that was missed during the previous three years, in addition to the mandatory courses required in the current year. a. At a minimum: i. officers must complete training on the content required in Part F of the Use of Force section of this Agreement before returning to assignment; and ii. officers must complete training on all other mandatory content required during the previous three years within the first full year of resumed active duty. b. Where the same mandatory content has been updated or required multiple times during the period of inactivity, officers are only required to take the most recent offering. The training required in this paragraph will count towards the total amount of training required by the In-Service Training Program.*

## Compliance Progress                (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The City and the CPD achieved Preliminary compliance during this reporting period.

Preliminary compliance requires CPD policy, training plans, and other policy and data sources demonstrate the requirements of this paragraph are written into CPD policy. Secondary compliance requires CPD policy, training plans, lesson plans, training schedules, training and other data sources demonstrate CPD has established and implemented a process to require officers returning to active duty to meet the training requirements specified in this paragraph.

In the previous reporting period, the IMT assessed this paragraph for the first time. We found that the City and the CPD did not achieve Preliminary compliance because sections of the controlling policy were not consistent with paragraph requirements. We noted that the CPD will need to verify that the process enumerated in the policy has been implemented.

The compliance target for the City and the CPD during the fifth reporting period was Preliminary compliance. The City and the CPD produced the following documents to demonstrate Preliminary compliance during this reporting period:

- Finalized S11-10-03 In-Service Training [produced informally on December 30, 2021]

- Finalized E04-05, Returning Service Officer

S11-10-03 III.L, "Returning Service Officers," and E04-05 V, mandate the requirements of this paragraph, thereby establishing Preliminary compliance. Additional documents demonstrating the policy had been published on internal message boards were included in the production.

No additional proofs for Secondary or Full compliance were submitted, therefore neither were assessed during this reporting period.

Secondary compliance can be achieved after Preliminary compliance by substantiating that the process enumerated in the policy has been implemented.

### Paragraph 329 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Training: ¶331

> **331.** *CPD will require that every newly promoted supervisor, except those promoted to the rank of Commander and above, receives mandatory supervisory, management, leadership, and command accountability training, tailored to each level of supervision and command before assignment to a supervisory rank or assumption of supervisory responsibilities associated with a particular supervisory rank.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**      *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶331 during this reporting period.

Preliminary compliance requires CPD policy, training plans, and other policy and data sources demonstrate requirements of this paragraph are written into policy. Secondary compliance is neither sought nor substantiated during this reporting period.

During the previous reporting period, the City and the CPD reached Preliminary compliance but did not achieve Secondary compliance. The IMT noted that to reach Secondary compliance, they must provide proofs that demonstrate that the preservice training meets paragraph requirements to be "tailored to each level of supervision and command."

The City and the CPD produced the following document to achieve or maintain Preliminary compliance during this reporting period:

- Finalized S11-10-02 Pre-Service Training

The requirements established in ¶331 through ¶334 are displayed in S11-10-02 II. A.1 through 5, establishing Preliminary compliance for each paragraph. No documents were produced to seek Secondary compliance.

Secondary compliance requires data and training sources demonstrate that every newly promoted supervisor received the required training before assignment to a supervised rewriting or assumption of supervisory responsibilities associated with a particular supervisory ring.

## Paragraph 331 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Training: ¶332

***332.*** *CPD will require that supervisors, upon their first promotion to the rank of Commander or above, receive mandatory supervisory, management, leadership, and command accountability training, tailored to command staff positions within six months of assignment to or assumption of supervisory responsibilities as a member of CPD's command staff.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶332 during this reporting period.

Preliminary compliance requires CPD policy, training plans, and other policy and data sources demonstrate requirements of this paragraph are written into policy. Secondary compliance is neither sought nor substantiated during this reporting period.

During the previous reporting period, CPD submitted the following documents as proofs of compliance with this paragraph:

- 2021 Training Plan

- Training Directives (S11-10, S11-10-01, and S11-11)

The updated 2021 Training Plan includes proposed pre-service training class schedules for each promotional rank.

The IMT reviewed updated draft training directives including Special Order S11-10 Department Training, Special Order S11-10-01 Training Notification and attendance responsibilities, and Special Order S11-11 Training Oversight Committee. IMT found that CPD met Preliminary compliance with this paragraph but failed to achieve Secondary compliance because CPD did not provide proofs that demonstrated or substantiated that pre-service training met ¶332 requirement that the training be tailored to command staff positions.

The City and the CPD produced the following document to achieve or maintain Preliminary compliance during this reporting period:

- Finalized S11-10-02 Pre-Service Training

The requirements established in ¶331 through ¶334 are displayed in S11-10-02 II. A.1 through 5, establishing Preliminary compliance for each paragraph. No documents were produced to seek Secondary compliance.

Secondary compliance requires data and training sources demonstrate that every newly promoted supervisor received the required training before assignment to a supervised rewriting or assumption of supervisory responsibilities associated with a particular supervisory ring.

### Paragraph 332 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Training: ¶333

***333.*** *The amount of pre-service promotional training may differ according to rank and command, but all pre-service promotional training will be adequate in quality, quantity, type, and scope and will cover topics appropriate to the specific rank and command.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

The City and the CPD met Preliminary compliance requirements during this reporting period.

Preliminary compliance requires CPD policy, training plans, and other policy and data sources demonstrate requirements of this paragraph are written into policy. Secondary compliance is neither sought nor substantiated during this reporting period.

During the previous reporting period, the City and the CPD did not achieve Preliminary compliance. The IMT noted that to reach Preliminary compliance, they must provide proofs that demonstrate that the preservice training meets paragraph requirements to be "tailored to each level of supervision and command."

The City and the CPD produced the following document to achieve or maintain Preliminary compliance during this reporting period:

- Finalized S11-10-02 Pre-Service Training

The requirements established in ¶331 through ¶334 are displayed in S11-10-02 II. A.1 through 5, establishing Preliminary compliance for each paragraph. No documents were produced to seek Secondary compliance.

To meet Secondary compliance, we will need to determine whether the CPD has taken significant steps to deliver the training in accordance with this paragraph and the *2022 Training Plan*, curriculum and curriculum development process. The Training plans, attendance records and lesson plans will all have to demonstrate CPD adherence to ¶333 requirements. The IMT looks forward to further review of these documents and processes.

Looking ahead, the IMT suggests memorializing the requirements of this paragraph and documenting the steps taken to determine the quality, quantity, type, and scope" requirements of this paragraph.

## Paragraph 333 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Training: ¶334

*334. By January 1, 2020, as appropriate and tailored to the specific rank and command, pre-service promotional training will include, but not be limited to: a. an overview of CPD's department-wide crime reduction strategies; b. specific methods for developing district-level crime reduction strategies that are consistent with the principles of community policing, and tools and techniques on how best to communicate with officers on how to incorporate principles of community policing in implementing those crime reduction strategies; c. techniques for effectively guiding and directing officers and promoting effective and ethical police practices, including detecting and addressing bias-based profiling and other forms of discriminatory policing; d. de-escalation strategies and the principles of force mitigation; e. intervening on a subject's behalf when observing a use of force that is excessive or otherwise in violation of policy; f. evaluating the completeness, correctness, and sufficiency of written reports; g. monitoring, reviewing, and investigating uses of force to ensure consistency with CPD policies; h. understanding the function and proper use of supervisory tools, such as Early Intervention System ("EIS") and body-worn cameras, at each rank; i. evaluating officer performance, informally and formally as part of CPD's annual performance evaluation process; j. CPD and COPA's disciplinary system requirements and available non-punitive corrective action; k. mentoring officers and fostering career development; l. responding to allegations of officer misconduct, including, but not limited to, excessive force and racial discrimination, for purposes of documenting the complaint and reporting it to COPA; m. building community partnerships and guiding officers on how to implement this requirement; and n. CPD policy and legal updates.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance during this reporting period.

Preliminary compliance requires training records, CPD policy, and data sources assure that training is tailored to the specific rank as prescribed in the requirements of this paragraph.

During the previous reporting period, we reviewed CPD training documents. We found that the City and the CPD did not achieve Preliminary compliance because paragraph requirements have not been incorporated into Department policy.

The City and the CPD produced the following document to achieve or maintain Preliminary compliance during this reporting period:

- Finalized S11-10-02 Pre-Service Training [produced informally on December 30, 2021]

The requirements established in ¶331 through ¶334 are displayed in S11-10-02 II. A.1 through 5, establishing Preliminary compliance for each paragraph. No documents were produced to seek Secondary compliance.

The CPD may achieve Secondary compliance by conducting the pre-service supervisory training courses and achieving 95% or higher attendance by eligible candidates.

### Paragraph 333 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Training: ¶335

***335.*** *The pre-service promotional training for new Sergeants and Lieutenants will include a field training component to provide newly promoted supervisors with a better understanding of the requirements of the position to which they have been promoted. a. The field training component for new Sergeants will consist of two days of shadowing current Sergeants in districts: one day observing the activities of a District Station Supervisor and one day observing the activities of a Field Sergeant. b. The field training component for new Lieutenants will consist of one day of shadowing a current Lieutenant in a district and observing the activities of a Watch Operations Lieutenant.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance during this reporting period. Preliminary compliance can be achieved when the requirements of this paragraph including all subparagraphs including are written into CPD policy.

During the previous reporting period, the City and the CPD reached Preliminary compliance but did not achieve Secondary compliance. We noted that they did develop a curricula and policies addressing the requirements of the paragraph. The IMT explained that to meet Secondary compliance, the CPD must verify that they have begun the implementation process to fulfill paragraph requirements.

The City and the CPD produce the following documents to establish compliance:

- Finalized S11-10-02 Pre-Service Training [produced informally on December 30, 2021]

- 2022 Training Plan

- Draft Pre-Service Promotional Training Field Observation

S11-10-02 III.A.6 mirrors the requirements of this paragraph, establishing Preliminary compliance.

The production documents also include an 8 hour Pre-Service Lieutenant lesson plan, Watch Operations Lieutenant Guide, Watch Operations Lieutenant Field Day Debrief, District Field Sergeant Observation Guide, District Station Supervisor Work Queue Action Items Visual Guide, District Station Supervisor Observation

Guide, Field Sergeant Observation Day Debriefing, District Station Supervisor Responsibilities lesson plan, District Station Supervisor Observation Day lesson plan, District Station Supervisor Observation Day Debriefing lesson plan, District Field Supervisor Responsibilities lesson plan, and the District Field Supervisor Observation Day lesson plan. The City apparently is progressing toward Secondary compliance with its Pre-Service Promotional Training Field Observation training, which is currently undergoing a ¶641 review process.

To achieve Secondary compliance, CPD must implement and establish the process to fulfill paragraph requirements.

### Paragraph 334 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Training: ¶336

**336.** *Within 30 days of the Effective Date, CPD will develop a formalized structure for the field training component to ensure consistency across districts. This structure will include a process for selecting which supervisors will be shadowed and guidance materials to ensure that the topics and information regarding supervisor responsibilities covered during the field training component are consistent with CPD policy and this Agreement.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**      *Not in Compliance* (NEW: LOST COMPLIANCE)
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

The City and the CPD did not maintain Preliminary or achieve Secondary compliance with ¶336 during this reporting period.

Maintaining Preliminary compliance requires CPD policy, training records, data, and other policy sources demonstrate CPD has developed a formalized structure for the full training component depicted in this paragraph. Secondary compliance requires CPD policy, training records, lesson plans, and attendance records to demonstrate training has been delivered and training requirements are congruent with the requirements in this paragraph.

During the previous reporting period, the City and the CPD reached Preliminary compliance but did not achieve Secondary compliance. We noted that they did create the corresponding formalized structure for the field training component. The IMT explained that to meet Secondary compliance, the CPD must provide guidance materials to ensure that the topics and information regarding supervisor responsibilities covered during the field training component are consistent with CPD policy and this Agreement.

The City and the CPD produced the following documents to demonstrate sustained Preliminary compliance during this reporting period:

- Draft Pre-Service Promotional Training Field Observation

The production documents also include an 8 hour Pre-Service Lieutenant lesson plan, Watch Operations Lieutenant Guide, Watch Operations Lieutenant Field Day Debrief, District Field Sergeant Observation Guide, District Station Supervisor Work Queue Action Items Visual Guide, District Station Supervisor Observation Guide, Field Sergeant Observation Day Debriefing, District Station Supervisor Responsibilities lesson plan, District Station Supervisor Observation Day lesson plan,

District Station Supervisor Observation Day Debriefing lesson plan, District Field Supervisor Responsibilities lesson plan, and the District Field Supervisor Observation Day lesson plan. These documents depict and describe several elements of the Pre-Service Training program. The City apparently is progressing toward Secondary compliance with its Pre-Service Promotional Training Field Observation training, which is currently undergoing a ¶641 review process.

IMT reviewed S11-10-02, "Pre-Service Training," to determine if a formalized structure has been written into policy. Whereas many aspects of the Pre-Service Training Program are addressed in this policy, it doesn't go as far as to create or articulate a formalized structure for the field training component to ensure consistency across districts, or a process for selecting which supervisors will be shadowed. Preliminary compliance is not maintained due to the failure to incorporate ¶336 requirements into CPD policy.

Looking forward, to meet Secondary compliance, the IMT will need to review guidance materials to ensure that the topics and information regarding supervisor responsibilities covered during the field training component are consistent with CPD policy and this Agreement.

### Paragraph 336 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | None |

# Training: ¶337

> **337.** *CPD will ensure that all supervisors who are active duty and available for assignment also receive in-service training consistent with the requirements of CPD's In-Service Training Program. As part of the In-Service Training Program, supervisors will receive refresher training related to their supervisory duties and training that covers managerial and leadership skills. The in-service training for supervisors may include, but is not limited to, the topics identified above for pre-service promotional training.*

### Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶337 during this reporting period.

Preliminary compliance requires policy and data sources demonstrate requirements of this paragraph are written into policy and respect and reflect the specified obligations enumerated in this paragraph.

During the previous reporting period, the City and the CPD achieved Preliminary compliance but did not achieve Secondary compliance. We noted that they did incorporate the supervisor training obligations from this paragraph into policy. The IMT explained that to meet Secondary compliance, the CPD must deliver training while meeting paragraph requirements.

To assess compliance the IMT reviewed The CPD's finalized policy S11-10-03 *In-Service Training* [produced informally on December 30, 2021] and a draft of the planned 2022 In-Service Supervisor Refresher Training, including the lesson plan and presentation.

We note that policy S11-10-03 captures the ¶337 requirements at J (1):

> Specific responsibilities and assignments within the Department require specialized mandatory annual refresher in-service training. This training will include topics covered in the respective pre-service training and any other topics as determined by the Training Oversight Committee.
>
> The assignments requiring annual refresher training will include, but is not limited to:

*1. supervisor and command staff training, including training on supervisory duties, managerial and leadership skills, and other topics identified in supervisor pre-service training*

The training included in the production advanced toward Secondary compliance but remained in the ¶641 review process at the close of the reporting period. Therefore, CPD has demonstrated Preliminary compliance during this reporting period.

To meet Secondary compliance, CPD must demonstrate that training has been delivered and training requirements are met. We understand that the CPD plans to deliver Supervisory Refresher training in 2022; we look forward to reviewing the attendance records in future reporting periods.

### Paragraph 337 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Training: ¶338

> ***338.*** *Any training course offered as part of a pre-service promotional training, which is also a mandatory In-Service Training Program course, satisfies that mandatory In-Service Training Program requirement. Any other training course completed during a pre-service promotional training will count towards the total amount of training required by the In-Service Training Program requirement.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶338 during this reporting period.

Preliminary compliance requires policy and data sources demonstrate the requirements of this paragraph are written into CPD policy.

During the previous reporting period, the City and the CPD reached Preliminary compliance but did not achieve Secondary compliance. IMT reviewed the draft *2021 Training Plan* to determine whether the Plan includes the training course requirements. We found that the City and the CPD did not achieve Secondary compliance but we explained that the CPD will need to verify that they have taken sufficient steps to deliver the training according to the conditions specified in the paragraph in future compliance assessments.

To assess Preliminary compliance, the IMT reviewed CPD's finalized S11-10-02 *Pre-Service Training.* In section II.C., S-11-10-02 establishes the requirements of this paragraph g in policy:

> *Any pre-service training, which is also a part of the Department's mandatory annual in-service training, will satisfy that mandatory annual in-service training requirement. Any other pre-service training course completed during a pre-service promotional training will count towards the total amount of training required by the Department's mandatory annual in-service training.*

This language is consistent with the requirements of this paragraph; thus the CPD achieved Preliminary compliance during this reporting period.

To meet Secondary compliance, the CPD will need to submit training documents via the CPD's centralized electronic system that schedules and tracks all CPD training, and the delivery method for trainings referenced in this paragraph so the IMT may determine whether the CPD has taken sufficient steps to deliver the training according to the conditions specified in the paragraph and as it relates to other relevant paragraphs in the Consent Decree.

## Paragraph 338 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Training: ¶339

**339.** *Within 90 days of the Effective Date, CPD will require that all members who are active duty and available for assignment are provided with training on the requirements of this Agreement, together with its goals, implementation process, and timelines.*

## Compliance Progress                     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* **(NEW: LOST COMPLIANCE)** |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not maintain Preliminary compliance during this reporting period.

Preliminary compliance requires policy and data sources demonstrate requirements of this paragraph were written into policy and reflect specified obligations.

During the previous reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance. IMT reviewed available Tableau records and found that the May compliance percentage barely missed the threshold. We noted that Secondary compliance requires at least 95% of eligible personnel review the monthly policy updates issued through May.

The City and the CPD did not submit any documents as compliance proofs during this reporting period. They have indicated that due to balancing workload demands, CPD intends to work towards submitting the materials that demonstrate Secondary compliance in the sixth reporting period.

Secondary compliance requires at least 95% of eligible personnel review the monthly policy updates issued through May. Full compliance is achievable when CPD has fully implemented and institutionalized a full process that aligns with ¶339 requirements.

### Paragraph 339 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Secondary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | None | |

# Training: ¶340

**340.** *In connection with issuing a policy or procedure pursuant to this Agreement, CPD will ensure that: a. all relevant CPD members review their responsibilities pursuant to the policy or procedure, including the requirements that each member is held accountable for their compliance and is required to report violations of policy; b. supervisors of all ranks are informed that they will be held accountable for identifying and responding to policy or procedure violations by members under their direct command; and c. CPD can document that each relevant CPD officer or other employee has received and reviewed the policy.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶340 during this reporting period.

Preliminary compliance requires policy and data sources demonstrate requirements of this paragraph were written into policy and reflect specified obligations.

During the previous reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance. IMT reviewed available Tableau records and found that the May compliance percentage barely missed the threshold. We noted that Secondary compliance requires at least 95% of eligible personnel review the monthly policy updates.

The City and the CPD did not submit any documents as compliance proofs during this reporting period. They have indicated that due to balancing workload demands, CPD intends to work towards submitting the materials that demonstrate Secondary compliance in the sixth reporting period.

Secondary compliance requires at least 95% of eligible personnel review the monthly policy updates. That number was not achieved for directives issued in May. Full compliance is achievable when CPD has fully implemented and institutionalized a full process that aligns with ¶340 requirements.

## Paragraph 340 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Appendix 7
# Supervision
# Compliance Assessments, by Paragraph

# Appendix 7
# Supervision
# Compliance Assessments, by Paragraph

| | | | |
|---|---|---|---|
| ¶348 | ¶355 | ¶363 | ¶372 |
| ¶350 | ¶356 | ¶364 | ¶373 |
| ¶352 | ¶360 | ¶368 | ¶374 |
| ¶353 | ¶361 | ¶370 | ¶375 |
| ¶354 | ¶362 | ¶371 | ¶376 |

# Supervision: ¶348

> **348.** *By January 1, 2020, CPD will review and, as necessary, revise its policies for supervision to ensure that such policies set out clear responsibilities for supervisors to comply with the requirements of this Agreement. CPD will inform all supervisors of their specific duties and responsibilities that are required by CPD policies, including this Agreement.*

## Compliance Progress　　　　(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶348, but did not reach Secondary compliance.

To maintain Preliminary compliance with ¶348, we considered whether the CPD reviewed and revised relevant CPD policies and finalized changes as outlined in the Consent Decree (¶¶626–41). To evaluate Secondary compliance with ¶348, we reviewed, among other things, the CPD's corresponding training materials.

*Progress in the Fifth Reporting Period*

In previous reporting periods, we reviewed iterations of the CPD's *Supervisory Responsibilities* (G01-09) policy, corresponding training documents, and other documents related to the requirements of this paragraph, such as training tracking sheets and the *Supervisory Policy Matrix*.[1] The City and the CPD reached Preliminary compliance in the second reporting period. The City and the CPD maintained Preliminary compliance, but did not reach additional levels of compliance in the third or fourth reporting periods, because the CPD needed to develop a tracking system for policies and trainings regarding supervisory responsibilities.

In the fourth reporting period, the CPD submitted a revised version of the *Supervisory Responsibilities* policy (G01-09). The IMT and OAG each submitted "no-objection" notices in March 2021, and the CPD submitted the policy for public comment and finalized it in May 2021. We noted in the fourth reporting period that the G01-09 policy "establishes a strong foundation for supervisors and provides their responsibilities under CPD policies, including those responsive to the Consent

---

[1]　Early versions of the *Supervisory Responsibilities* General Order were numbered G01-07 and G01-08. The finalized version of the policy, which was submitted this reporting period, is G01-09. For consistency, we refer to the *Supervisory Responsibilities* General Order as G01-09 throughout this report.

Decree" and serves as a "practical tool for supervisors." The City and the CPD maintained Preliminary compliance with ¶348 in the fourth reporting period by carefully revising, improving, and finalizing G01-09. We explained in the last report that, for the CPD to reach subsequent levels of compliance in the fifth reporting period, we would look to see that the CPD has a system for tracking supervisory responsibilities and trainings across all areas of the Consent Decree, and hoped to review supervisory logs that capture supervisor's actions that demonstrate compliance with the policies that outline expectations and responsibilities of supervisors.

*Progress in the Fifth Reporting Period*

During this reporting period the IMT reviewed CPD's *In-Service Supervisors Training* curriculum and considered how it supports the current supervisory responsibilities contained in G01-09. Several drafts and revisions were made to the In-Service Supervisors Training during the fourth and fifth reporting periods, which both the IMT and OAG provided feedback on The most recent draft was submitted by the CPD in November 2021; the IMT and OAG submitted a no-objection and provided feedback in December 2021. The accompanying comments stressed the importance of training supervisors on the following: de-escalation techniques and the utilization of CIT officers; review of *Investigatory Stop Reports*; engaging and mentoring officers; and problem-solving strategies to engage and develop partnerships with stakeholders. We look forward to the *2022 In-Service Supervisors Training* being finalized and the opportunity to observe the training in the sixth reporting period.

In addition to reviewing the *2022 In-Service Supervisors Training* materials during this period, we also reviewed the CPD's *Performance Evaluation System Pilot Program (PES)* policy (D21-09), and the *Officer Support System (OSS)* policy (D20-04). Both policies have been finalized and were issued in December 2021. To support the role supervisors will have in administering both systems, the CPD is developing specific training for supervisors. Because both the Performance Evaluation System and Officer Support System are pilots, not all supervisors will have access to these systems until a more comprehensive roll out occurs.

The aforementioned efforts have allowed the City and the CPD to maintain Preliminary compliance with ¶348. Looking forward to Secondary compliance, however, the CPD will need to develop an effective comprehensive, department-wide supervisory training plan for the policy and training requirements in G01-09, *Supervisory Responsibilities*, and other supervisory training outlined in the Consent Decree (¶¶626–41). This plan should include implementation and evaluation considerations. We also hope to see progress made on the development of a system for tracking supervisory responsibilities and trainings across all areas of the Consent Decree. Both the policies and training for the Performance Evaluation System and

the Officer Support System will help support Secondary compliance with ¶348. While awaiting the training on these two systems, the IMT also looks forward to reviewing the current supervisory logs implemented by the CPD to track supervisors' activities during their shifts. The submission and review of these logs will also help support Secondary compliance.

### Paragraph 348 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Supervision: ¶350

**350.** *CPD will regularly inform its members, including supervisors, of available training, professional development opportunities, and employee assistance resources.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**    *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶350, but did not reach Secondary compliance.

To assess Preliminary compliance with ¶350, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We noted in the fourth reporting period that we expected the CPD to develop an effective channel for informing members of training and professional development opportunities, as well as available employee-assistance resources. To evaluate Secondary compliance with ¶350, we considered whether (1) the CPD developed an effective channel for communicating these opportunities to members and (2) demonstrated that the notification system is utilized consistently in line with the various directives that touch on notifying members of training, professional development opportunities, and employee assistance resources.

*Progress before the Fifth Reporting Period*

We assessed the City and the CPD's compliance with ¶350 for the first time in the fourth reporting period. In the fourth reporting period, the CPD submitted and the IMT reviewed several documents regarding ¶350, including the CPD's 2020 Annual Report, and provided an updated draft of S11-10-01, *Training Notification and Attendance Responsibilities*, as well as information about the Performance Evaluations System pilot program. We noted that at least 95% percentage of CPD officers received 32 hours of in-service training, which evidenced a robust communication and notification system that ensured members were aware of their training requirements and additional opportunities for training.

The City and the CPD reached Preliminary compliance in the fourth reporting period. We explained that, in the fifth reporting period, we hoped to see that notification systems are employed in a manner consistent with the various directives that touch on notifying members of training, professional development opportunities, and employee-assistance resources. More specifically, we asked to review

data demonstrating how the notification systems work and their effectiveness in disseminating information.

*Progress in the Fifth Reporting Period*

The City and the CPD maintained Preliminary compliance with ¶350 in the fifth reporting period. In assessing ¶350 during this reporting period, the IMT has been monitoring CPD's progress in administering its *2021 Training Plan*. The CPD anticipates completing the *2021 In-Service Training* by March 2022. The 2021 Training Plan includes specific training for supervisors that consists of topics related to supervisory duties and managerial and leadership skills. The IMT awaits documentation on the number of supervisors trained in addition to any evaluation materials.

In addition to monitoring the implementation of the 2021 Training Plan, the IMT also reviewed the CPD's *2022 Training Plan* that includes an *In-Service Supervisors Training*. The *2022 In-Service Supervisors Training* plan and lesson plans will instruct supervisors on the soft skills necessary to have difficult but crucial conversations with members that they supervise and the value of practicing internal procedural justice as a model for practicing procedural justice in the community. In addition, the training will also include a "Supervisors Toolbox" to provide a brief overview of the available CPD wellness resources and supports.

During this reporting period, the CPD finalized and issued the *Performance Evaluation System Pilot Program (PES)* policy (D21-09) and the *Officer Support System (OSS)* policy (D20-04). The IMT looks forward to the implementation of the training pilot programs during the sixth reporting period. The effective implementation of these pilot programs will help the CPD demonstrate its ability to reach further levels of compliance.

Finally, the CPD submitted *Department Training* (S11-10) on December 29, 2021. This policy rescinds the September 24, 2020 version of S11-10-01, *Training Notification and Attendance Responsibilities*. The revised S11-10 sets out in-service training notification processes, as well as expectations for attending trainings and steps to be followed when trainings are missed. In the next reporting period, the IMT looks forward to reviewing data demonstrating how the notification system works and its effectiveness in disseminating information.

The City and the CPD maintained Preliminary compliance with ¶350, but did not achieve Secondary compliance in the fifth reporting period. The IMT believes that the City and the CPD are demonstrating progress toward Secondary compliance. We look forward to seeing that notification systems are employed in a manner consistent with the various directives that touch on notifying members of training, professional development opportunities, and employee assistance resources. We also look forward to observing and reviewing efforts that evaluate the effectiveness of the notification systems.

## Paragraph 350 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Supervision: ¶352

*352. Effective supervision requires that all supervisors, at a minimum, will: a. establish and enforce the expectation that members under their command perform their duties in a manner that complies with federal and state law, CPD policy, this Agreement, and that is consistent with the principles of procedural justice, de-escalation, impartial policing, and community policing; b. provide leadership, guidance, mentoring, direction, and support to members under their command to promote improved performance and professional development; and c. lead efforts to ensure that members under their command are working actively to engage the community and promote public trust and safety.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**   *In Compliance* (NEW)
**Secondary:**   *Not Yet Assessed*
**Full:**   *Not Yet Assessed*

We assessed the City and the CPD's compliance with ¶352 for the first time in the fifth reporting period. The City and the CPD reached Preliminary compliance with ¶352.

To evaluate Preliminary compliance with ¶352, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

In the fifth reporting period, the IMT reviewed the *Supervisory Responsibilities* policy (G01-09), which the CPD finalized in May 10, 2021. This policy sets forth various duties and responsibilities of supervisors. The policy directs supervisors to model appropriate conduct, including abiding by the law and CPD policy and displaying high standards of ethical behavior and integrity. Supervisors are expected to effectively supervise the members under their command to conduct their duties consistent with the established principles of procedural justice, sanctity of life, de-escalation, impartial policing, and community policing. The CPD has reached Preliminary compliance with ¶352.

To evaluate Secondary compliance in future reporting periods, the IMT will focus on several areas which demonstrate the requirements within ¶352. The IMT looks forward to evaluating whether CPD has a plan to track, measure, and show compliance with the requirements of this paragraph. In particular, the IMT will be fo-

cused on the Performance Evaluation System, which identifies many of the requirements in ¶352, including building upon the principles of community policing, de-escalation, procedural justice, and impartial policing.

The IMT looks forward to reviewing and monitoring the *In-Service Supervisors Training*, which instructs supervisors on the soft skills necessary to have difficult but crucial conversations with members they supervise on the value of practicing internal procedural justice as a model for procedural justice in the community. The IMT will also assess the Officer Support System Pilot Program and training, which is designed to assist supervisors in proactively supporting sworn members of the CPD and supporting the well-being of members in a non-disciplinary manner.

With a great deal of focus being placed on the three pilot districts (the 4th, 6th, and 7th districts), the IMT will also focus on assessing unity of command and span of control and monitoring whether supervisors have the time and appropriate span of control to properly meet the requirements of ¶352.

### Paragraph 352 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Supervision: ¶353

*353. Additionally, effective supervision requires that immediate supervisors will, for members under their direct command: a. respond to, review, and investigate uses of force and other incidents and conduct as required by CPD policy and this Agreement; b. monitor, manage, and coordinate incident response; c. confirm the correctness, sufficiency, and completeness of written reports submitted for review and approval; d. identify any adverse behavior or misconduct and ensure that it is adequately addressed through corrective action, training, or referral for discipline; e. respond appropriately to each complaint of misconduct received, in accordance with CPD's complaint and disciplinary policies; f. review and act upon information regarding at-risk behavior by the members under their direct command, as required by the Data Collection, Analysis, and Management section of this Agreement; g. advise members under their direct command of available training, professional development opportunities, and employee assistance resources; h. conduct annual performance evaluations and meet with members under their direct command on an ongoing basis as necessary to provide guidance, mentoring, direction, and support to the members regarding their performance and to identify areas for improvement; and i. document the performance of their supervisory duties as required by CPD policy and this Agreement using the appropriate records management system, the Performance Recognition System ("PRS"), and/or the EIS.*

---

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶353, but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶353, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. The CPD's policies should be realistic and explicit to effectively address supervisory responsibilities across its broad spectrum of administration and operations.

To evaluate Secondary compliance with ¶353, we reviewed the CPD's training development, implementation, and evaluation (¶286); reviewed data sources relevant to the requirements of the paragraph; and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts. Additionally, we considered whether the relevant policies are effective in addressing the requirements of ¶353, that supervisors are trained effectively to operate in compliance with policies, and that there are sufficient supervisors to perform the functions.

*Progress before the Fifth Reporting Period*

We provided a status update for ¶353 in the third reporting period and assessed the City and the CPD's compliance with ¶353 for the first time in the fourth reporting period. The City and the CPD reached Preliminary compliance in the fourth reporting period. We noted at that time that, in the fifth reporting period and future reporting periods, we would look for finalization of the Performance Evaluations System pilot program directive and to attend trainings on corresponding directives. Additionally, we noted that we hoped to review examples of Supervisor Logs along with paperwork regarding the new Performance Evaluations System pilot.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶353. Preliminary compliance was achieved with the implementation of G01-09 in the fourth reporting period.

During the fifth reporting period, the IMT continued to monitor the CPD's efforts to conduct in-service training, which supervisors are required to attend. The CPD submitted a *2022 In-Service Training Plan* that includes an *In-Service Supervisors training* curriculum. The training consist of topics related to supervisory duties and managerial and leadership skills. In addition, supervisors are provided instructions on the methods and skills to improve *Tactical Response Reports* (TRRs) to correct a variety of errors and with an emphasis on improved report writing. In addition, the training includes developing soft skills necessary to have difficult but crucial conversations with members they supervise and the value of practicing internal procedural justice as a model for procedural justice in the community.

The City and the CPD maintained Preliminary compliance with ¶353 in the fifth reporting period, but did not reach Secondary compliance. The IMT continues to encourage the CPD to acquire and implement technology solutions to help record, collect, and analyze data regarding supervisory responsibilities to achieve Secondary compliance. With a great deal of focus being placed on the three pilot districts

(the 4th, 6th, and 7th districts), the IMT will also focus on assessing unity of command and span of control, and monitoring whether supervisors have the time and appropriate span of control to properly meet the requirements of ¶353.

### Paragraph 353 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Supervision: ¶354

**354.** *During their tour of duty, immediate supervisors in the Bureau of Patrol will spend time interacting with, observing, and overseeing the members under their direct command, including time in the field, consistent with their duty assignment.*

### Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶354, but did not achieve Secondary compliance.

To assess Preliminary compliance, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

To evaluate Secondary compliance, the IMT reviewed data sources relevant to compliance with the requirements of ¶354 and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts, including written documentation and interviews with supervisors and officers under their command.

The IMT also reviewed records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities required by ¶354. We also considered whether the CPD has allocated sufficient resources to create, staff, fill, and maintain positions with qualified personnel to fulfill the requirements of ¶354 and the Consent Decree.

*Progress before the Fifth Reporting Period*

We provided a status update for ¶354 in the third reporting period and assessed the City and the CPD's compliance with ¶354 for the first time in the fourth reporting period. The City and the CPD reached Preliminary compliance in the fourth reporting period by finalizing the *Supervisory Responsibilities* policy (G01-09). We noted at that time that, moving forward in the fifth reporting period, we looked forward to observing trainings for supervisors regarding capturing feedback they provide to members, and reviewing logs kept relating to the requirements of this paragraph. We also encouraged the CPD to maintain efforts aimed to acquire and implement technology systems that will allow for efficient and accurate capture of this information.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶354 by finalizing and issuing the *Supervisory Responsibilities* policy, G01-09. To further support the requirements of ¶354, the CPD developed and submitted a *2022 In-Service Supervisors Training* plan and curriculum. The IMT reviewed, submitted comments, and issued a no-objection notice to the *In-Service Supervisors Training* plan on December 15, 2021, and the OAG submitted a no-objection letter and feedback on December 10, 2021.

During the fifth reporting period, the CPD submitted a revised D20-02, *Unity of Command and Span of Control Schedule – Pilot Program* policy. In October 2021, the IMT and the OAG issued no-objection notices for D20-02. The policy was issued on December 10, 2021, and speaks to the underlining goals related to this paragraph. The pilot currently operates in the 4th, 6th, and 7th districts. For supervisors to be able to spend time interacting with, observing, and overseeing the officers under their direct command—including time in the field, consistent with ¶354—they must be available and accessible to officers during their tour of duty.

During the fifth reporting period, the IMT conducted site visit interviews with sergeants in the 6th district who shared that they are currently required to respond to calls for service. While there are times that a supervisor would engage in such activity, this is typically a task for line officers. High call volumes and low staffing are preventing sergeants from being able to develop and engage with the officers they supervise on a regular basis. In mid-October 2021, the CPD shared that additional sergeants had been added to the 6th district. In addition, an overtime agreement has been finalized with the collective bargaining units that enhances the availability of personnel.

The City and the CPD maintained Preliminary compliance with ¶354 in the fifth reporting period, but did not achieve Secondary compliance. In the next reporting period, the IMT looks forward to observing trainings for supervisors regarding capturing feedback they provide to members, and reviewing logs kept relating to the requirements of this paragraph. We encourage the CPD to maintain efforts aimed to acquire and implement technology systems that will allow for efficient and accurate capture of this information.

The IMT continues to limit its focus of ¶354 to the pilot districts, but based on interviews conducted during the last two reporting periods, supervisors and officers continue to express concern with not having the time or personnel to reach Secondary or Full Compliance. The IMT does not believe the allotment of overtime will be efficient in addressing the identified concerns.

## Paragraph 354 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019

COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020

COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020

COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021

COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021

COMPLIANCE PROGRESS:
Preliminary

# Supervision: ¶355

> ***355.*** *Immediate supervisors will be required to document their actions taken with members under their direct command, pursuant to CPD policy, including, but not limited to: a. non-disciplinary or corrective actions, including, but not limited to, those taken pursuant to any internal or external review of the conduct of CPD officers or taken pursuant to the operation of any existing and future automated electronic systems contemplated by Part D of the Data Collection, Analysis, and Management section of this Agreement; b. disciplinary referrals; c. response to incident scenes as required by CPD policy; d. observations of member conduct, as required by CPD policy; and e. reviews and investigations of reportable uses of force and other reports required by CPD policy and this Agreement.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**   *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**    *Not in Compliance*
**Full:**       *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶355, but did not achieve Secondary compliance.

To evaluate Preliminary compliance with ¶355, we reviewed the CPD's relevant policies following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

To evaluate Secondary compliance with ¶355, the IMT reviewed the CPD's training development, implementation, and evaluation (¶286). The IMT reviewed records regarding whether the CPD has qualified personnel fulfilling the responsibilities required by ¶355. Additionally, the IMT looked for evidence that the CPD has trained supervisors to comply with relevant portions of G01-09 and reviewed evidence and data sources showing how supervisors will be documenting their engagements with their subordinates, including but not limited to supervisory logs, Performance Evaluation System entries, training materials, and other types of entries and forms the CPD will use to comply with the requirements of ¶355.

*Progress before the Fifth Reporting Period*

In previous reporting periods, we reviewed draft versions of the *Supervisory Responsibilities* policy.[2] The collaborative process used to review and revise such documents was ongoing at the end of the third reporting period. In the fourth reporting period, after revising, posting for public comment, and finalizing *Supervisory Responsibilities*, G01-09, the City and the CPD reached Preliminary compliance with ¶355. In the fourth reporting period, we noted that, moving forward in the fifth reporting period, we would look for evidence that the CPD has trained supervisors to comply with relevant portions of G01-09 and would review data sources to determine whether supervisors are consistently and appropriately engaging with those under their command to comply with ¶355.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶355 after finalizing G01-09 in the fourth reporting period. During the fifth reporting period, the IMT reviewed and submitted comments on two other policies supporting ¶355: the *Officer Support System Pilot Program (OSS)* policy (D20-04) and the *Performance Evaluation System Pilot Program (PES)* policy (D21-09). These policies were finalized and issued on December 30, 2021, and December 10, 2021, respectively. The main focus of the *Officer Support System* policy is designed to assist supervisors in proactively supporting officers and to support their wellbeing in a non-disciplinary manner.

The IMT was able to observe a virtual pre-service supervisors training on various CPD and Civilian Office of Police Accountability (COPA) policies and procedures related to personnel investigations. Accountability and requirements of the Consent Decree were addressed throughout this training.

To further support the requirements of ¶355 the CPD developed and submitted a *2022 In-Service Supervisors Training* plan and curriculum. The IMT reviewed, submitted comments, and issued a no-objection notice to the *2022 In-Service Supervisors Training* plan and curriculum on December 15, 2021. The *2022 In-Service Supervisors Training* includes learning objectives in support of ¶355, such as the consequences at the supervisory level regarding the failure of initiating a complaint investigation, turning a complaint into a positive community interaction, and requirements for completing a *Tactical Response Report* (TRR), along with report writing issues and recent changes to the Use of Force and related policies.

---

[2]   The CPD produced earlier drafts of the *Supervisory Responsibilities* policy as G01-07 and G01-08. For consistency, we refer to this General Order as G01-09 throughout this report.

The City and the CPD maintained Preliminary compliance with ¶355 in the fifth reporting period. In the next reporting period, and to achieve Secondary compliance, we will look for evidence that the CPD has trained supervisors to comply with relevant policy, and for data that demonstrates informative engagement with supervisors and those serving under their command. The IMT also looks forward to reviewing Supervisory Logs that are used to capture supervisors work during their shifts relating to the requirements of this paragraph. We encourage the CPD to maintain efforts aimed to acquire and implement technology systems that will allow for efficient and accurate capture of this information. Further, the IMT looks forward to observing the Officer Support System in how it is being implemented, utilized, and tracked.

### Paragraph 355 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Supervision: ¶356

> **356.** *As otherwise set out in this Agreement, CPD will ensure that it makes staffing and allocation decisions that provide for: a. the number of patrol field supervisors to ensure span of control and unity of command as required in this Part; b. the number of well-trained, qualified FTOs, as required in Part H of the Training section of this Agreement; c. the number of well-trained, qualified staff to train recruits and officers, as required in Part D of the Training section of this Agreement; d. the number of well-trained, qualified staff to conduct timely misconduct investigations, as required in the Accountability and Transparency section of this Agreement; e. the number of certified CIT Officers, as required in Part D of the Crisis Intervention section of this Agreement; and f. the number of officer assistance and wellness staff as required in the Officer Wellness and Support section of this Agreement.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance with ¶356 in the fifth reporting period.

To evaluate Preliminary compliance with ¶356, we considered, among other things, whether the CPD developed a plan to ensure that staffing and allocation decisions comply with the staffing requirements of this paragraph. We also considered the CPD's relevant policies and materials following the process described in the Consent Decree (¶¶626–41).

*Progress before the Fifth Reporting Period*

In previous reporting periods, we recognized that the CPD took steps toward compliance with subsections of ¶356. For example, they increased the staffing levels of the Professional Counseling Division to comply with subsection (f). Despite these efforts, the City and the CPD did not reach Preliminary compliance in the fourth reporting period because, by the end of the reporting period, the CPD had not yet demonstrated that it had an actionable plan to meet all staffing requirements set out in ¶356.

Still, in the fourth reporting period, the CPD expanded the Unity of Command and Span of Control pilot program to two additional districts. The program was initially

piloted in the 6th district and, in the fourth reporting period, the CPD expanded the pilot program into the 4th and 7th districts, as well. In addition to expanding the pilot program, the CPD updated the *Unity of Command and Span of Control Schedule - Pilot Program* policy, D20-02, in April 2021. The policy defines both unity of command and span of control and explains how it is designed to afford consistency within patrol areas and create manageable officer-to-sergeant ratios. Still, the CPD continued to face challenges that prevented reaching Preliminary compliance with ¶356.

In the fourth reporting period, through virtual site visits conducted with several officers and sergeants from the 4th, 6th, and 7th districts, we learned that unity-of-command and span-of-control efforts had not played out on the ground as D20-02 directs. Many members were supportive of unity-of-command and span-of-control concepts that the pilot program intends to achieve. Many of these officers believed that, if properly staffed, the program could benefit the CPD and Chicago's communities.

However, in the fourth reporting period, officers consistently described a continued and significant shortage of personnel, including both officers and sergeants. This shortage prevented compliance with the principles set out in the pilot program. These frustrations were captured in and reiterated by the Audit Division's Summary of challenges facing the expanded Unity of Command and Span of Control pilot program.[3]

In the fourth reporting period, we noted that the most notable obstacle for gaining compliance with this paragraph was the absence of a comprehensive staffing study. Although the City and the CPD had made efforts to engage staffing experts to assist in developing a staffing plan, the plan had not been developed or, at least, had not been submitted for review by the end of the fourth reporting period.

Still, we noted in the fourth reporting period that the CPD had made progress toward other ¶356 requirements. For example, the CPD had made progress toward finalizing the *Field Training and Evaluation Program* Special Order, S11-02, which requires a one-to-one ratio of Field Training Officers to Probationary Police Officers, and had increased the number of clinicians in the Professional Counseling Division.[4]

---

[3]    We understand that an additional audit was completed related to the Unity of Command and Span of Control pilot program during the fourth reporting period. The City and the CPD did not, however, produce this audit before the close of the reporting period. Therefore, our assessment did not reflect any findings of that audit.

[4]    For additional information regarding the staffing of the Professional Counseling Division, refer to our assessment of ¶391 in the Officer Wellness and Support section of this report. For additional information regarding S11-02, refer to our Training section.

In the fourth reporting period, we noted that, to reach Preliminary compliance with ¶356, the CPD needed to demonstrate an actionable plan to ensure that all staffing and allocation decisions were made in a manner consistent with all the requirements of ¶356. To do this, we explained that the CPD would need to complete a comprehensive staffing study to inform a realistic and effective staffing plan.

*Progress in the Fifth Reporting Period*

The City and the CPD did not achieve Preliminary compliance with ¶356 in the fifth reporting period. The CPD made notable progress, however, by revising and finalizing D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. The IMT and OAG submitted no-objection notices to the final iteration of this policy in October 2021. During bi-weekly meetings with the City, the CPD, and the OAG, the IMT provided feedback on staffing issues regarding unity of command/span of control, and the CPD made some adjustments accordingly. The CPD also provided updates on the status of their staffing dashboard, which will enable supervisors to better monitor officers assignments and span of control between sergeants and officers. The CPD also discussed the staffing dashboard's management tools for making staffing and operational decisions that it believes would enhance unity of command/span of control. The CPD assigned seven additional sergeants to the 6th district during this reporting period, which is one of three pilot districts.

The IMT also noted the formation of the Unity of Command and Span of Control Program Evaluation Committee. The IMT reviewed a June 2021, Program Evaluation Committee "Talking Points" production, which identified topics of discussion concerning unity of command and span of control. The IMT also attended several virtual site visits and spoke with officers and sergeants. As in the fourth reporting period, we heard a great deal of frustration expressed about staffing shortages, which made it very difficult to achieve unity of command/span of control throughout the ranks.

Policy and staffing are inextricably bound. The CPD cannot realistically achieve one without the other. To meet the requirements of ¶356, it is critical to meet the staffing objectives required to achieve unity of command and span of control. The City and the CPD must have enough staffing to achieve a 10-to-1 supervisor to officer ratio, while at the same time developing and implementing policy. Supervisors must also be trained on the outcomes of unity of command, and CPD must measure unity of command and span of control results.

With staffing challenges related to time off, officer stress, service demands, and increases in violent crime, it is imperative that the CPD conduct a staffing study that is focused as an internal guide to help consistently maintain and manage Unity of Command and Span of Control.

We also note the CPD has made progress toward other ¶356 requirements. For example, the *Field Training and Evaluation Program* policy (S11-02), which requires a one-to-one ratio of Field Training Officers to Probationary Police Officers, went through the Consent Decree process. This policy was finalized and published on December 31, 2021.

The City and the CPD did not achieve Preliminary compliance with ¶356 in the fifth reporting period, but did make notable progress by finalizing the *Unity of Command and Span of Control Schedule Pilot Program* policy (D20-02). To reach Preliminary compliance with ¶356, the CPD must demonstrate an actionable plan to ensure that all staffing and allocation decisions are made in a manner consistent with the requirements of ¶356. To do this, the CPD will need to complete a comprehensive staffing study to inform a realistic and effective staffing plan. We look forward to receiving this information and continuing to consult with the CPD and the City as they undertake these efforts.

### Paragraph 356 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Supervision: ¶360

**360.** *By January 1, 2020, CPD will develop a staffing model to achieve the principles of unity of command and span of control. CPD's staffing model will identify methods to implement unity of command and a span of control ratio of no more than ten officers to one Sergeant for all field units on each watch in each of CPD's patrol districts. To achieve this objective, CPD will maintain, at a minimum, one Sergeant for each sector.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶360, but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶360, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of the paragraph and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts.

To evaluate Secondary compliance, we reviewed whether the City and the CPD assessed the Unity of Command and Span of Control pilot program, made adjustments to ensure successful implementation of the program's requirements in the pilot districts, and established an Evaluation Committee to oversee the pilot program. We also reviewed data sources, including systems for tracking and auditing to monitor staffing assignments and levels; training development, implementation, and evaluation (¶286). We also reviewed records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities required by ¶360, including the development and implementation of an optimal staffing model to allow for more consistent staffing of the pilot districts.

*Progress before the Fifth Reporting Period*

The City and the CPD reached Preliminary compliance with ¶360 in the second reporting period by launching the Unity of Command and Span of Control pilot program in the 6th district. They maintained Preliminary compliance but did not reach further levels of compliance with ¶360 in the third reporting period.

At the time, we recognized that the CPD faced unanticipated challenges during the third reporting period—including the COVID-19 pandemic—that limited the CPD's ability to allocate sufficient attention toward the pilot program. We also emphasized that the staffing model would need to be critically reviewed to appropriately adjust the model to address the unique needs of the districts into which the pilot program had not yet been expanded. Despite this, we commended the efforts of the CPD's Audit Division, which conducted an assessment, identified areas of improvement, and expressed a continued optimism for the pilot program moving forward.

During the fourth reporting period, the CPD expanded the Unity of Command and Span of Control pilot program from the 6th district into the 4th and 7th districts. In May 2021, the CPD submitted a revised *Unity of Command and Span of Control Schedule – Pilot Program* policy, D20-02. At the end of the reporting period, the policy remained in the collaborative revision and review process outlined in ¶¶626–41.

The City and the CPD did not reach additional levels of compliance during the fourth reporting period. We noted that, since beginning the pilot in the second reporting period, the CPD had struggled to identify a sustainable path toward full, department-wide compliance with ¶360 in three critical areas that posed a challenge to the CPD's maintaining Preliminary compliance and achieving Secondary compliance:

(1) the CPD must continue developing and instituting an optimal staffing model to allow for a more consistent staffing of the pilot districts;

(2) the CPD must enhance their tracking, data, and auditing systems to monitor staffing assignments and levels; and

(3) the CPD must establish the Evaluation Committee, which the IMT believes is central to providing the oversight the Unity of Command and Span of Control pilot program needs to effectively expand.

During the fourth reporting period, we conducted a virtual site visit with sergeants and officers assigned to the pilot program. Members were generally supportive of the program and its intention of bringing consistency in resources and building a team environment. But they also shared frustrations with not being able to properly and consistently staff their beats with the same personnel, as envisioned by the pilot program. A variety of factors appeared to be causing this inconsistent staffing, such as a near-weekly detailing of officers and sergeants to other assignments, both within their districts and outside of their districts. These frustrations

were also captured in and reiterated by the Audit Division's Summary of challenges facing the expanded Unity of Command and Span of Control Pilot project.[5]

In the fourth reporting period, we noted that these continued staff shortages demonstrated that the Unity of Command and Span of Control pilot program was not working as planned. As we explained: "While creating a plan or policy that requires the staffing model outlined by ¶360 is necessary, the plan or policy must allow the CPD to '*achieve* the principle of unity of command and span of control.'"

The Unity of Command and Span of Control program had been in place for two reporting periods and in multiple districts, yet none of those districts have reached or maintained the staffing levels required by ¶360. This suggested that the plan or policy was either not realistic or was not being properly supported by necessary resources. We encouraged the CPD to dedicate attention and resources to either ensuring that the pilot districts are properly staffed or adjusting the pilot program so that it is realistic and provides guidance to allow for future compliance with ¶360 and other related paragraphs. We explained that, if issues identified with the pilot program were not addressed, the City and the CPD could lose Preliminary compliance with this paragraph.

Given the challenges identified above, the City and the CPD did not reach Secondary compliance with ¶360 in the fourth reporting period. We urged the City and the CPD to assess the Unity of Command and Span of Control pilot program in the fifth reporting period and to then begin to make adjustments to ensure that the program leads to the successful implementation of the requirements in the pilot districts and, ultimately, in all districts.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶360 by revising *Unity of Command and Span of Control – Pilot Program* (D20-02). The revised D20-02 directive incorporated feedback from IMT and OAG. The IMT submitted a no-objection notice to the revised policy on October 27, 2021, and the OAG submitted a no-objection notice to the revised policy on October 26, 2021. The policy was finalized and issued in December 2021.

The IMT also reviewed the Sergeant's District Deployment Initiative, which was issued via an Administrative Message on August 3, 2021. A memorandum produced in August 2021 describing the Initiative states:

---

[5]  We understand that an additional audit was completed related to the Unity of Command and Span of Control pilot program during the fourth reporting period. The City and the CPD did not, however, produce this audit before the close of the reporting period. Therefore, our assessment did not reflect any findings of that audit.

> *In an effort to curb the public violence incidents throughout the city, the Department will conduct the Sergeants District Deployment Initiative. This program only allows for Sergeants (rank E-3) to volunteer to work a regular day off or during their nonextended furlough segment.*

In addition to the Sergeants Initiative, the CPD produced an Agreement signed in December 2020 between the CPD's Labor Relations Division and the Fraternal Order of Police, which settled a conflict about regular days off with the creation of an overtime initiative for police officers. Although these stop gap measures help to address some of the more immediate staffing challenges, a long term solution is needed to fulfill the requirements of ¶360, similar to the assignment of seven additional sergeants to the 6th district. The IMT recognizes that the CPD has convened a Unity of Command and Span of Control Pilot Program Evaluation Committee, which is to meet at least quarterly to discuss implementation progress and share feedback from department members. It is the hope of the IMT that the committee will be able to anticipate and address some of the possible challenges in order to ensure a smoother implementation process.

The City and the CPD maintained Preliminary compliance with ¶360 in the fifth reporting period, but did not reach Secondary compliance. In the next reporting period, the IMT looks to have further conversations about the CPD's new pod staffing model, which implements a primary, secondary, and tertiary role for supervisors. The IMT also wishes to observe future Evaluation Committee meetings.

### Paragraph 360 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Supervision: ¶361

> *361. In order to achieve unity of command and a span of control of no more than ten officers to one Sergeant in the field units on each watch in each patrol district, the staffing model may consider: a. staffing requirements for watch operations, including, but not limited to, watch personnel assigned to field duties and watch administration functions; b. staffing requirements for all other district law enforcement functions, including, but not limited to, district administration, community policing, and tactical teams; c. data-driven resource allocation methods incorporating district-specific factors, including, but not limited to, calls for service, public violence, and property crime; and d. any other considerations CPD deems relevant to achieving unity of command and a span of control ratio of no more than ten officers to one Sergeant in all field units on each watch of the City's patrol districts.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed the City and the CPD's compliance with ¶361 for the first time in the fifth reporting period. The City and the CPD reached Preliminary compliance with ¶361.

To evaluate Preliminary compliance with ¶361, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. The IMT reviewed data sources relevant to compliance with the requirements of the paragraph and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts. The IMT also reviewed records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities required by ¶361.

In the fifth reporting period, the City and the CPD obtained Preliminary compliance with ¶361 by revising the *Unity of Command and Span of Control – Pilot Program* (D20-02). The revised D20-02 directive incorporated feedback from the IMT and the OAG. The IMT submitted a no-objection notice to the revised policy on October 27, 2021, and the OAG submitted a no-objection notice to the revised policy on October 26, 2021. The policy was finalized and issued in December 2021.

The policy addresses various requirements of ¶361, such as clearly defining unity of command ("police officers who are assigned to their clearly identified immediate primary sergeant with the same start time and same regular day off (RDO) group operating in a consistent geographical area") and span of control ("participating districts will maintain a span of control that will be no greater than ten police officers assigned to their clearly identified immediate primary sergeant achieving no more than a 10:1 employee to supervisor ratio."). The policy also addresses staffing requirements for other district personnel and their role in supporting unity of command and span of control.

Policy D20-02 also identifies a data dashboard that provides participating districts visual data verification for the fulfilment of the district's required operations with span of control and unity of command. To date, the IMT awaits additional opportunities to view and assess the data contained in the Tableau Dashboard.

The IMT also reviewed the Sergeant's District Deployment Initiative, which was issued via an Administrative Message on August 3, 2021. A memorandum produced in August 2021 describing the Initiative states:

> In an effort to curb the public violence incidents throughout the city, the Department will conduct the Sergeants District Deployment Initiative. This program only allows for Sergeants (rank E-3) to volunteer to work a regular day off or during their nonextended furlough segment.

In addition to the Sergeants Initiative, the CPD produced an Agreement signed in December 2020 between CPD's Labor Relations Division and the Fraternal Order of Police, which settled a conflict about regular days off with the creation of an overtime initiative for police officers.

Although these stop gap measures help to address some of the more immediate staffing challenges, a long-term solution is needed to fulfill the requirements of ¶361, similar to the assignment of seven additional sergeants to the 6th district.

In future reporting periods, the IMT looks forward to the development of additional permanent solutions to address staffing, the redeployment of additional resources in patrol districts, and further conversation about a staffing model that will sustain the unity of command and span of control requirements within this paragraph. The IMT would also like to see the continued development of technology, such as staffing dashboards, that can timely track compliance.

Paragraph 361 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Not Applicable | Preliminary | |

# Supervision: ¶362

> **362.** *By January 1, 2020, CPD will develop a system and protocols to allow the Department to assess, both long-term and on a day-to-day basis, whether field units on each watch in each patrol district meet the requirements for unity of command and span of control.*

**Compliance Progress**  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶362 in the fifth reporting period.

To evaluate Preliminary compliance with ¶362, we reviewed the CPD's relevant policies following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also considered data sources, such as information and insights of officers gathered during virtual site visits and audit results, which was necessary or helpful to identify, verify, and sustain compliance with review.

*Progress before the Fifth Reporting Period*

The City and the CPD did not reach any level of compliance with ¶362 in previous reporting periods. As with ¶360, compliance with ¶362 was likely slowed by unanticipated challenges that the City and the CPD faced during the third reporting period. Despite this, the CPD implemented a dashboard intended to display data regarding compliance with unity of command and span of control requirements. By the end of the third reporting period, more work was still needed to ensure data reliability.

In the fourth reporting period, we conducted virtual site visits with officers in the three districts with the Unity of Command and Span of Control pilot program (4th, 6th, and 7th) to hear their thoughts and observations concerning the implementation and management of the pilot program.

Officers expressed that the pilot program concepts allowed for building strong teams that work consistently with one another, better support one another, and better leverage each other's strengths. Many sergeants expressed a belief that the pilot program concepts provide the benefit of working with the same team members on a regular basis, which allow them to better engage, guide, and set expectations for their officers and full team. However, the pilot program was not being

implemented on the ground in accordance with the program policy or its concepts. We noted that the CPD's own audit—along with the feedback we received during site visits—demonstrated that field units on each watch, in each district, were not meeting the requirements for unity of command and span of control.[6]

In our report for the third reporting period, we noted that the CPD implemented a dashboard intended to display data regarding compliance with the unity of command and span of control requirements. In the fourth reporting period, however, the CPD did not provide us additional information regarding this dashboard or data coming out of this dashboard. Therefore, the City and the CPD did not reach Preliminary compliance in the fourth reporting period. In the third and fourth reporting periods, we suggested that the CPD should work to ensure that data underlying the dashboard was up to date and reliable.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the City and the CPD obtained Preliminary compliance with ¶362 by revising the *Unity of Command and Span of Control – Pilot Program* policy (D20-02). The policy was finalized and issued in December 2021. In section III-G of D20-02, the CPD sets forth the requirements for a dashboard to be displayed in four separate tabs: (1) Unity of Command Tab, (2) Unity of Command by Employee Tab, (3) Span of Control Ratio Tab, and (4) Report Export Tab. Each tab of the dashboard was designed to allow data verification of the district's required operations for span of control and unity of command such as total number of officers who worked in their assigned squad and the total number of officers and sergeants who worked on a daily basis per watch.

The IMT looks forward to reviewing the dashboard and the CPD's ability to track the requirements of the Unity of Command and Span of Control programs. Further, for the City and the CPD to reach Secondary compliance, the IMT looks forward to reviewing training on D20-02, as well as utilization of the CPD's data dashboard.

---

[6]    We understand that an additional audit was completed related to the Unity of Command and Span of Control pilot program during the fourth reporting period. The City and the CPD did not, however, produce this audit before the close of the reporting period. Therefore, our assessment did not reflect any findings of that audit.

## Paragraph 362 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Supervision: ¶363

> **363.** *When calculating the span of control ratios for field units, CPD may not use department-wide averages or factor in span of control ratios for Bureau of Patrol units or functions that are not included in the definition of field units above.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed the City and the CPD's compliance with ¶363 for the first time in the fifth reporting period. The City and the CPD reached Preliminary compliance with ¶363.

To evaluate Preliminary compliance with ¶363, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of the paragraph and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts.

In the fifth reporting period, the City and the CPD obtained Preliminary compliance with ¶361 by revising the *Unity of Command and Span of Control – Pilot Program* policy (D20-02). The policy was finalized and issued in December 2021. D20-02 delineates between field units versus specialized units and does not calculate Span of Control based on department-wide averages.

The City and the CPD reached Preliminary compliance with ¶363 in the fifth reporting period. In the next reporting period, and to achieve Secondary compliance, the IMT will look for data which shows compliance with the requirements of the paragraph.

### Paragraph 363 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Not Applicable | Preliminary | |

# Supervision: ¶364

**364.** *Beginning no later than January 31, 2020, CPD will begin to implement a staffing model to achieve unity of command and a span of control ratio of no more than ten officers to one Sergeant assigned to field units on each watch in each patrol district.*

**Compliance Progress**          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶364 in the fifth reporting period, but did not achieve Secondary compliance.

To evaluate Secondary compliance with ¶364, we reviewed the CPD's relevant training development, implementation, expansion, and evaluation of the CPD's Unity of Command and Span of Control pilot program, which the CPD launched in the 6th District in early 2020. As the CPD expands the pilot program into additional districts, we are looking for effective and consistent implementation of the staffing model, ensuring that the staffing levels comport with the 10 to 1 requirements from ¶364.

*Progress before the Fifth Reporting Period*

In previous reporting periods, we followed the creation and implementation of the Unity of Command and Span of Control pilot program, which seeks to achieve a ratio of no more than 10 officers to 1 sergeant. Based on the creation and launch of the pilot program in the 6th District, which occurred during the second reporting period, we granted Preliminary compliance with ¶364. We cautioned in the third reporting period that maintenance of Preliminary compliance required careful monitoring, evaluating, and refining of the staffing model to effectively expand the pilot program in all districts.

During the fourth reporting period, the CPD conducted a survey with the officers and sergeants assigned to the pilot districts. This survey showed limited staffing to be among officers' top concerns related to the Unity of Command and Span of Control pilot program.[7] This was consistent with what we learned during the virtual site visit we conducted at the time. During that visit, officers expressed major concerns with staffing. Many officers stated they have the same sergeant only

---

[7]     We understand that an additional audit was completed related to the Unity of Command and Span of Control pilot program during the fourth reporting period. The City and the CPD did not, however, produce this audit before the close of the reporting period. Therefore, our assessment did not reflect any findings of that audit.

about half of the time—which runs contrary to the consistent staffing envisioned by the program.

In the second reporting period, we found that the CPD reached Preliminary compliance by creating the Unity of Command and Span of Control pilot program. In the fourth reporting period, we noted that since then, it had become evident that the CPD was either not committed to following the program as outlined or did not have the resources to follow through with the program, as outlined. We suggested that the difficulties the pilot districts had faced in following the pilot program, as written, suggests that the pilot program may not be an effective roadmap for compliance with ¶364. We noted that the City and the CPD must address these issues to maintain Preliminary compliance and eventually reach Secondary compliance. We urged the City and the CPD to focus necessary resources to address issues related to the Unity of Command and Span of Control pilot program so that the program could eventually be responsibly expanded to other districts.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance ¶364, but did not achieve Secondary compliance. The IMT reviewed the *Unity of Command and Span of Control – Pilot Program* (D20-02). The policy was finalized and issued in December 2021. The IMT conducted a virtual site visit in October 2021 with sergeants and officers in the Unity of Command and Span of Control pilot districts. During this site visit it was again noted that while both officers and sergeants supported the Unity of Command and Span of Control program, they were very discouraged with the lack of personnel commitments. In addition, sergeants expressed concern about not having the time to complete various tasks associated with unity of command and span of control, such as providing one-on-one mentoring to officers. The CPD conducted an audit in June 2021, the results of which were not produced until the fifth reporting period. This audit confirmed much of what the IMT heard during the site visit interviews.

In October 2021, the CPD transferred seven additional sergeants to the 6th district to help supplement supervisory staffing. During the December 13, 2021 bi-weekly Supervision call, the CPD presented a "Pod Staffing Model" currently deployed within the 6th district. The IMT anticipates obtaining additional information regarding this model, along with reviewing any data associated with its deployment, in the next reporting period.

The CPD continues with various overtime initiatives for supervisors and officers to support the requirements of unity of command and span of control. While we appreciate these efforts, the IMT views these initiatives as temporary measures and are looking for more permanent solutions to obtain Secondary compliance with ¶364.

As noted in Independent Monitoring Report 4, an additional audit was completed related to the Unity of Command and Span of Control pilot program during the fourth reporting period. However, it was not produced before the close of the reporting period. During the fifth reporting period, the IMT reviewed a production entitled, *Data Collection Challenges Facing Expanded Unity of Command/Span of Control Pilot Project in Districts 004, 006, 007* (dated June 2021). The audit reported several findings associated with the pilot programs, most notably the following:

- Ambiguity exists regarding that beats are required to be included in each district's pilot effort and displayed in the dashboard to be used to monitor compliance with required ratios;

- Incomplete assignment of involved CPD members to pilot squads persists across the three districts, similar to finding of previous analysis of the 6th district data conducted in late 2020;

- The dashboard is not currently configured to draw from historical watch data, which will prevent the department from conducting reliable trend analyses moving forward;

- The presence of incomplete data raises additional concerns about reliability of unity of command and span of control ratios currently displayed in dashboard.

Each of these findings are of great concern and the IMT looks forward to receiving updates on progress made toward addressing them.

The IMT also noted the establishment of the Unity of Command and Span of Control Program Evaluation Committee. The CPD produced a Unity of Command and Span of Control Pilot Program Evaluation Committee Meeting Agenda on December 30, 2021 of a June 22, 2021, Committee meeting which listed various items for discussion, including Audit and Dashboard updates. The IMT looks forward to receiving additional updates on these topic areas during the next reporting period.

The City and the CPD maintained Preliminary compliance with ¶364 in the fifth reporting period, but did not achieve Secondary compliance. In the next reporting period, the IMT looks forward to reviewing the technology used to track data associated with the Unity of Command and Span of Control program within the pilot districts. Further, more information on the development of the Pod Staffing Model would be helpful to the IMT as well.

Paragraph 364 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Supervision: ¶368

**368.** *Beginning 365 days after the Effective Date, and annually thereafter, the Monitor will review and assess CPD's progress toward achieving unity of command and a span of control ratio of no more than ten officers to one Sergeant.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Annual      ☑ **Not Yet Applicable**

**Preliminary:**     *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**      *Not in Compliance*
**Full:**          *Not in Compliance*

The City and the CPD maintained Preliminary compliance with ¶368 in the fifth reporting period, but did not achieve Secondary compliance.

To evaluate Secondary compliance with ¶368, we reviewed the CPD's relevant policies, as well as records regarding the expansion of the CPD's Unity of Command and Span of Control pilot program. Also, to determine whether the CPD met the annual requirement of this paragraph, we considered whether the City and the CPD demonstrated with sufficient data that the unity of command and span of control ratio of ten officers to one sergeant.

### Progress before the Fifth Reporting Period

The City and the CPD reached Preliminary compliance with ¶368 in the second reporting period by launching the Unity of Command and Span of control pilot program. They maintained Preliminary compliance in the third reporting period but did not reach subsequent levels of compliance. We did, however, commend the CPD for keeping the IMT apprised regarding staffing and operational challenges.

In the fourth reporting period, the City and the CPD maintained Preliminary compliance but did not reach additional levels of compliance. The City and the CPD met the corresponding deadline by providing the IMT with sufficient information to make this assessment. On the other hand, we noted that the information provided demonstrated that the City and the CPD had a long way to go to achieve the unity of command and span of control ratio of no more than 10 officers to one sergeant. To maintain Preliminary compliance in future reporting periods, we noted that the City and the CPD must devote efforts to compiling and maintaining reliable data regarding efforts aimed at compliance with unity of command and span of control principles outlined in the Consent Decree.

We conducted a virtual site visit in the fourth reporting period. During that visit, we heard that the staffing ratio called for by these paragraphs was not being met. We noted that there seemed to be a staffing shortage caused by various factors that prevented the CPD from complying with this ratio. As we reported, these shortages were not only causing frustrations among officers in the districts in which the Unity of Command and Span of Control pilot program was being piloted (4th, 6th, and 7th), but seemed to have also caused unsafe situations for officers in those districts. The Audit Division's Summary of challenges facing the expanded Unity of Command and Span of Control Pilot project reiterated the frustrations and concerns we heard from officers.

We also noted in the fourth reporting period that we had not received data from the dashboard implemented to track compliance with the unity of command and span of control principles. Without this data, we could not fully assess the extent to which the CPD was or was not achieving the unity of command and span of control staffing ratio in the pilot districts (although we noted that anecdotal evidence suggested the CPD was not achieving this ratio). Therefore, we determined that the CPD did not meet the annual requirement for this paragraph. Similarly, the CPD did not reach Secondary compliance with this paragraph.

We noted in the fourth reporting period that, in order to reach Secondary compliance and maintain Preliminary compliance in upcoming reporting periods, the CPD would need to provide us with various data sources so that we could assess, using quantitative data, the CPD's compliance with this paragraph. These data sources included dispatch activity reports, rosters, sergeant staffing reports, CPD budgets and forecasts, and other similar data.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶368, but did not reach additional levels of compliance. During the IMT's virtual site visit, we heard that the staffing ratio called for by these paragraphs is not being met. The staffing shortage relayed to us in this and previous site visit conversations continues, preventing the CPD from complying with this ratio. These shortages are causing frustrations among officers and sergeants in the districts in which the Unity of Command and Span of Control pilot program is being piloted.

The CPD produced a Unity of Command/Span of Control Data Analysis on December 30, 2021, which outlined a staffing pod model for assessing the supervisor to officer ratio. During the December 13, 2021 bi-weekly Supervision meeting, the CPD presented the model to the IMT and OAG. The IMT appreciates the discussion and looks forward to obtaining more detail on the model, including how the model was designed along with the various data sources utilized. The goal of the model

is for a member to be assigned to a primary sergeant 75% of their time, a secondary sergeant 20% of their time, and a tertiary sergeant 5% of their time. This provides a platform for the IMT to annually assess progress toward achieving unity of command and span of control.

The IMT also reviewed D20-02, *Unity of Command and Span of Control – Pilot Program*. The policy was finalized and issued in December 2021. The policy specifically identifies in Section III. G. 1-4 that a data dashboard is designed to capture data to support the district's required operations with span of control and unity of command. The IMT looks forward to reviewing that dashboard.

The City and the CPD maintained Preliminary compliance with ¶368 in the fifth reporting period, but did not achieve Secondary compliance. In the next reporting period, and to achieve Secondary compliance, the IMT looks forward to reviewing additional data associated with the pod staffing model over a longer period of time. Additionally, we will look to review records regarding the expansion of the CPD's Unity of Command and Span of Control pilot program.

### Paragraph 368 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Supervision: ¶370

*370. CPD's performance evaluation process will identify, support, and recognize members' activity, performance, and conduct through an assessment of specific quantitative and qualitative performance dimensions, which will address, among other things, constitutional policing, community policing, problem-solving, and the effective use of de-escalation or specialized training. Although CPD may use quantitative measures in evaluating members to ensure that members are performing their required duties, CPD will not require members to achieve specific numerical thresholds, such as the number of arrests, investigatory stops, or citations. CPD will ensure that its performance evaluation process is consistent with the law and best practices. Within 18 months of the Effective Date, CPD will revise its performance evaluation policies and practices as necessary to meet the requirements of this Agreement.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**       *In Compliance* (NEW)
**Secondary:**        *Not Yet Assessed*
**Full:**                *Not Yet Assessed*

The City and the CPD reached Preliminary compliance with ¶370 in the fifth reporting period.

To assess Preliminary compliance with ¶370, we reviewed the CPD's relevant policies (D21-09[8]) and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Fifth Reporting Period*

In the third reporting period, the City and the CPD made steps toward compliance with ¶370, but did not reach Preliminary compliance. They submitted a draft of

---

[8]   Early versions of the *Performance Evaluation System – Pilot Program* Directive were numbered D21-03 and D02-09. The finalized version of the policy, which was submitted this reporting period, is D21-09. For consistency, we refer to the *Performance Evaluation System – Pilot Program* Directive as D21-09 throughout this report.

the *Performance Evaluations System – Pilot Program* policy (D21-09) and supporting materials for collaborative review.[9] However, D21-03 remained in the review process at the close of the third reporting period.

In the fourth reporting period, the CPD submitted and the IMT reviewed various documents associated with *Performance Evaluations of All Sworn Department Members Below the Rank of Superintendent* policy (E05-01), *Performance Recognition System* policy (E05-02), and the 2018 Performance Evaluation Reference Guide.[10] We noted that, while we appreciated that the CPD was continuing to evaluate members under these policies, the existing evaluation system did not sufficiently emphasize the elements contemplated by the Consent Decree, such as constitutional policing, community policing, problem solving, and effective de-escalation. Still, we noted that these documents provided a helpful backdrop against which we could compare the CPD's latest efforts toward reforming of performance evaluations.

We noted that the CPD's efforts toward reform in this area were captured in the *Performance Evaluations System-Pilot Program* policy (D21-09), which was to be piloted in the 4th, 6th, and 7th districts—the same districts in which the Unity of Command and Span of Control program was being piloted. However, at the conclusion of the fifth reporting period, these districts had not implemented the PES system. During the fourth reporting period, the CPD revised D21-09, the first draft of which was submitted at the end of the third reporting period. We noted that D21-09 incorporated specific quantitative and qualitative performance dimensions, allowing for the capturing of members' activities associated with constitutional policing, community policing, problem-solving, and the effective use of de-escalation.

In the fourth reporting period, in addition to the revised policy, the CPD revised the Performance Evaluation Reference Guide to serve as a resource for members being evaluated and those conducting evaluations. We noted that the Reference Guide also clearly described the various dimensions and provided guidance on how to capture the associated work. The CPD provided demonstrations of the electronic system along with sample performance submissions.

We submitted a no-objection notice regarding revised D21-09 on June 3, 2021. However, the policy was not submitted for public comment and finalized by the

---

[9]    Earlier versions of this directive were produced under D02-09. For consistency and to avoid confusion, we will refer to all versions of this policy as D21-03 throughout this report. However, we noted that the CPD produced another, separate directive during this reporting period under the same number (D21-03). The CPD will need to address this duplicative numbering in subsequent revisions of the directives.

[10]   These earlier created evaluation system documents remain in effect in districts that are not part of the D21-03 pilot program.

end of the fourth reporting period.[11] For this reason, the CPD did not reach Preliminary compliance in the fourth reporting period.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶370. The IMT reviewed the updated *Performance Evaluations System - Pilot Program Policy*, D21-09. After public comment, the policy was finalized and issued on December 10, 2021. The CPD also finalized and issued the *Performance Recognition System Policy* (E05-02) on December 10, 2021. This policy helps to support ¶370 by aiding supervisors in recognizing and documenting the job performance of department members under their command, such as exceptional job performance or adverse behavior that can be improved by non-disciplinary options.

The Performance Evaluation System Pilot Program outlined in D21-09 will be piloted in the 4th, 6th, and 7th districts—the same districts in which the Unity of Command and Span of Control program is being piloted. D21-09 incorporates specific quantitative and qualitative performance dimensions, allowing for the capture of members' activities associated with constitutional policing, community policing, problem-solving, and the effective use of de-escalation.

During this reporting period, the City and the CPD also produced several *Performance Evaluation* training materials for sworn members. The materials were produced in December 2021 and include the Performance Evaluation System Handbook, Guide Book, Evaluation Survey, Test, Training Video, and Instructors Guide. Many of the documents had been previously produced during the fourth reporting period, during which time the IMT and the OAG had the opportunity to submit written comments in June and July 2021.

The training materials capture specific quantitative and qualitative performance dimensions which address constitutional policing, community policing, problem-solving, and the effective use of de-escalation or specialized training.

The City and the CPD reached Preliminary compliance with ¶370 in the fifth reporting period. In addition, the City and the CPD submitted various training documents associated with the Performance Evaluation System for CPD officers to include supervisors. The IMT is looking forward to the CPD's finalization of training documents associated with the Performance Evaluation System Pilot Program, consisting of the Performance Evaluation System Guide, the Performance Evaluation System Pilot Training, and the Performance Evaluation System eLearning. We

---

[11]  On July 9, 2021, after the close of the fourth reporting, the CPD posted D21-03 for public comment.

also look forward to observing these trainings in the pilot districts and reviewing evaluation

## Paragraph 370 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Supervision: ¶371

> ***371.*** *Annual performance evaluations for members of all ranks, excluding the Superintendent, will be based upon work performance completed during a specific rating period and will include a written description of performance dimension expectations; the member's proficiency in fulfilling the specific duties and responsibilities of the assigned position, unit, or team; any areas of particular growth and achievement; and areas where the member requires further support and/or supervision. The evaluation process will provide for support, feedback, communication of expectations, and, when appropriate, corrective actions.*

## Compliance Progress            (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Annual                    ☑ **Met**    ☐ **Missed**

**Preliminary:**    *In Compliance* (NEW)
**Secondary:**    *Not Yet Assessed*
**Full:**    *Not Yet Assessed*

The City and the CPD reached Preliminary compliance with ¶371 in the fifth reporting period.

To assess Preliminary compliance with ¶371, we reviewed, among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed provided data sources relevant to compliance with the paragraph's requirements.

*Progress before the Fifth Reporting Period*

In the third reporting period, we evaluated the CPD's compliance with ¶371 for the first time and found that the City and the CPD had not reached Preliminary compliance. Still, we noted that the Performance Evaluations System pilot program—which was in the planning stages—marked progress toward the requirements of the paragraph.

In the fourth reporting period, the CPD continued to work toward finalizing the *Performance Evaluations System – Pilot Program* policy (D21-09).[12] We noted that this directive was a step toward compliance with this and several other paragraphs

---

[12]    Early versions of the *Performance Evaluation System – Pilot Program* Directive were numbered D21-03 and D02-09. The finalized version of the policy, which was submitted this reporting period, is D21-09. For consistency, we refer to the *Performance Evaluation System – Pilot Program* Directive as D21-09 throughout this report.

(¶¶370–76). The CPD provided a revised D21-09 on May 13, 2021, and after review, we submitted a no-objection notice on June 3, 2021. The OAG submitted a no-objection notice on June 2, 2021. The CPD also submitted training materials and other supporting materials related to the pilot program.

Under D21-09, the Performance Evaluations Systems program will be piloted in the 4th, 6th, and 7th districts. D21-09 incorporates specific quantitative and qualitative performance dimensions allowing for the capturing of members activities associated with constitutional policing, community policing, problem-solving, and the effective use of de-escalation. The directive focuses on assessing overall performances for all sworn members, provides opportunities to recognize achievements and progress, and highlights goal-setting opportunities. The evaluation period of members of the pilot districts began June 16, 2021. Evaluation periods are one year in duration.

The CPD also submitted the *Performance Evaluations of all Sworn Department Members Below the Rank of Superintendent* policy (E05-01) and the *Performance Recognition System* policy (E05-02) in the fourth reporting period. The CPD issued E05-01 on July 20, 2018, and E05-02 on December 29, 2021, rescinding a February 21, 2012 version. The CPD submitted these policies toward compliance with ¶¶371–76.

We noted in the fourth reporting period that the CPD's *Performance Evaluations System* policy (D21-09) was a great improvement over the previous evaluation systems used by the CPD, specifically, E05-01 and E05-02. Unlike these old policies, D21-09 incorporates specific quantitative and qualitative performance dimensions allowing for the capturing of members activities associated with constitutional policing, community policing, problem-solving, and the effective use of de-escalation. We noted that, with the drafting and revision of D21-09 and the creation and ongoing revision of supporting materials, the CPD made great strides toward compliance with this paragraph. However, because D21-09 had not been submitted for public comment or been finalized by the end of the fourth reporting period, the CPD and the City did not meet Preliminary compliance with this paragraph in the fourth reporting period.[13]

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶371. The IMT reviewed the updated *Performance Evaluation System - Pilot Program Policy (PES)* policy (D21-09). After receiving public comment, the policy was finalized and issued on December 10, 2021. Section III-E of the policy assigns supervisors to evaluate members and assist in setting goals under the Performance

---

[13]    On July 9, 2021, after the close of the fourth reporting, the CPD posted D21-03 for public comment.

Evaluation System. Further, supervisors will use the Performance Evaluation System to effectively assess and document job performance of members under their command. Supervisors are also required to record notable observations of members in the Portfolio Notes section of the Performance Evaluation System every police period, as well as provide continual feedback and coaching.

Policy D21-09 identifies five performance dimension categories to evaluate the job performance for all sworn members: Conduct and Professionalism, Respect for People and Public Trust, Adaptability and Situational Skills, Problem Solving, and Job Knowledge and Professional Development. Supervisors will consider various components under each dimension, depending upon the duties and responsibilities of the member being evaluated.

Section VII of the policy affords members an opportunity to set personal goals and requires supervisors to support and recognize members who perform their duties lawfully, safely, and effectively, as well as to identify and respond to members who perform poorly, engage in inappropriate conduct, or in conduct that otherwise undermines members, public safety, or community trust.

During this reporting period, the City and the CPD also produced several Performance Evaluation training materials for sworn members. The materials were produced in December 2021, and include the Performance Evaluation System Handbook, Guide Book, Evaluation Survey, Test, Training Video, and Instructors Guide. Many of the documents had been previously produced during the fourth reporting period, during which time the IMT and the OAG had the opportunity to submit written comments in June and July 2021.

The training materials clearly set forth examples of how members and supervisors set performance expectations and professional goals for members. The training materials also include an "Officer Transfer Procedure" for when members transfer into a Performance Evaluation System pilot district during the course of a rating year.

The City and the CPD reached Preliminary compliance with ¶371 in the fifth reporting period. The IMT acknowledges that D21-09 is only being used in the 4th, 6th, and 7th pilot districts, whereas E05-01, *Performance Evaluations of all Sworn Department Members Below the Rank of Superintendent* policy, is used for all other officers. Looking forward, the IMT would like to see this program expanded, where D21-09 will ultimately replace E05-01 as it incorporates specific quantitative and qualitative performance dimensions allowing for the capture of members activities associated with constitutional policing, community policing, problem-solving, and the effective use of de-escalation.

## Paragraph 371 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

# Supervision: ¶372

> **372.** *CPD will require supervisors of all ranks to conduct timely, accurate, and complete performance evaluations.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶372 in the fifth reporting period.

To evaluate Preliminary compliance with ¶372, we reviewed among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed data sources relevant to compliance with the paragraph's requirements.

*Progress before the Fifth Reporting Period*

In the third reporting period, we assessed the CPD's compliance with ¶372 for the first time. At the close of the reporting period, the Performance Evaluations System pilot program and materials—which aims to address the requirements of ¶372—remained in the collaborative review process. Therefore, the CPD did not reach Preliminary compliance.

In the fourth reporting period, the CPD revised the *Performance Evaluations System – Pilot Program* policy (D21-09).[14] The CPD also produced *Performance Evaluations of all Sworn Department Members Below the Rank of Superintendent* policy (E05-01), and *Performance Recognition System* policy (E05-02), issued July 20, 2018 and February 21, 2012, respectively.

In the fourth reporting period, the CPD also submitted samples of 2020 performance evaluation summaries and their currently-enacted performance evaluation policies. These documents set forth requirements for supervisors of all ranks to conduct timely, accurate, and complete performance evaluations. These policies, however, did not reflect the same quality and content that is contemplated by Consent Decree paragraphs related to performance evaluation—and addressed by

---

[14]   Early versions of the *Performance Evaluation System – Pilot Program* Directive were numbered D21-03 and D02-09. The finalized version of the policy, which was submitted this reporting period, is D21-09. For consistency, we refer to the *Performance Evaluation System – Pilot Program* Directive as D21-09 throughout this report.

the revised D21-09. Therefore, the CPD made progress toward, but did not ultimately reach Preliminary compliance with ¶372 in the fourth reporting period.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶372. The IMT reviewed the updated *Performance Evaluation System - Pilot Program Policy*, D21-09. After public comment, the policy was finalized and issued on December 10, 2021. The policy incorporates specific quantitative and qualitative performance dimensions allowing for the capture of members' activities associated with constitutional policing, community policing, problem-solving, and the effective use of de-escalation. The policy clearly outlines the timeline for the completion of the performance evaluation on an annual basis. In addition, the policy sets out requirements for when a member must be assigned to an evaluating supervisor. All performance evaluations for members will be documented on the Performance Evaluation System, located within the Talent Management System.

The City and the CPD reached Preliminary compliance with ¶372 in the fifth reporting period. In the next reporting period, and to obtain Secondary compliance, the IMT looks forward to reviewing the data sources which demonstrate performance evaluations that have occurred and the frequency and quality of those evaluations. In addition, the IMT will be monitoring the training for both supervisors and members as the Performance Evaluation System rolls out during the sixth reporting period.

### Paragraph 372 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Supervision: ¶373

> **373.** *Supervisors may only conduct a performance evaluation of members they have directly supervised and observed during the specific rating period.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The City and the CPD reached Preliminary compliance with ¶373 in the fifth reporting period.

To evaluate Preliminary compliance with ¶373, we reviewed among other things, the CPD's relevant policies and materials following the process described in the Consent Decree (¶¶626–41).

*Progress before the Fifth Reporting Period*

In the third reporting period, we assessed the City and the CPD's compliance with ¶373 for the first time. The CPD's Performance Evaluation System pilot program and materials remained under review at the close of the period. Therefore, the CPD did not reach Preliminary compliance. We emphasized that the integrity of the Performance Evaluations System depended upon the successful implementation of the Unity of Command and Span of Control staffing structure, as ¶373 requires that Supervisors completing performance evaluations have first-hand knowledge of the members being evaluated.

In the fourth reporting period, the CPD submitted a revised *Performance Evaluation System – Pilot Program* policy (D21-09), and we submitted a no-objection notice to this revised draft policy.[15] We noted that this policy clearly requires that supervisors limit their review to sworn members who have been assigned under their command for at least 30 days before the evaluation, which differed from the current E05-01 policy. For example, under Section IV.J of E05-01, where a unit member has been supervised by several different supervisors, the supervisors are able to confer with each other in evaluating that member, and there is no specified length of time for which supervisors must have overseen the officer they are evaluating.

---

[15] Early versions of the *Performance Evaluation System – Pilot Program* Directive were numbered D21-03 and D02-09. The finalized version of the policy, which was submitted this reporting period, is D21-09. For consistency, we refer to the *Performance Evaluation System – Pilot Program* Directive as D21-09 throughout this report.

In the fourth reporting period, we commended the CPD's efforts in rethinking, upgrading, and revising their performance evaluations programs, as demonstrated by D21-09. However, because D21-09 had not been submitted for public comment and finalized by the end of the reporting period, the CPD did not reach Preliminary compliance in the fourth reporting period.[16]

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶373. The IMT reviewed the updated *Performance Evaluation System - Pilot Program Policy* (D21-09). After receiving public comment, the policy was finalized and issued on December 10, 2021. Section III-D4 of the policy requires supervisors to complete evaluations only for members who have been assigned under their command for at least thirty days prior to the evaluation.

During this reporting period, the City and the CPD also produced several Performance Evaluation training materials for sworn members. The materials were produced in December 2021, and include the Performance Evaluation System Handbook, Guide Book, Evaluation Survey, Test, Training Video, and Instructors Guide. Many of the documents had been previously produced during the fourth reporting period, during which time the IMT and the OAG had the opportunity to submit written comments in June and July 2021.

The Performance Evaluation System Handbook and Guidebook provide clear directions that supervisors may only conduct a performance evaluation of members they have directly supervised and observed during the specific rating period.

The City and the CPD reached Preliminary compliance with ¶373 in the fifth reporting period. In the next reporting period, and to achieve Secondary compliance, the IMT looks forward to reviewing the Performance Evaluation System training for supervisors in addition to data sources which demonstrate methods for ensuring that evaluations are completed by supervisors who have observed and actively supervised the members being evaluated.

### Paragraph 374 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

---

[16] On July 9, 2021, after the close of the fourth reporting, the CPD posted D21-03 for public comment.

# Supervision: ¶374

**374.** *In addition to the formal annual performance evaluation, supervisors will meet with members under their direct command on an ongoing basis as necessary to provide guidance, mentoring, direction, and support to the members regarding their performance and to identify opportunities for improvement.*

**Compliance Progress**       (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶374 in the fifth reporting period.

To assess Preliminary compliance with ¶374, we reviewed, among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed data sources relevant to compliance with ¶374 requirements.

*Progress before the Fifth Reporting Period*

In previous reporting periods, we reviewed drafts of the *Unity of Command and Span of Control—Pilot Program* policy (D20-02), and the *Performance Evaluation System Directive* and *Handbook*. These materials marked progress toward compliance with ¶374. However, because the materials remained in the collaborative revision process and had not been finalized or implemented, the City and the CPD did not reach Preliminary compliance with this paragraph.

In the fourth reporting period, the draft *Performance Evaluations System – Pilot Program* policy (D21-09) moved the CPD toward Preliminary compliance with ¶374. For example, we explained that Section V.B. of D21-09 noted the following:

> [T]he assessment of a member's job performance is an ongoing process and the annual performance evaluation is not the only time during the year that supervisors should discuss performance issues with Department members. Ongoing coaching and

> *feedback provide supervisors with opportunities throughout the year . . . .*[17]

We noted in the fourth reporting period that the previous policies provided by the CPD demonstrated that D21-09 would be a great improvement. For example, we explained that *Performance Evaluations of all Sworn Department Members Below the Rank of Superintendent* (E05-01) only required the evaluator to provide job-performance feedback to members at the conclusion of an evaluation period. We commended the CPD's efforts to codify the requirement that supervisors provide informal and ongoing feedback to members under their command.

The IMT and the OAG submitted no-objection notices to the revised draft D21-09 in the fourth reporting period. However, the CPD had not yet submitted D21-09 for public comment or finalized the policy by the end of the fourth reporting period. Therefore, the CPD did not reach Preliminary compliance in the fourth reporting period.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶374. The IMT reviewed the updated *Performance Evaluation System - Pilot Program Policy* (D21-09). After receiving public comment, the policy was finalized and issued on December 10, 2021. Section V-B of this policy states that supervisors are responsible for ongoing job performance evaluation of the department members they supervise, beyond the annual performance evaluations.

During this reporting period the City and the CPD also produced several Performance Evaluation training materials for sworn members. The materials were produced in December 2021, and include the Performance Evaluation System Handbook, Guide Book, Evaluation Survey, Test, Training Video, and Instructors Guide. Many of the documents had been previously produced during the fourth reporting period, during which time the IMT and the OAG had the opportunity to submit written comments in June and July 2022.

The training materials provide guidance to supervisors on how to assist in setting professional goals for members and their responsibility to provide ongoing mentoring and coaching.

The City and the CPD reached Preliminary compliance with ¶374 in the fifth reporting period. In the next reporting period, and to obtain Secondary compliance,

---

[17] Early versions of the *Performance Evaluation System – Pilot Program* Directive were numbered D21-03 and D02-09. The finalized version of the policy, which was submitted this reporting period, is D21-09. For consistency, we refer to the *Performance Evaluation System – Pilot Program* Directive as D21-09 throughout this report.

the IMT looks forward to reviewing Performance Evaluation System training in addition to data sources, including written documentation and interviews with supervisors and those under their command.

### Paragraph 374 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Supervision: ¶375

> **375.** *Supervisors will recognize, when appropriate, formally (e.g., recommendation for commendation) and/or informally (e.g., public and private praise) subordinate members who demonstrate a commitment to procedural justice, de-escalation, impartial policing, and/or community policing.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**     *Not Yet Assessed*
**Full:**     *Not Yet Assessed*

The City and the CPD reached Preliminary compliance with ¶375 in the fifth reporting period.

To evaluate Preliminary compliance with ¶375, we reviewed, among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41).

*Progress before the Fifth Reporting Period*

In previous reporting periods, we reviewed the Performance Evaluations System program materials. The CPD was planning to pilot the program in the 4th, 6th, and 7th districts; however, at the conclusion of the fifth reporting period, the Performance Evaluation System had not been implemented in these districts. At the close of the third reporting period, the materials remained in the review and revision process. Therefore, although the City and the CPD made progress toward Preliminary compliance, they did not reach Preliminary compliance.

In the fourth reporting period, the CPD revised the *Performance Evaluations System – Pilot Program* (D21-09).[18] We submitted a no-objection notice to the revised draft D21-09 on June 3, 2021. The OAG also submitted a no-objection notice to D21-09. The CPD also produced *Performance Evaluations of All Sworn Department Members Below the Rank of Superintendent* (E05-01). This directive remained in place for members who are not in the Performance Evaluations System pilot program, which was and is being piloted in the 4th, 6th, and 7th Districts only.

---

[18] Early versions of the *Performance Evaluation System – Pilot Program* Directive were numbered D21-03 and D02-09. The finalized version of the policy, which was submitted this reporting period, is D21-09. For consistency, we refer to the *Performance Evaluation System – Pilot Program* Directive as D21-09 throughout this report.

We noted in the fourth reporting period that D21-09 demonstrated a marked improvement over E05-01 regarding the requirement in ¶375: supervisors recognizing subordinate members who demonstrate a commitment to procedural justice, de-escalation, impartial policing, or community policing. We noted that while E05-01 referenced recognizing exceptional performance by members and rewarding the same with commendations and other forms of recognition, D21-09 specifically outlined the requisite dimensions on which officers will be assessed, one of which was "Respect for People and Public Trust," which included such core competencies as respect, community policing, procedural justice, and impartial policing. We noted that these specified dimensions not only provided guidance to supervisors conducting evaluations but also helped solidify that the CPD valued these various dimensions.

In the fourth reporting period, we noted that we were encouraged by the CPD's efforts in drafting and revising D21-09, as well as their efforts in creating training and other supporting materials related to the pilot program. Nonetheless, the CPD did not reach Preliminary compliance with ¶375 in the fourth reporting period because the policy needed to be submitted for public comment and finalized.[19]

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶375. The IMT reviewed the updated *Performance Evaluation System - Pilot Program Policy*, D21-09. After receiving public comment, the policy was finalized and issued on December 10, 2021. The CPD also finalized and issued the *Performance Recognition System Policy*, E05-02, on December 10, 2021. Section III-B of D21-09 and Section IV-C of E05-02 outline the responsibility of supervisors to recognize the achievements of department members under their command.

The City and the CPD reached Preliminary compliance with ¶375 in the fifth reporting period. In the next reporting period, and to achieve Secondary compliance, the IMT looks forward to reviewing the Performance Evaluation System and PRS training along with qualitative and quantitative data from both systems to support ¶375.

---

[19] On July 9, 2021, after the close of the fourth reporting, the CPD posted D21-03 for public comment.

## Paragraph 375 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Supervision: ¶376

**376.** *CPD will maintain records of performance evaluations in the appropriate electronic data tracking system.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**      *Not Yet Assessed*
**Full:**               *Not Yet Assessed*

The City and the CPD reached Preliminary compliance with ¶376 in the fifth reporting period.

To evaluate Preliminary compliance with ¶376, we reviewed, among other things, the CPD's relevant records and submitted information to determine whether the CPD had acquired and implemented an appropriate computer system to track data required by the paragraph. We also looked to review any related policies, following the process described in the Consent Decree (¶¶626–41).

*Progress before the Fifth Reporting Period*

In the third reporting period, the City and the CPD made steps toward compliance with ¶376 requirements. The CPD's Performance Evaluation System—a program that remained in the review and revision process at the close of the third reporting period—addressed the requirements set out in this paragraph. However, we noted that beyond the development and implementation of the Performance Evaluation System, the CPD must also focus on the acquisition or implementation of appropriate technology for compliance with ¶376's record-maintenance requirements.

During the fourth reporting period, the CPD provided the IMT and the OAG with live demonstrations of the Performance Evaluations Electronic System, which is used to create and store performance evaluations.

Because the Performance Evaluation Electronic System was not yet fully implemented by the end of the reporting period, the CPD did not reach Preliminary compliance with ¶376 in the fourth reporting period.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶376. The IMT reviewed the updated *Performance Evaluation System - Pilot Program Policy* (D21-09). After receiving public comment, the policy was finalized and issued on December 10, 2021. The IMT has observed live demonstrations of the Performance Evaluation Electronic System during previous reporting periods. In addition, policy D21-09 IX.A states:

*Performance evaluations for sworn members will be documented on the Performance Evaluation System, located within the Talent Management System.*

The City and the CPD achieved Preliminary compliance with ¶376 in the fifth reporting period. The IMT looks forward to receiving actual demonstrations of the live Performance Evaluation System platform being utilized in the Performance Evaluation System pilot program, in addition to the training on the system with pilot district supervisors.

### Paragraph 376 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Appendix 8
# Officer Wellness and Support
# Compliance Assessments, by Paragraph

# Appendix 8
# Officer Wellness and Support
# Compliance Assessments, by Paragraph

| | | | |
|---|---|---|---|
| ¶381 | ¶390 | ¶401 | ¶412 |
| ¶382 | ¶391 | ¶402 | ¶413 |
| ¶383 | ¶392 | ¶404 | ¶414 |
| ¶384 | ¶393 | ¶406 | ¶415 |
| ¶385 | ¶394 | ¶407 | ¶416 |
| ¶386 | ¶395 | ¶408 | ¶417 |
| ¶387 | ¶398 | ¶409 | ¶418 |
| ¶388 | ¶399 | ¶410 | |
| ¶389 | ¶400 | ¶411 | |

# Officer Wellness and Support: ¶381

> **381.** *CPD will provide its members with a range of support services that comport with mental health professional standards and that seek to minimize the risk of harm from stress, trauma, alcohol and substance abuse, and mental illness. These support services will include: readily accessible confidential counseling services with both internal and external referrals; peer support; traumatic incident debriefings and crisis counseling; and stress management and officer wellness training.*

## Compliance Progress            (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

During the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶381.

To assess Preliminary compliance with ¶381, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626-641), which outlines applicable consultation, resolution, workout, and public comment periods.

For Secondary compliance, we reviewed records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities required by ¶381. We also considered whether the staff is sufficiently trained to provide the services required by the paragraph.

To evaluate Full compliance with ¶381, we considered data sources necessary or helpful to identify and verify sustained compliance and reform efforts relevant to the requirements of the paragraph. Specifically, we determined whether the CPD has sufficient methods for tracking, analyzing, and responding to various data points regarding officer wellness services.

*Progress before the Fifth Reporting Period*

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶381 by submitting the *Professional Counseling Division (PCD)* Policy (E06-01), the CPD's *Officer Wellness Support Plan*, and the CPD's Standard Operating Procedure (SOP) 19-01. The combination of E06-01, the Officer Wellness Support Plan, and SOP 19-01 establish a robust foundation for providing CPD members with a range of services contemplated in ¶381.

The City and the CPD achieved Secondary compliance with ¶381 by providing record of the clinicians' certifications and proof the staff have necessary training and credentials as well as a breadth of experience providing the services contemplated by E06-01 and ¶381.

*Progress in the Fifth Reporting Period*

During the fifth reporting period, the IMT further engaged the Professional Counseling Division through a discussion during a virtual site visit and received updates during the IMT's biweekly meetings with the CPD and members of the Professional Counseling Division. SOP 19-01, along with E06-01, establish the definitive framework for ensuring all CPD members (current and retired) and their families have access to the confidential services provided by the Professional Counseling Division. Because the CPD's civilian personnel do not attend the in-service training or roll calls, the City and the CPD have not demonstrated a process that promotes similar accessibility for civilian personnel. The IMT would like to see specific demographic data that aligns with the process by which the civilian staff is educated and informed, as well as the data reflecting services provided.

Additionally, in this reporting period, the IMT virtually observed an in-service classroom instruction regarding Officer Wellness. E06-01 and the support services were referenced during the training. Recognizing the limitation of space and the demand for services, 11 additional counselor positions were approved and allocated to meet the demands of those seeking Professional Counseling Division services. The CPD will also acquire two additional facilities to house members of the Professional Counseling Division.

The IMT looks forward to seeing the evolution of services that continue to expand through instruction and programs that support CPD personnel. In the future, we anticipate the CPD to implement a technology solution to adequately track and evaluate services offered, including data that reflects the efficiencies of tracking programs and services to all CPD personnel. This data should include non-identifying demographics that reflect traumatic briefings, crisis counseling, stress management, and it should include the collective data from officer-wellness trainings, analytics from pre- and post- test data, and analyses from any surveys conducted. The IMT appreciates the efforts demonstrated to reach the sworn personnel, but we have not seen proof that reflects a corporate outreach effort for the civilian staff members via training and other means to ensure accessibility to Professional Counseling Division services. Therefore, the City and the CPD have maintained Preliminary and Secondary compliance with ¶381 but have not yet reached Full compliance with this paragraph.

## Paragraph 381 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Officer Wellness and Support: ¶382

> **382.** *CPD currently offers clinical counseling services, programs regarding alcoholism and other addictions, and a peer support program to help CPD members cope with the psychological and personal toll their jobs can impose. By September 1, 2019, CPD will complete a needs assessment to determine what additional resources are necessary to ensure the support services available to CPD members comport with best practices and mental health professional standards.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD have maintained Preliminary and Secondary compliance with ¶382 following their creation of the *Officer Wellness Support Plan* and the completion of the needs assessment.

To assess Preliminary compliance with ¶382, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626-641), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary and Full compliance with ¶382, we considered data sources necessary or helpful to identify and verify sustained compliance and reform efforts relevant to the requirements of the paragraph.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶382 by completing the required needs assessment and addressing additional concerns via the CPD's *Officer Wellness Support Plan.* However, we found the CPD had not yet provided enough evidence demonstrating Full compliance because the CPD had not yet shown the IMT that the *Officer Wellness Support Plan* robustly supplements the initially conducted needs assessment and is a living document. Further, the CPD must implement a system to track the provision and use of wellness services and provide updated timelines for plans to address the member needs identified by these sources accurately and efficiently.

*Progress in the Fifth Reporting Period*

As the CPD identifies the resources necessary to support CPD members, the data collection must demonstrate an accurate account of both the needs and the response to those needs via tangible, sustainable, and measurable solutions. As noted in the fourth reporting period, an updated timeline will allow the Professional Counseling Division to establish a definitive timeframe as the goals and needs of both the division and the CPD members continue to evolve.

We look forward to seeing the continued implementation of the *Officer Wellness Support Plan* and the application of resources to the needs assessment as noted in the *2021 Annual Report to the Superintendent*. The Professional Counseling Division noted their outstanding needs as they seek Full compliance in the future. Moving forward, we hope the CPD will implement a system to track the provision and use of wellness services and continue to survey members to assist in meeting member needs accurately and efficiently.

### Paragraph 382 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary |

# Officer Wellness and Support: ¶383

*383. The needs assessment should analyze, at a minimum: a. staffing levels in CPD's Professional Counseling Division; b. the current workload of the licensed mental health professionals and drug and alcohol counselors employed by CPD; c. how long it takes CPD members requesting counseling services to be seen by a licensed mental health professional or drug and alcohol counselor; d. the professional specialties of CPD's licensed mental health professionals; e. the frequency and reasons for referrals of CPD members to clinical service providers external to CPD and the quality of those services; f. CPD member feedback, through statistically valid surveys that ensure anonymity to participants consistent with established Professional Counseling Division guidelines, regarding the scope and nature of the support services needs of CPD members and the quality and availability of services and programs currently provided through the Employee Assistance Program; g. similar mental health services offered in other large departments, including the ratio of licensed mental health professionals to sworn officers and the number of counseling hours provided per counselor per week; h. guidance available from law enforcement professional associations; i. the frequency and adequacy of CPD's communications to CPD members regarding the support services available to them; j. the frequency, quality, and demand for in-service trainings related to stress management, officer wellness, and related topics; and k. the quality of recruit training related to stress management, officer wellness, and related topics.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD have maintained Preliminary and Secondary compliance with ¶383 during the fifth reporting period. The City and the CPD have made progress toward, but did not achieve Full compliance in the fifth reporting period.

To evaluate Preliminary compliance with ¶383, we determined whether the CPD has allocated sufficient resources to conduct a needs assessment as required by this paragraph. For Secondary Compliance, we determined whether the CPD has conducted the corresponding needs assessment. To assess Full compliance with ¶383, we considered whether at least each subparagraph of ¶383 has been sufficiently assessed, and whether the CPD has the technology necessary to

accurately collect and report data regarding the Professional Counseling Division's services, staffing, and consumption of those services. The CPD should be striving to reach a point at which they are able to continually assess and adapt the services Professional Counseling Division provides to better meet the needs of CPD members.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶383 by developing the *Officer Wellness Support Plan*, which built upon the needs assessment. The *Officer Wellness Support Plan* created a framework for future assessments of the CPD's wellness-related needs. Additionally, we found the Professional Counseling Division continued to utilize stopgap measures to track use and provision of services, compiled, and submitted the *2021 Report to the Superintendent* based on anecdotal evidence.

However, these efforts are not sufficient means to reliably collect and analyze data on services provided. Because the CPD remained limited by technological capabilities, we found the CPD had not yet provided evidence demonstrating compliance with subsections (b), (c), and (e) of ¶ 383. We explained that the CPD would need to acquire or implement technology that could digitally track and assess wellness services to allow for proper analysis, benchmarking, and strategic forecasting as noted in the subparagraphs. To achieve Full compliance with ¶383, we must review each subparagraph for its merited compliance. With the collective application of both the *Officer Wellness Support Plan* and the needs assessment, some areas are progressively shifting but attainable data has not yet been presented to the IMT.

*Progress in the Fifth Reporting Period*

It is important to note that the Professional Counseling Division has demonstrated its efforts to increase staffing. The Professional Counseling Division anticipates starting the hiring process for 11 additional counselors who were approved in the most recent budget process in early 2022. Additionally, the CPD will require additional space for the counselors, which includes district locations throughout the City. This provides greater and more immediate service access by CPD personnel. The assignments, duties, and foreseeable efficiencies should be part of a plan set in motion early enough to create a smooth transition for the additional service providers.

Per sub-paragraph (b), the current workload is significant for the combined Professional Counseling Division staff. Though fully staffed, it is evident that at least 11 counselors are needed. In our virtual site visits, the Professional

Counseling Division conveyed that some improvements and form revisions have been made to collect data. With historical data not imported, the CPD will need to establish the necessary benchmarks to determine what its true capacity for providing services is to further determine where and when future resources may be needed. This is true for several sub-paragraphs (c, e, f, g, I, and k).

As the newly revised forms allow for input from the counselors and other members, a robust compilation of data analyses would not only assess the services and the relative demographics, but further aid in determining who are the most frequent users. This may, in turn, afford the Professional Counseling Division opportunities to introduce or integrate other preventive or intervention measures that may address issues that are commonly impacting an aggregate population within the CPD. Some findings may not be revealed without a true statistical analysis.

For subparagraph (f), the CPD needs to determine the frequency of surveys necessary to identify the needs of personnel; the quality of services, equipment, and personnel; as well as other resources needed to provide efficient and effective services. Beyond the needs assessment, the Professional Counseling Division has not produced any evidence for subparagraphs (g) and (h) that indicates it has sought available guidance from other law-enforcement professional agencies. The CPD has access to resources for benchmarking data to help determine additional resources and services because of its membership in organizations such as IACP, MCCA, CALEA, IACPnet, and sister agencies.

With the introduction of some technological tools during the fifth reporting period, the CPD has made some progress toward, but did not meet Full compliance with ¶383. The City and the CPD will need to identify and implement technological advances to move the analytical needs forward. The IMT looks forward to the CPD being able to collect sufficient data to support the anecdotal evidence.

### Paragraph 383 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Yet Applicable | None | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Officer Wellness and Support: ¶384

> **384.** *Within 60 days of the completion of the needs assessment, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs identified through the needs assessment required by the immediately preceding paragraph ("Officer Support Systems Plan"). CPD will implement the Officer Support Systems Plan in accordance with the specified timeline for implementation.*

## Compliance Progress        (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**      *In Compliance* (THIRD REPORTING PERIOD)
**Full:**           *Not in Compliance*

The City and the CPD maintained Preliminary and Secondary compliance but did not reach Full compliance with ¶384 during the fourth reporting period.

To assess Preliminary compliance with ¶384, we determined whether the CPD developed a sufficient *Officer Wellness Support Plan* to prioritize and address the needs assessment. For Secondary compliance, we determined whether the *Officer Wellness Support Plan* was sufficient and meets the requirement of this paragraph.

To evaluate Full compliance with ¶384, we reviewed data relevant to determining whether the CPD has implemented the *Officer Wellness Support Plan*. We further reviewed whether the CPD is adequately and appropriately using technology to sustainably and accurately track Professional Counseling Division services. This would also include tracking the use of those services, and identifying trends and emerging wellness needs of personnel, which would allow the CPD to determine if they are allocating resources appropriately.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶384 by finalizing the *Officer Wellness Support Plan*, which provides a framework for iterative review and assessment of the CPD's ability to meet the wellness needs of its members. However, the Professional Counseling Division did not reach Full compliance due to the technological limitations preventing them from scheduling, tracking, and reporting on the Professional Counseling Division's activities more efficiently and accurately. We explained that the City and the CPD would need to provide updated timelines with clear expectations for the CPD, which would allow the IMT to monitor their progress against their department-set expectations.

*Progress in the Fifth Reporting Period*

The *Officer Wellness Support Plan* clearly identifies the specific areas that offer a more comprehensive approach to long-term solutions. The timeline, as noted in ¶384 and in the *Officer Wellness Support Plan*, is too broad as it references specific paragraphs with the timeline for project completion. There are aspects of the *Officer Wellness Support Plan* that indicate implementation phases but do not create substantive and definitive steps to support the priorities, nor demonstrate the processes to address the needs delivered in the *Officer Wellness Support Plan* and the needs assessment. Additionally, as mentioned in our prior report, the CPD needs to implement technological solutions to conduct the necessary comprehensive data analysis. While the CPD made progress toward Full compliance during the fifth reporting period, they have not yet reached Full compliance.

The IMT suggests that the Professional Counseling Division considers using a project management timeline solution that enables the user to set a date for completion. The Professional Counseling Division could identify all steps to reach the conclusion and count the days down towards project completion as this endeavor is a multi-faceted approach to the many, but necessary, solutions. The IMT continues to look forward to the City and the CPD's implementation of technology applied solutions.

### Paragraph 384 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Officer Wellness and Support: ¶385

*385. As a component of CPD's Officer Support Systems Plan, CPD will develop and implement a communications strategy. The objectives of this communications strategy will be: a. to inform CPD members of the support services available to them; b. to address stigmas, misinformation, or other potential barriers to members using these services; and c. to emphasize that supporting officer wellness is an integral part of CPD's operations.*

---

**Compliance Progress**　　　　(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**　　　*In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**　　　*In Compliance* (THIRD REPORTING PERIOD)
**Full:**　　　*Not in Compliance*

The City and the CPD have taken significant steps to enhance effective communication and maintained Preliminary and Secondary compliance with ¶385 during the fifth reporting period.

To evaluate Preliminary compliance, we reviewed whether the CPD had a sufficient plan to develop and implement a communications strategy per ¶385. For Secondary compliance, we reviewed data and gathered information to determine whether the communications strategy, when put into practice, would be sufficient to meet the objectives of ¶385. To evaluate Full Compliance with ¶385, we considered whether the CPD has implemented and sustained implementation of a communications strategy to effectively disseminate information, dispel misinformation, and emphasize the CPD's commitment to wellness. We also considered the extent to which the CPD is continuously assessing its communications strategy and making appropriate adjustments.

*Progress before the Fifth Reporting Period*

During the third reporting period, the City and the CPD achieved Preliminary and Secondary compliance by submitting the *Officer Wellness Support Plan* to develop and implement a communication strategy that would fulfill all requirements of ¶385. The *Officer Wellness Support Plan* includes sufficient communications strategies for both general dissemination of information regarding Professional Counseling Division services and targeted outreach.

The CPD also submitted evidence of varied, extensive, and continued efforts to disseminate information that emphasizes member wellness, works to dispel misinformation, and informs members of wellness services available to them.

However, because Full compliance requires demonstration of sustained efforts under the communications strategy, we explained that the CPD must submit evidence that the CPD is assessing the effectiveness of the communications strategy and adjusting as needed. Additionally, we explained that, to reach Full compliance, the CPD must submit evidence that the communications are addressing stigmas and misinformation and expressing the CPD's continued commitment to supporting officer wellness.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the Professional Counseling Division made significant progress toward Full compliance with ¶385 by demonstrating dissemination of materials to promote several aspects of effective communication, including in various training curricula. However, the IMT has not seen the CPD's communication strategy sustained where documents are routinely updated, and where data is collected, analyzed, and addressed. The communications strategy, like the *Officer Wellness Support Plan*, should be utilized as a living document to ensure that relevant and current material is posted, pushed, and instructed.

Additionally, during the fifth reporting period, the IMT observed an Officer Wellness in-service training. Some participants were familiar with the Professional Counseling Division's services, and other participants were not. The Professional Counseling Division should strive to ensure all CPD personnel are aware of the available services. While the sworn staff receive information in various formats, the civilian staff are not as strategically reached through outreach efforts such as training roll calls. The IMT looks forward to seeing those efforts as well to ensure education and awareness are equitably conveyed to the civilian staff.

Continuity and stability are key components in achieving Full compliance and the challenges must be met with the evidence-based data to show not only what is implemented but what is continued and is a best practice for the CPD. Therefore, the City and the CPD have maintained Preliminary and Secondary compliance with the paragraph but have not yet reached Full compliance.

### Paragraph 385 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Officer Wellness and Support: ¶386

**386.** *As part of this communications strategy, CPD will, at a minimum: a. make information about the support services available, on a continuing basis, to members on its internal websites; b. post information, including pamphlets and posters, in each CPD facility in areas frequented by officers; c. issue wallet-sized cards to every CPD member with contact information for the CPD support services available; d. inform and remind members about the CPD support services offered, including providing handouts with contact information, at the annual use of force training required by this Agreement, during Academy training of new recruits, and at in-service trainings relating to stress management and officer wellness; e. provide training to supervisory personnel regarding available CPD officer support services and strategies for communicating with officers about these services in a manner that minimizes any perceived stigma; and f. seek to identify and correct misperceptions among CPD members about receiving counseling services.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD have maintained Preliminary and Secondary compliance with ¶386 during the fifth reporting period and are continuing to make significant steps towards Full compliance.

To evaluate Preliminary and Secondary compliance with ¶386, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also considered the CPD's training development, implementation, and evaluation. We looked at whether the CPD developed a plan to comply with ¶386 and whether the plan would be effective, when implemented.

To assess Full Compliance with ¶386, we looked for evidence of continued outreach and communications related to wellness services. The communications should increase and maintain personnel awareness of services provided by the Professional Counseling Division. We also looked for qualitative and quantitative data necessary to assess personnel of all rank's awareness of Professional Counseling Division services and determine whether members are aware of how to access desired information regarding these services.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶386 by submitting the CPD's communications strategy set out in the *Officer Wellness Support Plan*. We also reviewed materials produced pursuant to the communications strategy. While the communication materials reflected an earnest commitment to disseminating robust and accurate information regarding the CPD's wellness services, we stressed the importance of keeping posted information updated and replenished on a regular basis. To achieve Full compliance with ¶386, we will need to see evidence of adaptations of the communications strategy when needed; evidence that the CPD's efforts under this paragraph are effective in providing the information to members; and evidence of ongoing efforts to identify and address the topics and issues pertinent to CPD members' stigma and misperceptions related to seeking counseling services.

*Progress in the Fifth Reporting Period*

The CPD has taken significant steps to increase the awareness of the Professional Counseling Division services and how to access those services during the fifth reporting period. The *Officer Wellness Support Plan* and the communication strategy contain a strong foundation for ensuring that accessibility occurs. During this reporting period, the CPD continued to make information about the support services more available.

Furthermore, several forms of information have been revised and disseminated to both internal and external members during the last two reporting periods. The revised entities ranged from posted materials to numerous productions consisting of training materials, including the Officer Wellness in-service training, the supervisors training, and the Employees Assistance Program (EAP) training. Much of these training materials, lesson plans, informational handouts, and digital resource lists either are in the consent decree review process as designated by ¶641 or are in the final review stage.

The IMT looks forward to the opportunity to observe several of these instructional sessions. While the wallet-sized cards are issued to the CPD members to ensure the members have contact information for the Professional Counseling Division, with modern technology and the utility of cell phones and other devices, the IMT encourages the City and the CPD to evaluate the benefits of a technology specifically designed for CPD personnel and their families. This technology would place counseling information and employee wellness resources at the fingertips of CPD personnel.

While the City and the CPD maintained Preliminary and Secondary compliance with this paragraph, they have yet to reach Full compliance.

### Paragraph 386 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Officer Wellness and Support: ¶387

*387. Within 180 days of the Effective Date, CPD will develop and implement a roll call training to explain and address the effects on Firearm Owners Identification ("FOID") card eligibility, if any, when a CPD member seeks or receives CPD support services, including, but not limited to, counseling and mental health treatment.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD have continued to maintain Preliminary and Secondary compliance with ¶387 but did not reach Full compliance during the fifth reporting period.

To assess Preliminary and Secondary compliance, we reviewed information to determine whether the roll-call training was sufficient to explain and address the effects per ¶387. To evaluate Full Compliance with ¶387, we sought to review a variety of data sources to determine whether the CPD continued to provide the FOID card training as necessary to ensure members and recruits are aware of the effects support services has on FOID card eligibility.

### Progress before the Fifth Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶387 by developing a FOID card roll-call training, providing documentation showing that 99% of eligible employees had received the training and providing post-training survey data indicating the CPD members found the training helpful. At the close of the third reporting period, we expressed that the CPD should provide evidence that the training continues to be implemented. While the communication strategy submitted under other paragraphs lists FOID-related messaging, no evidence of this plan being implemented was provided to the IMT. We explained that to reach Full compliance, the CPD would need to provide evidence of consistent communications with CPD members regarding FOID eligibility.

### Progress in the Fifth Reporting Period

During the fifth reporting period, the IMT reviewed several productions that explained and addressed the effects of the FOID card eligibility when CPD

members are seeking counseling and mental health treatment. This was evidenced in several topics of training.

To reach Full compliance, however, the FOID card information should be presented in the appropriate lesson plans. The IMT advises the CPD to establish a procedure to ensure that the messages are pushed in a manner that provides regular and routine messaging. The IMT would remind CPD that the FOID card should be compiled with other beneficial counseling and mental health services information to ensure that the desire to seek services is not deterred.

### Paragraph 387 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Officer Wellness and Support: ¶388

> **388.** *As a component of the Officer Support Systems Plan, by January 1, 2020, CPD will develop and implement a comprehensive suicide prevention initiative ("Suicide Prevention Initiative"). In designing the Suicide Prevention Initiative, CPD will examine similar initiatives implemented in other large departments and incorporate guidance available from law enforcement professional associations. The Suicide Prevention Initiative will be overseen by a licensed mental health professional working in conjunction with a command staff member.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance but did not reach additional levels of compliance with ¶388 during the fifth reporting period.

To evaluate Preliminary compliance with ¶388, we reviewed the Officer Wellness Support Plan to determine whether that effectively addressed and implemented a suicide prevention initiative. For Secondary compliance with ¶388, we reviewed data sources and considered, among other things, feedback from clinicians and the CPD members to determine whether the services provided by the CPD are proactively and reactively meeting the wellness needs of members. We sought to determine whether the communication strategy set out in the *Officer Wellness Support Plan* is sufficient to meet the objectives of ¶388. We also sought to determine the extent to which the CPD has evaluated the success and shortcomings of the implementation of the *Officer Wellness Support Plan* and other wellness services programs to provide the holistic support to address wellness concerns that are believed to contribute to the complicated outcome of suicide.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶388 by submitting a variety of CPD documents, including the *Officer Wellness Support Plan*, communications regarding expanded Employee Assistance Program services, and drafts of the Traumatic Incident Stress Management Plan directive. The IMT has acknowledged that there is currently no "best practice" approach to use as a benchmark to measure the CPD's efforts

related to suicide prevention. Recognizing this, the CPD worked to create a holistic wellness program to address the underlying concerns of ¶388. This holistic approach takes the place of a stand-alone suicide prevention initiative, which is appropriate because death by suicide is a complicated outcome rooted in factors still poorly understood.

The CPD submitted the Professional Counseling Division's *2021 Report to the Superintendent* in the fourth reporting period. However, given the unavailability of other data regarding the consumption and provision of services, we explained that the City and the CPD had not yet reached Secondary compliance. We hoped to continue to see feedback loops between CPD members and the Professional Counseling Division; to learn more about the CPD's post-mortem assessment process in the horrific incident of officer death by suicide; to see evidence of efforts to address the information the Professional Counseling Division is receiving from these sources; and to see the implementation of a technology solution that will allow the CPD to empirically assess the provision and consumption of services.

*Progress in the Fifth Reporting Period*

During the fifth reporting period, the CPD further promoted overall member health and wellness. This is recognized via the various productions that further inform the CPD members of wellness-related subjects, including a lesson plan and policies that are in different stages of review. The IMT also looks forward to reviewing the anticipated Communications Plan with push alerts in 2022.

Additionally, during a virtual site visit with the Director of the Professional Counseling Division, he discussed the process of conducting a forensic analysis when incidences of suicide occur. However, the CPD has not shared any data to indicate evidence of an analytical assessment for aiding in the determination of causes related to suicide.

The lack of technology solutions also creates a barrier to collecting and empirically analyzing the data that is needed to properly assess the critical nature of suicide prevention and intervention. While prevention awareness is a significant facet, having a holistic, data-based approach would allow the CPD to develop a strategy aligned with best practices, preventive measures, and wellness solutions to address a growing issue among law enforcement agencies throughout the United States.

The benchmarking can begin with the historical data currently imported by the Professional Counseling Division. In a most recent announcement, the FBI will open its collection portal on January 1, 2022, to collect data submissions of law-enforcement officer suicides and attempted suicides. The IMT strongly advises the CPD, coupled with any collected data from within the Professional Counseling

Division, to ensure that this information is promptly and accurately submitted to the FBI collection portal to ensure that the CPD has data imported into the first released report.

To assess Secondary compliance, the IMT looks forward to receiving additional materials pertaining to the wellness initiatives in the sixth reporting period. To reach Full compliance, the IMT will look for the implementation of critical technology solutions to allow for data collection pertinent to Officer Wellness and Support.

### Paragraph 388 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Officer Wellness and Support: ¶389

> **389.** *At least annually, the Director of the Professional Counseling Division will provide a written report to the Superintendent, through his or her chain of command, that includes anonymized data regarding support services provided to CPD members, how long it takes CPD members requesting counseling services to receive them, and other metrics related to the quality and availability of these services. This report will also contain resource, training, and policy recommendations necessary to ensure that the support services available to CPD members reasonably address their identified needs and comply with the Officer Support Systems Plan.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    At Least Annually        ✓ **Not Yet Applicable**

**Preliminary:**        *Not in Compliance*
**Secondary:**        *Not Yet Assessed*
**Full:**            *Not Yet Assessed*

During the fourth reporting period, the City and the CPD fell out of Preliminary compliance with ¶389 and remained out of compliance during the fifth reporting period.

To assess Preliminary compliance with ¶389, we determined whether the Director of the Professional Counseling Division provided a written report to the Superintendent, which incorporates the data outlined in this paragraph.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶389, largely due to the Professional Counseling Division's manual efforts to create weekly reports. However, the IMT had stressed the importance of a technology solution to enable the Professional Counseling Division to create reports so that accurate data on all points required by the paragraph could be obtained. In the fourth reporting period, the City and the CPD had not acquired, implemented, or provided evidence of significant progress toward obtaining any such technology, and thus, they fell out of Preliminary compliance with ¶389.

The CPD previously provided the Professional Counseling Division's *2021 Report to the Superintendent* that details the current state of Professional Counseling

Division's officer-wellness initiatives. However, the report did not provide data regarding support services provided to CPD members, how long it takes CPD members requesting counseling services to receive them, and other metrics related to the quality and availability of these services.

Maintaining Preliminary compliance with ¶389 requires a written report with anonymized data to be provided annually to the Superintendent, which incorporates all the data outlined by ¶389. These metrics include a basic efficiency measure to assess the time between a service request and the service rendered.

*Progress in the Fifth Reporting Period*

During the fifth reporting period, the Professional Counseling Division has taken many efforts to identify resources, partners, and revise policies. However, the IMT continues to emphasize the priority of ensuring that the benefits of those resources can be measured. We note the importance of the pillars of wellness, building resilience, and shifting culture, as presented in the working session with the IMT—*Roadmap to Operational Wellness*. This roadmap specifically addressed the investment, tools, and technology necessary to ensure the success of the prioritized initiatives via a supportive foundation that will enable proper resourcing, clarity of objectives, awareness, and education. In the summary conclusion, the CPD acknowledged its general commitment but indicated that implementation has been lacking as they have not gained enough traction to drive its desired outcomes.

There is some tremendous work being done, but the steps are not allowing for the completion of the goals to occur. Sustainable projects associated with officer and employee wellness must be strategically prioritized to reflect objectives, the means, and the benchmarking achievement. The difficulty associated with taking these steps is due to the technology solutions not being in place. The anecdotal reviews will not support the lofty goals to be achieved through this multi-dimensional approach.

## Paragraph 389 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Officer Wellness and Support: ¶390

> **390.** *CPD currently employs three licensed mental health professionals and a supervising psychologist who serves as the Director of CPD's Professional Counseling Division. CPD offers free counseling services to CPD members through the Professional Counseling Division and through external referrals in certain circumstances. CPD will expand its capacity to provide the counseling services to CPD members as set forth in this Agreement.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary and Secondary compliance with ¶390 during the fifth reporting period.

To assess Preliminary compliance with ¶390, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance with ¶390, we reviewed records sufficient to show that the CPD has qualified personnel fulfilling the responsibilities required by ¶390. To evaluate Full compliance, we considered whether the CPD has allocated sufficient resources to create, staff, fill, and maintain positions with qualified personnel as necessary to fulfill the requirements of the paragraph and the Consent Decree.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶390 by submitting the *Officer Wellness Support Plan*, the Professional Counseling Division Standard Operating Procedure (SOP) 19-01, and directive E06-01. Together, these outline the Professional Counseling Division's staffing and resource needs and demonstrate efforts to ensure those resources are utilized appropriately.

The City and the CPD achieved Secondary compliance with ¶390 in the fourth reporting period by hiring additional, qualified clinicians to better address the needs of CPD members. To achieve Full compliance, however, the IMT explained that the City and the CPD will not only need to implement data solutions to track

and assess member's wellness needs and use of Professional Counseling Division professional services, but they will also need to respond to the data appropriately.

*Progress in the Fifth Reporting Period*

During the fifth reporting period, the CPD provided the IMT with a status update. The CPD currently employs a total of 13 clinicians, including the Director and the Assistant Director. During a most recent budget process, the CPD has received approval to hire 11 additional counselors in the Professional Counseling Division. The IMT was informed of a budgetary approval to increase the mental-health practitioners with the desire to decentralize the counseling staff and designate districts for the individual counselors in the future, where they will be housed as well.

The Professional Counseling Division informed the IMT of their goal to begin the hiring process in early 2022. The IMT encourages to the Professional Counseling Division to collaborate with the CPD's Human Resources team to strategically plan for this hiring process to be efficiently implemented to attain the most qualified personnel to fill those much-needed positions. The IMT will look forward to seeing and reviewing the process to bring the new counselors on board.

While the Professional Counseling Division has licensed mental health professionals, it recognizes it is lacking a position for a licensed psychiatrist, which limits the degree of care that may be provided in some instances. Even without a licensed psychiatrist on staff, the current mental-health professionals can make the necessary referrals to outside facilities should the specific need arise.

Additionally, the IMT was advised that the clinicians are currently visiting designated district stations and roll calls to build trust, familiarity, and a greater rapport with the members at those locations. The Professional Counseling Division counselors provided the IMT with anecdotal examples and references to their efforts to building trust with the members of the CPD during district visits and roll calls.

As noted in earlier paragraphs and mentioned in the needs assessment, there is no specific formula or best-practice framework that addresses ratio of counselors per member. It will be important for the CPD and the City to eventually evaluate the benefits of a working model or conduct a staffing study to determine the optimal number of licensed practitioners needed to meet the organizational needs considering the size of the agency; the external resources and services provided; and the efficiencies that are noted in the Officer Wellness Support Plan; the Report to the Superintendent, and the communications strategy. These factors will strongly contribute to the IMT re-evaluating the CPD's compliance with ¶390.

The IMT continues to applaud the CPD's efforts for expanding this unit to deliver the necessary and available services to CPD members. The City and the CPD have maintained Preliminary and Secondary compliance during the fifth reporting period.

As the 2022 proposed campaign gets underway, the IMT will look for additional evidence that the clinician assignments to the districts are also included in the push alerts as noted in the communications strategy.

### Paragraph 390 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Officer Wellness and Support: ¶391

> **391.** *CPD will initially increase the staffing level in its Professional Counseling Division to at least ten full-time licensed mental health professionals (or a combination of full- and part-time licensed mental health professionals capable of providing an equivalent amount of weekly clinical therapy hours) by January 1, 2020. CPD may contract with licensed mental health professionals external to CPD on an interim basis while CPD completes the process for creating these new positions and hiring individuals to fill them. Additional changes to staffing levels will be made consistent with the results of the needs assessment and Officer Support Systems Plan.*

### Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained its Preliminary and Secondary compliance with ¶391, but did not achieve Full compliance.

To evaluate Preliminary and Secondary compliance with ¶391, we considered the staffing levels of the Professional Counseling Division, the demand for services, and the types of services provided by the Professional Counseling Division. While the CPD can contract with mental-health professionals under the paragraph, we considered whether the CPD had sustainably staffed and developed the Professional Counseling Division, without the need for contractors.

For Full compliance with this paragraph, the CPD must maintain appropriate staffing levels, and demonstrate a continued ability to assess and address staffing and resources needs, as informed by a fully implemented software solution that adequately tracks necessary data. The long-term objective for the CPD is to be able to evaluate the wellness needs of members to ensure that the supply of services is efficiently and effectively addressing those needs.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶391 by hiring additional clinicians, expanding the resources of the Professional Counseling Division, maintaining staff levels, and

strategically assigning its clinical workforce.[1] Additionally, the Professional Counseling Division submitted evidence of 187 peer support members, five drug and alcohol counselors, and six chaplains providing wellness services to CPD personnel. However, the CPD did not reach Full compliance, as it had not obtained and implemented technology necessary to capture data regarding support services provided to CPD members; how long it takes CPD members requesting counseling services to receive them; and other metrics related to the quality and availability of these services.

*Progress in the Fifth Reporting Period*

The IMT applauds the CPD for its continual increase in staffing within the Professional Counseling Division. The Professional Counseling Division currently has 13 clinicians on staff with the potential to grow and increase staffing in 2022.[2] The support for the increase staffing is a positive step towards enhanced counseling services at the CPD. The IMT appreciates the current and projected growth of clinical staffing.

It will be important for the CPD to determine what steps, personnel, and tools will create a proper span of control over the entire wellness unit in the future. This assessment will ensure that all resources and services are efficiently and effectively managed. To effectively achieve this, the CPD needs to transition from manually tracking data to a more technologically sound approach to analyzing the data to help align the appropriate application of staffing resources pending the decentralization of the clinical staff. This will allow for the Professional Counseling Division to determine if greater resources are needed at some district locations compared to other locations.

Even with the staffing increases, without the necessary data collection and analysis system, it will prove difficult to innovate beyond the current level of services because the definitive data-support analyses of what works best for CPD will not be fully availed.

The CPD's work in the *Officer Wellness Plan*, the *2021 Report to the Superintendent*, the *Communications Strategy* will hopefully continue to build upon each other. Once the technological solutions are in place, the City and the CPD will be able to determine if additional resources are needed and further appreciate the work being done by the Professional Counseling Division.

---

[1] By the close of the fourth reporting period, the Professional Counseling Division had increased the number of clinicians to 13.

[2] During a recent meeting, the CPD informed us that they recently received budgetary approval to hire 11 additional clinicians.

While the City and the CPD has maintained Preliminary and Secondary compliance with this paragraph, we will continue to look for data-driven technological advancements to obtain Full compliance.

### Paragraph 391 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Officer Wellness and Support: ¶392

**392.** *CPD will ensure that its staff of licensed mental health professionals includes individuals with specialized training in one or more of each of the following subjects: posttraumatic stress disorder, domestic violence, alcohol and substance abuse, anger management, depression, and anxiety.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

During this fifth reporting period, the City and the CPD have maintained Preliminary compliance and Secondary compliance with ¶392.

To assess Preliminary compliance with ¶392, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, we reviewed records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities required by ¶392. We also considered whether the CPD has allocated sufficient resources to create, staff, fill, and maintain positions with qualified personnel as necessary to fulfill the requirements of the paragraph and Consent Decree.

To determine Full compliance with ¶392, we sought to determine whether CPD's licensed mental health professionals have the requisite specialized training required by this paragraph.

### Progress before the Fifth Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶392 by submitting the *Officer Wellness Support Plan* and the CPD's Standard Operating Procedure (SOP) 19-01, which include the requirements of this paragraph.

### Progress in the Fifth Reporting Period

At the end of the fifth reporting period, the Professional Counseling Division now had 13 licensed mental-health professionals, including the Director and Assistant Director, employed during this reporting period. The credentials of the clinicians

as presented during the virtual site visit reflect the diverse skill sets needed for the demands of the CPD members seeking related services.

During a virtual site visit, the Director of the Professional Counseling Division also shared that while one-on-one in-person sessions are preferred, the Professional Counseling Division can also provide some basic tele-health services when applicable. During this discussion, other clinicians in the Professional Counseling Division offered the top three areas in which CPD members require services, and stated the staff had expertise in those areas, as they were not outside the scope articulated in ¶392.

The credentials of these clinicians are presented in their respective bios with specialized training. This is further conveyed in the CPD's wellness page of its website. The IMT recommends that the CPD seek opportunities via professional associations and law-enforcement membership organizations to ensure professional training beyond the minimum requirements necessary to maintain certification are afforded to the members of the Professional Counseling Division.

The City and the CPD have made progress toward but did not reach Full compliance in the fifth reporting period. To reach Full compliance, the IMT will expect to review the areas of continuing education, training, and continued certification and the employment of the allotted positions. We look forward to being apprised of the future staffing efforts with the additional allocations.

### Paragraph 392 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Officer Wellness and Support: ¶393

> **393.** *In order to provide support services that are culturally appropriate, sensitive to differing circumstances, and attentive to the issues facing all CPD members, including, but not limited to, women, people of color, religious minorities, and LGBTQI individuals, CPD will ensure that: a. the licensed mental health professionals and counselors employed by CPD are trained and equipped to provide services in a manner respectful of these diverse experiences and perspectives; b. CPD members receiving services have the opportunity to provide feedback regarding whether such services are culturally appropriate and adapted to diverse experiences and perspectives; and c. appropriate corrective action is taken to the extent necessary based on feedback received.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD have maintained Preliminary and Secondary compliance with ¶393 during the fifth reporting period but have yet to reach Full compliance.

To assess Preliminary compliance with ¶393, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed various data, such as Professional Counseling Division clinicians' biographies, which is relevant to compliance with the requirements of this paragraph. To assess Secondary compliance, we considered whether the CPD has qualified and diverse personnel who are trained to address the wellness needs and concerns of a diverse population. To determine Full compliance with ¶393, we sought to determine whether the CPD has sufficient services in place to provide diverse support to all members.

### Progress before the Fifth Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶393 by submitting the *Officer Wellness Support Plan*, which sets out expectations that promote the training and development of officer wellness initiatives that are sensitive to the diversity found within the CPD and the community at large.

The City and the CPD achieved Secondary compliance with ¶393 by submitting the biographies of Professional Counseling Division clinicians, as well as evidence that they receive feedback regarding support services by conducting various focus groups. These focus groups touched on topics of diversity within Professional Counseling Division services as shown in the *2021 Report to the Superintendent*.

*Progress in the Fifth Reporting Period*

In a site visit discussion, the IMT learned that the Professional Counseling Division Director attends the executive sessions with CPD leaders who provide regular feedback. Additionally, the Professional Counseling Division receives some informal feedback at roll calls. However, this informal feedback would not be the most efficient way of assessing the services provided by the Professional Counseling Division or a way to determine the impact of those services as some personnel may be hesitant to approach the Professional Counseling Division staff at roll calls. Therefore, a more analytical approach must be made to determine the effectiveness of the Professional Counseling Division and its efficiencies.

Also, during the virtual site visit, the IMT discussed the credentials, background, and training of the mental-health counselors. The multi-disciplinary background and credentials create a unique opportunity to provide specialty services to the members of the CPD. The CPD benefits from the diverse backgrounds of the clinicians and from the specialized supplemental services provided by the other units within the Professional Counseling Division as well—alcohol and substance abuse counselors, chaplains, and peer support. Moreover, the Professional Counseling Division offers several group therapy sessions, including sessions for Black females, military personnel, and CPD members transitioning into retirement.

The Professional Counseling Division offers flexible services such as tele-health visits and in-person visits, including meeting CPD members where they are. This enables them to provide in-home services if an officer has been injured. The roll call and district visits enable the CPD members to personally connect with the counselor if they choose.

During the fifth reporting, the IMT did not receive any evidence of feedback regarding the appropriateness of providing culturally sensitive services to the members of the CPD. To achieve Full compliance, the Professional Counseling Division will need to develop a formal method to assess feedback to determine whether the Professional Counseling Division is perceived by the broader CPD membership as being culturally sensitive. If they are perceived otherwise, they would also need to determine how to address those issues.

The IMT looks forward to the Professional Counseling Division's efforts to assess feedback to ensure that it is not only providing the appropriate services but to

ensure that the quality of services provided are being done with a culturally sensitive approach to wellness.

## Paragraph 393 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary |

# Officer Wellness and Support: ¶394

> **394.** *CPD will offer members referrals for counseling services by external clinical service providers, including, but not limited to, private therapists, specialists, outside agencies, or hospitals, when a member requires specialized counseling that is beyond the training and expertise of CPD's licensed mental health professionals or certified counselors.*

## Compliance Progress                   (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During this reporting period, the City and the CPD have maintained the Preliminary compliance with ¶394 but have not achieved Secondary compliance with this paragraph.

To assess Preliminary compliance with ¶394, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed various data relevant to compliance with the requirements of this paragraph.

For Secondary compliance, we interviewed the CPD counselors about external referrals and sought to review data measuring the frequency and efficacy of outside referrals that is necessary or helpful to identify, verify, and sustain compliance and reform efforts.

In previous reporting periods, the City and the CPD reached Preliminary compliance with ¶394 by addressing referral to third-party vendors in the *Officer Wellness Support Plan*, the *2021 Report to the Superintendent*, and Standard Operating Procedure (SOP) 19-01.

*Progress in the Fifth Reporting Period*

During the fifth reporting period, the CPD representatives explained the various forms of referrals, and several discussions have centered on scope of work, workload, and accessibility. During the virtual site visits, the IMT inquired about types of conditions, counseling, and services that are beyond the scope of the Professional Counseling Division's ability to provide the necessary counseling services and treatment.

The IMT was informed of specific circumstances that necessitated external referrals. These special circumstances include, for example, the need for long-term care, hospitalization, or the need for a psychiatrist. The Professional Counseling Division makes referrals both in state and out-of-state as their primary objective is to ensure that the facilities and other referral sources can meet the needs of those seeking treatment.

To reach additional levels of compliance, the Professional Counseling Division needs technology to adequately collect anonymized data reflecting the requirements of this paragraph. The IMT looks forward to seeing samples of anonymized treatment plans that reflect in-house services and those outside referrals that require needs to be met beyond the scope of the Professional Counseling Division.

### Paragraph 394 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Officer Wellness and Support: ¶395

**395.** *CPD will ensure that CPD members have access to: a. non-emergency, generalized counseling sessions with CPD's licensed mental health professionals within two weeks of a member's request; and b. generalized emergency counseling by CPD's licensed mental health professionals within 24 hours of a member's request.*

**Compliance Progress**          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD have maintained Preliminary compliance with ¶395 but have not achieved additional levels of compliance.

To assess Preliminary compliance with ¶395, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed various data relevant to compliance with the requirements of this paragraph.

For Secondary compliance, we interviewed the CPD counselors about the requirements of this paragraph and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶395 by finalizing Directive E06-01 and Standard Operating Procedure (SOP) 19-01. Collectively, these policies establish an on-call system whereby a licensed clinician will be available 24 hours a day to respond to all crises and traumatic incidents and that emergency counseling sessions will be conducted within 24 hours of the request.

For non-emergency situations, both policies note that general counseling sessions with the Employee Assistance Program (EAP) licensed mental-health professionals will be held within two weeks of a member's request. The IMT explained that to achieve additional levels of compliance, the IMT would need to review various forms of documentation supporting timely efforts to accommodate members' need for services.

Although the requirements of this paragraph are reflected in policy, the IMT has not received documentation to indicate that the span of time between request and rendering of support services adequately reflect the times stipulated within ¶395.

*Progress in the Fifth Reporting Period*

During a virtual site visit in this reporting period, the Professional Counseling Division indicated that the required turnaround times are occasionally challenged by the officers' schedules and various other demands. The Professional Counseling Division conveyed, however, that they have seen significant improvement in this area and have been intentional about connecting with CPD members as soon as possible. These concerns were also noted in the *2021 Report to the Superintendent*.

The discussion also addressed the clinical workload of six to eight sessions a day, which does prompt the reference to staff-related issues that warrant the need to determine what is optimal staffing for the Professional Counseling Division and its related workload. This concern is relative to ensuring the Professional Counseling Division prevents "burn out" experience for those trying to counsel on similar issues with the CPD members.

Technological advances are necessary to remedy staffing matters and to evaluate the individual caseloads, types of cases, duration of cases, and counseling services for individual clinicians. This will also help to determine what optimal workloads and other efficiencies look like.

The IMT looks forward to reviewing anonymized is data that shows the movement towards these greater efficiencies in meeting the needs of CPD personnel who require the Professional Counseling Division's services.

### Paragraph 395 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Officer Wellness and Support: ¶396

> **396.** *CPD will continue to ensure that any mental health counseling services provided to CPD members remain confidential in accordance with state law, federal law, and current CPD policy.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have maintained Preliminary compliance with ¶396 during the fifth reporting period.

To assess Preliminary compliance with ¶396, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To determine Secondary compliance with ¶396, we sought to review the CPD's training development, implementation, and evaluation.

### Progress before the Fifth Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary compliance by submitting Directive E06-01 and Standard Operating Procedure (SOP) 19-01. Both policies stress privacy and confidentiality. To achieve additional levels of compliance, the IMT needs to review training and systems designed to ensure confidentiality as outlined by E06-01 and SOP 19-01, paying particular attention to how the Professional Counseling Division communicates the confidentiality requirement to staff and members.

### Progress in the Fifth Reporting Period

During this fifth reporting period, the CPD has submitted several productions which are between initial review, no objection, and other stages in the Consent Decree review process. Several of the productions have been lesson plans to include Employee Assistance Program (EAP), Peer Support, Peer Support Refresher, Supervisor In-Service Training, and Officer In-Service Training. While these productions are well underway, the IMT looks forward to seeing these lesson plans presented and instructed. As noted in E06–01 and SOP 19-01, confidentiality and privacy should be significantly emphasized.

During the virtual site visits, the Professional Counseling Division articulated the importance of confidentiality and privacy, which included the meeting locations to ensure that the CPD members felt a sense of privacy during their visits. The importance of confidentiality and privacy extends to visits with chaplains, peer support members, and drug and alcohol counselors as well. The IMT looks forward to seeing instruction and other evidence that conveys the significance of confidentiality and privacy.

### Paragraph 396 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Officer Wellness and Support: ¶397

> **397.** *CPD will continue to ensure that licensed mental health professionals employed by the Professional Counseling Division do not participate in fitness for duty evaluations, which will be conducted exclusively by third-party licensed mental health professionals.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have maintained Preliminary compliance with ¶397 during the fifth reporting period but have not achieved Secondary compliance.

To assess Preliminary compliance with ¶397, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed various data relevant to compliance with the requirements of this paragraph.

For Secondary compliance, we interviewed the CPD counselors about the requirements of this paragraph and sought to review data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶397 by submitting Directive E06-01, *Professional Counseling Division (PCD) Policy*, which prohibits the Professional Counseling Division from participating in fitness-for-duty evaluations. The IMT explained that, to achieve future levels of compliance, the CPD would need to submit data that shows that the Professional Counseling Division is, in fact, not involved in fitness for duty evaluations. To provide this data, the City and the CPD will need to ensure that the Professional Counseling Division has an adequate technological solution in place to collect such data.

The requirements stipulated in E06–01 are clearly articulated that the "licensed mental health professionals employed by the EAP will not participate in the fitness for duty evaluations."

*Progress in the Fifth Reporting Period*

During the virtual site visit, the Professional Counseling Division discussion reflected a resounding affirmation that the Professional Counseling Division does not participate in fitness for duty evaluations and discussed the importance of not being involved in same as they are providing counseling to the various members of the CPD. The CPD, however, has not submitted data to support the Professional Counseling Division's affirmations. For future levels of compliance, the CPD would need to submit data that shows that the Professional Counseling Division is, in fact, not involved in fitness for duty evaluations.

The IMT looks forward to anonymized data reflective of the fitness for duty information, which should identify no involvement of the Professional Counseling Division.

### Paragraph 397 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Officer Wellness and Support: ¶398

> **398.** *CPD currently employs five drug and alcohol counselors, all of whom are sworn CPD officers operating under the supervision of the Director of the Professional Counseling Division. These counselors provide free counseling for alcohol and substance abuse. CPD will continue to offer counseling services to CPD members for alcohol and substance abuse.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During the fifth reporting period, the City and the CPD remained in Preliminary compliance with ¶398 but did not reach Secondary compliance.

To assess Preliminary compliance with ¶398, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed various data relevant to compliance with the requirements of this paragraph. For Secondary compliance with ¶398, we interviewed the CPD counselors about the requirements of this paragraph and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts.

### Progress before the Fifth Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶398 by including this paragraph's requirements in Standard Operating Procedure (SOP) 19-01 and Directive E06-01. Furthermore, SOP 19-01 supports ¶398 compliance by requiring that all drug and alcohol counselors will be certified by the State of Illinois.

During the fourth reporting period, three of the five counselors had received their certifications, and the other two counselors were in the process of receiving their certifications. The IMT explained that we would monitor the progress of the two remaining Professional Counseling Division members who were in the process of obtaining their drug and alcohol counseling certifications. More generally, the IMT would look for continual training of clinicians in areas related to substance and alcohol abuse.

The CPD currently has five drug and alcohol counselors on staff. As in the fourth reporting period, two of the drug and alcohol counselors are still awaiting their

certifications. The drug and alcohol counselors continue to hold regular scheduled counseling sessions with CPD personnel. They also make sure that CPD personnel are aware of AA meetings, No Cop Outs Meetings, and other group sessions that are specific to certain demographics of the members in attendance.

*Progress in the Fifth Reporting Period*

During the fifth period, the IMT met with the drug and alcohol counselors during a virtual site visit. The drug and alcohol counselors discussed the specific counseling services provided by the unit. This site visit allowed for discussion, which indicated there was an alcohol and drug supervisor position in the budget allocation that had not been filled since 2013. If this position has remained vacant for eight years, the IMT recommends that the Director of the Professional Counseling Division, CPD's human resources department, and budget personnel evaluate the reason why such a vacancy currently exists and to reconsider the need for that position.

With the anticipated hire of 11 more mental health counselors in 2022, the span of control will be broadened, and this vacant position could afford the Director a position with some greater management oversight of the Drug and Alcohol Counselors unit. If this evaluation of the position should occur, there may be a need to determine whether that the current sworn rank is indeed appropriate eight years later. It further allows for an opportunity to conduct a job task analysis to determine whether the position's current duties and responsibilities remain applicable given the expanded role and services provided by the Professional Counseling Division during the years the position has remained vacant.

More importantly, it is concerning to see a position vacant with the current demand for available services and resources for such an extended period. The IMT further recommends this evaluation as an opportunity for asset management and review. Anonymized data is necessary to determine whether the volume of services provided by this unit is adequate, efficient, and effective.

The IMT looks forward to seeing the continued training topics that reference the Professional Counseling Division services to further reduce the stigma by enhancing knowledge and understanding of the benefits of such Professional Counseling Division services. The IMT was apprised of the drug and alcohol services provided to CPD members both sworn and civilian alike. Additionally, it was noted that other City entities have sought assistance from the CPD drug and alcohol counselors as well.

The City and the CPD maintained Preliminary compliance with this paragraph but have not yet met Secondary compliance. We continue to seek anonymized data of the drug and alcohol services provided to include the various ranks, civilian and

sworn classifications, any non-CPD departments seeking services, and all other tracking-related data.

### Paragraph 398 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Officer Wellness and Support: ¶399

> **399.** *CPD will ensure the number of drug and alcohol counselors available, either on staff or through referrals, meets the needs of CPD members consistent with the needs assessment and the Officer Support System Plan.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶399 during the fifth reporting period.

To assess Preliminary compliance with ¶399, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed records that show whether the CPD has qualified personnel fulfilling the responsibilities required by ¶399. We considered whether the CPD has allocated sufficient resources to create, staff, fill, and maintain positions with qualified personnel as required by this paragraph.

For Secondary compliance with ¶399, we interviewed the CPD counselors about the requirements of this paragraph and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts.

### Progress before the Fifth Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶399 by creating guidance through Directive E06-01 and the *Officer Wellness Support Plan* for frequent provision of alcohol and substance use-related services, as well as guidance for tracking activities. However, to collect sufficient and reliable data that can be used to assess the extent to which services are meeting the needs of members, the City and the CPD must focus efforts on obtaining and implementing a technology solution. Additionally, we need to see evidence of data analyses related to the demand and available resources for substance and alcohol use counseling.

### Progress in the Fifth Reporting Period

During a virtual site visit, the IMT and the CPD counselors discussed the range of services offered, including individual and group counseling sessions. The group

counseling sessions are specific to certain demographics like the women's group sessions, No Cop Outs, co-ed, and other sessions. Additionally, the CPD counselors also refer services when needed. Those referrals have included, for example, intensive outpatient services and partial hospitalization programs where appropriate based on the CPD member's needs.

While there were several different types of referrals, the three primary ones include in-state, local, and some out-of-state services based on the resources that were available at the time of need as centers for a treatment evolve and change with regard for specific needs for treatment provided by either alcohol centers for treatment or centers that focus on drug and narcotic use.

Also, during the virtual site visit, the IMT inquired about the three primary sources of referrals that initiate the process for counseling services within the Professional Counseling Division. That information consisted of (1) direct calls to the Professional Counseling Division office from supervisors, (2) direct calls to the Professional Counseling Division office from family members, and (3) the individual CPD personnel reaching out for assistance.

The IMT did not receive specific data for ¶399 during the fifth reporting period, and thus, the City and the CPD maintained Preliminary compliance, but did not achieve Secondary compliance. To reach Secondary compliance, the IMT will look for related data going forward. Specifically, we would like to see data analyses regarding the primary source of referral for Professional Counseling Division services and regarding referrals to outside sources. Data analyses regarding duration of treatment would also be helpful for the Professional Counseling Division to evaluate its caseload and workflow efficiencies.

To reach Secondary compliance, the IMT will look for related data going forward.

### Paragraph 399 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Officer Wellness and Support: ¶400

**400.** *CPD will ensure that its drug and alcohol counselors are certified in Illinois as Certified Alcohol and Other Drug Abuse Counselors.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* **(FOURTH REPORTING PERIOD)** |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶400 during this fifth reporting period. They have not yet achieved Secondary compliance.

To assess Preliminary compliance with ¶400, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance with ¶398, we considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts.

### Progress before the Fifth Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary compliance by submitting Directive E06-01, which addresses the requirements of ¶400. However, in the fourth reporting period, the CPD only produced certifications for three of the five drug and alcohol counselors. The IMT explained we would continue to monitor the progress of the remaining two counselors as they work toward obtain their certifications, and welcome evidence of ongoing training related to substance abuse.

### Progress in the Fifth Reporting Period

By the end of the fifth reporting period, the remaining two counselors have yet to receive their certifications. Also, there is a pending vacancy for a drug and alcohol counselor in January 2022.

Given certification statuses, with the pending vacancy forthcoming in January 2022, the IMT recommends that the Professional Counseling Division consider an immediate posting for the vacancy to fill the position as soon as possible. Additionally, the IMT further encourages the Professional Counseling Division to attempt to coordinate the certification process more tightly. The time between

selection for the drug and alcohol counselor position and the counselor receiving their certification should be significantly narrowed and expedited.

For Secondary compliance, the IMT looks forward to seeing the certifications completed for the drug and alcohol counselors and future vacancies filled expeditiously.

### Paragraph 400 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Officer Wellness and Support: ¶401

> **401.** *CPD currently offers anonymous support groups and programs for alcoholism and other addictions. CPD will ensure that a licensed mental health professional assigned to the Professional Counseling Division oversees any such programs offered by CPD, that the programs adhere to generally accepted practices in the field of addiction treatment (e.g., 12-step addiction treatment program), and that each program is reviewed at least annually by the Director of the Professional Counseling Division.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**     Annual          ☑ **Not Yet Applicable**

**Preliminary:**     *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Full:**          *Not in Compliance*

The City and the CPD maintained Preliminary and Secondary compliance with ¶401 during this fifth reporting period. They have not yet achieved Full compliance.

To determine Preliminary and Secondary compliance with ¶401, we determined whether the CPD has a licensed health professional and whether the CPD's programs adhere to generally accepted practices as required by this paragraph.

To assess Full compliance with ¶401, we sought to determine whether the Professional Counseling Division Director is completing annual reviews of substance-use-disorder services as called for by the paragraph. To make this determination we reviewed a variety of information relevant to compliance, including document submissions of the City and the CPD, and communications with members and Professional Counseling Division clinicians and staff.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶401 by increasing staffing of the Employee Assistance Program with several substance-use-disorder-treatment counselors and demonstrating the organization and supervision or the services, clinicians, and number of members utilizing the services. However, the IMT had not yet received an annual review of the services conducted by the Director of the Professional Counseling Division. This annual review should include an assessment of each

program to ensure they are adhering to generally accepted practices in the field of addiction treatment. To achieve Full compliance, the IMT noted that a technology solution would be critical to allow the Professional Counseling Division to reliably and efficiently collect and review data, as well as providing evidence of the annual review of alcohol and substance abuse programs.

*Progress in the Fifth Reporting Period*

During a virtual site visit in the fifth reporting period, the IMT met with the Professional Counseling Division Director and the drug and alcohol counselors. The discussion addressed the various support groups and some of the programs that are specifically designed for alcohol, substance use, and other addictions to include but not limited to gambling and food addiction.

Presently, there are five drug and alcohol counselors, but there is an expected vacancy occurring at the beginning of 2022. By the end of this reporting period, two of the counselors were still not certified. The IMT strongly encourages the Professional Counseling Division Director to evaluate the process for certification with urgency to ensure that all necessary steps can be taken within their control to ensure the counselors are positioned to receive the certifications as soon as possible.

During the virtual site visit, the Professional Counseling Division referenced the various programs to include AA meetings, No Cop Outs meetings, virtual and in-person meetings, women's meetings, and other meetings that are available to other City departments, including the CFD members and civilian personnel.

To achieve additional levels of compliance, the CPD needs to provide various records and data, including meeting schedules, attendance data, and outside referrals. Additionally, the CPD should collect and analyze aggregate data to compare services for different types of addictions.

Thus, the City and the CPD have maintained Preliminary and Secondary compliance but have not yet reached Full compliance with this paragraph. We look forward to reviewing a comprehensive list of programs and the respective data regarding sworn and non-sworn members of the CPD to include frequency, accessibility, and other anonymized data.

## Paragraph 401 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Preliminary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Secondary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Secondary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Secondary

# Officer Wellness and Support: ¶402

**402.** *CPD will train all supervisors regarding recognizing signs and symptoms of alcoholism and substance abuse, how to recommend available support services to CPD members experiencing alcoholism and substance abuse issues, and their obligations under CPD policy to report members exhibiting signs of alcohol or drug impairment.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During the fifth reporting period, the City and the CPD have maintained Preliminary compliance, but have not yet achieved Secondary compliance with ¶402.

To assess Preliminary compliance with ¶402, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To determine Secondary compliance with ¶402, we reviewed the CPD's training development, implementation, and evaluation.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶402 by submitting Standard Operating Procedure (SOP) 19-01 and Directive E06-01. These policies include provisions requiring supervisors to be trained on the signs and symptoms of alcohol abuse, as well as be trained on recommending support services and reporting members exhibiting signs of impairment. The IMT explained that, to reach Secondary compliance, we would look for training developed for supervisors that provides guidance on how to fulfill these obligations. For Full compliance, the CPD would need to provide evidence of training completion and a plan for continued training on these topics.

*Progress in the Fifth Reporting Period*

During the fifth reporting period, we reviewed the *Employee Assistance Program Pre-Service Promotional* training. This training addresses ¶402's requirements and has received no objection notices from both the IMT and the Attorney General's Office. With the development of this training, the City and the CPD have made good progress toward Secondary compliance with this paragraph. However, this

training will need to be provided before they reach Secondary compliance. We look forward to seeing this training implemented in the next reporting period.

### Paragraph 402 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Officer Wellness and Support: ¶404

*404. CPD will maintain a peer support program, ensuring that: a. a licensed mental health professional assigned to the Professional Counseling Division oversees and adequately manages the program; b. Peer Support Officers receive initial training in stress management, grief management, officer wellness, obligations and limitations regarding confidentiality and privacy, communication skills, common psychological symptoms and conditions, suicide assessment and prevention, dependency and abuse, and support services available to CPD members; c. Peer Support Officers are trained to recommend the services offered by the Professional Counseling Division in situations that are beyond the scope of their training; d. CPD offers Peer Support Officers the opportunity to meet at least annually to share successful strategies and identify ways to enhance the program; e. Peer Support Officers receive and comply with a written procedures manual approved by a licensed mental health professional assigned to the Professional Counseling Division; f. Peer Support Officers are offered sufficient non-monetary incentives and recognition to ensure broad recruitment of volunteers and widespread access to peer support services; and g. the scope and quantity of peer support services provided to CPD members are identified in a manner that facilitates effective management of the program and that preserves the anonymity and confidentiality of members receiving peer support services.*

## Compliance Progress   (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Recurring Schedule:** | Annually | ☑ **Not Yet Applicable** |
| | * May 3, 2022, Extended from February 28, 2021, due to COVID-19 | |
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) | |
| **Secondary:** | *Not in Compliance* | |
| **Full:** | *Not Yet Assessed* | |

During the fifth reporting period, the City and the CPD maintained Preliminary compliance but have not yet achieved Secondary compliance with ¶404.

To evaluate Preliminary compliance with ¶404, we considered whether the CPD has allocated sufficient resources to maintain the peer support program and whether the CPD offers peer support officers the opportunity to meet at least annually to share strategies and enhance the program. We reviewed all accessible data relevant to ¶404 efforts, including records of meetings, and considered other

sources of data, such as communications with CPD members, and any policies developed regarding the peer support program.

To assess Secondary compliance, we considered the CPD's training development, implementation, and evaluation relevant to the various requirements of this paragraph, as well as other data sources showing implementation of programs or actions specified in relevant policies that direct compliance with the various subsections of this paragraph.

### Progress before the Fifth Reporting Period

In previous reporting periods, the City and the CPD reached Preliminary compliance with ¶404 by submitting Directive E06-01 and Standard Operating Procedure (SOP) 19-01, which create a framework under which the CPD can reach compliance with all subsections. The IMT reviewed documentation during the fourth reporting period showing that CPD approved an award for peer support leadership and held meetings with peer support members in 2020 and 2021. These documents demonstrate efforts in accord with the requirements of ¶404 (f) and (d).

Related specifically to the requirements of ¶404 (b) and (c), the CPD submitted revised *Peer Support Training* materials in February 2021 to which the IMT submitted a no-objection notice. The IMT explained to reach Secondary compliance, the City and the CPD will need to provide the *Peer Support Training* and submit documents showing the provision and completion of that training. Additionally, to comply with the requirements of subsection (g), the City and the CPD will need to implement a technology solution to track and assess scope and quantity of the peer support services provided to CPD members while also ensuring anonymity and confidentiality of members utilizing those services.

### Progress in the Fifth Reporting Period

In the fifth reporting period, the IMT reviewed the *Peer Support (8 Hour) Refresher Training* and provided feedback on the training materials. On the last review of these materials, the IMT and the Office of the Attorney's General Office offered no objection notices and indicated our desire to observe future training sessions as information is disseminated and training is conducted.

Also, in this reporting period, the IMT participated in a virtual site visit with the Professional Counseling Division and peer support officers. During the visit, we discussed the importance of management attending some version of training services that address various topics to include the Employee Assistance Program, supervisors training, Officer Support System, etc. We stressed that one unified

message is critical, and training information must be shared with the leadership as well.

During the virtual site visit, it was noted by the IMT that, as counselors responded to events, they often provide sustenance, refreshments, and nourishments for people they are responding to various incidents, via callouts and other officer-involved events. The IMT suggests that such expenses be recorded or coordinated to allow for compensation for purchases made—even if the reimbursement occurs later. The IMT encourages the Professional Counseling Division to review, during its next annual assessment process, Directive E06-01, and best practices regarding future budgetary allocations for the reimbursement of provisions (*i.e.*, coffee, donuts, pizza, tissue, etc.) purchased by the members of the Professional Counseling Division units while delivering counseling services.

The Peer Support Unit's annual meeting occurred during a previous reporting period. The IMT recommends a regularly scheduled time for its annual meeting to determine next steps and best practices to include revisions in practice and policy.

With the development of the *Peer Support Training* and the *Peer Support Refresher Training*, the City and the CPD have made great progress toward Secondary compliance. To achieve Secondary compliance, however, the CPD should provide evidence that the trainings have been provided. We also need to be provided with proper and detailed data assessments, which are currently unavailable due to the delay of technological advances. The IMT cannot assess the quality of such services at this time as the process by which to evaluate the services fully and comprehensively is not yet in place.

### Paragraph 404 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Officer Wellness and Support: ¶406

*406. By January 1, 2020, CPD will develop and adopt a standard operating procedure ("SOP") outlining the roles and responsibilities of the Chaplains Unit. The Chaplains Unit SOP will identify that: a. the purpose of the Chaplains Unit is to: i. support the wellness of CPD members who voluntarily seek consultation with representatives of the Chaplains Unit; ii. make referrals to licensed mental health professionals and other service providers, when appropriate; iii. provide pastoral care to CPD members who voluntarily seek such services; iv. offer voluntary preventive programs for the purposes of supporting, encouraging, and affirming CPD members in their professional and family lives; and v. provide support in moments of crisis as requested by CPD members. b. when acting in the official capacity of a CPD Chaplain, representatives of the Chaplains Unit will refrain from actions or statements that are inconsistent with CPD policy. c. representatives of the Chaplains Unit, including CPD members and non-CPD members, will receive training regarding the roles and responsibilities of the Chaplains Unit.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Full:**     *Not in Compliance*

The City and the CPD maintained Preliminary and Secondary compliance for ¶406 in the fifth reporting period. They have not yet achieved Full compliance.

To assess Preliminary compliance with ¶406, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To determine Secondary compliance with ¶406, we reviewed the CPD's training development, implementation, and evaluation.

To evaluate Full compliance with ¶406, we sought to determine whether the CPD had sufficiently implemented its policy and training resulting in the Chaplains Unit operating in a manner consistent with those materials. Additionally, we looked for evidence that the CPD implemented mechanisms to regularly assess whether the Chaplains Unit is operating in accordance with Standard Operating Procedure (SOP) 20-01 and whether adjustments should be made to the Chaplains Unit or SOP 20-01.

*Progress before the Fifth Reporting Period*

In prior reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶406 by revising and finalizing SOP 20-01 and submitting and revising the Chaplains Unit SOP training materials, along with documentation demonstrating the chaplains' review of the training materials. We did not, however, receive the necessary data to assess the Chaplains Unit operations, and therefore, the City and the CPD did not reach Full compliance.

*Progress in the Fifth Reporting Period*

During the fifth reporting period, we reviewed a revised version of SOP 20-01. The IMT appreciates the efforts made in this revised version and issued a no objection letter. However, in our no objection letter issued for the policy, we reiterated that the CPD should strongly consider changing the "pastoral care" language with more inclusive terminology as the represented religions do not all typically use "pastoral" in their respective terminology. Moreover, the CPD should consider including a provision for confidentiality if a chaplain's religious ordination does not provide for a confidentiality privilege.

Additionally, during this reporting period, the IMT participated in a virtual site visit with a few chaplains. During the visit, we learned that the CPD currently has five full time chaplains and two part-time chaplains. We also learned of a new CPD member tracking form that the chaplains are currently using to collect data from their scheduled and unscheduled visits and encounters with CPD members.

It was also shared with the IMT that the chaplains attend roll calls and are located at the police academy for greater access to staff. Members of the Chaplain's Unit also discussed specific programs and innovative efforts designed to further promote CPD members' wellness. For instance, the Chaplain's Unit is organizing a couple's retreat and received some grant funding to reduce the overall cost of attendance for couples. This retreat is scheduled during the next reporting period, and we look forward to seeing the reported results of the event along with other data currently collected on the tracking forms. We encourage the Chaplains' Unit to continue seeking opportunities that may offer enhanced services to CPD members. The IMT appreciates having the opportunity to learn about individual chaplain's experiences.

We stress the importance of data collection to analyze where the unit's greatest resources are being expended and where potential gaps in services exist. While the chaplains are manually tracking information on the CPD member tracking form, a technology solution would more efficiently analyze the appropriate data.

The City and the CPD maintained Preliminary and Secondary compliance with this paragraph. To reach Full compliance, the City and the CPD will need to demonstrate the data collection and analysis process. Additionally, the IMT will need to review training records for the chaplains. While chaplains receive training from their respective faiths, the Professional Counseling Division should seek training opportunities that are available to chaplains beyond the training they receive via their faith training.

### Paragraph 406 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Officer Wellness and Support: ¶407

**407.** *CPD will continue to require that whenever a CPD member has experienced a duty-related traumatic incident, the member must attend counseling with a licensed mental health professional. The Director of the Professional Counseling Division or his or her designee will be responsible for documenting that a CPD member has attended the mandatory counseling and has completed the requirements of the Traumatic Incident Stress Management Program prior to the member returning to regular duty assignment. CPD will require any CPD member who has experienced a duty-related traumatic incident, unless medically unable to do so, to meet with a licensed mental health professional within seven days of the incident, and will ensure that it has an adequate staff of licensed mental health professionals who can accommodate this timing requirement.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

During this reporting period, the City and the CPD maintained Preliminary compliance with ¶407 but did not reach additional levels of compliance.

To evaluate Preliminary compliance with ¶407, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree. For Secondary compliance with this paragraph, we reviewed the CPD's training development, implementation, and evaluation.

### Progress before the Fifth Reporting Period

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶407 after finalizing the *Traumatic Incident Stress Management Program* (TISMP) directive (E06-03). The CPD also submitted clinicians' training materials for the Traumatic Incident Stress Management Program in the fourth reporting period. However, the IMT did not receive revised training materials for the Traumatic Incident Stress Management Program in the fifth reporting period. Because the CPD had not finalized the training, the CPD had not yet reached Secondary compliance with the paragraph. We hope to see revisions in the next reporting period.

We do note, however, that the *Annual Supervisor In-Service* training (2022) includes an instructional note to disseminate E06-03, among other resources, during the training. This topic area is also presented later in the training's lesson plan. The IMT appreciates that the CPD ensured that the policy was provided to each student.

*Progress in the Fifth Reporting Period*

During a virtual site visit with the Professional Counseling Division, the range of 24 hours to two weeks for counseling visits for employees who are involved in traumatic incidents was addressed as a follow-up noted in the *Annual Report to the Superintendent*. The notation referenced the importance of reducing the turnaround time for scheduled appointments. During the virtual site visit discussion, the Professional Counseling Division noted they can offer appointments within a few days of the initial call, but also acknowledged there are times where the face-to-face meeting is immediate and within the 24 hours depending on the circumstances. The IMT and Professional Counseling Division also discussed the high caseload and the average visits per day per counselor, which can sometimes interfere or cause a delay in scheduling.

The IMT must reiterate the significance of having the data to draw from and being able to review anonymized records. Again, the Professional Counseling Division needs to review its own data to see where it is best positioned to provide adequate and qualitative services to the members of the CPD in emergencies, ongoing counseling sessions, and newly scheduled visits. These services are crucial. Timeliness, planning, and efficient delivery of services that can be supported by data-driven analyses will be necessary to reach additional levels of compliance.

The City and the CPD maintained Preliminary compliance with ¶407 during this reporting period, but have yet to demonstrate additional levels of compliance. Moving forward, the City and the CPD should finalize the Traumatic Incident Stress Management Program training and implement technology solutions to adequately track the necessary data.

### Paragraph 407 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Officer Wellness and Support: ¶408

> **408.** *In addition to providing mandatory initial consultations and additional consultations as appropriate or as requested by CPD members, CPD's licensed mental health professionals will follow up with members who have experienced a duty-related traumatic incident within six months to offer additional support services.*

## Compliance Progress　　　　(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶408 during the fifth reporting period.

To evaluate Preliminary compliance with ¶408, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To assess Secondary compliance, we need to review the CPD's training development, implementation, and evaluation.

### Progress before the Fifth Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶408 by establishing language in *Traumatic Incident Stress Management Program* (TISMP) Directive E06-03 that the Professional Counseling Division personnel follow up with members released from the Traumatic Incident Stress Management Program within six months to offer additional support services. As with ¶407, the CPD did not reach Secondary compliance during the fourth reporting period because the CPD did not provide the IMT with evidence that the Traumatic Incident Stress Management Program clinicians' training materials were finalized and delivered.

Although the *Traumatic Incident Stress Management Program* directive has been finalized and the public comment period occurred during the fourth period, the IMT has not reviewed any records that have addressed the sixth month follow-up that is required by ¶408. This data will be necessary to further consider Full compliance.

Additionally, the IMT will need to review the additional data that will support: (1) additional services, (2) completion of counseling services, or (3) any related referrals beyond the services provided by Professional Counseling Division. The

IMT also looks forward to a finalized review of the Traumatic Incident Stress Management Program training materials in a future reporting period.

*Progress in the Fifth Reporting Period*

During a recent meeting, the Professional Counseling Division provided a status update regarding several Officer Wellness and Support paragraphs. We were apprised that various curricula were being reviewed and eLearning was under development to be produced in early 2022.

The IMT does have concerns about the duration of time it takes from the development of a lesson plan through its instructional period. We would prefer to see a more expedited effort by the CPD to ensure that timely information is presented as soon as possible so that a 2021 Lesson Plan does not become a 2022 Lesson Plan.

### Paragraph 408 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Officer Wellness and Support: ¶409

> **409.** *CPD has implemented a mandatory program for members who have experienced an officer-involved firearms discharge that consists of peer group discussions and other components. CPD will ensure that this program is overseen by a licensed mental health professional assigned to the Professional Counseling Division, reflects best practices, and comports with CPD's use of force policies and training.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶409.

To evaluate Preliminary compliance with ¶409, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To assess Secondary compliance, we need to review the CPD's training development, implementation, and evaluation.

### Progress before the Fifth Reporting Period

In the first reporting period, the City and the CPD achieved Preliminary compliance with ¶409 by implementing a mandatory, Commission on Accreditation for Law Enforcement Agencies (CALEA) qualified program for officers who have experienced an officer-involved firearm discharge. The CPD maintained Preliminary compliance with ¶409 before reporting periods by finalizing the *Traumatic Incident Stress Management Program* (TISMP) Directive E06-03. The IMT reviewed training materials for clinicians for the Traumatic Incident Stress Management Program in February 2021 and provided comments. To reach Secondary compliance, the IMT explained that the City and the CPD would need to complete the training materials and provide evidence that the training has been delivered along with an accounting of attendees and the other instructional delivery-related data.

### Progress in the Fifth Reporting Period

Although the CPD submitted the Traumatic Incident Stress Management Program training for review in February 2021, the training has yet to be finalized and

provided by the end of the fifth reporting period. Thus, the City and the CPD have yet to reach Secondary compliance with this paragraph.

Moving forward, the IMT seeks records showing oversight and review, by a licensed mental health professional, of the mandatory program and its review process to ensure best practices and comports with the CPD's use-of-force policies in training. The IMT looks forward to seeing these steps taken in the upcoming reporting periods.

### Paragraph 409 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Officer Wellness and Support: ¶410

> **410.** *CPD will continue to place any CPD member who has discharged a firearm, excluding training discharges, unintentional discharges, or discharges for the destruction of an animal where no person was injured, on mandatory administrative duty assignment for a minimum period of 30 days. Prior to permitting the member to return to regular field duties, CPD will require the member to (a) complete the Traumatic Incident Stress Management Program and any training determined by CPD to be appropriate; and (b) receive authorization from the First Deputy Superintendent. Authorization to return to regular field duties may be withheld pending the outcome of any administrative or criminal investigation.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD remained in Preliminary compliance with ¶410 during the fifth reporting period.

To evaluate Preliminary compliance with ¶410, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed the data sources relevant to compliance with the paragraph. We paid particular attention to the City and the CPD's acquisition or implementation of a technological solution that allows for reliable data tracking now and in the future.

### Progress before the Fifth Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶410 by finalizing the *Traumatic Incident Stress Management Program* (TISMP) Directive E06-03. This directive clearly defines the types of firearm discharges that mandate Traumatic Incident Stress Management Program referral. In addition, E06-03 requires the Professional Counseling Division to notify the Office of First Deputy Superintendent when a member who was referred to the Traumatic Incident Stress Management Program due to a firearm discharge is released from the program. The policy also requires members who have discharged a firearm to respond consistent with another CPD directive, *Firearm*

*Discharge Incidents Authorized Use and Post-Discharge Administrative Procedures*, G03-02-03.

To reach Secondary compliance, the City and the CPD will need to implement a technology solution that allows for data collection and analysis to track the Professional Counseling Division unit's and members' compliance effectively and accurately with this directive.

*Progress in the Fifth Reporting Period*

During the fifth reporting period, the IMT was not presented with any of the data sources to support compliance with ¶410 specific to Secondary compliance. A solution is needed to ensure that reliable tracking procedures exist for future reporting periods to attain further compliance.

### Paragraph 410 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Officer Wellness and Support: ¶411

> **411.** *At least annually, CPD will determine whether members who have experienced a duty-related traumatic incident have attended the mandatory counseling sessions and have completed the Traumatic Incident Stress Management Program.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**   Annual       ☑ **Not Yet Applicable**

**Preliminary:**    *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**     *Not in Compliance*
**Full:**          *Not Yet Assessed*

During the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶411.

To assess Preliminary compliance with ¶411, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary Compliance, we reviewed the CPD's training development, implementation, and evaluation. We also sought to review records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities delineated by ¶411.

### Progress before the Fifth Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶411 by submitting a CPD Audit Unit report providing a review of the Traumatic Incident Stress Management Program (TISMP) and including ¶411's requirements into Directive E06-03. Specifically, E06-03 requires the Audit Division to:

> *conduct an annual assessment to determine the extent to which members who experience traumatic incidents are referred to the [TISMP] and the extent to which referred members attend the mandatory debriefing session(s), complete the [TISMP], and receive follow-up communication and support services.*

The CPD did not provide the required annual assessment by the end of the fourth reporting period, and thus, did not reach Secondary compliance. To reach Secondary compliance, we explained that the City and the CPD would need to provide evidence of an annual review, as well as implement a technology solution

to allow for reliable and efficient tracking of compliance with ¶411. We also explained that we would look for the City and the CPD to train personnel to appropriately analyze data on program compliance which will then inform the annual review and report.

*Progress in the Fifth Reporting Period*

The IMT did not receive the required annual assessment during the fifth reporting period. We reiterate the importance of implementing a technology solution, and we await the basic data to determine Secondary compliance.

As noted previously, the City and the CPD will also need to train personnel to appropriately analyze data on program compliance to produce efficient and accurate reports. The IMT looks forward to CPD's annual assessment in future reporting periods.

### Paragraph 411 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Officer Wellness and Support: ¶412

> *412. Where it would add to the quality or effectiveness of the training, CPD will involve mental health professionals, as feasible, practical, and appropriate, in developing and reviewing recruit and in-service training on stress management, alcohol and substance abuse, officer wellness, and the support services available to CPD members.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

During this reporting period, the City and the CPD reached Preliminary compliance ¶412.

To evaluate Preliminary compliance with ¶412, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-641), which outlines applicable consultation, resolution, workout, and public comments periods.

*Progress before the Fifth Reporting Period*

In the third reporting period, we provided a status update stating the CPD had engaged the expertise of several outside professionals to assist in the development of a variety of programs and materials. In the fourth reporting period, the CPD revised Special Order S11-10, *Department Training*, which includes mental-health experts among the list of outside experts to be called on, and the IMT provided a no-objection notice. The CPD also partnered with several outside professionals in the development and delivery of the *In-Service Officer Wellness* training materials, to which we submitted a no-objection notice.

The CPD also produced the *Employee Assistance Program (EAP) Recruit Training* curriculum and lesson plans, presented by a licensed professional from the Professional Counseling Division. With the CPD's involvement of outside experts in developing these training materials, the IMT explained that the CPD has made significant progress toward Preliminary compliance. However, the IMT indicated that we would continue to look for evidence that the S11-10 is finalized and that trainings have been delivered to members.

*Progress in the Fifth Reporting Period*

During the fourth and fifth reporting period, the CPD had submitted several Officer Wellness training curricula, including the *2021 In-Service Officer Wellness Training*, the *EAP Pre-Service Promotional Training*, and the *EAP Recruit Training*.

The IMT was able to observe the delivery of the *2021 In-Service Officer Wellness Training* in this reporting period, which was followed up with a bi-weekly meeting and a virtual site visit discussion with members of the Professional Counseling Division to discuss observation of the curriculum delivery and instruction. Additionally, the IMT was able to observe the financial wellness topical area conducted by representative from an external resource.

In the fifth reporting period, a member of an outside mental-health resource attended an officer wellness meeting to discuss steps taken to develop curriculum and programming. The partnership with other mental-health professionals is a significant aspect of both the training development and providing services to CPD members to ensure that practices remain both relevant and current in providing services to the CPD members. Appendix G of the *2021 Training Plan* includes a list of external resources and subject-matter experts who have provided input in the development of specific training material and who have delivered instruction of the lesson plan.

The CPD also finalized S11-10 during the fifth reporting period, which addresses the requirements of this paragraph.[3] Therefore, the City and the CPD met Preliminary compliance with ¶412. Moving forward, we will look for evidence that shows trainings have been delivered to the members.

### Paragraph 412 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Preliminary | |

---

[3]    In the most recent production, the City inadvertently submitted Special Order S11-10, *Department Training*, without reference to ¶412. As a result, the City and the CPD may need to address and consider additional input from the OAG.

# Officer Wellness and Support: ¶413

> *413. CPD will involve experts, such as psychologists and cognitive and behavioral scientists, in developing training on use of force where their expertise would enhance the effectiveness of the training. The training topics that may benefit from such expertise could include: a. peer intervention by fellow officers to stop the use of excessive force; b. the interaction of human perception and threat assessment; and c. de-escalation and defusing techniques, including psychological methods of situation control, verbal control and communication, conflict resolution, and anger management.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶413 during the fifth reporting period.

To evaluate Preliminary compliance with ¶413, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-641), which outlines applicable consultation, resolution, workout, and public comments periods.

### Progress before the Fifth Reporting Period

In the third reporting period, we provided a status update, indicating we had reviewed documents reflecting the CPD's engagement of behavioral science experts in developing a variety of trainings. In the fourth reporting period, in addition to reviewing revisions to Special Order S11-10, *Department Training*, as discussed in ¶412 above, we reviewed the City and the CPD's *2021 Training Plan*. However, the IMT explained that while the City and the CPD have made progress towards Preliminary compliance with ¶413, we would look for evidence that the S11-10 is finalized. To reach Secondary compliance, we explained that the CPD would need to provide evidence that the trainings have been delivered to members.

### Progress in the Fifth Reporting Period

During the fifth reporting period, the IMT reviewed and provided comments on the *2021 Training Plan*. We acknowledge the work necessary to develop a

comprehensive training plan and the challenges of developing and implementing training during a pandemic. We appreciate the CPD's efforts to involve outside expertise to develop and review CPD curricula and to incorporate experts and guest speakers in the instruction. The outside experts are noted in Appendix G of the *2021 Training Plan*.

The CPD also finalized S11-10 during the fifth reporting period, which addresses the requirements of this paragraph.[4] Therefore, the City and the CPD met Preliminary compliance with ¶413. Moving forward, we will look for evidence that shows the relevant trainings have been delivered.

### Paragraph 413 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Preliminary | |

---

[4]   In the most recent production, the City inadvertently submitted Special Order S11-10, *Department Training*, without reference to ¶413. As a result, the City and the CPD may need to address and consider additional input from the OAG.

# Officer Wellness and Support: ¶414

> **414.** *CPD will ensure that all CPD members are provided in-service training on stress management, alcohol and substance abuse, and officer wellness at least every three years. CPD will include training regarding stress management, alcohol and substance abuse, officer wellness, and support services in the recruit training program.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary compliance with ¶414 during the fifth reporting period. They remain under assessment for Secondary compliance.

To assess Preliminary compliance with ¶414, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-641), which outlines applicable consultation, resolution, workout, and public comments periods. We also reviewed training materials that demonstrate the development of programs relevant to compliance with ¶414. To evaluate Secondary compliance with ¶414, the IMT reviewed the CPD's training development, implementation, and evaluation (¶286). For Full compliance, we will need to determine whether the CPD offers sufficient recruit training and in-services training on stress management, substance abuse, and officer wellness.

### Progress before the Fifth Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶414 by (1) submitting curricula for the Officer Wellness Training and the Employee Assistance Program (EAP) Pre-Service Promotional Training and (2) including verbiage in *Traumatic Incident Stress Management Program* (TISMP) Directive E06-01 that satisfies the requirements of ¶414. The CPD also submitted and revised *2021 In-Service Officer Wellness Training* materials, to which the IMT provided a no-objection notice. The IMT learned this training began in June 2021 and anticipated receiving evidence that all officers received this training in the fifth reporting period.

### Progress in the Fifth Reporting Period

At the close of the fifth reporting period, the CPD submitted the *EAP Recruit Training Course Production* to be reviewed by the IMT. With several

recommendations and comments reporting from the IMT, the City and the CPD will remain in Preliminary compliance while under assessment for Secondary compliance. The IMT requested these materials, and explained that to reach Secondary compliance, the CPD will need to submit the *EAP Recruit Course Training* materials and proof that these trainings have been delivered to all members of the CPD.

During the fifth reporting period, the IMT observed the In-Service Officer Wellness training to CPD members. The instruction included presentations, video, Q&A, and practical aspects of yoga. Although the IMT observed the class virtually and could not see the students, the IMT could observe the instructor and hear the level of engagement with the students. The IMT was also able to follow up with both questions and provide an overview of the class observation with members of the Professional Counseling Division.

However, the IMT did not receive any attendance records or any related data in this reporting period indicating attendance and the percentage of CPD membership that have yet to receive the training. The IMT looks forward to reviewing the respective data following the course instruction in a future reporting period.

Thus, the City and the CPD have maintained Preliminary compliance, but remain under assessment for Secondary compliance with ¶414.

### Paragraph 414 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Officer Wellness and Support: ¶415

**415.** *By July 1, 2020, and periodically thereafter, CPD will conduct a department-wide equipment and technology audit to determine what equipment is outdated, broken, or otherwise in need of repair or replacement. During each audit, CPD will solicit feedback from representatives of the collective bargaining units representing CPD members.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Ongoing            ☐ **Met**    ☑ **Missed**

**Preliminary:**        *Not in Compliance*
**Secondary:**        *Not Yet Assessed*
**Full:**            *Not Yet Assessed*

The City and the CPD have not yet met Preliminary compliance with ¶415 by the end of the fifth reporting period.

To assess Preliminary compliance with ¶415, the IMT sought to review the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comments periods. Specifically, we looked for the City and the CPD to develop a policy requiring periodic audits and specifying how and when the audits should be completed to adequately identify the current state of technology in CPD's possession and provide sufficient details to allow the CPD to quickly determine what technology or equipment is outdated, broken, or otherwise in need of repair or replacement.

*Progress before the Fifth Reporting Period*

In prior reporting periods, the City and the CPD did not reached Preliminary compliance because they did not provide evidence that a policy has been created to direct the completion of periodic audits as required by ¶415. Additionally, we note that ¶415 calls for equipment and technology audits to be conducted "periodically." When the City and the CPD draft a policy to guide compliance with this paragraph, they should include a timing requirement that guides the frequency of these audits. Once this policy is finalized, we will look for the CPD to meet its own deadlines for completing the department-wide equipment and technology audits.

Despite the lack of a policy, during the fourth reporting period, the City and the CPD submitted an Equipment and Technology Audit. While we appreciate the

efforts in completing this audit, it did not fully address the requirements of ¶415. Specifically, the audit did not provide a full and clear picture of (1) the equipment and technology in the CPD's possession; (2) the state of that equipment and technology; or (3) any recommendations for addressing any identified concerns or problems with CPD's equipment or technology. Moreover, we have not received indication that all collective-bargaining units were consulted in the completion of this audit. The IMT indicated that the City and the CPD would need to submit a policy that guides compliance with ¶415, and include all requirements set out in ¶415 in the Equipment and Technology Audit.

*Progress in the Fifth Reporting Period*

The IMT did not receive any materials pertaining to this paragraph during the fifth reporting period. We reiterate the need for a policy that memorializes the requirements of ¶415. Any such policy should clearly articulate this paragraph's requirements, including timelines for the audits to occur in the future and the assessment of the audit's findings.

The March 19, 2021 Audit from the CPD appears to be a basic IT assessment of some of the technology equipment the CPD has available. A true audit would afford the CPD to support proposals and budgetary forecasting for some of the technology needs that are frequently reiterated in the IMT reports.

Having not met the requirements for ¶415, the IMT will look for future evidence that addresses a true framework of an audit process in subsequent reporting periods.

### Paragraph 415 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Officer Wellness and Support: ¶416

> **416.** *Within 90 days of the completion of the initial audit, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs for repair or replacement of equipment and technology as identified through the needs assessment ("Equipment and Technology Audit Response Plan"). CPD will implement the Equipment and Technology Audit Response Plan in accordance with the specified timeline for implementation.*

## Compliance Progress            (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Deadline:**           Moving              ☑ **Not Yet Applicable**

**Preliminary:**        *Not in Compliance*
**Secondary:**          *Not Yet Assessed*
**Full:**               *Not Yet Assessed*

The City and the CPD have not met Preliminary compliance with ¶416 by the end of the fifth reporting period.

To assess Preliminary compliance with ¶416, the IMT sought to review the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-641), which outline applicable consultation, resolution, workout, and public comments periods.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the City and the CPD did not reach Preliminary compliance with ¶416. The IMT provided a status update in the third reporting period indicating we had not received any documents demonstrating compliance with this paragraph. As noted in our assessment of ¶415, the City and the CPD have not completed a sufficient technology and equipment audit. Without an adequate audit, the City and the CPD are unable to reach compliance with ¶416. We noted that, although the City and the CPD completed an audit—one which did not satisfy ¶415—they did not produce any additional documentation to show that the CPD developed an Equipment and Technology Audit Response plan to address the issues identified in the audit. Because of this the City and the CPD have not reached Preliminary compliance with ¶416.

*Progress in the Fifth Reporting Period*

The requirements of ¶416 cannot be met without also meeting ¶415's requirements. As noted earlier, ¶415 requires a periodically scheduled audit to be conducted and details produced to determine the status of equipment and technology. While the City produced a simplistic audit, they did not produce a comprehensive audit to meet ¶415's requirements, nor did the IMT receive evidence that the representatives of the collective bargaining units provided feedback.

Without the comprehensive initial audit, the CPD cannot meet the requirements of ¶416, which call for producing a plan to include a timeline for future audits in efforts to prioritize needs, repairs, and replacement of equipment and technology.

As noted in ¶415, a comprehensive audit could afford the city and the CPD to build a replacement, repair, disposal report that could later be used for budgetary planning and forecasting in the future.

The IMT looks forward to an update regarding ¶416 and next steps to remedy this multi-faceted issue to reach Preliminary compliance.

### Paragraph 416 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Officer Wellness and Support: ¶417

> *417. As a component of the Equipment and Technology Audit Response Plan, CPD will develop a schedule for future periodic audits. The schedule will specify the time period within which future periodic audits will occur. The time period may vary for different equipment types to account for differences in the expected useful life of different equipment types. CPD will perform the periodic audits in accordance with the schedule.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD remain out of Preliminary compliance with ¶417 during the fifth reporting.

To evaluate Preliminary compliance with ¶417, the IMT sought to review the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-641), which outline applicable consultation, resolution, workout, and public comments periods.

### Progress before the Fifth Reporting Period

The IMT provided a status update in the third reporting period stating the CPD's ability to comply with this paragraph was stalled because it needed to implement a new Inventory Control System. As mentioned in our assessment of ¶¶415–16, the City and the CPD have not developed a policy to guide the process or procedures—including a schedule—for engaging in periodic audits of technology and equipment. Because of this the City and the CPD did not reach Preliminary compliance with ¶417.

### Progress in the Fifth Reporting Period

Paragraph 417 is a subsequent paragraph to processes involving ¶¶415–16. To date, the IMT has not received any updated information regarding the creation of a comprehensive equipment and technology audit. As noted in the fourth reporting period, a scheduled audit to be conducted "periodically" would provide a timing requirement that would serve as a guide for the frequency of such audits in the future. Without a policy that creates the framework for processes, scheduling future audits, requirements of the audits, and steps to take follow in the audit report, ¶¶415–17 cannot reach Preliminary compliance.

The IMT looks forward to future updates regarding ¶417 and the next steps to remedy this paragraph of the Consent Decree.

### Paragraph 417 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Officer Wellness and Support: ¶418

**418.** *In order to facilitate physical health and mental well-being, CPD will ensure its members have access to exercise equipment at CPD facilities in geographically dispersed areas throughout the City.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD remain in Preliminary compliance with ¶418 during the fifth reporting period but did not achieve additional levels of compliance.

To evaluate Preliminary compliance with ¶418, we reviewed lists provided by the CPD accounting for the exercise equipment in the CPD's possession and listing the location of the equipment. For Secondary compliance, we reviewed various data sources to determine whether the City has conducted a survey to ensure that equipment is dispersed throughout Chicago to meet the demand in each location.

### Progress before the Fifth Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶418 by submitting information which accounted for the exercise equipment possessed by the CPD, along with the location of that equipment. The IMT stated that moving forward, we will look for evidence that the City has conducted a survey to ensure the exercise equipment is dispersed throughout the city such that it meets the demands present in each location. Additionally, future equipment audits should report on the condition of this equipment.

### Progress in the Fifth Reporting Period

During the fifth reporting period, the IMT did not receive any evidence reflective of the survey that the IMT referenced in the previous reporting period, which is necessary for Secondary compliance. During the fifth reporting period, the IMT reviewed the prior productions listing the equipment gym equipment at the various locations. However, the IMT noted that some documentation showed serial numbers but not the equipment item or name, which makes it difficult to know what type of equipment the serial number is attached to at the various locations for inventory purposes and future replacement purposes.

Without identity of the equipment and without a means of determining access and utility of the equipment, meeting the requirements of ¶418 create a challenge. The IMT looks forward to both the survey to determine access to equipment and locations and clarification and identification of the type of equipment listed on the previous productions.

### Paragraph 418 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Appendix 9
# Accountability and Transparency
# Compliance Assessments, by Paragraph

# Appendix 9
# Accountability and Transparency
# Compliance Assessments, by Paragraph

| | | | |
|---|---|---|---|
| ¶424 | ¶457 | ¶492 | ¶528 |
| ¶425 | ¶459 | ¶493 | ¶529 |
| ¶426 | ¶460 | ¶494 | ¶530 |
| ¶427 | ¶461 | ¶495 | ¶532 |
| ¶428 | ¶462 | ¶496 | ¶533 |
| ¶429 | ¶463 | ¶497 | ¶534 |
| ¶430 | ¶464 | ¶498 | ¶536 |
| ¶431 | ¶465 | ¶499 | ¶537 |
| ¶432 | ¶466 | ¶500 | ¶538 |
| ¶433 | ¶467 | ¶501 | ¶539 |
| ¶434 | ¶468 | ¶502 | ¶540 |
| ¶435 | ¶469 | ¶503 | ¶541 |
| ¶436 | ¶470 | ¶504 | ¶542 |
| ¶437 | ¶471 | ¶505 | ¶543 |
| ¶438 | ¶472 | ¶506 | ¶545 |
| ¶439 | ¶473 | ¶507 | ¶546 |
| ¶440 | ¶474 | ¶508 | ¶547 |
| ¶441 | ¶475 | ¶509 | ¶548 |
| ¶442 | ¶476 | ¶511 | ¶549 |
| ¶443 | ¶477 | ¶512 | ¶550 |
| ¶444 | ¶478 | ¶513 | ¶551 |
| ¶445 | ¶479 | ¶514 | ¶552 |
| ¶446 | ¶480 | ¶515 | ¶553 |
| ¶447 | ¶481 | ¶516 | ¶554 |
| ¶448 | ¶482 | ¶517 | ¶555 |
| ¶449 | ¶483 | ¶518 | ¶556 |
| ¶450 | ¶484 | ¶519 | ¶557 |
| ¶451 | ¶486 | ¶522 | ¶558 |
| ¶452 | ¶487 | ¶523 | ¶559 |
| ¶453 | ¶488 | ¶524 | ¶561 |
| ¶454 | ¶489 | ¶525 | ¶562 |
| ¶455 | ¶490 | ¶526 | ¶563 |
| ¶456 | ¶491 | ¶527 | ¶565 |

# Accountability and Transparency: ¶424

> **424.** *When members of the public submit complaints to the City ("complainants"), those complaints must be courteously received, properly classified, and efficiently investigated. Throughout a non-criminal investigation of the actions of a member (an "administrative investigation"), complainants should be able to track the status of their complaints and receive current, accurate information.*

| Compliance Progress | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|
| **Preliminary:** | *In Compliance* (NEW)[1] |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

This reporting period marks the first time we have assessed the City's compliance with ¶424. The City is working toward compliance with this paragraph through the efforts of the CPD and COPA. By the end of the fifth reporting period, COPA had finalized policies and completed training related to ¶424, and the CPD had finalized a policy related to ¶424. Through these efforts the City reached Preliminary compliance with this paragraph.

To evaluate Preliminary compliance with ¶424, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[2] These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms."

---

[1] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[2] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for the Civilian Office of Police Accountability (COPA), Illinois v. Chicago*, Case No. 17-cv-6260 (January 30, 2020), https://cpdmonitoringteam.com/wp-con-

In the fifth reporting period, the CPD and its Bureau of Internal Affairs (BIA) compiled and provided drafts of various directives that are relevant to the requirements of ¶424. General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which was subject to extensive collaborative review, posted for public comment, and on December 31, 2021, finalized by the CPD, completely addresses the requirements set out in ¶424. With this, the CPD reached Preliminary compliance with this paragraph.

Additionally, in previous reporting periods, BIA provided draft Unit Directives that relate to the mandates of ¶424, including *Initiation of Log Numbers in the Case Management System*. This Unit Directive instructs compliance with part of ¶424 by requiring that misconduct complaints be courteously received, properly classified, and efficiently investigated. While we submitted a no-objection notice to this Unit Directive in June, 2021, BIA has not posted this Unit Directive for public comment and finished the Unit Directive.

COPA has also made efforts relevant to ¶424. In the fourth reporting period, COPA finalized Policy 3.1.1, *Intake*. This policy speaks to ¶424's requirement that complainants "be able to track the status of their complaints and receive current, accurate information." Additionally, COPA posted for public comment and finalized Policy 3.1.2, *Fact Gathering & Investigative Process*, in the fifth reporting period, which reinforces that the complaint will be courteously received and processed. With this, COPA reached Preliminary compliance.

In the fifth reporting period, COPA revised its *Intake Unit: Overview of Policies and Procedures In-Service* training. This training instructs trainees how to respond to complaints in a manner compliant with ¶424. The training also makes trainees aware of the complaint system which allows complainants to track the status of their complaints and instructs trainees on their part of ensuring that this information is available to complainants. We submitted a no-objection notice to this training and COPA submitted evidence that 99% of its personnel completed this training during the fifth reporting period. With this, COPA reached Secondary compliance.

By finalizing policies that direct compliance with ¶424's requirements, both BIA and COPA reached Preliminary compliance in the fifth reporting period. COPA also reached Secondary compliance by developing and providing its *Intake Unit: Overview of Policies and Procedures In-Service* training.

---

tent/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for.__.pdf. The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

Moving forward, we will look for the CPD to develop training instructing compliance with their policies and ¶424. Additionally, we will look for BIA to post for public comment and finalize its *Initiation of Log Numbers in the Case Management System* Unit Directives and other Unit Directives that outline the procedure through which BIA will instruct compliance with ¶424's mandate. *See also* ¶545.

For COPA, we will look for evidence that COPA has followed its policies such that (1) complaints are courteously received and (2) complainants are able to track the stats of investigations into their complaints.

### Paragraph 424 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Not Applicable | Preliminary | |

# Accountability and Transparency: ¶¶425–26

*425. The City, CPD, and COPA will ensure individuals are allowed to submit complaints in multiple ways, including: in person to COPA or at a CPD district station, by telephone, online, anonymously, and through third party representatives. To ensure broad and easy access to its complaint system, within 90 days of the Effective Date: a. the City, CPD, and COPA will make the process for filing a complaint widely available to the public, including in-person, by telephone, and online; b. the City, CPD, and COPA will make the process for filing a complaint available electronically; c. the City, CPD, and COPA will make information on filing a complaint and accompanying instructions accessible to people who speak languages other than English and will provide telephonic language interpretation services consistent with the City's and CPD's existing limited English proficiency policies and this Agreement; d. the City, CPD, and COPA will ensure individuals may submit allegations of misconduct, regardless of whether the individual is a member or perceived member of an identifiable group, based upon, but not limited to: race, ethnicity, color, national origin, ancestry, religion, disability status, gender, gender identity, sexual orientation, marital status, parental status, military discharge status, financial status, or lawful source of income; e. the City, CPD, and COPA will continue to ensure that members of the public may make complaints via telephone using free 24-hour services, including by calling 311 and being given the option to leave a voicemail for COPA or speak to a CPD supervisor, and will clearly display this information on their respective websites and other appropriate City and CPD printed materials; f. the City, CPD, and COPA will ensure that instructions for submitting complaints are available via telephone, on-line, and in-person; and g. the City and CPD will ensure that complaint filing information is prominently displayed on CPD website's homepage, including by linking to COPA's online complaint form.*

*426. As part of the COPA's system for processing non-confidential complaints and administrative notifications (the "intake process"), each complaint and administrative notification will be assigned a unique tracking number. This unique tracking number will be linked with all phases of the investigation and disciplinary process, through the final disposition.*

**Compliance Progress**　　　　　(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | ¶425 | ¶426 |
|---|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* | *Not in Compliance* |
| | **CPD** | *Not in Compliance* | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* | *Not Yet Assessed* |

In the fifth reporting period, the CPD moved into Preliminary compliance with ¶425 and ¶426. Because COPA previously reached and maintained Preliminary compliance with these paragraphs, the City moved into Preliminary compliance with these paragraphs. Beyond this, COPA reached Secondary compliance by providing relevant training.

To evaluate Preliminary compliance with ¶¶425–26, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance with these paragraphs, we reviewed the entities training development, materials, implementation, and evaluation.[3]

*Progress and Assessments before the Fifth Reporting Period*

In past reporting periods, the CPD and COPA made progress toward compliance at different rates. While COPA reached Preliminary compliance in the fourth reporting period, the CPD had additional work to do in revising and finalizing policies relevant to these paragraphs by the end of the fourth reporting period.

COPA finalized Policy 3.1.1, *Intake*, which meets the requirements of ¶425 as it relates to COPA. The *Intake* policy also satisfies the mandate of ¶426 by requiring the Log Number assigned to an investigation to remain consistent throughout the investigation and disciplinary process.

---

[3]　The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for the Civilian Office of Police Accountability (COPA), Illinois v. Chicago*, Case No. 17-cv-6260 (January 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

But by the end of the fourth reporting period, the CPD and BIA remained in the drafting and revision stage of creating and finalizing policies that speak to the requirements of ¶¶425-426. For example, in the fourth reporting period, we noted that CPD's General Order G08-01-02, Initiation and Assignment of Investigations into Allegations of Misconduct, addressed many provisions of these paragraphs, but the collaborative review and revision process was ongoing.[4]

*Progress in the Fifth Reporting Period*

At the start of the fifth reporting period, City entities were in different stages of compliance. The CPD continued to work toward Preliminary compliance. COPA, on the other hand, began working toward Secondary compliance in this reporting period.

During this reporting period, the CPD worked toward and ultimately achieved Preliminary compliance with ¶425 by revising General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. In late November, 2021, the CPD submitted a much improved draft G08-01-02, which instructs compliance with all requirements of ¶425 and ¶426. We submitted a no-objection notice.[5] After posting the revised G08-01-02 for public comment, the CPD finalized the policy on the final day of the reporting period, December 31, 2021. In addition, the CPD finalized General Order G08-01, *Complaint and Disciplinary System*, on the final day of the reporting period. G08-01 provides an excellent description of the Intake process and details how Log Numbers are assigned. The finalization of these polices brought the CPD into Preliminary compliance with both paragraphs.

The CPD BIA has previously made efforts related to these paragraphs. For example, at the end of the fourth reporting period, BIA submitted a consultation draft of its *Case Management System* Unit Directive. We provided feedback on this Unit Di-

---

[4]  The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[5]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

rective in September 2021. This Unit Directive speaks to many requirements enumerated in the Consent Decree, including ¶426. This Unit Directive remains in the collaborative review and revision process.

Having reached Preliminary compliance in the last reporting period, COPA focused efforts on gaining Secondary compliance in the fifth reporting period. COPA provided materials for its training *Intake Unit: Overview of Policies and Procedures In-Service*. The lesson plan properly trains on all requirements set out in ¶¶425–26, and we were encouraged by COPA's well developed materials that are organized, easy to follow, and engaging. COPA provided evidence demonstrating that 99% of COPA personnel completed this training in the fifth reporting period, bringing COPA into Secondary compliance with both paragraphs.

With the finalization of G08-01 and G08-01-02, the CPD reached Preliminary compliance with both ¶425 and ¶426. And COPA, with the completion and provision of its *Intake Unit: Overview of Policies and Procedures In-Service* training, reached Secondary compliance. This moved the City, as a whole, into Preliminary compliance.

Moving forward, we will look for the CPD to develop training instructing compliance with their policies and ¶425 and ¶426. Additionally, we will look for BIA to continue revising their relevant Unit Directives. For COPA, we will look for evidence that COPA has followed its policies and trainings such that individuals are able to submit complaints and that all complaints are assigned a unique tracking number.

## Paragraph 425 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶427

> ***427.*** *The City and CPD will ensure all complaints are accepted, documented, submitted to COPA, and investigated in accordance with this Agreement and the applicable collective bargaining agreement, whether submitted: by a CPD member or a member of the public; verbally or in writing; in person, by telephone, online, or by a complainant anonymously; or by a third-party representative.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW)[6] |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD moved into Preliminary compliance with ¶427. Because COPA previously reached and maintained Preliminary compliance with these paragraphs, the City moved into Preliminary compliance with this paragraph. Beyond this, COPA reached Secondary compliance by providing relevant training.

To evaluate Preliminary compliance with ¶427, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[7] To evaluate Secondary compliance with this paragraph, we reviewed the CPD's and COPA's training development, implementation, and evaluation (¶286).

---

[6] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[7] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Fifth Reporting Period*

The CPD had not reached Preliminary compliance with ¶427 by the end of the Fourth reporting period, but the CPD made progress toward compliance by continuing to draft and revise General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*.[8] This General Order aimed to address the requirements of ¶427, but by the close of the fourth reporting period, it remained in the collaborative review and revision process under the Consent Decree (¶¶626–41).

COPA, on the other hand, reached Preliminary compliance by drafting, revising, and finalizing COPA's Policy 3.1.1, *Intake*, in the fourth reporting period. This policy instructs COPA to comply with ¶427 by listing the methods in which complaints are accepted and documented.

*Progress in the Fifth Reporting Period*

Throughout the fifth reporting period, the CPD revised General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. The revisions have greatly improved the policy, and it fully addresses the requirements of ¶427. After receiving no-objection notices from the IMT and the OAG, the CPD posted G08-01-02 for public comment and, on December 31, 2021, finalized this policy. This allowed the CPD to move into Preliminary compliance with ¶427.

In the fifth reporting period, COPA provided the IMT with documents for its *Intake Unit: Overview of Policies and Procedures In-Service* training materials, which related to the requirements of ¶427. We submitted a no-objection notice to this training, and COPA provided evidence that 99% of its personnel completed this training in the fifth reporting period. This moved COPA into Secondary compliance.[9]

---

[8] The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[9] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

With the finalization of G08-01-02, the CPD reached Preliminary compliance with ¶427. And COPA reached Secondary compliance with the completion and provision of its *Intake Unit: Overview of Policies and Procedures In-Service* training. This moved the City, as a whole, into Preliminary compliance.

Moving forward, we will look for the CPD to develop training instructing compliance with G08-01-02 and ¶427. Additionally, we will look for BIA to provide relevant Unit Directives.

For COPA, we will look for evidence that COPA has followed its policies and trainings such that all submitted complaints are investigated in accordance with the Consent Decree and the applicable collective bargaining agreements.

### Paragraph 427 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

## Accountability and Transparency: ¶428

> *428. When a CPD member becomes aware of an individual who wants to make a complaint regarding a CPD member's conduct, he or she will promptly provide the individual with COPA's contact information and notify a supervisor of the complaint received in the field. CPD will also ensure that, in response to complaints about CPD members, supervisors respond to the scene, document the complaint, and submit it to COPA. If the supervisor allegedly authorized, engaged in conduct that led to, witnessed, or otherwise allegedly participated in the incident complained of, the supervisor will contact his or her immediate supervisor, who will assign another supervisor to immediately document the complaint and submit it to COPA.*

### Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**  *In Compliance* (NEW)
**Secondary:**  *Not Yet Assessed*
**Full:**  *Not Yet Assessed*

In the fifth reporting period, the CPD reached Preliminary compliance with ¶428.

To evaluate Preliminary compliance with ¶428, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Fifth Reporting Period*

The City and the CPD have not reached any level of compliance with ¶428 in past reporting periods. However, the CPD continued to make progress toward Preliminary compliance in the fourth reporting period. Specifically, the CPD worked to revise its General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which was revised to address the requirements of ¶428 in detail and specifically explained the duties and responsibilities of CPD members and supervisors upon learning an individual wants to make a complaint regarding a CPD member's conduct.[10] G08-01-02 remained in the collaborative revision process by the end of the fourth reporting period. Therefore, the CPD did not reach Preliminary compliance.

---

[10]  The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

*Progress in the Fifth Reporting Period*

The CPD continued to revise and refine G08-01-02 in the fifth reporting period. These revision efforts resulted in an improved policy. After we submitted a no-objection notice to the revised G08-01-02, the CPD posted G08-01-02 for public comment for 15 days.[11] Thereafter, the CPD finalized G08-01-02 on December 31, 2021.

With the finalization and implementation of G08-01-02, the CPD reached Preliminary compliance with ¶428. Moving forward, we will look for the CPD to develop training instructing compliance with G08-01-02 and ¶428. Additionally, we will look for BIA to provide relevant Unit Directives outlining procedures to mobilize compliance with ¶428.

### Paragraph 428 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

---

[11] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶429

> **429.** *The City will continue to ensure that a website is made available to CPD members to anonymously report officer misconduct ("anonymous reporting website") and will internally disseminate information regarding the anonymous reporting website to all CPD members. Reports made on the anonymous reporting website will not relieve CPD members of their duties under CPD Rules of Conduct 21 and 22.*

## Compliance Progress   (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶429 in the fifth reporting period.

To evaluate Preliminary compliance with ¶429, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

### Progress before the Fifth Reporting Period

The IMT assessed the City's and CPD's compliance with ¶429 for the first time in the fourth reporting period. The CPD's compliance with this paragraph remained under assessment by the close of the fourth reporting period. While the Office of the Inspector General continued to host a website for CPD members to anonymously report officer misconduct, the CPD had not implemented a policy to protect the identity of an employee who anonymously reported misconduct during an internal investigation. The CPD provided for review General Order G08-01, *Complaint and Disciplinary System*, a portion of which was directed to the requirements of ¶429. But by the close of the fourth reporting period, G08-01 remained in need of revision to clarify CPD personnel's ability to anonymously report misconduct and protections reporting personnel are afforded.

### Progress in the Fifth Reporting Period

Throughout the fifth reporting period, the Office of the Inspector General continued to host a website for CPD members to anonymously report officer misconduct.[12] In addition, the CPD continued revising the relevant General Order G08-01,

---

[12]   *See Online Complaint Form*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO, https://igchicago.org/contact-us/report-fraud-waste-abuse/fraud-or-corruption-report-

*Complaint and Disciplinary System.* We submitted a no-objection notice in November 2021.[13] Thereafter the CPD posted G08-01 for public comment, and on December 31, 2021, the CPD finalized the policy.

Section IX, *Office of the Inspector General (OIG) Online Complaint Form* addresses ¶429 by noting that the Office of the Inspector General maintains the online complaint form that allows anonymous reporting by CPD members and other City employees. It also incorporates verbatim language from ¶429 that notes that anonymous reporting does not relieve a member of their duties to report under Rules of Conduct 21 and 22.

Because this policy covers all requirements of ¶429, the CPD has reached Preliminary compliance. We reiterate the concern expressed in the prior report: although the policy addresses the language of ¶429, we are concerned that the policy may leave members uncertain of the extent to which members who make anonymous reports are able to keep their identity unknown in the process. We encourage the CPD to consider how it might take a step beyond the requirements of ¶429 to not only comply with this paragraph, but to provide additional clarity and protection to members reporting misconduct via the Office of the Inspector General website.

Because the CPD finalized its policy G08-01, which addresses the minimum requirements outlined in ¶429, the CPD reached Preliminary compliance. Moving forward, we will look for the CPD to disseminate information related to the requirements of ¶429 and the CPD's related policies, through either a training or other appropriate means.

---

form/. *See also File an Anonymous Compliant (OIG)*, Chicago Police Department, https://home.chicagopolice.org/services/file-an-anonymous-complaint/.

[13]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 429 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Status Update

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Status Update

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Under Assessment

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶430

***430.*** *COPA will ensure that individuals who submit electronic complaints receive a copy of the information contained in the complaint via electronic mail, if an electronic mail address is provided, upon submission.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

COPA maintained Preliminary compliance with ¶430 in the fifth reporting period and made efforts toward Secondary compliance by developing a training relevant to the requirement outlined in ¶430.

To evaluate Preliminary compliance with ¶430, the IMT reviewed the COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[14] To assess Secondary compliance with this paragraph, we reviewed COPA's training development, implementation, and evaluation (¶286).[15]

### Progress before the Fifth Reporting Period

We assessed compliance with ¶430 for the first time in the fourth reporting period and found that COPA reached Preliminary compliance with this paragraph in the fourth reporting period. COPA received public feedback and finalized its *Intake Policy*, which requires that an electronic copy of the complaint be provided to a complainant who files an online compliant via email. Therefore, COPA met Preliminary compliance with ¶430.

---

[14]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[15]   The IMT evaluates training materials using as our standard the "ADDIE" model of curriculum development and implementation. This model typically incorporates the following elements: training needs assessment' curriculum design and development; training implementations (or delivery); and training evaluation.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, COPA moved into Secondary compliance with its *Intake Unit: Overview of Policies and Procedures In-Service* training. This training touches on the requirements of ¶430 and COPA's 3.1.1 *Intake* policy. After we reviewed and submitted a no-objection notice to this training, COPA demonstrated that the training was completed by 99% of its personnel.[16]

By providing this training to 99% of its personnel, COPA reached Secondary compliance with ¶430. Moving forward, we will look for COPA to demonstrate that it provides copies of complaints to complainants through email when an email address is provided.

### Paragraph 430 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

---

[16] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶431

> **431.** *The City and CPD will undertake best efforts to ensure that the absence of a signed complainant affidavit alone will not preclude an administrative investigation.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FOURTH REPORTING PERIOD)[17] |
| | **CPD** | *In Compliance* (FOURTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, the City maintained Preliminary compliance through the efforts of the CPD and COPA. The CPD finalized its relevant policy, General Order G08-01, *Complaint and Disciplinary Procedures*, thereby maintaining Preliminary compliance. COPA moved into Secondary compliance by providing training relevant to ¶431.

To evaluate Preliminary compliance with ¶431, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[18] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Fifth Reporting Period*

In the fourth reporting period, the City reached Preliminary compliance through the efforts of the CPD and COPA. At the close of the fourth reporting period, the CPD was working through revisions of General Order G08-01, *Complaint and Dis-*

---

[17] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[18] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*ciplinary Procedures,* which addresses the affidavit-override process and exceptions to the affidavit requirement. COPA's 3.1.1. *Intake* policy, which was finalized in the fourth reporting period, addresses ¶431 by noting that a sworn affidavit is not required for a preliminary investigation to begin.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD continued revising G08-01. After several revisions, we submitted a no-objection notice to the policy. Thereafter, the CPD posted the policy for public comment. After the public comment period closed, the CPD finalized G08-01 on December 31, 2021. This allowed the CPD to maintain Preliminary compliance with ¶431.

Additionally, COPA compiled and submitted for review materials for a training titled *COPA Intake Unit: Overview of Policies and Procedures*. Aside from providing training on the requirements set out in ¶431, this excellent training includes clear objectives, organized instructor notes, and engaging materials. After we reviewed and submitted a no-objection notice to this training, COPA demonstrated that the training was completed by 99% of its personnel. These efforts moved COPA into Secondary compliance

Moving forward, we will look for the CPD to provide training related to ¶431 and its related policy to ensure members are aware of the paragraph's mandate. Additionally, we will look for BIA to provide relevant Unit Directives outlining procedures to mobilize compliance with ¶431. Related to COPA, we will look for evidence that COPA has undertaken best efforts to ensure that an administrative investigation is not precluded by a lack of a signed complainant affidavit.

### Paragraph 431 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Accountability and Transparency: ¶432

> **432.** *The City and CPD will require that complaints about any CPD member are accepted, documented, submitted to COPA, and investigated even if the complainant could not identify the CPD member's name or other employee-identifying number, including star or badge number.*

**Compliance Progress**   (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW)[19] |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, the City moved into Preliminary Compliance with ¶432 through the efforts of the CPD and COPA. COPA, individually, also reached Secondary compliance, moving the City toward Secondary compliance.

To evaluate Preliminary compliance with ¶432, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[20] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Fifth Reporting Period*

In the fourth reporting period, the City made progress toward Preliminary compliance with ¶432 through the efforts of the CPD and COPA. COPA finalized policy 3.1.1 *Intake*, which mandates compliance with ¶432's requirements. However, by

---

[19]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[20]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

the end of the fourth reporting period, the CPD remained in the collaborative review and revision process with its ¶432-related policy, General Order G08-01-02.[21] Because the CPD had not yet finalized G08-01-02 by the end of the fourth reporting period, the City did not reach Preliminary compliance.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD continued revising G08-01-02. Section III.A.1.a. directs the CPD to accept complaints even if the complainant cannot identify the CPD member by "name, star number, beat number or any other employee-identifying information." We provided a no-objection notice to a version of the policy.[22] Thereafter the CPD posted this policy for public comment. On December 31, 2021, the CPD finalized G08-01-02, bringing the CPD into Preliminary compliance.

This reporting period, COPA maintained Preliminary compliance by finalizing Policy 3.1.1 *Intake*. COPA also moved into Secondary compliance with its *Intake Unit: Overview of Policies and Procedures In-Service* training. After we reviewed and submitted a no-objection notice to this training, COPA demonstrated that the training was completed by 99% of its personnel. This moves COPA into Secondary compliance

With the CPD's finalization of G08-01-02, the CPD reached Preliminary compliance, and COPA maintained Preliminary compliance. This moved the City, overall, into Preliminary compliance. In addition, the City made progress toward Secondary compliance through COPA's *Intake Unit: Overview of Policies and Procedures In-Service* training.

In the next reporting period, we look forward to reviewing training developed by the CPD relevant to the requirements of ¶432 and its policy. In addition, we will

---

[21] The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[22] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

look to review any BIA Unit Directives that outline processes necessary to effectuate compliant action with ¶432. For COPA, we will look for evidence that it is investigating complaints even if the CPD member is not specifically identified, as is required by this paragraph and its policies.

### Paragraph 432 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Accountability and Transparency: ¶433

*433. CPD will require that officers provide their name and star number, or in the case of non-sworn members other employee-identifying number, to any member of the public, upon request.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The CPD has made progress toward compliance with ¶433 but did not obtain Preliminary compliance by the close of the fifth reporting period.

To evaluate Preliminary compliance with ¶433, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).

### Progress before the Fifth Reporting Period

In the fourth reporting period, the CPD did not reach Preliminary compliance with ¶433 because it did not finalize a policy that requires CPD officers to provide their start number and name or other employee-identifying number to public members upon request.

### Progress in the Fifth Reporting Period

Toward the end of the fourth reporting period, the CPD provided a draft of its General Order G02-01, *Protection of Human Rights*. We reviewed this draft at the start of the fifth reporting period. While G02-01 remains in the collaborative review and revision process, we note that Section III.E.3. mandates that CPD personnel provide identifying information as required by ¶433. Because this policy is not yet finalized, the CPD has not reached Preliminary compliance.

The CPD has made progress toward but has not reached Preliminary compliance with ¶433. We encourage the CPD to continue with revisions of G02-01 in the sixth reporting period.

## Paragraph 433 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
| --- | --- | --- |
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
| --- | --- |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶434

> **434.** *When CPD responds to or investigates incidents involving allegations of officer involved domestic violence, CPD will ensure that COPA is provided an administrative notification. COPA will initiate the intake process and investigate all such allegations in accordance with this Agreement.*

---

**Compliance Progress**                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[23] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶434 in the fifth reporting period. The CPD made efforts toward but ultimately did not reach Preliminary compliance; COPA reached Secondary compliance with ¶434 in this reporting period.

To evaluate Preliminary compliance with ¶434, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[24] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Fifth Reporting Period*

The City worked towards compliance with ¶434 through the efforts of both the CPD and COPA. In the fourth reporting period, the City as a whole did not reach Preliminary compliance because the CPD had not finalized a policy mandating

---

[23]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[24]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

compliance with ¶434's requirements. COPA, however, finalized Policy 3.1.1 *Intake*, which not only met the requirements of ¶434, but exceeds the mandates of ¶434.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD revised General Order G08-01-02, *Complaint Initiation and Log Number Investigation* Assignment. After extensive collaboration and related revisions, we submitted a no-objection notice to G08-01-02. Section IV.A of this policy partially addresses the requirements of ¶434. In addition, Section V.A.6.a.1. provides helpful explanation as to COPA's responsibilities which related to ¶434. G08-01-02 requires that "all complaints against Department members, including any allegation of a sworn Department member committing domestic violence, are accepted, documented and submitted to COPA. This requirement includes reporting of "misconduct observed or complaints submitted via social media." But this falls shy of the requirements set out in ¶434, which requires the CPD ensure that COPA is notified "when CPD responds to or investigates incidents involving allegations of officer-involved domestic violence." CPD submitted the General Order for public comment, and the CPD finalized the policy on December 31, 2021. With minor editing of G08-01-02, the CPD could move into Preliminary compliance with ¶434 in the sixth reporting period.

Having reached Preliminary compliance with ¶434 in the fourth reporting period, COPA undertook developing and providing training to its personnel in the fifth reporting period. We reviewed COPA's *Intake Unit: Overview of Policies and Procedures In-Service* training, which explains that complaints or Notifications involving a CPD member involved in "domestic violence, sexual misconduct, and abuse of vulnerable subjects" are immediately assigned to COPA investigative staffed who are designated for investigating such incidents. We submitted a no-objection notice to this training, and by the end of the fifth reporting period, COPA provided evidence that 99% of its personnel completed this training. This brought COPA into Secondary compliance with ¶434.

While COPA maintained Preliminary compliance and moved into Secondary compliance with ¶434, the CPD has not quite reached preliminary compliance. This means the City has not yet reached Preliminary compliance. For the City to reach Preliminary compliance, they will need to slightly expand the language noted in G08-01-02 to ensure that all instances in which CPD responds to or investigates incidents involving officer-involved domestic violence will be reported to COPA.

## Paragraph 434 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶435

> **435.** *The City, CPD, and COPA will require that complaints alleging that a CPD member refused to accept a complaint, discouraged the filing of a complaint, or provided false or misleading information about filing a complaint are accepted, documented, and submitted to COPA for investigation and, where appropriate, recommended for discipline.*

**Compliance Progress** (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Under Assessment*[25] |
| | **CPD** | *Under Assessment* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

At the end of the fifth reporting period, the City remains under assessment for Preliminary compliance with ¶435. Additionally, through COPA's provision of training, however, the City made progress toward Secondary compliance with ¶435.

To evaluate Preliminary compliance with ¶435, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[26] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Fifth Reporting Period*

In the fourth reporting period, COPA reached Preliminary compliance with ¶435 on by finalizing Policy 3.1.1, *Intake.* The CPD made progress toward Preliminary compliance with this paragraph through its drafting and revision efforts related to

---

[25] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[26] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. However, this General Order remained in the review and revision process outlined by the Consent Decree by the end of the reporting period. Therefore, the CPD did not reach Preliminary compliance. In addition, we reviewed related training submitted by the CPD Bureau of Internal Affairs (BIA), *Complaint Initiation Process.* We submitted a no-objection notice to this training in April 2021 but did not thereafter receive additional information related to this training.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD finalized its General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which addresses the majority of the requirements of ¶435. Specifically, Section III.A.2 states that allegations that a CPD "member refused to accept a complaint, discouraged the reporting of the complaint, or provided false or misleading information about reporting a complaint" will be included in a complaint in addition to any original allegations. The OAG and the IMT submitted a no-objection notice to G08-01-02, but this policy does not sufficiently address ¶435's requirement that subjects of such complaints be, where appropriate, recommended for discipline.

COPA also made progress under ¶435. COPA provided us with materials for its training *Intake Unit: Overview of Policies and Procedures In-Service*. This training instructs compliance with the requirements of ¶435 and COPA policy 3.1.1, *Intake.* After we reviewed and submitted a no-objection notice to this training, COPA demonstrated that the training was completed by 99% of its personnel. These efforts brought COPA into Secondary compliance.

Because the CPD finalized G08-01-02 this reporting period but that policies falls shy or noting that certain complaints be recommended for discipline, the CPD's progress with ¶435 remains under assessment at the close of the fifth reporting period. And because COPA provided it *Intake Unit* training to 99% of its personnel, it moved into Secondary compliance.

Next reporting period we look forward to reviewing revised or new CPD policies that fully incorporate all requirements of ¶435. In addition we look forward to reviewing training developed by the CPD and any relevant Unit Directives or evidence that training has been provided to BIA in relation to ¶435's requirements. Related to COPA, we will look for evidence that actions of COPA comply with ¶435, COPA policy 3.1.1, and its *Intake Unit* training.

## Paragraph 435 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Under Assessment |

# Accountability and Transparency: ¶436

> **436.** *Within 90 days of the Effective Date, CPD will ensure that there are adequate policies and practices in place to encourage and protect CPD members who report potential misconduct by other CPD members. Such policies will provide, at a minimum: a. that CPD members promptly report any misconduct of which they are aware to a supervisor; b. that the supervisor document such alleged misconduct and promptly report it to COPA; and c. that all forms of retaliation, interference, intimidation, and coercion against a CPD member who reports misconduct or cooperates with an investigation of misconduct, are strictly prohibited.*

**Compliance Progress**         (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶436 in the fifth reporting period through the efforts of the CPD.

To evaluate Preliminary compliance with ¶436, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms."

*Progress before the Fifth Reporting Period*

In past reporting periods, the CPD worked towards Preliminary compliance providing various versions of General Orders, including but not limited to G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*[27], and G08-05, *Prohibition on Retaliation*.

In the third reporting period, the IMT provided a no-objection notice to G08-05.[28] CPD finalized and produced G08-05 for public comment in December 2020. Although G08-05 did not put CPD in Preliminary compliance, it brought the CPD much

---

[27]   The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[28]   Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements.

closer due to the policy addressing the requirements of ¶436(a) and 436(c). G08-05 makes clear to the CPD and community that retaliation by CPD personnel is not acceptable and is expected to be reported by CPD personnel if it does occur.

In the fourth reporting period, the IMT reviewed a revised version of General Order, G08-01-02, which goes further than the Consent Decree's requirements to address ¶436. Additionally, the IMT reviewed G08-01, *Complaint and Disciplinary System*, which included language to directly address the requirements of ¶436(b).

Although the CPD had made significant progress towards Preliminary compliance in both the third and fourth reporting periods, the CPD remained in the revision stage of creating and finalizing policies that speak to the requirements of ¶436.

*Progress in the Fifth Reporting Period*

During the Fifth reporting period, the CPD continued to work toward Preliminary compliance by revising General Order, G08-01, *Complaint and Discovery Procedures*, and General Order, G08-01-02, *Complaint Initiation and Log Number Investigation Assignment.*[29] The CPD produced multiple revised drafts of both General Orders during the reporting period. Throughout the revisions process for G08-01, the IMT encouraged the CPD to revise their policies to include the clearest language possible. G08-01 addresses ¶436(a) and (c). As revised, G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, includes language that exceeds the requirements of ¶436(b) by providing the Supervisors with specific instructions regarding the proper initial investigatory steps and notification required to COPA.

Following the CPD's substantial revisions to G08-01 and G08-01-02 during the Fifth reporting period, the IMT provided a no-objection notice. The CPD posted the general orders for public comment, and on the last day of the reporting period, finalized the policies.

---

*See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[29] The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

With the finalization of G08-01 and G08-01-02, the CPD moved into Preliminary compliance with ¶436. We look forward to reviewing the CPD's training on these directives, and G08-05, *Prohibition on Retaliation*, which was finalized in the third reporting period. These trainings should inform officers of the requirements of these directives, which include instruction specific to ¶436.

### Paragraph 436 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶437

**437.** *CPD will expressly prohibit all forms of retaliation, intimidation, coercion, or adverse action against any person who reports misconduct or cooperates with an administrative investigation.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**   *In Compliance (THIRD REPORTING PERIOD)*
**Secondary:**   *Not in Compliance*
**Full:**   *Not Yet Assessed*

In the fifth reporting period, the City maintained Preliminary compliance through the efforts of the CPD.

To evaluate Preliminary compliance with ¶437, the IMT reviewed the CPD's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms."

To evaluate Secondary compliance with this paragraph, we reviewed among other things, the CPD's training development, implementation, and evaluation (¶286).[30]

*Progress before the Fifth Reporting Period*

In the past two reporting periods, the CPD maintained Preliminary compliance with ¶437 due to the finalized General Order, G08-05, *Prohibition on Retaliation*. The CPD met Preliminary compliance by finalizing the policy and posting for public comment. In the previous reporting period, the IMT reviewed BIA's *Complaint Initiation Process – BIA Investigators & Accountability Sergeants Annual Training*. However, we did not receive BIA's corresponding on-boarding training. Additionally, the CPD had produced related training—the *2020 Supervisor In-Service Refresher* training—but this training remained in the collaborative review and revision process by the end of the fourth reporting period.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD and BIA produced no new information pertaining to the requirements of ¶437.

---

[30]   The IMT evaluates training materials using as our standard the "ADDIE" model of curriculum development and implementation. This model typically incorporates the following elements: training needs assessment' curriculum design and development; training implementations (or delivery); and training evaluation.

Moving forward, the IMT expects to receive training materials related to the requirements of G08-05 and ¶437. We look forward to additional collaborative review of the CPD's related training in the sixth reporting period.

### Paragraph 437 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶438

> **438.** *OAG acknowledges that the City, CPD, and COPA are work-ing to create an electronic Case Management System ("CMS"). The City, CPD, and COPA will ensure that the CMS maintains ac-curate data regarding the number, classification, and status of all administrative investigations, from the intake process through the final disciplinary decision, if any, and through any grievance process, arbitration, Police Board proceeding, or ap-peal relating to the final disciplinary decision (the "final disposi-tion"). CMS will be maintained by appropriate personnel from the City, CPD, and COPA. The CMS will be fully operational by June 30, 2020.*

---

**Compliance Progress**  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[31] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance (FOURTH REPORTING PERIOD)* |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, COPA maintained Preliminary compliance with ¶438. The CPD made efforts toward but did not ultimately reach Preliminary compliance with this paragraph. Because all relevant City entities must reach levels of compli-ance to bring the City, as a whole into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶438,, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and pub-lic comment periods.[32] To evaluate Secondary compliance with this paragraph, we

---

[31] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[32] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among

reviewed the entities training development, materials, implementation, and evaluation (¶286).

*Progress before the Fifth Reporting Period*

In past reporting periods, the CPD and COPA worked towards achieving compliance at different rates. While COPA achieved Preliminary compliance in the previous reporting period, the CPD was still finalizing policies and training materials related to ¶438.

Although the CPD showed commitment to compliance with ¶438 by conducting *CMS Investigative Console-Conducting/Investigations* training and developed its *CMS Updates and Enhancements Annual Training*, many of the requirements of ¶438 were not addressed. The CPD also developed a *CMS User Guide* for its BIA Investigators and Accountability Sergeants.

During the fourth reporting period, COPA developed and finalized policy 3.1.6, *Clear and Column CMS Systems*, which fully addressed the requirements of ¶438.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD and BIA provided drafts for two directives that address the requirements of ¶438. First, BIA Unit Directive, *Case Management System*, directs that all administrative misconduct investigations be entered into the case management system, which provides the ability to track investigations from intake through final disposition. We provided the CPD and BIA with comments in September 2021. However, this Unit Directive remained in the collaborative review and revision process at the end of the fifth reporting period.

Second, the CPD drafted and revised Special Order, S08-01-01, *Conducting Log Number Investigations*. Section II of S08-01-01 addresses the requirements of ¶438. S08-01-01 contributes to the overall understanding of how the case management system is intended to work. However, like the *Case Management System* Unit Directive, S08-01-01 remained in the collaborative review and revision process at the end of the fifth reporting period.

This reporting period, COPA provided training materials for review—*Case Management System: Overview of Policy and Procedures*. The lesson plan addresses the requirements of ¶438. We submitted a no-objection notice to these training materials in September 2021. We understand that COPA hopes to provide this training to its personnel in January 2022. They will need to provide this training to at least 95% of their staff to obtain Secondary compliance.

---

other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

With this, COPA maintained Preliminary compliance with ¶438 and made efforts toward Secondary compliance. The CPD continued to make progress toward Preliminary compliance with ¶438; both BIA Unit Directive, *Case Management System* and S08-01-01*, Conducting Log Number Investigations*, remained in the collaborative review and revision process at the end of the fifth reporting period. We look forward to the CPD prioritizing revisions of S08-01-01 and BIA's *Case Management System*, early in the sixth reporting period to allow the CPD ample time to revise, post for public comment, and finalize these polices. Doing so would propel the CPD into Preliminary compliance. We will also look for COPA to provide evidence that it has provided its *Case Management System: Overview of Policy and Procedures* training to at least 95% of its personnel.

### Paragraph 438 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶439

> *439. The City and CPD will ensure that complainants and their representatives are able to track non-confidential unique tracking numbers from the intake process through final disposition via telephone and in person. By June 30, 2020, the City will also ensure complainants and their representatives are able to track the status of non-confidential unique tracking numbers from the intake process through final disposition online.*

| Compliance Progress | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|
| **Preliminary:** | *In Compliance* (NEW)[33] |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City reached Preliminary compliance through the efforts of the CPD, which moved into Preliminary compliance this reporting period. Additionally, COPA moved into Secondary compliance this reporting period. But because all relevant City entities must reach the same level of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶439, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[34] To evaluate Secondary compliance with this paragraph, we reviewed the entities training development, materials, implementation, and evaluation (¶286).

---

[33] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[34] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Fifth Reporting Period*

In past reporting periods, the CPD and COPA worked towards achieving compliance at different rates. While COPA achieved Preliminary compliance in the previous reporting period, the CPD was still working toward Preliminary compliance with ¶439 by the close of the fifth reporting period.

In the past, COPA finalized Policy 3.1.6, *Clear and Column CMS Systems*, which incorporates the requirements of ¶439. COPA also developed an *Employee Agreement Regarding Use of CLEAR and Column CMS Systems* form that employees must review and sign before being granted access to the system. At the end of the previous reporting period, COPA submitted policy 3.1.1, *Intake*, as evidence of compliance. This policy fully addressed the requirements of ¶439 by including explanations for the various ways the complainant can track their complaints and provided responsibilities for COPA to ensure complainants are able to engage in tracking their complaints.

In past reporting periods, the CPD worked on developing and revising G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, to fully address the requirements of ¶439 related to BIA and the CPD. [35] This policy remained in the collaborative review and revision process at the end of the fourth reporting period.

*Progress in the Fifth Reporting Period*

As reflected above, at the start of the Fifth reporting period, City entities were in different stages of compliance. The CPD continued to work toward Preliminary compliance, and COPA began working toward Secondary compliance in this reporting period.

Specifically, the CPD continued revising G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. The CPD submitted multiple revised drafts during the reporting period, and we ultimately submitted a no-objection notice in November 2021.[36] This policy addresses ¶439's mandates, by directing that Log Num-

---

[35] The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[36] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice."

bers be trackable through final disposition by various means, including via telephone and in person. The CPD posted this policy for public comment, and on the last day of the reporting period, the CPD finalized the directive.

Having reached Preliminary compliance in the fourth reporting period, COPA focused efforts on gaining Secondary compliance in the fifth reporting. COPA compiled and submitted for review materials for a training titled *Intake Unit: Overview of Policies and Procedures In-Service*. This training lesson plan provides clear objectives and instructor notes and exceeded expectations by addressing the online component of complaint intake methods. COPA provided this training to more than 95% of its staff members. With this COPA gained Secondary compliance.

COPA also provided materials for its training *Case Management System: Overview of Policy and Procedures*. The lesson plan and accompanying slide deck presentation provide meaningful instruction also relevant to ¶439. We submitted a no-objection notice to these training materials in September 2021. We understand that COPA hopes to provide this training to its personnel in January 2022.

With the finalization of G08-01-02, the CPD moved into Preliminary compliance with ¶439. Because COPA provided its *Intake Unit: Overview of Policies and Procedures* training to at least 95% of its staff, COPA moved into Secondary compliance in the fifth reporting period.

Moving forward, we will look for the CPD to produce information demonstrating that personnel are properly trained to mobilize compliance with the requirements of ¶439. Additionally, we will look for COPA to provide evidence that it has provided its *Case Management System: Overview of Policy and Procedures* training to at least 95% of its personnel and that COPA employees are acting in accordance with ¶439's mandates.

### Paragraph 439 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

---

Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Accountability and Transparency: ¶440

**440.** *The City, CPD, and COPA will ensure that all non-confidential complaints are processed by COPA as follows: a. all non-confidential complaints of alleged misconduct received by CPD, including BIA and CPD supervisors, are documented and submitted to COPA within 24 hours of receipt; b. all complaints of alleged misconduct submitted to the anonymous reporting website and all non-confidential complaints of alleged misconduct received by the OIG will be submitted to COPA by the end of the next business day after the complaint was received; c. upon receipt of a complaint, COPA will promptly assign the complaint a unique tracking number, make an initial determination of the classification(s) of the alleged misconduct, and will either retain the complaint for investigation or transfer the complaint to BIA for investigation; d. COPA, pursuant to its ordinance and this Agreement, will have the jurisdiction to conduct administrative investigations of all allegations of misconduct that involve: i. excessive force; ii. domestic violence; iii. improper search or seizure of individuals or property; iv. coercion; v. verbal abuse as defined under Municipal Code of Chicago, § 2-78-100, including any unwelcome sexual advances or requests for sexual favors; or vi. unlawful denial of access to counsel. e. COPA, pursuant to its ordinance and this Agreement, will receive immediate administrative notification of and have jurisdiction to conduct administrative investigations of all incidents, including those in which no allegation of misconduct has been made, involving: i. firearm discharges by CPD officers that could potentially strike an individual ("officer-involved shooting"); ii. Taser or stun gun discharges by CPD officers that result in death or serious bodily injury; iii. any person who dies or sustains serious bodily injury while in CPD custody, or as a result of CPD actions; iv. "officer-involved deaths," as that term is defined in 50 ILCS 727/1-5; and v. other weapons discharges and other uses of CPD-issued equipment as a weapon that results in death or serious bodily injury, at the COPA Chief Administrator's discretion; f. the City, CPD, and COPA will ensure that all allegations are recorded and classified appropriately, even if the complainant does not accurately characterize the alleged misconduct; g. if BIA or district personnel conducting investigations into misconduct identify allegations of misconduct that are within COPA's administrative investigative jurisdiction as defined herein, the investigator will promptly notify COPA; and h. if a complaint contains multiple allegations of misconduct,*

> *one or more of which falls within COPA's administrative investi-*
> *gation jurisdiction as defined herein, COPA will have the right of*
> *first refusal to conduct an administrative investigation of the en-*
> *tire complaint.*

| Compliance Progress | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance* [37] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (NEW) |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not Yet Assessed* |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |

In the fifth reporting period, COPA reached Secondary compliance with ¶440. The CPD made efforts toward but did not ultimately reach Preliminary compliance with this paragraph. The Deputy PSIG maintained Full compliance with ¶440 in the fifth reporting period.[38] But because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶440, the IMT reviewed the CPD's, COPA's, and the Deputy PSIG's policies following the policy process described in the Consent Decree (¶¶626–41).[39] To evaluate Secondary compliance with this

---

[37]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[38]   In the fifth reporting period, the Deputy PSIG stepped down. Since then, the Interim Acting Deputy PSIG has continued the corresponding compliance efforts under the Consent Decree.

[39]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we reviewed various data points to determine whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶440's mandates. More specifically, to determine whether the Deputy PSIG maintained Full compliance, we review materials submitted by the Deputy PSIG, which included spreadsheets noting all COPA notifications made by the Office of the Inspector General and a memorandum detailing summary statistics relevant to ¶440's requirements.

*Progress before the Fifth Reporting Period*

In the last reporting period, the CPD, COPA, and the Office of the Inspector General made progress toward compliance at different rates. While the Deputy PSIG and COPA both reached Preliminary compliance, Deputy PSIG reached Full compliance by providing a supplement to its *Investigations Manual*, which contained policies and training materials regarding the submission and process for submitting alleged misconduct to COPA. The Deputy PSIG also provided training records to help establish Full compliance. COPA submitted policy 3.1.1, *Intake*, which addressed the requirements of ¶440(c), (e), (f), and (h). They also provided draft ordinance 2-78-120 that aimed to address subparagraphs (d) and (e). The CPD produced General Order G08-01-02, *Complaint Initiation and Log Number Investigation*, and two BIA Unit Directives (*Initiation of Log Numbers in the Case Management* System and *Assignment of Administrative Log Number Investigations)*. [40] However, these policies did not address all subparagraphs relevant to the CPD and were not finalized by the end of the reporting period.

*Progress in the Fifth Reporting Period*

At the start of the fifth reporting period, City entities were in different stages of compliance. The CPD continued to work toward Preliminary compliance, COPA began to work toward Secondary compliance, and the Office of the Inspector General worked to maintain Full compliance.

The CPD worked toward Preliminary compliance with ¶440(a), (e), (f), (g), and (h) as it revised G08-01-02, *Complaint Initiation and Log Number Investigation.* After several revisions, we submitted a no-objection notice related to G08-01-02.[41] The

---

[40]   The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct.*

[41]   Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on

CPD posted this policy for public comment and, on the last day of the reporting period, the CPD finalized the directive.

In the fifth reporting period, the CPD also provided revisions of Special Order, S08-01-01, *Conducting Log Number Investigations*. This draft policy directs BIA Supervising Lieutenant to promptly notify COPA for allegations of misconduct that are within COPA's jurisdiction, thereby addressing ¶440(g). However, S08-01-01 remained in the collaborative review and revision process at the close of the fifth reporting period.

In addition, the CPD has provided several BIA Unit Directives relevant to the requirements of ¶440 such as *Initial Responsibilities in Assigned Log Number Investigations* which speaks to ¶440(g) and (h), and *Initiation of Log Numbers in the Case Management System*, which addressed ¶440(f). But the CPD has additional work to do before these Unit Directives are finalized.

Having reached Preliminary compliance in the last reporting period, COPA focused efforts on gaining Secondary compliance with ¶440 in the fifth reporting period. COPA provided for review training materials for its training, *Intake Unit: Overview of Policies and Procedures In Service 2021*. This training instructed compliance with ¶440(c) and (h). COPA provided this training to more than 95% of their staff in the fifth reporting period.

To address, ¶440(d), COPA produced a revision to their draft ordinance 2-78-120, which provided closely aligned information to the current COPA ordinance 2-78-120, but it added the authority of COPA to investigate sexual-misconduct allegations with specific language used in the Consent Decree. The draft ordinance has not yet replaced the ordinance that is currently in place.

The draft ordinance also seeks to address the requirements of ¶440(e). However, it does not give the authority to COPA to receive "immediate administration notification" of the incidents stated in the ordinance. To ensure that COPA has the access they need, the CPD must develop a policy and procedure mandating that CPD members provide COPA notifications and access to officer involved scenes, officers, evidence, and witnesses.

Lastly, although it is CPD's responsibility to properly and timely notify COPA of officer involved shootings and deaths, the IMT commends COPA on taking the lead

---

the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

to develop its own policies for the response and investigations of officer involved shootings and deaths, which are noted in COPA's draft policy, *Major Incident Responses – Officer-Involved Shooting of Officer-Involved Death*. We provided a no-objection notice to COPA in December 2021, but this policy has not yet been finalized.

The focus for the Deputy PSIG in the fifth reporting period was maintaining Full compliance. The Deputy PSIG provided a memorandum to the IMT and the OAG that provided an update on their performance as it relates to the requirements of ¶440(b). The Office of the Inspector General has developed a comprehensive tracking and reporting procedure that allows them to track reporting to COPA and ensure that reporting to COPA is accomplished according to the requirements of the Consent Decree. In 2019, PSIG reported 68.5% of complaints to COPA by the end of the next business day, but in 2021, this number jumped to 94.2%. This demonstrates Full compliance with ¶440.

Because COPA provided its *Intake* training to at least 95% of its personnel, COPA moved into Secondary compliance in the fifth reporting period. Although the CPD made efforts towards Preliminary compliance, it has not finalized policies that speak to all CPD-related subparagraphs of ¶440. The Deputy PSIG remained in Full compliance this period through their efforts of developing a comprehensive tracking and reporting procedure.

Moving forward, we look forward to working with the CPD to finalize policies that instruct compliance with ¶440. We also look forward to receiving information from COPA demonstrating that they are complying with ¶440 and their related policies. For the Deputy PSIG, we expect to receive information that demonstrates continued compliance.

### Paragraph 440 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶441

> **441.** *The City will undertake best efforts to ensure that COPA has jurisdiction to conduct administrative investigations of allegations of sexual misconduct, as defined by this Agreement.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**     *Not Yet Assessed*
**Full:**          *Not Yet Assessed*

In the fifth reporting period, the City reached Preliminary compliance with ¶441.

To evaluate Preliminary compliance with ¶441, the IMT reviewed COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods for a draft ordinance.[42]

### Progress before the Fifth Reporting Period

In past reporting periods, the City made progress toward Preliminary compliance by providing a memorandum from COPA that included updates on their efforts to properly train investigative personnel in sexual-assault investigations, including trainings regarding interviewing victims of sexual assault. Additionally, a working group was developed with the goal of improving the investigative and notification process among all of the agencies. Although there was discussion around the possibility of a memorandum of understanding or agreement regarding how each entity involved should conduct administrative and criminal investigations of sexual misconduct cases, no COPA policy had been created by the end of the fourth reporting period. Lastly, the City provided a draft City Ordinance change to 2-78-120 that included specific language consistent with the Consent Decree language on COPA's jurisdiction of sexual-misconduct complaints.

### Progress in the Fifth Reporting Period

In this reporting period, the City continued to work toward Preliminary compliance by providing a revised draft Ordinance 2-78-120, which gives COPA the authority to investigate sexual misconduct allegations with language that closely aligns with

---

[42] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

the requirements of the Consent Decree. The draft ordinance has not yet been instated.

Additionally, COPA provided its *Sexual Misconduct* Policy that addresses the requirements of ¶441. The IMT provided a no-objection notice to COPA regarding this policy in December 2021 and the policy was finalized at the end of this reporting period.[43]

Through the finalization of COPA Policy, *Sexual Misconduct*, and the current Ordinance that is in place, the City reached Preliminary compliance with ¶441. We look forward to reviewing information pertaining to the Ordinance being put into effect for Secondary compliance, as well as information demonstrating COPA's investigations, which are being completed per the direction in their policy.

### Paragraph 441 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

---

[43] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶442

> ***442.*** *The City will ensure COPA has appropriately trained and ex-perienced staff to conduct sexual misconduct investigations.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Full:** *Not in Compliance*

In the fifth reporting period, the City maintained Secondary compliance with ¶442 through the efforts of COPA.

To evaluate Preliminary compliance with ¶442, the IMT reviewed COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[44] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and eval-uation (¶286). To evaluate Full compliance with this paragraph, we reviewed COPA's relevant data and evidence regarding investigations into sexual misconduct to determine whether they are operating in accordance with the paragraph and related policy.

*Progress before the Fifth Reporting Period*

In the last reporting period, the City and COPA achieved Preliminary and Secondary compliance. COPA submitted a Training Plan and a memo regarding COPA's Special Victim Squad, as well as a comprehensive lesson plan and accompanying presen-tation, *Sexual Assault Training: Understanding the Neurobiology of Trauma and Applying Trauma Informed Investigative Techniques*. Additionally, COPA produced its in-service training spreadsheet that detailed the trainings they provided (includ-ing the sexual assault training) and the list of attendees. This brought COPA into Secondary compliance.

*Progress in the Fifth Reporting Period*

At the start of the Fifth reporting period, the City and COPA produced a revised policy, *Sexual Misconduct Investigations*, for review. This policy addresses ¶442 by

---

[44] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

identifying the Special Victim Squad (SVS) as being comprised of appropriately experienced investigators who receive specialized training in domestic and sexual violence, including trauma informed interview training. This policy provides specific direction to COPA employees in conducting sexual-misconduct investigations. Additionally, COPA provided its *Sexual Misconduct* Policy that addresses the requirements of ¶442. The IMT provided a no-objection notice to COPA regarding this policy in December 2021 and the policy was finalized at the end of this reporting period.[45] COPA also produced the *Sexual Misconduct Best Efforts Letter* that fully captured the efforts that COPA has taken to address the requirements of ¶442 and other relevant Consent Decree paragraphs.

With this, COPA maintained Secondary compliance with ¶442 in the fifth reporting period. Moving forward, we will look to review COPA's relevant data and evidence regarding investigations into sexual misconduct to determine whether they instruct compliance with their stated policy and the requirements of this paragraph.

### Paragraph 442 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

---

[45] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶443

> ***443.*** *Consistent with COPA's jurisdiction, after conferring about the details of a particular criminal sexual misconduct investigation involving a CPD member, COPA and BIA may jointly agree that BIA may conduct the administrative investigation into allegations of sexual misconduct when they jointly determine that doing so avoids unnecessary disruption to the complainant.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* [46] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, COPA reached Preliminary compliance with ¶443. The CPD made efforts toward but did not ultimately reach Preliminary compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶443, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[47]

*Progress before the Fifth Reporting Period*

In past reporting periods, the City and COPA worked toward Preliminary compliance. During the fourth reporting period, the City provided an unsigned draft *Memorandum of Understanding regarding Joint Sexual Misconduct Investigations*.

---

[46]  As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[47]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

However, more discussions were necessary between the IMT, the City, and the OAG to ensure that memorandum met Preliminary compliance. Beyond this, by the end of the fourth reporting period, neither COPA nor the CPD had finalized corresponding written guidance following the Consent Decree process in ¶443.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD and BIA continued to work toward Preliminary compliance. BIA provided a revised draft of General Order, G08-06, *Prohibitions of Sexual Misconduct*, which addresses the requirements of ¶443 in Section VI.B.[48] The IMT provided comments to CPD and BIA in November 2021. The policy remained in the collaborative review and revision process at the close of the fifth reporting period.

COPA compiled and submitted for review the *COPA Sexual Misconduct Investigations Policy*. COPA, the IMT, and the OAG participated in collaborative discussions that led to COPA submitting an updated revised draft that addressed the requirements of ¶443. COPA even went beyond the requirements of ¶443 by describing factors that might be considered when making the determination that "BIA may conduct the administrative investigation." The policy provides explicit directions to COPA staff when making such decisions and considers the impact it will have on the victim. The IMT provided a no-objection notice for this policy in December 2021, and the policy was finalized at the end of this reporting period. [49]

Although the City did not reach Preliminary compliance with ¶443 in the fifth reporting period, COPA reached Preliminary compliance and the CPD made progress towards Preliminary compliance. We look forward to working with the CPD to finalize G08-06 directing compliance with ¶443. We expect that these efforts will take place early in the sixth reporting period to allow the CPD ample time to revise and finalize the policy, which would propel the CPD into Preliminary compliance. We note that the City provided a draft *Memorandum of Understanding regarding Joint Sexual Misconduct Investigations* but this has not yet been finalized. If the

---

[48] The CPD and BIA previously submitted this policy under the number G08-05.

[49] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

City proceeds with this Memorandum of Understanding, we look forward to reviewing it. We will also look for COPA to demonstrate that training has been provided to at least 95% of its personnel to ensure they are aware of the expectation that they confer about details of criminal sexual-misconduct investigations involving CPD personnel.

### Paragraph 443 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

## Accountability and Transparency: ¶444

***444.*** *Within ten days of the final disciplinary decision of each complaint of sexual misconduct against a CPD member alleging conduct against a non-CPD member, the City will provide the Deputy PSIG with the complete administrative investigative file, subject to applicable law. The Deputy PSIG will review and analyze each administrative investigative file and, on an annual basis, the Deputy PSIG will publish a report: a. assessing the quality of the sexual misconduct administrative investigations reviewed; b. recommending changes in policies and practices to better prevent, detect, or investigate sexual misconduct; and c. providing aggregate data on the administrative investigations reviewed, including: i. the volume and nature of allegations investigated, broken down by investigating agency; ii. the percentage of investigations referred to the Cook County State's Attorney's Office ("CCSAO") for criminal review; iii. the percentage of investigations criminally prosecuted; iv. the percentage of investigations closed after the Preliminary investigation; v. the percentage of investigations closed for lack of a signed complainant affidavit; and vi. the investigative findings and recommendations, including a summary breakdown of discipline recommended for investigations with sustained findings.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:** Annual  ☑ **Met**  ☐ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* [50] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not Yet Assessed* |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not Yet Assessed* |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |

In the fifth reporting period, COPA reached Preliminary compliance with ¶444. The CPD made efforts toward but did not ultimately reach Preliminary compliance with this paragraph. The Deputy PSIG maintained Full compliance with ¶444 in the fifth reporting period.[51] Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶444, the IMT reviewed CPD's, COPA's, and the Office of the Inspector General's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms."[52]

---

[50] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[51] In the fifth reporting period, the Deputy PSIG stepped down. Since then, the Interim Acting Deputy PSIG has continued the corresponding compliance efforts under the Consent Decree.

[52] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286).[53]

To evaluate Full compliance with this paragraph, we reviewed the Office of the Inspector General's policies to determine whether they have been sufficiently implemented and whether the Deputy PSIG's annual reports satisfy each subparagraph of ¶444. We also reviewed Office of the Inspector General's annual report on BIA's and COPA's sexual misconduct investigations.

*Progress before the Fifth Reporting Period*

In the fourth reporting period, the City did not meet Preliminary compliance with ¶444. While the Deputy PSIG met Full compliance, neither the CPD nor COPA achieved Preliminary compliance because they had not yet implemented policies that demonstrate compliance with ¶444. The Deputy PSIG met Full compliance because its *General Policy Manual* and *Annual Report* addressed the requirements of ¶444(c). The Deputy PSIG also provided training materials for review that addressed the requirements of ¶444—ultimately propelling them into Full compliance.

*Progress in the Fifth Reporting Period*

At the start of the fifth reporting period, City entities were in different stages of compliance. The CPD and COPA continued to work toward Preliminary compliance. The Deputy PSIG, on the other hand, worked to maintain full and effective compliance.

This reporting period, the CPD and BIA produced no information pertaining to the requirements of ¶444. The responsibilities outlined by ¶444 require efforts on the part of the CPD. COPA, alone, cannot fulfill the requirements of this paragraph. We look forward to the CPD making progress toward compliance with this paragraph in the sixth reporting period.

This reporting period, COPA continued to work toward Preliminary compliance by compiling and submitting for review the *COPA Sexual Misconduct Investigations Policy*. COPA, the IMT, and the OAG participated in collaborative discussions that led to COPA submitting an updated revised draft that addressed the requirements of ¶444. The IMT provided a no-objection notice to COPA regarding this policy and

---

[53] The IMT evaluates training materials using as our standard the "ADDIE" model of curriculum development and implementation. This model typically incorporates the following elements: training needs assessment' curriculum design and development; training implementations (or delivery); and training evaluation.

it was finalized at the end of this reporting period.[54] At the end of the fourth reporting period, the City provided a draft *Memorandum of Understanding regarding Joint Sexual Misconduct Investigations*. The Memorandum addresses the requirements of the main paragraph of ¶444, but to our knowledge, this Memorandum of Understanding has not been finalized. Additionally, COPA provided a revision to the draft ordinance 2-78-120, which provides direction and gives COPA the authority to investigate sexual misconduct allegations. The draft ordinance addresses ¶444, but it has not yet replaced the current ordinance in place.

Having reached Full compliance in the last reporting period, the Office of the Inspector General focused efforts on maintaining Full compliance in the fifth reporting period. PSIG's *General Policy Manual* produced last reporting period continued to address the requirements of ¶444(a) and (b). Additionally, PSIG's *Report on Investigations of Sexual Misconduct Allegations Against Chicago Police Department Members* continues to address 444(c) by laying the groundwork for the CPD and COPA to properly and uniformly classify sexual misconduct cases in a manner that is easily searchable for patterns of behavior.

Additionally, PSIG's training materials (*Neurobiology of Trauma and Applying Trauma-Informed Investigative Techniques*; *Resilience, Virtual Sexual Assault Crisis Intervention Training*; *Trauma Informed Investigative Techniques*) provided in the last reporting period continue to address ¶444.

Lastly, this reporting period, the Deputy PSIG informally submitted a memorandum discussing its performance related to the requirements of ¶444(b). In 2019 through the first nine months of 2021, the Deputy PSIG has steadily improved its reporting to meet the requirements of ¶444(b).

With the finalization of COPA's *Sexual Misconduct Investigations* Policy, COPA moved into Preliminary compliance in the fifth reporting period. Although the CPD made efforts towards Preliminary compliance, ultimately, the CPD must finalize policies that instruct compliance with ¶444. The Office of the Inspector General remained in Full compliance this period. We look forward to working with the CPD

---

[54] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

to finalize policies that instruct compliance with ¶444. We look forward to receiving information from COPA in the sixth reporting period including training materials that reflect compliance with ¶444. Lastly, we look forward to the Office of the Inspector General providing information in the coming reporting periods that demonstrates continued compliance with ¶444.

### Paragraph 444 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶445

> **445.** *The City will use best efforts to initiate and undertake a process with the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office to share information on at least a quarterly basis regarding any affirmative judicial findings made during the course of criminal proceedings that a CPD member was untruthful, including any findings made at suppression hearings. Upon receipt of information from the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office that may suggest misconduct COPA will initiate the intake process.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:** Quarterly  ☐ **Met**  ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[55] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not Yet Assessed* |

In the fifth reporting period, COPA reached Preliminary and Secondary compliance with ¶445. The CPD did not reach Preliminary compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶445, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[56] To evaluate Secondary compliance with ¶445, the

---

[55] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[56] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and*

IMT reviewed the CPD's and COPA's training development, implementation, and evaluation (¶286).

*Progress before the Fifth Reporting Period*

In past reporting periods, the City did not reach Preliminary compliance with ¶445 or the corresponding quarterly deadline to share information as stated in the Consent Decree. COPA submitted Policy 1.3.8, *Civil and Criminal Complaint Review*, and Policy 3.1.1, *Intake*, for evidence of compliance. Although COPA made efforts towards helping the City achieve Preliminary compliance, we stressed that it is crucial that the City take a more holistic approach toward compliance with this paragraph making sure that ¶445 requirements are understood and mandated by the City, not just COPA.

*Progress in the Fifth Reporting Period*

This reporting period, both the City and the CPD continued to work toward Preliminary compliance, but the CPD and BIA did not produce any information that pertained to the requirements of ¶445.

COPA's Policy 3.1.1, *Intake*, includes a commitment to share "affirmative judicial findings made during the course of criminal proceedings that a CPD member was untruthful, including any findings made at a suppression hearing." This incorporates the requirements of ¶445. In the fifth reporting period, COPA provided a training titled *Intake Unit: Overview of Policies and Procedures: In Service 2021*. A portion of this training instructed compliance with ¶445. COPA provided this training to at least 95% of their personnel propelling them towards Secondary compliance. While the City cannot force non-City entities to meet the requirements of ¶445, we applaud COPA's initiative to make the commitment to provide the information to other agencies. The City cannot fulfill the requirements of this paragraph through COPA's efforts alone. The City should ensure that BIA and CPD have a similar policy.

The finalization of COPA's *Intake* Policy, moved COPA moved into Preliminary compliance with ¶445. With COPA's *Intake Unit: Overview of Policies and Procedures: In Service 2021* training, which was provided to at least 95% of its personnel, COPA moved into Secondary compliance. This period, the CPD did not produce any information that instructs compliance with ¶445. We understand that the City cannot force non-City entities to meet the requirements of this paragraph. However, COPA has taken the initiative to ensure they provide this information to other

---

*Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

agencies. This paragraph cannot be in compliance through the efforts of COPA, alone. We look forward to the City prioritizing the development and finalization of policies that instruct compliance with ¶445 in the sixth reporting period.

### Paragraph 445 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶446

*446. In the course of investigating a complaint, the City, CPD, and COPA will ensure: a. within five business days of receipt of a non-confidential complaint COPA or BIA will send non-anonymous complainants or their representatives a written notice of receipt. The notice will include the unique tracking number assigned to the complaint. The notice will advise the complainant or his or her representative whether BIA or COPA will be investigating the complaint, and how the complainant or his or her representative may inquire about the status of the investigation. The notice will not contain any language discouraging participation in the investigation. b. within 60 days of the final disciplinary decision the complainant will be provided a copy of the Administrative Summary Report.*

| Compliance Progress | | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW)[57] |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, COPA reached Secondary compliance with ¶446 and the CPD reached Preliminary compliance with this paragraph. Because both city entities have now reached Preliminary compliance, the City has reached Preliminary compliance.

To evaluate Preliminary compliance with ¶446,, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[58] To evaluate Secondary compliance with this paragraph, we

---

[57] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[58] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among

reviewed the entities training development, materials, implementation, and evaluation (¶286).

*Progress before the Fifth Reporting Period*

In past reporting periods, the CPD and COPA made progress toward compliance at different rates. While COPA reached Preliminary compliance in the fourth reporting period, the CPD had not yet finalized or implemented their policies relevant to ¶446 by the end of the fourth reporting period. While the CPD provided a draft of General Order, G08-01-02[59] and BIA provided a draft of its *Assignment of Administrative Log Number Investigations* Unit Directive,[60] the policies were not revised, finalized, and implemented by the end of the fourth reporting period. COPA reached Preliminary compliance by finalizing Policy 3.2.2, *Timeliness Benchmarks*.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance by revising G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. Section IV.A.3 speaks to the requirements of ¶446(a) over which BIA has control. It also notes that COPA will generate the Log Number which provide helpful context and information to BIA members.[61] The IMT provided a no-objection notice in December 2021 to the CPD. The CPD posted the policy for public comment and, on the last day of the reporting period, finalized the G08-01-02.

Additionally, BIA submitted a revised version of Special Order, S08-01-04, *Post Investigation Log Number Procedures* that addresses ¶446(b).[62] We provided a no-objection notice at the end of November 2021. The CPD posted the S08-01-04 for public comment and, on the last day of the reporting period, finalized the S08-01-04. BIA also submitted their *Administrative Summary Report* packet at the end of the previous reporting period that pertains to the requirements of ¶446(b).

Having reached Preliminary compliance in the last reporting period, COPA focused efforts on gaining Secondary compliance. COPA provided its training, *COPA Intake*

---

other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[59] The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[60] CPD and BIA previously named this Unit Directive "Assignment of Administrative Log Number Investigations. This Unit Directive is now named "Initial Responsibilities in Assigned Log Number Investigations.

[61] COPA Policy 3.2.2, *Timeliness Benchmarks* finalized in the fourth reporting period, addresses the timing requirements specified in ¶446(a).

[62] The CPD changed the name of this directive during the revision stage. It was previously known as *Documenting Log Number Investigations and Post Investigations Procedures*.

*Unit: Overview of Policies and Procedures: In Service 2021*, which addressed ¶446 instructs compliance with the paragraph and the related policies. COPA presented this training to at least 95% of its personnel.

With the finalization of G08-01-02 and S08-01-04, the CPD moved into Preliminary compliance. Because COPA provided their *COPA Intake Unit: Overview of Policies and Procedures In Service 2021* training to at least 95% of its personnel, COPA moved into Secondary compliance. We look forward to reviewing the CPD's training on both G08-01-02 and S08-01-04 that demonstrate that personnel are properly trained to mobilize requirements of ¶446. For COPA, we look forward to receiving additional information related to ¶446 efforts to ensure they have sufficiently implemented their policies and training of such policies.

### Paragraph 446 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶447

> ***447.*** *The City and CPD will require that all COPA and BIA person-nel and Accountability Sergeants communicate with complain-ants and involved CPD members in a professional and respectful manner.*

**Compliance Progress**          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) [63] |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, CPD reached Preliminary compliance with this para-graph and COPA reached Secondary compliance with ¶447. This brings the City into Preliminary compliance.

To evaluate Preliminary compliance with ¶447, the IMT reviewed, CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and pub-lic comment periods.[64] To evaluate Secondary compliance with this paragraph, we reviewed the entities training development, materials, implementation, and eval-uation (¶286).

*Progress before the Fifth Reporting Period*

In the last reporting period, the CPD and COPA made progress toward compliance at different rates. While COPA reached Preliminary compliance last reporting pe-riod, the CPD had not yet implemented a policy codifying requirements of ¶447.

---

[63] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[64] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

The CPD and BIA produced two draft directives: Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, and BIA's Standard Operating Procedure, *Conduct of Investigation: Initial Responsibilities*. Both directives remained in the collaborative review and revision process by the end of the fourth reporting period. Additionally, BIA provided training materials related to ¶447. This training remained in need of revisions to address changes in related policies.

COPA, on the other hand, produced and finalized Policy 3.1.1, *Intake*, which elaborates on the requirements of the paragraph, requiring staff to be transparent and to remain objective. COPA sought feedback from their Community Policy Review Working Group. With that, they reached Preliminary compliance.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance by submitting a revised version of BIA's Unit Directive *Initial Responsibilities in Assigned Log Number Investigations*.[65] Although this directive addressed communicating with reporting parties in a professional and respectful manner, it did not address communicating with CPD members in the same manner, which is a requirement of ¶447. Further, this Unit Directive was not finalized by the end of the fifth reporting period.

Additionally, the CPD revised Special Order, S08-01, *Complaint and Disciplinary Investigators and Investigations*, which is a requirement of ¶447. We provided a no-objection notice.[66] The CPD posted S08-01 for public comment and, on the last day of the reporting period, finalized the S08-01.

Lastly, the CPD produced Special Order, S08-01-01, *Conducting Log Number Investigations*, which fully addressed the requirements of ¶447, specifically including language regarding department members, which Special Order, S08-01 did not in-

---

[65] Previous drafts of this Unit Directive were titled *Conduct of Investigation: Initial Responsibilities.*

[66] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

clude. We provided comments to the CPD in September 2021, but this policy remained in the collaborative review and revision process by the end of the fifth reporting period.

Having reached Preliminary compliance in the last reporting period, COPA focused efforts on gaining Secondary compliance. At the end of the previous reporting period, COPA submitted a revised Policy 3.1.1, *Intake*, which addressed ¶447 and included the expectation that COPA employees remain calm, respectful, objective, and professional. COPA finalized this policy. Building on this in the fifth reporting period, COPA provided training materials for its training *COPA Intake Unit: Overview of Policies and Procedures: In Service 2021* for review. The Lesson Plan includes instruction that addresses the requirements of ¶447, and we submitted a no-objection notice.[67] COPA presented this training to at least 95% of its personnel in the fifth reporting period.

With the finalization of S08-01, the CPD moved into Preliminary compliance. Because COPA provided their *COPA Intake Unit: Overview of Policies and Procedures In Service 2021* training to at least 95% of its personnel, COPA moved into Secondary compliance.

We look forward to the CPD continuing to revise and finalize *Initial Responsibilities in Assigned Log Number Investigations* and S08-01-01 in the sixth reporting period. We also look forward to reviewing the CPD's training on S08-01 to mobilize requirements of ¶447. For COPA, we look forward to receiving additional information related to ¶447 efforts to ensure they have sufficiently implemented their policies and training of such policies.

---

[67] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 447 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Accountability and Transparency: ¶448

> ***448.*** *If COPA, BIA, or the district does not arrive at the investigative findings and recommendations within 180 days, COPA, BIA or an Accountability Sergeant will, thereafter, periodically, but not less than once every 60 days, attempt contact with the complainant or his or her representative to provide status updates until the investigative findings and recommendations are issued. Such contacts will be documented in the administrative investigative file. By 2020, this requirement will be satisfied by providing complainants and their representatives the ability to track the status of non-confidential unique tracking numbers from the intake process through final disposition online.*

## Compliance Progress                      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW)[68] |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, COPA maintained Preliminary compliance with ¶448 and the CPD reached Preliminary compliance. This brought the City, as a whole into Preliminary compliance.

To evaluate Preliminary compliance with ¶448, the IMT reviewed, CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[69] To evaluate Secondary compliance with this paragraph, we

---

[68]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[69]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

reviewed the entities training development, materials, implementation, and evaluation (¶286).

*Progress before the Fifth Reporting Period*

In past reporting periods, the CPD and COPA made progress toward compliance at different rates. While COPA reached Preliminary compliance in the fourth reporting period, the CPD had additional work to do in revising and finalizing policies relevant to the paragraph by the end of the fourth reporting period.

In the fourth reporting period, COPA finalized Policy 3.2.2, *Timeliness Benchmarks*, which meets the requirements of ¶448 as it relates to COPA. By the end of the fourth reporting period, the CPD and BIA remained in the drafting and revision stage of creating and finalizing policies that speak to the requirements of ¶448.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance by revising S08-01, *Complaint and Disciplinary Investigators and Investigations*. Throughout the reporting period, the CPD submitted three different revised versions to the IMT for review. Overall, we believe that the revised version of S08-01 includes critical substance. The IMT provided a no-objection notice to the CPD in December 2021.[70] The CPD produced the S08-01 for public comment and, on the last day of the reporting period, finalized S08-01.

COPA did not submit evidence to show their effort toward Secondary compliance with ¶448 in the fifth reporting period.

With this, COPA maintained Preliminary compliance with ¶448. And with the finalization of S08-01, the CPD reached Preliminary compliance. We look forward to COPA and the CPD providing training materials for review that instruct compliance with ¶448 in the next reporting period.

---

[70] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 448 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶449

> **449.** *The City and CPD will notify the complainant in writing if an officer elects to file a labor grievance relating to any discipline imposed as a result of the complainant's complaint. Upon reaching the final disposition, the City and CPD will advise the complainant in writing of the final disposition.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**       *Not Yet Assessed*
**Full:**            *Not Yet Assessed*

The City reached Preliminary compliance with ¶449 in the fifth reporting period through the efforts of the CPD.

To evaluate Preliminary compliance with ¶449, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Fifth Reporting Period*

In the past reporting period, the CPD made progress toward Preliminary compliance, but by the close of the fourth reporting period, the CPD had additional work to do in revising and finalizing Special Order S08-01-04, *Post Investigation Log Number Procedures*, the draft of which addresses the requirements of ¶449.[71]

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance by revising Special Order, S08-01-04, *Post Investigation Log Number Procedures*. In November 2021, the CPD submitted a much improved draft that incorporated the requirements of ¶449. We provided a no-objection notice at the end of November 2021.[72] The CPD posted S08-01-04 for public comment and, on the last day of the reporting period, finalized this policy.

---

[71] This directive was previously submitted to the IMT as *Documenting Log Number Investigations and Post Investigations*.

[72] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the

With the finalization of S08-01-04, the CPD moved into Preliminary compliance. We look forward to reviewing the CPD's training on S08-01-04 that demonstrates that personnel are properly trained to mobilize requirements of ¶449.

### Paragraph 449 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

---

CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶450

*450. CPD will develop and implement policies to ensure that a CPD member who is alleged to be involved in misconduct (the "involved member") receives notice that he or she is under administrative investigation. The policies will provide, at a minimum: a. CPD members under investigation will not receive such notice of confidential investigations, but will receive notice prior to being formally interviewed by COPA, BIA, or an Accountability Sergeant; b. such notice will comport with due process and the law, and will describe the nature of the complaint made against the involved member, and the involved member's rights, but will not contain any information that is part of a confidential investigation; and c. once a CPD member has been notified or otherwise becomes aware that he or she is the subject of an administrative investigation, the CPD member will not review the following documents and evidence related to an incident under administrative investigation, until notified by BIA that he or she is permitted to do so, or as may be required to testify as a witness in criminal or civil proceedings: i. any investigative files; ii. any reports (except for reports about the incident authored by the CPD member); or iii. any other evidence, from any source, including body and dashboard camera footage (except as permitted for purposes of completing incident reports or other documentation).*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

Through the CPD, the City made efforts toward, but ultimately did not reach Preliminary compliance with ¶450 in the fifth reporting period.

To evaluate Preliminary compliance with ¶450, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Fifth Reporting Period*

During the fourth reporting period, BIA remained in the drafting and revision stage of creating and finalizing policies that speak to the requirements of ¶450. BIA had previously submitted BIA's *Accountability Sergeant* Unit Directive that spoke to but

did not fully address the requirements of ¶450. In addition, BIA submitted BIA's *Administrative Misconduct Investigations* Unit Directive, which did address ¶450 and the subparagraphs. These directives were not finalized by the end of the fourth reporting period.

*Progress in the Fifth Reporting Period*

At the start of this reporting period, we provided a no-objection notice to BIA's Unit Directive, *Administrative Misconduct Investigations*.[73] This directive completely addressed the requirements of ¶450 and its subparagraphs, just like in the fourth reporting period. However, this policy has not yet been posted for public comment and subsequently has not been finalized. The CPD and BIA also submitted a first draft of Special Order, S08-01-01, *Conducting Log Number Investigations* that addressed all requirements of ¶450 and its subparagraphs. However, this policy has not yet been revised based on the IMT and the OAG's comments and has not been posted for public comment.

Although the CPD made efforts toward Preliminary compliance, they ultimately had not finalized policies that demonstrated compliance with ¶450 by the end of the reporting period. We look forward to learning more about the CPD's and BIA's efforts to receive public feedback on its Unit Directive, *Administrative Misconduct Investigations*. We also look forward to engaging in further collaborative review and revision of S08-01-01 in the next reporting period.

### Paragraph 450 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

---

[73] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶451

**451.** *A CPD member who reviews audio or video evidence for purposes of completing an incident report will document in writing that he or she reviewed the evidence in each relevant incident report.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶451 in the fifth reporting period.

To evaluate Preliminary compliance with ¶451, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms."

### Progress before the Fifth Reporting Period

In past reporting periods, the CPD made progress toward Preliminary compliance but had additional work to do in revising and finalizing policies that fully address the requirements of ¶451. The CPD provided revised versions of Special Order S03-14, *Body Worn Cameras*, but it did not sufficiently address ¶451 because it still did not require officers to document in an incident report whether they reviewed the evidence.

### Progress in the Fifth Reporting Period

This reporting period, the CPD and BIA produced no information pertaining to the requirements of ¶451.

We look forward to receiving policies from the CPD for review that instruct compliance with ¶451 in the sixth reporting period.

## Paragraph 451 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶452

> *452. Consistent with the applicable collective bargaining agreements, CPD will require members to cooperate with administrative investigations, including appearing for an administrative interview when requested by COPA, BIA, or an Accountability Sergeant and will provide all requested documents and evidence under the CPD member's custody and control.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶452 in the fifth reporting period through the efforts of the CPD.

To evaluate Preliminary compliance with ¶452, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Fifth Reporting Period*

In past reporting periods, the CPD made progress toward both Preliminary and Secondary compliance, but ultimately had more work to do in revising and finalizing policies relevant to ¶452. By the end of the fourth reporting period, the CPD and BIA remained in the drafting and revision stage for General Order G08-01, *Complaint and Disciplinary Procedures*. In addition to their progress toward Preliminary compliance, BIA provided the *Log Number Investigations* training which is relevant to ¶452. The training, too, remained in collaborative review by the end of the fourth reporting period.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance by revising G08-01, *Complaint and Disciplinary System*.[74] This policy instructs compliance with all requirements listed in ¶452. Throughout the reporting period, the CPD submitted multiple revisions to G08-01. We submitted a no-objection notice

---

[74] CPD previously submitted versions of G08-01 named *Complaint and Disciplinary Procedures*.

to the policy in November 2021.[75] The CPD posted the General Order for public comment and, on the last day of the reporting period, finalized G08-01.

With the finalization of G08-01, the CPD moved into Preliminary compliance. We look forward to reviewing the CPD's training on G08-01 that demonstrates that personnel are properly trained to mobilize requirements of ¶452.

### Paragraph 452 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

---

[75]   Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to re-solve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶453

**453.** *If a criminal investigation of a CPD member's conduct has commenced, COPA, BIA, or the Accountability Sergeant will continue the administrative investigation, absent specific circumstances that would jeopardize the criminal investigation. In such circumstances, the determination to postpone the administrative investigation, along with the rationale for doing so, will be documented by COPA, BIA or the district in writing.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[76] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, COPA reached Preliminary compliance with ¶453. The CPD made efforts toward but did not ultimately reach Preliminary compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶453, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[77]

---

[76] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[77] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Fifth Reporting Period*

In past reporting periods, both the CPD and COPA made progress toward compliance at different rates. COPA compiled and submitted their Policy, 3.1.2, *Fact Gathering and the Investigative Process,* which addressed ¶453 but it had not yet been posted for public comment. The CPD, on the other hand, did not provide any evidence of efforts pertaining to ¶453.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance by compiling and submitting Special Order, S08-01-01, *Conducting Log Number Investigations*, which addressed ¶453. This policy goes beyond the requirements of ¶453, providing additional direction regarding documenting situations in writing, uploading the documentation into the CMS, and directing BIA Investigator/Accountability Sergeant to notify their supervisor. The IMT provided comments to the CPD in September 2021 and has not since received a revised draft of S08-01-01. The policy still remains in the collaborative review and revision process.

During this reporting period, COPA also continued to work toward Preliminary compliance by submitting a revised version of COPA Policy, 3.1.2, *Fact Gathering and the Investigative Process*, which addresses the requirements of ¶453 verbatim. COPA's Community Policy Review Working Group reviewed and provided feedback to COPA during the previous reporting period. The comments received were taken into consideration, and the policy was finalized at the end of November, 2021.

Because the CPD has not yet finalized S08-01-01, the CPD did not reach Preliminary compliance. COPA reached Preliminary compliance by finalizing *Fact Gathering and the Investigative Process* in this reporting period. We look forward to working with the CPD as they revise and finalize S08-01-01 in the next reporting period. Related to COPA, we will look to review training materials that instruct compliance with ¶453.

### Paragraph 453 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶454

**454.** *COPA, BIA, and the districts will conduct objective, compre-
hensive, and timely investigations of complaints.*

| Compliance Progress | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD reached Preliminary compliance with ¶454 and COPA reached Secondary compliance with this paragraph. With this, the City as a whole reached Preliminary compliance.

To evaluate Preliminary compliance with ¶454, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[78] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Fifth Reporting Period*

In past reporting periods, the CPD and COPA made progress toward compliance at different rates. While COPA reached Preliminary compliance in the fourth reporting period, the CPD had additional work to do in revising and finalizing policies relevant to these paragraphs by the end of the fourth reporting period. COPA finalized two Policies, *Recommendations Regarding Department Member Duties and Power* and *Fact Gathering and the Investigative Process*; both address the requirements of ¶454. By the end of the fourth reporting period, the CPD and BIA remained in the drafting and revision stage of creating and finalizing policies that speak to the requirements of ¶454.

---

[78] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance by revising G08-01, *Complaint and Disciplinary System*.[79] In late November 2021, the CPD submitted an improved draft G08-01 that addressed the requirements of ¶454 by stating that BIA Investigators and Accountability Sergeants will conduct objective, comprehensive, and timely Log Number Investigations into complaints. We submitted a no-objection notice to the policy. The CPD posted this policy for public comment and, on the last day of the reporting period, the CPD finalized the General Order. Additionally, the CPD submitted a revised S08-01, *Complaint and Disciplinary Investigators and Investigations*, which also fully addresses the requirements of ¶454, and to which we submitted a no-objection notice. The policy was posted for public comment, and on the last day of the reporting period, the CPD finalized the S08-01.

Having reached Preliminary compliance in the last reporting period, COPA focused efforts on gaining Secondary compliance. COPA compiled and submitted for review various documents during the reporting period, including 3.1.4, *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement*; 3.1.6, *Clear and Column CMS Systems*; 3.1.1, *Intake*; 2.1.2, *Transparency Issues – Release of Video and Related Materials*; *Candidates for COPA Employment*; and *Major Incident Responses*. All policies address the requirements of ¶454 and even go further than the requirements of the paragraph in many instances.

Making efforts toward Secondary compliance, COPA submitted materials for *COPA Intake Unit: Overview of Policies and Procedures: In Service 2021 Training*. The lesson plan addressed the training requirements of ¶454 and is consistent with language used in recently published policies and training blocks. Rather than simply telling trainees that investigations should be "objective, comprehensive, and timely," the training provides concrete instruction on how to conduct investigations such that they are "objective, comprehensive, and timely." Overall the training provides clear and detailed instruction in an engaging and easy-to-follow format. This training was presented to at least 95% of COPA's personnel. Additionally, COPA provided materials for the training for *Case Management System: Overview of Policy and Procedures* that addressed the principles of ¶454. We understand that COPA has plans to provide this training to its personnel in January 2022.

With this, COPA reached Secondary compliance with ¶454 and the CPD reached Preliminary compliance. Moving forward, we will look for the CPD to develop and provide for review training materials that instruct compliance with ¶454. Related to COPA, we look forward to COPA training at least 95% of its personnel in their

---

[79] BIA and CPD previously submitted this General Order as *Complaint and Disciplinary Procedures*.

*Case Management System: Overview of Policy and Procedures* training in the sixth reporting period.

### Paragraph 454 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶455

> **455.** *All investigative findings will be based on the appropriate standard of proof. This standard will be clearly delineated in COPA and BIA policies, training, and procedures.*

| Compliance Progress | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|
| **Preliminary:** | *In Compliance* (NEW)[80] |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, COPA maintained Preliminary compliance with ¶455 and the CPD reached Preliminary compliance. This brought the City into Preliminary compliance with this paragraph.

To evaluate Preliminary compliance with ¶455, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[81] To evaluate Secondary compliance, the IMT reviewed the entities training development, implementation, and evaluation (¶286).

*Progress before the Fifth Reporting Period*

In the fourth reporting period, we reviewed several items relevant to the CPD's efforts toward compliance with ¶455, including draft G08-01, *Complaint and Disciplinary System*, that did not address ¶455 by the close of the fifth reporting period. Additionally, we reviewed *Findings, Recommendations and Effective Log*

---

[80] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[81] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Number Closings Training* that did address the requirements of ¶455, but the information from the training was not included in policy. Therefore, the CPD did not reach Preliminary compliance.

COPA met Preliminary compliance with ¶455 in the fourth reporting period by finalizing its policy 3.1.3, COPA's *Final Summary Report*.

*Progress in the Fifth Reporting Period*

At the start of the fifth reporting period, the City entities were in different stages of compliance. The CPD continued to work toward Preliminary compliance. COPA, on the other hand, began working toward Secondary compliance.

This reporting period, the CPD revised G08-01, *Complaint and Disciplinary System*.[82] In late November 2021, the CPD submitted an improved draft of G08-01 that addressed the requirements of ¶455 by stating that "investigative findings will be supported by the appropriate standard of proof and documented in writing." The policy goes beyond the requirements of ¶455 requiring that each allegation associated with a Long Number Investigation include a separate finding. We provided a no-objection notice in December 2021.[83] The CPD posted this policy for public comment and, on the last day of the reporting period, the CPD finalized the directive.

COPA did not produce evidence of steps toward Secondary compliance with ¶455 in the fifth reporting period.

In the coming reporting periods, we will look for the CPD to provide training materials for review that instruct compliance with ¶455. We recognize that BIA has several training materials related to ¶455 and hope that they revise and finalize training during the sixth reporting period based on the approved and most recent policies. For COPA, we anticipate receiving draft training materials related to ¶455's requirements and COPA's related policy.

---

[82]  BIA and CPD previously submitted this General Order as *Complaint and Disciplinary Procedures*.

[83]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 455 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶456

**456.** *The City will ensure that the disciplinary histories of current and former CPD members are reviewed prior to employment with COPA, or assignment within BIA or as an Accountability Sergeant.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW)[84] |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This reporting period, COPA and the CPD reached Preliminary compliance with ¶456. With this, the City reached Preliminary compliance.

To evaluate Preliminary compliance with ¶456, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[85]

*Progress before the Fifth Reporting Period*

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeants* Unit Directive that included specific standards to disqualify candidates from serving as Accountability Sergeants. The IMT continuously raised concerns regarding the low standards that had been set in the directive.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance by revising S08-01, *Complaint and Disciplinary Investigators and Investigations*. In

---

[84] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[85] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

late November 2021, the CPD submitted an improved draft S08-01 that included a substantial revision to the minimum standards for the selection of Investigators. This revision was responsive to concerns raised during the collaborate process outlined in the Consent Decree. This policy addresses the requirements of ¶456. The IMT provided a no-objection notice in December 2021. The CPD posted this policy for public comment and, on the last day of the reporting period, the CPD finalized the directive.

This reporting period, COPA continued to work toward Preliminary compliance by compiling for review a draft policy, *Candidates for COPA Employment – Current or Former Chicago Police Department Members*. This policy provides thorough guidance for the hiring process of former and current CPD employees and exceeds the requirements of ¶456. The IMT provided a no-objection notice.[86] This policy was reviewed and commented on by COPA's Community Policy Review Working Group. This policy was finalized at the end of the fifth reporting period.

With this, COPA and the CPD reached Preliminary compliance. In the coming reporting periods, we will look forward to evidence that individuals responsible for hiring to BIA and COPA are aware of candidate requirements as set out by ¶456 and their respective policies. The CPD and COPA will then need to provide proof that they are following their respective policies.

### Paragraph 456 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

---

[86]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶457

**457.** *Within 90 days of the Effective Date, CPD will create a written policy regarding the circumstances under which BIA will retain and investigate complaints itself and under which BIA will transfer complaints to a CPD district for investigation. The policy will include as factors in that decision: consideration of the involved CPD member's complaint and disciplinary history and the seriousness of the alleged misconduct. It will be designed to ensure that all investigations are completed in a timely and thorough manner and in compliance with this Agreement.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**    *In Compliance* (NEW)
**Secondary:**      *Not Yet Assessed*
**Full:**           *Not Yet Assessed*

The City reached Preliminary compliance with ¶457 in the fifth reporting period through the efforts of the CPD.

To evaluate Preliminary compliance with ¶457, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD provided various policy and training documents for review, including S08-01, *Complaint and Disciplinary Investigators and Investigations* policy, and BIA's *Assignment of Administrative Log Number Investigations* Unit Directive. These draft policies sought to address the requirements of ¶457. Additionally, CPD provided BIA's *Intake and Case Assignment Process On-Boarding* training that partially addressed ¶457. However, by the end of the fourth reporting period, additional revisions were needed. Although the CPD had provided policies that addressed requirements of this paragraph, the policies had not finalized following the process set out in the Consent Decree—including a need for posting for public comment.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance by revising S08-01, *Complaint and Disciplinary Investigators and Investigations*. In late November 2021, the CPD submitted an improved draft of S08-01 that ad-

dressed the requirements of ¶457. We provided a no-objection notice.[87] Thereafter, the CPD posted this policy for public comment and, on the last day of the reporting period, the CPD finalized the directive. Additionally, BIA provided a "finalized" version of the *BIA Accountability Sergeants* Unit Directive that provided an in-depth consideration of all requirements in ¶457, even adding considerations beyond what is required in this paragraph. But, we note that, this Unit Directive has not been posted for public comment.

The CPD reached Preliminary compliance through S08-01. Moving forward, the CPD will need to obtain no-objection notices, post for public comment, and thereafter finalize relevant Unit Directives that instruct compliance with ¶457 and related policies. Additionally, we look forward to receiving training materials for review that instruct compliance with ¶457 and their respective policies.

### Paragraph 457 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

---

[87] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the IMT and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶459

> **459.** *Within 30 days of receiving an allegation: a. COPA and BIA will assess the allegation to determine whether the complainant has alleged potential misconduct; and b. if potential misconduct is alleged, COPA, BIA, or the district will initiate a Preliminary investigation into the complaint.*

### Compliance Progress　　　　　(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[88] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶459 in the fifth reporting period. The CPD has made efforts toward but has not reached Preliminary compliance because it has not finalized a policy related to ¶459's requirements. COPA reached Secondary compliance with this paragraph in the fifth reporting period. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶459, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[89]

To evaluate Secondary compliance, the IMT reviewed the entities training development, implementation, and evaluation (¶286).

---

[88] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[89] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Fifth Reporting Period*

In the previous reporting period, the CPD provided BIA's *Complainant Communications and Timeliness policy,* which sought to address the requirements of ¶459 but was not finalized prior to the end of the reporting period. Additionally, the CPD provided BIA's *Policies and Communications Techniques Onboard and Annual Training,* which oversimplified the requirements of ¶459 and required additional revisions.

In the fourth reporting period, COPA finalized its policy 3.2.2, *Timeliness Benchmarks Jurisdictional Decisions, Triage and Preliminary Investigation* that addressed the requirements of the paragraph.

*Progress in the Fifth Reporting Period*

At the start of the fifth reporting period, City entities were in different stages of compliance. The CPD continued to work toward Preliminary compliance. COPA, on the other hand, began working toward Secondary compliance in this reporting period.

The CPD continued to work toward Preliminary compliance by revising the Policy, *Initial Responsibilities in Assigned Log Number Investigations*. This policy addresses all requirements in ¶459 in its entirety. However, the CPD has not yet posted the directive for public comment and therefore has not been finalized following the process outlined in the Consent Decree. The CPD also presented Special Order, S08-01-01, *conducting Log Number Investigations* for review. The IMT provided comments to the CPD in September 2021. The policy remains in the collaborative review and revision process.

Having reached Preliminary compliance in the last reporting period, COPA focused efforts on gaining Secondary compliance. COPA compiled and submitted for review materials for a training *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021*. The lesson plan properly trains on all requirements set out in ¶459. COPA presented this training to at least 95% of its personnel propelling them into Secondary compliance.

In the coming reporting periods, we will look to work with the CPD in the collaborative review and revision process for S08-01-01. We also look forward to working with BIA as they develop a process for posting their Unit Directives for public comment. For COPA, we will look for evidence that COPA has sufficiently implemented and trained upon the requirements of ¶459 and their respective policies.

## Paragraph 459 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶460

**460.** *Preliminary investigations will take all reasonable steps to discover any and all objective verifiable evidence relevant to the complaint or administrative notification through the identification, retention, review, and analysis of all available evidence, including, but not limited to: all time-sensitive evidence, audio and video evidence, physical evidence, arrest reports, photographic evidence, GPS records, computer data, and witness interviews. All reasonable steps will be taken to preserve relevant evidence identified during the Preliminary investigation.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[90] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶460 in the fifth reporting period. The CPD provided no information related to ¶460's requirements in the fifth reporting period. COPA maintained Preliminary compliance with this paragraph and produced evidence of steps toward Secondary compliance with ¶460 in the fifth reporting period. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance. To evaluate Preliminary compliance with ¶460, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[91] To evaluate Secondary compliance, the IMT reviewed the entities training development, implementation, and evaluation (¶286).

---

[90] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[91] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among

*Progress before the Fifth Reporting Period*

In the fourth reporting period, the CPD submitted several policies for review that sought to address the requirements of ¶460, including BIA's *Conduct of Investigation: Sworn Affidavits and Sworn Affidavit Overrides* policy, *Complainant Communication Procedures and Timelines* policy, *Conduct of Investigations: Initial Responsibilities* policy, and *Intake Initiation of Log Number* policy. By the end of the fourth reporting period, the CPD had not yet finalized the policies following the process set out in the Consent Decree. COPA, in the fourth reporting period, finalized its Policy 3.1.2, *Fact Gathering and the Investigative Process*, which addressed the requirements of ¶460.

*Progress in the Fifth Reporting Period*

The CPD did not produce evidence of steps toward Preliminary compliance with ¶460 in the fifth reporting period.

Having reached Preliminary compliance in the last reporting period, COPA focused efforts on gaining Secondary compliance. COPA submitted for review materials for a training titled *Intake Unit: Overview of Policies and Procedures In-Service 2021*. The lesson plan trains on partial requirements set out in ¶460. However, it does not address "*identification, retention, review, and analysis of all available evidence, including, but not limited to: all time-sensitive evidence, audio and video evidence, physical evidence, arrest reports, photographic evidence, GPS records, computer data, and witness interviews*" as required by 460. Although this training did not fully address the requirements of ¶460, COPA did present this training to at least 95% of its personnel in the fifth reporting period.

In the next reporting period, we will look for the CPD to produce policies for review that instruct compliance with the requirements in ¶460. For COPA, we look forward to reviewing the training developed on the *Fact Gathering and the Investigative Process* policy to propel COPA into Secondary compliance.

### Paragraph 460 Compliance Progress History

| FIRST REPORTING PERIOD SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SECOND REPORTING PERIOD SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | THIRD REPORTING PERIOD MARCH 1, 2020 – DECEMBER 31, 2020 |
|---|---|---|
| COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Status Update | COMPLIANCE PROGRESS: Status Update |
| FOURTH REPORTING PERIOD JANUARY 1, 2021 – JUNE 30, 2021 | FIFTH REPORTING PERIOD JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: None | COMPLIANCE PROGRESS: None | |

---

other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

# Accountability and Transparency: ¶461

*¶461 Allegations of misconduct based on verbal abuse will be preliminarily investigated to determine whether it is appropriate to continue the investigation. Anonymously submitted misconduct allegations will be preliminarily investigated to determine whether it is appropriate to continue the investigation, in accordance with the applicable collective bargaining agreements in effect at the time of the allegation is made.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* [92] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶461 in the fifth reporting period. The CPD has made efforts toward, but ultimately, did not reach Preliminary compliance related to ¶461's requirements. COPA reached Secondary compliance with this paragraph in the fifth reporting period.

To evaluate Preliminary compliance with ¶461, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[93] To evaluate Secondary compliance, the IMT reviewed the entities training development, implementation, and evaluation (¶286).

---

[92] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[93] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Fifth Reporting Period*

In the previous reporting period, the CPD produced BIA's *Assignment of Administrative Log Number Investigations* Unit Directive, but it only partially addressed ¶461 and was not finalized by the end of the reporting period. Additionally, the CPD produced BIA's *Investigative Practices Annual Training* that sought to address the requirements of ¶461. COPA, in the fourth reporting period, produced their *Intake* policy and *Fact Gathering and the Investigative Process* policy. The *Intake* policy was finalized and propelled them into Preliminary compliance.

*Progress in the Fifth Reporting Period*

At the start of the fifth reporting period, the City entities were in different stages of compliance. The CPD continued to work toward Preliminary compliance. COPA, on the other hand, began working toward Secondary compliance.

This reporting period, the CPD continued to work toward Preliminary compliance by revising BIA's Unit Directive, *Initial Responsibilities in Assigned Log Number Investigations.*[94] This draft does not address the requirements of ¶461. Additionally, the CPD has not produced the Unit Directive for public comment, and therefore, it has not been finalized through the process outlined in the Consent Decree. Moreover, the CPD compiled and submitted for review S08-01-01, *Conducting Log Number Investigations*, which instructs compliance for all requirements of ¶461 by stating that anonymously submitted complaints will be preliminarily investigated to determine whether it is appropriate to continue the investigation and in accordance with the applicable CBA agreements in effect at the time the complaint is made. The IMT provided comments to the CPD in September 2021, and the policy remains in the collaborative review and revision process.

Having reached Preliminary compliance in the last reporting period, COPA focused efforts on gaining Secondary compliance. COPA provided materials for review from its training *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021*. The lesson plan properly trains on requirement set out in ¶461. COPA presented this training to at least 95% of its personnel.

In the coming reporting periods, we will look for the CPD to finalize S08-01-01 and BIA's Unit Directive, *Initial Responsibilities in Assigned Log Number Investigations.* For COPA, we look forward to receiving additional information related to ¶461 efforts to ensure they have sufficiently implemented their policies and training of such policies.

---

[94] The CPD previously submitted this directive titled "Assignment of Administrative Log Number Investigations."

## Paragraph 461 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶462

*462.* *A signed complainant affidavit will not be required to conduct a Preliminary investigation.*

**Compliance Progress** (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW)[95] |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, COPA reached Secondary compliance with ¶462 and the CPD reached Preliminary compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has reached Preliminary compliance.

To evaluate Preliminary compliance with ¶462, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[96] To evaluate Secondary compliance, the IMT reviewed the entities training development, implementation, and evaluation (¶286).

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD produced a draft of *Conduct of Investigation; Sworn Affidavits and Sworn Affidavit Overrides* policy for review. The IMT noted that if the CPD could finalize that directive along with *Complainant Commu-*

---

[95] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[96] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*nication Procedures and Timelines*, *Conduct of Investigations: Initial Responsibilities*, and *The Assignment of Log Number Investigations*, we anticipated them reaching Preliminary compliance in the fifth reporting period.

COPA, in the fourth reporting period, finalized its Policy 3.1.1, *Intake*, which covers the requirements of ¶462. This brought COPA into Preliminary compliance.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance by submitting a draft BIA Unit Directive, *Initial Responsibilities in Assigned Log Number Investigations*, which addresses the requirements of ¶462. However, this directive has not yet been finalized following the process set out in the Consent Decree. Additionally, the CPD submitted Special Order, S08-01-01, *Conducting Log Number Investigations*, which addresses the requirements of ¶462. We provided comments for improvement, and by the close of the fifth reporting period, this policy remained in the collaborative review and revision stage. Finally, the CPD revised General Order, G08-01, *Complaint and Disciplinary System*.[97] In late December 2021, the CPD submitted an improved draft of G08-01 that addresses the requirements of ¶462 by stating that a sworn affidavit is not required to conduct a preliminary investigation into a complaint. It also includes edits in response to the September 2021 collective bargaining agreement reached with the Fraternal Order of Police which affects affidavit requirements for anonymous complaints. The CPD posted this policy for public comment and, on the last day of the reporting period, the CPD finalized the directive.

Having reached Preliminary compliance in the last reporting period, COPA focused efforts on gaining Secondary compliance. COPA compiled and submitted for review materials for a training titled *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021*. The lesson plan properly trains on the requirements in ¶462. COPA administered this training to its staff during the reporting period—99% percent of staff receiving the training.

With the finalization of G08-01, *Complaint and Disciplinary System*, the CPD reached Preliminary compliance. With COPA training at least 95% of its personnel using their training titled *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021*, COPA reached Secondary compliance.

In coming reporting periods, we look forward to working with the CPD as they finalize BIA Unit Directive, *Initial Responsibilities in Assigned Log Number Investigations*, as well as S08-01-01, *Conducting Log Number Investigations*. For COPA, we

---

[97]    BIA and CPD previously submitted this General Order as *Complaint and Disciplinary Procedures*.

look forward to receiving additional information related to ¶462 efforts to ensure they have sufficiently implemented their policies and training of such policies.

### Paragraph 462 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶463

*463. The City, CPD, and COPA will ensure that, within 30 days of receiving a complaint, COPA, BIA, and Accountability Sergeants initiate and make reasonable attempts to secure a signed complainant affidavit, including in-person visits, phone calls, and other methods. Such attempts will reasonably accommodate the complainant's disability status, language proficiency, and incarceration status. a. If COPA, BIA, or the Accountability Sergeant is unable to obtain a signed complainant affidavit despite having made reasonable attempts to do so, COPA or BIA (for investigations conducted by both BIA and Accountability Sergeants) will assess whether the evidence collected in the Preliminary investigation is sufficient to continue the investigation. b. If the Preliminary investigation reveals objective verifiable evidence suggesting it is necessary and appropriate for the investigation to continue, BIA (for investigations conducted by BIA and Accountability Sergeants) will seek written approval for an override affidavit executed by the Chief Administrator of COPA, and COPA (for investigations conducted by COPA) will seek written approval for an override affidavit executed by the Chief of BIA. c. The Chief Administrator of COPA or the Chief of BIA will provide an override affidavit if there is objective verifiable evidence suggesting it is necessary and appropriate, and in the interests of justice, for the investigation to continue.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[98] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶463 in the fifth reporting period.

---

[98] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

To evaluate Preliminary compliance with ¶463, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[99]

### Progress before the Fifth Reporting Period

In previous reporting periods, the CPD produced BIA's *Conduct of Investigation; Sworn Affidavits and Sworn Affidavit Overrides* policy, which sought to address the requirements of ¶463(a)(b) and (c). However, this policy was not finalized by the end of the fourth reporting period. At the end of the fourth reporting period, we noted that the CPD could reach Preliminary compliance by finalizing the policy as well as its *Complainant Communication Procedures and Timelines* policy, the *Conduct of Investigations: Initial Responsibilities*, and *The Assignment of Log Number Investigations*. In addition to the draft policies, the CPD made progress toward Secondary compliance by submitting various trainings for review that sought to address the requirements of this paragraph. These remained in review and revision process by the end of the fourth reporting period.

### Progress in the Fifth Reporting Period

This reporting period, the CPD continued to work toward Preliminary compliance by submitting for review BIA's Unit Directive, *Initial Responsibilities in Assigned Log Number Investigations*, which addresses the main paragraph of ¶463, and subparagraphs (a) and (b). This Unit Directive has not been finalized following the process set out in the Consent Decree.

The CPD also produced Special Order, S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addresses the main paragraph of ¶463 and subparagraphs (a) and (b). The IMT provided a no-objection notice in December 2021 to the CPD.[100]The CPD posted the Special Order for public comment and, on the last day of the reporting period, finalized the Special Order.

---

[99]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[100]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice."

Lastly, the CPD produced the first draft of S08-01-01, *Conducting Log Number Investigations*, which addresses the main paragraph of ¶463 and subparagraphs (a–c). It provides additional direction regarding the responsibilities of BIA Investigator and Accountability Sergeant. The IMT provided the CPD with comments in late September, 2021. We have not yet received a revised draft of the policy.

This reporting period, COPA continued to work toward Preliminary compliance by submitting for review COPA 3.1.4, *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement*, which addresses the main paragraph of ¶463 and subparagraphs (a) and (c). However, the policy only partially addresses ¶463(b) because it does not mention "objective verifiable evidence" in preliminary investigations. This policy remains in the collaborative review and revision process. Relating to Secondary compliance, COPA provided materials for their training titled *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021* lesson plan, which addresses all requirements of ¶463. COPA presented this training to at least 95% of its personnel.

We applaud the CPD, BIA, and COPA on the work they conducted during this reporting period in providing direction to their investigators and staff in securing an Affidavit. The entities provided a number of policies, directives, and trainings that include the requirements of ¶463. We look forward to working with the CPD and COPA to finalize their policies that address the requirements of this paragraph. We also look forward to receiving training materials from CPD that instruct compliance with ¶463. For COPA, we look forward to receiving information that shows that COPA has sufficiently implemented their polices and provided the respective training as it relates to the requirements of ¶463.

### Paragraph 463 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

---

Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Accountability and Transparency: ¶464

*464. In the course of conducting thorough and complete misconduct investigations, COPA, BIA, and the districts will: a. take all reasonable steps to promptly identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including officer-recorded audio or video taken with body-worn cameras or other recording devices; b. take all reasonable steps to locate and interview all witnesses as soon as feasible, including non-CPD member witnesses, and attempt to interview any complainant or witness in-person at a time and place that is convenient and accessible for the complainant or witness, when feasible; c. determine whether there are any other open administrative investigations involving the same involved member, and monitor or combine the investigation(s), as appropriate; d. audio record non-CPD member interviews subject to the interviewee's consent, or promptly prepare summaries of interviews when the interview is not recorded; e. take all reasonable steps to identify the involved and witness CPD member(s) if the complainant was unable do so; f. determine if there may have been additional misconduct beyond that initially alleged. COPA, BIA, or the district will take all reasonable steps to ensure that such identified misconduct is fully and fairly documented, classified, and investigated; g. as applicable, consider a CPD member's behavior based on the available training records and disciplinary history, including complaints in which allegations were not sustained, as permitted by law and any applicable collective bargaining agreement; and h. identify and take into account known relevant evidence gathered in parallel criminal investigation or criminal or civil litigation, if available.*

### Compliance Progress　　　　(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* [101] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

---

[101] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

In the fifth reporting period, COPA reached Preliminary compliance with ¶464. Although the CPD made efforts toward, they ultimately did not reach Preliminary compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶464, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[102]

### Progress before the Fifth Reporting Period

In previous reporting periods, the CPD submitted for review BIA's draft *Administrative Misconduct Investigations* Unit Directive, which addresses the requirements of ¶464. The CPD also submitted for review their *Photo Room Operations* policy and its *Conduct of Investigation: Initial Responsibilities* policy that sought to address the requirements of ¶464. By the end of the fourth reporting period, the three policies had not yet been finalized.

COPA, in the fourth reporting period, submitted for review policy 3.1.2, *Fact Gathering and the Investigative Process*, which provides excellent detail, expectations, and requirements of the COPA Investigative Process to COPA Investigators. By the end of the fourth reporting period, this policy had not been posted for public comment and was not finalized.

### Progress in the Fifth Reporting Period

This reporting period, the CPD continued to work toward Preliminary compliance and submitted a revised S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addressed ¶464(a), (b), (c), (d), and (f). The IMT provided a no-objection notice in December 2021.[103] The CPD posted the S08-01 for public comment and, on the last day of the reporting period, finalized the Special Order.

---

[102]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[103]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice."

The CPD also submitted the first draft of Special Order, S08-01-01, *Conducting Log Number Investigations*, to which every subparagraph of ¶464 was addressed. The IMT provided comments to the CPD in September 2021; the policy remains in the collaborative review and revision process. The CPD also produced BIA Unit Directive, *Initial Responsibilities in Assigned Log Number Investigations*, which addresses ¶464(b). However, that directive has not been posted for public comment and thereby is not finalized. Lastly, the CPD produced BIA's Policy, *Photo Room Operations* that addressed ¶464(e). The IMT provided a no-objection notice in October 2021 and have not since received any further information from the CPD regarding this Policy.

This reporting period, COPA continued to work toward Preliminary compliance by submitting a revised Policy 3.1.2, Fact Gathering and the Investigative Process, which addresses the majority of ¶464 but does not address ¶464(g). The IMT provided a no-objection notice to this policy in September 2021 and COPA produced the policy for public comment. COPA finalized the policy towards the end of the reporting period. Additionally, at the end of the previous reporting period, COPA presented for review Policy 3.2.1, *Disciplinary and Remedial Recommendations* Policy that sought to address ¶464. The IMT provided a no-objection notice and COPA finalized the policy.

With the finalization of COPA's Policy 3.2.1, *Disciplinary and Remedial Recommendations*, COPA reached Preliminary compliance. Because the CPD does not yet have finalized policies addressing all requirements of ¶464, it has not yet reached Preliminary compliance.

In the coming reporting periods, we look forward to COPA presenting training related to ¶464's requirements. For the CPD, we look forward to working with them to revise and finalize policies relevant to the requirements of this paragraph.

### Paragraph 464 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶465

*465. When conducting an administrative interview of any CPD member, COPA, BIA, and the districts will: a. ask the identity of other persons with whom he or she has communicated regarding the incident in question, and the date, time, place, and content of such communication, subject to any evidentiary privilege recognized under Illinois or federal law; b. ask whether he or she has reviewed any audio or video footage of the incident in question, and, if so, the date, time, and place the video or audio was reviewed; c. ask whether he or she is aware of any media or social media coverage of the incident in question, and, if so, the content and source of such known media coverage; d. note on the record of the interview anytime the CPD member seeks or obtains information from his or her legal or union representative, as well as the length of any "off the record" discussion between the CPD member and his or her legal or union representative and ensure that the CPD member's counsel or representative does nothing to disrupt or interfere with the interview; e. document, and make part of the investigative file, all requests made on behalf of a CPD member to reschedule an interview; and f. audio record all CPD member in-person interviews.*

## Compliance Progress                 (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* [104] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, COPA reached Preliminary compliance with ¶465. Although the CPD made efforts toward, they ultimately did not reach Preliminary compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has reached Preliminary compliance.

---

[104] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

To evaluate Preliminary compliance with ¶465, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms."[105]

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD provided BIA's draft *Administrative Misconduct Investigation* Unit Directive that addressed the requirements of ¶465. This Unit Directive remained in the collaborative review and revision process at the end of the fourth period.

COPA, in the fourth reporting period, provided for review Policy 3.1.2(b), *COPA Interviews-Chicago Police Department Members* that addresses all parts of ¶465. By the end of the reporting period, the policy had not been posted for public comment and had not been finalized.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance and provided a draft S08-01-01, *Conducting Log Number Investigations*. This draft policy speaks to all subparagraphs of ¶465. We provided comments to the CPD in September 2021 and have since received a further revised draft of S08-01-01. This policy remained in the collaborative review and revision process.

Related to BIA's *Administrative Misconduct Investigation* Unit Directive that addresses the requirements of ¶465, we submitted a no-objection notice to this Unit Directive.[106] However, by the end of the reporting period, the directive had not been posted for public comment.

---

[105] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[106] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD

This reporting period, COPA continued to work toward Preliminary compliance and provided for review a revised Policy, 3.1.2(b) *COPA Interviews – Chicago Police Department Members*. This policy is well written and provides the COPA Investigator with proper direction to conduct an interview while maintaining the rights of the CPD member, as well as following legislation. The policy completely addresses the requirements of ¶465. The IMT provided a no-objection notice in September 2021. COPA posted the policy for public comment and finalized the policy in November 2021.

With the finalization of COPA's Policy 3.1.2(b), *COPA Interviews – Chicago Police Department Members*, COPA reached Preliminary compliance. In the coming reporting periods, we look forward to COPA presenting training related to ¶465's requirements. For the CPD, we look forward to working with them to revise and finalize S08-01-01, and BIA's *Administrative Misconduct Investigation* Unit Directive.

### Paragraph 465 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

---

posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶466

*466. When assessing credibility, COPA, BIA, and the districts will: a. make credibility determinations of statements made by complainants, involved CPD members, and witnesses based on independent, unbiased, and credible evidence, taking into account any known record or final determination of deception or untruthfulness in legal proceedings, administrative investigations, or other investigations; and b. critically evaluate all statements, like any other evidence, giving no automatic preference to, or discounting, any statement solely due to its source, including statements made by CPD members.*

| Compliance Progress | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance* [107] |
| CPD | *Not in Compliance* |
| COPA | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| CPD | *Not Yet Assessed* |
| COPA | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, COPA reached Secondary compliance with ¶466. Although the CPD made efforts toward, they ultimately did not reach Preliminary compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City as a whole into Preliminary compliance.

To evaluate Preliminary compliance with ¶466, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[108] To evaluate Secondary compliance, the

---

[107] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[108] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

IMT reviewed the entities training development, implementation, and evaluation (¶286).

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD provided BIA's *Administrative Misconduct Investigations Unit Directive* that sought to address the requirements of ¶466. However, by the end of the fourth reporting period, remained in the collaborative review and revision process.

COPA, in the fourth reporting period, provided their *Final Summary Report*, which addresses ¶¶466(a) and (b) in detail and exceeds the requirements of this paragraph. This propelled COPA into Preliminary compliance in the fourth reporting period.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance and provided draft S08-01-01, *Conducting Log Number Investigations*. This draft policy speaks the requirements of ¶466(a) and (b). We provided comments to the CPD in September 2021 and have not received a further revised draft of S08-01-01. By the end of the fifth reporting period, this policy still remained in the collaborative review and revision process.

Related to BIA's *Administrative Misconduct Investigation* Unit Directive that addresses the requirements of ¶466, we submitted a no-objection notice to this Unit Directive in July 2021. However, by the end of the reporting period, the directive had not been posted for public comment.

Having reached Preliminary compliance in the last reporting period, COPA focused efforts on gaining Secondary compliance. COPA posted Policy 3.1.3 *Final Summary Report* for public comment towards the end of the previous reporting period and finalized the policy on July 30, 2021. COPA also provided materials for the *Witness Reliability: In Service Training*. This training addresses all aspects of ¶446. It provides direction to COPA employees as to how to compare witness statements facts for purposes of assessing witness credibility. The lesson plan was complete and comprehensive, and serves as a primer and fundamental block of instruction for investigators.

By presenting the *Witness Reliability: In Service Training* to at least 95% of COPA's personnel, COPA reached Secondary compliance. In the coming reporting periods, we look forward to COPA presenting evidence that they have sufficiently implemented their policies and training instructing compliance with the requirements of ¶466. For the CPD, we look forward to working with them to revise and finalize S08-01-01, as well as BIA's *Administrative Misconduct Investigation* Unit Directive.

## Paragraph 466 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶467

*467. For each allegation associated with a misconduct investigation, COPA, BIA, or the districts will explicitly identify and recommend one of the following findings: a. "Sustained," where it is determined the allegation is supported by a preponderance of the evidence; b. "Not Sustained," where it is determined there is insufficient evidence to prove the allegations by a preponderance of the evidence; c. "Unfounded," where it is determined, by clear and convincing evidence, that an allegation is false or not factual; or d. "Exonerated," where it is determined, by clear and convincing evidence, that the conduct described in the allegation occurred but is lawful and proper.*

### Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW)[109] |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶467 in the fifth reporting period because the CPD reached Preliminary compliance and COPA maintained Preliminary compliance with this paragraph.

To evaluate Preliminary compliance with ¶467, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[110] To evaluate Secondary compliance, the

---

[109] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[110] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

IMT reviewed the entities training development, implementation, and evaluation (¶286).

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD provided BIA's draft *Administrative Summary Report*. The CPD continued to improve the report with each draft submitted. At the end of the fourth reporting period, however, the *Administrative Summary Report* was still under revision. Additionally, the CPD provided draft G08-01, to which we provided revisions that more closely aligned the language to the requirements of ¶467. This too remained under review and revision at the close of the fourth reporting period. COPA, in the fourth reporting period, finalized Policy 3.1.3, *Final Summary Report*. This brought COPA into Preliminary compliance.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance and provided a revised draft General Order G08-01, *Complaint and Disciplinary System*.[111] This policy instructs compliance with all subparagraphs of ¶467. The IMT provided a no-objection notice in December 2021.[112] The CPD posted the General Order for public comment and, on the last day of the reporting period, finalized the General Order.

COPA did not produce evidence of steps toward Secondary compliance with ¶467 in the fifth reporting period.

In the coming reporting periods, we will look for the CPD to provide training materials for review that instruct compliance with ¶467 and their respective policies. For COPA, we understand they are working to develop training that instructs compliance with ¶467 and their respective policies. We look forward to reviewing both entities' training materials in the sixth reporting period.

---

[111] BIA and CPD previously submitted this General Order as *Complaint and Disciplinary Procedures*.

[112] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 467 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

## Accountability and Transparency: ¶468

> **468.** *COPA, BIA, and the districts will ensure that investigators do not: a. ask leading questions that suggest legal justifications for the CPD member's conduct during interviews of witnesses, complainants, or the involved CPD member; b. make statements that could discourage a CPD member or non-CPD member witness from providing a full account of the specific allegations; c. close an administrative investigation solely because of findings in a related criminal proceedings; d. consider findings in a related criminal investigation to solely determine whether a CPD member engaged in misconduct; e. disregard a witness's statement solely because the witness has some connection to either the complainant or the CPD member or because the witness or complainant has a criminal history; or f. close an investigation solely because the complainant seeks to withdraw the complaint or is unavailable, unwilling, or unable to cooperate with an administrative investigation. If the complainant is unable or unwilling to provide information beyond the initial complaint, the administrative investigation will continue based on the available evidence in accordance with this Agreement, applicable law, and any applicable collective bargaining agreements.*

### Compliance Progress        (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* [113] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, COPA reached Preliminary compliance with ¶468. Although the CPD made efforts toward, they ultimately did not reach Preliminary compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole into compliance, the City has not reached Preliminary compliance.

---

[113] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

To evaluate Preliminary compliance with ¶468, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[114]

### Progress before the Fifth Reporting Period

In previous reporting periods, the CPD provided BIA's *Administrative Misconduct Investigation*, which was thorough and instructed compliance with all of ¶468's requirements. However, by the end of the reporting period, this Unit Directive remained under review and revision. COPA, in the fourth reporting period, made significant progress with *COPA Interviews - Chicago Police Department Members*, 3.1.2(b), which addresses ¶468(a), as well as *Fact Gathering and the Investigative Process*, 3.1.2, which addresses ¶468. By the end of the fourth reporting period, COPA had not finalized either policies.

### Progress in the Fifth Reporting Period

This reporting period, the CPD continued to work toward Preliminary compliance and provided a draft S08-01-01, *Conducting Log Number Investigations*. This draft policy speaks to the requirements of ¶468 and all of its subparagraphs. We provided comments to the CPD in September 2021 and have not received a further revised draft of S08-01-01. By the end of the fifth reporting period, this policy still remained in the collaborative review and revision process.

Related to BIA's *Administrative Misconduct Investigation* Unit Directive that addresses the requirements of ¶468, we submitted a no-objection notice to this Unit Directive.[115] However, by the end of the reporting period, the directive had not been posted for public comment.

---

[114]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[115]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

This reporting period, COPA continued to work toward Preliminary compliance focusing on two policies: 3.1.2, *Fact Gathering and the Investigative Process* and 3.1.2(b), *Interviews – Chicago Police Department Members*. The IMT provided a no-objection notice to both policies. Together, these policies sufficiently addressed the requirements of ¶468. COPA finalized both policies in the fifth reporting period.

With the finalization of 3.1.2 *Fact Gathering and the Investigative Process* and 3.1.2(b) *Interviews – Chicago Police Department Members*, COPA reached Preliminary compliance. In the coming reporting periods, we look forward to reviewing COPA's training materials that instruct compliance with the requirements of ¶468. For the CPD, we look forward to working with them to revise and finalize S08-01-01, and BIA's *Administrative Misconduct Investigation* Unit Directive.

### Paragraph 468 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶469

*469. The City, COPA, and CPD recognize the negative impact of actual bias or the appearance of bias on the legitimacy of administrative investigations. For that reason, conflicts of interest in administrative investigations will be identified and prohibited. The City, COPA, and CPD will ensure the following: a. COPA, BIA, and district personnel will not be assigned to conduct any investigation that could create a conflict of interest; b. an investigation may not be conducted by any supervisor or CPD member who allegedly authorized, engaged in conduct that led to, witnessed, or otherwise allegedly participated in the incident giving rise to the complaint, or who has a conflict of interest as defined by CPD policy or this Agreement. No such person may participate in making any disciplinary recommendations with respect to the investigation; c. no CPD member who has an external business relationship or close personal relationship with an involved CPD member or witness in an administrative investigation will conduct or review the administrative investigation. No such person may participate in making any disciplinary recommendations with respect to the misconduct investigation including in the determination of any applicable grievance or appeal arising from any discipline; and d. no CPD member will participate in making any disciplinary decisions or recommendations with respect to any person to whom he or she directly reports to in his or her chain of command. In cases where CPD is unable to meet this requirement, the investigation must be transferred to OIG.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* [116] |
| | CPD | *Not in Compliance* |
| | COPA | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

---

[116]  As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

The City did not reach Preliminary compliance with ¶469 in the fifth reporting period. Although the CPD made efforts toward, they ultimately did not reach Preliminary compliance. COPA maintained Preliminary compliance with this paragraph in the fifth reporting period.

To evaluate Preliminary compliance with ¶469, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[117] To evaluate Secondary compliance, the IMT reviewed the entities training development, implementation, and evaluation (¶286).

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD produced two policies related to the requirements of ¶469. G08-01-03 provides a complete overview of the conflict-of-interest issue and the *Conflict Certification Form* provides a consistent format for every person involved to certify that they do not have a conflict of interest in the investigation or disciplinary decision.

COPA, in the third reporting period, finalized its Policy 1.1.3 *Conflict of Interest*. The IMT has suggested over the past two reporting periods that COPA review and update this policy as needed to maintain alignment across all COPA policies.

*Progress in the Fifth Reporting Period*

At the start of the fifth reporting period, City entities were in different stages of compliance. The CPD continued to work toward Preliminary compliance. COPA, on the other hand, having reached Preliminary compliance in the third reporting period, continued working toward Secondary compliance in this reporting period.

During this reporting period, the CPD continued to work toward Preliminary compliance. BIA provided its Unit Directive, *Initial Responsibilities in Assigned Log Number Investigations*, which references that the first action in an investigation is to determine whether any conflicts of interest occur, reflecting the requirements of the main paragraph of ¶469. The CPD also provided a draft BIA Unit Directive, *Conflicts of Interest*, which addressed all aspects of ¶469. While we have submitted no-objection notices to these Unit Directives, the CPD has not posted the directives for public comment. Lastly, the CPD provided a draft General Order, G08-

---

[117]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

01-03, *Conflict of Interest* that addresses the requirements of ¶469(a), (c), and (d). The IMT provided a no-objection notice.[118] The CPD posted the G08-01-03 for public comment in December 2021, and on the last day of the reporting period, produced the public comments and finalized the directive.

Having reached Preliminary compliance in the third reporting period, COPA continued to focus their efforts on gaining Secondary compliance. COPA produced a revised COPA *Conflict of Interest and Recusal* Policy, which addresses all requirements of ¶469. The IMT provided a no-objection notice in December 2021. COPA posted the policy for public comments, produced public comments in December 2021, and finalized the policy at the end of the reporting period.

In the coming reporting periods, we will look for the CPD to post their Unit Directives relevant to the requirements of ¶469 for public comment prior to finalization. We also look forward to working with the CPD to ensure they address all subparagraphs in the policy. For COPA, we look forward to receiving and reviewing training materials that instruct compliance with the requirements of ¶469.

### Paragraph 469 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

---

[118] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626−37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627−28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶470

> **470.** *The City will ensure that COPA arrives at the investigative findings and recommendations within 180 days of the initiation of the investigation. Any request for an extension of time must be approved in writing by the Chief Administrator of COPA, or his or her designee, who must provide a short explanation of the reason(s) for granting or denying the extension.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City maintained Preliminary compliance with ¶470 in the fifth reporting period through the efforts of COPA.

To evaluate Preliminary compliance with ¶470, the IMT reviewed COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[119] To evaluate Secondary compliance, the IMT reviewed the entity's training development, implementation, and evaluation (¶286).

*Progress before the Fifth Reporting Period*

In the previous reporting period, COPA produced for review and finalized 3.2.2, *Timeliness Benchmarks*. This policy completely covered the requirements of ¶470 and brought COPA into Preliminary compliance.

*Progress in the Fifth Reporting Period*

COPA did not produce evidence of steps toward Secondary compliance with ¶470 in the fifth reporting period.

In the coming reporting periods, we will look for COPA to provide training materials related to ¶470's requirements and COPA's related policy.

---

[119] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

## Paragraph 470 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Accountability and Transparency: ¶471

> **471.** *The City and CPD will ensure that BIA arrives at the investigative findings and recommendations within 180 days of the initiation of the investigation. Any request for an extension of time must be approved in writing by the Chief of BIA or his or her designee.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶471 in the fifth reporting period through the efforts of the CPD.

To evaluate Preliminary compliance with ¶471, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

### Progress before the Fifth Reporting Period

In previous reporting periods, the CPD provided for review drafts of S08-01, *Complaint and Disciplinary Investigators and Investigations* and BIA's Unit Directive *Case Management System*. Both policies sought to address the requirements of ¶471, but they required additional work and were not finalized by the end of the reporting period. The CPD also submitted training materials related to the requirements of ¶471, but the training provided lacked detail and remained under revision at the end of the fourth reporting period.

### Progress before the Fifth Reporting Period

This reporting period, the CPD continued to work toward Preliminary compliance and provided a draft of BIA's Unit Directive, *Case Management System*. Still, this directive only partially addresses ¶471. We submitted comments in September 2021. The Unit Directive remained in the collaborative review and revision process at the end of the fifth reporting period.

Additionally, the CPD provided multiple revisions to Special Order, S08-01, *Complaint and Disciplinary Investigators and Investigations*. S08-01 fully addresses ¶471 by putting in place the timeline requirement to conclude an investigation. It also provides direction to BIA Investigators and Accountability Sergeants as to how

they are to notify the BIA Chief. The IMT submitted a no-objection notice in December 2021.[120] The CPD posted the S08-01 for public comment and, on the last day of the reporting period, finalized the S08-01. This moved the CPD into Preliminary compliance.

Finally, the CPD produced BIA's *2020 Audit*, where CPD stated they do not believe they are in operational compliance with the requirements of ¶471. While this Audit was well done, we must first point out that we received the 2020 Audit on December 28, 2021—which is several months too late. Moving forward, such audits need to be provided in a timelier manner not only for purposes of demonstrating compliance, but also to allow the CPD to identify areas on which it needs to focus its efforts and attention.

In the coming reporting periods, we will look for the CPD to revise their BIA Unit Directive and eventually post for public comment prior to finalization. Additionally, we strongly encourage the CPD to produce audits, such as BIA's *2020 Audit*, in a timely manner to identify areas to focus efforts and attention moving forward. Lastly, we look forward to receiving training materials related to ¶471's requirements and the CPD's related policies.

### Paragraph 471 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

---

[120] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶472

> **472.** *The City and CPD will ensure that the districts arrive at the investigative findings and recommendations within 90 days of the initiation of an investigation. Any request for an extension of time must be approved in writing by the appropriate District Commander.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶472 in the fifth reporting period through the efforts of the CPD.

To evaluate Preliminary compliance with ¶472, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

### Progress before the Fifth Reporting Period

In previous reporting periods, the CPD provided a draft Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. Although it addressed the requirements of ¶472, it still required additional work in the collaborative review and revision process. The IMT also reviewed BIA Unit Directive, *Case Management System*, but it only partially addresses the requirements of this paragraph and remained in revision at the end of the fourth reporting period. The CPD also submitted training materials toward Secondary compliance, but the training provided lacked detail and was in need of further revision.

### Progress in the Fifth Reporting Period

This reporting period, the CPD continued to work toward Preliminary compliance and provided multiple revisions to Special Order, S08-01, *Complaint and Disciplinary Investigators and Investigations*. S08-01 fully addresses ¶472. The IMT submitted a no-objection notice in December 2021.[121] The CPD posted the Special Order for public comment and, on the last day of the reporting period, finalized S08-01. This brought the CPD into Preliminary compliance.

---

[121]    Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the

Finally, the CPD produced BIA's *2020 Audit*, where the CPD stated they do not believe they are in operational compliance with the requirements of ¶472 because the CMS does not currently have a field for the appropriate District Commander to approve requests for extension of time in writing. While this audit was well done, we must first point out that we received the *2020 Audit* on December 28, 2021—which is several months too late. Moving forward, such audits need to be provided in a timelier manner, not only for purposes of demonstrating compliance, but also to allow the CPD to identify areas on which it needs to focus its efforts and attention.

In the coming reporting periods, we strongly encourage the CPD to produce audits, such as BIA's *2020 Audit*, in a timely manner and identify immediate areas to focus efforts and attention moving forward. Additionally, we look forward to receiving training materials related to ¶472's requirements and the CPD's related policies.

## Paragraph 472 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

---

policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶473

> **473.** *The City will ensure that if COPA does not arrive at the investigative findings and recommendations within 180 days, the Chief Administrator of COPA, or his or her designee, will notify, within five days after the end of the 180-day period, the Mayor or his or her designee, the Superintendent, the Chairman of the City Council Committee on Public Safety, the complainant or his or her representative, and the involved CPD member, or his or her counsel (unless such notification would compromise the integrity of the investigation). Such notification will include the reasons the administrative investigation has not concluded within 180 days. COPA will update such notice every 180 days until the administrative investigation is completed.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City maintained Preliminary compliance with ¶473 in the fifth reporting period through the efforts of COPA.

To evaluate Preliminary compliance with ¶473, the IMT reviewed COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[122] To evaluate Secondary compliance, the IMT reviewed the entity's training development, implementation, and evaluation (¶286).

In the previous reporting period, COPA provided for review Policy 3.2.2, *Timeliness Benchmarks*. This policy addresses the complete requirements for ¶473. This policy was finalized at the end of the previous reporting period. This brought COPA into Preliminary compliance.

COPA did not produce evidence of steps toward Secondary compliance with ¶473 in the fifth reporting period. Their *Timeliness Benchmark* policy remains in place.

---

[122] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

In the coming reporting periods, we look forward to receiving training materials for review related to ¶473's requirements and COPA's *Timeliness Benchmark* policy.

### Paragraph 473 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
| --- | --- | --- |
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
| --- | --- |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Accountability and Transparency: ¶474

> ***474.*** *CPD will ensure that if BIA does not arrive at the investiga-tive findings and recommendations within 180 days, or an Ac-countability Sergeant does not arrive at the investigative find-ings and recommendations within 90 days, BIA will notify, within five days of the end of the designated timeframe, the complain-ant or complainant representative, and the involved CPD mem-ber, or his or her counsel (unless such notification would compro-mise the integrity of the investigation). Such notification will in-clude the reasons for the inability to complete the administrative investigation within the designated timeframe. BIA or the Ac-countability Sergeant will update such notice every 90 days until the administrative investigation is completed.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶474 in the fifth reporting period through the efforts of the CPD.

To evaluate Preliminary compliance with ¶474, the IMT reviewed CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and pub-lic comment periods.

*Progress before the Fifth Reporting Period*

In the previous reporting period, the CPD made efforts toward compliance with ¶474 by providing drafts for review of Special Order, S08-01, *Complaint and Disci-plinary Investigators and Investigations*. However, by the close of the fourth re-porting period, draft S08-01 remained in the collaborative review and revision pro-cess. The CPD also produced training materials related to ¶474, but they lacked detail and did not satisfy the onboarding component of the paragraph as it relates to training.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance and provided drafts of Special Order, S08-01, *Complaint and Disciplinary Investiga-tors and Investigations*, which addresses ¶474 in Sections V.2 and V.3. The IMT

provided a no-objection notice in December 2021 to the CPD.[123] The CPD posted S08-01 for public comment and, on the last day of the reporting period, finalized S08-01.

Finally, the CPD produced BIA's *2020 Audit*, where the CPD stated they do not believe they are in operational compliance with the requirements of ¶474. While this audit was well done, we must first point out that we received the *2020 Audit* on December 28, 2021—which is several months too late. Moving forward, such audits need to be provided in a timelier manner not only for purposes of demonstrating compliance, but also to allow the CPD to identify areas on which it needs to focus its efforts and attention.

In the coming reporting periods, we strongly encourage the CPD to produce audits, such as BIA's *2020 Audit*, in a timely manner and identify immediately areas to focus efforts and attention moving forward. Additionally, we look forward to receiving training materials related to ¶474's requirements and the CPD's related policies.

### Paragraph 474 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

---

[123] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶475

> **475.** *The City and CPD will undertake best efforts to ensure that the identities of complainants are not revealed to the involved CPD member prior to the CPD member's interrogation.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW)[124] |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶475 in the fifth reporting period through the efforts of both the CPD and COPA. Because all relevant City entities must reach levels of compliance to bring the City as a whole into Preliminary compliance.

To evaluate Preliminary compliance with ¶475, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[125]

*Progress before the Fifth Reporting Period*

In the previous reporting periods, the CPD provided draft Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addressed the requirements of this paragraph. However, by the close of the fourth reporting period, draft S08-01 remained in the collaborative review and revision process. Ad-

---

[124] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[125] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

ditionally, the CPD worked to revise BIA's *Administrative Misconduct Investigations* Unit Directive. These policies remained under revision at the end of the fourth reporting period.

COPA, in the fourth reporting period, provided a draft 3.1.2(b), *COPA Interviews-Chicago Police Department Members* for review that addressed the requirements of ¶475. However, by the close of the fourth reporting period, draft 3.1.2(b) remained in the collaborative review and revision process

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance and provided revised drafts of Special Order, S08-01, *Complaint and Disciplinary Investigators and Investigations*, which incorporates the requirements of ¶475. The IMT provided a no-objection notice in December 2021. The CPD posted the S08-01 for public comment and, on the last day of the reporting period, finalized the S08-01

This reporting period, COPA continued to work toward Preliminary compliance and provided a revised draft of Policy 3.1.2(b) *COPA Interviews-Chicago Police Department Members*, which addresses the requirements of ¶475. Policy 3.1.2(b) instructs compliance with ¶475 in Section I.H. which states that "COPA will undertake best efforts to ensure that the identities of complainants are not revealed to the Department member prior to the Department member's interview." The IMT provided a no-objection notice in September 2021. COPA posted the policy for public comments and produced those in November 2021. Additionally, they finalized the policy in November 2021.

In coming reporting periods, we will look for evidence that COPA and the CPD are developing sufficient training to instruct and mobilize compliance with the requirements of ¶475 and each entities' related policies.

### Paragraph 475 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶476

*476. The City, CPD, and COPA will require that COPA and BIA supervisors regularly communicate with the investigators under their supervision, including Accountability Sergeants, to evaluate the progress of administrative investigations.*

| Compliance Progress | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|
| **Preliminary:** | *In Compliance* (NEW)[126] |
| CPD | *In Compliance* (NEW) |
| COPA | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| CPD | *Not in Compliance* |
| COPA | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, COPA maintained Preliminary compliance and the CPD reached Preliminary compliance. This brought the City, overall, into Preliminary compliance with ¶476.

To evaluate Preliminary compliance with ¶476, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[127] To evaluate Secondary compliance, the IMT reviewed the entity's training development, implementation, and evaluation (¶286).

*Progress before the Fifth Reporting Period*

In the fourth reporting period, the CPD made efforts toward compliance with ¶476 by providing draft Special Order, S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addresses the requirements of this paragraph. However,

---

[126] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[127] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

by the close of the fourth reporting period, draft S08-01 remained in the collaborative review and revision process.

COPA reached Preliminary compliance with this paragraph by finalizing Policy 3.2.2, *Timeliness Benchmarks.*

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance revising S08-01, *Complaint and Disciplinary Investigators and Investigations*. The IMT provided a no-objection notice in December 2021 to the CPD.[128] The CPD posted S08-01 for public comment and, on the last day of the reporting period, finalized the Special Order.

COPA maintained Preliminary compliance in the fifth reporting period through their finalized 3.2.2 *Timeliness Benchmarks* Policy, but did not otherwise submit evidence of additional efforts under ¶476 that would bring COPA into Secondary compliance.

Through the efforts of the CPD and COPA, the City reached Preliminary compliance with ¶476 in the fifth reporting period. Moving forward, we will look for evidence that COPA and CPD are developing sufficient training to instruct and mobilize compliance with the requirements of ¶476 and each entities' related policies.

### Paragraph 476 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

---

[128] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶477

> ***477.*** *The City and CPD will undertake best efforts to ensure that all complaints, including anonymous complaints, can be the subject of a misconduct investigation.*

| Compliance Progress | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD)[129] |
| **CPD** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City maintained Preliminary compliance with ¶477 in the fifth reporting period.

To evaluate Preliminary compliance with ¶477, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[130] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Fifth Reporting Period*

In the previous reporting period, the CPD provided G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct*, which addressed the requirements of ¶477.[131] However, by the close of the fourth reporting period,

---

[129]  As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[130]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[131]  The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*,

G08-01-02 remained in the collaborative review and revision process. Additionally, they submitted BIA's *Administrative Misconduct Investigation* directive for review, but had not finalized the Unit Directive per the Consent Decree process. COPA, on the other hand, reached Preliminary compliance through their *Anonymous Complaint Guidance*, which addresses the requirements of ¶477.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued revising General Order, G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which incorporates the requirements of ¶477. The IMT provided a no-objection notice in November 2021.[132] The CPD then posted the G08-01-02 for public comment and, on the last day of the reporting period, finalized G08-01-02, allowing the CPD to maintain Preliminary compliance. Additionally, BIA provided their Unit Directive, *Requirements of a Complete Investigative File*, which incorporates the requirements of ¶477. The IMT provided a no-objection notice, but the CPD finalized the directive without posting for public comment. The IMT contends that all Unit Directives must be posted for public comment prior to finalization per the Consent Decree review process.

COPA provided a revised draft of Policy 3.1.2 *Fact Gathering and the Investigative Process*, which addresses the requirements of ¶477. The IMT provided a no-objection notice in September 2021. COPA posted the policy for public comment and finalized it in November 2021. COPA's *Anonymous Complaint Guidance*, which addresses the requirements of ¶477, continued to provide guidance and detail to COPA employees on how to accomplish the procedures in the *Fact Gathering and the Investigative Process.*

With the finalization of G08-01-02, the CPD maintained Preliminary compliance with ¶477. With the finalization of 3.1.2, COPA maintained Preliminary compliance with ¶477. Moving forward, we will look for CPD to revise BIA's relevant Unit Directive that instructs compliance with this paragraph. After we will look for BIA to

---

and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct.*

[132] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

post this and other Unit Directives for public comment prior to finalizing the policies. Additionally, in the coming reporting periods, we will look for evidence that COPA and CPD are developing sufficient training to instruct and mobilize compliance with the requirements of ¶477 and each entities' related policies.

### Paragraph 477 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶478

> **478.** *Within 120 days of the Effective Date, CPD and COPA will each review and revise its policies regarding Preliminary investigations, including Preliminary investigations of anonymous complaints, and the process for seeking an override affidavit in the absence of a signed complainant affidavit.*

## Compliance Progress　　　(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* [133] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, COPA maintained Preliminary compliance and the CPD made efforts toward but ultimately did not reach Preliminary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not reached Preliminary compliance.

To evaluate Preliminary compliance with ¶478, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[134] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

---

[133] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[134] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD and BIA have focused efforts on developing a collection of policies to comply with ¶478. BIA has attempted to ensure that the requirements of this and related paragraphs are properly addressed through this collection. The IMT reviewed all relevant policies and provided no-objection notices to several policies,[135] but these policies were not finalized following the process outlined in the Consent Decree by the end of the fourth reporting period. On the other hand, COPA, in the previous reporting period, submitted and finalized various policies similar to BIA that the IMT provided no-objection notices to. This brought COPA into Preliminary compliance in the fourth reporting period.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD provided revised drafts of Special Order, S08-01, *Complaint and Disciplinary Investigators and Investigations*, which only partially address the requirements of ¶478. The IMT provided a no-objection notice in December 2021 to the CPD. The CPD posted the S08-01 for public comment and, on the last day of the reporting period, finalized the Special Order. The CPD also submitted a draft Special Order, S08-01-01, *Conducting Log Number Investigations*, attempting to address ¶478. We note however that ¶478 applies to several policies. We look forward to continuing to work with the CPD as they work to revise their relevant policies and procedures.

COPA did not produce evidence of steps toward Secondary compliance with ¶478 in the fifth reporting period.

In the coming reporting periods, we will look for the CPD to ensure they have developed policies that instruct compliance with all requirements of ¶478, including the finalization of S08-01-01. For COPA, we anticipate receiving a training related to ¶478's requirements and COPA's related policy.

---

[135] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 478 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
None

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶479

> **479.** *Within 120 days of the Effective Date, CPD and COPA will each adopt or review and, to the extent necessary, revise its policy establishing investigative timelines, benchmarks, and goals by which the progress of investigations will be measured.*

**Compliance Progress**          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* [136] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, COPA maintained Preliminary compliance and the CPD made efforts toward but ultimately did not reach Preliminary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not reached Preliminary compliance.

To evaluate Preliminary compliance with ¶479, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[137] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD provided a draft BIA Unit Directive, *Investigative Timelines and Benchmarks*, which instructed compliance with ¶479. We

---

[136] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[137] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

submitted a no-objection notice.[138] However, by the end of the fourth reporting period, the Unit Directive had not been posted for public comment and finalized. COPA, on the other hand, finalized its Policy 3.2.2, *Timeliness Benchmarks*, which addressed all requirements of ¶479. This brought COPA into Preliminary compliance.

*Progress in the Fifth Reporting Period*

At the start of the fifth reporting period, the City entities were in different stages of compliance. The CPD continued to work toward Preliminary compliance. COPA, on the other hand, began working toward Secondary compliance.

This reporting period, the CPD continued to work toward Preliminary compliance and provided revised drafts of Special Order, S08-01, *Complaint and Disciplinary Investigators and Investigations*, which partially addresses the requirements of ¶479. We understand that Section V of S08-01 provides a general overview of investigation timelines, but the IMT strongly encourages the CPD develop a standalone public facing directive that specifically addresses investigative timelines. The IMT provided a no-objection notice to S08-01 in December 2021. The CPD posted the S08-01 for public comment and, on the last day of the reporting period, finalized the Special Order. The CPD also submitted a draft Special Order, S08-01-01, *Conducting Log Number Investigations*, which remains under the collaborative review and revision process. Lastly, the CPD and BIA provided no information this reporting period about the finalization of BIA's Unit Directive *Investigative Timelines and Benchmarks*. To be finalized, the CPD must post the Directive for public comment.

COPA did not produce evidence of steps toward Secondary compliance with ¶479 in the fifth reporting period.

In the coming reporting periods, we will look for the CPD to develop a separate directive addressing, in detail, the timelines outlined in Section V of S08-01. Also,

---

[138] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

we look forward to working with the CPD to finalize S08-01-01 and BIA's *Investigative Timelines and Benchmarks* Unit Directive. For COPA, we anticipate receiving a training related to ¶479's requirements and COPA's related policy.

## Paragraph 479 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶480

> **480.** *Within 120 days of the Effective Date, the City, CPD, and COPA will each develop a policy establishing procedures for COPA, BIA, and Accountability Sergeant's review and consideration of evidence from civil and criminal litigation.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* [139] |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, COPA and the CPD made progress toward but ultimately did not reached Preliminary compliance with ¶480.

To evaluate Preliminary compliance with ¶480, the IMT reviewed the development of the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[140]

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD provided a letter from BIA to the IMT indicating that work was "underway" related to addressing requirements of ¶480 through a draft policy entitled "City Policy Regarding Procedures for COPA, BIA and the Accountability Sergeant's Review and Consideration of Evidence from Civil and Criminal Litigation." This information was provided in February 2020.

*Progress in the Fifth Reporting Period*

This reporting period, we received no additional information regarding the draft policy for which we were provided an update in February 2020. Notwithstanding

---

[139] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[140] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

this stall, the CPD continued to work toward Preliminary compliance and provided a draft Special Order, S08-01-01, *Conducting Log Number Investigations*, which addresses ¶480. The IMT provided the CPD with comments in September 2021 and the S08-01-01 remains under the collaborative review and revision process.

This reporting period, COPA continued to work toward Preliminary compliance by finalizing 3.2.2 *Timeliness Benchmarks* Policy. This policy provides general timelines related to COPA accomplishing the requirements of ¶480. In addition, COPA also submitted a draft revised *Civil/Criminal Complaint Review* Policy, which instructs on how COPA personnel will comply ¶480. By the end of the reporting period, this policy remained in the collaborative review and revision process. COPA will need to finalize this policy to move into preliminary compliance with ¶480.

In the coming reporting periods, we will look for the CPD to finalize S08-01-01 and for COPA to finalize *Civil/Criminal Complaint Review*.

### Paragraph 480 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶481

**481.** *The City, CPD, and COPA will ensure that if CPD, COPA, or the OIG requests the Superintendent's authorization to open an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the OIG became aware of the allegations, the Superintendent will respond within 30 days.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* [141] |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *Not in Compliance* |
| **OIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not Yet Assessed* |
| **OIG** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not Yet Assessed* |
| **OIG** | *In Compliance* (FOURTH REPORTING PERIOD) |

In the fifth reporting period, the CPD reached Preliminary compliance with ¶481. The Deputy PSIG maintained Full compliance with ¶481 in the fifth reporting period.[142] Although COPA made efforts toward, they ultimately did not reach Preliminary compliance because their respective policy was not finalized prior to the end of the reporting period. Because all relevant City entities must reach levels of compliance to bring the City, as a whole into compliance, the City did not reach Preliminary compliance.

To evaluate Preliminary compliance with ¶481, the IMT reviewed CPD's, COPA's, and the Deputy PSIG's relevant policies and documents following the policy pro-

---

[141] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[142] In the fifth reporting period, the Deputy PSIG stepped down. Since then, the Interim Acting Deputy PSIG has continued the corresponding compliance efforts under the Consent Decree.

cess described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[143] For COPA specifically, we reviewed a policy that explains the process for requesting the Superintendent to authorize opening an investigation for incidents alleged to have occurred more than five years ago.

To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286), specifically including training on drafting a request to the Superintendent and monitoring for timely response and feedback from CPD, COPA, and the Office of the Inspector General regarding the Superintendent's responses to requests to open an investigation older than 5 years. To evaluate the Deputy PSIG's maintenance of Full compliance with this paragraph, we reviewed all five-year letters the Deputy PSIG submitted to the Superintendent and the Superintendent's response each reporting period to ensure that the Deputy PSIG receives responses from the Superintendent within 30 days.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD provided drafts of G08-01, *Complaint and Disciplinary Procedures* and BIA Unit Directive*, Incidents occurring Five Years Prior to Complaint and Reopening Investigations Five Years After Initiation*. These polices were not yet posted for public comment or finalized at the end of the fourth reporting period.

In past reporting periods, COPA contended that it has no responsibility for this paragraph. The IMT has suggested in previous reporting periods that COPA develop a policy that explains the process for requesting that the Superintendent authorize the opening of "an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the Office of the Inspector General became aware of the allegations," and explaining that the Superintendent, under ¶481, must respond within 30 days.

The Deputy PSIG reached Full compliance in past reporting periods through their *Investigations Section Manual*, which explains the correct procedure for requesting the CPD Superintendent to reopen an investigation pursuant to ¶481.

---

[143] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress in the Fifth Reporting Period*

At the start of the fifth reporting period, the City entities were in different stages of compliance. The CPD and COPA continued to work toward Preliminary compliance. The Deputy PSIG, on the other hand, worked to maintain Full compliance.

This reporting period, the CPD continued to work toward Preliminary compliance and provided revised drafts of General Order G08-01, *Complaint and Disciplinary Procedures*, which addresses the requirements of ¶481. The IMT provided a no-objection in December 2021.[144] The CPD posted the General Order for public comment and, on the last day of the reporting period, finalized the General Order.

This reporting period, COPA continued to work toward Preliminary compliance by submitting a revised draft of their *Civil/Criminal Complaint Review* Policy that instructs compliance with ¶481. By the end of the reporting period, this policy remained in the collaborative review and revision process.

Having reached Secondary and Full compliance in the last reporting period, the Office of the Inspector General focused efforts on maintaining Full compliance. Through the submission of their Five Year Letters that specifically addressed the requirements of ¶481, the Deputy PSIG demonstrated that it continues to fully comply with the requirements of ¶481.

We look forward to receiving information from the CPD related to training on the requirements of ¶481 and their respective policy. We also look forward to COPA finalizing their *Civil/Criminal Complaint Review* Policy pushing them into Preliminary compliance. The Deputy PSIG remained in Full compliance this period through their efforts of developing a comprehensive tracking and reporting procedure. We expect to see similar evidence next reporting period.

---

[144] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 481 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
None

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶482

***482.*** *The City and CPD will ensure that BIA regularly conducts proactive investigations and integrity tests.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶482 in the fifth reporting period through the efforts of the CPD.

To evaluate Preliminary compliance with ¶481, the IMT reviewed the CPD's relevant policies and documents following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

This is the IMT's first time assessing the City's compliance with ¶482. The CPD provided revised drafts of General Order G08-01, *Complaint and Disciplinary System*.[145] This policy instructs compliance with ¶482. The IMT provided a no-objection notice in December 2021.[146] The CPD posted the G08-01 for public comment and, on the last day of the reporting period, finalized the General Order.

With the finalization of General Order, G08-01, the CPD moved into Preliminary compliance with ¶482. Moving forward, we look forward to reviewing the CPD's training materials that demonstrate that personnel are properly trained to mobilize requirements of ¶482.

---

[145] BIA and CPD previously submitted this General Order as *Complaint and Disciplinary Procedures*.

[146] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 482 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary |

# Accountability and Transparency: ¶483

**483.** *The City and CPD will ensure there are regularly conducted satisfaction surveys relating to the complaint intake and investigation processes. The City and CPD will evaluate trends and training opportunities identified as a result of information received from such quality control surveys.*

## Compliance Progress   (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶483 in the fifth reporting period through the efforts of the CPD.

To evaluate Preliminary compliance with ¶483, the IMT reviewed the CPD's relevant policies and documents following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

This is the IMT's first time assessing the City's compliance with ¶483. The CPD provided a revised Special Order S08-01-04, *Post Investigation Log Number Procedures* for review, which addresses ¶483.[147] The IMT provided a no-objection notice in November 2021.[148] The CPD posted the S08-01-04 for public comment, and, on the last day of the reporting period, finalized the Special Order.

With the finalization of S08-01-04, the CPD moved into Preliminary compliance with ¶483. Moving forward, we look forward to reviewing the CPD's training materials that demonstrate that personnel are properly trained to mobilize requirements of ¶483.

---

[147] The CPD previously submitted this Special Order under the title *Documenting Log Number Investigations and Post Investigations Procedures*.

[148] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 483 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary |

# Accountability and Transparency: ¶484

**484.** *If at any time during the intake or investigation of a complaint, COPA, BIA, or Accountability Sergeants find evidence indicating criminal conduct by any CPD member, the Chief Administrator of COPA or Chief of BIA will refer the investigation to the appropriate prosecuting agency.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* [149] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

This reporting period, COPA made notable efforts toward but did not yet reach Secondary compliance with ¶484. Although the CPD made efforts toward, they ultimately did not reach Preliminary compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶484, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. [150] To evaluate Secondary compliance, the IMT reviewed the entities' development, implementation, and evaluation of training (¶286). In addition we also determined whether the entities have developed a

---

[149] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[150] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

means of tracking referrals to prosecuting agencies and developed written guidance guiding the referral and tracking process. To reach Secondary compliance, the entities must train on the developed guiding and tracking process.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD produced for review BIA's *Initiation of Log Numbers in the Case Management System* Unit Directive which sought to address the requirements of ¶484. The IMT provided a no-objection notice for this directive, and we expected that the directive would posted for public comment prior to being finalized per the Consent Decree Review process. COPA, on the other hand, finalized Policy 3.1.1, *Intake* and 3.1.2, *Fact Gathering and the Investigative Process* to address the requirements of this paragraph. These policies brought COPA into Preliminary compliance.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance by providing a first draft of Special Order S08-01-01, *Conducting Log Number Investigations*. This policy only partially addresses the requirements of ¶484 because it does not address the requirement that "BIA will refer the investigation to the appropriate prosecuting agency." (See ¶484). The IMT provided comments to the CPD in September 2021. By the end of the reporting period, this policy remained in the collaborative review and revision process. BIA also produced the Unit Directive *Investigative File Maintenance*, which addresses ¶484. It also makes reference to another BIA Directive, *Criminal Misconduct Investigations* that has not yet been produced to the IMT. These Unit Directives have not yet been finalized following the Consent Decree process.

Having reached Preliminary compliance in the last reporting period, COPA focused efforts on gaining Secondary compliance. COPA provided its training titled *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021*, which instructs compliance with the requirements of ¶484. COPA provided this training to more than 95% of their personnel. This brings COPA closer to Secondary compliance. To reach Secondary compliance in the 6th reporting period COPA should focus on developing written guidance directing and means of tracking referrals to prosecuting agencies. As COPA trained personnel this reporting period regarding intake, it will also need to train personnel on the policy and application of the referral tracking process.

Moving forward, we look forward to working with CPD as they finalize S08-01-01 and various Unit Directives that reflect the requirements of this paragraph. For COPA, we look forward to reviewing policies, written guidance, and training related to the tracking of referrals to prosecuting agencies.

## Paragraph 484 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶486

***486.*** *The City, CPD, and COPA will ensure that CPD and COPA maintain thorough and complete administrative investigative files. Such administrative investigative files will include: a. documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the alleged misconduct. In situations in which there are no known witnesses, the file will specifically state this fact. In situations in which witnesses were present but circumstances prevented the investigator from collecting information from those witnesses, the investigative file will state the reasons why. The investigative file also will include all available identifying information for anyone who refuses to provide a statement; b. documentation of each interview conducted and the recording of those interviews, if available; c. the names of all CPD members who have been identified as witnesses to the alleged misconduct; d. COPA's, BIA's, or the district's narrative description and evaluation of the alleged misconduct, based on its review of the evidence gathered, including a determination of whether the CPD member's actions appear to be within CPD policy, procedure, regulations, orders, or other standards of conduct required of CPD members; e. in cases where material inconsistencies exist between complainant, CPD member, and witness statements, explicit identification of the inconsistencies, including a description of the evidence reviewed and written credibility findings; f. if a CPD member deployed a weapon, documentation of whether the CPD member's certification and training for the weapon were current; g. all CPD member original statements, as well as any amendments or clarifications to the original statement, and any subsequent statements; and h. an explicit identification of each allegation and the recommended finding for each allegation of misconduct in an investigation.*

| Compliance Progress | | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[151] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, the CPD and COPA made efforts toward but ultimately did not reach Preliminary compliance with ¶486.

To evaluate Preliminary compliance with ¶486, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[152]

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD provided BIA's *Requirements of a Compete Investigative File Directive*, which addressed the requirements of ¶486 but, by the end of the fourth reporting period, this Unit Directive had not been posted for public comment and finalized. CPD also submitted *Photo Room Operations* Directive which was also not finalized by the end of the period. Lastly, the CPD submitted BIA's *Administrative Misconduct Investigations* policy, which addressed the requirements of this paragraph, but it was not posted for public comment and finalized before the end of the reporting period.

COPA, on the other hand, informed the IMT that they were working on a policy that addresses the requirements of this paragraph, *Investigative File Maintenance*.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD provided the first draft of Special Order S08-01-01, *Conducting Log Number Investigations*. While it does not fully address 486(a), it

---

[151] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[152] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

does fully address 486(b), (c), (d), (e), (f), (g), (h). The IMT provided comments to the CPD in September 2021. S08-01-01 remains in the collaborative review and revision process. Additionally, the CPD produced BIA's Unit Directive, *Requirements of a Complete Investigative File*, which addresses all subparagraphs of ¶486. However, by the end of the reporting period, the CPD had not posted the Unit Directive for public comment.

This reporting period, COPA continued to work toward Preliminary compliance and provided drafts of COPA 3.1.9, *Investigative File Maintenance*. This policy addresses all subparagraphs of ¶486. The IMT provided a no-objection notice in late December 2021, but by the end of the reporting period the Policy had not been posted for public comment and finalized.

In the next reporting period, we look forward to COPA finalizing their 3.1.9, *Investigative File Maintenance* Policy pushing them into Preliminary compliance. We will also look for the CPD to revise, post for public comment, and finalize S08-01-01 and its *Requirements of a Complete Investigative File* Unit Directive, or other ¶486-related authority.

### Paragraph 486 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶487

> ***487.*** *Investigators will consider all original statements, and any subsequent statements, including amended or modified statements, for purposes of determining whether a CPD member willfully made a false statement about a fact material to the incident under investigation.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* [153] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

This reporting period, COPA reached Preliminary compliance with ¶487. Although the CPD made efforts toward, they ultimately did not reach Preliminary compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City as a whole into Preliminary compliance.

To evaluate Preliminary compliance with ¶487, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[154]

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD submitted for review BIA's *Requirements of a Complete Investigative File* Unit Directive, which addressed the requirements of ¶487. Additionally, the CPD submitted BIA's *Administrative Misconduct Investigations* Unit Directive, which also addressed the requirements of this paragraph.

---

[153] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[154] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

However, by the end of the reporting period both directives had not been posted for public comment and thereby were not finalized.

COPA, likewise submitted 3.1.2 *Fact Gathering and the Investigative Process* that addressed ¶487 but it remained in the collaborative review and revision process at the end of the fourth reporting period.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance and provided a first draft of Special Order S08-01-01, *Conducting Log Number Investigations*, which addresses the requirements of ¶487. We applaud CPD for addressing this paragraph twice in their draft policy as it is a critically important part of the investigative process. The IMT provided comments to the CPD in September 2021. At the end of the fifth reporting period, the policy remained in the collaborative review and revision process.

The CPD also submitted BIA's Unit Directive, *Requirements of a Complete Investigative File*, which addresses ¶487. However, this policy also has not been posted for public comment.

This reporting period, COPA continued to work toward Preliminary compliance by providing a revised Policy 3.1.2 *Fact Gathering and the Investigative Process*, which addresses the requirements of this paragraph. The IMT provided a no-objection notice to COPA in September 2021 and finalized the Policy in November 2021.

Moving forward, we look forward to working with the CPD to finalize S08-01-01 and BIA's Unit Directive, *Requirements of a Complete Investigative File*. For COPA, we look forward to reviewing materials for sufficient training to instruct and mobilize compliance with the requirements of ¶487 and COPA's related policies.

### Paragraph 487 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

## Accountability and Transparency: ¶488

***488.*** *In addition to the general investigative requirements established in this Agreement, with respect to the investigation of officer-involved shootings and deaths, the City and CPD will ensure that: a. COPA investigators be provided the opportunity to participate in the Preliminary assessment during the immediate aftermath of an officer-involved shooting or death to the same extent as any CPD member or any other law enforcement agency investigating the incident; b. the Chief Administrator of COPA, or his or her designee, is present for the first viewing by CPD of available video or audio material related to the incident and when any audio or video material is collected and preserved at or near the scene from CPD or third-party surveillance systems. i. the requirements of subparagraph (b), above, will not apply if: (1) the Chief Administrator of COPA, or his or her designee, has been informed of the incident and is not available; and (2) COPA is not on scene and there is a public safety need to review or listen to certain available audio or video prior to the COPA arrival on scene. c. there is written documentation identifying each CPD member who viewed video evidence or listened to audio evidence at the scene; d. within 30 days of the Effective Date, CPD issues a policy providing that: i. involved and witness CPD members do not discuss the facts relating to the incident with any witness until interviewed by COPA, except to the extent necessary to ensure public safety, as instructed by counsel in relation to civil or criminal proceedings, or participating in CPD officer wellness programs; ii. COPA may extend the prohibition on discussion to the extent necessary to preserve the integrity of the investigation; and iii. in no event may this prohibition extend beyond the final disciplinary decision, if any. e. involved and witness CPD members will be separated, transported separately from the scene, and monitored to avoid contact or communications relating to the incident until released by the responding supervisor at or above the rank of Commander; f. administrative interviews of involved and witness CPD members will be audio recorded and, where possible, video recorded, with COPA investigators present, except that a member may speak with his or her attorney or union representative in private; and g. investigators will not delay interviewing involved and witness CPD members, and will conduct such interviews as soon as feasible, consistent with any applicable collective bargaining agreement. Investigators will document, and make part of the administrative investigative file, all*

*requests made on behalf of involved or witness CPD members to reschedule an interview.*

**Compliance Progress**          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[155] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, the City did not reach Preliminary compliance with ¶488 as neither the CPD nor COPD had finalized policies that address the requirements of the paragraph.

To evaluate Preliminary compliance with ¶488, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[156]

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD and COPA faced challenges preventing successful efforts toward compliance. In the last week of the third reporting period, the City provided the IMT with a two-page Memorandum of Agreement between COPA and the CPD (MOA). On the final day of the fourth reporting period the City submitted the Illinois State Police, Division of Criminal Investigation, *CPD Officer Involved Death Investigation Proposal*, which is somewhat related to the requirements of ¶488. While the CPD implemented G03-06, *Firearms Discharge and Officer Involved Death Incident Response and Investigation*, G03-06 was only intended as a temporary, emergency policy, and it was not intended to fully comply with the Consent Decree requirements. At the end of the reporting period, the City

---

[155] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[156] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

produced an updated suite of directives, including G03-06 and related community engagement.

COPA, in the fourth reporting period, submitted for review COPA's 3.1.2(b) *COPA Interviews-Chicago Police Department Members*, which addressed the requirements of the paragraph.

*Progress in the Fifth Reporting Period*

The CPD did not produce any documentation related to efforts under ¶488 in the fifth reporting period.

Although many of the requirements of ¶488 apply to the CPD, COPA went above and beyond to include such requirements in their draft *Major Incident Responses* Policy. This policy addresses every subparagraph of ¶488 and is a model policy for COPA. The IMT provided a no-objection notice, but by the end of the reporting period, the policy remained in the collaborative review and revision process.

With this, the City did not reach Preliminary compliance. We will look for the CPD to provide draft policies related to ¶488's mandates in the coming reporting period. We also will look forward to COPA finalizing their *Major Incident Responses* Policy for Preliminary compliance.

### Paragraph 488 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶489

> ***489.*** *The City recognizes that officer-involved shootings are traumatic incidents. The City and CPD are committed to treating all impacted with dignity and respect.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[157] |
| | CPD | *Not in Compliance* |
| | COPA | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶489 in the fifth reporting period. Neither the CPD nor COPA reached Preliminary compliance with this paragraph.

To evaluate Preliminary compliance with ¶489, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[158]

### Progress before the Fifth Reporting Period

In the previous reporting period, the City produced an updated suite of directives. The suite was designed to more closely align with requirements of ¶¶488–92, but they were not submitted in time to be implemented following the requisite Consent Decree process.

### Progress in the Fifth Reporting Period

The CPD did not produce any documentation this reporting period that demonstrated efforts related to ¶489. COPA produced a draft *Major Incident Responses*

---

[157] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[158] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

Policy for review.[159] This policy had not yet been finalized by the close of the fifth reporting period.

With this, the City did not reach Preliminary compliance. We will look for the CPD to provide draft policies related to ¶489's mandates in the coming reporting period. We also will look forward to COPA finalizing their *Major Incident Responses* policy for Preliminary compliance.

### Paragraph 489 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

---

[159]   Please refer to the discussion of ¶488 regarding COPA's *Major Incident Responses* Policy.

# Accountability and Transparency: ¶490

> **490.** *The City and CPD are committed to ensuring their actions do not unreasonably impede access to information for families of the injured and deceased.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[160] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶489 in the fifth reporting period.

To evaluate Preliminary compliance with ¶490, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[161]

*Progress before the Fifth Reporting Period*

In the previous reporting period, the City produced an updated suite of directives. The suite is designed to more closely align with requirements of ¶¶488–92, but they were not submitted in time to be implemented under the requisite Consent Decree process.

*Progress in the Fifth Reporting Period*

The CPD did not produce any documentation this reporting period that demonstrated efforts related to ¶490. COPA produced a draft *Major Incident Responses*

---

[160] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[161] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

Policy for review.[162] This policy was not finalized by the end of the fifth reporting period.

With this, the City did not reach Preliminary compliance. We will look for the CPD to provide draft policies related to ¶490's mandates in the coming reporting period. We also will look forward to COPA finalizing their *Major Incident Responses* Policy for Preliminary compliance.

### Paragraph 490 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

---

[162] Please refer to the discussion of ¶488 regarding COPA's *Major Incident Responses* Policy.

# Accountability and Transparency: ¶491

**491.** *In addition to the investigative requirements set forth in this Agreement, with respect to officer-involved shootings and officer-involved deaths, the City and CPD will ensure that CPD members act in a manner that is consistent with CPD's commitment to the principle of the sanctity of life, and will treat the deceased with respect, including the prompt screening from public view or covering of the deceased and, following timely evidence collection procedures, removal of the deceased.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶491 in the fifth reporting period because the CPD did not provide any documentation demonstrating efforts related to ¶491 in the period.

To evaluate Preliminary compliance with ¶491, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Fifth Reporting Period*

In the previous reporting period, the City produced an updated suite of directives. The suite is designed to more closely align with requirements of ¶¶488–92, but they were not submitted in time to be implemented following the Consent Decree process.

*Progress in the Fifth Reporting Period*

The CPD did not produce any documentation related to efforts under ¶491 in the fifth reporting period.

With this, the City did not reach Preliminary compliance. We will look for the CPD to provide draft policies related to ¶491's mandates in the coming reporting period.

### Paragraph 491 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶492

*492. Criminal investigations into the actions of any CPD member relating to any "officer-involved death" will comply with the Police and Community Relations Improvement Act, 50 ILCS 727/1-1 et seq. ("PCRIA"). The City will use best efforts to ensure that a "law enforcement agency," as that term is defined under PCRIA, will conduct such investigations. The "law enforcement agency" conducting criminal investigations into the actions of any CPD member relating to any "officer-involved death" will have substantial experience and expertise in criminal homicide investigations.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶492 in the fifth reporting period because the CPD did not provide any documentation demonstrating efforts related to ¶492 in the period.

To evaluate Preliminary compliance with ¶492, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Fifth Reporting Period*

In the previous reporting period, the City produced an updated suite of directives. The suite is designed to more closely align with requirements of ¶¶488–92, but they were not submitted in time to be implemented following the requisite Consent Decree process.

*Progress in the Fifth Reporting Period*

The CPD did not produce any documentation related to efforts under ¶492 in the fifth reporting period.

With this, the City did not reach Preliminary compliance. We will look for the CPD to provide draft policies related to ¶492's mandates in the coming reporting period.

## Paragraph 492 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶493

*493. OAG acknowledges that, in many districts, CPD has designated Accountability Sergeants whose responsibilities include receiving, processing, and investigating complaints made against CPD members, which are referred to the districts by BIA. Within 120 days of the Effective Date, CPD will develop a policy outlining the responsibilities of Accountability Sergeants, their respective Commanders, and the BIA Lieutenants responsible for supervising the Accountability Sergeant's investigations ("BIA Lieutenants"). The policy will provide, among other things, a process by which: a. within 72 hours of receiving a complaint from BIA for investigation, an immediate supervisor will be provided a summary of the complaint allegations concerning the involved CPD member; b. within seven days of the final disciplinary decision, the Commander and an immediate supervisor will be provided with the investigative findings, recommended discipline or corrective action, if any; and c. an immediate supervisor of the involved CPD member and the Accountability Sergeant will meet with the involved CPD member regarding the investigative findings, recommended discipline or corrective action, if any, unless the CPD member declines to meet.*

## Compliance Progress                 (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶493 in the fifth reporting period through the efforts of the CPD.

To evaluate Preliminary compliance with ¶493, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD has submitted for review CPD's *Accountability Sergeants* Unit Directive, showing progress toward Preliminary compliance.

We provided a no-objection notice, but the Unit Directive was not posted for public comment.[163] Additionally, during a site visit in the fourth reporting period, the IMT learned that Accountability Sergeants were not aware of the directive. During the fourth reporting period, the IMT also reviewed several drafts of BIA's S08-01 *Complaint and Disciplinary Investigators and Investigations*, which was not finalized prior to the end of the reporting period.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance and provided revised drafts of Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addressed the requirements of ¶493(a). The IMT provided a no-objection notice in December 2021 to the CPD. The CPD posted the General Order for public comment and, on the last day of the reporting period, finalized the General Order.

The CPD also provided a revised Special Order S08-01-04, *Post Investigation Log Number Procedures*, which addresses ¶493(b) and (c). The IMT provided a no-objection notice in November 2021 to the CPD. The CPD posted the Special Order for public comment and, on the last day of the reporting period, finalized the Special Order.

With this, the City and the CPD reached Preliminary compliance. We look forward to receiving training materials from the CPD related to ¶493's requirements and the CPD's related policies. We will also look for BIA to revise, post for public comment, and ultimately finalize relevant Unit Directives that instruct compliance with ¶493.

---

[163] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 493 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
None

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶494

*494. CPD will require that: a. investigations completed by Accountability Sergeants are held to the same investigative standards as those completed by BIA; b. beginning in 2020, and by January 31, 2022, each District Commander designates at least two Accountability Sergeants who will report to the District Commander, and whose primary responsibility is receiving, processing, and investigating complaints against CPD members; c. before a Sergeant is designated an Accountability Sergeant, his or her name will be provided by his or her District Commander to BIA for BIA's review; d. each Accountability Sergeant is provided with the name of and contact information for the BIA Lieutenant responsible for reviewing the Accountability Sergeant's work; e. BIA Lieutenants provide regular case-related and overall performance feedback to each of the Accountability Sergeants and his or her respective District Commander; f. BIA Lieutenants review and approve all of the Accountability Sergeant's proposed investigative findings and disciplinary recommendations; g. all Accountability Sergeants and BIA Lieutenants have access to the PRS or any system replacing the PRS; h. all Accountability Sergeants have access to BIA policies, directives, protocols, and training materials; and i. all Accountability Sergeants receive the initial and in-service training provided to BIA investigators as provided for in this Agreement.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Deadline:** | April 4, 2022* | ✓ **Not Yet Applicable** |
| | *Extended from January 31, 2022, due to COVID-19 | |
| **Preliminary:** | *Not in Compliance* | |
| **Secondary:** | *Not Yet Assessed* | |
| **Full:** | *Not Yet Assessed* | |

The City did not reach Preliminary compliance with ¶494 in the fifth reporting period.

To evaluate Preliminary compliance with ¶494, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeants* Unit Directive, which addresses the requirements of ¶494. The CPD also produced S08-01, *Complaint and Disciplinary Investigators and Investigations* for review, which addresses the requirements of ¶494. By the end of the fourth reporting period, the *Accountability Sergeants* Unit Directive and S08-01 were not finalized.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance by providing revised drafts of S08-01, *Complaint and Disciplinary Investigations*, which addresses ¶494(a), (c), (d), (e), (f), (g), (h), (i). The IMT provided a no-objection notice in December 2021.[164] The CPD posted the S08-01 for public comment and, on the last day of the reporting period, finalized the Special Order.

The CPD also submitted for review BIA's Unit Directive, T*raining Unit*, which addresses ¶494(i). The IMT provided comments to the CPD in October 2021 and by the end of the reporting period this Unit Directive remained in the collaborative review and revision process.

Additionally, the CPD submitted for review the *Fiscal Year 2022 BIA Staffing and Equipment Needs Assessment Implementation Plan*. The plan includes concerning information that seems to indicate that while the Consent Decree requires two accountability sergeants, BIA does not require both to be full time investigators. While concerning, this statement is not a surprise because during site visits in the fall of 2021, we learned that the accountability sergeants are required to fill other supervisory responsibilities that often prevent them from being able to complete their investigations in a timely manner. We look forward to ongoing discussion related to this issue in the sixth reporting period.

Additionally, In the sixth reporting period, we will look for CPD to update policy to reflect the requirements of ¶494(b) ensuring that two Accountability Sergeants be full time investigators.

---

[164] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 494 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶495

***495.*** *Supervisory reviews of investigations will be conducted as follows: (a) Accountability Sergeants will forward the administrative investigative file through his or her chain of command to the BIA Lieutenant: (i) the Accountability Sergeant's chain of command will ensure that the proposed investigative findings and recommendations are complete, meet the requirements of law, CPD policy, and this Agreement, and that findings are supported by the appropriate standard of proof; (ii) BIA Lieutenants will review the proposed investigative findings and recommendations for accuracy and completeness, and will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings; and (iii) whenever a higher ranking officer orders additional investigation, it will be documented in writing. (b) all investigations conducted by COPA or BIA, once complete, will be forwarded through the investigator's chain of supervision/command to the Chief Administrator of COPA or the Chief of BIA, respectively: (i) COPA and BIA will each ensure that their respective administrative investigative files are complete, meet the requirements of law, COPA and CPD policy, and this Agreement; and that findings are supported by the appropriate standard of proof; (ii) the Chief Administrator or the Chief of BIA, or his or her designee, will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings; and (iii) whenever COPA and BIA orders additional investigation, the request and resulting investigation will be documented in writing.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* [165] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

[165] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

The City did not reach Preliminary compliance with ¶495 in the fifth reporting period. While COPA reached Preliminary compliance, the CPD has yet to finalize a policy that speaks to all of the requirements of ¶495.

To evaluate Preliminary compliance with ¶495, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Fifth Reporting Period*

In the previous reporting period, the CPD provided a draft of S08-01, *Complaint and Disciplinary Investigators and Investigations.* In addition, the CPD submitted BIA's Unit Directive, *Requirements of a Complete Investigative File*, which details the requirements of an administrative investigative file. Neither of these were finalized following the Consent Decree process by the end of the fourth reporting period. COPA, in the last reporting period, provided for review COPA's 3.1.3 *Final Summary Report*, which addresses ¶495(b)(i)-(b)(iii).

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance by providing revised drafts of Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addresses ¶495(a)(i) and (a)(iii) but does not fully address ¶495(a)(ii). The IMT provided a no-objection notice in December 2021.[166] The CPD posted the Special Order for public comment and, on the last day of the reporting period, finalized the Special Order.

The CPD also provided a first draft of Special Order S08-01-01, *Conducting Log Number Investigations*, which partially addresses ¶495(a)(i) and fully addresses ¶495(a)(ii). However, this policy does not address ¶495(b), and at the end of the fifth reporting period, it remained in the collaborative review and revision process.

This reporting period, COPA continued to work toward Preliminary compliance specifically for ¶495(b) by producing and finalizing 3.1.3 *Final Summary Report*.

---

[166] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

This policy completely addressed the entirety of ¶495(b), the only section relevant to COPA.

Although the CPD finalized S08-01, the policy did not address ¶495(a)(ii) or ¶495(b). We look forward to working with the CPD to finalize policies that address the entirety of the requirements of ¶495. For COPA, we will look for COPA to develop training related to the requirements of ¶495 and COPA's related policy.

### Paragraph 495 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶496

> **496.** *The City and CPD will ensure that interfering with an administrative investigation, including being untruthful in an investigation into misconduct or colluding with other individuals to undermine such an investigation, or intentionally withholding requested evidence or information from an investigator, will result in disciplinary action and/or criminal prosecution based on the seriousness of the conduct.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW)[167] |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶496 in the fifth reporting period through the efforts of the CPD and COPA.

To evaluate Preliminary compliance with ¶496, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[168]

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD submitted for review G08-01, *Complaint and Disciplinary Procedures*, but it only partially addressed the requirements of ¶496. COPA, in the previous reporting period, submitted for review 3.1.2 *Fact*

---

[167] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[168] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Gathering and the Investigative Process*, which addresses the requirements of this paragraph.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance by providing a revised General Order G08-01, *Complaint and Disciplinary Procedures*, which addresses ¶496. The IMT provided a no-objection notice in December 2021. The CPD posted the General Order for public comment and, on the last day of the reporting period, finalized the General Order. This moved the CPD into Preliminary compliance.

This reporting period, COPA continued to work toward Preliminary compliance by providing a revised 3.1.2 *Fact Gathering and the Investigative Process*, which addresses ¶496 in the Quality Assurance section of the policy. The IMT provided a no-objection notice.[169] COPA posted the Policy for public comments and finalized the Policy. This moved COPA into Preliminary compliance.

In the coming reporting periods we will look for the CPD and COPA to develop trainings related to the requirements of ¶496 and their related policies.

### Paragraph 496 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

---

[169] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶497

> **497.** COPA and CPD will review and revise, as necessary, the policies governing COPA and CPD to ensure the processes for prevention of CPD member collusion and witness contamination comply with the terms of this agreement.

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW)[170] |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶497 in the fifth reporting period through the efforts of the CPD and COPA.

To evaluate Preliminary compliance with ¶497, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[171]

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD submitted for review G08-01, *Complaint and Disciplinary Procedures*, that addressed the requirements of ¶497. G08-01 was not finalized by the close of the fourth reporting period. COPA 3.1.2 *Fact Gathering and the Investigative Process* that addressed ¶497 but it remained in the collaborative review and revision process at the end of the fourth reporting period.

---

[170] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[171] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Preliminary compliance by providing revised drafts of General Order G08-01, *Complaint and Disciplinary Procedures*, which addresses ¶497. The IMT provided a no-objection notice in December 2021. The CPD posted the General Order for public comment and, on the last day of the reporting period, finalized the General Order. Additionally, the CPD provided various Policies that contribute to setting the standards in place for prevention of CPD member collusion and witness contamination.[172]

This reporting period, COPA continued to work toward Preliminary compliance by providing a revised Policy 3.1.2 *Fact Gathering and the Investigative Process*, which addresses the requirements of this paragraph. The IMT provided a no-objection notice to COPA in September 2021. The COPA Community Policy Review Working Group reviewed this policy and provided feedback to COPA. COPA finalized the Policy in November 2021.

With this both the CPD and COPA reached Preliminary compliance with ¶497. In the sixth reporting period we will look for the CPD and COPA to develop trainings related to the requirements of ¶497 and their related policies.

### Paragraph 497 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

---

[172] Policies referenced include G08-01-02, S08-01-01, and S08-01.

# Accountability and Transparency: ¶498

**498.** *The City and CPD will ensure that any command channel review conducted is complete within 30 days. Within 30 days of the Effective Date, CPD may draft a policy that provides, for the most serious administrative investigations, the circumstances under which up to 45 days will be provided for command channel review. The draft policy will be provided to the Monitor for review and approval.*

---

**Compliance Progress**  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Secondary compliance with ¶498 in the fifth reporting period. Although the CPD made efforts toward, they ultimately did not reach Full compliance with ¶498 in the fifth reporting period.

To evaluate Preliminary compliance with ¶498, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed the entities training development, implementation, and evaluation (¶286). To evaluate Full compliance, the IMT reviewed records from multiple sources reflecting timelines of all command channel reviews to ensure they are conducted within 30 days. Additionally, we reviewed the sources to ensure that the City and CPD have sufficiently implemented their policies and training associated with ¶498.

*Progress before the Fifth Reporting Period*

In prior reporting periods, the IMT reviewed and approved the CPD's Special Order S08-01-03, *Command Channel Review (CCR)*, as well as BIA's related training materials—including lesson plans and slide decks—which were sufficient to demonstrate Preliminary compliance and Secondary compliance with ¶498. In the last reporting period, BIA maintained Secondary compliance due to its policy and continued training of the appropriate CPD command staff and officers. To further strengthen the Command Channel Review process, the CPD produced BIA's S08-01, *Complaint and Disciplinary Investigators and Investigations*.

*Progress in the Fifth Reporting Period*

This reporting period, the CPD continued to work toward Full compliance by providing for review BIA's Unit Directive, *Advocate Section Command Channel Review Procedures*. Upon review, the IMT found that it does not address ¶498 because it does not state that a Command Channel Review must be completed in 45 days, as required by the Consent Decree. We provided comments to the CPD in September 2021, but we have not received further information regarding the posting of the Unit Directive for public comment and finalization. Additionally, we are unclear whether this Unit Directive is considered the same directive with BIA as the *Command Channel Review* directive that was previously reviewed in reporting periods.

Finally, the CPD produced BIA's *2020 Audit*, where CPD stated that they are not in operational compliance with the requirements of ¶498. While this audit was well done, we must first point out that we received the *2020 Audit* on December 28, 2021—which is several months too late. Moving forward, such audits need to be provided in a timelier manner to demonstrate compliance and to allow the CPD to identify areas on which it needs to focus its efforts and attention.

In the coming reporting periods, we strongly encourage the CPD to produce audits, such as BIA's *2020 Audit*, in a timely manner and identify immediate areas to focus efforts and attention moving forward. Additionally, we look forward to receiving materials to determine whether the City and the CPD have sufficiently implemented their policies and training relevant to the requirements of ¶498, including the review of records from multiple sources reflecting timelines.

### Paragraph 498 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Accountability and Transparency: ¶499

> **499.** *When COPA, BIA, or the investigating district has arrived at the investigative findings and recommendations, it will promptly finalize a summary report ("Administrative Summary Report"). The Administrative Summary Report will include: a. a description of the CPD members and individuals involved in the alleged misconduct; b. the date, time, and location of the alleged misconduct; c. a description of the allegations and applicable policies; d. a narrative summary of the alleged misconduct; e. a narrative summary of the investigation; and f. the investigating body's findings and conclusions for each allegation of misconduct, including any discipline recommended.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW)[173] |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶499 in the fifth reporting period. While COPA maintained Preliminary compliance, the CPD finalized a policy that fulfilled the requirements of ¶499 and put them into Preliminary compliance.

To evaluate Preliminary compliance with ¶499, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[174] To evaluate Secondary compliance, the

---

[173] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[174] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Fifth Reporting Period*

In the fourth previous reporting period, the CPD produced for review the A*dministrative Summary Report (ASR)* packet and letter, to which the IMT provided a no-objection notice.[175] The CPD also produced for review S08-01-04 *Documenting Log Number Investigations and Post Investigation Procedures*. The IMT suggested that this policy refer the reader to the ASR Unit Directive forms rather than leave the reader guessing to determine if this is a separate process because it is addressed in a separate policy. COPA, in the previous reporting period, submitted for review 3.1.3, *Final Summary Report (FSR)*, which addresses ¶499(a)–(f) in detail. This Policy was reviewed by the COPA Community Working Group. It was finalized, thereafter.

*Progress in the Fifth Reporting Period*

At the start of the fifth reporting period, City entities were in different stages of compliance. The CPD continued to work toward Preliminary compliance. COPA, on the other hand, began working toward Secondary compliance in this reporting period.

This reporting period, the CPD continued to work toward Preliminary compliance by providing a revised draft Special Order S08-01-04, *Post Investigation Log Number Procedures*, which addressed all subparagraphs and the main paragraph of ¶499. The IMT provided a no-objection notice to the CPD in December 2021. The CPD posted the Special Order for public comments and, on the last day of the reporting period, finalized the S08-01-04. This brought the CPD into Preliminary compliance.

BIA also submitted their *Administrative Summary Report* Packet at the end of the previous reporting period that specifically addresses the requirements of ¶499.

---

[175] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

COPA did not produce any documentation related to efforts under ¶499 in the fifth reporting period. We understand that COPA intends to develop training that instructs compliance with ¶499 in future reporting periods.

With the finalization of S08-01-04 and the *Administrative Summary Report*, the CPD reached Preliminary compliance with ¶499. Moving forward, we will look for the CPD and COPA to develop training materials related to ¶499's requirements.

### Paragraph 499 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶500

***500.** For all misconduct investigations, BIA or COPA will publish the Administrative Summary Report within 60 days of the final disciplinary decision.*

| Compliance Progress | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|
| **Preliminary:** | *In Compliance* (NEW)[176] |
| CPD | *In Compliance* (NEW) |
| COPA | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| CPD | *Not in Compliance* |
| COPA | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶500 in the fifth reporting period through the efforts of the CPD and COPA.

To evaluate Preliminary compliance with ¶500, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[177] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Fifth Reporting Period*

In the fourth reporting period, COPA reached Preliminary compliance with ¶500 by finalizing its Policy 3.1.3, *Final Summary Report*, which addresses all requirements of the paragraph. Notably, Policy 3.2.2, *Timeliness Benchmarks*, finalized in the fourth reporting period, also speaks to the requirements of ¶500. The CPD, on the other hand, did not reach Preliminary compliance. While the CPD had a draft

---

[176] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[177] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

Special Order S08-01-04, *Post-Investigation Log Number Procedures*, which included provisions addressing ¶500's requirements, this policy remained in the collaborative review and revision process by the close of the fourth reporting period.

*Progress in the Fifth Reporting Period*

The CPD moved into Preliminary compliance with ¶500 in the fifth reporting period. After engaging in extensive discussion regarding revisions to Special Order S08-01-04, *Post-Investigation Log Number Procedures*, the CPD received a no-objection notice from the IMT.[178] Thereafter, the CPD posted the Special Order for public comment, and, on December 31, 2021, the CPD finalized S08-01-04. Section III.D. of this policy notes that "[w]ithin sixty days of the final disciplinary decision, the completed [Administrative Summary Report] will be published on the Department's public website."

Beyond S08-01-04, the CPD has also submitted BIA's *Administrative Summary Report Section* Unit Directive for review, which also relates to the requirements of ¶500. We submitted a no-objection notice in January 2021. The CPD has not submitted this Unit Directive for public comment and therefore is not finalized per the Consent Decree Review process. In addition to these efforts, at the end of the fourth reporting period, BIA submitted for review Administrative Summary Report ("ASR") forms. These will allow BIA to complete ASRs in a consistent and time-efficient manner.

Opposite to these efforts, the Audit Division's *Audit of 2020 Investigation Timeframe Requirements*, which we received December 28, 2021, indicated that there were 16 cases that had a final disciplinary decision in 2020, and BIA did not publish any of these Administrative Summary Reports for these cases within 60 days of the decisions. While this audit was well done, we must first point out that we received the *2020 Audit* on December 28, 2021—which is several months too late. Moving forward, such audits need to be provided in a timelier manner not only for purposes of demonstrating compliance, but also to allow the CPD to identify areas on which it needs to focus its efforts and attention. Given the dated nature of this audit, we are hopeful that an audit of efforts under ¶500 in 2021 will

---

[178] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

show better compliance with the paragraph. To assist with this, we expect to see the CPD develop and provide training relevant to the requirements of ¶500 and its policy. Additionally, the CPD could submit its related Unit Directive for public comment and finalize this instruction document to move toward Secondary compliance.

COPA maintained Preliminary compliance with ¶500 in the fifth reporting period, but they did not produce additional evidence of compliance with this paragraph and therefore did not reach additional levels of compliance.

With the finalization of S08-01-04, the CPD moved into Preliminary compliance with ¶500. COPA maintained Preliminary compliance but did not provide evidence of additional efforts toward Secondary compliance in the fifth reporting period.

Moving forward, we will look for both COPA and the CPD to produce information demonstrating that personnel are properly trained to mobilize ¶500 compliance efforts.

### Paragraph 500 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶501

*501. Within 60 days of the final disposition, the City will publish: the charges filed and the discipline recommended; the written decision(s), if any, related to the final disposition; and the discipline imposed. When available, the City will publish the date on which the discipline is scheduled to be imposed.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City did not reach Preliminary compliance with ¶501 in the fifth reporting period.

To evaluate Preliminary compliance with ¶501, we reviewed the City's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).

### Progress before the Fifth Reporting Period

In the third reporting period, the City indicated that it would be directly responsible for policy creation related to ¶501 as well as corresponding compliance efforts with this paragraph. Although we had reviewed some COPA and BIA materials related to ¶501 in previous reporting periods, we received nothing from the city. Therefore, the City did not provide any evidence of efforts toward compliance with ¶501.

### Progress in the Fifth Reporting Period

In the fifth reporting period, the City did not provide evidence of efforts it has made toward Preliminary compliance with ¶501. While the City pointed to Police Board findings and decisions, ¶501 calls for certain information to be posted "within 60 days of the final disposition." The scope of ¶501 is broader than dispositions arising from the Police Board only.

Because the City did not produce evidence of policy, procedure, or other written guidance to direct compliance with ¶501, it has not yet reached Preliminary compliance. We look forward to the City producing such material in the coming reporting periods to direct compliance with this paragraph.

## Paragraph 501 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶502

**502.** *Information contained in the Administrative Summary Report that is legally exempt from disclosure for privacy or other purposes will be redacted prior to electronic publication.*

| Compliance Progress | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|
| **Preliminary:** | *In Compliance* (NEW)[179] |
| CPD | *In Compliance* (NEW) |
| COPA | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| CPD | *Not in Compliance* |
| COPA | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City moved into Preliminary compliance with ¶502 in the fifth reporting period because the CPD moved into Preliminary compliance and COPA maintained Preliminary compliance with ¶502.

To evaluate Preliminary compliance with ¶502, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[180] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Fifth Reporting Period*

The City did not reach Preliminary compliance with ¶502 in the fourth reporting period because all implicated City entities did not reach Preliminary compliance. While COPA reached Preliminary compliance by finalizing Policy 3.1.3 *Final Summary Report*, the CPD did not reach any level of compliance. We reviewed BIA's

---

[179] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[180] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

draft *Administrative Summary* Report, but by the end of the reporting period, the CPD had not finalized any policies directing compliance with ¶502.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD revised Special Order S08-01-04, *Post-Investigation Log Number Procedures.* After engaging in collaborative discussions regarding revisions of S08-01-04, we submitted a no-objection notice to S08-01-04.[181] Thereafter the CPD posted the policy for public comment, and, on December 31, 2021, the CPD finalized this policy. Section III.B. of this policy notes that BIA "will redact information from [Administrative Summary Reports] that is legally exempt from disclosure for privacy or other purposes prior to electronic publication." With this, the CPD reached Preliminary compliance this reporting period.

In addition to these efforts, at the end of the fourth reporting period, BIA submitted for review Administrative Summary Report ("ASR") forms. These will allow BIA to complete ASRs in a consistent and time-efficient manner.

COPA maintained Preliminary compliance with ¶502 in the fifth reporting period, but did not reach additional levels of compliance because they did not produce evidence that instructs compliance with this paragraph.

The CPD reached Preliminary compliance with ¶502 in the fourth reporting period with its finalization of S08-01-04. COPA maintained Preliminary compliance. In the coming reporting periods, we will look for evidence from the CPD and COPA that personnel are trained to comply with ¶502 and the entities' related policies.

---

[181] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

### Paragraph 502 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Accountability and Transparency: ¶503

> ***503.*** *When an allegation of misconduct contains multiple separate potential policy violations, all applicable violations will be identified and investigated. Exoneration for the most serious allegations of misconduct will not preclude the recommendation of discipline, training, or other corrective measures for less serious misconduct stemming from the same set of allegations.*

### Compliance Progress       (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In assessing compliance with ¶503 for the first time in the fifth reporting period, we found that COPA reached Preliminary compliance through the finalization of Policy 3.2.1, *Disciplinary and Remedial Recommendations*. The CPD made efforts toward compliance with this paragraph through its draft Special Order S08-01-01, *Conducing Log Number Investigations*. But because the Special Order remains in the collaborative review and revision process, the CPD has not yet reached Preliminary compliance.

We assessed compliance with ¶503 for the first time in the fifth reporting period. To evaluate Preliminary compliance with ¶503, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[182]

While the CPD made efforts related to ¶503 during the fifth reporting period, the CPD has not yet reached Preliminary compliance. In August 2021, the CPD submitted Special Order S08-01-01, *Conducting Log Number Investigations*. We provided comments to S08-01-01 in September 2021, and we have not since received a revised draft. That said, we noted that the first draft of S08-01-01 addressed many requirements of the Consent Decree, including the mandates of ¶503. Additionally, we were encouraged by the fact that S08-01-01 goes beyond specific Consent Decree requirements, which reflects an effort to revise and reform policy beyond the minimum mandates of the Consent Decree. Moving forward, we look forward

---

[182]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

to continuing to engage in the collaborative review process as the CPD further refines and eventually finalizes this Special Order.

COPA has reached Preliminary compliance with ¶503 through its finalized Policy 3.2.1, *Disciplinary and Remedial Recommendations*. COPA submitted multiple drafts to the IMT and the OAG, and made revisions based on that collaboration. After receiving a no-objection notice, COPA received comments from the COPA Community Working Group, and thereafter finalized the policy.[183] Section I.B. of the policy incorporates the requirements of ¶503, verbatim. With this, COPA reached Preliminary compliance with ¶503.

Because COPA finalized its Policy 3.2.1, *Disciplinary and Remedial Recommendations*, COPA reached Preliminary compliance with ¶503. The CPD made efforts toward but has not yet reached Preliminary compliance.

Moving forward, we look forward to continuing to work with the CPD as they refine and finalize S08-01-01, *Conducting Log Number Investigations*. Additionally, we will look for evidence that COPA has properly trained personnel to mobilize compliance with ¶503 and COPA Policy 3.2.1.

### Paragraph 503 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Not Applicable | None | |

---

[183] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶504

> **504.** *As soon as feasible, but by no later than January 2020, upon arriving at the final disciplinary decision, CPD and COPA will ensure that the Administrative Summary Report is provided to the involved CPD member and the Department. CPD will ensure that the Administrative Summary Report is provided to the involved CPD member's District or Unit Commander and immediate supervisor.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW)[184] |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, COPA maintained Preliminary compliance and the CPD reached Preliminary compliance. This brought the City, overall, into Preliminary compliance with ¶504.

To evaluate Preliminary compliance with ¶504, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[185] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Fifth Reporting Period*

In the fourth reporting period, the CPD made efforts toward compliance with ¶504 by providing draft S08-01-04, *Post-Investigation Log Number Procedures*, which

---

[184] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[185] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

addresses the requirements of this paragraph. However, by the close of the fourth reporting period, draft S08-01-04 remained in the review and revision process. COPA reached Preliminary compliance with this paragraph by finalizing Policy 3.2.2, *Timeliness Benchmarks.*

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD continued to refine Special Order S08-01-04, *Post-Investigation Log Number Procedures*. Section III.C. of this policy addresses ¶504 requirements, instructing that within 7 days of the final disciplinary decision, BIA will email the Administrative Summary Report to the accused member and that member's exempt unit commanding officer. We submitted a no-objection notice to S08-01-04 in November 2021.[186] Thereafter, the CPD posted the policy for public comment, and on December 31, 2021, the CPD finalized the policy, bringing them into Preliminary compliance with ¶504.

COPA maintained Preliminary compliance in the fifth reporting period but did not otherwise submit evidence of additional efforts under ¶504 that would bring COPA into Secondary compliance.

Through the efforts of the CPD and COPA, the City reached Preliminary compliance with ¶504 in the fifth reporting period. Moving forward, we will look for evidence that COPA and CPD are developing sufficient training to instruct and mobilize compliance with the requirements of ¶504 and each entities' related policies.

### Paragraph 504 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

---

[186] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶505

> *505. The CMS will have the following capacities: a. maintain accurate and reliable data regarding the number, nature, and status of all complaints and administrative notifications, from the intake process to final disposition; b. identify the status of administrative investigations; c. identify caseloads for investigators; and d. maintain all documents and investigative materials—including audio and video—in a digital format, accessible via the CMS.*

---

**Compliance Progress**                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[187] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

In the fifth reporting period, COPA maintained Preliminary compliance with ¶505. The CPD made efforts toward but did not ultimately reach Preliminary compliance with this paragraph. Because all relevant City entities much reach levels of compliance to bring the City, as a whole into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶505, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[188] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

---

[187] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[188] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Fifth Reporting Period*

In the fourth reporting period, we reviewed several items relevant to the CPD's efforts toward compliance with ¶505 including BIA's *Case Management System* Unit Directive, which addresses all subparagraphs of ¶505. However, by the end of the fourth reporting period, this Unit Directive remains in the collaborative review process. Therefore, the CPD did not reach Preliminary compliance.

COPA met Preliminary compliance with ¶505 in the fourth reporting period by finalizing its Policy 3.1.6, *Clear and Column CMS Systems* (COPA 3.1.6), which addresses all requirements of ¶505.

*Progress in the Fifth Reporting Period*

The CPD did not reach Preliminary compliance in the fifth reporting period. While BIA *Case Management System* Unit Directive, which was originally submitted at the end of the fourth reporting period, touches on all ¶505 requirements, the CPD did not provide further revised drafts of this Unit Directive during the fifth reporting period. However, CPD made other efforts related to ¶505 through its draft of S08-01-01, *Conducting Log Number Investigations*, which was produced to the IMT and the OAG for review in August 2021. The IMT provided comments in September 2021. We have not since received a revised draft S08-01-01. In the initial draft of S08-01-01, all subparagraphs of ¶505 were addressed. These efforts should hopefully allow the CPD to revise their previously submitted policies and obtain Preliminary compliance in the sixth reporting period.

COPA maintained Preliminary compliance in the fifth reporting period and made efforts toward Secondary compliance. COPA submitted for review training materials for its training *Case Management System: Overview of Policy and Procedures*. These materials were well organized and provided instruction to mobilize efforts compliant with ¶505's mandates, and COPA's policy. We submitted a no-objection notice to these training materials.[189] We understand that COPA hopes to provide this training to its personnel in January 2022. They will need to provide this training to at least 95% of their staff to obtain Secondary compliance.

---

[189] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

With this, COPA maintained Preliminary compliance with ¶505 and made efforts toward Secondary compliance with this paragraph. The CPD continued to make progress toward compliance with ¶505, but have yet to finalize policies directing compliance with ¶505's mandates. We look forward to the CPD prioritizing revisions of S08-01-01 and BIA's *Case Management System* early in the sixth reporting period to allow the CPD ample time to revise and finalize these polices, which could propel the CPD into Preliminary and possibly Secondary compliance. We will also look for COPA to provide evidence that it has provided its *Case Management System: Overview of Policy and Procedures* training to at least 95% of its personnel.

### Paragraph 505 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶506

> **506.** *COPA, BIA, and the Accountability Sergeants will have access to the CMS as necessary to undertake their respective duties.*

**Compliance Progress**    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW)[190] |
| | CPD | *In Compliance* (NEW) |
| | COPA | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | CPD | *Not in Compliance* |
| | COPA | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶506 in the fifth reporting period, because the CPD reached Preliminary compliance and COPA maintained Preliminary compliance with this paragraph.

To evaluate Preliminary compliance with ¶506, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[191] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Fifth Reporting Period*

In the fourth reporting period, COPA reached Preliminary compliance with ¶506 through finalization of its Policy 3.1.6, *Clear and Column CMS Systems*. The CPD made efforts toward, but ultimately did not achieve Preliminary compliance with ¶506 by the end of the fourth reporting period. We recognized, however, that the CPD was addressing the requirements of ¶506 in two draft policies that remained in the collaborative review and revision process by the end of the fourth reporting

---

[190] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[191] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

period: *BIA's Case Management System* Unit Directive, and CPD's Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD continued to revise Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addresses ¶506. After several drafts, we submitted a no-objection notice to S08-01 on the final day of the reporting period. Prior to submitting this final draft of S08-01 to the IMT, the CPD posted their policy for public comment. Upon receiving our no-objection notice, the CPD finalized its policy on the final day of the reporting period. We appreciate the revisions made to the policy and take note that the CPD was able to move quickly to revise and finalize this policy before the close of the reporting period. S08-01 as revised and finalized is a good policy, and its finalization by the end of the reporting period allowed the CPD to reach Preliminary compliance. That said, this and other accountability-related policies did not receive the same focused and timely attention throughout the entire reporting period. We recognize that the CPD is motivated at the end of the reporting period, but the CPD will find more success under the Consent Decree if it is motivated by reform year round, and not just at the end of the reporting period.

Illustrative of this above point, the CPD's BIA submitted BIA's *Case Management* Unit Directive at the end of the fourth reporting period. This Unit Directive addresses ¶506 and outlines a process or audit to ensure integrity of the system. In September, we provided comments on this Unit Directive. By the close of the fifth reporting period, we had not received a revised draft of this Unit Directive. We hope to see a revised draft early in the sixth reporting period.

COPA maintained Preliminary compliance in the fifth reporting period and made efforts toward Secondary compliance. COPA submitted for review training materials for its training *Case Management System: Overview of Policy and Procedures*. These materials were well organized and provided instruction to mobilize efforts compliant with ¶506's mandates, and COPA's policy. We submitted a no-objection notice to these training materials in September 2021. We understand that COPA hopes to provide this training to its personnel in January 2022. They will need to provide this training to at least 95% of their staff to obtain Secondary compliance.

Through finalization of S08-01, the CPD reached Preliminary compliance with ¶506 at the end of the fifth reporting period. COPA maintained Preliminary compliance. Both entities had additional efforts underway which could help them reach Secondary compliance: COPA's *Case Management System: Overview of Policy and Procedures* training, and BIA's *Case Management System* Unit Directive. We look forward to reviewing information related to these efforts in the sixth reporting period.

## Paragraph 506 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Accountability and Transparency: ¶507

> **507.** *Administrative investigative files will be electronically pre-served within the CMS.*

**Compliance Progress**  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW)[192] |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City reached Preliminary compliance through the efforts of the CPD, which moved into Preliminary compliance this reporting period, and COPA, which maintained Preliminary compliance with ¶507.

To evaluate Preliminary compliance with ¶507, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[193] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Fifth Reporting Period*

Previously, the CPD made efforts toward Preliminary compliance by drafting Special Order S08-01-04, *Post-Investigation Log Number Procedures*, and BIA's *Case Management System* Unit Directive. However, by the close of the fourth reporting period, neither of these polices were finalized, preventing the CPD from reaching Preliminary compliance. COPA, on the other hand, reached Preliminary compliance with ¶507 by finalizing Policy 3.1.6, *Clear and Column CMS Systems*.

---

[192]  As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[193]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Fifth Reporting Period*

In the fifth reporting period, the CPD continued to refine Special Order S08-01-04, *Post-Investigation Log Number Procedures*. Section IX.B. of this policy addresses the requirements of ¶507, directing that "[a]ll administrative investigative files and disciplinary histories will be electronically preserved within CMS." We submitted a no-objection notice to S08-01-04 in November 2021.[194] Thereafter, the CPD posted the policy for public comment, and on December 31, 2021, the CPD finalized the policy, bringing them into Preliminary compliance with ¶507.

The CPD BIA's *Case Management System* Unit Directive also relates to ¶507's requirements. We provided comments on this Unit Directive in September 2021. We did not receive a further revised draft before the end of the fifth reporting period.

COPA maintained Preliminary compliance in the fifth reporting period and made efforts toward Secondary compliance. COPA submitted for review training materials for its training *Case Management System: Overview of Policy and Procedures*. These materials were well organized and provided instruction to mobilize efforts compliant with ¶507's mandates, and COPA's policy. We submitted a no-objection notice to these training materials in September 2021. We understand that COPA hopes to provide this training to its personnel in January 2022. They will need to provide this training to at least 95% of their staff to obtain Secondary compliance.

With the finalization of S08-01-04, the CPD moved into Preliminary compliance, and COPA maintained its Preliminary compliance. Both COPA and CPD have made efforts toward Secondary compliance: COPA with its *Case Management System: Overview of Policy and Procedures* training, and CPD with BIA's draft *Case Management System* Unit Directive. We look forward to receiving additional information related to ¶507 efforts including these policies and related trainings in the coming reporting periods.

---

[194] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 507 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶508

> **508.** *The City and CPD will undertake best efforts to ensure that all administrative investigation files, disciplinary history card entries, COPA and BIA disciplinary records, and any other disciplinary record or summary of such record, are retained electronically, and indefinitely, for purposes of historical trend analysis, non-disciplinary EIS, and public transparency.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[195] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶508 in the fifth reporting period. Although COPA maintained Preliminary compliance with the paragraph, the CPD did not move into Preliminary compliance with ¶508.

To evaluate Preliminary compliance with ¶508, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[196] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD made efforts toward Preliminary compliance by drafting and providing BIA's *Case Management System* Unit Directive. However, by the close of the fourth reporting period, this Unit Directive remained

---

[195] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[196] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

in the collaborative review and revision process. COPA, on the other hand, reached Preliminary compliance with ¶507 by finalizing Policy 3.1.6, *Clear and Column CMS Systems*.

*Progress in the Fifth Reporting Period*

The CPD provided BIA's *Case Management System* Unit Directive at the end of the fourth reporting period. This draft Unit Directive speaks to the requirements of ¶508. We provided feedback on this Unit Directive in September 2021. We did not receive a further revised draft of this Unit Directive and the CPD did not post this Unit Directive for public comment. Therefore, the CPD has not made any additional steps toward compliance with ¶508 in the fifth reporting period.

COPA maintained Preliminary compliance in the fifth reporting period and made efforts toward Secondary compliance. COPA submitted for review training materials for its training *Case Management System: Overview of Policy and Procedures*. These materials were well organized and provided instruction to mobilize efforts compliant with ¶508's mandates, and COPA's policy. We submitted a no-objection notice to these training materials.[197] We understand that COPA hopes to provide this training to its personnel in January 2022. They will need to provide this training to at least 95% of their staff to obtain Secondary compliance.

Because the CPD did not finalize BIA's *Case Management System* Unit Directive or draft or finalize another policy that instructs compliance with ¶508, the CPD did not reach Preliminary compliance. COPA maintained Preliminary compliance and made steps toward Secondary compliance with its development of *Case Management System: Overview of Policy and Procedures*.

Moving forward, we will look for CPD to revise BIA's relevant Unit Directive and post it for public comment, as well as provide any other policy the CPD believes instructs compliance with ¶508. Related to COPA efforts, we will look for evidence that COPA provided its *Case Management System: Overview of Policy and Procedures* training to at least 95% of its personnel.

---

[197] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 508 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶509

***509.*** *For each complaint, the CMS will separately track, and have capacity to conduct searches and generate reports sufficient to identify and analyze trends relating to, at a minimum, the following: a. allegations of discriminatory policing based on an individual's membership or perceived membership in an identifiable group, based upon, but not limited to: race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age; b. allegations of unlawful stop, search, citation, or arrest practices; c. allegations of excessive force; d. allegations of misconduct arising during an interaction with individuals in crisis; e. allegations of retaliation against non-CPD members; f. allegations of conduct alleged to have occurred in retaliation for engaging in First Amendment protected activities, such as lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct; g. allegations of officer-involved gender-based violence, domestic violence, or sexual misconduct; h. allegations of CPD member substance and/or alcohol abuse; and i. the self-reported demographic information of complainants, including race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age.*

| Compliance Progress | | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[198] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶509 by the end of the fourth reporting period. While COPA maintained Preliminary compliance, the CPD has not

---

[198] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

yet reached Preliminary compliance because it has not finalized a policy that addresses the requirements of ¶509.

To evaluate Preliminary compliance with ¶509, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[199] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Fifth Reporting Period*

Previously, the CPD made efforts toward Preliminary compliance by drafting BIA's *Case Management System* Unit Directive. However, by the close of the fourth reporting period, this Unit Directive was not finalized, preventing the CPD from reaching Preliminary compliance. COPA, on the other hand, reached Preliminary compliance with ¶509 by finalizing Policy 3.1.6, *Clear and Column CMS Systems*.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD provided a draft of Special Order S08-01-01, *Conducting Log Number Investigations*. This draft policy speaks to all the requirements listed in ¶509. We provided feedback on this policy in September 2021, but we did not receive a further revised draft of S08-01-01.

Similarly, the CPD BIA's draft *Case Management System* Unit Directive addresses all nine subparagraphs of ¶509. A draft of this Unit Directive was provided to the IMT at the end of the fourth reporting period. We provided comments on this Unit Directive in September 2021. We did not receive a further revised draft before the end of the fifth reporting period and the CPD has not posted the Unit Directive for public comment. Because both the Unit Directive and S08-01-01 remain in the collaborative review and revision process, the CPD did not reach Preliminary compliance.

COPA maintained Preliminary compliance in the fifth reporting period and made efforts toward Secondary compliance. COPA submitted for review training materials for its training *Case Management System: Overview of Policy and Procedures*. These materials were well organized and provided instruction to mobilize efforts compliant with ¶509's mandates, and COPA's policy. We submitted a no-objection

---

[199] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

notice to these training materials.[200] We understand that COPA hopes to provide this training to its personnel in January 2022. They will need to provide this training to at least 95% of their staff to obtain Secondary compliance.

By the close of the fifth reporting period, COPA maintained Preliminary compliance with ¶509, and made steps toward Secondary compliance by developing training related to these requirements. The CPD made some effort toward Preliminary compliance. In the coming reporting period, we will look for evidence that COPA provided its *Case Management System: Overview of Policy and Procedures* training to at least 95% of its personnel. We will also look for revised drafts of BIA *Case Management System* Unit Directive and CPD's Special Order S08-01-01.

### Paragraph 509 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

---

[200] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to re-solve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶511

*511. In order to develop a new mediation policy governing the resolution of disciplinary actions by the agreement of the CPD member and non-CPD member complainant, the City will solicit public input, through community engagement efforts, regarding the methods by which mediation will most effectively build trust between community members and police and foster mutual respect.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City maintained Preliminary and Secondary compliance with ¶511 but did not reach Full compliance in the fifth reporting period.

To assess Preliminary compliance with ¶511, we looked for a policy or plan that could be followed to actively engage the community input to inform a new mediation policy. To evaluate Secondary compliance, we looked for evidence that the City acted upon its plan and received significant community feedback relevant to the new mediation policy. To reach Full compliance, the City must demonstrate that it has incorporated this public input, as appropriate, in the development of the new mediation policy.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the City reached Secondary compliance with ¶511 after demonstrating that it engaged an outside expert to assist with community engagement efforts under ¶511. In addition to providing information about the engaged expert, the City provided notes regarding community feedback it received during two learning sessions.

*Progress in the Fifth Reporting Period*

At the end of the fifth reporting period, the City produced its *Interagency* Policy, IAP 11-01, *Community-Policy Mediation Pilot Program*. This document is better understood as an outline for a temporary program. We reviewed a *City Mediation* Policy in November 2020 and provided comments in January 2021. The December 30, 2022 version we received was the first time we had reviewed the policy in this new form.

In its production letter, the City indicated that after receiving comments from the IMT and the OAG regarding the mediation policy it produced in November of 2020,

"the City decided to rewrite its mediation pilot policy to better address these comments and concerns and to better incorporate community feedback." The City also specified that to incorporate the community feedback the City "reinforced themes of the community feedback, including transparency, accountability, timeliness, types of complaints, and member history, during its development discussions with COPA and BIA and has more clearly set forth and reiterated these themes throughout the policy."

We appreciate the efforts the City has undertaken thus far. However, because the *Interagency* Policy sets out a temporary, six-month pilot program, the City has not reached Full compliance. As the City launches the pilot program, we encourage the City to continue to gain community feedback to evaluate the pilot program on an ongoing basis. We look forward to the City developing a mediation policy incorporating, not only the feedback the City has received to date, but any additional community input it receives during the pilot program.

Since the City has chosen to undertake a pilot program related to the Consent Decree requirement that the City develop a Mediation Program, we hope the City will utilize the six-month program as a means to obtain real-time feedback regarding the effectiveness of the proposed program. We expect the City to critically analyze this pilot program on an ongoing basis, and we expect the City to provide the IMT with monthly updates regarding the progress of the pilot program during the sixth reporting period. Such real-time assessment and responsive modification will allow the city to create a mediation program that is "a valuable tool for expending the resolution of complaints, building trust between community members and police, and fostering mutual respect." ¶510.

With this, the City maintained Preliminary and Secondary compliance, but did not move into Full compliance. We look forward to engaging with the City as it launches its mediation pilot program. We hope the City will evaluate the pilot program on an ongoing basis and throughout the six-month period so that the City might make necessary changes and finalize a more permanent program shortly after the close of the pilot program.

### Paragraph 511 Compliance Progress History

| FIRST REPORTING PERIOD SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SECOND REPORTING PERIOD SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | THIRD REPORTING PERIOD MARCH 1, 2020 – DECEMBER 31, 2020 |
|---|---|---|
| COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Status Update |
| FOURTH REPORTING PERIOD JANUARY 1, 2021 – JUNE 30, 2021 | FIFTH REPORTING PERIOD JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: Secondary | COMPLIANCE PROGRESS: Secondary | |

# Accountability and Transparency: ¶512

*512. The City will ensure that within 365 days of the Effective Date, COPA and BIA have developed parallel policies regarding the mediation of misconduct complaints by non-CPD members. The policies will govern mediation of misconduct complaints involving non-CPD member complainants. The policies will specify, at a minimum, (a) the criteria for determining incidents eligible for resolution through mediation; (b) the goals of mediation, including efficiency, transparency, procedural justice, restorative justice, and strengthening public trust; (c) the steps in the mediation process; and (d) methods of communication with complainants regarding the mediation process and the opportunity to participate. Items (a) through (d) above will be consistent between the CPD and COPA mediation policies.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[201] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶512 in the fifth reporting period.

To evaluate Preliminary compliance with ¶512, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[202]

---

[201] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[202] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Fifth Reporting Period*

In previous reporting periods we reviewed BIA's *Community Mediation* Unit Directive and a draft of the City's Mediation Policy, *Complaints against the CPD*. We received both of these in the third reporting period. We provided comments to these two times. By the end of the fourth reporting period, we did not receive additional revised drafts of these policies. We did not receive any documents or evidence of efforts toward compliance with ¶512 from COPA.

*Progress in the Fifth Reporting Period*

Neither the CPD nor COPA produced any documentation related to efforts under ¶512 in the fifth reporting period. Paragraph 512 requires COPA and BIA to "have developed parallel policies regarding the mediation of misconduct complaints by non-CPD members."

At the end of the fifth reporting period the City provided its Interagency Policy, IAP 11-01, *Community-Police Mediation Pilot Program*. This document is better understood as an outline for a temporary program. We reviewed a *City Mediation Policy* in November 2020 and provided comments in January 2021. The City indicated that it rewrote the policy after receiving our comments and feedback from the community. The December 30, 2022 version we received was the first time we had reviewed the policy in this new form. Therefore, we've not been able to engage in collaborative review and revision. Notwithstanding this fact, the City indicated that all entities implicated by the Interagency Policy have signed onto the pilot program, and the City indicated it will launch the six-month mediation pilot program on January 15, 2022.

The City's steps toward the development of the mediation program is positive, however, we have concerns with the current pilot program policy. The pilot program lacks specificity in many areas and does not indicate methods to measure success of the program. Perhaps most concerning is an indication that the City will provide an assessment of the program 60 days after the six-month pilot program ends. A delayed assessment like this will not allow the City to make modifications to the pilot program during its six-month time frame to address concerns and test solutions. We urge the City to consider performing ongoing or regular assessments to more effectively and efficiently develop a mediation program under ¶511 and ¶512.

The City's Interagency Policy, does not fulfill ¶512 requirements for a variety of reasons. But most notably, it gives the City sole authority to revise or replace the Interagency Policy "in the event that the City determines the requirements are better accomplished by other means."

With this, the City did not reach Preliminary compliance. We will look for the CPD and COPA to provide draft policies related to ¶512's mandates in the coming reporting period.

### Paragraph 512 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶513

> ***513.*** *COPA and CPD will ensure that the recommended level of discipline for findings is consistently applied in a fair, thorough, and timely fashion, based on the nature of the misconduct. COPA and CPD will also ensure that mitigating and aggravating factors are identified, consistently applied, and documented.*

| Compliance Progress | | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[203] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶513 in the fifth reporting period. The CPD has made efforts toward but has not reached Preliminary compliance because it has not finalized a policy related to ¶513's requirements. COPA maintained Preliminary compliance with this paragraph but did not produce evidence of steps toward Secondary compliance with ¶513 in the fifth reporting period.

To evaluate Preliminary compliance with ¶513, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[204] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

---

[203] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[204] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD provided consultation drafts of BIA's *Advocate Section Command Channel Review Procedures* Unit Directive. This Unit Directive has not been finalized, therefore, the CPD did not reach Preliminary compliance. COPA, in the fourth reporting period, finalized its Policy 3.2.1, *Disciplinary and Remedial Recommendations*, which fulfills the requirements of ¶513. This brought COPA into Preliminary compliance.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD provided a draft of Special Order S08-01-01, *Conducting Log Number Investigations*. This draft policy speaks to ¶513's requirements. We provided feedback on this policy in September 2021. We did not receive a further revised draft of S08-01-01 by the end of the fifth reporting period. In addition, we provided consultation feedback to BIA's *Advocate Section Command Channel Review Procedures* Unit Directive. We noted that the latest version of the Unit Directive, which was provided in June 2021, demonstrated great improvement. We encouraged the CPD to provide a final draft of this Unit Directive for review under ¶627. We anticipate that BIA would receive a no-objection notice from us with minimal additional revisions and then be able to post this Unit Directive for public comment.[205] Without finalizing any policy speaking to ¶513's requirements, the CPD did not reach Preliminary compliance.

COPA did not produce evidence of steps toward Secondary compliance with ¶513 in the fifth reporting period.

In the coming reporting periods, we will look for the CPD to finalize S08-01-01 and BIA's *Advocate Section Command Channel Review Procedures* Unit Directive. For COPA, we anticipate receiving a training related to ¶513's requirements and COPA's related policy.

---

[205] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 513 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶514

> **514.** *The City, COPA, and CPD will use best efforts to ensure that the level of discipline recommended for sustained findings is applied consistently across CPD districts and without regard for the race of the complainant or the race of the involved CPD member.*

**Compliance Progress**          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[206] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶514 in the fifth reporting period. While COPA maintained Preliminary compliance with this paragraph, it did not provide evidence or efforts toward Secondary compliance. The CPD has not provided any policy related to ¶514, and therefore, has not reached Preliminary compliance.

To evaluate Preliminary compliance with ¶513, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[207] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Fifth Reporting Period*

In past reporting periods, the CPD's BIA provided onboarding and annual training scenarios, which relate to ¶514, but as BIA acknowledges, additional efforts are necessary to comply with ¶514. COPA, in the fourth reporting period, finalized its

---

[206] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[207] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

Policy 3.2.1, *Disciplinary and Remedial Recommendations*, which fulfills the requirements of ¶514. This brought COPA into Preliminary compliance.

*Progress in the Fifth Reporting Period*

Neither the CPD nor COPA provided records to demonstrate additional efforts toward compliance with ¶514 in the fifth reporting period.

In the coming reporting periods, we will look for the CPD to draft, revise, and eventually finalize a policy that speaks to the requirements of ¶514. Related to COPA, we will look for the development of training related to ¶514 and COPA's related policies.

### Paragraph 514 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶515

> ***515.*** *All disciplinary decisions and discipline imposed will be documented in writing, maintained in the administrative investigative file and the CPD member's disciplinary history, and reported within the CMS consistent with CPD policy and this Agreement.*

## Compliance Progress      (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and CPD reached Preliminary compliance with ¶515 in the fifth reporting period.

To evaluate Preliminary compliance with ¶515, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).

### Progress before the Fifth Reporting Period

Previously, the CPD made efforts toward Preliminary compliance by drafting Special Order S08-01-04, *Post-Investigation Log Number Procedures*. By the close of the fourth reporting period, we noted that the draft S08-01-04 touched on the requirements of ¶515, but it required extensive revisions to fully cover the requirements of ¶515. This Special Order remained in the collaborative review and revision process at the close of the fourth reporting period.

### Progress in the Fifth Reporting Period

In the fifth reporting period, the CPD continued to refine Special Order S08-01-04, *Post-Investigation Log Number Procedures*. Section IX, *Records Retention*, of this Special Order, completely addresses the requirements of ¶515. We submitted a no-objection notice to S08-01-04 in November 2021.[208] Thereafter, the CPD

---

[208] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

posted the policy for public comment, and on December 31, 2021, the CPD final-ized the policy, bringing them into Preliminary compliance with ¶515.

With the finalization of S08-01-04, the CPD reached Preliminary compliance with ¶515. Moving forward, we will look for the CPD to develop training materials re-lated to ¶515's requirements.

### Paragraph 515 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶516

> **516.** *Each sustained finding contained within a CPD member's disciplinary history will be considered for the purposes of recommending discipline for a subsequent sustained finding for a period of up to five years after the date of the incident or the date on which the violation is discovered, whichever is later.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[209] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶516 in the fifth reporting period. While COPA maintained Preliminary compliance, the CPD has yet to finalize a policy that speaks to the requirements of ¶516.

To evaluate Preliminary compliance with ¶516, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[210] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Fifth Reporting Period*

In past reporting periods, the CPD has not produced evidence of efforts toward compliance with ¶516. On the other hand, in the fourth reporting period, COPA

---

[209]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[210]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

finalized its Policy 3.2.1, *Disciplinary and Remedial Recommendations*, which completely covers the requirements of ¶516. This brought COPA into Preliminary compliance with this paragraph.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD provided a draft of S08-01-01, *Conducting Log Number Investigations*. This draft policy addressed the requirements of ¶516, verbatim. We provided feedback on this policy in September 2021, but we did not receive a further revised draft of S08-01-01, thereafter. Because S08-01-01 remained in the collaborative review and revision process at the close of the fifth reporting period, the CPD did not reach Preliminary compliance with ¶516.

COPA did not produce evidence of steps toward Secondary compliance with ¶516 in the fifth reporting period.

In the sixth reporting period, we will look for the CPD to further revise S08-01-01. We will also look for COPA to develop a training related to the requirements of ¶516 and COPA's related policy.

### Paragraph 516 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶517

> ***517.*** *The City, CPD, and COPA will ensure that findings of "Sustained – Violation Noted, No Disciplinary Action": a. may not be used in any investigation in which the conduct resulted in injury to any person; and b. will only be used for investigations that warrant a sustained finding, but were a result of unintentional violations of policy or law.*

## Compliance Progress       (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[211] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶517 in the fifth reporting period. While COPA maintained Preliminary compliance, the CPD has yet to finalize a policy that speaks to the requirements of ¶517.

To evaluate Preliminary compliance with ¶517, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[212] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Fifth Reporting Period*

The fourth reporting period was the first reporting period that we assessed compliance with ¶517. The CPD did not produce evidence of efforts toward compliance with ¶517. On the other hand, in the fourth reporting period, COPA finalized its

---

[211] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[212] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

Policy 3.2.1, *Disciplinary and Remedial Recommendations*, which completely covers the requirements of ¶517. This brought COPA into Preliminary compliance with this paragraph.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD provided a draft of S08-01-01, *Conducting Log Number Investigations*. This draft policy addressed the requirements of ¶517 verbatim. We provided feedback on this policy in September 2021. We did not receive a further revised draft of S08-01-01, thereafter. Because S08-01-01 remained in the collaborative review and revision process at the close of the fifth reporting period, the CPD did not reach Preliminary compliance with ¶517.

COPA did not produce evidence of steps toward Secondary compliance with ¶517 in the fifth reporting period.

In the sixth reporting period, we will look for the CPD to further revise S08-01-01. We will also look for COPA to develop a training related to the requirements of ¶517 and COPA's related policy.

### Paragraph 517 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶518

> **518.** *CPD will provide the required notice regarding disciplinary matters to the Illinois Law Enforcement Training and Standards Board, including when an officer resigns while a misconduct investigation or disciplinary charges are pending.*

## Compliance Progress        (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and CPD reached Preliminary compliance with ¶518 in the fifth reporting period.

To evaluate Preliminary compliance with ¶518, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).

### Progress before the Fifth Reporting Period

Previously, the CPD made efforts toward Preliminary compliance by drafting Special Order S08-01-04, *Post-Investigation Log Number Procedures*. By the close of the fourth reporting period, we noted that the draft S08-01-04 touched on the requirements of ¶518, but it required extensive revision to fully cover the requirements of ¶518. This Special Order remained in the collaborative review and revision process at the close of the fourth reporting period.

### Progress in the Fifth Reporting Period

In the fifth reporting period, the CPD continued to refine Special Order S08-01-04, *Post-Investigation Log Number Procedures*. Section VII, *Notification to the Illinois Law Enforcement Training Standards Board* completely addresses the requirements of ¶518. We submitted a no-objection notice to S08-01-04 in November 2021.[213] Thereafter, the CPD posted the policy for public comment, and on December 31, 2021, the CPD finalized the policy, bringing them into Preliminary compliance with ¶518.

---

[213] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice."

With the finalization of S08-01-04, the CPD reached Preliminary compliance with ¶518. Moving forward, we will look for the CPD to develop training materials related to ¶518's requirements.

### Paragraph 518 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

---

Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

# Accountability and Transparency: ¶519

*519. The failure to complete an administrative investigation within the timeframes set forth in this Agreement will not invalidate, impair, or otherwise negatively impact CPD's ability to issue discipline for sustained findings.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶519 in the fifth reporting period because, while the CPD has provided a draft policy speaking to the requirements of ¶519, the CPD has yet to finalize such a policy.

To evaluate Preliminary compliance with ¶519, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).

*Progress before the Fifth Reporting Period*

In the fourth reporting period—the first reporting period that we assessed compliance with ¶519—the CPD did not produce evidence of efforts toward compliance with ¶519.

*Progress before the Fifth Reporting Period*

In the fifth reporting period, the CPD provided a draft of S08-01-01, *Conducting Log Number Investigations*. This draft policy addressed the requirements of ¶519, verbatim. We provided feedback on this policy in September 2021. We did not receive a further revised draft of S08-01-01, thereafter. Because S08-01-01 remained in the collaborative review and revision process at the close of the fifth reporting period, the CPD did not reach Preliminary compliance with ¶519.

In the sixth reporting period we will look for the CPD to further revise S08-01-01.

## Paragraph 519 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶522

*522. Within 365 days of the Effective Date, COPA, the Deputy PSIG, and BIA will create separate staffing and equipment-needs plans. Such plans will include analyses setting forth the basis for the plans' staffing requirements and equipment needs assessments. CPD will implement the staffing and equipment-needs plans in accordance with the specified timeline for implementation.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW)[214] |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |

In the fifth reporting period, the Deputy PSIG and COPA maintained Full compliance with ¶522. In addition, the CPD moved into Preliminary compliance. This allowed the City as a whole to move into Preliminary compliance.

To evaluate Preliminary compliance with ¶522 we reviewed various data sources—including any plans developed under ¶522—to determine whether COPA, the Deputy PSIG, and BIA each created separate staffing and equipment needs plans. To assess Secondary compliance, we reviewed the produced plans to determine whether the plans were complete and sufficiently addressed the needs identified by the needs assessments. Finally, for Full compliance, we looked for evidence that COPA, the Deputy PSIG, and BIA communicated their needs plans to appropriate

---

[214] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

entities. We also looked at whether the CPD implemented the staffing and equipment needs plans provided by BIA.

*Progress before the Fifth Reporting Period*

In past reporting periods, we reviewed the Deputy PSIG's *Staffing and Equipment Needs Assessment* and *OIG Budget Request FY2021*. We also reviewed COPA's *Staffing and Equipment Needs Plan* for 2020 and 2021. With these efforts, we found that COPA and the Deputy PSIG reached Full compliance.

In the third reporting period, the CPD also provided the *Staffing and Equipment Needs Plan Annual Assessment*, but it contained little detail regarding specific personnel and equipment needs. As a result, BIA did not reach Preliminary compliance.

*Progress in the Fifth Reporting Period*

Paragraph 522 sets out a one-time obligation requiring the entities to submit sufficient staffing and equipment-needs plans. Because the PSIG and COPA already submitted plans in compliance with ¶522 in past reporting periods, they remain in Full compliance.

While COPA and the Deputy PSIG previously fully complied with ¶522, we highlight their continued, relevant efforts. COPA provided its *2021-22 Staffing and Equipment Needs Plan* during the fifth reporting period. COPA's plan follows a consistent format from previous years' plans which allows a reader to easily understand the report and compare changes in staffing levels from year to year. In addition to informing the reader about changes in positions, the plan also provides explanations for changes. This plan demonstrates that COPA had a detailed understanding of its operational needs. Additionally, the Deputy PSIG provided an update to its Staffing and Needs Assessment during the fifth reporting period.

In the fifth reporting period, the CPD BIA provided its *Staffing and Equipment Needs Assessment and Implementation Plan for Fiscal Year 2022*. In developing this plan, BIA took into account feedback we provided to its plan for the previous year. BIA's 2022 plan is much improved because it includes conclusions for staffing, technology, and equipment needs to allow BIA to adequately complete their responsibilities. We believe these requests would be bolstered by BIA's inclusion of additional data to support their requests. Relatedly, we encourage BIA to consider what additional tasks non-sworn personnel can take on to allow sworn personnel to handle the investigative responsibilities for BIA.

With this, the CPD and BIA reached Preliminary compliance with ¶522. We hope to see BIA build upon this plan in future years, including more data to support its requests. *See* ¶522 ("Such plans will include analyses setting forth the basis for the

plans' staffing requirements and equipment needs assessments."). Additionally, we hope that BIA will find value in this plan as it allows BIA to understand its actual needs for the responsibilities assigned to the unit.

Beyond this, once BIA completes their data-backed needs plan, we will look for evidence that the CPD "implement[ed] the staffing and equipment-needs plans." *See* ¶522.

### Paragraph 522 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶523

> **523.** *On an annual basis, COPA, the Deputy PSIG, and BIA will review and revise, if needed, each entity's respective staffing and equipment-needs plans.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**   Annual          ☑ **Not Yet Applicable**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW)[215] |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |

In the fifth reporting period, COPA and the Deputy PSIG maintained Preliminary compliance. The Deputy PSIG, having reached Full compliance in the fourth reporting period, maintained Full compliance in the fifth reporting period. COPA moved into Full compliance this reporting period. The CPD also reached Preliminary compliance with ¶523. Because all three entities have reached at least Preliminary compliance with ¶523 in the fifth reporting period, the City, as a whole, reached Preliminary compliance.

To evaluate Preliminary compliance with ¶523 we reviewed various data sources—including any plans developed under ¶523—to determine whether COPA, the Deputy PSIG, and BIA each created separate staffing and equipment needs assessments. To assess Secondary compliance, we reviewed the produced plans to determine whether the plans were complete and sufficiently addressed the needs identified by thorough needs assessments. Finally, for Full compliance, we looked for evidence that COPA, the Deputy PSIG, and BIA have developed processes for

---

[215] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

assessing their staffing and equipment needs on an annual basis, and after assessing needs, they communicate those needs to the appropriate entity.

*Progress before the Fifth Reporting Period*

In past reporting periods the Deputy PSIG and COPA produced sufficient staffing and equipment assessments and plans under ¶522 so as to lay the foundation for an annual assessment thereafter. Having produced such a report in the third reporting period, COPA reached Preliminary compliance. The Deputy PSIG not only provided a report but showed a recurring effort to revise its assessments and plans, allowing it to reach Full compliance. The CPD did not provide a staffing and needs assessment and plan that brought it into Preliminary compliance with ¶522 and which could serve as a foundation for repeated, annual review. Therefore, the CPD did not reach any level of compliance in the past.

*Progress in the Fifth Reporting Period*

As noted in ¶522, COPA, the Deputy PSIG and the CPD have submitted staffing and equipment-needs plans in past years. The data-supported and comprehensive assessments and plans submitted by Deputy PSIG and COPA have allowed them to reach Full compliance with ¶522. Paragraph 523 then requires that these plans be reviewed and revised as needed on an annual basis.

In the fifth reporting period, COPA provided its *2021-22 Staffing and Equipment Needs Plan*, dated November 21, 2021. COPA's plan follows a consistent format from previous years' plans which allows a reader to easily understand the report and compare changes in staffing levels from year to year. In addition to informing the reader about changes in positions, the plan also provides explanations for changes. This plan demonstrates that COPA had a detailed understanding of its operational needs and has mechanisms in place to assess those needs on an annual basis. With this COPA moved into Full compliance.

Additionally, the Deputy PSIG provided an update to its Staffing and Needs assessment, dated November 24, 2021. With this, the Deputy PSIG maintained Full Compliance

For the CPD, this reporting period marks the first year they provided a staffing and equipment need sufficient to reach Preliminary compliance. In the fifth reporting period, the CPD BIA provided its *Staffing and equipment Needs Assessment and Implementation Plan for Fiscal Year 2022*. In developing this plan, BIA took into account feedback we provided to its plan for the previous year. BIA's 2022 plan is much improved. It includes conclusions for staffing, technology, and equipment needs to allow BIA to adequately complete their responsibilities. With this, BIA moved into Preliminary compliance.

To reach additional levels of compliance we will need to see that BIA has mechanisms in place to complete a review of its assessment and plan and make revisions as needed on an annual basis. We expect that BIA will also use feedback received on its latest plan to bolster future assessments and plans with data. Including data will makes its requests for additional staff and equipment more poignant. With this, in future reporting periods, we will look for an improved, data-supported assessment and plan to be completed within one year of the most recent assessment and plan to demonstrate that a system has been developed to regularly assess needs and adjust plans and requests for additional resources.

In the coming year, we will look for COPA and the Deputy PSIG to provide evidence that they have reviewed and revised their staffing and equipment needs, to demonstrate maintained compliance.

### Paragraph 523 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Accountability and Transparency: ¶524

> **524.** *BIA's staffing and equipment-needs plans will include the investigation staffing and equipment needs of the districts.*

**Compliance Progress**                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**       *In Compliance* (NEW)
**Secondary:**        *Not in Compliance*
**Full:**                  *Not Yet Assessed*

In the fifth reporting period, the City and the CPD reached Preliminary compliance with ¶524.

To evaluate Preliminary compliance with ¶524 we reviewed BIA's staffing and equipment-needs plan to determine whether it includes investigation staffing and equipment needs of the districts. To evaluate Secondary compliance, we assessed whether the plan sections addressing investigation staffing and equipment needs of the districts was complete and sufficient.

*Progress before the Fifth Reporting Period*

We assessed BIA's compliance with ¶524 for the first time in the fourth reporting period. The City and CPD did not reach compliance because BIA's *Staffing and Equipment Needs Plan Annual Assessment*, which BIA provided at the end of the third reporting period, did not include specific details about investigation staffing and equipment needs of the districts as required by the paragraph.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, BIA provided its *Staffing and equipment Needs Assessment and Implementation Plan for Fiscal Year 2022*. This plan includes information relating to staffing and equipment needs for District and Unit Accountability Sergeants. With this BIA reached Preliminary compliance.

However, in discussing the needs related to District and Unit Accountability Sergeants, the plan asserts that the two accountability sergeants are not "both expected to be full-time investigators." *See Staffing and Equipment Needs Assessment and Implementation Plan for Fiscal Year 2022* at 9. However, this is in conflict with the requirements of ¶494(b), which requires that "each District Commander designates at least two Accountability Sergeants who will report to the District Commander, and whose **primary responsibility** is receiving, processing, and investigating complaints against CPD members." (Emphasis added). This assertion is all the more concerning given that, during site visits in the fifth reporting period, we

learned that accountability sergeants are required to fill supervisory responsibilities that often prevent them from completing their investigations in a timely manner.

Because the *Staffing and Equipment Needs Assessment and Implementation Plan for Fiscal Year 2022* incorporates a misunderstanding of the requirements of ¶494(b) and does not seem to account for the difficulties experienced by the current Accountability Sergeants, the plan does not yet sufficiently include investigation staffing and equipment needs of the districts.

With this, the CPD reached Preliminary compliance with ¶524 but has not yet reached Secondary compliance. We look forward to ongoing discussions regarding the designation of Accountability Sergeants in the districts and reviewing a plan that better addresses the requirements of the Consent Decree and the Districts' Accountability Sergeants.

### Paragraph 524 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶525

**525.** *Within 60 days of the Effective Date, the City will propose a permanent method of selecting the Chief Administrator of COPA. In creating the permanent selection method for COPA's Chief Administrator, the City will consider the views and recommendations of community stakeholders.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City maintained Preliminary compliance but did not reach Secondary compliance with ¶525 in the fifth reporting period.

To evaluate Preliminary compliance with ¶525, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance with ¶525, we considered a variety of data sources including documentation detailing the screening and hiring process that was used to fill the COPA chief vacancy to determine whether the set method for selecting chief administrator of COPA is understandable to those involved in the selection process.

### Progress before the Fifth Reporting Period

The City reached Preliminary compliance with ¶525 based on its February 28, 2020 *Selection Method for Chief Administrator of COPA* memorandum. At that time, we noted that the City informed us of its negotiations related to a proposed ordinance that would include a permanent process for selecting the COPA Chief Administrator. We reiterated that the City should ensure that opinions and recommendations of community stakeholders be incorporated to future changes of the temporary selection method. The City did not produce materials relevant to this requirement in the third reporting period. In the fourth reporting period, we noted that there was a vacancy for the COPA Chief Administrator, and we reiterated our understanding that the City would follow the Selection Method memorandum.

### Progress in the Fifth Reporting Period

On December 9, 2021, the City submitted Chief Selection Materials related to the recent appointment of a new COPA Chief Administrator, including but not limited to community engagement materials, the COPA Chief Administrator Job Description, and selection committee materials.

Upon review of the Selection Materials, we asked the City if it had a followed a more detailed process than what was outlined in the February 2020 memorandum because the materials produced suggested that a more detailed process had been followed. The City informed the IMT that a Standard Operating Procedure had been created. We received this Standard Operating Procedure, *COPA Chief Administrator Selection Process*, on December 30, 2021. This Standard Operating Procedure raises some concerns. First, it was not submitted for review before it was implemented. Second, not only did we receive the Standard Operating Procedure after the COPA Chief was appointed, but it was also signed and dated December 27, 2021—weeks after the Chief Selection materials were submitted for review. These discrepancies raise several questions including whether this Standard Operating Procedure was created prior to the selection process for a COPA Chief occurred or whether it was created after the appointment.

We recognize that the Standard Operating Procedure is intended to be an interim process until the Ordinance establishing the Civilian Oversight Commission takes effect, but the temporary nature of the Standard Operating Procedure does not alleviate these concerns.

Having a clear process is important for purposes of transparency and accountability. We would like to see improved clarity surrounding the appointment process in the future. The City recognized that the Standard Operating Procedure submitted December 9, 2021 is only a temporary solution, stating "[t]he City has recently codified a permanent selection method for selection of the Chief Administrator of COPA via City Council." We expect that a more permanent selection process will be created and submitted to us for review in the sixth reporting period as ¶525 calls for a *permanent* method for selecting the Chief Administrator of COPA.

Because the City does not yet have a more permanent selection method in place, it did not reach additional level of compliance with ¶525 in the fifth reporting period.

### Paragraph 525 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶526

> *526. Within 180 days of being assigned to BIA or being hired by COPA, all new BIA personnel and COPA employees will receive initial on-boarding training that is adequate in quality, quantity, scope, and type. Within 120 days of the Effective Date, COPA and BIA will verify that all existing personnel received training that is consistent with this Agreement.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[216] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |

The City did not reach Preliminary compliance because the CPD has not yet provided evidence of a training plan that will allow it to comply with ¶526. However, COPA reached Full compliance in the fifth reporting period.

To evaluate Preliminary compliance with ¶526, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[217] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we reviewed various data sources to determine whether the entities have appropriate training and systems in place to ensure all new personnel

---

[216] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[217] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

and employees receive adequate on-boarding training within 180 days of assignment.

*Progress before the Fifth Reporting Period*

In earlier reporting periods, the CPD provided drafts of BIA's *Training* Unit Directive. Sections of this Unit Directive speak to the requirements of ¶526, but this Unit Directive remained in the collaborative review and revision process at the end of the fourth reporting period. In the fourth reporting period, we also reviewed BIA's draft of its onboarding training materials. These materials were produced in March 2021. We provided feedback in, but we did not receive revised materials by the end of the reporting period. With this the CPD did not reach Preliminary compliance.

COPA met Preliminary compliance in the third reporting period by revising and ultimately receiving a no-objection notice on its Training Plan, which fully addressed the requirements of ¶526.[218] In the fourth reporting period, COPA provided, for review, training academy attendance records for *New Hire Onboarding Orientations* which showed that all 15 trainees attended and completed 29.5 hours of onboarding training. This training included Implicit Bias, Procedural Justice training, and a variety of other topics. With this, COPA reached Secondary compliance.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, BIA did not provide any additional drafts of its *Training* Unit Directive or its onboarding training materials that had been provided in earlier reporting periods and to which we provided feedback. Instead, this reporting period, the CPD focused on revising Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. This Directives copies verbatim the requirements set out in ¶526. But as discussed with CPD during the fifth reporting period, mere recitation of the requirements stated in ¶526 is not sufficient to reach Preliminary compliance. Instead, the CPD must show that it has a detailed, written plan for actually providing the training required by the paragraph.

---

[218] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

COPA, in the fifth reporting period, provided records that tracked the provision and completion of training to and by COPA employees. This tracker shows that COPA is providing training in accordance with the *Training and Professional Development Department Training Plan* which COPA provided in the third reporting period. These efforts demonstrate that the COPA has the necessary systems in place to meet the requirements of ¶526 and follow their own training plan. With this, COPA reached Full compliance with ¶526.

Because COPA has demonstrated its ability to implement and maintain systems that allow it to train employees in accordance with the paragraph and COPA's own training plans, COPA reached Full compliance. Next reporting period, we will look for evidence that COPA continues to train staff appropriately.

Because the CPD has not yet provided us evidence of a plan to development and complete training in accordance with ¶526, the CPD has not yet reached Preliminary compliance. We look forward to working with the CPD as they develop such plans.

### Paragraph 526 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶527

> ***527.*** *Within 180 days of the Effective Date, COPA and BIA will begin providing all investigation staff members with at least eight hours of annual, comprehensive, in-service training.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[219] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |

The City did not reach any level of compliance in the fifth reporting period because the CPD has not yet provided a plan as to how it will comply with ¶527. COPA, however, reached Full compliance during this reporting period.

To evaluate Preliminary compliance with ¶527, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[220] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we reviewed various data sources to determine whether the entities have systems in place to ensure that staff members are provided with eight hours of comprehensive, in-service training on an annual basis.

---

[219] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[220] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Fifth Reporting Period*

BIA has not reached Preliminary compliance with ¶527 in past reporting periods, though we have reviewed many materials produced under this paragraph. We reviewed BIA's in-service training plan, BIA's *Training* Unit Directive, and BIA's annual training plan. We have provided feedback on each of these items; none were sufficient to bring CPD into Preliminary compliance by the close of the fourth reporting period.

COPA reached Preliminary compliance with ¶527 in the third reporting period by drafting and revising a comprehensive *Training Plan*. COPA maintained but did not reach additional levels of compliance in the fourth reporting period.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, BIA did not provide any additional drafts of its *Training* Unit Directive or revised training plans. Instead, this reporting period the CPD focused on revising Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. This Directive copies verbatim the requirements set out in ¶527. But as discussed with CPD during the fifth reporting period, mere recitation of the requirements stated in ¶527 is not sufficient to reach Preliminary compliance. Instead, the CPD must show that it has a detailed, written plan for actually providing the training required by the paragraph.

In the fifth reporting period, COPA provided records demonstrating that 99% of its personnel completed its 2021 In-Service Training which included instruction blocks on procedural justice, implicit bias, witness reliability, and intake. COPA provided all of these training materials to the IMT prior to delivering these trainings and we ultimately provided no-objection notices to each. We commend COPA on developing comprehensive and professional trainings and for keeping such detailed and clear records which not only allow COPA to demonstrate compliance but keep track of personnel training histories for their own records. With this, COPA reached Full compliance with ¶527.

COPA reached Full compliance with ¶527. In the sixth reporting period, we will look for COPA to provide evidence that it is fully complying with ¶527's requirements.

The CPD has not yet reached Preliminary compliance with ¶527. For the CPD, we will look for a plan that details how the CPD will comply with ¶527's training requirements.

## Paragraph 527 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶528

*528. The initial and annual in-service training for COPA and BIA investigators will include instruction in: a. how to properly handle complaint intake, and the consequences for failing to take complaints; b. best practices in procedural justice, including techniques for communicating with complainants and members of the public; c. the collection of objective verifiable evidence; d. the process for seeking an override affidavit in the absence of a signed complainant affidavit; e. for COPA investigators, techniques for conducting impartial investigations of domestic violence and sexual misconduct; f. for BIA investigators, techniques for conducting impartial investigations of sexual misconduct; g. investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management; h. the challenges of law enforcement administrative investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation; i. properly weighing the credibility of witnesses against CPD members; j. using objective evidence to identify and resolve inconsistent statements; k. implicit bias; l. the proper application of the relevant standards of proof; m. relevant COPA and CPD rules, policies, and protocols including the requirements of this Agreement; n. relevant state and federal law; o. relevant CPD Rules of Conduct, including Rules 14, 21, and 22; p. the CMS; q. the applicable collective bargaining agreements; and r. how to access and use the PRS or information available on the PRS.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[221] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

[221] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

The City did not reach Preliminary compliance with ¶528 because the CPD has not yet provided a plan for accomplishing the training required by ¶528. COPA previously reached Preliminary compliance and has maintained that level of compliance in the fifth reporting period but has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶528, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[222] To evaluate Secondary compliance, we reviewed the entities' training development to determine whether COPA and BIA have sufficient initial and annual in-service training curriculum that meets the requirements of ¶528. To evaluate Full compliance, we review relevant training materials and consult various data sources to determine whether COPA and BIA provided the training required by ¶528.

*Progress in the Fifth Reporting Period*

BIA has not reached Preliminary compliance with ¶528 in past reporting periods, though we have reviewed many materials produced under this paragraph. We reviewed BIA's *Training* Unit Directive, BIA's *Accountability Sergeants* Unit Directive, BIA's *BIA Investigators* Unit Directive, and a variety of training materials that relate to the training requirements listed in ¶528. We provided feedback on the trainings in April 2021. We have provided feedback on all unit directives. By the close of the fourth reporting period none of the Unit Directives had been posted for public comment.

At the end of the fourth reporting period, we noted that while BIA had not met Preliminary compliance with ¶528, they had done significant work to develop onboarding and in-service training. We urged BIA to address comments and suggestions that the IMT and the OAG provided BIA on the blocks of instructions submitted to further refine the trainings.

COPA, on the other hand, reached Preliminary Compliance by compiling and revising its *Training and Professional Department Training Plan*. This Training Plan is comprehensive, meeting and exceeding all requirements listed in ¶528.

In the fourth reporting period, COPA produced a variety of training lesson plans relevant to the requirements of ¶528. This included the training regarding witness

---

[222] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

reliability (relating to ¶528(i)), procedural justice (relating to ¶528(b)), implicit bias (¶528(k)), and CPD Rules and Directives (¶528(o)).

*Progress in the Fifth Reporting Period*

This reporting period, BIA did not continue its efforts in developing its various training materials as we had anticipated at the end of the fourth reporting period. BIA did not provide revised training materials or any of its Unit Directives previously submitted under this paragraph. Nor did BIA post any of its Unit Directives related to ¶528 for public comment. Instead, this reporting period, the CPD focused on revising Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which speaks to ¶528. But as discussed with CPD during the fifth reporting period, mere recitation of the requirements stated in ¶528 is not sufficient to reach Preliminary compliance. Instead, the CPD must show that it has a detailed, written plan for actually providing the training required by the paragraph.

In the fifth reporting period, COPA provided its materials for its *Intake* in-service training. We submitted a no-objection notice to this training.[223] This well-presented and comprehensive training covers the requirements of ¶528(a). Toward the end of the reporting period, COPA provided training attendance records showing that 99% of its personnel completed the trainings related to intake (¶528(a)), procedural justice (¶528(b)), implicit bias (¶528(k)), and witness reliability (¶528(j)). This is great progress toward additional levels of compliance with ¶528. But because COPA has not yet provided training materials covering all listed topics, COPA has not yet reached Secondary compliance.

With this, the CPD did not reach Preliminary compliance in the fifth reporting period. COPA maintained Preliminary compliance but has not yet reached Secondary compliance.

We continue to recognize that many of the training topics required by ¶528 are complex and require significant time and resources to ensure that BIA Investiga-

---

[223] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

tors, COPA Investigators, and Accountability Sergeants have a comprehensive understanding of the material. These topics largely involve new processes, procedures, directives, and technology. Additionally, many of the topics will require the CPD and COPA to engage with subject matter experts to sufficiently develop and deliver the trainings. We hope to see BIA and COPA continuing to develop trainings related to the topics outlined in ¶528.

### Paragraph 528 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶529

**529.** *Within 180 days of the Effective Date, CPD will begin providing training to all CPD members on the terms of this Agreement and COPA's and CPD's revised or new policies related to administrative investigations and discipline. To the extent appropriate and necessary based upon a CPD member's duties, and contact with members of the public and/or individuals in custody, this training will include instruction on: a. identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in an investigation; b. use of the City's anonymous reporting website; c. for CPD supervisors: i. the proper initiation of the intake process, including providing COPA's contact information and the consequences for failing to initiate the intake process; and ii. techniques for turning the initiation of a complaint into a positive police-community member interaction.*

## Compliance Progress                (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not reach Preliminary compliance with ¶529 in the fifth reporting period.

To evaluate Preliminary compliance with ¶529, the IMT reviewed the CPD's relevant policies and other data sources to determine whether CPD is committed to training members as required by ¶529.

*Progress before the Fifth Reporting Period*

The CPD has not reached Preliminary compliance in past reporting periods. We have reviewed a variety of materials related to this paragraph including meeting agendas of BIA Education and Training Division demonstrating discussion of items related to ¶529 occurred, various BIA training materials, and BIA's *Training* Unit Directive. At the end of the fourth reporting period, we noted that the *Training* Unit Directive did not meet the requirements of ¶529 because it did not commit the entire CPD to training its members per ¶529.

*Progress before the Fifth Reporting Period*

We did not receive any revised or new materials related to ¶529 in the fifth reporting period.

We are discouraged that the CPD has not yet reached any level of compliance with ¶529. Moving forward, we hope to see a policy or other training commitment and timeline that demonstrates that the CPD will provide training as outlined in ¶529.

### Paragraph 529 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶530

**530.** *Within 90 days of the Effective Date, COPA and BIA will create separate initial and in-service training plans.*

| Compliance Progress | (Reporting Period: July 1, 2021, through Dec. 31, 2021) |
|---|---|
| **Preliminary:** | *Not In Compliance* (NEW: LOST COMPLIANCE)[224] |
| **CPD** | *Not In Compliance* (NEW: LOST COMPLIANCE) |
| **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

The City is no longer in Preliminary compliance with ¶530, because the CPD has not followed through with their draft training plans related to ¶530, and therefore do not have finalized written guidance instructing compliance with ¶530. COPA, however, maintained Secondary compliance with ¶530 in the fifth reporting period.

To evaluate Preliminary compliance with ¶530, we reviewed various data sources to determine whether the CPD and COPA allocated sufficient resources to create separate initial and in-service training plans. To evaluate Secondary compliance, we reviewed the entities' plans, where available, to determine whether the plans are sufficient. To evaluate Full compliance, we reviewed various data sources including training materials and attendance records to determine whether COPA and the CPD implemented their training plans.

*Progress before the Fifth Reporting Period*

COPA reached Preliminary and Secondary compliance in the third reporting period by providing and revising its *Training and Professional Development Training Plan*. After engaging in collaborative review and making responsive revisions, this three-year plan was determined to be sufficient to meet the requirements set out for initial and in-service training. Therefore, COPA reached Secondary compliance.

---

[224] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

The CPD reached Preliminary compliance in the third reporting period. We reviewed BIA's *In-Service Training Plan*, and Investigator and Accountability Sergeant On-Boarding Training Schedule and Course Description. We found that BIA reached Preliminary compliance by creating initial and in-service training plans because it demonstrated the CPD allocated sufficient resources to create separate initial and in-service training plans. By the end of the fourth reporting period, we were awaiting revisions to the *BIA Investigators' and Accountability Sergeant's Annual Training Plan*.

*Progress in the Fifth Reporting Period*

COPA's *Training and Professional Development Training Plan* is a three year plan. Therefore, we are not yet able to assess whether COPA has fully implemented its plan. COPA remains in Secondary compliance because it continues to provide training in accordance with its plans.

BIA did not provide any materials under ¶530 in the fifth reporting period. With this, we note that the last draft plan BIA provided related to training was in late 2020. BIA has not finalized a plan to address the requirements of ¶530 or the other training paragraphs (i.e., ¶¶526–29). Because of this, the CPD is no longer in Preliminary compliance with this paragraph.

With this, COPA maintains Secondary compliance and CPD is no longer in Preliminary compliance. In the sixth reporting period we will look forward to continuing to review training materials developed and delivered by COPA. We hope to see an updated training plan for BIA that demonstrates a renewed commitment to allocating resources to provide the requisite initial and in-service trainings.

### Paragraph 530 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | None | |

# Accountability and Transparency: ¶532

*532. Within 180 days of the Effective Date, the City will draft selection criteria for Police Board members with the objective of identifying individuals who possess sufficient experience, judgment, and impartiality to perform the duties of members of the Police Board. Selection criteria may include prior work in law or law enforcement, and service with Chicago-based community and non-profit organizations. The draft selection criteria will be published on the Police Board's website for a period of 30 days for public review and comment. Following the 30-day public review and comment period, the City will provide the draft criteria to OAG for review and comment. The final selection criteria will be published and maintained on the Police Board's website. The City will ensure that the selection criteria are the basis for future selection of Police Board members.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City maintained Preliminary compliance with ¶532 but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶532, the IMT reviewed the City's policies following the policy process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed various data sources and plans to determine whether the City developed a process for properly applying the selection criteria should a vacancy on the Police Board occur.

*Progress before the Fifth Reporting Period*

In the second reporting period, the City reached Preliminary compliance with their *Police Board Member Selection Criteria*. The City provided an initial draft and made subsequent revisions after receiving feedback from the IMT and the OAG. After revisions were made, we determined that the *Police Board Member Selection Criteria* allowed the City to move into Preliminary compliance. We did not receive additional evidence of compliance in the third or fourth reporting periods.

*Progress in the Fifth Reporting Period*

On December 14, 2021 the City submitted the Mayor's Office's *Policy Governing Police Board Member Selection* ("Selection Process") with an effective date of September 30, 2021 and supporting Police Board Candidate Screen Questions ("Screen Questions"). We provided feedback on these materials on December 29, 2021. We noted concern that the Selection Process does not provide much guidance to "ensure that the selection criteria are the basis for future selection of Police Board members." ¶532. The Selection Process and Screen Questions make little mention of the selection criteria set out in the City's *Police Board Member Selection Criteria*. While the Selection Process notes that Police Board leadership will identify and interview at least four candidates that meet the selection criteria, there is no indication of how Police Board leadership will verify that the criteria is met—such as through reviewing resumes, checking backgrounds or professional licenses, or calling references. The Screen Questions address only a couple of the criteria set out. Additionally, the Screen Questions indicate that answers to questions will be assessed on a 1–5 scale, but there is no minimum score to indicate whether criteria are met.

Before the City submitted the Selection Process and Screen Questions, the City selected two individuals to fill Police Board vacancies. It is unfortunate that the City did not submit the Selection Process and Screen Questions to the IMT and the OAG prior to beginning the selection process for these recent appointees. Had the City first submitted the Selection Process and Screen Questions for review—before finalizing it in September 2021—it could have benefited from collaborative review and been able to revise the Selection Process so that it was sufficient to meet Secondary compliance with ¶532. Beyond this, while we do not suggest the recently-suggested Police Board members are not appropriate appointees for the Police Board, a more refined Selection Process could have further improved confidence in the appointees selected to serve on the Police Board.

But beyond the Selection Process being in need of revisions and refinement, we are concerned that the City did not follow its own Selection Process. On December 30, 2021, the City submitted "Evidence of Police Board member Appointment" ("Appointment Evidence"); these materials suggest that the City did not abide by its own Selection Process. For example, the Selection Process indicates that the "Police Board leadership (the Board President, Vice President, and at least two members) will work together to identify at least four potential candidates that meet the selection criteria." The Appointment Evidence, however, does not indicate that this occurred. Instead, it suggests that the Police Board President, alone, identified four candidates. The Appointment Evidence also does not provide any detail as to how the Police Board President confirmed that the candidates met the selection criteria. There is no indication that the Screen Questions were utilized,

or the scores received by the candidates. And, while the Selection Process indicates the Police "Board President and Vice President together will interview each of the potential candidates," the Appointment Evidence suggests only the President interviewed all candidates. The Vice President appears to have interviewed only one individual. In addition, we have not received evidence that the two appointees fit the Police Board composition requirements listed in *Police Board Member Selection Criteria*.

While the members ultimately selected might be appropriate appointees, we have concern that their selection could be undermined if the City did not follow its own written Selection Process, even if that process could benefit from revisions. Just as developing clear and understandable policies and processes is an important aspect of accountability and transparency, following those established policies and process is crucial to foster community trust.

We hope the City will be able to provide information demonstrating that it did, in fact, follow its written policy in the sixth reporting period. Regardless of the City's ability to do so, we encourage the City to consider the example it sets for all City entities subject to the Consent Decree as it further revises policies, processes, and programs under the Consent Decree.

Because the Selection Process does not sufficiently ensure that "the selection criteria are the basis for future selection of Police Board members," the City did not reach Secondary compliance with ¶532 in the fifth reporting period. We look forward to working with the City as it considers revising and refining the Selection Process.

### Paragraph 532 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶533

> ***533.*** *Within 180 days of the Effective Date, the Police Board will submit selection criteria for Police Board hearing officers to the Monitor and OAG for review and comment. The criteria will be drafted to help identify individuals who possess sufficient competence, impartiality, and legal expertise to serve as hearing officers. The selection criteria will be published on the Police Board's website. The City and the Police Board will ensure that the selection criteria are the basis for future selection of Police Board hearing officers.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |

The Police Board maintained Full compliance with ¶533 during the fifth reporting period.

To evaluate Preliminary compliance with ¶533 we reviewed Police Board's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance with ¶533, we considered whether the Police Board Hearing Officer Selection Criteria—which enabled the City and Police Board to reach Preliminary compliance with ¶533—had been sufficiently disseminated and explained to ensure that the Police Board Hearing Officer Selection Criteria would be appropriately followed. We then looked for evidence that the City and the Police Board follow the selection criteria set forth to assess Full compliance with ¶533.

In the second reporting period, the Police Board reached Preliminary compliance by submitting *Police Board Hearing Office Selection Criteria*. In the fourth reporting period, the Police Board reached Secondary and Full compliance by demonstrating that the *Police Board Hearing Officer Selection Criteria* had been disseminated and followed in the Police Board's search for and hiring of a new Police Board Hearing Officer. Throughout the hiring process, the Police Board provided the IMT and the OAG updates that demonstrated an awareness of the *Police Board Hearing Officer Selection Criteria* and a commitment to following that guidance.

There were no Police Board Hearing Officer vacancies during the fifth reporting period. The Police Board maintains Preliminary compliance. If, in future reporting periods a vacancy occurs, we request that the Police Board notify the IMT and provide the same level of detail and transparency into its search and hiring process in order to maintain Full compliance.

## Paragraph 533 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
None

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Preliminary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

## Accountability and Transparency: ¶534

**534.** *In any disciplinary action requiring the vote of the Police Board, the City will ensure: a. a hearing officer will preside over the disciplinary proceedings; and b. disciplinary hearings will be videotaped in their entirety.*

### Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |

The City and the Police Board maintained Full compliance with ¶534 in the fourth reporting period.

To assess Preliminary compliance, we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's development, implementation, and evaluation of training. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training.

In the fourth reporting period, the Police Board reached Full compliance with ¶534 after providing several documents for review: (1) Section 2-8-030 of the Municipal Code of Chicago, which authorizes hearing officers to preside over Police Board disciplinary hearings and requires the hearing officers to conduct disciplinary hearings in accordance with the provisions of the Code and the Board's Rules of Procedure; (2) the Police Board's *Rules of Procedure*, which among other things, requires each disciplinary case to be assigned to a hearing officer and mandates that the hearing be video recorded in its entirety; and (3) links to video recordings disciplinary hearings for the three most recent cases decided by the Police Board.

These documents demonstrated that the Police Board not only has policies in place to instruct compliance with ¶534, but that the Police Board follows those policies and procedures, putting compliance with ¶534 into action.

In the fifth reporting period, the Police board provided links to recorded hearings that occurred via Zoom. These recordings confirm that the Police Board continues to have a hearing officer presiding over disciplinary hearings and that the hearings were video recorded in their entirety.

With this evidence, the Police Board remains in Full compliance with ¶534.

# Accountability and Transparency: ¶535

*535. Prior to any vote by the Police Board following any disciplinary hearing, the City will ensure: a. all Police Board members are required to watch and certify that they have watched the videotape of the entire evidentiary hearing; b. all Police Board members are provided copies of the complete record, including demonstrative exhibits; c. hearing officers will prepare a written report that sets forth evidence presented at the hearing: (i) in support of the charges filed; (ii) in defense or mitigation; and (iii) in rebuttal, including evidence and aggravation, if any; the hearing officer's report will also include information relating to witness credibility; d. the Police Board may, at its discretion, ask a hearing officer to additionally prepare a written report and recommendation that sets forth findings of fact and conclusions of law, including any findings relating to witness credibility; e. the parties before the Police Board will have 14 days to review the hearing officer's report, and recommendation, and file any written objections; and f. all Police Board members will review de novo the hearing officer's report and any recommendation, and the parties' written objections to the same.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**   *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**    *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**     *In Compliance* (FOURTH REPORTING PERIOD)

The City and the Police Board maintained Full compliance with ¶535 in the fourth reporting period.

To assess Preliminary compliance with ¶535, we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training.

The Police Board reached Full compliance with ¶535 in the fourth reporting period. In May 2021, the Police Board provided us with its *Rules of Procedure*. These rules addressed the requirements of ¶535's subsections (a) and (c)–(f). The Police Board also provided a written transcript that included exhibits which demonstrated that Police Board members receive complete records for review before a Police Board vote, as required by subsection (b). These documents demonstrated

that Police Board not only had policies and procedures in place instructing compliance with ¶535's requirements, but that the Police Board follows those policies and procedures. With this, they reached Full compliance.

In the fifth reporting period, the Police Board provided three Police Board hearing transcripts that demonstrated that Police Board members continued to comply with ¶535's requirements. Their actions included but are not limited to watching video recordings of evidentiary hearings, receiving and reviewing complete records from the hearings, and receiving and reviewing the hearing officers' written reports—all prior to any Police Board vote.

With this evidence, the Police Board maintained Full compliance with ¶535.

### Paragraph 534 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶536

> **536.** *As part of the Police Board proceedings, the parties to the Police Board case (the Superintendent and the involved CPD member) will be given access to the CPD member's complete disciplinary file and will have the opportunity to move for entry into the record of proceedings any relevant aspect of the CPD member's disciplinary file, as permitted by law and any applicable collective bargaining agreements.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |

The City and the Police Board maintained Full compliance with ¶536 in the fourth reporting period.

To assess Preliminary compliance, we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training.

The Police Board reached Full compliance with ¶536 in the fourth reporting period. In May 2021, the Police Board provided us with its *Rules of Procedures.* The *Rules of Procedures* ensure that parties in a Police Board case are provided access to the CPD member's disciplinary files and are able to move to enter relevant aspects of a CPD member's disciplinary file into the proceeding records. With this, the Police Board reached Full compliance.

In the fifth reporting period, the Police Board provided materials from three police disciplinary cases filed with the Board that show that Police Board members are given access to the CPD member's complete disciplinary file. This demonstrates that the Police Board continues to follow its procedures, acting in accordance with ¶536.

With this evidence, the Police Board maintained Full compliance with ¶536 in the fifth reporting period.

## Paragraph 536 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full |

# Accountability and Transparency: ¶537

**537.** *All regular meetings convened by the Police Board that are open to the public will be attended by the CPD Superintendent or his or her designee; the Chief Administrator of COPA or his or her designee; the Deputy PSIG or his or her designee; and the Chief of BIA or his or her designee.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |

Through the efforts the Police Board, the CPD Superintendent, the COPA Chief Administrator, the Deputy PSIG, and the BIA Chief, the City maintained Full compliance with ¶537 in the fourth reporting period.

To assess Preliminary compliance we reviewed the City's relevant policies and records to determine whether information is provided to all entities implicated by ¶537 so that they may attend Police Board public regular meetings. To evaluate Secondary compliance, we reviewed, records to show that all entities had sufficient personnel and have allocated sufficient resources to allow compliance with ¶537's mandate. To evaluate Full compliance, we reviewed data sources to show that all necessary entities attended Police Board meetings that are open to the public as required by ¶537.

The City reached Full compliance with ¶537 in the fourth reporting period. During the fourth reporting period, the IMT attended public Police Board meetings virtually. Each meeting was attended by the CPD Superintendent or designee, the COPA Chief Administrator or designee, the Deputy PSIG or designee and the BIA Chief. In fact, in very few meetings were the respective heads not in attendance, personally. Based on this, the City reached Full compliance.

In the fourth reporting period, we acknowledged the PSIG for its additional efforts at ensuring compliance. The Office of Inspector General *Public Safety Section Policies Manual* includes a policy that ensures attendance of the PSIG at the Police Board meetings.

In the fifth reporting period, the Police Board submitted attendance records from its public meetings that demonstrate that the individuals (or their designees) required to attend these meetings under ¶537 attended all public meetings. With this, the City maintained Full compliance.

To our knowledge, the PSIG remains the only entity that currently has a policy requiring attendance of the PSIG at the Police Board meetings. We strongly encourage that the CPD and COPA incorporate into policy a mandatory attendance of Police Board meetings.

### Paragraph 537 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶538

> ***538.*** *Within 90 days of the Effective Date, the City will create a policy for collecting, documenting, classifying, tracking, and responding to community input received during the Police Board's regular community meetings. The policy will outline the methods for: (a) directing community input to the appropriate responding entity, agency, or office; and (b) documenting and making public, all responses to community input.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Full:** *In Compliance* (FOURTH REPORTING PERIOD)

The City and the Police Board maintained Full compliance with ¶538 in the fourth reporting period.

To assess Preliminary compliance, we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training.

In previous reporting periods, we found the Police Board in Full compliance with ¶538. The Police Board's adopted *Policy Regarding the Attendance of and Participation by the Public at Board Meetings* (Participation Policy) and *Response* Policy work together to create a framework that addresses the requirements of ¶538. The Participation Policy governs requirements for speakers who require some immediate action on the part of the CPD, COPA, or the Police Board, and the Response Policy directs the expectations of response from the CPD, COPA, or the Police Board. In addition to attending meetings where we saw the CPD, COPA, and Police Board representatives assume responsibility for concerns or issues raised, we also reviewed materials showing responses or actions resulting from these meetings (which is normally posted on the Police Board's website in accordance with the Response Policy). With these efforts, the Police Board reached Full compliance.

The City maintained Full compliance with ¶538 in the fifth reporting period by providing a variety of materials, including but not limited to video and transcripts of Police Board meetings and community input reports. These reports track com-

munity input and responses from each agency. These records show that complaints and issues raised during meetings are followed up on in accordance with ¶538 and the policies created by the Police Board related to ¶538's requirements.

With this, the City maintained Full compliance with ¶538.

### Paragraph 538 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶539

*539. The Police Board will make best efforts to streamline discovery efforts in all pending proceedings.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |

The City and the Police Board maintained Full compliance with ¶539 in the fourth reporting period.

To assess Preliminary compliance, we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training using "best efforts" as defined by ¶729.

In the fourth reporting period, the Police Board produced to the IMT the *Police Board Rules of Procedure*. Section II.A of the Police Board Rules of Procedures addresses this paragraph and includes additional information to further explain the process. This allowed the Police Board to reach Full compliance with ¶539.

In the fifth reporting period, the Police Board provided materials from three Police Board Hearings that demonstrate a streamlined discovery process. In addition, the Police Board provided a letter summarizing its efforts to streamline the discovery process. The letter indicates that the process has been changed to allow the Complaint Register file to be produced at the time of the initial status hearing or within a few days after. This has resulted in the accused officer's attorney receiving discovery materials about 30 days sooner than they would have under the previous process. This change allows the parties to prepare for and schedule the discipline hearing more quickly

The above described information demonstrates that the Police Board maintained Full compliance with ¶539 in the fifth reporting period.

## Paragraph 539 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full |

# Accountability and Transparency: ¶540

*540. Within 180 days of the Effective Date, Police Board members and hearing officers will receive initial and annual training that is adequate in quality, quantity, scope, and type and will cover, at minimum, the following topics: a. constitutional and other relevant law on police-community encounters, including law on the use of force and stops, searches, and arrests; b. police tactics; c. investigations of police conduct; d. impartial policing; e. policing individuals in crisis; f. CPD policies, procedures, and disciplinary rules; g. procedural justice; and h. community outreach.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:** Annual (October 30, 2021*) ☐ **Met** ☑ **Missed**
*Extended from August 28, 2021, due to COVID-19

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The City and the Police Board reached Preliminary compliance with ¶540 in the fifth reporting period.

To evaluate Preliminary compliance with ¶540, the IMT reviewed training materials to determine if trainings were developed to sufficiently address requirements listed in ¶540. To evaluate Secondary compliance, we reviewed, among other things, the Police Board's training development, implementation, and evaluation. To assess Full compliance, we reviewed various data sources to determine whether the Police Board has mechanisms and processes in place to ensure that Police Board members are provided annual training as required by ¶540.

*Progress before the Fifth Reporting Period*

In previous reporting, the Police Board began working with a local law firm that agreed to provide training development to the Police Board at no cost. We commended the Police Board's decision to seek outside assistance in developing appropriate training since the Police Board does not have staff to help develop and deliver training. In past reporting periods, the Police Board has provided the following trainings to Police Board members: training regarding Police Boards in other Major U.S. Cities, and training regarding the Consent Decree. We noted that neither of these trainings covered requirements of ¶540 but recognized that these trainings were valuable.

Additionally, late in the fourth reporting period, the Police Board produced a "training agenda" that details the training the Police Board hopes to accomplish. We did not have sufficient time to assess the training agenda by the close of the fourth reporting period.

*Progress in the Fifth Reporting Period*

At the start of the fifth reporting period, we reviewed the Police Board's training agenda, which the Police Board produced at the end of the fourth reporting period. This agenda details the trainings the Police Board has completed, the next training sessions planned, and other trainings that the Police Board is contemplating. These proposed trainings outline all substantive topics of training required by ¶540. Because of this, the Police Board has reached Preliminary compliance.

During the fifth reporting period, Police Board members and hearing officers attended a one-hour block of training regarding responding to calls with a mental health component. This training was presented by NAMI Chicago and relates to the requirements set out in ¶540(e). The Police Board also submitted training materials for their training *Policing First Amendment Activity*. We submitted a no-objection notice to this training. [225] The Police Board has also provided other trainings beyond those required by ¶540.

Moving forward, we will look forward to receiving information regarding the Police Board's progress in providing the *Policing First Amendment Activity* training. Additionally, to reach Secondary compliance the Police Board will need to provide training materials and ultimately provide trainings that touch on all listed training topics for ¶540.

---

[225] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 540 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Preliminary |

# Accountability and Transparency: ¶541

> **541.** *The trainings [referenced in ¶540] will be provided by sources both inside and outside of CPD, as needed, to provide high quality training on investigative techniques, and CPD policies, procedures, and disciplinary rules.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and Police Board reached Preliminary compliance in the fifth reporting periods.

To evaluate Preliminary compliance with ¶541, the IMT reviewed the Police Board's policies following the policy process described in the Consent Decree (¶¶626–41). Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms."

### Progress before the Fifth Reporting Period

In previous reporting, the Police Board began working with a local law firm that agreed to provide training development to the Police Board at no cost. We commended the Police Board's decision to seek outside assistance in developing appropriate training since the Police Board does not have staff to help develop and deliver training. In past reporting periods, the Police Board has provided the following trainings to Police Board members: training regarding Police Boards in other Major U.S. Cities, and training regarding the Consent Decree. We noted that neither of these trainings covered requirements of ¶540 and ¶541 but recognized that these trainings were valuable.

Additionally, late in the fourth reporting period, the Police Board produced a training agenda that details the training the Police Board hopes to accomplish. We did not have sufficient time to assess the training agenda by the close of the fourth reporting period.

### Progress in the Fifth Reporting Period

In the fifth reporting period, the Police Board provided members and hearing officers a one-hour training regarding responding to calls with a mental health component. This training was presented by NAMI Chicago and addresses the requirements of ¶540(e). The Police Board also provided trainings beyond that required in ¶540 and ¶541, such as *Reflecting on the Holocaust: Defining Moments for Police*. Although this and other trainings are beyond those mentioned in ¶540 (and

referenced in ¶541), the Police Board leadership believes that providing such blocks of instruction are essential for the work they perform and will provide greater meaning and context to the trainings required by ¶540 and ¶541.

The Police Board presented a training agenda at the end of the fourth reporting period, and this agenda sets out trainings to address all training topics outlined in ¶541. Additionally, the Police Board has provided some trainings in accordance with its training agenda and has demonstrated its willingness to and ability to seek out and engage appropriate individuals to provide their trainings. With this, the Police Board reached Preliminary compliance.

Moving forward we will look for the Police Board to provide training materials relating to the topics set out in ¶541.

### Paragraph 541 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Preliminary | |

# Accountability and Transparency: ¶542

**542.** *Within 90 days of the Effective Date, the City will create a training policy for Police Board members and hearing officers.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The City reached Preliminary compliance with ¶542 in the fifth reporting period through the efforts of the Police Board.

To evaluate Preliminary compliance with ¶542, the IMT has reviewed the Police Board's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods.

*Progress before the Fifth Reporting Period*

In previous reporting, the Police Board began working with a local law firm that agreed to provide training development to the Police Board at no cost. We commended the Police Board's decision to seek outside assistance in developing appropriate training since the Police Board does not have staff to help develop and deliver training. In past reporting periods, the Police Board has provided the following trainings to Police Board members: training regarding Police Boards in other Major U.S. Cities, and training regarding the Consent Decree. We noted that neither of these trainings covered requirements of ¶541 but recognized that these trainings were valuable.

Additionally, late in the fourth reporting period, the Police Board produced a training agenda that details the training the Police Board hopes to accomplish. We did not have sufficient time to assess the training agenda by the close of the fourth reporting period.

*Progress in the Fifth Reporting Period*

During the fifth reporting period, we reviewed the training agenda the Police Board provided us at the end of the fourth reporting period. We provided feedback regarding the planned and contemplated training blocks. The Police Board provided an updated training agenda in December 2021. This updated draft captures the training blocks the Police Board provided during the fifth reporting period, such as the *Policing Individuals in Crisis*, presented by NAMI Chicago. It demonstrates the trainings the Police Board intends to provide next, *Consideration for Policing of First Amendment Activity*, and other trainings under the Police Board.

The training blocks of instruction already provided to Police Board members and hearing officers demonstrate adherence to this training plan. With this detailed training agenda that the Police Board has adhered to thus far, the Police Board reached Preliminary compliance.

Moving forward, we will look for the Police Board to continue to adhere to and update its training agenda. For Full compliance the Police Board will need to provide evidence that it has created a system to ensure continued training will be provided in the years to come.

### Paragraph 542 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Preliminary | |

# Accountability and Transparency: ¶543

**543.** *With regard to the promulgation or adoption of CPD rules and regulations, the Police Board's authority will be limited to issuing policy recommendations in the manner set forth in this Agreement.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Under Assessment* |

The fifth reporting period marked the first time the IMT assessed compliance with ¶543. During this reporting period the Police Board raised that this paragraph could inadvertently be in tension with the municipal code. By the end of the fifth reporting period, the Parties remained in discussions regarding the objectives and intentions of ¶543. Therefore, compliance with ¶543 remains Under Assessment.

### Paragraph 543 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Not Applicable | None | |

# Accountability and Transparency: ¶545

> **545.** *To the extent permissible by law, within 60 days of its imple-mentation, each CPD policy and directive, including those cre-ated pursuant to this Agreement, will be posted online and oth-erwise made publicly available. Any exception will be limited to documents that must remain confidential to protect public safety, and as approved by the Superintendent.*

## Compliance Progress         (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not reach Preliminary compliance with ¶545 in the fifth reporting period.

To evaluate Preliminary compliance with ¶545, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Con-sent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods.[226]

*Progress before the Fifth Reporting Period*

The City and the CPD have not reached any level of compliance with ¶545 in pre-vious reporting periods. In the fourth reporting period, the CPD provided General Order G01-03, *Department Directives Systems*, which the CPD contended supports compliance with ¶545. We noted that the CPD did not consistently solicit, receive or incorporate public comment into its various type of polices across units. While G01-03 does direct the CPD to make some policies publicly available, G01-03 does not currently require the CPD to make each CPD policy and directive—including those created pursuant to the Consent Decree—publicly available. At the end of the fourth reporting period the collaborative review and revision process re-mained ongoing.

---

[226]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Fifth Reporting Period*

General Order G01-03, *Department Directives System*, which the CPD previously contended supported compliance with ¶545 remained in collaborative review and revision process. We last provided written comments to this policy in October 2021. We also had extensive conversations with the CPD regarding its *Department Directives System* policy.

The IMT expects that, per ¶545, each policy and directive, including but not limited to General Orders, Special Orders, Unit Directives, Standard Operating Procedures, or any other document or direction developed pursuant to the Consent Decree will be posted online and made public. We further expect that the CPD will develop a policy or directive that identifies the different policy and directive categories and specifies how each will be posted for public review and to foster ongoing understanding of CPD operations

Because the CPD has not finalized such a policy, it did not reach Preliminary compliance in the fifth reporting period. We look forward to continued discussion and progress toward compliance with ¶545 in the sixth reporting period.

### Paragraph 545 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶546

*546. Within 180 days following the expiration of each calendar year of the term of this Agreement, the City will produce and publish an annual report describing CPD activity during the previous calendar year ("CPD Annual Report"). The purpose of the CPD Annual Report will be to inform the public of the City's law enforcement achievements and challenges, as well as new programs and steps taken to address challenges and build on successes. The CPD Annual Report will further provide information regarding the City's implementation and status of this Agreement. The CPD Annual Report will not include any specific information or data by law that may not be disclosed. Subject to applicable law, the CPD Annual Report will provide data and program updates analyzing: a. community engagement and problem-solving policing efforts, identifying successes, challenges, and recommendations for future improvement; b. stop, search, and arrest data and any analysis of that data that was undertaken; c. use-of-force data and associated analyses; d. CPD responses to requests for service from individuals in crisis; e. initiatives that CPD has implemented for officer assistance and support; f. recruitment efforts, challenges, and successes; and g. in-service and supplemental recruit training.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | | |
|---|---|---|---|
| **Recurring Schedule:** | Annual (August 30, 2021*) | ☐ **Met** | ☑ **Missed** |
| | * Extended from June 28, 2021, due to COVID-19 | | |
| **Preliminary:** | *Not in Compliance* | | |
| **Secondary:** | *Not Yet Assessed* | | |
| **Full:** | *Not Yet Assessed* | | |

The City and the CPD did not reach Preliminary compliance with ¶546 during the fifth reporting period.

To evaluate Preliminary compliance with ¶546 we reviewed various data sources to determine whether the City developed the annual report within 180 days following the expiration of each calendar year.

*Progress before the Fifth Reporting Period*

The City and the CPD did not meet Preliminary compliance with ¶546 in previous reporting periods. But at the end of the fourth reporting period, we noted that the City had until August 30, 2021, to produce its annual report.

In the third reporting period, we reviewed the 2019 CPD Annual Report. This report included information about CPD's organizational command but did not include information about some of the units that may be most interesting to the community, including the Force Review Unit, BIA, training, and Crisis Intervention Team (CIT). The Annual Report extensively reported various crime statistics across 35 pages, but only dedicated one page to the work that the CPD does in and with the community as required by this paragraph.

*Progress in the Fifth Reporting Period*

The CPD provided its Annual report in September 2021. Therefore, it missed the timeline set out by the paragraph and did not reach Preliminary compliance with ¶546. Additionally, we note that the 2020 report is less robust than the 2019 Annual report which we found to lack detail required by ¶546. This is concerning as we hope to see the CPD building on previous efforts to not only finalize and publish a timely report, but develop a report that improves upon previous reports.

Therefore, the City and the CPD did not reach Preliminary compliance with ¶546. Moving forward, we hope to work closely with the City to assess the CPD's Annual Report.

### Paragraph 546 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶547

> **547.** *CPD will regularly analyze the information it collects regarding reportable uses of force to identify significant trends. CPD will include information about any such trends in the CPD Annual Report.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**   Annual (August 30, 2021*)  ☐ **Met**  ☑ **Missed**
                          *Extended from June 28, 2021, due to COVID-19

**Preliminary:**   *Not in Compliance*
**Secondary:**    *Not Yet Assessed*
**Full:**         *Not Yet Assessed*

The City and the CPD did not reach Preliminary compliance with ¶547 during the fifth reporting period.

To assess Preliminary compliance with ¶547, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. The CPD has not reached Preliminary compliance with ¶547 in previous reporting periods.

In the fifth reporting period, the CPD provided its Annual report in September 2021. The 2020 Report lacks the data required by ¶547. Therefore, the City and the CPD did not reach Preliminary compliance with ¶547.

### Paragraph 547 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

## Accountability and Transparency: ¶548

*548. Within 180 days following the expiration of each calendar year of the term of this Agreement, the City will produce and publish an annual report describing certain legal activity involving CPD during the previous calendar year ("CPD Annual Litigation Report"). The CPD Annual Litigation Report will not include any specific information or data that may not be disclosed pursuant to applicable law. Subject to applicable law, the CPD Annual Litigation Report will address: a. a list of civil lawsuits in which the plaintiff(s) seek(s) to hold the City responsible for the conduct of one or more current or former CPD members and information that either (i) the lawsuit was concluded by final order and all opportunities for appellate review were exhausted, or (ii) any judgment was satisfied during the prior calendar year. This list will include civil lawsuits handled by the City's Department of Law's ("DOL's") Federal Civil Rights Division, as well as lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle pursuit, only. b. for each case identified in (a) above, the following information will be provided in spreadsheet or open-data format: i. case name; ii. case number; iii. the date the trial court entered the final order; iv. a list of the parties at the time the final order was entered; v. the nature of the order (e.g., dismissal with prejudice, summary judgment for plaintiff(s)/defendant(s), judgment of not liable, judgment of liable); vi. the amount of the compensatory and punitive damages awarded (if applicable); and vii. the amount of attorney's fees and costs awarded (if applicable). c. a list of civil lawsuits in which the plaintiff(s) seek(s) to hold the City responsible for the conduct of one or more current or former CPD members and a settlement was reached (including approval by City Council, if applicable) during the prior calendar year. This list will include civil lawsuits handled by DOL's Federal Civil Rights Division, as well as such lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle pursuit, only. d. for each case identified in (c) above, the following information will be provided in spreadsheet or open-data format: i. case name; ii. case number; iii. a list of the parties at the time the case was settled; iv. the amount of the settlement; and v. the amount of settlement allocated to attorney's fees and costs (if known). e. the amount of attorney's fees paid by the City during the prior calendar year to outside counsel engaged to defend the City and/or one or more current or former CPD members in civil lawsuits handled by DOL's Federal Civil Rights Division, as well as*

*such lawsuits handled by DOL's Tort's Division if the complaint seeks relief associated with a vehicle pursuit, only. This amount will be presented in the aggregate. f. for all individually named defendants in the cases identified in (a) and (c) above, the status (e.g., pending with BIA/COPA/OIG or charges sustained, not sustained, unfounded, or exonerated by BIA/COPA/OIG) of any administrative investigation(s) by BIA, COPA, or OIG at the time the trial court entered its final order or the settlement was reached. g. the disposition of any felony criminal prosecutions of current or former CPD members from the previous year. h. the number of pending civil lawsuits that seek to hold the City responsible for one or more current or former CPD members that the City is defending. This number will include civil lawsuits handled by the Department of Law's Federal Civil Rights Division, as well as lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle only.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**  Annual (August 30, 2021*)  ☐ **Met**  ☑ **Missed**
*Extended from June 28, 2021, due to COVID-19

**Preliminary:**  *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**  *Not in Compliance*
**Full:**  *Not Yet Assessed*

While the City produced an extensive 2020 Litigation Report, it did not do so within the timeline set out by ¶548.[227] Because of this the City did not reach Secondary compliance with this paragraph.

To evaluate Preliminary compliance, we reviewed various data sources to determine whether the City and the CPD developed the annual report within 180 days following the expiration of the calendar year. We review that report for sufficiency, accuracy, and completeness as required by ¶548. To assess Secondary compliance, we gathered various data points to determine whether the City has allocated sufficient resources to submit an annual report that meets the requirements of this paragraph.

---

[227] The 2020 Litigation Report is publicly available online: https://www.chicago.gov/content/dam/city/sites/public-safety-and-violenc-reduction/pdfs/City's%20Report%20on%202020%20Litigation%20(With%20Appendices).pdf. We encourage the City to ensure that these annual Litigation Reports are prominently featured online to allow community members to easily access this well-organized and illuminating report.

*Progress in the Fifth Reporting Period*

The City and the CPD met Preliminary compliance with ¶548 in the third reporting period. The City and the CPD provided the City's 2019 Annual litigation Report which was thorough and comprehensive. Because this report is to be published on an annual basis, the IMT did not receive or further assess compliance with ¶548 in the fourth reporting period.

*Progress in the Fifth Reporting Period*

On December 31, 2021, the City and the CPD provided the 2020 Litigation Report, dated December 2021. With this, the City failed to produce the report within the time frame required by ¶548. It is important that these reports be compiled and made public in a timelier manner moving forward.

Despite the timing issues, the 2020 Litigation Report is comprehensive and provides significant detail for the reader. This includes information such as the types of allegations against the CPD. The aggregated data should inspire a sense of urgency for developing clear policies and training officers, supervisors, and commanders. The information is not only important for the City leaders and community members, but also an important source of data for CPD members.

The 2020 Litigation Report covers all requirements of ¶548. Appendices A and B of the Litigation Report address the requirements of subparagraphs (a–d), (f), and (g). Each section provides a wealth of information. For example, Section VIII provides information regarding the amount of money paid to outside counsel to defend the City in litigation. Section IX provides information regarding the number of pending lawsuits being handled by the City's Department.

While this is an extensive and detailed report providing helpful information to the public, the report was produced late. To achieve additional levels of compliance the City must meet the deadlines required by ¶548.

### Paragraph 548 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶549

> **549.** *As part of the CPD Annual Litigation Report, the City will analyze the data and trends collected, and include a risk analysis and resulting recommendations.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Annual (August 30, 2021*)   ☐ **Met**   ☑ **Missed**
                          *Extended from June 28, 2021, due to COVID-19

**Preliminary:**       *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**        *Not in Compliance*
**Full:**             *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶549 but did not reach additional levels of compliance in the fifth reporting period.

To assess Preliminary compliance, we reviewed various data sources to determine whether the City has developed an annual report within 180 days following the expiration of each calendar year that includes data and trends collected and a risk analysis and resulting recommendations. We reviewed the litigation report for sufficiency, accuracy, and completeness as required by ¶548 and ¶549. To assess Secondary compliance, we gathered various data points to determine whether the City has allocated sufficient resources to submit an annual report that meets the requirements of this paragraph.

*Progress before the Fifth Reporting Period*

The City and the CPD met Preliminary compliance with ¶548 and ¶549 in the third reporting period. The City and the CPD provided the City's 2019 Annual litigation Report which was thorough and comprehensive. Because this report is to be published on an annual basis, the IMT did not receive or further assess compliance with ¶548 and ¶549 in the fourth reporting period.

*Progress in the Fifth Reporting Period*

On December 31, 2021, the City and the CPD provided the 2020 Litigation Report, dated December 2021.[228] With this, the City failed to produce the report within

---

[228] The 2020 Litigation Report is publicly available online: https://www.chicago.gov/content/dam/city/sites/public-safety-and-violence-reduction/pdfs/City's%20Report%20on%202020%20Litigation%20(With%20Appendices).pdf. We encourage the City to ensure that these annual Litigation Reports are prominently featured online to allow community members to easily access this well-organized and illuminating report.

the time frame required by ¶548 and ¶549. It is important that these reports be compiled and made public in a timelier manner moving forward.

Despite the timing issues, the 2020 Litigation Report is comprehensive and provides significant detail for the reader. Section XI of the report includes a thorough Risk Analysis. We understand the limitations expressed in this section of the report. However, moving forward we encourage the City to attempt to isolate and analyze data from cases arising in or after 2019, to the extent possible, in order to identify trends and make recommendations for training for the CPD.

While this is an extensive and detailed report providing helpful information to the public, the report was produced late. To achieve additional levels of compliance the City must meet the deadlines required by ¶548 and ¶549.

### Paragraph 549 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

## Accountability and Transparency: ¶550

*550. By April 2020, CPD and COPA will electronically publish quarterly and annual reports that will include, at a minimum, the following: a. aggregate data on the classification of allegations, self-reported complainant demographic information, and complaints received from anonymous or third party complainants; b. aggregate data on complaints received from the public, specified by district or unit of assignment and subcategorized by classification of allegations; c. aggregate data on the processing of investigations, including: i. The average time from the receipt of the complaint by COPA, BIA, or the district to the next or initial contact with the complainant or his or her representative; ii. the average time from the investigative findings and recommendations to the final disciplinary decision; iii. the average time from the investigative findings and recommendations to a final disposition; and iv. the number of investigations closed based on the absence of a complainant affidavit, including the number of attempts (if any) to obtain an override affidavit in the absence of a signed complainant affidavit; d. aggregate data on the outcomes of administrative investigations, including the number of sustained, not sustained, exonerated, and unfounded allegations; the number of sustained allegations resulting in a non-disciplinary outcome; and the number resulting in disciplinary charges; e. aggregate data on discipline, including the number of investigations resulting in written reprimand, suspension, demotion, and termination; f. aggregate data on grievance proceedings arising from misconduct investigations, including: the number of cases grieved; the number of cases that proceeded before the Police Board; the number of cases that proceeded to arbitration; and the number of cases that were settled prior to a full evidentiary hearing, whether before the Police Board or in arbitration; g. aggregate data on outcomes of misconduct investigations by classification of allegations, broken down by self-reported race, gender, and age of the complainant and the CPD member; h. aggregate data on (i) the number of CPD members who have been the subject of more than two completed misconduct investigations in the previous 12 months, and (ii) the number of CPD members who have had more than one sustained allegation of misconduct in the previous 12 months, including the number of sustained allegations; i. aggregate data on CPD members who have been the subject, in the previous 12 months, of more than two complaints in the following classifications of alle-*

*gations, regardless of the outcome of those complaint investigations: i. allegations of discriminatory policing based on an individual's membership or perceived membership in an identifiable group, based upon, but not limited to: race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age; ii. allegations of excessive force; and iii. allegations of unlawful stops, searches and arrests; j. the disposition of misdemeanor criminal prosecutions of current CPD members.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Recurring Schedule:** | Quarterly | ✓ **Met** ☐ **Missed** |
| **Recurring Schedule:** | Annually | ✓ **Met** ☐ **Missed** |

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW)[229] |
| | **CPD** | *In Compliance* (FOURTH REPORTING PERIOD) |
| | **COPA** | *Not in Compliance* (NEW) |
| **Secondary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

As a result of the CPD's and COPA's efforts, the City reached Preliminary and Secondary compliance with ¶550 in the fifth reporting period.

To evaluate Preliminary compliance, we reviewed various data sources to determine whether the CPD and COPA developed quarterly and annual reports that are sufficient, accurate and complete as required by ¶550. To evaluate Secondary compliance, we considered a variety of data points to determine whether the CPD and COPA have allocated sufficient resources to submit quarterly and annual reports that meet the requirements of ¶550.

*Progress before the Fifth Reporting Period*

In previous reporting periods, the CPD provided several quarterly reports which were easy to read and understandable. They demonstrate a commitment to transparency and building trust, internally and externally in BIA's operations. Notably the Third Quarter Report covered all requirements of ¶550 except subsection

---

[229]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

(c)(i). W reported that BIA, by the end of the fourth reporting period was continuing to develop data related to this requirement and intended to include it in future reports. We found that BIA was in Preliminary compliance based on its second and third quarterly reports, with the understanding that BIA would develop and include information delineated in ¶550(c)(i) in its next reporting period. We also noted our expectation that BIA would develop a Unit Directive guiding the work of BIA in compiling and releasing quarterly reports.

With respect to COPA, at the end of the fourth reporting period we noted that COPA continued to develop, refine, and publish its quarterly and annual reports. However, COPA's reports did not address all requirements set forth in ¶550(a), (c–g), and (i)–(j). COPA's 2021 Quarter 2 report aimed to address these gaps, but was not completed until after the close of the fourth reporting period. We recommended that COPA develop a policy directing continued publishing of quarterly and annual reports.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, BIA produced its Fourth Quarter Report for 2020. This report demonstrates continued improvement and standardization of quarterly reports. It provides the reader with a consistent and easy-to-follow format. This report addresses every subparagraph and requirement of ¶550.

BIA also provided its Annual Report in December 2021. This report completely addresses the requirements of all of ¶550's subparagraphs. The annual report is a strong first attempt at an annual report and we applaud BIA for these efforts. Detracting from the impressive report is the time that it took for BIA to produce. Moving forward, we anticipate that BIA will produce the annual report more quickly after the close of year.

In addition to the reports, the CPD revised and ultimately received a no-objection notice regarding General Order G08-01, *Complaint and Disciplinary System*. Thereafter the CPD posted the directive for public comment, and on December 31, 2021, the CPD finalized the directive. Section VIII addresses ¶550 completely. We believe this section of G08-01 to be of particular importance, and therefore warrants a stand-alone directive to instruct completion of quarterly and annual reports. During the review and revision process, we voiced these concerns and the CPD appeared receptive to developing such a directive. The IMT anticipates that the CPD will develop this directive in the sixth reporting period.

With this, the CPD has reached Secondary compliance. We note, however that to reach Full compliance BIA must begin finalizing and publishing their reports in a timelier manner. Although ¶550 does not include a specific deadline for publishing these reports, ¶550(h) and (i) contemplate that these reports will focus on the previous 12 months. Currently, BIA is providing these reports several quarters late,

such that, by the time of their release, they do not speak to the previous 12 months. We believe BIA will be able to begin producing these reports more quickly since they have developed a consistent report format.

During the fifth reporting period, COPA produced a timely and accurate report within 15 days of the close of the third Quarter. The report includes all data outlined by ¶550 that COPA is able to maintain. As COPA has explained, it does not house the data contemplated by subparagraphs (f) and (j). Instead BIA has this information, and as noted above, BIA has reported this information. With this, COPA has shown that it can now provide all data points available to it that are contemplated by the paragraph, and COPA has already established its ability to quickly and consistently publish reports required by ¶550. With this, BIA and COPA reached Secondary compliance with ¶550 in the fifth reporting period. Moving forward, we will look for BIA to continue to publish reports but do so in a timelier manner. For COPA we will look for proof that they publish an Annual report containing all data points contemplated by ¶550.

### Paragraph 550 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Secondary | |

# Accountability and Transparency: ¶551

*551. BIA's quarterly and annual reports will include data reflect-*
*ing investigations conducted by the districts.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | | | | |
|---|---|---|---|---|---|
| **Recurring Schedule:** | Quarterly | ✓ | **Met** | ☐ | **Missed** |
| **Recurring Schedule:** | Annually | ✓ | **Met** | ☐ | **Missed** |

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

In the fifth reporting period, the City and CPD reached Preliminary compliance with ¶551.

To evaluate Preliminary compliance with ¶551, the IMT has reviewed the CPD's, policies following the policy process described in the Consent Decree (¶¶626–41). To assess Secondary compliance, we reviewed various data sources and data points to determine whether the CPD has allocated resources to include data reflecting investigations conducted by the districts on a quarterly and annual basis.

*Progress before the Fifth Reporting Period*

BIA did not meet Preliminary compliance with ¶551 in previous reporting periods. While previous quarterly reports provided a good overview and discussed some of the requirements of ¶551 in narrative, it did not include data reflecting investigations conducted by the district. BIA did not have means to track this information, making compliance with this paragraph not feasible. As reporting in the fourth reporting period, BIA indicated in July 2021 that they have developed means to provide information required by ¶551.

In the fourth reporting period, we also reviewed the draft BIA Unit Directive, *Case Management System*. This draft policy addresses the requirements of ¶551. At the close of the fourth reporting period, this Unit Directive remained in the collaborative review process. We expressed our expectation that upon receiving a no-objection notice, BIA would post the directive for public comment and thereafter finalize the policy.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD made significant revisions to General Order G08-01, *Complaint and Discipline Procedures*. After the CPD completed extensive revisions, we submitted a no-objection notice to G08-01. After posting the policy

for public comment, the CPD finalized the policy on December 31, 2021. Section VIII.C codifies the requirements of ¶551. While this is beneficial, BIA quarterly and annual reports do not yet comply with ¶551 or the recently finalized G08-01.

During the fifth reporting period we received and reviewed BIA's Fourth Quarter 2020 Report. While this quarterly report includes data regarding investigations conducted by the districts, the data is not broken out to reflect the number or type of investigations that occurred in the districts. We also received BIA Annual Report for 2020. The 2020 Annual report partially addresses ¶551 in table four, by making it clear that the information presented represents investigations by BIA and the District Accountability Sergeants. Additionally, table 11 in the report provides aggregate data for the districts but does not indicate which cases were conducted by Accountability Sergeants and BIA investigators. We understand that BIA is currently unable to extract the data as required by ¶551 and as required by G08-01. We hope to see this remedied in the sixth reporting period.

In the coming reporting periods, we look forward to BIA developing quarterly and annual report that comply with the requirements of ¶551. Additionally, we look forward to BIA developing a process to extract the data as required by the paragraph and by G08-01.

## Paragraph 551 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶552

***552.*** *For non-disciplinary purposes, including historical trend analysis, CPD will track, for each CPD member, for every miscon-duct investigation: the nature of allegations, the outcome of the investigation, and the disposition of discipline.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not reach Preliminary compliance with ¶552 during the fifth reporting period.

To evaluate Preliminary compliance with ¶552, the IMT has reviewed the CPD's, policies following the policy process described in the Consent Decree (¶¶626–41).

### Progress before the Fifth Reporting Period

In the fourth reporting period, we reviewed BIA's draft *Case Management System* Unit Directive. We noted in the fourth reporting period that this draft Unit Di-rective partially addresses the requirements set out in ¶552. We also stated our belief that the Case Management System provides the CPD with a path toward compliance with this paragraph, but the CPD will need a finalized directive direct-ing compliance.

### Progress in the Fifth Reporting Period

As noted in the fourth report, BIA has a draft *Case Management System* Unit Di-rective that relates to the requirements of ¶552; additional edits are needed to better address the paragraph. This Unit Directive remains in the collaborative re-view and revision process.

We also reviewed Department Notice, D20-04 *Operational Support System (OSS) Pilot Program* in the fifth reporting period. Section III.C.6 of D20-04 contributes to compliance with ¶552. However, since the program remains in the pilot status and does not fully address the requirements of ¶552, the CPD did not reach Prelimi-nary compliance in the fifth reporting period.

With this, the City and the CPD did not reach Preliminary compliance with ¶552 this reporting period. We hope to see the CPD finalize a directive that completely addresses the requirements of this paragraph in the coming reporting period.

## Paragraph 552 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Accountability and Transparency: ¶553

> *553.* *Beginning in 2020, CPD will audit, on at least an annual ba-sis, the investigation and disciplinary process involving com-plaints investigated by BIA and the districts to ensure that the investigations are conducted in accordance with BIA policies and this Agreement. The audits will include completed investigations and the recommendations of discipline. CPD will make public any of the audit findings, ensuring that any personally identifiable information is redacted.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Annually          ✓ **Met**      ☐ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance in the fifth reporting period.

To evaluate Preliminary compliance with ¶553, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).

*Progress before the Fifth Reporting Period*

The CPD met Preliminary compliance with ¶553 in the third reporting period because the CPD Audit Division completed its annual report, CD-553-2020, *Review of Data on Investigations Into Allegations Made Against Department Members* (2019).

In the fourth reporting period, we received a draft of BIA's *Case Management System*, Unit Directive. The requirements of ¶553 are included in the draft Unit Directive, which remained in the collaborative review and revision process at the end of the reporting period. Notwithstanding the status of the Unit Directive, We noted that the requirements of ¶553 should be addressed in a department-wide directive.

We also reviewed G08-01, *Complaint and Discipline Procedures* in the fourth reporting period, which directed compliance with ¶553. Like the Unit Directive, this General Order remained in the review and revision process at the close of the fourth reporting period.

*Progress in the Fifth Reporting Period*

In the fifth reporting period, the CPD completed extensive revisions to General Order G08-01, *Complaint and Disciplinary Procedures*. After those revisions, we submitted a no-objection notice to the directive. Thereafter the CPD posed the directive for public comment and, on December 31, 2021, finalized the directive. This directive mandates compliance with ¶553. While this is sufficient to maintain Preliminary compliance, we encourage the CPD to develop a standalone directive guiding audits and reporting.

We also received and reviewed the Audit Division's *Audit of 2020 Investigation Timeframe Requirements*. This audit was well done. It noted many of the areas requiring significant additional work on the part of BIA to reach compliance with several Consent Decree Paragraphs—namely those related to reporting through the Case Management System. We have concern that this audit was not released for over eleven months after the close of the year, and we expect that annual audits will be provided in a timelier manner in the future. Still, we appreciate the thorough audit, which provides the CPD with focus points for improvement. We anticipate that CPD will begin providing regular reports on the status of correcting the deficiencies noted in the audit early in and throughout the sixth reporting period.

With the finalization of G080-01, the City and the CPD maintained Preliminary compliance. Moving forward, we will look for evidence that the audits are sufficient per the requirements of ¶553. We also encourage the CPD to publish this audit in a timelier manner to not only inform its own effort toward reform but also to provide information for the public.

### Paragraph 553 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶554

> ***554.*** *OAG acknowledges that the City adopted a policy relating to the public release of video footage capturing weapons discharges and incidents involving death or serious bodily injury. Consistent with applicable law, the City will continue to ensure COPA publicly releases such video footage pursuant to the June 2016 Video Release Policy for the City of Chicago. The Video Release Policy will not supersede or otherwise limit the City's legal obligations pursuant to state and federal transparency laws, including the Illinois Freedom of Information Act, 5 ILCS 140/1 et seq.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |

The City and COPA maintained Full compliance with ¶554 in the fifth reporting period.

To evaluate Preliminary compliance with ¶554, we reviewed the City's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[230] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we reviewed data sources to determine whether the City and COPA have implemented their policy and training to mobilize compliance with ¶554.

*Progress before the Fifth Reporting Period*

We assessed the City's compliance with ¶554 for the first time in fourth reporting period and found that the City reached compliance with the paragraph. As men-mentioned in the text of ¶554, prior to the implementation of the Consent Decree, the City had adopted a policy relating to the public release of footage of weapons

---

[230] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress in the Fifth Reporting Period*

In the fifth reporting period we reviewed a Video Release Policy submitted by the City in June 2021. We did not have any objection to the policy—it is quite similar to the previous policy. The City also provided documentation on several CPD cases that have followed the policy. COPA also presented its Policy 2.1.2, t*ransparency Issues-Release of Video and Related Materials*. This Policy completely and thoroughly addresses ¶554 and provides detail beyond that which is required by the Consent Decree, including how and when information will be released.

With this the City and COPA maintained Full compliance with this paragraph in the fifth reporting period.

### Paragraph 554 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶555

*555. On an annual basis, the Police Board will track and publish case-specific and aggregate data about Police Board decisions. Such publications will contain and include, at minimum, the following: a. the date on which the investigating agency (COPA, BIA, district, or OIG) received the complaint or notification for investigation; b. the date of the Police Board hearing over which the hearing officer presided; c. the disciplinary recommendations and/or decisions (where applicable) made by COPA, BIA, the Superintendent, and the Police Board; d. the average time between the filing of disciplinary charges with the Police Board and the first day of hearing; e. the average time between the filing of disciplinary charges with the Police Board and the Police Board's decision; f. the average time between the date on which the investigating agency (COPA, BIA, district, or OIG) received the complaint for investigation and the Police Board's decision; g. the date of the alleged misconduct; h. the average time between the date of the alleged misconduct giving rise to the complaint or notification and the Police Board's decision; and i. whether any Police Board decision has been appealed to any state court and, if so, the court's final judgment.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | | |
|---|---|---|
| **Deadline:** | March 5, 2022* | ☑ **Not Yet Applicable** |
| | *Extended from December 31, 2021, due to COVID-19 | |
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) | |
| **Secondary:** | *In Compliance* (NEW) | |
| **Full:** | *In Compliance* (NEW) | |

The City and the Police Board reached Full compliance with ¶555 in the fifth reporting period.

To evaluate Preliminary compliance with ¶555, the IMT reviewed the Police Board's policies following the policy process described in the Consent Decree (¶¶626–41) and determined whether the Police Board tracked and annually published case-specific and aggregate data publications to meet the requirements of ¶555. To evaluate Secondary compliance with ¶555, we gathered and considered various data points to determine whether the Police Board has allocated sufficient resources to develop and publish the case specific and aggregate data on an annual basis as required by ¶555. To evaluate Full compliance, we determined whether the Police Board's annual publications sufficiently captured case specific and aggregate data about Police Board decisions.

In past reporting periods, we found the Police Board reached Preliminary compliance based on our review of information provided on the Police Board's website and the Police Board's Annual Reports for years 2017 through 2019, which is responsive to all subparagraphs of ¶555.

In the fifth reporting period, the Police Board continues to provide complete, up-to-date information in an excel spreadsheet housed on the Police Board website. The discipline spreadsheet indicates the number of cases filed with the Police Board in 2021. The excel sheet contains information responsive to all subparagraphs of ¶555.

With this, the Police Board has demonstrated that it is able to continuously provide, in a timely manner, the information contemplated by ¶555. This allows the Police Board to be in Full compliance. Moving forward, we will look for evidence that the Police Board continues to provide information as required by ¶555.

### Paragraph 555 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Full | |

# Accountability and Transparency: ¶556

> **556.** *The Deputy PSIG will conduct periodic analysis and evaluations, and perform audits and reviews as authorized by Municipal Code of Chicago § 2-56-230.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Full:** *In Compliance* (FOURTH REPORTING PERIOD)

The City and Deputy PSIG maintained Full compliance with ¶556 in the fifth reporting period.[231]

To evaluate Preliminary compliance with ¶556 the IMT reviewed the PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance we reviewed, among other things, the Deputy PSIG's training development, implementation, and evaluation of training. For Full compliance, we evaluated various data sources to determine whether the PSIG sufficiently implemented its policy and training. To confirm that the Deputy PSIG maintained compliance with ¶556, we reviewed a memorandum submitted by the Deputy PSIG that detailed the audits and reviews completed by the Deputy PSIG.

In previous reporting periods, the Deputy PSIG reached Full Compliance with ¶556 by completing reviews and audits and detailing them in quarterly reports and the *Public Safety Section 2020 Annual Report.* We also reviewed the Deputy PSIG's *Public Safety Section Policies Manual*.

In November 2021, the Deputy PSIG provided a memorandum which provided evidence that the Deputy PSIG has continued to conduct periodic analysis and evaluations, and perform audits and evaluations as authorized by the Municipal Code.

With these efforts, the Deputy PSIG maintained Full compliance with ¶556 (which it initially reached in the fourth reporting period) in the fifth reporting period.

---

[231] In the fifth reporting period, the Deputy PSIG stepped down. Since then, the Interim Acting Deputy PSIG has continued the corresponding compliance efforts under the Consent Decree.

## Paragraph 556 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Full

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Full

# Accountability and Transparency: ¶557

*557. The Deputy PSIG's audits and reviews will be conducted pursuant to the Association of Inspectors General Principles and Standards for Offices of Inspector General.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |

The City and Deputy PSIG maintained Full compliance with ¶557 in the fifth reporting period.[232]

To evaluate Preliminary compliance with ¶557 the IMT reviewed the PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance we reviewed, among other things, the CPD's training development, implementation, and evaluation. For Full compliance, we evaluated various data sources to determine whether the Deputy PSIG sufficiently implemented its policy and training. To confirm that the Deputy PSIG maintained compliance with ¶557, we reviewed memorandum detailing how audits and reviews completed by the Deputy PSIG conformed to the Association of Inspector General Principles and Standards for Offices of Inspector Generals.

In the fourth reporting period, the Deputy PSIG reached Full compliance. The City and Deputy PSIG provided the Deputy PSIG's staff training materials and class rosters which demonstrated that the staff was well-trained and, therefore well-prepared to fulfill the requirements of ¶557. We also reviewed a letter from the Association of the Inspectors General that concluded that the Investigations and APR sections comply with the major standards set by the Association of Inspectors General Principles and Standards for Offices of Inspector General Green Book and Yellow Book.

During the fifth reporting period, there has been no change in the manner in which the Deputy PSIG follows the major standards set out by the Association of Inspector General Principles and Standards for Office of Inspector General Green Book and Yellow Book. In November 2021, the Deputy PSIG provided a memorandum that explained that the next Associate of Inspectors General peer review process is expected to occur in summer 2022. The Deputy PSIG also provided titles and web locations for 6 reports published since April 2021 that demonstrate the PSIG's continued adherence to the Green Book standards.

---

[232] In the fifth reporting period, the Deputy PSIG stepped down. Since then, the Interim Acting Deputy PSIG has continued the corresponding compliance efforts under the Consent Decree.

With these efforts, the Deputy PSIG maintained Full compliance with ¶557 (which it initially reached in the fourth reporting period) in the fifth reporting period.

### Paragraph 557 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

## Accountability and Transparency: ¶558

*558. Within 60 days of the Effective Date, the Deputy PSIG will develop policies for regularly, and at least annually, conducting data-driven reviews and audits to measure the effectiveness of the City and CPD's accountability practices. These reviews and audits will be designed to measure whether members of the community can readily make a complaint alleging misconduct and whether such complaints are investigated and adjudicated consistently with CPD policy, this Agreement, and the law. Reviews and audits will include: a. analysis of the number of complaints received, the disposition of complaints by complaint type, the timeliness and average length of administrative investigations, and disciplinary actions taken; b. analysis of complaint trends; c. analysis of CPD's enforcement of its Rule 14, Rule 21, and Rule 22; d. analysis of the thoroughness of administrative investigations, and of the justifications for terminating investigations before the investigative findings and recommendations; e. analysis of disciplinary grievance procedures and outcomes; and f. analysis of complainant-involved mediation.*

### Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**   At Least Annually          ✓ **Met**   ☐ **Missed**

**Preliminary:**   *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:**   *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**   *In Compliance* (FOURTH REPORTING PERIOD)

In the fifth reporting period, the Deputy PSIG maintained Full compliance with ¶558.

To evaluate Preliminary compliance with ¶558, the IMT reviewed the Deputy PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance we reviewed, among other things, the CPD's training development, implementation, and evaluation. To evaluate Full compliance, we reviewed various data points to determine both whether the Deputy PSIG completed the audits and reviews required by each subparagraph and performed these audits and reviews according to the Green Book, as well as whether the PSIG's policy manual reflects a requirement that the Deputy PSIG continues to do these audits and reviews at a frequency that complies with the paragraph and is consistent with their capabilities.

Since the Deputy PSIG met Full compliance in the fourth reporting period, we focused on confirming whether the Deputy PSIG maintained Full compliance. To do

this, we reviewed a memorandum detailing PSIG's progress on reviews and audits contained in PSIG's policy related to the requirements of ¶558. We also reviewed the annual plan which includes discussion of plans for and status updates for work related to mobilizing ¶558 compliance.

As mentioned, the Deputy PSIG reached Full compliance in previous reporting periods. As an initial matter, the City of Chicago Office of Inspector General Public Safety Section *Policies Manual* directs that the Deputy PSIG will, among many other responsibilities, conduct data-driven review and audits of the City's and the CPD's accountability practices. These reviews and audits include but are not limited to Service Call Response Times, Beat Integrity, Duty Restrictions for CPD Members, Compliance with Chicago's Welcoming Ordinance, Asset Forfeiture, Promotions, Inventory, Use and Impact of Military Grade Equipment and Homicide Clearance Rates.

In addition, we have received evidence demonstrating that the Deputy PSIG engages the public in a variety of ways and on a variety of issues. The PSIG seeks community input through a variety of means regarding each report or audit it conducts. Because the PSIG demonstrates that it continued to track and provide data related to the requirements listed in ¶558 in its yearly project plan, the City and the Deputy PSIG met Full compliance with ¶558.

In the fifth reporting period the Deputy PSIG continued to meet and exceed the requirements set out in ¶558. The Deputy PSIG provides up to date reports and audits on its websites. Their work ensures that BIA and COPA cases are properly investigated. The 2020 annual report provides detailed responses to the subparagraph. We anticipate that the Deputy PSIG will release its 2021 report during the sixth reporting period.

With continued efforts that meet all subparagraphs of ¶558, the Deputy PSIG maintained Full compliance.

### Paragraph 558 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| **FOURTH REPORTING PERIOD** | **FIFTH REPORTING PERIOD** | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶559

*559. The Deputy PSIG will conduct reviews of individual closed COPA and CPD administrative investigative files for thoroughness, fairness, and objectivity, and will make recommendations based on those reviews, including the recommendation that an investigation be reopened upon a finding of a deficiency that materially affects the outcome of the investigation.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |

The City and the Deputy PSIG maintained Full compliance with ¶559 in the fifth reporting period.

To evaluate Preliminary compliance with ¶559, the IMT reviewed the Deputy PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance we reviewed, among other things, the CPD's training development, implementation, and evaluation. To evaluate Full compliance, we reviewed various data points to determine whether the deputy PSIG sufficiently implemented its policy and training, including feedback the deputy PSIG receives from its own personnel, CPD, and COPA regarding the processes for sampling, reviews, and recommendations.

Since the Deputy PSIG met Full compliance in the fourth reporting period, we focused on confirming whether the Deputy PSIG maintained Full compliance. To do this, the Deputy PSIG submits for review any recommendations to reopen investigation. We also reviewed a memorandum provided to us by the Deputy PSIG that provides summary statistics regarding PSIG's case review work.

In the fourth reporting period, the Deputy PSIG reached Full compliance with ¶559. The Deputy PSIG provided the revised City of Chicago Office of Inspector General Public Safety Section *Policies Manual* (*PSIG Policy Manual*), dated April 2021, that provides a complete review process for closed COPA and the CPD administrative investigative files. The review process includes reviews for completeness, objectivity, and fairness, including a detailed process for recommendations that investigations be reopened by COPA or the CPD, per ¶559. The *PSIG Policy Manual* also requires Case Intake Meetings to include the specific PSIG members responsible for reviewing the closed case and supervisory PSIG personnel who discuss the cases and collectively determine whether a recommendation to reopen a case should be recommended to the CPD or COPA.

In the fourth reporting period, we also observed a PSIG Virtual Case Intake Meeting. All members required to attend per the *PSIG Policy Manual* were in attendance. This meeting was not unique but one of several such standing meetings. Beyond this, we also reviewed examples of administrative investigative files that reflected that the Deputy PSIG reviewed the administrative investigative files for thoroughness, fairness, and objectivity and made proper recommendations when necessary.

Because the PSIG Policy Manual provided direction, the Case Intake Meeting demonstrated that the policy is being followed, and the provided administrative investigative file examples demonstrated that the policy and work sufficiently address the paragraph, we found the Deputy PSIG in Full compliance with ¶559.

The Deputy PSIG provided a memorandum containing summary statistics regarding its case review work. We also reviewed recommendations to reopen and recommendations to inform and improve disciplinary investigations. These materials provide a wealth of information. As a snapshot of their work, in the third quarter of 2021, the Deputy PSIG conducted over 300 case screenings of closed BIA and COPA cases. It reopened 21 cases for further review.

This information provides evidence that the Deputy PSIG has continued ¶559 compliant actions and efforts throughout the fifth reporting period. The Deputy PSIG maintains Full compliance with ¶559.

## Paragraph 559 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶561

> **561.** *The Deputy PSIG will hire a full-time staff member responsible for diversity and inclusion issues, who will have specific authority to review CPD actions for potential bias, including racial bias, on any matter within the Deputy PSIG's statutory authority. The Deputy PSIG will regularly publish reports on diversity and inclusion issues, no less frequently than on an annual basis, which will contain findings and analysis.*

## Compliance Progress

(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**   At Least Annual     ✓ **Met**   ☐ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |

The Deputy PSIG and the City maintained Full compliance with ¶561 in the fifth reporting period.

To evaluate Preliminary compliance with ¶561, the IMT reviewed the Deputy PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed data sources to determine if the Deputy PSIG had hired a member responsive for diversity and inclusion issues as described in ¶561, and we reviewed training materials to ensure the hired individual is properly trained to fulfill their obligations as outlined in ¶561. To evaluate Full compliance, we reviewed various data sources to determine whether the Deputy PSIG sufficiently implemented its policy and training, and we also confirmed that the required reports on diversity and inclusion issues are published as required by ¶561.

Since the Deputy PSIG met Full compliance in the fourth reporting period, we focused on confirming whether the Deputy PSIG maintained Full compliance. To do this, the Deputy PSIG, submitted a memorandum detailing the review of CPD's actions for potential bias; this memorandum is to include information about the annual PSIG report, when appropriate.

The Deputy PSIG reached Preliminary compliance with ¶561 in the second reporting period when it introduced a diversity, equity, and inclusion (DEI) framework across its various responsibilities. With this, the DEI officer provides DEI-anchored feedback in various areas of the Office of the Inspector General's work. In the third and fourth reporting period the Deputy PSIG hired a new DEI Director. The DEI Director quickly got to work conducting audits and reviews of reports focusing on

issues of diversity, equity, and inclusion. We reviewed the *Evaluation of the Demographic Impacts of the Chicago Police Department's Hiring Process* draft report, which was an example of the DEI Director's work, in the fourth reporting period. The report contained findings and recommendations regarding the demographic impacts during the stages of the CPD hiring process.

After reviewing this and other data sources provided by the Deputy PSIG, we found they had reached Full compliance with ¶561.

In the fifth reporting period, we reviewed a memorandum provided by the Deputy PSIG that provided details regarding the DEI Director's ongoing work. During the fifth reporting period, the Deputy PSIG published the *Evaluation of the Demographic Impacts of the Chicago Police Department's Hiring Process*, the draft of which we had reviewed in the fourth reporting period. This report satisfied ¶561's annual reporting requirement. The memorandum also detailed projects that are being led by the DEI Director that review the CPD's operations for potential bias.

With this evidence, the Deputy PSIG maintained Full compliance with ¶561 in the fifth reporting period.

### Paragraph 561 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶562

> *562. The Deputy PSIG will provide all staff members with comprehensive initial onboarding training and annual in-service training. The Deputy PSIG will create initial and in-service training plans and submit these plans to the Monitor and OAG for review and comment.*

## Compliance Progress
(Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:** Annual    ☑ **Met**   ☐ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |

The City and the Deputy PSIG maintained Full compliance with ¶562 in the fifth reporting period.

To evaluate Preliminary compliance with ¶562, the IMT reviewed the Deputy PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance we reviewed, among other things, the Deputy PSIG's training development, implementation, and evaluation. To evaluate Full compliance, we reviewed various data sources to determine whether the Deputy PSIG sufficiently implemented its policy and training, and provided the training called for by ¶562.

Since the Deputy PSIG met Full compliance in the fourth reporting period, we focused on confirming whether the Deputy PSIG maintained Full compliance. To do so we reviewed a memorandum of the Deputy PSIG that details their ongoing training efforts, along with training presentations that have been developed and attendance records of the trainings that have been provided.

### Progress before the Fifth Reporting Period

The Deputy PSIG reached Full compliance with ¶562 in the fourth reporting period because they provided initial onboarding and annual in-service training to all staff members. They provided us training materials that were thorough and comprehensive. They also provided rosters showing the attendance of those trainings. This evidence demonstrated that the Deputy PSIG was undertaking actions consistent with ¶562's mandates.

### Progress in the Fifth Reporting Period

In the fifth reporting period, the Deputy PSIG provided a several-hundred page memorandum that included details of ongoing training efforts: training materials,

training presentations, and attendance rosters. They provided this material for both onboarding and in-service trainings. The Deputy PSIG's training remains consistently appropriate and thorough. With this, the Deputy PSIG maintained Full compliance with ¶562 in the fifth reporting period.

## Paragraph 562 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶563

> **563.** *At least 60 days prior to publishing its annual audit plan, the Deputy PSIG will provide the Monitor with a draft of its audit plan for review and comment.*

## Compliance Progress  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**  Annual (Moving)  ☑ **Not Yet Applicable**

**Preliminary:**  *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**  *In Compliance* (THIRD REPORTING PERIOD)
**Full:**  *In Compliance* (THIRD REPORTING PERIOD)

The City and the Deputy PSIG maintained Full compliance with ¶563 in the fifth reporting period.

To evaluate Preliminary compliance with ¶563, the IMT determined whether the Deputy PSIG provided the IMT with a draft of its audit plan. To evaluate Secondary compliance, we determined whether the Deputy PSIG provided an opportunity to receive IMT comments and appropriately responded. To evaluate Full compliance, we received the Deputy PSIG's audit plan to ensure that it was complete and sufficient under ¶563.

Since the Deputy PSIG met Full compliance in the fourth reporting period, we focused on confirming whether the Deputy PSIG maintained Full compliance. To do so, we reviewed the Deputy PSIG's draft annual audit plan and provided comments where appropriate.

The Deputy PSIG reached Full compliance with ¶563 in the third reporting period. The Deputy PSIG provided the IMT with its draft *2021 Outlook on Police Oversight and Accountability* ("2021 Audit Plan") for review and comment 60 days before publishing the plan. This marked the second year in a row that the Deputy PSIG provided the IMT with its Audit Plan consistent with ¶563. With this, the Deputy PSIG reached Full compliance.

In the fifth reporting period, the Deputy PSIG provided its *2022 Outlook on Police Oversight and Accountability* for review and comment. This draft is a comprehensive work and audit plan for 2022, and it was provided to us with plenty of time to allow the IMT to review and comment. This plan includes 22 potential projects, including some that were part of the 2021 Audit Plan that the Deputy PSIG was not able to address in 2021. We appreciate that the Deputy PSIG did not simply drop the 2021-listed projects but moved them into the 2022 Audit Plan.

With this, the Deputy PSIG maintained Full compliance with ¶563.

## Paragraph 563 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Preliminary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Full

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Full

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Full

# Accountability and Transparency: ¶565

*565. At least quarterly, COPA, the Deputy PSIG, and the President of the Police Board, or his or her designee, will meet to confer and share information regarding trends and analyses of data relating to CPD. They will jointly or separately provide any resulting recommendations for changes in CPD policy or rules, in writing, to the Superintendent. Thereafter: a. the Superintendent will respond to any such recommendation within 60 days of receipt; b. the Superintendent's response will include a description of the actions that the Superintendent has taken or plans to take with respect to the issues raised in the recommendations; and c. all policy recommendations and responses to the same will be published on a City website.*

## Compliance Progress       (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**   Quarterly           [✓] **Met**   [ ] **Missed**

**Preliminary:**   *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:**   *In Compliance* (SECOND REPORTING PERIOD)
**Full:**   *In Compliance* (FOURTH REPORTING PERIOD)

The City maintained Full compliance with ¶565 in the fifth reporting period.

To evaluate Preliminary compliance with ¶565, the IMT determined whether the relevant representatives are meeting quarterly. To evaluate Secondary compliance, we determined whether the relevant entities have allocated sufficient resources to ensure that the meetings contemplated by ¶565 continue on a quarterly basis. To evaluate Full compliance, we determined whether the meetings sufficiently include the requisite coordination and whether any recommendations result from the process.

The City and its entities achieved Full compliance with the requirements of ¶565 during the fourth reporting period. The IMT was provided evidence during the third and fourth reporting periods demonstrating that the COPA Chief, Deputy Inspector General for Public Safety, and the Police Board President and Vice President met to discuss trends and share information regarding data analysis related to the CPD. We were pleased to learn that these meetings have proven a meaningful opportunity to discuss such issues, as intended by ¶565.

In the fifth reporting period, the Police Board President provided the IMT with documentation regarding the Quarterly meetings held during the first three quarters of 2021. The meeting minutes indicate that the entities met regularly and had

substantive discussions regarding their individual agency's work within and outside of the Consent Decree. To date, no joint recommendations have been made to the CPD.

This evidence demonstrates continued Full compliance with ¶565.

### Paragraph 565 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Appendix 10
# Data Collection, Analysis & Management
# Assessments, by Paragraph

# Appendix 10
# Data Collection, Analysis & Management Assessments, by Paragraph

| | | | |
|---|---|---|---|
| ¶569 | ¶579 | ¶589 | ¶602 |
| ¶570 | ¶580 | ¶590 | ¶603 |
| ¶571 | ¶581 | ¶591 | ¶604 |
| ¶572 | ¶582 | ¶592 | ¶606 |
| ¶573 | ¶583 | ¶593 | ¶607 |
| ¶574 | ¶584 | ¶594 | ¶608 |
| ¶575 | ¶585 | ¶595 | ¶609 |
| ¶576 | ¶586 | ¶596 | |
| ¶577 | ¶587 | ¶598 | |
| ¶578 | ¶588 | ¶601 | |

## Data Collection, Analysis & Management: ¶569

*569. CPD must collect, track, and maintain all available documents related to use of force incidents, including: a. TRRs, or any other similar form of documentation CPD may implement for initial reporting of reportable use of force incidents; b. TRR-Is, or any other similar form of documentation CPD may implement to document supervisory investigation of reportable use of force incidents; c. Tactical Response Reports – Review ("TRR-Rs"), or any other similar form of documentation CPD may implement to document review or auditing of reportable use of force incidents; d. arrest reports, original case incident reports, and investigatory stop reports associated with a reportable use of force incident; e. administrative investigative files, including investigative materials generated, collected, or received by BIA, or COPA, or any similar form of documentation CPD may implement for misconduct allegations or civilian complaints; and f. all reasonably available documentation and materials relating to any reportable use of force, in-custody injury or death, or misconduct allegation, including body-worn, in-car, or known third-party camera recordings, and statements, notes, or recordings from witness and officer interviews.*

---

**Compliance Progress**          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶569.

During the fifth reporting period, the CPD maintained each of the data tools and corresponding directives necessary to demonstrate their ability to capture and audit the data points listed in ¶569. However, inconsistencies and deficiencies with CPD data that we highlighted in our last report have remained. For instance, the FRD continues to find significant deviations from policy expectations regarding force. For instance, the Force Review Division's Quarter 3 2021 report highlighted several of these deficiencies, finding that the most common debriefing point was not articulating force mitigation or de-escalation efforts (106 debriefings), and the second most common debriefing point identified for force events audited was for body worn camera activation issues (96 debriefings). Deficiencies included not

activating the body-worn cameras, late activation, and early termination, among other issues. Of the firearm pointing incident reports the FRD reviewed in the third quarter, the most common recommendation was late activation of the body worn camera (69% of all recommendations for training).

In addition, the Audit Division underwent significant staffing changes during the fifth monitoring period, leaving the Division without long-term leadership and raising questions about the scope of audits that will be performed in the near future. During the fifth monitoring period, we were not formally provided the results of any audit evaluating the comprehensiveness or consistency of CPD data. Thus, no audit of the specific tools in this paragraph were reviewed for accuracy.

Furthermore, the CPD has not conducted a baseline data assessment consistent with the full scope of ¶606 (see our assessment of that paragraph for additional information). As this assessment is designed to evaluate the collection and management processes for all data necessary to comply with the Consent Decree, its importance applies to this paragraph as well.

To their credit, CPD has started a remediation process for some of the data inconsistency issues, providing the IMT with a draft version of Special Order S09-12-01 (*Data Analysis and Communication*) which identifies data request and fulfillment responsibilities and incorporates an independent data-analysis validation component between the Strategic Initiatives Division (SID) and the Research and Development Division. Although additional clarification on the policy is needed, we recognize the CPD's efforts to standardize their data analysis procedures.

To reach additional levels of compliance, the CPD must be able to determine the reliability of the data points captured in ¶569 through regular audits of the data points and a thorough review of the systems housing the data. In part, this will be facilitated though a broad training approach to ensure officers and supervisors are familiar with their reporting requirements and are coding items appropriately. We will continue to evaluate the CPD's progress in the next monitoring period.

## Paragraph 569 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

## Data Collection, Analysis & Management: ¶570

*570. The City will ensure that reasonably available documents related to reportable uses of force that are or become subject to misconduct complaints or investigations are promptly provided to the appropriate investigative entity (e.g., COPA, BIA). The City will ensure that any reasonably available documents related to reportable uses of force subject to misconduct complaints or investigations, except for open confidential investigations, are accessible in the CMS the City is working to create, or in any similar electronic system, by June 30, 2020. Within seven days of the receipt of a misconduct complaint or the initiation of an administrative investigation, whichever occurs first, the City will identify any available reportable use of force documentation associated with the incident and ensure such documentation is accessible via the CMS or similar system. By June 30, 2020, whenever a reportable use of force incident becomes the subject of a misconduct investigation, COPA will notify CPD via the CMS within three days of the initiation of the investigation.*

---

### Compliance Progress                (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the City maintained Preliminary compliance with ¶570.

During the fifth monitoring period, the IMT learned from COPA representatives that the Central Management System (CMS) continues to be used as a mechanism for COPA to upload, maintain, and access force-related documents regarding administrative complaints. CMS does not, however, operate in the manner envisioned in ¶570. For instance, ¶570 envisions the CMS as an integrated document access point for CPD documents and other evidence (including body-worn-camera footage). Instead, COPA accesses such evidence through the corresponding data system and then stores that information in the casefile on CMS. Where COPA does not have direct access to necessary information (an occurrence COPA representatives described as being rare), investigators would then request the information from the CPD. While this process creates additional steps for COPA investigators, our conversation with them did not appear to

indicate that the current process hindered their investigations in any meaningful way.

Presently, COPA has Directive 3.1.6 (*CLEAR and COLUMN CMS Systems*) which sufficiently memorializes the operation of the Case Management System (CMS). Additionally, the CMS system's code allows for COPA to access the CMS for documents and evidence related to administrative investigations of use-of-force events. We therefore find the City has maintained Preliminary compliance with the requirements of ¶570.

However, we have not been provided with training records for COPA investigators to demonstrate Secondary compliance. Additionally, the CPD does not have a companion directive that memorializes their responsibilities for facilitating a full and complete investigation by COPA, including when COPA's access to CPD data systems is restricted, a further condition of subsequent levels of compliance. Once these elements are in place, the system will need to be audited to ensure that the CMS is being used consistent with the intent of ¶570, even if the letter of ¶570 cannot be accomplished. Relatedly, if the Parties agree that the CMS envisioned under ¶570 is not feasible or does not offer significant benefit above the current use of CMS, we recommend this be discussed during the upcoming comprehensive assessment. *See* ¶¶657–66.

### Paragraph 570 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Data Collection, Analysis & Management: ¶571

*571. CPD must have an electronic system that accurately and reliably tracks all data derived from reportable use of force incidents, including: a. the response by CPD members during the incident, including the type(s) of force used; b. the date, time, location, and district of the incident; c. whether a foot or vehicle pursuit occurred that is associated with the incident; d. the actual or, if unavailable, perceived race, ethnicity, age, and gender of the subject; e. the name, watch, employee number, and unit and beat of assignment of any CPD member(s) who used force; f. CPD units identified in the incident report as being on the scene of the use of force incident; g. whether the incident occurred during an officer-initiated contact or a call for service; h. the subject's mental health or medical condition, use of drugs or alcohol, ability to understand verbal commands, or disability, as perceived by the CPD member(s) at the time force was used; i. the subject's actions that led to the CPD member's use of force; j. whether the CPD member perceived that the subject possessed a weapon and, if so, what type(s); k. whether the subject possessed a weapon and, if so, what type(s); l. whether reportable force was used against a subject that was handcuffed or otherwise in physical restraints; m. any injuries sustained by CPD members; n. any injuries sustained or alleged by the subject(s) and any medical treatment that was offered or performed on the scene of the incident; o. for each weapon discharged by an officer, including firearms, Tasers, and OC devices, the number of discharges per weapon; and p. whether the subject was charged with an offense and, if so, which offense(s).*

---

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**       *Under Assessment*
**Full:**            *Not Yet Assessed*

In the fifth monitoring period, the City and the CPD maintained Preliminary compliance with ¶571.

Although the CPD has maintained their forms and database to capture and store the data required by ¶571, we note that updated training for officers and

supervisors on the new forms was not completed during the fifth monitoring period. As a result of COVID-19's impact on CPD operations, the City requested an extension until March 25, 2022 to deliver the in-service trainings for officers and supervisors.

Although CPD officers have been trained on completing prior versions of the *Tactical Response Report* (TRR), the force documentation and review process has undergone numerous changes as a result of Consent Decree requirements. Thus, we expect the CPD to provide updated training to all members on completing the TRR to ensure that the data system is being filled with reliable data.

To their credit, the CPD has developed an updated supervisor in-service training and has shared in conversations with the IMT that they are already very close to having trained 95% of staff. Accordingly, the City and the CPD remain under assessment for additional levels of compliance with ¶571.

### Paragraph 571 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

## Data Collection, Analysis & Management: ¶572

> **572.** *CPD will regularly review citywide and district-level data regarding reportable uses of force to: a. assess the relative frequency and type of force used by CPD members against persons in specific demographic categories, including race or ethnicity, gender, age, or perceived or known disability status; and b. identify and address any trends that warrant changes to policy, training, tactics, equipment, or Department practice.*

**Compliance Progress**              (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**    Ongoing          ☐ **Met**   ☑ **Missed**

**Preliminary:**        *Not in Compliance*
**Secondary:**         *Not Yet Assessed*
**Full:**               *Not Yet Assessed*

In the fifth monitoring, the City and the CPD did not take any meaningful steps to comply with the requirements of ¶572.

The Force Review Division (FRD) continues to be responsible for suggesting changes to policy, training, tactics, equipment, or Department practice based on their review of force events. This requirement of ¶572 continues to be memorialized in G03-02-02 (*Incidents Requiring the Completion of a Tactical Response Report*). We refer the reader to our other assessments for additional discussion related to the FRD's operations.

However, the City has made no meaningful effort to "assess the relative frequency and type of force used by CPD members against persons in specific demographic categories, including race or ethnicity, gender, age, or perceived or known disability status." We have not received the CPD's metrics for performing this assessment (see also ¶573) and the CPD has yet to even identify a unit to conduct the analyses. In September of 2021, the IMT provided the CPD with an email containing technical assistance on considerations the CPD should make when developing the metrics, anticipating that such assistance would initiate the process of collaborative development. However, we received no follow-up from our email, and our request to include discussion of these paragraphs in our regular meetings with the CPD were rejected due an admitted inability to provide any new information.

There is substantial public interest in knowing the relative use of force against persons in specific demographic categories. Indeed, this was a concern presented

in the Department of Justice's (DOJ's) findings, which led to the creation of the Consent Decree. The CPD cannot ignore the importance of providing transparent data on use of force. We also note the remediation efforts that may be necessary from the assessment's results. Current policy, training, and operational reforms being performed for other paragraphs in the Consent Decree may necessarily need to be revised (and therefore repeated) based on the findings of the use-of-force assessment.

In the fifth monitoring, the City and the CPD did not reach any level of compliance with ¶572. Simply, the CPD will need to prioritize this assessment in the next monitoring period and provide the IMT with a comprehensive plan going forward.

### Paragraph 572 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Data Collection, Analysis & Management: ¶573

*573.* *Prior to conducting the initial assessment required by Paragraph 572, CPD will share its proposed methodology, including any proposed factors to be considered as part of the assessment, with the Monitor for review and approval. The Monitor will approve CPD's proposed methodology provided that the Monitor determines that CPD's methodology comports with published, peer-reviewed methodologies and this Agreement.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**     Ongoing                     ☐ **Met**   ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth monitoring period, the CPD did not take any meaningful steps to comply with the requirements of ¶573.

As noted in our assessment of ¶572, the IMT has not received any metrics for the CPD to assess force, nor has the CPD identified the unit responsible for conducting the assessment. We re-emphasize the importance of this assessment and the fact that CPD will need to prioritize this effort in the upcoming monitoring period.

As stated in the conclusion for ¶572, the CPD must prioritize the development of the metrics for reviewing disparities in use of force in the next monitoring period and provide the IMT with a comprehensive plan going forward.

### Paragraph 573 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

## Data Collection, Analysis & Management: ¶574

*574. A designated unit at the CPD headquarters level will routinely review and audit documentation and information collected regarding each level 2 reportable use of force incident, a representative sample of level 1 reportable use of force, and incidents involving accidental firearms discharges and animal destructions with no human injuries to ensure: a. CPD members completely and thoroughly reported the reason for the initial stop, arrest, or other enforcement action, the type and amount of force used, the subject's actions or other circumstances necessitating the level of force used, and all efforts to de-escalate the situation; b. the district-level supervisory review, investigation, and policy compliance determinations regarding the incident were thorough, complete, objective, and consistent with CPD policy; c. any tactical, equipment, or policy concerns are identified and, to the extent necessary, addressed; and d. any patterns related to use of force incidents are identified and, to the extent necessary, addressed.*

### Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained Secondary compliance with ¶574.

The CPD has General Order G03-02-08, *Department Review of Use of Force*, which memorializes the role of the Force Review Division (FRD) and the requirements of ¶574. Additionally, the FRD has a comprehensive Standard Operating Procedure (SOP), which provides clear instruction on how to conduct the FRD's audits, including the points of review described in ¶574(a–d). Furthermore, FRD members have received sufficient training to carry out the tasks in accordance with the SOP.

As mentioned above, in the fourth reporting period, FRD personnel were provided with an 8-hour CIT training, which included modules related to de-escalation. The SOP and training satisfy the first of our criteria for achieving and maintaining Secondary compliance.

As we noted in our last two reports, the ability of the CPD to adequately staff the FRD is another criterion for Secondary compliance, one for which the CPD

demonstrated significant improvement during the fourth reporting period. However, during the fifth reporting period, the FRD experienced staffing shortages again, and currently has 11 vacancies. Despite making every effort to overcome this challenge by offering voluntary overtime, the FRD fell back into a backlog of cases.

In a December 2021 meeting with the CPD, we heard that there were 162 TRRs compared to just 19 TRRs in May 12 of 2021, emphasizing the importance of getting the FRD back to adequate staffing levels.

The FRD uses a tiered approach to conducting its audits. The first tier evaluates individual deficiencies based on officers' TRRs and supervisors' investigations and reviews of the force events. The FRD then forwards these identified deficiencies to the involved officer as a learning opportunity. In its second tier of review, the FRD identifies concerns at the unit level as compared with other units. The FRD then forwards these concerns to the District Commander for remediation. Lastly, the FRD's third tier aims to identify department-wide trends and may provide recommendations to the Education and Training Division or to the Research and Development Division to address the identified issues.

The FRD's quarterly reports detail the manner in which the FRD identifies meaningful trends and provides responsive recommendations. Based on the December 2021 report detailing FRD activities in the third quarter, about half of TRR reviews (50.7%, or 258) resulted in recommendations or advisements. The most common debriefing point for involved members continued to be not describing the de-escalation and force mitigation efforts used before using force. The most common debriefing point for Reviewing Supervisors was "Other policy/procedure," which is a catch all for any CPD policy and procedure. During the third quarter there were also 131 TRRs related to a foot pursuit accounting for about one-quarter of all TRRs reviewed. The CPD is developing a foot-pursuit policy that may help to reduce uses of force during foot pursuits.

Overall, we remain appreciative of the FRD and its work to date. Members of the FRD are provided clear instruction on their tasks, have demonstrated an ability to evaluate force events with a critical eye, and have made meaningful recommendations for improving the CPD. It is critical, however, that the FRD is sufficiently staffed. If the staffing shortage and subsequent backlog continues throughout the sixth reporting period, the City and the CPD may come out of Secondary compliance with ¶574.

Through comprehensive SOPs, the reduction of FRD backlogs, and the increase in resources to the FRD, we find that CPD has achieved Secondary compliance for

¶574. However, the data reconciliation issues discussed in other sections of this report (*see*, as one example, our assessment of ¶606) will need to be resolved before Full Compliance can be assessed.

### Paragraph 574 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

## Data Collection, Analysis & Management: ¶575

*575. CPD recently established a Force Review Unit ("FRU") and tasked the FRU with certain responsibilities described in the preceding paragraph. CPD will ensure that the FRU or any other unit tasked with these responsibilities has sufficient resources to perform them. CPD will ensure that the FRU or any other unit tasked with these responsibilities is staffed with CPD members, whether sworn or civilian, with sufficient experience, rank, knowledge, and expertise to: effectively analyze and assess CPD's use of force practices and related reporting and review procedures; conduct trend analysis based on use of force data; identify tactical, equipment, training, or policy concerns based on analysis of use of force incidents and data; and develop recommendations regarding modifications to tactics, equipment, training, or policy as necessary to address identified practices or trends relating to the use of force.*

### Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the fifth reporting period, the City and the CPD maintained Secondary compliance with ¶575.

In the fifth reporting period, the CPD produced the Audit Division Design Matrix: *Review of Actions Resulting from Force Review Division Advisements & Recommendations.* Overall, we appreciate the work that the Audit Division put into the officer and supervisor surveys and revised audit matrix. We also appreciate the responsiveness to the IMT's previous comments and that the CPD made several revisions consistent with those recommendations.

Additionally, training requirements for all members of the FRD are outlined in the *Force Review Division's Standard Operating Procedure* (SOP 2020-001), which includes an annual refresher training on the CPD's use-of-force policies, use-of-force law, and best practices in force review. As detailed in the FRD's *Q3 2021 Report*, FRD members attended weekly staff meetings, where they reviewed CPD policies, tactics, and trainings.[1] Earlier in 2021, FRD staff attended the 40-hour

---

[1]   *See Force Review Division 2021 Q3 Report*, CHICAGO POLICE DEPARTMENT (December 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Q3-2021-13-Dec-21.pdf.

mandatory in-service training for all CPD personnel, as well as additional training (*see* summary in Section 3 above). Training topics included Taser-use incidents, review of body-worn-camera footage (including specific topics in body-worn-camera footage review such as late body-worn-camera activation), handcuffing, incidents involving animals, responding to domestic violence calls, and processing juveniles, among others.

In the fifth reporting period, the City and the CPD maintained Secondary compliance with ¶575 because they continued to ensure that the FRD has sufficient training resources to perform their duties. Based on evidence of ongoing training, the IMT continues to be comfortable that the officers currently assigned to the FRD have "sufficient experience, rank, knowledge, and expertise" to conduct the evaluation process and that future officers may be reliably selected based on the evaluation criteria.

### Paragraph 575 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

## Data Collection, Analysis & Management: ¶576

*576. CPD will conduct random audits of body-worn and in-car camera recordings of incidents that involved civilian interactions to assess whether CPD officers are complying with CPD policy. CPD will take corrective action to address identified instances where CPD officers have not complied with CPD policy as permitted by law, and will identify any trends that warrant changes to policy, training, tactics, equipment, or Department practice.*

---

**Compliance Progress**        (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD did not achieve any level of compliance with ¶576.

During the fifth monitoring period, the CPD did not provide updated versions of Special Order S03-14, *Body Worn Cameras*, or Special Order S03-05, *In-Car Video Systems*, after the IMT and the OAG provided extensive comments on the policies. During the sixth monitoring period, we will work with the CPD to finalize the policies and ensure that the video-sampling process occurs with reasonable guidelines built into the automated selection system.

The CPD has also planned on utilizing the Audit Division as mechanism for auditing video recordings. However, the Audit Division underwent significant staffing changes during the fifth monitoring period, leaving the Audit Division without long-term leadership and raising questions about the scope of audits that can reasonably be performed in the near future. During the fifth monitoring period, we were not provided any update on how and when the audit division will begin conducting such reviews.[2]

The CPD will need to provide the IMT with updated policies to achieve Preliminary compliance with the requirements of ¶576. Subsequent levels of compliance will require the CPD to ensure that body-worn-camera and in-car-camera hardware is working adequately and that CPD members are consistently and reliably tagging videos in a way that would facilitate the Watch Operations Lieutenant reviews. The CPD will also need to train Watch Operations Lieutenants on an updated review

---

[2]    The IMT and the OAG were provided an update from the Audit Division in early 2022.

protocol, ensuring that each review is of consistent quality. Full compliance will then depend on Watch Operations Lieutenants conducting their reviews with the IMT conducting audits of reviews to ensure their accuracy and adequacy. Full compliance will also hinge on the CPD using the Audit Division's reports to improve operations and ensuring compliance with departmental policy.

### Paragraph 576 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None |

# Data Collection, Analysis & Management: ¶577

***577.*** *CPD will create a Force Review Board ("FRB") to review, from a Department improvement perspective: (a) any level 3 reportable use of force incident, except for accidental firearms discharges and animal destructions with no human injuries, and (b) any reportable uses of force by a CPD command staff member.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶577.

During the fifth monitoring period, the CPD maintained Directive G03-02-08, *Department Review of Use of Force*, which memorializes the role of the Force Review Board (FRB) in reviewing Level 3 uses of force and reportable uses of force by a CPD command staff member. As the FRB continues to be detailed in policy, we find the CPD has remained in Preliminary compliance with ¶577.

Additionally, the IMT, the OAG, and the CPD continued to discuss the issue of implementing a decision-point analysis in FRB review. At the end of the fifth reporting period, however, the CPD remained unwilling to adopt our recommendation to use such an approach. The IMT and the CPD have plans to discuss this in more detail in the sixth reporting period and work together to find an effective analytic approach to reviewing lethal force events. However, since no such resolution has been reached, the City and the CPD maintained Preliminary compliance but did not achieve further levels of compliance with ¶577.

Upon resolution of our outstanding recommendation around decision-point analysis, we believe the CPD will achieve Secondary compliance with the requirements of ¶577. Full compliance will be achieved upon the IMT observing the FRB process to verify that all necessary steps are being taken, including the identification and incorporation of policy, training, equipment, and personnel recommendations.

## Paragraph 577 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

## Data Collection, Analysis & Management: ¶578

*578. For any reportable use of force incident subject to an ongoing investigation by COPA, COPA will be exclusively responsible for recommending disciplinary action relating to the incident. The purpose of FRB's review will be to: a. evaluate if actions by CPD members during the incident were tactically sound and consistent with CPD training; and b. if applicable, identify specific modifications to existing policy, training, tactics, or equipment that could minimize the risk of deadly force incidents occurring and the risk of harm to officers and the public.*

### Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶578.

During the fifth monitoring period, the CPD maintained Directive G03-02-08, *Department Review of Use of Force*, which memorializes the role of the Force Review Board (FRB) in reviewing Level 3 uses of force and reportable uses of force by a CPD command staff member. As the FRB continues to have detailed policy, we find the CPD has remained in Preliminary compliance with ¶578.

Additionally, the IMT, the OAG, and the CPD continued to discuss the issue of implementing a decision-point analysis in FRB review. At the end of the fifth reporting period, however, the CPD remained unwilling to adopt our recommendation to use such an approach. The IMT and the CPD have plans to discuss this in more detail in the next reporting period and work together to find an effective analytic approach to reviewing lethal force events. However, since no such resolution has been reached, the City and the CPD maintained Preliminary compliance but did not achieve further levels of compliance with ¶578.

Upon resolution of our outstanding recommendation around decision-point analysis, we believe the CPD will achieve Secondary compliance with the requirements of ¶578. Full compliance will be achieved upon the IMT observing the FRB process to verify that all necessary steps are being taken, including the identification and incorporation of policy, training, equipment, and personnel recommendations.

## Paragraph 578 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Data Collection, Analysis & Management: ¶579

*579. The FRB will be chaired by the Superintendent, or his or her designee, and will include, at a minimum, the Chief of the Bureau of Patrol, or his or her designee, and CPD members at the rank of Deputy Chief, or above, who are responsible for overseeing policy development, policy implementation, training, and misconduct investigations. CPD's General Counsel, or his or her designee, will also serve on the FRB.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶579.

During the fifth monitoring period, the CPD maintained Directive G03-02-08, *Department Review of Use of Force*, which memorializes the role of Force Review Board (FRB) in reviewing Level 3 uses of force and reportable uses of force by a CPD command staff member. As the FRB continues to be detailed in policy, we find the CPD has remained in Preliminary compliance with ¶579.

Additionally, the IMT, the OAG, and the CPD continued to discuss the issue of implementing a decision-point analysis in FRB review. At the end of the fifth reporting period, however, the CPD remained unwilling to adopt our recommendation to use such an approach. The IMT and the CPD have plans to discuss this in more detail in the next reporting period and work together to find an effective analytic approach to reviewing lethal force events. However, since no such resolution has been reached, the City and the CPD maintained Preliminary compliance but did not achieve further levels of compliance with ¶579.

Upon resolution of our outstanding recommendation around decision-point analysis, we believe the CPD will achieve Secondary compliance with the requirements of ¶579. Full compliance will be achieved upon the IMT observing the FRB process to verify that all necessary steps are being taken, including the identification and incorporation of policy, training, equipment, and personnel recommendations.

## Paragraph 579 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Data Collection, Analysis & Management: ¶580

***580.*** *The FRB will review each incident within its purview promptly, which will in no event be more than 96 hours after the incident occurs. Within 30 days after its review of an incident, the FRB will issue recommendations, if appropriate, to the Superintendent regarding any need for additional training or modifications to policies, tactics, equipment, or Department practices. Upon review and approval by the Superintendent, or his or her designee, the FRB will assign each approved recommendation to a specific CPD command staff member for implementation. CPD will promptly implement each approved recommendation.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶580.

During the fifth monitoring period, the CPD maintained Directive G03-02-08 (*Department Review of Use of Force*) which memorializes the role of FRB in reviewing Level 3 uses of force and reportable uses of force by a CPD command staff member. As the FRB continues to be detailed in policy, we find the CPD has remained in Preliminary compliance with ¶580.

Additionally, the IMT, the OAG, and the CPD continued to discuss the issue of implementing a decision-point analysis in FRB review. At the end of the fifth reporting period, however, the CPD remained unwilling to adopt our recommendation to use such an approach. The IMT and the CPD have plans to discuss this in more detail in the next reporting period and work together to find an effective analytic approach to reviewing lethal force events. However, since no such resolution has been reached, the City and the CPD maintained Preliminary compliance but did not achieve further levels of compliance with ¶580.

Upon resolution of our outstanding recommendation around decision-point analysis, we believe the CPD will achieve Secondary compliance with the requirements of ¶580. Full compliance will be achieved upon the IMT observing the FRB process to verify that all necessary steps are being taken, including the

identification and incorporation of policy, training, equipment, and personnel recommendations.

### Paragraph 580 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

## Data Collection, Analysis & Management: ¶581

***581.*** *Beginning within 180 days of the Effective Date, CPD will publish on at least a monthly basis aggregated and incident-level data, excluding personal identifying information (e.g., name, address, contact information), regarding reportable use of force incidents via a publicly accessible, web-based data platform.*

**Compliance Progress** (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:** Monthly  ☑ **Met**  ☐ **Missed**

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶581 by maintaining their use-of-force dashboard, which updates on a monthly basis.

During the fifth reporting period, the Use of Force Dashboard underwent maintenance from September through November. During this time the Strategic Initiative Division and Research and Development Division reviewed data sources and any aggregating assumptions and made recommendations for revisions based on their findings. The CPD produced a *Data Validation Memo* that described actions taken during the Dashboard's downtime. The findings from this memo conclude that Dashboard is consistent with the Strategic Initiative Division's standard practices. All updates to the dashboard were structural in nature and not related to data displayed in the dashboard itself. Following this update, the Dashboard went back online in December 2021.

Thus the City maintained Preliminary compliance with ¶581. To achieve Secondary compliance, we continue to recommend the CPD to put in place mechanisms for collecting community feedback, including creating online dashboard tutorials and providing an avenue for community member feedback regarding the Dashboard. Should the CPD receive actionable feedback or find themes in the feedback received, we would expect the CPD would modify the Dashboard or provide a list of Frequently Asked Questions to help community members navigate the Dashboard.

## Paragraph 581 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

## Data Collection, Analysis & Management: ¶582

*582. The publicly accessible, web-based data platform will enable visitors to: a. identify where reportable uses of force occur through interactive maps depicting incident frequencies at a citywide, district, neighborhood, and ward level; b. identify the frequency, in the aggregate and by type, of reportable uses of force at the citywide, district, neighborhood, and ward level through graphs, charts, and other data visualizations; and c. review aggregate demographic information about the race, ethnicity, age, and gender of persons subjected to reportable uses of force at the citywide, district, neighborhood, and ward level through graphs, charts, and other data visualizations.*

### Compliance Progress       (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶582.

During the fifth reporting period, the Use of Force Dashboard underwent maintenance from September through November. During this time the Strategic Initiative Division and Research and Development Division reviewed data sources and any aggregating assumptions and made recommendations for revisions based on their findings. CPD produced a *Data Validation Memo* that described actions taken during the Dashboard's downtime. The findings from this memo conclude that Dashboard is consistent with the Strategic Initiative Division's standard practices. All updates to the dashboard were structural in nature, not related to data displayed in the dashboard itself. Following this update, the Dashboard went back online in December 2021.

Thus, the City and the CPD maintained Preliminary compliance with ¶582. For Secondary compliance, we continue to recommend the CPD to put in place mechanisms for collecting community feedback, including creating online dashboard tutorials and providing an avenue for community member feedback regarding the dashboard. Should the CPD receive actionable feedback or find themes in the feedback received, we would expect the CPD would modify the Dashboard or provide a list of Frequently Asked Questions to help community members navigate the dashboard.

## Paragraph 582 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Data Collection, Analysis & Management: ¶583

**583.** *CPD must collect and provide information to supervisors that enables them to proactively identify at-risk behavior by officers under their command, and to provide individualized interventions and support to address the at-risk behavior. CPD must provide supervisors with an automated electronic system that provides this information and equips supervisors to perform these duties.*

---

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶583.

For most supervisors, the Performance Recognition System is the mechanism by which they are to proactively identify at-risk behavior by officers and address such behavior. During the fifth monitoring period, the CPD provided us with an updated version of Directive E05-02, *Performance Recognition System*, which further reinforces supervisors' responsibilities to proactively engage officers. Also during the fifth monitoring period, the CPD continued piloting the Officer Support System (OSS). Related to this, the CPD provided us with an updated version of Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, which contains the elements of this paragraph. As a result, the CPD achieved preliminary compliance.

It will likely be difficult for the CPD to achieve subsequent levels of compliance with ¶583 without a full transition to the Officer Support System model. This is due to the fact that, while required by policy, supervisor use of Performance Recognition System is inconsistent and prior discussions with CPD members revealed that it is not user friendly. This limits how well the system equips supervisors to perform their duties under the Consent Decree. Additionally, supervisors have not received recent training on the Performance Recognition System, though the CPD indicated a refresher element will be added to roll-call trainings. We will therefore need to see full implementation of the Officer Support System before saying that all supervisors have received adequate training on how to achieve the goals of ¶583.

## Paragraph 583 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Data Collection, Analysis & Management: ¶584

*584. The automated electronic system must be: a. data-driven and developed with statistical methods and analytic techniques; b. customizable to CPD; c. adaptive as new information becomes available; d. capable of being audited and evaluated to improve accuracy; and e. able to generate sufficient data that enables assessment of the effects, if any, of support provided and interventions undertaken.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶584.

Housed with what will ultimately become the Talent Management System is the Officer Support System, an automated system which uses underlying statistical models to identify officers and alerts supervisors that a review is required.[3] During the fifth monitoring period, the CPD continued piloting the Officer Support System in the 5th District using four separate predictive models. In the near future, the CPD will expand the Officer Support System pilot to other districts.

Near the end of the fifth monitoring period, the CPD also provided us with an updated version of Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*). The updated version establishes the Officer Support System in accordance with ¶584 as well as with other paragraphs within this Section. As a result, the CPD achieved Preliminary compliance.

Subsequent levels of compliance for ¶584 will require subsections (a) through (e) to be operationalized and audited. For instance, although the present system appears to be capable of being audited and evaluated, we have not been provided any evidence of evaluation of the pilot program. The CPD informed us that there was insufficient quantitative data to conduct such an evaluation, which is understandable given the pilot was only in a single district and the Officer Support System is designed to identify outliers (*i.e.*, a small percentage of officers). However, no qualitative evaluation was conducted either, including interviews

---

[3]   We note that the Officer Support System process is different from that required by ¶583 in that ¶583 requires supervisors to *proactively* identify officers, whereas the Officer Support System process automatically flags officers for supervisory review. However, both processes require supervisors to review underlying data and implement appropriate interventions.

with members who were directly involved in the review and intervention process (*e.g.*, sergeants and officers who engaged with the alert and intervention process).

In upcoming monitoring periods, we will look to see how these elements of the Officer Support System are evaluated in the CPD's expanded pilot efforts, as well as how such evaluation approaches are memorialized in a department SOP to ensure ongoing review and auditing.

### Paragraph 584 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

## Data Collection, Analysis & Management: ¶585

*585. The automated electronic system must perform these primary functions: a. using statistical methods to identify officers who are at elevated risk of engaging in conduct leading to at-risk behavior; b. identifying and facilitating support and interventions that prevent or reduce the occurrence of the identified at-risk behavior; c. providing supervisors with a dashboard of relevant information about members under their direct command to facilitate appropriate supervisory intervention and support; and d. performing peer group analysis with comparative data to account for differences in job assignments, and to identify group- and unit-level patterns of activity.*

### Compliance Progress                  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶585.

In reviewing the Officer Support System (OSS), we find that it is capable of accomplishing the goals of ¶585. For instance, the Officer Support System uses four specific algorithmic scoring models, as well as an overarching model to identify officers. Additionally, the CPD has provided a list of support and interventions that are available to officers who have been identified as potentially problematic. Furthermore, the Officer Support System provides supervisors with a dashboard of relevant information in a centralized location, allowing them to implement tailored interventions. Finally, the four scoring models used by the Officer Support System control for several factors, including assignment, which negates the need for peer-group analysis since peer group factors are already statistically zeroed out. Each of these elements is listed in the updated version of D20-04, *Officer Support System (OSS) – Pilot Program*. As a result, the CPD achieved Preliminary compliance.

The CPD has also begun the necessary steps to achieve Secondary Compliance. During the monitoring period, we reviewed draft training materials which provided sufficient guidance for supervisors on engaging in difficult conversations with officers after an OSS alert. However, we cannot say that the training we reviewed was sufficient for Secondary Compliance as we recommended the CPD gather

additional information from collective bargaining units and provide greater clarity on details of the training. We anticipate these issues will be resolved early in the next monitoring period and will provide an update in our next report.

### Paragraph 585 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Data Collection, Analysis & Management: ¶586

*586. A primary goal of the automated electronic system will be to facilitate early identification of officers at elevated risk of being involved in certain types of events so that the officers can receive tailored interventions intended to reduce such risk. The types of events sought to be avoided could include, depending upon the feasibility of identifying these events using statistical methods and analytic techniques, examples such as any instance in which a CPD member is: directly involved in an excessive force incident; subject to a sustained finding in a misconduct investigation; a defendant in a civil lawsuit resulting in an adverse judgment or settlement; suspended more than five days; the subject of a recommendation of employment termination by COPA, BIA, or the Superintendent; a direct participant in an officer-involved shooting or death determined to be unjustified or out of policy by COPA, BIA, the Superintendent, the Police Board, or a court of law; convicted of a crime; or subject to an increased risk of suicide or alcohol and/or substance abuse.*

## Compliance Progress <span>(Reporting Period: July 1, 2021, through Dec. 31, 2021)</span>

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶586.

During the fifth monitoring period, the CPD provided the IMT with updated versions of Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*. The Directive identifies the four specific algorithmic scoring models to identify officers. These four models seek to identify officers who will experience:

(1) a complaint involving a domestic or substance use event,

(2) a complaint involving an off-duty event with the exception of a domestic or substance use event,

(3) a sustained excessive force complaint, and

(4) a suspension.

As such, the CPD has achieved Preliminary compliance.

In our last report, we noted that some of the models had relatively high false-positives, which may undermine officer buy-in and compromise the integrity of the Officer Support System (OSS) model. To account for this, we stressed that supervisors must be sufficiently trained in understanding the system, reviewing the officers' performance metrics in the Talent Management System (TMS), and initiating timely and effective interventions. However, no empirical findings from the pilot district were able to be made, as there was insufficient quantitative data and no reliable qualitative data was captured. Therefore, it was not possible to say whether these goals were accomplished.

Furthermore, the IMT's discussions with the commander of the pilot district revealed that lieutenants who were initially trained in the Officer Support System had transferred out of the district or retired and that the incoming lieutenants were not subsequently provided training on the Officer Support System. As a result, there was a knowledge gap in an important cog of the Officer Support System machine. This training oversight was also found for incoming sergeants though many sergeants remained in the district throughout the entire pilot program. Therefore, even if supervisors were initially adequately trained, it was not continuously maintained.

For secondary compliance, supervisors will need to be trained on explaining the statistical models discussed in ¶586. While CPD provided us with a proposed training, additional revisions are required and we will provide an update in our next report.

### Paragraph 586 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

## Data Collection, Analysis & Management: ¶587

*587. The automated electronic system must include a computerized relational database that will be used to collect, maintain, integrate, analyze, visualize, and retrieve data for each CPD officer. The information collected and maintained must include but is not limited to: a. all reportable uses of force; b. all arrests by CPD personnel; c. all injuries to and deaths of persons in CPD custody; d. all injuries and deaths resulting from conduct by CPD personnel; e. all vehicle pursuits and traffic collisions involving CPD equipment or personnel; f. all misconduct complaints and investigations involving CPD officers, including the disposition of each allegation; g. all civil or administrative claims initiated against the City or CPD, or CPD officers for Jobs-related conduct; h. all criminal proceedings initiated against a CPD officer, which CPD will require officers to report; i. all instances in which CPD is notified that a court has made a negative credibility determination regarding a CPD officer; j. instances in which CPD learns through the Cook County State's Attorney's Office that an affirmative finding was made during the course of a criminal proceeding that a CPD member was untruthful, including any findings made at suppression hearings; k. all instances in which CPD learns through the Cook County State's Attorney Office, the United States Attorney's Office for the Northern District of Illinois, or other prosecutorial authority that prosecution was declined based in whole or in part on concerns about a CPD officer's credibility; l. judicial proceedings where an officer is the subject of a restraining or protective order, which CPD will require officers to report; m. disciplinary history for all CPD members; n. all non-disciplinary corrective action retained electronically; o. all violations of CPD's body-worn and in-car camera policies; p. all awards and commendations received by CPD officers; q. officer sick leave usage; r. missed court appearances; s. training history; and t. rank, assignment, and transfer history.*

---

**Compliance Progress**         (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**         *In Compliance* (NEW)
**Secondary:**         *Not Yet Assessed*
**Full:**         *Not Yet Assessed*

---

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶587.

During the fifth monitoring period, the CPD provided the IMT with updated versions of Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, and Employee Resource E05-02, *Performance Recognition System*. In both, the requirements of ¶587 are alluded to. Whereas E05-20 has been revised to note that the PRS provides "a compilation of data from other Department reporting applications," D04-20 lists the exact data points in ¶587. As a result, the CPD has achieved Preliminary compliance.

However, the CPD does not currently have comprehensive training for supervisors on how to access the information referenced in ¶587. Furthermore, an independent assessment of the CPD's data systems found that the CPD does not collect some of the information required by this paragraph (*see* our assessment of ¶606 for additional information about the review). Therefore, additional levels of compliance will require remediation of these issues.

### Paragraph 587 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Data Collection, Analysis & Management: ¶588

*588. CPD will collect and maintain all information reasonably necessary to identify patterns of behavior that are indicative of a future instance of at-risk behavior. The automated electronic system must employ specific criteria to identify officers who will be subject to an intervention or targeted support. The criteria may be based on a single indicator, such as the number of misconduct complaints against an officer, a combination of multiple indicators, or an algorithmic scoring model. CPD will adjust the criteria as necessary based on data and experience to ensure interventions and support are optimally targeted.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶588.

During the fifth monitoring period, the CPD provided us with an updated version of Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, which memorializes the early intervention program contemplated by ¶588. The OSS uses CPD data as part of a predictive algorithm involving four separate scoring models to identify officers who are at a heightened risk for adverse events. As a result, the CPD achieved Preliminary compliance.

Moving forward, the CPD will need to provide adequate training to supervisors and officers during the expanded pilot phase. A review of training provided to the IMT by the CPD indicated the need for additional revision though we were overall impressed with the draft training provided. We anticipate training for additional pilot sites will occur in the next monitoring period and we will provide an update in our next report.

Furthermore, as indicated by ¶588, the CPD will need to comprehensively evaluate the implementation of the Officer Support System so as to be able to "adjust the criteria as necessary based on data and experience to ensure interventions and support are optimally targeted." We do not view this as only pertaining to the long-term success of the Officer Support System but also as applying to the present pilot tests. While quantitative data on the impact of OSS was understandably not possible during the first pilot test, the CPD has not provided us with any measurements on the success of the Officer Support System process. For instance,

the CPD may be interested in the experiences of officers and supervisors when discussing the Officer Support System alerts, particularly since such "difficult conversations" are a central tenet of the training we reviewed. We have requested an evaluation blueprint to be provided to the IMT prior to expanding the pilot so as to be sure this element of ¶588 receives the appropriate level of care.

### Paragraph 588 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Data Collection, Analysis & Management: ¶589

**589.** *CPD will ensure that all required information is entered into the automated electronic system in a timely, accurate, and complete manner. All information captured within the automated electronic system will be accessible in an organized manner that facilitates identification of at-risk officer conduct.*

## Compliance Progress                  (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**       *Not Yet Assessed*
**Full:**            *Not Yet Assessed*

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶589.

During the fifth monitoring period, the CPD provided us with updated versions of Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, and Employee Resource E05-02, *Performance Recognition System*. Both policies include provisions related to supervisors accessing the respective data system to review members and identify at-risk conduct. As a result, the CPD achieved Preliminary compliance.

For Secondary compliance, we will evaluate training for supervisors on how to access and review officer information to identify them as "at risk." The CPD provided the IMT with OSS training for districts that will be included in the pilot expansion that, while impressive, required additional revision. We anticipate this training will be delivered in the next monitoring period. For training on the Performance Recognition System, the CPD advised us that in early 2022, the CPD will provide supervisors training through "roll call training as well as electronic AMC messages to ensure that supervisors are fully aware and accountable for the continued required use of [the Performance Recognition System]." However, we have not yet been provided this training and while we appreciate the CPD reinforcing the need to conduct required reviews, we question whether a roll call training is the best avenue for refreshing supervisors on *how* to conduct such reviews. For each of these trainings, we will provide updates in our next report.

As necessary for Full compliance, the CPD, through an independent third-party consultant, conducted a focused assessment of OSS data and related data systems (*see* also our assessment of ¶606). As related to OSS, the report found that all of the data required for the Officer Support System was not collected by the CPD. Compliance will therefore depend on resolution of these issues, and we

recommend the CPD do so prior to expanding the Officer Support System department-wide.

### Paragraph 589 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Data Collection, Analysis & Management: ¶590

*590. CPD will require unit commanding officers to review the automated electronic system data regarding all officers who are transferred to their command within 14 days of the transfer. CPD will require supervisors to conduct monthly reviews of the automated electronic system data regarding officers under their direct command. The purpose of these reviews will be for supervisors to identify and address patterns of behavior by officers under their direct command that are indicative of a future instance of at-risk behavior. CPD will also require supervisors to review the automated electronic system data together with officers under their direct command during the annual performance evaluation process.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**   Monthly                    ✓ **Met**    ☐ **Missed**

**Preliminary:**   *In Compliance* (NEW)
**Secondary:**   *Not Yet Assessed*
**Full:**   *Not Yet Assessed*

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶590.

Although the CPD is still migrating from the Performance Recognition System to the Talent Management System (TMS) (which houses the Officer Support System), supervisors in non-pilot districts continue to be required to use the Performance Recognition System through Directive E05-02, *Performance Recognition System*. During this monitoring period, the CPD provided an updated version of Directive E05-20 that contains the requirements of ¶590. As ¶604 allows the CPD to continue to use Performance Recognition System on an interim basis while transitioning to the new system, we find that Directive E05-20, as currently revised, is sufficient to achieve Preliminary Compliance with the requirements of ¶590.

However, we note that in communication with the IMT, the CPD stated that "all districts/units who are not piloting the OSS" are required to use Performance Recognition System to conduct the reviews required by ¶590. As a technical matter, the Officer Support System directive does not contain the requirements of ¶590, and we therefore ask the CPD to clarify whether pilot districts are under the authority of both directives. If pilot districts are only under the authority of the

Officer Support System directive, we recommend that the CPD include the ¶590 language in the Officer Support System pilot directive.

We also note that it will likely be difficult for the CPD to achieve subsequent levels of compliance with ¶590 without a full transition to the Officer Support System model. This is due to the fact that, while required by policy, supervisor use of Performance Recognition System is inconsistent and prior discussions with CPD personnel revealed that it is not user friendly. Additionally, supervisors have not received recent training on the Performance Recognition System—though CPD indicates a refresher element will be added to roll call trainings. We will therefore need to see full implementation of the Officer Support System before saying that all supervisors have received adequate training on the requirements of ¶590 and that the system can facilitate the identification of officers.

### Paragraph 590 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Data Collection, Analysis & Management: ¶591

***591.*** *The automated electronic system will employ push notifications and similar mechanisms to alert supervisors when patterns of conduct indicative of a future instance of at risk behavior are identified. CPD will provide appropriate interventions and support in a timely manner.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶591.

During the fifth monitoring period, the CPD provided an updated version of Directive D20-04 (*Officer Support System Pilot Program*), which includes the elements of ¶591. For instance, the CPD uses OSS push notifications and CPD email to notify supervisors that an alert has been generated. Additionally, D20-04 includes specific timelines for completing tasks as part of the process, facilitating the timely provision of interventions and support. As a result, the CPD achieved Preliminary compliance.

In moving towards Secondary Compliance, the CPD will need to ensure adequate training on using the Officer Support System application. We have had the opportunity to review a draft version of the Officer Support System training that the CPD plans to provide supervisors (and already had provided in the initial pilot district). While we feel the training had many positive elements (including an appreciable portion related to having difficult conversations with those who had been flagged by the Officer Support System), there were additional revisions that would be necessary. For instance, the training could have greater clarity and guidance related to the types of interventions (including the decision to not implement an intervention), as well as guidance for when officers choose not to accept a supervisor's intervention recommendation. We also look forward to reviewing how the CPD will further revise the training based on the expanded pilot effort that will begin in the next monitoring period. We will assess this as part of our assessment of the overall expansion effort.

## Paragraph 591 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Data Collection, Analysis & Management: ¶592

***592.** CPD will ensure that any CPD member required to receive counseling after being identified through the automated electronic system has the opportunity to participate in an initial counseling session within 14 days of the member being notified of the requirement.*

## Compliance Progress            (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶592.

During the fifth monitoring period, the CPD provided an updated version of Directive D20-04, *Officer Support System Pilot Program*, which contains ¶592's requirements that officers receive an initial counseling session within 14 days of the agreed upon intervention. As a result, the CPD achieved Preliminary compliance.

For additional levels of compliance, we will need to ensure that (1) supervisors have been adequately trained on recognizing when counseling is the most appropriate intervention and (2) the CPD has the data-management capacities for tracking officers' use of CPD's counseling services.

For this first point, we have reviewed the CPD's draft training for supervisor utilization of the Officer Support System and, though additional revisions are necessary, we believe the training will ultimately allow supervisors to make informed decisions about when counseling is most appropriate. However, the second criteria (data management capacity) is potentially more problematic as the CPD does not have an adequate data-collection mechanism to reliably track the utilization of the CPD counseling services (*see* also our assessment of ¶¶ 389 and 391).

Full Compliance will necessarily depend on the CPD being able to reliably track adherence to the 14-day timeline through the acquisition of a data-management tool.

## Paragraph 592 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Data Collection, Analysis & Management: ¶593

*593. CPD will ensure that command staff regularly use the automated electronic system data to effectively manage CPD officers and supervisors across all ranks, watches, beats, and districts.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**      *Not Yet Assessed*
**Full:**           *Not Yet Assessed*

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶593.

Similar to the assessment of ¶590, the CPD supervisors in non-OSS pilot districts continue to be required to use the Performance Recognition System through Directive E05-02, *Performance Recognition System*. During this monitoring period, the CPD provided an updated version of Directive E05-20 that contains requirements for supervisors (including command-level supervisors) to regularly review members under their command. Furthermore, the updated version of Directive D20-04, *Officer Support System (OSS) – Pilot Program*, lists as the first of the Officer Support System's key elements to effectiveness the need for command staff to regularly review the Officer Support System to effectively manage CPD officers. As a result, the CPD achieved Preliminary compliance.

However, it will likely be difficult for the CPD to achieve subsequent levels of compliance with ¶593 without a full transition to the Officer Support System model. This is due to the fact that, while required by policy, supervisor use of the Performance Recognition System is inconsistent and prior discussions with CPD personnel revealed that it is not user friendly (therefore impacting supervisors' ability to *effectively* manage those under their command).

Additionally, supervisors have not received recent training on the Performance Recognition System, though CPD indicates a refresher element will be added to roll call trainings. We will therefore need to see full implementation of the Officer Support System before saying that all supervisors have received adequate training on how to achieve the goals of ¶593.

## Paragraph 593 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Data Collection, Analysis & Management: ¶594

***594.*** *CPD will provide training to all officers, supervisors, and command staff regarding the automated electronic system to ensure proper understanding and use of the system.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**     *Not Yet Assessed*
**Full:**     *Not Yet Assessed*

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶594.

During the fifth monitoring period, the CPD provided an updated version of Directive D20-04 (*Officer Support System (OSS) – Pilot Program*) which contains the training requirements found in ¶594. The Directive identifies training requirements for the pilot districts and accounts for situations where members transfer into a pilot district. The Directive also discusses training requirements for officers, supervisors, and command staff. As a result, the CPD achieved Preliminary compliance.

While CPD has memorialized the training requirements into D20-04, the development and delivery of the actual training has not occurred consistent with the intent of ¶594. The CPD has provided us with a draft of training for supervisors and, while we found the training to be well done overall, additional revisions are necessary (*see* ¶595). Finally, we have not received any training for officers to ensure that they have a proper understanding of the system.

To achieve additional levels of compliance, the CPD will need ensure that all members have been adequately trained. Full compliance will then require proper understanding and use of the system as demonstrated through a comprehensive evaluation.

### Paragraph 594 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |

## Paragraph 594 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Data Collection, Analysis & Management: ¶595

***595.*** *CPD will train all supervisors to use the automated electronic system as designed, to interpret the outputs, to perform appropriate interventions and support, to address underlying stressors to promote officer well-being, and to improve the performance of officers under their direct command.*

## Compliance Progress     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶595.

During the fifth monitoring period, the CPD provided the IMT with an updated version of Department Notice D20-04 which contains the requirement for all supervisors to be trained on the Officer Support System in accordance with ¶595. As a result, the CPD has achieved Preliminary compliance.

Additionally, the IMT reviewed a draft version of the training for OSS and, while impressive, additional revisions will be necessary. For instance, the training could have benefited from a more expansive set of scenarios which could account for a wider range of potential outcomes. Furthermore, the training could have provided greater clarity on a number of issues, including officers' ability to reject an intervention, the types of information a supervisor is expected to gather (and how to gather such information), and clarifying the goals and functions of the Officer Support System.

As we await a revised version of the training, we also note that the training should be informed by lessons learned from the initial pilot test. However, few analyses of that pilot site were conducted, and therefore, the CPD will require additional revisions to the training before implementing the Officer Support System department-wide. As part of this, we have requested that the CPD provide us with their evaluation metrics for the pilot expansion so that we can ensure future training is informed by a reliable evaluation of the current pilot efforts.

## Paragraph 595 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Data Collection, Analysis & Management: ¶596

**596.** *CPD will conduct annual audits of the automated electronic system. The audits will: a. assess the overall effectiveness of the automated electronic system and the support and interventions prompted by the system; b. assess whether and to what extent supervisors are completing monthly reviews of the automated electronic system information regarding officers under their direct command; c. assess whether and to what extent CPD is providing interventions and support in a timely manner; d. assess whether the interventions and support provided are appropriate and effective; and e. identify any recommended changes to improve the effectiveness of the automated electronic system.*

## Compliance Progress               (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**     Annually              ☑ **Not Yet Applicable**

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**     *Not Yet Assessed*
**Full:**     *Not Yet Assessed*

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶596.

During the fifth monitoring period, the CPD provided us with updated versions of D20-04 (*Officer Support System (OSS) – Pilot Program*) and E05-02 (*Performance Recognition System*), both of which contain the audit requirements of ¶596. As a result, the CPD remains under assessment for Preliminary compliance.

However, we have not been provided an audit plan or its equivalent that would act as a training component for how to conduct the audits, a necessary element for Secondary compliance. Similar to the evaluation metrics for the current pilot program, we will need to see a detailed audit proposal before CPD begins the actual audit process. Finally, for Full compliance, we will need to see evidence that the audits are happening in practice and that the results are being used to improve utilization of different systems.

## Paragraph 596 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

# Data Collection, Analysis & Management: ¶598

*598. In seeking to provide improved support and wellness to its officers, CPD will seek to identify which supports and interventions are most helpful to officers and develop support and training based on CPD feedback and best practices. The types of support services offered to CPD officers may include, but not be limited to: counseling; training; coaching and mentoring; and additional supervision or monitoring.*

## Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶598.

In the fifth monitoring period, the CPD provided us with updated versions of D20-04, *Officer Support System (OSS) – Pilot Program*, which contains the requirements of ¶598. As a result, the CPD has achieved Preliminary compliance with this paragraph.

As part of achieving Secondary Compliance, the CPD will need to demonstrate an ability to "identify which supports and interventions are most helpful to officers." As noted in our assessments of other paragraphs, the CPD did not adequately measure this during the initial pilot test.

While quantitative impact assessments would not be possible due to the single-district nature of the pilot, the CPD could assess this qualitatively at least, and we recommend they do so during the expanded pilot effort (including evaluation of officer, direct-supervisor, and chain-of-command supervisor experiences with the Officer Support System process). Upon sufficient outcome data being gathered (and a sufficient timeline to observe intended effects), the CPD will need to conduct a more rigorous assessment. We note that such an assessment will likely require several years of data and we will provide updates in future monitoring periods.

## Paragraph 598 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary |

# Data Collection, Analysis & Management: ¶601

**601.** *CPD will continue to solicit input and feedback from representatives of its collective bargaining units during the development and implementation of the EIS.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶601.

During the conceptualization phase of the Officer Support System (OSS), the CPD engaged with representatives of the CPD's various collective bargaining units. While this initial collaboration was a positive step, the CPD did not re-engage with the collective bargaining units until after the initial pilot effort had completed.

Additionally, the CPD did not consult with the collective bargaining units in developing the proposed OSS training that was provided to IMT. Finally, during a site visit in the monitoring period, it became clear that none of the collective-bargaining-unit representatives had a working understanding of the Officer Support System process, as many of them described a single-item threshold approach that is vastly different from the predictive model approach that the CPD uses. Using feedback from the IMT, the CPD re-engaged the collective bargaining units before updating Directive D20-04 (*Officer Support System (OSS) – Pilot Program*). As such, we find the CPD has achieved Preliminary compliance with this paragraph.

However, ongoing engagement will be an important part of the overall OSS process. Input from the collective bargaining units on the Officer Support System is of unique importance given that it is a non-disciplinary process that necessarily requires officer buy-in to have long-term success. The OSS identifies officers at higher risk even though they have broken no laws or policies. Therefore, participation in OSS is voluntary and officers must trust that OSS intervention will be a positive experience. Particularly in Chicago, the buy-in from collective bargaining units can be a critical determinant in whether officers develop that trust and thereby accept the intervention and reduce risky behavior.

Consistent with the above, subsequent levels of compliance with ¶601 will require the CPD to re-engage with collective bargaining units at each implementation stage of the Officer Support System. As the CPD is expanding to additional districts

in the near future, the collective bargaining units should be kept up-to-date on findings, issues, and proposed resolutions. The informed input from collective bargaining units should then be incorporated into the final OSS model, policy, and training before expanding the system department-wide.

### Paragraph 601 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

## Data Collection, Analysis & Management: ¶602

***602.*** *Prior to beginning the phased implementation of the EIS, CPD will develop and implement new or revised policies and procedures for using the EIS and, if applicable, the updated PRS and information obtained from them. The policies and procedures will address data storage, data retrieval, data analysis, reporting, pattern identification, supervisory use, intervention and support options and procedures, documentation and audits, access to the system, and confidentiality of personally identifiable information.*

### Compliance Progress          (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶602.

In the fifth monitoring period, the CPD provided the IMT with an updated version of Directive D20-04, *Officer Support System (OSS) – Pilot Program*, which contains each of the requirements listed in ¶602. Furthermore, in accordance with ¶602, the CPD revised E05-02, *Performance Recognition System*, which contains the requirements of ¶602 as well as requirements found in other paragraphs within this Section. As a result of both these policies, the CPD achieved Preliminary compliance during the monitoring period.

As discussed in other paragraphs within this Section, training on the new policies and procedures will be of great importance, particularly as it relates to issues of "data retrieval, data analysis, reporting, pattern identification, supervisory use, [and] intervention and support options."

The training for supervisors will need to be carefully developed, delivered, and evaluated. Full compliance will then require the CPD to demonstrate the skills learned in training are being applied when receiving an officer alert.

## Paragraph 602 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Data Collection, Analysis & Management: ¶603

***603.*** *After the completion of the development of the EIS, CPD will implement the EIS through a phased rollout that incorporates pilot testing to identify and address any technical or design issues. CPD will begin phased implementation of the EIS within 18 months of the Effective Date, and will complete full implementation of the EIS by no later than 24 months after the Effective Date.*

## Compliance Progress                    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | ***In Compliance*** (NEW) |
| **Secondary:** | ***Not Yet Assessed*** |
| **Full:** | ***Not Yet Assessed*** |

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶603.

During the fifth monitoring period, the CPD completed their initial pilot test phase of the Officer Support System, updated their pilot directive, and began developing an OSS training in earnest. As a result of the updated pilot Directive D20-04 (Officer Support System (OSS) – Pilot Program), the CPD achieved Preliminary compliance with this paragraph.

However, we note that the initial pilot phase was insufficient for the CPD to "identify and address any technical or design issues." Going forward, the CPD will need to finalize training as well as ensure that the expanded pilot is implemented in a way that can be evaluated for "technical and design issues," and we therefore recommend that the CPD provide the IMT with measurement tools prior to further expanding the Officer Support System pilot.

### Paragraph 603 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Data Collection, Analysis & Management: ¶604

**604.** *Prior to full implementation of the EIS, CPD will continue to use the PRS as well as other existing tools and resources to identify patterns of conduct by officers that warrant support and intervention. Following the development and implementation of the EIS, the functions required of the automated electronic system described above may be performed by a combination of the EIS and the PRS as long as all required functions are performed and supervisors are using the system(s) as required by CPD policy. To the extent CPD continues utilizing PRS to perform any of the functions required by this Agreement, CPD will update the PRS to enhance the system's effectiveness, usability, and accuracy by no later than January 1, 2020.*

## Compliance Progress       (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the CPD achieved Preliminary compliance with ¶604.

In the fifth monitoring period, the CPD had not yet fully implemented the Officer Support System and therefore the allowances of ¶604 were in effect. As it relates to this, the CPD provided the IMT with an updated version of E05-02 (*Performance Recognition System*), which includes sections related to identifying patterns of conduct by officers that warrant support and intervention. However, the Performance Recognition System is inconsistently used and, while CPD is planning a training effort in early 2022, they have indicated that it will be a roll-call training rather than a formal in-service module.

While the CPD expands the Officer Support System pilot, all supervisors not in the pilot districts remain accountable to ¶604. Therefore, the CPD must reinforce the process and importance of using the Performance Recognition System to supervisors to gain Secondary Compliance. While a roll-call training can certainly address the importance of Performance Recognition System, it will unlikely succeed in sufficiently covering the process. However, the CPD has not yet provided the IMT with the training, so we will still need to review it before being able to assess Secondary Compliance.

For Full compliance, we would need to observe how the Performance Recognition System is actually used by supervisors, though this may become moot if the CPD expands the Officer Support System department-wide beforehand.

### Paragraph 604 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Data Collection, Analysis & Management: ¶606

*606. Within 365 days of the Effective Date, CPD will conduct an assessment of CPD's current information collection mechanisms and data management technology to identify: a. what data CPD currently collects and what additional data is required to be collected to comply with this Agreement; b. the manner of collection (e.g., electronic or paper); c. the frequency with which each type of data is updated; d. the quality control mechanisms in place, or the need for such mechanisms, to ensure the accuracy of data collected; e. what software applications or data systems CPD currently has and the extent to which they are used or accessed by CPD members; f. redundancies or inefficiencies among the applications and systems currently in use; and g. the extent to which the applications and systems currently in use interact with one another effectively.*

## Compliance Progress (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | ***Under Assessment*** |
| **Secondary:** | ***Not in Compliance*** |
| **Full:** | ***Not in Compliance*** |

In the fifth reporting period, the City and the CPD make progress with ¶606 but ultimately did not achieve any level of compliance. The IMT notes that this paragraph remains under assessment because CPD is in the process of completing the assessment requirements outlined in ¶606.

In the fifth reporting period, the CPD submitted a data assessment that partially fulfills the requirements of ¶606. The consultant the CPD hired to complete this assessment took each of the subsections of ¶606 and provided an overall review, highlighting critical issues that have long been known within CPD. For instance, the report highlighted the lack of integration capability across CPD data systems, noting that the problem was, in part, due to a lack of planning on the part of the CPD. This is illustrated in one portion of the report which states the following:

*Overall, enterprise data architecture is somewhat pieced together in that applications are built on an as-needed basis. Often this was the result of a desire to automate an existing paper process.*

The integrative inabilities of CPD systems have long been known to the CPD, and the report succeeds at memorializing this and other long-standing data issues.

While the report provides an overall assessment of CPD's general data collection practices and uses the Consent Decree as a guide for areas of review, the assessment lacks the specificity required by ¶606 to capture the entirety of CPD's data-collection processes. For instance, the first subsection of ¶606 states the assessment must evaluate "what data CPD currently collects and what additional data is required to be collected to comply with this Agreement." This is not reflected in the report as there is no (or minimal) discussion of some Consent Decree sections.

For example, there is no discussion of data necessary to demonstrate compliance with the section on Community Engagement. Furthermore, discussion of the *Crisis Intervention Team Report* is limited to one row in a table in Appendix 1 and only states which system the CIT Report is housed in and that it is a "New Data Subject Area." There is no discussion as to the manner of data collection, the frequency with which data is updated, or the quality control mechanisms in place for this subject area. Additionally, it's unclear whether the CPD is of the position that this form represents all the data that would be required for compliance with the Crisis Intervention section of the Consent Decree (similar limited information is also provided for Officer Wellness and Firearm Pointing Incidents).

In other sections, the report appears incomplete. For instance, Section 2.1.2 of the report states that non-disciplinary corrective action is not tracked in CMS or SPAR, but that "such actions are potentially tracked by HR." Additionally, non-disciplinary corrective actions should be captured in the Performance Recognition System as part of the member's jacket, which is not discussed.

More broadly, Appendix 1 identifies different "Data Subject Areas" (for instance, Complaints), the systems used to capture data within the subject area, and brief notes pertaining the subject area. However, the section lacks overall clarity on the consultant's findings for each of those systems, including the elements of subsections (e) through (g) of ¶606. Furthermore, it is again unclear whether the CPD is of the position that the subject areas comprise all data areas that are needed to comply with the Consent Decree.

Finally, the report does not elaborate on the methodology employed with enough precision for the IMT to assess the scope of the analysis. It is unclear whether the CPD provided the consultant with a list of all data elements needed to comply with the Consent Decree in its entirety (we are not aware that CPD has such a list). Further, although the assessment indicates that surveys and interviews were conducted, it does not elaborate on the survey/interview items, survey response rates, which units or divisions participated (or declined to participate), or how such units and divisions were identified. Furthermore, despite recommending that the

assessment process include discussions with the IMT to identify the relevant data topics, the IMT was not consulted—nor was the OAG. Therefore, we have no framework for the guidance that they were provided outside of what is written in ¶606 and ¶587.

In all, the report provided by the CPD as evidence of compliance with ¶606 holds some key findings related to the CPD's overall data management status and meaningful effort. However, the report will need to be supplemented with the specific elements of ¶606, each of which we have previously discussed with the CPD.

First, the CPD will need to establish a list of all data elements required to comply with the Consent Decree. This will require a thorough reading of the Consent Decree, discussions with the IMT and the OAG, and a collaborative agreement about what data is sufficient for compliance.

Next, the CPD will need to provide the information found in subsections (b) through (d) for each of the data points necessary to achieve compliance with the Consent Decree.

Then, the CPD will need to provide commentary on each of the systems that house data necessary to comply with the Consent Decree, including the subsections (e) through (g) assessments. (We note that the current report does include this to some degree but again lacks the specificity required by the Consent Decree).

Finally, the CPD will need to memorialize the findings of the assessment in a manner that can act as a checklist for achieving compliance, using the (b) through (d) elements to inform specific data needs and the (e) through (g) elements to inform global improvements in the CPD's data structure.

## Paragraph 606 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Under Assessment | |

# Data Collection, Analysis & Management: ¶607

***607.*** *Within 90 days of completion of the assessment described in the preceding paragraph, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs identified to enhance CPD's information collection mechanisms and data management technology ("Data Systems Plan"). CPD will implement the Data Systems Plan in accordance with the specified timeline for implementation.*

## Compliance Progress    (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth monitoring period, the City and the CPD did not meet any level of compliance with ¶607.

As discussed above, the CPD has only provided a partial assessment report for ¶606. However, a complete assessment will be necessary for the CPD to comply with the development and implementation requirements of ¶607. As the ¶606 assessment has not yet been fully completed, the CPD cannot yet reach any level of compliance with ¶607.

To achieve Preliminary compliance with ¶607, the City and the CPD will first need to create a data systems plan to reflect the entirety of ¶606 rather than just the Officer Support System.

### Paragraph 607 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Data Collection, Analysis & Management: ¶608

*__608.__ CPD will continue to maintain an Information Systems Development Group ("ISDG"). The ISDG will continue to be chaired by the Chief of the Bureau of Technical Services or other high-ranking member of CPD's command staff. The ISDG will also include, in some capacity, personnel from various units of the Department that are responsible for overseeing patrol field operations; conducting criminal investigation and processing juvenile offenders; initiating and conducting investigations of organized crime; overseeing the administrative aspects of CPD; managing data, technology, and information systems; coordinating and exercising supervision over disciplinary matters; administering training; providing legal advice; developing and publishing department policies and procedures; and overseeing and coordinating CPD's budget and fiscal responsibilities. The ISDG will be responsible for: a. ensuring implementation of the Data Systems Plan; b. ensuring CPD's information collection mechanisms and data management technologies are in the best long-term interests of the Department for improving operations and management consistent with the terms of this Agreement; and c. recommending strategies to promote the development, sharing, and reporting of relevant information to the Superintendent, the public, the FRB, COPA, BIA, and OIG.*

## Compliance Progress         (Reporting Period: July 1, 2021, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

During the fifth monitoring period, the CPD achieved Secondary compliance with the requirements of ¶608.

In the fifth monitoring period, the CPD continued to maintain the Information Systems Development Group, which is chaired by the Deputy Director of Information Technology. The CPD sent Information Systems Development Group meeting notes and agendas, as well as a resource guide which outlines the meeting process. The Information Systems Development Group continues to include relevant personnel, as required in ¶608. This resource guide outlines the meeting process, including determining priorities for meeting topics, procedures

for opening and closing meetings, appropriate document templates for reviews, distribution of relevant materials, and documenting meeting notes.

Accordingly, the City and the CPD achieved Secondary compliance in the fifth reporting period. Full Compliance will require the CPD to demonstrate their ability to appropriately select and prioritize agenda topics, provide sound guidance on data system integrity, and assist in the implementation of recommendations born out of the complete ¶606 review.

### Paragraph 608 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD |
|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary |

# Data Collection, Analysis & Management: ¶609

> **609.** *On an annual basis, to improve the accuracy, reliability, and efficiency of its data collection, CPD will review and, as necessary, revise departmental forms relating to: use of force, arrests, interactions with individuals in crisis, and the disciplinary process.*

## Compliance Progress                     (Reporting Period: July 1, 2021, through Dec. 31, 2021)

**Recurring Schedule:**     Annual                    ☑ **Not Yet Applicable**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH MONITORING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH MONITORING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the fifth reporting period, the City and the CPD maintained Secondary compliance with ¶609.

During the fifth monitoring period, the CPD maintained Special Order S09-03-02, *Forms Management System*, which clearly states that the CPD will review departmental forms on an annual basis consistent with the requirements of ¶609. However, since the requirement for ¶609 is for an annual review, no additional documents were required for compliance during this monitoring period and we will provide an update in the sixth reporting period when forms will need to be reviewed again.

Going forward, the City and the CPD will need to demonstrate that they have conducted the necessary reviews and that such reviews have followed the process laid out in S09-03-02 to achieve Full compliance with this paragraph.

### Paragraph 609 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Appendix 11
# Implementation, Enforcement & Monitoring
# Compliance Assessments, by Paragraph

# Appendix 11
# Implementation, Enforcement & Monitoring
# Compliance Statuses, by Paragraph

| | | | |
|---|---|---|---|
| ¶677 | ¶680 | ¶685 | ¶706 |
| ¶678 | ¶683 | ¶686 | ¶711 |
| ¶679 | ¶684 | ¶700 | ¶720 |

## Consent Decree ¶677–78

*677. The City and CPD agree to hire, retain, or reassign current City or CPD employees to form a unit with the knowledge, skills, and abilities necessary to facilitate compliance with this Agreement.*

*678. At a minimum, CPD will designate personnel to be responsible for: a. coordinating the City's and CPD's compliance and implementation activities; b. facilitating the provision of data, documents, materials, and access to the City's and CPD's personnel to the Monitor and OAG, as needed; c. ensuring that all data, documents, and records are maintained as provided in this Agreement; and d. assisting in assigning implementation and compliance related tasks to CPD personnel, as directed by the Superintendent or the Superintendent's designee.*

## Compliance Status

While the City and the Chicago Police Department (CPD) continue to implement the requirements of the Consent Decree, we have had some specific concerns about the lack of consistent staffing and retention levels.

The City and the CPD have designated the following entities to be responsible for the following provisions of ¶678:

- 678(a): the CPD's Reform Management Group and the City's Department of Law;

- 678(b) and (c): the CPD's Office of Legal Affairs and the City's Department of Law; and

- 678(d): the CPD's Reform Management Group.

Overall, personnel from the City, the CPD, and other relevant City entities continue to assist the IMT by providing information, updates, and evidence of compliance efforts. These representatives frequently arrange communications and help the IMT navigate the complexity of the City entities.

As with previous reporting periods, we have had a few specific concerns about the lack of consistent staffing and retention levels in the Reform Management Group and the high level of turnover in the three years since the Consent Decree began. The Reform Management Group is located within the CPD's Office of Constitutional Policing and Reform and works closely with the CPD's Office of Legal Affairs and the City's Department of Law. The personnel in these groups have many of the

"knowledge, skills, and abilities necessary to facilitate compliance with this Agreement." The City's Department of Law provides many of the project management functions for the relevant city entities—the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General (OIG), including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC). The Reform Management Group provides many of these project management functions for the CPD.

We also have concerns about the staffing of the CPD's Audit Division, which is critical to the sustainability of the reform effort. The Audit Division's mission is as follows:

> *The mission of the Audit Division is to provide quality, independent and objective assessments of the operations, processes, and internal controls in support of the Chicago Police Department ('Department'), including but not limited to work related to the strategic plan and consent decree. During internal audits and other reviews in which areas for improvement are identified, recommendations will be made to enhance Department operations. The Audit Division promotes accountability by proactively working with officials across all the Department to identify risks, evaluate controls, and make recommendations intended to promote constitutional policing and the effective delivery of police services. The Department is committed to the use of audits and other reviews to assess adherence to its stated orders, policies, and procedures—as well as to demonstrate consistency with the strategic plan and compliance with the consent decree into which the Department entered with the Attorney General of the State of Illinois. All audits and reviews are intended to provide objective information to inform decision-making and to help improve the internal transparency and accountability of the Department's operations.*

The chronic understaffing of this unit is short-sighted for the future of sustainable reform at the CPD. We note that the civilian commanding officer of the Audit Division—along with other talented analysts and social scientists who have left the CPD in the last year—left in November 2021 and has not yet been replaced.[1]

---

[1]  *See, e.g.*, Gregory Pratt and Madeline Buckley, *Chicago police leader resigned over 'inability' of department brass 'to even feign interest' in reform, then accused officials of retaliation*, Chicago Tribune (November 11, 2021), https://www.chicagotribune.com/news/breaking/ct-chicago-police-consent-decree-reforms-resign-lightfoot-20211111-pdniyih24rgobpw6bmjog-wgf4a-story.html.

Likewise, since the beginning of the Consent Decree, we have had concerns regarding a lack of direct participation from CPD Command staff in reform activities. Those continued throughout the fifth reporting period. With some high-profile and notable exceptions, it is unclear to the IMT, for example, whether Command staff regularly review policy revisions or training curricula before the IMT, and the Office of the Illinois Attorney General (OAG) receive them for review. CPD leadership does not seem to be a part of the "unit" described above. The Office of Constitutional Policing and Reform has recently regained its Chief/Commanding Officer position, but that position was vacant since the retirement of the former Chief in May 2021. The CPD's leadership—from sergeants up to the Superintendent—must consistently and intentionally participate in reform to achieve compliance with the Consent Decree more expeditiously.

We also note our concern with the staffing in a few other units within the CPD that are crucial drivers of Consent Decree compliance. The City and the CPD must continue to make efforts to maintain staffing at appropriate levels at all times in the following key departments: the Research and Development Division, the Force Review Division, the Legal Affairs Division, the Education and Training Division, the Crisis Intervention Team, the Audit Division, the Office of Community Policing, and the Reform Management Group.

Further, during previous reporting periods, we identified several additional staffing and resource needs, noting the impacts of organizational changes. Throughout this reporting period, Superintendent David Brown has continued to make organizational changes. As we noted earlier, changes in leadership can disrupt efforts toward reform during transition periods.

Many of the City's and CPD's efforts and achievements in the first four reporting periods continued into the fifth reporting period. The City Department of Law, the CPD's Office of Constitutional Policing and Reform, the Legal Affairs Division, and the Research and Development Division (¶¶677–78) continued to be fully engaged in the monitoring process. The City and the CPD also maintained regular channels of communication with the IMT and the OAG and continued dialogue, problem-solving, and brainstorming about requirements and challenges regarding the paragraphs of the Consent Decree.

We recognize that the City's and the CPD's resources are limited. As referenced above, the City and the CPD have already added many resources to guide compliance efforts.

In prior reporting periods, we recommended that the City and the CPD increase resources and staffing to various departments. In response, the CPD increased staffing in the following departments:

- **The Research and Development Division.** The Research and Development Division frequently works with the IMT to develop compliance documents and policies. As a result, increases in staffing in this department reduced bottlenecking with limited personnel.

- **The Force Review Division.** As discussed further in the Use of Force section above, the Force Review Division is critical to several Consent Decree requirements. The CPD agreed that the workload of this department was greater than the department's capacity and has struggled to keep consistent, appropriate staffing levels.

Before the COVID-19 pandemic, many of these staffing increases had begun to make the City's compliance efforts more efficient. While we understand that ongoing challenges continue based on limited resources and staff and the continuing effects of COVID-19, we reiterate the need for the City and the CPD to devote sustained or increased resources and staffing to the Office of Community Policing, the Education and Training Division, the Audit Division, the Force Review Division, the Research and Development Division, and the Crisis Intervention Team.

## Consent Decree ¶679

> **679.** The City and CPD agree to collect and maintain all data and records necessary to document compliance with this Agreement, including data and records necessary for the Monitor to conduct reliable compliance reviews and audits.

### Compliance Status

As we have noted in each of our previous Independent Monitoring Reports and in the Data Collection, Analysis, and Management section of this report, the City and the CPD are not currently collecting and maintaining "all data and records necessary to document compliance with this Agreement." This is due, in part, to pervasive data systems challenges. Not only do we need complete and verifiable data to assess compliance across all areas of the Consent Decree, but also the City and the CPD need this data to monitor, reform, and adapt its efforts to current and future challenges. The research, analysis, and data collection under the Consent Decree and best practices are demanding. To effectively identify and resolve existing and upcoming challenges, the City and the CPD must maintain, track, and analyze the data. To meet these challenges, the City, the CPD, and the OAG continue to engage in data discussions for each topic area. Based on these discussions, there is universal agreement that the CPD has a long way to go to meet the data requirements of the Consent Decree.

The CPD still does not have a consistent system for auditing and validating its data systems or correcting and upgrading those systems based on regular audits. While

the CPD may maintain, assess, and correct data system problems regularly, it is not doing so based on a standard audit process.

In short, the CPD does not currently have the data resources and systems in place to meet the demands of the Consent Decree. We are aware that the CPD is still in the process of assessing and reorganizing several facets of its data management systems, and we hope that the reorganization is effective. We will continue to work with the City and the CPD to ensure that these efforts continue.

## Consent Decree ¶680

> **680.** Beginning with the Monitor's first report filed with the Court, and for each subsequent semiannual report by the Monitor, the City agrees to file a status report one month before each of the Monitor's reports is due for the duration of this Agreement. The City's status report will delineate the steps taken by CPD during the reporting period to comply with this Agreement, and CPD's assessment of the status of its progress implementing this Agreement.

### Compliance Status

The City filed the status reports required by ¶680 before the IMT issued its draft monitoring reports for the first three reporting periods. In the fourth reporting period, however, the City and the CPD filed the status report on September 8, 2021 and in the fifth reporting period, the City provided us with a draft of their report on January 26, 2022, which is too late to assist to the IMT in preparation of the initial draft of the Independent Monitoring Report 5, which is due to the Parties 30 days after the monitoring period ends (*see* ¶680 and ¶661). The City's most recent status report, which they filed on March 3, 2021 (over two months late), assesses its progress implementing the requirements of the Consent Decree and addresses topics including community policing, policy development, community engagement, training, and pilot programs.

The IMT views these status reports as a helpful tool as the City's and the CPD's self-assessment to help clarify the City's progress and make accurate compliance determinations. Their utility to the IMT would increase, however, if the City and the CPD completed them and submitted them to the IMT by the deadline set out in this paragraph.

## Consent Decree ¶683

**683.** *CPD will notify the Monitor as soon as practicable, and in any case within 24 hours, of any officer-involved shootings, any death of a person in CPD custody, or any arrest of a CPD member. In the event a CPD member is arrested by a law enforcement agency other than CPD, CPD will notify the Monitor as soon as practicable, and in any case within 24 hours of receiving notice of the arrest. The Monitor will cooperate with the City to obtain access to people and facilities in a reasonable manner that, consistent with the Monitor's responsibilities, minimizes interference with daily operations.*

### Compliance Status

Since the beginning of the monitoring process, the CPD has consistently notified the IMT of any officer-involved shootings, any death of a person in CPD custody, and any arrest of a CPD member within 24 hours after the event through its Crime Prevention and Information Center (CPIC) email notification system.

As of the date of this report, three members of the IMT are subscribed to the CPIC notification system and receive automatic emails about these events. The CPD and the City have provided IMT access to City personnel and facilities across entities. They have also allowed members of the IMT to observe and learn more about officer-involved shooting scenes and processes.

## Consent Decree ¶684

**684.** *The City and CPD will ensure that the Monitor has prompt access to all City and CPD documents and data related to the Agreement that the monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement, except any communications, documents, or data to which access is limited or precluded by court order, or protected by the work product doctrine or the attorney-client privilege (collectively, "privilege").*

### Compliance Status

The City and the CPD have made many efforts to provide the IMT with access to documents and data relevant to the Consent Decree.

As noted in our first four monitoring reports, we had significant concerns regarding document and data productions, as a substantial number of materials would arrive at or near the end of the reporting period. While this challenge continued in the

fifth reporting period, the City and its relevant entities made significant improvements. Further, throughout this monitoring period, the City and the CPD continued discussions with the IMT about how to improve the quality of their document and data productions. As we mention in ¶679, the CPD does not currently have the data resources and systems in place to meet the demands of the Consent Decree. We are aware that the CPD is still in the process of assessing and reorganizing several facets of its data management systems, and we hope that the reorganization is effective. We welcome and look forward to continued discussions and developments regarding data quality, analysis, and access. We welcome and look forward to continued discussions and developments.

Further, early in the Consent Decree, the IMT and the OAG began to have concerns regarding how promptly the City and some of the City's relevant entities respond to requests for information. In the fifth reporting period, the City, the CPD, the OAG, and IMT continued to dedicate time toward addressing these concerns and improving the request and production procedures.

We look forward to continuing to work with the City and the CPD to resolve the access issues and hope for more timely responses to our requests for information in future reporting periods.

## Consent Decree ¶¶685 and 686

*685. Privilege may not be used to prevent the Monitor from observing training sessions, disciplinary hearings, or other CPD, COPA, or Police Board activities or proceedings that do not involve the provision or receipt of legal advice. The City is not required to provide the Monitor with access to documents or data that is privileged. Should the City or CPD decline to provide the Monitor with access to communications, documents, or data based on privilege, the City or CPD will inform the Monitor and OAG that documents or data are being withheld on the basis of privilege which may, but need not be, in the form of a privilege log. If the Monitor or OAG objects to an assertion of privilege, the Monitor or OAG may challenge the propriety of the privilege assertion before the Court.*

\*\*\*

*686. In coordination with the City's legal counsel, OAG and its consultants and agents will have access to all City and CPD personnel, facilities, training, documents, and data related to this Agreement, except any documents or data protected by privilege. OAG and its consultants and agents will coordinate with the*

*City's legal counsel to access personnel, facilities, training, documents, and data in a reasonable manner that is consistent with OAG's right to seek enforcement of this Agreement and that minimizes interference with daily operations. The City is not required to provide the Monitor with access to communications, documents, or data that is privileged. Should the City or CPD decline to provide OAG with access to documents or data based on privilege, the City or CPD will inform OAG that that documents or data are being withheld on this basis, which may, but need not be, in the form of a privilege log. If OAG objects to a privilege assertion by the City or CPD, OAG may challenge the propriety of the privilege assertion before the Court.*

## Compliance Status

We do not believe that the City has deliberately used privilege to prevent us from accessing events (such as training sessions or meetings), documents, data, or communications "that do not involve the provision or receipt of legal advice" per ¶685. We regularly attend training session. While we have concerns that the production of some materials has been unnecessarily delayed, we continue to note significant improvements regarding the willingness to share confidential information with the IMT on a timely basis.

Further, since the beginning of the Consent Decree, there have also been access issues and disputes between the OAG and the City. We believe that the City and the OAG, collectively the Parties, continue to make progress toward resolving those issues.

### Consent Decree ¶700 and ¶706

**700.** *The City will be responsible for providing necessary and reasonable financial resources necessary through steps or processes that can include the budget process to fulfill its obligations under this Agreement, subject to the terms and conditions set forth herein.*

**706.** *The City is responsible for providing necessary support and resources to CPD to enable CPD to fulfill its obligations under this Agreement.*

## Compliance Status

As we noted in ¶¶677–78, we have significant concerns about the lack of consistent staffing and retention levels within the City and the CPD in areas crucial to the efficient implementation of the requirements of the Consent Decree. The City

and the CPD must continue to make efforts to maintain staffing at appropriate levels at all times in the following key departments: the Research and Development Division, the Force Review Division (now housed in TRED, the Tactical Review and Evaluation Division), the Legal Affairs Division, the Education and Training Division, the Crisis Intervention Team, the Audit Division, the Office of Community Policing, and the Reform Management Group.

By way of an example of resource shortages, when the Consent Decree process began in March 2019, the CPD comprised 13, 319 officers; as of the writing of this report in January 2022, the CPD comprises 11,900 officers.[2] That decrease in officers has drawn attention from elected leaders[3] and appointed leaders.[4] The IMT notes that significant understaffing of officers—particularly supervisors—will add to the challenge the CPD already faces to achieve compliance with the Consent Decree's Unity of Command and Span of Control requirements (*see* ¶¶357–68).

We also have concerns about the investment in the City's and the CPD's data infrastructure, arguably one of the most important investments the City can make toward achieving full and effective compliance (*see* ¶693) because the City bears the burden of demonstrating is compliance by a "preponderance of the evidence" (*see* ¶720).

## Consent Decree ¶711

> **711.** *Nothing in this Consent Decree is intended to (a) alter any of the CBAs between the City and the Unions; or (b) impair or conflict with the collective bargaining rights of employees in those units under the IPLRA. Nothing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate (i) the terms of the CBAs, including any Successor CBAs resulting from the negotiation process (including Statutory Impasse Resolution Procedures) mandated by the IPLRA with respect to the subject of wages, hours and terms and conditions of employment unless such terms violate the U.S. Constitution, Illinois law or public policy, or (ii) any bargaining obligations under the*

---

[2]  *See Sworn CPD Members data dashboard,* OFFICE OF THE INSPECTOR GENERAL, CITY OF CHICAGO (accessed March 22, 2022), https://informationportal.igchicago.org/cpd-sworn-officer-unit-assignments-over-time/.

[3]  *See, e.g.,* Fran Spielman, *City Council member says CPD moving cops from special units back to districts to deal with officer exodus*, CHICAGO SUN-TIMES (January 3, 2022), https://chicago.sun-times.com/news/2022/1/3/22865587/chicago-police-crime-strategy-districts-special-units-officers-retire-brown-beck-napolitano.

[4]  *See Chicago is losing cops at a "significant, almost alarming" rate, deputy mayor says*, CWB-CHICAGO (January 27, 2022), https://cwbchicago.com/2022/01/chicago-is-losing-cops-at-significant-almost-alarming-rate-deputy-mayor-says.html.

> *IPLRA, and/or waive any rights or obligations thereunder. In negotiating Successor CBAs and during any Statutory Resolution Impasse Procedures, the City shall use its best efforts to secure modifications to the CBAs consistent with the terms of this Consent Decree, or to the extent necessary to provide for the effective implementation of the provisions of this Consent Decree.*

## Compliance Status

As explained in our previous reports, the City is a party to collective bargaining relationships with four labor unions representing sworn police officers:

- The Fraternal Order of Police, Chicago Lodge No. 7 (FOP);

- The Policemen's Benevolent & Protective Association of Illinois (PBPA), Unit 156 – Sergeants;

- PBPA of Illinois, Unit 156 – Lieutenants; and

- PBPA of Illinois, Unit 156 – Captains (collectively, the "Unions").

Paragraph 711 of the Consent Decree harmonizes the City's statutory bargaining obligations with the Unions with the City's Consent Decree obligations. Specifically, Paragraph 711 adopts the following key tenets:

- As a threshold matter, the Consent Decree is not intended to alter the City's collective bargaining agreements or otherwise to impair or conflict with the officers' statutory rights to engage in collective bargaining through their chosen representatives (the Unions);

- Likewise, the Consent Decree does not obligate the City (or the Unions) to violate the terms of their collective bargaining agreements, or to violate or waive any bargaining rights or obligations;

- Nevertheless, in recognition of the fact that the City's labor agreements can and will directly impact its compliance with various provisions in the Consent Decree, the Consent Decree obligates the City to "use its best efforts" in the collective bargaining process "to secure modifications" to its collective bargaining agreements covering sworn officers that are consistent with the terms of the Consent Decree or to the extent necessary to implement the provisions of the Consent Decree.

The City's most recent collective bargaining agreements were long expired be-fore the start of the Consent Decree. Throughout the Consent Decree process, the City has been engaged in negotiations with the Unions for successor agreements.

While negotiations continued, the City applied the provisions of the expired agreements.

To monitor compliance with ¶711, the City, the IMT, and the OAG met on a near-monthly basis throughout the fifth reporting period, just as they had done in previous reporting periods, to discuss updates on the City's progress in bargaining successor labor agreements with the Unions.

During these meetings, the City provided access to members of its bargaining committee. These members explained the City's various contract proposals to the Unions, seeking to modify terms in the expired labor agreements to achieve compliance with various Consent Decree provisions. As previously reported, among the most significant of the City's proposals (and, to the Unions, among the most contentious), the City sought to modify the process for receiving and investigating complaints of officer misconduct, including allowing for the investigation of complaints that are anonymous or not backed by a sworn affidavit. *See, e.g.,* ¶¶421, 425, 427, 431, 461, 462, 475, 477, 508, and 514. The City also proposed changes to retain disciplinary records indefinitely, rather than for five years. *See* ¶508.

Throughout much of the parties' negotiations, the Unions consistently rejected these proposed changes. However, shortly following the conclusion of the fourth monitoring period, the City announced that it had reached an "interim agreement" with the FOP to implement a series of "accountability changes" to the parties' collective bargaining agreement.

During the fifth reporting period, the new proposed agreement with the FOP was approved, both by the FOP's membership through a ratification vote and by a majority vote of the City Council. The new eight-year labor agreement reaches back to the expiration of the prior agreement, July 1, 2017, and continues through June 30, 2025.

The new agreement includes a number of changes to the expired agreement specifically aimed at furthering CPD's compliance with various Consent Decree provisions:

- Eliminates the prior ban on anonymous complaints about police misconduct;

- Eliminates the requirement for sworn complainant affidavits, providing instead for an expedited "override" process for anonymous complaints and in situations where the complainant refuses to be identified;

- Removes the requirement to destroy disciplinary records older than five years;

- Allows for broader of use of disciplinary records in cases involving police misconduct;

- Adds language that explicitly requires supervisors to report all misconduct;

- Removes the contract language that was viewed as a "ban" on rewarding/recognizing officers who report misconduct, stating instead that officers who report potential misconduct are acting in the highest traditions of public service.

The new CBA with the FOP, and the extended bargaining that led to it, focused primarily on economics and accountability issues. Since ratification and approval of the new CBA with the FOP, the City and the FOP expect to commence so-called "phase two" negotiations over further issues and potential changes to employment terms. However, as of the end of the fifth reporting period, these phase two negotiations have not progressed, as the parties have instead been largely engaged in disputes pertaining to COVID-vaccine mandates, including various unfair labor practice charges (largely deferred to the parties' grievance and arbitration process) and a recent arbitration, which is now fully briefed and pending decision. The parties are scheduled to meet in February 2022 to begin phase two discussions. The IMT will continue to monitor progress of the parties' further negotiations and additional proposed and agreed changes consistent with Consent Decree obligations.

While the FOP-represented unit is the City's largest, in terms of numbers of represented officers, the City has instituted a number of similar changes to its collective bargaining agreements with the PBPA (the Union that represents sergeants, lieutenants, and captains). As explained in prior monitoring reports, these changes largely came about through a June 26, 2020 Interest Arbitration Board decision, which accepted the City's position with respect to several disputed contract proposals that have a direct impact on Consent Decree provisions. Most notably, the decision confirmed the City's right to use anonymous complaints as a basis for investigations of alleged officer misconduct and accepts the City's position regarding the retention of disciplinary records. The PBPA filed a state court lawsuit seeking to have the Interest Arbitration Board's decision vacated. The Union's state court challenge to the interest arbitration decision remains pending.

## Consent Decree ¶720

> **720.** *At all times, the City will bear the burden of demonstrating by a preponderance of the evidence it has achieved full and effective compliance with the requirements of this Agreement.*

### Compliance Status

To reach compliance with the Consent Decree, the City and the CPD must provide the IMT with sufficient evidence that they are making reforms. The CPD must also demonstrate that it has appropriate resources (*see* ¶¶700 and 706) and procedures that will effectuate timely and sustainable compliance.

We believe that the City understands that it bears the burden of demonstrating compliance with the Consent Decree. In fact, we believe that the City and many of its relevant entities have taken increased ownership over this obligation through large unilateral productions of compliance records. Since the City and its entities have started making these productions, the number of OAG and IMT requests for information has decreased. While there continue to be challenges with the City meeting the remaining requests for productions, the City and the CPD have maintained the level of improvement that they began earlier in the process throughout the fifth reporting period.

# Attachment A:
# Office of the Illinois Attorney General
# Comments
# March 2022



# OFFICE OF THE ATTORNEY GENERAL
## STATE OF ILLINOIS

**KWAME RAOUL**
ATTORNEY GENERAL

March 28, 2022

**SENT VIA EMAIL**

Margaret A. Hickey
Independent Monitor
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
(Maggie.Hickey@afslaw.com)

**Re:** **Comments on the Fifth Independent Monitoring Report**
**Consent Decree, *Illinois v. Chicago*, 17-cv-6260 (N.D. Ill.)**

Dear Ms. Hickey:

The Consent Decree gives the Office of the Illinois Attorney General (OAG) an opportunity to comment on the Fifth Monitoring Report (Fifth Report) before the Independent Monitoring Team (IMT) files it with the Court. The Fifth Report covers a six-month period that saw the City and Chicago Police Department (CPD) make incremental progress on important mandates, but continue to struggle with changing Department culture, building community trust, and moving reforms off paper and into practice in Chicago's communities.

The need for foundational change that precipitated the Consent Decree remains as present as ever. A recent report from the City's Office of Inspector General found that CPD overwhelmingly and disproportionately stopped and used force against Black people.[1] The disturbing findings underscore why the City and CPD must prioritize developing and implementing policies and trainings to end these racial disparities. The OAG is committed to

---

[1] CITY OF CHICAGO OFFICE OF INSPECTOR GENERAL, REPORT ON RACE- AND ETHNICITY-BASED DISPARITIES IN THE CHICAGO POLICE DEPARTMENT'S USE OF FORCE (Mar. 1, 2022), https://igchicago.org/wp-content/uploads/2022/02/Use-of-Force-Disparities-Report.pdf.

500 SOUTH SECOND STREET, SPRINGFIELD, ILLINOIS 62706 • (217) 782-1090 • TTY: (217) 785 -2771 • FAX: (217) 782-7046
100 WEST RANDOLPH STREET, CHICAGO, ILLINOIS 60601 • (312) 814-3000 • TTY: (312) 814-3374 • FAX: (312) 814-3806
1001 EAST MAIN, CARBONDALE, ILLINOIS 62901 • (618) 529-6400 • TTY: (618) 529-6403 • FAX: (618) 529-6416

ensuring that CPD meets its constitutional policing obligations, including equal justice under the law.

## The City and CPD's Progress This Period

The Fifth Report identifies several key steps forward taken by the City and CPD towards compliance with the Consent Decree, including:

- CPD adopted a permanent policy governing foot pursuits, which will be implemented in the summer of 2022;
- CPD's Bureau of Internal Affairs (BIA) finalized several critical accountability-related policies;
- The Civilian Office of Police Accountability (COPA) continued to take a thoughtful approach to meeting its Consent Decree obligations, including by meaningfully incorporating input from its community Working Group into policies and ensuring its intake and investigative staff are trained in trauma-informed techniques;
- The Office of the Inspector General and Public Safety Inspector General maintained full compliance with their responsibilities under the Consent Decree;
- CPD finalized a policy to govern a pilot program testing its performance evaluation system; and
- CPD and the City piloted a new co-responder model for individuals in crisis in several districts.

OAG commends the City and CPD for the important steps forward and urges an increased pace in the coming year.

## The Key Challenges to Full and Effective Consent Decree Implementation

In other key areas of reform, however, CPD made little progress. OAG identifies below five key obstacles to the City and CPD achieving Consent Decree compliance.

### 1. Building Community Trust in CPD

More than three years after the Consent Decree became effective, CPD has struggled at effectively building community trust. CPD's inability to change the continued lack of trust in CPD, especially among those communities most affected by CPD's policies and practices, is a significant concern to the OAG. In nearly every attempt to improve community relations, from revising policies related to impartial policing to Department-wide direction to officers patrolling Chicago's neighborhoods, CPD falls well short.

Despite holding an increased number of meetings with individuals and community organizations with lived experience with policing in Chicago, CPD still failed to make any progress drafting policies that govern officer interaction with members of Chicago's most vulnerable communities. Even where CPD obtained community feedback, it often did not sufficiently incorporate that feedback into the written policy until prompted to do so by the OAG and IMT. For example, CPD and the City continued to struggle to solicit and meaningfully

implement feedback from the Chicago Council on Mental Health Equity on its Crisis Intervention Team policies and procedures. CPD's inability to incorporate community concerns into policy development is particularly concerning because inconsistent feedback mechanisms erode trust building between the City, CPD, and relevant stakeholders.

Furthermore, as OAG has previously expressed, community policing should be a necessary and first step in all aspects of CPD's efforts to serve and protect Chicagoans, not an afterthought superficially tacked on at the end of a process. Yet, as the Report reflects, CPD failed to make meaningful progress this period on nearly every paragraph in the Community Policing section of the Consent Decree. In some instances, CPD did not even provide evidence of what CPD is doing to further its progress. These shortfalls are inexcusable and risk undermining the reforms that CPD is attempting to make across every section of the Consent Decree.

OAG has also raised concerns that CPD's stated goal of recording 1.5 million "positive community interactions" in 2022, without sufficient guidance, training, and data collection methods, may generate counter-productive outcomes. While OAG, the City, CPD, and the IMT continue to work collaboratively towards addressing these concerns, the declared PCI goal exemplifies a troubling pattern of announcing new initiatives before developing sufficient guidance and training for the officers charged with implementing them, and without seeking feedback from community members impacted by these initiatives.

## 2. Lags in Developing Critical Policies and Incorporating Community Input

Policy development is only the first step towards many required reforms, and yet the City and CPD have still not implemented the same critical policies that have been outstanding since March 1, 2019. CPD and the City have yet to put in place policies or procedures related to the following required reforms:

- Independent investigations of officer-involved shootings and deaths that are consistent with the requirements of the Consent Decree;
- Prohibition against sexual misconduct by CPD members;
- Permitting the public to record police officers performing their duties in a public place;
- Respectful and lawful interactions with members of religious communities;
- Requiring effective communication and meaningful access to police services for individuals with physical, mental, or developmental disabilities;
- Providing timely and meaningful access to police services for people with limited ability to speak, read, write, or understand English;
- Mandating developmentally appropriate responses to, and interactions with, youth and children; and
- Mandating use of body-worn cameras consistent with the Consent Decree and state law.

The City and CPD's three-year delay in developing these policies undercuts the limited progress made towards Consent Decree compliance in other areas. Additionally, OAG shares the ongoing concerns expressed by the IMT regarding CPD's lack of community engagement during policy development. In the coming monitoring period, the City and CPD must focus on policy

development, listen to and incorporate community input, and commit to implementing the policies they have promised to develop or revise under the Consent Decree.

### 3. Data Quality Problems and Antiquated Data Collection Practices

CPD and the City cannot achieve full and effective compliance with the Consent Decree until there are robust, auditable data collection systems. Without accurate data, CPD and the City cannot meaningfully evaluate whether reforms implemented under the Consent Decree are working.

In the middle of 2021, CPD disabled its foot pursuit data dashboard and revealed that the data it had collected over the past two years was flawed, causing it to fall out of compliance with certain requirements. Unfortunately, CPD has yet to fix its foot pursuit data collection flaws; in fact, the more CPD worked to uncover the source of the flawed data, the more it revealed challenges in its data collection methods. Similarly, CPD took down its public Use of Force data portal for several months without providing an explanation to the public. With the expected implementation of the new foot pursuit policy in the next several months, and the need for reliable, transparent tracking of use of force data, CPD must quickly rectify its data collection practices.

Data related to foot pursuits is just one example of CPD's challenges to collect and analyze accurate data. CPD's flawed or absent data collection practices hindered Consent Decree compliance across multiple areas. For example, CPD's inability to ensure regular data collection and analysis, including for the use of the Crisis Intervention Report and the timeliness of CPD responses to calls regarding individuals in crisis, has stalled compliance with certain requirements of the Crisis Intervention section. Similarly, CPD was unable to move forward with almost two dozen requirements in the Officer Wellness section because it lacks a technology solution to gather and track the required data.

OAG is also concerned that CPD has not conducted two required data assessments. First, CPD has not begun to assess the frequency of misdemeanor arrests and administrative notices of violation made by CPD officers of persons in specific demographic categories, such as race and gender. OAG is particularly concerned that CPD prepared a draft report nearly two years ago, but "because of internal disagreements over how to present the findings, including large racial disparities, the report was never released."[2] Although CPD reported to the OAG and IMT that it has outsourced this project, CPD has not identified its resource partner. Second, CPD has made no meaningful effort to assess the relative frequency and type of force used by CPD officers against persons in specific demographic categories, including race or ethnicity, gender, age, or disability status. CPD's lack of progress and transparency here is troubling; OAG urges CPD to prioritize conducting these assessments, with methodology approved by the IMT, as soon as possible.

The City and CPD must also prioritize accurate data collection and robust analysis in the coming monitoring period. In particular, the City and CPD must complete the long overdue comprehensive data assessment, identify and validate data CPD currently collects, and create technology solutions to analyze and improve department policies and procedures. Further

---

[2] Fifth Report, Paragraphs 79-82.

inattention to CPD's data reliability problems threatens to stall or even reverse the progress made in multiple sections of the Consent Decree.

### 4. Delays in Reforming CPD Accountability Systems

Reform of the City's police accountability systems is a cornerstone of the Consent Decree. Yet, with few exceptions, CPD remains reluctant to implement functioning, independent, and transparent systems to hold officers accountable for policy violations. While OAG acknowledges that CPD made some progress in finalizing long overdue policies this reporting period, that progress came in a rush at the very end of the reporting period, in late December 2021. The rushed policy development also meant that CPD failed to incorporate any community feedback it received on the policies until OAG and the IMT prompted CPD to do so.

In addition, the Audit Division's Audit of 2020 Investigation Timeframe Requirements raises serious concerns with CPD's ability to collect the data necessary to evaluate the Bureau of Internal Affairs' timeliness requirements under the Consent Decree.

Finally, OAG shares the IMT's concern that the City has not prioritized reform of its policies and practices concerning investigations of officer-involved shootings and deaths. OAG strongly urges the City to prioritize implementing these reforms to ensure that its most complex, public investigations are transparent and consistent with best practices and state law.

### 5. Diversion of Resources

The City has failed to provide sufficient resources to, or in some cases, shifted critical resources away from, CPD units responsible for implementing reform measures, such as the Office of Constitutional Policing and Reform, Office of Community Policing, Force Review Division, and Bureau of Internal Affairs. In some instances, these shifts in resources have even caused CPD to backslide in its level of compliance with some requirements. For example, CPD struggled to make and maintain progress towards Community Policing requirements, and made no progress towards Impartial Policing, in part because of resource deployment issues within the Office of Community Policing.

These diversions of resources raise concerns about whether CPD and the City are adequately prioritizing reform efforts. Reports that, in the summer of 2021, two high-ranking City and CPD officials resigned their positions and alleged a lack of commitment from the City and CPD to embrace meaningful reform further fueled these concerns.[3] The City and CPD must be willing to do the necessary self-examination, and prioritize the appropriate resources, required for real change.

---

[3] Gregory Pratt, *Top Lightfoot public safety adviser resigned amid concerns about city's ability to 'keep moving … forward' on crime prevention and consent decree*, CHICAGO TRIBUNE, Nov. 12, 2021, https://www.chicagotribune.com/politics/ct-chicago-advisor-police-resignation-lightfoot-20211112-ckrktn7rwbce3ainmwiozsgkvi-story.html; Gregory Pratt, Madeline Buckley, *Chicago police leader resigned over 'inability' of department brass 'to even feign interest' in reform, then accused officials of retaliation*, CHICAGO TRIBUNE, Nov. 11, 2021, https://www.chicagotribune.com/news/breaking/ct-chicago-police-consent-decree-reforms-resign-lightfoot-20211111-pdniyih24rgobpw6bmjogwgf4a-story.html.

## <u>Conclusion</u>

The OAG is committed to continuing to collaborate with the City, CPD, IMT, the Coalition, and all community members impacted by CPD's policing practices. As the Consent Decree enters its fourth year, the City and CPD must renew their commitment to building community trust, modernizing data collection systems, and holding officers accountable. OAG looks forward to accelerating progress by CPD on these foundational obligations in 2022.

Respectfully,

KWAME RAOUL
Attorney General of the State of Illinois

By: s/<u>Mary J. Grieb</u>
Mary J. Grieb
Deputy Bureau Chief, Civil Rights Bureau
Office of the Illinois Attorney General
100 W. Randolph St., 11th Flr.
Chicago, Illinois 60601
Phone: 312-814-3877
Email: Mary.Grieb@ilag.gov

cc: Stephen Kane, Zoe Jones, Camilla Krause, and Allan Slagel, Counsel for the City of Chicago; Dana O'Malley, General Counsel for the Chicago Police Department (via email)

# Attachment B:
# City of Chicago Comments
# March 2022



## City of Chicago's Comments on the
## Fifth Independent Monitoring Report

Pursuant to Consent Decree Paragraph 663, the City of Chicago ("City") provides the following comments on the Independent Monitoring Team's ("IMT") March 11, 2022, draft *Independent Monitoring Report 5* ("IMR5 Report"). The City looks forward to continued compliance progress in the next monitoring period.

### Summary of the City's Continued Increase in Compliance

By the close of the fifth monitoring period, just over two and half years into the Consent Decree, the City has achieved at least preliminary compliance with more than 70% of the 525 Consent Decree paragraphs that the IMT has assessed to date. This is a substantial increase from the approximately 50% of paragraphs that achieved at least preliminary compliance in the prior monitoring period. Moreover, this period, nearly 20% of assessed paragraphs have achieved secondary or full compliance. The City's consistently increasing rates of compliance are significant, and the City requests that the IMT more clearly emphasize this achievement in its report.



As written, the introductory sections of the IMR5 Report underemphasize the City's increased levels of compliance and instead focus heavily on areas with challenges, specifically regarding CPD's positive community interactions initiative and its foot pursuit policy. The City understands that positive community interactions with CPD and foot pursuits conducted by the



police are areas of great importance to the IMT, the OAG, Chicago residents, and others who interact with CPD. The City and CPD look forward to working collaboratively with the IMT, the OAG, and community members as the City and CPD work towards reform efforts in these areas.

CPD has already made strides. Regarding positive community interactions, CPD welcomed the IMT's and OAG's feedback and is currently revising its relevant policy. CPD anticipates making several changes adopting much of the feedback received and looks forward to further collaboration. Regarding foot pursuits, after significant engagement with the IMT and OAG, as well as several opportunities to listen to community feedback, CPD revised its foot pursuit policy. CPD anticipates finalizing the policy and in the coming months developing robust training to inform CPD members about the revisions made.

While the City acknowledges that these are important topics, they pertain to only a handful of paragraphs in the Consent Decree. The outsize focus in the IMT's introductory sections detracts from the many achievements and advancements in compliance that the City, CPD, and other entities have made, some of which are highlighted below.

### **IMR5 Achievements**

The City increased the number of paragraphs with some level of compliance by over 100 paragraphs this period—the result of hard work by the many City employees dedicated to public safety reform. This advance in compliance is primarily attributable to finalization of several key policies and the development and delivery of training to ensure that City personnel are trained in line with the requirements of the Consent Decree and best practices.

Some of the notable achievements in the Fifth Monitoring Period include:

- Development and finalization of several CPD accountability policies relating to complaint investigation and disciplinary procedures. CPD also undertook large-scale engagement efforts related to these policies, including external and internal surveys and solicitation of feedback from community organizations.

- Delivery of a full-day training on crisis intervention and mental health issues to Office of Emergency Management & Communications 911 call-taking and dispatch operators. This training addressed answering calls for service which include a mental health component and was delivered in partnership with NAMI Chicago.

- Development and finalization of interagency and Department of Human Resources policies which together achieved or maintained some level of compliance for every paragraph in the Recruitment, Hiring, and Promotion section of the Consent Decree.

- Finalization and delivery of training for COPA personnel on intake and handling of civilian complaints related to police misconduct.

- Robust engagement with the many knowledgeable members of the Chicago Council on Mental Health Equity ("CCMHE") to solicit feedback on CPD's crisis intervention



policies and procedures. CPD plans to implement many of these recommendations and looks forward to learning from and making changes to the recent review process as it goes forward with regular policy reviews with the CCMHE.

- Obtaining from the Court a finding of full compliance for all Consent Decree requirements pertaining to the Office of the Inspector General and Public Safety Inspector General.

The City acknowledges the paragraphs that remain out of compliance, and the City and its entities are working diligently to achieve compliance. As noted throughout the IMR5 Report, for many paragraphs, efforts to achieve preliminary and additional levels of compliance are already underway and are likely to be finalized in the coming months. The City, CPD, and other City entities look forward to working alongside the IMT, the OAG, and other community members to implement sustainable, systemic reforms.

### **Methodologies**

Consent Decree Paragraph 655 provides that the IMT will develop and share with the City and the OAG a proposed methodology for its compliance review. Paragraph 655 allows for the parties to submit comments regarding the methodology, which both the City and the OAG have consistently submitted.

The City recognizes the complexity and difficulty of developing distinct methodologies for several hundred Consent Decree requirements spanning numerous topics and appreciates the IMT's efforts to do so in a thorough manner. The City, however, believes that many of the methodologies delineated by the IMT add substantive requirements beyond the legal requirements stated in the Consent Decree. Other methodologies do not provide adequate detail about the data sources and analysis methods that will be used to assess compliance.

Consent Decree Paragraph 624 provides that the IMT's review will determine whether the City has substantially complied with the Consent Decree. This paragraph further notes that "Compliance with a requirement means that the City and CPD: (a) have incorporated the requirement into policy; (b) have trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) are carrying out the requirement in actual practice." Based on this paragraph, the IMT assess whether the City and its entities are in preliminary, secondary, or full compliance—each of these levels typically mirrors the three subparts of ¶ 642.[1]

Of particular concern for the IMR5 Report is the introductory section of the report, which states that:

> Secondary compliance also refers to creating effective supervisory, managerial, and executive practices designed to implement policies and procedures as written (¶730). The IMT will review and assess the City's documentation—including

---

[1] For certain Consent Decree requirements this three-pronged analysis is less suitable. In those situations, the Monitor develops alternate methodologies for assessing compliance.



reports, disciplinary records, remands to retraining, follow-up, and revisions to policies, as necessary—to ensure that the policies developed in the first stage of compliance are known to, are understood by, and are important to line, supervisory, and managerial levels of the City and the CPD.

This description by the IMT goes beyond the plain language of ¶ 642, which expressly delineates that training of relevant personnel is the standard for assessment for the second level of compliance. The City is concerned that the IMT is instead using requirements for full compliance, *i.e.* assessing whether the City is "carrying out the requirement in actual practice." This is important because it will unfairly delay the City's ability to reach full compliance. It also provides a misimpression to the public as to the efforts the City and its entities have undertaken to comply with the Consent Decree.

Additionally, the City has previously raised concerns that the IMT's methodologies do not provide sufficient detail to allow the City to understand what will be required to achieve compliance. The IMT reports frequently provide specific guidance, which the City and City entities find immensely helpful in planning their compliance efforts. There are, however, several paragraph assessments in the IMR5 Report that do not provide sufficient detail on what materials and information the IMT will rely on to make assessments to allow the City to engage in appropriate planning. As with other methodology issues, this is important because it will delay the City's compliance efforts and may also present a misleading picture to the public regarding the extent to which the City is undertaking the steps required to achieve compliance.

Some concerns related to specific paragraph assessments are addressed below, and further concerns have also been addressed in prior correspondence exchanged between the parties and the IMT. The City intends to continue engaging with the IMT to clearly define and align on the methodologies that will be applied for each assessment. The City therefore reserves the right to provide further responses or objections to the compliance methodologies identified in the IMR5 Report, or the application of any methodology to a specific Consent Decree requirement.

**<u>Specific Comments:</u>**

The City provides the following comments specific to the various sections of the report:

- **Community Policing**:
  - **Paragraph 14**: The City's position is that CPD has demonstrated full compliance. This paragraph states a one-time requirement to conduct a review and revision of Office of Community Policing policies, which CPD has satisfied. Any assessment of CPD's implementation of the policies should be conducted through other paragraphs that contain specific substantive requirements for community-policing related reforms.
  - **Paragraph 22**: The IMT's assessment indicates that operationalizing NPI, relevant training, and evidence of outcomes for increasing non-enforcement community activities are all required for secondary compliance. CPD's position is that the training methodology should be applied for this paragraph. NPI integration and evidence of increased non-enforcement community activities and related outcomes



should be assessed for full compliance. To the extent the IMT does not intend to apply a training methodology for secondary compliance, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.

- o **Paragraph 23**: The IMT's assessment indicates that demonstration of the expansion of community partnerships is required for secondary compliance. This assessment is appropriate for full, not secondary, compliance. CPD's position is that the training methodology should be applied for secondary compliance. To the extent the IMT does not intend to apply a training methodology for secondary compliance for this paragraph, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.

- o **Paragraph 24**: The IMT's assessment indicates that for secondary compliance, the IMT assessed "documentation of partnership efforts." Evidence of partnership expansion is appropriate for full, not secondary compliance. CPD's position is that the training methodology should be applied for secondary compliance. To the extent the IMT does not intend to apply a training methodology for secondary compliance for this paragraph, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.

- o **Paragraph 28**: The assessment indicates that revisions to G02-03 remained under review. These revisions, however, were finalized and evidence of the same was submitted in IMR5.

- o **Paragraph 29**: The City's position is that CPD has demonstrated secondary compliance. The IMT's IMR4 assessment indicated that secondary compliance depended on providing evidence of finalization of policy S02-01-03, which CPD finalized in IMR5.

- o **Paragraph 31**: The IMT's assessment indicates that for secondary compliance, "CPD must demonstrate supervisory oversight." CPD's position is that the training methodology should be applied for secondary compliance. To the extent the IMT does not intend to apply a training methodology for secondary compliance for this paragraph, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.

- o **Paragraphs 39, 40**: These paragraphs state one-time requirements. The City therefore requests modification to the assessments to so reflect, including removing references that training will be required to achieve the next level of compliance. Ongoing policy revision and training is relevant to Paragraphs 41 and 42, rather than 39 and 40.

- o **Paragraph 43**: The IMT's assessment for this paragraph states that "to achieve full compliance the IMT expects the CPD to establish a process for the annual review and update of the curriculum, and to assess efficacy." This methodology is inconsistent with the text of this paragraph, which provides a discrete, rather than ongoing, requirement.

- **Impartial Policing**:
  - o **Paragraphs 55, 56**: The IMT assessment lists three deliverables needed for secondary compliance. Items 2 and 3 are appropriate for full, rather than secondary, compliance. CPD's position is that the training methodology should be applied for secondary compliance. To the extent IMT does not intend to apply a training methodology for secondary compliance for this paragraph, the City seeks additional



clarification in the assessment as to the reasoning for deviation from the standard methodology.

o **Paragraph 58**: The IMT's assessment indicates that it will assess secondary compliance based on training and implementation in practice. CPD's position is that assessment of implementation in practice should be applied for full, not secondary, compliance. To the extent the IMT does not intend to apply a training methodology for secondary compliance for this paragraph, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.

o **Paragraph 62**: The IMT's assessment indicates that for secondary compliance, the IMT will assess officer responses and evaluation of effectiveness. CPD's position is that this evaluation is appropriate for full compliance, and the training methodology should be applied for secondary compliance. To the extent the IMT does not intend to apply a training methodology for secondary compliance for this paragraph, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.

o **Paragraph 66**: The City's position is OEMC has demonstrated secondary compliance with this paragraph. Consistent with the paragraph's requirements, OEMC has developed materials consistent with CPD's existing policy. In addition, the characterization regarding lack of supervisor training is incorrect. All roll call trainings are filed in the supervisor's office, supervisors are present for roll call training, and most roll call training is given by supervisors.

o **Paragraph 72**: The City and CPD's position is that it has demonstrated Preliminary compliance with this paragraph with the development of S11-10, S11-10-01, and S11-10-02. The concepts of impartial policing are included in those directives, and the assessment of whether the concepts have been integrated into the training curriculum are appropriate for Secondary, not Preliminary, compliance.

o **Paragraph 73**: The IMT's assessment indicates that for full compliance, the IMT intends to evaluate whether "CPD members are engaging in procedurally just behaviors on the street." This methodology goes beyond the scope of the paragraph, which requires only that CPD deliver procedural justice training.

o **Paragraphs 74 and 77**: The City and CPD's position is that it has demonstrated Preliminary compliance with these paragraphs with the development of S11-10-03. The concepts of impartial policing are included in this directive, and the assessment of whether the concepts have been integrated into the training curriculum are appropriate for secondary, not preliminary, compliance.

- **Crisis Intervention**:
  o **Executive Summary**: The Executive Summary for the Crisis Intervention section lists several pages of bullet points of areas it expects the City and City agencies to address in the coming reporting period. While the City appreciates this clear direction, please consider revising the language to reflect that not all of these items can be feasibly accomplished in a single reporting period. For example, given review timelines, CPD is unlikely to develop, finalize, and administer training in a single reporting period. Please consider revising the language to reflect these as goals for the next year or the next few reporting periods.
  o **Executive Summary**: The Executive Summary for the Crisis Intervention section states that the lack of a Refresher training has "weakened, and in many cases nulled, any semblance of a specialized response." While the City and CPD agree



that refresher training for CIT-Certified Officers will strengthen the program, the IMT's comment is stated in very strong terms. The City would appreciate additional information on what evidence the IMT is relying on for this statement.

o **Paragraph 87**: The narrative for Paragraph 87 states that the CIT "SOPs have not been subject to any public comment." Please clarify that these have not been subject to the 15-day public comment period. As noted by the IMT, these SOPs have been the subject of significant public engagement via the CCMHE.

o **Paragraph 88, 93, 104, 106, 113, 114, 133, 134, 135**: The IMT's assessment for these paragraphs indicates that for secondary compliance, the IMT will consider and assess outcome metrics. This methodology is appropriate for full, rather than secondary, compliance. CPD's position is that the training methodology should be applied for secondary compliance. To the extent the IMT does not intend to apply a training methodology, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.

o **Paragraph 91**: The narrative for this paragraph states that data, in addition to training, will be used to assess secondary compliance. CPD's position is that solely the training methodology should be applied for secondary compliance. To the extent the IMT does not intend to apply solely the training methodology, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.

o **Paragraph 97, 99**: The narratives for these paragraphs state that to achieve full compliance, CPD must administer refresher training to all Certified CIT Officers. This is not achievable in a time period that would allow for full compliance with the Consent Decree in an 8-year period. The City and CPD respectfully request that full compliance be measured by the CPD showing that it has a plan and procedure to provide refresher training for all officers, and that ongoing full compliance be measured by execution of this plan.

o **Paragraph 108, 109**: CPD acknowledges that it must draft and finalize its CIT Officer Implementation Plan. Completion of this plan, however, should satisfy full compliance rather than secondary. Implementation of the plan is addressed in Paragraph 110.

o **Paragraph 137**: This paragraph states a one-time requirement to revise policies. The narrative for this paragraph, however, provides that only preliminary compliance will be achieved with the revision of all CIT policies and procedures. Full compliance should be achieved at the completion of this process. Ongoing, annual review is covered separately by Paragraph 89.

o **Paragraph 139**: The City and OEMC request that the narrative for this section be amended to provide more clarity on the following details. First, a "Z" code is assigned to an event by CPD. OEMC dispatchers annotate that code on the event history, usually near the end of a call for service. Second, event types are assigned by OEMC. Call takers assign the *mental health disturbance* event type to a mental health crisis call for service. After that initial identification, CARE service is then considered. And, third, a "Y/N" response to the "weapons present?" question is captured in the triage diagram used by call takers. The details of "weapons present?" are then captured in the notes section. OEMC's current methodology for capturing weapons data allows flexibility needed for unique responses, while also



quickly providing information for officers to review on their portable data terminals (PDTs).

- **Use of Force**:
  - **Paragraph 158, 209**: Please consider listing secondary compliance as under assessment, as the 2021 Use of Force training was approved by the IMT and OAG and was administered, what remains is for CPD to provide proof of member attendance.
  - **Paragraphs 185, 186, 189**: Please consider listing full compliance as under assessment, as the narratives for these paragraphs suggest that the IMT is currently continuing to assess full compliance.

- **Recruitment Hiring and Promotion**:
  - **Paragraph 253**: The IMT's assessment indicates that for secondary compliance, the IMT intends to evaluate evidence of policy implementation. The City's position is that evidence of implementing guidance (*i.e.*, the training methodology), should apply for secondary compliance. To the extent the IMT does not intend to apply a training methodology, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.
  - **Paragraph 254**: The City and CPD request additional clarification in the narrative as to the IMT's assessment methodologies for Secondary compliance.
  - **Paragraph 262**: The IMT's assessment indicates that for secondary compliance, the IMT intends to evaluate whether the implementation plan is completed, shared, approved, and implemented. However, this is inconsistent with the IMT's proposed methodologies, which state that secondary compliance will be achieved when the implementation plan is developed, and full compliance will be achieved with the implementation plan is developed and implemented.
  - **Paragraph 264**: The IMT's assessment indicates that, to reach secondary compliance, CPD must demonstrate that it has fully implemented its policies and strategies to increase transparency; however, the assessment also states that a training methodology will be used to assess Secondary compliance. This is inconsistent with the IMT's proposed methodologies, which states that secondary compliance will be achieved when the implementation plan is developed, and full compliance will be achieved with the implementation plan is developed and implemented.

- **Training**:
  - **Paragraph 281**: The City's position is that it has demonstrated preliminary compliance with this paragraph. The preliminary compliance methodology for this paragraph is policy. Per the IMT's methodology key, assessment sources include "public postings. . . ; City, the CPD, and other relevant City entity websites and public postings." The City's website related to the facility meets this definition and is a public commitment to provide a facility meeting the requirements of Par. 281. The narrative for this paragraph states that "a formal policy statement committing the City and the CPD to ¶281 requirements would



help substantiate preliminary compliance." The website is a formal, public declaration that the City is committed to providing adequate training facilities and should be sufficient. The narrative also suggests that a survey of training facility users may be needed for preliminary compliance, however, the paragraph does not call for this nor is it consistent with the policy methodology. Additionally, the IMT's narrative suggests that "a Resolution by the Governing Body attesting to the City's commitment to ¶281 requirements" would demonstrate preliminary compliance. Mandating action by City Council is both not within the City's control and goes beyond the bounds of the plain text of the requirement.

o **Paragraph 286**: This paragraph does not state any assessable requirement and should be removed from assessment.

o **Paragraph 294**: The narrative for this paragraph does not explain why CPD lost compliance. As CPD did not rescind the materials that previously led to compliance, the previous finding of preliminary compliance should remain intact.

o **Paragraphs 300, 303, 304, 305, 306, 307, 329**: The IMT's assessments indicate that for secondary compliance, the IMT intends to evaluate implementation of policy requirements. CPD's position is that the training methodology should be applied for secondary compliance. To the extent the IMT does not intend to apply a training methodology, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.

o **Paragraph 308**: The methodologies for preliminary and secondary compliance appear to be the same in this assessment. CPD's position is that for preliminary compliance, the policy methodology should be applied, and for secondary compliance, the training methodology should be applied for this paragraph. To the extent the IMT does not intend to apply these methodologies, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.

o **Paragraph 309**: The IMT's assessments indicate that for secondary compliance, the IMT intends to evaluate whether "a full training cycle has completed with ¶309 required documentation." CPD's position is that the training methodology should be applied for secondary compliance. Proof of completion of required reports for the training cycles is evidence of implementation that should be assessed for full compliance.

o **Paragraph 320**: This paragraph states that CPD has lost compliance. Because the deadline by which to demonstrate continued compliance with this paragraph has not yet passed, CPD has not yet lost secondary compliance with this paragraph. Secondary compliance should remain in place unless and until CPD is no longer able to demonstrate compliance by the deadline for this paragraph. Further, having multiple consecutive periods of compliance supports full, and not just secondary, compliance.

o **Paragraph 339**: The City's position is that CPD has maintained preliminary compliance with this paragraph, as the materials memorializing the requirements of this paragraph remain active.



- **Supervision**
  - **Paragraph 352**: The IMT's assessment indicates that for secondary compliance, the IMT intends to evaluate "whether CPD has a plan to track, measure, and show compliance with the requirements of this paragraph." CPD's position is that the training methodology should be applied for secondary compliance, and these metrics are more applicable to full compliance. To the extent the IMT does not intend to apply a training methodology, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.
  - **Paragraph 353**: The IMT's assessment indicates that for secondary compliance, the IMT intends to evaluate data as well as whether supervisors are operating in compliance with policy. CPD's position is that the training methodology should be applied for secondary compliance, and these metrics are more applicable to full compliance. To the extent the IMT does not intend to apply a training methodology, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.
  - **Paragraph 355**: The IMT's assessment indicates that for secondary compliance, the IMT intends to evaluate "supervisory logs" and "data that demonstrates informative engagement with supervisors and those serving under their command." CPD's position is that the training methodology should be applied for secondary compliance, and these metrics are more applicable to full compliance. To the extent the IMT does not intend to apply a training methodology, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.
  - **Paragraph 372, 373, 374, 375,** : The IMT's assessment indicates that for secondary compliance, the IMT intends to evaluate data sources. CPD's position is that the training methodology should be applied for secondary compliance, and these metrics are more applicable to full compliance. To the extent the IMT does not intend to apply a training methodology, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.

- **Officer Wellness and Support**:
  - **Paragraph 412**: The IMT's assessment states that the IMT will continue to look for a finalized S11-10, however, S11-10 was finalized and produced during IMR5. Therefore, the City and CPD's position is that CPD has achieved Preliminary compliance with this paragraph.
  - **Paragraph 413**: The IMT's assessment states that the IMT will continue to look for a finalized S11-10, however, S11-10 was finalized and produced during IMR5. The IMT's assessment also states that "delivery of training is a requirement to reach Preliminary compliance." CPD's position is that delivery of the training is required to achieve secondary, not preliminary, compliance. Therefore, the City and CPD's position is that CPD has achieved preliminary compliance with this paragraph. To the extent IMT does not intend to apply a training methodology, the City seeks additional clarification in the assessment as to the reasoning for deviation from the standard methodology.



- **Accountability and Transparency**:
  - **Paragraph 435**: The narrative for this assessment states that CPD did not adequately incorporate this requirement into policy. Section III of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment* states that "The Department will courteously receive and accept all complaints regardless of how or from whom the complaint was received, such as complaints received verbally, in writing, in person, by telephone, or online, by a Department member, member of the public, anonymous complainant, or third-party representative. The Department will ensure all non-confidential complaints are documented and submitted to the Civilian Office of Police Accountability (COPA) within 24 hours of receiving the complaint" and Section III.A.2 provides that "If the complaint includes that a Department member refused to accept a complaint, discouraged the reporting of the complaint, or provided false or misleading information about reporting a complaint, the documentation of the complaint will include these allegations in addition to the original allegations." Together these encompass the requirements of this paragraph, and the City and CPD should therefore be in preliminary compliance.
  - **Paragraph 469**: The narrative for this assessment states that CPD did not adequately incorporate subsection (b) of this requirement into policy. In G08-01-03, *Conflict of Interest*, the definitions in Section II and the provisions of Section III cover the requirements of subsection (b) and others for the paragraph. The City and CPD should therefore be in preliminary compliance.
  - **Paragraph 471, 472, 474**: Because the methodology for secondary compliance for these paragraphs is the training methodology, CPD requests clarification in the assessment that administration of training will be used to assess secondary compliance and implementation, including completion of audits, should be used to assess full compliance.
  - **Paragraph 526, 527, 528**: Because CPD has incorporated the requirements of these paragraphs into finalized policy, it should be deemed in preliminary compliance. The narrative notes that a training plan is required for preliminary compliance. A training plan, a finalized training, and evidence of administering training support the training methodology and should instead be considered for secondary compliance.
  - **Paragraph 543**: On February 15, 2022, the City and the Police Board submitted a letter explaining that the Police Board cannot comply with Paragraph 543 as written because it contradicts municipal law. The City and the Police Board request that this Paragraph be removed from assessment in the IMR5 report and instead be assessed for the first time in the IMR6 report when the parties have had a chance for further discussion. If the IMT leaves this paragraph in the IMR5 report, the City and the Police Board request that it be noted as under assessment and that the narrative be updated to remove reference to the requirement for a policy demonstrating compliance, as this is not possible.
  - **Paragraph 550**: The IMT noted that compliance was withheld for COPA because its quarterly report lacks the data required by ¶ 550(c)(i). COPA's 2021 Annual Report and Q3 2021 Report include the data called for by 550(c)(i). COPA



acknowledges that though the reports were provided, the area containing this data was not highlighted.  It can be found on the Annual Report in the first paragraph of page 20 and the Quarterly Report in the first paragraph of page 13.

Independent
Monitoring Team | Chicago Police
Department
Consent Decree