

Independent Monitoring Team | Chicago Police Department Consent Decree

# Monitoring Plan
*Year Four*
*July 1, 2022, through June 30, 2023*

Report Date: November 2, 2022

## Table of Contents

Introduction and Year Four Priorities ..................................... 1

Monitoring in Year Four ....................................... 15

Conclusion and Looking Ahead ........................................... 20

Appendix A. The Consent Decree and
the Independent Monitoring Team ..................................... 22

*** 

**MONITORING PLAN FOR YEAR FOUR - FIGURES**

FIGURE 1: REPORTING PERIODS FOR YEARS ONE THROUGH FOUR.......................1

FIGURE 2: MONITORING PLAN FOR YEAR FOUR PARAGRAPHS
(ALL MONITORABLE PARAGRAPHS) .............................................14

FIGURE 3: CONSENT DECREE REQUIREMENTS FOR THE IMT .............................17

# Introduction and Year Four Priorities

As the Independent Monitoring Team (IMT), we assess the City of Chicago's (City's) compliance with the requirements of the Consent Decree.[1] Specifically, we assess how relevant City entities—including the Chicago Police Department (CPD); the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General, including the Deputy Inspector General for Public Safety; and the Office of Emergency Management and Communications—are complying with the Consent Decree.

This is our Monitoring Plan for Year Four of the Consent Decree (July 1, 2022, through June 30, 2023). It includes our projected assessments and tasks for the seventh and eighth reporting periods and builds on our Monitoring Plans for Years One, Two, and Three.[2]

Figure 1: Reporting Periods for Years One through Four

| Monitoring Plan for Year One | |
|---|---|
| 1st Reporting Period | March 1, 2019 – August 31, 2019 (*See* Independent Monitoring Report 1) |
| 2nd Reporting Period | September 1, 2019 – February 29, 2020 (*See* Independent Monitoring Report 2) |
| **Monitoring Plan for Year Two** | |
| 3rd Reporting Period | March 1, 2020 – December 31, 2020[3] (*See* Independent Monitoring Report 3) |
| 4th Reporting Period | January 1, 2021 – June 30, 2021 (*See* Independent Monitoring Report 4) |
| **Monitoring Plan for Year Three** | |
| 5th Reporting Period | July 1, 2021 – December 31, 2021 (*See* Independent Monitoring Report 5) |
| 6th Reporting Period | January 1, 2022 – June 30, 2022 (Independent Monitoring Report 6, Autumn 2022) |
| **Monitoring Plan for Year Four** | |
| 7th Reporting Period | July 1, 2022 – December 31, 2022 (Independent Monitoring Report 7, Spring 2023) |
| 8th Reporting Period | January 1, 2023 – June 30, 2023 (Independent Monitoring Report 8, Autumn 2023) |

---

[1] Background on the Consent Decree and the IMT, including our full organizational chart, is available in Appendix A.

[2] Our previous monitoring plans are available on our website. *See* Reports, INDEPENDENT MONITORING TEAM, https://cpdmonitoringteam.com/reports/.

[3] Because of the early shutdowns in response to COVID-19, the City and the Office of the Illinois Attorney General extended the third reporting period to December 31, 2020. *See* Order Regarding the Extension of Consent Decree Obligation Deadlines (March 27, 2020), https://cpd-monitoringteam.com/wp-content/uploads/2020/04/2020_03_27-Order-Regarding-the-Extension-of-Consent-Decree-Obligation-De....pdf.

## Year Four Priorities

At the end of Year Three, we began to assess the City's compliance with *all paragraphs with requirements* in the Consent Decree or "monitorable paragraphs." we will continue to assess all monitorable paragraphs in each six-month reporting period of Year Four and in the years ahead. *See* Figure 2. Our assessments will also include whether the City is on course to reach compliance—and demonstrate sustainable compliance—with all requirements by the end of Year Eight.[4]

In Year Four, we will continue to prioritize issues to facilitate the City's and the CPD's ability to reach compliance as efficiently as possible. We will do this in regular consultation with the City, the CPD, other relevant City entities, the Office of the Illinois Attorney General, the Coalition, and other stakeholders and members of Chicago's communities[5] We will also closely monitor challenges that have continued from previous years or that emerge in Year Three.

In ¶6 of the Introduction section of the Consent Decree, the City made commitments that help frame many of the issues facing reform efforts today:

> In this [Consent Decree], the City commits to
>
> ensuring that police services are delivered to all of the people of Chicago
>
> in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois,
>
> [in a manner that] respects the rights of all of the people of Chicago,

---

[4]   *See* ¶657 (requiring the IMT to "conduct a comprehensive assessment to determine whether and to what extent the City and CPD are in compliance with [the Consent Decree], whether the outcomes intended by [the Consent Decree] are being achieved, and whether any modifications to [the Consent Decree] are necessary in light of changed circumstances or unanticipated impact (or lack of impact) of the requirements."). *See also* ¶¶714–15. *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022) ("[T]he City agrees to endeavor to achieve full and effective compliance by the end of the 16th reporting period (June 30, 2027), eight years after the effective date of the Consent Decree."), https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timelin._.pdf.

[5]   *See* ¶669 ("The Parties have entered into a Memorandum of Agreement ('MOA') with certain community organizations that have established a broad-based community coalition ('Coalition') committed to monitoring, enforcing, and educating the community about this Agreement. No less frequently than quarterly, the Monitor will participate in meetings with the Coalition, as provided in Paragraph 9 of the MOA.").

> *[in a manner that] builds trust between officers and the communities they serve, and*
>
> *[in a manner that] promotes community and officer safety.*
>
> *The City also commits to providing CPD members with the resources and support they need, including improved training, supervision, and wellness resources.*

The CPD is—along with police departments across the nation—continuing to face significant challenges with meeting these commitments. Staffing and resource issues, for example, have negatively affected the City's and the CPD's progress toward simultaneously and sufficiently providing training, supervision, and officer-wellness. This, in turn, has undermined the City's and the CPD's ability to demonstrate effective policing practices that respect the rights of all of the people of Chicago; build trust between officers and the communities they serve; and promote community and officer safety.

