**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **STATE OF ILLINOIS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-cv-6260** |
| **CITY OF CHICAGO,** | **Judge Rebecca R. Pallmeyer** |
| **Defendant.** | |

<u>**INDEPENDENT MONITORING REPORT 7**</u>

      The Independent Monitor Margaret A. Hickey and the Independent Monitoring Team submit the attached Independent Monitoring Report 7.

Dated June 29, 2023

/s/Margaret A. Hickey
Margaret A. Hickey
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
maggie.hickey@afslaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that, on June 29, 2023, she caused a true and correct copy of the foregoing **Independent Monitoring Report 7** to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

<div align="right">

/s/Margaret A. Hickey

Margaret A. Hickey
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
maggie.hickey@afslaw.com

</div>



**Independent Monitoring Team** | Chicago Police Department Consent Decree

# INDEPENDENT MONITORING REPORT 7

*Reporting Period July 1, 2022, through December 31, 2022*

June 29, 2023

Independent Monitoring Team | Chicago Police Department Consent Decree



Monitor Maggie Hickey

By December 31, 2022—the end of the seventh reporting period—the City of Chicago (City), the Chicago Police Department (CPD), and the other relevant City entities reached at least Preliminary compliance with about 82% of the monitorable paragraphs in the Consent Decree. At the end of 2022, however, the City only reached Full compliance with about 6% of the Consent Decree requirements. Understandably, feedback continues to reflect that reforms are not being felt by the community, and the results from the recent 2022 Community Survey show a more critical view of the CPD in comparison to 2020 results.

To reach full and effective compliance, the CPD must urgently address lingering challenges. These challenges include (1) staffing shortages, (2) supervision deficiencies, and (3) missing data collection, management, and analysis.

First, staffing challenges—for sworn and unsworn personnel—continue to trend in the wrong direction, which not only stalls progress but also undermines the CPD's ability to maintain hard-earned achievements. For example, under the Consent Decree, the CPD created the Tactical Review and Evaluation Division (TRED), which provides new levels of internal oversight and transparency by reviewing and reporting on, among other things, uses of force, foot pursuits, and firearm pointing incidents. The CPD has struggled, however, to adequately staff TRED to maintain this critical function, resulting in a large backlog.



Chief Rodney Monroe, Ret.

Second, the CPD continues to struggle to meet its supervision ratios, which prevents the CPD from providing officers with the internal support that they need to meet the expectations of the CPD, the Consent Decree, and Chicago's communities. Even the best policies and training must be supported by "effective supervision necessary for members to perform their duties lawfully, safely, and effectively." Consent Decree ¶342. Officers should also reliably receive rewards for positive conduct and accountability for violations from a disciplinary system that is fair, timely, and consistent. *See, e.g.*, Consent Decree ¶¶48 and 420.

Third, the CPD also continues to struggle to improve its data collection and transparency (Consent Decree ¶¶606–08) and effectively use the data it has (Consent Decree ¶¶79, 672). Without reliable data collection, management, and analysis, the CPD will be unable to demonstrate full and effective compliance to the IMT, the Office of the Illinois Attorney General (OAG), Chicago's communities, or within the CPD.

We urge the City—and its new administration—to immediately make short- and long-term efforts to ensure required reforms become daily practices. *See, e.g.*, ¶706. This will likely need to include urgent implementation of (1) a comprehensive staffing study, (2) an efficient reporting and data system, and (3) a consistent community policing strategy.

Despite these challenges, dedicated members of the City, the CPD, and other relevant City entities have made real progress under the Consent Decree. Reform efforts to date include new and revised policies and training that provide the CPD's expectations for officers and personnel that reflect Consent Decree requirements, best practices, and community input. In the seventh reporting period, new and revised policies included the *Crisis Intervention Team (CIT) Program* policy (S05-

14), the *Foot Pursuits* policy (G03-07), and a series of new public-facing policies related to accountability and transparency. The CPD also delivered, among other trainings, the nationally recognized *Active Bystandership for Law Enforcement Training* (ABLE Training) and its *2022 De-Escalation, Response to Resistance and Use of Force In-Service Training*. The ABLE Training, for example, teaches officers how to effectively intervene when witnessing wrongful behavior by other officers.

Many of these policies and training courses *did not exist* for the CPD before the Consent Decree, and they are critical steps forward in building trust and setting officers up for success. Still, years into the Consent Decree, some policies remain outdated. Despite relevant changes to Illinois law, for example, the CPD's *Body Worn Camera* policy (S03-14), has not been updated since 2018—before the Consent Decree.

Some more recent developments are promising. We were encouraged, for example, by the CPD's hiring of a full-time Director of Wellness, which we hope will, among other things, lead to the long overdue implementation of a comprehensive suicide prevention initiative.

Likewise, earlier this month, the City and the OAG filed a Stipulation to the Consent Decree regarding investigatory stops, protective pat downs, and enforcement of loitering ordinances. These requirements are extensive and help detail the City and the CPD's path to full and effective compliance with, among other imperatives, the principles of community and impartial policing.

Moving forward, after June 2023, we will provide the City and the CPD with our comprehensive assessment, which will include (1) "whether and to what extent the City and CPD are in compliance," (2) "whether the outcomes intended by [the Consent Decree] are being achieved," and (3) "whether any modifications to [the Consent Decree] are necessary in light of changed circumstances or unanticipated impact (or lack of impact) of the requirements." *See* ¶¶657–60 and March 26, 2022 Stipulation, extending Consent Decree timelines). The IMT is currently required to detail compliance assessments with each monitorable paragraph, but consistent with the City's comments, we look forward to working with the City and the OAG to consider ways to potentially modify the Consent Decree and provide more digestible reports. *See* Consent Decree ¶661.

We anticipate that many monitoring efforts will continue to build on past reporting periods. Chief Judge Rebecca Pallmeyer and the IMT will continue to hold regular public status hearings with progress reports from the City, the CPD, and relevant City entities and will continue to welcome community comment. We will also continue to provide semiannual reports on compliance efforts, hold regularly scheduled virtual and in-person community meetings, provide regular community newsletters, collect and report on citywide community survey results, meet with members of Chicago's communities and stakeholders, and require the City and the CPD to meet the requirements of the Consent Decree.

Chicago deserves "effective law enforcement . . . . that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety." Consent Decree ¶2. We are committed to continue to provide thorough, fair, and transparent reports on the City's and the CPD's efforts to meet their commitments. While the City and the CPD have made significant progress under the Consent Decree, they must make immediate efforts to avoid further delays. It is our hope that the new administration and incoming superintendent will meet this moment.

# Monitoring Under the Consent Decree

In August 2017, the Office of the Illinois Attorney General (OAG) sued the City of Chicago (City) in federal court regarding civil rights abuses by the Chicago Police Department (CPD). The lawsuit led to a Consent Decree, effective March 1, 2019.[1] The same day, the federal court appointed Maggie Hickey as the Independent Monitor. Ms. Hickey leads the Independent Monitoring Team, which monitors the City of Chicago's progress in meeting the Consent Decree's requirements.

Paragraph 2 of the Consent Decree sets out its overall purpose, which has guided and will continue to guide our monitoring efforts:

> **2.** *The State, the City, and the Chicago Police Department . . . are committed to constitutional and effective law enforcement. In furtherance of this commitment, the Parties enter into this Agreement to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety. In addition, this Agreement seeks to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely. This Agreement requires changes in the areas of community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management.*[2]

---

[1]    For more information on the Consent Decree, see the Background section below. More information is also available on the Independent Monitoring Team's website (cpdmonitoringteam.com/) and on the Illinois Attorney General Office's Consent Decree website (chicagopoliceconsentdecree.org/about/).

[2]    We cite the relevant paragraphs of the Consent Decree throughout this Independent Monitoring Report. The Consent Decree is available on the Independent Monitoring Team's website: cpdmonitoringteam.com/wp-content/uploads/2020/08/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf. *See also* Resources, Chicago Police Consent Decree ("Consent Decree Approved by the Court on January 31, 2019"), chicagopoliceconsentdecree.org/resources/.

## Table of Contents

Executive Summary ........................................................................... 1

Consent Decree Compliance by December 31, 2022 ................ 18

Roadmap ....................................................................................... 21

Background ................................................................................... 22

Compliance Activities and Assessments ................................... 42

    I. Community Policing ......................................................... 47

    II. Impartial Policing ........................................................... 57

    III. Crisis Intervention ........................................................ 64

    IV. Use of Force ................................................................. 75

    V. Recruitment, Hiring & Promotions ................................ 84

    VI. Training ........................................................................ 88

    VII. Supervision ................................................................. 92

    VIII. Officer Wellness and Support ..................................... 98

    IX. Accountability and Transparency ................................ 107

    X. Data Collection, Analysis & Management ..................... 129

    XI. Implementation, Enforcement & Monitoring............... 134

Conclusion and
Looking Ahead to Independent Monitoring Report 8.............. 135

Appendix 1 Community Policing
Compliance Assessments, by Paragraph................................. 136

Appendix 2 Impartial Policing
Compliance Assessments, by Paragraph................................. 217

Appendix 3 Crisis Intervention
Compliance Assessments, by Paragraph................................. 293

Appendix 4 Use of Force
Compliance Assessments, by Paragraph................................. 519

Appendix 5 Recruitment, Hiring & Promotions
Compliance Assessments, by Paragraph................................... 749

Appendix 6 Training
Compliance Assessments, by Paragraph................................. 783

Appendix 7 Supervision
Compliance Assessments, by Paragraph................................. 959

Appendix 8 Officer Wellness and Support
Compliance Assessments, by Paragraph................................1054

Appendix 9 Accountability and Transparency
Compliance Assessments, by Paragraph................................1178

Appendix 10 Data Collection, Analysis & Management
Compliance Assessments, by Paragraph................................1627

Appendix 11 Implementation, Enforcement & Monitoring
Compliance Statuses, by Paragraph.......................................1718


Attachment A:
Office of the Illinois Attorney General Comments 2023 .........1754

Attachment B:
City of Chicago Comments 2023.............................................1760

**\*\*\***

Readers of the electronic pdf can click sections above to jump to the corresponding sections of the report.

# Executive Summary

As the Independent Monitoring Team (IMT), we assess the City of Chicago's (City's) compliance with the requirements of the Consent Decree. Specifically, we assess how relevant City entities—including the Chicago Police Department (CPD); the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General, the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC)—are complying with the Consent Decree.[3]

This is Independent Monitoring Report 7.[4] Here, we update the Court and the public on compliance efforts during the seventh reporting period: from July 1, 2022, through December 31, 2022.[5] Among other things required by the Consent Decree, this report includes following:

- an updated compliance or status assessment from the previous reporting period;

- a compliance or status assessment for all monitorable paragraphs in the Consent Decree;

- a summary of the principal achievements and challenges facing the City's compliance with the Consent Decree; and

- an updated projection of upcoming work for the City, the Office of the Illinois Attorney General (OAG), and the IMT. *See* ¶661.[6]

---

[3]  As a party to the Consent Decree, the City is ultimately responsible for compliance. *See* ¶720. Unless otherwise specified, our references to the City typically include its relevant entities. *See* ¶736.

[4]  We provided a draft of this report to the City and the OAG on January 30, 2022, as required by ¶¶661–65.

[5]  The Consent Decree generally prevents the IMT from making any public statements or issuing findings regarding any non-public information or materials outside of these reports (*see* ¶672). Because the Consent Decree will be in effect for a minimum of eight years, this is the seventh of at least 16 semiannual Independent Monitoring Reports. *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoring-team.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-War-rants-Consent-Decree-Timelin.._.pdf. Each year, we file a Monitoring Plan that sets out what we will assess during the year, and we file two semiannual Independent Monitoring Reports. The Independent Monitoring Plans and Reports are available on the IMT's website. *See Reports and Resources*, https://cpdmonitoringteam.com/reports-and-resources/.

[6]  In October 2022, we filed the Monitoring Plan for Year Four, which outlined the projected monitoring efforts under the Consent Decree for Year Four (July 1, 2022, through June 30, 2023). The IMT's Monitoring Plan for Year Four is available on the IMT's website. *See Reports*,

We note that the Consent Decree is a complex document that resulted from long and substantive negotiations between the City and the OAG. In this report, we have aimed to address the nuances of the agreement fairly and accurately.

The monitoring process contains some tensions that we address in both our monitoring efforts and this report. For example, there has been—and likely will continue to be—a tension between the City's need to make compliance efforts quickly and the need to ensure that its efforts are effective and sustainable. Because the Consent Decree prioritizes both goals, we do too. We recognize that if the City rushes to create a policy without, for example, the required community involvement, that may delay the date the City reaches compliance if the City must later re-engage the community, re-draft the policy, and potentially re-train personnel. We have attempted to address this tension in our analysis for each relevant paragraph in this report.

We know that many readers will be most interested in learning where the City, the CPD, and the other relevant entities have achieved compliance with the requirements of the Consent Decree. But in reviewing this report, it is important to keep at least three things in mind regarding the scope and significance of our compliance assessments:

❖ First, this report represents a six-month assessment of the City's compliance efforts from July 1, 2022, through December 31, 2022. It does not reflect all the efforts of the City, the CPD, or the other relevant City entities to date. While we report on the compliance efforts within defined reporting periods (*see* ¶661), we stress that work is ongoing by the City, its relevant entities, the OAG, the IMT, and Chicago's communities. In many cases, relevant City entities have continued to develop policies and train personnel after December 31, 2022, and before the date we submit this report. In this report, we have not assessed efforts made after December 31, 2022. We will do so in the monitoring report for the eighth reporting period (January 1, 2023, through June 30, 2023).

❖ Second, we assess compliance at three levels: (1) Preliminary, (2) Secondary, and (3) Full. The Consent Decree requires the City and its entities to reach Full compliance and maintain that compliance for one to two years. *See* ¶¶714–15. These compliance levels allow us to share our assessments of the City's progress throughout the duration of the Consent Decree. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the reform in practice. There are, however, many paragraphs that do not include policy or training elements. In those circumstances, the three levels may follow a different trajectory, such as (1) whether the City

---

INDEPENDENT MONITORING TEAM (November 2, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2022/11/2022.11.02-Monitoring-Plan-for-Year-Four-filed.pdf.

or its relevant entities have established the framework and resources to achieve the reform, (2) whether the City or its relevant entities have effectively communicated the reform to relevant personnel, and (3) whether the City or its relevant entities have appropriately implemented the reform.

❖ Third, because of the nuances of each Consent Decree requirement and each level of compliance, the City and its relevant entities must—in a timely manner—provide the IMT with evidence, including access to personnel, records, facilities, and data to establish that they have reached each level of compliance during the applicable reporting period.

Under the Consent Decree, the City, the CPD, or other relevant entities are not in compliance with any of the requirements of the Consent Decree until the IMT determines that the City provided sufficient proof that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement—which in some cases it has—the City still has the additional burden of providing sufficient proof of its efforts with sufficient time for the IMT and the OAG to review the information.

To reflect the City's and its relevant entities' progress through the Consent Decree process, we have added four subcategories for each of the three levels of compliance (Preliminary, Secondary, or Full):

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced per ¶720, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts are not completed within a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not yet met a lower level of compliance.

At the end of the seventh reporting period, the City and the CPD achieved Preliminary compliance to about 82% of monitorable paragraphs, Secondary compliance to about 25%, and Full compliance with 6%.

### Consent Decree Compliance by December 31, 2022

Paragraphs in **Preliminary**, **Secondary**, or **Full** Compliance
Paragraphs that have not met Preliminary compliance
Paragraphs under Assessment for Preliminary Compliance



Total: 552

## Major Developments and Principal Achievements and Challenges Impacting Compliance

In the Consent Decree, the City committed "to ensuring that police services are delivered to all of the people of Chicago in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of all of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety." The City also committed "to providing CPD members with the resources and support they need, including improved training, supervision, and wellness resources." ¶6.

As we have noted in previous reports and continue to emphasize here, to fulfill these commitments, it is paramount that the CPD increase ownership of reform across its operations. Specifically, compliance with the requirements of the Consent Decree relies heavily on increasing the communication and integration of efforts between the Office of Constitutional Policing and Reform and the CPD's Operations (*i.e.*, the Office of the First Deputy Superintendent, which includes the Bureau of Patrol and the Bureau of Counter-terrorism). The CPD's Operations personnel rarely participate in regular Consent Decree meetings regarding policy and training, and we would like to hear their voices in the reform process.

In the seventh reporting period, the City, the CPD, and Chicago faced ongoing challenges, including high levels of certain violent crimes, significant attrition of officers and non-sworn personnel leading to staffing difficulties, and heartbreaking losses of officers to suicides. This included three officers who died by suicide during the same week in December 2022.[7] While the CPD has developed some plans

---

[7]  *See Investigation of the Chicago Police Department*, UNITED STATES DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION AND UNITED STATES ATTORNEY'S OFFICE NORTHERN DISTRICT OF ILLINOIS at 123 (January 13, 2017) ("During our investigation we heard that officer suicide and suicide threats are a significant problem in CPD. In fact, when we met with officials from EAP in May 2016, they had just handled an officer suicide threat the night before. One CPD official told us that CPD's rate is 22.7 suicides per 100,000 Department members. The FOP shared figures showing that CPD's suicide rate between 2013 and 2015 was 29.4 per 100,000 based on available information.

to approach Consent Decree reforms, much more needs to be done to comprehensively demonstrate compliance efforts with officer wellness, community policing, impartial policing, community engagement, and crime-fighting strategies.[8] And we continue to have significant concerns regarding the CPD's commitment to have constitutional policing and reform efforts lead its crime-fighting strategies.

Still, in the seventh reporting period, many City entities and CPD divisions have demonstrated progress toward achieving some levels of compliance with Consent Decree requirements. The City and the City's entities have now achieved at least Preliminary compliance (the first of three levels of compliance) with most monitorable paragraphs through the seventh reporting period. We note, however, that the City and its entities have achieved Full compliance with comparatively few monitorable paragraphs. Compliance figures are detailed further below and throughout each section of this report. But in isolation, these figures only tell part of the story regarding the City's overall achievements and ongoing challenges to date. Executive Summary Figure 1, below, provides a sample of principal achievements and challenges across the 10 topic areas of the Consent Decree.

---

This would mean that CPD's officer suicide rate is more than 60% higher than the national average of 18.1 law enforcement suicides per 100,000."), http://chicagopoliceconsentdecree.org/resources/. *Cf.* ¶388.

[8]   For example, during a previous reporting period, the CPD's Office of Constitutional Policing and Reform presented the IMT and the OAG with a draft of a new "Roadmap toward Operational Compliance" planning document. While we appreciate the strategic thinking and thoughtful effort that went into crafting the plan, we remain concerned about the lack of movement to implement the plan.

Executive Summary Figure 1.    Sample of Principal Achievements & Challenges

| Section | Sample of Principal Achievements | Sample of Principal Challenges |
|---|---|---|
| Community Policing | • The CPD continued to develop and revise policies and complete trainings in accordance with the Community Policing section of the Consent Decree.<br>• The CPD has, over the last several years, developed and revised a district-wide process that provides opportunity for meaningful community input in setting district-wide policing priorities. This process is now implemented in all CPD districts.<br>• The CPD provided its School Resource Officers with some of the most comprehensive training in the nation and reflects national best practices and local concerns. The School Resource Officer training covers a wide range of topics, such as adolescent development, de-escalation, mediation, and school policies. | • The CPD continued to struggle with further implementing community policing practices throughout the CPD, as evidenced by ongoing delays in fully implementing the Neighborhood Policing Initiative (NPI)—includes the assignment of district coordination officers to support problem-solving policing—and expanding program to additional districts.<br>• The CPD is still challenged in its community engagement efforts regarding, for example, policy reviews, community dialogue, and feedback on ongoing practices and strategy development. Engagement challenges have been particularly pronounced with marginalized groups, including young men of color. |
| Impartial Policing | • The City and the CPD developed the *Search Warrant Community Resource and Referrals Pilot Program* (D22-07) in direct response to community feedback. As written, the pilot program provides for the securing and repairing of any damage to the point of entry caused by the execution of a residential search warrant and provides trauma-informed counseling services to other people present at the residence at the time the residential search warrant is executed. The pilot program involves significant collaboration across City entities.<br>• The City and the CPD finalized three policies and training courses: *Annual Carbine Operator Qualification Training*; *Hate Crime eLearning Refresher Training*; and *Religious Interactions* (G02-01-05). | • The CPD continued to struggle to find the staffing and resources available to fulfill its reform obligations, and certain endeavors by the CPD continue to be hindered by insufficient staffing.<br>• Consistent with the feedback related to the Community Policing section, the CPD continued to make refinements and improvements in its community engagement processes. Some community stakeholders still often report, however, that their input is not seriously considered or meaningfully implemented. In particular, community stakeholders report frustration that they engage in these processes but never hear from the CPD to know what, if anything, from their feedback has been considered. We continue to stress that some sort of consistent community-feedback mechanism is necessary, such as a summary of themes. |
| Crisis Intervention | • The CPD conducted training on updated *Crisis Intervention Refresher* curriculum, continued emphasis on de-escalation through in-service training; and finalized the *Crisis Intervention Team* policy (S05-14).<br>• The City has continued its efforts with the Crisis Assistance Response Engagement (CARE) program. | • The Crisis Intervention Unit faced significant staffing challenges in the seventh reporting period.<br>• Nearly half (46.51%) of certified CIT officers were trained six or more years ago and have not received refresher training since.<br>• The CPD would continue to benefit from meaningful community participation in new crisis intervention initiatives and the requisite *Crisis Intervention Team Officer Implementation Plan* and the *Crisis Intervention Plan*. |

| Section | Sample of Principal Achievements | Sample of Principal Challenges |
|---|---|---|
| Use of Force | • The CPD finalized the *Foot Pursuits* policy (G03-07).<br>• The Tactical Response and Evaluation Division (TRED) continued to observe, address, and publicly report on patterns and trends relating to uses of force, foot pursuits, and firearm pointing incidents. | • The CPD increased TRED's workload but decreased its staffing, which resulted in continued backlog of cases that have not yet been reviewed on the proper timeline (*see* ¶580).<br>• The CPD missed its intended timeline to update crucial use of force policies addressing Tasers and OC spray (although efforts have continued into 2023). |
| Recruitment, Hiring & Promotions | • The City and the CPD maintained compliance levels with several paragraphs of the Consent Decree.<br>• The City and the CPD gained Secondary compliance with one paragraph. | • The City and the CPD have not made any meaningful progress in the past several reporting periods. We are concerned that the staffing shortages and unexpected organizational changes in leadership of this section has stagnated any progress in this area. |
| Training | • The CPD made improvements in multiple training areas, including with the Field Training and Evaluation Program (FTEP) and related policies. The CPD also incorporated outside experts, community interest groups, and guest speakers in training development.<br>• The meeting minutes from the Training Oversight Committee (TOC) meetings have improved, demonstrating the depth and breadth of TOC oversight over training development expected under the Consent Decree. | • The CPD has yet to find the right sequence or timing for its required annual *Needs Assessment*, *Training Plan*, and training implementation. |
| Supervision | • The CPD continued to learn from its Unity of Command and Span of Control Pilot Program. | • Staffing shortages prevented the Unity of Command and Span of Control Pilot Program districts from consistently meeting the 10-to-1 officer-to-supervisor ratio required for all districts by ¶360. |
| Officer Wellness | • The CPD continued to maintain most compliance levels achieved in previous reporting periods. | • The CPD's implementation of the Suicide Prevention Initiative continued to be delayed.<br>• The CPD continued to struggle to collect data to analyze and evaluate wellness efforts.<br>• The CPD also faced challenges to fill vacant positions related to wellness and address internal concerns related to use of services, service providers, and confidentiality and privacy. |
| Accountability & Transparency | • The CPD's Bureau of Internal Affairs (BIA) implemented key public policies, reflecting significant efforts across many reporting periods.<br>• The OIG and PSIG continued to maintain compliance with its corresponding responsibilities. | • The CPD continued to struggle to implement and fully resource Accountability Sergeants (*see* ¶494). |
| Data Collection, Analysis & Manage- | • The CPD took a significant step toward identifying its data needs and goals (*see* ¶606). | • The CPD did not make progress toward analyzing citywide and district-level data on officers' uses of force per ¶572.<br>• Consistent with the concerns raised related to the Use of Force section, the inadequate staffing in TRED impacted reviews of officers' uses of force. |

In the following subsections, we provide additional details regarding several key developments and efforts:

- Personnel Changes and Staffing Challenges
- Officer Wellness and Support
- Data Collection, Management, and Analysis
- CPD's Community Engagement and Trust Building
- Use of Force and Accountability

## Personnel Changes and Staffing Challenges

Many of the City's and the CPD's efforts and achievements in the first six reporting periods continued into the seventh reporting period. The City Department of Law, the CPD's Office of Constitutional Policing and Reform, the Legal Affairs Division, and the Research and Development Division (¶¶677–78), continued to be engaged in the monitoring process. The City and the CPD also maintained channels of communication with the IMT and the OAG and continued dialogue, problem-solving, and brainstorming about requirements and challenges regarding meeting the requirements of the Consent Decree.

Staffing priorities remain challenging for the CPD. The IMT remains concerned that the CPD has not yet completed or produced its required comprehensive staffing study. *See, e.g.,* ¶¶343 and 356. As with many police departments across the country, the CPD has continued to struggle with recruiting and retaining personnel.[9] Such vacancies may ultimately impact community and officer safety and will continue to prevent the CPD from implementing the systems necessary to ensure constitutional and effective policing. We also have significant concerns about the lack of consistent staffing and retention levels within the City and the CPD in areas crucial to the efficient implementation of the requirements of the Consent Decree, including key training, supervision, and accountability responsibilities. This includes the lack of sergeants. The City and the CPD must continue to make efforts to maintain staffing at appropriate levels *at all times* in these key areas.

While some of the concerns referenced in this report relate directly to positions within the Office of Constitutional Policing and Reform, the CPD faces staffing issues across the entire department. We remain concerned about the CPD's capacity to address the need for additional sworn supervisors. The shortage of supervisors hinders the CPD's ability to comply with the Consent Decree's requirements

---

[9] *See, e.g.,* Ben Bradley, Andrew Schroedter, *"Officer Exodus: 1,000+ Chicago cops left the job last year,"* WGN9 (January 30, 2023), https://wgntv.com/news/wgn-investigates/officer-exodus-1000-chicago-cops-left-the-job-last-year/.

regarding the critical functional concepts of "unity of command" and "span of control" (*see* ¶¶357–68), as well as accountability issues (*see* ¶¶352–53 and 493–94).[10]

We recognize that City and CPD resources are limited, but as ¶¶700 and 706 note, the City is responsible for "providing necessary support and resources to CPD to enable CPD to fulfill its obligations under this Agreement," and as a point of reference, we note that the City paid out $123.2 million in settled and litigated cases involving Chicago police officer incidents in 2021.[11]

As referenced in previous reports, the City and the CPD have added some resources to their compliance efforts throughout the years of the Consent Decree process, but those resources have waxed and waned. Consistent focus on appropriate staffing is crucial for the City to continue to move into compliance with its agreed-upon requirements.

In our previous reports, we recommended that the City and the CPD increase resources and staffing to various departments and divisions. We reiterate that recommendation here. In previous reporting periods, the CPD responded by increasing staffing in, among other divisions, the Research and Development Division, the Tactical Review and Evaluation Division (TRED), and the Legal Affairs Division. But maintaining consistent levels of sufficient staffing has been a challenge.[12]

---

[10]  "Unity of command" means that "officers are supervised by a consistent and clearly identified immediate supervisor. Additionally, officers and their immediate supervisor will regularly have the same start time, the same day-off-group, and patrol the same geographic areas" (¶358(e)). Relatedly, "span of control" means the "number of officers assigned to each immediate supervisor for a tour of duty" (¶358(d)). Specifically, the Consent Decree requires "no more than ten officers to one Sergeant in the field units on each watch in each patrol district" (¶351). Due in part to the shortage of supervisors and an effort to diversify the ranks, in July 2021 Superintendent David Brown reinstated the controversial merit promotion system, a practice that was discontinued in 2019.

[11]  The City of Chicago's *Report on Chicago Police Department 2021 Litigation* is publicly available online: https://www.chicago.gov/content/dam/city/sites/public-safety-and-violenc-reduction/pdfs/2021-Annual-Litigation-Report-and-Exhibits.pdf at 7 ("The City settled 131 cases for a total of $50.1 million in settlement payouts in 2021. The City also paid $73 million after juries awarded damages to the plaintiffs in nine Litigated Cases. In total, the City paid $123.2 million in financial settlements and to satisfy jury awards in 131 Settled and nine Litigated Cases in 2021."). For comparison, in 2020 the City paid a total of $40.5 million in financial settlements to satisfy jury awards in 90 Settled and two Litigated cases.

[12]  The Research and Development Division frequently works with the IMT to develop compliance documents and policies. Increases in staffing in this department can reduce bottlenecking with limited personnel. As discussed further in the Use of Force section below, the Tactical Review and Evaluation Division (formerly called the Force Review Unit) is critical to several Consent Decree requirements. The Legal Affairs Division must frequently work with the IMT to provide compliance documents, policies, and efforts. Specifically, the Legal Affairs Division reviews every document that the IMT receives.

As the Consent Decree process continues, the City and the CPD must ensure that such divisions are sufficiently staffed on a continuous basis. While we understand that ongoing challenges continue based on limited resources, we reiterate the need for increased resources and staffing and the Consent Decree's requirement for the City to "hire, retain, or reassign current City or CPD employees to form a unit with the appropriate knowledge, skills, and abilities necessary to facilitate compliance with this agreement." ¶677. In the seventh reporting period, as we have from the beginning of the Consent Decree process, we continue to see the need for increased resources and staffing in the following areas (*see* ¶¶677–78):

❖ **Tactical Review and Evaluation Division (TRED).** The CPD has made TRED responsible for many key reform efforts, including reviewing use-of-force incidents and instances in which officers point firearms at people. TRED was already understaffed. Combined with increased responsibilities—and recurring deployments to patrol functions—understaffing in TRED has led to a continued backlog, undermining its efforts.

❖ **The Audit Division**. This division is crucial to the City's and the CPD's ability to sustain reforms, learn from its own operations, and change culture over the long term. The Audit Division aims to provide quality, independent, and objective assessments of the operations, processes, and internal controls within the CPD. The division also aims to demonstrate compliance with the Consent Decree. As it has been for many reporting periods, throughout the seventh reporting period the Audit Division was again understaffed.

❖ **Education and Training Division (ETD).** The CPD's Education and Training Division is, in many ways, at the heart of countless Consent Decree requirements. The CPD is one of the largest police departments in the country, and training personnel requires a massive effort. Our discussions with CPD personnel regarding training efforts, records, and plans underscore that the Training Division needs additional support. We learned during this reporting period that many academy instructors are performing the duties of instructors even though they are not permanently assigned to those duties, a practice the City and the CPD refer to as "acting up."[13] These instructors have not applied to fill permanent instructor positions, but rather have volunteered to take on instructor duties "temporarily." We understand that some of these instructors who are acting up are former Academy instructors with teaching experience, but the qualifications and experience of all instructors who are currently acting up remained unclear. As the City and the CPD continue to move into Preliminary compliance with many requirements, the City and the CPD must increase training efforts and resources and ensure that its instructors are appropriate

---

[13] *See Acting Up Policy*, CITY OF CHICAGO, https://www.chicago.gov/content/dam/city/depts/dhr/supp_info/ShakmanSettlement/ACTING_UP_POLICY_FINAL.pdf.

qualified and providing effective and consistent training (*see* ¶¶282, 284, and 301).

❖ **The Research and Development Division.** The Research and Development Division reviews, revises, and develops policies for the CPD. This division has been critical for many of the CPD's compliance efforts and levels to date. Decreased staffing, however, could negatively impact the CPD's ability to sustain compliance and ensure that policies remain current. *See, e.g.*, ¶636 ("CPD will periodically review each policy required to be revised or developed by this Agreement. CPD will conduct an initial review of each such policy no later than two years after the policy's implementation as provided for in this Agreement. CPD will conduct subsequent reviews every two years thereafter, although the Parties may modify the timeframe for the review of a specific policy. The purpose of the initial and subsequent reviews is to evaluate whether the policy provides effective guidance and direction to CPD members and is consistent with the requirements of this Agreement and current law.").

❖ **Strategic Initiatives Division.** The Strategic Initiatives Division is crucial to the City's and the CPD's successful reform endeavors, as it performs many of the CPD's data and analytics efforts. The City's Office of Public Safety Administration shares some of these crucial data collection, management, and analysis responsibilities as well.[14] As the City and the CPD move into Secondary compliance for some paragraphs, and look toward eventual Full compliance, they will need to drastically improve their data collection, management, and analytical capabilities to document their operational successes. As is clearly stated in ¶720, the City bears the burden of demonstrating its compliance with the requirements of the Consent Decree and the most efficient way to achieve that is through valid, reliable, and best practice data collection, management, analysis, and reporting. *See* our assessment of ¶606 in Appendix 10 (Data Collection, Analysis, and Management) for a more detailed discussion of the IMT's concerns about the CPD's data deficiencies and challenges.

❖ **The Reform Management Group.** The project managers in the Reform Management Group—both sworn and nonsworn—are crucial to the successful implementation and documentation of Consent Decree requirements. However, throughout the entirety of the Consent Decree process, we have seen consistent turnover and understaffing in these key project management positions,

---

[14] The City of Chicago's Office of Public Safety Administration's core mission and responsibility is to "provide shared services for Chicago's public safety departments. This includes reducing costs, finding efficiencies, improving administrative functions, leveraging technology solutions, employing staff who possess deep, professional experience in public safety, and, always searching for and developing new and innovative ways we can reduce costs and find efficiencies through shared services." *Office of Public Safety Administration*, CITY OF CHICAGO, https://www.chicago.gov/city/en/depts/opsa.html.

which hinder the CPD's ability to provide consistent and accurate information. During the last reporting period, it is our understanding that nearly half of the civilian staff members of the Reform Management Group left their positions, and while the CPD filled some of those positions, it will take time for new hires to learn processes and facilitate the flow of crucial information (*see* ¶720).

## Officer Wellness and Support

The Consent Decree requires the CPD to bolster its officer-support systems. As recognized by the Consent Decree, "[i]n fulfilling their duties, CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy [, and] psychological and emotional wellness are critical to officers' health, relationships, job performance, and safety." ¶377. The Consent Decree requirements aim to help the CPD "achieve a healthy, effective, and constitutionally compliant police force." ¶380. In fact, implementing reforms across the Consent Decree—including reforms related to Community Policing, Impartial Policing, Crisis Intervention, Use of Force, Training, Supervision, and Accountability and Transparency—require a healthy and effective police force. For officers to meet the high standards of the CPD, of the Consent Decree, and of Chicago's communities, officers must have sufficient support.

Chicago continues to experience heartbreaking losses of officers to suicides, including three officers who died by suicide during the same week in December 2022.[15] The IMT remains concerned about the safety, health, and wellness of CPD officers and encourages the CPD to develop and implement its required suicide prevention initiative—which was due by January 1, 2020 but has yet to be completed and implemented (*see* ¶388). Officers—and their families—require support to perform their high-stress jobs, and the Consent Decree requires the City and the CPD to provide increased levels of support (*see* ¶¶381–418).

During this reporting period the CPD hired a Director of Wellness.[16] We look forward to working with the Director of Wellness and urge him to move forward with

---

[15] *See Investigation of the Chicago Police Department*, UNITED STATES DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION AND UNITED STATES ATTORNEY'S OFFICE NORTHERN DISTRICT OF ILLINOIS at 123 (January 13, 2017) ("During our investigation we heard that officer suicide and suicide threats are a significant problem in CPD. In fact, when we met with officials from EAP in May 2016, they had just handled an officer suicide threat the night before. One CPD official told us that CPD's rate is 22.7 suicides per 100,000 Department members. The FOP shared figures showing that CPD's suicide rate between 2013 and 2015 was 29.4 per 100,000 based on available information. This would mean that CPD's officer suicide rate is more than 60% higher than the national average of 18.1 law enforcement suicides per 100,000."), http://chicagopoliceconsentdecree.org/resources/. *Cf.* ¶388.

[16] *See, e.g.*, CBS Chicago Team, *Chicago Police name Aaron Chatman as director of wellness* , CBS NEWS CHICAGO (JANUARY 20, 2023), https://www.cbsnews.com/chicago/news/chicago-police-aaron-chatman-director-wellness/.

some crucial Consent Decree requirements, including the required suicide prevention initiative.

## Data Collection, Management, and Analysis

As the City and the CPD move into Secondary compliance for some paragraphs and look toward eventual Full compliance, they will need to drastically improve their data collection, management, and analytical capabilities to document their operational successes. *See* Appendix 10 (Data Collection, Analysis, and Management).

The lack of a comprehensive assessment of the CPD's current information collection mechanisms and data management technology (*see* ¶606), has and will continue to delay the CPD's compliance efforts across the Consent Decree and ability to demonstrate constitutional and effective policing. Without a complete understanding of CPD's existing data systems, resources, and functionality, we cannot determine whether the CPD can successfully implement the Consent Decree in its totality. We note that we are four years into the Consent Decree process, and the comprehensive assessment was due at the end of the first year. In fact, the Consent Decree requires the CPD to annually "review and, as necessary, revise departmental forms relating to [for example] use of force" to "improve the accuracy, reliability, and efficiency of its data collection." ¶609.

We also note that along with monitoring the CPD's internal data collection, management, and analysis challenges, the IMT is also tracking the City's Public Safety Administration's role in overall compliance with the data requirements of the Consent Decree.

While the Consent Decree requires the City and the CPD to accurately report on, collect, manage, and analyze data regarding its police practices, the Consent Decree does not require officers to fill out duplicative and inefficient forms. Solutions to the CPD's data issues require allocating significant resources toward overhauling the CPD's data systems to integrate existing data and streamline accurate data collection.

The CPD continues to indicate that it is in the process of expediting these efforts and hopes to incorporate a data system that is able to, among other things, link and auto-populate forms for officers to increase data accuracy, efficiency, and utility. We greatly look forward to the City's and the CPD's continued efforts toward improving its data systems.

Moreover, we note some issues with the City's data management processes that produce relevant data and information to the IMT. Throughout the Consent Decree monitoring process, the IMT has worked collaboratively with the City to identify data and information necessary to demonstrate compliance, organize it, clarify it, and transmit it. In recent reporting periods, however, we have returned to some earlier concerns about the City's data management processes. For example, we

have again seen the bulk of the compliance data submitted for review near the end of the reporting period. We have consistently encouraged the City to produce compliance records early and often in any given reporting period and had gotten into a better rhythm with such productions in past years. In the seventh reporting period, however, we returned to receiving an extremely large amount of information from the City in the last days of the reporting period, which presents a challenge for the IMT to properly review and consider all data within the tight timeframe. While too much data in a short time frame is challenging, no data is also problematic. The City has disputed several of the IMT's requests for data. Through ongoing discussions, we hope that data are provided to demonstrate compliance or efficiently identify barriers to compliance and corresponding solutions. *See, e.g.*, ¶¶682 and 720.[17]

Since the end of the reporting period, the City, the CPD, the Office of the Illinois Attorney General, and the IMT have continued discussions to highlight the importance of timely productions and improve this process. We are hopeful that many of these issues will be mitigated in the next reporting period.

## CPD's Community Engagement and Trust Building

As in the first six reporting periods, we continued to have concerns about the CPD's efforts and approaches to engaging Chicago's communities throughout the seventh reporting period. Since the inception of the Consent Decree in 2019, we have consistently raised concerns about the CPD's insufficient community engagement during its policy development procedures, as well as its lack of comprehensive and layered community engagement and community policing strategies.

Despite the CPD's efforts to engage communities on specific policies, opportunities for community input continue to occur late in the policy development process for many policies under revision and only during public comment phases. When Chicago's community members are invited to provide input only at the later stages of the policy development process, they are prevented from contributing during the formative stages and, in some instances, are effectively prevented from meaningfully participating at all.[18]

---

[17]    *See* ¶682 ("The Monitor will have access to all individuals, facilities, trainings, meetings, disciplinary proceedings, reviews, and incident scenes that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement. The City will ensure that it facilitates the Monitor's access in a prompt, cooperative, and unobstructive manner."); ¶720 ("At all times, the City will bear the burden of demonstrating by a preponderance of the evidence it has achieved full and effective compliance with the requirements of this Agreement.").

[18]    *Compare* ¶54 ("In developing or revising policies and training referenced in this section, CPD will seek input from members of the community and community-based organizations with relevant knowledge and experience through community engagement efforts.").

We continue to be concerned about how the CPD understands and discerns the differences and nuances among community engagement, community partnerships, community relationships, community policing, and community service. It is still unclear—after over many years of asking for clarification on the issue—how the CPD proposes to harmonize its existing Chicago Alternative Policing Strategy (CAPS) with its Neighborhood Policing Initiative (NPI). Moreover, it is also unclear how these programs align with or complement the CPD's other community-focused efforts, such as the district-level Community Policing Strategic Plans, the activities of the Community Safety Team, or the CPD's goal of 1.5 million Positive Community Interactions in 2022. Furthermore, the CPD has yet to clearly articulate how these programs support an overall philosophy of community policing. *See* ¶¶8–11. We also note that during the Monitor and Deputy Monitor's in-person visits to all 22 District Commanders in November 2022, many articulated concerns about staffing, especially regarding the availability of officers to attend community meet and events.

Fortunately, the CPD continued its work from previous reporting periods on planning for long-term and consistent community engagement. We have seen some instances in which the City and the CPD have made meaningful changes to policies, training, and practices in response to community feedback. At the end of this reporting period, however, this work was ongoing, and unfortunately, there continues to be serious concerns regarding the CPD's ability to carry out the plans given the significant staffing issues discussed above.

While we appreciate the CPD's continued online community engagement efforts such as seeking community input on draft policies, the CPD must establish and maintain "clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies" within the reporting period. ¶160.[19] We encourage the City to continue to pilot and implement innovative strategies to engage Chicago's diverse communities.

---

[19] In the seventh reporting period, while the City, the CPD, and the Coalition continue to find common ground, they continue to meet regularly regarding various issues. *See* ¶669. (In March 2018, the Parties to the Consent Decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')." The Coalition "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits." *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.).

## Use of Force and Accountability

While the City and the CPD continue to make some progress toward the requirements of the Consent Decree that address use of force and accountability, the IMT remains concerned about the slow progress of these requirements and therefore the slow pace of culture change within the CPD that the spirit of the Consent Decree is meant to engender.

First, the Consent Decree, in part, is meant to encourage the CPD to become a self-reflective learning organization, by analyzing its own data and making necessary corrections to its practices in a timely manner. One of the key aspects of this process is the CPD's required review of officers' use-of-force incidents (*see* ¶¶577-580). We have seen consistent understaffing in the CPD's TRED throughout this reporting period, hindering the required analysis and impeding CPD's ability to learn from its officers' field practices. During this reporting period, the IMT became aware that the backlog of cases due for TRED review numbers in the thousands, which is concerning because it damages accountability throughout the CPD while also damaging the TRED's credibility within the CPD.

Second, a key close-to-the ground ingredient in accountability is the requisite staffing of Accountability Sergeants (*see* ¶¶493–95). During previous reporting periods, the IMT observed that these crucial roles were understaffed across Chicago, and that remains the case. Further, during the Monitor and Deputy Monitor's visits to all 22 District Commanders in November 2022, most acknowledged their concerns about staffing, specifically with regard to supervisors.

Further, the IMT has discovered in past reporting periods, continuing into the seventh, that the CPD is not requiring all Accountability Sergeants to receive, process, and investigate "complaints against CPD members" as their "primary responsibility" per ¶494(b). The IMT is concerned that CPD sergeants assigned as "Accountability Sergeants" often consider their accountability responsibilities to be secondary to their patrol responsibilities, which is not what the Consent Decree requires. It is the IMT's understanding that while some districts may have two Accountability Sergeants, one functions as the "primary" Accountability Sergeant, carrying a case-load of complaints that they are actively "receiving, processing, and investigating," while the other assigned Accountability Sergeant acts as a "secondary" Accountability Sergeant and carries a small caseload or no caseload, thereby failing to fulfill the mandate of ¶494(b). The IMT is concerned about the CPD's understanding of these requirements and hopes to see improvement soon.

## Compliance Assessments and Deadlines

At the end of the seventh reporting period, we assessed 554 paragraphs and provided status updates for 37 additional paragraphs (591 paragraphs total).[20]

Of course, some requirements in the Consent Decree demand more effort to comply with than others. The number of requirements—and the amount of work necessary under each requirement—can vary substantially within each paragraph and topic area.

When negotiating the Consent Decree, the City and the OAG agreed to specific deadlines to ensure that the City was making significant efforts to comply with the Consent Decree in a timely manner. As we are in Year Four of the Consent Decree, however, our focus will naturally shift from preliminary deadlines to measurements of effective and sustained practices. Since we are near the end of Year Four of the Consent Decree (the end of the eighth reporting period is June 30, 2023), all of our reports moving forward, including this one, will include the IMT's assessments on the City's efforts to comply with *all* requirements and monitorable paragraphs in the Consent Decree. The deadlines in this reporting period and moving forward comprise recurring timelines, such as regular policy review, training, and reporting requirements including annual reports.[21]

Executive Summary Figure 3 and Figure 4, respectively, show the City's compliance and deadline status through seven reporting periods. As a result of our focus on underlying efforts, we must also track and report on areas where the City or the CPD have lost levels of compliance. *See* Executive Summary Figure 5.

---

[20] While interrelated with the requirements of ¶¶79 and 80, ¶82 does not contain a substantive requirement for the City, and ¶81 contains conditional requirements that may never apply and did not apply this reporting period. For the purpose of this report, we have provided status updates for these paragraphs.

[21] *See, e.g.*, ¶¶78, 546, and 550.

# Consent Decree Compliance
# by December 31, 2022

### Executive Summary Figure 3: Compliance Status through Seven Reporting Periods
### Consent Decree Paragraphs



**First Reporting Period**
Paragraphs w/ Any Level of Compliance (15)
Paragraphs Not in Compliance (52)
(*including under assessment*)
Total: 67

**Second Reporting Period**
Paragraphs w, Any Level of Compliance (48)
Paragraphs w/ Deadlines Not in Compliance (81)
(*including under assessment*)
Foundational Paragraphs Under Assessment (88)
Total: 216

**Third Reporting Period**
Paragraphs w/ Any Level of Compliance (154)
Paragraphs Not in Compliance (120)
Paragraphs under Assessment for Preliminary Comp. (41)
Total: 315

**Fourth Reporting Period**
Paragraphs w/ Any Level of Compliance (266)
Paragraphs Not in Compliance (215)
Paragraphs under Assessment for Preliminary Comp. (26)
Total: 507

**Fifth Reporting Period**
Paragraphs w/ Any Level of Compliance (380)
Paragraphs Not in Compliance (123)
Paragraphs under Assessment for Preliminary Comp. (20)
Total: 523

**Sixth Reporting Period**
Paragraphs w/ Any Level of Compliance (433)
Paragraphs Not in Compliance (105)
Paragraphs under Assessment for Preliminary Comp. (14)
Total: 552*

**Seventh Reporting Period**
Paragraphs w/ Any Level of Compliance (460)
Paragraphs Not in Compliance (79)
Paragraphs under Assessment for Preliminary Comp. (13)
Total: 552*

**Executive Summary Figure 4:** Consent Decree Deadlines before December 31, 2022[22]



---

[22] These deadlines do not include "recurring deadlines." *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timelin.._.pdf.

Executive Summary Figure 5:
Lost Levels of Compliance in the Seventh Reporting Period



| | Sixth Reporting Period<br>(January 1, 2022 – June 30, 2022) | | Seventh Reporting Period<br>(July 1, 2022 – December 31, 2022) |
|---|---|---|---|
| **Paragraphs** | **Previous Compliance** | | **Current Compliance** |
| Crisis Intervention ¶90 | Secondary | → | Preliminary |
| Crisis Intervention ¶149 | Preliminary | → | Not in Compliance |
| Crisis Intervention ¶151 | Preliminary | → | Not in Compliance |
| Use of Force ¶198 | Secondary | → | Not in Compliance |
| Use of Force ¶199 | Secondary | → | Not in Compliance |
| Use of Force ¶201 | Secondary | → | Not in Compliance |
| Use of Force ¶204 | Secondary | → | Not in Compliance |
| Use of Force ¶205 | Secondary | → | Not in Compliance |
| Use of Force ¶216 | Secondary | → | Not in Compliance |
| Use of Force ¶245 | Preliminary | → | Not in Compliance |
| Accountability & Transparency ¶548 | Preliminary Compliance | → | Not in Compliance |
| Accountability & Transparency ¶549 | Preliminary Compliance | → | Not in Compliance |
| Accountability & Transparency ¶553 | Preliminary Compliance | → | Not in Compliance |
| Data ¶604 | Preliminary | → | Not in Compliance |

# Roadmap

We wrote this report to be as accessible and readable as possible. This report is long because the compliance efforts in the seventh reporting period required significant attention. As the IMT continues to move forward with its monitoring efforts and as we assess the City's requirements with appropriate detail, the monitoring reports may also continue to grow in length. For this reason, we have provided the following roadmap to help readers understand what they can expect from each section of this report.

We begin this report with a **Background** section that provides some historical context about the Consent Decree and the IMT. This section will help those who have not read or would like to reacquaint themselves with the background information from our previous reports and Monitoring Plans.

The next section, **Compliance Activities and Assessments**, provides the following information regarding the seventh reporting period:

❖ An overview of the IMT's assessment process and priorities for the seventh reporting period, including deadlines and status updates;

❖ A summary of the IMT's activities;

❖ A summary of the City's achievements and challenges; and

❖ For each topic of the Consent Decree, a summary of relevant compliance efforts, a more specific analysis for each Consent Decree paragraph with a deadline before December 31, 2022, and if applicable, a summary of efforts regarding the corresponding paragraphs that do not have specific deadlines.

❖ Finally, per ¶661, **Appendix A** details the IMT's compliance assessments for each and every monitorable paragraph, all of which were under review in the seventh reporting period.

Finally, the last section, **Conclusion and Looking Ahead to Independent Monitoring Report 8**, provides concluding remarks and a projection of the upcoming work in the eighth reporting period.

# Background

This is the IMT's seventh semiannual Independent Monitoring Report.[23] The report provides the IMT's monitoring activities and findings for the seventh reporting period—from July 1, 2022, through December 31, 2022.[24]

Specifically, consistent with the requirements of the Consent Decree (¶661), we address the following information throughout the sections of this report:

❖ The IMT's efforts during the reporting period;

❖ A description of each Consent Decree requirement that applied during the reporting period;

❖ The IMT's compliance findings for each corresponding requirement;

❖ A summary of the City's principal achievements and the challenges facing the City's ability to achieve complete compliance with the Consent Decree;

❖ The IMT's corresponding recommendations regarding the City's future efforts to achieve compliance; and

❖ A projection of the IMT's, the OAG's, and the City's upcoming work during the next reporting period (July 1, 2022, through December 31, 2022).

Per ¶661 of the Consent Decree, the IMT will continue to issue semiannual reports until the Consent Decree ends—which is after the City has reached full and effective compliance for each requirement for one to two years. *See* ¶¶693 and 714–15.

## The Chicago Police Consent Decree

In December 2015, the U.S. Attorney General launched a broad civil rights investigation into the CPD's policing practices. The U.S. Department of Justice released the results of its investigation in January 2017, finding a longstanding, pervasive

---

[23] We provided a draft of this report to the City and the OAG on January 30, 2023, as required by ¶¶661–65. Per ¶663, the OAG and the City then provided written responses on February 12, 2021, and February 15, 2022, respectively.

[24] The IMT's Monitoring Plan for Year Four is available on the IMT's website. *See Reports and Resources*, Independent Monitoring Team (November 2, 2022), https://cpdmonitoring-team.com/wp-content/uploads/2022/11/2022.11.02-Monitoring-Plan-for-Year-Four-filed.pdf. The City filed its seventh status report (¶680) with the Court on April 17, 2023. *See Chicago Police Department Reform Progress Update, Independent Monitoring Period No. 7*, Chicago Police Department (April 17, 2023), https://home.chicagopolice.org/wp-content/up-loads/IMR-7-Status-Report.pdf.

"pattern or practice" of civil rights abuses by the CPD.[25] Two separate class-action lawsuits followed: *Campbell v. City of Chicago* and *Communities United v. City of Chicago*.[26]

In August 2017, the OAG sued the City in federal court, seeking a Consent Decree that would address the US Department of Justice's (DOJ's) findings and recommendations. The case was assigned to federal Judge Robert M. Dow, Jr. The OAG then sought input from community members and Chicago police officers and negotiated the Consent Decree with the City.

In March 2018, the Parties to the Consent Decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')." The Coalition "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[27]

The OAG and the City then sought proposals for an Independent Monitoring Team (IMT) after posting a draft Consent Decree on the Chicago Police Consent Decree website.[28] Judge Dow approved and signed a modified version of the Consent Decree on January 31, 2019. The Consent Decree requires action by the CPD and many other City entities. On March 1, 2019, which was the effective date of the Consent Decree, and after a competitive selection process, Judge Dow appointed Maggie Hickey, a partner in the ArentFox Schiff law firm, as the Independent Monitor. On October 11, 2022, Chief US District Judge of the District Court for the Northern District of Illinois Rebecca R. Pallmeyer became the presiding judge over the Consent Decree. As the Independent Monitor, Ms. Hickey oversees the Independent Monitoring Team (IMT) and reports directly to Chief Judge Pallmeyer.[29]

---

[25] DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, http://chicagopolicecon-sentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPTREPORT.pdf.

[26] *See Campbell v. Chicago*, N.D. Ill. Case No. 17-cv-4467 (June 14, 2017), and *Communities United v. Chicago*, N.D. Ill. Case No. 17-cv-7151 (October 4, 2017).

[27] *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), http://chicagopoliceconsentdecree.org/wp-content/up-loads/2019/05/Executed_MOA.pdf.

[28] More information about the IMT selection process is available on this website, which the OAG maintains. *See Independent Monitor*, CHICAGO POLICE CONSENT DECREE, http://chicagopo-liceconsentdecree.org/independent-monitor/. Other resources, including Consent Decree documents, court filings, and reports, are also available on this website. *See Resources*, CHI-CAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/resources/.

[29] Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he "help[s] facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward imple-

## The Independent Monitoring Team

As the IMT, we (1) monitor the City's, the CPD's, and other relevant City entities' progress in meeting the Consent Decree's requirements and (2) offer assistance to the City, the CPD, and other relevant City entities to implement the changes that the Consent Decree requires. *See, e.g.,* ¶¶610 and 656.

Monitor Maggie Hickey and Deputy Monitor Chief Rodney Monroe, Ret., lead the IMT. The IMT's nine Associate Monitors, in turn, oversee the 10 topic areas of the Consent Decree. Our legal team, analysts, project managers, subject matter experts, Community Engagement Team, and community survey staff provide support in several ways: by reaching out to and engaging with Chicago communities; by providing general administrative support; and by collecting and analyzing policies, procedures, laws, and data, including conducting interviews and writing reports.

Our full organizational chart is in Background Figure 1 on the next page, and our team structure is in Background Figure 2 on the following page.

---

mentation of the consent decree." About, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/about/. As the special master, Judge Coar also reports directly to Chief Judge Pallmeyer.

Background Figure 1. Independent Monitoring Team Organizational Chart



## Background Figure 2. Independent Monitoring Team Members

| Monitoring Team Leadership | | |
|---|---|---|
| Independent Monitor | | Maggie Hickey |
| Deputy Monitor | | Rodney Monroe |

| Associate Monitors | | |
|---|---|---|
| Community Policing | | Stephen Rickman |
| Impartial Policing | | Denise Rodriguez |
| Crisis Intervention | | Julie Solomon |
| Use of Force | | Paul Evans |
| Training; Recruitment, Hiring Promotion | | Theron Bowman |
| Supervision | | Hassan Aden |
| Officer Wellness & Support | | Cassandra Deck-Brown |
| Accountability & Transparency | | Harold Medlock |
| Data Collection, Analysis & Management | | Tom Christoff |

| Community Engagement Team | | |
|---|---|---|
| Member and Community Surveys | | Joe Hoereth & Other Experts |
| Member | | Laura McElroy |
| Member | | Elena Quintana |
| Member (and Associate Monitor for Community Policing) | | Stephen Rickman |
| Member (and Associate Monitor for Impartial Policing) | | Denise Rodriguez |

| Subject Matter Experts and Legal Team | | |
|---|---|---|
| Project Director | | Laura Kunard |
| Lead Attorney | | Anthony-Ray Sepulveda |
| Attorney, Recruitment, Hiring, & Promotions; Training | | Stella Oyalabu |
| Attorney | | Derek Barella |
| Attorney, Accountability & Transparency | | Alex Becker |
| Attorney, Use of Force; Data Collection, Analysis & Management | | Meredith DeCarlo |
| Attorney, Community Policing; Impartial Policing | | Kaila Clark |
| Attorney, Crisis Intervention | | Brian Hamilton |
| Attorney, Officer Wellness and Support; Supervision | | Sarah Oligmueller |

| Monitoring Team Support | | |
|---|---|---|
| Project Manager, Analyst for Accountability & Transparency | | Bridgette Bryson |
| Analyst for Officer Wellness & Support | | Jessica Dockstader |
| Analyst for Use of Force | | Heleana Melendez |
| Analyst for Community Policing | | Tammy Felix |
| Analyst for Supervision | | Monique Jenkins |
| Analyst, Crisis Intervention | | Lindsey Clancey |
| Analyst for Recruitment, Hiring & Promotions | | Amada Bond |
| Analyst for Training | | Valerie Schmitt |
| Analyst for Data Collection, Analysis & Management | | Melissa Gutierrez |
| Analyst for Impartial Policing | | Christopher Sun |

# The IMT's Community Engagement Team Activities

The IMT's Community Engagement Team plays a critical role by monitoring levels of trust and sentiment among the stakeholders to the Consent Decree—the members of Chicago's communities. The IMT's Community Engagement Team includes experienced Chicago community organizers, community researchers, experts in police-community relations, and academic scholars. These team members work together to meaningfully engage Chicago's communities and ensure that community members participate throughout the monitoring process. The Community Engagement Team also works closely with the Monitor, the Deputy Monitor, and the Associate Monitors to assess the community components of compliance with the Consent Decree.

The IMT's Community Engagement Team's work is vital to measure compliance with specific policy, training, and procedural changes required by the Consent Decree. The City and the CPD do not function effectively when they lack trust from the communities they serve.[30]

Effective policing requires both procedural and cultural change and improved relationships between the City and the CPD and the communities they serve. The Community Engagement Team encourages improved relationships based on respect, trust, and partnership and emphasizes how relationships may be strengthened by transparency and accountability.

The IMT's Community Engagement Team performs two key tasks regarding the Consent Decree monitoring process: (1) gathering input from Chicagoans about their concerns regarding CPD policies and practices, and (2) providing information to the Chicago community about the IMT's activities and findings.

We sought to hear sentiments from a broad range of Chicagoans during this reporting period. For example, Judge Robert M. Dow and Judge Rebecca Pallmeyer held a public hearing on November 29, 2022, at the federal courthouse. At the hearing, the judges heard from a wide variety of Chicagoans, who attended in person to voice their concerns, observations, and ideas about the Chicago Police Department and the reform process.

---

[30]  In its 2017 report, the DOJ found that the impacts of the "CPD's pattern or practice of unreasonable force fall heaviest on predominantly black and Latino neighborhoods." DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPT-REPORT.pdf.   The DOJ also found that people in many neighborhoods in Chicago lack confidence that "their police force cares about them and has not abandoned them, regardless of where they live or the color of their skin." *Id.* at 15.

We also held a Virtual Listening Session co-hosted in partnership with the Heartland Alliance, focused on officer wellness. About 40 people attended the session and shared their thoughts and concerns about Chicago Police officer wellness with Independent Monitor Maggie Hickey, Associate Monitor for Officers Wellness and Support Chief (ret.) Cassandra Deck-Brown, and members of the IMT's Community Engagement Team.

Background Figure 3: IMT Virtual Listening Session Flyer (October 12, 2022)



We also issued periodic newsletters, emails, and press releases—in September, October, November, and December—to update community stakeholders on our monitoring activities.[31] *See* Background Figures 5 and 6, below.

---

[31] The IMT's newsletters are available online. *See, e.g., Help Reform the Chicago Police Department - Community Newsletter*, INDEPENDENT MONITORING TEAM (April 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/05/April-2020_IMTCommunityNewsletter-7.pdf; *Federal Court Listening Sessions – Community Newsletter*, INDEPENDENT MONITORING TEAM (August 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/12/IMT-Newsletter-Issue-3-August-2020.pdf; *Independent Monitoring Team Conducts Community Survey – Community Newsletter*, INDEPENDENT MONITORING TEAM (November 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/12/IMT-Newsletter-Issue-4-November-2020.pdf.

Background Figure 5: IMT Newsletter, November 11, 2022



## An Update from Monitor Maggie Hickey



I want to make you aware of an opportunity to voice your thoughts about the Chicago Police Department and be part of the solution.

The Chicago Police Department is asking for public comment on a draft policy of its Criminal Enterprise Information System. The department opened a public comment period on November 7, 2022. You have until December 7, 2022, to share your feedback. Just click below to comment on the draft policy.

Share Your Comments

Background Figure 6: IMT Newsletter, December 15, 2022

## An Update from Monitor Maggie Hickey



I want to make you aware of an opportunity to voice your thoughts about the Chicago Police Department and be part of the solution.

The Chicago Police Department is asking for public comment on draft policies for Body Worn Cameras and Prohibition on Sexual Misconduct. The department opened a public comment period on November 18, 2022. You have until December 15, 2022, to share your feedback.

Click below to comment on each draft policy.

**Body Worn Cameras** Draft Policy

**Prohibition on Sexual Misconduct** Draft Policy

Throughout this reporting period, the Community Engagement Team attended many community meetings across Chicago, including meetings with the Coalition (*see* ¶669) and community-based organizations. We summarize some of the Community Engagement Team's efforts in Background Figure 7 below.

Background Figure 7: IMT Community Engagement Efforts



498
Hours on
Community
Engagement

11
Meetings with
the Coalition
(¶669)

2
IMT Virtual
Community
Meetings

2,250
Email Newsletters
sent to community
members

## Focus Groups with Black and Latina Women (November 2021 – February 2023)

Per ¶¶645–46, the IMT conducts "reliable, representative, and comprehensive" survey of a broad cross-section of members of the Chicago community regarding CPD" every other year. Accordingly, the IMT conducted a large-scale probability sample surveys in Year One and Year Three of the Consent Decree.[32] The surveys included the responses of over 1,000 Chicagoans, as well as an additional group of over 300 young Black men, age 18–25, which is the population subgroup with the most frequent contact with the CPD.

Because the IMT believes that hearing community voices consistently throughout the monitoring process is crucial, we have also endeavored to conduct separate, special studies of Chicago's communities during the years we are not conducting the ¶¶645–51 community surveys. Understanding the personal experiences and opinions of Chicagoans who have frequent contact with the police helps the IMT assess the CPD's progress with various areas of the Consent Decree, including community policing, impartial policing, and procedural justice.[33]

---

[32] *Community Survey Report (October 2021 – May 2022)*, INDEPENDENT MONITORING REPORT (May 30, 2023), https://cpdmonitoringteam.com/wp-content/uploads/2023/05/2023.05.30-IMT-Community-Survey-Report-October-2021-May-2022-filed._-2.pdf.

[33] This includes, for example, the foundational requirements that the CPD must demonstrate to reach full and effective compliance with the Consent Decree—including key elements of ¶¶49–51, which include fairness, courtesy, dignity, partnerships, fostering public confidence, and policing without bias.

In December 2022, we filed a *Special Report: Focus Groups with Black and Latino Men, Ages 18–35 (Conducted December 2020 – June 2021)*.[34] Building from some of the key findings from our *2020 IMT Community Survey*, we provided the results of a series of focus groups with Black and Latino men in Chicago, ages 18–35.[35] Overall, we conducted 32 focus groups between December 16, 2020, and June 25, 2021, with 89 participants in Chicago within the target population of Black and Latino men, ages 18–35.[36]

Between November 2021 and February 2023, we conducted focus groups with Black and Latina women. The goal of conducting focus groups was to provide an in-depth description of individual perceptions and experiences with police from the perspectives of Black and Latina women in Chicago.

## Methodology

For these focus groups, the IMT employed exploratory qualitative methods to learn more about these women's perceptions of and experiences with the CPD. Criteria for evaluating qualitative methods differs from that used to evaluate quantitative methodology.[37] Qualitative research is not meant to be generalizable (i.e., findings may not apply to a larger population), but transferable (i.e., findings may apply to people with similar characteristics and experiences). Because this study focused on community perceptions, the IMT did not attempt to investigate or corroborate any factual assertions from participants.

These focus groups were not intended to fulfill the community surveys required by Consent Decree ¶¶645–51 and, therefore, did not follow the same procedures for the surveys we conduct "of a broad cross section of members of the Chicago community" every two years. Consent Decree ¶645. Instead, we followed the process described in Consent Decree ¶665: "In addition to the mandatory semiannual

---

[34] *See also Special Report: Focus Groups with Black and Latino Men, Ages 18–35 (Conducted December 2020 – June 2021)*, INDEPENDENT MONITORING TEAM (September 1, 2022), https://cpd-monitoringteam.com/overview/reports-and-resources/imt-special-report-focus-groups-with-black-and-latino-men-ages-18-35/.

[35] These focus groups were not intended to fulfill the community surveys required by Consent Decree ¶¶ 645–51 and, therefore, did not follow the same procedures for the surveys we conduct "of a broad cross section of members of the Chicago community" every two years. Consent Decree ¶ 645. Instead, we followed the process described in Consent Decree ¶ 665: "In addition to the mandatory semiannual reports, the Monitor may, at any time, prepare written reports on any issue or set of issues covered by the Agreement. The process for commenting on and publishing these additional reports will be the same as the process applicable to semiannual reports" (referencing Consent Decree ¶¶ 657–54).

[36] There were a total of 106 focus-group participants, but we have complete age and race data for the 89 whose text response data we included in our analysis for this report.

[37] Strauss, A., & Corbin, J. M. (1990). Basics of qualitative research: Grounded theory procedures and techniques. Sage Publications, Inc.

reports, the Monitor may, at any time, prepare written reports on any issue or set of issues covered by the Agreement."

We designed our approach to these focus groups to serve as a qualitative complement to our survey data and to help us better understand the nature of the interactions between Black and Latino women and the CPD. Primarily, we sought to assess how those interactions affected "perceptions of, and satisfaction with" the "CPD's overall police services, trustworthiness, community engagement, effectiveness, responsiveness, handling of misconduct complaints and investigations, and interactions with members of the Chicago community." Consent Decree ¶646. Because this study focused on community perceptions, the IMT did not attempt to investigate or corroborate any factual assertions from participants.

The findings from focus groups are not meant to be representative of the experiences, opinions, and perspectives of all Black and Latina women in Chicago. Rather, they are a logical next step in research, whereby researchers qualitatively explore trends and subsamples identified from broader quantitative approaches (in this case, the representative *2020 IMT Community Survey*). The IMT research team adheres to widely accepted principles of research in which the cycle of qualitative and quantitative research is continuous: using acquired knowledge to inspire further inquiry.[38] Moving forward, we will continue to regularly explore trends, issues, and subsamples through quantitative and qualitative methods, including focus groups and corresponding special reports per ¶¶645–51 and 665.

A crucial part of how the IMT assesses the City's and the CPD's progress with the requirements of the Consent Decree is to understand how reforms are being felt in our communities. The results discussed below shed light on important and nuanced aspects of interactions between Black and Latina women and CPD officers. Because the report also provides an important link between the administrative reforms—such as new policies and revised training curricula—and the day-to-day operations of the CPD, the report may also assist the CPD in considering ways to address participants' feedback.

Between November 2021 and February 2023, the IMT research team conducted focus-group discussions with a convenience sample and a snowball sample of Black and Latina women in Chicago, ages 18–49. Women were recruited to participate in the focus groups through community partner organizations and service providers. Our protocol was to ask participants to identify their race and age, as the minimum age for participation was 18.[39] The median age of the participants was 26, and they represented a wide range of neighborhoods across Chicago, as

---

[38] *See, e.g.,* Earl Babbie, *The Practice of Social Science Research, 9th Ed.*, WADSWORTH PUBLISHING COMPANY (2022).

[39] Two White, non-Latina women participated in the focus groups and are included in the analysis of the total of 41 women participants.

identified by the participants (*see* Background Figure 8 below). The focus groups were conducted both in person and online, and the conversations lasted between 30 and 90 minutes. The conversations were led by one facilitator and typically included one notetaker, who used a note-taking template (*see* Appendix).[40]

**Background Figure 8: Women focus group participants by neighborhood**

| Neighborhood | Number of Participants | Neighborhood | Number of Participants |
|---|---|---|---|
| Albany Park | 1 | Irving Park | 2 |
| Archer Heights | 1 | Little Village | 4 |
| Ashburn | 1 | Marquette Park | 1 |
| Auburn Gresham | 2 | Pilsen | 1 |
| Austin | 2 | Roseland | 2 |
| Back of the Yards | 2 | South Loop | 1 |
| Brighton Park | 2 | United Center / Medical District | 1 |
| Bronzeville | 1 | Washington Park | 1 |
| Chatham | 2 | West Elston | 2 |
| East Rogers Park | 1 | West Humboldt Park | 1 |
| Englewood | 1 | West Lawn | 1 |
| Gage Park | 1 | West Pullman | 1 |
| Garfield Park | 2 | Wicker Park | 1 |
| Humboldt Park | 1 | Woodlawn | 1 |
| Hyde Park | 1 | **Total** | **41** |

Data analysis was conducted by team members not involved in the data-collection process. The analysis team received the interview and focus-group notes from the interviewers. The analysis team compiled responses into a question-clustered matrix and organized them into three main themes: (1) Trust, (2) Recent Interactions with Police, and (3) Perceptions of how others are treated.[41] These themes are explained further in the Theme Analysis section below. As in our focus groups with men, participants in the women's focus groups provided suggestions for improving

---

[40] Each focus group began with an introduction and informed consent. *See* Appendix for both the Informed Consent language and the Focus Group Questions for Black and Latina Women that we used to guide the discussions.

[41] As noted above, we relied upon the grounded theory method of qualitative analysis. *See* Strauss, A., & Corbin, J. M. (1990). Basics of qualitative research: Grounded theory procedures and techniques. Sage Publications, Inc.

community-police relationships, which we also discuss below.[42] Overall, the results represent a descriptive summary of the range of responses in each of the themes.

THE THREE FOCUS GROUP THEMES



## Theme Analysis

Much of what was indicated by participants was consistent with and expanded upon what the IMT learned from its 2020 citywide community survey and its 2022 citywide community survey.[43]

### Trust



Women had disparate responses about trust in the CPD. Some said they trusted the CPD for the most part, while other women responded with a strong distrust that was often based on a specific incident that involved them or a family member. A third group of women had a mixed response, saying that they trusted some officers but not others, or that their trust depended on the situation, the officer or even what the officer's mood appeared to be that day. The majority of women who distrusted the CPD, however, based their sentiment on a lack of community engagement and responsiveness to calls for service.

At least a third of women said police did not respond to calls for service in a reasonable time and did not put adequate effort into solving crime in their neighborhoods. Women talked about police no-shows or extreme delays when they called the CPD. One participant said she goes into the district police station instead of calling because she gets a better response in person. Other participants talked about patrol cars ignoring crime while it was happening close to them because of

---

42 *See Special Report: Focus Groups with Black and Latino Men, Ages 18-35 (conducted December 2020 – June 2021),* Independent Monitoring Team (September 1, 2022), https://cpdmonitoringteam.com/overview/reports-and-resources/imt-special-report-focus-groups-with-black-and-latino-men-ages-18-35/.

43 *See Community Survey Report (October 2021 – May 2022),* INDEPENDENT MONITORING TEAM (May 30, 2023), https://cpdmonitoringteam.com/wp-content/uploads/2023/05/2023.05.30-IMT-Community-Survey-Report-October-2021-May-2022-filed._-2.pdf.

jurisdiction issues. The sentiment of unreliability was shared by women across represented neighborhoods and occurred in spite of the presence of the CPD on the streets.

> *I feel like some do their job of patrolling the streets and answering calls. Some take hours to show up for emergencies – especially for shootings.*

> *I feel like some police around my area turn a blind eye to most criminal activity. I feel like they see repetitive situations, so they don't bother to come help – like domestic violence, harassment, and overdoses.*

Women also discussed whether they detected generational differences in how people from their neighborhood felt about the CPD. Overwhelmingly, they said that young people have a different relationship with the CPD than older generations. Young women felt older people respected and trusted the CPD more, whereas younger people were targeted more often by the CPD and more frustrated about police misconduct. A few of the women felt there were no generational differences in their neighborhood, but a general distrust of the CPD.

### Nature of Recent Interactions with Police (within the last 12 months)



Our discussions with women regarding police interactions participants had within the last 12 months were mixed. Women were asked if they or someone they knew had been stopped by the CPD in the last year and what that interaction was like. A few reported no interactions. Some said they have had interactions that were neutral or friendly where someone was pulled over and politely questioned.

A few shared stories of what they perceived to be unnecessarily aggressive CPD behavior during a stop. One woman said she had been attacked and held down in a shelter for what she said was a minor infraction. Another said she had been handcuffed off the street because she "fit the description," but the CPD had been looking for a male suspect and had mistaken her for one.

Many respondents also talked about interactions in which CPD officers refused to listen, assumed the worst, and dismissed people who were coming to them for help. Several participants said that CPD officers would accuse people of smoking and drinking during routine traffic stops and commence a search based on these accusations.

We asked women if they had had a gun pointed at them by a CPD officer or if they had witnessed an officer pointing a gun at someone else. The majority of participants said no to both questions. A handful of the respondents had witnessed a CPD officer pointing a gun at someone else. None of the women in this sample had experienced a CPD officer pointing a gun at them.

### Perception of How Others Are Treated by Police



Participants were asked whether they perceived a difference between the CPD's treatment of males and females. Six of the participants said there were no differences. The majority of women, however, said that there was a difference and that CPD officers are more physically aggressive towards men. Sometimes the presence of a woman contributed to better-than-expected interactions with the CPD.

> *When my boyfriend and I got pulled over by the cops for I don't know what. My presence made the process easier… If I hadn't been there they probably would have given him a tougher time.*

Because of this, women sometimes intervened when they perceived a threat to a man in their community who encountered the CPD. One woman said there were frequent arrests in front of her home and that sometimes she would intervene. Another presented herself as the sister of a young man who was pulled over and the police let him go.

Notably, women perceived differential treatment independent of the individual officer's gender. They said that female CPD officers follow the model of male officers. One participant said that female CPD officers can be very aggressive because they wanted to be taken seriously.

Respondents said that despite being less physically aggressive towards women, CPD officers were more dismissive and disrespectful of women. A few respondents

described how they were ignored for long periods of time without any explanation.

One woman refused a car search and, in response, the CPD brought canine units to the scene and searched the perimeter of her car while directing her to wait on the curb without giving her any information. Another respondent had a minor accident with a police car, but was not dismissed after the reports were filed and had to approach the officers after standing around for a long time. One respondent called the CPD's behavior toward women "passive aggressive" and "manipulative."

Many respondents felt that CPD officers did not listen to women and did not take them seriously. Several participants stated that CPD officers had not believed them about experiencing sexual assault or domestic violence or had generally minimized women's complaints and injuries.

> *It happened to me. They [CPD officers] down-*
> *played my bruises and did not believe me.*

Women were also asked if they perceived differential treatment by the CPD based on neighborhood and race. An overwhelming majority said that the CPD treats people better in wealthier neighborhoods. Specifically, women said that CPD officers were ruder towards people in less wealthy neighborhoods and more protective towards those in wealthier areas. One woman said that "towards wealthy people [police] act like stewards."

In addition to neighborhood context, respondents said that an individual's race also mattered. Specifically, they said that Black Chicagoans are treated worse by the CPD than White or Latino Chicagoans even in neighborhoods with a predominantly White population.

> *If you are [Black] in a White part of town you*
> *will be put in handcuffs and taken to the sta-*
> *tion, but they let Hispanic or White people go.*

## Recommendations for Improving Community-Police Relations

The focus group discussions closed with two open-ended questions:

(1)    "What do you think Chicago Police officers should do to improve relation-ships with young people in your neighborhood?" and

(2)    "Is there anything important you would like to tell us?"

Respondents answered along two discernable themes: (1) community relations and (2) cultural responsiveness.

### Community Relations

Overwhelmingly, participants talked about the need for CPD officers to build better relationships with the communities they serve as a remedy to address lack of trust. None of the participants suggested lower police presence.

Most asked for "meet your officer" events and wanted police present when off duty. They asked for friendlier demeanor and respect in day-to-day interactions with people in their neighborhoods. Women thought the CPD should be more visible, more engaged with individuals and with community organizations and events, more empathic and understanding of community members, and more caring about the wellbeing of the community where they patrolled.

They made specific recommendations about how to achieve improved relationships, including community outreach, partnerships with grassroots organizations, being present in the neighborhood when off duty, and the improvement of beat meetings to make those more welcoming to community members.

*The walking and the riding in the neighborhood is important. They participate in riding in the community: lighting up the way. But they need to do this more, and engage with us more. They need to clean up and come out with us, and make sure that they care about how [the community] looks and feels.*

*If we have block parties, and do community clean-ups, help us, and do it with us. Be approachable: some gestures, some grins. If you put yourself in that position [i.e. policing], you have to engage.*

## Cultural Responsiveness

Another set of suggestions that came from this sample was for CPD officers to stop making assumptions and learn about the cultures of the communities they police. Suggestions included learning about urban fashion and learning how to communicate with people from different backgrounds, ages, and neighborhoods. Women considered this training a vital piece of effective policing and stated that it would result in fewer unnecessary searches. A handful of women mentioned the need for greater emphasis on trauma-informed care, mental health, and de-escalation techniques in CPD training.

> *Respect goes both ways: Not every young person walking down the street is guilty of anything. A person should be able to walk without being searched.*

## Conclusion

The IMT initiated focus groups with women in Chicago to better understand their perceptions and experiences with the CPD. Although this study on its own does not represent the experience of all Black and Latina women in Chicago, it begins to shed light on some of the issues related to the intersection of gender, race/ethnicity, and community context.

Overall, women from this sample shared mostly neutral to negative sentiments toward the CPD. Participants rarely raised positive, friendly interactions between officers and community members. The majority of women based their perceptions on general sentiments towards the CPD in their neighborhoods and on their experiences with inadequate police response. Many participants expressed the sense that CPD officers did not put adequate efforts into solving crime and helping community members who reached out to the police. They indicated that this was the case in spite of the presence of patrol cars on the streets.

During their recent interactions with police, women reported less physical force from the CPD towards women than they perceived for men. Participants did not report experiencing gun-pointing by CPD officers. Additionally, many participants stated that the CPD is too tough, too physical, and too aggressive in their interactions with fellow community members.

Participants reported other concerning police behavior, such as ignoring women for long periods of time without providing information and minimizing harm or the threat of harm that women reported to the police.

Participants perceived differential treatment by the CPD based on demographics of neighborhoods and the race of individuals. Almost all of the participants said CPD officers change their behavior and treatment of Chicagoans based on neighborhood or race, with much worse, ruder, and more aggressive treatment given to neighborhoods with less wealth and Black or Latino Chicagoans and much better, more polite, and more helpful treatment given to wealthier neighborhoods and White Chicagoans.

The overarching implication of these focus group results is that the CPD continues to have serious work ahead to improve trust and confidence in the CPD. The IMT looks forward to completing additional conversations with Chicagoans who agree to participate in future focus groups.

We will continue to hear from and reach out to Chicagoans throughout the Consent Decree process. *See* ¶646 ("646. The surveys will seek to assess perceptions of, and satisfaction with, CPD. The surveys will examine perceptions of CPD's overall police services, trustworthiness, community engagement, effectiveness, responsiveness, handling of misconduct complaints and investigations, and interactions with members of the Chicago community, including interactions with individuals who are people of color, LGBTQI, in crisis, youth, members of religious minorities, or have disabilities.").

## Get Involved

The Community Engagement Team works to connect with neighborhoods, community groups, religious organizations, activists, advocates, and residents across the city. The Community Engagement Team encourages community members to participate in meetings and to promote these sessions through their social and other networks. We regularly update the Community Involvement section of the IMT website with details on upcoming community meetings and events. If your neighborhood or community group would like to invite a Community Engagement Team member to a meeting, please email us at contact@cpdmonitoringteam.com or fill out a feedback form on our website (https://cpdmonitoringteam.com/feedback-form/).

We encourage community members to provide input on CPD policies. When the CPD modifies or creates applicable policies, it will post them on its website so that community members can provide input: https://home.chicagopolice.org/reform/policy-review/.

Community members may also participate in the monitoring process in the following ways:

❖ Attend our public meetings listed on our website;
❖ Complete an input form on our website; and

❖ Reach out to the IMT or members of our Community Engagement Team (see below).

## Contact the Independent Monitoring Team

Community members can reach out to the entire IMT via email:

❖ contact@cpdmonitoringteam.com

Community members can also contact individual members of our Community Engagement Team:

❖ Elena Quintana (Elena.Quintana@cpdmonitoringteam.com)

❖ Joe Hoereth (Joe.Hoereth@cpdmonitoringteam.com)

❖ Laura McElroy (Laura.McElroy@cpdmonitoringteam.com)

❖ Steve Rickman (Stephen.Rickman@cpdmonitoringteam.com)

❖ Denise Rodriguez (Denise.Rodriguez@cpdmonitoringteam.com)

Learn more at the Contact Us page on our website (https://cpdmonitoring-team.com/contact-us/).

Community members can also use the Feedback Form on our website to provide input (https://cpdmonitoringteam.com/feedback-form/).

# Compliance Activities and Assessments

This section provides an overview of compliance efforts for the seventh reporting period. We begin by explaining our priorities for the seventh reporting period that we described in our Monitoring Plan for Year Four. We include an overview of the assessment process and the deadlines within the seventh reporting period. We then provide summaries for the period, including summaries of our activities and of the City's achievements and challenges. Finally, we summarize the relevant compliance efforts for each topic area of the Consent Decree; provide a more specific analysis for each Consent Decree paragraph with a deadline before December 31, 2022; and summarize status updates for other paragraphs.

## The IMT's Methodologies during the Reporting Period

While most of this report addresses the City's efforts to meet the Consent Decree's requirements, the following subsection details the IMT's methodologies and activities in the seventh reporting period (July 1, 2022, through December 31, 2022).

In the seventh reporting period, we continued to meet regularly with representatives from the City, the City's relevant entities, the OAG, and members of Chicago's communities, including members of the Coalition (*see* ¶669). This included regular meetings with the CPD and the Superintendent (*see* ¶668), settlement conferences, and site visits (*see* ¶681).

At the beginning of the Consent Decree process, the City; the CPD; COPA; the Chicago Police Board; the City Office of Inspector General, including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC) worked to create open lines of communications.

Building on the efforts made in the previous reporting periods, these communications continued throughout the seventh reporting period. This included regularly scheduled meetings (*see, e.g.*, ¶¶668, 669), including regular meetings for each Consent Decree topic area. Specifically, we met consistently with, among others, members of the CPD, COPA, the City Office of Inspector General, the Police Board, and the OEMC, and reviewed thousands of City documents.[44]

A significant portion of our conversations involved discussing our methodologies for assessing the City's compliance with the Consent Decree. *See, e.g.*, ¶655. For the IMT, these discussions highlighted the importance of maintaining flexibility in our methodologies throughout the monitoring process. This flexibility ensures that

---

[44] The OAG has engaged in much of the same work and provided separate feedback to the City and the CPD.

our monitoring efforts continue to meet the letter and spirit of the Consent Decree, as the Parties and the IMT develop necessary information, learn from previous efforts, and identify unanticipated hurdles. *See, e.g.*, ¶717. Changed circumstances may require the IMT to consider fewer, more, or alternative sources of information. As a result, our methodologies may adjust based on ongoing consultation with the Parties, as we continue to identify and consider new information and data that is relevant to the Consent Decree. We endeavor to supplement our methodologies with additional specificity throughout this report. During this reporting period, like all prior reporting periods, the IMT discussed the methodologies with the Parties before implementation and prior to conducting its audits and reviews for this report, acknowledging their concerns, and making adjustments for clarity.

Finally, in addition to making these efforts, the IMT continued to adhere to several specific and ongoing requirements of the Consent Decree. Background Figure 7, below, summarizes our compliance with the Consent Decree's deadlines for the IMT in the seventh reporting period.

Background Figure 7:  IMT Deadlines in the Seventh Reporting Period

| ¶s | Requirement | Deadline | Seventh Reporting Period Deadlines |
|---|---|---|---|
| 627–37 | Review of CPD Policies and Procedures | Various, Ongoing | Corresponds with policy deadlines |
| 638–41 | Review of Implementation Plans and Training Materials | Various, Ongoing | Corresponds with plan and training deadlines |
| 642–44 | Compliance Reviews and Audits | Various, Ongoing | Occur during each reporting period |
| 652–55 | Review Methodologies | 45 Days prior (and every reporting period) | November 16, 2022 |
| 656 | Technical Assistance and Recommendations | Ongoing | Ongoing |
| 668 | Maintain Regular Contact with the Parties | Ongoing | Monthly |
| 669 | Monitor will Participate in Meetings with the Coalition | Quarterly | Quarterly |
| 670–71 | Communication with the Parties, Collective Bargaining Representatives, and the Public | Ongoing | Ongoing |

## Seventh Reporting Period Priorities

We set out our priorities for the seventh reporting period in our Monitoring Plan for Year Four.[45] Through the seventh reporting period, we were monitoring compliance with those paragraphs to match the pace of the five-year goal described in the Consent Decree. As explained above, in the sixth reporting period, the Parties entered a stipulation, which extends the pace of the Consent Decree to eight years.[46]

## Assessing Compliance

Overall, in accordance with ¶¶661–62 and 642, the IMT assesses how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: **(1) Preliminary compliance**, **(2) Secondary compliance**, and **(3) Full compliance**. The CPD and other City entities will not be "in compliance" with a requirement until they reach Full compliance for the requisite length of time required by the Consent Decree—either one or two years. *See* ¶714. We will assess the City's compliance on all appropriate levels for the paragraphs presented in this report.

❖ **Preliminary compliance** typically refers to the development of acceptable policies and procedures that conform to best practices (as defined in ¶730) and to the incorporation of requirements into policy (¶642). The IMT will assess the development of policies, procedures, rules, and regulations reasonably designed to achieve compliance. To attain Preliminary compliance, the City must have policies and procedures designed to guide officers, City employees, supervisors, and managers performing the tasks outlined in the Consent Decree. These policies and procedures must include appropriate enforcement and accountability mechanisms, reflect the Consent Decree's requirements, comply with best practices for effective policing policy, and demonstrate the City and its relevant entities' ability to build effective training and compliance.

❖ **Secondary compliance** typically refers to the development and implementation of acceptable and professional training strategies (¶642). Those strategies

---

[45] The IMT's Monitoring Plan for Year Four is available on the IMT's website. *See Reports and Resources*, INDEPENDENT MONITORING TEAM (November 2, 2022), https://cpdmonitoring-team.com/wp-content/uploads/2022/11/2022.11.02-Monitoring-Plan-for-Year-Four-filed.pdf. Given the varying workloads of separate departments and personnel, the City and its relevant entities may make compliance efforts earlier than anticipated. When appropriate, we may also assess those efforts in our monitoring reports earlier than anticipated.

[46] *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Re-garding-Search-Warrants-Consent-Decree-Timelin.._.pdf.

must convey the changes in policies and procedures that were established when we determined Preliminary compliance. Secondary compliance also refers to creating effective supervisory, managerial, and executive practices designed to implement policies and procedures as written (¶730). The IMT will review and assess the City's documentation—including reports, disciplinary records, remands to retraining, follow-up, and revisions to policies, as necessary—to ensure that the policies developed in the first stage of compliance are known to, are understood by, and are important to line, supervisory, and managerial levels of the City and the CPD. The IMT will be guided by the ADDIE model (Analysis, Design, Development, Implementation, and Evaluation) of curriculum development to assess training and will consider whether there are training, supervision, audit, and inspection procedures and protocols designed to achieve, maintain, and monitor the performances required by the Consent Decree.

❖ **Full compliance** refers to adherence to policies and training within day-to-day operations (¶642). Full compliance requires that personnel, including sergeants, lieutenants, captains, command staff, and relevant City personnel routinely hold each other accountable for compliance. In other words, the City must "own" and enforce its policies and training and hold officers accountable for misconduct through a disciplinary system that is fair, timely, and consistent. The IMT will assess whether the City's day-to-day operations follow directives, policies, and training requirements. When measuring Full compliance, we will note whether supervisors notice, correct, and supervise officer behavior and whether appropriate corrections occur in the routine course of business. In this phase, we will review whether compliance is reflected in routine business documents, demonstrating that reforms are being institutionalized. In addition, we will determine whether all levels of the chain of command ensure consistent and transparent compliance.

These levels typically correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. Still, the three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training rather than to create a policy. Likewise, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate. In other circumstances, levels of compliance may include implementing effective pilot programs before rolling out reforms across the entire CPD.

Throughout this report, we provide our compliance assessments and descriptions of the status of current compliance based on efforts within the seventh reporting

period. Under the Consent Decree, the City, the CPD, and other relevant City enti-ties are not in any level of compliance until we find that they comply. As a result, a finding that the City is not in compliance with a requirement does not mean that the City has not made efforts—even significant efforts—to achieve compliance to-ward that requirement.

In accordance with ¶¶661–62 and 642, we assess how the City, the Chicago Police Department (the CPD), and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Second-ary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training rather than to create a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are complying. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional bur-den of providing the IMT and the OAG with sufficient proof of its actions.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the seventh reporting period, we have added specific categories for each of the three levels of compliance, as ap-propriate:

- **In Compliance.** Based on the City's evidence, the City has met a level of com-pliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the City's evidence, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Con-sent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the City's evidence, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance, or the City has not met a lower level of compliance.

# I. Community Policing

## Guiding Principles

The IMT assessed whether the City complied with applicable Community Policing paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> ***8.*** *Strong community partnerships and frequent positive interactions between police and members of the public make policing safer and more effective, and increase public confidence in law enforcement. Moreover, these partnerships allow police to effectively engage with the public in problem-solving techniques, which include the proactive identification and analysis of issues in order to develop solutions and evaluate outcomes.*

> ***9.*** *To build and promote public trust and confidence in CPD and ensure constitutional and effective policing, officer and public safety, and sustainability of reforms, the City and CPD will integrate a community policing philosophy into CPD operations that promotes organizational strategies that support the systematic use of community partnerships and problem-solving techniques.*

> ***10.*** *CPD will ensure that its community policing philosophy is a core component of its provision of police services, crime reduction strategies and tactics, training, management, resource deployment, and accountability systems. All CPD members will be responsible for furthering this philosophy and employing the principles of community policing, which include trust and legitimacy; community engagement; community partnerships; problem-solving; and the collaboration of CPD, City agencies, and members of the community to promote public safety.*

> ***11.*** *The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest.*

# Summary of Compliance Efforts and Assessments

## Community Policing in the Seventh Reporting Period

In the seventh reporting period, the City and the CPD's compliance efforts continued to be adversely affected by staffing challenges and managing competing priorities. Especially impacted were efforts to put in place more effective community engagement strategies, expanding the National Policing Initiative (NPI) to other police districts, and finalizing policy governing CPD interactions with youth. In this reporting period, the CPD completed the required two-year review of *Processing Persons Under Departmental Control* (G06-01), *Arrestee and In-Custody Communications* (G06-04), and *Juvenile Processing Juveniles and Minors Under Department Control* (S04-04). *See* ¶636. The CPD also developed and delivered the requisite eLearning training and training bulletins required for implementation of these policies. The City and the CPD also completed a *School Resource Officer (SRO) Program Annual Report* that captured evaluative data and notable policy revisions reflecting continued progress with the implementation of SRO related Consent Decree requirements.

To assess compliance with the requirements of the community policing paragraphs, the IMT reviewed relevant draft policies, training curricula and records, and observed community meetings. The IMT met regularly with the CPD's Office of Constitutional Policing and Reform for updates on efforts to comply with the community policing paragraph requirements. The IMT has participated in briefings with the staff of the Neighborhood Policing Initiative and the Audit Division of the CPD. The IMT interviewed District Coordination Officers (DCOs) and Chicago Alternative Police Strategy (CAPS) officers regarding roles and responsibilities and coordination with other CPD functions. The IMT also observed community conversations used to help develop district crime reduction and community engagement activities and visited Whitney Young High School for a discussion with the assigned SRO and school staff.

During this reporting period the CPD held Beat meetings, District Advisory Committee meetings, conducted online surveys, and used DCOs and CAPs to engage and ascertain community input. Additionally, the CPD put together focus groups, task forces, advisory groups, and held focused deliberations with key stakeholders to garner feedback on policies and trainings. Community stakeholders, however, are persistent in their criticism of the CPD engagement and outreach efforts expressing that community input is not genuinely sought or considered, and that marginalized groups are minimally included in deliberations. To address these concerns, the CPD indicated that they will try to meet people where they are and seek more ways to reach members of marginalized groups. The CPD initiated work on a

more comprehensive community engagement plan that is expected to be completed in the eighth reporting period.

Expansion of the Neighborhood Policing Initiative (NPI), the agreed upon approach to broaden community policing practices throughout CPD, has not occurred in the past year. Currently NPI has been implemented to some extent in 10 of the 22 police districts. In meetings with DCOs and CAPs members, the IMT learned how the CPD is attempting to integrate these functions within their District's community policing office. In their pilot effort in the 6th District, the CAPS officers primarily serve as liaisons to the various marginalized groups within the district ensuring more accessibility. The DCOs follow up on select calls for service requiring more complex problem solving and often work directly with community members and other City workers to address community safety issues. The CAPS and DCOs coordinate their activities, both working as parts of their district's community policing office. The CPD intends to apply this model as they expand NPI to other districts. The IMT is concerned about the delays in expansion of NPI to other districts and encourages all program components be implemented and fully staffed.

At the end of the seventh reporting period, the CPD had yet to finalize the youth policy governing the CPD's interactions and addressing the issues of youth diversion and deflection. The CPD had developed a draft of the *Interactions with Youth* policy and have plans in place to expand services for at-risk youth. The City and the CPD are optimistic about finalizing this policy in the eighth reporting period.

In this reporting period, the CPD finalized its community partnership policy outlining reporting and review requirements for partnership activity in each district. The IMT is also hopeful that the CPD can make more progress in the next reporting period in identifying, documenting, further developing, and expanding community partnerships.

The City and the CPD continue to experience challenges with fully documenting Beat meetings, fully staffing District Advisory Committees and documenting their activities, and expanding participation to include more young people and those from marginalized groups. The CPD is now also interacting with the newly-elected District Councils (part of the CCPSA)[47] which are comprised of three people who represent each police district. The District Councils have an advisory role, and the CPD must now find ways to facilitate coordination among these two advisory bodies (the District Advisory Councils and the District Councils) that serve each police district. The CPD's district strategy development process continued to demonstrate improvement during this reporting period, producing more substantive

---

[47] *See Community Commission for Public Safety and Accountability, Information on District Councils*, City of Chicago, https://www.chicago.gov/city/en/depts/ccpsa/supp_info/district-councils.html

strategies. As with other CPD engagement activity, groups with high police contacts, such as young men of color and members of other marginalized groups, are poorly represented in the community conversations used to develop the district strategies.

The IMT was encouraged by the CPD -CPS production of the *School Resource Officer Annual Report* that addressed SRO activity in school settings, captured evaluative data, and presented notable revisions to policy resulting from program reviews. The CPS and the CPD continue to provide robust training to SROs that align with national best practices and the use of new selection criteria defined in updated policy.

The IMT was also encouraged with the progress made in finalizing policies and implementing training regarding the handling of juveniles in the CPD custody and the finalizing of policies relating to the reporting and documentation of partnership activity in each police district.

## Updated Compliance Levels for the Seventh Reporting Period:

Overall, the IMT assessed the City's compliance with 35 Community Policing paragraphs in the seventh reporting period (¶¶13–20 and 22–48). The City and the CPD maintained Preliminary compliance for 17 paragraphs (¶¶16, 19–20, 22–25, 27, 29, 31, 34–36, and 45–48), maintained Secondary compliance for 11 paragraphs (¶¶13—15, 26, 28, 30, 37–40, and 43), met Secondary compliance for four paragraphs (¶¶17, 18, and 41—42), and maintained Full compliance with one paragraph (¶44). The City did not reach Preliminary compliance in the two paragraphs (¶¶32–33). *See* Community Policing Figure 1 below.

Community Policing Figure 1:      Compliance Progress for Community Policing Paragraphs at the End of the Seventh Reporting Period (December 31, 2022)



Paragraphs in **Preliminary**, **Secondary**, or **Full** Compliance   (17)   (15) (1)   (33)
Paragraphs that have not met Preliminary compliance   (2)
Paragraphs Under Assessment for Preliminary compliance   (0)

## Community Policing Progress through Seven Reporting Periods

Progress by the City and the CPD in achieving compliance with the Community Policing section of the Consent Decree has slowed in the last several reporting periods. Most notable have been delays in finalizing policy governing CPD officers' interactions with youth, in the expansion of the Neighborhood Policing Initiative to all districts, and developing and implementing more effective engagement pro-

gramming including Beat and DAC meeting support, outreach, and documentation. The City and the CPD acknowledge that these delays are due in part to staffing challenges and managing workloads.

Over the course of the last seven reporting periods, the CPD has refined its strategy development process, greatly expanding its information gathering template, and capturing more detailed data and feedback. The design and implementation of the community conversations where community members participate in a series of facilitated discussions that result in highlighting neighborhood crime concerns, solutions, and desired engagement activity have evolved as an effective outreach tool to ascertain feedback from segments of the Chicago community. However, often absent from these community conversations are young people, and members of marginalized groups. Despite concerted efforts from the CPD since the onset of the Consent Decree to focus on increasing the number of positive interactions and expanding engagement activities with community members, broadening participation in youth programs, conducting task forces and focus groups to review policies and training, and more recently deliberative discussions with interested parties concerning the CPD policies and practices, community stakeholders persistently complain the CPD does not seriously consider their input and incorporate community input into their decision-making. The CPD's engagement strategies and processes must continue to evolve and expand community involvement in community safety decision-making.

A notable Consent Decree achievement is the City and the CPD working with CPS to further develop of the CPD School Resource Officer (SRO) Program. In prior reporting periods, in response to community concerns, CPS worked directly with community-based organizations to reach a consensus about School Resource Officer programming, including giving the decision to local school councils to determine whether to place School Resource Officers in their schools.[48] The CPD and the CPS over the course of the seven reporting periods have a comprehensive *School Resource Officer* policy in place that includes updated selection criteria and processes and have implemented a robust training program that includes 40-hours of initial training followed with additional hours of annual in-service training.[49] The CPD SRO program continues to develop as one of the most advanced SRO programs in the nation. In the most recent reporting period, the CPS and the CPD produced an annual report that captured salient performance metrics and notable policy revisions.

---

[48] *See School Resource Officer Program Information*, CHICAGO PUBLIC SCHOOLS, https://www.cps.edu/about/local-school-councils/school-resource-officer-program-information/.

[49] *See* Special Order S04-01-02, *School Resource Officers and Investigations at Chicago Public Schools,* CHICAGO POLICE Department (June 30, 2022), https://directives.chicagopolice.org/#directive/public/6724.

Through these seven reporting periods, the City and the CPD are close to achieving Preliminary compliance on nearly all of the community policing-related paragraphs. The City and the CPD have demonstrated some progress in developing and delivering training to implement many new Community Policing related policies. While the community policing training is routinely delivered to new officers, the IMT is concerned that it is not part of the annual in-service program with the CPD choosing to attempt to cover aspects of the Community Policing curriculum through other training courses. The CPD has been successful in developing and delivering training for implementing revised policies on the handling of juveniles in police custody and for the delivery of victim services.

In the Mayor's public safety cabinet meetings, the City also continues to demonstrate ongoing coordination among city entities in addressing community safety issues. During these cabinet discussions the City highlighted public-health inspired models that aim to address root causes of violent crime and social disorder by applying leveraged and coordinated public and private resources. This approach aligns with community policing principles and needs to be more fully integrated into the CPD's operations in achieving Consent Decree compliance and advancing community safety.

Through seven reporting periods, the City and the CPD have integrated several reforms from the Community Policing section into various policies and written guidance. Community Policing Figure 3, below, provides a sample of those policies.

Community Policing Figure 3: Sample of New or Revised Policies related to the Community Policing Section (between March 1, 2019, and December 31, 2022)[50]

|  | Policy # | Issue Date |
|---|---|---|
| ❖ Community Engagement in Policy Development | G01-03-01 | 05/28/2022 |
| ❖ School Resource Officers and Investigations at Chicago Public Schools | S04-01-02 | 05/19/2022 |
| ❖ Positive Community Interactions | S02-03-15 | 04/07/2022 |
| ❖ District Strategic Plans | S02-03-02 | 03/31/2022 |
| ❖ Community Policing Mission and Vision General Order | G02-03 | 12/31/2021 |
| ❖ Pre-Service Training Special Order | S11-10-02 | 12/29/2021 |
| ❖ In-Service Training Special Order | S11-10-03 | 12/29/2021 |
| ❖ School Resource Officers and Investigations at Chicago Public Schools Special Order | S04-01-02 | 12/17/2021 |

---

[50]  Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

| | Policy # | Issue Date |
|---|---|---|
| ❖ Neighborhood Policing Initiative | D21-04 | 6/30/2021 |
| ❖ The Community Policing Office Special Order | S02-03 | 6/30/2021 |
| ❖ Crime Victim Assistance Special Order | S02-01-03 | 6/10/2021 |
| ❖ CPD's Community Policing Advisory Panel (CPAP) Quarterly Report Standard Operating Procedure | n/a | 1/1/2021 |
| ❖ District Advisory Committee | S02-03-14 | 12/31/2020 |
| ❖ Bridging the Divide Special Order | S02-03-12 | 12/31/2020 |
| ❖ Officer Friendly Program Special Order | S02-03-11 | 12/31/2020 |
| ❖ Community Policing Business Public-Safety Initiative | S02-03-13 | 12/31/2020 |
| ❖ Social Media Outlet: Twitter Special Order | S02-03-10 | 12/31/2020 |
| ❖ Trespass Affidavit Special Order | S02-03-09 | 12/31/2020 |
| ❖ Gun Turn-In Special Order | S02-03-08 | 12/31/2020 |
| ❖ G.R.E.A.T. Program Special Order | S02-03-07 | 12/31/2020 |
| ❖ D.A.R.E. Program Special Order | S02-03-06 | 12/31/2020 |
| ❖ Ride Along Program Special order | S02-03-04 | 12/31/2020 |
| ❖ Community Concerns | S02-03-03 | 12/31/2020 |
| ❖ Beat Community Meetings | S02-03-01 | 12/31/2020 |
| ❖ Preliminary Investigations | G04-01 | 12/30/2020 |
| ❖ Processing of Juveniles and Minors Under Department Control | S06-04 | 2/29/2020 |

Through seven reporting periods, the City and the CPD have also developed or updated training materials to incorporate requirements from the Community Policing section. Community Policing Figure 4 provides a sample of training materials related to Community Policing that were developed or revised since the start of the Consent Decree.[51]

---

[51] As detailed in Appendix 1 (Community Policing), the City and the CPD may still need to demonstrate that they effectively provided all these training courses to the requisite personnel.

Community Policing Figure 4: Sample of New or Revised Training Materials related to the Community Policing Section (between March 1, 2019, and December 31, 2022)[52]

| New or Revised Community Policing Related Training Materials (between March 1, 2019, and December 31, 2022) | Date |
|---|---|
| ❖ *Community and Affinity Liaisons Training* | 2022 |
| ❖ *School Resource Officer Community Group Training* | 2022 |
| ❖ *Community Policing In-Service Training* | 2022 |
| ❖ *In-Service Two-day De-escalation, Response to Resistance Training* | 2022 |
| ❖ *Use of Force Training* | 2022 |
| ❖ *School Resource Officer Refresher Training (2021–2022)* | 2021 |
| ❖ *Strategies for Youth Training (Policing the Teen Brain)* | 2021 |
| ❖ *Neighborhood Policing Initiative Training* | 2021 |
| ❖ *School Resource Officer Initial Training (2019–2020)* | 2019 |

## Looking Ahead to the Eighth Reporting Period

Looking ahead to the eighth reporting period, the IMT is hopeful that the CPD will accelerate efforts to achieve compliance in the Community Policing section by devoting more resources to establishing supervisory and tracking mechanisms to ensure effective implementation of newly enacted or revised CPD policies. The IMT also expects the CPD to make significant progress in expanding the NPI—the centerpiece of their community policing strategy—to more police districts, and improve, define and refine the community engagement processes. The IMT will be paying particular attention to how the CPD works with and coordinates the activities of the District Advisory Committees and the recently formed District Councils. The IMT is encouraged by recent progress in formulating a new policy governing interaction with youth and expects the CPD to finalize this policy in the eighth reporting period.

In the seventh reporting period, the City and the CPD made progress toward compliance with various requirements of the Community Policing section of the Consent Decree. Moving forward, we are hopeful that the City and the CPD can pro-

---

[52] Some of these training courses may not have been provided to 95% of personnel at the time of this report.

vide sufficient resources toward reforms related to the Community Policing section, including developing and implementing related policies, training, supervision mechanisms, and evaluation processes.

As referenced above, the City and the CPD have made progress in this section by developing new or revised policies and training materials. The Consent Decree requires, however, additional policy changes. For example, at the end of the seventh reporting period, the City and the CPD continued developing the following new or revised policies:

- ❖ *CompStat and Command Engagement*                    G01-08
- ❖ *Community Partnership*                                          S02-03-16
- ❖ *Youth District Advisory Council*                             S02-03-15
- ❖ *Field Arrest Procedures General Order*                 G06-01-01
- ❖ *Interactions with Youth General Order* (NEW)        G02-05
- ❖ *Prohibition of Sexual Misconduct* (NEW)               G02-05

The Consent Decree also requires additional training development, and at the end of the seventh reporting period, the City and the CPD continued developing the following new or revised training materials:

- ❖ Integration Training Curriculum for DCOs and Community Policing Members, Par
- ❖ Crime Victim Assistance eLearning Lesson Plan/Training Curriculum
- ❖ Recruit Curriculum on Victim Services
- ❖ Training Curriculum (Recruit, In-Service & Pre-Service) covering "Arrestee and tody Communication"
- ❖ Processing Juveniles eLearning and Bulletin (in-service)
- ❖ Juvenile Processing Training (recruits)
- ❖ 2023 Youth Interactions In-Service Training
- ❖ Roll Call Training related to Diversion Program Roll-Out
- ❖ Pre-Service Training on Youth Diversion
- ❖ Recruit Training on Youth Diversion
- ❖ SRO Annual Refresher Training

We look forward to reporting on these finalized policies and training materials, as well as evidence that the City and the CPD have implemented these reforms into practice.

***

Specific compliance assessments, by paragraph, for the Community Policing section are included in Appendix 1.

# II. Impartial Policing

## Guiding Principles

The IMT assessed compliance with applicable Impartial Policing paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **49.** *The Parties agree that policing fairly, with courtesy and dignity, and without bias is central to promoting broad community engagement, fostering public confidence in CPD, and building partnerships between law enforcement and members of the Chicago community that support the effective delivery of police services.*

> **50.** *In conducting its activities, CPD will provide police services to all members of the public without bias and will treat all persons with the courtesy and dignity which is inherently due every person as a human being without reference to stereotype based on race, color, ethnicity, religion, homeless status, national origin, immigration status, gender identity or expression, sexual orientation, socio-economic class, age, disability, incarceration status, or criminal history.*

> **51.** *CPD will ensure its members have clear policy, training, and supervisory direction in order to provide police services in a manner that promotes community trust of its policing efforts and ensures equal protection of the law to all individuals.*

## Summary of Compliance Efforts and Assessments

### Impartial Policing in the Seventh Reporting Period

In the seventh reporting period, the City and the CPD revised several policies related to the Impartial Policing section of the Consent Decree. The CPD finalized *Human Rights* (G02-01), *Prohibition of Racial Profiling* (G02-04), *In Service training* (S11-10-03), and *Religious Interactions* (G02-01-05). The CPD also developed related training materials, such as training related to gender-based violence, constitutional policing, and fair and impartial policing. The City and the CPD also implemented its *Hate Crimes* e-Learning, *First Amendment* e-Learning, and *BIA* e-Learning and integrated concepts of impartial policing in a number of its in-service training courses during the reporting period.

Further, the IMT also reviewed and provided comment on the City and OEMC's revisions to the *Diversity Awareness Training*. Materials related to this training were produced at the end of the reporting period and in a preliminary review conducted by the IMT found that the OEMC addressed the IMT's previous comments.

As noted previously, while the City and the CPD also made improvements to their community engagement processes as they relate to community input on policy review and development, more work is needed to demonstrate comprehensive and meaningful community engagement, including informing the community about how their input impacted policy revisions. *See, e.g.*, ¶52. Technical assistance continued regarding the CPD's long-term community engagement and its community engagement in policy development. Near the end of the reporting period, the CPD proposed conducting a pilot of the *Community Engagement in Policy* directive, G01-03-01. The IMT looks forward to reviewing and collaborating with CPD on the development and implementation of the pilot to assess further levels of compliance with ¶52.

The IMT also observed various community engagement efforts during the seventh reporting period, including two community conversations on *Search Warrants and several Training Advisory Committee Meetings* in review of Gender-Based Violence and Religious Interactions training.

In the seventh reporting period, we continued to conduct check-ins with members of CPD responsible for the Impartial Policing section, including the Office of Community Policing. Throughout the reporting period, the IMT continued to review CPD policies and training regarding the requirements of this section, including materials on topics such as sexual misconduct, gender-based violence, constitutional policing, fair and impartial policing, and search warrants. In addition, the IMT met with members of the Office of Community Policing—including the Community Engagement Coordinators, Language Access Coordinator (or LAC), the Americans with Disabilities Act Liaison and the Community Liaisons—to discuss progress and corresponding compliance initiatives. The IMT also met with CPD Executive Leadership involved in the reform and personnel from the Research and Development and Training Support Group. These meetings provided an opportunity to discuss upcoming activities and efforts to achieve compliance with a wide arrange of the Impartial Policing paragraphs. The IMT also conducted a ride-along, focus group with District Coordination Officers (DCOs) and Chicago Alternative Policing Strategy (CAPS) officers in the 6th District, and observed a Strategic Planning Meeting in the 8th District.

In addition, the IMT met with various stakeholders outside of CPD involved in the reform, including OEMC and the Public Safety Inspector General. The meeting with OEMC included a discussion on its efforts to complete its development of the diversity awareness training. The meeting with the Public Safety Inspector General

centered around their efforts to audit and review various CPD activities, programs, and operations to better understand how their work compliments the monitoring work expected to be conducted as CPD moves into operational compliance.

Overall, the City and the CPD made minimal progress in many areas of Impartial Policing during this reporting period. As reflected in the Community Policing section above and noted in previous reporting periods, we attribute much of this delay to staffing issues and changing priorities—often changing away from compliance with the requirements of these sections. We continue to stress the impact of limited personnel resources within the Office of Community Policing on its efforts to be responsive to the Consent Decree and requirements of the paragraphs within Impartial Policing. Shortages in staff have presented continued delays, for example, in the production of revised policies, development of related training, reviews of plans, and documentation of annual reports. In light of these staffing shortages, the IMT stresses the importance for the Office of Community Policing to prioritize activities and develop a strategic plan to comply with this section of the Consent Decree.

Reaching Preliminary and Secondary compliance with many of the paragraphs within this section will depend on the City and the CPD's ability to articulate the policies and training that achieve compliance. It will be essential for the City and the CPD to establish a plan or strategy that clearly delineates the methods that it will use to achieve compliance, especially in the case of the paragraphs with broad requirements, such as ¶¶53–55. In addition, as the CPD moves into Secondary compliance and starts working on achieving Full compliance, the CPD will need to identify the data, reports, and auditing mechanisms to demonstrate implementation.

Further, although not specifically mandated by the Consent Decree, the IMT recommends that the City and the CPD consider creating an executive position within the CPD that focuses on the integration of the concepts of diversity, inclusion, equity, and impartial policing into all aspects of the CPD, including policy, training development, and operations. A Chief Equity Officer, or DEI Coordinator, can spearhead and accelerate the CPD's efforts to comply with the requirements of ¶¶53, 54, 72, and others within this section.

## Updated Compliance Levels for the Seventh Reporting Period

In this seventh reporting period, we assessed the City's compliance with all 31 of the Impartial Policing paragraphs (¶¶52–82)—with two of those paragraphs containing conditional requirements that did not apply to this reporting period (¶81–

82).[53] The City maintained Preliminary compliance for 11 paragraphs (¶¶52, 56–57, 59-61, 65–66, 70–71, and 74), moved into Preliminary compliance for one paragraph (¶58), maintained Secondary compliance for two paragraphs (¶¶67 and 73), moved into Secondary compliance for three paragraphs (¶¶76–78). The City is under Assessment for three paragraphs (¶¶54–55 and 75). The City failed to reach Preliminary compliance for the remaining nine paragraphs assessed (¶¶53, 62–64, 68–69, 72, and 79–80). *See* Impartial Policing Figure 1 below.

Impartial Policing Figure 1: Compliance Progress for Impartial Policing Paragraphs at the End of the Seventh Reporting Period (December 31, 2022)

| | |
|---|---|
| Paragraphs in **Preliminary**, **Secondary**, or **Full** Compliance |  (12)  (5) (17) |
| Paragraphs that have not met Preliminary compliance | (9) |
| Paragraphs Under Assessment for Preliminary compliance | (3) |

## Impartial Policing Progress through Seventh Reporting Periods

Through seven reporting periods, the City and the CPD have incorporated some of the requirements from the Impartial Policing section into various policies and written guidance. Impartial Policing Figure 2, below, provides a sample of those policies.

Impartial Policing Figure 2:
Sample of New or Revised Policies related to the Impartial Policing Section (between March 1, 2019, and December 31, 2022)[54]

| | Policy # | Issue Date |
|---|---|---|
| ❖ *Community Engagement in Policy Development – Pilot Program* | D22-08; G01-03-01 | 12/31/2022 |
| ❖ *Search Warrant Community Resources and Referrals Pilot Program* | D22-07 | 12/31/2022 |
| ❖ *Community Partnerships* | S03-02-16 | 12/28/2022 |
| ❖ *Religious Interactions* | G01-02-05 | 12/12/2022 |
| ❖ *First Amendment Rights* | G02-02 | 12/19/2022 (replaces |

---

[53] Specifically, because ¶¶79–82 are interrelated, we assessed their compliance together. Paragraph 82, however, does not contain a substantive requirement for the City. Likewise, ¶81 contains conditional requirements that may never apply and, at the time of this report, do not apply.

[54] Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

| | Policy # | Issue Date |
|---|---|---|
| | | 4/13/2021 version) |
| ❖ *Prohibitions of Sexual Misconduct* | G08-06 | 11/17/2022 |
| ❖ *Crime Victim and Witness Assistance* | E02-04 | 11/3/2022 (replaces 6/10/2021 version) |
| ❖ *Positive Community Interactions* | S02-03-15 | 6/7/2022 |
| ❖ *Interactions with Religious Communities* | G02-01-05 | 4/29/2022 |
| ❖ *Prohibition Regarding Racial Profiling and Other Bias Based Policing* | G02-04 | 11/15/2021 |
| ❖ *Protection of Human Rights* | G02-01 | 11/15/2021 |
| ❖ *Interactions with Transgender, Intersex, and Gender-Nonconforming Individuals (TGIN) Policy* | G02-01-03 | 6/30/2021 |
| ❖ *Hate Crimes and Related Incidents Motivated by Bias or Hate* | G04-06 | 4/1/2021 |
| ❖ *Prohibition on Retaliation* | G08-05 | 12/30/2020 |
| ❖ *Use of Social Media Outlets* | G09-01-06 | 2/5/2020 |

Through seven reporting periods, the City and the CPD have also developed or updated training materials to incorporate requirements from the Impartial Policing section. Impartial Policing Figure 3 provides a sample of those training materials.[55]

Impartial Policing Figure 3:
Sample of New and Revised Training Materials related to the Impartial Policing Section (between March 1, 2019, and December 31, 2022)[56]

**New or Revised Impartial Policing Related Training Materials (between March 1, 2019, and December 31, 2022)**

❖ *Community Policing Training* (NEW)
❖ *Fair and Impartial Policing Training* (NEW)
❖ *Annual Carbine Operator Qualification Training* (NEW)
❖ *First Amendment eLearning* (NEW)
❖ *S11-10, Department Training* (NEW)
❖ *S11-10-03, In-Service Training* (NEW)
❖ *G04-06, Hate Crimes eLearning* (NEW)
❖ *Recruit Use of Force Training*

[55] As detailed in Appendix 2 (Impartial Policing), the City and the CPD may still need to demonstrate that they effectively provided all these training courses to the requisite personnel.
[56] Some of these training courses may not have been provided to 95% of personnel at the time of this report.

**New or Revised Impartial Policing Related Training Materials (between March 1, 2019, and December 31, 2022)**

- ❖ *Gender-Based Violence In-Service Training*
- ❖ *Non-Bias Training*
- ❖ *Procedural Justice 3 Training Materials*
- ❖ *Sexual Assault Training and Knowledge Test*
- ❖ *2021 Two-Day De-Escalation, Response to Resistance, and Use of Force Training*

## Looking Ahead to the Eighth Reporting Period

In the seventh reporting period, the City and the CPD continued to struggle to make significant progress with the Impartial Policing section of the Consent Decree. Moving forward, we are hopeful that the City and the CPD can provide sufficient resources toward reforms related to the Community Policing and the Impartial Policing sections.

The City and the CPD have, however, been developing new and revised policies, written guidance, and training to make progress in this section. At the end of the seventh reporting period, the City and the CPD continued developing, for example, the following new or revised policies:

| | |
|---|---|
| ❖ Search Warrants | S04-09 |
| ❖ Limited English Proficiency Policy | S02-01-05 |
| ❖ Interactions with TIGN | G02-01-03 |
| ❖ Interactions with Religious Communities Policy | G02-01-05 |
| ❖ Interactions with People with Disabilities | S02-01-01 |
| ❖ Initiation and Assignment of Investigations into Allegations of Misconduct (previously titled Specific Responsibilities Regarding Allegations of Misconduct) | G08-01-02 |

The Consent Decree also requires additional training development, and at the end of the seventh reporting period, the City and the CPD continued developing, for example, the following new or revised training materials:

- ❖ Constitutional Policing In-Service Training
- ❖ 2023 Policy Updates Use of Force Training
- ❖ 2023 Annual Use of Force – Integrating Communications Assessments and Tactics (ICAT) Training
- ❖ OEMC Language Access Training, TNG 19-004
- ❖ OEMC Diversity Awareness and Implicit Bias Training [Introduction to Implicit Bias and Inclusion: Building an Inclusive Organizational Culture]

- ❖ CPD Interactions with People with Disabilities Training
- ❖ CPD Deaf/Hard of Hearing Training Bulletin Task File

We look forward to reporting on these finalized policies and training materials, as well as evidence that the City and the CPD have implemented these reforms into practice.

<div align="center">***</div>

Specific compliance assessments, by paragraph, for the Impartial Policing section are included in Appendix 2.

# III. Crisis Intervention

## Guiding Principles

The IMT assessed compliance with applicable Crisis Intervention paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *83. CPD officers often serve as first responders to individuals experiencing a behavioral or mental health crisis. These individuals may exhibit symptoms of known, suspected, or perceived behavioral or mental health conditions, including, but not limited to, mental illness, intellectual or developmental disabilities, or co-occurring conditions such as substance use disorders. The Parties acknowledge that having a mental illness, an intellectual or developmental disability, or co-occurring condition does not mean an individual necessarily is in crisis, or that having a behavioral or mental health condition would necessarily be the reason for any crisis that requires police involvement. However, it may need to be considered or warrant heightened sensitivity to ensure an appropriate response. Therefore, individuals in the groups listed above will be collectively referred to as "individuals in crisis" for the purposes of this Agreement.*

> *84. A person may be a suspected individual in crisis based on a number of factors, including, but not limited to, self-reporting; information provided by witnesses, family members, or individuals requesting service; CPD's previous knowledge of the individual; or an officer's direct observation.*

> *85. CPD officers will interact with individuals in crisis with dignity and respect. The use of trauma-informed crisis intervention techniques to respond appropriately to individuals in crisis will help CPD officers reduce the need to use force, improve safety in police interactions with individuals in crisis, promote the connection of individuals in crisis to the healthcare and available community-based service systems, and decrease unnecessary criminal justice involvement for individuals in crisis. CPD will allow officers sufficient time and resources to use appropriate crisis intervention techniques, including de-escalation techniques, to respond to and resolve incidents involving individuals in crisis. To*

*achieve these outcomes, the City and CPD will implement the requirements set out below.*

*86. The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest for individuals in crisis.*

# Summary of Compliance Efforts and Assessments

## Crisis Intervention in the Seventh Reporting Period

During the seventh reporting period, the CPD, the Office of Emergency Management and Communication (OEMC), and the Chicago Council on Mental Health Equity (also known as the CCMHE) worked to address the requirements in the Crisis Intervention section of the Consent Decree related to policy, training, operational practices, and community engagement.

The IMT reviewed data and conducted site visits throughout the seventh reporting period to assess compliance under the Consent Decree. For example, the IMT met with Crisis Intervention Team patrol officers, Crisis Intervention Team sergeants, the Crisis Intervention Team District Operations and Community Support team (CIT DOCS), the Crisis Intervention Team training division (also known as CITTS), the CIT Coordinator, the Chicago Council on Mental Health Equity, Coalition members, and the OEMC telecommunicators' supervisors, policy analyst, and the quality assurance director. The IMT also conducted call-taker audits; however the City made significant redactions to the calls, which presented barriers to the IMT's ability to conduct a sufficient audit. During the site visits this reporting period, the IMT participated in ride-alongs with CIT officers. We also continued to participate in monthly calls with the City, the OEMC, and the CPD, as well as observation of the quarterly Chicago Council on Mental Health Equity meetings.

The City and the CPD have demonstrated continued progress toward achieving compliance for several paragraphs in the Crisis Intervention Section. The CPD nearly finalized all of the Crisis Intervention related standard operating procedures this reporting period. Additionally, the CPD demonstrated that 95% of all CPD officers completed the Crisis Intervention e-learning, which covers key components of policy related to response to individuals in crisis. The CPD also nearly completed 95% of all officers taking the 8-hour Crisis Intervention training, an important accomplishment which covers key components of signs, symptoms, and best-practice responses to individuals in crisis. It is expected that the CPD will demonstrate full 95% completion early in the next reporting period. We appreciate the CPD taking important steps toward training all officers on response to individuals in crisis, with emphasis on de-escalation strategies.

The seventh reporting period reinforced, however, that the Crisis Intervention Unit is severely understaffed. *Compare* ¶89.[57] It will be difficult for the CPD to maintain or achieve future compliance if the unit initiatives that support the Crisis Intervention Section continue to have inadequate resources. Specifically, the IMT observed a striking reduction in the CPD's staffing of the Crisis Intervention Unit. The CPD's Crisis Intervention Unit's dedicated staffing was at its peak in March 2021, when it was staffed with 58 people consisting of a commander, lieutenant, seven sergeants, 38 police officers (with 14 assigned to the training unit and 24 assigned to district operations, and community support), a data analyst, and a community outreach coordinator. In the seventh reporting period, the Crisis Intervention Unit's staffing was cut *in half*, now totaling 27 people. The team has dropped from seven to four sergeants, from 38 to 24 police officers, from 24 to 14 assigned to District, Operations, and Community Support, and from 14 to 8 in the training unit. The team has also lost its civilian community outreach coordinator.

The CIT DOCS personnel have confirmed that staffing constraints prevent them from conducting the Crisis Call follow up activities that CIT DOCS are not only are required to do but also that are essential to a successful diversion program. These CIT DOCS members are also unable to adequately review CIT Reports and build community partnerships while capturing the necessary data that supports the important work of the CIT DOCS. For example, in a two-month period (August–October 2022), the Crisis Intervention Unit received over 2,000 CIT reports from patrol. Of those 2,000 CIT reports, 289 reports contained requests for follow-up services by the CIT DOCS area teams. Due to staffing constraints, only 74 of those 289 follow-up requests were completed. The IMT expects the number of CIT reports and requests for follow-up will only increase as officers continue to receive training on the Crisis Intervention Unit per ¶¶118 and 127, as well as training on properly completing the required CIT reports.

It is important to reinforce, in light of the City and the CPD having moved to a mandated CIT-training model in which all sworn officers receive CIT training, that the CPD commit itself to maintaining a specialized response unit composed of volunteer officers with a demonstrated interest and skillset in responding to individuals in crisis. Just because an officer is trained in CIT does not mean they have a demonstrated interest or skillset. While the CPD has engaged in meaningful discussion about this important topic, the IMT has not received sufficient evidence demonstrating how the CPD will operationalize the concept. The IMT understands that the CPD is developing dispatch priorities based on the levels of training (Designated Voluntary CIT officer, Mandated CIT officer, and Untrained officer), but the

---

[57] Paragraph 89 requires "a qualified, centralized staff, including supervisors, officers, and civilian employees, that is necessary to oversee the department-wide operation of the CIT Program, carry out the overall mission of the CIT Program, and perform the objectives and functions of the CIT Program."

IMT has not received any evidence of policy, training, or operational procedures that reflect the City and the CPD's change to a train-all mandated model.

As indicated in this and previous reports, the City and the CPD's data collection and related analysis continue to be inadequate. The City must employ a sufficient number of data analysts assigned to fulfill the CIT Program's objectives and functions. Since the start of the Consent Decree, there has been only one analyst assigned. The IMT has ongoing concern about not only whether this is sufficient, but also about the reliability of the data we have received. The CPD's data reporting and analysis appears stagnated, not increasingly reliable. The CPD was unable to validate the IMT's relatively basic data requests in the seventh reporting period, producing results that were unclear and nonresponsive. It is unclear to the IMT whether the data analyst is assigned full time to crisis intervention. The IMT requests clarification.

Relatedly, the City and the CPD still have not completed its required *Crisis Intervention Team Officer Implementation Plan* or its required *Crisis Intervention Plan*. *See* ¶¶108 and 122. Although required annually, the last report was submitted in the third reporting period (2020). While the IMT appreciates delaying these reports until they are supported by more robust strategies and reliable data, the City and the CPD's progress will continue to be delayed without them.

The IMT appreciates that the CPD is investing significant resources into developing, updating, and delivering training for all officers. The IMT also observed portions of the CPD's *De-escalation, Response to Resistance and Use of Force* training, which all officers receive. The CPD revised this training to emphasize skills regarding de-escalation, communication, and responding to individuals in mental or behavioral health crisis. The IMT also observed the eight-hour crisis-intervention training delivered to nearly all officers in 2022.

The IMT also appreciates the CPD's investment in its two-day *Crisis Intervention Team Refresher Training*, which is designed to refresh skills learned in *Basic Crisis Intervention Team* training. The cadence of the refresher training has also increased during this reporting period, which is appreciated. However, the training staff responsible for delivering the training has also been deeply cut. This refresher training is critical because a significant number of current "specialized" Crisis Intervention Team (CIT) officers have not received any refresher training since receiving their Basic Crisis Intervention Team training, which for many officers was several years ago. For example, in the last data produced to the IMT, 20.36% of all current certified CIT officers were trained over 10 years ago with no refresher since (2004–2012). One-third of all certified CIT officers were trained seven or more years ago (2004–2015), and nearly half (46.51%) of certified CIT officers were trained six or more years ago with no refresher since (2004–2016). This fails to meet best-practice standards for a specialized model. Moreover, the CPD is still

counting these officers toward the CPD's specialized CIT-officer response ratios, which are required under the Consent Decree.

The IMT continues to recommend that any Designated Voluntary CIT officer who has not received the 40-hour Basic CIT training since 2021 when the training was given a no-objection notice by the IMT, must be un-designated as a CIT officer and prioritized for receiving the approved 40-hour Basic CIT training. The proper cutoff for the Designated CIT Officer is 2021 because that is the year that the IMT approved the 40-hour Basic CIT. All officers who have received the Basic 40-hour CIT training since 2021 should fall into the cadence of the required three year refresher training. The IMT strongly recommends that the CPD prioritize officers who received Basic 40-hour CIT more than three years ago when a no-objection notice was issued to retake that training, and then those same officers can pick up the regular cadence of refresher training every three years thereafter. The City has gone to great lengths to develop the tiers of CIT-trained officers through the CIT Program, and it is crucial that the officers who will represent that program and the CPD as a whole be properly trained.

As we enter the Consent Decree's fourth year, the City's compliance under the Crisis Intervention section increasingly relies on interdepartmental collaboration. As such, the IMT must evaluate these entities' compliance efforts. For example, the Chicago Fire Department (CFD) is explicitly named in ¶131 and also qualifies as a "city agenc[y]" with responsibility "to assist in developing and expanding current strategies for responding to individuals in crisis, including reducing the need for police-involved responses to individuals in crisis and developing municipal and community resources such as pre and post arrest diversion resources and alternative response options." *See* ¶¶87(d) and 130. To date, the CFD has not been assessed for compliance under the Consent Decree and, going forward, this must change.

The City has also continued to launch portions of its Crisis Assistance Response Engagement (CARE) program. This is an alternative response pilot program designed to reduce the need for a criminal-justice response to individuals experiencing a mental-health crisis. The CARE program includes three types of responses:

(1) pre-response, which staffs mental-health professionals in the City's 911 Call Center to provide support to callers, call takers, dispatchers, and response teams;

(2) alternate response, where the 911 Call Center will dispatch mental-health professionals with first responders to respond to people in crisis; and

(3) post-response, which links residents with appropriate community-based services and uses alternate drop-off sites for people in behavioral health crisis.

This program aims to divert people in crisis away from the criminal justice system. *See, e.g.*, ¶86. These efforts are highly commendable, and should the City determine this program will be used toward compliance assessment, we look forward to seeing continued progress, as well as data supporting its strategic expansion. The City should dedicate additional attention to communicating with the public about these programs, specifically key advocacy and treatment communities and people with lived experience. The City deserves credit for these efforts, and the community deserves to know about them.

The City has largely resisted IMT efforts to obtain relevant information about the CARE Program and has indicated that it considers the CARE Program to be separate and apart from the Consent Decree. The IMT strongly encourages the City to re-evaluate this position for two reasons. First, the CARE Program is an excellent example of a successful, proactive diversion program that provides an alternative to arresting individuals in crisis. The City should be commended for these successful efforts, and the IMT believes that increased transparency will only increase public support for the program. Second, the City's position that the CARE Program is not covered by the Consent Decree appears to contradict its public-facing behavior to the community when discussing the CARE Program's role in the Consent Decree. But the City cannot have it both ways, and if the City continues to impede the IMT's access to information concerning the CARE Program, then the City risks losing compliance for several paragraphs in the next and in future reporting periods.

Separately, during this reporting period, the IMT learned that the OEMC excludes telecommunicators who answer medical- and fire-related calls for service from the Consent Decree's requirements. *Compare* ¶¶139–140, 42, and 46 ("all current active telecommunicators."). In relation to ¶¶142–147, discussed in detail below, the IMT sees no distinction between telecommunicators who dispatch 911 calls for police versus those who for the CFD or Emergency Medical Service response, relative to mental health, CIT awareness, and recognizing and responding to people in mental or behavioral health crisis. We believe it is crucial that all telecommunicators are well informed concerning these topics, inclusive of the training topics identified under ¶¶143–44. Moreover, a mental or behavioral health crisis call for service can be responded to by the CPD, CFD, or emergency medical services. Therefore, all telecommunicators benefit from training related to recognizing and responding to people in mental or behavioral health crisis, and the IMT believes all telecommunicators should be held to best-practice standards concerning their policy, training, and operational compliance. The IMT was unaware that the OEMC was making a distinction between these telecommunicators at the time Secondary compliance was issued for these paragraphs. This issue must be resolved in the coming reporting periods.

Regarding community engagement, important improvements have been made by both the CPD and the OEMC in its communication with the Chicago Council on

Mental Health Equity and the public. Both the CPD and the OEMC must increase their efforts, however, to seek public feedback and to respond to public feedback on policies, training, and operational practices. The OEMC should, but has not yet, posted its policies and standard operating procedures for public comment. While the CPD has improved its public comment period, both the CPD and the OEMC should standardize this process for all policies and standard operating procedures and commit to a timeline that supports responsiveness to public comment inclusive of identifying what feedback has been incorporated or not incorporated and why. *See* ¶131.

Both the CPD and the OEMC must also improve their training observation and feedback. It is insufficient to merely invite the Chicago Council on Mental Health Equity to review a policy or to observe a training. Rather, a more strategic and effective manner of accomplishing gaining thoughtful community-based feedback is needed. The Chicago Council on Mental Health Equity is composed of talented, dedicated experts and people with lived experience who are eager to provide crucial feedback.

## Crisis Intervention Progress through Seven Reporting Periods

During this reporting period, the IMT assessed the City's compliance with 66 Crisis Intervention paragraphs: ¶¶87–152. The City maintained Preliminary compliance for 37 paragraphs (¶¶87–88, 90–91, 93–95, 98, 100–06, , 113–15, 117, 119–21, 124–31, 133–36, 141, 147–48, and 150) , maintained Secondary compliance for 12 paragraphs (¶¶89, 92, 96–97, 99, 116, 132, 138–40, 144, and 152), moved into Secondary compliance for three paragraphs (¶¶113, 118, and 146) and maintained Full compliance for three paragraphs (¶¶142–43 and 145). The City lost compliance levels for three paragraphs (¶¶90, 149, and 151) and failed to reach Preliminary compliance in the remaining nine paragraphs assessed during the seventh reporting period (¶¶107–12, 122–23, and 137). *See* Crisis Intervention Figure 1.

Crisis Intervention Figure 1: Compliance Progress for Crisis Intervention Paragraphs at the End of the Seventh Reporting Period (December 31, 2022)



| Paragraphs in Preliminary, Secondary, or Full Compliance | (37) (15) (3) (55) |
| Paragraphs that have not met Preliminary compliance | (11) |
| Paragraphs Under Assessment for Preliminary compliance | (0) |

Crisis Intervention Figure 2:
Lost Levels of Compliance in the Crisis Intervention Section



Through seven reporting periods, the CPD has made significant progress towards annually reviewing Crisis Intervention-related policies and standard operating procedures and seeking input from the Chicago Council on Mental Health Equity and the public. This is most notable the last two reporting periods. While there is room for improvement, we very much appreciate the CPD's efforts.

The OEMC has also made strides this reporting period, seeking the Chicago Council on Mental Health Equity's input on some, but not all, of the relevant crisis intervention policies and standard operating procedures. Because the 911 call center is such a crucial part of overall Crisis Response, the Chicago Council on Mental Health Equity and the public must be actively included in all policy review, not merely select portions. The OEMC's transparency with community members regarding how 911 calls are taken and dispatched is crucial for stakeholders and the public to better understand and have input in.

The City and the CPD have incorporated required reforms from the Crisis Intervention section into various policies and written guidance. Crisis Intervention Figure 2, below, provides a sample of those policies. The City and the CPD is encouraged to identify a clear process and timeline for the required annual review and revision of policies and training courses based on issue dates. Moving forward, the City and the CPD must demonstrate evidence of how and when they are accomplishing the required annual review and revisions.

Crisis Intervention Figure 2:
Sample of New or Revised Policies
related to the Crisis Intervention Section
(between March 1, 2019, and December 31, 2022)[58]

|  | Policy # | Issue Date |
|---|---|---|
| ❖ *Recruit Training* | S11-10-01 | 11/17/2021 |
| ❖ *Pre-Service Training* | S11-10-02 | 11/17/2021 |
| ❖ *In-Service Training* | S11-10-03 | 11/17/2021 |
| ❖ *Annual Crisis Intervention Team Policy Review* | CIU S.O. 21-02 | 6/4/2021 |
| ❖ OEMC CAD Enhancement - *Crisis Intervention Team Check Box Training* | TNG 20-015 | 12/30/2020 |
| ❖ *Crisis Intervention Team Program* | S05-14 | 11/4/2020 |
| ❖ OEMC - *Crisis Intervention Team Program Policy* | TNG 21-004 | 10/7/2020 |
| ❖ OEMC - *Crisis Intervention Team Call Auditing Policy* |  | 10/7/2020 |
| ❖ OEMC - *Audit and Employee Review of Crisis Intervention Team Calls* |  | 10/7/2020 |
| ❖ OEMC - *Glossary for OEMC Quarterly Reports* |  | 10/7/2020 |
| ❖ OEMC - *Mental Health Training Policy* | TNG 21-005 | 10/7/2020 |
| ❖ OEMC *Training Guidelines Policy* | TNG 20-016 | 9/24/2020 |
| ❖ OEMC - *Crisis Intervention Team Certified Officers Data Flowchart* |  | 9/3/2020 |
| ❖ *Persons Subject to Involuntary or Voluntary Admission* | S04-20-02 | 2/2/2020 |
| ❖ *Persons on Unauthorized Absence from a State-Operated Mental Health Center* | S04-20-03 | 2/2/2020 |
| ❖ *Mental Health Transport and Related Duties Matrix* | S04-20-04 | 2/2/2020 |
| ❖ *Arrestees in Need of Mental Health Treatment* | S04-20-05 | 2/2/2020 |
| ❖ *Recognizing and Responding to Individuals in Crisis* | S04-20 | 2/2/2020 |

---

[58] Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

Crisis Intervention Figure 3:
Sample of New or Revised Training Materials
related to the Crisis Intervention Section
(between March 1, 2019, and December 31, 2022)[59]

|  | Date |
|---|---|
| ❖ OEMC *Crisis Intervention Team Refresher Training* | 2021 |
| ❖ *Crisis Intervention Team Basic Training* | 2020 |
| ❖ *Crisis Intervention Team Refresher Training* | 2020 |
| ❖ *Crisis Intervention Team Advanced Youth Training* | 2020 |

## Looking Ahead to the Eighth Reporting Period

Significant City and CPD compliance efforts are continuing into the eighth report-ing period. At the end of the seventh reporting period, the City and the CPD con-tinued developing, for example, the following new or revised policies, which nearly received a no-objection notice at the end of the seventh reporting period:

| | |
|---|---|
| ❖ *Crisis Intervention Team Program Coordinator* | CIU S.O. 21-01 |
| ❖ *Mental Health - Crisis Intervention Report* | CPD-15.520 |
| ❖ *Mission, Organization, and Functions of the Crisis Intervention Unit* | CIU S.O. 20-01 |
| ❖ *Crisis Intervention Team Training Schedule, Attendance, Eligibility, and Recruitment* | CIU S.O. 20-02 |
| ❖ *CIU Crisis Intervention Plan* | CIU S.O. 20-03 |
| ❖ *CIU District-Level Strategy for Crisis Intervention Team* | CIU S.O. 20-04 |
| ❖ *CIU Crisis Intervention Team Officer Implementation Plan* | CIU S.O. 20-05 |
| ❖ *District-Level Strategy for Crisis Intervention Team* | CPD-15.605 |

Various paragraphs in the Crisis Intervention section relate to the CPD's capacity to have Certified Crisis Intervention Team Officers who can provide a "timely re-sponse" to calls for services identified as involving individuals in crisis. *See, e.g.*, ¶¶108–09 and 120. The word "timely," however, remains undefined in relevant CPD policies, which will inhibit the CPD's ability to evaluate resources, perfor-mance, or success. As in so many Crisis Intervention paragraphs, the OEMC plays

---

[59] Some of these training courses may not have been provided to 95% of personnel at the time of this report.

an important role in this function, as the time between 911 call intake and dispatch matters as it relates to timely response.

As with other sections of the Consent Decree, the City and the CPD need comprehensive and reliable data to best inform policy, training, strategy, and operational success. Data has been and continues to be a significant challenge for the CPD and its efforts in the Crisis Intervention section, among others. The CPD operated without a data analyst for the Crisis Intervention-related efforts during the fourth and fifth reporting periods.[60] While the CPD hired a new data analyst in January 2022, the CPD has yet to produce reliable evidence demonstrating the scope and nature of the analyst's skills. Key requirements (*e.g.*, data captured by the new Crisis Intervention Team report, reliably tracking Crisis Intervention Team Officers' response ratios by designation or reliably tracking CIT officer training) cannot be accomplished without additional resources, a functional data platform, and reliable outputs which are able to be validated.

In the next reporting period, we hope to report on increased levels of compliance related to policy, training, and operational development.

<center>***</center>

Specific compliance assessments, by paragraph, for the Crisis Intervention section are included in Appendix 3.

---

[60] The previous analyst resigned shortly after she started but was making good progress in setting up foundational systems to build reliable data reports.

# IV. Use of Force

## Objectives[61]

The IMT assessed compliance with applicable Use of Force paragraphs in accordance with the Consent Decree's corresponding objectives:

> **153.** *CPD's use of force policies, as well as its training, supervision, and accountability systems, must ensure that: CPD officers use force in accordance with federal law, state law, and the requirements of this Agreement; CPD officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; when using force, CPD officers only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and any use of unreasonable or unnecessary force is promptly identified and responded to appropriately.*

<div align="center">***</div>

> **155.** *CPD officers have the authority to use force, but that authority is limited by the law and Department policy. The provisions of this Agreement seek to facilitate compliance with the law and Department policy regarding the use of force to reduce the circumstances in which using force is necessary, and to ensure accountability when CPD officers use force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances.*

## Summary of Compliance Efforts and Assessments

### Use of Force in the Seventh Reporting Period

In the seventh reporting period, the City and the CPD largely maintained the levels of compliance in the Use of Force section that they achieved in previous reporting periods, achieving new levels of compliance for some paragraphs under review but losing levels of compliance for others.

In our report on the sixth reporting period, we found the City and the CPD to be in provisional Preliminary and Secondary compliance with a number of paragraphs

---

[61] The Use of Force section of the Consent Decree includes "objectives" rather than "guiding principles."

based on their continued their efforts to engage the community in revising the CPD's use-of-force policies. We stated in *Independent Monitoring Report 6* that to maintain Preliminary and Secondary compliance, the CPD needed to implement and provide training on the revisions to its policies that it agreed to with the Coalition. Unfortunately, the CPD did not implement or train on these long-contemplated changes in the seventh reporting period. At the end of the reporting period, the CPD had also yet to provide a further revised version of its Use of Force policy suite. We remain hopeful, however, that the City and the CPD will make effective the necessary changes and train on them in the eighth reporting period and will quickly regain and maintain the levels of compliance lost in the seventh reporting period.

This reporting period, the IMT reviewed several new or revised policies and training intended to address the Consent Decree's requirements regarding the Use of Force section. For example, we reviewed and commented on draft training materials for the *Recruit Force Options Training* and *Use of Force ICAT (Integrating Communications Assessments and Tactics) Training*. In addition, two important policies were made effective and trained on in the seventh reporting period: the *First Amendment* policy and the CPD's permanent *Foot Pursuits* policy, G03-07. On the other hand, while we reviewed another revised draft of the CPD's *Body Worn Camera* policy, we noted that progress on that policy is long overdue; the effective version is from 2018, before the Consent Decree went into effect.

We met regularly with the City, the CPD, and the OAG to address the Use of Force requirements in the Consent Decree, including ongoing record productions from the City and the CPD.

We also continued to review reports published by the Tactical Review and Evaluation Division (TRED, and formerly known as the Force Review Division (FRD) or the Force Review Unit (FRU). We remain impressed by TRED's professionalism and its efforts to observe, address, and publicly report on patterns and trends relating to uses of force, foot pursuits, and firearm pointing incidents—even with inadequate resources. Unfortunately, however, TRED's lack of adequate resources continues to negatively impact its operations. TRED fell behind on its reviews during the fifth reporting period because of insufficient staffing, and the backlog grew in the sixth and seventh reporting periods. In the meantime, the CPD continues to give TRED new and important responsibilities regarding the observation and analysis of patterns and trends in the CPD's practices.

The CPD continued to deploy its limited TRED personnel into the field during the seventh reporting period. As we have previously noted, this practice is troubling and runs contrary to the lessons learned and recommendations from our *Special Report: the City's and the CPD's Responses to Protests and Unrest under the Con-*

*sent Decree*.[62] In addition to undermining the City and the CPD's efforts to demonstrate reform, identify trends, improve practices, and increase transparency and accountability, deploying TRED personnel creates significant concerns regarding supervision and force review. As we noted during the fifth and sixth reporting periods, it is imperative that the City and the CPD address its staffing issues to allow its existing and developing processes to best serve the CPD, its officers, and Chicago's communities.

At the end of the seventh reporting period, therefore, more work was necessary. The City and the CPD's data issues have continued to hamper the CPD's ability to evaluate its use-of-force policies, training, and operations in general and its recent focus on foot pursuits in particular. See ¶¶572–73 and 606. Until the City and the CPD adequately prioritize their data issues their progress in the Use of Force section (among others) will stall. This will require the City and the CPD to, among other things, consistently devote sufficient resources to address its data and supervision efforts, including adequately staffing TRED.

## Updated Compliance Levels for the Seventh Reporting Period

During this reporting period, the IMT assessed the City's compliance with 96 Use of Force paragraphs. At the end of the seventh reporting period, the City maintained Preliminary compliance for 21 paragraphs (¶¶153, 157–59, 167, 171, 174, 191, 193, 206–07, 213–15, 217, 228, 243–45, and 247–48). The City maintained Secondary compliance for 34 paragraphs (¶¶154, 161, 164–65, 169, 173, 175–87, 189–90, 192, 196–97, 202–03, 211–12, 218–21, 227, and 246) and achieved Secondary compliance for 21 paragraphs (¶¶162–63, 166, 168, 172, 200, 208–210, 222–26, and 229–35). The City maintained Full compliance for three paragraphs (¶¶170, 188, and 195) and achieved Full compliance with one paragraph (¶194). The City's Preliminary compliance for 9 paragraphs remained under assessment at the end of the seventh reporting period (¶¶155–56, 160, and 236–41), and the City failed to reach any level of compliance with the remaining paragraph (¶242). The City also lost levels of compliance with paragraphs (¶¶198–99, 201, 204–05, 216, and 245). *See* Use of Force Figure 1 below.

Use of Force Figure 1: Compliance Progress for Use of Force Paragraphs at the End of the Seventh Reporting Period (December 31, 2022)



[62] *See Special Report: The City of Chicago's and the Chicago Police Department's Responses to Protests and Unrest under the Consent Decree (May 2020 – November 2020),* INDEPENDENT MONITORING TEAM (July 10, 2021), https://cpdmonitoringteam.com/overview/reports-and-resources/imt-special-report-responses-to-protests-and-unrest/.

Use of Force Figure 2:
Lost Levels of Compliance in the Use of Force Section



| | Sixth Reporting Period (January 1, 2022 – June 30, 2022) | | Seventh Reporting Period (July 1, 2022 – December 31, 2022) |
|---|---|---|---|
| Paragraph | Previous Compliance | | Current Compliance |
| ¶198 | Secondary | → | Not in Compliance |
| ¶199 | Secondary | → | Not in Compliance |
| ¶201 | Secondary | → | Not in Compliance |
| ¶204 | Secondary | → | Not in Compliance |
| ¶205 | Secondary | → | Not in Compliance |
| ¶216 | Secondary | → | Not in Compliance |
| ¶245 | Preliminary | → | Not in Compliance |

## Use of Force Progress through Seven Reporting Periods

The CPD has made significant progress with its use-of-force policies, training, and analysis of data since the start of the Consent Decree.

Through seven reporting periods, for example, the City and the CPD have incorporated required reforms from the Use of Force section into various policies and written guidance. Use of Force Figure 3, below, provides a sample of those policies.

While we have had and continue to have concerns with the CPD's corresponding community engagement efforts and strategies, the CPD has made and continues to make meaningful efforts toward improving its corresponding community engagement and efforts to receive input. *See* ¶160.

Use of Force Figure 3:
Sample of New or Revised Policies related to the Use of Force Section
(between March 1, 2019, and December 31, 2022)[63]

|  | Policy # | Issue Date |
|---|---|---|
| ❖ The First Amendment and Police Actions (NEW)<br>This Directive establishes policy related to the First Amendment and community members engaged in First Amendment actions. | G02-02 | 12/19/2022 |
| ❖ Foot Pursuits (NEW)<br>Establishes policy when to engage in foot pursuits. | G03-07 | 8/26/2022 |
| ❖ Annual Prescribed Weapon Qualification Program and Taser Recertification (NEW)<br>This Directive updates to clarify that sworn officers must qualify with their prescribed duty weapons prior to the end of the seventh police period. | S11-03-01 | 5/5/2022 |
| ❖ Emergency Use of Department Vehicles<br>This revision updates titles and unit names regarding training per CALEA procedure requirements. | G03-03 | 3/11/2022 |
| ❖ *First Aid Kit Order, Law Enforcement Medical and Rescue Training (LEMART) Policy*<br>Updated the policy changing the LEMART requirement from "optional" to "mandatory," consistent with CPD practice. | U06-02-23 | 7/22/2021 |
| ❖ *Department Approved Weapons and Ammunition*<br>Adds additional requirements (*e.g.*, officers must be "currently certified" and must comply with applicable laws related to the storage of firearms). | U04-02 | 5/07/2021 |
| ❖ *De-escalation, Response to Resistance, and Use of Force*<br>Updates previous Use of Force policy, following revisions based on input from the Use of Force Working Group and other community input (e.g., further defining standards, responsibilities, and prohibitions for use of force). (Replaced *Use of Force*, G03-02, 12/31/2020.) | G03-02 | 4/15/2021 |
| ❖ *Department Review of Use of Force*<br>Aligned terminology with the Consent Decree terminology, and other Use of Force directives. Further detailed the responsibilities of the Force Review Division and Force Review Board. | G03-02-08 | 1/27/2021 |
| ❖ *Force Options*<br>Updates terminology in alignment with other Use of Force directives and clarifies the purpose of the directive and standards for levels of resistance. | G03-02-01 | 12/31/2020 |
| ❖ *Incidents Requiring the Completion of a Tactical Response Report*<br>Updates terminology in alignment with other Use of Force directives and further defines and clarifies the purpose and use of Tactical Response Reports (TRRs), supervisory responsibilities for reviewing use-of-force incidents, and the incident review process. | G03-02-02 | 12/31/2020 |
| ❖ *Firearms Discharge Incidents Involving Department Members*<br>Updates terminology in alignment with other Use of Force directives, clarifies administrative duty assignments, and adds trauma-informed techniques and implicit bias to post-shooting training. | G03-02-03 | 12/31/2020 |

---

[63]  Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

|  | Policy # | Issue Date |
|---|---|---|

❖ *Taser Use Incidents* — G03-02-04 — 12/31/2020
Updates terminology in alignment with other Use of Force directives and further defines the standard for when Taser use is authorized and when it is prohibited.

❖ *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents* — G03-02-05 — 12/31/2020
Updates terminology in alignment with other Use of Force directives.

❖ *Canine Use Incidents* — G03-02-06 — 12/31/2020
Updates terminology in alignment with other Use of Force directives and establishes a prohibition on canine response to protests.

❖ *Firearm Discharge and Officer-Involved Death Incident Response and Investigations* — G03-06 — 12/31/2020
Establishes a prohibition on retaliation in reporting use-of-force incidents, clarifies medical attention standards, and clarifies the responsibilities on using restraints/handcuffs.

❖ *Baton Use Incidents* — G03-02-07 — 12/31/2020
Updates terminology in alignment with other Use of Force directives.

❖ *Prohibition on Retaliation* — G08-05 — 12/30/2020
Adds language related to supervision, reporting, forms of retaliation, and retaliation specific to First Amendment activity.

❖ *Reporting the Response to Crowds, Protests, and Civil Disturbances* (NEW) — D20-08 — 11/02/2020
Requires documentation by supervisors of information concerning crowds and the nature of the police response and use of force during protests.

❖ *Control Devices and Instruments* — U04-02-02 — 2/28/2020
Clarifies language regarding training, CPD-issued Taser devices and personal OC devices.

❖ *Department Vehicles* — U02-01 — 2/28/2020
Clarifies standards for motor vehicle operations safety, accountability related to motor vehicle license suspension or revocation, and corresponding training requirements.

❖ *Firearm Pointing Incidents* (NEW) — D19-01 — 10/01/2019
Clarifies requirements for engaging in, reporting, documenting, and reviewing firearm-pointing incidents, including that officers are to point a firearm at a person only when objectively reasonable under the totality of the circumstances.

Through seven reporting periods, the City and the CPD have developed or updated training materials to incorporate requirements across the Use of Force section. For example, because of the Consent Decree, the CPD now develops and delivers use-of-force in-service training *every year*, which includes training on de-escalation and force mitigation. Use of Force Figure 4, below, provides a larger sample of those training materials.[64]

---

[64] As detailed in Appendix 4 (Use of Force), the City and the CPD may still need to demonstrate that they effectively provided all these trainings to the requisite personnel.

Use of Force Figure 4:
Sample of New or Revised Training Materials related to the Use of Force Section
(between March 1, 2019, and December 31, 2022)[65]

|  | Date |
|---|---|
| ❖ First Amendment eLearning (NEW) | 2022 |
| ❖ Foot Pursuit eLearning (NEW) | 2022 |
| ❖ Foot Pursuit Training for Lieutenants (NEW) | 2022 |
| ❖ 2022 CIT In-Service Training (NEW) | 2022 |
| ❖ Active Bystandership for Law Enforcement Training (NEW) | 2022 |
| ❖ Impact Weapon Test (NEW) | 2022 |
| ❖ Recruit Use of Force Training (NEW) | 2022 |
| ❖ Constitutional Policing Course (NEW) | 2022 |
| ❖ Emergency Vehicle Operations Course In-Service 4-Hour Training (NEW) | 2022 |
| ❖ Annual Prescribed Weapon Qualification, Taser Re-Certification and VirTra Simulation Exercise Training | 2022 |
| ❖ TRR Supervisory Debriefing Dashboard Training Bulletin | 2022 |
| ❖ Annual ICAT Training | 2022 |
| ❖ In-Service Supervisors Training | 2022 |
| ❖ Emergency Vehicle Operations Course In-Service 4-Hour Training | 2022 |
| ❖ Annual Carbine Training | 2021 |
| ❖ Foot Pursuit Training Bulletin (NEW) | 2020 |
| ❖ In-Service Use of Force 2020 (NEW) | 2020 |
| ❖ Custodial Escort and Custody Training (NEW) | 2020 |
| ❖ Positional Asphyxia Training Bulletin, ETB 20-01 (NEW) | 2020 |
| ❖ Foot Pursuits Review training (NEW) | 2020 |
| ❖ Force Review Unit Firearm Pointing Incident Review training (NEW) | 2020 |
| ❖ Weapons Discipline Training Bulletin (Firearms Pointing Incidents Training Bulletin) (NEW) | 2019 |

---

[65] Some of these training courses may not have been provided to 95% of personnel at the time of this report.

The CPD has also increased the workload carried by the Tactical Review and Evaluation Division (also known as TRED, and formerly known as the Force Review Division or Force Review Unit) in the time since the Consent Decree became effective. TRED now reviews use-of-force incidents, firearm-pointing incidents, and foot pursuits to identify and allow the CPD to address patterns and trends. It is also our understanding that TRED's responsibilities will soon be expanded to include search warrant reviews.[66]

Finally, while significant challenges remain, the CPD has made progress in its public reporting of use-of-force data. For example, the CPD makes relevant data available to the public via its Use of Force Dashboard.[67] TRED also publishes quarterly reports that contain analysis of and conclusions about the CPD's use-of-force data, including data collected via Tactical Response Reports (TRRs). TRED also analyzes and reports on firearm-pointing incidents and foot pursuits.

## Looking Ahead to the Eighth Reporting Period

In the seventh reporting period, the City and the CPD continued making progress toward compliance with the Use of Force section of the Consent Decree, particularly related to policy and training requirements. Community engagement, data, and staffing challenges continue to present significant hurdles to further levels of compliances.

Nonetheless, at the end of the seventh reporting period, the City and the CPD were also continuing to develop new and revised policies, written guidance, and training materials to make progress in this section.

For example, by the end of the sixth reporting period, the CPD was preparing to train on and implement its new, permanent *Foot Pursuits* policy, which went into effect on August 29, 2022, in the seventh reporting period. The CPD's related policy, *Department Review of Foot Pursuits*, G03-07-01 did not take effect until January 1, 2023, in the eighth reporting period, and we look forward to monitoring the CPD's progress regarding foot pursuits and reporting on progress in our next report.

---

[66] "It should be noted that the annual and quarterly reports were previously produced by the Force Review Unit (FRU). Moving forward these reports will be generated by the Tactical Review and Evaluation Division (TRED). The new name change more accurately reflects TRED's focus on new and future responsibilities which include search warrant, foot chase and investigative stop reviews." *TRED 2022 Q1 Report*, CPD TRED (August 16, 2022), https://home.chicagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf.

[67] *See Use of Force Dashboard*, CHICAGO POLICE DEPARTMENT (2015 to present), https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

Likewise, the CPD demonstrated its *Tactical Response Report Supervisory Dashboard* for the IMT during the seventh reporting period, which we hope will enhance front-line supervision and promote accountability for Department supervisors over those they supervise and their training needs. The CPD must also provide written guidance and training for supervisors on (1) how to effectively use the district-level dashboards to identify patterns and trends at the district and officer level, and (2) the strategies to address them, including how to provide constructive feedback from use-of-force incidents. *See, e.g.*, ¶234.

In the eighth reporting period, we look forward to reviewing the new incident debriefing report (IDR) that TRED was developing in the seventh reporting period. The incident debriefing report will streamline TRED's review and identification of de-briefing points for incidents involving multiple reportable events (uses of force, firearm pointing, and foot pursuits).

There are other policy and training requirements related to the Use of Force section, however, where progress has stalled. For example, the CPD must implement its revised Use of Force policy suite. The CPD must also implement a revised *Body Worn Camera* policy as the current version pre-dates the Consent Decree. The City and the CPD must also continue to address many of the unresolved reporting, planning, data, and training issues identified in our *Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*.[68]

In the seventh reporting period, the City and the CPD dedicated—and continue to dedicate—significant efforts to identifying and addressing data issues, particularly regarding foot pursuits. As we noted in previous reporting periods, until the CPD can appropriately collect, manage, and analyze data related to the Use of Force section, among others, the City and the CPD cannot sufficiently demonstrate whether the CPD's practices have improved. This will, in turn, prevent the City and the CPD from becoming a true learning agency, capable of reviewing and revising policies and training in a way that is data driven and specific to the needs of Chicago's communities and CPD officers. To be effective, such efforts must continue past the eighth reporting period, but we hope to be able to provide positive updates in our next monitoring report.

<div align="center">* * *</div>

Specific compliance assessments, by paragraph, for the Use of Force section are included in Appendix 4.

---

[68] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

# V. Recruitment, Hiring & Promotions

## Guiding Principles

The IMT will assess compliance with the Recruitment, Hiring, and Promotions paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

*249. Having a department that recruits, hires, and promotes officers who are qualified to meet the increasingly complex needs of law enforcement and that reflects a broad cross section of the Chicago community in which it serves is critical to accomplishing the following goals: running a professional police force; building community trust and confidence; increasing legitimacy and acceptance of CPD's supervision and accountability systems; and reducing perceptions of bias.*

*250. The provisions of this Agreement are designed to ensure that CPD attracts, hires, retains, and promotes individuals who are equipped to perform their jobs safely, effectively, and in accordance with the law, CPD policy, and the terms of this Agreement. Further, this Agreement is designed to ensure that CPD promotes individuals who are capable of: providing effective supervision; guiding officers under their command on lawful, safe, and effective policing; and holding officers accountable for misconduct.*

*251. The City and CPD's recruitment, hiring, and promotions policies and practices will show a commitment to attracting, hiring, and promoting qualified candidates at all ranks that reflect a broad cross section of the Chicago community the Department serves.*

*252. The Parties acknowledge that the City and CPD are currently subject to the City of Chicago Police Department Hiring Plan for Sworn Titles ("Hiring Plan"), dated May 14, 2014, which may be subject to change in the future.*

# Summary of Compliance Efforts and Assessments

## Recruitment, Hiring, and Promotions in the Seventh Reporting Period

In the seventh reporting period, the City and the CPD did not significantly progress toward additional compliance with the requirements of the Consent Decree. The City and the CPD either maintained or lost compliance levels this reporting period.

The CPD did not demonstrate a strong commitment to improving compliance toward requirements in the Recruitment, Hiring, and Promotions section. This delay is likely due to ongoing staffing issues that have perpetuated a lack of meaningful progress and appear to have shifted attention away from this important area. In many instances, applicable policies were produced without data demonstrating implemented practices that align with policy requirements.

Concerns regarding staffing shortages have continued from previous reporting periods, following the reassignment of the recruitment function to the BIA Chief during the sixth reporting period. Production delays, compliance setbacks, and unanticipated organization structural changes do not indicate that compliance with this section is a top priority for the CPD or the City. Until appropriate resources and attention are dedicated to recruitment, hiring, and promotions, the staffing shortages that have impeded meaningful progress in this and other areas under the Consent Decree are unlikely to be resolved.

## Updated Compliance Levels for the Seventh Reporting Period

Independent Monitoring Report 7 provides compliance assessments of the same 12 paragraphs the IMT addressed in Independent Monitoring Reports 5 and 6, and the City and the CPD maintained at least Preliminary compliance with each of these paragraphs during this reporting period.

Specifically, the City and the CPD maintained Preliminary compliance for nine paragraphs (¶¶253–54, 256, 258-260, and 262–64), maintained Secondary compliance for two paragraphs (¶¶255 and 261), and moved into Secondary compliance for one paragraph (¶257). *See* Recruitment Figure 1 below. However, the City and the CPD gained Secondary compliance for one paragraph (¶ 257). *See* Recruitment Figure 2 below.

Recruitment Figure 1: Compliance Progress for Recruitment, Hiring & Promotions
Paragraphs at the End of the Seventh Reporting Period (December 31, 2022)

| | | |
|---|---|---|
| Paragraphs in **Preliminary**, **Secondary**, or **Full** Compliance | (9) (3) | (12) |
| Paragraphs that have not met Preliminary compliance | (0) | |
| Paragraphs Under Assessment for Preliminary compliance | (0) | |

## Recruitment, Hiring, and Promotions Progress through Seven Reporting Periods

Through seven reporting periods, the City recently incorporated requirements of this section into policies and written guidance. Recruitment Figure 3, below, provides a sample of those policies.

Recruitment Figure 3:
Sample of New or Revised Policies
related to the Recruitment, Hiring, and Promotions Section
(between March 1, 2019, and December 31, 2022)[69]

| New or Revised Recruitment, Hiring, and Promotions Related Policies (between March 1, 2019, and December 31, 2022) | Policy # | Issue Date |
|---|---|---|
| ❖ *City Interagency Policy, CPD Sworn Member Recruitment and Hiring* | IAP 07-01 | 8/25/22 |
| ❖ *City Interagency Policy, CPD Sworn Member Promotions* | IAP 07-02 | 8/25/22 |
| ❖ *Department Recruitment Selection and Hiring Plan* | E05-34 | 3/2/22 |
| ❖ *Revision, Assessment, and Publication of Class Specifications for CPD Sworn & Civilian Class Titles* (NEW) | HR CPCD INCS01 | 12/31/21 |
| ❖ *Police Promotions Committee* (NEW) | HR CPCD INPC01 | 12/31/21 |
| ❖ *Sergeant and Lieutenant Expert Assessment Standard Operating Procedure* (NEW) | SOP 03-02 | 12/31/21 |

## Looking Ahead to the Eighth Reporting Period

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with nine paragraphs and Secondary compliance with two paragraphs of

---

[69]  Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

the Recruitment, Hiring, and Promotions section of the Consent Decree, in addition to gaining Secondary compliance with one paragraph. However, they did not make significant progress in gaining compliance levels overall. Further, the City and the CPD have not seen meaningful progress in compliance levels over the course of several reporting periods, offering no substantial efforts to establish proof of additional compliance. It appears clear that staffing shortages and unanticipated organizational changes in the leadership of this section has stalled progress in an area that is critical to addressing those same staffing shortages.

Looking forward to the eighth reporting period, the IMT hopes to see the City and the CPD allocate appropriate attention and resources to the Recruitment, Hiring, and Promotions section of the Consent Decree to make meaningful progress towards further levels of compliance, which should aid in addressing the CPD's ongoing staffing shortage and the corresponding challenges that staffing shortage has caused. Indeed, while this is the smallest section of the Consent Decree, the City's and the CPD's efforts directed at recruitment, hiring, and promotions are critical to every section of the Consent Decree and the short and long-term success of Chicago's policing efforts overall.

*** 

Specific compliance assessments, by paragraph, for the Recruitment, Hiring, and Promotions section are included in Appendix 5.

# VI. Training

## Guiding Principles

The IMT assessed compliance with the Training paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent sub-stantive requirements" and "the overall goals" (¶757):

> **265.** *CPD will enhance its recruit training, field training, in-service training, and preservice promotional training so that they are sufficient in duration and scope to prepare officers to comply with CPD directives consistently, effectively, and in accordance with the law, CPD policy, best practices, and this Agreement.*

> **266.** *CPD training will reflect its commitment to procedural justice, de-escalation, impartial policing, and community policing.*

> **267.** *CPD training will convey CPD's expectations that officers perform their jobs diligently and safely, and have an understanding of, and commitment to, the constitutional rights of the individuals they encounter.*

> **268.** *The training required under this Agreement is set out in this section and, for specific topic areas, in the Community Policing, Impartial Policing, Crisis Intervention, Use of Force, Officer Wellness and Support, and Accountability and Transparency sections.*

## Summary of Compliance Efforts and Assessments

### Training in the Seventh Reporting Period

In the seventh reporting period, the IMT notes continued improvement in multiple Training areas compared to prior reporting periods, including in particular with the Field Training and Evaluation Program (also known as FTEP) and related policies and by incorporating outside experts, community interest groups, and guest speakers in training development. The IMT noted improvements in meeting minutes from Training Oversight Committee (TOC) meetings in demonstrating the depth and breadth of TOC oversight over training development expected under the Consent Decree to ensure that training courses fully integrate the key concepts

of procedural justice, de-escalation, impartial policing, and community policing. However, more detail is needed to capture TOC guidance and deliberations leading to important decisions. The IMT observed multiple training classes this reporting period, which were generally well prepared and presented.

Additionally, the sequencing of the required annual *Needs Assessment*, *Training Plan*, and implementation of training continues to be problematic, in that the CPD must first assess its training needs, and then develop a training plan before delivering training. Also, more planning and work is needed to systematically integrate evaluative components into all courses and instruction provided, including pre- and post-tests and substantive course and instructor evaluations, as well as a process for the CPD to review and make use of the course and instructor evaluations provided.

## Updated Compliance Levels for the Seventh Reporting Period

Independent Monitoring Report 7 provides compliance assessments of the same 68 paragraphs. During this reporting period, the City and the CPD maintained Preliminary compliance with 50 paragraphs (¶¶272–82, 284–85, 289, 291–92, 295–300, 303–304, 306–14, 316–317, 319–21, 323–34, 326–29, 331–35, and 338), achieved Preliminary compliance for one paragraph (¶302), maintained Secondary compliance with four paragraphs (¶¶270–71, 283, and 322), and achieved Secondary compliance for three paragraphs (¶305, 337, and 340). The City failed to reach Preliminary compliance for 10 paragraphs (¶¶286–88, 290, 294, 301, 315, 318, 336, and 339). *See* Training Figure 1 below.

Training Figure 1:          Compliance Progress for Training Paragraphs at the End of the Seventh Reporting Period (December 31, 2022)



| | |
|---|---|
| Paragraphs in Preliminary, Secondary, or Full Compliance | (51) (7) (58) |
| Paragraphs that have not met Preliminary compliance | (10) |
| Paragraphs Under Assessment for Preliminary compliance | (0) |

## Training Progress through Seven Reporting Periods

Through seven reporting periods, the City and the CPD have incorporated requirements of the Training section into policies and written guidance. Training Figure 2, below, provides a sample of those policies.

Training Figure 2:
Sample of New or Revised Policies related to the Training Section
(between March 1, 2019, and December 31, 2022)[70]

| New or Revised Training Related Policies (between March 1, 2019, and December 31, 2022) | Policy # | Issue Date |
|---|---|---|
| ❖ *Field Training and Evaluation Program* | S11-02 | 07/02/22 |
| ❖ *Field Training and Evaluation Review Board* | S11-02-01 | 07/02/22 |
| ❖ *Application for Police Officer Assigned as FTO* | E05-08 | 10/20/22 |

Through seven reporting periods, the City and the CPD have developed or updated many training materials to incorporate requirements across the Consent Decree sections. Many of these training courses are reflected in the corresponding sections of this report.

## Looking Ahead to the Eighth Reporting Period

In the seventh reporting period, the City and the CPD continued making progress toward compliance with the Training section of the Consent Decree. The FTEP policies that were in development during the end of the last reporting period were finalized and produced this reporting period and received no-objection notices from the IMT and the OAG. The content of the *2022 Training Plan* was generally improved over the prior version, though the sequencing of the production of the annual *Needs Assessment, Training Plan*, and training implementation continues to be problematic. The City and the CPD also developed a Training Deviations tracking system that is an improvement from prior reporting periods but has some aspects that require further work as the IMT relayed in its comments to that production.

Looking forward to the next reporting period, the IMT anticipates enhanced and more substantive compliance reviews in several areas based on the progress the City and the CPD have made in meeting preliminary or maintaining preliminary compliance in most, but not all, sections. Such enhanced compliance reviews include recruit academy and field training, TOC oversight and training evaluations, training staffing, in-service training, and eLearning. Further progress is also expected on training and instructor evaluations and attendance documentation to demonstrate that the required training is being delivered and received.

<div align="center">***</div>

---

[70] Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

Specific compliance assessments, by paragraph, for the Training section are included in Appendix 6.

# VII. Supervision

## Guiding Principles

The IMT will assess compliance with the Supervision paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **341.** Effective supervisors, who lead by example and actively engage with the subordinates under their direct command, play a critical role in ensuring lawful, safe, effective, and community-centered policing. To achieve this outcome, the Parties agree to the requirements set out below.

> **342.** The provisions of this Agreement are designed to ensure that CPD supervisors provide the effective supervision necessary for members to perform their duties lawfully, safely, and effectively and for members to improve and grow professionally. Further, the provisions of this Agreement are designed to allow supervisors to spend time monitoring and training members under their direct command so as to provide adequate opportunities to prevent, promptly identify, and promptly correct adverse officer behavior. This meaningful supervision will facilitate the establishment and re-enforcement of a culture of community policing, community and officer safety, and accountability throughout the Department.

> **343.** CPD should have the staffing necessary to promote lawful, safe, effective, and community-centered policing; provide effective supervision; ensure officer safety and accountability; and implement the terms of this Agreement.

> **344.** Immediate supervisors of all ranks are responsible for supervising, managing, and overseeing, as appropriate, the day-to-day work activities of members under their direct command.

> **345.** Supervisors of all ranks are accountable for the performance of subordinate members directly observed or under their direct command.

> **346.** Effective supervisors will: a. engage in activities and conduct that support the mission and goals of the Department, including those set forth in this Agreement; b. model appropriate

*conduct, including abiding by high standards of integrity and ad-*
*hering to the United States Constitution and other laws, CPD pol-*
*icy, and the terms of this Agreement; and c. consistently demon-*
*strate professionalism, courtesy, and respect towards all people*
*with whom they interact.*

# Summary of Compliance Efforts and Assessments

## Supervision in the Seventh Reporting Period

Many of the City's and the CPD's efforts in the Supervision section of the Consent Decree rely on the concepts of unity of command and span of control. Unity of command requires that the same sergeant supervise the same group of police officers. *See* ¶358. Span of control limits the number of officers any one sergeant can supervise daily. *See* ¶358. The goal of span of control is to create a consistent ratio of 10 officers to 1 sergeant to encourage effective supervision. This is a fundamental change from the current model of shift (watch) scheduling and is a requirement of the Consent Decree.

The Unity of Command and Span of Control Pilot Program was launched to implement these concepts to enable more effective and efficient supervision, mentoring, officer support, and policing. Through the pilot program, the City and the CPD implemented a pod supervision structure (primary, secondary, and tertiary role for supervisors). The Unity of Command and Span of Control Pilot Program began in the 6th District during the second reporting period. In the fourth reporting period, the CPD expanded the pilot into the 4th and 7th districts. Ultimately, however, the CPD decided that implementing the Unity of Command and Span of Control Pilot programs in three districts was not feasible, so they chose to focus efforts on refining the program within the 6th District.

Despite the CPD's continued efforts to implement the Unity of Command and Span of Control Pilot Program, the CPD has faced various challenges with the implementation, as explained in previous IMT reports. The CPD continues to face staffing shortages that prevented the pilot districts from consistently meeting the 10-to-1 officer-to-supervisor ratio required by ¶360. We learned that officers were not being consistently overseen by the same supervisors, as envisioned by the pilot program. We also heard frustrations from officers regarding the staffing shortages, which not only hampered compliance with the program, but also created situations in which understaffing could have reduced officer safety.

In April 2022, the City and the CPD requested technical assistance from the IMT regarding the Unity of Command and Span of Control pilot program. During the sixth and seventh reporting periods, we had in-depth discussions with command staff, officers, and supervisors about the strengths and shortcomings of the pilot

program. We were informed that the pod supervision structure did not consistently result in unity of command as envisioned. Therefore, in late June 2022, during the first technical assistance meeting, the City and the CPD shared their plans to develop a new staffing model to address a number of the shortcomings of the pod model. This new model will focus on three tenets: (1) geographic familiarity, (2) high-quality supervision, and (3) resource flexibility. It is expected to be implemented beginning in the first quarter of 2023. The IMT believes that, despite the various challenges, the City and the CPD are working toward compliance in earnest.

The CPD has chosen to also begin implementing the pilots for the Performance Evaluation System and Officer Support System Pilot Programs in the same districts as the Unity of Command and Span of Control Pilot Program. We believe that it makes sense to think of these pilots and efforts together, because they all rely on effective supervision. As a result, however, the difficulties in fulfilling the requirements with the Unity of Command and Span of Control Pilot Program will also cause difficulties in achieving the goals of the other two pilot programs.

Finally, the CPD has also convened a Unity of Command and Span of Control Pilot Program Evaluation Committee, which is to meet at least quarterly to discuss implementation progress and share feedback from CPD personnel. The IMT observed one of the quarterly evaluation committee meetings during the prior reporting period. This committee will play an important role in the programs' effective implementation. The CPD has also recently added similar tasks to this committee for the Performance Evaluation System and Officer Support System Pilot Programs. The IMT hopes that the committee will work to anticipate and address some of the possible challenges to ensure a smoother implementation process.

The IMT believes that programs required by the Supervision section of the Consent Decree are being thoughtfully developed and implemented by the City and the CPD as a pilot. To test and develop strategies to implement Unity of Command and Span of Control, the Performance Evaluation System, and the Officer Support System Pilot Programs in all CPD districts, the 6th District became the central location and focus of the IMT and the Parties as the pilot district. We recognize the aforementioned progress that has been made and the pilot in the 6th District was used to assess and grant Preliminary compliance as policies and processes have been developed and are at various stages of implementation. However, the Consent Decree requires that all of the paragraphs within the Supervision area be implemented and measured for compliance in all CPD police districts. Therefore, while Preliminary compliance was achieved in the 6th District, further levels of compliance cannot be achieved until the pilot moves beyond the 6th District and is able to be replicated and implemented in other districts. The IMT may be able to consider these levels of compliance once evidence of successful implementation is observable and measurable beyond the 6th District. The IMT stands ready

to continue to work with the City and the CPD toward the goal of broadening the impact of implementing an effective supervision structure in all CPD districts.

## Updated Compliance Levels for the Seventh Reporting Period

Overall, we assessed the City's compliance with 29 Supervision paragraphs during the seventh reporting period (¶¶347–57 and 359–76). In the seventh reporting period, the City and the CPD maintained Preliminary compliance for 25 paragraphs (¶¶347–55, 359–64, and 367–76). The City and the CPD did not reach any level of compliance with four paragraphs (¶¶356–57 and 365–66).

Supervision Figure 1:        Compliance Status for Supervision Paragraphs at the End of the Seventh Reporting Period (December 31, 2022)



Paragraphs in Preliminary, Secondary, or Full Compliance — (25)
Paragraphs that have not met Preliminary compliance — (4)
Paragraphs Under Assessment for Preliminary compliance — (0)

## Supervision Progress through Seven Reporting Periods

Through seven reporting periods, and as referenced above, the City and the CPD have incorporated several required reforms from the Supervision section into various policies and written guidance. Supervision Figure 2, below, provides a sample of those policies.

Supervision Figure 2:
Sample of New or Revised Policies
related to the Supervision Section
(between March 1, 2019, and December 31, 2022)[71]

|  | Policy # | Issue Date |
|---|---|---|
| ❖ *Officer Support System (OSS) – Pilot Program* | D20-04 | 12/30/2021 |
| ❖ *Performance Evaluation System – Pilot Program* | D21-09[72] | 12/10/2021 |
| ❖ *Unity of Command and Span of Control Schedule – Pilot Program* | D20-02 | 12/10/2021 |

---

[71]  Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/in-side-cpd/department-directives-system-dds/.

[72]  Early versions of the *Performance Evaluation System – Pilot Program* Directive were numbered D21-03 and D02-09. The finalized version of the policy, which was submitted this reporting period, is D21-09. For consistency, we refer to the *Performance Evaluation System – Pilot Program* Directive as D21-09 throughout this report.

| | Policy # | Issue Date |
|---|---|---|
| ❖ *Supervisory Responsibilities* | G01-09[73] | 5/10/2021 |

Through seven reporting periods, the City and the CPD have also developed or updated training materials to incorporate requirements from the Supervision section. Supervision Figure 3 provides a sample of training materials related to Supervision that were developed or revised since the start of the Consent Decree.[74]

Supervision Figure 3:
Sample of New or Revised Training Materials related to the Supervision Section (between March 1, 2019, and December 31, 2022)[75]

| | |
|---|---|
| ❖ *Emotional Intelligence for Supervisors Pre-Service Training* | 2021 |
| ❖ *Performance Evaluation System Pilot Training* | 2022 |
| ❖ *Performance Evaluation System eLearning* | 2021 |
| ❖ *Pre-Service Promotional Training* | 2021 |
| ❖ *In-Service Supervisors Training* | 2021 |
| ❖ *Officer Support System Training for Supervisors* | 2021 |

## Looking Ahead to the Eighth Reporting Period

In the eighth reporting period, the IMT will continue to meet regularly with the City and the CPD to provide technical assistance concerning an appropriate staffing model to accomplish unity of command and span of control. We look forward to reviewing data relevant to the program such as the contents of the staffing dashboard, assignment sheets, transfer orders, and other relevant records. Additionally, we hope to conduct further interviews and focus groups with members of the pilot district. We look forward to reviewing how additional assigned supervisors to the 6th District have impacted the pilot programs. The IMT also anticipates observing training related to the Unity of Command and Span of Control Pilot Programs along with evaluations of that training. Further, we plan to observe further evaluation committee meetings and hope to see a shift from a briefing model to a more collaborative and conversational structure.

---

[73] Early versions of the *Supervisory Responsibilities* General Order were numbered G01-07 and G01-08. The finalized version of the policy, which was submitted in the fourth reporting period, is G01-09. For consistency, we refer to the *Supervisory Responsibilities* General Order as G01-09 throughout this report.

[74] As detailed in Appendix 7 (Supervision), the City and the CPD may still need to demonstrate that they effectively provided all these training courses to the requisite personnel.

[75] Some of these training courses may not have been provided to 95% of personnel at the time of this report.

***

Specific compliance assessments, by paragraph, for the Supervision section are included in Appendix 7.

# VIII. Officer Wellness and Support

## Guiding Principles

The IMT assessed compliance with applicable Officer Wellness and Support paragraphs in accordance with the Consent Decree's "Guiding Principles." These guidelines "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **377.** In fulfilling their duties, CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy. There is growing recognition that psychological and emotional wellness are critical to officers' health, relationships, job performance, and safety. The City and the CPD have an obligation to help CPD members cope with the consequences that come from their service to the public.

> **378.** The City and the CPD's obligation to CPD members includes providing adequate support systems to treat members experiencing mental health, substance abuse, and other emotional challenges.

> **379.** The City and the CPD's obligation to CPD members also includes equipping them in a manner that enables them to do their jobs as safely as reasonably possible. CPD will ensure that the safety of its members is not jeopardized by equipment and technology that is outdated, broken, or in need of repair or replacement.

> **380.** The City and the CPD will implement the following requirements in order to achieve a healthy, effective, and constitutionally compliant police force.

## Summary of Compliance Efforts and Assessments

### Officer Wellness and Support in the Seventh Reporting Period

As stated in the guiding principles for this section (*see* ¶377–80), CPD officers expose themselves to significant danger, high stress, and a wide spectrum of human tragedy. The City and the CPD have an obligation to help CPD officers and civilian personnel cope with the consequences that come from their service to the public. The City's and the CPD's obligation to CPD personnel includes providing adequate

support systems to treat CPD personnel experiencing mental health, substance-use disorder, and emotional challenges.

Officer wellness and support remain critical within the CPD. During the seventh reporting period, many current or former CPD members died by suicide. We offer our deepest and most heartfelt condolences to the CPD and their families as they navigate through these difficult times. In these pivotal moments, the IMT encourages the City and the CPD to work with the CPD members while optimizing wellness services rendered to the CPD membership and their families. The City and the CPD should take the necessary holistic and post-ventive measures to identify methods, partnerships, resources, and opportunities that truly promote holistic, healthy, recoverable, life experiences, which may reduce the occurrences of officer suicide.

The City and the CPD continued to face significant challenges in this reporting period. Obstacles to advancing towards further compliance include, but are not limited to, the following:

- Inadequate or nonexistent data collection to analyze and evaluate wellness efforts

- Challenges to fill vacant positions required to service the agency

- Member concerns related to use of services, service providers, and the issue of confidentiality and privacy

- Execution of the communications strategy agency-wide

- Delayed implementation of the Suicide Prevention Initiative

- Agency response to and mitigation of suicide

While the City and the CPD are facing several obstacles, the lack of data collection and analysis hinders almost every area of the CPD's compliance in this section. For several reporting periods, the IMT has requested statistical data demonstrating the level of services that have been provided by the Professional Counseling Division, including anonymized client data, services provided, caseload, and other related service demands. The IMT has also routinely requested, but has yet to receive, evidence of contact results through training, roll calls, counseling sessions, open houses, no cop-out sessions, retreats, or other events demonstrating the impact of the Professional Counseling Division's outreach efforts.

Aside from being unable to routinely assess their efficacy and efficiency, the Professional Counseling Division also has not produced the required annual report to

the Superintendent for three consecutive reporting periods—or 18 months—nor have they provided evidence of any annual review of the programs that were referenced during monthly meetings and virtual site visits. The IMT looks forward to an established annual review process of the programs that focuses on officer wellness in the CPD.

In the seventh reporting period, the IMT held several various virtual site visits and monthly meetings with the CPD and the Professional Counseling Division. During these meetings, we learned that the iCarol system was primarily in a pilot phase and much of the data that should reflect the various services provided by the Professional Counseling Division was entered on both manual forms and inputted in the iCarol system.[76] The iCarol pilot testing phase ended in November 2022. By the end of the seventh reporting period, however, the IMT still had not received any of the manually inputted nor the digital information. The IMT still awaits an opportunity to review anonymized data from the iCarol system. Perhaps the data can aid in determining workload and provide some indication of appropriate staffing levels needed to address services for the CPD membership. The IMT again reiterates the importance of taking a collective, multi-dimensional approach to gather, produce, and use the data to inform their approach to wellness.

Additionally, the IMT separately met with the CPD wellness leadership in the seventh reporting period. The leadership team recognized the lack of progress made by the CPD in the Officer Wellness section. The IMT appreciated the opportunity to ask specific questions regarding the critical nature of wellness. Their responses further solidified the IMT's request to review the anonymized data, electronic records, service capacity details, referral data, and utility of services provided that can support the CPD's and Professional Counseling Division's service delivery model and help determine where any gaps may require additional actionable steps.

The CPD leadership should be commended for taking a proactive stance toward wellness. We await productions evidencing those stated efforts, including: creating a Director of Wellness position in the agency; discussing the desire to conduct a more frequent needs assessment; and creating a Wellness Application for the CPD employees. We look forward to meeting the newly appointed Director of Wellness and working with them to fulfill the CPD's obligations. Any assessment finding should be executable, yet flexible to make changes or corrections for improving service delivery that is both efficient and effective.

Regarding the potential new Wellness Application, we appreciate the collaboration with CPD personnel. During the seventh reporting period, the CPD surveyed

---

[76] *See About iCarol*, ICAROL, https://www.icarol.com/.

its membership to ask how they would feel about using a digital application if offered. While the response rate was low (n=984), this data allowed the CPD's wellness leadership to learn of member concerns related to trust and questions of confidentiality.

During the seventh reporting period, the Monitor and the Deputy Monitor of the IMT conducted CPD District station tours, including a visit to the quiet rooms in each station. The IMT found that, at the time, many of the quiet rooms were unavailable and unserviceable. Specifically, many quiet rooms were locked, in poor condition, or were designated for other uses such as miscellaneous storage. During the crucial conversations of wellness, the rooms were not supported or set up for wellness purposes, even though quiet room space was referenced in a memo to support personnel during a holiday weekend in the summer.

After further review and discussion, the CPD partnered with Target to set up, furnish, and make the quiet rooms available for the purposes they are intended. The IMT applauds the CPD for these efforts and looks forward to touring the remodeled quiet rooms in future reporting periods.

The IMT has conveyed the significance of equity, diversity, and inclusion in the CPD's efforts to promote wellness to all CPD personnel. Conversations with the Professional Counseling Division have suggested that the sworn and civilian personnel have been afforded the various opportunities of wellness. However, the IMT must reiterate that uniformed personnel do not represent all civilian personnel. Inclusion and equity encompass the non-sworn, non-uniformed personnel as well, which would also include administrative personnel. The Professional Counseling Division should ensure their outreach efforts demonstrate availability of services to all CPD membership.

In line with the Consent Decree requirements (*see* ¶418), the CPD wellness leadership has also begun to account for and address the state of the equipment and technology in the CPD's possession and is working with the Chicago Police Memorial Foundation to replace certain pieces of exercise equipment.[77] The IMT appreciates the support the Chicago Police Memorial Foundation is providing to properly furnish the fitness facilities located at the various CPD locations. Several inventory attempts and audits revealed that fitness equipment (and other equipment and technology) was either not working or inadequately accounted for. During the seventh reporting period, the CPD assigned a project manager to oversee the disposition of equipment no longer useful and the installation and location assignments for incoming equipment. The IMT looks forward to the CPD carrying

---

[77] *See About the Chicago Police Memorial Foundation*, Chicago Police Memorial Foundation, https://cpdmemorial.org/about-the-chicago-police-memorial-foundation/.

out the recommendations of the Audit Division to properly manage the equipment and technology.

Again, the IMT appreciates the support the CPD has received from the Chicago Police Memorial Foundation as they show their continued support for the health and wellness of the CPD personnel. The IMT hopes the CPD communicates this supportive endeavor to the CPD members as it often helps to know that their community cares.

Finally, the IMT appreciates the measures the Professional Counseling Division is taking to work with the Department of Human Resources to review any barriers which may be impacting the recruitment and retention of personnel providing wellness services to the CPD and look forward to learning more as this process unfolds.

## Updated Compliance Levels for the Seventh Reporting Period

Overall, the IMT assessed the City's compliance with 36 Officer Wellness and Support paragraphs in the seventh reporting period (¶¶381–402, 404, and 406–18). We assessed all of these in previous reporting periods.

As in the sixth reporting period, in the seventh reporting period, the City and the CPD maintained Preliminary compliance with 19 paragraphs (¶¶388, 394–400, 402, 404, 407–414, and 418), maintained Secondary compliance with 13 paragraphs (¶¶381–87, 390–93, 401, and 406), and failed to reach Preliminary compliance with four paragraphs (¶¶389 and 415–17).

Where Secondary compliance may be achieved, it is imperative that the City and the CPD show that routine data collection, follow through, and continuity of programs is measured and reported on a regular basis.

Officer Wellness Figure 1:  Compliance Progress for Officer Wellness Paragraphs at the End of the Seventh Reporting Period (December 31, 2022)



Paragraphs in **Preliminary**, **Secondary**, or **Full** Compliance (19) (13) (32)
Paragraphs that have not met Preliminary compliance (4)
Paragraphs Under Assessment for Preliminary compliance (0)

## Officer Wellness and Support Progress through Seven Reporting Periods

Since the inception of the Consent Decree on March 1, 2019, the City and the CPD have developed and implemented several policies and training courses related to Officer Wellness and Support. The following Officer Wellness and Support policies have been implemented under the Consent Decree (between March 1, 2019, and December 31, 2022).

Officer Wellness Figure 2:
Sample of New or Revised Policies
related to the Officer Wellness Section
(between March 1, 2019, and December 31, 2022)[78]

|  | Policy # | Issue Date |
|---|---|---|
| ❖ *OPSA Inventory Audit Policy*[79] (NEW) | New | 12/27/2022 |
| ❖ *2022 Communications Strategy* | New | 05/19/2022 |
| ❖ *Professional Counseling Division (PCD) 2022 Communications Strategy* | New | 03/02/2022 |
| ❖ *Suicide Prevention Initiative* (REVISION) | New | 09/23/2022 |
| ❖ *Chaplains Unit Standard Operating Procedure* | 20-01 | 01/26/2022 |
| ❖ *Chaplains Unit Standard Operating Procedure* | 20-01 | 10/1/2021 |
| ❖ *Traumatic Incident Stress Management Program (TISMP) Directives* | E06-03 | 3/17/2021 |
| ❖ *Professional Counseling Division (PCD) Policy* | E06-01 | 5/17/2020 |
| ❖ *Professional Counseling Division (PCD) Standard Operating Procedure* | 19-01 | 5/17/2020 |
| ❖ *Officer Support Plan* | New | 2/10/2020 |
| ❖ *Firearms Owner's Identification Card (FOID) Standard Operating Procedure* | 19-01; E01-17 | 12/20/2019 |

Additionally, since the inception of the Consent Decree, the City and the CPD have worked to implement new and revised training related to Officer Wellness and

---

[78] Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

[79] The IMT notes that this is an Office of Public Safety Administration (OPSA) policy and not specifically a CPD policy. We noted in our comments to the City that we need clarification on whether and how this policy applies to CPD personnel and whether a separate CPD policy is necessary or beneficial.

Support. The following Officer Wellness and Support training courses have been developed under the Consent Decree (between March 1, 2019, and December 31, 2022).[80]

---

[80] As detailed in Appendix 8 (Officer Wellness and Support), the City and the CPD may still need to demonstrate that they effectively provided all these trainings to the requisite personnel.

Officer Wellness Figure 3:
Sample of New or Revised Training Materials
related to the Officer Wellness Section
(between March 1, 2019, and December 31, 2022)[81]

| New or Revised Officer Wellness Related Training Materials (between March 1, 2019, and December 31, 2022) | Date |
|---|---|
| ❖ *2023 ABLE Refresher Training* (REVISION) | 11/20/2022 |
| ❖ *2023 Annual Use of Force – ICAT Training* (NEW) | 10/25/2022 |
| ❖ *2021 Officer Wellness In-Service Training* | 06/02/2022 |
| ❖ *2022 In-Service Crisis Intervention Training (CIT)* (REVISION) | 10/08/2022 |
| ❖ *2021 De-Escalation, Response to Resistance, and Use of Force In-Service Training* | 05/26/2022 |
| ❖ *EAP Recruit Training* | 05/05/2022 |
| ❖ *Traumatic Incident Stress Management Program (TISMP) eLearning* | 03/29/2022 |
| ❖ *Active Bystandership for Law Enforcement Training* | 01/26/2022 |
| ❖ *Firearms Owner's Identification Card (FOID) Training* | 2/14/2020 |
| ❖ *EAP Pre-Service Promotional Training* | 12/2/2021 |
| ❖ *Chaplains Unit Training Deck: Overview of SOP 20-01* | 11/1/2020 |
| ❖ *Peer Support Program Training (40 Hours)* | 8/19/2020 |
| ❖ *2021 In-Service Wellness Training* | 6/14/2021 |
| ❖ *Peer Support 8 Hour Refresher* | 12/2/2021 |
| ❖ *EAP Recruit Training* | 2/3/2021 |
| ❖ *Peer Support for Public Safety Summary of Training Subjects* | 8/19/2020 |
| ❖ *Peer Support Training and Consultation Program Synopsis* | 8/19/2020 |
| ❖ *Training Experts Materials* | 8/26/2020 |
| ❖ *Stress Management & Resilience Course* | 9/24/2020 |
| ❖ *EAP Training* | 5/6/2020 |

---

[81] Some of these training courses may not have been provided to 95% of personnel at the time of this report.

## Looking Ahead to the Eighth Reporting Period

The City and the CPD's obligation to its members cannot be met without remedying the aforementioned issues related to data collection and analysis, staffing, employee concerns about confidentiality, the ongoing implementation of the communication strategy, and the holistic response to and efforts to prevent suicide.

At the end of the seventh reporting period, the City and the CPD continued to face significant barriers to their reform efforts. While the CPD has discussed with the IMT their desires to adopt a proactive stance, specifically through the procurement and implementation of a Wellness Application, hiring of a Director of Wellness, and the conducting of more frequent needs assessments, the IMT must see evidence of these efforts before awarding progress towards compliance.

In the eighth reporting period, the IMT expects to see data demonstrating what level of services have been provided by the current staffing of the Professional Counseling Division, including anonymized information of the clients, services provided, caseload, volume of client, and related demands. The information should also include contact results through training, roll calls, counseling sessions, open houses, no cop-out sessions, retreats, and other events. The CPD and the Professional Counseling Division should actively collect and assess this data to evaluate the Professional Counseling Division's services and to inform future decision-making.

We also look forward to the Professional Counseling Division's progress on hiring mental health service providers. While the City and the CPD re-evaluate and develop a more marketable package to hire qualified mental health counselors, we encourage the City and the CPD to evaluate possibilities to outsource a portion of the routine services. Paragraph 391 allows for contracting with external counseling services in an interim capacity, which could help ensure that the Professional Counseling Division is meeting the many demands of the CPD membership.

<div align="center">***</div>

Specific compliance assessments, by paragraph, for the Officer Wellness and Support section are included in Appendix 8.

# IX. Accountability and Transparency

## Guiding Principles

The IMT assessed compliance with applicable Accountability and Transparency paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *419. Holding public servants accountable when they violate law or policy is essential to ensuring legitimacy and community confidence.*

> *420. A robust and well-functioning accountability system in which CPD members are held to the highest standards of integrity is critical to CPD's legitimacy and is a priority of CPD. A culture of accountability also promotes employee safety and morale, and improves the effectiveness of CPD operations. Organizational justice also plays an important role in ensuring that CPD members have confidence in the legitimacy of the system that holds them accountable.*

> *421. In order to foster public trust and receive critically important community feedback, and promote confidence in CPD, the City and CPD will ensure the process for submitting and pursuing complaints that allege violations of CPD policy or the law by CPD members is open and accessible for all individuals who wish to file complaints.*

> *422. Meaningful community involvement is imperative to CPD accountability and transparency. Nothing in this Agreement should be construed as limiting or impeding community participation in CPD's accountability system, including the creation and participation of a community safety oversight board. OAG and the City acknowledge the significant work many of Chicago's community organizations have undertaken and are continuing to undertake, including work alongside CPD, in the area of police reform and accountability, and OAG and the City know this critical work will continue.*

> *423. The City, CPD, and COPA will ensure that all complaints of misconduct, whether from internal or external sources, are thoroughly, fairly, timely, and efficiently investigated in accordance*

*with this Agreement; that all investigative findings are sup-*
*ported by the appropriate standard of proof and documented in*
*writing; and that all CPD members who commit misconduct are*
*held accountable pursuant to a disciplinary system that is fair,*
*timely and consistent, and provides due process.*

# Summary of Compliance Efforts and Assessments

## Accountability and Transparency in the Seventh Reporting Period

The Accountability and Transparency section of the Consent Decree requires re-
form efforts from many City entities. The reach of the section is vast—involving
several City entities—and is motivated by the guiding principles at the outset of
the Section, as noted above (¶¶419–23).

The Accountability and Transparency section of the Consent Decree explicitly sets
obligations for the following City entities: the Chicago Police Department (CPD)
and the CPD's Bureau of Internal Affairs (BIA), the Office of the Inspector General's
(OIG) Deputy Inspector General for Public Safety (Deputy PSIG), the Civilian Office
of Police Accountability (COPA), and the Police Board. In addition, some of the re-
quirements of the Accountability and Transparency section call for action by the
City at large.

While the CPD, COPA, the Deputy PSIG, and the Police Board are working toward
the common goal of increased accountability and transparency, these entities
work toward this goal in different manners as appropriate for each entity and as
required by the Consent Decree. These entities have each found success in com-
plying with the requirements set out in the Accountability and Transparency sec-
tion at different paces and with varying degrees. The Deputy PSIG, for example,
achieved Full compliance with all requirements pertaining to its office in the fourth
reporting period and has maintained that Full compliance during subsequent re-
porting periods. COPA and the Police Board have developed and followed plans
that have allowed them to consistently gain compliance with various requirements
of this section in the past few reporting periods. The CPD has followed a less me-
thodical path toward compliance with the Accountability and Transparency re-
quirements, and because of this, has fallen behind in complying with Accountabil-
ity and Transparency requirements, but has started to make progress.

## Updated Compliance Levels for the Seventh Reporting Period

Overall, the IMT assessed the City's compliance with 139 Accountability and Trans-
parency paragraphs. With the combined efforts of all the City entities noted in this
section, the City maintained Preliminary compliance with 52 paragraphs (¶¶424–

29, 431–33, 436–37, 439, 446–49, 452, 454–57, 462, 467, 470–72, 474–77, 482–83, 493, 496–97, 499–500, 502, 504, 506–07, 515, 518, 522–25, 532, 540–42, and 551) and moved into Preliminary compliance with 34 paragraphs in the seventh reporting period (¶¶434–35, 438, 440, 443, 445, 450, 453, 459–61, 463–66, 468–69, 478–79, 484, 486–87, 495, 501, 503, 505, 508–09, 513–14, 516–17, 519, and 552). The City also maintained Secondary compliance with two paragraphs (¶¶498 and 560), moved into Secondary compliance with two paragraphs (¶¶473 and 511). The City also maintained Full compliance with 21 paragraphs (¶¶430, 441–42, 485, 533–39, 554–59, 561–63, and 565) and achieved Full compliance with two paragraphs (¶¶543 and 550). The City did not reach any level of compliance with 22 paragraphs (¶¶444, 451, 480–81, 488–89, 490–92, 494, 512, 521, 526–30, 544–47, and 564). The City remained under assessment for Preliminary compliance with one paragraph (¶531) and lost levels of compliance with three paragraphs (¶¶548, 549, and 553).

*See* Accountability Figure 1 below.

Accountability Figure 1:    Compliance Progress for Accountability & Transparency Paragraphs at the End of the Seventh Reporting Period (December 31, 2022)



This includes the fact that the City also lost compliance with three paragraphs (¶548, 549, and 553). *See* Accountability and Transparency Figure 2 below.

Accountability Figure 2:
Lost Levels of Compliance in the Accountability and Transparency Section



### Accountability and Transparency Progress through Seven Reporting Periods and Looking Ahead to the Eighth Reporting Period

Given the variable nature of the Accountability and Transparency Section requirements for each City entity, we provide a summary of each entity's efforts in turn, below.

#### The Chicago Police Department (CPD)

We have monitored the CPD's progress in a variety of ways, including but not limited to attending frequent meetings with BIA and the CPD's Research and Development Division to obtain updates on efforts and ask questions, reviewing draft policies and training materials, observing training sessions, and conducting site visits to gain insight from Accountability Sergeants and BIA investigators.

During the seventh reporting period, the CPD made significant progress by reaching Preliminary compliance with numerous paragraphs through the finalization of its S08-01 and G08-01 Accountability Directives Suites. We acknowledge the CPD's efforts and encourage the CPD to continue making progress to reach additional levels of compliance in the coming reporting periods.

At the same time, we have a number of concerns regarding the CPD's processes during this reporting period which must be noted.

The CPD continued to only meet once per month with the IMT, with the exception of two months during the reporting period, despite our recommendation in the sixth reporting period for more frequent meetings. The IMT continues to encourage the CPD to reinstate biweekly meetings in the eighth reporting period for all months to ensure that we are able to participate in fruitful discussions regarding productions.

The City's document productions for the Accountability and Transparency section during the seventh reporting period created significant confusion and caused the IMT to spend an unreasonable amount of time sorting through and analyzing productions to assess compliance with various Consent Decree paragraphs. We outline these issues below to provide context for our assessment this period, and to highlight these problems so that they can be resolved in future reporting periods.

- First, the City produced several document productions during this reporting period in which the Consent Decree paragraphs designated in the production cover letters did not match the Consent Decree paragraphs designated in the actual production materials, which made it unclear which paragraphs were being submitted for an assessment of compliance. In such cases, we assessed

compliance based on the paragraphs designated in the actual production materials, since it was often not clear that the production cover letters were accurate.[82]

- Second, the City produced several document productions during the seventh reporting period in which the production cover letters indicated that different versions of the same materials were produced for review with different combinations of Consent Decree paragraphs. While there may be instances where this is appropriate, such as when a policy or training has been revised to intentionally meet the requirements of additional Consent Decree paragraphs based on the IMT's feedback, the way in which this was done often appeared to lack such deliberation.[83] This approach makes the IMT's review unnecessarily burdensome and will not lead to greater levels of compliance.

- Third, many of the City's production cover letters during the seventh reporting period indicated that the productions were produced as "compliance records" under ¶720 of the Consent Decree, when these productions should have been produced for review under ¶627 (review of policies and procedures) or ¶641 (review of training materials) per the requirements of the Consent Decree. This creates unnecessary confusion regarding review processes, priorities, and timelines.

- Fourth, some productions contained information that created confusion. For example, on December 28, 2022, the CPD produced records demonstrating that more than 95% of *sworn* department members had taken and passed the BIA eLearning training. To reach Secondary compliance for training, the CPD must demonstrate that at least 95% of *all* department members have received the training, and it is unusual for the CPD to provide training for a smaller subset of relevant personnel. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck clarifying that only 93.94% of *sworn and civilian staff* had completed the BIA eLearning training.

We expect the City and the CPD to resolve these production issues in the next reporting period.

---

[82] For example, according to its December 1, 2022 production cover letter, the revised *BIA Onboard Training* was produced for review with a total of 46 paragraphs, many of which did not appear to be designated or addressed in the actual training materials.

[83] For example, the July 28, 2022 production cover letter for the CPD's *BIA Onboard Training* lists 26 paragraphs: ¶¶424, 428–29, 431, 432, 440–41, 447, 450, 453, 455, 460, 463–68, 471–72, 477, 486, 496, 499, 503, and 528, while the December 1, 2022 production cover letter for the revised materials lists 46 paragraphs: ¶¶424–25, 427, 429, 431–32, 436–37, 440–41, 443, 447–48, 450, 452–53, 455, 457, 460, 462–68, 469, 471–72, 475, 477–78, 484, 486–87, 496–97, 499, 503, 513, 515, 517–19, and 528.

Since the start of the Consent Decree, the CPD has implemented several policies related to the Accountability, which include the below list of new or revised policies.

## Accountability and Transparency: CPD Policies Implemented

| | | Policy Number | Issue Date |
|---|---|---|---|
| ❖ | *Conflict of Interest General Order* | G08-01-03 | 12/31/21 |
| ❖ | *Non-Disciplinary Intervention Special Order* | S08-01-08 | 05/04/18 |
| ❖ | *Cannabis Enforcement Special Order* | S04-32 | 7/9/2020 |
| ❖ | *Live Lineups, Photo Lineups, and Showups Special Order* | S06-02 | 10/16/20 |
| ❖ | *Extended-Hours Vehicle Use* | U02-01-07 | 3/18/22 |
| ❖ | *Nameplates and Unit Designators* | U06-01-24 | 7/22/20 |
| ❖ | *Uniform - Bicycle Patrol* | U06-03-04 | 7/27/20 |
| ❖ | *Complaint and Disciplinary System General Order* | G08-01 | 12/31/21 |
| ❖ | *Department Directives System General Order* | G01-03 | 5/5/20 |
| ❖ | *Protection of Human Rights General Order* | G02-01 | 6/30/22 |
| ❖ | *First Amendment Rights General Order* | G02-02 | 4/13/21 |
| ❖ | *Complaint Initiation and Log Number Investigation Assignment* | G08-01-02 | 12/31/21 |
| ❖ | *Prohibition of Retaliation General Order* | G08-05 | 12/30/20 |
| ❖ | *Complaint and Disciplinary Investigators and Investigations Special Order* | S08-01 | 12/31/21 |
| ❖ | *Log Number Case Management System* | S08-01-01 | 12/31/22 |
| ❖ | *Investigation Timelines and Benchmarks* | S08-01-02 | 12/31/22 |
| ❖ | *Communication Procedures and Timelines* | S08-01-03 | 12/31/22 |
| ❖ | *Initial Investigatory Responsibilities in Log Number Investigations* | S08-01-04 | 12/31/22 |
| ❖ | *Conducting Log Number Investigations* | S08-01-05 | 12/31/22 |
| ❖ | *BIA Supervisor Responsibilities in Log Number Investigations* | S08-01-06 | 12/31/22 |
| ❖ | *Command Channel Review* | S08-01-07 | 12/31/22 |
| ❖ | *Post-Investigation Log Number Procedures* | S08-01-08 | 12/31/22 |
| ❖ | *Requirements of a Complete Log Number Investigative File* | S08-01-09 | 12/31/22 |
| ❖ | *Complaint and Disciplinary System* | G08-01 | 12/31/22 |
| ❖ | *Complaint and Disciplinary Definitions* | G08-01-01 | 12/31/22 |
| ❖ | *Complaint Initiation and Log Number Investigation Assignment* | G08-01-02 | 12/31/22 |
| ❖ | *Conflict of Interest* | G08-01-03 | 12/31/22 |

In the sixth reporting period, the CPD informed the IMT that it would be eliminating the Unit Directives that the BIA had developed during the previous five reporting periods. Although these directives are now obsolete, the IMT acknowledges the work the CPD did to develop them and commends its decision to move away from these directives toward the publication of two full Accountability Suites of Special Orders and General Orders, which increases transparency. The obsolete Unit Directives include the following:

| | |
|---|---|
| ❖ Accountability Sergeants BIA Unit Directive | 2020-U001 |
| ❖ Administrative Misconduct Investigations Unit Directive | N/A |
| ❖ Administrative Summary Reports Unit Directive | 2021-U001 |
| ❖ Assignment of Administrative Log Number Investigations Unit Directive | N/A |
| ❖ BIA Confidentiality Policy Unit Directive | N/A |
| ❖ CPD Member Communication Procedures and Timelines Unit Directive | N/A |
| ❖ BIA Investigation Timelines and Benchmarks Unit Directive | N/A |
| ❖ BIA Investigators Unit Directive | N/A |
| ❖ BIA Log Number Unique Tracking Number Unit Directive | N/A |
| ❖ BIA Requirements of a Complete Investigative File Unit Directive | N/A |
| ❖ BIA Standard Operating Procedure Unit Directive | N/A |
| ❖ BIA Supervisory Responsibilities over Misconduct Investigations Unit Directive | N/A |
| ❖ BIA Training Unit Directive | N/A |
| ❖ Case Management System Unit Directive | N/A |
| ❖ Advocate Section Command Channel Review Procedures Unit Directive | N/A |
| ❖ Conflict of Interest in CCR Review Unit Directive | N/A |
| ❖ Command Channel Review Unit Directive | N/A |
| ❖ Complaint Communications and Timelines Unit Directive | N/A |
| ❖ Conflict of Interest Unit Directive | N/A |
| ❖ Initial Responsibilities in Assigned Log Number Investigations Unit Directive | N/A |
| ❖ Initiation, Intake, and Assignment of Log Investigation Unit Directive | 2019-U005 |
| ❖ Intake Initiation of Log Number Unit Directive | N/A |
| ❖ Initiation of Log Numbers in the Case Management System Unit Directive | N/A |
| ❖ Incidents Occurring Five Years Prior to Complaint Unit Directive | N/A |
| ❖ Photo Room Operations Unit Directive | N/A |
| ❖ Conduct of the Investigation; Sworn Affidavits and Sworn Affidavit Overrides Unit Directive | N/A |
| ❖ Mediation Protocol Unit Directive | N/A |
| ❖ City Policy Regarding Procedures for COPA, BIA, and Accountability Sergeant's Review and Consideration of Evidence from Civil and Criminal Litigation Unit Directive | N/A |
| ❖ BIA Training Directive | N/A |

During this reporting period, the CPD continued to draft and revise policies to comply with the requirements of the Consent Decree. These efforts included drafting, revising, and finalizing a suite of policies aimed at codifying numerous Accountability and Transparency Section requirements in Department-wide General Orders

and Special Orders. The policies under development during the seventh reporting period include the following:

### Accountability and Transparency: CPD Policies under Development

| | | Policy Number |
|---|---|---|
| ❖ | *Mediation Pilot Policy* | IAP 11-01 |
| ❖ | *Officer Support System Pilot Program* | D20-04 |
| ❖ | *Force Review Board Standard Operating Procedures* | 2020-002 |
| ❖ | *Prohibitions of Sexual Misconduct General Order[84]* | G08-06 |
| ❖ | *Firearm Discharge and Officer-Involved Death Incident Response and Investigation* | G03-06 |
| ❖ | *Response to Crowds and Civil Disturbances Special Order* | S03-22 |
| ❖ | *Coordinated Multiple Arrest Incident Procedures Special Order* | S06-06 |
| ❖ | *Search Warrants Special Order* | S04-19 |
| ❖ | *Community-Police Mediation Pilot Program* | D22-04 |

The CPD made progress in drafting, revising, and finalizing two suites of policies in the seventh reporting period. Still, in the previous reporting period, we strongly urged the CPD to diligently revise and finalize these policies early in the seventh reporting period. But as before, the City did not produce final materials of the suites of policies in a timely manner during the seventh reporting period. In the very last days of the reporting period, the City sent numerous "final" materials as informal productions in an attempt to reach further levels of compliance, and then did not formally produce these materials until weeks later in mid-January, which is the eighth reporting period. The seventh reporting period was the first instance where the IMT received informal production letters at the end of the reporting period without prior notice or discussion. Additionally, some informal productions did not include the policy or documentation for review at that time.

The late-in-the-reporting-period push to finalize policy demonstrated by the CPD in the seventh reporting period is part of a cycle the IMT identified and made the CPD aware of in previous reporting periods. (In Independent Monitoring Report 5 we explained that we would "not continue to allow the CPD's procrastination to force expedited reviews that, if occurring too often, can reduce the quality of revisions and suggestions for improvement on policies or training materials."[85]) We continue to encourage the CPD to produce materials for review and finalization earlier in the reporting period.

Since the second reporting period, the CPD delivered the *Command Channel Review Exempt Training/Command Staff* training, the BIA eLearning training, and many relevant CPD training courses remain in development. Specifically, the CPD

---

[84] CPD previously submitted this General Order as General Order G08-05, however as of May 5, 2021, CPD changed the numbering to General Order G08-06.

[85] *See Independent Monitoring Report 5* at 103.

worked with the IMT during the seventh reporting period to develop and revise the CPD's *BIA Onboard Training*. The IMT remains concerned that this training does not address the requirements of ¶¶526–28 and instead works to address numerous other paragraphs. The IMT has encouraged the CPD to work on addressing the requirements specifically in ¶¶526–28 early in the eighth reporting period in collaboration with the IMT and OAG.

The trainings courses under development includes the following:

### Accountability and Transparency: CPD Trainings under Development

**New or Revised Accountability and Transparency Related Training Materials (between March 1, 2019, and December 31, 2022)**

- ❖ *Automated Log Investigation*
- ❖ *Command Staff Training*
- ❖ *COPA Familiarization Training*
- ❖ *Complaint Log Number Investigation*
- ❖ *Civilian Ethics/Do the Right Thing*
- ❖ *Ethics Recruit Training*
- ❖ *BIA Investigator Log Number Investigator Training*
- ❖ *Complaint Log Investigation Clear*
- ❖ *Log Number Investigation/Call Out Procedures*
- ❖ *BIA Lieutenant Training*
- ❖ *BIA Field Training Officer Training*
- ❖ *BIA Sergeant Training*
- ❖ *BIA Recruit Training*
- ❖ *Rules/Regulations for Crossing Guards*
- ❖ *Firearm Discharge*
- ❖ *Police Impersonator Detective*
- ❖ *Log Number Investigation*
- ❖ *Rules and Regs Detention Aids*
- ❖ *Records/Summary Punishment Action Request (SPAR) Training*
- ❖ *Log Number Process*
- ❖ *BIA Investigators Formal Statement Standards*
- ❖ *BIA In-Service Training Plan*
- ❖ *BIA Investigator and Accountability Sergeant Basic Training Schedule*
- ❖ *BIA/Accountability Sergeant Training Plan*

**New or Revised Accountability and Transparency Related Training Materials (between March 1, 2019, and December 31, 2022)**

- ❖ *BIA Investigator Accountability Onboarding Training Schedule*
- ❖ *BIA Rules and Regulations*
- ❖ *SPAR*
- ❖ *BIA Ethics Training*
- ❖ *BIA Policies and Techniques On Boarding Annual Training*
- ❖ *Case Management System Case Investigative Console Conducting Investigations*
- ❖ *Complaint Initiation Process In-Service*
- ❖ *Advocate Section Overview*
- ❖ *Findings Recommendations & Effective Log Closings*
- ❖ *Intake & Case Assignment In Service/On Boarding*
- ❖ *Interviews, Questions & Answer Techniques*
- ❖ *Investigative Practices Annual Training*
- ❖ *Legal Update/Due Process*
- ❖ *Conducting Log Investigations On-Boarding*
- ❖ *Policies and Procedures*
- ❖ *Procedural Justice & Log Number Investigations*
- ❖ *Training Scenarios*
- ❖ *CCR Exempt Staff for Training Manual/2020*
- ❖ *BIA Training COPA Municipal Code 2020*
- ❖ *BIA Training Strategy, Implementation and Execution Plan*
- ❖ *CMS Updates & Enhancements Training In-service*
- ❖ *CMS Log Number Intake Training In-Service Lesson Plan/PowerPoint*
- ❖ *CPD BIA eLearning*
- ❖ *CPD BIA Onboard Training* (NEW)
- ❖ *CPD BIA Recorder Training* (NEW)

In the seventh reporting period, the CPD made significant progress in producing BIA quarterly and annual reports and over the course of the reporting period began to finalize and publish these reports in a timelier manner, which allowed the CPD to reach Full compliance with ¶550. The IMT is encouraged by this progress and expects the CPD and BIA to continue to publish these reports in a timely manner in future reporting periods. BIA worked closely with the IMT during the sev-

enth reporting period to improve its reports, including new data analysis. We continue to strongly suggest that the CPD develop a CPD policy that directs the regular and timely publication of quarterly and annual reports.

During site visits in September 2022, the IMT met with a number of Accountability Sergeants and BIA Investigators. These meetings were very helpful for the IMT to learn more about the day-to-day responsibilities and experiences of Accountability Sergeants and BIA Investigators. As stated in the previous reporting period, some of the information the IMT continues to learn about the day-to-day responsibilities and experiences of Accountability Sergeants and BIA Investigators during the course of these meetings are cause for great concern.

For example, as we noted in *Independent Monitoring Report 6*, the IMT has continued to learn that not every district has two Accountability Sergeants as required by the Consent Decree (*see* ¶494). Moreover, Accountability Sergeants are often required to fill in for patrol sergeants who are on days off, on leave, or when the district is short staffed. As a result, Accountability Sergeants are often not able to complete their investigations in a timely manner because they cannot conduct interviews and compile evidence when responding to calls for service as a patrol sergeant. We learned that Accountability Sergeants often have many other district responsibilities that take their focus away from administrative investigations, and therefore perform their duties as Accountability Sergeants on a part-time basis. Even with these challenges, Accountability Sergeants cannot easily lighten their caseloads, as other sergeants designated as "back-up" Accountability Sergeants only take cases when an Accountability Sergeant listed in the roster is away from duty for an extended period of time. Due to these additional demands on their time, Accountability Sergeants often must request multiple time extensions in order to complete their investigations. The IMT remains concerned that Accountability Sergeants cannot comply with the deadlines set forth in Special Order S08-01-05, *Conducting Log Number Investigations*, due to time constraints and the inability to have private working space where they can conduct this work in a timely manner.

Additionally, we continue to remain concerned that Accountability Sergeants do not have designated areas in the district where they can conduct interviews, review videos confidentially, and complete their investigations. Some Accountability Sergeants indicated that they have access to a private office only because they serve in some other role, such as an Administrative Sergeant, and most others must attempt to locate private space subject to availability, such as a Commander's office or a conference room that may or may not be in use. We also learned that Accountability Sergeants are not properly equipped to efficiently conduct investigations or utilize the Case Management System and are often using old technology with outdated and slow processing systems that cannot keep up with the Case Management System.

When the IMT suggested that Accountability Sergeants could be equipped with laptop computers to use for completing investigations, many were hopeful that this would occur due to the need for improved technology to adequately perform their duties. At the same time, others shared concerns that, with laptops, the CPD would then require them to complete the investigations at home on their personal time, since they do not have time to complete the investigations during the work day as a result of their conflicting responsibilities. Many BIA investigators shared the same thoughts and concerns and described BIA computer workstations with old technology and outdated computers that cannot keep up with the Case Management System sometimes cause them to wait hours for a case file to upload into the Case Management System.

In the sixth reporting period, the IMT raised concerns that Accountability Sergeants would not be able to comply with Special Order S08-01-05, *Conducting Log Number Investigations*, because this policy requires Accountability Sergeants to audio-record interviews and upload the interviews into the Case Management System. Based on the information we learned in conversations during past site visits with Accountability Sergeants, we were very concerned that Accountability Sergeants were not properly equipped to comply with this policy and would be in violation of the policy once it was implemented for reasons outside their control. The IMT provided comments to the CPD in the sixth reporting period noting that, for this policy to be followed once it becomes effective, Accountability Sergeants must be properly equipped. This included, at a minimum, having recording devices; quiet, private spaces in which to conduct interviews; and the ability to upload recordings into the Case Management System. During the seventh reporting period, the IMT was encouraged to learn that the CPD purchased audio recording devices for their Accountability Sergeants. Accountability Sergeants also received training in how to use the recorders. However, the IMT only received the CPD's *BIA Recorder Training* after the training was implemented. Per the requirements of ¶641, such training should be provided to the IMT and OAG for review and comment before implementation. The IMT is aware that CPD intends for this training to be incorporated into the *BIA Onboard Training*. Individuals who received the unapproved training will need to attend the new training once approved by the IMT and OAG.

Finally, the IMT continues to be concerned about the lack of reform of the Accountability and Disciplinary process. For example, many Accountability Sergeants still refer to themselves and their positions as "CR Sergeants," which reflects their previous titles, and are not familiar with the overall processes that the CPD has developed to better investigate administrative complaints. The IMT expects that the CPD will integrate the Accountability Sergeants and BIA Investigators into the new procedures and hopes that the CPD will begin to involve Accountability Sergeants and BIA investigators in the policy development that directs their work.

Moving forward, we will look for the CPD to develop and finalize policies in a focused and timely manner, and to continue developing and revising training related to the policies it has developed and implemented under the Consent Decree thus far. We continue to encourage the CPD to begin producing materials for IMT and OAG review early in future reporting periods and in a regular cadence. These materials should be produced in a manner that allows for meaningful review and comment from the public. This will allow the IMT and OAG to engage in substantive conversations with the CPD during the development of policies and training. We look forward to continuing to work with the CPD as it continues to develop its policies and training.

### Civilian Office of Police Accountability (COPA)

In the seventh reporting period, COPA continued making significant progress toward compliance with Accountability and Transparency requirements. COPA continues to work from a detailed plan to ensure that its policies and procedures are revised and comply with the requirements of the Consent Decree. COPA previously moved into Secondary compliance for many Consent Decree paragraphs due to its training plan that was very detailed and attainable. In the seventh reporting period, COPA maintained compliance with many paragraphs and achieved new levels of compliance, including Full compliance, with several other paragraphs. The IMT continued to meet with COPA monthly and each meeting was deliberate and demonstrated COPA's commitment to not only fulfilling the requirements of the Consent Decree, but recognizing the opportunity to improve their operational capacity and quality of their operations.

## Accountability and Transparency:
## COPA Written Guidance and Policies Implemented

| | Policy Number | Issue Date |
|---|---|---|
| ❖ *Investigative File Maintenance* | 3.1.9 | 2/8/2022 |
| ❖ *Major Incident Responses – Officer-Involved Shooting or Officer-Involved Death* | 3.1.10 | 6/15/2022 |
| ❖ *Timeliness Benchmarks and Appendix* | 3.3.2 | 6/24/2021 |
| ❖ *CLEAR and Column CMS Systems* | 3.1.6 | 7/30/2021 |
| ❖ *COPA Interviews – Chicago Police Department Members* | 3.1.2.b | 11/01/2021 |
| ❖ *Final Summary Report* | 3.1.3 | 7/30/2021 |
| ❖ *Conflict of Interest and Recusal* | 1.1.3 | 12/28/2021 |
| ❖ *Quality Assurance* | 3.3.1 | 6/24/2021 |
| ❖ *Transparency Initiatives - Release of Video and Related Materials* | 2.1.2 | 12/28/2021 |
| ❖ *Intake Policy* | 3.1.1 | 6/24/2021 |
| ❖ *Fact Gathering & Investigative Process* | 3.1.2 | 11/01/2021 |
| ❖ *COPA Equipment and Apparel* | 3.1.8 | 6/24/2021 |
| ❖ *Disciplinary and Remedial Recommendations* | 3.2.1 | 6/24/2021 |
| ❖ *Candidates for COPA Employment – Current or Former Chicago Police Department Members* | N/A | 12/28/2021 |
| ❖ *Recommendation Regarding Department Members Duties, Powers* | 3.2.2 | 6/24/2021 |
| ❖ *Sexual Misconduct Investigations* | N/A | 12/28/2021 |
| ❖ *Compelled Statements* | 3.4.4 | 11/1/2021 |
| ❖ *COPA Sexual Assault MOU w/BIA* | N/A | N/A |
| ❖ *Civil and Criminal Complaint Review* | N/A | 12/15/2022 |
| ❖ *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement* | N/A | 12/15/2022 |
| ❖ *COPA Guidance COLUMN CMS Administration* | N/A | |
| ❖ *COPA Guidance Investigative Correspondence* | N/A | |
| ❖ *COPA Guidance Processing Anonymous Complaints* | N/A | |
| ❖ *COPA Guidance Publishing and Distribution of Final Summary Reports* | N/A | |
| ❖ *COPA Guidance Referral for Mediation* | N/A | |
| ❖ *COPA Guidance Contacts with Non-Department Member Witnesses and Complainants and Confirmation of Representation* | N/A | |

During the seventh reporting period, COPA continued to revise policies and written guidance to be compliant with the Consent Decree. Further demonstrating COPA's efforts toward accountability and transparency, COPA continued working with the

COPA Community Policy Review Working group.[86] This working group consists of volunteers from across the Chicago community who are dedicated to working with COPA to produce exemplary and community-experience informed products. The group reviews COPA policies and documents related to efforts under the Consent Decree. COPA ensures that the group is involved throughout the development of the policy and not just at the end of the revision process. By regularly engaging this group, COPA has produced policies and procedures that provide detailed direction to its personnel and important information about COPA's practices to the community. This reporting period, COPA began working with this working group beyond just policy review and revision. In July 2022, COPA informed the IMT of its hope to start engaging with the working group to help develop a streamlined mechanism for community feedback, among other things. COPA hopes to build a component into its processes that fully utilize the working group in the future.

### Accountability and Transparency: COPA Policies under Development

| | Policy Number |
|---|---|
| ❖ *COPA Rules and Regulations Manual* | N/A |
| ❖ *COPA Guidelines and References* | N/A |
| ❖ *COPA Investigator Manual* | N/A |
| ❖ *Pattern or Practice Investigations* | 3.1.5 |
| ❖ *Superintendent Non-Concurrence* | 3.4.1 |
| ❖ *Medical Records & HIPAA Compliance* | 3.4.2 |
| ❖ *PCRIA Compliance* | 3.4.3 |
| ❖ *Request for Modification of Department Member Duties or Police Powers/Appendix* | 3.2.2.b |
| ❖ *Revised Employee Handbook* | N/A |
| ❖ *Request for Extension of Investigation* | N/A |
| ❖ *Civil and Criminal Complaint Review* | 1.3.8 |
| ❖ *Reopening a Case* | 1.3.9 |
| ❖ *Consideration of Officer Training and Disciplinary Records* | 3.1.2(a) |
| ❖ *COPA Employment Background Checks* | N/A |

Due to COPA's continued efforts toward compliance with Consent Decree requirements, COPA has moved into additional compliance levels with several paragraphs in the seventh reporting period. We acknowledge COPA's continued progress and

---

[86] The OAG, the City, and the IMT have agreed to a stipulation that mandates that COPA will solicit feedback on the draft policies relevant to the Consent Decree from a working group that consists of community stakeholders and thereby approved by the IMT. See Stipulation Regarding the Policy and Training Review Process for the Civilian Office of Police Accountability (COPA), Illinois v. Chicago, Case No. 17-cv-6260 (January 30, 2020), https://cpdmonitoring-team.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for._.pdf. The IMT has approved the members from COPA's Community Policy Review Working Group.

encourage COPA to continue these efforts in future reporting periods to maintain and reach additional levels of compliance.

### Accountability and Transparency: COPA Training Courses Delivered

- *COPA Intake*
- *COPA Training on CPD Directives*
- *Implicit Bias*
- *Procedural Justice*
- *CMS Overview of Policy and Procedures*
- *CMS Case Management System*
- *Collective Bargaining Agreement*
- *Consent Decree Overview*
- *Consent Decree Policies*
- *CPD Lockup Procedures*
- *CPD Rules and Directives*
- *Domestic Violence*
- *Evidence Collection*
- *Fourth Amendment*
- *Intro to OIS/OID Investigation*
- *Jurisdiction*
- *Lead Homicide Investigations*
- *Sexual Assault*
- *Use of Force*
- *Witness Reliability in Police Use of Force Investigations*
- *Legal Concepts Overview*
- *Complainant and Civilian Witness Interview*
- *Science of Justice Understanding the Role of Bias in Investigations*
- *Transparency and Confidentiality*
- *Quality Management*
- *Case and Time Management*
- *Civilian Oversight of Policing*
- *COPA Ordinance Mission Rules*
- *Disciplinary Process*
- *Bureau of Support Services*
- *Photo Array Procedures*
- *Parallel Civil and Criminal Litigation*
- *Personnel Rules and COPA Policies*
- *Approaching, Managing, Securing and Preserving the Scene*
- *Leading v. Non-leading Questions*
- *The Role of Evidence Specialist*
- *Core Values*
- *Chicago Police Board*
- *Ill. Notary Public Act*
- *OEMC Reports and Resources*

- ❖ *COPA Authority, Procedures, Rules, and Jurisdiction*
- ❖ *Understanding Cultural Differences*
- ❖ *Value Clarification Exercise*
- ❖ *Witness Reliability in Police Misconduct Cases*
- ❖ *Canvassing*
- ❖ *Civil, Criminal and Administrative Discovery*
- ❖ *FETI*
- ❖ *Welcome to COPA Academy Systems Training*
- ❖ *Digital Forensic Analyst*
- ❖ *Investigative Process Interview*
- ❖ *OEMC Records Portal*
- ❖ *Procedural Justice and Police Legitimacy*
- ❖ *Unnamed Graphs*
- ❖ *Professionalism in Service*
- ❖ *Intro to Training Academy*
- ❖ *Miranda and the Right to Counsel*
- ❖ *Forensic Podiatry*
- ❖ *Child Interviews*
- ❖ *Trauma Informed Care*
- ❖ *Intro to Use of Force*
- ❖ *CPD BIA*
- ❖ *COPA Policies Part III Professionalism*
- ❖ *Flex Fleet Training*
- ❖ *CPD Reports*
- ❖ *Fourth Amendment in Police Misconduct Cases*
- ❖ *Major Case Investigation Protocols*
- ❖ *CCSAO USAO Presentation*
- ❖ *CLEAR Training*
- ❖ *Lock Up Procedures*
- ❖ *Recorder*
- ❖ *Community Engagement*
- ❖ *Public Engagement*
- ❖ *COPA Academy CCSAO Presentation*
- ❖ *Investigative Process*
- ❖ *COPA Policies Part 1*
- ❖ *Public Policy in Police Accountability*
- ❖ *COPA Academy Cook County State's Attorney's Office, US Attorney's Office CCSAO Garrity*
- ❖ *2022 Disciplinary and Remedial Recommendations In-Service Training*
- ❖ *Officer Interviews Training* (NEW)
- ❖ *Final Summary Reports & Standards of Proof* (NEW)
- ❖ *Fact Gathering-Evidence Collection* (NEW)
- ❖ *Major Case Incident Response* (NEW)
- ❖ *Case Management System: Overview of Policy and Procedures* (NEW)

### Accountability and Transparency: COPA Training Courses under Development

**New or Revised Accountability and Transparency Related Training Materials (between March 1, 2019, and December 31, 2022)**

- ❖ *Introduction to the City of Chicago*
- ❖ *COPA Training Plan*
- ❖ *Affidavit Override*
- ❖ *COPA Lesson Plan Template*
- ❖ *Complaint Register*

### The Chicago Police Board

In the seventh reporting period the Police Board continued making progress toward fulfilling Accountability and Transparency section requirements. Throughout the seventh reporting period, we continued to meet with the Police Board on a monthly basis. These meetings are invaluable as the Police Board ensures that the Police Board leadership attends to share information with the IMT and OAG regarding their efforts. Beyond taking the steps necessary to achieve compliance levels, the Police Board has continued to show a dedication to the spirit of the Consent Decree, taking reform, accountability, and transparency seriously.

In past reporting periods, the Police Board achieved Full compliance with 11 paragraphs—the Police Board maintained this Full compliance with all of these paragraphs and achieved additional levels of compliance in the seventh reporting period.

### Accountability and Transparency: Police Board Policies Implemented

|  | Policy Number | Issue Date |
|---|---|---|
| ❖ *Policy Regarding Training of Police Board Members and Hearing Officers* | N/A | N/A |
| ❖ *Police Board Hearing Officer Selection Criteria* | 2.1.1 | 12/12/19 |
| ❖ *Police Board Policy Regarding Community Input Received at Police Board Public Meetings* | N/A | 6/20/19 |

The Police Board has not yet achieved Full compliance with all relevant Consent Decree paragraphs, but it continues to make thoughtful and methodical efforts toward compliance with these paragraphs. For example, the Police Board has continued to work toward meeting training requirements. (*See* ¶¶540-42.) The Police Board has sought the help of outside entities on a *pro bono* basis to provide relevant and thorough training on topics required by the Consent Decree, and the trainings provided to date has been appropriate and helpful. In the seventh reporting period, the Police Board provided a *Fourth Amendment Training* to the IMT for

review, and then provided the training to its members. The *Fourth Amendment Training* is excellent, and the IMT looks forward to the Police Board's development and implementation of additional training in the coming reporting periods.

Moving into the eighth reporting period, we anticipate that the Police Board will continue to work toward Full compliance with relevant Consent Decree requirements. We commend the Police Board for its continued efforts and progress to date.

### Deputy Inspector General of Public Safety (Deputy PSIG)

The Deputy PSIG achieved Full compliance with all Consent Decree requirements relevant to the Deputy PSIG in the fourth reporting period. The Deputy PSIG has made consistent efforts to maintain Full compliance in subsequent reporting periods. As we noted in the fifth reporting period, the Deputy PSIG developed a plan to maintain Full compliance. It has since followed that plan through the end of the seventh reporting period.

We met with the Deputy PSIG regularly during the seventh reporting period to discuss developments related to continued compliance and discuss what additional evidence, if any, was needed to assess continued compliance. The Deputy PSIG remains transparent and responsive in its Consent Decree compliance. The methodical and forthcoming approach adopted by the Deputy PSIG early in the Consent Decree has continued through the seventh reporting period and, with this, the Deputy PSIG maintained Full compliance with all relevant paragraphs.

### Other City Entities

As noted above, the City of Chicago often works toward and accomplishes compliance through the efforts of COPA, the Deputy PSIG, the CPD, and the Police Board. However, other City entities occasionally undertake efforts relevant to compliance with Accountability and Transparency section paragraphs.

In the seventh reporting period, the City provided materials related to its revised Community-Police Mediation Pilot Program, which began on October 1, 2022. The IMT was encouraged at the launch of the pilot program, and expressed concerns regarding a lack of prior status updates from the City regarding the pilot program, which had initially been planned to launch on January 15, 2022. We requested more regular updates going forward. In comments provided to the City, the IMT acknowledged the collaboration and efforts that took place to plan and facilitate the mediation pilot's implementation, including the consideration of community feedback in the development of the pilot program.

The IMT is encouraged by the launch of the Community-Police Mediation Pilot Program, which offers a meaningful opportunity to build trust and facilitate honest discussions between community members and CPD officers. The program appears to be structured in a way that is appealing to both community members and CPD officers, with many officers who qualify for mediation willing to participate, and also includes methods for evaluation and feedback from participants. The IMT encourages the City to continue this important program beyond the pilot program's end date, with the involvement of those who have worked to develop and implement this program, so that this program can continue improving and moving forward.

***

Specific assessments, by paragraph, for the Accountability and Transparency section are included in Appendix 9.

# X. Data Collection, Analysis & Management

## Guiding Principles

The IMT assessed compliance with applicable Data Collection, Analysis, and Management paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **566.** *Data can empower CPD to engage in the type of critical self-examination essential to instilling and maintaining constitutional policing. CPD can leverage data to ensure constitutional policing by: systematically collecting enough data to have a broad-based understanding of officers' interactions with the public; auditing the data to ensure it accurately reflects those interactions; analyzing the data to identify trends or areas of concern; developing tailored support and interventions to address behavior that is or may become problematic; and assessing the effectiveness of attempts to modify officers' behavior.*

> **567.** *In addition to enhancing CPD's capacity for internal accountability, CPD can use data to promote accountability to the public by regularly publishing data it collects.*

## Summary of Compliance Efforts and Assessments

### Data Collection, Analysis, and Management in the Seventh Reporting Period

In the seventh reporting period, the City and the CPD experienced a mix of accomplishments and setbacks for the reforms required by the Data Collection, Analysis, and Management section. For example, during this monitoring period, the CPD continued their efforts to roll out the Officer Support System (also known as the OSS) which will be used to proactively identify officers with a heightened risk for future adverse events and provide interventions to minimize such risks. However, the CPD has yet to address underlying issues that were identified in its initial pilot test and still has not provided a full evaluation for the OSS pilot program.

Similarly, the CPD provided three documents related to core elements of the Roadmap to Operational Compliance as part of their efforts to systematically evaluate data systems and the current scope of collected data (see ¶606). The development of these documents demonstrates the CPD's commitment to using their

data efficiently and effectively. While this has moved the CPD in the right direction towards Full compliance, the CPD must address additional elements of ¶606 requirements before analysis can be conducted.

In other areas, however, we found limited progress and, in some cases, a failure to regain compliance. For instance, in the sixth monitoring period, the CPD failed to maintain compliance with two paragraphs involving TRED (¶¶574–75), resulting in loss of compliance due to inadequate staffing and resources, resulting in a backlog of TRED reviews. However, during the seventh monitoring period these concerns were not addressed, so TRED continues to operate well under the budgeted personnel and with a sizable backlog. Despite these challenges, IMT acknowledges that the TRED provides meaningful feedback for the department.

We also continue to see no effort on the part of the City or the CPD to conduct a citywide and district-level data analysis of use of force (¶¶572–73). The CPD has continued to fail to provide us with a methodology or take any meaningful steps toward conducting the necessary analysis. The analysis is designed to allow the CPD to assess parity (or disparity) among demographic categories in the CPD's use of force, a primary component of the investigation and findings that led to the Consent Decree. At this point, we are left to conclude that the City and the CPD have no immediate intention of conducting this important analysis.

## Updated Compliance Levels for the Seventh Reporting Period

Overall, the IMT assessed the City's compliance with 42 Data Collection, Analysis, and Management paragraphs. At the end of the seventh reporting period, the City maintained Preliminary compliance for 24 paragraphs (¶¶568–69, 574, and 583–603), maintained Secondary compliance with six paragraphs (¶¶570–71, 581–82, and 608–09), achieved Secondary compliance for five paragraphs (¶¶577–80 and 606), and failed to reach any level of compliance with six paragraphs (¶¶572–73, 575–76, and 605–607). Additionally, the City lost levels of compliance with one paragraph (¶604). *See* Data Figure 1 below.

Data Figure 1:   Compliance Progress for Data Collection, Analysis & Management Paragraphs at the End of the Fifth Reporting Period (December 31, 2022)



Paragraphs in **Preliminary**, **Secondary**, or **Full** Compliance    (24)  (11)  (35)
Paragraphs that have not met Preliminary compliance    (1)
Paragraphs Under Assessment for Preliminary compliance    (0)

Data Figure 2:
Lost Levels of Compliance in the
Data Collection, Analysis, and Management Section



| | Sixth Reporting Period (January 1, 2022 – June 30, 2022) | Seventh Reporting Period (July 1, 2022 – December 31, 2022) |
|---|---|---|
| **Paragraphs** | **Previous Compliance** | **Current Compliance** |
| ¶604 | Preliminary → | Not in Compliance |

## Data Collection, Analysis, and Management Progress through Seven Reporting Periods

Through seven reporting periods, the City and the CPD have developed or updated policies to incorporate requirements from this section. Data Figure 3 provides a sample of training materials related to this section that were developed or revised since the start of the Consent Decree.

Data Figure 3:
Sample of New or Revised Policies
related to the Data Collection, Analysis, and Management Section
(between March 1, 2019, and December 31, 2022)[87]

| | | Policy # | Issue Date |
|---|---|---|---|
| ❖ | *Department Approved Weapons and Ammunition* | U04-02 | 05/07/2021 |
| ❖ | *Control Devices and Instruments* | U04-02-02 | 02/28/2020 |
| ❖ | *Use of Force* | G03-02 | 12/31/2020 |
| ❖ | *Force Options* | G03-02-01 | 12/31/2020 |
| ❖ | *Incidents Requiring the Completion of a Tactical Response Report* | G03-02-02 | 12/31/2020 |
| ❖ | *Firearms Discharge Incidents Involving Department Members* | G03-02-03 | 12/31/2020 |
| ❖ | *Taser Use Incidents* | G03-02-04 | 12/31/2020 |
| ❖ | *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents* | G03-02-05 | 12/31/2020 |
| ❖ | *Canine Use Incidents* | G03-02-06 | 12/31/2020 |
| ❖ | *Baton Use Incidents* | G03-02-07 | 12/31/2020 |
| ❖ | *Department Review of Use of Force* | G03-02-08 | 1/27/2021 |
| ❖ | *Prohibition on Retaliation* | G08-05 | 12/30/2020 |
| ❖ | *Foot Pursuit Reviews Standard Operating Procedure* | 2020-001 | |
| ❖ | *Performance Recognition System* | | |
| ❖ | *Audit Division Standard Operating Procedures* | | |
| ❖ | *Force Review Board (FRB), Standard Operating Procedure* | 2020-002 | |
| ❖ | *Information Systems Development Group Policy* | S09-01-01 | |

## Looking Ahead to the Eighth Reporting Period

Moving forward, the CPD must work more collaboratively and consistently to address the Data Collection, Analysis, and Management section of the Consent Decree. For instance, the OSS implementation has occurred without the CPD and the City utilizing the full extent of the IMT's recommendations and is in danger of repeating the same mistakes that occurred with the first pilot attempt. The analysis of force statistics by demographics has been ignored, despite repeated and ongoing encouragement by the IMT that such an analysis is needed to inform many

---

[87]   Many of these policies are available online in the CPD's Department Directives System. *See Department Directives System*, Chicago Police Department, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

other reforms that the CPD is attempting to implement (*e.g.*, informed community engagement, force management, supervision).

Finally, while appreciable effort to conduct a comprehensive assessment of the City and CPD data systems has been made, we still require the City and the CPD to reach out to each Associate Monitor to determine what additional data is needed to comply with the Consent Decree. Given the turnover in personnel that has occurred with this assessment, there should be focused effort for incoming personnel to work with IMT to ensure the final assessment is comprehensive and in line with the expectations set from the initial planning phases.

\*\*\*

Specific assessments, by paragraph, for the Data Collection, Analysis & Management section are included in Appendix 10.

# XI. Implementation, Enforcement & Monitoring

This is the last section of the Independent Monitoring Team's (IMT's) seventh semi-annual Independent Monitoring Report. It includes our status updates for the City of Chicago's (City's) and its relevant entities' efforts from July 1, 2022, through December 31, 2022, regarding the implementation, enforcement, and monitoring obligations of the Consent Decree.

As we identified in previous monitoring plans, the City has certain obligations that fall outside the 10 topic areas. While these paragraphs do not fall within the specific topic areas discussed above, these obligations are critical to the success of the reform efforts across all 10 topic areas of the Consent Decree. For this reason, the IMT is providing updates on the City's efforts under the following paragraphs: ¶¶626–27, 629–43, 677–80, 682–87, 699–701, 704–06, 711, 714, and 720–21.

Specific compliance status updates, by paragraph, for the Implementation, Enforcement, and Monitoring section are included in Appendix 11.

# Conclusion and Looking Ahead to Independent Monitoring Report 8

We have concluded our monitoring efforts for the seventh reporting period (July 31, 2022, through December 31, 2022). We appreciate the reform efforts made by many hard-working City personnel, including the significant compliance progress made by the City, the CPD, COPA; the Chicago Police Board; the OIG, including the Deputy PSIG; and the OEMC.

The IMT's next semiannual report, Independent Monitoring Report 8, will cover the reporting period from January 1, 2023, through June 30, 2023. As with previous reports, we will continue to work with the City and the OAG to address the requirements of all the Consent Decree's requirements. We will also continue to engage with Chicagoans to determine whether these reforms are being felt in their communities.

# Appendix 1

# Community Policing
# Compliance Assessments by Paragraph

| | | | |
|---|---|---|---|
| ¶13 | ¶23 | ¶32 | ¶41 |
| ¶14 | ¶24 | ¶33 | ¶42 |
| ¶15 | ¶25 | ¶34 | ¶43 |
| ¶16 | ¶26 | ¶35 | ¶44 |
| ¶17 | ¶27 | ¶36 | ¶45 |
| ¶18 | ¶28 | ¶37 | ¶46 |
| ¶19 | ¶29 | ¶38 | ¶47 |
| ¶20 | ¶30 | ¶39 | ¶48 |
| ¶22 | ¶31 | ¶40 | |

# Community Policing: ¶13

*13. In 2017, the Superintendent accepted CPAP's recommendations, and CPD began to implement some of the recommendations, namely, the creation of the Office of Community Policing, which reports directly to the Superintendent and is responsible for overseeing the implementation of CPD's community policing efforts. CPD will, within 90 days of the Effective Date, develop a plan, including a timeline, for implementing CPAP's recommendations, consistent with the requirements set forth in this Agreement.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and CPD maintained Preliminary and Secondary compliance by completing Community Policing Advisory Panel (CPAP) Quarterly reports for the second and third quarters of 2022.

To assess Preliminary compliance, the IMT compared the elements of the CPD plan to the CPAP recommendations and sub-recommendations. To assess Secondary compliance, the IMT reviewed the CPD's efforts to (1) convey accurate status updates and implementation challenges to the CPAP recommendations and (2) reporting progress in implementing the remaining CPAP recommendations. For Full compliance, we will monitor the CPD's efforts to evaluate the effectiveness of its implementation efforts.

*Progress before the Seventh Reporting Period*

As we have outlined in our previous reports, the CPD's plan to implement CPAP recommendations includes the following:

(1)     community partnerships;
(2)     restorative justice;
(3)     youth outreach;
(4)     community policing strategies;
(5)     annual strategy review and feedback;
(6)     quarterly reports;
(7)     community policing staffing and training;
(8)     selection of Chicago Alternative Policing Strategy (CAPS) officers;
(9)     coordination of City services;
(10)    victims' resources; and
(11)    community policing evaluations.

In the last reporting period, the City and the CPD achieved the following milestones:

- Youth District Councils met with the CPD 176 times with a total of 1,695 youth engaged;
- The CPD finalized G02-03, *Community Policing Mission and Vision*;
- The CPD completed Operation Clean, in which the CPD coordinates with other City agencies to problem solve quality of life issues that can lead to crime and disorder;
- The CPD conducted "Parks Rolling Rec on the Block," which provided activities and services in three different neighborhood blocks across Chicago every Friday during Q2, Q3, and Q4;
- The CPD completed 2022 District and Bureau Strategic Plans.

Likewise, in previous reporting periods, the CPD produced its published CPAP Quarterly Reports as evidence of their efforts to convey accurate status reports and challenges to implementation of the recommendations.[1] The Reports track and describe the implementation status of the 14 projects developed to implement the CPAP recommendations. Unfortunately, in the fifth reporting period, the CPD failed to provide the IMT with any evidence of its implementation efforts.

*Progress in the Seventh Reporting Period*

The IMT reviewed the CPAP Quarterly Reports for the first three quarters of 2022 which reflect CPD's efforts to convey accurate status reports and challenges to implementation of the CPAP recommendations. These reports track and describe the implementation status of the 14 projects developed to implement the CPAP recommendations.

---

[1]     The CPD's CPAP quarterly reports are available on the CPD's website: https://home.chicagopolice.org/community-policing-group/consent-decree/cpap/.

Highlights covered in the 2022 Quarterly Reports included the following:

- The CPD finalized S02-03-16, *Community Partnerships* (effective date 28 December 2022);
- The CPD continued development of an Interactions with Youth policy formalizing procedures for Department members when interacting with youth in a non-law enforcement capacity;
- The City and the CPD continued their collaborative efforts to develop and launch the City's youth deflection and diversion pilot;
- The CPD organized and implemented multiple youth summer programming engagements, including the Youth District Advisory Committees (YDAC) Summer Leadership Institute, Neighborhood Youth Corps Program, Police Athletic and Arts League (PALS), Cops and Kids Chess League, and G.R.E.A.T.
- The CPD continued work to finalize special order S02-03-17 *Youth District Advisory Council* to delineate procedures for engaging with youth and community partnerships to ensure long lasting relationships of trust;
- The CPD continued efforts to hire new community organizers;
- The CPD continued their coordinated effort with other City Departments to provide vital services in neighborhoods experiencing violence under the "Operation Clean" initiative;
- The CPD completed 2023 District and Bureau Strategic Plans.

The reports also acknowledge ongoing challenges in achieving implementation timelines, citing workforce shortages and COVID-19 related impediments.

<div align="center">***</div>

In this reporting period, the CPD completed three quarterly reports updating progress and identifying challenges in implementing the CPAP recommendations. For Full compliance, the IMT will assess the CPD's efforts to develop an appropriate process to assess effectiveness of the implementation of tasks relating to CPAP recommendations.

## Paragraph 13 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019

COMPLIANCE PROGRESS:
Preliminary

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020

COMPLIANCE PROGRESS:
Secondary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020

COMPLIANCE PROGRESS:
Secondary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021

COMPLIANCE PROGRESS:
Secondary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021

COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022

COMPLIANCE PROGRESS:
Secondary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:
Secondary

# Community Policing: ¶14

**14.** *Within 180 days of the Effective Date, CPD will review and, to the extent necessary, revise all relevant policies to clearly delineate the duties and responsibilities of the Office of Community Policing and any other offices or entities that report to the Office of Community Policing.*

### Compliance Progress <span>(Reporting Period: July 1, 2022, through December 31, 2022)</span>

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Secondary compliance by completing in-service training covering updated policy revisions.

To assess compliance, the IMT monitored the CPD's completion and documentation of relevant trainings and its efforts to supervise compliance with the Office of Community Policing policies to ensure the policy changes are implemented in CPD practices. We monitored the CPD's efforts to supervise the implementation of these policies, assessing, for example, whether the CPD's evaluation process, as outlined in the Community Policing Biennial Policy Review procedure, is effective at ensuring the policies are implemented.

*Progress before the Seventh Reporting Period*

This paragraph was first assessed in the second reporting period, but it failed to meet Preliminary compliance because, although the IMT reviewed policies regarding the Office of Community Policing, the IMT found that the draft policies and SOPs required further revision. The City and the CPD achieved Preliminary compliance in the third reporting period by reviewing and revising all relevant policies that delineate the duties and responsibilities of the Office of Community Policing and its programs and entities. In the fourth reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶14 because the CPD trained members of the Office of Community Policing on the various policy changes made as part of this paragraph's requisite review. In the last reporting period, the City and the CPD maintained Preliminary compliance but remained under assessment for Secondary compliance.

In previous reporting periods, the CPD reviewed and revised aspects of its community policing policy framework, however progress stalled in the seventh reporting period. Specifically, the CPD did not sufficiently demonstrate its ability to review the implementation of the policies to ensure the changes are reflected in member conduct and program engagement. In conversation with the Office of

Community Policing (also known as OCP), we learned that the CPD is developing additional standard operating procedures for some of the community policing programs covered in the Office of Community Policing policies. However, other than an updated version of the CPD's General Order G02-03, *Community Policing Mission and Vision policy*, we did not receive any records reflecting the CPD's efforts to supervise the implementation of the updated Office of Community Policing policies.

During the previous reporting period, CPD training records reflected that at least 95% of members completed required 2021 in-service community policing training. The CPD also developed and issued two directives covering community partnerships and Youth District Advisory Committees.

The CPD also plants to develop additional directives to strengthen supervisory oversight. These new directives will also provide additional guidance on engaging community members in the development of CPD policy The CPD also reports that during the next reporting period, a thorough review of Office of Community Policing programming—such as the Dare Program and Officer Friendly—to determine efficacy and help inform programming changes.

*Progress during the Seventh Reporting Period*

During the seventh reporting period, the CPD continued working to finalize S02-03-16 *Community Partnerships* policy, S02-03-17 *Youth District Advisory Council*, S02-03-14, *District Advisory Committee*, and S02-03-02 *District Strategic Plans*.

<p style="text-align:center">* * *</p>

The CPD and City maintained Secondary compliance by completing in-service training of OCP staff covering updated policy revisions and continuing with development of new directives to strengthen supervisory oversight. For Full compliance, the IMT will assess the effectiveness of the CPD's efforts to evaluate whether these programs and processes outlined in the Community policing Biennial Policy Review procedure and other directives, are effective in ensuring policy implementation and achieving intended outcomes.

## Paragraph 14 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Preliminary | Secondary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Community Policing: ¶15

*15. With the assistance of the Office of the Community Policing, CPD will ensure its command staff develops crime reduction and problem-solving strategies that are consistent with the principles of community policing. To achieve this outcome, CPD will: a. within 180 days of the Effective Date, provide CPD's command staff methods and guidance, in writing, for ensuring that department-wide and district-level crime reduction strategies are consistent with the principles of community policing; b. require CPD's command staff to review department-wide and district-level crime reduction strategies implemented under their command, as appropriate, in order to ensure they incorporate problem-solving techniques and are consistent with the principles of community policing; and c. designate the Deputy Chief of the Office of Community Policing to review and provide written feedback on implemented department-wide and district level crime reduction strategies, excluding operational strategies that are determined on a day-to-day or short term basis, to ensure they are community oriented and consistent with the principles of community policing.*

## Compliance Progress  (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Secondary compliance by completing another yearly district-wide and bureau-wide strategy development process and completing the development and review process within prescribed timeframes.

To assess compliance, the IMT monitored the CPD's efforts to engage in ¶15 review when developing crime-reduction strategies and problem-solving techniques. We also monitored the CPD's efforts to evaluate and refine its processes to ensure that they result in strategies consistent with community policing.

*Progress before the Seventh Reporting Period*

In the previous reporting period, the CPD provided compliance records regarding District Strategic Plans. The CPD also posted these finalized plans on their website early in the sixth reporting period. The 19-page template that each District completes addresses crime reduction strategies and community engagement priorities. Since its inception, the template has expanded from 4 pages to 19 pages,

which better provides the CPD and Chicago communities an opportunity to articulate detailed crime reduction and community engagement strategies.

Each District also engaged in "community conversations," which comprised a series of community meetings to identify, discuss, and establish crime reduction and engagement priorities. Feedback from these sessions, coupled with internal discussions informed by data, led to the priorities identified in each of the 22 District Plans. In addition, issues identified during Beat meeting discussions were often cited as sources of community concerns considered in the planning process.

The community engagement section of these strategies focused on youth, older adults, business community, survivors of domestic violence, and affinity groups. For youth engagement, many Districts planned to conduct outreach activities with schools, initiation, and/or expansion of *Police Explorer* programs, and expansion of *Youth Advisory Committees*. For older adults, well-being check-ins, and presentations covering safety tips were often-used strategies. Business engagement strategies primarily included security assessments and information sharing, while for survivors of domestic violence using liaisons to better connect victims to services. The affinity group outreach efforts often focus on the unsheltered and stepped-up efforts to connect to other marginalized groups.

The crime reduction and engagement strategies, however, lacked performance baselines and measurable goals. There is little guidance provided to explain how to assess performance levels and make judgements about strategy implementation and impact. The IMT suggested the CPD consider modifying the template to assign and capture measurable goals.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the CPD engaged in a deliberate process to engage the community in the development of district strategic plans. To achieve this, the CPD hosted two community conversation sessions per district. Participation at community conversation was generally diverse, but not in age. The CPD must continue to find ways to expand their outreach and strategy development participation among young men of color. Reaching and involving this demographic will provide important insights and contribute to building trust among this group.

The CPD also posted the draft plans to its website in November 2022 to elicit additional community feedback. Simultaneously, the CPD completed internal reviews with the DACs and provided feedback to the districts to revise and submit for final approval. As a result, the CPD completed the District- and Bureau-wide strategies for all 22 Districts prior to their implementation in 2023.

<p style="text-align:center">***</p>

In sum, the City and the CPD maintained Secondary compliance by completing the districtwide and Bureau-wide strategy development process in all 22 police districts. The process continues to evolve and capture community considerations. The IMT encourages the CPD to continue its efforts to involve more members from marginalized communities and young people in the strategy development process. To achieve Full compliance, the CPD must provide evidence of broadening input on strategy development to better reflect a cross-section of community members. The CPD will need to develop measures to assess the effectiveness of the engagement processes and impact of the districtwide and bureau-wide strategies in achieving community safety goals.

### Paragraph 15 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Preliminary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Community Policing: ¶16

*16. CPD Bureau of Patrol Area Deputy Chiefs and District Commanders will regularly review district efforts and strategies for building community partnerships and using problem-solving techniques.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**  Regularly          ☐ **Met**  ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

During the seventh reporting period, the City and the CPD achieved Preliminary compliance by finalizing community policing directives addressing the requirements of this paragraph.

The IMT monitored the CPD's efforts to finalize a policy that incorporates this paragraph's requirements, including guidance regarding what data the Deputy Chiefs and District Commanders should be reviewing, how regularly they should be reviewing them, and how to document the review.

*Progress before the Seventh Reporting Period*

The City and the CPD's efforts to comply with ¶16 was first assessed in the fourth reporting period where Preliminary compliance was not met because the CPD had not fully codified the requisite reviews into policy. Specifically, the CPD's Special Order S02-03-02, *District Strategic Plans*, was still under review. In the previous reporting period, the CPD continued to review and revise the policy that provides guidance for the command-level review of district efforts and strategies for building community partnerships and using problem-solving techniques. While the CPD expected to provide the IMT with a revised version of the *District Strategic Plans* policy, S02-03-02, to address ¶16, including additional guidance for how command staff should conduct these reviews, the CPD did not provide it by the end of the fifth reporting period.

During the sixth reporting period, the City and the CPD reported that District Commanders regularly reviewed their strategies and conducted quarterly reviews led by District Commanders. The City and the CPD also met Preliminary compliance through its *District Strategic Plans* policy, S02-03-02, with the CPD receiving no-objection notices from both the IMT and the Office of the Illinois Attorney General. On the other hand, the CPD has not yet implemented a recurring reviewing schedule to be met.

The IMT reviewed a revised version of S02-03-02 during the sixth reporting period. The CPD also received no-objection notices from both the IMT and the Office of the Illinois Attorney General and, at the end of the sixth reporting period, the CPD was in the process of receiving and considering community input.

*Progress in the Seventh Reporting Period*

In this reporting period, the CPD finalized S02-03-02 *District Strategic Plans* by adding specific requirements for command-level review and approval. While the IMT noted in the previous reporting period that the CPD needs to develop a specific directive for providing more guidance for developing, documenting, and tracking community partnerships, the CPD has not yet completed that task. We expect S02-03-02 to be implemented in the next reporting period, after the CPD has gathered and meaningfully considered community feedback on the policy.

***

The City and the CPD achieved Preliminary compliance by completing community policing directives that guide command-level reviews of district efforts and strategies for building community partnerships. For Secondary compliance, the IMT will assess whether the CPD provides sufficient supervisory oversight and review processes that provide adequate documentation of District partnership activities.[2]

### Paragraph 16 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

---

[2] In the City's and the CPD's comments to an earlier draft of this report, they raise a concern that this assessment describes the methodologies for Full compliance. We disagree. Consistent with our methodologies, the CPD identify a supervisory process to ensure each district's strategies are complete, align with other district and city-wide efforts, reflect the data, and represent best practice. Then, the CPD can follow this process to demonstrate Full compliance. Without this, the CPD will not have a clear path for reaching full and effective compliance. We welcome additional discussions with the City, the CPD, and the OAG to ensure that the CPD reaches compliance adequately and efficiently as possible.

# Community Policing: ¶17

*17. The overall effectiveness of CPD's department-wide and district-level crime reduction strategies will be determined by a reduction in crime and not by the number of arrests, stops, or citations.*

**Compliance Progress**        (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD achieved Secondary compliance with the requirements of ¶17 by including language in policy that address the requirements of this paragraph and reflected in districtwide crime reduction strategies.

To assess compliance, we monitored the CPD's efforts to incorporate this paragraph's requirement into policy, including guidance regarding the process by which the CPD would assess the effectiveness of the strategies. We also monitored the CPD's efforts to conduct such assessments based on appropriate data.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD achieved Preliminary compliance with this paragraph by adding specific language in a revised and approved S02-03-02, *District Strategic Plans*, covering procedures for developing District- and Bureau-wide crime-reduction and community-engagement strategies. The revised policy states that the "CPD will assess the effectiveness of policing strategies that focuses on crime reduction and not the numbers of arrests as the measure of effectiveness.

In previous reporting periods, the City and the CPD did not provide any evidence that the CPD revised or developed a new directive that establishes the process by which the CPD will assess the effectiveness of policing strategies that focuses on crime reduction and not the number of arrests as the measure of effectiveness.

*Progress in the Seventh Reporting Period*

During this reporting period, the CPD implemented procedures for developing District- and Bureau-wide crime-reduction and community-engagement strategies as detailed in the final version of CPD policy S02-03-02, *District Strategic Plans.* The CPD's efforts to develop their 2023 District Strategic Plans involved focused community engagement efforts (Community Conversations) to develop strategies

that focus on crime reduction and not the numbers of arrests as the measure of effectiveness.

*** 

The City and CPD maintained Secondary compliance with this paragraph. Districtwide crime reduction strategies include reductions in crime as specific goals reflecting the language in policy. To achieve Full compliance, the IMT expects the CPD to demonstrate, through its ongoing efforts, that CPD command staff and officers adhere to the requirements of this paragraph, as laid out in CPD policy.

### Paragraph 17 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Community Policing: ¶18

*18. The City will establish and coordinate regular meetings, at minimum quarterly, with representatives from City departments, sister agencies, and CPD to collaborate on developing strategies for leveraging City resources to effectively and comprehensively address issues that impact the community's sense of safety, security and well-being. The City departments and agencies will include, but not be limited to, the Department of Streets and Sanitation, the Department of Buildings, the Chicago Fire Department, the Department of Business Affairs and Consumer Protection, the Department of Planning and Development, the Office of Emergency Management and Communication People with Disabilities, the Department of Public Health, the Department of Family and Support Services, the Chicago Public Schools, the Chicago Housing Authority, and the Chicago Park District. If after two years the City concludes that less frequent meetings would be more effective, it may propose an alternative schedule subject to Monitor approval.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**     Quarterly          ✓ **Met**     ☐ **Missed**

**Preliminary:**     *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:**     *In Compliance* (NEW)
**Full:**     *Not in Compliance*

The City and the CPD achieved Secondary compliance by hosting the required quarterly meetings of City departments to collaborate on developing strategies to advance community safety.

To assess this paragraph, we observe, review, and track outcomes from the Quarterly meetings, chaired by the Mayor, that aim to coordinate City entities in leveraging resources to promote community safety.

*Progress before the Seventh Reporting Period*

The City met Preliminary compliance with this paragraph in the first reporting period by holding quarterly meetings and providing the IMT with a summary of its activities regarding regular meetings with representatives from City departments. The City maintained Preliminary compliance during the subsequent reporting periods by holding two "cabinet meetings."

In the sixth reporting period, the City and the CPD maintained Preliminary compliance but failed to achieve Secondary compliance by not providing documentation for two of the Quarterly Public Safety meetings required. The City has not achieved Secondary compliance previously because they have not produced records to show that these meetings involved quality collaboration on developing strategies for leveraging City resources, including a review of actions assigned, actions taken, and progress made.

*Progress in the Seventh Reporting Period*

During this reporting period, the IMT reviewed records reflecting the quarterly Mayor's Public Safety Cabinet meetings with representatives from City departments in July, September, and December of 2022.

Topics covered during these meetings includes:

- Review of the 2022 "Our City, Our Safety" Assessment
- Community Safety Framework
- Violence reduction dashboard
- Gender-based violence update
- Crisis assistance response and engagement (CARE) board
- History of police oversight in the City of Chicago
- Overview of Chicago's police accountability system
- Review of the investigatory process for complaints against officers
- Overview of youth diversion pilot program

In reviewing the agenda, attendance and meeting notes captured by the IMT, the City has demonstrated coordinated efforts to leverage resources to contribute to community safety efforts. One area that remains to be addressed is the development of meeting minutes that clearly articulate action items for City departments and agencies and follow through on these issues at subsequent meetings.

<div align="center">***</div>

The City and the CPD achieved Secondary compliance by hosting the required quarterly meetings of City departments to coordinate efforts and strategies that advance community safety. To achieve Full compliance, the City and CPD must demonstrate progress and impact of the coordinated interventions by City departments including CPD.

## Paragraph 18 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Preliminary

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Preliminary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Community Policing: ¶19

*19. CPD will ensure that officers are provided with information regarding the communities they serve, including their assets and challenges, community groups and leaders, and business, residential, and demographic profiles.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance because the CPD has not yet completed digitized updates of resource guides with community input.

To assess compliance, we monitored whether the CPD sought input from community stakeholders in developing and revising the district resource guides and whether district officers received and access the guides. We also continued to monitor the CPD's progress to develop a plan to track, assess, and update the officers' use of district recourse guides, determine which resources officers most often refer community members to, and which are not as active.

### Progress before the Seventh Reporting Period

During the previous reporting periods, the CPD's Special Order S02-03, *The Community Policing Office*, and Department Notice D21-03, *Neighborhood Policing Initiative Pilot Program*, effectively codified ¶19's requirements. We also reviewed the CPD's standard operating procedure regarding the Community Policing District Resource Guide, which provides more guidance regarding how the Office of Community Policing will collect community information. Because the CPD finalized S02-03 and D21-03 and developed a process by which the Office of Community Policing can collect and distribute community information, the City and the CPD met Preliminary compliance. As of the sixth reporting period, the CPD was still working on processes to produce, update, and disseminate resource guides and other pertinent District-related information using a digital process.

### Progress in the Seventh Reporting Period

During this reporting period, the CPD continued to distribute district resource guides to officers and made progress on efforts to provide officers with helpful neighborhood information but did not digitize this information. The CPD continues to search for the capability to create electronic copies of District resources to better support information sharing and to ensure the accuracy of resource-related

information to distribute to officers to assist with their day-to-day interactions with community members.

\*\*\*

The City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance because they did not develop digitized updates of resource guides that include community input. The IMT understands that the CPD expects to complete these guides and achieve Secondary compliance in the next reporting period.

### Paragraph 19 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Community Policing: ¶20

**20.** *Within 180 days of the Effective Date, CPD will develop and institute a policy prohibiting the transport of individuals with the intent to display or leave them in locations where known rivals or enemies live or congregate.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance because they did not provide evidence of a process to track juvenile transports, nor did they provide relevant training records.

To assess compliance, the IMT monitored the CPD's efforts to train officers on this requirement. Specifically, we reviewed records indicating that members received the *2021 In-Service Use of Force* training. We were also looking for the CPD to submit guidance on supervisory practices and data-collection efforts related to transports to evaluate how the CPD tracks transports to ensure members comply with this requirement.

*Progress before the Seventh Reporting Period*

In the previous reporting period, the City and the CPD maintained Preliminary compliance and took meaningful steps to achieve Secondary compliance. The City and the CPD did not provide any other records demonstrating that members attended the training courses, nor did we receive any evidence that the CPD has developed supervisory practices to ensure policy implementation.

The IMT reviewed the CPD's General Order G04-01, *Preliminary Investigations* (which addresses the requirements of this paragraph in section V.B., stating "Department members will not transport an individual for the purpose of intentionally displaying or leaving the individual in locations where known rivals or enemies live or congregate"); the CPD's 2021 *Two-Day De-Escalation, Response to Resistance*; and the revised *2021 In-Service Use of Force* training. The training includes guidance regarding this paragraph's requirements. The CPD did not provide any other records demonstrating developed supervisory practices including a process to track transports to ensure policy implementation.

*Progress in the Seventh Reporting Period*

During this reporting period, the City and the CPD reported that G04-01, *Preliminary Investigations* was covered in their 2022 *Two-Day De-Escalation, Response to Resistance*; and the revised *2022 In-Service Use of Force* training the IMT did not receive records demonstrating that members attended the training courses, nor did we receive any evidence that the CPD has developed a method for tracking juvenile transports (e.g., where the youth is picked-up and dropped off).

*\*\*\**

The City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance by not providing evidence of a process to track juvenile transport. To achieve Secondary compliance, the IMT expects the CPD to provide transport data and evidence of completion of recruit training on arrestee transport policy.

### Paragraph 20 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Community Policing: ¶22

*22. CPD will encourage and create opportunities for CPD members to participate in community activities and have positive interactions with the community, including those that extend beyond the context of law enforcement duties.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance with the requirements of ¶22 because they failed to complete the city-wide deployment of DCO officers, who facilitate positive community interactions.

To assess compliance, the IMT monitored the CPD's efforts to expand its Neighborhood Policing Initiative to the remaining CPD districts and to address concerns raised in Northwestern University's preliminary evaluation report.[3] The report provided suggested improvements to the Neighborhood Policing Initiative:

- shift resources to increase staffing levels of officers in the program;

- increase consistency by keeping officers with the program and not pulling officers to resume other calls;

- increase resources and compensate community ambassadors; and

- define the "community ambassador" roles more clearly.

We also assessed the CPD's efforts to train Neighborhood Policing Initiative personnel and develop other supervisory practices to ensure the relevant written guidance is implemented as written.

*Progress before the Seventh Reporting Period*

In the previous reporting period, the City and the CPD maintained Preliminary compliance by continued progress in implementing the Neighborhood Policing Initiative program in 10 of its 22 districts, including the hiring and deployment of

---

[3]  *See* IPR Rapid Research Report, *Northwestern Neighborhood and Network Initiative: Interim Findings and Recommendations*, NORTHWESTERN UNIVERSITY, INSTITUTE FOR POLICY RESEARCH (May 17, 2021), https://www.ipr.northwestern.edu/documents/reports/ipr-n3-rapid-research-reports-cnpi-preliminary-findings-17-may-2021.pdf

district coordination officers and assignment of liaison officers to work with affinity groups. However, the CPD did not make progress toward Secondary compliance during that period. The CPD noted its lack of progress citing overall efforts to balance workloads and address competing priorities.

During the sixth reporting period, the CPD launched a department-wide initiative to achieve 1.5 million positive community interactions (PCIs) in 2022. The IMT and the OAG provided feedback and articulated concerns on the initial implementation plan of the initiative. As a result of this feedback the CPD developed the draft *Positive Community Interactions* policy (S02-03-15) that addresses many of the concerns raised by the IMT and the OAG by better defining activities, data collection, and supervision and accountability measures. Field interviews with CPD officers revealed some confusion in defining and reporting on PCIs.

The CPD's participation in community activities most often involve Community Policing Office staff in each District which includes both District Coordination Officers and Chicago Alternative Policing Strategy (CAPS) officers. Field interviews revealed that District Coordination Officers engage primarily in helping with following up on service calls that require more time and problem-solving while CAPS officers often serve as liaisons for the various affinity groups attending many community meetings.

*Progress in the Seventh Reporting Period*

During this reporting period, the CPD continued to pilot the integration of Neighborhood Policing Initiative and Chicago Alternative Policing Strategy (CAPS) functions and still working to fine tune and expand programming to other Districts. As in the previous reporting period, the CPD continues to address issues raised in the Northwestern University's evaluation of the NPI program including not pulling officers away for other duties, shifting resources to increase officer participation, and more clearly defining the community ambassador role. The CPD also continues implementation of their PCI initiative, however the CPD did not produce any relevant data noting the nature or number of these events during this reporting period.

*** 

The City and the CPD maintained Preliminary compliance with these requirements but did not achieve Secondary compliance. The City and the CPD made no progress in this reporting period regarding the expansion of the Neighborhood Policing Initiative (NPI) and deployment of District Coordination Officers that facilitate positive interactions through problem solving. To achieve Secondary compliance, the CPD must continue for city-wide deployment of DCOs. The IMT also expects the CPD to report any outcome data concerning the PCI city-wide initiative.

## Paragraph 22 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Community Policing: ¶23

*23. CPD has established and will continue and build upon a variety of community partnerships and engagement strategies designed to encourage positive community interactions, such as Bridging the Divide, Officer Friendly, and youth mentorship and engagement programs.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance because they have not yet finalized a process to document and track District community partnership activity.

To assess compliance, the IMT monitored the CPD's efforts to document its coordinated efforts to build relationships with community partners, including ongoing outreach efforts. We also assessed the CPD's efforts to ensure personnel central to the implementation of these requirements received adequate training and to collect and document data regarding its collaborative work and partnerships with community organizations, groups, and community members.

*Progress before the Seventh Reporting Period*

In the previous reporting period, the CPD worked on drafting a special order to define community partnerships and provide guidance on how to develop, implement, track, and assess community partnerships. The CPD also reported that after finalizing the draft directives, they would begin to train relevant community policing staff members, but they did not provide sufficient evidence to support these efforts.

In earlier reporting periods, the City and the CPD met Preliminary compliance by codifying this paragraph into CPD Special Order S02-03, *The Community Policing Office*; General Order G02-03, *Community Policing Mission and Violence*; and Department Notice D21-03, *Neighborhood Policing Initiative Pilot Program*. In an early reporting period, the CPD updated 14 policies relating to community partnerships and programming, including programs like "Officer Friendly," "D.A.R.E," and "Bridging the Divide." The CPD's goal for these programs and others is, in part, to provide opportunities for CPD officers to have positive interactions with community members.

In the previous reporting period, the CPD issued Special-Order S02-03-16 *Community Partnerships* to define roles and responsibilities. The CPD reports that it continues to work on processes to document, and track expansion of partnerships using the Community Engagement Management System (also known as CEMS). The CPD hopes to complete these processes in the next reporting period. As previously noted, the CPD launched a major initiative encouraging officers to engage in and report unplanned positive community interactions. After considerable feedback from the IMT and the OAG, the CPD made some program changes and finalized a policy providing additional implementation guidance, S02-03-15, *Positive Community Interactions* (effective date 30 June 2022).

During the last reporting period, the CPD also reported expansion of the Police Athletic and Arts League (PAAL), primarily on the South and West sides, including basketball, baseball, and launching a new boxing program.

*Progress in the Seventh Reporting Period*

In this reporting period, the IMT reviewed to S02-03-16, *Community Partnerships*, and S02-03-17, *Youth District Advisory Council*, but did not formalize a process to document, and track expansion of partnerships using CEMS or to track supervisory oversight.

\*\*\*

The City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance during this reporting period. Moving forward, the IMT expects the CPD to provide evidence of a tracking system that documents District partnership activity, and supervisory oversight of such activity.

### Paragraph 23 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Community Policing: ¶24

*24. Each district will identify and maintain collaborative partnerships with community stakeholders to serve the specific needs of the community. District representatives will meet, as appropriate, with residential, business, religious, civic, educational, youth, and other community-based groups to proactively maintain these relationships and identify and address community problems and needs.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance, because the CPD did not provide documentation for tracking partnership activity in each District.

To assess compliance, the IMT monitored the CPD's efforts to develop written processes for documenting, tracking, and expanding partnerships. IMT monitored District Coordination Officers and Community Ambassadors' efforts to conduct outreach to a range of community stakeholder groups, as well as develop and implement partnerships.

*Progress before the Seventh Reporting Period*

In the previous reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance because of a lack of documentation of partnership efforts and training of staff to track, maintain, and expand those partnerships. Before the fifth reporting period, the City and the CPD incorporated guidance specific to this paragraph into various policies—*The Community Policing Office policy* (S02-03), *the Neighborhood Policing Initiative Pilot Program* department notice (D21-03), and *Community Policing Mission and Vision* policy (G02-03)—which collectively require collaborative partnerships to serve specific needs of Chicago's diverse communities.

In the previous reporting period, the CPD expanded its use of District Coordination Officers and Liaison officers to work with community partners and city agencies for problem solving and relationship building. Chicago Alternative Policing Strategy (CAPS) officers often served as community liaisons while District Coordination Officers engaged in more problem-solving activities. The CPD reports that there are now Liaison officers assigned in all 22 districts. The CPD also completed S02-03-16, *Community Partnerships*, which became effective in this reporting period

(effective December 28, 2022), and piloted efforts to integrate the Chicago Alternative Policing Strategy and District Coordination Officer functions. Staffing issues and pulling officers away to perform other duties adversely impacted program effectiveness and the CPD's planned expansion of District Coordination Officers to other districts has slowed.

*Progress in the Seventh Reporting Period*

In this reporting period, the IMT reviewed revisions to S02-03-16 *Community Partnerships* and an initial draft of S02-03-17, *Youth District Advisory Council*, but the CPD did not formalize a process to document and track expansion of partnerships.

<p style="text-align:center">***</p>

The City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance. Moving forward, the IMT expects the CPD to demonstrate evidence of documenting and tracking community development expansion efforts, produce reports, and provide any additional required training.

<p style="text-align:center"><strong>Paragraph 24 Compliance Progress History</strong></p>

| FIRST REPORTING PERIOD<br>SEPTEMBER 1, 2019 – AUGUST 31, 2019<br>COMPLIANCE PROGRESS:<br>Not Applicable | SECOND REPORTING PERIOD<br>SEPTEMBER 1, 2019 – FEBRUARY 29, 2020<br>COMPLIANCE PROGRESS:<br>Not Applicable | THIRD REPORTING PERIOD<br>MARCH 1, 2020 – DECEMBER 31, 2020<br>COMPLIANCE PROGRESS:<br>Not Applicable |
| --- | --- | --- |
| FOURTH REPORTING PERIOD<br>JANUARY 1, 2021 – JUNE 30, 2021<br>COMPLIANCE PROGRESS:<br>Preliminary | FIFTH REPORTING PERIOD<br>JULY 1, 2021 – DECEMBER 31, 2021<br>COMPLIANCE PROGRESS:<br>Preliminary | SIXTH REPORTING PERIOD<br>JANUARY 1, 2022 – JUNE 30, 2022<br>COMPLIANCE PROGRESS:<br>Preliminary |
| SEVENTH REPORTING PERIOD<br>JULY 1, 2022 – DECEMBER 31, 2022<br>COMPLIANCE PROGRESS:<br>Preliminary | | |

# Community Policing: ¶25

> **25.** *CPD will meet with members of the community from each beat and District Advisory Committee members at least once every two months. These community meetings will be scheduled in consultation with the community, be used to identify problems and other areas of concern in the community, and provide an opportunity to discuss responses and solutions through problem-solving tactics and techniques.*

## Compliance Progress      (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    Every Two Months    ☑ **Met**    ☐ **Missed**

**Preliminary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

In this reporting period, the City and the CPD maintained Preliminary compliance but failed to achieve Secondary compliance due to inadequate functionality of the District Advisory Committees (also known as DACs) and a lack of complete records on these proceedings.

To assess compliance, the IMT reviewed documents provided by the CPD pertaining to agendas and minutes for the district Beat and District Advisory Committee meetings. Sample documents provided to the IMT revealed information gaps regarding participation, and capturing detailed notes on district-specific problems, action items, and tracking mechanisms.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD spent considerable time revitalizing the District Advisory Committees. The CPD specifically identified Chairs for all its District Advisory Committees and stepped up the recruitment of new members. The CPD also worked to understand how the District Advisory Committees will function in the future considering passage of a new police oversight ordinance that establishes elected District Councils with similar goals.[4] The CPD indicated that they are working on a transition plan that will minimize interruption of District Advisory Committee activity, and keep current interested members involved in

---

[4]   *See Community Commission for Public Safety and Accountability, Mission*, CITY OF CHICAGO, https://www.chicago.gov/city/en/depts/ccpsa/auto_generated/ccpsa_mission.html; *see also Community Commission for Public Safety and Accountability, Information on District Councils*, CITY OF CHICAGO, https://www.chicago.gov/city/en/depts/ccpsa/supp_info/district-councils.html.

some capacity. The IMT was provided some documentation on District Advisory Committee and Beat meeting activities, but the CPD was clearly still working to expand and develop a more representative membership.

During the sixth reporting period, the CPD reported Beat and District Advisory Committee meetings occurred once every two months. The CPD provided a small sampling of agendas and minutes from these meetings. The CPD reported that many Beat and District Advisory Committee meetings were now returning to in-person. The CPD indicated that it is trying to implement a hybrid model allowing for both in-person and virtual access to meetings. The CPD also reported their continued efforts to work through the issues raised in the 2020 audit of Beat and District Advisory Committee meetings including further codification of policies and procedures and how documents are to be maintained and stored.

The CPD reported that it is working its internal Audit Division to plan a 2022 audit of District Advisory Committees and Beat meetings. They are also working on how to adapt the functioning of the current District Advisory Committees to align with new city ordinance establishing District Councils comprised of elected members that will be seated in May 2023. The CPD also noted that many District Advisory Committee members have resigned to run for District Councils because they are paid positions.

*Progress in the Seventh Reporting Period*

In this reporting period, the IMT reviewed the CPD's 20*21 Annual Community Policing Report*, Beat and DAC meeting records, and updates to CPD Special Order S02-03-14, *District Advisory Committee (DAC)*. The CPD continues to work through the challenges posed by adapting District Advisory Committee operations to align with the ordinance requirements and securing a more diverse and representative membership. The IMT will continue to monitor the CPD's efforts to incorporate the District Advisory Council in executing the requirements of the Consent Decree relevant to District Advisory Committee operations.

The IMT remains concerned about the dissemination of information about Beat and District Advisory Committee meetings. Locating the times and locations of these meetings on the CPD websites is onerous, especially virtual meeting addresses which require a Twitter account to access.

\*\*\*

The City and the CPD maintained Preliminary compliance but failed to achieve Secondary compliance resulting from inadequate District Advisory Committee functionality, a lack of complete records on these proceedings and easy access to meeting information. Sample documents provided included information gaps regarding participation and follow-up on action items. Moving forward, the CPD

must continue to enhance outreach efforts for Beat meeting participation, align District Advisory Committee operations with the new District Councils—as described in the new city ordinance—and continue to address document maintenance and storage issues.

### Paragraph 25 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Community Policing: ¶26

> **26.** *CPD's Office of Community Policing will designate CPD members, as needed, to serve as points of contact for organizations to assist with access to police services, including those serving communities that have experienced previous challenges with access to police services, such as LGBTQI individuals, religious minorities, immigrants, individuals with disabilities, homeless individuals, and survivors of sexual assault and domestic violence. The designated CPD members will provide feedback to the Deputy Chief of the Office of Community Policing about the issues or potential policy recommendations raised by community-based organizations or the community to improve access to police services.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In this reporting period, the City and the CPD maintained Secondary compliance by establishing liaison positions in all 22 Districts.

*Progress before the Seventh Reporting Period*

The City and the CPD's efforts to comply with ¶26 were first assessed in the fourth reporting period where they achieved Preliminary compliance by codifying ¶26's requirements into Special Order S02-03, *The Community Policing Office*. In the fifth reporting period, the City and the CPD achieved Secondary compliance by hiring citywide "liaisons" and providing initial training.

During the previous reporting period, we assessed the CPD's efforts to staff citywide liaison positions, train the selected members on their responsibilities, and develop supervisory practices that ensure the policy is implemented as written. The CPD hired one new Domestic Violence Advocate, reported the assignment of liaison officers in all 22 districts, and piloting efforts in the 6th District to integrate Chicago Alternative Policing Strategy (CAPS) and District Coordination Officer functions with CAPS officers often serving as liaisons at the District-level.

*Progress in the Seventh Reporting Period*

During this reporting period, the CPD maintained liaisons in all 22 districts, and made progress in moving forward with hiring for citywide positions. The CPD is

also working to develop a community engagement plan and annualized refresher training.

*** 

The City and the CPD maintained Secondary compliance by establishing liaison positions in all 22 districts and plans to move forward with additional hiring for citywide positions, and for annualized refresher training. To achieve Full compliance, the CPD needs to establish assessment processes to determine effectiveness and impact of the liaison program.

### Paragraph 26 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Community Policing: ¶27

> **27.** *CPD will facilitate relationships with youth by establishing regular meetings to serve as opportunities to provide input to CPD about the issues affecting their lives and their communities. CPD will partner with community-based organizations to identify strategies to include participants that represent a racially, geographically, and socio-economically diverse cross-section of Chicago youth, including, but not limited to, at-risk youth and youth who have been arrested, incarcerated, or otherwise involved in the criminal or juvenile legal systems.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**     *Not in Compliance*
**Full:**     *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance by not providing evidence of documenting, tracking and reporting on expansion of community partnerships.

To assess compliance, the IMT monitored the CPD's efforts to develop supervisory practices to ensure the General Order G02-03, *Community Policing and Vision*, is implemented as written. We also assessed the CPD's efforts to evaluate the effectiveness of its efforts to partner with community-based organizations and facilitate relationships with Chicago youth.

*Progress before the Seventh Reporting Period*

In the previous reporting period, the CPD worked with Youth Advisory Councils to expand its relationships with youth, but acknowledged minimal progress in developing partnerships with community-based organizations to engage youth from diverse backgrounds in discussions about how best to address community safety and quality of life issues. While this outreach and engagement with youth previously codified into policy (G02-03, *Community Policing and Vision*) is required, the CPD provided no evidence of implementation.

The CPD invested time in strengthening its Youth District Advisory Committees (also known as YDACs), which are governed by CPD policy G02-03, *Community Policing Mission and Vision*, in section IV.D.4.a., "Youth District Advisory Council." The CPD reports about 18 functioning Youth District Advisory Committees. During regular meetings and discussions, the CPD indicated its plans to establish a new civilian youth team with a priority to this summer to restart and relaunch the District Advisory Committees. The requirements of this paragraph directly address

the need for the CPD to partner with community organizations to identify a cross-section of youth to participate in these discussions. The CPD did not provide the IMT with evidence that the CPD worked with community-based organizations to facilitate youth discussions or with evidence of community input in determining Youth District Advisory Committee membership.

*Progress in the Seventh Reporting Period*

During the seventh reporting period, the CPD continued efforts to develop a mechanism for tracking partnership development and expansion, and to provide outcome data but have yet to finalize these capabilities.

*** 

The City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance by not documenting and tracking partnership development and expansion and reporting outcome data from CPD efforts to increase positive and non-enforcement communications. To achieve Secondary compliance, the IMT expects the CPD to put in place and report on partnership building activities.

### Paragraph 27 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Community Policing: ¶28

*28. CPD will, with the assistance of the Office of Community Policing, institute a public awareness campaign to inform the public, at least once a year, about: (a) CPD policies most relevant to police interactions with the public, including, but not limited to: use of force, body-worn cameras, and Tasers; (b) steps for filing a complaint against CPD or a CPD member; and (c) the public's rights when stopped, arrested, or interrogated by police. CPD's public awareness campaign may include presentations, trainings, written guides, or web-accessible videos.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    At Least Once a Year     ☑ **Met**    ☐ **Missed**

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**     *In Compliance* (FIFTH REPORTING PERIOD)
**Full:**     *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Secondary compliance by making necessary preparations for the third year of the public awareness campaign.

To assess compliance, the IMT monitored the CPD's efforts to expand the modalities of the campaign to ensure a larger audience sees the content. We also monitored the CPD's ability to supervise officers to ensure this requirement continues annually, and its efforts to assess its public awareness campaign metrics to determine effectiveness.

*Progress before the Seventh Reporting Period*

In the previous reporting period, the CPD followed the IMT's recommendation to codify the Public Awareness Campaign into a policy to ensure the campaign continues on an annual basis. The CPD incorporated the requirements of ¶28 into CPD policy G02-03, *Community Policing Mission and Vision* (addressed at VI.A.2.), which was submitted during the fifth reporting period for review. The CPD also finalized an SOP requiring public awareness campaigns on an annual basis.

For the 2021 campaign, CPD partnered with DePaul University's, marketing and advertising program, to engage current students in development of the campaign. Ads were developed, shown on various social media platforms, and posted on the CPD website. The ad campaign focused on knowing your rights. We also reviewed the second public awareness campaign that ran from December 13, 2021, through the end of the fifth reporting period, December 31, 2021. The ads included a Quick

Response (QR) code that linked readers to the CPD website, where they could read a question-and-answer format about the topics required by ¶28, including CPD policies on use of force and body-worn cameras; steps for filing a complaint; and rights when stopped, arrested, or interrogated by police. The DePaul University students intended for the campaign to utilize a wider range of communication channels to reach a broader audience, but CPD only shared the campaign digitally via social media, its website, and through the local media. The ads were also translated into Spanish. The CPD paid to promote the ads on Facebook and Twitter and targeted zip codes on the South and West Sides, along with the CPD's 19th District.

The CPD launched its most recent public awareness program at the end of the last reporting period. The CPD acknowledged some challenges which resulted in a small roll out. The ads were placed on platforms like Facebook, Instagram, and Twitter, targeting the south and west side of Chicago, and LGBTQ and minority communities on the north side. The information guided the audience back to the CPD website. The CPD a reaching about 200,000 people, with a smaller number clicking on and viewing the ad. The CPD reported improvements were needed in the process, including the need to identify a point person for the campaign, using similar messages and approaches from the previously supported DePaul University campaign, creating additional ads, establishing bilingual options, using more social media, and using a range of other advertising tools. The CPD pledged to work with a former professor from DePaul University's Marketing/communication Department to provide more specific assistance. The CPD reported that it will seek community input from some of the groups engaged with in developing the CPD's human-rights policies.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the CPD completed an analysis of previous year's public awareness campaign and began to make plans for the third year of the public awareness campaign.

\*\*\*

The City and the CPD maintained Secondary compliance by completing an analysis of the second-year public-awareness campaign and preparing for the third year of the public awareness campaign. To achieve Full compliance, the IMT expects a long-term plan that includes metrics that demonstrate the effectiveness of the program.

## Paragraph 28 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Secondary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Secondary

# Community Policing: ¶29

**29.** *Fair, unbiased, and respectful interactions between CPD members and victims of crime provide an opportunity to strengthen community trust and foster public confidence in CPD. CPD will continue to require that CPD members interact with victims of crime with courtesy, dignity, and respect. CPD will continue to require that CPD members inform victims of crime of the availability of victim assistance and resources, including providing written notices of victim's rights, when applicable. CPD will also have such victim assistance information readily available on its public website and at all district stations.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

At the conclusion of the seventh reporting period, the City and CPD remained under assessment for Secondary compliance with this paragraph's requirements concerning the processing and handling of juvenile arrestees.

In this reporting period the IMT monitored the CPD's efforts to ensure each district has the resources needed to inform crime victims of available resources, completed training curriculum, and their efforts to initiate staff training.

*Progress before the Seventh Reporting Period*

In the previous reporting period, the CPD's continued to make progress toward implementing requirements of this paragraph and hired victim advocates who focus on domestic violence cases citywide. The CPD also initiated a pilot for a violent crime victim services program. The CPD also continued to engage the Crime Victim Advisory Council comprised of community partners, completed CPD policy S02-01-03, *Crime Victim and Witness Assistance* (effective November 3, 2022) and develop an eLearning module to train CPD officers on the policy.

During the previous reporting period, the CPD experienced challenges in addressing this paragraph's requirements. The CPD continues to introduce pilots, but are limited to three victim advocates who now serve nine Districts. The CPD also reported that the victim services grant used to help fund the program expires at the end of the year and have requested additional funding to sustain the program.

*Progress in the Seventh Reporting Period*

During the seventh reporting period the CPD provided their *2021 Annual Community Policing Report* and completed revisions to their Crime Victim Assistance eLearning curriculum.[5] The CPD completed the eLearning curriculum to CPD members and, at the conclusion of the reporting period, the IMT was awaiting documentation to support that 95 percent of department members completed this training prior to the end of the reporting period.

*** 

The City and the CPD maintained Preliminary and are under assessment for Secondary compliance by completing required training for members to implement victim services requirements of this paragraph. To maintain Secondary compliance, the IMT expects the CPD to provide evidence of completion of the required training for paragraph implementation. For Full compliance, the CPD needs to provide evidence of the efficacy of the eLearning training and implementation of program.

### Paragraph 29 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

---

[5] The CPD's *2021 Community Policing Annual Report* may be accessed here: https://home.chicagopolice.org/wp-content/uploads/Community-Policing-2021-Annual-Report.pdf.

# Community Policing: ¶30

*30. CPD will prominently display signs both in rooms of police stations or other CPD locations that hold arrestees or suspects and near telephones which arrestees or suspects have access to. These signs will state: a. that arrestees and suspects have the right to an attorney; b. that if an arrestee cannot afford an attorney, one may be appointed by the court for free; and c. the telephone numbers for the Cook County Public Defender, and any other organization appointed by the Cook County Circuit Court to represent arrestees.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Secondary compliance but failed to achieve Full compliance because they have not yet put in place a system to verify signage.

To assess compliance the IMT monitored the CPD's effort to develop supervisory practices that will ensure its policy G06-01, *Processing Persons under Departmental Control*, is implemented as written, ensuring prominence and accuracy of signage. In previous reporting periods, we also provided guidance on how the CPD could demonstrate Full compliance with ¶30 by, for example, requiring District Commanders to annually review signage in their district stations and certify in writing compliance with this paragraph or surveying a sampling of arrestees to confirm awareness of signage. In fact, policy G06-01 states the following:

> *Unit commanding officers responsible for Department holding facilities are responsible for ensuring the following signs are posted prominently in rooms of the holding facility, near telephones, and other locations that arrestees or other persons in custody have access to: a. Notice for Free Legal Services (CPD-11.940) in English, Spanish, Polish, Simplified Chinese, and Arabic which provides notice of the detainee's right to an attorney and telephone numbers for the Cook County Public Defender, and any other organization appointed by the Cook County Circuit Court to represent arrestees. b. Notice of Rights of Persons Under Arrest (CPD-11.950) in English, Spanish, Polish, Simplified Chinese, and Arabic which provides notice of the detainee's treatment while in custody, including access to*

*medical attention. c. Notice of Arrestee Right to Communicate with Attorney and Family while in Police Custody (CPD-11.945) in English, Spanish, Polish, Simplified Chinese, and Arabic which provides notice of the detainee's right to make three telephone calls, at minimum, no later than three hours after arrival to the first and any subsequent place of custody, free of charge."*

*Progress before the Seventh Reporting Period*

The City and the CPD achieved Preliminary compliance in the third reporting period, because CPD's General Order G06-01, *Processing Persons Under Department Control*, incorporated this paragraph's requirements.

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance, as the IMT made direct observations of signage in locations that hold arrestees or suspects in eight Districts (1, 4, 6, 16, 17, 18, 19, and 20). The signs clearly stated the information outlined in this paragraph and appeared in multiple languages, including Spanish, English, Polish, and Mandarin. These signs provide arrestees and suspects with information, and also provide officers with a regular reminder of arrestee rights. Officer awareness of arrestee rights aligns with one of our recommendations in our *Special Report* addressing the City's and the CPD's responses to protests and unrest that the CPD should provide its officers with refresher training on arrestee rights and related topics.[6]

*Progress in the Seventh Reporting Period*

As in the previous reporting period, the CPD showed little progress in attaining Full compliance and provided no evidence of certifying compliance with the signage requirements in this paragraph. The IMT suggested options including certification by district commanders of compliance or surveying a sample of arrestees for signage awareness. While the CPD continued discussions about putting in place a process whereby a team would visit district stations to verify signage requirements and include in this process district commander certification, this did not occur during this reporting period.

<div align="center">***</div>

The City and the CPD maintained Secondary compliance but did not achieve Full compliance by not finalizing and documenting plans to conduct inspections on an

---

[6] *See Special Report: The City of Chicago's and the Chicago Police Department's Response to Protests and Unrest under the Consent Decree (May 2020 – November 2020),* Independent Monitoring Team (July 20, 2021), https://cpdmonitoringteam.com/overview/reports-and-resources/imt-special-report-responses-to-protests-and-unrest/.

annual basis that assesses signage is in each District and in a manner that meets paragraph requirements. To achieve Full compliance, the IMT expects the CPD to formalize the inspection processes and to document, track and verify the completion of annual inspections.

### Paragraph 30 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| Secondary |

# Community Policing: ¶31

**31.** *CPD will provide arrestees access to a phone and the ability to make a phone call as soon as practicable upon being taken into custody.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with the requirements of ¶31.

To assess compliance, the IMT monitored the CPD's efforts to implement supervisory practices to ensure the policy is up-to-date and implemented as written. However, the City and the CPD did not provide the IMT with evidence that they put together supervisory practices to ensure consistent implementation of G06-01-04, *Arrestee and In-Custody Communications*. Specifically, the CPD has not implemented procedures to track the time between when an arrestee is taken into custody and when the arrestee is provided access to a telephone.

*Progress before the Seventh Reporting Period*

In the last reporting period, the CPD reported working on policy revisions that will provide guidance on arrestee access to telephones and how to track the time. The CPD reported that portions of the policy are involved in litigation, but they had begun devising a plan for tracking when the access to telephones occurs. The CPD hoped to have the policy and tracking processes in place by the end of the seventh reporting period.

In previous reporting periods, the IMT noted our concerns with the lack of attention given to ensuring proper implementation of General Order G06-01-04, *Arrestee and In-Custody Communications*, which requires timely telephone access for arrestees. Illinois amended state law to guarantee an arrestee the right to a telephone call within three hours after arrival at the first place of custody.[7] This issue continues to be a subject of community concern, debated by City officials and community stakeholders.

---

[7]    *See* the SAFE-T Act (Safety, Accountability, Fairness and Equity – Today), codified as Public Act 101-0652.

*Progress in the Seventh Reporting Period*

In this reporting period, the CPD continued to work to implement tracking mechanisms that require documentation of time, place, and who makes the phone calls. At the end of the reporting period, this work was ongoing.

\*\*\*

In the seventh reporting period, IMT finds the City and CPD failed to achieve Secondary compliance by not putting in place tracking mechanisms that require documentation of time, place, and who makes the phone calls. Moving forward, to achieve Secondary compliance, the CPD must demonstrate that these tracking mechanisms are in place and supervisory oversight. To achieve Full compliance, the CPD must demonstrate supervisory oversight using this tracking system including generation of reports and provide other relevant evaluative data supporting implementation of the paragraph.

### Paragraph 31 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Community Policing: ¶32

*32. Within 180 days of the Effective Date, CPD will review and revise its current policies relating to youth and children and, within 365 days, will revise its training, as necessary, to ensure that CPD provides officers with guidance on developmentally appropriate responses to, and interactions with, youth and children, consistent with the provisions of this Agreement and as permitted by law.*

**Compliance Progress**          (Reporting Period: January 1, 2022, through June 30, 2022)

**Preliminary:**          *Not in Compliance*
**Secondary:**          *Not Yet Assessed*
**Full:**          *Not Yet Assessed*

In the seventh reporting period, yet again, the City and the CPD did not achieve Preliminary compliance due to their failure to finalize its policy G02-05, *Interactions in Youth Policy*.

To assess compliance, the IMT continued to assess the CPD's efforts to review and revise its youth-related directives and trainings curricula. During this reporting period, the IMT reviewed an informal, updated draft of G02-05, and also met with the Mayor's Office for a briefing regarding youth deflection, diversion, and reform efforts.

*Progress before the Seventh Reporting Period*

The City and the CPD were first assessed for compliance with ¶32 in the second reporting period but failed to meet Preliminary compliance because: (1) it had not completed its review and revision of each policy regarding youth and children; and (2) it did not provide any evidence showing its efforts to revise the requisite trainings. The City and CPD likewise failed to reach Preliminary compliance in the third reporting period because the CPD had not completed nor provided a plan for the review and revision process of its youth- and children-related policies. Although the CPD developed, updated, and finalized up to 18 general orders, special orders, and directives relating to youth interaction, the CPD did not complete its work on the core policy covering CPD *Interactions with Youth* (G02-05) and thus did not meet Preliminary compliance. During this reporting period, the CPD indicated that it continues to collaborate with the Mayor's Office and the Chicago Department of Family Support Services to arrive at a consensus on the *Interactions with Youth* policy. More specifically, the CPD indicated that these ongoing discussions are focused on how to best address youth diversion and deflection.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the City and the CPD did not achieve Preliminary compliance because G02-05 is still in development. During this reporting period, the IMT reviewed an informal, updated draft of G02-05, and also met with the Mayor's Office for a briefing regarding youth deflection, diversion, and reform efforts.

\*\*\*

Though the IMT is encouraged by the debriefing and the draft policy, we continue to be concerned about delays in finalizing this policy and delivering the requisite training. The IMT expects the CPD and the City to finalize G02-05 in the next reporting period to achieve Preliminary compliance.

### Paragraph 32 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Community Policing: ¶33

***33.*** *When interacting with youth and children, CPD will, as appropriate and permitted by law, encourage officers to exercise discretion to use alternatives to arrest and alternatives to referral to juvenile court, including, but not limited to: issuing warnings and providing guidance; referral to community services and resources such as mental health, drug treatment, mentoring, and counseling organizations, educational services, and other agencies; station adjustments; and civil citations.*

## Compliance Progress      (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD failed to achieve Preliminary compliance with ¶33 because they did not finalize the *Interactions with Youth Policy* (G02-05).

To assess compliance, the IMT continued to assess the CPD's efforts to review and revised its youth-related directives and trainings. During this reporting period, the IMT received a revised G02-05 informally, and met with the Mayor's Office to discuss both the progress and barriers experienced in the development of the policy.

*Progress before the Seventh Reporting Period*

The City and the CPD were first assessed on their compliance with the requirements of ¶33 during the fourth reporting period, and again in the fifth and sixth reporting periods, but failed to achieve Preliminary compliance because they did not finalize the *Interactions with Youth Policy* (G02-05).

*Progress in the Seventh Reporting Period*

As previously noted, during this reporting period, the City and the CPD continue develop G02-05. During an in-person site visit, the IMT met with members of the Mayor's Office to discuss the development of the policy in detail. It was communicated to the IMT that the Mayor's Office has slated its diversion program to start before the summer of 2023. Further, at the end of the reporting period, the City and the CPD shared an informal, up-to-date draft of the policy. While the IMT acknowledges the challenges in addressing administrative and legal barriers, the City and the CPD must prioritize resolving outstanding issues and finalizing this

policy in the next reporting period. The CPD will then need to develop and deliver the requisite training to implement the policy.

\*\*\*

The CPD failed to achieve Preliminary compliance because the City and the CPD have not finalized the *Interactions with Youth Policy* (G02-05), which covers the use of alternatives to arrests and alternatives to referrals to juvenile court by CPD officers. Moving forward, to achieve Preliminary compliance, the City and the CPD will have to finalize G02-05 in a manner that meets both ¶¶32 and 33 requirements. The IMT expects the City and the CPD to finalize the corresponding policy in the next reporting period and achieve Preliminary compliance.

### Paragraph 33 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Community Policing: ¶34

**34.** *CPD will clarify in policy that juveniles in CPD custody have the right to an attorney visitation, regardless of parent or legal guardian permission, even if the juvenile is not going to be interviewed.*

**Compliance Progress**          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

At the end of the seventh reporting period, the City and the CPD maintained Preliminary compliance and are under assessment for Secondary compliance with the requirements of ¶34 by finalizing and delivering eLearning modules covering paragraph requirements concerning the processing and handling of juvenile arrestees.

To assess Secondary compliance, the IMT monitors the CPD's efforts to train members on this specific directive and to create supervisory practices designed to ensure members are implementing the policy as written.

*Progress before the Seventh Reporting Period*

In the third reporting period, the CPD met Preliminary compliance by finalizing S06-04, *Processing of Juveniles and Minors under Department Control*, which clarifies juveniles' right to an attorney visitation. The CPD submitted the requisite training materials to the S06-04 policy but did so at the end of the fourth reporting period. In the fifth reporting period, the CPD began revising the eLearning module for ¶¶34–36 to provide specific guidance on implementation of those paragraphs, but "paused" revisions pending changes in juvenile policies and processes. During the sixth reporting period, the CPD demonstrated little progress in implementing training requirements of this paragraph.

*Progress in the Seventh Reporting Period*

During this reporting period, the IMT conducted two-year reviews of: G06-01, *Processing Persons Under Department Control*; G06-01-04, *Arrestee and In-Custody Communications*; and S06-04, *Processing of Juveniles and Minors under Department Control.* The IMT reviewed an eLearning training addressing CPD policy S06-04, *Processing of Juveniles and Minors under Department Control.* At the conclusion of the seventh reporting period, the City and the CPD remained under assessment for Secondary compliance with this paragraph's requirements

concerning the processing and handling of juvenile arrestees, as the IMT awaited documentation evincing that 95 percent of CPD members completed the training.

\*\*\*

The CPD remains under assessment for Secondary compliance because the CPD has delivered eLearning training to CPD officers covering requirements of the paragraph, but needs to provide documentation that 95 percent of CPD members completed the training. Moving forward, and to achieve Full compliance, the IMT expects the CPD to provide records documenting implementation of this policy concerning juvenile rights in CPD custody.

### Paragraph 34 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SEVENTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Community Policing: ¶35

**35.** *If a juvenile has been arrested CPD will notify the juvenile's parent or guardian as soon as possible. The notification may either be in person or by telephone and will be documented in any relevant reports, along with the identity of the parent or guardian who was notified. Officers will document in the arrest or incident report attempts to notify a parent or guardian. If a juvenile is subsequently interrogated, CPD policy will comply with state law and require, at a minimum, that: a. Juvenile Miranda Warning will be given to juveniles before any custodial interrogation; b. the public defender's office may represent and have access to a juvenile during a custodial interrogation, regardless of parent or legal guardian permission; c. CPD officers will make reasonable efforts to ensure a parent or legal guardian is present for a custodial interrogation of a juvenile arrestee under 15 years of age in custody for any felony offense; and d. juveniles in custody for felony offenses and misdemeanor sex offenses under Article 11 of the Illinois Criminal Code will have their custodial interrogation electronically recorded.*

### Compliance Progress　　(Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

At the conclusion of the seventh reporting period, the City and the CPD remained under assessment for Secondary compliance by developing and beginning to deliver eLearning materials and bulletins that address the paragraph requirements concerning the processing and handling of juvenile arrestees.

*Progress before the Seventh Reporting Period*

In the third reporting period, the CPD achieved Preliminary compliance by finalizing its Special Order S06-04, *Processing of Juveniles and Minors under Department Control*, which codifies this paragraph's requirements. In the fourth reporting period, the IMT assessed the CPD's efforts to finalize and deliver training to CPD members. Until this reporting period, the City and the CPD did not provide the IMT with any additional documentation regarding this paragraph so there was insufficient evidence regarding the training.

*Progress in the Seventh Reporting Period*

During this reporting period, the IMT conducted two-year reviews of: G06-01, *Processing Persons Under Department Contro*l; G06-01-04, *Arrestee and In-Custody Communications*; and S06-04, *Processing Juvenile and Minors under Departmental Control.* The IMT reviewed an eLearning training for *Processing Juveniles and Minors under Department Control*. The IMT also monitored the CPD's efforts to finalize training materials and deliver training to CPD members. CPD is under assessment for Secondary compliance because it has developed and started to deliver eLearning materials and bulletins that address the paragraph requirements concerning the processing and handling of juvenile arrestees, but needs to provide documentation to show that the training was delivered to 95 percent of CPD members.

***

In sum, the City and the CPD are under assessment for Secondary compliance by developing and delivering eLearning materials and bulletins that address this paragraph's requirements. To achieve Full compliance, the IMT expects the CPD to provide records documenting implementation of policy covering the juvenile processing requirements of this paragraph.

### Paragraph 35 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SEVENTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 − DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Community Policing: ¶36

*36. When determining whether or not to apply handcuffs or other physical restraints on a juvenile, CPD officers will consider the totality of the circumstances, including, but not limited to, the nature of the incident and the juvenile's age, physical size, actions, and conduct, when known or objectively apparent to a reasonable officer, and whether such restraints are necessary to provide for the safety of the juvenile, the officer, or others.*

**Compliance Progress**          (Reporting Period: January 1, 2022, through June 30, 2022)

**Preliminary:**      *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**        *Under Assessment*
**Full:**             *Not Yet Assessed*

At the conclusion of the seventh reporting period, the City and the CPD remain under assessment for Secondary compliance with this paragraph's requirements concerning the processing and handling of juvenile arrestees.

In this reporting period, the IMT assessed the CPD's efforts to finalize and train officers on Special-Order S06-04, *Processing of Juveniles and Minors Under Department Control Policy*, and to create supervisory practices designed to ensure officers are implementing the policy as written.

*Progress before the Seventh Reporting Period*

In the third reporting period, the City and the CPD achieved Preliminary compliance with ¶36 by implementing an updated version of CPD policy S06-04, *Processing of Juveniles and Minors Under Department Control Policy*, which codifies this paragraph's requirements. In the fourth reporting period, the CPD did not provide the IMT with any records regarding this paragraph or complete the training materials or deliver training to CPD officers. In the fifth reporting period, the CPD reported that it did not move forward with the required training to implement the paragraph requirements due to pending changes in juvenile processing procedures. During the sixth reporting period, the CPD did not provide the IMT with any additional documentation to demonstrate that they finalized and delivered the training consistent with the requirements of this paragraph. The CPD reported that it was still working on the curriculum and scheduling of the eLearning training to guide implementation of paragraph requirements.

*Progress in the Seventh Reporting Period*

During this reporting period, the IMT conducted two-year reviews of: G06-01, *Processing Persons Under Department Control*; G06-01-04, *Arrestee and In-*

*Custody Communications*; and S06-04, *Processing Juveniles and Minors under Departmental Control.* The IMT reviewed an eLearning training for *Processing Juveniles and Minors under Department Control*. The IMT also monitored the CPD's efforts to finalize training materials and deliver training to CPD members. CPD developed and began delivering eLearning materials and bulletins that address the paragraph requirements concerning the processing and handling of juvenile arrestees.

<div align="center">***</div>

The City and the CPD achieved Secondary compliance by developing and delivering eLearning materials and bulletins that address juvenile processing and handling requirements of this paragraph. To achieve Full compliance, the IMT expects the CPD to provide records documenting implementation of these paragraph requirements.

### Paragraph 36 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SEVENTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Community Policing: ¶37

*37. Consistent with the requirements set forth in the Training section of this Agreement, CPD will incorporate the philosophy of community policing into its annual in service training for all officers, including supervisors and command staff, by providing training on the following topics: a. an overview of the philosophy and principles of community policing, consistent with this Agreement; b. methods and strategies for establishing and strengthening community partnerships that enable officers to work with communities to set public safety and crime prevention priorities and to create opportunities for positive interactions with all members of the community, including, but not limited to, youth, people of color, women, LGBTQI individuals, religious minorities, immigrants, individuals with limited English proficiency, homeless individuals, and individuals with disabilities; c. problem-solving tactics and techniques; d. information about adolescent development and techniques for positive interactions with youth; and e. effective communication and interpersonal skills.*

## Compliance Progress  (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with the requirements of ¶37.

In this reporting period, the IMT assessed the CPD's efforts to develop a tracking system to determine whether its community-policing training is translating into effective community policing in Chicago's neighborhoods. Specifically, the IMT assessed whether CPD conducted a rigorous evaluation of its training, implemented improvements based on those assessments, and provided significant oversight to ensure officer behavior is reflective of this training.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the IMT reviewed the in-service training curriculum and the court-approved suite of community policing training from the Seattle, New Orleans, and Albuquerque police departments. The City and the CPD achieved Preliminary compliance in the fourth reporting period, which they maintained in the fifth reporting period when they remained under assessment for Secondary compliance resulting from a court granted COVID pandemic related extension to

March 2, 2022 to complete the delivery of the in-service community policing training and provide evidence for completion of that training. During the sixth reporting period, the CPD continued to revise its community policing in-service training. The City and the CPD requested and received feedback from the IMT before finalizing the curriculum. Further, the IMT was provided with records to indicate that the training was delivered to at least 95% of members during the reporting period.

*Progress in the Seventh Reporting Period*

The City and the CPD did not provide for any community policing-specific in-service training in 2022. Instead, they submitted documentation of the 2022 Crisis Intervention Team In-Service Training. As expressed during conversations with the City and CPD this reporting period, the IMT is not confident that the requisite elements of this paragraph are captured in the 2022 CIT In-Service Training. We reiterate that community policing needs to be reflected in training and throughout all relevant policy in the department.

<div align="center">***</div>

To maintain Secondary compliance, the CPD must provide annual in-service community policing training or more clearly demonstrate that inclusion of course requirements are fully covered in other delivered curricula. To achieve Full compliance, the CPD must demonstrate both effectiveness of training in reinforcing community policing concepts and further application of these concepts in CPD officer practices.

### Paragraph 37 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SEVENTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Community Policing: ¶38

*38. Through inter-governmental agreements between CPD and Chicago Public Schools ("CPS"), CPD has assigned officers to work in CPS schools. In the event that CPD and CPS decide to continue this practice, officers assigned to work in CPS schools will be appropriately vetted, trained, and guided by clear policy in order to cultivate relationships of mutual respect and understanding, and foster a safe, supportive, and positive learning environment for students.*

**Compliance Progress**        (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance by vetting, training, and assigning School Resource Officers (SROs) to schools while being guided by clear policy.

In this reporting period, the IMT assessed the CPD's efforts to provide the annualized in-service training for SROs closer to the beginning of the school year and provide additional documentation regarding the vetting and selection process. The IMT also interviewed SROs and school leadership.

*Progress before the Seventh Reporting Period*

In the fourth reporting period, the IMT reviewed Intergovernmental Agreements and Memoranda of Understanding documents for the past two years and the CPD's and the Chicago Public School's *Whole School Safety Plan*. The City and CPD achieved Preliminary compliance during the fourth reporting period. In previous reporting periods, the CPD, in conjunction with CPS, reengineered the selections and vetting process for SROs. In the fifth reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance because in-service training was not completed in a timely manner and sufficient documentation for the vetting and selection process was not provided. In the sixth reporting period, the City and the CPD provided an *SRO Training To-From Report* and *SRO School Assignment Roster*. The IMT also reviewed supplemental SRO in-service training curriculum and conducted interviews with SRO and school leadership and the CPD achieved Secondary compliance.

*Progress in the Seventh Reporting Period*

In this reporting period, the City and the CPD provided SRO training records and the *SRO Annual Report*. They also indicated that they are working on additional supplemental training materials and SRO evaluation criteria. Additionally, the IMT visited Whitney Young High School, and met with the principal, assistant principal, and the school's SRO to discuss the SRO process at the school.

\*\*\*

In sum, the City and the CPD maintained Secondary compliance by vetting, training, and assigning SRO officers to schools guided by clear policy. The CPS and the CPD completed these processes in a timelier fashion than in previous reporting periods. Moving forward, to maintain Secondary compliance, the IMT expects more documentation of the selection and vetting process. To achieve Full compliance, the City and the CPD must demonstrate effectiveness of implementation of this paragraph.

### Paragraph 38 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Community Policing: ¶¶39–40

**39.** *Before the 2019-2020 school year begins, in consultation with CPS and considering input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders, CPD will develop and implement screening criteria to ensure that all officers assigned to work in CPS schools have the qualifications, skills, and abilities necessary to work safely and effectively with students, parents and guardians, and school personnel. Only CPD officers who satisfy the screening criteria will be assigned to work in CPS schools.*

**40.** *Before the 2019-2020 school year begins, in consultation with CPS and considering input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders, CPD will develop a policy that clearly defines the role of officers assigned to work in CPS schools. This policy will be reviewed by the Monitor by the end of 2019. Any suggested revisions by the Monitor that are adopted by CPD will be implemented by CPD before the 2020-2021 school year. The policy will reflect best practices and will include, but not be limited to: a. the duties, responsibilities, and appropriate actions of officers assigned to work in CPS schools and school personnel, including an express prohibition on the administration of school discipline by CPD officers; b. selection criteria for officers assigned to work in CPS schools; c. the requirement that officers assigned to work in CPS school receive initial and refresher training; and d. the collection, analysis, and use of data regarding CPD activities in CPS schools.*

---

**Compliance Progress**  (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Secondary compliance by continuing to implement SRO policy involving officer selection and delineation of responsibilities, and delivery of annual two-part refresher course required for SROs.

During this reporting period, the IMT assessed the CPD's efforts to follow through with delivery of training prior to (or at the onset) of schoolyear and produce additional data regarding SRO activities in schools for the 2022/2023 school year.

The IMT also reviewed the revised SRO policy and the CPD's continued progress in delineating the SRO selection process in policy. *See* ¶42. Further, for Full compliance, we assessed the CPD and the City's ability to demonstrate use of data to continue to make improvements in the SRO program, and to provide evidence of the program's efficacy.

*Progress before the Seventh Reporting Period*

This paragraph has been under assessment from the outset of the monitoring plan. In the first and second reporting periods, the City and the CPD had not met Preliminary compliance with these paragraphs because CPD continued to refine its School Resource Officer policy regarding selection criteria and roles and responsibilities for *School Resource Officers* (S04-01-02). In the third reporting period, the CPD codified its SRO selection criteria and defined the roles of SROs in CPD's Special Order S04-01-02, *School Resource Officers (SROs) and Investigations at Chicago Public Schools (CPS)*. In the fourth and fifth reporting period, the City and the CPD maintained its Preliminary compliance but had not yet achieved Secondary compliance because they were unable to schedule all the required in-service training before or shortly after the onset of the current school year.

During the sixth reporting period, the CPD submitted a revised version of S04-01-02, *School Resource Officer and Investigations of Chicago Public Schools*, with further refinements. The CPD also completed development of the second part of a two-part annual refresher training for SROs. The supplemental training developed included extensive input and participation by community organizations with plans for community members to deliver much of the instruction. The CPD reports that the refresher training for the 2022/2023 schoolyear will be delivered prior to or at the onset of next schoolyear to avoid the delays that transpired in delivery the training in the previous schoolyear. The processes put in place through the implementation of S04-01-02 appear to be generally adhered to with opportunities for more deliberation in the selection and assignment of SROs.

*Progress during the Seventh Reporting Period*

In the seventh reporting period, the City and the CPD maintained Secondary compliance by continuing to implement SRO policy involving officer selection and delineation of responsibilities, and delivery of annual two-part refresher course required for SROs. To demonstrate compliance with this paragraph, the City and the CPD submitted S04-01-02, *School Resource Officers and Investigations at Chicago Public Schools*, the *SRO Annual Report*, and SRO training records. We have been advised that the SRO Evaluation Committee Meeting notes and Annual report are forthcoming.

***

In sum, the City and the CPD maintained Secondary compliance by continuing to implement SRO policy covering officer selection and delineation of roles and responsibilities. The IMT encourages the City and the CPD complete annual refresher training for SROs close to the onset of the next school year. To achieve Full compliance the IMT expects the City and the CPD to demonstrate consistency in implementation of this policy and its effectiveness.

### Paragraphs 39 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SEVENTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

### Paragraphs 40 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SEVENTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Community Policing: ¶41

> *41. CPD will, within 60 days of the completion of the 2019-2020 school year, and on an annual basis thereafter, review and, to the extent necessary, revise its policies and practices regarding officers assigned to work in CPS schools to ensure they are responsive to the needs of the Department, CPS, and its students. This evaluation will include input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders. Any revisions to CPD's policies and procedures regarding officers assigned to schools will be submitted to the Monitor and OAG in accordance with the requirements of Part C of the Implementation, Enforcement, and Monitoring section of this Agreement.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**  Annual                    ✓ **Met**  ☐ **Missed**

**Preliminary:**  *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**  *In Compliance* (NEW)
**Full:**  *Not Yet Assessed*

In the seventh reporting period, the City and the CPD achieved Secondary compliance by meeting the reporting requirements of ¶41.

In this reporting period, the IMT assessed the CPD's efforts to finalize the latest iteration of its Special Order S04-01-02, *School Resource Officers (SROs) and Investigations at Chicago Public Schools* and to implement trainings that align with any additional policy changes. *See* ¶42. The IMT also monitored the CPD's efforts to work closely with the CPS to anticipate potential changes to the policy as schools consider the different and more customized school safety options. We also interviewed SROs and school leadership on their perspectives of the SRO program.

*Progress before the Seventh Reporting Period*

During the third reporting period, the City and the CPD achieved Preliminary compliance by revising Special Order S04-01-02, *School Resource Officers (SROs) and Investigations at Chicago Public Schools*. The IMT also assessed the CPD's efforts to incorporate ¶41's review requirement into a policy. In the fifth reporting period, the City and the CPD maintained Preliminary compliance by finalizing revisions to the most current iteration of the SRO policy but did not achieve Secondary compliance. During the sixth reporting period, Chicago Public Schools and the CPD continued with the implementation of the *Whole School*

*Comprehensive Safety Plans*.[8] Local School Districts will again decide whether they want SROs posted in their schools. Currently, CPS reports that 19 of its 91 high schools maintain two SROs each, while 19 have one assigned SRO. The SRO budget has declined from $33 million in 2020 to $11 million this year with some funding shifting to *Whole School Comprehensive Safety Plans* to support mental health and restorative programming.

*Progress during the Seventh Reporting Period*

The IMT visited one SRO program and found that school personnel and SRO staff worked effectively together in implementing program policy and goals. The SROs were well integrated into the school environment and worked in a highly complementary manner with school personnel. CPS and the CPD finalized the curriculum and completed portions of in-service training for the SROs. The City achieved Secondary compliance by completing and submitting a completing an *SRO Annual Report* that met the requirements of this paragraph.

<center>***</center>

In sum, the City and CPD maintained Preliminary compliance due to its failure to complete the required annual report covering those areas stipulated in this paragraph. Moving forward, the IMT expects the CPD and the City to complete and make public the required *SRO Annual Report* to achieve Secondary compliance.

<center>Paragraph 41 Compliance Progress History</center>

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SEVENTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

---

[8]     *Whole School Comprehensive Safety Plan*, CHICAGO PUBLIC SCHOOLS, https://www.cps.edu/services-and-supports/student-safety-and-security/whole-school-safety-plans/.

# Community Policing: ¶42

*42. CPD officers assigned to work in CPS schools will receive specialized initial and annual refresher training that is adequate in quality, quantity, scope, and type, and that addresses subjects including, but not limited to: a. school-based legal topics; b. cultural competency; c. problem-solving; d. the use of de-escalation techniques, use of restorative approaches, and available community resources and alternative response options; e. youth development; f. crisis intervention; g. disability and special education issues; and h. methods and strategies that create positive interactions with specific student groups such as those with limited English proficiency, who are LGBTQI, or are experiencing homelessness.*

*The training will be developed and delivered in accordance with the requirements of the Training section of this Agreement.*

## Compliance Progress         (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**    Annual                    ☑ Met    ☐ Missed

**Preliminary:**    *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**    *In Compliance* (NEW)
**Full:**    *Not Yet Assessed*

In the seventh reporting period, the City and the CPD achieved Secondary compliance through its timely delivery of the required in-service training.

During this reporting period, the IMT assessed the CPD's effort to finalize the SRO refresher training and to deliver that training to SRO officers, in part, before and during the current school year. The IMT also monitored the CPD's efforts to establish a process to ensure annualized updates of this training based on evaluative materials and ongoing community stakeholder input. Further, the IMT also reviewed training records of SRO in-service members.

*Progress before the Seventh Reporting Period*

The IMT first assessed compliance with this paragraph in the second reporting period, and found that the City and CPD had not met Preliminary compliance. At that time, although the National Association of School Resource Officers (NASRO)-provided training and the materials submitted by the CPD addressed most of the consent decree requirements, the IMT raised concerns about large training class sizes and the processes in place to evaluate the training's effectiveness. Compliance was once again assessed in the fourth reporting period, with the IMT

reviewing drafts of SRO in-service training curricula, community input on SRO training, the 40-hour NASRO training, the CPS supplemental training curricula, and the draft SRO policy S04-01-02, *School Resource Officers and Investigations at Chicago Public Schools*. The City and CPD did not reach Preliminary compliance at that time because the policy was not yet finalized. In the fifth reporting period, the City and the CPD achieved Preliminary compliance for this paragraph by finalizing the SRO in-service training curriculum.

*Progress during the Seventh Reporting Period*

In this reporting period, the CPD completed delivery of its in-service SRO training for the 2022-2023 schoolyear and delivered the refresher training, having produced training records to that effect during the reporting period

\*\*\*

In sum, the City and the CPD achieved Secondary compliance by delivering the required annualized training to SROs in a timely manner. To achieve Full compliance, the IMT expects the CPD to provide evidence of the effectiveness of implementation of paragraph requirements.

### Paragraph 42 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Community Policing: ¶43

*43. The curricula, lesson plans, and course material used in initial training provided before the 2019-2020 school year will be reviewed by the Monitor by the end of 2019. Any suggested revisions by the Monitor that are adopted by CPD will be implemented by CPD before the 2020-2021 school year.*

## Compliance Progress                    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Secondary compliance. The IMT will assess the CPD's efforts to establish an annualized review process and demonstrate the effectiveness of training in order to reach Full compliance in the next reporting period.

*Progress before the Seventh Reporting Period*

The City and the CPD achieved Preliminary compliance for ¶43 in the second reporting period by providing the initial training materials for review prior to the end of the 2019/2020 school year. The City and the CPD maintained Preliminary compliance for the third and fourth reporting periods because they did not finalize the SRO refresher training curriculum. The IMT suggested that the CPD establish an annualized process for the review and update of the curriculum. In the fifth reporting period, the City and the CPD achieved Secondary compliance by reviewing and finalizing the SRO training curriculum and delivering a portion of the training to incoming SRO members. During the sixth reporting period, the IMT assessed the CPD's efforts to review and provide subsequent revisions to the SRO training program. The CPD completed an update of the SRO annual in-service training curricula of the current SRO with a required subsequent review by the IMT. The update included significant community input and addressed paragraph requirements. The IMT also reviewed the revised part two of the SRO in-service annual curriculum to be delivered prior to at onset of the 2022/2023 school year.

*Progress during the Seventh Reporting Period*

In the seventh reporting period, the City and the CPD maintained Secondary compliance but did not achieve Full compliance because they did not establish an annualized review process of the training curriculum, and therefore cannot demonstrate the effectiveness of the training. While we appreciate that every SRO

received the required training, Full compliance will depend on CPD's ability to demonstrate, through data, the effectiveness of the training.

\*\*\*

The City and CPD maintained Secondary compliance but did not achieve Full compliance. Moving forward, to achieve Full compliance, the IMT expects the CPD to establish an annualized review process demonstrating ongoing improvements and impact of the training.

### Paragraph 43 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SEVENTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Secondary |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| Secondary |

# Community Policing: ¶44

*44. Before the 2019-2020 school year begins, CPD will undertake best efforts to enter a memorandum of understanding with CPS, to clearly delineate authority and specify procedures for CPD officer interactions with students while on school grounds, consistent with the law, best practices, and this Agreement.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

Preliminary:         *In Compliance* (FIRST REPORTING PERIOD)
Secondary:         *In Compliance* (THIRD REPORTING PERIOD)
Full:             *In Compliance* (FIFTH REPORTING PERIOD)
Sustainment Period Ends    *December 31, 2023*

During the seventh reporting period, the City and the CPD maintained Full compliance through their execution of an intergovernmental agreement/memorandum of understanding IGA/MOU for the 2022-2023 schoolyear.

To assess Full compliance, the IMT reviewed whether the CPD and the CPS demonstrated a consistent and annualized effort to update the IGA/MOU to reflect changing community sentiments, feedback on SRO program performance, and other considerations.

*Progress before the Seventh Reporting Period*

Compliance with the consent decree requirements of this paragraph was assessed in the first reporting period. Although the IMT found some inconsistencies between the MOU and the CPD's SRO policy, the City and CPD nevertheless achieved Preliminary compliance, and were advised to review both the SRO policy and the MOU with CPS to address the inconsistencies. In the third reporting period, because the IMT found that the MOU could benefit from more precise and specific procedures regarding CPD officers' interactions with students, specifically the consultation processes and the complaint process, the CPD had not met Secondary compliance. The City and the CPD achieved Secondary compliance in the third reporting period by working with CPS to ensure that the 2020/2021 MOU aligned with the SRO policy. The City and the CPD maintained Preliminary and Secondary compliance with ¶44 during the fourth reporting period. During the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance and achieved Full compliance with ¶44 by finalizing and executing an IGA/MOU for the 2021-2022 school year. In the sixth reporting period, the CPS and the CPD successfully implemented the MOU requirements developed for the 2021/2022 schoolyear. The IMT noted expectations that the CPD and the CPS continue with its annual update of the MOU which is consistent with law and best

practices and reflecting extensive community engagement throughout the process.

*Progress during the Seventh Reporting Period*

In the sixth reporting period, the CPS and the CPD successfully implemented the MOU requirements developed for the 2022/2023 schoolyear. The IMT expects the CPD and the CPS to continue with its annual update of the MOU which is consistent with law and best practices, reflecting extensive community engagement.

\*\*\*

The City and the CPD maintained Full compliance through their development and execution of an IGA/MOU form the 2022-2023 school year. To maintain Full compliance, the IMT expects the CPD and the CPS to continue annually to execute IGA/MOU to define roles and responsibilities for SRO program. For six reporting periods, the CPD and the CPS have had in place MOUs governing the operations of the SRO program. The continued practice of the CPD and the CPS working together and annually entering a MOU consistent with law, and best practices and reflecting extensive community input results in a Full compliance assessment.

### Paragraph 44 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Community Policing: ¶45

*45. By January 1, 2020, and annually thereafter, District Commanders will review their district's policing strategies, with input from the District Advisory Committees and the Office of Community Policing, to ensure the strategies are consistent with the principles of community policing. This review will include, but not be limited to: a. reviewing available district resources and personnel assignments; b. identifying methods to support their district's ability to effectively problem-solve, including collaborating with City departments, services, and sister agencies; and c. identifying district-level CPD members, as needed, to assist members of the community with access to police and City services, including community members who have experienced previous challenges, such as LGBTQI individuals, religious minorities, immigrants, individuals with disabilities, individuals in crisis, homeless individuals, and survivors of sexual assault and domestic violence.*

---

### Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**   Annual                    ☑ **Not Yet Applicable**

**Preliminary:**   *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**   *Not in Compliance*
**Full:**   *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance with the requirements of ¶45. The CPD must demonstrate proposed improvements for the strategy development and review processes involving District Commanders, including more thorough documentation of deliberations and reviews by District Advisory Committees and enhanced outreach and participation by marginalized groups in the strategy development process.

To assess Secondary compliance, the IMT reviewed the CPD's efforts to garner community input from populations experiencing the most police contact. The IMT also reviewed a sampling of the CPD's efforts to implement supervisory practices to ensure the policy is up-to-date and implemented as written.

*Progress before the Seventh Reporting Period*

In the second reporting period, the City and the CPD did not meet Preliminary compliance with ¶45 because the IMT could not conclude from the CPD's records whether the District Commanders' review of their district community policing

strategic plans included a review of their district's available resources and personnel assignments. Similarly, the IMT was unable to determine from the records whether the District Commanders identified district-level members who could assist members of marginalized communities in gaining access to CPD and City services, as needed. In the third reporting period, the City and the CPD implemented its Special Order, S02-03-02, *District Strategic Plans*, and developed a new directive addressing the District Strategic Plans review process, Office of Community Policing (OCP) District Strategic Plans Standard Operating Procedure. The directives were, however, too limited in scope to achieve Preliminary compliance with ¶45 because they only covered District Strategic Plans.

The City and the CPD met Preliminary compliance with ¶45 in the fourth reporting period, which they maintained in the fifth reporting period. During the sixth reporting period, the CPD reported that the Commanders reviewed the crime reduction and strategies with input from the District Advisory Committees. The CPD acknowledged continued challenges and indicated that future efforts will focus on youth outreach and leveraging of partnerships to gain access and input from youth in the strategy development process.

*Progress in the Seventh Reporting Period*

During this reporting period, the City and the CPD produced district strategic plans, documentation of the reviews that occurred on the draft plans, and S02-03-02, *District Strategic Plans*. Unfortunately, these productions do not provide evidence that the CPD is incorporating input from a diverse cross-section of the communities each plan is to govern. The IMT acknowledges that staffing challenges may have slowed their efforts to implement some of the requirements of this paragraph.

<p style="text-align:center">***</p>

The City and the CPD maintained Preliminary compliance but have not achieved Secondary compliance. Moving forward, the City and the CPD must provide better documentation of the deliberative processes and demonstrate more participation by marginalized groups in the district strategy development process.

## Paragraph 45 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

## Community Policing: ¶46

*46. Within 180 days of the Effective Date, and as appropriate thereafter, CPD will solicit, consider, and respond to input, feedback, and recommendations from the community in each district about its policing efforts and strategies. Such practices may include, but are not limited to, direct surveys, community meetings, beat community meetings, and engagement through social media. CPD will identify strategies for soliciting input from individuals that reflect a broad cross-section of the community each district serves.*

**Compliance Progress**        (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance.

*Progress before the Seventh Reporting Period*

The City and the CPD first achieved Preliminary compliance with ¶46 in the second reporting period by implementing a multi-faceted engagement approach within the six-month deadline. Since then, the City and CPD have maintained Preliminary compliance but have failed to meet Secondary compliance because the CPD has not developed methods to effectively engage a broader and more representative group of community members, namely there remains a lack of sufficient input from marginalized groups in the development process.

*Progress in the Seventh Reporting Period*

During the seventh reporting period, the CPD continued to use Beat meetings, community conversations, District Advisory Committee meetings, online surveys, and community policing officers to obtain community input. The CPD reported that it plans to pilot a police officer contact survey in two Districts and hopes to launch that pilot during the summer of 2023.

Despite these efforts, many community members feel that the CPD does not always genuinely seek or seriously consider community input, suggesting a deficit in the engagement strategy. The CPD has stated that to address these concerns they will, "try to meet people where they are" and look for more creative ways to reach community members. The CPD also indicated that it will work equally as hard to ensure that everyone throughout the department will have heard and

addressed the issues. The CPD also developed a draft community engagement policy and plan and has requested technical assistance from the IMT to strengthen their engagement processes. In the last reporting period, the IMT provided technical assistance by engaging in conversation with the CPD about its overarching community engagement goals and how to integrate its current efforts into a comprehensive model.

\*\*\*

In sum, the City and the CPD maintained Preliminary compliance with this paragraph but did not achieve Secondary compliance. Moving forward, to achieve Secondary compliance the IMT expects the CPD and the City to provide more opportunities for community stakeholders and members of marginalized groups to have input in policing efforts and strategies.

### Paragraph 46 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SEVENTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Community Policing: ¶47

*47. Within 180 days of the Effective Date, CPD will develop procedures to annually evaluate the effectiveness of the Department's efforts and strategies for building community partnerships and using problem-solving techniques aimed at reducing crime and improving quality of life. CPD will determine any necessary adjustments based on its annual evaluation.*

**Compliance Progress**          (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**   Annual            ☐ **Met**   ☑ **Missed**

**Preliminary:**   *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**   *Not in Compliance*
**Full:**   *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance but failed to achieve Secondary compliance because they have yet to provide evidence of tracking and assessing the effectiveness of their community partnerships.

*Progress before the Seventh Reporting Period*

The IMT first assessed ¶47 in the second reporting period but found that the City and the CPD did not achieve Preliminary compliance because the SOP governing its performance management assessment process had not yet been finalized for implementation. The SOP was developed in the third reporting period, allowing the City and the CPD to meet Preliminary compliance. In the fourth reporting period, the IMT reviewed the Community Engagement Management System meeting notes that the CPD produced. The CPD did not use data variations to inform any needed adjustments in resource allocations, policing strategies, and tactics, and the IMT further noted that the system alone would not adequately capture partnership activity and development, so Preliminary compliance was maintained. No progress was made in the fifth reporting period, so the City and the CPD maintained Preliminary compliance.

*Progress in the Seventh Reporting Period*

During this reporting period, the IMT monitored the CPD's efforts to include partnership-related activity and development in their monthly reporting. We also assessed the CPD's efforts to consider other evaluation tools that may help them determine the effectiveness of their strategies and techniques in tracking and assessing effectiveness of partnerships. The CPD's policy S02-03-16, *Community*

*Partnerships*, was finalized at the end of this reporting period (December 28, 2022). The City and the CPD are looking for ways to incorporate community policing into weekly CompStat accountability meetings, creating metrics to evaluate community policing and partnerships to reduce crime and improve quality of life. The City and the CPD also indicate that they are looking for ways to operationalize important community policing concepts in more day-to-day functions during the next reporting period.

\*\*\*

The CPD maintained Preliminary compliance but failed to achieve Secondary compliance. Moving forward, to achieve Secondary compliance, the IMT expects the CPD to develop the tracking mechanisms to gather information to assess partnership activity.

## Paragraph 47 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SEVENTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Community Policing: ¶48

*48. CPD will create opportunities to highlight, reward, and encourage officer, supervisory, and district performance on furthering community partnerships, engaging in problem-solving techniques, effective use of de-escalation, exemplary and effective supervision, and implementing community-oriented crime prevention strategies.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

**Preliminary:**    *In Compliance (FOURTH REPORTING PERIOD)*
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with this paragraph but did not achieve Secondary compliance because the CPD has yet to develop specific opportunities to highlight, reward and encourage officer engagement in community policing practices.

### Progress before the Seventh Reporting Period

The City and the CPD achieved Preliminary compliance with ¶48 in the fourth reporting period, the first time it was assessed, by finalizing its policies: *Community Policing Mission and Vision* (G02-03) and *The Community Policing Office* policy (S02-03). In the fifth reporting period, the City and the CPD maintained Preliminary compliance with this paragraph but did not achieve Secondary compliance citing balancing workloads and competing priorities as reasons for the lack of progress.

### Progress in the Seventh Reporting Period

During this reporting period, the IMT monitored the CPD's efforts to include more detailed guidance on identifying officer behavior, actions deserving of rewards, and the nature of those rewards. We also assessed the CPD's efforts to evaluate after one year of having a reward matrix in place to assess the impact of this awards-based policing.

The CPD provided no data reflecting their efforts to implement the policy language addressing the requirements of this paragraph. They indicated working on ways to highlight and reward officers engaging in exemplary community policing practices, but none have been established or implemented. The CPD also agreed that there is a need for a tighter timeline so that the reward system reinforces the behavior closer to the event.

***

In sum, the City and the CPD maintained Preliminary compliance with this paragraph. Moving forward, to achieve Secondary compliance, the CPD and City need to establish and operationalize a reward system for officers who in exemplary ways implement community policing principles. The IMT expects the CPD to demonstrate rewarding officer performance in community problem solving and partnership activity.

### Paragraph 48 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SEVENTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Appendix 2

# Impartial Policing
# Compliance Assessments by Paragraph

| | | | |
|---|---|---|---|
| ¶52 | ¶60 | ¶68 | ¶76 |
| ¶53 | ¶61 | ¶69 | ¶77 |
| ¶54 | ¶62 | ¶70 | ¶78 |
| ¶55 | ¶63 | ¶71 | ¶79 |
| ¶56 | ¶64 | ¶72 | ¶80 |
| ¶57 | ¶65 | ¶73 | ¶81 |
| ¶58 | ¶66 | ¶74 | ¶82 |
| ¶59 | ¶67 | ¶75 | |

# Impartial Policing: ¶52

*52. In developing or revising policies and training referenced in this section, CPD will seek input from members of the community and community-based organizations with relevant knowledge and experience through community engagement efforts.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

**Preliminary:**   *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**   *Not in Compliance*
**Full:**   *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance for ¶52 during this reporting period. The City and the CPD continue to develop the *Community Input and Engagement Plan* and related procedures that will formalize the community engagement process and, near the end of this reporting period, communicated their intention to develop a pilot program to memorialize these processes.

To assess community engagement, the IMT continues to examine several dimensions: (1) outreach; (2) meetings, interactions, and problem-solving; (3) follow-up and sustainability of partnerships, community policing, and problem-solving activities; and (4) general police-community interactions regardless of context. We also assessed the CPD's efforts to engage community members and organizations with relevant knowledge and experience regarding impartial policing. Our assessment of the City and the CPD's efforts during this reporting period in each of the areas listed above is provided below.

*Progress before the Seventh Reporting Period*

In the last reporting period, the City and the CPD maintained Preliminary compliance but again failed to reach Secondary compliance with the requirements of ¶52 because the CPD again did not provide sufficient evidence to show it has established a sustainable community engagement process. The CPD reached Preliminary compliance in the third reporting period but has since struggled to provide evidence that their community engagement model would ensure that specific groups, as well as the public, had the opportunity to be heard, and that the data was being used effectively in the review of policy and training.

We are hopeful that the proposed pilot program, as described by the City and the CPD results in the training and mechanisms for continued engagement with constitutionally protected classes and their advocates. In prior reports, we have acknowledged the CPD's effort to engage certain segments of the community, but we have also underscored the limitations of these efforts and the need to engage

a cross-section of community members and organizations with relevant knowledge and experience.

*Progress in the Seventh Reporting Period*

During this reporting period, we assessed the CPD's efforts to involve qualified CPD personnel in planning and executing community engagement tasks. On June 15 and July 20, 2022, the IMT met with the CPD to discuss the revised directive, G01-03-01, *Community Engagement in Policy Development*, and corresponding plan and, at that time, we raised our concern that the requirements of this paragraph apply to both policies and training courses, yet the plan only covered policy development. In early July 2022, the City and the CPD produced the *2021 Community Policing Annual Report* and S02-03-15, *Positive Community Interactions*.[1] In October 2022, we conducted a site visit with the Office of Community Policing and learned more about their current and planned efforts related to community engagement. While their efforts are commendable, we continue to stress the need to more clearly define how policies will be selected for community engagement, how the level of community engagement will be determined, and the methods of community engagement that will be used. The policy should also include who is responsible for these decisions and responsibilities.

Further, the IMT also submitted its comments on G01-03-01, *Community Engagement in Policy Development* on October 14, 2022. These comments, while discussed during previous meetings with CPD, centered on clearly defining how policies will be selected for community engagement, how the level of community engagement will be determined, and the methods of community engagement that will be used. The IMT also highlighted the importance for the CPD to conduct a needs assessment to determine what resources the Office of Community Policing needs to adequately carry out the tasks and responsibilities noted within the policy.

Near the end of the reporting period, the CPD proposed to conduct a pilot of the *Community Input and Engagement Plan* for community engagement in policy and training. The pilot would allow the CPD to evaluate its proposed methodology and process as noted in the *Plan* and adjust the *Plan* before implementing it more broadly. The IMT recommended that the CPD consider the various aspects of the pilot before its implementation, such as establishing timelines, performance and evaluation measures, and protocols.

---

[1]   *See Community Policing 2021 Annual Report*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/wp-content/uploads/Community-Policing-2021-Annual-Report.pdf.

### 1. Outreach

The Office of Community Policing continued its outreach efforts during the seventh reporting period and sought input from the community on a number of the policies. These included G01-03-01, Community Engagement in Policy Development (¶52); G08-06, *Sexual Misconduct* (¶63); S04-19, *Search Warrants* (¶53, 54, 55) and the 2023 *Constitutional Policing In-Service eLearning* Curriculum (¶¶58, 61, 68, 71–72, and 74). The CPD sought feedback on these policies through different methodologies and provided the IMT with documentation of that outreach.

### 2. Meetings, Interactions, and Problem Solving

In this reporting period, the Office of Community Policing held a deliberative dialogue on G01-03-01, *Community Engagement in Policy Development*. This meeting was held virtually on July 20, 2022. Meetings were also held with the Training Community Advisory Committee to review the *2023 Annual Training Plan* in July 2022 and, in November and December 2022, the Office of Community Policing held two Community Conversations[2] on search warrants. The IMT observed several of these community conversations and deliberative dialogues.

Further, during the site visit in October 2022, the IMT also observed a 2023 Strategic Planning Community Conversation in the 8th District. This meeting included members of the CPD's CAPS and as well as various members of the community and focused on topics such as crime problems, strategies to address the crime problems and updates on the latest arrest and CLEARmap reports.

The IMT continues to encourage the CPD to create working groups that can oversee progress on specific topics or multiple topics in the Impartial Policing Section. As noted in the IMT's previous reports, sending policy and training materials to specific organizations for review and comment is another viable model of engagement.

### 3. Follow-up and Sustainability

The IMT continues to assess whether the CPD's community engagement includes sufficient follow-up and efforts to sustain meaningful partnerships and problem-solving activities with community members. Further the IMT continues to recom-

---

[2] Each year in the fall, the Chicago Police Department hosts Community Conversations throughout the city. These conversations are an opportunity for Chicagoans to participate in the creation of their district's strategic plan for the following calendar year. The valuable feedback provided by participants at these conversations is used to develop community-driven crime reduction strategies, as well as community engagement priorities, and is an integral part of the Chicago Police Department's implementation of the various reforms outlined in the Consent Decree.

mend that CPD prepare brief public reports, based on community input, that describe emerging themes for different topics and how CPD plans to address them. These reports would essentially become part of the CPD "share-back" process.

In discussions with the CPD about the importance of this share-back process, the IMT noted that providing little to no feedback to the community on how their input was used can negatively impact police-community relations and in turn result in limited engagement from the community engagement when input is sought.

During this reporting period, follow up efforts appeared to be limited to focused policy reviews directly with specific community groups engaged and there was lack of clarity provided in how policy summary reports were being shared back with the community. The IMT stresses to the CPD that broader mechanisms to share-back how community input was used in the policy review and training development be established. We also acknowledge that developing this process more robustly will be part of the proposed pilot previously mentioned.

Of note, the CPD produced a policy summary report that highlighted the engagement efforts, activities, and input gathered G02-01, *Protection of Human Rights*, and G02-04, *Prohibition regarding Racial Profiling and other Biased-Based Policing*, leading to their revisions and publishing. The CPD should continue to produce reports like this for similarly high impact policies and distribute broadly both internally and externally.

### 4. General Police-Community Interactions

Paragraph 52 requires that the CPD "seek input from members of the community and community organizations with relevant knowledge and experience." As noted in previous reports, the IMT continues to recommend that the City seek to reliably and systematically gather feedback for policy and training purposes by outsourcing and sustaining a valid contact survey. With this wealth of data, the CPD can engage relevant subject-matter experts and community organizations in developing or refining policy and training.

In the last reporting period, the IMT received a request for technical assistance regarding the development of the CPD's long-term community-engagement plan and policy. The request for assistance, dated May 20, 2022, included a draft community engagement plan and G01-03-01, *Community Engagement in Policy Development*. A meeting to discuss IMT's preliminary feedback on the draft plan and G01-03-01 with CPD was held on June 15, 2022. Much of the initial feedback centered on developing a broader organizational community engagement strategy, establishing performance measures for the plan, and including community input in the development of this plan. On June 30, 2022, the City and the CPD submitted a revised *Community Engagement Plan* and requested a follow-on meeting to discuss the updated draft. A follow-up discussion was again held on July 20, 2022. The

IMT looks forward to reviewing and collaborating with the CPD on the pending materials in future reporting periods to assess further levels of compliance with ¶52.

*** 

In sum, the CPD maintained Preliminary compliance but has yet to reach Secondary compliance. Although we appreciate the CPD's efforts thus far, much work is needed to codify its processes for gathering input from the community, seeking and developing relationship with various community groups directly affected by these policies, and following up with the community after the policies and trainings have been revised. As noted previously, given those difficulties, we recommend including guidance on outreach strategies and participant selection processes. Codifying such policies will help the CPD track its outreach methods to identify what's working and what needs refinement. As noted in previous reports, the City and the CPD will achieve Full compliance when the CPD creates mechanisms for sustained, targeted community engagement. The model should include a system of performance measurement that will (1) give Chicago communities an ongoing voice in evaluating police services in every police district and (2) provide the CPD with a reliable feedback loop that is used to shape police behavior, reduce all forms of bias on the street, and ultimately build public trust. This would include an expansion of community engagement to protected classes that may have been missed so far. Further, the IMT would like to continue to stress the importance of timeliness in seeking input from the community in policy development and in the transition into training development.

We look forward to reviewing CPD's finalized G01-03-01, *Community Engagement in Policy Development*, as well as the efforts and procedures related to the proposed pilot to implement the related policy. Further, the IMT also looks forward to continuing to work with CPD in the further development and refinement of its broader community engagement roadmap and strategies.

### Paragraph 52 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Impartial Policing: ¶53

*53. CPD will, consistent with this Agreement, ensure that its policies and practices prohibit discrimination on the basis of any protected class under federal, state, and local law, including race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military status, source of income, credit history, criminal record, or criminal history. CPD's policies and practices will prohibit retaliation consistent with Section 6-101 of the Illinois Human Rights Act (eff. Jan. 1, 2015) and Section 2-160-100 of the Municipal Code of Chicago (amended Oct. 11, 2017).*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD remain out of compliance for ¶53. Although the City and the CPD continued to develop and revise other policies and trainings curricula—including S04-19, *Search Warrants*, and the *Constitutional Policing* eLearning—many other operational deliverables remain pending and impede the IMT's ability to assess this paragraph for compliance. Further, the lack of an overarching policy, strategy, or plan that details how CPD addresses this paragraph's requirements, as well as those requirements in similar paragraphs (¶¶54, 55, 72), only serves to hinder its ability to demonstrate compliance.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of these paragraphs into policy (per the ¶¶626–41 review process) and engage the community as required by ¶52.

*Progress before the Seventh Reporting Period*

During previous periods, the IMT reviewed revised versions of CPD policies that they assert incorporate requirements, including G02-01, *Protection of Human Rights* (¶53 and ¶54); G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing* (¶55 and ¶56); and G08-05, *Prohibition on Retaliation,* and S02-01-03, *Crime Victim and Witness Assistance*. The IMT submitted no objection notices on these policies in previous reporting periods.

*Progress in the Seventh Reporting Period*

The City and the CPD produced a revised *Constitutional Policing Course* to the IMT during the reporting period, and feedback was provided by the IMT and the Office of the Illinois Attorney General near the end of the seventh reporting period. The IMT suggested revisions to this training course included seeking the review of the course by the Cook County State's Attorney's Office and replacing references to "citizens" in the training materials with a more inclusive term, such as "community members" or "residents." As previously stated, further revisions to other policies—including S04-19, *Search Warrants*—are necessary for the City and the CPD to achieve Preliminary compliance with ¶53. Though the City and the CPD took significant steps to enhance community engagement on this policy in the sixth reporting period, there are still deficiencies and a number of steps the CPD can take to enhance safety for the public and officers. A revised S04-19 was produced to address changes in the Cook County State's Attorney's administrative processes, but these recent revisions did not account for anything outside of these administrative changes. The IMT looks forward to reviewing revisions to S04-19 and further community engagement related to the development of this policy in the coming reporting period.

Further during this reporting period, the City and the CPD finalized G02-01, *Protection of Human Rights*, and G02-04, *Prohibition Regarding Racial Profiling and Other Bias-Based Policing*. Prior to finalizing, the City and the CPD produced for the IMT's review the feedback and input gathered from the community and internally from members of the department along with the proposed revisions in response to the comments received. A comprehensive policy summary was also produced during this reporting period. Similarly, a summary report of the development of CPD's S02-01-05, *Religious Interactions*, was also produced during this reporting period.

While this progress is commendable, the requirements of this paragraph are so broad and inclusive of many of policies within the department, thus it is important for the City and CPD to clearly delineate those core policies that it will use to demonstrate compliance with this paragraph and other similarly broad paragraphs, ¶¶53–56 and 72. Outlining these in a Plan, Policy, or Impartial Policing Strategy will allow the City and CPD to identify which policies and training it will use to demonstrate progress with respective paragraphs. Until this is completed it will be difficult for the IMT, OAG, and the City and CPD to accurately determine compliance with these paragraphs.

*** 

In sum, the City and the CPD did not achieve Preliminary compliance with ¶53 because they have not completed the ¶¶626–41 review process for all relevant policies—although progress is underway.

The IMT looks forward to further revisions to the community-engagement process initiated around the development of trainings, and to additional revisions to S04-19 and other related policies to address the requirements in this paragraph in future reporting periods. Finally, as noted in previous reports, the City and the CPD will need to find ways to reliably measure the things that matter to the public and that are needed to achieve policing without bias, as required by ¶¶53–56. Specifically, in effort to demonstrate progress in compliance in this and other related paragraphs, the CPD and the City will need to collect, analyze, and report data on the quality of police services and disparities in police actions for constitutionally protected classes, and use such data to create feedback loops within the organization designed to improve officer's performance on these dimensions.

Although not mandated or required by this paragraph or the Consent Decree, the IMT recommends that the City and the CPD strongly consider creating an executive position within the CPD that focuses on the integration of the concepts of diversity, inclusion, equity, and impartial policing into all aspects of the department, including policy and training development. A Chief Equity Officer, or DEI Coordinator, could spearhead and accelerate the CPD's efforts to comply with the requirements of this specific paragraph and others within this section. Departments such as the Los Angeles, CA Police Department, Detroit, MI Police Department, and the Metropolitan Police Department, Washington, D.C. have instituted similar roles within their agencies in the past few years.

### Paragraph 53 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Impartial Policing: ¶54

> *54. CPD will continue to require that all CPD members interact with all members of the public in an unbiased, fair, and respectful manner. CPD will require that officers refrain from using language or taking action intended to taunt or denigrate an individual, including using racist or derogatory language.*

## Compliance Progress  (Reporting Period: January 1, 2022, through June 30, 2022)

**Preliminary:** *Under Assessment*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

At the conclusion of the seventh reporting period, the City and the CPD were under assessment for Preliminary compliance with this paragraph. During this reporting period, the City produced and published various related policies, such as G02-01 and G02-04. Additionally, the City further revised S04-19, for example, and other related policies. To assess Preliminary compliance, the IMT is evaluating the development of an overarching policy, strategy, or plan detailing how CPD addresses this paragraph's requirements, as well as those requirements in similar paragraphs (¶¶53, 55, 72). We are also evaluating the CPD's efforts to codify the requirements of these paragraphs into policy (per the ¶¶626–41 review process) and engage the community as required by ¶52. The City and CPD believe that the implementation of G02-01 and G02-04 satisfy the requirements of this paragraph and warrant them achieving Preliminary compliance. Due to ongoing collaborative discussions with the Parties during the eighth reporting period, the IMT anticipates revised methodologies that may bear on the City and CPD's compliance with this paragraph. Therefore, this paragraph remains under assessment.

*Progress before the Seventh Reporting Period*

In previous reporting periods, we reviewed several policies that the CPD asserted incorporate requirements for ¶¶53–56. The following policies completed the review process (¶¶626–41) prior to this reporting period and became effective:

(1) General Order G08-05, *Prohibition of Retaliation* (eff. December 30, 2020), designed to prohibit retaliation by a CPD member against another CPD member or a member of the public, and

(2) Special Order S02-01-03, *Crime Victim and Witness Assistance* (effective November 3, 2022), designed to provide CPD members with guidance regarding service and assistance to victims of crime.

To achieve Preliminary compliance, the CPD's revised Special Order S04-19, *Search Warrants*, must complete the review process and be based on adequate community engagement (¶52).[3]

*Progress in the Seventh Reporting Period*

As noted above, the IMT received the finalized versions of G02-01, *Protection of Human Rights*, and G02-04, *Prohibition Regarding Racial Profiling and Other Bias-Based Policing*.

Further, the IMT reviewed a revised version of S04-19, *Search Warrants* to account for administrative changes, but the City and the CPD have yet to complete the Consent Decree review process for S04-19 as it still requires additional revision to meet the requirements of this paragraph. Near the end of the reporting period, the City and the CPD also produced AMCs Regarding Traffic Stops in 2022.

The IMT looks forward to additional revisions to S04-19 and other policies to address the requirements in this paragraph in future reporting periods.

As noted in ¶53, while this progress is commendable, the requirements of this paragraph are so broad and inclusive of many of policies within the department, thus it is important for the City and CPD to clearly delineate those core policies that it will use to demonstrate compliance with this paragraph and other similarly broad paragraphs, ¶¶53–56 and 72. Outlining these in a Plan, Policy, or Impartial Policing Strategy will allow the City and CPD to identify which policies and training it will use to demonstrate progress with respective paragraphs.

The IMT also looks forward to continuing discussions with CPD on identifying the policies and trainings that seek to achieve compliance with this paragraph and others like ¶¶53 and 55. Conducting such activity will establish a framework around the specific policies and trainings that are necessary to complete in effort to achieve compliance and move progress forward.

---

[3]   *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timelin._.pdf.

## Paragraph 54 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

**SEVENTH REPORTING PERIOD**

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Under Assessment

# Impartial Policing: ¶55

**55.** *CPD will prohibit officers from using race, ethnicity, color, national origin, ancestry, religion, disability, gender, gender identity, sexual orientation, immigration status, homeless status, marital status, parental status, military discharge status, financial status, or lawful source of income when making routine or spontaneous law enforcement decisions, except when such information is part of a specific subject description.*

**Compliance Progress** (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

As noted in related ¶ 54, the City and the CPD are under assessment to determine whether they have achieved Preliminary compliance with ¶55. Although the City produced and published various policies related to this paragraph, revisions of others, like S04-19, that codify this paragraph's requirements are still under ¶¶626–41 review. Please refer to ¶54 for an expanded explanation of to the IMT's efforts to assess the City and the CPD's efforts to comply with ¶¶53–56.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of these paragraphs into policy (per the ¶¶626–41 review process) and engage the community as required by ¶52.

*Progress before the Seventh Reporting Period*

In the fourth reporting period, the IMT reviewed a revised version of CPD's G02-04, *Prohibitions Regarding Racial Profiling and Other Biased-Based Policing*, which it asserts incorporates this paragraph's requirements. However, the City and the CPD had yet to complete the Consent Decree review process for this policy by the end of the fifth reporting period.

At the beginning of the fifth reporting period, the IMT commented on G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing*, as the CPD works towards compliance with this paragraph. While improved, the IMT holds that the revised directive needs to include mention of "age" as a factor that should be prohibited when making "routine or spontaneous law enforcement decisions" to comply with every Impartial Policing paragraph of the Consent Decree, not just the requirements of this paragraph.

At the beginning of the sixth reporting period, the IMT commented on G02-01 and G02-04 and reiterated the need to include mention of "age" as a factor that should

be prohibited when making "routine or spontaneous law enforcement decisions" to comply with every Impartial Policing paragraphs of the Consent Decree, not just the requirements of this paragraph.[4] The IMT reviewed further revised versions of the CPD's G02-01, *Protection of Human Rights*, G02-04, *Prohibitions Regarding Racial Profiling and Other Biased-Based Policing*, and S04-19, *Search Warrants*, which it asserts incorporates this paragraph's requirements. The revisions noted to the City for G02-01 and G02-04 were made, and the IMT submitted no-objection notices on June 17, 2022.

At the end of the sixth reporting period, S04-19 was still undergoing the review process. The IMT also reviewed evidence that certain members of the CPD completed their in-service training for community policing during the previous reporting period.

*Progress in the Seventh Reporting Period*

As noted above, S04-19 is still undergoing the review process and CPD was still gathering input from the community and working on incorporating that input into the policy. G02-01, Protection of Human Rights, and G02-04, *Prohibition Against Racial Profiling and Other Bias-Based Policing*, were also finalized and published during this reporting period.

The City and CPD also produced for review various related policies and training materials in compliance with this paragraph, including – fair and impartial policing training, 2023 use of force policy updates training, the *2023 Training Plan*, First Amendment eLearning, and G02-01-05, *Religious Interactions*, during this reporting period. The IMT reviewed and provided comments to CPD regarding these training materials and policies during the reporting period and/or expects to provide comments on these materials at the beginning of the eight reporting period.

Moving forward, we will continue to engage in the review process to ensure the CPD implements policies that incorporate the requirements of these paragraphs. In assessing Secondary compliance, we will evaluate the CPD's efforts to (1) incorporate these requirements into training, (2) evaluate said training, and (3) implement the training with CPD personnel. Assessing Full compliance will ultimately turn on the CPD's ability to measure what matters and document improvements in officers' street-level behavior and decision making including engaging in specific remedies to prevent bias-based policing and measuring changes in members' level of bias or impartial policing as a result of these remedies.

---

[4]   See ¶¶50 and 53(requiring the CPD to (i) provide police services to all members of the public without bias and without reference to stereotypes based on many factors, including age and (ii) ensure its policies and practices prohibit discrimination on the basis of protected classes, including age).

As noted in the previous paragraph, the IMT also looks forward to continuing discussions with the CPD on identifying the policies and trainings that seek to achieve compliance with this paragraph and others like ¶¶53 and 54. Conducting such activity will establish a framework around the specific policies and trainings that are necessary to complete in effort to achieve compliance and move progress forward.

### Paragraph 55 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Under Assessment

# Impartial Policing: ¶56

> **56.** *CPD will provide guidance, through training and supervision, that reinforces to officers that substitutes or stereotypes for the demographic categories listed above in Paragraph 55, such as manner of dress, mode of transportation, or language ability, is prohibited when making routine or spontaneous law enforcement decisions, except when such information is part of a specific subject description.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶56 during the seventh reporting period. The City finalized G02-01, *Protection of Human Rights*, and G02-04, *Prohibition Regarding Racial Profiling and Other Bias-Based Policing*, during the reporting period, and after review, IMT submitted no-objection notices for both policies.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of these paragraphs into policy (per the ¶¶626–41 review process) and engage the community as required by ¶52.

### Progress before the Seventh Reporting Period

In previous reporting periods, the IMT reviewed a revised version of CPD's G02-04, *Prohibitions Regarding Racial Profiling and Other Biased-Based Policing*, which it asserts incorporates this paragraph's requirements. However, the City and the CPD had not yet completed the Consent Decree review process for the policy due to the IMT concerns about G02-04 that were discussed earlier. In addition, the IMT wanted to see more community engagement related to development and refinement of the directive.

### Progress in the Seventh Reporting Period

In this reporting period, the City and the CPD published finalized versions of G02-01, *Protection of Human Rights*, and G02-04, *Prohibitions Regarding Racial Profiling and Other Biased-Based Policing*, and produced to the IMT the summaries of the community engagement processes used in the development and finalization of both directives.

Near the end of the reporting period, the City and the CPD also produced Fair and Impartial Policing Training and the AMCs Regarding Traffic Stops in 2022 for review. These documents are currently undergoing review.

Moving forward, in assessing Secondary compliance, we will continue to evaluate the CPD's efforts to (1) incorporate these requirements into training, (2) evaluate said training, and (3) implement the training with CPD personnel. Assessing Full compliance will ultimately turn on the CPD's ability to measure what matters and document improvements in officers' street-level behavior and decision making including engaging in specific remedies to prevent bias-based policing and measuring changes in members' level of bias or impartial policing as a result of these remedies.

### Paragraph 56 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Impartial Policing: ¶57

**57.** *CPD will continue to prohibit CPD members from posting, displaying, or transmitting content that is disparaging to a person or group based on race, religion, sexual orientation, or any other protected class on personal social media accounts.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance by having an implemented policy on this paragraph—G09-01-06, *Use of Social Media Outlet*—that has completed the Consent Decree review process. The CPD has not achieved Secondary compliance, because they did not submit any records reflecting the CPD's efforts (1) to complete a feedback loop with certain community organizations or (2) to train members on G09-01-06 in this reporting period. The IMT notes that no further progress on this paragraph has been made since the third reporting period and stresses the importance for the City and the CPD to establish implementation priorities or a strategic plan for continuing progress on this paragraph and others in a similar state.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of this paragraph into policy (per the ¶¶626–41 review process), engage the community as required by ¶52, and translate the policy into training. To assess Secondary compliance, the IMT monitored the CPD's efforts to train members on this specific directive and to create supervisory practices designed to ensure members are implementing the policy as written.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD completed the ¶¶626–41 review process for G09-01-06, the CPD's social-media policy. We also acknowledged that the CPD sought input from the Coalition (*see* ¶669), but the CPD did not incorporate many of their suggested edits. The training required by ¶57 was not developed.

*Progress in the Seventh Reporting Period*

Because the City and the CPD did not submit any records this period reflecting their efforts to comply with this paragraph, we cannot assess whether they moved into Secondary compliance during this period. At the end of the reporting period, CPD produced a two-year review for G09-01-06, *Use of Social Media Outlets*. The

IMT is currently reviewing the material produced and expects to provide their comments to CPD in the first weeks of the eighth reporting period.

To maintain Preliminary compliance, the CPD must submit records reflecting its efforts to comply with ¶52 in developing G09-01-06. For Secondary compliance, we will evaluate the CPD's efforts to develop and implement training for members on the G09-01-06, which includes evidence that ninety-five percent of members have completed the training. The training assessment will be linked to compliance with ¶¶72 and 74 and will require ¶52 community engagement.

The IMT looks forward to working with the CPD as it develops training materials related to this paragraph to achieve Secondary compliance.

### Paragraph 57 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Impartial Policing: ¶58

**58.** *Within 90 days of the Effective Date, CPD will clarify in policy that CPD officers will permit members of the public to photograph and record CPD officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy. The policy will also provide that officers may take reasonable action to maintain safety and control, secure crime scenes and accident sites, protect the integrity and confidentiality of investigations, and protect the safety of officers or others.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, the City and the CPD achieved Preliminary compliance with ¶58 because the CPD codified the requirements of this paragraph into various policies including G02-01, *Human Rights and Human Resources*, G01-02-05, *Religious Interactions*, and G02-02, *First Amendment Rights*, all of which were finalized during this reporting period.

### Progress before the Seventh Reporting Period

In earlier reporting periods, we reviewed G02-01, *Human Rights and Human Resources*, and G01-02-05, *Religious Interactions*, and G02-02, *First Amendment Rights*, but these directives still required additional revisions to meet requirements of this paragraph. In addition, the IMT recommended community engagement in the policy development processes for these directives.

### Progress in the Seventh Reporting Period

During this reporting period, the CPD submitted for review revisions to *First Amendment* eLearning, S03-14, *Body Worn Cameras*, and the *Constitutional Policing* course. After a round of revisions, the IMT submitted to the City and the CPD a no-objection notice for the *First Amendment* eLearning course. Further, the IMT also submitted comments to the City and the CPD on the *Constitutional Policing* course and S03-14. Further, in light of the extensive dialogues with the Coalition concerning soliciting and incorporating feedback from community members, the IMT expects to see the City and the CPD engage with communities concern S03-14. Soliciting community input is consistent with *Paragraph* 52 of the Consent Decree. G01-02-05, *Religious Interactions*, and G02-02, *First Amendment Rights*,

were also issued in December 2022. Further, the IMT submitted a no objection notice of G02-01, *Human Rights and Human Resources* in June 2022 and this policy was finalized in August 2022.

Further, at the end of the reporting period, the City and the CPD provided to the IMT materials demonstrating that 95% of its personnel have been trained in the First Amendment eLearning course. Notwithstanding this accomplishment, additional work is needed on the trainings for those policies listed above in order to move compliance with this paragraph forward.

The IMT also looks forward to reviewing future iterations of the *Constitutional Policing Course* and *S03-14, Body Worn Cameras* in continued support of Preliminary compliance with this paragraph. Moving forward, we will assess Secondary and Full compliance based on the CPD's efforts to train officers on these requirements and ensure the policies and training are implemented in practice.

### Paragraph 58 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Impartial Policing: ¶59

**59.** *Consistent with the requirements in the Accountability and Transparency section of this Agreement and CPD policy, CPD will require that CPD members immediately report to a CPD supervisor all incidents where they observe other CPD members who have engaged in misconduct, including discrimination, profiling, or other bias-based policing.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, the City and the CPD maintained Preliminary compliance with ¶59, but did not achieve Secondary compliance.

To assess Secondary compliance, we reviewed the CPD's efforts to train officers on these requirements and ensure the policies and training are implemented in practice.

*Progress before the Seventh Reporting Period*

As mentioned in ¶53, during previous periods, the IMT reviewed revised versions of CPD policies that they assert incorporate the requirements of ¶59, including G02-01, *Protection of Human Rights* (¶53 and ¶54), and G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing* (¶55 and ¶56).

*Progress in the Seventh Reporting Period*

The City and the CPD did not provide any materials documenting evidence of having conducted related training for this paragraph. As such, the City and the CPD have maintained Preliminary compliance with this paragraph, but the IMT expects to see documentary evidence of the implementation of the policies underlying this paragraph.

At the end of this reporting period, the City and the CPD did submit for review the training materials related to the Fair and Impartial Policing training that it plans to conduct in 2023. According to the CPD, this training is in furtherance of the procedural justice training conducted previously and will include discussion on its G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing* policy.

The IMT is reviewing this training material and will provide comments on said training in the first few weeks of the 8th reporting period.

Moving forward, we will assess Secondary and Full compliance based on the CPD's efforts to train officers on these requirements and ensure the policies and training are implemented in practice.

### Paragraph 59 Compliance Progress History

| | | |
|---|---|---|
| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Impartial Policing: ¶60

**60.** *Within 365 days of the Effective Date, CPD will develop and implement a policy guiding officers' interactions with members of religious communities. The policy will include, but not be limited to, instruction on interacting and searching individuals with garments or coverings of religious significance.*

**Compliance Progress** (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have maintained Preliminary compliance with ¶60 through its continued work to implement and finalize G02-01-05, *Religious Interactions*.

To assess Secondary compliance, we evaluated the CPD's efforts to train its officers on the new policy, including community engagement, and ensure adequate supervisory oversight is in place to ensure the policy is implemented into practice.

*Progress before the Seventh Reporting Period*

In the previous reporting periods, we assessed the CPD's efforts to engage faith-based community members and organizations in the development of G02-01-05 and incorporate this feedback into the policy development process. The CPD continued to make real progress by responding to faith-based organizations and, in the fifth reporting period, was also able to document and produce to the IMT how it used the feedback from faith-based organizations and surveys to improve the draft policy, resulting in a nearly finalized policy at the end of the fifth reporting period. In the sixth reporting period, the CPD significantly improved G02-01-05, addressing various concerns raised by the IMT, the Office of the Illinois Attorney General, and community feedback, resulting in a policy effective at achieving its purpose: providing guidance regarding the proper treatment and accommodations of individuals with various religious backgrounds. The IMT provided a no objection notice in July 2022. The City and CPD received continual input from the community and involved stakeholders and has made various revisions to the policy to address this feedback.

*Progress in the Seventh Reporting Period*

At the end of this reporting period, the CPD submitted a finalization package detailing its posting of the policy on social media sites, announcements, solicitation of comments from the public, the actual public comments, the lockup facility

weekly inspection report, among other things. Further, the CPD has begun utilizing paper head coverings.

Moving forward, we will assess the CPD's efforts to train its members on the new policy, including community engagement, and ensure adequate supervisory oversight is in place to ensure the policy is implemented into practice.

### Paragraph 60 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Impartial Policing: ¶61

*61. Within 180 days of the Effective Date, CPD will review and, as necessary, revise its policies guiding CPD members' interactions with transgender, intersex, and gender nonconforming individuals, including protocols for arrests, pat downs and searches, transportation, and detention, in order to ensure that, at a minimum: a. terms are properly defined; b. CPD members address individuals, using the names, pronouns, and titles of respect appropriate to the individual's gender identity as expressed or clarified by the individual; c. CPD members refer to individuals in documentation by the name and gender identity as expressed or clarified by the individual, in addition to the information provided on the individual's government-issued identification; d. where same-sex pat downs or searches are required by law or CPD policy, CPD members will respect the gender identity as expressed or clarified by the individual and not rely on proof of the individual's gender identity, such as an identification card, except when a pat down is immediately necessary and waiting for an officer of the same gender would compromise officer or public safety; e. absent exigent circumstances, a transgender, intersex, or gender nonconforming individual is not transported or detained with individuals of a different gender, and that when determining the gender of that individual, CPD members will respect the gender identity as expressed or clarified by the individual and not rely on proof of the individual's gender identity, such as an identification card; and f. CPD members are prohibited from inquiring about intimate details of an individual's anatomy, or medical history, except as necessary to serve a valid law enforcement purpose.*

### Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

**Preliminary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**      *Not in Compliance*
**Full:**           *Not Yet Assessed*

In this reporting period, the City and the CPD maintained Preliminary compliance with ¶61 but did not achieve Secondary compliance with this paragraph as training on topics related to this paragraph has not yet been conducted.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of this paragraph into policy (per the ¶¶626–41 review process) and engage the community as required by ¶52.

*Progress before the Seventh Reporting Period*

The City and the CPD achieved Preliminary compliance in the fourth reporting period by finalizing and completing the public comment period for G02-01-03, *Interactions with Transgender, Intersex, and Gender Nonconforming (TIGN) Individuals* and G06-01-01, *Field Arrests*, and by engaging community members and organizations with relevant knowledge for their input on those policy revisions. The final revised version of G02-01-03 became effective on the last day of the fourth reporting period.

Changes in leadership among the community stakeholders involved in the development and revision of G02-01-03 as part of the TIGN working group have halted much of CPD's efforts to reengage the group in the development of the related training.

*Progress in the Seventh Reporting Period*

The only materials produced in this reporting period related to this paragraph were for the *Constitutional Policing* course and *Fair and Impartial Policing* course, but as referenced in previous paragraph assessments, there are still improvements to be made. Part of our Secondary compliance review process includes not only the content of the materials but also the quality of training evaluations associated with the training. We also sought updates from the CPD regarding any changes in practices and in the development of training related to G02-01-03, *Interactions with Transgender, Intersex, and Gender Nonconforming (TIGN) Individuals* and the related General Order G06-01-01, *Field Arrest Procedures*. The IMT also monitors the CPD's supervisory oversight methods (*e.g.*, discipline, coaching, and other interventions) employed to ensure the policy is implemented as written.

As previously stated, in this reporting period, the City and the CPD provided training materials for the *Constitutional Policing Course*, and the IMT submitted comments on December 22, 2022. While the training course is comprehensive and includes many best practices, the IMT continues to push the CPD to ensure it is consistent with impartial-policing practices. For example, the training uses the word "citizens" when it should opt to use a more inclusive term, such as "community members" or "residents." The City and CPD also provided training materials for the Fair and Impartial Policing Course near the end of the reporting period, of which the IMT is still reviewing.

In sum, the City and the CPD maintained Preliminary compliance but still need to develop improved training and internal accountability measures to ensure that the policy is well implemented in practice. Further, the IMT reiterates that the TIGN Working Group expressed a desire to continue providing feedback as the CPD develops training related to this policy, and the CPD has agreed to this arrangement.

As noted above, collaboration with the TGIN working group has continued to be limited, mostly due to changes in staff and leadership amongst the community organizations participating in the working group. The CPD has noted that it will seek to re-engage the working group and other community stakeholders as it works on the related training.

As noted in ¶52, the IMT continues to stress the importance of timeliness and continued engagement of these community stakeholders on policies and training. Extended timelines between finalizing policy and developing training material presents issues in continued engagement and interest and can lead to the dissolution of community-police relationships. We look forward to following these developments as we assess Secondary compliance during the seventh reporting period.

For Full compliance, we will monitor whether the policy and training have been sufficiently implemented such that the CPD can demonstrate a positive impact on how CPD officers interact with TIGN individuals. Measuring the impact of the policy and training may involve a review of (1) police reports to ensure that CPD officers are completing them as proscribed in G02-01-03 and (2) contact survey responses from people who have had recent contact with a CPD officer.

### Paragraph 61 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Impartial Policing: ¶62

*62. CPD will require that officers comply with CPD policies related to officer response to allegations of sexual assault, sexual abuse, stalking, and domestic violence. All officers will receive in-service training every three years to ensure CPD's response to allegations of gender-based violence, including dispatch response, initial officer response, and on-scene and follow-up investigation, is both effective and unbiased.*

## Compliance Progress (Reporting Period: January 1, 2022, through June 30, 2022)

| Recurring Schedule: | Every Three Years (December 31, 2022) | ☐ Met | ☑ Missed |
|---|---|---|---|
| **Preliminary:** | *Not in Compliance* | | |
| **Secondary:** | *Not Yet Assessed* | | |
| **Full:** | *Not Yet Assessed* | | |

The City and the CPD has not yet achieved Preliminary compliance with the requirements of ¶62. Although the City and the CPD have produced the *Gender Based Violence In-Service Training* developed by the National Policing Institute, to which the IMT reviewed and subsequently a no-objection notice on this training was submitted on June 17, 2022, the City and the CPD have yet to produce a comprehensive Gender Based Violence policy.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of this paragraph into policy (per the ¶¶626–41 review process) and engage the community as required by ¶52.

*Progress before the Seventh Reporting Period*

In the previous reporting periods, the CPD has experienced difficulty engaging the community in its policy development process. Community engagement continues to be a significant stumbling block to the CPD's compliance with this paragraph, as the CPD has not followed through on its plan to create a working group to allow organizations with knowledge and expertise to have a voice in this reform process.

The CPD has made tremendous strides in previous reporting periods, including introducing an eight-hour online training titled, *Trauma-informed Response to Sexual Assault*; drafting an eight-hour online training titled, *The Psychology of Domestic Violence*; and receiving a grant from the U.S. Department of Justice, Office of Violence Against Women (OVW) that included proposed training on responses to gender-based violence. The CPD previously partnered with the National Police Foundation (NPF) to engage local stakeholders to identify CPD training needs around gender-based violence. A dozen virtual or in-person focus groups were

completed, including meetings with survivors, advocates, prosecutors, and CPD officers (including Domestic Violence Liaison officers). Training on Gender Based Violence was subsequently developed as part of these efforts.

In previous reports, the IMT also encouraged the CPD to create a special unit, a sex crimes unit, composed of officers and civilians with specialized knowledge and skills focused solely on sexual assault, sexual abuse, stalking, and domestic violence. A sex crimes unit would help to ensure the CPD's compliance with this paragraph by effectively investigating crimes of gender-based violence. Along the same line, the IMT continues to recommend that the CPD publish an annual report on the characteristics of these events (e.g., types of sexual assault) and the investigatory outcomes so that everyone may consider the implications for preventative strategies, victim services, justice/deterrence, CPD policy, and CPD training.

*Progress in the Seventh Reporting Period*

In this reporting period, the City and the CPD produced a revised version of the *Crime Victims Assistance* eLearning, and the IMT submitted a no-objection notice and feedback on October 29, 2022. The City and CPD have indicated that G04-06, *Domestic Incidents*, is forthcoming in the next reporting period.

Further, CPD has begun conducting the Gender based violence training, which is expected to be completed in early 2023. The department has also noted that they have begun working with various community groups to develop and revised its related gender-based violence policies and are hoping to leverage these community groups and other organizations whom have related expertise to obtain broader community input on the policy development.

To achieve Preliminary compliance with ¶62, the IMT must review and be satisfied with G04-06 and more importantly, the CPD must develop a gender-based violence policy. This policy will serve as the foundation for the training that is already underway and ensure the sustainability and accountability of officer's adherence to said policy and related training. The IMT continues to recommend that the City and the CPD consider seeking targeted technical assistance in the development of this policy and related resources.[5] To assess Secondary compliance, the IMT will review documentation demonstrating that officers have received the training on the courses developed.

---

[5]  In Independent Monitoring Report 5, the IMT recommended that the CPD consider adopting the *Response-to-Sexual-Assault-Report Review Checklist* developed by the International Association of Chiefs of Police (IACP). *See Response to Sexual Assault Report Review Checklist*, IACP (January 1, 2017), https://www.theiacp.org/resources/document/response-to-sexual-assault-report-review-checklist.

## Paragraph 62 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

## Impartial Policing: ¶63

**63.** *Within 180 days of the Effective Date, CPD will develop and implement a policy that prohibits sexual misconduct by CPD members. The policy will be consistent with best practices and applicable law and will provide definitions of various types of sexual offenses, including those that are not criminal in nature.*

**Compliance Progress**     (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have not achieved Preliminary compliance with ¶63 because the CPD has not yet completed the required ¶¶626–41 review process for General Order G08-06, *Prohibition of Sexual Misconduct*.[6] The City and the CPD provided a revised draft of G08-06 for review on subsequently a no objection notice was submitted by the IMT. Although the IMT submitted a no-objection notice on this policy, we do acknowledge that CPD is continuing to solicit community input on the policy and we look forward to reviewing these additional efforts and input as part of continued assessment of this paragraph and ¶52. It should also be noted that the OAG submitted further comments on this policy in response to the last production. We look forward to reviewing future iterations of this policy.

To assess Preliminary compliance, we will evaluate the CPD's efforts to codify the requirements of this paragraph into policy (per the ¶¶626–41 review process) and engage the community as required by ¶52. The IMT will assess Preliminary compliance based on the quality of directive G08-06 and the extent of community engagement in its development.

*Progress before the Seventh Reporting Period*

During previous reporting periods, the CPD submitted a draft directive of G08-06 on February 28, 2020, for early consultation review. The IMT provided comments on March 29, 2020. On April 22, 2020, the CPD submitted a revised version of the directive, and the IMT provided additional comments on May 22, 2020. After engaging community leaders and victim advocates, the CPD produced a revised G08-06 on October 6, 2021, and the IMT provided additional comments to the City on November 19, 2021. On March 16, 2022, the City and the CPD provided a revised draft of G08-06 for review. On March 28, 2022, the CPD asked the IMT and the

---

[6]  The CPD originally numbered this policy G08-05 but has numbered it G08-06 since the May 5, 2021 draft.

Office of the Illinois Attorney General to withhold review and comment until receiving a further revised draft. In the meantime, the IMT provided informal comments on April 5, 2022. On April 28, 2022, the City and the CPD provided a further revised G08-06 (dated April 7, 2022) and on May 11, 2022, the IMT provided comments.

*Progress in the Seventh Reporting Period*

During this reporting period, the City and the CPD provided a revised draft of G08-06 for review. Overall, we found this draft of G08-06 to be improved from the previous versions and a no objection notice was subsequently issued. We continue to emphasize, however, the importance of obtaining and considering community feedback during the CPD's development of policy and training materials. We expect to receive updates about these community engagement efforts, including information about community input gathered and the outcomes of such input.

In future reporting periods, the IMT looks forward to seeing continued community engagement efforts and training materials developed on G08-06. Preliminary compliance will depend on CPD's efforts to codify the requirements of this paragraph into policy and receiving no objection notices from both the IMT and OAG. Secondary compliance will depend on the quality of the training lesson plans, the level of community engagement in developing the training, the quality of the training delivered, and the evaluations used to measure effectiveness.

### Paragraph 63 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

## Impartial Policing: ¶64

> *64. Within 180 days of the Effective Date, CPD will review and, to the extent necessary, revise its language access policy to provide meaningful access to CPD programs and services for individuals who have a limited ability to speak, read, write, or understand English. CPD will ensure that its language access policy provides timely and meaningful access to police services for individuals with limited English proficiency ("LEP"). CPD will also require that qualified and Department-authorized interpreters are used in accordance with CPD policy, including for the provision of Miranda warnings. CPD will publish its language access policy on its website and, consistent with the requirements of Paragraph 28 of the Community Policing section of this Agreement, make the policy available to community-based group serving LEP communities in Chicago.*

### Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

**Preliminary:**      *Not in Compliance*
**Secondary:**       *Not Yet Assessed*
**Full:**              *Not Yet Assessed*

The City and the CPD have not yet achieved Preliminary compliance with the requirements of ¶64. The City and the CPD submitted a revised Special Order S02-01-05, *Limited English Proficiency* at the end of the seventh reporting period on December 28, 2022. However, as of the drafting of this report, the IMT has not yet reviewed said production. Preliminary review of the production found that additional outreach to those community members directly impacted by this policy to gather their input still needs to be conducted.

To assess Preliminary compliance, we will evaluate the CPD's efforts to codify the requirements of this paragraph into policy (per the ¶¶626–41 review process) and engage the community as required by ¶52.

*Progress before the Seventh Reporting Period*

During the previous reporting periods, the IMT reviewed and commented on drafts of S02-01-05 and monitored the CPD's efforts to implement targeted community engagement for input on revising the policy. We also reviewed the City's Language Access Coordinator's actions and the CPD's Language Access Coordinator's status reports, recommendations, and implementation plans. Those records reflect an excellent roadmap of changes that we hoped the CPD would incorporate in the next iteration of S02-01-05. Throughout the various reviews of S02-01-05, we noted significant improvements to the policy but highlighted significant issues,

such as the CPD's lack of analysis of community feedback and the absence of a mechanism or process for verification and certification for Department-Authorized interpreters. We continue to reiterate that this paragraph requires that the CPD ensure that qualified and Department-authorized interpreters are used.

*Progress in the Seventh Reporting Period*

In this reporting period, the IMT attended a site visit in October 2022, that included significant discussion of the LanguageLine pilot, a mobile application that can provide immediate translation services in a variety of languages, including those required in the Consent Decree, and attendance from the CPD Language Access Coordinator.

As of October 20, 2022, over 1,600 officers had received training on the availability and capabilities of LanguageLine and CPD had activated almost 2,000 devices that could use this service in the field. In addition, usage statistics from the application indicated that officers made over 500 requests for translation for 40 spoken languages as well as American Sign Language translation. Almost half of the requests were for Spanish translation services. The IMT appreciates the usage data that is available through LanguageLine, as it should inform CPD interpreter needs for the future, although CPD will need to ensure that the program is being used consistently, without bias, across different communities with limited English proficiency.

The City's and the CPD's ability to provide meaningful access to CPD services for individuals with limited English proficiency will depend, in part, on their ability to track language access needs data across different units and districts. In other words, access to language services should be based on a needs assessment, which in turn should be based on good data from the CPD and the Office of Emergency Management and Communications. Thus, we continue to encourage the CPD to codify tracking procedures on persistent and emerging translation needs within Chicago communities and incorporate them in S02-01-05.

While the IMT recognizes the immense value of LanguageLine availability and use to the CPD to meet requirements of this paragraph, the IMT continues to recommend that the CPD use LanguageLine as a supplemental service when "qualified and Department-authorized" interpreter services are unavailable, have a finalized S02-01-05 guide the use of this service, and ensure that subsequent training is based on the finalized policy. Until these actions have been taken, we are concerned that the use of such services will be applied inconsistently across districts to those who need it during interactions with CPD. For these reasons, we recommend that the CPD audit LanguageLine usage by CPD members, per ¶65.

Further, on December 28, 2022, the City and the CPD provided the IMT with a revised draft of S02-01-05 along with a summary of the community engagement efforts related to the policy. Although the IMT is still conducting its review of this

policy, we note that CPD must also provide all material related to its community engagement efforts. A review of the materials provided to community members and/or groups, along with the input received and gathered thus far are important to demonstrating compliance with this paragraph and with ¶52.

In future reporting periods, we will continue to monitor the CPD's effort to seek input from community members and organizations with relevant experience and knowledge in revision S02-01-05. Evidence of such engagement should include an analysis of how the CPD used community input to inform S02-01-05 policy revisions. We will also assess the CPD's efforts to finalize S02-01-05 according to the ¶¶626–41 review process. Once S02-01-05 is finalized and implemented, we will monitor the CPD's efforts to train its members in how to provide community members with meaningful access to the City's limited English proficiency programs and services. Moving forward, we will review the CPD's process of verifying and certifying that Department-Authorized interpreters have the skills and proficiencies and evaluate the CPD's success with the citywide rollout of LanguageLine's InSight application.

## Paragraph 64 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 − DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

## Impartial Policing: ¶65

> **65.** *Within 180 days of the Effective Date, the City will designate a language access coordinator who will coordinate with CPD and review CPD's compliance with its language access policy and Section 2-40 of the Municipal Code of Chicago. The City's language access coordinator will assess the effectiveness and efficiency of CPD's policies on an ongoing basis and will report to the Superintendent or his or her designee any recommendations to revise policy, if necessary.*

**Compliance Progress**  (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, the City and the CPD maintained Preliminary compliance, which it achieved with the hiring of the Language Access Coordinator, but has yet to achieve Secondary compliance because the Language Access Coordinator (also known as LAC) has yet to establish a system of review to "assess the effectiveness and efficacy of CPD's policies on an ongoing basis."

To evaluate Preliminary compliance, the IMT assessed whether the City and the CPD established and hired a language access coordinator, which they accomplished in the second reporting period. To evaluate Secondary compliance, we monitored the CPD's efforts to develop a system of data collection to assess limited English proficiency needs and services, including changes to CPD reports and CPD policy. We also reviewed the City's or CPD's efforts to evaluate/audit the delivery of language access services to ensure complete and impartial coverage.

*Progress before the Seventh Reporting Period*

In previous reporting periods, we credited the City's and the CPD's Language Access Coordinator for developing a working relationship within the Department and has roles clearly delineated in S02-01-05, *Limited English Proficiency*.[7] The CPD's Language Access Coordinator has offered a number of proposals to enhance the CPD's responsiveness to the needs of individuals with limited English proficiency and has developed a language access plan in April 2021 that guides assessment of language needs for the department and operating procedures for translation and

---

[7] The language access policy indicates that CPD's Language Access Coordinator is expect to "establish a monitoring program to ensure compliance with the LEP policy, including the: implementation of the policy; assignment, and use of multilingual Department members; and necessity of translating Department forms, publications, and distribution materials."

interpretation services. The Language Access Plan did not, however, provide the process of data collection and the metrics by which the CPD's Language Access Coordinator will assess the effectiveness and efficacy of the CPD's policies as required by this paragraph. Furthermore, the CPD's Language Access Coordinator developed a website geared towards individuals with limited English proficiency and posted materials, ranging from feedback and complaint forms to victim assistance, in five different languages.[8]

*Progress in the Seventh Reporting Period*

While the CPD maintained Preliminary compliance with this paragraph, the City did not produce any materials for assessment for additional levels of compliance in this reporting period. However, the IMT received an update on Language Access Coordinator actions during an in-person site visit in October 2022, indicating that the CPD is working to improve data collection processes to understand and monitor language access needs in Chicago communities such as collecting language requests during community interactions or calls for service as well as improving language service requests processes and forms. During the site visit, the CPD also provided updates on the development of criteria for selecting CPD-authorized interpreters, a key outstanding point from the IMT regarding codifying language access requirements of the Consent Decree. *See* ¶64 for more details on the site visit. The CPD expects to address this in revised submissions in the eighth reporting period.

To assess Secondary compliance, the IMT reviewed whether the Language Access Coordinator established a system of review to "assess the effectiveness and efficacy of CPD's policies on an ongoing basis." No new materials were produced for this paragraph during this reporting period, so the IMT could not further assess Secondary compliance and the CPD maintains Preliminary compliance.

In assessing Secondary compliance in future reporting periods, we will monitor the CPD's efforts to develop a system of data collection to assess limited English proficiency needs and services, including changes to CPD reports and CPD policy. This system is necessary to Language Access Coordinator's ability to evaluate the CPD's compliance with S02-01-05 and Section 42-40 of the Municipal Code of Chicago and to assess the effectiveness and efficiency of CPD's policies as they relate to the provision of impartial and timely access to high-quality limited English proficiency services.[9]

---

[8]  *See Language Access Policy of the Chicago Police Department*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/community-policing-group/language-access/.

[9]  Municipal Code of Chicago, Chapter 2-40, *Citywide Language Access to Ensure the Effective Delivery of City Services*, https://codelibrary.amlegal.com/codes/chicago/latest/chicago_il/0-0-0-2598829.

## Paragraph 65 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Impartial Policing: ¶66

**66.** *Within 365 days of the Effective Date, OEMC will provide training to its police communication supervisors, call-takers, and dispatchers (collectively, "tele-communicators") that is adequate in quality, quantity, type, and scope, and that addresses procedures consistent with CPD policy for responding to calls requiring language access services.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance (SECOND REPORTING PERIOD)* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During the seventh reporting period, the City and the Office of Emergency Management and Communications (OEMC) maintained Preliminary compliance with this paragraph. They did not achieve Secondary compliance because the OEMC may need to update its training to ensure the procedures are (1) consistent with the CPD's policy S02-01-05, *Limited English Proficiency*, which is still undergoing the ¶¶626–41 review and revision process; and (2) respond to the data collection needs that provide the foundation for improved limited English Proficiency services in Chicago.

To evaluate Preliminary compliance, the IMT examined whether OEMC developed a training directive to meet requirements of this paragraph and in alignment with current CPD policy S02-01-05. To evaluate Secondary compliance, the IMT examined development, implementation, and evaluation of said training materials.

### Progress before the Seventh Reporting Period

During the previous reporting period, OEMC produced a revised Training Notice 19-004 to address requirements of this paragraph. In review of this production, the IMT found that OEMC addressed the last outstanding comments regarding expectations for dispatchers as well as differentiated training content for all three articulated roles in this paragraph.

As mentioned in previous paragraphs, CPD is actively revising S02-01-05; thus, trainings to meet requirements of this paragraph must also include alignment with the finalized policy to ensure the training is fully "consistent with CPD policy."

### Progress in the Seventh Reporting Period

During the IMT site visit in October 2022, the IMT discussed the status of this paragraph with OEMC. The IMT is satisfied with the current content of Training Notice

19-004 for the OEMC requirements of this paragraph. Since OEMC needs to conduct an alignment assessment with the finalized CPD directive, expected in a future reporting period, Secondary compliance with this paragraph is contingent upon further action by CPD. OEMC has currently accomplished what is currently possible regarding this paragraph without further action by the CPD and the IMT noted this distinction during the site visit.

In addition, while the IMT is not currently assessing operational compliance with this paragraph, OEMC also presented language usage, and time to connect data during the site visit. While the IMT will assess these data for Operational compliance in future reporting periods when officially produced by the City, it is encouraging that OEMC is already thoughtfully collecting the types of data needed to demonstrate operational level of compliance.

The City and the OEMC maintained Preliminary compliance but have not met Secondary compliance. Moving forward, we will assess the OEMC's efforts to update TNG 19-004 based on CPD's final S02-01-05, and any feedback that the CPD receives from relevant community stakeholders. After finalizing an updated TNG 19-004, we will assess the OEMC's implementation and evaluation of the training and related usage data.

### Paragraph 66 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Impartial Policing: ¶67

*67. Within 180 days of the Effective Date, and as necessary thereafter, CPD will translate its language access policy into any non-English language spoken by a limited or non-English proficient population that constitutes 5% or 10,000 individuals, whichever is less, in Chicago, as outlined in Section 2-40-020 of the Chicago Municipal Code. CPD will publish translated versions of its language access policy on its website.*

Compliance Progress         (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Secondary compliance with this paragraph because the CPD's *Language Access Plan* sufficiently provides for a schedule and system to consistently review language access data to determine whether additional translations are necessary and to make revisions as needed to Special Order S02-01-05, *Limited English Proficiency*.

The City and the CPD have not met Full compliance because we have not assessed whether the day-to-day operations and supervisory over-sight suffices to determine that the translations' review schedule and system of review for S02-01-05 have been institutionalized. As of the end of the seventh reporting period, there have been no opportunities for the CPD to put the review process in practice considering that S02-01-05 is still under ¶¶626–41 review.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD met Preliminary compliance because the CPD translated its Special Order S02-01-05 into Spanish, Polish, Chinese, and Arabic. In the third reporting period, the City and the CPD met Secondary compliance by providing evidence that it has the managerial practices in place to confirm that the languages selected for translations represent all groups that meet the criteria outlined in this paragraph. The CPD approved its Language Access Coordinator's *Language Access Plan* during the fourth reporting period. The Plan outlines an annual schedule and system to review language access data to determine if additional translations are needed. During the fifth and sixth reporting period, the City and the CPD did not produce any materials related to additional levels of compliance for this paragraph.

*Progress in the Seventh Reporting Period*

In this reporting period, the City and the CPD did not produce any additional materials for review related to this paragraph. As a result, the IMT maintains its assessment of this paragraph from the previous reporting period. The CPD has maintained Secondary compliance and has made good efforts to institutionalize the translations review and revision process.

During the October 2022 IMT site visit, the Language Access Coordinator indicated final revisions to S02-01-05 will incorporate outstanding elements as required by this paragraph. In addition, she mentioned that CPD posted additional translations of the language access policy to the CPD website as required.

Since the annual review has not yet been completed, we cannot yet say the City and the CPD have reached Full compliance. The IMT continues to acknowledge issues in staffing and the impact of these shortages on tasks like the completion of the annual review of the *Language Access Plan* and stresses to the City and the CPD the importance of addressing these shortages in reaching compliance with the Consent Decree.

Moving forward, we will continue to monitor the CPD's efforts to adhere to the translation and review process outlined in the Language Access Plan, including the CPD's efforts to translate S02-01-05 once it is finalized.

## Paragraph 67 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Impartial Policing: ¶68

**68.** *Before January 1, 2020, CPD will review and, to the extent necessary, revise its policies and practices for ensuring effective communication and meaningful access to CPD programs, services, and activities for individuals with physical, mental, or developmental disabilities. These policies will identify specific procedures and responsibilities applicable to circumstances in which CPD officers encounter persons with intellectual or developmental disabilities, autism, dementia, blindness, deafness, hearing loss, and mobility disabilities, including, but not limited to: a. properly defining terms related to individuals with disabilities and the disability community; b. providing reasonable accommodations, to the extent safe and feasible, in order to facilitate CPD officer encounters with individuals with a disability; c. the arrest and transport of individuals with disabilities or who require the assistance of ambulatory devices; and d. using qualified and Department-authorized interpreters, consistent with CPD policy, to communicate with people who are deaf, hard of hearing, or who have a speech impairment, including for the provision of Miranda warnings.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance regarding this paragraph because the CPD has not finished revising its policies for ensuring effective communication and meaningful access to CPD services for individuals with physical, mental, or developmental disabilities.

To assess Preliminary compliance, the IMT assessed compliance based on the quality of directive S02-01-01, *People with Disabilities,* and extent of community engagement in its development.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD did not meet Preliminary compliance because the CPD had not started or completed the ¶¶626–41 review process regarding Special Order S02-01-01, *People with Disabilities*. The IMT's primary concerns regarding the submitted policy is that it could benefit from clearer and more precise language regarding use and certification of interpreters for deaf and hard-of-hearing individuals as specified in ¶68(d).

*Progress in the Seventh Reporting Period*

In this reporting period, there were no productions by the CPD related to revisions for S02-01-01. In addition, the IMT conducted site visits to each of the 22 districts in November 2022. These visits included a field checklist to observe the state of holding areas most specifically related to ¶68(c) and it was found that almost across all districts, the state of these areas for individuals with disabilities were in disrepair or were not operational. While CPD is not actively being assessed for Operational Compliance with this paragraph, it is concerning that accommodations for individuals with disabilities when arrested is almost universally not available or functional across Chicago.

The CPD and the City did produce a revised *Constitutional Policing* course in this reporting period, which includes training concepts ancillary to this paragraph. The IMT provided additional comments for revision of this course on December 22, 2022.

While the City and the CPD had limited progress on this paragraph in this reporting period, the CPD did indicate that they planned to gather community input on S02-01-01 in early 2023. CPD noted that they planned to incorporate previous community engagement efforts into the next draft of the policy and hold discussions with relevant community members regarding the draft policy.

Further, during this reporting period, the City and the CPD met with the IMT to discuss the way forward with this paragraph and ¶68 through a technical assistance engagement on August 17, 2022. The primary purpose of this discussion was to gather input and feedback around developing both a comprehensive policy on people with disabilities as well as sub-policies that delve into specific disabilities. During this discussion it was noted that S02-01-01 could serve as the parent policy and that the CPD should also develop sub-policies on responding to persons with 1) physical, 2) mental, and 3) developmental disabilities.

IMT looks forward to reviewing revised drafts of S02-01-01 along with the sub-policies mentioned above. We also look forward to assessing CPD's progress to engage members of the community directly affected by these policies as part of the development process.

Moving forward, we will assess the CPD's efforts to finalize S02-01-01 and incorporate these into training. We will also continue to assess the CPD's efforts to engage relevant disability communities and their advocates. Lastly, the IMT plans to engage CPD on how to improve the condition of holding areas for arrested individuals with disabilities as it moves forward with operational compliance.

After the CPD finalizes S02-01-01 and any other policies related to this paragraph, we will assess the CPD's efforts to train its officers on the updated policies, including the extent to which training aligns with the CPD's efforts to comply with ¶69.

### Paragraph 68 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Impartial Policing: ¶69

*69. Before January 1, 2020, CPD will develop a training bulletin that provides CPD members guidance on interactions with people with disabilities, including: a. recognizing and responding to conduct or behavior that is related to an individual's disability, including qualifying medical conditions such as Alzheimer's disease and diabetes; b. providing effective communication and minimizing barriers to communication, including by incorporating sign language and other modes of communication used by people who are deaf, hard of hearing, or who have a speech impairment during police-community interactions; c. attending to the specific needs of individuals with disabilities, such as mobility devices, prosthetics, and service animals; and d. recognizing and responding to identified abuse, neglect, or exploitation of individuals with disabilities, including making any notifications required by CPD policy or the law.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance during this reporting period because the CPD has not finished developing its training bulletins on interactions with people with disabilities.

To assess Preliminary compliance, the IMT assessed whether the CPD had finalized training bulletins on topics specified in this paragraph and in alignment with the related policy or policies.

*Progress before the Seventh Reporting Period*

During previous reporting periods, the CPD produced the following draft training bulletins: (1) *People with Disabilities*; (2) *Autism and Police Response*; (3) *Interacting with the Deaf Community; (4) What is a Service Animal?*; (5) *Understanding Diabetes, (6) A Law Enforcement Perspective*; and *Alzheimer's Disease and Related Dementias*. The ADA Liaison was meaningfully involved in the bulletin-development process, providing initial content for the general training bulletin on individuals with disabilities. However, the guiding policies for these training bulletins, most notably Special Order S02-01-01, *People with Disabilities,* had not been finalized, and thus, the IMT could not assess if these bulletins aligned with S02-01-01. We also monitored the CPD's continuing efforts to engage community members

and organizations with relevant knowledge and experience in developing and revising the relevant training bulletins.

*Progress in the Seventh Reporting Period*

During this reporting period, the CPD did not produce any additional productions related to this paragraph. Although, as noted in paragraph 68, additional discussion was had related to the development of related policies during the reporting period on August 17, 2022 regarding having S02-01-01 serve as a parent policy and have sub-directives provide guidance on responding to persons with 1) physical, 2) mental, and 3) developmental disabilities.

Special Order S02-01-01, *People with Disabilities*, and its related sub policies have not been finalized, and thus the IMT could not assess if these training bulletins aligned with the policy. Based on IMT recommendations, the CPD has indicated that they plan to finalize S02-01-01 and develop several sub policies before revising the training bulletins so that they can reflect the most accurate and up-to-date guidance from CPD's policy or Special Orders. We look forward to reviewing the revisions to S02-01-01, the related sub policies, the associated training bulletins, and CPD's efforts to engage the community in the development of these productions.

### Paragraph 69 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Impartial Policing: ¶70

**70.** *Within 180 days of the Effective Date, CPD will designate at least one member as an Americans with Disabilities Act ("ADA") liaison who will coordinate CPD's efforts to comply with the ADA and: a. regularly review the effectiveness and efficiency of CPD's policies and training as they relate to individuals with disabilities and report to the Superintendent, or his or her designee, any recommended revisions, if necessary, to ensure compliance with the law and this Agreement; b. serve as a resource to assist CPD members in providing meaningful access to police services for individuals with disabilities; and c. act as a liaison between CPD and individuals with disabilities.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance regarding ¶70 because the CPD designated an ADA Liaison in the third reporting period. However, the CPD did not achieve Secondary compliance for the current reporting period because the CPD still needs to demonstrate that the ADA Liaison is integrated into CPD processes and practices.

To evaluate Preliminary compliance, we assessed the CPD's efforts to designate an ADA Liaison. To evaluate Secondary compliance, we assessed the CPD's efforts to integrate the ADA Liaison into CPD processes and practices specific to this paragraph, as well as CPD policies that codify the role of the ADA Liaison, most specifically in S02-01-01. Annual reports and the implementation plan will be used to determine the extent to which the ADA Liaison is integrated into CPD processes and practices.

*Progress before the Seventh Reporting Period*

In previous reporting periods, we acknowledged that the CPD's designated ADA Liaison is qualified for the role, having 27 years of police experience, including experience with ADA issues while at the CPD. The CPD also provided S02-01-01 and two standard operating procedures covering the ADA Liaison's role and responsibilities. However, these productions are still in revision due to S02-01-01 not being final.

*Progress in the Seventh Reporting Period*

In this reporting period, the CPD did not produce any materials related to additional levels of compliance for this paragraph and S02-01-01, which codifies the role of the Liaison, is still being revised. That said, the IMT's October 2022 site-visit with the ADA Liaison included discussion on the progress on related paragraphs and her role in Consent Decree paragraphs.

During this site visit, the ADA Liaison summarized the accomplishments over the last year, goals for the next year, and development of the implementation plan and the status of the annual report. During the visit, the ADA Liaison noted that the CPD does not currently collect or maintain statistics on CPD interactions with people with disabilities at the offender, victim, or complainant level. The IMT urged CPD to consider developing ways to collect this in standard reporting mechanisms as they move into Operational Compliance assessment in the future.

The Liaison also noted she had been working with the Mayor Office's Council on People with Disabilities on an audit of CPD facilities for ADA compliance.[10] The IMT looks forward to the results of this collaboration as it relates to this paragraph and other paragraphs, specifically ¶68.

Similar to the staffing and resource issues noted in ¶65, these issues are also affecting the CPD's ability to continue work on its Implementation Plan and Annual Report. These materials will serve as the foundation for which to assess CPD's progress towards Secondary compliance. The IMT stresses the importance of ensuring that the ADA has the resources and staff available to conduct its activities and produce the reports and plans necessary to demonstrate that it is integrated into CPD processes and practices.

The City and the CPD maintained Preliminary compliance because the ADA Liaison's activities and efforts align with the requirements outlined in this paragraph. Moving forward, for Secondary compliance, we will assess the CPD's effort to finalize the relevant policies and procedures codifying the ADA Liaison's role and responsibilities. We will also assess the CPD's effort to implement supervisory oversight to ensure that the policies and procedures are implemented and effective. Finally, we will look for the collection of data on the effectiveness of CPD's polices and training regarding CPD's interactions and responses to individuals with disabilities. The CPD will need to articulate a method for determining whether these individuals are being treated with dignity and respect by CPD personnel and receiving the services they need. Further, we also look forward to reviewing upcoming drafts of the Implementation Plan and the Annual Report.

---

[10] *See Mayor's Office for People with Disabilities*, CITY OF CHICAGO, https://www.chicago.gov/city/en/depts/mopd.html.

## Paragraph 70 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

**SEVENTH REPORTING PERIOD**
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Impartial Policing: ¶71

**71.** *Within 180 days of the Effective Date, CPD will develop a policy for transporting arrested or detained individuals that requires CPD officers to notify OEMC of the start and end of a transport and whether the individual is a juvenile or adult.*

## Compliance Progress
(Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶71 because the CPD implemented a policy addressing the requirements in this paragraph. *See* G04-01, *Preliminary Investigations* (effective December 30, 2020). The City and the CPD did not achieve Secondary compliance as the related training materials have not yet been developed and/or finalized and as such training has not been conducted.

To assess Preliminary compliance, the IMT assessed compliance based on the quality of directive G04-01 and extent of community engagement in its development. To assess Secondary compliance, the IMT assessed training materials developed based on the policy, such as the *Constitutional Policing* course.

### Progress before the Seventh Reporting Period

During previous reporting periods, we assessed the CPD's efforts to review and revise G04-01 and related policies that reinforce the requirements of this paragraph. Because this paragraph is a relatively straightforward requirement, we were satisfied with the CPD's limited method of community engagement.

In addition, the City and the CPD submitted *Constitutional Policing* course in relation to this paragraph in Independent Monitoring Report 6. While we found that the training course was comprehensive, we noted additional improvements were necessary, particularly around including additional discussion on ensuring impartial-policing practices during enforcement actions and noting the importance of reinforcing these concepts and referencing related CPD directives to demonstrating how impartial policing builds positive community perspectives and improves legitimacy.

### Progress in the Seventh Reporting Period

On October 20, 2022, the City and the CPD submitted revised Constitutional Policing Course materials in relation to this paragraph and ¶72. On December 22, 2022,

the IMT provided our comments on this production. Related to the Impartial Policing paragraphs of the Consent Decree, the IMT did not have any additional comments on the materials provided. However, the IMT had comments regarding other sections of the Decree. As a result, the CPD will be finalizing the training materials, hopefully, in the eighth reporting period. The IMT will assess the final materials, and related records for this training for Secondary compliance in a future reporting period. Until then, the City and the CPD remains out of Secondary compliance with this paragraph.

The City and the CPD maintained Preliminary compliance because the implemented G04-01 codifies the requirement that officers notify the Office of Emergency Management and Communications (OEMC) of the start and end of a transport and whether the individual is a juvenile or an adult. Moving forward, for Secondary compliance, we will assess the CPD's efforts to train officers on these requirements and collect evaluation data on implementation of this training. For Full compliance, we will assess whether the CPD has sufficiently implemented the requirement by evaluating the CPD's efforts to assess whether officers are complying with the requirements of ¶71 and adjust policy and training to address any concerns regarding their effectiveness.

### Paragraph 71 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Impartial Policing: ¶72

*72. The Parties recognize that training is a necessary component of impartial policing. CPD will integrate the concept of impartial policing into related CPD training courses when appropriate, including, but not limited to, use of force courses, weapons training courses, and Fourth Amendment subjects courses.*

## Compliance Progress      (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance with ¶72 during this reporting period because the CPD has not developed a training strategy that codifies its efforts to adequately incorporate the concept of impartial policing into related CPD training courses. Although the CPD provided its *2023 Training Plan* to the IMT for review and noted within the courses it will deliver in 2023 that incorporate impartial policing, a broader strategy and/or plan is necessary for the department to achieve Preliminary compliance. A broader strategy and/or plan will also ensure the institutionalization and sustainability of these topics within training and not be dependent on whether these topics are included within the annual training plans.

To assess Preliminary compliance, the IMT assessed whether the CPD has reviewed its training courses and created an effective plan to integrate the concept of impartial policing into those related courses. To assess Secondary compliance, the IMT assessed the integration and delivery of topics such as impartial policing, procedural justice, and de-escalation into trainings.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD produced several training directives relevant to ¶72 and 74. Namely, the CPD produced S11-10, *Department Training*; S11-10-01, *Recruit Training*; S11-10-02, *Pre-Service Training*; and *In-Service Training*, S11-10-03 (collectively "Training Suite"). The IMT provided no-objection notices on these directives on February 15, 2022, to accompany the no-objection notice for S11-10-01 in the previous reporting period to complete the "Training Suite" provided by the City.

While the "Training Suite" incorporates concepts of Impartial Policing and requirements of this paragraph, the IMT continued to urge the City and CPD to develop a training strategy or plan to outlines the courses in which impartial policing has been integrated into said training, the number of training hours, and specific topics

covered. This should guide all trainings on impartial policing to meet the requirements of this paragraph.

In addition, as noted in ¶71, the, the, the City and the CPD submitted *Constitutional Policing* course in relation to this paragraph in Independent Monitoring Report 6. While we found that the training course was comprehensive, we noted additional improvements were necessary, particularly around including additional discussion on ensuring impartial-policing practices during enforcement actions and noting the importance of reinforcing these concepts and referencing related CPD directives to demonstrating how impartial policing builds positive community perspectives and improves legitimacy.

*Progress in the Seventh Reporting Period*

Throughout the reporting period, the City and the CPD submitted revised training materials including the *Constitutional Policing* in-service course materials, BIA eLearning, *Recruit Use of Force* training, *Fair and Impartial Policing* training, and Use of Force Policy Updates Training in relation to this paragraph. Related to the Impartial Policing paragraphs of the Consent Decree, the IMT did not have any additional comments on the materials provided with the BIA eLearning receiving a no-objection notice in this reporting period. However, the IMT had comments regarding other sections of the Decree related to these materials. As a result, the CPD will be finalizing these training materials, hopefully, in the eighth reporting period. The IMT will assess the final materials, and related records for this training for Secondary compliance in a future reporting period.

As noted in previous reports, we remain concerned that instructors for classes where integration is required lack knowledge on the subject, are not dedicated to impartial policing or procedural justice, and are not experienced in teaching difficult or uncomfortable subjects. Therefore, we encourage the CPD to make a concerted effort to retain the core of their procedural justice trainers. These trainers can help co-teach the related trainings and, ideally, partake in a larger effort to create a higher standard of teaching at the CPD.

During this reporting period, the City and the CPD made progress integrating impartial policing concepts into trainings. However, while the provided materials incorporate aspects of impartial policing and the requirements of this paragraph, integration of impartial policing concepts requires not only these efforts but also lasting direction on this issue. The IMT continues to recommend that the CPD develop a training plan or strategy that would guide integration of these principles throughout the trainings specified in this paragraph. Without sufficient policy direction on this issue, the City and the CPD will not meet Preliminary compliance metrics.

Full compliance will depend on the CPD's ability to demonstrate that it sufficiently and effectively incorporated the concept of impartial policing into related CPD training courses. The CPD will need to measure effectiveness, in part, by assessing the quality of the training delivered, changes in officers' attitudes and behavior prior to leaving the training session, and changes in behavior while on the job. The CPD will need an evaluation system for its trainings where it or its partners can quickly analyze survey and test data and quickly feed the analysis back to Training Division administrators and instructors to allow for immediate adjustments in particular classes and for long-term planning. This type of evaluation system does not currently exist.

Finally, as noted in paragraph 53, although not mandated or required by this paragraph or the Consent Decree, the IMT recommends that the City and the CPD strongly consider creating an executive position within the CPD that focuses on the integration of the concepts of diversity, inclusion, equity, and impartial policing into all aspects of the department, including policy and training development. A Chief Equity Officer, or DEI Coordinator, can spearhead and accelerate the CPD's efforts to comply with the requirements of this specific paragraph and others within this section.

### Paragraph 72 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Impartial Policing: ¶73

> *73. The Parties acknowledge that CPD has developed, with the aid of subject-matter experts, a three-part course called Procedural Justice, which covers certain impartial policing subjects including the principles of procedural justice, the importance of police legitimacy, and the existence of and methods for minimizing the impact of implicit bias. By the end of the year 2020, all officers, including supervisors, will complete the Procedural Justice course.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Secondary compliance with this paragraph because it ensured that all officers, including supervisors, completed the Procedural Justice (also known as PJ) courses.

To assess Preliminary compliance, we assessed the CPD's efforts to ensure its officers completed the training. We also reviewed the materials and observed classes to assess the quality of its content. To assess Secondary compliance, the IMT assessed how the CPD implemented the training of Procedural Justice courses and assessed the results. To assess Full compliance for this paragraph the IMT will assess whether the data indicate that CPD officers are engaging in procedurally just behaviors in the field. Operational data such as complaints, stops, arrests, use of force will be reviewed to determine Full compliance.

*Progress before the Seventh Reporting Period*

From 2018 to early 2021, the CPD offered a three-part procedural justice training as part of the CPD's in-service program. The course embodied concepts of impartial policing. Based on our review of the materials, we found that the procedural justice training offered a strong introduction to the concepts for all officers. We observed the *Procedural Justice* training, and Parts I and II were taught largely by CPD instructors who exhibited a solid understanding of how procedural justice can be applied to police work. The CPD out-sourced Part III's instruction to the Anti-Defamation League (ADL) Midwest. The ADL provided a solid 4-module training on implicit bias and strategies for managing it to 11,500 officers.

In the fifth reporting period, only 88% of the CPD officers had completed the Procedural Justice Part III (also known PJ-3) course. As a result, the CPD and the Anti-Defamation League (ADL) Midwest, the provider of the initial Procedural Justice

courses for CPD, developed a curriculum on "Inclusive Policing" that is available to officers who did not receive the original Procedural Justice III.[11] The IMT reviewed the training materials and we are satisfied with the content, thus CPD remained in Preliminary compliance.

At the end of the sixth reporting period, the CPD produced documents demonstrating completion of the Inclusive Policing Procedural Justice III training, as well as evidence of completion of community policing in-service training, and evidence of use of force in-service training. This achieved Secondary compliance for this paragraph.

*Progress in the Seventh Reporting Period*

Secondary compliance was achieved with the completion of the Inclusive Policing Procedural Justice III. In the seventh reporting period, the CPD provided the final training records for the Procedural Justice III (PJ3) course and requirements of this paragraph. Overall, 10,416 officers (or 98% of CPD officers) completed the PJ3 course, meeting IMT training requirement thresholds for Secondary compliance.

In addition, during the October IMT site visit, the Training Division discussed the transition to the Fair and Impartial Policing Course as a way to ensure topics covered in the Procedural Justice training continue in the training curriculum for officers. The training will be a four-hour course in the 2023 training schedule and will cover implicit bias, impacts of implicit bias, and strategies to mitigate implicit bias in policing. The IMT commends CPD for its efforts to institutionalize the topics of this paragraph into trainings beyond the PJ trainings required from this paragraph. CPD demonstrated these efforts in the 2023 Training Plan provided to the IMT for review.

Full compliance for this paragraph will require that the CPD provide data to indicate that CPD officers are engaging in procedurally just behaviors in the field. Further, Full compliance will also be contingent on the extent to which CPD incorporates the feedback and evaluation of this training into its annual training plans. The outcome data gathered from the field should be used to measure successes and inform future training. Thus, we encourage CPD to use its new contact survey to measure these outcomes and consider how best to measure operational compliance with this paragraph.

---

[11] ADL no longer has proprietary ownership over the original Procedural Justice III course, so they needed to develop a new course. The Inclusive Policing class is also called Procedural Justice III Training 2021–2022.

Moving forward, we will assess the CPD's efforts to use the foundation established with this Procedural Justice course and requirements of this paragraph as it works to comply with ¶¶72 and 74.

### Paragraph 73 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Impartial Policing: ¶74

*74. Consistent with the requirements set forth in the Training section of this Agreement, CPD will incorporate the concept of impartial policing into its annual in-service training for all officers, including supervisors and command staff, by providing training on the following topics: a. CPD's anti-bias and impartial policing policies, including, but not limited to, the policies referenced in this section unless otherwise required; b. refreshers of topics covered in Procedural Justice; c. appropriate use of social media; d. cultural competency training that prepares officers to interact effectively with people from diverse communities including, but not limited to, people of color, LGBTQI individuals, religious minorities, and immigrants; e. recognizing when a person has a physical, intellectual, developmental or mental disability, including protocols for providing timely and meaningful access to police services for individuals with disabilities; and f. the specific history and racial challenges in the City of Chicago.*

## Compliance Progress       (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**    *In Compliance (SIXTH REPORTING PERIOD)*
**Secondary:**     *Not in Compliance*
**Full:**         *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with this paragraph because the CPD codified the paragraph's requirements into policy in the sixth reporting period. The CPD has not met Secondary compliance because it has not drafted in-service training that adequately incorporates Impartial Policing.

To assess Preliminary compliance, we reviewed the CPD's efforts to comply with this paragraph, noting that we will use the ADDIE model (Analysis, Design, Development, Implementation, and Evaluation) to assess the CPD's training programs. Secondary compliance is assessed based on the Development, Implementation, and Evaluation phases of training.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD submitted a draft version of Special Order S11-10-03, *In-Service Training*, reflecting its efforts to codify ¶74's requirements. However, previous versions of this directive did not describe the topics that the annual in-service impartial policing training will cover and S11-10 was still under ¶¶626–41. In the sixth reporting period, the IMT reviewed a revised S11-10-03 and provided a no-objection notice on February 15, 2022, on this directive. This

updated directive addresses the requirements of this paragraph and satisfied Preliminary compliance requirements for this paragraph.

In addition, the City and the CPD provided a training titled *Constitutional Policing 2022* for review under this paragraph. On June 18, 2022, the IMT provided comments on this training specific to this paragraph. Overall, the training reflects many of the requirements of this paragraph and recommendations the IMT has made on previous trainings about pedagogy and delivery such as class exercises, knowledge checks, scenarios, and discussions on external and internal procedural justice. However, the IMT recommended revisions to this training to fully reflect the requirements of this paragraph. For example, the IMT recommended the CPD include not only examples of proper pat downs but also illustrative examples of improper pat downs. The IMT also found the evaluations and assessments for this course to not be sufficient or comprehensive for this training, particularly with communication during law enforcement actions.

*Progress in the Seventh Reporting Period*

As mentioned in ¶72, throughout the reporting period, the City and the CPD submitted revised training materials including the Constitutional Policing In-Service Course materials, BIA eLearning, Recruit Use of Force Training, Fair and Impartial Policing Training, and Use of Force Policy Updates Training in relation to ¶74. Related to the Impartial Policing paragraphs of the Consent Decree, the IMT provided or expects to provide additional comments on the materials provided. During this reporting period, the City and the CPD also submitted training records for the community policing in-service training in support of Secondary compliance. The IMT will assess the final materials, and related training records for these materials for Secondary compliance in a future reporting period.

During the October site visit, the IMT had an extended conversation about these topics with the Training Division. The Training Division noted some of the challenges of developing and implementing a training schedule include speed of officer completion, efficiency, and effectiveness of the training. They noted that they are making an effort to prioritize some of the topics, including those required by this paragraph, for in-person trainings given the importance of the topics discussed and the fact that some of the concepts taught are more effectively taught in person. Prioritizing in such a manner means that it will take time to establish the necessary officer completion rates. The IMT appreciates CPD prioritizing impartial policing topics in their in-person training schedule and looks forward to reviewing future productions to achieve further compliance with this paragraph.

As noted in previous reports, the IMT will continue to monitor whether the CPD has a sufficient number of trainers with specific educational backgrounds, skills, and understanding of procedural justice, impartial policing, and de-escalation

strategies and tactics. Also, the IMT will examine whether the CPD has employed a sufficient number of qualified analysts to ensure that the in-service and other training programs can be properly evaluated. Evaluations of the effectiveness of these trainings are necessary for CPD to demonstrate Full compliance.

Further, as noted in paragraph 72, although the CPD provided its *2023 Training Plan* to the IMT for review and noted within the in-service courses it will deliver in 2023 that incorporate impartial policing, a broader strategy and plan is also necessary for the department to achieve Full compliance.

### Paragraph 74 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 − DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Impartial Policing: ¶75

> **75.** *OEMC currently provides diversity awareness training to all new telecommunicators which, among other things, addresses the existence of and methods for minimizing the impact of implicit bias. OEMC will continue to provide training on this topic to all new tele-communicators and, beginning in 2020, will provide all tele-communicators with refresher training every two years on this topic that is adequate in quantity, quality, type, and scope.*

## Compliance Progress                    (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    Every Two Years         ☑  **Not Yet Applicable**

**Preliminary:**    *Under Assessment*
**Secondary:**     *Not Yet Assessed*
**Full:**              *Not Yet Assessed*

On December 27, 2022, the City provided an updated version of the OEMC Diversity Awareness Training. In the preliminary review conducted by the IMT, we note that not all documents related to the training were submitted as part of the production, however, of those materials that were submitted, the IMT noted that previous recommendations and feedback had been addressed. The IMT encourages the City and the OEMC to submit all documentation related to this training for final review and to verify that all revisions in response to our comments were addressed. For example, a revised Standard Operating Procedure was not submitted as part of the December 27, 2022 production.

To assess Preliminary compliance, the IMT will assess whether the OEMC had a finalized the development of its training on the topics specified in this paragraph. To assess Secondary compliance, the IMT will assess the implementation and evaluation of the Diversity Awareness Training.

*Progress before the Seventh Reporting Period*

In previous reporting periods, we assessed the OEMC's efforts to codify this paragraph's requirements into training. We reviewed multiple versions of the Diversity Awareness Training and noted OEMC's collaboration with the Mayor's Office of Equity and Racial Justice on the development of the training with suggestions for revisions on each of those iterations.

*Progress in the Seventh Reporting Period*

On July 6, 2022, the OEMC informally provided a further revised training, which was later formally produced on July 14, 2022. This production included training slide decks, lesson plans, and evaluation forms. On July 14, 2022, the City and the OEMC also provided a revised standard operating procedure for review. On September 8, 2022, the OEMC, IMT, and the OAG discussed these materials in a virtual meeting. In a review of the production and documentation provided the IMT notes that additional revisions to this training were necessary to provide more instructional time to discuss tools that OEMC employees can use to minimize the effects of implicit bias in practice, including additional practical applications and scenarios. The IMT also encouraged the City and OEMC to further distinguish the training delivered to new and current public-safety communication officials.

During the October 2022 site visit, the IMT discussed outstanding comments on the training materials including how to best integrate topical themes across the training, trainer notes, and trainer lesson plan. On December 27, 2022, the City and OEMC produced some of the revised training materials addressing these final outstanding comments. In a preliminary review conducted by the IMT of those materials submitted, it appears to meet the requirements of this paragraph. However, not all materials were submitted, such as the revised training slide presentation and updated Standard Operation Procedures.

In order for the City and the OEMC to meet Preliminary compliance the Diversity Awareness Training must be finalized and thus codify this paragraph's requirements. Moving forward, we will also assess the OEMC's efforts to ensure all telecommunicators receive the Training and refresher training and evaluate these training efforts.

### Paragraph 75 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Under Assessment | | |

# Impartial Policing: ¶76

**76.** *By January 1, 2020, CPD will review and, to the extent neces-sary, revise its policies and procedures to ensure that allegations and complaints of hate crimes, as defined by federal, state, and local law, are comprehensively investigated.*

**Compliance Progress**     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and CPD maintained Preliminary compliance with this paragraph and achieved Secondary compliance in this reporting period. The training related to this paragraph, *Hate Crimes* eLearning was conducted starting October 2022 and as of the end of the reporting period, the training has been completed by at least 95% of officers for Secondary compliance.

To assess Secondary compliance, the IMT assessed whether CPD had developed, implemented, and evaluated a training on this paragraph. The IMT also assessed training completion by at least 95% of officers for Secondary compliance. To assess Full compliance, the IMT will review whether the CPD has sufficiently imple-mented its policy and training and assess the CPD's efforts to evaluate the effec-tiveness of their compliance with these requirements.

*Progress before the Seventh Reporting Period*

During the previous reporting periods, CPD developed a supplemental standard operating procedure that responded to both community and IMT concerns about hate crime investigations.[12] The CPD developed a standard operating procedure to clarifying the role of supervisors to ensure a complete and timely investigation of the crime, while being sensitive to the needs of the crime victim. This standard operating procedure is helpful, but we did not see any evidence in this standard operating procedure or the hate crime policy indicating that CPD will seek to edu-cate the community about what constitutes a hate crime and how to report it.

In the previous reporting period, the City and the CPD produced a revised *Hate Crimes Refresher* eLearning training materials for review for Secondary compliance under this paragraph. While this draft of materials addressed some of the require-ments of this paragraph, the IMT remains concerned regarding community en-gagement for these materials, including how the CPD used the community input

---

[12]   This standard operating procedure is titled *Hate Crimes – Responses, Reporting, Investigating and Outreach.*

to revise the materials they provided. In addition, the CPD has also yet to adequately address what specialized training and content the Civil Rights Unit or Area Detective investigators will receive on this important issue given their roles in this area.

*Progress in the Seventh Reporting Period*

During this reporting period, the City and the CPD provided an updated *Hate Crimes* eLearning training for IMT review. This revised version addressed the IMT's outstanding comments from previous iterations and the IMT provided a no-objection notice for the training on September 15, 2022. In addition, at the end of the reporting period, the City and the CPD produced training completion logs for the Hate Crimes eLearning with 10,804 officers or 96.5% of CPD completing the training. This meets the IMT's threshold for Secondary compliance training completion.

Looking forward, for Full compliance, we will assess the CPD's efforts to evaluate the effectiveness of their compliance with the requirements of this paragraph.

### Paragraph 76 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Impartial Policing: ¶77

**77.** *CPD will ensure that all officers receive in-service training every two years on methods, strategies, and techniques for recognizing and responding to hate crimes, including CPD's procedures for processing reports and complaints.*

### Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | | | |
|---|---|---|---|
| **Deadline:** | December 31, 2022 | ✓ | **Met** |
| **Recurring Schedule:** | Every Two Years | ✓ | **Not Yet Applicable** |

**Preliminary:**      *In Compliance* (SIXTH REPORTING PERIOD)
**Secondary:**      *In Compliance* (NEW)
**Full:**      *Not Yet Assessed*

During this reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with the requirements of ¶77. We assessed whether the CPD has sufficiently implemented its policy and training. At the end of the seventh reporting period, CPD provided documentation to show that 95% of its officers have completed the Hate Crimes eLearning training. As such, the City and the CPD have met Secondary compliance. To assess Full compliance, the IMT will assess CPD's efforts to evaluate the effectiveness of this training and compliance with this paragraph.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD submitted a draft Special Order S11-10, *Department Training*, which provides that officers will receive in-service training every two years on topics regarding hate crimes. We noted that S11-10 does not provide the same level of specificity required by this paragraph and recommended that the CPD reconcile that inconsistency.

In the sixth reporting period, the IMT provided no-objection notices to both S11-10 *Department Training* and S11-10-03, *In Service Training.* As a result of finalizing these directives, including completing community input and public comment on these policies in the fifth reporting period, the City and the CPD achieved Preliminary compliance with the requirements of this paragraph.

*Progress in the Seventh Reporting Period*

As noted in the ¶76, the City and the CPD provided an updated *Hate Crimes* eLearning training for IMT review in the seventh reporting period. This revised version addressed the IMT's outstanding comments from previous iterations and the

IMT provided a no-objection notice for the training on September 15, 2022. In addition, at the end of the reporting period, the City and the CPD produced training completion logs for the Hate Crimes eLearning with 10,804 officers or 96.5% of CPD completing the training. This meets the IMT's threshold for Secondary compliance training completion.

The City and the CPD reached Preliminary compliance for ¶77 through codifying the policy into training as part of its *Hate Crime* eLearning. For Full compliance, we will assess the CPD's efforts to evaluate the effectiveness of their compliance with the requirements of this paragraph and in assessing the impact of training on the CPD organization and its field operations.

### Paragraph 77 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Impartial Policing: ¶78

**78.** *Within 180 days following the expiration of each calendar year of the term of this Agreement, CPD will publish an annual report summarizing reported hate crimes and non-criminal incidents motivated by hate during the previous calendar year ("CPD Hate Crime Report"). The CPD Hate Crime Report will provide information regarding the total number of reported hate crimes and non-criminal incidents motivated by hate, organized by type of crime, classification of bias motivation, and disposition of hate crime investigations in each district.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**   Annual                           ☑ **Met**      ☐ **Missed**

**Preliminary:**   *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**    *In Compliance* (NEW)
**Full:**         *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance. During this reporting period, the City and the CPD submitted, and published its *2021 Annual Hate Crimes Report* as required by the Consent Decree.[13]

For Full compliance, the IMT will assess the City and the CPD's continual submission and publication of the annual report as well as whether the reports addressed this paragraph's requirements, the quality of data that the CPD used to develop the report, and the department's efforts to outreach and engage in meaningful dialogue with the community and stakeholders about these reports and data.

*Progress before the Seventh Reporting Period*

In previous reporting periods, we received the *Hate Crime in Chicago: 2019 Annual Report* and *Hate Crime in Chicago: 2020 Annual Report*. Neither of these reports included important disposition data as required by ¶78 and as requested by the IMT. The 2019 and 2020 reports did not include important information regarding the disposition of hate-crime investigations. The only disposition data included in the 2019 and 2020 Reports was whether the hate crime incident was "Bona Fide," "Undetermined," or "Unfounded." However, the IMT and the public expected ad-

---

[13]   *See Chicago Police Department Hate Crimes – 2021 Review* , CHICAGO POLICE DEPARTMENT (August 29, 2022), https://home.chicagopolice.org/wp-content/uploads/Hate-Crimes-Annual-Report-2021-English-1.pdf.

ditional disposition data, such as whether the CPD conducted a follow-up investigation; whether a suspect was identified, arrested, charged with a hate crime and convicted; and whether the investigation remains open. Also, we continued to encourage the CPD to break down these dispositions by the protected classes to ensure the public that CPD's decisions and actions do not reflect any bias.

In the fifth reporting period, the City and the CPD finalized G04-06, *Hate Crimes and Related Incidents Motivated by Bias or Hate*, which included annual reporting requirements of this paragraph. As a result, the City and the CPD achieved Preliminary compliance with this paragraph in the last reporting period. In the sixth reporting period, the CPD did not submit a 2021 annual hate-crimes report to review but did provide the outline for the 2021 report. The IMT subsequently provided comments to the City and the CPD, which included expanding sections of the report that note the efforts that CPD has taken to address hate crimes and educate the community about reporting and the resources available to victims.

*Progress in the Seventh Reporting Period*

In August of 2022, the City and the CPD conducted a meeting with the IMT to review a draft of the *2021 Annual Hate Crimes Report*. During this meeting the IMT noted that the revisions that the City and the CPD had made to the report and outline were sufficiently addressed the comments we provided in April 2022 to the report outline.

The CPD published the *2021 Hate Crimes Annual Report* on August 29, 2022.[14]

As noted in previous reports, we encourage the CPD to engage community members and organizations with relevant knowledge who can provide feedback regarding the hate-crimes data-collection efforts and the information included in the annual report and dashboard. Such outreach efforts will also be used to determine the City and the CPD's achievement with Full compliance. Further, the City and the CPD must ensure that future annual reports are published within the 180 days *of the calendar year* as required by this paragraph.[15] For example, the *2022 Hate Crimes Annual Report* should be published by June 30, 2023.

---

[14] *See Chicago Police Department Hate Crimes – 2021 Review* , CHICAGO POLICE DEPARTMENT (August 29, 2022), https://home.chicagopolice.org/wp-content/uploads/Hate-Crimes-Annual-Report-2021-English-1.pdf.

[15] *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance,"* (March 25, 2022). This reflects the agreed modifications to the Consent Decree in response to the impact of COVID-19. As detailed most recently in our Monitoring Plan for Year Three, the Parties agreed to extend deadlines after March 27, 2020, by 64 days. As we have discussed with the Parties, a rigid 64-day extension may not uniformly or sensibly apply to all deadlines, such as quarterly or annual deadlines. We have included

## Paragraph 78 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

---

extension dates based on the discussions with the Parties that take into consideration the lo-gistical needs of the City (such as recurring training or reporting schedules) and efficiency with each corresponding Consent Decree requirement.

## Impartial Policing: ¶¶79–82

**79.** By April 1, 2020, and every year thereafter, CPD will conduct an assessment of the relative frequency of all misdemeanor arrests and administrative notices of violation ("ANOVs") effectuated by CPD members of persons in specific demographic categories, including race and gender.

**80.** Prior to conducting this assessment, CPD will share its proposed methodology, including any proposed factors to be considered as part of the assessment, with the Monitor for review and approval. The Monitor will approve CPD's proposed methodology provided that the Monitor determines that CPD's methodology comports with published, peer-reviewed methodologies and this Agreement. Upon completion of the assessment, CPD will identify any modifications to CPD's practices to address the findings in the assessment and develop a timeline for implementation, subject to Monitor review and approval. Upon completion of the assessment, CPD will publish the underlying data, excluding personal identifying information (e.g., name, address, contact information), via a publicly accessible, web-based data platform.

**81.** If at any point, the City's obligations under the August 6, 2015 Investigatory Stop and Protective Pat Down Settlement Agreement ("ACLU Agreement") terminate, CPD will include all stops effectuated by CPD members that were subject to the ACLU Agreement in the assessment required by this Part.

**82.** Nothing in this Part will be interpreted to require CPD to analyze statistical data beyond that currently collected and maintained in electronic databases unless otherwise required under this Agreement. In instances in which race or gender data is not maintained in an electronic database, CPD may use geographic data in its assessment. For purposes of this paragraph, information contained solely in a scanned PDF document or other image of a document, and not otherwise collected and maintained in an electronic database, is not considered data maintained in an electronic database.

**Compliance Progress**     (Reporting Period: July 1, 2022, through December 31, 2022)

| Recurring Schedule: | Annual | ☐ **Met** | ☑ **Missed** |
|---|---|---|---|

| | ¶¶79/82 | ¶¶80/82 |
|---|---|---|
| **Preliminary:** | *Not in Compliance* | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* | *Not Yet Assessed* |

The City and the CPD have not yet achieved Preliminary compliance for ¶¶79 or 80 because no revisions to the proposed methodology, as required by this paragraph were provided and no report was prepared.[16]

To assess Preliminary compliance, the IMT assesses the methodology CPD will use to comply with requirements of ¶¶79 and 80 for administrative notices of violation (ANOVs) and misdemeanor arrests.

*Progress before the Seventh Reporting Period*

In previous reporting periods, we monitored the CPD's efforts to assess misdemeanor arrest and ANOVs, focusing mostly on the CPD's proposed methodologies. We did not approve the CPD's preliminary methodology, as required by ¶80.

During the last reporting period, we continued to inquire about the CPD's efforts to revise the methodology based on our earlier feedback. On June 16, 2022, the CPD and the City provided a memo on the circumstances surrounding the lack of progress regarding the requirements of this paragraph—specifically, the developed but not produced draft ANOVs report as required by this paragraph. The memo noted a lack of reliable data and lack of change in the results over the five-year period examined.

While the IMT appreciates the production of a memo on the circumstances of this report, the IMT remains concerned that there has still been no update or planned timeline for progress on these paragraphs. The provided memo did not materially relate to the lack of an IMT-approved methodology for this paragraph, nor the lack of progress on these paragraphs. For the IMT to consider compliance with this paragraph, the City and the CPD must provide a proposed methodology for the ANOVs report, as a starting point. Given the length of time since the IMT reviewed but never approved these methodologies, the IMT recommends a renewed discussion

---

[16] Paragraph 81 does not require a compliance assessment at this time since the ACLU Agreement remains in effect. If, however, the ACLU Agreement is terminated, ¶81 will be activated and IMT will expect the same data and apply the same standards. Independent of ¶81, the IMT reserves the right to request investigatory stops data to assess outcomes specified in the Consent Decree regarding impartial policing and other reforms.

during regular check-ins with the City and the CPD on the requirements of this paragraph.

As the IMT has emphasized repeatedly, this annual report is important as it provides transparency regarding low-level enforcement practices, where officers have the most discretion, and will shed light on disparities by race, age, and gender.[17] ANOVs and misdemeanor arrests raise critical issues about constitutionally guaranteed freedoms. Americans have a Fourth Amendment right not to be stopped, questioned, and searched without sufficient justification. Within the context of impartial policing, these enforcement actions can lead to unequal treatment. Accurate data and careful documentation are essential to monitor disparities and identify patterns.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the City and the CPD did not produce any materials related to these paragraphs. However, during the site visit, the IMT did discuss the lack of progress on these paragraphs with the CPD. During the discussion with the Audit Division, the CPD indicated that they were not expecting to undertake related audits required under this paragraph in 2023 and that staffing availability was the primary challenge related to lack of progress on these paragraphs. The IMT continues to urge the CPD to fully staff the organization to meet the requirements of the Consent Decree.

\*\*\*

In sum, the City and the CPD did not achieve Preliminary compliance with these paragraphs because the CPD did not provide a revised proposed methodology for us to review, nor has the CPD developed a plan to address the remaining concerns, including a plan and timeline to eventually automate the collection and electronic storage of ANOVs demographic data (*e.g.*, race, age, and gender). Moving forward, we will monitor the CPD's efforts to revise its methodology for approval. After we approve the methodology, we will assess the CPD's efforts to conduct the ¶79 assessment and publish the findings.

---

[17] When officers have limited discretion (*e.g.*, deciding whether to stop someone who runs a red light at 80 miles per hour or arrest someone they observe shooting another person), policing bias is much less likely to appear. But for lower-level violations of the law, where officers can decide whether or not to take enforcement action, race and other characteristics are more likely to play a role.

## Paragraph 79–82 Compliance Progress History[18]

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| None |

---

[18] As above, ¶81 does not require a compliance assessment at this time since the ACLU Agreement remains in effect. If, however, the ACLU Agreement is terminated, ¶81 will be activated and IMT will expect the same data and apply the same standards. Independent of ¶81, the IMT reserves the right to request investigatory stops data to assess outcomes specified in the Consent Decree regarding impartial policing and other reforms.

# Appendix 3

# Crisis Intervention
# Compliance Assessments by Paragraph

| | | | |
|---|---|---|---|
| ¶87 | ¶104 | ¶121 | ¶138 |
| ¶88 | ¶105 | ¶122 | ¶139 |
| ¶89 | ¶106 | ¶123 | ¶140 |
| ¶90 | ¶107 | ¶124 | ¶141 |
| ¶91 | ¶108 | ¶125 | ¶142 |
| ¶92 | ¶109 | ¶126 | ¶143 |
| ¶93 | ¶110 | ¶127 | ¶144 |
| ¶94 | ¶111 | ¶128 | ¶145 |
| ¶95 | ¶112 | ¶129 | ¶146 |
| ¶96 | ¶113 | ¶130 | ¶147 |
| ¶97 | ¶114 | ¶131 | ¶148 |
| ¶98 | ¶115 | ¶132 | ¶149 |
| ¶99 | ¶116 | ¶133 | ¶150 |
| ¶100 | ¶117 | ¶134 | ¶151 |
| ¶101 | ¶118 | ¶135 | ¶152 |
| ¶102 | ¶119 | ¶136 | |
| ¶103 | ¶120 | ¶137 | |

# Crisis Intervention: ¶87

*87. The Crisis Intervention Team ("CIT") Program will continue to be responsible for CPD's crisis intervention response functions, including, but not limited to: a. developing CIT strategy and initiatives; b. supporting officers in the districts who respond to incidents involving individuals in crisis; c. engaging the community and community stakeholders to raise awareness of the CIT Program and issues involving individuals in crisis; d. coordinating among City agencies that respond to individuals in crisis; e. recruiting officers to apply for CIT training; f. developing and delivering CPD's Basic CIT Training and other CIT training, including Advanced CIT (e.g., youth, veterans) and refresher trainings, in accordance with the requirements of the Training section of this Agreement; g. delivering roll call trainings and mental health awareness initiatives; h. compiling and retaining the reports identified in Part F of this section and collecting and maintaining the appropriate CPD data related to incidents involving individuals in crisis to support and evaluate the effectiveness of the CIT Program and CPD's response to incidents identified as involving individuals in crisis, including identifying any district-level and department wide trends; i. coordinating data and information sharing with OEMC; and j. communicating with and soliciting feedback from crisis intervention-related community stakeholders, Certified CIT Officers, and OEMC call-takers and dispatchers regarding the effectiveness of CPD's CIT Program.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**   *In Compliance (SIXTH REPORTING PERIOD)*
**Secondary:**   *Not in Compliance*
**Full:**   *Not in Compliance*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶87.

To achieve Preliminary compliance with ¶87, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized,

and use clearly defined terms." The CPD achieved preliminary compliance by incorporating ¶87's requirements into S05-14, *Crisis Intervention Team (CIT) Program*.

*Progress before the Seventh Reporting Period*

During the third reporting period, the IMT submitted to the CPD recommended revisions to the CPD's standard-operating procedures (SOPs) several of which were not adequately revised. At the end of the fourth reporting period, several standard-operating procedures designed to memorialize the specific requirements of ¶87 were not finalized and published for community input.

In the fifth reporting period, the CPD made significant revisions to these policies to distinguish between department-wide directives and standard-operating procedures that are relevant only to the Crisis Intervention Unit. As part of this redesign, the CPD substantially expanded the S05-14, *Crisis Intervention Team (CIT) Program,* which the City and the CPD originally submitted on July 28, 2021. Specifically, the CPD expanded S05-14 to include elements that were previously included in SOPs.

During the sixth reporting period, the CPD produced and received a no objection on a fully-revised S05-14. The CPD adequately addressed each of the requirements of ¶87 within the policy and adhered to the review process with the Chicago Council on Mental Health Equity (*see* ¶¶135 and 137). Moreover, the Chicago Council on Mental Health Equity provided substantive feedback, to which the CPD mostly responded. However, moving forward, the CPD must fully explain to the Chicago Council on Mental Health Equity which comments were not included and why, as required by ¶131. The response was that "the Department has noted the recommendation and appreciates the feedback." This is essential for building knowledge and trust. The CPD should consider how public comments and community feedback will both advance its overall community-engagement goals and will build trust among a wide range of advocacy and treatment providers.

While the CPD sought public comment, as required by ¶633, it did so prematurely. At the end of the sixth reporting period, the CPD received substantive public comment on the policy, and has determined it will delay implementation until public comments can be fully assessed. The IMT encouraged the CPD to submit policy S05-14 for further IMT review and no-objection after the public comment period has ended and substantive comments can be assessed. Prematurely requesting a no-objection can cause additional delays in policy implementation.

*Progress in the Seventh Reporting Period*

During the seventh reporting period, the CPD's Crisis Intervention Unit had its staff cut in half, down from a peak of 58 people in March 2021. At its peak, the Crisis Intervention Unit was staffed with a commander, lieutenant, seven sergeants, 38 police officers (with 14 assigned to the training unit and 24 assigned to district operations and support), a data analyst, and a community outreach coordinator. In the seventh reporting period, the Crisis Intervention Unit dropped from seven to four sergeants, from 38 to 24 police officers, from 24 to 14 assigned to District, Operations, and Community Support (CIT DOCS), and from 14 to 8 in the training unit. The Crisis Intervention Unit also lost its civilian community outreach coordinator. The staffing levels were provided to the IMT both at the IMT site visit this reporting period and again on the November, 2022 CPD/IMT/OAG call. There is no evidence that staffing has improved at the end of the reporting period on December 31st, 2022. The IMT has received community concerns regarding the declining staffing as well.

Paragraph 87 requires a fully-staffed Crisis Intervention Unit. Fourteen CIT DOCS members cannot support officers in all of the city's districts, complete follow ups identified by district patrol, monitor city-wide trends, and effectively engage the community (including having lost its community outreach coordinator). Moreover, the training team under the CIU is significantly understaffed, with only ten dedicated people (eight police officers and two sergeants). The training team is down from the 14 members responsible for teaching the CIT Basic, Advanced CIT, and Refresher trainings. Site visit interviews have confirmed the quantity of training is unsustainable with such few dedicated trainers. These classes are provided nearly every week of the year rotating between refresher and Basic CIT, with the addition of the Advanced Youth Training taught in the summer.

\*\*\*

As reflected throughout this section, ¶87 is an overarching paragraph and compliance efforts for this paragraph affect compliance for several other paragraphs in the Crisis Intervention section.

To achieve Secondary compliance, the City and the CPD must provide comprehensive training for Area-level CIT District, Operations, and Community Support personnel, who are responsible for nearly all of ¶87's requirements. To date, efforts have focused on Preliminary compliance, and the City and the CPD have not provided records demonstrating comprehensive training with a consistent approach across the CIT DOCS sergeants, who have remained severely understaffed during the last several reporting periods. Because there are many critical requirements of ¶87, the IMT strongly recommends the CPD develop an implementation plan outlining how each component will be accomplished and measured which should include a staffing analysis.

## Paragraph 87 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Crisis Intervention: ¶88

> **88.** *The CIT Program will serve to meet the objectives of: a. improving CPD's competency and capacity to effectively respond to individuals in crisis; b. de-escalating crises to reduce the need to use force against individuals in crisis; c. improving the safety of officers, individuals in crisis, family members, and community members; d. promoting community-oriented solutions to assist individuals in crisis; e. reducing the need for individuals in crisis to have further involvement with the criminal justice system; and f. developing, evaluating, and improving CPD's crisis intervention-related policies and trainings to better identify and respond to individuals in crisis.*

## Compliance Progress  (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶88. The IMT reviewed the CPD's policy S05-14, *Crisis Intervention Team (CIT) Program* and found that it adequately incorporates the requirements of ¶88, thereby enabling the CPD to achieve Preliminary compliance.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD made significant progress toward compliance with ¶88 by adhering to policy review processes that were designed to memorialize the specific requirements of ¶88.

During the third reporting period, we provided the CPD with recommended revisions to the CPD's SOPs, several of which were not adequately revised. At the end of the fourth reporting period, several SOPs designed to memorialize ¶88's specific requirements were not finalized and published for community input.

In the fifth reporting period, the CPD made significant revisions to these policies to distinguish between the department-wide directives and the SOPs that are relevant only to the Crisis Intervention Unit. As part of this redesign, S05-14 *CIT Program,* which was originally submitted to the IMT on July 28, 2021, was substantially expanded to include policies that were previously included in SOPs.

Further, the text of ¶88 mostly relates to outcome-based metrics, which are tied to successfully implementing other paragraphs in the Crisis Intervention section.

Currently, the data dashboards that the CPD has developed relate to particular paragraph requirements (*e.g.*, ¶108 relates to the CIT response rates). However, the CPD should also focus on developing ways to measure ¶88's concepts. Developing these measures will require the CPD to answer complex research questions, as well as rigorously measure progress related to ¶88. Initial data from the CIT Report will be useful in this development process. In addition, as with ¶87, we reiterate our recommendation that the CPD expand its community input process for crisis response.

During the sixth reporting period, the CPD finalized a fully-revised S05-14, *CIT Program* policy after the IMT's review. The CPD adequately incorporated each of ¶88's requirements into the policy. The CPD also adhered to the review process with the Chicago Council on Mental Health Equity, as required under ¶¶135 and 137. The Chicago Council on Mental Health Equity provided substantive feedback, to which the CPD mostly responded. However, moving forward, the CPD must fully explain to the Chicago Council on Mental Health Equity which comments were not included and why, as required by ¶131. The response was only that "the Department has noted the recommendation and appreciates the feedback." The CPD also sought public comment as required by ¶633, but it did so prematurely. As a result, the CPD determined that it would delay implementing S05-14 until it could fully assess the public comments received. The IMT also encouraged the CPD to submit policies for IMT review and no-objection after the public comment period has ended and substantive comments can be assessed. Prematurely requesting a no-objection may cause additional delays in policy implementation.

As the CPD moves toward Secondary compliance with ¶88, the IMT will assess whether the City is collecting, tracking, and maintaining data, as required under this paragraph. Further, the CPD must develop metrics that, when tracked, adequately demonstrate the CPD's compliance with the requirements of ¶88. For the IMT to assess Full compliance, the CPD must identify which factors will contribute to achieving compliance and how those factors, and the CPD's progress toward compliance, will be measured. The IMT is seeking outcome-based metrics. These metrics will establish a floor by which the CPD's progress toward operational compliance can be assessed.

*Progress in the Seventh Reporting Period*

As indicated in ¶87's assessment, the Crisis Intervention Unit has been cut in half, down from 58 to 27 dedicated members. Paragraph 88 requires the CPD to maintain an adequate number of dedicated staff who can measure the CPD's progress towards ¶88's requirements, including effective response to people in crisis, evidence of de-escalating crisis calls for service, reduction in the CPD's use of force, and evaluation of data on the CPD's diversion efforts. Data relating to the CIT report and calls for service contain significant information necessary to measure

these outcomes. Without robust staffing, the CPD is unable to establish a strategy to measure data, let alone execute that strategy. For example, in a two-month period (August–October 2022), the Crisis Intervention Unit received over 2,000 CIT reports from patrol. Of those 2,000 CIT reports, 289 reports contained requests for follow-up services by the CIT DOCS area teams. Due to staffing constraints, only 74 of those 289 follow-up requests were completed.

The IMT expects the number of CIT reports and requests for follow-up will rise as officers continue to receive training on the Crisis Intervention Unit per ¶¶ 118 and 127, as well as training on completing the required CIT reports.

The City and the CPD will achieve Secondary compliance when they demonstrate an implementation strategy supporting ¶88's requirements and when staffing is appropriately allocated to carry out that strategy.

### Paragraph 88 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶89

*89. The CIT Program, through the CIT Coordinator, will annually review and, if necessary, revise its policies and practices to ensure the program's compliance with the objectives and functions of the CIT Program.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    Annually         ☑ **Met**    ☐ **Missed**

**Preliminary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Full:**    *Not Yet Assessed*

During the seventh monitoring period, the CPD maintained Preliminary and Secondary compliance with ¶89.

To achieve Preliminary compliance with ¶89, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms." The CPD achieved preliminary compliance by incorporating ¶89's requirements into S05-14, *Crisis Intervention Team (CIT) Program*.

To assess Secondary compliance with ¶89, the IMT evaluated whether the CPD has qualified personnel fulfilling the responsibilities that are needed to achieve ¶89's requirements and the Consent Decree's goals. Staffing has significantly declined since secondary compliance was achieved in the third reporting period, and secondary compliance will be reassessed should this not change in the next reporting period.

*Progress before the Seventh Reporting Period*

In the third reporting period, the IMT reviewed the CPD's S05-14 and determined that it satisfied ¶89's requirements. This policy also detailed the manner and scope of review expected for a comprehensive assessment on an annual basis, which provides a training mechanism for reviewers.

While ¶ 89 requires the CIT Program, through the CIT Coordinator, to annually review and, if necessary, revise its policies and practices to ensure the program's compliance with the objectives and functions of the CIT Program, ¶¶130, 135–37 and require the Chicago Council on Mental Health Equity to review and provide

feedback all CIT-related policies, procedures, forms and practices. Consequently, these paragraphs are all closely tied together for assessment purposes, since one cannot happen without the other. During the fifth reporting period, issues arose when the Chicago Council on Mental Health Equity had difficulty achieving a quorum. This lack of quorum in the fifth reporting period delayed a vote on two policies, both of which required a vote. These two policies were not approved until April 25, 2022 — during the sixth reporting period — when a quorum was eventually reached.

During the sixth reporting period, after members of the Chicago Council on Mental Health Equity expressed concerns about their expertise being under-utilized, its co-chairs presented a proposal at the quarterly meeting on April 25, 2022. The proposal sought to distinguish the Chicago Council on Mental Health Equity into two sub-groups: those members (1) interested in the Consent Decree, and (2) interested in crisis-system collaboration. The Chicago Council on Mental Health Equity co-chairs should be commended for this proposal, which appeared to solicit a healthy discussion and to activate members' engagement. However, action toward implementing a new structure has yet to take place. The IMT looks forward to the Chicago Council on Mental Health Equity further developing these changes in an effort to yield greater involvement and purpose.

The Chicago Council on Mental Health Equity has provided substantial feedback on policy review. While the CPD has improved with informing the Chicago Council on Mental Health Equity which comments were and were not incorporated, the CPD fell short in the sixth reporting period of articulating to the Chicago Council on Mental Health Equity why specific comments were *not* incorporated. This is essential for building knowledge and trust. The CPD should consider how public comments and community feedback will both advance its overall community-engagement goals and build trust among a wide range of advocacy and treatment providers.

In future monitoring periods, the IMT will determine whether the reviews (and potential revisions) by both the CIU through the CPD coordinator and the Chicago Council on Mental Health Equity occurred in a manner consistent with the process identified in the Consent Decree, including review of data informing revisions and a response by the CPD to each suggested revision voted on by the Chicago Council on Mental Health Equity. Should the CPD review both SOPs and directives in accordance with Consent Decree requirements, we would find the CPD to have substantially complied with the requirements of this paragraph so long as a more-robust public comment period and response also occurs. The Crisis Intervention Unit (CIU) remains highly understaffed, which affects the ability of the Unit, and the CIT Coordinator to comply with the requirements of ¶89.

In the sixth reporting period, the CPD also sought public comment on S05-14, as required by ¶633, however it did so prematurely. The CPD received substantive public comment on the policy and decided it would delay implementation until public comments could be fully assessed.

The IMT has generally encouraged the CPD to submit policy for IMT review and no-objection after the public comment period has ended, when substantive comments can be assessed. Prematurely requesting a no-objection can cause additional delays in policy implementation.

*Progress in the Seventh Reporting Period*

The CPD submitted the following policies under the annual review requirements of ¶89.

- S04-20, *Recognizing and Responding to Individuals in Crisis*;
- S04-20-02, *Persons Not Under Arrest But in Need of Involuntary or Voluntary Admission*;
- S04-20-05, *Persons Under Arrest in Need of Mental Health Treatment*;
- S06-08, *Approved Medical Facilities*;
- CPD-15.520, *Crisis Intervention Report*;
- CPD-15.521, *Mental Health Incident Notice*.

The IMT reviewed these policies which are well done. However, the IMT recommends that the CPD rely less on police transport for individuals requiring mental-health treatment. Under S04-20-02, *Persons Not Under Arrest But in Need of Involuntary or Voluntary Admission*, officers are allowed to request an ambulance "if the individual [in crisis] is sick or injured." The IMT recommends that the CPD emphasize that non-police transport may be preferable for voluntarily-compliant individuals in the midst of a mental-health crisis.

Illinois' recent Community Emergency Services and Supports Act supports the CPD's use of emergency medical services in this context and we encourage the CPD leadership to begin conversations with the Chicago Fire Department regarding opportunities to support such a system. *See* 50 ILCS 754/. See ¶¶88, 131

Additionally, the CPD should be commended for the revisions made to the Mental Health Incident Notice, which is provided to community members that requested law enforcement response. This document outlines the community-based resources available to them for support services. The CPD revised this document to include more robust services, including it being more easily accessible to community members.

With the inclusion of CIT officers in the City's Pilot CARE program, which includes a CPD Policy guiding the CPD's involvement in the CARE Pilot, the CPD should submit the CARE directive to the IMT and the Chicago Council on Mental Health Equity for formal review in the next round of annual policy revisions.

Finally, the Chicago Council on Mental Health Equity co-chairs presented a proposal at the quarterly meeting on April 25, 2022, seeking to distinguish the Chicago Council on Mental Health Equity into two sub-groups: those members (1) interested in the Consent Decree, and (2) interested in crisis-system collaboration. However, an entire reporting period has passed with no progress on this proposal. The IMT encourages the City to move forward with formalizing the new structure of the Chicago Council on Mental Health Equity, as this body continues to request clarification on its purpose, which includes review of policies found in ¶89.

To maintain Secondary compliance with ¶89, the CPD must address staffing reductions to the CIU. To achieve Full compliance with ¶89, the CPD must demonstrate that the annual review process thoughtfully considers public and community comment. This annual review process should include a feedback loop developed to clearly distinguish which comments the CPD is incorporating into policy and which it is not. The CPD should consider sharing relevant data with the community and key stakeholders. This data sharing would improve transparency and encourage feedback, while also demonstrating whether the policies are achieving their intended operational purpose. As appropriate, the CPD must consider where it requires new or revised policies to guide responses and address operational deficiencies, changes in programs, or the launch of new programs (e.g., the City's Crisis Assistance Response Engagement (CARE) pilot program, which includes CPD officers). The intended function of the Crisis Intervention Program includes diversion, deflection, and alternative responses to police interaction with persons in crisis. Consequently, the City and the CPD must determine which programs will provide documentation of compliance with these intended functions.

### Paragraph 89 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 − DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Crisis Intervention: ¶90

**90.** *The City and CPD will ensure that the CIT Program is provided with: a. the resources and access to data and information necessary to fulfill the objectives and functions of the CIT Program; and b. a qualified, centralized staff, including supervisors, officers, and civilian employees, that is necessary to oversee the department-wide operation of the CIT Program, carry out the overall mission of the CIT Program, and perform the objectives and functions of the CIT Program.*

**Compliance Progress** (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* (NEW: LOST COMPLIANCE) |
| **Full:** | *Not in Compliance* |

During the seventh monitoring period, the City and the CPD maintained Preliminary compliance with ¶90 but did not maintain Secondary compliance.

To maintain Preliminary compliance with ¶90, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶90 by confirming records sufficient to show that the City and the CPD are responding to the identified needs and objectives of the CIT program and through interviews with relevant CPD personnel, such as District Commanders, the CIT Coordinator, CIT DOCS sergeants, and CIT Patrol officers.

*Progress before the Seventh Reporting Period*

Paragraph 90's requirements were adequately addressed in the previous version of the CPD's S05-14, *Crisis Intervention Team (CIT) Program,* for which the CPD achieved preliminary compliance. However, the CPD made substantial revisions to S05-14 in the fourth reporting period, and the revised S05-14 neglected critical requirements of ¶90, including "a. the resources and access to data and information necessary to fulfill the objectives and functions of the CIT Program; and b. a qualified, centralized staff, including supervisors, officers, and civilian employees." The CPD further revised S05-14 in the fifth reporting period by identifying

"dedicated district level resources," but the CPD failed to include "centralized" staff.

As noted elsewhere in this report (*e.g.,* ¶91), the CPD's SOPs related to CIT district-level approaches provide more detail regarding the CPD's specific approaches to how resources, data, and information will be used to support the success of the CIT program. These SOPs were still under the review process in the sixth reporting period.

In the sixth reporting period, the IMT conducted site visits with the CPD that bolstered our ongoing concerns on whether the CPD is assigning the personnel necessary to support the CIT program's mission. CIT District, Operations, and Community Support (CIT DOCS) sergeants and area DOCS personnel are stretched far too thin. Each CIT DOCS sergeant is covering multiple Districts, and the number of CIT DOCS personnel has declined considerably. This is problematic because the role and function of the CIT DOCS sergeants and area personnel is integral to the CIT Program's overall mission. Therefore, the number of positions should be significantly increased. To increase the effectiveness of the CIT DOCS personnel, the CPD should consider providing them with vehicles and other support functions. The roles and responsibilities of the CIT DOCS personnel as outlined in S05-14 cannot be accomplished under the present staffing level.

Further, while the CPD has maintained a data analyst, it is unclear whether the analyst has the "resources and access to data" necessary to effectively analyze the relevant data. The CPD needs data metrics and outputs necessary to determine whether adequate resources have been dedicated to the CIT Program. Without adequate "data and information," the IMT is unable to assess whether staff or additional resources are needed.

Finally, the CPD has determined that all patrol officers will receive the 40-hour CIT curriculum. The IMT remains concerned about the CPD having an appropriate number of CIT-training personnel. The IMT looks forward to receiving an update from the CPD's training division on its staffing resources that will be used to accomplish the CPD's goal of all patrol officers receiving the 40-hour CIT curriculum. To date, site visits have indicated woefully insufficient staffing.

Relatedly, community engagement at the neighborhood level has been, and continues to be, a high priority for Chicagoans. This concern has been mentioned repeatedly by members of the Chicago Council on Mental Health Equity and Coalition. The CPD needs adequate staffing support in order to effectively fulfill the mission of the CIT Program.

*Progress in the Seventh Reporting Period*

The staffing concerns noted above only increased during this reporting period.

The CPD's Crisis Intervention Unit's dedicated staffing was at its peak in March 2021, when it was staffed with 58 people consisting of a commander, lieutenant, seven sergeants, 38 police officers (with 14 assigned to the training unit and 24 assigned to district, operations, and community support), a data analyst, and a community outreach coordinator. In the seventh reporting period, the Crisis Intervention Unit's staffing was cut *in half*, now totaling 27 people. The team has dropped from seven to four sergeants, from 38 to 24 police officers, from 24 to 14 assigned to District, Operations, and Community Support, and from 14 to 8 in the training unit. The team has also lost its civilian community outreach coordinator.

Paragraph 89 requires "*a qualified, centralized staff, including supervisors, officers, and civilian employees, that is necessary to oversee the department-wide operation of the CIT Program, carry out the overall mission of the CIT Program, and perform the objectives and functions of the CIT Program.*"

Fourteen DOCS team members cannot support officers in all of the City's districts to carry out the CIT Program's mission, nor can only ten dedicated people be responsible for teaching the CIT Basic, Advanced, and Refresher trainings. The IMT's site visit interviews confirmed that the quantity of training is unsustainable with such few dedicated trainers. These classes are provided nearly every week of the year rotating between refresher and Basic CIT, with the addition of the Advanced Youth Training taught in the summer.

Additionally, the IMT has requested the last two reporting periods for an updated data dashboard presentation and analysis, which to date has not been scheduled.

The CIT DOCS personnel have confirmed they are unable to do the Crisis Call follow up's they are required to do under policy due to staffing constraints, nor are they adequately able to review CIT Reports, build community partnerships, capture important data supporting the important work they are doing. For example, in a two-month period (August–October 2022), the Crisis Intervention Unit received over 2,000 CIT reports from patrol. Of those 2,000 CIT reports, 289 reports contained requests for follow-up services by the CIT DOCS area teams. Due to staffing constraints, only 74 of those 289 follow-up requests were completed.

Staffing must be addressed, with adequate training for onboarded personnel to support the work of the Crisis Intervention Unit.

The IMT will assess Full compliance with ¶90's requirements by reviewing whether the CPD has adequate staffing and resources to carry out the functions and mission of the CIT Program. The CPD's staffing and resources must also allow it to manage

department-wide operations. To assess Full compliance, the IMT will consider data analysis, site visits, and community feedback. The CPD's decision to train all officers in 40-hours of CIT will require significant resources, and we are concerned about the number of CIT DOCS sergeants, the CIT Training Team, and the CIT Coordinator to fulfill the extensive responsibilities outlined under each of them in S05-14. Finally, the IMT is interested in understanding how the CPD will assess whether its CIT objectives are being met. We hope to see clear data and metrics to that end in future reporting periods.

### Paragraph 90 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| July 1, 2022 – December 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶91

**91.** *Additionally, the City and CPD will ensure that the CIT Program has sufficient, dedicated district-level resources, consistent with the needs of each district identified by the District Commander and the CIT Coordinator, and approved by the Chief of the Bureau of Patrol, as needed to carry out the overall objectives and functions of the CIT Program at the district-level, which include, but are not limited to: a. supporting officers in the district with incidents involving individuals in crisis; b. delivering CIT Program-approved roll call trainings and mental health awareness initiatives; c. establishing relationships between the district and local service providers and healthcare agencies; d. referring and, when appropriate, connecting individuals in crisis with local service providers; e. engaging with the community to raise awareness of the CIT Program and issues involving individuals in crisis; and f. providing administrative support to the coordinator of the CIT Program.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶91.

To assess Preliminary compliance, the IMT reviewed the CPD's S05-14, *Crisis Intervention Team (CIT) Program* policy, which adequately incorporated ¶91's requirements thereby achieving Preliminary compliance.


*Progress before the Seventh Reporting Period*

During the fourth monitoring period, the CPD provided a revised draft version of Special Order SO20-04, *District-Level Strategy for Crisis Intervention Team (CIT) Program*. The requirements of ¶91 were memorialized into this draft version.

In the fifth reporting period, the CPD opted to distinguish between department-wide directives relevant to the entire CPD and SOPs relevant only to the Crisis Intervention Unit. As a part of this redesign, ¶91's requirements were fully included into the revised version of S05-14, which received a no-objection notice during the sixth reporting period.

However, the IMT is concerned with whether the CIT DOCS personnel— who are responsible for many of ¶91's requirements— are adequately staffed. Presently, these positions appear to be significantly understaffed. The current individuals in these roles are dedicated and work hard to fulfill the duties and responsibilities of their role. The IMT appreciates that these sergeants and CIT DOC area personnel have conducted some roll call trainings and are sometimes responding to requests by patrol officers to follow up with high frequency utilizers of police services via the new CIT Report. However, based on the conversations the IMT had during our site visits in the sixth reporting period, the IMT has ongoing concerns regarding adequate personnel resources being allocated to support the mission of the CIT Program. CIT DOCS personnel are stretched far too thin. Each CIT DOCS sergeant is responsible for covering multiple Districts and the number of positions in the unit has declined again this reporting period. We also note that there has also been high turnover in these positions. The number of CIT DOCS personnel must be increased because the role and function of CIT DOCS is integral to the overall mission of the CIT program. In addition, to facilitate their effectiveness, the CPD should consider providing vehicles and other support functions to CIT DOCS personnel.

*Progress in the Seventh Reporting Period*

The IMT's staffing concerns noted above only increased during this reporting period.

The CPD's Crisis Intervention Unit's dedicated staffing was at its peak in March 2021, when it was staffed with 58 people consisting of a commander, lieutenant, seven sergeants, 38 police officers (with 14 assigned to the training unit and 24 assigned to district, operations, and community support), a data analyst, and a community outreach coordinator. In the seventh reporting period, the Crisis Intervention Unit's staffing was cut *in half*, now totaling 27 people. The team has dropped from seven to four sergeants, from 38 to 24 police officers, from 24 to 14 assigned to District, Operations, and Community Support, and from 14 to 8 in the training unit. The team has also lost its civilian community outreach coordinator.

The fourteen CIT DOCS personnel who are responsible for many of ¶91's requirements cannot support officers and all of the City's districts to effectively carry out the CIT Program's mission. The IMT's site visit interviews during this reporting confirmed that the number of CIT DOCS personnel is unsustainable. For example, in a two-month period (August–October 2022), the Crisis Intervention Unit received over 2,000 CIT reports from patrol. Of those 2,000 CIT reports, 289 reports contained requests for follow-up services by the CIT DOCS area teams. Due to staffing constraints, only 74 of those 289 follow-up requests were completed.

The IMT expects the number of CIT reports and requests for follow-up will rise as officers continue to receive training on the Crisis Intervention Unit per ¶¶ 118 and

127, as well as training on completing the required CIT reports. Additionally, the IMT has requested the last two reporting periods for an updated data dashboard presentation and analysis, which to date has not been scheduled. It is impossible to determine the City's unique district-level needs without adequate data analysis. The CIT DOCS area teams should have enough dedicated resources to review their district CIT reports, officer response ratios, conduct district officer interviews, and establish community-based relationships to conduct individual district needs assessments. Currently, there is inadequate staffing to do so.

Additionally, the CPD must determine and articulate how it intends to assess whether it has "sufficient, dedicated district-level resources, consistent with the needs of each district identified by the District Commander and the CIT Coordinator" as required by ¶91. Data analytics capabilities are not only required by ¶¶120 and 121 but are also necessary to support data metrics and outputs necessary to inform whether adequate resources have been dedicated to each district. Without adequate data, the IMT is unable to assess whether the CPD is providing sufficient district-level resources.

Moreover, ¶91 requires specific objectives that must be used in assessing compliance. At the end of the fifth reporting period, the CPD produced a plan outlining some initial district level strategies. While the IMT appreciates the CPD's progress towards providing a CIT DOCS Strategy Plan and a quarterly progress update, both the strategy and corresponding update should be developed further. The IMT recommends that in future monitoring periods the CPD engage in more robust efforts, such as seeking more detail from the Chicago Council on Mental Health Equity, defining measurable outcomes, and prioritizing feedback relating to community engagement and program strategy. These efforts will continue to elude the CPD so long as the CIT DOCS personnel are understaffed.

Moving forward, as the CPD moves toward Secondary compliance, the IMT will seek evidence that 95% of district-level personnel are adequately trained and that district commanders understand the appropriate assessment of the CIT district needs. Data supporting use of district level resources by patrol officers will also be evaluated in addition to data supporting the linkage of individuals in crisis to local service providers and robust community engagement. The IMT will also consider whether the CPD is reliably assessing each district's unique needs and providing data demonstrating how those needs are being met. That assessment will be tied to adequate staffing assigned to the CIT DOCS teams to support the necessary follow-ups on CIT reports and calls for service data, as well as meeting the needs of each district.

## Paragraph 91 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Crisis Intervention: ¶92

> **92.** *Certified CIT Officers are officers who receive specialized training in responding to individuals in crisis. Certified CIT Officers retain their standard assignment and duties but may also take on specialized crisis intervention duties and are prioritized to respond to calls in the field identified as involving individuals in crisis, as assigned.*

**Compliance Progress**        (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶92.

To achieve Preliminary compliance with ¶92, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Preliminary compliance by reviewing relevant CPD policies. The IMT assessed Secondary compliance by evaluating whether the CPD has qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree and the requirements of ¶92. In addition, the IMT reviewed the City's and the CPD's level of data collection, tracking, analysis, and management, as required under the Consent Decree. The IMT "triangulate[s]" the data by comparing multiple data sources, yielding a more robust understanding of the requirements of ¶92. Secondary compliance will be reassessed in the next reporting period in light of drastic reductions in staffing required to support the purpose and function of the CIU.

*Progress before the Seventh Reporting Period*

As noted throughout this report, the CPD has memorialized the Crisis Intervention Team in Special Order S05-14, *Crisis Intervention Team (CIT) Program*. The CIT Program has also adequately trained Designated CIT Officers based on our review of training material and observation of the CIT Basic Training. Based on the CPD's policy and training, we are confident that the CPD has reinforced the importance of Designated CIT Officers responding to individuals in crisis.

While we are satisfied with how the CPD has historically viewed the specialized nature of Designated CIT Officers, the CPD is in the early stages of moving from a strictly voluntary CIT model to a partially mandated "train-all" model where all patrol officers are provided the 40-hour CIT basic curriculum. Several agencies across the nation use a train-all model, which has distinct benefits, as well as potential shortcomings when an advanced voluntary specialized response is not incorporated into the overall model. Primarily, a train-all model negates the specialized nature of the Designated CIT Officers, who by design have volunteered for the CIT because of their desire to serve those living with mental health conditions. These officers also have the demonstrated skill set to perform the duties of a specialized response. In communities where a "train all" model has been implemented it is best practice to elevate a specialized cadre of volunteer officers with a demonstrated skill set to respond to higher level calls for service involving a mental health component. Without such a cadre, a "specialized" response, as ¶92 requires, is difficult.

For example, community members who request CIT officers may be met with officers not well suited for the unique nature of these calls, which undermines the purpose of a specialized response. Community members requesting CIT officers rightfully expect an officer suited for the task. Since more than one in five people fatally shot by police are living with serious mental health conditions,[1] specialized response is crucial.

In the sixth reporting period, the IMT reviewed the CPD's CIT training model that includes three tiers: (1) volunteer officers; (2) recently promoted sergeants, lieutenants, and field training officers; and (3) mandatorily-assigned officers. The IMT remains concerned with the latter tier (mandatorily assigned officers) because the mandatory nature of their assignment suggests they may lack the volunteer officers' proactive desire and skill set to serve the mental health community. The CPD indicated that these mandatorily assigned officers who "opt out" of being voluntary will still be deemed "CIT Certified Officers." While the CPD and the OEMC will be tracking which officers volunteer for CIT and which officers participate in mandated training, the lack of clear distinction operationally is concerning.

In the fifth reporting period, the IMT observed the Basic CIT training course where officers were publicly called upon to state whether they would like the CIT application to voluntarily be a CIT officer, or if they would like to submit a "to/from" memo to opt out of being a certified officer "which would be reviewed by the Deputy Chief." This process unfolded in the first hour of the 40-hour Basic CIT

---

[1] *See* Fuller, D., Lamb, R., Biasotti, M. & Snook, J., *Overlooked in the Undercounted: The Role of Mental Illness in Fatal Law Enforcement Encounters*, OFFICE OF RESEARCH & PUBLIC AFFAIRS (2015), https://www.treatmentadvoca-cycenter.org/storage/documents/overlooked-in-the-under-counted.pdf.

training, prior to any of the officers receiving any substantive training. The IMT shared our concerns with the CPD.

During the sixth reporting period, the CPD agreed to wait until the end of the 40-hour training to ask those questions and has developed an application that allows officers to check a box identifying their status, but the IMT has remained concerned with this process. The CPD developed two applications: one for voluntary officers to complete before the training (CPD form 15.519, *Request for Crisis Intervention Team Officer Designation*) and a different one for all remaining officers to complete at the end of the training (CPD form 15.518, *Request for Crisis Intervention Team Training*) to indicate whether they would like to opt in or opt out of becoming a Certified CIT officer.

The IMT is concerned that two applications may create confusion. At the end of the last reporting period, the City, the CPD, and the IMT discussed these deep concerns and initial steps that could be taken to mitigate them. The IMT encouraged the CPD to utilize the CIT application only for those wishing to volunteer to become Certified CIT Officers. At the end of the reporting period, the CPD opted to keep both applications, with revisions. Additionally, the CPD has determined it will identify voluntary CIT officers as "designated" CIT officers and not "certified" CIT officers. While the IMT commends the City and the CPD for engaging in dialogue with the IMT and responding to our suggestions about how to rectify program deficiencies and clarify the concept of "specialization," we remain concerned and available for further consultation on these complex issues.

The overall philosophy of the CIT program in relation to specialized response will need to be closely monitored by the CPD, with the input of advocacy groups, service providers, and persons with lived experience prioritized. To assist both the CPD and the IMT in assessing the CIT's specialized response, the IMT recommends that the CPD revise its attendance records under ¶92 to align with the eligibility criteria and training requirements established by the Consent Decree, as well as with the CPD's forms 15.518, *Request for CIT Training*, and 15.519, *Request for CIT Officer Designation*. Specifically, the CPD should consider including a separate excel sheet that captures data such as: (a) Officer name and District of assignment; (b) newly promoted to Rank of [sergeant/lieutenant]; (c) promotion date; (d) CIT Basic training completion date; (e) CIT Refresher training completion date; (f) mandatory requirement; (g) whether the officer opted in or out of CIT Designated Officer; and (h) if opted out, the officer's reason for opting out (consider a drop down menu to include options such as "Disciplinary History Exclusion," "Did not want to be prioritized for response," or "Officer believes skill set is not suited to be a specialized CIT officer"). The CPD should consider capturing these recommended data points on separate excel sheets for the 40-hour Basic CIT Training, CIT Refresher Training, CIT Advanced Training (such as Youth, Veteran), In-service Training covering CIT topics, and Recruit Training.

While the CPD has maintained Preliminary and Secondary compliance with ¶92, we strongly suggest that the CPD ensure the following to keep this tiered model's fidelity to a specialized response: (1) the CPD should require mandated officers to "opt in" through the completion of the CIT application as a volunteer officer after careful explanation about what that means operationally as opposed to "opt out," and to do so at the end of the 40-hour CIT training so that officers have context knowledge for the program, and (2) the CPD should avoid listing those mandated officers who do not opt in to be still considered a "Certified CIT Officer." This undermines the program and what community members expect to receive when requesting a CIT officer.

Additionally, the CPD should further engage the OEMC for dispatch. Prioritization for responses to calls for service should be given in the following order: first to voluntary "designated" CIT Officers, second to mandated CIT trained officers who have opted out of being a voluntary designated CIT Officer and last, officers who have received no CIT training. In future assessments, the IMT will consider the system by which officers are dispatched reflecting the tiered system.

*Progress in the Seventh Reporting Period*

The CIT Program's specialized response continues to evolve, and the IMT's recommendations from previous reporting periods remain constant this reporting period. The CPD has implemented an improved designation of the tiers of officers as:

- *Designated* CIT officers (voluntary)
- *Trained* CIT officers (mandatorily trained but not voluntary)
- *Untrained* Officers

The IMT awaits evidence on how these designations are being incorporated into the CPD's operations. The first CIT unit audit revealed areas for improvement, such as discernible exclusionary criteria. The Audit found that disciplinary history was not adequately operationalized. As a result, there are voluntary designated CIT officers who have disciplinary histories that warrant the officer's removal from this specialized response to vulnerable populations.

Further, the City and the CPD produced training records this reporting period that were insufficient to analyze the CPD's adherence to a specialized response model. While the CPD's production of training records has improved since the last reporting period, the IMT recommends that the CPD continue its effort to improve on this front.

The CPD has maintained Preliminary and Secondary compliance with ¶92, but we strongly suggest, as we did in the last reporting period, that the CPD ensure the tiered model's fidelity to a specialized response. Prioritization for responses to

calls for service should be given in the following order: first to voluntary "designated" CIT Officers, second to mandated CIT trained officers who have opted out of being a voluntary designated CIT Officer and last, officers who have received no CIT training. In future assessments, the IMT will consider the system by which officers are dispatched reflecting the tiered system. Additionally, training records must clearly demonstrate that the CPD is achieving its training requirements.

### Paragraph 92 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Crisis Intervention: ¶93

*93. To be eligible for consideration as a Certified CIT Officer, applicants must have at least 18 months of experience as a CPD officer and no longer be on probationary status. CPD will assess each applicant's fitness to serve as a Certified CIT Officer by considering the applicant's application, performance history, and disciplinary history.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with the requirements of ¶93. To assess Preliminary compliance, the IMT reviewed CPD's policy S05-14 *Crisis Intervention Team (CIT) Program*, which adequately incorporates the requirements of ¶93.

*Progress before the Seventh Reporting Period*

In the fourth monitoring period, the IMT reviewed CPD's Special Order SO20-02, *CIT Training Schedule, Attendance, Eligibility, and Recruitment*. This Special Order was never finalized because it required further revisions on the guidance for assessing the CIT applicants.

However, in the fifth reporting period, the CPD opted to distinguish department-wide directives relevant to the entire CPD from those relevant only to the Crisis Intervention Unit. As a part of this re-design, ¶93's requirements were incorporated into the CPD's S05-14, *Crisis Intervention Team (CIT) Program*.

The CPD had previously proposed that officers be deemed ineligible to become a Certified CIT officer if they (1) had received a sustained misconduct complaint resulting in a suspension of more than seven days within the preceding 12 months, or (2) had three or more sustained misconduct complaints resulting in suspension within the past five years.

The IMT raised concerns regarding these low eligibility thresholds, which would result in very few officers being ineligible to serve in this specialized role serving vulnerable populations. In response, during the fifth monitoring period, the CPD provided the IMT with a substantially revised version of S05-14, *Crisis Intervention Team (CIT) Program*. That directive revised a portion of the eligibility criteria, lowering the sustained misconduct complaint suspension period from seven to three

days, thereby ensuring a higher standard of eligibility assessment. While the paragraph does not delineate minimum qualifications, we believe it is incumbent on the City to provide standards that would more adequately exclude officers who have demonstrated they are unlikely to be a good match for a specialized role serving vulnerable populations. This is especially important as the CPD continues to transition to a mandatory CIT model. While the IMT appreciated this reconsideration of the eligibility standard, we believe the CPD should apply the same thresholds required for SROs to Certified CIT Officers, which are more aligned with specialized roles for vulnerable individuals.

In the sixth reporting period, the CPD adopted these same thresholds as SRO officers, and incorporated those thresholds into policy. The IMT commends the CPD's responsiveness on this important issue.

*Progress in the Seventh Reporting Period*

The first audit of the CIT unit revealed areas that the CPD could improve in light of ¶93's requirements. One of those areas was exclusionary criteria: that the CPD was not operationalizing officer disciplinary and performance history. Consequently, several designated CIT officers have a disciplinary and/or performance history that should eliminate them from this specialized response to vulnerable populations.

Since this audit, the CPD adopted the same thresholds as SRO officers to be a specialized designated CIT officer. This is an important change. The IMT encourages the CPD to continue its efforts to improve the accuracy of identifying and removing designated CIT officers that have a disciplinary and/or performance history that fails to meet the CIT Program's minimum threshold, so that the next annual audit produces reliable outcomes.

Additionally, the CPD produced training records this reporting period that were insufficient to analyze its adherence to a specialized response model. While the CPD's production of training records has improved since the sixth reporting period, the IMT reiterates that training records must reliably indicate analysis that determines training requirements under the Consent Decree. The IMT's suggestions were conveyed to the CPD in the last monitoring period to address several Consent Decree paragraphs related to training requirements.

Looking ahead to Secondary compliance with ¶93, the CPD must produce records sufficient to demonstrate 95% of its officers have been trained appropriately and develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶93. The IMT recommends that the CPD revise its attendance records under ¶93 to align with the eligibility criteria and training requirements established by the Consent Decree, as well as with the CPD's forms 15.518, *Request for*

*CIT Training*, and 15.519, *Request for CIT Officer Designation*. Specifically, the CPD should consider including a separate excel sheet that captures data such as: (a) Officer name and District of assignment; (b) newly promoted to Rank of [sergeant/lieutenant]; (c) promotion date; (d) CIT Basic training completion date; (e) CIT Refresher training completion date; (f) mandatory requirement; (g) whether the officer opted in or out of CIT Designated Officer; and (h) if opted out, the officer's reason for opting out (consider a drop down menu to include options such as "Disciplinary History Exclusion," "Did not want to be prioritized for response," or "Officer believes skill set is not suited to be a specialized CIT officer"). The CPD should consider capturing these recommended data points on separate excel sheets for the 40-hour Basic CIT Training, CIT Refresher Training, CIT Advanced Training (such as Youth, Veteran), In-service Training covering CIT topics, and Recruit Training. This data will permit the IMT to assess Secondary compliance with ¶93 in an effective and efficient manner.

### Paragraph 93 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶94

**94.** *Under the direction of the CIT Coordinator, supervisors and instructors teaching crisis intervention-related topics will assist in identifying and recruiting qualified officers with apparent or demonstrated skills and abilities in crisis de-escalation and inter-acting with individuals in crisis to apply to receive CIT training.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with the requirements of ¶94. To assess Preliminary compliance, the IMT reviewed CPD's policy S05-14 *Crisis Intervention Team (CIT) Program*, which adequately incorporates the requirements of ¶94.

*Progress before the Seventh Reporting Period*

During the fourth reporting period, the IMT reviewed CPD's CIU Special Order SO20-02, *CIT Training Schedule, Attendance, Eligibility, and Recruitment*, which contained the requirements of ¶94. However, in the fifth reporting period, the CPD opted to distinguish department-wide directives relevant to the entire CPD from those relevant only to the Crisis Intervention Unit. As part of this redesign, a portion of ¶94's requirements were incorporated into the CPD's revised S05-14 *Crisis Intervention Program*.

The requirements for this paragraph were not satisfactorily memorialized within the revised S05-14 directive. The draft S05-14 failed to include supervisors into the responsibility for assisting with recruiting qualified candidates for the CIT role as required by this paragraph, and instead positioned this responsibility under the Crisis Intervention Team Training Section (CITTS). Supervisors in the field overseeing patrol officers are uniquely positioned to help actively recruit officers with the skill set to serve in this role in which they interact with vulnerable populations.

In the sixth reporting period, the City and the CPD incorporated the requirements of ¶94 in its revised S05-14, which was finalized.

*Progress in the Seventh Reporting Period*

To achieve Secondary compliance, adequate training must be provided to *"supervisors and instructors teaching crisis intervention-related topics"* to *"assist in identifying and recruiting qualified officers."* There has been insufficient training, however, on *how* they are going to accomplish these recruitment efforts. While there has been training on this new policy requirement, it is absent of training of how the requirements of ¶94 are to be accomplished. The IMT reviewed the Pre-Promotion Supervisor training this reporting period which did not have anything on Crisis Intervention.

The IMT will assess Secondary compliance by reviewing documentation that reflects 95% of CPD Field Supervisors and all Crisis Intervention Unit Training Division and relevant personnel have been trained on the requirements of ¶94, which includes what they are supposed to be doing to meet these requirements. While the CPD produced evidence of 95% completion of the CIT eLearning this reporting period, which commendably covered Crisis Intervention policy changes regarding other paragraphs, the CPD must produce additional training records supporting the requirements of ¶94, with the inclusion of Crisis Intervention related responsibilities in the Pre-Promotion Supervisor training. Moreover, the CPD has provided no evidence of recruitment efforts to date. The CITTS unit, which is identified as one of the units responsible for recruitment efforts is dramatically understaffed, which only contributes to inadequate training on what they are supposed to do to support the requirements of ¶94. A CIT Officer recruitment plan will be an important topic to include in the Crisis Intervention Plan which the City is required to produce annually, but has not since the fourth reporting period.

The IMT will assess Full compliance with ¶94 based on the CPD's robust plan for recruiting Designated CIT officers and evidence of progress toward meeting the objectives of ¶94. The CPD's recruitment plan should include both the Crisis Intervention Unit and field supervisors. Moreover, the CPD must also produce evidence regarding this recruitment plan's effectiveness in order for the IMT to assess Full compliance.

## Paragraph 94 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Crisis Intervention: ¶95

*95. Certified CIT Officers, at a minimum, must complete the spe-cialized 40-hour Basic CIT Training ("Basic CIT Training") and re-ceive CIT certification by the Illinois Law Enforcement Training and Standards Board before being identified as a "Certified CIT Officer." To maintain the Certified CIT Officer designation, offic-ers must receive a minimum of eight hours of CIT refresher train-ing ("CIT Refresher Training") every three years and maintain the eligibility requirements established by the CIT Program.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**        *In Compliance* (SIXTH REPORTING PERIOD)
**Secondary:**         *Not in Compliance*
**Full:**                   *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Preliminary com-pliance with the requirements of ¶95. To assess Preliminary compliance, the IMT reviewed CPD's S05-14, *Crisis Intervention Team (CIT) Program*, which adequately incorporates the requirements of ¶95.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD opted to distinguish department-wide direc-tives relevant to the entire CPD from SOPs that are relevant only to the Crisis In-tervention Unit. As part of this redesign, ¶95's requirements were incorporated into the CPD's revised S05-14, *Crisis Intervention Team (CIT) Program*.

Moreover, during the fifth monitoring period the CPD launched CIT Refresher Training while also continuing to provide the 40-hour Basic CIT Training. However, as indicated in previous paragraphs, the specialized nature of the CIT officer, as intended in the spirit of this consent decree and best practice, is undermined by the CPD's move towards a mandated "train-all" CIT model. This is especially true when many officers received their 40-hour Basic CIT Training many years ago, with-out receiving refresher training since their original CIT training. In fact, according to records the CPD produced to the IMT in the sixth reporting period, 20.36% of all current Certified CIT Officers were trained over ten years ago, with no refresher training since their original training, one-third of all Certified CIT Officers were trained over seven years ago, and nearly half (46.51%) of Certified CIT Officers were trained six or more years ago with no refresher since their original training. This is not in keeping with national best practices and does not meet best practice

standards for a specialized CIT model. The CPD produced an updated training record this reporting period, which was unable to be validated. Consequently, the IMT is unable to obtain more reliable data than we have now.

Additionally, the CPD began prioritizing the Refresher Training by those who have received the Basic CIT training in the last 3 years. Therefore, nearly half of the CIT officers who received Basic CIT Training more than six years ago are not presently being prioritized for the Refresher or to re-take the Basic CIT Training course.

*Progress in the Seventh Reporting Period*

During this reporting period, the IMT learned the CPD is now prioritizing the Refresher training by (1) volunteers, (2) pre-service, and (3) the Learning Management System, prioritizing officers who were trained the longest ago.

With priority 3 (Learning Management System), and as indicated in previous reporting periods, the IMT recommends that the CPD better align with best practice by having all Certified CIT Officers who have not received the Basic 40-hour class in the past three to five years be prioritized to re-take the Basic 40-hour training, and then fall into the required refresher cadence every three years. This would be a significant step towards best practice.

During site visits this reporting period, the CPD indicated that priority 2 (pre-service) comprises the majority of the Refresher training participants, followed by volunteers, and then the Learning Management System.

Additionally, the CPD produced training records this reporting period that were insufficient to analyze its adherence to ¶95's requirements. While the CPD's production of training records has improved since the sixth reporting period, the IMT reiterates that training records must reliably indicate analysis that determines training requirements under the Consent Decree. The IMT's suggestions were conveyed to the CPD in the last monitoring period to address several Consent Decree paragraphs related to training requirements.

The IMT looks forward to the City and the CPD's progress toward exploring a specialized CIT program that prioritizes the specialized nature of CIT designation.

The IMT reiterates its request that the CPD codify a plan for prioritizing the training of those officers who received Basic 40-hour CIT more than four years ago. A high percentage of officers received Basic 40-hour CIT more than four years ago, with some officers receiving it as far back as 2004, with no refresher training since. The IMT expects that this percentage was much higher than anticipated. The IMT strongly recommends that the CPD prioritize officers who received Basic 40-hour

CIT more than three years ago to retake that training, and then those same officers can pick up the regular cadence of refresher training every three years thereafter.

To assess Secondary compliance, the IMT will review whether the CPD and the Crisis Intervention Unit have a reliable training certification system, including on-going provision of the 40-hour Basic CIT Training. The IMT will also review records demonstrating that 95% of current "designated" CIT officers have received the required refresher training. The 95% threshold for refresher training is essential for Secondary compliance because there are a significant percentage of CIT officers who have received no refresher training in many years. Further, the IMT recommends that CIT officers who received the 40-hour Basic CIT training several years ago be prioritized for CIT Refresher Training or to re-take the forty-hour Basic CIT.

## Paragraph 95 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 − DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶96

*96. CPD's Basic CIT Training is an in-depth, specialized course that teaches officers how to recognize and effectively respond to individuals in crisis. In addition to the crisis intervention-related topics covered in the training provided to all officers, the Basic CIT Training will address signs and symptoms of individuals in crisis, suicide intervention, community resources, common mental health conditions and psychotropic medications, the effects of drug and alcohol abuse, perspectives of individuals with mental conditions and their family members, the rights of individuals with mental conditions, civil commitment criteria, crisis de-escalation, and scenario-based exercises.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with the requirements of ¶96.

The IMT assessed Preliminary compliance by reviewing relevant CPD policies. The IMT assessed Secondary compliance with ¶96 by reviewing training development, implementation, and evaluation in accordance with ¶286 of the Consent Decree, which incorporates the following evaluation criteria: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

### Progress before the Seventh Reporting Period

In the third reporting period, the IMT reviewed the CPD's Special Order S05-14, *Crisis Intervention Team (CIT) Program*, which states that the Crisis Intervention Team Training Section is responsible for developing, reviewing, and revising the CIT curricula, as well as the administration and delivery of the Basic CIT Training. The IMT submitted a no-objection notice on S05-14 on November 24, 2020. In the fourth reporting period, the IMT reviewed CPD's policy SO20-02, *CIT Training, Scheduling, Attendance, Eligibility, and Recruitment,* which addressed the requirements of ¶96. This Special Order was still under review when the CPD determined that many of the components of SO 20-02 would be moved into a substantially

revised S05-14, *Crisis Intervention Team (CIT) Program*. However, ¶96's requirements were not adequately memorialized in the revised S05-14, and ¶96's requirements were instead memorialized in policy during the sixth reporting period.

The IMT observed the curricula-revision process in the third reporting period and found that the CIT Unit included key community stakeholders to gather comments and recommendations for improving the training. Overall, we found these efforts to be consistent with ¶96's requirements.

The IMT observed the updated training in the fifth reporting period to verify that delivery is in-line with the approved lesson plans and presentation material. We found that ¶96's required topics were included in the curriculum and were given sufficient attention during the training. Overall, the IMT found the training well done. Additionally, the CPD invited Chicago Council on Mental Health Equity members to observe the training and provide feedback, which several members provided. Given the shift to a mandated CIT training model by the CPD, the IMT will closely monitor training resources.

*Progress in the Seventh Reporting Period*

The CPD continues to offer the 40-hour Basic CIT program more than half of the weeks of the year. This week-long course alternates with the Refresher CIT training. The 40-hour CIT training focuses on both the CPD and on community resources. Moreover, the frequency of CIT training has increased due to the change from a voluntary to patrol --mandated program. However, at the same time, the number of Crisis Intervention Unit training staff has been cut in half, from fourteen to eight members. The IMT is closely monitoring the training's quality in light of the significant reduction in dedicated staff. The IMT is concerned that trainers are spread too thin to do teach-backs or engage in other forms of skill development necessary to create a culture of dedicated trainers who feel supported and encouraged in their own professional development. The IMT's site visits confirmed that the Crisis Intervention Unit's dedicated staff are exhausted, spread too thin, and disheartened by the CPD's decision to significantly cut the number of training staff.

CIT related training evaluations have also not been produced this reporting period, and the IMT looks forward to reviewing them in the next monitoring period.

To assess Full compliance, the IMT will review the CPD's use of training evaluations and district-needs assessments to inform training revisions, while monitoring how the training resources affect the quality of the overall training requirements of ¶96. To support full and effective compliance, the CPD should continue inviting the Chicago Council on Mental Health Equity to attend training and to offer feedback, and the CPD should maintain sufficient staff to support CIT training.

## Paragraph 96 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Secondary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Secondary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Secondary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Secondary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Crisis Intervention: ¶97

**97.** *CPD's CIT Refresher Training is a specialized, advanced training to further develop and expand Certified CIT Officers' skills in recognizing and appropriately responding to calls for service that involve individuals in crisis. The CIT Refresher Training will include a review of the concepts, techniques, and practices offered in the Basic CIT Training as well as relevant and/or emerging topics in law enforcement responses to individuals in crisis, general and specific to CPD. Additionally, the CIT Refresher Training may cover the content included in the in-service crisis intervention training.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**      *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**              *Not in Compliance*

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with requirements of ¶97.

The IMT assessed Preliminary compliance by reviewing relevant CPD policies. The IMT assessed Secondary compliance with ¶97 by reviewing training development, implementation, and evaluation in accordance with ¶286 of the Consent Decree, which incorporates the following evaluation criteria: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

*Progress before the Seventh Reporting Period*

An early version of the CPD's Special Order S05-14, *Crisis Intervention Team (CIT) Program*, stated that the Crisis Intervention Team Training Section is responsible for developing, reviewing, and revising the Crisis Intervention Team curricula, as well as the administration and delivery of the CIT Refresher Training. In the fifth reporting period, the City and the CPD submitted a substantially-revised S05-14, which maintained the same language noted above.

The CPD began delivering the CIT Refresher Training in the fourth reporting period. The IMT observed the training in the fifth monitoring period and confirmed the refresher training curriculum includes ¶97's requirements. However, we note that a substantial portion of the training is dedicated to officer wellness topics (Officer Exposure to Trauma; Self Care Issues, Practices and Resources; Employee Assistance Programs (EAP)). While these are critically important topics, the City should

consider moving these topics to annual in-service training that ensures all officers, not just Designated CIT Officers, are receiving this information, and instead dedicate more of the CIT Refresher Training curriculum to relevant CIT topics. Further, since a substantial portion of officers receiving the CIT Refresher Training received their original 40-hour Basic CIT training over eight years ago and have not received any refresher training since, maximizing the time spent on refreshing crisis-intervention related topics is of the utmost importance to the CIT Refresher Training.

The IMT reiterates its request that the CPD codify a plan for prioritizing the training of those officers who received Basic 40-hour CIT more than four years ago. A high percentage of officers received Basic 40-hour CIT more than four years ago, with some officers receiving it as far back as 2004, with no refresher training since. The IMT expects that this percentage was much higher than anticipated. The spirit and intent of the Consent Decree is to align officers with best practice, and the current process does not reflect best practice. Further, under the Consent Decree, a member who completes Basic 40-hour CIT requires refresher training every three years, which is consistent with best practice. The IMT strongly recommends that the CPD prioritize officers who received Basic 40-hour CIT more than three years ago to retake that training, and then those same officers can pick up the regular cadence of refresher training every three years thereafter.

With the IMT continuing to observe the trainings virtually in light of the ongoing COVID-19 pandemic, training group activities (*e.g.*, Scenario-Based Role Play and officer discussion on field-related challenges with CIT) were difficult to hear). The IMT appreciates the time dedicated to scenario-based role play in the Refresher course. As the IMT indicated in our last report, we appreciate information that helps us understand the themes articulated during the "CIT Troubleshooting" and the "CIT Group Problem Solving" portions of the training, which is important to measuring and improving the overall CIT program. The IMT has formally requested, but not yet received, summaries of the topics that officers identified. The IMT is unable to assess trends without this information.

However, it is also important to reiterate some of the comments the IMT heard while observing the training, such as concerns about the OEMC lacking updated lists of CIT officers on duty; officers not knowing where to take people in crisis; and the need for more community outreach about the program.

Moreover, we also observed an officer discussion about incentivizing and maintaining officer interest in the program. Officers' suggestions included things like incentive pay, shift preference, extra points on promotional exams, a different title, a special room for de-compression after stressful CIT related calls for service, with time allocated to make use of it, and paid overtime for eLearning.

*Progress in the Seventh Reporting Period*

The CPD continues to offer the Refresher CIT training more than half of the weeks of the year. This 2-day training is alternated with the Basic 40-hour CIT training. The Refresher training focuses on both the CPD and on community resources. The frequency of both the 40-hour Basic and Refresher CIT training has increased due to the change from a voluntary to patrol mandated program. At the same time, the number of Crisis Intervention Unit training staff has been cut in half, from four-teen to eight members. The IMT is closely monitoring the training's quality in light of the significant reduction in dedicated staff. The IMT is concerned that trainers are spread too thin to do teach-backs or engage in other forms of skill develop-ment necessary to create a culture of dedicated trainers who feel supported and encouraged in their own professional development. The IMT's site visits confirmed that the Crisis Intervention Unit's dedicated staff are exhausted, spread too thin, and disheartened by the CPD's decision to significantly cut the number of training staff.

Additionally, there were no CIT training evaluations produced to the IMT this re-porting period. The IMT looks forward to receiving evaluations in the next report-ing period.

To assess Full compliance, the IMT will review the CPD's use of training evaluations and district-needs assessments to inform training revisions, while monitoring how the reduction in training resources affect the quality of the overall training require-ments of ¶97. Additionally, the IMT will assess how the CPD intends to conform to best practice when the majority of their CIT officers attended Basic CIT over 8 years ago with no refresher since. The IMT has recommended officers who went through the Basic 40-hour course over 3-5 years ago be prioritized to re-take the 40-hour course and then pick up the cadence of Refresher training every three years. This would be better aligned with best practice. Additionally, the IMT has made formal written requests for summaries of the topics identified during the "CIT Trouble-shooting" and the "CIT Group Problem Solving" portions of the training but to date have not received any (IMT 398). The IMT is unable to assess trends without this information, which may affect the quality of the Refresher training.

To support full and effective compliance, the CPD should continue inviting Chicago Council on Mental Health Equity to attend training and to offer feedback, and the CPD should maintain sufficient staff to support CIT training.

In assessing Full compliance with the requirements of ¶97, the IMT will review all CIT training documentation, as well as reviewing the feedback from both officers and non-CPD personnel. The CPD's training and attendance documentation pro-duced in the seventh reporting period were insufficient.

Regarding feedback from both officers and non-CPD personnel, the IMT has yet to receive training evaluations for those who have completed the CIT Refresher Training, nor have we received information about the number of people from the community who have attended the training, what feedback members of the community provided, and what the CPD intends to do with such feedback. The community's feedback, combined with officer feedback, should be integrated into the next 3-year iteration of CIT Refresher Training. Additionally, the IMT has shared with the CPD that a significant portion of the refresher training focuses on officer wellness. While this is a very important topic, it is better suited for all officers, not just CIT officers. The content of this refresher training should focus more on CIT-related topics and scenario-based training, especially given the CIT Program changes that have occurred since the start of the Consent Decree and the number of years many CIT officers have gone without any refresher training.

## Paragraph 97 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Crisis Intervention: ¶98

**98.** *Certified CIT Officers may satisfy the in-service training requirements, as outlined in Part H, by completing the CIT Refresher Training.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with the requirements of ¶98 in the seventh reporting period.

To assess Preliminary compliance, the IMT reviewed S11-10-03, *In-Service Training* and concluded that the CPD had adequately memorialized ¶98's requirements. Additionally, CPD has memorialized this requirement in the newly revised policy, S05-14, *Crisis Intervention Team (CIT) Program*, which was finalized during this reporting period.

To assess Secondary compliance, the IMT will review the CPD's training records and evaluations for its CIT Refresher Training. The IMT notes that a 95% completion rate will be necessary to achieve Secondary compliance.

### Paragraph 98 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶99

**99.** *Within 365 days of the Effective Date, the CIT Program staff, in coordination with the Education and Training Division will develop the CIT Refresher Training. The CIT Program staff will review and revise the CIT Refresher Training as necessary to ensure that Certified CIT Officers receive up-to-date training. The CIT Program will seek input from the Advisory Committee in the development of the refresher training.*

---

**Compliance Progress**   (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with the requirements of ¶99.

To assess Preliminary compliance, the IMT reviewed the CPD's S05-14, *Crisis Intervention Team (CIT) Program*, which states that the Crisis Intervention Team Training Section is responsible for developing, reviewing, and revising the Crisis Intervention Team curricula and for delivering the refresher training.

*Progress before the Seventh Reporting Period*

During the fourth reporting period, the CPD began delivering the CIT Refresher Training, which the IMT observed in the fifth monitoring period. *See* ¶97 assessment, above. As we stated in Independent Monitoring Report 4, the CPD achieved Secondary compliance through initiating the CIT Refresher Training and by seeking the Chicago Council on Mental Health Equity's review of and comment on the curriculum.

In the sixth reporting period, the CPD finalized a substantially-revised S05-14, *Crisis Intervention Team (CIT) Program*, which maintained this same language as the previous version of S05-14 that memorialized the requirements of ¶99.

Additionally, the Chicago Council on Mental Health Equity members were invited to attend the CIT Refresher Training during this reporting period, and to provide feedback. We appreciate this step taken by the CPD. The IMT did not receive any evidence of Chicago Council on Mental Health Equity members observing training and providing feedback. We look forward to receiving the Chicago Council on Mental Health Equity's feedback on their observations of the CIT Refresher Training during the next monitoring period.

As we indicate throughout this section of the report, the IMT strongly recommends that officers who have not received CIT training in a significant number of years be prioritized to receive the CIT Refresher Training. For instance, the IMT reviewed a data dashboard and spreadsheet indicating that a fairly significant percentage of Certified CIT officers were trained more than 8 years ago and have not received any formal refresher training since. This lack of formal refresher training results in a diluted, non-best practice model.

To strengthen both the integrity of the CIT program and officers' knowledge retention, the CPD should consider sending officers back to the Basic 40-hour CIT training if those officers, with no refresher, received the Basic 40-hour CIT training over three to five years ago. In fact, as outlined in this section of the report, 20.36% of all current certified CIT officers were trained over ten years ago (2004-2012) with no refresher since. Approximately a third of all certified CIT officers were trained more than seven years ago (2004-2015) with no refresher training, and nearly half (46.51%) of certified CIT officers were trained six or more years ago (2004-2016) with no refresher training. These gaps in training are not best practice and fail to meet best practice standards for a specialized model. However, the CPD is currently prioritizing Refresher Training for those officers who received Basic CIT training in the last three years. This means that the CIT officers who received Basic CIT more than six years ago, without refresher training, are not being prioritized for the Refresher, nor are they retaking the Basic CIT course. To better align with best practice, the CPD should prioritize all Certified CIT Officers who have not received the Basic 40-hour training in more than three to five years to re-take that Basic 40-hour training. Once those officers have retaken the Basic 40-hour training, they should then fall into the required refresher training cadence of every three years.

This would bring officers into compliance with best practices, policy updates, and program changes. It may also afford the CPD the opportunity to move into the cadence of refresher training every three years.

*Progress in the Seventh Reporting Period*

The CPD continues to offer the Refresher CIT training more than half of the weeks of the year. This 2-day training alternates with the Basic 40-hour CIT training. The Refresher training focuses on both the CPD and on community resources. The frequency of both the 40-hour Basic and Refresher CIT training has increased due to the CPD's change from a voluntary to patrol mandated program. At the same time, the number of Crisis Intervention Unit training staff has been cut in half, from fourteen to eight members. This affects the CIT Program staff's ability to review and revise the training, as required under ¶99. The IMT is closely monitoring the training's quality in light of the significant reduction in dedicated staff. The IMT is concerned that trainers are spread too thin to do teach-backs or engage in other forms of skill development necessary to create a culture of dedicated trainers who feel

supported and encouraged in their own professional development. The IMT's site visits confirmed that the Crisis Intervention Unit's dedicated staff are exhausted, spread too thin, and disheartened by the CPD's decision to significantly cut the number of training staff.

To assess Full compliance, the IMT will review the CPD's use of training evaluations and district-needs assessments to inform training revisions, while monitoring how the reduction in training resources affect the quality of the overall training requirements of ¶99. Additionally, the IMT will assess how the CPD intends to conform to best practice when the majority of their CIT officers attended Basic CIT over eight years ago with no refresher since. Furthermore, the IMT has made formal written requests for summaries of the topics identified during the "CIT Troubleshooting" and the "CIT Group Problem Solving" portions of the training but to date have not received any (IMT 398). The IMT is unable to assess trends that are addressed with revisions in the training without this information.

To support full and effective compliance, the CPD should continue inviting Chicago Council on Mental Health Equity to attend training and offer feedback. The IMT recommends the CPD and the City consider identifying a small group of Chicago Council on Mental Health Equity members who may volunteer to serve in a "training observation" capacity, providing feedback across the required CIT trainings. This would streamline consistent observations and reliable feedback.

In assessing Full compliance with the requirements of ¶99, the IMT will review all CIT training documentation, as well as reviewing the feedback from both officers and non-CPD personnel. Regarding feedback from both officers and non-CPD personnel, the IMT has yet to receive training evaluations for those who have completed the CIT Refresher Training, nor have we received information about the number of people from the community who have attended the training, what feedback members of the community provided, and what the CPD intends to do with such feedback. The community's feedback, combined with officer feedback, should be integrated into the next 3-year iteration of CIT Refresher Training. Additionally, the IMT has shared with the CPD that a significant portion of the refresher training is allocated to officer wellness. While this is a very important topic, it is better suited for all officers, not just CIT officers. The content of this refresher training should focus more on CIT related topics and scenario-based training, especially given the program changes that have occurred since the start of the Consent Decree and the number of years many CIT officers have gone without any refresher training.

## Paragraph 99 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Preliminary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Secondary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Secondary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Secondary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Crisis Intervention: ¶100

**100.** *All Certified CIT Officers who completed the Basic CIT Training before the development of the CIT Refresher Training must complete their first CIT Refresher Training within four years of the date that the CIT Refresher Training is developed. All Certified CIT Officers who complete Basic CIT Training on or after the date that the CIT Refresher Training is developed must complete their first CIT Refresher Training within three years of receiving the Basic CIT Training.*

---

**Compliance Progress**       (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**   Moving               ☑ **Not Yet Applicable**

**Preliminary:**   *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**   *Not in Compliance*
**Full:**   *Not Yet Assessed*

During the seventh monitoring period, the City and the CPD maintained Preliminary compliance with the requirements of ¶100.

*Progress before the Seventh Reporting Period*

In the fourth monitoring period, the IMT reviewed a revised draft version of CIU Special Order 20-02 (CIU SO-02), *CIT Training Scheduling, Attendance, Eligibility, and Recruitment*, which memorializes the requirements of ¶100. However, CIU SO 20-02 was not finalized, which prevented the CPD from achieving Preliminary compliance with ¶100 at that time.

In the fifth monitoring period, the CPD substantially revised S05-14, *Crisis Intervention Team Program*, and subsumed components of CIU SO 20-02 into the revised S05-14 directive. The CPD has also memorialized this requirement into S11-10-03, *In-Service Training,* enabling the CPD to achieve Preliminary compliance.

Due to limitations in their current electronic system, training records can only be updated quarterly to remove officers who no longer meet the eligibility requirements for certified CIT Officers.

As stated in previous paragraph assessments, the spirit and intent of the Consent Decree is to reflect best practice. A significant number of CIT officers received their 40-hour Basic CIT Training many years ago, without receiving refresher training since their original CIT training. In fact, 20.36% of all current Certified CIT Officers were trained over ten years ago, with no refresher training since their original

training, one-third of all Certified CIT Officers were trained over seven years ago, and nearly half (46.51%) of Certified CIT Officers were trained six or more years ago with no refresher since their original training. This is not in keeping with national best practices and does not meet best practice standards for a specialized CIT model. The CPD produced an updated training record this reporting period, which was unable to be validated. Consequently, the IMT is unable to obtain more reliable data than we have now.

To achieve Secondary compliance, the CPD's eLearning system must demonstrate effective and timely notification of (a) when the CPD's officers are due for training and (b) notification to the OEMC regarding officers whose certifications may have expired. The IMT notes that a functioning system should help remind officers that their expiration date is approaching. We also note that the requirements of ¶100 were incorporated into the eLearning that the CPD delivered in the seventh reporting period, which ensures all officers understand the requirements of ¶100, however, this is insufficient for secondary compliance. At this time, there is no evidence of what training has been provided for the responsible parties who will ensure the requirements of ¶100 are accomplished. Additionally, data methodologies for secondary compliance require the ability of CPD to demonstrate the voluntary nature of the refresher, thereby maintaining the specialized response. Training and attendance records must be produced demonstrating compliance with ¶100.

### Paragraph 100 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶101

*101. Certified CIT Officers who fail to complete the CIT Refresher Training within three years of taking their most recently required CIT Training, whether the Basic CIT Training or a prior CIT Refresher Training, will be deemed out of compliance with the CIT Program's CIT Refresher Training requirement. CPD will confirm on a quarterly basis that Certified CIT Officers remain in compliance with the CIT Refresher Training requirement. Any Certified CIT Officer found to be out of compliance during the quarterly review may not continue to be identified by CPD as a Certified CIT Officer and may not continue to be prioritized to respond to calls for service involving individuals in crisis. Each quarter, CPD will inform OEMC of officers who are out of compliance with the CIT Refresher Training requirement. An officer out of compliance with the CIT Refresher Training requirement must complete the most recently offered version of the CIT Refresher Training before CPD may resume identifying the officer as a Certified CIT Officer and before OEMC may resume prioritizing that officer to respond in the field to calls involving individuals in crisis.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    Quarterly      ☑ **Not Yet Applicable**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with the requirements of ¶101. The IMT reviewed the CPD's policy, S05-14, *Crisis Intervention Team (CIT) Program,* which adequately addresses the requirements of ¶101.

*Progress before the Seventh Reporting Period*

In the fourth monitoring period, the IMT reviewed a revised draft version of Crisis Intervention Unit (CIU) Special Order 20-02, *CIT Training Scheduling, Attendance, Eligibility, and Recruitment*, which memorialized the requirements of ¶101. However, in the fifth monitoring period, the CPD substantially revised S05-14, *Crisis Intervention Team Program,* and subsumed components of CIU SO 20-02 into the

revised S05-14 directive, which was finalized the sixth reporting period. The requirements of ¶101 are incorporated into S05-14.

In the sixth monitoring period, the draft versions of both CIU SO 20-02 and S05-14 indicate that the CPD will utilize their Learning Management System to track when CIT officers need CIT Refresher Training to ensure CIT officers are being prioritized for dispatch. Due to limitations in its current electronic system, the CPD's training records can only be updated quarterly to remove officers who no longer meet the eligibility requirements for certified CIT Officers.

*Progress in the Seventh Reporting Period*

The training records that the CPD produced this reporting period were insufficient to demonstrate that ¶101's requirements were met. This data will permit the IMT to assess compliance with ¶101 in an effective and efficient manner.

Moreover, as noted in this section of the report, 20.36% of all current certified CIT officers were trained over ten years ago (2004-2012) with no refresher since. Approximately a third of all certified CIT officers were trained more than seven years ago (2004-2015) with no refresher training, and nearly half (46.51%) of certified CIT officers were trained six or more years ago (2004-2016) with no refresher training. Updated records were produced this reporting period which were incomplete and unable to be validated. These gaps in training are not best practice and fail to meet best practice standards for a specialized model. However, the CPD is currently prioritizing Refresher Training for those officers who received Basic CIT training in the last three years. This means that the CIT officers who received Basic CIT more than six years ago, without refresher training, are not being prioritized for the Refresher, nor are they retaking the Basic CIT course. To better align with best practice, the CPD should prioritize all Certified CIT Officers who have not received the Basic 40-hour training in more than three to five years to re-take that Basic 40-hour training. Once those officers have retaken the Basic 40-hour training, they should then fall into the required refresher training cadence of every three years. This will go a long way toward best practice.

To achieve Secondary compliance, the CPD's system must demonstrate effective and timely notification to OEMC regarding officers whose certifications may have expired. The IMT notes that a functioning system should help remind officers that their expiration date is approaching. We also note that the requirements of ¶101 are also incorporated into the eLearning that the CPD delivered this reporting period, which ensures all officers understand the requirements of ¶101.

The IMT will continue to assess the CPD's compliance based on best practice. The number of CIT officers who have gone so many years since the Basic 40-hour training, with no refresher since, is inconsistent with best practice and is not considered

a specialized model. The CPD must address this new data. To better align with best practice, the IMT continues to encourage the CPD to consider a prioritization model that brings its officers who were CIT trained more than 3-5 years ago, with no refresher, to re-take the CIT Basic course, and then fall into its regular, required refresher cadence under the Consent Decree.

## Paragraph 101 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶102

**102.** *All newly assigned Field Training Officers ("FTOs") and pro-moted Sergeants and Lieutenants will continue to receive the Basic CIT Training. To be considered Certified CIT Officers, FTOs, Sergeants, and Lieutenants must meet the eligibility criteria and training requirements established by the CIT Program and this Agreement.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During the seventh monitoring period, the City and the CPD maintained Preliminary compliance with the requirements of ¶102.

*Progress before the Seventh Reporting Period*

In the fourth monitoring period, the IMT reviewed a revised draft version of Crisis Intervention Unit (CIU) Special Order 20-02, *CIT Training Scheduling, Attendance, Eligibility, and Recruitment*, which memorialized the requirements of ¶102, but was not finalized at that time. Additionally, the requirements of ¶102 were memorialized under, S11-10-02, *Pre-Service Training*, which was finalized during the fifth reporting period, allowing the CPD to achieve Preliminary compliance. In the fifth monitoring period, components of CIU SO 20-02 were subsumed into a revised directive S05-14, which was finalized during the sixth reporting period.

Additionally, in the third reporting period, the CPD had made progress on developing its new CIT dashboard, which includes data specific to ¶102. However, the CPD's progress regarding its data collection and analysis has stalled. In each of the last two reporting periods, the IMT has requested, but not received, a briefing with the data analyst. The IMT has not yet received sufficient evidence to demonstrate that robust data analysis is occurring.

The CPD achieved Preliminary compliance with ¶102 by memorializing its requirements in policy S11-10-02, *Pre-Service Training*. As we noted above, the CPD also memorialized the requirements of ¶102 into S05-14 during the sixth reporting period.

*Progress in the Seventh Reporting Period*

The CPD produced insufficient training and eligibility records in this reporting period. To achieve Secondary compliance with ¶102, the CPD's system must demonstrate its ability to track whether newly assigned Field Training Officers ("FTOs") and promoted Sergeants and Lieutenants complete the requisite training and meet the CIT Program's eligibility requirements. The IMT will review whether the system clearly articulates who has been newly promoted during a given reporting period, their training completion dates, and evidence that eligibility requirements have been met to become a designated CIT officer.

Additionally, the IMT's review of the CIT dashboard, with the ability to ask comprehensive questions including those related to ¶102, will be an important part of future compliance assessments with Consent Decree requirements.

### Paragraph 102 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶103

> **103.** *The CIT Program staff responsible for the CIT training curriculum will, where it would add to the quality or effectiveness of the training and when feasible and appropriate, encourage and seek the participation of professionals and advocates who work with individuals in crisis, and persons with lived experiences of behavioral or mental health crisis, including those with involvement in the criminal justice system, in developing and delivering CPD CIT trainings.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**    *In Compliance* (SIXTH REPORTING PERIOD)
**Secondary:**    *Under Assessment*
**Full:**    *Not in Compliance*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with the requirements of ¶103.

*Progress before the Seventh Reporting Period*

In the fourth monitoring period, the IMT reviewed a revised draft version of Crisis Intervention Unit (CIU) Special Order 20-02, *CIT Training Scheduling, Attendance, Eligibility, and Recruitment*, which memorialized the requirements of ¶103. However, in the fifth monitoring period, components of CIU SO 20-02 were subsumed into the CPD's substantially revised directive S05-14, *Crisis Intervention Program*, which was finalized during the sixth reporting period.

As noted in our prior reports, the CPD has incorporated the input of mental health professionals, stakeholders, and people with lived experience into the development and delivery of the 40-hour Basic CIT Training and the CIT Refresher Training. The CPD previously convened a working group to review curricula and provide feedback on training. Additionally, professionals and people with lived experience are involved in the CIT trainings as both instructors and participants. In our last report, we recommended that the CPD invite members of the Chicago Council on Mental Health Equity and other community representatives to observe the training's delivery and to provide feedback.

During this reporting period, Chicago Council on Mental Health Equity members were invited to attend both training courses and provide feedback. While the IMT appreciates this effort, we stress that the CPD must improve its community engagement efforts. The CPD must go beyond extending invitations by actively seeking out observations and feedback on its training sessions. During site visits in the

sixth reporting period, the IMT continued to be concerned about the CPD connecting with community and hearing community voices. We hope the CPD continues to improve in this area.

In the fifth reporting period, the IMT observed both the 40-hour CIT Training and the CIT Refresher Training and, overall, found them both to be well done. However, we note that a substantial portion of the Refresher training is dedicated to officer wellness topics (*e.g.*, Officer Exposure to Trauma; Self Care Issues, Practices and Resources; Employee Assistance Programs (EAP)). While these are critically important topics, the City should consider moving these topics to annual in-service training to ensure all officers, not just the CIT Certified Officers, are receiving this critically important information. Additionally, since a substantial portion of officers receiving this refresher training underwent their original 40-hour Basic CIT training over eight years ago without any refresher training since, maximizing the time spent on refreshing crisis intervention related topics is of the utmost importance.

*Progress in the seventh reporting period*

The CPD has produced no evidence of improving community engagement efforts. Rather, the CPD cut the Crisis Intervention Unit by over half of its personnel, including the dedicated community outreach position. The Crisis Intervention Unit is significantly understaffed, an issue which the CPD must meaningfully address.

Additionally, the CPD has produced no evidence demonstrating community-member observation and feedback on the CIT-related trainings. The CPD must go beyond merely extending invitations, and instead must actively seek observations and feedback on its training sessions. The IMT recommends the CPD and the City brainstorm how they intend to accomplish this. The IMT recommends that the City and the CPD consider a small training subgroup composed of volunteers who can attend the training sessions, participate in debriefs, and provide written feedback.

The IMT continues to be concerned about the CPD connecting with the community and hearing community voices. The drastic reduction in staffing causes real barriers for meaningful community engagement. We hope the CPD continues to improve in this area. The IMT has received continued feedback through our portal system from community members expressing deep concern about the CIT program.

To assess Full compliance, the IMT will continue to review how the CPD incorporates the input of professionals and of people with lived experience, including the feedback received by community participants who have observed the training. In addition, we will assess how the CPD has furthered its outreach to include additional perspectives. It is important for the CPD to actively invite relevant members of the community to observe their training and provide feedback. Advocacy

groups, people with lived experience, members of the Coalition (*see* ¶669), and community partners represent important viewpoints. Finally, the IMT encourages the CPD to consider developing a short community member evaluation form to gather input after community members observe training sessions.

### Paragraph 103 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| Preliminary |

# Crisis Intervention: ¶104

**104.** *CPD will develop policies regarding the criteria for ongoing participation as a Certified CIT Officer, consistent with this Agreement.*

Compliance Progress        (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**        *In Compliance (SIXTH REPORTING PERIOD)*
**Secondary:**        *Under Assessment*
**Full:**        *Not in Compliance*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with the requirements of ¶104.


*Progress before the Seventh Reporting Period*

In the fourth monitoring period, the CPD provided the IMT with Special Order SO20-02, *CIT Training Schedule, Attendance, Eligibility, and Recruitment*, which memorialized the requirements of ¶104. However, in the fifth monitoring period, components of CIU SO 20-02 were subsumed under a revised S05-14, *Crisis Intervention Program* policy.

The CPD had previously proposed that officers be deemed ineligible to become a Certified CIT officer if they (1) have received a sustained misconduct complaint resulting in a suspension of more than seven days within the preceding 12 months, or (2) have three or more sustained misconduct complaints resulting in suspension within the past five years.

The IMT raised concerns regarding these low eligibility thresholds, which would result in few officers being deemed ineligible to serve in this specialized role that serves vulnerable populations. During the fifth monitoring period, the CPD responded to the IMT's concerns by providing the IMT with a substantially revised version of S05-14, *Crisis Intervention Team (CIT) Program*. That directive revised a portion of the eligibility criteria, lowering the sustained misconduct complaint suspension period from seven to three days, thereby ensuring a higher standard of eligibility assessment. While the paragraph does not delineate minimum qualifications, we believe it is incumbent on the City to provide standards that would more adequately exclude officers who have demonstrated they are unlikely to be a good match for a specialized role serving vulnerable populations. This is especially important as the CPD continues to transition to a mandatory CIT model. While the IMT appreciated the CPD's reconsideration of the eligibility standard, we recom-

mended that the CPD apply the same thresholds required for School Resource Officers to Certified CIT Officers, which are more aligned with specialized roles for vulnerable individuals.

In the sixth reporting period, the CPD adopted the same thresholds for CIT Officers as School Resource Officers, and it incorporated those thresholds into policy. The CPD should be commended for this. S05-14 was finalized during this reporting period. The CPD also developed eLearning materials intended to educate all officers on the CIT program, including policy changes which affect the entire department. This eLearning addresses the requirements of ¶104.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, as reflected in our assessments for other paragraphs, the CPD demonstrated that 95% of officers completed the eLearning addressing policy changes. The CPD has not, however, produced sufficient evidence that explains the system in place to ensure that an officer is removed from daily rosters as a CIT officer when the threshold for service is crossed. To achieve Secondary compliance, the CPD must first have a reliable system in place to accomplish the requirements of ¶104 and also produce evidence that the designated individuals responsible to implement this plan are adequately trained.

Full compliance will then hinge on reliable implementation of this system. The IMT will review records that demonstrate the implementation of that system designed to ensure CPD has properly qualified personnel serving as CIT officers. To that end, the IMT recommends that the CPD revise its attendance records under ¶104 to align with the eligibility criteria and training requirements established by the Consent Decree, as well as with the CPD's forms 15.518, *Request for CIT Training*, and 15.519, *Request for CIT Officer Designation*.

### Paragraph 104 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶105

> **105.** *CPD will continue to maintain an up-to-date list of Certified CIT Officers, including their unit of assignment.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with the requirements of ¶105.

The CPD's Special Order S05-14, *Crisis Intervention Team (CIT) Program*, clearly states that the Training Division is responsible for updating officer training records regarding the completion of Basic, Advanced, and Refresher CIT training.

The CPD and the OEMC continue to utilize multiple approaches for informing the OEMC telecommunicators which CPD members are CIT certified. For example, the OEMC personnel may access the roster of CIT officers available on a per-shift basis based on the CPD's and the OEMC's auto-generated software platforms. Additionally, watch supervisors can provide a list of CIT officers to the OEMC utilizing a separate dataset. During this reporting period at our 9/27/22 site visit, this process largely remains the same, with a partly automated and partly manual system: (1) CLEAR (the CPD data warehouse) communicates with Oracle (OEMC data warehouse) in an automated process which cross checks LMS with Oracle. This designates a z attribute next to CIT officers and (2) Dispatch confirms over the air if they are CIT trained and can make updates to the z attribute when there are inaccuracies. OEMC reported that asking over the radio if the officer is CIT-certified works best due to shift schedule changes or furloughs. They are able to change discrepancies. While CPD still receives a daily roster from watch supervisors to reflect daily changes in assignments (including when officers have sick, furlough, or vacation days.), OEMC reports that the daily fax is not referred to frequently, rather the automated roster and asking over the air have been more reliable. In a CIT Refresher course observed by the IMT in the sixth reporting period, some officers expressed concern regarding the accuracy of officers on patrol designated as "Certified CIT Officers" (*see* ¶¶92–95).

### Progress before the Seventh Reporting Period

In previous reports, we noted that Secondary compliance would depend on the development of a system plan to ensure that officers who violate the eligibility criteria or who allow their required CIT training to lapse are removed from the list

of "Certified CIT Officers" in the CPD's CLEAR and eLearning systems. In response, the CPD provided CIU S.O. 20-02, *CIT Training Schedule, Attendance, Eligibility, and Recruitment*, in the fourth reporting period. SO 20-02 and S05-14 indicate that the CPD will use the CPD's Learning Management System to track when CIT officers need CIT Refresher Training, so that those officers may avoid being removed from the Certified CIT Officers list prioritized for dispatch. Due to limitations in their current electronic system, training records can only be updated quarterly to remove officers who no longer meet the eligibility requirements for certified CIT Officers.

*Progress in the Seventh Reporting Period*

To achieve Secondary compliance, the CPD must demonstrate evidence of a functioning system that identifies and removes ineligible officers from the list of Certified CIT officers. The CPD must also produce training records, which during this reporting period were insufficient and unreliable. Further, the IMT will review whether the CPD has developed a plan and trained the responsible personnel to ensure that officers who violate the Certified CIT Officer eligibility criteria, or who allow their required CIT training to lapse, are undesignated in the CLEAR and eLearning systems. The Audit Division found discrepancies in the accuracy of this eligibility requirement. The IMT will also review whether the CPD has clearly designated who is responsible for maintaining an up-to-date list of Certified CIT Officers. Presently, this function is assigned to the CIT Training team, which is drastically understaffed. The Crisis Intervention Unit, as a whole, as well as the training division specifically, has been cut in half this reporting period. The Crisis Intervention Unit's ability to maintain the same responsibilities with half the staff is unsustainable and will negatively affect the City and the CPD's future compliance. To assess Secondary compliance, the IMT must review not only a current list of Certified CIT officers, but also that the personnel responsible for ensuring when the threshold for service is crossed, a system is in place to remove that officer from the daily roster, and responsible personnel are adequately trained on this process. The IMT will also assess whether the CPD tracks the number of officers who were "undesignated" each reporting period, including why those officers were undesignated.

Going forward, the IMT recommends that the CPD revise its attendance records under ¶105 to align with the eligibility criteria and training requirements established by the Consent Decree, as well as with the CPD's forms 15.518, *Request for CIT Training*, and 15.519, *Request for CIT Officer Designation*. This data will permit the IMT to assess Secondary compliance with ¶105 in an effective and efficient manner. Additionally, the CPD must meaningfully address the deep cuts to CIT staffing.

## Paragraph 105 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Crisis Intervention: ¶106

> **106.** *CPD will require that, when available, at least one Certified CIT Officer will respond to any incident identified as involving an individual in crisis. Certified CIT Officers will continue to be prioritized for dispatch to incidents identified as involving individuals in crisis, as assigned. CPD will review and revise the appropriate policies to ensure that, in situations in which a Certified CIT Officer is not available to respond to a call or incident identified as involving an individual in crisis, the responding officer engages in crisis intervention response techniques, as appropriate and consistent with CPD policy and their training, throughout the incident. Responding officers will document all incidents involving an individual in crisis in a manner consistent with this Agreement.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During the seventh monitoring period, the City and the CPD maintained Preliminary compliance with the requirements of ¶106.

To assess Preliminary compliance, the IMT reviewed the CPD's relevant directives, such as S04-20, *Recognizing and Responding to Individuals in Crisis*, which adequately addresses the requirements of ¶106. Additionally, the CPD has developed an eLearning course intended for all officers that educates them on CIT-related policy and program changes; The City has also developed and implemented a comprehensive *Crisis Intervention Team (CIT) Report* for officers to document incidents involving an individual in mental health crisis.

*Progress in the Seventh Reporting Period*

To assess Secondary compliance, the IMT reviewed the CPD's relevant training efforts. This reporting period, the CPD produced sufficient evidence that 95% of CPD members completed the eLearning, which included updated policy changes including the requirement for when and how officers are to complete the *Crisis Intervention Team (CIT) Report*. While the CPD has made significant progress on providing updated training on responding to calls for service involving individuals in mental health crisis through the 8-hour CIT training required under the 2022 annual in-service, the CPD did not reach the 95% required to demonstrate that

non-Certified CIT Officers have received sufficient training *to ensure the responding officer engages in crisis intervention response techniques, as appropriate and consistent with CPD policy and their training, throughout the incident*. The IMT believes that the CPD will reach secondary compliance with ¶106 once this is delivered to 95% of CPD officers. Additionally, we note that the CPD has strengthened its annual *De-escalation, Response to Resistance, and Use of Force* training, allocating additional training time to de-escalation and crisis intervention, which also addresses some of the requirements of ¶106. These trainings together should equip all officers with the skills and knowledge required under ¶106.

Looking toward assessing Full compliance, the IMT will review the CPD's efforts to capture, manage, and analyze valid and reliable data, as well as the CPD's dispatch prioritization of Certified CIT Officers. As we have mentioned throughout this section, the CPD is moving toward a "train all" mandated CIT model; the IMT will remain focused on the prioritization of officers dispatched to crisis and mental health-related calls for service. In summary, Full compliance will depend on evidence (1) of *prioritization* of at least one Designated CIT officer to calls for service involving a mental health component, (2) that *all* officers engage in effective crisis-response techniques, and (3) that the CIT report is completed on all z-coded events. The data must be analyzed and used to demonstrate compliance with ¶106.

## Paragraph 106 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶107

**107.** *Within 180 days of the Effective Date, and quarterly thereafter, CPD will collect and analyze the number of calls for service identified as involving individuals in crisis for every watch in each district to evaluate the number of Certified CIT Officers needed to timely respond. The number of Certified CIT Officers on each watch in every district will be driven by the demand for crisis intervention services for the particular watch and district.*

---

**Compliance Progress**     (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    Quarterly         ☐ **Met**   ☑ **Missed**

**Preliminary:**      *Not in Compliance*
**Secondary:**      *Not in Compliance*
**Full:**        *Not in Compliance*

During the seventh monitoring period, the CPD did not achieve Preliminary compliance with ¶107.

*Progress before the Seventh Reporting Period*

During the fourth monitoring period, the CPD provided a revised draft of Special Order 20-05, *CIT Officer Implementation Plan.* However, S020-05 required additional revisions before it could be finalized. For example, we had requested that the CPD define the term "timely," as used in ¶107 (i.e., "timely respond"), to determine the number of CIT officers needed in a particular district and watch. Upon completing the necessary revisions, we anticipate the CPD will achieve Preliminary compliance with ¶107.

During the fifth reporting period, the CPD's progress regarding data collection and analysis requirements stalled. The IMT has requested an in-depth briefing with the data analyst during the last two reporting periods, which to date has not yet been scheduled. Evidence of robust data reporting and analysis is required by this paragraph.

As the CPD builds its capacity for more sophisticated analysis to address the requirements of this paragraph, we encourage the Crisis Intervention Unit and Data Analyst to engage in simple analyses that provide some foundational understanding. The CPD should then use this foundational understanding to further build its analysis. For example, if 5% of all CIT calls occur in a certain district, the CPD could reasonably expect approximately 5% of all CIT officers to be in that same district.

This straightforward analysis would begin to inform the "demand for crisis intervention services," which the CPD is required to understand under ¶107. The IMT is concerned that the CIU, who is presently responsible for this function, is drastically understaffed. During this reporting period, CIU staffing has been cut in half while their responsibilities have not been adjusted. This is unsustainable. We look forward to an update on the staffing capability and observing the Crisis Intervention Unit's improved analytical functions in the next reporting period, along with a measure for "timely" response.

### Paragraph 107 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶108

**108.** *Within 180 days of the Effective Date, CPD will develop an implementation plan ("CIT Officer Implementation Plan") based on, at a minimum, its analysis of the demand for crisis intervention services for each watch in each district. The CIT Officer Implementation Plan will identify the number of Certified CIT Officers necessary, absent extraordinary circumstances, to meet the following response ratio targets: a. a sufficient number of Certified CIT Officers to ensure that Certified CIT Officers are available on every watch in each district to timely respond to at least 50% of the calls for service identified as involving individuals in crisis, absent extraordinary circumstances ("initial response ratio target"); and b. a sufficient number of Certified CIT Officers to ensure that Certified CIT Officers are available on every watch in each district to timely respond to at least 75% of the calls for service identified as involving individuals in crisis, absent extraordinary circumstances ("second response ratio target").*

## Compliance Progress
(Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the seventh monitoring period, the CPD did not achieve Preliminary compliance with ¶108.

To achieve Preliminary compliance with ¶108, the City and the CPD must develop and finalize policies that incorporate ¶108's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41).

*Progress before the Seventh Reporting Period*

During the fourth monitoring period, the IMT reviewed a revised draft of Special Order 20-05, *CIT Officer Implementation Plan*. However, SO20-05 required additional revisions before it could be finalized. For example, the IMT requested that the CPD define the term "timely," as used in ¶107-108, to determine the number of CIT officers needed in a particular district and watch. Upon the necessary revisions, the CPD will achieve Preliminary compliance with ¶108.

During the sixth reporting period, the CPD did not more forward regarding its data collection and analysis requirements. The IMT has yet to receive data that demonstrates the Crisis Intervention Unit's capacity for robust data reporting and analysis. During each of the last two reporting periods, the IMT has requested but not received an in-depth briefing with the data analyst. Paragraph 108 requires the CPD to produce robust evidence of data reporting and analysis.

We note that another 6-month monitoring period has passed without the completion of the *CIT Officer Implementation Plan*, as required by ¶108 "within 180 days of the Effective Date," which was March 2019. While the IMT understands the CPD's delaying of this plan until the CPD is able to support the plan with reliable data and a more-robust strategy, the CPD should focus on the actions necessary to produce this vital plan. Moreover, the plan should detail how the CPD is to achieve the required response-ratio targets, as required by this paragraph.

### Paragraph 108 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Crisis Intervention: ¶109

**109.** *The CIT Officer Implementation Plan will further identify the steps that are necessary to meet and maintain the initial response ratio target by January 1, 2020, and the second response ratio target by January 1, 2022 and the strategies, methods, and actions CPD will implement to make progress to timely achieve and maintain these response ratio targets.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the seventh monitoring period, the CPD did not achieve Preliminary compliance with ¶109. To achieve Preliminary compliance with ¶109, the City and the CPD must develop and finalize policies that incorporate ¶109's requirements.

*Progress before the Seventh Reporting Period*

During the fourth monitoring period, the CPD provided a revised draft of Special Order 20-05, *CIT Officer Implementation Plan*. However, SO20-05 required additional revisions before it could be finalized. For example, we have requested that the CPD define the term "timely," as used in ¶¶107-08, to determine the number of CIT members needed in a particular district and watch. Upon completing the necessary revisions, we anticipate the CPD will achieve Preliminary compliance with ¶109.

During the fifth reporting period, the IMT did not note forward progress in the CPD's requirements regarding data collection and analysis. The IMT has yet to receive data that demonstrates the analysts' or Crisis Intervention Unit's capacity for robust data reporting and analysis. During each of the last two reporting periods, the IMT has requested but not received an in-depth briefing with the data analyst. Paragraph 109 requires the CPD to produce robust evidence of data reporting and analysis.

During the seventh reporting period, the CPD had still not dedicated the necessary effort to cleaning and analyzing the data required by ¶108, nor has it used data analysis to inform the *CIT Officer Implementation Plan* required by ¶109.

We will continue to assess the CPD's efforts to ensure that its CIT data is reliable. To achieve Secondary compliance with ¶109, the CPD must demonstrate that the

*CIT Officer Implementation Plan* is complete and includes the number of Certified CIT Officers necessary to satisfy the requisite response ratios.

### Paragraph 109 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| July 1, 2022 – December 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Crisis Intervention: ¶110

***110.*** *Within 180 days of completing the CIT Officer Implementation Plan, and annually thereafter, CPD will submit a report to the Monitor and the Office of the Attorney General ("OAG") regarding the progress the Department has made to meet: (a) the response ratio targets ("Implementation Plan Goals") identified in the Implementation Plan and (b) the number of Certified CIT Officers identified as necessary to achieve the response ratio targets. The Monitor and OAG will have 30 days to respond in writing to CPD's progress report. The Monitor and CPD will publish CPD's report and the Monitor's and OAG's response, if any, within in 45 days of the date CPD submitted the progress report to the Monitor and OAG.*

**Compliance Progress**                   (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**     Moving              ✓  **Not Yet Applicable**

**Preliminary:**         *Not in Compliance*
**Secondary:**          *Not in Compliance*
**Full:**              *Not in Compliance*

In the seventh monitoring period, the City and the CPD did not achieve any level of compliance with ¶110. Because this paragraph's requirements are tied to the CPD's completion of the *CIT Officer Implementation Plan,* these requirements are not yet applicable.

To achieve Preliminary compliance with ¶110, the City and the CPD must develop and finalize policies that incorporate ¶110's requirements and are in keeping with Consent Decree requirements ¶¶626-41, including the requirement that policies be "plainly written, logically organized, and use clearly defined terms." We have requested, for example, that the CPD clearly define "timely," as used in ¶¶107-08, in its draft of the *CIT Officer Implementation Plan*.

*Progress before the Seventh Reporting Period*

During the fourth monitoring period, the IMT reviewed a revised draft of Special Order 20-05, *CIT Officer Implementation Plan*. However, SO20-05 required additional revisions before it could be finalized.

During the fifth reporting period, the CPD did not progress toward achieving its data collection and analysis requirements. During each of the last two reporting

periods, the IMT has requested but not received an in-depth briefing with the data analyst. Paragraph 110 requires the CPD to produce robust evidence of data reporting and analysis.

### Paragraph 110 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Crisis Intervention: ¶111

> **111.** *Through the execution of the CIT Officer Implementation Plan, CPD will ensure that it maintains a sufficient number of Certified CIT Officers on duty on every watch of each district to help ensure that a Certified CIT Officer is available to timely respond to each incident identified as involving individuals in crisis, absent extraordinary circumstances.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the seventh monitoring period, the City and the CPD did not achieve Preliminary compliance with the requirements of ¶111.

To achieve Preliminary compliance with ¶111, the City and the CPD must develop and finalize policies that incorporate ¶111's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

During the fourth monitoring period, the CPD provided a revised draft of Special Order SO20-05, *CIT Officer Implementation Plan*. However, the SO20-05 required additional revisions before it could be finalized. For example, we have requested that the CPD define the term "timely," as used in ¶111, to determine the number of CIT officers needed in a particular district and watch. Upon implementing the necessary revisions, the CPD will achieve Preliminary compliance with ¶111.

During this reporting period, the CPD continued to lack forward progress regarding its data collection and analysis requirements. During each of the last two reporting periods, the IMT has requested but not received an in-depth briefing with the data analyst. Paragraph 111 requires the CPD to produce robust evidence of data reporting and analysis.

To assess Secondary compliance, the IMT will also make reasonable efforts to ensure that the CPD's Crisis Intervention Unit data is reliable. Moving forward, Secondary compliance will also depend on the completion of the *CIT Officer Implementation Plan*, including the CPD's determination of the number of Certified CIT Officers necessary to satisfy the requisite response ratios. As indicated in previous paragraph assessments, the IMT remains increasingly concerned with the under-

staffing of the Crisis Intervention Unit. The Crisis Intervention Unit's dedicated staff has been cut in half, but is still being held accountable for the same number of responsibilities, which are extensive. The IMT is very concerned that the number of staff is unsustainable. The IMT's site visit interviews also reinforced the Crisis Intervention Unit's strain and exhaustion. The CPD must demonstrate that it is prioritizing this program, otherwise it risks losing levels of compliance. The IMT continues to receive community member concerns through our IMT portal about the lack of CPD support for this program, including its low staffing allocations.

### Paragraph 111 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Crisis Intervention: ¶112

> *112. If the Monitor determines that CPD has not made material progress toward achieving the CIT Officer Implementation Plan Goals during any given reporting period, CPD will review and revise the CIT Officer Implementation Plan as necessary to enable CPD to make material progress to achieve the Implementation Plan Goals.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the seventh monitoring period, the City and the CPD did not achieve Preliminary compliance with ¶112.

To achieve Preliminary compliance with ¶112, the City and the CPD must develop and finalize policies that incorporate ¶112's requirements and the goals of the *CIT Officer Implementation Plan.*

During the fourth monitoring period, the CPD provided a revised draft of Special Order SO20-05, *CIT Officer Implementation Plan*. However, SO20-05 required additional revisions before it could be finalized. For example, we have requested that the CPD define the term "timely," as used in ¶¶107-08, to determine the number of CIT officers needed in a particular district and watch. Upon completing the necessary revisions, we anticipate the CPD will be in Preliminary compliance with ¶112.

The IMT remains concerned that the CPD has not yet completed the *CIT Officer Implementation Plan*, required by ¶¶108-112. While the IMT appreciates delaying progress on the Plan until it is supported by valid and reliable data and a more robust strategy, the CPD should focus on what actions it must take to produce the Plan. Without a completed *CIT Officer Implementation Plan*, the IMT cannot assess the requirements of ¶112.

The Crisis Intervention Unit's dedicated staff has been cut in half, but is still being held accountable for the same number of responsibilities, which are extensive. The IMT is very concerned that the number of staff is unsustainable. The IMT's site visit interviews also reinforced the Crisis Intervention Unit's strain and exhaustion. The CPD must demonstrate that it is prioritizing this program, otherwise it risks losing levels of compliance. The IMT continues to receive community member concerns through our IMT portal about the lack of CPD support for this program, including its low staffing allocations.

## Paragraph 112 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| None |

# Crisis Intervention: ¶113

> **113.** *CPD will require that responding Certified CIT Officers will take the lead in interacting with individuals in crisis, once on scene, when appropriate and with supervisory approval, if required by CPD policy. If an officer who is not a CIT-Certified Officer has assumed responsibility for the scene, the officer will seek input from the on-scene Certified CIT Officer on strategies for resolving the crisis, when it is safe and practical to do so.*

**Compliance Progress**  (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

In the seventh monitoring period, the CPD maintained Preliminary compliance and achieved Secondary compliance with the requirements of ¶113.

The IMT has reviewed the CPD's policy S04-20, *Recognizing and Responding to Individuals in Crisis*, which clearly states that officers assigned to incidents with mental health components will request a Certified CIT-trained officer to assist, if available. We note, however, that the policy does not require the Certified CIT Officer to take the lead in interacting with individuals in crisis; the IMT encourages the CPD to consider adding language that clarifies this requirement.

The CPD achieved Secondary compliance this reporting period with ¶113 by demonstrating that 95% of officers have received the CIT eLearning, which addresses the requirements of this paragraph. Looking forward, the IMT will assess whether the City has qualified personnel fulfilling the CIT responsibilities to achieve the goals of the Consent Decree. The IMT will also assess the City on resource allocation, staffing capacity, and efforts to fill any vacant positions. The IMT remains deeply concerned about insufficient staffing in the Crisis Intervention Unit, as detailed in previous paragraph assessments. Additionally, the CPD is counting officers as specialized CIT officers despite receiving CIT Basic training several years ago, with no refresher since. This is inconsistent with best practice and has implications for the requirements of CIT officers to take the lead on interactions as required under ¶113. Community members rightfully expect that specialized CIT officers are educated on best practices and practicing their skills through regular training and didactic interaction. This specialization is not reflected in a significant portion of the CPD's CIT officers.

## Paragraph 113 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Crisis Intervention: ¶114

**114.** *Certified CIT Officers will receive ongoing feedback from the CIT Program and unit supervisors regarding their responses to incidents identified as involving individuals in crisis.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh monitoring period, the CPD maintained Preliminary compliance with the requirements of ¶114.

To assess Preliminary compliance, the IMT reviewed the CPD's Special Order S05-14, *Crisis Intervention Team (CIT) Program*, which requires that area-level personnel within the CIT Unit will provide advice, guidance, and feedback on incidents involving people in crisis, and will follow up on mental and behavioral health-related events beyond the preliminary investigation.

In the fifth reporting period, the CPD's Special Order S05-14, *Crisis Intervention Team (CIT) Program* underwent significant revisions. Under the newly revised S05-14, the CIT District, Operations, and Community Support (CIT DOCS) unit is responsible for "providing members with feedback." This revised draft version neglected to include supervisors (*i.e.*, officers' shift sergeants and lieutenants) into the responsibility for providing feedback, as required by ¶114. Field supervisors overseeing patrol officers are uniquely positioned to help provide crucial feedback to CIT officers, whose service occurs alongside vulnerable populations. Additionally, the CIT DOCS unit is significantly understaffed, making the responsibilities designated to them under ¶114 challenging.

In the sixth reporting period, the CPD incorporated the requirements of ¶114 – including field supervisors – into S05-14. The IMT appreciates this further revision.

To assess Secondary compliance, the IMT will assess evidence that unit supervisors (*i.e.*, members' shift sergeant and lieutenant) and CIT DOCS personnel are providing ongoing feedback after officers interact with people in mental health crises. The CPD's supervisors should receive the 40-hour Basic CIT training in order to provide this valuable feedback. Further, unit supervisors should be provided training on the responsibilities required by ¶114. While the CPD's eLearning training for all CPD officers includes a review of relevant policy changes, that eLearning training lacks supervisor-specific details on the process of reviewing reports and evaluating officer responses to calls involving a person in mental health crisis. *See*

¶119. Additionally, the supervisor promotion training does not cover any topic related to CIT. Consequently, field supervisors are unprepared to satisfy ¶114's requirements. The IMT provided feedback to the CPD regarding the necessary changes that must be made to the supervisor training. Moreover, the Crisis Intervention Unit plays an important role in operationalizing ¶114. The Crisis Intervention Unit's dedicated staff (including the CIT DOCS team responsible for district-level support) has been cut in half but has the same responsibilities, which are extensive. This level of staffing is unsustainable. The IMT's site visit interviews continue to reinforce the Crisis Intervention Unit's strain and exhaustion. The CPD must demonstrate that it is prioritizing this program in order to maintain compliance. The IMT also continues to receive community member concerns via the community feedback portal on the IMT's website on the lack of CPD support for this program, including the CPD's unacceptably low staffing allocations.

### Paragraph 114 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| July 1, 2022 – December 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶115

> **115.** *CPD has designated and will maintain a Certified CIT Officer, at the rank of Lieutenant or above, with the sole responsibility to act as a Crisis Intervention Team Program Coordinator ("CIT Coordinator"). The CIT Coordinator will work to increase the effectiveness of CPD's CIT Program, improve CPD's responses to incidents involving individuals in crisis, and facilitate community engagement between CPD and crisis intervention-related stakeholders.*

## Compliance Progress                    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with the requirements of ¶115. The IMT reviewed CPD policy S05-14 *Crisis Intervention Team (CIT) Program*, which adequately incorporates the requirements of ¶115.

### Progress before the Seventh Reporting Period

We note that ¶115 requires the CPD to "designate and … maintain a Certified CIT Officer, at the rank of Lieutenant or above, with the *sole* responsibility to act as a Crisis Intervention Team Program Coordinator" (emphasis added). In a previous monitoring period, the designated CIT Coordinator was promoted to Deputy Chief overseeing the Education and Training Division. This resulted in the CIT Coordinator's duties being significantly expanded. During a previous submission of S05-14, the policy did not specify this important function of "sole" responsibility, but in the sixth reporting period this function was included in the revised S05-14, which was finalized during the sixth reporting period.

During the fifth reporting period, the CPD onboarded a new CIT Coordinator with the sole responsibility of overseeing the CIT Program, as required by ¶115. The IMT reviewed the new CIT Coordinator's credentials and believes he is sufficiently qualified to serve in this important role.

### Progress in the Seventh Reporting Period

Paragraph 115 requires the CIT Coordinator to "work to increase the effectiveness of CPD's CIT Program, improve CPD's responses to incidents involving individuals

in crisis, and facilitate community engagement between CPD and crisis intervention-related stakeholders." The Crisis Intervention Unit's dedicated staff have been cut in half but still have the same responsibilities, which are extensive. Consequently, the CIT Coordinator, as the program's leader, is forced to maintain the program, rather than proactively lead it. This is unsustainable. The IMT's site visit interviews continue to reinforce the Crisis Intervention Unit's strain and exhaustion. Additionally, the CPD cut the community engagement position, which was designed to support the CIT Coordinator in fulfilling some of the requirements of ¶115. In previous reporting periods, the CIT Coordinator had the Deputy Chief of Training (who was the former CIT Coordinator) to support the new CIT Coordinator and the overall Crisis Intervention program. It is unclear to the IMT why the Deputy Chief of Training position was uninvolved during this reporting period.

The CPD must demonstrate that it is prioritizing this program in order to maintain compliance. The IMT continues to also receive community member concerns via the IMT portal about the CPD not supporting this program, including the CPD's unacceptably low staffing allocations.

Moving forward, the IMT expects to see evidence of staffing increases in the Crisis Intervention Unit, which will help promote the ability of the CIT Coordinator to demonstrate proactive leadership. As indicated, ¶115 requires outcomes, including community engagement and demonstrating the CIT Program's increasing effectiveness. Secondary compliance with ¶115 will require the CPD to produce such evidence. Because the CIU is significantly understaffed, the IMT is concerned that the CIT coordinator will not have the band-width to accomplish the responsibilities outlined in ¶115.

### Paragraph 115 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶116

> **116.** *The CIT Coordinator will receive initial and refresher professional development training that is adequate in quality, quantity, type, frequency, and scope to prepare the CIT Coordinator to take on the role and responsibilities of the CIT Coordinator, in addition to the Basic CIT training.*

## Compliance Progress      (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

During the seventh monitoring period, the CPD maintained Preliminary and Secondary compliance with the requirements of ¶116.

To assess Preliminary compliance, the IMT reviewed the CPD's policy S05-14, *Crisis Intervention Team (CIT) Program*, which adequately reflects the requirements of ¶116. Moreover, the CPD achieved Secondary compliance in the third reporting period because the previous CIT Program Coordinator had both adequate training and the requisite background to fulfill the role.

### Progress before the Seventh Reporting Period

As noted previously in this report, the former CIT Program Coordinator had been promoted to Deputy Chief over the Training Division and was assuming multiple roles, which contradicts ¶115's requirement that the CIT Program be the "sole responsibility" of the "designated" CIT Coordinator. In the fifth reporting period, the CPD onboarded a new CIT Coordinator, whose sole responsibility is the CIT Program.

The new coordinator also has adequate training and the requisite background to fulfill the CIT Coordinator role. The IMT has reviewed documentation indicating that the CIT Coordinator received the initial 40-hour Basic CIT Training in 2016 and CIT Refresher Training in 2021.

While we encouraged the CPD to evaluate the CIT Coordinator's on-the-street experience as a CIT officer as a part of the selection criteria for a CIT Coordinator, the CPD opted to not consider this experience of CIT Coordinator candidates. The IMT continues to encourage the CPD to consider this recommendation moving forward, as we believe such experience adds to the foundational effectiveness of any CIT Coordinator who oversees the CIT program. On-the-ground context knowledge is important for any supervisory role, and the CIT Coordinator is no exception.

*Progress in the Seventh Reporting Period*

The CIT Coordinator attended the Basic CIT training in 2016, or seven years ago. The CPD should encourage and support the new coordinator in attending the Basic 40-hour course again. This would both assist the coordinator with experiencing what officers are being taught in this class presently, as required under ¶115, and elevate the CIT Coordinator's skills to be consistent with best practice. This is especially important as the leader of such an important program. The CPD should support and encourage the coordinator to broaden and deepen his skill set and leadership capabilities. The CIT Coordinator should also be supported in participating in advanced level training to best position the CIT Coordinator for Unit leadership.

The Crisis Intervention Unit's dedicated staff has been cut in half this reporting period, but still has the same responsibilities, which are extensive. Consequently, the CIT Coordinator, as the primary leader of the program, is forced to maintain the program, rather than proactively lead it. This is not sustainable. Site visit interviews continue to reinforce the strain and exhaustion of not only the unit, but also the CIT Coordinator. Additionally, the CPD cut the community engagement position, which was designed to support the CIT Coordinator in fulfilling some of the requirements of this paragraph (*see* ¶115). In previous reporting periods, the CIT Coordinator had the Deputy Chief of Training (and former CIT Coordinator) to support the CIT Coordinator and the program. It is unclear to the IMT why the Deputy Chief of Training position was absent this reporting period.

The CPD must demonstrate it is prioritizing this program or risks losing future levels of compliance. The IMT continues to also receive concerns via the community feedback portal on the IMT's website about the CPD not supporting this program, including unacceptably low staffing allocations.

The IMT remains concerned that the CIU is severely understaffed, thereby not allowing the CIT coordinator to complete the requirements of the role. *See* ¶ 115. As indicated, ¶115 requires outcomes, including community engagement and demonstrating the CIT Program's increasing effectiveness. Secondary compliance with ¶115 will require the CPD to produce such evidence.

To achieve Full compliance, the CIT Program Coordinator must provide evidence that the requirements of ¶¶115–17 are being met, demonstrating the CIT Coordinator is effectively engaged in the roles and responsibilities outlined for this position.

## Paragraph 116 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Crisis Intervention: ¶117

*117. The responsibilities of the CIT Coordinator will include, at a minimum: a. developing and managing a uniform CIT Program strategy; b. researching and identifying best practices to incorporate into CPD response to individuals in crisis; c. reviewing and, when necessary to meet the requirements of this Agreement, enhancing the CIT training curricula; d. selecting and removing Certified CIT Officers from the CIT Program consistent with the requirements of this Agreement; e. overseeing crisis intervention-related data collection, analysis, and reporting; f. developing and implementing CPD's portion of any Crisis Intervention Plan; g. supervising CIT Program staff; h. participating in the Advisory Committee; i. encouraging the public recognition of the efforts and successes of the CIT Program and individual Certified CIT Officers; and j. regularly communicating and interacting with relevant CPD command staff to recommend improvements to Department crisis intervention-related strategies, staffing and deployment, policies, procedures, and training.*

## Compliance Progress       (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**     *Not in Compliance*
**Full:**          *Not Yet Assessed*

During the seventh monitoring period, the CPD maintained Preliminary compliance with ¶117.

*Progress before the Seventh Reporting Period*

As described throughout this Section, the CPD's substantially revised S05-14 *Crisis Intervention Team (CIT) Program* subsumed content from the previously submitted SOPs and incorporated the requirements of this paragraph. However, we note that the CIT Coordinator is operating without a tangible, written, operational guidance for how the Coordinator is expected to execute his or her duties. To achieve Secondary compliance with ¶117, the CPD must develop training plans and operational guidance that address ¶117's requirements and provide evidence of progress toward the requirements of ¶117. While the CPD has produced documents demonstrating that the new CIT Coordinator is sufficiently qualified for the role, it has not demonstrated how it will operationalize ¶117's requirements.

It is unclear whether there has been sufficient scope of training and coaching to "prepare the CIT Coordinator to take on the role and responsibilities of the CIT Coordinator," per ¶116. Under ¶117, the CIT Coordinator's roles and responsibilities are expansive, as outlined in both this paragraph and in policy.

*Progress in the Seventh Reporting Period*

The CIT Coordinator attended the Basic CIT training in 2016, or seven years ago. The CPD should encourage and support the new coordinator attending the Basic 40-hour course again. This would both assist the coordinator with experiencing what officers are being taught in this class, as required under ¶115, and elevate the CIT Coordinator's skills to be consistent with best practice. This is especially important as the leader of such an important program. The CPD should support and encourage the coordinator to broaden and deepen his skill set and leadership capabilities.

The Crisis Intervention Unit's dedicated staff has been cut in half this reporting period, but still has the same responsibilities, which are extensive. Consequently, the CIT Coordinator, as the primary leader of the program, is forced to maintain the program, rather than proactively lead it. This is not sustainable. Site visit interviews continue to reinforce the strain and exhaustion of not only the unit, but also the CIT Coordinator. Additionally, the CPD cut the community engagement position, which was designed to support the CIT Coordinator in fulfilling some of the requirements of this paragraph (*see* ¶115). In previous reporting periods, the CIT Coordinator had the Deputy Chief of Training (and former CIT Coordinator) to support the CIT Coordinator and the program. It is unclear to the IMT why this position was absent this reporting period.

The CPD must demonstrate it is prioritizing this program to maintain compliance. The IMT continues to also receive community member concerns via the IMT portal about the CPD not supporting this program, including unacceptably low staffing allocations.

Full compliance will require the CPD to produce such evidence. As stated throughout this report, the CIU is understaffed, making it challenging for the CIT coordinator to fulfill the responsibilities assigned to the role. For the IMT to assess Full compliance, the CPD must indicate which tangible factors will contribute to achieving compliance and how those factors, and the CPD's progress toward compliance, will be measured.

## Paragraph 117 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Crisis Intervention: ¶118

*118. By January 1, 2020, CPD will require that, after responding to an incident involving an individual in crisis, the assigned CPD officer completes a CIT Report, or any similar form of documentation CPD may implement. The CIT Report, or similar documentation, at a minimum, will include: a. the nature of the incident; b. the date, time, and location of the incident; c. the subject's age, gender, and race/ethnicity; d. whether the subject is or claims to be a military veteran, if known; e. the relationship to the subject, if any and if known, of the individual calling for service; f. whether the subject has had previous interactions with CPD, if known; g. whether the subject is observed or reported to be experiencing symptoms of a mental illness, intellectual or developmental disability, co-occurring condition such as a substance use disorder, or other crisis; h. the behaviors observed during the incident, including whether the subject used or displayed a weapon; i. the name(s) and star (i.e., badge) number(s) of the assigned CPD officer(s) and whether any of the assigned officers are Certified CIT Officers; j. the name(s) and star (i.e., badge) number(s) of any supervisor responding to the scene; k. the skills, techniques, or equipment used by the responding CPD officers; l. whether a reportable use of force was documented on a Tactical Response Reports ("TRR"), or whatever similar form of documentation CPD may implement, for the incident ; m. a narrative describing the CPD officer's interaction with the subject, when no other CPD report captures a narrative account of the incident; and n. the disposition of the incident, including whether the individual was transported to municipal or community services, transported to a hospital, subject to a voluntary or involuntary commitment, or arrested.*

## Compliance Progress                    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**      *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**       *In Compliance* (NEW)
**Full:**             *Not Yet Assessed*

In the seventh reporting period, the CPD maintained Preliminary compliance and achieved Secondary compliance with the requirements of ¶118.

To assess Preliminary compliance with ¶118, the IMT reviewed the CPD's relevant policies incorporating ¶118's requirements. The CPD achieved Preliminary compliance in the third reporting period when ¶118's requirements were memorialized into S04-20, *Recognizing and Responding to Individuals in Crisis*, which clearly states that officers must complete a *CIT Report* when they determine that a call for service includes a mental-health component.

The IMT also reviewed the CPD's CIT eLearning addressing policy changes, including the requirement that officers complete a *CIT Report* for any mental health related call for service. Previously, this requirement had only been memorialized for CIT officers in certain situations (*e.g.*, when no other report was completed).

*Progress in the Seventh Reporting Period*

The CPD has achieved Secondary compliance with ¶118 this reporting period by demonstrating that 95% of officers have received and passed the CIT eLearning training course. Subsequent levels of compliance will require operational integrity that 95% of officers are completing the CIT Report when required, thereby informing reliable data collection. Moreover, the IMT has learned through ongoing site visits and ride-alongs with the CPD that there are challenges with completing the CIT report. For example, the CPD regularly receives service calls that are not easily categorized into whether or not they have a mental-health component. Despite this ambiguity, responding officers can only clear calls by checking a "yes" or "no" box regarding the mental health component, even when the call has no bearing on being a mental health call. Going forward, the CPD should consider addressing such operational challenges. Additionally, at present, there are seven reports that the CPD members must complete on service calls involving a mental health component. This is challenging for officers and we encourage the CPD to identify a more efficient manner for collecting relevant data.

### Paragraph 118 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Crisis Intervention: ¶119

**119.** *CPD will require that a supervisory member reviews and approves completed CIT Reports, or any similar form of documentation CPD may implement to document incidents involving an individual in crisis, before submitting them to the CIT Program.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶119.

To achieve Preliminary compliance with ¶119, the City and the CPD developed and finalized policies that partially incorporated ¶119's requirements. The CPD's policies were plainly written, logically organized, and used clearly defined terms, as required by ¶626. Moreover, and the policies and procedures submitted to the IMT allowed the parties to engage in a collaborative revision process. To maintain Preliminary compliance going forward, the City and the CPD will need to fully incorporate ¶119's requirements into similar policies.

The CPD's policy S04-20, *Recognizing and Responding to Individuals in Crisis*, states that supervisors will "review and *if appropriate*, approve the completed Crisis Intervention Team (CIT) Report submitted for their approval" (emphasis added). The IMT previously noted that ¶119 *requires* approval of the *CIT Report,* not just "if appropriate." This has been addressed and included in subsequent policy revisions, as well as incorporated into training.

*Progress before the Seventh Reporting Period*

The IMT reviewed the CPD's CIT eLearning, which addresses the IMT's recommended policy changes, including policy changes resulting from ¶119. The IMT noted that the eLearning covers little information specific to supervisors, including how and when they are expected to conduct the reviews required by ¶119. In addition, the CPD produced the pre-service training for Sergeants and Lieutenants on August 11, 2022. Unfortunately, it did not include any content on the Crisis Intervention Program, including the requirements under ¶119. The IMT recommends that the CPD incorporate a module on the Crisis Intervention Unit and the Crisis Intervention Program to this pre-service training, which should include the responsibilities of field supervisors. The 40-hour Basic CIT program that is required

for pre-service is not intended for this purpose and does not cover supervisor responsibilities. Secondary compliance will be achieved once *both* 95% of the eLearning is completed and supervisor responsibilities under the Crisis intervention Program are fully integrated into appropriate training curricula. CIT In-service training and Pre-service training would be good considerations for achieving Secondary compliance.

*Progress in the Seventh Reporting Period*

The CPD finalized their CIT eLearning materials and *CIT In-Service Training* this reporting period, which all CPD officers are required to take. These trainings address the CPD's Crisis Intervention Team Program and how to respond to individuals in crisis, although content specific to supervisor responsibilities is relatively weak and should be improved.

This reporting period, 95% completion of the CIT eLearning was demonstrated. The CPD was unable to achieve 95% completion of the CIT In-Service Training. The IMT recommends that more information specific to supervisors be strengthened, including how or when supervisors are expected to complete reviews of the CIT report, or other similar documents, under by ¶119. The IMT observed this ambiguity during site visit interviews, where some supervisors were unaware they were responsible for reviewing and approving CIT reports. The IMT has also not received evidence that supervisors are indeed reviewing and approving CIT reports.

During the seventh reporting period, the CPD maintained Preliminary compliance with ¶119. Secondary compliance was partially achieved this reporting period because the CPD demonstrated 95% of the CPD officers and supervisors have received and passed the CIT eLearning However, to achieve Secondary compliance with ¶119, 95% of the CPD officers and supervisors will need to have also received and passed the CIT In-Servicing training, and supervisors will still require training on how and when to conduct the reviews of CIT Reports and similar documentation. It is concerning that there was no content on the CIT Program included in the Supervisor Training, which the IMT reviewed this reporting period. The CPD must add this information to the pre-service training for Sergeants and Lieutenants, along with the CIT In-Service training.

Full compliance will require operational integrity that the *CIT Reports* are indeed being reviewed and approved before they are submitted to the CIT Unit, thereby informing reliable data collection.

## Paragraph 119 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Crisis Intervention: ¶120

> **120.** *CPD will collect, analyze, and report data regarding the number and types of incidents involving individuals in crisis and responses of CPD officers to such events to assess staffing and deployment of Certified CIT Officers and department-wide responses to individuals in crisis. The CIT Program will review the data contained within the submitted CIT Reports, or any similar form of documentation CPD may implement, to evaluate the overall response and effectiveness by CPD officers and identify any district-level and department-wide trends regarding responses to incidents identified as involving individuals in crisis.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶120. The IMT reviewed CPD policy S05-14 *Crisis Intervention Team (CIT) Program*, which adequately incorporates the requirements of ¶120.

To achieve Preliminary compliance with ¶120, the City and the CPD must develop and finalize policies that incorporate ¶120's requirements. Specifically, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

The requirements of ¶120 are found in several directives and forms which, when viewed together, largely memorialize the CPD's responsibilities for collecting, analyzing, and reporting data. The CPD's SO20-05, *CIT Officer Implementation Plan*, previously submitted in the fourth reporting period, memorialized ¶120's requirements but was never finalized.

During the fifth reporting period, SO20-05 was subsumed into a substantially revised version of S05-14, *Crisis Intervention Team Program*, which also did not adequately incorporate ¶120's requirements.

In the sixth reporting period, the CPD produced a substantially revised version of S05-14 that addressed the IMT's outstanding comments, incorporating ¶120's requirements therein. This substantially revised version of S05-14 was finalized, and the City and the CPD achieved Preliminary compliance with ¶120.

While the CPD produced evidence that 95% of officers completed the CPD's CIT eLearning, Secondary compliance with ¶120 will require adequate methodologies for reviewing data related to the CIT Officer Implementation Plan, as well as data collected from the Crisis Intervention Report. The CPD must verify the Crisis Intervention Report's data, including its integrity, reliability, and comprehensiveness. Based on conversations with the CPD, we are aware that the previous Crisis Intervention Reports were rarely completed, especially given the number of crisis calls. The CPD must seek to ensure that officers are completing the updated CIT Report as required by policy. Additionally, the CIT Area DOCS teams will need to develop some form of useful documentation to capture the important district work they are doing to assist with the requirements of ¶120. Community member follow ups on crisis calls, community engagement, CIT report review, and hearing from CIT officers on what is or is not working well helps to inform data collection, analysis, and reporting on incidents involving individuals in crisis. Lastly, the IMT has requested the last two reporting periods for the data analyst to provide an in-depth briefing on CIT data collection and analysis. This has yet to occur. ¶ 120 requires *the CPD to collect, analyze, and report data regarding the number and types of incidents involving individuals in crisis and responses of CPD officers to such events to assess staffing and deployment of Certified CIT Officers and department-wide responses to individuals in crisis*. This is unable to be assessed without an analyst briefing.

Full compliance will require the CPD to demonstrate that district-level and department-wide trends are (1) being identified and (2) being comprehensively addressed.

## Paragraph 120 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Crisis Intervention: ¶121

*121. CPD will identify and assign a sufficient number of data analysts to collect and analyze data related to the CIT Program and CPD's response to incidents involving individuals in crisis.*

## Compliance Progress
(Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *In Compliance (FOURTH REPORTING PERIOD)*
**Secondary:** *Not In Compliance*
**Full:** *Not Yet Assessed*

In the seventh reporting period, the CPD maintained Preliminary compliance with the requirements of ¶121.

To achieve Preliminary compliance with ¶121, the CPD identified the number of data analysts that it believed was sufficient to address the CIT Program's data needs, consistent with ¶121's requirements.

The CPD memorialized ¶121's requirements into the substantially revised S05-14, *Crisis Intervention Team (CIT) Program*, which was finalized in the sixth reporting period thereby maintaining Preliminary compliance.

The CPD's designated data analyst, a crucial, centralized position, resigned in the fourth reporting period. The new data analyst was onboarded in the fifth reporting period. The CPD has only assigned one analyst to the Crisis Intervention Unit to collect and analyze data regarding the CIT Program and the CPD's response to incidents involving individuals in crisis.

In the fifth reporting period, the Crisis Intervention Unit implemented the requirement that officers complete the CIT report on all calls involving a mental health component. The data contained in this report will be instrumental to the overall CIT Program, and for the CIT data analyst. However, the frequency with which these reports are being completed, and the extent to which the information contained in them is reliable, is unclear.

At this time, the CPD has determined that one analyst is sufficient to satisfy ¶121's requirements. While the IMT has met and interviewed the data analyst, we have requested each of the last two reporting periods to have an in-depth data conversation, which has yet to occur. Therefore, we have not had the opportunity to review the quality of the analysts work. Without reviewing the quality of the analysts work, it is difficult for the IMT to assess whether a single analyst is indeed sufficient. Future compliance assessments will depend on the CPD finalizing the CIT

dashboard and integrating data from the unit and district levels. Based on the quality of this work, the CPD will then need to conduct ongoing assessments to determine if more analysts are necessary for Full compliance.

To achieve Secondary compliance, it is crucial that the analyst collect and robustly analyze data of responses to incidents involving individuals in crisis. This data should be both in writing and presented to the IMT so that the IMT can ask questions and assess the quality of data collection and analysis, as required under ¶121. Additionally, the *CIT Officer Implementation Plan* and the City's *Crisis Intervention Plan* required under ¶¶122–23 have not been completed over the last several reporting periods. These reports contain important data, much of which would be the data analyst's responsibility and required to assess Secondary compliance with ¶121.

### Paragraph 121 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶122

*122. Within 365 days of the Effective Date, and on an annual basis thereafter, the City will publish a written Crisis Intervention Plan. The development of the Crisis Intervention Plan will be based on the regular review of aggregate data and a sample of incidents conducted by CPD and OEMC. The CIT Coordinator will consider quantitative crisis-intervention data, qualitative data on officers' and community members' perception of the effectiveness of the CIT Program, CPD member feedback regarding crisis intervention-related training, actual incident information, staffing and deployment analysis of available Certified CIT officers, research reflecting the latest in best practices for police responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee. OEMC will consider the response to, identification of, and dispatch of calls for service involving individuals in crisis by OEMC tele-communicators, research reflecting the latest in best practices for tele-communicator responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee.*

## Compliance Progress       (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**   Annual          ☐ **Met**   ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During the seventh monitoring period, the City did not achieve any level of compliance with the requirements of ¶122.

Paragraph 122 requires annual submission of the *Crisis Intervention Plan*. While the City incorporated the requirements of ¶122 into the substantially revised S05-14, *Crisis Intervention Team (CIT) Program,* the City's required submission of the *Crisis Intervention Plan* is also required to achieve Preliminary compliance.

*Progress before the Seventh Reporting Period*

In the fourth monitoring period, the IMT reviewed a draft version of the *Crisis Intervention Unit* Special Order 20-03 (CIU SO 20-03), which clearly identified the steps necessary to complete the CPD's portion of the City's *Crisis Intervention Plan*. In the fifth reporting period, the CPD's CIU SO 20-03 was subsumed under the

substantially revised S05-14 *Crisis Intervention Team Program,* which memorialized many, but not all, of ¶122's requirements. Moreover, the *Crisis Intervention Plan* must be submitted annually, but it has not been submitted since the third reporting period, which ended December 2020.

Despite these shortcomings, the City *had* been making strides in the scope of the *Crisis Intervention Plan's* evaluation, as well as the transparency of data included in the same. However, during the last two reporting periods, we have seen this progress lag, with CIU staffing levels being cut in half. We have not reviewed evidence supporting any further progress toward the City building an infrastructure to complete a *Crisis Intervention Plan.*

The IMT continues to be concerned regarding transparency and accuracy related to primary and secondary CIT officer responses, which affect response-ratio requirements. There are also deficiencies in officers hitting the "on scene" key, which makes it difficult to reliably assess when a CIT officer arrives on scene, whether that arrival is primary or secondary, and how long into the call arrival occurs. As noted earlier, the IMT is increasingly concerned about CIT staffing levels. Public trust relies on transparency, even when deficiencies are present, and we would expect this transparency to continue in future iterations of the *Crisis Intervention Plan*.


*Progress in the Seventh Reporting Period*

Both the CPD and the City have gone another reporting period without submitting a *CIT Officer Implementation Plan* or a *Crisis Intervention Plan*, as required by ¶¶108 and 122. While the IMT appreciates delaying these reports so that they can be supported by reliable data and a more robust strategy, the City and the CPD should focus on what actions it needs to take to produce these reports annually. Instead, as indicated throughout this report, the CPD and the City have cut the Crisis Intervention Unit's dedicated staff in half.

Community members have raised concerns regarding the OEMC's call-taking and dispatching process, particularly in relation to Black and Brown communities who experience a significant variance in time for dispatch and arrival on scene on priority calls. Because ¶122 specifically requires that "OEMC will consider the response to, identification of, and dispatch of calls for service involving individuals in crisis by OEMC tele-communicators, research reflecting the latest in best practices for tele-communicator responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee," additional call-taker and dispatch

data should to be added to the monthly OEMC report so that dispatch delays compared to arrival on scene can be assessed.[1]

Because the majority of patrol vehicles are now equipped with GPS, the CPD should be able to accurately account for arrival-on-scene data, rather than just the time at dispatch. Moving forward, OEMC should account for the time at call intake, time of dispatch, and time of arrival on scene.

Moreover, the City's *Crisis Intervention Plan* must continue to include information and feedback from all stakeholders within the City's crisis response system, including the CPD, the Chicago Council on Mental Health Equity, the Chicago Fire Department, the OEMC, and the Chicago Department of Public Health. In the last received Crisis Intervention Plan back in the third reporting period, each entity identified its accomplishments. Since that time, the Chicago Department of Public Health has launched its pilot CARE program, an important step toward reducing law enforcement response to individuals in crisis and promoting deflection and diversion as an overarching goal of the Crisis Intervention Section of the Consent Decree and also required under ¶¶ 126, 130, 131, and 134.

Additionally, effective July 2021, the Illinois General Assembly passed the Community-Law Enforcement and Other First Responder Partnership for Deflection and Substance Use Disorder Treatment Act, which authorizes "law enforcement and other first responders to develop and implement collaborative deflection programs in Illinois that offer immediate pathways to substance use treatment and other services as an alternative to traditional case processing and involvement in the criminal justice system, and to unnecessary admission to emergency departments."[2]

The CARE program is one such program that meets not only the spirit and intent of the Consent Decree, but also the requirements of the Act. The CARE program requires a collaborative approach to diversion and deflection, and the IMT looks forward to policy, training, and operational progress as this pilot program expands. Because these alternative response teams include CIT officers (CPD), emergency medical services (Chicago Fire Department), Clinician (Chicago Department of Public Health), and call-takers and dispatch (OEMC), the City, in collaboration with these entities, should finalize a CARE policy guiding the responsibilities of each entity. Training curricula should also be produced.

---

[1]   *See, e.g.*, Joe Mahr and Annie Sweeney, *Many 911 calls deserve an 'immediate' police response. But in thousands of cases, officers didn't arrive for more than an hour*, CHICAGO TRIBUNE (January 1, 2023), https://www.chicagotribune.com/news/criminal-justice/ct-chicago-police-dispatch-long-delays-20230101-y3ky5kq6rnfuhd6b3hrbj5lia4-story.html.

[2]   *See* 5 ILCS 820, *Community-Law Enforcement and Other First Responder Partnership for Deflection and Substance Use Disorder Treatment Act*, https://www.ilga.gov/legislation/ilcs/ilcs3.asp?ActID=3901&ChapterID=2.

As previously indicated in this report, the CPD's designated data analyst, a crucial position, resigned in the fourth reporting period. In the fifth reporting period, a new analyst was hired and onboarded. The data analysis required to meet ¶122 requires evidence that the analyst has the data needed to perform reliable, robust analysis. Paragraph 121 requires sufficient data analysts be assigned to the Crisis Intervention Unit. During each of the last two reporting periods, the IMT has requested but not yet received an in-depth briefing with the data analyst.

The City has increased funding investment toward improving crisis services to Chicagoans. For example, during the November 7th Chicago Council on Mental Health Equity meeting, the Director of the health department's substance use program reported that in 2019, the city had 12 million dollars in the mental health budget. This year, 2023, will be the highest budget, at 89 million dollars. The Chicago Department of Public Health reports that 60,000 people were served in 2022 from 11 neighborhoods. In 2023, the goal is to serve up to 75,000 in all 77 neighborhoods. These are admirable goals, and the IMT looks forward to progress updates.

During that same November 7th Chicago Council on Mental Health Equity quarterly meeting, the IMT received a presentation on the status and early outcomes of the Crisis Assistance Response and Engagement (CARE) Program. Additionally, the IMT has reviewed the public dashboard identifying outcomes of the CARE pilot.[3] The dashboard states that there have been over 400 CARE responses, and no uses for force. The IMT cannot assess how reliable this dashboard information is because the IMT has not been provided information on the CARE program's documentation policies and procedures. It is also reported that the City intends to open a stabilization housing center in 2023 and continues to make progress on a sobering center. These would be useful to community crisis response efforts.

The IMT appreciates the Chicago Council on Mental Health Equity's robust work, which is voluntary and unpaid. There is exceptional professional and lived experience in the Chicago Council on Mental Health Equity, whose work is vital to the City's response strategies. The City must make progress on the Chicago Council on Mental Health Equity's new structure, which the City discussed with the Chicago Council on Mental Health Equity during the fifth reporting period. There has been no evidence of change or continued progress updates to the Chicago Council on Mental Health Equity, which are overdue. There continues to be confusion and frustration among some members of the Chicago Council on Mental Health Equity about their role, purpose, and function.

The IMT encourages more proactive communication with community members, the Chicago Council on Mental Health Equity, and the Coalition (*see* ¶669) on all

---

[3]   *See Crisis Assistance Response and Engagement (CARE) Dashboard*, CITY OF CHICAGO, https://www.chicago.gov/city/en/sites/public-safety-and-violence-reduction/home/CARE-Dashboard.html.

crisis intervention efforts. There are increasing community concerns regarding not only the stagnation, but regression, of the CIT and alternative response programs.

Finally, since the *Crisis Intervention Plan* is a City Requirement, which encompasses both the CPD and the OEMC, the IMT encouraged the City to address all requirements of ¶122 in policy, including the OEMC's responsibilities. The CPD's S05-14, *Crisis Intervention Team (CIT) Program*, included the OEMC's responsibilities, a good initial effort at increasing communication between the CPD and the OEMC. However, the CARE program is not included in policy, nor are any requirements of the CFD.

The IMT looks forward to reviewing a *Crisis Intervention Plan* in the near future. Future levels of compliance will hinge on reliable and transparent data and timely submission of the report as required under ¶122.

## Paragraph 122 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| None |

## Crisis Intervention: ¶123

*123. The purpose of the Crisis Intervention Plan will be to evaluate the City's identification of and response to incidents involving individuals in crisis and recommend any changes to staffing and deployment, policy, or training to ensure consistency with CPD and OEMC policy, this Agreement, and best practices. CPD will implement the Crisis Intervention Plan in accordance with the specified timeline for implementation. The Crisis Intervention Plan will: a. report the number, type, and outcome of incidents involving individuals in crisis, the number of Certified CIT Officers available and on duty in each district and on each watch, the percentage of calls for service involving individuals in crisis for which Certified CIT Officers were the first officers to respond to the scene for each watch in every district, and the response times for calls for service involving individuals in crisis for each watch in every district; b. evaluate the CIT Program's compliance with the objectives and functions identified above; c. identify strategies to ensure that CPD has a sufficient number of Certified CIT Officers to meet its response ratio targets for calls for service involving individuals in crisis; d. describe any additional resources, including program staff or equipment, the CIT Program needs to perform its functions; e. identify safety issues and trends regarding interactions between individuals in crisis and officers; f. identify deficiencies and opportunities for improvement in identifying and dispatching calls for service involving individuals in crisis; g. recognize and highlight CIT Program and Certified CIT Officer successes, including successful individual officer performance; h. develop response strategies for repeat calls for service involving individuals who are frequently in crisis; i. recommend any changes to crisis intervention-related strategies, policies, and procedures; j. recommend any changes to CPD and OEMC trainings related to individuals in crisis, including any case studies and teaching scenarios; and k. include a timeline and plan for implementing recommended changes.*

---

### Compliance Progress       (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

---

During the seventh monitoring period, the City did not achieve any level of compliance with the requirements of ¶123.

Paragraph 123 requires annual submission of the *Crisis Intervention Plan*. While the City incorporated the requirements of ¶123 into the substantially revised S05-14, *Crisis Intervention Team (CIT) Program,* the City's required submission of the *Crisis Intervention Plan* is also required to reach Preliminary compliance.

### Progress before the Seventh Reporting Period

The IMT reviewed a draft version of Crisis Intervention Unit Special Order SO20-03, *Crisis Intervention Team (CIT) Plan*, which clearly identified the steps necessary to complete the CPD's portion of the *Crisis Intervention Plan*.

In the fifth reporting period, the CPD's standard operating procedure SO20-03 was subsumed under the substantially revised S05-14, *Crisis Intervention Plan,* which memorialized many requirements of ¶123. However, key requirements were missing. For example, the functions of the OEMC identified in ¶123 were not memorialized.

Moreover, the *Crisis Intervention Plan* must be submitted annually, but it has not been submitted since the third reporting period, which ended December 2020.

Despite these shortcomings, the City *had* been making strides in the scope of the Crisis Intervention Plan's evaluation, as well as the transparency of data included in the same. However, the progress has slowed during the last two reporting periods, with the CPD's CIU staff cut in half. The IMT has seen no evidence of further progress toward building an infrastructure necessary to complete the *Crisis Intervention Plan.*

The IMT continues to be concerned regarding transparency and accuracy related to primary and secondary CIT-officer response, which affects response-ratio requirements. There are also deficiencies in officers hitting the "on scene" key, which makes it difficult to reliably assess when a CIT officer arrives on scene, whether that arrival is primary or secondary, and how long into the call arrival occurs. Public trust relies on transparency, and the IMT expects the City and the CPD to facilitate this transparency in future iterations of the *Crisis Intervention Plan* despite the City and the CPD's ongoing staffing shortages.

### Progress in the Seventh Reporting Period

Both the CPD and the City have gone another reporting period without submitting a *CIT Officer Implementation Plan* or a *Crisis Intervention Plan*, as required by ¶¶108 and 122. While the IMT appreciates delaying these reports so that they can

be supported by reliable data and a more robust strategy, the CPD should focus on what actions it needs to take to produce these reports annually. Instead, as indicated throughout this report, the CPD and the City have cut the Crisis Intervention Unit's dedicated staff in half.

The community has also raised concerns regarding the OEMC's call-taking and dispatching process, particularly in relation to black and brown communities who experience a significant variance in time for dispatch and arrival on scene on priority calls. This is deeply concerning. Because ¶122 specifically includes that "OEMC will consider the response to, identification of, and dispatch of calls for service involving individuals in crisis by OEMC tele-communicators, research reflecting the latest in best practices for tele-communicator responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee," call-taker and dispatch data will need to be added to the monthly OEMC report so that dispatch delays can also be assessed in supporting compliance with ¶122 –23.

Moreover, the City's *Crisis Intervention Plan* must continue to include information and feedback from all stakeholders within the City's crisis response system, including the CPD, the Chicago Council on Mental Health Equity, the Chicago Fire Department, the OEMC, and the Chicago Department of Public Health. In the last received Crisis Intervention Plan back in the third reporting period, each entity identified its accomplishments. Since that time, the Chicago Department of Public Health has launched its pilot CARE program, an important step toward reducing law enforcement response to individuals in crisis and promoting deflection and diversion as an overarching goal of the Crisis Intervention Section of the Consent Decree and also required under ¶¶126, 130, 131, and 134.

Additionally, effective July 2021, the Illinois General Assembly passed the Community-Law Enforcement and Other First Responder Partnership for Deflection and Substance Use Disorder Treatment Act, which authorizes "law enforcement and other first responders to develop and implement collaborative deflection programs in Illinois that offer immediate pathways to substance use treatment and other services as an alternative to traditional case processing and involvement in the criminal justice system, and to unnecessary admission to emergency departments."[4]

The CARE program is one such program that meets not only the spirit and intent of the Consent Decree, but also the requirements of the Act. The CARE program requires a collaborative approach to diversion and deflection, and the IMT looks forward to policy, training, and operational progress as this pilot program expands.

---

[4]    *See* 5 ILCS 820, *Community-Law Enforcement and Other First Responder Partnership for Deflection and Substance Use Disorder Treatment Act*, https://www.ilga.gov/legislation/ilcs/ilcs3.asp?ActID=3901&ChapterID=2.

Because these alternative response teams include CIT officers (CPD), emergency medical services (Chicago Fire Department), Clinician (Chicago Department of Public Health), and call-takers and dispatch (OEMC), the City, in collaboration with these entities, should finalize a CARE policy guiding the responsibilities of each entity. Training curricula should also be submitted for the IMT's review.

As previously indicated, the CPD's designated data analyst, a crucial position, resigned in the fourth reporting period. In the fifth reporting period, a new analyst was hired and onboarded. The data analysis required to achieve compliance with ¶122 requires evidence that the analyst has the data needed to perform reliable, robust analysis. Paragraph 121 requires sufficient data analysts be assigned to the Crisis Intervention Unit. During each of the last two reporting periods, the IMT has requested but not received an in-depth briefing with the data analyst.

The City has increased funding investment toward improving crisis services to Chicagoans. For example, during the November 7th Chicago Council on Mental Health Equity meeting, the Director of the health department's substance use program reported that in 2019, the City had 12 million dollars in the mental health budget. This year, 2023, will be the highest budget, at 89 million dollars. The Chicago Department of Public Health reports that 60,000 people were served in 2022 from 11 neighborhoods. In 2023, the goal is to serve up to 75,000 in all 77 neighborhoods. These are admirable goals, and the IMT looks forward to progress updates.

The IMT received a presentation on the status and early outcomes of the CARE program on April 26, 2022, and also during the November 7th Chicago Council on Mental Health Equity quarterly meeting. Additionally, the IMT has reviewed the public dashboard identifying outcomes of the CARE pilot. The dashboard states that there have been over 400 responses, and no uses for force. The IMT cannot assess how reliable this dashboard information is because the IMT has not been provided information on the CARE program's documentation policies and procedures. It is also reported that the City intends to open a stabilization housing center in 2023 and continues to make progress on a sobering center. These would be useful to community crisis response efforts.

The IMT appreciates the Chicago Council on Mental Health Equity's robust work, which is voluntary and unpaid. There is exceptional professional and lived experience in the Chicago Council on Mental Health Equity, whose work is vital to the City's response strategies. The City must make progress on the Chicago Council on Mental Health Equity's new structure, which the City discussed with the Chicago Council on Mental Health Equity during the fifth reporting period. There has been no evidence of continued progress to the Chicago Council on Mental Health Equity, which are overdue. There continues to be confusion and frustration among some members of the Chicago Council on Mental Health Equity about their role, purpose, and function.

The IMT encourages more proactive communication with community members, the Chicago Council on Mental Health Equity, and the Coalition on all crisis intervention efforts. There are increasing community concerns regarding not only the stagnation, but regression, of the CIT and alternative response programs.

Finally, since the *Crisis Intervention Plan* is a City Requirement, which encompasses both the CPD and the OEMC, the IMT encouraged the City to address all requirements of ¶122-123 in policy, including the OEMC's responsibilities. The CPD's S05-14, *Crisis Intervention Team (CIT) Program*, included the OEMC's responsibilities, which is a good initial effort at increasing communication between the CPD and the OEMC. However, the CARE program is not included in policy, nor are any requirements of the Chicago Fire Department.

The IMT looks forward to reviewing a *Crisis Intervention Plan* in the near future. Future levels of compliance will hinge on reliable and transparent data and timely submission of the report as required under ¶123.

### Paragraph 123 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Crisis Intervention: ¶124

**124.** *The data included in the Crisis Intervention Plan will not include any personal identifying information.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *In Compliance (SIXTH REPORTING PERIOD)*
**Secondary:** *Not In Compliance*
**Full:** *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶124.

To achieve Preliminary compliance with ¶124, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." To achieve Preliminary compliance with ¶124, the City and the CPD must develop and finalize policies that incorporate ¶124's requirements.

### Progress before the Seventh Reporting Period

During the fourth monitoring period, the CPD provided the IMT with SO20-03, *Crisis Intervention Plan*, which included ¶124's requirements but was never finalized.

In the fifth monitoring period, SO20-03 was subsumed under a substantially revised S05-14, *Crisis Intervention Team (CIT) Program*, which did not memorialize ¶124's requirements.

In the sixth reporting period, the City and the CPD achieved Preliminary compliance when ¶124's requirements were incorporated into a revised S05-14, *Crisis Intervention Team (CIT) Program*.

### Progress in the Seventh Reporting Period

There has been no discernible progress toward ¶124 this reporting period. We await the City's next *Crisis Intervention Plan*. Upon finalizing the *Crisis Intervention Plan*, we anticipate the City and the CPD will achieve Secondary and Full compliance with this paragraph.

## Paragraph 124 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

**SEVENTH REPORTING PERIOD**
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Crisis Intervention: ¶125

**125.** *The CIT Coordinator will have CPD's portion of the Crisis Intervention Plan reviewed and approved by the Chief of the Bureau of Patrol within 60 days of the plan's completion.*

**Compliance Progress**   (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not In Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶125.

To achieve Preliminary compliance with ¶125, the IMT assessed the City's and the CPD's data collection, tracking, analysis, and management, as required under the Consent Decree. The IMT also reviewed the *Crisis Intervention Team (CIT) Program* policy (S05-14), which the CPD finalized in the sixth monitoring period.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the IMT reviewed a draft version of Crisis Intervention Unit Special Order SO20-03, *Crisis Intervention Plan*, which clearly stated the requirement for the CPD's portion of the *Crisis Intervention Plan* to be reviewed and approved by the Chief of the Bureau of Patrol.

In the sixth reporting period, the CPD standard operating procedure SO20-03 was subsumed under the substantially revised S05-14. The requirements of ¶125 were memorialized into S05-14, although the designated person to review and approve the *Crisis Intervention Plan* is identified as the Executive Director, Office of Constitutional Policing and Reform.

In the sixth monitoring period, the City and CPD met Preliminary compliance with ¶125 by finalizing and implementing S05-14.

*Progress in the Seventh Reporting Period*

There has been no progress toward ¶125 this reporting period. We await the City's next *Crisis Intervention Plan.* Secondary and Full compliance will depend on continuous evidence that the CPD's portion of the *Crisis Intervention Plan* was indeed reviewed and approved by the Executive Director of the CPD's Office of Constitutional Policing and Reform. The City and the CPD must make strides to produce the

*Crisis Intervention Plan*, which has not been completed since the third reporting period.

### Paragraph 125 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| July 1, 2022 – December 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶126

*126. Consistent with the requirements set forth in the Training section of this Agreement, all officers will receive in-service training, every three years, regarding responding to individuals in crisis that is adequate in quality, quantity, and scope for officers to demonstrate competence in the subject matter. This in-service training will include, but not be limited to, the following topics: a. a history of the mental health system; b. how to recognize and respond to individuals in crisis, including, but not limited to, identifying types of mental health conditions, signs and symptoms of mental health conditions, common treatments and medications, and common characteristics, behaviors, or conduct associated with individuals in crisis; c. the potential interactions officers may have on a regular basis with individuals in crisis, their families, and service providers, including steps to ensure effective communication and avoid escalating an interaction with an individual in crisis; d. techniques to safely de-escalate a potential crisis situation; e. the circumstances in which a Certified CIT Officer should be dispatched or consulted; and f. local resources that are available to provide treatment, services, or support for individuals in crisis, including available pre- and post-arrest diversion programs, and when and how to draw upon those resources.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh monitoring period, the City and the CPD maintained Preliminary compliance with the requirements of ¶126.

To achieve Preliminary compliance with ¶126, the City and the CPD implemented sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." The City and the CPD achieved Preliminary compliance because S11-10-03 *In-Service Training,* which incorporated ¶126's requirements, was finalized in the fifth reporting period.

Moreover, the CPD produced a substantially revised S05-14, *Crisis Intervention Team (CIT) Program* in the fifth reporting period, but that directive, in relevant part, only stated that the Crisis Intervention Team Training Section will "provid[e] expertise and support to the Training Division with in-service . . . training." This did not sufficiently identify the "quantity, quality, and scope" of training that all officers will receive, including the topics identified in ¶126. However, the topics identified in ¶126 were captured under S11-10-03. The CPD may want to also consider fully including ¶126's requirements into S05-14. Incorporating the requirements into S05-14 will help the City and the CPD maintain Preliminary compliance with ¶126 even if significant changes occur in the Training section of the Consent Decree.

During this reporting period, the CPD made progress towards but did not achieve Secondary compliance with ¶126. To achieve Secondary compliance, the CPD must produce evidence that 95% of all the CPD's members received training through the 8-hour Crisis Intervention training provided in the 2022 Annual In-service. The IMT observed a portion of this training in person, and the full training virtually. Overall, this training was well done; however, the Crisis Intervention Unit is not involved in this training, and should be. This raises the IMT's concern over why a topic designated to Crisis Intervention is not being taught by members of the Crisis Intervention Unit's training division. The Crisis Intervention Unit's Training Division is deeply understaffed.

Moreover, the CPD did not produce officer evaluations of the training, which is necessary to determine whether it sufficiently met the requirements of ¶126, nor did the CPD produce outcome metrics that the CPD will use to assess the effectiveness of the training.

To evaluate Full compliance, the IMT will assess future levels of compliance by reviewing training records that indicate 95% of all officers receive training every three years, as required by ¶126, officer evaluations of the training, and the outcome metrics the CPD will develop to assess the effectiveness of the training so that adjustments can be made to the training, which is informed by department outcomes. Additionally, the CPD should consider consulting with the Chicago Council on Mental Health Equity on this training. The IMT recommends that the Chicago Council on Mental Health Equity observe this training and, where appropriate, provide community and lived-experience feedback. *See* ¶130.

## Paragraph 126 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Crisis Intervention: ¶127

**127.** *All new recruits will receive training that is adequate in quantity, quality, and scope regarding responding to individuals in crisis. It will include, but not be limited to, training on the subjects identified above.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

During the seventh monitoring period, the City and the CPD maintained Preliminary compliance with the requirements of ¶127. The CPD achieved Preliminary compliance with ¶127 in the last reporting period by developing and finalizing its policy S011-10-01, *Recruit Training*, which incorporates ¶127's requirements.

### Progress before the Seventh Reporting Period

In the fourth reporting period, the IMT reviewed recruit training curricula related to responding to individuals in crisis. Overall, the content of the training was well done, but there was still room for improvement. For example, the IMT recommended that the recruit training's scenario-based training emphasize scenarios that end in de-escalation without the use of force, which is how most service calls conclude.

During the fifth monitoring period, the IMT reviewed a draft version of S11-10-01, *Recruit Training*, which clearly memorialized ¶127's requirements.

Moreover, the CPD produced a substantially revised S05-14, *Crisis Intervention Team (CIT) Program* in the fifth reporting period. That directive, in relevant part, only stated that the Crisis Intervention Team Training Section will "provid[e] expertise and support to the Training Division with recruit…training." This did not sufficiently identify the "quantity, quality, and scope" of training recruits will receive, including the training topics required by ¶126. However, during the sixth reporting period the CPD fully incorporated the requirements of ¶127 into S05-14 *Crisis Intervention Team (CIT) Program*.

### Progress in the Seventh Reporting Period

In the seventh reporting period, the City produced training curricula designed to meet the requirements of ¶127. The IMT commends the CPD for these training materials, which are thorough, well done, and largely satisfy the objectives of

¶127. These training materials also do a nice job of covering de-escalation strategies. However, ¶126 sets forth the training topics that must be covered to meet the objectives of ¶127. The training did not cover the required topics (1) "identifying types of mental-health conditions, common signs and symptoms of mental health conditions, common treatments and medications, and common characteristics, behaviors, or conduct associated with individuals in crisis" and (2) "the circumstances in which a Certified CIT Officer should be dispatched or consulted" of ¶126. The CPD has developed these topics in the CIT Basic training and other CPD trainings, which could be repurposed for recruit training to meet compliance requirements under ¶¶126–27. Moreover, the CPD should consider consulting with the Chicago Council on Mental Health Equity for this training. The IMT recommends that the Chicago Council on Mental Health Equity observe this training and, where appropriate, provide community and lived-experience feedback. See ¶130.

Future compliance will hinge on demonstrating that the training includes all requirements of ¶¶126-127 and has been delivered to a minimum of one recruit academy cohort and that recruit feedback is incorporated into future training material.

Last, the IMT will also assess the CPD's outcome metrics, which will be used by the CPD to evaluate the effectiveness of the training.

## Paragraph 127 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶128

*128. The City will have a crisis intervention response advisory committee ("Advisory Committee") with subject matter exper-tise and experience that will assist in identifying problems and developing solutions and interventions designed to improve out-comes for individuals in crisis who require City services. The Par-ties acknowledge that the City has formed the City-wide Mental Health Steering Committee and that the City may draw upon those resources to satisfy the requirements of this Agreement.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh monitoring period, the City maintained Preliminary compliance with ¶128.

To achieve Preliminary compliance with ¶128, the IMT assessed whether the City has qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree. Specifically, the IMT examined whether the City has created the requisite Advisory Committee with appropriate expertise and experience. The City created the requisite Advisory Committee, known as the Chicago Council on Men-tal Health Equity (also known as the CCMHE). The IMT also assessed the City on resource allocation, staffing capacity, efforts to fill any vacant positions and im-proved processes designed to build trust, improve transparency, and seek greater consensus building. Going forward, further levels of compliance will depend on substantive reviews by the Chicago Council on Mental Health Equity on data, poli-cies, training, community engagement, and operational practices that help to in-form the "identification of problems and developing solutions and interventions designed to improve outcomes for individuals in crisis."

*Progress before the Seventh Reporting Period*

The Advisory Committee that is responsive to the requirements of ¶128 has evolved from the Crisis Intervention Advisory Committee (also known as the CIAC) into the Chicago Council on Mental Health Equity (CCMHE). The Crisis Intervention Advisory Committee narrowly focused on police responses, whereas the Chicago Council on Mental Health Equity expanded its mission to include the City's broader crisis response systems. The Chicago Council on Mental Health Equity is largely comprised of representatives from the Crisis Intervention Advisory Committee,

and therefore the Chicago Council on Mental Health Equity members' qualifications support their function.

The IMT notes that the Chicago Council on Mental Health Equity is a group of esteemed professionals and key community members who have the experience and credibility to be a crucial force in developing effective crisis response systems.

The IMT recognizes that the City's co-chairs are experienced individuals who strive to support the intended function of this group. There are inherent challenges with leading a group of this size, and while some improvements have been made, more needs to be done to improve its functionality.

The IMT has had ongoing concerns with the City's oversight of the Chicago Council on Mental Health Equity, including the following: lack of bylaws, despite 3 years under Consent Decree (while the city has made progress toward this, lack of quorum prevented a vote during this reporting period); an inadequate feedback loop to the Chicago Council on Mental Health Equity regarding the outcome of its proposed policy revisions; insufficient involvement of persons with lived experience; insufficient Chicago Council on Mental Health Equity involvement in training observation and feedback; lack of clarity on the role/function of the Chicago Council on Mental Health Equity's members; the need for additional staff resources so that this voluntary, unpaid committee can progress in their work; insufficient community engagement through the Open Meetings Act; meetings often feeling reactive, as opposed to a proactive use of time and resources; and the inadequate sharing of materials to be reviewed and discussed in quarterly meetings in advance of meetings to permit review and formulation of questions/comments.

During the fifth and sixth monitoring periods, the City took important steps toward the requirements of ¶¶128 and 137 by inviting the Chicago Council on Mental Health Equity to review and submit feedback on twelve Crisis Intervention standard operating procedures (S04-20; S04-20-02; S04-20-03; S04-20-04; S04-20-05; S05-14; S.O. 20-01; S.O. 20-02; S.O. 20-03; S.O. 20-04; S.O. 21-01; S.O. 21-02). This was an important step for inclusion of feedback, making the process more transparent, providing the time necessary for productive review, and giving participants a voice.

The CPD significantly improved their process of reviewing the Chicago Council on Mental Health Equity's comments and reporting back to which comments were and were not incorporated. However, improvements need to be made to explain why certain Chicago Council on Mental Health Equity feedback was not incorporated, as required by ¶¶130 and 131. The City and the CPD must continue to build trust by listening and responding to legitimate concerns and continuing to improve the process. The IMT appreciates the City's and the CPD's more robust approach to policy review by the Chicago Council on Mental Health Equity and looks forward to this continuing to improve.

In response to consistent concerns by members of the Chicago Council on Mental Health Equity about their role and function, including declining participation to the point that a quorum has been difficult to achieve in the last few quarterly meetings, the co-chairs engaged in a meaningful dialogue in the fifth reporting period about a possible restructuring of the Committee to address these concerns. While the IMT appreciates these important efforts and the conversation elicited good discussion with the Chicago Council on Mental Health Equity, we have seen little progress since then.

*Progress in the Seventh Reporting Period*

The Chicago Council on Mental Health Equity meets regularly, and the IMT has participated in all full committee virtual meetings during this reporting period.

During the seventh reporting period, the City and the CPD have made efforts to address some of these concerns, but there is much more work to be done. The City sought the Chicago Council on Mental Health Equity's feedback on the group's draft bylaws, and members expressed concern regarding these bylaws. Ultimately, the City was unable to achieve the quorum needed during December 5th meeting to vote on the bylaws.

Additionally, the City invited Chicago Council on Mental Health Equity members to attend relevant training and provide feedback. While this is an important step, the City must increase efforts toward better attendance and feedback by Chicago Council on Mental Health Equity members. This experiential observation and feedback create transparency and invite ongoing improvements. The City should continue to prioritize and cultivate attendance at CPD and OEMC training sessions, even if it means implementing more proactive requests, such as developing a training observation subgroup, invitation to persons with lived experience, members of an organization in an advocacy role, as well as other broad invitations. Additionally, prioritizing interagency participation in these trainings (for example, the Chicago Fire Department, the OEMC, and the CPD) would be useful, increasing communication between these agencies.

Important to the requirements of ¶128, the Chicago Council on Mental Health Equity must have access to relevant polices, operational practices, and data for the OEMC, the CPD, the Chicago Fire Department, among other entities. The City has increased access this reporting period. For instance, the City introduced the Chicago Council on Mental Health Equity to some of the relevant OEMC policies, as well as a presentation and overview of the pilot Crisis Assistance Response and Engagement (CARE) program. The IMT appreciates this helpful communication and expects this increased communication and access to continue in the next reporting period.

Chicago Council on Mental Health Equity members continue to express concern about how the City and the CPD intend to seek feedback from neighborhood stakeholders, as well as how individual communities will know when there are meetings or public postings for policies, CIT data, and program updates.

Further, as discussed in previous reports, the manner in which the City and the CPD solicit community input in light of the Open Meetings Act needs to be revised to promote active community engagement. For example, the City requires community members to submit comments 24 hours before the meetings begin, which may serve to deter community participation. In the last two reporting periods, no community-member comments have been submitted to the City through this required process. This is deeply problematic. Additionally, the City often fails to share in advance those documents and PowerPoint presentations it intends to discuss at the quarterly meetings. This makes it difficult for both Chicago Council on Mental Health Equity members and the public to prepare for the meeting with questions or comments. Rather, the documents and presentations are more likely to be shared *after* the meeting, and often at the request of a Chicago Council on Mental Health Equity member.

The City informally produced the Chicago Council on Mental Health Equity's draft bylaws to the IMT, which the IMT has reviewed and intends to provide feedback to in the next reporting period. The City sought a vote on the Chicago Council on Mental Health Equity's draft bylaws before it formally produced them to the IMT. This City should reconsider this approach in light of the Consent Decree paragraphs requiring Chicago Council on Mental Health Equity involvement. The IMT also strongly recommends that the Chicago Council on Mental Health Equity bylaws include provisions for more meaningful community engagement. The draft bylaws contained restrictive language regarding community members' opportunities to ask questions or give feedback. Community members have voiced strong public feedback on mental health initiatives globally, so absence of any feedback through the Open Meeting Act suggests too many barriers exist in the City's feedback system.

The IMT's review of the draft bylaws prompted concerns related to (a) how the City intends to document whether a quorum was present and (b) the Chicago Council on Mental Health Equity's scope and nature. The IMT recommends that the Chicago Council on Mental Health Equity's meeting minutes reflect whether there was a quorum. (*See* Section V.A.4.b). The Consent Decree states that the Chicago Council on Mental Health Equity "will assist in identifying problems and developing solutions and interventions designed to improve outcomes for individuals in crisis who require City services" (¶128). However, the Bylaws state that the Chicago Council on Mental Health Equity is "the City's main advisory committee related to mental health and behavioral health policy making and planning." The IMT recommends the Chicago Council on Mental Health Equity's scope, as required by

Consent Decree, be reflected in the bylaws. Chicago Council on Mental Health Equity members have repeatedly expressed concerns related to their role, function, and adequate utilization of their expertise. One Chicago Council on Mental Health Equity member reflected concerns about the bylaws putting "all power and authority in the city." The City should also re-consider the appropriateness of employees of the City being given voting power, which is often reflected in the meeting minutes.

For future Chicago Council on Mental Health Equity meetings, the IMT encourages the City to publicly address Chicago Council on Mental Health Equity members' questions and comments. For example:

1. Conduct a briefing on emerging best practices in other cities. One CCMHE member asked "What is our north star - what do we hope to accomplish? How do we measure success? What are the expected outcomes?"

2. The role of the Chicago Council on Mental Health Equity, including Consent Decree requirements. This would be a good place to address the changing structure of the Chicago Council on Mental Health Equity. One member expressed confusion about the subcommittees and subcommittee chair requirements referenced in the bylaws: "It's also not always clear the function the committee is serving."

In the seventh monitoring period, the City maintained Preliminary compliance with ¶128. The City must reach a quorum to have the Chicago Council on Mental Health Equity's bylaws passed and implemented, which would formalize the structure of this important body. Moreover, the Chicago Council on Mental Health Equity's revised structure must be developed for the City to move into Secondary compliance. The Chicago Council on Mental Health Equity's progress will continue to stall until the City develops its new structure, and that structure must continue to focus on the group's mission and goal. The community's involvement must also improve. The City should remove barriers to community participation that presently exist, and the City should share meeting materials with the public in advance of the meetings. Moving forward, further levels of compliance will depend on substantive reviews by the Chicago Council on Mental Health Equity on data, policies, training, community engagement, and operational practices informing recommendations on response to individuals in crisis.

## Paragraph 128 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Crisis Intervention: ¶129

> **129.** *The Advisory Committee, at a minimum, will meet quarterly to review and recommend improvements to the City's overall response to individuals in crisis, with consideration to areas such as coordinated crisis response; data collection and evaluation; community engagement and awareness; service outreach and prevention; and the CIT Program.*

**Compliance Progress**       (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**   Quarterly       ☑ **Met**   ☐ **Missed**

**Preliminary:**   *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**   *Not in Compliance*
**Full:**   *Not Yet Assessed*

In the seventh monitoring period, the City maintained Preliminary compliance with the requirements of ¶129 by convening meetings of the Chicago Council on Mental Health Equity on August 24, November 7, and a special session on December 5. The IMT does not believe any of the meetings this reporting period achieved a quorum. While the City indicated that it does not believe a quorum is required, the City's own bylaws governing the Chicago Council on Mental Health Equity require a quorum.

To achieve Preliminary compliance with ¶129, the IMT assessed the City's level of data collection, tracking, analysis, and management as required under the Consent Decree. Specifically, the IMT examined whether the City created the requisite Advisory Committee with appropriate expertise and experience, and whether the Chicago Council on Mental Health Equity meetings are occurring at least quarterly. Going forward, further levels of compliance will depend on substantive reviews by the Chicago Council on Mental Health Equity on data, policies, training, community engagement, and operational practices informing recommendations on overall response to individuals in crisis.

*Progress before the Seventh Reporting Period*

Over the course of the Consent Decree, the Advisory Committee that is responsive to the requirements of ¶129 has evolved from the Crisis Intervention Advisory Committee (also known as the CIAC) into the Chicago Council on Mental Health Equity at the beginning of 2020. The Crisis Intervention Advisory Committee narrowly focused on police responses, whereas the Chicago Council on Mental Health Equity has expanded its mission to the City's broader crisis response systems. The Chicago Council on Mental Health Equity is largely comprised of representatives

from the Crisis Intervention Advisory Committee, and therefore the IMT does not have any concerns about the Chicago Council on Mental Health Equity members' qualifications, nor do we have concerns about the maintenance of institutional knowledge being transferred to the new committee.

The IMT notes that the Chicago Council on Mental Health Equity is a group of esteemed professionals and key community members who have the experience and credibility to be a crucial force in developing effective crisis response systems.

The IMT recognizes that the City's co-chairs are experienced individuals who strive to support the intended function of this group. There are inherent challenges with leading a group of this size, and while some improvements have been made, more needs to be done to improve it.

The IMT has had ongoing concerns with the City's oversight of the Chicago Council on Mental Health Equity, including the following: lack of bylaws, despite 3 years under the Consent Decree (while the city has made progress toward this, a lack of quorum prevented a vote during this reporting period); an inadequate feedback loop to the Chicago Council on Mental Health Equity regarding the outcome of its proposed policy revisions; insufficient involvement of persons with lived experience; insufficient Chicago Council on Mental Health Equity involvement in training observation and feedback; lack of clarity on the role/function of the Chicago Council on Mental Health Equity's members; the need for additional staff resources so that this voluntary, unpaid committee can progress in their work; insufficient community engagement through the Open Meetings Act; meetings often feeling reactive, as opposed to a proactive use of time and resources; and an inadequate sharing of materials to be reviewed and discussed in quarterly meetings in advance of meetings to permit review and formulation of questions/comments.

During the fourth and fifth monitoring periods, the City took important steps toward the requirements of ¶¶129 and 137 by inviting the Chicago Council on Mental Health Equity to review and submit feedback on twelve Crisis Intervention standard operating procedures (S04-20; S04-20-02; S04-20-03; S04-20-04; S04-20-05; S05-14; S.O. 20-01; S.O. 20-02; S.O. 20-03; S.O. 20-04; S.O. 21-01; S.O. 21-02). This was an important step for inclusion of feedback, making the process more transparent, providing the time necessary for productive review, and giving participants a voice.

The CPD significantly improved their process to review these comments and report back to the Chicago Council on Mental Health Equity on what was and was not incorporated compared to the first policy review. However, improvements need to be made to explain why certain Chicago Council on Mental Health Equity feedback was not incorporated, as required by ¶¶130 and 131. The City and the CPD must continue to gain trust by listening and responding to legitimate concerns and continuing to improve the process.

The IMT appreciates the City's and the CPD's more robust approach to policy review by the Chicago Council on Mental Health Equity and looks forward to continuing improvements.

In response to consistent concerns by members of the Chicago Council on Mental Health Equity about their role and function, including declining participation to the point that a quorum has been difficult to achieve in the last few quarterly meetings, the co-chairs engaged in a meaningful dialogue in the fifth reporting period about a possible restructuring of the committee to address these concerns. While the IMT appreciates these efforts and the conversation elicited good discussion with the Chicago Council on Mental Health Equity, there has been no evidence of progress since then.

*Progress in the Seventh Reporting Period*

Although the Chicago Council on Mental Health Equity is still unable to meet in person due to the COVID-19 pandemic, the IMT has participated in all subcommittee and full committee virtual meetings.

During the seventh reporting period, the City and the CPD have made efforts to address some of these concerns, but there is much more work to be done. The City sought the Chicago Council on Mental Health Equity's feedback on the group's draft bylaws, and members expressed concern regarding these bylaws. *See below*. Ultimately, the City was unable to achieve the quorum needed during December 5th meeting to vote on the bylaws.

Additionally, the City invited Chicago Council on Mental Health Equity members to attend relevant training and provide feedback. While this is an important step, the City must increase efforts toward better attendance and feedback by Chicago Council on Mental Health Equity members. This experiential observation and feedback create transparency and invite ongoing improvements. The City should continue to prioritize and cultivate attendance at CPD and OEMC training sessions, even if it means implementing more proactive requests, such as developing a training observation subgroup, invitation to persons with lived experience, members of an organization in an advocacy role, as well as other broad invitations. Additionally, prioritizing interagency participation in these trainings (for example, the Chicago Fire Department, the OEMC, and the CPD) would be useful, increasing communication between these agencies.

Important to the requirements of ¶¶128-29, the Chicago Council on Mental Health Equity must have access to relevant polices, operational practices, and data for the OEMC, the CPD, the Chicago Fire Department, among other entities. The City has improved in increasing access this reporting period. For instance, the City introduced the Chicago Council on Mental Health Equity to some of the relevant OEMC

policies, as well as a presentation and overview of the City's pilot Crisis Assistance Response and Engagement (CARE) program. This is commendable. The IMT expects this increased communication and access to continue in the next reporting period, and transition from a city "report out" to the Chicago Council on Mental Health Equity to a more collaborative approach.

Because ¶129 requires the City to invite the Chicago Council on Mental Health Equity to "review and recommend improvements to the City's overall response to individuals in crisis, with consideration to areas such as coordinated crisis response; data collection and evaluation; community engagement and awareness; service outreach and prevention; and the CIT Program," the bylaws, committee structure, and scope should promote this. The CARE program is one such program that would fall under this umbrella, and the IMT encourages the City to determine whether this program should fall under the scope of Consent Decree assessment. The CARE program includes a CIT officer (CIT Program); OEMC, CPD, Chicago Department of Public Health, Chicago Fire Department (coordinated crisis response); Data Dashboard (Data collection and evaluation); Diversion from the criminal justice system (service outreach and prevention) and promotion to the community (community engagement and awareness). While the CARE program supports the requirements of ¶¶129-130, this program has been designed and implemented by the City, without Chicago Council on Mental Health Equity input. Moreover, the pilot, developed in 2021, is still only in two districts. The City and the CPD must make more effort to promote the types of programs identified under ¶129.

Chicago Council on Mental Health Equity members continue to express concern over how the City and the CPD intend to seek feedback from neighborhood stakeholders, as well as how individual communities will know when there are meetings or public postings for policies, CIT data, and program updates.

Further, as discussed in previous reports, the manner in which the City and the CPD solicit community input in light of the Open Meetings Act needs to be revised to promote active community engagement. For example, the City requires community members to submit public comments 24 hours before the meetings start, but does not permit public comment during the meeting. Given the exclusive lack of any public comment for the last two reporting periods, the City should reevaluate its process to both meet the requirements of the OMA, and to provide greater opportunity for public comment. Additionally, the City often fails to share in advance those documents and PowerPoint presentations it intends to discuss at the quarterly meetings (for example, when the agenda is produced). This makes it difficult for both Chicago Council on Mental Health Equity members and the public to prepare for the meeting with questions or comments. Rather, the documents and presentations are more likely to be shared *after* the meeting, and often at the request of a Chicago Council on Mental Health Equity member.

The City informally produced the Chicago Council on Mental Health Equity's draft bylaws to the IMT, which the IMT has reviewed and intends to provide feedback to in the next reporting period. The City sought a vote on the Chicago Council on Mental Health Equity's draft bylaws before it formally produced them to the IMT. This City should reconsider this approach in light of the Consent-Decree paragraphs requiring Chicago Council on Mental Health Equity involvement. The IMT also strongly recommends that the Chicago Council on Mental Health Equity bylaws include provisions for more meaningful community engagement. The draft bylaws contained restrictive language regarding community members' opportunities to ask questions or give feedback. Community members have voiced strong public feedback on mental health initiatives globally, so absence of any feedback through the Open Meeting Act suggests too many barriers exist in the City's feedback system.

In the IMT review of the draft Bylaws, the IMT's concerns primarily relate to (a) how the City intends to document whether a quorum was present and (b) the Chicago Council on Mental Health Equity's scope and nature. The IMT recommends that the Chicago Council on Mental Health Equity's meeting minutes reflect whether there was a quorum. (*See* Section V.A.4.b). The Consent Decree states that the Chicago Council on Mental Health Equity "will assist in identifying problems and developing solutions and interventions designed to improve outcomes for individuals in crisis who require City services" (¶128). However, the Bylaws state that the Chicago Council on Mental Health Equity is "the City's main advisory committee related to mental health and behavioral health policy making and planning." The IMT recommends the Chicago Council on Mental Health Equity's scope, as required by Consent Decree, be reflected in the bylaws. Chicago Council on Mental Health Equity members have repeatedly expressed concerns related to their role, function, and adequate utilization of their expertise. One Chicago Council on Mental Health Equity member reflected concerns about the bylaws putting "all power and authority in the city." The City should also re-consider the appropriateness of employees of the City being given voting power, which is often reflected in the meeting minutes.

For future Chicago Council on Mental Health Equity meetings, the IMT encourages the City to address Chicago Council on Mental Health Equity members' public questions and comments. For example:

1. Conduct a briefing on emerging best practices in other cities. A CCMHE member asked "What is our north star - what do we hope to accomplish? How do we measure success? What are the expected outcomes?"

2. The role of the Chicago Council on Mental Health Equity, including Consent Decree requirements. This would be a good place to address changing structure of the Chicago Council on Mental Health Equity. One member expressed

confusion about the subcommittees and subcommittee chair requirements referenced in the bylaws: "It's also not always clear the function the committee is serving."

In the seventh monitoring period, the City maintained Preliminary compliance with ¶129. The City must reach a quorum to have the Chicago Council on Mental Health Equity's Bylaws passed and implemented, formalizing the structure of this important body. Moreover, the Chicago Council on Mental Health Equity's revised structure must be developed for the City to move into Secondary compliance. The Chicago Council on Mental Health Equity's progress will continue to stall until it's the City develops its new structure, and that structure must continue to focus on the group's mission and goal. The community's involvement must also improve. The City should removing barriers that presently exist, and the City should share meeting materials with the public in advance of the meetings. Moving forward, further levels of compliance will depend on substantive reviews by the Chicago Council on Mental Health Equity on data, policies, training, community engagement, and operational practices informing recommendations on response to individuals in crisis.

## Paragraph 129 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶130

*130. The City will request that the Advisory Committee provide guidance on crisis response-related policies, procedures, and training of City agencies, including CPD and OEMC, and assist the City in developing and expanding current strategies for responding to individuals in crisis, including reducing the need for police-involved responses to individuals in crisis and developing municipal and community resources, such as pre- and post-arrest diversion resources and alternative response options (like drop-off centers, mobile crisis teams, a central nonemergency crisis line). The City will further request that in providing the guidance detailed above the Advisory Committee will consider specific strategies for responding to children and youth when they experience a behavioral or mental health crisis.*

## Compliance Progress                      (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**          *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**            *Not in Compliance*
**Full:**                 *Not Yet Assessed*

In the seventh monitoring period, the City maintained Preliminary compliance with the requirements of ¶130.

To achieve Preliminary compliance with ¶130, the IMT assessed the City's level of data collection, tracking, analysis, and management as required under the Consent Decree. Specifically, the IMT examined whether the City created the requisite Advisory Committee with appropriate expertise and experience, and whether the Chicago Council on Mental Health Equity meetings are occurring at least quarterly. Going forward, further levels of compliance will depend on substantive reviews by the Chicago Council on Mental Health Equity on data, policies, training, community engagement, and operational practices informing recommendations on overall response to individuals in crisis. A critical component of compliance with this Paragraph, which the IMT will assess, is the Chicago Council on Mental Health Equity's engagement with the OEMC, the CPD, and other crisis-related policies, procedures, and training.

### Progress before the Seventh Reporting Period

Over the course of the Consent Decree, the Advisory Committee that is responsive to the requirements of ¶130 has evolved from the Crisis Intervention Advisory Committee (also known as the CIAC) into the Chicago Council on Mental Health

Equity at the beginning of 2020. The Crisis Intervention Advisory Committee narrowly focused on police responses, whereas the Chicago Council on Mental Health Equity has expanded its mission to the City's broader crisis response systems. The Chicago Council on Mental Health Equity is largely comprised of representatives from the Crisis Intervention Advisory Committee, and therefore the IMT does not have any concerns about the Chicago Council on Mental Health Equity members' qualifications. Nor do we have concerns about the maintenance of institutional knowledge being transferred to the new committee.

The IMT notes that the Chicago Council on Mental Health Equity is a group of esteemed professionals and key community members who have the experience and credibility to be a crucial force in developing effective crisis response systems.

The IMT recognizes that the City's co-chairs are experienced individuals who strive to support the intended function of this group. There are inherent challenges with leading a group of this size, and while some improvements have been made, more needs to be done to improve it.

The IMT has had ongoing concern with the City's oversight of the Chicago Council on Mental Health Equity, including the following: lack of Bylaws, despite 3 years under the Consent Decree (while the city has made progress toward this, lack of quorum prevented a vote during this reporting period); an inadequate feedback loop to the Chicago Council on Mental Health Equity regarding the outcome of its proposed policy revisions; insufficient involvement of persons with lived experience; insufficient Chicago Council on Mental Health Equity involvement in training observation and feedback; lack of clarity on the role/function of the Chicago Council on Mental Health Equity's members; the need for additional staff resources so that this voluntary, unpaid committee can progress in their work; insufficient community engagement through the Open Meetings Act; meetings often feeling reactive, as opposed to a proactive use of time and resources; and inadequate sharing of materials to be reviewed and discussed in quarterly meetings in advance of the meetings.

During the fourth and fifth monitoring periods, the City took important steps toward the requirements of ¶¶130 and 137 by inviting the Chicago Council on Mental Health Equity to review and submit feedback on twelve Crisis Intervention standard operating procedures (S04-20; S04-20-02; S04-20-03; S04-20-04; S04-20-05; S05-14; S.O. 20-01; S.O. 20-02; S.O. 20-03; S.O. 20-04; S.O. 21-01; S.O. 21-02). This was an important step for inclusion of feedback, making the process more transparent, providing the time necessary for productive review, and giving participants a voice.

The CPD significantly improved their process to review these comments and to report back to the Chicago Council on Mental Health Equity what was and was not incorporated compared to the first policy review. However, improvements need to

be made to explain why certain Chicago Council on Mental Health Equity feedback was not incorporated, as required by ¶¶130 and 131. The City and the CPD must continue to gain trust by listening and responding to legitimate concerns and continuing to improve the process. The IMT appreciates the City and CPD's more robust approach to policy review by the Chicago Council on Mental Health Equity and looks forward to this continuing to improve.

In response to consistent concerns by members of the Chicago Council on Mental Health Equity about their role and function, including declining participation to the point that a quorum has been difficult to achieve during recent quarterly meetings, the co-chairs engaged in a meaningful dialogue in the fifth reporting period about possibly restructuring the committee. While the IMT appreciates these efforts and the conversation elicited good discussion with the Chicago Council on Mental Health Equity, there has been no evidence of progress since then.

*Progress in the Seventh Reporting Period*

Although the Chicago Council on Mental Health Equity is still unable to meet in person due to the COVID-19 pandemic, the IMT has participated in all subcommittee and full committee virtual meetings.

During the seventh reporting period, the City and the CPD have made efforts to address some of these concerns, but there is much more work to be done. The City sought the Chicago Council on Mental Health Equity's feedback on the group's draft bylaws, and members expressed concern regarding these bylaws. *See below*. Ultimately, the City was unable to achieve the quorum needed during December 5th meeting to vote on the bylaws.

Additionally, the City invited Chicago Council on Mental Health Equity members to attend relevant training and provide feedback. While this is an important step, the City must increase efforts toward better attendance and feedback by Chicago Council on Mental Health Equity members. This experiential observation and feedback create transparency and invite ongoing improvements. The City should continue to prioritize and cultivate attendance at CPD and OEMC training sessions, even if it means implementing more proactive requests, such as developing a training observation subgroup, invitation to persons with lived experience, members of an organization in an advocacy role, as well as other broad invitations. Additionally, prioritizing interagency participation in these trainings (for example, the Chicago Fire Department, the OEMC, and the CPD) would be useful, increasing communication between these agencies.

Important to the requirements of ¶¶128–30, the Chicago Council on Mental Health Equity must have access to relevant polices, operational practices, and data for the OEMC, the CPD, the Chicago Fire Department, among other entities. The

City has improved in increasing access this reporting period. For instance, the City introduced the Chicago Council on Mental Health Equity to some of the relevant OEMC policies, as well as a presentation and overview of the pilot Crisis Assistance Response and Engagement (CARE) program. This is commendable. The IMT expects this increased communication and access to continue in the next reporting period and transition from a city "report out" to the Chicago Council on Mental Health Equity, to a more collaborative approach. Because ¶130 requires the City to invite the Chicago Council on Mental Health Equity to "review and recommend improvements to the City's overall response to individuals in crisis, with consideration to areas such as coordinated crisis response; data collection and evaluation; community engagement and awareness; service outreach and prevention; and the CIT Program," the Bylaws should promote this through committee structure and scope of work. The CARE program is one such program that would fall under this umbrella, and the IMT encourages the City to determine whether this program should fall under the scope of Consent Decree assessment. The CARE program includes CIT officers (CIT Program); OEMC, CPD, CDMH, CFD (coordinated crisis response); Data Dashboard (Data collection and evaluation); Diversion from the criminal justice system (service outreach and prevention) and promotion to the community (community engagement and awareness). Additionally, ¶130 empowers the Chicago Council on Mental Health Equity to assist the City in "developing and expanding current strategies for responding to individuals in crisis, including reducing the need for police-involved responses to individuals in crisis and developing municipal and community resources, such as pre- and post-arrest diversion resources and alternative response options (like drop-off centers, mobile crisis teams, a central nonemergency crisis line)." While the CARE program supports the requirements of ¶¶129-130, this program has been designed and implemented by the City, without Chicago Council on Mental Health Equity input. Additionally, the pilot, developed in 2021, is still only in two districts. The City and the CPD must make more effort to promote the types of programs identified under ¶130.

Chicago Council on Mental Health Equity members continue to express concern over how the City and the CPD intend to seek feedback from neighborhood stakeholders, as well as how individual communities will know when there are meetings or public postings for policies, CIT data, and program updates.

Further, as discussed in previous reports, the manner in which the City and the CPD solicit community input in light of the Open Meetings Act needs to be revised to promote active community engagement. For example, the City requires community members to submit public comments 24 hours before the meetings start, but does not permit public comment during the meeting. Given the exclusive lack of any public comment for the last two reporting periods, the City should reevaluate its process to both meet the requirements of the OMA, and to provide greater opportunity for public comment. Additionally, the City often fails to share in advance those documents and PowerPoint presentations it intends to discuss at the

quarterly meetings (for example, when the agenda is produced). This makes it difficult for both Chicago Council on Mental Health Equity members and the public to prepare for the meeting with questions or comments. Rather, the documents and presentations are more likely to be shared *after* the meeting, and often at the request of a Chicago Council on Mental Health Equity member.

The City informally produced the Chicago Council on Mental Health Equity's draft bylaws to the IMT, which the IMT has reviewed and intends to provide feedback to in the next reporting period. The City sought a vote on the Chicago Council on Mental Health Equity's draft bylaws before it formally produced them to the IMT. This City should reconsider this approach in light of the Consent-Decree paragraphs requiring Chicago Council on Mental Health Equity involvement. The IMT also strongly recommends that the Chicago Council on Mental Health Equity bylaws include provisions for more meaningful community engagement. The draft bylaws contained restrictive language regarding community members' opportunities to ask questions or give feedback. Community members have voiced strong public feedback on mental health initiatives globally, so absence of any feedback through the Open Meeting Act suggests too many barriers exist in the City's feedback system.

In the IMT review of the draft Bylaws, the IMT's concerns primarily relate to (a) how the City intends to document whether a quorum was present and (b) the Chicago Council on Mental Health Equity's scope and nature. The IMT recommends that the Chicago Council on Mental Health Equity's meeting minutes reflect whether there was a quorum. (*See* Section V.A.4.b). The Consent Decree states that the Chicago Council on Mental Health Equity "will assist in identifying problems and developing solutions and interventions designed to improve outcomes for individuals in crisis who require City services" (¶128). However, the Bylaws state that the Chicago Council on Mental Health Equity is "the City's main advisory committee related to mental health and behavioral health policy making and planning." The IMT recommends the Chicago Council on Mental Health Equity's scope, as required by Consent Decree, be reflected in the bylaws. Chicago Council on Mental Health Equity members have repeatedly expressed concerns related to their role, function, and adequate utilization of their expertise. One Chicago Council on Mental Health Equity member reflected concerns about the bylaws putting "all power and authority in the city." The City should also re-consider the appropriateness of employees of the City being given voting power, which is often reflected in the meeting minutes.

For future CCMHE meetings, the IMT encourages the City to address CCMHE members public questions and comments. For example:

1. Conduct a briefing on emerging best practices in other cities. One CCMHE member asked "What is our north star - what do we hope to accomplish? How do we measure success? What are the expected outcomes?"

2. The role of the CCMHE, including Consent Decree requirements. This would be a good place to address the changing structure of the CCMHE. One member expressed confusion about the subcommittees and subcommittee chair requirements referenced in the bylaws: "It's also not always clear the function the committee is serving."

In the seventh monitoring period, the City maintained Preliminary compliance with ¶130. The City must reach a quorum to have the Chicago Council on Mental Health Equity's bylaws passed and implemented, which would formalize the structure of this important body.

The City's own bylaws governing the CCMHE require a quorum.

Moreover, the Chicago Council on Mental Health Equity's revised structure must be developed for the City to move into Secondary compliance. The Chicago Council on Mental Health Equity's progress will continue to stall until it's the City develops its new structure, and that structure must continue to focus on the group's mission and goal. The community's involvement must also improve. The City should work to remove the barriers that presently exist, and the City should share meeting materials with the public in advance of the meetings. Moving forward, further levels of compliance will depend on substantive reviews by the Chicago Council on Mental Health Equity on data, policies, training, community engagement, and operational practices informing recommendations on response to individuals in crisis.

### Paragraph 130 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶131

*131. Within 365 days of the Effective Date, the City will request that the Advisory Committee identify and evaluate in writing any opportunities to develop or enhance crisis response-related policies, procedures, and training of City agencies, including CPD, OEMC, and the Chicago Fire Department, and increase municipal and community resources and alternative response options, including rapid-access clinics, drop-off centers, mobile crisis teams, a central non-emergency crisis line, other pre- and post-arrest diversion efforts, and strategies targeted at children and youth. The City will also request that the Advisory Committee identify and evaluate the steps necessary to develop non-criminal justice responses to individuals in crisis, including, but not limited to, a behavioral health unit to provide alternative non-criminal justice responses to individuals in crisis. In evaluating potential community resources and strategies, the Advisory Committee will identify challenges and opportunities for improvement, if any, and make recommendations. The City will address the feedback and recommendations identified by the Advisory Committee, including identifying recommendations that it will adopt, and the plan for implementation, in the Crisis Intervention Plan. The City will respond to each of the recommendations made by the Advisory Committee. The response will include a description of the actions that CPD has taken or plans to take with respect to the issues raised in the recommendations. If the City declines to implement a recommendation, it will explain the reason(s) for declining.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**   *In Compliance (SECOND REPORTING PERIOD)*
**Secondary:**   *Not In Compliance*
**Full:**   *Not Yet Assessed*

In the seventh monitoring period, the City maintained Preliminary compliance with the requirements of ¶131.

To achieve Preliminary compliance with ¶131, the IMT assessed the City's level of data collection, tracking, analysis, and management as required under the Consent Decree. Specifically, the IMT examined whether the City has made the requisite requests of the Advisory Committee, which is now referred to as the Chicago Council on Mental Health Equity, and that the Chicago Council on Mental Health Equity

is providing the requisite guidance in return. Going forward, further levels of compliance will depend on the Chicago Council on Mental Health Equity's substantive reviews on data, policies, training, community engagement, and operational practices informing recommendations on responses to individuals in crisis. A critical component of compliance with this Paragraph, which the IMT will assess, is the City's leadership with the Chicago Council on Mental Health Equity's engagement with the OEMC, CPD, and other crisis-related policies, procedures, and training.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City requested that the Crisis Intervention Advisory Committee (also known as the CIAC; now the Chicago Council on Mental Health Equity, *see analysis for* ¶128) provide recommendations on the CPD's and the OEMC's policies, procedures, and training. In addition, the Crisis Intervention Advisory Committee provided recommendations for improving the City's broader mental-health-response system. These recommendations were universally accepted by the City. In its draft *Crisis Intervention Plan* submitted in the third monitoring period, the City provided updates on its implementation of some—but not all—of these recommendations.

The City has not produced the required annual *Crisis Intervention Plan* since the third monitoring period. Consequently, progress on the recommendations that the City universally accepted are overdue. The IMT has encouraged the City to prioritize both the next iteration of the *Crisis Intervention Plan*, as well as Chicago Council on Mental Health Equity recommendation updates since the third reporting period. Further, ¶131 requires the City's response to "include a description of the actions that CPD has taken or plans to take with respect to the issues raised in the recommendations." The City must take concrete steps in supporting and using this group's expertise to satisfy ¶¶129–31's requirements.

The IMT notes that the Chicago Council on Mental Health Equity is a group of esteemed professionals and key community members who have the experience and credibility to be a crucial force in developing effective crisis response systems. They must be utilized as such, as required under ¶¶129–31.

The IMT recognizes that the City's co-chairs are experienced individuals who strive to support the intended function of this group. There are inherent challenges with leading a group of this size, and while some improvements have been made, more needs to be done to improve it.

The IMT has had ongoing concern with the City's oversight of the Chicago Council on Mental Health Equity, including the following: a lack of Bylaws, despite 3 years under the Consent Decree (while the city has made progress toward this, lack of quorum prevented a vote during this reporting period); an inadequate feedback

loop to the Chicago Council on Mental Health Equity regarding the outcome of its proposed policy revisions; insufficient involvement of persons with lived experience; insufficient Chicago Council on Mental Health Equity involvement in training observation and feedback; lack of clarity on the role/function of the Chicago Council on Mental Health Equity's members; the need for additional staff resources so that this voluntary, unpaid committee can progress in their work; insufficient community engagement through the Open Meetings Act; meetings often feeling reactive, as opposed to a proactive use of time and resources; and inadequate sharing of materials to be reviewed and discussed in quarterly meetings in advance of the meetings.

During the fourth and fifth monitoring periods, the City took important steps toward the requirements of ¶¶130 and 137 by inviting the Chicago Council on Mental Health Equity to review and submit feedback on twelve Crisis Intervention standard operating procedures (S04-20; S04-20-02; S04-20-03; S04-20-04; S04-20-05; S05-14; S.O. 20-01; S.O. 20-02; S.O. 20-03; S.O. 20-04; S.O. 21-01; S.O. 21-02).

Valuable feedback was given by the professionals and persons with lived experience that make up the Chicago Council on Mental Health Equity. As required under ¶¶130–31, the City (including the OEMC) and the CPD must review and respond to this feedback, even if the response is only to explain why the council's comments were not incorporated. While the City made significant improvements on the policy revision process, the CPD and the OEMC must do a better explain to the Chicago Council on Mental Health Equity why certain recommendations were not included in the revisions. The same is true for the recommendations the Chicago Council on Mental Health Equity made to the City in the first year of the Consent Decree. This is a crucial part of building knowledge, trust, and strengthening directives, training, and operational practices.

The City invited members of the Chicago Council on Mental Health Equity to observe the OEMC and the CPD Mental Health related training during the fifth and sixth reporting period. Attendance continues to be low, which may indicate a broader system issue. The City must increase its efforts to improve both attendance and feedback by Chicago Council on Mental Health Equity members.

The Chicago Council on Mental Health Equity's experiential observation and corresponding feedback increase transparency and invite improvements. The City should continue to prioritize and cultivate attendance at the CPD's and OEMC's training sessions, even if it means implementing more proactive requests, for example, developing a training observation subgroup, invitation to persons identifying as someone with lived experience, members of an organization in an advocacy role as well as other broad invitations. Additionally, prioritizing interagency participation in these trainings (for example, the Chicago Fire Department, the OEMC, and the CPD) would be useful, increasing communication between these agencies.

In response to consistent concerns by members of the Chicago Council on Mental Health Equity about their role and function, including declining participation to the point that a quorum has been difficult to achieve in the last few quarterly meetings, the co-chairs engaged in a meaningful dialogue in the fifth reporting period about a possible restructuring of the committee to address these concerns. While the IMT appreciates these efforts and the conversation elicited good discussion with the Chicago Council on Mental Health Equity, there has been no evidence of progress since then. This must change.

As it considers restructuring the committee, the City has also eliminated all subcommittee meetings scheduled to occur during the last two reporting periods. The City must prioritize resuming these meetings.

*Progress in the Seventh Reporting Period*

During this monitoring period, the City did not produce the next iteration of the *Crisis Intervention Plan*, which is required to be produced annually under ¶131. Therefore, the City is unable to reach any further compliance level for ¶131.

Although the Chicago Council on Mental Health Equity is still unable to meet in person due to the COVID-19 pandemic, the IMT has participated in all subcommittee and full committee virtual meetings.

The Chicago Council on Mental Health Equity, being the most recent iteration of the City's advisory committee, is still a relatively new body and has a broader focus on citywide crisis-response systems. The IMT has observed each of the Chicago Council on Mental Health Equity virtual meetings and maintains that the Chicago Council on Mental Health Equity represents a sound opportunity for the City to develop and implement a comprehensive citywide crisis response system. There are dedicated experts from the field and persons with lived experience actively involved in the CCMHE, and the City must take steps to formalize their role and function as defined (*see analysis for ¶¶128-129*).

During the seventh reporting period, the City sought the Chicago Council on Mental Health Equity's feedback on the group's draft bylaws, and members expressed concern regarding these bylaws. *See below*. Ultimately, the City was unable to achieve the quorum needed during December 5th meeting to vote on the bylaws.

The bylaws govern ¶131's requirements.

The IMT has regularly encouraged the City to provide a robust data presentation to the Chicago Council on Mental Health Equity in an effort to build knowledge content for the council's members, who in turn would be better equipped to pro-

vide recommendations for crisis response, as required under ¶131. The IMT witnessed some of these efforts during this reporting period. For example, the City presented on the CARE program, which is an important step in the City's evolution in crisis response. However, key members of the Chicago Council on Mental Health Equity have expressed ongoing concern about their awareness of or role in key programs that speak directly to ¶131. The IMT expects this increased communication and access to continue in the next reporting period and transition from a city "report out" to the Chicago Council on Mental Health Equity, to a more collaborative approach.

The OEMC also presented to the Chicago Council on Mental Health Equity on August 24, 2022 and December 5th, 2022. This was an important step in beginning to build the committee's foundational knowledge of the OEMC's important role and function. These presentations primarily included a partial policy review of key components of SOP 21-004, *Crisis Intervention Program*, TNG 22-005, *Mental Health Training*, and an explanation of a Cooperative Project where information on mental health facilities or non-traditional diversion facilities was requested to be entered into the OEMC's CAD system. While the OEMC produced records indicating they had updated the list of facilities in the CAD, which is commendable, it is unclear how these are utilized operationally.

 The OEMC Triage Questions were reviewed which elicited good discussion, along with the list of OEMC's identifiable diagnoses and presenting problems that they digitally select from when taking a call. CCMHE members requested whether Intellectual and Developmental Disabilities could be added, along with Suicidal Ideation. The OEMC indicated that there is an "other" box that would be utilized for anything not explicitly listed. This should be reconsidered. CCMHE members also had good questions about the interface between the OEMC and 988, which is essentially a transfer of the call from OEMC to 988 when appropriate. It is unclear what the call taker's process is in determining when to transfer a call, nor the utilization rate of actual transfer of calls to 988. This is an important effort in meeting Consent Decree requirements for deflection and diversion from a criminal justice response, also a requirement of this paragraph, and should be included in future reporting to both the IMT and the CCMHE. Additionally, concern regarding when a call comes into 911 from a child was brought up on the December 5 Chicago Council on Mental Health Equity meeting. The members asked what training the OEMC telecommunicators have regarding 911 callers that are children. The OEMC was unable to provide a sufficient answer. Also, a Chicago Council on Mental Health Equity member asked how the OEMC transfers a call to the CARE program. The OEMC referred the question to the Department of Public Health, who oversees the CARE program. However, the OEMC should have a collaborative protocol with the OEMC regarding how CARE-eligible 911 calls are transferred.

Overall, the OEMC should be commended for taking important steps in in educating the CCMHE on policy and operational practices, and beginning to invite discussion, which was overdue. The IMT expects this to continue moving forward. Additionally, the City and the OEMC should provide the Chicago Council on Mental Health Equity more notice by sending presentation materials in advance of the meeting so that there is time to review and prepare comments and questions. This is crucial for a robust and informed discussion.

Chicago Council on Mental Health Equity members continue to express concern over how the City and the CPD intend to seek feedback from neighborhood stakeholders, as well as how individual communities will know when there are meetings or public postings for policies, CIT data, and program updates.

Further, as discussed in previous reports, the manner in which the City and the CPD solicit community input in light of the Open Meetings Act needs to be revised to promote active community engagement. For example, the City requires community members to submit public comments 24 hours before the meetings start, but does not permit public comment during the meeting. Given the exclusive lack of any public comment for the last two reporting periods, the City should reevaluate its process to both meet the requirements of the OMA and to provide greater opportunity for public comment. Additionally, the City often fails to share in advance those documents and PowerPoint presentations it intends to discuss at the quarterly meetings (for example, when the agenda is produced). This makes it difficult for both Chicago Council on Mental Health Equity members and the public to prepare for the meeting with questions or comments. Rather, the documents and presentations are more likely to be shared *after* the meeting, and often at the request of a Chicago Council on Mental Health Equity member.

The City informally produced the Chicago Council on Mental Health Equity's draft bylaws to the IMT, which the IMT has reviewed and intends to provide feedback to in the next reporting period. The City sought a vote on the Chicago Council on Mental Health Equity's draft bylaws before it formally produce them to the IMT. This City should reconsider be reconsider this approach in light of the Consent Decree paragraphs requiring Chicago Council on Mental Health Equity involvement. The IMT also strongly recommends that the Chicago Council on Mental Health Equity bylaws include provisions for more meaningful community engagement. The draft bylaws contained restrictive language regarding community members' opportunities to ask questions or give feedback. Community members have voiced strong public feedback on mental health initiatives globally, so absence of any feedback through the Open Meeting Act suggests too many barriers exist in the City's feedback system.

In the IMT review of the draft Bylaws, the IMT's concerns primarily relate to (a) how the City intends to document whether a quorum was present and (b) the Chicago Council on Mental Health Equity's scope and nature. The IMT recommends that the Chicago Council on Mental Health Equity's meeting minutes reflect whether there was a quorum. (*See* Section V.A.4.b). The Consent Decree states that the Chicago Council on Mental Health Equity "will assist in identifying problems and developing solutions and interventions designed to improve outcomes for individuals in crisis who require City services" (¶128). However, the Bylaws state that the Chicago Council on Mental Health Equity is "the City's main advisory committee related to mental health and behavioral health policy making and planning." The IMT recommends the Chicago Council on Mental Health Equity's scope, as required by Consent Decree, be reflected in the bylaws. Chicago Council on Mental Health Equity members have repeatedly expressed concerns related to their role, function, and adequate utilization of their expertise. One Chicago Council on Mental Health Equity member reflected concerns about the bylaws putting "all power and authority in the city." The City should also re-consider the appropriateness of employees of the City being given voting power, which is often reflected in the meeting minutes.

For future Chicago Council on Mental Health Equity meetings, the IMT encourages the City to publicly address Chicago Council on Mental Health Equity members' questions and comments. For example:

1. Conduct a briefing on emerging best practices in other cities. A member asked "What is our north star - what do we hope to accomplish? How do we measure success? What are the expected outcomes?"

2. The role of the Chicago Council on Mental Health Equity, including Consent Decree requirements. This would be a good place to address the changing structure of the Chicago Council on Mental Health Equity. One member expressed confusion about the subcommittees and subcommittee chair requirements referenced in the bylaws: "It's also not always clear the function the committee is serving."

In the seventh monitoring period, the City maintained Preliminary compliance with ¶128. The City must reach a quorum to have the Chicago Council on Mental Health Equity's bylaws passed and implemented, which would formalize the structure of this important body. Moreover, the Chicago Council on Mental Health Equity's revised structure must be developed for the City to move into Secondary compliance. The Chicago Council on Mental Health Equity's progress will continue to stall until the City develops its new structure, and that structure must continue to focus on the group's mission and goal. The community's involvement must also improve. The City should remove barriers that presently exist, and the City should

share meeting materials with the public in advance of the meetings. Moving forward, further levels of compliance will depend on substantive reviews by the Chicago Council on Mental Health Equity on data, policies, training, community engagement, and operational practices informing recommendations on response to individuals in crisis. The OEMC should produce the full CIT policy suite for review and discussion with the Chicago Council on Mental Health Equity during the next annual round of policy review. There are some OEMC policies that have been rescinded, and some which were produced to the IMT, but have no enactment date.

The City and the Chicago Council on Mental Health Equity are considering complicated issues. We look forward to reviewing the final draft of the Chicago Council on Mental Health Equity Bylaws, which should support continued efforts to promote inclusion and transparency. The City and the CPD should further these efforts by dedicating a quarterly meeting reviewing the CIT Dashboard to members, which would also be a useful step toward compliance with ¶131. Moreover, spending time on the council's structure, and the City's progress with the Chicago Council on Mental Health Equity's recommendations would also be useful efforts.

## Paragraph 131 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶132

> *132. The Advisory Committee will be chaired by the Mayor's Of-*
> *fice. The Mayor's Office will invite individuals who have person-*
> *ally experienced a behavioral or mental health crisis, people with*
> *experience working with individuals in crisis, and experts with*
> *knowledge in law enforcement responses to individuals in crisis.*
> *At a minimum, the Mayor's Office will invite individuals from the*
> *following groups: first responders; the CIT Coordinator; OEMC;*
> *county and city hospitals, health care providers, and mental*
> *health professionals; the Cook County State's Attorney's Office;*
> *the Cook County Public Defender's Office; at least one academic*
> *research entity; community behavioral and mental health pro-*
> *fessionals; advocacy groups for consumers of behavioral and*
> *mental health services; behavioral and mental health service*
> *providers; homeless service providers; substance abuse service*
> *providers; persons with lived experiences of behavioral or mental*
> *health crises; and other similar groups.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the seventh monitoring period, the City maintained Preliminary and Secondary compliance with ¶132.

To achieve Preliminary compliance with ¶132, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." In addition, the IMT assesses whether the City has qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree. The IMT also assesses the City on resource allocation, staffing capacity, and efforts to fill any vacant positions. Specifically, the IMT examines whether the City has created the requisite Advisory Committee with appropriate expertise and experience.

Both chairs of the Chicago Council on Mental Health Equity continue to be well qualified to meet the requirements of ¶132, with the necessary background, experience, and commitment to the Chicago Council on Mental Health Equity pro-

cess. Additionally, the Chicago Council on Mental Health Equity membership includes representatives from each of the groups listed in ¶132. There is ongoing concern about the low representation of people with lived experience. Active participation continues to be low, and the City should consider additional ways to improve participation of people with lived experience. There are many professionals serving on this committee who would be a good resource to assist with recruiting additional lived experience. This remains a concern among Chicago Council on Mental Health Equity members, and members of the Coalition.

Additionally, in the fifth reporting period, the chairs discussed with the Chicago Council on Mental Health Equity possibly restructuring the committee to address those more interested in Consent Decree compliance efforts and those more interested in broad coordinated service response systems. At that time, the subcommittee structure that existed, along with the subcommittee chairs leading that work, were paused. There has been no subcommittee work accomplished since, nor has a new structure been promoted. The Chicago Council on Mental Health Equity members remain concerned about their unclear role and function. This lack of clarity may relate to the committee's ongoing difficulties in achieving a quorum.

It is unclear whether the entities identified in ¶132 are indeed actively participating in the Chicago Council on Mental Health Equity. The IMT recommends that the Chairs annually request committee members to identify themselves in a pre-established subject area consistent with ¶132, and that the City produce to the IMT this updated membership list, with each member's self-identified subject area. This would facilitate the IMT's future assessment efforts.

*** 

In the seventh monitoring period, the City maintained Preliminary and Secondary compliance with ¶132. To assess Full compliance, the IMT will monitor the City's efforts to finalize the Chicago Council on Mental Health Equity's bylaws, demonstrate compliance with quorum and attendance representing the categories identified in ¶132, and evaluate robust participation from the Chicago Council on Mental Health Equity members, including people with lived experience. The IMT will also monitor the leadership response to the Chicago Council on Mental Health Equity and Coalition (*see* ¶669) concerns as addressed in ¶128-29. Last, the IMT will continue to assess the City and the CPD's efforts to *proactively* engage the members in solution building.

## Paragraph 132 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Crisis Intervention: ¶133

> **133.** *CPD policy will provide that a crisis response may be necessary even in situations where there has been an apparent violation of law.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**       *Not In Compliance*
**Full:**            *Not Yet Assessed*

In the seventh monitoring period, the City and the CPD maintained Preliminary compliance with the requirements of ¶133.

To achieve Preliminary compliance with ¶133, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." In addition, the IMT assesses whether the City has qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree. The IMT also assesses the City on resource allocation, staffing capacity, and efforts to fill any vacant positions. Moreover, ¶133's requirements must also be adequately memorialized into policy.

To achieve Secondary compliance with ¶133, the City and the CPD must demonstrate 95% completion of both the Crisis Intervention Team eLearning that addressed policy changes affecting all officers and the 2021 *Crisis Intervention Team In-Service Training* which equips crisis response by all officers. Moving forward, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶133. Further assessment levels will require an assessment of those developed metrics.

The CPD memorialized the requirements of ¶133 into Special Order S04-20, *Recognizing and Responding to Individuals in Crisis,* which received a no objection in the third reporting period. Additionally, the directive provides tips and techniques for recognizing a person who may be in a mental-health crisis, including requirements for responding to such calls for service.

The CPD produced a newly developed *Crisis Intervention Team* eLearning to address policy changes affecting all officers and a revised 2021 *Crisis Intervention Team In-Service Training,* both of which were reviewed by the IMT in the third reporting period. While there is room for improvement, a no-objection was issued in the third reporting period.

The CPD has made strides in strengthening the content of crisis response for all officers.

*** 

In the seventh monitoring period, the City and the CPD maintained Preliminary compliance with ¶133's requirements. To achieve Secondary compliance, the CPD must deliver the necessary crisis response training(s), with 95% completion on both trainings. The City and the CPD produced sufficient evidence of 95% completion of the CIT eLearning, but not the CIT In-Service Training. Going forward, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶133. Further assessment levels will require an assessment of those developed metrics.

Full compliance with the requirements of ¶133 will require reliable data on calls involving people in mental health crisis. This will require consistent completion of the *Crisis Intervention Report* (*see* ¶118) and will require an audit of crisis calls once reliable data is available. We will assess this in future monitoring periods.

### Paragraph 133 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶134

> **134.** *CPD policy will encourage officers to redirect individuals in crisis to the healthcare system, available community resources, and available alternative response options, where feasible and appropriate.*

## Compliance Progress      (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh monitoring period, the City and the CPD maintained Preliminary compliance with the requirements of ¶134.

To achieve Preliminary compliance with ¶134, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." To achieve Secondary compliance with ¶133, the City and the CPD must demonstrate 95% completion of both the *Crisis Intervention Team* eLearning that addressed policy changes affecting all officers and the 2021 *Crisis Intervention Team In-Service Training* equipping officers with knowledge of available community resources, and available alternative response options per ¶134. Going forward, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶134. Further assessment levels will require an assessment of those developed metrics.

### Progress before the Seventh Reporting Period

The CPD memorialized the requirements of ¶134 into Special Order S04-20, *Recognizing and Responding to Individuals in Crisis,* which received a no objection in the third reporting period.

The CPD Special Order S04-20, *Recognizing and Responding to Individuals in Crisis*, requires officers responding to a call involving an individual in crisis to provide that individual with the document "Mental Health Incident Notice." We reviewed the Mental Health Incident Notice in the sixth reporting period and had concerns about whether it adequately informed community members of the healthcare system, available community resources, and available alternative response options as required under ¶134. Rather, NAMI Chicago and Smart 911 were the only re-

sources identified, which was insufficient. The IMT encouraged the CPD to consider the utility of the Mental Health Incident Notice, and consider a more useful mechanism containing important resources to give to community members.

The CPD also produced a newly developed Crisis Intervention Team eLearning to address policy changes affecting all officers and a revised 2021 *Crisis Intervention Team In-Service Training,* both of which were reviewed by the IMT in the third reporting period. While there is room for improvement, a no-objection was issued in the third reporting period.

The CPD has made strides in strengthening the content of crisis response for all officers.

*Progress in the Seventh Reporting Period*

The CPD responded to the IMT's concern about the usefulness of the Mental Health Incident Notice by revising it this reporting period into a more robust tool designed to inform community members of the healthcare system, available community resources, and available alternative response options outlined under ¶134. The CPD has Special Order S04-20, *Recognizing and Responding to Individuals in Crisis*, which requires officers responding to a call involving an individual in crisis to provide that individual with this document. The IMT appreciates that the newly revised Mental Health Incident Notice also includes hyperlinks to NAMI Chicago and Smart 911, enabling community members to gain more information on these new resources easily.

Additionally, the City and the CPD produced evidence of 95% completion of the CIT eLearning training during this reporting period.

While ¶134's requirements are incorporated into the policy, the IMT will continue to assess whether the CPD has a responsive data collection tool to measure whether "available alternate response options" are being utilized.

The IMT notes that the City's pilot alternative response program, Crisis Assistance Response Engagement (CARE) was launched nearly two years ago. This is an important step, but requires additional policy considerations for the City, the OEMC, the Fire Department, and the CPD, who will all need to demonstrate increased communication guided by policy. Moreover, the effectiveness of the CPD's *Mental Health Incident Notice* remains uncertain. The CPD will need to assess whether the notice sufficiently addresses ¶134's requirements.

*** 

In the seventh monitoring period, the City and the CPD maintained Preliminary compliance with the requirements of ¶134. To achieve Secondary compliance, the

CPD must deliver the necessary crisis response training(s), with 95% completion on both trainings. The City and the CPD produced sufficient evidence of 95% completion of the CIT eLearning, but not the CIT In-Service Training. Going forward, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶134. Further assessment levels will require an assessment of those developed metrics. Moreover, the IMT will also consider policy that is developed in relation to the new CARE alternative response program as well as the utility of the Mental Health Incident Notice.

Full compliance with the requirements of ¶134 will require reliable data on calls involving people in mental health crisis. This will require responding officers to reliably complete the *Crisis Intervention Report* (*see* ¶118), use the *Mental Health Incident Notice* (or other alternative supporting additional resources), and will require an audit of crisis calls once the City has more reliable data. These requirements will be assessed in future monitoring periods.

### Paragraph 134 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶135

**135.** *CPD will ensure that the language used in policies, procedures, forms, databases, and trainings to communicate about incidents involving individuals in crisis is appropriate, respectful, and consistent with industry recognized terminology. CPD will seek input from community stakeholders, including the Advisory Committee, for recommendations to identify appropriate and respectful terminology.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh monitoring period, the City and the CPD maintained Preliminary compliance with ¶135.

To achieve Preliminary compliance with ¶135, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." To achieve Secondary compliance with ¶135, the City and the CPD must demonstrate 95% completion of both the Crisis Intervention Team eLearning that addressed policy changes affecting all officers and the 2021 *Crisis Intervention Team In-Service Training* whereby appropriate language is trained to all officers. Going forward, the City and the CPD will need to develop metrics that, when tracked, adequately demonstrate the CPD's success under ¶135. Further assessment levels will require an assessment of those developed metrics.

*Progress before the Seventh Reporting Period*

The CPD has Special Order S05-14, *Crisis Intervention Team (CIT) Program*, which states that language used in the policies, procedures, forms, databases, and training materials to communicate about incidents involving individuals in crisis should be appropriate, respectful, and consistent with professional terminology.

In addition, Special Order S04-20, *Recognizing and Responding to Individuals in Crisis*, clearly communicates the CPD's commitment to interacting with individuals in crisis with dignity, respect, and the utmost regard for the preservation of human life and the safety of all persons involved. Under the "Procedures" section of the

directive, officers are instructed that they are required to interact with individuals in crisis with dignity and respect. Finally, the CPD policies and trainings have been reviewed by members of the Chicago Council on Mental Health Equity, thereby accomplishing the second part of ¶135. It is apparent from the policies, procedures, forms, databases, and training materials that we have reviewed that the CPD is committed to reinforcing respectful dialogue when discussing people in crisis.

In the third reporting period, the CPD developed an eLearning and in-service course for all CPD members on the Crisis Intervention program and responding to individuals in crisis. Both trainings were implemented by the CPD this reporting period.

*Progress in the Seventh Reporting Period*

However, the CPD has not yet provided updated training on using appropriate and respectful communication when interacting with people in mental health crisis. Although we believe that the CPD has certainly taken sufficient steps to ensure that respectful language is used in policies, procedures, and databases, updated training will ensure that members use respectful language on forms and when "communicat[ing] about individuals in crisis." Such training will be necessary for Secondary compliance.

The City and the CPD produced evidence of 95% completion of the CIT eLearning training which addresses policy changes during this reporting period.

The CPD Event Code presently uses outdated and inappropriate language (*e.g.*, DISTME). The phrase "disturbance mental" is used and will need to be updated. With the onboarding of a new Computer Aided Dispatch (CAD) system in 2023, the CPD should be encouraged to consider alternate event codes for mental health related calls for service and seek input now from the CCMHE so that the CPD is prepared to put forth a new code reflecting best practice.

\*\*\*

In the seventh monitoring period, the City and the CPD maintained Preliminary compliance with ¶135. To achieve Secondary compliance, the CPD must deliver the necessary crisis response training(s) demonstrating 95% of personnel has been trained. To achieve Secondary compliance, the CPD must deliver the necessary crisis response training(s), with 95% completion on both trainings. The City and the CPD produced sufficient evidence of 95% completion of the CIT eLearning, but not the CIT In-Service Training. Going forward, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the CPD's success under ¶135. Further assessment levels will require an assessment of those developed metrics.

Full compliance with the requirements of ¶135 will require reliable data on calls involving people in mental health crisis. This will require consistent completion of the *Crisis Intervention Report* (*see* ¶118) and will require an audit of crisis calls once reliable data is available. We will assess this in future monitoring periods once the CPD delivers the training necessary for Secondary compliance.

### Paragraph 135 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶136

**136.** *CPD will develop and implement policies, procedures, and protocols regarding the collection, maintenance, and use of information related to an individual's medical and mental health to facilitate necessary and appropriate communication while adequately protecting an individual's confidentiality. To develop these policies, procedures, and protocols, CPD will seek input from community stakeholders, including the Advisory Committee.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh monitoring period, the City and the CPD maintained Preliminary compliance with ¶136.

To achieve Preliminary compliance with ¶136, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

### Progress before the Seventh Reporting Period

In the fourth reporting period, the IMT reviewed Special Order S04-20, *Recognizing and Responding to Individuals in Crisis*, which provides guidance about verbal, behavioral, and environmental cues that may allow an officer to recognize a person in mental health crisis and guidance for officers to collect and use information during the on-scene encounter. S04-20 also includes the requirement for officers to complete a *Crisis Intervention Report* for all calls involving a mental-health component. The report requires data related to individual cases, but the data will also be used in aggregate to identify overall trends in the CPD's mental health response approach. The earlier version of Special Order S05-14, *Crisis Intervention Team (CIT) Program*, clearly identified the responsible parties for following up on mental and behavioral health-related events and for referring and, when appropriate, connecting individuals in crisis with local service providers. However, during the fifth monitoring period, key requirements of these SOP's were subsumed under a significantly revised S05-14. While initially missing several key requirements, the CPD

has now included all requirements of ¶136 into the revised S05-14. The information collected by the draft *CIT Report* also appears capable of assisting area-level resources in conducting such follow up.

In the sixth monitoring period, the significantly revised S05-14 incorporated all key requirements of ¶136. The associated SOPs are still under review and have not yet been resubmitted to the IMT.

As indicated previously, the City and the CPD initiated a much more thorough review of the various directives and SOPs by the Chicago Council on Mental Health Equity in the fifth and sixth reporting periods. While concerns were raised in previous sections of this report about the process, the City and the CPD significantly improved the review process for policies. The IMT looks forward to expanding this review to additional "community stakeholders" in subsequent rounds of revisions. This expansion should include more robust public notice, which will help the CPD obtain broader input. During the sixth reporting period, the City and the CPD posted the directive for public comment prior to achieving a no objection from the IMT. This creates process issues that could otherwise be avoided. Moreover, the IMT suggests that the CPD make greater efforts to inform members of the Chicago Council on Mental Health Equity why specific comments were not included in revisions to CPD policy. This explanation not only build community trust, but it also a requirement to future levels of compliance. *See* ¶131. The response was only that "The Department appreciates the feedback."

The CPD will have an opportunity in the next reporting period to further improve the policy review process noting the insufficiencies in the previous two reviews. The CPD is on the right track to do so.

*Progress in the Seventh Reporting Period*

The City and the CPD were responsive to the IMT comments this reporting period on the Unit Specific SOP's, re-producing them to the IMT in the last few days of the reporting period. We expect a no objection will be given in the next reporting period.

The City and the CPD developed an eLearning to achieve partial requirements outlined in ¶136 relating to policies, procedures and protocols and demonstrated 95% of CPD members were trained.

*** 

In the seventh monitoring period, the City and the CPD maintained Preliminary compliance with ¶136.

Because ¶136 requires review and input of "policies, procedures, and protocols", and not just "policies", Secondary compliance will also hinge on the finalization of the CIT unit specific SOPs, which the Chicago Council on Mental Health Equity reviewed at the end of the fifth monitoring period. Improvements to the responsiveness to the feedback by the CPD occurred this monitoring period. These Unit Specific SOP's go into further depth on the "procedures and protocols" of the CIT Unit, including the mandatory completion of the CIT Report, which is required by ¶136. Additionally, training for area-level resources on how to conduct policy and procedure requirements defined in policy and training will also be considered. However, we credit the CPD for taking the above-referenced steps to date. We expect the CPD to move into Secondary compliance with the finalization of the Standard Operating Procedures which will receive a no-objection in the next reporting period.

### Paragraph 136 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶137

**137.** *Within 180 days of the Effective Date, CPD will review and revise its crisis intervention-related policies as necessary to comply with the terms of this Agreement. CPD will consider any recommendations or feedback provided by the Advisory Committee when revising its policies.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During the seventh monitoring period, the City and the CPD did not achieve any level of compliance with ¶137.

To achieve Preliminary compliance with ¶137, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." To achieve Preliminary compliance with ¶137, the City and the CPD must develop and finalize policies and associated standard operating procedures (SOP's) that incorporate ¶137's requirements.

In the fourth reporting period, the City produced draft *Crisis Intervention Unit* specific standard operating procedures. As noted in our assessments of other paragraphs, the CPD has made a good-faith effort to ensure that the Consent Decree's requirements were incorporated into CIT-related policies and that a responsible party is listed for each requirement. In the fifth reporting period, the City opted to subsume key Consent Decree requirements, which were previously covered under the draft standard operating procedures, into a substantially revised Special Order S05-14, *Crisis Intervention Team (CIT) Program*. The City intended to produce revised standard operating procedures in the sixth reporting period, but did not. The CPD has sought feedback from the Chicago Council on Mental Health Equity into draft policies, and have made efforts to improve this process, which represents an important step forward.

During the sixth monitoring period, the CPD produced a substantially revised Special Order S05-14, *Crisis Intervention Team (CIT) Program* which incorporated ¶137's requirements. While some CPD directives that fulfill Consent Decree requirements have been published, the CPD intends to enumerate other requirements in "crisis intervention-related" standard operating procedures that the City

had yet to produce to the IMT. Because ¶137 requires review of "crisis intervention-related policies," the associated unit specific SOPs must receive the Chicago Council on Mental Health Equity's feedback.

*Progress During the Seventh Reporting Period*

We appreciated the CPD's more comprehensive effort on this policy review requirement than in the second reporting period. The feedback and recommendations provided by the Chicago Council on Mental Health Equity, which were robust, were considered and largely responded to. But the City and the CPD must do a better explain why specific recommendations from the Chicago Council on Mental Health Equity were not included. Feedback loops and open communication build community trust and fulfills a Consent Decree requirement. The response was only that "the Department appreciates the feedback."

The CPD also incorporated the IMT comments into the revised policies and SOP's and produced them to the IMT at the end of this reporting period. As indicated, we anticipate issuing a no objection letter in the next reporting period.

\*\*\*

In the seventh monitoring period, the City and the CPD did not meet any level of compliance with ¶137. To achieve Preliminary compliance with ¶137, the CPD must finalize policies that incorporate ¶137's requirements. The CPD incorporated IMT comments this reporting period and re-submitted the Crisis Intervention related SOP's at the end of this reporting period. The IMT anticipates a no-objection to be issued in the next reporting period. However, strong consideration should be given moving forward to when and how the CPD posts these SOP's for public comment. This is necessary for public transparency and improving policies and procedures though public engagement. The process for annual review of associated policies and procedures is improving by the CPD and we encourage the CPD to formalize the process so that each annual review is scheduled in advance and includes CCMHE feedback and Public posting for comment of all Crisis Intervention related Policies and SOP's.

Once the CPD has finalized each relevant crisis intervention-related policy, and the associated standard operating procedures, we anticipate that the CPD will be in Preliminary compliance with the ¶137.

We appreciate the CPD's efforts to accomplish the task of policy review in a comprehensive fashion. For future annual revisions, the IMT recommends a more robust communication plan for soliciting broader community feedback, a concern shared not only by the IMT, but also by the Coalition and members of the Chicago Council on Mental Health Equity.

## Paragraph 137 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

# Crisis Intervention: ¶138

**138.** *OEMC call-takers will continue to identify calls for service involving an individual known, suspected, or perceived to be in crisis.*

**Compliance Progress** (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

During the seventh monitoring period, the City and the OEMC maintained Preliminary and Secondary compliance with the requirements of ¶138.

To achieve Preliminary compliance with ¶138, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." To maintain Preliminary compliance with ¶138, the OEMC must demonstrate that it is thoroughly reviewing its policies as described in ¶¶626–41.

Secondary compliance is assessed relative to ¶286, which incorporates the following evaluation criteria: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation. In the eighth reporting period, the IMT will re-assess Secondary compliance relative to ¶286, and should include a needs assessment.

Moreover, to maintain Secondary compliance with ¶138 in future reporting periods, the OEMC must provide sufficient documentation demonstrating 95% completion of training in each reporting period including training evaluations. Training review and where appropriate revisions, must be reliably conducted, inclusive, where required, of CCMHE feedback. We must also review any updated policies and training capturing program changes affecting call-intake- and dispatches regarding mental health related calls. These updates to policies may include, but are not limited to, revised CIT officer designations, the CARE program, clinicians inside 911, or the National 988 system[5]. The OEMC indicated in its response to the IMT's draft IMR 7 report that there "are no new CIT officer designations, no contracts for clinicians inside 911, and the 988 system is not an OEMC program." The IMT

---

[5] *See 988 Suicide & Crisis Lifeline Factsheet*, FEDERAL COMMUNICATIONS COMMISSION, https://www.fcc.gov/sites/default/files/988-fact-sheet.pdf.

strongly recommends that the OEMC reconsider this response, as there were indeed revised CIT officer designations deployed by the CPD during the fifth monitoring period. Further, the OEMC plays a crucial role in transferring 911 calls to 988. *See* TNG 22-005, *9-8-8 Calls for Crisis Hotline*. Last, the 2022 CARE Annual Report confirms that clinicians indeed "join staff in the city's 911 emergency communications center[6]."

*Progress before the Seventh Reporting Period*

In the fourth reporting period, the IMT reviewed an updated draft version of the OEMC's *Crisis Intervention Team Program* standard operating procedure. The standard operating procedure clearly identifies the way in which telecommunicators are required to code incidents by utilizing a "Z-code" to denote a call involving a "mental health disturbance." A "Z-code" can also assigned by CPD officers who are on scene in response to a call for service whereby they determine it involves a mental health component. The OEMC standard operating procedure also explains how to complete the required set of "CIT triage questions" that gather important information on calls involving a mental health component.

The standard operating procedure also instructs call-takers that if there is any doubt about whether a call includes a possible mental health component, the steps listed in the standard operating procedure "can and should apply." This SOP received a no objection notice from the IMT in the fourth reporting period. There have been new designations put into place since then (Designated CIT Officer-voluntary; Trained CIT Officer-mandated; Un-trained Officer-not trained in CIT). During our conversations with the CPD and OEMC during this reporting period, the IMT came away with the understanding that the CPD and OEMC intend to implement new designations with additional alpha characters, but we have not seen documentation about whether policy has been revised to guide call-takers and dispatchers on new protocols responsive to ¶138-139, nor whether training or operational practices have changed. The regular cadence of annual policy and training revisions required under Consent Decree is meant to assist in addressing fluidity in program improvements.

During the fifth monitoring period, the IMT observed the eight-hour CIT and Mental Health Awareness training that all OEMC telecommunicators receive, which includes a module on mental health response (*see* ¶¶142–46). The IMT noted that the OEMC telecommunicators have received sufficient training on how to identify calls involving an individual known, suspected, or perceived to be in crisis and

---

[6]  *Crisis Assistance Response and Engagement Program (CARE) Annual Report*, CITY OF CHICAGO (December 8, 2022) at 2, https://www.chicago.gov/content/dam/city/sites/public-safety-and-violenc-reduction/pdfs/CARE%202022-Annual%20Report-12-7.pdf.

noted that the new standard operating procedure is incorporated into training, meeting the requirements of ¶138.

The training included a review of CIT Policies—covering the OEMC drop down boxes, what automatically triggers a CIT drop-down box to appear (*e.g.*, calls that include suicidal ideation or threat, the new requirement to ask about Weapons, Medications, Violent Tendencies, Triggers, etc.). The IMT has suggested improvements to the development of a drop-down box on the Weapons question, as identifying the type of weapon is crucial information for responding officers. The IMT encourages a drop-down field indicating common types of weapons. For example, a drop-down field could include commons weapons (*e.g.*, gun, knife) along with a narrative field to describe other objects being used as a weapon (*e.g.*, hammer, screwdriver). This data is enormously useful to responding officers, particularly because the rising number of officer-involved fatalities involve a mental health call for service. While the training included listening to two audio calls with discussion afterwards, live scenario-based training permitting the practice of these important skills would be a good addition to the training. Overall, the eight-hour training was well done.

The CIT officer designations have changed since the observation of this training, and it is unclear to the IMT whether training has been adjusted to reflect this, which is required to maintain Secondary compliance. In the sixth reporting period, designations changed to "a. Designated CIT officer (voluntary) b. Trained CIT Officer (mandatory) and c. Untrained officer (has not received training)." The IMT has requested information supporting the new designations when identifying and dispatching calls with a mental health component, but that has not yet been received. The IMT receives monthly auto-generated reports on call intake and dispatch and we have requested the new designations be updated to this report so that we may accurately understand the data.

In the sixth monitoring period, the IMT reviewed the OEMC's next iteration of policy-review. The IMT noted then that a no objection on this review will not be given until robust engagement of the Chicago Council on Mental Health Equity occurs. During the first policy review process, there was essentially no engagement of the Chicago Council on Mental Health Equity as required under ¶122. Since then, the IMT has been clear that compliance will be delayed until the City demonstrates that the Chicago Council on Mental Health Equity is significantly engaged with the OEMC's policy-review process. (*See*, *e.g.*, ¶¶139-40, 151, below.)

During the sixth reporting period, the OEMC reviewed the policies during a quarterly Chicago Council on Mental Health Equity meeting. The OEMC also attached the policies to an email to the Chicago Council on Mental Health Equity, inviting feedback, but did not receive any. This lack of feedback suggested inadequate engagement, but engagement is required for the OEMC to maintain compliance.

Therefore, the IMT recommended in the last reporting period that the OEMC engage the CPD and the City to articulate a robust plan to solicit thorough review and comment from the Chicago Council on Mental Health Equity. The OEMC plays a crucial role in the initial identification and appropriate dispatch of calls involving a mental health component, and their processes may improve with input from the CCMHE.

In the sixth reporting period, the OEMC also launched its CIT Refresher course, which the IMT observed on March 9, 2022. The City produced partial attendance records for both the CIT Refresher and the 8-hour CIT and Mental Health Awareness training in the sixth monitoring period. The records showed the date personnel were scheduled to attend, but it did not include actual training completion dates, so we were unable to determine the percent of OEMC personnel who have completed the training.

The OEMC also gave a brief presentation to the Chicago Council on Mental Health Equity, providing a high-level overview of the role and function of the OEMC. We appreciated the efforts toward engagement with the Chicago Council on Mental Health Equity, but note that it did not constitute a meaningful solicitation process for feedback on the OEMC's policies and training. Specifically, the OEMC's presentation merely invited the Chicago Council on Mental Health Equity to observe the OEMC's CIT Refresher Training; such an invitation does not equate to solicitation of feedback on the OEMC's policies and training.

The IMT was clear that we could not assess compliance with these requirements without written feedback from the Chicago Council on Mental Health Equity. We recommended that the OEMC consult either the CPD or members of the Chicago Council on Mental Health Equity for suggestions on how to obtain thorough feedback. The IMT indicated in the sixth reporting period that if rigorous feedback on policy and training remained absent again during the next reporting period, then the OEMC may no longer be in Preliminary and Secondary compliance with ¶138.

Moreover, the OEMC produced two training attendance records in the sixth reporting period. The OEMC produced the "Mental Health Crisis Awareness – Refresher" and "Mental Health Crisis Awareness Training," both of which lacked information indicating the training completion date and lacked the required 95% completion. The IMT cannot calculate the percent of OEMC employees who have completed the training without a system that identifies the total number of eligible employees, along with complete training attendance records. To maintain Secondary compliance, the IMT requires evidence of training attendance, along with training evaluations in the next reporting period.

*Progress in the Seventh Reporting Period*

During the Seventh Reporting Period, the OEMC has made meaningful improvements regarding engagement with the Chicago Council on Mental Health Equity, but there is room for improvement.

During the seventh reporting period, the OEMC improved its engagement with the Chicago Council on Mental Health Equity by initiating the first robust discussion with members during the August 23, 2022 quarterly meeting. The OEMC's SOP 21-004, *Crisis Intervention Program*, was discussed and the Chicago Council on Mental Health Equity provided substantive feedback to the OEMC. The OEMC also presented to the Chicago Council on Mental Health Equity during the December 5, 2022 special session.

This reporting period, the OEMC informed the IMT of a new, interagency CIT working group, for which it was in the process of developing a charter. While this interagency CIT working group is a significant step towards increased coordination and collaboration between City entities, the IMT encourages the entities to allocate more than thirty minutes per meeting to adequately address the important purpose of this new working group. It is essential that stakeholders from the CPD, the CFD, and the OEMC are actively engaged in this working group, prioritized for attendance, and that the OEMC produce to the IMT records demonstrating attendance and topic discussion.

The IMT suggested this reporting period that the OEMC identify a training observation committee composed of a cohort of Chicago Council on Mental Health Equity volunteers, Coalition Members, and/or Advocacy Groups. The OEMC should prioritize attendance at training sessions, even if it means implementing more proactive requests, such as developing a training observation subgroup, invitation to persons with lived experience, members of an organization in an advocacy role, as well as other broad invitations. Enhancing training through Chicago Council on Mental Health Equity feedback is important to maintaining Secondary compliance. Additionally, prioritizing interagency participation in these trainings (for example, the Chicago Fire Department, the OEMC, and the CPD) would be useful, increasing communication between these agencies.

We also encourage the OEMC to increase transparency with the IMT. We strive to establish trust with the OEMC so that we may meaningfully understand policy, training, and operations across the City's entities. The OEMC has increasingly pressed the IMT to employ overly-formalized methods for obtaining necessary information from the OEMC. The OEMC's insistence on such a formalized approach is inconsistent with the OEMC's obligations under the Consent Decree. *See* ¶¶681–82, 720.

By way of example, during the IMT's site visit with the OEMC this reporting period, the IMT asked the Quality Assurance manager about the frequency that watch commanders enter comments on the CIT discrepancy audit protocol, but the OEMC interrupted the IMT's question before the Quality Assurance manager could respond. Even when the IMT attempts to comply with the OEMC's formalized structure for obtaining information, many of the IMT's requests go unanswered. For example, the IMT submitted several formal requests to the OEMC this reporting period to which the OEMC responded with a lack of substantive information. The information that the IMT has requested from the OEMC, but has not received, includes evidence on how the OEMC is distinguishing the response of CIT officers, an audit of randomized 911 calls involving a mental health component, and a "sit along" with call-takers and dispatchers from the OEMC 911 floor.

It is imperative that the IMT obtain this requested information. For example, the OEMC's Quality Assurance manager reported that the most common discrepancies in the Quality Assurance Reviews concern the call taker's triage questions on whether there are weapons present and whether the individual in crisis has violent tendencies. It is important for the IMT to note that persons in mental health crisis are more likely to be killed by law enforcement. Additionally, a recently published report based on 2022 national data supports this growing concern, with 2022 data continuing to demonstrate that a relatively high number of fatalities start as a mental health call for service.[7]

A more holistic assessment of the City's crisis response system is warranted under Consent Decree and we hope to gain more information through our continued discussions. To that end, we note that OEMC telecommunicators who are embedded within OEMC as call-takers and dispatch for all City Medical and Fire-related 911 calls, are not required by the OEMC to take the OEMC Crisis intervention and Mental Health Awareness Training, despite sitting on the same 911 floor and being responsible for call-taking and dispatching of medical-related calls. This reporting period, the OEMC produced attendance records which substantially demonstrated 95% of telecommunicators dispatching police calls for service received training, but the Consent Decree encompasses *all* OEMC call-takers and dispatchers, not just those telecommunicators facilitating CPD-related calls. Therefore the OEMC is at risk of losing Secondary compliance in the next and in future reporting periods if it does not clarify which trainings the OEMC telecommunicators responsible for medical and fire related calls do and do not receive. In short, *all* OEMC call-talkers should be included in the OEMC's attendance records.

Throughout the Consent Decree, the OEMC has produced to the IMT various policies and Standard Operating Procedures (SOPs), several of which lack an SOP

---

[7]   *See, e.g.*, *2022 Police Violence Report*, MAPPING POLICE Violence (noting that there were 1,194 officer-involved fatalities in 2022 and that 110 of which occurred after police responded to reports of someone experiencing a mental-health crisis)), https://policeviolencereport.org/.

number causing the IMT to be unsure whether the OEMC has or has not finalized the SOP. In addition, several of these OEMC SOPs that reference *CPD* policies have not been updated to conform to recent *CPD* revisions. For example, the IMT has not received any policies from the OEMC that use the "Designated CIT Officer" language that the CPD adopted in its S05-14, *CIT Program* directive in July 2022.

The OEMC has maintained Preliminary and Secondary compliance with ¶138. However, Preliminary and Secondary compliance will be assessed in the next reporting period based on the concerns identified under this paragraph assessment. Adequate training cannot be assessed without evidence supporting whether program changes (*e.g.*, the pilot CARE Program), new coding (Designated, Certified, Trained), audit outcomes, and Chicago Council on Mental Health Equity observation and feedback of policies and training have been addressed. Full and effective engagement with the Chicago Council on Mental Health Equity, while improved this reporting period, must continue to be strengthened. Sufficient training records and evaluations must be produced each reporting period, along with completed audit sheets ("CIT Employee Review"; "CIT Reviewed Events," and "CIT Quality Assurance Report") and updated auto-generated monthly reports to include new designations and duration of time between call intake, dispatch, and arrival on scene.

Further levels of compliance will depend on broader system operation, which includes addressing the barriers outlined in this paragraph assessment. The IMT will also consider the OEMC's ongoing performance and reliable data, as evidenced by its policy, training, and operational practices.

### Paragraph 138 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Crisis Intervention: ¶139

> **139.** *OEMC will continue to code all incidents identified as potentially involving an individual in crisis in a manner that allows for subsequent data analysis necessary for the evaluation of CPD and OEMC responses to individuals in crisis and the development of the plans required by this section of the Agreement.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

During the seventh monitoring period, the City and the OEMC maintained Preliminary and Secondary compliance with the requirements of ¶139.

To achieve Preliminary compliance with ¶139, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." To maintain Preliminary compliance with ¶139, the OEMC must demonstrate that it is thoroughly reviewing its policies as described in ¶¶626–41.

Secondary compliance is assessed relative to ¶286, which incorporates the following evaluation criteria: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation. In the 8th reporting period, the IMT will re-assess Secondary compliance relative to ¶286, and should include a needs assessment.

Moreover, to maintain Secondary compliance with ¶139 in future reporting periods, the OEMC must provide sufficient documentation demonstrating 95% completion of training in each reporting period including training evaluations. Training review and where appropriate revisions, must be reliably conducted, inclusive, where required, of CCMHE feedback. We must also review any updated policies and training capturing program changes affecting call-intake- and dispatches regarding mental health related calls. These updates to policies may include, but are not limited to, revised CIT officer designations, the CARE program, clinicians inside 911, or the National 988 system[8]. The OEMC indicated in its response to the IMT's draft IMR 7 report that there "are no new CIT officer designations, no contracts for clinicians inside 911, and the 988 system is not an OEMC program." The IMT

---

[8] *See 988 Suicide & Crisis Lifeline Factsheet,* FEDERAL COMMUNICATIONS COMMISSION, https://www.fcc.gov/sites/default/files/988-fact-sheet.pdf.

strongly recommends that the OEMC reconsider this response, as there were indeed revised CIT officer designations deployed by the CPD during the fifth monitoring period. Further, the OEMC plays a crucial role in transferring 911 calls to 988. *See* TNG 22-005, *9-8-8 Calls for Crisis Hotline*. Last, the 2022 CARE Annual Report confirms that clinicians indeed "join staff in the city's 911 emergency communications center[9]."

*Progress before the Seventh Reporting Period*

In the fourth reporting period, the IMT reviewed an updated draft version of the OEMC's *Crisis Intervention Team Program* standard operating procedure. The standard operating procedure clearly identifies the way in which telecommunicators are required to code incidents by utilizing a "Z-code" to denote a call involving a "mental health disturbance." A "Z-code" can also assigned by CPD officers who are on scene in response to a call for service whereby they determine it involves a mental health component. The OEMC standard operating procedure also explains how to complete the required set of "CIT triage questions" that gather important information on calls involving a mental health component.

The standard operating procedure also instructs call-takers that if there is any doubt about whether a call includes a possible mental health component, the steps listed in the standard operating procedure "can and should apply." This SOP received a no objection notice from the IMT in the fourth reporting period. There have been new designations put into place since then (Designated CIT Officer-voluntary; Trained CIT Officer-mandated; Un-trained Officer-not trained in CIT). During our conversations with the CPD and OEMC during this reporting period, the IMT came away with the understanding that the CPD and OEMC intend to implement new designations with additional alpha characters, but we have not seen documentation about whether policy has been revised to guide call-takers and dispatchers on new protocols responsive to ¶138-139, nor whether training or operational practices have changed. The regular cadence of annual policy and training revisions required under Consent Decree is meant to assist in addressing fluidity in program improvements.

During the fifth monitoring period, the IMT observed the eight-hour CIT and Mental Health Awareness training that all OEMC telecommunicators receive, which includes a module on mental health response (*see* ¶¶142–46). The IMT noted that the OEMC telecommunicators have received sufficient training on how to identify calls involving an individual known, suspected, or perceived to be in crisis and

---

[9]    *Crisis Assistance Response and Engagement Program (CARE) Annual Report*, CITY OF CHICAGO (December 8, 2022) at 2, https://www.chicago.gov/content/dam/city/sites/public-safety-and-violenc-reduction/pdfs/CARE%202022-Annual%20Report-12-7.pdf.

noted that the new standard operating procedure is incorporated into training, meeting the requirements of ¶139.

The training included a review of CIT Policies—covering the OEMC drop down boxes, what automatically triggers a CIT drop-down box to appear (*e.g.*, calls that include suicidal ideation or threat, the new requirement to ask about Weapons, Medications, Violent Tendencies, Triggers, etc.). The IMT has suggested improvements to the development of a drop-down box on the Weapons question, as identifying the type of weapon is crucial information for responding officers. The IMT encourages a drop-down field indicating common types of weapons. For example, a drop-down field could include commons weapons (*e.g.*, gun, knife) along with a narrative field to describe other objects being used as a weapon (*e.g.*, hammer, screwdriver). This data is enormously useful to responding officers, particularly because the rising number of officer-involved fatalities involve a mental health call for service. While the training included listening to two audio calls with discussion afterwards, live scenario-based training permitting the practice of these important skills would be a good addition to the training. Overall, the eight-hour training was well done.

The CIT officer designations have changed since the observation of this training, and it is unclear to the IMT whether training has been adjusted to reflect this, which is required to maintain Secondary compliance. In the sixth reporting period, designations changed to "a. Designated CIT officer (voluntary) b. Trained CIT Officer (mandatory) and c. Untrained officer (has not received training)." The IMT has requested information supporting the new designations when identifying and dispatching calls with a mental health component, but that has not yet been received. The IMT receives monthly auto-generated reports on call intake and dispatch and we have requested the new designations be updated to this report so that we may accurately understand the data.

In the sixth monitoring period, the IMT reviewed the OEMC's next iteration of policy-review. The IMT noted then that a no objection on this review will not be given until robust engagement of the Chicago Council on Mental Health Equity occurs. During the first policy review process, there was essentially no engagement of the Chicago Council on Mental Health Equity as required under ¶122. Since then, the IMT has been clear that compliance will be delayed until the City demonstrates that the Chicago Council on Mental Health Equity is significantly engaged with the OEMC's policy-review process. (*See*, *e.g.*, ¶¶139-40, 151, below.)

During the sixth reporting period, the OEMC reviewed the policies during a quarterly Chicago Council on Mental Health Equity meeting. The OEMC also attached the policies to an email to the Chicago Council on Mental Health Equity, inviting feedback, but did not receive any. This lack of feedback suggested inadequate engagement, but engagement is required for the OEMC to maintain compliance.

Therefore, the IMT recommended in the last reporting period that the OEMC engage the CPD and the City to articulate a robust plan to solicit thorough review and comment from the Chicago Council on Mental Health Equity. The OEMC plays a crucial role in the initial identification and appropriate dispatch of calls involving a mental health component, and their processes may improve with input from the CCMHE.

In the sixth reporting period, the OEMC also launched its CIT Refresher course, which the IMT observed on March 9, 2022. The City produced partial attendance records for both the CIT Refresher and the 8-hour CIT and Mental Health Awareness training in the sixth monitoring period. The records showed the date personnel were scheduled to attend, but it did not include actual training completion dates, so we were unable to determine the percent of OEMC personnel who have completed the training.

The OEMC also gave a brief presentation to the Chicago Council on Mental Health Equity, providing a high-level overview of the role and function of the OEMC. We appreciated the efforts toward engagement with the Chicago Council on Mental Health Equity, but note that it did not constitute a meaningful solicitation process for feedback on the OEMC's policies and training. Specifically, the OEMC's presentation merely invited the Chicago Council on Mental Health Equity to observe the OEMC's CIT Refresher Training; such an invitation does not equate to solicitation of feedback on the OEMC's policies and training.

The IMT was clear that we could not assess compliance with these requirements without written feedback from the Chicago Council on Mental Health Equity. We recommended that the OEMC consult either the CPD or members of the Chicago Council on Mental Health Equity for suggestions on how to obtain thorough feedback. The IMT indicated in the sixth reporting period that if rigorous feedback on policy and training remained absent again during the next reporting period, then the OEMC may no longer be in Preliminary and Secondary compliance with ¶139.

Moreover, the OEMC produced two training attendance records in the sixth reporting period. The OEMC produced the "Mental Health Crisis Awareness – Refresher" and "Mental Health Crisis Awareness Training," both of which lacked information indicating the training completion date and lacked the required 95% completion. The IMT cannot calculate the percent of OEMC employees who have completed the training without a system that identifies the total number of eligible employees, along with complete training attendance records. To maintain Secondary compliance, the IMT requires evidence of training attendance, along with training evaluations in the next reporting period.

*Progress in the Seventh Reporting Period*

During the Seventh Reporting Period, the OEMC has made meaningful improvements regarding engagement with the Chicago Council on Mental Health Equity, but there is room for improvement.

During the seventh reporting period, the OEMC improved its engagement with the Chicago Council on Mental Health Equity by initiating the first robust discussion with members during the August 23, 2022 quarterly meeting. The OEMC's SOP 21-004, *Crisis Intervention Program*, was discussed and the Chicago Council on Mental Health Equity provided substantive feedback to the OEMC. The OEMC also presented to the Chicago Council on Mental Health Equity during the December 5, 2022 special session.

This reporting period, the OEMC informed the IMT of a new, interagency CIT working group, for which it was in the process of developing a charter. While this interagency CIT working group is a significant step towards increased coordination and collaboration between City entities, the IMT encourages the entities to allocate more than thirty minutes per meeting to adequately address the important purpose of this new working group. It is essential that stakeholders from the CPD, the CFD, and the OEMC are actively engaged in this working group, prioritized for attendance, and that the OEMC produce to the IMT records demonstrating attendance and topic discussion.

The IMT suggested this reporting period that the OEMC identify a training observation committee composed of a cohort of Chicago Council on Mental Health Equity volunteers, Coalition Members, and/or Advocacy Groups. The OEMC should prioritize attendance at training sessions, even if it means implementing more proactive requests, such as developing a training observation subgroup, invitation to persons with lived experience, members of an organization in an advocacy role, as well as other broad invitations. Enhancing training through Chicago Council on Mental Health Equity feedback is important to maintaining Secondary compliance. Additionally, prioritizing interagency participation in these trainings (for example, the Chicago Fire Department, the OEMC, and the CPD) would be useful, increasing communication between these agencies.

We also encourage the OEMC to increase transparency with the IMT. We strive to establish trust with the OEMC so that we may meaningfully understand policy, training, and operations across the City's entities. The OEMC has increasingly pressed the IMT to employ overly-formalized methods for obtaining necessary information from the OEMC. The OEMC's insistence on such a formalized approach is inconsistent with the OEMC's obligations under the Consent Decree. *See* ¶¶681–82, 720.

By way of example, during the IMT's site visit with the OEMC this reporting period, the IMT asked the Quality Assurance manager about the frequency that watch commanders enter comments on the CIT discrepancy audit protocol, but the OEMC interrupted the IMT's question before the Quality Assurance manager could respond. Even when the IMT attempts to comply with the OEMC's formalized structure for obtaining information, many of the IMT's requests go unanswered. For example, the IMT submitted several formal requests to the OEMC this reporting period to which the OEMC responded with a lack of substantive information. The information that the IMT has requested from the OEMC, but has not received, includes evidence on how the OEMC is distinguishing the response of CIT officers, an audit of randomized 911 calls involving a mental health component, and a "sit along" with call-takers and dispatchers from the OEMC 911 floor.

It is imperative that the IMT obtain this requested information. For example, the OEMC's Quality Assurance manager reported that the most common discrepancies in the Quality Assurance Reviews concern the call taker's triage questions on whether there are weapons present and whether the individual in crisis has violent tendencies. It is important for the IMT to note that persons in mental health crisis are more likely to be killed by law enforcement. Additionally, a recently published report based on 2022 national data supports this growing concern, with 2022 data continuing to demonstrate that a relatively high number of fatalities start as a mental health call for service.[10]

A more holistic assessment of the City's crisis response system is warranted under Consent Decree and we hope to gain more information through our continued discussions. To that end, we note that OEMC telecommunicators who are embedded within OEMC as call-takers and dispatch for all City Medical and Fire-related 911 calls, are not required by the OEMC to take the OEMC Crisis intervention and Mental Health Awareness Training, despite sitting on the same 911 floor and being responsible for call-taking and dispatching of medical-related calls. This reporting period, the OEMC produced attendance records which substantially demonstrated 95% of telecommunicators dispatching police calls for service received training, but the Consent Decree encompasses *all* OEMC call-takers and dispatchers, not just those telecommunicators facilitating CPD-related calls. Therefore the OEMC is at risk of losing Secondary compliance in the next and in future reporting periods if it does not clarify which trainings the OEMC telecommunicators responsible for medical and fire related calls do and do not receive. In short, *all* OEMC call-talkers should be included in the OEMC's attendance records.

Throughout the Consent Decree, the OEMC has produced to the IMT various policies and Standard Operating Procedures (SOPs), several of which lack an SOP

---

[10]   *See, e.g.*, *2022 Police Violence Report*, MAPPING POLICE Violence (noting that there were 1,194 officer-involved fatalities in 2022 and that 110 of which occurred after police responded to reports of someone experiencing a mental-health crisis)), https://policeviolencereport.org/.

number causing the IMT to be unsure whether the OEMC has or has not finalized the SOP. In addition, several of these OEMC SOPs that reference *CPD* policies have not been updated to conform to recent *CPD* revisions. For example, the IMT has not received any policies from the OEMC that use the "Designated CIT Officer" language that the CPD adopted in its S05-14, *CIT Program* directive in July 2022.

### Paragraph 139 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Crisis Intervention: ¶140

**140.** *OEMC police communication dispatchers will continue to prioritize Certified CIT Officers for dispatch to incidents that involve an individual known, suspected, or perceived to be in crisis. If a Certified CIT Officer is not available to timely respond, OEMC will continue to dispatch an available officer to avoid compromising response time. OEMC dispatchers will dispatch a Certified CIT Officer, when available, if the responding officer requests assistance from a Certified CIT Officer.*

## Compliance Progress  (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

During the seventh monitoring period, the City and the OEMC maintained Preliminary and Secondary compliance with the requirements of ¶140.

To achieve Preliminary compliance with ¶140, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." To maintain Preliminary compliance with ¶140, the OEMC must demonstrate that it is thoroughly reviewing its policies as described in ¶¶626–41.

Secondary compliance is assessed relative to ¶286, which incorporates the following evaluation criteria: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation. In the 8th reporting period, the IMT will re-assess Secondary compliance relative to ¶286, and should include a needs assessment.

Moreover, to maintain Secondary compliance with ¶140 in future reporting periods, the OEMC must provide sufficient documentation demonstrating 95% completion of training in each reporting period including training evaluations. Training review and where appropriate revisions, must be reliably conducted, inclusive, where required, of CCMHE feedback. We must also review any updated policies and training capturing program changes affecting call-intake- and dispatches regarding mental health related calls. These updates to policies may include, but are not limited to, revised CIT officer designations, the CARE program, clinicians inside

911, or the National 988 system[11]. The OEMC indicated in its response to the IMT's draft IMR 7 report that there "are no new CIT officer designations, no contracts for clinicians inside 911, and the 988 system is not an OEMC program." The IMT strongly recommends that the OEMC reconsider this response, as there were indeed revised CIT officer designations deployed by the CPD during the fifth monitoring period. Further, the OEMC plays a crucial role in transferring 911 calls to 988. *See* TNG 22-005, *9-8-8 Calls for Crisis Hotline*. Last, the 2022 CARE Annual Report confirms that clinicians indeed "join staff in the city's 911 emergency communications center[12]."

*Progress before the Seventh Reporting Period*

In the fourth reporting period, the IMT reviewed an updated draft version of the OEMC's *Crisis Intervention Team Program* standard operating procedure. The standard operating procedure clearly identifies the way in which telecommunicators are required to code incidents by utilizing a "Z-code" to denote a call involving a "mental health disturbance." A "Z-code" can also assigned by CPD officers who are on scene in response to a call for service whereby they determine it involves a mental health component. The OEMC standard operating procedure also explains how to complete the required set of "CIT triage questions" that gather important information on calls involving a mental health component.

The standard operating procedure also instructs call-takers that if there is any doubt about whether a call includes a possible mental health component, the steps listed in the standard operating procedure "can and should apply." This SOP received a no objection notice from the IMT in the fourth reporting period. There have been new designations put into place since then (Designated CIT Officer-voluntary; Trained CIT Officer-mandated; Un-trained Officer-not trained in CIT). During our conversations with the CPD and OEMC during this reporting period, the IMT came away with the understanding that the CPD and OEMC intend to implement new designations with additional alpha characters, but we have not seen documentation about whether policy has been revised to guide call-takers and dispatchers on new protocols responsive to ¶138-139, nor whether training or operational practices have changed. The regular cadence of annual policy and training revisions required under Consent Decree is meant to assist in addressing fluidity in program improvements.

---

[11] *See 988 Suicide & Crisis Lifeline Factsheet*, Federal Communications Commission, https://www.fcc.gov/sites/default/files/988-fact-sheet.pdf.

[12] *Crisis Assistance* Response *and Engagement Program (CARE) Annual Report*, City of Chicago (December 8, 2022) at 2, https://www.chicago.gov/content/dam/city/sites/public-safety-and-violenc-reduction/pdfs/CARE%202022-Annual%20Report-12-7.pdf.

During the fifth monitoring period, the IMT observed the eight-hour CIT and Mental Health Awareness training that all OEMC telecommunicators receive, which includes a module on mental health response (*see* ¶¶142–46). The IMT noted that the OEMC telecommunicators have received sufficient training on how to identify calls involving an individual known, suspected, or perceived to be in crisis and noted that the new standard operating procedure is incorporated into training, meeting the requirements of ¶140.

The training included a review of CIT Policies—covering the OEMC drop down boxes, what automatically triggers a CIT drop-down box to appear (*e.g.*, calls that include suicidal ideation or threat, the new requirement to ask about Weapons, Medications, Violent Tendencies, Triggers, etc.). The IMT has suggested improvements to the development of a drop-down box on the Weapons question, as identifying the type of weapon is crucial information for responding officers. The IMT encourages a drop-down field indicating common types of weapons. For example, a drop-down field could include commons weapons (*e.g.*, gun, knife) along with a narrative field to describe other objects being used as a weapon (*e.g.*, hammer, screwdriver). This data is enormously useful to responding officers, particularly because the rising number of officer-involved fatalities involve a mental health call for service. While the training included listening to two audio calls with discussion afterwards, live scenario-based training permitting the practice of these important skills would be a good addition to the training. Overall, the eight-hour training was well done.

The CIT officer designations have changed since the observation of this training, and it is unclear to the IMT whether training has been adjusted to reflect this, which is required to maintain Secondary compliance. In the sixth reporting period, designations changed to "a. Designated CIT officer (voluntary) b. Trained CIT Officer (mandatory) and c. Untrained officer (has not received training)." The IMT has requested information supporting the new designations when identifying and dispatching calls with a mental health component, but that has not yet been received. The IMT receives monthly auto-generated reports on call intake and dispatch and we have requested the new designations be updated to this report so that we may accurately understand the data.

In the sixth monitoring period, the IMT reviewed the OEMC's next iteration of policy-review. The IMT noted then that a no objection on this review will not be given until robust engagement of the Chicago Council on Mental Health Equity occurs. During the first policy review process, there was essentially no engagement of the Chicago Council on Mental Health Equity as required under ¶122. Since then, the IMT has been clear that compliance will be delayed until the City demonstrates that the Chicago Council on Mental Health Equity is significantly engaged with the OEMC's policy-review process. (*See, e.g.*, ¶¶139-40, 151, below.)

During the sixth reporting period, the OEMC reviewed the policies during a quarterly Chicago Council on Mental Health Equity meeting. The OEMC also attached the policies to an email to the Chicago Council on Mental Health Equity, inviting feedback, but did not receive any. This lack of feedback suggested inadequate engagement, but engagement is required for the OEMC to maintain compliance. Therefore, the IMT recommended in the last reporting period that the OEMC engage the CPD and the City to articulate a robust plan to solicit thorough review and comment from the Chicago Council on Mental Health Equity. The OEMC plays a crucial role in the initial identification and appropriate dispatch of calls involving a mental health component, and their processes may improve with input from the CCMHE.

In the sixth reporting period, the OEMC also launched its CIT Refresher course, which the IMT observed on March 9, 2022. The City produced partial attendance records for both the CIT Refresher and the 8-hour CIT and Mental Health Awareness training in the sixth monitoring period. The records showed the date personnel were scheduled to attend, but it did not include actual training completion dates, so we were unable to determine the percent of OEMC personnel who have completed the training.

The OEMC also gave a brief presentation to the Chicago Council on Mental Health Equity, providing a high-level overview of the role and function of the OEMC. We appreciated the efforts toward engagement with the Chicago Council on Mental Health Equity, but note that it did not constitute a meaningful solicitation process for feedback on the OEMC's policies and training. Specifically, the OEMC's presentation merely invited the Chicago Council on Mental Health Equity to observe the OEMC's CIT Refresher Training; such an invitation does not equate to solicitation of feedback on the OEMC's policies and training.

The IMT was clear that we could not assess compliance with these requirements without written feedback from the Chicago Council on Mental Health Equity. We recommended that the OEMC consult either the CPD or members of the Chicago Council on Mental Health Equity for suggestions on how to obtain thorough feedback. The IMT indicated in the sixth reporting period that if rigorous feedback on policy and training remained absent again during the next reporting period, then the OEMC may no longer be in Preliminary and Secondary compliance with ¶140.

Moreover, the OEMC produced two training attendance records in the sixth reporting period. The OEMC produced the "Mental Health Crisis Awareness – Refresher" and "Mental Health Crisis Awareness Training," both of which lacked information indicating the training completion date and lacked the required 95% completion. The IMT cannot calculate the percent of OEMC employees who have completed the training without a system that identifies the total number of eligible

employees, along with complete training attendance records. To maintain Secondary compliance, the IMT requires evidence of training attendance, along with training evaluations in the next reporting period.

*Progress in the Seventh Reporting Period*

During the Seventh Reporting Period, the OEMC has made meaningful improvements regarding engagement with the Chicago Council on Mental Health Equity, but there is room for improvement.

During the seventh reporting period, the OEMC improved its engagement with the Chicago Council on Mental Health Equity by initiating the first robust discussion with members during the August 23, 2022 quarterly meeting. The OEMC's SOP 21-004, *Crisis Intervention Program*, was discussed and the Chicago Council on Mental Health Equity provided substantive feedback to the OEMC. The OEMC also presented to the Chicago Council on Mental Health Equity during the December 5, 2022 special session.

This reporting period, the OEMC informed the IMT of a new, interagency CIT working group, for which it was in the process of developing a charter. While this interagency CIT working group is a significant step towards increased coordination and collaboration between City entities, the IMT encourages the entities to allocate more than thirty minutes per meeting to adequately address the important purpose of this new working group. It is essential that stakeholders from the CPD, the CFD, and the OEMC are actively engaged in this working group, prioritized for attendance, and that the OEMC produce to the IMT records demonstrating attendance and topic discussion.

The IMT suggested this reporting period that the OEMC identify a training observation committee composed of a cohort of Chicago Council on Mental Health Equity volunteers, Coalition Members, and/or Advocacy Groups. The OEMC should prioritize attendance at training sessions, even if it means implementing more proactive requests, such as developing a training observation subgroup, invitation to persons with lived experience, members of an organization in an advocacy role, as well as other broad invitations. Enhancing training through Chicago Council on Mental Health Equity feedback is important to maintaining Secondary compliance. Additionally, prioritizing interagency participation in these trainings (for example, the Chicago Fire Department, the OEMC, and the CPD) would be useful, increasing communication between these agencies.

We also encourage the OEMC to increase transparency with the IMT. We strive to establish trust with the OEMC so that we may meaningfully understand policy, training, and operations across the City's entities. The OEMC has increasingly

pressed the IMT to employ overly-formalized methods for obtaining necessary information from the OEMC. The OEMC's insistence on such a formalized approach is inconsistent with the OEMC's obligations under the Consent Decree. *See* ¶¶681–82, 720.

By way of example, during the IMT's site visit with the OEMC this reporting period, the IMT asked the Quality Assurance manager about the frequency that watch commanders enter comments on the CIT discrepancy audit protocol, but the OEMC interrupted the IMT's question before the Quality Assurance manager could respond. Even when the IMT attempts to comply with the OEMC's formalized structure for obtaining information, many of the IMT's requests go unanswered. For example, the IMT submitted several formal requests to the OEMC this reporting period to which the OEMC responded with a lack of substantive information. The information that the IMT has requested from the OEMC, but has not received, includes evidence on how the OEMC is distinguishing the response of CIT officers, an audit of randomized 911 calls involving a mental health component, and a "sit along" with call-takers and dispatchers from the OEMC 911 floor.

It is imperative that the IMT obtain this requested information. For example, the OEMC's Quality Assurance manager reported that the most common discrepancies in the Quality Assurance Reviews concern the call taker's triage questions on whether there are weapons present and whether the individual in crisis has violent tendencies. It is important for the IMT to note that persons in mental health crisis are more likely to be killed by law enforcement. Additionally, a recently published report based on 2022 national data supports this growing concern, with 2022 data continuing to demonstrate that a relatively high number of fatalities start as a mental health call for service.[13]

A more holistic assessment of the City's crisis response system is warranted under Consent Decree and we hope to gain more information through our continued discussions. To that end, we note that OEMC telecommunicators who are embedded within OEMC as call-takers and dispatch for all City Medical and Fire-related 911 calls, are not required by the OEMC to take the OEMC Crisis intervention and Mental Health Awareness Training, despite sitting on the same 911 floor and being responsible for call-taking and dispatching of medical-related calls. This reporting period, the OEMC produced attendance records which substantially demonstrated 95% of telecommunicators dispatching police calls for service received training, but the Consent Decree encompasses *all* OEMC call-takers and dispatchers, not just those telecommunicators facilitating CPD-related calls. Therefore the OEMC is at risk of losing Secondary compliance in the next and in future reporting periods if it does not clarify which trainings the OEMC telecommunicators responsible for

---

[13] *See, e.g., 2022 Police Violence Report*, MAPPING POLICE Violence (noting that there were 1,194 officer-involved fatalities in 2022 and that 110 of which occurred after police responded to reports of someone experiencing a mental-health crisis)), https://policeviolencereport.org/.

medical and fire related calls do and do not receive. In short, *all* OEMC call-talkers should be included in the OEMC's attendance records.

Throughout the Consent Decree, the OEMC has produced to the IMT various policies and Standard Operating Procedures (SOPs), several of which lack an SOP number causing the IMT to be unsure whether the OEMC has or has not finalized the SOP. In addition, several of these OEMC SOPs that reference *CPD* policies have not been updated to conform to recent *CPD* revisions. For example, the IMT has not received any policies from the OEMC that use the "Designated CIT Officer" language that the CPD adopted in its S05-14, *CIT Program* directive in July 2022.

### Paragraph 140 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Crisis Intervention: ¶141

*141. CPD will provide OEMC with an updated list of current and active Certified CIT Officers and their assignment at least every week. At the beginning of each watch, CPD will continue to identify for OEMC the Certified CIT Officers on duty for each watch and in each district so that OEMC dispatchers know which Certified CIT Officers to prioritize for dispatch to incidents involving an individual known, suspected, or perceived to be in crisis.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh monitoring period, the City and the CPD maintained Preliminary compliance with ¶141.

To achieve Preliminary compliance with ¶141, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." Going forward, to achieve Secondary compliance, the CPD will need to demonstrate that at least 95% of officers have received the e-learning which was accomplished this reporting period. However, the City and the CPD must also develop a systematic plan to reliably ensure officers who violate the eligibility criteria or who allow their training to lapse are undesignated in the CLEAR and eLearning systems and are not prioritized for dispatch. Persons responsible for this plan will need to be trained on the processes and expectations for doing so. The CPD will need to develop metrics that, when tracked, adequately demonstrate the CPD's success under ¶141. Further assessment levels will require an assessment of those developed metrics.

*Progress before the Seventh Reporting Period*

In the third reporting period, the CPD achieved Preliminary compliance by memorializing the requirements of ¶141 into Special Order S05-14, *Crisis Intervention Team (CIT) Program*, which contained the requirements of ¶141 as they relate to the CPD's responsibilities. During the fourth reporting period, the IMT reviewed a process flowchart demonstrating the two separate ways in which the CPD provides the OEMC with updated lists of current and active Certified CIT Officers and their

assignments daily. Specifically, data is transmitted by (1) manually inputting training records into the CPD's CLEAR and eLearning systems and (2) asking the CPD watch supervisors to identify the CIT officers from the eLearning application and to send a roster to the OEMC daily for each district and watch.

On September 27, 2022, the IMT attended a site visit and observed improvements toward a fully automated CIT officer reporting system. A manual system for override still exists, but the automated system is largely implemented. CLEAR (the CPD data warehouse), Learning Management System, and Oracle (OEMC) via the Computer Aided Dispatch interface together to identify a z-code attribute next to CIT officers. Dispatch also confirms over the air if they are CIT-trained and OEMC can make updates to the z attribute when there are inaccuracies. The OEMC reported that asking over the radio if the officer is CIT certified is important due to shift schedules changing and officers being furloughed. While CPD still receives a daily roster from watch supervisors to reflect daily changes in assignments, the OEMC reports that the automated roster and verbal communications via dispatch are most reliable. The combination of these systems therefore acts as the CPD's official list.

During the fifth monitoring period, the City and the CPD submitted a substantially revised S05-14, *Crisis Intervention Team (CIT) Program*. While ¶141's requirements had been met in the earlier version of S05-14, thus achieving Preliminary compliance, the revised version of S05-14 has changed the requirement that the CPD provide OEMC with an updated list of current and active Certified CIT Officers and their assignment "at least every week" to "no less than quarterly."

However, in the sixth monitoring period, the City and the CPD addressed this discrepancy, permitting ongoing Preliminary compliance. The CPD has yet to develop a systematic plan to ensure that officers who violate the eligibility criteria or who allow their training to lapse are undesignated in the CLEAR and eLearning systems and are not prioritized for dispatch. For instance, the CPD might create an automatic notification of ineligibility based on the number of days lapsed since their last training. Additionally, for those who exceed the ineligibility thresholds (see ¶93 and ¶104), the CPD should create a policy that requires personnel to cross-check the CIT roster against any sustained finding to determine whether the finding renders the officer ineligible. While S05-14 notes that "each quarter, the Commander of the Strategic Initiatives Division[14] is responsible for inform[ing] OEMC of officers who are out of compliance with the CIT Program eligibility requirements," this does not constitute a systematic plan because it provides no significant guidance on what, precisely, the Commander is supposed to do. In other words, the CPD must adequately define a plan that ensures the requirements to

---

[14] According to the CPD's last updated organizational chart in the reporting period (dated 12/16/20), a commander oversees the Strategic Initiatives Division, rather than a Deputy Chief as indicated by the policy. The CPD should resolve this inconsistency.

remain a designated CIT officer are in place and a system is established which ensures this is occurring so that "an updated list of current and active Certified CIT Officers and their assignment" can be sent to OEMC.

Moreover, the CIT officer designations changed in the sixth reporting period and it is unclear to the IMT how these designations are being enacted affecting ¶141. In the sixth reporting period, designations changed to a. Designated CIT officer (voluntary) b. Trained CIT Officer (mandatory) and c. Untrained officer (has not received Basic CIT training). The IMT has made formal data requests for information supporting the new designations when identifying and dispatching calls with a mental health component, but that has not yet been received. Monthly auto-generated reports on call intake and dispatch are produced to the IMT. The IMT has requested the new designations be updated to this report so that proper assessment can be accomplished.

The IMT observed Basic CIT Training in the fifth reporting period, and the officers in that training expressed concern over the accuracy of CPD's data to the OEMC regarding who is CIT certified and on duty. The City reports technology limitations in their LMS system which may result in inaccuracies in the weekly transmission of certified CIT officers to OEMC. The city has indicated the present capability of their LMS system is to be able to track a quarterly report of who has fallen out of compliance. This will be monitored over time.

\*\*\*

In the seventh monitoring period, the City and the CPD maintained Preliminary compliance with ¶141. During this reporting period, the CPD demonstrated that 95% of their officers completed the required eLearning. To achieve Secondary compliance, the City and the CPD must also develop a systematic plan to ensure the reliability that officers who violate the eligibility criteria or who allow their training to lapse are undesignated in the CLEAR and eLearning systems and are not prioritized for dispatch. Persons responsible for this plan will need to be trained on the processes and expectations for doing so. The CPD will also need to demonstrate a reliable system for differentiating between the new designations of officers. Such training requires a systematic plan. Full compliance will then depend on demonstration of the system's success should a CIT officer become ineligible.

## Paragraph 141 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Crisis Intervention: ¶142

**142.** *Within 90 days of the Effective Date, OEMC will ensure that all current active tele-communicators have received mental health and CIT awareness training ("OEMC Training"). OEMC will provide the OEMC Training to new tele-communicators before tele-communicators complete their training and begin answering calls independently.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

In the seventh monitoring period, the City and the OEMC maintained Full compliance with ¶142.

To achieve Preliminary compliance with ¶142, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶142 by reviewing training development, implementation, and evaluation in accordance with ¶286 of the Consent Decree, which incorporates the following evaluation criteria: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

Full compliance with ¶142 is assessed by confirming that 95% of employees have received the requisite training.

In the first reporting period, the City and the OEMC achieved Preliminary and Secondary compliance with the requirements of ¶142 by demonstrating that all current active telecommunicators have received mental-health and CIT-awareness training. The OEMC has also memorialized this requirement into CIT and Mental Health Awareness policy, which clearly states the requirement for all telecommunicators to receive the mental health and CIT awareness training.

However, in the sixth reporting period, training records were insufficient to demonstrate ongoing compliance.

Training attendance records were produced for the "Mental Health and CIT Awareness Training." However, the OEMC only produced to the IMT records with a training completion date of Dec 3, 2021 (which is the fifth reporting period). There were 17 participants for this Mental Health Crisis Awareness Training. These training records included training evaluations, which were strong. The most common theme in these evaluations was a desire for better integration with the CPD, bringing CPD experiences in the field.

Because it is impossible to know if 17 participants are new or returning employees, which maintains a 95% completion, the IMT highly recommends a single spreadsheet indicating the employee name, date of hire, and date of training attendance. This will show a running list of all employees, date of hire and date of attendance. The Mental Health and CIT Awareness Training, the Refresher Training and attendance at the 40-hour training could be on the same spreadsheet and re-produced each monitoring period.

Moreover, the OEMC's productions in the sixth reporting period again did not ensure the evaluation forms, policies, and trainings all reflected the correct, full title of the various training and policy names. This feedback has been given both orally and in writing in previous reporting periods.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the OEMC produced much more comprehensive training and attendance records which substantially demonstrated 95% of *non*-CFD telecommunicators received training, however as indicated in this assessment, the IMT does not have evidence of whether training has reflected program changes, nor do we have evidence of any training evaluations. The IMT will take into consideration all OEMC telecommunicators, not just police telecommunicators in the next reporting period. The OEMC made significant improvements by producing improved training records this reporting period, and the OEMC should be commended for this. In future reporting periods, the IMT encourages the OEMC to further improve these records to include the total OEMC call takers and dispatchers which encompass both Police and Fire.

In relation to ¶¶142–47, the IMT sees no distinction between telecommunicators who dispatch 911 calls for police versus those who for the CFD or Emergency Medical Service response, relative to mental health, CIT awareness, and recognizing and responding to persons in mental or behavioral health crisis. We believe it is crucial that all telecommunicators are well informed concerning these topics, including the training topics identified under ¶¶143–44. Further, the IMT understands ¶¶142 and 146 to include "*all telecommunicators*." The IMT was unaware that the City was making a distinction between these telecommunicators at the time Secondary compliance was issued.

The IMT has advised the OEMC that comprehensive attendance records *and training evaluations* must be produced each reporting period for Full compliance to be maintained. These OEMC productions must occur to avoid the OEMC's risk of losing compliance with ¶142. Should training evaluations not be produced again in the next reporting period, the OEMC is at risk of losing compliance.

### Paragraph 142 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Crisis Intervention: ¶143

> **143.** *The OEMC Training will be at least an eight-hour course taught jointly by qualified OEMC staff and a mental health clinician or advocate.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *December 31, 2023* |

In the sixth monitoring period, the City and the OEMC maintained Full compliance with ¶143.

To achieve Preliminary compliance with ¶143, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶143 by determining whether the City and the OEMC have qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree and the requirements of ¶143.

Full compliance was assessed in the fifth reporting period by evaluating records of attendance, and ongoing Full compliance will also assess the City's and the OEMC's efforts to engage with the community, including the Chicago Council on Mental Health Equity, regarding requisite policy, training, and operations development and implementation as referenced in the Consent Decree (¶¶10, 12, 49, 52, 115, 129, 511, 531, and 633). However, the City and the CPD's engagement with the Chicago Council on Mental Health Equity and with the public is insufficient to date to maintain Full compliance. While efforts improved this reporting period, which the OEMC is commended for, engagement must continue to grow in the next reporting period for Full compliance to be maintained. Full compliance is at risk in the next reporting period should the OEMC not produce comprehensive training records along with training revisions including concerns identified (*see* ¶¶138–42) and training evaluations. To maintain Full compliance, these will need to be produced each reporting period.

*Progress before the Seventh Reporting Period*

During the fifth monitoring period, the IMT observed the revised eight-hour training in crisis intervention that all OEMC telecommunicators receive, which includes a module on mental health response (*see* ¶¶142–46). The IMT notes that the OEMC telecommunicators had received sufficient training on how to identify calls involving an individual known, suspected, or perceived to be in crisis and found that the new standard operating procedure is incorporated into training, meeting the requirements of ¶143.

The external instructors included representatives from the National Alliance on Mental Illness and from people with lived experience. The training included a review of CIT Policies—covering the OEMC drop down boxes, what automatically triggers a CIT drop down box to appear (*e.g.*, calls that include suicidal ideation or threat); the new requirement to ask about Weapons, Medications, Violent Tendencies, Triggers, *etc*. The IMT has made suggestions about developing a drop-down box on the Weapons question, as identification of the type of weapon is crucial information for responding officers. While the training did include listening to two audio calls with discussion afterwards, live scenario-based training permitting the practice of these important skills would be a good addition to the training, and this will be assessed in the next iteration of training.

The OEMC has also incorporated a contingency plan for if there are not enough new telecommunicators hired to warrant their own eight-hour training. In such situations, the OEMC sends the new hires to CPD's 40-hour CIT training. Afterwards, the new hire receives a two-hour training relevant to telecommunicators. When this training is complete, new telecommunicators are eligible to answer calls independently (*see* ¶142). However, once the OEMC has enough capacity to conduct the eight-hour training, the new hires will also be required to attend this training, which is a reasonable approach to satisfying the intent of ¶143 and looks forward to reviewing complete training records.

In the fifth monitoring period, the City and the OEMC reached Full compliance with ¶143. The OEMC produced evidence of those individuals who attended the eight-hour training since the last submission. However, in the sixth reporting period, the OEMC produced training records for the "Mental Health and CIT Awareness Training," but these records were insufficient to demonstrate ongoing compliance. The OEMC's productions again did not ensure the evaluation forms, policies, and trainings all reflected the correct, full title of the various training and policy names. This feedback has been given both orally and in writing in previous reporting periods.

During the sixth reporting period, the OEMC produced to the IMT records with a training completion date of Dec 3, 2021 (which is the fifth reporting period). There were 17 participants for this Mental Health Crisis Awareness Training. This production *did* provide training evaluations which were strong, with the most common

theme for improvements focused on better integration with the CPD, bringing CPD experiences in the field.

Additionally, another record was submitted that showed scheduled training of March 31, 2021, but the date attended column is left blank.

Future productions of training records should state whether any of the individuals taking the training had previously attended the 40-hour Basic CIT training according to the OEMC plan, while awaiting enough new telecommunicators to conduct the eight hour training. The OEMC should also consider prioritizing call taker attendance at the 40- hour Basic CIT training, which would provide call takers with a better understanding of what is being taught in the CPD training.

Because it is impossible to know if 17 participants are new or returning employees, which maintains a 95% completion, the IMT highly recommends a single spreadsheet indicating the employee name, date of hire, and date of training attendance. This will show a running list of all employees, date of hire, and date of attendance. The *Mental Health and CIT Awareness Training*, the *Refresher Training* and attendance at the 40-hour training could be on the same spreadsheet and re-produced each monitoring period. The IMT has advised the OEMC that complete training records and evaluations must be produced each reporting period for Full compliance to be maintained.

Moreover, the only records produced by the OEMC to support the Chicago Council on Mental Health Equity's invitation to the training was a PowerPoint, with two training dates identified, and an email from a Chicago Council on Mental Health Equity member requesting to attend the training in person. There was no evidence of response by the OEMC, nor of the member attending the training in person.

*Progress in the Seventh Reporting Period*

Training records produced this reporting period were a significant improvement, and the OEMC should be commended for this.

However as indicated in this assessment, the IMT does not have evidence of whether training has reflected program changes, and this must occur in future reporting periods to maintain Full compliance. Additionally, the IMT encourages the OEMC to further improve training records to include the total OEMC call takers and dispatchers which encompass both Police and Fire. No training evaluations were produced this reporting period, and must occur in the next reporting period to maintain Full compliance.

The IMT will evaluate for a period of two years evidence that training is reliably being provided to all telecommunicators, including new hires, and continues to be

provided by qualified personnel with records demonstrating such. Additionally, a more robust scenario-based exercise process permitting the practice of important skills would enhance this training, and the IMT will be looking for this in future iterations of this training (see ¶144). The OEMC will be assessed for inclusion of training revisions addressing the concerns identified under ¶¶138–40, ¶144. The IMT will evaluate the City's and the OEMC's efforts to incorporate community and Chicago Council on Mental Health Equity feedback, along with training evaluations and trend analysis into ongoing revisions of the 8-hour training. More is needed at this point in the Consent Decree Process to maintain Full compliance.

Other designated OEMC paragraphs will address accountability for ensuring the required training is operationally successful, including ¶¶138–140, 147, and 149.

### Paragraph 143 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Crisis Intervention: ¶144

**144.** *The OEMC Training will cover, at a minimum, the following topics: identification of individuals in crisis; telephonic suicide prevention strategies; crisis and stress management, de-escalation, and scenario-based exercises; interactions with individuals with mental illness; information that should be gathered and shared with the responding officer or Certified CIT Officer when the call-taker suspects that the call involves an individual in crisis; the types of calls that may require the dispatching of a Certified CIT Officer or a coordinated crisis response of first responders reflective of established policy for intake and dispatch; and the procedures for dispatching a Certified CIT Officer.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not In Compliance* |

In the seventh monitoring period, the City and the OEMC maintained Preliminary and Secondary compliance with ¶144.

To achieve Preliminary compliance with ¶144, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶144 by reviewing the City's and the OEMC's level of data collection, tracking, analysis, and management as required under the Consent Decree. The IMT "triangulate[s]" the data by comparing multiple data sources, yielding a more robust understanding of ¶144's requirements.

### Progress before the Seventh Reporting Period

During the fourth reporting period, OEMC's *Mental Health Training* directive was finalized, which clearly requires the topics listed in ¶144 to be included in their training. Additionally, during the fifth monitoring period members of the IMT observed the OEMC's delivery of the eight-hour training and confirmed that the training at that time sufficiently contained each of the necessary requirements on how to identify calls involving an individual known, suspected, or perceived to be in

crisis and found that the new standard operating procedure is incorporated into training, meeting the requirements of ¶144.

The training curriculum was also reviewed by members of the Chicago Council on Mental Health Equity, although more robust efforts on training review and feedback must occur moving forward and this will be assessed for future compliance. The OEMC staff and outside instructors (including mental health clinicians and advocates) were qualified relative to their presentations, including representatives from NAMI and people with lived experience.

In the sixth monitoring period, the OEMC produced records demonstrating its policy review process to the IMT. The IMT appreciated these records, but noted that the City and the CPD must demonstrate a more robust engagement with the Chicago Council on Mental Health Equity. During the first policy review process, there was essentially no engagement of the Chicago Council on Mental Health Equity as required under ¶¶130—31. Since this first policy review, the IMT has been clear that the absence of significant engagement will delay the achievement of Full compliance.

The OEMC briefly touched on the policies, and attached those policies to an email to the Chicago Council on Mental Health Equity, inviting feedback. However, no feedback was received. This lack of feedback indicates inadequate engagement. The IMT recommends the OEMC engage the CPD and the City to identify a robust plan to solicit thorough review and comment. The OEMC plays a crucial role in the initial identification and appropriate dispatch of calls involving a mental health component, and experts and people with lived experience should be given due process. Evidence of Chicago Council on Mental Health Equity comments on policies both during Chicago Council on Mental Health Equity meetings and by email, along with OEMC's response to those comments is required. While OEMC engagement efforts improved during this reporting period, the OEMC's efforts must continue to improve in order to maintain compliance. During this reporting period, there was no evidence of any CCMHE member observing any OEMC training. This must change in the next reporting period.

Additionally, Paragraph 144 requires the OEMC training to include multiple topics, and special emphasis must be given in the next iteration of the training to bolster *training topics* requiring greater emphasis. For example, scenario-based exercises; information that should be gathered and shared with the responding officer or Certified CIT Officer when the call-taker suspects that the call involves an individual in crisis, including the types of weapons involved, which is crucial for both officer and civilian safety; the types of calls that may require the dispatching of a Certified CIT Officer or a coordinated crisis response of first responders reflective of established policy for intake and dispatch; and the procedures for dispatching a Certified CIT Officer. Suicide prevention requires special skills for 911 call takers.

The OEMC should consider using brief web-based trainings to target these important skills.

The City two years ago launched a new Crisis Assistance Response and Engagement (CARE) pilot program, qualifying as a *coordinated crisis response*. We commend the City for this step. The OEMC plays a key role in identifying and dispatching a coordinated crisis response. The IMT looks forward to the City's progress as these programs continue to grow. As cited in previous paragraph assessments, the topics and programs identified under ¶144 have evolved since the onset of the Consent Decree, and both policy and training must reflect these changes. To date, the IMT has no evidence of such.

Full compliance requires the OEMC to produce evidence that all telecommunicators, including any new hires since the last submission, have received the required training, as outlined in the OEMC's procedures, and that supplemental training is developed and delivered addressing the special topics outlined above. Moreover, the OEMC will be assessed for inclusion of training revisions addressing the concerns identified under (see ¶'s 138-140). Training records produced in the last reporting period were insufficient, as noted in previous paragraphs. The IMT highly recommends a single spreadsheet indicating the employee name, date of hire, and date of training attendance. This will show a running list of all employees and date of attendance. The *Mental Health and Crisis Intervention Team Awareness Training*, the *Refresher Training* and attendance at the 40-hour training could be on the same spreadsheet and re-produced each monitoring period.

*Progress in the Seventh Reporting Period*

Training records produced this reporting period were a significant improvement, and the OEMC should be commended for this.

However as indicated in this assessment, the IMT does not have evidence of whether training has reflected program changes, and this must occur in future reporting periods to maintain Full compliance. Additionally, the IMT encourages the OEMC to further improve training records to include the total OEMC call takers and dispatchers which encompass both Police and Fire. In future reporting periods, the IMT encourages the OEMC to further improve these records to include the total OEMC call takers and dispatchers which encompass both Police and Fire.

The training records which were produced indicate very few call takers and dispatchers have received the 40 hour Basic CIT training, and increasing attendance at this important training is encouraged.

***

In the seventh monitoring period, the City and the OEMC maintained Preliminary and Secondary compliance with ¶144. Once Full compliance is achieved, the IMT will evaluate for a period of two years evidence that all topics identified under ¶144 are reliably being provided to all telecommunicators, including new hires. The City's and the OEMC's efforts to incorporate community and Chicago Council on Mental Health Equity feedback, policy and program changes, along with training evaluations and trend analysis into ongoing revisions of the 8-hour training, will be assessed as it relates to each of the topics covered under this training. Special attention must be paid to alternative response programs including CARE and embedded clinicians in the 911 call center. Additionally, CCMHE observation and feedback of this important training will be monitored in the next reporting period, which to date has been essentially none. Other designated OEMC paragraphs will address accountability for ensuring the required training is operationally successful. *See* ¶¶138-40, 147, and 149.

However, more is needed to maintain compliance in the next reporting period.

### Paragraph 144 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Crisis Intervention: ¶145

> **145.** *Any training on mental health and CIT awareness that has already been provided to tele-communicators may fulfill the OEMC Training requirement of this Agreement, if the previously provided training satisfies the criteria for the OEMC Training described in this Agreement.*

## Compliance Progress · (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Full:** *In Compliance* (FOURTH REPORTING PERIOD)
**Sustainment Period Ends** *June 30, 2023*

During the seventh monitoring period, the City and the OEMC maintained Full compliance with ¶145.

To achieve Preliminary compliance with ¶145, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶145 by reviewing the City's and the OEMC's level of data collection, tracking, analysis, and management as required under the Consent Decree. The IMT "triangulate[s]" the data by comparing multiple data sources, yielding a more robust understanding of ¶145's requirements.

In continuing to assess Full compliance, the IMT will monitor ongoing performance, reliable data, and whether the City and the CPD have qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree.

In the fourth reporting period, the City and the OEMC met Full compliance with ¶145 because they are not intending to submit previous training as evidence of compliance with the OEMC's training requirements.

In other words, the requirements of ¶145 are somewhat moot because, rather than relying on previously delivered mental health and CIT awareness training to fulfill the training requirements found in ¶¶142–44, the OEMC has provided the required eight-hour training as a single training block. To maintain compliance with ¶145, the City and the OEMC will have to continue to follow through and provide the requisite training.

The IMT has observed the eight-hour training in crisis intervention which includes a module on mental health response (*see* ¶¶142–46). The IMT notes that the OEMC telecommunicators had received sufficient training on how to identify calls involving an individual known, suspected, or perceived to be in crisis and found that their policies are incorporated into training. However, programs have changed since that time, and training must reflect this.

\*\*\*

In the seventh monitoring period, City and the OEMC maintained Full compliance with ¶145 because they are not intending to submit previous training as evidence of compliance with the OEMC's training requirements, rather utilize their eight-hour training to fulfill compliance. To maintain compliance with ¶145, the City and the OEMC will continue to provide the requisite training. Going forward, the IMT will continue to assess the OEMC based on its delivery of the eight-hour training as prescribed in ¶142–44. The IMT highly recommends a single spreadsheet indicating the employee name, date of hire, and date of training attendance. This will show a running list of all employees and date of attendance. The Mental Health and CIT Awareness Training, the Refresher Training and attendance at the 40-hour training could be on the same spreadsheet and re-produced each monitoring period.

Training records produced this reporting period were a significant improvement, and the OEMC should be commended for this.

However as indicated in this assessment, the IMT does not have evidence of whether training has reflected program changes, and this must occur in future reporting periods to maintain Full compliance. Additionally, the IMT encourages the OEMC to further improve training records to include the total OEMC call takers and dispatchers which encompass both Police and Fire. In future reporting periods, the IMT encourages the OEMC to further improve these records to include the total OEMC call takers and dispatchers which encompass both Police and Fire.

Moreover, as indicated in previous paragraph assessments, the next iteration of training must reflect program and procedural changes in order to maintain Full compliance.

## Paragraph 145 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Full

# Crisis Intervention: ¶146

> **146.** *All tele-communicators will receive at least annual refresher training on mental health and CIT awareness that is adequate to refresh the tele-communicators' skills on identifying, dispatching, and appropriately responding to calls for service that involve individuals in crisis.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    Annual                    ✓  **Not Yet Applicable**

**Preliminary:**    *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**    *In Compliance* (NEW)
**Full:**    *Not Yet Assessed*

In the seventh monitoring period, the City and the OEMC achieved Secondary compliance with ¶146.

To achieve Preliminary compliance with ¶146, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." Going forward, to achieve Secondary compliance with ¶146, the OEMC will need to develop metrics that, when tracked, will adequately demonstrate the OEMC's success under ¶146. Further assessment levels will require an assessment of those developed metrics.

During the fourth reporting period, the OEMC finalized the *Mental Health Training* directive, which clearly states the requirement for all telecommunicators to receive annual refresher training on mental health and CIT awareness, per ¶146. Moreover, the directive identifies the topics to be included in the refresher training, including skills on identifying, dispatching, and appropriately responding to calls for service that involve individuals in crisis.

In the sixth monitoring period, the OEMC produced records to the IMT evidencing the OEMC's policy review process. The IMT notes that future levels of compliance will require the City and the CPD to robustly engage with the Chicago Council on Mental Health Equity. During the first policy review process, there was essentially no engagement with the Chicago Council on Mental Health Equity, as required under ¶130—31. Since the OEMC's first policy review, the IMT has been clear that the absence of significant engagement with the Chicago Council on Mental Health Equity will delay future levels of compliance or remove compliance.

In the sixth reporting period, the OEMC briefly touched on the policies during a presentation to the Chicago Council on Mental Health Equity, attaching those policies to an email to the Chicago Council on Mental Health Equity and inviting their feedback. However, no feedback was received. This lack of feedback indicates inadequate engagement. The IMT recommended that the OEMC engage the CPD and the City to identify a robust plan to solicit thorough review and comment. The OEMC plays a crucial role in the initial identification and appropriate dispatch of calls involving a mental health component, and experts and people with lived experience should be given due process. Evidence of Chicago Council on Mental Health Equity comments on policies both during Chicago Council on Mental Health Equity meetings and by email, along with OEMC's response to those comments is required. Should this robust engagement not continue to improve the IMT will consider withdrawing compliance with ¶146.

The IMT also observed the OEMC's required *Refresher Training* in the sixth reporting period. The IMT notes that the OEMC telecommunicators had received sufficient training on how to identify calls involving an individual known, suspected, or perceived to be in crisis and found that the new standard operating procedure was incorporated into training, meeting the requirements of ¶146.

The City and the OEMC invited members of the Chicago Council on Mental Health Equity to observe the OEMC's 8 hour training during the sixth monitoring period. However, the invitation only identified two dates in March in a PowerPoint presentation given to the Chicago Council on Mental Health Equity. Based on the OEMC productions this reporting period, it appears only one individual requested to observe the training in person, and there was no evidence that the OEMC responded to the request, nor that the person observed the training in person. In future reporting period, the IMT must see robust involvement with the IMT on both training observation and policy review and comment.

During the sixth reporting period, two training attendance records were produced. One for the "Mental Health Crisis Awareness -Refresher" and one for the "Mental Health Crisis Awareness Training." The Refresher training is a new training implemented during the sixth reporting period. However, the OEMC only produced to the IMT: Training completion dated March 14, 2022 -Mental Health Awareness Training-Refresher which had 30 participants plus 7 guests with 4 missing signatures and 2 identified as late to the training. *This production did not include training evaluations, nor did it support 95% completion.* The records show the date personnel was scheduled to attend, but it does not show the actual training completion date. Rather, there is an "attended" column that is blank. There is also no way to measure the percent who have completed the training without a system that identifies the total number of eligible employees to cross check with a attendance completion date which is missing. The OEMC will need a reliable method to demonstrate sufficient attendance.

\*\*\*

In the seventh monitoring period, the City and the OEMC achieved Secondary compliance with ¶146. The city produced more complete training attendance records this reporting period assisting the IMT to assess compliance, however no training evaluations were produced.

As indicated in this assessment, the IMT does not have evidence of whether policy nor training has reflected program changes, and this must occur in future reporting periods to maintain compliance. Additionally, the IMT encourages the OEMC to further improve training records to include the total OEMC call takers and dispatchers which encompass both Police and Fire. In future reporting periods, the IMT encourages the OEMC to further improve these records to include the total OEMC call takers and dispatchers which encompass both Police and Fire.

The IMT appreciates that the OEMC created a single spreadsheet as recommended containing the information required including a list of all employees and date of attendance of the Mental Health and CIT Awareness Training, the Refresher Training and attendance at the 40-hour training. This spreadsheet should be re-produced each monitoring period.

To maintain Secondary compliance, the City and OEMC must produce sufficient documentation each reporting period that supports evidence that the refresher training has been delivered to at least 95% of all telecommunicators.

To maintain Secondary compliance, the OEMC must update its trainings to reflect the significant changes that have occurred in the CIT Program. Moreover, updated training must include demonstrating that the Chicago Council on Mental Health Equity and community stakeholder input has been incorporated. The IMT encourages the OEMC to consider developing a training observation subgroup, inviting persons with lived experience, members of an organization in an advocacy role, as well as other broad invitations. Additionally, prioritizing interagency participation in these trainings (for example, the Chicago Fire Department, the OEMC, and the CPD) would be useful and would increase communication between these agencies. The OEMC's efforts in this regard must be improved. The Chicago Council on Mental Health Equity and community at large have strong opinions on mental-health and justice-related issues, and the OEMC's lack of Chicago Council on Mental Health Equity attendance at training suggests a larger problem exists that may negatively affect ongoing compliance. Additionally, training evaluations must be produced each reporting period, which were absent this reporting period.

## Paragraph 146 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Crisis Intervention: ¶147

> **147.** *OEMC will evaluate all mental health and CIT awareness trainings for telecommunicators on at least an annual basis to ensure that the trainings meet OEMC needs, comply with this Agreement, incorporate best practices, and ensure that the training is effective for personnel and for the individuals in crisis served. OEMC will consider recommendations and feedback from the CIT Coordinator and the Advisory Committee when conducting its evaluation.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    At Least Annually        ☑ **Not Yet Applicable**

**Preliminary:**    *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

In the seventh monitoring period, the City and the OEMC maintained Preliminary compliance with ¶147.

To achieve Preliminary compliance with ¶147, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." Going forward, to achieve Secondary compliance with ¶147, the OEMC will need to develop metrics that, when tracked, will adequately demonstrate the OEMC's success under ¶147. Further assessment levels will require an assessment of those developed metrics.

*Progress before the Seventh Reporting Period*

During the fourth reporting period, the OEMC finalized the *Mental Health Training* directive, which clearly states the requirement for all telecommunicators to receive training on the eight-hour mental health and CIT awareness training and annual refresher training, per ¶146. Moreover, the directive identifies the topics to be included in the eight hour and refresher training, including skills on identifying, dispatching, and appropriately responding to calls for service that involve individuals in crisis.

In the sixth monitoring period, the OEMC produced records evidencing its policy review process to the IMT. The IMT noted that the City and the CPD must robustly

engage with the Chicago Council on Mental Health Equity in order to maintain Preliminary compliance with ¶147. Moreover, ¶147's requirements must be explicitly included in the City and the CPD's engagement with the Chicago Council on Mental Health Equity. During the OEMC's first policy review process, there was essentially no engagement of the Chicago Council on Mental Health Equity, as required under ¶130—31. Since its first policy review process, the IMT has been clear with the OEMC that the absence of significant engagement will delay achievement of the OEMC's future compliance or remove current compliance.

In this sixth reporting period, the OEMC briefly touched on the policies in a PowerPoint presentation to the Chicago Council on Mental Health Equity, attaching those policies to an email to the Chicago Council on Mental Health Equity and inviting their feedback. However, no feedback was received. This lack of feedback from an actively engaged group indicates a broader system issue leading to inadequate engagement. The IMT recommended that the OEMC engage the CPD and the City to identify a robust plan to solicit thorough review and comment. The OEMC plays a crucial role in the initial identification and appropriate dispatch of calls involving a mental health component, and experts and people with lived experience should be given due process. The IMT was clear with the OEMC that should more robust engagement not occur by the end of the next reporting period, the IMT would consider withdrawing Preliminary compliance with ¶147.

During the sixth monitoring period, the City and the OEMC invited members of the Chicago Council on Mental Health Equity to observe the OEMC 8-hour training. However, the invitation did not meet the standards of a robust, proactive invitation. Based on the OEMC productions, it appears only one individual requested to observe the training in person, and there was no evidence that the OEMC responded to the member's inquiry, or that the member attended the in-person training. The IMT had also not received evidence of the Chicago Council on Mental Health Equity's comments. The IMT has been clear that the IMT must see robust involvement with the Chicago Council on Mental Health Equity on both training observation and policy review and comment.

The IMT observed the OEMC's required Refresher Training in the sixth reporting period. The IMT notes that the OEMC telecommunicators had received sufficient training on how to identify calls involving an individual known, suspected, or perceived to be in crisis and found that the new standard operating procedure is incorporated into training, meeting the requirements of ¶147. However, sufficient evaluations of all mental health related training by the OEMC have not been produced and there is no evidence that program changes have been incorporated into updated policy and training revisions as required under ¶147. There were only partial training evaluations submitted this reporting period on the 8-hour training, and no records on the refresher training, and there was no evidence of CCMHE feedback on training.

*Progress during the Seventh Reporting Period*

Paragraph 147 requires review by and feedback from the CIT Coordinator and the CCMHE. To date, the IMT has received no evidence of such feedback. Future levels of compliance will depend on the OEMC producing evidence of the CCMHE and CIT Coordinator's review and feedback consistent with ¶147's requirements. Additionally, ¶147 requires annual review and revision of all OEMC training, and there has been no evidence of such, nor has there been evidence of revisions including program and policy changes.

Additionally, the OEMC conducts performance audits related to crisis intervention calls. This is a valid measurement of behavior and can inform future training needs. However, the OEMC again did not produce evidence of such audits, which would include productions of the *CIT Employee Review* and *CIT Reviewed Events*, and *CIT Quality Assurance Report*. This has been repeatedly addressed in prior reports, during site visits, and on monthly calls between the OEMC and the IMT, yet it has still not occurred.

Audit spreadsheets alone will not be sufficient for assessing compliance without robust interpretation, and response to trends.

Because ¶147 requires *annual* evaluation of Mental Health Awareness and CIT Training, the OEMC must produce documentation that demonstrates the annual cadence the OEMC is participating in to demonstrate compliance.

Additionally, ¶147 requires training to incorporate best practice and ensure it is effective for personnel and individuals in crisis, while also receiving feedback from both the CIT Coordinator and the Chicago Council on Mental Health Equity. As indicated in previous paragraph assessments, OEMC's training must be updated to reflect the broad program changes that have occurred in the last two reporting periods. The OEMC's future compliance levels will depend on be affected by the OEMC's ability to address this change.

While the OEMC significantly improved its training attendance records this reporting period, these should be produced each reporting period to maintain compliance, along with training evaluations, which have not been satisfactorily produced.

The OEMC's engagement of the Chicago Council on Mental Health Equity improved this reporting period, with policy and procedure discussion at two quarterly meetings that elicited good dialogue. The OEMC should be commended for this. These efforts must continue, including training observation and written feedback. Another reporting period without evidence of these efforts may result in the IMT's withdrawal of compliance. The IMT has been clear that the OEMC must produce evidence of robust involvement with the Chicago Council on Mental Health Equity on both training observation and policy review and comment.

***

In the seventh monitoring period, the City and the OEMC maintained Preliminary compliance with ¶147. To achieve Secondary compliance, the OEMC must ensure that the CIT Coordinator and the Chicago Council on Mental Health Equity has observed the OEMC trainings to provide recommendations and feedback. Additionally, the OEMC audits must be produced, as requested, over numerous reporting periods. The required annual training revisions must include the substantial program changes that have occurred. They must also incorporate training evaluations and best practices. The person responsible for conducting the evaluations must be qualified to make revisions and have insight into current best practices. The IMT has yet to receive documentation indicating how Chicago Council on Mental Health Equity feedback was incorporated on the 8-hour training, which likely reflects the minimal to no observation of training by the Chicago Council on Mental Health Equity. The IMT looks forward to the same with the Refresher training. This reporting period, the OEMC significantly improved its training evaluation records, which they should be commended for.

In summary, more needs to be done to maintain or achieve future levels of compliance.

### Paragraph 147 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶148

**148.** *OEMC will develop and implement its portion of the Crisis Intervention Plan.*

**Compliance Progress**        (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**        *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**        *Not in Compliance*
**Full:**        *Not Yet Assessed*

In the seventh monitoring period, the City and the OEMC maintained Preliminary compliance with ¶148.

To achieve Preliminary compliance with ¶148, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." Going forward, to achieve Secondary compliance, the OEMC will need to develop metrics that, when tracked, will adequately demonstrate the OEMC's success under ¶148. Further assessment levels will require the IMT's evaluation of those developed metrics.

### Progress before the Seventh Reporting Period

During the fourth reporting period, the OEMC finalized its policy *Crisis Intervention Program (21-004)* that includes the requirement to develop its portion of the *Crisis Intervention Plan*. However, ¶148 requires not only development, but also implementation, and requires this to be accomplished annually. OEMC is at risk for losing Preliminary compliance if the full requirements of ¶148 are not included in policy in the next reporting period. Additionally, neither the CPD nor OEMC have "develop[ed] and implement[ed]" its portion of the Crisis Intervention Plan since the fourth reporting period. Preliminary compliance will hinge on the full requirements of ¶148 being embedded into policy and the Crisis Intervention Plan being produced in the next reporting period. Embedding a requirement into policy without following the policy is insufficient.

### Progress in the Seventh Reporting Period

During this monitoring period, the City again did not produce the next iteration of the *Crisis Intervention Plan*, as required annually by ¶122. Therefore, the OEMC is unable to reach any further compliance level for ¶148.

While the IMT appreciates delaying these reports until they can be supported by a more robust strategy and reliable data, additional the City and the CPD should focus on accomplishing the necessary steps to produce these important reports.

*** 

In the seventh monitoring period, the City and the OEMC maintained Preliminary compliance with ¶148. Finalization of policy embedding the requirements of ¶148 and developing their portion of the *Crisis Intervention Plan* is required for Preliminary compliance. Subsequent levels of compliance will depend on the OEMC demonstrating ongoing implementation of the goals as listed in the *Crisis Intervention Plan*.

### Paragraph 148 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Crisis Intervention: ¶149

**149.** *OEMC supervisors, on an ongoing basis, will audit and provide feedback to calltakers and dispatchers regarding their ability to identify, dispatch, and respond appropriately to calls for service involving individuals in crisis.*

---

**Compliance Progress**  (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* (NEW: LOST COMPLIANCE) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh monitoring period, the City and the OEMC lost Preliminary compliance with ¶149.

To achieve Preliminary compliance with ¶149, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." Going forward, to achieve Secondary compliance, the OEMC will need to develop metrics that, when tracked, will adequately demonstrate the OEMC's success under ¶149. Further assessment levels will require an assessment of those developed metrics.

*Progress before the Seventh Reporting Period*

During the fourth monitoring period, the OEMC finalized its *Crisis Intervention Program* policy, which includes the requirement to audit and provide feedback to call takers and dispatchers regarding their ability to identify, dispatch, and respond appropriately to calls for service involving individuals in crisis. The accompanying SOP "Mental Health Event Audit" provides detailed guidance to how these audits will be accomplished, which the IMT gave a no objection on June 4, 2021. However, in the sixth reporting period, this *Mental Health Event Audit* was re-produced, but did not include an SOP number and indicated a May 18, 2022 draft date. The IMT is unsure whether this policy was ever enacted, which is a requirement for Preliminary compliance. The IMT advised the OEMC of this discrepancy in the last reporting period, but to date the OEMC has not re-produced evidence addressing this issue. This SOP is the operating procedure for how supervisors complete the audits that ¶149 requires. It is therefore crucial to the OEMC's compliance efforts. The OEMC must demonstrate that both the governing directive and accompanying SOP have been enacted.

In the sixth monitoring period, the OEMC produced records evidencing its policy review process to the IMT. The IMT notes that while more robust engagement with the Chicago Council on Mental Health Equity occurred this reporting period, which is commendable, more needs to be done for future levels of compliance. During the first policy review process, there was essentially no engagement of the Chicago Council on Mental Health Equity as required under ¶130—131. Since the OEMC's first policy review process, the IMT has been clear that future compliance will be delayed without significant engagement with the Chicago Council on Mental Health Equity. While the OEMC improved their policy review process with the Chicago Council on Mental Health Equity this reporting period, the SOP covering ¶149 was not discussed. The IMT encourages the OEMC to formalize their annual procedures for review and revision of both policies and training as required under ¶148 and ¶151. All Crisis Intervention related policies and accompanying SOP's should be put through the review process.

In the sixth reporting period, the OEMC briefly presented its policies to the Chicago Council on Mental Health Equity, attaching those policies to an email to the Chicago Council on Mental Health Equity and inviting their feedback. However, no feedback was received. This lack of feedback indicated inadequate engagement. Evidence of Chicago Council on Mental Health Equity comments on policies both during Chicago Council on Mental Health Equity meetings and by email, along with OEMC's response to those comments is required. The IMT recommended the OEMC engage the CPD and the City to identify a robust plan to solicit thorough review and comment. The OEMC plays a crucial role in the initial identification and appropriate dispatch of calls involving a mental health component, and experts and people with lived experience should be given due process. Based on the IMT's recommendations from the 2021 review, the OEMC made changes to the *Mental Health Event Audit* so it could be used as a training tool. For instance, we recommended the OEMC maintain consistency between the information reflected in the *Mental Health Event Audit* policy and its corresponding spreadsheets. This included ensuring that all data elements identified in the policy are captured in the respective spreadsheet. Similarly, the IMT recommended that all spreadsheet columns match those identified in the *Mental Health Event Audit* policy. Last, we suggested that the OEMC merge data sets that are repeated across the spreadsheets, as doing so could avoid confusion. These edits were included in the production of the SOP in the sixth reporting period, which was commendable.

Moreover, the OEMC reviewed on a monthly call with the IMT the excel spreadsheet the OEMC is using to track audit outcomes. While we believe this protocol will provide sufficient guidance to act as a training tool for supervisors, the OEMC did not produce completed audit spreadsheets during the last or current reporting period, so the IMT cannot assess them (*e.g.*, "CIT Employee Review," "CIT Reviewed Events," and "CIT Quality Assurance Report"). The IMT has requested these be produced in prior monitoring reports, on site visit and on monthly calls.

These spreadsheets must include the OEMC's analysis, which is necessary to assess the metrics on which Full compliance will be based. The Chicago Council on Mental Health Equity must review and provide input on the revised *Mental Health Event Audit* policy. The Chicago Council on Mental Health Equity's review is required for the OEMC to maintain Preliminary compliance with ¶149. Because it is unclear whether this policy was ever finalized and enacted after the IMT no-objection was issued, and this policy guides the implementation of ¶149, finalization and enactment with CCMHE review is required to maintain compliance.

The OEMC improved its policy review process this reporting period, moving away from merely a presentation style to inviting dialogue. This elicited good feedback from the Chicago Council on Mental Health Equity which the IMT is encouraged by. However, the Mental Health Event Audit Policy was not reviewed and opened up for dialogue with the Chicago Council on Mental Health Equity as required. Further, all Crisis Intervention related policies and governing standard operating procedures must be reviewed annually, including Chicago Council on Mental Health Equity feedback.

Throughout the Consent Decree, the OEMC has produced to the IMT various policies and Standard Operating Procedures (SOPs).[15]

The OEMC has produced revised versions of its policies and SOPs. For example, 11–001, *Mental Health Program CIT* ; SOP TNG 10 –014P, *Transport Tracking* ; SOP 21–005, *Mental Health Training*; 21–004, *CPD CIT Program*; TNG 20–016, *Training Guidelines*; TNG 20-015, *CAD Enhancement CIT Check Box*; C-P11-001, *CIT SOP*; CA-TNG-011, *CIT Orange Light*; ; *Mental Health Training Policy*[16] ; *CIT Call Auditing, Audit and Employee Review of CIT Call, Mental Health Event Audit*.[17]

Some of the associated productions lack an SOP number, rather, for example, contains: Number XX-XXXX and Date XX. Therefore, it is unclear if the OEMC finalized these directives and associated SOPs. Additionally, some of these OEMC policies reference CPD policies, such as S05-14 and S04-20. But the OEMC policy does not reflect updates that have occurred in those the CPD's policies. For example, the CPD's change from "Certified" to "Designated" CIT Officers in S04-15 is not reflected in the OEMC's policies.

The IMT requests that the OEMC produce a complete list of all associated directives and SOPs presently in use, and that each directive and SOP listed includes an assigned directive/SOP number and effective date. . This will not only allow the

---

[15]  Production dates include: August 30, 2019; May 19, 2020; June 25, 2020; September 24, 2020; October 7, 2020; December 30, 2020; and May 25, 2021.

[16]  This OEMC policy has an effective date of February 20, 2020, but it did not assign an SOP number.

[17]  This OEMC policy also has an effective date of February 20, 2020, but it did not assign an SOP number.

IMT to assess paragraph compliance, but it will also assist the OEMC in developing the annual cadence of policy, procedure, and training review and revision, including the CCMHE and CIT Coordinator.

Additionally, ¶149 requires OEMC supervisors to audit and provide feedback to call takers and dispatchers. The OEMC developed audit spreadsheets to accomplish this (*e.g.*, "CIT Employee Review," "CIT Reviewed Events," and "CIT Quality Assurance Report"). The OEMC has still not produced completed audit spreadsheets despite repeated requests in prior monitoring reports, data requests, in our site visit and on monthly calls, so the IMT cannot assess them. Questions at the Site visit this reporting period regarding audit findings were interrupted by the OEMC with a request for the IMT to put it in writing. Future compliance will require audit spreadsheets be produced.

Preliminary compliance of ¶149 was removed in the seventh reporting period. The standard operating procedure governing the requirements of this paragraph, *Mental Health Event Audit*, was not produced to the IMT this reporting period after specific request for it in the last monitoring period due to concerns about whether it was ever enacted. In the sixth reporting period, this *Mental Health Event Audit* was re-produced, but did not include an SOP number and indicated a May 18, 2022 draft date. The IMT is unclear whether this policy was ever implemented. The IMT requested this be addressed in the last reporting period, however no records were produced again this reporting period.

The enacted SOP must be produced for Preliminary compliance to be restored, including Chicago Council on Mental Health Equity review and feedback. Additionally, completed audit sheets must be produced for future compliance.

## Paragraph 149 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Crisis Intervention: ¶150

> **150.** *The Parties acknowledge that OEMC currently meets regularly with CPD and the City-wide Mental Health Steering Committee. OEMC will continue to meet regularly with CPD, in addition to appropriate members of the Advisory Committee, including service providers and advocates, to review and assess data and information regarding the identification of, the dispatch of, and response to calls for service involving individuals in crisis by OEMC telecommunicators.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the sixth monitoring period, the City and the OEMC maintained Preliminary compliance with ¶150.

To achieve Preliminary compliance with ¶150, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms." Going forward, to achieve Secondary compliance, the OEMC will need to develop metrics that, when tracked, will adequately demonstrate the OEMC's success under ¶150. Demonstration of robust engagement with the CPD and the Chicago Council on Mental Health Equity will be required. Further assessment levels will require an assessment of those developed metrics.

While Preliminary compliance was achieved, the IMT encourages the OEMC to embed the requirements of ¶150 into policy during the next round of annual revisions. Maintenance of Preliminary compliance will be assessed by this in the next reporting period, and the City is at risk of losing compliance should policy enactment and review not be evidenced.

Throughout the Consent Decree, the OEMC has produced to the IMT various policies and Standard Operating Procedures (SOPs).[18]

The OEMC has produced revised versions of its policies and SOPs. For example, 11–001, *Mental Health Program CIT* ; SOP TNG 10 –014P, *Transport Tracking* ; SOP

---

[18] Production dates include: August 30, 2019; May 19, 2020; June 25, 2020; September 24, 2020; October 7, 2020; December 30, 2020; and May 25, 2021.

21–005, *Mental Health Training*; 21–004, *CPD CIT Program*; TNG 20–016, *Training Guidelines*; TNG 20-015, *CAD Enhancement CIT Check Box*; C-P11-001, *CIT SOP*; CA-TNG-011, *CIT Orange Light*; ; *Mental Health Training Policy*[19] ; *CIT Call Auditing, Audit and Employee Review of CIT Call, Mental Health Event Audit*.[20]

Some of the associated productions lack an SOP number, rather, for example, contains: Number XX-XXXX and Date XX. Therefore, it is unclear if the OEMC finalized these directives and associated SOPs. Additionally, some of these OEMC policies reference CPD policies, such as S05-14 and S04-20. But the OEMC policy does not reflect updates that have occurred in those the CPD's policies. For example, the CPD's change from "Certified" to "Designated" CIT Officers in S04-15 is not reflected in the OEMC's policies.

The IMT requests that the OEMC produce a complete list of all associated directives and SOPs presently in use, and that each directive and SOP listed includes an assigned directive/SOP number and effective date. This will not only allow the IMT to assess paragraph compliance, but it will also assist the OEMC in developing the annual cadence of policy, procedure, and training review and revision, including the CCMHE and CIT Coordinator.

*Progress before the Sixth Reporting Period*

During the fifth reporting period, the IMT recommended that the OEMC have a more robust involvement with the Chicago Council on Mental Health Equity. In response, the OEMC assigned a dedicated staff representative to participate in Chicago Council on Mental Health Equity meetings. The IMT also recommended that the OEMC demonstrate that they are indeed prioritizing regular meetings with the CPD, including agendas, meeting minutes, and attendees.

The IMT appreciates that the OEMC briefly presented to the Chicago Council on Mental Health Equity, informing them of the OEMC's role in the fifth reporting period. This is an important foundational step. While the OEMC invited the Chicago Council on Mental Health Equity to review policies and attend training, there was no evidence of either comments on policies or training observation. As indicated in previous paragraphs, compliance assessments require a robust policy and training review process along with evidence of collaboration with the CPD.

The IMT continues to suggest the OEMC consider ways to deepen and broaden the involvement of the Chicago Council on Mental Health Equity. There has been improvement this reporting period, and the IMT looks forward to this strengthening.

---

[19] This OEMC policy has an effective date of February 20, 2020, but it did not assign an SOP number.

[20] This OEMC policy also has an effective date of February 20, 2020, but it did not assign an SOP number.

For example, the OEMC may consider meeting with the subcommittee chairs (which have presently been dismantled but are supposed to resume) to further discuss the role and function of the OEMC, review data the OEMC is capturing, and discuss the OEMC's priorities. Data presentations should also be considered.

During the sixth reporting period, the only evidence of the OEMC meeting with the CPD was an email from the OEMC to the CPD requesting to meet. Further, the email indicated there were "no trends" in the data. A lack of any trends, after three years of Consent Decree Data, indicates a broader system issue. There must be improved collaboration and communication between these two entities. There was also no evidence that the CPD responded to the OEMC email, or of any meetings actually taking place. The IMT continues to highly recommend producing meeting agendas, records of attendees, and meeting minutes.

Both the Chicago Council on Mental Health Equity and the IMT have shared concerns with siloed systems. As the Consent Decree moves forward, there is greater reliance on systems working collaboratively to ensure success. The onboarding of the CPD's Alternative Response Pilot (CARE) program, the embedding of clinicians inside the 911 call center and the national 988 system are all examples.

The IMT strongly encouraged the OEMC to engage in a robust data presentation to the full Chicago Council on Mental Health Equity committee, along with a significant improvement in the policy revision process and the operational practice of the meetings between the OEMC, CPD, and other stakeholders.

Advance Notice of policy review, along with a thorough review process with a corresponding feedback loop back to the Chicago Council on Mental Health Equity was strongly encouraged. Additionally, a public comment period is important for transparency and public trust, which has not been accomplished by the OEMC.

*Progress in the seventh reporting period*

During this reporting period, the OEMC improved its engagement with the Chicago Council on Mental Health Equity, participating in greater discussion regarding OEMC policies and operational practices. This is commendable. This elicited good questions and feedback by Chicago Council on Mental Health Equity members. This is encouraging, and moves in the direction the IMT is seeking for compliance assessment. The OEMC is encouraged to engage the CPD and Chicago Council on Mental Health Equity on review of their full CIT related policy and SOP suite in the next reporting period, along with training observation. Since there were substantially-new policies developed by the OEMC since the Consent Decree, feedback by the CPD, Chicago Council on Mental Health Equity, and the public will be essential, along with audit data.

This reporting period, the OEMC informed the IMT of a new, interagency CIT working group, for which a charter was being developed. At the end of the reporting period, the OEMC produced records with a ratified charter and record of monthly meetings scheduled for thirty minutes each. While this new body is a significant step in the right direction toward coordination and collaboration between City entities, the IMT encourages more than just thirty minutes be allocated in order to adequately address the important purpose of this new working group, including requirements of ¶150. The charter indicates the Office of the Mayor as the coordinating body with the chair from the Mayor's Office, a data analyst, and a recorder as the minimally required entities. Stakeholders from the CPD, OEMC, and City law office were also identified, though not required. This should be reconsidered. The IMT looks forward to more information regarding this development moving forward. It is crucially important that stakeholders from the CPD, CFD, and OEMC be actively engaged, prioritized for attendance, and with records indicating attendance and topic discussion.

Because ¶150 requires the OEMC to "review and assess data and information regarding the identification of, the dispatch of, and response to calls for service involving individuals in crisis by OEMC telecommunicators," improved engagement must continue with both the Chicago Council on Mental Health Equity and the CPD. The CFD and CDMH should also be included. New program changes and enhancements should be specifically addressed.

*** 

In the seventh monitoring period, the City and the OEMC maintained Preliminary compliance with ¶150. The City is at risk of losing Preliminary compliance in the next reporting period should policy enactment and review not be evidenced. Subsequent levels of compliance will depend on the OEMC demonstrating regular meetings are occurring with important outcomes. This would go a long way toward demonstrating greater partnership toward efforts to increase communication between the OEMC and the CPD systems; having more active engagement with the Chicago Council on Mental Health Equity; observing the annual policy, training, and data review and feedback process with the Chicago Council on Mental Health Equity, as required in ¶150; and providing evidence to the IMT that the meetings contribute to the City's overall crisis response approach. The IMT highly encourages efforts to share crisis-intervention-related policy, training, and data to the full Chicago Council on Mental Health Equity committee. This will build upon the relatively new and limited knowledge this committee has been exposed to 911 telecommunications. Evidence of regular meetings occurring between the identified entities is also required for ongoing compliance.

## Paragraph 150 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Crisis Intervention: ¶151

> **151.** *Within 180 days of the Effective Date, and annually there-after, OEMC will review and revise its intake and dispatch policies and protocols as necessary to meet the requirements of this Agreement. OEMC will consider any recommendations or feed-back provided by the Advisory Committee when revising its poli-cies.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:** Annually ☑ **Not Yet Applicable**

**Preliminary:** *Not in Compliance* **(NEW: LOST COMPLIANCE)**
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

In the seventh monitoring period, the City and the OEMC lost Preliminary compliance with ¶151.

To achieve Preliminary compliance with ¶151, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

### Progress before the Seventh Reporting Period

During the fourth reporting period, the OEMC finalized its directive, *Mental Health Training*. While this directive memorialized the requirements that the OEMC is to review the training on an annual basis and incorporate recommendations from the Chicago Council on Mental Health Equity, this SOP fell short of fully incorporating ¶151's requirements, which focus on intake and dispatch policies and protocols. The IMT recommended that the OEMC include the exact requirements of ¶151 into the directive, which includes the annual requirement to review and revise its intake and dispatch policies and protocols with feedback from the Advisory Committee.

The OEMC had undertaken its annual requirement to review and revise policy in the sixth reporting period, which was an opportune time to ensure the exact requirements of ¶151 were incorporated. In the last reporting period, the IMT was clear that it was at risk of losing Preliminary compliance should this not occur again. The OEMC re-produced the Mental Health Training Directive this reporting

period, which did not include this revision. Further, the Chicago Council on Mental Health Equity's sufficient engagement in the policy revision process for all OEMC Crisis Intervention related policies and standard operating procedures, as indicated in previous paragraph assessments, must occur for the OEMC to maintain compliance with ¶151.

The OEMC began its required annual policy and protocol review process during the sixth reporting period. The exact language of the Consent Decree must be incorporated into the revised policy, as the SOP used for Preliminary compliance fell short of fully incorporating the requirements of ¶151, which focuses on intake and dispatch policies and protocols. In the Seventh reporting period, the exact language was not included, nor were all of the OEMC Crisis Intervention related policies and standard operating procedures reviewed and revised annually, with CCMHE review and feedback as required under ¶151. Consequently, Preliminary compliance has been removed.

Throughout the Consent Decree, the OEMC has produced to the IMT various policies and Standard Operating Procedures (SOPs).[21]

The OEMC has produced revised versions of its policies and SOPs. For example, 11–001, *Mental Health Program CIT* ; SOP TNG 10 –014P, *Transport Tracking* ; SOP 21–005, *Mental Health Training*; 21–004, *CPD CIT Program*; TNG 20–016, *Training Guidelines*; TNG 20-015, *CAD Enhancement CIT Check Box*; C-P11-001, *CIT SOP*; CA-TNG-011, *CIT Orange Light*; ; *Mental Health Training Policy*[22] ; *CIT Call Auditing, Audit and Employee Review of CIT Call, Mental Health Event Audit*.[23]

Some of the associated productions lack an SOP number, rather, for example, contains: Number XX-XXXX and Date XX. Therefore, it is unclear if the OEMC finalized these directives and associated SOPs. Additionally, some of these OEMC policies reference CPD policies, such as S05-14 and S04-20. But the OEMC policy does not reflect updates that have occurred in those the CPD's policies. For example, the CPD's change from "Certified" to "Designated" CIT Officers in S04-15 is not reflected in the OEMC's policies.

The IMT requests that the OEMC produce a complete list of all associated directives and SOPs presently in use, and that each directive and SOP listed includes an assigned directive/SOP number and effective date. This will not only allow the IMT to assess paragraph compliance, but it will also assist the OEMC in developing the

---

[21] Production dates include: August 30, 2019; May 19, 2020; June 25, 2020; September 24, 2020; October 7, 2020; December 30, 2020; and May 25, 2021.

[22] This OEMC policy has an effective date of February 20, 2020, but it did not assign an SOP number.

[23] This OEMC policy also has an effective date of February 20, 2020, but it did not assign an SOP number.

annual cadence of policy, procedure, and training review and revision, including the CCMHE and CIT Coordinator.

In the Sixth reporting period, the SOP "Mental Health Audit" was produced, guiding procedures for the OEMC. The IMT raised questions regarding whether that SOP was ever enacted. As indicated in previous paragraph assessments, ¶151 requires annual review and revision of policies and *protocols,* with Chicago Council on Mental Health Equity review and feedback. The SOP "Mental Health Event Audit" provides detailed guidance on OEMC policy and procedures, which the IMT gave a no objection on June 4, 2021. However, in the sixth reporting period, the *Mental Health Event Audit* was re-produced, but did not include an SOP number and indicated a May 18, 2022 draft date. The IMT is unsure whether this policy was ever enacted, which is a requirement for Preliminary compliance. The IMT requested this be addressed in the last reporting period, however no records were produced this reporting period addressing this. Both the governing directive and accompanying SOP must have evidence of being reviewed, revised and enacted with CCMHE feedback.

The IMT notes that more robust engagement with the Chicago Council on Mental Health Equity is required. During the first policy review process, there was essentially no engagement of the Chicago Council on Mental Health Equity as required under ¶¶130—31. The IMT has been clear since the first policy review process that without significant engagement, future levels of compliance will be delayed or removed. Evidence of Chicago Council on Mental Health Equity comments on policies both during Chicago Council on Mental Health Equity meetings and by email, along with OEMC's response to those comments is required.

In the sixth reporting period, the OEMC briefly touched on the policies at a briefing at a quarterly Chicago Council on Mental Health Equity meeting, attaching those policies to an email to members. However, no feedback was received. This lack of feedback indicates inadequate engagement The IMT recommended the OEMC engage the CPD and the City to identify a robust plan to solicit thorough review and comment. The OEMC plays a crucial role in the initial identification and appropriate dispatch of calls involving a mental health component, and experts and people with lived experience should be given due process.

During the sixth monitoring period, the City and the OEMC invited members of the Chicago Council on Mental Health Equity to observe the OEMC crisis intervention training. Shortcomings have been noted in previous paragraphs, demonstrated by no Chicago Council on Mental Health Equity observation nor feedback and no response to the council member that requested to observe training in person. It is important for members of the Chicago Council on Mental Health Equity to observe CIT-related trainings, as this helps members of the Chicago Council on Mental Health Equity understand what is being taught, and how policy informs protocol

and training as required under ¶151. It also provides an opportunity for community experts and persons with lived experience to suggest improvements to the training.

*Progress during the seventh reporting period*

The OEMC improved its policy review process this reporting period, moving away from merely a presentation style to inviting dialogue. This elicited good feedback from the Chicago Council on Mental Health Equity which the IMT is encouraged by. However, the OEMC did not produce evidence of updating its policy, *Mental Health Training to* memorialize the exact requirement of ¶151's which focus on annual review and revision of intake and dispatch policies and protocols with CCMHE feedback. The IMT recommended that the OEMC include the exact requirements of ¶151 into the directive the last two reporting periods.

As indicated, the OEMC Directive *Mental Health Event Audit* was re-produced last reporting period, but did not include an SOP number and indicated a May 18, 2022 draft date. The IMT is unsure whether this policy was ever implemented, which is a requirement for Preliminary compliance. The IMT requested this be addressed in the last reporting period, however no records were produced this reporting period addressing this.

Additionally, each of the OEMC Crisis Intervention related policies were not reviewed and revised as required under ¶151. Significant program changes have occurred since the onset of the Consent Decree, and all OEMC Crisis Intervention related policies and protocols should be reviewed and revised annually, with input from the Chicago Council on Mental Health Equity. The IMT encourages the OEMC to formalize a full policy suite review process.

\*\*\*

Preliminary and subsequent levels of compliance for this paragraph will evidence that all directives and accompanying SOP's guiding OEMC procedures are reviewed by the Chicago Council on Mental Health Equity and enacted. Additionally, all directives and SOP's should be revised to include new operational practices as discussed in previous paragraph assessments. The OEMC should establish a clear process to meet the requirements of ¶151, with a regular cadence of annual policy and procedure review, including advanced notice of the review and revision process and a corresponding feedback loop and public comment period. Since there were substantially new policies and protocols developed since the onset of the Consent Decree, the IMT will consider how operational practice under these new policies is proceeding, and what changes are made to policy revisions reflecting such. The Chicago Council on Mental Health Equity deserves to have the opportunity to deepen their understanding of the call intake process, what questions are

asked, how dispatch is determined, what quality assurance protocols are in place and what data is being collected. The OEMC has taken steps to accomplish this during this reporting period, however more needs to be done. This foundational information will go a long way toward helping Chicago Council on Mental Health Equity members understand the role and function of the policies and protocols for identifying calls involving a mental health component and dispatch of CIT officers and/or alternate crisis response. This education of the Chicago Council on Mental Health Equity is in its infancy stages, and must have the opportunity to deepen it's understanding of the important function of the 911 call center in order to have their expertise utilized in the manner in which the Chicago Council on Mental Health Equity governing body was intended.

### Paragraph 151 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| None |

# Crisis Intervention: ¶152

*152. OEMC will ensure that the language used in policies, procedures, forms, databases, trainings, and by tele-communicators to communicate about calls involving individuals in crisis is appropriate, respectful, and consistent with industry-recognized terminology. OEMC will seek input from the Advisory Committee for recommendations to identify appropriate and respectful terminology.*

## Compliance Progress  (Reporting Period: January 1, 2022, through June 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the seventh monitoring period, the City and the OEMC maintained Preliminary and Secondary compliance with ¶152.

To achieve Preliminary compliance with ¶152, the City and the CPD must implement sufficient policies, procedures, or written guidance through the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public-comment periods. These paragraphs detail various requirements, including that policies are "plainly written, logically organized, and use clearly defined terms."

The IMT assessed Secondary compliance with ¶152 by reviewing training development, implementation, and evaluation in accordance with ¶286 of the Consent Decree, which incorporates the following evaluation criteria: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

### Progress before the Sixth Reporting Period

During the fourth reporting period, the OEMC finalized its directive, *Mental Health Training*, which clearly states the requirements of ¶152. The OEMC has made a concerted effort to ensure that language used in the policies, procedures, forms, databases, trainings, and by telecommunicators to communicate about calls involving individuals in crisis is appropriate, respectful, and consistent with industry-recognized terminology. Additionally, we have observed members of the OEMC using respectful language and this has been reinforced in trainings we have observed. Therefore, the OEMC has met Preliminary and Secondary compliance with this paragraph.

*Progress before the Seventh Reporting Period*

During the sixth monitoring period, the IMT observed members of the OEMC, during their refresher training, using respectful language involving individuals in crisis.

Currently, the event code used by the OEMC, but originating through the CPD does not reflect best practices (*e.g.*, DISTME). The phrase "disturbance mental" is utilized and will need to be updated. This will need to be addressed for future compliance. With the onboarding of a new Computer Aided Dispatch (CAD) system in 2023, the OEMC and the CPD will be encouraged to consider alternate event code(s) for mental health related calls for service. The OEMC and the CPD should consider what event code change they would recommend utilizing best practice language.

*Progress during the seventh reporting period*

The OEMC again failed to produce the Quality Assurance Audits, which are the tools measuring operational compliance with ¶152. These audits have been requested by the IMT for several reporting periods through formal production requests, in monthly meetings and in prior monitoring report.

\*\*\*

In the sixth monitoring period, the City and the OEMC maintained both Preliminary and Secondary compliance with ¶152. For Full compliance, the IMT must receive the three spreadsheets encompassing the OEMC's audits, (*e.g.*, "CIT Employee Review," "CIT Reviewed Events," and "CIT Quality Assurance Report"), which will help to ensure that industry-recognized language is used and updated when appropriate.

## Paragraph 152 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Appendix 4

# Use of Force
# Compliance Assessments by Paragraph

| | | | |
|---|---|---|---|
| ¶153 | ¶177 | ¶201 | ¶225 |
| ¶154 | ¶178 | ¶202 | ¶226 |
| ¶155 | ¶179 | ¶203 | ¶227 |
| ¶156 | ¶180 | ¶204 | ¶228 |
| ¶157 | ¶181 | ¶205 | ¶229 |
| ¶158 | ¶182 | ¶206 | ¶230 |
| ¶159 | ¶183 | ¶207 | ¶231 |
| ¶160 | ¶184 | ¶208 | ¶232 |
| ¶161 | ¶185 | ¶209 | ¶233 |
| ¶162 | ¶186 | ¶210 | ¶234 |
| ¶163 | ¶187 | ¶211 | ¶235 |
| ¶164 | ¶188 | ¶212 | ¶236 |
| ¶165 | ¶189 | ¶213 | ¶237 |
| ¶166 | ¶190 | ¶214 | ¶238 |
| ¶167 | ¶191 | ¶215 | ¶239 |
| ¶168 | ¶192 | ¶216 | ¶240 |
| ¶169 | ¶193 | ¶217 | ¶241 |
| ¶170 | ¶194 | ¶218 | ¶242 |
| ¶171 | ¶195 | ¶219 | ¶243 |
| ¶172 | ¶196 | ¶220 | ¶244 |
| ¶173 | ¶197 | ¶221 | ¶245 |
| ¶174 | ¶198 | ¶222 | ¶246 |
| ¶175 | ¶199 | ¶223 | ¶247 |
| ¶176 | ¶200 | ¶224 | ¶248 |

# Use of Force: ¶153

*153. CPD's use of force policies, as well as its training, supervision, and accountability systems, must ensure that: CPD officers use force in accordance with federal law, state law, and the requirements of this Agreement; CPD officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; when using force, CPD officers only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and any use of unreasonable or unnecessary force is promptly identified and responded to appropriately.*

## Compliance Progress            (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**       *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**        *Under Assessment*
**Full:**               *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶153.

To assess Preliminary compliance with ¶153, the IMT reviewed the CPD's Use of Force policies to ensure they are in accordance with law and the Consent Decree and appropriately address use of de-escalation. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶153, the IMT is reviewing the CPD's use of force training materials and records for completion of training as it relates to the requirements of the Consent Decree.

To assess Full compliance with ¶153, the IMT will assess the implementation and supervision of Use of Force policies by department personnel, to include supervisors, and accountability measures. For this assessment, the IMT is reviewing supervision at a district level, by the Tactical Review and Evaluation Division (TRED),[1] CPD command staff, and COPA to determine if supervision and accountability systems are effective.

In the fifth reporting period, the IMT continued to assess Secondary compliance with ¶153 by reviewing and observing the CPD's 2021 in-service training and Supervisory Refresher Training related to use of force, paying particular attention to accountability and supervision. We reviewed TRED's quarterly reports, CPD's Use of Force Dashboard, and COPA's allegations and findings on excessive force. We

---

[1]    The Tactical Review and Evaluation Division (TRED) was formerly called the Force Review Division (FRD).

also monitored the CPD's progress with the TRED dashboard for supervisors—which was launched March 11, 2022—and looked forward to the CPD training supervisors on its utility and providing guidance or policies on expectations for its use.

This reporting period, the IMT continued to assess Secondary compliance. CPD provided records to demonstrate that as of December 5, 2022, more than 95% of supervisors received the 2022 In-Service Supervisor Training. The CPD continued to provide its *2022 De-Escalation, Response to Resistance and Use of Force Training* but did not provide attendance records by the end of the reporting period. The IMT also reviewed CPD's *Recruit Force Options Suite Training* and *Tactical Response Report (TRR) Supervisory Debriefing Dashboard Training Bulletin*.

TRED's continued attention to de-escalation in its reviews has played an important role. Proper articulation of de-escalation/force mitigation is one of the biggest review points identified by TRED. TRED provided this feedback to CPD's Training Division last year, which resulted in additional focus on the quality of TRRs in the 2021 in-service training. While the CPD cannot point to specific improvements tied to the impact of training, TRED noted they have seen a steady decrease in debriefing points on this matter during this reporting period.

In the sixth reporting period, on March 11, 2022, the CPD launched its Supervisory Debriefing dashboard. This dashboard provides an important tool for accountability and supervision of use of force incidents. TRED's *2022 Q2 Report* states the goal of "publishing the dashboard is to assist the Department in identifying current or developing trends and patterns, allowing for early intervention by supervisors."[2]

On October 13, 2022, the CPD produced a copy of its *TRR Supervisory Debriefing Dashboard Training Bulletin*, ETB# 22-03. The IMT provided feedback on the bulletin on November 12, noting that the bulletin provides detailed instruction on how to access and use the dashboard. However, the IMT recommended the bulletin better explain how use of the dashboard relates to supervisors' responsibilities as outlined in G01-09, *Supervisory Responsibilities*, including the specific duties outlined in Section IV.D, "Use of Force Incidents." The IMT awaits a response from CPD on its comments.

The IMT continues to stress the importance of front-line supervisors playing a greater role in addressing deficiencies when reviewing TRRs, and the *Supervisory Debriefing Dashboard* provides them with a useful tool to do so. However, during IMT interviews this reporting period, district supervisors showed little to no understanding of the supervisory dashboard. Some supervisors stated they were

---

[2]    *See Tactical Review and Evaluation Division 2022 Q2 Report*, CHICAGO POLICE DEPARTMENT (November 22, 2023), https://home.chicagopolice.org/wp-content/uploads/Q2-2022-22Nov22.pdf

aware of the dashboard from the initial release notification or eLearning, but do not use it because it they found it difficult to navigate. Supervisors also shared that sergeants are responsible for officers based on daily sector assignments, with the exception of tactical or specialty units. Thus, supervisors do not have continued responsibility for specific officers and pending broader use of the dashboard, there is currently no way formally for supervisors to be aware of and monitor use of force issues with their officers. Some supervisors noted that monitoring trends is the responsibility of TRED. While the IMT commends CPD for creating the supervisory dashboard to enhance supervisor review and tracking of use of force, further training on the expectations of supervisors and the dashboard is critical to CPD achieving Secondary compliance.

Additionally, during the last reporting period, the CPD shared that it intends to integrate the supervisory dashboard into its CompStat meetings, where supervisors will be required to review and report on data and resulting actions at the district-level. The IMT observed CompStat meetings in the fall of 2022 and there was no indication that the supervisory dashboard was being used.

The IMT also reviewed COPA data to assess whether officers are complying with ¶153. According to COPA's third quarter report for 2022 (July 1, 2022 to September 30, 2002),[3] COPA recorded 118 excessive force allegations, and 1,102 excessive force cases pending. During this period, excessive force case outcomes included 32 sustained, 14 not sustained, 13 unfounded, and 10 exonerated.

In conclusion, the CPD remains in Preliminary compliance for ¶153. The CPD is making positive steps related to this paragraph. TRED is doing a solid job identifying use of force and de-escalation issues; however, they have little value if deficiencies are not being addressed with officers until weeks later. Supervision and accountability systems are not in place and need to be at the district level. Moving forward, the IMT will monitor the CPD's efforts to train all supervisors on the dashboards for Secondary compliance and demonstrate proper supervision and accountability.

---

[3] *See Civilian Office of Police Accountability 2022 Third Quarter Report (July 1, 2022 – September 30, 2022)*, COPA (October 15, 2022), https://www.chicagocopa.org/wp-content/uploads/2022/10/2022-Q3-Report.pdf.

## Paragraph 153 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Use of Force: ¶154

**154.** *CPD adopted revised use of force policies on October 16, 2017 ("October 2017 Policies"). The October 2017 Policies incorporated multiple best practices that were not reflected in CPD's prior use of force policies. Building on these improvements, CPD will maintain the best practices reflected in the October 2017 Policies and make additional improvements to its policies consistent with the terms of this Agreement.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**      *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**           *Not in Compliance*

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶154.

To assess Preliminary compliance with ¶154, the IMT reviewed the CPD's Use of Force policies and *Foot Pursuits* policy to ensure they reflect best practices and delineate who is responsible for identifying best practices, and for maintaining Advanced Law Enforcement Accreditation from the Commission on Accreditation for Law Enforcement Agencies (CALEA) standards. Foot pursuits account for a significant portion of use of force incidents and, thus, relate to ¶154. The IMT also reviewed information from the CPD on policies it reviewed from other jurisdictions and assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies and Foot Pursuit policy.

To assess Secondary compliance with ¶154, the IMT reviewed the CPD's Use of Force and Foot Pursuit training materials for updates related to improvements to maintain best practices, as well as and records reflecting completion of required training.

To assess Full compliance with ¶154, the IMT is assessing ongoing efforts by the CPD to identify best practices (including person responsible and internal processes to adhere to best practices, and to make necessary updates per CALEA certification requirements).

The CPD achieved both Preliminary and Second compliance in the fourth reporting period. For Preliminary compliance, the CPD issued its most recent Use of Force policies on December 31, 2020, which became effective April 15, 2021. In addition, the CPD attained and maintained CALEA accreditation, indicating compliance with national policy standards, including for use of force. The CPD also issued a temporary foot pursuit policy on May 26, 2021. To evaluate Secondary compliance, the

IMT reviewed records indicating that 96% of CPD officers completed the 2020 Use of Force training.

During this reporting period, the CPD made notable progress with policies relevant to ¶154. CPD issued G03-06, *Foot Pursuits*, on August 8, 2022, and G02-02, *First Amendment Rights*, on December 19, 2022. The CPD continues to resolve community feedback with the Coalition (*see* ¶669) on its Taser and OC Spray policies.

For Full compliance, the IMT continues to monitor TRED findings of patterns and trends for the CPD's application of best practices and identification of areas for additional improvement. The IMT also notes that the CPD finalized D22-08, *Community Engagement in Policy Development – Pilot Program*, on December 31, 2022. This policy outlines the CPD's guidelines, procedures, and responsibilities for engaging people in the development of CPD policy (see the assessment of ¶160 for more details). In the next reporting period, the IMT looks forward to reviewing the CPD's efforts to seek community input and the CPD's activities for launching this pilot program in 2023.

Moving forward, we will regularly review Preliminary compliance and discuss the Use of Force policies with the CPD to ensure the CPD maintains best practices and makes additional policy improvements consistent with the Consent Decree, including required community engagement. We will also continue to review Secondary compliance yearly, requiring the CPD to meet the aforementioned criteria for ¶154.

### Paragraph 154 Compliance Progress History

| | | |
|---|---|---|
| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶155

*155. CPD officers have the authority to use force, but that authority is limited by the law and Department policy. The provisions of this Agreement seek to facilitate compliance with the law and Department policy regarding the use of force to reduce the circumstances in which using force is necessary, and to ensure accountability when CPD officers use force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD remained under assessment for Preliminary compliance with ¶155.

To assess Preliminary compliance with ¶155, the IMT reviewed the CPD's Use of Force policies and department protocols to ensure policies and systems meet the requirements of this paragraph.

The IMT began assessing compliance for ¶155 during the last reporting period. The requirements of this paragraph are within CPD's current Use of Force policies. While the latest drafts of the revised policies have yet to be issued, the CPD has engaged community members and the Coalition (*see* ¶669) in various formats for input on these policies.

During the seventh reporting period, in reviewing TRED's reports and the CPD's Use of Force dashboard, the CPD saw a 9.08% increase in TRRs from 2021 (3,316) to 2022 (3,617 TRRs). The 3,617 TRRs correspond to 1,909 incidents. This is a change from prior decreases in TRRs (see Use of Force Appendix Figure 1).

Use of Force Appendix Figure 1: TRRs reported by the CPD[4]

| | Reported TRRs |
|---|---|
| 2019 | 4,989 |
| 2020 | 4,259 |
| 2021 | 3,316 |
| 2022 | 3,617 |

---

[4]    *Use of Force Dashboard (2015–Present)*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

The CPD continues to emphasize de-escalation in training and practice, to include creating a de-escalation dashboard that identifies the percentage of time used and under what type of circumstances warranted force.

To assess compliance, the IMT looked at COPA reports to develop an understanding of complaints brought to COPA and the findings that have resulted related to ¶155. In 2021, COPA reported 496 allegations of excessive force and during that year made findings[5] on excessive force cases as follows: 64 sustained, 76 not sustained, 41 unfounded, and 84 exonerated. For the first three quarters of 2022, COPA reported 317 allegations of excessive force and made findings as follows: 82 sustained, 72 not sustained, 59 unfounded, and 47 exonerated. See ¶164, Use of Force Appendix Figure 4 for more data on COPA Recommended Discipline for Excessive Force from 2017–2021.

In conclusion, the City and the CPD remain under assessment for Preliminary compliance with ¶155. To assess Preliminary compliance, the IMT will continue to monitor progress with finalization of the CPD Use of Force policies. Additionally, ¶155 requires ensuring "accountability when CPD officers use force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances." Moving forward, IMT will continue to review COPA reports to develop an understanding of complaints brought to COPA and the findings that have resulted for further compliance with ¶155.

### Paragraph 155 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Under Assessment | | |

---

[5] Findings are not exclusive to that year/period, and may include findings on cases from prior periods.

# Use of Force: ¶156

*156. CPD's use of force policies and training, supervision, and accountability systems will be designed, implemented, and maintained so that CPD members: a. act at all times in a manner consistent with the sanctity of human life; b. act at all times with a high degree of ethics, professionalism, and respect for the public; c. use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; d. use sound tactics to eliminate the need to use force or reduce the amount of force that is needed; e. only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; f. only use force for a lawful purpose and not to punish or retaliate; g. continually assess the situation and modify the use of force as circumstances change and in ways that are consistent with officer safety, including stopping the use of force when it is no longer necessary; h. truthfully and completely report all reportable instances of force used; i. promptly report any use of force that is excessive or otherwise in violation of policy; j. are held accountable, consistent with complaint and disciplinary policies, for use of force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances, or that otherwise violates law or policy; and k. act in a manner that promotes trust between CPD and the communities it serves.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD remained under assessment for Preliminary compliance with ¶156.

To assess Preliminary compliance with ¶156, the IMT reviewed the CPD's Use of Force policies to ensure policies and systems meet the requirements of this paragraph. Paragraph 156 addresses many sections of the Consent Decree, including short- and long-term efforts. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies and Foot Pursuit policy.

As in prior reporting periods, the CPD remained under assessment with ¶156. While the City and the CPD have made significant compliance efforts with Use of Force policies and training since the start of the Consent Decree, related policies—including those related to training, supervision, and accountability systems—remained works in progress. At the close of the seventh reporting period, the CPD

had not yet issued updated Use of Force policies, including revisions that the CPD made as a result of its discussions with the Coalition to its policies regarding Tasers and OC Spray. The CPD did finalize and issue two critical policies this period (on foot pursuits and First Amendment Rights).

The CPD has made significant strides on its policies and trainings related to ¶156. However, we urge the CPD to pay additional attention to its Use of Force supervision and accountability requirements and systems, as noted in the last reporting period. These are critical to Secondary compliance with this paragraph. The CPD's Supervisory Dashboard, launched on March 11, 2022, provides the system for supervision and accountability if initiated properly. The CPD provided a training bulletin on this dashboard to the IMT on October 13, 2022, for review and has advised that it plans to include training on how to effectively use the Supervisor's dashboard in its in-service training. The draft bulletin currently details the expectations and responsibilities for supervisors using the dashboard. But, as described in ¶153, during IMT interviews this reporting period with district supervisors, supervisors showed little to no understanding of the supervisory dashboard. While CPD has taken steps to address supervision and accountability systems, the current implementation of systems do not promote supervision and accountability.

In addition to increasing utility of the supervisory dashboard, to ensure greater supervision and accountability, the IMT recommends that the CPD establish policies and organization that hold supervisors accountable for officers by having specific supervisors assigned to overseeing specific officers, not by sector or geography. The IMT has been working with the CPD on a pilot effort for unity of command in the 6th district, outlined in D20-02, *Unity of Command and Span of Control Schedule – Pilot Program.* The IMT will continue to monitor this pilot as it relates to supervision and accountability of use of force incidents.

In conclusion, the City and the CPD remain under assessment for Preliminary compliance with ¶156. The IMT will continue to monitor progress with finalization of the CPD Use of Force policies and attention to Use of Force supervision and accountability requirements and systems.

## Paragraph 156 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Under Assessment | Under Assessment |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:

Under Assessment

# Use of Force: ¶157

> **157.** *CPD will collect and analyze information on the use of force by CPD members, including whether and to what extent CPD members use de-escalation techniques in connection with use of force incidents. CPD will use this information to assess whether its policies, training, tactics, and practices meet the goals of this Agreement, reflect best practices, and prevent or reduce the need to use force.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶157.

To assess Preliminary compliance with ¶157, the IMT reviewed the CPD's Use of Force policies and revisions to the TRR, TRR-R, and TRR-I forms to see if they are designed to capture de-escalation and other data in an extractable format.

To assess Secondary compliance with ¶157, the IMT is reviewing the CPD's Use of Force training materials and records, focusing on training specific to de-escalation and force-mitigation techniques, and related to reporting use of these techniques in TRRs.

The CPD achieved Preliminary compliance in the fourth reporting period, following the IMT's review of data collected by the CPD, and specifically, TRED.

In the prior reporting periods, TRED showed a continued focus on de-escalation reporting. However, according to TRED reports, this was one of the top TRR reporting issues. Thus, the IMT expressed that the CPD must continue to focus on front-line supervisors taking the lead on enforcing de-escalation actions and reporting, in order to achieve Secondary compliance.

During this reporting period, the IMT conducted interviews with district supervisors, and some indicated that TRED is responsible for identifying patterns and trends for TRR debriefings. The anticipated *2023 Use of Force Policy Update Training* includes the following requirement of the investigating supervisor, per G03-02-08, *Department Review of Use of Force*: "When determining any recommended after-action support for Department members or supervisors, the investigating supervisor will access the *TRR Debriefing Point Dashboard* to identify and review any previous use-of-force-related debriefing points for the involved members." The

IMT believes this updated policy training is a positive step to having district supervisors taking the lead on enforcing de-escalation actions. COPA data for multiple allegations of excessive force (See Use of Force Appendix Figure 2), show officers with as many as nine allegations in a year.

Use of Force Appendix Figure 2: Number of CPD Officers who are the Subject for More than Two Allegations of Excessive Force, July 2, 2021 to June 30, 2022[6]

| Number of Member(s) | Total Allegations of Excessive Force |
|---|---|
| 20 | 3 |
| 10 | 4 |
| 3 | 5 |
| 1 | 6 |
| 1 | 7 |
| 1 | 9 |

In addition, the IMT reviewed CPD-collected data from the de-escalation dashboard this reporting period. Use of Force Appendix Figure 3 shows a fairly consistent use of various types of force mitigation efforts in 2021 and 2022. Presently, TRED's focus has been on ensuring proper documentation of de-escalation efforts, which has been emphasized in training. The IMT has not seen an emphasis on analysis of de-escalation data (e.g., for force mitigation, should certain mitigation efforts be used more or less).

Use of Force Appendix Figure 3: Force Mitigation Efforts for TRRs, 2021 and 2022

| | 2021 Reported TRRs (% of Total) | 2022 Reported TRRs (% of Total) |
|---|---|---|
| Verbal Commands | 2,798 (84.4%) | 3,078 (84.3%) |
| Additional Units | 2,102 (63.4%) | 2,457 (67.3%) |
| Tactical Position | 1,579 (47.6%) | 1,743 (47.7%) |
| Move to Avoid | 728 (22.0%) | 770 (21.1%) |
| Zone of Safety | 727 (21.9%) | 800 (21.9%) |
| Other | 76 (2.3%) | 79 (2.2%) |
| Specialized Units | 64 (1.9%) | 45 (1.2%) |
| None | 28 (0.8%) | 29 (0.8%) |

The CPD's Audit Division planned to conduct a review of TRED's debriefing procedures in 2022, which has been delayed to 2023. The IMT awaits the audit's findings, specifically related to debriefings on issues such as de-escalation.

---

[6] *Civilian Office of Police Accountability 2022 Second Quarter Report (April 1, 2022 – June 30, 2022)*, COPA (October 15, 2022) at 31, https://www.chicagocopa.org/wp-content/uploads/2022/07/Q2-2022-COPA-Final-Report-1.pdf.

Finally, the IMT also continued discussions with the CPD's de-escalation certification roll-out plan. The CPD shared that this would be incorporated into the Department's recruit training and annual qualifications. The IMT will continue to seek more details on this to assess whether CPD's training, tactics, and practices meet the goals of ¶157.

In sum, the City and the CPD continue to make notable progress towards Secondary compliance by continuing to emphasize de-escalation in anticipated training. As noted, de-escalation needs to be a priority identified at the district and unit level by front-line supervisors. Moving forward, the IMT looks to assess Secondary and Full compliance with ¶157.

### Paragraph 157 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Use of Force: ¶158

**158.** *CPD's use of force policies must comply with applicable law and this Agreement, reflect the objectives described above, and promote trust between CPD and the communities that it serves.*

**Compliance Progress** (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *Under Assessment*
**Full:** *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and is under assessment for Secondary compliance with ¶158.

To assess Preliminary compliance with ¶158, the IMT reviewed the CPD's Use of Force policies, related to community engagement, and plans and efforts by the CPD to address suggestions from the community.

To assess Secondary compliance with ¶158, the IMT is reviewing the CPD's Use of Force training materials and records, focusing on whether training complies with applicable law and the Consent Decree, promotes use of force behavior that promotes trust with the community, and how training reflects input/changes from community feedback.

The CPD achieved Preliminary compliance with ¶158 in the fourth reporting period following revisions to the Use of Force policing as a result of feedback and recommendations from the IMT and the OAG. As described in prior monitoring reports, the CPD has also sought community input in the Use of Force policies, Foot Pursuit policy, and First Amendment Rights policy in the prior reporting periods. To continuously monitor Preliminary compliance, the IMT observed engagements between the Coalition and CPD regarding these policies.

Building trust with the community is incremental and the IMT believes the CPD must have a plan and process regarding community engagement in its use of force policies that meets both the needs of the CPD and the community. The CPD has begun to make strides in establishing such processes to continue to promote community trust. In this reporting period, the IMT reviewed draft General Order G01-03-01, *Community Engagement in Policy Development*, and began supporting the CPD in developing a community engagement plan in response to its request for technical assistance. The CPD finalized this policy on December 31, 2022, renaming it D22-08 *Community Engagement in Policy Development – Pilot Program*. This policy outlines the Department's guidelines, procedures, and responsibilities for engaging members of the community and Department members in the development of Department policy (see ¶160 for more details). In the next reporting period, the

IMT will consider the CPD's efforts to seek community input in this new policy to achieve Preliminary compliance, and the CPD's activities for launching this pilot program in 2023.

Further, the CPD has measured community views on trust and safety through a monthly citywide survey since 2017. The results of this survey are shared on the CPD's *Sentiment Dashboard*.[7] Trust in the police reached a high in June 2020 (score of 65.3), after which trust began to decline through June 2022 (score of 55.6). Since June 2022, the trust score has begun to rise and was last reported at 58.4 for November 2022. This survey provides the IMT a general sense of trust the community has with the police, but this measure is not specific to policy development. The goal of raising trust and security in each district is reinforced at each CPD CompStat meeting, where commanders are measured on community's response.

Moving forward, the IMT will continue to monitor the CPD's efforts to build trust with the community it serves through its community engagement plan and community engagement policy, particularly regarding its Use of Force policies. Additionally, in the next reporting period, the IMT will continue to review Secondary and Full compliance with ¶158 to include reviewing examples of the new policy in practice.

### Paragraph 158 Compliance Progress History

| | | |
|---|---|---|
| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

---

[7] *See* Elucd, *Chicago Police Sentiment Dashboard*, CHICAGO POLICE DEPARTMENT, https://home.chi-cagopolice.org/statistics-data/data-dashboards/sentiment-dashboard/.

# Use of Force: ¶159

**159.** *CPD will conduct an annual review of its use of force policies consistent with accreditation requirements of the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). In addition, every two years, CPD will conduct a comprehensive review of its use of force policies to assess whether CPD's use of force policies meet the requirements of this Agreement, incorporate best practices, address observed trends and practices, as necessary, and reflect developments in applicable law.*

---

**Compliance Progress**      (Reporting Period: July 1, 2022, through December 31, 2022)

| | | |
|---|---|---|
| **Recurring Schedule:** | Annual | ☑ **Not Yet Applicable** |
| **Recurring Schedule:** | Every Two Years | ☑ **Not Yet Applicable** |

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and is under assessment for Secondary compliance with ¶159.

To assess Preliminary compliance with ¶159, the IMT reviewed the CPD's policies and standard operating procedures (SOPs) related to completion of CALEA accreditation. We also reviewed the data sources/elements that are to be assessed during the comprehensive Use of Force policy review.

To assess Secondary compliance with ¶159, the IMT is reviewing CALEA and CPD reports and training sources to assess whether training requirements are detailed, with attention to de-escalation efforts and the CPD's training adjustments based on findings of use of force patterns and reviews. We also review the CPD's annual *Use of Force Report*.

In the fourth reporting period, the CPD achieved Preliminary compliance with ¶159 through its annual review for maintaining its Advanced Law Enforcement Accreditation through the CALEA.

This reporting period, the CPD finalized its Foot Pursuit and First Amendment Rights policies. The CPD remains in discussion with the Coalition to update its Taser and OC Spray policies.

In prior reporting periods, the IMT continued assessing Secondary compliance to determine whether training requirements related to ¶159 are detailed, with attention to de-escalation and adjustments in training based on the findings of CPD's

biannual comprehensive review of its Use of Force policies. The CPD has yet to complete a comprehensive review of its use of force policies to assess whether they meet the requirements of the Consent Decree, incorporate best practices, address observed trends and practices, as necessary, and reflect developments in applicable law. The IMT continues to await the CPD's completion of this review via its forthcoming *Use of Force Two Year Review Status Report*, which is necessary for Secondary compliance.

This reporting period, the CPD did release its first annual use of force report.[8] The report provides an overview of the use of force law and policy, training, documentation and review, accountability, and 2021 use of force data. The IMT found this initial report to be detailed and well-done, and we provided recommendations to the CPD to improve the report in the future (e.g., incorporating critical data in the report instead of referring to other reports for the data and including more details on patterns and trends in use of force and how they are being addressed).

Finally, per ¶159, the CPD needs to clearly demonstrate its compliance with CALEA standards annually, which it has yet to do for 2022.

In conclusion, the City and the CPD maintained Preliminary compliance with ¶159 this reporting period and are under assessment for Secondary compliance as it is developing its first annual comprehensive Use of Force review and demonstrates CALEA compliance for 2022.

### Paragraph 159 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

---

[8] *See Chicago Police Department 2021 Annual Use of Force Report*, CHICAGO POLICE DEPARTMENT (AUGUST 31, 2022), https://home.chicagopolice.org/wp-content/uploads/2021-Annual-Use-of-Force-Report_FINAL-DRAFT_31Aug22.pdf.

# Use of Force: ¶160

**160.** *CPD will establish and maintain clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies. CPD will regularly review the input received, including during the biennial review process.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD made progress toward Preliminary compliance but remain under assessment for the requirements of ¶160.

To evaluate Preliminary compliance, we are reviewing the CPD's community engagement efforts related to its Use of Force policies. In assessing community engagement, we examine (1) outreach; (2) meetings and interactions and problem-solving and decision making; (3) follow-up and sustainability of partnerships, trust, community policing, and problem-solving activities; and (4) general police-community interactions regardless of context.

Since the Consent Decree took effect, the CPD has been in continuous discussion with the IMT, the OAG, and the community about its Use of Force policies. As we detailed in our prior four reports, the CPD began consulting with the Use of Force Working Group in June 2020 and while the IMT thought the CPD's community engagement efforts with the Use of Force Working Group in 2020 were inadequate, the processes and engagement improved in subsequent reporting periods. There were to be some substantive changes as a result of discussions between the CPD and Working Group, but not all of those changes were reflected in policy and training at the close of this reporting period.

The CPD has also sought community feedback on its Foot Pursuits and First Amendment Rights policies through a variety of formats (e.g., conversations with the Coalition, public comment via the CPD website, webinars, and deliberative dialogues). These policies were both issued during this reporting period.

Additionally, during the fifth reporting period, on December 31, 2021, the IMT and OAG received General Order G01-03-01, *Community Engagement in Policy Development*, for review. This policy outlines the Department's guidelines, procedures, and responsibilities for engaging member of the community and Department members in the development of Department policy. The policy is thoughtful and

recognizes not only the need to engage the community up front in policy development, but to include consistent follow-up on the community's suggestions. It also recognizes that there is not one single way to approach engagement; it is a multi-prong approach. The policy describes 10 different engagement methods, such as advisory committees, anonymous surveys, focus groups, public comment, working groups, and more. On December 31, 2022 the CPD issued and made effective this policy, renamed, D22-08, *Community Engagement in Policy Development – Pilot Program*. In the next reporting period, the IMT will consider the CPD's efforts to seek community input in this new policy to achieve Preliminary compliance, and the CPD's activities for launching this pilot program in 2023.

Further, the CPD has measured community views on trust and safety through a monthly citywide survey since 2017. The results of this survey are shared on the CPD's *Sentiment Dashboard*.[9] This survey ask individuals to rate their level of agreement (from 0-10) on statements, such as "The police in my neighborhood treat local residents with respect" or "The police in my neighborhood listen to and take into account the concerns of local residents."

According to this survey, trust in the police reached a high in June 2020 (score of 65.3), after which trust began to decline through June 2022 (score of 55.6). Since June 2022, the trust score has begun to rise and was last reported at 58.4 for November 2022. This provides the IMT a general sense of trust the community has in the police but does not measure trust specific to use of force policies. The goal of raising trust and security in each district is reinforced at each CPD CompStat meeting, where commanders are measured on community's response.

In conclusion, the City and the CPD remain under Preliminary assessment with ¶160. The IMT appreciates the CPD's continued engagement and commitment to working with the community on its Use of Force policies and its policy on community engagement in policy development. However, the IMT awaits community feedback on D22-08 to determine whether the City and the CPD have achieved Preliminary compliance.

---

[9] *See* Elucd, *Chicago Police Sentiment Dashboard*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/statistics-data/data-dashboards/sentiment-dashboard/.

## Paragraph 160 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Under Assessment | Under Assessment |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Under Assessment

# Use of Force: ¶161

*161. CPD recently adopted de-escalation as a core principle. CPD officers must use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible. CPD officers are required to de-escalate potential and ongoing use of force incidents whenever safe and feasible through the use of techniques that may include, but are not limited to, the following: a. using time as a tactic by slowing down the pace of an incident; b. employing tactical positioning and re-positioning to isolate and contain a subject, to create distance between an officer and a potential threat, or to utilize barriers or cover; c. continual communication, including exercising persuasion and advice, and providing a warning prior to the use of force; d. requesting assistance from other officers, mental health personnel, or specialized units, as necessary and appropriate; and e. where appropriate, use trauma-informed communication techniques, including acknowledging confusion or mistrust, or using a respectful tone.*

## Compliance Progress       (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶161.

To assess Preliminary compliance with ¶161, the IMT reviewed the CPD's Use of Force policies and TRR forms to ensure they address de-escalation requirements and reporting. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶161, the IMT reviewed the CPD's training materials and records specific to de-escalation/force mitigation techniques, and related to reporting use of these techniques in TRRs and revisions/updates in policy.

To assess Full compliance with ¶161, the IMT will review TRED reports, TRRs, video footage, and CPD dashboards, as well as conducting interviews with CPD personnel, to determine whether the CPD has sufficiently implemented its policy and training related to de-escalation. The IMT is examining data and information on trends and patterns in de-escalation, and subsequent corrective actions taken by the CPD.

In the fourth reporting period, the CPD reached Preliminary compliance through its revision of its Use of Force policies, informed by community engagement efforts, related to ¶161's requirements. The CPD reached Secondary compliance in the sixth reporting period by providing evidence that more than 95% of officers received the two-day *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training.[10] The training included information on force mitigation principles and de-escalation principles, with an emphasis on documenting these actions in the TRR forms. Additionally for Secondary compliance, the CPD demonstrated that appropriate processes are in place to provide feedback to officers on de-escalation behavior through revisions in the TRR reporting forms and launch of the Supervisor's Use of Force and De-escalation dashboards (see ¶153 for more on these dashboards) to allow districts to identify patterns and trends in de-escalation at a local level.

During this reporting period, the IMT reviewed and provided comments on the Supervisory Dashboard training bulletin. IMT raised continued concern that it is unclear to supervisors whether the dashboard is a discretionary or mandatory tool to be used to monitor and address repeated TRR deficiencies. IMT believes, as has been stated in TRED reports and training, that it is most impactful for front line supervisors to address patterns and trends with their district officers. On December 15, 2022, the CPD produced to the IMT and OAG its *2023 Policy Updates Use of Force* training. Once the review process is complete, the CPD intends the training to be a part of the 2023 40-hour in-service training program and was developed to inform staff of upcoming changes to the G03-02, *De-Escalation, Response to Resistance, and Use of Force* policy suite. The IMT appreciates that this training instructs that the investigating supervisor will access the TRR Debriefing Point Dashboard before making a recommendation on a TRR. This is important for shifting accountability for addressing use of force patterns and trends to district supervisors.

For Full compliance with ¶161, the IMT has regularly monitored de-escalation in action, examining how updated policies and training in this paragraph are impacting the actions of Department members. While TRED continues to place emphasis on members fully articulating de-escalation tactics in the narrative of the TRR, the IMT believes that debriefings are most effective when conducted shortly after the incident and by district/unit supervisors. This is critical for achieving Full compliance. In our assessment, the IMT has found few examples where TRR deficiencies are identified at the district/unit level. Supervisors need policies to hold them accountable for this.

---

[10] Because of the COVID-19 extension, the CPD had until March 5, 2022, to complete the delivery of its 2021 in-service training.

In conclusion, the CPD and the City maintained Preliminary and Secondary compliance with ¶161. Looking forward, the IMT will continue to assess Full compliance, which will depend on the CPD demonstrating whether the processes currently in place have the desired impact and if the CPD has made it clear to their supervisors the expectations for de-escalation behaviors of their staff.

## Paragraph 161 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶162

*162. Consistent with CPD's commitment to preventing and reducing the need for force, CPD officers will allow individuals to voluntarily comply with lawful orders whenever safe and feasible (e.g., allowing individuals the opportunity to submit to arrest before force is used).*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶162.

To assess Preliminary compliance with ¶162, the IMT reviewed the CPD's Use of Force policies and community engagement efforts related to Consent Decree requirements.

To assess Secondary compliance with ¶162, the IMT is reviewing training sources and records to determine whether the CPD has sufficiently trained on its Use of Force and First Amendment Rights policies, to include prior and current training related to handling protests and civil unrest.

In prior monitoring reports, the IMT reviewed CPD Use of Force policies which describe the requirements of ¶162, including requiring de-escalation when safe and feasible. We also noted concerns about CPD actions during the protests of 2020 related to officers allowing individuals to voluntarily comply with lawful orders. The CPD addressed related reporting requirements in its updated Department Notice D20-08, *Reporting the Response to Crowds, Protests, and Civil Disturbances* (effective November 20, 2020). Additionally, the CPD developed forms to document force and all efforts to encourage protestors to voluntarily comply with directives to ensure proper documentation of the same. The CPD achieved Preliminary compliance due to these policies and forms in the fourth reporting period. During 2021, the CPD worked with the IMT, OAG, Coalition, and the Court to draft and revise General Order G02-02, *First Amendment Rights*. The CPD also sought public comment on the policy from April 28, 2022, to May 13, 2022. The CPD finalized G02-02 on June 30, 2022, incorporating input from public comments, but delayed issuing the policy until it had provided eLearning instruction on the changes. During the seventh reporting period, on December 19, 2022, the CPD issued and made effective the revised G02-02, *First Amendment Rights*.

For Secondary compliance, the CPD provided training related to ¶162 in its *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training. The CPD provided records during the sixth reporting period to show that more than 95% of officers received the two-day *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training.[11]

Specific to the application of ¶162 to response to protest, the CPD delivered eLearning training on its *First Amendment Rights* policy. The IMT and OAG reviewed and provided comment on the eLearning training materials. Following revisions and "no objection" notices from the IMT and OAG on October 24, 2022 and October 4, 2022, respectively, the CPD delivered this training. As of December 20, 2022, 95.25% of officers completed the training. Due to these efforts, the IMT finds the CPD in Secondary compliance with ¶162.

The IMT continues to monitor how updated policies and training related to this paragraph are impacting the actions of CPD officers, in an effort to assess Full compliance with ¶162. According to the CPD's de-escalation dashboard in 2022, officers used verbal commands 84.3% of the time (3,078 out of 3,651 TRRs), which is fairly consistent with 2020 (84.4%).

In conclusion, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶162 this reporting period. Moving forward, the IMT will continue to assess the CPD's progress with Full compliance.

### Paragraph 162 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

---

[11] Because of the COVID-19 extension, the CPD had until March 5, 2022, to complete the delivery of its 2021 in-service training.

# Use of Force: ¶163

> **163.** *CPD officers may only use force for a lawful purpose. CPD officers are prohibited from using force as punishment or retaliation, such as using force to punish or retaliate against a person for fleeing, resisting arrest, insulting an officer, or engaging in protected First Amendment activity (e.g., lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct).*

## Compliance Progress                (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD achieved Preliminary and Secondary compliance with ¶163.

To assess Preliminary compliance with ¶163, the IMT reviewed the CPD policies and procedures related to handling demonstrations. Related policies include the CPD's Use of Force policies, First Amendment policy, and *Foot Pursuits* policy. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on these policies.

In prior reporting periods, the IMT determined that G03-02, *De-escalation, Response to Resistance, and Use of Force*, issued on December 31, 2020, addresses ¶163 in Section III.B.5, which prohibits using force as punishment, retaliation, or in response to the lawful exercise of First Amendment rights. The CPD also issued forms and directives to assist in the proper documentation of various aspects of the Consent Decree, including the Use of Force section.

The IMT also discussed criticism of the CPD using force for retaliation and, more specifically, in response to the lawful exercise of First Amendment rights during protests in 2020. We noted the shortcomings in prior CPD policies related to retaliation during protests, which the CPD has addressed in its Use of Force policies, effective April 15, 2021, and Department Notice D20-08, *Reporting the Response to Crowds, Protests, and Civil Disturbances*, effective November 2, 2020. During 2021 and 2022, the CPD worked with the IMT, OAG, Coalition, and the Court to draft and revise General Order G02-02, *First Amendment Rights*. The CPD also sought public comment on the policy from April 28, 2022, to May 13, 2022. The CPD finalized internally G02-02 on June 30, 2022, incorporating input from public comments, but delayed issuing the policy until it had provided eLearning instruction on the changes. During the seventh reporting period, on December 19, 2022, the CPD issued and made effective the revised G02-02, *First Amendment Rights*.

On May 26, 2021, the CPD issued a temporary policy G03-07, *Foot Pursuits*, which became effective June 11, 2021. In the fourth reporting period, the CPD engaged in dialogue with the IMT, OAG, Court, community, and other stakeholders to revise the foot pursuit policy. On June 30, 2022, the CPD advised all Department members that its revised Foot Pursuit policy would become effective on August 29, 2022 and replace the interim policy. See ¶172 for more detail on the development of the foot pursuit policy.

For Secondary compliance, during the last reporting period, the IMT reviewed records demonstrating that 95.25% of CPD officers completed the *First Amendment Rights eLearning* by December 20, 2022. The CPD also delivered its *Foot Pursuits Policy eLearning* training and *Foot Pursuits Training for Lieutenants*. As of October 10, 2022, 98.67% of officers completed the *Foot Pursuits eLearning* and 98.1% of Lieutenants completed the Lieutenants' duties course.

Further for Secondary compliance, as described in *Independent Monitoring Report 6*, the IMT reviewed the 2021 in-service training and the 2022 In-service Supervisory Training curriculum, which provides good instruction regarding retaliation. The CPD provided records to show that as of February 18, 2022, more than 95% of officers received the two-day *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training.[12] The CPD also reported in its Annual Training Report for 2021 that 3,728 officers received an 8-hour Crowd Control and Behavior Refresher/Field Force Operations course.

In conclusion, due to the CPD's efforts to issue policies and complete training relevant to ¶163, the IMT finds the CPD in Preliminary and Secondary compliance with ¶163. Moving forward, the IMT will monitor continued Secondary compliance, looking for attendance records for CPD's 2023 in-service training which will provide more in-depth training, including scenarios, on the updated policies and requirements relevant to ¶163. For Full compliance, the IMT will review data and information related to disciplinary outcomes as they relate to First Amendment responses or foot pursuits (e.g., during the second quarter of 2022, COPA received one First Amendment complaint, so we will monitor what recommendations and actions result).

---

[12] Because of the COVID-19 extension, the CPD had until March 5, 2022, to complete the delivery of its 2021 in-service training.

## Paragraph 163 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Under Assessment

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Under Assessment

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Under Assessment

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Under Assessment

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Use of Force: ¶164

**164.** *CPD officers must only use force when it is objectively reasonable, necessary, and proportional under the totality of the circumstances.*

**Preliminary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**     *Not in Compliance*

In the seventh reporting period, the City and the CPD remained in Preliminary and Secondary compliance with ¶164.

To assess Preliminary compliance with ¶164, the IMT reviewed the CPD's Use of Force policies and community engagement efforts related to Consent Decree requirements. To assess Secondary compliance with ¶164, the IMT reviewed the CPD's in-service *2021* and *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training materials and records to determine whether the CPD has sufficiently trained its officers on its use-of-force policies.

To assess Full compliance, the IMT is reviewing CPD reports, the CPD's use of force dashboard, COPA findings, and legal settlements and judgments, as well as conducting interviews with CPD officers to determine whether the CPD has sufficiently implemented its policy and training related to ¶164.

In prior reporting periods, the CPD achieved Preliminary compliance with ¶164, following the CPD's continued discussions with the Use of Force Working Group and issuance of revised Use of Force policies on December 31, 2020, which went into effect on April 15, 2021. Additionally, the 2020 in-service training covered the conditions when force may be utilized, and as a result, the CPD reached Secondary compliance. The IMT noted at the close of the prior two reporting periods that to maintain Preliminary compliance, the City and the CPD must continue to review and revise its Use of Force policies, including establishing and maintaining clear channels for community input. To maintain Secondary compliance, the City and the CPD must, as appropriate, develop, revise, and provide corresponding training.

During this reporting period, the IMT continued to monitor Preliminary and Secondary compliance with ¶164.

To assess Full compliance, the IMT is reviewing whether the CPD has sufficiently implemented its policy and training related to ¶164. During this reporting period, the IMT continued to review TRED reports and the CPD's Use of Force Dashboard,

paying attention to incidents where force was used and found not to be in compliance with CPD policy, and COPA's data regarding complaints of excessive force.

In 2022, the CPD saw a departure from the downward trend for TRRs, with a slight increase in TRRs compared to 2021 (2.96% increase with 3,413 in 2022 and 3,324 in 2021). In 2022, the CPD also reported 48 Level 3 firearm discharges and TRED's 2022 second quarter report indicated 2 incidents with use of chokehold, occurring on June 20 and June 30, one with one TRR submitted and one with three TRRs submitted, respectively.[13]

The IMT also reviewed the number of allegations and findings on excessive force by COPA (see Use of Force Appendix Figure 4), which shows a decrease of total excessive force cases reviewed by COPA from 2020 to 2021, with a similar downward trend for the first three quarters of 2022.

Use of Force Appendix Figure 4: COPA Recommended Discipline for Excessive Force, 2017–2021

|  | 2020 | 2021 | 2022 (first three quarters) |
|---|---|---|---|
| **Total** | 876 | 496 | 317 |
| **Sustained** | 105 | 64 | 82 |
| **Not Sustained** | 65 | 76 | 72 |
| **Unfounded** | 34 | 41 | 59 |
| **Exonerated** | 73 | 84 | 47 |

Finally, the IMT reviewed COPA recommended discipline for the past few years below (See Use of Force Appendix Figure 5).[14] COPA's report does not distinguish the specific reason for the outcomes and it is unclear to the IMT how many cases may be excessive force, but there has been an increase in suspensions and separation recommendations from COPA in last 2 years.

Use of Force Appendix Figure 5: COPA Recommended Discipline for Excessive Force, 2017–2021

|  | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| **1–29 day suspension** | 48 | 106 | 128 | 98 | 132 |
| **30+ day suspension** | 11 | 8 | 15 | 14 | 48 |
| **Separation** | 5 | 4 | 3 | 19 | 59 |

---

[13] This data is exclusive of any baton or further chokeholds for the last half of 2022, which the IMT does not have TRED data for.

[14] *Civilian Office of Police Accountability Annual Report 2021*, COPA (February 15, 2022) at 29, https://www.chicagocopa.org/wp-content/uploads/2022/02/2021-Annual-Report-Final.pdf.

In conclusion, the City and the CPD remain in Preliminary and Secondary compliance with ¶164. Moving forward, to maintain Preliminary compliance, the City and the CPD must continue to review and revise its Use of Force policies, including establishing and maintaining clear channels for community input. To maintain Secondary compliance, the City and the CPD must, as appropriate, develop, revise, and provide corresponding training, which is anticipated with CPD's 2023 in-service training which includes education on constitutional policing and use of force. For Full compliance, the IMT will continue to review the CPD's and COPA's data and outcomes regarding use of force, as well as the Superintendent's position on discipline.

### Paragraph 164 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶165

**165.** *CPD officers are prohibited from using deadly force except in circumstances where there is an imminent threat of death or great bodily harm to an officer or another person. CPD officers are not permitted to use deadly force against a person who is a threat only to himself or herself or to property. CPD officers may only use deadly force as a last resort.*

---

**Compliance Progress**            (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD remained in Preliminary and Secondary compliance with ¶165.

To assess Preliminary compliance with ¶165, the IMT reviewed the CPD's Use of Force policies and community engagement efforts related to Consent Decree requirements. To assess Secondary compliance with ¶165, the IMT reviewed the CPD's in-service *2021* and *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training materials and records to determine whether the CPD has sufficiently trained on its use-of-force policies, specific to use of deadly force.

To assess Full compliance, the IMT is reviewing CPD reports, TRRs, video footage, the CPD's use of force dashboard, and COPA findings, Chicago Police Board findings, as well as conducting interviews with CPD officers and City personnel, to determine whether the CPD has sufficiently implemented its policy and training related to ¶165. This includes reviewing the number of deadly force incidents, process for submitting cases to COPA for determination of appropriateness, and COPA's findings.

In the fourth reporting period, the IMT found the CPD in Preliminary compliance with ¶165, following the CPD's continued discussions with the Use of Force Working Group and issuance of revised Use of Force policies on December 31, 2020, which went into effect on April 15, 2021. Additionally, the 2020 in-service training covered the conditions of deadly force, and as a result of required completion rates, the CPD reached Secondary compliance. The IMT noted at the close of the prior three reporting periods that to maintain Preliminary compliance, the City and the CPD must continue to review and revise its Use of Force policies, including establishing and maintaining clear channels for community input. To maintain Secondary compliance, the City and the CPD must, as appropriate, develop, revise, and provide corresponding training.

---

During this reporting period, the IMT continued to review data and reports on deadly force incidents. For 2022, officers discharged their firearm 48 times, according to the CPD's Use of Force Dashboard. This is a decrease compared to the 2021 with 61 discharges.

The IMT is also reviewing data from TRED on deadly force. In its first two 2022 quarterly reports, TRED reported 2 chokehold incidents, totaling 4 TRRs. For 2022, the CPD Use of Force dashboard reports 48 firearm discharges, resulting in a total of 52 deadly force incidents.

COPA and the Chicago Police Board have issued a number of decisions regarding the use of deadly force and firearm discharges. Use of Force Appendix Figure 6 shows COPA findings on officer involved shootings from 2017 to 2021 (findings do not necessary occur in the year of decision).[15] Reports for the first three quarters of 2022 indicate six officers were recommended for separation as a result of COPA's review.

Use of Force Appendix Figure 6: COPA Findings for Officer-Involved Shootings, 2017–2021

|  | 2017 | 2018 | 2019 | 2020 | 2021 | 2022* |
|---|---|---|---|---|---|---|
| **Sustained** | 6 | 2 | 2 | 6 | 4 | 6 |
| **Not Sustained** | 0 | 0 | 5 | 2 | 4 | 0 |
| **Unfounded** | 0 | 1 | 0 | 0 | 0 | 0 |
| **Exonerated** | 0 | 2 | 2 | 0 | 0 | 1 |
| **Admin Closed** | 12 | 2 | 2 | 0 | 0 | 0 |
| **Close Hold** | 0 | 1 | 0 | 1 | 1 | 1 |
| **Within Policy** | 30 | 17 | 17 | 17 | 13 | 9 |

*Findings for first three quarters of 2023*

Moving forward, the IMT continues to seek access to data and documents from all involved agencies to evaluate the investigation and conclusions/recommendations of each incident. The IMT will seek additional information on incidents of officers being shot at.

In conclusion, the CPD remains in Preliminary and Secondary compliance with ¶165. The IMT continues to have reservations about the nature and thoroughness of deadly force investigations (*see* ¶492) and looks forward to conducting an operational review of investigations, including working with all the Parties to ensure that investigations are conducted in a timely and thorough manner.

---

[15] *Civilian Office of Police Accountability Annual Report 2021*, COPA (February 15, 2022) at 26, https://www.chicagocopa.org/wp-content/uploads/2022/02/2021-Annual-Report-Final.pdf.

## Paragraph 165 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Use of Force: ¶166

*166. CPD officers are prohibited from using deadly force against fleeing subjects who do not pose an imminent threat of death or great bodily harm to an officer or another person.*

**Compliance Progress**              (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**        *In Compliance* (SIXTH REPORTING PERIOD)
**Secondary:**        *In Compliance* (NEW)
**Full:**              *Not Yet Assessed*

In the seventh reporting period, the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶166.

To assess Preliminary compliance with ¶166, the IMT reviewed the CPD's Use of Force policies and foot pursuit policy, and community engagement efforts related to Consent Decree requirements in this paragraph. Paragraph 166 deals with use of deadly force, but the fleeing suspect aspect of this paragraph has been a primary focus. Thus, the IMT believes that G03-02 *De-escalation, Response to Resistance and Use of Force,* Section III.D.3 - Force used as punishment or retaliation (e.g., force used to punish or retaliate for fleeing, resisting arrest, or insulting a Department member) must be read in conjunction with the Foot Pursuit policy.

To assess Secondary compliance with ¶166, the IMT is reviewing the CPD's training materials and records to determine whether the CPD has sufficiently trained its officers on its use of force and foot pursuit policies.

In the prior reporting periods, the CPD engaged the Use of Force Working Group is discussions regarding non-lethal force on fleeing subjects and foot pursuits. The CPD moved language regarding these prohibitions into General Order G03-02, *De-escalation, Response to Resistance, and Use of Force*, which now indicates deadly force will not be used against a fleeing person unless the person poses an imminent threat (Section IV.D.1.a). The CPD issued revised Use of Force policies on December 31, 2020, which went into effect on April 15, 2021.

Further, during the fourth monitoring period, as required by ¶172, on March 5, 2021, the IMT recommended that the CPD adopt a foot pursuit policy based on our assessment of CPD data and information. On May 26, 2021, the CPD issued a temporary policy G03-07, *Foot Pursuits*, which became effective June 11, 2021. In the prior reporting period, the CPD engaged in dialogue with the IMT, OAG, Court, community, and other stakeholders to revise the foot pursuit policy.

The CPD's revised Foot Pursuit policy became effective in the seventh reporting period on August 29, 2022. See ¶172 for more detail on the development of the

foot pursuit policy. G03-07, *Foot Pursuits*, requires officers to report on foot pursuits they engage in. The expectation is that a new foot pursuit reporting form will result in more reliable data, as CPD previously had issues with the accuracy of foot pursuit data (*see Independent Monitoring Report* ¶168 for more detail). As described in ¶163, the CPD sufficiently trained more than 95% of officers on the foot pursuit policy via eLearning. As a result, the IMT finds the City and CPD in Secondary compliance with ¶166.

To assess Full compliance, the IMT is reviewing data related to use of force against a fleeing subject. The OIG's TRR dashboard[16] reports a general decline in TRRs and incidents with a fleeing subject from 2015 to 2022. For 2015, it identifies 1,951 TRRs (31% of TRRs), covering 1,335 incidents where the subject was fleeing. For 2022 it identifies 973 TRRs (27% of TRRs), covering 649 incidents where the subject was fleeing.

The IMT continues to monitor the outcomes of firearm discharges referred to COPA and subsequent outcomes. See ¶184 for more detail.

In conclusion, the City and CPD achieved Secondary compliance with ¶166 in this reporting period. In the next reporting period, the IMT will continue to assess Full compliance by reviewing data related to use a force against a fleeing subject.

### Paragraph 166 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Under Assessment | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

---

[16]   *See Information Portal, Tactical Response Reports*, OFFICE OF INSPECTOR GENERAL, https://informationportal.igchicago.org/dashboards/public-safety/tactical-response-reports/.

# Use of Force: ¶167

> **167.** *CPD officers will operate their vehicles in a manner that is consistent with CPD policy and training and with the foremost regard for the safety of all persons involved. CPD will periodically include instruction regarding sound vehicle maneuvers in its in-service training regarding use of force. As appropriate, CPD will provide supplemental training guidance regarding dangerous vehicle maneuvers that should be avoided.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**       *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**        *Under Assessment*
**Full:**                  *Not Yet Assessed*

The CPD maintained Preliminary compliance with ¶167 in the seventh reporting period but did not reach Secondary compliance.

To assess Preliminary compliance with ¶167, the IMT reviewed the CPD's Use of Force policies and vehicle pursuit policy to ensure they address requirements specific to this paragraph. The CPD achieved Preliminary compliance in the second reporting period with G03-03-01, *Emergency Vehicle Operations – Eluding and Pursuing*.

To assess Secondary compliance with ¶167, the IMT is reviewing the CPD's process and policies to identify drivers in need of remedial training and whether such training has occurred, as well as training that was provided to all officers. Furthermore, to achieve Secondary compliance, the CPD must periodically include traffic safety in its training and demonstrate how officers are identified and receive remedial training when not following policy.

In the prior reporting periods, the IMT reviewed the CPD's 2021 in-service training curriculum which includes instruction (module 4) on how to conduct a motor vehicle stop and a portion on vehicular eluding and pursuit. The IMT also reviewed the CPD's 2022 in-service training plan, which includes *In-Service Peak Performance Driving training* which "provides a review of basic driving skills and traffic pursuit policy and reinforces skills related to proper emergency driving techniques."

Additionally, on May 19, 2022, the CPD submitted to the IMT course materials for its *Emergency Vehicle Operations Course In-Service 4-hour training*. The IMT reviewed the course and had minimal comments, finding it appropriate to the requirements of the Consent Decree. The CPD planned to begin offering this training in the seventh reporting period. On September 15, 2022, the CPD provided revised

training materials for which the OAG and IMT provided no-objection to on September 28, 2022 and November 12, 2022, respectively.

This training reviews general data and statistics to contextualize and emphasize content, including the importance of safety. This includes data from 2018 to 2021 on traffic accidents and officer deaths, as well as data, per recommendation of the IMT, on fatalities and life changing events as a result of police accidents (see Use of Force Appendix Figure 7). The CPD aims to complete this training in the next reporting period. Upon 95% completion of this training, the IMT will find the City and the CPD in Secondary compliance with ¶167.

Use of Force Appendix Figure 7: COPA Findings for Vehicle Pursuits, 2017–2021

|  | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| Total Pursuits in Compliance | 244 | 196 | 205 | 252 |
| Total Pursuits Not in Compliance | 32 | 57 | 40 | 60 |
| Total Pursuits Terminated | 115 | 113 | 96 | 157 |
| Total Pursuits Resulting in Accidents | 166 | 180 | 91 | 129 |
| Total Pursuits Resulting in Fatalities | 4 | 9 | 5 | 3 |

The IMT has also been reviewing activities, data, and actions regarding motor vehicle operations. For the vehicular data provided above from the emergency vehicle in-service training, the CPD has seen an increase in number of pursuits terminated over time. The training also states $65,860,996 settlement costs resulted from 2016 through 2021.

COPA reported six fatal accidents under investigation in 2021, 37 pending as of the second quarter of 2022, and one motor vehicle fatality under investigation for the third quarter of 2022. The IMT is reviewing the outcomes of these cases for corrective action. COPA findings related to vehicle incidents in recent years include a CPD officer being suspended for 180 days for violating policy, and recommendation for termination of a CPD responding officer who crashed into another police vehicle and subsequently civilian vehicles which resulted in the death of a woman.

On December 31, 2021, the IMT submitted a written request for monthly Traffic Review Board reports to include number of officers sent to remedial training, to conduct a deeper review of the nature of the board's findings, recommendations for training, and any corrective action that emanates from the Board. The CPD shared traffic pursuits data from July 1, 2020 to December 31, 2021 in response to the IMT request on November 3, 2022. This data includes pursuits reviewed by the Traffic Review Board (TRB) and those handled at the district level. During this 18-month period, 458 pursuits occurred with 439 reviewed by the TRB or Districts. For these pursuits, progressive discipline and training actions included: 82 officers received 1- or 2-day suspensions, 151 with reprimands, and 57 required to complete driving school/policy review.

In conclusion, the City and the CPD remain under Assessment for Secondary compliance with ¶167. Moving forward, the IMT will continue to assess Secondary compliance pending receipt of copies of Traffic Review Board reports, and requisite attendance at the Emergency Vehicle Operations in-service four-hour course.

### Paragraph 167 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Use of Force: ¶168

> **168.** *Starting no later than January 1, 2019, CPD will track and analyze the frequency with which CPD officers engage in foot pursuits of persons attempting to evade arrest or detention by fleeing on foot, regardless of whether the foot pursuit is associated with a reportable use of force incident. CPD will track foot pursuits associated with reportable use of force incidents through TRRs or any similar form of documentation CPD may implement.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD achieved Preliminary and Secondary compliance with ¶168.

To assess Preliminary compliance with ¶168, the IMT assesses policies and practices to enable the CPD to capture and analyze appropriate data related to foot pursuits, as required by this paragraph.

In the prior three reporting periods, the City and the CPD did not maintain Preliminary or Secondary compliance due to the failure to properly capture and analyze foot pursuit data. In prior reporting periods, the City and the CPD had achieved Preliminary and Secondary compliance for this paragraph's requirements based on the fact that the OEMC has processes in place that capture foot pursuits; the CPD's TRED reviews all TRRs that are foot pursuit-related and result in the use of force; and the TRED's tracking and analysis of pursuits was sound. However, in the fourth reporting period, the IMT was alerted to the fact that there were serious issues of data quality regarding foot pursuits. Specifically, the way in which foot pursuit data were captured was not correct. This raised several concerns for the IMT.

In the last reporting period, the CPD made important strides to fix the foot pursuit data issues. First, it worked extensively to develop and update its *Foot Pursuits* policy. On August 29, 2022, the revised G03-07 became effective. See ¶172 for more detail on the development of the foot pursuit policy. As such, the IMT finds the CPD back in Preliminary compliance with ¶168.

The new policy requires officers to report on foot pursuits they engage in. During this reporting period, the CPD created new Foot Pursuit Report forms for officers and supervisors to complete in Clearnet. On November 17, 2022, the CPD demonstrated the forms (officer initial report and WOL review of the report) for the IMT

and OAG. The CPD expects that this new reporting form will result in more reliable data. During this meeting, the IMT and OAG expressed questions and concerns for the CPD's plan for the WOL to review foot pursuits based on individual reports, as opposed to reviewing reports applicable to the incident as a whole. This issue remains unresolved, which the IMT will follow up on in the next reporting period.

Related to Secondary compliance, during the last reporting period, the IMT and OAG reviewed the CPD's Foot Pursuits Policy eLearning training, providing "no-objection" notices on June 16, 2022 and June 8, 2022, respectively. The IMT and OAG also reviewed the CPD's Foot Pursuits Training for Lieutenants, providing "no-objection" notices on August 5, 2022. Upon receipt of the "no-objections," CPD began delivery of these trainings. As of October 10, 2022, 98.67% of officers completed the Foot Pursuits eLearning and 98.1% of Lieutenants completed the Lieutenants' duties course, resulting in Secondary compliance.

In conclusion, the City and the CPD achieved Preliminary and Secondary compliance for ¶168. Moving forward, the IMT will continue to evaluate data collection and analysis related to foot pursuits with more long-term implementation of the new foot pursuit policy and forms.

### Paragraph 168 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Under Assessment |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 − DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶169

**169.** *For foot pursuits associated with reportable use of force incidents, by January 1, 2020, CPD will review all associated foot pursuits at the headquarters level to identify any tactical, equipment, or training concerns.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶169, and are under assessment for Full compliance.

To assess Preliminary compliance with ¶169, the IMT reviewed the CPD's Use of Force policies and TRED SOP to ensure they address the requirements for a headquarters-level entity to review foot pursuits with associated reported use of force incidents. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶169, the IMT reviewed training sources and records related to reviews of foot pursuits, including reviewing the nature of debriefings and supplemental training following the identification of patterns and trends. Specifically, the IMT reviewed the TRED's processes regarding debriefings, which are similar to brief remedial training sessions.

To assess Full compliance, the IMT is reviewing whether the CPD has sufficiently implemented its foot pursuit review policy, protocols, and training and if the TRED and the CPD are appropriately recommending and acting on tactical, equipment, and training concerns.

During the fourth reporting period, per ¶172, on March 5, 2021, the IMT recommended that the CPD adopt a foot pursuit policy. The CPD was required to adopt a foot pursuit policy by September 3, 2021. On May 26, 2021, the CPD issued a temporary policy G03-07, *Foot Pursuits*, which became effective June 11, 2021. The CPD further revised the policy, which became effective on August 29, 2022.

In the last reporting periods, the IMT continued to assess Full compliance with ¶169 by monitoring efforts by the TRED to review foot pursuits. The data issues encountered in ¶168 do not impact this paragraph, as the data TRED pulls and analyzes comes from TRRs.

The IMT continues to review the annual and quarterly reports developed by the TRED, paying specific attention to debriefing points emanating from reviews of

pursuits with TRRs. The new policy significantly increases the review of foot pursuits, as *all* foot pursuits, not just force-related ones, will now be reviewed by TRED. TRED continues to issue debriefing points on issues, such as partner separation, communication, and weapons handling. See Use of Force Appendix Figure 8 for data reported by TRED the first half of 2022. Additionally in 2022, there were four instances of major injury from a foot pursuit.

| Use of Force Appendix Figure 8: | Foot Pursuit Data in 2020 vs. 2020 | |
|---|---|---|
| | **2020** | **2021** |
| Foot Pursuits with a TRR | 425 | 516[2] |
| Pursuits with no debriefing point | 394 | 473 |
| Debriefing for partner separation | 7 | 20 |
| Debriefing for radio communication | 9 | 18 |
| Debriefing for other | 2 | 5 |

The CPD has done an admirable job addressing debriefing points related to foot pursuits in training. As of October 10, 2022, 98.67% of officers completed Foot Pursuits eLearning and 98.1% of Lieutenants completed Foot Pursuits Training for Lieutenants, which reviewed the provision of the updated policy.

In conclusion, the City and the CPD maintained Preliminary and Secondary compliance with ¶169. With the updated foot pursuit policy and TRED's increased responsibility to review all foot pursuits, the CPD will have additional data to analyze on foot pursuits. Moving forward, the IMT will review such data and analysis for Full compliance.

### Paragraph 169 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| Secondary |

# Use of Force: ¶170

**170.** *CPD recently issued a foot pursuit training bulletin. By July 1, 2019, CPD will develop and issue a supplemental foot pursuit training bulletin that reflects best practices from foot pursuit policies in other jurisdictions. The supplemental training bulletin will be subject to review and approval by the Monitor and OAG. The supplemental training bulletin will: a. identify risks and tactical factors officers should consider prior to initiating and during the course of a foot pursuit; b. provide guidance to officers regarding radio communications during a foot pursuit; c. instruct officers to avoid, to the extent practical, separating from other officers in the course of a foot pursuit; d. provide guidance on circumstances when alternatives to a foot pursuit may be appropriate; and e. inform officers that they must follow supervisors' instructions in the course of a foot pursuit, including instructions to alter tactics or discontinue the pursuit.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

In the seventh reporting period, the City and the CPD maintained Preliminary, Secondary, and Full compliance with ¶170.

To assess Preliminary compliance with ¶170, the IMT determined whether the CPD developed and issued a foot pursuit bulletin.

To assess Secondary compliance with ¶170, the IMT and OAG reviewed the training bulletin and underlying sources to determine whether it reflects best practices from foot pursuit policies in other jurisdictions and compiles with the requirements in this paragraph of the Consent Decree.

To assess Full compliance with ¶170, the IMT reviewed training sources and records to assess comprehension of the foot pursuit actions by officers and supervisors (including separation from and responsibility to one's partner). We also reviewed TRED reports, TRRs, video footage, and COPA cases involving foot pursuits to assess the extent to which officers follow the training bulletin, such as officer separation or firearm retention issues, and the extent that district supervisors address noncompliance with the foot pursuit training bulletin.

In the fourth reporting period, the City, the CPD, the OAG, and the IMT had many discussions regarding the on-going compliance efforts regarding CPD foot pursuits. The 2019 Training Bulletin was not sufficient for these ongoing efforts—particularly as the City and the CPD continued to develop the Foot Pursuit policy and corresponding training, which differ from the Training Bulletin. As a result, this paragraph was considered a one-time requirement—although ¶170 will continue to inform how the CPD should instruct officers regarding foot pursuits.

In conclusion, the City and the CPD achieved Full compliance with ¶170 in the fourth reporting period and maintained it through the seventh reporting period. The IMT will continue to measure the CPD's ongoing policy, training, and implementation efforts under other paragraphs.

### Paragraph 170 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Secondary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Use of Force: ¶171

*171. CPD will provide scenario-based training regarding foot pursuits and the supplemental foot pursuit training bulletin during the first annual use of force training required by this Agreement.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Under Assessment* |

In the seventh reporting period, the City and the CPD achieved Preliminary compliance with ¶171.

To assess Preliminary compliance with ¶171, the IMT reviewed the CPD's annual Use of Force training to determine whether it has incorporated scenario-based training regarding foot pursuits and assessed whether the CPD looked at examples of how other jurisdictions may have done so. Additionally, to evaluate Preliminary compliance, the CPD's annual *De-Escalation, Response to Resistance, and Use of Force* in-service training needs to re-enforce new requirements or restrictions for foot pursuits through scenario-based training.

In the fourth reporting period, the City and CPD achieved Preliminary compliance with ¶171 with the issuance of the temporary foot pursuit policy, and remains in compliance due to the revised policy going into effect on August 29, 2022. Section XVIII (Additional Responsibilities) of the revised policy addresses the requirements of ¶171, stating "the Training Division will provide Department members with training including scenario based on the policy."

To assess Secondary compliance, the IMT reviewed the *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training and the training proposed for 2022.

During this reporting period, the CPD completed eLearning training on the new foot pursuit policy. This trained include audio-based scenarios. The CPD has committed to in-person scenario training for its 2023 in-service training.

In conclusion, the City and the CPD maintained Preliminary compliance with ¶171 in this reporting period. In the next reporting period, the IMT will continue to assess Secondary compliance as the CPD provides scenario-based training on the new policy in its 2023 in-service training.

## Paragraph 171 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Under Assessment

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Under Assessment

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Use of Force: ¶172

> **172.** *By no later than January 1, 2021, the Monitor will complete an assessment of CPD data and information to determine whether CPD should adopt a foot pursuit policy. If the Monitor recommends that CPD should adopt a foot pursuit policy, CPD will adopt a foot pursuit policy no later than July 1, 2021. Any foot pursuit policy adopted by CPD will be subject to review and approval by the Monitor and OAG.*

**Compliance Progress**   (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶172.

To assess Preliminary compliance with ¶172, the IMT reviewed the CPD's *Foot Pursuits* policy and its efforts to garner appropriate community input on the policy. The IMT is also assessing how the CPD and OEMC establish appropriate foot pursuit data reporting systems.

In the fourth reporting period, on March 5, 2021, the IMT recommended that the CPD adopt a foot pursuit policy based on our assessment of CPD data and information. Because of our recommendation, the CPD was required to adopt a foot pursuit policy by September 3, 2021, and "[a]ny foot pursuit policy adopted by CPD will be subject to review and approval by the Monitor and OAG."

On June 11, 2021, the CPD issued a temporary policy, though the IMT and OAG had previously noted multiple concerns to the City and CPD regarding a draft of the temporary policy. The draft did not provide clear expectations for CPD officers or supervisors, allow the CPD to enforce such expectations, or provide the public with notice on the CPD's expected practices and procedures. Furthermore, the City and the CPD did not receive community input on the policy, which is necessary to receive compliance under the Consent Decree. *See* ¶160.

Since then, the CPD worked with the IMT and the OAG to revise its interim policy and engaged the department and the community for input on this policy. On June 2, 2021, the CPD conducted a public webinar on its new temporary foot pursuit policy. In addition, in June 2021, the CPD conducted "deliberative dialogues" with community organizations on the policy. On December 23, 2021, the CPD, the OAG, and the IMT reached an agreement on a permanent policy, General Order G03-07, *Foot Pursuits*.

In the sixth reporting period, the CPD continued efforts to refine and finalize the policy. On February 10, 2022, the CPD posted the draft policy for a 15-day public comment period. Following continued dialogue with the community, Coalition, and Court, the OAG provided a no objection letter on May 16, 2022, and the IMT provided a no objection letter on May 20, 2022, to the revised G03-07, *Foot Pursuits* policy, G03-07-01, *Foot Pursuits Review* policy, and accompanying forms. To support our review of the CPD's draft policies, the IMT reviewed best practices and policies from other departments across the nation and foot pursuit related data in TRED reports (e.g., number of injuries, weapons recovered, weapons pointed, and arrests). The IMT also reviewed comments from community members and CPD personnel provided via the public-comment website portal, e-mail, webinars, and deliberative dialogues. We also participated in numerous discussions with the CPD, the OAG, the Coalition, and the Court regarding foot pursuit best practices from various jurisdictions, including some jurisdictions under consent decrees.

The IMT's no objection notice to the policy was, in part, a recognition of the CPD's need to complete a policy and training as soon as possible. However, the IMT continued to have concerns about the accuracy and reliability of foot-pursuit data (*see* ¶168 in Independent Monitoring Report 6).

On June 30, 2022, the CPD announced via AMC message to Department members that the revised foot pursuit policy would go into effective in August.

The City and the CPD maintained Preliminary compliance with ¶172 due to CPD issuing the revised G03-07, *Foot Pursuits* on August 26, 2022, which became effective on August 29, 2022. For Secondary compliance, during the last reporting period, the IMT and OAG reviewed the CPD's Foot Pursuits Policy eLearning training, providing "no-objection" notices on June 16, 2022 and June 8, 2022, respectively. The IMT and OAG also reviewed the CPD's Foot Pursuits Training for Lieutenants, providing "no-objection" notices on August 5, 2022. Upon receipt of the "no-objections," CPD began delivery of these trainings. As of October 10, 2022, 98.67% of CPD officers completed the Foot Pursuits eLearning and 98.1% of Lieutenants completed the Lieutenants' duties course. Due to the CPD completing training of more than 95% of officers on the revised policy and demonstrating the ability to produce reliable data on foot pursuits (see ¶168), the CPD has achieved Secondary compliance with ¶172.

In conclusion, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶172 this reporting period. Moving forward, the IMT will assess Full compliance, looking for evidence of sustained resolution to data issues related to foot pursuits to evaluate the effective operationalization of the foot pursuit policy.

## Paragraph 172 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Under Assessment

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Under Assessment

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Use of Force: ¶173

*173. Following a use of force, once the scene is safe and as soon as practicable, CPD officers must immediately request appropriate medical aid for injured persons or persons who claim they are injured.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶173.

To assess Preliminary compliance with ¶173, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph regarding requesting medical aid following a use of force. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies. To assess Secondary compliance with ¶173, the IMT reviewed the CPD's Use of Force and LEMART training sources and records to determine whether the CPD has sufficiently trained on its latest policies.

In the fourth reporting period, the CPD achieved Secondary compliance through completion of the 2020 Use of Force in-service training for more than 95% of CPD officers. This training addressed requirements of ¶173 related to requesting medical aid for injured persons following a Use of Force incident.

In the prior period, the IMT began assessing Full compliance with ¶173 by reviewing TRR forms, TRED reports, COPA reports and videos, and recent changes to Illinois law. The CPD's TRR form directs officers to indicate provision of medical aid. The CPD's TRR-I form requires the Watch Operations Lieutenant to examine people for injuries. The number of occasions in which injuries are detected by the Lieutenant and not by the officers may offer some indication of compliance with ¶173. To further improve reporting and review of ¶173, in the future, the CPD revised its TRR-R form to add a debriefing point box entitled "Officer did not request medical aid in a timely way." The IMT has not had sufficient opportunity to review TRED assessments of provision of medical aid due to the recent change in the TRR, thus the CPD remains under assessment for Full compliance. The CPD did report in its 2021 Annual Use of Force Report that for 44% of use of force incidents (1,466), the person was taken to the hospital.

In conclusion, the City and the CPD remain in Preliminary and Secondary compliance with ¶173. The IMT looks to assess this paragraph for Full compliance in future reporting periods, and has requested information from BIA, COPA, and the City's Law Department that will aid in our review. The IMT will also review additional data from TRRs and TRED reports. The IMT also seeks to identify cases in which the Watch Operations Lieutenant has identified injuries via the TRR-I, to include how many of these cases had injuries and what transpired with officers at the scene.

### Paragraph 173 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶174

**174.** *Before January 1, 2021, CPD will ensure that all CPD officers receive Law Enforcement Medical and Rescue Training ("LEMART"). The LEMART training provided to CPD officers will incorporate scenario-based elements. Before January 1, 2021, CPD will equip all CPD officers engaged in patrol activities who have completed LEMART training with an individual first aid kit ("IFAK") (as defined in current CPD policy, U06-02-23).*

**Compliance Progress**         (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶174.

Since the CPD had already begun its significant training on LEMART, the IMT assessed this paragraph to be in Preliminary compliance by adjusting our methodologies in the fourth monitoring period – essentially considering training as evidence of Preliminary compliance and policy as evidence of Secondary compliance.

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶174. In the fifth reporting period, to assess training, the IMT reviewed LEMART course materials, observed a live training session, and reviewed training attendance and equipment records to determine whether the CPD has sufficiently provided LEMART training and the number and percentage of officers who have under-gone training and received individual first aid kits (IFAKs). The training appropriately covered the requirements of ¶174 regarding instruction to officers on requesting medical aid and using IFAKs. During the training, all officers electronically verified their attendance and confirmed they received their IFAKs at the end of the course.

During the last reporting period, on May 26, 2022, the CPD provided the IMT with documentation of 2021 LEMART training and IFAK distribution. Between September 2019 and April 2022, 2,341 officers received LEMART training, and of those officers 2,339 were issued IFAKs. The IMT observed the LEMART and in-service training that addressed rendering aid and included scenario-based exercises.

However, we have not received verification of training and distribution of IFAK to all officers.

In conclusion, the City and the CPD remained under assessment for Secondary compliance with ¶174. The IMT awaits the complete training and equipment numbers to assess Secondary compliance in the next reporting period.

### Paragraph 174 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Use of Force: ¶175

*175. Starting January 1, 2021, in use of force incidents involving CPD officers, CPD will require CPD officers to provide life-saving aid consistent with their LEMART training to injured persons as soon as it is safe and feasible to do so until medical professionals arrive on scene. CPD will replenish IFAKs, and the contents thereof, used by CPD officers as necessary to ensure officers have the equipment necessary to render aid consistent with their LEMART training. Subsequent to January 1, 2021, CPD will ensure that any officer regularly engaged in patrol activities who has no prior LEMART training receives LEMART training within one year of beginning his or her regular patrol activities.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | | | |
|---|---|---|---|
| **Recurring Schedule:** | Ongoing | ☐ Met | ☑ **Missed** |

**Preliminary:**     *In Compliance (FOURTH REPORTING PERIOD)*
**Secondary:**     *In Compliance (FOURTH REPORTING PERIOD)*
**Full:**          *Under Assessment*

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶175.

To assess Preliminary compliance with ¶175, the IMT reviewed CPD's policy requiring officers to provide life-saving aid consistent with LEMART training, regarding replenishing IFAKs, and ensuring that any officer regularly engaged in patrol activities receive LEMART training within one year of beginning patrol activities.

To assess Secondary compliance with ¶175, the IMT reviewed LEMART course materials, and reviewed training attendance and equipment records to determine whether officers are appropriately trained on the requirements of ¶175.

To assess Full compliance with ¶175, the IMT will determine whether the CPD has sufficiently implemented its policy and training, specifically regarding the provision of life saving aid during incidents and if there is a process for distributing and replenishing IFAKs.

In the fourth reporting period, the CPD achieved Preliminary compliance, through General Order G03-02, *De-Escalation, Response to Resistance, and Use of Force* and G03-06, *Firearm Discharge and Officer-Involved Death Incident Response and Investigation*. Following the IMT's review of LEMART course materials, live training, and training attendance and equipment records, the CPD also achieved Secondary compliance in the fourth reporting period.

However, the requirements regarding replenishing IFAKs and receiving LEMART training within one year of beginning patrol duties were not documented in CPD policy.

To achieve Full compliance, the CPD needs to demonstrate that all CPD officers have received LEMART training and received IFAKs, as well as provide documentation demonstrating processes replenishing IFAKs. Furthermore, the IMT will assess whether officers are complying with policy and training for provisions regarding providing life-saving aid. Per recommendation of the IMT, the CPD revised its TRR-R form to add a debriefing point box entitled "Officer did not request medical aid in a timely way." Data resulting from this debriefing point will assist the IMT in assessing Full compliance, but sufficient data is not yet available due to the recent change. The CPD's 2021 Annual Use of Force Report did share that for 44% of use of force incidents the subject was taken to the hospital.

In conclusion, the City and the CPD remain in Preliminary and Secondary compliance with ¶175. Moving forward, the IMT will continue to assess Full compliance, to include reviewing use of force incidents to evaluate the degree of operational compliance. The IMT also needs data from the CPD on the distribution of IFAKs to all officers.

### Paragraph 175 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶176

> **176.** *CPD officers must recognize and act upon the duty to intervene on the subject's behalf when another officer is using excessive force.*

## Compliance Progress
(Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Full:** *Under Assessment*

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶176.

To assess Preliminary compliance with ¶176, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph regarding the duty to intervene. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶176, the IMT reviewed the CPD's Use of Force training sources and records to determine whether the CPD has sufficiently trained on its latest policies.

To assess Full compliance with ¶176, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training.

In the second reporting period, the CPD achieved Preliminary compliance with ¶176. The CPD engaged the Use of Force Working Group on the requirements of this paragraph, which resulted in a change in G03-02, *De-Escalation, Response to Resistance, and Use of Force*.

In the fourth reporting period, the CPD achieved Secondary compliance with ¶176. The IMT reviewed the development, implementation, and evaluation of the 2020 Use of Force in-service training specific to the duty to intervene, and determined this requirement is covered within training.

In this reporting period, the IMT continued to monitor ongoing Preliminary and Secondary compliance with ¶176. Related to Secondary compliance, the IMT reviewed the Annual Prescribed Weapons Qualification eLearning, which includes a slide on Duty to Intervene. The duty to intervene is also addressed in the CPD's Active Bystander for Law Enforcement (ABLE) Training, which the CPD is delivering and also provided a revised version of the training for the IMT and OAG to review in November. Additionally, written reporting obligations for officers who have knowledge of use of force against another person in violation with policy are detailed in CPD's *2023 Policy Updates Use of Force Training* in module 1, which the

CPD shared materials for review on December 15, 2022. This will inform officers of upcoming changes to the G03-02 *De-Escalation, Response to Resistance*, and Use of Force policy suite, and be included in CPD's 2023 40-hour in-service training program. The IMT commends the CPD for incorporating this provision in multiple training courses.

To assess Full compliance with ¶176, the IMT is unaware of any reported cases for violating the duty to intervene from officers in the field. The IMT inquired about this with district Sergeants and Lieutenants during interviews in December 2022. There have been cases identified by units in an oversight role (TRED and COPA). To achieve Full compliance, the IMT believes that excessive force cases where there is an opportunity to intervene should be identified and reported at district level.

In conclusion, the City and the CPD remain in Preliminary and Secondary compliance with ¶176. The CPD training in this area is admirable, but the IMT has not received the data and time to determine Full compliance.

### Paragraph 176 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶177

> **177.** *Consistent with CPD policy that force must be objectively reasonable, necessary, and proportional, CPD officers must generally not use force against a person who is handcuffed or otherwise restrained absent circumstances such as when the person's actions must be immediately stopped to prevent injury or escape or when compelled by other law enforcement objectives.*

### Compliance Progress       (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶177.

To assess Preliminary compliance with ¶177, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph regarding use of force against a person who is handcuffed or otherwise restrained. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶177, the IMT reviewed the CPD's Use of Force training sources and records to determine whether the CPD has sufficiently trained on its latest policies.

To assess Full compliance with ¶177, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training. This includes reviewing the number of incidents in which force was used against a person who was handcuffed or otherwise restrained; whether the CPD has a process that differentiates force against a person who was handcuffed or otherwise restrained and identifies and forwards those cases to COPA; as well as reviewing a random sampling of such incidents, including review of reviewing supervisors' and TRED's findings on each case as to whether it was in compliance with policy.

The CPD achieved Preliminary compliance with ¶177 in the fourth reporting period. The IMT found that the CPD received the requisite community input for G03-02-01, *Response to Resistance and Force Options*, and finalized the policy. Based on feedback from the community, the CPD's December 31, 2020, revised G03-02-01 policy clarified the "necessary" aspect of use of force by clarifying the "minimum amount force."

In the sixth reporting period, the CPD achieved Secondary compliance with ¶177 by completing training on policy revisions in its annual *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training. The CPD provided records to show that as of February 18, 2022, more than 95% of officers received the training.

For Full compliance, in the fifth reporting period IMT began reviewing incidents where force was used against a person who was handcuffed or otherwise restrained. Use of force against a person who is handcuffed or otherwise restrained is a Level 2 force and as such must be responded to by a supervisor and reviewed by TRED. If there is a complaint log, COPA will review the use of force. COPA's 2021 Annual Report has no specific allegation entitled force against handcuffed prisons, and if it exists it may fall under the general category of excessive force.

According to TRED's reports, in the first quarter of 2022, there were six debriefing points for TRRs with handcuffed prisoners. In the second quarter of 2022, there were 13 debriefing points for TRRs with handcuffed prisoners.

The CPD Superintendent has supported discipline on two occasions as a result of use of force involving a person who was handcuffed or restrained. One case resulted in a 100-day suspension of an officer for kicking a handcuffed prisoner in the head during a high stress situation. For the second case, the Superintendent recommended discharge for an officer guilty of pressure of the neck, which the Police Board upheld. These disciplinary actions reinforce the Department's policy and requirements of ¶177.

In conclusion, the City and the CPD remained in Preliminary and Secondary compliance with ¶177. Moving forward, the IMT will continue to seek data on the number of events, cases referred to COPA, and complaints from outside sources in order to assess Full compliance with ¶177.

### Paragraph 177 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶178

*178.* CPD officers are prohibited from using carotid artery restraints or chokeholds (or other maneuvers for applying direct pressure on a windpipe or airway, i.e., the front of the neck, with the intention of reducing the intake of air) unless deadly force is authorized. CPD officers must not use chokeholds or other maneuvers for intentionally putting pressure on a person's airway or carotid artery restraints as take-down techniques.

## Compliance Progress
(Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *In Compliance* (SIXTH REPORTING PERIOD)
**Full:** *Under Assessment*

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶178.

To assess Preliminary compliance with ¶178, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph regarding use of carotid artery restraints or chokeholds. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶178, the IMT reviewed the CPD's Use of Force training sources and records to determine whether the CPD has sufficiently trained on its latest policies.

To assess Full compliance with ¶178, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training. This includes the TRED's review of such incidents in quarterly and annual reports (all deadly force incidents, shootings, head strikes, and chokeholds).

In the fourth period, the CPD achieved Preliminary compliance with ¶178 with revisions to G03-02, *De-Escalation, Response to Resistance, and Use of Force*, effective April 15, 2021. The CPD achieved Secondary compliance with ¶178 by completing training on policy revisions in its annual *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training. The CPD provided records to show that as of February 18, 2022, more than 95% of officers received the training.

During the fifth reporting period, the IMT began assessing Full compliance with ¶178 by reviewing TRED quarterly reports. Chokeholds are considered a Level 3 use of force requiring the response of a Street Deputy. Since April 1, 2021, the CPD

established a process for capturing all Level 3 use of force incidents, including ca-
rotid artery restraints. From April 22, 2021, through December 31, 2021, TRED's
2021 Annual report provides that there were no incidents reported to OEMC that
required a Street Deputy to respond for a chokehold.

During this reporting period, TRED's *2022 Q2 Report* identifies two chokehold in-
cidents. In both cases a Street Deputy responded and indicated medical aid was
provided. The IMT will attempt to review these two cases in more depth moving
forward, as well as seek sources outside of CPD to explore if there are unreported
cases of chokeholds.

The CPD Superintendent has supported discipline for a Police Board case involving
carotid artery restraint by an officer. This reinforces the Department's policy and
requirements of ¶178.

In conclusion, the City and the CPD maintained Preliminary and Secondary com-
pliance with ¶178 this reporting period. The IMT will continue to monitor these
incidents for Full compliance moving forward and looks to determine if other en-
tities (e.g., BIA, COPA, or the City's Law Department) have received complaints.


### Paragraph 178 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶179

**179.** *CPD's use of force policies must guide officers on all force techniques, technologies, and weapons that CPD officers are authorized to use. CPD's use of force policies must clearly define and describe each force option and the circumstances under which use of such force is appropriate to address potential types of resistance.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:** *In Compliance* (SIXTH REPORTING PERIOD)
**Full:** *Not in Compliance*

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶179.

To evaluate Preliminary compliance, the IMT reviewed the CPD's Use of Force policies and community engagement efforts related to ¶179's requirements for guidance to officers on all force techniques, technologies, and weapons that officers are authorized to use.

For Secondary compliance, in prior reporting periods we reviewed the 2020 annual Use of Force in-service training, and the *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training. The CPD provided records to show that more than 95% of officers received the training.

In 2020 and through the prior reporting period, the CPD continued to engage the community on its Use of Force policies. The Use of Force Working Group raised concerns with the use and prohibitions of Tasers and OC Spray. While changes to address these concerns have yet to be finalized, the CPD has noted that the revised policy will reflect additional criteria not required by ¶179.

In conclusion, the City and the CPD maintained Secondary compliance with ¶179 this reporting period. Moving forward, the IMT will continue to assess CPD's community engagement efforts related to the force options requirements of ¶179.

## Paragraph 179 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Preliminary | Secondary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Secondary

# Use of Force: ¶180

**180.** *CPD will maintain policies for each of the following weapons, using the following guidelines.*

**Compliance Progress** (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶180. (The weapons listed in the Consent Decree following ¶180 include subheadings as follows: "a. firearms," "b. Electronic Control Weapons ('Tasers')," "c. Oleoresin Capsicum Devices ('OC Devices')," and "d. Impact Weapons.")

To assess Preliminary compliance with ¶180, the IMT reviewed the CPD's policies to ensure they address requirements specified in this paragraph for maintaining weapons-specific policies. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

CPD achieved Preliminary compliance with ¶180 with revisions to its use of force policy suite, effective April 15, 2021, and continued community engagement in policy into 2022. The CPD achieved Secondary compliance with ¶180, by completing training on policy revisions in its annual *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training. The CPD provided records to show that as of February 18, 2022, more than 95% of officers received the training.

While the CPD has met the requirements of ¶180 for almost all of the weapons policies, it must still insert language regarding "must render lifesaving aid to injured persons consistent with training" into the Baton and Taser policies. This language is currently present in parent policy G03-02, *De-escalation, Response to Resistance, and Use of Force*, but not in those weapons-specific policies. Changes to these policies based on community input are currently in draft form and go beyond the specific requirements of the weapons paragraphs. On December 15, 2022, the CPD shared with the IMT its 2023 Policy Updates Use of Force training to educate Department members on forthcoming policy changes.

In conclusion, the City and the CPD maintained Preliminary and Secondary compliance with ¶180 in this reporting period. Moving forward, the IMT will continue to monitor both Preliminary and Secondary compliance, the maintenance of which will require the CPD to issue the updated use-of-force policy suite.

## Paragraph 180 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Secondary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Secondary

# Use of Force: ¶181

**181.** *CPD will continue to require that only officers who are currently certified may be issued, carry, and use firearms.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**          *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**          *In Compliance* (THIRD REPORTING PERIOD)
**Full:**          *Under Assessment*

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶181.

To assess Preliminary compliance with ¶181, the IMT reviewed the CPD's policies to ensure they address requirements specified in this paragraph regarding issuance, carry, and use of firearms. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶181, the IMT reviewed the CPD's training sources and records to determine whether the CPD has sufficiently trained officers on firearm use. We also reviewed records showing the percentage of officers who qualified at the range and possessed the requisite FOID card.

To assess Full compliance with ¶181, the IMT will review various community and data sources to determine whether the CPD has sufficiently implemented its policy and training and ensures that officers are certified to issue, carry, and use firearms (including active FOID cards and CPD qualifications).

Beginning in the fourth reporting period, to assess Full compliance, the IMT attempted to audit firearms certification records for all officers and review the results of those records. In the fifth reporting period, the IMT reviewed the CPD's *2020 Annual Training Report*, which indicated 11,921 officers (97%) took an eLearning course prior to firearms qualification.

During this reporting period on September 22, 2022, the CPD shared its Annual Prescribed Weapon Qualification, TASER Re-Certification and VirTra Simulation Exercise Training materials for review. CPD requires officers to receive qualification training on firearms annually. This mandatory training includes eLearning modules, Live Fire Firearm and TASER Qualification and VirTra Simulation Exercise. Specific to ¶181, the training notes it is the member's responsibility to qualify with their prescribed duty weapon by the end of the seventh period of the current year. The CPD submitted an updated version of this training on November 22, 2022. Per comment of the IMT, the revisions include stronger language regarding the need

for CPD officers to produce a valid FOID card for qualification, specifically stating that officers failing to produce a FOID card will not be allowed to qualify.

In order for the IMT to properly assess Full compliance, we continue to seek data or records indicating that only officers who are qualified and possess necessary licenses carry a firearm. The CPD informed the IMT that this data is forthcoming in the next reporting period.

Furthermore, an officer-involved shooting investigation by COPA resulted in a 30-day recommended suspension for an expired FOID card. As such, the IMT recommends the CPD create a process that ensures officers have necessary licenses.

In conclusion, the City and the CPD maintained Preliminary and Secondary compliance with ¶181. Moving forward, the IMT looks forward to assessing Full compliance upon receipt of firearm qualification and certification records for all officers.

### Paragraph 181 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶182

> **182.** *CPD will require officers to consider their surroundings before discharging their firearms and take reasonable precautions to ensure that people other than the target will not be struck.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**          *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**          *In Compliance* (FIFTH REPORTING PERIOD)
**Full:**          *Under Assessment*

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶182.

To assess Preliminary compliance with ¶182, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph regarding officer precautions before discharging a firearm. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶182, the IMT reviewed the CPD's training sources and records to determine whether the CPD has sufficiently trained officers on firearm use. We also reviewed records showing the percentage of officers who qualified at the range and possessed the requisite FOID card.

To assess Full compliance with ¶182, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training. This includes a review of data on firearm discharges, nature of the incident, and whether this paragraph's requirements were an issue.

In the fourth reporting period, the CPD achieved Preliminary compliance with ¶182, after receiving requisite community input on General Order G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*. Additionally, the CPD demonstrated it has a process in place to capture data related to the conditions under which an officer discharges his/her firearm via the TRR-I form, which is completed by the Street Deputy.

In the fifth reporting period, the CPD achieved Secondary compliance with ¶182, following IMT review of training on de-escalation. Specifically, de-escalation training applied to all uses of force and firearms, including the responsibility to issue a warning if safe and feasible.

The IMT began assessing Full compliance in the fifth reporting period by reviewing TRED quarterly reports and COPA's dashboard for firearm discharges and continued that review during the seventh reporting period.

Beginning April 2021, TRED began capturing and reporting data on all Level 3 incidents, and Street Deputies assessed whether the discharge involved the possibility of nearby people being at risk. TRED reported in its first two quarterly reports for 2022 that there were no instances where officers fired into crowds or buildings.

The IMT also examined COPA's 2021 Use of Force Annual report which provides COPA findings on 22 firearm discharges, where three were sustained, four were not sustained, 13 were consistent with policy, and one was in close hold status. Three officers were recommended for separation. For one case a foot pursuit resulted in a fatal shooting. COPA recommended termination but the CPD Superintendent did not agree. The case awaits decision by the Police Board.

In conclusion, the City and the CPD maintained Preliminary and Secondary compliance with ¶182. Moving forward, to assess Full compliance the IMT continues to require access to investigative data from all concerned entities (COPA, Police Board, IRT, and FRB) for discharge cases to make an informed determination.

### Paragraph 182 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶183

*183. CPD will require officers to issue a verbal warning prior to the use of any reportable force, including the use of firearms, when it is safe and feasible to do so.*

## Compliance Progress                    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**       *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**       *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**                 *Under Assessment*

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶183.

To assess Preliminary compliance with ¶183, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph regarding verbal warning prior to use of any reportable force. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶183, the IMT reviewed the CPD's training sources and records to determine whether the CPD has sufficiently trained officers, specifically with an emphasis on the importance of verbal warnings if safe and feasible.

To assess Full compliance with ¶183, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training, to include reviewing CPD data and findings on how many times verbal warnings were given.

In the fourth reporting period, the CPD achieved Preliminary compliance due to its continued community engagement regarding the Use of Force policies.

The CPD also achieved Secondary compliance in the fourth reporting period. More than 95% of CPD officers had completed the 2020 Use of Force in-service training, which appropriately addressed ¶183's requirements related to issuing verbal warnings. The CPD maintained Secondary compliance in the last reporting period due to ongoing *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training that included instruction on ¶183.

Related to Full compliance, the CPD has focused on de-escalation and TRED has issued many debriefing points on this matter. Specifically, TRED reports have identified debriefing points regarding when officers have failed to issue a verbal warning.

To assist in the review of compliance with ¶183, the IMT recommended that TRED revise the TRR-R form to include as a debriefing point failure to give warning prior to using force, which the CPD did in 2022.

The CPD's de-escalation dashboard indicates for 2022, there were 3,651 TRRs, and verbal commands were used as a force mitigation effort for 84.3% of them. This is fairly consistent with 2021 where 84.4% of TRRs included verbal commands. Additionally, in 2022, there were 48 firearm discharges, for 50% of which verbal commands were used as a force mitigation effort. This is a slight decrease from 2021 where 52.9% of firearm discharges included verbal commands.

In conclusion, the City and the CPD maintained Preliminary and Secondary compliance with ¶183. Moving forward, the IMT will explore whether warnings before uses of firearms are routinely addressed in COPA investigations and if such information is accessible.

### Paragraph 183 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶184

**184.** *When CPD officers discharge firearms, they must continually assess the circumstances that necessitated the discharge and modify their use of force accordingly, including ceasing to use their firearm when the circumstances no longer require it (e.g., when a subject is no longer a threat).*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶184.

To assess Preliminary compliance with ¶184, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph regarding discharge of a firearm. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶184, the IMT reviewed the CPD's training sources and records to determine whether the CPD has sufficiently trained officers, specifically with an emphasis on the importance of constant assessment when using deadly force with a firearm.

To assess Full compliance with ¶184, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training. This includes reviewing data on firearm discharges, nature of the incident and whether this section was an issue (e.g., any instance where an officer may have discharged more than 3 rounds in one incident), and disciplinary actions to reinforce the policy.

In the fourth reporting period, the CPD achieved Preliminary compliance after receiving requisite community input for its Use of Force policies. Section II.E-F of G03-02-01, *Response to Resistance and Force Options*, details policy requirements for officers to continually assess situations and modify force. The CPD also achieved Secondary compliance in the fourth reporting period. More than 95% of CPD officers had completed the 2020 Use of Force in-service training, which appropriately addressed ¶184 requirements. In the fifth and sixth reporting periods, the CPD maintained Secondary compliance due to delivery of the *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training that includes instruction on ¶184.

To begin assessing Full compliance, in the fifth reporting period the IMT reviewed the CPD's Use of Force Dashboard, TRED quarterly reports, COPA's dashboard and reports, and media reports (for general accounts of officer discharges), and efforts of the Force Review Board, which we continued to review in this reporting period.

This reporting period, TRED reported that CPD Street Deputies responded to all Level 3 incidents and found no instances where officers could have modified their actions or ceased firing.

In conclusion, the City and the CPD maintained Preliminary and Secondary compliance with ¶184. Moving forward, the IMT will require access to more documentation from the CPD and COPA to make an informed decision regarding firearm discharges.

### Paragraph 184 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶185

*185. CPD will continue to prohibit officers from firing warning shots.*

**Compliance Progress**       (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance (SECOND REPORTING PERIOD)* |
| **Secondary:** | *In Compliance (FOURTH REPORTING PERIOD)* |
| **Full:** | *Under Assessment* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶185.

To assess Preliminary compliance with ¶185, the IMT reviewed the CPD's Use of Force policies to ensure they prohibit officers from firing warning shots. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶185, the IMT reviewed the CPD's training sources and records to determine whether the CPD has sufficiently trained officers, specifically with an emphasis that firing warning shots is prohibited.

To assess Full compliance with ¶185, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training. This includes reviewing CPD data on how many times officers fired warning shots.

The CPD achieved Preliminary compliance with this paragraph in the second reporting period with its Use of Force policies. In the fourth reporting period, the CPD achieved Secondary compliance. We reviewed the development, implementation, and evaluation of the 2020 Use of Force in-service training, eLearning materials, and recruit force options training specific to firearms and deadly force. These trainings cover instruction on the requirements of ¶185. As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training. Finally, during the fourth reporting period, because of feedback from the IMT to develop a process to track data related to Level 3 reportable use of force incidents, the CPD also established a process to track and examine the nature of firearm discharge incidents and determine the nature of the event via the TRR-I form.

In the fifth reporting period, the IMT began assessing Full compliance by examining data from the CPD's Use of Force Dashboard, video, and reports from COPA's website, and TRED quarterly reports, which we continued to do this reporting period.

Beginning April 2021, the TRED began reporting data on all Level 3 reportable uses of force. In 2021, the TRED reported 45 Level 3 incidents. The responding Street

Deputies determined no firearm discharges to be warning shots. Likewise, the responding Street Deputies determined no firearm discharges to be warning shots in the first two quarters of 2022.

In conclusion, the City and the CPD maintained Secondary compliance with ¶185. Moving forward, the IMT looks to review as much investigatory information as possible to assess Full compliance, to include written information from the Incident Response Team and the Force Review Board. The IMT requires access to more documentation from the CPD and COPA to make an informed determination regarding whether officers fire warning shots.

### Paragraph 185 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶186

**186.** *CPD officers must not fire at moving vehicles when the vehicle is the only force used against the officer or another person, except in extreme circumstances when it is a last resort to preserve human life or prevent great bodily harm to a person, such as when a vehicle is intentionally being used to attack a person or group of people. CPD will continue to instruct officers to avoid positioning themselves or remaining in the path of a moving vehicle, and will provide officers with adequate training to ensure compliance with this instruction.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶186.

To assess Preliminary compliance with ¶186, the IMT reviewed the CPD's Use of Force policies to ensure they address requirements specified in this paragraph. The IMT also assessed the CPD's efforts to actively engage the community and obtain feedback on its Use of Force policies.

To assess Secondary compliance with ¶186, the IMT reviewed the CPD's training sources and records to determine whether the CPD has sufficiently trained officers, specifically with an emphasis on use of force and moving vehicles.

To assess Full compliance with ¶186, the IMT is reviewing various community and data sources to determine whether the CPD has sufficiently implemented its policy and training. This includes reviewing CPD data regarding how many times officers fired at moving vehicles.

In the fourth reporting period, the CPD achieved Preliminary compliance following review of the CPD's Use of Force policies by the IMT, OAG, and community. Section II.D.6 of G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*, prohibits firing at or into a moving vehicle.

The CPD also achieved Secondary compliance in the fourth reporting period through 95% completion of its 2020 Use of Force in-service training and recruit force options training specific to firearms and deadly force.

In the fifth reporting period, the IMT began assessing Full compliance by reviewing TRED quarterly reports to determine whether officers were sufficiently trained on

prohibitions from firing at a moving vehicle, which we continued to assess in this reporting period. TRED reported that during the first half of 2022, Street Deputies determined there were two incidents involving officers firing at moving vehicles.

In conclusion, the City and the CPD maintained Preliminary and Secondary compliance with ¶186. Moving forward, the IMT requests thorough information on all incidents involving officers shooting at moving vehicles to determine the outcomes and rationale for decisions made by both CPD and COPA, to include documentation of the Superintendent's position.

### Paragraph 186 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶187

> **187.** *CPD will prohibit officers from firing from a moving vehicle unless such force is necessary to protect against an imminent threat to life or to prevent great bodily harm to the officer or another person.*

## Compliance Progress        (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶187 and made progress toward Full compliance.

The City and the CPD achieved Preliminary and Secondary compliance with ¶187 in the fourth reporting period. To assess Preliminary compliance, the IMT reviewed the CPD's policies to determine whether they sufficiently address ¶187's requirements—specifically, Section II.D.7 of G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*. In addition, the CPD demonstrated its commitment to actively engage the Working Group and community in dialogue regarding the Use of Force policies and their recommendations.

To assess Secondary compliance, the IMT reviewed data to determine whether the CPD had provided sufficient training to its officers on the requirements of ¶187 via the 2021 Use of Force in-service training, and by putting into place a process to track firearm discharges via a supplement to the TRR-I form. We also reviewed the number of officers who have completed Use of Force in-service training.

To assess Full compliance, the IMT will continue to evaluate whether the CPD has sufficiently implemented its policy and training, including by reviewing data on firearm discharges. Sources of that data may include, but are not limited to, completed TRRs, TRED reports, Use of Force data dashboards, COPA investigatory reports, supervisory audits, video footage, and interviews with CPD officers.

In the fourth, fifth, and sixth reporting periods, the IMT reviewed data regarding firearm discharge cases from the CPD, COPA, and the Police Board.

Data from the TRR-I supplement, which the CPD implemented on April 1, 2021, was first reflected in TRED's Quarterly Reports for Q2 and Q3 2021.[17] According to

---

[17]    *See Chicago Police Department Force Review Division 2021 Q2 Report*, CHICAGO POLICE DEPARTMENT (OCTOBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Force-Review-

the TRED reports, among the firearm discharge incidents examined by the Force Review Board during Q2 and Q3 of 2021, Street Deputies reported no instances of officers firing shots from a moving motor vehicle. TRED's *2021 Year-End Report* indicates that for one incident occurring November 2, 2021, TRR No. 2021-03135, it was unknown whether a firearm was discharged "at or into a moving motor vehicle" or "from a moving motor vehicle."[18]

The City's Policy Board held an evidentiary hearing in November 2021 for a patrol officer charged with violating the CPD's prohibition against shooting at a moving vehicle during an incident on October 4, 2018.[19] The officer was inside a police SUV when the officer fired four times at the other vehicle. On January 20, 2022, the City's Police Board found the officer guilty and ordered that he be suspended for two years.[20] The officer had previously been stripped of police powers in October 2018 and placed in a no-pay status in February 2021. COPA and the Police Superintendent had recommended in 2020 that the officer be fired. In addition to the suspension, the Police Board ordered the officer to complete full re-training on the use of deadly force, including scenario-based elements and interactive exercises. The IMT considers the City, the CPD, and the City's other entities' responses to individual incidents—including disciplinary actions—as part of the broader picture in evaluating whether the CPD has sufficiently implemented its policy and training.

The IMT was unable to determine the exact nature of the violations that COPA sustained for its shooting cases because COPA publicly reports only the "primary category" of concluded investigations on its dashboard.[21]

During the seventh reporting period, the IMT continued to review data regarding firearm discharge cases from the CPD and other sources. TRED's *2022 Q1 Report* and *2022 Q2 Report*, both published during the seventh reporting period, indicate there were no incidents during which a firearm was discharged from a moving motor vehicle.

---

Division-2021-Q2-Report.pdf; *Chicago Police Department Force Review Division 2021 Q3 Report*, CHICAGO POLICE DEPARTMENT (DECEMBER 13, 2021), https://home.chicagopolice.org/wp-content/uploads/Q3-2021-13-Dec-21.pdf.

[18] TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 65, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

[19] *See, Police Discipline*, CHICAGO POLICE BOARD, https://www.chicago.gov/city/en/depts/cpb/provdrs/police_discipline.html.

[20] *See, e.g.*, Chip Mitchell, *A Chicago panel is letting a cop keep his job after a 'clearly unreasonable and unnecessary' shooting*, WBEZ CHICAGO (January 21, 2022), https://www.wbez.org/stories/chicago-cop-to-keep-his-job-after-clearly-unreasonable-and-unnecessary-shooting/5c5b4dd8-c23d-4d89-a130-abbad061079d.

[21] *See Closed Cases*, CIVILIAN OFFICE OF POLICE ACCOUNTABILITY, https://www.chicagocopa.org/data-cases/data-dashboard/.

To support ongoing Secondary compliance during the seventh reporting period, the CPD provided course materials for its *Annual Prescribed Weapon Qualification TASER Re-Certification and VirTra Simulation Exercise Training*, which covers prohibitions on the use of firearms, including firing from moving vehicles as prohibited by ¶187. The training materials received no-objection notices from the IMT and the OAG during this reporting period. The CPD also provided course materials for its *Recruit Use of Force Training* and *2023 Policy Updates Use of Force In-Service Training* in connection with ¶187, but the training materials remained in the review process at the end of the reporting period. The CPD did not provide attendance records for the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training by the end of the reporting period.

The City and the CPD maintained Preliminary and Secondary compliance with ¶187 in the seventh reporting period. The supplemental TRR-I data continues to represent an important step toward Full compliance, but additional data—including data from COPA on cases involving firearms discharges and motor vehicles—is needed. We look forward to examining more data and information regarding firearm discharges in the next reporting period, including additional TRED quarterly reports.

### Paragraph 187 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶188

> **188.** *By January 1, 2019, CPD will develop a training bulletin that provides guidance on weapons discipline, including circumstances in which officers should and should not point a firearm at a person. CPD will incorporate training regarding pointing of a firearm in the annual use of force training required by this Agreement in 2019.*

**Compliance Progress**     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Full:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2024* |

In the seventh reporting period, the City and the CPD maintained Preliminary, Secondary, and Full compliance with ¶188.

To assess Preliminary compliance with ¶188, the IMT determined whether the CPD developed and issued the requisite training bulletin. To assess Secondary compliance, the IMT determined whether the training bulletin complied with ¶188's requirements and whether the IMT and the OAG approved the bulletin.

To assess Full compliance, the IMT reviewed the CPD's training attendance records and data, as well as progress made by the CPD to educate and operationalize the Weapons Discipline Training Bulletin (such as whether the annual Use of Force training sufficiently addresses TRED's recommendations regarding pointing incidents).

In prior reporting periods, we indicated that to attain Full compliance, the CPD would need to demonstrate an ability to sufficiently analyze all pointing incidents, including those not documented in ISRs or arrest reports. While we still believe that the CPD's firearm pointing training should be data-driven, in the sixth reporting period we revised our methodology for Full compliance with this paragraph to reflect the Parties' agreement that the CPD's analysis of pointing incidents is covered by ¶¶189 and 190.

The City and the CPD achieved Preliminary and Secondary compliance in the second reporting period and have since maintained that status based on the CPD's subsequent Use of Force in-service training.

The CPD has also demonstrated ongoing training on firearm pointing and weapon discipline, which is necessary to maintain Full compliance. During the sixth reporting period, the CPD provided records to show that more than 95% of officers received the two-day *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training, with 96.71% of participants completing the *Communications*

eight-hour course and 96.86% completing the *Procedures* eight-hour course.[22] The IMT reviewed and provided a no-objection notice for training materials for the CPD's *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training. We also observed a session of the CPD's *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training, as well as a session of the CPD's *Supervisor's in-service training*. The City and the CPD therefore achieved Full compliance with ¶188 in the sixth reporting period.

Although the CPD did not provide attendance records for the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training by the end of the reporting period, the City and the CPD maintained Full compliance with ¶188 in the seventh reporting period. The IMT expects to receive the attendance records in the eighth reporting period for the City and the CPD to maintain Full compliance in the future. The IMT looks forward to continuing to monitor the CPD's ongoing training on firearm pointing and weapon discipline.

## Paragraph 188 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Secondary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

---

[22] Because of the COVID-19 extension, the CPD had until March 5, 2022, to complete the delivery of its 2021 in-service training.

# Use of Force: ¶189

**189.** *CPD will clarify in policy that when a CPD officer points a firearm at a person to detain the person, an investigatory stop or an arrest has occurred, which must be documented. CPD will also clarify in policy that officers will only point a firearm at a person when objectively reasonable under the totality of the circumstances.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶189.

To assess Preliminary compliance, the IMT reviewed the CPD's relevant policies, including the CPD's Use of Force policies to ensure they address the requirements specified in ¶189. We also evaluated the CPD's efforts to obtain and address community engagement and input on the policy that addresses ¶189's requirements.

To assess Secondary compliance, we reviewed data and documentation to determine whether the CPD has sufficiently trained on its Use of Force policies. We also reviewed the number of officers who have completed Use of Force in-service training.

To assess Full compliance, the IMT evaluates whether officers understand the firearm-pointing policy, particularly with respect to the requirements of ¶189. Along with other sources of information, the IMT reviews TRED reports for its findings on patterns and trends, recommendations for follow-up training, and referrals to COPA.

The City and the CPD have maintained Preliminary compliance with ¶189 since reaching it in the first reporting period. The current version of the CPD's Department Notice D19-01, *Firearm Pointing Incidents*, has been in effect since November 1, 2019.

In the fourth reporting period, the City and the CPD achieved Secondary compliance because a sufficient number of CPD personnel received appropriate training as part of the 2020 Use of Force in-service training. In the fifth reporting period, TRED began reviewing all firearm pointing incident reports (FPIRs), including FPIRs that did not have an investigatory stop report (ISR) or arrest report associated with the incident, which had been a longstanding IMT recommendation. We appreciate TRED including these incidents in their review processes.

During the sixth and seventh reporting periods, the IMT reviewed TRED's quarterly and year-end reports.

TRED made a recommendation for training in connection with 865 (31%) of the 3,005 individual firearm pointing incidents (FPIs) reported in 2021.[23] Another five reports were referred to COPA. TRED also made three referrals to the district or unit of occurrence for corrective and/or disciplinary action because an officer "was observed in a related TRR or FPIR pointing their firearm at a person and there was no notification to OEMC of a FPI by that member."

In the first quarter of 2022, TRED reviewed 734 FPIRs and made a recommendation for training in connection with 240 (32.7%).[24] In contrast, supervisors reported that they recognized a training opportunity and took corrective action at the time the incident occurred in only four instances.[25] Of the 269 training recommendations TRED made in connection with the 240 FPIRs, 236 (87.7%) were for improper body-worn camera usage. In the second quarter of 2022, TRED reviewed 962 FPIRs and made a recommendation for training in connection with 280 (29.1%).[26] Supervisors did not report a single instance in which they recognized a training opportunity and took corrective action at the time the incident occurred.[27] Of the 309 training recommendations TRED made in connection with the 280 FPIRs, 277 (89.6%) were for improper body-worn camera usage.

In the seventh reporting period, TRED added a debriefing point to the TRR-R for supervisors who did not address a body-worn camera deficiency at the time of occurrence.[28] Although the new debriefing point is currently available only for use-of-force incidents—not firearm pointing incidents—we hope the new debriefing point encourages supervisors to immediately correct body-worn camera issues.

The IMT continues to appreciate the CPD's efforts to begin reviewing all firearm pointing incidents, including those not associated with an arrest or ISR. Because of how frequently they occur (508, or 17% of the total number of FPIRs in 2021), this review is critical to the credibility of the CPD's analysis of firearm pointing overall. In 2021, TRED referred 31 firearm pointing incidents that were not associated with an arrest or ISR (6%) to the Fourth Amendment Stop Review Unit for a final determination as to whether "there was a reporting deficiency."[29] TRED referred 10 (9%)

---

[23]  TRED's *2021 Year-End Report*, Chicago Police Department (April 29, 2022) at 85, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

[24]  TRED's *2022 Q1 Report*, Chicago Police Department (August 16, 2022) at 18, https://home.chicagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf.

[25]  *Id.* at 21.

[26]  TRED's *2022 Q2 Report*, Chicago Police Department (November 22, 2022) at 19, https://home.chicagopolice.org/wp-content/uploads/Q2-2022-22Nov22.pdf.

[27]  *Id.* at 22.

[28]  *Id.* at 24.

[29]  TRED's *2021 Year-End Report* at 80.

and 20 (17%) firearm pointing incidents that were not associated with an arrest or ISR to the Fourth Amendment Stop Review Unit in the first and second quarters of 2022, respectively.[30]

The CPD's Audit Division has indicated that it plans to initiate a review of TRED's debriefing procedures during 2022; we await the Audit Division's findings.

During the seventh reporting period, the CPD indicated that it is in the process of reviewing D19-01; ¶636 requires the CPD to review each policy periodically (typically every two years) to "evaluate whether the policy provides effective guidance and direction to CPD members and is consistent with the requirements of this Agreement and current law." The CPD should consider revising D19-01 to address the issues identified in its data; as described in greater detail above, ongoing issues with body-worn camera usage and potential failures to report investigative stops suggest the need for more effective supervision of pointing incidents.

With respect to ongoing training on firearm pointing, the CPD provided course materials for its *Carbine Operator Qualification and Annual Training* and *Annual Prescribed Weapon Qualification TASER Re-Certification and VirTra Simulation Exercise Training*, both of which cover the reasonableness standard described in ¶189. The training materials received no-objection notices from the IMT and the OAG during this reporting period. The CPD also provided course materials for its *Recruit Use of Force Training*, but the materials remained in the review process at the end of the seventh reporting period. None of the foregoing course materials cover the requirement to document an investigatory stop or an arrest when a firearm is pointed at a person to detain them—the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training materials do, but CPD did not provide attendance records for that course by the end of the reporting period.

The CPD demonstrated its TRR Supervisory Dashboard for the IMT during the sixth reporting period. According to TRED's *2021 Year-End Report*, "The information included in this dashboard should allow for Department supervisors to correct the action of individual members and also recommend specific training for their districts/units based on documented need."[31] To that end, the IMT hopes that the dashboard will be expanded in the future to include firearm pointing incidents. TRED's *2021 Year-End Report* contains extensive FPI data—detailed by beat and unit, weapons recovered, nature of the initial incident, foot pursuits, and FPIs reported in error, for example—that could be useful to supervisors in real time.

---

[30] TRED's *2022 Q1 Report* at 18 and 20 and TRED's *2022 Q2 Report* at 19 and 21.

[31] TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 95, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

In the seventh reporting period, we began to examine COPA data regarding unnecessary displays of a weapon as a potential additional source of information regarding firearm pointing incidents. We will seek clarity regarding COPA's data in the eighth reporting period.

The City and the CPD maintained Preliminary and Secondary compliance with ¶189 in the seventh reporting period and have continued to make progress toward Full compliance. TRED has done an excellent job of identifying patterns and trends at the citywide and local level. The IMT looks forward to continuing to monitor TRED's review of firearm pointing incidents that are not associated with arrest reports or ISRs, as well as TRED's continued identification of patterns and trends associated with those and all firearm pointing incidents. In particular, we appreciate TRED's identification of other reports in which pointing incidents have been documented when there is no associated ISR or arrest report, such as the Traffic Stop Statistical Study Card (blue card) or the General Offense Case Report, and we look forward to learning more about the additional steps that the CPD will take to ensure that firearm pointing incidents are properly documented. We also look forward to learning more about how the Supervisory Dashboard is used, monitoring the results of the CPD's ¶636 review of D19-01, and to the results of the Audit Division's review of TRED's debriefing procedures.

## Paragraph 189 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |

| SEVENTH REPORTING PERIOD | | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶190

> **190.** *Beginning July 1, 2019, CPD officers will, at a minimum, promptly after the incident is concluded, notify OEMC of investigatory stop or arrest occurrences in which a CPD officer points a firearm at a person in the course of effecting the seizure. The notification will identify which CPD beat(s) pointed a firearm at a person in the course of effecting the seizure. The City will ensure that OEMC data recording each such notification is electronically linked with CPD reports and body-worn camera recordings associated with the incident, and all are retained and readily accessible to the supervisor of each CPD beat(s) identified in the notification.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**     *Not in Compliance*

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶190.

To assess Preliminary compliance, the IMT reviewed the CPD's *Use of Force* policies—particularly Department Order D19-01, *Firearm Pointing Incidents*, effective November 1, 2019—and the OEMC's policies to ensure they address the requirements of ¶190. We also evaluated the CPD's efforts to obtain and address community engagement and input on the policy that addresses ¶190's requirements.

To assess Secondary compliance, we determined whether the CPD and the OEMC have sufficiently trained on their relevant policies. We also reviewed the number of officers who have completed *Use of Force* in-service training.

To assess Full compliance, the IMT will evaluate whether the CPD and the OEMC have sufficiently implemented their policies and training and to ensure that OEMC records for firearm pointing notifications are properly linked to Police Computer Aided Dispatch (PCAD) reports and body-worn camera videos. One way to assess whether the notifications are occurring would be to sample incidents that are likely to involve a firearm pointing but for which no pointing was reported (such as reports of a person with a firearm or shots fired that result in an arrest); similarly, body-worn camera videos will be reviewed to determine whether required notifications occur, and video is properly linked. Other sources of information would include TRED's various reported findings with respect to firearm pointing incidents (including policy violations, proportion of cases with associated body worn camera video, and the proportion of cases for which documentation is lacking (such as an arrest report or ISR). The IMT may also consider records from BIA, COPA, and the

City's Law Department concerning firearm pointing incidents that are not reported to the OEMC.

In the fifth reporting period, TRED began reviewing all FPIRs, including FPIRs that did not have an ISR or arrest report associated with the incident, which had been a longstanding IMT recommendation.

During the sixth and seventh reporting periods, the IMT reviewed TRED's quarterly and year-end reports.

TRED's *2021 Year-End Report* indicates that officers reported 3,005 individual firearm pointing incidents (FPIs) in 2021.[32] TRED reviewed 2,751 of those.[33] Because one incident may involve multiple beats reporting an FPI, these reports corresponded to 2,562 incidents.

In 2021, TRED made a recommendation for training in connection with 865 of the 3,005 reports (31%).[34] Another five reports were referred to COPA. TRED also made three referrals to the district or unit of occurrence for corrective and/or disciplinary action because an officer "was observed in a related TRR or FPIR pointing their firearm at a person and there was no notification to OEMC of a FPI by that member."

In the first quarter of 2022, TRED reviewed 734 FPIRs and made a recommendation for training in connection with 240 (32.7%).[35] In contrast, supervisors reported that they recognized a training opportunity and took corrective action at the time the incident occurred in only four instances.[36] In the second quarter of 2022, TRED reviewed 962 FPIRs and made a recommendation for training in connection with 280 (29.1%).[37] Supervisors did not report a single instance in which they recognized a training opportunity and took corrective action at the time the incident occurred.[38]

Paragraph 190 requires the City to ensure that OEMC data is linked with CPD reports and body-worn camera recordings, "and all are retained and readily accessible to the supervisor of each CPD beat(s) identified in the notification."

---

[32] TRED's *2021 Year-End Report*, Chicago Police Department (April 29, 2022) at 70, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

[33] *Id.* at 85. Elsewhere, the report states that TRED reviewed 2,748 FPI reports, *id.* at 70.

[34] *Id.* at 85.

[35] TRED's *2022 Q1 Report*, Chicago Police Department (August 16, 2022) at 18, https://home.chicagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf.

[36] *Id.* at 21.

[37] TRED's *2022 Q2 Report*, Chicago Police Department (November 22, 2022) at 19, https://home.chicagopolice.org/wp-content/uploads/Q2-2022-22Nov22.pdf.

[38] *Id.* at 22.

In 2021, body-worn camera video was available for 97% of reviews compared to 90% in 2020.[39] TRED reports that in the first and second quarters of 2022, body-worn camera video was available for 94.7%[40]and 94.1%[41] of reviews, respectively.

However, as in prior reporting periods, the majority of TRED's training recommendations in the seventh reporting period for firearm pointing addressed body-worn camera issues. In the first quarter of 2022, of the 269 training recommendations TRED made in connection with the 240 FPIRs, 236 (87.7%) were for improper body-worn camera usage.[42] In the second quarter of 2022, of the 309 training recommendations TRED made in connection with the 280 FPIRs, 277 (89.6%) were for improper body-worn camera usage.[43]

The IMT continues to appreciate the CPD's efforts to begin reviewing all firearm pointing incidents, including those not associated with an arrest or ISR. Because of how frequently they occur (508, or 17% of the total number of FPIRs in 2021), this review is critical to the credibility of the CPD's analysis of firearm pointing overall. In 2021, TRED referred 31 firearm pointing incidents that were not associated with an arrest or ISR (6%) to the Fourth Amendment Stop Review Unit for a final determination as to whether "there was a reporting deficiency."[44] TRED referred 10 (9%) and 20 (17%) firearm pointing incidents that were not associated with an arrest or ISR to the Fourth Amendment Stop Review Unit in the first and second quarters of 2022, respectively.[45]

In the seventh reporting period, we began to examine COPA data regarding unnecessary displays of a weapon as a potential additional source of information regarding firearm pointing incidents. We will seek clarity regarding COPA's data in the eighth reporting period.

With respect to ongoing training on firearm pointing, the CPD provided course materials for its *Carbine Operator Qualification and Annual Training* and *Annual Prescribed Weapon Qualification TASER Re-Certification and VirTra Simulation Exercise Training*, both of which cover the requirement to notify OEMC as required by D19-01 and ¶190. The training materials received no-objection notices from the IMT and the OAG during this reporting period. The CPD also provided course materials for its *Recruit Use of Force Training* in connection with ¶190, but the materials remained in the review process at the end of the seventh reporting period.

---

[39]  TRED's *2021 Year-End Report* at 87.
[40]  TRED's *2022 Q1 Report*, Chicago Police Department (August 16, 2022) at 13, https://home.chicagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf.
[41]  TRED's *2022 Q2 Report*, Chicago Police Department (November 22, 2022) at 14, https://home.chicagopolice.org/wp-content/uploads/Q2-2022-22Nov22.pdf.
[42]  TRED's *2022 Q1 Report* at 18.
[43]  TRED's *2022 Q2 Report* at 19.
[44]  TRED's *2021 Year-End Report* at 80.
[45]  TRED's *2022 Q1 Report* at 18 and 20 and TRED's *2022 Q2 Report* at 19 and 21.

The CPD did not provide attendance records for the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training by the end of the reporting period.

The CPD demonstrated its TRR Supervisory Dashboard for the IMT during the sixth reporting period. According to TRED's *2021 Year-End Report*, "The information included in this dashboard should allow for Department supervisors to correct the action of individual members and also recommend specific training for their districts/units based on documented need."[46] To that end, the IMT hopes that the dashboard will be expanded in the future to include firearm pointing incidents. TRED's *2021 Year-End Report* contains extensive FPI data—about beat and unit, weapons recovered, the nature of the initial incident, foot pursuits, and FPIs reported in error, for example—that could be useful to supervisors in real time.

The City and the CPD maintained Preliminary compliance with ¶190 since reaching it in the second reporting period.

During the seventh reporting period, the CPD indicated that it is in the process of reviewing D19-01; ¶636 requires the CPD to review each policy periodically (typically every two years) to "evaluate whether the policy provides effective guidance and direction to CPD members and is consistent with the requirements of this Agreement and current law." The CPD should consider revising D19-01 to address the issues identified in its data; as described in greater detail above, ongoing issues with body-worn camera usage and potential failures to report investigative stops suggest the need for more effective supervision of pointing incidents.

In the fourth reporting period, the City and the CPD achieved Secondary compliance because a sufficient number of CPD personnel received appropriate training as part of the 2020 *Use of Force* in-service training. As we have previously noted, the CPD's ability to achieve Full compliance will depend on its ability to account for all firearm pointing incidents and achieve greater compliance with body-worn camera use.

The IMT looks forward to continuing to monitor TRED's review of firearm pointing incidents that are not associated with arrest reports or ISRs, as well as TRED's continued identification of patterns and trends associated with those and all firearm pointing incidents. In particular, we appreciate TRED's identification of other reports in which pointing incidents have been documented when there is no associated ISR or arrest report, such as the Traffic Stop Statistical Study Card (blue card) or the General Offense Case Report, and we look forward to learning more about the additional steps that the CPD will take to ensure that firearm pointing incidents are properly documented. We also look forward to monitoring the results of the

---

[46] TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 95, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

CPD's ¶636 review of D19-01 and learning more about how the Supervisory Dashboard is used and whether it can be expanded to include FPI data. Going forward, the City and the CPD should continue to encourage and support front-line supervisors' efforts to identify, address, and document late activation of body-worn cameras.

### Paragraph 190 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶191

> **191.** *OEMC will notify an immediate supervisor of the identified beat(s) each time the pointing of a firearm is reported. Notified CPD supervisors will ensure that the investigatory stop or arrest documentation and the OEMC recordation of the pointing of a firearm are promptly reviewed in accordance with CPD policy. CPD supervisors will effectively supervise the CPD members under their command consistent with their obligations set forth in the Supervision section of this Agreement.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶191.

To assess Preliminary compliance, the IMT reviewed the CPD's *Use of Force* policies—particularly Department Order D19-01, *Firearm Pointing Incidents*, effective November 1, 2019—and the OEMC's relevant policies to ensure they address the requirements specified in ¶191. We also evaluated the CPD's efforts to obtain and address community engagement and input on the policy that addresses ¶191's requirements.

To assess Secondary compliance, we reviewed data and documentation to determine whether the CPD has trained a sufficient number of officers and whether officers understand the firearm pointing policies and procedures. We also reviewed supervisor-specific training.

To assess Full compliance, the IMT will evaluate whether the OEMC is making the required notifications and whether the CPD has sufficiently implemented its policy and training. Along with other sources of information, we will review TRED data on supervisor advisements and recommendations, which provide insight into whether supervisors are identifying deficiencies and training opportunities. We will also review a sample of firearm pointing incidents to assess whether supervisors respond appropriately.

The City and the CPD have maintained Preliminary compliance with ¶191 since reaching it in the second reporting period. In the fourth reporting period, the City and the CPD also made progress toward Secondary compliance with ¶191 via its 2020 Use of Force in-service training. We noted, however, that training specific to supervisors was still needed because TRED had reported that supervisors were

proactively taking action in only 5 percent of pointing incidents warranting action. The IMT also communicated to the CPD that further training on body-worn camera use was necessary for compliance with ¶191.

Additionally, in the fourth reporting period, we stated that the CPD should consider a process in which supervisors identify and record any issues with firearm pointing incidents shortly after review because the onus of enforcing the CPD's directives cannot and should not fall only on TRED.

We noted that during the fifth reporting period, TRED started to report how often supervisors indicated that they recognized a training opportunity and took corrective action at the time an incident occurs. TRED's *2021 Q4 Report* reported that there were zero instances of supervisors indicating that they recognized a training opportunity and took corrective action at the time an incident occurred (compared to eight and four in Q2 and Q3, respectively). In contrast, TRED made 225 recommendations regarding FPIRs in Q4.[47]

During the seventh reporting period, in the first quarter of 2022, TRED reviewed 734 FPIRs and made a recommendation for training in connection with 240 (32.7%).[48] In contrast, supervisors reported that they recognized a training opportunity and took corrective action at the time the incident occurred in only four instances.[49] In the second quarter of 2022, TRED reviewed 962 FPIRs and made a recommendation for training in connection with 280 (29.1%).[50] Supervisors did not report a single instance in which they recognized a training opportunity and took corrective action at the time the incident occurred.[51]

As in prior reporting periods, the majority of TRED's training recommendations in the seventh reporting period for firearm pointing incidents were for body-worn camera issues. In the first quarter of 2022, of the 269 training recommendations TRED made in connection with the 240 FPIRs, 236 (87.7%) were for improper body-worn camera usage.[52] In the second quarter of 2022, of the 309 training recommendations TRED made in connection with the 280 FPIRs, 277 (89.6%) were for improper body-worn camera usage.[53]

---

47    TRED's *2021 Q4 Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 21, https://home.chica-gopolice.org/wp-content/uploads/Q4-2021-FRD-Report.pdf.

48    TRED's *2022 Q1 Report*, CHICAGO POLICE DEPARTMENT (August 16, 2022) at 18, https://home.chi-cagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf.

49    *Id.* at 21.

50    TRED's *2022 Q2 Report*, CHICAGO POLICE DEPARTMENT (November 22, 2022) at 19, https://home.chicagopolice.org/wp-content/uploads/Q2-2022-22Nov22.pdf.

51    *Id.* at 22.

52    TRED's *2022 Q1 Report* at 18.

53    TRED's *2022 Q2 Report* at 19.

Significantly, the CPD revised the TRR-R to include a debriefing for supervisors who did not address a body-worn camera deficiency at the time of occurrence, and TRED began delivering this debriefing during the second quarter of 2022 (in a total of seven instances).[54] Although the new debriefing point is currently available only for use-of-force incidents—not firearm pointing incidents—we appreciate this effort to encourage supervisors to immediately correct body-worn camera issues and look forward to monitoring its progress.

The IMT continues to appreciate the CPD's efforts to begin reviewing all firearm pointing incidents, including those not associated with an arrest or ISR. Because of how frequently they occur (508, or 17% of the total number of FPIRs in 2021), this review is critical to the credibility of the CPD's analysis of firearm pointing overall. In 2021, TRED referred 31 firearm pointing incidents that were not associated with an arrest or ISR (6%) to the Fourth Amendment Stop Review Unit for a final determination as to whether "there was a reporting deficiency."[55] TRED referred 10 (9%) and 20 (17%) firearm pointing incidents that were not associated with an arrest or ISR to the Fourth Amendment Stop Review Unit in the first and second quarters of 2022, respectively.[56]

In the seventh reporting period, we began to examine COPA data regarding unnecessary displays of a weapon as a potential additional source of information regarding firearm pointing incidents. We will seek clarity regarding COPA's data in the eighth reporting period.

During the seventh reporting period, the CPD indicated that it is in the process of reviewing D19-01; ¶636 requires the CPD to review each policy periodically (typically every two years) to "evaluate whether the policy provides effective guidance and direction to CPD members and is consistent with the requirements of this Agreement and current law." The CPD should consider revising D19-01 to address the issues identified in its data; as described in greater detail above, ongoing issues with body-worn camera usage and potential failures to report investigative stops suggest the need for more effective supervision of pointing incidents.

With respect to ongoing training on firearm pointing, the CPD provided attendance records for its *2022 In-Service Supervisor Training*, showing that 97.55% of participants completed the course by December 5, 2022. However, the CPD did not provide attendance records for the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training by the end of the reporting period. In addition, we

---

[54] TRED's *2022 Q2 Report* at 24.

[55] TRED's *2021 Year-End Report*, Chicago Police Department (April 29, 2022) at 80, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

[56] TRED's *2022 Q1 Report* at 18 and 20 and TRED's *2022 Q2 Report* at 19 and 21.

have asked the CPD for evidence that firearm pointing incidents are covered in its pre-service training for supervisors.

The CPD demonstrated its TRR Supervisory Dashboard for the IMT during the sixth reporting period. According to TRED's *2021 Year-End Report*, "The information included in this dashboard should allow for Department supervisors to correct the action of individual members and also recommend specific training for their districts/units based on documented need."[57] To that end, the IMT hopes that the dashboard will be expanded in the future to include firearm pointing incidents. TRED's *2021 Year-End Report* contains extensive FPI data—about beat and unit, weapons recovered, the nature of the initial incident, foot pursuits, and FPIs reported in error, for example—that could be useful to supervisors in real time.

During the seventh reporting period, the IMT learned through interviews with supervisors that they do not understand their duties to include reviewing body-worn camera footage of firearm pointing incidents.

The City and the CPD maintained Preliminary compliance with ¶191 in the seventh reporting period. The CPD provided evidence that a sufficient number of supervisors completed the *2022 In-Service Supervisor Training*, but based on the data from TRED's reports, further training is necessary to encourage front-line supervisors to take on a greater responsibility for identifying issues and training opportunities, and taking corrective action, at the time that a firearm pointing incident occurs. In particular, the IMT looks forward to learning more about the training and instructions the CPD will provide in connection with the Supervisory Dashboard and how the dashboard is used. We also look forward to monitoring the results of the CPD's ¶636 review of D19-01.

### Paragraph 191 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 − DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

---

[57] TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 95, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

# Use of Force: ¶192

*192. A designated unit at the CPD headquarters level will routinely review and audit documentation and information collected from all investigatory stop and arrest occurrences in which a CPD officer pointed a firearm at a person in the course of effecting a seizure. The review and audit will be completed within 30 days of each such occurrence. This review and audit will: a. identify whether the pointing of the firearm at a person allegedly violated CPD policy; b. identify any patterns in such occurrences and, to the extent necessary, ensure that any concerns are addressed; and c. identify any tactical, equipment, training, or policy concerns and, to the extent necessary, ensure that the concerns are addressed. The designated unit at the CPD headquarters level will, where applicable, make appropriate referrals for misconduct investigations or other corrective actions for alleged violations of CPD policy. At the completion of each review and audit, the designated unit at the CPD headquarters level will issue a written notification of its findings and, if applicable, any other appropriate actions taken or required to an immediate supervisor as described above.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**     Ongoing                    ☐ **Met**   ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶192. Due to deployments, staff attrition, and insufficient resources, however, TRED did not meet the 30-day review deadline during the seventh reporting period.

To assess Preliminary compliance, the IMT reviewed the CPD's Use of Force policies—particularly Department Order D19-01, *Firearm Pointing Incidents*, effective November 1, 2019—to ensure they address the requirements specified in ¶192.

To assess Secondary compliance, we reviewed the CPD's training regarding its firearm pointing incident policy and procedures for TRED, and determined whether a sufficient number of officers have completed the training.

To assess Full compliance, the IMT evaluates training, community, and data sources, including footage from body-worn cameras, firearm-pointing data, and TRED review schedules and TRED review completion records to determine

whether the CPD has sufficiently implemented its policy and training. We also examine whether concerns are adequately identified (both detected and evaluated), and whether the processes in place "ensure that concerns are addressed" at both the organizational and individual level.

The City and the CPD have maintained Preliminary compliance with ¶192 since reaching it in the second reporting period.

During the seventh reporting period, the CPD indicated that it is in the process of reviewing D19-01; ¶636 requires the CPD to review each policy periodically (typically every two years) to "evaluate whether the policy provides effective guidance and direction to CPD members and is consistent with the requirements of this Agreement and current law." The CPD should consider revising D19-01 to address the issues identified in TRED's data. As described below, ongoing issues with body-worn camera usage and potential failures to report investigative stops suggest the need for more effective supervision of pointing incidents.

In the fourth reporting period, the City and the CPD achieved Secondary compliance with ¶192 via the CPD's 2020 Use of Force in-service training and training that it delivered to TRED staff. We noted that the CPD also made progress toward Full compliance in the fourth and fifth reporting periods. In the fifth reporting period, however, we cautioned that TRED requires additional personnel in order to meet its 30-day deadline for firearm pointing incident reviews.

In the sixth and seventh reporting periods, the IMT reviewed TRED quarterly and year-end reports. The IMT also attended virtual site visits and monthly meetings with TRED's leadership. The reports and visits reveal that TRED made the following progress in the required areas for ¶192:

1. *Complete the review and audit within 30 days of each occurrence.* Despite TRED's best efforts, it is no longer able to meet the 30-day deadline for all firearm pointing incident reviews because of deployments, staff attrition, and insufficient resources.[58]

2. *Identify whether the pointing of the firearm at a person allegedly violated policy*. TRED reported just five referrals to COPA in all of 2021, and none so far in 2022. The most common recommendations for TRED Firearm Pointing Reviews continue to be related to body-worn camera use.

3. *Identify any patterns and ensure such concerns are addressed*. The IMT continues to appreciate the CPD's efforts to review all firearm pointing incidents, including those not associated with an arrest or ISR. Because of how frequently

---

[58] TRED's *2022 Q2 Report*, Chicago Police Department (November 22, 2022) at 13 ("TRED was not able to review all FPIRs within 30 days due to staffing shortages."), https://home.chicagopolice.org/wp-content/uploads/Q2-2022-22Nov22.pdf.

they occur (508, or 17% of the total number of FPIRs in 2021), this review is critical to the credibility of the CPD's analysis of firearm pointing overall. In 2021, TRED referred 31 firearm pointing incidents that were not associated with an arrest or ISR (6%) to the Fourth Amendment Stop Review Unit for a final determination as to whether "there was a reporting deficiency."[59] TRED referred 10 (9%) and 20 (17%) firearm pointing incidents that were not associated with an arrest or ISR to the Fourth Amendment Stop Review Unit in the first and second quarters of 2022, respectively.[60]

4. *Identify tactical, equipment, training, or policy concerns and to the extent necessary ensure that the concerns are addressed*. As in prior reporting periods, the majority of TRED's training recommendations in the seventh reporting period for firearm pointing incidents were for body-worn camera issues. In the first quarter of 2022, of the 269 training recommendations TRED made in connection with the 240 FPIRs, 236 (87.7%) were for improper body-worn camera usage.[61] In the second quarter of 2022, of the 309 training recommendations TRED made in connection with the 280 FPIRs, 277 (89.6%) were for improper body-worn camera usage.[62] In its *2021 Q4 Report*, TRED stated that it requested and was granted access to re-enroll officers in a *Body Worn Camera E-Learning* module, which it intended to begin implementing during the second quarter of 2022. We look forward to learning more about this promising development. In addition, we note that there is a mechanism in place to track TRED's recommendations to individual beats. When TRED makes a recommendation on a FPIR, it is assigned to a supervisor to debrief the involved beat. TRED reports that 78.8% (189) of its recommendations for incidents in the first quarter of 2022 were debriefed and closed out by the unit of assignment, and that 21.3% (51) were "still pending the completion of recommended training, debriefing, or the approval thereof by the involved beat's unit of assignment."[63] For the second quarter of 2022, 58.2% (163) of TRED's recommendations were debriefed and closed out by the unit of assignment, with 41.8% (117) "still pending the completion of recommended training, debriefing, or the approval thereof by the involved beat's unit of assignment."[64]

In addition, TRED's *2021 Q4 Report* reported that there were zero instances of supervisors indicating that they recognized a training opportunity and took corrective action at the time an incident occurred (compared to eight and four in Q2 and

---

[59] TRED's *2021 Year-End Report*, Chicago Police Department (April 29, 2022) at 80, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

[60] TRED's *2022 Q1 Report*, Chicago Police Department (August 16, 2022) at 18 and 20, https://home.chicagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf, TRED's *2022 Q2 Report* at 19 and 21.

[61] TRED's *2022 Q1 Report* at. 18.

[62] TRED's *2022 Q2 Report* at 19.

[63] TRED's *2022 Q1 Report* at 21.

[64] TRED's *2022 Q2 Report* at 22.

Q3, respectively). In contrast, TRED made 225 recommendations regarding FPIRs in Q4.[65] The IMT observed refresher training for supervisors during the sixth reporting period that emphasized the need for front-line supervisors to identify, address, and document body-worn camera issues, but TRED's statistics suggest that more can and should be done.

During the seventh reporting period, in the first quarter of 2022, TRED reviewed 734 FPIRs and made a recommendation for training in connection with 240 (32.7%).[66] In contrast, supervisors reported that they recognized a training opportunity and took corrective action at the time the incident occurred in only four instances.[67] In the second quarter of 2022, TRED reviewed 962 FPIRs and made a recommendation for training in connection with 280 (29.1%).[68] Supervisors did not report a single instance in which they recognized a training opportunity and took corrective action at the time the incident occurred.[69]

In the seventh reporting period, TRED added a debriefing point to the TRR-R for supervisors who did not address a body-worn camera deficiency at the time of occurrence.[70] Although the new debriefing point is currently available only for use-of-force incidents—not firearm pointing incidents—we hope the new debriefing point encourages supervisors to immediately correct body-worn camera issues.

The CPD demonstrated its TRR Supervisory Dashboard for the IMT during the sixth reporting period. According to TRED's *2021 Year-End Report*, "The information included in this dashboard should allow for Department supervisors to correct the action of individual members and also recommend specific training for their districts/units based on documented need."[71] To that end, the IMT hopes that the dashboard will be expanded in the future to include firearm pointing incidents. TRED's *2021 Year-End Report* contains extensive FPI data—about beat and unit, weapons recovered, the nature of the initial incident, foot pursuits, and FPIs reported in error, for example—that could be useful to supervisors in real time.

---

[65]  TRED's *2021 Q4 Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 21, https://home.chicagopolice.org/wp-content/uploads/Q4-2021-FRD-Report.pdf.

[66]  TRED's *2022 Q1 Report*, CHICAGO POLICE DEPARTMENT (August 16, 2022) at 18, https://home.chicagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf.

[67]  *Id.* at 21.

[68]  TRED's *2022 Q2 Report*, CHICAGO POLICE DEPARTMENT (November 22, 2022) at 19, https://home.chicagopolice.org/wp-content/uploads/Q2-2022-22Nov22.pdf.

[69]  *Id.* at 22.

[70]  *Id.* at 24.

[71]  TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 95, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

In the seventh reporting period, we began to examine COPA data regarding unnecessary displays of a weapon as a potential additional source of information regarding firearm pointing incidents. We will seek clarity regarding COPA's data in the eighth reporting period.

The City and the CPD maintained Secondary compliance with ¶192 in the seventh reporting period.

We appreciate TRED's continued work addressing most of the requirements of ¶192, but it requires additional personnel in order to meet its 30-day deadline for firearm pointing incident reviews. We urge the City and the CPD to sufficiently staff TRED and to stop deploying its personnel.

We will continue to monitor TRED's review of firearm pointing incidents that are not associated with arrest reports or ISRs, as well as TRED's continued identification of patterns and trends associated with those and all firearm pointing incidents.

In addition, as TRED's data continues to show, front-line supervisors are not yet identifying or addressing deficiencies in pointing incidents at an effective rate. The CPD provided evidence that a sufficient number of supervisors completed the *2022 In-Service Supervisor Training*, but based on the data from TRED's reports further training is necessary to encourage front-line supervisors to take on a greater responsibility for identifying issues and training opportunities, and taking corrective action, at the time that a firearm pointing incident occurs. The IMT stresses that front line supervisors are crucial to this reform process. They must hold officers accountable and provide proper supervision, guidance, and correction consistently. In particular, the IMT looks to learn more about the training and instructions the CPD will provide in connection with the Supervisory Dashboard and how the dashboard is used. We also look forward to monitoring the results of the CPD's ¶636 review of D19-01.

### Paragraph 192 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶193

**193.** *CPD will ensure that the designated unit at the CPD headquarters level responsible for performing the duties required by this Part has sufficient resources to perform them, including staff with sufficient experience, rank, knowledge, and expertise.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶193.

To assess Preliminary compliance, the IMT reviewed the CPD's Use of Force policies to ensure they address the requirements specified in ¶193.

To assess Secondary compliance, we reviewed the CPD's training regarding its firearm pointing incident policy and procedures for TRED, and determined whether a sufficient number of officers have completed the training.

To assess Full compliance, the IMT evaluated whether the CPD has sufficiently implemented its policy and training, including a review of TRED quarterly reports and data on TRED staffing levels and expertise to assess the capacities and capabilities of the TRED. The IMT also monitors TRED training and whether the TRED's firearm pointing review unit has sufficient personnel to address their workload and consistently meet the 30-day review deadline. The IMT also reviewed a sample of pointing incidents to determine whether policy has been complied with and accurately categorized.

The City and the CPD have maintained Preliminary compliance with ¶193 since reaching it in the second reporting period. The City and the CPD achieved Secondary compliance in the third reporting period and maintained it through the fifth reporting period before losing it in the sixth reporting period due to staff shortages.

In the fourth reporting period, TRED continued to demonstrate its commitment to ensuring its staff have sufficient knowledge and expertise through continued in-service training. With respect to Full compliance, we noted during our site visit in the fourth reporting period that TRED was understaffed by at least 13 officers.

In the fifth reporting period, the CPD indicated its intent to expand the responsibilities of TRED to include search warrants and committed to allowing the IMT to

review the changes and criteria for staffing the unit in light of the added responsibilities. We noted then that TRED was understaffed even for its current scope of responsibilities and had been missing its 30-day firearm pointing incident review deadline and accumulating a backlog for its review of TRRs.

During the seventh reporting period, TRED staff received 44 hours of training to perform their responsibilities over and above the 40 hours of annual in-service training that all officers receive (28 hours in Q1 and 16 hours in Q2 of 2022).[72]

The IMT continues to appreciate TRED's efforts to begin reviewing all firearm pointing incidents, including those not associated with an arrest or ISR. Because of how frequently they occur (508, or 17% of the total number of FPIRs in 2021), this review is critical to the credibility of the CPD's analysis of firearm pointing overall. TRED continues to provide the CPD with an extremely valuable service, and given sufficient resources, could do even more.

Soon, TRED will be responsible for reviewing all foot pursuits and for reviewing search warrants. However, even as the CPD continues to increase TRED's responsibilities, the CPD is failing to provide TRED with sufficient officers and supervisors to shoulder its existing workload. The CPD's continued practice of deploying TRED staff compounds this problem.

TRED's staffing levels continued to decline in the seventh reporting period; TRED maintained one lieutenant and six sergeants, but went from 36 officers in the sixth reporting period to 34 by the second quarter of 2022.[73] By December 15, 2022, TRED had only 32 officers but had gained a commander and a sergeant. During that time, TRED was initially budgeted for 48 officers, which was reduced to 46 officers by October 20, 2022. More than a year after selecting five officers for assignment to TRED, TRED was still waiting for CPD leadership to permit the assignment of the officers.

As we noted in the fifth reporting period, TRED was using voluntary overtime to avoid a significant backlog. TRED's backlog began increasing at an accelerating pace during the sixth reporting period. CPD's practice of deploying TRED personnel would continue to disrupt TRED's operations, in part because overworked staff would be less likely to take on voluntary overtime. By the end of the sixth reporting period, TRED was no longer meeting its 30-day deadline for firearm pointing incident reviews, and its backlog continued to grow in the seventh reporting period.

---

[72] TRED's *2022 Q1 Report*, Chicago Police Department (August 16, 2022) at 1, https://home.chicagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf; TRED's *2022 Q2 Report*, Chicago Police Department (November 22, 2022) at 1, https://home.chicagopolice.org/wp-content/uploads/Q2-2022-22Nov22.pdf.

[73] TRED's *2022 Q2 Report* at 1.

We were told that the Superintendent gave verbal approval to stop "normal" deployments of TRED personnel in the fall of 2022, but we were also told that TRED could continue to be deployed as-needed for big events (such as the Chicago marathon or for New Year's Eve).

In addition to the strain that deployments place on TRED's ability to meet its workload, deploying members of TRED to meet patrol needs risks undercutting TRED's credibility if it must review its own personnel's uses of force. We have repeatedly raised this serious concern with CPD leadership.

Because of the severity of TRED's lack of resources—and in spite of TRED's best efforts—we find that although TRED continues to train its staff, TRED no longer has enough trained staff to perform its duties. Therefore, the City and the CPD have not regained Secondary compliance in the seventh reporting period.

In conclusion, because the CPD has not sufficiently staffed TRED—even according to its budgeted positions—and the CPD continues to deploy TRED personnel, the City and the CPD are failing to provide TRED with sufficient resources to fulfill all of TRED's duties under the Consent Decree. On top of that, TRED is in the process of taking on additional responsibilities for the CPD. The professionalism and expertise of TRED personnel, along with the extensive training that they receive, simply cannot make up for the fact that TRED requires additional personnel in order to meet its 30-day deadline for firearm pointing incident reviews and to take on its new duties.

### Paragraph 193 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Use of Force: ¶194

> **194.** *CPD officers will not be required to notify OEMC of the pointing of a firearm at a person when the CPD officer is a SWAT Team Officer responding to a designated SWAT incident, as defined in CPD Special Order S05-05, or an officer assigned to a federal task force during the execution of federal task force duties.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (NEW) |
| **Sustainment Period Ends** | *December 31, 2024* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance and achieved Full compliance with ¶194.

To assess Preliminary compliance, the IMT reviewed the CPD's *Use of Force* policies to ensure they address the requirements specified in ¶194.

To assess Secondary compliance, we reviewed the CPD's training regarding its firearm pointing incident policy and procedures for TRED, and determined whether a sufficient number of officers have completed the training.

To assess Full compliance, the IMT evaluated whether the CPD has sufficiently implemented its policy and training, including whether notifications that are not required are tracked and if ¶194's exemptions to the general firearm pointing reporting requirements result in complaints or other issues. As we continue to monitor Full compliance, sources of information may include OEMC data, TRED reports, and news reports.

The City and the CPD have maintained Preliminary compliance with ¶194 since reaching it in the third reporting period. In the fourth reporting period, the City and the CPD achieved Secondary compliance with ¶194 via the CPD's 2020 *Use of Force* in-service training.

In the fifth reporting period, the CPD's TRED provided a letter to the IMT dated December 16, 2021, that stated that TRED "found no Firearm Pointing Incidents that were erroneously reported by Department Members assigned to SWAT team member assigned to a SWAT incident as defined in Department Special Order: S05-05-Special Weapons and Tactics (SWAT) Incidents." TRED did not separately address whether any such exempted notifications were made by an officer assigned to a federal task force during the execution of federal task force duties.

The CPD indicated that beginning in 2022, TRED would begin documenting whether any exempted firearm pointing notifications occur in its quarterly reports.

In our fifth semi-annual report, the IMT recommended that the CPD consider whether to continue to exempt SWAT from its general firearm pointing reporting requirements.

TRED's *2021 Year-End Report* indicates that there was one instance in 2021 in which a SWAT team member reported an FPI during a SWAT incident despite the exception to the notification requirement.[74] The report also indicates that there were no instances of a member assigned to a federal task force reporting an FPI.

TRED's reports from the first and second quarters of 2022 do not state whether any exempted firearm pointing notifications occurred.

During the seventh reporting period, the CPD indicated that it is in the process of reviewing D19-01, *Firearm Pointing Incidents*; ¶636 requires the CPD to review each policy periodically (typically every two years) to "evaluate whether the policy provides effective guidance and direction to CPD members and is consistent with the requirements of this Agreement and current law."

The CPD also responded to record requests from the IMT regarding how many exempted firearm pointing notifications had occurred since the start of the Consent Decree. According to the CPD, since the effective date of D19-01 (November 1, 2019), there has been only one instance in which a SWAT team member erroneously reported an FPI through April 21, 2022, and there have been no instances of a member assigned to a federal task force reporting an FPI through April 21, 2021.

The City and the CPD maintained Preliminary and Secondary compliance and achieved Full compliance with ¶194 in the seventh reporting period.

The IMT will continue to monitor information about whether exempted notifications are occurring in future reporting periods. In addition, the IMT will explore further whether the exemptions will remain viable in light of the expansion of TRED's role to cover review of search warrants.

---

[74]  TRED's *Year-End Report*, Chicago Police Department (April 29, 2022) at 78, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

## Paragraph 194 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Full

# Use of Force: ¶195

> **195.** *CPD officers will not be required to notify OEMC of any un-holstering or display of a firearm or having a firearm in a "low ready" position during the course of an investigation, unless the firearm is pointed at a person.*

### Compliance Progress        (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**          *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**          *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**                  *In Compliance* (SIXTH REPORTING PERIOD)
**Sustainment Period Ends**     *June 30, 2024*

In the seventh reporting period, the City and the CPD maintained Full compliance with ¶195.

To assess Preliminary compliance, the IMT reviewed the CPD's *Use of Force* policies—particularly Department Order D19-01, *Firearm Pointing Incidents*, effective November 1, 2019—to ensure they address the requirements specified in ¶195.

To assess Secondary compliance, we reviewed the CPD's training regarding its firearm pointing incident policy and procedures for TRED, and determined whether a sufficient number of officers have completed the training.

To assess Full compliance, the IMT evaluated whether the CPD has sufficiently implemented its policy and training, including whether notifications that are not required are tracked and if ¶195's exemptions to the general firearm pointing reporting requirements result in complaints or other issues.

The City and the CPD have maintained Preliminary compliance with ¶195 since reaching it in the third reporting period. In the fourth reporting period, the City and the CPD achieved Secondary compliance with ¶195 via the CPD's 2020 Use of Force in-service training.

In the fifth reporting period, the CPD indicated that beginning in 2022, TRED would begin documenting in its quarterly reports whether any "erroneous" firearm pointing notifications occur.

During the sixth reporting period, the IMT reviewed TRED's quarterly and annual reports. TRED's *2021 Year-End Report* indicates that officers reported 3,005 individual firearm pointing incidents (FPIs) in 2021.[75] TRED reviewed 2,751 of those.[76]

---

[75] TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 70, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

[76] *Id.* at 85. Elsewhere, the report states that TRED reviewed 2,748 FPI reports. *See id.* at 70.

TRED made no recommendations for training in connection with 1881 (68%) of those reports and made a recommendation for training in connection with 865 (31%).[77] Another five reports were referred to COPA. TRED also made three referrals to the district or unit of occurrence for corrective and/or disciplinary action because an officer "was observed in a related TRR or FPIR pointing their firearm at a person and there was no notification to OEMC of a FPI by that member."[78]

In comparison, in 2021, there were five instances where an officer reported a firearm pointing incident when TRED only observed the firearm in a low-ready position.[79] In addition, there were three instances where an officer reported an FPI after pointing a Taser at a person.

During the seventh reporting period, the CPD also responded to a record request from the IMT regarding how times an officer made a firearm pointing notification when they were at the low-ready position since the start of the Consent Decree. According to the CPD, between November 1, 2019 (the effective date of D19-01) and April 21, 2021, there were only five instances such instances.

We appreciate that TRED began publicly reporting the number of "erroneous" firearm pointing incident reports in its *2021 Year-End Report*, but note that TRED's reports from the first and second quarters of 2022 do not state whether any exempted firearm pointing notifications occurred. Nevertheless, the infrequency with which such reports occur—coupled with TRED's ability to address such incidents—demonstrates that officers and supervisors are well aware that CPD's firearm pointing policy does not require a notification to OEMC of a mere "unholstering or display of a firearm or having a firearm in a 'low ready' position," ¶195. Therefore, we found that City and the CPD met Full compliance with ¶195 in the sixth reporting period and maintained it in the seventh reporting period.

With respect to ongoing training on firearm pointing reporting, in the sixth reporting period, the IMT reviewed and provided a no-objection notice for training materials for the CPD's *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training, and observed a session of that training. The CPD did not provide attendance records for the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training by the end of the seventh reporting period.

The City and the CPD maintained Full compliance with ¶195 in the seventh reporting period.

The IMT will continue to review information in TRED's reports about whether notifications are occurring that are not required by ¶195.

---

[77] *Id.* at 85.
[78] *Id.* at 70.
[79] *Id.* at 78.

## Paragraph 195 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Full |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| Full |

# Use of Force: ¶196

*196. The City will ensure that all documentation and recordation of investigatory stop or arrest occurrences in which a CPD member points a firearm at a person, including OEMC data, is maintained in a manner that allows the Monitor, CPD, and OAG to review and analyze such occurrences. Beginning January 1, 2020, the Monitor will analyze these occurrences on an annual basis to assess whether changes to CPD policy, training, practice, or supervision are necessary, and to recommend any changes to the process of documenting, reviewing, and analyzing these occurrences. CPD will either adopt the Monitor's recommendations or respond in writing within 30 days. Any dispute regarding the whether the Monitor's recommendations should be implemented will be resolved by the Court.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**     Ongoing               ☐ **Met**  ☑ **Missed**

**Preliminary:**     *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**      *In Compliance* (THIRD REPORTING PERIOD)
**Full:**          *Not in Compliance*

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶196.

Paragraph 196—along with a few other paragraphs in the Consent Decree—is written to highlight the IMT's actions or reviews but ultimately relates to City responsibilities.

To assess Preliminary compliance, the IMT reviewed the CPD's *Use of Force* policies—particularly Department Order D19-01, *Firearm Pointing Incidents*, effective November 1, 2019—to ensure they address the requirements specified in ¶196.

To assess Secondary compliance, we reviewed the CPD's training regarding its firearm pointing incident policy and procedures for TRED, and determined whether a sufficient number of officers have completed the training.

To assess Full compliance, the IMT evaluated whether the CPD has sufficiently implemented its policy and training, including following practices for maintaining and reviewing documentation, recordation, and data regarding firearm pointing incidents. We also evaluated whether the CPD produces data that allows the IMT to identify patterns and trends at the district, shift, and beat level in a timely fashion

for all current pointing incidents (including those not associated with an ISR or arrest report) and how the CPD responds to recommendations regarding trends and patterns.

The City and the CPD have maintained Preliminary and Secondary compliance with ¶196 since reaching those levels in the second and third reporting periods, respectively.

In the fourth reporting period, the IMT noted our longstanding recommendation for the CPD to review all firearm pointing incidents, including those that did not have an associated ISR or arrest report. We also discussed our recommended revisions to the dashboards to include detailed data at the beat level, allowing for identification of geographic areas with high levels of firearm pointing incidents. We explained that capturing and analyzing data at the beat level will enable the CPD to identify patterns and trends that may be rectified through, for example, training or increased supervisor engagement. We also noted that the CPD was planning to conduct an audit to assess the effectiveness of debriefings.

During the fifth reporting period, TRED began reviewing all FPIRs, including FPIRs that did not have an ISR or arrest report associated with the incident, which had been a longstanding IMT recommendation. We appreciate the effort. We noted, however, that TRED required additional personnel in order to meet its 30-day deadline for firearm pointing incident reviews.

We also noted that we looked forward to reviewing the CPD's ongoing efforts to address our recommendations, including the CPD's plan to introduce a Supervisory Dashboard to enable and encourage field supervisors to take on a greater responsibility for identifying issues and training opportunities, and taking corrective action, at the time that a firearm pointing incident occurs.

During the fifth reporting period, TRED started to report how often supervisors indicated that they recognized a training opportunity and took corrective action at the time an incident occurs. TRED's *2021 Q4 Report* reported that there were zero instances of supervisors indicating that they recognized a training opportunity and took corrective action at the time an incident occurred (compared to eight and four in Q2 and Q3, respectively). In contrast, TRED made 225 recommendations regarding FPIRs in Q4.[80]

During the seventh reporting period, in the first quarter of 2022, TRED reviewed 734 FPIRs and made a recommendation for training in connection with 240

---

[80]  TRED's *2021 Q4 Report*, Chicago Police Department (April 29, 2022) at 21, https://home.chicagopolice.org/wp-content/uploads/Q4-2021-FRD-Report.pdf.

(32.7%).[81] In contrast, supervisors reported that they recognized a training opportunity and took corrective action at the time the incident occurred in only four instances.[82] In the second quarter of 2022, TRED reviewed 962 FPIRs and made a recommendation for training in connection with 280 (29.1%).[83] Supervisors did not report a single instance in which they recognized a training opportunity and took corrective action at the time the incident occurred.

During the seventh reporting period, the IMT learned through interviews with supervisors that they do not understand their duties to include reviewing body-worn camera footage of firearm pointing incidents.

During the sixth and seventh reporting periods, the IMT reviewed TRED's quarterly and year-end reports. TRED's *2021 Year-End Report* indicates that TRED made a recommendation for training in connection with 865 of the 3,005 firearm pointing incident reports made in 2021 (31%) and made no recommendations for training in connection with 1881 (68%).[84]

As in prior reporting periods, the majority of TRED's training recommendations in the seventh reporting period for firearm pointing incidents were for body-worn camera issues. In the first quarter of 2022, of the 269 training recommendations TRED made in connection with the 240 FPIRs, 236 (87.7%) were for improper body-worn camera usage.[85] In the second quarter of 2022, of the 309 training recommendations TRED made in connection with the 280 FPIRs, 277 (89.6%) were for improper body-worn camera usage.[86] In its *2021 Q4 Report*, TRED stated that it requested and was granted access to re-enroll officers in a *Body Worn Camera E-Learning* module, which it intended to begin implementing during the second quarter of 2022. We look forward to learning more about this promising development. The IMT also observed refresher training for supervisors during the sixth reporting period that emphasized the need for front-line supervisors to identify, address, and document body-worn camera issues, but TRED's statistics suggest that more can and should be done.

In the seventh reporting period, TRED added a debriefing point to the TRR-R for supervisors who did not address a body-worn camera deficiency at the time of occurrence.[87] Although the new debriefing point is currently available only for use-

---

[81]    TRED's *2022 Q1 Report*, CHICAGO POLICE DEPARTMENT (August 16, 2022) at 18, https://home.chicagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf.

[82]    *Id.* at 21.

[83]    TRED's *2022 Q2 Report*, CHICAGO POLICE DEPARTMENT (November 22, 2022) at 19, https://home.chicagopolice.org/wp-content/uploads/Q2-2022-22Nov22.pdf.

[84]    TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 85, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

[85]    TRED's *2022 Q1 Report* at 18.

[86]    TRED's *2022 Q2 Report* at 19.

[87]    *Id.* at 24.

of-force incidents—not firearm pointing incidents—we hope the new debriefing point encourages supervisors to immediately correct body-worn camera issues.

The IMT continues to appreciate the CPD's efforts to begin reviewing all firearm pointing incidents, including those not associated with an arrest or ISR. Because of how frequently they occur (508, or 17% of the total number of FPIRs in 2021), this review is critical to the credibility of the CPD's analysis of firearm pointing overall. In 2021, TRED referred 31 firearm pointing incidents that were not associated with an arrest or ISR (6%) to the Fourth Amendment Stop Review Unit for a final determination as to whether "there was a reporting deficiency."[88] TRED referred 10 (9%) and 20 (17%) firearm pointing incidents that were not associated with an arrest or ISR to the Fourth Amendment Stop Review Unit in the first and second quarters of 2022, respectively.[89]

The CPD demonstrated its TRR Supervisory Dashboard for the IMT during the sixth reporting period. According to TRED's *2021 Year-End Report*, "The information included in this dashboard should allow for Department supervisors to correct the action of individual members and also recommend specific training for their districts/units based on documented need."[90] To that end, the IMT hopes that the dashboard will be expanded in the future to include firearm pointing incidents. TRED's *2021 Year-End Report* contains extensive FPI data—about beat and unit, weapons recovered, the nature of the initial incident, foot pursuits, and FPIs reported in error, for example—that could be useful to supervisors in real time.

During the seventh reporting period, the CPD indicated that it is in the process of reviewing D19-01; ¶636 requires the CPD to review each policy periodically (typically every two years) to "evaluate whether the policy provides effective guidance and direction to CPD members and is consistent with the requirements of this Agreement and current law." The CPD should consider revising D19-01 to address the issues identified in TRED's data. As described above, ongoing issues with body-worn camera usage and potential failures to report investigative stops suggest the need for more effective supervision of pointing incidents.

The City and the CPD maintained Preliminary and Secondary compliance with ¶196 in the seventh reporting period. The IMT will continue to monitor TRED's review of firearm pointing incidents that are not associated with arrest reports or ISRs, as well as TRED's continued identification of patterns and trends associated with those and all firearm pointing incidents. We also look forward to learning

---

[88] *Id.* at 80.

[89] TRED's *2022 Q1 Report* at 18 and 20 and TRED's *2022 Q2 Report* at 19 and 21.

[90] TRED's *2021 Year-End Report*, Chicago Police Department (April 29, 2022) at 95, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

more about how the Supervisory Dashboard is used, and whether it can be expanded to include FPI data.

Going forward, the City and the CPD should continue to encourage and support front-line supervisors' efforts to identify, address, and document issues with FPIs. The CPD provided attendance records for its *2022 In-Service Supervisor Training*, showing that 97.55% of participants completed the course by December 5, 2022. Based on the data from TRED's reports, however, further training is necessary to encourage front-line supervisors to take on a greater responsibility for identifying issues and training opportunities, and taking corrective action, at the time that a firearm pointing incident occurs. For instance, we have asked the CPD for evidence that firearm pointing incidents are covered in its pre-service training for supervisors. The City and the CPD will lose Secondary compliance if the need for further training is not addressed.

Finally, the CPD's Audit Division has indicated that it plans to initiate a review of TRED's debriefing procedures during 2022; we await further updates as well as the Audit Division's findings.

### Paragraph 196 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| Secondary |

# Use of Force: ¶197

> **197.** *CPD will continue to require that only officers who are currently certified may be issued, carry, and use Tasers.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**          *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**          *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**          *Under Assessment*

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with and remained under assessment for Full compliance with ¶197.

To assess Preliminary compliance with ¶197, the IMT reviewed the CPD's policies that reflect the requirements of the Consent Decree, including Uniform and Property U04-02-02, *Control Devices and Instruments*, General Order G03-02-04, *Taser Use Incidents*, and Special Order S11-03-01, *Annual Prescribed Weapon Qualification Program and Taser Recertification*.

During the sixth reporting period, the CPD continued to meet with the Coalition to revise G03-02-04, its *Taser Use Incidents* policy. On the final day of the reporting period, the CPD provided the IMT with a revised version of G03-02-04 reflecting revisions that the CPD made as a result of its discussions with the Coalition.

In the sixth reporting period, the CPD provided records to show that more than 95% of officers received the two-day *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training, with 96.71% of participants completing the *Communications* eight-hour course and 96.86% completing the *Procedures* eight-hour course.[91] In addition, the IMT reviewed and provided a no-objection notice for training materials for the CPD's *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training, and observed a session of that training. The CPD did not provide attendance records for the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training by the end of the seventh reporting period.

During the seventh reporting period, the CPD indicated that it is in the process of reviewing U04-02-02; ¶636 requires the CPD to review each policy periodically (typically every two years) to "evaluate whether the policy provides effective guidance and direction to CPD members and is consistent with the requirements of this Agreement and current law."

---

[91] Because of the COVID-19 extension, the CPD had until March 5, 2022, to complete the delivery of its 2021 in-service training.

As in previous reporting periods, the IMT continues to seek a data source with which to clearly assess the CPD's Full compliance. The data base should include all officers who are certified Taser users, the date of their certification, length of their certification, and requirements of their certification, searchable by reporting period. We also plan to review TRED records and TRRs regarding Taser use to cross check against the list of certified officers. We look forward to the CPD's continued progress on the requirements of ¶197.

### Paragraph 197 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 − DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶198

> **198.** *CPD will instruct officers that Tasers can cause serious injury or death and, as a result, officers should use Tasers only after balancing relevant factors including the threat presented by the subject, the risk of injury if a Taser is used, and the seriousness of the suspected offense. Consistent with this standard, CPD officers should not use Tasers against persons who are reasonably perceived to be non-violent, unarmed, and suspected of low-level offenses, such as property-related misdemeanors, quality of life offenses, moving or traffic violations, or municipal code violations.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | ***Not In Compliance*** (NEW: LOST COMPLIANCE) |
| **Secondary:** | ***Not In Compliance*** (NEW: LOST COMPLIANCE) |
| **Full:** | ***Not Yet Assessed*** |

In the seventh reporting period, the City and the CPD lost Preliminary and Secondary compliance with ¶198.

To evaluate Preliminary compliance with ¶198, we continued to focus our review on whether the City and the CPD received the requisite community input for General Order G03-02-04, *Taser Use Incidents*.

On the final day of the sixth reporting period, the CPD provided the IMT with a revised version of G03-02-04 reflecting revisions that the CPD made as a result of its discussions with the Coalition (*see* ¶669). We stated in our report on the sixth reporting period that in order to maintain Preliminary compliance in the seventh reporting period, we expected the CPD to issue and make effective the changes agreed upon with the Coalition to G03-02-04.

During the seventh reporting period, the IMT and the OAG provided comments on the revised version during the seventh reporting period, but the CPD did not provide a further-revised version of G03-02-04, much less issue and make effective the revised policy.

With regard to Secondary compliance, we stated in our report on the sixth reporting period that in order to maintain Secondary compliance, the CPD needed to provide training on the revisions it agreed to with the Coalition that go beyond ¶198's requirements. The CPD did not do so in the seventh reporting period. On December 15, 2022, the CPD produced to the IMT and OAG its *2023 Policy Updates Use of Force* training. Once the review process is complete, CPD intends the training to be a part of the 2023 40-hour in-service training program, and it was developed to inform staff of upcoming changes to the G03-02, *De-Escalation, Response*

*to Resistance, and Use of Force* policy suite, including anticipated changes to G03-02-04.

As we noted in the previous reporting period, according to the CPD's Use of Force Dashboard, Taser usage has seen a significant reduction in recent years.

Use of Force Appendix Figure 4.
Data from CPD's Use of Force Dashboard re: Taser Use[92]

| YEAR | REPORTED TASER INCIDENTS |
|------|--------------------------|
| 2016 | 484 |
| 2017 | 391 |
| 2018 | 218 |
| 2019 | 224 |
| 2020 | 161 |
| 2021 | 115 |
| 2022 | 97 |

The IMT will continue to monitor data regarding Taser use in the next reporting period.

### Paragraph 198 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Under Assessment | Secondary |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 − DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| None |

---

[92] The IMT's review of TRR data reported by CPD revealed minor data discrepancies between CPD's Public Use of Force Dashboard and TRED reports. For the purposes of this report, we are reporting data from the dashboard. The IMT plans to further examine and discuss these discrepancies with the CPD in the next reporting period.

# Use of Force: ¶199

**199.** *CPD will clarify in policy that flight alone, without any other basis for reasonable articulable suspicion or probable cause, does not justify use of a Taser against a subject.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**    *Not In Compliance* (NEW: LOST COMPLIANCE)
**Secondary:**    *Not In Compliance* (NEW: LOST COMPLIANCE)
**Full:**    *Not Yet Assessed*

In the seventh reporting period, the City and the CPD lost Preliminary and Secondary compliance with ¶199.

To evaluate Preliminary compliance with ¶199, we continued to focus our review on whether the City and the CPD received the requisite community input for General Order G03-02-04, *Taser Use Incidents*.

On the final day of the sixth reporting period, the CPD provided the IMT with a revised version of G03-02-04 reflecting revisions that the CPD made as a result of its discussions with the Coalition (*see* ¶669). We stated in our report on the sixth reporting period that in order to maintain Preliminary compliance in the seventh reporting period, we expected the CPD to issue and make effective the changes agreed upon with the Coalition to G03-02-04.

During the seventh reporting period, the IMT and the OAG provided comments on the revised version during the seventh reporting period, but the CPD did not provide a further-revised version of G03-02-04, much less issue and make effective the revised policy.

With regard to Secondary compliance, we stated in our report on the sixth reporting period that in order to maintain Secondary compliance, the CPD needed to provide training on the revisions it agreed to with the Coalition that go beyond ¶199's requirements. The CPD did not do so in the seventh reporting period.

We are hopeful that the CPD will regain Preliminary and Secondary compliance by issuing, making effective, and training on the changes agreed upon with the Coalition to G03-02-04.

## Paragraph 199 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Under Assessment | Secondary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:

None

# Use of Force: ¶200

**200.** *When safe and feasible to do so, CPD officers must give verbal commands and warnings prior to, during, and after deployment of a Taser. When safe and feasible to do so, CPD officers will allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use a Taser, unless doing so would compromise the safety of an officer or another person.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Under Assessment* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶200 and achieved Secondary compliance.

To evaluate Preliminary compliance with ¶200—which the City and the CPD achieved in the fourth reporting period—we reviewed General Order G03-02-04, *Taser Use Incidents*. The version of G03-02-04, *Taser Use Incidents*, that is currently in effect was issued December 31, 2020, with an effective date of April 15, 2021. That version contains the necessary language for Preliminary compliance with ¶200.

With regard to Secondary compliance, in the sixth reporting period, the CPD provided records to indicate that more than 95% of officers received the two-day *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training, with 96.71% of participants completing the *Communications* eight-hour course and 96.86% completing the *Procedures* eight-hour course.[93] In addition, the IMT reviewed and provided a no-objection notice for training materials for the CPD's *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training, and observed a session of that training. The CPD did not provide attendance records for the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training by the end of the seventh reporting period.

We also reviewed TRED's quarterly and year-end reports and the CPD's Use of Force Dashboard and note (*see* data table in ¶198) that Taser use incidents have declined over the last six years, with 97 Taser discharges in 2022.

At the end of the fifth reporting period, we recommended to the CPD that TRED add a debriefing point to the TRR-R to track whether a verbal warning was issued

---

[93] Because of the COVID-19 extension, the CPD had until March 5, 2022, to complete the delivery of its 2021 in-service training.

prior to the use of any reportable force (as required by ¶183). We consider this an important step toward Secondary compliance.

By the end of the seventh reporting period, the CPD revised the TRR-R to track whether a verbal warning was issued prior to the use of any reportable force.

In its *2021 Year-End Report*, TRED indicated that there was one debriefing for an officer failing to give a warning prior to Taser use.[94] TRED's first and second quarterly reports for 2022 do not indicate whether there were any instances in which officers failed to give a warning prior to Taser use.

The CPD achieved Secondary compliance with the requirements of ¶200 in the seventh reporting period. To further assess Full compliance, we look forward to continuing to review data regarding the issuance of verbal warnings.

### Paragraph 200 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

---

[94]  TRED's *Year-End Report*, CHICAGO POLICE DEPARTMENT (APRIL 29, 2022) AT 60, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

# Use of Force: ¶201

**201.** *CPD will strongly discourage the use of Tasers in schools and on students. CPD will require officers to consider the totality of the circumstances, including a subject's apparent age, size, and the threat presented, in assessing the reasonableness and necessity of using a Taser in a school.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not In Compliance* **(NEW: LOST COMPLIANCE)** |
| **Secondary:** | *Not In Compliance* **(NEW: LOST COMPLIANCE)** |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD lost Preliminary and Secondary compliance with ¶201.

To evaluate Preliminary compliance with ¶201, we considered the CPD's changes to "strongly discourage" the use of Tasers in schools and on students in a revised version of S04-01-02, *School Resource Officer*, that was issued and made effective on June 30, 2022 (the last day of the reporting period). We recommended that the CPD revise S04-01-02 in the fourth reporting period and determined that the City and the CPD failed to maintain Preliminary compliance in the fifth reporting period pending that revision.

We also continued to focus our review on whether the City and the CPD received the requisite community input for General Order G03-02-04, *Taser Use Incidents*.

On the final day of the sixth reporting period, the CPD provided the IMT with a revised version of G03-02-04 reflecting revisions that the CPD made as a result of its discussions with the Coalition (*see* ¶669). We stated in our report on the sixth reporting period that in order to maintain Preliminary compliance in the seventh reporting period, we expected the CPD to issue and make effective the changes agreed upon with the Coalition to G03-02-04.

During the seventh reporting period, the IMT and the OAG provided comments on the revised version during the seventh reporting period, but the CPD did not provide a further-revised version of G03-02-04, much less issue and make effective the revised policy.

With regard to Secondary compliance, we stated in our report on the sixth reporting period that in order to maintain Secondary compliance, the CPD needed to provide training on the revisions it agreed to with the Coalition that go beyond ¶201's requirements. The CPD did not do so in the seventh reporting period.

We are hopeful that the CPD will regain Preliminary and Secondary compliance by issuing, making effective, and training on the changes agreed upon with the Coalition to G03-02-04.

We recommended in the previous reporting period that TRED begin reporting on Taser use in schools and on students in its regular reports. TRED's *2022 Q2 Report* indicates there were no instances of Taser use in schools.[95]

We look forward to continuing to monitor data, including TRED's reports, on Taser use in schools and on students.

### Paragraph 201 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Under Assessment | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

---

[95] TRED's *2022 Q2 Report*, CHICAGO POLICE DEPARTMENT (November 22, 2022) at 9, https://home.chicagopolice.org/wp-content/uploads/Q2-2022-22Nov22.pdf.

# Use of Force: ¶202

> **202.** *CPD officers will treat each application or standard cycle (five seconds) of a Taser as a separate use of force that officers must separately justify as objectively reasonable, necessary, and proportional. CPD will continue to require officers to, when possible, use only one five-second energy cycle and reassess the situation before any additional cycles are given or cartridges are discharged. In determining whether any additional application is necessary, CPD officers will consider whether the individual has the ability and has been given a reasonable opportunity to comply prior to applying another cycle.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the seventh reporting period, the CPD maintained Preliminary and Secondary compliance with and remained under assessment for the requirements of ¶202.

To evaluate Preliminary compliance with ¶202, we reviewed on General Order G03-02-04, *Taser Use Incidents*, which became effective on April 15, 2021.

Section II.F of G03-02-04 clearly states that officers must "Justify Separate Uses of Force. An initial Taser application and each subsequent application of Taser energy (either re-energizing a discharged cartridge with the ARC switch or discharging a second cartridge) must be individually justified and documented on the Tactical Response Report (TRR) as a separate use of force."

The Parties and the Coalition (*see* ¶669) continued to meet and discuss Taser issues throughout the sixth reporting period; we appreciate these community engagement efforts.

In *Independent Monitoring Report 4*, we noted that for Secondary compliance, the CPD would need to demonstrate its ability to identify TRRs with multiple applications. During the fifth reporting period, TRED's reports indicated a vehicle to assess multiple cycle events.

During the sixth and seventh reporting periods, the IMT reviewed TRED's quarterly and year-end reports. We also reviewed CPD's Use of Force Dashboard and note (*see* data table in ¶198) that Taser use incidents have declined over the last six years, with 115 Taser discharges in 2021 and 97 in 2022. TRED's *2021 Year-End*

*Report* indicates that 66 of the TRRs (56.9%) involved the discharge of multiple energy cycles.[96]

In 2021, TRED made a training recommendation for 71 (61.2%) of the 116 TRRs involving Taser discharge.[97] "Taser – Other" was the reason for 24 of the recommendations, and TRED indicated that eleven of those debriefings "were for the involved member incorrectly documenting the number of energy cycles."[98] TRED's 2021 Q3 report indicated 22 incidents of Taser discharges, 15 of which were a single energy cycle and 7 of which were multiple cycles. Of the 22 incidents, 7 resulted in an enrollment in the Taser Refresher Training course offered by CPD's Training and Support Group. In contrast, in all 22 instances, the district-level Investigating Supervisor found the officer complied with policy.

In two instances in 2021, the officer did not switch to another force option after the initial three energy cycles were ineffective, and in two more instances, TRED observed the involved member use more than three energy cycles of the Taser device. The investigating supervisor for both of the latter instances found the use of force to be within Department policy. In one instance, the officer did not fully articulate each energy cycle.

In the first two quarters of 2022, 19 (2.7%) and 28 (3.5%) of the TRRs TRED reviewed involved Taser use, respectively.[99] TRED made a training recommendation for 4 (21.1%) and 5 (17.9%) of those TRRs; in contrast, in all instances, the district-level Investigating Supervisor found the officer complied with policy. Of the 47 TRRs involving Taser use, 10 (21.3%) involved the discharge of multiple energy cycles.

With regard to training, during the sixth reporting period, the IMT reviewed and provided a no-objection notice for training materials for the CPD's *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training, and observed a session of that training. The CPD did not provide attendance records for the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training by the end of the seventh reporting period.

---

[96] TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 60, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

[97] The IMT's review of TRR data reported by CPD revealed minor data discrepancies between CPD's Public Use of Force Dashboard and TRED reports. The IMT plans to further examine and discuss these discrepancies with the CPD in the next reporting period.

[98] *Id.*

[99] TRED's *2022 Q1 Report*, CHICAGO POLICE DEPARTMENT (August 16, 2022) at 9, https://home.chicagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf; TRED's *2022 Q2 Report*, CHICAGO POLICE DEPARTMENT (November 22, 2022) at 9, https://home.chicagopolice.org/wp-content/uploads/Q2-2022-22Nov22.pdf.

By the end of the seventh reporting period, the CPD added the following debriefing points to the TRR-R that relate to ¶202:

- Multiple Applications of Taser - Not Articulated
- Taser - >3 Applications
- Taser - Over 5 Seconds

In the fifth and sixth reporting periods, the IMT requested to review TRRs that reflect multiple Taser applications in order to review the narrative justifications for multiple applications. During the seventh reporting period, the CPD responded to our initial request for copies of TRRs by providing a list of such TRRs (a total of 135) dated between March 1, 2019 and December 31, 2021. The IMT updated our request for TRRs on October 17, 2022, seeking all TRRs since January 1, 2022 that involved multiple Taser applications. IMT has not yet received the requested records and is therefore unable to make a determination whether each application was justified in each case. To continue to maintain Secondary compliance, the CPD must maintain its levels of appropriate training regarding Taser use. For Full compliance, the IMT will review and analyze a sampling of TRRs involving multiple Taser applications and monitor data obtained from the new TRR-R debriefing points. In addition, given COPA's role in reviewing Taser use and evaluating the use of excessive force and violations of policy, we expect to review COPA's data, too; COPA's Q3 2022 Report indicates that twelve of its pending investigations involve an allegation of "Taser Discharge-Injury or Death." We look forward to the CPD's continued progress on this paragraph.

### Paragraph 202 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶203

**203.** *CPD will require that if the subject has been exposed to three, five-second energy cycles (or has been exposed to a cumulative 15 total seconds of energy) and the officer has not gained control, officers switch to other force options unless the officer can reasonably justify that continued Taser use was necessary to ensure the safety of the officer or another person, recognizing that prolonged Taser exposure may increase the risk of death or serious injury.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the seventh reporting period, the CPD maintained Preliminary and Secondary compliance with and remained under assessment for Full compliance with the requirements of ¶203.

To evaluate Preliminary compliance with ¶203, we reviewed on General Order G03-02-04, *Taser Use Incidents*, which became effective on April 15, 2021.

CPD's policy G03-02-04*, Taser Use Incidents*, which became effective on April 15, 2021, includes the requirements of ¶203. Specifically, Section III.B.7. of G03-02-04 clearly states that "if the subject has been exposed to three, five-second energy cycles (or has been exposed to a cumulative 15 total seconds of energy) and the member has not gained control of the subject, switch to other force options unless the member can reasonably justify that continued Taser use was necessary to ensure the safety of the member or another person," echoing the language and requirements of ¶203. The policy also includes a "NOTE," which states "Prolonged Taser exposure under certain circumstances may increase the risk of serious injury or death."

The Parties and the Coalition (*see* ¶669) continued to meet and discuss Taser issues throughout the sixth reporting period; we appreciate these community engagement efforts.

With regard to Secondary compliance, during the sixth period, the IMT reviewed and provided a no-objection notice for training materials for the CPD's *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training, and observed a session of that training. The CPD did not provide attendance records for the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training by the end of the seventh reporting period.

During the fifth reporting period, TRED's reports indicated a vehicle to assess multiple cycle events.

During the sixth and seventh reporting period, the IMT reviewed TRED's quarterly and year-end reports. We also reviewed CPD's Use of Force Dashboard and note (*see* data table in ¶198) that Taser use incidents have declined over the last six years, with 115 Taser discharges in 2021 and 97 in 2022. TRED's *2021 Year-End Report* indicates that 66 of the TRRs (56.9%) involved the discharge of multiple energy cycles.[100]

In 2021, TRED made a training recommendation for 71 (61.2%) of the 116 TRRs involving Taser discharge.[101] "Taser – Other" was the reason for 24 of the recommendations, and TRED indicated that eleven of those debriefings "were for the involved member incorrectly documenting the number of energy cycles."[102]

In two instances in 2021, the officer did not switch to another force option after the initial three energy cycles were ineffective, and in two more instances, TRED observed the involved officers use more than three energy cycles of the Taser device. The investigating supervisor for both of the latter instances found the use of force to be within Department policy. In one instance, the officer did not fully articulate each energy cycle.

In the first two quarters of 2022, 19 (2.7%) and 28 (3.5%) of the TRRs TRED reviewed involved Taser use, respectively.[103] TRED made a training recommendation for 4 (21.1%) and 5 (17.9%) of those TRRs; in contrast, in all instances, the district-level Investigating Supervisor found the officer complied with policy. Of the 47 TRRs involving Taser use, 10 (21.3%) involved the discharge of multiple energy cycles.

By the end of the seventh reporting period, the CPD added the following debriefing points to the TRR-R that relate to ¶202:

- Multiple Applications of Taser - Not Articulated
- Taser - >3 Applications
- Taser - Over 5 Seconds

---

[100]  TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 60, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

[101]  The IMT's review of TRR data reported by CPD revealed minor data discrepancies between CPD's Public Use of Force Dashboard and TRED reports. The IMT plans to further examine and discuss these discrepancies with the CPD in the next reporting period.

[102]  *Id.*

[103]  TRED's *2022 Q1 Report*, CHICAGO POLICE DEPARTMENT (August 16, 2022) at 9, https://home.chicagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf; TRED's *2022 Q2 Report*, CHICAGO POLICE DEPARTMENT (November 22, 2022) at 9, https://home.chicagopolice.org/wp-content/uploads/Q2-2022-22Nov22.pdf.

In the fifth and sixth reporting periods, the IMT requested to review TRRs that reflect multiple Taser applications in order to review the narrative justifications for multiple applications. During the seventh reporting period, the CPD responded to our initial request for copies of TRRs by providing a list of such TRRs (a total of 135) dated between March 1, 2019 and December 31, 2021. The IMT updated our request for TRRs on October 17, 2022, seeking all TRRs since January 1, 2022 that involved multiple Taser applications. IMT has not yet received the requested records and is therefore unable to make a determination whether each application was justified in each case.

For Full compliance, the IMT will review and analyze a sampling of TRRs involving multiple Taser applications and monitor data obtained from the new TRR-R debriefing points; we look forward to the CPD's continued progress on this paragraph.

### Paragraph 203 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶204

**204.** *CPD officers must: a. determine the necessity, objective rea-sonableness, and proportionality of Taser use based on the totality of the circumstances, including the subject's apparent age, size, physical and mental condition, disability, and impairment; b. not use Tasers in drive-stun mode unless the subject is an assailant and other force options are not readily available or would otherwise be ineffective; c. when practicable, avoid the use of Tasers when it is reasonably evident that a deployment may cause serious physical injury, including if the subject is elevated above the ground, if the subject is operating or riding any mode of transportation, or if the subject may be less able to catch or protect themselves in a fall; d. not use Tasers in any environment that contains potentially flam-mable, volatile, or explosive material; e. not use Tasers on a subject who is at a greater risk of serious injury or death from Taser use, including, but not limited to, children, pregnant individuals, and the elderly, unless the subject is an assailant and other force options are not readily available or would otherwise be ineffective; f. target the Taser in probe mode at the lower center mass and avoid the head, neck, and genitalia; g. not activate more than one Taser at a time against a subject, unless an officer already attempted to use a Taser against the subject but the probes did not make contact with the subject; and h. keep Tasers in a weak-side holster.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not In Compliance* (NEW: LOST COMPLIANCE) |
| **Secondary:** | *Not In Compliance* (NEW: LOST COMPLIANCE) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD lost Preliminary and Second-ary compliance with ¶204.

To evaluate Preliminary compliance with ¶204, we continued to focus our review on whether the City and the CPD received the requisite community input for Gen-eral Order G03-02-04, *Taser Use Incidents*. On the final day of the sixth reporting period, the CPD provided the IMT with a revised version of G03-02-04 reflecting revisions that the CPD made as a result of its discussions with the Coalition (*see* ¶669). We stated in our report on the sixth reporting period that in order to main-tain Preliminary compliance in the seventh reporting period, we expected the CPD to issue and make effective the changes agreed upon with the Coalition to G03-02-04.

During the seventh reporting period, the IMT and the OAG provided comments on the revised version during the seventh reporting period, but the CPD did not provide a further-revised version of G03-02-04, much less issue and make effective the revised policy.

With regard to Secondary compliance, we stated in our report on the sixth reporting period that in order to maintain Secondary compliance, the CPD needed to provide training on the revisions it agreed to with the Coalition that go beyond ¶204's requirements. The CPD did not do so in the seventh reporting period.

We are hopeful that the CPD will regain Preliminary and Secondary compliance by issuing, making effective, and training on the changes agreed upon with the Coalition to G03-02-04. Our assessment of ¶204 for Full compliance will involve review of COPA's cases involving Taser use, among other data.

### Paragraph 204 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Under Assessment | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Use of Force: ¶205

> **205.** *CPD officers must request medical aid for a person subjected to a Taser application. CPD officers must place any person subjected to a Taser application in a position that does not impair respiration, as soon as it is safe and feasible to do so. CPD officers must render life-saving aid to injured persons consistent with their training until medical professionals arrive on scene. Only trained medical personnel may remove Taser probes from a subject.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *Not In Compliance* **(NEW: LOST COMPLIANCE)**
**Secondary:**     *Not In Compliance* **(NEW: LOST COMPLIANCE)**
**Full:**     *Not Yet Assessed*

In the seventh reporting period, the City and the CPD lost Preliminary and Secondary compliance with ¶205.

To evaluate Preliminary compliance with ¶205, we continued to focus our review on whether the City and the CPD received the requisite community input for General Order G03-02-04, *Taser Use Incidents*. On the final day of the sixth reporting period, the CPD provided the IMT with a revised version of G03-02-04 reflecting revisions that the CPD made as a result of its discussions with the Coalition (*see* ¶669).

We note that Section V.B of the current version of the CPD's primary use of force policy, G03-02, *De-Escalation, Response to Resistance, and Use of Force*, states that Department members *will* render life-saving medical aid:

> *[A]s soon as it is safe and feasible to do so, members will provide life saving aid consistent with their Department training, including the Law Enforcement Medical and Rescue Training (LEMART) training, to injured persons until medical professionals arrive on the scene.*

However, as we noted in our past three reports, this required language was not present in G03-02-04, *Taser Use Incidents*. The revised version of G03-02-04 that we received during the sixth reporting period does include this language, prompting us to find that the City and the CPD to achieved Preliminary compliance last reporting period. We stated in our report, however, that in order to maintain Preliminary compliance in the seventh reporting period, we expected the CPD to issue and make effective that change to G03-02-04.

During the seventh reporting period, the IMT and the OAG provided comments on the revised version during the seventh reporting period, but the CPD did not provide a further-revised version of G03-02-04, much less issue and make effective the revised policy.

With regard to Secondary compliance, we stated in our report on the sixth reporting period that in order to maintain Secondary compliance, the CPD needed to train on the revision to G03-02-04 that reflects ¶205's requirements. The CPD did not do so in the seventh reporting period.

We are hopeful that the CPD will regain Preliminary and Secondary compliance by issuing, making effective, and training on the change to G03-02-04 that reflects ¶205's requirements.

### Paragraph 205 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Use of Force: ¶206

> **206.** *CPD will conduct Taser inspections on a periodic basis to perform information downloads, ensure Tasers are operable, and perform necessary maintenance or repairs.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**     *Under Assessment*
**Full:**     *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and was under assessment for Secondary compliance with the requirements of ¶206.

To assess Preliminary compliance, the IMT reviewed the CPD's relevant policy and notes that Uniform and Property U04-02-02, *Control Devices and Instruments* (effective February 29, 2020) clearly states:

> *District commanders/unit commanding officers will ensure that Taser inspections are conducted on a quarterly basis. During inspections, district commanders/unit commanding officers will ensure: a. a Taser discharge data report is downloaded for each Taser assigned to the unit. b. a Taser Data Reconciliation Report (CPD-21.969) is completed. c. Tasers assigned to the unit are operational and any Tasers requiring maintenance or repairs are hand-carried during 2nd watch by a sworn member to the Taser Repair Center,*

It also contains a "NOTE," which states, "If necessary, Taser inspections can be conducted more often."

During the fourth reporting period, the IMT reviewed training materials relating to the above provision in U04-02-02, but the CPD did not provide corresponding attendance records. Similarly, the CPD provided a copy of the Taser Data Reconciliation Report form (CPD-21.969), but we have not received data about or gleaned from those reports.

During the seventh reporting period, the CPD indicated that it is in the process of reviewing U04-02-02; ¶636 requires the CPD to review each policy periodically (typically every two years) to "evaluate whether the policy provides effective guidance and direction to CPD members and is consistent with the requirements of this Agreement and current law."

The IMT continues to seek further information about the CPD's Taser inspections, related training, and documentation. We look forward to assessing the CPD's continued progress with ¶206 in the next reporting period, including monitoring the results of the CPD's ¶636 review of U04-02-02.

## Paragraph 206 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Use of Force: ¶207

> **207.** *CPD officers may use OC devices only when such force is objectively reasonable, necessary, and proportional under the totality of the circumstances, and consistent with the objectives above.*

**Compliance Progress**    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶207.

To evaluate Preliminary compliance with ¶207, we reviewed G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, which became effective on April 15, 2021; the policy addresses all the requirements of ¶207.

On the final day of the sixth reporting period, the CPD provided the IMT with a revised version of G03-02-05 reflecting revisions that the CPD made as a result of its discussions with the Coalition (*see* ¶669). During the seventh reporting period, the IMT and the OAG provided comments on the revised version during the seventh reporting period, but the CPD did not provide a further-revised version of G03-02-05 by the end of the reporting period.

In the sixth reporting period, the CPD also continued discussions with the Coalition about General Order G02-02, *First Amendment Rights*, which affects OC spray usage. The CPD sought public comment on the policy from April 28, 2022, to May 13, 2022. The CPD delayed issuing the policy, however, until it had provided eLearning instruction on the changes. The CPD issued and made effective the revised G02-02 during the seventh reporting period, on December 19, 2022.

During the sixth reporting period, the IMT reviewed and provided a no-objection notice for training materials for the CPD's *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training, and observed a session of that training. The CPD did not provide attendance records for the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training by the end of the seventh reporting period. However, during the seventh reporting period, the IMT reviewed records demonstrating that 95.25% of CPD officers completed the *First Amendment Rights eLearning* by December 20, 2022.

During the sixth and seventh reporting periods, the IMT reviewed TRED's quarterly and year-end reports. We also reviewed CPD's Use of Force Dashboard and note that OC spray use incidents declined in 2021 but rose again in 2022. TRED's *2021*

*Year-End Report* indicates that only 15 TRRs involved an OC discharge, or 0.4% of all TRRs.[104] TRED reports that it did not make any training recommendations based on an officer's discharge of OC in all of 2021.

In the first two quarters of 2022, 3 (0.4%) and 4 (0.5%) of the TRRs TRED reviewed involved OC use, respectively.[105] TRED made a training recommendation for one of the second quarter TRRs for not properly documenting multiple applications of OC spray.

Use of Force Appendix Figure 5.
Data from CPD's Use of Force Dashboard re: OC Spray Use[106]

| YEAR | REPORTED OC SPRAY INCIDENTS |
|------|------------------------------|
| 2017 | 36 |
| 2018 | 18 |
| 2019 | 38 |
| 2020 | 45 |
| 2021 | 15 |
| 2022 | 26 |

The IMT will continue to monitor data regarding OC Spray use in the next reporting period. Our assessment of ¶207 for Full compliance will involve review of COPA's cases involving OC use, among other data.

In order to maintain Preliminary compliance with ¶207 in the eighth reporting period, we expect the CPD to issue and make effective the changes agreed upon with the Coalition to G03-02-05.

---

[104] TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 58, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

[105] TRED's *2022 Q1 Report*, CHICAGO POLICE DEPARTMENT (August 16, 2022) at 10, https://home.chicagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf TRED's *2022 Q2 Report*, CHICAGO POLICE DEPARTMENT (November 22, 2022) at 10, https://home.chicagopolice.org/wp-content/uploads/Q2-2022-22Nov22.pdf.

[106] The IMT's review of TRR data reported by CPD revealed minor data discrepancies between CPD's Public Use of Force Dashboard and TRED reports. For the purposes of this report, we are reporting data from the dashboard. The IMT plans to further examine and discuss these discrepancies with the CPD in the next reporting period.

## Paragraph 207 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Use of Force: ¶208

**208.** *CPD officers may only use OC devices for crowd dispersal when such force is necessary, objectively reasonable, and proportional to the threat presented to public safety. CPD will continue to require that the Superintendent or his or her designee provides authorization before OC devices are used for noncompliant groups, crowds, or an individual taking part in a group or crowd.*

**Compliance Progress**      (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD achieved Preliminary and Secondary compliance with ¶208.

To evaluate Preliminary compliance with ¶208, we focused our review on G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents* and G02-02, *First Amendment Rights.*

On April 15, 2021, the CPD's revised G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, became effective. Sections II.C.3 and 4 state:

> *3.*     *A Personal OC device is an authorized force option against passive resisters only under the following conditions: a. Occupants of a motor vehicle who are passively resisting arrest only after obtaining authorization from an on-scene supervisor the rank of sergeant or above. b. Noncompliant groups, crowds, or an individual taking part in a group or crowd and only after obtaining authorization from the Superintendent or his or her designee.*

> *4.*     *Special weapons that dispense the Capsaicin II powder agent or larger volumes of chemical agents are authorized force options against active and passive resistors that are part of a noncompliant groups, crowds, or an individual taking part in a group or crowd only under the following conditions: a. when the chemical agent is used only for area saturation, and b. only after obtaining authorization from the Superintendent or his or her designee.*

On April 13, 2021, the CPD issued an updated version of G02-02, *First Amendment Rights*, but it did not mention the use of OC spray in that context.

During the sixth reporting period, the CPD continued discussions with the Coalition about G02-02, *First Amendment Rights*, which affects OC spray usage. The CPD sought public comment on the policy from April 28, 2022, to May 13, 2022. The CPD delayed issuing the policy, however, until it had provided eLearning instruction on the changes. The CPD issued and made effective the revised G02-02 during the seventh reporting period, on December 19, 2022.

During the seventh reporting period, the IMT reviewed records demonstrating that 95.25% of CPD officers completed the *First Amendment Rights eLearning* by December 20, 2022. The CPD also provided course materials for its 2023 *Constitutional Policing* training, and we requested that the CPD provide course materials for its *Basic Field Force Operations*, *Advanced Field Force Operations*, and *Field Force Operations for Leaders* courses.

By issuing and making effective the revised *First Amendment Rights* policy, the CPD achieved Preliminary compliance with ¶208 in the seventh reporting period. The CPD also achieved Secondary compliance by providing its *First Amendment eLearning* course. We look forward to the CPD's provision of additional training in order to maintain Secondary compliance.

### Paragraph 208 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Under Assessment | Under Assessment |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶209

> **209.** When safe and feasible to do so, CPD officers must issue verbal commands and warnings to the subject prior to, during, and after the discharge of an OC device. When safe and feasible to do so, CPD will require officers to allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use an OC device, unless doing so would compromise the safety of an officer or another person.

**Compliance Progress**    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD achieved Secondary compliance with ¶209.

To assess Preliminary compliance, the IMT reviewed G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, which became effective on April 15, 2021. Section III.A. 1 and 2 articulate the requirements of ¶209:

> III. CONDITIONS ON THE USE OF PERSONAL OC DEVICES OR OTHER CHEMICAL AGENTS
>
> A. Authorized Manner of Use. When it is safe and feasible to do so, a member who is discharging a Personal OC device or other chemical agent will:
>
> 1. give verbal commands and warnings prior to, during, and after discharge, including informing other Department members on the scene of the discharge.
>
> 2. allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use a Personal OC device or other chemical agent, unless doing so would compromise the safety of a Department member or another person.

During the sixth reporting period, the CPD continued discussions with the Coalition about G02-02, *First Amendment Rights*, which affects OC spray usage. The CPD sought public comment on the policy from April 28, 2022, to May 13, 2022. The CPD delayed issuing the policy, however, until it had provided eLearning instruction on the changes. The CPD issued and made effective the revised G02-02 during the seventh reporting period, on December 19, 2022.

During the seventh reporting period, the IMT reviewed records demonstrating that 95.25% of CPD officers completed the *First Amendment Rights eLearning* by December 20, 2022.

During the sixth and seventh reporting periods, the IMT also reviewed TRED's quarterly and year-end reports. And as we note in ¶207 above, CPD data indicate that OC spray usage was trending downward in 2021 but rose again in 2022. TRED's *2021 Year-End Report* indicates that only 15 TRRs involved an OC discharge, or 0.4% of all TRRs.[107] In 2021, TRED conducted debriefings with officers for "failure to warn," but not related to OC spray. In fact, TRED reports that it did not make any training recommendations based on an officer's discharge of OC in all of 2021.

In the first two quarters of 2022, 3 (0.4%) and 4 (0.5%) of the TRRs TRED reviewed involved OC use, respectively.[108] TRED made a training recommendation for one of the second quarter TRRs for not properly documenting multiple applications of OC spray.

By the end of the seventh reporting period, the CPD revised the TRR-R to track whether a verbal warning was issued prior to the use of any reportable force.

During the sixth reporting period, the IMT reviewed and provided a no-objection notice for training materials for the CPD's *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training, and observed a session of that training. The CPD did not provide attendance records for the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training by the end of the seventh reporting period.

As we have explained in prior reporting periods, however, we continue to stress the need for training for all officers on OC spray in the context of protests, unrest, and crowd control.[109] Maintenance of Secondary compliance will depend on the provision of such training. During the seventh reporting period, the CPD provided revised course materials for its 2023 *Constitutional Policing* training, and we requested that the CPD provide course materials for its *Basic Field Force Operations*, *Advanced Field Force Operations*, and *Field Force Operations for Leaders* courses.

In order to maintain Preliminary and Secondary compliance with ¶209 in the eighth reporting period, we expect the CPD to issue, make effective, and train on

---

[107] TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 58, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

[108] TRED's *2022 Q1 Report*, CHICAGO POLICE DEPARTMENT (August 16, 2022) at 10, https://home.chicagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf; TRED's *2022 Q2 Report*, CHICAGO POLICE DEPARTMENT (November 22, 2022) at 10, https://home.chicagopolice.org/wp-content/uploads/Q2-2022-22Nov22.pdf.

[109] The requirements of ¶209 are not limited to the CPD's annual *De-Escalation, Response to Resistance, and Use of Force* in-service training.

anticipated changes to G03-02-05 and continue to provide training on OC spray in the context of protests, unrest, and crowd control. We look forward to continued progress on ¶209 in the next reporting period.

### Paragraph 209 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶210

> **210.** *Each individual application of an OC device (e.g., each spray of an officer's personal OC device) by a CPD officer must be objectively reasonable, necessary, and proportional under the totality of the circumstances, and consistent with the objectives above.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶210.

To assess compliance, the IMT reviews relevant CPD policy, TRED's quarterly and year-end reports, the CPD's Use of Force Dashboard, and relevant CPD training.

We note that CPD's policy G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, which became effective on April 15, 2021, includes the requirements of this paragraph in II.C: "When Use is Authorized. Department members' use of Personal OC devices or other chemical agents must be objectively reasonable, necessary, and proportional to the threat, actions, and level of resistance offered by a subject, under the totality of the circumstances" and II.E.: "Justify Separate Uses of Force. An initial application of a Personal OC device or other chemical agent and each subsequent application must be individually justified and documented on the Tactical Response Report (TRR) as a separate use of force."

In the sixth reporting period, the CPD continued discussions with the Coalition about General Order G02-02, *First Amendment Rights*, which affects OC spray usage. The CPD sought public comment on the policy from April 28, 2022, to May 13, 2022. The CPD delayed issuing the policy, however, until it had provided eLearning instruction on the changes. The CPD issued and made effective the revised G02-02 during the seventh reporting period, on December 19, 2022.

In the sixth and seventh reporting periods, the IMT reviewed TRED's quarterly and year-end reports and the data presented therein. TRED's *2021 Year-End Report* indicates that only 15 TRRs involved an OC discharge, or 0.4% of all TRRs.[110] TRED's *2021 Year-End Report* does not indicate whether any of the 15 TRRs involved multiple applications of OC spray. TRED reports that it did not make any training recommendations based on an officer's discharge of OC in all of 2021. TRED's 1st

---

[110] TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 58, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

Quarterly 2022 report indicates three OC spray discharges: two instances were a single discharge and one instance was two discharges. TRED's 2nd quarterly 2022 report indicates four instances of OC spray discharges: three instances were a single discharge and one instance was two discharges. TRED made a training recommendation for one of the second quarter TRRs for not properly documenting multiple applications of OC spray. All of the OC spray discharges in the first half of 2022 were determined to be within policy by reviewing supervisors.

The IMT recognizes that the CPD's current TRR can capture the number of times OC spray may have been discharged, similar to how it captures multiple applications of Tasers. In the fifth and sixth reporting periods, the IMT requested to review TRRs that reflect multiple applications in order to review the narrative justifications for multiple applications. During the seventh reporting period, the CPD responded to our initial request for copies of TRRs by providing a list of such TRRs (a total of 23) dated between March 1, 2019 and April 21, 2022. The IMT updated our request for TRRs on October 17, 2022, seeking all TRRs since January 1, 2022 in which multiple applications of OC Spray were discharged. IMT has not yet received the requested records and is therefore unable to make a determination whether each application was justified in each case.

During the sixth reporting period, the IMT reviewed records to demonstrate that more than 95% of officers received the two-day *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training, with 96.71% of participants completing the *Communications* eight-hour course and 96.86% completing the *Procedures* eight-hour course.[111] In addition, the IMT reviewed and provided a no-objection notice for training materials for the CPD's *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training, and observed a session of that training.

The CPD did not provide attendance records for the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training by the end of the seventh reporting period. However, during the seventh reporting period, the IMT reviewed records demonstrating that 95.25% of CPD officers completed the *First Amendment Rights eLearning* by December 20, 2022. The CPD also provided course materials for its 2023 *Constitutional Policing* training, and we requested that the CPD provide course materials for its *Basic Field Force Operations*, *Advanced Field Force Operations*, and *Field Force Operations for Leaders* courses.

As we have explained in prior reporting periods, we continue to stress the need for training for all officers on OC spray in the context of protests, unrest, and crowd

---

[111] Because of the COVID-19 extension, the CPD had until March 5, 2022, to complete the delivery of its 2021 in-service training.

control.[112] In order to maintain Secondary compliance with ¶210 in the eighth re-porting period, we expect the CPD to continue to provide training on OC spray in the context of protests, unrest, and crowd control.

### Paragraph 210 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

---

[112] The requirements of ¶209 are not limited to the CPD's annual *De-Escalation, Response to Resistance, and Use of Force* in-service training.

# Use of Force: ¶211

> ***211.*** *CPD officers must assist subjects exposed to application of an OC device with decontamination and flushing when it is safe and feasible to do so. CPD officers must request the appropriate medical aid for a subject after the discharge of an OC device if the subject appears to be in any physical distress, or complains of injury or aggravation of a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, or a heart ailment).*

## Compliance Progress                (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**      *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**      *In Compliance* (SIXTH REPORTING PERIOD)
**Full:**               *Under Assessment*

In the seventh reporting period, the CPD maintained Preliminary and Secondary compliance with ¶211.

To assess compliance, the IMT reviewed relevant CPD policy, TRED's quarterly and year-end reports, the CPD's Use of Force Dashboard, and the CPD's training.

We note that CPD's policy G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, which became effective on April 15, 2021, states the requirements of this paragraph in IV.B.2., which states that an officer discharging OC spray will "request the appropriate medical aid, including contacting emergency medical services (EMS) from the Chicago Fire Department, if the subject appears to be in any physical distress or complains of injury or aggravation of a known pre-existing medical condition (*e.g.*, asthma, emphysema, bronchitis, or a heart ailment)."

During the sixth reporting period, the IMT reviewed records demonstrating that more than 95% of officers received the two-day *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training, with 96.71% of participants completing the *Communications* eight-hour course and 96.86% completing the *Procedures* eight-hour course.[113] As a result, the City and the CPD achieved Secondary compliance with ¶211. In addition, the IMT reviewed and provided a no-objection notice for training materials for the CPD's *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training, and observed a session of that training.

---

[113]   Because of the COVID-19 extension, the CPD had until March 5, 2022, to complete the delivery of its 2021 in-service training.

The CPD did not provide attendance records for the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training by the end of the seventh reporting period.

In the seventh reporting period, the IMT reviewed TRED's first and second quarterly reports. TRED made a training recommendation for one of the second quarter TRRs for not properly documenting multiple applications of OC spray. All of the OC spray discharges in the first half of 2022 were determined to be within policy by reviewing supervisors. TRED also reports the following about aid rendered after deploying OC spray in the first two quarters of 2022:

- TRED's 2022 Q1 report notes three instances of OC spray discharge; in two of those, the subjects were transported to local hospitals by CFD and in the other incident, aid was provided by the officer and the person was also transported to the hospital.

- TRED's 2022 Q2 report notes a total of four instances of OC spray discharges. In two instances, the officers involved rendered aid and additional aid was provided by the Chicago Fire Department's (CFD) Emergency Medical Service (EMS) and subjects were transported to hospitals; in two other instances the officers did not render aid, but CFD provided medical aid and transported to hospitals.

We look forward to assessing continued progress on ¶211 in future reporting periods.

### Paragraph 211 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶212

> ***212.*** *CPD officers may only use department-issued or approved OC devices.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**          *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**          *In Compliance* (SIXTH REPORTING PERIOD)
**Full:**          *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶212.

CPD policy U04-02-02 *Control Devices and Instruments* states: "Department members are not approved to carry or use any type of personal OC device different from that which is prescribed" in Section IV.C.

To assess Secondary compliance, we reviewed the following training materials provided to us by the CPD during the last reporting period:

- *November 2020 Training Bulletin on Personal Oleoresin Capsicum (OC) Devices*

- *Recruit Training on Control Tactics: Chemical Weapons Exposure (Oleoresin Capsicum)*

- *Recruit Force Options Suite Training*

- *Recruit Inspection Report*

During the seventh reporting period, the CPD indicated that it is in the process of reviewing U04-02-02; ¶636 requires the CPD to review each policy periodically (typically every two years) to "evaluate whether the policy provides effective guidance and direction to CPD members and is consistent with the requirements of this Agreement and current law."

Moving forward, the IMT seeks to review the CPD's measures to ensure officers are carrying authorized OC devices (*e.g.*, training records and periodic inspections at roll call). We are unaware of whether such inspections regularly occur and have seen no relevant records. As we noted in our last report, we hope to understand and see documentation of the CPD's processes for ensuring compliance with this paragraph in the next reporting period.

## Paragraph 212 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Preliminary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Secondary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Use of Force: ¶213

> **213.** *CPD officers must not use impact weapons (e.g., baton, asp, improvised impact weapons) to intentionally strike a subject in the head or neck, except when deadly force is justified.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**     *Under Assessment*
**Full:**     *Not Yet Assessed*

In the seventh reporting period, the CPD maintained Preliminary compliance and remained under assessment for Secondary compliance with the requirements of ¶213.

To assess Preliminary and Secondary compliance, the IMT reviews relevant policy, the CPD's Use of Force Dashboard, TRED's quarterly and year-end reports, and the CPD's training.

As we have previously noted, the updated G03-02-07, *Baton Use Incidents* policy went into effect on April 15, 2021, and Section II.D.1 clearly states the requirements of this paragraph: "Head and Neck Strikes. Members will not use batons to intentionally strike a subject in the head or neck except when deadly force is justified."

The CPD's 2020 Use of Force in-service training covered ¶213's requirements, and the CPD has continued to train its officers annually on use of force. In the sixth reporting period, the IMT reviewed and provided a no-objection notice for training materials for the CPD's *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training, and observed a session of that training. The CPD did not provide attendance records for the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training by the end of the seventh reporting period.

We have recommended in previous reports, including our Special Report on the City and the CPD's responses to the 2020 protests and unrest, that the CPD provide "adequate training for all officers on new or revised policies, including use of force, de-escalation, batons, and personal OC spray." During the seventh reporting period, the IMT reviewed records demonstrating that 95.25% of CPD officers completed the *First Amendment Rights eLearning* by December 20, 2022. The CPD also provided course materials for its 2023 *Constitutional Policing* training, and we requested that the CPD provide course materials for its *Basic Field Force Operations*, *Advanced Field Force Operations*, and *Field Force Operations for Leaders* courses. We look forward to the CPD's continued training on this important subject.

All strikes to the head or neck are Level 3 uses of force and require a COPA response. In the first two quarters of 2022, TRED reported no intentional baton strikes to the head or neck of a person.

We look forward to continuing to assess the CPD's progress with ¶213.

### Paragraph 213 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Use of Force: ¶214

**214.** *When safe and feasible to do so, CPD officers must give verbal commands and warnings prior to, during, and after using an impact weapon.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**    *In Compliance (FOURTH REPORTING PERIOD)*
**Secondary:**    *Under Assessment*
**Full:**    *Not Yet Assessed*

In the seventh reporting period, the CPD maintained Preliminary compliance with the requirements of ¶214.

To assess compliance, the IMT reviews CPD's relevant policies, TRED's quarterly and year-end reports and the CPD's Use of Force Dashboard, and related training.

During the sixth reporting period, the IMT reviewed data and records demonstrating that more than 95% of officers received the two-day *2021 De-Escalation, Response to Resistance, and Use of Force*, which covered the need to warn prior to use of force, including batons. In addition, the IMT reviewed and provided a no-objection notice for training materials for the CPD's *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training, and observed a session of that training. The CPD did not provide attendance records for the *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training by the end of the seventh reporting period. The IMT looks forward to reviewing those records in the next reporting period.

As we have noted in previous reports, however, CPD officers' baton use significantly increased in the summer protests of 2020 (see chart below[114]), so the CPD must focuses on protocols to document when officers issue warnings to disperse. As CPD data indicates, baton use averaged 39 instances for the last few of years, with the exception of 2020, when the summer protests drove reported baton use up to 180. The CPD needs to focus on training on baton use specific to protest and crowd control contexts that emphasize the CPD's changes to its First Amendment policy.

During the seventh reporting period, the CPD provided course materials for its 2023 *Constitutional Policing* training, and we requested that the CPD provide course materials for its *Basic Field Force Operations*, *Advanced Field Force Opera-*

---

[114]   *Use of Force Dashboard (2015–Present)*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

*tions*, and *Field Force Operations for Leaders* courses. We look forward to continuing our review of relevant course materials and the CPD's training on this important subject.

Use of Force Appendix Figure 6.

| YEAR | REPORTED INSTANCES OF BATON USE |
|------|--------------------------------|
| 2016 | 37 |
| 2017 | 39 |
| 2018 | 41 |
| 2019 | 39 |
| 2020 | 180 |
| 2021 | 30 |
| 2022 | 28 |

We also note that TRED has been responsive to IMT suggestions regarding data collection with regard to uses of force. The May 2022 version of the TRR-R includes a section for "verbal warning issued prior to the use of force," which will produce data for the IMT to review for trends related to this paragraph's requirements.

While the CPD remains in Preliminary compliance with the requirements of ¶214, we look forward to the CPD training all of its officers on proper baton use in protest situations in the near future.

Paragraph 214 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|------------------------|-------------------------|------------------------|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|-------------------------|------------------------|------------------------|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Use of Force: ¶215

> **215.** *CPD officers must receive training on proper use of an impact weapon before being permitted to carry such weapon.*

**Compliance Progress**   (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance with the requirements of ¶215 but remained under assessment for Secondary compliance.

To assess Preliminary compliance, the IMT reviews relevant policies. We also reviewed TRED's quarterly and year-end reports and the CPD's Use of Force Dashboard noting baton use (*see* ¶214 for data on baton use).

In the sixth reporting period, we attended a session of CPD recruit training regarding impact weapons in person (in March 2022). The 8-hour course featured the basics of handling batons, including holstering and unholstering and different types of uses in the field, such as strikes. The instructors made mention of de-escalation principles only a few times throughout and the training included some limited scenarios but focused mostly on drills. In response to our feedback, the CPD revised its impact weapon test to include de-escalation as a component. We have not yet received records demonstrating the administration of the revised training.

We also look forward to evidence of training on proper baton use in protest situations. As we have noted in previous reports and throughout this one, CPD officers' baton use significantly increased in the summer protests of 2020 (*see* ¶214 above), so the CPD must focus on training on baton use specific to protest and crowd control contexts that emphasize the CPD's changes to its *First Amendment Rights* policy.

During the seventh reporting period, the CPD provided course materials for its 2023 *Constitutional Policing* training, and we requested that the CPD provide course materials for its *Basic Field Force Operations*, *Advanced Field Force Operations*, and *Field Force Operations for Leaders* courses. We look forward to continuing our review of relevant course materials and the CPD's training on this important subject.

While the CPD remains in Preliminary compliance with the requirements of ¶215, we look forward to the CPD training all of its recruits and all officers on proper use of batons in protest situations in the near future.

### Paragraph 215 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Use of Force: ¶216

> **216.** *CPD officers must request appropriate medical aid for a subject who experiences an impact weapon strike when the subject appears to be in any physical distress or complains of injury, or when the subject sustained a strike to the head from an impact weapon or a hard, fixed object. CPD officers must render life-saving aid to the subject consistent with the officers' training until medical professionals arrive on scene.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not In Compliance* **(NEW: LOST COMPLIANCE)** |
| **Secondary:** | *Not In Compliance* **(NEW: LOST COMPLIANCE)** |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD lost both Preliminary and Secondary compliance with ¶216.

To evaluate Preliminary compliance with ¶216, we reviewed the CPD's relevant force policies, including G03-02-07, *Baton Use Incidents*.

As we have noted in prior reporting periods, Section V.B of the current version of the CPD's primary use of force policy, G03-02, *De-Escalation, Response to Resistance, and Use of Force*, states that Department members *will* render life-saving medical aid:

> [A]s soon as it is safe and feasible to do so, members will provide life saving aid consistent with their Department training, including the Law Enforcement Medical and Rescue Training (LEMART) training, to injured persons until medical professionals arrive on the scene.

However, this required language is not present in the currently effective version of G03-02-07, *Baton Use Incidents*. On the final day of the sixth reporting period, the CPD provided the IMT with a revised version of G03-02-07 that includes the required language. During the seventh reporting period, the IMT and the OAG provided comments on the revised version during the seventh reporting period, but the CPD did not provide a further-revised version of G03-02-07 by the end of the reporting period. As we noted in our last report, in order to maintain Preliminary compliance in the seventh reporting period, we expected the CPD to issue and make effective that change to G03-02-07, which it did not.

With regard to Secondary compliance, while we acknowledge that the CPD provided records to demonstrate that more than 95% of officers received the two-day

*2021 De-Escalation, Response to Resistance, and Use of Force*, we noted in our last report that to maintain Secondary compliance going forward, the CPD needed to train its officers on the revision to G03-02-07 that reflects ¶216's requirements, which it did not accomplish during the seventh reporting period.

## Paragraph 216 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Secondary |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| None |

# Use of Force: ¶217

> **217.** *To be effective, the foundation of CPD's accountability system must be CPD members. When CPD members use force, they must be able to demonstrate that the force used complies with the law and CPD policy. When a member's use of force does not comply with the law and CPD policy, the member's supervisors must be able to identify the non-compliance and take appropriate action to address it. To facilitate evaluation of how CPD members use force, CPD will ensure that members report incidents when they use force and that supervisors collect and review available information about the incidents.*

## Compliance Progress  (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶217.

To assess Preliminary compliance, the IMT reviews the CPD's *Use of Force* policies to ensure they address the requirements specified in ¶217. We also evaluate the CPD's efforts to obtain and address community engagement and input on the policies that address ¶217's requirements.

To assess Secondary compliance, we determine whether the CPD has sufficiently trained on its *Use of Force* policies, including supervisors' responsibilities. We also review the number of officers who have completed *Use of Force* in-service training.

To assess Full compliance, the IMT evaluates the extent to which the policies and trainings that reflect ¶217's requirements are operationalized. Along with other sources of information, the IMT may review (1) TRED reports for its findings on patterns and trends, recommendations for follow-up training, and referrals to COPA; (2) the CPD's Use of Force Dashboard and other data sources; and (3) relevant work conducted by the CPD's Audit Division. The IMT also regularly interviews supervisors, as we did again in this reporting period.

The IMT has consistently emphasized that officer accountability – and public transparency about accountability processes – must be a shared responsibility among all leaders in the CPD, from sergeants to the Superintendent.

During the sixth reporting period, we reviewed and determined that the CPD's policies—in particular, the Use of Force policy suite—sufficiently address ¶217's requirements. In addition, the CPD demonstrated its commitment to actively engage the Coalition (*see* ¶669) and community in dialogue regarding the Use of Force policies and their recommendations. We also considered the CPD's process for addressing TRED's recommendations and individual debriefing points.

The CPD demonstrated its TRR Supervisory Dashboard for the IMT during the sixth reporting period. According to TRED's *2021 Year-End Report*, "The information included in this dashboard should allow for Department supervisors to correct the action of individual members and also recommend specific training for their districts/units based on documented need."[115] Similarly, in TRED's *2021 Q4 Report*, TRED stated, "The central goal in building this dashboard is to provide a tool for supervisors and [TRED] to better understand patterns and trends within each unit and to allow supervisors and command staff to better understand how those patterns and trends within their own unit compare to other units throughout the city."[116]

While we appreciate the effort that went into building the *TRR Supervisory Dashboard*, we see no evidence that supervisors are using it regularly to identify and address issues with the officers for which they are responsible.

TRED also states, "The best practice is for a supervisor to recognize a training opportunity and take corrective action at the time an incident occurs."[117] TRED's 2022 statistics from the first half of the year suggest that more can and must be done. In the first quarter of 2022, there were 495 TRRs, 226 (45.7%) of which resulted in recommendations or advisements and just 43 (8.6%) of which were handled by front line supervisors. Similarly, in the second quarter of 2022, there were 799 TRRs, 337 (42.2%) of which resulted in recommendations or advisements and only 69 (8.6%) of which were handled by front line supervisors. These small numbers in which front line supervisors identify and address officer deficiencies are not showing improvement over time and we recommend more training on this issue.

Furthermore, noncompliance with the CPD's body-worn camera policy continues to persist, with front line supervisors rarely taking initiative to identify these failings and address them. In fact, our interviews with district field supervisors revealed that they do not consider it their responsibility to identify deficiencies or to address them. In the 2nd Quarter TRED Report, the CPD began issuing deficiencies

---

[115] TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 95, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

[116] TRED's *2021 Q4 Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022), https://home.chicagopolice.org/wp-content/uploads/Q4-2021-FRD-Report.pdf.

[117] *Id.* at 21.

to investigating supervisors for failing to address activation of a body-worn camera, which is an important step, if utilized.

Significantly, the CPD revised the TRR-R to include a debriefing for supervisors who did not address a body-worn camera deficiency at the time of occurrence, and TRED began delivering this debriefing during the second quarter of 2022 (in a total of seven instances).[118] We appreciate this effort to encourage supervisors to immediately correct body-worn camera issues and look forward to monitoring its progress.

In regard to Secondary compliance, the CPD provided records in the seventh reporting period to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*, a course that emphasized the need for front-line supervisors to identify, address, and document body-worn camera issues. But based on the data from TRED's reports and our interviews, further training is necessary to encourage front-line supervisors to take on a greater responsibility for identifying issues and training opportunities, and take corrective action, at the time a use-of-force incident occurs.

The CPD also provided a copy of its *TRR Supervisory Debriefing Dashboard Training Bulletin*, ETB# 22-03, during this reporting period. The IMT provided feedback on the bulletin on November 12, noting that the bulletin provides detailed instruction on how to access and use the dashboard. However, the IMT recommended the bulletin better explain how use of the dashboard relates to supervisors' responsibilities as outlined in G01-09, *Supervisory Responsibilities*, including the specific duties outlined in Section IV.D, "Use of Force Incidents." The IMT awaits a response from CPD on its comments.

The City and the CPD maintained Preliminary compliance with ¶217 in the seventh reporting period. We are disappointed that our reviews indicate that supervisors addressing deficiencies with TRRs or firearm pointing rarely occurs. We are concerned that problems with officers activating body worn cameras in compliance with CPD policy persist. We hope to see some improvement on these crucial supervisor issues in the next reporting period. The IMT looks forward to learning more about the training the CPD will provide in connection with the Supervisory Dashboard and how the dashboard is used. In addition, the CPD's Audit Division has indicated that it plans to review of TRED's debriefing procedures; we look forward to the Audit Division's findings.

---

[118]   TRED's *2022 Q2 Report* at 24.

## Paragraph 217 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Use of Force: ¶218

**218.** *CPD members must report and document any reportable use of force. Beginning January 1, 2019, a reportable use of force will be defined as any use of force by a CPD member included in any of the following three levels: a. A level 1 reportable use of force is the use of any force by a CPD member to overcome the active resistance of a subject that does not rise to a level 2 or level 3 reportable use of force. This would include force that is reasonably expected to cause pain or an injury, but does not result in injury or complaint of injury. The following techniques are level 1 reportable uses of force when applied in response to active resistance: pressure point compliance techniques; joint manipulation techniques; wristlocks; armbars; and any leg sweep, weaponless defense techniques, or takedown that does not result in injury or complaint of injury. It is not a reportable use of force for a CPD member to escort, touch, or handcuff a person with no or minimal resistance. b. A level 2 reportable use of force is the use of any force by a CPD member that includes use of a less-lethal weapon or that causes an injury or results in a complaint of an injury, but that does not rise to a level 3 reportable use of force. Force options in this level include: discharge of an OC device; discharge of a Taser; impact weapon strikes to any part of the body other than the head or neck; use of impact munitions; any physical apprehension by a canine; any reportable use of force against a handcuffed subject; and any leg sweep, weaponless defense technique, or takedown resulting in an injury or complaint of injury. c. A level 3 reportable use of force is when a CPD member does any of the following: uses any force that constitutes deadly force, such as discharging a firearm or using an impact weapon to strike a person's head or neck; uses a chokehold or other maneuver for intentionally putting pressure on a person's airway or carotid artery; uses any force that causes the death of any person; or uses any force that causes injury to any person resulting in admission to a hospital.*

## Compliance Progress  (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

During the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶218.

To assess Preliminary compliance, the IMT reviewed the applicable policy and notes that the levels of force outlined in this paragraph (i.e., the change from 4 levels of force to 3 levels of force) continue to be echoed in the CPD's General Order G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (effective date April 15, 2021).

To assess Secondary compliance, the IMT reviewed TRED's Quarterly Reports and Year-End Report. We also reviewed the curriculum materials for the CPD's 2022 in-service training for supervisors, which also addresses the requirements of this paragraph. During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*, a course that addresses the requirements of ¶218.

To assess Full compliance, the IMT reviews potential sources of information to identify unreported uses of force, such as the City's Law Department and COPA. For example, the IMT seeks data from COPA regarding how many community complaints regarding uses of force do not have a corresponding TRR, and we hope to review that data in the next reporting period.

### Paragraph 218 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶219

**219.** *Whenever a CPD member engages in a reportable use of force, the member must complete a TRR, or any similar form of documentation CPD may implement, prior to the end of his or her tour of duty. In addition to completing the TRR, officers must also document the reason for the initial stop, arrest, or other enforcement action per CPD policy. CPD may allow members requiring medical attention a reasonable amount of additional time to complete the required documentation. CPD may allow supervisors to complete the TRR for members who are unable to complete the report due to injury or in other extraordinary circumstances.*

**Compliance Progress**     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

During the seventh reporting period, the City and the CPD maintained Preliminary compliance and Secondary compliance with ¶219.

To assess Preliminary compliance, the IMT reviewed the applicable policy including the CPD's General Order G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, (effective April 15, 2021) and analyzed other records and information provided during the reporting period, such as TRED's Quarterly Reports.

To assess Secondary compliance, the IMT reviews TRED's Quarterly Reports and Year-End Report, which describe training activities. We also reviewed the curriculum and accompanying materials for the CPD's 2022 in-service training for supervisors and the *2023 Constitutional Policing* training curriculum, all of which address some requirements of this paragraph. During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*.

The IMT closely tracks and reviews TRED's Quarterly Reports, which describe "narrative deficiencies" in some TRR forms filled out by CPD officers and the mandatory debriefings designed to address those narrative deficiencies. TRED's Quarterly Reports indicate that narrative deficiencies are addressed.

Maintaining Secondary compliance will depend upon the CPD continuing to feature TRRs in relevant training courses to reinforce their importance and to continue to reduce the narrative deficiencies in the TRR reports reviewed by TRED. Training will also need to continue to focus on the problems and issues identified

in the OIG's and the IMT's reports regarding the City's and the CPD's responses to the protests of 2020, which documented the failure of officers to fulfill reporting responsibilities. We look forward to assessing the CPD's continued progress with ¶219 and as we continue to assess Full compliance, we will review a sample of TRRs with a focus on Constitutional policing and the CPD's efforts to address the concerns of the protests that occurred in 2022. Also, as we noted in our assessment of ¶218, the IMT seeks data from COPA regarding how many community complaints regarding uses of force do not have a corresponding TRR, and we hope to review that data in the next reporting period.

### Paragraph 219 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶220

> **220.** *In completing the TRR, or whatever similar documentation CPD may implement, CPD members must include a narrative that describes with specificity the use of force incident, the subject's actions, or other circumstances necessitating the level of force used; and the involved member's response, including de-escalation efforts attempted and the specific types and amounts of force used. The narrative requirement does not apply to CPD members who discharged a firearm in the performance of duty or participated in an officer-involved death in the performance of duty. Any CPD member who observes or is present when another CPD member discharges a firearm or uses other deadly force must complete a written witness statement prior to the end of his or her tour of duty. CPD members will note in their TRRs the existence of any body-worn camera or in-car camera audio or video footage, and whether any such footage was viewed in advance of completing the TRR or any other incident reports. CPD members must complete TRRs, or whatever similar documentation CPD may implement, and other reports related to the incident, truthfully and thoroughly.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

During the seventh reporting period, the City and the CPD maintained Preliminary compliance and Secondary compliance with ¶220.

To assess Preliminary compliance, the IMT reviews the CPD's applicable policies including the CPD's General Order G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, (effective April 15, 2021), G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*, (effective April 15, 2021), and G03-06, *Firearm Discharge and Officer-involved Death Incident Response and Investigation,* and analyze other records and information provided during the reporting period, such as TRED's quarterly and year-end reports and the CPD's Use of Force Dashboard.

To assess Secondary compliance during the seventh reporting period, the IMT reviewed records provided by the CPD to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*. Further, the IMT closely tracked and reviewed TRED's Quarterly Reports, which describe trends in TRRs as well as officer "debriefing points," which are conversations in

which TRED provides guidance to officers on how to better articulate force mitigation efforts on future reports, for example.

Continuing from last reporting period, TRED focused on de-escalation and emphasizing the completeness of TRRs. Specifically, TRED reviews whether each box that was checked for a de-escalation technique has an accompanying narrative. We continue to see hundreds of instances of debriefing points per quarter for "force mitigation – not articulated" and encourage TRED to continue its regular cadence of reviews and debriefings about this officer reporting failure. Specifically, TRED's first two 2022 quarterly reports note 205 debriefings for "force mitigation – not articulated."

In the next reporting period, the IMT seeks to review documentation about whether officers submit their required reports prior to the conclusion of their shift.

We appreciate that the City flagged some changes in Illinois law that they intend to integrate appropriately into these processes, including when officers may view body worn camera footage, and intends to address these in 2023 training.

The IMT continues to seek direct access to officer-involved shooting reports and documentation to continue our assessment of the requirements of this paragraph. We look forward to the CPD's continued progress on this paragraph.

### Paragraph 220 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶221

**221.** *Any CPD member who engages in a reportable use of force must immediately report the incident to OEMC. OEMC is required to notify the involved member's immediate supervisor and the Watch Operations Lieutenant of the district of occurrence.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶221.

To assess compliance, the IMT reviews relevant policy and training—such as the CPD's G02-02 *First Amendment Rights* policy and 2022 *In-Service Supervisory Refresher* training—and TRED's quarterly and year-end Reports. The IMT also held conversations with CPD supervisors and leadership on use of force issues throughout this monitoring period.

During the sixth reporting period, the CPD sought public comment on G02-02 from April 28, 2022, to May 13, 2022. The CPD delayed issuing the policy, however, until it had provided eLearning instruction on the changes.

The CPD issued and made effective the revised G02-02 during the seventh reporting period, on December 19, 2022.

During the seventh reporting period, the IMT reviewed records demonstrating that 95.25% of CPD officers completed the *First Amendment Rights eLearning* by December 20, 2022.

The CPD also provided revised draft course materials for its 2023 *Constitutional Policing* training, one hour of which addresses First Amendment Rights and public assemblies. The course also includes a participant guide, in which the following topics are addressed: prohibitions on officers' behavior, crowd management, dispersal orders, specific forms for protests supervisors must complete, and procedures for mass arrests. The guide specifically states that any force during a protest is not an exception to reporting requirements – that if the force used requires a TRR (*see* ¶218), officers must submit the TRR.

We appreciate the CPD's efforts to address the force reporting failures of 2020 and encourage the CPD to continue to address them adequately and directly through training, reinforced through supervision.

To assess Full compliance, the IMT seeks information on use of force cases reported to COPA that do not have a corresponding TRR.

## Paragraph 221 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| Secondary |

# Use of Force: ¶222

> **222.** *A CPD supervisor will immediately respond to the scene when a level 2 or level 3 reportable use of force occurs ("responding supervisor"). CPD supervisors may, at their discretion, respond to the scene when a level 1 reportable use of force occurs, but they are not required to do so.*

### Compliance Progress        (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶222.[119]

To assess compliance with this paragraph, the IMT reviews applicable CPD policy, data and information from the CPD's TRED such as Quarterly and Year-End Reports, and the CPD's training.

During the sixth reporting period, we reviewed the CPD's *In-Service Supervisor Training*, including its lesson plan, PowerPoint slides, and the course materials distributed. Moreover, on April 12, 2022, IMT observed a Supervisory training session and we note that the requirements of this paragraph were included on slides 95 and 103. We note that the CPD distributed a *Tactical Response Report Training Guide* on supervisory duties and responsibilities and guide for filling out TRRs, which we also reviewed.

During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*. Therefore, the CPD achieved Secondary compliance with ¶222.

We also conducted interviews with supervisors during this reporting period. One supervisor said that responding to use of force scenes is "engrained as their responsibility," which we found promising. We also heard from supervisors, however, that in some of the busier districts they may have multiple scenes or incidents

---

[119] We acknowledge that the OAG disagrees with our determination of Secondary compliance for this paragraph, based on "the In-Service Supervisors' training because CPD has not consistently identified these paragraphs in production materials regarding the training." We acknowledge these concerns, and also acknowledge the CPD's training efforts. The IMT will determine whether deficient supervision is an issue for Full compliance, and understand that our inquiries might support the need for additional training.

to respond to simultaneously, and will respond as quickly as they can, but not always immediately.

We also reviewed TRED data during this reporting period.

TRED's *2022 Q1 Report* indicates that there were 17 incidents of supervisors failing to respond to scenes when they were required to do so, and the *2022 Q2 Report* indicates 2 incidents of supervisors failing to respond to scenes when they were required to do so.

The IMT underscores that it is imperative that supervisors respond to all Level 2 and Level 3 use of force incidents. Moreover, the IMT notes that it is difficult to properly assess with the CPD's existing data how quickly supervisors respond to various use of force incidents. We encourage the CPD to consider how it may, in the future, determine and track how quickly supervisors respond when they are required to do so.

### Paragraph 222 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶223

*223. For level 2 and level 3 reportable use of force incidents, the duties of the responding supervisor will include, at a minimum: a. identifying known available witnesses to the use of force to the extent reasonably possible and documenting their identities and statements in a written report, except in incidents for which the Civilian Office of Police Accountability ("COPA") receives administrative notifications and responds to the scene; b. coordinating with COPA, as appropriate; c. gathering and preserving evidence related to the use of force; d. requesting the assignment of an evidence technician to photograph persons involved in the incident, including any injuries sustained; e. ensuring that members and subjects receive appropriate medical care; f. making notifications as required by CPD policy; and g. reviewing reports regarding the incident for legibility and completeness.*

## Compliance Progress      (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with the requirements of ¶223.[120]

To assess compliance with this paragraph, the IMT reviews applicable CPD policy, data and information from the CPD's TRED, such as Quarterly and Year-End Reports, and the CPD's training.

During the sixth reporting period, we reviewed the CPD's *In-Service Supervisor Training*, including its lesson plan, PowerPoint slides, and the course materials distributed. Moreover, on April 12, 2022, IMT observed a supervisor training session and we note that the requirements of this paragraph were included on slides 103–106. We note that the CPD distributed a *Tactical Response Report Training Guide* on supervisory duties and responsibilities and guide for filling out TRRs, which we also reviewed.

---

[120] We acknowledge that the OAG disagrees with our determination of Secondary compliance for this paragraph, based on "the In-Service Supervisors' training because CPD has not consistently identified these paragraphs in production materials regarding the training." We acknowledge these concerns, and also acknowledge the CPD's training efforts. The IMT will determine whether deficient supervision is an issue for Full compliance, and understand that our inquiries might support the need for additional training.

During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*. Therefore, the CPD achieved Secondary compliance with ¶223.

Our review of TRED's first two quarterly reports indicates that failure to request an evidence technician (as required by ¶223(d)) when necessary—which includes any time a person is injured during a use of force incident—has become the most common debriefing point among reviewing supervisors with regard to the requirements of ¶223. Specifically, the *2022 Q1 Report* and *2022 Q2 Report* note that this failure happened 21 and 25 times, respectively. We hope to see improvement on this requirement in the next reporting period.

### Paragraph 223 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| Secondary |

# Use of Force: ¶224

**224.** *In addition, for level 2 and level 3 reportable use of force incidents involving an injury or complaint of injury for which COPA does not have jurisdiction, the responding supervisor will undertake reasonable efforts to identify and interview additional witnesses beyond those that are known and available.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with the requirements of ¶224.[121]

To assess compliance for this paragraph the IMT reviews the CPD's relevant policies, TRED's Year-End and Quarterly Reports, the CPD's use of force dashboard, and the CPD's training.

During the sixth reporting period, we reviewed the CPD's *In-Service Supervisor Training* and noted that it addressed this requirement. We also noted that the revised TRR form (issued December 2020) includes the requirement to identify witnesses and document those efforts. On April 12, 2022, the IMT observed the supervisor training and the requirements of this paragraph were adequately addressed on slide 105 of the training PowerPoint deck. Additionally, the CPD distributed a *Tactical Response Report Training Guide* on supervisory duties and responsibilities and guide for filling out TRRs, which we also reviewed.

During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*. Therefore, the CPD achieved Secondary compliance with ¶224.

We continued to review TRED data during this reporting period.

As we noted in the prior reporting period, the extent of Reviewing Supervisors' efforts to identify witnesses and to canvas neighborhoods is difficult to determine from the limited information in TRED reports. TRED's first two quarterly reports

---

[121]  We acknowledge that the OAG disagrees with our determination of Secondary compliance for this paragraph, based on "the In-Service Supervisors' training because CPD has not consistently identified these paragraphs in production materials regarding the training." We acknowledge these concerns, and also acknowledge the CPD's training efforts. The IMT will determine whether deficient supervision is an issue for Full compliance, and understand that our inquiries might support the need for additional training.

identify 28 incidents of "narrative deficiency" for responding supervisors; whether these deficiencies relate to required witness identification cannot be determined. Another common debriefing point for responding supervisors is for "witness box issue," with 22 occurrences in the first two quarters of 2022.

In order for the CPD to move toward Full compliance, the IMT will explore with TRED whether its existing debriefings suffice to monitor responding supervisors' required witness identification efforts. We look forward to such conversations in the next reporting period.

### Paragraph 224 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶225

> **225.** *A supervisor who used force or ordered force to be used during a reportable use of force incident will not perform the duties assigned to the responding supervisor for that incident.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**    *In Compliance* (NEW)
**Full:**    *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with the requirements of ¶225.[122]

To determine compliance, the IMT reviews relevant CPD policies, TRED's Quarterly and Year-End Reports, the CPD's use of force dashboard, and the CPD's training.

During the sixth reporting period, we reviewed the CPD's *In-Service Supervisor Training*. In addition, the IMT observed a supervisor training session in April 2022 and reviewed the supervisor's *Tactical Response Report Training Guide* that was distributed along with that training; we note that the requirements of this paragraph are covered in the *Tactical Response Report Training Guide*.

During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*. Therefore, the CPD achieved Secondary compliance with ¶225.

We continued to review TRED data during this reporting period. TRED's *2021 Year-End Report* identifies 39 debriefing points for a supervisor either using or ordering the use of reportable force and conducting the investigation as the reviewing/responding supervisor.[123] We understand that the CPD continues to face challenges around the numbers and availability of supervisors. TRED's *2022 Q1 Report* identifies four instances in which supervisors were debriefed on this issue, while the *2022 Q2 Report* does not report any. We look forward to reviewing the remaining 2022 TRED data on this issue in forthcoming quarterly reports.

---

[122] We acknowledge that the OAG disagrees with our determination of Secondary compliance for this paragraph, based on "the In-Service Supervisors' training because CPD has not consistently identified these paragraphs in production materials regarding the training." We acknowledge these concerns, and also acknowledge the CPD's training efforts. The IMT will determine whether deficient supervision is an issue for Full compliance, and understand that our inquiries might support the need for additional training.

[123] TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (APRIL 29, 2022), https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

The CPD remains in Preliminary compliance with these requirements and achieved Secondary compliance during this reporting period. We appreciate the CPD's efforts and look forward to continued progress with these requirements.

### Paragraph 225 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶226

> **226.** *CPD will continue to require the responding supervisor to document information collected and actions taken in performing his or her investigatory duties in the supervisor's portion of the TRR, or in any other similar form of documentation CPD may implement.*

---

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with the requirements of ¶226.[124]

To determine compliance, the IMT reviews relevant CPD policy, CPD forms including the TRR, the TRR-I, and the TRR-R, TRED's and Quarterly Reports, the CPD's use-of-force dashboard, and the CPD's training.

During the sixth reporting period, we reviewed the CPD's *In-Service Supervisor Training*. On April 12, 2022, the IMT observed the supervisor training and note that a 2-hour block of that training focused on supervisory reporting responsibilities related to TRRs. Additionally, the CPD distributed a *Tactical Response Report Training Guide* on supervisory duties and responsibilities and guide for filling out TRRs, which we also reviewed.

During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*. Therefore, the CPD achieved Secondary compliance with ¶226.

We continued to review TRED data during this reporting period.

TRED's *2021 Year-End Report* identifies a number of recurring issues regarding these requirements, including supervisors failing to request an evidence technician (114 times in 2021), failing to articulate their efforts to identify relevant witnesses to a use of force incident (56 times in 2021), narrative deficiencies (37 times in 2021), and "TRR Entry – Other" (56 times in 2021).[125] TRED's *2022 Q1 Report*

---

[124] We acknowledge that the OAG disagrees with our determination of Secondary compliance for this paragraph, based on "the In-Service Supervisors' training because CPD has not consistently identified these paragraphs in production materials regarding the training." We acknowledge these concerns, and also acknowledge the CPD's training efforts. The IMT will determine whether deficient supervision is an issue for Full compliance, and understand that our inquiries might support the need for additional training.

[125] TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (APRIL 29, 2022), https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

and *2022 Q2 Report* identify 28 incidents of "narrative deficiency" for responding supervisors. TRED's first two quarterly reports also indicate that failure to request an evidence technician has become the most common debriefing point among reviewing supervisors; specifically, TRED reports 21 and 25 debriefing points in the first and second quarters, respectively. We are concerned at the continued levels of supervisors failing to notify evidence technicians when required to do so.

The CPD remains in Preliminary compliance with the requirements of ¶226 and has achieved Secondary compliance through its training efforts.

### Paragraph 226 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶227

> **227.** *Any CPD member who becomes aware of information indicating that a reportable use of force occurred but was not reported must immediately notify his or her supervisor.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**          *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**          *In Compliance* (FIFTH REPORTING PERIOD)
**Full:**          *Under Assessment*

In the seventh reporting period, the City and the CPD maintained Preliminary and Secondary compliance with the requirements of ¶227.

To determine compliance, the IMT reviews relevant CPD policies, TRED's Year-End and Quarterly Reports, documentation on COPA's website, and the CPD's training.

During the sixth reporting period, we reviewed the CPD's *In-Service Supervisor Training*. On April 12, 2022, the IMT observed the supervisor training.

During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*.

We have explored requesting additional relevant data from COPA regarding this issue, but they do not have such data readily available at this time. Moreover, we note that during TRED's reviews of officers who use force, they routinely review all body-worn camera of the officer involved and the officers present, so TRED is in a position to identify unreported force by officers but the IMT has received no such reports. In our interviews with supervisors during this reporting period, they were unaware of any instance in which an officer reported a previously unreported use of force incident.

We remain concerned about the possibility of future failures to report force because both the IMT's Special Report and the OIG's report on the 2020 protests indicate that unreported use of force was a significant issue. We appreciate the emphasis on this issue in training through which the CPD maintains Secondary compliance and look forward to continued emphasis. For the CPD to move toward Full compliance, the IMT will be reviewing documentation from other sources including BIA, COPA, and the City's Law Department and will look for evidence of procedures to capture such information and to identify the agency or unit that would be the repository of such reports.

## Paragraph 227 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Secondary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:

Secondary

# Use of Force: ¶228

**228.** *Supervisors play a critical role in ensuring that force is used legally, consistent with CPD policy, and in a manner that will promote community confidence in the Department. Supervisor reviews and investigations of uses of force are essential to identify necessary individual and departmental corrective action.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD remained in Preliminary compliance with the requirements of ¶228 and remains under assessment for Secondary compliance.

To assess compliance, the IMT reviews relevant CPD policies, TRED's Year-End and Quarterly Reports, the CPD's Use of Force Dashboard and supervisory dashboard, and the CPD's training. We also meet each month with members of CPD leadership.

During the sixth reporting period, we reviewed the CPD's *In-Service Supervisor Training*. On April 12, 2022, the IMT observed the supervisor training. The training focused on the need for front-line supervisors to point out training needs and deficiencies when they investigate use of force incidents and emphasizes the CPD's processes for supervisors to do so.

During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*.

We remain concerned that while front-line supervisors and members of TRED have access to the same reports and body-worn camera videos, the results of their observations differ greatly. TRED reports continue to identify front-line supervisors' failure to take action when there are clear officer deficiencies.

This is troubling, since the *In-Service Supervisor Training* that was delivered during this reporting period specifically directs supervisor to (1) identify; (2) address; and (3) document officer deficiencies regarding use of force and reporting requirements. Training and direction around the Supervisory Dashboard must clearly articulate supervisor expectations to immediately address officer issues and not wait for TRED to review then and take action. Again, the IMT stresses the criticality of

front-line supervisors embracing their roles in accountability to move reform forward.

In our interviews with supervisors during this reporting period, one noted that the importance of addressing officer deficiencies "up front at the district level" rather than "wait to get the TRED notice later" was starting to take hold among supervisors, which we found promising. On the other hand, some of the supervisors we interviewed this reporting period indicated that TRED is responsible for identifying patterns and trends for TRR debriefings.

The anticipated *2023 Use of Force Policy Update Training* includes the following requirement of the investigating supervisor, per G03-02-08, *Department Review of Use of Force*: "When determining any recommended after-action support for Department members or supervisors, the investigating supervisor will access the 'TRR Debriefing Point Dashboard' to identify and review any previous use-of-force-related debriefing points for the involved members." The IMT hopes the training will continue to encourage district supervisors to address deficiencies as they arise.

TRED's *2021 Year-End Report* indicates that supervisors documented corrective action 128 times in 2021, which accounts for 5.4% of reviewed TRRs.[126] TRED's *2022 Q1 Report* and *2022 Q2 Report* indicate that supervisors documented corrective action 43 (8.6%) and 69 (8.6%) times in the first half of 2022.

In conclusion, the IMT stresses that the CPD needs to emphasize timely and effective front-line supervision, clearly addressing these deficiencies through training. The CPD remains in Preliminary compliance and is under assessment for Secondary compliance. We see an opportunity to further address these shortcomings with the rollout of the Supervisory Dashboard tool and the CPD's messaging to supervisors about its utility. The IMT looks forward to the CPD's additional efforts to address these continuing issues in the next reporting period.

---

[126]    TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (APRIL 29, 2022), https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

## Paragraph 228 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:

Preliminary

# Use of Force: ¶229

> **229.** All reportable uses of force by CPD members must be reviewed by CPD supervisors.

**Compliance Progress**     (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**    *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:**    *In Compliance* (NEW)
**Full:**    *Not Yet Assessed*

During the seventh reporting period, the CPD maintained Preliminary compliance and achieved Secondary compliance with the requirements of ¶229.[127]

To assess compliance with this paragraph, the IMT relied on several data sources, such as the CPD's relevant policies, including G02-02 *First Amendment Rights* policy, TRED's Year-End and Quarterly Reports, the CPD's Use of Force Dashboard, the CPD's processes regarding its First Amendment policy, and the CPD's training.

During the sixth reporting period, we reviewed the CPD's *In-Service Supervisor Training* and on April 12, 2022, the IMT observed the supervisor training. Additionally, the CPD distributed a *Tactical Response Report Training Guide* on supervisory duties and responsibilities and guide for filling out TRRs, which we also reviewed.

During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*. The IMT also reviewed records demonstrating that 95.25% of CPD officers completed the *First Amendment Rights eLearning* by December 20, 2022. Therefore, the CPD achieved Secondary compliance with ¶229.

As we noted in our analysis of ¶227, we remain concerned about the possibility of officers failing to report use of force incidents. We note that TRED's *2021 Year-End Report* does not note any debriefings for failing to report force, as those cases would be sent to COPA. Our past inquiries of COPA on this issue have not yielded any data, as this is a category not currently tracked.

The CPD's in-service annual training addresses the expectations and requirements for officers to report uses of force in their day-to-day policing and the CPD's *First Amendment Rights* policy and accompanying forms address problems associated

---

[127]   We acknowledge that the OAG disagrees with our determination of Secondary compliance for this paragraph, based on "the In-Service Supervisors' training because CPD has not consistently identified these paragraphs in production materials regarding the training." We acknowledge these concerns, and also acknowledge the CPD's training efforts. The IMT will determine whether deficient supervision is an issue for Full compliance, and understand that our inquiries might support the need for additional training.

with the CPD's failures to report force used during the 2020 protests. Moreover, the CPD's *Constitutional Policing* course, anticipated in 2023, addresses protests and reporting issues.

We appreciate the CPD's training efforts on this issue to date and we look forward to the CPD's continued efforts to ensure that all reportable uses of force are indeed reported and are appropriately reviewed by CPD supervisors.

### Paragraph 229 Compliance Progress History

| | | |
|---|---|---|
| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶230

> **230.** *After a reportable use of force has occurred, required TRRs have been completed, and, in the case of level 2 and level 3 incidents, a responding supervisor has documented any investigatory information collected, the incident will be reviewed and evaluated by a CPD supervisor at least the rank of Lieutenant, and in all instances at least one rank level above that of the highest-ranking member who engaged in the reportable use of force, or by a command staff member, when designated ("reviewing supervisor").*

## Compliance Progress             (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with the requirements of ¶230.[128]

To assess compliance, the IMT reviewed relevant CPD policies, the TRR, TRR-I, TRR-R forms, TRED Year-End and Quarterly Reports, and the CPD's training.

During the sixth reporting period, we reviewed the CPD's *In-Service Supervisor Training*. On April 12, 2022, the IMT observed the supervisor training and note that the curriculum addresses the requirements of this paragraph. Additionally, the CPD distributed a *Tactical Response Report Training Guide* on supervisory duties and responsibilities and guide for filling out TRRs, which we also reviewed.

During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*.

TRED's *2021 Year-End Report* indicates that a CPD sergeant has never approved a TRR for another sergeant.[129] However, the IMT is aware of two instances in which the required processes of reporting and reviewing force did not happen.

---

[128] We acknowledge that the OAG disagrees with our determination of Secondary compliance for this paragraph, based on "the In-Service Supervisors' training because CPD has not consistently identified these paragraphs in production materials regarding the training." We acknowledge these concerns, and also acknowledge the CPD's training efforts. The IMT will determine whether deficient supervision is an issue for Full compliance, and understand that our inquiries might support the need for additional training.

[129] TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (APRIL 29, 2022), https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

In conclusion, while the CPD remains in Preliminary compliance and has achieved Secondary compliance with the requirements of ¶230, we stress the importance of these processes and encourage continued training and supervision of these requirements.

## Paragraph 230 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
| --- | --- | --- |
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| --- | --- | --- |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD |
| --- |
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| Secondary |

# Use of Force: ¶231

*231. The reviewing supervisor will conduct an investigation into the reportable use of force incident by reviewing all information reasonably available regarding the incident, including written reports, video or audio recordings, and, in the case of level 2 and level 3 reportable use of force incidents, witness statements, photographs (if available), and other evidence or information collected by the responding supervisor. After advising the subject of his or her right not to answer questions and other applicable rights, and only if the subject voluntarily consents to an interview, the reviewing supervisor will interview the subject solely about the reportable use of force. In addition, the reviewing supervisor will visually inspect the subject and document any injuries observed.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance and achieved Secondary compliance with the requirements of ¶231.[130]

To assess compliance, the IMT reviews relevant CPD policies, TRED Year-End and Quarterly Reports, the CPD's use of force Dashboard, and the CPD's training.

During the sixth reporting period, we reviewed the CPD's *In-Service Supervisor Training* and on April 12, 2022, the IMT observed the supervisor training. Additionally, the CPD distributed a *Tactical Response Report Training Guide* on supervisory duties and responsibilities and guide for filling out TRRs, which we also reviewed. The supervisor training and accompanying materials emphasized the importance of the watch operations lieutenant inspecting subjects for injuries and responding to a hospital if required (it appears in the *Tactical Response Report Training Guide* at page 2, pages 12–13, and in notes 1–4).

---

[130] We acknowledge that the OAG disagrees with our determination of Secondary compliance for this paragraph, based on "the In-Service Supervisors' training because CPD has not consistently identified these paragraphs in production materials regarding the training." We acknowledge these concerns, and also acknowledge the CPD's training efforts. The IMT will determine whether deficient supervision is an issue for Full compliance, and understand that our inquiries might support the need for additional training.

During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*.

In our interviews with lieutenants during this reporting period, they indicated that they routinely check for injuries and ensure transfers to hospitals as appropriate. They also noted that during investigations, arrestees will rarely engage in discussion regarding an officer's use of force.

Data from TRED reports indicate the following debriefing points for reviewing supervisor performance on the requirements of this paragraph in 2022: reports not completed within 48 hours without documented approval (11 debriefings in the first quarter of 2022 and 10 debriefings in the second quarter of 2022); TRR reviewed by supervisor who used or ordered force (4 debriefings in the first quarter of 2022). All of these deficiencies cause the IMT some concern; we hope to see improvement during the next reporting period.

### Paragraph 231 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶232

> **232.** *For all reportable uses of force, the reviewing supervisor will determine, based on the information reviewed, if the use of force requires a notification to COPA and will assess whether the use of force was in compliance with CPD policy (except for incidents involving deadly force or an officer-involved death). The reviewing supervisor will also review the TRR, or any similar form of documentation CPD may implement, for sufficiency and completeness.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with the requirements of ¶232.[131]

To assess compliance with these requirements, the IMT reviews relevant CPD policies, TRED's Year-End and Quarterly Reports, the CPD's Use of Force Dashboard, and the CPD's training.

During the sixth reporting period, we reviewed the CPD's *In-Service Supervisor Training* and on April 12, 2022, the IMT observed the supervisor training. Additionally, the CPD distributed a *Tactical Response Report Training Guide* on supervisory duties and responsibilities and guide for filling out TRRs, which we also reviewed.

During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*.

Data reported by TRED during this reporting period—along with our interviews with supervisors during this reporting period—indicate that supervisors are referring cases to COPA with relative frequency. As we noted in our prior report, TRED's *2021 Year-End Report* indicates that the number of cases tagged for COPA review by CPD district and unit personnel was 256, or 10.8% of all 2021 TRRs, a slight decrease from 2020 when 266 cases were tagged for COPA review. We note that this decrease is likely consistent with the lower numbers of TRRs and arrests being

---

[131] We acknowledge that the OAG disagrees with our determination of Secondary compliance for this paragraph, based on "the In-Service Supervisors' training because CPD has not consistently identified these paragraphs in production materials regarding the training." We acknowledge these concerns, and also acknowledge the CPD's training efforts. The IMT will determine whether deficient supervision is an issue for Full compliance, and understand that our inquiries might support the need for additional training.

made by the CPD. We await TRED's *2022 Year-End Report* and will include those data in our next report.

Our review of the first two TRED Quarterly Reports for 2022 indicate that unit or district supervisors notified COPA 31 times regarding complaints in Q1 and 21 times in Q2.

Finally, the IMT notes that the CPD's Use of Force Dashboard has not been updated to provide the numbers of 2022 TRRs, TRR-Is, and TRR-Rs as the sources of referrals to COPA.

We appreciate the CPD's training efforts to achieve Secondary compliance during this reporting period.

### Paragraph 232 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶233

> **233.** *For all reportable use of force incidents, the reviewing supervisor will: provide timely, constructive feedback, where appropriate, to the officer who engaged in the reportable use of force, the officer's supervisor, or both; recommend additional training and/or support as necessary based on the incident; take appropriate action, including referring uses of force that may violate law or CPD policy to COPA.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with the requirements of ¶233.[132]

To assess compliance, the IMT reviews relevant CPD policies, TRED's Year-End and Quarterly Reports, the TRR, TRR-I, TRR-R forms, TRED's system for ensuring the documentation of debriefing points, and the CPD's related training.

In our review of CPD policy G03-02-02, *Incidents Requiring the Completion of Tactical Response Report* (effective date April 15, 2021), we note that section VI.B.2.g.(1)–(3) addresses the requirements of this paragraph.

We also note that the TRR-I form requires the watch operations lieutenant to indicate via check boxes which (if any) actions they recommend for officer improvement; those actions address some of the requirements of this paragraph.

During the sixth reporting period, we reviewed the CPD's *In-Service Supervisor Training* and on April 12, 2022, the IMT observed the supervisor training. Additionally, the CPD distributed a *Tactical Response Report Training Guide*, which clearly advises watch operations lieutenants to identify issues, address issues, and document issues with officers and supervisors.

---

[132] We acknowledge that the OAG disagrees with our determination of Secondary compliance for this paragraph, based on "the In-Service Supervisors' training because CPD has not consistently identified these paragraphs in production materials regarding the training." We acknowledge these concerns, and also acknowledge the CPD's training efforts. The IMT will determine whether deficient supervision is an issue for Full compliance, and understand that our inquiries might support the need for additional training.

During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*.

In the second quarter of 2022, TRED began to address a new debriefing point for instances when an officer is debriefed for a body-worn camera issue but the approving supervisor takes no corrective action.[133] TRED's *2022 Q2 Report* indicates that TRED issued seven of these new debriefing points in the second quarter of 2022. Body-worn camera problems persist and holding district level supervisors accountable for failing to address them is an important step. We hope to see progress on supervisors fulfilling their requirements to act when they see officers' deficiencies.

We appreciate the progress on this paragraph during this reporting period and look forward to continued progress in the next reporting period.

### Paragraph 233 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

---

[133]  TRED's *2022 Q2 Report* at 6.

# Use of Force: ¶234

> **234.** *CPD will continue to require the reviewing supervisor to document in a Tactical Response Report – Investigation ("TRR-I"), or in any other similar form of documentation CPD may implement, his or her detailed assessment of compliance with CPD policy, any constructive feedback, and any required or recommended action. In addition, the reviewing supervisor will include in the TRR-I or in any other similar form of documentation CPD may implement, the identities of CPD members on scene during the incident who are reasonably believed to have relevant knowledge or information regarding the reportable use of force.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with the requirements of ¶234.[134]

To assess compliance, the IMT reviewed the CPD's relevant policies, TRED's Year-End and Quarterly Reports, the CPD's Use of Force Dashboard data, the TRR, TRR-I, and TRR-R forms, and the CPD's related training.

During the sixth reporting period, we reviewed the CPD's *In-Service Supervisor Training* and on April 12, 2022, the IMT observed the supervisor training. Additionally, the CPD distributed a *Tactical Response Report Training Guide*.

During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*.

TRED's reports point to issues with supervisors fulfilling their responsibilities regarding the "witness box" on the form, but do not detail failures of supervisors to document officers on scene. The TRR-R, which was revised in May 2022, lists a debriefing point for "CPD Witness Identified"; in the next reporting period, we will seek clarification from TRED about whether this debriefing point addresses the

---

[134] We acknowledge that the OAG disagrees with our determination of Secondary compliance for this paragraph, based on "the In-Service Supervisors' training because CPD has not consistently identified these paragraphs in production materials regarding the training." We acknowledge these concerns, and also acknowledge the CPD's training efforts. The IMT will determine whether deficient supervision is an issue for Full compliance, and understand that our inquiries might support the need for additional training.

requirements of ¶234. It is our understanding that TRED reviews all body-worn camera footage of involved officers and uninvolved officers who respond to a use of force incident scene.

In the second quarter of 2022, TRED began to address a new debriefing point for instances when an officer is debriefed for a body-worn camera issue but the approving supervisor takes no corrective action.[135] TRED's *2022 Q2 Report* indicates that TRED issued seven of these new debriefing points in the second quarter of 2022. Body-worn camera problems persist and holding district level supervisors accountable for failing to address them is an important step. We hope to see progress on supervisors fulfilling their requirements to act when they see officers' deficiencies.

We look forward to continued progress with these requirements.

### Paragraph 234 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

---

[135] TRED's *2022 Q2 Report* at 6.

# Use of Force: ¶235

> **235.** *All district-level supervisory review documentation regarding a reportable use of force incident must be completed within 48 hours of the incident, unless an extension is approved by a command staff member.*

## Compliance Progress        (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with the requirements of ¶235.[136]

To assess compliance, the IMT reviews relevant CPD policy, TRED's Year-End and Quarterly Reports, the CPD's use of force Dashboard, and the CPD's related training. We also participate in numerous conversations with CPD personnel on regularly scheduled calls.

During the sixth reporting period, we reviewed the CPD's *In-Service Supervisor Training* and on April 12, 2022, the IMT observed the supervisor training. Additionally, the CPD distributed a *Tactical Response Report Training Guide*.

During the seventh reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*.

TRED's *2021 Year-End Report* indicates that there were 37 incidents in 2021 in which investigations exceeded 48 hours without documented approval and TRED conducted debriefings with those supervisors.[137] TRED's first two *2022 Quarterly Reports* indicate that there were 11 incidents in 2022 Q1 and 10 incidents in 2022 Q2 in which investigations exceeded 48 hours without documented approval and TRED conducted debriefings with those supervisors.

---

[136]  We acknowledge that the OAG disagrees with our determination of Secondary compliance for this paragraph, based on "the In-Service Supervisors' training because CPD has not consistently identified these paragraphs in production materials regarding the training." We acknowledge these concerns, and also acknowledge the CPD's training efforts. The IMT will determine whether deficient supervision is an issue for Full compliance, and understand that our inquiries might support the need for additional training.

[137]  TRED's *2021 Year-End Report*, CHICAGO POLICE DEPARTMENT (April 29, 2022) at 57, https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

In our interviews during this reporting period, supervisors in one district that they require sergeants to complete reports prior to the end of their shifts; another indicated that they sought and obtained permission and were granted a time extension to complete their TRR-I.

The IMT appreciates the delivery of the *In-Service Supervisor Training* during this reporting period, which addressed the requirements of ¶235 in its curriculum. We look forward to continued progress in the next reporting period.

### Paragraph 235 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶236

**236.** *CPD will continue to develop, implement, and maintain a system of video recording officers' encounters with the public with body-worn cameras. The use of body-worn cameras will be designed to increase officer accountability, improve trust and CPD legitimacy in the community, and augment CPD's records of law enforcement-related activities.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period the City and the CPD have not yet achieved Preliminary compliance and remain under assessment.

To assess compliance, the IMT reviewed the current version of the CPD's *Body Worn Cameras* Special Order (effective April 30, 2019), and, in May 2022, a revised draft of Special Order S03-14, *Body Worn Cameras*. We also reviewed TRED's Year-End and Quarterly Reports and held many conversations with CPD personnel during regularly scheduled meetings. As we noted in our last report, given the impact of body-worn cameras on community trust, the City and the CPD will not reach Preliminary compliance until they gather the community input required by ¶160.

This reporting period, the IMT provided feedback on the May 2022 production of S03-14, which also included review of revised draft forms CPD-21.130, *Body Worn Camera Video Review* and CPD-21.131, *Body Worn Camera Videos Viewed*. The CPD shared a revised version of S03-14 with the IMT on November 17, 2022 for review and comment. On December 31, 2022, the IMT shared its comments on the policy. A continued concern that we raised—and have included in prior review comments on the policy—is that the CPD had not engaged with Chicago's communities regarding the policy per ¶160 and the CPD's obligation to "establish and maintain clear channels through which community members can provide input" regarding this policy. In October 2022, the CPD had shared plans to engage the community in comment on this policy, working with its Office of Community-Oriented Policing. Community engagement was to include at least one web-based seminar on the content of the policy and a public comment period. The IMT has recommended previously that the CPD initiate community engagement earlier in their policy development process as opposed to in the final stages. Shortly after producing the revised policy to the IMT and OAG, on November 18, 2022, the CPD did post the policy on its website for public comment through December 15, 2022. The IMT looks forward to the CPD's further efforts in the next reporting period to engage the community in this policy.

In our December comments, the IMT also emphasized again that S03-14 is critical to, among other things, the CPD's ability to comply with requirements across the Consent Decree—and not just the paragraphs cited by CPD in its productions for review of the revised policy (¶¶236–41).

In addition to IMT feedback, the OAG and Coalition have expressed concerns with the policy. In December 2022, the Coalition shared several faults regarding body-worn cameras, such as early deactivation of cameras, supervisors reviewing only one body-worn camera per shift, and supervisors' failures to review footage to ensure probable cause. Similarly, the OAG found fault with the deactivation of cameras during public safety questioning. The IMT looks forward to the CPD addressing these concerns.

Additionally, the IMT continues to seek more information to understand any discipline resulting from repeated body-worn-camera-related failures. A review of the first two TRED quarterly reports of 2022 indicated issues with body-worn cameras that resulted in debriefings 269 times.

Finally, we continue to await the creation of an effective and efficient system in which front-line supervisors monitor and address deficiencies of all sorts, including body-worn camera deficiencies. Once supervisors properly understand the functions and expectations for use of the Supervisory dashboard and it is operational, we expect that supervisors will be reminded to pay close attention to their officers' body-worn camera usage. The IMT awaits the finalization of Special Order S03-14, *Body Worn Cameras*, after it appropriately incorporates community feedback, followed by clear training on the policy, which will move the CPD toward Secondary compliance.

### Paragraph 236 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Under Assessment | Under Assessment |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Under Assessment | | |

# Use of Force: ¶237

> **237.** *CPD will continue to require all officers assigned to patrol field duties to wear body-worn cameras and microphones with which to record law-enforcement related activities as outlined in the Illinois Law Enforcement Officer-Worn Body Camera Act (50 ILCS 706/10-1 et seq.), with limited exceptions, including, but not limited to, when requested by a victim or witness of a crime, or interacting with a confidential informant. CPD will develop and implement a written policy delineating the circumstances when officers will not be equipped with body-worn cameras.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD remain under assessment with ¶237, pending the requisite community engagement on the body-worn camera policy, Special Order S03-14 *Body Worn Cameras*. As we noted in our last two reports, given the impact of body-worn cameras on community trust, the City and the CPD will not reach Preliminary compliance until they gather community input and meaningfully consider it. We encourage the CPD to hear community concerns about cameras and privacy.

To assess compliance, we continue to review drafts of S03-14 *Body Worn Cameras* (see ¶236 for details on the development and review of S03-14 during this reporting period). In our previous assessments of the CPD's progress on these requirements, we noted concerns with the CPD clearly articulating "when officers will not be equipped with body-worn cameras." The current version of the policy that the IMT reviewed most recently addresses this issue and appears to address the criteria of this paragraph. We note that the current version of S03-14, *Body Worn Cameras*, addresses who should be equipped in Section IV subsection F6, which states, "Commanding officers of units identified above will ensure that all members under their command that are not equipped and required to use BWC are properly documented in the Clear Watch application."

The IMT is concerned about the CPD giving direction to its officers as soon as possible through the finalization of this policy and the appropriate corresponding training. We look forward to the CPD's continued progress toward finalizing the *Body Worn Cameras* policy and delivering the necessary training to its officers.

## Paragraph 237 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Under Assessment

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Under Assessment

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Under Assessment

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Under Assessment

# Use of Force: ¶238

***238.*** *CPD will continue to maintain a policy regarding body-worn camera video and audio recording that will require officers to record their law-enforcement related activities, and that will ensure the recordings are retained in compliance with the Department's Forms Retention Schedule (CPD-11.717) and the Illinois Law Enforcement Officer-Worn Body Camera Act. At a minimum, CPD's body-worn camera policy will: a. clearly state which officers are required to use body-worn cameras and under which circumstances; b. require officers, subject to limited exceptions specified in writing, to activate their cameras when responding to calls for service and during all law enforcement-related activities that occur while on duty, and to continue recording until the conclusion of the incident(s); c. require officers to articulate in writing or on camera their reason(s) for failing to record an activity that CPD policy otherwise requires to be recorded; d. require officers to inform subjects that they are being recorded unless doing so would be unsafe, impractical, or impossible; e. address relevant privacy considerations, including restrictions on recording inside a home, and the need to protect witnesses, victims, and children; f. establish a download and retention protocol; g. require periodic random review of officers' videos for compliance with CPD policy and training purposes; h. require that the reviewing supervisor review videos of incidents involving reportable uses of force by a subordinate; and i. specify that officers who knowingly fail to comply with the policy may be subject to progressive discipline, training, or other remedial action.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD remain under assessment with the requirements of ¶238, pending the requisite community engagement on the body-worn camera policy, Special Order S03-14, *Body Worn Cameras*. As we noted in our last three reports, given the impact of body-worn cameras on community trust, the City and the CPD will not reach Preliminary compliance until they gather community input.

To assess compliance for this paragraph, we continue to review drafts of S03-14 *Body Worn Cameras* (see ¶236 for details on the development and review of S03-14 during this reporting period). In our previous assessments of the CPD's progress on these requirements, we noted concerns with the CPD clearly articulating "when

officers will not be equipped with body-worn cameras." (See ¶237.) The current version of the policy that the IMT reviewed most recently addresses this issue and appears to address the criteria of ¶238 in subsections *a* through *i*.

However, the community engagement process has not been completed to the extent that it needs to. Concerns have been raised that the CPD needs to have legitimate community engagement. The IMT has suggested in the past to initiate community input earlier in the policy process as opposed to the final stages.

We look forward to the CPD's continued progress toward finalizing the *Body Worn Cameras* policy and the necessary training.

### Paragraph 238 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Under Assessment | Under Assessment |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Under Assessment | | |

# Use of Force: ¶239

> **239.** *CPD officers must comply with the body-worn camera policy. CPD will impose progressive discipline, training, or other remedial action on officers who do not comply with the body-worn camera policy, as permitted by applicable law.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *Under Assessment*
**Secondary:**       *Not Yet Assessed*
**Full:**            *Not Yet Assessed*

In the seventh reporting period, the City and the CPD remain under assessment for Preliminary compliance with ¶239.

To assess compliance, the IMT reviewed Special Order S03-14, *Body Worn Cameras*, and TRED's Year-End and Quarterly Reports, and participated in many conversations with CPD officials during regularly scheduled meetings.

We note that the CPD has not yet finalized Special Order S03-14, *Body Worn Cameras*; the CPD still needs to gather and consider the requisite community engagement on the body-worn camera policy. As we noted in our last several reports, given the impact of body-worn cameras on community trust, the City and the CPD will not reach Preliminary compliance until they gather community input.

We have also carefully observed the development of the Supervisory Dashboard, which is a tool that should be used by supervisors to observe operational deficiencies, such as failures in use of body-worn cameras. As noted in other paragraphs for this reporting period, the CPD must set clear and defined expectations for the use of this dashboard by supervisors.

The IMT is still awaiting the status of labor issues on BWC failures; however, in the 2022 TRED second quarterly report, approving supervisors received seven recommendations for failing to address a body-worn-camera deficiency for the first time. TRED is also re-enrolling officers for late body-worn camera activation if they had one prior occurrence of failure to or late activation.

TRED's 2022 first two quarterly report summary on body-worn camera issues are as follows*:*

Use of Force Appendix Figure 7.

| 2022 TRED First 2 Quarterly Reports Summary | |
|---|---|
| BWC: TRR late activation | 190 |
| BWC: TRR early de-activation | 33 |
| BWC: no activation | 19 |
| BWC: TRR other | 14 |
| BWC: no buffering | 12 |
| BWC: issue not articulated | 1 |
| *Total BWC issues* | *269* |

Furthermore, the body-worn camera problems for firearm pointing incidents for all of 2022 from CPD's dashboard totaled 1,392.

The use of body-worn cameras has improved but remains a significant issue as the above data indicates. The ability to identify repeat offenders and impose training and progressive discipline, where warranted, is necessary for the CPD to continue to improve.

The IMT has received inconsistent information regarding progressive discipline in prior reporting periods. During this reporting period, the IMT saw some progress in this area. In August 2022, the CPD shared with the IMT that the CPD does not have a transgression code for body-worn camera failures, thus they are unable to provide SPAR data. It also indicated a recommendation to create a new transgression code for body-worn cameras. Additionally, in the fourth quarter of 2021, TRED began to re-enroll officers in the body-worn camera eLearning module if they had one prior deficiency.

Furthermore, a recent Police Board decision settled a dispute between COPA and the CPD Superintendent regarding the appropriate punishment for failing to activate a body-worn camera. COPA imposed a recommended 10-day suspension and the Superintended countered with a recommended 1-day suspension. The Police Board sided with COPA, imposing 10 days of suspension. The case highlighted the need for consistent punishment for BWC offenses, which does not currently exist.

Now that it has been developed, the IMT awaits the use of the Supervisory Dashboard by supervisors, which may help identify and rectify some of the persistent body-worn camera issues, as well as community input in the *Body Worn Cameras* policy. We look forward to clarifying in future reporting periods how and whether the CPD imposes progressive discipline as ¶239 requires.

## Paragraph 239 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Under Assessment | Under Assessment |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Under Assessment

# Use of Force: ¶240

**240.** *Any CPD officer required to wear a body-worn camera must: a. visually and physically inspect the body-worn camera and ensure that it is the member's assigned camera, fully charged, and operational at the beginning of each tour of duty; and b. notify a supervisor as soon as practical if, at any time, the member's assigned body-worn camera becomes inoperable (including when either or both of the audio or video recording functions is inoperable) or is damaged.*

## Compliance Progress
(Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD remained under assessment for Preliminary and Secondary compliance with ¶240.

To assess compliance with these requirements, we continue to review drafts of S03-14 *Body Worn Cameras* (see ¶236 for details on the development and review of S03-14 during this reporting period). As noted in the sixth reporting period, the draft of Special Order S03-14 contains language responsive to this requirement, closely tracking the language of this paragraph and clearly articulating, for example, that damaged cameras will be replaced promptly in order to ensure that officers have properly functioning cameras.

As in the last two reporting periods, the CPD remains under assessment, however, because S03-14 was not finalized and issued during this reporting period. The CPD has not yet completed the requisite community engagement on this policy.

We look forward to reviewing the finalized policy in the next reporting period.

### Paragraph 240 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Under Assessment | Under Assessment |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Under Assessment | | |

# Use of Force: ¶241

**241.** *CPD will ensure that any CPD officer who reports an inoperable or damaged body-worn camera is promptly provided with a temporary or replacement body-worn camera, which will in no event be later than the beginning of the member's next tour of duty.*

## Compliance Progress  (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *Under Assessment*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

In the seventh reporting period, the City and the CPD remain under assessment for the requirements of ¶241, pending the requisite community engagement on the body-worn camera policy, Special Order S03-14, *Body Worn Cameras*. As we noted in our last three reports, given the impact of body-worn cameras on community trust, the City and the CPD will not reach Preliminary compliance until they gather community input.

To assess compliance, we continue to review drafts of S03-14 *Body Worn Cameras* (see ¶236 for details on the development and review of S03-14 during this reporting period). The current draft policy addresses the requirements of this paragraph, stating that Chicago's Office of Public Safety Administration[138] is responsible for "promptly providing department members who have reported an inoperable or damaged BWC with a replacement (temporary or permanent) no later than the beginning of the reporting members next tour of duty." We also reviewed applicable Illinois law.

We anticipate that the CPD will achieve Preliminary compliance with this paragraph after community input has been gathered and incorporated into the policy and the policy is finalized. We look forward to additional progress in the next reporting period.

---

[138] *See Office of Public Safety Administration*, CITY OF CHICAGO, https://www.chicago.gov/city/en/depts/opsa.html.

## Paragraph 241 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Under Assessment

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Under Assessment

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Under Assessment

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Under Assessment

# Use of Force: ¶242

> **242.** *CPD will ensure that CPD officers assigned to Department vehicles that are equipped with in-car cameras check that the cameras are fully functional at the beginning of each watch and make appropriate notifications when they are not. CPD will ensure that any nonfunctioning or malfunctioning in-car camera is repaired or replaced within two weeks of a CPD officer reporting that the in-car camera is not functioning properly.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD are not in compliance with the requirements of ¶242.

To assess compliance, the IMT reviewed the CPD's Special Order S03-05, *In-Car Video Systems* (effective date November 27, 2018), which has not been updated since the consent decree began in 2019.

The current policy requires that officers determine whether in-car cameras are operational prior to beginning their shift and requires supervisors to monitor which cars have functioning in-car cameras and which do not, along with proper documentation.

The current policy does not provide for non-functioning in-car cameras to be repaired within two weeks, as this policy requires.

As the CPD works to update this policy, the IMT emphasizes the importance of seeking the requisite community feedback on this important policy. We look forward to the CPD's progress on these requirements in the next reporting period.

## Paragraph 242 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

None

# Use of Force: ¶243

> **243.** *CPD's pre-service and in-service training must provide officers with knowledge of policies and laws regulating the use of force; equip officers with tactics and skills, including de-escalation techniques, to prevent or reduce the need to use force or, when force must be used, to use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and ensure appropriate supervision and accountability.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and are under assessment for Secondary compliance with the requirements of ¶243.

To assess compliance, the IMT reviewed relevant CPD policy, TRED's Year-End and Quarterly Reports, and in-service training curricula, including the *2022 In-Service Supervisor Training* and the *2022 2022 De-Escalation, Response to Resistance, and Use of Force* in-service training. We also observed demonstrations of both the Supervisory Dashboard and the De-escalation Dashboards and reviewed TRED's debriefing points on de-escalation in its *2021 Year-End Report.*

Overall, CPD policy and training provides officers with the knowledge and skills regulating use of force and de-escalation. The CPD describes in policy the requirements of ¶243 in General Order G03-02, *De-escalation, Response to Resistance, and Use of Force*. Specifically, it states in Section X, Use of Force Training: "At a minimum, Department members will receive annual training on the laws and Department policies regulating the use of force, including, but not limited to, de-escalation, force options, and appropriate supervision and accountability."

The IMT acknowledges the CPD's efforts to equip officers with knowledge of policy and law related to using force, tactics, and skills, and particularly appreciates the focus on de-escalation during this reporting period. The IMT's area of concern continues to be supervision and accountability. The CPD must emphasize the importance of front-line supervisors immediately pointing out deficiencies and must encourage its supervisors to use proper documentation.

The IMT believes ensuring appropriate supervision and accountability remains an area requiring further training.

The CPD shared its *Pre-Service Supervisor Use of Force Training* with the IMT and OAG on August 11, 2022, for which the IMT and OAG provided feedback on September 12, 2022 and September 10, 2022, respectively. On November 17, 2022, the CPD provided a revised version of the training, for which the IMT and OAG provided a no-objection notice on December 29, 2022 and December 2, 2022, respectively. This training emphasizes the front-line supervisory need for immediate reviews, de-escalation, and scenario-based training. Additionally, the Pre-Service training introduces the Supervisory Dashboard.

The IMT acknowledges that CPD's Pre-Service and In-Service trainings have addressed training on laws and policies, as well as equipping officers with tactics and skills when force must be used as indicated in prior paragraphs.

Issues surrounding accountability and supervision must be further addressed and become the responsibility of front-line supervisors. We look forward to the CPD's clear communications to supervisors regarding expectations for using the Supervisory and De-escalation Dashboards in the next reporting period.

## Paragraph 243 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Use of Force: ¶244

**244.** *CPD's training regarding the use of firearms, Tasers, OC devices, impact weapons, and other force options that CPD currently authorizes or may authorize in the future will be consistent with its commitment to de-escalation as a core principle. Any initial training, qualification, or requalification regarding these force options will incorporate scenario-based elements, including scenarios in which officers achieve resolution without employing force. CPD's training regarding these force options will also provide specific guidance to officers regarding required procedures and techniques after each of these force options are used, including procedures and techniques for limiting a subject's injuries.*

## Compliance Progress  (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance for the requirements of ¶244 and remain under assessment for Secondary compliance.

To assess compliance, we reviewed the CPD's use-of-force policy suite and community engagement efforts related to ¶244's requirements, including CPD General Order G03-02, *De-escalation, Response to Resistance, and Use of Force*, which describes the requirements for Use of Force training. We note that policy provides clear guidance on what types of force are authorized depending on the situation and the nature of resistance. We also reviewed relevant policy and training regarding officers rendering aid after a force incident.

To assess Secondary compliance the IMT has reviewed various CPD trainings related to ¶244's requirements. For example, during the last reporting period, the IMT attended a session of CPD recruit training regarding impact weapons in March 2022. The 8-hour course featured the basics of handling batons, including holstering and unholstering and different types of uses in the field, such as strikes. The instructors made mention of de-escalation principles only a few times throughout and the training included some limited scenarios but focused mostly on baton-handling drills. The training did not include a scenario "in which officers achieve resolution without employing force" nor did it include "procedures and techniques for limiting a subject's injuries" as required by this paragraph.

Throughout the last reporting period, the IMT also had conversations regarding scenario-based training during the qualification for firearms. The CPD continues to explore complying with this requirement alongside safety concerns.

During this reporting period, on September 22, 2022, the CPD provided materials for its *Annual Prescribed Weapon Qualification, TASER Re-Certification, and VirTra Simulation Exercise Training*. The IMT provided comments on this training on October 22, 2022. Overall, we found the training to be comprehensive and thorough to include scenario-based elements related to Tasers, firearms, and force options. The IMT shared recommendations for a few policy additions and clarifications to improve training. The CPD revised the training materials and shared a revised version on November 22, 2022, for which the IMT provided a no-objection notice for on December 27, 2022.

The IMT continues to emphasize the need for more scenarios at all levels of force training for qualification, re-qualification, and resolving incidents without officers resorting to force. We look forward to further progress on these requirements in the next reporting period.

### Paragraph 244 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Use of Force: ¶245

> **245.** *CPD will provide all current CPD officers with in-service use of force training on at least an annual basis, and more frequently when necessitated by developments in applicable law and CPD policy. CPD will coordinate and review all use of force training to ensure quality, consistency, and compliance with federal and state law, CPD policy, and this Agreement.*

**Compliance Progress**      (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    Annual        ☑ **Not Yet Applicable**

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**      *Under Assessment* (NEW: LOST COMPLIANCE)
**Full:**           *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance but lost Secondary compliance with ¶245.

To assess Preliminary compliance, the IMT reviewed relevant CPD policy. To assess Secondary compliance, the IMT reviewed and observed the 2021 in-service training, which included applicable legal updates, and we note that the PowerPoint slide presentation featured the latest revisions to relevant CPD policies.

During the sixth reporting period, the CPD provided records to demonstrate that as of February 18, 2022, more than 95% of officers received the two-day *2021 De-Escalation, Response to Resistance, and Use of Force* in-service training, with 96.71% of participants completing the *Communications* eight-hour course and 96.86% completing the *Procedures* eight-hour course.[139] As a result, the City and the CPD achieved Secondary compliance with ¶245 in the sixth reporting period. However, during this reporting period, the CPD did not demonstrate training completion of 95% of officers for its *2022 De-Escalation, Response to Resistance, and Use of Force* in-service training. Paragraph 245 requires at least annual in-service training on use of force, thus the IMT will review this requirement for maintaining compliance annually.

The CPD's training has consistently improved by addressing issues identified by TRED and providing officers with the most recent policy and law changes. The CPD is preparing for the 2023 in-service training and we look forward to that. We note that the CPD's forthcoming *Constitutional Policing* course addresses many recent

---

[139] Because of the COVID-19 extension, the CPD had until March 5, 2022, to complete the delivery of its 2021 in-service training.

critical issues, including G02-02 *First Amendment Rights* policy and G03-07 *Foot Pursuits* policy.

Moving forward, it is the IMT's intent to review the 2023 in-service training to assess quality for Full compliance and we await attendance records for the 2022 in-service training to assess Secondary compliance.

### Paragraph 245 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Use of Force: ¶246

*246. The annual use of force training will include the following topics: a. CPD policies and Fourth Amendment law governing the use of force; b. proper use of force decision-making that utilizes a critical thinking framework in which officers gather relevant facts; assess the situation, threats, and risks; consider CPD policy; identify options and determine the best course of action; and act, review, and reassess the situation; c. role-playing scenarios and interactive exercises that illustrate proper use of force decision-making; d. ethical decision-making and peer intervention, principles of procedural justice, the role of implicit bias, and strategies for interacting with individuals in crisis; e. de-escalation techniques and tactics to prevent or reduce the need for force, including exercising persuasion and advice, and providing a warning; stabilizing the situation through the use of time, distance, or positioning to isolate and contain a subject; and requesting additional personnel to respond or make use of specialized units or equipment; the proper deployment of CPD-issued or -approved weapons or technologies, including firearms and Tasers; f. use of force reporting, investigation, and review requirements, including documenting reportable use of force incidents; and g. other topics as determined based on the training needs assessment required by this Agreement.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | | | |
|---|---|---|---|
| **Recurring Schedule:** | March 5, 2022* | ✓ **Met** | ☐ **Missed** |
| | *Extended from December 31, 2021, due to COVID-19 | | |
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) | | |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) | | |
| **Full:** | *Under Assessment* | | |

In the seventh reporting period, the CPD maintained Preliminary and Secondary compliance and is under assessment for Full compliance with the requirements of ¶246.

To assess compliance, the IMT reviewed all applicable use-of-force policies and use of force training curricula, as well as observed use of force training both in person and online. Specifically, we reviewed and observed the 2022 in-service training focused on de-escalation, and the in-service supervisor training, including a review of the lesson plan and the participant's handbook *Tactical Response Report Training Guide* which was provided to all participants. Those training curricula address in part the requirements of this paragraph and we appreciate the CPD's efforts to meaningfully develop those lesson plans and materials.

The CPD's 2022 in-service curriculum includes all aspects of this paragraph's requirements, and for the first time, touches upon critical decision-making theory, which the IMT finds encouraging.

This reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*. However, the CPD did not provide attendance records for its *2022 De-Escalation, Response to Resistance and Use of Force Training* by the end of the reporting period.

The IMT notes that recruit training and in-service use-of-force training curricula and lesson plans have improved over time. Again, we stress that along with training, supervision and accountability are paramount to achieving Full compliance. We look forward to continued progress on ¶246.

### Paragraph 246 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Use of Force: ¶247

> **247.** *CPD will also provide initial training on all of the topics identi-fied above, as well as others, to all recruits as part of its recruit training curriculum.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    Ongoing         ☑ **Met**    ☐ **Missed**

**Preliminary:**    *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**    *Under Assessment*
**Full:**    *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance and remain under assessment for Secondary compliance with the requirements of ¶247.

To assess compliance, the IMT reviewed the updated Special Order S11-10-01, *Recruit Training* (effective February 28, 2022), which contains all required elements of ¶247. We also reviewed the CPD's relevant use of force and de-escalation policies, as well as the recruit training curriculum package provided to the IMT in May 2022, including lesson plans and slide presentations, which address all the elements required elements by ¶246.

In the last reporting period, we also observed a session of CPD's recruit training regarding impact weapons in March 2022. The 8-hour course featured the basics of handling batons, including holstering and unholstering and different types of uses in the field, such as strikes. The instructors made mention of de-escalation principles only a few times throughout and the training included some limited scenarios but focused mostly on baton-handling drills. The training did not include a scenario "in which officers achieve resolution without employing force" nor did it include "procedures and techniques for limiting a subject's injuries" as required by ¶244.

In this reporting period, the CPD has been responsive to a number of comments on the Recruit Force Options Training. The IMT looks forward to the finalized training in the next reporting period. The CPD has not received a letter of no objection from the IMT for the *Recruit Force Options* training course.

We look forward to the CPD's continued progress toward Secondary compliance in the next reporting period.

## Paragraph 247 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:

Preliminary

# Use of Force: ¶248

**248.** *Supervisors of all ranks, as part of their initial pre-service pro-motional training and other identified supervisory training, will receive training on the following: a. conducting use of force reviews or investigations appropriate to their rank; b. strategies for effectively directing officers in de-escalation principles and acting to intervene on the subject's behalf when any use of force is observed that is excessive or otherwise in violation of policy; and c. supporting officers who report objectively unreasonable or unreported force, or who are retaliated against for attempting to prevent objectively unreasonable force.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with and remained under assessment for Secondary compliance with the requirements of ¶248.

To assess compliance, the IMT reviewed relevant CPD policy regarding training, including CPD's S11-10-02, *Pre-Service Training* (effective February 28, 2022), which contains all elements required by ¶248 in Section III(A)(5).

We also reviewed the Pre-Service Supervisor Training, particularly the session *De-escalation, Response to Resistance, Use of Force and Tactical Response Report*.

During the sixth reporting period, our review and observation of the *2022 In-service Supervisor Training* revealed that it features support for supervisors, emphasizes their responsibilities in use of force review, reporting, and investigations, and allocates time to address retaliation and assisting officers who report objectively unreasonable or unreported force. The CPD also provided a handout to participants entitled *Tactical Response Report Training Guide.*

This reporting period, the CPD provided records to show that as of December 5, 2022, more than 95% of supervisors received the *2022 In-Service Supervisor Training*. However, the CPD did not provide attendance records for its *2022 De-Escalation, Response to Resistance and Use of Force Training* by the end of the reporting period.

In this reporting period, the pre-service training addressed use of force reviews for both sergeants and lieutenants, de-escalation, core principles, and mitigation, and

provides a focus on mentoring. The training also contained information on retaliation and the duty to report, as well as the duty to intervene. The IMT has raised some concerns with the training and has issued comments. The CPD has submitted revisions which are still under review.

The IMT looks forward to continuing our review of course materials and training attendance records which will move the CPD toward Secondary compliance.

## Paragraph 248 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Appendix 5

# Recruitment, Hiring & Promotions Compliance Assessments, by Paragraph

¶253      ¶256      ¶259      ¶262

¶254      ¶257      ¶260      ¶263

¶255      ¶258      ¶261      ¶264

# Recruitment, Hiring, and Promotions: ¶253

> **253.** *The City and CPD will ensure that its recruitment, hiring, and promotion policies and practices are lawful, fair, and consistent with best practices, anti-discrimination laws, and the terms of this Agreement.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶253 during this reporting period.

To assess Preliminary compliance with ¶253, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To assess Secondary compliance with this paragraph, we need to review substantive data demonstrating that recruitment and hiring practices align with the requirements of this paragraph, including records reflecting the development of clear guidance on the relevant policies and procedures and the allocation of responsibility thereunder.[1]

### Progress before the Seventh Reporting Period

This paragraph was assessed for the first time in the fourth reporting period when the IMT determined that the CPD failed to achieve Preliminary compliance. The City and the CPD first achieved Preliminary compliance in the fifth reporting period. During the fifth reporting period, we reviewed the CPD recruitment, hiring, and promotion records to determine if the City and the CPD developed and finalized policies, written in plain language, with proper procedures. The City and the CPD submitted the following records to support Preliminary compliance during the previous reporting period:

---

[1]    By way of example, as explained below, the documents submitted depicting Police Promotions Committee activities substantiate the City's commitment to lawful and fair promotion practices, satisfying Secondary compliance for the promotions component of this paragraph. Submission of similar data related to recruitment and hiring practices would support Secondary compliance for the recruitment and hiring components of this paragraph.

- E05-34, *Department Recruitment, Selection and Hiring Plan* (produced March 2, 2022)

- IAP 07-01, *CPD Sworn Member Recruitment* (produced June 30, 2022) (revised)

- IAP 07-02, *CPD Sworn Member Promotions* (produced June 30, 2022) (revised)

The IAP 07-01 revisions added the requirement for submission to the IMT and the OAG (per ¶638) and a change in V(2) from every four years to every three years (per ¶258). The IAP 07-02 revisions added the requirement for submission to the IMT and the OAG (per ¶638) and a change in III(2) from every four years to every three years (per ¶261). The City and the CPD also produced multiple documents depicting Police Promotions Committee activities, substantiating the City's commitment to lawful and fair promotion practices.

E05-34 clearly established responsibility for ensuring that the CPD's recruitment and hiring practices are meeting ¶253 requirements. Section III(A) provided that the Office of the Inspector General will monitor employment activity, such as recruitment, selection, hiring, and promotions for Equal Employment Opportunity. While these policies made evident that recruitment, hiring, and promotions policies meet ¶253 requirements, substantial data demonstrating that recruitment and hiring practices align with requirements was not provided. The CPD, however, maintained Preliminary compliance with E05-34 combined with IAP 07-01 and IAP 07-02.

*Progress in the Seventh Reporting Period*

The City and the CPD maintained Preliminary compliance during the seventh reporting period. The City and the CPD produced finalized and bates-stamped versions of E05-34 (July 2022), IAP 07-01 and IAP 07-02 (August 2022), and Police Promotions Committee Activities (August 2022) during the seventh reporting period, but did not produce any new substantive data demonstrating that the recruitment and hiring practices align with the requirements of this paragraph to establish Secondary compliance.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, data addressing the promotions component would indicate Secondary compliance only on promotions practices, but substantive data demonstrating Secondary compliance still has not been provided for recruitment and hiring practices. Secondary compliance with recruitment and hiring practices requires the City and the CPD to submit data demonstrating that they have sufficiently developed clear guidance on E05-34 and IAP 07-01 policies and procedures and have

allocated related responsibilities, such as by providing records similar to the documents submitted depicting Police Promotions Committee activities, which satisfy Secondary compliance for promotions practices under this paragraph.

### Paragraph 253 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| Preliminary |

# Recruitment, Hiring, and Promotions: ¶254

**254.** *CPD will provide clear guidance on its policies and procedures for recruiting, hiring, and promoting police officers and will clearly allocate responsibilities for recruitment, hiring, and promotion efforts.*

### Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶254 during this reporting period.

To assess Preliminary compliance with ¶254, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To assess Secondary compliance with this paragraph, we will need to review data demonstrating that the responsibilities allocated by the relevant policies are being executed by those designated under such policy.

The IMT sought to review policy sources, data sources, and job sources including a review of the developed job descriptions and requirements for each sworn member.

*Progress before the Seventh Reporting Period*

This paragraph was assessed for the first time in the fourth reporting period when the IMT determined that the CPD failed to achieve Preliminary compliance. During the fifth reporting period, we reviewed the CPD recruitment, hiring, and promotion records, and the City and the CPD achieved Preliminary compliance for the first time. We noted that the collective documents included the specified responsibilities and roles that would demonstrate Preliminary compliance.

During the sixth reporting period, the City and the CPD submitted the following documents to substantiate compliance during the reporting period: E05-34, *Department Recruitment, Selection and Hiring Plan*; a revised version of IAP 07-01, *CPD Sworn Member Recruitment*; and a revised version of IAP 07-02, *CPD Sworn Member Promotions*.

These policies made evident that recruitment, hiring and promotions policies and procedures meet ¶254 requirements by clearly allocating responsibilities for ¶254 efforts. However, no data was provided demonstrating that recruitment and hiring activities articulated in the policies were occurring, facilitated by those designated

in policy. Therefore, through submission of E05-34 combined with the revised versions of IAP 07-01 and IAP 07-02, the CPD maintained Preliminary compliance, but did not achieve Secondary compliance.

*Progress in the Seventh Reporting Period*

The City and the CPD maintained Preliminary compliance during the seventh reporting period. The City and the CPD produced finalized and bates-stamped versions of E05-34 (July 2022), IAP 07-01 and IAP 07-02 (August 2022), and Police Promotions Committee Activities (August 2022) during the seventh reporting period, demonstrating that policies have been put in place for recruiting, hiring and promoting police officers. However, the City and the CPD did not produce any new data demonstrating that recruitment and hiring activities articulated in the policies were occurring, facilitated by those designated in policy to substantiate Secondary compliance.

*** 

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance may be met by submission of data demonstrating that the responsibilities allocated by the relevant policies are being executed by those designated under such policies.

### Paragraph 254 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Recruitment, Hiring, and Promotions: ¶255

**255.** *To further this goal, the City and CPD will publish job descriptions for each sworn member title code, specifying the current duties, responsibilities, and minimum qualifications for each position.*

**Compliance Progress**  (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Secondary compliance with the requirements of ¶255 during this reporting period.

To assess Preliminary compliance with ¶255, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To assess Secondary compliance, we reviewed published job descriptions and requirements for each sworn member, as well as policy and standard operating procedures that guide the process of periodical updates to such job descriptions. To assess Full compliance, we will need to review data sufficient to demonstrate implementation and sustainment of a systematic policy- and procedure-guided process for developing, revising, and publishing job descriptions for each sworn member.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the IMT assessed documents that the City and the CPD produced to demonstrate compliance. The City and the CPD achieved Preliminary and Secondary compliance in the fifth reporting period. The records demonstrated requirements for updating and publishing job descriptions, including key Consent Decree concepts.

During the sixth reporting period, the City and the CPD produced the following records as data to demonstrate compliance with ¶255 during this reporting period: IAP 07-01 (*CPD Sworn Member Recruitment and Hiring*) and IAP 07-02 (*CPD Sworn Member Promotions*). IAP 07-01 § IV., *Job Descriptions*, requires the Department of Human Resources to review, update, and publish the job descriptions for each sworn and civilian member title code, specifying the current duties, responsibilities, and minimum qualifications for each position, as required by ¶255.

*Progress in the Seventh Reporting Period*

The City and the CPD produced finalized and bates-stamped versions of IAP 07-01 and IAP 07-02 (August 2022) during the seventh reporting period. The City and the CPD did not provide a link or updates to job descriptions or activities during this reporting period related to job descriptions. The IMT examined some CPD job descriptions published online and did not identify any substantive changes this reporting period. The status on updates and revisions to job descriptions will be required in the eighth reporting period and future reporting periods in order to continue to substantiate Secondary compliance.

<center>***</center>

The City and the CPD maintained Secondary compliance during this reporting period. Unlike in previous reporting periods, the CPD did not provide a link or updates to job descriptions or activities during this reporting period related to job descriptions. Looking forward, this information will be required to continue to substantiate Secondary compliance with ¶255. Full compliance will require the City and the CPD to demonstrate sufficient implementation and sustainment of a systematic policy- and procedure-guided process for developing, revising, and publishing job descriptions for each sworn member.

## Paragraph 255 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

## Recruitment, Hiring, and Promotions: ¶256

**256.** *The City and CPD will continue to review any hiring and promotional exams to ensure they are fair, validated, and properly administered.*

### Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance during this reporting period.

To assess Preliminary compliance with ¶256, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. Our evaluation included a review of whether such policies and the processes described therein ensure fairness, validity, and proper administration of hiring and promotional exams. To assess Secondary compliance, we need to review data sufficient to determine if the City and the CPD are collecting, tracking, and maintaining data about hiring and promotional exams as required by this paragraph. The IMT will also need to assess job postings and hirings to determine if the City and the CPD have created the requisite positions and have staffed those positions with qualified personnel required to ensure fairness, validity, and proper administration of such exams.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶256 by submitting the *CPD Sworn Member Recruitment and Hiring* Policy (IAP 07-01) and the *CPD Sworn Member Promotions* Policy (IAP 07-02). The policies included requirements for reviewing promotional exams and ensuring that they are administered according to Consent Decree requirements. We suggested that the City and the CPD make changes to the frequency of periodic reviews to align with all requirements of the Consent Decree.

*Progress in the Seventh Reporting Period*

The City and the CPD produced the following documents during this reporting period related to ¶256:

- IAP 07-01, *CPD Sworn Member Recruitment* (revised)
  (produced on August 25, 2022)

- IAP 07-02, *CPD Sworn Member Promotions* (revised)
  (produced on August 25, 2022)

- DHR SOP, *Department of Human Resources (DHR) Review of Hiring and Promotional Exams* (revised)
  (produced on August 25, 2022)

- *Office of Public Safety Administration Standard Operating Procedure*
  (produced on October 27, 2022)

- Training on DHR SOP
  (produced September 1, 2022)

- Exam materials for CPD Detective, Explosives Tech, and Canine Handler Exam Processes
  (produced December 16, 2022)

IAP 07-01 and IAP 07-02 require the Department of Human Resources (DHR) to review promotional examinations to ensure they are fair, validated, and properly administered. The policies further require each promotional exam, and its administration process, to be reviewed no less frequently than every three years.

As noted in the sixth reporting period, the Department of Human Resources Standard Operating Procedure (DHR SOP) is intended to reflect the Department of Human Resources' process for review of hiring and promotional exams. The DHR SOP addresses the Department of Human Resources' responsibilities for exam review, development, and administration by category, substance of exam review, procuring a developing or administering consultant, exam development, exam administration, exam security, post exam activities, and review.

The Office of Public Safety Administration Standard Operating Procedure (PSA SOP) assures the City and the CPD will review any hiring and promotional exams. However, the IMT noted that the PSA SOP did not provide for when consultants would be utilized in exam development and administration. For certain category of positions, as written, it appeared that the use of consultants was discretionary under the PSA SOP. The element of discretion leaves room for a process that may produce no transparency or no review of the hiring and promotional exams.

No additional supporting documentation was provided this reporting period relevant to the requirements of ¶256, including but not limited to documentation demonstrating that the training described in these policies has been delivered or that consultants have been engaged where appropriate to develop and administer hiring and promotional examinations.

<div align="center">***</div>

The City and the CPD maintained Preliminary compliance during this reporting period through production of the aforementioned policies and SOPs. Looking forward, achieving Secondary compliance requires the City and the CPD to demonstrate that they have sufficiently assessed processes to ensure fairness, validity, and proper administration of exams. Specifically, the IMT will assess policies, processes, and other records to determine if the City and the CPD are collecting, tracking, and maintaining data about hiring and promotional exams as required by this paragraph. The IMT will also assess job postings and hirings to determine if the City and the CPD have created the requisite positions and have staffed those positions with qualified personnel required to ensure fairness, validity, and proper administration of such exams.

### Paragraph 256 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Recruitment, Hiring, and Promotions: ¶257

**257.** *CPD will inform officers of the role of the Office of the Inspector General ("OIG") in overseeing the hiring and promotions processes.*

---

Compliance Progress                    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**          *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**          *In Compliance* (NEW)
**Full:**                      *Not in Compliance*

The City and the CPD maintained Preliminary compliance with this paragraph, regained Secondary compliance, but failed to regain Full compliance.

To assess Preliminary compliance with ¶257, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To assess Secondary compliance, we need to review current data demonstrating that the CPD has informed at least 95% of CPD officers of the Office of the Inspector General's role and sufficiently and fully developed and implemented a sustainable process to inform CPD officers of the Office of the Inspector General's role.

*Progress before the Seventh Reporting Period*

During the fifth reporting period, we reviewed CPD training records to assess compliance and found that the City and the CPD achieved Full compliance with this paragraph. We reviewed training records that showed a 98% completion for the e-learning training. The fifth reporting period was the second consecutive period of sustained Secondary compliance. We noted that to continue to sustain Full compliance, the City and the CPD would need to continue to demonstrate that they have implemented a sustainable process for informing CPD officers of the OIG's role.

During the sixth reporting period, the City and the CPD submitted materials, which included a Mandatory eLearning Compliance Roster, Data Analysis Input Verification Form, and a screenshot of the OIG Hiring and Promotions eLearning training. These materials demonstrated that an Office of Inspector General eLearning course was created and was used to train at least 98% of CPD officers about this paragraph's requirements. But that data source was only current through April of 2021 and the City and the CPD did not submit any data to demonstrate continued compliance beyond April 2021.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following document to demonstrate compliance during this reporting period.

- OIG eLearning Excel Sheet and OIG eLearning Dashboards (with and without the Recruiting Unit) (produced November 17, 2022)

This document demonstrates that 99% of eligible officers (except Academy recruits) successfully completed the requisite OIG eLearning course, achieving Secondary compliance because the City and the CPD provided data that showed continued compliance with this paragraph's requirements.

\*\*\*

The City and the CPD achieved Secondary compliance with this paragraph this reporting period. Looking forward, achieving and sustaining Full compliance requires the City and the CPD to demonstrate they have fully developed and implemented a sustainable process to inform CPD officers, especially Academy recruits, of the Office of the Inspector General's role in overseeing the hiring and promotional processes.

### Paragraph 257 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Full | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Recruitment, Hiring, and Promotions: ¶258

> **258.** *By December 31, 2020, and at least every three years thereafter, CPD will assess its recruitment and hiring processes to ensure that its policies and practices comply with the law, are transparent, and are consistent with this Agreement.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**     Every Three Years          ☑ Not Yet Applicable

**Preliminary:**          *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**          *Not In Compliance*
**Full:**              *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance.

To assess Preliminary compliance with ¶258, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To assess Secondary compliance, we need to review an assessment prepared by a qualified consultant engaged to assess whether the CPD's recruitment and hiring policies and practices comply with the law, are transparent, and are consistent with ¶258 requirements. The IMT understands that this assessment has been completed, but not yet reviewed by the IMT.

*Progress before the Seventh Reporting Period*

During previous reporting periods, we reviewed the CPD's recruitment, hiring, and promotion records, as well as the draft Assessment Scope from a third-party consultant and the operating procedure for consultant engagements. The City and the CPD achieved Preliminary compliance in the fifth reporting period. We noted that the IMT would conduct a further assessment during the next reporting period, following the extended deadline provided due to the COVID-19 pandemic.

*Progress in the Seventh Reporting Period*

The City and the CPD produced the following records as data demonstrating compliance with ¶258 during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on August 25, 2022)

- *CPD Sworn Member Promotions*, IAP 07-02 (produced on August 25, 2022)

- *Coleman & Associates' Findings and Recommendations Report: Consent Decree PAR 258 and PAR 258* (informally produced on December 29, 2022)

IAP 07-01 states the following:

> *To ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety; to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely; and to ensure that the Law Department can conduct the law business of the City and protect the rights and interest of the City, the City will take the necessary steps to engage a qualified consultant.*

This "qualified consultant" must evaluate whether the CPD's recruitment and hiring policies and practices comply with the law, are transparent, and are consistent with the Consent Decree (per ¶258). The scope of the consultant's assessment covers ¶259(a–g) requirements. This work is intended to ensure that the City and the CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety; to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely; and to ensure that the Law Department can conduct the law business of the City and protect the rights and interests of the City. The consultant's work was informally produced to the IMT two days before the end of the seventh reporting period, but not timely enough for the IMT to meaningfully review and evaluate it, as required for Secondary compliance with this paragraph.

In addition to the policy review, the IMT attended Recruitment, Hiring, and Promotions meetings where the consultant presented updates to their work, obviating that the policy is being applied.

\*\*\*

The City and the CPD failed to achieve Secondary compliance during this reporting period. The third-party consultant's report was informally produced at the very end of the reporting period, but not timely enough for a meaningful review and assessment by the IMT. Looking forward, Secondary compliance requires completion of the consultant assessments described above and the IMT's opportunity to fully review of those comprehensive assessments. Full compliance may be demonstrated by the consultant's timely work-product submission reflecting that the CPD's recruitment and hiring processes comply with the law, are transparent, and

are consistent with Consent Decree requirements to be regularly scheduled and completed every three years.

### Paragraph 258 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Recruitment, Hiring, and Promotions: ¶259

*259. The recruitment and hiring assessment will identify and consider: a. the core set of characteristics and capabilities of qualified recruits; b. methods for consideration of discriminatory or biased behavior by the applicant against a member of a protected class in hiring decisions; c. barriers and challenges to successfully completing the recruit application process; d. Department strategies for attracting and hiring qualified applicants that reflect a broad cross section of the Chicago community; e. input, which could consider surveys, from successful and unsuccessful applicants, recruits and other CPD members, community members, community-based organizations, legal and law enforcement professionals, and internal and external subject matter experts regarding the strengths and weaknesses of the recruitment and hiring processes; f. recommendations for any modifications to the current recruitment and hiring processes that would enable CPD to satisfy the requirements of this section; and g. a plan for implementing any recommended modifications with a timeline for implementation.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance during this reporting period.

To assess Preliminary compliance with ¶259, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To assess Secondary compliance, we need to review an assessment prepared by a qualified consultant engaged to assess whether the CPD's recruitment and hiring policies and practices comply with the law, are transparent, and are consistent with ¶258 requirements. The IMT understands that this assessment has been completed, but not yet reviewed by IMT.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the IMT assessed documents the City and the CPD produced to demonstrate compliance and the City and the CPD achieved Preliminary compliance. The documents showed that the CPD's recruitment, hiring, and

promotion records, draft Assessment Scope, and the operating procedures, document the appropriate responsibilities and procedures required by this paragraph. The City and the CPS maintained Preliminary compliance in the sixth reporting period, but did not achieve Secondary compliance.

*Progress in the Seventh Reporting Period*

The City and the CPD produced the following records as data demonstrating compliance with ¶258 during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on August 25, 2022)

- *CPD Sworn Member Promotions*, IAP 07-02 (produced on August 25, 2022)

- *Coleman & Associates' Findings and Recommendations Report: Consent Decree PAR 258 and PAR 258* (informally produced on December 29, 2022)

IAP 07-01 states the following:

> *To ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety; to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely; and to ensure that the Law Department can conduct the law business of the City and protect the rights and interest of the City, the City will take the necessary steps to engage a qualified consultant.*

This "qualified consultant" must evaluate whether the CPD's recruitment and hiring policies and practices comply with the law, are transparent, and are consistent with the Consent Decree (per ¶258). The scope of the consultant's assessment covers ¶259(a–g) requirements. This work is intended to ensure that the City and the CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety; to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely; and to ensure that the Law Department can conduct the law business of the City and protect the rights and interests of the City. The consultant's work was informally produced to the IMT two days before the end of the seventh reporting period, but not timely enough for the IMT to meaningfully review and evaluate it, as required for Secondary compliance with this paragraph.

In addition to the policy review, the IMT attended Recruitment, Hiring, and Promotions meetings where the consultant presented updates to their work, obviating that the policy is being applied.

*** 

The City and the CPD maintained Preliminary compliance during this reporting period. The third-party consultant's report was informally produced at the very end of the reporting period, but not timely enough for a meaningful review and assessment by the IMT. Looking forward, Secondary compliance requires the City and the CPD substantiating that the consultant's work and work-product meet ¶259(a–g) requirements.

### Paragraph 259 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Recruitment, Hiring, and Promotions: ¶260

**260.** *CPD will implement the plan above in Paragraph 259 in accordance with the specified timeline for implementation.*

**Compliance Progress**     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance during this reporting period.

To assess Preliminary compliance with ¶260, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To assess Secondary compliance, we need to review the final work product from a qualified consultant engaged to assess whether the CPD's recruitment and hiring policies and practices comply with the law, are transparent, and are consistent with ¶259(a–g) requirements, as well as data demonstrating that the consultant's assessments have been timely completed within eight months of the consultant's engagement. The IMT understands that this assessment has been completed, but not yet reviewed by IMT.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the IMT assessed documents the City and the CPD produced to demonstrate compliance and the City and the CPD achieved Preliminary compliance in the fifth reporting period. The documents showed that the recruitment, hiring, and promotion records included requirements that demonstrated Preliminary compliance. The City and the CPD maintained Preliminary compliance in the sixth reporting period, but did not achieve Secondary compliance.

*Progress in the Seventh Reporting Period*

The City and the CPD produced the following records as data demonstrating compliance with ¶258 during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on August 25, 2022)

- *CPD Sworn Member Promotions*, IAP 07-02 (produced on August 25, 2022)

- *Coleman & Associates' Findings and Recommendations Report: Consent Decree PAR 258 and PAR 258* (informally produced on December 29, 2022)

IAP 07-01 states the following:

> *To ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety; to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely; and to ensure that the Law Department can conduct the law business of the City and protect the rights and interest of the City, the City will take the necessary steps to engage a qualified consultant.*

This "qualified consultant" must evaluate whether the CPD's recruitment and hiring policies and practices comply with the law, are transparent, and are consistent with the Consent Decree (per ¶258). The scope of the consultant's assessment covers ¶259(a–g) requirements. This work is intended to ensure that the City and the CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety; to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely; and to ensure that the Law Department can conduct the law business of the City and protect the rights and interests of the City. The third-party consultant's report was informally produced to the IMT two days before the end of the seventh reporting period, but not timely enough for the IMT to meaningfully review and evaluate it, as required for Secondary compliance with this paragraph.

In addition to the policy review, the IMT attended Recruitment, Hiring, and Promotions meetings where the consultant presented updates to their work, obviating that the policy is being applied.

While IAP 07-01 mandates compliance with ¶259(a-g), Section III(E)(2) requires the consultant to complete the *Recruitment and Hiring Assessment* and the *Recruitment and Hiring Implementation Plan* within eight months from the date that the consultant was retained. The City and the CPD did not produce data substantiating this, therefore it has maintained Preliminary compliance, but did not attain a further level of compliance.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, to meet Secondary compliance the City and the CPD must substantiate that the third-party consultant's assessment discussed above was completed and submitted in accordance with the requirements of this paragraph within the specified timeline.

### Paragraph 260 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Recruitment, Hiring, and Promotions: ¶261

*261. Within 18 months of the Effective Date, and at least every three years thereafter, CPD will obtain an independent expert assessment of its promotions processes for the ranks of Sergeant and Lieutenant to ensure that its policies and practices comply with the law, are transparent, and are consistent with this Agreement. The independent expert will review the existing Hiring Plan, and any relevant collective bargaining agreements in order to conduct the assessment of the Sergeant and Lieutenant promotions processes. The Sergeant and Lieutenant promotions assessment, at a minimum, will identify: a. the processes by which CPD selects candidates for promotion to Sergeant and Lieutenant who possess a core set of competencies, characteristics, and capabilities and, when applicable, who are effective supervisors in compliance with CPD policy and this Agreement; b. methods for consideration of each candidate's disciplinary history in the selection process; c. Department strategies for promoting qualified applicants who reflect a broad cross section of the Chicago community; d. the frequency with which CPD should hold promotional exams; e. opportunities to increase transparency and officer awareness about the promotions process and promotions decisions, including, but not limited to, identifying criteria for promotions; and f. recommendations for any modifications to the current promotions processes, which would enable CPD to address the requirements of this section.*

### Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    Every Three Years    ☑ **Not Yet Applicable**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Secondary compliance during this reporting period.

To assess Preliminary compliance with ¶261, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To assess Secondary compliance, we reviewed data to determine whether each promotional exam, and its administration process, are reviewed by a qualified expert no less frequently than every three years. Because

this paragraph requires a three-year assessment period, the next period to fully assess compliance, including the aforementioned expert assessment documentation, ends in fourth quarter 2023.

*Progress before the Seventh Reporting Period*

In previous reporting periods, we reviewed the CPD recruitment, hiring, and promotion records, draft *Assessment Scope*, and the operating procedures documents. The City and the CPD maintained Preliminary and Secondary compliance. We noted that policies demonstrated requirements for periodic reviews of exams and the promotion process.

We also reviewed the Law Department Standard Operating Procedure 03-02, *Independent Sergeant and Lieutenant Expert Engagement*. This standard operating procedure designates the Law Department with responsibility for selecting and hiring the Expert to conduct the Sergeant and Lieutenant Assessment of the CPD's promotions processes for the ranks of Sergeant and Lieutenant following the requirements set forth in ¶261. The Public Safety Reform Division will implement this responsibility on behalf of the Department of Law, and § I(1) requires the Expert to complete the Sergeant and Lieutenant Assessment every three years. This process must be initiated with Expert engagement completed in fourth quarter 2023, and at least every three years thereafter. However, no such document was produced during the sixth reporting period.

During the sixth reporting period, the City and the CPD produced IAP 07-01, *CPD Sworn Member Recruitment and Hiring* and IAP 07-02, *CPD Sworn Member Promotions* towards compliance with ¶261, maintaining Preliminary and Secondary compliance.

*Progress in the Seventh Reporting Period*

The City and the CPD maintained Secondary compliance during this reporting period. Because this paragraph requires promotions processes assessments every three years, the next period to fully assess compliance ends in fourth quarter 2023.

## Paragraph 261 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Secondary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Secondary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Secondary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Secondary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Recruitment, Hiring, and Promotions: ¶262

*262. Within 60 days of the completion of the independent expert's promotions assessment, CPD will develop an implementation plan to respond to any recommendations identified in the assessment, including any recommended modifications to the promotions processes and a timeline for implementation. Upon completion, CPD will share the results of the assessment and its implementation plan with the Monitor for review and approval. Within 60 days of receiving the Monitor's approval, CPD will begin to implement the plan.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance during this reporting period.

To assess Preliminary compliance with ¶262, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. Specifically, the IMT assessed Preliminary compliance by reviewing policies and data to determine whether the CPD has developed a policy to create, adopt, and implement an implementation plan based on the independent expert's promotions assessment recommendations. To assess Secondary compliance, we will need to review the independent expert's promotions assessment and data to determine whether the CPD has sufficiently developed an implementation plan to implement the expert's recommendations as required by this paragraph. Our review will include a determination of whether the expert's assessment and the implementation plan related to that assessment identified all requisite criteria, such as a job-task analysis.

*Progress before the Seventh Reporting Period*

During previous reporting periods, we reviewed the CPD's recruitment, hiring, and promotional records. The City and the CPD achieved Preliminary compliance in the fifth reporting period because of the CPD's requirement for a qualified expert to assess its promotions processes and develop an implementation plan related to the expert's assessment and recommendations. We noted that Secondary compliance may be achieved when records produced demonstrate that the implementation plan is completed, shared, and approved.

The City and the CPD produced IAP 07-01, *CPD Sworn Member Recruitment and Hiring* and IAP 07-02 towards compliance with ¶262. We previously noted that the language of the policies, i.e., the requirement to engage qualified experts to assess the CPD's promotions process for the ranks of Sergeant and Lieutenant, were sufficient to meet ¶262 Preliminary compliance requirements. We noted that Secondary compliance required the City and the CPD to demonstrate that they have sufficiently developed the implementation plan required by this paragraph.

*Progress in the Seventh Reporting Period*

The City and the CPD produced the following records towards compliance with ¶262 during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on August 25, 2022)

- *CPD Sworn Member Promotions*, IAP 07-02 (produced on August 25, 2022)

The City and the CPD produced revised verisons of IAP 07-01 and IAP 07-02, which requires the City and the CPD to engage a qualified expert to assess the CPD's promotions process for the ranks of Sergeant and Lieutenant, and commits the Law Department to take the necessary steps to hire an expert ("Expert") to conduct an independent assessment ("Sergeant and Lieutenant Assessment"). The language within the policies continue to meet ¶262 Preliminary compliance requirements. However, no additional data were submitted to substantiate either the selection of the expert or the selected expert's work product.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance requires the City and the CPD to demonstrate that they have sufficiently developed the implementation plan required by this paragraph. Full compliance requires development and implementation of a full implementation plan required by this paragraph.

## Paragraph 262 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Recruitment, Hiring, and Promotions: ¶263

**263.** *Within 365 days of the Effective Date, CPD will identify and publish, both internally and externally, for the ranks of Captain and Commander, the duties, eligibility criteria, knowledge, skills, and abilities considered to select qualified candidates who are effective supervisors in compliance with CPD policy and this Agreement.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary compliance during this reporting period.

To assess Preliminary compliance with ¶263, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed publicly available Captain and Commander job descriptions. To assess Secondary compliance, we need to review data sufficient to demonstrate that Captain and Commander job descriptions and eligibility criteria are published internally and externally as required by this paragraph. To assess Full compliance, we need to review data demonstrating that the CPD has developed a "feedback loop" with candidates to revise and improve future processes applicable to the hiring of Captain and Commander roles.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the City and the CPD achieved Preliminary and Secondary compliance. During the fifth reporting period, the City and the CPD produced documents that showed that the Captain and Commander job descriptions were revised and published. We noted that achieving Full compliance will require establishing a "feedback loop" with candidates. However, Secondary compliance was lost in the sixth reporting period. The City or the CPD did not produce any additional data to substantiate either the selection of a qualified expert to conduct an independent assessment or the selected expert's work product to meet ¶263 requirements.

*Progress in the Seventh Reporting Period*

The City and the CPD produced the following records towards compliance with ¶263 during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01
  (produced on August 25, 2022)

- *CPD Sworn Member Promotions*, IAP 07-02
  (produced on August 25, 2022)

The IMT reviewed the Interagency policies and observed that IAP 07-02 § V(1-4), *Captain and Commander Promotions,* has the requisite language to establish and maintain Preliminary compliance with ¶263. Specifically, IAP 07-02 provides that the "CPD will internally publish the above criteria on an ongoing basis, as needed."

The IMT additionally reviewed publicly accessible Captain and Commander job descriptions. No links or actual job description documents or internal or external publications citing the duties, eligibility criteria, knowledge, skills, and abilities considered to select qualified candidates were directly provided as compliance data. These are required to demonstrate Secondary compliance.

The IMT informed the City and the CPD in the second reporting period that to achieve Full compliance, they should establish a "feedback loop" with candidates to revise and improve future processes. Compliance data submitted during this reporting period did not substantiate the presence and adoption of that critical methodological step. The CPD also should ensure that step is included to close the communication loop with CPD personnel.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period, but did not maintain Secondary compliance. Looking forward, Secondary compliance requires the City and the CPD to demonstrate that job descriptions and eligibility criteria are published internally and externally. The IMT informed the City and the CPD in the second reporting period that to achieve Full compliance, they should establish a "feedback loop" with candidates to revise and improve future processes.

## Paragraph 263 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Preliminary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Secondary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Under Assessment

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Secondary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

## Recruitment, Hiring, and Promotions: ¶264

**264.** *Within 365 days of the Effective Date, CPD will develop strategies to increase transparency and awareness about the promotions process for the ranks of Captain and Commander, including, but not limited to, criteria for promotions and promotion decisions.*

### Compliance Progress       (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance during this reporting period.

To assess Preliminary compliance with ¶264, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed publicly available Captain and Commander job descriptions. To assess Secondary compliance, we need to review data demonstrating the incorporation of the required promotions criteria required under this paragraph into policy. Specifically, that evaluation will include a review of data reflecting that the City and the CPD have developed and implemented strategic plans to improve internal communications among the CPD officers to increase transparency and officer awareness about the promotions process for the ranks of Captain and Commander.

*Progress before the Seventh Reporting Period*

The City and the CPD maintained Preliminary compliance, but did not achieve Secondary compliance in the last reporting period. The documents showed that the CPD established communication plans to increase transparency and awareness and also revised Captain and Commander job descriptions. We noted that to assess Secondary compliance, we need to assess the incorporation of the required promotions criteria into policy and evaluate the CPD's internal communication strategic plans.

*Progress in the Seventh Reporting Period*

The City and the CPD produced the following records towards compliance with ¶264 during this reporting period:

- *CPD Sworn Member Recruitment and Hiring*, IAP 07-01 (produced on August 25, 2022)

- *CPD Sworn Member Promotions*, IAP 07-02
  (produced on August 25, 2022)

- *CPD Organizational Charts* (produced July 28, 2022, September 15, 2022, November 17, 2022, and November 22, 2022)

The IMT reviewed the Interagency policies and observed that IAP 07-02 § V(4), *Captain and Commander Promotions,* has the requisite language for Preliminary compliance with ¶264. Specifically, IAP 07-02 provides that the "CPD will develop strategies to increase transparency and awareness about the promotions process for the ranks of Captain and Commander, including, but not limited to, criteria for promotions and promotion decisions."

No additional documents, except the organizational charts referenced above, were submitted during this reporting period towards Secondary compliance.

*** 

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, to assess Secondary compliance, the IMT will need to review policy, training, and data sources, including observing meetings and communications within the CPD; assess incorporation of required criteria for promotions into policy statements; and review the CPD's internal communication strategic plans to evaluate effective outreach and transparency.

### Paragraph 264 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Appendix 6

# Training
# Compliance Assessments by Paragraph

| | | | |
|---|---|---|---|
| ¶270 | ¶290 | ¶308 | ¶326 |
| ¶271 | ¶291 | ¶309 | ¶327 |
| ¶272 | ¶292 | ¶310 | ¶328 |
| ¶273 | ¶294 | ¶311 | ¶329 |
| ¶277 | ¶295 | ¶312 | ¶331 |
| ¶278 | ¶296 | ¶313 | ¶332 |
| ¶279 | ¶297 | ¶314 | ¶333 |
| ¶280 | ¶298 | ¶315 | ¶334 |
| ¶281 | ¶299 | ¶316 | ¶335 |
| ¶282 | ¶300 | ¶317 | ¶336 |
| ¶283 | ¶301 | ¶318 | ¶337 |
| ¶284 | ¶302 | ¶319 | ¶338 |
| ¶285 | ¶303 | ¶320 | ¶339 |
| ¶286 | ¶304 | ¶321 | ¶340 |
| ¶287 | ¶305 | ¶322 | |
| ¶288 | ¶306 | ¶323 | |
| ¶289 | ¶307 | ¶324 | |

# Training: ¶270

> **270.** *The TOC, or other similarly-structured oversight entity, will continue to review and oversee the Department's training program and will be chaired by the First Deputy Superintendent, or other high-ranking member of CPD's command staff. The TOC will also include, in some capacity, personnel from various units of the Department that are responsible for overseeing patrol field operations; administering training; providing legal advice; coordinating and exercising supervision over disciplinary matters; managing data, technology, and information systems; overseeing and coordinating the community relations strategy; and reviewing reportable use of force incidents. It will meet at least once a month and continue to record meeting minutes.*

## Compliance Progress      (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**   Monthly      ☑ **Met**   ☐ **Missed**

**Preliminary:**   *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**   *In Compliance* (FIFTH REPORTING PERIOD)
**Full:**   *Not in Compliance*

The City and the CPD maintained Preliminary and Secondary compliance with the requirements of ¶270 during this reporting period.

To evaluate Preliminary compliance with ¶270, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. This review focused on determining whether the requirements of this paragraph are written into policy and if the structure of the Training Oversight Committee (also known as the TOC) is clearly outlined and understandable to CPD personnel. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether TOC meetings occurred with required representatives in attendance and whether TOC meetings were held monthly as required with meeting minutes produced following each meeting. To evaluate Full compliance, we reviewed data points to determine whether sufficient resources have been allocated to consistently conduct the annual needs assessment, training planning, and training delivery processes in a timely and sequentially appropriate fashion.

*Progress before the Seventh Reporting Period*

During the fifth reporting period, the City and the CPD achieved Preliminary and Secondary compliance based on the produced CPD training records and the Training Oversight Committee meeting materials. We reviewed policy and data sources to determine the requirements of this paragraph were written into policy demonstrating Preliminary compliance. We found that documentation of monthly Training Oversight Committee meetings and Training Oversight Committee meeting minutes demonstrated Secondary compliance.

The City and the CPD maintained Preliminary and Secondary compliance in the sixth reporting period. The City and the CPD submitted Training Oversight Committee meetings materials, including minutes, agendas, and votes, from monthly meetings that occurred from December 2021 to April 2022. The IMT also attended and observed a Training Oversight Committee meeting. The Training Oversight Committee documentation demonstrated that the Training Oversight Committee met and was substantively involved in reviewing, deliberating, and decision-making exercises consistent with its oversight responsibilities.

We noted that processes that are reviewed and approved by the Training Oversight Committee, including the annual Needs Assessment and Training Plan, had not been created and produced on schedule and in the proper sequence. We recommended that the Training Oversight Committee take a more active role in ensuring the training function at least sufficiently resourced to timely and efficiently execute the training mission.

*Progress in the Seventh Reporting Period*

To demonstrate compliance with ¶270 this reporting period, the City and the CPD submitted meeting materials from the Training Oversight Committee meetings occurring in each of the months from July to November 2022, as well as May and June meeting materials from the sixth reporting period. The IMT virtually attended and observed the Training Community Advisory Committee meeting on July 18, 2022, in which the Committee reviewed CPS's Hate Crimes eLearning Module. The IMT also virtually attended and observed the Training Community Advisory Committee meeting on July 21, 2022, in which the CPD reviewed the 2023 CPD Draft Training Plan with the committee members. The meeting materials produced included minutes and agenda for each of the monthly Training Oversight Committee meetings, as well as virtual notes on the following: (i) the *2023 Master Training Plan* and (ii) a PowerPoint presentation on the 2023 Training Plan. The production documents not only demonstrate that the Training Oversight Committee met, but also were substantively involved in reviewing, deliberating, and decision-making exercises consistent with their oversight responsibilities. The IMT also reviewed

documents produced for the *2023 Annual Training Plan,* including meeting materials from the September 2022 Training Oversight Committee meeting in which the *2023 Training Plan* was presented and voted on by the committee members.

The productions in the sixth and seventh reporting period demonstrate improvements by the CPD to create and produce the annual Needs Assessment and the Annual Training Plan in advance of the 2023 calendar year and in the appropriate sequence for effective training planning, development, and delivery.

*\*\*\**

The City and the CPD maintained Preliminary and Secondary compliance during this reporting period. Looking forward, to demonstrate Full compliance the Training Oversight Committee must assure sufficient resources are allocated and applied to conduct and implement the annual needs assessment, training planning, and delivery processes in a timely and sequentially appropriate fashion.

### Paragraph 270 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Training: ¶271

*271. Within 180 days of the Effective Date, and on an annual basis thereafter, CPD's Education and Training Division will, under the supervision of the TOC, conduct a needs assessment, which will, among other things identify and consider: a. information collected from use of force reviews, discipline and civilian complaints, and reports of officer safety issues; b. input from CPD members of all ranks and their respective collective bargaining units, if applicable; c. input from members of the community; d. recommendations from CPD oversight entities, including, but not limited to COPA, the Deputy Inspector General for Public Safety ("Deputy PSIG"), and the Police Board; e. changes in the law, to the Illinois Law Enforcement Training and Standards Board requirements, and to CPD policy, if any; f. court decisions and litigation; g. research reflecting the latest in training and law enforcement best practices; h. information obtained from evaluation of training courses, instructors, and FTOs; and i. member reaction to, and satisfaction with, the training they received.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring**          Annual          ☑ **Met**     ☐ **Missed**

**Preliminary:**     *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**      *In Compliance* (FIFTH REPORTING PERIOD)
**Full:**                 *Not in Compliance*

The City and the CPD maintained Preliminary and Secondary compliance with the requirements of ¶271 in this reporting period.

To evaluate Preliminary compliance with ¶271, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the annual *Needs Assessment* sufficiently addressed the requirements of this paragraph. To evaluate Full compliance, we reviewed data points to determine whether sufficient resources have been allocated to timely and consistently conduct the ongoing annual needs assessments required by this paragraph, including the appropriate sequencing of the annual *Needs Assessment* and *Training Plan*.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT reviewed the CPD training policy and data sources to evaluate compliance. We reviewed the *Needs Assessment for the 2023 Training Plan* (May 2022), the May 2022 Training Oversight Committee meeting agenda and minutes, the *Needs Assessment Combined Responses*. We found that the City and the CPD did maintained Preliminary and Secondary compliance.

*Progress in the Seventh Reporting Period*

To demonstrate compliance with ¶271 this reporting period, the City and the CPD submitted meeting materials from the Training Oversight Committee meetings occurring in September, October, and November 2022. The IMT also virtually attended and observed the Training Community Advisory Committee meeting on July 21, 2022, in which the CPD reviewed the *Draft 2023 Training Plan* with the committee members. The meeting materials included information about the *2023 Needs Assessment* produced during the previous reporting period. The meeting materials produced also included minutes and agenda for each of the monthly Training Oversight Committee meetings, as well as virtual votes on the following: (i) the *2023 Master Training Plan and* (ii) a PowerPoint presentation on the *2023 Training Plan*. The documents produced not only demonstrate that the Training Oversight Committee met, but also were substantively involved in reviewing, deliberating, and decision-making exercises consistent with their oversight responsibilities. The IMT also reviewed documents produced for the *2023 Annual Training Plan,* including meeting materials from the September 2022 Training Oversight Committee meeting in which the *2023 Training Plan* was presented and voted on by the committee members.

These sixth and seventh reporting period productions demonstrate improvements by the CPD to create and produce the annual Needs Assessment and the annual Training Plan in advance of the 2023 calendar year and in the appropriate sequence for effective training planning, development, and delivery.

*** 

The City and the CPD maintained Secondary compliance through this reporting period. Looking forward, achieving Full compliance requires a determination that the City and the CPD have allocated sufficient resources to conduct ongoing annual needs assessments while demonstrating consistency in executing these approaches. This is the first *Needs Assessment* and *Training Plan* cycle where the CPD has demonstrated the ability to timely sequence the *Needs Assessment* with the annual *Training Plan*. Continued Secondary compliance through another full year cycle should result in a Full compliance finding as the CPD will have demonstrated consistency in executing these processes.

## Paragraph 271 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Preliminary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Secondary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
SECONDARY

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

## Training: ¶272

*272. Within one year of the Effective Date, and on an annual basis thereafter, the Education and Training Division will develop—and the TOC will review and approve—a written Training Plan for CPD's recruit, field, in-service, and pre-service promotional training to ensure that CPD members are trained to safely, effectively, and lawfully carry out their duties in accordance with the law, CPD policy, best practices, and this Agreement. CPD will implement the Training Plan in accordance with the specified timeline for implementation. The Training Plan will: a. identify training priorities, principles, and broad goals consistent with this Agreement; b. prioritize the needs identified during the needs assessment and identify those needs that will be addressed by the plan; c. include a plan and schedule for delivering all CPD training as necessary to fulfill the requirements and goals of this Agreement; d. identify subject areas for CPD training; e. determine the mandatory and elective courses, consistent with this Agreement, to be provided as part of the In-Service Training Program; f. develop a plan to inform officers about the In-Service Training Program, its course offerings, and its requirements; g. determine which aspects of the In-Service Training Program can be delivered in a decentralized manner, including e-learning, and which training requires more intensive, centralized delivery, to ensure effective delivery and comprehension of the material; h. address any needed modification of the Field Training and Evaluation Program to fulfill the requirements and goals of this Agreement; i. identify necessary training resources including, but not limited to, instructors, curricula, equipment, and training facilities; j. determine the content, consistent with this Agreement, to be provided as part of pre-service promotional training for Sergeants, Lieutenants, Captains, and command staff; k. develop a plan to implement and utilize a centralized electronic system for scheduling and tracking all CPD training; l. develop a plan to implement and utilize a system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities; and m. identify community-based organizations that represent a broad cross section of the City to participate, as feasible, practical, and appropriate, in the development and delivery of the curriculum regarding subjects including, but not limited to, procedural justice, de-escalation, impartial policing, and community*

*policing, and make efforts to encourage such participation by such organizations.*

**Compliance Progress** (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:** Annually ☐ Met ☑ **Missed**

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with the requirements of ¶272 during this reporting period.

To evaluate Preliminary compliance with ¶272, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. This included a review of the *2022 Training Plan.* To evaluate Secondary compliance with this paragraph, we reviewed data sources to determine whether the annual *Training Plan* required under this paragraph sufficiently met each of the enumerated requirements of this paragraph and was executed pursuant to those requirements, including the timely completion and proper sequencing of the annual *Training Plan*.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT reviewed the CPD's *2022 Training Plan* materials. We found that the revised *2022 Training Plan* met the requirements of this paragraph and that the City and the CPD achieved Preliminary compliance. We determined that the City and the CPD could achieve Secondary compliance by incorporating the requirements of this paragraph into existing CPD training directives by the end of the reporting period. We found the *2022 Training Plan* to be thorough and well written, and we commended the CPD for improving its approach to community engagement throughout its trainings. However, the IMT continued to have concerns about the production schedule and the effective date of annual training plans, including the fact that the *2022 Training Plan* continued to be reviewed well into the 2022 training year.

*Progress in the Seventh Reporting Period*

To demonstrate sustained Preliminary compliance with ¶272, the City and the CPD produced documents related to the *2023 Annual Training Plan,* including meeting materials and minutes from the September 2022 Training Oversight Committee meeting in which the *2023 Training Plan* was presented and voted on by the committee members. Future Training Oversight Committee minutes should better document questions and responses raised during TOC discourse on the Training Plan.

We note that alignment between the Needs Assessment and Training Plan should also be clearly evident.

Productions in the sixth and seventh reporting period demonstrate improvements by the CPD to create and implement the annual Needs Assessment and the Annual Training Plan in advance of the 2023 calendar year and in the appropriate sequence for effective training planning and development.

*** 

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance may be achieved by timely submission and approval of the *2023 Training Plan* prior to the start of the new training year and incorporating ¶272 requirements into one or more prominent training directives.

## Paragraph 272 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶273

> **273.** With oversight from the TOC, CPD will develop and implement recruit, field, in service, and pre-service promotional training curricula and lesson plans that comport with CPD's Training Plan and that address the requirements and goals of this Agreement.

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with the requirements of ¶273 during this reporting period.

To evaluate Preliminary compliance with ¶273, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed data to determine whether the CPD has developed and implemented the trainings required by this paragraph and that such trainings comport with the annual *Training Plan* and address Consent Decree requirements. Specifically, to assess both Preliminary and Secondary compliance, the IMT reviewed training curricula, lesson plans, special orders, Training Oversight Committee meeting documents, and other policy, training, and data sources. These sources are needed to determine whether the CPD has sufficiently developed training, curricula, and lesson plans in alignment with the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT reviewed CPD training curricula, lesson plans, special orders, Training Oversight Committee meeting documents, and other policy, training, and data sources. We determined that the CPD maintained Preliminary compliance but did not achieve Secondary compliance. We noted that to achieve Secondary compliance, produced documents should demonstrate that the *Needs Assessment*, *Training Plan* and corresponding Training Oversight Committee approval, course curriculum development and corresponding Training Oversight Committee approval, and training delivery occur in sequential steps that demonstrate adherence to the requirements in this paragraph. Further, we noted that post-delivery evaluation documentation is required for Secondary compliance.

The IMT reviewed Special Order S11-11 (*Training Oversight Committee*) and found that Section III(A)(7) includes language that met ¶273 requirements.

Data reviewed during the sixth reporting period indicated that the TOC's oversight is consistent with S11-11 requirements. It could not be determined whether training curricula and lesson plans comport with the CPD's *Annual Training Plan* because many of the training curricula provided for IMT review were not submitted pursuant to an approved and finalized training plan.

*Progress in the Seventh Reporting Period*

To demonstrate compliance with ¶273, this reporting period the City and the CPD submitted Training Oversight Committee meeting agendas, minutes, and materials for the monthly Training Oversight Committee meetings occurring in June through December, 2022. The Training Oversight Committee meeting materials included a *Field Training and Evaluation Program (FTEP) Report to the TOC slide deck* and *FTEP Report to the TOC TO/FROM to Office of Supt.* (December 2022). The City and the CPD also submitted a draft *2023 Annual Training Plan* that included the *Master 2023 Training Plan*.

A review of submitted documents indicate the timeline and sequence of the *Needs Assessment*, *Training Plan* and corresponding Training Oversight Committee approval, course curriculum development and corresponding Training Oversight Committee approval, and training delivery has improved and is moving towards adherence to the requirements in this paragraph. Post-delivery evaluation documentation is required for Secondary compliance and must also be produced for a Full compliance assessment.

The IMT appreciates the inclusion of the meeting slide deck along with minutes and agendas for each TOC meeting. While they are all very helpful in understanding the general nature of TOC discussions, it is important that any discussion and deliberation regarding ¶273 and other TOC-related consent decree paragraphs is captured and produced towards compliance.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, attaining Secondary compliance requires determining if the CPD has sufficiently developed training in alignment with the requirements of this paragraph and evaluating the implementation of that training. No evaluative or follow-up documents were produced that demonstrate that the CPD has sufficiently developed, implemented, and delivered training in alignment with the requirements of this paragraph during this reporting period.

## Paragraph 273 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:

Preliminary

# Training: ¶274

> **274.** *Under the supervision of the TOC, CPD's Education and Training Division, pursuant to the Training Plan, will develop and approve training curricula, lesson plans, and course materials that are (a) consistent across subjects; (b) of sufficient quality to adequately communicate the intended subject matter to CPD members; and (c) in accordance with the law, CPD policy, best practices, and this Agreement.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶274 during this reporting period.

To evaluate Preliminary compliance with ¶274, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed data to determine whether the CPD Education and Training Division (also known as the ETD), pursuant to the terms of the annual *Training Plan*, has reviewed and approved the training curricula, lesson plans, and course materials with Training Oversight Committee supervision, that are consistent across subjects, quality, lawful, and within policy and best practices. Data sources assessed for this review included training criteria and plans, training attendance, Training Oversight Committee documents, and the IMT's in-person and virtual observations of training sessions. The IMT also sought to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT reviewed CPD training curricula, lesson plans, special orders, Training Oversight Committee meeting documents, and other policy, training, and data sources. We determined that the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance. We noted that produced documents should demonstrate that the *Needs Assessment*, *Training Plan* and corresponding Training Oversight Committee approval, course curriculum, development and corresponding Training Oversight Committee approval, and training delivery occur in sequential steps that demonstrate adherence to requirements in this paragraph. Further, we noted that post-delivery evaluation documentation is required for Secondary compliance.

*Progress in the Seventh Reporting Period*

To demonstrate compliance with ¶274, this reporting period the City and the CPD submitted Training Oversight Committee meeting agendas, minutes, and materials for the monthly Training Oversight Committee meetings occurring in June through December, 2022. The Training Oversight Committee meeting materials included a *Field Training and Evaluation Program (FTEP) Report to the TOC slide deck* and *FTEP Report to the TOC TO/FROM to Office of Supt.* (December, 2022). The City and the CPD also submitted a draft *2023 Annual Training Plan* that included the *Master 2023 Training Plan*.

<p align="center">***</p>

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, attaining Secondary compliance requires determining whether the CPD Education and Training Division, pursuant to the terms of the *Annual Training Plan*, has reviewed and approved the training curricula, lesson plans, and course materials with Training Oversight Committee supervision, that are consistent across subjects, quality, lawful, and within policy and best practices and evaluating the implementation of that training. No evaluative or follow-up documents were produced that demonstrate that the CPD has sufficiently developed, implemented, and delivered training in alignment with the requirements of this paragraph during this reporting period.

Full compliance requires the CPD Education and Training Division to demonstrate a systematic methodology to regularly review and approve training in accordance with ¶274 requirements.

## Paragraph 274 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶275

> **275.** *The TOC will oversee the integration of the concepts of procedural justice, de-escalation, impartial policing, and community policing into CPD training, including, but not limited to use of force, weapons training, and Fourth Amendment subjects, as appropriate.*

**Compliance Progress** (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD has maintained Preliminary compliance during this reporting period.

To evaluate Preliminary compliance with ¶275, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the CPD has fully implemented Training Oversight Committee oversight of key concepts' integration that also are consistent with the CPD's *Annual Training Plan.* Specifically, we reviewed Training Oversight Committee minutes, directives, and other policy, training, and job sources, including lesson plans and curricula, to determine whether they substantiate the Training Oversight Committee's review and oversight of CPD training to ensure that they have appropriately integrated the key concepts of procedural justice, de-escalation, impartial policing, and community policing.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT reviewed the *2022 Annual In-Service Field Training Officer Refresher Training Curriculum* (June 2022), Training Oversight Committee minutes and meeting materials for Training Oversight Committee monthly meetings occurring in December of 2021 and January through April of 2022, and Special Order S11-11 (*Training Oversight Committee*). S11-11 § III(A)(8) included language that met ¶275 requirements.

The IMT found the City and the CPD maintained Preliminary compliance, but did not achieve Secondary compliance. Data submitted indicated that Training Oversight Committee oversight policy S11-11 was consistent with ¶275 requirements. We noted that the Training Oversight Committee meeting minutes provided did not detail any discussions or deliberations on the key concepts. We pointed out the absence of a separate report or record documenting the Training Oversight

Committee's efforts to ensure integration of the key concepts into CPD training materials. Additionally, a substantial proportion of the lesson plans and course curricula reviewed during the sixth reporting period post-Training Oversight Committee review and approval were returned with IMT and Office of the Illinois Attorney General comments, suggesting the need to enhance the integration of at least one of these core concepts, thus indicating a need for more Training Oversight Committee rigor in their oversight.

*Progress in the Seventh Reporting Period*

To demonstrate compliance with ¶275, this reporting period the City and the CPD submitted Training Oversight Committee meeting agendas, minutes, and materials for the monthly Training Oversight Committee meetings occurring in June through December, 2022. The Training Oversight Committee meeting materials included a *Field Training and Evaluation Program Report (FTEP) to the TOC slide deck* and *FTEP Report to the TOC TO/FROM to Office of Supt.* (December 2022). The City and the CPD also submitted a draft *2023 Annual Training Plan* that included the *Master 2023 Training Plan*. The concepts required by this paragraph are mentioned in some of the produced TOC meeting minutes. However, there is not a clear indication that the TOC provided active oversight of the actual integration of these concepts throughout training development.

The IMT appreciates the inclusion of the meeting slide deck along with minutes and agendas for each TOC meeting. While they are all very helpful in understanding the general nature of TOC discussions, it is important that any discussion and deliberation regarding ¶275 and other TOC-related consent decree paragraphs is captured and produced towards compliance.

*** 

The City and the CPD has maintained Preliminary compliance during this reporting period. Looking forward, to assess Secondary compliance the IMT will review data demonstrating continued application of controlling policy, curricula, lesson plans, and course material that sufficiently integrate the required key concepts into CPD trainings. The City and the CPD will need to produce Training Oversight Committee meeting minutes that reflect guidance on these key concepts and submit lesson plans and curricula for IMT review that consistently integrate the key concepts of procedural justice, de-escalation, impartial policing, and community policing.

Full compliance requires the CPD to sufficiently develop a method for the Training Oversight Committee to sustain regular review and oversight of required key concepts into CPD trainings.

## Paragraph 275 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Training: ¶276

*276. The TOC will oversee continued development and integration of instructional strategies that incorporate active learning methods such as problem-solving, scenario-based activities, and adult learning techniques—in addition to traditional lecture formats—into training delivery.*

**Compliance Progress** (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶276 in this reporting period.

To evaluate Preliminary compliance with ¶276, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data reflecting training development, implementation, and evaluation to determine whether the City and the CPD have developed training plans and curricula with appropriate Training Oversight Committee input and delivered that training to the relevant personnel during the necessary intervals. Where applicable, we assessed whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph. We also reviewed data to assess whether the training required under this paragraph is evidence-based and conforms to best practices, as applicable, and that data include sufficient attendance records (*i.e.*, 95% of relevant personnel), including data reflecting hours attended.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the CPD submitted revised *2022 Annual In-Service Field Training Officer Refresher Training Curriculum* (June 2022), Training Oversight Committee minutes and meeting materials for Training Oversight Committee meetings occurring in December of 2021 and January through April of 2022, and Special Order S11-11 (*Training Oversight Committee*). Section III(A)(8) included language that met ¶276 requirements.

Data submitted indicated that Training Oversight Committee oversight policy S11-11 was consistent with ¶276 requirements. We noted that the Training Oversight Committee meeting minutes provided did not detail any discussions or deliberations on the integration of the required instructional strategies of this paragraph

into training delivery. We pointed out the absence of separate reports or records produced documenting the Training Oversight Committee's effort to ensure integration of these strategies into CPD trainings.

*Progress in the Seventh Reporting Period*

To demonstrate compliance with ¶276, this reporting period the City and the CPD submitted Training Oversight Committee meeting agendas, minutes, and materials for the monthly Training Oversight Committee meetings occurring in June through December, 2022. The Training Oversight Committee meeting materials included a *Field Training and Evaluation Program (FTEP_ Report to the TOC slide deck* and *FTEP Report to the TOC TO/FROM to Office of Supt.* (December 2022). The City and the CPD also submitted a draft *2023 Annual Training Plan* that included the *Master 2023 Training Plan*. The concepts required by this paragraph are mentioned in some of the produced TOC meeting minutes. However, there is not a clear indication that TOC provided active oversight of the actual integration of these concepts throughout training development.

For example, the CPD 11.201 Cover Sheet for the December 30, 2022 production indicates ¶276 requirements are covered in the October 28, 2022 Minutes at Section 6, and November 9, 2022 Minutes at Section 7. However, upon reviewing those sections, no direct correlation between the respective section's content and ¶276 requirements is apparent.

IMT appreciates the inclusion of the meeting slide deck along with minutes and agendas for each TOC meeting. While they are all very helpful in understanding the general nature of TOC discussions, it is important that any discussion and deliberation regarding ¶276 and other TOC-related consent decree paragraphs is captured and produced towards compliance.

\*\*\*

The City and the CPD maintained Preliminary compliance through this reporting period. Looking forward, Secondary compliance can be achieved by the CPD developing a method for how the Training Oversight Committee reviews, oversees, and ensures integration of the instructional strategies required by this paragraph.

Full compliance may be demonstrated by fully developing and implementing a systematic method for the Training Oversight Committee to sustain regular instructional strategies review and oversight following the requirements of ¶276.

## Paragraph 276 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Training: ¶277

***277.*** *Where it would add to the quality or effectiveness of the training program, the Education and Training Division will seek the assistance of outside expertise, as feasible, practical, and appropriate, either in developing or reviewing CPD curricula and lesson plans, or reviewing pilot versions of CPD courses.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**     *Not in Compliance*
**Full:**     *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶277 during this reporting period.

To evaluate Preliminary compliance with ¶277, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the City and the CPD have created and staffed positions with qualified personnel, including creating and implementing a process to acquire "outside expertise" as required by ¶277. This process must ensure that such outside experts are qualified to "add to the quality or effectiveness of the training program." Where applicable, we assessed whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph. The IMT also sought to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended.

*Progress before the Seventh Reporting Period*

To demonstrate compliance with ¶277, during the last reporting period the CPD submitted an August 20, 2021, Training Community Advisory Committee (also known as the TCAC) invitation signed by Deputy Chief inviting community partners to attend several Training Community Advisory Committee meetings scheduled in September and October 2021, along with a Training Community Advisory Committee Fall 2021 Agenda. The CPD also submitted meeting notes from Training Community Advisory Committee meetings that occurred on September 9, 20, 23, 27, 30, and October 7, 2021, as well as a Fourth Amendment Comment Matrix showing the CPD's responses to Training Community Advisory Committee comments provided to the 2022 Fourth Amendment PowerPoint and Lesson Plan presented

at the September 27 and 30, 2021, Training Community Advisory Committee meetings.

Additionally, the CPD submitted Training Community Advisory Committee meeting notes for Training Community Advisory Committee monthly meetings that occurred from February through May 2022, along with a bullet point summary of the Training Community Advisory Committee feedback offered to the Modules discussed at the March 3, 2022 Training Community Advisory Committee meeting. Finally, the CPD also submitted *Community Group Training for School Resource Officers* that the CPD described as being developed by several Chicago area community groups.

In assessing compliance for the current reporting period, the IMT also reviewed Training Directives S11-10 (*Department Training Records Maintenance*) and S11-11 (*Training Oversight Committee*). S11-10 § VII(A)(3) (29 December 2021) tracked ¶277 language and met the requirements for Preliminary compliance. As we have stated since the third reporting period, the City and the CPD had not articulated or enacted processes to hire, retain, evaluate, and terminate outside experts, nor had they established a criterion for the selection and retention of outside experts, which are required to obtain Secondary compliance. We suggested the City and the CPD should include these steps in the controlling policy to reach Secondary compliance.

*Progress in the Seventh Reporting Period*

To demonstrate compliance during this reporting period, the City and the CPD submitted the following documents:

- Training Community Advisory Committee (TCAC) Notes July 2022 (produced September 1, 2022)

- Constitutional Policing In-Service Training (produced October 20, 2022)

- SRO Training Records (produced December 23, 2022)

The TCAC notes indicate several community members representing multiple organizations were involved in discussing the Training Plan and Hates Crimes eLearning course. The documents produced did not indicate why each participating person was selected nor what criteria was applied to qualify their expertise.

The Constitutional Policing documents include COPA and TCAC member comments on the training. COPA's inclusion seems especially appropriate for this particular training. Once again, the City and the CPD would be well-served by documenting how engaging the selected external parties adds to the quality or effectiveness of the training program.

The SRO Training Records indicate that 100% of CPD School Resource Officers as-signed to work in Chicago schools have completed training provided by the Na-tional Association of School Resource Officers (NASRO). While the IMT is familiar with NASRO training and agree that many urban school resource officers receive NASRO training, documents submitted by the CPD do not articulate the quality or effectiveness objectives of this particular outside training vendor. The CPD should consider applying a systematic process for selecting and receiving outside exper-tise.

<p style="text-align:center">***</p>

The City and the CPD maintained Preliminary compliance during this reporting pe-riod. Looking forward, Secondary compliance requires the CPD to sufficiently take steps to implement a plan to receive subject-matter-expert assistance, including outside experts.

Full compliance requires the CPD to have implemented a plan to continue to re-ceive subject-matter-expert assistance and standards to evaluate subject-matter-expert contributions for impact on training programs' quality and effectiveness.

### Paragraph 277 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶278

> **278.** *The TOC will continue to oversee a process that effectively incorporates material changes in relevant case law, statutes, and the CPD policy into recruit, field, in-service, and preservice promotional training in a timely and effective manner.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶278 during this reporting period.

To evaluate Preliminary compliance with ¶278, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the City and the CPD have a reliable process to substantiate Training Oversight Committee oversight for incorporation of material changes in case law, statutes, and CPD policy into trainings and Training Oversight Committee meeting discussions on such material changes. The IMT also sought to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended. Where applicable, we assessed whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

To demonstrate compliance with ¶278, last reporting period the CPD submitted Training Oversight Committee minutes and meeting materials for Training Oversight Committee meetings occurring in December of 2021 through April of 2022. The Training Oversight Committee meeting materials included a *Field Training and Evaluation Program Recommendation Memorandum* (January 2022), a *Needs Assessment PowerPoint* presented at the April 28, 2022 Training Oversight Committee meeting, and virtual votes. The IMT also reviewed a *Revised 2022 Training Plan* (April 2022) and *Needs Assessment for the 2023 Training Plan* that was discussed in the April and May 2022 Training Oversight Committee meetings.

Additionally, the IMT reviewed Special Order S11-11 (*Training Oversight Committee*). S11-11 § III(A)(12) tracked the language of ¶278 and met the requirements of Preliminary compliance.

Data indicated Training Oversight Committee oversight policy S11-11 is consistent with ¶278 requirements. However, the Training Oversight Committee meeting minutes provided did not detail any discussions or deliberations on timely and effectively incorporating material changes in relevant case law, statutes, and CPD policy as required by ¶278. There were no separate reports or records produced documenting the Training Oversight Committee's effort to ensure timely and effective incorporation of these material changes in relevant case law, statutes, and CPD policy into CPD trainings.

*Progress in the Seventh Reporting Period*

To demonstrate compliance with ¶278, this reporting period the City and the CPD submitted Training Oversight Committee meeting agendas, minutes, and materials for the monthly Training Oversight Committee meetings occurring in June through December, 2022. The Training Oversight Committee meeting materials included a *Field Training and Evaluation Program (FTEP) Report to the TOC slide deck* and *FTEP Report TO/FROM to Office of Supt.* (December 2022). The City and the CPD also submitted a draft *2023 Annual Training Plan* that included the *Master 2023 Training Plan*.

Each TOC meeting has two agenda items that are especially relevant to this paragraph. They are the Training Needs Monthly Report §§ iv. "LAD: changes in the law, ILETSB requirements, court decisions, and litigation" and viii. "R&D: changes to CPD policy." The IMT did not identify substantive discussion or discourse on these agenda items and the process required by this paragraph is not immediately apparent in the documents produced. The presence of a process that both timely and effectively incorporates ¶278 requirements is not apparent.

The IMT appreciates the inclusion of the meeting slide deck along with minutes and agendas for each TOC meeting. While they are all very helpful in understanding the general nature of TOC discussions, it is important that any discussion and deliberation regarding ¶278 and other TOC-related consent decree paragraphs is captured and produced towards compliance.

<p style="text-align:center">***</p>

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance may be achieved by substantiating the Training Oversight Committee oversight process for incorporation of material changes in case law, statutes, and CPD policy into trainings and Training Oversight Committee meeting discussions on such material changes. Full compliance may be demonstrated after the CPD sustains oversight of the process described in ¶278.

## Paragraph 278 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Training: ¶279

> **279.** *All training materials disseminated to CPD members and displayed at CPD facilities will reflect current CPD policy.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**    *In Compliance (FIFTH REPORTING PERIOD)*
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with the requirements of ¶279 during this reporting period.

To evaluate Preliminary compliance with ¶279, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the City and the CPD have a reliable process to ensure that training materials disseminated to CPD officers and displayed at every CPD facility reflect current CPD policy. Where applicable, we assessed whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph. The IMT also sought to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, we found that the City and the CPD achieved Preliminary compliance because training directive S11-10, *Department Training Records Maintenance* met the requirements of this paragraph. In the last reporting period, the City and the CPD did not submit any data relevant to ¶279, thereby maintaining Preliminary compliance. We noted that to achieve Secondary compliance, we would need to assess the dissemination, audit, and inspection processes to ensure that training materials disseminated to CPD officers and displayed at every CPD facility reflect current CPD policy. We recommended that additional auditing or site inspection processes should be considered.

*Progress in the Seventh Reporting Period*

To substantiate compliance with this paragraph, the City and the CPD submitted *Recruit Use of Force Training* (produced on September 22, 2022), and *Gender Based Violence Curriculum* (produced December 8, 2022). Neither production obviates that the CPD has established a process to ensure training materials disseminated to CPD members and displayed at every CPD facility reflect current CPD policy.

***

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, to achieve Secondary compliance, the CPD must establish a process to ensure that training materials disseminated to CPD officers and displayed at every CPD facility reflect current CPD policy. While some document control may be ascertained with the requirement that the Graphic Arts and Print Shop, Public Safety Administration ensures that the production of all training materials reflect Training and Support Group approved content, additional auditing or site inspection processes should also be considered.

### Paragraph 279 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶280

**280.** *CPD will develop, implement, and utilize a centralized electronic system for scheduling and tracking all CPD training to allow the Education and Training Division to effectively plan and manage training schedules and instructor assignments for all training.*

## Compliance Progress      (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶280 during this reporting period.

To evaluate Preliminary compliance with ¶280, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the CPD has established and uses a centralized electronic system for scheduling and tracking all CPD training to allow the Education and Training Division to effectively plan and manage training schedules and instructor assignments for all trainings. We also confirmed whether this system is in continual use and whether the City and the CPD have developed policies for the Education and Training Division to use the system as required.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD did not submit any data to substantiate maintained Preliminary compliance. The IMT reviewed Training Directives S11-10 (*Department Training Records Maintenance*) and S11-11 (*Training Oversight Committee*). We determined that Preliminary compliance was maintained because S11-10 XIII included language regarding the utilization of "a centralized electronic system for scheduling and tracking all Department officers' training, and a centralized electronic file system for assessing the content and delivery of all Department training." This language met the policy requirements of ¶280.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD did not produce any documentation that demonstrated efforts related to ¶280.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance requires the CPD to use a centralized electronic system for scheduling and tracking all CPD training to allow the Education and Training Division to effectively plan and manage training schedules and instructor assignments for all training.

Full compliance requires the CPD's continuous and ongoing use of a centralized electronic system for scheduling and tracking all CPD training and for the Education and Training Division to effectively plan and manage training schedules and instructor assignments for all training using this system.

### Paragraph 280 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶281

> **281.** *The City will be responsible for providing appropriate training facilities that offer adequate access to safe and effective training.*

---

**Compliance Progress** (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance during this reporting period.

To evaluate Preliminary compliance with ¶281, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we will need to review data to determine whether the City and the CPD have developed and begun the implementation of plans and appropriate guidance and staffing to provide appropriate training facilities, including allocating sufficient resources. The IMT will also seek to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended. Where applicable, we will assess whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD did not submit any written data to substantiate Secondary compliance during this reporting period. In support of Preliminary compliance, the IMT conducted site visits to the Academy, the Professional Development Center, and the new Public Safety Training Facility that was under construction. The CPD advised that it expected the Public Safety Training Facility to be open and operational for training by the first quarter of 2023. We were very impressed by the progress and potential of the new Public Safety Training Facility, particularly with regards to opportunities for improving overall officer training. We provided the CPD verbal feedback and recommendations on potential additional uses and improvements to the facility, particularly with regards to opportunities to improve community engagement through adding certain amenities to the existing community room and the involvement of CPD alumni and community members in scenario-based officer trainings.

The IMT further suggested that the City and the CPD should provide documents that detail training facility needs and the City's strategic approach to addressing those needs, which would allow the IMT to further assess compliance with ¶281 requirements.

*Progress in the Seventh Reporting Period*

The IMT conducted a site visit to the new Public Safety Training Facility during this reporting period. We noted that the CPD has incorporated some of our earlier community-friendly recommendations into the facility. Once completed, this state-of-the art facility should greatly enhance the CPD's ability to provide safe and effective training to CPD members.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance can be substantiated with policies, procedures, plans, evaluations, and training materials that indicate the City and the CPD have developed and begun the implementation of plans to provide appropriate training facilities, including allocating sufficient resources.

Full compliance may be achieved after the CPD provides evidence that adequate, safe, and effective training is conducted in its facilities according to the requirements of ¶281. Policies, procedures, plans, processes, and demonstrations of system operations may all be used to substantiate compliance.

### Paragraph 281 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶282

**282.** *All CPD training instructors must be appropriately qualified for their instructional roles and use only approved curricula and lesson plans. CPD will actively recruit and retain qualified instructors to ensure that CPD has sufficient qualified instructors to meet the needs of the Department and requirements of the Training Plan.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance during this reporting period.

To evaluate Preliminary compliance with ¶282, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we will need to review data to determine whether the City and the CPD have plans and criteria in place to acquire qualified experts to develop and instruct courses. Assessment sources include policy, procedure, qualifications, and training plans to determine if the City and the CPD have sufficiently taken steps to evaluate and acquire experts to develop and instruct courses. The IMT will also seek to verify sufficient attendance records (*i.e*., 95% of relevant personnel), including hours attended. Where applicable, we will assess whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD did not submit any data to establish Secondary compliance. However, Training Directive S11-10 (*Department Training Records Maintenance*) produced in the fifth reporting period continued to support Preliminary compliance. We noted that Secondary compliance could be achieved by implementing a strategy to determine and review instructor qualifications and to ensure that instructors use only approved lesson plans and curricula.

*Progress in the Seventh Reporting Period*

To further demonstrate compliance efforts this reporting period, the City and the CPD submitted the following documents:

- Outside Instructor Qualifications (produced on December 8, 2022)

Included in these documents is a Professional Law Enforcement Training (PLET) Group Instructor approval letter from the Illinois Law Enforcement Training and Standards Board (ILETSB). Overall, these documents demonstrate that the City and the CPD have vetted and received ILETSB approval for several PLET Group instructors to teach 2022 CPD Officer Wellness In-Service Training and Gender Based Violence In-Service Training courses.

These documents move the CPD closer to establishing a process for vetting outside instructors. Now the CPD must provide an instructor recruiting and retention strategy that ensures the CPD has the requisite qualified instructors to meet the CPD's *Needs Assessment* and *Training Plan* requirements.

<p style="text-align:center">***</p>

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance may be achieved by articulating and implementing a strategy to determine and review instructor qualifications and to ensure that instructors use only approved lesson plans and curricula.

Full compliance requires the CPD to systematically determine and review appropriate instructor qualifications and ensure that instructors use only approved lesson plans and curricula. The CPD's periodically refined instructor recruiting and retention strategy must ensure that there are sufficient qualified instructors to meet the CPD's *Needs Assessment* and *Training Plan* requirements.

### Paragraph 282 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶283

> ***283.*** *As appropriate to accomplish the requirements and goals of this Agreement, CPD will incorporate experts and guest speakers to participate in the development and instruction of relevant courses, as feasible, practical, and appropriate, including, but not limited to: a. CPD members of all ranks; b. members of the community; c. legal and law enforcement professionals, such as judges, prosecutors, and public defenders; d. crime victims; and e. subject matter experts.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Secondary compliance with the requirements of ¶283 during this reporting period.

To evaluate Preliminary compliance with ¶283, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the City and the CPD have developed a strategy to incorporate experts and guest speakers to participate in the development and instruction of relevant courses, as feasible, practical, and appropriate in accordance with the requirements of this paragraph. Specifically, the IMT reviewed CPD policy, lesson plans, training plans, and training schedules to determine if the CPD has sufficiently implemented its policy and training plans, that course instructors' qualifications comply with the requirements of this paragraph, and that guest speakers, including CPD officers, community members, and outside experts, are involved in course instruction where feasible, practical, and appropriate.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT assessed compliance by reviewing Training Community Advisory Committee meeting notes for Training Community Advisory Committee meetings occurring from February through May 2022, along with a bullet point summary of the Training Community Advisory Committee feedback. The CPD also submitted an August 20, 2021 Training Community Advisory Committee invitation signed by the Deputy Chief inviting community partners to attend several Training Community Advisory Committee meetings scheduled in

September and October 2021 along with a Training Community Advisory Committee Fall 2021 Agenda. The CPD also submitted meeting notes from Training Community Advisory Committee meetings that occurred in September and October 2021, as well as a Fourth Amendment Comment Matrix showing the CPD's responses to Training Community Advisory Committee comments provided to the 2022 Fourth Amendment PowerPoint and Lesson Plan presented at the September 27 and 30, 2021 Training Community Advisory Committee meetings.

The IMT determined the CPD maintained Preliminary compliance according to the language included in Training Directive S11-10 (*Department Training Records Maintenance*). Data indicated that the CPD has incorporated experts and guest speakers to participate in the development and instruction of relevant courses, as required by this paragraph. We advised that Secondary compliance requires the CPD to demonstrate that it has sufficiently taken steps to evaluate and acquire appropriate experts to develop and instruct courses as required by this paragraph.

*Progress in the Seventh Reporting Period*

To demonstrate compliance during this reporting period, the City and the CPD submitted the following documents:

- Training Community Advisory Committee (TCAC) Notes July 2022 (produced September 1, 2022)

- Constitutional Policing In-Service Training (produced October 20, 2022)

- Gender Based Violence In-Service Training (produced December 8, 2022)

- Outside Instructor Qualifications (produced December 8, 2022)

- SRO Training Records (produced December 23, 2022)

The TCAC notes indicate several community members representing multiple organizations were involved in discussing the Training Plan and Hates Crimes eLearning course. The documents produced did not demonstrate that the CPD sufficiently evaluated the experts, specifically, why each participating person was selected nor what criteria was applied to qualify their expertise.

The Constitutional Policing documents include COPA and TCAC member comments on the training. COPA's inclusion seems especially appropriate for this particular training. Once again, the City and the CPD would be well-served by documenting how engaging the selected external parties adds to the quality or effectiveness of the training program.

The Outside Instructor Qualifications documents include a Professional Law Enforcement Training (PLET) Group Instructor approval letter from the Illinois Law

Enforcement Training and Standards Board (ILETSB). These documents demonstrate that the City and the CPD have vetted and received ILETSB approval for several PLET Group instructors to teach 2022 CPD Officer Wellness In-Service Training and Gender Based Violence In-Service Training courses.

The SRO Training Records indicate that 100% of CPD School Resource Officers assigned to work in Chicago schools have completed training provided by the National Association of School Resource Officers (NASRO). While the IMT is familiar with NASRO training and agree that many urban School Resource Officers receive NASRO training, documents submitted do not articulate the quality or effectiveness objectives of this particular outside training vendor. The CPD should consider applying a systematic process for selecting and receiving outside expertise.

The IMT also attended several CPD training classes virtually and in person. We note, for example, that some segments of the *Crisis Intervention Training Refresher* courses conducted in June 2022 used outside actors and an instructor. We also reviewed and attended the Gender Based Violence course.

Overall, the data submitted indicates that the CPD has incorporated experts and guest speakers to participate in the development and instruction of relevant courses, as required by this paragraph.

<p style="text-align:center">***</p>

The City and the CPD maintained Secondary compliance during this reporting period. Looking forward, Full compliance may be achieved after sustained Secondary compliance where the CPD sufficiently evaluates and acquires experts to initially and periodically develop and instruct courses in accordance with the requirements of this paragraph.

### Paragraph 283 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Training: ¶284

> **284.** *CPD will require that all new and current Education and Training Division instructors and curriculum developers are certified by the Illinois Law Enforcement Training and Standards Board and, as appropriate to their roles, receive initial and annual refresher training on subjects including, but not limited to, effective teaching, adult-learning techniques, and curriculum development. CPD will further require that instructors are trained in the specific subject matter they are assigned to teach and are also cross-trained in other related subjects so that they are equipped to deliver effective interdisciplinary instruction. Instructor training will also include peer review.*

## Compliance Progress　　　(Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶284 during this reporting period.

To evaluate Preliminary compliance with ¶284, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the City and the CPD have developed and implemented a process for course and instructor training evaluation, including officer feedback and analysis of the extent to which such training is reflected in how officers perform, if this information is used in creating the *Needs Assessment*, and whether the CPD has demonstrated that training is having the intended impact. Specifically, we reviewed the CPD's training plans and curricula and data demonstrating that training was delivered to the relevant personnel during the necessary intervals. This assessment included a review of the City's, the CPD's, and the other relevant entities' training development, implementation, and evaluation to determine whether training is evidence-based and conforms to best practices, as applicable. The IMT also sought to verify through data sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended. Where applicable, we assessed whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD did not submit any data to establish Secondary compliance. However, Training Directive S11-10 (*Department Training Records Maintenance*) produced in the prior reporting period continued to support Preliminary compliance.

The IMT attended several training courses in-person in June 2022. We noted and discussed with CPD supervisors an observation where students and the instructors were almost solely focused on the tactics specific to that training and missed opportunities to reinforce routine principles and practices that are native to other officer disciplines. This demonstrated an absence of the cross-training in interdisciplinary instruction as required by this paragraph.

*Progress in the Seventh Reporting Period*

To demonstrate compliance during this reporting period, the City and the CPD submitted the following documents:

- Outside Instructor Qualifications (produced December 8, 2022)

The Outside Instructor Qualifications documents include a Professional Law Enforcement Training (PLET) Group Instructor approval letter from the Illinois Law Enforcement Training and Standards Board (ILETSB). These documents demonstrate that the City and the CPD have vetted and received ILETSB approval for several PLET instructors to teach 2022 CPD Officer Wellness In-Service Training and Gender Based Violence In-Service Training courses.

It is clear that at least some CPD instructors have received ILETSB approval. No documents were produced that demonstrate instructors received initial and annual refresher training on the required courses, are trained in the specific subject matter they are required to teach and are also cross trained in other related subjects so that they are equipped to deliver effective interdisciplinary instruction.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, achieving Secondary compliance will require the CPD to implement a plan to ensure that all instructors are properly credentialed. Full compliance will require Secondary compliance status and for all instructors to be credentialed in accordance with ¶284 standards on an ongoing basis.

## Paragraph 284 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Training: ¶285

> **285.** *The Education and Training Division will conduct annual instructor performance reviews. Performance reviews will include classroom observations, member feedback, and in-person meetings with instructors to discuss performance and areas of improvement. These performance reviews will be considered in assessing whether instructors may continue to serve in that role.*

**Compliance Progress** (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶285 during this reporting period.

To evaluate Preliminary compliance with ¶285, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we will need to review data to determine whether the City and the CPD have developed policies and procedures to conduct annual instructor performance reviews according to the requirements of ¶285.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD did not submit any data to establish Secondary compliance. However, Training Directive S11-10 (*Department Training Records Maintenance*) produced in the fifth reporting period continued to support Preliminary compliance. We noted that Secondary compliance could be achieved once the City and the CPD substantiate through policies, procedures, plans, training materials, and communication materials that they have established and implemented a process to conduct annual instructor performance reviews as required by this paragraph.

*Progress in the Seventh Reporting Period*

The City and the CPD did not submit any data to establish Secondary compliance during this reporting period. However, Training Directive S11-10 (*Department Training Records Maintenance*) produced in a prior reporting period continues to support Preliminary compliance.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance may be achieved by producing policies and procedures, plans, training materials, and communication materials that substantiate the City and the CPD have established and implemented a process to conduct annual instructor performance reviews according to the requirements of ¶285. A training methodology that includes reviewing the City's, the CPD's, and the other relevant entities' training development, implementation, and evaluation (¶286) also applies. The IMT will rely upon the "ADDIE model" of curriculum development and implementation as our evaluation standard, which typically incorporates the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation. Each of these five elements is considered an essential component of effective training. Training evaluation includes student and trainee evaluations—both formative and summative evaluations—as well as measurements of how specific training goals are implemented at the organizational level. We will also assess whether training is evidence-based and conforms to best practices, as applicable. We will also use this model to measure the effectiveness of the trainers (¶¶283–85). When applicable, we will also assess whether the City, the CPD, and the other relevant entities adequately sought, received, and incorporated community input and facilitated community participation. The IMT will also seek to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended.

Full compliance may be achieved by demonstrating through policies, procedures, plans, processes, and demonstrations of systems operations, reports, and audits, that the City and the CPD have fully implemented annual instructor performance reviews according to the requirements of this paragraph.

## Paragraph 285 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶286

*286. The review and analysis of the content and delivery of training will enable CPD to determine whether the training provided to members effectively prepares them to police fairly, safely, and in accordance with the law, CPD policy, best practices, and this Agreement.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve any level of compliance with the requirements of ¶286 during this reporting period.

To evaluate Preliminary compliance with ¶286, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the City and the CPD have developed acceptable policies, procedures, and plans to conduct an analysis and review of the content and delivery of training according to the requirements of ¶286.

*Progress before the Seventh Reporting Period*

During the fifth reporting period, the IMT assessed compliance with this paragraph for the first time by reviewing policies and procedures and found that the City and the CPD did not achieve any level of compliance. During the last reporting period, the City and the CPD did not produce any documents substantiating Preliminary compliance, and the City indicated its position that this paragraph lacks an assessable requirement. The IMT respectfully disagreed and noted that Secondary compliance may be substantiated by providing documentation demonstrating that the CPD has established and implemented a process to analyze the content and delivery of training.

*Progress in the Seventh Reporting Period*

The City and the CPD did not submit any data to establish any level of compliance during this reporting period.

\*\*\*

The City and the CPD did not achieve any level of compliance during this reporting period. Looking forward, Preliminary compliance requires the City and the CPD to develop acceptable policies, procedures, and plans to conduct an analysis and review of the content and delivery of training according to the requirements of ¶286.

Secondary compliance will require policy and procedure, planning, training materials, communication materials, and meeting minutes, including but not limited to from Training Community Advisory Committee and Training Oversight Committee meetings, to substantiate whether the CPD has established and implemented a process to analyze and review the content and delivery of training according to the requirements of this paragraph.

Full compliance may be achieved when records submitted indicate and substantiate that the City and the CPD have conducted an analysis and review of the content and delivery of trainings and the CPD has determined if trainings are effective in preparing officers according to the requirements of this paragraph.

### Paragraph 286 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Training: ¶287

*287. Pursuant to its Training Plan, CPD will develop and implement a process that provides for the collection, analysis, and review of course and instructor evaluations to document the effectiveness of existing training and to improve the quality of future instruction and curriculum. This process will include member feedback on the training they have received and analysis of the extent to which such training is reflected in how members perform. The Education and Training Division will consider this information in conducting its annual needs assessment.*

## Compliance Progress       (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve any level of compliance with the requirements of ¶287 during this reporting period.

To evaluate Preliminary compliance with ¶287, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the annual *Training Plan* or related policies require the CPD to develop and implement a process for collection, analysis, and review of course and instructor training evaluations, including officer feedback and an analysis of the extent to which such training is reflected in how officers perform and how this information will be used in the annual *Needs Assessment*. The IMT also sought to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended. Where applicable, we assessed whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD did not submit any data to establish any level of compliance. Notwithstanding, the IMT assessed compliance by reviewing the *2022 Training Plan* and training directives S11-10 (*Department Training Records Maintenance Program*), S11-10-01 (*Training Notification and Attendance Responsibilities*) and S11-11 (*Training Oversight Committee*). We found that these plans and directives attempted to include the language required

in this paragraph, but lacked documentation containing the requisite language. We determined that the City and the CPD had not yet achieved Preliminary compliance. We noted that supporting documentation with the necessary language would be necessary to demonstrate Preliminary compliance.

*Progress in the Seventh Reporting Period*

The City and the CPD did not submit any data to establish any level of compliance during this reporting period.

<div align="center">* * *</div>

The City and the CPD did not achieve any level of compliance during this reporting period. Looking forward, Preliminary compliance requires the City and the CPD to develop and implement a process for collection, analysis, and review of course and instructor training evaluation, including officer feedback and analysis of the extent to which such training is reflected in how officers perform and how this information will be used in the annual *Needs Assessment*.

To achieve Secondary compliance, the City and the CPD must demonstrate that they have implemented a process for course and instructor training evaluations, including officer feedback and analysis of the extent to which such training is reflected in how officers perform. This information must then be used in the annual training *Needs Assessment* to determine whether the CPD has demonstrated that training is having the intended impact.

Full compliance may be achieved when policies, lesson plans, training plans, training schedules, and evaluation instruments are components of a sustained evaluation process that meets the requirements of this paragraph.

### Paragraph 287 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 − DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Training: ¶288

> **288.** *The Education and Training Division will develop and implement a process to maintain audits, reviews, assessments, or evaluations of the sufficiency or effectiveness of the training programs.*

### Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve any level of compliance with the requirements of ¶288 during this reporting period.

To evaluate Preliminary compliance with ¶288, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we will need to review data to determine whether the Education and Training Division has developed and implemented a process to maintain audits, reviews, assessments, or evaluations of the sufficiency or effectiveness of the CPD's training program. The IMT will also seek to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended. Where applicable, we will assess whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD did not seek Preliminary compliance for this paragraph. The City indicated that the CPD intended to work towards integrating the requirements of this paragraph into policy during the sixth reporting period.

*Progress in the Seventh Reporting Period*

The City and the CPD did not submit any data to establish any level of compliance during this reporting period.

\*\*\*

The City and the CPD did not achieve any level of compliance during this reporting period. Looking forward, Preliminary compliance requires The City and the CPD to develop and implement plans and controlling policies for Education and Training

Division to develop and implement a process to maintain audits, reviews, assessments, or evaluations of the sufficiency or effectiveness of the CPD's training programs.

To achieve Secondary compliance, the City and the CPD must demonstrate that they have established a process to maintain audits, reviews, assessments, or evaluations of the sufficiency or effectiveness of the training programs.

Full compliance may be achieved when the Education and Training Division has fully developed and implemented a process to maintain audits, reviews, assessments, or evaluations of the sufficiency or effectiveness of the CPD's training programs.

### Paragraph 288 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Training: ¶289

> **289.** *CPD will develop and implement testing policies and procedures to ensure that any member testing that is administered is reliable and fair. To achieve this purpose, both knowledge-based and performance-based tests will be designed, developed, administered, and scored according to best practices. All tests will assess the knowledge and skills required for successful job performance and will align with the materials delivered in training.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶289 during this reporting period.

To evaluate Preliminary compliance with ¶289, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the CPD has developed testing policies and procedures consistent with the requirements of this paragraph. The IMT also sought to determine if the CPD has established a process to ensure that testing that is administered is reliable and fair and uses both knowledge-based and performance-based tests that are designed, developed, administered, and scored according to best practices. The IMT further sought to determine that all tests are designed to assess the knowledge and skills required for successful job performance and align with the materials delivered in trainings. Where applicable, we assessed whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT assessed compliance by reviewing BIA eLearning materials, including draft eLearning materials and a pre-and post-tests. These documents alone did not demonstrate that the CPD had established a process to ensure that testing that is administered is reliable and fair, and uses both knowledge-based and performance-based tests that are designed, developed, administered, and scored according to best practices.

*Progress in the Seventh Reporting Period*

To demonstrate compliance with ¶289, this reporting period the CPD submitted the following materials:

- BIA eLearning, including draft eLearning materials and a pre-and post-test Training (produced August 18, 2022 and November 9, 2022).

Again, these documents alone do not demonstrate that the CPD has established a process to ensure that testing that is administered is reliable and fair, and uses both knowledge based and performance-based tests that are designed, developed, administered, and scored according to best practices.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance may be achieved after the CPD has established a process to ensure that testing that is administered is reliable and fair, and that testing uses both knowledge-based and performance-based tests that are designed, developed, administered, and scored according to best practices. All tests are designed to assess the knowledge and skills required for successful job performance and align with materials developed in training. Assessment sources include policy, procedure, plans and processes, and testing materials.

Full compliance may be demonstrated when the CPD implements testing policies and procedures that are reliable and fair and use both knowledge-based and performance-based tests that are designed, developed, administered, and scored according to best practices, and when the CPD demonstrates that all tests assess the knowledge and skills required for successful job performance and align with the materials delivered in training.

### Paragraph 289 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 − DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶290

*290. CPD will develop, implement, and utilize a centralized electronic file system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities. This system will allow the Education and Training Division to electronically track and maintain complete and accurate records of all training provided to CPD members, including curricula, lesson plans, training delivered, member feedback, assessments, and other training materials. This system will, at a minimum: a. maintain training records for each member of the Department; b. record the course description, duration, curriculum, date, location, and the members who completed the training; and c. identify members who did not complete required training and describe remedial training actions that were taken.*

## Compliance Progress        (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve any level of compliance with the requirements of this paragraph during this reporting period.

To evaluate Preliminary compliance with ¶290, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we will need to review data to determine whether the City and the CPD have established a process to implement an electronic file system in accordance with the requirements of this paragraph. The IMT will also seek to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended. Where applicable, we will assess whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD did not submit any data to establish any level of compliance during this reporting period, and we found that the City and the CPD did not achieve any level of compliance with this para-

graph. The City previously indicated that the CPD intended to work towards Preliminary compliance during the sixth reporting period by memorializing the requirements of this paragraph into policy.

*Progress in the Seventh Reporting Period*

The City and the CPD did not submit any data to establish any level of compliance during this reporting period.

<div align="center">* * *</div>

The City and the CPD did not achieve any level of compliance with this paragraph during this reporting period. Looking forward, achieving Secondary compliance will require the CPD to establish an "electronic file system" in accordance with the requirements of this paragraph. Assessment sources would include policies, procedures, plans and processes, and demonstrations of system operations.

### Paragraph 290 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Training: ¶291

> **291.** *The Education and Training Division will document all training provided to or received by CPD members, whether required or not. Members will sign an acknowledgement of attendance or digitally acknowledge completion of training.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶291 during this reporting period.

To evaluate Preliminary compliance with ¶291, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we will need to review data to determine whether the City and the CPD have sufficiently established a process to document all CPD trainings. Assessment sources would include policy, procedure, and training records. The IMT will also seek to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended. Where applicable, we will assess whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the fifth reporting period, the IMT assessed compliance by reviewing the submitted Training Directives S11-10 (*Department Training Records Maintenance*) and S11-11 (*Training Oversight Committee*) and found that the City and the CPD did not maintain Preliminary compliance with the requirements of this paragraph because they did not submit any documents or data to establish its compliance during the prior reporting period.

To demonstrate compliance with ¶291, in the sixth reporting period the City and the CPD submitted a cover letter seeking to clarify its position that the Training Directives S11-10 (*Department Training Records Maintenance*), S11-10-01 (*Recruit Training*), S11-10-02 (*Pre-Service Training*), and S11-10-03 (*In-Service Training*) previously produced on December 29, 2021 support Preliminary compliance with the requirements of this paragraph. Additionally, the IMT reviewed Employee Resource E05-04 (*Merit Board*), E05-04-01 (*Academic Selection Board*), and E02-07 (*Travel, Department-Funded Training, and Reimbursement Guidelines*). S11-10

§ III(A), and §§ VII(B) & (C) provide the requisite language for Preliminary compliance.

*Progress in the Seventh Reporting Period*

The City and the CPD did not submit any documents to demonstrate compliance with ¶291 this reporting period. However, the IMT reviewed Employee Resource E05-04 (*Merit Board*), E05-04-01 (*Academic Selection Board*), and E02-07 (*Travel, Department-Funded Training, and Reimbursement Guidelines)*, as well as S11-10 (*Department Training Records Maintenance*). S11-10 § III(A), and §§ VII(B) & (C) provide the requisite language to support continued Preliminary compliance.

<p style="text-align:center">***</p>

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, the CPD may achieve Secondary compliance when it demonstrates that it has sufficiently established a process to document all CPD trainings. Assessment sources would include policy, procedure, training records, and training attendance records.

## Paragraph 291 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶292

> *292. The Education and Training Division will, on an annual basis, report on training to the TOC and the Superintendent. At a minimum, this report will: a. contain a description of each course, including a summary of the subject matter; b. state the duration, date, location, and number of persons by rank who completed the training; c. identify whether the training was part of the recruit, in-service, or pre-service promotional training program; d. state whether the training was centralized or decentralized, and delivered in person or through electronic means; e. list whether the training was mandatory, elective, or remedial; and f. document the members who did not complete required training and any remedial training actions taken.*

**Compliance Progress**        (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    Annually        ☑ **Not Yet Applicable**

**Preliminary:**    *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with the requirements of ¶292 during this reporting period.

To evaluate Preliminary compliance with ¶292, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the City and the CPD have implemented a policy requiring an annual report on training and provided the annual report, as required. The IMT also sought to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended. Where applicable, we assessed whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress in the Seventh Reporting Period*

During the previous reporting period, the City and the CPD submitted the *2021 Annual Training Report* (March 2022) and related materials, including a PowerPoint presentation regarding the *2021 Annual Training Report* presented to the Training Oversight Committee at the March 23, 2022 Training Oversight Committee meeting and Training Oversight Committee meeting minutes.

A submission consistent with ¶292(f) requirements could not be identified in review of the documents produced. The IMT advised it recognized that the CPD had been working on an In-Service Training Deviation Dashboard that may ultimately, in part, address this requirement, but that its applicability is limited to In-Service Training and had not yet achieved No Objection status. The IMT advised that all other ¶292 Secondary compliance requirements appeared to be met, but Secondary compliance failed because of the ¶292(f) requirement.

*Progress in the Seventh Reporting Period*

No new documents demonstrating compliance were submitted this reporting period. The *2022 Training Plan* and Training Directive S11-10-01 (*Training Notification and Attendance Responsibilities*) were both reviewed during the previous reporting period and allows the CPD to maintain Preliminary compliance. The IMT anticipates the *2022 Annual Training Report* and *2023 Training Plan* will be provided during the upcoming reporting period, possibly substantiating higher compliance levels.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance may be achieved when the CPD provides the annual report and ¶292(a–f) criteria are met in the report. Full compliance may be achieved after the CPD has sustained the annual report on training, as required.

## Paragraph 292 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶294

> **294.** *CPD will ensure that upon graduation from the Academy, recruits demonstrate a firm grasp of the basic technical and tactical skills, critical thinking, problem-solving, and interpersonal skills that form the basis for safe and effective policing. In order to do so, CPD will rely on appropriate evaluation tools to measure recruits' skills and qualifications.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**          *Not in Compliance*
**Secondary:**          *Not in Compliance*
**Full:**          *Not Yet Assessed*

The City and the CPD failed to achieve any level of compliance with the requirements of ¶294 during this reporting period.

To evaluate Preliminary compliance with ¶294, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the CPD has a policy that requires recruits to demonstrate the requirements of this paragraph. Such policy should also fully align with the CPD's training goals generally.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD did not submit any documents to demonstrate compliance with the requirements of this paragraph. During the fourth reporting period, we determined that the CPD had written the recruit requirements of this paragraph into policy, but we noted that for continued Preliminary compliance, the CPD would need to demonstrate the validity of the recruit evaluation tools. As the CPD did not provide any data of such validity during the fifth reporting period, we determined that the CPD had lost Preliminary compliance. The City previously indicated that the CPD planned to work towards Secondary compliance during the sixth reporting period.

*Progress in the Seventh Reporting Period*

The IMT did not identify any data submitted by the City and the CPD to establish compliance with ¶294.

***

The City and the CPD failed to achieve any level of compliance during this reporting period. Looking forward, Preliminary compliance requires the CPD to have a policy that requires recruits to demonstrate the requirements of this paragraph and that also fully aligns with the training goals of this paragraph. Secondary compliance requires the CPD to have developed and use tools designed to measure recruits' grasp of the basic technical and tactical skills, critical thinking, problem-solving, and interpersonal skills that form the basis for safe and effective policing. To do so, the CPD must rely on appropriate evaluation tools to measure recruits' skills and qualifications upon graduation from the Academy.

### Paragraph 294 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Training: ¶295

> ***295.*** *The Parties acknowledge that CPD, through its Recruit Curriculum Working Group, revised and updated the content and delivery of its recruit training curriculum in 2017. CPD will further modify the amount, content, and delivery of its recruit training to comport with its Training Plan and the requirements and goals of this Agreement.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with these requirements during this reporting period.

To evaluate Preliminary compliance with ¶295, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we will need to review data to determine whether the CPD has policy, plans, and processes for modifying recruit training in accordance with this paragraph. The IMT will also seek to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended.

*Progress before the Seventh Reporting Period*

During the sixth period, the IMT reviewed the Annual Training Report, Training Oversight Committee Minutes (23 Mar 22), Annual Training Report presentation, and a To-From from First Deputy to the Superintendent. The Training Oversight Committee Minutes indicated the Annual Training Report was delivered to the Training Oversight Committee on March 23, 2022, and the To-From from the First Deputy to the Superintendent indicated the Annual Training Report was delivered on April 20, 2021. The IMT advised that more information was needed to resolve this date conflict. Neither the Annual Training Report nor any other document produced indicated modifications to the amount, content, and delivery of recruit training to comport with the *Training Plan*. The materials identify differences between the basic state curriculum and the CPD Academy training requirements, but did not provide any information regarding year-to-year changes to the CPD recruit training itself.

*Progress in the Seventh Reporting Period*

The *2022 Training Plan* and Training Directive S11-11-01 (*Training Notification and Attendance Responsibilities*), submitted during the fifth reporting period, continue to substantiate Preliminary compliance. The IMT did not identify any data submitted by the City and the CPD this reporting period to establish Secondary compliance with ¶295.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance requires the CPD to have established a verifiable process to modify recruit training. Full compliance requires the CPD to have sufficiently modified recruit training to align with the requirements of its *Training Plan* and ¶295.

## Paragraph 295 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶296

> **296.** *CPD will ensure that the Academy is sufficiently staffed to effectively train recruits. CPD will further ensure that, except in extraordinary circumstances, courses are scheduled with sufficient advance time for instructors to be notified of the class and to properly prepare and deliver quality instruction.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶296 during this reporting period.

To evaluate Preliminary compliance with ¶296, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the City and the CPD have effective policies and plans for ensuring adequate staffing levels in the Academy. We further sought to review data to determine whether the City and the CPD have developed training plans and curriculum and delivered that training to the relevant personnel during the necessary intervals. Our review requires the CPD to provide data reflecting sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended. Where applicable, we assessed whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD did not submit any data to establish any level of compliance. However, Training Directive S11-10-01 (*Training Notification and Attendance Responsibilities*) produced in the prior reporting period continued to support Preliminary compliance.

The IMT also participated in a site visit to the Academy occurring over multiple days in June 2022. We spoke with and observed staff officers who the CPD deployed to other CPD assignments to the detriment of being able to fully focus on meeting the training objectives of the CPD. Academy personnel in some cases had worked more than three consecutive weeks without a day off. Training staff must be able to plan, implement, train, evaluate, remediate, and modify trainings. The

IMT advised that the CPD's training mission could not be adequately met without investing in and maintaining the requisite staffing resources.

*Progress in the Seventh Reporting Period*

The City and the CPD did not submit any data to establish any level of compliance during this reporting period. However, Training Directive S11-10-01 (*Training Notification and Attendance Responsibilities*) produced in the fifth reporting period continues to support Preliminary compliance.

<div align="center">*** </div>

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance requires the CPD to establish a process to ensure adequate Academy staffing levels. Full compliance can be achieved if policy, procedure, processes, staffing levels, training schedules, materials for instructors, communication/notification, and other materials are submitted to demonstrate that the CPD maintains sufficient Academy staffing levels and that courses are scheduled with sufficient advance time in accordance with ¶296 requirements.

## Paragraph 296 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶297

> **297.** *CPD will require end-of-course training evaluations of recruits that ensure they graduate with the requisite knowledge and skills to engage in policing activities safely, effectively, and lawfully.*

## Compliance Progress        (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶297 during this reporting period.

To evaluate Preliminary compliance with ¶297, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we will need to review data to determine whether the City and the CPD are constructing and administering a validated end-of-course knowledge and skills evaluation to ensure recruits can police safely, effectively, and lawfully.

*Progress before the Seventh Reporting Period*

During the fifth reporting period, the IMT assessed compliance by reviewing Training Directive S11-10-01 (*Training Notification and Attendance Responsibilities*). We determined that the City and the CPD achieved Preliminary compliance by incorporating the requirements of this paragraph into policy. We noted that Secondary compliance requires constructing and administering a validated end-of-course knowledge and skills evaluation to ensure recruits can police safely, effectively, and lawfully.

*Progress in the Seventh Reporting Period*

The City and the CPD did not submit any data to establish any level of compliance during this reporting period. However, Training Directive S11-10-01 (*Training Notification and Attendance Responsibilities*) produced in the fifth reporting period continues to support Preliminary compliance.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance requires constructing and administering a validated end-of-course knowledge and skills evaluation to ensure recruits

can police safely, effectively, and lawfully. Full compliance can be achieved when end-of-course evaluations demonstrate efficacy in identifying recruits with the requisite knowledge and skills to engage in policing activities.

### Paragraph 297 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶298

*298. An effective field training program is necessary for reinforcing the policies, practices, and skills taught in recruit training and instilling in new police officers the principles of safe, effective, and lawful policing that will guide them throughout their careers. CPD will sufficiently staff, supervise, and manage its field training program ("Field Training and Evaluation Program") to train and evaluate new officers in the necessary skills required to deescalate or use force in accordance with the sanctity of life, the law, CPD policy, and this Agreement.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**   *In Compliance* (SIXTH REPORTING PERIOD)
**Secondary:**    *Not Yet Assessed*
**Full:**         *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with the requirements of ¶298 during this reporting period.

To evaluate Preliminary compliance with ¶298, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we will need to review data to determine whether the City and the CPD have developed acceptable policies, procedures, and plans to sufficiently staff, supervise, and manage its field training program according to requirements of ¶298. "Sufficiently staff" must also be clearly defined by objective criteria.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT assessed compliance by reviewing a revised version of Training Directive S11-02 (*Field Training and Evaluation Program*), and found that the City and the CPD achieved Preliminary compliance. No other documents were produced to demonstrate Secondary compliance, which involves the implementation of a process to review and revise the Field Training and Evaluation Program (also known as the FTEP) as necessary.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program* (FTEP) and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- FTO Initial Training (produced September 8, 2022)

The policy block of documents contain the ¶298 required language for Preliminary compliance. The FTO initial training blocks contains 103 hours of the following courses:

## FIELD TRAINING EVALUATION PROGRAM
### PRE-SERVICE FTO TRAINING CURRICULUM
**SUMMARY OF PRE-SERVICE TRAINING HOURS**

| Course | Hours | CD Requirements |
|---|---|---|
| Admin (Orientation, FOP, HR) | 4 | 1, 10 |
| Uniform Inspection | 1 | 1 |
| FTO Exams | 2 | 1-10 |
| FTO Procedures (Roles and Responsibilities) | 7 | 1, 2, 3, 5, 6, 7, 8, 10 |
| FTO / TSA Scenarios | 3 | 1, 5, 6, 10 |
| DUI Refresher | 7 | 1, 10 |
| Caboodle (GIS Mapping) | 1 | 1, 2, 8, 10 |
| IAD Review (Rules and Regulations) | 1 | 1 - 10 |
| Law Review – Liability in LE Training | 7 | 1 - 10 |
| Control Tactics and Use of Force | 4 | 1 - 10 |
| Leadership | 4 | 1 - 10 |
| Weapons Policy | 1 | 1, 3, 5, 9, 10 |
| Sexual Harassment | 1 | 1, 6, 10 |
| Recent Civil Matters (Corporation Counsel) | 1 | 1 – 10 |
| CIT - Crisis Intervention Team | 35 | 1, 5, 7, 8, 10 |
| Police Community Relations (Hrs. 8-10) | 3 | 1 – 10 |
| Neighborhood/Community Profiles | 4 | 1 - 10 |
| Recruit Training Curriculum Changes | 1 | 1, 9, 10 |
| Adult Learning and Training | 2 | 1, 6, 7, 10 |
| Dealing with Difficult Participants | 1 | 1, 5, 6, 7, 8, 10 |
| Effective Communications | 1 | 1 - 10 |
| Emotional Intelligence | 1 | 1, 3, 6, 10 |
| Teach on the Fly & Critiques | 2 | 1, 6, 9, 10 |
| Training with Honor | 1 | 1 - 10 |
| Procedural Justice | 7 | 1, 3, 4, 5, 6, 7, 8 |
| ISR for FTOs | 1 | 1, 3, 6, 10 |
| FTO Program Critique | 1 | 1 - 10 |
| **TOTAL HOURS** | **103** | |

*Consent Decree Requirements*
1. *Management, mentoring, modeling, effective problem-solving techniques, and teaching*
2. *Community policing*
3. *Procedural justice*
4. *Impartial policing*
5. *De-escalation*
6. *Ethics*
7. *Diversity*
8. *Field communication*
9. *Any recent substantive changes made to the recruit training curriculum*
10. *Any substantive changes to policies and practices that affect their roles as mentors and trainers of PPOs*

None of the documents submitted this reporting period substantiate that the City and the CPD has established and implemented a process and applicable formulas to sufficiently staff, supervise, and manage its field training program according to the requirements of ¶298 needed to establish Secondary compliance.

*** 

The City and the CPD achieved Preliminary compliance during this reporting period. Looking forward, Secondary compliance may be achieved by the City and the CPD establishing and implementing a process and determining and applying objective applicable formulas to sufficiently staff, supervise, and manage its field training program according to requirements of ¶298.

### Paragraph 298 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶299

**299.** *CPD will revise, as necessary and appropriate, the Field Training and Evaluation Program to comport with CPD's Training Plan and this Agreement.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance during this reporting period.

To evaluate Preliminary compliance with ¶299, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether CPD policies and plans follow the requirements for Field Training and Evaluation Program operation, and to determine whether the CPD has sufficiently taken steps to follow requirements for Field Training and Evaluation Program operation as required by this paragraph. The IMT also sought to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended. Where applicable, we assessed whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress in the Seventh Reporting Period*

During the previous reporting period, the IMT assessed compliance by reviewing revised versions of S11-02, *Field Training Evaluation Program* (May and June 2022), including a Comments Matrix showing changes to the prior version of S11-02 produced in the last reporting period and the CPD's responses to comments offered by the IMT. The finalized policy along with finalized revisions to S11-02-01 (Field Training and Evaluation Review Board) were issued effective June 30, 2022 and produced July 2, 2022.

Because the language of S11-02, VI(F) tracks ¶299, the CPD met the requirements for Preliminary compliance. No additional documents were submitted to establish Secondary compliance.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- FTO Initial Training (produced September 8, 2022)

The policy block of documents contains the ¶299 required language for Preliminary compliance. The FTO initial training blocks contain 103 hours of FTO training courses (see ¶298 assessment above for the course listings). None of the documents submitted substantiate that the CPD has revised, as necessary and appropriate, the Field Training and Evaluation Program to comport with the CPD's Training Plan according to requirements of ¶299.

*** 

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, assessing Secondary compliance requires reviewing policy, procedure, plans, and other submissions to determine if the CPD has established a process to review and revise the Field Training and Evaluation Program, as necessary.

Full compliance may be achieved if policy, procedure, plans, training plans, and other field training program documents demonstrate that the CPD has sufficiently and systematically reviewed and revised the Field Training and Evaluation Program in accordance with ¶299 requirements.

### Paragraph 299 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶300

**300.** *The Field Training and Evaluation Program will follow recruit training and be at least 12 weeks in duration and include at least three training cycles. The Field Training and Evaluation Program will not designate probationary police officers ("PPOs") as "field qualified," as defined by this Agreement, until they have successfully completed the entire program.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶300 during this reporting period.

To evaluate Preliminary compliance with ¶300, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the CPD has written the requirements of this paragraph into policy. Policy direction should include guidance on how changes to training curricula will be addressed. Data should further allow the IMT to determine whether the CPD has taken steps to deliver initial and refresher training in an effective manner, including sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended. Where applicable, we will assess whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the IMT assessed compliance by reviewing three areas of amended policy in Training Directive S11-02 (*Field Training and Evaluation Program*) and found the City and the CPD achieved Preliminary compliance. Secondary compliance requires substantive documents demonstrating that the CPD has implemented the approved policy, directive, and standard operating procedure reflected in this paragraph. We noted that the IMT will rely on the ADDIE model of curriculum development as our evaluation standard, including evaluations of student and instructors. We advised that we would also consider whether the City and the CPD integrated community input, as applicable.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- FTO Initial Training (produced September 8, 2022)

The policy block of documents contain the ¶300 required language for Preliminary compliance. The FTO initial training blocks contain 103 hours of FTO training courses (see ¶298 assessment above for the course listings). None of the documents submitted this reporting period further substantiate that ¶300 requirements are achieved to establish Secondary compliance.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, to meet Secondary compliance the CPD must demonstrate that it has implemented the approved policy, directive, and standard operating procedure reflecting training imperatives of this paragraph. A training methodology that includes reviewing the City's, the CPD's, and the other relevant entities' training development, implementation, and evaluation (¶286) also applies to Secondary compliance requirements. The IMT relies upon the Analysis, Design, Development, Implementation, and Evaluation (ADDIE) model of curriculum development and implementation as our evaluation standard, which typically incorporates the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

When applicable, we will also assess whether the City, the CPD, and the other relevant entities adequately sought, received, and incorporated community input and participation. The IMT will also seek to verify sufficient attendance records, including hours attended.

The Field Training and Evaluation Program training records should correspond with policy and procedural requirements.

## Paragraph 300 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Training: ¶301

**301.** *CPD will review and revise as necessary its FTO selection policies and procedures to establish and implement a program that effectively attracts and retains qualified FTOs.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve any level of compliance with the requirements of ¶301 during this reporting period.

To evaluate Preliminary compliance with ¶301, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, the IMT will review data to determine whether the CPD's policies and plans for reviewing and revising its Field Training Officer selection policies and procedures follow the requirements of ¶301. Where applicable, we assessed whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD did not submit any data to establish any level of compliance. No sections of S11-02 (*Field Training And Evaluation Program*) or S11-02-01 (*Field Training And Evaluation Review Board*) produced during the previous reporting period contained the requisite language for compliance. Therefore, Preliminary compliance was not achieved.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- FTO Initial Training (produced September 8, 2022)

The FTO initial training blocks contain 103 hours of FTO training courses (see ¶298 assessment above for the course listings). No sections of S11-02 (*Field Training*

*And Evaluation Program*) or S11-02-01 (*Field Training And Evaluation Review Board*) contain the requisite language for compliance. Therefore, Preliminary compliance is not achieved.

\*\*\*

The City and the CPD did not achieve any level of compliance during this reporting period. Looking forward, Secondary compliance may be achieved after the City and the CPD have reviewed and revised its Field Training Officer selection policies and procedures and implemented a Field Training Officer program that follows the requirements of this paragraph. Secondary assessment sources include policy, procedure, processes, training schedules, Field Training Officer, Probationary Police Officers, and other evaluations, reports, Notice of Job Opportunities , job descriptions, and personnel allocation records that show course completion for Probationary Police Officers.

### Paragraph 301 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Training: ¶302

> **302.** *CPD's policies and procedures will continue to delineate the criteria and methodology for selecting FTOs. Subject to its collective bargaining agreements with the CPD unions, CPD will review and, as appropriate, revise its eligibility criteria and promotional practices to ensure that FTOs are selected based on their applications, previous performance as police officers, FTO training examination scores, and disciplinary histories.*

### Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance with the requirements of ¶302 during this reporting period.

To evaluate Preliminary compliance with ¶302, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we will need to review data to determine whether the City and the CPD have developed a process to review and revise eligibility criteria and promotional practices and have created acceptable policies, procedures, and plans to continue to delineate the criteria and methods for selecting Field Training Officers according to requirements of ¶302.

*Progress before the Seventh Reporting Period*

During the sixth reporting period, no relevant documents were submitted by the City and the CPD to demonstrate any level of compliance. The IMT reviewed S11-02 (*Field Training and Evaluation Program*) and found no applicable sections satisfied the requirements of this paragraph. As a result, we determined the Preliminary compliance requirements were not met.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- FTO Initial Training (produced September 8, 2022)

- E05-08 *Application for Police Officer (Assigned as Field Training Officer)* (produced October 20, 2022)

The FTO initial training blocks contain 103 hours of FTO training courses (see ¶298 assessment above for the course listings). The CPD finalized and posted directive E05-08 for the FTO job application process on July 11, 2022.

E05-08 sets forth FTO assignment and duties, eligibility, application procedures, selection processes and describes the reference material, eligibility list, FTO responsibilities, and some additional conditions. The policy specifications meet the requirements of ¶302 Preliminary compliance.

**\*\*\***

The City and the CPD achieved Preliminary compliance during this reporting period. Secondary compliance requires the City and the CPD to establish and implement a process to continue to delineate the criteria and methodology for selecting Field Training Officers and the resultant policies and procedures, according to the requirements of ¶302.

### Paragraph 302 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶303

> *303. FTOs will receive initial and refresher training that is adequate in quality, quantity, scope, and type, and that addresses subjects including, but not limited to management and mentoring, community policing, effective problem-solving techniques, ethics, diversity, field communication, and any recent substantive changes made to the recruit training curriculum. FTOs will receive refresher training on an annual basis as part of the In-Service Training Program outlined in this Agreement. FTOs will be promptly notified of any substantive changes to policies and practices that affect their roles as mentors and trainers of PPOs.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**   Annual              ☑ Met   ☐ Missed

| | |
|---|---|
| **Preliminary:** | *In Compliance (FIFTH REPORTING PERIOD)* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶303 during this reporting period.

To evaluate Preliminary compliance with ¶303, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the CPD has developed plans and policies for evaluating Field Training Officer proficiency in managing and mentoring Probationary Police Officers, teaching key principles, and maintaining documentation of Field Training Officer trainings and evaluations. The IMT also sought to determine if the CPD has sufficiently taken steps to evaluate Field Training Officer proficiency in managing and mentoring Probationary Police Officers and to maintain documentation of Field Training Officer training and evaluation.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT assessed compliance by reviewing the *2022 Annual In-Service Field Training Officer Refresher Training Curriculum* (March 2022), a revised *2022 Annual In-Service Field Training Officer Refresher Training Curriculum* (June 2022), and a revised version of Training Directive S11-

02, *Field Training and Evaluation Program* (May and June 2022), including a Comments Matrix showing changes to the prior version of S11-02 produced in the prior reporting period and the CPD's responses to comments offered by the IMT.

S11-02 § VIII(B)(1), (2)(a), and (2)(d) commits the City and the CPD to all aspects of ¶303. Collectively, these policies affirmed Preliminary compliance status during the sixth reporting period. The training data demonstrated the adequacy of the training courses in fulfilling ¶303 requirements. However, no documents were produced indicating that at least 95% of Field Training Officers had received the required annual refresher training needed to establish Secondary compliance.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- 2022 Annual In-Service FTO Refresher Training Curriculum (produced September 8, 2022)

- FTO Initial Training (produced September 8, 2022)

- 2022 Annual In-Service FTO Refresher Training Curriculum (produced November 22, 2022)

S11-02 § VIII(B)(1), (2)(a), and (2)(d) commit the City and the CPD to all aspects of ¶303. Collectively, these policies affirm Preliminary compliance status during this reporting period.

The 2022 Annual In-Service FTO Refresher Training includes a lesson plan, curriculum, revised PowerPoint slides to ensure course materials cover all ¶303 requirements, and a pre- and post-test.

The FTO initial training blocks contain 103 hours of FTO training courses (see ¶298 assessment above for the course listings).

The documentation provided this reporting period indicate that all of the ¶303 Preliminary compliance requirements are met. Secondary compliance requires an additional documentation proving that FTOs received the training. All other Secondary compliance requirements appear to be met.

<p style="text-align:center">***</p>

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, the CPD may achieve Secondary compliance after it has sufficiently documented effective training delivery. Full compliance may be realized when FTOs routinely receive initial and refresher training and the CPD has incorporated and documented all ¶303 requirements.

### Paragraph 303 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| Preliminary |

# Training: ¶304

**304.** *FTOs will be required to maintain and demonstrate their proficiency in managing and mentoring PPOs, as well as modeling and teaching, by their example, procedural justice, de-escalation, impartial policing, and community policing. The Education and Training Division will maintain documentation of the training of FTOs. The Bureau of Patrol will maintain documentation of the evaluations of FTOs.*

**Compliance Progress**  (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶304 during this reporting period.

To evaluate Preliminary compliance with ¶304, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the CPD has developed plans and policies for evaluating Field Training Officer proficiency in managing and mentoring Probationary Police Officers (also known as PPOs), teaching key principles, and maintaining documentation of Field Training Officer training and evaluation. The IMT also sought to determine if the CPD has sufficiently taken steps to evaluate Field Training Officer proficiency in managing and mentoring Probationary Police Officers and to maintain documentation of Field Training Officer training and evaluation. The IMT also sought to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended. Where applicable, we assessed whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT assessed compliance by reviewing CPD Training Directive S11-02 (*Field Training and Evaluation Program*) and found this training directive to include the requisite language required by this paragraph to achieve Preliminary compliance.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- 2022 Annual In-Service FTO Refresher Training Curriculum (produced September 8, 2022)

- FTO Initial Training (produced September 8, 2022)

- 2022 Annual In-Service FTO Refresher Training Curriculum (produced November 22, 2022)

S11-02 § VIII(B)(2)(b-c), VIII(J)(2), and VIII(I)(7) commit the City and the CPD to all aspects of ¶303. Collectively, these policies affirm Preliminary compliance status during this reporting period.

The 2022 Annual In-Service FTO Refresher Training includes a lesson plan, curriculum, revised PowerPoint slides to ensure course materials cover all ¶303 requirements, and a pre- and post-test. The FTO initial training blocks contain 103 hours of FTO training courses (see ¶298 assessment above for the course listings).

Taken together, these S11-10 (*Department Training Records Maintenance*) subparagraphs exhibit the requisite language to meet Preliminary compliance status. No submitted documents demonstrate Field Training Officer proficiency in managing and mentoring Probationary Police Officers, or document Field Training Officer training and evaluations necessary to establish Secondary compliance.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance may be achieved after the CPD has sufficiently taken steps to evaluate Field Training Officer proficiency in managing and mentoring Probationary Police Officers and maintained documentation of Field Training Officer training and evaluation. Secondary assessment sources include policy, procedure, processes, training schedules, training and evaluation records, and other policy, data, jobs, and training sources.

## Paragraph 304 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Training: ¶305

**305.** *CPD will revise the Field Training and Evaluation Program to ensure that no more than one PPO is assigned to an FTO during each training cycle. The City will provide CPD with the necessary support and resources to designate a sufficient number of FTOs to meet the requirements of this Agreement. Officers performing FTO duties in a temporary capacity are considered FTOs under this Agreement so long as they meet the requirements set forth for FTOs in this Agreement, except for the selection requirements.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶305 during this reporting period.

To evaluate Preliminary compliance with ¶305, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the CPD has developed policy and plans to revise Field Training and Evaluation Program to meet ¶305 requirements. Such data must confirm that Field Training and Evaluation Program revisions are completed and implemented. The IMT also sought to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended. Where applicable, we assessed whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

To demonstrate compliance with ¶305 in the prior reporting period, the CPD submitted revised versions of Training Directive S11-02, *Field Training and Evaluation Program* (May and June 2022), including a Comments Matrix showing changes to the prior version of S11-02 and the CPD's responses to comments offered by the IMT. S11-02 § VII(C) provides the requisite language for Preliminary compliance. Documents substantiating Secondary compliance were not submitted for review during the prior reporting period.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- FTO Initial Training (produced September 8, 2022)

- FTO/PPO Quarterly Surveys (produced December 8, 2022)

- FTEP Report to the TOC (produced December 30, 2022) and TOC Minutes (December 21, 2022)

S11-02 § VII(C) provides the requisite language for Preliminary compliance.

The City and the CPD provided a survey link to data gathered from Q4 2021 through Q2 2022. The Field Training Officer Quarterly surveys are given to allow Probationary Police Officers to provide feedback about their training and for Field Training Officers to provide feedback regarding the Field Training and Evaluation Program.

The Field Training and Evaluation Program Report to the Training Oversight Committee included a slide presentation that discussed FTO/PPO ratios and efforts to maintain the 1:1 ratio. This discussion was further substantiated by minutes of the December 21, 2022, Training Oversight Committee meeting where this presentation occurred.

IMT met with the CPD and Department of Human Resources during a site visit and discussed FTO/PPO ratios. We were made aware of the need for the CPD to expedite onboarding of new Act-Up FTOs in order to avoid violating ¶305 requirements in 2023. It is evident that the City and the CPD held an FTO exam during the eighth reporting period. The City and the CPD has thus far demonstrated appropriate sensitivity to ¶305 mandates and appear from the IMT's perspective to be making adjustments as required by this paragraph to maintain the required 1:1 FTO/PPO ratio. Acute FTO shortages elevate the criticality of adhering to ¶305 requirements.

***

The City and the CPD achieved Secondary compliance during this reporting period. Looking forward, Full compliance is demonstrated when data confirms a one-to-one Probationary Police Officer to Field Training Officer ratio sustained through

training cycles and the CPD has implemented a process that will ensure that Probationary Police Officers are not placed on assignments in the field without adequate supervision.

### Paragraph 305 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Training: ¶306

**306.** *CPD will ensure that PPOs in the Field Training and Evaluation Program train with different FTOs during each of their training cycles.*

**Compliance Progress**   (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶306 during this reporting period.

To evaluate Preliminary compliance with ¶306, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether ¶306 requirements are met. Specifically, we reviewed policy, processes, Probationary Police Officers (also known as PPOs) and Field Training Officer assignments, and Field Training and Evaluation Program-related materials. These data sources must confirm a one-to-one Probationary Police Officer to Field Training Officer ratio sustained through training cycles and that Probationary Police Officers train with a different Field Training Officer each training cycle. Such data must also demonstrate that the CPD has implemented a process that will ensure that Probationary Police Officers are not placed on assignments in the field without adequate supervision, and that they train with a different Field Training Officer each training cycle.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT assessed compliance by reviewing revised versions of Training Directive S11-02, *Field Training and Evaluation Program* (May and June 2022), including a Comments Matrix showing changes to the prior version of S11-02 produced in the fifth reporting period and the CPD's responses to comments offered by the IMT. S11-02 § VIII(A)(3) matched the language in ¶306, substantiating Preliminary compliance.

No additional documents provided by the CPD indicated Secondary compliance.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- FTO Initial Training (produced September 8, 2022)

- FTO/PPO Quarterly Surveys (produced December 8, 2022)

- FTEP Report to the TOC (produced December 30, 2022) and TOC Minutes (December 21, 2022)

S11-02 § VIII(A)(3) provides the requisite language for Preliminary compliance.

The City and the CPD provided a survey link to data gathered from Q4 2021 through Q2 2022. The FTO Quarterly surveys are given to allow PPOs to provide feedback about their training and for FTOs to provide feedback regarding the FTEP.

The FTEP Report to the TOC included a slide presentation that discussed FTO/PPO ratios and efforts to maintain the 1:1 ratio. This discussion was further substantiated by minutes of the December 21, 2022, TOC meeting where this presentation occurred.

No additional documents or schedules were provided by the CPD indicating Secondary compliance this reporting period.

<div align="center">***</div>

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance may be achieved by demonstrating the Probationary Police Officers in the Field Training and Evaluation Program train with different Field Training Officers during each of their training cycles. Secondary assessment sources may include policy, procedure, processes, training schedules, and training evaluation records. Full compliance may be achieved when the CPD has sufficiently, systemically, and consistently ensured that Probationary Police Officers placed in field assignments train with different Field Training Officers during each of their training cycles.

## Paragraph 306 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Training: ¶307

**307.** *CPD will ensure that PPOs awaiting assignment to an FTO will not be placed on assignments in the field without adequate supervision. CPD will track and document all instances of PPOs placed in field assignments prior to starting the Field Training and Evaluation Program.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶307 during this reporting period.

To evaluate Preliminary compliance, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine if Field Training and Evaluation Program revisions are completed and implemented. Data must confirm that a one-to-one Probationary Police Officer to Field Training Officer ratio is sustained through training cycles and that the CPD has implemented a process that will ensure that Probationary Police Officers are not placed on assignments in the field without adequate supervision. The IMT also sought to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended. Where applicable, we assessed whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the CPD submitted a revised version of Training Directive S11-02, *Field Training and Evaluation Program* (May and June 2022), including a Comments Matrix showing changes to the prior version of S11-02 produced in the last reporting period and the CPD's responses to comments offered by the IMT.

The IMT reviewed S11-02 and found S11-02 § VI(D) contained the requisite language for Preliminary compliance with ¶307. As a result, Preliminary compliance was maintained. No additional data of Secondary compliance were submitted or reviewed last reporting period.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- FTO Initial Training (produced September 8, 2022)

S11-02 § VI(D) provides the requisite language for Preliminary compliance. No additional documents were submitted this reporting period to substantiate Secondary compliance with this paragraph.

<center>***</center>

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance may be achieved if policies, processes, assignments, Field Training and Evaluation Program-related materials, and other policy, data, job, and training sources indicate the requirements of this paragraph are fully met. Full compliance may be achieved when data confirms a one-to-one Probationary Police Officer to Field Training Officer ratio sustained through training cycles and the CPD has implemented and maintained a process that will ensure that Probationary Police Officers are not placed on assignments in the field without adequate supervision.

### Paragraph 307 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶308

> ***308.*** *The Field Training and Evaluation Program will continue to require that FTOs document PPO progress and performance each day in the Daily Observation Report, at the end of each of the first two cycles in the Cycle Summary Report, at the end of the third cycle in the Final Summary Report and, if necessary, at the end of any additional cycles in the Remedial Summary Report. FTOs will identify and document in those reports areas for PPO improvement.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance during this reporting period.

To evaluate Preliminary compliance with ¶308, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we will need to review data to determine if the CPD's plans and policies ensure that Field Training Officers document Probationary Police Officers (also known as PPOs) progress and performance as specified in this paragraph. Data must demonstrate that Field Training Officer training on policy has been completed and that a full training cycle has been completed.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the CPD submitted a revised version of Training Directive S11-02, *Field Training and Evaluation Program* (May and June 2022), including a Comments Matrix showing changes to the prior version of S11-02 produced in the fifth reporting period and the CPD's responses to comments offered by the IMT. S11-02 §§ VIII(B)(2)(e–j) and VIII(B)(3) track the language from ¶308, therefore meeting the Preliminary compliance threshold for this paragraph.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- FTO Initial Training (produced September 8, 2022)

S11-02 §§ VIII(B)(2)(e–j) and VIII(B)(3) track the language from ¶308, therefore meeting the Preliminary compliance threshold for this paragraph. No additional documents were submitted this reporting period to substantiate Secondary compliance with ¶308.

<div align="center">***</div>

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance can be attained with plans and policies for insuring Field Training Officers document Probationary Police Officers' progress and performance as specified in this paragraph. Field Training Officer and supervisor training on policy and a full training cycle must, at minimum, be completed. Secondary assessment sources include policy, training plans, and observation reports.

### Paragraph 308 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶309

**309.** *In each Cycle Summary Report, the FTO will assess whether the PPO should progress to the next cycle of training based on the PPO's performance and compliance with the Field Training and Evaluation Program standards.*

**Compliance Progress**         (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**      *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶309 this reporting period.

To evaluate Preliminary compliance with ¶309, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine if the CPD's plans and policies provide for Field Training Officer assessment and reporting as specified in this paragraph. Data must establish that Field Training Officer and supervisors training on policy has been completed and that at least a full training cycle has been completed.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the CPD submitted a revised version of Training Directive S11-02, *Field Training and Evaluation Program* (May and June 2022), including a Comments Matrix showing changes to the prior version of S11-02 produced in the fifth reporting period and the CPD's responses to comments offered by the IMT.

S11-02 § VIII(B)(2)(g) and (h) and § VIII(D)(4) reflect the policy language required to achieve Preliminary compliance. No additional documents were submitted or reviewed to substantiate Secondary compliance the prior reporting period.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- FTO Initial Training (produced September 8, 2022)

S11-02 § VIII(B)(2)(g) and (h) and § VIII(D)(4) track the language from ¶309, therefore meeting Preliminary compliance. No additional documents were submitted this reporting period to substantiate the Secondary compliance requirements of this paragraph.

*** 

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance will require IMT review of Field Training Reports, including Cycle Summary reports, which were not submitted by the end of this reporting period. The City and the CPD will achieve Secondary compliance when Field Training Officer training on policy is finalized and a full training cycle has been completed with ¶309 required documentation. Full compliance can be attained when Field Training Officer training on policy and methodology is completed and multiple consecutive training cycles meeting these requirements are successfully completed.

### Paragraph 309 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶310

> **310.** *A PPO must be deemed "field qualified" in order to complete the Field Training and Evaluation Program. For a PPO to be deemed "field qualified," all end-of-cycle reports must be completed by the FTO and reviewed and approved by the necessary supervisors.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶310 during this reporting period.

To evaluate Preliminary compliance with ¶310, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the CPD's plans and policies ensure Probationary Police Officers (also known as PPOs) are deemed "field qualified" at completion of the Field Training and Evaluation Program and that end-of-cycle reports are completed by the Field Training Officer and approved by the necessary supervisors as specified in this paragraph.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the IMT assessed compliance by reviewing policy and data sources, processes, and Field Training and Evaluation Program-related materials to determine whether the CPD had policies and processes in place to ensure Probationary Police Officers (PPOs) are field qualified before completing the Field Training and Evaluation Program. We reviewed Training Directive S11-02 (*Field Training and Evaluation Program*) and found the directive to include the requisite language to achieve Preliminary compliance. We noted that the IMT must review Field Training and Evaluation Program-related materials and Field Training Reports, including but not limited to Cycle Summary Reports, and Daily Observation Reports to advance to Secondary compliance. We also advised that the CPD must provide finalized Field Training Officer and supervisors training on policy and training records demonstrating that 95% of eligible CPD officers have been trained for at least a full training cycle.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- FTO Initial Training (produced September 8, 2022)

The IMT identified S11-02 § III, S11-02 § VIII(B)(1–7), S11-02 § VIII(D)(4), S11-02 § VIII(E)(4), and S11-02 § VIII(G)(1), as key sections that reflect the policy language required to achieve Preliminary compliance.

Deconstructing ¶310, it first indicates that "a PPO must be deemed 'field qualified' in order to complete the Field Training and Evaluation Program." S11-02 § III provides a definition of "field qualified," and delineates that it succeeds completion of all required Field Training and Evaluation Program cycles.

Paragraph 310 then conditions "field qualified" status upon completion of all end-of-cycle reports reviewed and approved by the "necessary supervisors." S11-02 § VIII(B)(2)(g) and (h) mandates the Field Training Officer complete a Cycle Summary Report at the end of the Probationary Police Officer's first and second training cycles and a Final Summary Report at the end of the third cycle. S11-02 § VIII(D)(4) requires the "Evaluating Sergeant" to ensure that the assigned Field Training Officer indicates that the Probationary Police Officer met the minimum competency in each key performance characteristic in the Cycle and Final Summary Report and that the Field Training Officer indicated that the Probationary Police Officer was field qualified in the Final Summary Report.

S11-02 § VIII(E)(4) binds the "Designated District Lieutenant" to "ensure completeness of, and if appropriate approve, the Final Summary Report when submitted by the evaluating Sergeant, including reviewing and approving any document recommendations (e.g., 'field-qualified' or remedial training)." S11-02 § VIII(G)(1) mandates the executive officer in each district "ensure the assigned field training officers and evaluations sergeants are performing the duties as outlined in this directive."

These S11-02 subsections, woven together, form the policy framework that substantiates Preliminary compliance with ¶310 during this reporting period. No additional documents substantiating Secondary compliance were submitted or reviewed this reporting period.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance requires the IMT to review Field Training and Evaluation Program-related materials and Field Training Reports, including but not limited to Cycle Summary Reports and Daily Observation Reports. The CPD must also provide finalized Field Training Officer and supervisors training on policy and training records demonstrating that 95% of eligible CPD officers have been trained for at least a full training cycle. Full compliance requires Field Training Officer and supervisors training on policy and methodology is completed and multiple consecutive training cycles meeting these requirements are successfully completed.

## Paragraph 310 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶311

> **311.** *FTOs may recommend specific remedial field or classroom training for a PPO. Any recommendation for remedial training will be provided as promptly as possible to the necessary supervisors and must be documented in the PPO's training record, including, but not limited to, the Final Summary Report or Remedial Summary Report. Recommendations for remedial training must be reviewed by the necessary supervisors and, if approved, recommended training must be completed by the PPO before the PPO completes the Field Training and Evaluation Program.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**   *In Compliance (SIXTH REPORTING PERIOD)*
**Secondary:**    *Not in Compliance*
**Full:**      *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶311 during this reporting period.

To evaluate Preliminary compliance with ¶311, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine if the CPD's plans and policies ensure that remedial training is provided promptly and is documented as required by the paragraph.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the IMT assessed compliance by reviewing the CPD plans and policies to ensure remedial training is promptly provided and documented as required by this paragraph. We determined that the City and the CPD did not achieve Preliminary compliance due to the omission of the required time-bound requirement in Training Directive S11-02 (*Field Training and Evaluation Program*), as indicated in ¶311.

In the sixth reporting period, the City and the CPD submitted revised versions of Training Directive, *Field Training and Evaluation Program*, including a Comments Matrix showing changes to the prior version of S11-02 produced in the fifth reporting period and the CPD's responses to comments offered by the IMT. S11-02 § VIII(B)(4–5) reflected the policy language required to achieve Preliminary compliance.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- FTO Initial Training (produced September 8, 2022)

- FTEP Report to the TOC (produced December 30, 2022) and TOC Minutes (December 21, 2022)

The IMT identified S11-02 § VIII(B)(4–5) as key sections that reflect the policy language required to achieve Preliminary compliance.

S11-02 § VIII(B)(5) specifically addresses a scenario where a recruit is not responding to training. In this instance, a Field Training Officer is directed to notify the evaluation sergeant and designated district lieutenant (S11-02 § VIII(B)(5)(a)), submit a To-From-Subject Report through the chain of command to the Chief, Bureau of Patrol, or designee (S11-02 VIII § (B)(5)(b)), and document this fact in the DOR, CSR, or Final Summary Report at least seven days prior to the start of the next period, if feasible (S11-02 § VIII(B)(5)(c)).

Additional training cycles may be added at any time during the probationary cycle. Probationary Police Officers must complete all additional training before he or she is deemed field qualified and complete the Field Training and Evaluation Program (S11-02 § VIII (A)(8)).

The assigned Field Training Officer must complete a Remedial Summary Report on a recruit that goes through a remedial training cycle. That report establishes if a Probationary Police Officer is "field qualified" (S11-02 § VIII(B)(4)).

To meet Preliminary compliance, the CPD must demonstrate that its policies and plans ensure "any recommendation for remedial training is provided as promptly as possible to the necessary supervisors" and is documented as required in the paragraph. The June 30, 2022, revision to S11-02 § VIII(B)(5) does stipulate "immediately," reaching the requirements for Preliminary compliance.

The FTEP Report to the TOC included a slide presentation that discussed FTO/PPO ratios and efforts to maintain the 1:1 ratio. This discussion was further substantiated by minutes of the December 21, 2022, TOC meeting where this presentation occurred.

No additional documents or schedules were provided by the CPD indicating Secondary compliance during this reporting period.

*\*\**

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance requires the CPD to demonstrate that Field Training Officer and supervisors training on applicable policy is completed and all ¶311 requirements are met and maintained for a full training cycle.

### Paragraph 311 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶312

> **312.** *The Field Training and Evaluation Review Board, or other entity with similar responsibilities, will review a PPO's performance at the request of an assigned FTO or supervisor and have the power to recommend separation, re-training by the Academy, or additional field training. A request for review by the Board must be made, and the Board must convene, if a PPO is not deemed "field qualified" at the end of any remedial training cycle. The Field Training and Evaluation Review Board will provide all such referrals and recommendations for action to the Chief of the Bureau of Patrol.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶312 during this reporting period.

To evaluate Preliminary compliance with ¶312, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine if the CPD's plans and policies ensure remedial training is provided promptly and is documented as required in this paragraph. Such data must establish that Field Training Officers' and supervisors' training on the relevant policy is completed and that a full training cycle is completed.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT assessed compliance by reviewing a revised version of Training Directive S11-02, *Field Training and Evaluation Program* (May and June 2022), including a Comments Matrix showing changes to the prior version of S11-02 produced in the fifth reporting period and the CPD's responses to comments offered by the IMT. The CPD also provided S11-02-01 (*Field Training and Evaluation Review Board*), including a Comment Matrix showing revisions to an earlier version of S11-02-01 based on feedback provided by the IMT.

S11-02 § VIII(B)(5) directs a Field Training Officer's action when that Field Training Officer determines a Probationary Police Officer's performance needs to be reviewed by the Field Training and Evaluation Review Board. S11-02 §§ VII(C)(3) and

VIII(D)(10) direct a supervisor's action when that supervisor determines a Probationary Police Officer's performance is deficient in any category or needs to be reviewed by the Board.

S11-02-01 § II(F) (30 June 2022) states, "The process for initiating the Review Board by a Field Training Officer or a supervisor is via To-From-Subject Report through the chain of command to the Chief, Bureau of Patrol, or designees." S11-02-01 §V(B) states, "The Chief, Bureau of Patrol, will convene a Review Board within 14 days of a request for a review received from a Field Training Officer or supervisory officer." S11-02-01 § V(F) requires all recommendations by the Board be sent to the Chief, Bureau of Patrol, for review. Together, the IMT found that these policies met Preliminary compliance.

No additional data were submitted or reviewed to establish Secondary compliance in the prior reporting period.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- FTO Initial Training (produced September 8, 2022)

S11-02 § VIII(B)(5), S11-02-01 § II(F), S11-02-01 §V(B), and S11-02-01 § V(F) track the language from ¶312, therefore meeting Preliminary compliance for this paragraph. No additional documents were submitted this reporting period to substantiate the Secondary compliance requirements of this paragraph.

<p align="center">***</p>

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, to achieve Secondary compliance, the CPD must demonstrate that Field Training Officers, supervisors, and Field Training and Evaluation Program Review Board training on the applicable policy is completed and substantiated, and this paragraph's requirements achieved for a full recruit training cycle. Full compliance can be ascertained when Field Training Officer, supervisors, and Field Training and Evaluation Program Review Board training on policy and methodology is completed and substantiated and multiple consecutive training cycles meeting these requirements are successfully completed.

## Paragraph 312 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:

Preliminary

# Training: ¶313

**313.** *CPD will create a mechanism for PPOs to provide confidential feedback regarding their field training, including the extent to which their field training was consistent with what they learned at the Academy; whether their FTOs did or did not provide effective guidance and instruction; and suggestions for changes to recruit training based upon their experience in the Field Training and Evaluation Program.*

**Compliance Progress** (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶313 during this reporting period.

To evaluate Preliminary compliance with ¶313, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we will need to review data to determine whether the CPD's plans and policies provide for receiving and reviewing Probationary Police Officer (also known as PPO) feedback.

*Progress before the Seventh Reporting Period*

In the sixth reporting period, the City and the CPD achieved Preliminary compliance. The IMT reviewed a revised version of Training Directive S11-02, *Field Training and Evaluation Program* (May and June 2022), including a Comments Matrix showing changes to the prior version of S11-02 produced in the fifth reporting period and the CPD's responses to comments offered by the IMT. The CPD also submitted the *2022 Annual In-Service Field Training Officer Refresher Training Curriculum* (June 2022), including a revised PowerPoint, a revised outline of the Curriculum, 2022 Field Training Officer Pre- and Post-Training Test Questions, and a Comment Review document showing the CPD's responses and edits based on feedback from the IMT and the Office of the Illinois Attorney General to the earlier version of the training materials.

S11-02 § VIII(A)(9) requires Probationary Police Officers to critique the Field Training and Evaluation Program (also known as FTEP) quarterly by completing the Field Training and Evaluation Program Critique Survey and forwarding it directly and

confidentially to the Field Training and Evaluation Program Section, Bureau of Patrol. The policy specifies the parameters for that feedback to include ¶313 required language, and thus met the Preliminary compliance threshold. No additional substantive data were provided last reporting period to substantiate Secondary compliance.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- 2022 Annual In-Service FTO Refresher Training Curriculum (produced September 8, 2022)

- FTO Initial Training (produced September 8, 2022)

- 2022 Annual In-Service FTO Refresher Training Curriculum (produced November 22, 2022)

- FTO/PPO Quarterly Surveys (produced December 8, 2022)

- FTEP Report to the TOC (produced December 30, 2022) and TOC Minutes (December 21, 2022)

S11-02 § VIII(A)(9) provides the requisite language to maintain Preliminary compliance.

The City and the CPD provided a survey link to data gathered from Q4 2021 through Q2 2022. The FTO Quarterly surveys are given to allow PPOs to provide feedback about their training and for FTOs to provide feedback regarding the FTEP.

The FTEP Report to the TOC included a slide presentation that discussed FTO/PPO ratios and efforts to maintain the 1:1 ratio. This discussion was further substantiated by minutes of the December 21, 2022, TOC meeting where this presentation occurred.

Documents provided by the CPD demonstrate that FTO training content is completed and ready for dissemination. No records were produced to demonstrate FTOs, supervisors, and recruits have all been trained on the policy or received an orientation. Secondary compliance requires documentation showing that training has occurred, plus one full recruit training cycle to be successfully completed.

***

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance can be demonstrated by completion of Field Training Officer, supervisors and recruit training or orientation on the policy and completion of a full recruit training cycle using the prescribed feedback process. The IMT will assess policy, training plans, Field Training and Evaluation Program-related materials, and data collection instruments rate to assess Secondary compliance with the requirements of this paragraph.

### Paragraph 313 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶314

***314.*** *The Education and Training Division and Bureau of Patrol will review, consistent with their scope of responsibility within the Field Training and Evaluation Program, aggregate PPO feedback on a quarterly basis; document their responses, including the rationale behind any responsive action taken or decision to take no action; and share such feedback with the TOC and, as necessary, FTOs and FTO supervisors.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    Quarterly          ✓ **Met**    ☐ **Missed**

**Preliminary:**    *In Compliance* (SIXTH REPORTING PERIOD)
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with the requirements of ¶314 during this reporting period.

To evaluate Preliminary compliance with ¶314, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine if the CPD's plans and policies ensure that the Education and Training Division and Bureau of Patrol review aggregate Probationary Police Officers' feedback on a quarterly basis, documents their responses as required by this paragraph, and share such feedback with the Training Oversight Committee, Field Training Officers (FTOs) and FTO supervisors as appropriate and necessary.

*Progress before the Seventh Reporting Period*

In the sixth reporting period, the City and the CPD achieved Preliminary compliance. The CPD provided plans and policies to aggregate Probationary Police Officer feedback on a quarterly basis as indicated in this paragraph. We reviewed a revised version of Training Directive S11-02, *Field Training and Evaluation Program* (May and June 2022), including a Comments Matrix showing changes to the prior version of S11-02 produced in the fifth reporting period and the CPD's responses to comments offered by the IMT. We found that S11-02 § VIII (A)(9) requires Probationary Police Officers to critique the Field Training and Evaluation Program quarterly by completing the Field Training and Evaluation Program Critique Survey and forwarding it directly and confidentially to the Field Training and Evaluation Program Section, Bureau of Patrol. We also noted that S11-02 § VIII(A)(9)(c) requires

the Strategic Initiatives Division to collect and enter the information into a Tableau dashboard for the Bureau of Patrol and Training and Support Group to review, document, share relevant feedback and submit documentation to the Training Oversight Committee, as required by ¶314. Moreover, S11-02 § VIII(I)(7) requires the Field Training and Evaluation Section, Bureau of Patrol, to "conduct and maintain documentation of the Field Training and Evaluation Program Critique Survey quarterly and share feedback with the Training and Support Group, the Training Oversight Committee, and as necessary to FTOs and FTO supervisors…" We found that these collective policies met the requirements of ¶314, reaching the Preliminary compliance threshold.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced July 2, 2022)

- 2022 Annual In-Service FTO Refresher Training Curriculum (produced September 8, 2022)

- FTO Initial Training (produced September 8, 2022)

- 2022 Annual In-Service FTO Refresher Training Curriculum (produced November 22, 2022)

- 2023 Annual Training. Plan (produced December 1, 2022)

- FTO/PPO Quarterly Surveys (produced December 8, 2022)

- FTEP Report to the TOC (produced December 30, 2022) and TOC Minutes (December 21, 2022)

S11-02 continues to satisfy the requirements of ¶314, thus maintaining Preliminary compliance.

The City and the CPD provided a link to the FTO/PPO quarterly surveys. However, they did not provide substantive data indicating that the Education and Training Division and Bureau of Patrol conducted quarterly reviews of the PPO/FTO survey data, documented their responses and shared that data with the TOC, FTOs, and FTO Supervisors, as required to attain Secondary compliance.

***

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, to achieve Secondary compliance status, the Education and Training Division, Bureau of Patrol, Field Training Officers, Field Training Officer supervisors, and Training Oversight Committee training or orientation on the applicable ¶314 compliant policy must be completed, and a full recruit training cycle completed. Full compliance requires that the Education and Training Division, Bureau of Patrol, Field Training Officers, Field Training Officer supervisors, and Training Oversight Committee training or orientation on policy is completed and Probationary Police Officer feedback is reviewed, documented, and shared as required by this paragraph.

### Paragraph 314 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶315

**315**. *CPD will create a mechanism for FTOs to provide feedback regarding the quality of the Field Training and Evaluation Program, including suggestions for changes to FTO training, the PPO evaluation process, and recruit training. The Education and Training Division and Bureau of Patrol will review, consistent with their scope of responsibility within the Field Training and Evaluation Program, FTO feedback on a quarterly basis and, as necessary and appropriate, share such feedback with the Training Oversight Committee, FTOs, and FTO supervisors.*

---

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**     Quarterly                    ☐ **Met**   ☑ **Missed**

**Preliminary:**          *Not in Compliance*
**Secondary:**          *Not in Compliance*
**Full:**                    *Not Yet Assessed*

The City and the CPD failed to achieve any level of compliance with the requirements of ¶315 during this reporting period.

To evaluate Preliminary compliance with ¶315, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine if the CPD's plans and policies ensure that a mechanism is in place for Field Training Officers (FTO) to provide feedback regarding the quality of the Field Training and Evaluation Program as required by this paragraph and that the Education Training Division and Bureau of Patrol review FTO feedback quarterly and share such feedback with the Training Oversight Committee, FTOs and FTO supervisors as necessary and appropriate. The IMT also sought to determine if the Education and Training Division, Bureau of Patrol, FTO, FTO supervisors, and Training Oversight Committee training or orientation on the policy required under this paragraph is completed and that a full recruit training cycle completed.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD did not submit any data to establish any level of compliance. The IMT reviewed a memorandum dated January 19, 2022, from the First Deputy to the Superintendent regarding the 2021 Annual Field Training and Evaluation Review. That document stated as follows:

> *Paragraph 315 of the Consent Decree requires Field Training Of-*
> *ficer feedback on the program. The Field Training and Evaluation*
> *Section continues to conduct quarterly surveys. Field Training Of-*
> *ficer feedback was aggregated, and responses were docu-*
> *mented. The survey results are shared with the Training and Sup-*
> *port Group to assist training development and modifications.*
> *The feedback recommends more training in report writing, traf-*
> *fic-related offenses, arrest procedures, and more scenario-based*
> *interactive training for the Probationary Police Officers before*
> *leaving the academy.*

The IMT further reviewed Training Oversight Committee minutes from December 14, 2021. Item #6 is recorded as "Field Training & Evaluation Program 2021 Annual Review." A presentation was included in the minutes, indicating the Field Training Officer feedback was shared with the Training Oversight Committee, as required by this paragraph. There was no indication that this information was shared with Field Training Officers and Field Training Officer supervisors or that there was CPD policy guidance mandating this ¶315 required process. Accordingly, no level of compliance was achieved.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- S11-02 *Field Training and Evaluation Program (FTEP)* and S11-02-01 *Field Training and Evaluation and Review Board* (produced December 1, 2022)

- FTO/PPO Quarterly Surveys (produced December 8, 2022)

- FTEP Report to the TOC (produced December 30, 2022) and TOC Minutes (December 21, 2022)

S11-02 §VIII(B)(10)(d) prescribes the FTO to "complete the anonymous survey regarding the Field Training and Evaluation Program administered by the Bureau of Patrol quarterly." S11-02 §VIII(I)(7) requires the Field Training and Evaluation Section (FTES) of the Bureau of Patrol to "conduct and maintain documentation of the field training and evaluation program critique survey quarterly and share feedback with the Training and Support Group, the Training Oversight Committee, and as necessary to FTO and FTO supervisors, including but not limited to (a) concerning comments on FTO performance (b) rationale to any responsive action taken and (c) rationale to any decision to take no action." §VIII(I)(8) requires FTES to complete and maintain documentation of FTO surveys and share the FTOs' feedback quarterly with the Training and Support Group, the Training Oversight Committee, and as necessary to FTOs and FTO supervisors.

While these policies approximate ¶315 requirements, they do not specifically require feedback, including suggestions for changes to FTO training, the PPO evaluation process, and recruit training, as mandated by ¶315. Thus, Preliminary compliance was not achieved this reporting period.

<p style="text-align:center">***</p>

The City and the CPD failed to achieve any level of compliance during this reporting period. Looking forward, Preliminary compliance requires the requirements of this paragraph be written into policy. Several additional data sources are required to demonstrate Secondary compliance, including a sample of quarterly surveys. Substantive questions soliciting feedback on Probationary Police Officer evaluations are needed. Field Training Officer surveys from each previous and contiguous quarter are needed to demonstrate the quarterly feedback is captured as required. Data reflecting that the Education and Training Division and the Bureau of Patrol have reviewed each quarter's feedback and shared, as appropriate, with the Training Oversight Committee, Field Training Officers and Field Training Officer supervisors are needed.

Full compliance can be demonstrated when the Education and Training Division, the Bureau of Patrol, Field Training Officers, Field Training Officer supervisors, and Training Oversight Committee training or orientation on policy are completed and multiple consecutive full recruit training cycles meeting ¶315 requirements are successfully completed as required.

### Paragraph 315 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Training: ¶316

> **316.** *The TOC will annually review the Field Training and Evaluation Program and consider best practices in this area as well as feedback and recommendations from FTOs and PPOs. Additionally, the TOC will review referrals and recommendations by the Field Training and Evaluation Review Board to the Bureau of Patrol. Based on this information, the TOC will recommend to the Superintendent the implementation of any appropriate changes to policies or procedures related to the Field Training and Evaluation Program.*

## Compliance Progress   (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**   Annually   ☑ **Met**   ☐ **Missed**

**Preliminary:**   *In Compliance (SIXTH REPORTING PERIOD)*
**Secondary:**   *Not in Compliance*
**Full:**   *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with the requirements of ¶316 during this reporting period.

To evaluate Preliminary compliance with ¶316, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine if the requirements of this paragraph are written into policy. Specifically, the IMT reviewed policy, data, and training sources, including Training Oversight Committee meeting notes, special orders, Field Training Evaluation Program documentation, and other documents including annual reviews and recommendations provided to the Superintendent, to determine if the Field Training Evaluation Program Review Board, Education and Training Division, Bureau of Patrol, Field Training Officers, Field Training Officer supervisors, and Training Oversight Committee training or orientation on policy is completed and a full annual training cycle completed. Such data must demonstrate that the CPD has established a reliable process for documenting the referrals and recommendations received from these sources. The IMT also sought to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT reviewed meeting materials from Training Oversight Committee meetings occurring in December of 2021 and Janu-

ary of 2022, a *Field Training and Evaluation Program Recommendation Memorandum*, dated January 19, 2022, from the First Deputy to the Superintendent regarding the 2021 Annual Field Training and Evaluation Review, and Training Oversight Committee minutes from December 14, 2021. These documents were important components of the compliance requirement for ¶316 and reflected that the ¶316 requirements were enshrined in CPD policy contained in S11-11 (*Training Oversight Committee*) § III.A.13. Accordingly, Preliminary compliance was achieved. No documents were submitted last reporting period to substantiate Secondary compliance.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- FTO/PPO Quarterly Surveys (produced December 8, 2022)

The quarterly surveys provide evidence that PPO input is being received. However, the surveys themselves do not substantiate compliance with ¶316 requirements. Instead, a review of previously submitted Training Oversight Committee Special Order S11-11 § (III)(A)(13) indicates the ¶316 requirements are enshrined within that policy. Accordingly, the CPD has maintained Preliminary compliance this reporting period, but no data was submitted to substantiate Secondary compliance this reporting period.

*** *

The City and the CPD maintained Preliminary compliance during this reporting period. Secondary compliance may be demonstrated through Training Oversight Committee meeting notes, special orders, Field Training Evaluation Program documentation, and other documents including annual reviews and recommendations provided to the Superintendent. Additionally, Secondary compliance requires that Field Training Evaluation Program Review Board, Education and Training Division, Bureau of Patrol, Field Training Officers, Field Training Officer supervisors, and Training Oversight Committee training or orientation on policy to be completed and for a full annual training cycle completed. The CPD must have established a reliable process to document the referrals and recommendations received from these sources.

## Paragraph 316 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Training: ¶317

> ***317.*** *Regular in-service training is critical to ensure that CPD officers continue to hone important policing skills and remain up-to-date on changes in the law, CPD policy, technology, community expectations, and developments in best practices. In-service training should, as appropriate, reinforce CPD's commitment to procedural justice, de-escalation, impartial policing, and community policing.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**     *Not in Compliance*
**Full:**     *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶317 during this reporting period.

To evaluate Preliminary compliance with ¶317, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the City and the CPD have developed reliable procedures to demonstrate that training, lesson plans, and curricula across all appropriate in-service training and evaluations demonstrate the requirements of this paragraph. The IMT also sought to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD submitted Bureau of Internal Affairs (BIA) eLearning materials (April 2022), including a draft of the BIA eLearning materials and Pre- and Post-tests. The City and the CPD did not submit data that training lesson plans and curricula across all appropriate in-service training and evaluations fulfill the requirements of this paragraph. Therefore, the IMT determined that Secondary compliance was not achieved.

*Progress in the Seventh Reporting Period*

To demonstrate compliance with this paragraph, the City and the CPD submitted the following documents this reporting period:

- BIA eLearning Training (produced August 18, 2022)

- Child Abuse and Neglect eLearning Training (produced September 8, 2022)

- Communication in Police Environment eLearning (produced September 29, 2022)

- Crime Victim Assistance eLearning (produced October 13, 2022)

- Annual Carbine Operator Qualification Training (produced October 20, 2022)

- 2023 Annual Use of Force – Integrating Communications Assessments and Tactics (ICAT) Training (produced October 20, 2022)

- BIA eLearning Training (produced November 9, 2022)

- 2023 Annual Training Plan (produced December 1, 2022)

- Child Abuse and Neglect eLearning Training (produced December 1, 2022)

- Communication in Police Environment eLearning (produced December 15, 2022)

- Evidence of 95% of sworn personnel receiving BIA eLearning Training (produced December 28, 2022)

These documents reflect the eLearning and classroom course content intended for in-service training classes. The content includes some pre- and post-tests and slide presentations, along with evidence of completion of the BIA eLearning course. The *Annual Training Plan* includes all in-service courses intended for delivery in 2023.

These submissions substantiate maintained Preliminary compliance with ¶317 requirements. However, the City and the CPD did not submit training lesson plans and curricula across all appropriate in-service training and pre- and post-course evaluations, thus failing to achieve Secondary compliance this reporting period.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, to achieve Secondary compliance the CPD must demonstrate that training, lesson plans, and curricula across all appropriate in-service training and evaluations demonstrate the requirements of this paragraph. Full compliance may be demonstrated when training lesson plans and curricula across all in-service training demonstrate the requirements of this paragraph and training delivery and evaluations reflect those requirements.

## Paragraph 317 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:

Preliminary

# Training: ¶318

> **318.** *The Parties recognize that CPD has begun to develop and implement an In-Service Training Program for its officers. The Parties acknowledge that CPD has developed a project plan establishing development and implementation of the In-Service Training Program from 2018 through 2019 that includes the following components: a. a list of planned courses, including the status of the development and approval of any new course curricula; b. the dates that CPD officers collectively will start and complete the planned courses; c. the identification of any need for additional instructors, equipment, and training facilities and a schedule for addressing the needs; and d. a list of CPD personnel responsible for overseeing each project plan task.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *Not in Compliance*
**Secondary:**      *Not Yet Assessed*
**Full:**           *Not Yet Assessed*

The City and the CPD did not achieve any level of compliance with ¶318 during this reporting period.

To evaluate Preliminary compliance with ¶318, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we will need to review data to determine whether the City and the CPD have developed acceptable policies, procedures, and plans to transition from a project plan to develop and fully implement the In-Service Training Program according to the requirements of this paragraph. The IMT will also seek to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended. Where applicable, we will assess whether the City and the CPD have created the requisite positions and staffed those positions with qualified personnel in order to achieve the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the prior reporting period, no documents were submitted or reviewed to substantiate any compliance level.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted S11-02, *Field Training and Evaluation Program* and S11-02-01, *Field Training and Evaluation Board* towards compliance with

¶318. However, ¶318 refers to the in-service training of CPD officers, while the submitted policies refer to field training. As such, no documents responsive to ¶318 requirements were submitted or reviewed to establish any level of compliance during this reporting period.

\*\*\*

The City and the CPD did not achieve any level of compliance during this reporting period. Looking forward, Preliminary compliance requires the City and the CPD to have developed acceptable policies, procedures, and plans to transition from a project plan to develop and fully implement the In-Service Training Program according to the requirements of this paragraph. Secondary compliance requires the City and the CPD to have fully developed, implemented, and institutionalized the In-Service Training Program according to the requirements of this paragraph.

### Paragraph 318 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Training: ¶319

> **319.** *CPD will implement the In-Service Training Program to comport with the Training Plan and the requirements and goals of this Agreement.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶319 during this reporting period.

To evaluate Preliminary compliance with ¶319, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine if the CPD has implemented an In-Service Training Program that comports with the annual training plan and with all other applicable Consent Decree requirements.

*Progress before the Seventh Reporting Period*

During the fifth reporting period, the IMT reviewed policies that require implementation of In-Service Training that is consistent with the applicable *Annual Training Plan* and Consent Decree requirements. We reviewed the *2022 Training Needs Assessment* and the *2022 Training Plan* and found that Preliminary compliance requirements were met in each relevant paragraph.

In the sixth reporting period, the City and the CPD did not submit any data to establish any level of compliance. However, consistent with our methodology applied during the previous reporting period, we applied the results of the following related paragraphs to assign a rating:

| ¶ | Section | Compliance Rating in the Sixth Reporting Period |
|---|---------|------------------------------------------------|
| 272 | Training | Preliminary |
| 317 | Training | Preliminary |
| 318 | Training | None |
| 320 | Training | Preliminary |
| 321 | Training | Preliminary |
| 322 | Training | Secondary |
| 323 | Training | Preliminary |
| 324 | Training | Preliminary |
| 326 | Training | Preliminary |
| 327 | Training | Preliminary |
| 328 | Training | Preliminary |
| 329 | Training | Preliminary |
| | | |

*Progress in the Seventh Reporting Period*

The City and the CPD did not submit any data to establish any level of compliance during this reporting period. However, consistent with our methodology applied during the previous reporting period, we applied the results of the following related paragraphs to assign a rating this reporting period as follows:

| ¶ | Section | Compliance Rating in the Seventh Reporting Period |
|---|---------|--------------------------------------------------|
| 272 | Training | Preliminary |
| 317 | Training | Preliminary |
| 318 | Training | None |
| 320 | Training | Preliminary |
| 321 | Training | Preliminary |
| 322 | Training | Secondary |
| 323 | Training | Preliminary |
| 324 | Training | Preliminary |
| 326 | Training | Preliminary |
| 327 | Training | Preliminary |
| 328 | Training | Preliminary |
| 329 | Training | Preliminary |

No data was submitted this reporting period to substantiate Secondary compliance with these paragraphs.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance requires actually implementing and operating the In-Service Training program in a manner that complies with the requirements of ¶¶317–29 and consistent with ¶272(e), (f), (g), (i), (k), (l), and (m) requirements. Secondary compliance in all of these paragraphs and subparagraphs is *prima facie* evidence of Secondary compliance in this paragraph.

### Paragraph 319 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶320

*320. The In-Service Training Program will require that all non-probationary police officers who are active duty and available for assignment, including supervisors and command staff, receive, at a minimum, the following amount of in-service training each year: a. 16 hours by the end of 2018; b. 24 hours by the end of 2019; c. 32 hours by the end of 2020; and d. 40 hours by the end of 2021, and in each subsequent year.*

## Compliance Progress                    (Reporting Period: July 1, 2022, through December 31, 2022)

| | | |
|---|---|---|
| **Recurring Schedule:** | March 5, 2023* | ✓ **Not Yet Applicable** |
| | *Extended from December 31, 2022, due to COVID-19[1] | |
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) | |
| **Secondary:** | *Not in Compliance* | |
| **Full:** | *Not Yet Assessed* | |

The City and the CPD maintained Preliminary compliance with the requirements of ¶320 during this reporting period.

To evaluate Preliminary compliance with ¶320, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether CPD documentation demonstrates that 95% of eligible personnel received the training required by this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT assessed compliance and determined that the City and the CPD maintained Preliminary compliance. We reviewed training materials and completion data for the following In-Service Training courses: De-Escalation, Response to Resistance, and Use of Force Training, Active Bystandership for Law Enforcement (ABLE) Training, Gender-Based Violence In-Service Training, In-Service CIT Training, and Constitutional Policing. Additionally, the IMT reviewed a cover letter (2022 May 5) seeking to clarify the CPD's position that the Training Directives S11-10 (*Department Training Records Maintenance*), S11-01 (*Recruit Training*), S11-10-02 (*Pre-Service Training*), and S11-10-03 (*In-Service Training*) previously produced on December 29, 2021 support Preliminary compliance with the requirements of this paragraph.

---

[1]     CPD training is returning to the calendar year in 2023.

The cover letter clarifying S11-10-03 (*In-Service Training*) allowed the City and the CPD to maintain Preliminary compliance. The IMT advised that documentation establishing 95% or higher attendance in each 2021 In-Service Training course was required to substantiate Secondary compliance. Some, but not all, attendance records were provided during the last reporting period. The IMT advised that Full compliance requires sustainment of Secondary compliance for at least two consecutive reporting periods.

*Progress in the Seventh Reporting Period*

The City and the CPD produced the following documents to demonstrate compliance with this paragraph this reporting period:

- 2022 CIT In-Service Training (produced August 4, 2022), including the Cover Sheet, 2022 In-Service Crisis Intervention Lesson Plan, 2022 In-Service Participant Guide, 2022 In-Service Crisis Intervention PowerPoint, CPD-11.202 Response to OAG/IMT Comments 29 April 2022, Clinicians Biographies, Video File: ACES TED TALK, Video File: Mindfulness- Based Resilience Training in Law Enforcement, and Video File: In-Service Roll Play video.

- 2022 CIT In-Service Training (produced September 8, 2022), including the Cover Sheet CPD-11.201, CPD Response to Comments, and Crisis Intervention Resource Guide.

- Child Abuse and Neglect eLearning Training (produced September 8, 2022), including Cover Sheet 11.201 with eLearning Review Links, and Child Abuse and Neglect Post Test.

- Evidence of Traumatic Incident Stress Management Program (TISMP) eLearning Training 95% Compliance (produced September 15, 2022), including, Cover Sheet CPD-11.201, TISMP Dashboard, and TISMP Roster of Department members completed training.

- Communication in Police Environment eLearning (produced September 29, 2022), including CPD-11.201 Cover Sheet with the articulate review links.

- 2022 CIT In-Service Training (produced October 6, 2022), including Cover Sheet CPD-11.201, CPD Response to Comments, CIT Addendum, Revised - Crisis Intervention Resource Guide, V3.7 2022 CIT In-Service Participant Guide, and V3.7 LP 2022 Crisis Intervention In-Service – Revised, V3.8 2022 In-Service Crisis Intervention Training PPT 26 Aug 2022.

- Crime Victim Assistance eLearning (produced October 13, 2022), including CPD-11.201 Cover Sheet with the articulate review links, CPD Response to Comments CPD-11.202, and Crime Victims Assistance 2022 Pre-Post Test.

- Constitutional Policing In-Service Training (produced October 20, 2022), including CPD-11.201 Cover Sheet with the articulate review links, CPD Response to Comments CPD-11.202, Constitutional Policing Lesson Plan, Constitutional Policing PPT, Constitutional Policing Participant Guide, Constitutional Policing Pre-Post Test TCAC 28 Feb 2022 Notes, TCAC 3 Mar 2022 Notes, 2022-03-03 COPA Feedback Constitutional Policing Training, and TCAC COPA Comments Response.

- 2023 Annual Use of Force – Integrating Communications Assessments and Tactics (ICAT) Training (produced October 20, 2022), including Cover Sheet CPD-11.201 ICAT Test, ICAT PPT, and ICAT Training Guide March 2022.

- BIA eLearning Training (produced November 9, 2022) including Cover Sheet CPD-11.201 – with Module 1-5 Articulate Links; Pre/Post Test Articulate Links, Response to Comments CPD-11.202, BIA Module Pre/Post Test - Mapping Document, BIA eLearning Module 1 – Mapping Document, BIA eLearning Module 2 – Mapping Document, BIA eLearning Module 3 – Mapping Document, BIA eLearning Module 4 – Mapping Document, and BIA eLearning Module 5 – Mapping Document.

- 2023 ABLE Refresher Training (produced November 17, 2022), including CPD-11.201 Cover Sheet, ABLE Focus on Wellness Facilitator Guide, ABLE Focus on Wellness Presentation, ABLE Focus on Wellness Resource Packet, and ABLE Refresher Test.

- Child Abuse and Neglect eLearning Training (produced December 1, 2022), Cover Sheet 11.201 with eLearning Review Links, CPD Response to Comments CPD-11.202, and Child Abuse and Neglect Post Test.

- Fair and Impartial Policing Training (produced December 8, 2022), including CPD-11.201 Cover Sheet with the articulate review links, FIP PPT for Patrol and Supervisors, FIP Worksheet for Patrol, and FIP Worksheet for Supervisors.

- Gender Based Violence In-Service Training (produced December 8, 2022), including CPD-11.201 Cover Sheet, CPD previous response to comments CPD-11.202, Facilitator Guide, Abbreviated Participant Guide, Reference Guide, Cumulative Slide Deck, and GBV CURRICULUM 07-25-22.

- 2023 Policy Updates Use of Force Training (produced December 15, 2022), including Cover Sheet CPD-11.201, DRTRUOF Policy Updates Lesson Plan, DRTRUOF Policy Updates PPT, and DRTRUOF Policy Updates Test Questions.

- Communication in Police Environment eLearning (produced December 15, 2022), including CPD-11.201 Cover Sheet with the articulate review links for e-learning course and post-test, and CPD Response to Comments CPD-11.202.

- Evidence of 95% of sworn personnel receiving BIA eLearning Training (produced December 28, 2022), including Cover Sheet CPD-11.201, Screenshot of Dashboard, and List of members trained.

Special Order S11-10-03 (*In-Service Training*) continues to support Preliminary compliance. Documentation establishing 95% or higher attendance in each In-Service Training class is required to substantiate Secondary compliance. As with the last reporting period, some, but not all, of the necessary attendance records were provided this reporting period, thus failing to establish Secondary compliance. Full compliance requires sustainment of Secondary compliance for at least two consecutive reporting periods.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, data establishing 95% or higher attendance in each In-Service Training class is required to substantiate Secondary compliance. Some, but not all, were provided this reporting period. Full compliance requires sustainment of Secondary compliance for at least two consecutive reporting periods.

### Paragraph 320 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶321

> **321**. *CPD's In-Service Training Program will include specific courses that will be mandatory for every officer in that training year.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**     March 5, 2023*          ☑ **Not Yet Applicable**

*Extended from December 31, 2022, due to COVID-19[2]

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**     *Not in Compliance*
**Full:**     *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶321 during this reporting period.

To evaluate Preliminary compliance with ¶321, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether CPD's In-Service Training Program includes the courses required by this paragraph and that CPD documentation demonstrates that 95% of eligible personnel received the training required under this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT assessed compliance and determined that the City and the CPD maintained Preliminary compliance. We reviewed training materials and attendance data for the following In-Service Training courses: De-Escalation, Response to Resistance, and Use of Force Training, Active Bystandership for Law Enforcement (ABLE) Training, Gender-Based Violence In-Service Training, In-Service CIT Training, and Constitutional Policing. The IMT found that the documents submitted supported Preliminary compliance and while we appreciated the volume of documents submitted as data to support compliance, attendance records for each course were required to support Secondary compliance, and those records were not provided during the sixth reporting period.

*Progress in the Seventh Reporting Period*

The City and the CPD produced the following documents to demonstrate compliance with this paragraph during this reporting period:

---

[2]     CPD training is returning to the calendar year in 2023.

- 2022 CIT In-Service Training (produced August 4, 2022), including the Cover Sheet, 2022 In-Service Crisis Intervention Lesson Plan, 2022 In-Service Participant Guide, 2022 In-Service Crisis Intervention PowerPoint, CPD-11.202 Response to OAG/IMT Comments 29 April 2022, Clinicians Biographies, Video File: ACES TED TALK, Video File: Mindfulness- Based Resilience Training in Law Enforcement, and Video File: In-Service Roll Play video.

- 2022 CIT In-Service Training (produced September 8, 2022), including the Cover Sheet CPD-11.201, CPD Response to Comments, and Crisis Intervention Resource Guide.

- Child Abuse and Neglect eLearning Training (produced September 8, 2022), including Cover Sheet 11.201 with eLearning Review Links, and Child Abuse and Neglect Post Test.

- Evidence of Traumatic Incident Stress Management Program (TISMP) eLearning Training 95% Compliance (produced September 15, 2022), including, Cover Sheet CPD-11.201, TISMP Dashboard, and TISMP Roster of Department members completed training.

- Communication in Police Environment eLearning (produced September 29, 2022), including CPD-11.201 Cover Sheet with the articulate review links.

- 2022 CIT In-Service Training (produced October 6, 2022), including Cover Sheet CPD-11.201, CPD Response to Comments, CIT Addendum, Revised - Crisis Intervention Resource Guide, V3.7 2022 CIT In-Service Participant Guide, and V3.7 LP 2022 Crisis Intervention In-Service – Revised, V3.8 2022 In-Service Crisis Intervention Training PPT 26 Aug 2022.

- Crime Victim Assistance eLearning (produced October 13, 2022), including CPD-11.201 Cover Sheet with the articulate review links, CPD Response to Comments CPD-11.202, and Crime Victims Assistance 2022 Pre-Post Test.

- Constitutional Policing In-Service Training (produced October 20, 2022), including CPD-11.201 Cover Sheet with the articulate review links, CPD Response to Comments CPD-11.202, Constitutional Policing Lesson Plan, Constitutional Policing PPT, Constitutional Policing Participant Guide, Constitutional Policing Pre-Post Test TCAC 28 Feb 2022 Notes, TCAC 3 Mar 2022 Notes, 2022-03-03 COPA Feedback Constitutional Policing Training, and TCAC COPA Comments Response.

- 2023 Annual Use of Force – Integrating Communications Assessments and Tactics (ICAT) Training (produced October 20, 2022), including Cover Sheet CPD-11.201 ICAT Test, ICAT PPT, and ICAT Training Guide March 2022.

- BIA eLearning Training (produced November 9, 2022) including Cover Sheet CPD-11.201 – with Module 1-5 Articulate Links; Pre/Post Test Articulate Links, Response to Comments CPD-11.202, BIA Module Pre/Post Test - Mapping Document, BIA eLearning Module 1 – Mapping Document, BIA eLearning Module 2 – Mapping Document, BIA eLearning Module 3 – Mapping Document, BIA eLearning Module 4 – Mapping Document, and BIA eLearning Module 5 – Mapping Document.

- 2023 ABLE Refresher Training (produced November 17, 2022), including CPD-11.201 Cover Sheet, ABLE Focus on Wellness Facilitator Guide, ABLE Focus on Wellness Presentation, ABLE Focus on Wellness Resource Packet, and ABLE Refresher Test.

- Child Abuse and Neglect eLearning Training (produced December 1, 2022), Cover Sheet 11.201 with eLearning Review Links, CPD Response to Comments CPD-11.202, and Child Abuse and Neglect Post Test.

- Fair and Impartial Policing Training (produced December 8, 2022), including CPD-11.201 Cover Sheet with the articulate review links, FIP PPT for Patrol and Supervisors, FIP Worksheet for Patrol, and FIP Worksheet for Supervisors.

- Gender Based Violence In-Service Training (produced December 8, 2022), including CPD-11.201 Cover Sheet, CPD previous response to comments CPD-11.202, Facilitator Guide, Abbreviated Participant Guide, Reference Guide, Cumulative Slide Deck, and GBV CURRICULUM 07-25-22.

- 2023 Policy Updates Use of Force Training (produced December 15, 2022), including Cover Sheet CPD-11.201, DRTRUOF Policy Updates Lesson Plan, DRTRUOF Policy Updates PPT, and DRTRUOF Policy Updates Test Questions.

- Communication in Police Environment eLearning (produced December 15, 2022), including CPD-11.201 Cover Sheet with the articulate review links for e-learning course and post-test, and CPD Response to Comments CPD-11.202.

- Evidence of 95% attendance of sworn personnel for BIA eLearning Training (produced December 28, 2022), including Cover Sheet CPD-11.201, Screenshot of Dashboard, and List of members trained.

The documents submitted continue to support Preliminary compliance with this paragraph. While the IMT appreciates the volume of documents submitted as data to support compliance this reporting period, as we advised last reporting period, attendance records for each in-service training course is required to attain Secondary compliance, which were not provided this reporting period.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance requires CPD documentation demonstrating that 95% of eligible personnel received the training required by this paragraph. The CPD will need to submit training attendance records to demonstrate that at least 95% of all eligible personnel attended each required training to establish Secondary compliance. Full compliance requires sustained Secondary compliance.

### Paragraph 321 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶322

**322.** *CPD's In-Service Training Program may also offer specific courses as elective subjects. The elective subjects will be selected and approved by the TOC in accordance with the Training Plan. The TOC will solicit and consider officer requests and will rely on the Education and Training Division's needs assessments when selecting and evaluating elective subjects.*

## Compliance Progress  (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Full:** *Not in Compliance*

The City and the CPD maintained Secondary compliance with the requirements of ¶322 during this reporting period.

To evaluate Preliminary compliance with ¶322, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to demonstrate that elective and mandatory subjects of the CPD's In-Service Training Program are approved by the Training Oversight Committee and that the Training Oversight Committee has solicited and considered officer requests and relied on the *Needs Assessment* when selecting and evaluating elective subjects.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT determined that the City and the CPD maintained Preliminary and Secondary compliance with this paragraph. We reviewed the *2022 Training Needs Assessment*, the *2022 Training Plan*, a memorandum regarding the 95% completion of in-service training, and Training Oversight Committee meeting materials. The IMT also reviewed Training Directive S11-11 (*Training Oversight Committee*). Meeting minutes from the December 2021 and January 2022 Training Oversight Committee meetings were submitted as additional data to establish compliance in the prior reporting period. The data submitted during the previous reporting supported Preliminary and Secondary compliance.

*Progress in the Seventh Reporting Period*

This reporting period the IMT reviewed the *2023 Training Plan* to establish ongoing compliance with this paragraph. Additionally, the data submitted during prior reporting periods, as described above, remain valid and continue to support both

Preliminary and Secondary compliance this reporting period. The IMT is aware that the CPD is working to align its Training Calendar with the calendar year, therefore continued compliance with this paragraph must be reestablished by the production of documents maintaining compliance during the eighth reporting period.

\*\*\*

The City and the CPD maintained Secondary compliance during this reporting period. Looking forward, to demonstrate Full compliance, the CPD must further demonstrate they have fully implemented and established a full process that aligns with requirements of ¶322. That includes providing data that courses listed as elective were actually offered. This may be established in the Training Summary Report and with attendance data for each elective topic.

### Paragraph 322 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Training: ¶323

> **323.** *As part of the In-Service Training Program, mandatory and elective courses will be apportioned as follows: a. in 2018, CPD will require that each officer receive at least 16 hours of in person mandatory courses; b. in 2019, CPD will require that each officer receive at least 16 hours of in person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the TOC; c. in 2020, CPD will require that each officer receive at least 24 hours of in-person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the TOC; d. starting in 2021, and every year thereafter, CPD will require that each officer receive at least 24 hours of in-person mandatory courses with the remaining 16 hours to be provided either as mandatory or elective courses, as determined by the TOC; and e. this Agreement does not require CPD to provide more than 40 hours of annual department-wide in-service training.*

## Compliance Progress　　　(Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Recurring Schedule:** | March 5, 2023*　　☑ **Not Yet Applicable** |
| | *Extended from December 31, 2022, due to COVID-19[3] |
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶323 during this reporting period.

To evaluate Preliminary compliance with ¶323, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether course attendance for each course required under ¶323(d) meets or exceeds 95% of eligible personnel required to receive the training required by this paragraph.

---

[3]　　CPD training is returning to the calendar year in 2023.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT assessed compliance and found the City and the CPD maintained Preliminary compliance with this paragraph. We reviewed training materials and attendance records for the following In-Service Training courses: *De-Escalation, Response to Resistance, and Use of Force Training*, *Active Bystandership for Law Enforcement (ABLE) Training*, *Gender-Based Violence In-Service Training*, *In-Service CIT Training*, and *Constitutional Policing*.

Collectively, we found these documents established Preliminary compliance during the prior reporting period. We advised that Secondary compliance requires the CPD to demonstrate that at least 95% of officers received the ¶323 required mix of training. Although some of the training documents produced included snapshots of the Tableau Dashboard demonstrating that at least 95% of eligible attendees received the training, that verification was not submitted for each ¶323(d) course. As a result, Secondary compliance requirements were not met in the prior reporting period.

*Progress in the Seventh Reporting Period*

The City and the CPD produced the following documents to demonstrate compliance with this paragraph:

- 2022 CIT In-Service Training (produced August 4, 2022), including the Cover Sheet, 2022 In-Service Crisis Intervention Lesson Plan, 2022 In-Service Participant Guide, 2022 In-Service Crisis Intervention PowerPoint, CPD-11.202 Response to OAG/IMT Comments 29 April 2022, Clinicians Biographies, Video File: ACES TED TALK, Video File: Mindfulness- Based Resilience Training in Law Enforcement, and Video File: In-Service Roll Play video.

- 2022 CIT In-Service Training (produced September 8, 2022), including the Cover Sheet CPD-11.201, CPD Response to Comments, and Crisis Intervention Resource Guide.

- Child Abuse and Neglect eLearning Training (produced September 8, 2022), including Cover Sheet 11.201 with eLearning Review Links, and Child Abuse and Neglect Post Test.

- Evidence of Traumatic Incident Stress Management Program (TISMP) eLearning Training 95% Compliance (produced September 15, 2022), including, Cover Sheet CPD-11.201, TISMP Dashboard, and TISMP Roster of Department members completed training.

- Communication in Police Environment eLearning (produced September 29, 2022), including CPD-11.201 Cover Sheet with the articulate review links.

- 2022 CIT In-Service Training (produced October 6, 2022), including Cover Sheet CPD-11.201, CPD Response to Comments, CIT Addendum, Revised - Crisis Intervention Resource Guide, V3.7 2022 CIT In-Service Participant Guide, and V3.7 LP 2022 Crisis Intervention In-Service – Revised, V3.8 2022 In-Service Crisis Intervention Training PPT 26 Aug 2022.

- Crime Victim Assistance eLearning (produced October 13, 2022), including CPD-11.201 Cover Sheet with the articulate review links, CPD Response to Comments CPD-11.202, and Crime Victims Assistance 2022 Pre-Post Test.

- Constitutional Policing In-Service Training (produced October 20, 2022), including CPD-11.201 Cover Sheet with the articulate review links, CPD Response to Comments CPD-11.202, Constitutional Policing Lesson Plan, Constitutional Policing PPT, Constitutional Policing Participant Guide, Constitutional Policing Pre-Post Test TCAC 28 Feb 2022 Notes, TCAC 3 Mar 2022 Notes, 2022-03-03 COPA Feedback Constitutional Policing Training, and TCAC COPA Comments Response .

- 2023 Annual Use of Force – Integrating Communications Assessments and Tactics (ICAT) Training (produced October 20, 2022), including Cover Sheet CPD-11.201 ICAT Test, ICAT PPT, and ICAT Training Guide March 2022.

- BIA eLearning Training (produced November 9, 2022) including Cover Sheet CPD-11.201 – with Module 1-5 Articulate Links; Pre/Post Test Articulate Links, Response to Comments CPD-11.202, BIA Module Pre/Post Test - Mapping Document, BIA eLearning Module 1 – Mapping Document, BIA eLearning Module 2 – Mapping Document, BIA eLearning Module 3 – Mapping Document, BIA eLearning Module 4 – Mapping Document, and BIA eLearning Module 5 – Mapping Document.

- 2023 ABLE Refresher Training (produced November 17, 2022], including CPD-11.201 Cover Sheet, ABLE Focus on Wellness Facilitator Guide, ABLE Focus on Wellness Presentation, ABLE Focus on Wellness Resource Packet, and ABLE Refresher Test.

- Child Abuse and Neglect eLearning Training (produced December 1, 2022), Cover Sheet 11.201 with eLearning Review Links, CPD Response to Comments CPD-11.202, and Child Abuse and Neglect Post Test.

- Fair and Impartial Policing Training (produced December 8, 2022), including CPD-11.201 Cover Sheet with the articulate review links, FIP PPT for Patrol and Supervisors, FIP Worksheet for Patrol, and FIP Worksheet for Supervisors.

- Gender Based Violence In-Service Training (produced December 8, 2022), including CPD-11.201 Cover Sheet, CPD previous response to comments CPD-

11.202, Facilitator Guide, Abbreviated Participant Guide, Reference Guide, Cumulative Slide Deck, and GBV CURRICULUM 07-25-22.

- 2023 Policy Updates Use of Force Training (produced December 15, 2022), including Cover Sheet CPD-11.201, DRTRUOF Policy Updates Lesson Plan, DRTRUOF Policy Updates PPT, and DRTRUOF Policy Updates Test Questions.

- Communication in Police Environment eLearning (produced December 15, 2022), including CPD-11.201 Cover Sheet with the articulate review links for e-learning course and post-test, and CPD Response to Comments CPD-11.202.

- Evidence of 95% of sworn personnel receiving BIA eLearning Training (produced December 28, 2022), including Cover Sheet CPD-11.201, Screenshot of Dashboard, and List of members trained.

The *2023 Training Plan* (page 42) establishes that "In 2023, mandatory and elective training courses will be delivered as part of the following CPD training programs: Annual In-Service Training Program; Crisis Intervention Team Program, Domestic Preparedness Program, Tactical Training Program, Law Enforcement Medical and Rescue Training Program, Weapons Discipline and De-escalation Program, Peak Performance Driving Program, eLearning Training Program, Video Services Training Program, Career Development Program, and Investigative Development Program." The Training Plan mandates 40 hours of in-service training for each CPD officer.

Additionally, S11-10-03 §III(A) states "All non-probationary police officers who are active duty and available for assignment, including sworn supervisors and command staff, will receive, at a minimum, 40 hours of training which includes 24 hours mandatory courses and 16 hours of either mandatory or elective courses, as determined by the Training Oversight Committee (TOC) and the training requirements established by the Illinois [Law] Enforcement Training and Standards Board."

These documents substantiated maintenance of Preliminary compliance. However, while some compliance records were produced this reporting period demonstrating that at least 95% of officers received the ¶323 required mix of training, that verification was not submitted for each ¶323(d) course, thus failing to establish Secondary compliance this reporting period.

<div align="center">***</div>

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance may be achieved if evidence is provided demonstrating that course attendance for each course required under

¶323(d) meets or exceeds 95%. Full and sustained implementation of ¶323 requirements as demonstrated by training records, training attendance records, and lesson plans, may result in Full compliance with this paragraph.

### Paragraph 323 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶324

> **324.** *Various sections of this Agreement contain in-service training requirements which require CPD to provide some or all of its members with training on specific topics. CPD retains the discretion to determine the sequencing, scheduling, and location of such training, unless otherwise specified by this Agreement, provided that: all in-service training identified herein will begin no later than the 2021 calendar year; is adequate in quantity, quality, type, and scope; and is consistent with the terms of this Agreement.*

**Compliance Progress**        (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶324 during this reporting period.

To evaluate Preliminary compliance with ¶324, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to ascertain if the CPD's training lesson plans, instructor selections, training schedules, and curricula across all in-service training demonstrate compliance with the requirements of this paragraph**.** Such data must also demonstrate that the CPD has fully implemented the requirements of this paragraph and that training delivery has been initiated within the specified timeline and conditions. The IMT also sought to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended.

*Progress before the Seventh Reporting Period*

During the previous reporting periods, the IMT assessed compliance with this paragraph by reviewing the *2022 Training Plan* and Training Directive S11-10-03 (*In-Service Training*). We determined that the City and the CPD maintained Preliminary compliance. The CPD indicated that additional documentation reflecting "evidence documenting 95% completion of training" would be submitted in the sixth reporting period to demonstrate Secondary compliance.

Sections of the Consent Decree that require officers to receive in-service training on specific topics including the following:

| Consent Decree Section | Consent Decree Reference Paragraph(s) |
|---|---|
| Community Policing | 37 |
| Impartial Policing | 72–5 |
| Crisis Intervention | 126 |
| Use of Force | 243–46 |
| Officer Wellness and Support | 414 |
| Accountability and Transparency | 527–28 |

To demonstrate compliance with ¶324 in the sixth reporting period, the CPD submitted course materials for the following trainings: *De-Escalation, Response to Resistance, and Use of Force Training, Active Bystandership for Law Enforcement (ABLE) Training, Gender-Based Violence In-Service Training, In-Service Crisis Intervention Team Training, and Constitutional Policing Course.* We found the submitted documents supported Preliminary compliance with the requirements of this paragraph and, while they were essential components for establishing Secondary compliance. However, we noted that to establish Secondary compliance the City and the CPD must also demonstrate that all required training has commenced, and course attendance met or exceeded the 95% threshold for those assigned and required to take the course. We advised that data depicting the percentage attendance in each ¶324 area would help substantiate Secondary compliance in future reporting periods.

*Progress in the Seventh Reporting Period*

To demonstrate compliance with this paragraph this reporting period, the City and the CPD submitted the 2023 Annual Training Plan. The IMT also reviewed S11-10-03. Those documents contain the prescribed policy language required for the maintenance of Preliminary compliance. The City and the CPD did not submit data this reporting period depicting the percentage attendance in each ¶324 area that are needed to substantiate Secondary compliance.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, achieving Secondary compliance requires the CPD to demonstrate that all required training has commenced and training plans, lesson plans, training schedules, course curriculum, and evaluations demonstrate that the training is "adequate in quantity, quality, type, and scope." Data depicting the percentage attendance in each ¶324 area will help to substantiate Secondary compliance.

Secondary compliance also requires training lesson plans, instructor selections, training schedules, and curricula across all in-service training to demonstrate compliance with the requirements of this paragraph. Full compliance may be achieved

when the CPD has fully implemented the requirements of this paragraph and training delivery has been initiated within the specified timeline and conditions.

### Paragraph 324 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Training: ¶326

*326. Training provided through the In-Service Training Program may take place at the Academy or in a decentralized manner, including at the district or unit level, so long as the training is: a. developed by the Education and Training Division; b. reviewed by the TOC and approved by the Education and Training Division before training is delivered; and c. taught by instructors pursuant to the requirements provided above Part D of this section.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶326 during this reporting period.

To evaluate Preliminary compliance with ¶326, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to ascertain if the CPD has delivered training following the requirements of ¶326 as demonstrated through training plans, lesson plans, course curricula, training schedules, and other training and data sources and in accordance with ¶282–85 instructor selection and development requirements.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT assessed compliance with this paragraph and determined that the City and the CPD achieved Preliminary compliance. We reviewed De-Escalation, Response to Resistance, and Use of Force Training materials (January 2022), including a Lesson Plan, a PowerPoint, Test Questions, Agenda materials and an Equipment Checklist, a Participant Guide, a Task File, and a Comment Matrix showing changes from a prior version of the training materials. The CPD also submitted Active Bystandership for Law Enforcement (ABLE) Training materials (June 2022), including ABLE Content Knowledge Test Question Bank with Answers, a Comment Matrix showing changes from the prior version of the training materials, and a To-From Subject Report (April 2022) describing plans to certify Training and Support Group personnel as trainers for the ABLE Training program. These records supported a finding of Preliminary compliance.

The IMT also reviewed the 2021 Annual Training Report. That report, while not containing all the ¶326 required information, established whether training was done at the Academy or was decentralized. The IMT advised that it appeared that the "In-Service Classroom" section of the report may be further customizable to indicate alignment with ¶326(a–d) requirements. We noted this information would further assist the City and the CPD in attaining Secondary compliance requirements in future reporting periods.

*Progress in the Seventh Reporting Period*

To demonstrate compliance with this paragraph, the City and the CPD submitted the following documents:

- 2023 Annual Training Plan (produced December 1, 2022)

- 2023 Policy Updates Use of Force Training (produced December 15, 2022)

The IMT also reviewed S11-10-03 §II(B) which indicates, "In service training will be conducted using multiple platforms such as classroom instruction, eLearning, roll call training, and streaming videos and may take place in a decentralized manner, including at the district or unit level, through eLearning, or through other electronic means." This language allows the CPD to maintain Preliminary compliance with this paragraph. Records were not submitted this reporting period to establish Secondary compliance.

<p style="text-align:center">***</p>

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance requires the CPD to deliver training following the requirements of ¶326, as demonstrated through training plans, lesson plans, course curricula, training schedules, and other training and data sources and in accordance with ¶¶282–85 instructor selection and development requirements. Full compliance can be achieved when the CPD has fully implemented the requirements of this paragraph and training delivery has been initiated within the specified timeline and conditions.

## Paragraph 326 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Training: ¶327

**327.** *Courses offered by CPD to fulfill the portion of the In-Service Training Program not required to be delivered in person may be provided through e-learning or other electronic means, so long as they are reviewed and approved by the TOC and are consistent with this Agreement. In considering e-learning courses for approval, the TOC will ensure that instructional objectives can be sufficiently achieved through e-learning. Following the completion of any e-learning course provided as part of the In-Service Training Program, CPD will test participants on their comprehension of the underlying subject matter.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶327 during this reporting period.

To evaluate Preliminary compliance with ¶327, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine if the CPD's applicable policies, lesson plans, attendance records, training plans, and other training and data sources demonstrate that it has established and implemented e-learning course development and delivery in accordance with the requirements of this paragraph, including evidence of appropriate Training Oversight Committee review and approval of e-learning courses and appropriate post-course evaluations. The IMT also sought to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the IMT assessed compliance with this paragraph and determined that the City and the CPD achieved Preliminary compliance. We reviewed Training Directive S11-10-03 (*In-Service Training*), Training Oversight Committee meeting materials, and the Psychology of Domestic Violence eLearning. The CPD advised that an additional document, "Evidence documenting 95% completion of training," would be produced during the sixth reporting period. We found that S11-10-03 incorporated the ¶327 requirements into policy, meeting Preliminary compliance. We noted that data demonstrating Secondary compliance

had not been submitted and may include documentation from the Training Oversight Committee as specified in this paragraph, attendance records, evaluation results following the delivery of a course, or other training and data sources, as appropriate.

In the sixth reporting period, the CPD submitted BIA eLearning materials (April 2022), including draft eLearning materials and a pre- and post-test. We determined that documents or information that are required to demonstrate Secondary compliance for ¶327 were not provided.

*Progress in the Seventh Reporting Period*

To demonstrate compliance with ¶327, this reporting period the CPD submitted BIA eLearning materials (produced August 18, 2022 and November 9, 2022), including Module 1-5 Articulate links, and Pre- and Post-test Articulate links. The CPD also submitted BIA eLearning Training (produced November 9, 2022), 2023 Annual Training Plan (produced December 1, 2022), and evidence of 95% of sworn personnel receiving BIA eLearning Training (produced December 28, 2022).

The following information and documents are required to demonstrate Secondary compliance.

| ¶327 requirements written into policy | S11-10-03 |
|---|---|
| Full list of courses offered by CPD to fulfill the portion of the In-Service Training Program not required to be delivered in person | Not Provided |
| Reviewed and approved by the Training Oversight Committee (Training Oversight Committee minutes) | Not provided |
| Consistent with Consent Decree requirements (No objection notices on eLearning course) | Not provided |
| Training Oversight Committee ensures that instructional objectives can be sufficiently achieved (Training Oversight Committee minutes) | Not provided |
| Following the completion of any e-learning course provided as part of the In-Service Training Program, CPD will test participants on their comprehension of the underlying subject matter. (Curriculum or actual exams) | Only BIA eLearning test provided |

As a result, the City and the CPD maintained Preliminary compliance during this reporting period, but failed to achieve Secondary compliance.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance may be achieved when the CPD's policies, lesson plans, attendance records, training plans, and other training and data sources demonstrate that the CPD has established and implemented eLearning course development and delivery in accordance with the requirements of this paragraph, including evidence of appropriate Training Oversight Committee review and approval of e-learning courses and appropriate post-course evaluations.

### Paragraph 327 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 − DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶328

**328.** *CPD will develop and implement a process for addressing non-compliance with training requirements to ensure that all officers who are active duty and available for assignment, including supervisors and command staff, successfully complete all required training programs within the time frames set out in this Agreement.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with the requirements of ¶328 during this reporting period.

To evaluate Preliminary compliance with ¶328 we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine if the CPD has established a process to require officers returning to active duty to meet the training requirements specified in this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD submitted Training Deviation materials, including a Screenshot of an In-Service Training Deviation Dashboard and a Deviation Spreadsheet and the 2021 Annual Training Report. Along with S11-10 (*Department Training*), these materials satisfied Preliminary compliance, but did not yet establish Secondary compliance, which we advised could be demonstrated by the submission of documentation establishing that each step of the process for addressing non-compliance with training requirements is functional and operates as described in policy. .

We advised that to substantiate that the Training Deviation process is fully implemented in order to meet Secondary and eventually Full compliance, the CPD must submit additional documents demonstrating that each step of the process is functional and operates as described in policy. The number of training deviation investigations should approximate the number of personnel who did not attend required trainings. Each step enumerated in policy S11-10 (*Department Training Records Maintenance Program*) § XII was not demonstrated in the data submitted during this reporting period. Secondary compliance was therefore not achieved.

*Progress in the Seventh Reporting Period*

The IMT reviewed previously submitted policy S11-10, *Department Training Records Maintenance Program).* § XII describes the training deviation process and the CPD's process for addressing ¶328 requirements. This policy allows the CPD to maintain Preliminary compliance. However, no additional documents were submitted this reporting period to substantiate Secondary compliance, including documentation showing the CPD's adherence to its policy regarding training deviations.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, to further substantiate that this process is fully implemented to meet Secondary and eventually Full compliance, the CPD must submit additional documents demonstrating that each step of the process required by this paragraph is functional and operates as described in policy. The number of training deviation investigations should approximate the number of personnel who did not attend required trainings.

### Paragraph 328 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶329

> ***329.*** *Officers, including supervisors and command staff, returning to active duty after taking a leave of absence of a year or more must complete all mandatory training content required as part of the In-Service Training Program that was missed during the previous three years, in addition to the mandatory courses required in the current year. a. At a minimum: i. officers must complete training on the content required in Part F of the Use of Force section of this Agreement before returning to assignment; and ii. officers must complete training on all other mandatory content required during the previous three years within the first full year of resumed active duty. b. Where the same mandatory content has been updated or required multiple times during the period of inactivity, officers are only required to take the most recent offering. The training required in this paragraph will count towards the total amount of training required by the In-Service Training Program.*

## Compliance Progress  (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶329 during this reporting period.

To evaluate Preliminary compliance with ¶329, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we will need to review data to determine whether the requirements of this paragraph are written into policy and reflect that specified obligations and trainings align with the requirements of this paragraph. Such data must substantiate that the training processes enumerated in S11-10-03 (*In-Service Training*) and E04-05 (*Returning Service*) have been implemented. The IMT also sought to verify sufficient attendance records (*i.e.*, 95% of relevant personnel), including hours attended.

*Progress before the Seventh Reporting Period*

During the fifth reporting period, the IMT assessed compliance and determined that the City and the CPD achieved Preliminary compliance for the first time. We

reviewed the finalized S11-10-03 (*In-Service Training*) and finalized E04-05 (*Returning Service*) policy documents as evidence of compliance. No additional data were produced to establish a further level of compliance.

*Progress in the Seventh Reporting Period*

S11-10-03 (*In-Service Training*) and E04-05 (*Returning Service*) continue to support Preliminary compliance. The City and the CPD did not submit any data this reporting period to establish Secondary compliance.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance can be achieved by substantiating that the processes enumerated in S11-10-03 (*In-Service Training*) and E04-05 (*Returning Service*) have been implemented.

### Paragraph 329 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶331

> **331.** *CPD will require that every newly promoted supervisor, except those promoted to the rank of Commander and above, receives mandatory supervisory, management, leadership, and command accountability training, tailored to each level of supervision and command before assignment to a supervisory rank or assumption of supervisory responsibilities associated with a particular supervisory rank.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with these requirements during this reporting period.

To evaluate Preliminary compliance with ¶331, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data demonstrating that every newly promoted supervisor received the training required by this paragraph before assignment to a supervisory rank or assumption of supervisory responsibilities associated with a particular supervisory rank.

*Progress before the Seventh Reporting Period*

During the previous reporting periods, the IMT assessed compliance related to this paragraph and determined that the City and the CPD maintained Preliminary compliance. We reviewed the finalized S11-10-02 (*Pre-Service Training*) as evidence of Preliminary compliance. No documents were produced to demonstrate Secondary compliance in the prior reporting period.

*Progress in the Seventh Reporting Period*

To demonstrate compliance this reporting period, the City and the CPD submitted the following documents:

- Annotated Pre-Service (Lt. and Sgt.) Curricula (produced August 11, 2022)

The annotated curricula describe each course and specify the number of hours assigned to each course. The IMT also reviewed the draft *2023 Training Plan*, which also addresses pre-service training requirements.

S11-10-02 (*Pre-Service Training*) continues to support Preliminary compliance. No additional documents were submitted to support Secondary compliance this reporting period, which requires the submission of documents demonstrating that every newly promoted supervisor received the required training before assignment to a supervisory rank or assumption of supervisory responsibilities.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance requires data and training sources demonstrating that every newly promoted supervisor received the required training before assignment to a supervisory rank or assumption of supervisory responsibilities associated with a particular supervisory rank.

### Paragraph 331 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶332

**332.** *CPD will require that supervisors, upon their first promotion to the rank of Commander or above, receive mandatory supervisory, management, leadership, and command accountability training, tailored to command staff positions within six months of assignment to or assumption of supervisory responsibilities as a member of CPD's command staff.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶332 during this reporting period.

To evaluate Preliminary compliance with ¶332, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine if the CPD has taken sufficient steps to deliver the training required by this paragraph according to the conditions specified in this paragraph, including that every newly promoted supervisor received the required training before assignment to a supervisory rank or assumption of supervisory responsibilities associated with a particular supervisory rank.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT assessed compliance and found that the City and the CPD maintained Preliminary compliance with this paragraph. We reviewed E05-05 (*Promotional Process for Commander*) (February 2022). E05-05 § IX(B) had the requisite ¶332 language to support Preliminary compliance.

No documents were submitted during the prior reporting period to demonstrate that the CPD had taken sufficient steps to deliver the training according to the conditions specified in this paragraph to support Secondary compliance.

*Progress in the Seventh Reporting Period*

E05-05 (*Promotional Process for Commander*) produced in the prior reporting period contains language in § IX(B) that continues to support Preliminary compliance. No additional documents were submitted during this reporting period to substantiate Secondary compliance.

***

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance requires data and training sources demonstrating that every newly promoted supervisor received the required training before assignment to a supervisory rank or assumption of supervisory responsibilities associated with a particular supervisory rank.

### Paragraph 332 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| Preliminary |

# Training: ¶333

**333.** *The amount of pre-service promotional training may differ according to rank and command, but all pre-service promotional training will be adequate in quality, quantity, type, and scope and will cover topics appropriate to the specific rank and command.*

**Compliance Progress**     (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**     *Not in Compliance*
**Full:**     *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶333 during this reporting period.

To evaluate Preliminary compliance with ¶333, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine whether the CPD's training is tailored to rank and follows the requirements of this paragraph and that the CPD has taken steps to deliver training in accordance with the requirements of this paragraph, the *2022 Training Plan*, and approved curricula. Such data, including training plans, lesson plans, and attendance records, must demonstrate the CPD's adherence to ¶333 requirements and also must demonstrate that training has been conducted and that the CPD achieved 95% attendance by eligible personnel.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT assessed compliance with this paragraph and determined that the City and the CPD achieved Preliminary compliance. We reviewed the finalized S11-10-02 (*Pre-Service Training*) which incorporated the requirements of ¶¶331–34. To demonstrate further compliance with ¶333, in the prior reporting period the CPD submitted E05-05-04 (*Promotional Process for Captain*) (February 2022) and E05-05 (*Promotional Process for Commander*) (February 2022). Section X of each of these policies outlines training requirements for each promotional rank.

The IMT advised that Secondary compliance would require the CPD to demonstrate that it has taken significant steps to deliver training in accordance with this paragraph and the *2022 Training Plan*, curriculum, and curriculum development process. We further advised that training plans, attendance records, and lesson plans would all have to demonstrate the CPD's adherence to ¶333 requirements

and that records must demonstrate that training has been conducted and that the CPD achieved 95% attendance by eligible candidates.

*Progress in the Seventh Reporting Period*

To demonstrate compliance during this reporting period, the City and the CPD submitted the following documents:

- Annotated Pre-Service (Lt. and Sgt.) Curricula (produced August 11, 2022)

The annotated curricula describe each course and specify the number of hours assigned to each course. The IMT also reviewed the draft *2023 Training Plan*, which also addresses pre-service training requirements.

The requirements established in ¶¶331–34 are contained in S11-10-02 (*Pre-Service Training*) § III(A)(1–5), establishing Preliminary compliance for each paragraph. The CPD previously submitted CPD E05-05-04 (*Promotional Process for Captain*) (February 2022) and E05-05 (*Promotional Process for Commander*) (February 2022) for compliance with ¶333. Section X of each of these policies outlines training requirements for each promotional rank. No additional records were submitted this reporting period to establish Secondary compliance.

*** *

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance requires the CPD to demonstrate that it has taken significant steps to deliver training in accordance with this paragraph and the *2022 Training Plan*, curriculum, and curriculum development process. The training plans, attendance records, and lesson plans will all have to demonstrate the CPD's adherence to ¶333 requirements. Records must also demonstrate that training has been conducted and that the CPD achieved 95% attendance by eligible candidates.

## Paragraph 333 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:

Preliminary

# Training: ¶334

*334. By January 1, 2020, as appropriate and tailored to the specific rank and command, pre-service promotional training will include, but not be limited to: a. an overview of CPD's department-wide crime reduction strategies; b. specific methods for developing district-level crime reduction strategies that are consistent with the principles of community policing, and tools and techniques on how best to communicate with officers on how to incorporate principles of community policing in implementing those crime reduction strategies; c. techniques for effectively guiding and directing officers and promoting effective and ethical police practices, including detecting and addressing bias-based profiling and other forms of discriminatory policing; d. de-escalation strategies and the principles of force mitigation; e. intervening on a subject's behalf when observing a use of force that is excessive or otherwise in violation of policy; f. evaluating the completeness, correctness, and sufficiency of written reports; g. monitoring, reviewing, and investigating uses of force to ensure consistency with CPD policies; h. understanding the function and proper use of supervisory tools, such as Early Intervention System ("EIS") and body-worn cameras, at each rank; i. evaluating officer performance, informally and formally as part of CPD's annual performance evaluation process; j. CPD and COPA's disciplinary system requirements and available non-punitive corrective action; k. mentoring officers and fostering career development; l. responding to allegations of officer misconduct, including, but not limited to, excessive force and racial discrimination, for purposes of documenting the complaint and reporting it to COPA; m. building community partnerships and guiding officers on how to implement this requirement; and n. CPD policy and legal updates.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶334 during this reporting period.

To evaluate Preliminary compliance with ¶334, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution,

workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine if the CPD has implemented processes to fulfill the pre-service promotional training requirements of this paragraph, including by conducting the pre-service promotional training courses and demonstrating implementation of processes to fulfill the other requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the fifth reporting period, the IMT assessed compliance and found that the City and the CPD achieved Preliminary compliance. We reviewed the finalized S11-10-02 (*Pre-Service Training*), which incorporated the requirements of ¶¶331–34. We noted that Secondary compliance could be achieved by conducting the pre-service supervisory training course and achieving 95% or higher attendance by eligible candidates.

*Progress in the Seventh Reporting Period*

To demonstrate compliance during this reporting period, the City and the CPD submitted the following documents:

- Annotated Pre-Service (Lt. and Sgt.) Curricula (produced August 11, 2022)

The annotated curricula describe each course and specify the number of hours assigned to each course. The IMT also reviewed the draft *2023 Training Plan*, which also addresses pre-service training requirements.

The requirements established in ¶¶331–34 are contained in S11-10-02 (*Pre-Service Training*) § III(A)(1–5), maintaining Preliminary compliance for each paragraph. The City and the CPD did not submit any substantive data this reporting period that establishes Secondary compliance.

<p align="center">***</p>

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, the CPD may achieve Secondary compliance by conducting the pre-service promotional training courses and demonstrating implementation of processes to fulfill the requirements of this paragraph. Full compliance may be demonstrated when the CPD has fully implemented and has established a full process that aligns with the requirements of this paragraph.

## Paragraph 334 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Training: ¶335

*335. The pre-service promotional training for new Sergeants and Lieutenants will include a field training component to provide newly promoted supervisors with a better understanding of the requirements of the position to which they have been promoted. a. The field training component for new Sergeants will consist of two days of shadowing current Sergeants in districts: one day observing the activities of a District Station Supervisor and one day observing the activities of a Field Sergeant. b. The field training component for new Lieutenants will consist of one day of shadowing a current Lieutenant in a district and observing the activities of a Watch Operations Lieutenant.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**  *In Compliance (FOURTH REPORTING PERIOD)*
**Secondary:**   *Not in Compliance*
**Full:**      *Not Yet Assessed*

The City and the CPD has maintained Preliminary compliance with the requirements of ¶335 during this reporting period.

To evaluate Preliminary compliance with ¶335, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine if the CPD has developed a formalized structure for the field training component of this paragraph and if the CPD has implemented processes to fulfill the pre-service promotional training requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the fifth reporting period, the IMT assessed compliance with this paragraph and determined the City and the CPD maintained Preliminary compliance. We reviewed the finalized S11-10-02 (*Pre-Service Training*), the *2022 Training Plan*, and the Draft Pre-Service Promotional Training Field Observation, and these documents met the requirements of this paragraph. The City and the CPD sought Secondary compliance by producing a curricula and policies meeting the requirements of this paragraph, but the IMT noted that Secondary compliance requires verification that the CPD has begun implementation.

The City and the CPD maintained Preliminary compliance in the sixth reporting period. The City and the CPD did not submit any data to establish Secondary compliance during this reporting period.

*Progress in the Seventh Reporting Period*

Preliminary compliance was established in a previous reporting period and is maintained during this period. The City and the CPD did not submit any substantive data to establish Secondary compliance during this reporting period.

\*\*\*

The City and the CPD has maintained Preliminary compliance during this reporting period. Looking forward, to achieve Secondary compliance the CPD must implement and establish processes to fulfill the pre-service promotional training requirements of this paragraph.

### Paragraph 335 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶336

**336.** *Within 30 days of the Effective Date, CPD will develop a formalized structure for the field training component to ensure consistency across districts. This structure will include a process for selecting which supervisors will be shadowed and guidance materials to ensure that the topics and information regarding supervisor responsibilities covered during the field training component are consistent with CPD policy and this Agreement.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not reach any level of compliance with ¶336 during this reporting period.

To evaluate Preliminary compliance with ¶336, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to ascertain whether the CPD has developed a formalized structure for the field training component to ensure consistency across districts, including a process for selecting which supervisors will be shadowed and creation of guidance materials to ensure that the topics and information regarding supervisor responsibilities covered during the field training component are consistent with CPD policy and Consent Decree requirements. Such data should also demonstrate that training has been delivered in accordance with the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT assessed compliance and determined that the City and the CPD did not submit any data to establish Preliminary compliance, which requires a formalized structure for the field training component to be written into CPD policy. Therefore, no level of compliance was demonstrated. We reviewed the Pre-Service Promotional Training Field Observation training that were going through a ¶641 review process at the conclusion of the fifth reporting period, and advised that this would help to substantiate Secondary compliance once Preliminary compliance was met and the CPD submitted documents showing that the training had been implemented and delivered.

*Progress in the Seventh Reporting Period*

The City and the CPD did not submit any data to establish Preliminary or Secondary compliance during this reporting period. Therefore, no level of compliance has been demonstrated.

\*\*\*

The City and the CPD did not reach any level of compliance during this reporting period. Looking forward, Preliminary compliance requires a formalized structure for the field training component to be written into CPD policy. To achieve Secondary compliance, the CPD must submit data demonstrating that training has been delivered and that the training requirements of this paragraph are met.

### Paragraph 336 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Training: ¶337

> **337.** CPD will ensure that all supervisors who are active duty and available for assignment also receive in-service training consistent with the requirements of CPD's In-Service Training Program. As part of the In-Service Training Program, supervisors will receive refresher training related to their supervisory duties and training that covers managerial and leadership skills. The in-service training for supervisors may include, but is not limited to, the topics identified above for pre-service promotional training.

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Secondary compliance with the requirements of ¶337 during this reporting period.

To evaluate Preliminary compliance with ¶337, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to ascertain whether the CPD has taken steps to ensure that supervisors receive the in-service training, including refresher training, required by this paragraph. Data should include attendance records demonstrating that at least 95% of all eligible personnel received the training required by this paragraph.

### Progress before the Seventh Reporting Period

During the previous reporting period, the IMT assessed compliance and found that the City and the CPD maintained Preliminary compliance with this paragraph. To assess Secondary compliance, the IMT reviewed the finalized policy S11-10-03 (*In-Service Training*) materials and a draft of the planned *2022 In-Service Supervisor Refresher Training* that was still under ¶641 review at the close of the fifth reporting period. The IMT also attended a site visit of Annual In-Service Supervisor Training during the week of April 11, 2022. Attendance records for these trainings were not submitted, therefore Secondary compliance was not achieved.

### Progress in the Seventh Reporting Period

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- 95% Compliance 2022 Annual In-Service Supervisors Training (produced September 22, 2022), including Cover Sheet CPD-11.201, 2022 Annual In-Service Supervisors Training Dashboard, and Training Members Excel_2022 Annual In-Service Supervisors Training.

- In-Service Supervisor Training Records (produced December 23, 2022), including Cover Sheet, Roster of Department members completed for the In-Service Supervisors Training, and In-Service Supervisors Training Screenshot of Tableau Dashboard.

The Annual In-Service Training Dashboard indicates over 96% of supervisors received the training. The December 23, 2022, Tableau dashboard indicates approximately 98% of supervisors completed the required training.

The City and the CPD previously attained Preliminary compliance, which is maintained with S11-10-03 (*In-Service Training*). Additionally, the data submitted during this reporting period is sufficient to demonstrate Secondary compliance.

*** 

The City and the CPD maintained Preliminary compliance and achieved Secondary compliance during this reporting period. Looking forward, Full compliance requires the City and the CPD to have fully implemented and established a full process that aligns with ¶337 requirements.

### Paragraph 337 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Training: ¶338

> **338.** *Any training course offered as part of a pre-service promotional training, which is also a mandatory In-Service Training Program course, satisfies that mandatory In-Service Training Program requirement. Any other training course completed during a pre-service promotional training will count towards the total amount of training required by the In-Service Training Program requirement.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶338 during this reporting period.

To evaluate Preliminary compliance with ¶338, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine if the requirements of this paragraph are written into policy and reflect specified obligations for pre-service promotional training. Such data must include attendance records demonstrating that at least 95% of all eligible personnel received the training required by this paragraph.

*Progress before the Seventh Reporting Period*

In prior reporting periods, the IMT assessed compliance by reviewing the CPD's finalized S11-10-02 (*Pre-Service Training*) and determined that it is consistent with the requirements of this paragraph. We noted that Secondary compliance may be achieved by submitting training documents via the CPD's centralized electronic system that schedules and tracks all CPD trainings so that the IMT may determine if the CPD has taken sufficient steps to deliver training in accordance with this paragraph and others in the Consent Decree.

*Progress in the Seventh Reporting Period*

Preliminary compliance was established in a previous reporting period and is maintained through this reporting period. The City and the CPD did not submit any data to establish Secondary compliance during this reporting period.

\*\*\*

The City and the CPD maintained Preliminary compliance during this reporting period. Looking forward, Secondary compliance may be achieved when training has been conducted and the CPD has demonstrated that it achieved 95% attendance by eligible candidates. Full compliance may be achieved after the CPD has fully implemented and established a full process that aligns with the requirements of this paragraph.

### Paragraph 338 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Training: ¶339

***339.*** *Within 90 days of the Effective Date, CPD will require that all members who are active duty and available for assignment are provided with training on the requirements of this Agreement, together with its goals, implementation process, and timelines.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve any level of compliance with the requirements of ¶339 during this reporting period.

To evaluate Preliminary compliance with ¶339, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed data to determine if the requirements of this paragraph are written into policy and reflect specified obligations. Specifically, the IMT needs to review a policy requiring CPD personnel, including new hires, to be trained on Consent Decree requirements, followed by data demonstrating that at least 95% of applicable personnel are trained on this policy, followed by data demonstrating the CPD's systematic adherence to the policy and training requirements of this paragraph.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the IMT found that the City and the CPD did not attain Preliminary compliance with this paragraph, requiring ¶339 requirements to be written into policy. The City and the CPD did not submit any data to substantiate compliance, but indicated that they intended to submit documents establishing Preliminary compliance and demonstrating Secondary compliance during the sixth reporting period.

*Progress in the Seventh Reporting Period*

The City and the CPD did not submit any data to establish any level of compliance during this reporting period.

\*\*\*

The City and the CPD did not achieve any level of compliance during this reporting period. Looking forward, Preliminary compliance may be met when requirements of this paragraph are written into policy and reflect specified obligations. Secondary compliance requires documentation that at least 95% of eligible personnel are provided with training on the requirements of this paragraph. Full compliance may be achieved when the CPD has fully implemented and institutionalized a full process that aligns with ¶339 requirements.

### Paragraph 339 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Secondary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Training: ¶340

> **340.** *In connection with issuing a policy or procedure pursuant to this Agreement, CPD will ensure that: a. all relevant CPD members review their responsibilities pursuant to the policy or procedure, including the requirements that each member is held accountable for their compliance and is required to report violations of policy; b. supervisors of all ranks are informed that they will be held accountable for identifying and responding to policy or procedure violations by members under their direct command; and c. CPD can document that each relevant CPD officer or other employee has received and reviewed the policy.*

## Compliance Progress   (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Secondary compliance with the requirements of ¶340 during this reporting period.

To evaluate Preliminary compliance with ¶340, we reviewed the City's and the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed documentation to determine if they demonstrate that the requirements of this paragraph are written into policy and reflect specified obligations. Such data must reflect that at least 95% of all eligible personnel review the monthly policy updates.

*Progress before the Seventh Reporting Period*

During the previous reporting period, the City and the CPD did not submit any data to establish any level of compliance. However, the IMT reviewed General Order G01-03, *Department Directives System* produced in a prior reporting period to confirm that the City and the CPS maintained Preliminary compliance with this paragraph.

*Progress in the Seventh Reporting Period*

The City and the CPD submitted the following documents to demonstrate compliance during this reporting period:

- Evidence of Monthly Directive Training 95% Compliance (produced September 15, 2022), including Cover Sheet Directives In-Service Dashboard, January 2022 Directives Roster, February 2022 Directives Roster, March 2022 Directives Roster, April 2022 Directives Roster, May 2022 Directives Roster, June 2022 Directives Roster, and July 2022 Directives Roster.

- Evidence of Monthly Directive Training 95% Compliance (produced December 20, 2022), including Cover Sheet, Directives In-Service Dashboard May through October, and Directives Roster May through October.

The December 20, 2022, Tableau dashboard indicates that each month from May through October 2022, between 97–99% of students completed the policy training.

\*\*\*

The City and the CPD achieved Secondary compliance during this reporting period. Looking forward, continued Secondary compliance requires documentation that at least 95% of eligible personnel review the monthly policy updates. Full compliance may be achieved when the CPD has fully implemented and institutionalized a full process that aligns with ¶340 requirements.

### Paragraph 340 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Appendix 7

# Supervision
# Compliance Assessments by Paragraph

¶347     ¶355     ¶364     ¶372

¶348     ¶356     ¶365     ¶373

¶349     ¶357     ¶366     ¶374

¶350     ¶359     ¶367     ¶375

¶351     ¶360     ¶368     ¶376

¶352     ¶361     ¶369

¶353     ¶362     ¶370

¶354     ¶363     ¶371

# Supervision: ¶347

> **347.** *CPD will require its supervisors, through policy and auditing, to consistently apply CPD policies and procedures from shift to shift, among all geographic areas of the city, and in all units of the Department.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶347 in the seventh reporting period.

To evaluate Preliminary compliance with ¶347, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we sought to review the CPD's corresponding training materials and plan for supervisor audits.

*Progress before the Seventh Reporting Period*

We assessed the requirements of ¶347 for the first time in the sixth reporting period. The City and the CPD previously finalized the *Supervisory Responsibilities* policy (G01-09), on May 10, 2021, which the IMT reviewed. This policy allowed the CPD to reach Preliminary compliance with ¶347 because it sets forth various duties and responsibilities of supervisors. Specifically, the policy directs supervisors to model appropriate conduct, including abiding by the law and CPD policy and displaying high standards of ethical behavior and integrity. Supervisors are expected to effectively supervise the members under their command to conduct their duties consistent with the established principles of procedural justice, sanctity of life, de-escalation, impartial policing, and community policing.

*Progress in the Seventh Reporting Period*

The IMT conducted a site visit in August 2022, during the seventh reporting period. In focus groups conducted with officers and sergeants in the 6th district, we heard concerns about supervisors transitioning in and out of the 6th district, both at the sergeant and lieutenant levels. The consistent turnover of supervisors, whether actual or perceived, raises concerns to the IMT about whether members are receiving the level of supervision required by the Consent Decree. Members expressed keen interest in the opportunity to build relationships with supervisors, receive feedback, and have consistency in supervision. Supervisory logs, which

outline a supervisor's daily activities and tasks, would allow the IMT to better understand if this is occurring. Despite requests for at least the last three reporting periods, we have not received these. The CPD has, however, indicated that they intend to produce the logs in the next reporting period.

\*\*\*

The CPD maintained Preliminary compliance in the seventh reporting period, but did not reach Secondary compliance. The IMT looks forward to reviewing documentation, such as the supervisory logs, and conducting further focus groups with officers and supervisors to hear their direct insights.

### Paragraph 347 Compliance Progress History

| FIRST REPORTING PERIOD SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SECOND REPORTING PERIOD SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | THIRD REPORTING PERIOD MARCH 1, 2020 – DECEMBER 31, 2020 |
|---|---|---|
| COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Not Applicable |
| FOURTH REPORTING PERIOD JANUARY 1, 2021 – JUNE 30, 2021 | FIFTH REPORTING PERIOD JULY 1, 2021 – DECEMBER 31, 2021 | SIXTH REPORTING PERIOD JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Preliminary |
| SEVENTH REPORTING PERIOD JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: Preliminary | | |

# Supervision: ¶348

> **348.** *By January 1, 2020, CPD will review and, as necessary, revise its policies for supervision to ensure that such policies set out clear responsibilities for supervisors to comply with the requirements of this Agreement. CPD will inform all supervisors of their specific duties and responsibilities that are required by CPD policies, including this Agreement.*

## Compliance Progress · (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶348, but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶348, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance with ¶348, we reviewed the CPD's corresponding training materials and whether the CPD has developed a system for tracking supervisory responsibilities in policies and trainings across all areas of the Consent Decree.

*Progress before the Seventh Reporting Period*

In previous reporting periods, we reviewed iterations of the CPD's *Supervisory Responsibilities* (G01-09) policy, corresponding training documents, and other documents related to the requirements of this paragraph, such as training tracking sheets and the *Supervisory Policy Matrix*. The City and the CPD reached Preliminary compliance in the second reporting period. The City and the CPD maintained Preliminary compliance by carefully revising, improving, and finalizing *Supervisory Responsibilities* policy (G01-09) and finalizing the curriculum for the *2022 In-Service Supervisors Training*. Additionally, the IMT was able to review the CPD's *Performance Evaluation System Pilot Program (PES)* policy (D21-09), and the *Officer Support System (OSS)* policy (D20-04).

We explained in previous reports that, for the CPD to reach subsequent levels of compliance, we would look to see that the CPD has a system for tracking supervisory responsibilities and trainings across all areas of the Consent Decree, and we had hoped to review supervisory logs that capture supervisor's actions that demonstrate compliance with the policies that outline expectations and responsibilities of supervisors.

In the sixth reporting period, members of the IMT observed the *2022 In-Service Supervisors Training*, both in person and virtually. The training instructed supervisors on the soft skills necessary to have difficult but crucial conversations with members that they supervise and the value of practicing internal procedural justice as a model for practicing procedural justice in the community. The training also included a "Supervisors Toolbox" to provide a brief overview of the available CPD wellness programs, resources, and supports.

Additionally, the IMT was able to conduct focus groups with officer, supervisors, and command staff within the 6th District during an in-person site visit. These conversations provided additional insight into the realities of supervision and daily operations in the department.

Further, the IMT reviewed the *Performance Evaluation System (PES) Pilot Training* and submitted a no-objection notice in April 2022. The City and the CPD also submitted a revised and updated the *Officer Support System (OSS) Pilot Training* for IMT review in May 2022. The Performance Evaluation System and Officer Support System were anticipated to be launched in the 6th District during the seventh reporting period.

*Progress in the Seventh Reporting Period*

The IMT conducted a site visit in August 2022. In focus groups held with officers and sergeants in the 6th district, we heard concerns about supervisors transitioning in and out of the 6th district, both at the sergeant and lieutenant levels. The consistent turnover of supervisors, whether actual or perceived, raises concerns to the IMT about whether members are receiving the level of supervision required by the Consent Decree. Members expressed keen interest in the opportunity to build relationships with supervisors, receive feedback, and have consistency in supervision. Supervisory logs, which outline a supervisor's daily activities and tasks, would allow the IMT to better understand if this is occurring. Despite requests for at least the last three reporting periods, we have not received these. The CPD has, however, indicated that they intend to produce the logs in the next reporting period.

On July 21, 2022, the City and CPD produced *Performance Evaluation System Training*. The IMT submitted a no-objection letter on August 4, 2022. The IMT believes that the trainings were well-designed as they included adult learning methods and covered the required material. We observed the human resources portion of this training on November 4, 2022. It was well-received by the members and the instructors effectively engaged with the participants.

<p style="text-align:center">***</p>

These efforts have allowed the City and the CPD to maintain Preliminary compliance with ¶348 in the seventh reporting period. However, they are not sufficient to reach Secondary compliance. In the eighth reporting period, the IMT will be closely observing the rollout of the Officer Support System and Performance Evaluation System Pilot Program. The IMT also looks forward to reviewing the current supervisory logs implemented by the CPD to track supervisors' activities during their shifts. The submission and review of these logs could help support Secondary compliance.

## Paragraph 348 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Supervision: ¶349

> **349.** *CPD will require that all supervisors perform their specific duties and responsibilities in compliance with CPD policy, including the terms of this Agreement.*

### Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶349 in the seventh reporting period.

To evaluate Preliminary compliance with ¶349, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance with ¶349, we sought to review, among other things, the CPD's corresponding training materials.

*Progress before the Seventh Reporting Period*

We assessed the requirements of ¶349 for the first time in the sixth reporting period. The City and the CPD previously finalized the *Supervisory Responsibilities* policy (G01-09), on May 10, 2021, which the IMT reviewed. This policy allowed the CPD to reach Preliminary compliance with ¶347 because it sets forth various duties and responsibilities of supervisors. Specifically, the policy directs supervisors to model appropriate conduct, including abiding by the law and CPD policy and displaying high standards of ethical behavior and integrity. Supervisors are expected to effectively supervise the members under their command to conduct their duties consistent with the established principles of procedural justice, sanctity of life, de-escalation, impartial policing, and community policing.

An important measure of supervisor efficacy are the supervisory logs, which outline a supervisor's daily activities and tasks. The submission and review of these logs will also help the IMT evaluate Secondary compliance. The IMT looks forward to reviewing these and to conducting focus groups with officers and supervisors to hear their direct insights.

*Progress in the Seventh Reporting Period*

The IMT conducted a site visit in August 2022. In focus groups held with officers and sergeants in the 6th district, we heard concerns about supervisors transitioning in and out of the 6th district, both at the sergeant and lieutenant levels. The consistent turnover of supervisors, whether actual or perceived, raises

concerns to the IMT about whether members are receiving the level of supervision required by the Consent Decree. Members expressed keen interest in the opportunity to build relationships with supervisors, receive feedback, and have consistency in supervision. Supervisory logs, which outline a supervisor's daily activities and tasks, would allow the IMT to better understand if this is occurring. Despite requests for at least the last three reporting periods, we have not received these. The CPD has, however, indicated that they intend to produce the logs in the next reporting period.

On July 21, 2022, the City and CPD produced the *Performance Evaluation System Training*. The IMT submitted a no-objection letter on August 4, 2022. The IMT believes that the trainings were well-designed as they included adult learning methods and covered the required material. We observed the human resources portion of this training on November 4, 2022. It was well-received by the members and the instructors effectively engaged with the participants.

*** 

These efforts have allowed the City and the CPD to maintain Preliminary compliance with ¶348 in the seventh reporting period. However, they are not sufficient to reach Secondary compliance. In the eighth reporting period, the IMT will be closely observing the rollout of the Officer Support System and Performance Evaluation System. The IMT also looks forward to reviewing the current supervisory logs implemented by the CPD to track supervisors' activities during their shifts. The submission and review of these logs could help support Secondary compliance.

### Paragraph 349 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶350

> **350.** *CPD will regularly inform its members, including supervisors, of available training, professional development opportunities, and employee assistance resources.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶350, but did not reach Secondary compliance.

To assess Preliminary compliance with ¶350, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We noted in the fourth reporting period that we expected the CPD to develop an effective channel for informing members of training and professional development opportunities, as well as available employee-assistance resources.

To evaluate Secondary compliance with ¶350, we considered whether (1) the CPD developed an effective channel for communicating these opportunities to members and (2) demonstrated that the notification system is utilized consistently in line with the various directives that touch on notifying members of training, professional development opportunities, and employee assistance resources.

*Progress before the Seventh Reporting Period*

The IMT reviewed ¶350 for the first time during the fourth reporting period. In the fourth reporting period, the City and the CPD reached Preliminary compliance with this paragraph by submitting several documents regarding ¶350, including the CPD's 2020 Annual Report, an updated draft of S11-10-01, *Training Notification and Attendance Responsibilities*, as well as information about the Performance Evaluations System Pilot Program. We noted that at least 95% percentage of CPD officers received 32 hours of in-service training, which evidenced a robust communication and notification system that ensured members were aware of their training requirements and additional opportunities for training.

The City and the CPD maintained Preliminary compliance with ¶350 in the fifth reporting period by finalizing the curriculum for the *2022 In-Service Supervisors Training*. Additionally, the IMT was able to review the CPD's *Performance*

*Evaluation System Pilot Program (PES)* (D21-09), the *Officer Support System (OSS)* (D20-04), and the *Department Training* (S11-10) policies.

We explained that, in future reporting periods, we hoped to see that notification systems are employed in a manner consistent with the various directives that touch on notifying members of training, professional development opportunities, and employee assistance resources. More specifically, we asked to review data demonstrating how the notification systems work and their effectiveness in disseminating information.

In April 2022, during the sixth reporting period, the IMT conducted an in-person site visit, during which we were able to speak with groups of officers, supervisors, and command staff within the 6th District. These conversations provided additional insight into the realities of supervision and daily operations in the CPD. While we did not specifically observe supervisors notifying members of training opportunities and resources, we do highlight a productive roll-call where sergeants and lieutenants debriefed situations that occurred on previous shifts with a focus on officer safety, community service, and policy clarifications. The IMT notes that these observations are an important step toward assessing additional levels of compliance.

Further, members of the IMT observed the *2022 In-Service Supervisors Training*, both in person and virtually. The training instructed supervisors on the soft skills necessary to have difficult but crucial conversations with members that they supervise and the value of practicing internal procedural justice as a model for practicing procedural justice in the community. The training also included a "Supervisors Toolbox" to provide a brief overview of the available CPD wellness programs, resources, and supports.

*Progress in the Seventh Reporting Period*

On December 7, 2022, members of the IMT observed the *Officer Support System Training*. This training was well-executed, explaining the purpose of the system, the model on which it was developed, and how supervisors should utilize it. Trainees were required to participate in a role-playing exercise where they were able to practice various techniques for the nuanced conversations they may need to engage in. Further, the training outline available resources and training that supervisors can suggest to officers in need.

*** 

The City and the CPD have maintained Preliminary compliance with ¶350 in the seventh reporting period. The IMT believes that the City and the CPD are demonstrating progress toward Secondary compliance. We look forward to seeing that notification systems are employed in a manner consistent with the various

directives that touch on notifying members of training, professional development opportunities, and employee assistance resources. We also look forward to further focus groups with department members to hear their direct insights.

### Paragraph 350 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶351

> **351.** *Supervisors of all ranks will effectively supervise the members under their command to ensure accountability across the Department.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶351 in the seventh reporting period.

To evaluate Preliminary compliance with ¶351, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, the CPD should develop a plan to ensure supervisors of all ranks will effectively supervise the members under their command to ensure accountability across the CPD, including written guidance, training, tracking, and accountability.

*Progress before the Seventh Reporting Period*

We assessed the requirements of ¶351 for the first time in the sixth reporting period. Prior to the sixth reporting period, the City and the CPD finalized the *Supervisory Responsibilities* policy (G01-09), on May 10, 2021, which the IMT reviewed. This policy allowed the CPD to reach Preliminary compliance because it sets forth various duties and responsibilities of supervisors. The policy directs supervisors to model appropriate conduct, including abiding by the law and CPD policy and displaying high standards of ethical behavior and integrity. Supervisors are expected to effectively supervise the members under their command to conduct their duties consistent with the established principles of procedural justice, sanctity of life, de-escalation, impartial policing, and community policing.

As explained in our prior report, to evaluate Secondary compliance in future reporting periods, the IMT will focus on areas which demonstrate the requirements within ¶351. The IMT will evaluate whether the CPD has a plan to track, measure, and show compliance with the requirements of this paragraph. An important measure of supervisor efficacy are the supervisory logs, which outline a supervisor's daily activities and tasks. The submission and review of these logs, either electronic or paper, will also help the IMT assess Secondary compliance.

*Progress in the Seventh Reporting Period*

The IMT conducted a site visit in August 2022. In focus groups held with officers and sergeants in the 6th district, we heard concerns about supervisors transitioning in and out of the 6th district, both at the sergeant and lieutenant levels. The consistent turnover of supervisors, whether actual or perceived, raises concerns to the IMT about whether members are receiving the level of supervision required by the Consent Decree. Members expressed keen interest in the opportunity to build relationships with supervisors, receive feedback, and have consistency in supervision. Supervisory logs, which outline a supervisor's daily activities and tasks, would allow the IMT to better understand if this is occurring. Despite requests for at least the last three reporting periods, we have not received these. The CPD has, however, indicated that they intend to produce the logs in the next reporting period.

On July 21, 2022, the City and CPD produced *Performance Evaluation System Training*. The IMT submitted a no-objection letter on August 4, 2022. The IMT believes that the trainings were well-designed as they included adult learning methods and covered the required material. We observed the human resources portion of this training on November 4, 2022. It was well-received by the members and the instructors effectively engaged with the participants. In the seventh reporting period, the CPD maintained Preliminary compliance but did not reach Secondary compliance.

On December 7, 2022, members of the IMT observed the *Officer Support System Training*. This training was well-executed, explaining the purpose of the system, the model on which it was developed, and how supervisors should utilize it. Trainees were required to participate in a role-playing exercise where they were able to practice various techniques for the nuanced conversations they may need to engage in.

\*\*\*

These efforts have allowed the City and the CPD to maintain Preliminary compliance with ¶351 in the seventh reporting period. However, they are not sufficient to reach Secondary compliance. In the eighth reporting period, the IMT will be closely observing the rollout of the Officer Support System and Performance Evaluation System. The IMT also looks forward to reviewing the current supervisory logs implemented by the CPD to track supervisors' activities during their shifts. The submission and review of these logs could help support Secondary compliance.

## Paragraph 351 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Not Applicable

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Not Applicable

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Supervision: ¶352

> ***352.*** *Effective supervision requires that all supervisors, at a minimum, will: a. establish and enforce the expectation that members under their command perform their duties in a manner that complies with federal and state law, CPD policy, this Agreement, and that is consistent with the principles of procedural justice, de-escalation, impartial policing, and community policing; b. provide leadership, guidance, mentoring, direction, and support to members under their command to promote improved performance and professional development; and c. lead efforts to ensure that members under their command are working actively to engage the community and promote public trust and safety.*

## Compliance Progress  (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance in the seventh reporting period, but did not reach further levels of compliance with ¶352.

To determine Preliminary compliance with ¶352, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we sought to determine whether the CPD has a plan to track, measure, and show compliance with the requirements of this paragraph. In particular, the IMT focused on the Performance Evaluation System, which identifies many of the requirements in ¶352, including building upon the principles of community policing, de-escalation, procedural justice, and impartial policing.

*Progress before the Seventh Reporting Period*

We assessed the City and the CPD's compliance with ¶352 for the first time in the fifth reporting period. The City and the CPD reached Preliminary compliance with ¶352 by finalizing the *Supervisory Responsibilities* policy (G01-09). This policy sets forth various duties and responsibilities of supervisors. Supervisors are expected to effectively supervise the members under their command to conduct their duties consistent with the established principles of procedural justice, sanctity of life, de-escalation, impartial policing, and community policing.

During the sixth reporting period, the IMT was able to conduct focus groups with officer, supervisors, and command staff within the 6th District during an in-person site visit. These conversations provided additional insight into the realities of supervision and daily operations in the CPD. While officers we spoke with during these focus groups expressed that supervisors were supportive, they also shared that reduced staffing affected supervisors' ability to engage in proactive coaching on a regular basis. Supervisory mentorship is invaluable to an officer's performance and professional development and is a core component of ¶352.

In April 2022, members of the IMT observed the *2022 In-Service Supervisors Training*, both in person and virtually. The training instructed supervisors on the soft skills necessary to have difficult but crucial conversations with members that they supervise and the value of practicing internal procedural justice as a model for practicing procedural justice in the community. The training also included a "Supervisors Toolbox" to provide a brief overview of the available CPD wellness programs, resources, and supports.

Additionally, the IMT reviewed the Performance Evaluation System (PES) Pilot Training and submitted a no-objection notice in April 2022. The City and the CPD also submitted a revised and updated the Officer Support System (also known as the OSS) Pilot Training for IMT review in May 2022. On May 19, 2022, the City and the CPD produced the *OSS Evaluation Plan*, which outlines short, medium, and long-term goals and objectives for the Officer Support System. These steps have allowed the City and the CPD to maintain Preliminary compliance with ¶352.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the City and CPD maintained Preliminary compliance, but did not achieve Secondary compliance. In virtual meetings with members of the City and the CPD throughout the seventh reporting period, the IMT has been provided with updates on the progress of Officer Support System and Performance Evaluation System implementation plans.

Additionally, on July 21, 2022, the City and CPD produced *Performance Evaluation System Training*. The IMT submitted a no-objection letter on August 4, 2022. The IMT believes that the trainings were well-designed as they included adult learning methods and covered the required material. We observed the human resources portion of this training on November 4, 2022. It was well-received by the members and the instructors effectively engaged with the participants. IMT members noted that the CPD curriculum contained the components required by the Consent Decree and, in some areas, exceeded our expectations. An example of that is the focus on training the raters on the type of learner their employees are: auditory, kinesthetic, visual or reading/writing learners. This level of detail is not often seen in training materials on performance evaluation systems and can significantly impact how the employee receives feedback and encouragement. Further, the

curriculum had a strong focus on providing leadership, guidance, mentoring, direction, and support to members under their command to promote improved performance and professional development.

On December 7, 2022, members of the IMT observed the *Officer Support System Training*. This training was well-executed, explaining the purpose of the system, the model on which it was developed, and how supervisors should utilize it. Trainees were required to participate in a role-playing exercise where they were able to practice various techniques for the nuanced conversations they may need to engage in. Further, the training outlined available resources and training that supervisors can suggest to officers in need.

\*\*\*

In future reporting periods, the IMT will evaluate whether the CPD has a plan to track, measure, and show compliance with the requirements of this paragraph. In particular, the IMT will be focused on the Performance Evaluation System, which identifies many of the requirements in ¶352, including building upon the principles of community policing, de-escalation, procedural justice, and impartial policing. The IMT will also focus on assessing unity of command and span of control and monitoring whether supervisors have the time and appropriate span of control to properly meet the requirements of ¶352. The IMT also looks forward to the updated evaluation plans for the pilots of Unity of Command and Span of Control, Officer Support System, and Performance Evaluation System.

### Paragraph 352 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶353

*353. Additionally, effective supervision requires that immediate supervisors will, for members under their direct command: a. respond to, review, and investigate uses of force and other incidents and conduct as required by CPD policy and this Agreement; b. monitor, manage, and coordinate incident response; c. confirm the correctness, sufficiency, and completeness of written reports submitted for review and approval; d. identify any adverse behavior or misconduct and ensure that it is adequately addressed through corrective action, training, or referral for discipline; e. respond appropriately to each complaint of misconduct received, in accordance with CPD's complaint and disciplinary policies; f. review and act upon information regarding at-risk behavior by the members under their direct command, as required by the Data Collection, Analysis, and Management section of this Agreement; g. advise members under their direct command of available training, professional development opportunities, and employee assistance resources; h. conduct annual performance evaluations and meet with members under their direct command on an ongoing basis as necessary to provide guidance, mentoring, direction, and support to the members regarding their performance and to identify areas for improvement; and i. document the performance of their supervisory duties as required by CPD policy and this Agreement using the appropriate records management system, the Performance Recognition System ("PRS"), and/or the EIS.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the sixth reporting period, the City and the CPD maintained Preliminary compliance with ¶353, but did not reach Secondary compliance.

To assess Preliminary compliance with ¶353, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. The CPD's policies should be realistic and explicit to effectively address supervisory responsibilities across its broad spectrum of administration and operations.

To determine Secondary compliance with ¶353, we reviewed the CPD's training development, implementation, and evaluation (¶286); reviewed data sources relevant to the requirements of the paragraph; and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts. We also considered whether the relevant policies are effective in addressing the requirements of ¶353, that supervisors are trained effectively to operate in compliance with policies, and that there are sufficient supervisors to perform the functions. Additionally, we determined whether the CPD has demonstrated a plan to track, measure, and show compliance with this paragraph.

*Progress before the Seventh Reporting Period*

We provided a status update for ¶353 in the third reporting period and assessed the City and the CPD's compliance with ¶353 for the first time in the fourth reporting period. The City and the CPD reached Preliminary compliance in the fourth reporting period with the implementation of the *Supervisory Responsibilities* policy (G01-09). During the fifth reporting period, the IMT continued to monitor the CPD's efforts to conduct in-service training, which supervisors are required to attend. The CPD submitted a *2022 In-Service Training Plan* that includes an *In-Service Supervisors training* curriculum. We explained that, in future reporting periods, we hoped to see the CPD to acquire and implement technology solutions to help record, collect, and analyze data regarding supervisory responsibilities to achieve further levels of compliance.

In April 2022, members of the IMT observed the 2022 In-Service Supervisors Training, both in person and virtually. The training consisted of topics related to supervisory duties and managerial and leadership skills. In addition, supervisors are provided instructions on the methods and skills to improve *Tactical Response Reports* (TRRs) to correct a variety of errors and with an emphasis on improved report writing. In addition, the training includes developing soft skills necessary to have difficult but crucial conversations with members they supervise and the value of practicing internal procedural justice as a model for procedural justice in the community.

Further, the IMT reviewed the Performance Evaluation System (also known as the PES) Pilot Training and submitted a no-objection notice in April 2022. This training will help to support ¶353 by aiding supervisors in recognizing and documenting the job performance of department members under their command, such as exceptional job performance or adverse behavior that can be improved by non-disciplinary options. The City and the CPD also submitted a revised and updated the Officer Support System (also known as OSS) Pilot Training for IMT review in May 2022. This training will help to support ¶353 by assisting supervisors in proactively supporting sworn members of the CPD and to support the well-being of members in a non-disciplinary manner. The Performance Evaluation System and

Officer Support System were projected to be launched in the 6th District during the seventh reporting period.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the City and CPD maintained Preliminary compliance, but did not achieve Secondary compliance. In virtual meetings with members of the City and the CPD throughout the seventh reporting period, the IMT has been provided with updates on the progress of Officer Support System and Performance Evaluation System implementation plans.

Additionally, on July 21, 2022, the City and CPD produced Performance Evaluation System Training. The IMT submitted a no-objection letter on August 4, 2022. The IMT believes that the trainings were well-designed as they included adult learning methods and covered the required material. We observed the human resources portion of this training on November 4, 2022. It was well-received by the members and the instructors effectively engaged with the participants. IMT members noted that the CPD curriculum contained the components required by the Consent Decree and, in some areas, exceeded our expectations. An example of that is the focus on training the raters on the type of learner their employees are: auditory, kinesthetic, visual or reading/writing learners. This level of detail is not often seen in training materials on performance evaluation systems and can significantly impact how the employee receives feedback and encouragement. Further, the curriculum had a strong focus on identifying adverse behavior or misconduct and ensure that it is adequately addressed.

On December 7, 2022, members of the IMT observed the *Officer Support System Training*. This training was well-executed, explaining the purpose of the system, the model on which it was developed, and how supervisors should utilize it. Trainees were required to participate in a role-playing exercise where they were able to practice various techniques for the nuanced conversations they may need to engage in. Further, the training outline available resources and training that supervisors can suggest to officers in need.

<p style="text-align:center">***</p>

The City and the CPD maintained Preliminary compliance with ¶353 in the seventh reporting period, but did not reach Secondary compliance. The IMT continues to encourage the CPD to acquire and implement technology solutions to help record, collect, and analyze data regarding supervisory responsibilities to achieve Secondary compliance. With a great deal of focus being placed on the pilot district (the 6th District), the IMT will also focus on assessing unity of command and span of control, and monitoring whether supervisors have the time and appropriate span of control to properly meet the requirements of ¶353. The IMT will be closely

observing the rollout of the Officer Support System and Performance Evaluation System pilot.

### Paragraph 353 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶354

*354.* *During their tour of duty, immediate supervisors in the Bureau of Patrol will spend time interacting with, observing, and overseeing the members under their direct command, including time in the field, consistent with their duty assignment.*

## Compliance Progress  (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**  *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**  *Not in Compliance*
**Full:**  *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶354, but did not reach Secondary compliance.

For Preliminary compliance with ¶354, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

To evaluate Secondary compliance, the IMT reviewed data sources relevant to compliance with the requirements of ¶354 and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts, including written documentation and interviews with supervisors and officers under their command. The IMT also sought to review records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities required by ¶354. We also considered whether the CPD has allocated sufficient resources to create, staff, fill, and maintain positions with qualified personnel to fulfill the requirements of ¶354 and the Consent Decree.

*Progress before the Seventh Reporting Period*

We provided a status update for ¶354 in the third reporting period and assessed the City and the CPD's compliance with ¶354 for the first time in the fourth reporting period. The City and the CPD reached Preliminary compliance in the fourth reporting period by finalizing the *Supervisory Responsibilities* policy (G01-09). In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶354 by issuing G01-09. The CPD also developed and submitted a *2022 In-Service Supervisors Training* plan and curriculum and a revised D20-02, *Unity of Command and Span of Control Schedule – Pilot Program* policy. We noted, in future reporting periods, that we hoped to observe supervisory trainings for supervisors and review logs kept relating to the requirements of this paragraph.

During the sixth reporting period, the IMT was able to conduct focus groups with officer, supervisors, and command staff within the 6th District during an in-person site visit. These conversations provided additional insight into the realities of supervision and daily operations in the department. While officers we spoke with during these focus groups expressed that supervisors were supportive, they shared that high call volumes and low staffing are preventing sergeants from being able to develop and engage with the officers they supervise on a regular basis. In May 2022, the CPD shared that additional sergeants will be assigned to the 6th District.

Also during the site visit, the IMT observed roll-call and noted that sergeants and lieutenants debriefed situations that occurred on previous shifts with a focus on officer safety, community service, and policy clarifications. The IMT notes that these observations are an important step toward assessing further levels of compliance with ¶354.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the City and CPD maintained Preliminary compliance, but did not achieve Secondary compliance. The IMT conducted a site visit in August 2022. In focus groups conducted with officers and sergeants in the 6th district, we heard concerns about supervisors transitioning in and out of the 6th district, both at the sergeant and lieutenant levels. The consistent turnover of supervisors, whether actual or perceived, raises concerns to the IMT about whether members are receiving the level of supervision required by the Consent Decree. Members expressed keen interest in the opportunity to build relationships with supervisors, receive feedback, and have consistency in supervision.

Supervisory logs, which outline a supervisor's daily activities and tasks, would allow the IMT to better understand if this is occurring. Despite requests for at least the last three reporting periods, we have not received these. The CPD has, however, indicated that they intend to produce the logs in the next reporting period. Additionally, on December 15, 2022, the City and CPD produced district personnel rosters by rank for the sixth district. These rosters improved our understanding of the current staffing levels in the district.

<div align="center">***</div>

The IMT looks forward to the continued review of records and logs kept relating to the requirements of this paragraph. We encourage the CPD to maintain efforts aimed to acquire and implement technology systems that will allow for efficient and accurate capture of this information. Additionally, while the IMT recognizes this prioritization of staffing in the pilot district as a step in the right direction, we would like to see a sufficient amount of sergeants maintained over time. To

accurately assess staffing levels, we look forward to receiving additional personnel rosters as CPD makes updates.

### Paragraph 354 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| Preliminary |

# Supervision: ¶355

> *355. Immediate supervisors will be required to document their actions taken with members under their direct command, pursuant to CPD policy, including, but not limited to: a. non-disciplinary or corrective actions, including, but not limited to, those taken pursuant to any internal or external review of the conduct of CPD officers or taken pursuant to the operation of any existing and future automated electronic systems contemplated by Part D of the Data Collection, Analysis, and Management section of this Agreement; b. disciplinary referrals; c. response to incident scenes as required by CPD policy; d. observations of member conduct, as required by CPD policy; and e. reviews and investigations of reportable uses of force and other reports required by CPD policy and this Agreement.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶355, but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶355, we reviewed the CPD's relevant policies following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

For Secondary compliance, the IMT reviewed the CPD's training development, implementation, and evaluation (¶286). The IMT reviewed records regarding whether the CPD has qualified personnel fulfilling the responsibilities required by ¶355. Additionally, the IMT looked for evidence that the CPD has trained supervisors to comply with relevant portions of G01-09 and reviewed evidence and data sources showing how supervisors will be documenting their engagements with their subordinates, including but not limited to supervisory logs, Performance Evaluation System entries, training materials, and other types of entries and forms the CPD will use to comply with the requirements of ¶355.

*Progress before the Seventh Reporting Period*

In previous reporting periods, we reviewed draft versions of the *Supervisory Responsibilities* policy. The collaborative process used to review and revise such documents was ongoing at the end of the third reporting period. In the fourth

reporting period, after revising, posting for public comment, and finalizing *Supervisory Responsibilities*, G01-09, the City and the CPD reached Preliminary compliance with ¶355. In the fifth reporting period, the City and the CPD maintained Preliminary compliance by finalizing and issuing two other policies supporting ¶355: the *Officer Support System Pilot Program (OSS)* policy (D20-04) and the *Performance Evaluation System Pilot Program (PES)* policy (D21-09). To further support the requirements of ¶355 the CPD developed and submitted a *2022 In-Service Supervisors Training* plan and curriculum.

We explained that, for the CPD to reach subsequent levels of compliance, we will look for evidence that the CPD has trained supervisors to comply with relevant policy, and for data that demonstrates informative engagement with supervisors and those serving under their command. The IMT would also look to review supervisory logs that are used to capture supervisors work during their shifts relating to the requirements of this paragraph.

In the sixth reporting period, the IMT observed the 2022 In-Service Supervisors Training which included learning objectives in support of ¶355, such as the consequences at the supervisory level regarding the failure of initiating a complaint investigation, turning a complaint into a positive community interaction, and requirements for completing a Tactical Response Report (TRR), along with report writing issues and recent changes to the Use of Force and related policies.

Additionally, the IMT reviewed the *Performance Evaluation System (PES) Pilot Training* and submitted a no-objection notice in April 2022. This training will help to support ¶355 by aiding supervisors in recognizing and documenting the job performance and conduct of department members under their command, such as exceptional job performance or adverse behavior that can be improved by non-disciplinary options. The IMT observed the *Officer Support System (OSS) Pilot Training* December 2022. This training helps to support ¶355 by assisting supervisors in proactively supporting sworn members of the CPD and to support the well-being of members in a non-disciplinary manner. The Performance Evaluation System and Officer Support System were projected to be launched in the 6th District during the seventh reporting period.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the City and CPD maintained Preliminary compliance, but did not achieve Secondary compliance. In virtual meetings with members of the City and the CPD throughout the seventh reporting period, the IMT has been provided with updates on the progress of Officer Support System and Performance Evaluation System implementation plans.

Additionally, on July 21, 2022, the City and CPD produced *Performance Evaluation System Training*. The IMT submitted a no-objection letter on August 4, 2022. The IMT believes that the trainings were well-designed as they included adult learning methods and covered the required material. We observed the human resources portion of this training on November 4, 2022. It was well-received by the members and the instructors effectively engaged with the participants.

Further, on December 7, 2022, members of the IMT observed the *Officer Support System Training*. This training was well-executed, explaining the purpose of the system, the model on which it was developed, and how supervisors should utilize it. There was a focus on the fact that this system is non-disciplinary and corrective in nature. Trainees were required to participate in a role-playing exercise where they were able to practice various techniques for the nuanced conversations they may need to engage in.

<center>***</center>

The IMT looks forward to reviewing supervisory logs that are used to capture supervisors work during their shifts relating to the requirements of this paragraph. We encourage the CPD to maintain efforts aimed to acquire and implement technology systems that will allow for efficient and accurate capture of this information. Additionally, the IMT looks forward to observing the rollout of the Officer Support and Performance Systems trainings, along with how they are utilized and tracked. Further, the IMT will review the forthcoming evaluation plans for the Officer Support System, Performance Evaluation System, and Unity of Command and Span of Control pilots. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs.

### Paragraph 355 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶356

*356. As otherwise set out in this Agreement, CPD will ensure that it makes staffing and allocation decisions that provide for: a. the number of patrol field supervisors to ensure span of control and unity of command as required in this Part; b. the number of well-trained, qualified FTOs, as required in Part H of the Training section of this Agreement; c. the number of well-trained, qualified staff to train recruits and officers, as required in Part D of the Training section of this Agreement; d. the number of well-trained, qualified staff to conduct timely misconduct investigations, as required in the Accountability and Transparency section of this Agreement; e. the number of certified CIT Officers, as required in Part D of the Crisis Intervention section of this Agreement; and f. the number of officer assistance and wellness staff as required in the Officer Wellness and Support section of this Agreement.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**          *Not in Compliance*
**Secondary:**          *Not Yet Assessed*
**Full:**          *Not Yet Assessed*

The City and the CPD have not yet reached Preliminary compliance with ¶356.

To evaluate Preliminary compliance with ¶356, we considered, among other things, whether the CPD developed a plan to ensure that staffing and allocation decisions comply with the staffing requirements of this paragraph and whether the CPD completed a comprehensive staffing study to inform a realistic and effective staffing plan. We also considered the CPD's relevant policies and materials following the process described in the Consent Decree (¶¶626–41).

*Progress before the Seventh Reporting Period*

In previous reporting periods, we recognized that the CPD took steps toward compliance with subsections of ¶356. For example, they increased the staffing levels of the Professional Counseling Division to comply with subsection (f). Despite these efforts, the City and the CPD did not reach Preliminary compliance in the fourth reporting period because, by the end of the reporting period, the CPD had not yet demonstrated that it had an actionable plan to meet all staffing requirements set out in ¶356.

Still, in the fourth reporting period, the CPD expanded the Unity of Command and Span of Control Pilot Program to two additional districts. The program was initially

piloted in the 6th District and, in the fourth reporting period, the CPD expanded the pilot program into the 4th and 7th districts as well. In the fourth reporting period, through virtual site visits conducted with several officers and sergeants from the 4th, 6th, and 7th districts, we learned that unity-of-command and span-of-control efforts had not played out on the ground as D20-02 directs. Many members were supportive of unity-of-command and span-of-control concepts that the pilot program intends to achieve. Many of these officers believed that, if properly staffed, the program could benefit the CPD and Chicago's communities. The CPD has since limited the pilot back to the 6th District.

The CPD made notable progress in the fifth reporting period by revising and finalizing D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. Additionally, the IMT noted the formation of the Unity of Command and Span of Control Program Evaluation Committee. The CPD also made progress toward other ¶356 requirements. For example, the *Field Training and Evaluation Program* policy (S11-02), which requires a one-to-one ratio of Field Training Officers to Probationary Police Officers, was finalized and published.

We explained in previous reports that, for the CPD to reach subsequent levels of compliance, the CPD needed to demonstrate an actionable plan to ensure that all staffing and allocation decisions were made in a manner consistent with all the requirements of ¶356. To do this, we explained that the CPD would need to complete a comprehensive staffing study to inform a realistic and effective staffing plan.

In the sixth reporting period, the IMT provided feedback on staffing issues regarding unity of command/span of control, and the CPD made some adjustments accordingly. The CPD also provided updates on the status of their staffing dashboard, which will enable supervisors to better monitor officers assignments and span of control between sergeants and officers. During meetings with the City, the CPD, and the OAG, the CPD also discussed the staffing dashboard's management tools for making staffing and operational decisions that it believes would enhance unity of command/span of control.

To meet the requirements of ¶356, it is critical to meet the staffing objectives required to achieve unity of command and span of control throughout all 22 districts. With staffing challenges related to time off, officer stress, service demands, and increases in violent crime, it is imperative that the CPD conduct a staffing study that is focused as an internal guide to help consistently maintain and manage unity of command and span of control.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the City and CPD maintained Preliminary compliance, but did not achieve Secondary compliance. On October 6, 2022, the

City and CPD produced an updated D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. The IMT provided comments on November 5, 2022. We believed the policy to be well-written and commended the department for their effort to include aspects of the related pilot programs, Performance Evaluation System and Officer Support System, in D20-02. However, we also noted the need for clarity about the intent of CPD to use "an average" of ten officers per sergeant for span of control.

In virtual meetings with members of the City and the CPD throughout the seventh reporting period, the IMT has been provided with updates on the staffing dashboard's management tools for making staffing and operational decisions that it believes would enhance unity of command/span of control.

The IMT conducted a site visit in August 2022. In focus groups conducted with officers and sergeants in the 6th district, we heard concerns about supervisors transitioning in and out of the 6th district, both at the sergeant and lieutenant levels. The consistent turnover of supervisors, whether actual or perceived, raises concerns to the IMT about whether members are receiving the level of supervision required by the Consent Decree. Members expressed keen interest in the opportunity to build relationships with supervisors, receive feedback, and have consistency in supervision.

Supervisory logs, which outline a supervisor's daily activities and tasks, would allow the IMT to better understand if this is occurring. Despite requests for at least the last three reporting periods, we have not received these. The CPD has, however, indicated that they intend to produce the logs in the next reporting period. Concerns about the future expansion of pilot programs due to a lack of prioritization of staffing were also shared by supervisors. Members specifically highlighted cancelled days off and tiered deployments as points of contention affecting morale and consistency of supervision in the department.

Further, on December 8, 2022, the City and CPD produced a briefing about projections of the ratio of field training officers to probationary police officers. This document highlights the potential for a deficit if no action by the CPD is taken to acquire 280 FTOs in 2023. The failure of the CPD to do so would affect their ability to meet the requirements of this paragraph.

\*\*\*

The City and the CPD did not achieve Preliminary compliance with ¶356 in the seventh reporting period. To reach Preliminary compliance with ¶356, the CPD must demonstrate an actionable plan to ensure that all staffing and allocation decisions are made in a manner consistent with the requirements of ¶356. The CPD will need to complete a comprehensive staffing study to inform a realistic and effective staffing plan. The CPD has shared that they plan to conduct a Workforce

Allocation Study to develop a staffing model along with recommendations on transfer procedures in the eighth reporting period. We look forward to receiving this information and continuing to consult with the CPD and the City as they undertake these efforts.

## Paragraph 356 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| None |

# Supervision: ¶357

**357.** *The City and the CPD will deploy a sufficient amount of qualified supervisors to provide effective supervision, as outlined in this section.*

## Compliance Progress — (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The City and the CPD have not yet reached Preliminary compliance with ¶357.

To evaluate Preliminary compliance with ¶357, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

### Progress before the Seventh Reporting Period

We assessed the requirements of ¶357 for the first time in the sixth reporting period. Prior to the sixth reporting period, the CPD finalized D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. The policy defines both unity of command and span of control and explains how they are designed to afford consistency within patrol areas and create manageable officer-to-sergeant ratios. D20-02 also identifies a Tableau Dashboard that provides participating districts visual data verification for the fulfilment of the district's required operations with unity of command and span of control.

During the sixth reporting period, the CPD shared that they plan to conduct a Workforce Allocation Study to develop a staffing model along with recommendations on transfer procedures in the seventh reporting period. The CPD also shared that they plan to assign additional sergeants to the 6th District during this reporting period, which is the primary pilot district.

### Progress in the Seventh Reporting Period

In the seventh reporting period, the City and CPD did not achieve Preliminary compliance with ¶357. On October 6, 2022, the City and CPD produced an updated D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. The IMT provided comments on November 5, 2022. We believed the policy to be well-written and commended the department for their effort to include aspects of the related pilot programs, Performance Evaluation System and Officer Support System, in D20-02. However, we also noted the need for clarity about the intent of CPD to use "an average" of ten officers per sergeant for span of control.

In virtual meetings with members of the City and the CPD throughout the seventh reporting period, the IMT has been provided with updates on the staffing dashboard's management tools for making staffing and operational decisions that it believes would enhance unity of command/span of control.

The IMT conducted a site visit in August 2022. In focus groups conducted with officers and sergeants in the 6th district, we heard concerns about supervisors transitioning in and out of the 6th district, both at the sergeant and lieutenant levels. The consistent turnover of supervisors, whether actual or perceived, raises concerns to the IMT about whether members are receiving the level of supervision required by the Consent Decree. Members expressed keen interest in the opportunity to build relationships with supervisors, receive feedback, and have consistency in supervision.

Supervisory logs, which outline a supervisor's daily activities and tasks, would allow the IMT to better understand if this is occurring. Despite requests for at least the last three reporting periods, we have not received these. The CPD has, however, indicated that they intend to produce the logs in the next reporting period. Concerns about the future expansion of pilot programs due to a lack of prioritization of staffing were also shared by supervisors. Members specifically highlighted cancelled days off and tiered deployments as points of contention affecting morale and consistency of supervision in the department.

*** 

The City and the CPD did not achieve Preliminary compliance with ¶357 in the seventh reporting period. To reach Preliminary compliance, the CPD must demonstrate an actionable plan to ensure that all staffing and allocation decisions are made in a manner consistent with the requirements of ¶357. The CPD will need to complete a comprehensive staffing study to inform a realistic and effective staffing plan.

The CPD shared that they plan to conduct a Workforce Allocation Study to develop a staffing model along with recommendations on transfer procedures in the seventh reporting period. However, we saw no evidence of this study during the seventh reporting period. We look forward to receiving this information and continuing to consult with the CPD and the City as they undertake these efforts. We also look forward to reviewing the contents of the CPD staffing dashboard, assignment sheets, and other records, to include transfer orders. Additionally, we hope to conduct further interviews and focus groups with members of the pilot district.

## Paragraph 357 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Not Applicable

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Not Applicable

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
None

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

# Supervision: ¶359

> **359.** *CPD will ensure that the principles of unity of command and span of control are realized for watch personnel assigned to field units within district law enforcement.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶359 in the seventh reporting period.

To evaluate Preliminary compliance with ¶359, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, the IMT sought to review data sources relevant to compliance with the requirements of ¶359 and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts.

*Progress before the Seventh Reporting Period*

We assessed the requirements of ¶359 for the first time in the sixth reporting period. In the fifth reporting period, the CPD finalized D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. The policy defines both unity of command and span of control and explains how they are designed to afford consistency within patrol areas and create manageable officer-to-sergeant ratios. D20-02 also identifies a Tableau Dashboard that provides participating districts visual data verification for the fulfilment of the district's required operations with Unity of Command and Span of Control.

During the sixth reporting period, the City and the CPD produced BOP #22-0049 *Unity of Command Span of Control Briefing for Newly Assigned Members*. This is a brief training conducted by a commander with new members and supervisors of the 6th District, which outlines the core principles of unity of command and span of control along with their importance.

*Progress in the Seventh Reporting Period*

In the previous reporting period, the City and the CPD requested technical assistance from the IMT regarding the Unity of Command and Span of Control Pilot Program. This was provided to CPD and the City throughout the seventh reporting period. As a result, the City and CPD developed a new staffing model to address a

number of the shortcomings of the pod model. This new model will focus on three tenets: geographic familiarity, high-quality supervision, and resource flexibility. The CPD shared that it intends to implement the new model beginning in the first quarter of 2023.

The IMT conducted a site visit in August 2022. We met with members of the Office of Constitutional Reform along with Bureau of Patrol to hear further about CPD-conducted focus groups with members of the 6th district, as multiple pilots were set to begin. These pilots, and specifically, the Unity of Command and Span of Control pilot would have required changes to the current partner structure along with scheduling shifts. With school beginning in September 2022 and shift bid changes later in the year, the CPD shared that many focus groups members raised concerns about pilot implementation beginning in the seventh reporting period. The IMT recognize that the support of pilot participants is integral to the success of the pilot, and eventually, the expansion of these programs to the entire department. The IMT is supportive of the decision by the City and CPD to begin implementation in the eighth reporting period.

On October 6, 2022, the City and CPD produced an updated D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. The IMT provided comments on November 5, 2022. We believed the policy to be well-written and commended the department for their effort to include aspects of the related pilot programs, Performance Evaluation System and Officer Support System, in D20-02. However, we also noted the need for clarity about the intent of CPD to use "an average" of ten officers per sergeant for span of control.

\*\*\*

In the eighth reporting period, the IMT will be closely observing the rollout of the Unity of Command and Span of Control, Officer Support System, and Performance Evaluation System pilot programs. We look forward to reviewing the contents of the CPD dashboard, assignment sheets, transfer orders, and other relevant records. Additionally, we hope to conduct further interviews and focus groups with members of the pilot district. The IMT anticipates observing training related to the Unity of Command and Span of Control Pilot Program along with evaluations of that training. Further, the IMT will review the forthcoming evaluation plans for the Officer Support System, Performance Evaluation System, and Unity of Command and Span of Control pilot programs. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs.

## Paragraph 359 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Not Applicable

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Not Applicable

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Supervision: ¶360

**360.** *By January 1, 2020, CPD will develop a staffing model to achieve the principles of unity of command and span of control. CPD's staffing model will identify methods to implement unity of command and a span of control ratio of no more than ten officers to one Sergeant for all field units on each watch in each of CPD's patrol districts. To achieve this objective, CPD will maintain, at a minimum, one Sergeant for each sector.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance in the seventh reporting period, but did not reach Secondary compliance with ¶360.

To evaluate Preliminary compliance with ¶360, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of the paragraph and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts.

For Secondary compliance, we reviewed whether the City and the CPD assessed the Unity of Command and Span of Control Pilot Program, made adjustments to ensure successful implementation of the program's requirements in the pilot districts, and established an evaluation committee to oversee the pilot program. We also reviewed data sources, including systems for tracking and auditing to monitor staffing assignments and levels; training development, implementation, and evaluation (¶286). We also sought to review records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities required by ¶360, including the development and implementation of an optimal staffing model to allow for more consistent staffing of the pilot districts.

*Progress before the Seventh Reporting Period*

The City and the CPD reached Preliminary compliance with ¶360 in the second reporting period by launching the Unity of Command and Span of Control Pilot Program in the 6th District. In the third reporting period, we recognized that the CPD faced unanticipated challenges during the third reporting period—including the COVID-19 pandemic—that limited the CPD's ability to allocate sufficient

attention toward the pilot program. We also emphasized that the staffing model would need to be critically reviewed to appropriately adjust the model to address the unique needs of the districts into which the pilot program had not yet been expanded. Despite this, we commended the efforts of the CPD's Audit Division, which conducted an assessment, identified areas of improvement, and expressed a continued optimism for the pilot program moving forward.

During the fourth reporting period, the CPD expanded the Unity of Command and Span of Control Pilot Program from the 6th District into the 4th and 7th districts. We noted that, since beginning the pilot in the second reporting period, the CPD had struggled to identify a sustainable path toward full, department-wide compliance with ¶360 in three critical areas that posed a challenge to the CPD's maintaining Preliminary compliance and achieving Secondary compliance:

(1) the CPD must continue developing and instituting an optimal staffing model to allow for a more consistent staffing of the pilot districts;

(2) the CPD must enhance their tracking, data, and auditing systems to monitor staffing assignments and levels; and

(3) the CPD must establish an evaluation committee, which the IMT believes is central to providing the oversight the Unity of Command and Span of Control Pilot Programs needs to effectively expand.

A variety of factors appeared to be causing this inconsistent staffing, such as a near-weekly detailing of officers and sergeants to other assignments, both within their districts and outside of their districts. Additionally, we noted that these continued staff shortages demonstrated that the Unity of Command and Span of Control Pilot Program was not working as planned. As we explained: "While creating a plan or policy that requires the staffing model outlined by ¶360 is necessary, the plan or policy must allow the CPD to '*achieve* the principle of unity of command and span of control.'"

The Unity of Command and Span of Control program had been in place for two reporting periods and in multiple districts, yet none of those districts have reached or maintained the staffing levels required by ¶360. This suggested that the plan or policy was either not realistic or was not being properly supported by necessary resources. We encouraged the CPD to dedicate attention and resources to either ensuring that the pilot districts are properly staffed or adjusting the pilot program so that it is realistic and provides guidance to allow for future compliance with ¶360 and other related paragraphs. We explained that, if issues identified with the pilot program were not addressed, the City and the CPD could lose Preliminary compliance with this paragraph.

In the fifth reporting period, the City and the CPD maintained Preliminary compliance with ¶360 by revising *Unity of Command and Span of Control – Pilot Program* (D20-02). The revised D20-02 directive incorporated feedback from the IMT and the OAG. The IMT also reviewed the Sergeant's District Deployment Initiative, which was issued via an Administrative Message on August 3, 2021. In addition to the Sergeants Initiative, the CPD produced an Agreement signed in December 2020 between the CPD's Labor Relations Division and the Fraternal Order of Police, which settled a conflict about regular days off with the creation of an overtime initiative for police officers. We shared our hopes to have further conversations about the unity of command/span of control staffing models and to observe future Evaluation Committee meetings in the sixth reporting period.

In the sixth reporting period, the City and the CPD produced BOP #22-0049 *Unity of Command Span of Control Briefing for Newly Assigned Members*. This is a brief training conducted by a commander with new members and supervisors of the 6th District, which outlines the core principles of unity of command and span of control along with their importance.

Also during the sixth reporting period, the IMT attended several virtual and in-person site visits and conducted focus groups with officers and sergeants. As in the fifth reporting period, we heard a great deal of frustration expressed about inconsistent supervision and staffing shortages, which made it very difficult to achieve unity of command/span of control throughout the ranks. During meetings with the City, the CPD, and the OAG, the CPD also discussed the staffing dashboard's management tools for making staffing and operational decisions, such as an electronic watch assignment sheet from the 6th District which allows the CPD to (at a glance) give supervisors the ability to see span of control and unity of command alignment. The CPD also shared that they plan to assign additional sergeants to the 6th District during this reporting period, which is the primary pilot district.

The City and the CPD implemented a new pod supervision structure (primary, secondary, and tertiary role for supervisors). However, during the IMT's conversations with command staff, officers, and supervisors, the results of the pod supervision structure did not consistently result in unity of command.

The IMT recognizes that the CPD has convened a Unity of Command and Span of Control Pilot Program Evaluation Committee, which is to meet at least quarterly to discuss implementation progress and share feedback from department members. The IMT observed one evaluation committee meeting on June 2, 2022. It is the hope of the IMT that the committee will be able to anticipate and address some of the possible challenges in order to ensure a smoother implementation process for when the pilot programs are expanded into other districts.

*Progress in the Seventh Reporting Period*

In April 2022, during the sixth reporting period, the City and the CPD requested technical assistance from the IMT regarding the Unity of Command and Span of Control Pilot Program. This was provided to CPD and the City throughout the seventh reporting period. As a result, the City and CPD developed a new staffing model to address a number of the shortcomings of the pod model. This new model will focus on three tenets: geographic familiarity, high-quality supervision, and resource flexibility. It will be implemented beginning in the first quarter of 2023.

The IMT conducted a site visit in August 2022. We met with members of the Office of Constitutional Reform along with Bureau of Patrol to hear further about CPD-conducted focus groups with members of the 6th district, as multiple pilots were set to begin. These pilots, and specifically, the Unity of Command and Span of Control pilot would have required changes to the current partner structure along with scheduling shifts. With school beginning in September 2022 and shift bid changes later in the year, the CPD shared that many focus groups members raised concerns about pilot implementation beginning in the seventh reporting period. The IMT recognize that the support of pilot participants is integral to the success of the pilot, and eventually, the expansion of these programs to the entire department. The IMT is supportive of the decision by the City and CPD to begin implementation in the eighth reporting period.

On October 6, 2022, the City and CPD produced an updated D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. The IMT provided comments on November 5, 2022. We believed the policy to be well-written and commended the department for their effort to include aspects of the related pilot programs, Performance Evaluation System and Officer Support System, in D20-02. However, we also noted the need for clarity about the intent of CPD to use "an average" of ten officers per sergeant for span of control.

For the last two reporting periods, the City and CPD have shared their intentions to conduct a staffing allocation study and provide the results to the IMT. We are still awaiting this information as it is foundational to the successful implementation of the Unity of Command and Span of Control pilot. This is particularly important as CPD works to expand the pilot to further districts.

*** 

The City and the CPD maintained Preliminary compliance with ¶360 in the seventh reporting period, but did not reach Secondary compliance. In the eighth reporting period, we look forward to reviewing data relevant to the program such as the contents of the staffing dashboard, assignment sheets, transfer orders, and other relevant records. Additionally, we hope to conduct further interviews and focus groups with members of the pilot district. The IMT will be closely observing the

rollout of the Unity of Command and Span of Control, Officer Support System, and Performance Evaluation System pilot programs. Further, we plan to observe further evaluation committee meetings and hope to see a shift from a briefing model to more collaborative and conversational structure. The IMT will review the forthcoming evaluation plans for the Officer Support System, Performance Evaluation System, and Unity of Command and Span of Control pilot programs. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs.

## Paragraph 360 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶361

*361. In order to achieve unity of command and a span of control of no more than ten officers to one Sergeant in the field units on each watch in each patrol district, the staffing model may consider: a. staffing requirements for watch operations, including, but not limited to, watch personnel assigned to field duties and watch administration functions; b. staffing requirements for all other district law enforcement functions, including, but not limited to, district administration, community policing, and tactical teams; c. data-driven resource allocation methods incorporating district-specific factors, including, but not limited to, calls for service, public violence, and property crime; and d. any other considerations CPD deems relevant to achieving unity of command and a span of control ratio of no more than ten officers to one Sergeant in all field units on each watch of the City's patrol districts.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶361 in the seventh reporting period, but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶361, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. The IMT reviewed data sources relevant to compliance with the requirements of the paragraph and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts. The IMT also reviewed records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities required by ¶361.

For Secondary compliance, the IMT looked for the development of additional permanent solutions to address staffing, the redeployment of additional resources in patrol districts, and further conversation about a staffing model that will sustain the unity of command and span of control requirements within this paragraph. The CPD should also continue the development of technology, such as staffing dashboards, that can timely track compliance.

*Progress before the Seventh Reporting Period*

The IMT assessed ¶361 for the first time during the fifth reporting period. In the fifth reporting period, the City and the CPD obtained Preliminary compliance with ¶361 by finalizing the *Unity of Command and Span of Control – Pilot Program* (D20-02). The policy addresses various requirements of ¶361, such as clearly defining unity of command and span of control. The policy also addresses staffing requirements for other district personnel and their role in supporting unity of command and span of control. Further, policy D20-02 identifies a data dashboard that provides participating districts visual data verification for the fulfilment of the district's required operations with span of control and unity of command.

The IMT also reviewed the Sergeant's District Deployment Initiative, which was issued via an Administrative Message on August 3, 2021. In addition to the Sergeants Initiative, the CPD produced an Agreement signed in December 2020 between CPD's Labor Relations Division and the Fraternal Order of Police, which settled a conflict about regular days off with the creation of an overtime initiative for police officers.

We shared that, in future reporting periods, the IMT would look forward to the development of additional permanent solutions to address staffing, the redeployment of additional resources in patrol districts, and further conversation about a staffing model that will sustain the unity of command and span of control requirements within this paragraph.

In the sixth reporting period, the IMT attended several virtual and in-person site visits and conducted focus groups with officers and sergeants. As in the fifth reporting period, we heard a great deal of frustration expressed about inconsistent supervision and staffing shortages, which made it very difficult to achieve unity of command/span of control throughout the ranks. During meetings with the City, the CPD, and the OAG, the CPD also discussed the staffing dashboard's management tools for making staffing and operational decisions that it believes would enhance unity of command/span of control. The CPD also shared that they plan to assign additional sergeants to the 6th District during this reporting period, which is the primary pilot district.

The City and the CPD implemented a new pod supervision structure (primary, secondary, and tertiary role for supervisors) in the fifth reporting period. However, during the IMT's conversations with command staff, officers, and supervisors, the results of the pod supervision structure did not consistently result in unity of command. In April 2022, the City and the CPD requested technical assistance from the IMT regarding the Unity of Command and Span of Control Pilot Program. In late June, during the first technical assistance meeting, the City and the CPD shared their plans to develop a new staffing model to address a number of the shortcomings of the pod model.

The IMT recognizes that the CPD has convened a Unity of Command and Span of Control Pilot Program Evaluation Committee, which is to meet at least quarterly to discuss implementation progress and share feedback from department members. The IMT observed one evaluation committee meeting on June 2, 2022. It is the hope of the IMT that the committee will be able to anticipate and address some of the possible challenges in order to ensure a smoother implementation process when expanding into other districts.

*Progress in the Seventh Reporting Period*

Throughout the seventh reporting period, the IMT provided technical assistance to the CPD regarding the Unity of Command and Span of Control Pilot Program. As a result, the City and CPD developed a new staffing model to address a number of the shortcomings of the pod model. This new model will focus on three tenets: geographic familiarity, high-quality supervision, and resource flexibility. The CPD anticipates implementing this new model beginning in the first quarter of 2023.

The IMT conducted a site visit in August 2022. We met with members of the Office of Constitutional Reform along with Bureau of Patrol to hear further about CPD-conducted focus groups with members of the 6th district, as multiple pilots were set to begin. These pilots, and specifically, the Unity of Command and Span of Control pilot would have required changes to the current partner structure along with scheduling shifts. With school beginning in September 2022 and shift bid changes later in the year, the CPD shared that many focus groups members raised concerns about pilot implementation beginning in the seventh reporting period. The IMT recognize that the support of pilot participants is integral to the success of the pilot, and eventually, the expansion of these programs to the entire department. The IMT is supportive of the decision by the City and CPD to begin implementation in the eighth reporting period.

On October 6, 2022, the City and CPD produced an updated D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. The IMT provided comments on November 5, 2022. We believed the policy to be well-written and commended the department for their effort to include aspects of the related pilot programs, Performance Evaluation System and Officer Support System, in D20-02. However, we also noted the need for clarity about the intent of CPD to use "an average" of ten officers per sergeant for span of control.

For the last two reporting periods, the City and CPD have shared their intentions to conduct a staffing allocation study to aid in the development of an effective staffing model, along with recommendations on transfer procedures in the seventh reporting period. We are still awaiting this information as it is foundational to the successful implementation of the Unity of Command and Span of Control pilot. We look forward to receiving this information and continuing to consult with

the CPD and the City as they undertake these efforts. This is particularly important as CPD works to expand the pilot to further districts.

\*\*\*

The City and the CPD maintained Preliminary compliance with ¶361 in the seventh reporting period, but did not reach Secondary compliance. In the eighth reporting period, we look forward to reviewing data relevant to the program such as the contents of the staffing dashboard, assignment sheets, transfer orders, and other relevant records. Additionally, we hope to conduct further interviews and focus groups with members of the pilot district. The IMT will be closely observing the rollout of the Unity of Command and Span of Control, Officer Support System, and Performance Evaluation System pilot programs.

Further, we plan to observe further evaluation committee meetings and hope to see a shift from a briefing model to more collaborative and conversational structure. The IMT will review the forthcoming evaluation plans for the Officer Support System, Performance Evaluation System, and Unity of Command and Span of Control pilot programs. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs.

### Paragraph 361 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶362

> **362.** *By January 1, 2020, CPD will develop a system and protocols to allow the Department to assess, both long-term and on a day-to-day basis, whether field units on each watch in each patrol district meet the requirements for unity of command and span of control.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶362 in the seventh reporting period, but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶362, we reviewed the CPD's relevant policies following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also considered data sources, such as information and insights of officers gathered during virtual site visits and audit results, which was necessary or helpful to identify, verify, and sustain compliance with review. To assess Secondary compliance, the IMT reviewed, among other things, the CPD's training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

The City and the CPD did not reach any level of compliance with ¶362 until the fifth reporting period. As with ¶360, compliance with ¶362 was likely slowed by unanticipated challenges that the City and the CPD faced during the third reporting period. Despite this, the CPD implemented a dashboard intended to display data regarding compliance with unity of command and span of control requirements. By the end of the third reporting period, more work was still needed to ensure data reliability.

In the fourth reporting period, we conducted virtual site visits with officers in the three districts with the Unity of Command and Span of Control Pilot Program (4th, 6th, and 7th) to hear their thoughts and observations concerning the implementation and management of the pilot program. Officers expressed that the pilot program concepts allowed for building strong teams that work consistently with one another, better support one another, and better leverage each other's strengths. Many sergeants expressed a belief that the pilot program concepts provide the benefit of working with the same team members on a regular basis, which allow them to better engage, guide, and set expectations for their

officers and full team. However, the pilot program was not being implemented on the ground in accordance with the program policy or its concepts. We noted that the CPD's own audit—along with the feedback we received during site visits—demonstrated that field units on each watch, in each district, were not meeting the requirements for unity of command and span of control.

In our report for the third reporting period, we noted that the CPD implemented a dashboard intended to display data regarding compliance with the unity of command and span of control requirements. In the fourth reporting period, however, the CPD did not provide us additional information regarding this dashboard or data coming out of this dashboard. Therefore, the City and the CPD did not reach Preliminary compliance in the fourth reporting period. In the third and fourth reporting periods, we suggested that the CPD should work to ensure that data underlying the dashboard was up to date and reliable.

In the fifth reporting period, the City and the CPD obtained Preliminary compliance with ¶362 by finalizing the *Unity of Command and Span of Control – Pilot Program* policy (D20-02). Policy D20-02 identifies a data dashboard that provides participating districts visual data verification for the fulfilment of the district's required operations with span of control and unity of command. During monthly meetings and site visit, the CPD provided brief updates on the status of their staffing dashboard, which will enable supervisors to better monitor officers assignments and span of control between sergeants and officers. However, the IMT has yet to receive comprehensive information about the tracking mechanism.

During the sixth reporting period, the City and the CPD produced BOP #22-0049 *Unity of Command Span of Control Briefing for Newly Assigned Members*. This is a brief training conducted by a commander with new members and supervisors of the 6th District which outlines the core principles of Unity of Command and Span of Control along with their importance.

The CPD convened a Unity of Command and Span of Control Pilot Program Evaluation Committee, which is to meet at least quarterly to discuss implementation progress and share feedback from department members. The IMT observed one evaluation committee meeting on June 2, 2022. It is the hope of the IMT that the committee will be able to anticipate and address a number of the possible challenges in order to ensure a smoother implementation process.

*Progress in the Seventh Reporting Period*

In April 2022, the City and the CPD requested technical assistance from the IMT regarding the Unity of Command and Span of Control Pilot Program. This was provided to CPD and the City throughout the seventh reporting period. As a result, the City and CPD developed a new staffing model to address a number of the shortcomings of the pod model. This new model will focus on three tenets:

geographic familiarity, high-quality supervision, and resource flexibility. It is expected be implemented beginning in the first quarter of 2023.

The IMT conducted a site visit in August 2022. We met with members of the Office of Constitutional Reform along with Bureau of Patrol to hear further about CPD-conducted focus groups with members of the 6th district, as multiple pilots were set to begin. These pilots, and specifically, the Unity of Command and Span of Control pilot would have required changes to the current partner structure along with scheduling shifts. With school beginning in September 2022 and shift bid changes later in the year, the CPD shared that many focus groups members raised concerns about pilot implementation beginning in the seventh reporting period. The IMT recognize that the support of pilot participants is integral to the success of the pilot, and eventually, the expansion of these programs to the entire department. The IMT is supportive of the decision by the City and CPD to begin implementation in the eighth reporting period.

On October 6, 2022, the City and CPD produced an updated D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. The IMT provided comments on November 5, 2022. We believed the policy to be well-written and commended the department for their effort to include aspects of the related pilot programs, Performance Evaluation System and Officer Support System, in D20-02. However, we also noted the need for clarity about the intent of CPD to use "an average" of ten officers per sergeant for span of control.

For the last two reporting periods, the City and CPD have shared their intentions to conduct a staffing allocation study to aid in the development of an effective staffing model, along with recommendations on transfer procedures in the seventh reporting period. We are still awaiting this information as it is foundational to the successful implementation of the Unity of Command and Span of Control Pilot Program. We look forward to receiving this information and continuing to consult with the CPD and the City as they undertake these efforts. This is particularly important as CPD works to expand the pilot to further districts.

\*\*\*

The City and the CPD maintained Preliminary compliance with ¶362 in the seventh reporting period, but did not reach Secondary compliance. In the eighth reporting period, we look forward to reviewing data relevant to the program such as the contents of the staffing dashboard, assignment sheets, transfer orders, and other relevant records. Additionally, we hope to conduct further interviews and focus groups with members of the pilot district. The IMT will be closely observing the rollout of the Unity of Command and Span of Control, Officer Support System, and Performance Evaluation System pilot programs.

Further, we plan to observe further evaluation committee meetings and hope to see a shift from a briefing model to more collaborative and conversational structure. The IMT will review the forthcoming evaluation plans for the Officer Support System, Performance Evaluation System, and Unity of Command and Span of Control pilot programs. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs.

### Paragraph 362 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶363

**363.** *When calculating the span of control ratios for field units, CPD may not use department-wide averages or factor in span of control ratios for Bureau of Patrol units or functions that are not included in the definition of field units above.*

**Compliance Progress**    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶363 in the seventh reporting period, but did not reach Secondary compliance.

To determine Preliminary compliance with ¶363, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, the IMT sought to review data sources necessary or helpful to demonstrate how the CPD is calculating span of control ratios for field units and whether the CPD's method is consistent with the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

We assessed the City and the CPD's compliance with ¶363 for the first time in the fifth reporting period. In the fifth reporting period, the City and the CPD obtained Preliminary compliance with ¶361 by revising the *Unity of Command and Span of Control – Pilot Program* policy (D20-02). The policy was finalized and issued in December 2021. D20-02 delineates between field units versus specialized units and does not calculate span of control based on department-wide averages.

During the sixth reporting period, the IMT conducted site visits and attended monthly meetings where the City and the CPD shared documentation which shows progress about the pilot programs broadly. Such meetings included updates about a pod supervision structure (primary, secondary, and tertiary role for supervisors) implemented in the fifth reporting period. The CPD and City shared that the model was calculated using field units, as directed by the Consent Decree. However, during the IMT's conversations with command staff, officers, and supervisors, the results of the pod supervision structure did not consistently result in unity of command.

*Progress in the Seventh Reporting Period*

In April 2022, the City and the CPD requested technical assistance from the IMT regarding the Unity of Command and Span of Control Pilot Program. This was provided to CPD and the City throughout the seventh reporting period. As a result, the City and CPD developed a new staffing model to address a number of the shortcomings of the pod model. This new model will focus on three tenets: geographic familiarity, high-quality supervision, and resource flexibility. It is expected to be implemented beginning in the first quarter of 2023.

The IMT conducted a site visit in August 2022. We met with members of the Office of Constitutional Reform along with Bureau of Patrol to hear further about CPD-conducted focus groups with members of the 6th district, as multiple pilots were set to begin. These pilots, and specifically, the Unity of Command and Span of Control pilot would have required changes to the current partner structure along with scheduling shifts. With school beginning in September 2022 and shift bid changes later in the year, the CPD shared that many focus groups members raised concerns about pilot implementation beginning in the seventh reporting period. The IMT recognize that the support of pilot participants is integral to the success of the pilot, and eventually, the expansion of these programs to the entire department. The IMT is supportive of the decision by the City and CPD to begin implementation in the eighth reporting period.

On October 6, 2022, the City and CPD produced an updated D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. The IMT provided comments on November 5, 2022. We believed the policy to be well-written and commended the department for their effort to include aspects of the related pilot programs, Performance Evaluation System and Officer Support System, in D20-02. However, we also noted the need for clarity about the intent of CPD to use "an average" of ten officers per sergeant for span of control.

For the last two reporting periods, the City and CPD have shared their intentions to conduct a staffing allocation study to aid in the development of an effective staffing model, along with recommendations on transfer procedures in the seventh reporting period. We are still awaiting this information as it is foundational to the successful implementation of the Unity of Command and Span of Control Pilot Program. We look forward to receiving this information and continuing to consult with the CPD and the City as they undertake these efforts. This is particularly important as CPD works to expand the pilot to further districts.

<center>***</center>

The City and the CPD maintained Preliminary compliance with ¶363 in the seventh reporting period, but did not reach Secondary compliance. In the eighth reporting period, we look forward to reviewing data relevant to the program such as the

contents of the staffing dashboard, assignment sheets, transfer orders, and other relevant records. Additionally, we hope to conduct further interviews and focus groups with members of the pilot district. The IMT will be closely observing the rollout of the Unity of Command and Span of Control, Officer Support System, and Performance Evaluation System pilot programs.

Further, we plan to observe further evaluation committee meetings and hope to see a shift from a briefing model to more collaborative and conversational structure. The IMT will review the forthcoming evaluation plans for the Officer Support System, Performance Evaluation System, and Unity of Command and Span of Control pilot programs. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs.

### Paragraph 363 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶364

*364. Beginning no later than January 31, 2020, CPD will begin to implement a staffing model to achieve unity of command and a span of control ratio of no more than ten officers to one Sergeant assigned to field units on each watch in each patrol district.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶364 in the seventh reporting period, but did not reach Secondary compliance.

To determine Preliminary compliance with ¶364, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. The IMT also assessed the creation and development of the Unity of Command and Span of Control Pilot Program.

To evaluate Secondary compliance with ¶364, we reviewed the CPD's relevant training development, implementation, expansion, and evaluation of the CPD's Unity of Command and Span of Control Pilot Program, which the CPD launched in the 6th District in early 2020. As the CPD expands the pilot program into additional districts, we are looking for effective and consistent implementation of the staffing model, ensuring that the staffing levels comport with the 10 to 1 requirements from ¶364.

*Progress before the Seventh Reporting Period*

In previous reporting periods, we followed the creation and implementation of the Unity of Command and Span of Control Pilot Program, which seeks to achieve a ratio of no more than 10 officers to 1 sergeant. Based on the creation and launch of the pilot program in the 6th District, which occurred during the second reporting period, we granted Preliminary compliance with ¶364. We cautioned in the third reporting period that maintenance of Preliminary compliance required careful monitoring, evaluating, and refining of the staffing model to effectively expand the pilot program in all districts.

During the fourth reporting period, the CPD conducted a survey with the officers and sergeants assigned to the pilot districts. This survey showed limited staffing to be among officers' top concerns related to the Unity of Command and Span of Control Pilot Program. This was consistent with what we learned during the virtual

site visit we conducted at the time. During that visit, officers expressed major concerns with staffing. Many officers stated they have the same sergeant only about half of the time—which runs contrary to the consistent staffing envisioned by the program.

It had become evident in the fourth reporting period that the CPD was either not committed to following the program as outlined or did not have the resources to follow through with the program as outlined. We suggested that the difficulties the pilot districts had faced in following the pilot program, as written, suggests that the pilot program may not be an effective roadmap for compliance with ¶364. We noted that the City and the CPD must address these issues to maintain Preliminary compliance and eventually reach Secondary compliance. We urged the City and the CPD to focus necessary resources to address issues related to the Unity of Command and Span of Control Pilot Program so that the program could eventually be responsibly expanded to other districts.

In the fifth reporting period, the City and the CPD maintained Preliminary compliance by finalizing the *Unity of Command and Span of Control – Pilot Program* (D20-02). The policy was finalized and issued in December 2021. During a site visit in the fifth reporting period, it was again noted that while both officers and sergeants supported the Unity of Command and Span of Control program, they were very discouraged with the lack of personnel commitments.

During the sixth reporting period, the IMT conducted site visits and attended monthly meetings where the City and the CPD shared documentation which shows progress about the pilot programs broadly. Such meetings included updates about a pod supervision structure (primary, secondary, and tertiary role for supervisors) implemented in the fifth reporting period. However, during the IMT's conversations with command staff, officers, and supervisors, the results of the pod supervision structure did not consistently result in Unity of Command.

Additionally, the CPD convened a Unity of Command and Span of Control Pilot Program Evaluation Committee, which is to meet at least quarterly to discuss implementation progress and share feedback from CPD personnel. The IMT observed one evaluation committee meeting on June 2, 2022. It is the hope of the IMT that the committee will be able to anticipate and address a number of the possible challenges in order to ensure a smoother implementation process.

Further, the City and the CPD produced BOP #22-0049 *Unity of Command Span of Control Briefing for Newly Assigned Members*. This is a brief training conducted by a commander with new members and supervisors of the 6th District, which outlines the core principles of Unity of Command and Span of Control along with their importance.

*Progress in the Seventh Reporting Period*

In April 2022, the City and the CPD requested technical assistance from the IMT regarding the Unity of Command and Span of Control Pilot Program. This was provided to CPD and the City throughout the seventh reporting period. As a result, the City and CPD developed a new staffing model to address a number of the shortcomings of the pod model. This new model will focus on three tenets: geographic familiarity, high-quality supervision, and resource flexibility. It expected to be implemented beginning in the first quarter of 2023.

The IMT conducted a site visit in August 2022. We met with members of the Office of Constitutional Reform along with Bureau of Patrol to hear further about CPD-conducted focus groups with members of the 6th district, as multiple pilots were set to begin. These pilots, and specifically, the Unity of Command and Span of Control pilot would have required changes to the current partner structure along with scheduling shifts. With school beginning in September 2022 and shift bid changes later in the year, the CPD shared that many focus groups members raised concerns about pilot implementation beginning in the seventh reporting period. The IMT recognize that the support of pilot participants is integral to the success of the pilot, and eventually, the expansion of these programs to the entire department. The IMT is supportive of the decision by the City and CPD to begin implementation in the eighth reporting period.

On October 6, 2022, the City and CPD produced an updated D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. The IMT provided comments on November 5, 2022. We believed the policy to be well-written and commended the department for their effort to include aspects of the related pilot programs, Performance Evaluation System and Officer Support System, in D20-02. However, we also noted the need for clarity about the intent of CPD to use "an average" of ten officers per sergeant for span of control.

For the last two reporting periods, the City and CPD have shared their intentions to conduct a staffing allocation study to aid in the development of an effective staffing model, along with recommendations on transfer procedures in the seventh reporting period. We are still awaiting this information as it is foundational to the successful implementation of the Unity of Command and Span of Control Pilot Program. We look forward to receiving this information and continuing to consult with the CPD and the City as they undertake these efforts. This is particularly important as CPD works to expand the pilot to further districts.

*** 

The City and the CPD maintained Preliminary compliance with ¶364 in the seventh reporting period, but did not reach Secondary compliance. In the eighth reporting period, we look forward to reviewing data relevant to the program such as the

contents of the staffing dashboard, assignment sheets, transfer orders, and other relevant records. Additionally, we hope to conduct further interviews and focus groups with members of the pilot district. The IMT will be closely observing the rollout of the Unity of Command and Span of Control, Officer Support System, and Performance Evaluation System pilot programs.

Further, we plan to observe further evaluation committee meetings and hope to see a shift from a briefing model to more collaborative and conversational structure. The IMT will review the forthcoming evaluation plans for the Officer Support System, Performance Evaluation System, and Unity of Command and Span of Control pilot programs. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs.

### Paragraph 364 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶365

*365. By January 31, 2022, CPD will fully implement and maintain a staffing model that achieves unity of command and a span of control ratio of no more than ten officers to one Sergeant for all field units on each watch in each of CPD's patrol districts. To achieve this objective, CPD will maintain, at a minimum, one Sergeant for each sector.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance with ¶365 in the seventh reporting period.

To evaluate Preliminary compliance with ¶365, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also sought to review relevant data sources necessary or helpful to demonstrate the City and the CPD's ability to develop and maintain an efficient staffing model consistent with this paragraph.

*Progress before the Seventh Reporting Period*

We assessed the requirements of ¶365 for the first time in the sixth reporting period. In the sixth reporting period, D20-02, *Unity of Command and Span of Control Schedule Pilot Program*, was produced as proof of compliance with this paragraph. This policy, which received a no-objection by the IMT and OAG in the fifth reporting period, defines both unity of command and span of control and explains how they are designed to afford consistency within patrol areas and create manageable officer-to-sergeant ratios. However, discussion of a staffing model is limited to section VII-C-2 which states, "The Audit Section will work with the Bureau of Patrol and Field Technology and Innovation Section to develop statistical models that will assist the Bureau of Patrol in expanding this program to all district law enforcement." This does not sufficiently address the full requirements of this paragraph.

During the sixth reporting period, the IMT conducted site visits and attended monthly meetings where the City and the CPD shared documentation which shows progress about the pilot programs broadly. Such meetings included updates about a pod supervision structure (primary, secondary, and tertiary role for supervisors) implemented in the fifth reporting period. However, during the IMT's

conversations with command staff, officers, and supervisors, the results of the pod supervision structure did not consistently result in unity of command.

*Progress in the Seventh Reporting Period*

In April 2022, the City and the CPD requested technical assistance from the IMT regarding the Unity of Command and Span of Control Pilot Program. This was provided to CPD and the City throughout the seventh reporting period. As a result, the City and CPD developed a new staffing model to address a number of the shortcomings of the pod model. This new model will focus on three tenets: geographic familiarity, high-quality supervision, and resource flexibility. It is expected to be implemented beginning in the first quarter of 2023.

The IMT conducted a site visit in August 2022. We met with members of the Office of Constitutional Reform along with Bureau of Patrol to hear further about CPD-conducted focus groups with members of the 6th district, as multiple pilots were set to begin. These pilots, and specifically, the Unity of Command and Span of Control pilot would have required changes to the current partner structure along with scheduling shifts. With school beginning in September 2022 and shift bid changes later in the year, the CPD shared that many focus groups members raised concerns about pilot implementation beginning in the seventh reporting period. The IMT recognize that the support of pilot participants is integral to the success of the pilot, and eventually, the expansion of these programs to the entire department. The IMT is supportive of the decision by the City and CPD to begin implementation in the eighth reporting period.

On October 6, 2022, the City and CPD produced an updated D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. The IMT provided comments on November 5, 2022. We believed the policy to be well-written and commended the department for their effort to include aspects of the related pilot programs, Performance Evaluation System and Officer Support System, in D20-02. However, we also noted the need for clarity about the intent of CPD to use "an average" of ten officers per sergeant for span of control.

For the last two reporting periods, the City and CPD have shared their intentions to conduct a staffing allocation study to aid in the development of an effective staffing model, along with recommendations on transfer procedures in the seventh reporting period. We are still awaiting this information as it is foundational to the successful implementation of the Unity of Command and Span of Control Pilot Program. We look forward to receiving this information and continuing to consult with the CPD and the City as they undertake these efforts. This is particularly important as CPD works to expand the pilot to further districts. In IMT-led focus groups with supervisors in the sixth district, concerns about the future expansion of pilot programs due to a lack of prioritization of staffing were shared. Members specifically highlighted cancelled days off and tiered deployments as

points of contention affecting morale and consistency of supervision in the department.

*\*\**

The City and the CPD did not achieve Preliminary compliance with ¶365 in the seventh reporting period. To reach compliance with this paragraph, there is significant work to be done. The IMT looks forward to the City's and the CPD's ability to develop and maintain an efficient staffing model in the pilot district for a sustained period.

In the eighth reporting period, we look forward to reviewing data relevant to the program such as the contents of the staffing dashboard, assignment sheets, transfer orders, and other relevant records. Additionally, we hope to conduct further interviews and focus groups with members of the pilot district. The IMT will be closely observing the rollout of the Unity of Command and Span of Control, Officer Support System, and Performance Evaluation System pilot programs.

### Paragraph 365 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Supervision: ¶366

**366.** *CPD will continue to maintain unity of command and a span of control ratio of no more than ten officers to one Sergeant for district tactical teams and area saturation teams.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance with ¶366 in the seventh reporting period.

To evaluate Preliminary compliance with ¶366, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also sought to review relevant data sources necessary or helpful to demonstrate the City and the CPD's ability to develop and maintain an efficient staffing model consistent with this paragraph.

*Progress before the Seventh Reporting Period*

We assessed the requirements of ¶366 for the first time in the sixth reporting period. During the sixth reporting period, the CPD produced D20-02, Unity of Command and Span of Control Schedule Pilot Program, under this paragraph. This policy, which received a no-objection by the IMT and OAG in the fifth reporting period, defines both unity of command and span of control and explains how they are designed to afford consistency within patrol areas and create manageable officer-to-sergeant ratios. However, discussion of specialized units is limited to section II-B which states, "The Unity of Command and Span of Control Schedule Pilot Program will not include watch personnel assigned to tactical teams or district administration." Therefore, the City and the CPD did not provide data to sufficiently address the full requirements of this paragraph.

During the sixth reporting period, the IMT conducted site visits and attended monthly meetings where the City and the CPD shared documentation which shows progress about the pilot programs broadly. Such meetings included updates about a pod supervision structure (primary, secondary, and tertiary role for supervisors) implemented in the fifth reporting period. In April 2022, the City and the CPD requested technical assistance from the IMT regarding the Unity of Command and Span of Control Pilot Program. In late June, during the first technical assistance meeting, the City and the CPD shared their plans to develop a new staffing model to address a number of the shortcomings of the pod model. The CPD also shared

that they plan to conduct a Workforce Allocation Study to aid in the development of an effective staffing model, along with recommendations on transfer procedures in the seventh reporting period.

The City and the CPD have shared that the inherently smaller nature of specialized units, such as tactical teams allowed them to achieve a 10:1 ratio on a more regular basis. It is the belief of the IMT that the City and the CPD are working toward compliance in earnest. However, we noted that we have not yet received additional formal productions or data that would allow us to assess further compliance levels with the requirements of ¶366.

*Progress in the Seventh Reporting Period*

In April 2022, the City and the CPD requested technical assistance from the IMT regarding the Unity of Command and Span of Control Pilot Program. This was provided to CPD and the City throughout the seventh reporting period. As a result, the City and CPD developed a new staffing model to address a number of the shortcomings of the pod model. This new model will focus on three tenets: geographic familiarity, high-quality supervision, and resource flexibility. The CPD anticipates implementing this new model beginning in the first quarter of 2023.

The IMT conducted a site visit in August 2022. We met with members of the Office of Constitutional Reform along with Bureau of Patrol to hear further about CPD-conducted focus groups with members of the 6th district, as multiple pilots were set to begin. These pilots, and specifically, the Unity of Command and Span of Control pilot would have required changes to the current partner structure along with scheduling shifts. With school beginning in September 2022 and shift bid changes later in the year, the CPD shared that many focus groups members raised concerns about pilot implementation beginning in the seventh reporting period. The IMT recognize that the support of pilot participants is integral to the success of the pilot, and eventually, the expansion of these programs to the entire department. The IMT is supportive of the decision by the City and CPD to begin implementation in the eighth reporting period.

On October 6, 2022, the City and CPD produced an updated D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. The IMT provided comments on November 5, 2022. We believed the policy to be well-written and commended the department for their effort to include aspects of the related pilot programs, Performance Evaluation System and Officer Support System, in D20-02. However, we also noted the need for clarity about the intent of CPD to use "an average" of ten officers per sergeant for span of control.

For the last two reporting periods, the City and CPD have shared their intentions to conduct a staffing allocation study to aid in the development of an effective staffing model, along with recommendations on transfer procedures in the

seventh reporting period. We are still awaiting this information as it is foundational to the successful implementation of the Unity of Command and Span of Control Pilot Program. We look forward to receiving this information and continuing to consult with the CPD and the City as they undertake these efforts. This is particularly important as CPD works to expand the pilot to further districts. In IMT-led focus groups with supervisors in the sixth district, concerns about the future expansion of pilot programs due to a lack of prioritization of staffing were shared. Members specifically highlighted cancelled days off and tiered deployments as points of contention affecting morale and consistency of supervision in the department.

<div align="center">***</div>

The City and the CPD did not achieve Preliminary compliance with ¶366 in the seventh reporting period. To reach compliance with this paragraph, there is significant work to be done. The IMT looks forward to the City's and the CPD's ability to develop and maintain an efficient staffing model in the pilot district for a sustained period, both in field units and in specialized units.

In the eighth reporting period, we look forward to reviewing data relevant to the program such as the contents of the staffing dashboard, assignment sheets, transfer orders, and other relevant records. Additionally, we hope to conduct further interviews and focus groups with members of the pilot district. The IMT will be closely observing the rollout of the Unity of Command and Span of Control, Officer Support System, and Performance Evaluation System pilot programs.

### Paragraph 366 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Supervision: ¶367

**367.** *CPD may review and revise its staffing model as necessary to ensure that all field units on each watch in each patrol district achieve unity of command and a span of control ratio of no more than ten officers to one Sergeant.*

## Compliance Progress       (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶367 in the seventh reporting period, but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶367, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, we reviewed relevant data sources necessary or helpful to demonstrate the City and the CPD's ability to develop and maintain an efficient staffing model consistent with this paragraph.

*Progress before the Seventh Reporting Period*

We assessed the requirements of ¶367 for the first time in the sixth reporting period. During the sixth reporting period, the CPD produced D20-02, Unity of Command and Span of Control Schedule Pilot Program, under this paragraph. This policy, which received a no-objection by the IMT and OAG in the fifth reporting period, defines both unity of command and span of control and explains how they are designed to afford consistency within patrol areas and create manageable officer-to-sergeant ratios.

The policy specifically discusses evaluation of the pilot programs such as in section VIII-B-5 which states, "Responsibilities of the Unity of Command and Span of Control Schedule Program Evaluation Committee include assessing the unity of command in the program and determine if it should be modified in any of its operations." The policy also encourages the participation of the Strategic Initiatives Division and Professional Standards and Compliance Division in assessing the effectives of the program. The IMT believes that the flexibility of D20-02 addresses the requirements of ¶367. Further, the City and the CPD have shown their willingness to shift practices when current operations are ineffective.

*Progress in the Seventh Reporting Period*

In April 2022, the City and the CPD requested technical assistance from the IMT regarding the Unity of Command and Span of Control Pilot Program. This was provided to CPD and the City throughout the seventh reporting period. As a result, the City and CPD developed a new staffing model to address a number of the shortcomings of the pod model. This new model will focus on three tenets: geographic familiarity, high-quality supervision, and resource flexibility. It should be implemented beginning in the first quarter of 2023.

The IMT conducted a site visit in August 2022. We met with members of the Office of Constitutional Reform along with Bureau of Patrol to hear further about CPD-conducted focus groups with members of the 6th district, as multiple pilots were set to begin. These pilots, and specifically, the Unity of Command and Span of Control pilot would have required changes to the current partner structure along with scheduling shifts. With school beginning in September 2022 and shift bid changes later in the year, the CPD shared that many focus groups members raised concerns about pilot implementation beginning in the seventh reporting period. The IMT recognize that the support of pilot participants is integral to the success of the pilot, and eventually, the expansion of these programs to the entire department. The IMT is supportive of the decision by the City and CPD to begin implementation in the eighth reporting period.

On October 6, 2022, the City and CPD produced an updated D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. The IMT provided comments on November 5, 2022. We believed the policy to be well-written and commended the department for their effort to include aspects of the related pilot programs, Performance Evaluation System and Officer Support System, in D20-02. However, we also noted the need for clarity about the intent of CPD to use "an average" of ten officers per sergeant for span of control.

For the last two reporting periods, the City and CPD have shared their intentions to conduct a staffing allocation study to aid in the development of an effective staffing model, along with recommendations on transfer procedures in the seventh reporting period. We are still awaiting this information as it is foundational to the successful implementation of the Unity of Command and Span of Control Pilot Program. We look forward to receiving this information and continuing to consult with the CPD and the City as they undertake these efforts. This is particularly important as CPD works to expand the pilot to further districts.

<div align="center">***</div>

The City and the CPD maintained Preliminary compliance with ¶367 in the seventh reporting period, but did not reach Secondary compliance. In the eighth reporting period, we look forward to reviewing data relevant to the pilot program such as

the contents of the staffing dashboard, assignment sheets, transfer orders, and other relevant records. These will be helpful to show City's and the CPD's ability to develop and maintain an efficient staffing model in the pilot district for a sustained period. Additionally, we hope to conduct further interviews and focus groups with members of the pilot district. The IMT will be closely observing the rollout of the Unity of Command and Span of Control, Officer Support System, and Performance Evaluation System pilot programs.

Further, we plan to observe further evaluation committee meetings and hope to see a shift from a briefing model to more collaborative and conversational structure. The IMT will review the forthcoming evaluation plans for the Officer Support System, Performance Evaluation System, and Unity of Command and Span of Control pilot programs. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs.

## Paragraph 367 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶368

> **368.** *Beginning 365 days after the Effective Date, and annually thereafter, the Monitor will review and assess CPD's progress toward achieving unity of command and a span of control ratio of no more than ten officers to one Sergeant.*

## Compliance Progress   (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**   Annually   ☑ **Not Yet Applicable**

**Preliminary:**   *In Compliance (SECOND REPORTING PERIOD)*
**Secondary:**   *Not in Compliance*
**Full:**   *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶368 in the seventh reporting period, but did not reach Secondary compliance.

To assess Preliminary compliance with ¶368, we reviewed data regarding the CPD's efforts to comply with Unity of Command and Span of Control principles outlined in the Consent Decree. To evaluate Secondary compliance with ¶368, we reviewed the CPD's relevant policies, as well as records regarding the expansion of the CPD's Unity of Command and Span of Control Pilot Program. Also, we considered whether the City and the CPD demonstrated with sufficient data that the unity of command and span of control ratio of ten officers to one sergeant.

*Progress before the Seventh Reporting Period*

The City and the CPD reached Preliminary compliance with ¶368 in the second reporting period by launching the Unity of Command and Span of Control Pilot Program. In the fourth reporting period, we noted that the information provided demonstrated that the City and the CPD had a long way to go to achieve the unity of command and span of control ratio of no more than 10 officers to one sergeant.

During a site visit in the fourth reporting period, we heard that the staffing ratio called for by these paragraphs was not being met. We noted that there seemed to be a staffing shortage caused by various factors that prevented the CPD from complying with this ratio. As we reported, these shortages were not only causing frustrations among officers in the districts in which the Unity of Command and Span of Control Pilot Program was being piloted (4th, 6th, and 7th), but seemed to have also caused unsafe situations for officers in those districts. The Audit Division's Summary of challenges facing the expanded Unity of Command and Span of Control Pilot project reiterated the frustrations and concerns we heard from officers.

We also noted in the fourth reporting period that, in order to reach Secondary compliance and maintain Preliminary compliance in upcoming reporting periods, the CPD would need to provide us with various data sources so that we could assess, using quantitative data, the CPD's compliance with this paragraph. These data sources included dispatch activity reports, rosters, sergeant staffing reports, CPD budgets and forecasts, and other similar data.

In the fifth reporting period, the IMT's virtual site visit again revealed that the staffing ratio called for by these paragraphs is not being met. The staffing shortage continued, preventing the CPD from complying with this ratio. These shortages were causing frustrations among officers and sergeants in the districts in which the Unity of Command and Span of Control Pilot Program is being piloted.

The CPD produced a Unity of Command/Span of Control Data Analysis on December 30, 2021, which outlined a staffing pod model for assessing the supervisor to officer ratio. The goal of the model is for a member to be assigned to a primary sergeant 75% of their time, a secondary sergeant 20% of their time, and a tertiary sergeant 5% of their time. The CPD also produced D20-02, *Unity of Command and Span of Control – Pilot Program*, which was finalized and issued in December 2021. The policy specifically identifies in Section III. G. 1-4 that a data dashboard is designed to capture data to support the district's required operations with span of control and unity of command.

We shared that, in the next reporting period, and to achieve Secondary compliance, the IMT looks forward to reviewing additional data associated with the pod staffing model over a longer period of time. Additionally, we would look to review records regarding the expansion of the CPD's Unity of Command and Span of Control Pilot Program.

During the sixth reporting period, the IMT attended several virtual and in-person site visits and conducted focus groups with officers and sergeants. As in the fifth reporting period, we heard a great deal of frustration expressed about inconsistent supervision and staffing shortages, which made it very difficult to achieve unity of command/span of control throughout the ranks. During meetings with the City, the CPD, and the OAG, the CPD also discussed the staffing dashboard's management tools for making staffing and operational decisions, such as an electronic watch assignment sheet from the 6th District which allows the CPD to (at a glance) give supervisors the ability to see span of control and unity of command alignment. Additionally, the CPD shared that they plan to assign additional sergeants to the 6th District during this reporting period, which is the primary pilot district.

The City and the CPD implemented a new pod supervision structure (primary, secondary, and tertiary role for supervisors) in the fifth reporting period. However, during the IMT's conversations with command staff, officers, and supervisors, the

results of the pod supervision structure did not consistently result in Unity of Command. In April 2022, the City and the CPD requested technical assistance from the IMT regarding the Unity of Command and Span of Control Pilot Program. In late June, during the first technical assistance meeting, the City and the CPD shared their plans to develop a new staffing model to address a number of the shortcomings of the pod model.

Additionally, the IMT recognizes that the CPD has convened a Unity of Command and Span of Control Pilot Program Evaluation Committee, which is to meet at least quarterly to discuss implementation progress and share feedback from department members. The IMT observed one evaluation committee meeting on June 2, 2022. It is the hope of the IMT that the committee will be able to anticipate and address a number of the possible challenges in order to ensure a smoother implementation process.

*Progress in the Seventh Reporting Period*

In April 2022, the City and the CPD requested technical assistance from the IMT regarding the Unity of Command and Span of Control Pilot Program. This was provided to CPD and the City throughout the seventh reporting period. As a result, the City and CPD developed a new staffing model to address a number of the shortcomings of the pod model. This new model will focus on three tenets: geographic familiarity, high-quality supervision, and resource flexibility. It is expected to be implemented beginning in the first quarter of 2023.

The IMT conducted a site visit in August 2022. We met with members of the Office of Constitutional Reform along with Bureau of Patrol to hear further about CPD-conducted focus groups with members of the 6th district, as multiple pilots were set to begin. These pilots, and specifically, the Unity of Command and Span of Control pilot would have required changes to the current partner structure along with scheduling shifts. With school beginning in September 2022 and shift bid changes later in the year, the CPD shared that many focus groups members raised concerns about pilot implementation beginning in the seventh reporting period. The IMT recognize that the support of pilot participants is integral to the success of the pilot, and eventually, the expansion of these programs to the entire department. The IMT is supportive of the decision by the City and CPD to begin implementation in the eighth reporting period.

On October 6, 2022, the City and CPD produced an updated D20-02, *Unity of Command and Span of Control Schedule Pilot Program*. The IMT provided comments on November 5, 2022. We believed the policy to be well-written and commended the department for their effort to include aspects of the related pilot programs, Performance Evaluation System and Officer Support System, in D20-02. However, we also noted the need for clarity about the intent of CPD to use "an average" of ten officers per sergeant for span of control.

For the last two reporting periods, the City and CPD have shared their intentions to conduct a staffing allocation study to aid in the development of an effective staffing model, along with recommendations on transfer procedures in the seventh reporting period. We are still awaiting this information as it is foundational to the successful implementation of the Unity of Command and Span of Control Pilot Program. We look forward to receiving this information and continuing to consult with the CPD and the City as they undertake these efforts. This is particularly important as CPD works to expand the pilot to further districts.

<p style="text-align:center">***</p>

The City and the CPD maintained Preliminary compliance with ¶368 in the seventh reporting period, but did not reach Secondary compliance. In the eighth reporting period, we look forward to reviewing data relevant to the pilot program such as the contents of the staffing dashboard, assignment sheets, transfer orders, and other relevant records. These will be helpful to show City's and the CPD's ability to develop and maintain an efficient staffing model in the pilot district for a sustained period. Additionally, we hope to conduct further interviews and focus groups with members of the pilot district. The IMT will be closely observing the rollout of the Unity of Command and Span of Control, Officer Support System, and Performance Evaluation System pilot programs.

Further, we plan to observe further evaluation committee meetings and hope to see a shift from a briefing model to more collaborative and conversational structure. The IMT will review the forthcoming evaluation plans for the Officer Support System, Performance Evaluation System, and Unity of Command and Span of Control pilot programs. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs.

## Paragraph 368 Compliance Progress History

| FIRST REPORTING PERIOD SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SECOND REPORTING PERIOD SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | THIRD REPORTING PERIOD MARCH 1, 2020 – DECEMBER 31, 2020 |
|---|---|---|
| COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Preliminary | COMPLIANCE PROGRESS: Preliminary |
| FOURTH REPORTING PERIOD JANUARY 1, 2021 – JUNE 30, 2021 | FIFTH REPORTING PERIOD JULY 1, 2021 – DECEMBER 31, 2021 | SIXTH REPORTING PERIOD JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: Preliminary | COMPLIANCE PROGRESS: Preliminary | COMPLIANCE PROGRESS: Preliminary |
| SEVENTH REPORTING PERIOD JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: Preliminary | | |

# Supervision: ¶369

*369. A performance evaluation process will enable CPD to identify, support, and recognize members who perform their duties lawfully, safely, and effectively, as well as to identify and respond to members who perform poorly, demonstrate adverse behaviors, or engage in inappropriate conduct or conduct that otherwise undermines member or public safety and community trust.*

## Compliance Progress  (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance (SIXTH REPORTING PERIOD)* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶369.

To evaluate Preliminary compliance with ¶369, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, we reviewed the CPD's training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

We assessed the requirements of ¶369 for the first time in the sixth reporting period. The City and the CPD achieved Preliminary compliance by finalizing D21-09, Performance *Evaluation System - Pilot Program Policy* (PES) in the fifth reporting period, which meets the requirements of this paragraph. Section III-E of the policy assigns supervisors to evaluate members and assist in setting goals under the Performance Evaluation System. Further, supervisors will use the Performance Evaluation System to effectively assess and document job performance of members under their command. Supervisors are also required to record notable observations of members in the Portfolio Notes section of the Performance Evaluation System every police period, as well as provide continual feedback and coaching.

Policy D21-09 identifies five performance dimension categories to evaluate the job performance for all sworn members: Conduct and Professionalism, Respect for People and Public Trust, Adaptability and Situational Skills, Problem Solving, and Job Knowledge and Professional Development. Supervisors will consider various components under each dimension, depending upon the duties and responsibilities of the member being evaluated. It also affords members an

opportunity to set personal goals and requires supervisors to support and recognize members who perform their duties lawfully, safely, and effectively, as well as to identify and respond to members who perform poorly, engage in inappropriate conduct, or in conduct that otherwise undermines member, public safety, or community trust.

*Progress in the Seventh Reporting Period*

In virtual meetings with members of the City and the CPD throughout the seventh reporting period, the IMT has been provided with updates on the progress of the Performance Evaluation System implementation plans.

On July 21, 2022, the City and CPD produced *Performance Evaluation System Training*. The IMT submitted a no-objection letter on August 4, 2022. The IMT believes that the trainings were well-designed as they included adult learning methods and covered the required material. We observed the human resources portion of this training on November 4, 2022. It was well-received by the members and the instructors effectively engaged with the participants. IMT members noted that the CPD curriculum contained the components required by the Consent Decree and in some areas, exceeded our expectations. An example of that is the focus on training the raters on the type of learner their employees are: auditory, kinesthetic, visual or reading/writing learners. This level of detail is not often seen in training materials on performance evaluation systems and can significantly impact how the employee receives feedback and encouragement. Additionally, the curriculum addressed how supervisors should identify members who were successfully performing their duties, along with those who are struggling to do so.

\*\*\*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶369. We look forward to future site visits and focus groups to gather direct input regarding the Performance Evaluation System. It will also be important for the CPD to recognize the interconnectedness of all pilot programs (Unity of Command, Span of Control, Performance Evaluation System, and Officer Support System) as they move toward expansion. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs. Further, we look forward to observing evaluation committee meetings and hope to see a shift from a briefing model to more collaborative and conversational structure.

## Paragraph 369 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Not Applicable

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Not Applicable

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Supervision: ¶370

*370. CPD's performance evaluation process will identify, support, and recognize members' activity, performance, and conduct through an assessment of specific quantitative and qualitative performance dimensions, which will address, among other things, constitutional policing, community policing, problem-solving, and the effective use of de-escalation or specialized training. Although CPD may use quantitative measures in evaluating members to ensure that members are performing their required duties, CPD will not require members to achieve specific numerical thresholds, such as the number of arrests, investigatory stops, or citations. CPD will ensure that its performance evaluation process is consistent with the law and best practices. Within 18 months of the Effective Date, CPD will revise its performance evaluation policies and practices as necessary to meet the requirements of this Agreement.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶370 in the seventh reporting period, but did not reach Secondary compliance.

To assess Preliminary compliance with ¶370, we reviewed the CPD's relevant policies (D21-09) and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, we reviewed the CPD's training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

We assessed compliance with ¶370 for the first time during the fifth reporting period. In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶370 by finalizing the updated *Performance Evaluations System - Pilot Program Policy*, D21-09. D21-09 incorporates specific quantitative and qualitative performance dimensions, allowing for the capture of members' activities associated with constitutional policing, community policing, problem-solving, and the effective use of de-escalation.

The CPD also finalized and issued the *Performance Recognition System Policy* (E05-02) during the fifth reporting period. This policy helps to support ¶370 by aiding

supervisors in recognizing and documenting the job performance of department members under their command, such as exceptional job performance or adverse behavior that can be improved by non-disciplinary options. During this reporting period, the City and the CPD also produced several *Performance Evaluation* training materials for sworn members.

During the sixth reporting period, the IMT reviewed training materials for sworn members associated with the Performance Evaluation System (PES) Pilot Program, consisting of the Performance Evaluation System Handbook, Guide Book, Evaluation Survey, Test, Training Video, and Instructors Guide. The training materials capture specific quantitative and qualitative performance dimensions which address constitutional policing, community policing, problem-solving, and the effective use of de-escalation or specialized training.

*Progress in the Seventh Reporting Period*

In virtual meetings with members of the City and the CPD throughout the seventh reporting period, the IMT has been provided with updates on the progress of the Performance Evaluation System implementation plans.

On July 21, 2022, the City and CPD produced *Performance Evaluation System Training*. The IMT submitted a no-objection letter on August 4, 2022. The IMT believes that the trainings were well-designed as they included adult learning methods and covered the required material. We observed the human resources portion of this training on November 4, 2022. It was well-received by the members and the instructors effectively engaged with the participants. IMT members noted that the CPD curriculum contained the components required by the Consent Decree and in some areas, exceeded our expectations. An example of that is the focus on training the raters on the type of learner their employees are: auditory, kinesthetic, visual or reading/writing learners. This level of detail is not often seen in training materials on performance evaluation systems and can significantly impact how the employee receives feedback and encouragement. Additionally, the curriculum addressed specific quantitative and qualitative performance dimensions.

\*\*\*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶370. We look forward to future site visits and focus groups to gather direct input regarding the Performance Evaluation System. The IMT will review the forthcoming evaluation plans for the Officer Support System, Performance Evaluation System, and Unity of Command and Span of Control pilot programs. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs. Further, we look forward to observing evaluation committee

meetings and hope to see a shift from a briefing model to more collaborative and conversational structure.

### Paragraph 370 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶371

> **371.** *Annual performance evaluations for members of all ranks, excluding the Superintendent, will be based upon work performance completed during a specific rating period and will include a written description of performance dimension expectations; the member's proficiency in fulfilling the specific duties and responsibilities of the assigned position, unit, or team; any areas of particular growth and achievement; and areas where the member requires further support and/or supervision. The evaluation process will provide for support, feedback, communication of expectations, and, when appropriate, corrective actions.*

## Compliance Progress        (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    December 31, 2022      ☐ Met   ☑ Missed

**Preliminary:**    *In Compliance (FIFTH REPORTING PERIOD)*
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶371 in the seventh reporting period, but did not reach Secondary compliance.

To assess Preliminary compliance with ¶371, we reviewed, among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, we reviewed the CPD's training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

We assessed compliance with ¶371 for the first time during the fifth reporting period. In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶371 by finalizing the updated *Performance Evaluation System - Pilot Program Policy (PES)* (D21-09). Section III-E of the policy assigns supervisors to evaluate members and assist in setting goals under the Performance Evaluation System. Further, supervisors will use the Performance Evaluation System to effectively assess and document job performance of members under their command. Supervisors are also required to record notable observations of members in the Portfolio Notes section of the Performance Evaluation System every police period, as well as provide continual feedback and coaching.

Policy D21-09 identifies five performance dimension categories to evaluate the job performance for all sworn members: Conduct and Professionalism, Respect for People and Public Trust, Adaptability and Situational Skills, Problem Solving, and Job Knowledge and Professional Development. Supervisors will consider various components under each dimension, depending upon the duties and responsibilities of the member being evaluated. It also affords members an opportunity to set personal goals and requires supervisors to support and recognize members who perform their duties lawfully, safely, and effectively, as well as to identify and respond to members who perform poorly, engage in inappropriate conduct, or in conduct that otherwise undermines member, public safety, or community trust.

However, the IMT acknowledged that D21-09 is only being used in the pilot districts, whereas E05-01, *Performance Evaluations of all Sworn Department Members Below the Rank of Superintendent* policy, is used for all other officers. We shared that, in future reporting periods, the IMT would like to see this program expanded, where D21-09 will ultimately replace E05-01.

During the sixth reporting period, the IMT reviewed training materials for sworn members associated with the Performance Evaluation System (PES) Pilot Program, consisting of the Performance Evaluation System Handbook, Guide Book, Evaluation Survey, Test, Training Video, and Instructors Guide. The training materials capture specific quantitative and qualitative performance dimensions which address constitutional policing, community policing, problem-solving, and the effective use of de-escalation or specialized training. The training materials also clearly set forth examples of how members and supervisors set performance expectations and professional goals for members. Further, they include an "Officer Transfer Procedure" for when members transfer into a Performance Evaluation System pilot district during the course of a rating year.

*Progress in the Seventh Reporting Period*

In virtual meetings with members of the City and the CPD throughout the seventh reporting period, the IMT has been provided with updates on the progress of the Performance Evaluation System implementation plans.

On July 21, 2022, the City and CPD produced *Performance Evaluation System Training*. The IMT submitted a no-objection letter on August 4, 2022. The IMT believes that the trainings were well-designed as they included adult learning methods and covered the required material. We observed the human resources portion of this training on November 4, 2022. It was well-received by the members and the instructors effectively engaged with the participants. IMT members noted that the CPD curriculum contained the components required by the Consent Decree and in some areas, exceeded our expectations. An example of that is the focus on training the raters on the type of learner their employees are: auditory,

kinesthetic, visual or reading/writing learners. This level of detail is not often seen in training materials on performance evaluation systems and can significantly impact how the employee receives feedback and encouragement. Additionally, the curriculum addressed how supervisors are expected to complete written descriptions of member performance across the various performance dimensions.

\*\*\*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶371. We look forward to future site visits and focus groups to gather direct input regarding the Performance Evaluation System. The IMT also hopes to see these formal trainings reinforced through informal instruction, such as rollcall training. It will also be important for the CPD to recognize the interconnectedness of all pilot programs (Unity of Command, Span of Control, Performance Evaluation System, and Officer Support System) as they move toward expansion. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs. Further, we look forward to observing evaluation committee meetings and hope to see a shift from a briefing model to more collaborative and conversational structure.

### Paragraph 371 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶372

**372.** *CPD will require supervisors of all ranks to conduct timely, accurate, and complete performance evaluations.*

**Compliance Progress**    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶372 in the seventh reporting period, but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶372, we reviewed among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, we reviewed the CPD's training development, implementation, and evaluation. We also considered relevant data sources that demonstrate completion of performance evaluations, and the frequency and quality of those evaluations.

*Progress before the Seventh Reporting Period*

We assessed compliance with ¶372 for the first time during the fifth reporting period. In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶372 by finalizing the updated *Performance Evaluation System - Pilot Program Policy*, D21-09. The policy incorporates specific quantitative and qualitative performance dimensions allowing for the capture of members' activities associated with constitutional policing, community policing, problem-solving, and the effective use of de-escalation. The policy clearly outlines the timeline for the completion of the performance evaluation on an annual basis. In addition, the policy sets out requirements for when a member must be assigned to an evaluating supervisor. All performance evaluations for members will be documented on the Performance Evaluation System, located within the Talent Management System.

We shared that, in future reporting periods, and to obtain Secondary compliance, the IMT looks forward to reviewing the data sources which demonstrate performance evaluations that have occurred and the frequency and quality of those evaluations. In addition, the IMT will be monitoring the training for both supervisors and members as the Performance Evaluation System rolls out during the sixth reporting period.

During the sixth reporting period, the IMT reviewed training materials for sworn members associated with the Performance Evaluation System (PES) Pilot Program, consisting of the Performance Evaluation System Handbook, Guide Book, Evaluation Survey, Test, Training Video, and Instructors Guide. The training materials capture specific quantitative and qualitative performance dimensions which address constitutional policing, community policing, problem-solving, and the effective use of de-escalation or specialized training.

The IMT recognizes that the CPD has convened a Unity of Command and Span of Control Pilot Program Evaluation Committee, which is to meet at least quarterly to discuss implementation progress and share feedback from department members. This evaluation committee has been expanded to provide feedback on other pilot programs, to include the Performance Evaluation System pilot. The IMT observed one evaluation committee meeting on June 2, 2022. It is the hope of the IMT that the committee will be able to anticipate and address a number of the possible challenges in order to ensure a smoother implementation process.

*Progress in the Seventh Reporting Period*

In virtual meetings with members of the City and the CPD throughout the seventh reporting period, the IMT has been provided with updates on the progress of the Performance Evaluation System implementation plans.

On July 21, 2022, the City and CPD produced *Performance Evaluation System Training*. The IMT submitted a no-objection letter on August 4, 2022. The IMT believes that the trainings were well-designed as they included adult learning methods and covered the required material. We observed the human resources portion of this training on November 4, 2022. It was well-received by the members and the instructors effectively engaged with the participants. IMT members noted that the CPD curriculum contained the components required by the Consent Decree and in some areas, exceeded our expectations. An example of that is the focus on training the raters on the type of learner their employees are: auditory, kinesthetic, visual or reading/writing learners. This level of detail is not often seen in training materials on performance evaluation systems and can significantly impact how the employee receives feedback and encouragement. Additionally, the curriculum addressed expectations for supervisors at various levels.

\*\*\*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶372. We look forward to future site visits and focus groups to gather direct input regarding the Performance Evaluation System. The IMT also hopes to see these formal trainings reinforced through informal instruction, such as rollcall training. It will also be important for the CPD to recognize the interconnectedness of all pilot programs (Unity of Command, Span of Control,

Performance Evaluation System, and Officer Support System) as they move toward expansion. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs. Further, we look forward to observing evaluation committee meetings and hope to see a shift from a briefing model to more collaborative and conversational structure.

### Paragraph 372 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶373

> **373.** *Supervisors may only conduct a performance evaluation of members they have directly supervised and observed during the specific rating period.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**    *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶373 in the seventh reporting period, but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶373, we reviewed among other things, the CPD's relevant policies and materials following the process described in the Consent Decree (¶¶626–41). For Secondary compliance, we reviewed the Performance Evaluation System training for supervisors in addition to data sources which demonstrate methods for ensuring that evaluations are completed by supervisors who have observed and actively supervised the members being evaluated.

*Progress before the Seventh Reporting Period*

We assessed compliance with ¶373 for the first time during the third reporting period. The CPD's Performance Evaluation System Pilot Program and materials remained under review at the close of the period. Therefore, the CPD did not reach Preliminary compliance. We emphasized that the integrity of the Performance Evaluations System depended upon the successful implementation of the Unity of Command and Span of Control staffing structure, as ¶373 requires that supervisors completing performance evaluations have first-hand knowledge of the members being evaluated.

In the fourth reporting period, the CPD submitted a revised *Performance Evaluation System – Pilot Program Policy* (D21-09), and we submitted a no-objection notice to this revised draft policy. We noted that this policy clearly requires that supervisors limit their review to sworn members who have been assigned under their command for at least 30 days before the evaluation, which differed from the current E05-01 policy. For example, under Section IV.J of E05-01, where a unit member has been supervised by several different supervisors, the supervisors are able to confer with each other in evaluating that member, and there is no specified length of time for which supervisors must have overseen the officer they are evaluating.

In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶373 by finalizing the updated *Performance Evaluation System - Pilot Program Policy* (D21-09). Section III-D4 of the policy requires supervisors to complete evaluations only for members who have been assigned under their command for at least thirty days prior to the evaluation.

During the sixth reporting period, the IMT reviewed training materials for sworn members associated with the Performance Evaluation System (PES) Pilot Program, consisting of the Performance Evaluation System Handbook, Guide Book, Evaluation Survey, Test, Training Video, and Instructors Guide. The training materials capture specific quantitative and qualitative performance dimensions which address constitutional policing, community policing, problem-solving, and the effective use of de-escalation or specialized training. The Performance Evaluation System Handbook and Guidebook provide clear directions that supervisors may only conduct a performance evaluation of members they have directly supervised and observed during the specific rating period.

*Progress in the Seventh Reporting Period*

In virtual meetings with members of the City and the CPD throughout the seventh reporting period, the IMT has been provided with updates on the progress of the Performance Evaluation System implementation plans.

On July 21, 2022, the City and CPD produced *Performance Evaluation System Training*. The IMT submitted a no-objection letter on August 4, 2022. The IMT believes that the trainings were well-designed as they included adult learning methods and covered the required material. We observed the human resources portion of this training on November 4, 2022. It was well-received by the members and the instructors effectively engaged with the participants. IMT members noted that the CPD curriculum contained the components required by the Consent Decree and in some areas, exceeded our expectations. An example of that is the focus on training the raters on the type of learner their employees are: auditory, kinesthetic, visual or reading/writing learners. This level of detail is not often seen in training materials on performance evaluation systems and can significantly impact how the employee receives feedback and encouragement. Additionally, the curriculum addressed the expectation that supervisors complete performance evaluations only for members whom they have directly supervised.

*** 

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶373. We look forward to future site visits and focus groups to gather direct input regarding the Performance Evaluation System. The IMT also hopes to see these formal trainings reinforced through informal instruction, such as rollcall training. It will also be important for the CPD to recognize the

interconnectedness of all pilot programs (Unity of Command, Span of Control, Performance Evaluation System, and Officer Support System) as they move toward expansion. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs. Further, we look forward to observing evaluation committee meetings and hope to see a shift from a briefing model to more collaborative and conversational structure.

### Paragraph 373 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶374

> **374.** *In addition to the formal annual performance evaluation, supervisors will meet with members under their direct command on an ongoing basis as necessary to provide guidance, mentoring, direction, and support to the members regarding their performance and to identify opportunities for improvement.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance (FIFTH REPORTING PERIOD)* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶374 in the seventh reporting period, but did not reach Secondary compliance.

To assess Preliminary compliance with ¶374, we reviewed, among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, we reviewed the CPD's training development, implementation, and evaluation. We sought to review the Performance Evaluation System training in addition to data sources, including written documentation and interviews with supervisors and those under their command.

*Progress before the Seventh Reporting Period*

In previous reporting periods, we reviewed drafts of the *Unity of Command and Span of Control—Pilot Program Policy* (D20-02), and the Performance Evaluation System Directive and Handbook. These materials marked progress toward compliance with ¶374. However, because the materials remained in the collaborative revision process and had not been finalized or implemented, the City and the CPD did not reach Preliminary compliance with this paragraph.

We noted in the fourth reporting period that the previous policies provided by the CPD demonstrated that D21-09 would be a great improvement. For example, we explained that *Performance Evaluations of all Sworn Department Members Below the Rank of Superintendent* (E05-01) only required the evaluator to provide job-performance feedback to members at the conclusion of an evaluation period. We commended the CPD's efforts to codify the requirement that supervisors provide informal and ongoing feedback to members under their command.

In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶374 by finalizing the updated *Performance Evaluation System - Pilot Program Policy* (D21-09). Section V-B of this policy states that supervisors are responsible for ongoing job performance evaluation of the department members they supervise, beyond the annual performance evaluations. We shared that, in the next reporting period, and to obtain Secondary compliance, the IMT looks forward to reviewing Performance Evaluation System training in addition to data sources, including written documentation and interviews with supervisors and those under their command.

During the sixth reporting period, the IMT reviewed training materials for sworn members associated with the Performance Evaluation System (PES) Pilot Program, consisting of the Performance Evaluation System Handbook, Guide Book, Evaluation Survey, Test, Training Video, and Instructors Guide. The training materials provide guidance to supervisors on how to assist in setting professional goals for members and their responsibility to provide ongoing mentoring and coaching.

Additionally, in April 2022, the IMT conducted an in-person site visit, during which we were able to speak with groups of officers, supervisors, and command staff within the 6th District. These conversations provided additional insight into the realities of supervision and daily operations in the department. During this site visit, we also had to opportunity to observe a productive roll-call where sergeants and lieutenants debriefed situations that occurred on previous shifts with a focus on officer safety, community service, and policy clarifications. This was an effective example of guidance, mentoring, and direction outside of formal performance evaluations as required by the Consent Decree. The IMT notes that these observations are an important step toward assessing further levels of compliance.

*Progress in the Seventh Reporting Period*

In virtual meetings with members of the City and the CPD throughout the seventh reporting period, the IMT has been provided with updates on the progress of the Performance Evaluation System implementation plans.

On July 21, 2022, the City and CPD produced *Performance Evaluation System Training*. The IMT submitted a no-objection letter on August 4, 2022. The IMT believes that the trainings were well-designed as they included adult learning methods and covered the required material. We observed the human resources portion of this training on November 4, 2022. It was well-received by the members and the instructors effectively engaged with the participants. IMT members noted that the CPD curriculum contained the components required by the Consent Decree and in some areas, exceeded our expectations. An example of that is the focus on training the raters on the type of learner their employees are: auditory, kinesthetic, visual or reading/writing learners. This level of detail is not often seen

in training materials on performance evaluation systems and can significantly impact how the employee receives feedback and encouragement. Additionally, the curriculum addressed the expectation that supervisors provide ongoing feedback to members under their supervision between formal evaluations.

\*\*\*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶374. We look forward to future site visits and focus groups to gather direct input regarding the Performance Evaluation System. The IMT also hopes to see these formal trainings reinforced through informal instruction, such as rollcall training. It will also be important for the CPD to recognize the interconnectedness of all pilot programs (Unity of Command, Span of Control, Performance Evaluation System, and Officer Support System) as they move toward expansion. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs. Further, we look forward to observing evaluation committee meetings and hope to see a shift from a briefing model to more collaborative and conversational structure.

### Paragraph 374 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶375

> **375.** *Supervisors will recognize, when appropriate, formally (e.g., recommendation for commendation) and/or informally (e.g., public and private praise) subordinate members who demonstrate a commitment to procedural justice, de-escalation, impartial policing, and/or community policing.*

### Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶375 in the seventh reporting period, but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶375, we reviewed, among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41). For Secondary compliance, we reviewed the CPD's training development, implementation, and evaluation. We considered the Performance Evaluation System and Performance Recognition System trainings along with qualitative and quantitative data from both systems to support compliance with ¶375.

*Progress before the Seventh Reporting Period*

In prior reporting periods, the CPD revised and produced the *Performance Evaluations System – Pilot Program* (D21-09) and the *Performance Evaluations of All Sworn Department Members Below the Rank of Superintendent* (E05-01). E05-01 remained in place for members who are not in the Performance Evaluations System Pilot Program, which was and is being piloted in the 4th, 6th, and 7th Districts only.

We noted in the fourth reporting period that D21-09 demonstrated a marked improvement over E05-01 regarding the requirement in ¶375: supervisors recognizing subordinate members who demonstrate a commitment to procedural justice, de-escalation, impartial policing, or community policing. We noted that while E05-01 referenced recognizing exceptional performance by members and rewarding the same with commendations and other forms of recognition, D21-09 specifically outlined the requisite dimensions on which officers will be assessed, one of which was "Respect for People and Public Trust," which included such core competencies as respect, community policing, procedural justice, and impartial policing. We noted that these specified dimensions not only provided guidance to

supervisors conducting evaluations but also helped solidify that the CPD valued these various dimensions.

In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶375 by finalizing the updated *Performance Evaluation System - Pilot Program Policy*, D21-09 and the *Performance Recognition System Policy*, E05-02. Section III-B of D21-09 and Section IV-C of E05-02 outline the responsibility of supervisors to recognize the achievements of department members under their command. We shared that, in the next reporting period, and to achieve Secondary compliance, the IMT looks forward to reviewing the Performance Evaluation System and Performance Recognition System training along with qualitative and quantitative data from both systems to support ¶375.

During the sixth reporting period, the IMT reviewed training materials for sworn members associated with the Performance Evaluation System (PES) Pilot Program, consisting of the Performance Evaluation System Handbook, Guide Book, Evaluation Survey, Test, Training Video, and Instructors Guide. The training materials provide guidance to supervisors on how to assist in setting professional goals for members and their responsibility to provide ongoing mentoring and coaching.

Additionally, in April 2022, the IMT conducted an in-person site visit, during which we were able to speak with groups of officers, supervisors, and command staff within the 6th District. These conversations provided additional insight into the realities of supervision and daily operations in the department. During this site visit, we also had to opportunity to observe a productive roll-call where sergeants and lieutenants debriefed situations that occurred on previous shifts and shared general praise and appreciation for how officers were effectively handling high call volumes. The IMT notes that these observations are an important step toward assessing further levels of compliance.

*Progress in the Seventh Reporting Period*

In virtual meetings with members of the City and the CPD throughout the seventh reporting period, the IMT has been provided with updates on the progress of the Performance Evaluation System implementation plans.

On July 21, 2022, the City and CPD produced *Performance Evaluation System Training*. The IMT submitted a no-objection letter on August 4, 2022. The IMT believes that the trainings were well-designed as they included adult learning methods and covered the required material. We observed the human resources portion of this training on November 4, 2022. It was well-received by the members and the instructors effectively engaged with the participants. IMT members noted that the CPD curriculum contained the components required by the Consent Decree and in some areas, exceeded our expectations. An example of that is the

focus on training the raters on the type of learner their employees are: auditory, kinesthetic, visual or reading/writing learners. This level of detail is not often seen in training materials on performance evaluation systems and can significantly impact how the employee receives feedback and encouragement. Additionally, the curriculum addressed the expectation that supervisors provide formal and informal recognition to members when appropriate.

\*\*\*

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶375. We look forward to future site visits and focus groups to gather direct input regarding the Performance Evaluation System. The IMT also hopes to see these formal trainings reinforced through informal instruction, such as rollcall training. It will also be important for the CPD to recognize the interconnectedness of all pilot programs (Unity of Command, Span of Control, Performance Evaluation System, and Officer Support System) as they move toward expansion. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs. Further, we look forward to observing evaluation committee meetings and hope to see a shift from a briefing model to more collaborative and conversational structure.

### Paragraph 375 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Supervision: ¶376

> **376.** *CPD will maintain records of performance evaluations in the appropriate electronic data tracking system.*

## Compliance Progress
(Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶376 in the seventh reporting period, but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶376, we reviewed, among other things, the CPD's relevant records and submitted information to determine whether the CPD had acquired and implemented an appropriate computer system to track data required by the paragraph. We also looked to review any related policies, following the process described in the Consent Decree (¶¶626–41). To assess Secondary compliance, the IMT relevant data sources to determine whether the CPD sufficiently maintains records in the electronic tracking system that reflect data integrity, efficiency, and analytical sophistication.

*Progress before the Seventh Reporting Period*

The IMT assessed compliance with ¶376 for the first time during the third reporting period. In the third reporting period, the City and the CPD made steps toward compliance with ¶376 requirements. The CPD's Performance Evaluation System—a program that remained in the review and revision process at the close of the third reporting period—addressed the requirements set out in this paragraph. However, we noted that beyond the development and implementation of the Performance Evaluation System, the CPD must also focus on the acquisition or implementation of appropriate technology for compliance with ¶376's record-maintenance requirements.

During the fourth reporting period, the CPD provided the IMT and the OAG with live demonstrations of the Performance Evaluations Electronic System, which is used to create and store performance evaluations. Because the Performance Evaluation Electronic System was not yet fully implemented by the end of the reporting period, the CPD did not reach Preliminary compliance with ¶376 in the fourth reporting period.

In the fifth reporting period, the City and the CPD achieved Preliminary compliance with ¶376 by finalizing the updated *Performance Evaluation System - Pilot Program Policy* (D21-09). The IMT has observed live demonstrations of the

Performance Evaluation Electronic System during previous reporting periods. We shared that, in future reporting periods, the IMT looks forward to receiving actual demonstrations of the live Performance Evaluation System platform being utilized in the Performance Evaluation System Pilot Program, in addition to the training on the system with pilot district supervisors.

During the sixth reporting period, the IMT reviewed training materials for sworn members associated with the Performance Evaluation System (PES) Pilot Program, consisting of the Performance Evaluation System Handbook, Guide Book, Evaluation Survey, Test, Training Video, and Instructors Guide. The training materials clearly outline how department supervisors will maintain records of performance evaluations in the appropriate electronic data tracking system.

The IMT recognizes that the CPD has convened a Unity of Command and Span of Control Pilot Program Evaluation Committee, which is to meet at least quarterly to discuss implementation progress and share feedback from department members. This evaluation committee has been expanded to provide feedback on other pilot programs, to include the Performance Evaluation System pilot along with its tracking system. The IMT observed one evaluation committee meeting on June 2, 2022. It is the hope of the IMT that the committee will be able to anticipate and address a number of the possible challenges in order to ensure a smoother implementation process.

*Progress in the Seventh Reporting Period*

In virtual meetings with members of the City and the CPD throughout the seventh reporting period, the IMT has been provided with updates on the progress of the Performance Evaluation System implementation plans.

On July 21, 2022, the City and CPD produced *Performance Evaluation System Training*. The IMT submitted a no-objection letter on August 4, 2022. The IMT believes that the trainings were well-designed as they included adult learning methods and covered the required material. We observed the human resources portion of this training on November 4, 2022. It was well-received by the members and the instructors effectively engaged with the participants. IMT members noted that the CPD curriculum contained the components required by the Consent Decree.

*** 

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶376. We look forward to future site visits and focus groups to gather direct input regarding the Performance Evaluation System. The IMT also hopes to see these formal trainings reinforced through informal instruction, such as rollcall training. We will review the forthcoming evaluation plans for the officer

support system, Performance Evaluation System, and Unity of Command and Span of Control pilots. These plans are integral to the success of the programs and the IMT hopes to see a focus on the data collection necessary to successfully implement the programs. Further, we look forward to observing evaluation committee meetings and hope to see a shift from a briefing model to more collaborative and conversational structure.

## Paragraph 376 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Appendix 8

# Officer Wellness and Support
## Compliance Assessments by Paragraph

| | | | |
|---|---|---|---|
| ¶381 | ¶390 | ¶399 | ¶410 |
| ¶382 | ¶391 | ¶400 | ¶411 |
| ¶383 | ¶392 | ¶401 | ¶412 |
| ¶384 | ¶393 | ¶402 | ¶413 |
| ¶385 | ¶394 | ¶404 | ¶414 |
| ¶386 | ¶395 | ¶406 | ¶415 |
| ¶387 | ¶396 | ¶407 | ¶416 |
| ¶388 | ¶397 | ¶408 | ¶417 |
| ¶389 | ¶398 | ¶409 | ¶418 |

# Officer Wellness and Support: ¶381

> **381.** *CPD will provide its members with a range of support services that comport with mental health professional standards and that seek to minimize the risk of harm from stress, trauma, alcohol and substance abuse, and mental illness. These support services will include: readily accessible confidential counseling services with both internal and external referrals; peer support; traumatic incident debriefings and crisis counseling; and stress management and officer wellness training.*

### Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Secondary compliance for ¶381 during the seventh reporting period.

To assess Preliminary compliance with ¶381, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, we reviewed records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities required by ¶381. We also considered whether the staff is sufficiently trained to provide the services required by the paragraph.

To evaluate Full compliance with ¶381, we considered data sources necessary or helpful to identify and verify sustained compliance and reform efforts relevant to the requirements of the paragraph. Specifically, we determined whether the CPD has sufficient methods for tracking, analyzing, and responding to various data points regarding officer-wellness services.

*Progress before the Seventh Reporting Period*

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶381 by submitting the *Professional Counseling Division (PCD)* Policy (E06-01), the CPD's Officer Wellness Support Plan, and the CPD's Standard Operating Procedure (SOP) 19-01. The combination of E06-01, the Officer Wellness Support Plan, and SOP 19-01 establish a robust foundation for providing CPD members with a range of services contemplated in ¶381.

The City and the CPD then achieved Secondary compliance with ¶381 by providing record of the clinicians' certifications and evidence the staff have necessary

training and credentials, as well as a breadth of experience providing the services contemplated by E06-01 and ¶381.

During the fifth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶381, but did not reach Full compliance. The IMT noted that we anticipated the CPD to implement a technology solution to adequately track and evaluate services offered, including data that reflects the efficiencies of tracking programs and services to all CPD personnel, and we specified the type of data we would expect to see tracked. We further explained that we did not see proof that reflects a corporate outreach effort for the civilian staff members via training and other means to ensure accessibility to Professional Counseling Division (also known as the PCD) services.

In the sixth reporting period, the IMT reiterated the importance to collect and produce anonymous data to support the efficiency, effectiveness, and the planning for and forecasting of additional resources. During these discussions, the Professional Counseling Division informed the IMT of the development of iCarol, a software system which should provide the necessary data and related information. The full launch of the iCarol system was originally scheduled for June 2022 but was delayed and did not launch during the sixth reporting period. The CPD also failed to provide specific data regarding client caseload and the non-identifying demographics that were requested in the fifth reporting period.

Also during the sixth period, the IMT received the Professional Counseling Division's 2022 Communication Strategy. The strategy was a great start to increase in mental health awareness for CPD personnel, but lacked other facets of wellness (i.e., financial, physical, and spiritual) as referenced in the strategy. The IMT recommended that the Professional Counseling Division provide details relating to how the non-sworn members of the CPD gain access to the same information about the available services because they do not attend roll calls or in-service trainings like the sworn personnel.

The City and the CPD produced three trainings for compliance under ¶381 in the sixth reporting period: the Peer Support Refresher training, the Traumatic Incident Stress Management Program (or TISMP) eLearning, and the Active Bystandardship for Law-Enforcement (ABLE) training. The City's Department of Human Resources also posted for an additional 11 clinician positions to aid in the delivery of these confidential services, after the CPD obtained budgetary approval.

*Progress in the Seventh Reporting Period*

During the various virtual site visits and meetings with the Professional Counseling Division and staff, the IMT was informed that the iCarol system was primarily in a pilot phase and much of the data that should reflect the various entities of services

provided by the PCD was first entered on manual forms then inputted in the iCarol system. Therefore, while the data references were presented either in conversation or anecdotally, the IMT has not been able to review any anonymized data during the seventh reporting period. However, the IMT did receive a number of productions submitted that referenced the services of the Professional Counseling Division, which included the CIT In-Service Training and the Traumatic Incident Stress Management Program (TISMP) eLearning. According to documents reviewed by the IMT, the TISMP eLearning included both sworn and non-sworn members.

During the seventh reporting period, a memo from the Director of Professional Counseling (Ref. # 281792 – EAP and Cooling Station) was sent to all units regarding the July 2-3, 2022 deployments. The memo emphasized the Professional Counseling Division and Employee Assistance Program providing additional officer wellness resources, including AA No Cop Out meetings, counseling via Zoom during the deployment weekend, in-person meetings for officers in recovery, and a cooling station with coffee and water provided. This "all hands-on deck" approach was one of the CPD's effort to help alleviate stress during the July 4th weekend of deployments.

The Professional Counseling Division along with the CPD have worked with the City's Department of Human Resources to post for the available mental health clinician positions, which were appropriated in the previous budget year. The selection process, which will be discussed in later paragraphs, was advertised via the NOJO (Notification of Job Opportunity) for qualified candidates. They continue to fill the vacant positions.

In October 2022, the IMT held a virtual community listening session, which included discussions regarding the stressors that contributed to the demand for Professional Counseling Division services. The audience, which consisted primarily of CPD members, shared their opinions and concerns about services provided. Some audience members on the call voiced concerns that ranged from uncertainty of the available resources to outright distrust of service delivery for counseling. Other members expressed they were satisfied with the services they received from the Professional Counseling Division.

*** 

The IMT continues to encourage the City and the CPD to be diligent in its efforts to provide counseling services to the membership as the department has experienced both tragedy and loss of its members, through both line of duty deaths and personal experiences. The collective trauma of the CPD members necessitates that the CPD and the City remain vigilant in seeking opportunities, training, and available services that promote confidentiality and minimize the risk of harm from stress, trauma, alcohol, and substance use. The efforts of the CPD

are evolving—as is the collective needs of its membership. Thus, to reach the optimal levels needed, its approach must be multi-faceted and multi-dimensional while recognizing when outside/external resources are better options, through referrals, training, and supportive partnerships.

Therefore, the City and the CPD maintained Secondary compliance with this paragraph. To reach Full compliance, the IMT continues to seek opportunities to review consistent and continuous data that reflects the dedication and efforts by the Professional Counseling Division in providing the services to the CPD members.

### Paragraph 381 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Officer Wellness and Support: ¶382

> **382.** *CPD currently offers clinical counseling services, programs regarding alcoholism and other addictions, and a peer support program to help CPD members cope with the psychological and personal toll their jobs can impose. By September 1, 2019, CPD will complete a needs assessment to determine what additional resources are necessary to ensure the support services available to CPD members comport with best practices and mental health professional standards.*

**Compliance Progress**            (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Full:**            *Not in Compliance*

The City and the CPD maintained Secondary compliance with ¶382 during the seventh reporting period.

To assess Preliminary and Secondary compliance with ¶382, we reviewed the CPD's relevant policies and records including the needs assessment and the CPD's Officer Wellness Support Plan. For Full compliance, we sought to determine whether the Officer Wellness Support Plan robustly supplements the initially conducted needs assessment and whether the CPD has sufficient methods for tracking, analyzing, and responding to various data points regarding officer wellness services.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶382 by completing the required needs assessment and addressing additional concerns via the CPD's Officer Wellness Support Plan. However, we found the CPD had not yet provided enough evidence demonstrating Full compliance because the CPD had not yet shown the IMT that the Officer Wellness Support Plan robustly supplements the initially conducted needs assessment and is a living document.

Further, the CPD must implement a system to track the provision and use of wellness services and provide updated timelines for plans to address the member needs identified by these sources accurately and efficiently. As noted in the fourth reporting period, an updated timeline will allow the Professional Counseling Division (also known as the PCD) to establish a definitive timeframe as the goals and needs of both the division and the CPD members continue to evolve. In the

sixth reporting period, the Professional Counseling Division submitted the 2022 Communication Strategy; however, it had not yet been fully implemented.

*Progress in the Seventh Reporting Period*

During the seventh reporting period, the CPD and the Professional Counseling Division have recognized that there is a need to complete an assessment more frequently than they have been done in the past. The IMT concurs with the need to conduct more frequent needs assessments, as the CPD completed the last wellness assessment in 2019 and an initial communication strategy in 2020. Additionally, the follow-through in response to the assessment findings must be executable, yet flexible to make changes or corrections for improving delivery, efficiency, and effectiveness.

<div align="center">***</div>

While the City and the CPD maintained Secondary compliance, they did not reach Full compliance with this paragraph. In a virtual meeting this reporting period with the Professional Counseling Division, the members referenced the expectation and need to develop a more recent assessment tool. The IMT looks forward to seeing the next needs assessment come to fruition and would like to be informed of the development process for the next assessment tool. As the onset of the eighth reporting period is the beginning of a new calendar year, timeliness and planning are critical with regard to wellness.

## Paragraph 382 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Officer Wellness and Support: ¶383

*383. The needs assessment should analyze, at a minimum: a. staffing levels in CPD's Professional Counseling Division; b. the current workload of the licensed mental health professionals and drug and alcohol counselors employed by CPD; c. how long it takes CPD members requesting counseling services to be seen by a licensed mental health professional or drug and alcohol counselor; d. the professional specialties of CPD's licensed mental health professionals; e. the frequency and reasons for referrals of CPD members to clinical service providers external to CPD and the quality of those services; f. CPD member feedback, through statistically valid surveys that ensure anonymity to participants consistent with established Professional Counseling Division guidelines, regarding the scope and nature of the support services needs of CPD members and the quality and availability of services and programs currently provided through the Employee Assistance Program; g. similar mental health services offered in other large departments, including the ratio of licensed mental health professionals to sworn officers and the number of counseling hours provided per counselor per week; h. guidance available from law enforcement professional associations; i. the frequency and adequacy of CPD's communications to CPD members regarding the support services available to them; j. the frequency, quality, and demand for in-service trainings related to stress management, officer wellness, and related topics; and k. the quality of recruit training related to stress management, officer wellness, and related topics.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**      *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**       *In Compliance* (THIRD REPORTING PERIOD)
**Full:**            *Not in Compliance*

The City and the CPD maintained Secondary compliance with ¶383 during the seventh reporting period.

To evaluate Preliminary compliance with ¶383, we determined whether the CPD has allocated sufficient resources to conduct a needs assessment as required by this paragraph. For Secondary compliance, we determined whether the CPD has conducted the corresponding needs assessment.

To assess Full compliance with ¶383, we considered whether at least each subparagraph of ¶383 has been sufficiently assessed, and whether the CPD has

the technology necessary to accurately collect and report data regarding the Professional Counseling Division's (also known as the PCD) services, staffing, and consumption of those services. The CPD should be striving to reach a point at which they are able to continually assess and adapt the services the Professional Counseling Division provides to better meet the needs of CPD members.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶383 by developing the Officer Wellness Support Plan, which built upon the needs assessment. The Officer Wellness Support Plan created a framework for future assessments of the CPD's wellness-related needs. Additionally, we found the Professional Counseling Division (also known as the PCD) continued to utilize stopgap measures to track use and provision of services, compiled, and submitted the 2021 Report to the Superintendent based on anecdotal evidence.

During the fifth and sixth reporting periods, the Professional Counseling Division demonstrated its efforts to increase staffing by posting notification for job opportunities for 11 additional counselors who were approved in a budget process in early 2022. The Professional Counseling Division also hired a Wellness Director and began onboarding this position in the sixth reporting period. The Wellness Director will be responsible for both the frequency and adequacy of providing relevant information to the CPD members.

In the fifth reporting period, the IMT noted that the CPD would need to establish the necessary benchmarks to determine what the Professional Counseling Division's true capacity for providing services is to further determine where and when future resources may be needed. This is true for several sub-paragraphs (c, e, f, g, i, and k). In the sixth reporting period, the workload (subparagraph (b)) remained a question of the IMT to understand whether the units were adequately providing the most effective and efficient services they can to the CPD membership. The IMT had yet to obtain data that represents the active or closed caseloads by any of the service units within the Professional Counseling Division. The Professional Counseling Division has indicated that the length of time between the request for services and the appointment (subparagraph (c)) has been reduced but the IMT has not received any data regarding the same.

During the sixth reporting period, the CPD introduced the eLearning curriculum on the Traumatic Incident Stress Management Program (TISMP) (subparagraph (j)). The IMT commended the CPD for the quality of this training and requested to review the pre- and post-tests for this particular training. The CPD also produced the Suicide Prevention Initiative and the Active Bystandership for Law-Enforcement (ABLE) training under this paragraph.

With the introduction of some technological tools during the fifth and sixth reporting periods, the CPD had made some progress toward, but did not meet Full compliance with ¶383. Because the CPD remained limited by technological capabilities, we found the CPD had not yet provided evidence demonstrating compliance with subsections (b), (c), and (e) of ¶383. We explained that the CPD would need to acquire or implement technology that could digitally track and assess wellness services to allow for proper analysis, benchmarking, and strategic forecasting as noted in the subparagraphs. To achieve Full compliance with ¶383, the CPD must meet the requirements of each subparagraph. With the collective application of both the Officer Wellness Support Plan and the needs assessment, some areas are progressively shifting but attainable data had not yet been presented to the IMT.

*Progress in the Seventh Reporting Period*

The IMT routinely met with members of the Professional Counseling Division throughout the seventh reporting period. The discussions have provided insight on the status of various programs and initiatives that are underway and in various phases relative to the subparagraphs of ¶383. Although the Officer Wellness Support Plan was produced during the third reporting period, the CPD has not produced the necessary data to show that the current staffing levels are adequate (subparagraph (a)).

During the fifth reporting period, the City allocated 11 new clinician positions. However, the CPD has experienced some challenges with filling all the vacancies. During the virtual meetings with the Professional Counseling Division this reporting period, the IMT discussed evidence of the NOJO (Notification of Job Opportunity) for the clinician positions. The Professional Counseling Division shared the challenges that impact hiring qualified candidates, including the current pay which is significantly below the market rate for similar positions, the demand for counseling on a 24/7 basis, and the time commitment.

The IMT has inquired about the validity and source of information and was apprised that it had been gained through feedback from applicants who withdrew from the interview/hiring/selection process, some of the candidates who declined their offers due to pay issues previously mentioned, and feedback from peer professionals about various factors as well, who are not employed by the City of Chicago.

Though anecdotally, this information was revisited several times during the seventh reporting period. The IMT initially inquired if the Professional Counseling Division and/or the CPD had considered meeting with the City's Department of Human Resources for a review of the NOJO, to discuss marketing strategies, the vacant positions, and relative pay. During the seventh reporting period, it was

discussed that these conversations were starting to happen and efforts to re-evaluate the specific classification level designated for the clinicians, responsibilities, and pay were among the considerations to develop a more appealing package for the position for hire. The IMT must iterate that the other subparagraphs of ¶383 are directly impacted by this issue of hiring qualified clinicians.

Without data from the needs assessment or unit performance data, the current workloads (subparagraph (b)) of the mental health counselors and the other Professional Counseling Division units are undetermined. The IMT still awaits an opportunity to review anonymized data from the iCarol system. Perhaps the data can aid in determining workload and provide some indication of appropriate work levels needed to address services for the CPD membership. Even though the information was recorded in paper form, the data has not been shared with the IMT. Additionally, according to the Professional Counseling Division staff, the iCarol pilot testing phase ended in November 2022, but the IMT has not received any of the digital information either.

<div align="center">***</div>

Therefore, the City and the CPD has maintained Secondary compliance with this paragraph, but has yet to reach Full compliance. The IMT again iterates the importance of taking a collective, multi-dimensional approach to gather, produce, and use the data sooner than later to support the requirements of this paragraph. Specific to subparagraphs (j) and (k), the CPD conducted an audit of the TISMP program and found several areas that required corrections or policy revisions based on findings and recommendations following the audit. The IMT awaits further verification that such changes and recommendations have been made.

### Paragraph 383 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Yet Applicable | None | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Officer Wellness and Support: ¶384

> **384.** *Within 60 days of the completion of the needs assessment, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs identified through the needs assessment required by the immediately preceding paragraph ("Officer Support Systems Plan"). CPD will implement the Officer Support Systems Plan in accordance with the specified timeline for implementation.*

**Compliance Progress**       (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Secondary compliance with ¶384 during the seventh reporting period.

To assess Preliminary compliance with ¶384, we determined whether the CPD developed a sufficient Officer Wellness Support Plan to prioritize and address the needs assessment. For Secondary compliance, we determined whether the Officer Wellness Support Plan was sufficient and meets the requirement of this paragraph.

To evaluate Full compliance with ¶384, we reviewed data relevant to determining whether the CPD has implemented the Officer Wellness Support Plan. We further reviewed whether the CPD is adequately and appropriately using technology to sustainably and accurately track Professional Counseling Division (also known as the PCD) services. This would also include tracking the use of those services, and identifying trends and emerging wellness needs of personnel, which would allow the CPD to determine if they are allocating resources appropriately.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶384 by finalizing the *Officer Wellness Support Plan*, which provides a framework for iterative review and assessment of the CPD's ability to meet the wellness needs of its members. However, the Professional Counseling Division did not reach Full compliance due to the technological limitations preventing them from scheduling, tracking, and reporting on the Professional Counseling Division's activities more efficiently and accurately. We previously explained that the City and the CPD would need to provide updated

timelines with clear expectations, which would allow the IMT to monitor their progress against their department-set expectations.

While the Officer Wellness Support Plan clearly specifies areas that offer a comprehensive approach to long-term solutions, the timeline, as noted in ¶384 and in the Officer Wellness Support Plan, is too broad as it references specific paragraphs with the timeline for project completion. There are aspects of the Officer Wellness Support Plan that indicate implementation phases but do not create substantive and definitive steps to support the priorities, nor demonstrate the processes to address the needs delivered in the Officer Wellness Support Plan and the needs assessment. Additionally, as mentioned in the IMT's last three reports, the CPD needs to implement technological solutions to conduct the necessary comprehensive data analysis.

*Progress in the Seventh Reporting Period*

The CPD has not produced necessary data to show that they have met the stipulations of the last needs assessment. The IMT recognizes the various efforts put forth by the CPD and the Professional Counseling Division. However, the CPD does not have the necessary technological support to produce the data that offers evidence that the facets of the needs assessments are being met. Without data from the previous assessment, the timeliness of its efforts to meet these needs are a cause for concern. During a virtual meeting in the seventh reporting period, the Professional Counseling Division acknowledged that it should produce a needs assessment more frequently, but has not done so.

\*\*\*

The City and the CPD currently maintain Secondary compliance for this paragraph. However, with the lack of progress since the third reporting period and inability to demonstrate that existing levels of compliance are building toward Full compliance, the City and the CPD may be at risk of losing its compliance with ¶384 in the next reporting period. To maintain compliance, the CPD needs to produce relative data that comprehensively addresses the needs identified in the needs assessment plan.

## Paragraph 384 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:

Secondary

# Officer Wellness and Support: ¶385

> **385.** *As a component of CPD's Officer Support Systems Plan, CPD will develop and implement a communications strategy. The objectives of this communications strategy will be: a. to inform CPD members of the support services available to them; b. to address stigmas, misinformation, or other potential barriers to members using these services; and c. to emphasize that supporting officer wellness is an integral part of CPD's operations.*

## Compliance Progress                (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD have maintained Secondary compliance for ¶385 in the seventh reporting period.

To assess Preliminary compliance, we reviewed whether the CPD had a sufficient plan to develop and implement a communications strategy per ¶385. For Secondary compliance, we reviewed data and gathered information to determine whether the communications strategy, when put into practice, would be sufficient to meet the objectives of ¶385.

To evaluate Full compliance with ¶385, we considered whether the CPD has implemented and sustained implementation of a communications strategy to effectively disseminate information, dispel misinformation, and emphasize the CPD's commitment to wellness. We also considered the extent to which the CPD is continuously assessing its communications strategy and making appropriate adjustments.

*Progress before the Seventh Reporting Period*

During the third reporting period, the City and the CPD achieved Preliminary and Secondary compliance by submitting the Officer Wellness Support Plan to develop and implement a communication strategy that would fulfill all requirements of ¶385. The Officer Wellness Support Plan includes sufficient communications strategies for both general dissemination of information regarding Professional Counseling Division services and targeted outreach.

The CPD also submitted evidence of varied, extensive, and continued efforts to disseminate information that emphasizes member wellness, works to dispel misinformation, and informs members of wellness services available to them.

However, because Full compliance requires demonstration of sustained efforts under the communications strategy, we explained that the CPD must submit evidence that the CPD is assessing the effectiveness of the communications strategy and adjusting as needed. Additionally, we explained that, to reach Full compliance, the CPD must submit evidence that the communications are addressing stigmas and misinformation and expressing the CPD's continued commitment to supporting wellness.

In the fifth reporting period, the Professional Counseling Division made significant progress toward Full compliance with ¶385 by demonstrating dissemination of materials to promote several aspects of effective communication, including in various training curricula. However, the IMT had not seen the CPD's communication strategy sustained where documents are routinely updated, and where data is collected, analyzed, and addressed. The communications strategy, like the Officer Wellness Support Plan, should be utilized as a living document to ensure that relevant and current material is posted, pushed, and instructed.

Additionally, during the fifth and sixth reporting periods, the IMT stressed the importance of communicating the wellness services to all CPD members. During an Officer Wellness in-service training, the IMT observed that some participants were familiar with the Professional Counseling Division's services, and other participants were not. The Professional Counseling Division and CPD leadership should strive to ensure all CPD personnel are aware of the available services. While the sworn staff receive information in various formats, the civilian staff were not as strategically reached through outreach efforts such as training and roll calls. The IMT stated the importance of the inclusion of civilian staff in those efforts as well to ensure education and awareness are equitably conveyed and inquired as to how the non-sworn members gain access to the same information regarding services as they do not attend rollcall or in-service training like sworn personnel.

During the sixth reporting period, the Professional Counseling Division submitted the 2022 Communications Strategy. The IMT stated it looked forward to receiving continued evidence of materials demonstrating the implementation of the communication strategy through 2022 toward Full compliance, which includes showing efforts to collect, analyze, and address concerns raised by data.

*Progress in the Seventh Reporting Period*

The 2022 Communications Strategy was a topic of discussion at various meetings between the CPD, the IMT, and the OAG during the seventh reporting period. The strategy focuses on three primary facets: the calendar, the contents, and the distribution of information. During these meetings, the CPD and the Professional Counseling Division provided an overview of its efforts but has seen very little evidence of what the calendar informs the CPD membership, the relevance of

content, and how distribution is carried out. There has been mention that the strategy is working, but there is a lack of evidence demonstrating the strategy's efficiency, how frequently the updates occur, and who actually received the information among CPD membership.

On two occasions during this reporting period, the IMT had an opportunity to hear from CPD membership, both directly and indirectly. One occasion was when the City Council members met with the members of the CPD regarding wellness in the Virtual Joint Committee Meeting on Human Relations and Public Safety. There was tremendous discussion (but not always agreement) on the effectiveness of communication throughout CPD, days off, and opportunities for engagement.

Also during this reporting period, the CPD conducted a survey regarding the CPD members' interest in utilizing a third-party wellness application. The survey reached both sworn and civilian members, and the CPD is in the process of vetting vendors. The IMT commends the CPD on their efforts to explore the app as it further supports the objectives of the communication strategy by informing members of available services at their fingertips, further attempts to address potential barriers, and demonstrates an innovative way to support wellness through the use of a smart device.

*** 

The City and the CPD maintained Secondary compliance with this paragraph. The IMT continues to look forward to the implementation of the 2022 Communication Strategy and the corresponding data that reflects collection, analysis, and steps taken to address concerns regarding wellness.

## Paragraph 385 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Officer Wellness and Support: ¶386

> *386. As part of this communications strategy, CPD will, at a minimum: a. make information about the support services available, on a continuing basis, to members on its internal websites; b. post information, including pamphlets and posters, in each CPD facility in areas frequented by officers; c. issue wallet-sized cards to every CPD member with contact information for the CPD support services available; d. inform and remind members about the CPD support services offered, including providing handouts with contact information, at the annual use of force training required by this Agreement, during Academy training of new recruits, and at in-service trainings relating to stress management and officer wellness; e. provide training to supervisory personnel regarding available CPD officer support services and strategies for communicating with officers about these services in a manner that minimizes any perceived stigma; and f. seek to identify and correct misperceptions among CPD members about receiving counseling services.*

## Compliance Progress           (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Secondary compliance for ¶386 during the seventh reporting period.

To evaluate Preliminary and Secondary compliance with ¶386, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outline applicable consultation, resolution, workout, and public comment periods. We also considered the CPD's training development, implementation, and evaluation. We looked at whether the CPD developed a plan to comply with ¶386 and whether the plan would be effective, when implemented.

To assess Full compliance with ¶386, we looked for evidence of continued outreach and communications related to wellness services. The communications should increase and maintain personnel awareness of services provided by the Professional Counseling Division (also known as the PCD). We also looked for qualitative and quantitative data necessary to assess personnel of all rank's awareness of Professional Counseling Division services and determine whether members are aware of how to access desired information regarding these services.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶386 by submitting the CPD's communications strategy set out in the Officer Wellness Support Plan. We also reviewed materials produced pursuant to the communications strategy. While the communication materials reflected an earnest commitment to disseminating robust and accurate information regarding the CPD's wellness services, we stressed the importance of keeping posted information updated and replenished on a regular basis.

During the fifth reporting period, the CPD took significant steps to increase the awareness of the Professional Counseling Division services and how to access those services through the Officer Wellness Support Plan and the communication strategy, which contain a strong foundation for ensuring that accessibility occurs. The CPD also continued to make information about the support services more readily available.

Furthermore, several forms of information were revised and disseminated to both internal and external members during the fourth and fifth reporting periods. The revised entities ranged from posted materials to numerous productions consisting of training materials, including the Officer Wellness in-service training, the Supervisors training, and the Employees Assistance Program (EAP) training.

During the fifth and sixth reporting period, the IMT also encouraged the City and the CPD to evaluate the benefits of a technology solution specifically designed for CPD personnel and their families. This technology would place counseling information and employee wellness resources at the fingertips of CPD personnel. With the addition of the Wellness Director in the Professional Counseling Division, this app would possibly ensure that the new pushes of information released in these periodic updates would be routinely released and pushed throughout the app as well, with the ability to add new material and to remove material that is no longer relevant with greater ease and less material costs. The wallet size card would become the comprehensive app on any smart device in this digital age.

During the sixth reporting period, the City and the CPD provided a draft of the Professional Counseling Division 2022 Communication Strategy for review. The IMT provided feedback and further iterated that the communication strategy was a great start to increase mental health awareness for CPD personnel. However, the IMT continued to seek confirmation on how the CPD and the Professional Counseling Division demonstrate their efforts to reach the non-sworn staff throughout the organization. While it has been clearly articulated that the Professional Counseling Division attends roll calls and conducts other trainings where sworn personnel are the recipients of the information promoting wellness and support, the Professional Counseling Division has not yet demonstrated via evidence or process how it reaches or specifically targets its civilian/non-sworn

personnel. Additionally, the IMT indicated it looks forward to seeing evidence of same as this communication strategy is a means of demonstrating a comprehensive effort to inform the entire membership of CPD. It has been articulated during the monthly meetings and virtual site visits that the roll call visits and various facets of training are ongoing and serve as a vehicle by which to inform the sworn membership.

As previously noted, to achieve Full compliance with ¶386, the IMT would need to see evidence of adaptations of the communications strategy when needed; evidence that the CPD's efforts under this paragraph are effective in providing the information to members; and evidence of ongoing efforts to identify and address the topics and issues pertinent to CPD members' stigma and misperceptions related to seeking counseling services. The IMT noted that in future reporting periods, we would like to see the schedule of roll calls, attendance, and receipts and records of other appearances that offer such a means to identify and correct misperceptions among all CPD members about receiving counseling services.

*Progress in the Seventh Reporting Period*

The CPD submitted the 2022 Communications Strategy during the sixth reporting period. However, to date, the IMT has not received any evidence that facets of the Communications Strategy are being measured. As the seventh reporting period ends with the calendar year 2022, the IMT also looks forward to the submission of the 2023 Communications Strategy and evidence of what was accomplished in the 2022 Communications Strategy or what will be carried over into 2023. Additionally, the IMT seeks to understand the expected plan of the CPD regarding the schedule for producing or updating the Communications Strategy in the future.

In the seventh reporting period, the IMT visited the CPD district stations. These visits afforded the IMT to locate, inspect, and observe the available postings and printed material regarding support services. Although the documents were located in various locations, the specific locations containing materials were not particularly consistent in each of the districts. Yet, it did appear the information was available for members, as required by subparagraph (b). The IMT looks forward to seeing records of how often materials are either updated or replaced in the various locations as changes in Professional Counseling Division's office locations and staffing have occurred recently and may continue to change.

Subparagraph (c) requires the CPD to "issue wallet-sized cards to every CPD member with contact information for the CPD support services available." While the CPD has not provided evidence that wallet-sized cards have been issued to every CPD member, it should be noted that the CPD is currently working on its preliminary efforts to consider the acquisition/procurement of a CPD wellness app. The CPD surveyed its membership to ask how they would feel about using a

digital application if offered. While the responses were minimal (n=984), there were obvious concerns of trust and questions of confidentiality. Upon review of the survey responses, the IMT inquired about how the survey was announced or introduced to the CPD membership prior to coming online. The IMT awaits a response.

For subparagraph (e), during the sixth reporting period, the CPD produced a supervisory training on CPD support services along with the Recruit Employee Assistance Program training. The IMT awaits data to show both delivery of the curricula and the corresponding attendance records. Additionally, the CPD provided the Annual Use of Force ICAT–Integrating Communications Assessment and Tactics Training, which included handouts to be provided at the training containing the available CPD support services as required by subparagraph (d). The IMT believes that the training will complement the ABLE training and the other scenario-based curricula.

In their efforts to identify and correct misperceptions about counseling services (subparagraph (f)), the Professional Counseling Division attends roll calls in person to share and present information regarding its available services. During the seventh reporting period, they hosted an open house event at the Professional Counseling Division's main location to inform the membership and their families of who they are and what services they provide. The IMT was told during one of the virtual site visits that members and some families attended the open house, but the IMT has not received any data to support the comment. The IMT applauds their efforts, but must iterate the value in attendance data or a feedback survey, which further helps to identify what was most effective, informative, or perhaps what else is needed. Such data collections also allow for the Professional Counseling Division to know if the majority in attendance were current CPD members, family members, retirees, or civilian employees.

The IMT appreciates and supports their efforts to be visible but must emphasize that their efforts must continue to be multi-dimensional as they seek opportunities that reduce stigma and misperceptions. Their efforts should be proactive, in-person (whenever possible), and engaging.

Additionally, although routinely requested by the IMT, the Professional Counseling Division has not produced evidence of contact results through training, roll calls, counseling sessions, open houses, no cop-out sessions, retreats, or other events to show the impact of their outreach efforts. While their attempts or events are ongoing, there has been no evidence produced to show that they are either successful, or that they occurred. The IMT continues to encourage the Professional Counseling Division to accurately document these encounters, roll-call events, trainings, and other events that further prove their efforts towards minimizing misperceptions. This aids in countering the feedback from hearings or app surveys

that speak to a portion of the membership, who appear to distrust the services or may just be ill-informed about applicable services provided by the Professional Counseling Division.

<p style="text-align:center">***</p>

Therefore, the City and the CPD maintained Preliminary compliance with this paragraph in the seventh reporting period. In order to reach Full compliance, the City and the CPD must provide data that validates the efforts/initiatives they are putting forth. Currently, they have not provided evidence to support a greater compliance level. Once again, the IMT, looks forward to reviewing data that supports ¶386.

### Paragraph 386 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

## Officer Wellness and Support: ¶387

> **387.** *Within 180 days of the Effective Date, CPD will develop and implement a roll call training to explain and address the effects on Firearm Owners Identification ("FOID") card eligibility, if any, when a CPD member seeks or receives CPD support services, including, but not limited to, counseling and mental health treatment.*

**Compliance Progress** (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD have maintained Secondary compliance during the seventh reporting period for ¶387.

To assess Preliminary and Secondary compliance, we reviewed information to determine whether the roll-call training was sufficient to explain and address the effects per ¶387. To evaluate Full compliance with ¶387, we sought to review a variety of data sources to determine whether the CPD continued to provide the FOID card training as necessary to ensure members and recruits are aware of the effects support services has on FOID card eligibility.

*Progress before the Seventh Reporting Period*

In earlier reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶387 by developing a FOID card roll-call training, providing documentation showing that 99% of eligible employees had received the training, and providing post-training survey data indicating the CPD members found the training helpful. In the third reporting period, we expressed that the CPD should provide evidence that the training continues to be implemented. While the communication strategy submitted under other paragraphs lists FOID-related messaging, no evidence of this plan being implemented was provided to the IMT. We explained that to reach Full compliance, the CPD would need to provide evidence of consistent communications with CPD members regarding FOID eligibility.

During the fifth reporting period, the IMT reviewed several productions that explained and addressed the effects of the FOID card eligibility when CPD members are seeking counseling and mental health treatment. This was evidenced in several topics of training.

During the sixth reporting period, the CPD and Professional Counseling Division produced several trainings that address the FOID card eligibility and the effects when members seek and receive CPD support services. These trainings are in various stages ranging from the document/curriculum revision stage to currently being instructed. The IMT also received evidence of attendance for completed instruction in these areas. As mentioned in ¶386, the IMT would like to see data that mirrors roll call training as well. Furthermore, as noted in the previous reporting period, the critical nature of this topic necessitates that it is not only referenced but the evidence supports the ongoing training and presentations.

Additionally, during the sixth reporting period, the CPD produced the 2022 CIT In-Service Training, which includes a module that is specific to officer wellness. Module #6 in this curriculum addresses the issue of FOID card revocation, reinstatement, and the circumstances that impact an officer's possession of the FOID card for both voluntary and involuntary mental health treatment.

As previously noted, to reach Full compliance, the FOID card information should be presented in the appropriate lesson plans. The IMT advised the CPD to establish a procedure to ensure that the messages are pushed in a manner that provides regular and routine messaging. The IMT would remind the CPD that the FOID card should be compiled with other beneficial counseling and mental health services information to ensure that the desire to seek services is not deterred.

*Progress in the Seventh Reporting Period*

The CPD did not produce any material relevant to this paragraph during the seventh reporting period. In previous reporting periods, the CPD produced the policy on FOID card eligibility, conducted roll call training, completed a FOID card survey, and infused the FOID card eligibility in several training topics. The IMT has reviewed several curricula in the sixth reporting period that reference the FOID card eligibility. However, the IMT is still awaiting data that concludes their efforts of training on these specific topics.

*** 

The City and the CPD remain in Secondary compliance for this paragraph. To reach Full compliance, the data reflecting the completion of training that covered the FOID card eligibility is needed. This delay in delivery presents the challenge to reach further compliance while recognizing there is an ongoing expectation that such training is continuously maintained, which should provide analytics more expeditiously in the future. The IMT looks forward to reviewing supporting data for ¶387.

## Paragraph 387 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
None

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Preliminary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Secondary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Secondary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Secondary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Secondary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Officer Wellness and Support: ¶388

**388.** *As a component of the Officer Support Systems Plan, by January 1, 2020, CPD will develop and implement a comprehensive suicide prevention initiative ("Suicide Prevention Initiative"). In designing the Suicide Prevention Initiative, CPD will examine similar initiatives implemented in other large departments and incorporate guidance available from law enforcement professional associations. The Suicide Prevention Initiative will be overseen by a licensed mental health professional working in conjunction with a command staff member.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have maintained Preliminary compliance for ¶388 during the seventh reporting period.

To evaluate Preliminary compliance with ¶388, we reviewed the Officer Wellness Support Plan to determine whether that effectively addressed and implemented a suicide prevention initiative. For Secondary compliance with ¶388, we reviewed data sources and considered, among other things, feedback from clinicians and the CPD members to determine whether the services provided by the CPD are proactively and reactively meeting the wellness needs of members.

### Progress before the Seventh Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶388 by submitting a variety of CPD documents, including the Officer Wellness Support Plan, communications regarding expanded Employee Assistance Program services, and drafts of the Traumatic Incident Stress Management Plan (TISMP) directive. The IMT has acknowledged that there is currently no "best practice" approach to use as a benchmark to measure the CPD's efforts related to suicide prevention. Recognizing this, the CPD worked to create a holistic wellness program to address the underlying concerns of ¶388. This holistic approach takes the place of a stand-alone suicide prevention initiative, which is appropriate because death by suicide is a complicated outcome rooted in factors still poorly understood.

The CPD submitted the Professional Counseling Division's 2021 Report to the Superintendent in the fourth reporting period. However, given the unavailability of other data regarding the consumption and provision of services, we explained that the City and the CPD had not yet reached Secondary compliance. We hoped to continue to see feedback loops between CPD members and the Professional Counseling Division; to learn more about the CPD's post-mortem assessment process in the horrific incident of officer death by suicide; to see evidence of efforts to address the information the Professional Counseling Division is receiving from these sources; and to see the implementation of a technology solution that will allow the CPD to empirically assess the provision and consumption of services.

During the fifth reporting period, the CPD further promoted overall member health and wellness by submitting a lesson plan and policies for review, and we noted we also looked forward to reviewing the anticipated communications plan with push alerts in 2022. Also during the fifth reporting period, during a virtual site visit with the Director of the Professional Counseling Division, he discussed the process of conducting a forensic analysis when suicides occur. However, the CPD had not shared any data to indicate evidence of an analytical assessment for aiding in the determination of causes related to suicide.

In the sixth reporting period, during another virtual site visit with the Professional Counseling Division Director, the extent and role the unit has when conducting a forensic analysis when incidence of suicide occurs was further clarified. The efforts of the Professional Counseling Division were in very rudimentary stages—though referenced in smaller circles, no efforts have been made to approach this analytical, yet delicate process from a broader stance, which would include other key participants such as detectives and other key subject matter experts. Also during the sixth reporting period, the International Association of Chiefs of Police (IACP) addressed this critical topic and offered a brief roadmap of how to proceed and who should be involved in same.[1] The IMT noted we looked forward to reviewing and discussing the preliminary findings of this post-vention endeavor.

During the fifth and sixth reporting periods, the IMT noted that the lack of technology solutions created a barrier to collecting and empirically analyzing the data that is needed to properly assess the critical nature of suicide prevention and intervention. While prevention awareness is a significant facet, having a holistic, data-based approach would allow the CPD to develop a strategy aligned with best practices, preventive measures, and wellness solutions to address a growing issue among law enforcement agencies throughout the United States.

---

[1] *Thompson, J. Focus on Officer Wellness: Investigating Police Suicide.* POLICE CHIEF MAGAZINE, INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE (IACP), https://www.policechiefmagazine.org/focus-on-officer-wellness-investigating-police-suicide/.

The CPD submitted the Suicide Prevention Initiative and the CIT In-Service training for review in the sixth reporting period. The OAG commended the CPD for its effort and development of the Suicide Prevention Initiative. Several comments for areas of improvement were made by both the OAG and the IMT. The Suicide Prevention Initiative will be overseen by the Director of the Professional Counseling Division. As a component of the Officer Wellness Support Plan, the Suicide Prevention Initiative introduced a number of national resources the Professional Counseling Division identified as best practices in an effort to create a model that supports and sustains the CPD's framework to care for its personnel. Additionally, they addressed the expansion of internal resources, which includes the additional appropriated 11 clinician positions.

As noted, the IMT awaits the review of the refined Suicide Prevention Initiative and looks forward to the advanced implementation of same. The Suicide Prevention Initiative includes a broad spectrum of components targeted to address the issue surrounding this pivotal topic of suicide to include training, policy, communications, programming, procedures, memorial consideration, and reporting amid the continuity of operations (as noted in the initiative). The initiative was inclusive of the various units that make up the Professional Counseling Division and identifies their value and roles along with other partners, support groups, mental health providers, command, and training staff.

*Progress in the Seventh Reporting Period*

The Suicide Prevention Initiative was resubmitted in the seventh reporting period with the CPD's response to the IMT's and OAG's comments, which included revisions to capture the timeline to hire additional clinicians; timeline of CPD's exploration of the wellness app; the explanation of the eventual use of iCarol to measure availability of services; efficiency and accuracy of reporting; availability of data; to include language that reflects ongoing efforts to address the evolving and tragic topic of suicide; and to include a component of firearms discussion and the role they sometimes have in the mental health crisis.

The conclusion statement of the Suicide Prevention Initiative document specifies that both current structure and resources allow for initial development of a formal Suicide Prevention Initiative that puts a comprehensive and holistic initiative in place to allow the department members, civilian employees, and their families to live a higher quality of life across all dimensions of wellness.

One of the ongoing challenges to this initiative is not having an official reporting system in place as a principal suicide assessment tool and data point collection guide. While the CPD notes this in the Suicide Prevention Initiative document, the IMT is unaware of any assessment tools being considered to address this very key and tragic topic. During various virtual site visits in the seventh reporting period,

the IMT has inquired about the topic of suicide that, unfortunately, remains most relevant in context, analysis, and prevention/post-vention dynamics. The IACP offers best practices and recognizes the impact of law-enforcement suicides, the agency experience with such tragedy, and the steps needed to support the membership. The IACP also addresses the challenges an agency faces without access to sound evidence and informed research to guide is efforts towards focusing on post-vention steps.

In virtual meetings during prior reporting periods, the IMT inquired whether the CPD had further considered post-vention assessments to include, but not limited to forensic reviews as well. The CPD had initiated discussion about further post-vention forensic assessments. In this reporting period, we inquired whether further discussion has occurred on the topic, but it appears that no further effort was made to implement forensic reviews. The IMT was not provided a reason for this. Yet, the Suicide Prevention Initiative encompasses the relativity of post-vention and holistic suicide prevention efforts. The model of post-vention is very intentional about the steps necessary to effectively enhance quality of life from the initial response to providing services for those responding to a scene and providing aid to families, peers, and the greater organization.

At the time of this writing, the IMT regrettably addresses this issue again as the CPD has experienced several active officer and retired officer suicides in 2022. The IMT offers its deepest and most heartfelt condolences for these losses. We encourage the City and the CPD to continue working with members and families to take the necessary holistic/post-inventive measures to identify methods, partnerships, resources, and opportunities that truly promote holistic, healthy, recoverable, life experiences that reduce the occurrences of officer suicide in the CPD membership.

<div align="center">***</div>

The City and the CPD maintained Preliminary compliance with this paragraph during the seventh reporting period. To reach further levels of compliance, the City and the CPD should implement the Suicide Prevention Initiative and provide related data that supports the necessary steps taken as noted within the initiative. The IMT looks forward to seeing a fully implemented Suicide Prevention Initiative that is supported by data, driven steps, reflective of both prevention and post-vention efforts.

## Paragraph 388 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Officer Wellness and Support: ¶389

> *389. At least annually, the Director of the Professional Counseling Division will provide a written report to the Superintendent, through his or her chain of command, that includes anonymized data regarding support services provided to CPD members, how long it takes CPD members requesting counseling services to receive them, and other metrics related to the quality and availability of these services. This report will also contain resource, training, and policy recommendations necessary to ensure that the support services available to CPD members reasonably address their identified needs and comply with the Officer Support Systems Plan.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**     At Least Annually          ☐ **Met**   ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD remain out of Preliminary compliance for ¶389, which was lost during the fourth reporting period.

To assess Preliminary compliance with ¶389, we determined whether the Director of the Professional Counseling Division provided a written report to the Superintendent, which incorporates the data outlined in this paragraph.

### Progress before the Seventh Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶389, largely due to the Professional Counseling Division's manual efforts to create weekly reports. However, the IMT had stressed the importance of a technology solution to enable the Professional Counseling Division to create reports so that accurate data on all points required by the paragraph could be obtained. In the fourth reporting period, the City and the CPD had not acquired, implemented, or provided evidence of significant progress toward obtaining any such technology, and thus, they fell out of Preliminary compliance with ¶389.

The CPD previously provided the Professional Counseling Division's 2021 Report to the Superintendent that details the current state of Professional Counseling Division's officer-wellness initiatives. However, the report did not provide data

regarding support services provided to CPD members, how long it takes CPD members requesting counseling services to receive them, and other metrics related to the quality and availability of these services.

Maintaining Preliminary compliance with ¶389 requires a written report with anonymized data to be provided annually to the Superintendent, which incorporates all the data outlined by ¶389. These metrics include a basic efficiency measure to assess the time between a service request and the service rendered.

During the fifth reporting period, the Professional Counseling Division took many efforts to identify resources, partners, and revise policies. However, the IMT continued to emphasize the priority of ensuring that the benefits of those resources can be measured. We noted the importance of the pillars of wellness, building resilience, and shifting culture, as presented in the working session about the CPD's Roadmap to Operational Wellness. In the summary conclusion, the CPD acknowledged its general commitment, but indicated that implementation had been lacking as they have not gained enough traction to drive its desired outcomes.

In the sixth reporting period, the IMT reviewed and re-evaluated the 2021 Report to the Superintendent – Wellness Strategy Presentation that was presented during the fifth reporting period in absence of receiving the 2022 Report to the Superintendent. The benchmarking efforts in the 2021 report, the Officer Wellness Support Plan, the Report to the Superintendent, the Communications Strategy, and the Roadmap to Operational Compliance each identify the goals, objectives, and steps to achieve the optimal targets for overall organizational wellness. However, each area noted is premised on those data points produced through a technological means that supports the mission, vision, and the desired outcomes needed to truly benchmark success efficiencies and effectiveness of these noted initiatives, strategies roadmaps and reports.

*Progress in the Seventh Reporting Period*

The City and the CPD remained out of compliance for ¶389 because they could not demonstrate that they had advanced technology that afforded the production of data-driven reports to support the mission of the Professional Counseling Division services provided to its membership.

Moreover, the City and the CPD did not submit the 2022 Report to the Superintendent. The last submission of the Report to the Superintendent was dated 2021. During the seventh reporting period, the Professional Counseling Division advised the IMT that the 2022 Report to the Superintendent would be completed by the Director of Wellness. However, that position remained unfilled for the duration of 2022. During a virtual meeting this reporting period, it was

explained that this Director of Wellness position would be able to approach the report and related topics from a broader perspective that would allow for the inclusion of training, operations, and administrative functions that are more encompassing of the organization's overall wellness efforts. In essence, the Director of Wellness would provide a more global approach to the CPD's work towards organizational wellness.

\*\*\*

Therefore, the City and the CPD have not reached any level of compliance with this paragraph, after falling out of compliance in the fourth reporting period. The IMT looks forward to reviewing the overdue 2022 Report to the Superintendent, as well as the upcoming 2023 report. In the next reporting period, we also hope to see progress toward establishing a data-driven program that sustains the mission of a Suicide Prevention Initiative and related wellness model.

### Paragraph 389 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Officer Wellness and Support: ¶390

**390.** *CPD currently employs three licensed mental health professionals and a supervising psychologist who serves as the Director of CPD's Professional Counseling Division. CPD offers free counseling services to CPD members through the Professional Counseling Division and through external referrals in certain circumstances. CPD will expand its capacity to provide the counseling services to CPD members as set forth in this Agreement.*

---

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Secondary compliance with ¶390 during the seventh reporting period.

To assess Preliminary compliance with ¶390, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance with ¶390, we reviewed records sufficient to show that the CPD has qualified personnel fulfilling the responsibilities required by ¶390.

To evaluate Full compliance, we considered whether the CPD has allocated sufficient resources to create, staff, fill, and maintain positions with qualified personnel as necessary to fulfill the requirements of the paragraph and the Consent Decree.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶390 by submitting the Officer Wellness Support Plan, the Professional Counseling Division's Standard Operating Procedure (SOP) 19-01, and directive E06-01. Together, these outline the Professional Counseling Division's staffing and resource needs and demonstrate efforts to ensure those resources are utilized appropriately.

The City and the CPD achieved Secondary compliance with ¶390 in the fourth reporting period by hiring additional, qualified clinicians to better address the needs of CPD members. To achieve Full compliance, however, the IMT explained that the City and the CPD will not only need to implement data solutions to track

and assess member's wellness needs and use of Professional Counseling Division's services, but they will also need to respond to the data appropriately.

During the fifth reporting period, the City had approved the hiring of 11 additional mental health clinicians for the Professional Counseling Division. At the time, the CPD employed a total of 13 clinicians, including the Director and the Assistant Director. The hope was, with the additional clinician, the CPD would be able to decentralize the counseling staff and designate districts for the individual counselors.

During the various virtual site visits in the fifth reporting period, the IMT was apprised of the constant evolution of the employment of the newly allocated positions. The Professional Counseling Division indicated the challenges it was facing in order to fill the new allocations. The IMT encouraged the Professional Counseling Division and the City to consider a strategic approach to addressing this issue through a collaborative process that includes the Professional Counseling Division and the City's Department of Human Resources (DHR). The IMT does see the value in having the Director engaged in that process or providing input from some members of the Employee Assistance Program as this is a specific and specialized need that requires certain certifications and other criteria prior to employment considerations. Additionally, it may benefit the City to review benchmarking options regarding a salary and related benefits analysis as these positions may be competing with the current market value and other current market conditions for similar professions. However, they are commended for taking additional steps to consider other remedies that make the position more appealing and more market competitive to qualified candidates.

During the sixth reporting period, the Director of the Professional Counseling Division informed the IMT during a virtual site visit that three conditional offers were being made and that the Southside District Station was open and fully functional. This opening allowed for clinicians, peer support, alcohol and drug counselors, and chaplains to have greater access to meet with staff and those in need of services. It also helped remove several barriers that may have existed earlier to include accessibility, location, and travel. The IMT was informed that the Northwest District is in the proposal phase to be presented during the proposed budget process with anticipation and hopes for approval to move forward in the upcoming budget year.

As noted in earlier paragraphs and mentioned in the needs assessment, there is no specific formula or best-practice framework that addresses ratio of counselors per member. The IMT stressed the importance of the CPD and the City to evaluate the benefits of a working model or conduct a staffing study to determine the optimal number of licensed practitioners needed to meet the organizational needs. The staffing study should consider the size of the agency; the external

resources and services provided; and the efficiencies that are noted in the Officer Wellness Support Plan, the Annual Report to the Superintendent, and the communications strategy. We noted that we will continue to seek the evidence that announces the clinicians as they are on-boarded with the Professional Counseling Division.

*Progress in the Seventh Reporting Period*

With budgetary approval, the CPD was allocated 11 additional clinicians during the sixth reporting period. The IMT was informed that the total allocation for Professional Counseling Division Mental Health Counselors/Clinicians will be twenty-four (24), which includes the position of the Director and the Assistant Director. Several members of the staff moved to the temporary Southside Station[2] to provide greater access to Professional Counseling Division services to the CPD members during the seventh reporting period.

Despite creating 11 additional clinical positions, there has not been statistical data showing what level of services have been provided by the current staffing of the Professional Counseling Division. For several reporting periods, the IMT has requested data showing anonymized information of the clients, services provided, caseload, volume of client and related demands, etc. However, the lack of related data coupled with the limited number of counselors, the increase in demand for counseling services, and the traumatic exposures to the CPD membership compounds the necessity to re-evaluate the positions, pay, job descriptions, expectations, and marketing plan at this critical stage. Without sufficient data, the CPD does not have a definitive method to determine if these twenty-four (24) positions are sufficient to staff and manage the mental health work/caseload of services provided to the membership of the CPD.

Additionally, as noted in ¶383, the Professional Counseling Division is facing challenges with staffing the existing vacancies. Over a year has passed with the some of the allocated positions remaining vacant. As noted previously, the challenges were informed by applicants who withdrew from the interview/hiring/selection process, candidates who declined their offers due to pay issues, which may not be aligned with the competitive market salaries for similar positions, and feedback from peer professionals who are not employed by the City.

Though anecdotally received and not research based, this information was revisited several times during the seventh reporting period. The IMT initially

---

[2] While not reflected in this report, as of the date of this report, the Southside District Station is no longer open due to an infestation. The CPD has informed us that they are working to secure a different south side location.

inquired whether the Professional Counseling Division and/or the CPD had considered meeting with the City of Chicago's Department of Human Resources for a review of the NOJO, to discuss marketing strategies, the vacant positions, and relative pay. Those meetings are currently underway.

\*\*\*

Therefore, the City and the CPD maintained Secondary compliance with this paragraph during the seventh reporting period. However, as the CPD, the Professional Counseling Division, and the City's Department of Human Resources begin to discuss next steps, the IMT appeals with urgency to fill the positions with quality candidates, who can assist the greater CPD membership through the provision of mental health services.

Moving forward, a recruitment strategy will be essential to fill the vacant clinical positions. Continued stagnation in filling these positions could result in the City and the CPD losing its Secondary compliance status. The IMT looks forward to seeing some level of advancement in the future.

### Paragraph 390 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Officer Wellness and Support: ¶391

> **391.** *CPD will initially increase the staffing level in its Professional Counseling Division to at least ten full-time licensed mental health professionals (or a combination of full- and part-time licensed mental health professionals capable of providing an equivalent amount of weekly clinical therapy hours) by January 1, 2020. CPD may contract with licensed mental health professionals external to CPD on an interim basis while CPD completes the process for creating these new positions and hiring individuals to fill them. Additional changes to staffing levels will be made consistent with the results of the needs assessment and Officer Support Systems Plan.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and CPD have maintained Secondary compliance for ¶391 of the Consent Decree during the Seventh Reporting Period.

To evaluate Preliminary and Secondary compliance with ¶391, we considered the staffing levels of the Professional Counseling Division (also known as the PCD), the demand for services, and the types of services provided by the Professional Counseling Division. While the CPD can contract with mental-health professionals under the paragraph, we considered whether the CPD had sustainably staffed and developed the Professional Counseling Division, without the need for contractors.

For Full compliance with this paragraph, the CPD must maintain appropriate staffing levels, and demonstrate a continued ability to assess and address staffing and resources needs, as informed by a fully implemented software solution that adequately tracks necessary data. The long-term objective for the CPD is to be able to evaluate the wellness needs of members to ensure that the supply of services is efficiently and effectively addressing those needs.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶391 by hiring additional clinicians, expanding the resources of the Professional Counseling Division, maintaining staff levels, and strategically assigning its clinical workforce. Additionally, the Professional Counseling Division submitted evidence of 187 peer support members, five drug

and alcohol counselors, and six chaplains providing wellness services to CPD personnel.

During the fifth reporting period, the IMT stressed the importance of the CPD to be able to determine what steps, personnel, and tools will create a proper span of control over the entire wellness unit in the future. This assessment will ensure that all resources and services are efficiently and effectively managed. To effectively achieve this, the CPD needs to transition from manually tracking data to a more technologically sound approach to analyzing the data to help align the appropriate application of staffing resources pending the decentralization of the clinical staff. This will allow for the Professional Counseling Division to determine if greater resources are needed at some district locations compared to other locations. Once the applicable technological solutions are in place, the City and the CPD will be able to determine if additional resources are needed and further appreciate the work being done by the Professional Counseling Division.

During the sixth reporting period, the 13 members of the counseling unit had been reduced to 11 due to attrition. This also included the Director of the Professional Counseling Division. The additional 11 were being actively recruited. However, the challenges previously noted in ¶390 do and will require a more strategic approach to employing additional clinicians. This may be an opportunity for the CPD and the Professional Counseling Division to reimagine what potential services could look like to include possible partnerships with the external resource providers for part-time assistance as the need arises should the candidate pool continue to decrease. The IMT encouraged the CPD to seek opportunities to have the Director or other designees participate in strategic planning discussions regarding recruitment efforts for the specifically skilled individuals they seek.

While the City and the CPD had maintained Preliminary and Secondary compliance with this paragraph in previous reporting periods, the IMT explained we would continue to look for data-driven technological advancements to obtain Full compliance.

*Progress in the Seventh Reporting Period*

Currently, the CPD is still challenged with determining proper steps, personnel, and the tools to create the proper span of control over the entire wellness unit. While the wellness assessment was conducted several years prior to the additional mental health clinicians being approved in the budget, the CPD has not provided any evidence to the IMT that systems are in place to support the ongoing demands for mental health services. The staffing increase for mental health counselors will undoubtedly be a benefit. However, the IMT has not been afforded any information or data that supported the increase of the mental health clinicians,

including data that identifies the number of clients or volume of services currently provided to the CPD membership.

During the seventh reporting period, the CPD and the Professional Counseling Division began testing the iCarol system while still completing the manual forms and entering data into the new iCarol system. However, the IMT did not receive any evidence reflecting caseload, service capacity, frequency of service requests, etc. to support the current use or increased demand for applicable resources such as human, technology, time, and support services.

The IMT encourages the City and CPD to evaluate possibilities to outsource a portion of the routine services in order to ensure they are meeting the demands of the CPD membership. Paragraph 391 allows for contracting with external counseling services for the purpose of counseling beyond the scope of the Professional Counseling Division services, based on experiences and certifications, and also for contracting external services in an interim capacity, while the City and the CPD are re-evaluating the NOJO and developing a more marketable package to hire qualified mental health counselors.

<p style="text-align:center">***</p>

The City and the CPD maintained Secondary compliance with this paragraph during the seventh reporting period. Anecdotally, it appears that perhaps some level of demand for Professional Counseling Division services may have increased based on commentary during the virtual site visits with various units of the CPD. Without evidence-based data to support these discussions, the level of demand and other needs are most difficult to validate. However, if this is indeed the case, it would indicate that time is of the essence. Contractual services may prove to be a force multiplier as the City and CPD determine next steps to hire qualified mental health counselors. The IMT looks forward to the review of data to support movement and progress of ¶391.

### Paragraph 391 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Officer Wellness and Support: ¶392

***392.*** *CPD will ensure that its staff of licensed mental health professionals includes individuals with specialized training in one or more of each of the following subjects: posttraumatic stress disorder, domestic violence, alcohol and substance abuse, anger management, depression, and anxiety.*

### Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Secondary compliance with ¶392 during the seventh reporting period.

To assess Preliminary compliance with ¶392, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

For Secondary compliance, we reviewed records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities required by ¶392. We also considered whether the CPD has allocated sufficient resources to create, staff, fill, and maintain positions with qualified personnel as necessary to fulfill the requirements of the paragraph and Consent Decree.

To determine Full compliance with ¶392, we sought to determine whether CPD's licensed mental health professionals have the requisite specialized training required by this paragraph.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶392 by submitting the Officer Wellness Support Plan and the CPD's Standard Operating Procedure (SOP) 19-01, which include the requirements of this paragraph.

At the end of the fifth reporting period, the Professional Counseling Division had employed 13 licensed mental-health professionals, including the Director and Assistant Director. The credentials of these clinicians reflect the diverse skill sets needed for the demands of the CPD members seeking related services. This information is conveyed in the clinicians' respective bios and on the CPD's wellness page of its website. The IMT recommended that the CPD seek opportunities via

professional associations and law-enforcement membership organizations to ensure professional training beyond the minimum requirements necessary to maintain certification are afforded to the members of the Professional Counseling Division.

During a virtual site visit during the fifth reporting period, the Director of the Professional Counseling Division also shared that while one-on-one in-person sessions are preferred, the Professional Counseling Division can also provide some basic tele-health services when applicable. During this discussion, other clinicians in the Professional Counseling Division offered the top three areas in which CPD members require services, and stated the staff had expertise in those areas, as they were not outside the scope articulated in ¶392.

During the sixth reporting period, the Professional Counseling Division lost two of the licensed clinicians due to retirements and were working to fill those vacancies in the near future. Due to the diverse needs of the members of the CPD, it is critically important that the CPD members have access to qualified counselors with credentials that reflect specialized training in the areas stipulated, but not limited to ¶392.

*Progress in the Seventh Reporting Period*

During the seventh reporting period, the Professional Counseling Division has experienced some flux in staffing. In a virtual site visit with the clinicians, the IMT inquired about counseling demands and requested to know the top three issues/concerns they were having to address. The counselors advised they were considerable concerns around officers' days off being routinely canceled because of deployment, which creates ongoing stressors with both them and their families. Various family dynamics that create emotional circumstances were another common issue/concern among members.

The added stress of schedule changes and canceling officers' days off creates challenges with the officers coming in for counseling sessions, as they cannot make the various appointments. The Professional Counseling Division has seen cancellations across-the-board due to the schedule changes. When this occurs, the clinicians try to hold virtual or phone sessions. And sometimes, the clinicians will go to them meet them in the districts. However, they do not feel that meeting the members in the district is the most conducive as they need to be removed from that environment in order to focus on the issues discussed during the sessions.

While this paragraph lists specific areas of training for the clinicians, it does not limit the types of specialized training or certifications the clinician can or may already hold. During this reporting period, the IMT was apprised of additional training and certification received by some of the clinicians. Several of the

clinicians have the Eye Movement Desensitization and Reprocessing Therapy (EMDR) Therapy certification. Eye Movement Desensitization and Reprocessing Therapy is a mental health therapy method, which treats mental health conditions that happen because of memories from traumatic events in your past. This type of therapy best known for its role in treating post-traumatic stress disorder (PTSD), but its use is expanding to include treatment of many other conditions.

\*\*\*

The City and the CPD maintained Secondary compliance with this paragraph during the seventh reporting period. The IMT commends the clinicians for the work that they are doing and their ongoing efforts. Although services are provided by the Professional Counseling Division, to reach Full compliance, the IMT expects to review the areas of continuing education, training, and continued certification and the employment of the allotted positions.

### Paragraph 392 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Officer Wellness and Support: ¶393

> *393. In order to provide support services that are culturally appropriate, sensitive to differing circumstances, and attentive to the issues facing all CPD members, including, but not limited to, women, people of color, religious minorities, and LGBTQI individuals, CPD will ensure that: a. the licensed mental health professionals and counselors employed by CPD are trained and equipped to provide services in a manner respectful of these diverse experiences and perspectives; b. CPD members receiving services have the opportunity to provide feedback regarding whether such services are culturally appropriate and adapted to diverse experiences and perspectives; and c. appropriate corrective action is taken to the extent necessary based on feedback received.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Secondary compliance with ¶393.

To assess Preliminary compliance with ¶393, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed various data, such as Professional Counseling Division (also known as the PCD) clinicians' biographies, which is relevant to compliance with the requirements of this paragraph.

To assess Secondary compliance, we considered whether the CPD has qualified and diverse personnel who are trained to address the wellness needs and concerns of a diverse population. To determine Full compliance with ¶393, we sought to determine whether the CPD has sufficient services in place to provide diverse support to all members.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶393 by submitting the Officer Wellness Support Plan, which sets out expectations that promote the training and development of officer wellness

initiatives that are sensitive to the diversity found within the CPD and the community at large.

The City and the CPD achieved Secondary compliance with ¶393 by submitting the biographies of Professional Counseling Division clinicians, as well as evidence that they receive feedback regarding support services by conducting various focus groups. These focus groups touched on topics of diversity within Professional Counseling Division services as shown in the 2021 Report to the Superintendent.

During the fifth reporting period, the IMT learned that the Professional Counseling Division Director and staff receive feedback through executive sessions with CPD leaders and at roll calls. However, the IMT recommended a more analytical approach to determine the effectiveness of the Professional Counseling Division and its efficiencies. During the fifth reporting period, the IMT did not receive any evidence of feedback regarding the appropriateness of providing culturally sensitive services to the members of the CPD.

In the sixth reporting period, the IMT learned from several of the clinicians about their credentials and their specializations, which ranged from advance certifications in couples and family counseling to include intensive trauma and stress therapy, music therapy, substance use disorder, cognitive behavioral therapy, and mindfulness. The clinicians also had tenured careers that ranged from 12 to 22 years of experience.

The IMT applauded the CPD for their broad reaching array of certifications of clinicians as it does serve as a force multiplier by having the diversity of credentials available to address the variety of needs presented by the members of the CPD. However, as noted in the fifth reporting period, the Professional Counseling Division did not provided any evidence of subparagraph (b). The Professional Counseling Division should solicit feedback from CPD members receiving services regarding the appropriateness of those services as it relates to culture and the adaptation of diverse experiences and perspectives.

Also during the sixth reporting period, the IMT inquired about the caseloads of the mental health clinicians. It was reported to the IMT that although it varies, the clinicians stated that their caseloads average between 25 and 30 clients a week, which was approximately 5 to 8 personnel a day. The caseloads admittedly seemed high from their perspective. However, without case management tools, auditing practices, and procedures in place along with a formal case review, it is difficult to determine how to adequately measure what a workable caseload should look like.

With the use of iCarol, which was in the testing phase, it is imperative that the Professional Counseling Division look at how best to capture some important information, provision of services, and updates in a real time manner. During the discussion surrounding the iCarol system, it was explained that the Professional

Counseling Division can build this system out to meet its needs. The IMT encourages the Professional Counseling Division to determine the best means of capturing this critical information. The lack of efficiencies in measuring case/workloads can lead to the burnout of the clinicians whose purpose is to aid in the pre- and post-ventive measures that ensure clinician burnout does not occur.

*Progress in the Seventh Reporting Period*

During virtual site visits in the seventh reporting period, the IMT had the opportunity to meet with some of the Professional Counseling Division staff members and was able to see some level of diversity. The IMT is aware through discussions that there have been some programs that are provided to specific populations of personnel such as the couples retreat. However, the IMT has yet to receive specific data that correlates Professional Counseling Division services to specific groups within the CPD or specific documental relative to cultural competence.

During previous reporting periods, the IMT had inquired about the ability for the Professional Counseling Division to capture some demographic data as it inputs other information into the iCarol system. The Professional Counseling Division has informed the IMT in previous reporting periods that the diverse certification portfolio of the clinicians does afford the division to ensure that it reaches a broad spectrum of clients who have a broad array of needs that can be met with certified Professional Counseling Division services.

<center>***</center>

The City and the CPD maintained Secondary compliance with ¶393. To reach Full compliance, the IMT needs to review data that reflects the collective demographics of the Professional Counseling Division membership in all aspects. The IMT would appreciate reviewing the data of all units within the Professional Counseling Division and the respective service providers.

## Paragraph 393 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:

Secondary

# Officer Wellness and Support: ¶394

> **394.** *CPD will offer members referrals for counseling services by external clinical service providers, including, but not limited to, private therapists, specialists, outside agencies, or hospitals, when a member requires specialized counseling that is beyond the training and expertise of CPD's licensed mental health professionals or certified counselors.*

## Compliance Progress  (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Secondary compliance for ¶393 during the seventh reporting period.

To assess Preliminary compliance with ¶394, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, we interviewed the CPD counselors about external referrals and sought to review data measuring the frequency and efficacy of outside referrals that is necessary or helpful to identify, verify, and sustain compliance and reform efforts.

### Progress before the Seventh Reporting Period

In previous reporting periods, the City and the CPD reached Preliminary compliance with ¶394 by addressing referral to third-party vendors in the Officer Wellness Support Plan, the 2021 Report to the Superintendent, and Standard Operating Procedure (SOP) 19-01. During the fifth reporting period, the CPD discussed the various forms of referrals, the scope of work, workload, accessibility of the Professional Counseling Division, in addition to the types of conditions, counseling, and services that are beyond the scope of the Professional Counseling Division's ability to provide the necessary counseling services and treatment.

During the sixth reporting period, the clinicians discussed the referral process with the IMT. The Professional Counseling Division holds weekly meetings with the clinicians. During these weekly meetings, the clinicians discuss the clients' status and recommendations for referrals. The clinicians also discuss treatment plans that may be considered and developed for the CPD members in need of additional services. It was also noted that some members are sometimes referred to offsite treatment facilities, depending on the needs of the CPD member and the services

provided by the external resources. During this discussion, the clinicians referenced an internal process for mandatory referrals regarding the officer's exposure to trauma-related incidents. Those referrals are entered into the CLEAR System with documentation of follow-up entered at the time of the call and when debriefings occur.

During the fifth and sixth reporting periods, the IMT explained that to reach additional levels of compliance, the Professional Counseling Division would need a technology solution to adequately collect anonymized data reflecting the requirements of this paragraph. It remains difficult to capture the essence of the work being done when tools are not in place to provide the analytical assessment needed to identify where the critical counseling services can best be utilized. Establishing enhanced benchmarking tools can allow for the Professional Counseling Division to enhance its efforts by promoting and exploring additional external resources and identifying the best possible practices to ensuring effective and efficient internal counseling.

*Progress in the Seventh Reporting Period*

During the seventh reporting period, the CPD and the Professional Counseling Division piloted the iCarol system, and advised that a dual process of collecting data had occurred both manual on paper and digital. However, the IMT was not provided with either version of evidence. Moreover, the Professional Counseling Division failed to submit a report to the superintendent in 2022. Therefore, the IMT has no evidentiary documentation to support validation that the referrals have occurred beyond discussions during virtual meetings. There has been no delivery of data that supports or identifies the number of referrals to any specialized counseling resources.

Again, the IMT seeks anonymous data that identifies the demographics of the CPD membership and the referral types. To date, the IMT has asked on several occasions where referrals are made. It has been verbalized that local institutions have received referrals, and some referrals were as far away as Florida. However, the same comment was provided in prior reporting periods. There is no indication whether these are the same referrals as prior periods, or whether additional referrals have been made during the seventh reporting period.

It should also be noted that the topic of referrals, insurance, and confidentiality, FOID card surrenders, resonated during the public hearings focused on wellness conducted in the seventh reporting period, including the Virtual Joint Committee on Human Relations and Public Safety on August 25, 2022 and the IMT's Virtual Listening Session on October 21, 2022. During these public hearings, the IMT heard an anecdotal summary of services provided and the diverse needs of the CPD membership. Given the array of feedback, data analysis is a critical

component in determining what resources are best suited for the needs of the CPD membership with consideration for staffing challenges, location, and accessibility. The Professional Counseling Division and the CPD should also pay close attention to the voiced concerns regarding the services provided and the actual or perceived lack of confidentiality.

***

Until the IMT can review additional data, the City and the CPD remain in Preliminary compliance with this paragraph. The IMT continues to seek opportunities to evaluate data that supports ¶394. Without the relevant data, it remains a challenge to determine efficacy of the unit and to further establish benchmarks to measure efficiency or effectiveness.

Additionally, the IMT wishes to congratulate the City and the CPD on being awarded the 2022 Law-Enforcement Mental Health and Wellness Act (LEMHWA) Implementation Project. This grant, awarded by the Community Oriented Policing Services (COPS), is to support the Professional Counseling Division's psychiatric care and counseling services that are available to both sworn officers and civilian employees. The IMT looks forward to also reviewing the reports related to this grant as this additional reporting data should support ¶394.

### Paragraph 394 Compliance Progress History

| FIRST REPORTING PERIOD SEPTEMBER 1, 2019 – AUGUST 31, 2019 COMPLIANCE PROGRESS: Not Applicable | SECOND REPORTING PERIOD SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 COMPLIANCE PROGRESS: Not Applicable | THIRD REPORTING PERIOD MARCH 1, 2020 – DECEMBER 31, 2020 COMPLIANCE PROGRESS: Not Applicable |
|---|---|---|
| FOURTH REPORTING PERIOD JANUARY 1, 2021 – JUNE 30, 2021 COMPLIANCE PROGRESS: Preliminary | FIFTH REPORTING PERIOD JULY 1, 2021 – DECEMBER 31, 2021 COMPLIANCE PROGRESS: Preliminary | SIXTH REPORTING PERIOD JANUARY 1, 2022 – JUNE 30, 2022 COMPLIANCE PROGRESS: Preliminary |
| SEVENTH REPORTING PERIOD JULY 1, 2022 – DECEMBER 31, 2022 COMPLIANCE PROGRESS: Preliminary | | |

# Officer Wellness and Support: ¶395

**395.** *CPD will ensure that CPD members have access to: a. non-emergency, generalized counseling sessions with CPD's licensed mental health professionals within two weeks of a member's request; and b. generalized emergency counseling by CPD's licensed mental health professionals within 24 hours of a member's request.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶395 during the seventh reporting period.

To assess Preliminary compliance with ¶395, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, we interviewed the CPD counselors about the requirements of this paragraph and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶395 by finalizing Directive E06-01 and Standard Operating Procedure (SOP) 19-01. Collectively, these policies establish an on-call system whereby a licensed clinician will be available 24 hours a day to respond to all crises and traumatic incidents and that emergency counseling sessions will be conducted within 24 hours of the request.

For non-emergency situations, both policies note that general counseling sessions with the Employee Assistance Program (EAP) licensed mental-health professionals will be held within two weeks of a member's request. Although the requirements of this paragraph are reflected in policy, the IMT has not received documentation to indicate that the span of time between request and rendering of support services adequately reflect the times stipulated within ¶395. The IMT explained that to achieve additional levels of compliance, the IMT would need to review various forms of documentation supporting timely efforts to accommodate members' need for services.

During the fifth reporting period, the Professional Counseling Division indicated that the required turnaround times are occasionally challenged by the officers' schedules and various other demands. The Professional Counseling Division conveyed, however, that they have seen significant improvement in this area and have been intentional about connecting with CPD members as soon as possible. These concerns were also noted in the 2021 Report to the Superintendent. The discussion also addressed the clinical workload of six to eight sessions a day, which warranted the need to determine what is optimal staffing for the Professional Counseling Division and its related workload. This concern is relative to ensuring the Professional Counseling Division prevents burn out experience for clinicians trying to counsel on similar issues with the CPD members.

During the sixth reporting period, the Professional Counseling Division again noted that it was occasionally challenging to meet the 24-hour meeting request required by subparagraph (b). The Professional Counseling Division, however, did state that they had seen significant improvement in addressing the turn-around time for providing generalized emergency counseling within the 24-hour period. Though clearly articulated in E06–03 and discussed in various trainings to include Supervisor In-Service (2022), Traumatic Incident Stress Management Program training, and Employees Assistance Program Recruit Training, there was no indication that the quality assurance is being measured to ensure that the Professional Counseling Division is meeting the 24-hour requirement.

The IMT stressed in the fifth and sixth reporting periods that technological advances were necessary to remedy staffing matters and help to determine what optimal workloads and other efficiencies look like. We stated additional data would be needed to move to Full compliance, such as anonymized data that shows the movement towards these greater efficiencies in meeting the needs of CPD personnel who require the Professional Counseling Division's services.

*Progress in the Seventh Reporting Period*

The CPD has previously finalized Directive E06-01 and SOP 19–01. These policies have established the pertinent protocol for on-call response for the license clinicians to provide 24/7 services for both crises and traumatic incidents, which necessitate emergency counseling and non-emergency counseling. However, the IMT still seeks to review anonymized data that identified the recordkeeping efforts of the Professional Counseling Division to evaluate the time access by the nonemergency (two weeks) or emergency counseling sessions (24 hours).

As mentioned in other paragraphs, the Professional Counseling Division has entered data into the iCarol pilot system, manually collected paper records, and maintained information in the CLEAR system. Despite these stated efforts, no data was provided to the IMT during the seventh reporting period. In virtual site visits

this reporting period, the Professional Counseling Division offered again that, while they believe they have made efforts to meet the 24-hour meeting requirements, they cannot definitively validate the anecdotal references.

It should be further noted that during the seventh reporting period, the CPD audited the Traumatic Incident Stress Management Program (TISMP). Although the program is more specific to ¶¶407-408 and 411, the TISMP is also addressed in policy E06–03 and stipulates the necessity for the 24-hour meeting requirement. The audit found that they were gaps in the referral process that were probably created by, but not specifically limited to, the lack of training, human error, or unintentional omissions for referral. As noted in the OAG's response to the TISMP audit production, improved accounting and recordkeeping is critical to resolve or mitigate those issues. The audit was telling, but it should also be noted that the audit used 2021 data.

<p align="center">***</p>

The City and the CPD maintained Preliminary compliance with this paragraph during the seventh reporting period. While the IMT was grateful for the steps taken by conducting the TISMP audit, we look forward to real time data collection that assesses the quality assurance levels as they are occurring with regard to Professional Counseling Division services.

### Paragraph 395 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Officer Wellness and Support: ¶396

> **396.** *CPD will continue to ensure that any mental health counseling services provided to CPD members remain confidential in accordance with state law, federal law, and current CPD policy.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶396.

To assess Preliminary compliance with ¶396, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To determine Secondary compliance with ¶396, we sought to review the CPD's training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance by submitting Directive E06-01 and Standard Operating Procedure (SOP) 19-01. Both policies stress privacy and confidentiality. During the fifth reporting period, the CPD submitted lesson plans to include Employee Assistance Program (EAP), Peer Support, Peer Support Refresher, Supervisor In-Service Training, and Officer In-Service Training.

During virtual site visits conducted during the fifth reporting period, the Professional Counseling Division articulated the importance of confidentiality and privacy, which included the meeting locations to ensure that the CPD members felt a sense of privacy during their visits. The importance of confidentiality and privacy extends to visits with chaplains, peer support members, and drug and alcohol counselors as well. We explained we would look forward to seeing instruction and other evidence that conveys the significance of confidentiality and privacy. To achieve additional levels of compliance, the CPD would need to provide evidence of training and systems designed to ensure confidentiality as outlined by E06-01 and SOP 19-01, paying particular attention to how the Professional Counseling Division communicates the confidentiality requirement to staff and members.

In the sixth reporting period, the IMT observed the Peer Support Refresher Training and noted the emphasis on confidentiality and its importance as it related to the expectations of those providing counseling services and those receiving the services. Also in the sixth reporting period, the CPD submitted the Employees Assistance Program Recruit Training curriculum for review. The lesson plan introduces the Professional Counseling Division and its counseling services along with an emphasis on the free and confidential programs available for all active and retired CPD members and their families. The IMT also received the submission of the CIT In-Service training for review. The last module is designed for officer wellness, which specifies the importance of confidentiality, including the exceptions of confidentiality as designated by law.

*Progress in the Seventh Reporting Period*

As stipulated in E06-01 and SOP 19-01, confidentiality and privacy are paramount. During the sixth and the seventh reporting period, the IMT reviewed several training curricula that iterated the significance of confidentiality and privacy. Several of those topical areas included the TISMP eLearning, CIT training, and Recruit Employee Assistance Program training.

During the seventh reporting period, the IMT attended the Virtual Joint Committee on Human Relations and Public Safety and hosted the IMT Virtual Listening Session, both of which focused on wellness. The topics of trust and confidentiality weighed significantly in the discussions. Some members voiced concerns that the CPD administrators are aware of their counseling experiences and did not feel that the counseling sessions provided were confidential. Additionally, in a wellness app survey conducted by the CPD, some expressed concerns of confidentiality.

The IMT strongly encourages the CPD and the Professional Counseling Division to continue to identify ways to further promote trust and confidentiality in the services they provide to the CPD membership. The Professional Counseling Division counselors have referenced their efforts to emphasize confidentiality and privacy during the various site visits with the IMT. Aside from the trainings provided, the various units within the Professional Counseling Division repeatedly emphasize the importance of confidentiality during their various visits to roll calls, casual encounters, special sessions like the couple's retreat, No Cop Outs meetings, etc.

Despite the stated efforts of the CPD and Professional Counseling Division, there appears to be a gap in trust and confidentiality, whether actual or perceived. Trust in any relationship is a perpetual goal to strive towards. The CPD and the Professional Counseling Division must understand and embrace the effort to build trust both externally and internally.

*** 

Therefore, the City and the CPD maintained Preliminary compliance with ¶396 during the seventh reporting period. We emphasize again that the CPD and the Professional Counseling Division must continue to identify ways that promote a sense of trust and confidentiality. Unfortunately, the technology nor the data are in place to afford the CPD the evidence-based information needed to enable them to improve upon their efforts because they cannot conduct a proper analysis of their work. The IMT looks forward to seeing the advancement of both technology and the data to measure, support, improve, further develop, and evolve their current efforts.

### Paragraph 396 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Officer Wellness and Support: ¶397

> **397.** *CPD will continue to ensure that licensed mental health professionals employed by the Professional Counseling Division do not participate in fitness for duty evaluations, which will be conducted exclusively by third-party licensed mental health professionals.*

**Compliance Progress**                    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶397 during the seventh reporting period.

To assess Preliminary compliance with ¶397, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, we interviewed the CPD counselors about the requirements of this paragraph and sought to review data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶397 by submitting Directive E06-01, Professional Counseling Division (PCD) Policy, which prohibits the Professional Counseling Division from participating in fitness-for-duty evaluations. The requirements stipulated in E06–01 clearly articulate that the "licensed mental health professionals employed by the Employees Assistance Program will not participate in the fitness for duty evaluations," as required by this paragraph.

During virtual site visits in the fifth and sixth reporting periods, the Professional Counseling Division affirmed that it does not participate in fitness for duty evaluations and discussed the importance of not being involved in same as they are providing counseling to the various members of the CPD. The CPD, however, had not submitted data to support the Professional Counseling Division's affirmations. The IMT explained that anonymized data reflective of the fitness for duty information is needed, which should demonstrate that the Professional Counseling Division is, in fact, not involved in fitness for duty evaluations. To

provide this data, the City and the CPD will need to ensure that it has an adequate technological solution in place to collect such data.

*Progress in the Seventh Reporting Period*

The CPD has policy stipulating that the Professional Counseling Division shall not participate in fitness for duty evaluations. The Professional Counseling Division also affirms that they do not participate in conducting fitness for duty evaluations. However, the IMT has still not been afforded the necessary evidence to ensure that the Professional Counseling Division is, in fact, not participating in the fitness for duty evaluations. As explained in prior reporting periods, anonymized data is needed to demonstrate compliance with this paragraph.

\*\*\*

Therefore, the City and the CPD maintained Preliminary compliance with this paragraph, but have not reached further levels of compliance during the seventh reporting period. During the eighth reporting period, the IMT will seek to have discussions with the appropriate CPD unit/department to observe the fitness for duty process and to discuss the evidentiary data needed to prove that the Professional Counseling Division is not involved in the fitness for duty process.

### Paragraph 397 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Officer Wellness and Support: ¶398

> **398.** *CPD currently employs five drug and alcohol counselors, all of whom are sworn CPD officers operating under the supervision of the Director of the Professional Counseling Division. These counselors provide free counseling for alcohol and substance abuse. CPD will continue to offer counseling services to CPD members for alcohol and substance abuse.*

## Compliance Progress <span>(Reporting Period: July 1, 2022, through December 31, 2022)</span>

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance level with ¶398 during the seventh reporting period.

To assess Preliminary compliance with ¶398, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance with ¶398, we interviewed the CPD counselors about the requirements of this paragraph and sought to review anonymized data of the drug and alcohol services provided to include the various ranks, civilian and sworn classifications, any non-CPD departments seeking services, and all other tracking-related data.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶398 by including this paragraph's requirements in Standard Operating Procedure (SOP) 19-01 and Directive E06-01. SOP 19-01 also supports ¶398 compliance by requiring that all drug and alcohol counselors will be certified by the State of Illinois.

During the fourth reporting period, the CPD had five drug and alcohol counselors of staff. Three of the five counselors had received their certifications, and the other two counselors were in the process of receiving their certifications. The IMT explained that we would monitor the progress of the outstanding certifications, and more generally, we would look for continual training of clinicians in areas related to substance and alcohol use disorders.

By the end of the fifth reporting period, the CPD still had five drug and alcohol counselors on staff, and two of the drug and alcohol counselors were still awaiting their certifications. Also, the drug and alcohol counselors indicated that there was

an alcohol and drug supervisor position in the budget allocation that had not been filled since 2013. It is concerning to see a position vacant with the current demand for available services and resources for such an extended period. The IMT recommended that the Director of the Professional Counseling Division, the CPD's Human Resources Department, and the budget personnel evaluate the reason why such a vacancy existed for eight years and to reconsider the need for that position. We noted that with the anticipated hire of 11 more mental health clinicians in 2022, the reach of this unit to provide services will be broadened, and this vacant position could afford the director a position with some greater management oversight of the drug and alcohol counselors unit.

In the sixth reporting period, the Professional Counseling Division had four out of six allocated full-time drug and alcohol counselors on staff, and the IMT learned five CPD officers had been interviewed in an effort to fill the two vacancies caused by retirements. The Professional Counseling Division anticipated that the positions could be filled by the close of the sixth reporting period. Three of the four drug and alcohol counselors were fully certified. The fourth was awaiting the scheduled test date and site location for the state exam. The drug and alcohol counselors must also meet a 40-hour continuing education requirement every two years.

During the fifth and sixth reporting periods, it also was noted that the drug and alcohol unit had manually tracked information via paper forms. The IMT inquired about the number of CPD members that are currently being served by the drug and alcohol counselors. However, there was no empirical or raw data presented to confirm the estimates provided during the site visit. With the iCarol system under development during the sixth reporting period, the drug and alcohol counselors could only provide anecdotal information regarding the number of CPD members they were seeing at the present time.

The Professional Counseling Division alerted the IMT that the paper forms from the previous years would not be imported into the iCarol system. The IMT further inquired about the fields that will be created to assess key information about the client population and about a field that would indicate whether the referral source is via self-reporting or by a third-party (*i.e.*, coworker, family, supervisor, etc.). This field at the time of this virtual visit in the sixth reporting period had not been considered. Again, the data would help the Professional Counseling Division to determine not only who is being seen, but it would be key to analyze how the referrals are getting to the Professional Counseling Division. This further provides an opportunity for additional resources, assessments, as well as future opportunities to further educate and inform particular audiences.

*Progress in the Seventh Reporting Period*

The IMT conducted another virtual site visit with the drug and alcohol counselors during the seventh reporting period. At the time of the meeting, there were four drug and alcohol counselors on staff, but one was currently out on leave due to an injury on duty. That counselor was expected to return at the end of 2022 or early 2023. A new counselor had been hired during the seventh reporting period, but the unit also lost a counselor during the seventh reporting period due to a promotion. Therefore, once the one counselor is back from leave and the new counselor is on-boarded, the unit will have five of the six allocated counselor positions filled. We were also informed that the CPD posted a job opening for a drug and alcohol supervisor, the position that has remained vacant since 2013.

Of the current drug and alcohol counselors, three of the four have completed their certifications. One of the counselors is still in the process of completing their certification. Also, the new counselor is anticipated to have their certification expedited as some courses have become available via in-person conferences. These courses were not available during the last few years due to the pandemic. Some of the conferences were now being held in-person again, and the members are looking forward to opportunities to acquire additional training.

While the counseling services are free, the IMT inquired again about the caseload and whether there was adequate staffing to address the needs of the CPD membership. Like other Professional Counseling Division units, the data was still maintained on paper forms and inputted into the iCarol system by an administrative officer. The counselors have approximately 30 cases each on their respective caseloads but receive very little feedback on actual caseload numbers beyond the weekly data that gets imported into the iCarol system.

The counselors recognized the voluminous caseload and admitted that it was difficult to track caseloads because of the various stages individuals were in treatment or counseling. They see the need for additional drug and alcohol counselors, but without the necessary data, they would be guessing at what numbers support effective staffing levels. Technological advances are needed to capture proper data to aid in determining efficiencies, staffing, and the effectiveness of the services provided.

During the virtual site visit, the drug and alcohol counselors also indicated that the three primary areas of concern they were seeing were relapse, suicide, and family matters and related treatment. It is important to ensure family members were aware of counseling services and other programs for both themselves and their police family members as well. A program referenced was Al-Anon. The counselors also indicated that there was a need to ensure that they have adequate supplies of books that are needed for Alcoholics Anonymous (AA) sessions, such as AA (the

Big Book), The Twelve Steps and Twelve Traditions by AA, and Thought of the Day–Hazelden Betty Ford.

The counselors were aware of and recognize the ongoing issues of mistrust, as emphasized in public hearings in the seventh reporting period and as discussed in other paragraphs. The drug and alcohol counselors assured the IMT that they maintain confidentiality during their counseling sessions.

\*\*\*

The City and the CPD maintained Preliminary compliance with ¶398 during the seventh reporting period. Again, the IMT looks forward to receiving documentation, verifying the specific levels of certifications and the services provided by each drug and alcohol counselor. The IMT recommends that the CPD ensure that the various units have the necessary supplies and materials they need to support the CPD membership who seek the various counseling services. Items like books, brochures, and other printed or digital material are and should be a part of the overall communications strategy if these materials are recommended resources for providing basic and standard services in this area.

## Paragraph 398 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Officer Wellness and Support: ¶399

> **399.** *CPD will ensure the number of drug and alcohol counselors available, either on staff or through referrals, meets the needs of CPD members consistent with the needs assessment and the Officer Support System Plan.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶399 in the seventh reporting period.

To assess Preliminary compliance with ¶399, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed records that show whether the CPD has qualified personnel fulfilling the responsibilities required by ¶399. We considered whether the CPD has allocated sufficient resources to create, staff, fill, and maintain positions with qualified personnel as required by this paragraph.

For Secondary compliance with ¶399, we interviewed the CPD counselors about the requirements of this paragraph and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶399 by creating guidance through Directive E06-01 and the Officer Wellness Support Plan for frequent provision of alcohol and substance use-related services, as well as guidance for tracking activities. However, to collect sufficient and reliable data that can be used to assess the extent to which services are meeting the needs of members, the City and the CPD must focus efforts on obtaining and implementing a technology solution. Additionally, we need to see evidence of data analyses related to the demand and available resources for substance and alcohol use counseling.

During a virtual site visit in the fifth reporting period, the IMT and the CPD counselors discussed the range of services offered, including individual and group counseling sessions, which are specific to certain demographics like the women's group sessions, No Cop Outs, co-ed, and other sessions. Additionally, the CPD counselors also refer services when needed, which have included, for example,

intensive outpatient services and partial hospitalization programs where appropriate based on the CPD member's needs. Also during the virtual site visit, the IMT inquired about the three primary sources of referrals that initiate the process for counseling services. We were informed that referral generally begin with (1) direct calls to the Professional Counseling Division office from supervisors, (2) direct calls to the Professional Counseling Division office from family members, or (3) the individual CPD personnel reaching out for assistance.

During the sixth reporting period, the CPD continued to collect data regarding the available services, but did not show evidence that it was being measured or analyzed. The available data was manually captured on paper forms but was not being utilized to determine the numbers of referrals or to help determine if the Professional Counseling Division is meeting the needs of the CPD membership.

As the IMT did not receive specific data for ¶399 during the fifth or sixth reporting periods, the City and the CPD maintained Preliminary compliance, but did not achieve Secondary compliance. To reach Secondary compliance, the IMT stated we would look for data analyses regarding the primary source of referral for Professional Counseling Division services and regarding referrals to outside sources. Data analyses regarding duration of treatment would also be helpful for the Professional Counseling Division to evaluate its caseload and workflow efficiencies.

*Progress in the Seventh Reporting Period*

During the seventh reporting period, the IMT virtually met with the drug and alcohol counselors. They are currently conducting alcohol and substance use counseling; alcoholics anonymous (AA) open and close meetings; phone and in-person meetings; and attending roll calls as some of their required duties, though not specifically limited to those duties mentioned. Currently, the CPD has allocated six drug and alcohol positions and one supervisor position. At the time of the virtual site visit, the staff consisted of four counselors, although one was currently on leave. Three of the four counselors on staff had completed all necessary certifications, and one was in the process of completing the required certifications.

The IMT inquired specifically about their caseload. As noted in ¶398, the counselors have difficulty tracking their caseload without adequate technology in place. They enter their weekly information on paper forms. Beyond their weekly review of their entries, they have little to no feedback on the cumulative data reflective of their respective caseloads. Thus, the data is not available to adequately determine whether there is sufficient staffing to meet the needs of the CPD membership.

Due to the lack of the necessary data collection and related analytics, the IMT has not been able to determine whether there could be other factors that could warrant referrals such as caseload volume, scope of counseling work, availability of counselor skillset, and intensity of treatment. The counselors referenced that they guess they each carry approximately 30 cases. They further stated that there were approximately 15 to 20 individuals receiving out of house treatment at locations as far away as Florida and Indiana.

The counselors also offered an anecdotal assessment of the three most significant counseling issues, but the CPD has not provided any data to validate their anecdotal suggestions. Additionally, the IMT has not received any information to indicate the number of outside resource referrals made for those in need of alcohol and other drug use counseling beyond the services offered by the Professional Counseling Division.

It is concerning to the IMT that the data is not available for the professionals who initiate the counseling data and manage their specific caseloads. This disconnect presents a greater issue in their limited ability to articulate specifics about their overall work product because they have no access, which serves to defeat opportunities to determine efficiencies, accuracy of record-keeping, staffing levels, etc.

*** 

Therefore, while the City and the CPD maintained Preliminary compliance with the paragraph, they must collect and analyze all records of certifications; anonymous data representing clientele demographics; duration of services; referrals-in/out of house; and other relative information. If they continue to stall the necessary data collection and analysis, they could be in jeopardy of losing their Preliminary compliance status in the next reporting period until such data serves to support the conditions stipulated in ¶399.

## Paragraph 399 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Officer Wellness and Support: ¶400

**400.** *CPD will ensure that its drug and alcohol counselors are certified in Illinois as Certified Alcohol and Other Drug Abuse Counselors.*

## Compliance Progress            (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD have maintained Preliminary compliance with ¶400 during the seventh reporting period.

To assess Preliminary compliance with ¶400, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, we determined whether the CPD's drug and alcohol counselors are properly certified. For Full compliance, we will seek to determine whether CPD systematically ensures that counselors have the necessary certifications.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance by submitting Directive E06-01, which addresses the requirements of ¶400. However, in the fourth reporting period, the CPD only produced certifications for three of the five drug and alcohol counselors. By the end of the fifth reporting period, the remaining two counselors had yet to receive their certifications. Also, there was a pending vacancy for a drug and alcohol counselor in January 2022. Given certification statuses, with the pending vacancy, the IMT recommended that the Professional Counseling Division consider an immediate posting for the vacancy to fill the position as soon as possible. Additionally, the IMT further encouraged the Professional Counseling Division to attempt to coordinate the certification process more tightly. The time between selection for the drug and alcohol counselor position and the counselor receiving their certification should be significantly narrowed and expedited.

In the sixth reporting period, there were six allocated drug and alcohol counselor positions, but two were vacant, and only three of the four counselors were fully certified. The fourth counselor was awaiting notification of date, time, and location to take the state exam. Also, the two vacancies were expected to soon be filled as there had been five interviews of potential candidates at the time of the

filing. The Professional Counseling Division anticipated the positions to be filled within the next 30 days. The certifications are directed by E06–01 the requirements stipulated in ¶400. To reach Secondary compliance, the IMT stated we would look forward to seeing the certifications completed for the drug and alcohol counselors and future vacancies filled expeditiously.

*Progress in the Seventh Reporting Period*

As noted in other paragraphs, the IMT conducted another virtual site visit with the drug and alcohol counselors during the seventh reporting period. At the time of the meeting, there were four drug and alcohol counselors on staff, but one was currently out on leave due to an injury on duty. That counselor was expected to return at the end of 2022 or early 2023. A new counselor had been hired during the seventh reporting period, but the unit also lost a counselor during the seventh reporting period due to a promotion. Therefore, once the one counselor is back from leave and the new counselor is on-boarded, the unit will have five of the six allocated counselor positions filled. We were also informed that the CPD posted a job opening for a drug and alcohol supervisor, the position that has remained vacant since 2013.

Of the current drug and alcohol counselors, three of the four have completed their certifications. One of the counselors is still in the process of completing their certification. Also, the new counselor is anticipated to have their certification expedited as some courses have become available via in-person conferences. These courses were not available during the last few years due to the pandemic. Some of the conferences were now being held in-person again and the members are looking forward to opportunities to acquire additional training. Additionally, all of the counselors are currently in different stages in obtaining the 40 continuous education hours as mandated by the State of Illinois every two years.

<p align="center">***</p>

Therefore, the City and the CPD maintained Preliminary compliance with this paragraph. The IMT looks forward to reviewing all available certifications in the eighth reporting period.

## Paragraph 400 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Officer Wellness and Support: ¶401

> **401.** *CPD currently offers anonymous support groups and programs for alcoholism and other addictions. CPD will ensure that a licensed mental health professional assigned to the Professional Counseling Division oversees any such programs offered by CPD, that the programs adhere to generally accepted practices in the field of addiction treatment (e.g., 12-step addiction treatment program), and that each program is reviewed at least annually by the Director of the Professional Counseling Division.*

## Compliance Progress        (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**  Annually      ☐ **Met**  ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary compliance with ¶401 during the seventh reporting period.

To determine Preliminary and Secondary compliance with ¶401, we determined whether the CPD has a licensed health professional and whether the CPD's programs adhere to generally accepted practices as required by this paragraph.

To assess Full compliance with ¶401, we sought to determine whether the Professional Counseling Division Director is completing annual reviews of substance-use-disorder services as called for by the paragraph. To make this determination, we reviewed a variety of information relevant to compliance, including document submissions of the City and the CPD, and communications with members and Professional Counseling Division clinicians and staff.

### Progress before the Seventh Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶401 by increasing staffing of the Employee Assistance Program with several substance-use-disorder-treatment counselors and demonstrating the organization and supervision of the services, clinicians, and number of members utilizing the services. However, the IMT had not yet received an annual review of the services conducted by the Director of the Professional Counseling Division. This annual review should include an assessment of each

program to ensure they are adhering to generally accepted practices in the field of addiction treatment.

During the fifth reporting period, the Professional Counseling Division had five drug and alcohol counselors, but there was an expected vacancy occurring at the beginning of 2022. By the end of the fifth reporting period, two of the counselors were still not certified. The IMT strongly encouraged the Professional Counseling Division to evaluate the process for certification with urgency to ensure that all necessary steps can be taken within their control to ensure the counselors are positioned to receive the certifications as soon as possible. At the onset of the sixth reporting period, the Professional Counseling Division alerted the IMT that interviews were underway to fill the additional positions added to the Professional Counseling Division, to include one additional drug and alcohol counselor position and eleven mental health clinician positions.

In the sixth reporting period, the CPD opened a Southside District Station[3] which provides additional space for four license clinicians, two drug and alcohol counselors, peer support, and chaplains. Placing them closer to the officers in proximity and being physically located in the building allows for greater access to counseling services with consideration to travel time to the site, as well as overall distance traveled. The new location will provide greater access to those available Professional Counseling Division services. It was previously noted that appointments were sometimes missed because traffic was impeding members' ability to get across the City with adequate time to keep their appointments. In the sixth reporting period, the Northwest Side station house was pending for review and council approval as part of the proposed budget. The timing for this facility to come online was uncertain as the building would require some construction, retrofitting, and furnishings.

Also during the sixth reporting period, the IMT suggested that the Director of the Professional Counseling Division continue to seek opportunities to advance programming, expand personnel, and enhance technology while placing priorities on assessing both efficiencies and the overall effectiveness of the work that the PCD is engaged in to deliver services to the CPD membership.

While the various Professional Counseling Division units continued to use tracking logs throughout the sixth reporting period, the IMT did not receive any evidence of the collected data on these forms. The IMT inquired about the data collection and analysis processes for the pending iCarol system but did not receive precise answers related to the individual responsibility for importing the data; administrative access to the data; and report retrieval access of the data. The

---

[3]    While not reflected in this report, as of the date of this report, the Southside District Station is no longer open due to an infestation. The CPD has informed us that they are working to secure a different south side location.

implementation of a technology solution will afford an accurate accounting of the work and services provided by units within the Professional Counseling Division, thus enabling the Professional Counseling Division to determine if additional resources are needed to most efficiently carry out the work and services mandated by policy, strategy, reports, and necessity.

*Progress in the Seventh Reporting Period*

The Professional Counseling Division Director overseas the various units and programs offered by the Professional Counseling Division, as required by this paragraph. During the seventh reporting period, the IMT attended virtual site visits with several of the various units. However, the IMT has not received any evidence that an annual assessment has been conducted for each of the programs, which is required under this paragraph.

\*\*\*

Therefore, while the City and the CPD currently maintained Secondary compliance with ¶401, they might be at risk of losing compliance status in the eighth reporting period. To maintain their compliance status, the City and the CPD submit evidence of any annual review for the programs that are referenced during the monthly meetings and the virtual site visits. The annual review should contain, among other things, a complete listing of all wellness programs and a schedule of where and when the programs are available for membership. The IMT looks forward to an established process that reflects an annual review of the programs that focuses on wellness in the CPD.

### Paragraph 401 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Officer Wellness and Support: ¶402

**402.** *CPD will train all supervisors regarding recognizing signs and symptoms of alcoholism and substance abuse, how to recommend available support services to CPD members experiencing alcoholism and substance abuse issues, and their obligations under CPD policy to report members exhibiting signs of alcohol or drug impairment.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Secondary compliance with ¶402.

To assess Preliminary compliance with ¶402, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To determine Secondary compliance with ¶402, we reviewed the CPD's training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶402 by submitting Standard Operating Procedure (SOP) 19-01 and Directive E06-01. These policies include provisions requiring supervisors to be trained on the signs and symptoms of alcohol use disorder, as well as be trained on recommending support services and reporting members exhibiting signs of impairment.

During the fifth reporting period, we reviewed the Employee Assistance Program Pre-Service Promotional training. This training addresses ¶402's requirements and has received no objection notices from both the IMT and the OAG. The City and the CPD also submitted a revised Annual Supervisor In-Service training for year 2022 in the sixth reporting period. The lesson plan definitively outlined the role and expectations of the supervisor per the requirements outlined in ¶402, SOP 19-01, and Directive E06–01.

With the development of these trainings, the City and the CPD have made good progress toward Secondary compliance with this paragraph. However, the trainings will need to be provided before they reach Secondary compliance. For

Full compliance, the CPD would need to provide evidence of training completion and a plan for continued training on these topics.

*Progress in the Seventh Reporting Period*

The City and the CPD produced trainings that cover the requirements of this paragraph in prior reporting periods. However, the IMT has not seen evidence that these trainings have been completed nor a plan for continued training on these topics.

Although not for supervisors, the CPD is commended for including information regarding recognizing signs and symptoms of alcoholism and substance abuse in the Field Training Officer's (FTO) Training. FTOs have a significant role in overseeing the development and training of officers early in their career after the completion of the academy.

\*\*\*

Therefore, the City and the CPD have maintained Preliminary compliance with this paragraph in the seventh reporting period, but have not yet reached further levels of compliance. The IMT looks forward to receiving the evidence to verify that the requirements of ¶402 have been met.

### Paragraph 402 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Officer Wellness and Support: ¶404

*404. CPD will maintain a peer support program, ensuring that: a. a licensed mental health professional assigned to the Professional Counseling Division oversees and adequately manages the program; b. Peer Support Officers receive initial training in stress management, grief management, officer wellness, obligations and limitations regarding confidentiality and privacy, communication skills, common psychological symptoms and conditions, suicide assessment and prevention, dependency and abuse, and support services available to CPD members; c. Peer Support Officers are trained to recommend the services offered by the Professional Counseling Division in situations that are beyond the scope of their training; d. CPD offers Peer Support Officers the opportunity to meet at least annually to share successful strategies and identify ways to enhance the program; e. Peer Support Officers receive and comply with a written procedures manual approved by a licensed mental health professional assigned to the Professional Counseling Division; f. Peer Support Officers are offered sufficient non-monetary incentives and recognition to ensure broad recruitment of volunteers and widespread access to peer support services; and g. the scope and quantity of peer support services provided to CPD members are identified in a manner that facilitates effective management of the program and that preserves the anonymity and confidentiality of members receiving peer support services.*

## Compliance Progress        (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    Annually        ☑ **Not Applicable**

**Preliminary:**    *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶404 during the seventh reporting period.

To evaluate Preliminary compliance with ¶404, we considered whether the CPD has allocated sufficient resources to maintain the peer support program and whether the CPD offers peer support officers the opportunity to meet at least annually to share strategies and enhance the program. We reviewed all accessible data relevant to ¶404 efforts, including records of meetings, and considered other

sources of data, such as communications with CPD members, and any policies developed regarding the peer support program.

To assess Secondary compliance, we considered the CPD's training development, implementation, and evaluation relevant to the various requirements of this paragraph, as well as other data sources showing implementation of programs or actions specified in relevant policies that direct compliance with the various subsections of this paragraph.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD reached Preliminary compliance with ¶404 by submitting Directive E06-01 and Standard Operating Procedure (SOP) 19-01, which created a framework under which the CPD can reach compliance with all subsections. The IMT reviewed documentation during the fourth reporting period showing that CPD approved an award for peer support leadership and held meetings with peer support members in 2020 and 2021. These documents demonstrate efforts in accord with the requirements of ¶404 (f) and (d).

Related specifically to the requirements of ¶404 (b) and (c), the CPD submitted revised Peer Support Training materials in February 2021 to which the IMT submitted a no-objection notice. The IMT explained to reach Secondary compliance, the City and the CPD will need to provide the Peer Support Training and submit documents showing the provision and completion of that training. Additionally, to comply with the requirements of subsection (g), the City and the CPD will need to implement a technology solution to track and assess scope and quantity of the peer support services provided to CPD members while also ensuring anonymity and confidentiality of members utilizing those services.

In the fifth reporting period, the IMT reviewed the Peer Support (8 Hour) Refresher Training and provided feedback on the training materials. Also, in that reporting period, the IMT participated in a virtual site visit with the Professional Counseling Division and peer support officers. During the visit, we discussed the importance of management attending some version of training services that address various topics to include the Employee Assistance Program, supervisors training, Officer Support System, etc. We stressed that one unified message is critical, and training information must be shared with the leadership as well.

During the virtual site visit, it was noted by the IMT that, as counselors responded to events, they often provide sustenance, refreshments, and nourishments for people they are responding to various incidents, via callouts and other officer-involved events. The IMT encourages the Professional Counseling Division to review, during its next annual assessment process, Directive E06-01, and best

practices regarding future budgetary allocations for the reimbursement of provisions (i.e., coffee, donuts, pizza, tissue, etc.) purchased by the members of the Professional Counseling Division units while delivering counseling services.

We noted that with the development of the Peer Support Training and the Peer Support Refresher Training, the City and the CPD made great progress toward Secondary compliance. To achieve Secondary compliance, however, the CPD needed to provide evidence that the trainings have been provided. We also needed to be provided with proper and detailed data assessments, which were unavailable due to the delay of technological advances.

During the sixth reporting period, the IMT met with the members of the Peer Support program on a virtual site visit. As noted in ¶401, the Director of Professional Counseling Division continues to oversee all entities within the division including the Peer Support program. We virtually observed the Peer Support Refresher Training during the sixth reporting period. The training included open discussion, experiential learning, policy review, scenarios, and role-plays along with a clear expectation of the role of the peer support member.

The IMT also had a virtual site visit with several peer support members in the sixth reporting period. The peer support members shared the services they provide, ranging from meeting with the CPD members in retirement to real-time response to critical incidents. They further discussed the importance of being able to reach the veteran personnel while also reaching the recruits and conveying the expectations of on and off-duty conduct and the importance of career survival.

During the site visit, we learned that there is an average of 10 peer support members on call at a time along with one lead peer member, and that there is one car available for the whole unit. Thus, many peer support members had to frequently respond to events via their personally owned vehicle. At times, depending on how many callouts occur at the same time or due to the complexity of the circumstances, members are picking up family members in their personal vehicles and transporting them to hospitals and other specific locations. The IMT suggested that the CPD further evaluate this process logistically and with consideration to any liability created by the use of personally owned vehicles.

Also in the sixth reporting period, the peer support members were still required to manually enter their peer support engagement and service encounters on paper forms. The IMT heard that the Professional Counseling Division was in the process of establishing a workflow with regard to the implementation and inputting of information with the iCarol software system. At the moment, the peer support members complete the forms, which are then passed off to three coordinators. The IMT expressed interest in learning where the information goes beyond the coordinators. To achieve Secondary compliance, in addition to evidence of training implementation, the IMT also needed to be provided with

proper and detailed data assessments, which were unavailable due to the delay of technological advances.

*Progress in the Seventh Reporting Period*

The peer support unit is overseen by the Director of the Professional Counseling Division, who is a licensed mental health professional, as required by subparagraph (a). The IMT has virtually met with the Director on several occasions throughout the seventh reporting period during monthly meetings and site visits.

Related specifically to the requirements of ¶404 (b) and (c), the CPD previously submitted the Peer Support Training and the Peer Support Refresher Training. The IMT observed the Peer Support Refresher Training in the sixth reporting period. However, we have yet to receive evidence that the trainings have been provided to at least 95% of the peer support members.

During the seventh reporting period, the IMT met with several peer support members in a virtual site visit. The peer support members advised that they frequently visited the roll calls to meet with the CPD membership and present their services, as well as verbally recruit among their peers. However, the Professional Counseling Division has not presented any evidence of the efforts of the Peer Support Unit's delivery of services, including peer counseling sessions, recruitment efforts, roll call visits, referrals, peer support annual meeting, or other related documentation.

Also during the virtual site visit, the IMT inquired about incentives available to the peer support members. We learned that some peer support members are more involved in responding to the CPD members' needs than other, which mirrors the findings in the Office of the General Inspector's report on Peer Support and Supervisory Wellness Support Strategies. We recommend that the City and the CPD review and refine the notification process to ensure equitable distribution and response of the peer support members.

\*\*\*

The IMT has no evidence to determine how the CPD and/or the Professional Counseling Division quantifies size and the scope of the peer support services provided to the CPD membership. Therefore, during the seventh reporting period, the City and the CPD maintained Preliminary compliance with this paragraph, but have not reached further levels of compliance. The CPD has not demonstrated how it facilitates effective management of the program to preserve anonymity and confidentiality of members receiving peer support services. Again, the IMT looks forward to data that helps to determine the work of the Professional Counseling Division.

## Paragraph 404 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Officer Wellness and Support: ¶406

*406. By January 1, 2020, CPD will develop and adopt a standard operating procedure ("SOP") outlining the roles and responsibilities of the Chaplains Unit. The Chaplains Unit SOP will identify that: a. the purpose of the Chaplains Unit is to: i. support the wellness of CPD members who voluntarily seek consultation with representatives of the Chaplains Unit; ii. make referrals to licensed mental health professionals and other service providers, when appropriate; iii. provide pastoral care to CPD members who voluntarily seek such services; iv. offer voluntary preventive programs for the purposes of supporting, encouraging, and affirming CPD members in their professional and family lives; and v. provide support in moments of crisis as requested by CPD members. b. when acting in the official capacity of a CPD Chaplain, representatives of the Chaplains Unit will refrain from actions or statements that are inconsistent with CPD policy. c. representatives of the Chaplains Unit, including CPD members and non-CPD members, will receive training regarding the roles and responsibilities of the Chaplains Unit.*

## Compliance Progress      (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary and Secondary compliance with ¶406 during the seventh reporting period.

To assess Preliminary compliance with ¶406, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To determine Secondary compliance with ¶406, we reviewed the CPD's training development, implementation, and evaluation.

To evaluate Full compliance with ¶406, we sought to determine whether the CPD had sufficiently implemented its policy and training resulting in the Chaplains Unit operating in a manner consistent with those materials. Additionally, we looked for evidence that the CPD implemented mechanisms to regularly assess whether the Chaplains Unit is operating in accordance with Standard Operating Procedure (SOP) 20-01 and whether adjustments should be made to the Chaplains Unit or SOP 20-01.

*Progress before the Seventh Reporting Period*

In prior reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶406 by revising and finalizing SOP 20-01 and submitting and revising the Chaplains Unit SOP training materials, along with documentation demonstrating the chaplains' review of the training materials.

During the fifth reporting period, we reviewed a revised version of SOP 20-01. The IMT appreciates the efforts made in this revised version and issued a no objection letter. However, in our no objection letter issued for the policy, we reiterated that the CPD should strongly consider changing the "pastoral care" language with more inclusive terminology as the represented religions do not all typically use "pastoral" in their respective terminology. Moreover, the CPD should consider including a provision for confidentiality if a chaplain's religious ordination does not provide for a confidentiality privilege.

Additionally, during the fifth reporting period, the IMT participated in a virtual site visit with a few chaplains, during which we learned that the CPD had five full time chaplains and two part-time chaplains. We also learned of a new CPD member tracking form that the chaplains were using to collect data from their scheduled and unscheduled visits and encounters with CPD members.

It was also shared with the IMT that the chaplains attend roll calls and are located at the police academy for greater access to staff. Members of the Chaplain's Unit also discussed specific programs and innovative efforts designed to further promote CPD members' wellness. For instance, the Chaplain's Unit was organizing a couple's retreat and received some grant funding to reduce the overall cost of attendance for couples, to occur during the sixth reporting period. We stated that we looked forward to seeing the reported results of the event along with other data currently collected on the tracking forms.

During the sixth reporting period, the IMT met with the chaplains during a virtual site visit. The chaplains referenced one of the challenges they sometimes face is working with the primary personnel list with contact information that is not accurate. The primary personnel list is not always up-to-date and sometimes they have difficulty reaching employees. The IMT did inquire about the Couples Retreat. The planning activities occurred during the fifth reporting period and was held in February 2022. A short evaluation was provided to the participants to complete. The results yielded ratings of four and five—where five was the largest positive response. Although the IMT did not see the survey or know what was measured in the survey, the Chaplains expressed the success of the event. A total of 10 couples attended the retreat, and all who registered were able to attend.

The workload assessment remains a challenge as the IMT did not receive a definitive indication of caseload the chaplains currently manage. Without the

proper and accurate accounting of its caseloads, it remains difficult to predict or forecast for additional chaplain support and resources without supporting metrics that could better aid in determining if the current number of chaplains is sufficient for the size of the organization. As we have previously stressed, data collection to analyze where the unit's greatest resources are being expended and where potential gaps in services exist is critical. While the chaplains are manually tracking information on the CPD member tracking form, a technology solution would more efficiently analyze the appropriate data. The IMT stated that to reach Full compliance, the City and the CPD would need to demonstrate the data collection and analysis process. Additionally, the IMT would need to review training records for the chaplains.

*Progress in the Seventh Reporting Period*

The IMT conducted a virtual site visit with the Chaplains Unit of the Professional Counseling Division in the seventh reporting period. The Chaplains Unit is comprised of members who are both sworn and non-sworn members representing various religious denominations. The chaplains were positive about their experience and the level of communication they have with the Director of the Professional Counseling Division. They discussed that they felt their input was sought and valued.

We appreciated this conversation, as they openly discussed their chaplaincy experience at the CPD. Four chaplains are currently located at the academy and another chaplain meets near the academy at a remote site. They all indicated that they spend a tremendous amount of time in their vehicles traversing the entire City, but indicated that they appreciated the confidential nature of their role in meeting at their remote offices to avoid gossip or stigmatization of those seeking counseling. Because of the ability to be mobile, they visit hospitals, coffee, shops, parks, districts, stations, etc. Their emphasis is on meeting people where they are. This further benefits the chaplains in their effort to demonstrate confidentiality and trust.

The chaplains also referenced the effort to promoting confidentiality and the importance of Professional Counseling Division support services and the Employee Assistance Program. Though anecdotal, they feel confident that a significant number of the CPD membership trusts the chaplains and their ability to maintain confidentiality. However, they acknowledge that the members of the CPD do have concerns about confidentiality maintained with the Employee Assistance Program. They advised that they share this information with the director, who oversees the Chaplains Unit and the other units within the Professional Counseling Division.

It is important to note that the chaplains, like the other units within the Professional Counseling Division, are still reporting their counseling sessions and

contacts on paper while the ongoing process of inputting the written material remains underway with the iCarol system. Although they advised the information in the iCarol system would be real time, they acknowledge that some areas for input are not listed in the system, which includes when they counsel recruits. Apparently, there is not currently a category indicating recruits, but they anticipate that modifications would be made to the system as needed.

*** 

Therefore, the City and the CPD maintained Secondary compliance with ¶406 during the seventh reporting period. Like other areas within the Professional Counseling Division, the IMT continues to look forward to reviewing the applicable data. As noted in the previous reporting period, the chaplains do not have scheduled training opportunities specific to chaplaincy duties. That specific training is available through professional chaplain's associations, which was noted in our last report.

Again, the Professional Counseling Division is encouraged to advance training with its chaplains beyond what is specifically offered in their respective ministries via religious institutional training requirement. While that training will be helpful, it could further benefit the chaplains to commune with other professionals to network, learn, professionally develop, and share like experiences. This further promotes a needed assurance that the CPD and the Professional Counseling Division are maintaining healthy, resilient service providers who are not isolated from some of the same exposures that are also experienced by the members they are providing chaplaincy services to. The Professional Counseling Division is encouraged to seek out opportunities that are specific to the roles of police chaplains.

As noted in ¶403, which references the benefits of a "well-run" peer support program, the IMT expresses the need for "well-run" to be applicable to all the Professional Counseling Division programs. Without adequate exposure to quality training opportunities and metrics to assess both efficiency and effectiveness, the qualitative trait of "well-run" cannot yet be determined.

## Paragraph 406 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Preliminary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Secondary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Secondary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Secondary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Secondary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Officer Wellness and Support: ¶407

> *407. CPD will continue to require that whenever a CPD member has experienced a duty-related traumatic incident, the member must attend counseling with a licensed mental health professional. The Director of the Professional Counseling Division or his or her designee will be responsible for documenting that a CPD member has attended the mandatory counseling and has completed the requirements of the Traumatic Incident Stress Management Program prior to the member returning to regular duty assignment. CPD will require any CPD member who has experienced a duty-related traumatic incident, unless medically unable to do so, to meet with a licensed mental health professional within seven days of the incident, and will ensure that it has an adequate staff of licensed mental health professionals who can accommodate this timing requirement.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *In Compliance (FOURTH REPORTING PERIOD)*
**Secondary:**     *Not in Compliance*
**Full:**     *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶407 during the seventh reporting period.

To evaluate Preliminary compliance with ¶407, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree. For Secondary compliance with this paragraph, we reviewed the CPD's training development, implementation, and evaluation.

### Progress before the Seventh Reporting Period

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶407 after finalizing the Traumatic Incident Stress Management Program (TISMP) directive (E06-03). The CPD also submitted clinicians' training materials for the Traumatic Incident Stress Management Program in the fourth reporting period. In the Annual Supervisor In-Service training (2022), an instructional note was included to disseminate E06-03, among other resources, during the training. This topic area is also presented later in the training's lesson plan. The IMT appreciates that the CPD ensured that the policy was provided to each student.

During a virtual site visit with the Professional Counseling Division in the fifth reporting period, the IMT inquired about the range of 24 hours to two weeks for counseling visits for employees who are involved in traumatic incidents as a follow-up noted in the Annual Report to the Superintendent. The notation referenced the importance of reducing the turnaround time for scheduled appointments. During the discussion, the Professional Counseling Division noted they can offer appointments within a few days of the initial call, but also acknowledged there are times where the face-to-face meeting is immediate and within the 24 hours depending on the circumstances. The IMT and Professional Counseling Division also discussed the high caseload and the average visits per day per counselor, which can sometimes interfere or cause a delay in scheduling.

During the sixth reporting period, the City and CPD submitted productions for the Traumatic Incident Stress Management Program training based on the eLearning format. The curriculum was found to be clear, concise, and relevant with the specific policies noted along with information regarding counseling resources and ways to contact the Professional Counseling Division for services. The IMT expressed an interest in reviewing the data following the release of eLearning attendance and referrals. Additionally, the IMT sought to review data records noted in the module regarding qualifying incidents to Traumatic Incident Stress Management Program by employee referral, immediate follow-up upon the initial referral, and data stipulated in the release from the Traumatic Incident Stress Management Program.

The CPD also submitted the CIT In-Service training 2022 curriculum during the sixth reporting period. The sixth module of the training provides information that covers officer wellness with specific information regarding Traumatic Incident Stress Management Program.

The IMT reiterated the significance of having the data to draw from and being able to review anonymized records. The Professional Counseling Division needs to review its own data to see where it is best positioned to provide adequate and qualitative services to the members of the CPD in emergencies, ongoing counseling sessions, and newly scheduled visits.

*Progress in the Seventh Reporting Period*

During the seventh reporting period, the CPD conducted an audit of Traumatic Incident Stress Management Program (TISMP) to assess the CPD's compliance with requirements outlined in ¶407 and ¶408 of the Consent Decree. The data that was audited covered the period from March 1, 2021, through December 31, 2021.

It was determined by the Audit Division that they were unable to identify the total number of CPD members who should have been required to participate in the

TISMP. The Audit Division was only able to determine a subset of those persons qualifying to participate in the mandatory TISMP due to those members having discharged a firearm as conditionally stipulated policy E06-03.

The reason that current practices did not meet the standards was due to the CPD lacking the mechanism that systematically identifies members involved in traumatic accidents. The Audit Division further noted that many types of potential traumatizing incidents members experience may not be captured in the existing forms and data. The data collected by the Audit Division came from several sources. However, the data was not comprehensive due to the fragmented storage. Thus, the audit also yielded several implications that the CPD was unable to identify the entire population of members required to complete the program, and therefore could not determine the extent to which all affected members had participated in the required counseling programs.

The Audit Division recommended that the CPD weigh the cost and benefits of more systematically capturing whenever a member experiences a traumatic incident. It also stated that, while some traumatic incidents are routinely captured in department data (e.g., firearm discharges), the nature of other incidents may not be clearly definable or amenable to data analysis. It also suggested that frontline supervisors continue to have a degree of discretion in referring members to TISMP for these incidents.

It further suggested that the Professional Counseling Division or other appropriate units monitor incident types currently captured in the CPD data to ensure that affected members are referred to and attend the TISMP program.

Additionally, the Audit Division was unable to determine why several members with a designated code (which is designed to indicate a referral to TISMP) were not documented in the TISMP data. It recommended that supervisors ensure the proper codes are entered and assigned to refer members to the TISMP. The Audit Division also recommended that the CPD determine an appropriate process by which the CPD verifies that members referred to the program do not return to duty prior to being properly released from the program.

The CPD's internal audit of the TISMP program corroborated the IMT's comments and inquiries during the meetings and site visits, in both current and past reporting periods regarding the lack of technology, inefficient data collection, recordkeeping, and analysis. This TISMP audit reflects the critical nature of gaps, proper versus improper referrals, and the need for collective data that is required to identify where the greatest needs exist and what optimal remedies are available for those members who have experienced traumatic incidents. Given the gravity of trauma and the necessity for an effective and efficient program, the IMT recommends an expedited effort to address properly capturing the necessary codes and data.

During the seventh reporting period, the IMT recommended that the Professional Counseling Division work closely with the vendor of the iCarol system to ensure that the necessary seals can be captured for the TISMP referrals and that completion versus non-completion (with reason) be developed in order to determine who attended the program and who was return to duty. Additionally, as noted in other paragraphs, the CPD should clarify the difference between counseling versus debriefing in the TISMP policy. Personnel must understand the expectation in order to meet the expectations.

*** 

Therefore, the City and the CPD maintained Preliminary compliance, but did not reach additional levels of compliance with this paragraph in the seventh reporting period. Again, the IMT continues to await data that supports moving forward with ¶407. Given the various data sources that the Audit Division assess, the IMT is concerned that the data captured either in paper form or in the iCarol system may not be comprehensive enough. If the initial referral is subjectively not made or the necessary follow-up does not occur, CPD members may fall through the cracks and miss the debriefing events or other mandatory counseling.

### Paragraph 407 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Officer Wellness and Support: ¶408

> **408.** *In addition to providing mandatory initial consultations and additional consultations as appropriate or as requested by CPD members, CPD's licensed mental health professionals will follow up with members who have experienced a duty-related traumatic incident within six months to offer additional support services.*

## Compliance Progress  (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶408 during the seventh reporting period.

To evaluate Preliminary compliance with ¶408, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To assess Secondary compliance, we need to review the CPD's training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶408 by establishing language in Traumatic Incident Stress Management Program (TISMP) Directive E06-03 that the Professional Counseling Division (also known as PCD) personnel follow up with members released from the Traumatic Incident Stress Management Program within six months to offer additional support services. Although the Traumatic Incident Stress Management Program directive had been finalized and the public comment period occurred during the fourth period, the IMT was not provided any records that have addressed the sixth month follow-up that is required by ¶408.

In a virtual meeting during the fifth reporting period, the Professional Counseling Division apprised the IMT that various curricula were being reviewed and eLearning was under development to be produced in early 2022. The IMT responded with concerns related to the duration of time it takes from the development of a lesson plan through its instructional period and would prefer more of an expedited effort by the CPD to ensure that timely information is presented.

While the Professional Counseling Division continued to provide services to those referred after having experienced a duty-related traumatic incident, in the sixth reporting period, the IMT did not receive any records showing CPD adherence to ¶408 and other policy stipulations in Directive E06-03. The IMT needs to see data showing that the Professional Counseling Division's mental health counselors are indeed following up six months after the initial consultations, as directed.

As with ¶407, the CPD did not reach Secondary compliance during the fourth, fifth, or sixth reporting periods because the CPD did not provide the IMT with evidence that the Traumatic Incident Stress Management Program clinicians' training materials were finalized and delivered. The IMT will need to review additional data that will support: additional services; completion of counseling services; any additional related referrals beyond the services provided by the Professional Counseling Division; and the Traumatic Incident Stress Management Program eLearning (¶¶407, 408, 409).

*Progress in the Seventh Reporting Period*

It was determined during the seventh reporting period that the six-month follow-up was not occurring as stipulated in ¶408. Instead, follow-up was inconsistent and intermittent at best. The Audit Division's TISMP Audit (Finding 2) referenced ¶408 of the Consent Decree. Under the current practices, the Audit Division was unable to assess the Department's compliance with the ¶408. The reasons stipulated in the audit indicated:

(1) The counselors in the Professional Counseling Division input follow-up dates into the CLEAR application prior to completing the follow up. However, the application does not include a separate data field that captures when the follow-up occurred.

(2) Additionally, after the debriefing sessions occurred, and members were released from the program, the Professional Counseling Division clinicians did not have access to edit the cases which would allow real time entry of details that was specific to the six-month follow-up call.

(3) It was also noted that neither the Consent Decree nor the Department directives specify the starting point for the six-month follow-up period (e.g., incident date, notification date, initial debrief date, release date, or other).

At the time of the audit, the Audit Division also noted as an implication that the CPD does not have a mechanism for systematically verifying the follow-up calls between the Professional Counseling Division and the referral members occur within six months. The audit also recommended that the Professional Counseling Division should ensure that it is recording the date follow-ups factually occur in its

application and that the CPD should clarify in its directives the starting point for the six-month follow up.

The IMT was informed during a virtual site visit that the CPD's IT department has made the necessary modifications in the CLEAR system to ensure that counselors can now go into the system and make additional follow-up comments and updates as needed, and the counselors are now able to enter the follow-up information within the six-month period as required by ¶408.

\*\*\*

The IMT commends the CPD for making the modifications to allow the Professional Counseling Division clinicians to make the necessary follow-up details in the CLEAR system. However, the IMT has not received any data that shows these efforts or any data to reflect a six-month follow-up with CPD members who had experienced a traumatic incident. Additionally, the IMT has not been shown whether any members receive additional support or referral services following the six-month follow up. Therefore, the City and the CPD maintained Preliminary compliance but did not reach Secondary compliance with this paragraph during the seventh reporting period. We continue to await data to support the stipulations directed in both ¶407 and ¶408.

### Paragraph 408 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Officer Wellness and Support: ¶409

> *409. CPD has implemented a mandatory program for members who have experienced an officer-involved firearms discharge that consists of peer group discussions and other components. CPD will ensure that this program is overseen by a licensed mental health professional assigned to the Professional Counseling Division, reflects best practices, and comports with CPD's use of force policies and training.*

## Compliance Progress                    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶409 during the seventh reporting period.

To evaluate Preliminary compliance with ¶409, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To assess Secondary compliance, we review the CPD's corresponding training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

In the first reporting period, the City and the CPD achieved Preliminary compliance with ¶409 by implementing a mandatory, Commission on Accreditation for Law Enforcement Agencies (CALEA) qualified program for officers who have experienced an officer-involved firearm discharge. The CPD maintained Preliminary compliance with ¶409 in the following reporting periods by finalizing the Traumatic Incident Stress Management Program (TISMP) Directive E06-03.

The IMT reviewed training materials for clinicians for the Traumatic Incident Stress Management Program in February 2021 and provided comments. During the fifth reporting period, although the CPD submitted the Traumatic Incident Stress Management Program training for review in February 2021, the training had yet to be finalized and provided.

The Professional Counseling Division oversees the Traumatic Incident Stress Management Program as noted in policy, training, various strategies, and the relative paragraphs of the Consent Decree. During the sixth reporting period, the Professional Counseling Division apprised the IMT of a status update regarding several officer wellness policies, initiatives, programs, and trainings. While they

continued to provide services to those who are referred to the Professional Counseling Division after having experienced a duty-related traumatic incident, the IMT did not received any information, data, nor reviewed any records that document the efforts being made per ¶408 and Directive E06-03 during the sixth reporting period. The Professional Counseling Division did not submit any records showing their adherence to this paragraph and other policy stipulations.

As noted in prior reporting periods, the IMT still awaits review of data that will support the prescribed Professional Counseling Division services, group discussions and other components pertinent to this paragraph, completion of the counseling services, and any additional related referrals beyond the services provided by the Professional Counseling Division.

To reach additional levels of compliance, we noted that the CPD should submit records showing oversight and review, by a licensed mental health professional, of the mandatory program and its review process to ensure best practices and comports with the CPD's use-of-force policies in training. Furthermore, the City and the CPD need to complete the training materials and provide evidence that the training has been delivered along with an accounting of attendees and the other instructional delivery-related data.

*Progress in the Seventh Reporting Period*

During the seventh reporting period, the CPD produced an internal audit of its Traumatic Incident Stress Management Program (TISMP). The audit consisted of 2021 data, which identified a number of gaps in practices in training and policy alignment. The CPD achieved Preliminary compliance in the first reporting period based on its mandatory debriefing program, which is also a CALEA requirement. However, the TISMP audit found that there appeared to be confusion in the interpretation of the CALEA requirement regarding a debriefing and counseling sessions. Thus, operational assumptions prevailed when CPD members should have been referred to counseling but were referred to the routine debriefings instead.

In the TISMP audit, Observations #1 and #2 noted that the structure of the CPD's debriefings potentially do not match the expectations of the Consent Decree. The Professional Counseling Division personnel mentioned that while debriefings were considered a form of therapy, they are not therapy. The Audit Division suggested that the CPD confirm whether the Professional Counseling Division's debriefing sessions match the expectations and requirements of the Consent Decree. The IMT recommends that a policy revision should be made to clarify counseling versus debriefing in order for personnel to understand expectations. Given that policy E06-03 V1.B1 refers to the CALEA requirement, this does not ensure that peer

group discussions, counseling sessions, or other best practices are occurring without sufficient data evidenced to support same.

Also during the seventh reporting period, the CPD submitted records demonstrating that at least 95% of CPD members have completed the TISMP eLearning.

\*\*\*

Therefore, the City and the CPD maintained Preliminary compliance with this paragraph. While the TISMP program is overseen by the Director of the Professional Counseling Division, the IMT seeks current data that shows proof that the practices of the City and the CPD are consistent with the requirements of ¶409.

### Paragraph 409 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Officer Wellness and Support: ¶410

> **410.** *CPD will continue to place any CPD member who has discharged a firearm, excluding training discharges, unintentional discharges, or discharges for the destruction of an animal where no person was injured, on mandatory administrative duty assignment for a minimum period of 30 days. Prior to permitting the member to return to regular field duties, CPD will require the member to (a) complete the Traumatic Incident Stress Management Program and any training determined by CPD to be appropriate; and (b) receive authorization from the First Deputy Superintendent. Authorization to return to regular field duties may be withheld pending the outcome of any administrative or criminal investigation.*

## Compliance Progress  (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶410.

To evaluate Preliminary compliance with ¶410, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed the data sources relevant to compliance with the paragraph. We paid particular attention to the City and the CPD's acquisition or implementation of a technological solution that allows for reliable data tracking now and in the future.

### Progress before the Seventh Reporting Period

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶410 by finalizing the Traumatic Incident Stress Management Program (TISMP) Directive E06-03. This directive clearly defines the types of firearm discharges that mandate Traumatic Incident Stress Management Program referral. In addition, E06-03 requires the Professional Counseling Division to notify the Office of First Deputy Superintendent when a member who was referred to the Traumatic Incident Stress Management Program due to a firearm discharge is released from the program. The policy also requires members who have discharged a firearm to respond consistent with another CPD directive, Firearm

Discharge Incidents Authorized Use and Post-Discharge Administrative Procedures, G03-02-03.

During the fifth and sixth reporting periods, the CPD did not present the IMT with any of the data sources to support Secondary compliance with ¶410. The IMT explained that to reach Secondary compliance, the City and the CPD would need to implement a technology solution that allows for data collection and analysis to track the Professional Counseling Division unit's and members' compliance effectively and accurately with this directive. Such anonymized data would include: the number of members on administrative duty; the number of members mandated to complete TISMP or any other specific training that may be required; the number of members returning to regular field duty; and the number of members who were not permitted to return or who were extended pending the outcome of an investigation.

Throughout the sixth reporting period, the CPD apprised the IMT of the anticipated implementation of the iCarol software. However, the IMT is concerned whether this is a data set that can be captured by the iCarol platform, as the continuity of this training and respective tracking of an employee referred to the Traumatic Incident Stress Management Program due to the firearm discharge may include a number of other entities within the CPD who also address portions of this case-by-case matter. The example offered is IAB, Training, Employees Assistance Program, and other external resources which may all be connected to this one employee before they are returned to full duty. The IMT seeks to understand how all touch points are captured and properly recorded to ensure the consistency and continuity of this paragraph is applied accordingly. Additionally, as these events and incidents occur, the IMT seeks to understand how data is mirrored by the various facets created by ¶410, including the notification of the deputy superintendent, the additional training that may be required, and the extension of the admin duty beyond 30 days resulting in withholding one's return to regular duty.

Also, in several discussions regarding when and what data will be imported into the iCarol system, there has been no indication that it will include historical data. The IMT would like to see some historical data in this area as ¶410 encompasses a number of other entities to include the Deputy Superintendent, training, and other referrals, and those aspects of the requirement that may not be currently captured or recorded at this time.

It is necessary to evaluate the data sources that reflect and support compliance of this paragraph. Those data sources are specific to the CPD members who have discharged their firearm under specific circumstances and who are on mandatory administrative duty assignments for a minimum of 30 days. The IMT awaits further

discussion and the data solutions that address both ¶410 and E06-03 in order to begin moving toward Secondary compliance.

*Progress in the Seventh Reporting Period*

The City and the CPD show inconsistencies in the practice as noted in the internal TISMP audit conducted by the CPD's Audit Division, which was unable to identify the full population of members that should have been required to participate in the mandatory TISMP. The Audit Division was, therefore, unable to determine to which extent all affected members have participated in counseling sessions.

The IMT is greatly concerned that, while the Audit Division analyzed 2021 data, the same operational and administrative practices were ongoing during the curation of 2022 data, which is not being shared or presented to the IMT. The additional concern reflects those who were either not recommended to TISMP, or did not show for briefings or counseling services, yet continued to work without receiving authorization from the First Deputy Superintendent to return to regular field duties.

The CLEAR system was modified during the seventh reporting period to allow counselors the opportunity to enter the six-month follow-up and to determine whether further referrals or other services were needed. However, the IMT has not been afforded an opportunity to review relative data to 2022 caseloads of TISMP referrals. Likewise, the IMT has no statistical evidence to indicate who or how many have been approved to return to regular duty versus those who may have been extended for other reasons. The IMT has no proof of evidence to show that practices have been improved upon, or remain the same with the 2022 data to compare to the Audit Division's findings with regard to 2021 data.

\*\*\*

Therefore, the City and the CPD maintained Preliminary compliance with this paragraph, but did not reach further levels of compliance during the seventh reporting period. The IMT looks forward to the review, completion, and follow through of the recommendations suggested in TISMP audit offered by the CPD's Audit Division.

## Paragraph 410 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Officer Wellness and Support: ¶411

> **411.** *At least annually, CPD will determine whether members who have experienced a duty-related traumatic incident have attended the mandatory counseling sessions and have completed the Traumatic Incident Stress Management Program.*

## Compliance Progress                (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**   Annually            ☐ Met   ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶411, but did not reach additional levels of compliance.

To assess Preliminary compliance with ¶411, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. For Secondary compliance, we reviewed the CPD's training development, implementation, and evaluation. We also sought to review records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities delineated by ¶411.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶411 by submitting a CPD Audit Unit report providing a review of the Traumatic Incident Stress Management Program (TISMP) and including ¶411's requirements into Directive E06-03. Specifically, E06-03 requires the Audit Division to:

> *conduct an annual assessment to determine the extent to which members who experience traumatic incidents are referred to the [TISMP] and the extent to which referred members attend the mandatory debriefing session(s), complete the [TISMP], and receive follow-up communication and support services.*

The CPD did not provide the required annual assessment by the end of the fourth nor during the fifth reporting period. We reiterated the importance of implementing a technology solution and await the basic data to determine Secondary compliance.

During the sixth reporting period, the City and the CPD did not progress beyond Preliminary compliance, as the IMT did not receive any data or related productions that support further compliance for ¶411. The IMT previously stated that this requirement should be routinely collected as these events do occur and some facet of this data should already exist to be only enhanced with technology solutions. Therefore, the IMT expects to see historical data applied to ¶411.

We previously explained that to reach Secondary compliance, the City and the CPD would need to provide evidence of an annual review, as well as implement a technology solution to allow for reliable and efficient tracking of compliance with ¶411. Beyond Secondary compliance, we will look for evidence of the routinized data collection and related assessments that verifiably support ¶411. We will also expect the CPD to train personnel to appropriately analyze data on program compliance which will then inform the annual review and report.

*Progress in the Seventh Reporting Period*

During the seventh reporting period, the City and the CPD produced a 2021 audit of the TISMP. The IMT is unaware of the 2020 data assessment and has yet to see and any evidentiary records of 2022 TISMP program data to support ¶411. There were inconsistencies with the data sources, which were noted and addressed in the findings, recommendations, suggestions, and observations of the most recent TISMP audit.

As noted in ¶410, the IMT has not received any evidence of the annual assessment of the TISMP. Reliance on 2021 data showed inconsistencies in referrals, debriefings, and attendance for counseling sessions. It appeared that some personnel were referred to debriefings when they perhaps should have been referred to a mandatory counseling session. And there were some indications that some personnel were not referred when they should have been. This inconsistency leaves a gap in the process of who should have attended mandatory counseling sessions and who actually did attend the required session.

The audit included an observation "that a definitive classification must be made between counseling sessions and debriefings," which identified the confusion created with referrals and debriefing attendance. However, no anonymized data has been presented to support ¶411. The City and the CPD should work to clarify this observation in the next reporting period.

*** 

Therefore, the City and the CPD maintained Preliminary compliance with this paragraph, but did not reach further levels of compliance during the seventh reporting period. Unfortunately, yet relative to the nature and types of calls (crisis-

driven, violence-related) that require police response, the officer's exposure to traumatic incidents is more common and more frequent. To maintain Preliminary compliance in the next reporting period, the City and the CPD must ensure that adequate processes are in place to confirm that debriefings, counseling, and mandatory referrals to participate in TISMP are solidly established to minimize the risk that the CPD members who have experienced a duty-related traumatic incident are missing Professional Counseling Division services due to steps that can be clarified. The IMT looks forward to more detailed analyses in the eighth reporting period and the clarification of counseling versus debriefing sessions to ensure proper and appropriate referrals are mad and can be accounted for.

### Paragraph 411 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Officer Wellness and Support: ¶412

*412. Where it would add to the quality or effectiveness of the training, CPD will involve mental health professionals, as feasible, practical, and appropriate, in developing and reviewing recruit and in-service training on stress management, alcohol and substance abuse, officer wellness, and the support services available to CPD members.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance (FIFTH REPORTING PERIOD)* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance, but did not reach further levels of compliance with ¶412 during the seventh reporting period.

To evaluate Preliminary compliance with ¶412, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-641), which outlines applicable consultation, resolution, workout, and public comments periods. For Secondary compliance, we reviewed the CPD's training development, implementation, and evaluation. We also sought to determine how the CPD is seeking input from mental health professionals in developing and reviewing the training on mental health related topics, what feedback the professionals provide, and how the CPD utilizes such feedback.

*Progress before the Seventh Reporting Period*

In the third reporting period, we provided a status update stating the CPD had engaged the expertise of several outside professionals to assist in the development of a variety of programs and materials. In the fourth reporting period, the CPD revised Special Order S11-10, Department Training, which includes mental-health experts among the list of outside experts to be called on, and the IMT provided a no-objection notice.

The CPD partnered with several outside professionals in the development and delivery of the In-Service Officer Wellness training materials, to which we submitted a no-objection notice. During the fourth and fifth reporting period, the CPD had submitted several Officer Wellness training curricula, including the 2021 In-Service Officer Wellness Training, the Employee Assistance Program Pre-Service Promotional Training, and the Employee Assistance Program Recruit Training.

During the fifth reporting period, the IMT was able to observe the delivery of the 2021 In-Service Officer Wellness Training and participate in a virtual site visit

discussion with members of the Professional Counseling Division to discuss observation of the curriculum delivery and instruction. Additionally, the IMT was able to observe the financial wellness topical area conducted by representative from an external resource.

Additionally, in the fifth reporting period, a member of an outside mental-health resource attended an officer wellness meeting to discuss steps taken to develop curriculum and programming. The partnership with other mental-health professionals is a significant aspect of both the training development and providing services to CPD members to ensure that practices remain both relevant and current in providing services to the CPD members. Appendix G of the 2021 Training Plan includes a list of external resources and subject-matter experts who have provided input in the development of specific training material and who have delivered instruction of the lesson plan. The CPD also finalized S11-10 during the fifth reporting period, which addresses the requirements of this paragraph.

With the CPD's involvement of outside experts in developing these training materials, and the finalization of S11-10, the IMT reached Preliminary compliance. The IMT indicated that we would continue to look for evidence that trainings have been delivered to members to reach further levels of compliance.

During the sixth reporting period, the IMT received the revised Employees Assistance Program Recruitment Training curriculum. We expressed appreciation for a clear, concise revision of the curriculum. The lesson plan introduces the wellness program to recruits who have joined the CPD. The curriculum is particularly important for recruit classes as they are introduced to the available internal and external resources and services that further promote mental health and wellness. With emphasis on confidentiality, introduction to the Professional Counseling Division and the programs offered, the curriculum presents the avenues by which to contact the Professional Counseling Division and support units for stress management and related mental health matters.

Although the CPD only presented one production regarding ¶412, throughout the sixth reporting period, the IMT did note that the Professional Counseling Division has premised aspects of this paragraph ranging from in-service training to support services that are found in other productions. Several of those productions that were in development referenced several external resources and related best practices to include: the US Department of Defense on suicide prevention, credit union on aspects of financial wellness, Traumatic Incident Stress Management Program, philanthropic support for the Couples Retreat, Georgetown University with the ABLE curriculum and NAMI. We expressed that we looked forward to seeing an inclusive list that reflects to the CPD's continued and expanding engagement with those resources that further wellness and support of the recruits

and the greater CPD membership, along with the data reflecting the class completion and attendance records, as well as pre- and post-test data.

*Progress in the Seventh Reporting Period*

The City and the CPD produced several training curricula that included components of the counseling services provided by the Professional Counseling Division during the seventh reporting period. The Field Training Officers (FTO) Initial Training included a module that was specific to the Employee Assistance Program. The IMT noted that the training further enhances the knowledge of both the FTO and the recruit.

The CPD also submitted the 2023 Active Bystandership for Law Enforcement (ABLE) Wellness Refresher, which is a curriculum developed out of Georgetown University. This curriculum has been utilized throughout the United States in police departments of various sizes. The IMT applauds the CPD for seeking training that is developed on an evidence-based platform with input from a spectrum of subject matter experts who employ data, theory, and best practices that are supported by both national and international law enforcement associations and academia. We agree with the OAG's comment that the CPD should consider distributing additional handouts to trainees that included wellness resources noted in the Curriculum Resource Packet.

Additionally, the IMT reviewed the ICAT – Integrating Communication Assessment and Tactics Training, which included a portion on officer wellness. We appreciate the CPD identifying those training courses that allow for the infusion of officer wellness.

The CPD also produced a revised Suicide Prevention Initiative during the seventh reporting period, along with a response to prior comments from the OAG. The response addressed the ongoing hiring process for the additional clinicians, the CPD's training and support groups exploration of a CPD wellness app, an explanation of how iCarol will allow the Professional Counseling Division to measure use and availability of services in their overall efforts to increase efficiency and accuracy of reporting, and the inclusion of a training topic on the role that firearms have in mental health crisis.

*** 

The IMT applauds the CPD for its efforts to increase opportunities to introduce effective and quality training regarding mental health services available to the CPD membership. As noted in the sixth reporting period, the IMT continues to seek opportunities to review data that reflects the stipulations of ¶412, including

classes taught, attendance records, and other trainings that include an officer wellness component.

Therefore, the City and the CPD maintained Preliminary compliance with this paragraph in the seventh reporting period. The IMT hopes to see further analyses of class, attendance, and curricular delivery in the next reporting period.

## Paragraph 412 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Officer Wellness and Support: ¶413

> **413.** *CPD will involve experts, such as psychologists and cognitive and behavioral scientists, in developing training on use of force where their expertise would enhance the effectiveness of the training. The training topics that may benefit from such expertise could include: a. peer intervention by fellow officers to stop the use of excessive force; b. the interaction of human perception and threat assessment; and c. de-escalation and defusing techniques, including psychological methods of situation control, verbal control and communication, conflict resolution, and anger management.*

**Compliance Progress**   (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶413.

To evaluate Preliminary compliance with ¶413, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-641), which outlines applicable consultation, resolution, workout, and public comments periods.

For Secondary compliance, we reviewed the CPD's training development, implementation, and evaluation. We also sought to determine how the CPD is identifying the means and methods by which input is sought from experts in developing training on use of force where their expertise would enhance the effectiveness of the training, how the CPD is seeking input from experts in developing these trainings, what feedback the experts provide, and how the CPD utilizes such feedback.

*Progress before the Seventh Reporting Period*

In the third reporting period, we provided a status update, indicating we had reviewed documents reflecting the CPD's engagement of behavioral science experts in developing a variety of trainings. In the fourth reporting period, in addition to reviewing revisions to Special Order S11-10, Department Training, as discussed in ¶412 above, we reviewed the City and the CPD's 2021 Training Plan.

During the fifth reporting period, the IMT again reviewed and provided comments on the 2021 Training Plan. We appreciated the CPD's efforts to involve outside

expertise to develop and review CPD curricula and to incorporate experts and guest speakers in the instruction. The outside experts are noted in Appendix G of the 2021 Training Plan. The CPD also finalized S11-10 during the fifth reporting period, which addresses the requirements of this paragraph. Therefore, the City and the CPD met Preliminary compliance with ¶413. To reach Secondary compliance, the IMT expects evidence that shows the relevant trainings have been delivered.

During the sixth reporting period, the IMT noted our appreciation of the effort the CPD took to include the ABLE training founded on the campus of Georgetown University. As this training has been nationally recognized, it requires train-the-trainer certification to ensure continuity of the training experience. The CPD also referenced some professional organizations and some outside subject matter experts throughout the submission of various lesson plans. However, during the sixth reporting period, the delivery of those lesson plans, date of attendance, and finalizing S11-10 had not been completed. Also, several productions were still in various stages of development such as the Suicide Prevention Initiative and 2022 Communications Strategy.

*Progress in the Seventh Reporting Period*

During the seventh reporting period, the CPD produced several training curricula, including the 2023 Active Law Bystandership for Law Enforcement (ABLE) Wellness Refresher, which was developed by a number of subject matter experts. ABLE is a product of the Center for Innovations in Community Safety, who partnered with the global law firm Sheppard and Mullen on the campus of Georgetown Law. As noted in ¶412, the 2023 ABLE Wellness Refresher is an evidence-based curriculum with input from a spectrum of subject matter experts who employ data, theory, and best practices that are supported by both national and international law enforcement associations and academia. The training provides a reinforcement of the previous ABLE curriculum, and also prioritizes the importance of officer wellness.

The IMT applauds the CPD for seeking training that was developed by subject matter experts across a broad spectrum of professions with a focus on officer wellness. We agree with the OAG that to improve the effectiveness of training, the CPD should consider distributing additional handouts to the trainees including additional wellness resources noted in the Curriculum Resource Packet. The ABLE course also includes a self-assessment tool that provides an informal means of evaluating mindfulness, connectedness, health, sleep, and rest. This package contains a brief guide focusing on self-prioritization for health and wellness.

The CPD also submitted the 2023 Use of Force Integrating Communications Assessments and Tactics (ICAT) Training during the seventh reporting period. ICAT

is developed by the Police Executive Research Forum (PERF), and it provides first-responding police officers with tools, skills, and options for successfully and safely defusing a wide range of critical incidents and applying foundational principles of critical thinking, crisis intervention, communications, and tactics in an integrated approach to training.

<div align="center">***</div>

Therefore, the City and the CPD maintained Preliminary compliance with this paragraph during the seventh reporting period. The IMT seeks clarification regarding the instruction plan for the academy recruits and the expected launch date for instruction in relation to the first ABLE curriculum. We look forward to receiving data and proof of completed course delivery and instruction.

## Paragraph 413 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Officer Wellness and Support: ¶414

**414.** *CPD will ensure that all CPD members are provided in-service training on stress management, alcohol and substance abuse, and officer wellness at least every three years. CPD will include training regarding stress management, alcohol and substance abuse, officer wellness, and support services in the recruit training program.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶414 during the seventh reporting period.

To assess Preliminary compliance with ¶414, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-641), which outlines applicable consultation, resolution, workout, and public comments periods. We also reviewed training materials that demonstrate the development of programs relevant to compliance with ¶414.

To evaluate Secondary compliance with ¶414, the IMT reviewed the CPD's training development, implementation, and evaluation (¶286). For Full compliance, we will need to determine whether the CPD offers sufficient recruit training and in-services training on stress management, substance use disorder, and officer wellness.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶414 by (1) submitting curricula for the Officer Wellness Training and the Employee Assistance Program (EAP) Pre-Service Promotional Training and (2) including verbiage in Traumatic Incident Stress Management Program (TISMP) Directive E06-01 that satisfies the requirements of ¶414. The CPD also submitted and revised 2021 In-Service Officer Wellness Training materials, to which the IMT provided a no-objection notice. The IMT learned this training began in June 2021 and anticipated receiving evidence that all officers received this training in the fifth reporting period.

At the close of the fifth reporting period, the CPD submitted the EAP Recruit Training Course production to be reviewed by the IMT. During the fifth reporting period, the IMT observed the In-Service Officer Wellness training to CPD members.

However, the IMT did not receive any attendance records or any related data in that reporting period indicating attendance and the percentage of CPD membership that have yet to receive the training.

During the sixth reporting period, the CPD submitted several training productions for in-service training on the topic of stress management; alcohol and substance use disorders; and support services to include recruit training as well. The Employees Assistance Program Recruit Training was submitted during the sixth reporting period. However, the records of completion, attendance, pre- and post-testing were not submitted in that reporting period. Additionally, the Traumatic Incident Stress Management Program training further promotes wellness and was also reviewed during this reporting period. This training thus ensures that all CPD members are provided in-service training on stress management and alcohol and substance use disorder along with general officer wellness.

The IMT noted that we looked forward to the sustainable records, training, and routine training schedules that will ensure that each recruiting class is presented with this most pertinent information that apprises recruits of wellness at the onset of their careers. The IMT encouraged the CPD to incorporate some informative facet of financial wellness into the Employees Assistance Program training as the financial matters can sometimes be the source of those types of stressors that this training attempts to offer preventive remedies that promote wellness.

*Progress in the Seventh Reporting Period*

During the seventh reporting period, the IMT met with the CPD's Officer Wellness and Support Leadership during a virtual site visit. This was the first time the IMT had specifically met with the leadership team as a separate site visit to discuss specific issues. One of the key points made by the leadership team was that the CPD was building the Professional Counseling Division with intervention and post-vention, as well as prevention planning, programming, and additional educational opportunities to fully support holistic wellness and well-being.

It was also shared with the IMT that the Superintendent has begun monthly meetings with internal and external stakeholders, unions, and other subject matter experts to start discussions to identify potential needs and issues of the CPD membership in an effort to obtain feedback and utilize it comprehensively as they implement the next annual needs assessment. They further indicated that they seek more opportunities for additional training on wellness as well.

The City and the CPD produced the following trainings for all CPD members in the seventh reporting period, which included the topic of wellness as required in ¶414:

- FTO Initial Training – Employee Assistance Program (EAP) Hour

- 2023 Active Bystandership for Law Enforcement (ABLE) – A Refresher on Officer Wellness.

- 2022 In-Service Crisis Intervention Training, which included a Resource Guide

- 2023 Training Plan, which included a listing of the curriculum topics, delivery model (roll call/video, eLearning, classroom), and the training audience (pre-service, in-service, recruit)

Although the IMT has reviewed and commented on the aforementioned trainings, we have not received indication that the curricula has been taught as some topics are intended to be taught in future reporting periods. During the seventh reporting period, the CPD provided data indicating that 95% of the CPD membership had completed the TISMP eLearning course.

\*\*\*

Therefore, the City and the CPD maintained Preliminary compliance with this paragraph in the seventh reporting period. We look forward to the completion and delivery of those topics to the CPD membership and the corresponding data demonstrating that membership has received the trainings.

### Paragraph 414 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Officer Wellness and Support: ¶415

> **415.** *By July 1, 2020, and periodically thereafter, CPD will conduct a department-wide equipment and technology audit to determine what equipment is outdated, broken, or otherwise in need of repair or replacement. During each audit, CPD will solicit feedback from representatives of the collective bargaining units representing CPD members.*

**Compliance Progress**       (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**   Ongoing          ☐ **Met**   ☑ **Missed**

**Preliminary:**   *Not in Compliance*
**Secondary:**   *Not Yet Assessed*
**Full:**   *Not Yet Assessed*

The City and the CPD have not yet reached Preliminary compliance with ¶415 during the seventh reporting period. Additionally, the City and the CPD have not met the deadline of ¶415 because they did not submit evidence of a department-wide audit that met all requirements specified in the paragraph.

To assess Preliminary compliance with ¶415, the IMT sought to review the CPD's relevant policies and documents directing the completion of periodic audits and solicitation of feedback from the collective bargaining units as required by ¶415, following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comments periods.

*Progress before the Seventh Reporting Period*

In prior reporting periods, the City and the CPD did not reached Preliminary compliance because they did not provide evidence that a policy has been created to direct the completion of periodic audits as required by ¶415. Additionally, we noted that ¶415 calls for equipment and technology audits to be conducted "periodically." The IMT suggested that when the City and the CPD draft a policy to guide compliance with this paragraph, they should include a timing requirement that guides the frequency of these audits. Once this policy is finalized, we would look for the CPD to meet its own deadlines for completing the department-wide equipment and technology audits.

Despite the lack of a policy, during the fourth reporting period, the City and the CPD submitted an Equipment and Technology Audit. While we appreciated the efforts in completing this audit, it did not fully address the requirements of ¶415. Specifically, the audit did not provide a full and clear picture of (1) the equipment

and technology in the CPD's possession; (2) the state of that equipment and technology; or (3) any recommendations for addressing any identified concerns or problems with CPD's equipment or technology. Moreover, we had not received indication that all collective-bargaining units were consulted in the completion of this audit. The IMT indicated that the City and the CPD would need to submit a policy that guides compliance with ¶415, and include all requirements set out in ¶415 in the Equipment and Technology Audit.

During the fifth reporting period, the IMT did not receive any materials pertaining to this paragraph. The March 19, 2021 Audit from the CPD appeared to be a basic IT assessment of some of the technology equipment the CPD has available. A true audit would afford the CPD to support proposals and budgetary forecasting for some of the technology needs that are frequently reiterated in the IMT reports.

During the sixth reporting period, the IMT met with the PSA/Data Committee on several occasions, including a virtual site visit regarding the specific needs to be addressed in the department-wide equipment and technology audit. In the required department-wide audit, the CPD should determine what equipment is current, functional, non-functional, reached the end of life, and necessitates repair or replacement. The discussions were both informative and reflective of understanding what information is needed, how to conduct the audit, and the conveyance of why such an audit is necessary.

*Progress in the Seventh Reporting Period*

In the sixth reporting period, the CPD produced a second report of the CPD's audit of technology and equipment. The IMT met with the CPD in the sixth and seventh reporting periods to discuss the required department-wide audit required by ¶415. The CPD indicated that they had planned to develop a policy for the audit, which would identify:

1) who would conduct the audits in the future;
2) what data would be collected;
3) how the data would be stored;
4) what equipment is broken, outdated;
5) what repairs and when are feasible; and
6) a method for gathering collective bargaining input regarding equipment and technology.

During a meeting in the seventh reporting period, the CPD presented the ServiceNow data collection platform to demonstrate their in-house inventory program could centralize recordkeeping for technology and equipment. They further indicated that this platform would enable the CPD to better manage their assets have the capability of reporting issues and creating task orders. The feature

also included the input portal, financial data input, and an audit feature with other pertinent dashboards pertaining to asset management of technology and equipment.

The IMT was also informed that the CPD will roll out 4,200 new computers by the end of the first quarter of 2023. During the seventh reporting period, the CPD conducted a survey of the collective bargaining units to collect input about technology and police equipment, which resulted in some comments regarding the quality in the state of some of the technology and equipment. The CPD hopes to show improvement through the computer replacements during the roll-out as this was an area noted in the survey.

It should be noted that the CPD also referenced technology regarding the digital wellness app during several meeting discussions and virtual site visits. They surveyed personnel, and one of the concerns noted in the survey was about using their personal phones for a CPD app. The IMT was informed that the City was in the process of evaluating the personal phone issue and was looking into how to remedy this technology need regarding personal phones.

Currently, the CPD is looking at several third-party vendors for the wellness app. As they prepare for a procurement process, they plan to share information about the vendors and then schedule meetings to give in depth demonstrations about functionality and features of the app. The CPD advised us that their priority was data privacy, customization, and driving engagement. The CPD expressed hope to get the wellness app launched in early 2023 so that officers can be more directly connected to resources and training content to promote wellness.

Part of the overall technology and equipment audit also included the equipment in all fitness facilities, which will be further discussed in ¶418.

*** 

The City and the CPD have yet to reach Preliminary compliance with this paragraph during the seventh reporting period. The IMT looks forward to receiving the confirmation of a policy completion with data reporting from the ServicesNow platform that accurately reflects detailed property and asset management.

The IMT appreciates the efforts demonstrated by the CPD to address ¶¶415-18, as it furthers reflects a necessary fiscal stewardship over such a vast array of valuable equipment.

## Paragraph 415 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
None

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

# Officer Wellness and Support: ¶416

> *416. Within 90 days of the completion of the initial audit, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs for repair or replacement of equipment and technology as identified through the needs assessment ("Equipment and Technology Audit Response Plan"). CPD will implement the Equipment and Technology Audit Response Plan in accordance with the specified timeline for implementation.*

## Compliance Progress  (Reporting Period: July 1, 2022, through December 31, 2022)

**Deadline:**  Moving  ✓ **Not Yet Applicable**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have not yet reached Preliminary compliance with ¶416 during the seventh reporting period.

To assess Preliminary compliance with ¶416, the IMT sought to review the CPD's relevant policies and documents directing the development of an Equipment and Technology Audit Response Plan as required by ¶416, following the process described in the Consent Decree (¶¶626-641), which outline applicable consultation, resolution, workout, and public comments periods.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD did not reach Preliminary compliance with ¶416. The IMT provided a status update in the third reporting period indicating we had not received any documents demonstrating compliance with this paragraph. As noted in our assessment of ¶415, the City and the CPD had not completed a sufficient technology and equipment audit. Without an adequate audit, the City and the CPD are unable to reach compliance with ¶416. We noted that, although the City and the CPD completed an audit during the fourth reporting period—one which did not satisfy ¶415—they did not produce any additional documentation to show that the CPD developed an Equipment and Technology Audit Response plan to address the issues identified in the audit.

The requirements of ¶416 cannot be met without also meeting ¶415's requirements. As noted earlier, ¶415 requires a periodically scheduled audit to be conducted and details produced to determine the status of equipment and

technology. Without the comprehensive initial audit, the CPD cannot meet the requirements of ¶416, which call for producing a plan to include a timeline for future audits in efforts to prioritize needs, repairs, and replacement of equipment and technology.

During the sixth reporting period, the City and the CPD produced another audit, which did not fully address the requirements of ¶415. The IMT met with the CPD to discuss the necessary audit requirements, and noted that we looked forward to an update regarding ¶416 and next steps to remedy this multi-faceted issue to reach Preliminary compliance. Because of this the City and the CPD continued to remain out of Preliminary compliance with ¶416 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

During a virtual meeting in the seventh reporting period, the CPD presented the ServiceNow data collection platform to demonstrate their in-house inventory program could centralize recordkeeping for technology and equipment. The IMT recognizes the CPD's effort to build a digital platform that will enable them to better manage their assets, have the capability of reporting issues, and creating task orders. The IMT also inquired about replacement schedules of their assets.

As noted in prior reporting periods, the requirements of ¶416 cannot be met without also meeting ¶415's requirements. Without the comprehensive initial audit required by ¶415, the CPD cannot meet the requirements of ¶416, which call for producing a plan to include a timeline for future audits in efforts to prioritize needs, repairs, and replacement of equipment and technology.

\*\*\*

Therefore, the City and the CPD have yet to reach Preliminary compliance with this paragraph. The IMT looks forward to reviewing a comprehensive initial audit and the corresponding plan, as required by this paragraph.

## Paragraph 416 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
None

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

# Officer Wellness and Support: ¶417

> **417.** *As a component of the Equipment and Technology Audit Response Plan, CPD will develop a schedule for future periodic audits. The schedule will specify the time period within which future periodic audits will occur. The time period may vary for different equipment types to account for differences in the expected useful life of different equipment types. CPD will perform the periodic audits in accordance with the schedule.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have not yet reached Preliminary compliance with ¶417 during the seventh reporting period.

To evaluate Preliminary compliance with ¶417, the IMT sought to review the CPD's relevant policies and documents directing the development of a schedule for future periodic audits as a component of the Equipment and Technology Audit Response Plan as required by ¶417, following the process described in the Consent Decree (¶¶626-641), which outline applicable consultation, resolution, workout, and public comments periods. Specifically, the policy should specify how and when the audits should be completed to adequately identify the current state of technology in CPD's possession and provide sufficient details to allow the CPD to quickly determine what technology or equipment is outdated, broken, or otherwise in need of repair.

*Progress before the Seventh Reporting Period*

The IMT provided a status update in the third reporting period stating the CPD's ability to comply with this paragraph was stalled because it needed to implement a new Inventory Control System. As mentioned in our assessment of ¶¶415–16, the City and the CPD have not developed a policy to guide the process or procedures—including a schedule—for engaging in periodic audits of technology and equipment. Because of this the City and the CPD did not reach Preliminary compliance with ¶417.

Paragraph 417 is a subsequent paragraph to processes involving ¶¶415–16. As of the fifth reporting period, the IMT had not received any updated information regarding the creation of a comprehensive equipment and technology audit. As noted in the fourth reporting period, a scheduled audit to be conducted

"periodically" would provide a timing requirement that would serve as a guide for the frequency of such audits in the future. Without a policy that creates the framework for processes, scheduling future audits, requirements of the audits, and steps to follow in the audit report, ¶¶415–17 cannot reach Preliminary compliance.

In the sixth reporting period, the CPD produced a Technology and Equipment Audit. This audit was more accurate than the first audit produced, but still did not fully meet the requirements of ¶415. Also, there was still no evidence that CPD created a policy that met the requirements of ¶417.

As noted in ¶416, the IMT references the need for the CPD to establish a schedule that provides a routinized process to conduct the audit within a specified time. The IMT will suggest that the audit is conducted, and its report is released within a sufficient timeframe that would allow the necessary units within the CPD to fiscally plan and forecast for any equipment and components that are at the end of life and require repairs or replacement. This enables the CPD to be strategic in its effort to determine immediate needs and long-term needs to determine both expedient requisitions versus capital planning.

*Progress in the Seventh Reporting Period*

The CPD produced a more accurate Technology and Equipment Audit during the sixth reporting period. Working with the Information Services Data Group (ISDG), the information regarding the equipment is more accurately noted in the inventory database, and the IMT appreciates the work towards accurately assessing assets and having/maintaining a system that affords the understanding of what is working and what should be properly disposed of due to the equipment's end of life.

The IMT met with the CPD during the seventh reporting period to discuss what information should be included in the audit along with the requirements of this paragraph. However, the IMT has not received any information that establishes a schedule for future periodic audits that identifies a specific time period in which the future periodic audits will occur.

<center>***</center>

Therefore, the City and the CPD have not yet met Preliminary compliance with this paragraph during the seventh reporting period. The IMT recognizes that the time period may vary for different equipment types to account for differences in the expected useful life of different equipment types. To achieve Preliminary compliance, the CPD should establish the schedule and the expected time period for future audits for both technology and equipment.

## Paragraph 417 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
None

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

# Officer Wellness and Support: ¶418

**418.** *In order to facilitate physical health and mental well-being, CPD will ensure its members have access to exercise equipment at CPD facilities in geographically dispersed areas throughout the City.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶418.

To evaluate Preliminary compliance with ¶418, we reviewed lists provided by the CPD accounting for the exercise equipment in the CPD's possession and listing the location of the equipment. For Secondary compliance, we reviewed various data sources to determine whether the City has conducted a survey to ensure that equipment is dispersed throughout Chicago to meet the demand in each location.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and the CPD achieved Preliminary compliance with ¶418 by submitting information which accounted for the exercise equipment possessed by the CPD, along with the location of that equipment. The IMT stated that moving forward, we would look for evidence that the City has conducted a survey to ensure the exercise equipment was dispersed throughout the City such that it meets the demands present in each location. Additionally, we would expect future equipment audits to report on the condition of this equipment.

During the fifth reporting period, the IMT did not receive any evidence reflective of the survey referenced in the previous reporting period, which is necessary for Secondary compliance. The IMT reviewed the prior productions listing the gym equipment at the various locations. However, we noted that some documentation showed serial numbers but not the equipment item or name, which made it difficult to know what type of equipment the serial number is attached to at the various locations for inventory purposes and future replacement purposes.

Therefore, the IMT explained that we cannot consider further compliance levels until these matters are adequately addressed and the productions of the equipment audits are aligned with other informed audits. Simply stated, the equipment, though geographically placed throughout the City, has not been

properly inventoried to indicate identity, utility, and location. The IMT recommended that this type of inventory process be placed on the schedule and to assure the equipment repairs or replacement are done in the most fiscally efficient manner. This ensures that, as new facilities come on-line, the furniture, fixtures, and equipment can be properly budgeted for in the construction/up-fit costs.

During the sixth reporting period, the CPD produced the findings of the Technology and Equipment Audit, which contained multiple inaccuracies. A revised audit was later resubmitted, which included additional information in efforts to identify the fitness equipment and other items that were not previously labeled. It was much improved from the first audit, but it was still a work in progress as there were still aspects of the audit that did not reveal the status of the equipment. Without identity of the equipment and without a means of determining access and utility of the equipment, the City and the CPD will be challenged in meeting the requirements of ¶418.

*Progress in the Seventh Reporting Period*

During a virtual site visit with Officer Wellness Leadership in the seventh reporting period, we learned that the CPD was being deliberate in their efforts to ensure that equipment would be properly identified, inventoried, and disposed of as the new equipment was beginning to arrive the day of virtual site visit. The CPD had appointed a staff member to oversee this project to effort for quality assurance purposes.

It was also noted during the site visit with Leadership that there would be further inspections at all fitness facilities to see whether repairs are needed or whether new flooring is required. Some facility inspections were ordered for Districts 2, 9, and 16. They had also scheduled the removal of equipment that was being replaced. The CPD was appreciative of the support it was receiving from the Police Memorial, which was funding the equipment for the districts. Also during the seventh reporting period, the Monitor and the Deputy Monitor visited the various district stations and observed the functioning and accessible equipment at those locations.

To determine the use and access to the fitness rooms, the CPD uses sign-in sheets but recognizes that the sheets do not always get used at check-in. Therefore, the CPD is looking for a different way to track the usage of fitness rooms.

<div align="center">***</div>

The City and the CPD maintained Preliminary compliance with this paragraph during the seventh reporting period. While functional equipment is being

delivered and installed at the various locations, the IMT looks forward to CPD providing an update on the delivery and disposal of equipment and its steps to determine and assess use and access to the equipment.

### Paragraph 418 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Appendix 9

# Accountability and Transparency Compliance Assessments, by Paragraph

| | | | |
|---|---|---|---|
| ¶424 | ¶460 | ¶495 | ¶532 |
| ¶425 | ¶461 | ¶496 | ¶533 |
| ¶426 | ¶462 | ¶497 | ¶534 |
| ¶427 | ¶463 | ¶498 | ¶535 |
| ¶428 | ¶464 | ¶499 | ¶536 |
| ¶429 | ¶465 | ¶500 | ¶537 |
| ¶430 | ¶466 | ¶501 | ¶538 |
| ¶431 | ¶467 | ¶502 | ¶539 |
| ¶432 | ¶468 | ¶503 | ¶540 |
| ¶433 | ¶469 | ¶504 | ¶541 |
| ¶434 | ¶470 | ¶505 | ¶542 |
| ¶435 | ¶471 | ¶506 | ¶543 |
| ¶436 | ¶472 | ¶507 | ¶544 |
| ¶437 | ¶473 | ¶508 | ¶545 |
| ¶438 | ¶474 | ¶509 | ¶546 |
| ¶439 | ¶475 | ¶511 | ¶547 |
| ¶440 | ¶476 | ¶512 | ¶548 |
| ¶441 | ¶477 | ¶513 | ¶549 |
| ¶442 | ¶478 | ¶514 | ¶550 |
| ¶443 | ¶479 | ¶515 | ¶551 |
| ¶444 | ¶480 | ¶516 | ¶552 |
| ¶445 | ¶481 | ¶517 | ¶553 |
| ¶446 | ¶482 | ¶518 | ¶554 |
| ¶447 | ¶483 | ¶519 | ¶555 |
| ¶448 | ¶484 | ¶521 | ¶556 |
| ¶449 | ¶485 | ¶522 | ¶557 |
| ¶450 | ¶486 | ¶523 | ¶558 |
| ¶451 | ¶487 | ¶524 | ¶559 |
| ¶452 | ¶488 | ¶525 | ¶560 |
| ¶453 | ¶489 | ¶526 | ¶561 |
| ¶454 | ¶490 | ¶527 | ¶562 |
| ¶455 | ¶491 | ¶528 | ¶563 |
| ¶456 | ¶492 | ¶529 | ¶564 |
| ¶457 | ¶493 | ¶530 | ¶565 |
| ¶459 | ¶494 | ¶531 | |

# Accountability and Transparency: ¶424

> *424. When members of the public submit complaints to the City ("complainants"), those complaints must be courteously received, properly classified, and efficiently investigated. Throughout a non-criminal investigation of the actions of a member (an "administrative investigation"), complainants should be able to track the status of their complaints and receive current, accurate information.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[1] |
| CPD | *In Compliance* (FIFTH REPORTING PERIOD) |
| COPA | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| CPD | *Not in Compliance* |
| COPA | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| CPD | *Not Yet Assessed* |
| COPA | *In Compliance* (SIXTH REPORTING PERIOD) |

In the seventh reporting period, COPA maintained Full compliance with ¶424. The CPD made efforts toward but did not ultimately reach Secondary compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶424, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[2] To evaluate Secondary compliance with

---

[1] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[2] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for the Civilian Office of Police Accountability (COPA), Illinois v. Chicago*, Case No. 17-cv-6260 (January 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for.._.pdf. The review process in the Stipulation mirrors the review process under ¶¶626–

this paragraph, we reviewed the CPD's and COPA's training development, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we evaluated whether the entities have implemented their policies and trainings such that complaints are courteously received, properly classified, and efficiently investigated, and community members are able to track the status of investigations into their complaint.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD and its Bureau of Internal Affairs (BIA) provided draft Unit Directives relating to ¶424 but had not finalized those directives. In the fifth reporting period, the CPD BIA compiled and provided drafts of various directives that were relevant to the requirements of ¶424, specifically General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. CPD reached Preliminary compliance in the fifth reporting period due to the finalization of the General Order. In the previous reporting period, BIA provided a first draft of its eLearning relevant to ¶424 but it remained in the drafting phase at the end of the reporting period.

In previous reporting periods, COPA finalized 3.1.1, *Intake*, as well as 3.1.2, *Fact Gathering & Investigative Process*, which propelled COPA to reach Preliminary compliance. In the fifth reporting period, COPA revised its *Intake Unit: Overview of Policies and Procedures In-Service Training* and submitted evidence that 99% of its personnel completed this training during the fifth reporting period. This propelled COPA to reach Secondary compliance in the fifth reporting period. In the sixth reporting period, COPA provided evidence that COPA is fulfilling the requirements of ¶424, therefore COPA reached Full compliance.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a revised draft of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. Section IV.C.3.d addresses ¶424 by requiring a fair and impartial and efficient investigation. Further, Section IV.D requires that the complainant is able to track their complaint from intake to final disposition by the assigned Log Number. The IMT submitted a no-objection notice to G08-01-02 on December 5, 2022. Additionally, BIA's website allows complainants to enter the Log Number specific to their case or complaint to track the status of the investigation.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs. The IMT provided extensive feedback on these training materials on September 11, 2022

41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review. The latest draft of this training does not completely address the requirements of ¶424 as it does not include that the complainant must be able to track the status of their complaints and receive current, accurate information. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

Although the CPD had previously produced draft BIA eLearning Training materials for review with this paragraph in the sixth reporting period, the CPD did not produce revised versions of these training materials for review with ¶424 this reporting period and did not designate the training materials as meeting the requirements of this paragraph.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶424. However, the IMT reviewed COPA's website, which clearly directs all complainants to the CPD portal, which allows complainants to track the status of their complaints and receive current, accurate information. With this, COPA maintained Full compliance.

<p style="text-align:center">***</p>

The CPD did not yet reach Secondary compliance, but made significant efforts related to this paragraph in the seventh reporting period. Moving forward, we will look for the CPD to finalize BIA's eLearning to instruct compliance with ¶424 and to designate the training materials as meeting the requirements of this paragraph. Additionally, we will look for CPD to revise its BIA Onboard training materials to address the requirements of this paragraph. For COPA, we will continue to look for evidence demonstrating that COPA continues to follow policies and trainings such that community members' complaints are being courteously received and that complainants are able to track the status of investigations into their complaint. To maintain Full compliance, early in the eighth reporting period, we expect COPA to demonstrate that the various methods by which COPA receives complaints are courteous. To maintain Full compliance, we expect to receive such materials in each future reporting period.

## Paragraph 424 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019

COMPLIANCE PROGRESS:

Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020

COMPLIANCE PROGRESS:

Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020

COMPLIANCE PROGRESS:

Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021

COMPLIANCE PROGRESS:

Not Applicable

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021

COMPLIANCE PROGRESS:

Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022

COMPLIANCE PROGRESS:

Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

## Accountability and Transparency: ¶¶425–26

**425.** *The City, CPD, and COPA will ensure individuals are allowed to submit complaints in multiple ways, including: in person to COPA or at a CPD district station, by telephone, online, anonymously, and through third party representatives. To ensure broad and easy access to its complaint system, within 90 days of the Effective Date: a. the City, CPD, and COPA will make the process for filing a complaint widely available to the public, including in-person, by telephone, and online; b. the City, CPD, and COPA will make the process for filing a complaint available electronically; c. the City, CPD, and COPA will make information on filing a complaint and accompanying instructions accessible to people who speak languages other than English and will provide telephonic language interpretation services consistent with the City's and CPD's existing limited English proficiency policies and this Agreement; d. the City, CPD, and COPA will ensure individuals may submit allegations of misconduct, regardless of whether the individual is a member or perceived member of an identifiable group, based upon, but not limited to: race, ethnicity, color, national origin, ancestry, religion, disability status, gender, gender identity, sexual orientation, marital status, parental status, military discharge status, financial status, or lawful source of income; e. the City, CPD, and COPA will continue to ensure that members of the public may make complaints via telephone using free 24-hour services, including by calling 311 and being given the option to leave a voicemail for COPA or speak to a CPD supervisor, and will clearly display this information on their respective websites and other appropriate City and CPD printed materials; f. the City, CPD, and COPA will ensure that instructions for submitting complaints are available via telephone, on-line, and in-person; and g. the City and CPD will ensure that complaint filing information is prominently displayed on CPD website's homepage, including by linking to COPA's online complaint form.*

**426.** *As part of the COPA's system for processing non-confidential complaints and administrative notifications (the "intake process"), each complaint and administrative notification will be assigned a unique tracking number. This unique tracking number will be linked with all phases of the investigation and disciplinary process, through the final disposition.*

| Compliance Progress | | (Reporting Period: January 1, 2022, through June 30, 2022) | |
|---|---|---|---|
| | | ¶425 | ¶426 |
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD) | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* | *Not in Compliance* |
| | **CPD** | *Not in Compliance* | *Not in Compliance* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) | *In Compliance* (SIXTH REPORTING PERIOD) |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶425–26. COPA maintained Full compliance with these paragraphs. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance ¶425–26.

To evaluate Preliminary compliance with ¶¶425–26, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance with these paragraphs, we reviewed the entities' training development, materials, implementation, and evaluation.[3] To evaluate Full compliance with these paragraphs, we reviewed various data sources including but not limited to training materials, demonstrations, complaint submission systems, and website features to determine whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶425–26's mandates.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD and BIA were in the process of creating and finalizing policies that spoke to the requirements of ¶¶425–26. The CPD submitted a consultation draft of its *Case Management System* Unit Directive in the fourth

---

[3] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for the Civilian Office of Police Accountability (COPA)*, *Illinois v. Chicago*, Case No. 17-cv-6260 (January 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

reporting period, but this Unit Directive remained in the collaborative review and revision process at the end of the fifth reporting period. Also in the fifth reporting period, the CPD and BIA finalized General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, and General Order G08-01, *Complaint and Disciplinary System*. Through these efforts, the CPD reached Preliminary compliance in the fifth reporting period. In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning which is relevant to ¶425(d) and ¶426. Additionally, the CPD provided a revised version of Special Order S08-01-01, *Log Number Case Management System*, for review.

In the fourth reporting period, COPA finalized Policy 3.1.1, *Intake*, which met the requirements for Preliminary compliance for ¶425 and ¶426. In the fifth reporting period, COPA provided materials for its training *Intake Unit: Overview of Policies and Procedures In-Service* and 99% of COPA personnel completed this training in the fifth reporting period, bringing COPA into Secondary compliance with both paragraphs. In the sixth reporting period, COPA provided materials for its training: *Case Management System: Overview of Policy and Procedures*, which trained on the requirements of ¶425 in the main paragraph, as well as ¶425(a) and (e) regarding how COPA will accept complaints. Additionally, COPA's website and information it submitted demonstrated that COPA continues to make available to the public several means through which a community member can file a complaint, and that the public is aware of these options, which allowed COPA to reach Full compliance with ¶425. Lastly, COPA provided documentation demonstrating how the Log Number assigned at intake follows the investigation through all phases of the investigation and disciplinary process to its final disposition, including the findings and discipline imposed, per the requirements of ¶426, moving COPA into Full compliance.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶425(a), (b), and (d) but does not address the remaining subparagraphs. However, the revised BIA eLearning materials address ¶426 and its requirements. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that 93.94% of sworn and civilian staff had completed the BIA eLearning training.[4]

Additionally, this reporting period, the CPD produced a revised draft of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. Section II.B.1-4

---

[4]    To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

addresses how and where a complaint can be made and addresses the requirements of ¶425 and ¶425(a). Section II.E provides that the contact information for making a complaint is included on the department website and addresses the requirements of ¶425(c). Section II.B and Section II.D provide that any person may submit a complaint according to the requirements of ¶425(d). Section II.C.2 and Section II.D ensure that complaints may be made by telephone according to the requirements of ¶425(e). Section II.C outlines how complaints may be made via the CPD or COPA websites and addresses ¶425(f)–(g).

Additionally, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶425–26. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review with a different combination of Consent Decree paragraphs, including ¶425 but not ¶426. The latest draft of this training does not completely address the requirements of ¶425. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶425–26.

<p align="center">***</p>

Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. Additionally, we will look for the CPD to further develop its BIA Onboard training to instruct compliance with the requirements of ¶425–26. For COPA, we will look for evidence of continued Full compliance with ¶425–26's mandates. To maintain Full compliance, we expect to receive such materials in each future reporting period.

## Paragraph 425 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

## Paragraph 426 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶427

> *427. The City and CPD will ensure all complaints are accepted, documented, submitted to COPA, and investigated in accordance with this Agreement and the applicable collective bargaining agreement, whether submitted: by a CPD member or a member of the public; verbally or in writing; in person, by telephone, online, or by a complainant anonymously; or by a third-party representative.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[5] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (NEW) |

In the seventh reporting period, the CPD made efforts toward but did not reach Secondary compliance. The CPD maintained Preliminary compliance with ¶427. COPA moved into Full compliance with ¶427. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶427, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[6] To evaluate Secondary compliance with this paragraph, we reviewed the CPD's and COPA's training development, implementation,

---

5   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

6   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

and evaluation (¶286). To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶427's mandates.

*Progress before the Seventh Reporting Period*

Throughout previous reporting periods, the CPD worked to draft, revise, and finalize General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*.[7] By the end of the fifth reporting period, the CPD finalized this policy and reached Preliminary compliance. In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning relevant to ¶427, however it was still in draft state by the end of the reporting period.

COPA reached Preliminary compliance with this paragraph in the fourth reporting period by finalizing its Policy 3.1.1, *Intake*. In the fifth reporting period, COPA provided the IMT with documents for its *Intake Unit: Overview of Policies and Procedures In-Service* training materials, which related to the requirements of ¶427 and provided evidence that 99% of its personnel completed the training. Through these efforts, COPA reached Secondary compliance. In the sixth reporting period, COPA did not produce any evidence related to Full compliance efforts under ¶427.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the CPD continued to work toward Secondary compliance. The CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶427. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning, however CPD did not designate the evidence of training as meeting the requirements of this paragraph. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[8]

Additionally, this reporting period, the CPD produced a revised draft of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. Section II.A addresses ¶427 by requiring that all complaints are properly received and documented and submitted to COPA within 24 hours of receiving the complaint.

---

[7]  The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[8]  To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶427. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review with a different combination of Consent Decree paragraphs, including ¶427. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

COPA, in the seventh reporting period, submitted a case management system memorandum that demonstrated that all complaints are received, including the methods of the receipt of the complaint, with information regarding the complaint, per the requirements of ¶427. With this, COPA moved into Full compliance.

<p align="center">***</p>

Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. Additionally, we will look for the CPD to further develop its BIA Onboard training to instruct compliance with the requirements of ¶427. For COPA, we will look for continued evidence of efforts related to maintaining Full compliance.

### Paragraph 427 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 − DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶428

*428. When a CPD member becomes aware of an individual who wants to make a complaint regarding a CPD member's conduct, he or she will promptly provide the individual with COPA's contact information and notify a supervisor of the complaint received in the field. CPD will also ensure that, in response to complaints about CPD members, supervisors respond to the scene, document the complaint, and submit it to COPA. If the supervisor allegedly authorized, engaged in conduct that led to, witnessed, or otherwise allegedly participated in the incident complained of, the supervisor will contact his or her immediate supervisor, who will assign another supervisor to immediately document the complaint and submit it to COPA.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance (FIFTH REPORTING PERIOD)* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The CPD made efforts toward but did not ultimately reach Secondary compliance with this paragraph. The CPD maintained Preliminary compliance with ¶428.

To evaluate Preliminary compliance with ¶428, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed the CPD's training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

The City and the CPD reached Preliminary compliance with ¶428 in the fifth reporting period. The CPD had worked to revise its General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which addressed the requirements of ¶428. In the fifth reporting period, we submitted a no-objection notice to the revised G08-01-02 and the CPD posted G08-01-02 for public comment for 15 days.[9] The CPD finalized the General Order, reaching Preliminary compliance with ¶428. In the sixth reporting period, the CPD and BIA provided a first

---

[9]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on

draft of its eLearning relevant to ¶428, but it remained in draft state at the end of the reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶428. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022, however the CPD did not designate ¶428 for review in the revised version. For further discussion of the BIA Onboard Training, see ¶526–27.

Additionally this reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶428. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning, however CPD did not designate the evidence of training as meeting the requirements of this paragraph. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[10]

Additionally, this reporting period, the CPD produced a revised draft of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. Sections II.B and III.C completely address the requirements of ¶428.

<center>* * *</center>

Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel.

---

the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[10]   To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

Additionally, we will look for the CPD to further develop its BIA Onboard training to instruct compliance with the requirements of ¶428.

### Paragraph 428 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶429

> ***429.*** *The City will continue to ensure that a website is made available to CPD members to anonymously report officer misconduct ("anonymous reporting website") and will internally disseminate information regarding the anonymous reporting website to all CPD members. Reports made on the anonymous reporting website will not relieve CPD members of their duties under CPD Rules of Conduct 21 and 22.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

**Preliminary:**    *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

The CPD made efforts toward but did not ultimately reach Secondary compliance with this paragraph. The CPD maintained Preliminary compliance with ¶429.

To evaluate Preliminary compliance with ¶429, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed the CPD's training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In previous reporting periods, the Office of the Inspector General continued to host a website for CPD members to anonymously report officer misconduct. The CPD worked to revise and finalize General Order G08-01, *Complaint and Disciplinary System*, a portion of which was directed to the requirements of ¶429. The CPD finalized the G08-01 on the last day of the fifth reporting period. Additionally, Section IX of the Office of the Inspector General (OIG) Online Complaint Form addressed ¶429. Although the policy covered the requirements of the paragraph—and the CPD therefore reached Preliminary compliance—we reiterated concerns expressed in the fourth reporting period that while the policy addresses the language of ¶429, the policy may leave members uncertain of the extent to which members who make anonymous reports are able to keep their identity unknown in the process. We encouraged the CPD to consider how it might take a step beyond the requirements of ¶429 to not only comply with this paragraph, but to provide additional clarity and protection to members reporting misconduct via the Office of the Inspector General website. In the sixth reporting period, the CPD provided a first draft of its eLearning relevant to ¶429 but the materials remained in draft state and not in final, presentation form.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶429. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest draft of this training does not adequately address the requirements of ¶429. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

Additionally this reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶429. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning, however CPD did not designate the evidence of training as meeting the requirements of this paragraph. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff have completed the BIA eLearning training.[11]

Additionally, this reporting period, the CPD provided a revised draft of G08-01, *Complaint and Disciplinary System*. This policy completely addresses the requirements of ¶429 and Section VIII addresses the OIG Anonymous Reporting Website and the obligations that members must adhere to when reporting misconduct to the OIG. The IMT submitted a no-objection notice to G08-01 on December 5, 2022.

\*\*\*

Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. Additionally, we will look for the CPD to further develop its BIA Onboard training to instruct compliance with the requirements of ¶429.

---

[11]     To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

## Paragraph 429 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Status Update

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Status Update

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Under Assessment

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶430

> **430.** *COPA will ensure that individuals who submit electronic complaints receive a copy of the information contained in the complaint via electronic mail, if an electronic mail address is provided, upon submission.*

**Compliance Progress**        (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2024* |

In the seventh reporting period, COPA maintained Full compliance with ¶430.

To evaluate Preliminary compliance with ¶430, the IMT reviewed the COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[12] To assess Secondary compliance with this paragraph, we reviewed COPA's training development, implementation, and evaluation (¶286).[13] To evaluate Full compliance with this paragraph, we reviewed various data sources including but not limited to training materials, presentations, demonstrations, and case files to determine whether COPA has implemented its policies and trainings such that it is acting in accordance with ¶430's mandates.

*Progress before the Seventh Reporting Period*

In previous reporting periods, COPA met Preliminary compliance by finalizing its *Intake Policy*, which requires that an electronic copy of the complaint be provided to a complainant who files an online compliant via email. In the fifth reporting period, COPA moved into Secondary compliance with its *Intake Unit: Overview of Policies and Procedures In-Service* training. This training touches on the requirements of ¶430 and COPA's 3.1.1 *Intake* policy. COPA provided evidence that the training was completed by 99% of its personnel. In the sixth reporting period, COPA continued to develop and provide training that speaks to the requirements of

---

[12]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[13]  The IMT evaluates training materials using as our standard the "ADDIE" model of curriculum development and implementation. This model typically incorporates the following elements: training needs assessment' curriculum design and development; training implementations (or delivery); and training evaluation.

¶430. For example, COPA provided materials for its training *Case Management System: Overview of Policy and Procedures*, however they did not provide training records prior to the end of the sixth reporting period. Additionally, COPA provided two case files along with an IMT review of the website that demonstrates that COPA had continued to actualize the requirements of ¶430 and therefore reached Full compliance.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, COPA did not produce any information related to compliance with ¶430. Although COPA provided documentation of evidence that 100% of employees completed *the Case Management System: Overview of Policy and Procedures* training, ¶430 was not designated in the production. Additionally, COPA did not submit documentation evidencing that individuals who submit electronic complaints continue to receive a receipt or acknowledgement that the complaint was received. COPA maintained Full compliance this reporting period, but moving forward, the IMT will expect to receive documentation demonstrating ongoing efforts related to maintaining Full compliance with this paragraph in each reporting period.

<div align="center">***</div>

Moving forward, we expect COPA to provide evidence early in the eighth reporting that at least 95% of its personnel received its *Case Management System: Overview of Policy and Procedures* training and that COPA employees are acting in accordance with ¶430's mandates. Additionally, we will look for documentation evidencing that individuals who submit electronic complaints continue to receive a receipt or acknowledgement that the complaint was received. To maintain Full compliance, we will expect to receive documentation related to this paragraph in each reporting period.

### Paragraph 430 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶431

> **431.** *The City and CPD will undertake best efforts to ensure that the absence of a signed complainant affidavit alone will not preclude an administrative investigation.*

**Compliance Progress**          (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FOURTH REPORTING PERIOD)[14] |
| | **CPD** | *In Compliance* (FOURTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (NEW) |

The CPD made efforts toward but did not ultimately reach Secondary compliance with this paragraph. COPA reached Full compliance with ¶431. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶431, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[15] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶431's mandates.

---

[14] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[15] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

The CPD and COPA reached Preliminary compliance in the fourth reporting period. The CPD revised General Order G08-01, *Complaint and Disciplinary Procedures,* which addresses the affidavit-override process and exceptions to the affidavit requirement. In the fifth reporting period, we submitted a no-objection notice to G08-01.[16] The CPD finalized the policy on the last day of the reporting period after receiving public comment. In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶431.

COPA reached Preliminary compliance by finalizing 3.1.1. *Intake* policy, which was finalized in the fourth reporting period. The *Intake* policy addresses ¶431 by noting that a sworn affidavit is not required for a preliminary investigation to begin. In the fifth reporting period, COPA compiled and submitted for review materials for a training titled *COPA Intake Unit: Overview of Policies and Procedures*. The IMT submitted a no-objection notice and COPA demonstrated that the training was completed by 99% of its personnel. This moved COPA into Secondary compliance. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶431.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶431. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest draft of this training does not adequately address the requirements of ¶431. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA continued to work toward Full compliance with ¶431. On December 1, 2022, COPA provided a memorandum with documentation that

---

[16]     Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

provides specific information regarding the affidavit override and override request. Additionally, this is a normal practice to provide this type of information in COPA's quarterly and annual reports. With this, COPA moved into Full compliance with ¶431.

*** 

Moving forward we will look for the CPD to further develop its BIA Onboard training to instruct compliance with the requirements of ¶431. For COPA, we will look for evidence that COPA undertakes best efforts to ensure that the absence of a signed complainant affidavit alone will not preclude an administrative investigation, pursuant to the requirements of ¶431.

### Paragraph 431 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶432

> **432.** *The City and CPD will require that complaints about any CPD member are accepted, documented, submitted to COPA, and investigated even if the complainant could not identify the CPD member's name or other employee-identifying number, including star or badge number.*

| Compliance Progress | | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[17] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |

In the seventh reporting period, the CPD made efforts toward but ultimately did not reach Secondary compliance with this paragraph. COPA maintained Full compliance.

To evaluate Preliminary compliance with ¶432, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[18] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance with this paragraph, we reviewed various data sources including but not limited to documentation related to case intakes and up-to-date lists of complaint cases to determine whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶432's mandates.

---

[17] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[18] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD worked to revise General Order G08-01-02[19] to instruct compliance with ¶432. In the fifth reporting period, the CPD continued revising G08-01-02. We provided a no-objection notice to G08-01-02.[20] Thereafter, the CPD posted the policy for public comment and finalized the policy on the last day of the fifth reporting period. In the sixth reporting period, the CPD and BIA provided a draft of its eLearning, however it remained in draft state at the end of the reporting period.

COPA reached Preliminary compliance in the fourth reporting period by finalizing Policy 3.1.1 *Intake*, which mandates compliance with ¶432's requirements. In the fifth reporting period, COPA moved into Secondary compliance with its *Intake Unit: Overview of Policies and Procedures In-Service* training. After we submitted a no-objection notice, COPA demonstrated that the training was completed by 99% of its personnel. In the sixth reporting period, COPA reached Full compliance by providing various examples of case intakes and additional detail regarding multiple 2021 and 2022 complaint cases, which demonstrated COPA's adherence to the requirements of ¶432.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶432. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning, however CPD did not designate the evidence of training as meeting the requirements of this paragraph. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck

---

[19] The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[20] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[21]

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶432. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest draft of this training addresses the requirements of ¶432 by requiring that every complaint must be accepted even if the complaint is anonymous. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

Additionally, this reporting period, the CPD produced a revised draft of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. Section II.A.1.a addresses ¶432 by requiring that the department will accept complaints even if the reporting party cannot provide the employee's name, identification number or star number.

In the seventh reporting period, COPA did not produce any information related to ¶432. COPA maintained Full compliance this reporting period, but moving forward, the IMT will expect to receive documentation demonstrating ongoing efforts related to maintaining Full compliance with this paragraph in each reporting period.

\*\*\*

Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. Additionally, we will look for the CPD to further develop its BIA Onboard training to instruct compliance with the requirements of ¶432. For COPA, we will look for evidence early in the eighth reporting that COPA and its employees are acting in accordance with ¶432's mandates. Additionally, we will look for documentation evidencing that individuals who submit electronic complaints continue to receive a receipt or acknowledgement that the complaint was received. To maintain Full compliance, we will expect to receive documentation related to this paragraph in each reporting period.

---

[21] To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

## Paragraph 432 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶433

**433.** *CPD will require that officers provide their name and star number, or in the case of non-sworn members other employee-identifying number, to any member of the public, upon request.*

**Compliance Progress**          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The CPD made efforts toward but did not ultimately reach Secondary compliance with ¶433.

To evaluate Preliminary compliance with ¶433, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed CPD's training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD worked to finalize a policy that requires CPD officers to provide their star number and name or other employee-identifying number to public members upon request. Toward the end of the fourth reporting period, the CPD provided a draft of its General Order G02-01, *Protection of Human Rights*. We reviewed this draft at the start of the fifth reporting period. By the end of the fifth reporting period, the draft General Order remained in the collaborative review and revision process. In the sixth reporting period, the CPD provided a revised version of G02-01, which addressed the requirements of ¶433. CPD posted the policy for public comment and finalized the policy, which propelled CPD into Preliminary compliance. Additionally, CPD and BIA provided a first draft of its eLearning relevant to ¶433 but it remained in draft state at the end of the reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶433. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning, however CPD did not designate the evidence of training as meeting the requirements of this paragraph. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck

noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[22]

\*\*\*

Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel.

### Paragraph 433 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

---

[22] To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

# Accountability and Transparency: ¶434

*434. When CPD responds to or investigates incidents involving allegations of officer involved domestic violence, CPD will ensure that COPA is provided an administrative notification. COPA will initiate the intake process and investigate all such allegations in accordance with this Agreement.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance*[23] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (NEW) |

The City and the CPD reached Preliminary compliance with ¶434 in the seventh reporting period. COPA reached Full compliance with ¶434. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶434, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[24] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance with this paragraph, we reviewed various data sources to determine whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶434's mandates. To meet Full compliance, the City, the CPD, and COPA will need to demonstrate that the corresponding policies and

---

[23]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[24]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

training materials are implemented into practice. For COPA, this means providing case-specific information regarding intake and investigations that demonstrates the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City as a whole did not reach Preliminary compliance because the CPD had not finalized a policy mandating compliance with ¶434's requirements. In the fifth reporting period, the CPD worked to revise General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. Although the CPD revised G08-01-02 and received a no-objection notice from the IMT, the policy fell short of the requirements set out in ¶434, which requires the CPD to ensure that COPA is notified "when CPD responds to or investigates incidents involving allegations of officer-involved domestic violence."[25] We noted that while the CPD did finalize the policy, minor revisions were necessary to move into Preliminary compliance. In the sixth reporting period, we continued to encourage the CPD to revise G08-01-02 to further instruct compliance with the requirements of ¶434 because it remained in a state that fell short of the requirements set out in ¶434, which requires the CPD to ensure that COPA is notified "when CPD responds to or investigates incidents involving allegations of officer-involved domestic violence." Additionally in the sixth reporting period, the CPD and BIA provided a draft eLearning relevant to ¶434 but it remained in draft state at the end of the reporting period.

COPA finalized Policy 3.1.1, *Intake*, in the fourth reporting period, which not only met the requirements of ¶434, but exceeded the mandates of ¶434. In the fifth reporting period, COPA undertook developing and providing training to its personnel. We reviewed COPA's *Intake Unit: Overview of Policies and Procedures In-Service* training, which instructed compliance with the requirements of ¶434, and COPA provided evidence that 99% of its personnel completed this training. Therefore, COPA moved into Secondary compliance in the fifth reporting period. In the sixth reporting period, COPA provided data in a chart illustrating the numbers and locations of occurrences in which CPD personnel were involved in domestic violence and sexual misconduct incidents from 2019 to 2022. The IMT requested that

---

[25] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

more case-specific information be provided, notably information regarding the intake and investigations detailing how the process was initiated and completed, to demonstrate Full compliance in future reporting periods.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided a revised version of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. This policy completely addresses the requirements of ¶434. The IMT submitted a no-objection notice to G08-01-02 on December 5, 2022. Additionally, the City and the CPD provided a revised version of G08-01-01, *Complaint and Disciplinary Definitions*. This policy provides a more expansive and descriptive definition of a Log Number, which better supports G08-01-02. With this, the City and the CPD reached Preliminary compliance.

Additionally, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶434. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[26]

COPA, in the seventh reporting period, provided a memorandum with supporting documentation regarding multiple domestic violence cases and the process COPA engaged that adheres to the requirements of ¶434. With this, COPA moved into Full compliance with this paragraph.

\*\*\*

The CPD reached Preliminary compliance with ¶434 in the seventh reporting period. In the next reporting period, we will look for the CPD to revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. For COPA, we will look for evidence that COPA continues to initiate the intake process and investigate all such allegations.

---

[26]  To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

## Paragraph 434 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶435

> **435.** *The City, CPD, and COPA will require that complaints alleging that a CPD member refused to accept a complaint, discouraged the filing of a complaint, or provided false or misleading information about filing a complaint are accepted, documented, and submitted to COPA for investigation and, where appropriate, recommended for discipline.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (NEW) |

The City and the CPD reached Preliminary compliance with this ¶435 in the seventh reporting period. COPA reached Secondary and Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶435, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[27] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶435's mandates.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD made progress toward Preliminary compliance with this paragraph through its drafting and revision efforts related to Gen-

---

[27] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

eral Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. We also reviewed related training submitted by the CPD Bureau of Internal Affairs (BIA), *Complaint Initiation Process*. We submitted a no-objection notice to this training in April 2021. We did not, however, receive additional information related to this training. In the fifth reporting period, the CPD finalized G08-01-02, but this policy did not sufficiently address ¶435's requirement that subjects of such complaints be, where appropriate, recommended for discipline. In the sixth reporting period, we continued to encourage the CPD to revise G08-01-02 to further instruct compliance with the requirements of ¶435, which requires that subjects of such complaints be, where appropriate, recommended for discipline. Additionally in the sixth reporting period, the CPD and BIA provided a draft eLearning relevant to ¶435 but it remained in draft state at the end of the reporting period.

COPA finalized Policy 3.1.1, *Intake*, in the fourth reporting period, which moved it into Preliminary compliance. In the fifth reporting period, COPA provided materials for its training *Intake Unit: Overview of Policies and Procedures In-Service*. COPA provided evidence that the training was completed by 99% of its personnel, which moved COPA into Secondary compliance. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶435.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided a revised version of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. This policy completely addresses the requirements of ¶435. The IMT submitted a no-objection notice to G08-01-02 on December 5, 2022. With this, the City and the CPD reached Preliminary compliance.

Additionally, this reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶435. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning, however CPD did not designate the evidence of training as meeting the requirements of this paragraph. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[28]

COPA, in the seventh reporting period, provided a spreadsheet detailing approximately 57 violations of failing to accept a complaint, discouraging the filing of a complaint, or providing false or misleading information about filing a complaint, therefore demonstrating COPA's investigations into such complaints. It appears that COPA inherited most of these complaints from the Independent Police Review

---

[28]   To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

Authority (IPRA) from as far back as 2011 through 2017. COPA appears to have concluded the investigations and recommended some form of discipline with many of the cases adjudicated. The IMT notes that several cases, which are several years old, appear to be pending appeal or other administrative sanctions beyond COPA's jurisdiction. The IMT has concerns that CPD or the City appear unable to render a final disciplinary decision or make appeal decisions in a timely manner. COPA appears to be conducting and closing investigations per the requirements of ¶435 more quickly, although it is unclear how many ongoing open investigations COPA is investigating. COPA reached Full compliance in the seventh reporting period.

<p style="text-align:center">***</p>

The CPD reached Preliminary compliance with ¶434 in the seventh reporting period. In the next reporting period, we will look for the CPD to revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. For COPA, we will look for continued efforts demonstrating Full compliance.

### Paragraph 435 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Under Assessment | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶436

> *436. Within 90 days of the Effective Date, CPD will ensure that there are adequate policies and practices in place to encourage and protect CPD members who report potential misconduct by other CPD members. Such policies will provide, at a minimum: a. that CPD members promptly report any misconduct of which they are aware to a supervisor; b. that the supervisor document such alleged misconduct and promptly report it to COPA; and c. that all forms of retaliation, interference, intimidation, and coercion against a CPD member who reports misconduct or cooperates with an investigation of misconduct, are strictly prohibited.*

### Compliance Progress · (Reporting Period: January 1, 2022, through June 30, 2022)

**Preliminary:** *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The CPD maintained Preliminary compliance with ¶436 in the seventh reporting period.

To evaluate Preliminary compliance with ¶436, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms." To evaluate Secondary compliance, we reviewed the CPD's training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD worked toward Preliminary compliance by providing various versions of General Orders, including but not limited to G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, and G08-05, *Prohibition on Retaliation*.[29] Although the CPD made significant progress toward Preliminary compliance in the third and fourth reporting periods, the policies remained in the revision stages of creating and finalizing policies that speak to the requirements of ¶436 at the beginning of the fifth reporting period. In the fifth reporting period, the CPD revised General Order G08-01, *Complaint and Discovery Procedures*, and General Order G08-01-02, *Complaint Initiation and Log Number*

---

[29] The name of this directive changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

*Investigation Assignment.*[30] We provided a no-objection notice to both policies and the CPD posted the General Orders for public comment.[31] On the last day of the fifth reporting period, the CPD finalized the policies. This moved the CPD into Preliminary compliance.

In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning relevant to ¶436, but the draft only addressed ¶436(b) and (c). The draft of the eLearning module did not seem to instruct compliance with the requirements of ¶436(a): "that CPD members promptly report any misconduct of which they are aware to a supervisor." At the end of the reporting period, the eLearning materials remained in a draft state.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a revised version of G08-01, *Complaint and Disciplinary System*. This policy meets the requirements of ¶436(a) and ¶436(c). The IMT submitted a no-objection notice to G08-01 on December 5, 2022. Additionally, the CPD produced a revised version of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. This policy addresses the requirements of ¶436(b). The IMT submitted a no-objection notice to G08-01-02 on December 5, 2022.

Although the CPD had previously produced draft BIA eLearning Training materials for review with ¶436 in the sixth reporting period, the CPD did not produce revised versions of these training materials for review with ¶436 this reporting period and did not designate the training materials as meeting the requirements of this paragraph.

This reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶436. The IMT provided extensive feedback on these training materials on September 11,

---

[30] The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[31] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review with a different combination of Consent Decree paragraphs, including ¶436. The latest draft of this training does not adequately address the requirements of ¶436. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

\*\*\*

The CPD maintained Preliminary compliance with ¶436 in the seventh reporting period. Moving forward, we will look for the CPD to revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. We will also look for the CPD to further develop its BIA Onboard Training materials.

### Paragraph 436 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶437

> **437.** *CPD will expressly prohibit all forms of retaliation, intimidation, coercion, or adverse action against any person who reports misconduct or cooperates with an administrative investigation.*

**Compliance Progress**                    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The CPD made efforts toward but did not ultimately reach Secondary compliance with ¶437.

To evaluate Preliminary compliance with ¶437, the IMT reviewed the CPD's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms." To evaluate Secondary compliance with this paragraph, we reviewed among other things, the CPD's training development, implementation, and evaluation (¶286).[32]

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD maintained Preliminary compliance with ¶437 due to the finalized General Order G08-05, *Prohibition on Retaliation*. In the fourth reporting period, the IMT reviewed BIA's *Complaint Initiation Process – BIA Investigators & Accountability Sergeants Annual Training*. However, we did not receive BIA's corresponding on-boarding training. Additionally, the CPD had produced related training—the *2020 Supervisor In-Service Refresher* training—but this training remained in the collaborative review and revision process at the end of the fourth reporting period. In the fifth reporting period, the CPD and BIA produced no new information pertaining to the requirements of ¶437. In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning relevant to ¶437. At the end of the reporting period, the eLearning materials remained in a draft state.

---

[32] The IMT evaluates training materials using as our standard the "ADDIE" model of curriculum development and implementation. This model typically incorporates the following elements: training needs assessment' curriculum design and development; training implementations (or delivery); and training evaluation.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶437. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review with a different combination of Consent Decree paragraphs, including ¶437. The latest version of this training addresses ¶437. For further discussion of the BIA Onboard Training, see ¶¶526–27.

Although the CPD had previously produced draft BIA eLearning Training materials for review with ¶437 in the sixth reporting period, the CPD did not produce revised versions of these training materials for review with ¶437 this reporting period and did not designate the training materials as meeting the requirements of this paragraph.

\*\*\*

The CPD maintained Preliminary compliance with ¶437 in the seventh reporting period. Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. We will also look for the CPD to further develop its BIA Onboard Training materials.

### Paragraph 437 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶438

> **438.** OAG acknowledges that the City, CPD, and COPA are work-ing to create an electronic Case Management System ("CMS"). The City, CPD, and COPA will ensure that the CMS maintains ac-curate data regarding the number, classification, and status of all administrative investigations, from the intake process through the final disciplinary decision, if any, and through any grievance process, arbitration, Police Board proceeding, or ap-peal relating to the final disciplinary decision (the "final disposi-tion"). CMS will be maintained by appropriate personnel from the City, CPD, and COPA. The CMS will be fully operational by June 30, 2020.

## Compliance Progress　　　　(Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Under Assessment* |

The City and the CPD reached Preliminary compliance with ¶438 in the seventh reporting period. COPA reached Secondary compliance with ¶438 and remains Un-der Assessment for Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶438, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and pub-lic comment periods.[33] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and eval-

---

[33]　The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

uation (¶286). To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies, training, and a CMS system that fulfills the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD showed commitment to compliance with ¶438 by conducting *Case Management System Investigative Console-Conducting/Investigations* training and developing its *Case Management System Updates and Enhancements Annual Training*. However, many of the requirements of ¶438 were not addressed. The CPD also developed a *Case Management System User Guide* for its BIA Investigators and Accountability Sergeants. In the fifth reporting period, the CPD and BIA provided drafts of Unit Directive, *Case Management System*, but it remained in the collaborative review and revision process at the end of the reporting period. Additionally, CPD drafted and revised Special Order S08-01-01, *Conducting Log Number Investigations*.[34] Although the Special Order addressed the requirements of ¶438, it also remained in the collaborative review and revision process at the end of the reporting period.

In the sixth reporting period, the CPD submitted a revised Special Order S08-01-01, *Log Number Case Management System*, for review, which speaks to ¶438's requirement that the Case Management System maintains accurate data from the intake process through the final disciplinary decision. We submitted a no-objection notice subject to additional revisions including adding language clarifying that the Log Number will follow the investigation from the intake process to the final disposition. Additionally, the CPD submitted Special Order S08-01-05, *Conducting Log Number Investigations*, for review.[35] This revised policy instructs compliance with the requirements of ¶438. Although the IMT provided comments to S08-01-05 and a no-objection notice to S08-01-01, additional revisions remained necessary before the CPD finalized the policies.

COPA reached Preliminary compliance in the fourth reporting period due to the finalization of Policy 3.1.6, *Clear and Column Case Management System Systems*. In the fifth reporting period, COPA provided training materials for review—*Case Management System: Overview of Policy and Procedures*. The IMT submitted a no-objection notice to the training, but COPA did not provide the training by the end of the reporting period.[36] The IMT expected the training to be held in January 2022

---

[34] This policy was renumbered to S08-01-05 in the sixth reporting period.

[35] The *Conducting Log Number Investigations* policy was produced in previous reporting periods as S08-01-01. The policy was re-numbered as S08-01-05 when it was produced May 5, 2022. We refer to the policy in this report as S08-01-05 for clarity.

[36] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on

for at least 95% of its personnel to obtain Secondary compliance. In the sixth reporting period, COPA provided the training but did not submit documentation that COPA provided its training to 95% of its staff. However, COPA did provide documentation demonstrating how the Log Number assigned at intake follows the investigation through to its final disposition, including the findings and discipline imposed, per the requirements of ¶438.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy completely addresses the requirements of ¶438. The IMT submitted no-objection notices to S08-01-05 in September and October 2022. The CPD produced S08-01-01, *Log Number Case Management System*, for review with ¶438 in the sixth reporting period. This policy addresses the requirements of ¶438. The IMT submitted a no-objection notice to S08-01-01 on June 3, 2022. In the seventh reporting period, the CPD produced a final version of this policy. With this, the CPD reached Preliminary compliance.

COPA, in the seventh reporting period, provided documentation that more than 95% of COPA employees attended the training *Case Management System: Overview of Policy and Procedures*. Additionally, COPA provided its *COPA Guidance Column CMS Administration*, which supported COPA's *Clear and Column CMS* policy by placing the responsibility on COPA of maintaining accurate and reliable data regarding the number, classification, and status of all administrative investigations from intake to the final disposition in the CMS. Additionally, the IMT viewed CMS data and randomly reviewed cases during a site visit this reporting period.

COPA remains Under Assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

<p style="text-align:center">* * *</p>

The City and the CPD reached Preliminary compliance. COPA reached Secondary compliance and remains Under Assessment for Full compliance.

---

the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 438 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Under Assessment

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
None

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶439

> *439.* *The City and CPD will ensure that complainants and their representatives are able to track non-confidential unique tracking numbers from the intake process through final disposition via telephone and in person. By June 30, 2020, the City will also ensure complainants and their representatives are able to track the status of non-confidential unique tracking numbers from the intake process through final disposition online.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[37] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶439. COPA maintained Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶439, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[38] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and eval-

---

[37] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[38] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

uation (¶286). To evaluate Full compliance with this paragraph, we reviewed various data sources including but not limited to documentation and demonstration of complaint tracking systems to determine whether the CPD and COPA has sufficiently implemented its policy and training, as well as a Case Management System that fulfills the requirements of ¶439.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD worked on developing and revising G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, to fully address the requirements of ¶439.[39] In the fifth reporting period, the CPD submitted multiple revised drafts, and we ultimately submitted a no-objection notice in November 2021.[40] The finalization of this policy moved the CPD into Preliminary compliance. In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶439.

COPA in past reporting periods finalized Policy 3.1.6, *Clear and Column Case Management System Systems*, developed an *Employee Agreement Regarding Use of CLEAR and Column Case Management System Systems* form, and at the end of the fourth reporting period submitted Policy 3.1.1, *Intake*, as evidence of compliance. In the fifth reporting period, COPA compiled and submitted for review materials for a training titled *Intake Unit: Overview of Policies and Procedures In-Service* and demonstrated that more than 95% of its personnel received the training. COPA also provided materials for its training *Case Management System: Overview of Policy and Procedures*, and the IMT understood that COPA would provide the training in January 2022. These efforts moved COPA into Secondary compliance in the fifth reporting period. In the sixth reporting period, COPA continued to develop and provide training that spoke to the requirements of ¶439. For example, COPA provided materials for its training *Case Management System: Overview of Policy and Procedures*. Although COPA did not submit training records relevant to participa-

---

[39] The name of this directive changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[40] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

tion in trainings for the sixth reporting period, we anticipated receiving those records in the seventh reporting period showing more than 95% of its personnel participating.

Related to Full compliance in the sixth reporting period, COPA provided documentation demonstrating how the Log Number assigned at intake follows the investigation through to its final disposition, including the findings and discipline imposed, per the requirements of ¶439. COPA's website allows a complainant to input the Log Number and see where the complaint is in the investigation process.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a revised version of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. This policy addresses the requirements of ¶439. The IMT submitted a no-objection notice to G08-01-02 on December 5, 2022.

Although COPA provided documentation demonstrating that 100% of employees completed *the Case Management System: Overview of Policy and Procedures* training, ¶439 was not included in the production. Additionally, COPA, in the seventh reporting period, provided its *COPA Guidance Column CMS Administration*, which supported COPA's *Clear and Column CMS* policy by placing the responsibility of ensuring that complainants are able to track their non-confidential unique tracking numbers from the intake process through final disposition online. With this, COPA maintained Full compliance in the seventh reporting period. However, to maintain Full compliance in the coming reporting periods, COPA must also demonstrate that complainants and their representatives are able to track non-confidential unique tracking numbers from the intake process through final disposition via telephone and in person, in addition to online.

*** 

Moving forward, we will look for the CPD to develop training instructing compliance with its policies and ¶439. For COPA, we expect COPA to receive evidence early in the eighth reporting that at least 95% of its personnel received its *Case Management System: Overview of Policy and Procedures* training and that COPA employees are acting in accordance with ¶439's mandates. Further, to maintain Full compliance in coming reporting periods, we will look for evidence that complainants and their representatives are able to track non-confidential unique tracking numbers from the intake process through final disposition via telephone and in person, in addition to online.

## Paragraph 439 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

## Accountability and Transparency: ¶440

**440.** *The City, CPD, and COPA will ensure that all non-confidential complaints are processed by COPA as follows: a. all non-confidential complaints of alleged misconduct received by CPD, including BIA and CPD supervisors, are documented and submitted to COPA within 24 hours of receipt; b. all complaints of alleged misconduct submitted to the anonymous reporting website and all non-confidential complaints of alleged misconduct received by the OIG will be submitted to COPA by the end of the next business day after the complaint was received; c. upon receipt of a complaint, COPA will promptly assign the complaint a unique tracking number, make an initial determination of the classification(s) of the alleged misconduct, and will either retain the complaint for investigation or transfer the complaint to BIA for investigation; d. COPA, pursuant to its ordinance and this Agreement, will have the jurisdiction to conduct administrative investigations of all allegations of misconduct that involve: i. excessive force; ii. Domestic violence; iii. Improper search or seizure of individuals or property; iv. Coercion; v. verbal abuse as defined under Municipal Code of Chicago, § 2-78-100, including any unwelcome sexual advances or requests for sexual favors; or vi. Unlawful denial of access to counsel. E. COPA, pursuant to its ordinance and this Agreement, will receive immediate administrative notification of and have jurisdiction to conduct administrative investigations of all incidents, including those in which no allegation of misconduct has been made, involving: i. firearm discharges by CPD officers that could potentially strike an individual ("officer-involved shooting"); ii. Taser or stun gun discharges by CPD officers that result in death or serious bodily injury; iii. Any person who dies or sustains serious bodily injury while in CPD custody, or as a result of CPD actions; iv. "officer-involved deaths," as that term is defined in 50 ILCS 727/1-5; and v. other weapons discharges and other uses of CPD-issued equipment as a weapon that results in death or serious bodily injury, at the COPA Chief Administrator's discretion; f. the City, CPD, and COPA will ensure that all allegations are recorded and classified appropriately, even if the complainant does not accurately characterize the alleged misconduct; g. if BIA or district personnel conducting investigations into misconduct identify allegations of misconduct that are within COPA's administrative investigative jurisdiction as defined herein, the investigator will promptly notify COPA; and h. if a complaint contains multiple allegations of misconduct,*

> *one or more of which falls within COPA's administrative investigation jurisdiction as defined herein, COPA will have the right of first refusal to conduct an administrative investigation of the entire complaint.*

### Compliance Progress　　　　　(Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not in Compliance* |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |

The City and the CPD reached Preliminary compliance with ¶440. COPA maintained Secondary compliance. The Deputy PSIG maintained Full compliance with ¶440 in the seventh reporting period. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶440, the IMT reviewed the CPD's, COPA's, and the Deputy PSIG's policies following the policy process described in the Consent Decree (¶¶626–41).[41] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶440's mandates. Specific to determining whether the Deputy PSIG maintained Full compliance, we reviewed materials submitted by the Deputy PSIG, which included spreadsheets noting all COPA notifications made by the Office of the Inspector General and a memorandum detailing summary statistics relevant to ¶440's requirements.

---

[41] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD, COPA, and the Office of the Inspector General made progress toward compliance at different rates. The CPD previously produced General Order G08-01-02, *Complaint Initiation and Log Number Investigation*[42] and two BIA Unit Directives (*Initiation of Log Numbers in the Case Management* System and *Assignment of Administrative Log Number Investigations*). [43] These policies did not address all subparagraphs relevant to the CPD. In the fifth reporting period, the CPD worked to address ¶440(a), (e), (f), (g), and (h) as it revised G08-01-02, *Complaint Initiation and Log Number Investigation.* The IMT submitted a no-objection notice and the CPD finalized the General Order on the last day of the reporting period.[44] Additionally, the CPD provided revisions of Special Order S08-01-01, *Conducting Log Number Investigations*, but it remained in the collaborative review and revision process at the close of the fifth reporting period. Lastly, the CPD has provided several BIA Unit Directives relevant to the requirements of ¶440 such as *Initial Responsibilities in Assigned Log Number Investigations*, which speaks to ¶440(g) and (h), and *Initiation of Log Numbers in the Case Management System*, which addresses ¶440(f). These directives were not finalized by the end of the reporting period. In the sixth reporting period, the CPD provided a first draft of its BIA eLearning, which was relevant only to ¶440(a), however it remained in draft state at the end of the reporting period. Additionally, the CPD provided drafts of Special Order S08-01-05, *Conducting Log Number Investigations*[45] and Special Order S08-01-04, *Initial Investigatory Responsibilities in Log*

---

[42] The name of this directive changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[43] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in the sixth reporting period and it is ongoing.

[44] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[45] In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01; it is now S08-01-05, *Conducting Log Number Investigations*.

*Number Investigations*[46] for review, relevant to ¶440(g). Both policies remained in the collaborative review and revision process at the end of the reporting period.

COPA submitted and finalized Policy 3.1.1, *Intake*, which addressed the requirements of ¶440(c), (e), (f), and (h). Additionally, COPA provided a draft ordinance 2-78-120 that aimed to address subparagraphs (d) and (e). In the fifth reporting period, COPA provided for review training materials for its training *Intake Unit: Overview of Policies and Procedures In Service 2021* and demonstrated that more than 95% of its personnel received the training. Additionally, COPA produced a revised draft ordnance 2-78-120. The IMT commended COPA for taking the lead to develop its own policies for the response and investigations of officer involved shootings and deaths, which were noted in COPA's draft policy, *Major Incident Responses – Officer-Involved Shooting or Officer-Involved Death*. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶440.

Finally, the Deputy PSIG reached Full compliance by providing a supplement to its *Investigations Manual*, which contained policies and training materials regarding the submission and process for submitting alleged misconduct to COPA. The Deputy PSIG also provided training records to help establish Full compliance. In the fifth reporting period, the Deputy PSIG provided a memorandum to the IMT and the OAG that provided an update on its performance as it relates to the requirements of ¶440(b). In 2019, the Deputy PSIG reported 68.5% of complaints to COPA by the end of the next business day, but in 2021, this number jumped to 94.2%. In the sixth reporting period, the Deputy PSIG maintained Full compliance and provided a memorandum detailing its compliance with the requirements of ¶440(b). According to a May 2022 production, 91% of the time, the OIG reports complaints by the end of the next business day.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy addresses the requirements of ¶440(g). The IMT submitted no-objection notices to S08-01-05 in September and October 2022. The City and the CPD also provided a revised version of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investiga-*

---

[46] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period and incorporated instruction previously included in the BIA *Initial Responsibilities in Assigned Log Number Investigations* Unit Directive (to which we submitted a no-objection in October 2021) into S08-01-04. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

*tions*. This policy addresses the requirements of ¶440(g) and (h). The IMT submitted a no-objection notice to S08-01-04 in September 2022. Additionally, this reporting period, the CPD produced a revised version of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. This policy addresses the requirements of ¶440(a) and ¶440(f). The IMT submitted a no-objection notice to G08-01-02 on December 5, 2022. With this, the CPD reached Preliminary compliance.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶440. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest draft of this training does address the requirements of ¶440(f). This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶440.

The focus for the Deputy PSIG in the seventh reporting period was maintaining Full compliance. The Deputy PSIG provided a memorandum detailing its compliance with the requirements of ¶440(b). The documentation shows constant improvement of notifying COPA of complaints of alleged misconduct until the first half of 2022. PSIG believes this is partly due to a significant increase in complaints, but also is due to PSIG's complete overhaul of its Intake System. This overhaul included moving the Intake function from the Investigation section to the Legal section, therefore creating an entirely new Intake Unit staffed with new employees. This Unit is led by an experienced Intake Specialist. All new Intake Specialists were trained in PSIG's responsibilities under ¶440(b) and the IMT anticipates that the Deputy PSIG will see significant improvements in reporting complaints to COPA within the requirements of ¶440(b) during the eighth reporting period. With these efforts, the Deputy PSIG maintained Full compliance with ¶440 in the seventh reporting period.

\*\*\*

The City and the CPD reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward we will look for the CPD to further develop its BIA Onboard training to instruct compliance with the requirements of ¶440. COPA maintained Secondary compliance. Moving forward, we will look forward to receiving information from COPA demonstrating that it is complying with ¶440 and its related policies. For the Deputy PSIG, we expect to receive information that demonstrates continued Full compliance.

## Paragraph 440 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Accountability and Transparency: ¶441

**441.** *The City will undertake best efforts to ensure that COPA has jurisdiction to conduct administrative investigations of allegations of sexual misconduct, as defined by this Agreement.*

## Compliance Progress (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2024* |

In the seventh reporting period, the City maintained Full compliance with ¶441.

To evaluate Preliminary compliance with ¶441, the IMT reviewed COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods for a draft ordinance.[47] To evaluate Secondary compliance with this paragraph, we spoke with relevant City representatives and reviewed memoranda, city ordinances, and other relevant documentation regarding the City's efforts to ensure that COPA has jurisdiction to conduct administrative investigations of allegations of sexual misconduct. To evaluate Full compliance, we considered whether the City's efforts ensured that COPA had the requisite jurisdiction as contemplated by this paragraph and utilized best efforts toward this end.

*Progress before the Seventh Reporting Period*

In previous reporting periods, COPA provided a memorandum that included updates on its efforts to properly train investigative personnel in sexual-assault investigations, including trainings regarding interviewing victims of sexual assault. Additionally, a working group was developed with the goal of improving the investigative and notification process among all of the agencies. The City also provided a draft City Ordinance change to 2-78-120 that included specific language consistent with the Consent Decree language on COPA's jurisdiction of sexual-misconduct complaints. In the fifth reporting period, the City provided a revised draft Ordinance 2-78-120, which gives COPA the authority to investigate sexual misconduct allegations with language that closely aligns with the requirements of the Consent Decree. COPA also provided its *Sexual Misconduct* policy, which it finalized

---

[47] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

at the end of the reporting period. Through COPA's efforts, the City reached Preliminary compliance with ¶441. In the sixth reporting period, COPA provided a *Memorandum of Understanding: Joint Sexual Misconduct Investigations*, which addressed the requirements of ¶441. Additionally, the Municipal Code 2-78-100 and 2-78-120 give specific authority to COPA to investigate complaints of sexual misconduct. With this, the City reached Secondary compliance with ¶441.

Additionally, COPA submitted a memo regarding COPA's jurisdiction to investigate allegations of sexual misconduct, as well as the City Council's Journal of Proceedings regarding the City's ordinance amendments for COPA's jurisdiction of sexual misconduct investigations. These documents meet the City and COPA's obligations to ensure that COPA has jurisdiction to conduct administrative investigations of allegations of sexual misconduct. With this documentation and proof that the City has ensured that COPA has the requisite jurisdiction to conduct administrative investigations of allegations of sexual misconduct, the City reached Full compliance.

Lastly, COPA provided certification at the end of the sixth reporting period demonstrating that COPA provided its Forensic Experiential Trauma Interviews (FETI) Training to its investigative staff handling investigations of allegations of sexual misconduct.

*Progress in the Seventh Reporting Period*

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶441.

The CPD, in the seventh reporting period, provided quarterly reports and an annual report that also speak to the requirements of this paragraph. The CPD's *BIA 2021 Quarter 3 Report*, BIA 2022 Quarters 1, 2, and 3 Reports, and *BIA 2021 Annual Report* explain the responsibilities of the CPD and COPA as provided by ¶441 and ¶443. We recommend that the City and the CPD consider how these reports may further efforts to meet the requirements of ¶441.

*** 

We look forward to reviewing documentation demonstrating that the City remains in Full compliance in future reporting periods. To maintain Full compliance, the City will need to continue providing evidence of compliance in each reporting period.

## Paragraph 441 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Status Update

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Status Update

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Full

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Full

# Accountability and Transparency: ¶442

***442.*** *The City will ensure COPA has appropriately trained and ex-perienced staff to conduct sexual misconduct investigations.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2024* |

In the seventh reporting period, the City maintained Full compliance with ¶442.

To evaluate Preliminary compliance with ¶442, the IMT reviewed COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and pub-lic comment periods.[48] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and eval-uation (¶286). To evaluate Full compliance with this paragraph, we reviewed COPA's relevant data and evidence regarding investigations into sexual misconduct to determine whether it is operating in accordance with the paragraph and related policy, specifically whether it has implemented its policies and training such that sexual misconduct investigations are conducted by trained and experienced staff. More specifically, we looked at sample data regarding who conducted the investi-gations and evidence that the investigations were completed in compliance with policy.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City and COPA achieved Preliminary and Sec-ondary compliance by submitting a Training Plan and a memo regarding COPA's Special Victim Squad, as well as a comprehensive lesson plan and accompanying presentation, *Sexual Assault Training: Understanding the Neurobiology of Trauma and Applying Trauma Informed Investigative Techniques*. Additionally, COPA pro-duced its in-service training spreadsheet that detailed the trainings it provided (in-cluding the sexual assault training) and the list of attendees. In the fifth reporting period, the City and COPA provided a revised policy, *Sexual Misconduct Investiga-*

---

[48] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*tions*, for review. This policy addressed the requirements of ¶442 and COPA finalized the policy. Additionally, COPA produced the *Sexual Misconduct Best Efforts* letter that also addressed the requirements of ¶442. In the sixth reporting period, COPA reached Full compliance by providing a *Memorandum of Understanding: Joint Sexual Misconduct Investigations*. The memorandum provided documentation showing that the City is utilizing best practices and ensuring that COPA has appropriately trained experienced staff to conduct sexual misconduct investigations. Additionally, COPA provided certification demonstrating that COPA provided its Forensic Experiential Trauma Interviews (FETI) Training to its investigative staff handling investigations of allegations of sexual misconduct.

*Progress in the Seventh Reporting Period*

This reporting period, the City did not produce any documentation that demonstrated efforts related to ¶442.

\*\*\*

We look forward to reviewing documentation demonstrating that the City remains in Full compliance in future reporting periods. To maintain Full compliance, the City will need to continue providing evidence of compliance in each reporting period.

### Paragraph 442 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶443

*443. Consistent with COPA's jurisdiction, after conferring about the details of a particular criminal sexual misconduct investigation involving a CPD member, COPA and BIA may jointly agree that BIA may conduct the administrative investigation into allegations of sexual misconduct when they jointly determine that doing so avoids unnecessary disruption to the complainant.*

## Compliance Progress (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |

The City and the CPD reached Preliminary compliance with ¶443 in the seventh reporting period. COPA maintained Full compliance with ¶443. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶443, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[49] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286). To evaluate Full compliance, we reviewed various data sources to determine whether the entities sufficiently implemented their training and policies relevant to ¶443.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City provided an unsigned draft *Memorandum of Understanding regarding Joint Sexual Misconduct Investigations*. By the end of

---

[49] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

the fourth reporting period, neither COPA nor the CPD had finalized corresponding written guidance following the Consent Decree process in ¶443. In the fifth reporting period, BIA provided a revised draft of General Order G08-06, *Prohibitions of Sexual Misconduct*, which addresses the requirements of ¶443 in Section VI.B.[50] At the end of the reporting period, the policy remained in the collaborative review and revision process. In the sixth reporting period, the City and the CPD provided a revised General Order G08-06, *Prohibitions of Sexual Misconduct*.[51] The revised policy addressed only some of the requirements of ¶443 and remained in the collaborative review and revision process at the end of the reporting period.

COPA, in the fifth reporting period, submitted for review the *COPA Sexual Misconduct Investigations Policy*. COPA went beyond the requirements of ¶443 by describing factors that might be considered when making the determination that "BIA may conduct the administrative investigation." The IMT provided a no-objection notice to the policy, and COPA finalized the policy, which moved COPA into Preliminary compliance.[52] In the sixth reporting period, COPA provided a *Memorandum of Understanding: Joint Sexual Misconduct Investigations*, which addressed the requirements of ¶443. This memorandum went further than the requirements of the Consent Decree by indicating that COPA, the Cook County State's Attorney's Office, and BIA have developed a Sexual Misconduct Working Group to develop protocols and best practices for investigating sexual misconduct and domestic violence cases involving CPD employees. Additionally, COPA submitted a memo regarding COPA's jurisdiction to investigate allegations of sexual misconduct, as well as the City Council's Journal of Proceedings regarding the City's ordinance amendments for COPA's jurisdiction of sexual misconduct investigations. Before the end of the reporting period, the City Board of Aldermen overwhelmingly passed the revised ordinance. Lastly, COPA provided certification at the end of the reporting period demonstrating that COPA provided its Forensic

---

[50] The CPD and BIA previously submitted this policy under the number G08-05.

[51] The CPD originally numbered this policy G08-05 but has numbered it G08-06 since the May 5, 2021 draft.

[52] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

Experiential Trauma Interviews (FETI) Training to its investigative staff handling investigations of allegations of sexual misconduct. With these efforts, COPA moved into Full compliance in the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the City and CPD continued to work toward Preliminary compliance. The CPD provided a revised version of G08-06, *Prohibitions of Sexual Misconduct*.[53] This policy completely addresses the requirements of ¶443 and the IMT believes this is one of the most comprehensive policies the CPD has produced in the first seven reporting periods. Additionally, the City and the CPD provided a revised version of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. This policy completely addresses the requirements of ¶443. The IMT submitted no-objection notices to G08-06 and G08-01-02 in December 2022. The City and the CPD reached Preliminary compliance by finalizing G08-01-02.

The CPD also provided an Annual Report and quarterly reports that speak to the requirements of this paragraph. The CPD's BIA 2021 Annual Report explains the responsibilities of the CPD and COPA as provided in ¶441 and ¶443, but does not fully address the requirements of ¶443. The BIA 2022 Quarters 1, 2, and 3 Reports reference ¶441 and ¶443, but do not fully meet the requirements of these paragraphs.

This reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶443. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review with a different combination of Consent Decree paragraphs, including ¶443. The latest draft of this training does not adequately address the requirements of ¶443. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶443. COPA maintained Full compliance this reporting period, but moving forward, the IMT will expect to receive documentation demonstrating ongoing efforts related to maintaining Full compliance with this paragraph in each reporting period.

\*\*\*

---

[53] The CPD originally numbered this policy G08-05 but has numbered it G08-06 since the May 5, 2021 draft.

The City and the CPD reached Preliminary compliance with ¶443 in the seventh reporting period. COPA maintained Full compliance with ¶443. Moving forward, we will look for the CPD to provide training materials related to this paragraph, and for COPA to provide documentation evidencing its continued willingness to cooperate with BIA regarding sexual misconduct complaints. To maintain Full compliance, we will expect to receive documentation related to this paragraph in each reporting period.

### Paragraph 443 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Accountability and Transparency: ¶444

***444.*** *Within ten days of the final disciplinary decision of each complaint of sexual misconduct against a CPD member alleging conduct against a non-CPD member, the City will provide the Deputy PSIG with the complete administrative investigative file, subject to applicable law. The Deputy PSIG will review and analyze each administrative investigative file and, on an annual basis, the Deputy PSIG will publish a report: a. assessing the quality of the sexual misconduct administrative investigations reviewed; b. recommending changes in policies and practices to better prevent, detect, or investigate sexual misconduct; and c. providing aggregate data on the administrative investigations reviewed, including: i. the volume and nature of allegations investigated, broken down by investigating agency; ii. The percentage of investigations referred to the Cook County State's Attorney's Office ("CCSAO") for criminal review; iii. The percentage of investigations criminally prosecuted; iv. The percentage of investigations closed after the Preliminary investigation; v. the percentage of investigations closed for lack of a signed complainant affidavit; and vi. The investigative findings and recommendations, including a summary breakdown of discipline recommended for investigations with sustained findings.*

## Compliance Progress

(Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**  Annually    ☑ **Not Yet Applicable**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[54] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |

In the seventh reporting period, the Deputy PSIG continued to maintain Full compliance with ¶444. The CPD made efforts toward but did not ultimately reach Preliminary compliance with this paragraph. COPA maintained Preliminary compliance but did not reach Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶444, the IMT reviewed the CPD's, COPA's, and the Office of the Inspector General's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms."[55]

---

[54] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[55] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286).[56] To evaluate Full compliance with this paragraph, we reviewed the Office of the Inspector General's policies to determine whether they have been sufficiently implemented and whether the Deputy PSIG's annual reports satisfy each subparagraph of ¶444. We also reviewed Office of the Inspector General's annual report on BIA's and COPA's sexual misconduct investigations.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the entities worked toward compliance at differing rates. While the Deputy PSIG met Full compliance, neither the CPD nor COPA achieved Preliminary compliance by the end of the fourth reporting period because they had not yet implemented policies that demonstrate compliance with ¶444.

The Deputy PSIG met Full compliance in the fourth reporting period because its *General Policy Manual* and *Annual Report* addressed the requirements of ¶444(c). The Deputy PSIG also provided training materials for review that addressed the requirements of ¶444—ultimately propelling it into Full compliance. In the fifth reporting period, the Deputy PSIG worked to maintain Full compliance. PSIG's *General Policy Manual* produced in the fifth reporting period continued to address the requirements of ¶444(a) and (b). Additionally, PSIG's *Report on Investigations of Sexual Misconduct Allegations Against Chicago Police Department Members* continued to address 444(c). PSIG's training materials submitted in the fourth reporting period continued to address the requirements of ¶444. Finally, the Deputy PSIG informally submitted a memorandum discussing its performance related to the requirements of ¶444(b). In 2019 through the first nine months of 2021, the Deputy PSIG had steadily improved its reporting to meet the requirements of ¶444(b). In the sixth reporting period, PSIG produced their *Report on Investigations of Sexual Misconduct Allegations Against CPD Members*, which continued to address the requirements of ¶444(a), (b), and (c).

In the fifth reporting period, the CPD and BIA did not produce any information pertaining to the requirements of ¶444. The responsibilities outlined by ¶444 require efforts on the part of the CPD. In the sixth reporting period, the CPD provided a revised General Order G08-06, *Prohibitions of Sexual Misconduct*.[57] The revised policy did not address the requirements of ¶444. The IMT provided comments to

---

[56] The IMT evaluates training materials using as our standard the "ADDIE" model of curriculum development and implementation. This model typically incorporates the following elements: training needs assessment' curriculum design and development; training implementations (or delivery); and training evaluation.

[57] The CPD originally numbered this policy G08-05 but has numbered it G08-06 since the May 5, 2021 draft.

the CPD on May 11, 2022, stating that the CPD should revise the policy to better instruct compliance with ¶444, which requires that the administrative file must be provided to the PSIG within 10 days of the final disciplinary decision. At the end of the reporting period, the policy remained in the collaborative review and revision process.

COPA, in the fifth reporting period, submitted for review the *COPA Sexual Misconduct Investigations Policy*. COPA finalized this policy after receiving a no-objection notice.[58] This moved COPA into Preliminary compliance with ¶444 in the fifth reporting period. Additionally, COPA provided a revision to the draft ordinance 2-78-120, which provides direction and gives COPA the authority to investigate sexual misconduct allegations. This ordinance was not yet in effect by the end of the fifth reporting period. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶444.

Also in the sixth reporting period, the City submitted a *Memorandum of Understanding: Joint Sexual Misconduct Investigations*. The memorandum addressed the requirements of ¶444 that requires COPA and BIA to provide the full administrative file to the PSIG within ten days of the final disciplinary decision.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD continued to work toward Preliminary compliance. The CPD provided a revised version of G08-06, *Prohibitions of Sexual Misconduct*.[59] This policy completely addresses the requirements of ¶444, even though the CPD is not responsible for ¶444(a)–(c), which are the responsibility of the Deputy PSIG. The IMT believes this is one of the most comprehensive policies CPD has produced in the first seven reporting periods. The IMT submitted a no-objection notice to G08-06 in December 2022. However, this policy remained in the collaborative review and revision process at the end of the seventh reporting period. Therefore, the City and the CPD did not meet Preliminary compliance.

---

[58] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[59] The CPD originally numbered this policy G08-05 but has numbered it G08-06 since the May 5, 2021 draft.

COPA continued working toward Secondary compliance this reporting period. COPA provided a guidance document related to tracking complaints of Sexual Misconduct. The documentation explains the reason for the procedures and provides an exact procedure that COPA personnel fulfill. This ensures that PSIG is provided with timely and accurate case file information. If a particular case is not forwarded, the guidance document denotes that this will be explicitly documented to the rank of Deputy Chief Administrator as to the reason the case was not forwarded. Although this document addresses COPA's responsibilities under ¶444, the IMT has not received information regarding COPA's training on its policy and the requirements of ¶444. Therefore, COPA did not reach Secondary compliance this reporting period.

This reporting period, the Deputy PSIG did not produce any documentation related to ¶444. We will expect to receive further documentation in the next reporting period.

<p style="text-align:center">***</p>

The CPD did not yet reach Preliminary compliance, but made significant efforts related to this paragraph in the seventh reporting period. Once the CPD submits a final version of G08-06 to the IMT, the CPD will reach Preliminary compliance. We anticipate that the CPD will be able to obtain Preliminary compliance in the next reporting period. For COPA, we anticipate receiving information in the eighth reporting period regarding COPA's training on its policy and the requirements of ¶444. Lastly, we look forward to the Office of the Inspector General providing information in the coming reporting periods that demonstrates continued compliance with ¶444.

### Paragraph 444 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

## Accountability and Transparency: ¶445

> *445. The City will use best efforts to initiate and undertake a pro-cess with the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Of-fice to share information on at least a quarterly basis regarding any affirmative judicial findings made during the course of crim-inal proceedings that a CPD member was untruthful, including any findings made at suppression hearings. Upon receipt of in-formation from the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Of-fice that may suggest misconduct COPA will initiate the intake process.*

### Compliance Progress        (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**   Quarterly          ☐ **Met**   ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not in Compliance* |

The City and the CPD reached Preliminary compliance with ¶445 in the seventh reporting period. COPA maintained Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶445, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[60] To evaluate Secondary compliance with ¶445, the IMT reviewed the CPD's and COPA's training development, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we considered

---

[60]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶445's mandates.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City did not reach Preliminary compliance with ¶445 or the corresponding quarterly deadline to share information as stated in the Consent Decree. COPA submitted Policy 1.3.8, *Civil and Criminal Complaint Review*, and Policy 3.1.1, *Intake*, for evidence of compliance. Although COPA made efforts toward helping the City achieve Preliminary compliance, we stressed that it is crucial that the City take a more holistic approach toward compliance with this paragraph by making sure that ¶445's requirements are understood and mandated by the City, not just COPA.

In the fifth reporting period, COPA's finalized Policy 3.1.1, *Intake*, incorporated the requirements of ¶445. Additionally, COPA provided a training, *Intake Unit: Overview of Policies and Procedures: In Service 2021*, to which a portion of the training addressed the requirements of the paragraph. COPA provided evidence that at least 95% of its personnel received the training. With this, COPA reached Preliminary and Secondary compliance in the fifth reporting period. We continued to note that the City cannot fulfill the requirements of this paragraph through COPA's efforts alone, and that the City should ensure that BIA and COPA have a similar policy. In the sixth reporting period, COPA revised its policy, *Civil and Criminal Complaint Review*. The policy addressed COPA's responsibilities and expectations arising from ¶445 and provided instruction for how COPA employees are to fulfill the requirements of the policy and ¶445.

In previous reporting periods, the CPD did not produce any documentation that demonstrated efforts related to ¶445.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided a revised version of G08-01-2, *Complaint Initiation and Log Number Investigation Assignment*. This policy did not fully address the requirements of ¶445 as it does not instruct CPD supervisors or command on what to do if they learn that a CPD member was untruthful. The IMT submitted a no-objection notice to G08-01-02 in December 2022 noting the revision that was necessary for ¶445, and the CPD made the revision to the final version. With this, the CPD reached Preliminary compliance.

COPA did not produce any materials for review with ¶445 this reporting period.

The City provided a preliminary and non-final draft Memorandum of Understanding (MOU) between the City of Chicago, the Cook County State's Attorney's Office (CCSAO), the United States Attorney's Office, the Federal Defender's Office, and

the Cook County Public Defender's Office, with preliminary edits from the US Attorney's office and CCSAO, for review with ¶445. This draft MOU relates to the sharing of information with COPA regarding any affirmative judicial findings made during the course of criminal proceedings that a CPD member was untruthful, including any findings made at suppression hearings, per the requirements of ¶445. The IMT commends COPA for reaching out to the federal and state entities to develop this draft MOU, and looks forward to receiving a final version ratified by the relevant parties in the coming reporting period.

\*\*\*

The City and the CPD reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph. For COPA, we will look for evidence that it has sufficiently implemented its policies and trainings. For the City, we will look for a final version of the Memorandum of Understanding ratified by the relevant parties.

### Paragraph 445 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶446

> **446.** *In the course of investigating a complaint, the City, CPD, and COPA will ensure: a. within five business days of receipt of a non-confidential complaint COPA or BIA will send non-anonymous complainants or their representatives a written notice of receipt. The notice will include the unique tracking number assigned to the complaint. The notice will advise the complainant or his or her representative whether BIA or COPA will be investigating the complaint, and how the complainant or his or her representative may inquire about the status of the investigation. The notice will not contain any language discouraging participation in the investigation. B. within 60 days of the final disciplinary decision the complainant will be provided a copy of the Administrative Summary Report.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[61] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (NEW) |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶446. The CPD made efforts toward but did not reach Secondary compliance with this paragraph. COPA reached Full compliance with ¶446. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶446, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree

---

[61] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

(¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[62] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are providing sufficient notice pursuant to the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD provided a draft of General Order G08-01-02 and BIA provided a draft of its *Assignment of Administrative Log Number Investigations* Unit Directive.[63] In the fifth reporting period, the CPD revised General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which spoke to the requirements of ¶446(a). Additionally, BIA submitted a revised version of Special Order S08-01-04, *Post Investigation Log Number Procedures* that addressed ¶446(b).[64] The IMT provided a no-objection notice to both policies, and the CPD finalized the policies on the last day of the fifth reporting period.[65] BIA also submitted its *Administrative Summary Report* packet that pertains to the requirements of ¶446(b). With this, the CPD moved into Preliminary compliance in the fifth reporting period. In the sixth reporting period, the CPD and BIA provided

---

[62] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[63] The name of this directive changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

The CPD and BIA previously named this Unit Directive "Assignment of Administrative Log Number Investigations." This Unit Directive is now named "Initial Responsibilities in Assigned Log Number Investigations."

[64] The CPD changed the name of this directive during the revision stage. It was previously known as *Documenting Log Number Investigations and Post Investigations Procedures*.

[65] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

a first draft of its eLearning relevant to ¶446(b), however it remained in draft state at the end of the reporting period.

COPA reached Preliminary compliance by finalizing Policy 3.2.2, *Timeliness Benchmarks* in previous reporting periods. In the fifth reporting period, COPA provided its training, *COPA Intake Unit: Overview of Policies and Procedures: In Service 2021*, which addressed ¶446, and provided evidence that at least 95% of its personnel received the training. With this, COPA moved into Secondary compliance in the fifth reporting period. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶446.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning appears to address the requirements of ¶446(a) and (b), however the IMT will require review of the final eLearning to observe whether the folders in the slide refer to the paragraph's requirements for training. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[66]

Additionally, the CPD provided a revised version of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. Section IV.A.3 of this policy completely addresses ¶446(a) and Section III.C.2.b-c complete addresses ¶446(b). Additionally, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*.[67] This policy completely addresses the requirements of ¶446(b) by requiring that the ASR be provided to the complainant within 60 days of the disciplinary decision.

COPA continued working toward Full compliance this reporting period. COPA provided guidance for review on the publishing and distribution of Final Summary Reports. This document fully addressed the requirements of ¶446(b). Additionally, COPA provided guidance on contacts with non-department member witnesses and complainants and confirmation of representation, which generally addressed the requirements of ¶446(a). This guidance supports and supplements the COPA *Timeliness and Benchmarks* policy by explaining how the contacts will be documented within the CMS. Lastly, COPA provided a memorandum with examples of three COPA investigations portraying the process from the complaint intake through the

---

[66] To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

[67] This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

final/administrative summary reports. This fully addresses the requirements of ¶446(a) and (b) and therefore moved COPA into Full compliance.

\*\*\*

Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. For COPA, we will look for information showing that COPA continues to implement its policies and training in accordance with ¶446. Specifically, we will look for information documenting that COPA is providing sufficient notice per the requirements of ¶446.

### Paragraph 446 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Accountability and Transparency: ¶447

> **447.** *The City and CPD will require that all COPA and BIA person-nel and Accountability Sergeants communicate with complain-ants and involved CPD members in a professional and respectful manner.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[68] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not in Compliance* |

In the seventh reporting period, COPA maintained Secondary compliance with ¶447 and the CPD maintained Preliminary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compli-ance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶447, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and pub-lic comment periods.[69] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and eval-uation (¶286). To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they

---

[68]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[69]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

are requiring all COPA and BIA personnel and Accountability Sergeants to communicate with complainants and CPD members in a professional manner pursuant to the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD reached Preliminary compliance. The CPD submitted a revised version of BIA's Unit Directive *Initial Responsibilities in Assigned Log Number Investigations*.[70] This Unit Directive did not address all requirements of ¶447 and was not finalized by the end of the reporting period. Additionally, the CPD revised Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which incorporated the requirements of ¶447. We submitted a no-objection notice and the CPD finalized the policy on the last day of the reporting period.[71] Finally, the CPD produced Special Order S08-01-01, *Conducting Log Number Investigations*, which fully addressed the requirements of ¶447. At the end of the fifth reporting period, it remained in the collaborative review and revision process. In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶447.

COPA finalized Policy 3.1.1, *Intake*, which propelled COPA to Preliminary compliance in the fourth reporting period. Building on this in the fifth reporting period, COPA provided training materials for its training *COPA Intake Unit: Overview of Policies and Procedures: In Service 2021* for review. COPA provided evidence that at least 95% of its personnel received the training, which moved COPA into Secondary compliance in the fifth reporting period. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶447.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶447. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision

---

[70]  Previous drafts of this Unit Directive were titled *Conduct of Investigation: Initial Responsibilities.*

[71]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest draft of this training does address the requirements of ¶447. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA produced documentation demonstrating that COPA communicated with every witness, accused, or complainant in a professional and respectful manner. It is clear that COPA investigators perform as neutral investigators and conduct interviews in a methodical and professional manner, allowing those interviewed to give their versions of events and observations without feeling rushed or disrespected no matter their involvement in the incident.

\*\*\*

We look forward to reviewing the CPD's training materials in the next reporting period. For COPA, we look forward to receiving additional information related to ¶447 to ensure COPA has sufficiently implemented its policies and training.

### Paragraph 447 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶448

> *448. If COPA, BIA, or the district does not arrive at the investigative findings and recommendations within 180 days, COPA, BIA or an Accountability Sergeant will, thereafter, periodically, but not less than once every 60 days, attempt contact with the complainant or his or her representative to provide status updates until the investigative findings and recommendations are issued. Such contacts will be documented in the administrative investigative file. By 2020, this requirement will be satisfied by providing complainants and their representatives the ability to track the status of non-confidential unique tracking numbers from the intake process through final disposition online.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[72] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶448. COPA reached Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶448, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[73] To evaluate Secondary compliance with this paragraph, we

---

[72]  As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[73]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

reviewed the entities' training development, materials, implementation, and evaluation (¶286), as well as systems for contacting the complainant or his or her representative pursuant to the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD revised S08-01, *Complaint and Disciplinary Investigators and Investigations*. Throughout the fifth reporting period, the CPD submitted three different revised versions to the IMT for review. The IMT provided a no-objection notice and the CPD finalized the policy on the last day of the reporting period.[74] This moved the CPD into Preliminary compliance with ¶448. In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶448.

COPA reached Preliminary compliance in the fourth reporting period. COPA finalized Policy 3.2.2, *Timeliness Benchmarks*, which meets the requirements of ¶448 as it relates to COPA. In the fifth and sixth reporting periods, COPA did not submit evidence showing efforts toward Secondary compliance with ¶448, and therefore maintained Preliminary compliance.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶448. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review with a different combination of Consent Decree paragraphs, including ¶448. The latest draft of this training does not adequately address the requirements of ¶448. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

COPA, in the seventh reporting period, provided guidance on *Investigative Correspondence*, which states that the CMS will automatically update case information

---

[74]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

for complainants to track their complaint. Additionally, it notes that COPA's CMS auto-generated outreach to the complainant, among others, will occur automatically. Also, COPA's CMS generates an internal list of cases reaching each 180-day threshold for COPA Case Liaisons and Supervisors to review to ensure that investigations are progressing appropriately. COPA also provided a memorandum with documentation of three examples of letters to complainants showing that COPA is acting in accordance with the requirements of ¶448. With this, COPA reached Secondary compliance.

Additionally, COPA provided its *COPA Guidance Column CMS Administration* for review with ¶448, but this Guidance does not appear to completely address the requirements of ¶448.

\*\*\*

The CPD maintained Preliminary compliance with ¶448 in the seventh reporting period. COPA reached Secondary compliance. Moving forward, we will look for the CPD to provide training materials for review that instruct compliance with ¶448 in the next reporting period. For COPA, we will look for evidence that COPA has sufficiently implemented its policies, training, and notification systems to meet the requirements of this paragraph.

### Paragraph 448 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶449

> **449.** *The City and CPD will notify the complainant in writing if an officer elects to file a labor grievance relating to any discipline imposed as a result of the complainant's complaint. Upon reaching the final disposition, the City and CPD will advise the complainant in writing of the final disposition.*

## Compliance Progress  (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD made efforts toward but did not ultimately reach Secondary compliance with ¶449 in the seventh reporting period.

To evaluate Preliminary compliance with ¶449, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286).

### Progress before the Seventh Reporting Period

In previous reporting periods, the CPD worked to revise and finalize Special Order S08-01-04, *Post Investigation Log Number Procedures*, a draft of which addressed the requirements of ¶449.[75] In the fifth reporting period, the CPD continued to revise S08-01-04. We provided a no-objection notice and the CPD finalized the policy on the last day of the reporting period.[76] This moved the CPD into Preliminary compliance. In the sixth reporting period, the CPD and BIA provided a first draft of

---

[75]  This directive was previously submitted to the IMT as *Documenting Log Number Investigations and Post Investigations*.

[76]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

its eLearning relevant to ¶449, however it remained in draft state at the end of the reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶449, however the IMT must review the final eLearning to ensure the folder in the slides refer to the requirements of the paragraph. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[77]

This reporting period, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*.[78] This policy completely addresses the requirements of ¶449 and provides further direction that the notification of a labor grievance will be sent to the complainant within ten days of receiving the notification.

*** 

The City and the CPD maintained Preliminary compliance but did not reach Secondary compliance. Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel.

---

[77] To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

[78] This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

## Paragraph 449 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶450

*450. CPD will develop and implement policies to ensure that a CPD member who is alleged to be involved in misconduct (the "involved member") receives notice that he or she is under administrative investigation. The policies will provide, at a minimum: a. CPD members under investigation will not receive such notice of confidential investigations, but will receive notice prior to being formally interviewed by COPA, BIA, or an Accountability Sergeant; b. such notice will comport with due process and the law, and will describe the nature of the complaint made against the involved member, and the involved member's rights, but will not contain any information that is part of a confidential investigation; and c. once a CPD member has been notified or otherwise becomes aware that he or she is the subject of an administrative investigation, the CPD member will not review the following documents and evidence related to an incident under administrative investigation, until notified by BIA that he or she is permitted to do so, or as may be required to testify as a witness in criminal or civil proceedings: i. any investigative files; ii. any reports (except for reports about the incident authored by the CPD member); or iii. any other evidence, from any source, including body and dashboard camera footage (except as permitted for purposes of completing incident reports or other documentation).*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

**Preliminary:**      *In Compliance* (NEW)
**Secondary:**       *Not Yet Assessed*
**Full:**             *Not Yet Assessed*

In the seventh reporting period, the CPD reached Preliminary compliance with ¶450.

To evaluate Preliminary compliance with ¶450, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Seventh Reporting Period*

In previous reporting periods, BIA worked to draft and revise policies that speak to the requirements of ¶450. BIA had previously submitted BIA's *Accountability Sergeant* Unit Directive that spoke to but did not fully address the requirements of

¶450. In addition, BIA submitted BIA's *Administrative Misconduct Investigations* Unit Directive, which addressed ¶450 and the subparagraphs. In the fifth reporting period, we provided a no-objection notice to BIA's revised Unit Directive, *Administrative Misconduct Investigations*.[79] However, the policy was not posted for public comment and was not finalized by the end of the reporting period.[80] The CPD and BIA also submitted a first draft of Special Order S08-01-01, *Conducting Log Number Investigations*, that addressed all requirements of ¶450 and its subparagraphs, but it also was not finalized by the end of the reporting period. In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05, *Conducting Log Number Investigations*. At the end of the sixth reporting period, this policy remained in the collaborative review and revision process.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy completely addresses the requirements of ¶450(a), (b), and (c). The IMT submitted no-objection notices to S08-01-05 in September and October 2022. With this, the CPD reached Preliminary compliance.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶450. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest draft of this training does not adequately address the requirements of ¶450(c). This training is

---

[79]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[80]  In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in the sixth reporting period and it is ongoing.

still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

Although ¶450 is not a requirement for COPA, the IMT acknowledges that COPA makes its employees aware of the requirements of this paragraph in its *Officer Interviews In-Service* training. During an IMT Site visit on September 29, 2022, the IMT attended and observed the *Officer Interviews In-Service Training*. Both instructors were prepared, knowledgeable in the course material, and used their experience to highlight specific points and examples in their presentation. The instructors encouraged and received student participation that generated discussion and allowed for other veteran investigators to share their best practices. The IMT continues to commend COPA for its thoughtful training.

\*\*\*

The CPD reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward we will look for the CPD to further develop its BIA Onboard training to instruct compliance with the requirements of ¶450.

### Paragraph 450 Compliance Progress History

| FIRST REPORTING PERIOD SEPTEMBER 1, 2019 – AUGUST 31, 2019 COMPLIANCE PROGRESS: Not Applicable | SECOND REPORTING PERIOD SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 COMPLIANCE PROGRESS: Status Update | THIRD REPORTING PERIOD MARCH 1, 2020 – DECEMBER 31, 2020 COMPLIANCE PROGRESS: Status Update |
|---|---|---|
| FOURTH REPORTING PERIOD JANUARY 1, 2021 – JUNE 30, 2021 COMPLIANCE PROGRESS: None | FIFTH REPORTING PERIOD JULY 1, 2021 – DECEMBER 31, 2021 COMPLIANCE PROGRESS: None | SIXTH REPORTING PERIOD JANUARY 1, 2022 – JUNE 30, 2022 COMPLIANCE PROGRESS: None |
| SEVENTH REPORTING PERIOD JULY 1, 2022 – DECEMBER 31, 2022 COMPLIANCE PROGRESS: Preliminary | | |

# Accountability and Transparency: ¶451

**451.** *A CPD member who reviews audio or video evidence for pur-poses of completing an incident report will document in writing that he or she reviewed the evidence in each relevant incident report.*

**Compliance Progress**     (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD did not reach Preliminary compliance with ¶451.

To evaluate Preliminary compliance with ¶451, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms."

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD drafted and revised policies that speak to the requirements of ¶451. The CPD provided revised versions of Special Order S03-14, *Body Worn Cameras*, but it did not sufficiently address ¶451 because it did not require officers to document in an incident report whether they reviewed the evidence. In the fifth reporting period, the CPD and BIA produced no information pertaining to the requirements of ¶451. In the sixth reporting period, the CPD continued to work toward Preliminary compliance by submitting a revised Special Order S03-14, *Body-Worn Cameras*. This policy met the requirements of ¶451 by stating that "department members will . . . document the review of their [body-worn camera] recording of an incident in the narrative portion of any report they complete for the incident (e.g., incident case report, Arrest Report, Tactical Response Report)." At the end of the sixth reporting period, this policy remained in the collaborative review and revision process.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided a revised version of Special Order S03-14, *Body-Worn Cameras*, which we noted in the sixth reporting period met the requirements of ¶451. The CPD provided the revised version of S03-14 on November

25, 2022, and the IMT provided feedback on December 31, 2022. This Special Order remains in the collaborative review and revision process and therefore was not finalized by the end of the seventh reporting period.

\*\*\*

We look forward to working with the CPD to further revise S03-14 to instruct compliance with ¶451 in the eighth reporting period.

### Paragraph 451 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| None |

# Accountability and Transparency: ¶452

> **452.** *Consistent with the applicable collective bargaining agreements, CPD will require members to cooperate with administrative investigations, including appearing for an administrative interview when requested by COPA, BIA, or an Accountability Sergeant and will provide all requested documents and evidence under the CPD member's custody and control.*

## Compliance Progress (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶452. The CPD made efforts toward but did not ultimately reach Secondary compliance with this paragraph.

To evaluate Preliminary compliance with ¶452, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD and BIA drafted and revised General Order G08-01, *Complaint and Disciplinary Procedures*, which is relevant to ¶452's requirements. In addition to this progress toward Preliminary compliance, BIA provided the *Log Number Investigations* training, which is relevant to ¶452. This training remained in the collaborative review and revision process at the end of the fourth reporting period. In the fifth reporting period, the CPD further revised General Order G08-01, *Complaint and Disciplinary System*.[81] After multiple revisions in the fifth reporting period, we submitted a no-objection notice and the CPD finalized the policy on the last day of the reporting period.[82] This propelled the CPD

---

[81] CPD previously submitted versions of G08-01 named *Complaint and Disciplinary Procedures*.

[82] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the

into Preliminary compliance. In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning relevant to ¶452, however it remained in draft state at the end of the reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶452. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning, however CPD did not designate the evidence of training as meeting the requirements of this paragraph. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[83]

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶452. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022, including ¶452. The latest draft of this training does not adequately address the requirements of ¶452. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

Additionally, this reporting period, the CPD provided a revised version of G08-01, *Complaint and Disciplinary System*. Section IV.D.44.a–c of this policy addresses the requirements of ¶452. The IMT submitted a no-objection notice to G08-01 on December 5, 2022.

*** 

The City and the CPD maintained Preliminary compliance with ¶452 in the seventh reporting period. Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least

---

City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[83] To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

95% of its personnel. Additionally, we will look for the CPD to further develop its BIA Onboard training to instruct compliance with the requirements of ¶452.

### Paragraph 452 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶453

> *453. If a criminal investigation of a CPD member's conduct has commenced, COPA, BIA, or the Accountability Sergeant will continue the administrative investigation, absent specific circumstances that would jeopardize the criminal investigation. In such circumstances, the determination to postpone the administrative investigation, along with the rationale for doing so, will be documented by COPA, BIA or the district in writing.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶453 in the seventh reporting period. COPA reached Secondary compliance.

To evaluate Preliminary compliance with ¶453, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[84] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

The CPD did not provide any evidence of efforts pertaining to ¶453 until the fifth reporting period. In the fifth reporting period, the CPD submitted submitting Special Order S08-01-01, *Conducting Log Number Investigations*, which addresses ¶453. This policy goes beyond the requirements of ¶453, providing additional direction regarding documenting situations in writing, uploading the documentation into the Case Management System, and directing the BIA Investigator or Accountability Sergeant to notify their supervisor. The IMT provided comments on the

---

[84] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

draft, which remained in the collaborative review and revision process at the end of the fifth reporting period. In the sixth reporting period, the CPD renumbered the Special Order previously labeled S08-01-01 to S08-01-05, *Conducting Log Number Investigations*. This revised policy instructed compliance with the requirements of ¶453, however it remained in the collaborative review and revision process at the end of the sixth reporting period.

In the fifth reporting period, COPA submitted a revised version of COPA Policy, 3.1.2, *Fact Gathering and the Investigative Process*, which addresses the requirements of ¶453 verbatim. The policy went through the Community Policy Review Working Group and was finalized. This propelled COPA into Preliminary compliance. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶453.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy completely addresses the requirements of ¶453. The IMT submitted no-objection notices to S08-01-05 in September and October 2022. With this, the CPD reached Preliminary compliance.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶453. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest draft of this training adequately addresses the requirements of ¶453. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

COPA, in the seventh reporting period, provided its *Fact-Gathering Evidence Collection* training lesson plan to the IMT. This lesson plan fully addresses the requirements of ¶453. In December 2022, the IMT virtually attended the training given to COPA in-service staff. The instructor was clearly a subject matter expert and used personal experience to illustrate specific points of the lesson plan. The instructor was prepared for the presentation and appeared to have spent considerable time learning the lesson plan, which made for a seamless delivery, and was comfortable engaging the class in discussion. COPA continues to consistently demonstrate its ability to develop thorough, relevant training from its policies and procedures. COPA submitted documentation demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

***

The City and the CPD reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward we will look for the CPD to further develop its BIA Onboard training to instruct compliance with the requirements of ¶453. COPA reached Secondary compliance. For COPA, we will look for documentation demonstrating that COPA has sufficiently implemented its policies and training.

### Paragraph 453 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶454

***454.*** *COPA, BIA, and the districts will conduct objective, compre-hensive, and timely investigations of complaints.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Under Assessment* |

In the seventh reporting period, COPA reached Secondary compliance with ¶454. The CPD maintained Preliminary compliance and made efforts toward Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶454, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[85] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶454's mandates.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD continued to draft and revise policies that spoke to the requirements of ¶454. In the fifth reporting period, the CPD revised G08-01, *Complaint and Disciplinary System*.[86] Additionally, the CPD submitted a revised S08-01, *Complaint and Disciplinary Investigators and Investigations*, which also fully addresses the requirements of ¶454. We provided no-objection notices

---

[85] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[86] The CPD previously submitted this General Order as *Complaint and Disciplinary Procedures*.

and the CPD finalized the policies in the fifth reporting period.[87] This moved the CPD into Preliminary compliance. In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning relevant to ¶454, however it remained in draft state at the end of the sixth reporting period.

In the fourth reporting period, COPA finalized two Policies, *Recommendations Regarding Department Member Duties and Power* and *Fact Gathering and the Investigative Process*; both address the requirements of ¶454, which moved COPA into Preliminary compliance. In the fifth reporting period, COPA compiled and submitted for review various documents, including 3.1.4, *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement*; 3.1.6, *Clear and Column Case Management System Systems*; 3.1.1, *Intake*; 2.1.2, *Transparency Issues – Release of Video and Related Materials*; *Candidates for COPA Employment*; and *Major Incident Responses*. These policies all addressed the requirements of ¶454. To demonstrate efforts toward Secondary compliance, COPA submitted materials for *COPA Intake Unit: Overview of Policies and Procedures: In Service 2021 Training*. COPA provided evidence that at least 95% of its personnel received the training. Additionally, COPA provided training materials for *Case Management System: Overview of Policy and Procedures* that addressed the principles of ¶454 and we understood that COPA planned to provide the training in January 2022. These efforts propelled COPA into Secondary compliance in the fifth reporting period. In the sixth reporting period, COPA provided a revised Policy 3.1.4, *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirements*, which addressed the requirements of ¶454. By the end of the sixth reporting period, COPA had not yet finalized the policy.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided a revised version of G08-01, *Complaint and Disciplinary System*. Section IV.C.1 of this policy addresses the requirements of ¶454. The IMT submitted a no-objection notice to G08-01 on December 5, 2022.

Although the CPD had previously produced draft BIA eLearning Training materials for review with this paragraph in the sixth reporting period, the CPD did not pro-

---

[87] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

duce revised versions of these training materials for review with ¶454 this reporting period and did not designate the training materials as meeting the requirements of this paragraph.

COPA, in the seventh reporting period, provided a final version of its policy *Affidavits, Affidavit Overrides, Exception to Affidavit Requirement*. This policy addresses the requirements of ¶454. COPA also provided the following Guidance documents: *Accessibility-People with Disabilities, Language Services and Incarcerated Individuals*; *Processing Anonymous Complaints*; and *Misconduct Complaints Identified or Initiated by COPA*, but these guidance documents do not address the requirements of this paragraph.

Additionally, COPA provided evidence that more than 95% of its employees attended and completed the *Case Management System: Overview of Policy and Procedures* and *Disciplinary and Remedial Recommendations* trainings. COPA also provided *Final Summary Reports & Standards of Proof (FSR)* training materials. These training materials provide an excellent explanation of the reason for the FSRs and the purposes of the FSR training and meet the requirements of ¶454. The IMT submitted a no-objection notice to these training materials on November 10, 2022. The IMT virtually attended the *Final Summary Reports & Standards of Proof* training delivered to COPA staff on November 29, 2022. The training was well-presented and engaging, and the instructors were knowledgeable about the subject matter. COPA continues to demonstrate its ability to develop thorough training relevant to its policies and procedures and the Consent Decree. COPA additionally provided evidence that more than 95% of its employees attended and completed the *Final Summary Reports & Standards of Proof* training.

Finally, COPA provided a screenshot of its closed case dashboard to provide proof that cases are investigated in a timely manner per the requirements of ¶454. COPA remains Under Assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

\*\*\*

Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel.

Moving forward, we will look for COPA to demonstrate that it has implemented its policies and trainings such that COPA personnel are acting in accordance with ¶454.

## Paragraph 454 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

## Accountability and Transparency: ¶455

**455.** *All investigative findings will be based on the appropriate standard of proof. This standard will be clearly delineated in COPA and BIA policies, training, and procedures.*

### Compliance Progress                    (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[88] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Under Assessment* |

The City and the CPD maintained Preliminary compliance with ¶455. COPA reached Secondary compliance and remains Under Assessment for Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶455, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[89] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶455's mandates.

---

[88] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[89] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

In previous reporting periods, we reviewed several items relevant to the CPD's efforts toward compliance with ¶455, including draft G08-01, *Complaint and Disciplinary System*. Additionally, we reviewed *Findings, Recommendations and Effective Log Number Closings Training*, which addressed the requirements of ¶455, but the information from the training was not included in policy. In the fifth reporting period, the CPD revised G08-01, *Complaint and Disciplinary System*.[90] We provided a no-objection notice and the CPD finalized the policy on the last day of the reporting period. This moved the CPD into Preliminary compliance. In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning relevant to ¶455, however it remained in draft state at the end of the sixth reporting period.

COPA met Preliminary compliance with ¶455 in the fourth reporting period by finalizing its Policy 3.1.3, COPA's *Final Summary Report*. In the fifth reporting period, COPA did not produce evidence of steps toward Secondary compliance with ¶455. In the sixth reporting period, COPA provided its *Disciplinary and Remedial Recommendations In-Service* lesson plan, which addressed the requirements of ¶455. By the end of the reporting period, COPA did not submit training records to demonstrate the extent of personnel who had completed the training for the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided a revised version of G08-01, *Complaint and Disciplinary System*. Section IV.C.1.a of this policy addresses the requirements of ¶455. The IMT submitted a no-objection notice to G08-01 on December 5, 2022.

This reporting period, COPA provided evidence that more than 95% of its personnel completed the *Disciplinary and Remedial Recommendations* training for both the COPA Academy and in-service training, which moves COPA into Secondary compliance. Additionally, COPA submitted the *Final Summary Reports & Standards of Proof* training materials. These training materials address the requirements of ¶455. The IMT submitted no-objection notices to these trainings in August and November 2022. Additionally, the IMT virtually attended the *Final Summary Reports & Standards of Proof* training delivered to COPA staff on November 29, 2022. The training was well-presented and engaging, and the instructors were knowledgeable about the subject matter. COPA continues to demonstrate its ability to develop thorough training relevant to its policies and procedures. This training addresses the training requirement for ¶455. At the end of the reporting period, COPA provided documentation demonstrating that this training was provided to

---

[90] The CPD previously submitted this General Order as *Complaint and Disciplinary Procedures*.

100% of its in-service staff and 100% of its Academy class. With this, COPA reached Secondary compliance.

COPA also provided a memorandum that included examples of five Final Summary Reports (FSRs), which included the appropriate standard of proof in which the investigative findings were based, per the requirements of ¶455. COPA remains Under Assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

\*\*\*

The City and the CPD maintained Preliminary compliance in the seventh reporting period. In the next reporting period, we will look for the CPD to further develop its training. We look forward to COPA providing documentation demonstrating Full compliance with ¶455 in future reporting periods.

### Paragraph 455 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶456

> *456. The City will ensure that the disciplinary histories of current and former CPD members are reviewed prior to employment with COPA, or assignment within BIA or as an Accountability Sergeant.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[91] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

In the seventh reporting period, the CPD and COPA maintained Preliminary compliance with ¶456.

To evaluate Preliminary compliance with ¶456, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[92] To evaluate Secondary compliance, the IMT reviewed the entities' guidance or written processes setting out who will be tasked with checking an individual's disciplinary history prior to employment or assignment, and how that information is presented to the appropriate individuals tasked with hiring or assignment.

---

[91]  As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[92]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeants* Unit Directive that included specific standards to disqualify candidates from serving as Accountability Sergeants.[93] The IMT continuously raised concerns regarding the low standards that had been set in the directive. In the fifth reporting period, the CPD revised Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. After a second round of revisions in the fifth reporting period, the policy addressed the requirements of ¶456. We provided a no-objection notice and the CPD finalized the policy on the last day of the reporting period.[94] This moved the CPD into Preliminary compliance. In the sixth reporting period, the CPD provided an audit to demonstrate that at that time, the vast majority of CPD Sergeants met the enhanced standards for BIA and Accountability Sergeant assignment.

COPA previously compiled a draft policy, *Candidates for COPA Employment – Current or Former Chicago Police Department Member*, which exceeded the requirements of ¶456 regarding the hiring process of former and current CPD employees. We provided a no-objection notice and COPA finalized the policy by the end of the fifth reporting period. This moved COPA into Preliminary compliance. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶456.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the CPD and COPA did not produce any documentation that demonstrated efforts related to ¶456.

<p style="text-align:center">***</p>

---

[93] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in the sixth reporting period, and the process is ongoing.

[94] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

As stated in previous reporting periods, we will look forward to receiving evidence that individuals responsible for hiring to BIA and COPA are aware of candidate requirements as set out by ¶456 and their respective policies, and that processes are developed to make clear who is tasked with checking disciplinary histories for employment or assignment candidates. The CPD and COPA will then need to provide proof that they are following their respective policies. We expect these materials to be produced in each reporting period.

### Paragraph 456 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶457

> **457.** *Within 90 days of the Effective Date, CPD will create a written policy regarding the circumstances under which BIA will retain and investigate complaints itself and under which BIA will transfer complaints to a CPD district for investigation. The policy will include as factors in that decision: consideration of the involved CPD member's complaint and disciplinary history and the seriousness of the alleged misconduct. It will be designed to ensure that all investigations are completed in a timely and thorough manner and in compliance with this Agreement.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶457.

To evaluate Preliminary compliance with ¶457, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD provided various policy and training documents for review, including Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations* policy, and BIA's *Assignment of Administrative Log Number Investigations* Unit Directive. Additionally, the CPD provided BIA's *Intake and Case Assignment Process On-Boarding* training that partially addressed ¶457. The CPD revised and finalized S08-01 in the fifth reporting period. This moved the CPD into Preliminary compliance. Additionally, BIA provided a "finalized" version of the *BIA Accountability Sergeants* Unit Directive that provided an in-depth consideration of all requirements in ¶457, even adding considerations beyond what is required in this paragraph. However, that directive was not posted for public comment prior to the end of the fifth reporting period.[95] In the sixth reporting period,

---

[95]  In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and it is ongoing.

the CPD and BIA provided a first draft of its eLearning relevant to ¶457, however it remained in draft state at the end of the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶457. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning, however CPD did not designate the evidence of training as meeting the requirements of this paragraph. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[96]

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶457. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022, including ¶457. The latest draft of this training does address the requirements of ¶457. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

<p align="center">***</p>

Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. Additionally, we will look for the CPD to further develop its BIA Onboard training to instruct compliance with the requirements of ¶457.

---

[96] To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

## Paragraph 457 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶459

> *459. Within 30 days of receiving an allegation: a. COPA and BIA will assess the allegation to determine whether the complainant has alleged potential misconduct; and b. if potential misconduct is alleged, COPA, BIA, or the district will initiate a Preliminary investigation into the complaint.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Not in Compliance* |

The City and the CPD reached Preliminary compliance with ¶459 in the seventh reporting period. COPA maintained Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶459, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[97] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶459's mandates.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD provided BIA's *Complainant Communications and Timeliness policy*. Additionally, the CPD provided BIA's *Policies and Communications Techniques Onboard and Annual Training,* which oversimplified the

---

[97] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

requirements of ¶459 and required additional revisions. In the fifth reporting period, the CPD revised its policy, *Initial Responsibilities in Assigned Log Number Investigations*, but it was not posted for public comment before the end of the reporting period. The CPD also presented Special Order S08-01-01, *Conducting Log Number Investigations*, for review, but it remained in the collaborative review and revision process at the end of the fifth reporting period. In the sixth reporting period, the CPD began the process of incorporating Unit Directive information into General Orders and Special Orders. Special Order S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*, addressed the requirements of ¶459 but it remained in the collaborative review and revision process at the end of the sixth reporting period.

COPA, in the fourth reporting period, finalized its policy 3.2.2, *Timeliness Benchmarks Jurisdictional Decisions, Triage and Preliminary Investigation* which addressed the requirements of ¶459 and moved COPA into Preliminary compliance. In the fifth reporting period, COPA compiled and submitted for review materials for a training entitled *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021*. COPA provided evidence that at least 95% of its personnel received the training, which propelled it into Secondary compliance. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶459.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*. This policy completely addresses the requirements of ¶459 and its subparagraphs. The IMT submitted no-objection notices to S08-01-04 in August and September 2022. With this, the CPD reached Preliminary compliance.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶459.

\*\*\*

The City and the CPD reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph. For COPA, we will look for evidence that COPA has sufficiently implemented and trained upon the requirements of ¶459 and related policies.

## Paragraph 459 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Status Update

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
None

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶460

*460. Preliminary investigations will take all reasonable steps to discover any and all objective verifiable evidence relevant to the complaint or administrative notification through the identification, retention, review, and analysis of all available evidence, including, but not limited to: all time-sensitive evidence, audio and video evidence, physical evidence, arrest reports, photographic evidence, GPS records, computer data, and witness interviews. All reasonable steps will be taken to preserve relevant evidence identified during the Preliminary investigation.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶460 in the seventh reporting period. COPA reached Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶460, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[1] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

Previously, in the fourth reporting period, the CPD submitted several policies for review that sought to address the requirements of ¶460, including BIA's *Conduct of Investigation: Sworn Affidavits and Sworn Affidavit Overrides*; *Complainant*

---

[1]    The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Communication Procedures and Timelines*; *Conduct of Investigations: Initial Responsibilities*; and *Intake Initiation of Log Number*. However, these policies were not finalized by the end of the fifth reporting period. In the sixth reporting period, the CPD submitted multiple revised versions of S08-01-05, *Conducting Log Number Investigations*.[2] The policy did not completely address ¶460, which requires that reasonable steps be taken to "preserve relevant evidence identified during the preliminary investigation" and that steps be taken to "discover any and all objective verifiable evidence relevant to the complaint." ¶460. Additionally, the CPD submitted multiple revised versions of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*.[3] This policy addressed the requirements of ¶460, however it remained in the collaborative review and revision process at the end of the sixth reporting period.

COPA, in the fourth reporting period, finalized its Policy 3.1.2, *Fact Gathering and the Investigative Process*, which addressed the requirements of ¶460 and moved COPA into Preliminary compliance. In the fifth reporting period, COPA submitted materials for a training titled *Intake Unit: Overview of Policies and Procedures In-Service 2021*. This training partially addressed the requirements of ¶460, and COPA provided the training to its personnel. COPA made progress toward but had not reached Secondary compliance with ¶460 by the end of the fifth reporting period. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶460.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy completely addresses the requirements of ¶460. The IMT submitted no-objection notices to S08-01-05 in September and October 2022. Additionally, the City and the CPD provided a revised version of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*. This policy completely addresses the requirements of ¶460. With this, the CPD reached Preliminary compliance.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including

---

[2]    The *Conducting Log Number Investigations* policy was produced in previous reporting periods as S08-01-01. The policy was re-numbered as S08-01-05 when it was produced May 5, 2022.

[3]    In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Initial Responsibilities in Assigned Log Number Investigations* into S08-01-05. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

¶460. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest draft of this training does not adequately address the requirements of ¶460. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

COPA, in the seventh reporting period, provided *Fact Gathering-Evidence Collection* training materials, which address the requirements of ¶460. The IMT submitted a no-objection to these training materials on September 30, 2022. The IMT virtually attended the *Fact Gathering-Evidence Collection* training delivered to COPA in-service staff on December 13, 2022. The training followed the lesson plan and the slide presentation allowed the instructor to provide specific detail without reading from the slides. The instruction was clear and engaging. The instructor was well-prepared, knowledgeable in the subject matter, and was able to effectively draw from personal experience to illustrate specific points in the lesson plan while comfortably engaging the class in discussion. COPA continues to consistently demonstrate its ability to develop thorough training relevant to its policies and procedures. This training addresses the training requirement for ¶460. On January 12, 2023, COPA submitted documentation for the seventh reporting period demonstrating that this training was provided to at least 95% of its staff. With this, COPA reached Secondary compliance.

<div align="center">* * *</div>

The City and the CPD reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward, we will look for the CPD to further develop training relevant to the requirements of this paragraph.

COPA reached Secondary compliance. For Full compliance, we will look for COPA to demonstrate that it has sufficiently implemented its policies and training.

<div align="center">

Paragraph 460 Compliance Progress History

</div>

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

## Paragraph 460 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶461

*¶461 Allegations of misconduct based on verbal abuse will be preliminarily investigated to determine whether it is appropriate to continue the investigation. Anonymously submitted misconduct allegations will be preliminarily investigated to determine whether it is appropriate to continue the investigation, in accordance with the applicable collective bargaining agreements in effect at the time of the allegation is made.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (NEW) |

The City and the CPD reached Preliminary compliance with ¶461 in the seventh reporting period. COPA reached Full compliance with ¶461. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶461, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[4] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, the IMT reviewed various sources to determine whether the City, the CPD, and COPA have sufficiently implemented their policies and training.

---

[4] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

Previously, the CPD produced BIA Unit Directives that partially addressed the requirements of ¶461, such as the *Assignment of Administrative Log Number Investigations* Unit Directive. In addition, the CPD produced S08-01-01, *Conducting Log Number Investigations* for review in the fifth reporting period. Neither the Unit Directives nor S08-01-01 were finalized by the end of the fifth reporting period. In the sixth reporting period, the CPD submitted multiple revised versions of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations.*[5] Sections III.C–D of the policy addressed the requirements of ¶461. On June 30, 2022, the last day of the reporting period, the CPD submitted a further revised version. Therefore, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

In the fourth reporting period, COPA produced, revised, and finalized its *Intake* policy and *Fact Gathering and the Investigative Process* policy. This moved COPA into Preliminary compliance. In the fifth reporting period, COPA reached Secondary compliance by providing materials for its training *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021*. This lesson plan properly trained on the requirements set out in ¶461 and was presented to at least 95% of COPA's personnel. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶461.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided a revised version of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*. This policy completely addresses the requirements of ¶461. The IMT submitted no-objection notices to S08-01-04 in August and September 2022. With this, the CPD reached Preliminary compliance.

COPA reached Full compliance in the seventh reporting period. On December 16, 2022, COPA provided screenshots of its data dashboard demonstrating the number of verbal abuse and anonymous complaints it received via Intake. While this information is important and helpful to understand the numbers of these complaints received through Intake, it would be helpful to understand the numbers received specific to this current year to better understand all complaints received, investigated, and adjudicated.

*** 

---

[5]    S08-01-04 includes information that was previously included in the BIA Directive *Initial Responsibilities in Assigned Log Number Investigations*, to which the IMT submitted a no-objection notice on October 14, 2021.

The City and the CPD reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph. For COPA, we look forward to receiving additional information related to ¶461 efforts to ensure COPA sufficiently implemented its policies and training of policies that were completed in previous reporting periods. Specifically, we look forward to COPA revising their data dashboard to illustrate the number of complaints that are received and adjudicated year by year.

### Paragraph 461 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶462

**462.** *A signed complainant affidavit will not be required to conduct a Preliminary investigation.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[6] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not in Compliance* |

The CPD made efforts toward but did not ultimately reach Secondary compliance with this paragraph. COPA made efforts toward but did not reach Full compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶462, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[7] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, the IMT reviewed various sources to determine whether the City, the CPD, and COPA have sufficiently implemented their policies and training.

---

[6]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[7]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD produced various draft policies relevant to ¶462. In the fifth reporting period, the CPD submitted Special Order S08-01-01, *Conducting Log Number Investigations*, which addressed the requirements of ¶462. S08-01-01 remained in the collaborative review process at the end of the fifth reporting period. In addition, the CPD revised and finalized General Order G08-01, *Complaint and Disciplinary System*.[8] This moved the CPD into Preliminary compliance. In the sixth reporting period, the CPD made dual efforts relevant to ¶462: drafting and revising S08-01-05, and providing draft BIA eLearning materials.

COPA reached Preliminary compliance in the fourth reporting period by finalizing its Policy 3.1.1, *Intake*, which covers the requirements of ¶462. In the fifth reporting period, COPA submitted for review materials for a training titled *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021*. The lesson plan properly trained on the requirements in ¶462, and the training was administered to 99% of COPA's staff, allowing COPA to achieve Secondary compliance. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶462.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶462. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[9]

Additionally, this reporting period, the CPD produced a revised draft of G08-01, *Complaint and Disciplinary System*. Section IV.H.2 addresses ¶462 by clearly stating that a signed affidavit is not required to conduct a preliminary investigation into a complaint.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶462. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review with a

---

[8]  The CPD previously submitted this General Order as *Complaint and Disciplinary Procedures*.

[9]  To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

different combination of Consent Decree paragraphs, including ¶462. The latest draft of this training addresses the requirements of ¶462. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

COPA, this reporting period, provided the *Complaint Register Training* for review. The training addresses the requirements of ¶462 by explaining a preliminary investigation. The IMT submitted a no-objection to the materials for this training on November 15, 2022 and noted that it is an excellent training that provides thorough instruction, effective instructor notes, and helpful illustrations that encourage class participation.

*** 

Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. Additionally, we will look for the CPD to further revise and develop the BIA Onboard Training. For COPA, we will look for evidence that COPA has sufficiently implemented its policies and training per the requirements of this paragraph.

### Paragraph 462 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶463

***463.*** *The City, CPD, and COPA will ensure that, within 30 days of receiving a complaint, COPA, BIA, and Accountability Sergeants initiate and make reasonable attempts to secure a signed complainant affidavit, including in-person visits, phone calls, and other methods. Such attempts will reasonably accommodate the complainant's disability status, language proficiency, and incarceration status. a. If COPA, BIA, or the Accountability Sergeant is unable to obtain a signed complainant affidavit despite having made reasonable attempts to do so, COPA or BIA (for investigations conducted by both BIA and Accountability Sergeants) will assess whether the evidence collected in the Preliminary investigation is sufficient to continue the investigation. b. If the Preliminary investigation reveals objective verifiable evidence suggesting it is necessary and appropriate for the investigation to continue, BIA (for investigations conducted by BIA and Accountability Sergeants) will seek written approval for an override affidavit executed by the Chief Administrator of COPA, and COPA (for investigations conducted by COPA) will seek written approval for an override affidavit executed by the Chief of BIA. c. The Chief Administrator of COPA or the Chief of BIA will provide an override affidavit if there is objective verifiable evidence suggesting it is necessary and appropriate, and in the interests of justice, for the investigation to continue.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City, the CPD, and COPA reached Preliminary compliance with ¶463 in the seventh reporting period. COPA also made significant efforts toward Secondary compliance but did not reach it this reporting period.

To evaluate Preliminary compliance with ¶463, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[10] To evaluate Secondary compliance, the

---

[10]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and*

IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD produced for review several draft policies that relate to ¶463's requirements. This included draft BIA Unit Directives: *Conduct of Investigation; Sworn Affidavits and Sworn Affidavit Overrides*, *Complainant Communication Procedures and Timelines* policy, the *Conduct of Investigations: Initial Responsibilities*, and *The Assignment of Log Number Investigations*. These policies were never finalized in accordance with the Consent Decree. In the fifth reporting period, the CPD produced Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addresses the main paragraph of ¶463 and subparagraphs (a) and (b). The CPD posted the Special Order for public comment and, on the last day of the reporting period, finalized the Special Order. In addition, the CPD produced S08-01-01, *Conducting Log Number Investigations*, which addresses the main paragraph of ¶463 and subparagraphs (a)–(c). This policy was not finalized by the end of the fifth reporting period. In the sixth reporting period, the CPD submitted multiple revised versions of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*, which provided instruction related to the main paragraph of ¶463 and subsections (a)–(b). Upon review, we suggested that the CPD include language relevant to ¶463's instruction that investigators will make reasonable attempts to secure a signed affidavit. In addition, the CPD submitted S08-01-05, *Conducting Log Number Investigations*,[11] which spoke to the requirements of ¶463(c). These policies remained in the collaborative review and revision process at the end of the sixth reporting period.

In the fifth reporting period, COPA submitted for review COPA 3.1.4, *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement*, which addresses the main paragraph of ¶463 and subparagraphs (a) and (c). However, the policy only partially addressed ¶463(b). The policy remained in the collaborative review and revision process at the end of the fifth reporting period. Therefore, COPA did not reach Preliminary compliance with ¶463. COPA also provided materials for its training titled *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021* lesson plan, which addressed all requirements of ¶463 and was presented to at least 95% of COPA's personnel. In the sixth reporting period, the City and COPA provided the IMT with a further revised version of the policy *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement*. COPA revised this policy such that

---

*Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[11]  In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05.

it meets all requirements of ¶463 and its subparagraphs, however it had not been finalized by the end of the reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided a revised version of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*. This policy completely addresses the requirements of ¶463. The IMT submitted no-objection notices to S08-01-04 in August and September 2022. The City and the CPD also provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy completely addresses the requirements of ¶463(c). The IMT submitted no-objection notices to S08-01-05 in September and October 2022. With this, the CPD reached Preliminary compliance.

The CPD also provided an Annual Report and quarterly reports that speak to the requirements of this paragraph. The CPD's BIA 2021 Annual Report makes reference to the requirements of this paragraph and how the SAFE-T Act impacts the affidavit and affidavit override but does not fully address the requirements of ¶463(a) and (c). The BIA 2022 Quarters 1, 2, and 3 Reports reference ¶463, but do not fully meet the requirements of these paragraphs.

This reporting period, COPA provided a revised version of its *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement*. The revised policy addresses the requirements of the main paragraph of ¶463 and its subparagraphs (a), (b), and (c). The IMT submitted two no-objection notices in September 2022. COPA provided a finalized version of this policy. With this, COPA reached Preliminary compliance.

COPA also provided *Complaint Register* In-Service training materials, which address the requirements of the main paragraph of ¶463 and its subparagraphs (a), (b), and (c). The IMT submitted a no-objection notice to these training materials in November 2022. COPA will provide this training in the next reporting period.

\*\*\*

The City, the CPD, and COPA reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward, we will look for the entities to develop training relevant to the requirements of this paragraph.

## Paragraph 463 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

## Accountability and Transparency: ¶464

*464. In the course of conducting thorough and complete misconduct investigations, COPA, BIA, and the districts will: a. take all reasonable steps to promptly identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including officer-recorded audio or video taken with body-worn cameras or other recording devices; b. take all reasonable steps to locate and interview all witnesses as soon as feasible, including non-CPD member witnesses, and attempt to interview any complainant or witness in-person at a time and place that is convenient and accessible for the complainant or witness, when feasible; c. determine whether there are any other open administrative investigations involving the same involved member, and monitor or combine the investigation(s), as appropriate; d. audio record non-CPD member interviews subject to the interviewee's consent, or promptly prepare summaries of interviews when the interview is not recorded; e. take all reasonable steps to identify the involved and witness CPD member(s) if the complainant was unable do so; f. determine if there may have been additional misconduct beyond that initially alleged. COPA, BIA, or the district will take all reasonable steps to ensure that such identified misconduct is fully and fairly documented, classified, and investigated; g. as applicable, consider a CPD member's behavior based on the available training records and disciplinary history, including complaints in which allegations were not sustained, as permitted by law and any applicable collective bargaining agreement; and h. identify and take into account known relevant evidence gathered in parallel criminal investigation or criminal or civil litigation, if available.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶464 in the seventh reporting period. COPA reached Secondary compliance with his paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶464, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[12] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD submitted, revised, and ultimately finalized S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addressed ¶464(a), (b), (c), (d), and (f). The CPD also submitted Special Order S08-01-01, *Conducting Log Number investigations*, which addressed all requirements of ¶464, but S08-01-01 was not finalized by the close of the fifth reporting period. The CPD had also produced various BIA Unit Directives relevant to this paragraph in previous reporting periods: BIA's draft *Administrative Misconduct Investigations* Unit Directive; the *Photo Room Operations* policy; and the *Conduct of Investigation: Initial Responsibilities* policy. These Unit Directives were not finalized as necessary to allow the CPD to reach compliance. In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05, *Conducting Log Number Investigations*. The CPD continued to revise this policy throughout the sixth reporting period. This policy remained in the collaborative review and revision process at the end of the sixth reporting period.

---

[12] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

COPA reached Preliminary compliance in the fifth reporting period by submitting, revising, and finalizing its Policies 3.1.2, *Fact Gathering and the Investigative Process*, which addressed most of ¶464 but did not address ¶464(g), and 3.2.1, *Disciplinary and Remedial Recommendations*, which addresses all of ¶464's requirements. In the sixth reporting period, COPA submitted its *Disciplinary and Remedial Recommendation* training materials, which trained on portions of ¶464 requirements.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided a revised version of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*. This policy completely addresses the requirements of ¶464(b) and (c). The IMT submitted no-objection notices to S08-01-04 in August and September 2022. The City and the CPD also provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy addresses the requirements of ¶464(a), (b), (d), (e), (f), (g), and (h). The IMT submitted no-objection notices to S08-01-05 in September and October 2022. With this, the CPD reached Preliminary compliance.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶464. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest draft of this training addresses the requirements of ¶464(a), but as written does not adequately address the other subparagraphs. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

COPA, in the seventh reporting period, provided *Fact Gathering-Evidence Collection* training materials, which addresses the requirements of ¶464 and all of its subparagraphs. The IMT submitted a no-objection to these training materials on September 30, 2022. The IMT virtually attended the *Fact Gathering-Evidence Collection* training delivered to COPA in-service staff on December 13, 2022. The training followed the lesson plan and the slide presentation allowed the instructor to provide specific detail without reading from the slides. The instruction was clear and engaging. The instructor was well-prepared, knowledgeable in the subject matter, and was able to effectively draw from personal experience to illustrate specific points in the lesson plan while comfortably engaging the class in discussion. COPA continues to consistently demonstrate its ability to develop thorough training relevant to its policies and procedures. This training addresses the training requirement for ¶464. COPA submitted documentation demonstrating that this

training was provided to at least 95% of its staff. With this, COPA reached Secondary compliance.

*\*\**

The City and the CPD reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph.

COPA reached Secondary compliance. For Full compliance, we will look for COPA to demonstrate that it has sufficiently implemented its policies and training.

### Paragraph 464 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Accountability and Transparency: ¶465

*465. When conducting an administrative interview of any CPD member, COPA, BIA, and the districts will: a. ask the identity of other persons with whom he or she has communicated regarding the incident in question, and the date, time, place, and content of such communication, subject to any evidentiary privilege recognized under Illinois or federal law; b. ask whether he or she has reviewed any audio or video footage of the incident in question, and, if so, the date, time, and place the video or audio was reviewed; c. ask whether he or she is aware of any media or social media coverage of the incident in question, and, if so, the content and source of such known media coverage; d. note on the record of the interview anytime the CPD member seeks or obtains information from his or her legal or union representative, as well as the length of any "off the record" discussion between the CPD member and his or her legal or union representative and ensure that the CPD member's counsel or representative does nothing to disrupt or interfere with the interview; e. document, and make part of the investigative file, all requests made on behalf of a CPD member to reschedule an interview; and f. audio record all CPD member in-person interviews.*

### Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶465. COPA reached Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶465, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized,

and use clearly defined terms."[13] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD provided BIA's draft *Administrative Misconduct Investigation* Unit Directive, which addressed the requirements of ¶465, but this Unit Directive was not posted for public comment and finalized. In the fifth reporting period, the CPD submitted a draft of Special Order S08-01-01, *Conducting Log Number Investigations*. This draft policy directs action in accordance with all of ¶465's requirements, but at the end of the fifth reporting period, this policy remained in the collaborative review and revision process. Therefore, the CPD had not yet reached Preliminary compliance. In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05, *Conducting Log Number Investigations*, which fully addressed the requirements of ¶465 and its subparagraphs. However, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

In the fifth reporting period, COPA reached Preliminary compliance by submitting, revising, and finalizing Policy 3.1.2(b), *COPA Interviews-Chicago Police Department Members*, which addressed all parts of ¶465. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶465.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy completely addresses the requirements of ¶465 and its subparagraphs. The IMT submitted no-objection notices to S08-01-05 in September and October 2022. With this, the CPD reached Preliminary compliance.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶465. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest draft of this

---

[13] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

training addresses the requirements of ¶465(a)–(f). This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

The CPD also produced a first draft of *BIA Recorder Training*. This training was produced as a compliance record rather than for review per the requirements of ¶641. The training does not meet the requirements of ¶465 and it provides inconsistent and uncoordinated information between the lesson plan and the PowerPoint. The IMT submitted comments to *BIA Recorder Training* in January 2023. As written, the training materials are confusing and difficult to follow due to the lack of correspondence between the Lesson Plan and the PowerPoint presentation slides. The Audio Recorder Training Records submitted with this production indicate that numerous BIA and Accountability Sergeants have already been trained on this material, which causes the IMT to be concerned about the quality of the training received given the current state of the training materials. The IMT is also concerned that this training was provided before submitting the training materials to the IMT for review, per the requirements of ¶641 of the Consent Decree. Going forward, the IMT expects that such training materials will be provided to the IMT and the OAG for review prior to implementation.

This reporting period, COPA provided *Officer Interviews In-Service* training for review, which completely addresses the requirements of ¶465. The training materials provide a complete block of instruction that is thoughtfully prepared. During an IMT Site visit on September 29, 2022, the IMT attended and observed the *Officer Interviews In-Service Training*. Both instructors were prepared, knowledgeable in the course material, and used their experience to highlight specific points and examples in their presentation. The instructors encouraged and received student participation that generated discussion and allowed for other veteran investigators to share their best practices. The IMT continues to commend COPA for its thoughtful and excellent training. COPA submitted documentation demonstrating that this training was provided to more than 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

Additionally, on January 12, 2023, the City submitted a COPA memorandum for the seventh reporting period indicating that COPA produced several examples of interviews with complainants, witnesses, and officers in a variety of investigations; however, the relevant files were not provided until February 3, 2023. Upon review, the examples contained in these files, which reflected investigators' interviews and investigations, met the requirements ¶465 and its subparagraphs, except for subparagraph (e) (instructing COPA to "document, and make part of an investigative file, all requests made on behalf of a CPD member to reschedule an interview").

***

The City and the CPD reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward, we will look for the CPD to further develop training relevant to the requirements of this paragraph. COPA reached Secondary compliance. Moving forward, we will look for COPA to demonstrate that it has sufficiently implemented its policies and training.

### Paragraph 465 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶466

*466. When assessing credibility, COPA, BIA, and the districts will: a. make credibility determinations of statements made by complainants, involved CPD members, and witnesses based on independent, unbiased, and credible evidence, taking into account any known record or final determination of deception or untruthfulness in legal proceedings, administrative investigations, or other investigations; and b. critically evaluate all statements, like any other evidence, giving no automatic preference to, or discounting, any statement solely due to its source, including statements made by CPD members.*

## Compliance Progress   (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |

The City and the CPD reached Preliminary compliance with ¶466. COPA maintained Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶466, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[14] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, the IMT reviewed various sources to determine whether the City, the CPD, and COPA have sufficiently implemented their policies and training.

---

[14] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD provided a draft of S08-01-01, *Conducting Log Number Investigations*, which spoke to the requirements of ¶466(a) and (b). This policy remained in the collaborative review and revision process at the end of the fifth reporting period, and therefore, the CPD did not reach Preliminary compliance. In addition, in past reporting periods, the CPD submitted BIA's *Administrative Misconduct Investigations* Unit Directive that sought to address the requirements of ¶466. We submitted a no-objection notice to BIA's *Administrative Misconduct Investigation* Unit Directive in July 2021.[15] However, the directive was not posted for public comment by the end of the reporting period. In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05, *Conducting Log Number Investigations*. The CPD submitted multiple revised drafts of S08-01-05, which completely addressed the requirements of ¶466. However, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

In the fourth reporting period, COPA provided its Policy 3.1.3 *Final Summary Report*, which addressed ¶¶466(a) and (b) in detail and exceeded the requirements of this paragraph. This allowed COPA to achieve Preliminary compliance. In the fifth reporting period, COPA provided materials for the *Witness Reliability: In Service Training*, which completely addressed ¶446. By presenting the *Witness Reliability: In Service Training* to at least 95% of its personnel, COPA reached Secondary compliance. In the sixth reporting period, COPA produced three sample Final Summary Reports (also known as FSRs) for review. In addition to providing these samples we noted that COPA posted Final Summary Reports from 2017 through 2022 on its website. We reviewed the three samples provided by COPA and others on its website. These reports demonstrate that COPA is following the requirements of ¶466 and its related policies and training. Additionally, we commended COPA for publishing this information on its website—an action not required by the Consent Decree. This demonstrates COPA's continued commitment to transparency and improving community rapport and trust.

---

[15] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy completely addresses the requirements of ¶466 (a) and (b). The IMT submitted no-objection notices to S08-01-05 in September and October 2022. With this, the CPD reached Preliminary compliance.

This reporting period, COPA provided *Officer Interviews In-Service* training for review, which completely addresses the requirements of ¶466(a) and (b). The training materials provide a complete block of instruction that is thoughtfully prepared. During an IMT Site visit on September 29, 2022, the IMT attended and observed the *Officer Interviews In-Service Training*. Both instructors were prepared, knowledgeable in the course material, and used their experience to highlight specific points and examples in their presentation. The instructors encouraged and received student participation that generated discussion and allowed for other veteran investigators to share their best practices. The IMT continues to commend COPA for their thoughtful training. COPA submitted documentation demonstrating that this training was provided to more than 95% of COPA's staff by the end of the seventh reporting period.

<p style="text-align:center">***</p>

The City and the CPD reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph. COPA maintained Full compliance. Moving forward we will look for evidence that COPA continues to make credibility determinations through thorough investigations per the requirements of ¶466.

### Paragraph 466 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |

## Paragraph 466 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| None | None | None |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

## Accountability and Transparency: ¶467

> ***467.*** *For each allegation associated with a misconduct investiga-*
> *tion, COPA, BIA, or the districts will explicitly identify and recom-*
> *mend one of the following findings: a. "Sustained," where it is*
> *determined the allegation is supported by a preponderance of*
> *the evidence; b. "Not Sustained," where it is determined there is*
> *insufficient evidence to prove the allegations by a preponder-*
> *ance of the evidence; c. "Unfounded," where it is determined, by*
> *clear and convincing evidence, that an allegation is false or not*
> *factual; or d. "Exonerated," where it is determined, by clear and*
> *convincing evidence, that the conduct described in the allegation*
> *occurred but is lawful and proper.*

### Compliance Progress            (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[16] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Under Assessment* |

The CPD maintained Preliminary compliance with ¶467 in the seventh reporting period. COPA reached Secondary compliance and remains Under Assessment for Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶467, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[17] To evaluate Secondary compliance, the

---

[16]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[17]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and*

IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, we determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Seventh Reporting Period*

The CPD reached Preliminary compliance with ¶467 in the fifth reporting period, when it posted for public comment and finalized General Order G08-01, *Complaint and Disciplinary System*. G08-01 addresses all requirements of ¶467, including those enumerated in the subparagraphs. The CPD also provided in previous reporting periods BIA's draft *Administrative Summary Report* Unit Directive which spoke to the mandates of ¶467.[18] In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review, however these materials were still in draft state at the end of the sixth reporting period.

COPA reached Preliminary compliance with ¶467 in the fourth reporting period when it finalized Policy 3.1.3, *Final Summary Report*. COPA had not provided evidence of efforts toward Secondary compliance with ¶467 by the end of the fifth reporting period. In the sixth reporting period, COPA provided samples of its Final Summary Reports (also known as FSRs), which can also be found on COPA's website. There readers can locate cases by log number and read about the allegations made, the investigation, and the disposition.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶467. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest draft addresses the requirements of ¶467 and its subparagraphs. For further discussion of the BIA Onboard Training, see ¶526–27.

---

*Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[18] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

Although the CPD had previously produced draft BIA eLearning Training materials for review with this paragraph in the sixth reporting period, the CPD did not produce revised versions of these training materials for review with ¶467 this reporting period and did not designate the training materials as meeting the requirements of this paragraph.

Additionally this reporting period, the CPD provided a revised G08-01-01, *Complaint and Disciplinary Definitions*, which provides a more thorough definition for each of the findings that indicates a finding is assigned to each allegation and not a complaint. CPD also provided a revised G08-01, *Complaint and Disciplinary System*. Section IV.V.1.b–e addresses ¶467(a)–(d) by defining the findings that an investigation will determine.

Also in the seventh reporting period, COPA provided *Final Summary Reports and Standard of Proof* training materials. These training materials address ¶467. The IMT virtually attended this training and the instructor appeared to be a subject matter expert in this area of the training. The instructor was clearly prepared for the presentation and the training delivery was seamless. COPA continues to demonstrate its ability to develop thorough and relevant training from its policies and procedures. COPA submitted documentation demonstrating that this training was provided to at least 95% of COPA's staff. With this, COPA reached Secondary compliance.

Additionally, COPA provided a memorandum with documentation that included a breakdown of closed cases including the allegations, number and type of allegations, and findings, per the requirements of ¶467. COPA remains Under Assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

*** 

The CPD maintained Preliminary compliance. Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. We will also look for the CPD to further revise the BIA Onboard Training materials.

COPA reached Secondary compliance and remains under assessment for Full compliance.

## Paragraph 467 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Status Update

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

## Accountability and Transparency: ¶468

*468. COPA, BIA, and the districts will ensure that investigators do not: a. ask leading questions that suggest legal justifications for the CPD member's conduct during interviews of witnesses, complainants, or the involved CPD member; b. make statements that could discourage a CPD member or non-CPD member witness from providing a full account of the specific allegations; c. close an administrative investigation solely because of findings in a related criminal proceedings; d. consider findings in a related criminal investigation to solely determine whether a CPD member engaged in misconduct; e. disregard a witness's statement solely because the witness has some connection to either the complainant or the CPD member or because the witness or complainant has a criminal history; or f. close an investigation solely because the complainant seeks to withdraw the complaint or is unavailable, unwilling, or unable to cooperate with an administrative investigation. If the complainant is unable or unwilling to provide information beyond the initial complaint, the administrative investigation will continue based on the available evidence in accordance with this Agreement, applicable law, and any applicable collective bargaining agreements.*

### Compliance Progress   (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶468 in the seventh reporting period. COPA reached Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶468, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[19] To evaluate Secondary compliance, the

---

[19]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and*

IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD provided BIA's *Administrative Misconduct Investigation* Unit Directive, which was thorough and instructed compliance with all of ¶468's requirements. However, this Unit Directive was never finalized as required to achieve Preliminary compliance.[20] In the fifth reporting period, the CPD submitted a draft of Special Order S08-01-01, *Conducting Log Number Investigations*. This draft Special Order addressed the requirements of ¶468 and all of its subparagraphs, but it remained in the collaborative review and revision process at the end of the fifth reporting period. In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05, *Conducting Log Number Investigations.* The CPD submitted multiple revised versions of S08-01-05 throughout this reporting period, which addressed ¶468 and its subparagraphs. However, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

COPA reached Preliminary compliance with ¶468 in the fifth reporting period, when it finalized two policies that together mandate compliance with the requirements ¶468: Policy 3.1.2, *Fact Gathering and the Investigative Process;* and Policy 3.1.2(b), *Interviews – Chicago Police Department Members*. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶468.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy completely addresses the requirements of ¶468 and its subparagraphs. The IMT submitted no-objection notices to S08-01-05 in September and October 2022. With this, the CPD reached Preliminary compliance.

---

*Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[20] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

This reporting period, COPA provided *Officer Interviews In-Service* training for review, which completely addresses the requirements of ¶468(a) and (b). The training materials provide a complete block of instruction that is thoughtfully prepared. During an IMT Site visit on September 29, 2022, the IMT attended and observed the *Officer Interviews In-Service Training*. Both instructors were prepared, knowledgeable in the course material, and used their experience to highlight specific points and examples in their presentation. The instructors encouraged and received student participation that generated discussion and allowed for other veteran investigators to share their best practices. The IMT continues to commend COPA for its thoughtful training. COPA submitted documentation demonstrating that this training was provided to more than 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

Additionally, COPA provided *Fact Gathering-Evidence Collection* training materials, which addresses the requirements of ¶468. The IMT submitted a no-objection notice to these training materials on September 30, 2022. The IMT virtually attended the *Fact Gathering-Evidence Collection* training delivered to COPA In-Service staff on December 13, 2022. The training followed the lesson plan, and the slide presentation allowed the instructor to provide specific detail without reading from the slides. The instruction was clear and engaging. The instructor was well-prepared, knowledgeable in the subject matter, and was able to effectively draw from personal experience to illustrate specific points in the lesson plan while comfortably engaging the class in discussion. COPA continues to consistently demonstrate its ability to develop thorough training relevant to its policies and procedures. COPA submitted documentation demonstrating that this training was provided to more than 95% of COPA's staff by the end of the seventh reporting period, thereby meeting Secondary compliance.

Additionally, on January 12, 2023, the City submitted a COPA memorandum for the seventh reporting period indicating that COPA produced several examples of interviews with complainants, witnesses, and officers in a variety of investigations; however, the relevant files were not provided until February 3, 2023. Upon review, the examples contained in these files, which reflected investigators' interviews and investigations, met the requirements ¶468(a), (b), (d), and (e).

<div align="center">***</div>

The City and the CPD reached Preliminary compliance with ¶468 in the seventh reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph.

COPA reached Secondary compliance. Moving forward, we will look for COPA to demonstrate that it has sufficiently implemented its policies and training.

## Paragraph 468 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Accountability and Transparency: ¶469

**469.** *The City, COPA, and CPD recognize the negative impact of actual bias or the appearance of bias on the legitimacy of administrative investigations. For that reason, conflicts of interest in administrative investigations will be identified and prohibited. The City, COPA, and CPD will ensure the following: a. COPA, BIA, and district personnel will not be assigned to conduct any investigation that could create a conflict of interest; b. an investigation may not be conducted by any supervisor or CPD member who allegedly authorized, engaged in conduct that led to, witnessed, or otherwise allegedly participated in the incident giving rise to the complaint, or who has a conflict of interest as defined by CPD policy or this Agreement. No such person may participate in making any disciplinary recommendations with respect to the investigation; c. no CPD member who has an external business relationship or close personal relationship with an involved CPD member or witness in an administrative investigation will conduct or review the administrative investigation. No such person may participate in making any disciplinary recommendations with respect to the misconduct investigation including in the determination of any applicable grievance or appeal arising from any discipline; and d. no CPD member will participate in making any disciplinary decisions or recommendations with respect to any person to whom he or she directly reports to in his or her chain of command. In cases where CPD is unable to meet this requirement, the investigation must be transferred to OIG.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶469 in the seventh reporting period. COPA maintained Preliminary compliance with this paragraph.

To evaluate Preliminary compliance with ¶469, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution,

workout, and public comment periods.[21] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD produced a few draft policies that relate to the requirements of ¶469. In the fifth reporting period, the CPD provided a draft of BIA's Unit Directive, *Initial Responsibilities in Assigned Log Number Investigations*, and draft of BIA's Unit Directive, *Conflicts of Interest*.[22] Together these draft Unit Directives addressed the requirements of this paragraph, but these Unit Directives were never posted for public comment and finalized as is required to achieve Preliminary compliance. In addition to these Unit Directives, the CPD submitted, revised, publicly posted, and finalized General Order G08-01-03, *Conflict of Interest*. The finalization of G08-01-03 did not move the CPD into Preliminary compliance, though, because while it addressed the requirements of ¶469(a), (c), and (d), G08-01-03 did not cover the requirements of ¶469(b). In the sixth reporting period, the CPD did not provide any additional policies related to ¶469. The IMT noted that the CPD would need to include ¶469(b)'s requirements in policy to reach Preliminary compliance with this paragraph. Although finalized policies did not yet cover all of ¶469's requirements, the CPD began working on developing training relevant to ¶469. The CPD submitted draft BIA eLearning materials which were still in draft state and not in final presentation form at the end of the reporting period.

COPA reached Preliminary compliance with ¶469 in the fifth reporting period by finalizing its *Conflict of Interest and Recusal* Policy, which addressed all requirements of ¶469. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶469.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided a revised version of G08-01-01, *Complaint and Disciplinary Definitions*. This policy completely addresses the

---

[21] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[22] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

requirements of ¶469. The IMT submitted a no-objection notice to G08-01-01 in December 2022. Additionally, the City and the CPD provided a revised version of G08-01-03, *Conflict of Interest.* This policy addresses the requirements of ¶469 and specifically addresses the requirements of ¶469(b) and (d). With these efforts, the CPD reached Preliminary compliance.

Additionally this reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶469(a), (b), (c), and (d). On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning, but the CPD did not designate the evidence of training as meeting the requirements of this paragraph. Further, on January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[23]

The CPD also produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶469. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review with a different combination of Consent Decree paragraphs, including ¶469. The latest draft of this training does not adequately address the requirements of this paragraph. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

In the seventh reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶469.

<center>***</center>

The City and the CPD reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward, we will look for the CPD to revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. To achieve Secondary compliance, the CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. We will also look for the CPD to further revise and develop the BIA Onboard Training.

---

[23]  To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

For COPA, we look forward to reviewing training materials instructing compliance with ¶469 and COPA's relevant policies.

### Paragraph 469 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶470

> **470.** *The City will ensure that COPA arrives at the investigative findings and recommendations within 180 days of the initiation of the investigation. Any request for an extension of time must be approved in writing by the Chief Administrator of COPA, or his or her designee, who must provide a short explanation of the reason(s) for granting or denying the extension.*

## Compliance Progress

(Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and COPA maintained Preliminary compliance with ¶470.

To evaluate Preliminary compliance with ¶470, the IMT reviewed COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[24] To evaluate Secondary compliance, the IMT reviewed COPA's training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In the fourth reporting period, COPA produced for review and finalized Policy 3.2.2, *Timeliness Benchmarks*. This policy completely covers the requirements of ¶470 and brought COPA into Preliminary compliance. COPA did not produce evidence of steps toward Secondary compliance with ¶470 in the fifth reporting period. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶470.

*Progress in the Seventh Reporting Period*

COPA did not produce any materials for review with ¶470 this reporting period and therefore did not reach Secondary compliance.

\*\*\*

---

[24] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

We look forward to reviewing training materials instructing compliance with ¶470 and COPA's relevant policies, as well as reviewing data in the coming reporting periods that shows the number and percentage of cases for which COPA arrived at investigative findings and recommendations within 180 days of the initiation of the investigation, and the number and percentage of cases for which COPA missed the 180-day timeline. Additionally, we would like to see data indicating the number of extensions requested by COPA.

### Paragraph 470 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶471

*471. The City and CPD will ensure that BIA arrives at the investigative findings and recommendations within 180 days of the initiation of the investigation. Any request for an extension of time must be approved in writing by the Chief of BIA or his or her designee.*

**Compliance Progress**  (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD made efforts toward but did not ultimately reach Secondary compliance with ¶471 in the seventh reporting period.

To evaluate Preliminary compliance with ¶471, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD reached Preliminary compliance with ¶471 when it revised, submitted for public comment, and finalized Special Order S08-01, which fully addressed ¶471. The CPD also produced BIA's *2020 Audit* in the fifth reporting period, which recognized that the CPD was not yet in operational compliance with the requirements of ¶471. We appreciated the honest self-assessment present in the *2020 Audit* and overall believed the *2020 Audit* was well done. We noted, however, that the *2020 Audit* was produced several months too late and encouraged the CPD to compile and produce these audits in a timelier manner not only for purposes of demonstrating compliance, but also to allow the CPD to identify areas on which it needs to focus its efforts and attention. In the sixth reporting period, the City and the CPD provided drafts of Special Order S08-

01-02, *Investigation Timelines and Benchmarks*.[25] This policy addressed the requirements of ¶471.[26] Thereafter, the City and the CPD provided a revised draft of S08-01-02 that removed important language from the policy, and we pointed this out. This policy remained in the collaborative review and revision process at the end of the sixth reporting period. The CPD also submitted Special Order S08-01-06, *Supervisor Responsibilities in Log Number Investigations*. But when this Special Order was submitted, the CPD indicated that this Special Order was not submitted "to demonstrate compliance with Consent Decree paragraphs, and the CPD is not seeking review of this policy at this time." Nonetheless, we reviewed the policy and provided comments on June 15, 2022, expressing our desire to receive a final draft of this policy for review under ¶627. We observed that Section IV.A.10 of the draft policy reinforces the principles of ¶471.

Beyond draft policies, the CPD also submitted draft BIA eLearning materials for review. These materials were still in draft state at the end of the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶471. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest version of this training does not adequately address the requirements of this paragraph. This training is still

---

[25] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Investigative Timelines and Benchmarks* Unit Directive into S08-01-02. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

[26] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

under development. For further discussion of the BIA Onboard Training, see ¶526–27.

Although the CPD had previously produced draft BIA eLearning Training materials for review with this paragraph in the sixth reporting period, the CPD did not produce revised versions of these training materials for review with ¶471 this reporting period and did not designate the training materials as meeting the requirements of this paragraph.

<div align="center">***</div>

We look forward to reviewing training materials instructing compliance with ¶471 and CPD's relevant policies, as well as reviewing data in the coming reporting periods that shows the number and percentage of cases for which BIA arrived at investigative findings and recommendations within 180 days of the initiation of the investigation, and the number and percentage of cases for which BIA missed the 180-day timeline. Additionally, we would like to see data indicating the number of extensions requested by BIA.

### Paragraph 471 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶472

**472.** *The City and CPD will ensure that the districts arrive at the investigative findings and recommendations within 90 days of the initiation of an investigation. Any request for an extension of time must be approved in writing by the appropriate District Commander.*

**Compliance Progress**     (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and CPD made efforts toward but did not ultimately reach Secondary compliance with this paragraph in the seventh reporting period.

To evaluate Preliminary compliance with ¶472, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed the CPD's training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD reached Preliminary compliance by revising, submitting for public comment, and finalizing Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which fully addressed ¶472.[27] The CPD also produced BIA's *2020 Audit*, in which the CPD recognized that CPD was not yet in a place to reach operational compliance because the Case Management System did not yet have a field for the appropriate District Commander to approve requests for extensions of time in writing. We appreciated the CPD's honest self-assessment and encouraged the CPD to continue to produce high-quality audits, but in a more timely manner, not only for purposes of demonstrating compliance, but also to allow the CPD to identify areas in which it needs to focus its efforts and attention.

---

[27] In earlier reporting periods, the CPD had also produced a draft BIA Unit Directive, *Case Management System*. In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in the sixth reporting period. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

The IMT also reviewed BIA Unit Directive, *Case Management System*, but this directive only partially addressed the requirements of ¶472 and remained in the collaborative review and revision process at the end of the fourth reporting period. The CPD also submitted training materials toward Secondary compliance, but the training provided lacked detail and was in need of further revision. In the sixth reporting period, the CPD provided drafts of S08-01-02, *Investigation Timelines and Benchmarks*. However, at the end of the reporting period, the policy remained in the collaborative review and revision process. Additionally, the CPD submitted draft BIA eLearning materials for review in the sixth reporting period, but they remained in draft state at the end of the reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶472. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[28]

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶472. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest draft of this training does not adequately address the requirements of this paragraph. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

<p style="text-align:center">***</p>

Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. We will also look for the CPD to further develop and revise the BIA Onboard Training. Additionally, we look forward to reviewing data in the coming reporting periods that shows the number and percentage of cases for which Accountability Sergeants arrived at investigative findings and recommendations within 180 days of

---

[28]   To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

the initiation of the investigation, and the number and percentage of cases for which Accountability Sergeants missed the 180-day timeline. Additionally, we would like to see data indicating the number of extensions requested by Accountability Sergeants.

### Paragraph 472 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶473

> **473.** *The City will ensure that if COPA does not arrive at the in-vestigative findings and recommendations within 180 days, the Chief Administrator of COPA, or his or her designee, will notify, within five days after the end of the 180-day period, the Mayor or his or her designee, the Superintendent, the Chairman of the City Council Committee on Public Safety, the complainant or his or her representative, and the involved CPD member, or his or her counsel (unless such notification would compromise the in-tegrity of the investigation). Such notification will include the reasons the administrative investigation has not concluded within 180 days. COPA will update such notice every 180 days until the administrative investigation is completed.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and COPA reached Secondary compliance with ¶473 in the seventh reporting period.

To evaluate Preliminary compliance with ¶473, the IMT reviewed COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[29] To evaluate Secondary compliance, the IMT reviewed COPA's training development, implementation, and evaluation (¶286), and the development of a notification system to make notifications to the persons and entities designated by this paragraph.

*Progress before the Seventh Reporting Period*

In the fourth reporting period, COPA provided for review Policy 3.2.2, *Timeliness Benchmarks*. This policy completely addressed the requirements for ¶473. This policy was finalized at the end of the previous reporting period, which allowed COPA to achieve Preliminary compliance. COPA did not produce evidence of steps toward Secondary compliance with ¶473 in the fifth reporting period. In the sixth

---

[29] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

reporting period, COPA again did not produce any information related to compliance, however the IMT was aware that COPA was working toward producing its *Information Systems* standard operating procedure in the future to move COPA toward Secondary compliance.

*Progress in the Seventh Reporting Period*

This reporting period, COPA provided guidance on *Investigative Correspondence*, which explains that COPA has designed its Case Management System (CMS) to automatically provide the appropriate notifications to the Mayor, the CPD Superintendents, the City Council Public Safety Chairman, the complainant, and the involved CPD member. The notifications include the reasons that COPA's investigation remains in an open status and occur automatically and consistently. The guidance document explains that the notifications are made via CMS to reduce the potential for human error.

\*\*\*

COPA reached Secondary compliance with ¶473. Moving forward, we will look for evidence and a demonstration that COPA has sufficiently implemented its notification system to comply with ¶473's mandates.

### Paragraph 473 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Accountability and Transparency: ¶474

> ***474.*** *CPD will ensure that if BIA does not arrive at the investigative findings and recommendations within 180 days, or an Accountability Sergeant does not arrive at the investigative findings and recommendations within 90 days, BIA will notify, within five days of the end of the designated timeframe, the complainant or complainant representative, and the involved CPD member, or his or her counsel (unless such notification would compromise the integrity of the investigation). Such notification will include the reasons for the inability to complete the administrative investigation within the designated timeframe. BIA or the Accountability Sergeant will update such notice every 90 days until the administrative investigation is completed.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The CPD made efforts toward but did not ultimately reach Secondary compliance with this paragraph in the seventh reporting period.

To evaluate Preliminary compliance with ¶474, the IMT reviewed CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed the CPD's training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD reached Preliminary compliance by finalizing Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addressed ¶474 in Sections V.2 and V.3. The CPD also produced BIA's *2020 Audit*, where the CPD acknowledged that additional work is necessary to reach Full compliance with ¶474. This audit was well done, but we noted that it was released several months too late. We explained that, moving forward, such audits need to be provided in a timelier manner not only for purposes of demonstrating compliance, but also to allow the CPD to identify areas in which it needs to focus its efforts and attention. In the sixth reporting period, the CPD provided revised versions of S08-01, *Complaint and Disciplinary Investigators and Investigations,* and S08-01-02, *Investigation Timelines and Benchmarks.* At the end of the reporting period, it remained in the collaborative review and revision process. Additionally,

the CPD and BIA submitted BIA eLearning materials for review, but these materials remained in draft state at the end of the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶474. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[30]

\*\*\*

Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel.

### Paragraph 474 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

---

[30] To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

# Accountability and Transparency: ¶475

> **475.** *The City and CPD will undertake best efforts to ensure that the identities of complainants are not revealed to the involved CPD member prior to the CPD member's interrogation.*

## Compliance Progress

(Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[31] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶475, while COPA reached Secondary compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶475, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[32] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD reached Preliminary compliance with ¶475 by providing revised drafts of Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addressed the requirements of ¶475. The

---

[31] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[32] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

IMT provided a no-objection notice in December 2021.[33] Thereafter, the CPD posted the S08-01 for public comment and, on the last day of the reporting period, finalized S08-01, moving the CPD into Preliminary compliance. In the sixth reporting period, the CPD did not provide evidence of efforts toward Secondary compliance with this paragraph.

COPA also reached Preliminary compliance with ¶475 in the fifth reporting period by finalizing its Policy 3.1.2(b) *COPA Interviews-Chicago Police Department Members*, which incorporated ¶475's mandate. In the sixth reporting period, COPA did not provide evidence of efforts toward Secondary compliance with this paragraph.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶475. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review with a different combination of Consent Decree paragraphs, including ¶475. The latest draft of this training partially but does not fully address the requirements of this paragraph. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA provided *Officer Interviews In-Service* training for review, which completely addresses the requirements of ¶475. The training materials provide a complete block of instruction that is thoughtfully prepared. During an IMT Site visit on September 29, 2022, the IMT attended and observed the *Officer Interviews In-Service Training*. Both instructors were prepared, knowledgeable in the course material, and used their experience to highlight specific points and examples in their presentation. The instructors encouraged and received student participation that generated discussion and allowed for other veteran investigators to share their best practices. The IMT continues to commend COPA for its

---

[33] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

thoughtful training. COPA submitted documentation demonstrating that this training was provided to more than 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

\*\*\*

Moving forward, we will look for the CPD to provide training materials that include instruction and outline processes to ensure the requirements of ¶475 are put into action. Specifically, we will look for the CPD to further revise the BIA Onboard Training. The CPD will then need to provide their training to 95% of employees to reach Secondary compliance. For COPA related to Full compliance, we will look for COPA to demonstrate that it has sufficiently implemented its policing and training.

### Paragraph 475 Compliance Progress History

| FIRST REPORTING PERIOD SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SECOND REPORTING PERIOD SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | THIRD REPORTING PERIOD MARCH 1, 2020 – DECEMBER 31, 2020 |
|---|---|---|
| COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Status Update | COMPLIANCE PROGRESS: None |
| FOURTH REPORTING PERIOD JANUARY 1, 2021 – JUNE 30, 2021 | FIFTH REPORTING PERIOD JULY 1, 2021 – DECEMBER 31, 2021 | SIXTH REPORTING PERIOD JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: None | COMPLIANCE PROGRESS: Preliminary | COMPLIANCE PROGRESS: Preliminary |
| SEVENTH REPORTING PERIOD JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: Preliminary | | |

# Accountability and Transparency: ¶476

> **476.** The City, CPD, and COPA will require that COPA and BIA supervisors regularly communicate with the investigators under their supervision, including Accountability Sergeants, to evaluate the progress of administrative investigations.

## Compliance Progress　　　(Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[34] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

In the seventh reporting period, the City maintained Preliminary compliance with ¶476.

To evaluate Preliminary compliance with ¶476, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[35] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

Through the efforts of the CPD and COPA, the City reached Preliminary compliance with ¶476 in the fifth reporting period. In the fifth reporting period, the CPD revised and finalized Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. This Special Order incorporates the expectations set out by

---

[34] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[35] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

¶476. Therefore, when the CPD finalized S08-01, it moved into Preliminary compliance. In the sixth reporting period, the CPD produced additional draft policies that were relevant to the requirements of ¶476. Specifically, the City and the CPD provided S08-01-06, *Supervisor Responsibilities in Log Number Investigations*, where multiple sections of the policy addressed the requirements of this paragraph.

COPA had reached Preliminary compliance with this paragraph in the fourth reporting period by finalizing Policy 3.2.2, *Timeliness Benchmarks*. COPA maintained Preliminary compliance in the fifth and sixth reporting periods but did not submit evidence of additional efforts toward Secondary compliance.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD and COPA did not produce any documentation that demonstrated efforts related to ¶476.

\*\*\*

In future reporting periods, we will look for both entities to provide draft training materials that instruct compliance with ¶476 and the entities' relevant policies.

### Paragraph 476 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶477

> ***477.*** *The City and CPD will undertake best efforts to ensure that all complaints, including anonymous complaints, can be the subject of a misconduct investigation.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD)[36] |
| **CPD** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Under Assessment* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶477. COPA reached Secondary compliance and remains Under Assessment for Full compliance.

To evaluate Preliminary compliance with ¶477, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[37] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

---

[36] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[37] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD finalized General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment,* which codified the requirements of ¶477.[38] The CPD also submitted BIA Unit Directives relevant to ¶477: *Requirements of a Complete Investigative File*, and *Administrative Misconduct*.[39] These efforts brought the CPD into Preliminary compliance. In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶477.

In previous reporting periods, COPA provided for review *Anonymous Complaint Guidance*, which addressed the requirements of ¶477. COPA also finalized its Policy 3.1.2 *Fact Gathering and the Investigative Process*, which addressed the requirements of ¶477. These efforts brought COPA into Preliminary compliance with ¶477. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶477.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶477. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest draft of this training does not adequately address the requirements of this paragraph. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA provided *COPA Guidance Processing Anonymous Complaints* that supports ¶477. While this policy alone does not address ¶477, it contributes to the overall obligation with other COPA policies ensuring that all complaints, including anonymous complaints, can be the subject of a misconduct investigation.

---

[38] The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[39] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in the sixth reporting period and is ongoing.

COPA's *Complaint Register Training* addresses the requirements of ¶477. The IMT submitted a no-objection to the materials for this training on November 15, 2022 and noted that it is an excellent training that provides thorough instruction, effective instructor notes, and helpful illustrations that encourage class participation. The training also provides instructive reference to other Consent Decree paragraphs for which COPA is not directly responsible but enhance students' understanding on the complex issue of affidavit overrides and where both COPA and the CPD fit into the affidavit override process. Also in the seventh reporting period, COPA provided *Fact Gathering-Evidence Collection* training materials, which address the requirements of ¶477. The IMT submitted a no-objection to these training materials on September 30, 2022.

The IMT virtually attended the *Fact Gathering-Evidence Collection* training delivered to COPA In-Service staff on December 13, 2022. The training followed the lesson plan and the slide presentation allowed the instructor to provide specific detail without reading from the slides. The instruction was clear and engaging. The instructor was well-prepared, knowledgeable in the subject matter, and was able to effectively draw from personal experience to illustrate specific points in the lesson plan while comfortably engaging the class in discussion. COPA continues to consistently demonstrate its ability to develop thorough training relevant to its policies and procedures. COPA submitted documentation demonstrating that its *Fact Gathering-Evidence Collection* training was provided to at least 95% of COPA's staff. With this, COPA reached Secondary compliance.

Lastly, COPA provided a screenshot of its closed case dashboard to provide proof that COPA requires that verbal abuse and anonymous complaints will be preliminarily investigated to determine whether a full investigation is warranted per the requirements of ¶477. The dashboard screenshots also provided the number of verbal abuse and anonymous complaints COPA received via intake. COPA remains Under Assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

\*\*\*

We look forward to receiving revised training materials from the CPD that will provide instruction on how to comply with ¶477's mandate. For COPA, we will look for COPA to demonstrate that it has sufficiently implemented its policies and training.

## Paragraph 477 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶478

*478. Within 120 days of the Effective Date, CPD and COPA will each review and revise its policies regarding Preliminary investigations, including Preliminary investigations of anonymous complaints, and the process for seeking an override affidavit in the absence of a signed complainant affidavit.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶478 in the seventh reporting period. The City and CPD are no longer Under Assessment for this paragraph. COPA maintained Preliminary compliance with ¶478 in the seventh reporting period.

To evaluate Preliminary compliance with ¶478, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[40] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD and BIA developed a collection of policies that relate to ¶478. The IMT reviewed all relevant policies and provided no-objection notices to several policies, but these policies were not finalized following the process outlined in the Consent Decree.[41] In the fifth reporting period, the CPD

---

[40] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[41] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on

provided revised drafts of Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which only partially addressed the requirements of ¶478. The IMT provided a no-objection notice in December 2021. The CPD posted S08-01 for public comment and, on the last day of the reporting period, finalized the Special Order. Also in the fifth reporting period, the CPD submitted a draft Special Order S08-01-01, *Conducting Log Number Investigations*, for review with paragraph ¶478, but this policy remained in the collaborative review and revision process at the end of the fifth reporting period. In the sixth reporting period, the CPD provided multiple revised versions of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations,* but the policy did not fully address the requirements of the paragraph.

COPA reached Preliminary compliance with ¶478 in the fourth reporting period by developing, revising, and finalizing various policies that instruct compliance with ¶478, such as the *Intake* policy. In the sixth reporting period, COPA further revised its *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement* policy, but it remained in the collaborative review and revision process at the end of the reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*. Although this policy is relevant to the requirements of ¶478, it alone does not address all of the paragraph's requirements. The IMT submitted no-objection notices to S08-01-04 in August and September 2022.

Additionally, the CPD revised and finalized the G08 and S08 Accountability Suites of policies this reporting period. These suites of policies direct preliminary complaints, preliminary investigations, anonymous complaints, and the process for seeking an override affidavit in the absence of an assigned complaint affidavit, and together address the requirements of ¶478. However, the IMT notes that the CPD has not provided a memorandum or official notification which specifically states that the General Orders and Special Orders, as a group, address the requirements of this paragraph, and have instead referred to specific paragraphs within individual policies that do not alone completely address the requirements of ¶478. As the IMT has stated during conferences with the CPD and has noted when reviewing individual policies, the entire group of policies addresses the requirements of this

---

the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

paragraph. With this, CPD reached Preliminary compliance. Because the City and the CPD were Under Assessment in the sixth reporting period for this paragraph and did not reach Preliminary compliance this period, we have removed the Under Assessment status.

This reporting period, COPA provided *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement* Policy for review. This policy addresses the requirements of ¶478 and even provides additional direction not specified by the Consent Decree, including directing COPA to report the anonymous complaint to the Illinois Law Enforcement Training and Standards Board (ILETSB). Additionally, COPA provided Guidance, *Processing Anonymous Complaints*, which addresses the requirements of ¶478 by directing the intake and preliminary investigation of anonymous complaints.

<div align="center">***</div>

The City and the CPD reached Preliminary compliance, and COPA maintained Preliminary compliance. Moving forward, we will look for the CPD and COPA to develop training on their relevant policies.

### Paragraph 478 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Under Assessment |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Accountability and Transparency: ¶479

*479. Within 120 days of the Effective Date, CPD and COPA will each adopt or review and, to the extent necessary, revise its policy establishing investigative timelines, benchmarks, and goals by which the progress of investigations will be measured.*

### Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD reached Preliminary compliance with ¶479. COPA maintained Preliminary compliance with ¶479.

To evaluate Preliminary compliance with ¶479, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[42] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD finalized Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which partially addressed the requirements of ¶479. The CPD also submitted a draft Special Order S08-01-01, *Conducting Log Number Investigations*, which remained in the collaborative review and revision process at the end of the reporting period. Before the fifth reporting period, the CPD had also provided a draft BIA Unit Directive, *Investigative Timelines and Benchmarks*, which instructed compliance with ¶479. We submitted a no-objection notice to this Unit Directive, but the CPD and BIA did not finalize this

---

[42] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

Unit Directive by the end of the fifth reporting period.[43] In the sixth reporting period, the CPD submitted multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, as well as S08-01-02, *Investigation Timelines and Benchmarks.* Both policies remained in the collaborative review and revision process at the end of the sixth reporting period.

In the fourth reporting period, COPA finalized its Policy 3.2.2, *Timeliness Benchmarks*, which addressed all requirements of ¶479. This allowed COPA to achieve Preliminary compliance. In the fifth and sixth reporting period, COPA did not produce evidence of steps toward Secondary compliance with ¶479.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided a revised S08-01-02, *Investigations Timelines and Benchmarks*. This policy completely addresses the requirements of ¶479. The IMT submitted no-objection notices to S08-01-02 in August and September 2022. With this, the CPD reached Preliminary compliance.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶479.

\*\*\*

The City and the CPD reached Preliminary compliance with ¶479 in the seventh reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph. For COPA, we will look for materials that train on the requirements of ¶479.

---

[43]   Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 479 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

**SEVENTH REPORTING PERIOD**
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶480

> **480.** *Within 120 days of the Effective Date, the City, CPD, and COPA will each develop a policy establishing procedures for COPA, BIA, and Accountability Sergeant's review and consideration of evidence from civil and criminal litigation.*

**Compliance Progress**  (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[44] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

COPA reached Preliminary compliance with ¶480 in the seventh reporting period. The CPD did not reach Preliminary compliance because it did not produce any documentation demonstrating efforts related to this paragraph.

To evaluate Preliminary compliance with ¶480, the IMT reviewed the development of the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[45]

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD provided a letter from BIA to the IMT indicating that work was "underway" related to addressing the requirements of ¶480 through a draft policy entitled "City Policy Regarding Procedures for COPA, BIA and the Accountability Sergeant's Review and Consideration of Evidence from Civil and Criminal Litigation." This information was provided in February 2020. We did not receive any additional information regarding the draft policy in the fifth reporting period. However, the CPD provided a draft Special Order S08-01-01, *Conducting Log Number Investigations*, which addressed ¶480. The IMT provided comments

---

[44] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[45] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

in September 2021, but S08-01-01 remained in the collaborative review and revision process at the end of the reporting period. In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶480.

Also in the fifth reporting period, COPA finalized 3.2.2 *Timeliness Benchmarks* Policy. This policy provides general timelines related to COPA accomplishing the requirements of ¶480. In addition to this guidance, COPA submitted a draft revised *Civil/Criminal Complaint Review* Policy, which details how COPA personnel are to comply ¶480. At the end of the reporting period, this policy remained in the collaborative review and revision process. We explained that COPA would need to finalize this policy to achieve Preliminary compliance with ¶480. In the sixth reporting period, COPA revised its policy relevant to ¶480: *Civil/Criminal Complaint Review* Policy. This policy detailed how COPA personnel are to comply ¶480. However this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶480.

In the sixth reporting period, we stated that COPA's *Civil/Criminal Complaint Review* Policy addressed the requirements of ¶480 but that it remained in the collaborative review and revision process at the end of the reporting period. This reporting period, COPA provided a final version of the *Civil and Criminal Complaint Review Policy* and related guidance, and also demonstrated community input. Additionally, the City provided a memorandum updating the status of the process by which the Department of Law notifies COPA of pending lawsuits. With this, COPA reached Preliminary compliance.

\*\*\*

COPA reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward, we will look for COPA to develop training relevant to the requirements of this paragraph. We will look for CPD to develop a policy relevant to the requirements of this paragraph.

## Paragraph 480 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
None

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
None

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

## Accountability and Transparency: ¶481

> **481.** *The City, CPD, and COPA will ensure that if CPD, COPA, or the OIG requests the Superintendent's authorization to open an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the OIG became aware of the allegations, the Superintendent will respond within 30 days.*

### Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[46] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *Not in Compliance* |
| **OIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not Yet Assessed* |
| **OIG** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not Yet Assessed* |
| **OIG** | *In Compliance* (FOURTH REPORTING PERIOD) |

The City did not reach Preliminary compliance with ¶481 in the seventh reporting period because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance. COPA has not yet reached Preliminary compliance. CPD maintained Preliminary compliance and the Deputy PSIG maintained Full compliance with ¶481.

To evaluate Preliminary compliance with ¶481, the IMT reviewed the CPD's, COPA's, and the Deputy PSIG's relevant policies and documents following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[47] For COPA

---

[46] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[47] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among

specifically, we looked for a policy that explains the process for requesting the Superintendent to authorize opening an investigation for incidents alleged to have occurred more than five years ago.

To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286), specifically including training on drafting a request to the Superintendent and monitoring for timely response and feedback from the CPD, COPA, and the Office of the Inspector General regarding the Superintendent's responses to requests to open an investigation older than five years. For Full compliance, we looked for evidence that the entities implemented their policies and trainings such that they receive responses form the Superintendent within 30 days.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD provided drafts of G08-01, *Complaint and Disciplinary Procedures* and BIA Unit Directive, *Incidents occurring Five Years Prior to Complaint and Reopening Investigations Five Years After Initiation*. These polices were not posted for public comment or finalized at the end of the fourth reporting period.

In the fifth reporting period, the CPD finalized General Order G08-01, *Complaint and Disciplinary Procedures*, which addressed the requirements of ¶481. This brought the CPD into Preliminary compliance. Before this, in earlier reporting periods, the CPD also provided BIA Unit Directive, *Incidents occurring Five Years Prior to Complaint and Reopening Investigations Five Years After Initiation*.[48] This Unit Directive was never finalized. In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶481.

In past reporting periods, COPA contended that it has no responsibility for ¶481. The IMT suggested that COPA develop a policy which explains the process for requesting that the Superintendent authorize the opening of "an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the Office of the Inspector General became aware of the allegations," and explaining that the Superintendent, per the requirements of ¶481, must respond within 30 days. In the fifth reporting period, COPA continued to work toward Preliminary compliance by submitting a revised draft of its *Civil/Criminal Complaint Review* Policy that instructs compliance with ¶481. At the end of the

---

other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[48] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period and is ongoing.

reporting period, this policy remained in the collaborative review and revision process. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶442.

The Deputy PSIG reached Full compliance in past reporting periods through its *Investigations Section Manual*, which explains the correct procedure for requesting the CPD Superintendent to reopen an investigation pursuant to ¶481. The Deputy PSIG has since maintained Full compliance through submission of its Five Year Letters that it submits to the Superintendent as well as information regarding the Superintendent's response.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a revised draft of G08-01, *Complaint and Disciplinary System*. Section VI.A.3 addresses ¶481 by clearly stating that the Superintendent of Police may authorize an investigation which occurred five years before the date of awareness at the request of COPA, OIG, or the Department. Additionally it states that the Superintendent must respond to the request within 30 days of receiving it.

Although COPA has previously contended that it has no responsibility for ¶481, the IMT continues to suggest that COPA develop a policy which explains the process for requesting that the Superintendent authorize the opening of "an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the Office of the Inspector General became aware of the allegations," and explaining that the Superintendent, per the requirements of ¶481, must respond within 30 days.

This reporting period, the Deputy PSIG continued to maintain Full compliance by providing a memorandum noting that their office made one request to the Superintendent to open an investigation which allegedly occurred more than five years before that date. This information is also documented in OIG's Quarterly Reports for the second and third quarters of 2022.

<div align="center">***</div>

In the seventh reporting period, the City did not reach Preliminary compliance because COPA has not yet finalized a policy relevant to ¶481's requirements. The CPD maintained Preliminary compliance, and the Deputy PSIG maintained Full compliance.

## Paragraph 481 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
None

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
None

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶482

> ***482.*** *The City and CPD will ensure that BIA regularly conducts proactive investigations and integrity tests.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance but did not reach Secondary compliance with ¶482 this reporting period.

To evaluate Preliminary compliance with ¶482, the IMT reviewed the CPD's relevant policies and documents following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286), looking specifically for proof that the appropriate BIA staff are trained to conduct investigations and integrity tests in line with policy, and implementation of a system by the City and the CPD to monitor and ensure BIA is completing investigations and tests as required.

*Progress before the Seventh Reporting Period*

The IMT assessed the City's compliance with ¶482 for the first time in the fifth reporting period. The CPD finalized its General Order G08-01, *Complaint and Disciplinary System*.[49] With this, the CPD achieved Preliminary compliance with ¶482. In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶482.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a revised draft of G08-01, *Complaint and Disciplinary System*. Section VI.B.1 addresses ¶482.

\*\*\*

The City and the CPD maintained Preliminary compliance. Moving forward, we look forward to reviewing the CPD's training materials that demonstrate that personnel are properly trained to comply with the paragraph's requirements.

---

[49]   The CPD previously submitted this General Order as *Complaint and Disciplinary Procedures*.

## Paragraph 482 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Not Applicable

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶483

> **483.** *The City and CPD will ensure there are regularly conducted satisfaction surveys relating to the complaint intake and investigation processes. The City and CPD will evaluate trends and training opportunities identified as a result of information received from such quality control surveys.*

## Compliance Progress
(Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶483 but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶483, the IMT reviewed the CPD's relevant policies and documents following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed various sources to determine whether individuals responsible for conducting surveys are aware of expectations set by policy and are provided the means to conduct surveys and identify additional training needs.

*Progress before the Seventh Reporting Period*

The IMT assessed the City's compliance with ¶483 for first time in the fifth reporting period. The CPD finalized Special Order S08-01-04, *Post Investigation Log Number Procedures* for review, which addresses ¶483.[50] With this, the CPD achieved Preliminary compliance. In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶483.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*.[51] This policy partially addresses the requirements of ¶483 by requiring satisfaction surveys relating to the complaint and investigation process. The policy should include language defining the structure for the development of the satisfaction surveys, including but not limited to the timeline,

---

[50] The CPD previously submitted this Special Order under the title *Documenting Log Number Investigations and Post Investigations Procedures*.

[51] This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

the percentage of cases in the sample group, what is being sampled, and how it will be validated.

Additionally this reporting period, the CPD provided BIA's *Satisfaction Survey Administration Plan.* The IMT provided specific comments to the materials in December 2022. As produced, this Plan does not meet the requirements of ¶483, which states that the CPD will conduct regular satisfaction surveys relating to the complaint intake and investigation processes. The CPD has not developed a policy for this paragraph, which would dictate a timeline. Moreover, in this instance, a policy may also increase and improve participation. We also expressed concerns regarding the more than 12-month timeline for distributing, reviewing, and analyzing satisfaction surveys, and suggested shortening this timeline to allow for ongoing improvement of the survey process and regular review and consideration of officer and community feedback. Finally, we recommended including information about the BIA Satisfaction Surveys in the BIA's and the CPD's quarterly and annual reports.

<div align="center">***</div>

Moving forward, we will look for the CPD to develop training relevant to the requirements of ¶483, and to revise its survey process and plan to address the IMT's concerns provided to the CPD in December 2022.

### Paragraph 483 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶484

> **484.** *If at any time during the intake or investigation of a complaint, COPA, BIA, or Accountability Sergeants find evidence indicating criminal conduct by any CPD member, the Chief Administrator of COPA or Chief of BIA will refer the investigation to the appropriate prosecuting agency.*

## Compliance Progress                    (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶484. COPA maintained Preliminary compliance but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶484, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[52] To evaluate Secondary compliance, we determined whether the entities have developed a means of tracking referrals to prosecuting agencies and developed written guidance guiding the referral and tracking process. To reach Secondary compliance, the entities must train on the developed guiding and tracking process.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD provided draft Special Order S08-01-01, *Conducting Log Number Investigations* for review, which partially addressed the requirements of ¶484. The IMT provided comments in September 2021. At the end of the reporting period, this policy remained in the collaborative review and revision process. BIA also produced the Unit Directives *Investigative File Maintenance* and *Initiation of Log Numbers in the Case Management System* which addressed

---

[52] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

¶484.[53] The Unit Directives were not finalized following the Consent Decree process by the end of the reporting period. In the sixth reporting period, the CPD submitted multiple revised versions of S08-01-05, however it remained in the collaborative review and revision process at the end of the reporting period.

In the fourth reporting period, COPA finalized Policy 3.1.1, *Intake* and 3.1.2, *Fact Gathering and the Investigative Process*, which together addressed the requirements of ¶484 and brought COPA into Preliminary compliance. In the fifth reporting period, COPA provided its training titled *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021*, which instructed compliance with the requirements of ¶484. COPA provided this training to more than 95% of its personnel. We explained that, to reach Secondary compliance, COPA should focus on developing written guidance and a means of directing and tracking referrals to prosecuting agencies, and that COPA would also need to train personnel on the policy and application of the referral tracking process. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶484.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy completely addresses the requirements of ¶484. The IMT submitted no-objection notices to S08-01-05 in September and October 2022. With this, the CPD reached Preliminary compliance.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶484. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review with a different combination of Consent Decree paragraphs, including ¶484. The latest draft of this training only partially addresses the requirements of ¶484. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

---

[53] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive Initial Responsibilities in Assigned Log Number Investigations into S08-01-05. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶484.

\*\*\*

The City and the CPD reached Preliminary compliance with ¶484 in the seventh reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph. For COPA, we will look for training materials relevant to ¶484, including written guidance regarding making and tracking referrals to prosecuting agencies.

### Paragraph 484 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶485

> **485.** *The City will continue to provide the Chief Administrator of COPA the discretion to direct COPA to review and investigate the facts of individual civil lawsuits and criminal proceedings involving alleged misconduct in order to identify and investigate incidents of misconduct.*

## Compliance Progress  (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2024* |

In the seventh reporting period, the City maintained Full compliance with ¶485.

To evaluate Preliminary compliance with ¶485, the IMT reviewed the City's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[54] As a threshold matter, we looked for an ordinance that provides discretion to direct COPA reviews and investigations to the Chief Administrator of COPA. To evaluate Secondary compliance we looked for evidence of intention to maintain the COPA Chief's discretion. For Full compliance, we looked for evidence to confirm whether the COPA Chief is to act within their discretion.

*Progress before the Seventh Reporting Period*

The IMT assessed compliance with ¶485 for the first time in the sixth reporting period. We noted that Chicago Municipal Code 2-78-120, which has been on the books for several years, grants the COPA Chief Administrator the ability to "review lawsuits and claims against the Department or one or more of its members, or against the City, alleging police misconduct that falls within COPA's jurisdiction." Beyond this, on December 23, 2021, COPA provided the IMT with a revised version of its *Civil and Criminal Complaint Review* policy. This policy was well written and thorough, and provided useful instruction for COPA employees to fulfill the requirements of ¶485. Included with the policy, COPA compiled *Civil and Criminal Complaint Review* Guidance that not only set out COPA's intention to comply with

---

[54] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

this paragraph but provided instruction in how COPA employees are to fulfill the requirements of the *Civil and Criminal Complaint Review* policy and this paragraph. Finally, through conversations with COPA, the IMT confirmed that the Chief Administrator of COPA has the ability to exercise the discretion granted the position.

*Progress in the Seventh Reporting Period*

This reporting period, the City provided a memorandum which updated the status of the process by which DOL notifies COPA of pending lawsuits, as well as a Memorandum of Understanding between DOL and COPA. The City's memorandum indicates that beginning in December 2020 the DOL has provided information on lawsuits involving CPD members on a bi-weekly basis to review and investigate the facts of individual civil lawsuits and criminal proceedings involving alleged misconduct for COPA to investigate incidents of misconduct. The Memorandum of Understanding provided to the IMT is foundational to formalizing the informal notification system that has been in place since December 2020, but is unsigned. The IMT looks forward to receiving a final signed version of the Memorandum and to reviewing the bi-weekly memos regarding civil and criminal proceedings.

Additionally, COPA provided a final *Civil and Criminal Complaint Review* policy and guidance related to this paragraph.

\*\*\*

Moving forward we will continue to look for documentation demonstrating that the Chief Administrator of COPA is afforded discretion and able to act under that discretion as is called for by ¶485. We will also look forward to receiving a final signed version of the Memorandum of Understanding and to reviewing bi-weekly memos regarding civil and criminal proceedings.

## Paragraph 485 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

## Accountability and Transparency: ¶486

***486.*** *The City, CPD, and COPA will ensure that CPD and COPA maintain thorough and complete administrative investigative files. Such administrative investigative files will include: a. documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the alleged misconduct. In situations in which there are no known witnesses, the file will specifically state this fact. In situations in which witnesses were present but circumstances prevented the investigator from collecting information from those witnesses, the investigative file will state the reasons why. The investigative file also will include all available identifying information for anyone who refuses to provide a statement; b. documentation of each interview conducted and the recording of those interviews, if available; c. the names of all CPD members who have been identified as witnesses to the alleged misconduct; d. COPA's, BIA's, or the district's narrative description and evaluation of the alleged misconduct, based on its review of the evidence gathered, including a determination of whether the CPD member's actions appear to be within CPD policy, procedure, regulations, orders, or other standards of conduct required of CPD members; e. in cases where material inconsistencies exist between complainant, CPD member, and witness statements, explicit identification of the inconsistencies, including a description of the evidence reviewed and written credibility findings; f. if a CPD member deployed a weapon, documentation of whether the CPD member's certification and training for the weapon were current; g. all CPD member original statements, as well as any amendments or clarifications to the original statement, and any subsequent statements; and h. an explicit identification of each allegation and the recommended finding for each allegation of misconduct in an investigation.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶486 in the seventh reporting period. COPA maintained Preliminary compliance.

To evaluate Preliminary compliance with ¶486, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[55] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD provided draft Special Order S08-01-01, *Conducting Log Number Investigations*, for review with this paragraph. But S08-01-01 remained in the collaborative review and revision process at the end of the reporting period. Also, in earlier reporting periods, the CPD produced BIA's Unit Directive, *Requirements of a Complete Investigative File*, *Photo Room Operations*, and *Administrative Misconduct Investigation* under ¶486. But these policies were not finalized by the end of the fifth reporting period and therefore did not bring the CPD into Preliminary compliance. In the sixth reporting period, the CPD provided S08-01-09, *Requirements of a Complete Log Number Investigative File*, for review with ¶¶486–87. The IMT provided feedback and a no-objection notice on June 3, 2022. We suggested that the CPD add "regulations, orders, or other standards of conduct required of CPD members" to the first paragraph of Section III.H to sufficiently address ¶486(d). However, at the end of the reporting period the policy remained in the collaborative review and revision process.

In the fifth reporting period, COPA provided drafts of COPA 3.1.9, *Investigative File Maintenance*, which addressed all subparagraphs of ¶486. The IMT provided a no-objection notice in late December 2021, but by the end of the reporting period the Policy had not been posted for public comment and finalized. In the sixth reporting

---

[55]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

period, COPA continued its efforts from the fifth reporting period related to its policy *Investigative File Maintenance*. This policy addressed the requirements of ¶486. With this, COPA moved into Preliminary compliance with ¶486 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

In the previous reporting period the CPD provided S08-01-09, *Requirements of a Complete Log Number Investigative File*, for review with ¶486–87. The IMT provided feedback and a no-objection notice on June 3, 2022. We suggested that the CPD add "regulations, orders, or other standards of conduct required of CPD members" to the first paragraph of Section III.H to sufficiently address ¶486(d). We noted in the sixth reporting period that if this revision was made, S08-01-09 would fully address the requirements of ¶486 and its subparagraphs. The City and the CPD produced the final S08-01-09 on January 12, 2023 for the seventh reporting period, and the final version of the policy incorporated the IMT's requested changes, thereby meeting the requirements of ¶486 and its subparagraphs. With this, the CPD reached Preliminary compliance.

Additionally this reporting period, the CPD produced a first draft of *BIA Recorder Training*. This training was produced as a compliance record rather than under review per the requirements of ¶641. The training does not meet the requirements of ¶486, as it only addresses subparagraph (b), and it provides inconsistent and uncoordinated information between the lesson plan and the PowerPoint. The IMT submitted comments to *BIA Recorder Training* in January 2023. As written, the training materials are confusing and difficult to follow due to the lack of correspondence between the Lesson Plan and the PowerPoint presentation slides. The Audio Recorder Training Records submitted with this production indicate that numerous BIA and Accountability Sergeants have already been trained on this material, which causes the IMT to be concerned about the quality of the training received given the current state of the training materials. The IMT is also concerned that this training was provided before submitting the training materials to the IMT for review, per the requirements of ¶641 of the Consent Decree. Going forward, the IMT expects that such training materials will be provided to the IMT and the OAG for review prior to implementation.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶486. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest draft of this training addresses the requirements of ¶486(c) but does not appear to address

¶486(d), (e), or (h), which the training designates. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶486.

\*\*\*

The City and the CPD reached Preliminary compliance with this paragraph, and COPA maintained Preliminary compliance. Moving forward, we will look for the entities to develop training materials that instruct compliance with this paragraph and the entities' related policies.

### Paragraph 486 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶487

> ***487.*** *Investigators will consider all original statements, and any subsequent statements, including amended or modified statements, for purposes of determining whether a CPD member willfully made a false statement about a fact material to the incident under investigation.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Under Assessment* |

The City and the CPD reached Preliminary compliance with ¶487 in the seventh reporting period. COPA maintained Secondary compliance with ¶487 and remains Under Assessment for Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance with ¶487.

To evaluate Preliminary compliance with ¶487, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[56] To evaluate Secondary compliance, the IMT reviewed the entities' development, implementation, and evaluation of training (¶286). To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD provided a first draft of Special Order S08-01-01, *Conducting Log Number Investigations*, which addressed the requirements of ¶487. However, the policy remained in the collaborative review and revision

---

[56] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

process at the end of the reporting period. In addition the CPD submitted BIA's Unit Directive, *Requirements of a Complete Investigative File*, which also spoke to ¶487's requirements.[57] However, the Unit Directive was not posted for public comment. In the sixth reporting period, the CPD submitted multiple revised versions of S08-01-05, but the policy remained in the collaborative review and revision process at the end of the sixth reporting period.

In the fifth reporting period, COPA provided a finalized Policy 3.1.2 *Fact Gathering and the Investigative Process*, which addressed the requirements of ¶487. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶487.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy completely addresses the requirements of ¶487. The IMT submitted no-objection notices to S08-01-05 in September and October 2022. The CPD also provided a final version of S08-01-09, *Requirements of a Complete Log Number Investigative File*. This policy addresses the requirements of ¶487. With these efforts, the CPD reached Preliminary compliance.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶487. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review with a different combination of Consent Decree paragraphs, including ¶487. The latest draft of this training addresses the requirements of ¶487. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA provided *Fact Gathering-Evidence Collection* training materials, which address the requirements of ¶487. The IMT submitted a no-objection to these training materials on September 30, 2022. The IMT virtually attended the *Fact Gathering-Evidence Collection* training delivered to COPA In-Service staff on December 13, 2022. The training followed the lesson plan and the slide presentation allowed the instructor to provide specific detail without reading

---

[57]   In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and efforts are ongoing.

from the slides. The instruction was clear and engaging. The instructor was well-prepared, knowledgeable in the subject matter, and was able to effectively draw from personal experience to illustrate specific points in the lesson plan while comfortably engaging the class in discussion. COPA continues to consistently demonstrate its ability to develop thorough training relevant to its policies and procedures. On January 12, 2023, the City and COPA submitted documentation for the seventh reporting period demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period.

Additionally, COPA provided for review six Final Summary Reports of investigations involving CPD members who may have made false statements during an investigation, among other charges. The investigations show that COPA Investigators conducted thorough follow up interviews, considered statements and evidence, and carefully considered all original statements and facts, as well as follow up statements. The documentation also provided evidence that COPA Investigators arrived at fair and accurate conclusions. The IMT notes that two of the cases were Independent Police Review Authority (IPRA) cases, with one being more than a decade old. COPA inherited this case and conducted a thorough investigation. COPA remains Under Assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

<p style="text-align:center">***</p>

The City and the CPD reached Preliminary compliance. Moving forward, we look forward to the CPD developing training materials relevant to the requirements of this paragraph. COPA maintained Secondary compliance and remains Under Assessment for Full compliance. Moving forward, we will look for COPA to continue demonstrating that it has sufficiently implemented its policies and training.

### Paragraph 487 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶488

***488.*** *In addition to the general investigative requirements estab-lished in this Agreement, with respect to the investigation of of-ficer-involved shootings and deaths, the City and CPD will ensure that: a. COPA investigators be provided the opportunity to par-ticipate in the Preliminary assessment during the immediate af-termath of an officer-involved shooting or death to the same ex-tent as any CPD member or any other law enforcement agency investigating the incident; b. the Chief Administrator of COPA, or his or her designee, is present for the first viewing by CPD of available video or audio material related to the incident and when any audio or video material is collected and preserved at or near the scene from CPD or third-party surveillance systems. i. the requirements of subparagraph (b), above, will not apply if: (1) the Chief Administrator of COPA, or his or her designee, has been informed of the incident and is not available; and (2) COPA is not on scene and there is a public safety need to review or lis-ten to certain available audio or video prior to the COPA arrival on scene. c. there is written documentation identifying each CPD member who viewed video evidence or listened to audio evi-dence at the scene; d. within 30 days of the Effective Date, CPD issues a policy providing that: i. involved and witness CPD mem-bers do not discuss the facts relating to the incident with any wit-ness until interviewed by COPA, except to the extent necessary to ensure public safety, as instructed by counsel in relation to civil or criminal proceedings, or participating in CPD officer wellness programs; ii. COPA may extend the prohibition on discussion to the extent necessary to preserve the integrity of the investiga-tion; and iii. in no event may this prohibition extend beyond the final disciplinary decision, if any. e. involved and witness CPD members will be separated, transported separately from the scene, and monitored to avoid contact or communications relat-ing to the incident until released by the responding supervisor at or above the rank of Commander; f. administrative interviews of involved and witness CPD members will be audio recorded and, where possible, video recorded, with COPA investigators present, except that a member may speak with his or her attorney or un-ion representative in private; and g. investigators will not delay interviewing involved and witness CPD members, and will con-duct such interviews as soon as feasible, consistent with any ap-plicable collective bargaining agreement. Investigators will doc-ument, and make part of the administrative investigative file, all*

*requests made on behalf of involved or witness CPD members to reschedule an interview.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *Not in Compliance*[58] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

COPA reached Secondary compliance with ¶488 in the seventh reporting period. The CPD did not yet reach Preliminary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance with ¶488.

To evaluate Preliminary compliance with ¶488, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[59] To evaluate Secondary compliance, the IMT reviewed the entities' development, implementation, and evaluation of training (¶286).

*Progress before the Seventh Reporting Period*

In past reporting periods the City produced a number of items under ¶488, including a two-page Memorandum of Agreement between COPA and the CPD (MOA) and, in the fourth reporting period, the Illinois State Police, Division of Criminal Investigation, *CPD Officer Involved Death Investigation Proposal*, which related to the requirements of ¶488. Additionally, the CPD implemented G03-06, *Firearms Discharge and Officer Involved Death Incident Response and Investigation*. But

---

[58] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[59] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

G03-06 was only intended as a temporary, emergency policy, and it was not intended to fully comply with the Consent Decree's requirements. The CPD did not produce any documents relevant to this paragraph in the fifth reporting period. In the sixth reporting period the City and the CPD provided a revised version of General Order G03-06, *Firearm Discharge and Officer-Involved Death Incident Response and Investigation*, for review with ¶¶488–91.[60] A previous version of this policy had been implemented but only as a temporary solution and we noted that the temporary version fell short of meeting Consent Decree requirements.

In short, we noted previously that significant revisions were necessary for G03-06 to meet the requirements of ¶¶488–91. We encouraged the CPD to prioritize overhauling this policy and to rethink how to address the requirements of ¶¶488–91.

We noted in the fifth reporting period that, although many of the requirements of ¶488 apply to the CPD, COPA went above and beyond to include such requirements in its draft *Major Incident Responses* Policy. We noted that this policy addresses every subparagraph of ¶488 and is a model policy for COPA. The IMT provided a no-objection notice, but by the end of the reporting period, the policy remained in the collaborative review and revision process. In the sixth reporting period, COPA finalized its *Major Incident Responses – Officer-Involved Shooting or Officer-Involved Death* policy, moving them into Preliminary compliance.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶488. The CPD continues to delay developing an internal policy to direct its response and involvement in officer-involved shootings and death incidents (OIS/OID). The IMT continues to encourage the CPD to develop a policy that addresses the requirements of ¶488, specifically in how the CPD interacts with COPA on the scenes of OIS/OID, while the City determines how to address the statutory requirements regarding who will handle the criminal investigation and how the criminal investigation will be handled.

Although COPA is not responsible for a majority of the requirements of ¶488, COPA worked to address those requirements. COPA, in the seventh reporting period, provided training materials for two trainings relevant to ¶488: *Major Case Incident Response Training* and *Officer Interviews Training*.

---

[60] The City and the CPD first provided a draft of G03-06, *Officer Involved Death Investigations*, for review with ¶488–92 on July 19, 2019, and this policy then underwent multiple rounds of revision, review, and comment in connection with ¶488–92 and other paragraphs (often alongside the Use of Force policy suite); its title changed to *Firearm Discharge and Officer-Involved Death Incident Response and Investigations*; and the City and the CPD issued temporary versions of the policy pursuant to ¶631 (extraordinary circumstances).

The *Major Case Incident Response Training* addresses the requirements of ¶488 and its subparagraphs. The IMT submitted a no-objection notice to the *Major Case Incident Response Training* on November 8, 2022 and noted that this is an excellent training that provides thorough instruction and completely addresses the requirements of ¶488 and its subparagraphs. The IMT virtually attended the *Major Case Incident Response Training* on December 14, 2022. The training was delivered according to the lesson plan and the instructor was a subject matter expert that was well-prepared and engaging. COPA continues to consistently demonstrate its ability to develop thorough, relevant training based on its policies and procedures. On January 12, 2023, the City and COPA submitted documentation demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

Additionally COPA's *Officer Interviews Training* addresses the requirements of ¶488(d), (f), and (g). During an IMT Site visit on September 29, 2022, the IMT attended and observed the *Officer Interviews In-Service Training*. Both instructors were prepared, knowledgeable in the course material, and used their experience to highlight specific points and examples in their presentation. The instructors encouraged and received student participation that generated discussion and allowed for other veteran investigators to share their best practices. The IMT continues to commend COPA for its thoughtful training. COPA submitted documentation demonstrating that this training was provided to more than 95% of COPA's staff by the end of the seventh reporting period.

\*\*\*

The City did not yet reach Preliminary compliance. COPA reached Secondary compliance. CPD has significant work ahead to reach Preliminary compliance. We hope that the CPD will continue to make consistent efforts to revise G03-06 and work with the IMT and the OAG to do so throughout the eighth reporting period. For COPA, moving forward, we will look for evidence that it has sufficiently implemented its policies and training.

## Paragraph 488 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
None

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
None

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶489

> ***489.*** *The City recognizes that officer-involved shootings are trau-matic incidents. The City and CPD are committed to treating all impacted with dignity and respect.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[61] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

COPA reached Secondary compliance with ¶489 in the seventh reporting period. The CPD did not yet meet Preliminary compliance. Because all relevant City enti-ties must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance with ¶489.

To evaluate Preliminary compliance with ¶489, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[62] To evaluate Secondary compliance, the IMT reviewed the entities' development, implementation, and evaluation of train-ing (¶286).

*Progress before the Seventh Reporting Period*

In the fourth reporting period, the City produced an updated suite of directives. The suite was designed to more closely align with the requirements of ¶¶488–92,

---

[61]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[62]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

but the policies were not submitted in time to be implemented following the requisite Consent Decree process. In the fifth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶489. In the sixth reporting period, the City and the CPD provided a revised version of General Order G03-06, *Firearm Discharge and Officer-Involved Death Incident Response and Investigation*, for review with ¶¶488–91.[63] A previous version of this policy had been implemented but only as a temporary solution and we noted that the temporary version fell short of meeting Consent Decree requirements. In short, we noted that significant revisions were necessary for G03-06 to meet the requirements of ¶¶488–91. We encouraged the CPD to prioritize overhauling this policy and to rethink how to address the requirements of ¶¶488–91.

Also in the fifth reporting period, COPA produced a draft *Major Incident Responses* policy for review.[64] This policy remained in the collaborative review and revision process at the end of the fifth reporting period. In the sixth reporting period, COPA submitted its *Major Incident Responses – Officer-Involved Shooting or Officer-Involved Death* policy, which fully addressed the requirements of ¶489. This moved COPA into Preliminary compliance with this paragraph.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶489. The CPD continues to delay developing an internal policy to direct its response and involvement in officer-involved shootings and death incidents (OIS/OID). The IMT continues to encourage CPD to develop a policy that addresses the requirements of ¶489, specifically in how the CPD interacts with COPA on the scenes of OIS/OID, while the City determines how to address the statutory requirements regarding who will handle the criminal investigation and how the criminal investigation will be handled.

Although COPA is not responsible for a majority of the requirements of ¶489, COPA worked to address those requirements. COPA, in the seventh reporting period, provided training materials for *Major Case Incident Response Training*. The *Major Case Incident Response Training* addresses the requirements of ¶489 by teaching the exact process and procedure for officer-involved cases. The IMT submitted a no-objection notice to the *Major Case Incident Response Training* on November 8, 2022 and noted that this is an excellent training that provides thorough instruction. The lesson plan is written in a manner that not only teaches COPA employees

---

[63] The City and the CPD first provided a draft of G03-06, *Officer Involved Death Investigations*, for review with ¶488–92 on July 19, 2019, and this policy then underwent multiple rounds of revision, review, and comment in connection with ¶488–92 and other paragraphs (often alongside the Use of Force policy suite); its title changed to *Firearm Discharge and Officer-Involved Death Incident Response and Investigations*; and the City and the CPD issued temporary versions of the policy pursuant to ¶631 (extraordinary circumstances).

[64] Please refer to the discussion of ¶488 regarding COPA's *Major Incident Responses* Policy.

the Policy and the appropriate Municipal Codes that authorize COPA's investigative responsibilities, but also provides instruction on the Consent Decree requirements of ¶489 and COPA's responsibilities for responding to and investigating major officer-involved cases. The lesson plan explains the COPA policy to ensure COPA employees understand what CPD employees and the community can expect from COPA in such investigations. The entire lesson plan speaks to treating all involved with dignity and respect, including CPD officers and command staff who are involved in the investigation of an incident. On January 12, 2023, the City and COPA submitted documentation for the seventh reporting period demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

<div align="center">***</div>

The City did not yet reach Preliminary compliance. COPA reached Secondary compliance. CPD has significant work ahead to reach Preliminary compliance. We hope that the CPD will continue to make consistent efforts to revise G03-06 and work with the IMT and the OAG to do so throughout the eighth reporting period. For COPA, moving forward, we will look for evidence that it has sufficiently implemented its policies and training.

### Paragraph 489 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Accountability and Transparency: ¶490

*490. The City and CPD are committed to ensuring their actions do not unreasonably impede access to information for families of the injured and deceased.*

## Compliance Progress  (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[65] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

COPA reached Secondary compliance with ¶490 in the seventh reporting period. The CPD did not yet meet Preliminary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance with ¶490.

To evaluate Preliminary compliance with ¶490, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[66] To evaluate Secondary compliance, the IMT reviewed the entities' development, implementation, and evaluation of training (¶286).

*Progress before the Seventh Reporting Period*

In the fourth reporting period, the City produced an updated suite of directives. The suite was designed to more closely align with the requirements of ¶¶488–92,

---

[65]  As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[66]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

but the policies were not submitted in time to be implemented following the requisite Consent Decree process. In the fifth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶490. In the sixth reporting period, the City and the CPD provided a revised version of General Order G03-06, *Firearm Discharge and Officer-Involved Death Incident Response and Investigation*, for review with ¶¶488–91.[67] A previous version of this policy had been implemented but only as a temporary solution and we noted that the temporary version fell short of meeting Consent Decree requirements. In short, we noted that significant revisions were necessary for G03-06 to meet the requirements of ¶¶488–91. We encouraged the CPD to prioritize overhauling this policy and to re-think how to address the requirements of ¶¶488–91.

Also in the fifth reporting period, COPA produced a draft *Major Incident Responses* policy for review.[68] This policy remained in the collaborative review and revision process at the end of the fifth reporting period. In the sixth reporting period, COPA submitted its *Major Incident Responses – Officer-Involved Shooting or Officer-Involved Death* policy, which fully addressed the requirements of ¶490. This moved COPA into Preliminary compliance with this paragraph.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶490. The CPD continues to delay developing an internal policy to direct its response and involvement in officer-involved shootings and death incidents (OIS/OID). The IMT continues to encourage CPD to develop a policy that addresses the requirements of ¶490, specifically in how the CPD interacts with COPA on the scenes of OIS/OID, while the City determines how to address the statutory requirements regarding who will handle the criminal investigation and how the criminal investigation will be handled.

Although COPA is not responsible for a majority of the requirements of ¶490, COPA worked to address those requirements. COPA, in the seventh reporting period, provided training materials for *Major Case Incident Response Training*. The *Major Case Incident Response Training* addresses the requirements of ¶490. The IMT submitted a no-objection notice to the *Major Case Incident Response Training* on November 8, 2022 and noted that this is an excellent training that provides thorough instruction. The lesson plan is written in a manner that not only teaches COPA employees the Policy and the appropriate Municipal Codes that authorize

---

[67] The City and the CPD first provided a draft of G03-06, *Officer Involved Death Investigations*, for review with ¶488–92 on July 19, 2019, and this policy then underwent multiple rounds of revision, review, and comment in connection with ¶488–92 and other paragraphs (often alongside the Use of Force policy suite); its title changed to *Firearm Discharge and Officer-Involved Death Incident Response and Investigations*; and the City and the CPD issued temporary versions of the policy pursuant to ¶631 (extraordinary circumstances).

[68] Please refer to the discussion of ¶488 regarding COPA's *Major Incident Responses* Policy.

COPA's investigative responsibilities, but also provides instruction on the Consent Decree requirements of ¶490. On January 12, 2023, the City and COPA submitted documentation for the seventh reporting period demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

*** 

The City did not yet reach Preliminary compliance. COPA reached Secondary compliance. CPD has significant work ahead to reach Preliminary compliance. We hope that the CPD will continue to make consistent efforts to revise G03-06 and work with the IMT and the OAG to do so throughout the eighth reporting period. For COPA, moving forward, we will look for evidence that it has sufficiently implemented its policies and training.

### Paragraph 490 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Accountability and Transparency: ¶491

> **491.** *In addition to the investigative requirements set forth in this Agreement, with respect to officer-involved shootings and officer-involved deaths, the City and CPD will ensure that CPD members act in a manner that is consistent with CPD's commitment to the principle of the sanctity of life, and will treat the deceased with respect, including the prompt screening from public view or covering of the deceased and, following timely evidence collection procedures, removal of the deceased.*

## Compliance Progress        (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This reporting period, the City and CPD did not reach Preliminary compliance with ¶491.

To evaluate Preliminary compliance with ¶491, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[69]

*Progress before the Seventh Reporting Period*

In the fourth reporting period, the City produced an updated suite of directives. The suite was designed to more closely align with the requirements of ¶¶488–92, but the policies were not submitted in time to be implemented following the requisite Consent Decree process. In the fifth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶491. In the sixth reporting period, the City and the CPD provided a revised version of General Order G03-06, *Firearm Discharge and Officer-Involved Death Incident Response and Investigation*, for review with ¶¶488–91.[70] A previous version of this policy had been

---

[69]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[70]   The City and the CPD first provided a draft of G03-06, *Officer Involved Death Investigations*, for review with ¶488–92 on July 19, 2019, and this policy then underwent multiple rounds of revision, review, and comment in connection with ¶488–92 and other paragraphs (often alongside the Use of Force policy suite); its title changed to *Firearm Discharge and Officer-Involved*

implemented but only as a temporary solution and we noted that the temporary version fell short of meeting Consent Decree requirements. In short, we noted that significant revisions were necessary for G03-06 to meet the requirements of ¶¶488–91. We encouraged the CPD to prioritize overhauling this policy and to re-think how to address the requirements of ¶¶488–91.

Also in the fifth reporting period, COPA produced a draft *Major Incident Responses* policy for review.[71] This policy remained in the collaborative review and revision process at the end of the fifth reporting period. In the sixth reporting period, COPA submitted its *Major Incident Responses – Officer-Involved Shooting or Officer-Involved Death* policy, which fully addressed the requirements of ¶491.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶491. The CPD continues to delay developing an internal policy to direct its response and involvement in officer-involved shootings and death incidents (OIS/OID). The IMT continues to encourage the CPD to develop a policy that addresses the requirements of ¶491, specifically in how the CPD interacts with COPA on the scenes of OIS/OID, while the City determines how to address the statutory requirements regarding who will handle the criminal investigation and how the criminal investigation will be handled.

<div align="center">* * *</div>

The City did not yet reach Preliminary compliance with this paragraph. CPD has significant work ahead to reach Preliminary compliance. We hope that the CPD will continue to make consistent efforts to revise G03-06 and work with the IMT and the OAG to do so throughout the eighth reporting period.

---

*Death Incident Response and Investigations*; and the City and the CPD issued temporary versions of the policy pursuant to ¶631 (extraordinary circumstances).

[71]  Please refer to the discussion of ¶488 regarding COPA's *Major Incident Responses* Policy.

## Paragraph 491 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶492

*492. Criminal investigations into the actions of any CPD member relating to any "officer-involved death" will comply with the Police and Community Relations Improvement Act, 50 ILCS 727/1-1 et seq. ("PCRIA"). The City will use best efforts to ensure that a "law enforcement agency," as that term is defined under PCRIA, will conduct such investigations. The "law enforcement agency" conducting criminal investigations into the actions of any CPD member relating to any "officer-involved death" will have substantial experience and expertise in criminal homicide investigations.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶492 in the seventh reporting period because the CPD did not provide any documentation demonstrating efforts related to ¶492 during the reporting period.

To evaluate Preliminary compliance with ¶492, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Seventh Reporting Period*

In the fifth and sixth reporting periods, the CPD did not produce any documentation related to efforts under ¶492. We noted that compliance with this paragraph will required enlisting the help of an outside agency, and that we hoped to work closely with the City and the CPD throughout this process.

*Progress in the Seventh Reporting Period*

This reporting period, the City and CPD did not produce any documentation that demonstrated efforts related to ¶492. The City has not produced any documentation related to efforts for this paragraph to date.

\*\*\*

We look forward to the City and CPD working toward developing a policy that instructs compliance with the requirements of ¶492 in future reporting periods.

## Paragraph 492 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶493

> ***493.*** *OAG acknowledges that, in many districts, CPD has desig-*
> *nated Accountability Sergeants whose responsibilities include re-*
> *ceiving, processing, and investigating complaints made against*
> *CPD members, which are referred to the districts by BIA. Within*
> *120 days of the Effective Date, CPD will develop a policy outlining*
> *the responsibilities of Accountability Sergeants, their respective*
> *Commanders, and the BIA Lieutenants responsible for supervis-*
> *ing the Accountability Sergeant's investigations ("BIA Lieuten-*
> *ants"). The policy will provide, among other things, a process by*
> *which: a. within 72 hours of receiving a complaint from BIA for*
> *investigation, an immediate supervisor will be provided a sum-*
> *mary of the complaint allegations concerning the involved CPD*
> *member; b. within seven days of the final disciplinary decision,*
> *the Commander and an immediate supervisor will be provided*
> *with the investigative findings, recommended discipline or cor-*
> *rective action, if any; and c. an immediate supervisor of the in-*
> *volved CPD member and the Accountability Sergeant will meet*
> *with the involved CPD member regarding the investigative find-*
> *ings, recommended discipline or corrective action, if any, unless*
> *the CPD member declines to meet.*

## Compliance Progress (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶493 in the seventh reporting period.

To evaluate Preliminary compliance with ¶493, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed the entities' development, implementation, and evaluation of training (¶286).

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD revised and ultimately finalized Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addresses the requirements of ¶493(a). The CPD also finalized Special Order S08-01-04, *Post Investigation Log Number Procedures*, which addresses ¶493(b) and (c),

on the final day of the fifth reporting period, moving the CPD into Preliminary compliance with ¶493. In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review, however these materials remained in draft state at the end of the reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*.[72] This policy completely addresses the requirements of ¶493(b) by placing the responsibility of immediately providing the investigative findings to the member's supervisor directly upon the district or unit commander.

Although the CPD had previously produced draft BIA eLearning Training materials for review with this paragraph in the sixth reporting period, the CPD did not produce revised versions of these training materials for review with ¶493 this reporting period and did not designate the training materials as meeting the requirements of this paragraph.

Although the requirements of ¶493 do not apply to COPA, the IMT commends COPA for providing its *Complaint Register* training that makes reference to this paragraph to ensure that COPA employees are aware of the responsibilities of Accountability Sergeants in the preliminary investigative process. This demonstrates COPA's commitment to providing complete instruction regarding the investigative process of not only COPA but also CPD's responsibilities.

*** 

We look forward to reviewing further revised CPD materials in the coming reporting period.

---

[72] This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

## Paragraph 493 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
None

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶494

**494.** *CPD will require that: a. investigations completed by Accountability Sergeants are held to the same investigative standards as those completed by BIA; b. beginning in 2020, and by January 31, 2022, each District Commander designates at least two Accountability Sergeants who will report to the District Commander, and whose primary responsibility is receiving, processing, and investigating complaints against CPD members; c. before a Sergeant is designated an Accountability Sergeant, his or her name will be provided by his or her District Commander to BIA for BIA's review; d. each Accountability Sergeant is provided with the name of and contact information for the BIA Lieutenant responsible for reviewing the Accountability Sergeant's work; e. BIA Lieutenants provide regular case-related and overall performance feedback to each of the Accountability Sergeants and his or her respective District Commander; f. BIA Lieutenants review and approve all of the Accountability Sergeant's proposed investigative findings and disciplinary recommendations; g. all Accountability Sergeants and BIA Lieutenants have access to the PRS or any system replacing the PRS; h. all Accountability Sergeants have access to BIA policies, directives, protocols, and training materials; and i. all Accountability Sergeants receive the initial and in-service training provided to BIA investigators as provided for in this Agreement.*

## Compliance Progress        (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and CPD did not reach Preliminary compliance with ¶494.

To evaluate Preliminary compliance with ¶494, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD finalized S08-01, *Complaint and Disciplinary Investigations*, which addressed ¶494(a), (c), (d), (e), (f), (g), (h), and (i). The CPD also submitted for review BIA's Unit Directive, *Training Unit*, in the fifth reporting

period, which addressed ¶494(i). Before the fifth reporting period, the CPD had produced other BIA Unit Directives under ¶494 such as *Accountability Sergeants*, which we found addressed the requirements of ¶494. However these Unit Directives were never posted for public comment and finalized.[73]

Additionally, the CPD submitted for review the *Fiscal Year 2022 BIA Staffing and Equipment Needs Assessment Implementation Plan*. This plan included concerning information that seemed to indicate that while ¶494(b) of the Consent Decree requires two Accountability Sergeants, BIA does not require both to be full time investigators. During site visits in the fall of 2021, we learned that the Accountability Sergeants were required to fill other supervisory responsibilities that often prevented them from being able to complete their investigations in a timely manner. We explained that we expected to have ongoing discussions related to this issue, and urged the CPD to update the policy to ensure that two Accountability Sergeants are full time investigators, per the requirements of ¶494(b).

In the sixth reporting period, the City and the CPD provided Special Order S08-01-06, *Supervisor Responsibilities in Log Number Investigations*, but stated in its production letter that S08-01-06 was not submitted S08-01-06 "to demonstrate compliance with Consent Decree paragraphs, and the CPD was not seeking review of this policy at this time." Nonetheless, we reviewed the draft S08-01-06 and submitted comments, noting our expectation that we would receive a final draft of this policy for review under ¶627. In the meantime, we suggested that the CPD consider changing the title of S08-01-06 to "BIA Supervisor Responsibilities in Log Number Investigations" for clarity, since the policy only addresses the responsibilities of BIA personnel. We observed that Sections IV.A.15 and IV.B.9 addressed the requirements of ¶494(i).

Although we encouraged the CPD to produce and revise S08-01-06 per the Consent Decree process, we noted that finalization of S08-01-06 as it is now written would not bring the CPD into compliance with ¶494 because subparagraph (b) will still not be addressed by CPD policy. We encouraged the CPD to consider how this requirement can be incorporated into current policy, and then urged the CPD to assure that positions are adequately staffed to allow for compliance with subparagraph (b).

---

[73] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and the process is ongoing.

Also in the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. These materials were still in draft state and not in final presentation form at the end of the reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD did not produce any documentation for review with ¶494. Although the CPD had previously produced draft BIA eLearning Training materials for review with this paragraph in the sixth reporting period, the CPD did not produce revised versions of these training materials for review with ¶494 this reporting period and did not designate the training materials as meeting the requirements of this paragraph.

During site visits in June 2022, the IMT met with several groups of BIA Investigators and Accountability Sergeants to discuss their experiences. Through these conversations we learned about some of the realities on the ground and challenges Investigators and Accountability Sergeants face when performing their duties.

For example, ¶494(b) of the Consent Decree requires two Accountability Sergeants for each district and unit within CPD. However, we learned that the CPD consistently and uniformly does not adhere to this standard. We learned that most districts have allocated only one sergeant as the Accountability Sergeant and the district or unit may or may not have designated a "backup sergeant" for case assignment when the primary Accountability Sergeant is away from duty. The backup Accountability Sergeant performs other assignments in the district and only has cases assigned during the absence of the "Primary Accountability Sergeant." This creates a very high caseload for the one designated Accountability Sergeant. For additional discussion of the requirements of ¶494(b), see summaries for ¶¶521–24.

<div align="center">***</div>

As we stated in the sixth reporting period, the CPD must focus its attention on incorporating into policy the requirements of ¶494(b) to move forward with compliance with this paragraph. We look forward to reviewing revised policy from the CPD in future reporting periods.

## Paragraph 494 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| None |

# Accountability and Transparency: ¶495

***495.*** *Supervisory reviews of investigations will be conducted as follows: (a) Accountability Sergeants will forward the administrative investigative file through his or her chain of command to the BIA Lieutenant: (i) the Accountability Sergeant's chain of command will ensure that the proposed investigative findings and recommendations are complete, meet the requirements of law, CPD policy, and this Agreement, and that findings are supported by the appropriate standard of proof; (ii) BIA Lieutenants will review the proposed investigative findings and recommendations for accuracy and completeness, and will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings; and (iii) whenever a higher ranking officer orders additional investigation, it will be documented in writing. (b) all investigations conducted by COPA or BIA, once complete, will be forwarded through the investigator's chain of supervision/command to the Chief Administrator of COPA or the Chief of BIA, respectively: (i) COPA and BIA will each ensure that their respective administrative investigative files are complete, meet the requirements of law, COPA and CPD policy, and this Agreement; and that findings are supported by the appropriate standard of proof; (ii) the Chief Administrator or the Chief of BIA, or his or her designee, will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings; and (iii) whenever COPA and BIA orders additional investigation, the request and resulting investigation will be documented in writing.*

## Compliance Progress         (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Under Assessment* |

The City and the CPD reached Preliminary compliance with ¶495 in the seventh reporting period. COPA reached Secondary compliance with ¶495 and remains Under Assessment for Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶495, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed COPA's training development, implementation, and evaluation (¶286). To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD produced for review several draft policies that relate to ¶495's requirements. This included S08-01, *Complaint and Disciplinary Investigators and Investigations* and BIA's Unit Directive, *Requirements of a Complete Investigative File*.[1] In the fifth reporting period, the CPD provided revised drafts of Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addressed ¶495(a)(i) and (a)(iii) but did not fully address ¶495(a)(ii). We submitted a no-objection notice.[2] Thereafter, the CPD posted the

---

[1]   In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and efforts are ongoing.

[2]   Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the

Special Order for public comment and, on the last day of the reporting period, finalized the Special Order. In addition, the CPD produced S08-01-01, *Conducting Log Number Investigations*, which partially addresses ¶495(a)(i) and fully addresses ¶495(a)(ii). However, this policy did not address ¶495(b), and at the end of the fifth reporting period, it remained in the collaborative review and revision process.

In the sixth reporting period, the City and the CPD provided S08-01-06, *Supervisor Responsibilities in Log Number Investigations*. But when this Special Order was submitted, the CPD indicated that this Special Order was not submitted "to demonstrate compliance with Consent Decree paragraphs, and the CPD is not seeking review of this policy at this time." Nonetheless, we reviewed the policy and provided comments on June 15, 2022, expressing our expectation that we would receive a final draft of this policy for review under ¶627. We observed that Section IV.A.8 of the draft policy addressed the requirements of ¶495(a)(i), and Section VI.A.9. addressed the requirements of ¶495(a)(ii). Additionally, the CPD submitted multiple revised versions of S08-01-05, *Conducting Log Number Investigations*.[3] We noted that the draft versions of this policy addressed the requirements of ¶495(a)(i), ¶495(a)(ii), and ¶495(b) by outlining the process by which supervisory reviews of investigations will be conducted. The CPD submitted a further revised version of S08-01-05 on June 30, 2022, the last day of the reporting period. Therefore, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

COPA, in the fourth reporting period, provided Policy 3.1.3, *Final Summary Report*, which addressed ¶495. In the fifth reporting period, COPA continued to work toward Preliminary compliance, and eventually finalized Policy 3.1.3 *Final Summary Report*. We noted that this policy completely addresses ¶495(b). While COPA maintained Preliminary compliance with ¶495 in the sixth reporting period, COPA did not submit any materials to demonstrate Secondary compliance with ¶495 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy completely addresses the requirements of ¶495. The IMT submitted no-objection notices to S08-

---

CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[3] The *Conducting Log Number Investigations* policy was produced in previous reporting periods as S08-01-01. The policy was re-numbered as S08-01-05 when it was produced May 5, 2022.

01-05 in September and October 2022. With this, the CPD reached Preliminary compliance.

COPA, in the seventh reporting period, provided *Final Summary Reports & Standards of Proof (FSR)* training materials. These training materials address the requirements of ¶495 relevant to COPA. The IMT submitted a no-objection notice to these training materials on November 10, 2022. The IMT virtually attended the *Final Summary Reports & Standards of Proof* training delivered to COPA staff on November 29, 2022. The training was well-presented and engaging, and the instructors were knowledgeable about the subject matter. COPA continues to demonstrate its ability to develop thorough training relevant to its policies and procedures. This training addresses the training requirement for ¶495. On January 12, 2023, COPA produced documentation demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

Additionally, COPA provided documentation with case examples that appear to address the requirements of ¶495(b)(i), but do not appear to include information to address the requirements of ¶495(b)(ii)–(iii). COPA remains Under Assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

\*\*\*

The City and the CPD reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph.

COPA reached Secondary compliance with this paragraph and remains Under Assessment for Full compliance.

### Paragraph 495 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶496

> **496.** *The City and CPD will ensure that interfering with an administrative investigation, including being untruthful in an investigation into misconduct or colluding with other individuals to undermine such an investigation, or intentionally withholding requested evidence or information from an investigator, will result in disciplinary action and/or criminal prosecution based on the seriousness of the conduct.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[4] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Under Assessment* |

The City and the CPD maintained Preliminary compliance with ¶496 in the seventh reporting period. COPA reached Secondary compliance and remains Under Assessment for Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶496, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[5] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation

---

[4]     As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[5]     The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

(¶286). To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD revised and finalized General Order G08-01, *Complaint and Disciplinary Procedures*, which addressed ¶496. This brought the CPD into Preliminary compliance. In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. We reviewed and provided the CPD feedback on the materials, and noted that we would look forward to reviewing further developed BIA eLearning materials in the seventh reporting period.

In the fifth reporting period, COPA finalized Policy 3.1.2, *Fact Gathering and the Investigative Process*, which addresses ¶496 in the Quality Assurance section of the policy. With this, COPA achieved Preliminary compliance. While COPA maintained Preliminary compliance with ¶496 in the sixth reporting period, COPA did not submit any materials to demonstrate Secondary compliance with ¶496 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶496. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[6]

Additionally, the CPD provided a revised draft of G08-01, *Complaint and Disciplinary System*. Although this revised policy was not produced for review with ¶496, it addresses the requirements of ¶496. The IMT submitted a no-objection notice to G08-01 on December 5, 2022.

COPA, in the seventh reporting period, provided *Fact Gathering-Evidence Collection* training materials, which address the requirements of ¶496. The IMT submitted a no-objection to these training materials on September 30, 2022. The IMT virtually attended the *Fact Gathering-Evidence Collection* training delivered to COPA In-Service staff on December 13, 2022. The training followed the lesson plan and the slide presentation allowed the instructor to provide specific detail without reading from the slides. The instruction was clear and engaging. The instructor was well-prepared, knowledgeable in the subject matter, and was able to effectively draw from personal experience to illustrate specific points in the lesson plan while

---

[6] To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

comfortably engaging the class in discussion. COPA continues to consistently demonstrate its ability to develop thorough training relevant to its policies and procedures. This training addresses the training requirement for ¶496. On January 12, 2023, COPA produced documentation demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

Additionally, COPA provided a memorandum and documentation related to its Final Summary Reports (FSRs). The IMT reviewed seven FSRs regarding investigations involving CPD officers allegedly making false statements, among other charges. The investigations demonstrate that COPA investigators carefully considered all original statements and facts as well as follow-up statements and arrived at fair and accurate conclusions. The IMT notes that two of the cases were Independent Police Review Authority (IPRA) cases, one more than a decade old that COPA inherited, and COPA performed a thorough investigation. Although these materials were produced for review with ¶495, the materials are relevant to ¶496. COPA remains Under Assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

\*\*\*

The City maintained Preliminary compliance with ¶496. We look forward to reviewing CPD's further revised training materials in the coming reporting period. Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel.

COPA reached Secondary compliance with this paragraph and remains Under Assessment for Full compliance.

### Paragraph 496 Compliance Progress History

| FIRST REPORTING PERIOD SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SECOND REPORTING PERIOD SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | THIRD REPORTING PERIOD MARCH 1, 2020 – DECEMBER 31, 2020 |
|---|---|---|
| COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: None |
| FOURTH REPORTING PERIOD JANUARY 1, 2021 – JUNE 30, 2021 | FIFTH REPORTING PERIOD JULY 1, 2021 – DECEMBER 31, 2021 | SIXTH REPORTING PERIOD JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: None | COMPLIANCE PROGRESS: Preliminary | COMPLIANCE PROGRESS: Preliminary |
| SEVENTH REPORTING PERIOD JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: Preliminary | | |

## Accountability and Transparency: ¶497

> **497.** *COPA and CPD will review and revise, as necessary, the policies governing COPA and CPD to ensure the processes for prevention of CPD member collusion and witness contamination comply with the terms of this agreement.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[7] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶497 in the seventh reporting period. COPA reached Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶497, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[8] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

---

[7] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[8] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD finalized General Order G08-01, *Complaint and Disciplinary Procedures*, which addressed ¶497. Additionally, the CPD provided various policies that contribute to setting the standards aimed to prevent CPD member collusion and witness contamination.[9] These efforts brought the CPD into Preliminary compliance.

In the fifth reporting period, COPA finalized Policy 3.1.2, *Fact Gathering and the Investigative Process*, which addresses ¶497. With this, COPA achieved Preliminary compliance.

While both the CPD and COPA maintained Preliminary compliance with ¶497, neither entity produced materials to demonstrate Secondary compliance with ¶497 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided a revised draft of G08-01, *Complaint and Disciplinary System*. This revised policy addresses the requirements of ¶497. The IMT submitted a no-objection notice to G08-01 on December 5, 2022.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶497. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review with a different combination of Consent Decree paragraphs, including ¶497. The latest draft of this training addresses the requirements of ¶497. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

COPA, in the seventh reporting period, provided *Fact Gathering-Evidence Collection* training materials, which address the requirements of ¶497. The IMT submitted a no-objection to these training materials on September 30, 2022. The IMT virtually attended the *Fact Gathering-Evidence Collection* training delivered to COPA In-Service staff on December 13, 2022. The training followed the lesson plan and the slide presentation allowed the instructor to provide specific detail without reading from the slides. The instruction was clear and engaging. The instructor was well-prepared, knowledgeable in the subject matter, and was able to effectively draw from personal experience to illustrate specific points in the lesson plan while comfortably engaging the class in discussion. COPA continues to consistently

---

[9]     Policies referenced include G08-01-02, S08-01-01, and S08-01.

demonstrate its ability to develop thorough training relevant to its policies and procedures. This training addresses the training requirement for ¶497. On January 12, 2023, COPA produced documentation demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

<div align="center">***</div>

The CPD did not yet reach Secondary compliance, but made significant efforts related to this paragraph in the seventh reporting period. In the next reporting period, we will look for the CPD to further develop its training.

COPA reached Secondary compliance with this paragraph in the seventh reporting period. Moving forward, we will look for COPA to demonstrate that it has sufficiently implemented its policies and training.

## Paragraph 497 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Accountability and Transparency: ¶498

> **498.** *The City and CPD will ensure that any command channel review conducted is complete within 30 days. Within 30 days of the Effective Date, CPD may draft a policy that provides, for the most serious administrative investigations, the circumstances under which up to 45 days will be provided for command channel review. The draft policy will be provided to the Monitor for review and approval.*

Compliance Progress (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Secondary compliance with ¶498 in the seventh reporting period.

To evaluate Preliminary compliance with ¶498, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, we consulted various data sources to ensure that the City and the CPD have sufficiently implemented their policies and training associated with ¶498. More specifically, the IMT sought out timelines of all command channel reviews to ensure they are conducted within 30 days and in a manner in accordance with ¶498.

*Progress before the Seventh Reporting Period*

In prior reporting periods, the IMT reviewed and approved the CPD's Special Order S08-01-03, *Command Channel Review (CCR)*, as well as BIA's related training materials—including lesson plans and slide decks—which were sufficient to demonstrate Preliminary and Secondary compliance with ¶498. In the fourth reporting period, BIA maintained Secondary compliance due to its policy and continued training of the appropriate CPD command staff and officers. To further strengthen the Command Channel Review process, the CPD produced BIA's S08-01, *Complaint and Disciplinary Investigators and Investigations*.

In the fifth reporting period, the CPD provided for review BIA's Unit Directive, *Advocate Section Command Channel Review Procedures*. This directive did not address ¶498 because it did not state that a Command Channel Review must be completed in 45 days, as required by the Consent Decree. We provided comments in

September 2021, but we did not receive further information regarding the posting of the Unit Directive for public comment and finalization.[10] The CPD also produced BIA's *2020 Audit*, in which the CPD stated that it was not in operational compliance with the requirements of ¶498. While this audit was well done, we received the *2020 Audit* on December 28, 2021—several months too late. We explained that, moving forward, such audits need to be provided in a timelier manner to demonstrate compliance and to allow the CPD to identify areas on which it needs to focus its efforts and attention.

In the sixth reporting period, the City and the CPD provided drafts of Special Order S08-01-07, *Command Channel Review*.[11] On June 30, 2022, the last day of the reporting period, the CPD submitted a further revised draft of S08-01-07. Therefore, this policy remained in the collaborative review and revision process at the end of the sixth reporting period. While the CPD did not specifically reference ¶498 in its submission of S08-01-07, a draft policy focused on the Command Channel Review process. We noted that Section III.B.3 of the draft policy appeared to partially, but not fully, address the requirements of ¶498. For example, we explained that the policy states that "any *two-level* Command Channel Review process will be concluded within thirty days," whereas ¶498 provides that "*any* command channel review conducted is complete within 30 days" (emphases added). Further, we noted that Section III.B.4 does not specify tracking or discipline for those command staff who do not fulfill their responsibilities in the Command Channel Review process. We explained that this is relevant because, as noted in the BIA 2020 Audit, nearly half of the Command Channel Review cases did not meet the thirty-day policy requirement.

Furthermore, we noted in the sixth reporting period that Section III.B.5 of S08-01-07 includes a fundamental requirement of ¶498—that more serious allegations will require a third level of Command Channel Review within forty-five days. We observed that the BIA 2020 Audit indicates that none of the 1,406 BIA cases closed

---

[10]  In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and the effort is ongoing.

[11]  The IMT previously reviewed multiple drafts of S08-01-03, *Command Channel Review* (previously titled *Complaint Summary Reporting and Review Procedures*). The IMT also previously reviewed Unit Directives regarding Command Channel review procedures. In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Advocate Section Command Channel Review Procedures* (previously titled *Command Channel Review*) into S08-01-07. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

in 2020 underwent a third-level of review because the Case Management System was not able to identify those cases. We expressed our concern that command personnel may not be fully aware of the Command Channel Review directives, or may not follow the policy. We explained that CPD commanders must follow these policies and procedures and meet the required deadlines to set the proper standard for BIA investigators and Accountability Sergeants.

Finally, we noted that with updated policy instructing compliance with ¶498, the CPD should revisit training relevant to the paragraph to determine whether updates are necessary. We also noted that the training related to ¶498 began being provided over a year ago, yet the CPD has not shown that it has implemented its training such that it is in Full compliance. We encouraged the CPD to critically consider not only this training but all training if the desired outcomes are not realized through the training.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided a memorandum regarding its Command Channel Review training. This memorandum documented that more than 95% of command staff have been trained in the Command Channel Review process. The IMT appreciates the level of detail included in this memorandum and the manner in which attendance is documented from 2019 to the present. The IMT assumes that the updates to S08-01-07, *Command Channel Review*, have been incorporated into this training, and looks forward to receiving information regarding whether such updates have been made to the training materials. Additionally, the IMT looks forward to receiving documentation in the ninth reporting period showing the command staff that have been trained in the Command Channel Review process during 2023.

*** 

The City and the CPD maintained Secondary compliance with ¶498 in the seventh reporting period. In the coming reporting periods, we look forward to receiving materials to determine whether the City and the CPD have sufficiently implemented their policies and training relevant to the requirements of ¶498, including the review of records from multiple sources reflecting timelines.

## Paragraph 498 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Accountability and Transparency: ¶499

*499. When COPA, BIA, or the investigating district has arrived at the investigative findings and recommendations, it will promptly finalize a summary report ("Administrative Summary Report"). The Administrative Summary Report will include: a. a description of the CPD members and individuals involved in the alleged misconduct; b. the date, time, and location of the alleged misconduct; c. a description of the allegations and applicable policies; d. a narrative summary of the alleged misconduct; e. a narrative summary of the investigation; and f. the investigating body's findings and conclusions for each allegation of misconduct, including any discipline recommended.*

| Compliance Progress | | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[12] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Under Assessment* |

The City and the CPD maintained Preliminary compliance with ¶499 in the seventh reporting period. COPA reached Secondary compliance and remains Under Assessment for Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶499, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[13] To evaluate Secondary compliance, the

---

[12] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[13] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and*

IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Seventh Reporting Period*

The CPD reached Preliminary compliance with ¶499 in the fifth reporting period, when it posted for public comment and finalized Special Order S08-01-04, *Documenting Log Number Investigations and Post-Investigation Procedures*.[14] The CPD also provided in previous reporting periods BIA's draft *Administrative Summary Report* Packet, which specifically addressed the requirements of ¶499. In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. These materials were still in draft state and not in final presentation form. The draft training materials addressed the requirements of ¶499 and its subparagraphs.

COPA reached Preliminary compliance with ¶499 in the fourth reporting period when it finalized Policy 3.1.3, *Final Summary Report (FSR)*, which addressed ¶499(a)–(f) in detail. COPA maintained compliance but did not provide any documentation related to efforts under ¶499 in the fifth reporting period. In the sixth reporting period, COPA maintained compliance with ¶499, but did not submit materials related to ¶499.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*.[15] This policy completely addresses the requirements of ¶499 and its subparagraphs.

Additionally this reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶499. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[16]

---

*Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[14]  In the sixth reporting period, this finalized policy was renumbered and retitled as Special Order S08-01-08, *Post-Investigation Log Number Procedures*.

[15]  This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

[16]  To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

Additionally, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶499. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. The latest draft of this training addresses the requirements of ¶499 and its subparagraphs verbatim. This training is still under development. For further discussion of the BIA Onboard Training, see ¶¶526–27.

CPD is also developing an Administrative Summary Report training for BIA investigators and Accountability Sergeants, which is in draft form and still requires further revision.

COPA, in the seventh reporting period, provided *Final Summary Report & Standards of Proof (FSR)* training materials. These training materials completely meet the requirements of ¶499. The IMT submitted a no-objection notice to these training materials on November 10, 2022. On January 12, 2023, the City and COPA submitted documentation demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

The IMT virtually attended the *Final Summary Reports & Standards of Proof* training delivered to COPA In-Service staff on November 29, 2022. The training followed the lesson plan and the slide presentation allowed the instructor to provide specific detail without reading from the slides. The instruction was clear and engaging. The instructor was well-prepared, knowledgeable in the subject matter, and was able to effectively draw from personal experience to illustrate specific points in the lesson plan while comfortably engaging the class in discussion. COPA continues to consistently demonstrate its ability to develop thorough training relevant to its policies and procedures. This training completely meets the requirements for ¶499.

Additionally, COPA provided a memorandum documenting five COPA Final Summary Reports (FSRs), along with a link to FSRs published on COPA's website. These FSRs include all of the information required by ¶499(a)–(f). COPA remains Under Assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

\*\*\*

The City maintained Preliminary compliance with ¶499. We look forward to reviewing CPD's further revised training materials in the coming reporting period. Moving forward, we anticipate that the CPD will revise the BIA eLearning to include

the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel.

COPA reached Secondary compliance with this paragraph and remains Under Assessment for Full compliance.

### Paragraph 499 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶500

> ***500.*** *For all misconduct investigations, BIA or COPA will publish the Administrative Summary Report within 60 days of the final disciplinary decision.*

## Compliance Progress (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[17] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Under Assessment* |

The City and the CPD maintained Preliminary compliance with ¶500 in the seventh reporting period. COPA reached Secondary compliance and remains Under Assessment for Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶500, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[18] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

---

[17] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[18] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

The CPD achieved Preliminary compliance with ¶500 in the fifth reporting period with the finalization of S08-01-04, *Post-Investigation Log Number Procedures*.[19] Additionally, in the fifth reporting period, the CPD submitted BIA's *Administrative Summary Report Section* Unit Directive. We submitted a no-objection notice to this Unit Directive in January 2021.[20] However, the CPD did not submit this Unit Directive for public comment. Therefore, it was not finalized per the Consent Decree Review process. The CPD also produced BIA's *2020 Audit* in the fifth reporting period, in which the CPD acknowledged that, while there were 16 cases that received a final disciplinary decision in 2020, the BIA did not publish any Administrative Summary Reports for these cases within 60 days of the decisions. We appreciated the CPD's honest self-assessment and encouraged the CPD to continue to produce high-quality audits, but in a more timely manner. These audits will not only help in demonstrating compliance, but also to allow the CPD to identify areas on which it needs to focus its efforts and attention. In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. These materials were still in draft state and not in final presentation form. The draft training materials addressed the requirements of ¶500 and its subparagraphs.

COPA reached Preliminary compliance with ¶500 in the fourth reporting period by finalizing its Policy 3.1.3, *Final Summary Report*, which addresses all requirements of the paragraph. COPA maintained Preliminary compliance but did not provide evidence of additional efforts toward Secondary compliance in the fifth reporting period. In the sixth reporting period, COPA maintained Preliminary compliance but did not submit materials related to ¶500.

---

[19] In the sixth reporting period, we were informed that this finalized policy would be renumbered as Special Order S08-01-08, *Post-Investigation Log Number Procedures*.

[20] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*.[21] This policy completely addresses the requirements of ¶500 by directing that the Administrative Summary Report be published within 60 days of the final disciplinary decision.

Additionally this reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶500. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[22]

COPA, in the seventh reporting period, provided *Final Summary Report & Standards of Proof (FSR)* training materials. These training materials address ¶500's requirement to publish the report "within 60 days of the final disciplinary decision." The IMT submitted a no-objection notice to these training materials on November 10, 2022. Additionally, COPA provided Guidance, *Publishing and Distribution of Final Summary Reports*, which addresses how the Final Summary Report is published and identifies the COPA staff who are responsible for ensuring that the processes occur correctly and within the 60-day timeframe required by ¶500. The IMT submitted a no-objection notice to this Guidance on December 2, 2022. On January 12, 2023, the City and COPA submitted documentation demonstrating that the *Final Summary Report & Standards of Proof* training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

Additionally, COPA provided documentation related to its Final Summary Reports (FSRs), including examples of FSRs. However, one of these examples appears to be an FSR that was posted more than five months from the data the investigation closed, which does not meet the requirement of ¶500. The IMT virtually attended the *Final Summary Reports & Standards of Proof* training delivered to COPA In-Service staff on November 29, 2022. The training followed the lesson plan and the slide presentation allowed the instructor to provide specific detail without reading from the slides. The instruction was clear and engaging. The instructor was well-prepared, knowledgeable in the subject matter, and was able to effectively draw from personal experience to illustrate specific points in the lesson plan while com-

---

[21]   This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

[22]   To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

fortably engaging the class in discussion. COPA continues to consistently demonstrate its ability to develop thorough training relevant to its policies and procedures. This training completely meets the requirements of ¶500.

COPA remains Under Assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

*** 

The CPD made significant efforts toward Secondary compliance in the seventh reporting period, but did not yet reach it. Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. COPA reached Secondary compliance and remains Under Assessment for Full compliance.

### Paragraph 500 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶501

> *501. Within 60 days of the final disposition, the City will publish: the charges filed and the discipline recommended; the written decision(s), if any, related to the final disposition; and the discipline imposed. When available, the City will publish the date on which the discipline is scheduled to be imposed.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶501 in the seventh reporting period.

To evaluate Preliminary compliance with ¶501, we reviewed the City's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).

*Progress before the Seventh Reporting Period*

In the third reporting period, the City indicated that it would be directly responsible for policy creation related to ¶501 as well as corresponding compliance efforts with this paragraph. Although we had reviewed some COPA and BIA materials related to ¶501 in previous reporting periods, we received nothing from the City. Therefore, the City did not provide any evidence of efforts toward compliance with ¶501.

In the fifth reporting period, the City did not provide evidence of efforts it had made toward Preliminary compliance with ¶501. While the City pointed to Police Board findings and decisions, ¶501 calls for certain information to be posted "within 60 days of the final disposition." We noted that the scope of ¶501 is broader than dispositions arising from the Police Board only. Because the City did not produce evidence of policy, procedure, or other written guidance to direct compliance with ¶501, it did not reach Preliminary compliance in the fifth reporting period. In the sixth reporting period, the City did not produce evidence of policy, procedure, or other written guidance to direct compliance with ¶501, and therefore did not reach Preliminary compliance.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*.[23] This policy addresses the requirements of ¶501 by requiring that within 60 days of final disposition, the City will publish the charges filed and recommended discipline along with the dates the discipline is imposed. With this, the CPD reached Preliminary compliance.

<p style="text-align:center">***</p>

Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph.

### Paragraph 501 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

---

[23] This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

# Accountability and Transparency: ¶502

> **502.** *Information contained in the Administrative Summary Report that is legally exempt from disclosure for privacy or other purposes will be redacted prior to electronic publication.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[24] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶502 in the seventh reporting period. COPA reached Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶502, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[25] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we considered whether the entities have implemented measures to investigate allegations of misconduct involving multiple policy violations and obtain data to demonstrate that exoneration of the most serious allegations does not prevent other appropriate measures from being undertaken.

---

[24] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[25] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

The City reached Preliminary compliance with ¶502 when all implicated City entities reached Preliminary compliance. The CPD reached Preliminary compliance in the fifth reporting period by finalizing Special Order S08-01-04, *Post-Investigation Log Number Procedures*.[26] In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. These materials were still in draft state and not in final presentation form. We noted that the draft training materials addressed ¶502's requirement that information contained in the Administrative Summary Report that is legally exempt from disclosure for privacy or other purposes will be redacted prior to electronic publication.

COPA reached Preliminary compliance with ¶502 in the fourth reporting period by finalizing Policy 3.1.3, *Final Summary Report*. COPA maintained Preliminary compliance with ¶502 in the fifth reporting period, but did not reach additional levels of compliance because it did not produce evidence that instructs compliance with this paragraph. In the sixth reporting period, COPA maintained Preliminary compliance with ¶502, but did not submit materials related to ¶502.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*.[27] This policy addresses the requirements of ¶502.

Additionally this reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶502. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[28]

COPA, in the seventh reporting period, provided *Final Summary Report & Standards of Proof (FSR)* training materials. These training materials address ¶502's requirement that information contained in the report "that is legally exempt from disclosure for privacy or other purposes will be redacted prior to electronic publication." The IMT submitted a no-objection notice to these training materials on November 10, 2022. On January 12, 2023, the City and COPA submitted documentation demonstrating that this training was provided to at least 95% of COPA's staff

---

[26]  In the sixth reporting period, we were informed that this policy will be renumbered S08-01-08, *Post-Investigation Log Number Procedures*.

[27]  This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

[28]  To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

Additionally, COPA provided Guidance, *Publishing and Distribution of Final Summary Reports*, which addresses ¶502 by stating that COPA legal staff will ensure that redactions to the FSR are appropriate. The IMT submitted a no-objection notice to this Guidance on December 2, 2022. Further, COPA submitted a memorandum documenting the process for making redactions prior to electronic publication.

The IMT virtually attended the *Final Summary Reports & Standards of Proof* training delivered to COPA In-Service staff on November 29, 2022. The training followed the lesson plan and the slide presentation allowed the instructor to provide specific detail without reading from the slides. The instruction was clear and engaging. The instructor was well-prepared, knowledgeable in the subject matter, and was able to effectively draw from personal experience to illustrate specific points in the lesson plan while comfortably engaging the class in discussion. COPA continues to consistently demonstrate its ability to develop thorough training relevant to its policies and procedures. This training meets the requirements of ¶502. For Full compliance, COPA will need to demonstrate that it has implemented measures to investigate allegations of misconduct involving multiple policy violations and obtain data to demonstrate that exoneration of the most serious allegations does not prevent other appropriate measures from being undertaken.

*＊＊＊*

The CPD made significant efforts toward Secondary compliance in the seventh reporting period, but did not yet reach it. Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. COPA reached Secondary compliance. Moving forward, we will look for COPA to demonstrate efforts related to maintaining Full compliance with this paragraph.

## Paragraph 502 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶503

> *503. When an allegation of misconduct contains multiple separate potential policy violations, all applicable violations will be identified and investigated. Exoneration for the most serious allegations of misconduct will not preclude the recommendation of discipline, training, or other corrective measures for less serious misconduct stemming from the same set of allegations.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Under Assessment* |

The City and the CPD reached Preliminary compliance with ¶503 in the seventh reporting period. COPA reached Secondary compliance and remains Under Assessment for Full compliance.

We assessed compliance with ¶503 for the first time in the fifth reporting period. To evaluate Preliminary compliance with ¶503, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[29] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, we determined whether the City, the CPD, and COPA have sufficiently implemented their policies and training.

*Progress before the Seventh Reporting Period*

The CPD made efforts related to ¶503 during the fifth reporting period, but did not reach Preliminary compliance. In August 2021, the CPD submitted Special Order S08-01-01, *Conducting Log Number Investigations*. We provided comments in September 2021, but did not receive a revised draft. Nonetheless, we noted that

---

[29] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

the first draft of S08-01-01 addressed many requirements of the Consent Decree, including the mandates of ¶503. Additionally, we were encouraged by the fact that S08-01-01 went beyond specific Consent Decree requirements, which we noted reflects an effort to revise and reform policy beyond the minimum mandates of the Consent Decree. In the sixth reporting period, the CPD submitted multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, which was previously numbered S08-01-01. This policy addresses ¶503, but it remained in the collaborative review and revision process at the close of the sixth reporting period. We noted that once the IMT and the OAG submit no-objection notices to S08-01-05, the CPD will need to post for public comment and implement the policy to reach Preliminary compliance.

In the fifth reporting period, COPA reached Preliminary compliance with ¶503 through its finalized Policy 3.2.1, *Disciplinary and Remedial Recommendations*. COPA submitted multiple drafts to the IMT and the OAG, and made revisions based on that collaboration. After receiving a no-objection notice,[30] COPA received comments from the COPA Community Working Group, and thereafter finalized the policy.[31] Section I.B. of the policy incorporates the requirements of ¶503 verbatim. In the sixth reporting period, COPA maintained Preliminary compliance with ¶503 by submitting its *Disciplinary and Remedial Recommendations In-Service Lesson Plan*. We noted that this lesson plan addresses ¶503 verbatim. Members of the IMT attended the *Disciplinary and Remedial Recommendations In-Service Training* class on June 22, 2022. We observed that the class instructor covered the lesson plan material completely and appropriately, provided examples to illustrate the instruc-

---

[30] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[31] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

tion material, and allowed for class interaction. We explained that, to achieve Secondary compliance, COPA will need to provide this training to at least 95% of its personnel.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy address the requirements of ¶503 by stating that exoneration of the most serious allegations will not preclude discipline for less serious misconduct allegations. The IMT submitted no-objection notices to S08-01-05 in September and October 2022. With this, the CPD reached Preliminary compliance.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶503. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. As written, the latest draft of the lesson plan for this training does not adequately address the requirements of ¶503. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

COPA, in the seventh reporting period, provided documentation regarding its *Case Management System (CMS)* training and *Disciplinary and Remedial Recommendations Training* for both its COPA Academy and COPA in-service training for new and veteran staff members. This documentation demonstrates that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. With this, COPA reached Secondary compliance with ¶503.

Additionally, COPA provided documentation regarding its Final Summary Reports (FSRs). This documentation included a Summary Report of Investigation in which the officers involved in the incident were cleared of the most serious misconduct allegations, but were found to have violated several lower level policies based on the complaint. Both officers were disciplined for the lower level violations of policy and COPA recommended a suspension. This FSR served as an example of a case in which COPA exonerated the most serious allegation but sustained three separate lower level violations of policy stemming from the same allegations, as contemplated by ¶503. COPA remains Under Assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

<p style="text-align:center">***</p>

The City and the CPD reached Preliminary compliance with ¶503 in the seventh reporting period. Moving forward, we will look for the CPD to further develop training relevant to the requirements of this paragraph. COPA reached Secondary compliance with ¶503 and remains Under Assessment for Full compliance.

### Paragraph 503 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶504

> **504.** *As soon as feasible, but by no later than January 2020, upon arriving at the final disciplinary decision, CPD and COPA will ensure that the Administrative Summary Report is provided to the involved CPD member and the Department. CPD will ensure that the Administrative Summary Report is provided to the involved CPD member's District or Unit Commander and immediate supervisor.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[32] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City, the CPD, and COPA maintained Preliminary compliance with ¶504 in the seventh reporting period.

To evaluate Preliminary compliance with ¶504, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[33] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation, and systems for providing the Administrative Summary Report to the involved CPD member and the Department pursuant to the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

The City reached Preliminary compliance with ¶504 when all implicated City entities reached Preliminary compliance. The CPD achieved Preliminary compliance

---

[32]  As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[33]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among

with ¶504 in the fifth reporting period by finalizing Special Order S08-01-04, *Post-Investigation Log Number Procedures*.[34] In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. These materials were still in draft state and not in final presentation form. We noted that the draft training materials addressed the requirements of ¶504.

COPA reached Preliminary compliance with ¶504 in the fourth reporting period by finalizing Policy 3.2.2, *Timeliness Benchmarks.* COPA maintained Preliminary compliance in the fifth reporting period, but did not otherwise submit evidence of additional efforts under ¶504 that would bring COPA into Secondary compliance. COPA did not produce evidence of efforts relevant to reaching Secondary compliance with ¶504 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

The CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*[35] for review with ¶504 in the seventh reporting period. This policy addresses the requirements of ¶504 by requiring the Administrative Summary Report to be provided to the involved CPD member and the Department including the district or unit commander. COPA provided Guidance, *Publishing and Distribution of Final Summary Reports*, which addresses ¶504 by directing COPA to provide the Final Summary Report to the involved CPD members and the Department upon arriving at the final disciplinary decision and explains the process for doing so. However, this Guidance does not appear to indicate that the FSRs are automatically distributed to BIA upon the closure of a case. As written in section 1.B.1.a, the Guidance states that "[d]esignated legal staff will forward a copy of the FSR . . ." Additionally, COPA provided documentation regarding its Final Summary Reports (FSRs), including examples of FSRs. However, this documentation does not demonstrate that the FSR was "provided to the involved CPD member and the Department" per the requirement of ¶504.

To reach Secondary compliance, COPA will need to provide training materials related to the requirements of this paragraph and train 95% of its staff, or alternatively, revise its Guidance as needed to specify that FSRs are automatically distributed to "the involved CPD member and the Department." *See* ¶504.

<div align="center">***</div>

---

[  ] other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[34] In the sixth reporting period, this policy was renumbered S08-01-08, *Post-Investigation Log Number Procedures*.

[35] This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

The City, the CPD, and COPA maintained Preliminary compliance with ¶504 in the seventh reporting period. Moving forward, we will look for evidence that the CPD and COPA are developing sufficient training and systems to instruct compliance with the requirements of ¶504 and each entities' related policies.

### Paragraph 504 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶505

*505. The CMS will have the following capacities: a. maintain accurate and reliable data regarding the number, nature, and status of all complaints and administrative notifications, from the intake process to final disposition; b. identify the status of administrative investigations; c. identify caseloads for investigators; and d. maintain all documents and investigative materials—including audio and video—in a digital format, accessible via the CMS.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (NEW) |

The City and the CPD reached Preliminary compliance with ¶505 in the seventh reporting period. COPA reached Secondary and Full compliance with ¶505. Because all relevant City entities must reach levels of compliance to bring the City as a whole into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶505, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[36] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we determined whether the City, the CPD, and COPA have sufficiently implemented their policies, training, and a CMS system that fulfills the requirements of this paragraph.

---

[36] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

The CPD made progress toward but did not reach Preliminary compliance in the fifth reporting period. While BIA's *Case Management System* Unit Directive, which was originally submitted at the end of the fourth reporting period, touches on all ¶505 requirements, the CPD did not provide further revised drafts of this Unit Directive during the fifth reporting period.[37] The CPD made other efforts related to ¶505 in the fifth reporting period through its draft of S08-01-01, *Conducting Log Number Investigations*,[38] which was produced to the IMT and the OAG for review in August 2021. The IMT provided comments in September 2021. We noted in the fifth reporting period that we had not since received a revised draft of S08-01-01, but that in the initial draft of S08-01-01, all subparagraphs of ¶505 were addressed. In the sixth reporting period, the City and the CPD provided a new Special Order S08-01-01, *Log Number Case Management System*, for review with ¶505. The IMT submitted a no-objection notice with comments on June 3, 2022. We noted that this policy completely addresses ¶505 and its subparagraphs. However, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

COPA achieved Preliminary compliance with ¶505 in the fourth reporting period by finalizing its Policy 3.1.6, *Clear and Column Case Management Systems* (COPA 3.1.6), which addressed all requirements of ¶505. COPA maintained Preliminary compliance in the fifth reporting period and made efforts toward Secondary compliance. COPA submitted for review training materials for its training *Case Management System: Overview of Policy and Procedures*. We noted that these materials were well organized and provided instruction to mobilize efforts compliant with ¶505's mandates, and COPA's policy. We submitted a no-objection notice to these training materials.[39] We noted our understanding that COPA hoped to provide this

---

[37]  In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Initial Responsibilities in Assigned Log Number Investigations* into S08-01-05. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

[38]  In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01, and it is now S08-01-05, *Conducting Log Number Investigations*.

[39]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the

training to its personnel in January 2022, and explained that it would need to provide this training to at least 95% of its staff to obtain Secondary compliance. COPA maintained Preliminary compliance with ¶505 in the sixth reporting period, but did not submit any materials related to ¶505 for Secondary compliance.

*Progress in the Seventh Reporting Period*

The CPD produced S08-01-01, *Log Number Case Management System*, for review with ¶505 in the sixth reporting period. This policy addresses the requirements of ¶505 and its subparagraphs. The IMT submitted a no-objection notice to S08-01-01 on June 3, 2022. In the seventh reporting period, the CPD produced a final version of this policy. With this, the CPD reached Preliminary compliance.

COPA, in the seventh reporting period, provided documentation regarding its *Case Management System (CMS)* training and *Disciplinary and Remedial Recommendations* training for both its COPA Academy and COPA In-Service Training for new and veteran staff members. This documentation demonstrates that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. With this, COPA reached Secondary compliance with ¶505.

COPA also provided Guidance, *COLUMN CMS Administration* for review with ¶505. While Section I.A of this Guidance states that COPA's Information Systems Section is responsible for developing and managing COPA's information technology, this Guidance does not specifically address ¶505. Additionally, COPA provided documentation of its CMS capabilities. This documentation demonstrates COPA's continued abilities to collect and maintain accurate and reliable data through the COPA CMS in accordance with the requirements of ¶505. With this, COPA reached Full compliance.

<p align="center">***</p>

The City and the CPD reached Preliminary compliance with ¶505 in the seventh reporting period. COPA reached Secondary and Full compliance with ¶505. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph. For COPA, we will look for evidence of sustained efforts related to Full compliance with this paragraph.

---

City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

## Paragraph 505 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Accountability and Transparency: ¶506

> **506.** *COPA, BIA, and the Accountability Sergeants will have access to the CMS as necessary to undertake their respective duties.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[40] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not In Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (NEW) |

The City and the CPD maintained Preliminary compliance with ¶506 in the seventh reporting period. COPA reached Secondary and Full compliance. Because all relevant City entities must reach levels of compliance to bring the City as a whole into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶506, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[41] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training and a CMS system that fulfills the requirements of this paragraph.

---

[40] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[41] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD made efforts toward Preliminary compliance with ¶506 by drafting two policies that remained in the collaborative review and revision process at the end of the fourth reporting period: BIA's *Case Management System* Unit Directive, and the CPD's Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. The CPD reached Preliminary compliance with ¶506 in the fifth reporting period by finalizing Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. In the sixth reporting period, the City and the CPD provided S08-01-01, *Log Number Case Management System*,[42] for review. The IMT submitted a no-objection notice with comments on June 3, 2022. We noted that this policy addresses ¶506 and includes command staff and auditing and technology personnel as having permissions to access the Case Management System. We explained that this policy also provides the process for granting such permissions, and the process for conducting audits to ensure the integrity of the access to the system. This policy remained in the collaborative review and revision process at the end of the sixth reporting period.

In the fourth reporting period, COPA reached Preliminary compliance with ¶506 through finalization of its Policy 3.1.6, *Clear and Column Case Management Systems*. COPA maintained Preliminary compliance in the fifth reporting period and made efforts toward Secondary compliance. COPA submitted for review training materials for its training *Case Management System: Overview of Policy and Procedures*. We submitted a no-objection notice to these training materials in September 2021,[43] and we explained that COPA would need to provide this training to at least 95% of its staff to obtain Secondary compliance. In the sixth reporting period, COPA provided its *Case Management System: Overview of Policy and Procedures*

---

[42] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Case Management System* into S08-01-01. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

[43] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

training materials. We noted that these training materials address ¶506 by providing that COPA employees will have access to the Case Management System and the CLEAR System to undertake their duties. We commented that the lesson plan is very comprehensive and goes beyond the requirements of ¶506 by not only explaining that COPA investigators will have access to the Case Management System, but also by explaining the responsibility that comes with the Case Management System access. Further, the lesson plan explains who will issue credentials and how the systems may be audited to ensure no misuse occurs, and explains that misuse or improper use is strictly prohibited and may be subject to misconduct investigations that may include disciplinary action to include discharge. On January 12, 2022, the IMT observed the two-hour mandatory *In-Service Case Management System* training. The lesson plan was presented as written, and the instructors were knowledgeable. The IMT provided suggestions regarding delivery of the instruction. We explained that, to achieve Secondary compliance, COPA will need to provide this training to at least 95% of its personnel.

*Progress in the Seventh Reporting Period*

The CPD did not produce any materials for review with ¶506 in the seventh reporting period.

COPA, in the seventh reporting period, provided documentation regarding its *Case Management System (CMS)* training and *Disciplinary and Remedial Recommendations* training for both its COPA Academy and COPA in-service training for new and veteran staff members. This documentation demonstrates that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. This documentation allows COPA to reach Secondary compliance with ¶506.

Additionally, COPA provided Guidance, *COLUMN CMS Administration*, which supports COPA's *CLEAR and Columns CMS Systems* policy by ensuring that the proper COPA employees have the credentials and training to access and operate within the CMS, per ¶506's requirement that COPA "will have access to the CMS as necessary to undertake their respective duties." Further, COPA provided a memorandum with supporting documentation that identified the COPA employees with access to the CMS and the parameters of their access. With this, COPA reached Full compliance with ¶506.

*** 

The City and the CPD maintained Preliminary compliance with ¶506 in the seventh reporting period. COPA reached Secondary and Full compliance. Moving forward, we look forward to the CPD developing a policy and training relevant to ¶506 and the CPD's related policies. For COPA, we will look for evidence demonstrating that it has maintained efforts related to the requirements of this paragraph.

## Paragraph 506 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶507

***507.*** *Administrative investigative files will be electronically preserved within the CMS.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[44] |
| | CPD | *In Compliance* (FIFTH REPORTING PERIOD) |
| | COPA | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | CPD | *Not in Compliance* |
| | COPA | *In Compliance* (NEW) |
| **Full:** | | *Not in Compliance* |
| | CPD | *Not Yet Assessed* |
| | COPA | *In Compliance* (NEW) |

The City and the CPD maintained Preliminary compliance with ¶507 in the seventh reporting period. COPA reached Secondary and Full compliance with ¶507 in the seventh reporting period. Because all relevant City entities must reach levels of compliance to bring the City as a whole into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶507, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[45] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training and a CMS system that fulfills the requirements of this paragraph.

---

[44] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[45] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD made efforts toward Preliminary compliance with ¶507 by drafting two policies that remained in the in the collaborative review and revision process at the end of the fourth reporting period: BIA's *Case Management System* Unit Directive, and the CPD's Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. The CPD reached Preliminary compliance with ¶507 in the fifth reporting period by finalizing Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. In the sixth reporting period, the City and the CPD provided S08-01-01, *Log Number Case Management System*, for review.[46] The IMT submitted a no-objection notice with comments on June 3, 2022. We noted that Section IV.B of this policy completely addresses ¶507's requirement that administrative investigative files be electronically preserved within the Case Management System, although the CPD did not submit the policy under this paragraph. We encouraged the CPD to submit this policy for review with ¶507. This policy remained in the collaborative review and revision process at the end of the sixth reporting period.

In the fourth reporting period, COPA reached Preliminary compliance with ¶507 through finalization of its Policy 3.1.6, *Clear and Column Case Management Systems*. COPA maintained Preliminary compliance in the fifth reporting period and made efforts toward Secondary compliance. COPA submitted for review training materials for its training *Case Management System: Overview of Policy and Procedures*. We submitted a no-objection notice to these training materials in September 2021,[47] and explained that COPA would need to provide this training to at least 95% of its staff to obtain Secondary compliance. In the sixth reporting period, COPA provided its *Case Management System: Overview of Policy and Procedures*

---

[46]  In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Case Management System* into S08-01-01. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

[47]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

training materials. We noted that these training materials address ¶507. On January 12, 2022, the IMT observed the two-hour mandatory *In-Service Case Management System* training. We observed that the lesson plan was presented as written, and the instructors appeared knowledgeable. The IMT provided suggestions regarding delivery of the instruction, which COPA took into consideration for future trainings. We explained that, to achieve Secondary compliance, COPA will need to provide this training to at least 95% of its personnel.

*Progress in the Seventh Reporting Period*

The CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*[48] for review with ¶507 in the seventh reporting period. This policy addresses the requirements of ¶507 by requiring that all administrative investigative files will be electronically preserved within the Case Management System (CMS).

COPA, in the seventh reporting period, provided documentation training for both its COPA Academy and COPA In-Service Training for new and veteran staff members. This documentation demonstrates that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. This documentation allows COPA to reach Secondary compliance with ¶507.

Additionally, COPA provided Guidance, *COLUMN CMS Administration*, which supports COPA's *CLEAR and Columns CMS Systems* policy by outlining the process and responsibilities of supporting the COPA System Developer to ensure proper data security for cloud storage for investigative file materials, per ¶507's requirement that "[a]dministrative investigative files will be electronically preserved within the CMS." Further, COPA provided a memorandum with supporting documentation that identifies the COPA staff members with access to the CMS and the parameters of their access, and demonstrating that the requirements of ¶507 are met. With this, COPA reached Full compliance with ¶507.

*** 

The City and the CPD maintained Preliminary compliance with ¶507 in the seventh reporting period. COPA reached Secondary and Full compliance. Moving forward, we look forward to the CPD developing training relevant to ¶507 and the CPD's related policies. For COPA, we will look for evidence demonstrating that it has maintained efforts related to the requirements of this paragraph.

---

[48]  This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

## Paragraph 507 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶508

> *508. The City and CPD will undertake best efforts to ensure that all administrative investigation files, disciplinary history card entries, COPA and BIA disciplinary records, and any other disciplinary record or summary of such record, are retained electronically, and indefinitely, for purposes of historical trend analysis, non-disciplinary EIS, and public transparency.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶508 in the seventh reporting period. COPA reached Secondary compliance with ¶508 in the seventh reporting period. Because all relevant City entities must reach levels of compliance to bring the City as a whole into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶508, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[49] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD made efforts toward Preliminary compliance by drafting and providing BIA's *Case Management System* Unit Directive. However, by the close of the fourth reporting period, this Unit Directive remained in the collaborative review and revision process. The CPD provided BIA's *Case Management System* Unit Directive at the end of the fourth reporting period. This

---

[49] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

draft Unit Directive speaks to the requirements of ¶508. We provided feedback on this Unit Directive in September 2021. We did not receive a further revised draft of this Unit Directive and the CPD did not post this Unit Directive for public comment.[50] Therefore, the CPD did not made any additional steps toward compliance with ¶508 in the fifth reporting period. In the sixth reporting period, the City and the CPD provided S08-01-01, *Log Number Case Management System*, for review.[51] The IMT submitted a no-objection notice with comments on June 3, 2022. We noted that Section IV.C.1–3 of this policy addresses ¶508. However, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

COPA reached Preliminary compliance with ¶508 by finalizing Policy 3.1.6, *Clear and Column Case Management Systems*. COPA maintained Preliminary compliance in the fifth reporting period and made efforts toward Secondary compliance. COPA submitted for review training materials for its training *Case Management System: Overview of Policy and Procedures*. We submitted a no-objection notice to these training materials[52] and explained that COPA would need to provide this training to at least 95% of its staff to obtain Secondary compliance. In the sixth reporting period, COPA provided its *Case Management System: Overview of Policy and Procedures* training materials. We noted that these training materials provide instruction relevant to compliance with ¶508. On January 12, 2022, the IMT observed the two-hour mandatory *In-Service Case Management System* training. We observed that the lesson plan was presented as written, and the instructors were knowledgeable. The IMT provided suggestions regarding delivery of the instruction, which COPA took into consideration for future trainings. We explained that, to achieve Secondary compliance, COPA will need to provide this training to at least 95% of its personnel.

---

[50] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period.

[51] The CPD incorporated instruction previously included in the BIA Directive *Case Management System* into S08-01-01.

[52] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

*Progress in the Seventh Reporting Period*

The CPD produced S08-01-01, *Log Number Case Management System*, for review with ¶508 in the sixth reporting period. This policy addresses the requirements of this paragraph. The IMT submitted a no-objection notice to S08-01-01 on June 3, 2022. In the seventh reporting period, the CPD produced a final version of this policy. With this, the CPD reached Preliminary compliance.

COPA, in the seventh reporting period, provided documentation regarding its *Case Management System (CMS)* training for both its COPA Academy and COPA in-service training for new and veteran staff members. This documentation demonstrates that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. This documentation allows COPA to reach Secondary compliance with ¶508.

Additionally, COPA provided Guidance, *COLUMN CMS Administration*. Section I.A.4 of this Guidance partially addresses ¶508 and supports COPA's *CLEAR and Columns CMS Systems* policy by outlining the process and responsibilities of supporting the COPA System Developer to ensure proper data security for cloud storage for investigative file materials. Further, COPA provided a memorandum with supporting documentation that identifies the COPA staff members with access to the CMS and the parameters of their access.

\*\*\*

The City and the CPD reached Preliminary compliance with ¶508 in the seventh reporting period. COPA reached Secondary compliance with ¶508 in the seventh reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph. For COPA, we will look for COPA to demonstrate that it has sufficiently implemented its policies and training.

### Paragraph 508 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶509

**509.** *For each complaint, the CMS will separately track, and have capacity to conduct searches and generate reports sufficient to identify and analyze trends relating to, at a minimum, the following: a. allegations of discriminatory policing based on an individual's membership or perceived membership in an identifiable group, based upon, but not limited to: race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age; b. allegations of unlawful stop, search, citation, or arrest practices; c. allegations of excessive force; d. allegations of misconduct arising during an interaction with individuals in crisis; e. allegations of retaliation against non-CPD members; f. allegations of conduct alleged to have occurred in retaliation for engaging in First Amendment protected activities, such as lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct; g. allegations of officer-involved gender-based violence, domestic violence, or sexual misconduct; h. allegations of CPD member substance and/or alcohol abuse; and i. the self-reported demographic information of complainants, including race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age.*

---

**Compliance Progress**        (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶509 in the seventh reporting period. COPA reached Secondary compliance with ¶509 in the seventh reporting period. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶509, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent

Decree (¶¶626–41).[53] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training and a CMS system that fulfills the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD made efforts toward Preliminary compliance by drafting BIA's *Case Management System* Unit Directive. However, by the close of the fourth reporting period, this Unit Directive was not finalized, preventing the CPD from reaching Preliminary compliance. In the fifth reporting period, the CPD provided a draft of Special Order S08-01-01, *Conducting Log Number Investigations*, which addressed all the requirements of ¶509.[54] We provided feedback on this policy in September 2021, but we did not receive a further revised draft of S08-01-01. We also did not receive a further revised draft of BIA's draft *Case Management System* Unit Directive, which we provided comments on in September 2021, by the end of the fifth reporting period. Because both S08-01-01 and the Unit Directive remained in the collaborative review and revision process, the CPD did not reach Preliminary compliance in the fifth reporting period. In the sixth reporting period, the City and the CPD provided a new Special Order S08-01-01, *Log Number Case Management System*, for review.[55] The IMT submitted a no-objection notice with comments on June 3, 2022.[56] We noted that Section IV.E.1–9

---

[53] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[54] In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01, and it is now S08-01-05, *Conducting Log Number Investigations*.

[55] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Case Management System* into S08-01-01. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

[56] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD

of this policy addresses the requirements of ¶509(a–i) verbatim. However, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

COPA reached Preliminary compliance with ¶509 in the fourth reporting period by finalizing Policy 3.1.6, *Clear and Column Case Management System*. COPA maintained Preliminary compliance in the fifth reporting period and made efforts toward Secondary compliance. COPA submitted for review training materials for its training *Case Management System: Overview of Policy and Procedures*. We submitted a no-objection notice to these training materials[57] and explained that COPA would need to provide this training to at least 95% of its staff to obtain Secondary compliance. In the sixth reporting period, COPA provided its *Disciplinary and Remedial Recommendations In-Service Lesson Plan*. COPA also provided its *Case Management System: Overview of Policy and Procedures* training materials in the sixth reporting period. We noted that these training materials completely address ¶509 and its subparagraphs. Additionally, we noted that the training materials provide information on the types of allegations to which a tracking number will be assigned. On January 12, 2022, the IMT observed the two-hour mandatory *In-Service Case Management System* training. The lesson plan was presented as written, and the instructors were knowledgeable. The IMT provided suggestions regarding delivery of the instruction, which COPA took into consideration for future trainings. We explained that, to achieve Secondary compliance, COPA will need to provide this training to at least 95% of its personnel.

*Progress in the Seventh Reporting Period*

The CPD produced S08-01-01, *Log Number Case Management System,* for review with ¶509 in the sixth reporting period. This policy completely addresses the requirements of this paragraph. The IMT submitted a no-objection notice to S08-01-01 on June 3, 2022. In the seventh reporting period, the CPD produced a final version of this policy. With this, the CPD reached Preliminary compliance.

---

posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[57] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

COPA, in the seventh reporting period, provided documentation regarding its *Case Management System (CMS)* training and *Disciplinary and Remedial Recommendations* training for both its COPA Academy and COPA in-service training for new and veteran staff members. These training materials completely address ¶509. This documentation demonstrates that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. This documentation allows COPA to reach Secondary compliance with ¶509.

Additionally, COPA provided Guidance, *COLUMN CMS Administration*. Section I.A.5 and I.A.5.a address ¶509 and supports COPA's *CLEAR and Columns CMS Systems* policy by outlining the process and responsibilities of ensuring that COPA staff can extract data, query, retrieve, and present information from CMS to recognize investigative trends. Further, COPA provided a memorandum with supporting documentation that identifies the COPA staff members with access to the CMS and the parameters of their access.

<p style="text-align:center">***</p>

The City and the CPD reached Preliminary compliance with ¶509 in the seventh reporting period. COPA reached Secondary compliance with ¶508 in the seventh reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph. For COPA, we will look for COPA to demonstrate that it has sufficiently implemented its policies, training, and CMS that fulfills the requirements of this paragraph.

### Paragraph 509 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶511

> **511.** *In order to develop a new mediation policy governing the resolution of disciplinary actions by the agreement of the CPD member and non-CPD member complainant, the City will solicit public input, through community engagement efforts, regarding the methods by which mediation will most effectively build trust between community members and police and foster mutual respect.*

## Compliance Progress        (Reporting Period: January 1, 2022, through June 30, 2022)

**Preliminary:**    *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**      *In Compliance* (NEW)
**Full:**           *Not Yet Assessed*

The City regained Secondary compliance with ¶511 in the seventh reporting period, after having lost compliance in the sixth reporting period.

To assess Preliminary compliance with ¶511, we looked for a policy or plan that could be followed to actively engage the community input to inform a new mediation policy. To evaluate Secondary compliance, we looked for evidence that the City acted upon its plan and received significant community feedback relevant to the new mediation policy. To reach Full compliance, the City must demonstrate that it has incorporated this public input, as appropriate, in the development of the new mediation policy.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the City reached Secondary compliance with ¶511 after demonstrating that it engaged an outside expert to assist with community engagement efforts under ¶511. In addition to providing information about the engaged expert, the City provided notes regarding community feedback it received during two learning sessions.

At the end of the fifth reporting period, the City produced its *Interagency* Policy, IAP 11-01, *Community-Policy Mediation Pilot Program*. This document is better understood as an outline for a temporary program. We reviewed a *City Mediation* Policy in November 2020 and provided comments in January 2021. The December 30, 2022 version we received was the first time we had reviewed the policy in this new form.

In its production letter, the City indicated that after receiving comments from the IMT and the OAG regarding the mediation policy it produced in November of 2020,

"the City decided to rewrite its mediation pilot policy to better address these comments and concerns and to better incorporate community feedback." The City also specified that to incorporate the community feedback the City "reinforced themes of the community feedback, including transparency, accountability, timeliness, types of complaints, and member history, during its development discussions with COPA and BIA and has more clearly set forth and reiterated these themes throughout the policy."

We noted our appreciation of the City's efforts. However, because the *Interagency* Policy sets out a temporary, six-month pilot program, the City did not reach Full compliance in the fifth reporting period. We encouraged the City as it launches the pilot program to continue to gain community feedback to evaluate the pilot program on an ongoing basis. We noted that we looked forward to the City developing a mediation policy incorporating not only the feedback the City has received to date, but any additional community input it receives during the pilot program.

We explained that, since the City has chosen to undertake a pilot program related to the Consent Decree requirement that the City develop a Mediation Program, we hoped the City would utilize the six-month program as a means to obtain real-time feedback regarding the effectiveness of the proposed program. We noted our expectation that the City critically analyze this pilot program on an ongoing basis, and that the City provide the IMT with monthly updates regarding the progress of the pilot program during the sixth reporting period. We explained that such real-time assessment and responsive modification will allow the city to create a mediation program that is "a valuable tool for expending the resolution of complaints, building trust between community members and police, and fostering mutual respect." ¶510. With this, the City maintained Preliminary and Secondary compliance in the fifth reporting period, but did not move into Full compliance.

Early in the sixth reporting period, the City met with the IMT to describe its intentions to roll out the Mediation Pilot Program. At that time we voiced concerns that the program appeared to be designed for evaluation only once the sixth-month pilot period was completed. We asked for regular updates on the progress of the program throughout the pilot, which the City agreed to provide. We also urged that the City continue to consider the real-time feedback it received regarding the Mediation Pilot Program. However, we received no updates regarding the Mediation Pilot Program in the sixth reporting period.

We explained that Secondary compliance with this paragraph requires demonstration that the City received significant community feedback relevant to the new mediation policy and is acting upon its plans in order to develop a community-informed mediation policy. Because we have received no updates regarding the extent to which the Mediation Pilot Program had been implemented, nor had we

received any assurance that the City was capturing real-time feedback from the community regarding the Pilot Program, the City lost Secondary compliance.

*Progress in the Seventh Reporting Period*

This reporting period, the City provided several materials related to its revised Community-Police Mediation Pilot Program, which began on October 1, 2022. These materials included Department Notice D22-04, *Community-Police Mediation Pilot Program*, which still requires further development. *See* ¶512 discussion.

The IMT noted its encouragement at the launch of the pilot program, but also expressed concerns that we had not received any prior status updates from the City regarding the pilot program, which had initially been planned to launch on January 15, 2022. We requested to receive more regular updates going forward. In comments provided to the City, the IMT acknowledged the collaboration and efforts that took place to plan and facilitate the mediation pilot's implementation, including the consideration of community feedback in the development of the pilot program.

Additionally, COPA provided Guidance, *Referral for Mediation*, which outlines COPA's role in the mediation pilot program. The IMT submitted a no-objection notice to this Guidance on November 21, 2022.

The IMT is encouraged by the launch of the Community-Police Mediation Pilot Program on October 1, 2022, which so far appears to offer a meaningful opportunity to build trust and facilitate honest discussions between community members and CPD officers. The program appears to be structured in a way that is appealing to both community members and CPD officers, with many officers who qualify for mediation willing to participate, and also includes methods for evaluation and feedback from participants. Given this progress so far, the IMT is concerned that, as of the writing of this report, the pilot program is only funded for six months and therefore may face operational challenges beyond the pilot period, which is scheduled to conclude at the end of March 2023. The IMT encourages the City to continue this important program beyond the pilot program's end date, with the involvement of those who have worked to develop and implement this program, so that this program can continue improving and moving forward.

<center>∗∗∗</center>

With this, the City regained Secondary compliance with ¶511 in the seventh reporting period. To maintain Secondary and reach additional levels of compliance, we will look for the CPD to further develop its policy and for the City to continue the mediation program.

## Paragraph 511 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Secondary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Secondary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Accountability and Transparency: ¶512

*512. The City will ensure that within 365 days of the Effective Date, COPA and BIA have developed parallel policies regarding the mediation of misconduct complaints by non-CPD members. The policies will govern mediation of misconduct complaints involving non-CPD member complainants. The policies will specify, at a minimum, (a) the criteria for determining incidents eligible for resolution through mediation; (b) the goals of mediation, including efficiency, transparency, procedural justice, restorative justice, and strengthening public trust; (c) the steps in the mediation process; and (d) methods of communication with complainants regarding the mediation process and the opportunity to participate. Items (a) through (d) above will be consistent between the CPD and COPA mediation policies.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *Not in Compliance*[58] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The CPD did not reach Preliminary compliance with ¶512 in the seventh reporting period. COPA reached Preliminary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶512, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[59]

---

[58] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[59] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

In previous reporting periods we reviewed BIA's *Community Mediation* Unit Directive and a draft of the City's Mediation Policy, *Complaints Against the CPD*. We received both of these in the third reporting period and provided multiple rounds of comments. By the end of the fourth reporting period, we did not receive additional revised drafts of these policies. We did not receive any documents or evidence of efforts toward compliance with ¶512 from COPA. In the fifth reporting period, neither the CPD nor COPA produced any documentation related to efforts under ¶512.

However, at the end of the fifth reporting period the City provided its Interagency Policy, IAP 11-01, *Community-Police Mediation Pilot Program*. This document is better understood as an outline for a temporary program. We reviewed a *City Mediation Policy* in November 2020 and provided comments in January 2021. The City indicated that it rewrote the policy after receiving our comments and feedback from the community. The December 30, 2022 version we received was the first time we had reviewed the policy in this new form. Therefore, we explained in the fifth reporting period that we were not able to engage in collaborative review and revision. Notwithstanding this fact, the City indicated that all entities implicated by the Interagency Policy have signed onto the pilot program, and the City indicated that it will launch the six-month mediation pilot program on January 15, 2022.

We noted that the City's steps toward the development of the mediation program were positive; however, we expressed concerns with the pilot program policy. We explained that the pilot program lacked specificity in many areas and did not include methods to measure success of the program. Perhaps most concerning was an indication that the City would provide an assessment of the program 60 days after the six-month pilot program ended. We explained that a delayed assessment like this would not allow the City to make modifications to the pilot program during its six-month time frame to address concerns and test solutions. We urged the City to consider performing ongoing or regular assessments to more effectively and efficiently develop a mediation program under ¶511 and ¶512.

We noted in the fifth reporting period that the City's Interagency Policy did not fulfill ¶512's requirements for a variety of reasons. Most notably, we explained, it gave the City sole authority to revise or replace the Interagency Policy "in the event that the City determines the requirements are better accomplished by other means." With this, the City did not reach Preliminary compliance in the fifth reporting period. We noted that we would look for the CPD and COPA to provide draft policies related to ¶512's mandates in the sixth reporting period.

The City and the CPD did not provide any information related to the pilot mediation program in the sixth reporting period, as the City and the CPD had agreed to

provide. As such, the IMT noted that it had no information about the status of the Mediation Pilot Program. The IMT expressed its continued concern that the pilot program lacked the necessary structure and support it needed to be an informative and beneficial pilot. Because the City did not provide a status update and because no documentation was provided to the IMT during the sixth reporting period, the City did not reach Preliminary compliance with ¶512.

Additionally in the sixth reporting period, the City and the CPD provided S08-01-06, *Supervisor Responsibilities in Log Number Investigations*. But when this Special Order was submitted, the CPD indicated that this Special Order was not submitted "to demonstrate compliance with Consent Decree paragraphs, and the CPD is not seeking review of this policy at this time." Nonetheless, we reviewed the policy and provided comments June 15, 2022, expressing our desire to receive a final draft of this policy for review under ¶627. We observed that Section IV.A.13 of the policy directed the BIA Chief to ensure that BIA is engaged in mediation practices. We explained that, while this direction is important, it does not include the specific requirements of ¶512.a–c.

COPA did not submit materials related to ¶512 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the City provided several materials related to its revised Community-Police Mediation Pilot Program, which began on October 1, 2022. These materials included Department Notice D22-04, *Community-Police Mediation Pilot Program*. The IMT noted its encouragement at the launch of the pilot program, but also expressed concerns that we had not received any prior status updates from the City regarding the pilot program, which had initially been planned to launch on January 15, 2022. We requested to receive more regular updates going forward. We did not receive further status updates in the seventh reporting period. In comments provided to the City, the IMT acknowledged the collaboration and efforts that took place to plan and facilitate the mediation pilot's implementation. Nonetheless, Paragraph 512 requires that the City ensures that "COPA and BIA have developed parallel policies regarding the mediation of misconduct complaints by non-CPD members."

COPA provided Guidance, *Referral for Mediation*, which outlines COPA's role in the mediation pilot program. The IMT submitted a no-objection notice to this Guidance on November 21, 2022. However, the CPD's Department Notice D22-04, *Community-Police Mediation Pilot Program* does not appear to be a parallel policy. Whereas COPA Guidance, *Referral for Mediation* outlines COPA's role in the mediation pilot program and provides specific details regarding communication with complainants and managing the mediation process, Department Notice D22-04 provides a general overview of the mediation pilot program. Department Notice

D22-04 provides some information regarding "the criteria for determining incidents eligible for resolution through mediation" (*see* ¶512(a)) as related to community members, however, it is unclear what criteria is used to determine the eligibility of CPD members for the mediation process. Further, D22-04 does not include the level of detail required by ¶512, such as "the goals of mediation, including efficiency, transparency, procedural justice, restorative justice, and strengthening public trust" (¶512(b)) and "the steps in the mediation process" (¶512(c)). Department Notice D22-04 should include more specific information to meet the requirements of ¶512 and to ensure that CPD members and community members understand the program.

As discussed in ¶511, the IMT is encouraged by the launch of the Community-Police Mediation Pilot Program, which so far appears to offer a meaningful opportunity to build trust and facilitate honest discussions between community members and CPD officers. The program appears to be structured in a way that is appealing to both community members and CPD officers, with many officers who qualify for mediation willing to participate, and also includes methods for evaluation and feedback from participants. Given this progress so far, the IMT is concerned that, as of the writing of this report, the pilot program is only funded for six months and therefore may face operational challenges beyond the pilot period, which is scheduled to conclude at the end of March 2023. The IMT encourages the City to continue this important program beyond the pilot program's end date, with the involvement of those who have worked to develop and implement this program, so that this program can continue improving and moving forward.

\*\*\*

With this, the City and the CPD did not reach Preliminary compliance with ¶512 in the seventh reporting period. COPA reached Preliminary compliance. We will look for the CPD to provide a parallel draft policy that meets the requirements of ¶512 in the next reporting period. For COPA, we will look for evidence of training on its policy regarding the mediation of misconduct complaints by non-CPD members.

## Paragraph 512 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶513

> ***513.*** *COPA will ensure that the recommended level of discipline for findings is consistently applied in a fair, thorough, and timely fashion, based on the nature of the misconduct. COPA and CPD will also ensure that mitigating and aggravating factors are identified, consistently applied, and documented.*

### Compliance Progress                (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶513 in the seventh reporting period. COPA reached Secondary compliance with ¶513 in the seventh reporting period. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶513, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[60] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD provided consultation drafts of BIA's *Advocate Section Command Channel Review Procedures* Unit Directive. This Unit Directive had not been finalized by the end of the fourth reporting period, therefore, the CPD did not reach Preliminary compliance. In the fifth reporting period, the CPD provided a draft of Special Order S08-01-01, *Conducting Log Number Investigations*, which addressed ¶513's requirements.[61] We provided feedback on this

---

[60]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[61]   In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01; it is now S08-01-05, *Conducting Log Number Investigations*.

policy in September 2021. We did not receive a further revised draft of S08-01-01 by the end of the fifth reporting period. In addition, we provided consultation feedback to BIA's *Advocate Section Command Channel Review Procedures* Unit Directive. We noted that the latest version of the Unit Directive, which was provided in June 2021, demonstrated great improvement. We encouraged the CPD to provide a final draft of this Unit Directive for review under ¶627. We noted our anticipation in the fifth reporting period that the BIA would receive a no-objection notice from us with minimal additional revisions and then be able to post this Unit Directive for public comment.[62] Without finalizing any policy speaking to ¶513's requirements, the CPD did not reach Preliminary compliance in the fifth reporting period. In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 as S08-01-05. The CPD submitted multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. We noted that the draft version of this policy completely addresses the requirements of ¶513. The CPD submitted a further revised version of S08-01-05 on June 30, 2022, the last day of the reporting period. Therefore, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

The CPD also provided drafts of S08-01-07, *Command Channel Review* in the sixth reporting period.[63] On June 30, 2022, the last day of the reporting period, the CPD submitted a further revised version. We explained that, while this policy also addresses the requirements of ¶513, it remained in the collaborative review and revision process at the end of the sixth reporting period.

---

[62] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[63] The IMT previously reviewed multiple drafts of S08-01-03, *Command Channel Review* (previously titled *Complaint Summary Reporting and Review Procedures*). The IMT also previously reviewed Unit Directives regarding Command Channel review procedures. In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Advocate Section Command Channel Review Procedures* (previously titled *Command Channel Review*) into S08-01-07. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

In the fourth reporting period, COPA finalized its Policy 3.2.1, *Disciplinary and Remedial Recommendations*, which fulfills the requirements of ¶513. This brought COPA into Preliminary compliance. COPA did not produce evidence of steps toward Secondary compliance with ¶513 in the fifth reporting period. In the sixth reporting period, COPA maintained Preliminary compliance with ¶513. COPA also worked toward Secondary compliance by submitting its *Disciplinary and Remedial Recommendations In-Service Lesson Plan*. We noted that this lesson plan fully addresses ¶513 and provides more depth than is required by the paragraph. Several members of the IMT attended the *Disciplinary and Remedial Recommendations In-Service Training* class on June 22, 2022. The class instructor covered the lesson plan material completely and appropriately, provided examples to illustrate the instruction material, and allowed for class interaction. We explained that, to achieve Secondary compliance, COPA will need to provide this training to at least 95% of its personnel.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy addresses the requirements of ¶513. The IMT submitted no-objection notices to S08-01-05 in September and October 2022. The CPD also provided multiple revised versions of S08-01-07, *Command Channel Review*. This policy addresses the requirements of ¶513. The final revised version of S08-01-07 was produced on the last day of the sixth reporting period, which required the IMT to review this policy in the seventh reporting period. The IMT submitted a no-objection notice to S08-01-07 on August 5, 2022. The CPD produced a final version of S08-01-07 on January 12, 2023 for the seventh reporting period. The CPD reached Preliminary compliance.

COPA, in the seventh reporting period, provided documentation regarding its *Disciplinary and Remedial Recommendations* training for both its COPA Academy and COPA in-service Training for new and veteran staff members. This documentation demonstrates that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. With this, COPA reached Secondary compliance with ¶513.

<div align="center">* * *</div>

The City and the CPD reached Preliminary compliance with this paragraph in the seventh reporting period. COPA reached Secondary compliance with ¶513 in the seventh reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph. For COPA, we will look for evidence to demonstrate that it has sufficiently implemented its policies and training.

## Paragraph 513 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
None

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶514

**514.** *The City, COPA, and CPD will use best efforts to ensure that the level of discipline recommended for sustained findings is applied consistently across CPD districts and without regard for the race of the complainant or the race of the involved CPD member.*

**Compliance Progress**     (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶514 in the seventh reporting period. COPA reached Secondary compliance with ¶514 in the seventh reporting period. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶514, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[64] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

In past reporting periods, the CPD's BIA provided onboarding and annual training scenarios, which relate to ¶514, but as BIA acknowledged, additional efforts are necessary to comply with ¶514. The CPD did not provide records to demonstrate additional efforts toward compliance with ¶514 in the fifth reporting period. In the sixth reporting period, the CPD submitted multiple revised versions of Special Order S08-01-05, *Conducting Log Number Investigations*.[65] We noted that Section

---

[64]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[65]  The *Conducting Log Number Investigations* policy was produced in previous reporting periods as S08-01-01. The policy was re-numbered as S08-01-05 when it was produced May 5, 2022.

IV.B.6.a–b of the draft version of this policy completely addresses ¶514 and provides additional detail which guides the Advocate Section. The CPD submitted a further revised version of S08-01-05 on June 30, 2022, the last day of the reporting period. Therefore, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

The CPD also provided drafts of Special Order S08-01-07, *Command Channel Review* in the sixth reporting period.[66] On June 30, 2022, the last day of the reporting period, the CPD submitted a further revised draft of this policy. Therefore, this policy remained in the collaborative review and revision process at the end of the sixth reporting period. We noted that Sections II.B and II.C.2.b of this draft policy completely address ¶514 by ensuring that every CPD investigation will be conducted consistently, with the level of discipline recommended for sustained findings applied regardless of the member's assignment or the race of the complainant or the accused member.

In the fourth reporting period, COPA finalized its Policy 3.2.1, *Disciplinary and Remedial Recommendations*, which fulfills the requirements of ¶514. This brought COPA into Preliminary compliance. COPA did not provide records to demonstrate additional efforts toward compliance with ¶514 in the fifth reporting period. In the sixth reporting period, COPA maintained Preliminary compliance with ¶514 by submitting its *Disciplinary and Remedial Recommendations In-Service Lesson Plan*. We noted that this lesson plan addresses ¶514 verbatim. Members of the IMT attended the *Disciplinary and Remedial Recommendations In-Service Training* class on June 22, 2022. The class instructor covered the lesson plan materials completely and appropriately, provided examples to illustrate the instruction material, and allowed for class interaction. We explained that, to achieve Secondary compliance, COPA will need to provide this training to at least 95% of its personnel.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. Section X.B.6.b and NOTE address the re-

---

[66] The IMT previously reviewed multiple drafts of S08-01-03, *Command Channel Review* (previously titled *Complaint Summary Reporting and Review Procedures*). The IMT also previously reviewed Unit Directives regarding Command Channel review procedures. In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Advocate Section Command Channel Review Procedures* (previously titled *Command Channel Review*) into S08-01-07. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

quirements of ¶514. The IMT submitted no-objection notices to S08-01-05 in September and October 2022. The CPD also provided multiple revised versions of S08-01-07, *Command Channel Review*. Sections II.B and II.C.2.b completely address the requirements of ¶514. The final revised version of S08-01-07 was produced on the last day of the sixth reporting period, which required the IMT to review this policy in the seventh reporting period. The IMT submitted a no-objection notice to S08-01-07 on August 5, 2022. The CPD produced a final version of S08-01-07 on January 12, 2023 for the seventh reporting period. The CPD reached Preliminary compliance.

COPA, in the seventh reporting period, provided documentation regarding its *Case Management System (CMS)* training and *Disciplinary and Remedial Recommendations* training for both its COPA Academy and COPA in-service training for new and veteran staff members. This documentation demonstrates that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. With this, COPA reached Secondary compliance with ¶514.

<p style="text-align:center">***</p>

The City and the CPD reached Preliminary compliance with this paragraph in the seventh reporting period. COPA reached Secondary compliance with ¶514 in the seventh reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph, and for COPA to provide evidence to demonstrate that it has sufficiently implemented its policies and training.

### Paragraph 514 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶515

> **515.** *All disciplinary decisions and discipline imposed will be documented in writing, maintained in the administrative investigative file and the CPD member's disciplinary history, and reported within the CMS consistent with CPD policy and this Agreement.*

**Compliance Progress**          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The CPD maintained Preliminary compliance with ¶515 in the seventh reporting period, but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶515, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed the CPD's training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

The CPD reached Preliminary compliance with ¶515 in the fifth reporting period by finalizing Special Order S08-01-04, *Post-Investigation Log Number Procedures*.[67] Section IX, *Records Retention*, of this Special Order completely addresses the requirements of ¶515. In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. These materials were still in draft state and not in final presentation form. We reviewed and provided the CPD feedback on the materials.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*.[68] This policy completely addresses the requirements of ¶515 by requiring that all disciplinary decisions and imposed discipline is documented and maintained in the Case Management System (CMS).

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶515. The IMT provided extensive feedback on these training materials on

---

[67]   In the sixth reporting period, the CPD informed us that this policy will be renumbered S08-01-08, *Post-Investigation Log Number Procedures*.

[68]   This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review with a different combination of Consent Decree paragraphs, including ¶515. As written, the latest draft of the lesson plan for this training does not adequately address the requirements of ¶515. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

\*\*\*

The CPD maintained Preliminary compliance with ¶515 in the seventh reporting period. We look forward to reviewing further materials in the coming reporting period.

## Paragraph 515 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶516

> ***516.*** *Each sustained finding contained within a CPD member's disciplinary history will be considered for the purposes of recommending discipline for a subsequent sustained finding for a period of up to five years after the date of the incident or the date on which the violation is discovered, whichever is later.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Under Assessment* |

The City and the CPD reached Preliminary compliance with ¶516 in the seventh reporting period. COPA reached Secondary compliance with ¶516 and remains Under Assessment for Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶516, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[69] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we determined whether the City, the CPD, and COPA have sufficiently implemented their policies and training.

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD provided a draft of S08-01-01, *Conducting Log Number Investigations*. This draft policy addressed the requirements of ¶516 verbatim. We provided feedback on this policy in September 2021 but did not re-

---

[69] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

ceive a further revised draft thereafter. Because S08-01-01 remained in the collaborative review and revision process at the close of the fifth reporting period, the CPD did not reach Preliminary compliance with ¶516. In the sixth reporting period, the CPD renumbered the Special Order previously labeled S08-01-01 to S08-01-05, *Conducting Log Number Investigations*. The CPD submitted multiple revised versions of Special Order S08-01-05, *Conducting Log Number Investigations* in the sixth reporting period. We noted that Section V.B of the draft version of the S08-01-05 addresses ¶516 and goes beyond the up-to-five-year period required by ¶516, which we commended. The CPD submitted a further revised version of S08-01-05 on June 30, 2022, the last day of the reporting period. Therefore, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

COPA reached Preliminary compliance with ¶516 in the fourth reporting period by finalizing its Policy 3.2.1, *Disciplinary and Remedial Recommendations*, which completely addresses the requirements of ¶516. COPA did not produce evidence of steps toward Secondary compliance with ¶516 in the fifth reporting period. In the sixth reporting period, COPA maintained Preliminary compliance with ¶516 by submitting its *Disciplinary and Remedial Recommendations In-Service Lesson Plan*. We noted that this lesson plan addresses ¶516 verbatim and provides additional detail and examples of the final summary report narrative in order to address the requirements of this paragraph. Members of the IMT attended the *Disciplinary and Remedial Recommendations In-Service Training* class on June 22, 2022. The class instructor covered the lesson plan material completely and appropriately, provided examples to illustrate the instruction material, and allowed for class interaction. We explained that, to achieve Secondary compliance, COPA will need to provide this training to at least 95% of its personnel.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. Section IX.B addresses the requirements of ¶516 by requiring disciplinary history to be considered when recommending discipline within a five-year time frame. The IMT submitted no-objection notices to S08-01-05 in September and October 2022. With this, the CPD reached Preliminary compliance.

COPA, in the seventh reporting period, provided documentation regarding its *Case Management System (CMS)* training and *Disciplinary and Remedial Recommendations* training for both its COPA Academy and COPA in-service training for new and veteran staff members. This documentation demonstrates that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. With this, COPA reached Secondary compliance with ¶516.

Additionally, COPA provided documentation demonstrating that officers' disciplinary histories were considered for purposes of recommending discipline, per the requirement of ¶516. COPA remains Under Assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

<center>***</center>

The City and the CPD reached Preliminary compliance with this paragraph in the seventh reporting period. COPA reached Full compliance with ¶516 in the seventh reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph. COPA reached Secondary compliance with ¶516 and remains Under Assessment for Full compliance.

<center>Paragraph 516 Compliance Progress History</center>

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶517

> **517.** *The City, CPD, and COPA will ensure that findings of "Sustained – Violation Noted, No Disciplinary Action": a. may not be used in any investigation in which the conduct resulted in injury to any person; and b. will only be used for investigations that warrant a sustained finding, but were a result of unintentional violations of policy or law.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Under Assessment* |

The City and the CPD reached Preliminary compliance with ¶517 in the seventh reporting period. COPA reached Secondary compliance with ¶517 and remains Under Assessment for Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶517, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[70] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Seventh Reporting Period*

We assessed compliance with ¶517 for the first time in the fourth reporting period. That reporting period, the CPD did not produce evidence of efforts toward compliance with ¶517. However, in the fifth reporting period, the CPD provided a

---

[70] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

draft of S08-01-01, *Conducting Log Number Investigations*. This draft policy addressed the requirements of ¶517 verbatim. We provided feedback on this policy in September 2021. We did not receive a further revised draft of S08-01-01 thereafter. Because S08-01-01 remained in the collaborative review and revision process at the close of the fifth reporting period, the CPD did not reach Preliminary compliance with ¶517. In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05. The CPD submitted multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. We noted that Section V.C.1.a of the draft S08-01-05 attempts to address ¶517; however, Section V.C.1.c appears to limit consideration of the sustained violations to only one year when making disciplinary determinations, which may be inconsistent with the requirements of ¶516 ("Each sustained finding contained within a CPD member's disciplinary history will be considered for the purposes of recommending discipline for a subsequent sustained finding *for a period of up to five years* after the date of the incident or the date on which the violation is discovered, whichever is later." (emphasis added)). We requested clarification of Section V.C.1.c. in our comments on June 29, 2022. The CPD submitted a further revised version of S08-01-05 on June 30, 2022, the last day of the reporting period. Therefore, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

COPA reached Preliminary compliance with ¶517 in the fourth reporting period by finalizing its Policy 3.2.1, *Disciplinary and Remedial Recommendations*, which completely covers the requirements of ¶517. COPA did not produce evidence of steps toward Secondary compliance with ¶517 in the fifth reporting period. In the sixth reporting period, COPA maintained Preliminary compliance with ¶517 by submitting its *Disciplinary and Remedial Recommendations In-Service Lesson Plan*. We noted that this lesson plan addresses the requirements ¶517. Several members of the IMT attended the *Disciplinary and Remedial Recommendations In-Service Training* class on June 22, 2022. The class instructor covered the lesson plan material completely and appropriately, provided examples to illustrate the instruction material, and allowed for class interaction. We explained that, to achieve Secondary compliance, COPA will need to provide this training to at least 95% of its personnel.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. Section IX.C.1.a–b completely addresses ¶517. The IMT submitted no-objection notices to S08-01-05 in September and October 2022. With this, the CPD reached Preliminary compliance.

COPA, in the seventh reporting period, provided documentation regarding its *Case Management System (CMS)* training and *Disciplinary and Remedial Recommendations* training for both its COPA Academy and COPA in-service training for new and veteran staff members. This documentation demonstrates that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. With this, COPA reached Secondary compliance with ¶517.

Additionally, on January 12, 2023, COPA produced three examples of Summary Report of Investigations, along with a memorandum documenting the three COPA cases as examples where sustained violations were noted for various policy violations and where CPD officers' conduct did not cause injury to any person involved. This documentation addresses the requirements of ¶517 and its subparagraphs. COPA remains Under Assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

<div align="center">***</div>

The City and the CPD reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph. COPA reached Secondary compliance and remains Under Assessment for Full compliance.

### Paragraph 517 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶518

> **518.** *CPD will provide the required notice regarding disciplinary matters to the Illinois Law Enforcement Training and Standards Board, including when an officer resigns while a misconduct investigation or disciplinary charges are pending.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶518 in the seventh reporting period, but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶518, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, the IMT reviewed the CPD's training development, implementation, and evaluation (¶286).

*Progress before the Seventh Reporting Period*

In the fifth reporting period, the CPD finalized Special Order S08-01-04, *Post-Investigation Log Number Procedures*. We noted that Section VII, *Notification to the Illinois Law Enforcement Training Standards Board*, completely addressed the requirements of ¶518. With this, the CPD moved into Preliminary compliance. In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. At the time of our review, these materials were still in draft state and not in final presentation form. The draft training materials contained instruction relevant to ¶518. We reviewed and provided the CPD feedback on the materials.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*.[71] This policy addresses the requirements of ¶518.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶518. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and

---

[71] This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review with a different combination of Consent Decree paragraphs, including ¶518. The latest draft of this training addresses the requirements of ¶518. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

Although the CPD had previously produced draft BIA eLearning Training materials for review with this paragraph in the sixth reporting period, the CPD did not produce revised versions of these training materials for review with ¶518 this reporting period and did not designate the training materials as meeting the requirements of this paragraph.

With these efforts, the City and the CPD maintained Preliminary compliance with ¶518, but did not reach Secondary compliance.

*** 

The CPD maintained Preliminary compliance with ¶518. We look forward to reviewing further revised materials in the coming reporting period.

### Paragraph 518 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶519

> ***519.*** *The failure to complete an administrative investigation within the timeframes set forth in this Agreement will not invalidate, impair, or otherwise negatively impact CPD's ability to issue discipline for sustained findings.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The CPD reached Preliminary compliance with ¶519 in the seventh reporting period.

To evaluate Preliminary compliance with ¶519, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).

*Progress before the Seventh Reporting Period*

In the fourth reporting period—the first reporting period that we assessed compliance with ¶519—the CPD did not produce evidence of efforts toward compliance with ¶519. However, in the fifth reporting period, the CPD provided a draft of S08-01-01, *Conducting Log Number Investigations*. We noted that this draft policy addressed the requirements of ¶519 verbatim. We provided feedback on this policy in September 2021. We did not receive a further revised draft of S08-01-01 thereafter. Because S08-01-01 remained in the collaborative review and revision process at the close of the fifth reporting period, the CPD did not reach Preliminary compliance with ¶519. In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05. The CPD submitted multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. We note that Section V.D of this draft version of the policy addresses ¶519 verbatim. The CPD submitted a further revised version of S08-01-05 on June 30, 2022, the last day of the reporting period. Therefore, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy addresses the requirements of ¶519. The IMT submitted no-objection notices to S08-01-05 in September and October 2022. With this, the CPD reached Preliminary compliance.

Additionally this reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, not including ¶519. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022 for review with a different combination of Consent Decree paragraphs, including ¶519. As written, the latest draft of the lesson plan for this training does not adequately address the requirements of ¶519. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526–27.

*** 

The CPD reached Preliminary compliance with this paragraph in the seventh reporting period. Moving forward, we will look for the CPD to further develop training relevant to the requirements of this paragraph.

### Paragraph 519 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶521

> **521.** *The City, CPD, and COPA will continue to build on these critical efforts by ensuring that BIA, COPA, the Police Board, and the Deputy PSIG have sufficient funding and an adequate number of qualified staff to fulfill their respective missions as required by law, each entity's policies, and this Agreement.*

## Compliance Progress　　(Reporting Period: January 1, 2022, through June 30, 2022)

| Preliminary: | | |
|---|---|---|
| | CITY | *Under Assessment* |
| | CPD | *Not in Compliance* |
| | COPA | *In Compliance* (NEW) |
| Secondary: | | *Not Yet Assessed* |
| Full: | | *Not Yet Assessed* |

**Preliminary:** *Not in Compliance*

The CPD did not achieve Preliminary compliance with ¶521 in the seventh reporting period. COPA reached Preliminary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶521 we reviewed various data sources to determine whether the City, the CPD, and COPA have reviewed and considered, as appropriate, staffing and needs assessments of BIA, COPA, the Police Board, and the Deputy PSIG to determine whether the entities have sufficient funding and staff to fulfill their obligations.

*Progress before the Seventh Reporting Period*

The IMT assessed compliance with ¶521 for the first time in the sixth reporting period. During site visits in June 2022, the IMT met with several groups of BIA Investigators and Accountability Sergeants to discuss their experiences. Through these conversations we learned about some of the realities on the ground and challenges Investigators and Accountability Sergeants face when performing their duties.

For example, ¶494(b) of the Consent Decree requires two Accountability Sergeants for each district and unit within CPD. However, we learned that the CPD consistently and uniformly does not adhere to this standard. We learned that most districts have allocated only one sergeant as the Accountability Sergeant and the district or unit may or may not have designated a "backup sergeant" for case assignment when the primary Accountability Sergeant is away from duty. The backup Accountability Sergeant performs other assignments in the district and only has

cases assigned during the absence of the "Primary Accountability Sergeant." This creates a very high caseload for the one designated Accountability Sergeant.

Of additional concern, we learned that the primary Accountability Sergeants also fill other assignments, such as serving as the Administrative Sergeant for the district or the Unit, and therefore are only able to conduct Administrative Investigations when other duties permit. We learned that the Accountability Sergeants are routinely assigned to cover patrol shifts due to shift supervisor's absences, which causes delays in investigations.

Further, we learned that Accountability Sergeants and BIA Investigators do not have the proper technology to allow them to fulfill their responsibilities. Accountability Sergeants share outdated desktop computers with other district personnel, which does not provide administrative investigative security or the ability to efficiently enter data and information into the Case Management System. We also learned that Accountability Sergeants do not have the proper locations to interview complainants, witness employees, or officers, which frequently requires them to schedule around office space that might become available.

The IMT explained in the sixth reporting period that we were greatly concerned that these factors, among others, are setting up Accountability Sergeants and BIA Investigators to violate the new directives that CPD would soon implement. It was also apparent that Accountability Sergeants and BIA Investigators had not been sufficiently informed of the upcoming Administrative Investigative directives and had not been consulted in policy development that directs their work. In conversations with Accountability Sergeants, many still referred to themselves as "CR Sergeants," which indicated that CPD leadership is not leading the cultural change necessary to reform the CPD.

We explained that, to comply with ¶521, it is imperative that the CPD honestly assess where it falls short in allotting necessary resources to ensure that Accountability Sergeants and BIA Investigators are properly equipped and supported to adequately perform their duties as required by the Consent Decree and the CPD's policies.

COPA did not provide any materials related to ¶521 in the sixth reporting period.

The Police Board, in a letter to the IMT dated April 14, 2022, indicated that the Police Board had adequate physical, equipment, and personnel resources to adequately perform its assigned duties. The Police Board further explained that it would provide a Needs Assessment to the City, which would be provided to the IMT in the seventh reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided BIA's 2023 *Staffing and Equipment Needs Assessment Implementation Plan* (the Plan) for review with ¶521–24. We provided comments on December 28, 2022, noting that the Plan was comprehensive and demonstrates notable improvements over versions from previous years. We noted that we particularly appreciated the CPD and BIA's detailed breakdown of equipment needs. Still, we expressed several concerns and also provided several recommendations, particularly related to staffing. For example, we encouraged the BIA to consider having non-sworn personnel fill needs such as those identified in the Plan's sections related to the BIA Accountability Sergeants Team and the BIA Consent Decree Compliance to allow sworn members to fill investigative positions. We also inquired about the staffing requirement to maintain paper and digital files, and expressed the following strong concerns related to the Plan's recommendations regarding staffing for Accountability Sergeants.

As written, the Plan states that while ¶494(b) of the Consent Decree "requires each patrol district to have at least two accountability sergeants . . . they are not both expected to be full-time investigators." Further, the Plan states that "[s]taffing for accountability sergeants can be fluid" due to factors such as "temporary staffing shortages that require sergeants to perform multiple functions . . . ." The interpretation of ¶494(b) in this section of the Plan seems to disregard that ¶494(b) requires that the District Commander designate at least two Accountability Sergeants, "whose *primary responsibility* is receiving, processing, and investigating complaints against CPD members." (Emphasis added.). The Plan states that ¶494(b) requires each patrol district to have at least two accountability sergeants, but that "they are not both expected to be full-time investigators." The section goes on to state that designation as an Accountability Sergeant means the sergeant is *eligible* to conduct investigations and "the additional sergeant or sergeants remain in the district and available for other assignments."

Paragraph 494(b) does not provide that Accountability Sergeants merely serve in this role on a part-time basis. Rather, paragraph 494(b) describes Accountability Sergeants' "*primary responsibility*" as "receiving, processing, and investigating complaints against CPD members." *See* ¶494(b) (emphasis added). Given the Accountability Sergeants' significant caseload and resulting challenges in completing cases in a timely manner per the timeline requirements set out by CPD policy, the IMT does not believe it is realistic to expect that this role can be adequately performed on a part-time basis. The IMT recommends that the CPD consider Accountability Sergeants for other assignments only when their caseload of assigned investigations is current. Otherwise, the Accountability Sergeants will not be able to complete the investigations in a timely manner with Accountability Sergeants regularly assigned to cover other positions and responsibilities.

Additionally, we recommend including information in the Plan regarding the number of Accountability Sergeants that are not considered full-time, the number of cases that are open, and the number of open cases that are past the timelines stated in CPD policy. We encourage the CPD and BIA to provide data that takes into consideration the caseload and duties and responsibilities of Accountability Sergeants to fully assess staffing needs. We also recommend including additional information in the Plan regarding the primary responsibility of Accountability Sergeants to complete investigations per the timeline requirements set out by CPD policy to fully assess staffing needs related to this responsibility.

As we explained in Independent Monitoring Report 6, to comply with ¶521, it is imperative that the CPD honestly assess where it falls short in allotting necessary resources to ensure that Accountability Sergeants and BIA Investigators are properly equipped and supported to adequately perform their duties as required by the Consent Decree and the CPD's policies. The CPD must be realistic about its staffing requirements so that Accountability Sergeants are able to fulfill their primary responsibilities per the requirements of the Consent Decree.

On January 19, 2023, the City and COPA produced COPA's *Staffing and Equipment Plan* for the seventh reporting period. This Plan is comprehensive and provides a thoughtful assessment of the staffing, equipment, and space needs COPA requires to fulfill its mission and responsibilities. The Plan provides details regarding COPA's 2022 staffing and organizational update which COPA believes will provide additional focus on its investigative responsibilities and will provide more leadership and supervision. The Plan also forecasts COPA's operational space needs for when COPA is fully staffed. COPA indicates that they have already reached out to other City stakeholders to make them aware of their future space needs. Finally, COPA provided an updated organizational chart with the Plan. The City places a high degree of responsibility on COPA for its investigations of cases involving CPD members, and the IMT urges the City to fund COPA's personnel and associated equipment needs in the next budget cycle. With these efforts, COPA reached Preliminary compliance.

<div align="center">***</div>

The City did not achieve Preliminary compliance with ¶521 in the seventh reporting period, but COPA reached Preliminary compliance

We look forward to CPD's revised Staffing and Needs Assessment that they have committed to early in the eighth reporting period. In the next reporting period, we will look for evidence demonstrating that the City is fulfilling the requirements of the paragraph.

## Paragraph 521 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶522

> *522. Within 365 days of the Effective Date, COPA, the Deputy PSIG, and BIA will create separate staffing and equipment-needs plans. Such plans will include analyses setting forth the basis for the plans' staffing requirements and equipment needs assessments. CPD will implement the staffing and equipment-needs plans in accordance with the specified timeline for implementation.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[72] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |

In the seventh reporting period, the Deputy PSIG and COPA maintained Full compliance with ¶522. The CPD maintained Preliminary compliance with ¶522, but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶522 we reviewed various data sources—including any plans developed under ¶522—to determine whether COPA, the Deputy PSIG, and BIA each created separate staffing and equipment needs plans. To assess Secondary compliance, we reviewed the produced plans to determine whether the plans were complete and sufficiently addressed the needs identified by the needs assessments. For Full compliance, we looked for evidence that COPA,

---

[72] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

the Deputy PSIG, and BIA communicated their needs plans to the appropriate entities. We also looked at whether the CPD implemented the staffing and equipment needs plans provided by BIA.

*Progress before the Seventh Reporting Period*

Paragraph 522 sets out a one-time obligation requiring the entities to submit sufficient staffing and equipment-needs plans. In past reporting periods, we reviewed the Deputy PSIG's *Staffing and Equipment Needs Assessment* and *OIG Budget Request FY2021*. We also reviewed COPA's *Staffing and Equipment Needs Plan* for 2020 and 2021. With these efforts, we found that COPA and the Deputy PSIG reached Full compliance. Given the one-time nature of this paragraph, these entities have since remained in Full compliance.

In the third reporting period, the CPD provided the *Staffing and Equipment Needs Plan Annual Assessment*, but it contained little detail regarding specific personnel and equipment needs. As a result, BIA did not reach Preliminary compliance. In the fifth reporting period, the CPD BIA provided its *Staffing and Equipment Needs Assessment and Implementation Plan for Fiscal Year 2022*. In developing this plan, BIA took into account feedback we provided to its plan for the previous year. We noted that BIA's 2022 plan was much improved because it included conclusions for staffing, technology, and equipment needs to allow BIA to adequately complete its responsibilities. We noted our belief that these requests would be bolstered by BIA's inclusion of additional data to support its requests. We encouraged BIA to consider what additional tasks non-sworn personnel can take on to allow sworn personnel to handle the investigative responsibilities for BIA. With this, we found CPD and BIA reached Preliminary compliance with ¶522 in the fifth reporting period, but encouraged the BIA to build upon this plan in the future by including more data to support its requests. *See* ¶522 ("Such plans will include analyses setting forth the basis for the plans' staffing requirements and equipment needs assessments."). The CPD did not produce materials relevant to ¶522 in the sixth reporting period, and therefore maintained Preliminary compliance but did not reach Secondary compliance. We explained that we would expect to receive an assessment that includes data-informed requests in the seventh reporting period.

While COPA and the Deputy PSIG previously fully complied with ¶522, in the fifth reporting period we highlighted their continued, relevant efforts. COPA provided its *2021-22 Staffing and Equipment Needs Plan*. We noted that COPA's plan followed a consistent format from previous years' plans which allows a reader to easily understand the report and compare changes in staffing levels from year to year. In addition to informing the reader about changes in positions, the plan also provides explanations for changes. We explained that this plan demonstrates that COPA has a detailed understanding of its operational needs. Additionally, the Deputy PSIG provided an update to its Staffing and Needs Assessment. Given the one-

time nature of this paragraph, COPA and PSIG maintained Full compliance with ¶522 in past reporting periods.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided BIA's 2023 *Staffing and Equipment Needs Assessment Implementation Plan* (the Plan) for review with ¶521–24. We provided comments on December 28, 2022, noting that the Plan was comprehensive and demonstrates notable improvements over versions from previous years. We noted that we particularly appreciated the CPD and BIA's detailed breakdown of equipment needs. Still, we expressed several concerns and also provided several recommendations. For example, we encouraged the BIA to consider having non-sworn personnel fill needs such as those identified in the Plan's sections related to the BIA Accountability Sergeants Team and the BIA Consent Decree Compliance to allow sworn members to fill investigative positions. We also inquired about the staffing requirement to maintain paper and digital files, and expressed the following strong concerns related to the Plan's recommendations regarding staffing for Accountability Sergeants.

As written, the Plan states that while ¶494(b) of the Consent Decree "requires each patrol district to have at least two accountability sergeants . . . they are not both expected to be full-time investigators." Further, the Plan states that "[s]taffing for accountability sergeants can be fluid" due to factors such as "temporary staffing shortages that require sergeants to perform multiple functions . . . ." The interpretation of ¶494(b) in this section of the Plan seems to disregard that ¶494(b) requires that the District Commander designate at least two Accountability Sergeants, "whose *primary responsibility* is receiving, processing, and investigating complaints against CPD members." (Emphasis added). The Plan states that ¶494(b) requires each patrol district to have at least two accountability sergeants, but that "they are not both expected to be full-time investigators." The section goes on to state that designation as an Accountability Sergeant means the sergeant is *eligible* to conduct investigations and "the additional sergeant or sergeants remain in the district and available for other assignments."

Paragraph 494(b) does not provide that Accountability Sergeants merely serve in this role on a part-time basis. Rather, paragraph 494(b) describes Accountability Sergeants' "*primary responsibility*" as "receiving, processing, and investigating complaints against CPD members." *See* ¶494(b) (emphasis added). Given the Accountability Sergeants' significant caseload and resulting challenges in completing cases in a timely manner per the timeline requirements set out by CPD policy, the IMT does not believe it is realistic to expect that this role can be adequately performed on a part-time basis. The IMT recommends that the CPD consider Accountability Sergeants for other assignments only when their caseload of assigned investigations is current. Otherwise, the Accountability Sergeants will not be able to

complete the investigations in a timely manner with Accountability Sergeants regularly assigned to cover other positions and responsibilities.

Additionally, we recommend including information in the Plan regarding the number of Accountability Sergeants that are not considered full-time, the number of cases that are open, and the number of open cases that are past the timelines stated in CPD policy. We encourage the CPD and BIA to provide data that takes into consideration the caseload and duties and responsibilities of Accountability Sergeants to fully assess staffing needs. We also recommend including additional information in the Plan regarding the primary responsibility of Accountability Sergeants to complete investigations per the timeline requirements set out by CPD policy to fully assess staffing needs related to this responsibility.

Given the one-time nature of this paragraph, PSIG and COPA maintained Full compliance with ¶522 in past reporting periods. Nonetheless, on January 19, 2023, the City and COPA produced COPA's *Staffing and Equipment Plan* for the seventh reporting period. This Plan is comprehensive and provides a thoughtful assessment of the staffing, equipment, and space needs COPA requires to fulfill its mission and responsibilities. The Plan provides details regarding COPA's 2022 staffing and organizational update which COPA believes will provide additional focus on its investigative responsibilities and will provide more leadership and supervision. The Plan also forecasts COPA's operational space needs for when COPA is fully staffed. COPA indicates that they have already reached out to other City stakeholders to make them aware of their future space needs. Finally, COPA provided an updated organizational chart with the Plan. The City places a high degree of responsibility on COPA for its investigations of cases involving CPD members, and the IMT urges the City to fund COPA's personnel and associated equipment needs in the next budget cycle.

<p style="text-align:center">***</p>

The Deputy PSIG and COPA maintained Full compliance with ¶522. The CPD maintained Preliminary compliance with ¶522, but did not reach Secondary compliance. We will expect to receive an assessment that includes data-informed requests in the next reporting period.

## Paragraph 522 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶523

*523. On an annual basis, COPA, the Deputy PSIG, and BIA will review and revise, if needed, each entity's respective staffing and equipment-needs plans.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**   Annually              ☑ **Not Yet Applicable**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[73] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶523. COPA maintained Full compliance with ¶523. The Deputy PSIG maintained Full compliance with ¶523. Because all three entities maintained at least Preliminary compliance, the City, as a whole, is in Preliminary compliance.

To evaluate Preliminary compliance with ¶523 we reviewed various data sources—including any plans developed under ¶523—to determine whether COPA, the Deputy PSIG, and BIA each created separate staffing and equipment needs assessments. To assess Secondary compliance, we reviewed the produced plans to determine whether the plans were complete and sufficiently addressed the needs identified by thorough needs assessments. For Full compliance, we looked for evidence that COPA, the Deputy PSIG, and BIA have developed processes for assessing their staffing and equipment needs on an annual basis, and after assessing needs, that they communicate those needs to the appropriate entity.

---

[73]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

*Progress before the Seventh Reporting Period*

In past reporting periods, as required by ¶522, COPA, the Deputy PSIG, and the CPD submitted staffing and equipment-needs plans.

The Deputy PSIG not only provided a report but showed a recurring effort to revise its assessments and plans, allowing it to reach Full compliance in the fourth reporting period. The Deputy PSIG provided an update to its Staffing and Needs assessment, allowing the Deputy PSIG to maintain Full compliance in the fifth reporting period.

In the fifth reporting period, COPA provided its *2021-22 Staffing and Equipment Needs Plan*. This plan demonstrated that COPA had a detailed understanding of its operational needs and has mechanisms in place to assess those needs on an annual basis. With this, COPA reached Full compliance.

For the CPD, the fifth reporting period marked the first year it provided a staffing and equipment needs plan sufficient to reach Preliminary compliance. The CPD BIA provided its *Staffing and Equipment Needs Assessment and Implementation Plan for Fiscal Year 2022*. In developing this plan, BIA took into account feedback we provided to its plan for the previous year. We noted in the fifth reporting period that BIA's 2022 plan was much improved. It included conclusions for staffing, technology, and equipment needs to allow BIA to adequately complete its responsibilities. With this, BIA reached Preliminary compliance. We explained in the fifth reporting period that, to reach additional levels of compliance, BIA must have mechanisms in place to complete a review of its assessment and plan and make revisions as needed on an annual basis, and must use feedback received on its plan to bolster future assessments and plans with data.

In the sixth reporting period, the CPD maintained Preliminary compliance, and COPA and the Deputy PSIG maintained Full compliance with ¶523. Because this paragraph sets out an annual requirement and the parties submitted materials relevant to ¶523 in the fifth reporting period, we explained in the sixth reporting period that we expect that they will produce additional information in the seventh reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided BIA's 2023 *Staffing and Equipment Needs Assessment Implementation Plan* (the Plan) for review with ¶521–24. We provided comments on December 28, 2022, noting that the Plan was comprehensive and demonstrates notable improvements over versions from previous years. We noted that we particularly appreciated the CPD and BIA's detailed breakdown of equipment needs. Still, we expressed several concerns and also provided several recommendations. For example, we encouraged the BIA to consider having non-sworn

personnel fill needs such as those identified in the Plan's sections related to the BIA Accountability Sergeants Team and the BIA Consent Decree Compliance to allow sworn members to fill investigative positions. We also inquired about the staffing requirement to maintain paper and digital files, and expressed the following strong concerns related to the Plan's recommendations regarding staffing for Accountability Sergeants.

As written, the Plan states that while ¶494(b) of the Consent Decree "requires each patrol district to have at least two accountability sergeants . . . they are not both expected to be full-time investigators." Further, the Plan states that "[s]taffing for accountability sergeants can be fluid" due to factors such as "temporary staffing shortages that require sergeants to perform multiple functions . . . ." The interpretation of ¶494(b) in this section of the Plan seems to disregard that ¶494(b) requires that the District Commander designate at least two Accountability Sergeants, "whose *primary responsibility* is receiving, processing, and investigating complaints against CPD members." (Emphasis added). The Plan states that ¶494(b) requires each patrol district to have at least two accountability sergeants, but that "they are not both expected to be full-time investigators." The section goes on to state that designation as an Accountability Sergeant means the sergeant is *eligible* to conduct investigations and "the additional sergeant or sergeants remain in the district and available for other assignments."

Paragraph 494(b) does not provide that Accountability Sergeants merely serve in this role on a part-time basis. Rather, paragraph 494(b) describes Accountability Sergeants' "*primary responsibility*" as "receiving, processing, and investigating complaints against CPD members." *See* ¶494(b) (emphasis added). Given the Accountability Sergeants' significant caseload and resulting challenges in completing cases in a timely manner per the timeline requirements set out by CPD policy, the IMT does not believe it is realistic to expect that this role can be adequately performed on a part-time basis. The IMT recommends that the CPD consider Accountability Sergeants for other assignments only when their caseload of assigned investigations is current. Otherwise, the Accountability Sergeants will not be able to complete the investigations in a timely manner with Accountability Sergeants regularly assigned to cover other positions and responsibilities.

Additionally, we recommend including information in the Plan regarding the number of Accountability Sergeants that are not considered full-time, the number of cases that are open, and the number of open cases that are past the timelines stated in CPD policy. We encourage the CPD and BIA to provide data that takes into consideration the caseload and duties and responsibilities of Accountability Sergeants to fully assess staffing needs. We also recommend including additional information in the Plan regarding the primary responsibility of Accountability Sergeants to complete investigations per the timeline requirements set out by CPD policy to fully assess staffing needs related to this responsibility.

The Deputy PSIG, in the seventh reporting period, provided a memorandum detailing its 2023 City budget request and needs assessment. This documentation also provided information on how the Deputy PSIG's 2022 budget request and needs assessment were addressed by the City budget process. PSIG continues to provide detailed information, often with more detail than the Consent Decree requires. With this, PSIG maintained Full compliance.

On January 19, 2023, the City and COPA produced COPA's *Staffing and Equipment Plan* for the seventh reporting period. This Plan is comprehensive and provides a thoughtful assessment of the staffing, equipment, and space needs COPA requires to fulfill its mission and responsibilities. The Plan provides details regarding COPA's 2022 staffing and organizational update which COPA believes will provide additional focus on its investigative responsibilities and will provide more leadership and supervision. The Plan also forecasts COPA's operational space needs for when COPA is fully staffed. COPA indicates that they have already reached out to other City stakeholders to make them aware of their future space needs. Finally, COPA provided an updated organizational chart with the Plan. The City places a high degree of responsibility on COPA for its investigations of cases involving CPD members, and the IMT urges the City to fund COPA's personnel and associated equipment needs in the next budget cycle. With these efforts, COPA maintained Full compliance.

<div align="center">***</div>

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶523. COPA maintained Full compliance with ¶523. The Deputy PSIG maintained Full compliance with ¶523.

In the coming reporting periods, we will look for COPA and the Deputy PSIG to provide evidence that they have reviewed and revised their staffing and equipment needs to demonstrate maintained compliance. For the City and the CPD to reach additional levels of compliance, we will need to see that BIA has mechanisms in place to complete a review of its assessment and to plan and make revisions as needed on an annual basis.

## Paragraph 523 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶524

**524.** *BIA's staffing and equipment-needs plans will include the investigation staffing and equipment needs of the districts.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained compliance with ¶524 in the seventh reporting period, but did not reach additional levels of compliance.

To evaluate Preliminary compliance with ¶524 we reviewed BIA's staffing and equipment-needs plan to determine whether it includes investigation staffing and equipment needs of the districts. To evaluate Secondary compliance, we assessed whether the plan sections addressing investigation staffing and equipment needs of the districts were complete and sufficient.

*Progress before the Seventh Reporting Period*

We assessed BIA's compliance with ¶524 for the first time in the fourth reporting period. The City and the CPD did not reach compliance at that time because BIA's *Staffing and Equipment Needs Plan Annual Assessment* (submitted in the third reporting period) did not include specific details about investigation staffing and equipment needs of the districts as required by the paragraph. In the fifth reporting period, BIA provided its *Staffing and Equipment Needs Assessment and Implementation Plan for Fiscal Year 2022*. This plan includes information relating to staffing and equipment needs for District and Unit Accountability Sergeants. With this, BIA reached Preliminary compliance.

However, in discussing the needs related to District and Unit Accountability Sergeants, the plan asserts that the two Accountability Sergeants are not "both expected to be full-time investigators." *See Staffing and Equipment Needs Assessment and Implementation Plan for Fiscal Year 2022* at 9. This is in conflict with the requirements of ¶494(b), which requires that "each District Commander designates at least two Accountability Sergeants who will report to the District Commander, and whose **primary responsibility** is receiving, processing, and investigating complaints against CPD members." (Emphasis added). We noted that this assertion is all the more concerning given that, during site visits in the fifth reporting period, we learned that Accountability Sergeants are required to fill supervisory responsibilities that often prevent them from completing their investigations in a timely manner.

Because the *Staffing and Equipment Needs Assessment and Implementation Plan for Fiscal Year 2022* incorporated a misunderstanding of the requirements of ¶494(b) and did not seem to account for the difficulties experienced by the Accountability Sergeants, we noted that the plan did not yet sufficiently include investigation staffing and equipment needs of the districts. With this, the CPD reached Preliminary compliance with ¶524 in the fifth reporting period, but did not reach Secondary compliance.

The City and the CPD maintained compliance with ¶524 in the sixth reporting period, but did not reach additional levels of compliance. Because the needs assessment plans are typically completed annually, the CPD did not submit materials related to ¶524 in the sixth reporting period, but we explained that we would expect materials to be submitted in the seventh reporting period. We also noted in the sixth reporting period that we would look forward to ongoing discussions regarding the designation of Accountability Sergeants in the districts and reviewing a plan that better addresses the requirements of the Consent Decree and the Districts' Accountability Sergeants.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided BIA's 2023 *Staffing and Equipment Needs Assessment Implementation Plan* (the Plan) for review with ¶521–24. We provided comments on December 28, 2022, noting that the Plan was comprehensive and demonstrates notable improvements over versions from previous years. We noted that we particularly appreciated the CPD and BIA's detailed breakdown of equipment needs. Still, we reiterated our concerns explained in Independent Monitoring Report 5 regarding the Plan's recommendations regarding staffing for Accountability Sergeants.

As written, the Plan states that while ¶494(b) of the Consent Decree "requires each patrol district to have at least two accountability sergeants . . . they are not both expected to be full-time investigators." Further, the Plan states that "[s]taffing for accountability sergeants can be fluid" due to factors such as "temporary staffing shortages that require sergeants to perform multiple functions . . . ." The interpretation of ¶494(b) in this section of the Plan seems to disregard that ¶494(b) requires that the District Commander designate at least two Accountability Sergeants, "whose *primary responsibility* is receiving, processing, and investigating complaints against CPD members." (Emphasis added). The Plan states that ¶494(b) requires each patrol district to have at least two accountability sergeants, but that "they are not both expected to be full-time investigators." The section goes on to state that designation as an Accountability Sergeant means the sergeant is *eligible* to conduct investigations and "the additional sergeant or sergeants remain in the district and available for other assignments."

Paragraph 494(b) does not provide that Accountability Sergeants merely serve in this role on a part-time basis. Rather, paragraph 494(b) describes Accountability Sergeants' "*primary responsibility*" as "receiving, processing, and investigating complaints against CPD members." *See* ¶494(b) (emphasis added). Given the Accountability Sergeants' significant caseload and resulting challenges in completing cases in a timely manner per the timeline requirements set out by CPD policy, the IMT does not believe it is realistic to expect that this role can be adequately performed on a part-time basis. The IMT recommends that the CPD consider Accountability Sergeants for other assignments only when their caseload of assigned investigations is current. Otherwise, the Accountability Sergeants will not be able to complete the investigations in a timely manner with Accountability Sergeants regularly assigned to cover other positions and responsibilities.

Because the *Staffing and Equipment Needs Assessment Implementation Plan for Fiscal Year 2023* incorporates a misunderstanding of the requirements of ¶494(b) and does not seem to account for the difficulties experienced by the Accountability Sergeants, the Plan does not sufficiently include investigation staffing and equipment needs of the districts. With this, the CPD maintained Preliminary compliance with ¶524 in the seventh reporting period, but did not reach Secondary compliance.

<div align="center">✱✱✱</div>

The City and the CPD maintained Preliminary compliance with ¶524 in the seventh reporting period, but did not reach additional levels of compliance. We look forward to ongoing discussions regarding the designation of Accountability Sergeants in the districts and reviewing a plan that better addresses the requirements of the Consent Decree and the Districts' Accountability Sergeants.

### Paragraph 524 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶525

*525. Within 60 days of the Effective Date, the City will propose a permanent method of selecting the Chief Administrator of COPA. In creating the permanent selection method for COPA's Chief Administrator, the City will consider the views and recommendations of community stakeholders.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City maintained Preliminary compliance but did not reach Secondary compliance with ¶525 in the seventh reporting period.

To evaluate Preliminary compliance with ¶525, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance with ¶525, we considered a variety of data sources including documentation detailing the screening and hiring process that was used to fill the COPA Chief Administrator vacancy to determine whether the set method for selecting the Chief Administrator of COPA is understandable to those involved in the selection process.

*Progress before the Seventh Reporting Period*

The City reached Preliminary compliance with ¶525 in the second reporting period based on its February 28, 2020 *Selection Method for Chief Administrator of COPA* memorandum. At that time, the City had informed us of its negotiations related to a proposed ordinance that would include a permanent process for selecting the COPA Chief Administrator. We reiterated that the City should ensure that opinions and recommendations of community stakeholders be incorporated into future changes of the temporary selection method. In the fourth reporting period, we noted that there was a vacancy for the COPA Chief Administrator, and we reiterated our understanding that the City would follow the Selection Method memorandum.

On December 9, 2021, the City submitted Chief Selection Materials related to the recent appointment of a new COPA Chief Administrator, including but not limited to community engagement materials, the COPA Chief Administrator Job Description, and selection committee materials. Upon review of the Selection Materials, we asked the City if it had a followed a more detailed process than what was outlined in the February 2020 memorandum. The City informed the IMT that a Standard Operating Procedure had been created. We received this Standard Operating

Procedure, *COPA Chief Administrator Selection Process*, on December 30, 2021. This Standard Operating Procedure raised some concerns, including questions as to whether this Standard Operating Procedure was created prior to the selection process for a COPA Chief Administrator occurred or after the appointment.

Having a clear appointment process is important for purposes of transparency and accountability. We noted that we would like to see improved clarity surrounding the appointment process in the future. The City recognized that the Standard Operating Procedure submitted December 9, 2021 is only a temporary solution, stating "[t]he City has recently codified a permanent selection method for selection of the Chief Administrator of COPA via City Council." We expressed our expectation that a more permanent selection process will be created and submitted to us for review as ¶525 calls for a *permanent* method for selecting the Chief Administrator of COPA.

Because the City did not have a more permanent selection method in place, it did not reach additional levels of compliance with ¶525 in the fifth reporting period.

The City did not submit materials related to ¶525 in the sixth reporting period. We explained that, without submitting materials for review that demonstrate a more permanent selection method, the City did not reach additional levels of compliance with ¶525 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

The City did not submit materials related to ¶525 in the seventh reporting period.

\*\*\*

Without submitting materials for review that demonstrate a more permanent selection method, the City did not reach additional levels of compliance with ¶525 in the seventh reporting period.

### Paragraph 525 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶526

> **526.** Within 180 days of being assigned to BIA or being hired by COPA, all new BIA personnel and COPA employees will receive initial on-boarding training that is adequate in quality, quantity, scope, and type. Within 120 days of the Effective Date, COPA and BIA will verify that all existing personnel received training that is consistent with this Agreement.

## Compliance Progress       (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[74] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |

The City made efforts toward but did not reach Preliminary compliance with ¶526 in the seventh reporting period. COPA maintained Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶526, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[75] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we reviewed various data sources to determine whether the entities have appropriate training and systems in place to ensure all new personnel

---

[74] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[75] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

and employees receive adequate on-boarding training within 180 days of assign-ment.

*Progress before the Seventh Reporting Period*

In earlier reporting periods, the CPD provided drafts of BIA's *Training* Unit Di-rective. Sections of this Unit Directive speak to the requirements of ¶526, but this Unit Directive remained in the collaborative review and revision process at the end of the fourth reporting period. In the fourth reporting period, we reviewed BIA's draft of its onboarding training materials. We provided feedback but did not re-ceive revised materials by the end of the reporting period. Therefore, the CPD did not reach Preliminary compliance.

In the fifth reporting period, BIA did not provide any additional drafts of its *Train-ing* Unit Directive or its onboarding training materials that had been provided in earlier reporting periods and to which we provided feedback. Instead, the CPD fo-cused on revising Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. This Directive copied verbatim the requirements set out in ¶526. But as we discussed with CPD during the fifth reporting period, we noted that mere recitation of the requirements stated in ¶526 is not sufficient to reach Preliminary compliance. Instead, we explained that the CPD must show that it has a detailed, written plan for actually providing the training required by the para-graph. Because the CPD did not provide us evidence of a plan to develop and com-plete training in accordance with ¶526, the CPD did not reach Preliminary compli-ance in the fifth reporting period.

The CPD did not submit materials related to ¶526 in the sixth reporting period. We explained that, because the CPD had not yet provided evidence of a training plan that would allow it to comply with ¶526, the CPD had not yet reached Preliminary compliance.

COPA met Preliminary compliance in the third reporting period by revising and ul-timately receiving a no-objection notice on its Training Plan, which fully addressed the requirements of ¶526.[76] In the fourth reporting period, COPA provided for re-view training academy attendance records for *New Hire Onboarding Orientations*

---

[76] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to re-solve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD

which showed that all 15 trainees attended and completed 29.5 hours of on-boarding training. This training included Implicit Bias, Procedural Justice training, and a variety of other topics. With this, COPA reached Secondary compliance.

COPA, in the fifth reporting period, provided records that tracked the provision and completion of training to and by COPA employees. We noted that this tracker showed that COPA was providing training in accordance with the *Training and Professional Development Department Training Plan* which COPA provided in the third reporting period. These efforts demonstrated that the COPA has the necessary systems in place to meet the requirements of ¶526 and follow its own training plan. With this, COPA reached Full compliance with ¶526.

COPA did not submit materials related to ¶526 in the sixth reporting period, however we attended a training and were provided verbal updates regarding COPA's continued training efforts. With this, COPA maintained Full compliance in the sixth reporting period. We explained that we expected to receive detailed training attendance records in the seventh reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs. The CPD and BIA began developing this training to address the Consent Decree requirements for training new BIA investigators and Accountability Sergeants in best practices for satisfactory administrative investigations. While the CPD produced these training materials for review under ¶528, not ¶526, the IMT is assessing these materials under both of these paragraphs, since ¶526 sets out the requirement that "all new BIA personnel will receive initial on-boarding training that is adequate in quality, quantity, scope, and type," whereas ¶528 outlines the instructional content that the training must include. *See* ¶¶526 and 528. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. This production was still under review at the end of the reporting period.

COPA, in the seventh reporting period, provided training rosters for its *COPA Academy* and new-hire and in-service training which verify that COPA is providing consistent training that meets the requirements of the Consent Decree. COPA has a training policy and comprehensive lesson plans that demonstrate best practices. COPA uses subject matter experts to develop and present the lesson plan material

---

posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

to ensure that COPA employees are completely trained. COPA provided documentation of in-service training demonstrating that more than 95% of its employees received at least eight hours of in-service training. With these efforts, COPA maintained Full compliance.

<p style="text-align:center">***</p>

The City and the CPD made efforts toward but did not reach Preliminary compliance with ¶526 in the seventh reporting period. COPA maintained Full compliance. In the coming reporting periods, we will look for the CPD to further develop its training materials. For COPA, we will look for evidence demonstrating that it is maintaining Full compliance with the requirements of this paragraph.

### Paragraph 526 Compliance Progress History

| FIRST REPORTING PERIOD<br>SEPTEMBER 1, 2019 – AUGUST 31, 2019<br>COMPLIANCE PROGRESS:<br>None | SECOND REPORTING PERIOD<br>SEPTEMBER 1, 2019 – FEBRUARY 29, 2020<br>COMPLIANCE PROGRESS:<br>None | THIRD REPORTING PERIOD<br>MARCH 1, 2020 – DECEMBER 31, 2020<br>COMPLIANCE PROGRESS:<br>None |
| --- | --- | --- |
| FOURTH REPORTING PERIOD<br>JANUARY 1, 2021 – JUNE 30, 2021<br>COMPLIANCE PROGRESS:<br>None | FIFTH REPORTING PERIOD<br>JULY 1, 2021 – DECEMBER 31, 2021<br>COMPLIANCE PROGRESS:<br>None | SIXTH REPORTING PERIOD<br>JANUARY 1, 2022 – JUNE 30, 2022<br>COMPLIANCE PROGRESS:<br>None |
| SEVENTH REPORTING PERIOD<br>JULY 1, 2022 – DECEMBER 31, 2022<br>COMPLIANCE PROGRESS:<br>None | | |

# Accountability and Transparency: ¶527

**527.** *Within 180 days of the Effective Date, COPA and BIA will begin providing all investigation staff members with at least eight hours of annual, comprehensive, in-service training.*

## Compliance Progress (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[77] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |

The City made efforts toward but did not reach Preliminary compliance in the seventh reporting period. COPA maintained Full compliance in the seventh reporting period.

To evaluate Preliminary compliance with ¶527, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[78] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we reviewed various data sources to determine whether the entities have systems in place to ensure that staff members are provided with eight hours of comprehensive, in-service training on an annual basis.

---

[77]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[78]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

BIA did not reach Preliminary compliance with ¶527 in past reporting periods, though we reviewed numerous materials produced under this paragraph, including BIA's in-service training plan, BIA's *Training* Unit Directive, and BIA's annual training plan. In the fifth reporting period, BIA did not provide any additional drafts of its *Training* Unit Directive or revised training plans. Instead, the CPD focused on revising Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. This Directive copied verbatim the requirements set out in ¶527. But as we discussed with CPD during the fifth reporting period, mere recitation of the requirements stated in ¶527 is not sufficient to reach Preliminary compliance. Instead, we explained that the CPD must show that it has a detailed, written plan for actually providing the training required by the paragraph. The CPD did not submit materials related to ¶527 in the sixth reporting period, and therefore did not reach Preliminary compliance with ¶527.

COPA reached Preliminary compliance with ¶527 in the third reporting period by drafting and revising a comprehensive *Training Plan*. In the fifth reporting period, COPA provided records demonstrating that 99% of its personnel completed its 2021 In-Service Training which included instruction blocks on procedural justice, implicit bias, witness reliability, and intake. COPA provided all of these training materials to the IMT prior to delivering these trainings and we ultimately provided no-objection notices to each. We commended COPA on developing comprehensive and professional trainings and for keeping such detailed and clear records which not only allow COPA to demonstrate compliance but keep track of personnel training histories for its own records. With this, COPA reached Full compliance with ¶527. COPA did not submit materials related to ¶527 in the sixth reporting period, however we attended a training and were provided verbal updates regarding COPA's continued training efforts. COPA thus maintained Full compliance with ¶527. We explained that we expected to receive detailed training attendance records in the seventh reporting period.

*Progress in the Seventh Reporting Period*

The CPD did not submit materials related to ¶527 in the seventh reporting period, and therefore did not reach Preliminary compliance with ¶527. To date, the CPD has not provided any documentation that BIA staff have received at least eight hours of comprehensive in-service training. The CPD provided a *BIA Training Plan* for 2023 late in the seventh reporting period, to which the IMT provided feedback. However, this *Training Plan* does not sufficiently address the requirements of ¶527. For a more detailed discussion of the *2023 BIA Training Plan*, see summary for ¶530. The IMT looks forward to the BIA further developing the *Training Plan* in the next reporting period and then beginning the development of individual lesson plans that meet the requirements of the Consent Decree.

COPA, in the seventh reporting period, provided training rosters for its *COPA Academy* and new-hire and in-service training which verify that COPA is providing consistent training that meets the requirements of the Consent Decree. COPA has a training policy and comprehensive lesson plans that demonstrate best practices. COPA uses subject matter experts to develop and present the lesson plan material to ensure that COPA employees are completely trained. COPA provided documentation of in-service training demonstrating that more than 95% of its employees received at least eight hours of in-service training. With these efforts, COPA maintained Full compliance.

\*\*\*

The City did not reach any level of compliance in the seventh reporting period. COPA maintained Full compliance in the seventh reporting period. Moving forward, we will look for the CPD to further developing a plan that details how the CPD will comply with ¶527's training requirements. For COPA, we will look for COPA to continue to provide evidence that is it fully complying with ¶527's requirements.

### Paragraph 527 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD | | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Accountability and Transparency: ¶528

***528.*** *The initial and annual in-service training for COPA and BIA investigators will include instruction in: a. how to properly handle complaint intake, and the consequences for failing to take complaints; b. best practices in procedural justice, including techniques for communicating with complainants and members of the public; c. the collection of objective verifiable evidence; d. the process for seeking an override affidavit in the absence of a signed complainant affidavit; e. for COPA investigators, techniques for conducting impartial investigations of domestic violence and sexual misconduct; f. for BIA investigators, techniques for conducting impartial investigations of sexual misconduct; g. investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management; h. the challenges of law enforcement administrative investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation; i. properly weighing the credibility of witnesses against CPD members; j. using objective evidence to identify and resolve inconsistent statements; k. implicit bias; l. the proper application of the relevant standards of proof; m. relevant COPA and CPD rules, policies, and protocols including the requirements of this Agreement; n. relevant state and federal law; o. relevant CPD Rules of Conduct, including Rules 14, 21, and 22; p. the CMS; q. the applicable collective bargaining agreements; and r. how to access and use the PRS or information available on the PRS.*

## Compliance Progress (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[79] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

[79] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

The CPD did not reach Preliminary compliance with ¶528 in the seventh reporting period. COPA maintained Preliminary compliance with ¶528. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶528, the IMT reviewed the CPD's and COPA's relevant policies and training plans following the process described in the Consent Decree (¶¶626–41).[80] To evaluate Secondary compliance, we reviewed the entities' training development to determine whether COPA and BIA have sufficient initial and annual in-service training curriculum that meets the requirements of ¶528. To evaluate Full compliance, we reviewed relevant training materials and consulted various data sources to determine whether COPA and BIA provided the training required by ¶528.

*Progress before the Seventh Reporting Period*

BIA did not reach Preliminary compliance with ¶528 in past reporting periods, though we reviewed numerous materials produced under this paragraph. We reviewed BIA's *Training* Unit Directive, BIA's *Accountability Sergeants* Unit Directive, BIA's *BIA Investigators* Unit Directive, and a variety of training materials that relate to the training requirements listed in ¶528. We urged BIA to address comments and suggestions stated in ¶528 and the OAG provided BIA on the blocks of instructions submitted to further refine the trainings.

BIA did not provide revised training materials for any of its Unit Directives previously submitted under this paragraph in the fifth reporting period. Nor did BIA post any of its Unit Directives related to ¶528 for public comment. Instead, during the fifth reporting period, the CPD focused on revising Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which speaks to ¶528. But as we discussed with CPD during the fifth reporting period, mere recitation of the requirements stated in ¶528 is not sufficient to reach Preliminary compliance. Instead, we explained that the CPD must show that it has a detailed, written plan for actually providing the training required by the paragraph. The CPD did not reach Preliminary compliance. The CPD did not submit materials related to ¶528 in the sixth reporting period, and therefore did not reach Preliminary compliance.

COPA reached Preliminary compliance by compiling and revising its *Training and Professional Department Training Plan*. This Training Plan is comprehensive, meeting and exceeding all requirements listed in ¶528. In the fourth reporting period,

---

[80]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

COPA produced a variety of training lesson plans relevant to the requirements of ¶528. This included the training regarding witness reliability (relating to ¶528(i)), procedural justice (relating to ¶528(b)), implicit bias (¶528(k)), and the CPD Rules and Directives (¶528(o)). In the fifth reporting period, COPA provided its materials for its *Intake* in-service training. We submitted a no-objection notice to this training.[81] We noted that this well-presented and comprehensive training covers the requirements of ¶528(a). Toward the end of the reporting period, COPA provided training attendance records showing that 99% of its personnel completed the trainings related to intake (¶528(a)), procedural justice (¶528(b)), implicit bias (¶528(k)), and witness reliability (¶528(j)). We noted that this demonstrated great progress toward additional levels of compliance with ¶528. But because COPA had not yet provided training materials covering all listed topics, COPA did not reach Secondary compliance. With this, COPA maintained Preliminary compliance but did not reach Secondary compliance in the fifth reporting period.

In the sixth reporting period, COPA provided its Forensic Experiential Trauma Interviews (FETI) Training. This training addresses the In-Service Training for conducting impartial investigations of sexual misconduct as directed by ¶528(e); proper interview and interrogation techniques and objectively analyzing evidence and data and case management as directed by ¶528(g); and identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation as directed by ¶528(h). COPA also provided certification for the FETI training that is provided to its investigators responsible for investigating sexual misconduct and domestic violence cases involving CPD members. This certification demonstrates that COPA has provided the required training for its investigative staff to meet the requirements of ¶528(e). The IMT requested to audit the FETI Training to determine compliance levels, and noted that it hoped to have the opportunity to observe the FETI Training in the seventh reporting period.

COPA also provided its *Case Management System: Overview of Policy and Procedures* training materials in the sixth reporting period. These training materials include instruction in the Case Management System, per the requirement of ¶528(p), and provide that COPA employees will have access to the Case Management System and the CLEAR System to undertake their duties. We noted that the

---

[81] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

lesson plan is very comprehensive and explains not only that COPA investigators will have access to the Case Management System, but also the responsibility that comes with the Case Management System access. We noted that the lesson plan explains who will issue credentials and how the systems may be audited to ensure no misuse occurs, and explains that misuse or improper use is strictly prohibited and may be subject to misconduct investigations that may include disciplinary action to include discharge. On January 12, 2022, the IMT observed the two-hour mandatory *In-Service Case Management System Training*. The lesson plan was presented as written, and the instructors appeared knowledgeable. The IMT provided suggestions regarding delivery of the instruction, which COPA took into consideration for future trainings.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶528. The IMT provided extensive feedback on these training materials on September 11, 2022 and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022. As written, the latest draft of the lesson plan for this training does not adequately address the requirements of ¶528 and its subparagraphs. This training is still under development. For further discussion of the BIA Onboard Training, see ¶526.

Paragraph 528 includes 18 subparagraphs that outline the instructional content that must be included in the BIA's and COPA's initial on-boarding and annual in-service trainings. The draft BIA Onboard Training addresses some of these subparagraphs, but not others. Specifically, the draft training addresses ¶528(c) ("the collection of objective verifiable evidence"); ¶528(g) ("investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management"); ¶528(k) ("implicit bias"); ¶528(l) ("the proper application of the relevant standards of proof"); ¶528(q) ("the applicable collective bargaining agreements"); and ¶528(r) ("how to access and use the PRS or information available on the PRS"). The draft training touches on ¶528(a), (b), (f), (m), and (o), but does not fully address subparagraphs (a), (b), (f), (m), or (o), or any other subparagraphs. For example, the draft training discusses procedural justice, per the requirements of ¶528(b), but does not include "techniques for communicating with complainants and members of the public." *See* ¶528(b). The draft training discusses relevant CPD rules, policies, and protocols, but does not include enough information regarding COPA's rules, policies, and protocols. *See* ¶528(m). The draft training touches on the "relevant CPD Rules of Conduct, including Rules 14, 21, and 22" (*see* ¶528(o)), but must more fully explain the rea-

sons why these rules are important and must provide better guidance to the instructor. Because the BIA Onboard Training needs to be further revised to meet the numerous requirements of ¶528 and its subparagraphs, the CPD made efforts toward but did not reach Preliminary compliance. The IMT looks forward to providing additional feedback on the CPD's revised BIA Onboard Training and to reviewing further training materials in the coming reporting period.

COPA, in the seventh reporting period, provided training materials for four trainings relevant to ¶528: *Major Case Incident Response Training*; *Officer Interviews Training*; *Complaint Register Training*; and *Final Summary Reports & Standards of Proof.*

The *Major Case Incident Response Training* addresses the requirements of ¶528(b), (g), and (m). The training addresses the requirements of ¶528(b) by providing instruction in the exact processes and procedures for investigators to follow during investigations of officer-involved incidents. The training provides instruction on relevant policies and municipal codes as well as "best practices in procedural justice," per the requirements of ¶528(b), and also outlines COPA's responsibilities for responding to and investigating major officer-involved incidents. The training explains the relevant COPA policy to ensure that COPA staff understand what CPD officers and community members should expect in such investigations, including how and when COPA releases information to impacted families and to the public. The training also emphasizes the importance of treating all those involved with dignity and respect, including CPD officers and command staff who are involved in the investigation of the incident. The training addresses the requirements of ¶528(g) by providing specific instruction in "investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management." *See* ¶528(g). The training addresses ¶528(m) by providing instruction on the relevant COPA "rules, policies, and protocols" (*see* ¶528(m)); however, COPA is not able to provide instruction on the relevant CPD rules, policies, and protocols because the CPD is still in the process of developing policies required by the Consent Decree that are relevant to officer-involved shooting and officer-involved death investigations. The IMT submitted a no-objection notice to the *Major Case Incident Response Training* on November 8, 2022, and noted that this is an excellent training that provides thorough instruction. On January 12, 2023, the City and COPA submitted documentation demonstrating that 97% of COPA staff had received this training.

The *Officer Interviews Training* contributes to meeting the requirements of ¶528(c), (g), (h), (i), and (j). The training contributes to meeting the requirements of ¶528(c) by providing instruction regarding interview skills to obtain objective verifiable evidence from witness officers and involved officers. The training contributes to meeting the requirements of ¶528(g) by providing instruction regarding interview skills for "gathering and objectively analyzing evidence." *See* ¶528(g).

The training contributes to meeting the requirements of ¶528(h) by providing instruction regarding interview skills to assist investigators in "identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation." *See* ¶528(h). The training contributes to meeting the requirements of ¶528(i) by providing instruction regarding interview skills to assist investigators in "properly weighing the credibility of witnesses against CPD members." *See* ¶528(i). And the training contributes to meeting the requirements of ¶528(j) by providing instruction regarding interview skills to assist investigators in "using evidence to identify and resolve inconsistent statements." *See* ¶528(j). The IMT submitted no-objection notices to the *Officer Interviews Training* on August 2, 2022 and October 25, 2022, and noted that this training provides an excellent overview of the policy and procedures associated with COPA employees conducting interviews with CPD officers. The IMT also observed this training during a site visit to COPA on September 29, 2022 and noted that the training instruction was thorough, effective, and engaging. On January 12, 2023, the City and COPA submitted documentation demonstrating that 96% of COPA staff had received this training.

The *Complaint Register Training* addresses the requirements of ¶528(d) ("the process for seeking an override affidavit in the absence of a signed complainant affidavit") by providing thorough instruction on the affidavit override process. The IMT submitted a no-objection to the materials for this training on November 15, 2022, and noted that it is an excellent training that provides thorough instruction, effective instructor notes, and helpful illustrations that encourage class participation. The training also provides instructive reference to other Consent Decree paragraphs for which COPA is not directly responsible but enhance students' understanding on the complex issue of affidavit overrides and where both COPA and the CPD fit into the affidavit override process.

COPA also produced a revised version of the *Final Summary Reports & Standard of Proof (FSR)* training for review with ¶528 on October 27, 2022, according to the production cover letter (a previous version of this training was produced for review with other paragraphs entirely, not including ¶528), but did not designate which sections of the training corresponded with the requirements of ¶528 or its subparagraphs. The IMT reviewed the training for compliance only with paragraphs that were designated in the training materials. The IMT submitted a no-objection notice to these training materials on November 10, 2022. The IMT virtually attended the *Final Summary Reports & Standards of Proof* training delivered to COPA In-Service staff on November 29, 2022. The training followed the lesson plan and the slide presentation allowed the instructor to provide specific detail without reading from the slides. The instruction was clear and engaging. The instructor was well-prepared, knowledgeable in the subject matter, and was able to effectively draw from personal experience to illustrate specific points in the lesson plan while comfortably engaging the class in discussion. COPA continues to consistently

demonstrate its ability to develop thorough training relevant to its policies and procedures. On January 12, 2023, the City and COPA submitted documentation demonstrating that 100% of COPA staff had received this training.

Additionally, in the seventh reporting period, COPA provided the IMT with access to the FETI training certification program, which the IMT observed. As we noted in Independent Monitoring Report 6, this certification demonstrates that COPA has provided the required training for its investigative staff to meet the requirements of ¶528(e).

<div align="center">***</div>

The City and the CPD made efforts toward but did not reach Preliminary compliance with ¶528 in the seventh reporting period. COPA maintained Preliminary compliance and continued to make progress toward further levels of compliance. To reach further levels of compliance, both the CPD and COPA will need to provide training materials that cover all listed topics in ¶528 and its subparagraphs.

We continue to recognize that many of the training topics required by ¶528 are complex and require significant time and resources to ensure that BIA Investigators, COPA Investigators, and Accountability Sergeants have a comprehensive understanding of the material. These topics largely involve new processes, procedures, directives, and technology. Additionally, many of the topics will require the CPD and COPA to engage with subject matter experts to sufficiently develop and deliver the trainings. We are encouraged by the CPD and COPA's progress, and look forward to reviewing further trainings related to all of the topics outlined in ¶528 and its subparagraphs.

### Paragraph 528 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Accountability and Transparency: ¶529

*529. Within 180 days of the Effective Date, CPD will begin providing training to all CPD members on the terms of this Agreement and COPA's and CPD's revised or new policies related to administrative investigations and discipline. To the extent appropriate and necessary based upon a CPD member's duties, and contact with members of the public and/or individuals in custody, this training will include instruction on: a. identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in an investigation; b. use of the City's anonymous reporting website; c. for CPD supervisors: i. the proper initiation of the intake process, including providing COPA's contact information and the consequences for failing to initiate the intake process; and ii. techniques for turning the initiation of a complaint into a positive police-community member interaction.*

## Compliance Progress (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not reach Preliminary compliance with ¶529 in the seventh reporting period.

To evaluate Preliminary compliance with ¶529, the IMT reviewed the CPD's relevant policies and other data sources to determine whether CPD is committed to training members as required by ¶529.

*Progress before the Seventh Reporting Period*

The CPD did not reach Preliminary compliance in past reporting periods. We reviewed a variety of materials related to this paragraph including meeting agendas of the BIA Education and Training Division demonstrating that discussion of items related to ¶529 occurred, various BIA training materials, and BIA's *Training* Unit Directive. At the end of the fourth reporting period, we noted that the *Training* Unit Directive did not meet the requirements of ¶529 because it did not commit the entire CPD to training its members per ¶529.

We did not receive any revised or new materials related to ¶529 in the fifth reporting period. At that time, we expressed our discouragement that the CPD had not yet reached any level of compliance with ¶529. We stated that, moving forward,

we hoped to see a policy or other training commitment and timeline that demonstrates that the CPD will provide training as outlined in ¶529.

In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. These materials were still in draft state and not in final presentation form. We noted that the draft training materials begin to address the requirements of ¶529 and its subparagraphs by providing department-wide training regarding administrative investigations and discipline. However, as previously noted, we explained that this training was still in draft form and will require further revision for the IMT to review. We noted that this training addresses multiple directives that are new to the CPD. The IMT noted that this training should not replace or supplant the requirement that every CPD employee read, sign, and understand the information in each of the directives. The IMT explained that it looked forward to learning more about this training and how it will provide critical information regarding administrative investigations and discipline to the entire department in a consistent manner.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided further revised BIA eLearning materials. The BIA eLearning addresses the requirements of ¶529(a) and (c), but does not fully address the requirements of ¶529(b), which requires the training to include instruction on "use of the City's anonymous reporting website." *See* ¶529(b). The IMT submitted a no-objection notice to the BIA eLearning Training on December 9, 2022, with the caveat that some of the paragraphs designated by the CPD were not addressed by this training, and as a result, the current iteration of this training may not be, on its own, sufficient for corresponding levels of compliance with those paragraphs. On December 28, 2022, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning. On January 9, 2023, during a monthly meeting required by ¶668, the CPD presented a slide deck noting that only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[82]

\*\*\*

The City and the CPD made efforts toward but did not reach Preliminary compliance with ¶529 in the seventh reporting period. Moving forward, we anticipate that the CPD will revise the BIA eLearning to include the paragraphs and subparagraphs that were not addressed, and to provide the revised BIA eLearning for review. The CPD will then need to train on the revised BIA eLearning to meet the

---

[82]  To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel.

### Paragraph 529 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| None |

# Accountability and Transparency: ¶530

**530.** *Within 90 days of the Effective Date, COPA and BIA will cre-*
*ate separate initial and in-service training plans.*

**Compliance Progress**  (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[83] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |

The City did not meet Preliminary compliance with ¶530 in the seventh reporting period. COPA maintained Secondary compliance with ¶530 in the seventh reporting period. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶530, we reviewed various data sources to determine whether the CPD and COPA allocated sufficient resources to create separate initial and in-service training plans. To evaluate Secondary compliance, we reviewed the entities' plans, where available, to determine whether the plans are sufficient. To evaluate Full compliance, we reviewed various data sources including training materials and attendance records to determine whether COPA and the CPD implemented their training plans.

*Progress before the Seventh Reporting Period*

COPA reached Preliminary and Secondary compliance in the third reporting period by providing and revising its *Training and Professional Development Training Plan*. COPA's *Training and Professional Development Training Plan* is a three-year plan. Therefore, we were not able to assess in the fifth reporting period whether COPA had fully implemented its plan. COPA remained in Secondary compliance in the

---

[83] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

fifth reporting period because it continued to provide training in accordance with its plans.

The CPD reached Preliminary compliance in the third reporting period. We reviewed BIA's *In-Service Training Plan*, and *Investigator and Accountability Sergeant On-Boarding Training Schedule* and Course Description. We found that BIA reached Preliminary compliance by creating initial and in-service training plans. It demonstrated the CPD allocated sufficient resources to create separate initial and in-service training plans. By the end of the fourth reporting period, we were awaiting revisions to the *BIA Investigators' and Accountability Sergeant's Annual Training Plan*.

BIA did not provide any materials under ¶530 in the fifth reporting period. With this, we noted that the last draft plan BIA provided related to training was in late 2020. BIA did not finalize a plan to address the requirements of ¶530 or the other training paragraphs (*i.e.*, ¶¶526–29). Because of this, we found that the CPD was no longer in Preliminary compliance with this paragraph in the fifth reporting period.

Neither the CPD nor COPA submitted materials related to ¶530 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD provided the *BIA 2023 Training Plan* for review with ¶530. The IMT provided comments noting that the 2023 Training Plan is comprehensive, but we expressed concern that the eight hours allotted for training in the draft Training Plan did not appear to be a sufficient amount of time to meaningfully address all of the topics covered in the annual in-service training. For this reason, we suggested that the BIA consider providing in-service training on these topics on a rotating year basis, rather than attempting to cover all of the topics in eight hours. The CPD provided a revised version of the *BIA Training Plan* on December 20, 2022, changing from a one-year to a two-year cycle. Still, the revised *BIA Training Plan* is not realistic in that, even with the change to a two-year cycle, it appears to try to cover at least 12 hours of material in an eight-hour timespan. Additionally, the timelines in the *BIA Training Plan* propose providing the trainings in the First Quarter of 2023 even though the CPD has not developed or finalized the relevant lesson plans as of the end of December 2022. While ¶530 sets out the basic requirement that "COPA and BIA will create separate initial and in-service training plans" (*see* ¶530), the training plans must be realistic for purposes of reaching compliance with this paragraph. The IMT believes the CPD would be better served by adjusting the timelines and material to be more achievable. The IMT looks forward to reviewing lesson plans and observing instruction relevant to this paragraph in the next reporting period. COPA did not produce any materials related to ¶530 in the seventh reporting period.

\*\*\*

With this, the CPD did not meet Preliminary compliance with ¶530 in the seventh reporting period. COPA maintained Secondary compliance with ¶530 in the seventh reporting period.

In the next reporting period, for CPD, we will look forward to reviewing lesson plans and observing instruction relevant to this paragraph. For COPA, we look forward to reviewing training materials and attendance records.

### Paragraph 530 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Accountability and Transparency: ¶531

***531.*** *In order to function effectively, CPD's accountability system must protect the due process rights of involved CPD members. In order to build public trust and credibility, CPD must provide opportunities for meaningful community engagement that extends beyond the complaint process. The Police Board strives to play the important dual roles of protecting CPD members' due process rights and providing a platform for regular community feedback. The City will ensure that the Police Board has adequate resources, training, and institutional support to fulfill its important duties.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **CPD** | *Under Assessment* |
| **Police Board** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Under Assessment* |
| **Police Board** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* |
| **CPD** | *Under Assessment* |
| **Police Board** | *In Compliance* (SIXTH REPORTING PERIOD) |

The Police Board maintained Full compliance with ¶531 in the seventh reporting period. The CPD's compliance with this paragraph remains Under Assessment because further discussion is required between the City, the CPD, the Police Board, the Office of the Illinois Attorney General, and the IMT.

To evaluate Preliminary compliance with ¶531, the IMT reviewed the CPD's and Police Board's policies and written guidance following the policy process described in the Consent Decree (¶¶626–41). Specific to the Police Board, we considered whether the Police Board regularly assesses its needs. For the CPD we looked for policies aimed (1) at maintaining an accountability system that protects members' due process rights and builds community trust and (2) creating opportunities for meaningful community engagement beyond the complaint process. To evaluate Secondary compliance with ¶531, the IMT looked at whether the CPD provided training regarding the policies related to ¶531, and we looked at whether the Police Board was making its needs known to the City, requesting resources necessary to ensure it can fulfill its dual roles. To evaluate Full compliance, we looked for evidence that the CPD has implemented its policy and training such that its accountability system operates to protect officers' due process rights and build public trust, including through opportunities for community members to provide feedback. Related to the Police Board, we seek to determine whether the Police Board

has developed a system to continually assess and identify needs to the City and ultimately determine whether the Police Board is serving the dual roles of protecting CPD members' due process rights and providing a platform for community feedback.

We reviewed evidence that the City has a plan to provide the Police Board adequate resources to fulfill its duties, as identified by the Police Board. To evaluate Full compliance with ¶531, the IMT evaluated whether the Police Board has developed a system to continually assess and identify needs so the City can ensure that adequate resources are provided.

*Progress before the Seventh Reporting Period*

The Police Board achieved Full compliance with ¶531 in the sixth reporting period. In the sixth reporting period, the Police Board completed needs assessments and, in a letter to the IMT dated April 14, 2022, the Police Board indicated that it had adequate physical, equipment, and personnel resources to adequately perform its assigned duties. The letter also stated that the City provides training to Police Board employees on a variety of topics that support the Police Board's efforts to fulfill its duties. The Police Board further explained that it provides an in-depth assessment of the Police Board's resources and needs on an annual basis as part of the City's annual budget process to ensure that the Police Board has sufficient resources for each upcoming year. The Police Board explained that this needs assessment would be provided to the IMT in the seventh reporting period. In addition to confirming that the City is providing the needs that the Police Board identifies after thoughtful assessment, the Police Board also provided ample evidence that it is serving its dual roles.

The Police Board strives to protect CPD's members' due process rights. The Police Board has a hearing officer preside over disciplinary hearings and ensures that all hearings are videotaped in full. *See* ¶534 assessment. The Police Board has developed strong *Rules of Procedure*, which among other things requires that Police Board members are required to watch the entire evidentiary hearing recording and are provided a complete record for the case before the Police Board can take any vote following a disciplinary hearing. *See* ¶535 assessment. The Police Board also ensures that the CPD member involved in a Police Board case has access to the CPD member's complete discovery file and has the opportunity to enter relevant evidence therefrom into the record. *See* ¶536 assessment.

The Police Board also plays an important function by creating a platform for regular community feedback. The Police Board regularly holds meetings open to the public. Community members are afforded the opportunity to provide feedback and raise concerns. *See* ¶537 assessment. Furthermore, the Police Board has a policy and procedure for collecting, documenting, and responding to community

feedback it receives. *See* ¶538 assessment. With all of this, the Police Board achieved Full compliance with ¶531.

The CPD remained under assessment in the sixth reporting period. We explained that additional conversations with the Parties were necessary to ascertain the measurable requirements set out by this paragraph and how the CPD should begin to move toward compliance. We explained that we expected this conversation to occur in the seventh reporting period. With this, the CPD's compliance was Under Assessment in the sixth reporting period.

*Progress in the Seventh Reporting Period*

The Police Board maintained Full compliance in the seventh reporting period, but moving forward, the IMT will expect to receive documentation demonstrating on-going efforts related to maintaining Full compliance with this paragraph in each reporting period.

The CPD remained under assessment in the seventh reporting period. As we explained in the sixth reporting period, additional conversations with the Parties are necessary to ascertain the measurable requirements set out by this paragraph and how the CPD should begin to move toward compliance.

<center>* * *</center>

The Police Board maintained Full compliance with ¶531 in the seventh reporting period. Moving forward, we will expect to receive documentation related to this paragraph in each reporting period. The CPD remained under assessment.

<center>Paragraph 531 Compliance Progress History</center>

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Under Assessment | | |

# Accountability and Transparency: ¶532

*532. Within 180 days of the Effective Date, the City will draft se-lection criteria for Police Board members with the objective of identifying individuals who possess sufficient experience, judg-ment, and impartiality to perform the duties of members of the Police Board. Selection criteria may include prior work in law or law enforcement, and service with Chicago-based community and non-profit organizations. The draft selection criteria will be published on the Police Board's website for a period of 30 days for public review and comment. Following the 30-day public re-view and comment period, the City will provide the draft criteria to OAG for review and comment. The final selection criteria will be published and maintained on the Police Board's website. The City will ensure that the selection criteria are the basis for future selection of Police Board members.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City maintained Preliminary compliance with ¶532 but did not reach Second-ary compliance.

To evaluate Preliminary compliance with ¶532, the IMT reviewed the City's poli-cies following the policy process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed various data sources and plans to determine whether the City developed a process for properly applying the selec-tion criteria should a vacancy on the Police Board occur.

*Progress before the Seventh Reporting Period*

In the second reporting period, the City reached Preliminary compliance with its *Police Board Member Selection Criteria*. The City provided an initial draft and made subsequent revisions after receiving feedback from the IMT and the OAG. After revisions were made, we determined that the *Police Board Member Selection Cri-teria* allowed the City to move into Preliminary compliance. We did not receive additional evidence of compliance in the third or fourth reporting periods.

In the fifth reporting period, the City submitted the Mayor's Office's *Policy Gov-erning Police Board Member Selection* ("Selection Process") and supporting Police Board Candidate Screen Questions ("Screen Questions"). We provided feedback

on these materials on December 29, 2021. We detailed our concern that the Selection Process did not provide much guidance to "ensure that the selection criteria are the basis for future selection of Police Board members." *See* ¶532. Because the Selection Process did not sufficiently ensure that "the selection criteria are the basis for future selection of Police Board members," the City did not reach Secondary compliance with ¶532 in the fifth reporting period.

The City did not submit any materials related to ¶532 in the sixth reporting period. With this, the City maintained Preliminary compliance with ¶532 but did not reach Secondary compliance.

*Progress in the Seventh Reporting Period*

The City did not submit any materials related to ¶532 in the seventh reporting period.

\*\*\*

With this, the City maintained Preliminary compliance with ¶532 but did not reach Secondary compliance. Moving forward, we will look for the City to revise and refine its Selection Process to ensure that "the selection criteria are the basis for future selection of Police Board members" as required by ¶532.

### Paragraph 532 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶533

> **533.** *Within 180 days of the Effective Date, the Police Board will submit selection criteria for Police Board hearing officers to the Monitor and OAG for review and comment. The criteria will be drafted to help identify individuals who possess sufficient competence, impartiality, and legal expertise to serve as hearing officers. The selection criteria will be published on the Police Board's website. The City and the Police Board will ensure that the selection criteria are the basis for future selection of Police Board hearing officers.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The Police Board maintained Full compliance with ¶533 during the seventh reporting period.

To evaluate Preliminary compliance with ¶533 we reviewed Police Board's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance with ¶533, we considered whether the *Police Board Hearing Officer Selection Criteria*—which enabled the City and Police Board to reach Preliminary compliance with ¶533—had been sufficiently disseminated and explained to ensure that the Police Board Hearing Officer Selection Criteria would be appropriately followed. For Full compliance, we looked for evidence that the City and the Police Board follow the selection criteria set forth to assess Full compliance with ¶533.

*Progress before the Seventh Reporting Period*

In the second reporting period, the Police Board reached Preliminary compliance by submitting *Police Board Hearing Office Selection Criteria*. In the fourth reporting period, the Police Board reached Secondary and Full compliance by demonstrating that the *Police Board Hearing Officer Selection Criteria* had been disseminated and followed in the Police Board's search for and hiring of a new Police Board Hearing Officer. Throughout the hiring process, the Police Board provided the IMT and the OAG updates that demonstrated an awareness of the *Police Board Hearing Officer Selection Criteria* and a commitment to following that guidance. In the fifth reporting period, there were no Police Board Hearing Officer vacancies. We requested that, if a vacancy occurs in future reporting periods, the Police Board notify the

IMT and provide the same level of detail and transparency into its search and hiring process in order to maintain Full compliance.

In the sixth reporting period, the Police Board submitted a letter dated April 14, 2022 indicating that the Police Board continued to follow the process for Hearing Officer selection and reporting that the Police Board had no vacant hearing officer positions and did not conduct a hearing officer search during the sixth reporting period. With this, the Police Board maintained Full compliance with ¶533 during the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the Police Board submitted a letter dated November 10, 2022 indicating that the Police Board continued to follow the process for Hearing Officer selection and reporting that the Police Board had no vacant hearing officer positions. With this, the Police Board maintained Full compliance with ¶533 during the seventh reporting period.

\*\*\*

The Police Board maintained Full compliance with ¶533 during the seventh reporting period.

### Paragraph 533 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶534

**534.** *In any disciplinary action requiring the vote of the Police Board, the City will ensure: a. a hearing officer will preside over the disciplinary proceedings; and b. disciplinary hearings will be videotaped in their entirety.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The City and the Police Board maintained Full compliance with ¶534 in the seventh reporting period.

To assess Preliminary compliance, we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's development, implementation, and evaluation of training. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training.

*Progress before the Seventh Reporting Period*

In the fourth reporting period, the Police Board reached Full compliance with ¶534 after providing several documents for review: (1) Section 2-8-030 of the Municipal Code of Chicago, which authorizes hearing officers to preside over Police Board disciplinary hearings and requires the hearing officers to conduct disciplinary hearings in accordance with the provisions of the Code and the Board's Rules of Procedure; (2) the Police Board's *Rules of Procedure*, which among other things, requires each disciplinary case to be assigned to a hearing officer and mandates that the hearing be video recorded in its entirety; and (3) links to video recorded disciplinary hearings for the three most recent cases decided by the Police Board.

These documents demonstrated that the Police Board not only has policies in place to instruct compliance with ¶534, but that the Police Board follows those policies and procedures, putting the mandates of ¶534 into action.

In the fifth reporting period, the Police board provided links to recorded hearings that occurred via Zoom. These recordings confirmed that the Police Board continued to have a hearing officer presiding over disciplinary hearings and that the hearings were video recorded in their entirety. With this evidence, the Police Board remained in Full compliance with ¶534 in the fifth reporting period.

In the sixth reporting period, the Police Board provided transcripts and videos of recorded hearings. These recordings confirmed that the Police Board continued to have a hearing officer presiding over disciplinary hearings and that the hearings were video recorded in their entirety. With this, the Police Board maintained Full compliance with ¶534 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the Police Board provided transcripts and videos of recorded hearings. These recordings confirmed that the Police Board continued to have a hearing officer presiding over disciplinary hearings and that the hearings were video recorded in their entirety. With this, the Police Board maintained Full compliance with ¶534 in the seventh reporting period.

\*\*\*

The Police Board maintained Full compliance with ¶534 during the seventh reporting period.

### Paragraph 534 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶535

***535.*** *Prior to any vote by the Police Board following any discipli-
nary hearing, the City will ensure: a. all Police Board members
are required to watch and certify that they have watched the
videotape of the entire evidentiary hearing; b. all Police Board
members are provided copies of the complete record, including
demonstrative exhibits; c. hearing officers will prepare a written
report that sets forth evidence presented at the hearing: (i) in
support of the charges filed; (ii) in defense or mitigation; and (iii)
in rebuttal, including evidence and aggravation, if any; the hear-
ing officer's report will also include information relating to wit-
ness credibility; d. the Police Board may, at its discretion, ask a
hearing officer to additionally prepare a written report and rec-
ommendation that sets forth findings of fact and conclusions of
law, including any findings relating to witness credibility; e. the
parties before the Police Board will have 14 days to review the
hearing officer's report, and recommendation, and file any writ-
ten objections; and f. all Police Board members will review de
novo the hearing officer's report and any recommendation, and
the parties' written objections to the same.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The City and the Police Board maintained Full compliance with ¶535 in the seventh
reporting period.

To assess Preliminary compliance with ¶535, we reviewed the City's relevant poli-
cies and records following the process described in the Consent Decree (¶¶626–
41), which outlines applicable consultation, resolution, workout, and public com-
ment periods. To evaluate Secondary compliance, we reviewed, among other
things, the City's training development, implementation, and evaluation. To assess
Full compliance, the IMT determined whether the City and Police Board had suffi-
ciently implemented their policies and training.

*Progress before the Seventh Reporting Period*

The Police Board reached Full compliance with ¶535 in the fourth reporting pe-
riod. In May 2021, the Police Board provided us with its *Rules of Procedure*. These
rules addressed the requirements of ¶535's subsections (a) and (c)–(f). The Police

Board also provided a written transcript that included exhibits which demonstrated that Police Board members receive complete records for review before a Police Board vote, as required by subsection (b). These documents demonstrated that the Police Board not only had policies and procedures in place instructing compliance with ¶535's requirements, but that the Police Board follows those policies and procedures. With this, the Police Board reached Full compliance.

In the fifth reporting period, the Police Board provided three Police Board hearing transcripts that demonstrated that Police Board members continued to comply with ¶535's requirements. With this evidence, the Police Board maintained Full compliance with ¶535 in the fifth reporting period.

In the sixth reporting period, the Police Board provided two Police Board hearing transcripts and related case materials that demonstrated that Police Board members continued to comply with ¶535's requirements. The Police Board's actions included but were not limited to watching video recordings of evidentiary hearings, receiving and reviewing complete records from the hearings, and receiving and reviewing the hearing officers' written reports—all prior to any Police Board vote. With this evidence, the Police Board maintained Full compliance with ¶535 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the Police Board provided documentation demonstrating that the Police Board continues to comply with ¶535's requirements. With this evidence, the Police Board maintained Full compliance with ¶535 in the seventh reporting period.

*** 

The Police Board maintained Full compliance with ¶535 in the seventh reporting period.

### Paragraph 534 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 − DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶536

> **536.** *As part of the Police Board proceedings, the parties to the Police Board case (the Superintendent and the involved CPD member) will be given access to the CPD member's complete disciplinary file and will have the opportunity to move for entry into the record of proceedings any relevant aspect of the CPD member's disciplinary file, as permitted by law and any applicable collective bargaining agreements.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The City and the Police Board maintained Full compliance with ¶536 in the seventh reporting period.

To assess Preliminary compliance, we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training.

*Progress before the Seventh Reporting Period*

The Police Board reached Full compliance with ¶536 in the fourth reporting period. In May 2021, the Police Board provided us with its *Rules of Procedures.* The *Rules of Procedures* ensure that parties in a Police Board case are provided access to the CPD member's disciplinary files and are able to move to enter relevant aspects of a CPD member's disciplinary file into the proceeding records. In the fifth reporting period, the Police Board provided materials from police disciplinary cases filed with the Board that showed that Police Board members were given access to the CPD member's complete disciplinary file. This demonstrated that the Police Board continued to follow its procedures, acting in accordance with ¶536.

In the sixth reporting period, the Police Board provided materials from three police disciplinary cases filed with the Board that showed that Police Board members were given access to the CPD member's complete disciplinary file. This demon-

strated that the Police Board continued to follow its procedures, acting in accordance with ¶536. With this evidence, the Police Board maintained Full compliance with ¶536 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the Police Board provided documentation demonstrating that the Superintendent and the involved CPD member were given access to the CPD member's complete disciplinary file. This demonstrated that the Police Board continued to follow its procedures, acting in accordance with ¶536. With this evidence, the Police Board maintained Full compliance with ¶536 in the seventh reporting period.

\*\*\*

The Police Board maintained Full compliance with ¶536 in the seventh reporting period.

### Paragraph 536 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶537

> ***537.*** *All regular meetings convened by the Police Board that are open to the public will be attended by the CPD Superintendent or his or her designee; the Chief Administrator of COPA or his or her designee; the Deputy PSIG or his or her designee; and the Chief of BIA or his or her designee.*

## Compliance Progress  (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

Through the efforts of the Police Board, the CPD Superintendent, the COPA Chief Administrator, the Deputy PSIG, and the BIA Chief, the City maintained Full compliance with ¶537 in the seventh reporting period.

To assess Preliminary compliance we reviewed the City's relevant policies and records to determine whether information is provided to all entities implicated by ¶537 so that they may attend Police Board public regular meetings. To evaluate Secondary compliance, we reviewed records to show that all entities had sufficient personnel and have allocated sufficient resources to allow compliance with ¶537's mandate. To evaluate Full compliance, we reviewed data sources to show that all necessary entities attended Police Board meetings that are open to the public as required by ¶537.

*Progress before the Seventh Reporting Period*

The City reached Full compliance with ¶537 in the fourth reporting period. At that time, the IMT attended public Police Board meetings virtually. Each meeting was attended by the CPD Superintendent or designee, the COPA Chief Administrator or designee, the Deputy PSIG or designee and the BIA Chief. In fact, in very few meetings were the respective heads not personally in attendance. Based on this, the City reached Full compliance.

In the fourth reporting period, we acknowledged the PSIG for its additional efforts ensuring compliance. The Office of Inspector General *Public Safety Section Policies Manual* includes a policy that ensures attendance of the PSIG at the Police Board meetings.

In the fifth reporting period, the Police Board submitted attendance records from its public meetings that demonstrated that the individuals (or their designees) required to attend these meetings under ¶537 attended all public meetings. With this, the City maintained Full compliance.

In the sixth reporting period, the Police Board again submitted attendance records and meeting minutes from its public meetings that demonstrated that the individuals (or their designees) required to attend these meetings under ¶537 attended all public meetings. With this, the City maintained Full compliance with ¶537 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the Police Board again submitted attendance records and meeting minutes from its public meetings that demonstrated that the individuals (or their designees) required to attend these meetings under ¶537 attended all public meetings. With this, the City maintained Full compliance with ¶537 in the seventh reporting period.

\*\*\*

The City maintained Full compliance with ¶537 in the seventh reporting period.

### Paragraph 537 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶538

*538. Within 90 days of the Effective Date, the City will create a policy for collecting, documenting, classifying, tracking, and responding to community input received during the Police Board's regular community meetings. The policy will outline the methods for: (a) directing community input to the appropriate responding entity, agency, or office; and (b) documenting and making public, all responses to community input.*

## Compliance Progress      (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The City and the Police Board maintained Full compliance with ¶538 in the seventh reporting period.

To assess Preliminary compliance, we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training.

*Progress before the Seventh Reporting Period*

In previous reporting periods, we found the Police Board in Full compliance with ¶538. The Police Board's adopted *Policy Regarding the Attendance of and Participation by the Public at Board Meetings* (Participation Policy) and *Response Policy,* which work together to create a framework that addresses the requirements of ¶538. The *Participation Policy* governs requirements for speakers who require some immediate action on the part of the CPD, COPA, or the Police Board, and the *Response Policy* directs the expectations of response from the CPD, COPA, or the Police Board. In addition to attending meetings where we saw the CPD, COPA, and Police Board representatives assume responsibility for concerns or issues raised, we also reviewed materials showing responses or actions resulting from these meetings (which is normally posted on the Police Board's website in accordance with the Response Policy). With these efforts, the Police Board reached Full compliance.

The City maintained Full compliance with ¶538 in the fifth reporting period by providing a variety of materials, including but not limited to video and transcripts of Police Board meetings and community input reports. These reports tracked community input and responses from each agency. These records showed that complaints and issues raised during meetings are followed up on in accordance with ¶538 and the policies created by the Police Board related to ¶538's requirements. With this, the City maintained Full compliance with ¶538 in the fifth reporting period.

The City maintained Full compliance with ¶538 in the sixth reporting period by providing a variety of materials, including but not limited to video and transcripts of Police Board meetings and community input reports. These reports tracked community input and responses from each agency. These records showed that complaints and issues raised during meetings are followed up on in accordance with ¶538 and the policies created by the Police Board related to ¶538's requirements. Complaints and issues identified during each meeting are assigned to one of the four agencies for action and follow-up, and each issue is documented and made public on the Police Board website. With this, the City maintained Full compliance with ¶538 in the fifth reporting period.

*Progress in the Seventh Reporting Period*

The City maintained Full compliance with ¶538 in the seventh reporting period by providing a variety of materials, including but not limited to video and transcripts of Police Board meetings and community input reports. These reports tracked community input and responses from each agency. These records showed that complaints and issues raised during meetings are followed up on in accordance with ¶538 and the policies created by the Police Board related to ¶538's requirements.

\*\*\*

With this, the City maintained Full compliance with ¶538 in the seventh reporting period.

## Paragraph 538 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Full

# Accountability and Transparency: ¶539

> **539.** *The Police Board will make best efforts to streamline discovery efforts in all pending proceedings.*

## Compliance Progress (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The City and the Police Board maintained Full compliance with ¶539 in the seventh reporting period.

To assess Preliminary compliance, we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training using "best efforts" as defined by ¶729.

*Progress before the Seventh Reporting Period*

In the fourth reporting period, the Police Board produced to the IMT the *Police Board Rules of Procedure*. Section II.A of the Police Board Rules of Procedures addresses ¶539 and includes additional information to further explain the process.

In the fifth reporting period, the Police Board provided materials from three Police Board Hearings that demonstrated a streamlined discovery process. In addition, the Police Board provided a letter summarizing its efforts to streamline the discovery process. The letter indicated that the process had been changed to allow the Complaint Register file to be produced at the time of the initial status hearing or within a few days after. This had resulted in the accused officer's attorney receiving discovery materials about 30 days sooner than they would have under the previous process. This change allowed the parties to prepare for and schedule the discipline hearing more quickly. With this, the Police Board maintained Full compliance with ¶539 in the fifth reporting period.

In the sixth reporting period, the Police Board provided materials from two Police Board Hearings that demonstrated a streamlined discovery process. In addition, the Police Board provided a letter summarizing its efforts to streamline the discovery process, which reiterated its efforts taken during the fifth reporting period. With this, the Police Board maintained Full compliance with ¶539 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the Police Board provided documentation that continues to demonstrate a streamlined discovery process.

\*\*\*

With this, the Police Board maintained Full compliance with ¶539 in the seventh reporting period.

## Paragraph 539 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶540

*540. Within 180 days of the Effective Date, Police Board members and hearing officers will receive initial and annual training that is adequate in quality, quantity, scope, and type and will cover, at minimum, the following topics: a. constitutional and other relevant law on police-community encounters, including law on the use of force and stops, searches, and arrests; b. police tactics; c. investigations of police conduct; d. impartial policing; e. policing individuals in crisis; f. CPD policies, procedures, and disciplinary rules; g. procedural justice; and h. community outreach.*

## Compliance Progress          (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**     Annually          ☑ Not Yet Applicable

**Preliminary:**     *In Compliance (FIFTH REPORTING PERIOD)*
**Secondary:**     *Not in Compliance*
**Full:**     *Not Yet Assessed*

The City and the Police Board maintained Preliminary compliance with ¶540 in the seventh reporting period.

To evaluate Preliminary compliance with ¶540, the IMT reviewed training materials to determine if trainings were developed to sufficiently address requirements listed in ¶540. To evaluate Secondary compliance, we reviewed, among other things, the Police Board's training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the Police Board worked with a local law firm that agreed to provide training development to the Police Board at no cost. We commended the Police Board's decision to seek outside assistance in developing appropriate training since the Police Board does not have staff to help develop and deliver training. The Police Board provided training regarding Police Boards in other major U.S. cities and the Consent Decree. We noted that neither of these trainings covered the requirements of ¶540, but we recognized that these trainings were valuable.

At the end of the fourth reporting period, the Police Board produced a "training agenda" that detailed the training the Police Board hoped to accomplish. We reviewed the Police Board's training agenda in the fifth reporting period. These proposed trainings outlined all substantive topics of training required by ¶540. With this, the Police Board reached Preliminary compliance in the fifth reporting period.

During the fifth reporting period, Police Board members and hearing officers attended a one-hour block of training regarding responding to calls with a mental health component. This training was presented by NAMI Chicago and related to the requirements set out in ¶540(e). The Police Board also submitted training materials for its training *Policing First Amendment Activity*. We submitted a no-objection notice to this training.[1] The Police Board also provided other trainings beyond those required by ¶540.

We explained in the fifth reporting period that to reach Secondary compliance the Police Board would need to provide training materials and ultimately provide trainings that touched on all listed training topics for ¶540.

During the sixth reporting period, Police Board members and hearing officers attended the training *Policing First Amendment Activity*, which speaks to subsection ¶540(a)—though it doesn't complete satisfy ¶540(a). The IMT observed this training and found the training to be excellent in terms of its material, its instruction, and its presentation. The training was presented by attorneys from a local law firm, with each attorney providing instruction in specific areas of expertise, and was both engaging and effective. The training concluded with a question and answer session, and the instructors were able to answer questions and provide additional context. With this, the City and the Police Board maintained Preliminary compliance with ¶540 in the sixth reporting period. We explained that, to reach Secondary compliance, the Police Board will need to provide training materials and ultimately provide trainings that touch on all listed training topics for ¶540.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the Police Board provided the Police Board's *Fourth Amendment Training* for review. The IMT submitted a no-objection notice to these training materials on October 11, 2022. These training materials are excellent. The *Fourth Amendment Training* is comprehensive, is presented in a logical and clear manner, and incorporates scenarios designed to promote discussion and participant engagement. It is our understanding that attorneys who have specific knowledge of regarding Fourth Amendment procedures will deliver the training.

---

[1] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

The IMT looks forward to attending this training when it is delivered to the Police Board and its staff. The training materials cover topics that address the requirements of ¶540(a) ("constitutional and other relevant law on police-community encounters, including law on the use of force and stops, searches, and arrests"), ¶540(b) ("police tactics"), ¶540(e) ("policing individuals in crisis"), and ¶540(f) ("CPD policies, procedures, and disciplinary rules"). The Police Board also provided documentation demonstrating that 100% of the current Police Board members and hearing officers attended the training in-person or as a virtual recording.

<p style="text-align:center">* * *</p>

With this, the Police Board maintained Preliminary compliance. Moving forward, the IMT will look for the Police Board to provide training materials on the topics outlined in ¶540(c) ("investigations of police conduct"), ¶540(d) ("impartial policing"), ¶540(g) ("procedural justice"), and ¶540(h) ("community outreach").

### Paragraph 540 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶541

*541. The trainings [referenced in ¶540] will be provided by sources both inside and outside of CPD, as needed, to provide high quality training on investigative techniques, and CPD policies, procedures, and disciplinary rules.*

**Compliance Progress** (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and Police Board maintained Preliminary compliance with ¶541 in the seventh reporting period.

To evaluate Preliminary compliance with ¶541, the IMT reviewed the Police Board's policies following the policy process described in the Consent Decree (¶¶626–41). Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the Police Board worked with a local law firm that agreed to provide training development to the Police Board at no cost. We commended the Police Board's decision to seek outside assistance in developing appropriate training. The Police Board also provided training regarding Police Boards in other major U.S. cities and training regarding the Consent Decree. We noted that neither of these trainings covered the requirements of ¶540 and ¶541 but recognized that these trainings were valuable.

At the end of the fourth reporting period, the Police Board produced a training agenda that detailed the training the Police Board hoped to accomplish. In the fifth reporting period, the Police Board provided members and hearing officers a one-hour training regarding responding to calls with a mental health component. This training was presented by NAMI Chicago and addressed the requirements of ¶540(e). The Police Board also provided trainings beyond that required in ¶540 and ¶541, such as *Reflecting on the Holocaust: Defining Moments for Police*. Although this and other trainings are beyond those mentioned in ¶540 (and referenced in ¶541), the Police Board leadership believed that providing such blocks of instruction were essential for the work they perform and would provide greater meaning and context to the trainings required by ¶540 and ¶541. Additionally, the Police Board provided some trainings in accordance with its training agenda and

demonstrated its willingness and ability to seek out and engage appropriate individuals to provide its trainings. With this, the Police Board reached Preliminary compliance in the fifth reporting period.

During the sixth reporting period, Police Board members and hearing officers attended the training *Policing First Amendment Activity*. The IMT observed this training and found the training to be excellent in terms of its material, its instruction, and its presentation. The training was presented by attorneys from a local law firm, with each attorney providing instruction in specific areas of expertise, and was both engaging and effective. The training concluded with a question and answer session, and the instructors were able to answer questions and provide additional context.

Although we noted that this training alone does not fulfill the requirements of ¶541, it further demonstrates the Police Board's commitment to methodically addressing the requirements of ¶540 while not burdening the Police Board and staff with a great number of training blocks. This high quality, meaningful training was developed and delivered at no cost to the City. With this, the City and Police Board maintained Preliminary compliance with ¶541 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the Police Board provided the Police Board's *Fourth Amendment Training* for review. The IMT submitted a no-objection notice to these training materials on October 11, 2022. These training materials are excellent. The *Fourth Amendment Training* is comprehensive, is presented in a logical and clear manner, and incorporates scenarios designed to promote discussion and participant engagement. It is our understanding that attorneys who have specific knowledge of regarding Fourth Amendment procedures will deliver the training. The IMT looks forward to attending this training when it is delivered to the Police Board and its staff. The training materials address the requirements of ¶541. The Police Board also provided documentation demonstrating that 100% of the current Police Board members and hearing officers attended the training in-person or as a virtual recording. The partnership between the Police Board and attorneys from a local law firm demonstrates the City's ability to establish and foster relationships with organizations to provide trainings and share expertise, per ¶541's requirement that trainings "will be provided by sources both inside and outside of CPD, as needed, to provide high quality training on investigative techniques, and CPD policies, procedures and disciplinary rules."

\*\*\*

With this, the City and Police Board maintained Preliminary compliance with ¶541 in the seventh reporting period. Moving forward we will look for the Police Board to provide training materials relating to the topics set out in ¶541.

## Paragraph 541 Compliance Progress History

| | | |
|---|---|---|
| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶542

> **542.** *Within 90 days of the Effective Date, the City will create a training policy for Police Board members and hearing officers.*

## Compliance Progress (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City maintained Preliminary compliance with ¶542 in the seventh reporting period.

To evaluate Preliminary compliance with ¶542, the IMT reviewed the Police Board's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the Police Board worked with a local law firm that agreed to provide training development to the Police Board at no cost. We commended the Police Board's decision to seek outside assistance in developing appropriate training since the Police Board does not have staff to help develop and deliver training. The Police Board provided training regarding Police Boards in other major U.S. cities and the Consent Decree. At the end of the fourth reporting period, the Police Board produced a training agenda that detailed the training the Police Board hoped to accomplish.

During the fifth reporting period, we reviewed the training agenda the Police Board provided us at the end of the fourth reporting period. We provided feedback regarding the planned and contemplated training blocks. The Police Board provided an updated training agenda in December 2021. This updated draft captured the training blocks the Police Board provided during the fifth reporting period, such as the *Policing Individuals in Crisis*, presented by NAMI Chicago. It demonstrated the trainings the Police Board intended to provide next, *Consideration for Policing of First Amendment Activity*, and other trainings under the Police Board.

We noted in the fifth reporting period that the training blocks of instruction already provided to Police Board members and hearing officers demonstrated adherence to this training plan. With this detailed training agenda that the Police Board had adhered to, the Police Board reached Preliminary compliance in the fifth reporting period.

The Police Board did not provide additional materials related to ¶542 in the sixth reporting period, but maintained Preliminary compliance by continuing to develop its training materials. With this, the City maintained Preliminary compliance with ¶542 in the sixth reporting period. We explained that, moving forward, we will look for the Police Board to continue to adhere to and update its training agenda. We also explained that, for Full compliance, the Police Board will need to provide evidence that it has created a system to ensure continued training will be provided in the years to come.

*Progress in the Seventh Reporting Period*

The Police Board did not provide additional materials related to ¶542 in the seventh reporting period, but maintained Preliminary compliance by continuing to develop its training materials.

\*\*\*

With this, the City maintained Preliminary compliance with ¶542 in the seventh reporting period. Moving forward, we will look for the Police Board to continue to adhere to and update its training agenda. For Full compliance the Police Board will need to provide evidence that it has created a system to ensure continued training will be provided in the years to come.

### Paragraph 542 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶543

> **543.** *With regard to the promulgation or adoption of CPD rules and regulations, the Police Board's authority will be limited to issuing policy recommendations in the manner set forth in this Agreement.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (NEW) |
| **Sustainment Period Ends** | *December 31, 2024* |

The City reached Full compliance with ¶543 in the seventh reporting period.

The fifth reporting period marked the first time the IMT assessed compliance with ¶543. During this reporting period the Police Board raised that this paragraph could inadvertently be in tension with the municipal code. By the end of the fifth reporting period, the Parties remained in discussions regarding the objectives and intentions of ¶543. Therefore, compliance with ¶543 remained Under Assessment.

To evaluate Preliminary compliance in the sixth reporting period, the IMT considered whether the Police Board's proposed rule changes conflicted with the Consent Decree. To evaluate Secondary compliance, the IMT reviewed the Police Board's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. To evaluate Full compliance, the IMT considered whether the City and the Office of the Attorney General reached an agreement that solidifies the requirements of this paragraph for the life of the Consent Decree.

During the sixth reporting period, the City and the CPD provided a draft *Policy on Adopting Chicago Police Department Rules and Regulations* for review with ¶543. The IMT submitted a no-objection notice on May 10, 2022.[2] On June 2, 2022, the

---

[2] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

City and Police Board provided a revised draft of the policy. We submitted a second no-objection notice on June 15, 2022, and noted that the policy addresses the Police Board's authority regarding policy issuance and recommendations, which is relevant to the requirements of ¶543 by creating guidelines and processes for policy recommendations. Still we recognized that, while we appreciated the goals, format, and instruction of the *Policy on Adopting Chicago Police Department Rules and Regulations*, ¶543 is potentially in tension with the Police Board's authority under the municipal code, which is the subject of the policy, and that the City of Chicago and Office of the Illinois Attorney General would continue to work through this issue. During subsequent discussions between the Parties, the City agreed to revise the *Policy on Adopting Chicago Police Department Rules and Regulations* to provide the Office of the Attorney General and the Independent Monitoring Team an opportunity to review and approve proposed rule changes before implementation in order to ensure compliance with ¶543. With these efforts, the City achieved Preliminary and Secondary compliance with this paragraph.

We explained that, to achieve Full compliance, the IMT will look for the City and the Office of the Attorney General to reach an agreement that solidifies the requirements of this paragraph for the life of the Consent Decree. Because the Parties remained in discussions about what such an agreement might look like, Full compliance with ¶543 remained Under Assessment.

*Progress in the Seventh Reporting Period*

This reporting period, the City and the Office of the Attorney General reached an agreement solidifying the requirements of ¶543.[3] With this, the City reached Full compliance with ¶543.

### Paragraph 543 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Under Assessment | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

[3] *See Stipulation Regarding the Review and Comment Process For the Chicago Police Board's Adoption and Revision of Rules and Regulations for the Chicago Police Department*, *Illinois v. Chicago*, Case No. 1:17-cv-06260.

## Accountability and Transparency: ¶544

> **544.** *The City, CPD, and COPA recognize the importance of transparency to improving CPD-community relations, and the City, CPD, and COPA have taken important steps to increase transparency about their operations, including how they conduct investigations into CPD member misconduct. The City, CPD, and COPA will continue to take steps to increase transparency, including the implementation of the requirements set forth below.*

| Compliance Progress | | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not Yet Assessed* |

The City and CPD did not reach Preliminary compliance with ¶544 in the seventh reporting period. COPA maintained Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶544, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods.[4] For Secondary compliance, we reviewed various data sources, including Quarterly and Annual Reports to determine if those reports comply with the policies aimed at promoting transparency, and determined whether the entities are engaging with the community related to their policies and directives. For Full compliance we sought to determine whether the entities continued to prioritize and take steps toward increasing transparency, including but not limited to continuing efforts to timely produce reports, providing information to the community, and identifying on their own means to increase transparency.

---

[4] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Seventh Reporting Period*

The CPD has not yet provided materials related to ¶544.

In the fifth reporting period, COPA revised and finalized its *Transparency Initiatives – Release of Video and Related Materials* policy. This policy requires COPA to make public the results of its investigations, and complete and post quarterly and annual reports that summarize data including information on complaint intake and investigation resolutions. In addition, COPA's *Quality Assurance* policy, which was finalized in the fourth reporting period, further strengthens COPA's Preliminary compliance with ¶544 by requiring that COPA receive comments from its public working group regarding policies, post policies for public comment, and publish quarterly and annual reports on aggregate investigative data. With these policies, COPA reached Preliminary compliance.

We explained in the sixth reporting period that, as discussed in more detail in the assessment of ¶550 in Independent Monitoring Report 6, COPA has consistently produced timely quarterly and annual reports that provide agency background information, agency goals, information on policies and training, and extensive data regarding intake of complaint, investigation processes and timelines and investigation outcomes. In addition, COPA has consistently used its community working group to review and refine draft polices. Once policies are drafted and revised, COPA has consistently posted policies for further public comment. We noted that these efforts demonstrated a commitment to transparency, and moved COPA into Secondary compliance.

*Progress in the Seventh Reporting Period*

The CPD has not yet provided materials related to ¶544.

COPA has continued to produce timely and accurate quarterly reports within fifteen days of the end of the first three quarters of 2022.[5] These reports provide details required by the Consent Decree and COPA's administrative activities, community engagement efforts, and specific investigations. COPA's quarterly reports continue to improve each quarter and provide the reader with transparent information about its operations and investigations, per the requirements of ¶544. COPA's 2022 quarterly reports and 2021 Annual Report produced early in January 2022 allow COPA to maintain Secondary compliance with ¶544 in the seventh reporting period. The IMT expects to receive COPA's 2022 Annual Report early in the eighth reporting period.

Moving forward, we will look for the CPD to develop policies that instruct compliance with the goals set out in ¶544. For COPA we will look for evidence that it

---

[5]    For further discussion, see assessment of ¶550.

continues to prioritize transparency by timely providing information to the public, and self-assessing how it can further improve transparency with the public.

### Paragraph 544 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Accountability and Transparency: ¶545

**545.** *To the extent permissible by law, within 60 days of its implementation, each CPD policy and directive, including those created pursuant to this Agreement, will be posted online and otherwise made publicly available. Any exception will be limited to documents that must remain confidential to protect public safety, and as approved by the Superintendent.*

## Compliance Progress       (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD made efforts toward but did not reach Preliminary compliance with ¶545 in the seventh reporting period.

To evaluate Preliminary compliance with ¶545, the IMT reviewed the City's, the CPD's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods.[6]

*Progress before the Seventh Reporting Period*

The City and the CPD did not reach any level of compliance with ¶545 in previous reporting periods. In the fourth reporting period, the CPD provided General Order G01-03, *Department Directives Systems*, which the CPD contended supports compliance with ¶545. We noted that the CPD did not consistently solicit, receive, or incorporate public comment into its various types of policies across units. While G01-03 directs the CPD to make some policies publicly available, G01-03 does not currently require the CPD to make each CPD policy and directive—including those created pursuant to the Consent Decree—publicly available. At the end of the fourth reporting period the collaborative review and revision process remained ongoing.

In the fifth reporting period, General Order G01-03, *Department Directives System*, remained in the collaborative review and revision process. We provided written comments to this policy and had extensive conversations with the CPD regarding

---

[6] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

the policy. We noted our expectation that, per ¶545, each policy and directive, including but not limited to General Orders, Special Orders, Unit Directives, Standard Operating Procedures, or any other document or direction developed pursuant to the Consent Decree would be posted online and made public. We further stated our expectation that the CPD will develop a policy or directive that identifies the different policy and directive categories and specifies how each will be posted for public review to foster ongoing understanding of CPD operations. Because the CPD did not finalize such a policy, it did not reach Preliminary compliance with ¶545 in the fifth reporting period.

In the sixth reporting period, we noted that the CPD had 96 separate department directives listed on its website in a section titled "Draft Policy - Review and Comment." We commended the CPD for placing its directives on its website for public review and comment in accordance with ¶545. We explained that General Order G01-03, *Department Directives System*, directs the publishing of the policies and directives pursuant to the requirements of ¶545. However, while reviewing G01-03, the IMT observed that the policy was outdated in many areas and requires revisions to ensure that it reflects current practices. For example, we noted that G01-03 contained a section on Unit-Level directives—which are no longer used by the CPD—and did not include definitions for several levels of directives. While we noted that G01-03 addresses ¶545 by directing the publication of CPD policies and directives, we strongly encouraged the CPD to revise G01-03 in the seventh reporting period to bring the policy up-to-date. Furthermore, as we stated in the fifth reporting period, we noted our expectation that the CPD will develop a policy or directive that identifies the different policy and directive categories and specifies how each will be posted for public review to foster ongoing understanding of CPD operations.

The City and the CPD did not reach Preliminary compliance with ¶545 in the sixth reporting period. We explained that, in the next reporting period, we will look for the CPD to further revise and finalize G01-03, *Department Directives System*, to address the requirements of ¶545.

*Progress in the Seventh Reporting Period*

The City and the CPD did not submit any materials related to ¶545 in the seventh reporting period and did not provide a revised G01-03, *Department Directives System*, policy.

The CPD received no-objection notices from the IMT for several General Orders and Special Orders during the seventh reporting period. The CPD decided to publish these policies as suites of directives, rather than individual policies, and therefore posted them online for public comment late in the reporting period and some during the holiday season. The number of policies and timing of their public posting is not conducive to proper community engagement, and the IMT is concerned

that this timeline and approach may have limited the public's opportunity to adequately review and comment on the policies. The City and the CPD then did not provide the finalized versions of the suites of policies to the IMT until January 12, 2023, at which point the IMT observed that a few of the policies had been changed *after receiving no-objection notices* from the IMT and the Office of the Illinois Attorney General (OAG) and after posting the policy for public comment. While many of these changes were minor, a few were significant, and required the IMT to review each policy in depth and to compare the policies to the earlier "final" drafts that had received no-objection notices.

The City and the CPD have developed a practice over multiple reporting periods of providing materials at the very end of the reporting period, and sometimes even the last day of the reporting period. The IMT has previously expressed concerns about this approach, particularly when the City and the CPD produce large numbers of documents at the very end of the reporting period.

The CPD will reach Preliminary compliance with ¶545 when it begins to provide policies and procedures for public comment in a timely manner and in a way that allows for meaningful public review of its policies prior to their finalization.

<div align="center">* * *</div>

The City and the CPD did not reach Preliminary compliance with ¶545 in the seventh reporting period. In the next reporting period, we will look for the CPD to further revise and finalize G01-03, *Department Directives System*, to address the requirements of ¶545. Moving forward, we also expect that the City and the CPD will post policies and directives for public comment in a timely and meaningful manner.

<div align="center">

### Paragraph 545 Compliance Progress History

</div>

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Accountability and Transparency: ¶546

*546. Within 180 days following the expiration of each calendar year of the term of this Agreement, the City will produce and publish an annual report describing CPD activity during the previous calendar year ("CPD Annual Report"). The purpose of the CPD Annual Report will be to inform the public of the City's law enforcement achievements and challenges, as well as new programs and steps taken to address challenges and build on successes. The CPD Annual Report will further provide information regarding the City's implementation and status of this Agreement. The CPD Annual Report will not include any specific information or data by law that may not be disclosed. Subject to applicable law, the CPD Annual Report will provide data and program updates analyzing: a. community engagement and problem-solving policing efforts, identifying successes, challenges, and recommendations for future improvement; b. stop, search, and arrest data and any analysis of that data that was undertaken; c. use-of-force data and associated analyses; d. CPD responses to requests for service from individuals in crisis; e. initiatives that CPD has implemented for officer assistance and support; f. recruitment efforts, challenges, and successes; and g. in-service and supplemental recruit training.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**     Annually        ☑ **Not Yet Applicable**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not reach Preliminary compliance with ¶546 during the seventh reporting period.

To evaluate Preliminary compliance with ¶546 we reviewed various data sources to determine whether the City developed the annual report within 180 days following the expiration of each calendar year, and whether the CPD has developed a policy regarding the compilation and publication of an Annual Report.

*Progress before the Seventh Reporting Period*

The City and the CPD did not meet Preliminary compliance with ¶546 in previous reporting periods.

In the third reporting period, we reviewed the 2019 CPD Annual Report. This report included information about CPD's organizational command but did not include information about some of the units that may be most interesting to the community, including the Force Review Unit, BIA, training, and the Crisis Intervention Team (CIT). The Annual Report extensively reported various crime statistics across 35 pages, but only dedicated one page to the work that the CPD does in and with the community as required by this paragraph.

At the end of the fourth reporting period, we noted that the City had until August 30, 2021, to produce its annual report. In the fifth reporting period, the CPD provided its Annual report in September 2021. Therefore, it missed the timeline set out by the paragraph and did not reach Preliminary compliance with ¶546 in the fifth reporting period. Additionally, we noted that the 2020 report was less robust than the 2019 Annual report which we found to lack detail required by ¶546. We noted our concern and hope in the fifth reporting period that the CPD would build on previous efforts to not only finalize and publish a timely report, but develop a report that improves upon previous reports. For these reasons, the City and the CPD did not reach Preliminary compliance with ¶546 in the fifth reporting period.

The CPD did not produce its Annual Report for 2021 by the end of the sixth reporting period. Therefore, it did not reach Preliminary compliance with ¶546 in the sixth reporting period. Additionally, the CPD made no reference to the Annual Report in its discussions with the IMT during the sixth reporting period. We noted that the CPD must develop a directive that requires publishing its Annual Report in a timely manner and in accordance with ¶546 and it subparagraphs. With this, the City and the CPD did not reach Preliminary compliance with ¶546 in the sixth reporting period. We explained that, moving forward, we would expect the CPD to develop a policy regarding the compilation and publication of an Annual Report and to finalize and publish a detailed and timely Annual Report.

*Progress in the Seventh Reporting Period*

This reporting period, the CPD produced its Annual Report for 2021 on September 1, 2022. The IMT provided detailed feedback on November 1, 2022. We noted that while commended the CPD for its efforts and achievements in the areas of Community Trust, Professional Development, Operational Excellence, and Public Safety, the CPD must also include a discussion of challenges and an analysis of significant use-of-force trends to meet the requirements of ¶546 and ¶547 in future reports. To meet the requirements of ¶546, the CPD must better inform the public of challenges and the CPD's strategies to address these challenges. Because the Annual Report for 2021 was produced outside the 180 days required by ¶546 ("Within 180 days following the expiration of each calendar year of the terms of this Agreement, the City will produce and publish an annual report describing CPD

activity during the previous calendar year . . . ."), the CPD did not meet the requirements of this paragraph in the seventh reporting period.

<p style="text-align:center">***</p>

The City and the CPD did not reach Preliminary compliance with ¶546 in the seventh reporting period. Moving forward, we expect the CPD to develop a policy regarding the compilation and publication of an Annual Report and to finalize and publish a detailed and timely Annual Report that addresses the requirements of ¶546, including the CPD's challenges and strategies to address these challenges.

### Paragraph 546 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Accountability and Transparency: ¶547

**547.** *CPD will regularly analyze the information it collects regarding reportable uses of force to identify significant trends. CPD will include information about any such trends in the CPD Annual Report.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**     Annually          ☑ **Not Yet Applicable**

**Preliminary:**     *Not in Compliance*
**Secondary:**     *Not Yet Assessed*
**Full:**     *Not Yet Assessed*

The City and the CPD did not reach Preliminary compliance with ¶547 during the seventh reporting period.

To assess Preliminary compliance with ¶547, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

### Progress before the Seventh Reporting Period

The CPD did not reach Preliminary compliance with ¶547 in previous reporting periods. In the fifth reporting period, the CPD provided its Annual report in September 2021. The 2020 Report lacked the data required by ¶547. Therefore, the City and the CPD did not reach Preliminary compliance with ¶547 in the fifth reporting period.

As noted in ¶546, the CPD did not produce its Annual Report for 2021 by the end of the sixth reporting period. Therefore, the City and the CPD did not reach Preliminary compliance with ¶547, as no information was provided regarding trends in reportable uses of force. Additionally, the CPD made no reference to the Annual Report in its discussions with the IMT during this reporting period. We noted that the CPD must develop a directive that requires publishing its Annual Report in a timely manner and in accordance with ¶¶546–47. For these reasons, the City and the CPD did not reach Preliminary compliance with ¶547 in the sixth reporting period.

### Progress in the Seventh Reporting Period

This reporting period, the CPD produced its Annual Report for 2021 on September 1, 2022. The IMT provided detailed feedback on November 1, 2022. We noted that

while commended the CPD for its efforts and achievements in the areas of Community Trust, Professional Development, Operational Excellence, and Public Safety, the CPD must also include a discussion of challenges and an analysis of significant use-of-force trends to meet the requirements of ¶546 and ¶547 in future reports. To meet the requirements of ¶547, the CPD must include in its report an analysis of significant use-of-force trends. While the Annual Report for 2021 included a significant amount of use-of-force data, it did not analyze the data to identify significant trends per the requirements of ¶547 ("CPD will regularly analyze the information it collects regarding reportable uses of force to identify significant trends . . . .").

<div align="center">***</div>

The City and the CPD did not reach Preliminary compliance with ¶547 in the seventh reporting period. Moving forward, we expect the CPD to develop a policy regarding the compilation and publication of an Annual Report and to finalize and publish a detailed and timely Annual Report that addresses the requirements of ¶547, including an analysis of use-of-force data to identify significant trends.

### Paragraph 547 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

## Accountability and Transparency: ¶548

*548. Within 180 days following the expiration of each calendar year of the term of this Agreement, the City will produce and publish an annual report describing certain legal activity involving CPD during the previous calendar year ("CPD Annual Litigation Report"). The CPD Annual Litigation Report will not include any specific information or data that may not be disclosed pursuant to applicable law. Subject to applicable law, the CPD Annual Litigation Report will address: a. a list of civil lawsuits in which the plaintiff(s) seek(s) to hold the City responsible for the conduct of one or more current or former CPD members and information that either (i) the lawsuit was concluded by final order and all opportunities for appellate review were exhausted, or (ii) any judgment was satisfied during the prior calendar year. This list will include civil lawsuits handled by the City's Department of Law's ("DOL's") Federal Civil Rights Division, as well as lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle pursuit, only. b. for each case identified in (a) above, the following information will be provided in spreadsheet or open-data format: i. case name; ii. case number; iii. the date the trial court entered the final order; iv. a list of the parties at the time the final order was entered; v. the nature of the order (e.g., dismissal with prejudice, summary judgment for plaintiff(s)/defendant(s), judgment of not liable, judgment of liable); vi. the amount of the compensatory and punitive damages awarded (if applicable); and vii. the amount of attorney's fees and costs awarded (if applicable). c. a list of civil lawsuits in which the plaintiff(s) seek(s) to hold the City responsible for the conduct of one or more current or former CPD members and a settlement was reached (including approval by City Council, if applicable) during the prior calendar year. This list will include civil lawsuits handled by DOL's Federal Civil Rights Division, as well as such lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle pursuit, only. d. for each case identified in (c) above, the following information will be provided in spreadsheet or open-data format: i. case name; ii. case number; iii. a list of the parties at the time the case was settled; iv. the amount of the settlement; and v. the amount of settlement allocated to attorney's fees and costs (if known). e. the amount of attorney's fees paid by the City during the prior calendar year to outside counsel engaged to defend the City and/or one or more current or former CPD members in civil lawsuits handled by DOL's Federal Civil Rights Division, as well as*

*such lawsuits handled by DOL's Tort's Division if the complaint seeks relief associated with a vehicle pursuit, only. This amount will be presented in the aggregate. f. for all individually named defendants in the cases identified in (a) and (c) above, the status (e.g., pending with BIA/COPA/OIG or charges sustained, not sustained, unfounded, or exonerated by BIA/COPA/OIG) of any administrative investigation(s) by BIA, COPA, or OIG at the time the trial court entered its final order or the settlement was reached. g. the disposition of any felony criminal prosecutions of current or former CPD members from the previous year. h. the number of pending civil lawsuits that seek to hold the City responsible for one or more current or former CPD members that the City is defending. This number will include civil lawsuits handled by the Department of Law's Federal Civil Rights Division, as well as lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle only.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**    Annually    ☐ **Met**    ☑ **Missed**

**Preliminary:**    *Not in Compliance* (NEW: LOST COMPLIANCE)
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

The City lost Preliminary compliance with ¶548 in the seventh reporting period because it did not produce its Annual Litigation Report "within 180 days following the end of each calendar year of the term of this Agreement" as required by ¶548. Despite these timing issues, the City provided the *2021 Litigation Report* at the end of the reporting period, which provided valuable and detailed—albeit concerning—information regarding the types of allegations against the CPD, addressing ¶548's subparagraphs.

To evaluate Preliminary compliance, we considered whether the City and the CPD produced and published the annual report as required by ¶548. To assess Secondary compliance, we reviewed various data sources to determine whether the City and the CPD developed the annual report within 180 days following the expiration of the calendar year. We reviewed that report for sufficiency, accuracy, and completeness as required by ¶548. We also considered whether the City has allocated sufficient resources to submit an annual report that meets the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

The City and the CPD met Preliminary compliance with ¶548 in the third reporting period by producing the City's 2019 Annual Litigation Report, which was thorough and comprehensive. In the fifth reporting period, on December 31, 2021, the City and the CPD provided the 2020 Litigation Report, but failed to produce the report within the time frame required by ¶548. Despite the timing issues, the 2020 Litigation Report was comprehensive and provided significant detail for the reader, including information such as the types of allegations against the CPD. This information is not only important for the City leaders and community members, but also an important source of data for CPD members. The 2020 Litigation Report covered all requirements of ¶548, but the report was produced late. We emphasized that, to achieve additional levels of compliance, the City must meet the deadlines required by ¶548.

The City did not produce this report by the end of the sixth reporting period. We noted that we would expect to receive it in the seventh reporting period. We emphasized that the City should make efforts to produce the 2021 Litigation Report early in the seventh reporting period to move closer to the 180-day timeframe required by ¶548.

*Progress in the Seventh Reporting Period*

The City did not produce its annual litigation report "within 180 days following the end of each calendar year of the term of this Agreement" as required by ¶548. We noted in Independent Monitoring Report 6 that we expected to receive the 2021 Litigation Report early in the seventh reporting period, and emphasized that the City should make efforts to produce its annual litigation report early in the reporting period to move closer to the 180-day timeframe required by ¶548.

Despite these timing issues, the 2021 Litigation Report provided valuable and detailed, albeit concerning, information regarding the types of allegations against the CPD, and addresses ¶548's subparagraphs. This information is not only important for City leaders and community members, but also provides an important source of data for CPD members. The IMT urges to CPD to use this report to instill a sense of urgency for training officers, supervisors, and command staff. To assist in changing the culture of the department, the CPD should also consider making this report required reading for every member of CPD command staff and presenting the report to every CPD employee. To regain and maintain compliance with ¶548, the City must produce the 2022 Litigation Report and future litigation reports within the 180-day time frame set out by this paragraph.

<div align="center">***</div>

With this, the City lost compliance with ¶548 in the seventh reporting period. Moving forward, we will look for the City to produce its annual litigation report earlier in each reporting period, per the requirements of ¶548.

### Paragraph 548 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Accountability and Transparency: ¶549

*549. As part of the CPD Annual Litigation Report, the City will analyze the data and trends collected, and include a risk analysis and resulting recommendations.*

## Compliance Progress (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:** Annually  ☑ **Not Yet Applicable**

**Preliminary:** *Not in Compliance* (NEW: LOST COMPLIANCE)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City lost Preliminary compliance with ¶549 in the seventh reporting period because it did not produce its Annual Litigation Report "within 180 days following the end of each calendar year of the term of this Agreement" as required by ¶548, and did not provide a sufficient analysis of trends and resulting recommendations, as required by ¶549.

To evaluate Preliminary compliance, we considered whether the City and the CPD produced and published the annual report as required by ¶548. To assess Secondary compliance, we reviewed various data sources to determine whether the City has developed an annual report within 180 days following the expiration of each calendar year that includes data and trends collected and a risk analysis and resulting recommendations. We reviewed the litigation report for sufficiency, accuracy, and completeness as required by ¶548 and ¶549. We also considered whether the City has allocated sufficient resources to submit an annual report that meets the requirements of this paragraph.

*Progress before the Seventh Reporting Period*

The City and the CPD met Preliminary compliance with ¶548 in the third reporting period. The City and the CPD provided the City's 2019 Annual Litigation Report which was thorough and comprehensive. Because this report is to be published on an annual basis, the IMT did not receive or further assess compliance with ¶548 and ¶549 in the fourth reporting period.

In the fifth reporting period, on December 31, 2021, the City and the CPD provided the 2020 Litigation Report, but failed to produce the report within the time frame required by ¶548 and ¶549. Despite the timing issues, we noted that the 2020 Litigation Report was comprehensive and provided significant detail for the reader and included a thorough Risk Analysis. Moving forward we encouraged the City to

attempt to isolate and analyze data from cases arising in or after 2019, to the extent possible, in order to identify trends and make recommendations for training for the CPD.

We explained in the fifth reporting period that while the 2020 Litigation Report was an extensive and detailed report providing helpful information to the public, the report was produced late. We emphasized that, to achieve additional levels of compliance, the City must meet the deadlines required by ¶548 and ¶549.

The City did not produce an annual litigation report by the end of the sixth reporting period. We noted that we would expect to receive it in the seventh reporting period. We emphasized that the City should make efforts to produce the 2021 Litigation Report early in the seventh reporting period to move closer to the 180-day timeframe required by ¶548. We explained that, to achieve additional levels of compliance, the City must meet the deadlines required by ¶548.

*Progress in the Seventh Reporting Period*

The City did not produce its annual litigation report "within 180 days following the end of each calendar year of the term of this Agreement" as required by ¶548. We noted in Independent Monitoring Report 6 that we expected to receive the 2021 Litigation Report early in the seventh reporting period, and emphasized that the City should make efforts to produce its annual litigation report early in the reporting period to move closer to the 180-day timeframe required by ¶548. Despite these timing issues, the 2021 Litigation Report provides detailed data and risk analysis. However, the report focuses more on how the City is unable to recognize trends than on making recommendations for improvement. If more data and case information is necessary to provide an analysis of trends and to make conclusions and recommendations, this data should be provided to the City. We note that the 2019 and 2020 Litigation Reports included more detailed analysis, conclusions, and recommendations than the 2021 Litigation Report.

\*\*\*

With this, the City lost compliance with ¶549 in the seventh reporting period. Moving forward, we will look for the City to produce its annual litigation report earlier in each reporting period, per the requirements of ¶548, and to analyze data and trends and provide a risk analysis and recommendations, per the requirements of ¶549.

## Paragraph 549 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

## Accountability and Transparency: ¶550

*550. By April 2020, CPD and COPA will electronically publish quarterly and annual reports that will include, at a minimum, the following: a. aggregate data on the classification of allegations, self-reported complainant demographic information, and complaints received from anonymous or third party complainants; b. aggregate data on complaints received from the public, specified by district or unit of assignment and subcategorized by classification of allegations; c. aggregate data on the processing of investigations, including: i. The average time from the receipt of the complaint by COPA, BIA, or the district to the next or initial contact with the complainant or his or her representative; ii. the average time from the investigative findings and recommendations to the final disciplinary decision; iii. the average time from the investigative findings and recommendations to a final disposition; and iv. the number of investigations closed based on the absence of a complainant affidavit, including the number of attempts (if any) to obtain an override affidavit in the absence of a signed complainant affidavit; d. aggregate data on the outcomes of administrative investigations, including the number of sustained, not sustained, exonerated, and unfounded allegations; the number of sustained allegations resulting in a non-disciplinary outcome; and the number resulting in disciplinary charges; e. aggregate data on discipline, including the number of investigations resulting in written reprimand, suspension, demotion, and termination; f. aggregate data on grievance proceedings arising from misconduct investigations, including: the number of cases grieved; the number of cases that proceeded before the Police Board; the number of cases that proceeded to arbitration; and the number of cases that were settled prior to a full evidentiary hearing, whether before the Police Board or in arbitration; g. aggregate data on outcomes of misconduct investigations by classification of allegations, broken down by self-reported race, gender, and age of the complainant and the CPD member; h. aggregate data on (i) the number of CPD members who have been the subject of more than two completed misconduct investigations in the previous 12 months, and (ii) the number of CPD members who have had more than one sustained allegation of misconduct in the previous 12 months, including the number of sustained allegations; i. aggregate data on CPD members who have been the subject, in the previous 12 months, of more than two complaints in the following classifications of alle-*

*gations, regardless of the outcome of those complaint investigations: i. allegations of discriminatory policing based on an individual's membership or perceived membership in an identifiable group, based upon, but not limited to: race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age; ii. allegations of excessive force; and iii. allegations of unlawful stops, searches and arrests; j. the disposition of misdemeanor criminal prosecutions of current CPD members.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | | | |
|---|---|---|---|
| **Recurring Schedule:** | Quarterly | ☐ Met | ✓ **Missed** |
| **Recurring Schedule:** | Annually | ☐ Met | ✓ **Missed** |

| | | |
|---|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[7] | |
| **CPD** | *In Compliance* (FOURTH REPORTING PERIOD) | |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) | |
| **Secondary:** | *In Compliance* (FIFTH REPORTING PERIOD) | |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) | |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) | |
| **Full:** | *In Compliance* (NEW) | |
| **CPD** | *In Compliance* (NEW) | |
| **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) | |
| **Sustainment Period Ends** | *December 31, 2024* | |

The City reached Full compliance with ¶550 in the seventh reporting period.

To evaluate Preliminary compliance, we reviewed various data sources to determine whether the CPD and COPA developed quarterly and annual reports that are sufficient, accurate and complete as required by ¶550. To evaluate Secondary compliance, we considered whether the CPD and COPA have allocated sufficient resources to submit quarterly and annual reports that meet the requirements of ¶550. To evaluate Full compliance, we considered whether CPD's and COPA's quarterly and annual reports sufficiently capture the requirements of this paragraph, including but not limited to the timeliness of such reports, and reviewed quarterly and annual reports for sufficiency, accuracy, and completeness for the requirements of this paragraph.

---

[7] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the CPD provided several quarterly reports which were easy to read and understandable. These reports demonstrate a commitment to transparency and building trust, internally and externally in BIA's operations. Notably the Third Quarter Report covered all requirements of ¶550 except subsection (c)(i). We reported that BIA, by the end of the fourth reporting period, was continuing to develop data related to this requirement and intended to include it in future reports. We found that BIA was in Preliminary compliance based on its second and third quarterly reports, with the understanding that BIA would develop and include information delineated in ¶550(c)(i) in its next reporting period.

In the fifth reporting period, BIA produced its Fourth Quarter Report for 2020. This report demonstrated continued improvement and standardization of quarterly reports. It provided the reader with a consistent and easy-to-follow format. This report addressed every subparagraph and requirement of ¶550. BIA also provided its Annual Report in December 2021. This report completely addressed the requirements of all of ¶550's subparagraphs. The annual report was a strong first attempt at an annual report and we applauded BIA for these efforts. We noted, however, that detracting from the impressive report was the time that it took for BIA to produce the report. Moving forward, we noted our anticipation that BIA would produce the annual report more quickly after the close of year and explained that more timely production of these reports will be necessary for Full compliance.

In addition to the reports, the CPD finalized General Order G08-01, *Complaint and Disciplinary System*, in the fifth reporting period. We noted that Section VIII addressed ¶550 completely. We noted our belief that this section of G08-01 was of particular importance, and therefore warranted a stand-alone directive to instruct completion of quarterly and annual reports. During the review and revision process, we voiced these concerns and the CPD appeared receptive to developing such a directive. We noted our anticipation that the CPD would develop this directive in the sixth reporting period.

In the sixth reporting period, the City and the CPD provided S08-01-01, *Log Number Case Management System*.[8] The IMT submitted a no-objection notice with

---

[8]  In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Case Management System* into S08-01-01. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

comments on June 3, 2022.[9] We noted that Section IV of this policy addresses ¶550 and its subparagraphs by listing the information that must be included in the CPD's quarterly and annual reports; however, the policy does not specifically direct the CPD to *publish* quarterly and annual reports as required by ¶550. We encouraged the CPD to make this revision. This policy remained in the collaborative review and revision process at the end of the sixth reporting period. While not required by the Consent Decree, the IMT noted its continued concern that the CPD and BIA do not include the demographic information of officers who are accused of misconduct in the report. We strongly recommended, as we have for the past three years, that the CPD develop a department directive that addresses the regular and timely publication of quarterly and annual reports with this information.

In the sixth reporting period, the CPD produced quarterly reports only for the first two quarterly reports of 2021 and had not produced its 2021 Annual Report. We noted that the first and second quarterly reports provided consistent data and addressed every subparagraph of ¶550, but did not address the requirements of ¶551. We explained that the CPD and BIA must begin finalizing and publishing their reports in a timelier manner to reach Full compliance.

With respect to COPA, at the end of the fourth reporting period, we noted that COPA continued to develop, refine, and publish its quarterly and annual reports. However, COPA's reports did not address all requirements set forth in ¶550(a), (c)–(g), and (i)–(j). COPA's 2021 Second Quarter Report aimed to address these gaps, but was not completed until after the close of the fourth reporting period. We recommended that COPA develop a policy directing continued publishing of quarterly and annual reports.

COPA, in the fifth reporting period, produced a timely and accurate report within 15 days of the close of the Third Quarter. The report included all data outlined by ¶550 that COPA is able to maintain. As COPA has explained, it does not house the data contemplated by subparagraphs (f) and (j). Instead BIA has this information, and as noted above, BIA has reported this information. With this, COPA demonstrated in the fifth reporting period that it could provide the information available to it that is contemplated by the paragraph, and COPA established its ability to

---

[9] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

quickly and consistently publish reports required by ¶550. With this, BIA and COPA reached Secondary compliance with ¶550 in the fifth reporting period.

In the sixth reporting period, COPA continued to publish timely and accurate quarterly and annual reports on the COPA website within 15 days of the end of the reporting period. We noted that the First Quarter 2021 Report was consistent with previous COPA quarterly reports and included improved information on pending investigations and Consent Decree compliance and training, among other topics. We noted that the data was accurate and current and addressed every subparagraph of ¶550 except ¶550(f) and (j) which include data that COPA does not house, but the BIA has this information and includes it in its reports. COPA produced its 2021 Annual Report on February 15, 2022, continuing COPA's commitment to providing its Annual Reports in a timely manner. We noted that the 2021 Annual Report builds upon the quarterly reports and includes relevant information regarding COPA leadership changes, agency goals, and COPA policy, training, and data.

With this, the CPD maintained Preliminary and Secondary compliance with ¶550 in the sixth reporting period, and COPA reached Full compliance. We explained that, moving forward, we would look for BIA to continue to publish reports but to do so in a timelier manner. We also strongly suggested that the CPD develop a department policy that directs the regular and timely publication of quarterly and annual reports. For COPA, we explained that we would look for evidence that it continues to publish an Annual Report containing the information contemplated by ¶550.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the CPD made significant progress in producing quarterly and annual reports that address ¶550's requirements and began to finalize and publish these reports in a timely manner, allowing the CPD to reach Full compliance with this paragraph.

First, the CPD produced BIA quarterly reports for the second and third quarters of the 2021 calendar year. Although these reports were provided to the IMT six to nine months after the end of 2021, the reports provided consistent documentation that allowed the reader to quickly understand the data and statistics for disciplinary issues and investigations for which BIA is responsible. While these quarterly reports addressed most of the requirements of ¶550 and its subparagraphs, neither of the quarterly reports addressed the requirements of ¶550(c)(i) (aggregate data on the processing of investigations, including "[t]he average time from the receipt of the complaint [by BIA] . . . to the next or initial contact with the complainant or his or her representative."). The IMT recommends that a data analyst be permanently assigned to BIA to collect the aggregate data required by ¶550.

The CPD also produced the BIA 2021 Annual Report. Although this report was provided to the IMT eight months after the end of the 2021 calendar year, the report was comprehensive and improved upon the BIA 2020 Annual Report. The report provided data and information to address nearly every subparagraph of ¶550 except for ¶550(j) ("the disposition of misdemeanor criminal prosecutions of current CPD members").[10] In the BIA 2021 Annual Report, BIA added a new column to many of its charts comparing 2020 and 2021 data. However, it appeared that the 2020 data in the 2021 Annual Report did not match the data in the 2020 Annual Report; the BIA should consider including information in next year's Annual Report to explain this apparent discrepancy. The 2021 Annual Report also includes new or revised categories of information in several of its tables (*see, e.g.*, Table 2). This information is helpful, but the BIA should consider providing additional detail to explain what each category of information means.[11] The IMT also notes that Table 6 provides much more comprehensive data in the 2021 Annual Report than in the 2020 Annual Report. The IMT appreciates that the CPD and BIA provided documentation demonstrating their use of social media to publicize the release of the Annual Report.

The CPD also produced BIA quarterly reports for the first and second quarters of the 2022 calendar year in the seventh reporting period. These reports were produced in a timelier manner than previous quarterly reports, with the first quarter report being produced approximately seven months following the end of the first quarter, and the second quarter report being produced approximately four months following the end of the second quarter. These reports included improvements to previous BIA quarterly reports, including more robust detail and information to help readers understand the mission and focus of BIA, its capabilities, and its limitations. The reports also included a more thorough definitions section and aggregated data in tables and charts. BIA provided documentation that the reports are published on the CPD website as well as on CPD social media platforms. The IMT is encouraged by the improvements to the quarterly reports, which serve both to increase transparency and accountability as well as to help CPD leadership better understand disciplinary trends and concerns. The BIA first and second quarter reports met the requirements of ¶550 and all its subparagraphs.

Further, the CPD produced a BIA quarterly report for the third quarter of the 2022 calendar year in the seventh reporting period. This quarterly report was produced in a timely manner and continued to improve upon previous quarterly reports. This quarterly report provided graphics that allows readers to easily follow processes and information, improved definitions and tables, references to relevant Consent

---

[10] BIA staff indicated that a section addressing ¶550(j) was inadvertently omitted from the Annual Report and assured the IMT that future Annual Reports will include the information required by ¶550(j).

[11] For example, in Table 2, the BIA should consider defining "complaint not constituted" and "administrative termination."

Decree paragraphs, and additional information regarding how cases are assigned to BIA and accountability sergeants. The CPD should consider requiring data regarding the assignment of cases to accountability sergeants for each district to determine whether districts are properly staffed with accountability sergeants and to whether the accountability sergeants have sufficient time to conduct and conclude the investigations. The data presented indicates that Accountability Sergeants are consistently responsible for slightly less than half of the administrative investigations, which the CPD should emphasize for transparency and to make improvements. BIA also provided documentation that the quarterly reports are posted on the CPD website. This report addressed every subparagraph of ¶550 and the BIA is making strides to address the requirements of ¶551. With this, the CPD reached Full compliance with ¶550.

Additionally, the CPD provided a revised draft of G08-01, *Complaint and Disciplinary System*. Although this revised policy was not produced for review with ¶550, it is relevant to ¶550 because Section V of the policy requires BIA to electronically publish annual and quarterly reports that address all of the requirements of ¶550. While this policy addresses the requirements of ¶550 and its subparagraphs, the IMT continues to strongly recommend that the CPD develop a standalone department policy that directs the regular and timely publication of quarterly and annual reports. The IMT submitted a no-objection notice to the revised G08-01 on December 5, 2022.

COPA, in the seventh reporting period, provided Guidance, *Contacts with Non-Department Member Witnesses and Complainants and Confirmation of Representation*. The IMT submitted a no-objection notice to this Guidance on December 9, 2022. This Guidance specifically directs COPA to record the initial contact or attempt to contact the complainant or complainant representative to begin the investigation, per the requirements of ¶550(c)(i). Additionally, COPA provided Guidance, *COLUMN CMS Administration*, which addresses ¶550 by directing the COPA Information Systems section to provide timely data for the COPA quarterly and annual reports, and sets specific expectations regarding when the data is expected to be available.

COPA has continued to produce timely and accurate quarterly reports within fifteen days of the end of the first three quarters of 2022. These reports provide details required by the Consent Decree and COPA's administrative activities, community engagement efforts, and specific investigations. COPA's quarterly reports continue to improve each quarter and provide the reader with background information as well as specific data required by ¶550 and its subparagraphs. The IMT expects to receive COPA's 2022 Annual Report early in the eighth reporting period.

<div align="center">***</div>

The City and the CPD reached Full compliance with ¶550 in the seventh reporting period by producing timely reports that meet the requirements of this paragraph, and COPA maintained Full compliance. Moving forward, we will look for BIA to continue to publish reports in a timely manner. We also strongly suggest that the CPD develop a department policy that directs the regular and timely publication of quarterly and annual reports. For COPA we will look for evidence that it continues to publish an Annual Report containing the information contemplated by ¶550.

### Paragraph 550 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶551

*551. BIA's quarterly and annual reports will include data reflecting investigations conducted by the districts.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**   Quarterly     ☐ Met   ☑ **Missed**
**Recurring Schedule:**   Annually     ☐ Met   ☑ **Missed**

**Preliminary:**    *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶551 in the seventh reporting period.

To evaluate Preliminary compliance with ¶551, the IMT reviewed the CPD's policies following the policy process described in the Consent Decree (¶¶626–41). To assess Secondary compliance, we reviewed various data sources to determine whether the CPD has allocated resources to include data reflecting investigations conducted by the districts on a quarterly and annual basis.

*Progress before the Seventh Reporting Period*

In earlier reporting periods, BIA did not have means to track this information, making compliance with this paragraph not feasible. But in the fourth reporting period, BIA indicated that it had developed means to provide information required by ¶551.

In the fourth reporting period, we also reviewed the draft BIA Unit Directive, *Case Management System*. This draft policy addressed the requirements of ¶551. At the close of the fourth reporting period, this Unit Directive remained in the collaborative review process. We expressed our expectation that upon receiving a no-objection notice, BIA would post the directive for public comment and thereafter finalize the policy.[12]

---

[12]   In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and the process is ongoing.

In the fifth reporting period, the CPD made significant revisions to General Order G08-01, *Complaint and Disciplinary System*. After the CPD completed extensive revisions, we submitted a no-objection notice to G08-01.[13] After posting the policy for public comment, the CPD finalized the policy on December 31, 2021. Section VIII.C codifies the requirements of ¶551. We explained that while this is beneficial, BIA quarterly and annual reports did not yet comply with ¶551 or G08-01.

During the fifth reporting period we received and reviewed BIA's Fourth Quarter 2020 Report. While this quarterly report included data regarding investigations conducted by the districts, the data was not broken out to reflect the number or type of investigations that occurred in the districts. We also received BIA's Annual Report for 2020. The 2020 Annual report partially addressed ¶551 in Table Four, by making it clear that the information presented represents investigations by BIA and the District Accountability Sergeants. Additionally, Table 11 in the report provided aggregate data for the districts but did not indicate which cases were conducted by Accountability Sergeants and BIA investigators. We noted that we understood that BIA was unable to extract the data as required by ¶551 and as required by G08-01 at that time. We explained that we hoped to see this remedied in the sixth reporting period.

In the sixth reporting period, we reviewed BIA's First and Second Quarter 2021 Reports. These reports did not address ¶551's requirement that BIA's quarterly and annual reports will include data reflecting investigations conducted by the districts. With this, the City and the CPD maintained Preliminary compliance with ¶551 in the sixth reporting period, but did not achieve Secondary compliance.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, we reviewed BIA's Third Quarter 2021 Report, BIA's 2021 Annual Report, and BIA's First, Second, and Third Quarter 2022 Reports. These reports did not address ¶551's requirement that "BIA's quarterly and annual reports will include data reflecting investigations conducted by the districts." During conversations with BIA leadership in November 2022, the IMT explained that the information required by this paragraph means that the CPD should report

---

[13] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

on the investigations conducted by each district or unit which is assigned to Accountability Sergeants. BIA indicated that it believed it could produce this information in future reports. In the Third Quarter 2022 Report, BIA included new tables that provided aggregate data and an additional breakdown of how cases are assigned to BIA and accountability sergeants; however, ¶551 specifically requires data reflecting investigations "conducted by the districts." The CPD should consider requiring data regarding the assignment of cases to accountability sergeants for each district to determine whether districts are properly staffed with accountability sergeants and to whether the accountability sergeants have sufficient time to conduct and conclude the investigations. The data presented indicates that Accountability Sergeants are consistently responsible for slightly less than half of the administrative investigations, which the CPD should emphasize for transparency and to make improvements.

Additionally, the CPD provided a revised draft of G08-01, *Complaint and Disciplinary System*. Although this revised policy was not produced for review with ¶551, it is relevant to ¶551 because Section VII.C of the policy requires quarterly and annual reports to include data concerning Log Number investigations conducted by the district by district Accountability Sergeants. The IMT submitted a no-objection notice to the revised G08-01 on December 5, 2022.

<div align="center">***</div>

The City and the CPD maintained Preliminary compliance with ¶551 in the seventh reporting period, but did not achieve Secondary compliance. In the coming reporting periods, we will look for BIA to provide quarterly and annual reports that comply with the requirements of ¶551.

### Paragraph 551 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Accountability and Transparency: ¶552

> **552.** *For non-disciplinary purposes, including historical trend analysis, CPD will track, for each CPD member, for every misconduct investigation: the nature of allegations, the outcome of the investigation, and the disposition of discipline.*

## Compliance Progress (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶552 in the seventh reporting period.

To evaluate Preliminary compliance with ¶552, the IMT reviewed the CPD's policies following the policy process described in the Consent Decree (¶¶626–41).

### Progress before the Seventh Reporting Period

In the fourth reporting period, we reviewed BIA's draft *Case Management System* Unit Directive. We noted that this draft Unit Directive partially addressed the requirements set out in ¶552. We also stated our belief that the Case Management System provides the CPD with a path toward compliance with this paragraph, but the CPD would need a finalized directive directing compliance.

In the fourth and fifth reporting periods, we noted that BIA had a draft *Case Management System* Unit Directive that related to the requirements of ¶552; additional edits were needed to better address the paragraph. We noted in the fifth reporting period that this Unit Directive remained in the collaborative review and revision process.[14]

We also reviewed Department Notice, D20-04 *Operational Support System (OSS) Pilot Program* in the fifth reporting period. We stated that Section III.C.6 of D20-04 contributed to compliance with ¶552. However, since the program remained in the pilot status and did not fully address the requirements of ¶552, the CPD did not reach Preliminary compliance in the fifth reporting period.

---

[14] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and the process is ongoing.

In the sixth reporting period, the City and the CPD provided S08-01-01, *Log Number Case Management System*.[15] The IMT submitted a no-objection notice with comments on June 3, 2022. Section IV.D of this policy completely addresses the requirements of ¶552 by stating specifically that the CPD will track, for each CPD member, for every misconduct investigations: the nature of allegations, the outcome of the investigation, and the disposition of discipline. This policy remained in the collaborative review and revision process at the end of the sixth reporting period. With this, the City and the CPD did not reach Preliminary compliance with ¶552 in the sixth reporting period. We explained that we would look for the CPD to finalize S08-01-01, which addresses ¶552, in the seventh reporting period.

*Progress in the Seventh Reporting Period*

The CPD produced S08-01-01, *Log Number Case Management System*, for review with ¶552 in the sixth reporting period. This policy addresses the requirements of ¶552 by directing that the Case Management System (CMS) will track every misconduct investigation including the nature of the allegations, the outcome of investigation, and the disposition of discipline. The IMT submitted a no-objection notice to S08-01-01 on June 3, 2022. In the seventh reporting period, the CPD produced a final version of this policy. With this, the CPD reached Preliminary compliance.

*** 

The City and the CPD reached Preliminary compliance with ¶552. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph.

---

[15] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Case Management System* into S08-01-01. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

## Paragraph 552 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019

COMPLIANCE PROGRESS:

Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020

COMPLIANCE PROGRESS:

Status Update

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020

COMPLIANCE PROGRESS:

Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021

COMPLIANCE PROGRESS:

None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021

COMPLIANCE PROGRESS:

None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022

COMPLIANCE PROGRESS:

None

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Accountability and Transparency: ¶553

> ***553.*** *Beginning in 2020, CPD will audit, on at least an annual ba-*
> *sis, the investigation and disciplinary process involving com-*
> *plaints investigated by BIA and the districts to ensure that the*
> *investigations are conducted in accordance with BIA policies and*
> *this Agreement. The audits will include completed investigations*
> *and the recommendations of discipline. CPD will make public any*
> *of the audit findings, ensuring that any personally identifiable*
> *information is redacted.*

## Compliance Progress               (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**    Annually                    ☑ **Not Yet Applicable**

**Preliminary:**    *Not in Compliance* (NEW: LOST COMPLIANCE)
**Secondary:**      *Not in Compliance*
**Full:**           *Not Yet Assessed*

The City and the CPD lost Preliminary compliance with ¶553 in the seventh report-
ing period because the CPD did not provide an annual audit that meets the re-
quirements of this paragraph.

To evaluate Preliminary compliance with ¶553, the IMT reviewed the CPD's rele-
vant policies and documents following the process described in the Consent De-
cree (¶¶626–41). To evaluate Secondary compliance, we reviewed annual audits
to determine whether the annual audits are sufficient and made public as required
by this paragraph.

*Progress before the Seventh Reporting Period*

The CPD met Preliminary compliance with ¶553 in the third reporting period be-
cause the CPD Audit Division completed its annual report, CD-553-2020, *Review of
Data on Investigations Into Allegations Made Against Department Members*
(2019).

In the fourth reporting period, we received a draft of BIA's *Case Management Sys-
tem* Unit Directive. The draft Unit Directive addressed the requirements of ¶553,
but remained in the collaborative review and revision process at the end of the
reporting period. Notwithstanding the status of the Unit Directive, we noted that
the requirements of ¶553 should be addressed in a department-wide directive.

We also reviewed G08-01, *Complaint and Disciplinary System* in the fourth reporting period, which directed compliance with ¶553. Like the Unit Directive, this General Order remained in the review and revision process at the close of the fourth reporting period.

In the fifth reporting period, the CPD completed extensive revisions to General Order G08-01, *Complaint and Disciplinary System*. After those revisions, we submitted a no-objection notice to the directive.[16] Thereafter the CPD published the directive for public comment and, on December 31, 2021, finalized the directive. With the finalization of G08-01, the City and the CPD maintained Preliminary compliance with ¶553 in the fifth reporting period. While this is sufficient to maintain Preliminary compliance, we encouraged the CPD to develop a standalone directive guiding audits and reporting.

We also received and reviewed the Audit Division's *Audit of 2020 Investigation Timeframe Requirements* in the fifth reporting period. We stated that this audit was well done. It noted many of the areas requiring significant additional work on the part of BIA to reach compliance with several Consent Decree Paragraphs— namely those related to reporting through the Case Management System. We expressed concern that this audit was not released for over eleven months after the close of the year, and stated our expectation that annual audits will be provided in a timelier manner in the future. Still, we noted our appreciation of the thorough audit, which provided the CPD with focus points for improvement. We stated our anticipation that CPD will begin providing regular reports on the status of correcting the deficiencies noted in the audit early in and throughout the sixth reporting period.

In the sixth reporting period, the City and the CPD provided S08-01-01, *Log Number Case Management System*.[17] The IMT submitted a no-objection notice with

---

[16] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[17] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included

comments on June 3, 2022. We noted that Section IV.F.2 of this policy addresses ¶553, although the CPD did not document it as such. This policy remained in the collaborative review and revision process at the end of the sixth reporting period.

We noted that in the sixth reporting period that, while this policy addresses the text of ¶553, the CPD has much work to do to ensure that it can fulfill the requirements of this paragraph operationally. We explained that, as we noted in Independent Monitoring Report 5, the BIA Audit Division's *Audit of 2020 Investigation Timeframe Requirements* indicates that BIA is not in operational compliance with many of the paragraphs which involve reporting requirements through the Case Management System. We explained that, to achieve greater levels of compliance, the CPD must have these reporting systems in place. We noted that the 2020 Audit indicated that command officers are either not aware of policies and procedures they must adhere to, or do not follow policy and procedure.

In Independent Monitoring Report 5, we expressed our concern that this Audit was not released for over eleven months after the close of the year and that the CPD waited until two days before the end of the reporting period to produce the Audit to the IMT for review. In the sixth reporting period we noted our expectation that this Audit and production of this Audit will occur much earlier following each reporting period, and that future audits will include updates on the deficiencies identified in this Audit and will continue to identify other issues not identified or included in this Audit report. We suggested that future audits should include interviews and/or surveys with those responsible for following these policies to ensure that they are aware of and understand their responsibilities and obligations. We noted that we looked forward to receiving the *Audit of 2021 Investigation Timeframe Requirements* in the seventh reporting period. With this, the City and the CPD maintained Preliminary compliance with ¶553 in the sixth reporting period. We explained that, moving forward, we would look for evidence that the audits are sufficient per the requirements of ¶553. We also encouraged the CPD to publish the next audit in a timelier manner to not only inform its own effort toward reform but also to provide information for the public. Additionally, as we noted in Independent Monitoring Report 5, we encouraged the CPD to develop a standalone directive guiding audits and reporting.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the CPD produced the BIA Audit Division's Follow-Up of Audit of 2020 BIA Investigation Timeframe Requirements. The Follow-Up of Audit of 2020 BIA Investigation Timeframe Requirements contains helpful information, however, it does not itself meet the requirements of ¶553, which requires an annual audit. Additionally, it does not provide sufficient detail regarding what

---

in the BIA Directive *Case Management System* into S08-01-01. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

specific changes were implemented to address the audit's recommendations. As such, it does not meet the requirements of ¶553. The IMT also attended and reviewed a presentation by the Audit Division, which included completed projects and projects underway. This information was informative, but did not meet the requirements of ¶553.

Additionally, the CPD provided a revised draft of G08-01, *Complaint and Disciplinary System*. Although this revised policy was not produced for review with ¶553, it is relevant to ¶553 because Section VII.D of the policy directs that the CPD Audit Section will conduct annual audits involving the BIA investigation and disciplinary process. The IMT submitted a no-objection notice to the revised G08-01 on December 5, 2022.

Because ¶553 requires that the CPD conduct an annual audit, the CPD lost compliance with this paragraph in the seventh reporting period.

<div align="center">***</div>

The City and the CPD lost Preliminary compliance with ¶553 in the seventh reporting period. Moving forward, we will look for the CPD to provide an annual audit per the requirements of this paragraph, and we will look for evidence that the audits are sufficient per the requirements of this paragraph. We also encourage the CPD to publish the next audit in a timely manner to not only inform its own effort toward reform but also to provide information for the public. Additionally, as we noted in Independent Monitoring Reports 5 and 6, we encourage the CPD to develop a standalone directive guiding audits and reporting.

### Paragraph 553 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Accountability and Transparency: ¶554

> **554.** *OAG acknowledges that the City adopted a policy relating to the public release of video footage capturing weapons discharges and incidents involving death or serious bodily injury. Consistent with applicable law, the City will continue to ensure COPA publicly releases such video footage pursuant to the June 2016 Video Release Policy for the City of Chicago. The Video Release Policy will not supersede or otherwise limit the City's legal obligations pursuant to state and federal transparency laws, including the Illinois Freedom of Information Act, 5 ILCS 140/1 et seq.*

## Compliance Progress            (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The City and COPA maintained Full compliance with ¶554 in the seventh reporting period.

To evaluate Preliminary compliance with ¶554, we reviewed the City's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[18] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we reviewed data sources to determine whether the City and COPA have implemented their policy and training to mobilize compliance with ¶554.

*Progress before the Seventh Reporting Period*

We assessed the City's compliance with ¶554 for the first time in fourth reporting period and found that the City reached compliance with the paragraph. In the fifth reporting period we reviewed a Video Release Policy submitted by the City in June 2021. The City also provided documentation on several CPD cases that have followed the policy. COPA also presented its Policy 2.1.2, *Transparency Initiatives-Release of Video and Related Materials*. We stated that this Policy completely and thoroughly addresses ¶554 and provides detail beyond that which is required by

---

[18] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

the Consent Decree, including how and when information will be released. With this the City and COPA maintained Full compliance with ¶554 in the fifth reporting period.

The City and COPA maintained Full compliance in the sixth reporting period by continuing to implement policy and training addressing the requirements of ¶554, including COPA's Policy 2.1.2., *Transparency Initiatives – Release of Video and Related Materials* and COPA's online Case Data Portal. With this the City and COPA maintained Full compliance with ¶554 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

The City and COPA did not produce any materials related to ¶554 in the seventh reporting period. The IMT continued to review publicly released video footage on COPA's online Case Data Portal.

\*\*\*

The City and COPA maintained Full compliance with ¶554 in the seventh reporting period.

### Paragraph 554 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶555

*555. On an annual basis, the Police Board will track and publish case-specific and aggregate data about Police Board decisions. Such publications will contain and include, at minimum, the following: a. the date on which the investigating agency (COPA, BIA, district, or OIG) received the complaint or notification for investigation; b. the date of the Police Board hearing over which the hearing officer presided; c. the disciplinary recommendations and/or decisions (where applicable) made by COPA, BIA, the Superintendent, and the Police Board; d. the average time between the filing of disciplinary charges with the Police Board and the first day of hearing; e. the average time between the filing of disciplinary charges with the Police Board and the Police Board's decision; f. the average time between the date on which the investigating agency (COPA, BIA, district, or OIG) received the complaint for investigation and the Police Board's decision; g. the date of the alleged misconduct; h. the average time between the date of the alleged misconduct giving rise to the complaint or notification and the Police Board's decision; and i. whether any Police Board decision has been appealed to any state court and, if so, the court's final judgment.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**     Annually     ☑ **Met**     ☐ **Missed**

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**     *In Compliance* (FIFTH REPORTING PERIOD)
**Full:**     *In Compliance* (FIFTH REPORTING PERIOD)
**Sustainment Period Ends**     *December 31, 2023*

The City and Police Board maintained Full compliance with ¶555 in the seventh reporting period.

To evaluate Preliminary compliance with ¶555, the IMT reviewed the Police Board's policies following the policy process described in the Consent Decree (¶¶626–41) and determined whether the Police Board tracked and annually published case-specific and aggregate data publications to meet the requirements of ¶555. To evaluate Secondary compliance with ¶555, we considered whether the Police Board has allocated sufficient resources to develop and publish the case specific and aggregate data on an annual basis as required by ¶555. To evaluate Full compliance, we determined whether the Police Board's annual publications sufficiently captured case specific and aggregate data about Police Board decisions.

*Progress before the Seventh Reporting Period*

In past reporting periods, we found the Police Board reached Preliminary compliance based on our review of information provided on the Police Board's website and the Police Board's Annual Reports for years 2017 through 2019, which is responsive to all subparagraphs of ¶555.

In the fifth reporting period, the Police Board continued to provide complete, up-to-date information in an excel spreadsheet housed on the Police Board website. The discipline spreadsheet indicates the number of cases filed with the Police Board in 2021. The excel sheet contains information responsive to all subparagraphs of ¶555. With this, the Police Board demonstrated that it is able to continuously provide, in a timely manner, the information contemplated by ¶555. This moved the Police Board into Full compliance in the fifth reporting period.

In the sixth reporting period, the Police Board continued to provide complete, up-to-date information in an excel spreadsheet housed on the Police Board website. The discipline spreadsheet indicated the number of cases filed with the Police Board in 2022. The excel sheet contained information responsive to all subparagraphs of ¶555. Additionally, we noted that the Police Board's website provides comprehensive information on the Police Discipline page, including Police Board decisions, reports, and data on Police Board cases; cases currently before the Police Board; and reviews of COPA and the CPD disagreements on discipline. In addition to this information, the Police Board submitted its *2021 Annual Report* in the sixth reporting period. The report reflected the information provided in the discipline spreadsheet and further provided comprehensive information regarding Police Board activities and disciplinary cases. With this, the Police Board maintained Full compliance with ¶555 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the Police Board continued to provide complete, up-to-date information in an excel spreadsheet housed on the Police Board website. The discipline spreadsheet indicated the number of cases filed with the Police Board in the last six months of 2022. The excel sheet contained information responsive to all subparagraphs of ¶555. Additionally, we noted that the Police Board's website provides comprehensive information on the Police Discipline page, including Police Board decisions, reports, and data on Police Board cases; cases currently before the Police Board; and reviews of COPA and the CPD disagreements on discipline. With this, the Police Board maintained Full compliance with ¶555 in the seventh reporting period.

***

Moving forward, we will look for the Police Board to continue these efforts and provide information to the IMT to maintain compliance with ¶555.

## Paragraph 555 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶556

> *556. The Deputy PSIG will conduct periodic analysis and evalua-*
> *tions, and perform audits and reviews as authorized by Munici-*
> *pal Code of Chicago § 2-56-230.*

## Compliance Progress        (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The City and Deputy PSIG maintained Full compliance with ¶556 in the seventh reporting period.

To evaluate Preliminary compliance with ¶556 the IMT reviewed the PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed, among other things, the Deputy PSIG's training development, implementation, and evaluation of training. For Full compliance, we evaluated various data sources to determine whether the PSIG sufficiently implemented its policy and training. To confirm that the Deputy PSIG maintained compliance with ¶556, we reviewed a memorandum submitted by the Deputy PSIG that detailed the audits and reviews completed by the Deputy PSIG.

*Progress before the Seventh Reporting Period*

In previous reporting periods, the Deputy PSIG reached Full compliance with ¶556 by completing reviews and audits and detailing them in quarterly reports and the *Public Safety Section 2020 Annual Report.* We also reviewed the Deputy PSIG's *Public Safety Section Policies Manual*.

In November 2021, the Deputy PSIG provided a memorandum which provided evidence that the Deputy PSIG had continued to conduct periodic analysis and evaluations and perform audits and evaluations as authorized by the Municipal Code. With these efforts, the Deputy PSIG maintained Full compliance with ¶556 in the fifth reporting period.

In the sixth reporting period, the Deputy PSIG published its *2021 Annual Report*. This report showed the continued progress the Deputy PSIG has made in regard to the requirements of ¶556. The report was comprehensive, factual, and provided great detail to the community regarding the work PSIG conducted during 2021. Additionally, the report addressed specific analyses and evaluations that comply with the requirements of ¶556 and are authorized by *Municipal Code of Chicago § 2-56-230*. The report also provided an overview of the evaluations and reviews

PSIG conducted during 2021 and provided encouragement for the community to seek the actual reports for each evaluation for more detailed information. In addition, the Deputy PSIG also provided the following reports: *Report on Race-and Ethnicity-Based Disparities in the Chicago Police Department's Use of Force*, *Fairness and Consistency in the Disciplinary Process for CPD Members*, and *Advisory on Background Checks on Members of the Public*. With this, the City and Deputy PSIG maintained Full compliance with ¶556 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the Deputy PSIG conducted evaluations per the requirement of ¶556 and published several reports responsive to *Municipal Code of Chicago § 2-56-230*. These reports included the following: *Consecutive Days Worked by Chicago Police Department Members, April – May 2022* (Aug. 29, 2022); *Understanding the City of Chicago Police Department's Budget* (Sep. 27, 2022); *Use of Litigation Data in Risk Management Strategies for the Chicago Police Department* (Sep. 29, 2022); *The Chicago Police Department's Peer and Supervisory Wellness Support Strategies* (Nov. 2, 2022); and the Public Safety Section 2021 Annual Report. Each of these reports were posted on the Office of the Inspector General (OIG) website. The Deputy PSIG has also updated several reports, audits, and dashboards from previous reporting periods consistent with its intention of maintaining ongoing oversight of the progress of the entities involved. With this, the City and Deputy PSIG maintained Full compliance with ¶556 in the seventh reporting period.

<div align="center">***</div>

We look forward to the Deputy PSIG continuing its efforts in the eighth reporting period to maintain Full compliance with ¶556.

<div align="center">

### Paragraph 556 Compliance Progress History

</div>

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶557

***557.*** *The Deputy PSIG's audits and reviews will be conducted pursuant to the Association of Inspectors General Principles and Standards for Offices of Inspector General.*

## Compliance Progress (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The City and Deputy PSIG maintained Full compliance with ¶557 in the seventh reporting period**.**

To evaluate Preliminary compliance with ¶557 the IMT reviewed the PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed, among other things, the CPD's training development, implementation, and evaluation. For Full compliance, we evaluated various data sources to determine whether the Deputy PSIG sufficiently implemented its policy and training. To confirm that the Deputy PSIG maintained compliance with ¶557, we reviewed a memorandum detailing how audits and reviews completed by the Deputy PSIG conformed to the Association of Inspector General Principles and Standards for Offices of Inspector Generals.

*Progress before the Seventh Reporting Period*

In the fourth reporting period, the Deputy PSIG reached Full compliance. The City and Deputy PSIG provided the Deputy PSIG's staff training materials and class rosters which demonstrated that the staff was well-trained, and therefore, well-prepared to fulfill the requirements of ¶557. We also reviewed a letter from the Association of the Inspectors General that concluded that the Investigations and APR sections comply with the major standards set by the Association of Inspectors General Principles and Standards for Offices of Inspector General Green Book and Yellow Book.

During the fifth reporting period, there was no change in the manner in which the Deputy PSIG followed the major standards set out by the Association of Inspector General Principles and Standards for Office of Inspector General Green Book and Yellow Book. In November 2021, the Deputy PSIG provided a memorandum that explained that the next Associate of Inspectors General peer review process was expected to occur in summer 2022. The Deputy PSIG also provided titles and web locations for six reports published since April 2021 that demonstrated the PSIG's

continued adherence to the Green Book standards. With these efforts, the Deputy PSIG maintained Full compliance with ¶557 in the fifth reporting period.

In the sixth reporting period, the Deputy PSIG provided documentation that showed continued compliance with the requirements of ¶557. Additionally, PSIG submitted documentation regarding the standard, three-year peer review according to the AIG Principles and Standards for Offices of Inspector General. The peer review revealed that the Office of Inspector General and specifically PSIG adhere to the principles and standards of the Association of Inspector General Principles and that the peer review revealed no issues or problems.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the Deputy PSIG provided documentation that showed continued compliance with the requirements of ¶557. Additionally, the Deputy PSIG published the following reports which were produced in compliance with the Association of Inspectors General Principles and Standards for Office of Inspector General ("Green Book") standards: *Fairness and Consistency in the Disciplinary Process for CPD Members* (June 16, 2022); *Consecutive Days Worked by Chicago Police Department Members, April – May 2022* (Aug. 29, 2022); *Understanding the City of Chicago Police Department's Budget* (Sep. 27, 2022); *Use of Litigation Data in Risk Management Strategies for the Chicago Police Department* (Sep. 29, 2022); and *The Chicago Police Department's Peer and Supervisory Wellness Support Strategies* (Nov. 2, 2022). These reports are publicly available on the OIG website. The Deputy PSIG staff also attended several trainings relevant to ¶557 and compliance with Green Book standards, including a training institute presented by the Association of Inspectors General (AIG), the AIG 2022 Annual Training Conference, and the Illinois Chapter of the Association of Inspectors General Fall 2022 Training. With this, the City and Deputy PSIG maintained Full compliance with ¶557 in the seventh reporting period.

\*\*\*

We look forward to the Deputy PSIG continuing its efforts to maintain Full compliance with ¶557 in the eighth reporting period.

## Paragraph 557 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Full

## Accountability and Transparency: ¶558

*558. Within 60 days of the Effective Date, the Deputy PSIG will develop policies for regularly, and at least annually, conducting data-driven reviews and audits to measure the effectiveness of the City and CPD's accountability practices. These reviews and audits will be designed to measure whether members of the community can readily make a complaint alleging misconduct and whether such complaints are investigated and adjudicated consistently with CPD policy, this Agreement, and the law. Reviews and audits will include: a. analysis of the number of complaints received, the disposition of complaints by complaint type, the timeliness and average length of administrative investigations, and disciplinary actions taken; b. analysis of complaint trends; c. analysis of CPD's enforcement of its Rule 14, Rule 21, and Rule 22; d. analysis of the thoroughness of administrative investigations, and of the justifications for terminating investigations before the investigative findings and recommendations; e. analysis of disciplinary grievance procedures and outcomes; and f. analysis of complainant-involved mediation.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|

**Recurring Schedule:**  At Least Annually  ☑ **Met**  ☐ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The Deputy PSIG maintained Full compliance with ¶558 in the seventh reporting period.

To evaluate Preliminary compliance with ¶558, the IMT reviewed the Deputy PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed, among other things, the CPD's training development, implementation, and evaluation. To evaluate Full compliance, we considered whether the Deputy PSIG completed the audits and reviews required by each subparagraph and performed these audits and reviews according to the Green Book, as well as whether the PSIG's policy manual reflects a requirement that the Deputy PSIG continues to do these audits and reviews at a frequency that complies with the paragraph and is consistent with its capabilities. Additionally, we evaluated whether the Deputy PSIG continued to track and provide data related to the requirements listed in ¶558 in its yearly project plan. The Deputy PSIG met Full compliance in the fourth reporting period. In

the fifth reporting period, we focused on confirming whether the Deputy PSIG maintained Full compliance. To do this, we reviewed a memorandum detailing PSIG's progress on reviews and audits contained in PSIG's policy related to the requirements of ¶558. We also reviewed the annual plan which includes discussion of plans for and status updates for work related to mobilizing ¶558 compliance.

*Progress before the Seventh Reporting Period*

The Deputy PSIG reached Full compliance in the fourth reporting period. As we explained in the fifth reporting period, the City of Chicago Office of Inspector General Public Safety Section *Policies Manual* directs that the Deputy PSIG will, among many other responsibilities, conduct data-driven review and audits of the City's and the CPD's accountability practices. Proposed reviews and audits include but are not limited to Service Call Response Times, Beat Integrity, Duty Restrictions for CPD Members, Compliance with Chicago's Welcoming Ordinance, Asset Forfeiture, Promotions, Inventory, Use and Impact of Military Grade Equipment and Homicide Clearance Rates.

We received evidence demonstrating that the Deputy PSIG engages the public in a variety of ways and on a variety of issues. The PSIG seeks community input through a variety of means regarding each report or audit it conducts. Because the PSIG demonstrated that it continued to track and provide data related to the requirements listed in ¶558 in its yearly project plan, the City and the Deputy PSIG met Full compliance with ¶558.

In the fifth reporting period, the Deputy PSIG continued to meet and exceed the requirements set out in ¶558. The Deputy PSIG provides up-to-date reports and audits on its websites. Its work ensures that BIA and COPA cases are properly investigated. The 2020 annual report provided detailed responses to the subparagraph. We anticipated that the Deputy PSIG would release its 2021 report during the sixth reporting period. With continued efforts that met all subparagraphs of ¶558, the Deputy PSIG maintained Full compliance in the fifth reporting period.

In the sixth reporting period, the Deputy PSIG published its *Annual Report*, which was comprehensive, factual, and provided great detail to the community regarding the work PSIG conducted during 2021. The report specifically addressed analyses and evaluations that are directed by the requirements of ¶558. The report also provided an overview of the evaluations and reviews PSIG conducted during 2021 and provided encouragement for the community to seek the actual reports for each evaluation for more detailed information. Additionally, PSIG provided its *Public Safety Section Policies Manual* that fully addressed the requirements set forth in ¶558. We noted that the Deputy PSIG continues to meet and exceed the requirements set out in ¶558, and continues to provide up-to-date reports and audits on its website. With this, the City and Deputy PSIG maintained Full compliance with ¶558 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the Deputy PSIG produced a memorandum that provides specific documentation and references to materials that continue to address every requirement of ¶558 and its subparagraphs. Relevant to compliance with ¶558(a)–(b) and (d), the Deputy PSIG published its 2021 Annual Report, which includes a new and expanded data analysis of individual closed disciplinary investigations. Additionally, relevant to compliance with ¶558(c), the Deputy PSIG reports that its Public Safety section's projects on CPD's enforcement of Rules 14, 21, and 22 are underway and are expected to be completed in the eighth reporting period. Relevant to ¶558(e), PSIG reports that it is engaged in the investigative phase of a follow-up report on disciplinary grievance procedures and outcomes, which is expected to be completed in the eighth or ninth reporting periods. Relevant to ¶558(f), PSIG is involved in evaluating the City's mediation six-month pilot program. While the PSIG is engaged in evaluation of this program, it is still too early to conduct an evaluation. The PSIG reports that it will gather as much information as possible at this stage and will request additional documents and data once the pilot program is completed. With these efforts, the Deputy PSIG maintained Full compliance with ¶558.

\*\*\*

We look forward to the Deputy PSIG continuing its efforts to maintain Full compliance with ¶558 in the eighth reporting period.

### Paragraph 558 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶559

> ***559.*** *The Deputy PSIG will conduct reviews of individual closed COPA and CPD administrative investigative files for thoroughness, fairness, and objectivity, and will make recommendations based on those reviews, including the recommendation that an investigation be reopened upon a finding of a deficiency that materially affects the outcome of the investigation.*

---

**Compliance Progress**    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The Deputy PSIG maintained Full compliance with ¶559 in the seventh reporting period**.**

To evaluate Preliminary compliance with ¶559, the IMT reviewed the Deputy PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance we reviewed, among other things, the CPD's training development, implementation, and evaluation. To evaluate Full compliance, we reviewed various data sources including but not limited to PSIG's Policy Manual and observed PSIG's Virtual Case Intake Meeting to determine whether the Deputy PSIG sufficiently implemented its policy and training, including feedback the Deputy PSIG receives from its own personnel, CPD, and COPA regarding the processes for sampling, reviews, and recommendations.

The Deputy PSIG met Full compliance in the fourth reporting period. In the fifth reporting period, we focused on confirming whether the Deputy PSIG maintained Full compliance. To do this, the Deputy PSIG submits for review any recommendations to reopen investigation. We also reviewed a memorandum provided to us by the Deputy PSIG that provides summary statistics regarding PSIG's case review work.

*Progress before the Seventh Reporting Period*

In the fourth reporting period, the Deputy PSIG reached Full compliance with ¶559. The Deputy PSIG provided the revised City of Chicago Office of Inspector General Public Safety Section *Policies Manual* (*PSIG Policy Manual*), dated April 2021, that provides a complete review process for closed COPA and the CPD administrative investigative files. The review process includes reviews for completeness, objectivity, and fairness, including a detailed process for recommendations that investigations be reopened by COPA or the CPD, per ¶559. The *PSIG Policy*

*Manual* also requires Case Intake Meetings to include the specific PSIG members responsible for reviewing the closed case and supervisory PSIG personnel who discuss the cases and collectively determine whether a recommendation to reopen a case should be recommended to the CPD or COPA.

In the fourth reporting period, we also observed a PSIG Virtual Case Intake Meeting. All members required to attend per the *PSIG Policy Manual* were in attendance. This meeting was not unique but one of several such standing meetings. Beyond this, we also reviewed examples of administrative investigative files that reflected that the Deputy PSIG reviewed the administrative investigative files for thoroughness, fairness, and objectivity and made proper recommendations when necessary.

Because (1) the PSIG Policy Manual provided direction, (2) the Case Intake Meeting demonstrated that the policy is being followed, and (3) the provided administrative investigative file examples demonstrated that the policy and work sufficiently address the paragraph, we found the Deputy PSIG in Full compliance with ¶559.

Since reaching Full compliance, the Deputy PSIG has provided evidence that it continues to act in accordance with ¶559. Thus, the Deputy PSIG maintained Full compliance with ¶559 in the fifth reporting period.

In the sixth reporting period, the Deputy PSIG provided a memorandum containing statistics regarding its case review work. The Deputy PSIG demonstrated consistency in its case screening and reviews. Additionally, it demonstrated consistency in its recommendations to improve future disciplinary investigations and decisions. As a snapshot of its work, in the fourth quarter of 2021 and first quarter of 2022, the Deputy PSIG conducted 500 case screenings of closed BIA and COPA cases. It reopened 24 cases for further review. This information provided evidence that the Deputy PSIG continued ¶559 compliant actions and efforts throughout the sixth reporting period. The Deputy PSIG maintained Full compliance with ¶559.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the Deputy PSIG produced a memorandum indicating that the Deputy PSIG conducted 662 case screenings and opened 25 cases for investigation during the Second and Third Quarters of 2022. This information is also included in PSIG's Quarter 2 and Quarter 3 reports. Additionally, PSIG provided a confidential appendix of its recommendations to reopen cases by Log Number and the responsible agency's response to PSIG's recommendations. PSIG continues to demonstrate consistency in its case screenings and review. The Deputy PSIG maintained Full compliance with ¶559.

<div align="center">***</div>

We look forward to the Deputy PSIG continuing its efforts to maintain Full compliance with ¶559 in the eighth reporting period.

### Paragraph 559 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶560

*560. The Deputy PSIG will have timely and full access to all information in the possession or control of COPA, CPD, the Police Board, and any other City departments or agencies in order to conduct any review or audit within the Deputy PSIG's jurisdiction.*

## Compliance Progress     (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SIXTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SIXTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |
| | **Police Board** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | | *In Compliance* (SIXTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SIXTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |
| | **Police Board** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| | **Police Board** | *Not in Compliance* |

This reporting period, the CPD, COPA, and the Police Board maintained Secondary compliance with ¶560, allowing the City to maintain Secondary compliance. COPA reached Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Full compliance.

To evaluate Preliminary compliance with ¶560, the IMT reviewed data sources relevant to compliance with the requirements of the paragraph and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts. Specifically, the IMT looked for evidence that COPA, CPD, the Police Board, and any other City departments or agencies are aware of obligations to provide information to the Deputy PSIG and that they develop systems to share information and communicate with PSIG regarding their information needs. To evaluate Secondary compliance with ¶560, the IMT reviewed data sources to demonstrate that COPA, CPD, the Police Board, and any other City departments or agencies will timely provide access to information to PSIG. To assess Full compliance we looked at the entities' relevant policies and records following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods that instruct provisions of information to PSIG, and looked for evidence of each entity following that policy.

*Progress before the Seventh Reporting Period*

The sixth reporting period marked the first time the IMT assessed compliance with ¶560. The Deputy PSIG provided a memorandum that indicated it developed a method for data requests from the entities. Additionally, PSIG organized a twice monthly meeting with the CPD to discuss specific production requests made to the CPD. The memorandum stated that in the sixth reporting period, PSIG made three production/document requests to COPA which were fully responded to in a timely fashion. PSIG made twelve document requests to CPD with ten that were responded to and two that were being addressed in a timely fashion. Lastly, PSIG made one document request to the Police Board, which received a full and prompt response. All three entities were aware of their obligations to provide information to the Deputy PSIG and had developed systems to share the information and communicate with PSIG regarding their information needs. Additionally, all three entities demonstrated their ability to timely provide access to information to PSIG. With this, COPA, the CPD, and the Police Board reached Secondary compliance with ¶560 in the sixth reporting period.

We explained that, in the seventh reporting period, we would look for the CPD, COPA, and the Police Board to develop a policy that instructs compliance with ¶560 to determine whether information is adequately shared with the Deputy PSIG in accordance with the agency's respective policies.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the Deputy PSIG produced a memorandum detailing PSIG's ability to have timely access and full access to all information in the possession or control of COPA, CPD, the Police Board, and other city agencies in order to conduct any review or audit within the Deputy PSIG's jurisdiction. PSIG reports that, during the seventh reporting period, it made 25 production and/or document requests to the CPD, and the CPD responded to 20 fully and in a timely fashion, with five outstanding. PSIG reports that it made 12 production and/or document requests to COPA, and COPA responded to nine fully and in a timely fashion and three remain outstanding. PSIG reports that it made two production and/or document requests to the Police Board, which were responded to timely. PSIG expresses no concern regarding the outstanding requests to the CPD and COPA due to the complexity of the cases involved. Additionally, PSIG reports that it has established a twice-monthly meeting with the CPD and a monthly meeting with COPA to discuss such requests and to provide clarification as needed. While these meetings are not required by the Consent Decree, the IMT appreciates that the Deputy PSIG, the CPD, and COPA are taking the initiative to hold these meetings to ensure the Deputy PSIG has full access to all information requested.

Additionally, COPA provided Guidance, *COLUMN CMS Administration*. Section I.A.6 of this Guidance addresses ¶560 and supports COPA's CLEAR and Column CMS

Systems policy by delegating responsibility to ensure the PSIG has timely and full access to information in COPA CMS in order to conduct reviews and audits within PSIG's jurisdiction. The IMT submitted a no-objection notice to this Guidance on December 2, 2022. With this, COPA reached Full compliance with ¶560.

The CPD and the Police Board have not reached Full compliance because they have not yet developed policies related to the requirements of ¶560.

<div align="center">**\*\*\***</div>

The City maintained Secondary compliance with ¶560, and COPA reached Full compliance. Moving forward, we will look for the CPD and the Police Board to develop policies related to the requirements of this paragraph.

<div align="center">

### Paragraph 560 Compliance Progress History

</div>

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Accountability and Transparency: ¶561

> **561.** *The Deputy PSIG will hire a full-time staff member responsible for diversity and inclusion issues, who will have specific authority to review CPD actions for potential bias, including racial bias, on any matter within the Deputy PSIG's statutory authority. The Deputy PSIG will regularly publish reports on diversity and inclusion issues, no less frequently than on an annual basis, which will contain findings and analysis.*

## Compliance Progress  (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**  At Least Annually  ☑ **Met**  ☐ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The Deputy PSIG maintained Full compliance with ¶561 in the seventh reporting period**.**

To evaluate Preliminary compliance with ¶561, the IMT reviewed the Deputy PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed data sources to determine if the Deputy PSIG had hired a member responsible for diversity and inclusion issues as described in ¶561, and we reviewed training materials to ensure the hired individual is properly trained to fulfill their obligations as outlined in ¶561. To evaluate Full compliance, we reviewed various data sources to determine whether the Deputy PSIG sufficiently implemented its policy and training, and we also confirmed that the required reports on diversity and inclusion issues are published as required by ¶561.

*Progress before the Seventh Reporting Period*

The Deputy PSIG reached Preliminary compliance with ¶561 in the second reporting period when it introduced a diversity, equity, and inclusion (DEI) framework across its various responsibilities. With this, the DEI officer provides DEI-anchored feedback in various areas of the Office of the Inspector General's work. In the third and fourth reporting periods the Deputy PSIG hired a new DEI Director. The DEI Director quickly got to work conducting audits and reviews of reports focusing on issues of diversity, equity, and inclusion. We reviewed the *Evaluation of the Demographic Impacts of the Chicago Police Department's Hiring Process* draft report, which was an example of the DEI Director's work, in the fourth reporting period. The report contained findings and recommendations regarding the demographic

impacts during the stages of the CPD hiring process. After reviewing this and other data sources provided by the Deputy PSIG, we found it had reached Full compliance with ¶561.

In the fifth reporting period, we reviewed a memorandum provided by the Deputy PSIG that provided details regarding the DEI Director's ongoing work. During the fifth reporting period, the Deputy PSIG published the *Evaluation of the Demographic Impacts of the Chicago Police Department's Hiring Process*, the draft of which we had reviewed in the fourth reporting period. We found that this report satisfied ¶561's annual reporting requirement. The memorandum also detailed projects that are being led by the DEI Director that review the CPD's operations for potential bias. With this evidence, the Deputy PSIG maintained Full compliance with ¶561 in the fifth reporting period.

In the sixth reporting period, we reviewed a memorandum provided by the Deputy PSIG that detailed the ongoing involvement of the DEI Director in PSIG's general operations including training and other projects. We noted that the Director is involved in every aspect of PSIG's audits and reports to ensure that diversity, equity, and inclusion are considered. The memorandum also advised that the DEI Director is also involved in ongoing evaluations that do not specifically focus on DEI in order to discuss how DEI might be considered during the studies. Additionally, we noted that the DEI Director is involved in investigations involving CPD members who are being investigated for DEI related issues. The Deputy PSIG also provided its *Report on Race- and Ethnicity-Based Disparities in the Chicago Police Department's Use of Force*, which satisfied PSIG's annual reporting requirement related to ¶561. With this, the Deputy PSIG maintained Full compliance with ¶561 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, we reviewed a memorandum provided by the Deputy PSIG that detailed the ongoing involvement of the DEI Director in PSIG's general operations including training and other projects. The memorandum highlighted the DEI Director's involvement in the production of reports including *The Chicago Police Department's Peer and Supervisory Wellness Support Strategies* (Nov. 2, 2022) and the PSIG Public Safety section's Annual Report for 2021. The PSIG memorandum also noted the DEI Director's involvement in leading several projects which review CPD's operations for potential bias. The PSIG memorandum also highlights in-progress projects in which the DEI Director is involved, which include an inquiry into CPD's policies and practices relevant to rank promotions and an analysis of CPD's current Probationary Police Officer (PPO) applicant backlog. In addition to leading individual projects, the DEI Director has ongoing duties to review and provide input on ongoing evaluations and to participate in closed case

reviews and weekly screening meetings related to reviews of CPD disciplinary matters. Additionally, the DEI Director serves as the Team Lead for OIG's Learning Cohort process facilitated by the Mayor's Office of Ethnic and Racial Justice, in which a team of ten OIG staff members receive trainings and other assistance as they work through a racial equity tool and create a Racial Equity Action Plan for the office. The racial equity tool involves engagement with communities most negatively impacted by socioeconomic disparities, and this community engagement will inform OIG's Racial Equity Action Plan. With these efforts, the Deputy PSIG maintained Full compliance with ¶561 in the seventh reporting period.

<p style="text-align:center">***</p>

We look forward to the Deputy PSIG continuing its efforts to maintain Full compliance with ¶561 in the eighth reporting period.

### Paragraph 561 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶562

> *562. The Deputy PSIG will provide all staff members with comprehensive initial onboarding training and annual in-service training. The Deputy PSIG will create initial and in-service training plans and submit these plans to the Monitor and OAG for review and comment.*

**Compliance Progress**     (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:** Annually          ☑ **Met**    ☐ **Missed**

**Preliminary:**         *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**          *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**               *In Compliance* (FOURTH REPORTING PERIOD)
**Sustainment Period Ends**   *June 30, 2023*

The Deputy PSIG maintained Full compliance with ¶562 in the seventh reporting period.

To evaluate Preliminary compliance with ¶562, the IMT reviewed the Deputy PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed, among other things, the Deputy PSIG's training development, implementation, and evaluation. To evaluate Full compliance, we reviewed various data sources to determine whether the Deputy PSIG sufficiently implemented its policy and training, and provided the training called for by ¶562. In considering whether the Deputy PSIG maintained Full compliance, we reviewed a memorandum that details the Deputy PSIG's ongoing training efforts, along with training presentations that have been developed and attendance records of the trainings that have been provided.

*Progress before the Seventh Reporting Period*

The Deputy PSIG reached Full compliance with ¶562 in the fourth reporting period because it provided initial onboarding and annual in-service training to all staff members. The Deputy PSIG provided us training materials that were thorough and comprehensive. It also provided rosters showing the attendance of those trainings. This evidence demonstrated that the Deputy PSIG was undertaking actions consistent with ¶562's mandates.

In the fifth reporting period, the Deputy PSIG provided a several-hundred page memorandum that included details of ongoing training efforts: training materials, training presentations, and attendance rosters. The Deputy PSIG provided this ma-

terial for both onboarding and in-service trainings. The Deputy PSIG's training remained consistently appropriate and thorough. With this, the Deputy PSIG maintained Full compliance with ¶562 in the fifth reporting period.

In the sixth reporting period, the Deputy PSIG provided training materials and information regarding all attendees for trainings provided. PSIG continued to demonstrate that it will provide relevant and timely training for its new employees, as well as veteran staff through onboarding training and in-service training. We commended PSIG's commitment to providing such trainings and acknowledged the comprehensive reporting regarding the specifics of each training throughout the reporting periods. With this, the Deputy PSIG maintained Full compliance with ¶562 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

During this reporting period, the Deputy PSIG continued to provide staff members with comprehensive initial onboarding training and annual in-service training. PSIG staff attended a variety of external and internal in-service trainings (19 external trainings and 11 internal trainings total). In a memorandum to the IMT, the Deputy PSIG listed the trainings attended, identified the PSIG staff members who attended each training, and provided lessons plans and presentations for trainings and conferences attended during the reporting period. The Deputy PSIG continues to provide opportunities for its staff members to attend state and national conferences and training courses that are relevant to staff members' responsibilities. PSIG staff presented a training at the Association of Inspectors General (AIG) 2022 Annual Training Conference, and one PSIG staff member attended a five-day training institute presented by the Association of Inspectors General (AIG), the organization which promulgates the *Principles and Standards for Offices of Inspectors General* ("the Green Book"), and received certification as a Certified Inspector General Inspector-Evaluator. It is clear that the Deputy PSIG has invested considerably in developing and providing training and continuing education opportunities to its staff. The Deputy PSIG maintained Full compliance with ¶561 in the seventh reporting period.

*** 

We look forward to the Deputy PSIG continuing its efforts to maintain Full compliance with ¶562 in the eighth reporting period.

## Paragraph 562 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Under Assessment |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Full

## Accountability and Transparency: ¶563

**563.** *At least 60 days prior to publishing its annual audit plan, the Deputy PSIG will provide the Monitor with a draft of its audit plan for review and comment.*

---

**Compliance Progress** (Reporting Period: January 1, 2022, through June 30, 2022)

**Deadline:** Annually (Moving) ☑ **Met** ☐ **Missed**

**Preliminary:** *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:** *In Compliance* (THIRD REPORTING PERIOD)
**Full:** *In Compliance* (THIRD REPORTING PERIOD)
**Sustainment Period Ends** *June 30, 2023*

The Deputy PSIG maintained Full compliance with ¶563 in the seventh reporting period.

To evaluate Preliminary compliance with ¶563, the IMT determined whether the Deputy PSIG provided the IMT with a draft of its audit plan. To evaluate Secondary compliance, we determined whether the Deputy PSIG provided an opportunity to receive IMT comments and appropriately responded. To evaluate Full compliance, we reviewed the Deputy PSIG's audit plan to ensure that it was complete and sufficient under ¶563. To determine whether the Deputy PSIG maintained Full compliance we have reviewed the draft annual audit plan and provided comments, where appropriate.

*Progress before the Seventh Reporting Period*

The Deputy PSIG reached Full compliance with ¶563 in the third reporting period. The Deputy PSIG provided the IMT with its draft *2021 Outlook on Police Oversight and Accountability* ("2021 Audit Plan") for review and comment 60 days before publishing the plan. This marked the second year in a row that the Deputy PSIG provided the IMT with its Audit Plan consistent with ¶563. With this, the Deputy PSIG reached Full compliance.

In the fifth reporting period, the Deputy PSIG provided its *2022 Outlook on Police Oversight and Accountability* for review and comment. This draft was a comprehensive work and audit plan for 2022, and it was provided to us with plenty of time to allow the IMT to review and comment. This plan includes 22 potential projects, including some that were part of the 2021 Audit Plan that the Deputy PSIG was not able to address in 2021. We noted our appreciation that the Deputy PSIG did not simply drop the 2021-listed projects but moved them into the 2022 Audit Plan. With this, the Deputy PSIG maintained Full compliance with ¶563 in the fifth reporting period.

As required by ¶563, the Deputy PSIG publishes an annual audit plan. We explained in the sixth reporting period that, since the plan will be released in the seventh reporting period, the Deputy PSIG did not have materials to provide relevant to the requirements of ¶563. We noted our anticipation that we would receive the Audit Plan in the seventh reporting period at least 60 days prior to its publishing for review and comment. With this, the Deputy PSIG maintained Full compliance with ¶563 in the sixth reporting period.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the Deputy PSIG published its annual audit plan, titled *2023 Outlook on Police Oversight and Accountability*. The audit plan provides detailed information on the OIG's and the Deputy PSIG's commitment to building upon previous audit plans and its continued efforts toward identifying issues and making recommendations to improve the work of the Chicago Police Department, the Civilian Office of Police Accountability, and the Chicago Police Board. Additionally, the 2023 audit plan provides detail regarding several projects that the Deputy PSIG was not able to launch in 2022, demonstrating the Deputy PSIG's commitment to potentially pursuing those projects in 2023. The IMT submitted a no objection notice to this audit plan on November 13, 2022. The Deputy PSIG provided the IMT with a draft of the audit plan on October 14, 2022, thereby meeting ¶563's requirement to provide a draft of its audit plan for review and comments "[a]t least 60 days prior to publishing its annual audit plan." With this, the Deputy PSIG maintained Full compliance with ¶563 in the seventh reporting period.

\*\*\*

We look forward to reviewing the Deputy PSIG's annual audit plan in the seventh reporting period for continued compliance with ¶563.

### Paragraph 563 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Full |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Full | | |

# Accountability and Transparency: ¶564

> ***564.*** *The Deputy PSIG will exercise his or her discretionary and oversight responsibilities without interference from any person, group, or organization, including CPD, COPA, the Police Board, and City officials. Any person that knowingly interferes with the Deputy PSIG's performance of his or her duties will be subject to the penalties set forth in Municipal Code of Chicago Sections 2-56-140, 145, 270.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Police Board** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The CPD and the Police Board did not reach Preliminary compliance with ¶564 in the seventh reporting period. COPA reached Preliminary compliance with ¶564 in the seventh reporting period. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶564, the IMT reviewed the CPD's, the Police Board's, and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. [19] These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms."

*Progress before the Seventh Reporting Period*

The sixth reporting period marked the first time the IMT assessed compliance with ¶564. This paragraph sets a negative requirement for the CPD, COPA, Police Board,

---

[19] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for the Civilian Office of Police Accountability (COPA), Illinois v. Chicago*, Case No. 17-cv-6260 (January 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for.__.pdf. The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

and City members: that they not interfere with the Deputy PSIG's exercise of discretion and oversight responsibility. The Deputy PSIG provided a memorandum stating that PSIG made requests to COPA, the Police Board, and the CPD, and the PSIG confirmed that the entities were responding appropriately. The memorandum did not suggest that the Deputy PSIG had faced any interference from these entities or other City officials.

We explained that, while we appreciate that the entities appear to have followed the mandates of ¶564 in the sixth reporting period, to reach Preliminary compliance, each entity must produce written guidance such as a policy that captures the requirement of this paragraph. We did not receive any policies from the entities on this point in the sixth reporting period. Therefore, the entities did not reach Preliminary compliance.

*Progress in the Seventh Reporting Period*

The Deputy PSIG provided a memorandum reporting that it is "unaware of any interference from any person, group, or organization—including CPD, COPA, the Police Board, and City officials—that has impaired or affected its ability to conduct its discretionary and oversight responsibilities."

COPA provided Guidance, *COLUMN CMS Administration*. Section I.A.7 of this Guidance addresses ¶564 by clearly stating that COPA staff will not interfere with the PSIG's discretionary and oversight responsibilities. This clear statement in COPA's guidance will ensure that all COPA staff are aware of this requirement. With this, COPA met Preliminary compliance with ¶564 in the seventh reporting period.

The CPD and the Police Board did not produce materials related to ¶564 in the seventh reporting period.

\*\*\*

The City, the CPD, and the Police Board have not yet reached Preliminary compliance with ¶564, but COPA has reached Preliminary compliance. Moving forward, we will look for the CPD and the Police Board to produce written guidance such as a policy that captures the requirements of this paragraph. For COPA, we will evaluate data sources to determine whether repercussions for interference with the Deputy PSIG's performance of its duties are made readily knowable to employees of the City, the CPD, COPA, and the Police Board.

## Paragraph 564 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Not Applicable

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Not Applicable

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
None

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶565

> **565.** *At least quarterly, COPA, the Deputy PSIG, and the President of the Police Board, or his or her designee, will meet to confer and share information regarding trends and analyses of data relating to CPD. They will jointly or separately provide any resulting recommendations for changes in CPD policy or rules, in writing, to the Superintendent. Thereafter: a. the Superintendent will respond to any such recommendation within 60 days of receipt; b. the Superintendent's response will include a description of the actions that the Superintendent has taken or plans to take with respect to the issues raised in the recommendations; and c. all policy recommendations and responses to the same will be published on a City website.*

## Compliance Progress    (Reporting Period: January 1, 2022, through June 30, 2022)

**Recurring Schedule:**    Quarterly        ☑ **Met**    ☐ **Missed**

**Preliminary:**          *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:**           *In Compliance* (SECOND REPORTING PERIOD)
**Full:**                *In Compliance* (FOURTH REPORTING PERIOD)
  **Sustainment Period Ends**   *June 30, 2023*

The City maintained Full compliance with ¶565 in the seventh reporting period.

To evaluate Preliminary compliance with ¶565, the IMT determined whether the relevant representatives are meeting quarterly. To evaluate Secondary compliance, we determined whether the relevant entities have allocated sufficient resources to ensure that the meetings contemplated by ¶565 continue on a quarterly basis. To evaluate Full compliance, we determined whether the meetings sufficiently include the requisite coordination and whether any recommendations result from the process.

*Progress before the Seventh Reporting Period*

The City and its entities achieved Full compliance with the requirements of ¶565 during the fourth reporting period. In the third and fourth reporting periods, the COPA Chief, the Deputy Inspector General for Public Safety, and the Police Board President and Vice President met to discuss trends and share information regarding data analysis related to the CPD. We were pleased to learn that these meetings have proven a meaningful opportunity to discuss such issues, as intended by ¶565.

In the fifth reporting period, the Police Board President provided the IMT with documentation regarding the Quarterly meetings held during the first three quarters of 2021. The meeting minutes indicated that the entities met regularly and had substantive discussions regarding each agency's work within and outside of the Consent Decree. We noted that, to date, no joint recommendations had been made to the CPD. This evidence demonstrated continued Full compliance with ¶565.

In the sixth reporting period, the Police Board President provided the IMT with documentation regarding the Quarterly meetings held during the fourth quarter of 2021. The Police Board provided minutes of the March 2022 meeting of the Police Board, COPA, and Deputy PSIG Quarterly meeting. Representatives from each were documented as attending the meeting, and relevant topics appear to have been discussed in a meaningful way. The minutes indicated that COPA, the Deputy PSIG and the Police Board continued meeting on a regular basis and had substantive discussions regarding each agency's work within and beyond the scope of the Consent Decree. At this point in the sixth reporting period, no joint recommendations had been made to the CPD Superintendent.

*Progress in the Seventh Reporting Period*

In the seventh reporting period, the Police Board President provided the IMT with documentation and minutes from the quarterly meetings held during 2022. The minutes, which are recorded and approved at the following meeting, indicate that COPA, the Deputy PSIG and the Police Board continued meeting on a regular basis and had substantive discussions regarding each agency's work within and beyond the scope of the Consent Decree. At this point in the seventh reporting period, no joint recommendations have been made to the CPD Superintendent. With this, the City maintained Full compliance with ¶565.

*** 

The City maintained Full compliance with ¶565 in the seventh reporting period. Next reporting period we expect to receive evidence of continued compliance with this paragraph.

## Paragraph 565 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Preliminary

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Secondary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Secondary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Full

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Full

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Full

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Full

# Appendix 10

# Data Collection, Analysis & Management Compliance Assessments by Paragraph

| | | | |
|---|---|---|---|
| ¶568 | ¶579 | ¶590 | ¶601 |
| ¶569 | ¶580 | ¶591 | ¶602 |
| ¶570 | ¶581 | ¶592 | ¶603 |
| ¶571 | ¶582 | ¶593 | ¶604 |
| ¶572 | ¶583 | ¶594 | ¶605 |
| ¶573 | ¶584 | ¶595 | ¶606 |
| ¶574 | ¶585 | ¶596 | ¶607 |
| ¶575 | ¶586 | ¶597 | ¶608 |
| ¶576 | ¶587 | ¶598 | ¶609 |
| ¶577 | ¶588 | ¶599 | |
| ¶578 | ¶589 | ¶600 | |

# Data Collection, Analysis & Management: ¶568

**568.** *CPD will collect and maintain the data and records necessary to accurately evaluate its use of force practices and to facilitate transparency and accountability regarding those practices.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the seventh monitoring period, the City and CPD maintained Preliminary compliance with ¶568.

The CPD presently possesses the necessary directives and forms to ensure that data and records related to use of force are collected and maintained. The IMT considers this sufficient to act as data collection efforts related to this paragraph and remain in Preliminary compliance.

Secondary compliance requires CPD to "accurately evaluate…and facilitate transparency and accountability" regarding the collection and maintenance of use of force data which can be achieved through comprehensive training on use of force policies. On October 17, 2022, the IMT submitted a Records Request to the City of Chicago Law Department requesting the most recent training records related to the following: (1) Tactical Response Report (TRR), G03-02-02; (2) Tactical Response Investigation Report (TRR-I), G03-02-08; (3) Tactical Response Report Review (TRR-R), G03-02-08; (4) Arrest Report, G06-01-01 and G03-02-02; (5) Case Incident Report: Field Reporting Manual, S04-13-06, D20-03, and G03-02- 02; (6) Investigatory Stop Report, S04-13-09; (7) Administrative Case Files, G08-01; (8) Body-Worn Camera, S03-14; (9) In-Car Camera, S03-05; (10) Third-Party Recordings, G03-02-02; (11) Witness Interviews, G03-02-02; (12) Officer Interviews, G03-02-02. The IMT did not receive the requested training records for modules related to each of the above directives and forms during the monitoring period.

In addition to providing training records, the Audit Division will need to provide the IMT with documented protocols for auditing and evaluating the Watch Operations Lieutenants (WOLs) reviews of BWC recordings, as stated in Special Order S03-14, *Body Worn Cameras*. The IMT was not provided with protocols or parameters during the monitoring period, and therefore cannot discern how the Audit Division will conduct this oversight.

The CPD must also demonstrate effective operation of the TRED, which continues to be understaffed and has been unable to reduce the significant backlog of cases awaiting review.

## Paragraph 568 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Not Applicable

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Not Applicable

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

## Data Collection, Analysis & Management: ¶569

*569. CPD must collect, track, and maintain all available documents related to use of force incidents, including: a. TRRs, or any other similar form of documentation CPD may implement for initial reporting of reportable use of force incidents; b. TRR-Is, or any other similar form of documentation CPD may implement to document supervisory investigation of reportable use of force incidents; c. Tactical Response Reports – Review ("TRR-Rs"), or any other similar form of documentation CPD may implement to document review or auditing of reportable use of force incidents; d. arrest reports, original case incident reports, and investigatory stop reports associated with a reportable use of force incident; e. administrative investigative files, including investigative materials generated, collected, or received by BIA, or COPA, or any similar form of documentation CPD may implement for misconduct allegations or civilian complaints; and f. all reasonably available documentation and materials relating to any reportable use of force, in-custody injury or death, or misconduct allegation, including body-worn, in-car, or known third-party camera recordings, and statements, notes, or recordings from witness and officer interviews.*

---

### Compliance Progress

(Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the seventh monitoring period, the City and CPD maintained Preliminary compliance with ¶569.

The CPD presently possesses the necessary directives and forms to ensure that data and records related to use of force are collected and maintained. The IMT considers this sufficient to act as data collection efforts related to this paragraph and remain in Preliminary compliance.

Secondary compliance requires CPD to "accurately evaluate…and facilitate transparency and accountability" regarding the collection and maintenance of use of force data which can be achieved through comprehensive training on use of force policies. On October 17, 2022, the IMT submitted a Records Request to the City of Chicago Law Department requesting the most recent training records

related to the following: (1) Tactical Response Report (TRR), G03-02-02; (2) Tactical Response Investigation Report (TRR-I), G03-02-08; (3) Tactical Response Report Review (TRR-R), G03-02-08; (4) Arrest Report, G06-01-01 and G03-02-02; (5) Case Incident Report: Field Reporting Manual, S04-13-06, D20-03, and G03-02- 02; (6) Investigatory Stop Report, S04-13-09; (7) Administrative Case Files, G08-01; (8) Body-Worn Camera, S03-14; (9) In-Car Camera, S03-05; (10) Third-Party Recordings, G03-02-02; (11) Witness Interviews, G03-02-02; (12) Officer Interviews, G03-02-02. The IMT did not receive the requested training records for modules related to each of the above directives and forms during the monitoring period.

In addition to providing training records, the Audit Division will need to provide the IMT with documented protocols for auditing and evaluating the Watch Operations Lieutenants (WOLs) reviews of BWC recordings, as stated in Special Order S03-14, *Body Worn Cameras*. The IMT was not provided with protocols or parameters during the monitoring period, and therefore cannot discern how the Audit Division will conduct this oversight.

The CPD must also demonstrate effective operation of the TRED, which continues to be understaffed and has been unable to reduce the significant backlog of cases awaiting review.

### Paragraph 569 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Data Collection, Analysis & Management: ¶570

*570. The City will ensure that reasonably available documents related to reportable uses of force that are or become subject to misconduct complaints or investigations are promptly provided to the appropriate investigative entity (e.g., COPA, BIA). The City will ensure that any reasonably available documents related to reportable uses of force subject to misconduct complaints or investigations, except for open confidential investigations, are accessible in the CMS the City is working to create, or in any similar electronic system, by June 30, 2020. Within seven days of the receipt of a misconduct complaint or the initiation of an administrative investigation, whichever occurs first, the City will identify any available reportable use of force documentation associated with the incident and ensure such documentation is accessible via the CMS or similar system. By June 30, 2020, whenever a reportable use of force incident becomes the subject of a misconduct investigation, COPA will notify CPD via the CMS within three days of the initiation of the investigation.*

### Compliance Progress       (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH MONITORING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the seventh monitoring period, the City maintained Preliminary and Secondary compliance with ¶570.

To assess Preliminary compliance with ¶570, the IMT reviews the policies of the City's entities. To assess Secondary compliance with ¶570, the IMT reviews records demonstrating that the City's entities have qualified personnel to meet the requirements of this paragraph. To assess Full compliance, the IMT will review the City's entities' data to determine whether the requirements of ¶570 have been operationalized.

During the seventh monitoring period, COPA maintained Directive 3.1.6, *CLEAR and COLUMN CMS Systems*, which sufficiently memorializes the operation of the Case Management System (CMS). Additionally, the CMS code continues to allow for COPA to access the CMS for documents and evidence related to administrative investigations of use-of-force events. We therefore find the City has maintained Preliminary compliance with the requirements of ¶570.

Furthermore, in this previous monitoring period, the IMT was provided with the prior three years of COPA in-service training related to the CMS. As noted in our last report, these training materials provided sufficient guidance for COPA investigators to navigate the CMS and store investigative material as necessary. We therefore find the City has maintained Secondary compliance with the requirements of ¶570.

During the seventh monitoring period, we were provided with technical demonstrations of the Case Management System for both CPD's BIA as well as COPA. Both CMSs are built using the same platform and mirror each other with respect to capabilities. Given that both groups have a functional CMS, we find this represents a first step towards Full compliance.

Also during the seventh monitoring period, we conducted a random audit of closed use of force investigations investigated by COPA. As part of the audit, we sought to verify that "reasonably available documents related to reportable uses of force" were in fact saved within the COPA CMS. However, when meeting with COPA representatives, we found that all documents were not saved within the CMS. For instance, we found several cases in which no TRR or BWC video was found in the CMS casefile. For some, the lack of documentation was understandable (e.g., the actions of the officer were not a reportable use of force and therefore there would not have been a TRR). However, in other instances, COPA could not adequately explain the lack of BWC video or TRR and believed it was likely that the reason was because the documentation was not saved by CPD into the data systems (i.e., a BWC video was not saved into evidence.com or that a TRR was not saved onto the CLEAR system). In part, this also may be due to the, at times, difficult process of pairing BWC footage to particular events. Regardless, while we find that COPA and CPD have the means to comply with this paragraph through their respective case management systems, the information is not always consistently saved within those systems, thereby preventing us from finding Full compliance.

We also continue to note that the CPD does not have a companion directive that memorializes their responsibilities for facilitating a full and complete investigation by COPA, including when COPA's access to CPD's data systems is restricted, a further condition of Full compliance. Moving forward, we recommend CPD develop a companion directive so as to ensure there are no barriers to COPA's ability to access and store pertinent documents related to use of force investigations.

## Paragraph 570 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Secondary

## Data Collection, Analysis & Management: ¶571

*571. CPD must have an electronic system that accurately and reliably tracks all data derived from reportable use of force incidents, including: a. the response by CPD members during the incident, including the type(s) of force used; b. the date, time, location, and district of the incident; c. whether a foot or vehicle pursuit occurred that is associated with the incident; d. the actual or, if unavailable, perceived race, ethnicity, age, and gender of the subject; e. the name, watch, employee number, and unit and beat of assignment of any CPD member(s) who used force; f. CPD units identified in the incident report as being on the scene of the use of force incident; g. whether the incident occurred during an officer-initiated contact or a call for service; h. the subject's mental health or medical condition, use of drugs or alcohol, ability to understand verbal commands, or disability, as perceived by the CPD member(s) at the time force was used; i. the subject's actions that led to the CPD member's use of force; j. whether the CPD member perceived that the subject possessed a weapon and, if so, what type(s); k. whether the subject possessed a weapon and, if so, what type(s); l. whether reportable force was used against a subject that was handcuffed or otherwise in physical restraints; m. any injuries sustained by CPD members; n. any injuries sustained or alleged by the subject(s) and any medical treatment that was offered or performed on the scene of the incident; o. for each weapon discharged by an officer, including firearms, Tasers, and OC devices, the number of discharges per weapon; and p. whether the subject was charged with an offense and, if so, which offense(s).*

### Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the seventh monitoring period, the City and the CPD maintained Secondary compliance with ¶571.

The CPD completed their training of officers and supervisors on reporting requirements after a use-of-force event during the sixth monitoring period. The

training had previously been approved by the IMT and included instruction on completing the Tactical Response Report (TRR) and TRR-Review (TRR-R) forms; however, the IMT was not provided with requested training records in the current monitoring period. CPD therefore remains in Secondary compliance.

Full compliance relies on audit findings that ensure officers and supervisors are completing the forms accurately. Presently, the TRED reviews TRRs and TRR-Rs to identify deficiencies in report writing and issues corresponding recommendations or advisements. For example, in the second quarter of 2022 (the most recent quarter we have data for), the TRED review noted that 337 of the 799 TRRs (42.2%) that were reviewed resulted in some type of recommendation and/or advisement for either the officer or the supervisor. This represents a decrease in deficiencies from the fourth quarter of 2021 (60.2%) though still represents nearly half of TRRs.

Further related to Full compliance, we are also awaiting some type of audit approach from the Audit Division to determine the reliability of the data. Whereas TRED currently evaluates the validity of the data (i.e., the accuracy of the data), an evaluation of data reliability (i.e., the consistency of the data) should be more broadly conducted by the Audit Division. We continue to engage with CPD's Audit Division to include this in future audit plans.

### Paragraph 571 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

## Data Collection, Analysis & Management: ¶572

**572.** *CPD will regularly review citywide and district-level data regarding reportable uses of force to: a. assess the relative frequency and type of force used by CPD members against persons in specific demographic categories, including race or ethnicity, gender, age, or perceived or known disability status; and b. identify and address any trends that warrant changes to policy, training, tactics, equipment, or Department practice.*

**Compliance Progress**          (Reporting Period: July 1, 2022, through December 31, 2022)

| | | |
|---|---|---|
| **Recurring Schedule:** | Ongoing | ☐ Met   ☑ Missed |

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh monitoring, the City and the CPD did not take any meaningful steps to comply with the requirements of ¶572.

The Tactical Review and Evaluation Division (TRED) continues to be responsible for suggesting changes to policy, training, tactics, equipment, or Department practice based on their review of force events. This requirement of ¶572 continues to be memorialized in G03-02-02 (*Incidents Requiring the Completion of a Tactical Response Report*). However, the TRED continues to be woefully understaffed, an issue we discuss further in our assessment of ¶¶574–75.

As for the requirement to "assess the relative frequency and type of force used by CPD members against persons in specific demographic categories, including race or ethnicity, gender, age, or perceived or known disability status," it appears that the CPD is actively attempting to evade conducting such an assessment as required by the Consent Decree. In each of our past two reports, we have commented on the importance of such an assessment given the findings of the Department of Justice (DOJ) related to bias and racial disparity in use of force. In order to make reforms stemming from DOJ's findings of unconstitutional use of force against minorities, we expect CPD would first want to understand the range and scope of disparate use of force against minorities. Why this has not happened to date remains confusing to us. We have also noted that providing transparent data on relative frequency of force events across demographic categories would be important for establishing and maintaining community trust in CPD operations. This too does not appear to have been persuasive to CPD or the City. Finally, we

have previously provided guidance to CPD on a framework for the assessment and have raised our concerns in several meetings about the fact that no progress has been made to date. In response, we were assured that our comments were noted.

As a result of persistent pressing from the IMT and persistent indifference from CPD and the City, we are therefore left with no option other than reporting here to the public (as well as to the Parties and the Court) that CPD has not demonstrated any appearance of willingness to conduct this assessment in violation of the terms of the Consent Decree. Moving forward, we recommend the City and CPD re-engage with the IMT, provide a proposed methodology, and conduct the assessment as obligated under the Consent Decree.

### Paragraph 572 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Data Collection, Analysis & Management: ¶573

*573. Prior to conducting the initial assessment required by Paragraph 572, CPD will share its proposed methodology, including any proposed factors to be considered as part of the assessment, with the Monitor for review and approval. The Monitor will approve CPD's proposed methodology provided that the Monitor determines that CPD's methodology comports with published, peer-reviewed methodologies and this Agreement.*

## Compliance Progress     (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**    Ongoing     ☐ **Met**   ☑ **Missed**

**Preliminary:**     *Not in Compliance*
**Secondary:**     *Not Yet Assessed*
**Full:**     *Not Yet Assessed*

In the seventh monitoring period, the CPD did not take any meaningful steps to comply with the requirements of ¶573.

Consistent with our assessment of ¶572 and despite several efforts by the IMT to have them do so, the CPD has not demonstrated any willingness to provide us with a methodology for conducting this assessment in violation of the terms of the Consent Decree.

### Paragraph 573 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

## Data Collection, Analysis & Management: ¶574

*574. A designated unit at the CPD headquarters level will routinely review and audit documentation and information collected regarding each level 2 reportable use of force incident, a representative sample of level 1 reportable use of force, and incidents involving accidental firearms discharges and animal destructions with no human injuries to ensure: a. CPD members completely and thoroughly reported the reason for the initial stop, arrest, or other enforcement action, the type and amount of force used, the subject's actions or other circumstances necessitating the level of force used, and all efforts to de-escalate the situation; b. the district-level supervisory review, investigation, and policy compliance determinations regarding the incident were thorough, complete, objective, and consistent with CPD policy; c. any tactical, equipment, or policy concerns are identified and, to the extent necessary, addressed; and d. any patterns related to use of force incidents are identified and, to the extent necessary, addressed.*

### Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶574.

During the seventh monitoring period, the CPD maintained General Order G03-02-08, *Department Review of Use of Force*, which memorializes the role of the Tactical Review and Evaluation Division (TRED) and the requirements of ¶574. Additionally, the TRED has a comprehensive Standard Operating Procedure (SOP), which provides clear instruction on how to conduct the TRED's audits, including the points of review described in ¶574(a–d). Furthermore, TRED members have received sufficient training to carry out the tasks in accordance with the SOP, as well have been provided with an 8-hour CIT training which included modules related to de-escalation (so as to adequately be able to assess the appropriateness of de-escalation attempts by officers). The SOP and overall training regimen continue to satisfy the first of our criteria for achieving Secondary compliance.

However, in the sixth monitoring period, we found the CPD to have lost Secondary compliance due to the failure to adequately staff the TRED, a second criterion used to assess Secondary compliance for this paragraph. During the seventh monitoring period, this issue was not resolved and the TRED continues to operate understaffed. For instance, the TRED is currently budgeted for 46 officers though during an October 2022 site visit, we were informed that they only had 35 and that, despite making a request for additional staff every month, they were continuously denied. Additionally, higher-rank TRED members are also understaffed and have fewer personnel than they are budgeted for. Later in the monitoring period, we were informed that an additional 5 officers were being assigned to the TRED though they would need to be trained and onboarded. However, this may not fully resolve staffing issues as TRED reviewers estimated that they would really need an additional 10 officers given new responsibilities related to foot pursuits.

In addition to the personnel limitations (as well as resulting from those limitations), at the end of the reporting period, TRED still had a backlog of reviews for force events more than one month old. Based on this backlog, we were informed that, even if fully staffed, it would likely take 6–8 months to completely catch up (and potentially longer as this was only a best-scenario estimate).

Some reasons for the backlog (in addition to the reduced personnel) are related to deployment decisions over summer. In speaking with TRED reviewers, we were informed that they were regularly deployed over the summer but also were expected to maintain their normal TRED workload. At times, this interrupted reviews that were already in-process, causing the reviewers to need to re-watch videos multiple times and stop/restart reports. We were also informed that such deployments impacted the morale of TRED reviewers given the fact that they could be deployed with almost zero notice and could be detailed to anywhere at any time.

Aside from being able to provide timely data through immediate review, the delay in conducting the reviews also impacts the quality of the review. For instance, we were informed during our October site visit that it takes up to three months for a use of force event to be reviewed. However, we were also informed that pod camera footage is deleted after 30 days, meaning that many reviews are not able to include such footage. Additionally, given the amount of time that has passed, any advisements or recommendations for deficient reporting or tactics will likely have diminished impact on the officer since the underlying event would have been so long ago.

Despite these challenges, we continue to find that the work of the TRED continues to achieve a three-tier approach to reviewing use of force, pointing of a firearm, and foot pursuit events. The first tier evaluates individual deficiencies based on officers' TRRs and supervisors' investigations and reviews of the force events. The TRED then forwards these identified deficiencies to the involved officer as a learning opportunity. In its second tier of review, the TRED identifies concerns at the unit level as compared with other units. The TRED then forwards these concerns to the District Commander for remediation. Lastly, the TRED's third tier aims to identify department-wide trends and may provide recommendations to the Education and Training Division or to the Research and Development Division to address the identified issues.

The TRED's quarterly reports detail how the TRED identifies meaningful trends and provides responsive recommendations. Based on TRED's 2022 second quarter report (published November 2022), 42.2% of TRR reviews (337 out of 799) resulted in recommendations or advisements, which is a decrease of 3.5% compared to the first quarter. The most common debriefing point for involved members was for deficiencies in body-worn camera activation, in addition to continued inadequacies in describing the de-escalation and force mitigation efforts used before using force. The most common debriefing point for Reviewing Supervisors was "Evidence Technician Not Requested," as supervisors are required to request an evidence technician any time an injury or alleged injury occurs. During the second quarter there were also 190 TRRs related to a foot pursuit accounting for about 23% of all TRRs reviewed, a decrease compared to the previous quarter. During the second quarter, there were 69 instances in which a deficiency or training opportunity was identified and addressed by a field supervisor before the TRR was even flagged for TRED review, which accounts for 8.6% of TRRs reviewed.

Through comprehensive SOPs and well-trained personnel, the TRED has the opportunity to provide meaningful feedback for the department and in fact already does so. However, as a result of the staffing issues violating one of our compliance criterion, we find that the CPD has not maintained Secondary compliance for this paragraph. To return to Secondary compliance, the CPD will need to ensure that TRED has sufficient personnel and that they have been adequately trained.

## Paragraph 574 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Preliminary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

## Data Collection, Analysis & Management: ¶575

*575. CPD recently established a Force Review Unit ("FRU") and tasked the FRU with certain responsibilities described in the preceding paragraph. CPD will ensure that the FRU or any other unit tasked with these responsibilities has sufficient resources to perform them. CPD will ensure that the FRU or any other unit tasked with these responsibilities is staffed with CPD members, whether sworn or civilian, with sufficient experience, rank, knowledge, and expertise to: effectively analyze and assess CPD's use of force practices and related reporting and review procedures; conduct trend analysis based on use of force data; identify tactical, equipment, training, or policy concerns based on analysis of use of force incidents and data; and develop recommendations regarding modifications to tactics, equipment, training, or policy as necessary to address identified practices or trends relating to the use of force.*

### Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD did not regain any level of compliance with ¶575.

During the seventh monitoring period, the Tactical Review and Evaluation Division (TRED) continued to experience staffing deficiency, thereby preventing us from being able to say that CPD has provided "sufficient resources to perform" the tasks TRED is required to perform. For instance, the TRED is currently budgeted for 46 officers though during an October 2022 site visit, we were informed that they only had 35 and that, despite making a request for additional staff every month, they were continuously denied. Additionally, higher-rank TRED members are also understaffed and have fewer personnel than they are budgeted for. Later in the monitoring period, we were informed that an additional 5 officers were being assigned to the TRED though they would need to be trained and onboarded. However, this may not fully resolve staffing issues as TRED reviewers estimated that they would really need an additional 10 officers given new responsibilities related to foot pursuits.

In addition to the personnel limitations (as well as resulting from those limitations), at the end of the reporting period, the TRED continued to have a backlog of reviews for force events more than one month old. Based on this backlog, we were informed that, even if fully staffed, it would likely take 6–8 months to completely catch up (and potentially longer as this was only a best-scenario estimate).

Aside from our concerns with adequately resourcing TRED, we find that the work TRED is able to accomplish appears to have the potential to significantly and positively inform supervisory decision-making. For instance, TRED findings continue to be fed into a supervisory dashboard that would allow supervisors to identify officers with repeated reporting deficiencies as well as identify group trends for deficiencies. In the seventh monitoring period, we were provided with supervisory training for accessing and reviewing the dashboard. However, the training required additional revisions to better tie the use of the dashboard to supervisors' duties. For instance, it is unclear whether supervisors are required to use the dashboard in fulfilling their duties or not. We will continue to provide updates in future reports.

### Paragraph 575 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Data Collection, Analysis & Management: ¶576

*576. CPD will conduct random audits of body-worn and in-car camera recordings of incidents that involved civilian interactions to assess whether CPD officers are complying with CPD policy. CPD will take corrective action to address identified instances where CPD officers have not complied with CPD policy as permitted by law, and will identify any trends that warrant changes to policy, training, tactics, equipment, or Department practice.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD did not achieve any level of compliance with ¶576.

During the seventh monitoring period, the CPD provided a further revised version of Special Order S03-14, *Body Worn Cameras*. While we find the policy itself contains the necessary Preliminary compliance information, there remain deficiencies in the related *Body Worn Camera Review Report* which still does not collect data on whether officers' actions throughout the interaction were consistent with broader CPD policies. Additionally, we have not yet been provided the Random Video Review (RVR) protocols and parameters to ensure that CPD has built in reasonable guidelines for selecting videos. Finally, ¶576 also requires random audits of in-car camera recordings. As noted in prior reports, we have yet to receive an updated version of Special Order S03-05, *In-Car Video Systems* to ensure it contains similar processes as the BWC Special Order. Each of these currently prevent CPD from achieving Preliminary compliance for this paragraph.

To achieve subsequent levels of compliance, the CPD will need to ensure that body-worn-camera and in-car-camera hardware is working adequately and that CPD members are consistently and reliably tagging videos in a way that would facilitate the Watch Operations Lieutenant reviews. The CPD will also need to train Watch Operations Lieutenants on an updated review protocol, ensuring that each review is of consistent quality. Full compliance will then depend on Watch Operations Lieutenants conducting their reviews with the IMT conducting audits of reviews to ensure their accuracy and adequacy.

As of the end of this reporting period, the Audit Division was still conducting a BWC Activation Audit and we have not seen the results. The CPD provided its one-page Audit Design Matrix (dated July 22, 2022) on November 3, 2022, and we will assess the adequacy of the Audit Division's efforts once we receive additional information.

### Paragraph 576 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD |
|---|
| JULY 1, 2022 – DECEMBER 31, 2022 |
| COMPLIANCE PROGRESS: |
| None |

## Data Collection, Analysis & Management: ¶577

**577.** *CPD will create a Force Review Board ("FRB") to review, from a Department improvement perspective: (a) any level 3 reportable use of force incident, except for accidental firearms discharges and animal destructions with no human injuries, and (b) any reportable uses of force by a CPD command staff member.*

### Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD achieved Secondary compliance with ¶577.

During the seventh monitoring period, the CPD maintained General Order G03-02-08, *Department Review of Use of Force*, which memorializes the role of the Force Review Board (FRB) in reviewing Level 3 uses of force and reportable uses of force by a CPD command staff member. As the FRB continues to be detailed in policy, we find CPD has remained in Preliminary compliance with ¶577.

Additionally, the CPD has provided the IMT with an updated version of SOP 2020-003 (*Force Review Board*). Using prior IMT comments, the CPD revised the SOP which now provides comprehensive guidance for conducting the reviews required by this set of paragraphs. In particular, the SOP was updated to expand the list of observable actions that the FRB must review, clarify the term "involved Department member" to ensure that reviews include the actions of all on-scene officers who directly or indirectly contributed to the incident, and ensure adequate documentation of all debriefing points. As a result, the IMT provided a no-objection notice to the SOP during this monitoring period.

To achieve Full compliance with the requirements of ¶577, the IMT will still need to observe an FRB proceeding from start to finish. During this monitoring period, we were able to observe the first portion of an FRB wherein a factual overview of the incident is provided to FRB members. We found this portion to be informative and covered the necessary facts that would allow the FRB to be able to evaluate the actions of CPD members and identify implications for policy, training, tactics, and equipment. However, the IMT is currently unable to observe the second portion of FRB proceedings which would evidence that they actually did. This is due to the City's concern that by including the IMT in such discussions, it may

constitute a waiver of privileged communication for future civil proceedings (see also ¶689). As a result, the Parties submitted a motion to the Court during the seventh monitoring period to confirm that IMT's attendance would not result in any waiver of privileged communication. We will await a ruling by the Court before proceeding and will provide updates in our next monitoring report if we are able to attend.

### Paragraph 577 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

## Data Collection, Analysis & Management: ¶578

*578. For any reportable use of force incident subject to an ongoing investigation by COPA, COPA will be exclusively responsible for recommending disciplinary action relating to the incident. The purpose of FRB's review will be to: a. evaluate if actions by CPD members during the incident were tactically sound and consistent with CPD training; and b. if applicable, identify specific modifications to existing policy, training, tactics, or equipment that could minimize the risk of deadly force incidents occurring and the risk of harm to officers and the public.*

### Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD achieved Secondary compliance with ¶578.

During the seventh monitoring period, the CPD maintained General Order G03-02-08, *Department Review of Use of Force*, which memorializes the fact that the FRB will not conduct a disciplinary review if the event is being investigated by COPA. Furthermore, the policy includes the language of subsections (a) and (b) as the focus of the review. As the FRB continues to be detailed in policy, we find CPD has remained in Preliminary compliance with ¶578.

Additionally, the CPD has provided the IMT with an updated version of SOP 2020-003 (*Force Review Board*). Using prior IMT comments, the CPD revised the SOP which now provides comprehensive guidance for conducting the reviews required by this set of paragraphs. In particular, the SOP was updated to expand the list of observable actions that the FRB must review, clarify the term "involved Department member" to ensure that reviews include the actions of all on-scene officers who directly or indirectly contributed to the incident, and ensure adequate documentation of all debriefing points. As a result, the IMT provided a no-objection notice to the SOP during this monitoring period.

To achieve Full compliance with the requirements of ¶578, the IMT will still need to observe an FRB proceeding from start to finish. During this monitoring period, we were able to observe the first portion of an FRB wherein a factual overview of the incident is provided to FRB members. We found this portion to be informative

and covered the necessary facts that would allow the FRB to be able to evaluate the actions of CPD members and identify implications for policy, training, tactics, and equipment. However, the IMT is currently unable to observe the second portion of FRB proceedings which would evidence that they actually did. This is due to the City's concern that by including the IMT in such discussions, it may constitute a waiver of privileged communication for future civil proceedings (see also ¶689). As a result, the Parties submitted a motion to the Court during the seventh monitoring period to confirm that IMT's attendance would not result in any waiver of privileged communication. We will await a ruling by the Court before proceeding and will provide updates in our next monitoring report.

### Paragraph 578 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

## Data Collection, Analysis & Management: ¶579

**579.** *The FRB will be chaired by the Superintendent, or his or her designee, and will include, at a minimum, the Chief of the Bureau of Patrol, or his or her designee, and CPD members at the rank of Deputy Chief, or above, who are responsible for overseeing policy development, policy implementation, training, and misconduct investigations. CPD's General Counsel, or his or her designee, will also serve on the FRB.*

---

**Compliance Progress**         (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and the CPD achieved Secondary compliance with ¶579.

During the seventh monitoring period, the CPD maintained General Order G03-02-08, *Department Review of Use of Force*, which memorializes the membership necessary for FRB proceedings. As the FRB continues to be detailed in policy, we find CPD has remained in Preliminary compliance with ¶579.

Additionally, the CPD has provided the IMT with an updated version of SOP 2020-003 (*Force Review Board*). Using prior IMT comments, the CPD revised the SOP which now provides comprehensive guidance for conducting the reviews required by this set of paragraphs. In particular, the SOP was updated to expand the list of observable actions that the FRB must review, clarify the term "involved Department member" to ensure that reviews include the actions of all on-scene officers who directly or indirectly contributed to the incident, and ensure adequate documentation of all debriefing points. As a result, the IMT provided a no-objection notice to the SOP during this monitoring period.

To achieve Full compliance with the requirements of ¶579, the IMT will still need to observe an FRB proceeding from start to finish. During this monitoring period, we were able to observe the first portion of an FRB wherein a factual overview of the incident is provided to FRB members. We found this portion to be informative and covered the necessary facts that would allow the FRB to be able to evaluate the actions of CPD members and identify implications for policy, training, tactics, and equipment. However, the IMT is currently unable to observe the second portion of FRB proceedings which would evidence that they actually did. This is due to the City's concern that by including the IMT in such discussions, it may

constitute a waiver of privileged communication for future civil proceedings (see also ¶689). As a result, the Parties submitted a motion to the Court during the seventh monitoring period to confirm that IMT's attendance would not result in any waiver of privileged communication. We will await a ruling by the Court before proceeding and will provide updates in our next monitoring report.

### Paragraph 579 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Data Collection, Analysis & Management: ¶580

*__580.__ The FRB will review each incident within its purview promptly, which will in no event be more than 96 hours after the incident occurs. Within 30 days after its review of an incident, the FRB will issue recommendations, if appropriate, to the Superintendent regarding any need for additional training or modifications to policies, tactics, equipment, or Department practices. Upon review and approval by the Superintendent, or his or her designee, the FRB will assign each approved recommendation to a specific CPD command staff member for implementation. CPD will promptly implement each approved recommendation.*

## Compliance Progress       (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD achieved Secondary compliance with ¶580.

During the seventh monitoring period, CPD maintained General Order G03-02-08, *Department Review of Use of Force*, which memorializes timelines and processes for implementing recommendations generated from FRB meetings. As the FRB continues to be detailed in policy, we find CPD has remained in Preliminary compliance with ¶580.

Additionally, the CPD has provided the IMT with an updated version of SOP 2020-003 (*Force Review Board*). Using prior IMT comments, the CPD revised the SOP which now provides comprehensive guidance for conducting the reviews required by this set of paragraphs. In particular, the SOP was updated to expand the list of observable actions that the FRB must review, clarify the term "involved Department member" to ensure that reviews include the actions of all on-scene officers who directly or indirectly contributed to the incident, and ensure adequate documentation of all debriefing points. As a result, the IMT provided a no-objection notice to the SOP during this monitoring period.

To achieve Full compliance with the requirements of ¶580, the IMT will still need to observe an FRB proceeding from start to finish. During this monitoring period, we were able to observe the first portion of an FRB wherein a factual overview of the incident is provided to FRB members. We found this portion to be informative

and covered the necessary facts that would allow the FRB to be able to evaluate the actions of CPD members and identify implications for policy, training, tactics, and equipment. However, the IMT is currently unable to observe the second portion of FRB proceedings which would evidence that they actually did. This is due to the City's concern that by including the IMT in such discussions, it may constitute a waiver of privileged communication for future civil proceedings (see also ¶689). As a result, the Parties submitted a motion to the Court during the seventh monitoring period to confirm that IMT's attendance would not result in any waiver of privileged communication. We will await a ruling by the Court before proceeding and will provide updates in our next monitoring report.

As it specifically relates to ¶580, we have seen some evidence of the recommendations coming from the FRB. In their most recent quarterly report, TRED includes a summary of the FRB's recommendations demonstrating that of nine (9) Level Three use of force incidents (resulting in 18 TRRs), there were a total of 17 debriefing points for involved members and 7 debriefing points for reviewing supervisors. For both involved members and reviewing supervisors, the most common debriefing point was coded "Other – Policy." While we appreciate the aggregate statistics, we will need to observe the second portion of the FRB proceedings to ensure that comprehensive recommendations are being made.

Finally, we note that the Consent Decree's language that FRBs be convened within 96 hours after an incident occurs continues to potentially limit the efficacy of FRB reviews. We have expressed this concern in prior reports, noting that 96 hours was a relatively short window to ensure that all relevant and meaningful evidence can be collected. While CPD holds in policy that FRBs can be re-convened after 96-hours should additional information become known, it is not likely to occur unless the additional evidence substantially changes the fact pattern. Although we do not make this a condition of substantial compliance, we suggest CPD implement a follow-up process (similar to the FRB process) once all evidence is received from COPA and all administrative allegations are thoroughly addressed. This will ensure that policy, training, tactics, and equipment recommendations are made using all the information gathered during the investigative process.

## Paragraph 580 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

## Data Collection, Analysis & Management: ¶581

***581.*** *Beginning within 180 days of the Effective Date, CPD will publish on at least a monthly basis aggregated and incident-level data, excluding personal identifying information (e.g., name, address, contact information), regarding reportable use of force incidents via a publicly accessible, web-based data platform.*

### Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:** Monthly ☑ **Met** ☐ **Missed**

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *In Compliance* (SIXTH REPORTING PERIOD)
**Full:** *Not Yet Assessed*

In the seventh reporting period, the City and the CPD maintained Secondary compliance with ¶581.

During the seventh reporting period, the CPD maintained their use-of-force dashboard, which updates on a monthly basis. The dashboard continues to provide aggregate data on the department's use of force as well as incident-level data via the ability to download the dashboard's underlying data. The CPD has also maintained their mechanisms for collecting community feedback and has updated the dashboard to provide a user guide for community members (though see also our comments from Independent Monitoring Report 6 regarding CPD collecting names and email addresses). The TRED continues to be the unit responsible for reviewing public comments received through the feedback form. However, the CPD did not provide us any documentation of public comments received nor do we see any such information in TRED's quarterly reports. Given that CPD has maintained their database and has identified a unit responsible for collecting and addressing public comments, we continue to find the CPD has achieved Secondary compliance with the requirements of ¶581. However, Full compliance will require CPD to provide evidence that community comments are being appropriately addressed. Full compliance will also depend on CPD's ability to demonstrate the reliability of the use of force dashboard data, discussed in greater detail in our assessment of ¶569.

## Paragraph 581 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Secondary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

## Data Collection, Analysis & Management: ¶582

*582. The publicly accessible, web-based data platform will enable visitors to: a. identify where reportable uses of force occur through interactive maps depicting incident frequencies at a citywide, district, neighborhood, and ward level; b. identify the frequency, in the aggregate and by type, of reportable uses of force at the citywide, district, neighborhood, and ward level through graphs, charts, and other data visualizations; and c. review aggregate demographic information about the race, ethnicity, age, and gender of persons subjected to reportable uses of force at the citywide, district, neighborhood, and ward level through graphs, charts, and other data visualizations.*

---

**Compliance Progress**       (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance (THIRD REPORTING PERIOD)* |
| **Secondary:** | *In Compliance (SIXTH REPORTING PERIOD)* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Secondary compliance with ¶582.

During the seventh reporting period, the CPD maintained their use-of-force dashboard, which updates on a monthly basis. The dashboard continues to provide aggregate data on the department's use of force as well incident-level data via the ability to download the dashboard's underlying data. The CPD has also maintained their mechanisms for collecting community feedback and has updated the dashboard to provide a user guide for community members (though see also our comments from *Independent Monitoring Report 6* regarding CPD collecting names and email addresses). The TRED continues to be the unit responsible for reviewing public comments received through the feedback form. However, the CPD did not provide us any documentation of public comments received nor do we see any such information in TRED's quarterly reports. Given that CPD has maintained their database and has identified a unit responsible for collecting and addressing public comments, we continue to find the CPD has achieved Secondary compliance with the requirements of ¶582. However, Full compliance will require CPD to provide evidence that community comments are being appropriately addressed. Full compliance will also depend on CPD's ability to demonstrate the reliability of the use of force dashboard data, discussed in greater detail in our assessment of ¶569.

## Paragraph 582 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Secondary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Secondary

## Data Collection, Analysis & Management: ¶583

**583.** *CPD must collect and provide information to supervisors that enables them to proactively identify at-risk behavior by officers under their command, and to provide individualized interventions and support to address the at-risk behavior. CPD must provide supervisors with an automated electronic system that provides this information and equips supervisors to perform these duties.*

### Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, CPD maintained Preliminary compliance with ¶583.

The CPD continues to have Employee Resource E05-02, *Performance Recognition System*, and Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*,[1] which we continue to find are sufficient to evidence Preliminary compliance with this paragraph.

During the seventh monitoring period, CPD held a supervisor training for the OSS pilot, which was delivered to a few supervisors in the 6th District. Before the training was delivered, we provided a no-objection notice for the relevant training material finding that the training was "thorough and will likely positively impact

---

[1] Several paragraphs within the Consent Decree relate to the Officer Support System (OSS) which is designed to assist supervisors in supporting CPD sworn members in a non-disciplinary manner. The OSS helps supervisors identify members who may benefit from additional support by collecting and maintaining data on each member's reported uses of force, arrests, injuries, vehicle pursuits, misconduct allegations, civil or administrative claims, disciplinary history, body-worn and in-car camera policy violations, awards and commendations, sick leave usage, missed court appearances, training history, and current rank and assignment. It uses advanced models to identify Department members who may be at risk of experiencing an excessive force complaint, suspension, an off-duty complaint, or a domestic abuse/substance abuse complaint. The OSS application provides early intervention and relies on five key elements that include regular reviews, continued communication between supervisors and sworn members, and connecting members with available resources.

Additionally, other paragraphs in this section relate to the Performance Recognition System, a data warehouse where supervisors are able to cull through similar data as those that feed the OSS. Supervisors are required to regularly check officer metrics so as to proactively identify officers who demonstrate potentially problematic behavior. The interventions available through PRS reviews mirror the interventions available in the OSS.

the implementation of the OSS." However, our no-objection notice also stated that "**CPD should not provide this training until after the CPD finalizes the *OSS Evaluation Plan***" (bold in original). In December of 2022, the CPD provided this training without finalizing the *OSS Evaluation Plan*.

During this monitoring period, we were also provided with officer training designed to give officers information about the OSS so as to create awareness of the system and the system's processes. Our review of the training was overall positive though we felt additional revisions were necessary, including the need for a strong evaluation tool for the training (see also ¶286). However, we were provided the materials in early-November and were informed that CPD planned on delivering the training in mid-November. As we were not allotted the full time to provide responses, the training was provided to officers without the benefit of our review. We recommend our comments be incorporated into future pilot stages.

Overall, the roll-out of the OSS has appeared to take a large step backwards and the underlying reasons are still not being addressed by CPD. In conducting their first pilot test in one district (5th District), CPD did not have an evaluation plan, did not collect all data needed for the OSS (see ¶587), and did not adequately and consistently train officers and supervisors on the system. In the end, the pilot test in the 5th District did not result in any significant findings which would help guide the expansion of the program. Now, in their second pilot test of one district (6th District), the CPD has not provided a full evaluation plan, has not provided evidence that all data is collected (see ¶587), and have trained officers and supervisors without using the full expertise of the monitoring team (including other sections of the Consent Decree related to Training, Officer Wellness, and Supervision).

In short, we see similarities between the past approach and the current approach. As CPD has essentially re-started the OSS pilot, now in the 6th District, we will re-start the monitoring approach that we took when they first began their pilot in the 5th District. As a result of CPD having an OSS policy as well as a PRS-policy for non-pilot sites, we find they are in Preliminary compliance with the requirements of this paragraph (though we suggest they consider revising D20-04 as it currently includes the originally proposed expansion Districts as well as District 5). We do not find Secondary compliance with this paragraph as all training provided (and the manner it was provided) did not adequately incorporate the feedback of the IMT or OAG. Once available data has been collected in accordance with the current (although incomplete) evaluation plan, the CPD should analyze the data, make revisions to policy and training as necessary, and then expand to additional pilot sites (incorporating, where appropriate, the guidance of the University of Chicago

Crime Labs; see ¶¶599–600). Before actually beginning in those pilot sites, we recommend the CPD provide the IMT with *final* program documents, including an updated and complete evaluation plan so that a rigorous evaluation can be completed. We will base Secondary compliance on these final program documents. Once the expanded pilot evaluation has been completed, the CPD should repeat this process before rolling the OSS out department-wide. This will then set the basis for evaluating Full compliance with the suite of OSS paragraphs.

### Paragraph 583 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Data Collection, Analysis & Management: ¶584

*584. The automated electronic system must be: a. data-driven and developed with statistical methods and analytic techniques; b. customizable to CPD; c. adaptive as new information becomes available; d. capable of being audited and evaluated to improve accuracy; and e. able to generate sufficient data that enables assessment of the effects, if any, of support provided and interventions undertaken.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶584.

Housed with what will ultimately become the Talent Management System is the Officer Support System (OSS), an automated system which uses underlying statistical models to identify officers and alerts supervisors that a review is required. During the seventh monitoring period, the CPD maintained Department Notice D20-04 which contains the requirements of ¶584.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

## Paragraph 584 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Data Collection, Analysis & Management: ¶585

*585. The automated electronic system must perform these primary functions: a. using statistical methods to identify officers who are at elevated risk of engaging in conduct leading to at-risk behavior; b. identifying and facilitating support and interventions that prevent or reduce the occurrence of the identified at-risk behavior; c. providing supervisors with a dashboard of relevant information about members under their direct command to facilitate appropriate supervisory intervention and support; and d. performing peer group analysis with comparative data to account for differences in job assignments, and to identify group- and unit-level patterns of activity.*

## Compliance Progress         (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶585.

In reviewing the Officer Support System (OSS), we continue to find that it is capable of accomplishing the goals of ¶585. For instance, the OSS uses four specific algorithmic scoring models, as well as an overarching model to identify officers. Additionally, the CPD has provided a list of supports and interventions that are available to officers who have been identified as potentially problematic. Furthermore, the OSS provides supervisors with a dashboard of relevant information in a centralized location, allowing them to implement tailored interventions. Finally, the four scoring models used by the OSS control for several factors, including assignment, which negates the need for peer-group analysis since peer group factors are already statistically zeroed out. Each of these elements is listed in the updated version of D20-04, *Officer Support System (OSS) – Pilot Program*. As a result, the CPD has maintained Preliminary compliance.

### Steps to achieve primary functions of OSS



However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

Furthermore, we continue to note that none of the training we have observed or reviewed has been specifically related to command staff. Given ¶585's requirement to use the OSS to "identify group- and unit-level patterns of activity," we maintain that tailored training for command staff will be necessary and should incorporate the findings of Jain, Sinclair, & Papachristos (2022) as discussed in prior reports.

## Paragraph 585 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

## Data Collection, Analysis & Management: ¶586

*586. A primary goal of the automated electronic system will be to facilitate early identification of officers at elevated risk of being involved in certain types of events so that the officers can receive tailored interventions intended to reduce such risk. The types of events sought to be avoided could include, depending upon the feasibility of identifying these events using statistical methods and analytic techniques, examples such as any instance in which a CPD member is: directly involved in an excessive force incident; subject to a sustained finding in a misconduct investigation; a defendant in a civil lawsuit resulting in an adverse judgment or settlement; suspended more than five days; the subject of a recommendation of employment termination by COPA, BIA, or the Superintendent; a direct participant in an officer-involved shooting or death determined to be unjustified or out of policy by COPA, BIA, the Superintendent, the Police Board, or a court of law; convicted of a crime; or subject to an increased risk of suicide or alcohol and/or substance abuse.*

### Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶586.

During the seventh monitoring period, the CPD maintained Department Notice D20-04, *Officer Support System (OSS) – Pilot Program* which identifies the four specific algorithmic scoring models to identify officers potentially in need of an intervention. These four models seek to identify officers who will experience:

(1) a complaint involving a domestic or substance use event,

(2) a complaint involving an off-duty event with the exception of domestic or substance use event,

(3) a sustained excessive force complaint, and

(4) a suspension.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

### Paragraph 586 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Data Collection, Analysis & Management: ¶587

*587. The automated electronic system must include a computerized relational database that will be used to collect, maintain, integrate, analyze, visualize, and retrieve data for each CPD officer. The information collected and maintained must include but is not limited to: a. all reportable uses of force; b. all arrests by CPD personnel; c. all injuries to and deaths of persons in CPD custody; d. all injuries and deaths resulting from conduct by CPD personnel; e. all vehicle pursuits and traffic collisions involving CPD equipment or personnel; f. all misconduct complaints and investigations involving CPD officers, including the disposition of each allegation; g. all civil or administrative claims initiated against the City or CPD, or CPD officers for Jobs-related conduct; h. all criminal proceedings initiated against a CPD officer, which CPD will require officers to report; i. all instances in which CPD is notified that a court has made a negative credibility determination regarding a CPD officer; j. instances in which CPD learns through the Cook County State's Attorney's Office that an affirmative finding was made during the course of a criminal proceeding that a CPD member was untruthful, including any findings made at suppression hearings; k. all instances in which CPD learns through the Cook County State's Attorney Office, the United States Attorney's Office for the Northern District of Illinois, or other prosecutorial authority that prosecution was declined based in whole or in part on concerns about a CPD officer's credibility; l. judicial proceedings where an officer is the subject of a restraining or protective order, which CPD will require officers to report; m. disciplinary history for all CPD members; n. all non-disciplinary corrective action retained electronically; o. all violations of CPD's body-worn and in-car camera policies; p. all awards and commendations received by CPD officers; q. officer sick leave usage; r. missed court appearances; s. training history; and t. rank, assignment, and transfer history.*

---

**Compliance Progress**   (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**   *In Compliance (FIFTH REPORTING PERIOD)*
**Secondary:**   *Not Yet Assessed*
**Full:**   *Not Yet Assessed*

---

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶587.

During the seventh monitoring period, the CPD maintained Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, and Employee Resource E05-02, *Performance Recognition System*, which identify the system-data required by ¶587. As a result, the CPD maintained Preliminary compliance.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

Furthermore, we have not yet been provided with evidence that the data identified in ¶587 *actually is* being collected. As noted in *Independent Monitoring Report 6* report (see our assessment of this paragraph as well as ¶606), an independent assessment found that CPD did not collect all data required by ¶587. This must also be resolved before CPD can achieve Full compliance.

### Paragraph 587 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

# Data Collection, Analysis & Management: ¶588

*588. CPD will collect and maintain all information reasonably necessary to identify patterns of behavior that are indicative of a future instance of at-risk behavior. The automated electronic system must employ specific criteria to identify officers who will be subject to an intervention or targeted support. The criteria may be based on a single indicator, such as the number of misconduct complaints against an officer, a combination of multiple indicators, or an algorithmic scoring model. CPD will adjust the criteria as necessary based on data and experience to ensure interventions and support are optimally targeted.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**     *In Compliance (FIFTH REPORTING PERIOD)*
**Secondary:**       *Not Yet Assessed*
**Full:**            *Not Yet Assessed*

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶588.

During the seventh monitoring period, the CPD maintained Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, and Employee Resource E05-02, *Performance Recognition System*, which memorialize the early intervention program contemplated by ¶588. The policy specifies that the OSS uses CPD data as part of a predictive algorithm involving four separate scoring models to identify officers who are at a heightened risk for adverse events.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

## Paragraph 588 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Data Collection, Analysis & Management: ¶589

**589.** *CPD will ensure that all required information is entered into the automated electronic system in a timely, accurate, and complete manner. All information captured within the automated electronic system will be accessible in an organized manner that facilitates identification of at-risk officer conduct.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶589.

During the seventh monitoring period, the CPD maintained Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, and Employee Resource E05-02, *Performance Recognition System*, which include provisions related to supervisors accessing the respective data system to review members and identify at-risk conduct. As such, we found them sufficient to warrant Preliminary compliance.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

## Paragraph 589 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Data Collection, Analysis & Management: ¶590

*590. CPD will require unit commanding officers to review the automated electronic system data regarding all officers who are transferred to their command within 14 days of the transfer. CPD will require supervisors to conduct monthly reviews of the automated electronic system data regarding officers under their direct command. The purpose of these reviews will be for supervisors to identify and address patterns of behavior by officers under their direct command that are indicative of a future instance of at-risk behavior. CPD will also require supervisors to review the automated electronic system data together with officers under their direct command during the annual performance evaluation process.*

---

**Compliance Progress**　　　　(Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**　　Monthly　　　　　☑ **Met**　　☐ **Missed**

**Preliminary:**　　*In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**　　*Not Yet Assessed*
**Full:**　　*Not Yet Assessed*

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶590.

During the seventh monitoring period, the CPD maintained Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, and Employee Resource E05-02, *Performance Recognition System* which contain the requirements of ¶590. As such, we continue to find them in Preliminary compliance with this paragraph.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

## Paragraph 590 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Data Collection, Analysis & Management: ¶591

***591.*** *The automated electronic system will employ push notifications and similar mechanisms to alert supervisors when patterns of conduct indicative of a future instance of at risk behavior are identified. CPD will provide appropriate interventions and support in a timely manner.*

## Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶591.

During the seventh monitoring period, the CPD maintained Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, which includes the elements of ¶591. For instance, the CPD uses OSS push notifications and CPD email to notify supervisors that an alert has been generated. Additionally, D20-04 includes specific timelines for completing tasks as part of the process, facilitating the timely provision of interventions and support. As a result, the CPD maintained Preliminary compliance.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

## Paragraph 591 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Data Collection, Analysis & Management: ¶592

*592. CPD will ensure that any CPD member required to receive counseling after being identified through the automated electronic system has the opportunity to participate in an initial counseling session within 14 days of the member being notified of the requirement.*

## Compliance Progress                    (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶592.

During the seventh monitoring period, CPD maintained Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, which contains ¶592's requirements that officers receive an initial counseling session within 14 days of the agreed upon intervention. As a result, the CPD continues to be in Preliminary compliance with this paragraph.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

Furthermore, as noted in our prior reports, the CPD does not currently possess the data processes to reliably track and document whether officers received an initial counseling session within 14 days, as required by ¶592. We discuss this issue in more depth in our assessments of ¶¶389 and 391. In order to achieve Full compliance, the CPD will need to resolve the wellness unit's data shortcomings so as to demonstrate adherence with the 14-day timeline found in this paragraph.

## Paragraph 592 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Data Collection, Analysis & Management: ¶593

***593.*** *CPD will ensure that command staff regularly use the automated electronic system data to effectively manage CPD officers and supervisors across all ranks, watches, beats, and districts.*

## Compliance Progress                (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**          *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**          *Not Yet Assessed*
**Full:**          *Not Yet Assessed*

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶593.

During the seventh monitoring period, CPD maintained Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, which includes regular command staff review of the OSS as a key element of the system. As a result, the CPD has maintained Preliminary compliance.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to them find in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

Furthermore, we continue to note that none of the training we have observed or reviewed has been specifically related to command staff. Given ¶593's requirement to use the OSS to "effectively manage CPD officers and supervisors across *all ranks, watches, beats, and districts*" (emphasis added), we maintain that tailored training for command staff will be necessary and should incorporate the findings of Jain, Sinclair, & Papachristos (2022) as discussed in prior reports.

## Paragraph 593 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Data Collection, Analysis & Management: ¶594

***594.*** *CPD will provide training to all officers, supervisors, and command staff regarding the automated electronic system to ensure proper understanding and use of the system.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**  *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**  *Not Yet Assessed*
**Full:**  *Not Yet Assessed*

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶594.

During the seventh monitoring period, the CPD maintained Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, which contains the training requirements found in ¶594. The policy identifies training requirements for the pilot districts and accounts for situations where members transfer into a pilot district. The policy also discusses training requirements for officers, supervisors, and command staff. As a result, the CPD has maintained Preliminary compliance.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

## Paragraph 594 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

## Data Collection, Analysis & Management: ¶595

*595. CPD will train all supervisors to use the automated electronic system as designed, to interpret the outputs, to perform appropriate interventions and support, to address underlying stressors to promote officer well-being, and to improve the performance of officers under their direct command.*

### Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶595.

During the seventh monitoring period, the CPD maintained Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, which contains the requirement for all supervisors to be trained on the OSS in accordance with ¶595. As a result, the CPD has maintained Preliminary compliance.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

## Paragraph 595 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

## Data Collection, Analysis & Management: ¶596

*596. CPD will conduct annual audits of the automated electronic system. The audits will: a. assess the overall effectiveness of the automated electronic system and the support and interventions prompted by the system; b. assess whether and to what extent supervisors are completing monthly reviews of the automated electronic system information regarding officers under their direct command; c. assess whether and to what extent CPD is providing interventions and support in a timely manner; d. assess whether the interventions and support provided are appropriate and effective; and e. identify any recommended changes to improve the effectiveness of the automated electronic system.*

### Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**     Annually          ☐ **Met**     ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance (FIFTH REPORTING PERIOD)* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶596.

During the seventh monitoring period, the CPD maintained D20-04, *Officer Support System (OSS) – Pilot Program*, and E05-02, *Performance Recognition System*, both of which contain the audit requirements of ¶596. As a result, the CPD maintains Preliminary compliance.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

## Paragraph 596 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

## Data Collection, Analysis & Management: ¶597

*597. CPD will provide timely and appropriate interventions and support to officers identified through the automated electronic system. Interventions and support will be designed to assist officers in avoiding and correcting at-risk behavior. All interventions and support will be documented in the automated electronic system. CPD will review, evaluate, and document in the automated electronic system the progress and effectiveness of the intervention or support strategy for each officer.*

### Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶597.

During this monitoring period, the CPD maintained Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, which includes the process for determining, documenting, and tracking interventions stemming from the OSS system. As a result, we find the CPD to be in Preliminary compliance with the requirements of this paragraph.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

Furthermore, as discussed in our assessment of ¶592, the CPD does not currently possess the data processes to reliably track and document wellness-based interventions (e.g., counseling). In order to achieve Full compliance, the CPD will need to resolve the wellness unit's data shortcomings in order to allow the department to review the progress of the intervention.

## Paragraph 597 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

## Data Collection, Analysis & Management: ¶598

**598.** *In seeking to provide improved support and wellness to its officers, CPD will seek to identify which supports and interventions are most helpful to officers and develop support and training based on CPD feedback and best practices. The types of support services offered to CPD officers may include, but not be limited to: counseling; training; coaching and mentoring; and additional supervision or monitoring.*

### Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶598.

In the seventh monitoring period, the CPD provided us with updated versions of D20-04, *Officer Support System (OSS) – Pilot Program*, which contains the requirements of ¶598. As a result, the CPD continues to be in Preliminary compliance with this paragraph.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

## Paragraph 598 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

# Data Collection, Analysis & Management: ¶¶599 & 600[2]

> **599.** *CPD currently maintains a PRS, which is modeled on first-generation attempts by other large departments to develop early intervention systems to identify and address at-risk conduct by officers. CPD has partnered with the University of Chicago's Crime Lab ("Crime Lab") to develop a next-generation EIS that will improve on early intervention systems implemented in other jurisdictions.*

> **600.** *CPD will maintain its partnership with the Crime Lab or another similarly qualified service provider until such time as an EIS consistent with the requirements of this Agreement has been implemented department-wide, and CPD has developed sufficient technical competency to maintain and improve the EIS as necessary.*

---

**Compliance Progress**     (Reporting Period: July 1, 2022, through December 31, 2022)

| | ¶599 | ¶600 |
|---|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* | *Not in Compliance* |
| **Full:** | *Not in Compliance* | *Not in Compliance* |

In the seventh monitoring period, the CPD maintained Preliminary compliance with ¶¶599 & 600.

In the sixth monitoring period, we reported that CPD had provided us with a Non-Disclosure Agreement (NDA) which identified the range and scope of data that is available to Crime Labs as part of the partnership. We cited this as evidence that an ongoing relationship exists and, as the NDA remains in effect, we continue to find Preliminary compliance.

We further noted in our prior report that subsequent levels of compliance would depend on, in large part, the point at which CPD has "developed sufficient technical competency to maintain and improve the [OSS] as necessary." However, as discussed in prior paragraphs, the implementation of OSS has suffered from critical setbacks and CPD has not yet demonstrated the competency to maintain or improve the OSS independently. Furthermore, separate from the NDA, we have not been provided any evidence that CPD is still in active partnership with Crime

---

[2]     We monitor ¶¶599 and 600 together because their requirements are interconnected.

Labs to *develop* the OSS as required by these paragraphs. As the development of the system is far from over given the return to a single-district pilot, we would expect the City and CPD to provide records of ongoing collaboration with Crime Labs moving forward.

In our prior report, we also stated our expectation that CPD would post Notice of Job Opportunities (NOJOs) and develop staff who would be able to maintain and independently oversee the OSS. This has not yet occurred, leaving us concerned with the sufficiency of resources being provided for the OSS Unit given that the pilot failure in the 5th District was in part due to issues of resources (*see also* ¶¶604–05). Without qualified personnel to fill the necessary roles, it's unclear how CPD plans to gain the competency necessary to take over the OSS completely. We will continue to assess the rollout of the OSS moving forward, though as it relates to these paragraphs, we recommend the CPD provide us with evidence of ongoing partnership with Crime Labs until such a point where CPD demonstrates sufficient competency.

### Paragraph 599 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Preliminary | | |

## Paragraph 600 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Not Applicable

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Not Applicable

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Data Collection, Analysis & Management: ¶601

**601.** *CPD will continue to solicit input and feedback from representatives of its collective bargaining units during the development and implementation of the EIS.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶601.

During this monitoring period, we received minutes from a Collective Bargaining Unit (CBU) Engagement Meeting regarding Supervisor Pilots. The various pilots include the OSS as well as concurrent pilots related to unity of command/span of control, the Performance Evaluation System, and a Watch application. As CPD has maintained ongoing collaboration with CBU representatives, we continue to find they have achieved Preliminary compliance.

However, as noted in our prior reports, subsequent levels of compliance with ¶601 will require the CPD to re-engage with collective bargaining units after sufficient pilot data has been collected to inform the department-wide rollout, consistent with the recommendations throughout this report regarding the OSS. At such a point, we would expect CPD to discuss with the collective bargaining units the findings, issues, and proposed resolutions resulting from their evaluation. The informed input from collective bargaining units should then be incorporated into the final OSS model, policy, and training before expanding the system department-wide.

## Paragraph 601 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

# Data Collection, Analysis & Management: ¶602

**602.** *Prior to beginning the phased implementation of the EIS, CPD will develop and implement new or revised policies and procedures for using the EIS and, if applicable, the updated PRS and information obtained from them. The policies and procedures will address data storage, data retrieval, data analysis, reporting, pattern identification, supervisory use, intervention and support options and procedures, documentation and audits, access to the system, and confidentiality of personally identifiable information.*

## Compliance Progress    (Reporting Period: July 1, 2022, through December 31, 2022)

**Preliminary:**  *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**  *Not Yet Assessed*
**Full:**  *Not Yet Assessed*

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶602.

In the seventh monitoring period, the CPD maintained Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, which contains each of the requirements listed in ¶602. Furthermore, in accordance with ¶602, the CPD maintained Employee Resource E05-02, *Performance Recognition System*, which contains the requirements of ¶602 as well as requirements found in other paragraphs within this Section. As a result of having both of these policies, the CPD continues to be in Preliminary compliance with this paragraph.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

## Paragraph 602 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

## Data Collection, Analysis & Management: ¶603

***603.*** *After the completion of the development of the EIS, CPD will implement the EIS through a phased rollout that incorporates pilot testing to identify and address any technical or design issues. CPD will begin phased implementation of the EIS within 18 months of the Effective Date, and will complete full implementation of the EIS by no later than 24 months after the Effective Date.*

### Compliance Progress (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD maintained Preliminary compliance with ¶603.

During the seventh monitoring period, the CPD maintained Department Notice D20-04, *Officer Support System (OSS) – Pilot Program*, which continues to evidence Preliminary compliance with this paragraph.

However, as thoroughly discussed in our assessment of ¶583, the roll-out of the Officer Support System has taken steps backwards. As a result of CPD having an OSS policy and PRS-policy (for non-pilot sites), we continue to find them in Preliminary compliance. Subsequent levels of compliance will necessarily require CPD to gather initial system-data in the new pilot district, use it to revise policies and training, and expand the pilot. After conducting similar steps during the expanded pilot, we will then need to see the OSS implemented agency-wide, at which point we will assess Full compliance.

## Paragraph 603 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

Preliminary

## Data Collection, Analysis & Management: ¶604

**604.** *Prior to full implementation of the EIS, CPD will continue to use the PRS as well as other existing tools and resources to identify patterns of conduct by officers that warrant support and intervention. Following the development and implementation of the EIS, the functions required of the automated electronic system described above may be performed by a combination of the EIS and the PRS as long as all required functions are performed and supervisors are using the system(s) as required by CPD policy. To the extent CPD continues utilizing PRS to perform any of the functions required by this Agreement, CPD will update the PRS to enhance the system's effectiveness, usability, and accuracy by no later than January 1, 2020.*

---

Compliance Progress            (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* (NEW: LOST COMPLIANCE) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the CPD lost Preliminary compliance with ¶604.

In the seventh monitoring period, the CPD had not yet fully implemented the Officer Support System and therefore the allowances of ¶604 were in effect. Consequently, the CPD maintained Employee Resource E05-02, *Performance Recognition System*, which includes sections related to identifying patterns of conduct by officers that warrant support and intervention.

However, during this monitoring period, members of the IMT conducted a site visit to the 5th District, which was the original pilot district for OSS. During that site visit, we heard from the Commander that OSS was not currently operating in that district anymore. The reason for this is that while training had been provided at one time in the 5th District, none of those supervisors remained and none of the new supervisors had received the training due to insufficient resources for the OSS (see also ¶605). We were also informed by the 5th District that, although the OSS was not operating within the District, supervisors were also not conducting any responsibilities under E05-02 (which applies to all non-pilot sites). Therefore, for a period of time, the CPD's 5th District has not been operating in accordance with any policy related to regular evaluation of officer performance metrics.

As CPD has a district with no enforced policy regarding regular supervisory review of officers, we no longer find them to be in any level of compliance with this

paragraph. In order to return to Preliminary compliance with this paragraph, CPD should revise D20-04 to remove District 5 from the list of pilot sites, thereby ensuring they are accountable to E05-02. We also recommend CPD initiate formal accountability processes for command staff who allowed an entire district to operate without any policy related to the regular evaluation of officers. This represents a disregard for CPD policy, and the Consent Decree reforms and those responsible should be held to account.

### Paragraph 604 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

# Data Collection, Analysis & Management: ¶605

**605.** *The City will ensure CPD has adequate funding to develop, implement, and maintain the EIS and, if necessary, the updated PRS, including ongoing hardware and support requirements and officer support services.*

**Compliance Progress**     (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

During the seventh monitoring period, the CPD did not reach any level of compliance with the requirements of ¶605.

As discussed in prior paragraphs, the OSS program is currently being re-launched. Thus, we have not yet been provided any evidence that demonstrates the City has ensured "adequate funding to develop, implement, and maintain the [OSS]." Quite the contrary, available evidence is that CPD does not have adequate funding. For instance, the pilot test of OSS in the 5th District failed in part due to insufficient funding to train supervisors and evaluate alerts. Furthermore, we have no evidence that CPD has issued the necessary NOJOs to "implement and maintain the EIS" independently (see also ¶600).

The IMT is still awaiting a revised evaluation plan for the pilot in the 6th District and we will look to see whether measures of OSS funding sufficiency are included in it. As stated in our last report, the measures should span the entirety of the program, particularly looking at funding for officer support services. The CPD and City will also need to ensure a process is developed for ongoing assessment of funding adequacy and, where the assessment identifies additional funding is necessary, work together to provide the appropriate resources.

## Paragraph 605 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

SEVENTH REPORTING PERIOD

JULY 1, 2022 – DECEMBER 31, 2022

COMPLIANCE PROGRESS:

None

## Data Collection, Analysis & Management: ¶606

*606. Within 365 days of the Effective Date, CPD will conduct an assessment of CPD's current information collection mechanisms and data management technology to identify: a. what data CPD currently collects and what additional data is required to be collected to comply with this Agreement; b. the manner of collection (e.g., electronic or paper); c. the frequency with which each type of data is updated; d. the quality control mechanisms in place, or the need for such mechanisms, to ensure the accuracy of data collected; e. what software applications or data systems CPD currently has and the extent to which they are used or accessed by CPD members; f. redundancies or inefficiencies among the applications and systems currently in use; and g. the extent to which the applications and systems currently in use interact with one another effectively.*

### Compliance Progress       (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

In the seventh reporting period, the City and CPD achieved Secondary compliance with ¶606.

In the seventh reporting period, the CPD continued their efforts to fully map and explore their current data collection systems and processes. Near the end of the monitoring period, the CPD and City provided us with three documents related to the core elements of the Roadmap to Operational Compliance, including Community Engagement, Operational Excellence, and Investment in CPD Members.[3] Each of the documents focused on a specific core element (as well as foundational programs underlying each element) and clearly identified:

• The data metric being collected
• The unit responsible for collecting the data
• The type of metric (either an activity metric or an outcome metric)
• Relevant Consent Decree paragraphs
• The specific data collection mechanism (if one exists)

---

[3]  *See Roadmap to Operational Compliance*, CHICAGO POLICE DEPARTMENT (March 2022), https://home.chicagopolice.org/wp-content/uploads/Roadmap-to-Operational-Compliance-Report-online.pdf.

- The manner of data collection (either paper-based or digital)
- The quality control mechanisms in place
- Where the data is stored
- How frequently the data is updated
- Data reporting mechanisms
- Whether the data is currently used for analysis by CPD/City (and where/how the analysis is used)
- The CPD cultural objective the metric is aligned with, as well as the specific corresponding program and member expectation found in the Roadmap to Operational Compliance

Overall, we are impressed with the effort that CPD and the City have put into creating these documents. They clearly identify the data CPD needs to inform and evaluate the successful implementation of their Roadmap to Operational Compliance. Given the inconsistent history with addressing this paragraph that we have discussed in our prior reports, the thorough assessment conducted during this monitoring period demonstrates a commitment to using CPD data efficiently and effectively. As this represents a further significant step in achieving the goals of ¶606, we find the City and CPD have achieved Secondary compliance with this paragraph.

To achieve Full compliance with ¶606, the CPD and City will need to ensure that each specific subsection of the paragraph is thoroughly addressed. While the documents provided certainly address the majority of ¶606 requirements, other elements remain. For instance, we maintain our suggestion that CPD and the City reach out to each Associate Monitor to identify what "additional data is required to be collected to comply with this Agreement" apart from the data identified by CPD. Although we believe that CPD has certainly addressed a substantial majority, the Independent Monitoring Team is in the best position to discuss the full range of "additional data" needed to comply with Consent Decree.

Furthermore, there are some subsections of ¶606 that could not be addressed before completing the type of analysis conducted by CPD. For instance, now that CPD has identified necessary metrics and data collection efforts, they are able to better assess subsection (f) ("redundancies or inefficiencies among the applications and systems currently in use") and subsection (g) ("the extent to which the applications and systems currently in use interact with one another effectively"). These subsections are not addressed in the documents we received though they are summative assessments and are best addressed in a final assessment document that will inform the data systems plan (see ¶607). Upon incorporating the input of the entire IMT and developing a final assessment report

to inform the data systems plan, the CPD will achieve Full compliance with this paragraph.

### Paragraph 606 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Under Assessment | Preliminary |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| Secondary | | |

# Data Collection, Analysis & Management: ¶607

***607.*** *Within 90 days of completion of the assessment described in the preceding paragraph, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs identified to enhance CPD's information collection mechanisms and data management technology ("Data Systems Plan"). CPD will implement the Data Systems Plan in accordance with the specified timeline for implementation.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the seventh monitoring period, the City and the CPD did not meet any level of compliance with ¶607.

As discussed above, the CPD has taken significant steps towards the assessment related to ¶606 and, ultimately, ¶607. However, as the ¶606 assessment has not yet been fully completed, the CPD cannot yet reach any level of compliance with ¶607.

To achieve Preliminary compliance with ¶607, the City and the CPD will first need to create a data systems plan which reflects the assessment done in accordance with ¶606.

### Paragraph 607 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | | |
| JULY 1, 2022 – DECEMBER 31, 2022 | | |
| COMPLIANCE PROGRESS: | | |
| None | | |

## Data Collection, Analysis & Management: ¶608

*608. CPD will continue to maintain an Information Systems Development Group ("ISDG"). The ISDG will continue to be chaired by the Chief of the Bureau of Technical Services or other high-ranking member of CPD's command staff. The ISDG will also include, in some capacity, personnel from various units of the Department that are responsible for overseeing patrol field operations; conducting criminal investigation and processing juvenile offenders; initiating and conducting investigations of organized crime; overseeing the administrative aspects of CPD; managing data, technology, and information systems; coordinating and exercising supervision over disciplinary matters; administering training; providing legal advice; developing and publishing department policies and procedures; and overseeing and coordinating CPD's budget and fiscal responsibilities. The ISDG will be responsible for: a. ensuring implementation of the Data Systems Plan; b. ensuring CPD's information collection mechanisms and data management technologies are in the best long-term interests of the Department for improving operations and management consistent with the terms of this Agreement; and c. recommending strategies to promote the development, sharing, and reporting of relevant information to the Superintendent, the public, the FRB, COPA, BIA, and OIG.*

| Compliance Progress | (Reporting Period: July 1, 2022, through December 31, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

During the seventh monitoring period, the CPD maintained Secondary compliance with the requirements of ¶608.

In the seventh monitoring period, the CPD continued to maintain the Information Systems Development Group (ISDG), which is chaired by the Deputy Director of Information Technology. The CPD has sent us ISDG meeting notes and agendas, as well as a resource guide which outlines the meeting process. The minutes continue to include relevant personnel, as required in ¶608. Additionally, the resource guide outlines the meeting process, including determining priorities for meeting topics,

procedures for opening and closing meetings, appropriate document templates for reviews, distribution of relevant materials, and documenting meeting notes.

We have continue to see each of the above elements in practice. For instance, in September and November of 2022, the IMT observed ISDG meetings that discussed updates to CPD's timesheet systems, the Secure Radio pilot, the new computer aided dispatch (CAD) system, the Desktop Experience (DEX) system, and the impending switch to a new records management system (RMS).

Each of these systems provides an opportunity for improved CPD operations and we have seen commitment to implementing them. For instance, during our site visit, we were provided an in-person technical demonstration of the DEX system, observing how CPD phones can be loaded into the in-car computer, allowing officers to prepare reports while in the vehicle while also having the portability of the phone when needed in the field. Furthermore, we have reviewed the RFP for a comprehensive RMS. In speaking with City representatives about the RMS, it appears that the new system will ultimately benefit the CPD and City by allowing them to standardize data collection and data extraction across the various platforms currently being used. The RMS also provides the hope that some of CPD's paper-based data collection processes can be modernized and automate portions of officers' reports to reduce redundancy. However, the City remains in the process of evaluating external proposals to develop the RMS and even upon selection of a capable vendor, the system will still need to be developed and implemented. Therefore, the ISDG should take this into consideration when "ensuring the implementation of the Data Systems Plan" (subsection (a) of ¶608) as the findings of the ¶606 assessment (which informs this paragraph) may be moderated by the introduction of the new RMS. We will continue to provide updates in future monitoring reports.

The City and CPD maintained Secondary compliance with this paragraph in the seventh reporting period. Full compliance will require the CPD to continue to demonstrate their ability to appropriately select and prioritize agenda topics, provide sound guidance on data system integrity, and assist in the implementation of recommendations born out of the finalized ¶606 review.

## Paragraph 608 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Secondary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Secondary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Data Collection, Analysis & Management: ¶609

**609.** *On an annual basis, to improve the accuracy, reliability, and efficiency of its data collection, CPD will review and, as necessary, revise departmental forms relating to: use of force, arrests, interactions with individuals in crisis, and the disciplinary process.*

## Compliance Progress          (Reporting Period: July 1, 2022, through December 31, 2022)

**Recurring Schedule:**   Annually          ☐ **Met**   ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the seventh reporting period, the City and the CPD maintained Secondary compliance with ¶609.

During the seventh monitoring period, the CPD maintained Special Order S09-03-02, *Forms Management System*, which clearly states that the CPD will review departmental forms on an annual basis consistent with the requirements of ¶609. Embedded within S09-03-02 is the "Transmittal/Response Sheet-Forms Management" form which serves to standardize the process for ensuring reviews of all CPD directives and data collection forms. The "Transmittal/Response Sheet-Forms Management" form, coupled with S09-03-02, continues to evidence Secondary compliance with the requirements of this paragraph.

However, the IMT has still not been provided with any completed "Transmittal/Response Sheet-Forms Management" forms, either during this monitoring or in the prior monitoring period. Subsequent levels of compliance will depend on the IMT being able to review these forms and we therefore recommend the CPD provide these to us as a regular part of the monitoring period productions in future monitoring periods.

## Paragraph 609 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Secondary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Secondary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Secondary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

# Appendix 11

# Implementation, Enforcement & Monitoring Compliance Statuses by Paragraph

| | | | |
|---|---|---|---|
| ¶626 | ¶637 | ¶680 | ¶704 |
| ¶627 | ¶638 | ¶682 | ¶705 |
| ¶629 | ¶639 | ¶683 | ¶706 |
| ¶630 | ¶640 | ¶684 | ¶711 |
| ¶631 | ¶641 | ¶685 | ¶714 |
| ¶632 | ¶642 | ¶686 | ¶720 |
| ¶633 | ¶643 | ¶687 | ¶721 |
| ¶634 | ¶677 | ¶699 | |
| ¶635 | ¶678 | ¶700 | |
| ¶636 | ¶679 | ¶701 | |

## Consent Decree ¶¶626-27 and 629-41

**626.** *CPD will develop, revise, implement, and maintain policies and procedures as required by this Agreement consistent with the timelines identified herein. CPD will ensure that its policies and procedures are plainly written, logically organized, and use clearly defined terms.*

\*\*\*

**627.** *The City and CPD will submit all policies and procedures required to be implemented or maintained by this Agreement to the Monitor and OAG for review, comment, and, subsequently, if necessary, objection. When the City and CPD have developed the draft of a new or revised policy or procedure required by this Agreement, they will consult in a collaborative manner at the earliest feasible time with the Monitor and OAG, with the goal of developing consensus on the substance of the policy or procedure, and make any necessary and appropriate adjustments based on those consultations. The City and CPD will submit the final draft of any new or revised policy or procedure subject to review and comment by the Monitor and OAG to the Monitor and OAG at least 30 days before the policy or procedure is scheduled to take effect, unless the Parties and the Monitor agree that a shorter period of time is appropriate under the circumstances. The Parties and the Monitor will work collaboratively on developing and revising policies and procedures related to this Agreement.*

\*\*\*

**629.** *To the extent the Parties and the Monitor have unresolved disagreements regarding a particular policy or procedure after attempting to resolve them for at least 30 days, the Monitor or OAG may provide a written notice of outstanding objections to the City and CPD ("objection notice"). The Monitor or OAG may object only if a policy or procedure does not incorporate the requirements of this Agreement or is inconsistent with the goals and objectives of this Agreement or applicable law.*

\*\*\*

**630.** *In the event the Monitor or OAG provides an objection notice, the Monitor will convene the Parties and attempt to resolve the identified objections within 30 days of the objection notice being received by the City ("workout period"). The Monitor will*

*issue a proposed resolution of remaining objections in writing at the conclusion of the workout period. If either Party disagrees with the Monitor's resolution of an objection, either Party may ask the Court to resolve such dispute. Subject to the limited extraordinary circumstances exception set out below, CPD will not publish or implement new or revised policies or procedures required by this Agreement until the Monitor and OAG have reviewed and commented on such policies or procedures, or until the workout period and related resolution processes have occurred.*

*\*\*\**

**631.** *If extraordinary circumstances demand an immediate revision or clarification (e.g., due to a change in law or other urgent circumstance), CPD may issue a temporary policy or procedure. CPD must provide prompt notice of the temporary policy or procedure to the Monitor and OAG, and the temporary policy or procedure will only remain in effect until the adoption of a revised policy or procedure pursuant to the review, comment, and objections process set forth above. This paragraph does not permanently exempt any new or revised policy or procedure from the review and comment process.*

*\*\*\**

**632.** *The Parties and the Monitor will work collaboratively and cooperatively to establish and adhere to a schedule that ensures policies and procedures required by this Agreement are reviewed adequately, efficiently, and expeditiously.*

*\*\*\**

**633.** *CPD will ensure that its officers and the public have a meaningful opportunity to review and comment on material changes to CPD policies and procedures required by this Agreement. CPD will publish upcoming opportunities for CPD member and/or community input, involvement, or engagement that relate to the material requirements of this Agreement. After the Monitor and OAG comment on a proposed policy or procedure, or all workout period processes described above have been completed, CPD will post proposed policies and procedures on its public website and provide its officers and the public with an opportunity to comment for a period of not less than 15 days. There will be reasonable exceptions to the posting requirement for policies and procedures that are law enforcement sensitive, such as procedures*

*regarding undercover officers or operations. In response to any comments received, CPD will consider whether any further revisions to the proposed policy or procedure are appropriate. Changes implemented in response to public or officer comment will be subject to consultation among the Parties, and review and comment by the Monitor and OAG prior to publication and implementation.*

\*\*\*

**634.** *CPD will post final and published department-wide directives, policies, and procedures on CPD's public website, subject to reasonable exceptions for policies and procedures that are law enforcement sensitive.*

\*\*\*

**635.** *CPD will provide a mechanism to electronically access approved and published department-wide directives in a usable, organized, and searchable format.*

\*\*\*

**636.** *CPD will periodically review each policy required to be revised or developed by this Agreement. CPD will conduct an initial review of each such policy no later than two years after the policy's implementation as provided for in this Agreement. CPD will conduct subsequent reviews every two years thereafter, although the Parties may modify the timeframe for the review of a specific policy. The purpose of the initial and subsequent reviews is to evaluate whether the policy provides effective guidance and direction to CPD members and is consistent with the requirements of this Agreement and current law.*

\*\*\*

**637.** *CPD will make any necessary updates to its policies and training based on changes in the law that are relevant to CPD's law enforcement activities and will promptly communicate to its members such changes in the law and related policies.*

\*\*\*

**638.** *CPD will submit the following plans required by this Agreement to the Monitor and OAG for their review and approval: a. the Crisis Intervention Plan referenced in Part G of the Crisis In-*

*tervention section of this Agreement; b. the CIT Officer Implementation Plan referenced in Part D of the Crisis Intervention section of this Agreement;*

\*\*\*

**639.** *When the City and CPD have developed the draft of a plan, they will consult at the earliest feasible time with the Monitor and OAG, with the goal of developing consensus on the substance and timetable for the plan, and make any necessary and appropriate adjustments based on those consultations.*

\*\*\*

**640.** *CPD will submit the final draft of each plan required by this Agreement and subject to review and approval by the Monitor and OAG to the Monitor and OAG at least 30 days prior to the proposed date for initial implementation. In the event that the Monitor and OAG fail to comment on a submitted plan within the 30-day period, the Monitor and OAG will be deemed to have no objection to the plan, unless the Monitor, OAG, or both state in writing that additional time is necessary to complete an adequate review. Requests for additional time to review plans will be subject to the same standard and process set forth above for requesting additional time to review policies and procedures. The Parties and the Monitor will adhere to the dispute resolution process described in Part C of this Section to resolve objections as necessary. The Monitor or OAG may object if a proposed plan does not incorporate the requirements of this Agreement or is inconsistent with the goals and objectives of this Agreement. Final versions of the plans will be made public.*

\*\*\*

**641.** *CPD will submit all new or revised curricula, lesson plans, and course materials related to trainings required by this Agreement to the Monitor and OAG for their review, comment, and, subsequently, if necessary, objection. When the City and CPD have developed the draft of any such materials required by this Agreement, they will consult at the earliest feasible time with the Monitor and OAG, with the goal of developing consensus on the substance of the materials, and make any necessary and appropriate adjustments based on those consultations. CPD will provide final drafts of curricula, lesson plans, and course materials subject to review and comment by the Monitor and OAG to the*

*Monitor and OAG at least 30 days prior to instituting the applicable training. In the event that the Monitor and OAG fail to comment on submitted training materials within the 30-day period, the Monitor and OAG will be deemed to have no objection to the training materials, unless the Monitor, OAG, or both state in writing that additional time is necessary to complete an adequate review. Requests for additional time to review training materials will be subject to the same standard and process set forth above for requesting additional time to review policies and procedures. The Parties and the Monitor will adhere to the workout period process to resolve objections as necessary.*

## Compliance Status

The Consent Decree outlines the policy review process in ¶¶626–37 and the plan review process in ¶¶638–41. Paragraph 633 requires the CPD to "ensure that its officers and the public have a meaningful opportunity to review and comment on material changes to CPD policies and procedures required by this Agreement." *See also*, ¶¶52 and 160. Further, as the City and the CPD develop and revise policies throughout the Consent Decree process, they must consult with the IMT and the OAG to develop the necessary policy or revision. The City and the CPD must then provide the IMT with the new or revised policy at least 30 days before the policy is scheduled to go into effect (¶¶627–28). The IMT and the OAG then have 30 days to comment, with a possible 15-day extension (¶¶627–28). The City, the CPD, the OAG, and the IMT then have at least 30 days to resolve comments. If we are unable to come to a timely agreement, an entity may submit a formal objection, which triggers a "workout period" (¶630). The entities then have an additional 30 days to resolve the issue before one of the Parties brings the issue to the Court to resolve (¶630). On the other hand, when the IMT and the OAG provide a "no objection" notice, then when applicable, the City and the CPD will post the new or revised policy for public comment for a minimum of 15 days (¶633). The entities will then review and consider the public comments and agree to any changes before the City and the CPD finalize the policy (¶633).

In our first report, we noted that the review process would be more efficient if the City and the CPD consulted earlier in the process and more often with the IMT while they developed policies. There was much more consultation among the IMT and the Parties during the second reporting period. As a result, the City and the CPD began to regularly develop compliant policies, curricula, and plans with input from the IMT or the OAG.

In our fourth report, we noted that the City and the CPD continued to appropriately focus on developing optimal policies and plans. Strong policing policies provide the foundation for implementing and sustaining best practices (*see* ¶730)

with transparency and accountability. These efforts continued throughout the fifth reporting period. Overall, we have been satisfied by the City's, the CPD's, and willingness to collaborate with the IMT, the OAG, and some communities regarding their policies. As we note below, the City and the CPD must continue to improve their community engagement processes around policy creation and revision. The review processes have not always been without complications since the inception of the Consent Decree, but we continue to work through disagreements in a largely collaborative fashion.

In the seventh reporting period, the City and the CPD continued to make efforts towards compliance with the requirements of ¶¶626-41. They continued to work to create and revise policies in collaboration with the IMT and OAG across all sections of the Consent Decree. Below, we provide some further details, by paragraph.

- **¶631.** The CPD has issued policies without IMT and OAG input, review, or approval by citing to ¶631 on occasion. The IMT has had concerns about the CPD's invocation of ¶631 on limited but important circumstances, such as the *Search Warrants* policy (Special Order S04-19) and the *Foot Pursuits* policy.

- **¶633–35.** Recently, the CPD has generally followed the process outlined in the Consent Decree to ensure that its officers and the public have a meaningful opportunity to review and comment on material changes to CPD policies and procedures. We did, however, continue to have concerns in the seventh reporting period with the CPD posting policies for public comment without notice and during the holidays. The CPD has committed, however, to setting up a more regular process for posting policies for review.

  Specifically, the CPD continues to consider how to engage the public in meaningful opportunities to review and comment on material changes to their policies and procedures. In the sixth reporting period, the CPD requested technical assistance from the IMT (*see* ¶656) to address their community engagement plans and provided us with a draft of their *Roadmap to Improved Community Trust*, which references public comment on CPD policies. The IMT appreciates the CPD's thoughtful development of a long-term plan to ensure that there will be opportunities for public comment on policies every two years and look forward to seeing the public's suggestions taken into consideration. We recognize that the CPD has developed a new public-facing directives system and posts their final and published department-wide directives, policies, and procedures on the CPD's public website in accordance with the requirements of ¶634.[1]

---

[1] The CPD posts its final policies on its Department Directives System, accessible here: https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

- **¶636:** This paragraph requires the CPD to "periodically review each policy required to be revised or developed by this Agreement. CPD will conduct an initial review of each such policy no later than two years after the policy's implementation as provided for in this Agreement." Although the CPD did complete three two-year reviews during the seventh reporting period, the IMT is concerned that the CPD is not keeping to this required timeline for review. For example, CPD policies S06-04 *Juvenile Processing*, G05-02-04 *Arrestee and In-Custody Communications,* G09-01-06 *Use of Social Media Outlets*, and U04-02-02 *Control Device Instruments* were all due for review in 2022; the CPD has communicated to the IMT that the policies were still being worked on. Since many CPD policies became effective in 2020, many were due for review in 2022. We urge the CPD to carefully track and submit their required policy reviews on the appropriate rolling basis moving forward.

- **¶637:** With limited exceptions, the CPD has consistently made necessary changes to its policies and training based on relevant changes in the law.

- **¶¶638–41**. To achieve compliance with the requirements of ¶¶638–41, the CPD must submit nine separate plans to the IMT and the OAG for review and approval. CPD's status of each plan is listed below. As reflected in the corresponding sections of this report, the development of some of these plans and do not seems to be sufficiently prioritized, as some have exceeded their due dates by several years. We continue to urge the City and the CPD to complete the outstanding plans in the next reporting period.

The City and the CPD have made improvements in their practices and processes for the specific requirements laid out in ¶¶626-41. We look forward to the City and CPD continuing their work to timely revise policies, procedures, and plans in collaboration with the IMT, the OAG, CPD officers, and Chicago's communities. Additionally, we will look for the City and the CPD to further refine their public engagement process, providing for a feedback loop to community members who offer insights.

## Consent Decree ¶642

> *642. The Monitor will conduct reviews or audits as necessary to determine whether the City and CPD have substantially complied with the requirements of this Agreement. Compliance with a requirement means that the City and CPD: (a) have incorporated the requirement into policy; (b) have trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) are carrying out the requirement in actual practice.*

## Compliance Status

Throughout the Consent Decree process, the IMT has conducted reviews or audits to determine the City's and the CPD's compliance with the requirements of this agreement. Those reviews and audits comprise our semiannual reports, which are filed with the Court and made public.[2] *See* ¶¶661–65.

First, each of the IMT's Independent Monitoring Reports represent a six-month assessment of the City's compliance efforts; they do not reflect *all* the efforts of the City, the CPD, or the other relevant City entities to date. While we report on the compliance efforts within defined reporting periods (*see* ¶661), we stress that work is ongoing by the City, its relevant entities, the OAG, the IMT, and Chicago's communities.

Second, we assess compliance at three levels: (1) Preliminary, (2) Secondary, and (3) Full, which roughly correspond to the requirements of (a), (b), and (c) in ¶642. The Consent Decree requires the City and its entities to reach Full compliance and maintain that compliance for one to two years. *See* ¶¶714–15. These compliance levels allow us to share our assessments of the City's progress throughout the life of the Consent Decree with the Court; the City and its relevant entities; the OAG; and the public. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the reform in practice. There are, however, many paragraphs that do not include policy or training elements. In those circumstances, the three levels may follow a different trajectory, such as (1) whether the City or its relevant entities have established the framework and resources to achieve the reform, (2) whether the City or its relevant entities have effectively communicated the reform to relevant personnel, and (3)

---

[2]   Each of our semiannual reports, referred to as *Independent Monitoring Reports* may be found on the IMT's public website, accessible at https://cpdmonitoringteam.com/overview/reports-and-resources/.

whether the City or its relevant entities have appropriately implemented the reform.

Third, because of the nuances of each Consent Decree requirement and each level of compliance, the City and its relevant entities must—in a timely manner—provide the IMT with evidence, including access to personnel, records, and data to conduct our required reviews and audits to determine whether and when they have reached each level of compliance during the applicable reporting period.

Under the Consent Decree, the City, the CPD, or other relevant entities are not in compliance with any of the requirements of the Consent Decree until the IMT determines that the City provided the IMT with sufficient proof that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement—which in many cases it has—the City still has the additional burden of providing sufficient proof of its efforts with sufficient time for the IMT and the OAG to review the information.

To reflect the City's and its relevant entities' progress through the Consent Decree process, we have added four subcategories for each of the three levels of compliance (Preliminary, Secondary, or Full):

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced per ¶720, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts are not completed within a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not yet met a lower level of compliance.

## Consent Decree ¶643

> **643.** *CPD members who violate policies, procedures, orders, or directives that are required by this Agreement or that implement its provisions will be held accountable by CPD and the City, including through CPD's progressive discipline process. The Monitor may review and audit whether CPD is enforcing the policies, procedures, orders, or directives required by or implementing this Agreement.*

## Compliance Status

Throughout the Consent Decree process, the IMT has noted many challenges with the CPD's accountability processes. In fact, the lack of accountability for CPD officers engaging in misconduct was among the major findings of the U.S. Department of Justice's investigation into the CPD for civil rights violations, which ultimately resulted in the Consent Decree.

The City's and the CPD's accountability processes are complex,[3] involving many entities with overlapping roles and responsibilities, including the CPD's Bureau of Internal Affairs (BIA),[4] the Chicago Police Board,[5] the Civilian Office of Police Accountability (COPA),[6] the four police unions (*see* ¶711), the City's Department of Law, and the Office of the Inspector General's Public Safety Section (PSIG).[7] Moreover, the City has just implemented a new police oversight entity, the Community Commission for Public Safety and Accountability,[8] which is being into the fabric of Chicago's complex police accountability system.

The IMT acknowledges that holding officers who "violate policies, procedures, orders, or directives that are required by this Agreement" accountable for their actions is sometimes complicated. The IMT has consistently emphasized that officer accountability – and public transparency about accountability processes – must be

---

[3]  For an overview of the CPD's and the City's disciplinary processes, see the Office of the Inspector General's video explaining the process: https://igchicago.org/about-the-office/our-office/public-safety-section/cpd-disciplinary-process-overview/.

[4]  *See Bureau of Internal Affairs Reports*, Chicago Police Department, https://home.chicagopolice.org/inside-cpd/reports/.

[5]  *See Chicago Police Board*, City of Chicago , https://www.chicago.gov/city/en/depts/cpb.html

[6]  *See Civilian Office of Police Accountability*, COPA, https://www.chicagocopa.org/.

[7]  *See Public Safety Section*, Office of Inspector General City of Chicago, https://igchicago.org/about-the-office/our-office/public-safety-section/.

[8]  *See Mayor Lightfoot Announces Adam Gross to Serve as Executive Director of the Community Commission for Public Safety and Accountability, Adam Gross will lead the City's first-ever Community Commission for Public Safety and Accountability*, Office of the Mayor (January 10, 2022), https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2022/january/Adam-Gross-Appointment.html.

a shared responsibility among all leaders in the CPD, from sergeants to the Super-intendent.

Determining compliance with this paragraph is also complex; indeed, the entire *Accountability and Transparency* section of the Consent Decree (and of this report) addresses the complexity and nuance of the City's accountability processes. We have endeavored to clearly state where accountability processes are working and where they need improvement throughout that section.

Moreover, the Public Safety section of Chicago's Office of the Inspector General recently published a review of the CPD's disciplinary system, reflecting their eval-uation of the "consistency and fairness of the processes by which investigating and reviewing agencies determine disciplinary sanctions."[9] Overall, the OIG's report found that "the disciplinary process for the Chicago Police Department members risks unfair and inconsistent outcomes across misconduct investigations,"[10] which is cause for concern.

We note, for example, that while several paragraphs of the Consent Decree require progressive discipline (*see* ¶¶238–39 in addition to ¶643), we have seen no evi-dence of a functional progressive discipline policy or process.

We understand that negotiations between the City and the FOP regarding the im-plementation of such discipline regarding officers failing to use BWCs properly are ongoing since discipline is subject to bargaining under the City's current collective bargaining agreements.[11].

---

[9] *See Chicago Police Department Disciplinary Process Overview*, OFFICE OF INSPECTOR GENERAL CITY OF CHICAGO, https://igchicago.org/about-the-office/our-office/public-safety-section/cpd-disci-plinary-process-overview/.

[10] *See OIG Finds That The Disciplinary Process For Chicago Police Department Members Risks Un-fair And Inconsistent Outcomes Across Misconduct Investigations*, CITY OF CHICAGO OFFICE OF IN-SPECTOR GENERAL (June 16, 2022), https://igchicago.org/2022/06/16/oig-finds-that-the-discipli-nary-process-for-chicago-police-department-members-risks-unfair-and-inconsistent-out-comes-across-misconduct-investigations/ . *See also*, *Enforcement of the Chicago Police Depart-ment's Rule Against False Reports*, CITY OF CHICAGO OFFICE OF INSPECTOR GENERAL (May 25, 2023), Enforcement of CPD's Rule Against False Reports – Rule 14 (igchicago.org).

[11] The full text of the Illinois SAFE-T Act is available here: https://www.ilga.gov/legislation/publi-cacts/101/PDF/101-0652.pdf.

## Consent Decree ¶677–78

**677.** *The City and CPD agree to hire, retain, or reassign current City or CPD employees to form a unit with the knowledge, skills, and abilities necessary to facilitate compliance with this Agreement.*

**678.** *At a minimum, CPD will designate personnel to be responsible for: a. coordinating the City's and CPD's compliance and implementation activities; b. facilitating the provision of data, documents, materials, and access to the City's and CPD's personnel to the Monitor and OAG, as needed; c. ensuring that all data, documents, and records are maintained as provided in this Agreement; and d. assisting in assigning implementation and compliance related tasks to CPD personnel, as directed by the Superintendent or the Superintendent's designee.*

### Compliance Status

While the City and the Chicago Police Department (CPD) continue to implement the requirements of the Consent Decree, we are increasingly concerned about the lack of consistent staffing and retention levels.

The City and the CPD have designated the following entities to be responsible for the following provisions of ¶678:

- 678(a): the CPD's Reform Management Group and the City's Department of Law;

- 678(b) and (c): the CPD's Office of Legal Affairs and the City's Department of Law; and

- 678(d): the CPD's Reform Management Group.

Overall, personnel from the City, the CPD, and other relevant City entities continue to assist the IMT by providing information, updates, and evidence of compliance efforts. These representatives frequently arrange communications and help the IMT navigate the complexity of the City entities.

As with previous reporting periods, we have had some specific concerns about the lack of consistent staffing and retention levels in the Reform Management Group and the high level of turnover in the nearly four years since the Consent Decree began. The Reform Management Group is located within the CPD's Office of Constitutional Policing and Reform and works closely with the CPD's Office of Legal Affairs and the City's Department of Law. Earlier in this report, we mentioned our

concern about the turnover in Executive Directors in the CPD's Office of Constitutional Policing and Reform – three people have held that position in 3.5 years. Consistent leadership is of the utmost importance for reform to be sustainably implemented.

The personnel in these groups have many of the "knowledge, skills, and abilities necessary to facilitate compliance with this Agreement," as ¶677 requires. The City's Department of Law provides many of the project management functions for the relevant city entities—the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General (OIG), including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC). The Reform Management Group provides many of these project management functions for the CPD.

We also have concerns about the staffing of the CPD's Audit Division, which is critical to the sustainability of the reform effort. The Audit Division's mission is as follows:

> The mission of the Audit Division is to provide quality, independent and objective assessments of the operations, processes, and internal controls in support of the Chicago Police Department ('Department'), including but not limited to work related to the strategic plan and consent decree. During internal audits and other reviews in which areas for improvement are identified, recommendations will be made to enhance Department operations. The Audit Division promotes accountability by proactively working with officials across all the Department to identify risks, evaluate controls, and make recommendations intended to promote constitutional policing and the effective delivery of police services. The Department is committed to the use of audits and other reviews to assess adherence to its stated orders, policies, and procedures—as well as to demonstrate consistency with the strategic plan and compliance with the consent decree into which the Department entered with the Attorney General of the State of Illinois. All audits and reviews are intended to provide objective information to inform decision-making and to help improve the internal transparency and accountability of the Department's operations.

The chronic understaffing of this unit is short-sighted for the future of sustainable reform at the CPD. We note that over a year lapsed between the time the prior Assistant Director of the Audit Division—along with other talented analysts and social scientists —left the CPD in November 2021 and the time a new Assistant Director was named. Stability and staffing in this important self-monitoring function is crucial for sustainable reform. The CPD should be mindful of how these

staffing shortages affect the long-term durability of reforms. Moreover, it is unclear to the IMT how and whether the CPD implements any of the recommendations coming from Audit Division findings. We would appreciate seeing plans to and evidence of the CPD's implement of Audit Division recommendations.

Likewise, since the beginning of the Consent Decree, we have had concerns regarding a lack of direct participation from the CPD Command staff in reform activities. Those continued throughout the seventh reporting period. With a few notable exceptions, it is unclear to the IMT-- after nearly four years of work on Consent Decree requirements -- whether CPD's Command staff regularly reviews policy revisions or training curricula before the IMT and the Office of the Illinois Attorney General (OAG) receive them for review. CPD leadership does not seem to be a part of the "unit" described above and rarely participates in meetings or discussions with the exception of the monthly meetings required by ¶668, in which the Superintendent is required to participate. The Office of Constitutional Policing and Reform has recently regained its sworn Chief position, but that position was vacant for a considerable amount of time. The CPD's leadership—from sergeants up to the Superintendent—must consistently and intentionally participate in reform to achieve compliance with the Consent Decree more expeditiously. We have been disappointed in the lack of participation from the highest ranks across the organization for the four years of the Consent Decree and urge the CPD's leadership to engage meaningfully in the reform process.

We also note our concern with the staffing in a few other units within the CPD that are crucial drivers of Consent Decree compliance. The City and the CPD must continue to make efforts to maintain staffing at appropriate levels at all times in the following key departments: the Research and Development Division, the Tactical Review and Evaluation Division[12] (or TRED, an umbrella under which the Force Review Unit, the Firearm Pointing Review Unit, the Foot Pursuit Review Unit, the Search Warrant Review Unit, and the Fourth Amendment Stop Review Unit reside), the Legal Affairs Division, the Education and Training Division, the Crisis Intervention Team, the Audit Division, the Office of Community Policing, and the Reform Management Group. All have experienced consistent understaffing, which is concerning.

Further, during previous reporting periods, we identified several additional staffing and resource needs, noting the impacts of organizational changes. Throughout this

---

[12]  The CPD Force Review Division's 2021 Year-End Report notes, "Beginning in 2022, the Force Review Division will be renamed the Tactical Review and Evaluation Division (TRED). This name change was enacted to reflect the additional duties performed by the FRD. TRED will encompass the Force Review Unit, Firearm Pointing Review Unit, Foot Pursuit Review Unit, Search Warrant Review Unit, and the Fourth Amendment Stop Review Unit" (p.13). Before TRED's expanded responsibilities, it was known simply as the Force Review Division (as reflected in the title of the 2021 Year-End Report). The *2021 Year-End Report* may be accessed here: https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf.

reporting period, then-Superintendent David Brown[13] continued to make organizational changes, as well as deploy officers out of these key units to perform patrol and field duties. As we noted earlier, changes in leadership can disrupt efforts toward reform during transition periods.

Many of the City's and the CPD's efforts and achievements in the first six reporting periods continued into the seventh reporting period. The City Department of Law, the CPD's Office of Constitutional Policing and Reform, the Legal Affairs Division, and the Research and Development Division (¶¶677–78) continued to be fully engaged in the monitoring process. The City and the CPD also maintained regular channels of communication with the IMT and the OAG and continued dialogue, problem-solving, and brainstorming about requirements and challenges regarding the paragraphs of the Consent Decree.

As noted in previous reporting period, we recognize that the City's and the CPD's resources are limited. As referenced above, the City and the CPD have already added many resources to guide compliance efforts.

We remain concerned, however, about whether these divisions are sufficiently staffed at present. Before the COVID-19 pandemic, many of these staffing increases had begun to make the City's compliance efforts more efficient. While we understand that ongoing challenges continue based on limited resources and staff and the continuing effects of COVID-19, as well as the CPD's continuing recruitment challenges,[14] we reiterate the need for the City and the CPD to devote sustained or increased resources and staffing to the Office of Community Policing, the Education and Training Division, the Audit Division, the Tactical Review and Evaluation Division, the Research and Development Division, and the Crisis Intervention Team. The pace of reform will continue to be painfully slow without the City and the CPD devoting appropriate levels of resources to these crucial divisions.

---

[13] David Brown served as CPD Superintendent throughout the seventh monitoring period; On March 16, 2023, during the eighth reporting period, he resigned from his position.

[14] *See, e.g.,* Jake Sheridan, *Chicago police to try rehiring retired cops, in bid to bolster ranks, officials say,* CHICAGO TRIBUNE (March 24, 2023), https://www.chicagotribune.com/news/breaking/ct-chicago-police-rehire-retired-officers-lateral-20230325-cxn57szfpvbn-zhfvrt6mb46omq-story.html.

## Consent Decree ¶679

> **679.** *The City and CPD agree to collect and maintain all data and records necessary to document compliance with this Agreement, including data and records necessary for the Monitor to conduct reliable compliance reviews and audits.*

### Compliance Status

As we have noted in each of our previous Independent Monitoring Reports and in the Data Collection, Analysis, and Management section of this report, we are still unsure whether the City and the CPD are currently collecting and maintaining "all data and records necessary to document compliance with this Agreement." This is due, in part, to pervasive data systems challenges. Not only do we need complete and verifiable data to assess compliance across all areas of the Consent Decree, but also the City and the CPD need this data to monitor, reform, and adapt its efforts to current and future challenges. The research, analysis, and data collection under the Consent Decree and best practices are demanding. To effectively identify and resolve existing and upcoming challenges, the City and the CPD must collect, maintain, track, and analyze the data. To meet these challenges, the City, the CPD, and the OAG continue to engage in data discussions for each topic area. Based on these discussions, there is universal agreement that the CPD has a long way to go to meet the data requirements of the Consent Decree.

The CPD still does not have a consistent system for auditing and validating its data systems or correcting and upgrading those systems based on regular audits (*see* ¶606). While the CPD may maintain, assess, and correct data system problems regularly, it is not doing so based on a standard audit process. The CPD is currently analyzing how it plans to identify the data required by the Consent Decree, whether it is currently collected and if not, how to collect it. That process, however, is only complete for one sub-section of the Data Collection, Analysis, and Management section of the Consent Decree requirements.

In short, the CPD does not currently have the data resources and systems in place to meet the demands of the Consent Decree. We are aware that the CPD is still in the process of assessing and reorganizing several facets of its data management systems, and we hope that the reorganization is effective. We will continue to work with the City and the CPD to ensure that these efforts are prioritized.

## Consent Decree ¶680

*680. Beginning with the Monitor's first report filed with the Court, and for each subsequent semiannual report by the Monitor, the City agrees to file a status report one month before each of the Monitor's reports is due for the duration of this Agreement. The City's status report will delineate the steps taken by CPD during the reporting period to comply with this Agreement, and CPD's assessment of the status of its progress implementing this Agreement.*

### Compliance Status

The City filed the status reports required by ¶680 before the IMT issued its draft monitoring reports for the first three reporting periods. In the fourth reporting period, however, the City and the CPD filed the status report on September 8, 2021, and in the fifth reporting period, the City and the CPD filed the status report in March 2022 (over two months late). In the sixth reporting period, the City's status report is dated "October 2022," which is – again -- over two months late.

In the seventh reporting period, the City and the CPD filed their status report on April 17, 2023. Because the IMT received the status report so late, it could not be used to assist to us in preparation of the initial drafts of the Independent Monitoring Report 7, which is the intention of this Consent Decree requirement.

The IMT views these status reports as helpful tools, as the City's and the CPD's self-assessment to help clarify the City's progress and make accurate compliance determinations. The City's lack of compliance with this paragraph is frustrating for the IMT. The utility of these reports to the IMT hinge upon their timing. They are most useful if the City and the CPD completed them and submitted them to the IMT by the deadline required by this paragraph. We urge the City to comply with this Consent Decree requirement in the future.

## Consent Decree ¶682

*682. The Monitor will have access to all individuals, facilities, trainings, meetings, disciplinary proceedings, reviews, and incident scenes that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement. The City will ensure that it facilitates the Monitor's access in a prompt, cooperative, and unobstructive manner.*

### Compliance Status

Since the beginning of the Consent Decree monitoring process, the IMT and the City discussed logistics regarding access to individuals, facilities, trainings, meetings, and incident scenes. Although the IMT has generally had access to necessary people, places, and events, we have not experienced receiving access to these in a prompt manner in all instances. These efforts have been a work in progress. We appreciate, for example, that the City finally provided IMT access to Critical Incident Reviews and Force Review Board proceedings following officer involved shooting incidents. We are hopeful that we will be able to work with the City and the CPD to continue to resolve access issues in the eighth reporting period.

We expect the City to continue its work to ensure access to individuals, facilities, trainings, meetings, and incident scenes in a prompt, cooperative, and unobstructive manner. Additionally, we hope to see the City make improvements to allow the IMT access also to all disciplinary proceedings and reviews. We will continue to work with the City to ensure compliance with the requirements of ¶682.

## Consent Decree ¶683

> **683.** *CPD will notify the Monitor as soon as practicable, and in any case within 24 hours, of any officer-involved shootings, any death of a person in CPD custody, or any arrest of a CPD member. In the event a CPD member is arrested by a law enforcement agency other than CPD, CPD will notify the Monitor as soon as practicable, and in any case within 24 hours of receiving notice of the arrest. The Monitor will cooperate with the City to obtain access to people and facilities in a reasonable manner that, consistent with the Monitor's responsibilities, minimizes interference with daily operations.*

### Compliance Status

Since the beginning of the monitoring process, the CPD has consistently notified the IMT of any officer-involved shootings, any death of a person in CPD custody, and any arrest of a CPD member within 24 hours after the event through its Crime Prevention and Information Center (CPIC) email notification system.

As of the date of this report, three members of the IMT are subscribed to the CPIC notification system and receive automatic emails about these events. In this reporting period, however, the CPIC notification emails did not consistently reach all members of the IMT who are subscribed. We have discussed this lapse with the CPD and we understand they are working on fixing the issue.

The CPD and the City have provided IMT access to City personnel and facilities across entities. They have also allowed members of the IMT to observe and learn more about officer-involved shooting scenes and processes.

## Consent Decree ¶684

**684.** *The City and CPD will ensure that the Monitor has prompt access to all City and CPD documents and data related to the Agreement that the monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement, except any communications, documents, or data to which access is limited or precluded by court order, or protected by the work product doctrine or the attorney-client privilege (collectively, "privilege").*

## Compliance Status

The City and the CPD have made many efforts to provide the IMT with access to documents and data relevant to the Consent Decree.

As noted in many of our monitoring reports, we have had significant concerns regarding document and data productions, as a substantial number of materials would arrive at or near the end of the reporting period. This challenge continues. While in the fifth reporting period, the City and its relevant entities made significant improvements, we again see materials arriving at the tail end of the reporting period, which hampers the IMT's thorough reviews. Further, throughout the seventh monitoring period, the City and the CPD continued discussions with the IMT about how to improve the quality of their document and data productions. As we mention in ¶679 (*see also* ¶606), the CPD does not currently have the data resources and systems in place to meet the demands of the Consent Decree. We are aware that the CPD is still in the process of assessing and reorganizing several facets of its data management systems, and we hope that the reorganization is effective. In the seventh reporting period, the City and the CPD continued to work with the IMT to continue the process of assessing and reorganizing several facets of its data management system.

Further, early in the Consent Decree, the IMT and the OAG began to have concerns regarding how promptly the City and some of the City's relevant entities respond to requests for information. In the seventh reporting period, the City, the CPD, the OAG, and IMT continued to dedicate time toward addressing these concerns and improving the request and production procedures, but we remain concerned about many IMT and OAG requests for information that remain unfulfilled.

We look forward to continuing to work with the City and the CPD to resolve the access issues and hope for more timely responses to our requests for information in future reporting periods.

## Consent Decree ¶¶685 and 686

*685. Privilege may not be used to prevent the Monitor from observing training sessions, disciplinary hearings, or other CPD, COPA, or Police Board activities or proceedings that do not involve the provision or receipt of legal advice. The City is not required to provide the Monitor with access to documents or data that is privileged. Should the City or CPD decline to provide the Monitor with access to communications, documents, or data based on privilege, the City or CPD will inform the Monitor and OAG that documents or data are being withheld on the basis of privilege which may, but need not be, in the form of a privilege log. If the Monitor or OAG objects to an assertion of privilege, the Monitor or OAG may challenge the propriety of the privilege assertion before the Court.*

<div align="center">***</div>

*686. In coordination with the City's legal counsel, OAG and its consultants and agents will have access to all City and CPD personnel, facilities, training, documents, and data related to this Agreement, except any documents or data protected by privilege. OAG and its consultants and agents will coordinate with the City's legal counsel to access personnel, facilities, training, documents, and data in a reasonable manner that is consistent with OAG's right to seek enforcement of this Agreement and that minimizes interference with daily operations. The City is not required to provide the Monitor with access to communications, documents, or data that is privileged. Should the City or CPD decline to provide OAG with access to documents or data based on privilege, the City or CPD will inform OAG that that documents or data are being withheld on this basis, which may, but need not be, in the form of a privilege log. If OAG objects to a privilege assertion by the City or CPD, OAG may challenge the propriety of the privilege assertion before the Court.*

## Compliance Status

As we have noted, we do not believe that the City has deliberately used privilege to prevent us from accessing events (such as training sessions or meetings), documents, data, or communications "that do not involve the provision or receipt of legal advice" per ¶685. We regularly attend training sessions. While we continue to have concerns that the production of some materials has been unnecessarily delayed, we continue to note significant improvements regarding the willingness to share confidential information with the IMT on a timely basis.

Further, since the beginning of the Consent Decree, there have also been access issues and disputes between the OAG and the City. And in the seventh reporting period, we have seen increases in the City or the CPD disputing access to information. We anticipate that the City, the CPD, the OAG, and the IMT will continue to make progress toward resolving those issues.

## Consent Decree ¶687

> **687.** *The Monitor and OAG will provide the City and CPD with reasonable notice of a request for documents or data. Upon such request, the City and CPD will provide the documents or data (in electronic format, where readily available) in a timely manner, unless withheld based on privilege.*

### Compliance Status

As we state in ¶684, early in the Consent Decree process the IMT and the OAG began to have concerns regarding how promptly the City and some of the City's relevant entities respond to requests for information.

It is important that the IMT and OAG be provided requested documents and data in a timely manner moving forward. Delays affect our compliance assessments and the City's progress in achieving compliance with the Consent Decree. We will continue to work with the City and the CPD by providing full and detailed document and data requests regularly and look forward to receiving such materials in a prompt manner.

## Consent Decree ¶699

> **699.** *The City agrees to require compliance with this Agreement by its officers, officials, employees, agents, agencies, assigns, or successors.*

### Compliance Status

This paragraph is an overarching paragraph with requirements that the City and the CPD will likely not achieve until it has achieved much more progress overall. In previous reporting periods, the IMT has relayed concerns that the City and the CPD have not made as much progress toward achieving the requirements of the Consent Decree as the IMT had hoped in the first few years. However, the City and its relevant entities have begun to work diligently to develop, revise, and implement policies, as well as develop plans and training curricula compliant with the Consent Decree.

By the end of the seventh reporting period, the City has not yet finalized and implemented all policies required by the Consent Decree. Although we have seen significant progress in this area, without finalization and implementation of each required policy, it is unclear whether the City has required "compliance by its officers, officials, employees, agents, agencies, assigns, or successors" as this paragraph requires.

We look forward to continued progress toward compliance with the requirements ¶699 and we will continue to work collaboratively with the City following the policy and plan review procedures detailed in ¶¶626-41.

### Consent Decree ¶700, 701, 704, 705, and ¶706

**700.** The City will be responsible for providing necessary and reasonable financial resources necessary through steps or processes that can include the budget process to fulfill its obligations under this Agreement, subject to the terms and conditions set forth herein.

**701.** The City's entry into this Agreement is not an admission by the City, CPD, or any agent or employee of either entity that it has engaged in any unconstitutional, illegal, or otherwise improper activities or conduct. The City's entry into this Agreement is not an admission of any of the findings or conclusions contained in the DOJ's Report.

**704.** This Agreement is binding upon all Parties hereto, by and through their officials, employees, agents, representatives, agencies, assigns, and successors. If the City establishes or reorganizes a government agency or entity whose function includes overseeing, regulating, investigating, or otherwise reviewing the operations of CPD or any aspect thereof, the City agrees to ensure that these functions and entities are consistent with the terms of this Agreement and will incorporate the terms of this Agreement into the oversight, regulatory, investigation, or review functions of the government agency or entity as necessary to ensure consistency.

**705.** Nothing in this Agreement will in any way prevent or limit the City's right to adopt future measures that exceed or surpass the obligations contained herein, as long as the terms of this Agreement are satisfied.

*706. The City is responsible for providing necessary support and resources to CPD to enable CPD to fulfill its obligations under this Agreement.*

## Compliance Status

As we noted in ¶¶677–78, we have significant concerns about the lack of consistent staffing and retention levels within the City and the CPD in areas crucial to the efficient implementation of the requirements of the Consent Decree. The City and the CPD must continue to make efforts to maintain staffing at appropriate levels at all times in the following key departments: the Research and Development Division, the Force Review Unit (now housed in TRED, the Tactical Review and Evaluation Division), the Legal Affairs Division, the Education and Training Division, the Crisis Intervention Team, the Audit Division, the Office of Community Policing, and the Reform Management Group.

By way of an example of resource shortages, when the Consent Decree process began in March 2019, the CPD comprised 13,319 officers; as of the end of the seventh reporting period, the CPD comprised 11,710 officers.[15] We provide more detail about the CPD's challenges in hiring officers in the Recruitment, Hiring, and Promotion section of this report and also note that during this reporting period, the CPD lowered its hiring standards amid the staffing shortage.[16]

The decrease in officers has drawn attention from elected leaders[17] and appointed leaders.[18] The IMT notes that significant understaffing of officers—particularly supervisors—will add to the challenge the CPD already faces to achieve compliance with the Consent Decree's Unity of Command and Span of Control requirements (*see* ¶¶357–68).

One example of insufficient staffing levels is the number of officers working in the CPD's Tactical Review and Evaluation Division (TRED). The number of officers, Sergeants, Lieutenants, and Commanders decreased significantly over the course of the seventh reporting period. Specifically, the number of officers assigned to TRED

---

[15] *See Sworn CPD Members data dashboard,* OFFICE OF THE INSPECTOR GENERAL, CITY OF CHICAGO (accessed July 25, 2022), https://informationportal.igchicago.org/cpd-sworn-officer-unit-assignments-over-time/.

[16] *See, e.g.,* Cherranda Smith, *Chicago Police Department Lowers Hiring Standards Amid Staffing Shortage,* NEWSRADIO (MARCH 18, 2022), HTTPS://WOODRADIO.IHEART.COM/CONTENT/2022-03-18-CHICAGO-POLICE-DEPARTMENT-LOWERS-HIRING-STANDARDS-AMID-STAFFING-SHORTAGE/.

[17] *See, e.g.,* Fran Spielman, *City Council member says CPD moving cops from special units back to districts to deal with officer exodus,* CHICAGO SUN-TIMES (January 3, 2022), https://chicago.suntimes.com/news/2022/1/3/22865587/chicago-police-crime-strategy-districts-special-units-officers-retire-brown-beck-napolitano.

[18] *See Chicago is losing cops at a "significant, almost alarming" rate, deputy mayor says,* CWB-CHICAGO (January 27, 2022), https://cwbchicago.com/2022/01/chicago-is-losing-cops-at-significant-almost-alarming-rate-deputy-mayor-says.html.

decreased 19 percent and the number of sergeants assigned to TRED decreased 14 percent. The number of Lieutenants remained the same, as only one Lieutenant working in TRED. Also noteworthy was the decrease of Commanders from one Commander to zero by the end of the seventh reporting period.

We are quite concerned about the insufficient staffing in TRED, a division crucial to the City and the CPD's implementation of the requirements of the Consent Decree that is responsible for reviewing that force used by CPD officers against Chicagoans is Constitutional. In fact, we are aware of a sizable backlog in cases regarding firearm pointing incidents, preventing TRED from meeting the review timeline (30 says) required by ¶192. The CPD must staff TRED appropriately moving forward to continue its implementation of these important requirements.

Additionally, we continue to have significant concerns about the investment in the City's and the CPD's data infrastructure, arguably one of the most important investments the City can make toward achieving full and effective compliance (*see* ¶693) because the City bears the burden of demonstrating is compliance by a "preponderance of the evidence" (*see* ¶720). We are encouraged by the work of the Public Safety Administration Data team that is working to improve data collection, analysis, and management but are disappointed that three years have passed since the Consent Decree process began, and the City and the CPD have yet to fully understand their own data limitations (*see* ¶606), an exercise that was to have been completed during the first year of the Consent Decree.

Lastly, ¶705 ensures that the Consent Decree does not "prevent or limit the City's right to adopt future measures that exceed or surpass the obligations." Superintendent Brown has stated repeatedly that he sees the Consent Decree as "a floor, not a ceiling."[19] It is important that the City and the CPD continue to work diligently toward compliance with all paragraphs, but also recognize and understand the cultural changes that must take place to fully comply with this agreement.

---

[19] *See, e.g., Joint Statement from Mayor Lori E. Lightfoot and CPD Superintendent David O. Brown on The Independent Monitoring Team's Fourth Semiannual Report* (October 8, 2021), https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2021/october/JointStatementIndependentMonitorReport.html.

## Consent Decree ¶711

*711. Nothing in this Consent Decree is intended to (a) alter any of the CBAs between the City and the Unions; or (b) impair or conflict with the collective bargaining rights of employees in those units under the IPLRA. Nothing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate (i) the terms of the CBAs, including any Successor CBAs resulting from the negotiation process (including Statutory Impasse Resolution Procedures) mandated by the IPLRA with respect to the subject of wages, hours and terms and conditions of employment unless such terms violate the U.S. Constitution, Illinois law or public policy, or (ii) any bargaining obligations under the IPLRA, and/or waive any rights or obligations thereunder. In negotiating Successor CBAs and during any Statutory Resolution Impasse Procedures, the City shall use its best efforts to secure modifications to the CBAs consistent with the terms of this Consent Decree, or to the extent necessary to provide for the effective implementation of the provisions of this Consent Decree.*

## Compliance Status

As explained in our previous reports, the City is a party to collective bargaining relationships with four labor unions representing sworn police officers:

- The Fraternal Order of Police, Chicago Lodge No. 7 (FOP);

- The Policemen's Benevolent & Protective Association of Illinois (PBPA), Unit 156 – Sergeants;

- PBPA of Illinois, Unit 156 – Lieutenants; and

- PBPA of Illinois, Unit 156 – Captains (collectively, the "Unions").

Paragraph 711 of the Consent Decree harmonizes the City's statutory bargaining obligations with the Unions with the City's Consent Decree obligations. Specifically, Paragraph 711 adopts the following key tenets:

- As a threshold matter, the Consent Decree is not intended to alter the City's collective bargaining agreements or otherwise to impair or conflict with the officers' statutory rights to engage in collective bargaining through their chosen representatives (the Unions);

- Likewise, the Consent Decree does not obligate the City (or the Unions) to violate the terms of their collective bargaining agreements, or to violate or waive any bargaining rights or obligations;

- Nevertheless, in recognition of the fact that the City's labor agreements can and will directly impact its compliance with various provisions in the Consent Decree, the Consent Decree obligates the City to "use its best efforts" in the collective bargaining process "to secure modifications" to its collective bargaining agreements covering sworn officers that are consistent with the terms of the Consent Decree or to the extent necessary to implement the provisions of the Consent Decree.

At the time the Consent Decree was entered, the state of affairs with respect to the City's collective bargaining relationships was as follows: (1) the City's most recent collective bargaining agreements with the Unions were expired (and had been expired for an extended period of years); (2) the parties' ongoing negotiations had been unsuccessful in reaching successor agreements for any of the bargaining units; (3) pursuant to its obligations under state labor law, the City continued to apply the provisions of the expired labor agreements while negotiations continued; and (4) the parties were engaged in litigation of various claims, in arbitration and before the Illinois State Labor Relations Board, concerning issues and disputes alleged to arise under the expired agreements and/or to relate to the unsuccessful negotiations.

To monitor compliance with ¶711, the City, the IMT, and the OAG met on a near-monthly basis throughout each of the reporting periods, including the most-recent seventh reporting period, to discuss updates on the City's progress in bargaining successor labor agreements with the Unions and the status of related pending litigation.

During these meetings, the City provided access to members of its bargaining committee. These members explained the City's various contract proposals to the Unions, seeking to modify terms in the expired labor agreements to achieve compliance with various Consent Decree provisions. They further explained the City's efforts in resisting and defending litigation initiated by the Unions relating to these same issues.

For instance, as previously reported, among the most significant of the City's bargaining proposals (and, to the Unions, among the most contentious), the City proposed to modify the process for receiving and investigating complaints of officer misconduct, including allowing for the investigation of complaints that are anonymous or not backed by a sworn affidavit. *See, e.g.,* ¶¶421, 425, 427, 431, 461, 462, 475, 477, 508, and 514. The City also proposed changes to retain disciplinary records indefinitely, rather than for five years. *See* ¶508. The Unions consistently rejected these proposals.

Despite the Unions' objections, the City has now instituted these and a number of similar changes to its processes as applied to all officers in each of the four Union-represented units.

With respect to those officers in the three bargaining units represented by the PBPA, the City prevailed in a June 26, 2020 Interest Arbitration Board decision, which accepted the City's position with respect to several disputed contract proposals that have a direct impact on Consent Decree provisions. Most notably, the decision confirmed the City's right to use anonymous complaints as a basis for investigations of alleged officer misconduct and accepts the City's position regarding the retention of disciplinary records. The PBPA filed a state court lawsuit seeking to have the Interest Arbitration Board's decision vacated. As reported below, the Circuit Court (Chancery Division) recently granted summary judgment to the City, dismissing the PBPA's challenges to the interest arbitration decision. The PBPA has appealed that adverse ruling.

With respect to the City's largest bargaining unit of sworn officers—the unit represented by the FOP—the City announced shortly following the conclusion of the fourth monitoring period, that it had reached an "interim agreement" with the FOP to implement a series of "accountability changes" to the parties' collective bargaining agreement. Then, during the fifth reporting period, the new proposed agreement with the FOP was approved, both by the FOP's membership through a ratification vote and by a majority vote of the City Council. The new eight-year labor agreement reaches back to the expiration of the prior agreement, July 1, 2017, and continues through June 30, 2025.

The new agreement with the FOP includes a number of changes to the expired agreement specifically aimed at furthering CPD's compliance with various Consent Decree provisions:

- Eliminates the prior ban on anonymous complaints about police misconduct;

- Eliminates the requirement for sworn complainant affidavits, providing instead for an expedited "override" process for anonymous complaints and in situations where the complainant refuses to be identified;

- Removes the requirement to destroy disciplinary records older than five years;

- Allows for broader of use of disciplinary records in cases involving police misconduct;

- Adds language that explicitly requires supervisors to report all misconduct;

- Removes the contract language that was viewed as a "ban" on rewarding/recognizing officers who report misconduct, stating instead that officers who report potential misconduct are acting in the highest traditions of public service.

The new CBA with the FOP, and the extended bargaining that led to it, focused primarily on economics and accountability issues. Following ratification and approval of the new CBA with the FOP, the City and the FOP were to commence so-called "phase two" negotiations over further issues and potential changes to employment terms. As of the end of the fifth reporting period, these phase two negotiations had not progressed. We have seen some recent movement on the phase two negotiations and look forward to hearing more about how they progress.

As noted above, during the sixth reporting period, the City received a favorable ruling from the Circuit Court, granting the City summary judgment with respect to the PBPA's challenges to the June 2020 interest arbitration award. That interest arbitration decision, in turn, approved the City's changes to procedures concerning use of anonymous complaints as a basis for investigations of alleged officer misconduct and retention of disciplinary records. The PBPA appealed the Circuit Court's decision to the Illinois Appellate Court. The City continues to defend this action (and the underlying procedural changes) throughout the seventh reporting period.

Aside from the ongoing litigation concerning the interest arbitration award, the City's most recent agreements with the PBPA expired June 30, 2022. The parties gave notice of intent to negotiate further changes to the expired agreements and are in the process of scheduling bargaining. The City expects the PBPA to present proposals relating to COVID vaccinations, wages, and benefits.

Also during the seventh reporting period, the City commenced Phase Two bargaining with the FOP. The parties met in February, May, and June 2022. Those negotiations yielded little progress, and the parties' discussions were largely dominated by disputes pertaining to COVID vaccine mandates and the City's cancellation of officer regular days off ("RDOs"). In August and September, 2022, the City and FOP met for multiple sessions with a mediator, but were not successful in resolving outstanding issues. Accordingly, the parties commenced interest arbitration proceedings before Arbitrator Edwin Benn. Following the parties' initial submission of proposals and pre-hearing briefing, Arbitrator Benn scheduled a mediation conference to precede an actual hearing. In light of the mayoral elections and internal FOP elections, Arbitrator Benn stayed mediation and further proceedings until early May 2023.

Beyond discussions at the Phase Two bargaining table, the parties continued during the seventh reporting period to litigate a number of unfair labor practice charges filed by the FOP with the State Labor Relations Board, challenging various aspects of the City's COVID response and vaccination mandate. The labor board

largely deferred those claims to the parties' contractual grievance and arbitration process. Thereafter, following a hearing and subsequent briefing concerning a consolidated grievance implicating all four Union-represented bargaining units, Arbitrator George Roumell upheld the City's vaccine mandate, but retained jurisdiction over the dispute going forward. Since the arbitrator's award (issued February 23, 2022), the parties have returned to the arbitrator for supplemental hearings and awards on issues related to testing, masking, and discipline. The arbitrator's supplemental award concerning discipline, in particular, outlines a partial matrix of discipline for approximately 200 officers based on relative time in "no pay" status. In addition, the Unions have appealed Arbitrator Roumell's original decision upholding the vaccine mandate. That appeal remains pending in the Illinois Supreme Court.

In addition to the COVID-related grievances, the City and the Unions remain opposed with respect to a dispute concerning the City's ability to cancel an officer's "regular day off" (RDO) and require the officer to work. The City maintains the CBA allows for this practice, provided the officer receives premium pay. The Unions have positioned this consolidated grievance as an officer wellness issue, arguing that officers effectively no longer have RDOs and are suffering from exhaustion, which can lead to errors.

The IMT will continue to monitor the City's efforts to utilize best efforts to secure process and procedure changes applicable to its Union-represented workforce consistent with the reforms set forth in the Consent Decree. And where to date the City has achieved varying measures of success in securing such changes, the IMT will continue to monitor the City's ongoing efforts to maintain these changes in the face of ongoing litigation and other challenges initiated by the Unions.

In addition, to the extent that issues concerning COVID response and officer days off have direct bearing on officer staffing and the City's corresponding ability to implement the Consent Decree, the IMT will continue to monitor progress regarding the Parties' ongoing Phase Two negotiations and litigation.

## Consent Decree ¶714

**714.** *The City will endeavor to achieve full and effective compliance within five years of the Effective Date. On or about five years from the Effective Date, the Court will hold a hearing to assess whether the Agreement should be terminated. This Agreement will terminate when the Court finds that the City has achieved full and effective compliance with this Agreement and has maintained such compliance with the material requirements for at least one year for the sections delineated as Group A below, and for at least two years for the sections delineated as Group B below. a. Group A: Recruitment, Hiring, and Promotions; Training; and Officer Wellness and Support. b. Group B: Community Policing; Impartial Policing; Crisis Intervention; Use of Force; Supervision; Accountability and Transparency; and Data Collection, Analysis, and Management.*

### Compliance Status

On March 25, 2022, the City, the CPD, and the OAG entered into a Stipulation to the Consent Decree regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance"[20] (*see* ¶717).

As stated in previous monitoring reports and throughout this process, the IMT articulated its concern that the City would not achieve full and effective compliance with the Consent Decree within five years of its effective date (March 1, 2024). As a result of those concerns and other pressing issues, the Parties negotiated the Stipulation, which states that "the City agrees to endeavor to achieve full and effective compliance by the end of the 16th reporting period (June 30, 2027), eight years after the effective date of the Consent Decree." To that end, we will also provide our comprehensive assessment—and along with corresponding responsibilities in the Consent Decree—after the eighth reporting period (June 30, 2023).

Likewise, the Parties also clarified to how the IMT will report on further progress:

*Given the City's and the CPD's intention to reach full and effective compliance with the Consent Decree in 2027 and the ongoing efforts to mitigate the impact of COVID-19, the Parties also agreed that the Monitor will track specific deadlines and recurring obligations differently: The specific deadlines will continue to be extended*

---

[20] *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance,"* Illinois v. Chicago, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timelin.._.pdf.

*by 64 days, but recurring obligations will return to the appropriate cadences (e.g., monthly, quarterly, annually). For each paragraph and requirement, the Parties and the IMT will—following the text of the Consent Decree—collaborate to ensure recurring requirements are scheduled to enable the City, CPD, and other City entities to reach compliance as efficiently as possible and in accordance with the purposes of each requirement (e.g., effective and regular training or data analysis).*

As reflected throughout this report, we believe that these changes will permit the City, the CPD, the OAG, and the IMT to focus on the most effective and efficient paths toward effective and sustainable compliance.[21]

We look forward to the progress the City will make over the next five years as they work toward achieving full and effective compliance with all requirements of the Consent Decree. The IMT remains committed to working collaboratively with the City and the CPD as they work towards the new timelines set forth in the stipulation.

## Consent Decree ¶720

**720.** *At all times, the City will bear the burden of demonstrating by a preponderance of the evidence it has achieved full and effective compliance with the requirements of this Agreement.*

### Compliance Status

To reach compliance with the Consent Decree, the City and the CPD must provide the IMT with sufficient evidence that they are making reforms and meeting the requirements set forth therein. The CPD must also demonstrate that it has appropriate resources (*see* ¶¶700 and 706) and procedures that will effectuate timely and sustainable compliance.

We believe that the City understands that it bears the burden of demonstrating compliance with the Consent Decree. In fact, we believe that the City and many of its relevant entities have taken increased ownership over this obligation through large unilateral productions of compliance records. Since the City and its entities have started making these productions, the number of OAG and IMT requests for

---

[21]   The Stipulation also clarified the process for the Court to find the City in full and effective compliance regarding any of the material requirements in the Consent Decree. *See* ¶715. Specifically, the Court "may accept the IMT's determination that the City has met 'Full compliance' in a semiannual report and may retroactively start the relevant one- or two-year compliance period at the date the IMT filed the corresponding semiannual report." *Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance,"* Illinois v. Chicago, Case No. 17-cv-6260 (March 25, 2022).

information has decreased (*see* ¶687). While we appreciate the productions of compliance records, there continue to be some challenges with the City meeting the remaining requests for information, or disputing that the IMT needs the requested information. *See* ¶684. The City and the CPD have struggled to maintain the levels of improvement that they began to achieve earlier in the monitoring process throughout the seventh reporting period.

### Consent Decree ¶721

> **721.** *Prior to termination of this Agreement, CPD will develop a plan, in consultation with the Monitor and OAG, to conduct compliance reviews, audits, and community surveys deemed necessary and appropriate following the termination of the Consent Decree. CPD will publish the plan for continuing assessments, if any, on CPD's website.*

## Compliance Status

As mentioned throughout this report, the CPD's Audit Division remains understaffed, which affects its ability to comply with the requirements of the Consent Decree. As of the date of this report, the IMT has not yet received a comprehensive plan for compliance reviews, audits, and community surveys following the termination of the Consent Decree. Although CPD has discussed their *Road to Operational Compliance* with the IMT in detail, we remain concerned about the CPD's plans for sustainability. We have not yet received a plan that covers how each division and the department as a whole will continue the reformed practices as laid out in the Consent Decree.

We are hopeful that the CPD will begin to think forward to a long-term plan for not only reaching full and effective compliance, but how it can continue these reformed practices well after the Consent Decree is terminated. Constitutional policing practices must be ingrained into the CPD's policies, practices, and culture. We believe it is crucially important that CPD begin to develop such a plan as required by ¶721.

Attachment A:
Office of the Illinois Attorney General
Comments
June 1, 2023



# OFFICE OF THE ATTORNEY GENERAL
## STATE OF ILLINOIS

**KWAME RAOUL**
ATTORNEY GENERAL

June 1, 2023

**<u>SENT VIA EMAIL</u>**

Margaret A. Hickey
Independent Monitor
ArentFox Schiff LLP
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
Maggie.Hickey@afslaw.com

Re:     **OAG Comments on the Seventh Independent Monitoring Report
Consent Decree, *Illinois v. Chicago*, 17-cv-6260 (N.D. Ill.)**

Dear Ms. Hickey:

The Consent Decree gives the Office of the Illinois Attorney General (OAG) an opportunity to comment on the Seventh Monitoring Report (Report) before the Independent Monitoring Team (IMT) files it with the Court. The Report covers a six-month period in which progress with the City's and Chicago Police Department's (CPD's) implementation of reforms mandated by the Consent Decree lost forward momentum. Between July 1, 2022 and December 31, 2022, the City made limited advances in compliance in most sections of the Consent Decree and no progress in others. CPD also moved backwards in some areas this period, losing preliminary or secondary compliance with a number of paragraphs in the Crisis Intervention, Use of Force, Accountability and Transparency, and Data Collection, Analysis, and Management sections. Four years into the implementation of the Consent Decree, the City remains out of any level of compliance with at least 70 monitorable paragraphs.

Leadership transitions at the City and CPD present an opportunity to reverse recent backsliding. Seizing this opportunity will require CPD to treat reform as integral to its day-to-day work of preventing and responding to crime. CPD must stop siloing reform efforts in discrete divisions with inadequate resources; rather, commitment to reform must be evident at the top and prioritized

500 South Second Street, Springfield, Illinois 62706 • (217) 782-1090 • TTY: (217) 785 -2771 • Fax: (217) 782-7046
100 West Randolph Street, Chicago, Illinois 60601 • (312) 814-3000 • TTY: (312) 814-3374 • Fax: (312) 814-3806
1001 East Main, Carbondale, Illinois 62901 • (618) 529-6400 • TTY: (618) 529-6403 • Fax: (618) 529-6416

in every part of CPD's operations. This is particularly critical as summer approaches, when Chicago's violence becomes most acute. As we have stressed throughout the life of the Consent Decree, incorporating community policing principles into the Department's anti-violence efforts is essential to the effectiveness of those efforts. This approach is what the Consent Decree requires and Chicagoans deserve.

We look forward to working with new City and CPD leadership to integrate community policing throughout the Department's operations and to progress in areas where reform has lagged, which we highlight below.

### Critical Consent Decree Requirements Remain Stalled at the Starting Line

CPD has yet to achieve any level of compliance with more than 70 paragraphs of the Consent Decree, which represent critical reforms that are now years overdue. Among these are:

- CPD's policy ensuring meaningful access to police services for individuals with limited English proficiency (Paragraph 64);
- CPD's policy ensuring meaningful access to police services for individuals with disabilities (Paragraph 68);
- CPD's policy mandating the use of body-worn cameras in compliance with the Consent Decree and Illinois law (Paragraphs 238-41);
- CPD's policy governing investigations of officer-involved shootings and deaths in compliance with the Consent Decree and Illinois law (Paragraphs 488-92); and
- Important data analyses, including the assessment of the frequency of misdemeanor arrests and administrative notices of violation made by CPD officers of persons in specific demographic categories, such as race and gender, (Paragraphs 79-80) and the assessment of the relative frequency and type of force used by CPD officers against persons in specific demographic categories, including race or ethnicity, gender, age, or disability status (Paragraphs 572-73).

CPD's lengthy delays adopting these key reforms have ongoing impacts, both in how officers do their jobs and in exacerbating public distrust. Chicagoans have the right to expect CPD to approach these policies and data analyses with urgency. OAG urges CPD to prioritize them in the coming months.

### CPD Must Objectively Examine and Reconsider Staff Allocation

Nearly every section of the voluminous Report emphasizes the insufficiency of the personnel that have been designated to undertake reform efforts within CPD. Specifically, the Report notes that lack of adequate staff in the Office of Community Policing, Crisis Intervention Unit, Tactical Review and Evaluation Division (TRED), Training Division, Office of Constitutional Policing and Reform, and Reform Management, among others, has contributed to stalled progress in nearly every section of the Consent Decree. While CPD has pointed to insufficient staffing for its failure to implement large-scale reform, it is evident from the Report that CPD lacks a systematic, empirically-driven approach to assessing staffing needs and allocation.

CPD has both a much higher ratio of sworn officers to civilian employees than typical among U.S. law enforcement agencies and a higher number of police officers per capita.[1] Yet CPD frequently cites staffing as the limiting factor in its ability to achieve comprehensive reform. This disconnect indicates a pressing need to assess how CPD is using its resources. As stated in the Report, the Consent Decree requires the City to hire, retain, or *reallocate* sufficient staff to enable CPD to fulfill its obligations under the agreement. OAG shares IMT's concerns that CPD has yet to complete or produce the "comprehensive staffing study" required by the Consent Decree; moreover, given CPD's perpetual staffing challenges, such an assessment is necessary. The City and CPD should engage an independent outside entity to conduct this study, to enable CPD to make clear-eyed determinations regarding how it is using its members and how it can deploy them more efficiently. In short, CPD must act to address its staffing allocation challenges if it hopes to regain momentum in achieving reform.

## CPD Must Prioritize Attentive and Effective Community Engagement

The Report also emphasizes CPD's ongoing challenges to effectively engage the community and the negative impact its deficient community engagement practices have. CPD has struggled to engage the community from the beginning. CPD has repeatedly fallen into a pattern of developing policies and trainings entirely on its own before presenting what it considers to be nearly final products to community members and organizations for feedback. In addition, CPD frequently solicits and collects feedback from the community and later fails to communicate whether and how that feedback was incorporated, leaving individuals and organizations to feel as though their time and energy were wasted.

Effective community engagement is both an explicit requirement of many parts of the Consent Decree and a method by which CPD has the opportunity to repair broken trust. Conversely, if CPD continues to solicit community input without being willing to incorporate it, or fails to communicate how community input is used, CPD runs the risk of further alienating members of the community, dissuading them from participating in CPD's work in the future.

CPD must make it a priority to get community engagement right. It must partner with individuals and community groups with relevant lived experience early in the process, allowing them to inform policy and training development from the beginning. It must also consistently close the feedback loop, by intentionally communicating to community members whether and how their input was utilized. Community engagement cannot be seen as an extra or optional step, but must be viewed as an essential aspect of reform. Without effective community engagement, CPD will continue to struggle to make meaningful progress on the ultimate reform metric – whether Chicagoans trust the police.

## Progress in the Seventh Monitoring Period

While CPD and the City made minimal overall progress toward Consent Decree implementation in the seventh monitoring period, there were a few bright spots, which are highlighted below.

---

[1] *Chicago Police Department Staffing Analysis*, THE CIVIC FEDERATION (Jul. 8, 2022), https://www.civicfed.org/civic-federation/blog/chicago-police-department-staffing-analysis.

- The City and CPD implemented the Search Warrant Community Resource and Referrals Pilot Program, providing for the securing and repairing of damage caused by the execution of residential search warrants and provision of trauma-informed counseling services to individuals present at the time of execution. The pilot program involves collaboration across multiple City entities.
- Despite difficulty recruiting and retaining Field Training Officers (FTOs), CPD has maintained the ratio of one FTO for every one Probationary Police Officer (PPO) that is required by the Consent Decree. CPD deserves credit for its efforts to maintain this 1:1 ratio, which is important to ensure adequate training and supervision of new officers.
- CPD finalized important policies this period. The Department finalized and issued G02-01-05, *Religious Interactions*, governing officers' interactions with members of religious communities. This policy was developed in close partnership with the Council of Religious Leaders of Metropolitan Chicago, in a positive example of effective community engagement. CPD also clarified in policy, including G02-01, *Protection of Human Rights*, and G02-02, *First Amendment Rights*, that members of the public are permitted to photograph and record officers performing their law enforcement duties in public. These are critical and long overdue policies that OAG hopes will eventually result in improved experiences for community members interacting with CPD officers on the ground.
- CPD finalized and issued G08-01 et al. and S08-01 et al., suites of important policies related to the Department's accountability practices.
- The Office of the Inspector General and the Deputy Inspector General for Public Safety maintained full compliance with their Consent Decree obligations.
- The Civilian Office of Police Accountability (COPA) continued to make progress toward secondary and operational compliance with its responsibilities under the Consent Decree.

OAG commends the diligent individuals at CPD and other City entities who have realized these accomplishments despite the challenges they have faced. In order to ensure that those individuals do not lose morale, the City and CPD must redouble their commitment to reform in the coming months.

### Conclusion

The City of Chicago recently welcomed a new mayor, and he will soon name a new Superintendent of Police. This year has the potential to be an inflection point. OAG encourages the City and the Department to embrace the opportunity this moment provides by prioritizing critical and overdue Consent Decree requirements; undertaking an independent study to examine its staff allocation; and overhauling its community engagement processes. We look forward to working with our new partners in this critical work.

Respectfully,

KWAME RAOUL
Attorney General of the State of Illinois

By: */s/ Katherine Pannella*

Katherine Pannella
Assistant Attorney General
Civil Rights Bureau
Office of the Illinois Attorney General
100 West Randolph St., 11th Floor
Chicago, Illinois 60601
773.590.7083
Katherine.Pannella@ilag.gov

cc: Jennifer Bagby, Danielle Clayton, Max Frazier, Arthur Haynes, and Allan Slagel, Counsel for the City of Chicago (via email)

# Attachment B:
# City of Chicago Comments
# June 1, 2023



### DEPARTMENT OF LAW
### CITY OF CHICAGO

June 1, 2023

Independent Monitoring Team
c/o Maggie Hickey, Independent Monitor
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Maggie.Hickey@afslaw.com


Dear Ms. Hickey:

The City of Chicago provides its comments to the Independent Monitoring Team's draft report for the reporting period July 1, 2022, through December 31, 2022 (IMR 7). The City looks forward to continued compliance progress in the current monitoring period (January 1, 2023 – June 30, 2023).

### City of Chicago's Comments on the
### Seventh Independent Monitoring Report

Pursuant to Consent Decree Paragraph 663, the City of Chicago ("City") provides the following comments on the Independent Monitoring Team's ("IMT") May 1, 2023, draft Independent Monitoring Report 7 ("IMR7 Report").

### Summary of the City's Continued Increased Compliance

By the close of the seventh monitoring period, nearly four years into the Consent Decree, the City has achieved some level of compliance with more than 82% of the 552[1] paragraphs assessed by the IMT in IMR7. This is an increase in the percentage of compliance from the

---

[1] The City disputes that paragraph 81 is under assessment at this time and disputes that paragraph 82 is a monitorable paragraph. Therefore, neither should be included in the total paragraphs under assessment. By the City's calculation, it has achieved some level of compliance with 458 out of the 550 paragraphs under assessment for some level of compliance with slightly over 83% of all monitorable paragraphs.



**DEPARTMENT OF LAW**
CITY OF CHICAGO

previous monitoring report where the City was in compliance with 77% of the 554 paragraphs assessed by the IMT[2].



The City's consistently increasing rates of compliance are significant but represent only a portion of the work done throughout the reporting period. The City appreciates the IMT's acknowledgement that "this report represents a sixth-month assessment of the City's compliance efforts from July 1, 2022, through December 31, 2022 . . [and] does not reflect all [of] the efforts of the City, the CPD, or the other relevant City entities to date." (See IMR 7 Report – Executive Summary, pg. 2). The City further appreciates that in the IMT's Executive Summary for IMR 7, it added the achievements by CPD and other relevant City agencies in its section "*Major Developments and Principal Achievements and Challenges Impacting Compliance*." The

---

[2] The City disputed that paragraphs 81 and 82 were monitorable in IMR 6.



**DEPARTMENT OF LAW**
CITY OF CHICAGO

acknowledgement of the efforts being made for future progress along with the additional information more appropriately recognizes the building nature of the City's reform efforts. The City believes this approach more appropriately balances the report of compliance with the demonstrated work being done by the Chicago Police Department (CPD), the Office of Emergency Management Communication (OEMC), the Civilian Office of Police Accountability (COPA), the Police Board, the Office of Inspector General (OIG), Department of Human Resources (DHR), Public Safety Administration (PSA), and the other City entities involved in the work of reform.

**IMR 7 Achievements**

The City increased the percentage of monitorable paragraphs with some level of compliance to over 80% of Consent Decree paragraphs during this reporting period and decreased the number of paragraphs in which there was no compliance. This increased level of compliance is the result of hard work by the many City employees in CPD, OEMC, COPA, the Police Board, OIG, DHR, PSA, the Mayor's Office and many other City employees.

Some of the notable achievements in the Seventh Monitoring Period include:

- The completion / implementation of numerous CPD policies and policy suites after review by the IMT and OAG and community engagement, including: CPD's Accountability Policy Suite (G08-01 and S08-01); Responding to Individuals in Crisis (S04-20); Crisis Intervention Team (CIT) Program (S05-14); and Department Training Directives (S11-10, S11-10-03)..

- Completion of numerous trainings by the required 95% of CPD members, including: First Amendment eLearning; Hate Crimes eLearning; Processing Juveniles eLearning; Crime Victims' Assistance eLearning; 2022 De-Escalation, response to Resistance and Use of Force In-Service Training; and Active Bystandership for Law Enforcement Training.



### DEPARTMENT OF LAW
CITY OF CHICAGO

- Implementation of CPD's Foot Pursuit Policy. The implementation of this policy in IMR 7 was the culmination of a great deal of policy development in IMR 6 and training in IMR 6 and 7.
- The implementation of the Police Community Complaint Mediation Pilot Program for the mediation of certain community member complaints against CPD members in partnership between the Office of the Mayor, COPA, CPD, and the Center for Conflict Resolution (CCR).
- CPD's hiring of a full-time Director of Wellness, Dr. Aaron Chatman.
- Continued full compliance for all Consent Decree requirements pertaining to the Office of the Inspector General and Public Safety Inspector General.

**IMT Reporting Process**

The Monitor's current report, Report 7, documents the City's compliance efforts for July 1, 2022 – December 31, 2022. The current draft of the IMT's Report 7 is over 1600 pages long and will be published in June 2023, nearly six months after the end of the reporting period at issue. While the City appreciates the amount of work that has gone into this evolving document, the City would request that the IMT reconsider the format of its reports in order to complete and file the report much closer in time to the completion of the reporting period documented in the report. Consent Decree paragraphs 661 – 663 require the Monitor to prepare and file semiannual reports regarding the status of compliance with the Consent Decree. Paragraph 663 requires the Monitor to provide a draft of each semiannual report to the parties within 30 days of the end of each reporting period and requires the Parties to provide their responses 15 days after receipt of the draft. While the Consent Decree controls the exchange of initial drafts and responses, it is silent on the deadline by which the report must be filed. The volume of the report guarantees a prolonged review and finalization process by the Parties and the Monitor. The volume of the report, even with inclusion of summaries, is also likely a deterrent to the public being able to



fully appreciate the progress being made by the City on the Consent Decree   The City would recommend that the IMT explore  ways to archive the historical portions of the report and focus its semi-annual reports on the work completed in the reporting period as well as what is required to achieve further compliance in future reporting periods.  This will lead to more focused reports, allow the parties to complete the review and publication in a timely manner, and make the report more readable to the public, all of which will increase transparency and provide timely feedback to the City as it continues the work of reform.

**Methodologies**

Consent Decree Paragraph 655 provides that the IMT will develop and share with the City and the OAG a proposed methodology for its compliance reviews. Paragraph 655 allows for the parties to submit comments regarding the methodology, which both the City and the OAG have consistently submitted.

The City recognizes the complexity and difficulty of developing distinct methodologies for several hundred Consent Decree requirements spanning numerous topics and appreciates the IMT's efforts to do so in a thorough manner. The City, however, believes that many of the methodologies delineated by the IMT add substantive requirements beyond the legal requirements stated in the Consent Decree. Other methodologies do not provide adequate detail about the data sources and analysis methods that will be used to assess compliance.

Consent Decree Paragraph 624 provides that the IMT's review will determine whether the City has substantially complied with the Consent Decree. This paragraph further notes that "Compliance with a requirement means that the City and CPD: (a) have incorporated the requirement into policy; (b) have trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) are carrying out the requirement in actual practice." Based on this paragraph, the IMT assess whether the City and its entities are in



**DEPARTMENT OF LAW**
CITY OF CHICAGO

preliminary, secondary, or full compliance—each of these levels typically mirrors the three subparts of ¶ 642.[3]

As noted below, many of the City's disagreements with the IMT's current report involve methodology descriptions that vary from the methodologies described above. The City is concerned that the IMT often conflates the requirements for full compliance when assessing secondary compliance. Additionally, often the IMT's methodologies do not provide sufficient actionable detail to allow the City to understand what will be required to achieve the next level of compliance. The IMT reports frequently provide specific guidance, which the City finds immensely helpful in planning their future compliance efforts. However, where the guidance is unclear or based upon a methodology beyond what is contained in the Consent Decree, it could cause a delay in the City's compliance efforts and may present a misleading picture to the public regarding the extent to which the City is undertaking the steps required to achieve compliance.

Some concerns related to specific section or paragraph assessments are addressed below, and further concerns have been addressed in prior correspondence and conversations between the parties and the IMT. The City will continue to engage with the IMT to clearly define and align the methodologies that will be applied for each assessment. The City reserves the right to provide further responses or objections to the compliance methodologies identified in the IMR 7 Report, or the application of any methodology to a specific Consent Decree requirement.

**Specific Comments**

The City provides the following comments in response to the IMT's comments related to various Consent Decree sections / specific Consent Decree paragraphs / or involved City Agencies:

- **Community Policing:**

---

[3] For certain Consent Decree requirements, this three-pronged analysis is less suitable. In those situations, the Monitor develops alternate methodologies for assessing compliance.



DEPARTMENT OF LAW
CITY OF CHICAGO

- o **Paragraph 16:** The IMT notes that it will assess Secondary compliance by assessing "whether the CPD's process includes sufficient supervisor oversight to ensure the review processes effectively determines whether each District's strategies are effective in building and strengthening community partnerships and using problem solving techniques." This description of secondary compliance is contrary to the methodologies set forth in ¶ 642 of the Consent Decree and describes full or operational compliance, not secondary compliance.

- **Impartial Policing**:

  - o **Paragraphs 54 and 55**: The City and CPD believe that the implementation of Protection of Human Rights (G02-01) and Prohibition Regarding Racial Profiling and Other Bias-Based Policing (G02-04) satisfy the requirements of these two paragraphs and warrant awarding preliminary compliance.

- **Crisis Intervention:**

  - o **Paragraphs 149 and 151 (OEMC):** The City and OEMC have produced evidence in IMR7 and previously that: (1) OEMC established a quality assurance program; (2) OEMC incorporated IMT feedback into its draft protocol for the quality assurance program; and (3) OEMC communicated in writing why it awaits IMT and OAG approval before continuous data reporting commences. Additionally, OEMC has produced evidence annually of: (1) substantial policy reviews; (2) annual requests for feedback from several relevant entities; and (3) OEMC's consideration of feedback received. Finally, evidence has been consistently produced that OEMC has established viable structures surrounding the requirements of both 149 and 151. Accordingly, OEMC respectfully requests that the IMT restore its compliance levels with paragraphs 149 and 151.

- **Training:**

  - o **Paragraph 302:** The IMT's comments note that the "policy specifications" of E05-08 "meet ¶ 302 requirements for Preliminary compliance," yet the IMT has failed to award preliminary compliance for this paragraph.



**DEPARTMENT OF LAW**
CITY OF CHICAGO

- **Supervision:**

  o **Paragraphs 347, 348, 349, 350, 351, 353, 354, and 355:** The In-Service Supervisor Training, which received a "no objection" from the IMT covers the requirements of these paragraphs and should establish secondary compliance upon completion by the requisite number of CPD supervisors. Reference in these paragraphs to any other compliance items such as review of Supervisor Logs or the Unity of Command / Span of Control, PES, and OSS pilots is inconsistent with the methodology established by the IMT. These materials are necessary for operational compliance but not secondary compliance.

  o **Paragraphs 369, 370, 371, 372, 373, 374, 375, and 376:** The IMT's comments suggest that compliance with these paragraphs will depend on the combined progress of the Unity of Command / Span of Control Pilot, the PES Pilot, and the OSS Pilot. Each of these pilots should be assessed individually and the appropriate compliance awarded based upon each.

- **Accountability and Transparency:**

  o **Paragraph 448 (COPA):** COPA produced a memorandum and supporting materials towards full compliance with this paragraph on December 1, 2022 (*see* MONITOR 1405); accordingly, COPA should be awarded full compliance with this paragraph.

  o **Paragraph 470 (COPA):** COPA maintains that the Disciplinary Recommendation Training completed in IMR 6 covered the requirements of this paragraph and should have established secondary compliance. (*See* MONITOR 1292).

  o **Paragraphs 495, 499, 500, 502 (COPA):** The IMT correctly awarded secondary compliance to COPA for paragraph 467 based upon COPA's "FSR Training." However, this training also satisfied paragraphs 495, 499, 500, and 502 and COPA should be awarded secondary compliance for these paragraphs as well.



DEPARTMENT OF LAW
CITY OF CHICAGO

In addition to the City's overall comments, contained in this letter, the City also submits the attached letter from the Office of the Inspector General, reflecting their comments to their work on sustained operational compliance throughout IMR 7.

Sincerely,

*/s/  Jennifer K. Bagby*
Deputy Corporation Counsel
Public Safety Reform Division

Cc:  Christopher Wells, Office of the Attorney General
Dana O'Malley, General Counsel, CPD
Allan Slagel, Taft Law
Robin Murphy, General Counsel, COPA
Max Caproni, Executive Director, Police Board
Megan Carlson, Associate General Counsel for Public Safety, Office of the Inspector General
Michael Kawaters, Policy Analyst, Office of Emergency Communications
Jessica Gall-Adediran, First Deputy, Community Safety, Office of the Mayor



Deborah Witzburg | Inspector General
City of Chicago
Office of Inspector General
740 N. Sedgwick St., Ste 200
Chicago, IL 60654
Phone: (773) 478-7799

Via Electronic Mail

May 4, 2023

Independent Monitoring Team
Margaret A. Hickey, Independent Monitor
Harold Medlock, Associate Monitor
233 S. Wacker Dr., Ste. 7100
Chicago, Illinois 60606
Maggie.Hickey@asflaw.com
Harold.Medlock@cpdmonitoringteam.com

Re: Office of Inspector General Comments on Draft IMR7 Report

Dear Ms. Hickey and Mr. Medlock:

I write to submit the Office of Inspector General (OIG) and Deputy Inspector General for Public Safety's (PSIG) comments on the draft IMR7 report, submitted to the City on May 1, 2023.  *See* Consent Decree ¶ 663.

OIG and PSIG agree with the findings and conclusions in the draft IMR7 report that OIG and PSIG have maintained full compliance with the obligations contained in paragraphs 440, 444, 481, 522, 523, 537, 556, 557, 558, 559, 561, 562, 563, and 565.  OIG and PSIG do not seek any substantive changes to the draft IMR7 report's summaries of their compliance with those paragraphs.  Additionally, OIG and PSIG agree that they are not subject to a compliance assessment with response to paragraphs 521, 560, and 564. OIG and PSIG previously offered comments on the draft IMR7 report submitted to the City on January 31, 2023 and appreciate the incorporation of that feedback into the updated draft. *See* **Ltr. from Megan Carlson, Acting Deputy Inspector General for Public Safety, City of Chi. to Margaret A. Hickey, Independent Monitor re OIG Comments on Draft IMR7 Report (February 7, 2023).** OIG and PSIG have no additional comments on the draft at this time.

Sincerely,

Tobara Richardson
Deputy Inspector General for Public Safety
Office of Inspector General

cc:    Office of Illinois Attorney General
        Jennifer Bagby, Deputy Corporation Counsel, Department of Law
        Allan Slagel, Partner, Taft

Independent | Chicago Police
Monitoring Team | Department
Consent Decree