**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF ILLINOIS, | ) | |
| | ) | Case No. 17-cv-06260 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**COMMUNITIES UNITED PARTIES' POSITION STATEMENT ON
PARTIES' AMENDED STIPULATION REGARDING INVESTIGATORY STOPS,
PROTECTIVE PAT DOWNS, AND ENFORCEMENT OF LOITERING ORDINANCES**

The *Communities United* parties within the Coalition of community and civil rights organizations with enforcement authority under Consent Decree ¶ 709 (Dkt. 703-1)[1] submit this statement on the Parties' Amended Stipulation Regarding Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances (Dkt. 1096) ("Stipulation"). The *Communities United* parties represent thousands of Chicagoans from all backgrounds and neighborhoods throughout the City, many of whom have been subjected to the Chicago Police Department's ("CPD") racist and unconstitutional stop and frisk practices for decades. The Stipulation fails to require necessary changes to end the persistent civil rights violations caused by CPD's discriminatory investigatory stops and protective pat downs ("stop and frisk") and Loitering Ordinance enforcement.

On August 1, the Court granted the Coalition's motion for a fairness hearing (Dkt. 1103) and stated its intention to evaluate whether the Stipulation is "lawful, fair, reasonable, and adequate." For the reasons discussed below, the *Communities United* parties request that the Court order the City of Chicago and the State of Illinois ("Parties") to reopen negotiations regarding the Stipulation – this time with *Communities United* and other community members at the table – to include limitations on stops and frisks that will comply with the Constitution and meaningfully advance the Consent Decree's requirements of impartial policing and community engagement.

### I. Background of the Stipulation: The ACLU Stop and Frisk Agreement.

For decades, CPD has over-stopped and frisked Black and Latino Chicagoans. In March 2015, the ACLU of Illinois reported, based on CPD data obtained under the Illinois Freedom of

---

[1] The *Communities United* Coalition organizations are: ACLU of Illinois; Community Renewal Society; Communities United; ONE Northside; and Next Steps. The *Campbell* Coalition organizations are: Black Lives Matter Chicago; Blocks Together; Brighton Park Neighborhood Council; Westside Branch of the NAACP; Illinois State Conference of the NAACP; Network 49; Women's All Points Bulletin WAPB; The 411 Movement for Pierre Loury; and Chicago Urban League. Together, we are the "Coalition." This position statement is filed on behalf of the *Communities United* parties.

Information Act, that "Black Chicagoans were subjected to 72% of all stops yet constitute just 32% of the city's population." ACLU of Illinois, *Stop and Frisk in Chicago*, 3 (March 2015).[2] CPD's data further showed that CPD made significantly more stops per capita in Black neighborhoods compared to majority white neighborhoods. *Id.* at 9. For nearly half of CPD's stops and frisks, CPD either recorded an unlawful basis for the stop or failed to record enough information to determine whether the stop complied with the Fourth Amendment. *Id.* at 7-8. CPD kept no data regarding frisks. *Id.* at 14. The ACLU concluded that CPD's policies and training failed to instruct officers on the law. *See id.* at 18.

In August 2015, the ACLU reached a settlement agreement ("ACLU Agreement") (attached as Ex. 2) with the City of Chicago and CPD to reform CPD's stop and frisk policies and training to ensure compliance with the U.S. Constitution's Fourth Amendment, the Illinois Constitution, and the Illinois Civil Rights Act ("ICRA"), 740 ILCS 23/5(a)(2), which prohibits government policies and practices that have a disparate impact on the basis of race, national origin, and other protected characteristics. The ACLU Agreement required CPD to collect and report comprehensive data regarding all investigatory stops, frisks, and searches. Ex. 2, §1. It required CPD to incorporate into its policies and practices the principle that officers "may not use" protected characteristics such as race or ethnicity "[i]n making routine or spontaneous law enforcement decisions." *Id.* §II.2. It further required continuous supervisory review and quarterly or semi-annual department-level audits of CPD's stop and frisk data. *Id.* §II.3. And it required regular data reporting and analysis by an independent expert and a Consultant to determine whether CPD was in compliance with the Fourth Amendment and ICRA. *Id.* §V.

