UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS,<br><br>           Plaintiff,<br><br>    v.<br><br>CITY OF CHICAGO,<br><br>           Defendant. | Case No. 17-cv-6260<br><br>Hon. Rebecca R. Pallmeyer |

### *CAMPBELL* PLAINTIFFS' POSITION STATEMENT ON THE STIPULATION REGARDING INVESTIGATORY STOPS, PROTECTIVE PAT DOWNS, AND ENFORCEMENT OF LOITERING ORDINANCES

      The Parties' Stipulation Regarding Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances (Doc. 1096) contains remedies intended to redress a persistent form of police abuse and harassment—the practice commonly referred to as "stop and frisk." The harms this Stipulation aims to redress affect thousands of Chicagoans who are entitled to have their rights protected through the consent decree process—which provides unparalleled transparency, accountability and, if done correctly, opportunities for community oversight and input. The *Campbell* Plaintiffs support the inclusion of stop and frisk remedies in this Consent Decree. However, this Stipulation was developed without the requisite community input. As a result, it lacks significant protections and fails to provide remedies sufficient to redress the harms of unlawful stop and frisk police practices. For these reasons, the *Campbell* Plaintiffs request that the Court order the parties to renegotiate the terms of the Stipulation to address the oversights described more fully below, as well as those described by community members during the August 9, 2023, Fairness Hearing.

      Specifically, the Parties, with the input of community members and Coalition Counsel

1

should be required to negotiate terms that will redress the following deficiencies:

1. **Fails to provide meaningful protection against office bias and contains language that will eviscerate meaningful protections currently enshrined in CPD policy.**

CPD executes stop and frisk policing with an overwhelming focus on Black and Latinx communities.[1] Yet, the Stipulation fails to provide meaningful protections against officer bias and discrimination and its terms conflict with existing policy that—if operationalized—would provide important protections against police bias. If this Stipulation becomes part of the Consent Decree, there is a real danger that it would prompt revisions that would weaken existing CPD policies. For example, the Stipulation prohibits officers from conducting stops "solely" on the basis of race (or other protected classes). But spontaneous police decisions should never be animated by membership in a protective class.[2] CPD's current policy prohibiting racial profiling recognizes this. General order 02-04[3] states explicitly that officers will not use membership in a protected class when making "routine or spontaneous law enforcement decisions." The Stipulation must be renegotiated to include the same, clear unequivocal language to protect against racial profiling.

---

[1] *Chicago Police Department Annual Report*, 2022 at 145 (https://home.chicagopolice.org/statistics-data/statistical-reports/annual-reports/)

[2] *Chavez v. Illinois State Police*, 251 F.3d 612, 656 (7th Cir. 2001)("[We recognize the destructive effects of racial and ethnic profiling by any police agency.); *Martinez v. Vill. of Mount Prospect*, 92 F. Supp. 2d 780, 782 (N.D. Ill. 2000)("Racial profiling of any kind is anathema to our criminal justice system because it eviscerates the core integrity that is necessary to operate that system effectively in our diverse democracy.")

[3] Chicago Police Department, General Order G02-04, *Prohibition Regarding Racial Profiling and Other Bias Policing.*

2. **Fails to prohibit CPD officers from escalating encounters and to mitigate CPD's officers' financial and other incentives to escalate during stops.**

In 2017, US Department of Justice investigation into the CPD concluded, *inter alia*, "that CPD officers escalate encounters unnecessarily. This includes incidents in which CPD officers use retaliatory force against people who object and claim that they were unlawfully stopped by CPD."[4] The Independent Monitor's recent Report on focus groups with Black and Latinx men ages 18-35 confirms that the DOJ's 2017 findings remain the reality for many Black and Latinx people who encounter CPD officers today. In those focus groups, "participants described [CPD] stops for minor infractions led to more serious interactions. (Doc. 1047 at 45.) Young Black and Latinx men described how CPD officers harassed them and escalated situations. "It was not unusual for a participant to say that they had been harassed in the past—sometimes repeatedly and, in some cases even, by the same officers—ranging from repeated stops for minor infractions to threats and intimidation." Id at 9. "[M]any participants reported having repeated, frequent involuntary contact with police, and some participants indicated having up to 30 involuntary interactions with police in the past year." Id. at 2.

