**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **STATE OF ILLINOIS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-cv-6260** |
| **CITY OF CHICAGO,** | **Hon. Rebecca R. Pallmeyer** |
| **Defendant.** | |

<u>**MONITORING PLAN FOR YEAR FIVE**</u>

  The Independent Monitor Margaret A. Hickey and the Independent Monitoring Team submit the attached Monitoring Plan for Year Five.

Dated August 21, 2023

/s/Margaret A. Hickey
Margaret A. Hickey
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
maggie.hickey@afslaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that, on August 21, 2023, she caused a true and correct copy of the foregoing **Monitoring Plan for Year Five** to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

/s/Margaret A. Hickey
Margaret A. Hickey
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
maggie.hickey@afslaw.com



Independent Monitoring Team | Chicago Police Department Consent Decree

# Monitoring Plan

*Year Five*
*July 1, 2023, through June 30, 2024*

August 21, 2023

## Table of Contents

Introduction and Year Five Priorities ...................................... 1

Monitoring in Year Five ....................................................... 17

Conclusion and Looking Ahead ........................................... 22


Appendix A.

The Consent Decree and the Independent Monitoring Team (IMT) .............. 24

**\*\*\***

Monitoring Plan for Year Five - Figures

Figure 1:        Reporting Periods for Years One through Five ............................... 3

Figure 2:        Monitoring Plan for Year Five Paragraphs
                 (All Monitorable Paragraphs) ......................................... 16

Figure 3:        Consent Decree Requirements for the IMT ................................. 19

# Introduction and Year Five Priorities

As the Independent Monitoring Team (IMT), we assess the City of Chicago's (City's) compliance with the requirements of the Consent Decree.[1] Specifically, we assess how relevant City entities—including the Chicago Police Department (CPD); the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General, including the Deputy Inspector General for Public Safety; and the Office of Emergency Management and Communications—are complying with the Consent Decree.

This is our Monitoring Plan for Year Five of the Consent Decree (July 1, 2023, through June 30, 2024). It includes our projected assessments and tasks for the ninth and tenth reporting periods and builds on our Monitoring Plans for Years One, Two, Three, and Four.[2] *See* Figure 1 (Reporting Periods for Years One through Five), below.

Most notably, the IMT will continue to assess the City's compliance with *all paragraphs with requirements* in the Consent Decree—or "monitorable paragraphs"—from previous reporting periods In Year Five, however, we anticipate three potential changes to the "monitorable paragraphs."

First, the number of monitorable paragraphs may change as the City and its relevant entities begin to achieve full and effective compliance with any requirements. To achieve full and effective compliance with Consent Decree requirements, the City and its relevant entities must achieve and maintain Full compliance for either one or two years, depending on the section of the Consent Decree. *See* ¶714. In those cases, the IMT will stop assessing those requirements for compliance unless "showing that compliance with such requirements has materially lapsed" during the Consent Decree process. ¶716.

Second, on June 21, 2023, the City and the Office of the Illinois Attorney General (OAG) submitted an amended stipulation regarding investigatory stops, protective pat downs, and enforcement of loitering ordinances (the Stipulation).[3] The Stipulation adds paragraphs 800 through 877 to the Consent Decree and was approved by the Court on June 27, 2023. The City, the OAG, and the IMT continue to discuss

---

[1] Background on the Consent Decree and the IMT, including our full organizational chart, is available in Appendix A.

[2] Our previous monitoring plans and other reports are available on our website. *See Reports*, INDEPENDENT MONITORING TEAM, https://cpdmonitoringteam.com/reports/.

[3] *See Amended Stipulation regarding Investigatory Stops, Protective Pat Downs, And Enforcement Of Loitering Ordinances*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (June 27, 2023). The Stipulation is available on the Independent Monitoring Team website: https://cpdmonitoring-team.com/wp-content/uploads/2023/08/2023.06.27-Amended-Stipulation-regarding-Investigation-Stops-Protective-Pat-Downs-and-Enforcement-of-Loitering-Ordinances.pdf.

the timelines for these corresponding assessments, and the IMT will report on the results of those discussions.

Finally, per ¶657, the IMT is currently developing its comprehensive assessment of the Consent Decree to "determine whether and to what extent the City and CPD are in compliance with [the Consent Decree], whether the outcomes intended by [the Consent Decree] are being achieved, and whether any modifications to [the Consent Decree] are necessary in light of changed circumstances or unanticipated impact (or lack of impact) of the requirements." Based on this comprehensive assessment, the IMT will also "recommend any modifications to [the Consent Decree] necessary to achieve and sustain intended results," and "where the Parties agree with the [IMT's] recommendations, the Parties will move the Court to modify [the Consent Decree] accordingly." As a result, the comprehensive assessment may lead the Parties to further modify the Consent Decree and the corresponding monitorable paragraphs, which may affect the IMT's assessments in Year Five. If this occurs, the IMT—and likely the Court and the Parties—will report on those developments.

Figure 1: Reporting Periods for Years One through Five

| Monitoring Plan for Year One | |
|---|---|
| 1st Reporting Period | March 1, 2019 – August 31, 2019<br>(*See* Independent Monitoring Report 1) |
| 2nd Reporting Period | September 1, 2019 – February 29, 2020<br>(*See* Independent Monitoring Report 2) |
| **Monitoring Plan for Year Two** | |
| 3rd Reporting Period | March 1, 2020 – December 31, 2020[4]<br>(*See* Independent Monitoring Report 3) |
| 4th Reporting Period | January 1, 2021 – June 30, 2021<br>(*See* Independent Monitoring Report 4) |
| **Monitoring Plan for Year Three** | |
| 5th Reporting Period | July 1, 2021 – December 31, 2021<br>(*See* Independent Monitoring Report 5) |
| 6th Reporting Period | January 1, 2022 – June 30, 2022<br>(*See* Independent Monitoring Report 6) |
| **Monitoring Plan for Year Four** | |
| 7th Reporting Period | July 1, 2022 – December 31, 2022<br>(Independent Monitoring Report 7) |
| 8th Reporting Period | January 1, 2023 – June 30, 2023<br>(Independent Monitoring Report 8, Autumn 2023) |
| **Monitoring Plan for Year Five** | |
| 9th Reporting Period | July 1, 2023 – December 31, 2023<br>(Independent Monitoring Report 9, Spring 2024) |
| 10th Reporting Period | January 1, 2024 – June 30, 2024<br>(Independent Monitoring Report 10, Autumn 2024) |

---

[4] Because of the shutdowns in response to COVID-19, the City and the Office of the Illinois Attorney General extended the third reporting period to December 31, 2020. *See Order Regarding the Extension of Consent Decree Obligation Deadlines* (March 27, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/04/2020_03_27-Order-Regarding-the-Extension-of-Consent-Decree-Obligation-De....pdf.

