**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF ILLINOIS, | ) | |
| | ) | Case No. 17-cv-06260 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**COMMUNITIES UNITED PARTIES' STATEMENT
REGARDING COMPREHENSIVE ASSESSMENT OF THE CONSENT DECREE**

The Communities United (CU) parties of the Community Coalition provide these recommendations for modifications to the Consent Decree in connection with the Independent Monitor's Comprehensive Assessment under ¶¶ 657–59. The Consent Decree authorizes the Monitor to recommend any modifications to the Decree that are "necessary to achieve and sustain [the Decree's] intended results." *Id.* Modifications are urgently needed. Four years into the Consent Decree, the City has reached full compliance with only 5% of the Decree's requirements. The people of Chicago, particularly those most impacted by harmful policing—Black and Brown Chicagoans and Chicagoans with disabilities—have yet to see meaningful on-the-ground changes in policing.

The modifications suggested below are critically important for ensuring the successful implementation of the transformative changes required in the Consent Decree. They fall into the following categories, discussed further below:

- Adding new substantive requirements where prior terms have failed, including to terms limiting officers' uses of force, improving CPD training to adhere to impartial policing principles, improving officers' interactions with people with disabilities and people in crisis, as well as adding a program to divert low-level offenses from law enforcement responses;

- Adding numerical targets for CPD's operational compliance with the Consent Decree;

- Adding mandatory minimum staffing requirements for CPD's Consent Decree functions;

- Enhancing the Coalition's role in the Consent Decree to ensure that its work leads to meaningful changes for impacted communities;

- Strengthening the requirements for the City to partner with the community in transforming policing in Chicago;

- Strengthening the monitoring process to ensure that the Consent Decree is achieving its ultimate goals of making policing less discriminatory and less harmful to people of color and people with disabilities in Chicago; and

- Improving the transparency of Consent Decree processes.

Additional recommendations by the Community Coalition will be set forth in a separate filing by the Campbell parties.

## I.  Strengthening Key Substantive Areas of the Consent Decree

### A.  Enhancing Training on Impartial Policing

The Consent Decree's in-service training requirements related to impartial policing (¶ 74) should be expanded to achieve the Consent Decree's goal of ensuring non-biased and non-discriminatory policing by all officers. Based on our observations since 2019, CPD's impartial policing training has not resulted in decreased racial disparities in uses of force, firearm pointing incidents, foot chases, home raids, investigatory stops, frisks, searches, or arrests. The Consent Decree should require that CPD use evidence-based training shown to reduce unconscious bias and racial disparities in officer decision-making and policing outcomes. For example, the "Situational Decisionmaking" training developed by University of Chicago researchers and provided to over 2,000 CPD officers in a randomized controlled trial led to reductions in officers'

uses of force, discretionary arrests, and arrests of Black community members.[1] CPD should be required to adopt empirically-proven impartial policing trainings such as this.

Further, the Consent Decree should require that officers learn the history of police misconduct and police violence in Chicago and the ongoing effects of racial segregation and community trauma in Chicago. The Decree should also require that training on impartial policing reflect substantial input from community-based organizations representative of the communities most impacted by harmful and discriminatory policing. To that end, the Decree should require that the perspectives of impacted community members be presented during these training units.

### B. Improving CPD's Training and Data Collection Regarding Interacting with People with Disabilities

The Consent Decree's requirements (¶ 69) for training officers on interactions with people with disabilities should be significantly enhanced, from a training bulletin to comprehensive in-service training.[2] CPD has struggled to complete its training bulletin (and has not done so) in part because the vast array of diverse disabilities and how they impact everyday police encounters, as well as major incidents, is too complex to be meaningfully addressed in a "bulletin" or "special directive." Comprehensive training is needed to present these issues in a way that can impact and guide CPD members in their work. Additionally, the Consent Decree's requirements for data collection and analysis regarding CPD's interactions with people with disabilities need to be enhanced to ensure their meaningful use in ongoing development of improved policy, training and practices.

