**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, | |
| Plaintiff, | Case No. 17-cv-6260 |
| v. | Hon. Rebecca R. Pallmeyer |
| CITY OF CHICAGO, | |
| Defendant. | |

**_CAMPBELL_ PLAINTIFFS' POSITION STATEMENT ON REQUIRED**
**MODIFICATIONS TO THE CONSENT DECREE**

The Coalition comprised of the _Campbell_ Plaintiffs respectfully requests that this Court

ensure that the Consent Decree is modified as further described below.  The need for these

modifications could not be more urgent. As this Court has heard in each public hearing it has held

on this matter and read in each Monitor's Report[1], the meaningful change has not yet happened

within the Chicago Police Department (CPD). As result—despite the significant investment of time

and resources into this process from the City, the State, this Court and affected communities--Black

and brown Chicagoans still remain at a significant risk of harm from CPD's deficient policies and

practices.[2] The proposed modifications described in more detail below would (if implemented with

---

[1] Doc 1097, Seventh Monitor's Report, June 29, 2023, at 5, ("We continue to have significant concerns regarding the CPD's commitment to have constitutional policing and reform efforts lead its crime-fighting strategies.").

[2] See Doc. 1047, _Special Report: Focus Groups with Black and Latino Men_, ("Focus Group Report"), Sept. 1, 2022,  at 10 ("Participants often described officers as aggressive, tough, intimidating, arrogant, or physically or verbally abusive. Often, officers' "tough" behavior was enough for many participants to express fear or a sense of intimidation during the interaction."). _Id._ at 2 ("In fact, many focus-group participants described that most interactions they have had with the CPD are negative, even when the interactions end without law-enforcement actions.") at 8 ("Many participants referenced encounters with officers who were blatantly rude or disrespectful. Some participants expressed that officers failed to treat them as human beings and as equals.") at 9 ("Some of the **most troubling incidents reported by** participants involved officers being overly aggressive or harassing them. Some participants provided accounts involving the same officer repeatedly making threats of arrest or demonstrating other intimidating behavior toward the same participant.").

fidelity) go a long ways towards ensuring that this Consent Decree delivers on its potential to transform the CPD and put an end of generations of racist and violent police practices. Specially, the *Campbell* Plaintiffs request that this Court ensure that Consent Decree contain the following requirements: 1) mandated de-escalation and reductions in uses of force; 2) the development of diversion initiatives that would reduce unnecessary police interaction; 3) restrictions on officer gun pointing and reporting requirements; 4) meaningful community engagement through the development of Working Groups; 5) provisions that protect survivors of police violence and misconduct. Should this Consent Decree be expanded to include traffic stops, those provisions should include prohibitions on pretextual stops and limits on officer discretion to engage in low-level traffic enforcement.

## I. MODIFY CONSENT DECREE USE OF FORCE PROVISIONS TO REQUIRE DE-ESCALATION AND COMPLY WITH GENERALLY ACCEPTED PREVAILING STANDARDS REGARDING OFFICER GUN POINTING

### A. MANDATE DE-ESCLATION AND REQUIRE REDUCTIONS IN OFFICER USE OF FORCE

CPD officers frequently engage in overly aggressive tactics that unnecessarily escalate situations and lead to excessive force and needless arrests.[3] In situations that do not require police intervention, as well as where officers stop individuals for low-level offenses, officers repeatedly resort to excessive force by using tasers and guns, even when the individuals do not present a threat to the officers or any bystanders.[4] The DOJ also reported that CPD officers regularly use retaliatory force against people who object to being stopped.[5]

---

[3] United States Department of Justice Civil Rights Division & United States Attorney's Office Northern District of Illinois, *Investigation of the Chicago Police Department* (Jan. 2017) at 28. ("DOJ Report")
[4] *Id.* at 32.
[5] DOJ Report, at 33-34.

More recent data underscores that young Black men still bear the brunt of police violence and harassment. Ten percent of Young Black Men surveyed by the IMT reported experiencing a use of force (other than handcuffing) by a CPD officer, a rate six times greater than all Chicago adults during this time.[6] The IMT Special Report on focus groups with Black and Latino Men documents the presence of CPD's racially discriminatory and inherently escalatory conduct: "[t]here was plenty of discussion about harassment and officers escalating situations. It was not unusual for a participant to recount an incident of being harassed in the past, sometimes repeatedly harassed, in some cases even by the same officers. Reports of harassment ranged from repeated stops for minor infractions to threats and intimidation." [7] The same Report notes that "participants stated feelings of fear of the police and expressed that they also felt sometimes that the police seemed to be afraid of ordinary civilians and, therefore, acted too harshly in their interactions with civilians. . . . Even in involuntary interactions, like getting pulled over by the police, individuals stated that the police were too harsh."[8] Further, the CPD's own data demonstrates that use of force is on an upwards trajectory.[9]

The Consent Decree does contain provisions that required the use of de-escalation whenever "safe and feasible."[10] But there is no way to measure compliance with that objective. The Decree should be modified to require officers to 1) de-escalate force at the very earliest possible moment; and 2) require officers to use disengagement, waiting out a subject, and/or calling in specialized units to avoid force whenever possible.[11] The CPD Consent Decree must also require

---

[6] Doc. 1089, *Community Survey Report Oct. 2021-May 22*, at 46

[7] Focus Group Report at. 26.