As explained further in the following pages, we have identified several interrelated categories of priorities for Year Four:

(1) Staffing, Resources, and Deployments

(2) Community, Impartial, and Effective Policing
(including routine and spontaneous law enforcement decisions and strategies)

(3) Community Policing and Trust Building

(4) Efficient Data Collection, Management, and Analysis

(5) Consistent and High-Quality Training

(6) Officer Wellness

(7) Compliance with the Police and Community Relations Improvement Act (PCRIA)

(8) Compliance Efforts that Remain behind Schedule from Previous Years and Demonstrating Compliance in Practice and on the Street

### (1) Staffing, Resources, and Deployments

As an overarching issue affecting all areas of the Consent Decree, CPD staffing shortages continue to slow the CPD's compliance progress. Recent staffing shortages in the Office of Constitutional Policing and Reform, for example, threaten to undermine critical reform efforts from the Education and Training Division and the Tactical Response and Evaluation Division, which are responsible for key internal tracking and oversight functions. We will continue to monitor the City's and the City's ability to address these issues.

Likewise, in the previous three years of the Consent Decree, we have observed a pattern where the CPD makes significant progress with the Consent Decree, which then diminishes as the CPD shifts resources toward deployments and unspecified crime-reduction strategies. In Year Four, we will monitor the City's and the CPD's efforts to create and implement strategies where reform and effective-policing efforts are aligned and mutually beneficial.

### (2) Community, Impartial, and Effective Policing
   *(including routine and spontaneous law enforcement decisions and strategies)*

The City, the CPD, and the OAG entered into the Consent Decree "to ensure that [(1)] the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety[; and (2)] that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely." ¶2.

To this end, we will monitor the CPD's efforts to "ensure that its community policing philosophy is a core component of its provision of police services, crime reduction strategies and tactics, training, management, resource deployment, and accountability systems." We will also monitor the CPD's efforts to ensure that the "CPD will prohibit officers from using race, ethnicity, color, national origin, ancestry, religion, disability, gender, gender identity, sexual orientation, immigration status, homeless status, marital status, parental status, military discharge status, financial status, or lawful source of income when making routine or spontaneous law enforcement decisions, except when such information is part of a specific subject description." ¶55.

While routine interactions with law enforcement agencies often do not receive the same level attention as more visible interactions (such as uses-of-force incidents), routine interactions can have a great impact on perceptions of police. The City and

the CPD will need to ensure that such routine interactions, such as traffic stops, are conducted fairly and free from prohibited bias.

Various paragraphs in the Consent Decree reflect the importance of community and impartial policing across all police interactions and must be incorporated into all operational policies and training. This includes, for example, the following:

❖ Determining the effectiveness of CPD department-wide and district-level crime reduction strategies by reduction in crime and not by the number of arrests, stops, or citations (¶17);

❖ Partnering with community-based organizations with participants that represent a racially, geographically, and socio-economically diverse cross section of Chicago youth (¶27);

❖ Fair, unbiased, and respectful interactions with victims of crime (¶29);

❖ Developmentally appropriate interactions with children and youth (¶32);

❖ Positive and procedurally just communication (¶54);

❖ Interactions with transgender, intersex, and gender non-conforming individuals (¶61);

❖ Interactions with people with disabilities (¶¶69–70); and

❖ Misdemeanor arrests and administrative notices of violation (¶¶79–82).

Likewise, in March 2022, the City, the CPD, the OAG, and the IMT agreed to a stipulation regarding practices around search warrants.[6] As clarified by the Stipulation, the City and the CPD must demonstrate that the search-warrant practices (1) are not unlawfully discriminatory or retaliatory and (2) occur in an unbiased, fair, and respectful manner. Specifically, the CPD must implement sufficient policies, training, data collection, supervision, and accountability systems to ensure that the CPD's planning for, internal approval processes for, execution of, and after-action review of search warrants are carried out in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois and are in accordance with best practices.[7] This topic will continue to be a focus in Year Four.

---

[6]  *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timelin.._.pdf.

[7]  The Parties further agreed that the City and the CPD must also continue to fulfill other Consent Decree requirements during the planning for, internal approval processes for, execution of, and after-action review of search warrants. The following is a non-exhaustive list of Consent Decree

### (3) Community Engagement and Trust Building

To build and maintain trust—and to measure effectiveness with reforms and policing strategies—the CPD must engage with Chicago's communities. This must include populations most likely to interact with the CPD. In 2019 and 2020, we conducted a survey that, among other things, reflected that young Black and Latino men in Chicago report having the highest frequency of contact with police *and* the most negative perception of police and lowest levels of trust in police.[8] In 2020 and 2021, we conducted focus groups with young Black and Latino men in Chicago.[9] While the specific feedback we received from these focus groups were not meant to be representative of the experiences, opinions, and perspectives of all young Black and Latino men in Chicago, much of what was indicated by participants was consistent with what we learned from this population in the *2020 IMT Community Survey*.

Effective and sustainable police reform requires adherence to the principles of community engagement. As a result, the City and the CPD must ensure that the input of the community—including the members of the Coalition (¶669)—is sought, respected, and incorporated into the development of policy, training, and operations. This will include going beyond current efforts—such as the Positive Community Interactions initiative—to more effectively measure and respond to community sentiment.

In Year Four, we will build upon our assessments in Year Three to evaluate the CPD and the City's requisite community engagement efforts related to various issues of the Consent Decree. This will include issues related to the following topics:

---

paragraphs that the CPD must continue to comply with during the execution of warrants: ¶¶32 (regarding developmentally appropriate interactions with youth and children), 35 (regarding Miranda warnings for juveniles), 36 (regarding the use of handcuffs or other restraints on juveniles), 37 (regarding training on problem-solving tactics and effective communication/interpersonal skills), 156 (regarding use-of-force policies and training; supervision; and accountability systems), 157 (regarding the collection, analysis, and use of information on the use-of-force and de-escalation techniques by CPD officers), 162 (regarding providing people with the opportunity to comply with lawful orders), 164 (regarding only using force that is objectively reasonable, necessary, and proportional), 189 (regarding pointing a firearm), 238 (regarding the need to record video and audio of law enforcement activities), 352 (regarding effective supervision requirements for all supervisors), 509 (regarding related Central Management System requirements), 546 (regarding annual report requirements), and 550 (regarding annual and quarterly report requirements).