---

[2] The public reports referenced herein are authenticated in the attached Declaration of Alexandra K. Block, ¶ 4 (Ex. 1) ("Block Dec.").

2

ACLU and CPD retained the Honorable Arlander Keys (Ret.) as the first Consultant, and Judge Keys completed three reports for the periods January-June 2016,[3] July-December 2016,[4] and January-December 2017.[5] In his third report, Judge Keys concluded that serious deficiencies in CPD's data – and, particularly, CPD's practice of allowing officers to rewrite investigatory stop reports ("ISRs") to change the claimed basis for an officer's decision to stop or frisk someone – prevented an accurate analysis of whether CPD substantially complied with the Fourth Amendment. *See id.* at 26. As a result, the ACLU and CPD agreed on a Temporary Stay of the Review of the Statistically Representative Sample of ISRs (attached as Ex. 3), which suspended the Consultant's Fourth Amendment analysis until CPD could improve its ISR forms, policies and practices. Ex. 3, §2. The Consultant's review of racial and ethnic disparities in CPD's stops and frisks continued. *See* Ex. 3, §14.

Also in 2019, the Parties agreed to the Consent Decree, which carved out the ACLU Agreement, *see* ¶ 712. Because of the overlap between the Consent Decree's impartial policing obligations and the ACLU Agreement, in 2020, Maggie Hickey became the Consultant for the ACLU Agreement, replacing Judge Keys. Margaret A. Hickey, *Consultant Status Report*, 4 (March 19, 2021) ("2021 Consultant Report").

In 2021 and 2023, Consultant Hickey published reports explaining the steps that her team, the ACLU and CPD were taking under the ACLU Agreement. *Id;* Margaret A. Hickey, *Consultant Report: Progress Update and Data Analysis of Chicago Police Department Stops between 2018 and 2020*, 15-16 (June 14, 2023) ("2023 Consultant Report"). First, they began a robust, multi-

---

[3] Hon. Arlander Keys, *Consultant's First Semiannual Report on the Investigatory Stop and Protective Pat Down Agreement for the Period January 1, 2016-June 30, 2016* (March 23, 2017).
[4] Hon. Arlander Keys, *The Consultant's Second Semi-Annual Report, Investigatory Stop & Protective Pat Down Agreement* (March 5, 2018).
[5] Hon. Arlander Keys, *The Third Report Assessing the Chicago Police Department's Compliance with the Investigatory Stop & Protective Pat Down Agreement* (Oct. 17, 2019).

3

tiered community engagement process to advise CPD on its stop and frisk practices. *See* 2021 Consultant Report at 9-10. Community organizations and members received funding to design and co-lead city-wide focus groups, which took place in early 2023. *See* 2023 Consultant Report at 15-16. Ms. Hickey will publish the community recommendations and CPD's required written response in a future report. *Id.* at 16.

Second, beginning in 2020, the Consultant, ACLU and CPD worked to develop a single "universal" Stop Form (or electronic system) to record all CPD investigatory stops, traffic stops, pat downs and searches. 2021 Consultant Report at 11; 2023 Consultant Report at 17. The form was finalized and agreed to in November 2021.[6] A single form is important to collect accurate data on how many people CPD stops, frisks and searches, whether there are racial and ethnic disparities, and whether there is a legal basis for those encounters.

Third, the Consultant, CPD and ACLU developed drafts of CPD's new Fourth Amendment policies. 2021 Consultant Report at 11. In 2020, the Consultant proposed a draft Fourth Amendment policy explaining to officers when and on what basis they are allowed to stop people for investigatory purposes. *Id.* CPD did not accept the Consultant's recommended policy, and instead developed a new policy suite. *See* 2023 Consultant Report at 16-17. The Consultant and ACLU provided detailed comments on several iterations of those policies in January and December 2022. *Id.* at 17-18.