Relatedly, in 2017 the Chicago Office of Inspector General documented that CPD officers engage in "trolling" which is the practice of officers intentionally escalating interactions with community members in order to receive an extension of tour overtime.[5] CPD has—to this day— failed to implement the changes required to end the practice of trolling.[6] The Stipulation contains no language redressing the documented harms that occur when CPD officer intentionally escalate stops and/or engage in the practice of trolling. Additionally, the Stipulation fails to include language that

---

[4] United States Department of Justice Civil Rights Division & United States Attorney's Office Northern District of Illinois, *Investigation of the Chicago Police Department* (Jan. 2017) at 33.

[5] *CPD Overtime Controls Audit*, Chicago Office of Inspector General, Oct. 2017 at 6.

[6] *CPD Overtime Controls Audit Follow-up Inquiry*, Chicago Office of Inspector General, Feb. 2020 at 7.

would ensure compliance with Consent Decree ¶ 17, which directs that "the overall effectiveness of CPD's department-wide and district-level crime reduction strategies will be determined by a reduction in crime and not by the number of arrests, stops, or citations."

The Stipulation must be renegotiated to address these oversights. Specifically, the Stipulation should include language that requires CPD officers to engage in the least intrusive policing response for all ordinance and quality of life violations. The current Stipulation contains language requiring officers to use the least intrusive policing response only when enforcing loitering ordinances and it fails to define the term "least intrusive." The Stipulation should require that CPD officers engage in the least intrusive response whenever engaging with community members—but particularly when enforcing ordinance and/or quality of life violations. The Stipulation should further define "least intrusive policing" as requiring that officers choose the least intrusive response appropriate under the circumstances as reasonably understood by the officer at the time. In other words, a verbal warning and dispersal order is preferrable to a stop and frisk, and a citation is preferable to a custodial arrest.[7] In order to ensure Compliance with ¶ 17, the Stipulation should state that CPD is prohibited from either formally or informally using, stops, tickets, citations, and/or completed Investigatory Stop Reports to evaluate an officer's productivity. The Stipulation must also contain prohibitions on trolling and provide that CPD will implement comprehensive policies, practices, supervisory procedures, and training modules to ensure that that no CPD officer engages in trolling. The Stipulation must also clearly require officers to instruct community members that they are free to leave at the moment that reasonable suspicion is dispelled.

---

[7] A similar provision is contained in the Baltimore Consent Decree. See *U.S v. Baltimore*, 17cv99, (D. Md) (Doc 2-2 Consent Decree at ¶62).

3. **Fails to prescribe the manner in which officers should conduct searches and particularly fails to prohibit sexual violence and harm attendant to stop and frisk.**

The Monitor's Focus Group Report describes Black and Latinx young men's interactions with CPD officers during stops. "Participants often described officers as aggressive, tough, intimidating, arrogant, or physically or verbally abusive. Often, officers' "tough" behavior was enough for many participants to express fear or a sense of intimidation during the interaction." (Doc 1047 at 10.) A January 2020 report focused on CPD's interactions with women engaged in sex work documents instances where, incident to a stop, CPD officers forced sex workers to either engage in sex acts or face arrest or other harms.[8] During the August 9, 2023 Fairness Hearing on this Stipulation, several community members compared their experiences with CPD officers during a stop and frisk to a sexual assault. The omission of *any* language in the Stipulation restricting CPD officers' actions during a frisk incident to a stop is particularly problematic given the CPD's ongoing refusal to comply with Consent Decree ¶63 which required the development of a sexual misconduct policy 180 days after the Decree's effective date. As documented in the latest Monitor's report, CPD is not even in *preliminary* compliance with this requirement. [9]

The Stipulation must be renegotiated to include provisions that will require officers to limit the humiliation, trauma, sexual intimidation, and sexual misconduct that can often occur during these searches. The Stipulation must provide that a frisk incident to a stop can occur only when an officer reasonably suspects that a person is armed and dangerous and that the purpose of a frisk is

---

[8] *Policing & Enforcement of Prostitution Law in Chicago*, Chicago Alliance Against Sexual Exploitation, https://www.caase.org/wp-content/uploads/2020/05/Report-PEOPL-Jan20-v1.3-WithAppx.pdf, Jan. 2020, at 8.