## Year Five Priorities

At the end of Year Three, we began to assess the City's compliance with *all paragraphs with requirements* in the Consent Decree—or "monitorable paragraphs." We will continue to assess these paragraphs in each six-month reporting period of Year Five. *See* Figure 2. Our assessments will also include whether the City is on course to reach compliance—and demonstrate sustainable compliance—with all requirements by the end of Year Eight.[5]

In Year Five, we will continue to prioritize issues to facilitate the City's and the CPD's ability to reach compliance as efficiently as possible. We will do this in regular consultation with the City, the CPD, other relevant City entities, the Office of the Illinois Attorney General, the Coalition, and other stakeholders and members of Chicago's communities.[6] We will also closely monitor challenges that have continued from previous years or that emerge in Year Five.

In ¶6 of the Introduction section of the Consent Decree, the City made commitments that help frame many of the issues facing reform efforts today:

> In this [Consent Decree], the City commits to
>
> ensuring that police services are delivered to all of the people of Chicago
>
> in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois,
>
> [in a manner that] respects the rights of all of the people of Chicago,

---

[5] *See* ¶657 (requiring the IMT to "conduct a comprehensive assessment to determine whether and to what extent the City and CPD are in compliance with [the Consent Decree], whether the outcomes intended by [Consent Decree] are being achieved, and whether any modifications to [the Consent Decree] are necessary in light of changed circumstances or unanticipated impact (or lack of impact) of the requirements."). *See also* ¶¶714–15. *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022) ("[T]he City agrees to endeavor to achieve full and effective compliance by the end of the 16th reporting period (June 30, 2027), eight years after the effective date of the Consent Decree."), https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timelin._.pdf.

[6] *See* ¶669 ("The Parties have entered into a Memorandum of Agreement ('MOA') with certain community organizations that have established a broad-based community coalition ('Coalition') committed to monitoring, enforcing, and educating the community about this Agreement. No less frequently than quarterly, the Monitor will participate in meetings with the Coalition, as provided in Paragraph 9 of the MOA.").

*[in a manner that] builds trust between officers and the communities they serve, and*

*[in a manner that] promotes community and officer safety.*

*The City also commits to providing CPD members with the resources and support they need, including improved training, supervision, and wellness resources.*

The CPD—along with police departments across the nation—continues to face significant challenges with meeting these commitments. Staffing and resource issues, for example, continue to negatively affect the City's and the CPD's progress toward simultaneously and sufficiently providing supervision, officer-wellness, and support. This, in turn, has undermined the City's and the CPD's ability to demonstrate effective policing practices that respect the rights of all the people of Chicago; build trust between officers and the communities they serve; and promote community and officer safety.

As explained further in the following pages, we have identified several interrelated categories of priorities for Year Five:

(1) Staffing, Resources, and Deployments

(2) Community, Impartial, and Effective Policing
    (including routine and spontaneous law enforcement decisions and strategies)

(3) Community Engagement and Trust Building

(4) Accountability and Transparency

(5) Efficient Data Collection, Analysis, and Management

(6) Consistent and High-Quality Training

(7) Officer Wellness

(8) Compliance with the Police and Community Relations Improvement Act (PCRIA)

## *(1) Staffing, Resources, and Deployments*

As an overarching issue affecting all areas of the Consent Decree, CPD staffing shortages continue to slow the CPD's compliance progress. Continuing staffing shortages in the Office of Constitutional Policing and Reform, for example,

threaten to undermine critical reform efforts from the Tactical Response and Evaluation Division (TRED), which is responsible for key internal tracking and oversight functions. In fact, TRED's understaffing has led to substantial backlog of reviews, which are ongoing. This large backlog hinders accountability, and we will continue to monitor the City's and the City's ability to address these issues.

Likewise, in the previous four years of the Consent Decree, we have observed a pattern where the CPD makes significant progress with the Consent Decree, which then diminishes as the CPD shifts resources toward deployments and unspecified crime-reduction strategies. In Year Five, we will continue to monitor the City's and the CPD's efforts to create and implement strategies where reform and effective-policing efforts are aligned and mutually beneficial.

## (2) Community, Impartial, and Effective Policing (including routine and spontaneous law enforcement decisions and strategies)

The City, the CPD, and the OAG entered into the Consent Decree "to ensure that [(1)] the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety[; and (2)] that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely." ¶2.

To this end, we will continue to monitor the CPD's efforts to "ensure that its community policing philosophy is a core component of its provision of police services, crime reduction strategies and tactics, training, management, resource deployment, and accountability systems." We will also monitor the CPD's efforts to ensure that the "CPD will prohibit officers from using race, ethnicity, color, national origin, ancestry, religion, disability, gender, gender identity, sexual orientation, immigration status, homeless status, marital status, parental status, military discharge status, financial status, or lawful source of income when making routine or spontaneous law enforcement decisions, except when such information is part of a specific subject description." ¶55.

While routine interactions with law enforcement agencies often do not receive the same level attention as more visible interactions (such as uses-of-force incidents), routine interactions can have a great impact on perceptions of police. The City and the CPD will need to ensure that such routine interactions, such as pedestrian and traffic stops, are conducted fairly and without prohibited bias.

Various paragraphs in the Consent Decree reflect the importance of community and impartial policing across all police interactions and must be incorporated into all operational policies and training. This includes, for example, the following:

❖ Determining the effectiveness of CPD department-wide and district-level crime reduction strategies by reduction in crime and not by the number of arrests, stops, or citations (¶17);

❖ Developmentally appropriate interactions with children and youth (¶32);

❖ Partnering with community-based organizations with participants that represent a racially, geographically, and socio-economically diverse cross section of Chicago youth (¶27);

❖ Fair, unbiased, and respectful interactions with victims of crime (¶29);

❖ Positive and procedurally just communication (¶54);

❖ Interactions with transgender, intersex, and gender non-conforming individuals (¶61);

❖ Interactions with people with disabilities (¶¶69–70); and

❖ Misdemeanor arrests and administrative notices of violation (¶¶79–82).

Likewise, in March 2022, the City, the CPD, the OAG, and the IMT agreed to a stipulation regarding practices around search warrants.[7] As clarified by that stipulation, the City and the CPD must demonstrate that the search-warrant practices (1) are not unlawfully discriminatory or retaliatory and (2) occur in an unbiased, fair, and respectful manner. Specifically, the CPD must implement sufficient policies, training, data collection, supervision, and accountability systems to ensure that the CPD's planning for, internal approval processes for, execution of, and after-action review of search warrants are carried out in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois and are in accordance with best practices.[8]

---

[7]     *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timelin.._.pdf.