### C. Finding New Strategies to Decrease Criminal Justice Outcomes for People with Behavioral or Mental Health Needs

---

[1] Oeindrila Dube, Sandy Jo MacArthur, and Anuj K. Shah, *A Cognitive View of Policing*, National Bureau of Economic Research Working Paper Series (Sept. 2023), https://www.nber.org/system/files/working_papers/w31651/w31651.pdf.
[2] *See* CU Fairness Hearing Comments (dkt. 158) at 17-21.

As set forth in the Consent Decree, the CPD's Crisis Intervention program should be utilized to, among other things, reduce use of force and decrease criminal justice involvement for "individuals in crisis," defined to include people with behavioral and mental health disabilities, as well as other disabilities. (¶¶ 85 and 88 (objectives) and 759 (definition)). CPD's current policies implementing this program have failed to uplift or facilitate these objectives. Instead, the programs focus on training the officers on the forms they need to complete, but not on the outcomes they should achieve.

The IMT has identified many barriers to making the Crisis Intervention program work to meet both its training goals and these more fundamental program objectives. As a result, the Consent Decree needs stronger terms to require CPD to work to decrease total police contacts with people in crisis. This will require a new process, with dedicated resources to ensure that these calls can be diverted from police responses. Not only would this requirement enhance safety for people in crisis, it would ease the current shortage of CI program staff and CIT-certified officers. Additionally, the Consent Decree should expressly require that, when police officers do respond to these calls, they must attempt to resolve crisis interactions without citations, arrest, or charges. Currently this is a goal of the CIT program, but it is not specifically required and is not even set forth in the Crisis Intervention policies. As a result, CPD's revised policies for its CIT program currently do not facilitate this crucial goal.

**D. Establishing and Expanding Pre-Arrest Diversion Programs**

We continue to support the Coalition's recommendation[3] that the Consent Decree (¶¶ 11, 86) should be modified to require the implementation of pre-arrest diversion programs, with the

---

[3] 3 *See* Campbell Fairness Hearing Comments (dkt. 157) at 47-55 and Ex. D.

goal of reducing unnecessary police interactions, and subsequent uses of force or escalation of police encounters.

Nearly five years and millions of dollars into Consent Decree reforms, it is evident that revisions to policies and trainings are not enough to change the police practices that led to this Decree. The City can do more, and do it more efficiently, by expanding diversion programs that reduce reliance on unnecessary criminal justice responses.

### E. Enhancing CPD's Internal Audit Functions

As the IMT repeatedly has observed, CPD's Audit Division "is crucial to the City's and the CPD's ability to sustain reforms, learn from its own operations, and change culture over the long term." (IMR7 at pdf p. 18.) But CPD has consistently ignored and sidelined its Audit Division, and left it understaffed and under-resourced. (*Id.* at pdf p. 1735–36.) The Consent Decree should be amended to: (i) ensure the Audit Division has adequate resources and staff to conduct rigorous assessments of CPD's operations, processes, and internal controls; (ii) require CPD to publish Audit Division reports on its website; and (iii) require CPD to implement Audit Division recommendations and promptly correct any deficiencies in Audit Division findings.

### F. Improving the City's Community Mediation Pilot Program

It appears that the City's pilot program for community mediation (developed pursuant to ¶ 512) will not be able to scale up. Throughout the 6-month pilot, only eight out of 121 eligible cases were mediated, with six cases resulting in a resolution and two cases not resolving.[4] The Consent Decree (¶512) should be amended to require that the City start again with a different

---

[4] City of Chicago Office of Inspector General, *Community-Police Mediation Pilot Program* (July 25, 2023) at 16, https://igchicago.org/wp-content/uploads/2023/07/Community-Police-Mediation-Pilot-Program-with-Department-Responses.pdf

community mediation model that is facilitated by trained community members who are survivors of police abuse and otherwise representative of the community members they serve.[5]

### G. Specifying Gun-Pointing as a Use of Deadly Force

Consent Decree ¶ 189 should be amended to impose a more restrictive standard that would treat gun-pointing as a use of deadly force and prohibit officers from pointing a gun at a person unless the person presents an immediate threat of death or serious bodily injury.[6]

### H. Requiring Adequate *Giglio* Disclosures

The Coalition recommended this improvement to the Consent Decree in 2018.[7] Since then, the City still has failed to create a centralized repository and accurate mechanism for disclosure of police misconduct to prosecutors and defense attorneys in criminal cases.