[8] *Id.*

[9] Chicago Police Use of Force Dashboard, https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/. Between 2021 and 2022 CPD's use of force increased by several hundred incidents. As of October 27, 2023, CPD's use of force for this calendar year is on track to increase yet again.

[10] Doc. 703, CPD Consent Decree, at ¶ 46.

[11] See *U.S. v. New Orleans*, 12-CV-01924, (ED La.), Doc. 565, Consent Decree at ¶109(g)(mandating that officers be required to use "de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified").

officers to document de-escalation efforts when reporting use of force. Further, the IMT should rigorously analyze and document use of force data in its reports. As explained further below, Chicago is an outlier—most recent police consent decrees contain provisions that mandate a reduction in use of force and/or are interpreted by Independent Monitors as requiring this outcome.

For example, the New Orleans decree includes mandatory de-escalation provisions[12] and the Monitor there includes data regarding reported use of force in its annual reports. In the 2022 NOPD Monitor Report, the Monitor notes from 2017-2020 there was a steady decline in NOPD use of force numbers and documents that while there was an increase in overall force incidents from 2021 to 2022, serious force incidents have continued to decline.[13] The report further provides recommendations for compliance priorities to redress the increase in less serious force incidents.[14]

Similarly, the Baltimore police consent decree in Baltimore requires officers to use de-escalation techniques, including verbal persuasion and warnings and tactical de-escalation techniques . . .whenever possible, before resorting to force and to reduce the need for force. . ."[15] Further the Baltimore decree contains provisions that explicitly prohibit officers from engaging in the escalatory behaviors so common among CPD officers. "Recognizing that tactics leading up to the use of force can influence whether the force used was necessary, BPD will prohibit the use of tactics that unnecessarily escalate an encounter and create a need for force."[16] These provisions have successfully and significantly reduced the amount of force Baltimore police officers use. The Monitor there determined that "[t]he number of force incidents in which BPD officers were involved declined by nearly 54.7% from 2018 to 2021. .."[17]

---

[12] *Id.*
[13] *U.S. v. New Orleans*, Doc. 674, 2022 Annual Monitor's Report, at. 16.
[14] *Id.*
[15] *U.S. v. Baltimore*, 17-CV-99, (D. Md), Doc. 2, Consent Decree at ¶125.
[16] *Id.* at 135.
[17] *U.S. v. Baltimore*, Doc 585, Compliance Review and Outcome Assessment Regarding Use of Force, at. 9.

The Seattle Decree provides that "[o]fficers should use de-escalation techniques, when appropriate and feasible, in order to reduce the need for force. . . Officers should not use force against individuals who only verbally confront them. . .." [18] The Seattle Monitor concluded that "[o]ver the course of the Consent Decree, SPD's use of force decreased significantly overall and across all levels of force. . ."[19]

Finally, the Minneapolis Consent Decree states that "officers [a]re required to engage in interactions with community members and resolve incidents without resorting to the use of force, including through de-escalation strategies, and "[h]ave a clear affirmative duty to de-escalate and use de-escalation techniques and tactics to minimize the need to use force and increase the likelihood of voluntary compliance with legitimate and lawful orders." [20] The Minneapolis Decree has not yet been monitored but provides a strong example of language that should be imported into Chicago's decree.

## B. REDUCE POLICE INTERACTIONS THAT LEAD TO UNNECESSARY POLICE VIOLENCE

The current Consent Decree fails to address the harm that arises from unnecessary police interactions—and fails to make the connections between those interactions and uses of force. This problem was well documented by the DOJ and the Police Accountability Task Force (PATF). The PATF found that CPD officers approach "routine situations with an overaggressive and hostile demeanor, using racially charged and abusive language."[21] The DOJ similarly found that CPD officers commit tactical errors that unnecessarily escalate situations and "result in avoidable uses of

---

[18] *U.S. v. Seattle*, 12cv1282, Doc. 3, Settlement Agreement and Stipulated Order of Resolution, at ¶ 70(a).
[19] *U.S. v. Seattle*, Use of Force Preliminary Assessment, April 2022, at 2.
[20] *Minnesota v. Minneapolis*, 27cv23-4177, Minn. D. Ct., Settlement Agreement and Order, July 13, 2023, ¶56(a), (f).