[8] *See, e.g.*, *Community Survey Report*, Independent Monitoring Team (August 26, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/08/2020_08_26-Community-Survey-Filed.pdf.

[9] *See Special Report: Focus Groups with Black and Latino Men, Ages 18–35 (Conducted December 2020 – June 2021)*, Independent Monitoring Team (September 1, 2022), https://cpdmonitoringteam.com/overview/reports-and-resources/imt-special-report-focus-groups-with-black-and-latino-men-ages-18-35/.

- ❖ Crime reduction strategies (¶15);

- ❖ Meetings between district representatives and community stakeholders (¶24);

- ❖ Youth and children (¶33);

- ❖ Policing efforts and strategies (¶¶46–47);

- ❖ Policies and training (¶52);

- ❖ Search Warrants (¶¶53–55);

- ❖ Crisis Intervention training (¶¶99, 122, 130);

- ❖ Crisis intervention-related strategies (¶115);

- ❖ Mental health advisory committee (¶¶129–31);

- ❖ Use of Force policies (¶160);

- ❖ First Amendment activities (¶163);

- ❖ Foot Pursuits (¶172);

- ❖ Accountability and transparency (¶¶421–22, 424, 546); and

- ❖ The Police Board (¶531).

*(4) Data Collection, Management, and Analysis*

The City and the CPD's ability to efficiently collect, analyze, and utilize data to make evidence-based decisions and demonstrate compliance will continue to be a primary focus in Year Four.

The Consent Decree requires the City and the CPD to accurately report on, collect, manage, and analyze data regarding its police practices. This includes, for example, requiring the CPD to "review and, as necessary, revise departmental forms relating to[ for example] use of force" to "improve the accuracy, reliability, and efficiency of its data collection." ¶609. Investing in improved data-collection and efficiency will, in the long run, save the City and the CPD time and resources; identify and resolve otherwise unidentifiable problems; and ultimately, demonstrate compliance within the CPD and for the OAG, the IMT, the Court, and Chicago's communities. As an initial step to achieve this goal, the City and the CPD will need to develop and follow through with a plan to address data-collection needs based on their "assessment of CPD's current information collection mechanisms and data management technology." ¶606–07.

In all sections of the Consent Decree, the City and the CPD are required to incorporate updated data collection forms, processes, and analysis. This includes data collection of, for example, the following:

❖ Misdemeanor arrests and administrative notices of violation (¶¶79–82);

❖ Objectives and functions of the Crisis Intervention Team Program (¶91);

❖ Crisis Intervention Team events (¶¶107–08, 118);

❖ Crisis Intervention Team officer coverage (¶111–12);

❖ Office of Emergency Management and Communications data related to Crisis Intervention (¶149);

❖ Ongoing force assessments and associated use-of-force data (¶¶157, 217, 568–72);

❖ Foot pursuits (¶¶168–69);

❖ Pointing of a Firearm (¶¶190 and 192);

❖ Recruitment and hiring assessment (¶259);

❖ Training audits (¶288);

❖ CPD training tracking system (¶290);

❖ Effective supervision and supervisory decision-making (¶353–55);

❖ Staffing models (¶¶365–67);

❖ Performance evaluations (¶¶369–72);

❖ Compliance with Officer Support Systems Plan (¶389);

❖ Administrative investigations (¶¶438 and 440), including the Case Management Systems (¶¶505 and 509);

❖ Accountability satisfaction surveys (¶483);

❖ CPD's Annual Report (¶546);

❖ CPD's Annual Litigation Report (¶548);

❖ CPD and COPA quarterly and annual accountability reports (¶550);

❖ Accountability audits (¶¶553 and 558);

❖ Audits of body-worn camera and in-car camera recordings (¶576);

❖ Officer Support System (¶¶584–85, 588, and 597); and

❖ Information Systems Data Group (¶608).

While the City's and the CPD's successful implementation of the Consent Decree requires reliable data collection, maintenance, and analysis, data validation functions are not yet fully in place. The City and the CPD's ongoing data-validation efforts will continue to be a priority for the IMT in Year Four.

Notably, the CPD relies on use-of-force data for a number of Consent Decree paragraphs (¶¶568–69, 571–74, 581–82, and 587). The CPD continues to work to ensure the underlying force data points are reliable. For example, the CPD's Tactical Review and Evaluation Division (TRED), among other things, analyzes the CPD's use-of-force practices and related reporting and review procedures based on field-level data collected via the Tactical Response Report. TRED continues to make advisements and recommendations regarding improved reporting.[10] Moving forward, we look forward to receiving a plan from the CPD to demonstrate the accuracy and reliability of this data to meet these requirements.

Finally, in addition to ensuring reliable data, the CPD will need to make better use of the data the CPD has. For example, the CPD has not, per ¶79, annually "conduct[ed] an assessment of the relative frequency of all misdemeanor arrests and administrative notices of violation ('ANOVs') effectuated by CPD members of persons in specific demographic categories, including race and gender." Likewise, the CPD has not made any progress with ¶572, which requires the CPD to

> regularly review citywide and district-level data regarding reportable uses of force to:
>
> a. assess the relative frequency and type of force used by CPD members against persons in specific demographic categories, including

---

[10] *See Tactical Review and Evaluation Division Reports*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/statistics-data/statistical-reports/tactical-review-and-evaluation-division-reports/. TRED was formerly known as the Force Review Unit and the Force Review Division. TRED is responsible for, among other things, "effectively analyz[ing] and assess[ing] CPD's use of force practices to include foot pursuits and firearm pointing incidents and related reporting and review procedures; conduct trend analysis based on use of force data; identify tactical, equipment, training, or policy concerns based on analysis of use of force incidents and data; and develop recommendations regarding modifications to tactics, equipment, training, or policy as necessary to address identified practices or trends relating to the use of force." *See* ¶575.

We are also concerned about the backlog of cases relating to uses of force that have yet to be reviewed and analyzed by TRED. Without conducting timely reviews and data validation, TRED simply cannot achieve its mission.