Fourth, the Consultant and ACLU worked with CPD to develop comprehensive Fourth Amendment training for officers. 2023 Consultant Report at 21-22. CPD first proposed a "Fourth Amendment eLearning" module, which had significant legal deficiencies. *Id.* CPD then discontinued the eLearning, and instead designed a "Constitutional Policing" curriculum with five

---

[6] ACLU requested CPD's agreement to file a copy of the proposed universal stop form as an attachment to this brief. CPD's counsel did not respond. Block Dec. ¶ 5 (Ex. 1).

4

modules covering Fourth Amendment subjects. *Id.* at 22. The ACLU and Consultant provided comments on this curriculum in February 2023. *Id.*

Development of CPD's revised stop form, policy, and training materials was in process in early 2023, when CPD informed the ACLU and the Consultant that it planned to terminate the ACLU Agreement to resolve a separate matter, *Smith v. City of Chicago*, No. 15 CV 3467.

The Consultant published her final analysis of CPD's stop and frisk data on June 14, 2023. 2023 Consultant Report at 23 *ff.* That report found that, while CPD's total investigatory stops, frisks and searches declined in 2018-20, significant, unexplained racial and ethnic disparities continued. *Id.* at 24. "Black and Latino people were stopped at far higher rates than White" Chicagoans. *Id.* On average, CPD stopped one in eight Black residents, one in 25 Latino residents, and one in 73 White residents each year. *Id.*

## II. The Parties Excluded the Coalition and Other Community Members from the Negotiations on the Stipulation.

Despite the Coalition's express request to be at the table and the ACLU's eight-year history of working with CPD to transform its stop and frisk practices, the Parties refused to allow the Coalition, the ACLU, or directly impacted community members to participate in the negotiations on the Stipulation. The Parties' failure to engage with individuals and groups directly harmed by CPD's discriminatory stop and frisk practices before adding this important subject to the Consent Decree violates the spirit of the community engagement requirements of the Consent Decree (*see, e.g.,* ¶¶ 21-28) and undermines the legitimacy of the Stipulation. The Court should undertake a rigorous evaluation of whether the Stipulation is lawful, fair, reasonable, and adequate, in light of the Parties' closed-door process of negotiating the Stipulation.

**III.     The Stipulation Omits Key Provisions Needed to Cure ongoing Civil Rights Violations in CPD's Stop and Frisk Practices.**

Because the Parties shut out *Communities United* and other community members' input, the Stipulation fails to include provisions that would meaningfully change the way CPD treats Black and Latino Chicagoans. Below, we discuss the deficiencies in the Stipulation's substantive requirements, as well as its lack of accountability and transparency mechanisms.

**A.  The Limits on Stops and Frisks in Stipulation § XIV.B Are Not Legally Sufficient.**

Paragraph 806 of the Stipulation purports to restrict investigatory stops for discriminatory purposes, but the existing language is unlikely to remedy discriminatory CPD practices and, in certain instances, violates existing law and the Consent Decree's other paragraphs.

**1. Paragraph 806(g) Fails to Comport with the Consent Decree and the Equal Protection Clause.**

The Equal Protection Clause prohibits policing decisions made on the basis of race, ethnicity, or other protected characteristics (unless part of a specific description of a person). Police action is unconstitutional if "a discriminatory purpose has been *a motivating factor*"; a plaintiff need not show that a discriminatory purpose was the "dominant" or "primary" factor. *Floyd v. City of New York*, 959 F. Supp. 2d 540, 571 (S.D.N.Y. 2013), citing *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977) (finding New York City's stop and frisk program was unconstitutional racial profiling) (emphasis added). But Stipulation ¶ 806(g) prohibits officers only from "[c]onducting investigatory stops and protective pat downs ***solely*** on the basis" of an individual's protected characteristics (emphasis added). This language permits CPD to make unconstitutional stops and frisks that are motivated – even in part – by a person's race or ethnicity. To ensure that CPD complies with the Equal Protection Clause, the word "solely" must be removed from ¶ 806(g).

6

Additionally, Consent Decree ¶ 55 prohibits officers from "using" protected characteristics "when making routine or spontaneous law enforcement decisions,"[7] and ¶ 56 prohibits officers from using "substitutes or stereotypes" as stand-ins for protected characteristics. By limiting its application only to stops and frisks "solely" on the basis of protected characteristics, Stipulation ¶ 806(g) violates the broader protections enshrined in ¶¶ 55-56.