[9] *Independent Monitoring Report 7*, June 20, 2023 at p. 32

not to discover evidence of a crime.[10] Further, the Stipulation must include language that clarifies the extremely limited nature of a frisk. [11]

4. **Conflicts with existing consent decree requirements requiring the use of best practice and problem-solving policing.**

Stop and frisk imposes significant harms on communities. Public health research documents that "the stress of relatively nonviolent, short-lived interactions with police, such as pedestrian stop-and-frisk encounters, can render long-lasting trauma and anxiety, heightened emotional distress, depression, and psychological strain."[12] In Chicago, this harm is almost entirely concentrated in Black communities.[13] The Chicago Police Department's own data demonstrates that

---

[10] See *Floyd v. City of New York*, 08cv1034, (S.D.NY) (Remedial Order at 16)

[11] *Id.* at (Doc 514) In the NYC stop and frisk litigation, the monitor defined a frisk as: "A carefully limited running of the hands over the outside of a person's clothing feeling for a deadly weapon or any instrument, article or substance readily capable of causing serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons. A frisk is authorized when the member of the service reasonably suspects the person is armed and dangerous.. . . A frisk may not be conducted to discover evidence or the proceeds or instrumentalities of a crime. A police officer cannot "frisk" a bag or item of personal property unless the officer has a reasonable suspicion that the person is armed and dangerous and the bag or item could contain a weapon and is within the person's reach."

[12] *Aggressive Policing, Health, And Health Equity*, " Health Affairs Health Policy Brief, April 30, 2021.DOI: 10.1377/hpb20210412.99757; see also, *Aggressive Policing and the Mental Health of Young Men*, Amanda Geller et al. Urban Men American Journal of Public Health 104 https://doi.org/10.2105/AJPH.2014.302046 ("Participants who reported more police contact also reported more trauma and anxiety symptoms, associations tied to how many stops they reported, the intrusiveness of the encounters, and their perceptions of police fairness.); *Collateral Damage: The Health Effects of Invasive Police Encounters in New York City,* A.A..Sewell et al.. J Urban Health. 2016 Apr. https://doi.org/10.1007/s11524-015-0016-7 ([L]iving in neighborhoods where pedestrian stops are more likely to become invasive is associated with worse health. Living in neighborhoods where stops are more likely to result in frisking show the most consistent negative associations.")

[13] *Consultant Report: Progress Update and Data Analysis of CPD Stops Between 2018 and 2020* at 4-5 ("Citywide, in 2018 and 2019, a Black person was nine times as likely to be stopped as a White person, and a Latino person was about three times as likely to be stopped as a White person Black people were stopped at higher rates than their population share in every police district in Chicago, regardless of the racial/ethnic composition or crime rate of the district.")

6

70% of people CPD targets for stop and frisks are Black.[14] And multiple studies reveal that there is no public safety benefit commensurate with the significant harm imposed by stop and frisk policing.[15] Consent Decree ¶2 requires that CPD invest in approaches that will build community trust, while Consent Decree ¶¶ 9 and 10 require that CPD operate with a community policing philosophy and develop a focus on problem solving policing. Consent Decree ¶86 requires that the City and CPD explore implementing "diversion programs, and alternatives to arrest."

Given the significant well-documented affirmative harm created by this practice and the Consent Decree requirements noted above, the Stipulation must be amended to require that CPD, in collaboration with the Monitor and with meaningful community input, conduct a holistic assessment of the alleged public safety benefits of stop and frisk in Chicago and the attendant harms imposed on community members. The results of this assessment should determine the future of stop and frisk policing in Chicago. In short, even if CPD stops are perfectly constitutional, CPD cannot continue engaging in this undoubtedly harmful practice that has little proven public safety benefit without running afoul of the Consent Decree provisions described above. The Stipulation

---

[14] *Chicago Police Department Annual Report*, 2022 at 145 (https://home.chicagopolice.org/statistics-data/statistical-reports/annual-reports/)

[15] *Identifying and Measuring Excessive and Discriminatory Policing,* Alex Chohlas-Wood et al. (March 6, 2022). University of Chicago Law Review, Vol. 89, No. 441, U of Chicago, Public Law Working Paper No. 801, https://ssrn.com/abstract=4050959 (concluding based on an empirical analysis of stops in New York City and Nashville that stops "disproportionately impacted communities of color without achieving their stated public-safety goals.") *Do Stop, Question, and Frisk Practices Deter Crime?.,* Weisburd, D et al, Criminology & Public Policy, 15: 31-56. https://doi.org/10.1111/1745-9133.12172 (stop and frisk practices are costly in terms of police time and are potentially harmful to police legitimacy."); *Police stops to reduce crime: A systematic review and meta-analysis.* K. Peterson et al, *Campbell Systematic Reviews*, 19 e1302. https://doi.org/10.1002/cl2.1302 ("[E]vidence of negative individual-level effects [of stop and frisk] makes it difficult to recommend the use of these tactics over alternative policing interventions. Recent systematic reviews of hot spots policing and problem-oriented policing approaches indicate a more robust evidence-base and generally larger crime reduction effects than [stop and frisk], often without the associated backfire effects on individual health, attitudes, and behavior.")