[8]     The Parties further agreed that the City and the CPD must also continue to fulfill other Consent Decree requirements during the planning for, internal approval processes for, execution of, and after-action review of search warrants. The following is a non-exhaustive list of Consent Decree paragraphs that the CPD must continue to comply with during the execution of warrants: ¶¶32 (regarding developmentally appropriate interactions with youth and children), 35 (regarding

This topic will continue to be a focus in Year Five. In fact, as of the filing of this report, the City, the CPD, the IMT, the Court, and the Coalition continue to meet regarding search warrant policies and practices.

### (3) Community Engagement and Trust Building

To build and maintain trust—and to measure effectiveness with reforms and policing strategies—the City and the CPD must engage with Chicago's communities. This must include populations most likely to formally interact with the CPD. The Consent Decree provides the framework for the City of Chicago and the CPD to prioritize building and maintaining community trust, confidence, and partnerships for short and long-term community and officer safety. *See* Consent Decree ¶6.

Per ¶¶645–46, the IMT conducts "reliable, representative, and comprehensive" survey of a broad cross-section of members of the Chicago community regarding CPD" every other year. Accordingly, the IMT conducted large-scale probability sample surveys in Year One and Year Three of the Consent Decree. The surveys included the responses of over 1,000 Chicagoans, as well as an additional group of Young Black Men, ages 18–25, which is the population subgroup with the most frequent contact with the CPD. The surveys asked about overall police services, effectiveness, community engagement, responsiveness, trustworthiness and procedural justice, contact and interactions with the CPD, misconduct complaints and investigations, and confidence in reform.

In response to both surveys, Young Black Men gave the CPD the lowest ratings, followed by all Black Chicagoans, Latino Chicagoans, and White Chicagoans. Specifically, our first citywide survey—conducted in 2019 and 2020—reflected that, among other things, young Black and Latino men in Chicago report having the

---

Miranda warnings for juveniles), 36 (regarding the use of handcuffs or other restraints on juveniles), 37 (regarding training on problem-solving tactics and effective communication/interpersonal skills), 156 (regarding use-of-force policies and training; supervision; and accountability systems), 157 (regarding the collection, analysis, and use of information on the use-of-force and de-escalation techniques by CPD officers), 162 (regarding providing people with the opportunity to comply with lawful orders), 164 (regarding only using force that is objectively reasonable, necessary, and proportional), 189 (regarding pointing a firearm), 238 (regarding the need to record video and audio of law enforcement activities), 352 (regarding effective supervision requirements for all supervisors), 509 (regarding related Central Management System requirements), 546 (regarding annual report requirements), and 550 (regarding annual and quarterly report requirements).

highest frequency of contact with police *and* the most negative perception of police and lowest levels of trust in police.[9] Our second citywide survey, conducted in 2021 and 2022 indicated similar results.[10]

There were, however, differences between the latest results. For example, while still significant in the latest survey, the differences among these groups were smaller than in the first survey, with Black Chicagoans providing fewer negative ratings and White Chicagoans providing fewer positive ratings than in the first survey. Moreover, in the latest survey, the CPD received a combined positive rating by over 50% of Chicagoans on only 11 of the 54 (20%) ratings questions. This was a decrease from the first Survey, where 20 of the 54 (37%) ratings questions received an overall positive rating.

Understanding the personal experiences and opinions of Chicagoans who have frequent contact with the police helps the IMT assess the CPD's progress with various areas of the Consent Decree, including community policing, impartial policing, and procedural justice.[11] Because the IMT believes that hearing community voices consistently throughout the monitoring process is crucial, we have also endeavored to conduct separate, special studies of Chicago's communities during the years we are not conducting these surveys.

In 2020 and 2021, for example, we conducted focus groups with young Black and Latino men in Chicago.[12] While the specific feedback we received from the focus group participants was not meant to be representative of the experiences, opinions, and perspectives of all young Black and Latino men in Chicago, much of what was indicated by participants was consistent with what we learned from this population in the *2020 IMT Community Survey*.

---

[9] *See, e.g., Community Survey Report*, Independent Monitoring Team (August 26, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/08/2020_08_26-Community-Survey-Filed.pdf.

[10] *See, e.g., Community Survey Report (October 2021-May 2022),* Independent Monitoring Team (May 30, 2023), https://cpdmonitoringteam.com/wp-content/uploads/2023/05/2023.05.30-IMT-Community-Survey-Report-October-2021-May-2022-filed._-2.pdf.

[11] This includes, for example, the foundational requirements that the CPD must demonstrate to reach full and effective compliance with the Consent Decree—including key elements of ¶¶49–51, which include fairness, courtesy, dignity, partnerships, fostering public confidence, and policing without bias.

[12] *See Special Report: Focus Groups with Black and Latino Men, Ages 18–35 (Conducted December 2020 – June 2021)*, Independent Monitoring Team (September 1, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2022/09/2022.09.01-IMT-Special-Report-Focus-Groups-with-Black-and-Latino-Men-.._.pdf.

In addition, in 2022 and 2023, we conducted focus groups with young Black and Latina women in Chicago.[13] Again, while the specific feedback we received from the focus group participants was not meant to be representative of the experiences, opinions, and perspectives of all young Black and Latina women in Chicago, much of what was indicated by participants was consistent with what we learned from this population in the *2022 IMT Community Survey.*

Effective and sustainable police reform requires adherence to the principles of community engagement. As a result, the City and the CPD must ensure that the input of the community—including the members of the Coalition (¶669)—is sought, respected, and incorporated into the development of policy, training, and operations.

In Year Five, we will build upon our assessments in previous years to evaluate the City's and the CPD's requisite community engagement efforts related to various issues of the Consent Decree. This will include issues related to the following topics:

❖ Crime reduction strategies (¶15);

❖ Meetings between district representatives and community stakeholders (¶24);

❖ Youth and children (¶33);

❖ Policing efforts and strategies (¶¶46–47);

❖ Policies and training (¶52);

❖ Search Warrants (¶¶53–55);

❖ Crisis Intervention training (¶¶99, 122, 130);

❖ Crisis intervention-related strategies (¶115);

❖ Mental health advisory committee (¶¶129–31);

❖ Use of Force policies (¶160);

❖ First Amendment activities (¶163);

❖ Foot Pursuits (¶172);

---

[13] *See Independent Monitoring Report 7,* INDEPENDENT MONITORING TEAM (June 29, 2023) at 30, https://cpdmonitoringteam.com/wp-content/uploads/2023/06/2023.06.29-Independent-Monitoring-Report-7-final-1.pdf.