### I. Improving the City's Policy for Release of Body-Worn Camera (BWC) Footage

The prompt release of BWC footage following a police shooting or other use of force incident is essential to public transparency and restoring communities' trust in CPD. The City's current Video Release Policy—which has not been updated since 2016 and is codified in ¶ 554—requires the City (COPA) to release BWC footage within 60 days after the date of an incident (plus a possible 30-day additional delay). The Video Release Policy and Consent Decree (¶ 554) should be amended to ensure that BWC footage is released sooner than 60 days whenever possible.

### J. Improving Transparency of Use of Force Data by TRED

In 2022, the Tactical Review and Evaluation Division (TRED) instituted an internal data dashboard that compiles data from TRED reviews of use of force incidents, foot pursuits, and other

---

[5] New Orleans uses such a community-facilitated mediation model. *See* Office of the Independent Police Monitor, City of New Orleans, 2020 Annual Report: Community-Police Mediation Program, https://nolaipm.gov/wp-content/uploads/2022/03/2020-OIPM-Annual-Report-Mediation.pdf

[6] *See* Campbell Fairness Hearing Comments (dkt. 157) at 67-71.

[7] *See* CU Fairness Hearing Comments (dkt. 158) at 23–26 (detailing recommendations for Consent Decree to require the City to provide information to meet its *Giglio* obligations).

police activity subject to TRED review. This dashboard is currently available only for internal Department use. The Decree (¶¶ 574–75) should be amended to require that CPD make this dashboard publicly available online. Publishing this TRED dashboard will enable elected officials, community groups, activists, journalists, researchers, and other stakeholders to identify trends and patterns on use of force issues, allowing for critically needed public transparency and public input—key to building trust and legitimacy around CPD's use of force.

### K.  Coalition Recommendations for Improving the Stop & Frisk Stipulation

If not addressed earlier by the Court, the IMT's Comprehensive Assessment should recommend adoption of the Coalition's proposed changes to the Amended Stipulation Regarding Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances (dkt. 1096).[8]

## II.     Adding Outcome-Based Numerical Metrics for CPD's Operational Compliance

The Consent Decree should be modified to mandate quantifiable, outcome-based measures for assessing whether CPD has reached full compliance with the Decree's requirements (known as "operational compliance"). While the Decree's definition of "compliance" requires that CPD "carry[] out the [Decree's] requirement[s] in actual practice," ¶ 642, the Decree is silent as to whether or how quantifiable, outcome-based metrics will be used to determine whether CPD is complying with the Decree. Such metrics are essential to determining whether CPD has in fact achieved sustained, tangible, on-the-ground improvements in "actual practice," as required by the Decree. The Decree (*e.g.*, ¶¶ 644, 717) should therefore be revised to make clear that outcome-based measurements are essential to assessing operational compliance. Other policing federal

---

[8] *See* CU Parties' Aug. 3, 2023 Position Statement (dkt. 1104); Campbell Parties' Aug. 13, 2023 Position Statement (dkt. 1110).

consent decrees include specific outcome assessments or metrics.[9]  For Chicago's Consent Decree, these metrics should include:

- Numerical targets for reducing uses of force, firearm pointing incidents, foot chases, home raids, investigatory stops, frisks, searches, and arrests of people in crisis that are unjustified, unlawful, or otherwise violate CPD policy;

- Numerical targets for reducing instances of biased or discriminatory policing;

- Numerical targets for reducing officers' failure to report reportable uses of force as required under ¶ 219;

- Numerical targets for reducing unnecessary police contacts with members of the public;

- Numerical targets for reducing unjustified disparities in the types of police encounters listed above with respect to race, disability, LGBTQ status, and other marginalized groups who are disproportionately impacted by harmful policing;

- Numerical targets for reducing the number of sustained misconduct complaints against CPD personnel; and

- Numerical targets for improving community satisfaction with and trust in CPD, as measured via surveys and focus groups (¶¶ 646–47).