[21] Chicago Police Accountability Task Force, Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities They Serve 13 (Apr. 2016), at 16.

force and resulting harm, including deaths."[22] Multiple IMT Reports—as well as testimony provided during this Court's public hearings—demonstrate that the Consent Decree has failed to remedy this issue. [23] The Consent Decree must be modified to address this problem by 1) developing diversion programs for minor quality of life issue and community disputes and 2) eliminating financial incentives police have to engage in unnecessary and harmful community interactions.

The Baltimore Consent Decree requires the city to assess "efforts to decrease Youth involvement with the juvenile and criminal justice systems … including the [c]ity's diversion programs, community-based alternatives to incarceration, and treatment options for Youth in need of mental health treatment, drug treatment, or other services."[24] This provision further requires the city to issue a report that articulates its findings and recommendations regarding youth and diversion programs.[25] In addition, the Baltimore decree also includes provisions addressing arrests for low-level offenses, which include: obstructing, hindering, or resisting an officer, disorderly conduct, failure to obey an officer, gambling, making a false statement to an officer, and misdemeanor trespassing offenses.[26] For these offenses, the police department must "require that an officer seek permission from a permanent rank supervisor prior to effectuating an Arrest, unless not practicable under the circumstances, in which case officers must notify a permanent rank supervisor as soon as practicable after effectuating an Arrest."[27] Similarly, for quality of life offenses, which encompasses loitering, trespassing, public urination/defecation, disorderly conduct, failure to obey, disturbing the peace, hindering, open container, and littering, the decree articulates that the policy for the police

---

[22] DOJ Report at 28.
[23] Supra, notes 1 & 2.
[24] *Baltimore Consent Decree* ¶ 219.

[25] *Id.*

[26] *Id.*, ¶ 61.

[27] *Id.*

department should be "the least intrusive response appropriate under the circumstances as reasonably understood by the officer at the time," meaning that "a verbal warning and counseling is preferable to a Citation, and a Citation is preferable to a custodial Arrest."[28]  Moreover, as with low-level offenses, "a permanent rank supervisor [must] approve or disapprove the officer's request to make an Arrest and [the police department] will ensure that its supervisors ensure that any Arrest is based on the existence of probable cause and that the officer adhered to [department] policy when determining when to verbally warn and counsel, issue Citations, or Arrest individuals for Quality of Life Offenses."[29]  The police department is also required to develop a system that tracks citations for low-level and quality of life offenses, and this data must be regularly reported to the Monitor and analyzed by the police department to assess its effectiveness in quality of life policing.[30]

The Ferguson Decree contains provisions that require the development of mediation programs "mediation at all stages of the dispute, from early-intervention to intervention after charges have been filed, as a diversion from the criminal justice system." And requires collaboration with community mediators to "promote lasting resolutions of appropriately selected disputes among community members, while reducing the need for involvement in the criminal justice system."[31]

Further contributing to the problem of unnecessary escalation, CPD has created economic incentives for officers to arrest people and thereby intensify interactions with community members.[32]  A 2017 audit conducted by the OIG detailed findings about CPD's practice of trolling, which occurs when officers actively seek "traffic, disorderly conduct or other violations at the end of a shift" or when they "make an arrest at the end of a shift as a result of escalating a situation which

---

[28] *Id.*, ¶¶ 62, 511.

[29] *Id.*, ¶ 63.

[30] *Id.*, ¶ 62.

[31] *United States of America v. City of Ferguson*, Case No. 16-cv-180-CDP (E.D. Mo.), at ¶ 34.

[32] Office of Inspector General, *CPD Overtime Controls Audit* (Oct. 3, 2017).

would have been in the officer's discretion to dismiss."[33]  Officers are encouraged to troll by the promise of receiving financial compensation for additional arrests.  Under most circumstances, officers will make "one and one half times" their regularly hourly rate when they accumulate trolling-related overtime, a perverse incentive that does little to improve community-police relations or reduce occurrences of excessive force.[34]  The OIG's 2020 follow-up report documents that the CPD made no effort to remedy trolling related practices. [35]  In fact, the OIG reports that CPD failed to acknowledge the existence of trolling even though "CPD management acknowledged the practices during the [OIG] audit." [36]

In order for the Decree to adequately address CPD's systemic use of excessive force and discriminatory treatment of community members, it must be revised to establish substantive diversion requirements.  These provisions require: (1) the development of a city-wide pre-arrest diversion program; (2) the creation of a citation program and a mandate that officers receive supervisory approval prior to making an arrest for minor and quality of life offenses; (3) the creation of a mediation/restorative justice program for the purpose of promoting the voluntary resolution of disputes between community members, to reduce the need for involvement in the justice system; and (4) prohibitions on officers engaging in the practice of trolling and on CPD using arrest, stops, tickets, citations or investigatory stop reports to evaluate an officer's productivity.