> *race or ethnicity, gender, age, or perceived or known disability sta-*
> *tus; and*
>
> *b. identify and address any trends that warrant changes to policy,*
> *training, tactics, equipment, or Department practice.*

### (5) Consistent and High Quality Training

As stated previously, the City and the CPD have made progress in creating policies and procedures related to the reforms required by the Consent Decree. While further work is still required to bring all paragraphs into Preliminary Compliance, we will also continue to evaluate whether City and CPD representatives are being effectively trained in the reforms.

As we have noted in our monitoring reports, the CPD's Education and Training Division is at the heart of many Consent Decree requirements. While we realize that training thousands of officers is a massive effort, sustainable reform requires consistent high-quality training provided by qualified instructors.

The Consent Decree requires at least 40 hours of in-service training this year (¶320), and we will focus on whether that training is completed and at sufficient quality. The training must also be accurately tracked (*see* ¶290) and conducted in accordance with the CPD's *Training Plan* (¶319) by appropriately qualified instructors (¶282). Completing the in-service training requirements will require adequate staffing (¶706). As referenced above, we have expressed concerns about the adequacy of staffing in the Education and Training Division and will be mindful of the staffing changes and needs throughout Year Four.

Accordingly, our Year Four training priorities will build upon compliance efforts from Year Three and will be focused on, for example, the following:

❖ Community Policing (¶37)

❖ Impartial Policing (¶74)

❖ Crisis Intervention training (¶¶95–97 and 126)

❖ Force mitigation and de-escalation (¶¶243–46)

❖ Conducting recruitment, hiring, and promotions (¶254)

❖ Promotion assessment (¶¶261–62)

❖ Development of training (¶¶273–76)

❖ Training facilities (¶281)

❖ Instructor performance reviews and training efficacy (¶¶285–86)

❖ Training outcomes (¶294)

❖ Field training (¶298)

❖ Field Training Officer training (¶¶301–04)

❖ Supervisor training (¶¶331–32)

❖ Ongoing street-level training (¶352)

❖ Officer wellness (¶¶412–13)

❖ Bureau of Internal Affairs training (¶¶526, 528–29)

❖ Police Board training (¶540)

*(6) Officer Wellness and Support*

As recognized by the Consent Decree, "[i]n fulfilling their duties, CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy[, and] psychological and emotional wellness are critical to officers' health, relationships, job performance, and safety." ¶377. The Consent Decree requirements aim to help the CPD "achieve a healthy, effective, and constitutionally compliant police force." ¶380. In fact, implementing reforms across the Consent Decree—including reforms related to Community Policing, Impartial Policing, Crisis Intervention, Use of Force, Training, Supervision, and Accountability and Transparency—require a healthy and effective police force. For officers to meet the high standards of the CPD, of the Consent Decree, and of Chicago's communities, officers must have sufficient support.

Chicago continues to experience heartbreaking losses of officers to suicides.[11] In Year Four, we will continue to monitor the CPD's progress in identifying strategies and resources to support the health and wellbeing of all officers.

---

[11]  *See Investigation of the Chicago Police Department*, UNITED STATES DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION AND UNITED STATES ATTORNEY'S OFFICE NORTHERN DISTRICT OF ILLINOIS at 123 (January 13, 2017) ("During our investigation we heard that officer suicide and suicide threats are a significant problem in CPD. In fact, when we met with officials from EAP in May 2016, they had just handled an officer suicide threat the night before. One CPD official told us that CPD's rate is 22.7 suicides per 100,000 Department members. The FOP shared figures showing that CPD's suicide rate between 2013 and 2015 was 29.4 per 100,000 based on available information. This would mean that CPD's officer suicide rate is more than 60% higher than the national average of 18.1 law enforcement suicides per 100,000."), http://chicagopoliceconsentdecree.org/resources/.

The IMT remains concerned about the safety, health, and wellness of CPD officers. Officers—and their families—require support to perform their high-stress jobs, and the Consent Decree requires the City and the CPD to provide increased levels of support (*see* ¶¶381–418).

We appreciate that, according to its job-position advertisement, the CPD is moving toward hiring a Director of Wellness, along with additional clinicians, to "enhance the Department's wellness services for members of the Chicago Police Department and their families." We hope these positions will be filled soon so that this important work may move forward.

*(7) Compliance with PCRIA*

The City must comply with the Police and Community Relations Improvement Act, 50 ILCS 727/1-1 *et seq.* (PCRIA) relating to officer-involved deaths. *See, e.g.*, ¶492. The City must also "use best efforts to ensure that a 'law enforcement agency,' as that term is defined under PCRIA, will conduct [criminal officer-involved-death investigations]." *Id.* Currently, only sworn members of law enforcement agencies can investigate homicides. As currently written, COPA does not have the authority to investigate officer-involved shootings within the City. These investigations have vast implications for community trust that officer-involved incidents are fairly and impartially investigated.

As such, we will continue to encourage City representatives and stakeholders statewide to ensure that "best efforts" are made to have an independent law enforcement agency conduct such investigations and comply with both Illinois law and the Consent Decree.

*(8) Compliance Efforts that Remain behind Schedule from Previous Years and Demonstrating Compliance in Practice and on the Street*

As reflected in our first five independent monitoring reports, the City continues to work toward fulfilling requirements across all sections of the Consent Decree. This includes developing policy and training that must be implemented before being able to demonstrate compliance in practice. Some topics, however, are further behind and require additional attention. We must priorities lagging requirements to ensure that certain policies and training materials do not continue to fall behind. This includes, for example, the CPD's efforts to reach sufficient Unity of Command and Span of Control requirements, which is critical to sustainable compliance across all sections of the Consent Decree.

Simultaneously, now that the City and the CPD have codified more Consent Decree requirements in policy and training, we will begin to allocate more attention toward assessing the CPD's practices in the field. We will also work with the City, the

CPD, the other City's relevant entities, the OAG, and Chicago's communities to fur-
ther prioritize the timeline of these assessments throughout the year.[12]

***

Figure 2 on the following page reflects all monitorable paragraphs in the Consent
Decree, which the IMT will continue to monitor in Year Four.

---

[12]  *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for
    "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022),
    https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Re-
    garding-Search-Warrants-Consent-Decree-Timelin.._.pdf.