### 2. The Rest of Paragraph 806 Fails to Meaningfully Curb CPD's Abusive Stop and Frisk Practices.

The limitations in ¶ 806(c)-(f) and (i)-(j) provide free reign to CPD to continue its harmful and racist patterns of stops and frisks. The Parties must remove "solely" from ¶¶ 806(d)-(f) and (i)-(j). Prohibiting officers from relying "solely" on an individual's presence in a so-called high-crime location (¶ 806(d)), attempt to avoid police (¶ 806(e)), "presence in the company of others suspected of criminal activity" (¶ 806(f)), the odor of cannabis (¶ 806(i)), or "officer safety" (¶ 806(j)), allows officers to rely on two or more of these factors together to justify unlawful stops and frisks. Considering the "solely" limitation in ¶ 806(g), the Stipulation allows a CPD officer to stop someone because of a person's race *and* presence in a high-crime area, or race *and* avoidance of police. Or an officer could justify a frisk by claiming a need to protect "officer safety" in a so-called high-crime area. History shows that CPD uses these amorphous factors based on racialized stereotypes to disproportionately stop and frisk Black and Latino people in under-resourced neighborhoods on the South and West sides. *See e.g., City of Chicago v. Morales,* 527 U.S. 41 (1999); *Nelson v. City of Chicago,* 83-C-1168 (N.D. Ill.).

---

[7] Consent Decree ¶ 55 is almost identical Section II.2 of the ACLU Agreement (Ex. 2), which governed the City and CPD's behavior throughout the period September 2015-June 2023.

Paragraph 806 sets a floor that will be difficult for the Monitor, the *Communities United* parties, or other community members to convince CPD to exceed when CPD issues new Fourth Amendment policies implementing the Stipulation's terms. The inevitable result will be CPD's continued harassment of primarily young Black and Latino men – rather than a decrease in such abuse, which should be the Stipulation's goal.

In addition, ¶ 806(c) prohibits officers only from "[r]elying on information known to the officer at the time to be materially false…" but it fails to prohibit officers from relying on sources known to be unreliable or to have previously provided incorrect information. It also fails to prohibit reliance on uncorroborated anonymous tips. *See Florida v. J.L.*, 529 U.S. 266, 274 (2000) (officers may rely on anonymous tips only if corroborated and verified with evidence from other sources). These deficiencies must be corrected.

Finally, ¶ 806 fails to prohibit officers from relying on other factors that courts have found insufficient to justify stops and frisks, and/or that should be prohibited because they lead to racially biased and illegitimate police encounters, including but not limited to:

- *"Furtive gestures" or "body movements that create suspicion"* (vague phrases that CPD previously agreed, at ACLU's request, to delete from its Constitutional Policing training).

- *Nervous or evasive behavior* (*See United States v. Williams*, 731 F.3d 678, 687 (7th Cir. 2013) ("Most people, when confronted by a police officer, are likely to act nervous, avoid eye contact, and even potentially shift their bodies as if to move away from the area, thus making such behaviors of very little import to a reasonable suspicion determination.") (holding that nervousness – alone or in conjunction with presence in "a high-crime area" – did not support a patdown)).

- *An individual's past criminal activity or criminal history* (*see* Consent Decree ¶ 53, prohibiting routine or spontaneous policing decisions based on these factors unless they are part of a suspect's description).

- *Time of day or night* (*See United States v. Brewer*, 561 F.3d 676, 679 (7th Cir. 2009) (mentioning time of day only in connection with other factors that created reasonable articulable suspicion for an investigatory stop)).

8

- *An officer's "training and experience"* (a vague factor that does not reflect that CPD's Fourth Amendment training has been and continues to be insufficient).

### B. Stipulation § XIV.A Should Require CPD to Reduce the Number of, and Racial/Ethnic Disparities in, Stops and Frisks.