7

must be renegotiated to reflect this fact and to require the development of alternative public safety strategies that will reduce the need to rely on stop and frisk strategies.[16]

5. **Fails to provide sufficient provisions to ensure accountability and community voice in implementation.**

The Stipulation fails to provide sufficient provisions to ensure officer accountability—this includes a failure to require regular community input on CPD's compliance with Stipulation. While the Stipulation requires CPD officers to report stops and frisks, the Stipulation does not address how CPD will prevent officers from engaging in unreported stops and frisks. The Monitor has already documented that CPD's data deficiencies reveal "potential failures to report investigative stops." [17] Therefore, the Stipulation must provide explicit accountability measures for officers who fail to report stops and who violate the Stipulation—including a requirement that supervisors conduct random audits of officers' body camera footage for unreported stops, inappropriate frisks and other problematic interactions that would violate this Stipulation. Further, accountability measures must include community engagement that is not focused on just on policy feedback but on deep, meaningful outreach that would capture community perspective on the nature of stops and officer conduct during searches.

In the *Floyd* Litigation, the class action lawsuit that aims to redress New York City Police Department's stop and frisk practice, 8 years after the court ordered remedies, the Plaintiffs filed a motion to modify the remedial plan to provide meaningful community input into the monitoring

---

[16] *Examining Alternatives to Stop and Frisk*, The Crime Report, Nov. 2013 https://thecrimereport.org/2013/11/15/2013-11-examining-alternatives-to-stop-and-frisk/; (describing community-based policing initiatives as an alternative to stop and frisk); *Police in Northwest Philly Launch Alternative Program to Stop and Frisk*, Tiffany Rivera, Al Dia, July 2021, https://aldianews.com/en/local/philadelphia/end-stop-and-frisk (describing pilot program aimed at reducing stop and frisks for people involved in "petty" crimes).
[17] *Independent Monitoring Report 7*, June 20, 2023, at 88.

process because the initial remedies failed to sufficiently incorporate community experience and perspective.[18] As the *Floyd* Court recognized "no amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety," and "[n]either an independent Monitor, nor a municipal administration, nor this Court can speak for those who have been and will be most affected by the NYPD's use of stop and frisk."[19] For this reason, the Stipulation should be modified to require that the Monitor work with outside entities to conduct annual community surveys to assess public perception of police-community street level interactions. These surveys should use a participatory action methodology[20] to ensure those most impacted by CPD's stop and frisk practices have a central role in remedying this harm. The Stipulation should also include the use of annual focus groups focused explicitly on stop and frisk practices and should require that the Parties, with the input of the Monitor and the Coalition develop a process for developing field audits that would rely on trained testers to assess whether officers are engaging in unlawful stops and/or searchers.[21]

      For the reasons fully described above, the Coalition comprised of the Campbell Plaintiffs respectfully requests that this Court order the parties to renegotiate the Stipulation to address the deficiencies identified above as well as further described by community members during the August 9, 2023, fairness hearing.

---

[18] *Floyd v. City of New York*, 08cv1034, (S.D.N.Y.) (Doc. 841 Plaintiffs Memorandum of Law in Support of Their Moton to Modify the Floyd Order)("*Floyd* Motion to Modify"); see Doc. 891 (*Floyd* Plaintiff eventually requested that the Court hold their Motion to Modify in abeyance after the Monitor and Community Liaison developed a plan for redressing the concerns raised in the Motion to Modify.)
[19] *Floyd* Motion to Modify at 25, citing *Floyd* Doc. 372 at 29

[20] Participatory Action Research "involves researchers and participants working together to understand a problematic situation and change it for the better."
https://www.participatorymethods.org/glossary/participatory-action-research

[21] *Testing Racial Profiling: Empirical Assessment of Disparate Treatment by Police*, Sonja B. Starr, 2016 UNIVERSITY OF CHICAGO LEGAL FORUM 485, 518-19, 521-24 (2016), available at
https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1574&context=uclf

Respectfully submitted,

By: /s/ Sheila A. Bedi

Date: August 13, 2023

Sheila A. Bedi
Community Justice Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-2492
sheila.bedi@law.northwestern.edu

Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-1271
vanessa.delvalle@law.northwestern.edu

Craig B. Futterman
Mandel Legal Aid Clinic
University of Chicago Law School
6020 S. University Ave.
Chicago, IL 60637
(773) 702-9611
futterman@uchicago.edu

**Counsel for the Coalition**