❖ Accountability and transparency (¶¶421–22, 424, 546); and

❖ The Police Board (¶531).

### (4) Accountability and Transparency

The CPD's use of force, review of use-of-force incidents, and ability of the City and the CPD to hold their officers accountable for policy violations, misconduct, and criminal behavior are at the heart of the Consent Decree. We continue to have concerns about the accountability practices, including body-worn-camera compliance. We will continue to closely monitor these requirements in the context of the guiding principles, such as ¶¶420 and 423:

> 420. A robust and well-functioning accountability system in which CPD members are held to the highest standards of integrity is critical to CPD's legitimacy and is a priority of CPD. A culture of accountability also promotes employee safety and morale, and improves the effectiveness of CPD operations. Organizational justice also plays an important role in ensuring that CPD members have confidence in the legitimacy of the system that holds them accountable.

> 423. The City, CPD, and COPA will ensure that all complaints of misconduct, whether from internal or external sources, are thoroughly, fairly, timely, and efficiently investigated in accordance with this Agreement; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all CPD members who commit misconduct are held accountable pursuant to a disciplinary system that is fair, timely and consistent, and provides due process.

### (5) Data Collection, Analysis, and Management

The City and the CPD's ability to efficiently collect, manage, analyze, and utilize data to make evidence-based decisions and demonstrate compliance will continue to be a primary focus in Year Five. Indeed, the importance of the CPD's data systems and functions cannot be overstated, as the burden of proof to demonstrate compliance is on the City (see ¶720), and without appropriate data collection, management, and analysis, the City cannot effectively and consistently demonstrate full and effective compliance.

The Consent Decree requires the City and the CPD to accurately report on, collect, manage, and analyze data regarding police practices. This includes, for example, requiring the CPD to "review and, as necessary, revise departmental forms relating

to use of force" to "improve the accuracy, reliability, and efficiency of its data collection." ¶609.[14] Investing in improved data-collection and efficiency will, in the long run, save the City and the CPD time and resources; identify and help resolve otherwise unidentifiable problems; and ultimately, demonstrate compliance within the CPD and for the OAG, the IMT, the Court, and Chicago's communities.

In all sections of the Consent Decree, the City and the City's relevant entities are required to incorporate updated data collection forms, processes, and analysis. This includes data collection of, for example, the following:

❖ Misdemeanor arrests and administrative notices of violation (¶¶79–82);

❖ Objectives and functions of the Crisis Intervention Team Program (¶91);

❖ Crisis Intervention Team events (¶¶107–08, 118);

❖ Crisis Intervention Team officer coverage (¶111–12);

❖ Office of Emergency Management and Communications data related to Crisis Intervention (¶149);

❖ Ongoing force assessments and associated use-of-force data (¶¶157, 217, 568–72);

❖ Foot pursuits (¶¶168–69);

❖ Pointing of a Firearm (¶¶190 and 192);

❖ Recruitment and hiring assessment (¶259);

❖ Training audits (¶288);

❖ CPD training tracking system (¶290);

❖ Effective supervision and supervisory decision-making (¶353–55);

❖ Staffing models (¶¶365–67);

❖ Performance evaluations (¶¶369–72);

❖ Compliance with Officer Support Systems Plan (¶389);

---

14    Consent Decree Paragraph 609 reads in full: "On an annual basis, to improve the accuracy, reliability, and efficiency of its data collection, CPD will review and, as necessary, revise departmental forms relating to: use of force, arrests, interactions with individuals in crisis, and the disciplinary process."

❖ Administrative investigations (¶¶438 and 440), including the Case Management Systems (¶¶505 and 509);

❖ Accountability satisfaction surveys (¶483);

❖ CPD's *Annual Report* (¶546);

❖ The City's *Annual Litigation Report* (¶548);

❖ CPD and COPA quarterly and annual accountability reports (¶550);

❖ Accountability audits (¶¶553 and 558);

❖ Audits of body-worn camera and in-car camera recordings (¶576);

❖ Officer Support System (¶¶584–85, 588, and 597); and

❖ Information Systems Data Group (¶608).

While the City's and the CPD's successful implementation of the Consent Decree requires reliable data collection, maintenance, and analysis, data validation functions are not yet fully in place. The City and the CPD's ongoing data-validation efforts will continue to be a priority for the IMT in Year Five.

Finally, in addition to ensuring valid and reliable data, the CPD will need to make better use of the data it has available. For example, the CPD has not, per ¶79, annually "conduct[ed] an assessment of the relative frequency of all misdemeanor arrests and administrative notices of violation ('ANOVs') effectuated by CPD members of persons in specific demographic categories, including race and gender." Likewise, the CPD has not made any progress with ¶572, which critically requires the CPD to

> *regularly review citywide and district-level data regarding reportable uses of force to:*
>
> *a. assess the relative frequency and type of force used by CPD members against persons in specific demographic categories, including race or ethnicity, gender, age, or perceived or known disability status; and*
>
> *b. identify and address any trends that warrant changes to policy, training, tactics, equipment, or Department practice.*

### (6) Consistent and High-Quality Training

As stated previously, the City and the CPD have made progress in creating policies and procedures related to the reforms required by the Consent Decree. While further work is still required to bring all paragraphs into Preliminary Compliance, we will also continue to evaluate whether City and CPD representatives are being effectively trained in the reforms.

As we have noted in our monitoring reports, the CPD's Education and Training Division is central to many Consent Decree requirements. While we realize that training thousands of officers is a massive effort, sustainable reform requires consistent high-quality training provided by qualified instructors.

The Consent Decree requires at least 40 hours of in-service training this year (¶320), and the City and the CPD have dedicated significant efforts to continue to reach that goal. In turn, we will continue to focus on whether that training is completed and of sufficient quality. The training must also be accurately tracked (*see* ¶290) and conducted in accordance with the CPD's *Training Plan* (¶319) by appropriately qualified instructors (¶282).

### (7) Officer Wellness and Support

The IMT remains concerned about the safety, health, and wellness of CPD officers. Officers—and their families—require support to perform their high-stress jobs, and the Consent Decree requires the City and the CPD to provide increased levels of support (*see* ¶¶381–418). As recognized by the Consent Decree, "[i]n fulfilling their duties, CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy[, and] psychological and emotional wellness are critical to officers' health, relationships, job performance, and safety." ¶377. The Consent Decree requirements aim to help the CPD "achieve a healthy, effective, and constitutionally compliant police force." ¶380. In fact, implementing reforms across the Consent Decree—including reforms related to Community Policing, Impartial Policing, Crisis Intervention, Use of Force, Training, Supervision, and Accountability and Transparency—require a healthy and effective police force. For officers to meet the high standards of the CPD, of the Consent Decree, and of Chicago's communities, officers must have sufficient support.