## III.     Mandatory Minimum Staffing Requirements for CPD's Consent Decree Functions

A significant roadblock to the pace of change is that CPD consistently has failed to put enough staff in place to carry out many important Consent Decree requirements. As noted in the most recent Independent Monitoring Report, many CPD units crucial to Consent Decree implementation have severe personnel shortages, including: the Tactical Review & Evaluation Division, Research & Development Division, Education and Training Division, Crisis Intervention Unit, Office of Community Policing, Strategic Initiatives Division, Office of Constitutional Policing and Reform, Reform Management Group, Legal Affairs Division, and Audit Division.

---

[9] *See, e.g.,* Amended and Restated Consent Decree Regarding the New Orleans Police Department, *United States v. New Orleans,* 12-CV-1924 (E.D. La.) ¶448 ("Outcome Assessments"), https://nola.gov/getattachment/NOPD/NOPD-Consent-Decree/Consent-Decree.pdf/; Consent Decree, *United States v. Police Dep't of Baltimore,* 17-CV-00099 (D. Md.) ¶ 165 ("Outcome Assessments"), https://www.justice.gov/opa/file/925056/download; Settlement Agreement and Court Order, *Collins v. Milwaukee*, 17-cv-234 (E.D. Wis.) §V.1.d, https://www.aclu.org/cases/collins-et-al-v-city-milwaukee-et-al#legal-documents

Making matters worse, those who are assigned to Consent Decree functions often get assigned out to patrol, taking them away from critical reform duties. (IMR7 at pdf pp. 6-8, 10-16, 18-19, 74, 1736, 1758.) The Consent Decree should be amended to specify numerical minimum staffing levels for CPD units crucial to Consent Decree compliance and should impose clear consequences for violations.

## IV. Strengthening the Coalition's Role in the Consent Decree Process

While substantial work has been completed under this Consent Decree, its impact has not reached communities targeted by police violence. Enhancing the role of the Community Coalition, as set forth below, can help move this Consent Decree toward its promise and purpose.

### A. Stipulations or Changes to the Consent Decree

The Decree should be amended to provide the Coalition with an opportunity to give input on any substantive amendments, stipulations or changes to the Consent Decree before they take effect, including participating in negotiations regarding the addition of new subjects to the Decree, criteria for termination of the Decree, or any extensions to the term of the Decree.

### B. Early Review of Draft Policies

The Coalition should have the ability to review and provide input on draft CPD policies (or revisions to those policies) in certain key subject areas *before* they are released for public comment so that the Coalition can provide input during the formative stages of developing policies and trainings. These key subject areas include: use of force, community policing, impartial policing, crisis intervention, supervision, and accountability and transparency. With respect to certain key policies that CPD has not yet finalized (including but not limited to policies regarding interactions with youth, interactions with people with disabilities, and interactions with people of limited English proficiency), the Coalition should have a role in negotiating these policies, and

9

CPD's training on these policies, from the inception of the development process. As set forth in more detail below, in some areas, more meaningful engagement should similarly be completed by use of working groups, which would include the Coalition and other stakeholders, to develop policies and training from the ground up. Gaining community input and buy-in *before* CPD substantially completes its draft policies would significantly speed up the policy development process overall, in comparison to CPD's current method of releasing fully-formed policies for public comment, only to go back to the drawing board after community members raise objections.

### C. Input on the IMT's Methodologies for Assessing Operational Compliance

Under ¶ 655, IMT will determine its methods for assessing CPD's compliance with each Consent Decree paragraph. While the Consent Decree gives the parties an opportunity to submit comments or concerns regarding IMT's proposed methodologies prior to each compliance review, the IMT is not currently required to publicly disclose the methodology until *after* IMT has applied the methodology and completed its assessment of CPD's compliance. ¶¶ 655, 661. It is critical that community members most impacted by the Decree's mandated changes, such as the Coalition, have a voice in the methodologies that will be used to assess operational compliance. The Decree (¶ 655) should be revised to ensure that the Coalition, and the general public, has an opportunity to provide input on IMT's proposed methodologies for assessing operational compliance. Specifically, there should be an opportunity to provide feedback and object (if appropriate) to IMT's proposed numerical benchmarks, as proposed in Part II above.