### C.  RESTRICT THE CIRCUMSTANCES IN WHICH OFFICERS ARE PERMITTED TO POINT THEIR GUNS AT PEOPLE AND REQUIRE OFFICERS TO FILE A WRITTEN REPORT EACH TIME THEY DO SO.

---

[33] *Id.* at 6.

[34] *Id.* at 13.

[35] Office of Inspector General, CPD Overtime Controls Audit Follow-up Inquiry,(Feb. 2020),
[36] *Id.* at 7.

CPD officers continue to point guns at alarming rates at people who pose no threat to anyone's physical safety.[37] In addition, CPD's reporting requirements for gun pointing have failed to produce a working system of oversight, accountability, and public transparency necessary to prevent officers from needlessly traumatizing thousands of individuals and families.

The Consent Decree's requirement that the CPD adopt a gun pointing policy that permits officers to point guns at people when it is "objectively reasonable" to do so has proved deficient.[38] Pointing a gun at a person *is* a use of deadly force. As every firearms trainer in America teaches, you must not point a gun at a person unless you are prepared to kill them.[39] Yet, Chicago police officers routinely point their guns at people at the first instance of uncertainty, rather than as a measure of last resort. According to CPD's own data, Chicago police officers point guns at people an average of nearly ten times a day.[40] Police officers pointed their guns at over 3,500 adults and children in 2022.[41]

On November 2017, 9-year-old Peter Mendez and 5-year-old Jack Mendez had guns pointed at them and watched as their dad was forced into handcuffs and held at gunpoint. Later, the police realized they had entered the wrong home. A 9-year-old, an elementary school child, should never be confronted with a gun and should never have to watch his father or mother or grandmother face possible deadly force.

Since that time, there have been numerous incidents of law enforcement entering homes and pointing guns at children, including one instance where police raided the home of the Archie family

---

[37] *Community Survey Report Oct. 2021-May 22* at 46 ("Eleven percent of Young Black Men reported having had a gun pointed at them by a Chicago police officer over the past 12 months, over five times as many as Chicagoans overall.")

[38] Consent Decree at para 189 ("CPD will also clarify in policy that officers will only point a firearm at a person when objectively reasonable under the totality of the circumstances.") f

[39] Royce de R. Barondes, *Article: Automatic Authorization Of Frisks In Terry Stops For Suspicion Of Firearms Possession,* 43 S. Ill. U. L. J. 1, 14 (2018); *see also Perez v. City of Los Angeles*, 83 Cal. Rptr. 3d 821, 825-26 (Cal. Ct. App. 2008) (this rule is one of the "cardinal rules of firearm safety.".

[40] *See* Chicago Police Department 2022 Annual Use of Force Report, 6 (3,584 instances were reported in 2022).

[41] *Id.* This is no doubt underreported as no adequate mechanism currently exists to audit whether CPD officers are actually notifying OEMC each time they point their guns at people.

three times in four months in 2019, once when no adult was home.[42] Body Camera footage from

one of the raids showed officers pointing guns at the children, 14-year-old Savannah, 11-year-old

Telia and 7-year-old JJ, as they begged not to be killed. All three children have symptoms of PTSD

and live in fear that they will be traumatized yet again. Having a gun pointed at you is a life altering

trauma. This is especially true when children are the ones at whom the gun is pointed. After CPD

pointed assault rifles at 3-year-old Davianna Simmons her doctor described her as suffering the

worst case of child post-traumatic stress disorder (PTSD) he has ever seen.[43]

 The observations of community representatives in Chicago's Use of Force Community

Working Group of CPD's recent Use of Force trainings provide further evidence of the urgent need

for change. During the trainings, working group members observed veteran officers routinely reach

for their guns "as a first reaction to any potential threat"—as muscle memory, rather than as a

response to a deadly threat.[44] It is long past time that the CPD follow national best practice and

change its policy and training to prohibit officers from pointing their guns at people under most

circumstances.[45] If the Consent Decree is not strengthened, Chicago police officers will continue to

unnecessarily traumatize hundreds of other young children like Peter Mendez.

 CPD's requirements for documenting gun pointing incidents have also proved deficient in

both curbing unnecessary instances of gun pointing and in creating a working system of public

accountability. The Consent Decree currently only requires police officers to notify the Office of

Emergency and Management Communications (OEMC) when they point guns at people during an

---

[42] *Another Family Sues Chicago Police For Raiding The Wrong Home 3 Times In 4 Months, Pointing Guns At Children*, CBS2.com, July 19, 2019.

[43] Hannah Moore, *Chicago police to pay out $2.5 million to family after a cop 'pointed a gun at a three-year-old girl's chest' as he arrested her mother*, DailyMail.com, June 27, 2018.

[44] Second Report of the Community Representatives of Chicago's Use of Force Working Group at p. 18 (March 2023).