Figure 2: Monitoring Plan for Year Four Paragraphs (All Monitorable Paragraphs)

| Topic Area | Year Four Monitoring |
|---|---|
| Community Policing | 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48 <br> (Total = 35) |
| Impartial Policing | 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82 <br> (Total = 31) |
| Crisis Intervention | 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152 <br> (Total = 66) |
| Use of Force | 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 247, 248 <br> (Total = 96) |
| Recruitment, Hiring, and Promotion | 253, 254, 255, 256, 257, 258, 259, 260, 261, 262, 263, 264 <br> (Total = 12) |
| Training | 270, 271, 272, 273, 274, 275, 276, 277, 278, 279, 280, 281, 282, 283, 284, 285, 286, 287, 288, 289, 290, 291, 292, 294, 295, 296, 297, 298, 299, 300, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 324, 326, 327, 328, 329, 331, 332, 333, 334, 335, 336, 337, 338, 339, 340 <br> (Total = 68) |
| Supervision | 347, 348, 349, 350, 351, 352, 353, 354, 355, 356, 357, 359, 360, 361, 362, 363, 364, 365, 366, 367, 368, 369, 370, 371, 372, 373, 374, 375, 376 <br> (Total = 29) |
| Officer Wellness and Support | 381, 382, 383, 384, 385, 386, 387, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401, 402, 404, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418 <br> (Total = 36) |
| Accountability and Transparency | 424, 425, 426, 427, 428, 429, 430, 431, 432, 433, 434, 435, 436, 437, 438, 439, 440, 441, 442, 443, 444, 445, 446, 447, 448, 449, 450, 451, 452, 453, 454, 455, 456, 457, 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469, 470, 471, 472, 473, 474, 475, 476, 477, 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488, 489, 490, 491, 492, 493, 494, 495, 496, 497, 498, 499, 500, 501, 502, 503, 504, 505, 506, 507, 508, 509, 511, 512, 513, 514, 515, 516, 517, 518, 519, 521, 522, 523, 524, 525, 526, 527, 528, 529, 530, 531, 532, 533, 534, 535, 536, 537, 538, 539, 540, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 554, 555, 556, 557, 558, 559, 560, 561, 562, 563, 564, 565 <br> (Total = 139) |
| Data Collection, Analysis, and Management | 568, 569, 570, 571, 572, 573, 574, 575, 576, 577, 578, 579, 580, 581, 582, 583, 584, 585, 586, 587, 588, 589, 590, 591, 592, 593, 594, 595, 596, 598, 597, 599, 600, 601, 602, 603, 604, 605, 606, 607, 608, 609 <br> (Total = 42) |
| **TOTAL** | **554** |
| Other | 626, 627, 629, 630, 631, 632, 633, 634, 635, 636, 637, 638, 639, 640, 641, 642, 643, 677, 678, 679, 680, 682, 683, 684, 685, 686, 687, 699, 700, 701, 704, 705, 706, 711, 714, 720, 721 <br> (Total = 37) |

# Monitoring in Year Four

Overall, in accordance with ¶¶661–62 and 642, the IMT assesses how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: **(1) Preliminary compliance**, **(2) Secondary compliance**, and **(3) Full compliance**. We will assess the City's compliance on all appropriate levels for the paragraphs presented in this report.

❖ **Preliminary compliance** typically refers to the development of acceptable policies and procedures that conform to best practices (as defined in ¶730) and to the incorporation of requirements into policy (¶642). The IMT will assess the development of policies, procedures, rules, and regulations reasonably designed to achieve compliance. To attain Preliminary compliance, the City must have policies and procedures designed to guide officers, City employees, supervisors, and managers performing the tasks outlined in the Consent Decree. These policies and procedures must include appropriate enforcement and accountability mechanisms, reflect the Consent Decree's requirements, comply with best practices for effective policing policy, and demonstrate the City and its relevant entities' ability to build effective training and compliance.

❖ **Secondary compliance** typically refers to the development and implementation of acceptable and professional training strategies (¶642). Those strategies must convey the changes in policies and procedures that were established when we determined Preliminary compliance. Secondary compliance also refers to creating effective supervisory, managerial, and executive practices designed to implement policies and procedures as written (¶730). The IMT will review and assess the City's documentation—including reports, disciplinary records, remands to retraining, follow-up, and revisions to policies, as necessary—to ensure that the policies developed in the first stage of compliance are known to, are understood by, and are important to line, supervisory, and managerial levels of the City and the CPD. The IMT will be guided by the ADDIE model (Analysis, Design, Development, Implementation, and Evaluation) of curriculum development to assess training and will consider whether there are training, supervision, audit, and inspection procedures and protocols designed to achieve, maintain, and monitor the performances required by the Consent Decree.

❖ **Full compliance** refers to adherence to policies and training within day-to-day operations (¶642). Full compliance requires that personnel, including sergeants, lieutenants, captains, command staff, and relevant City personnel routinely hold each other accountable for compliance. In other words, the City must "own" and enforce its policies and training and hold officers accountable for misconduct through a disciplinary system that is fair, timely, and consistent.

The IMT will assess whether the City's day-to-day operations follow directives, policies, and training requirements. When measuring Full compliance, we will note whether supervisors notice, correct, and supervise officer behavior and whether appropriate corrections occur in the routine course of business. In this phase, we will review whether compliance is reflected in routine business documents, demonstrating that reforms are being institutionalized. In addition, we will determine whether all levels of the chain of command ensure consistent and transparent compliance.

These levels typically correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. Still, the three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training rather than to create a policy. Likewise, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate. In other circumstances, levels of compliance may include implementing effective pilot programs before rolling out reforms across the entire CPD.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are complying. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its actions.

As a result, the City, the CPD, and other relevant City entities are not in any level of compliance until we find that that they are in a level of compliance. The CPD and other City entities will reach "full and effective compliance" with a requirement once they reach and maintain Full compliance for the requisite length of time required by the Consent Decree—either one or two years. *See* ¶714. "If the City and CPD have achieved compliance with some requirements, but not others, the Court may terminate the Agreement as to those requirements for which compliance has been achieved. The Monitor will not review, assess, or audit requirements that are so terminated. At any time prior to the full termination of this Agreement, the Court may reinstate previously terminated requirements upon a showing that compliance with such requirements has materially lapsed." ¶716.