In 2014, prior to the ACLU Agreement, CPD conducted over 700,000 investigatory stops. Alex Chohlas-Wood et al., *Identifying and Measuring Excessive and Discriminatory Policing*, 89 Univ. of Chicago L. Rev. 441, 471 (2002). By 2022, that number fell to about 69,000 stops. Chicago Police Department, 2022 ISR data, available at: https://home.chicagopolice.org/statistics-data/isr-data/ (last visited Aug. 3, 2023). This very substantial reduction means that hundreds of thousands of people – primarily young Black men – were not racially profiled, harassed, interrogated, or brutalized by CPD officers. Stipulation § XIV.A. fails to build on this progress made under the ACLU Agreement. To be effective, the Stipulation must require CPD to conduct a cost/benefit analysis of whether its stop and frisk practices are achieving a public safety benefit, and to reduce or eliminate stop and frisk policing if CPD cannot demonstrate a tangible benefit.[8]

The Stipulation also fails to require CPD to analyze the reasons for the ongoing racial and ethnic disparities in whom officers stop, frisk, and search. As the 2023 Consultant Report stated (at 5 n.8), CPD has never articulated "a policy objective or crime strategy" that would justify the "observed disparities between racial/ethnic groups." That report found that in 2018-2020, CPD was nine times more likely to stop Black people than white people, and three times as likely to stop Latino people compared to white people. *Id.* at 5. Black and Latino people also suffered disproportionate numbers of frisks and searches, even though CPD officers were more likely to find contraband when frisking and searching white people – indicating that officers wrongly

---

[8] Academic research demonstrates that stop and frisk had only a minimal effect on the rate of homicides and shootings in Chicago during the period 2004-2018. *See* Wesley G. Skogan, *Stop & Frisk and the Politics of Crime in Chicago*, 206-08 (2022).

stereotype Black and Latino people as more suspicious. *Id.* at 24. From 2018-2020, only 1.3% of investigatory stops resulted in officers finding a gun. Less than 3% of searches and less than 2% of pat downs resulted in discovery of a gun. *Id.* at 6. In short, CPD's stop and frisk policing has been a high-volume, low-yield strategy that disproportionately targets Black and Latino Chicagoans without any justification for the severe racial and ethnic disparities. Worse, CPD has not decreased the racial and ethnic disparities since 2015. The Stipulation should require CPD to identify the public safety goals of its stop and frisk program and analyze whether it is achieving those goals, and, if so, whether the achievement of such goals outweighs the tremendous damage that stop and frisk policing inflicts on Black and Latino Chicagoans.

### IV. The Stipulation Discards Changes to Policies, Training and Recordkeeping Negotiated Under the ACLU Agreement, Rolling Back Crucial Reforms.

As detailed in Section I above and in the 2021 and 2023 Consultant Reports, the Consultant, CPD and the ACLU made significant progress on comprehensive revisions to CPD's Fourth Amendment policies and training and developing a universal Stop Form. The Stipulation (¶¶ 867-72) disregards this years-long progress and allows CPD to go back to the drawing board to propose entirely new Fourth Amendment policies, training, and recordkeeping systems – without any enforceable deadlines. The Parties toss aside three years of work under the ACLU Agreement, instead permitting CPD to indefinitely delay critical reforms.

The Stipulation should: memorialize CPD's previous commitment to using the universal Stop Form; require CPD to use the draft Fourth Amendment policies under the ACLU Agreement as a starting point, including the adoption of changes recommended by the Consultant and ACLU;

10

and require CPD to adopt the changes to its Constitutional Policing curriculum recommended by the Consultant and ACLU.[9]

## V. The Stipulation Fails to Ensure Accountability for Officers Who Violate CPD Policies and Constitutional Rights.

The Stipulation's accountability measures fall short in a number of ways. First, in a glaring omission, the Stipulation does not clearly state that officers who violate community members' legal rights or CPD policies relating to stops and frisks will be subject to discipline. For example, Stipulation ¶ 841 requires CPD to develop a "system to track and document which CPD officers have repeated rejected ISRs or Stop Reports," but does not prescribe any consequences or corrective action for those officers. Stipulation ¶ 841 also fails to specifically require tracking and discipline of officers whose stops and frisks exhibit racial/ethnic profiling or other law enforcement actions taken on the basis of protected characteristics. The Stipulation must include clear measures for accountability and progressive discipline against officers who violate individuals' Fourth and Fourteenth Amendment rights, ICRA, and/or CPD policies.