Chicago continues to experience heartbreaking losses of officers to suicides, including three officers who died by suicide during the same week in December 2022.[15] In Year Five, we will continue to encourage, monitor, and report on the

---

[15] *See Investigation of the Chicago Police Department*, UNITED STATES DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION AND UNITED STATES ATTORNEY'S OFFICE NORTHERN DISTRICT OF ILLINOIS at 123 (January 13, 2017) ("During our investigation we heard that officer suicide and suicide threats are a significant problem in CPD. In fact, when we met with officials from EAP in May 2016, they had

CPD's efforts to identify strategies and resources to support the health and well-being of all officers.

### (8) Compliance with PCRIA

The City must comply with the Police and Community Relations Improvement Act (PCRIA), 50 ILCS 727/1-1 *et seq.*, relating to officer-involved deaths. *See, e.g.*, ¶492. The City must also "use best efforts to ensure that a 'law enforcement agency,' as that term is defined under PCRIA, will conduct [criminal officer-involved-death investigations]." *Id.* Currently, only sworn members of law enforcement agencies can investigate homicides. As currently written, COPA does not have the authority to investigate officer-involved shootings within the City. These investigations have vast implications for community trust that officer-involved incidents are fairly and impartially investigated.

As such, we will continue to encourage City representatives and stakeholders statewide to ensure that "best efforts" are made to have an independent law enforcement agency conduct such investigations and comply with both Illinois law and the Consent Decree.

\*\*\*

Figure 2 on the following page reflects all monitorable paragraphs in the Consent Decree, which the IMT will continue to monitor in Year Five.[16]

---

just handled an officer suicide threat the night before. One CPD official told us that CPD's rate is 22.7 suicides per 100,000 Department members. The FOP shared figures showing that CPD's suicide rate between 2013 and 2015 was 29.4 per 100,000 based on available information. This would mean that CPD's officer suicide rate is more than 60% higher than the national average of 18.1 law enforcement suicides per 100,000."), http://chicagopolicecon-sentdecree.org/resources/.

[16] As we noted above, on June 21, 2023, the City and the Office of the Illinois Attorney General (OAG) submitted an amended stipulation regarding investigatory stops, protective pat downs, and enforcement of loitering ordinances (the Stipulation). The Stipulation adds paragraphs 800 through 877 to the Consent Decree and was approved by the Court on June 27, 2023. The City, the OAG, and the IMT continue to discuss the timelines for these corresponding assessments, and the IMT will report on the results of those discussions. *See Amended Stipulation regarding Investigatory Stops, Protective Pat Downs, And Enforcement Of Loitering Ordinances*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (June 27, 2023). The Stipulation is available on the Independent Monitoring Team website: https://cpdmonitoringteam.com/wp-content/up-loads/2023/08/2023.06.27-Amended-Stipulation-regarding-Investigation-Stops-Protective-Pat-Downs-and-Enforcement-of-Loitering-Ordinances.pdf.

Figure 2: Monitoring Plan for Year Five Paragraphs (All Monitorable Paragraphs)

| Topic Area | Year Five Monitoring |
|---|---|
| Community Policing | 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48<br><br>**(Total = 35)** |
| Impartial Policing | 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82<br><br>**(Total = 31)** |
| Crisis Intervention | 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152<br><br>**(Total = 66)** |
| Use of Force | 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 247, 248<br><br>**(Total = 96)** |
| Recruitment, Hiring, and Promotion | 253, 254, 255, 256, 257, 258, 259, 260, 261, 262, 263, 264<br><br>**(Total = 12)** |
| Training | 270, 271, 272, 273, 274, 275, 276, 277, 278, 279, 280, 281, 282, 283, 284, 285, 286, 287, 288, 289, 290, 291, 292, 294, 295, 296, 297, 298, 299, 300, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 324, 326, 327, 328, 329, 331, 332, 333, 334, 335, 336, 337, 338, 339, 340<br><br>**(Total = 68)** |
| Supervision | 347, 348, 349, 350, 351, 352, 353, 354, 355, 356, 357, 359, 360, 361, 362, 363, 364, 365, 366, 367, 368, 369, 370, 371, 372, 373, 374, 375, 376<br><br>**(Total = 29)** |
| Officer Wellness and Support | 381, 382, 383, 384, 385, 386, 387, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401, 402, 404, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418<br><br>**(Total = 36)** |
| Accountability and Transparency | 424, 425, 426, 427, 428, 429, 430, 431, 432, 433, 434, 435, 436, 437, 438, 439, 440, 441, 442, 443, 444, 445, 446, 447, 448, 449, 450, 451, 452, 453, 454, 455, 456, 457, 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469, 470, 471, 472, 473, 474, 475, 476, 477, 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488, 489, 490, 491, 492, 493, 494, 495, 496, 497, 498, 499, 500, 501, 502, 503, 504, 505, 506, 507, 508, 509, 511, 512, 513, 514, 515, 516, 517, 518, 519, 521, 522, 523, 524, 525, 526, 527, 528, 529, 530, 531, 532, 533, 534, 535, 536, 537, 538, 539, 540, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 554, 555, 556, 557, 558, 559, 560, 561, 562, 563, 564, 565<br><br>**(Total = 139)** |
| Data Collection, Analysis, and Management | 568, 569, 570, 571, 572, 573, 574, 575, 576, 577, 578, 579, 580, 581, 582, 583, 584, 585, 586, 587, 588, 589, 590, 591, 592, 593, 594, 595, 596, 598, 597, 599, 600, 601, 602, 603, 604, 605, 606, 607, 608, 609<br><br>**(Total = 42)** |
| **TOTAL** | **554** |
| Other | 626, 627, 629, 630, 631, 632, 633, 634, 635, 636, 637, 638, 639, 640, 641, 642, 643, 677, 678, 679, 680, 682, 683, 684, 685, 686, 687, 699, 700, 701, 704, 705, 706, 711, 714, 720, 721<br><br>**(Total = 37)** |

# Monitoring in Year Five

Overall, in accordance with ¶¶661–62 and 642, the IMT assesses how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: **(1) Preliminary compliance**, **(2) Secondary compliance**, and **(3) Full compliance**.