### D. Discovery

The Decree should be amended to provide the Coalition with the ability to obtain discovery from CPD, including any discovery necessary to determine whether CPD is in compliance with the Consent Decree.

## V. Enhancing CPD's Community Engagement

Beyond amendments to enhance the Coalition's role in helping transform CPD, additional changes are needed to ensure that CPD's engagement with the community as a whole provides meaningful opportunities for genuine community input and influence over important areas of policing in Chicago.

### A. Extending the Public Comment Period on CPD's Policies

The 15-day period for public comments on CPD policies (¶ 633) should be extended to a minimum of 30 days, with significantly longer periods for draft policies that are substantially new or heavily revised or that are the subject of particular public interest or controversy (*e.g.*, foot pursuits, search warrants, youth interactions, interactions with people with disabilities and with limited English proficiency), or in circumstances where CPD releases multiple policies for public comment simultaneously. In addition, CPD should give advanced notice of upcoming opportunities for public comment so that community members, organizations, and other stakeholders can plan in advance for the comment periods. Further, CPD should be required to advertise public comment opportunities in public service television and radio announcements as well as paid media, such as newspaper ads.

For lengthy or complicated policy revisions, the CPD should post them with guidance on what is changing and the purpose of the changes, as well as suggested questions that can help members of the general public to understand their role in providing feedback as well as doing so in a manner that can facilitate meaningful policy changes.

### B. Requiring a Feedback Loop

Paragraph 633 also should be amended to require CPD to provide a feedback loop to community members after receiving community feedback. CPD generally does not respond in

writing and does not explain how it uses, or does not use, the feedback it receives. The Consent Decree should expressly mandate that CPD publish a summary with each updated version of a policy that explains how CPD used community feedback in developing that version. These summaries should explain what suggestions CPD accepted, what suggestions it rejected, and why. These summaries should also disclose which community organizations CPD solicited and received input from (if those organizations consent to the disclosure).

### C. Convening Working Groups

The Coalition has repeatedly proposed a structured working group model, similar to the model used for the Community Use of Force Working Group, to ensure that CPD obtains meaningful input from the Coalition and other impacted community members and organizations, as required under the Consent Decree. The Coalition proposed creating working groups on key Consent Decree topics important to those with lived experiences of police violence and mistreatment including but not limited to:

- Impartial policing;
- Women and gender/prohibition of sexual violence;
- Police interaction with youth/police in schools;
- Accountability, transparency, and COPA;
- Supervision and officer performance evaluations;
- Crisis intervention (which could be broadened at this stage to include other forms of diversion); and
- Officer training.

The Consent Decree should be amended to establish a sustained community engagement framework, such as working groups, for incorporating impacted communities' input on CPD policies, training, and practices. This community engagement framework could also be modeled on the process—designed and implemented by community groups, with compensation for community participants—that Consultant Hickey's team led under the Stop and Frisk Agreement between the ACLU of Illinois and City of Chicago.

12

### D. Coordinating with Police District Councils and the CCPSA

The community engagement provisions of the Consent Decree should be amended to incorporate the role of the democratically elected Community Commission for Public Safety and Accountability (CCPSA) and Police District Councils, established in the Empowering Communities for Public Safety Ordinance. This framework for civilian oversight and input into policing in Chicago is a new addition since the Consent Decree was adopted. At a minimum, the Consent Decree should be amended to recognize this oversight framework and require CPD to coordinate and cooperate with the CCPSA and District Councils.