[45] *See e.g.*, Baltimore Police Department, Policy 409- Firearms Regulations at 4 (Nov. 24, 2019) (officers "shall not point a firearm at a person unless they reasonably believe that the person poses a present or immediate threat of death or serious physical injury to the member or another person"); Philadelphia Police Department, Directive 10.1—Use of Force— Involving Discharge of Firearms at 6 (Jan. 30, 2017) (officers "shall not draw their firearms unless they reasonably believe an immediate threat for serious bodily injury or death to themselves or another person exists.").

arrest or investigative stop. It does not require officers to report gun pointing as a use of force or document it in an official Use of Force Reports (which CPD calls, "Tactical Response Reports"). It does not require officers to write a report to document when they point guns at people or their reasons for doing so. The Decree also exempts SWAT, including in home raids, from any documentation when they point guns at people. SWAT is not even required to notify OEMC when they point guns at people, including in home raids. *See* generally paras 190-196 of the Decree.

CPD's failure to require officers to report instances in which they point their guns at people has encouraged officers to continue to routinely point their guns at adults and children without cause. And they continue to do so, resulting in the kinds of harm that our clients and their neighbors have documented in our home raids enforcement filings and in public hearings before the Court. If we hope to stop officers from unnecessarily traumatizing thousands of adults and children, the Consent Decree must be strengthened to require CPD to treat pointing a gun at a person as the serious use of force that it is—including by following best practice to document uses of force.

In addition, CPD's deficient practices for documenting gun pointing have exacerbated CPD's lack of transparency and accountability to the public—issues that are also central to the Consent Decree. CPD's current system is fraught with delays and lacks transparency—there is no requirement of any real time public reporting each time officer points gun at a person, as there is with respect to other uses of force.[46] No data has been publicly reported on the instances in which Chicago police have pointed guns at community members in 2023. CPD has also refused to publish existing reports that would allow community members to know about or track officers who repeatedly point their guns at people. The Decree should be modified to require CPD to treat gun

---

[46] See OIG TRR/CPD force data dashboard, https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/

pointing like every other use of force and require prompt public reporting in order to foster transparency and accountability.

### III. REVISE COMMUNITY ENGAGEMENT PROVISIONS TO REQUIRE MEANINGFUL, RESPECTFUL ENAGEMENT WITH CHICAGO'S DIVERSE COMMUNITIES—INCLUDING CPD's CRITICS

Chicago's Consent Decree process has persistently failed to require CPD to conduct meaningful community engagement with the Black and brown communities most affected by police violence and misconduct. As described by the IMT in the Seventh Report: "CPD is still challenged in its community engagement efforts regarding, for example, policy reviews, community dialogue, and feedback on ongoing practices and strategy development. Engagement challenges have been particularly pronounced with marginalized groups, including young men of color" [47] Further, the IMT documents CPD's refusal to provide feedback to community hinders true engagement. ". . .[C]ommunity stakeholders still often report, however, that their input is not seriously considered or meaningfully implemented. In particular, community stakeholders report frustration that they engage in these processes but never hear from the CPD to know what, if anything, from their feedback has been considered. We continue to stress that some sort of consistent community-feedback mechanism is necessary. . ."[48]

In *Floyd v. City of New York City*, the New York City litigation concerning that City's stop and frisk practices, the federal court recognized that lack of meaningful community engagement is absolutely fatal to compliance efforts—despite the best efforts of policing experts and monitors. In the words of the *Floyd* Court, "no amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety,"

---

[47] Doc. 6260, Independent Monitoring Report 7, at 6.
[48] *Id.*

and "[n]either an independent Monitor, nor a municipal administration, nor this Court can speak for those who have been and will be most affected by the NYPD. . .." [49]

To ensure that the Consent Decree course corrects with regard to community engagement, the Consent Decree should be modified to require the development of Working Groups on select Consent Decree related topics.[50] Working Groups are not a new concept to the CPD. CPD's Use of Force Working Group, comprised of CPD members, family members of those killed by CPD, attorneys for the City, the Coalition and other interested and affected community members is a model for engagement.[51] While that process was challenging, it resulted in improved policy development and demonstrated (an ultimately short lived) commitment to relying on the expertise of Chicago's communities during the Consent Decree implementation process.

To remedy the Consent Decree's ongoing deficiencies regarding community engagement, its terms must be amended to require the development of working groups that will bring together people who have differing views and life experience, along with an urgent timetable and compensation for community members who volunteer their time to this process. [52] Community engagement efforts will continue to fail for so long as CPD refuses to engage meaningfully with its critics. As explained by the Illinois Attorney General Kwame Raoul: "[w]ithout effective community engagement, CPD will continue to struggle to make meaningful progress on the ultimate reform metric – whether Chicagoans trust the police."[53]

## IV.    PROVIDE PROTECTIONS FOR SURVIVORS OF POLICE HARM AND THEIR FAMILIES

---

[49] Floyd v. City of New York, 08cv1034, (S.D.N.Y.) (Doc. 841)
[50] See Ex. A, attached for an example of a Memorandum of Understanding that describes the roles and responsibilities of Community Working Groups
[51] Supra, note 44.
[52] See Ex. A. Proposed Working Group MOU.
[53] Doc. 1097 at 1757.