## The IMT's Assessments and Deadlines

In addition to monitoring the City's compliance efforts, the IMT is bound to several specific and ongoing requirements under the Consent Decree. Figure 3, below,

summarizes the Consent Decree requirements for the IMT, many of which are on-going.

The IMT will conduct compliance reviews and data analyses on an ongoing basis throughout the monitoring project. Our assessments have included, for example, reviewing records, policies, procedures, training curricula, and various data sources; virtual observations of training sessions; interviews; and meetings with the Parties, personnel, community members, and external stakeholders about specific Consent Decree requirements, progress, and plans to achieve compliance.

Figure 3: Consent Decree Requirements for the IMT

| Paragraphs | Requirement | Recurring Schedule | Year Four Requirements |
|---|---|---|---|
| 627–37 | Review of CPD Policies and Procedures | Various, Ongoing | Correspond with policy deadlines |
| 638–41 | Review of Implementation Plans and Training Materials | Various, Ongoing | Correspond with plan and training deadlines |
| 642–44 | Compliance Reviews and Audits | Various, Ongoing | Will occur during each reporting period |
| 645–51 | Community Surveys | Every Two Years | 2022 |
| 652–55 | Monitoring Plan | Annually | Draft by September 15, 2022 |
| 656 | Technical Assistance and Recommendations | Ongoing | Ongoing |
| 669 | Monitor will Participate in Meetings with the Coalition | Quarterly | Quarterly |
| 670–71 | Communication with the Parties, Collective Bargaining Representatives, and the Public | Ongoing | Ongoing |

## The IMT's Community Engagement Team Activities

The IMT's Community Engagement Team plays a critical role by monitoring levels of trust and sentiment among the stakeholders to the Consent Decree. The IMT's Community Engagement Team includes experienced Chicago community members, experts in police-community relations, lawyers, and academics. These members work together to meaningfully engage Chicago's communities and ensure community participation throughout the monitoring process. The Community Engagement Team also works closely with the Monitor, Deputy Monitor, and Associate Monitors to assess the community component of compliance with the Consent Decree.

Because of the COVID-19 pandemic, the IMT's Community Engagement Team has continued to connect with community members virtually, and we have hosted

online events regularly since the COVID-19 pandemic began. We look forward to continuing to connect with community groups across Chicago via teleconferences and video conferences and look forward to some in-person community meetings.

The IMT's Community Engagement Team's work is important to create sustainable change within the City and the CPD and to measure compliance with specific policy, training, and procedural changes required by the Consent Decree. The City and the CPD do not function effectively when they lack trust from the communities they serve. In its 2017 report, the DOJ found that the impacts of the "CPD's pattern or practice of unreasonable force fall heaviest on predominantly black and Latino neighborhoods."[13] The DOJ also found that people in many neighborhoods in Chicago lack confidence that "their police force cares about them and has not abandoned them, regardless of where they live or the color of their skin."[14]

Effective policing requires both (1) procedural and cultural change and (2) improved relationships between the City, the CPD, and the communities they serve. The Community Engagement Team encourages improved relationships based on respect, trust, and partnership. These relationships will also be strengthened by transparency and accountability.

The IMT's Community Engagement Team will continue to perform two key tasks regarding the monitoring process: (1) gathering input from Chicago residents about their concerns regarding CPD policies and practices and (2) providing information to the Chicago community regarding the IMT's activities and findings. In Year One, we completed our first citywide survey about the CPD, which gathered opinions from over 1,300 Chicagoans and in Year Three, we completed our second citywide survey. We will repeat that citywide survey in 2024 and will use the results of that survey to guide our community engagement work moving forward.

Because the IMT believes that hearing community voices consistently throughout the monitoring process is crucial, we have undertaken special studies of Chicago's communities during the years we are not conducting the ¶¶645–51 community surveys.

The IMT filed a special report with the Court in August 2022, describing a series of focus groups with Black and Latino males to help provide context and deeper understanding of the survey results, which indicated that young Black men, and to a lesser extent Latino men, experienced police using force at much higher rates than

---

[13] *See Investigation of the Chicago Police Department*, UNITED STATES DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION AND UNITED STATES ATTORNEY'S OFFICE NORTHERN DISTRICT OF ILLINOIS at 4 (January 13, 2017), http://chicagopoliceconsentdecree.org/resources/.

[14] *Id.* at 15. *See also Special Report: Focus Groups with Black and Latino Men, Ages 18–35 (Conducted December 2020 – June 2021)*, Independent Monitoring Team (September 1, 2022), https://cpdmonitoringteam.com/overview/reports-and-resources/imt-special-report-focus-groups-with-black-and-latino-men-ages-18-35/.

the survey respondents in general. Between December 2020 and June 2021, the IMT conducted focus groups with Black and Latino males between the ages of 15 and 35. We released a corresponding special report on those focus groups in September 2022.[15] Focus groups with women of color began in 2021 and are ongoing. Once data collection is complete, the IMT will report on our findings from the focus groups.

Throughout Year Four, we will continue to make contact with many individuals, community leaders, and community-based organizations. As conditions permit, the Community Engagement Team looks forward to hosting and attending in-person community meetings across Chicago, including meetings with the Coalition, community-based organizations, and CPD beat meetings.

## Independent Monitoring Reports

The IMT will release two Independent Monitoring Reports for Year Four. Independent Monitoring Report 7 will cover the first six-month period of Year Four, July 1, 2022, through December 31, 2022, and Independent Monitoring Report 8 will cover the next six-month monitoring period of Year Four, January 1, 2023, through June 30, 2023. These reports will summarize monitoring activities, including data analysis and reviews and audits conducted during the two reporting periods. The reports will also summarize the IMT's determinations of Preliminary, Secondary, and Full compliance for each paragraph reviewed or explain why the IMT was unable to adequately assess a requirement.

As with our first six Independent Monitoring Reports, these reports will be comprehensive and will reference specific data and information that we use to make determinations of compliance. The Independent Monitoring Reports will also include relevant data and observations from the Community Engagement Team.