Second, Stipulation ¶ 818 allows officers to submit "one revised version" of an ISR. The Consultant found that allowing officers to change the reason provided in an ISR for a stop or frisk *even once* made it extremely challenging to determine whether officers were complying with the Fourth Amendment. Allowing changes to ISRs permits officers to cover up unconstitutional stops, frisks and searches by changing the documented rationale after the fact. The Stipulation should prohibit officers from making any substantive revisions once an ISR is completed.

Alternatively, if officers are permitted to revise their ISRs, the Stipulation's procedures for supervisory review (¶¶ 828-832) should be amended to prohibit supervisors from rejecting an ISR

---

[9] As stated in the Block Dec. ¶ 5 (Ex. 1), ACLU requested CPD's permission to attach the draft policies and forms to this filing, but CPD's counsel did not respond.

11

for any reason other than a ministerial error (e.g., typos). As explained in the 2023 Consultant Report at 18, CPD policy currently has three types of supervisory rejections: "Administrative Rejection" for reports with ministerial errors; "Deficiency Rejection" for reports with substantive errors including failure to include sufficient information to show reasonable articulable suspicion for a stop or frisk; and "Send to Integrity Unit" for forms that have improper justification or when the ISR was generated in error. The Stipulation should require CPD to cease using the "Deficiency Rejection" category and sending deficient ISRs back to officers to be changed. If an officer fails to show that a stop or a frisk was supported by reasonable articulable suspicion that the individual was engaged in criminal activity, the form should immediately be sent for integrity review and consideration of discipline.

Third, despite the clear provisions of the Illinois Law Enforcement Officer-Worn Body Camera Act, 50 ILCS 706/10-1 *et seq,* and Consent Decree ¶ 237, the Stipulation (¶ 805(b)(iv)) fails to require all CPD officers conducting stops, frisks and searches to be equipped with functioning body-worn cameras ("BWC") and record the *entire* stop and (if applicable) pat-down. The Stipulation must require officers to wear and activate their BWC throughout each stop and frisk encounter. And while Stipulation ¶ 829 requires supervisors to review each ISR, it fails to require supervisors to review the BWC footage to determine if the ISR accurately and honestly depicts the circumstances reported. The Stipulation should require supervisors to review BWC footage along with their review of each ISR. At the very least, supervisors should review BWC footage when they reject an ISR as deficient. (Stipulation ¶ 859 currently requires supervisory review of BWC footage only after an officer submits five deficient stop reports within 90-days).

### VI. Independent Data Analysis of CPD's Stop and Frisk Must Continue with Deadlines and CPD Must Make Changes to Address Racial and Ethnic Disparities

As explained above, for eight years under the ACLU agreement, the Consultant's independent expert analyzed CPD's stop and frisk data for public reporting. Despite CPD collecting and sharing this data for eight years, Stipulation ¶¶ 835-37 requires CPD to prepare a new "data plan" for investigatory stop and loitering enforcement. This permits CPD to have an excuse for further delays and non-compliance with the law. Consent Decree ¶¶ 606-09 already required CPD to develop a comprehensive "data plan" by 2020, and three years later, CPD has not done it. *See* Dkt. 1097 at 21, 129. Requiring CPD to undertake a similar assessment but only for investigatory stop data is likely to be futile.

Stipulation ¶ 843 includes methodology to analyze CPD's stop and frisk and Loitering Ordinance data collected for the period 2021-2024. The Independent Monitoring Team ("IMT") is to report the 2021-2024 analysis with an independent expert. The Stipulation must include a deadline for the IMT to publish its report, so the public receives timely and accurate information about whether CPD is complying with the Fourth Amendment and ICRA.

After 2024, the Stipulation requires CPD to conduct its own data analysis, but CPD should not be allowed to monitor itself. CPD has an inherent conflict of interest and has demonstrated it is incapable of conducting adequate data analysis. For example, since 2020, Consent Decree ¶ 79 has required CPD to report annually on misdemeanor arrests and administrative notices of violation, including the race and gender of the person involved. Three years later, CPD has never done it. *See* Dkt. 1097 at 4; 297-8. Going forward, IMT must publish the annual stop and frisk data analysis with outside experts, or the City's Office of Inspector General ("OIG") should do so.