❖ **Preliminary compliance** typically refers to the development of acceptable policies and procedures that conform to best practices (as defined in ¶730) and to the incorporation of requirements into policy (¶642). The IMT will assess the development of policies, procedures, rules, and regulations reasonably designed to achieve compliance. To attain Preliminary compliance, the City must have policies and procedures designed to guide officers, City employees, supervisors, and managers performing the tasks outlined in the Consent Decree. These policies and procedures must include appropriate enforcement and accountability mechanisms, reflect the Consent Decree's requirements, comply with best practices for effective policing policy, and demonstrate the City and its relevant entities' ability to build effective training and compliance.

❖ **Secondary compliance** typically refers to the development and implementation of acceptable and professional training strategies (¶642). Those strategies must convey the changes in policies and procedures that were established when we determined Preliminary compliance. Secondary compliance also refers to creating effective supervisory, managerial, and executive practices designed to implement policies and procedures as written (¶730). The IMT will review and assess the City's documentation—including reports, disciplinary records, remands to retraining, follow-up, and revisions to policies, as necessary—to ensure that the policies developed in the first stage of compliance are known to, are understood by, and are important to line, supervisory, and managerial levels of the City and the CPD. The IMT will be guided by the ADDIE model (Analysis, Design, Development, Implementation, and Evaluation) of curriculum development to assess training and will consider whether there are training, supervision, audit, and inspection procedures and protocols designed to achieve, maintain, and monitor the performances required by the Consent Decree.

❖ **Full compliance** refers to adherence to policies and training within day-to-day operations (¶642). Full compliance requires that personnel, including sergeants, lieutenants, captains, command staff, and relevant City personnel routinely hold each other accountable for compliance. In other words, the City must "own" and enforce its policies and training and hold officers accountable for misconduct through a disciplinary system that is fair, timely, and consistent. The IMT will assess whether the City's day-to-day operations follow directives,

policies, and training requirements. When measuring Full compliance, we will note whether supervisors notice, correct, and supervise officer behavior and whether appropriate corrections occur in the routine course of business. In this phase, we will review whether compliance is reflected in routine business documents, demonstrating that reforms are being institutionalized. In addition, we will determine whether all levels of the chain of command ensure consistent and transparent compliance.

These levels typically correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. Still, the three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training rather than to create a policy. Likewise, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate. In other circumstances, levels of compliance may include implementing effective pilot programs before rolling out reforms across the entire CPD.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are complying. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its actions.

As a result, the City, the CPD, and other relevant City entities are not in any level of compliance until we find that that they are in a level of compliance. The CPD and other City entities will reach "full and effective compliance" with a requirement once they reach and maintain Full compliance for the requisite length of time required by the Consent Decree—either one or two years. *See* ¶714. "If the City and CPD have achieved compliance with some requirements, but not others, the Court may terminate the Agreement as to those requirements for which compliance has been achieved. The Monitor will not review, assess, or audit requirements that are so terminated. At any time prior to the full termination of [the Consent Decree], the Court may reinstate previously terminated requirements upon a showing that compliance with such requirements has materially lapsed." ¶716.

## The IMT's Assessments and Deadlines

In addition to monitoring the City's compliance efforts, the IMT is bound to several specific and ongoing requirements under the Consent Decree. Figure 3, below, summarizes the Consent Decree requirements for the IMT, many of which are on-going.

The IMT will conduct compliance reviews and data analyses on an ongoing basis throughout the monitoring project. Our assessments have included, for example, reviewing records, policies, procedures, training curricula, and various data sources; observations of training sessions; interviews; and meetings with the Parties, personnel, community members, and external stakeholders about specific Consent Decree requirements, progress, and plans to achieve compliance.

Figure 3: Consent Decree Requirements for the IMT

| Paragraphs | Requirement | Recurring Schedule |
|---|---|---|
| 627–37 | Review of CPD Policies and Procedures | Various, Ongoing |
| 638–41 | Review of Implementation Plans and Training Materials | Various, Ongoing |
| 642–44 | Compliance Reviews and Audits | Various, Ongoing |
| 645–51 | Community Surveys | Every Two Years |
| 652–55 | Monitoring Plan | Annually |
| 656 | Technical Assistance and Recommendations | Ongoing |
| 669 | Monitor will Participate in Meetings with the Coalition | Quarterly |
| 670–71 | Communication with the Parties, Collective Bargaining Representatives, and the Public | Ongoing |

## The IMT's Community Engagement Team Activities

The IMT's Community Engagement Team plays a critical role by monitoring levels of trust and sentiment among the stakeholders to the Consent Decree. The IMT's Community Engagement Team includes experienced Chicago community members, experts in police-community relations, lawyers, and academics. These members work together to meaningfully engage Chicago's communities and ensure community participation throughout the monitoring process. The Community Engagement Team also collaborates closely with the Monitor, Deputy Monitor, and

Associate Monitors to assess the community component of compliance with the Consent Decree.

The IMT's Community Engagement Team has continued to connect with community members virtually, and we have hosted online events regularly since the COVID-19 pandemic began. We look forward to continuing to connect with community groups across Chicago via teleconferences and video conferences and look forward to some in-person community meetings.

The IMT's Community Engagement Team's work is important to create sustainable change within the City and the CPD and to measure compliance with specific policy, training, and procedural changes required by the Consent Decree. The City and the CPD do not function effectively when they lack trust from the communities they serve. In its 2017 report, the DOJ found that the impacts of the "CPD's pattern or practice of unreasonable force fall heaviest on predominantly black and Latino neighborhoods."[17] The DOJ also found that people in many neighborhoods in Chicago lack confidence that "their police force cares about them and has not abandoned them, regardless of where they live or the color of their skin."[18]

Effective policing requires both (1) procedural and cultural change and (2) improved relationships between the City, the CPD, and the communities they serve. The Community Engagement Team encourages improved relationships based on respect, trust, and partnership. These relationships will also be strengthened by transparency and accountability.

The IMT's Community Engagement Team will continue to perform two key tasks regarding the monitoring process: (1) gathering input from Chicago residents about their concerns regarding CPD policies and practices and (2) providing information to the Chicago community regarding the IMT's activities and findings.

As referenced above, in Year One, we completed our first citywide survey about the CPD, which gathered opinions from over 1,300 Chicagoans and in Year Three, we completed our second citywide survey, which gathered opinions from over 1,300 Chicagoans as well. We will repeat that citywide survey in 2024 and will use the results of that survey to guide our community engagement work moving forward.

---

[17]   *See Investigation of the Chicago Police Department*, UNITED STATES DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION AND UNITED STATES ATTORNEY'S OFFICE NORTHERN DISTRICT OF ILLINOIS at 4 (January 13, 2017), http://chicagopoliceconsentdecree.org/resources/.