### VI. Strengthening the Tools and Processes for Consent Decree Monitoring and Implementation

### A. Prioritizing and Enforcing Monitoring Plans

1. <u>Monitoring Plans That Prioritize Meaningful Change</u>. The Monitor's annual plans (*see* ¶ 652) should clearly state substantive priorities for CPD to work toward within each monitoring period. The IMT's annual Monitoring Plans lack a clear articulation of short-term and long-term priorities—among the hundreds of areas of Consent Decree implementation—to ensure that CPD makes meaningful progress toward the goals of the Consent Decree. The monitoring plan should prioritize changes that can be felt by impacted communities. Additionally, the public needs to know what CPD is expected to work on each year and also how each annual plan will result in full and timely compliance with the entirety of the Consent Decree. The monitoring plans should contain concrete benchmarks that demand progress toward Consent Decree goals. The plans should include target levels of compliance for the City to reach on a semiannual, annual, or other periodic basis. With regard to operational compliance, the Monitoring Plans should include outcome-based numerical metrics that IMT will use to assess whether CPD has achieved compliance, as discussed in Part II above.

2.      Enforcement.  The Monitoring Plans should be an enforceable part of the Consent Decree. The City has violated numerous Consent Decree deadlines without any consequences. The Decree should be modified to impose consequences on the City for violating Consent Decree deadlines or the IMT's Monitoring Plans, including consequences for not meeting the compliance targets set forth in the Monitoring Plans. Such consequences could include increased disclosure obligations, increased monitoring, and/or increased authority for the Court to issue equitable remedies for Decree violations and for IMT to propose such remedies. Finally, the City should agree to be subject to monetary penalties ("liquidated damages") for compliance failures, with such automatic payments going toward additional Consent Decree staffing, resources, monitoring, and compliance supervision.

### B.  Improving Policy & Training Revision Processes

CPD has stalled meaningful changes mandated by the Consent Decree (policy development, training and implementation) by endlessly objecting to changes recommended by the OAG and/or the Monitor.  While ¶¶ 629–30 lay out a process for the Monitor and, ultimately, the Court to resolve objections that the Monitor or OAG raise to CPD "policy or procedure," those terms should be modified to provide an efficient resolution. This can be done by allowing either the Monitor or the Court[10] to have a more robust tie-breaking role in the event of impasses that are delaying changes to policy,  training curricula, policy and training implementation, and the like. In addition, this authority to resolve disputes should apply not only to objections to recommendations from the Monitor and OAG but also to those raised by the Coalition.

---

[10] The Court may consider appointing subject-matter expert(s) or additional monitor(s) to advise and assist with specific areas of Consent Decree implementation. For example, a court-appointed expert could recommend best practices and assist the Court in achieving resolution during policy negotiations (such as the ongoing Search Warrant Policy negotiations with the Coalition).  A court-appointed expert or specialized monitor also could assist in the event the Court were called on to break impasses between the parties with respect to policies or training curricula.

**VII.    Improving the Consent Decree's Transparency**

We believe that the broad confidentiality restrictions in ¶ 672 (prohibiting the Monitor from making public statements and disclosing non-public information) and ¶ 689 (requiring the Monitor and OAG to maintain certain information about CPD as confidential), as well as other specific confidentiality exceptions in the Decree (e.g., ¶ 545 (allowing CPD to withhold policies and directives from online posting)) undermine the legitimacy of the Consent Decree process in the eyes of the public. This is a critical issue, given the Decree's stated purpose of improving community trust in CPD.  The Consent Decree's confidentiality restrictions should be narrowed, with the goal of providing full information to the public regarding the parties' work to achieve compliance with the Decree.

**VIII.   Conclusion**

The CU Parties appreciate the opportunity to make these recommendations and look forward to working with the Court, the Monitor, the State, and the City to negotiate and implement these crucial reforms to ensure that the transformational promises of the Consent Decree are achieved in practice.

DATED: October 23, 2023

Respectfully Submitted,
*/s/ Alexandra K. Block*
Alexandra K. Block (ablock@aclu-il.org)
Michelle T. García (mgarcia@aclu-il.org)
Joshua M. Levin (jlevin@aclu-il.org)
Roger Baldwin Foundation of ACLU, Inc.
150 N. Michigan Ave., Suite 600
Chicago, IL 60601
(312) 201-9740

Amanda Antholt (amanda@equipforequality.org)
Ruben Bautista (ruben@equipforequality.org)
Equip for Equality
20 N. Michigan Ave., Suite 300
Chicago, IL 60602
(312) 341-0022