This Court has heard significant testimony about the harm CPD has imposed on our communities since the Consent Decree has been in place. IMT reports confirm that Chicagoans are deeply hurting as a result of CPDs' refusal to vigorously implement the spirit and the letter of this decree. [54] But the Decree is silent on CPD's obligations toward those it harms. Survivors of police violence and their families are entitled to be treated fairly, with dignity and respect. Instead, survivors have described to this Court how CPD officers cover up their badges, and mock people they have mistreated. The Consent Decree should be modified to require that the City of Chicago provide City provide at least three types of services following a police use of force resulting in injury or death: (1) respectful treatment of the victim and survivors; (2) physical and mental healthcare and trauma-informed support services for survivors; and (3) the provision of information to families and loved ones relevant to the investigation of police misconduct and any subsequent court proceedings.

The Consent Decree provides only that, in event of an officer-involved shooting or death, CPD members "will treat the deceased with respect, including the prompt screening from public view or covering of the deceased…."). Decree, ¶ 491. This is a critically important provision, but it is insufficient to promote the legitimacy of a police force that has just harmed a member of the community. In addition to the above, CPD officers must:

a. Refrain from handcuffing the deceased or family members;

b. Allow family members and/or emergency contacts access to the deceased loved one, if requested;

c. Remove the deceased from the scene as soon as it is documented, in most cases with an hour of the time of death;

d. Facilitate access of the deceased's family members and support system at any medical facility or morgue; and

e. Allow an individual who is receiving emergency medical care to contact their family/support system so that the individual can immediately inform them of their

---

[54] Supra, Notes 1 and 2.

whereabouts and the nature of the injury. In the event that the individual is unable to make such contact themselves, CPD must provide the relevant information to the individual's family/next of kin.

In the event that a CPD officer's actions have resulted in an individual's death or injury, the Decree must ensure that physical and mental health care and trauma-informed support services are available for survivors and their families. In particular, the City should:

a. Ensure that a trained bereavement specialist immediately contacts the deceased individual's family/next of kin or closest known associate and provides them with accurate information about the whereabouts of their loved one;

b. Fund and make available trauma-informed psycho-social support services for survivors of police violence and the families of both victims and survivors of police violence, for as long as necessary. These services should be made available to individuals and families within 24 hours of the incident; and

c. Provide financial resources for families left with exorbitant and unexpected expenses incurred as a result of police violence, including burial costs and lost wages.

The Decree must task CPD with keeping victims, family members and close associates apprised of developments in any investigation stemming from the police use of force. In this vein, the City should provide, at no cost to the individual or his or her survivors, medical examiners' reports, arrest reports, TRRs, investigative reports, and all other documentation related to the incident.

## V. The Consent Decree should be Modified to Prohibit Pretextual Traffic Stops and Restrict CPD Authority to Enforce Low-Level Traffic Violations.

If the Consent Decree is amended to incorporate traffic stops, it must include provisions that prohibit pretext stops and remove CPD from the business of low-level traffic enforcement and equipment violations unnecessary to address any immediate threat to public safety. CPD's

discriminatory practice of targeting people in Black and Brown communities for traffic stops inflicts lasting harm on individuals and families, triggers unnecessary violence, and jeopardizes public safety.

Traffic stops have become a flashpoint for unnecessary police violence in Chicago, as they have skyrocketed in Black and Brown communities, underscoring the persistent issues of systemic racism and excessive force within the CPD. As the number of pedestrian stops decreased with the heightened scrutiny and oversight from the ACLU's 2015 stop and frisk agreement, CPD replaced unconstitutional stop-and-frisks with equally unconstitutional, harmful, and discriminatory traffic stops.[55] Traffic stops made by CPD increased seven-fold from 85,965 stops in 2015 to 598,515 in 2019.[56] CPD traffic stops have continued to rise to 660,000 stops in 2022, a 28% increase from the previous year.[57] A March 2023 data analysis by Block Club Chicago and Injustice Watch revealed that CPD has made more than 4.5 million traffic stops since 2015, targeting Black and Brown neighborhoods on Chicago's South and West sides for disproportionate enforcement.[58] CPD data collected by the Illinois Department of Transportation show that in 2022, CPD stopped Black drivers at more than four times the rate of white drivers.[59] As CPD's traffic stops of Black and Brown people skyrocketed, so did CPD violence associated with those stops. According to CPD data reported to the Illinois Department of Transportation, from 2018 to 2021, Chicago police used force or violence against community members on at least 1,012 occasions during a traffic stop.[60] CPD data also show that Chicago police use force following a traffic stop largely and

---

[55] David Hausman and Dorothy Kronick, *The Illusory End of Stop and frisk in Chicago?*, 9 Science Advances 39 (Sep. 2023), (finding that qualitative and quantitative evidence suggest that CPD deliberately switched from targeting Black and Brown people in pedestrian stops to targeting the same populations in traffic stops and also finding dramatic increases in low-level equipment stops for Black drivers as compared to moving violations).