During Year Four, the IMT will also release a report on its second citywide Community Survey. *See* ¶645.

---

[15] *See also Special Report: Focus Groups with Black and Latino Men, Ages 18–35 (Conducted December 2020 – June 2021)*, Independent Monitoring Team (September 1, 2022), https://cpd-monitoringteam.com/overview/reports-and-resources/imt-special-report-focus-groups-with-black-and-latino-men-ages-18-35/.

# Conclusion and Looking Ahead

In the first three years of the Consent Decree process, the City and the CPD have made significant progress revising and developing policies and training. The City and the CPD has struggled, however, with community engagement; reliable data collection, management, and analysis; staffing and resource shortages; training; and supervision. In Year Four, we look forward to monitoring the City's and the CPD's efforts to continue to bridge these gaps and continue demonstrating compliance with the Consent Decree.

In future years, our priorities may shift as the City and the CPD make progress with the requirements of the Consent Decree. The monitoring plans for subsequent years will reflect those shifts.

There are, however, several elements of the IMT's work that will remain consistent over time. The IMT's Community Engagement Team will remain involved with local community-based groups invested in police reform in Chicago. We will disseminate information to community members about the City's and the CPD's progress and collect important information from Chicago residents. Likewise, the IMT will continue to implement and assess community surveys and research and solicit input from CPD members.

We will also continue to prioritize transparent community engagement and participation; independent reviews of police policies and practices; and regular communication with the OAG, the City, the CPD, the Chicago Police Board, the Civilian Office of Police Accountability, the Office of the Inspector General, the Deputy Inspector General for Public Safety, other relevant City entities, members of the Coalition (¶669), and members of Chicago communities.

Finally, we must note the limits of this Monitoring Plan. Any plan is subject to change, and that is especially true of a plan developed to address a project as complex and comprehensive as the Consent Decree. As a result, we expect that we may need to add to, subtract from, or otherwise modify various aspects of this Monitoring Plan. Nonetheless, this is our best estimate of what we expect to monitor during Year Four, and we will publicly report and explain any major changes.

When Judge Robert Dow Jr. approved the Consent Decree in 2019, he set the stage for the years ahead:

> *The State of Illinois and the City of Chicago have entered into this consent decree with the goal of using it as a vehicle for solving*

> *the common problems . . . in a manner that defuses tension, re-*
> *spects differences of opinion, and over time produces a 'lawful,*
> *fair, reasonable, and adequate' result for everyone involved.*[16]

The IMT remains steadfast in its commitment to fairly monitor and assess the City's compliance with the requirements of the Consent Decree and to deliver technical assistance to assist the City when requested.

---

[16]  *See Memorandum Opinion and Order Approving Proposed Consent Decree* (January 31, 2019), 16, *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/Order-Approving-Consent-Decree.pdf. On October 11, 2022, Chief US District Judge of the District Court for the Northern District of Illinois Rebecca R Pallmeyer became the presiding judge over the Consent Decree.

# Appendix A.
# The Consent Decree and
# the Independent Monitoring Team

In December 2015, the U.S. Attorney General launched a civil-rights investigation into the CPD's policing practices. The U.S. Department of Justice released the results of its investigation in January 2017, finding a longstanding, pervasive "pattern or practice" of civil rights abuses by the CPD. Two separate class-action lawsuits followed: *Campbell v. City of Chicago* and *Communities United v. City of Chicago*.[17]

In August 2017, the Office of the Illinois Attorney General (OAG) sued the City in federal court, seeking a Consent Decree that would address the DOJ's findings and recommendations. The case was assigned to federal Judge Robert M. Dow, Jr. The OAG then sought input from community members and Chicago police officers and negotiated the Consent Decree with the City.

In March 2018, the Parties to the Consent Decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')," which "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[18]

The OAG and the City then sought proposals for an independent monitoring team after posting a draft Consent Decree on the Chicago Police Consent Decree website. Judge Dow approved and signed a modified version of the Consent Decree on January 31, 2019. This Consent Decree provides a unique opportunity for feedback from Chicago communities and local stakeholders. The OAG oversees and enforces the Consent Decree. *See* ¶694. The Coalition has certain enforcement rights and meets with the independent monitoring team at least quarterly. *See* ¶¶709(a) and ¶669, respectively.[19]

The Consent Decree requires action by the CPD and many other City entities. On March 1, 2019, the effective date of the Consent Decree, and after a competitive

---

[17]   *See Campbell v. Chicago*, N.D. Ill. Case No. 17-cv-4467 (June 14, 2017), and *Communities United v. Chicago*, N.D. Ill. Case No. 17-cv-7151 (October 4, 2017).

[18]   *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

[19]   *See also Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs*, ¶9 (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

selection process, Judge Dow appointed Maggie Hickey, a partner at ArentFox Schiff LLP, as the Independent Monitor.[20] On October 11, 2022, Chief US District Judge of the District Court for the Northern District of Illinois Rebecca R Pallmeyer became the presiding judge over the Consent Decree. As the Independent Monitor, Ms. Hickey oversees the Independent Monitoring Team (IMT) and reports directly to Chief Judge Pallmeyer.

As the IMT, we (1) monitor the City's, the CPD's, and other relevant City entities' progress in meeting the Consent Decree's requirements and (2) offer assistance to the City, the CPD, and other relevant City entities to implement the changes that the Consent Decree requires.

Monitor Maggie Hickey and Deputy Monitor Chief Rodney Monroe, Ret., lead the IMT. The IMT's eight Associate Monitors, in turn, oversee the 10 topic areas of the Consent Decree. Our legal team, analysts, subject matter experts, Community Engagement Team, and community survey staff provide support in several ways: by reaching out to and engaging with Chicago communities; by providing general administrative support; and by collecting and analyzing policies, procedures, laws, and data, including conducting observations and interviews and writing reports.

Our full organizational chart is in Appendix A, Figure 1 on the next page, and our team structure is in Appendix A, Figure 2 on the following page.

---

[20] Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he will "help facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree." About, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/about/. As the special master, Judge Coar also reports directly to Judge Dow.