Compounding CPD's proven inability to analyze its own data, the Stipulation fails to include the methodology that CPD must use or the goals of the analysis. The Stipulation should

incorporate the Consultant's current methodology, as well as deadlines to publish the annual report. Most importantly, the Stipulation must state that the IMT or other entity charged with analyzing CPD's data conduct a yearly analysis of whether CPD has substantially complied with the Fourth Amendment and ICRA. And to complete a valid analysis under ICRA, CPD must identify the community safety purpose(s) that allegedly justifies its stop and frisk practices for each reportable year, including whether the purpose has changed from the prior year, so the analysis can determine whether CPD's practices are necessary to achieve the identified goal.

Finally, Stipulation ¶¶ 850-51 should *require* CPD to address and correct any documented racial and ethnic disparities that violate ICRA, not merely "assess whether to implement any revision to policies, procedures, or training" to correct such disparities.

## VII. CPD's Review and Audit of Stop and Frisk Data Must Be Robust and Staffed

CPD's Tactical Review and Evaluation Division's ("TRED") Fourth Amendment Stop Review Unit was required to audit a 15% daily sample of ISRs as a statistically relevant sample under the ACLU Agreement. *See* Ex. 2, § 3(b); Stipulation ¶ 855. As of June 11, 2023, TRED had a backlog of 25,886 ISRs to review. 2023 Consultant Report at 21. The Stipulation (¶¶ 854, 857) permits TRED to audit only 5% of the backlog and fails to specify the threshold for "a representative sample" going forward. Worse, Stipulation ¶ 853 does not commit CPD to providing the Fourth Amendment Stop Review Unit with any specific level of staffing or resources, nor does it impose any consequences on CPD for untimely audits.

Stipulation ¶ 860 does add to the Fourth Amendment Stop Review Unit's responsibilities a semi-annual report regarding rejected ISRs, which is welcome, but it fails to require that CPD publish such reports and, again, does not require CPD to commit specific resources to this task. Without significantly enhanced requirements and resources, the Fourth Amendment Stop Review

14

Unit's work is unlikely to create the needed accountability and transparency regarding CPD's future stop and frisk practices.

## VIII. The Stipulation Fails To Require Meaningful Community Engagement

The Consent Decree requires CPD to ensure that the public has "a meaningful opportunity" to engage with CPD on "material changes" and "material requirements" of the Decree (¶ 633). The Stipulation jettisons the robust community engagement process developed under the ACLU Agreement, described in Section I, leaving in place only a watered-down obligation to "seek input" on CPD's Fourth Amendment and Loitering Ordinance policies (¶ 864). Having co-developed the robust community engagement process, the Stipulation should CPD require to use it for the required biennial policy review going forward.

## IX. Conclusion

The Parties filed the Stipulation without community involvement in the negotiations and without building on the years of progress made under the ACLU Agreement. Its weak limitations on stop and frisk, lack of guardrails, and inadequate accountability and transparency measures all but ensure that CPD's years-long pattern of racist and unconstitutional stop and frisk policing will continue. The Court should require the Parties to renegotiate the Stipulation with the *Communities United* parties and other community representatives at the table, to remedy the deficiencies listed above.

DATED: August 3, 2023  Respectfully Submitted,

*/s/ Alexandra K. Block*
Alexandra K. Block (ablock@aclu-il.org)
Michelle T. García (mgarcia@aclu-il.org)
Joshua M. Levin (jlevin@aclu-il.org)
Roger Baldwin Foundation of ACLU, Inc.
150 N. Michigan Ave., Suite 600
Chicago, IL 60601
(312) 201-9740

Amanda Antholt (amanda@equipforequality.org)
Ruben Bautista (ruben@equipforequality.org)
Equip for Equality
20 N. Michigan Ave., Suite 300
Chicago, IL 60602
(312) 341-0022