[18]   *Id.* at 15. *See also Special Report: Focus Groups with Black and Latino Men, Ages 18–35 (Conducted December 2020 – June 2021)*, Independent Monitoring Team (September 1, 2022), https://cpdmonitoringteam.com/overview/reports-and-resources/imt-special-report-focus-groups-with-black-and-latino-men-ages-18-35/.

Because the IMT believes that hearing community voices consistently throughout the monitoring process is crucial, we have undertaken special studies of Chicago's communities during the years we are not conducting the ¶¶645–51 community surveys. For example, we released a special report on the focus groups we conducted with young Black and Latino men in September 2022.[19]

Throughout Year Five, we will continue to contact many individuals, community leaders, and community-based organizations. As conditions permit, the Community Engagement Team looks forward to hosting and attending in-person community meetings across Chicago, including meetings with the Coalition, community-based organizations, and CPD beat meetings.

## Independent Monitoring Reports

The IMT will release two independent monitoring reports for Year Five. *Independent Monitoring Report 9* will cover the first six-month period of Year Five, July 1, 2023, through December 31, 2023, and *Independent Monitoring Report 10* will cover the next six-month monitoring period, January 1, 2024, through June 30, 2024. These reports will summarize monitoring activities, including data analysis and reviews and audits conducted during the two reporting periods. The reports will also summarize the IMT's determinations of Preliminary, Secondary, and Full compliance for each paragraph reviewed or explain why the IMT was unable to adequately assess a requirement.

As with our first eight independent monitoring reports, these reports will be comprehensive and will reference specific data and information that we use to make determinations of compliance. The independent monitoring reports will also include relevant data and observations from the Community Engagement Team.

---

[19]  *See also Special Report: Focus Groups with Black and Latino Men, Ages 18–35 (Conducted December 2020 – June 2021)*, Independent Monitoring Team (September 1, 2022), https://cpd-monitoringteam.com/overview/reports-and-resources/imt-special-report-focus-groups-with-black-and-latino-men-ages-18-35/.

# Conclusion and Looking Ahead

In the first four years of the Consent Decree process, the City and the CPD have made significant progress revising, developing, and implementing policies and training. The City and the CPD have struggled, however, with community engagement; reliable data collection, analysis, and management; staffing and resource shortages; training; supervision; and accountability. In Year Five, we look forward to monitoring the City's and the CPD's efforts to continue to bridge these gaps and continue demonstrating compliance with the Consent Decree.

In future years, our priorities may shift as the City and the CPD make progress with the requirements of the Consent Decree. The monitoring plans for subsequent years will reflect those shifts.

There are, however, several elements of the IMT's work that will remain consistent over time. The IMT's Community Engagement Team will remain involved with local community-based groups invested in police reform in Chicago. We will disseminate information to community members about the City's and the CPD's progress and collect important information from Chicago residents. Likewise, the IMT will continue to implement and assess community surveys and research and solicit input from CPD members.

We will also continue to prioritize transparent community engagement and participation; independent reviews of police policies and practices; and regular communication with the OAG, the City, the CPD, the Chicago Police Board, the Civilian Office of Police Accountability, the Office of the Inspector General, the Deputy Inspector General for Public Safety, other relevant City entities, members of the Coalition (¶669), and members of Chicago communities.

Finally, we must note the limits of this Monitoring Plan. Any plan is subject to change, and that is especially true of a plan developed to address a project as complex and comprehensive as the Consent Decree. As a result, we expect that we may need to add to, subtract from, or otherwise modify various aspects of this Monitoring Plan. Nonetheless, this is our best estimate of what we expect to monitor during Year Five, and we will publicly report and explain any major changes.

When Judge Robert Dow Jr. approved the Consent Decree in 2019, he set the stage for the years ahead:

> *The State of Illinois and the City of Chicago have entered into this consent decree with the goal of using it as a vehicle for solving*

> *the common problems . . . in a manner that defuses tension, re-*
> *spects differences of opinion, and over time produces a 'lawful,*
> *fair, reasonable, and adequate' result for everyone involved.*[20]

For our part, the IMT remains steadfast in its commitment to fairly monitor and assess the City's compliance with the requirements of the Consent Decree and to deliver technical assistance to assist the City when requested.

---

[20]  *See Memorandum Opinion and Order Approving Proposed Consent Decree* (January 31, 2019), 16, *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/Order-Approving-Consent-Decree.pdf. On October 11, 2022, Chief US District Judge of the District Court for the Northern District of Illinois Rebecca R. Pallmeyer became the presiding judge over the Consent Decree.

# Appendix A.
# The Consent Decree and
# the Independent Monitoring Team

In December 2015, the U.S. Attorney General launched a civil-rights investigation into the CPD's policing practices. The U.S. Department of Justice released the results of its investigation in January 2017, finding a longstanding, pervasive "pattern or practice" of civil rights abuses by the CPD. Two separate class-action lawsuits followed: *Campbell v. City of Chicago* and *Communities United v. City of Chicago*.[21]

In August 2017, the Office of the Illinois Attorney General (OAG) sued the City in federal court, seeking a Consent Decree that would address the DOJ's findings and recommendations. The case was assigned to federal Judge Robert M. Dow, Jr. The OAG then sought input from community members and Chicago police officers and negotiated the Consent Decree with the City.

In March 2018, the Parties to the Consent Decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')," which "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[22]

The OAG and the City then sought proposals for an independent monitoring team after posting a draft Consent Decree on the Chicago Police Consent Decree website. Judge Dow approved and signed a modified version of the Consent Decree on January 31, 2019. This Consent Decree provides a unique opportunity for feedback from Chicago communities and local stakeholders. The OAG oversees and enforces the Consent Decree. *See* ¶694. The Coalition has certain enforcement rights and meets with the independent monitoring team at least quarterly. *See* ¶¶709(a) and ¶669, respectively.[23]

The Consent Decree requires action by the CPD and many other City entities. On March 1, 2019, the effective date of the Consent Decree, and after a competitive

---

[21] *See Campbell v. Chicago*, N.D. Ill. Case No. 17-cv-4467 (June 14, 2017), and *Communities United v. Chicago*, N.D. Ill. Case No. 17-cv-7151 (October 4, 2017).

[22] *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

[23] *See also Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs*, ¶9 (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

selection process, Judge Dow appointed Maggie Hickey, a partner at ArentFox Schiff LLP, as the Independent Monitor.[24] On October 11, 2022, Chief US District Judge of the District Court for the Northern District of Illinois Rebecca R. Pallmeyer became the presiding judge over the Consent Decree. As the Independent Monitor, Ms. Hickey oversees the Independent Monitoring Team (IMT) and reports directly to Chief Judge Pallmeyer.