[56] BPI (Business and Professional People for the Public Interest), A *New Vehicle for "Stop and Frisk" The Scope Impact And inequities of Traffic Stops in Chicago 2–27* (2023).

[57] Pascal Sabino, *The New Stop And Frisk? Chicago Police Make Millions Of Traffic Stops While Searching For Guns*, Block Club Chi. (Mar. 30, 2023).

[58] *Id.*

[59] Matt Kiefer, et al., *Illinois Traffic Stops of Black Drivers Reach a 20-Year High*, WBEZ (Sep. 27, 2023).

[60] BPI at p. 25.

disproportionately against Black and Latinx people, 85% and 11% respectively.[61][62] Given CPD's historic failures to accurately report force, these numbers almost certainly fail to paint the complete picture of the extent and frequency of CPD's discriminatory violence in traffic stops.[63]

Ongoing problems with CPD training on the use of force[64] and the prevalence of aggressive policing tactics exacerbate these volatile situations, leading to tragic outcomes, including unwarranted arrests, physical harm, and fatalities. The recurring pattern of traffic stops evolving into scenes of unwarranted police violence highlights the urgent need for fundamental change.

### A. The Consent Decree should be Modified to Prohibit Pretextual Stops.

Chicago Police have used traffic safety as a pretext for searching Black and Brown people for weapons and other contraband, concentrating these stops predominantly Black and Latinx communities.[65] Despite CPD's efforts to use traffic stops to find and seize guns, according to Chicago Police Department's own data, only about 1% of its traffic stops lead to the recovery of weapons.[66]

---

[61] *Id*; *see also* Tactical Response Reports Dashboard, City of Chicago Office of the Inspector General, https://informationportal.igchicago.org/dashboards/ public-safety/tactical-response-reports/; ITPSS Data, 2015-2021.
[62] National data also dramatize the extent to which minor traffic stops lead to violence by police. *New York Times* study found that within a five-year period, "police officers have killed more than 400 drivers or passengers who were not wielding a gun or a knife, or under pursuit for a violent crime — a rate of more than one a week." [62] David D. Kirkpatrick, Steve Eder, Kim Barker and Julie Tate, *Why Many Police Traffic Stops Turn Deadly*, N.Y. Times (Oct. 31, 2021). It reported that minor infractions such as a broken taillight or a rolling stop have escalated into police officers killing people, particularly Black people who have been disproportionately stopped and even more disproportionately subject to police violence. *Id.* Last year alone, police killed 1,201 people in the United States; 87 of those killings resulted from police force during a traffic stop. Mapping Police Violence, 2022 Police Violence Report, (2022).
[63] For example, an investigation published in the *Chicago Reader* documented 83 baton strikes by Chicago police officers, 51 of which were captured on video, against at least 32 different people between May 30 and June 1 during the 2020 protests; in contrast, CPD's data dashboard reported just 12 baton incidents during the entire month. Andrew Fan and Dana Brozost-Kelleher, Cops Appear to Violate Use-Of-Force Rules Dozens of Times at Protests, Chicago Reader (June 23, 2020); see also, Report on CPD's Response to George Floyd Protests and Unrest, City of Chicago Officer of the Inspector General, (2021) (noting that Chicago police officers underreported the number of actual uses of force).
[64] A report from last Spring by the community representatives of Chicago's Use of Force Community Working Group found that CPD training on the use of force teaches officers that their lives are worth more than the lives of community members. *Second Report of the Community Representatives of Chicago's Use of Force Working Group* (March 2023).
[65] Pascal Sabino, *Chicago Police Are Arresting Thousands More Black Drivers After Traffic Stops Than They Report*, BLOCK CLUB CHI. (Aug. 23, 2023).
[66] *Id.*

The Court should prohibit CPD from using traffic violations as a pretext for stopping and searching Black and Brown people. Pretextual stops have led to an alarming increase in CPD violence that the Consent Decree was designed to prevent, aggravated a climate of animosity between CPD and the community— particularly in marginalized and over-policed neighborhoods.[67]

### B. The Consent Decree should be Revised to Limit Police Discretion Over Enforcing Low-Level Traffic Infractions.

If traffic stops are incorporated into the Consent Decree, the Decree should be amended consistent with developing best practice to restrict CPD enforcement in low-level traffic violations. Doing so would result in a dramatic reduction in CPD violence against Black and brown people in Chicago.