Appendix B, Figure 1. Independent Monitoring Team Organizational Chart



## Appendix B, Figure 2. Independent Monitoring Team Members

| Monitoring Team Leadership | | |
|---|---|---|
| Independent Monitor | | Maggie Hickey |
| Deputy Monitor | | Rodney Monroe |

| Associate Monitors | | |
|---|---|---|
| Community Policing | | Stephen Rickman |
| Impartial Policing | | Denise Rodriguez |
| Crisis Intervention | | Julie Solomon |
| Use of Force | | Paul Evans |
| Training; Recruitment, Hiring Promotion | | Theron Bowman |
| Supervision | | Hassan Aden |
| Officer Wellness & Support | | Cassandra Deck-Brown |
| Accountability & Transparency | | Harold Medlock |
| Data Collection, Analysis & Management | | Tom Christoff |

| Community Engagement Team | | |
|---|---|---|
| Member | | Joe Hoereth |
| Member | | Laura McElroy |
| Member | | Elena Quintana |
| Member (and Associate Monitor for Community Policing) | | Stephen Rickman |
| Member (and Associate Monitor for Impartial Policing) | | Denise Rodriguez |
| Community Surveys | | Joe Hoereth & Other Experts |

| Subject Matter Experts and Legal Team | | |
|---|---|---|
| Project Director | | Laura Kunard |
| Lead Attorney | | Anthony-Ray Sepulveda |
| Attorney, Recruitment, Hiring, & Promotions; Training | | Kyle Jacob |
| Attorney | | Derek Barella |
| Attorney, Accountability & Transparency | | Alex Becker |
| Officer Wellness & Support | | Brandi Burque |
| Attorney, Use of Force; Data Collection, Analysis & Management | | Meredith DeCarlo |
| Use of Force; Data Collection, Analysis & Management | | Terry Gainer |
| Attorney, Community Policing; Impartial Policing | | Kaila Clark |
| Attorney, Crisis Intervention | | Brian Hamilton |
| Community Policing; Crisis Intervention | | Bruce Johnson |
| Training | | Blake McClelland |
| Attorney, Officer Wellness and Support; Supervision | | Sarah Oligmueller |
| Community Policing | | Hildy Saizow |
| Attorney, Accountability & Transparency | | Kylie Wood |
| Supervision; Recruitment, Hiring & Promotions | | Tom Woodmansee |

| Monitoring Team Support | | |
|---|---|---|
| Analyst for Accountability & Transparency | | Bridgette Bryson |
| Analyst for Officer Wellness & Support | | Jessica Dockstader |
| Project Manager, Analyst for Use of Force | | Vivian Elliot |
| Analyst for Community Policing | | Tammy Felix |
| Analyst for Supervision | | Monique Jenkins |
| Analyst, Crisis Intervention | | Heleana Melendez |
| Deputy Project Manager, Analyst for Recruitment, Hiring & Promotions | | Keri Richardson |
| Analyst for Training | | Valerie Schmitt |
| Analyst for Data Collection, Analysis & Management | | Gentry Schaffer |
| Analyst for Impartial Policing | | Christopher Sun |

# Frequently Asked Questions from the Community

Throughout the first reporting period, the IMT received many questions from the community. We list the most frequently asked questions and our corresponding answers below.

## What is a Consent Decree?

A Consent Decree is a court-approved settlement that resolves a legal dispute between parties. This Consent Decree requires the CPD and the City to reform training, policies, and practices in many important areas, such as use of force, community policing, impartial policing, training, accountability, officer wellness, and data and information systems. The goal is to ensure that the CPD performs constitutional and effective policing that keeps both community members and officers safe and restores the community's trust in the CPD (¶2).[21] Federal judge Robert M. Dow, Jr. was appointed to oversee the Consent Decree, and he chose the Independent Monitor. On October 11, 2022, Chief US District Judge of the District Court for the Northern District of Illinois Rebecca R Pallmeyer became the presiding judge over the Consent Decree. Under the federal judge, the Independent Monitoring Team assesses the CPD's and the City's compliance with the Consent Decree. The Consent Decree will be in effect for at least five years so that the CPD can develop, implement, and sustain the training, policies, and practices that the Consent Decree requires.[22]

## How Can I Get Involved?

The Community Engagement Team works to connect with neighborhoods, community groups, religious organizations, activists, advocates, and residents across the city. The Community Engagement Team encourages community members to participate in meetings and to promote these sessions through their social and other networks. We regularly update the Community Involvement section of the IMT website with details on upcoming community meetings and events. If your neighborhood or community group would like to invite a Community Engagement Team member to a meeting, please email us at contact@cpdmonitoringteam.com or fill out a feedback form on our website (https://cpdmonitoringteam.com/feedback-form/).

We encourage community members to provide input on CPD policies. When the CPD modifies or creates applicable policies, it will post them on its website so that

---

[21] The final Consent Decree is available on the Chicago Police Consent Decree Website. *See Consent Decree* (January 31, 2019), http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf.

[22] To learn more about the Consent Decree, visit the Office of the Attorney General's Consent Decree website: http://chicagopoliceconsentdecree.org/.

community members can provide input: https://home.chicagopolice.org/re-form/policy-review/.

Community members may also participate in the monitoring process in the following ways:

- Attend our public meetings listed on our website;
- Complete an input form on our website; and
- Reach out to the IMT or members of our Community Engagement Team (see below).

## How can I contact the IMT?

Community members can reach out to the entire IMT via email:
- contact@cpdmonitoringteam.com

Community members can also contact individual members of our Community Engagement Team:
- Elena Quintana (Elena.Quintana@cpdmonitoringteam.com)
- Joe Hoereth (Joe.Hoereth@cpdmonitoringteam.com), and
- Laura McElroy (Laura.McElroy@cpdmonitoringteam.com)
- Steve Rickman (Stephen.Rickman@cpdmonitoringteam.com)
- Denise Rodriguez (Denise.Rodriguez@cpdmonitoringteam.com)

Learn more at the Contact Us page on our website (https://cpdmonitoring-team.com/contact-us/).

Community members can also use the Feedback Form on our website to provide input (https://cpdmonitoringteam.com/feedback-form/).

Independent | Chicago Police
Monitoring Team | Department
Consent Decree