As the IMT, we (1) monitor the City's, the CPD's, and other relevant City entities' progress in meeting the Consent Decree's requirements and (2) offer assistance to the City, the CPD, and other relevant City entities to implement the changes that the Consent Decree requires.

Monitor Maggie Hickey and Deputy Monitor Chief Rodney Monroe, Ret., lead the IMT. The IMT's eight Associate Monitors, in turn, oversee the 10 topic areas of the Consent Decree. Our legal team, analysts, subject matter experts, Community Engagement Team, and community survey staff provide support in several ways: by reaching out to and engaging with Chicago communities; by providing general administrative support; and by collecting and analyzing policies, procedures, laws, and data, including conducting observations and interviews, and drafting reports.

Our full organizational chart is in Appendix A, Figure 1 on the next page, and our team structure is in Appendix A, Figure 2 on the following page.

---

[24] Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he will "help facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree." About, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/about/. As the special master, Judge Coar also reports directly to Judge Pallmeyer.

Appendix B, Figure 1. Independent Monitoring Team Organizational Chart



Appendix B, Figure 2. Independent Monitoring Team Members

| Monitoring Team Leadership | | |
|---|---|---|
| | Independent Monitor | Maggie Hickey |
| | Deputy Monitor | Rodney Monroe |

| Associate Monitors | | |
|---|---|---|
| | Community Policing | Stephen Rickman |
| | Impartial Policing | Denise Rodriguez |
| | Crisis Intervention | Julie Solomon |
| | Use of Force | Paul Evans |
| | Training; Recruitment, Hiring Promotion | Theron Bowman |
| | Supervision | Hassan Aden |
| | Officer Wellness & Support | Cassandra Deck-Brown |
| | Accountability & Transparency | Harold Medlock |
| | Data Collection, Analysis & Management | Tom Christoff |

| Community Engagement Team | | |
|---|---|---|
| | Member and Community Surveys | Joe Hoereth & Other Experts |
| | Member | Laura McElroy |
| | Member | Elena Quintana |
| | Member (and Associate Monitor for Community Policing) | Stephen Rickman |
| | Member (and Associate Monitor for Impartial Policing) | Denise Rodriguez |

| Subject Matter Experts and Legal Team | | |
|---|---|---|
| | Project Director | Laura Kunard |
| | Lead Attorney | Anthony-Ray Sepulveda |
| | Attorney, Recruitment, Hiring, & Promotions; Training | Stella Oyalabu |
| | Attorney | Derek Barella |
| | Attorney, Accountability & Transparency | Alex Becker |
| | Attorney, Use of Force; Data Collection, Analysis & Management | Meredith DeCarlo |
| | Attorney, Community Policing; Impartial Policing | Kaila Clark |
| | Attorney, Crisis Intervention | Brian Hamilton |
| | Attorney, Officer Wellness and Support; Supervision | Sarah Oligmueller |

| Monitoring Team Support | | |
|---|---|---|
| | Project Manager, Analyst for Accountability & Transparency | Bridgette Bryson |
| | Analyst for Officer Wellness & Support | Jessica Dockstader |
| | Analyst for Use of Force | Heleana Melendez |
| | Analyst for Community Policing | Tammy Felix |
| | Analyst for Supervision | Monique Jenkins |
| | Analyst, Crisis Intervention | Lindsey Clancey |
| | Analyst for Recruitment, Hiring & Promotions | Amada Bond |
| | Analyst for Training | Valerie Schmitt |
| | Analyst for Data Collection, Analysis & Management | Melissa Gutierrez |
| | Analyst for Impartial Policing | Christopher Sun |

# Frequently Asked Questions from the Community

Throughout the first reporting period, the IMT received many questions from the community. We list the most frequently asked questions and our corresponding answers below.

## What is a Consent Decree?

A Consent Decree is a court-approved settlement that resolves a legal dispute between parties. This Consent Decree requires the CPD and the City to reform training, policies, and practices in many important areas, such as use of force, community policing, impartial policing, training, accountability, officer wellness, and data and information systems. The goal is to ensure that the CPD performs constitutional and effective policing that keeps both community members and officers safe and restores the community's trust in the CPD (¶2).[25] Federal judge Robert M. Dow, Jr. was appointed to oversee the Consent Decree, and he chose the Independent Monitor. On October 11, 2022, Chief US District Judge of the District Court for the Northern District of Illinois Rebecca R. Pallmeyer became the presiding judge over the Consent Decree. Under the federal judge, the Independent Monitoring Team assesses the CPD's and the City's compliance with the Consent Decree. The Consent Decree will be in effect for at least eight years so that the CPD can develop, implement, and sustain the training, policies, and practices that the Consent Decree requires.[26]

## How Can I Get Involved?

The Community Engagement Team works to connect with neighborhoods, community groups, religious organizations, activists, advocates, and residents across the city. The Community Engagement Team encourages community members to participate in meetings and to promote these sessions through their social and other networks. We regularly update the Community Involvement section of the IMT website with details on upcoming community meetings and events. If your neighborhood or community group would like to invite a Community Engagement Team member to a meeting, please email us at contact@cpdmonitoringteam.com or fill out a feedback form on our website (https://cpdmonitoringteam.com/feedback-form/).

We encourage community members to provide input on CPD policies. When the CPD modifies or creates applicable policies, it will post them on its website so that

---

[25] The final Consent Decree is available on the Chicago Police Consent Decree Website. *See Consent Decree* (January 31, 2019), http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf.

[26] To learn more about the Consent Decree, visit the Office of the Attorney General's Consent Decree website: http://chicagopoliceconsentdecree.org/.

community members can provide input: https://home.chicagopolice.org/re-form/policy-review/.

Community members may also participate in the monitoring process in the following ways:

- Attend our public meetings listed on our website;
- Complete an input form on our website; and
- Reach out to the IMT or members of our Community Engagement Team (see below).

## How can I contact the IMT?

Community members can reach out to the entire IMT via email:
- contact@cpdmonitoringteam.com

Community members can also contact individual members of our Community Engagement Team:
- Elena Quintana (Elena.Quintana@cpdmonitoringteam.com)
- Joe Hoereth (Joe.Hoereth@cpdmonitoringteam.com), and
- Laura McElroy (Laura.McElroy@cpdmonitoringteam.com)
- Steve Rickman (Stephen.Rickman@cpdmonitoringteam.com)
- Denise Rodriguez (Denise.Rodriguez@cpdmonitoringteam.com)

Learn more at the Contact Us page on our website (https://cpdmonitoring-team.com/contact-us/).

Community members can also use the Feedback Form on our website to provide input (https://cpdmonitoringteam.com/feedback-form/).

Independent Monitoring Team | Chicago Police Department Consent Decree