Cities around the country have responded to the racial discrimination and violent outcomes of police-enforced traffic stops by initiatives that end the policy of pulling over drivers for minor infractions and the practice of pretextual stops. While many of these programs are in their infancy, early data suggests that they have had "a significant impact in cutting down racially-motivated pretextual stops, and no negative impact on public safety."[68]

Philadelphia, in connection with a settlement agreement in a class action arising from racial discrimination in its stop-and-frisk policy, passed the Driving Equality Act.[69] The law categorizes certain infractions as failing to meet the requirements for a lawful traffic stop.[70] In the Driving Equality Act's first year of enforcement, Black men were stopped 54% less for minor vehicle infractions than in the previous year, although racial disparities remained.[71]

---

[67] BPI (Business and Professional People for the Public Interest), A New Vehicle for "Stop and Frisk" The Scope Impact And inequities of Traffic Stops in Chicago (2023).

[68] Press Release, Defender Association of Philadelphia, *Keisha Hudson on First Year of Driving Equality Law* (Mar. 3, 2023).

[69] Maya Brown & Emma Tucker, *Philadelphia to become first major US city to ban police from stopping drivers for low-level traffic violations*, CNN (last updated Oct. 30, 2021).

[70] *Id.*

[71] Sammy Caiola, *Data shows Philly traffic stops involving Black men are down 54%*, WHYY (Mar. 6, 2023).

Los Angeles similarly adopted a policy limiting police officers' ability to engage in minor stops to situations in which they have a reason to believe there is a more serious offense, which they must record by body camera before making the stop.[72] Analyzing Los Angeles Police Department data before and after the policy, the *Los Angeles Times* found that stops for minor infractions had declined while the success rate of finding contraband during stops increased.[73] The policy also led to fewer stops of Black drivers, though like Philadelphia, did not erase racial disparities in stops altogether.[74] These results are mirrored in similar efforts to reduce low-level pretext traffic stops in Fayetteville, North Carolina[75] and St. Paul, Minnesota.[76]

The effectiveness of these pilot programs has led other cities to follow in their footsteps. The Seattle Police Department ended the practice of engaging in certain low-level traffic stops under the guidance of Office of the Inspector General.[77] The San Francisco Police Commission voted to prohibit officers from making stops for equipment violations like expired tags or tinted windows in January 2023.[78] Memphis responded to the killing of Tyre Nichols during a traffic stop by adopting a law modeled after Philadelphia's Driving Equality Act.[79]

Chicago should seize upon this opportunity to strengthen the Decree to eliminate the countless instances of unnecessary and discriminatory violence associated with routine traffic enforcement and CPD's practice of using equipment violations as pretexts for counterproductive and harassing

---

[72] Libor Jany & Ben Poston, *Minor police encounters plummet after LAPD put limits on stopping drivers and pedestrians,* L.A. TIMES (Nov. 14, 2022).

[73] *Id.*

[74] *Id.*

[75] Mike Dolan Fliss, Frank Baumgartner, Paul Delamater, Steve Marshall, & Charles Poole, *Re-prioritizing traffic stops to reduce motor vehicle crash outcomes and racial disparities*, INJURY EPIDEMIOLOGY (2020).

[76] Renee Cooper, *New data: Reducing low-level traffic stops decreases racial disparity, increases percentage stopped for safety violations in Ramsey County*, KSTP (June 7, 2023).

[77] Press Release, Seattle Police Department, SPD Updates Traffic Stop Guidelines (Jan. 14, 2022),

[78] Fatima Dahir, *Pretext Stops in San Francisco: Will Reforms Reduce Violence and Injustice?*, STANFORD CTR. FOR RACIAL JUST. (May 10, 2023).

[79] Nick Valencia, *Memphis leaders pass measure that ends police stops for minor infractions, three months after Tyre Nichols' death*, CNN (Apr. 12, 2023).

investigative stops. It is critically important that we listen to the people who have been most harmed by CPD's practices, learn from the experiences of other cities, and limit CPD's ability to make pretextual traffic stops for low-level traffic infractions and equipment violations. While the data is clear that these initiatives alone cannot end racially discriminatory policing, they can reduce the number of stops that targeted communities experience and the violence associated with those stops.

## CONCLUSION

This Consent Decree has the potential to put a permanent end to systemic deficiencies in one of the most notorious and intractable police departments in the United States. That historic potential will only be fully realized if the Consent Decree contains the terms outlined above, which are deemed essential by Chicago's communities most affected by police violence and misconduct.

Respectfully submitted,

By: /s/ Sheila A. Bedi

Date: October 27, 2023

Sheila A. Bedi
Community Justice Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-2492
sheila.bedi@law.northwestern.edu

Craig B. Futterman
Mandel Legal Aid Clinic
University of Chicago Law School
6020 S. University Ave.
Chicago, IL 60637
(773) 702-9611
futterman@uchicago.edu

**Counsel for the Coalition**