**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **STATE OF ILLINOIS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-cv-6260** |
| **CITY OF CHICAGO,** | **Judge Rebecca R. Pallmeyer** |
| **Defendant.** | |

**INDEPENDENT MONITORING REPORT 8 AND
COMPREHENSIVE ASSESSMENT PART I**

The Independent Monitor Margaret A. Hickey and the Independent Monitoring Team submit the attached *Independent Monitoring Report 8 and Comprehensive Assessment Part I.*

Dated November 1, 2023

/s/Margaret A. Hickey
Margaret A. Hickey
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
maggie.hickey@afslaw.com

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that, on November 1, 2023, she caused a true and correct copy of the foregoing ***Independent Monitoring Report 8 and Comprehensive Assessment Part I*** to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

/s/Margaret A. Hickey
Margaret A. Hickey
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
maggie.hickey@afslaw.com



Independent Monitoring Team | Chicago Police Department Consent Decree

# INDEPENDENT MONITORING REPORT 8
*(Reporting Period January 1, 2023, through June 30, 2023)*

## & Comprehensive Assessment, Part I

Report Date: November 1, 2023

Independent | Chicago Police
Monitoring Team | Department
Consent Decree



Monitor Maggie Hickey

We congratulate Superintendent Larry Snelling on his recent appointment and his public commitments to transparency in policing.[1] It is our hope that his commitment to transparency will be reflected in the Chicago Police Department's immediate efforts to address unfulfilled reforms and achieve the outcomes intended by the Consent Decree.

Superintendent Snelling has the opportunity to lead efforts to address challenges that have disproportionately delayed progress across the Consent Decree: The CPD's ability to demonstrate compliance will increase exponentially with transparent plans to address community policing and engagement; supervision and staffing; and data collection, management, and analysis.

For example, the CPD has yet to implement a comprehensive, consistent, and transparent community policing strategy.[2] And while the City of Chicago and the CPD have made efforts to address recruitment and retention challenges, the CPD continues to allocate personnel and prioritize resources without a transparent and data-driven staffing study.[3] Likewise, without reliable and verified data across all sections of the Consent Decree and functions of policing in Chicago, the City of Chicago and the CPD will not be able to demonstrate sufficient compliance to Chicago's communities, the Court, the Independent Monitoring Team, the Office of the Illinois Attorney General, and within the CPD. While the City of Chicago and the CPD continue to work to implement a new Records Management System, the CPD must also make immediate improvements to the accuracy *and efficiency* of its existing data collection and reporting systems.



Chief Rodney Monroe, Ret.

By prioritizing transparency, the CPD can immediately make progress to address lagging efforts to address Consent Decree requirements. This includes the City of Chicago's and

---

[1]   *See* Sam Charles, *New CPD boss promises to balance reform and aggressive policing through transparency*, Chicago Tribune (October 18, 2023), https://www.chicagotribune.com/news/criminal-justice/ct-cpd-snelling-interview-20231018-mqaaiip4xnco3i2ln6g6uplclq-story.html. As a guiding principle to the Consent Decree, the CPD must also "ensure that its community policing philosophy is a core component of its . . . crime reduction strategies and tactics" (Consent Decree ¶10).

[2]   In fact, in the eighth reporting period, an evaluation of the CPD's Neighborhood Policing Initiative (NPI) found that this initiative has neither built trust nor reduced crime. Center for Neighborhood Engaged Research & Science (CORNERS), *The Chicago Neighborhood Policing Initiative: Research and Evaluation Report, 2019-2023*, Institute for Policy Research Rapid Research Report (April 20, 2023), https://uploads-ssl.webflow.com/630fc70085c3ed55d3d41d54/6462577e91593b350aea8bae_CORNERS%202023%20CNPI%20Report%20(1).pdf.

[3]   *See, e.g.,* Consent Decree ¶343 ("CPD should have the staffing necessary to promote lawful, safe, effective, and community-centered policing; provide effective supervision; ensure officer safety and accountability; and implement the terms of [the Consent Decree].").

the CPD's missing annual assessment of the frequency of misdemeanor arrests and administrative notices of violation ("ANOVs") by CPD officers across specific demographic categories, including race and gender.[4] The CPD can also immediately finish posting "each CPD policy and directive" and begin its regular review of "citywide and district-level data regarding reportable uses of force" across specific demographic categories and, as appropriate, revise its policy, training, tactics, equipment, or Department practice."[5]

The Consent Decree requires the City of Chicago and the CPD to demonstrate that Chicago receives "constitutional and effective law enforcement."[6] In this report—*Independent Monitoring Report 8* and *Comprehensive Assessment, Part I*—our team has detailed the City of Chicago's and the CPD's compliance efforts through June 30, 2023, including the areas of greatest progress, achievement, and concern.[7] As described throughout this report, dedicated City and CPD personnel have developed and implemented a myriad of new policies, training materials, and public data sources since the start of the Consent Decree. The remaining compliance levels, however, reflect that much more must be done.

This report is a roadmap to full and effective compliance with the existing Consent Decree. In the coming months, we will build from this report—incorporate the feedback that we have received from the City of Chicago, the CPD, the Office of the Illinois Attorney General, the Court, and Chicago's communities—and file *Comprehensive Assessment Part II*. In *Comprehensive Assessment Part II*, we will include our assessment of whether the outcomes intended by the Consent Decree are being achieved and whether changes are necessary to expedite and sustain reform.[8] The City of Chicago and the Office of the Illinois Attorney General will then determine any changes to the Consent Decree.

In the coming reporting periods, we will also work with the Court to provide additional transparency about reform. This includes working with the Office of the Illinois Attorney General and the City of Chicago to provide more digestible public reports and, if necessary, make changes to the Consent Decree to do so.[9] We will also work with the Court to hold regular public hearings for status updates.

We welcome Superintendent Snelling's recent emphasis on transparency. Chicago's communities deserve expedited efforts to demonstrate that the City of Chicago and the CPD fully comply with "the Constitution and laws of the United States and the State of Illinois, respect[] the rights of the people of Chicago, build[] trust between officers and the communities they serve, and promote[] community and officer safety."[10] It is our hope that this emphasis will allow the City and the CPD to better demonstrate the great work that so many City and CPD personnel do every day and better identify and overcome barriers to reform.

---

[4]     Consent Decree ¶79.
[5]     Consent Decree ¶¶545 and 572.
[6]     Consent Decree ¶2.
[7]     *See* Consent Decree ¶¶657–58.
[8]     Consent Decree ¶¶657–60 (*see also* the March 26, 2022 Stipulation, extending Consent Decree timelines).
[9]     *Compare* Consent Decree ¶661.
[10]    Consent Decree ¶2.

# Monitoring Under the Consent Decree

In August 2017, the Office of the Illinois Attorney General (OAG) sued the City of Chicago (City) in federal court regarding civil rights abuses by the Chicago Police Department (CPD). The lawsuit led to a Consent Decree, effective March 1, 2019.[11] The same day, the federal court appointed Maggie Hickey as the Independent Monitor. Ms. Hickey leads the Independent Monitoring Team, which monitors the City of Chicago's progress in meeting the Consent Decree's requirements.

Paragraph 2 of the Consent Decree sets out its overall purpose, which has guided and will continue to guide our monitoring efforts:

> **2.** *The State, the City, and the Chicago Police Department . . . are committed to constitutional and effective law enforcement. In furtherance of this commitment, the Parties enter into this Agreement to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety. In addition, this Agreement seeks to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely. This Agreement requires changes in the areas of community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management.*[12]

---

[11] For more information on the Consent Decree, see the Background section below. More information is also available on the Independent Monitoring Team's website (cpdmonitoringteam.com/) and on the Illinois Attorney General Office's Consent Decree website (chicagopoliceconsentdecree.org/about/).

[12] We cite the relevant paragraphs of the Consent Decree throughout this Independent Monitoring Report. The Consent Decree is available on the Independent Monitoring Team's website: cpdmonitoringteam.com/wp-content/uploads/2020/08/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf. *See also* Resources, Chicago Police Consent Decree ("Consent Decree Approved by the Court on January 31, 2019"), chicagopoliceconsentdecree.org/resources/.

**Table of Contents**

Executive Summary .................................................................. 1

Consent Decree Compliance by June 30, 2023 ......................... 22

Roadmap ................................................................................ 25

Background ............................................................................ 26

Compliance Activities and Assessments ................................... 29

    I. Community Policing ........................................................ 38

    II. Impartial Policing .......................................................... 44

    III. Crisis Intervention ....................................................... 48

    IV. Use of Force ............................................................... 59

    V. Recruitment, Hiring & Promotions ................................. 65

    VI. Training ...................................................................... 68

    VII. Supervision ................................................................ 71

    VIII. Officer Wellness and Support ...................................... 76

    IX. Accountability and Transparency ................................... 82

    X. Data Collection, Analysis & Management ........................ 93

    XI. Implementation, Enforcement & Monitoring................... 97

Conclusion and Looking Ahead to Comprehensive Assessment
Part II & Independent Monitoring Report 9.............................. 98

Link to Appendix 1
(Community Policing) ................................................................ 100

Link to Appendix 2
(Impartial Policing) .................................................................. 101

Link to Appendix 3
(Crisis Intervention) ................................................................ 102

Link to Appendix 4
(Use of Force) ......................................................................... 103

Link to Appendix 5
(Recruitment Hiring and Promotions) ..................................... 104

Link to Appendix 6
(Training) ................................................................................ 105

Link to Appendix 7
(Supervision) .......................................................................... 106

Link to Appendix 8
(Officer Wellness and Support) ............................................... 107

Link to Appendix 9
(Accountability and Transparency) .......................................... 108

Link to Appendix 10
(Data Collection, Analysis, and Management) ......................... 109

Link to Appendix 11
(Implementation, Enforcement, and Monitoring) ................... 110

Attachment A:
Office of the Illinois Attorney General Comments 2023 .......... 116

Attachment B:
City of Chicago Comments 2023 .............................................. 121

# Executive Summary

As the Independent Monitoring Team (IMT), we assess the City of Chicago's (City's) compliance with the requirements of the Consent Decree. Specifically, we assess how relevant City entities—including the Chicago Police Department (CPD); the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General, the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC)—are complying with the Consent Decree.[13]

This is *Independent Monitoring Report 8* and *Comprehensive Assessment, Part I*.[14] As in previous monitoring reports, this is an update to the Court and the public on compliance efforts during the eighth reporting period: from January 1, 2023, through June 30, 2023.[15] Among other things required by the Consent Decree, this report also includes the following:

- an updated compliance or status assessment from the previous reporting period;
- a compliance or status assessment for all monitorable paragraphs in the Consent Decree;
- a summary of the principal achievements and challenges facing the City's compliance with the Consent Decree; and
- an updated projection of upcoming work for the City, the Office of the Illinois Attorney General (OAG), and the IMT. *See* ¶661.[16]

---

[13] As a party to the Consent Decree, the City is ultimately responsible for compliance. *See* ¶720. Unless otherwise specified, our references to the City typically include its relevant entities. *See* ¶736.

[14] We provided a draft of this report to the City and the OAG on July 30, 2023, as required by ¶¶661–65. Details about the required comprehensive assessment may be found in ¶¶657-659.

[15] The Consent Decree generally prevents the IMT from making any public statements or issuing findings regarding any non-public information or materials outside of these reports (*see* ¶672). Because the Consent Decree will be in effect for a minimum of eight years, this is the eighth of at least 16 semiannual Independent Monitoring Reports. *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoring-team.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-War-rants-Consent-Decree-Timelin.._.pdf. Each year, we file a Monitoring Plan that sets out what we will assess during the year, and we file two semiannual Independent Monitoring Reports. The Independent Monitoring Plans and Reports are available on the IMT's website. *See Reports and Resources*, https://cpdmonitoringteam.com/reports-and-resources/.

[16] In November 2022, we filed the Monitoring Plan for Year Four, which outlined the projected monitoring efforts under the Consent Decree for Year Four (July 1, 2022, through June 30, 2023). The IMT's Monitoring Plan for Year Four is available on the IMT's website. *See Reports*, INDEPENDENT MONITORING TEAM (November 2, 2022), https://cpdmonitoringteam.com/wp-con-tent/uploads/2022/11/2022.11.02-Monitoring-Plan-for-Year-Four-filed.pdf.

Per ¶661 of the Consent Decree, the IMT will continue to issue semiannual reports until the Consent Decree ends—which is after the City has reached full and effective compliance for each requirement for one to two years. *See* ¶¶693 and 714–15. With the agreement of the Parties, however, we will endeavor to streamline the reporting process in future reporting periods. Specifically, in accordance with ¶672, the IMT will seek to provide more information on our website to meet the requirements of ¶661 on a more regular basis and issue shorter, more manageable reports.

This report also includes Part I of our Comprehensive Assessment. Specifically, this report includes "whether and to what extent the City and CPD are in compliance with this Agreement," including "areas of greatest progress and achievement, and the requirements that appear to have contributed to these achievements, as well as areas of greatest concern." ¶¶657–58.

In the coming months, we will provide a separate report, *Comprehensive Assessment Part II*, which will include "whether the outcomes intended by [the Consent Decree] are being achieved[;] whether any modifications to [the Consent Decree] are necessary in light of changed circumstances or unanticipated impact (or lack of impact) of the requirements including strategies for accelerating full and effective compliance; as well as "strategies for accelerating full and effective compliance."[17]

In the meantime, we note that the Consent Decree is a complex document that resulted from long and substantive negotiations between the City and the OAG. In this report, we have aimed to address the nuances of the agreement fairly and accurately.

The monitoring process contains some tensions that we address in both our monitoring efforts and this report. For example, there has been—and likely will continue to be—a tension between the City's need to make compliance efforts quickly and the need to ensure that its efforts are effective and sustainable. Because the Consent Decree prioritizes both goals, we do too. We recognize that if the City rushes to create a policy without, for example, the required community involvement, that may delay the date the City reaches compliance if the City must later re-engage the community, re-draft the policy, and potentially re-train personnel. We have attempted to address this tension in our analysis for each relevant paragraph in this report.

We know that many readers will be most interested in learning where the City, the CPD, and the other relevant entities have achieved compliance with the requirements of the Consent Decree. But in reviewing this report, it is important to keep

---

[17] ¶696 notes that "OAG and the City may jointly agree to make changes, modifications, and amendments to this Agreement, which will be effective if approved by the Court."

at least three things in mind regarding the scope and significance of our compliance assessments:

❖ First, this report represents a six-month assessment of the City's compliance efforts from January 1, 2023, through June 30, 2023. It does not reflect all the efforts of the City, the CPD, or the other relevant City entities to date. While we report on the compliance efforts within defined reporting periods (*see* ¶661), we stress that work is ongoing by the City, its relevant entities, the OAG, the IMT, and Chicago's communities. In many cases, relevant City entities have continued to develop policies and train personnel after June 30, 2023, and before the date we submit this report. In this report, we have not assessed efforts made after June 30, 2023. We will do so in the monitoring report for the ninth reporting period (July 1, 2023, through December 31, 2023).

❖ Second, we assess compliance at three levels: (1) Preliminary, (2) Secondary, and (3) Full. The Consent Decree requires the City and its entities to reach Full compliance and maintain that compliance for one to two years. *See* ¶¶714–15. These compliance levels allow us to share our assessments of the City's progress throughout the duration of the Consent Decree. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the reform in practice. There are, however, many paragraphs that do not include policy or training elements. In those circumstances, the three levels may follow a different trajectory, such as (1) whether the City or its relevant entities have established the framework and resources to achieve the reform, (2) whether the City or its relevant entities have effectively communicated the reform to relevant personnel, and (3) whether the City or its relevant entities have appropriately implemented the reform.



❖ Third, because of the nuances of each Consent Decree requirement and each level of compliance, the City and its relevant entities must—in a timely manner—provide the IMT with evidence, including access to personnel, records,

facilities, and data to establish that they have reached each level of compliance during the applicable reporting period.

Under the Consent Decree, the City, the CPD, or other relevant entities are not in compliance with any of the requirements of the Consent Decree until the IMT determines that the City provided sufficient proof that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement—which in some cases it has—the City still has the additional burden of providing sufficient proof of its efforts with sufficient time for the IMT and the OAG to review the information.

To reflect the City's and its relevant entities' progress through the Consent Decree process, we have added four subcategories for each of the three levels of compliance (Preliminary, Secondary, or Full):

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced per ¶720, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts are not completed within a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not yet met a lower level of compliance.

At the end of the eighth reporting period, the City and the CPD remain in Preliminary compliance with about 50% of monitorable paragraphs, in Secondary compliance with about 29%, and in Full compliance with about 6%. Overall, the City and the CPD have achieved some level of compliance with about 85% of monitorable paragraphs.



Consent Decree Compliance by June 30, 2023

## Major Developments and Principal Achievements and Challenges Impacting Compliance

In the Consent Decree, the City committed "to ensuring that police services are delivered to all of the people of Chicago in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of all of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety." The City also committed "to providing CPD members with the resources and support they need, including improved training, supervision, and wellness resources." ¶6.

As we have noted consistently throughout the reform process and continue to emphasize here, to fulfill these commitments, it is paramount that the CPD increase ownership of reform across its operations. Specifically, compliance with the requirements of the Consent Decree relies heavily on increasing the communication and integration of efforts between the Office of Constitutional Policing and Reform and the CPD's Operations (*i.e.*, the Office of the First Deputy Superintendent, which includes the Bureau of Patrol and the Bureau of Counter-terrorism). The CPD's Operations personnel rarely participate in regular Consent Decree meetings regarding policy and training, and we would like to hear their voices in the reform process.

In the eighth reporting period, the City, the CPD, and Chicago faced ongoing challenges, including high levels of certain violent crimes, significant attrition of officers and non-sworn personnel leading to staffing difficulties, and heartbreaking

losses of officers to suicides.[18] While the CPD has developed some plans to approach Consent Decree reforms, much more needs to be done to comprehensively demonstrate compliance efforts with officer wellness, community policing, impartial policing, community engagement, and crime-fighting strategies.[19] And we continue to have significant concerns regarding the CPD's commitment to have constitutional policing and reform efforts lead its crime-fighting strategies.

Still, in the eighth reporting period, many City entities and CPD divisions have demonstrated progress toward achieving some levels of compliance with Consent Decree requirements. The City and the City's entities have now achieved at least Preliminary compliance (the first of three levels of compliance) with most monitorable paragraphs through the eighth reporting period. We note, however, that the City and its entities have achieved Full compliance with comparatively few monitorable paragraphs. Compliance figures are detailed further below and throughout each section of this report. But in isolation, these figures only tell part of the story regarding the City's overall achievements and ongoing challenges to date. Executive Summary Figure 1, below, provides a sample of principal achievements and challenges across the 10 topic areas of the Consent Decree.

---

[18]  *See Investigation of the Chicago Police Department*, UNITED STATES DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION AND UNITED STATES ATTORNEY'S OFFICE NORTHERN DISTRICT OF ILLINOIS at 123 (January 13, 2017) ("During our investigation we heard that officer suicide and suicide threats are a significant problem in CPD. In fact, when we met with officials from EAP in May 2016, they had just handled an officer suicide threat the night before. One CPD official told us that CPD's rate is 22.7 suicides per 100,000 Department members. The FOP shared figures showing that CPD's suicide rate between 2013 and 2015 was 29.4 per 100,000 based on available information. This would mean that CPD's officer suicide rate is more than 60% higher than the national average of 18.1 law enforcement suicides per 100,000."), http://chicagopoliceconsentdecree.org/resources/. *Cf.* ¶388.

[19]  For example, during a previous reporting period, the CPD's Office of Constitutional Policing and Reform presented the IMT and the OAG with a draft of a new "Roadmap to Operational Compliance" planning document. While we appreciate the strategic thinking and thoughtful effort that went into crafting the plan, we remain concerned about the lack of movement to implement the plan.

Executive Summary Figure 1.    Sample of Principal Achievements & Challenges

| Section | Sample of Principal Achievements | Sample of Principal Challenges |
|---|---|---|
| Community Policing | • The City, the CPD, and the Chicago Public Schools (CPS) sustained progress regarding the screening, placement and training of SRO officers<br>• The CPD made significant progress on the *Interactions with Youth and Children* policy (G02-05) by receiving no-objection notices from the IMT and the OAG and posting for public comment | • Insufficient staffing in the Office of Community Policing (as well as re-allocation of existing personnel to other functions) has undermined the CPD's ability to achieve and maintain compliance |
| Impartial Policing | • The CPD finalized the *Prohibitions of Sexual Misconduct* (G08-06) policy on June 21, 2023<br>• The City and the CPD continue to engage with the community in its efforts to review, revise, and reform its search warrant policies and practices | • As above, insufficient staffing has undermined the CPD's ability to achieve and maintain compliance |
| Crisis Intervention | • The CPD improved in responding to public feedback on its Crisis Intervention Policy suite | • Insufficient staffing in the Crisis Intervention Unit has undermined the CPD's ability to achieve and maintain compliance |
| Use of Force | • The CPD maintained compliance with several requirements by continuing to regularly review and implement key policy and training efforts | • TRED's lack of adequate resources continues to negatively impact its operations, and TRED's continued deployment remains a cause for concern |
| Recruitment, Hiring & Promotions | • After delays in several previous reporting periods, the City and the CPD achieved additional levels of compliance this reporting period regarding its assessments of recruitment and hiring processes | • Concerns regarding staffing shortages have continued from previous reporting periods, following the reassignment of the recruitment function to the BIA Chief during the sixth reporting period |
| Training | • The City and the CPD also opened the new Joint Public Safety Training Facility, and The CPD launched the scenario-based training arena for recruit and in-service training during April 2023<br>• The CPD restructured the Training Oversight Committee (TOC) during this reporting period, resulting in more actionable and in-depth participation by TOC members | • The CPD continued to face chronic staffing issues in the Training Support Group |
| Supervision | • The CPD implemented the Unity of Command and Span of Control Pilot Program based on a new staffing model to address several the shortcomings of the previous model, and the updated staffing model allowed the CPD to maintain a 10-to-1 officer-to-supervisor ratio between 68% and 74% of the time during the eighth reporting period | • Staffing shortages prevented the Unity of Command and Span of Control Pilot Program district from consistently meeting the 10-to-1 officer-to-supervisor ratio required for all districts by ¶360 |

| Section | Sample of Principal Achievements | Sample of Principal Challenges |
|---|---|---|
| Officer Wellness | • The CPD hired and onboarded a Director of Wellness<br>• The CPD has developed a multifaceted Officer Wellness and Support training and has begun to provide this training to both sworn and non-sworn personnel<br>• The CPD made policy-level changes to the Traumatic Incident Stress Management Program | • The CPD has still not fully addressed the findings of the Traumatic Incident Stress Management Program audit, including implementing a prompting mechanism to follow-up with members after six months per ¶408<br>• Implementation of the iCarol case-management system has stalled, and meanwhile, the CPD has not produced any relevant data for compliance<br>• The Professional Counseling Division failed to produce any data to document their efforts or support their current levels of staffing |
| Accountability & Transparency | • **The OIG and PSIG successfully maintained Full compliance for corresponding sustainment periods**<br>• COPA's People's Academy was an effective and valuable means of interacting and increasing transparency<br>• The CPD trained 95% of personnel on its BIA eLearning, enabling it to meet Secondary compliance with several Consent Decree paragraphs<br>• The Police Board continued to demonstrate commitment to compliance with Consent Decree requirements | • Many Accountability Sergeants continue to have other responsibilities that significantly compete with their Accountability Sergeant duties, which should be their primary responsibility<br>• COPA's did not provide sustainment evidence for Full compliance with some requirements |
| Data Collection, Analysis & Management | • The CPD has made efforts to conduct a comprehensive assessment of the City and CPD data systems and provided a list of data that the CPD believes is necessary to comply with the Consent Decree | • We also continue to see no effort on the part of the City or the CPD to conduct a citywide and district-level data analysis of use of force (¶¶572–73)<br>• As referenced above, TRED continues to operate well under the budgeted personnel and with a sizable backlog |
| Implementation | • To address staffing challenges, the City and the CPD worked to fill positions in relevant groups, including in Reform Management | • Personnel changes and staffing challenges persist, including in the Tactical Review and Evaluation Division (TRED); the Audit Division; Training and Support Group (TSG); Crisis intervention Team; Research and Development Division; Strategic Initiatives Division; and the Reform Management Group |

As reflected in the sample below, through eight reporting periods, the City and the CPD have developed many new and revised policies and written guidance to comply with Consent Decree requirements.

Executive Summary Figure 2:
Sample of New or Revised Policies related to the Community Policing Section (between March 1, 2019, and June 30, 2023)[20]

## Community Policing

- ❖ Processing Persons Under Department Control, G06-01
- ❖ Community Partnerships, S02-03-16
- ❖ District Strategic Plans, S02-03-02
- ❖ Community Engagement in Policy Development, G01-03-01
- ❖ School Resource Officers and Investigations at Chicago Public Schools, S04-01-02
- ❖ Positive Community Interactions, S02-XX-XXX
- ❖ District Strategic Plans, S02-03-02
- ❖ Community Policing Mission and Vision General Order, G02-03
- ❖ Pre-Service Training Special Order, S11-10-02
- ❖ In-Service Training Special Order, S11-10-03
- ❖ School Resource Officers and Investigations at Chicago Public Schools Special Order, S04-01-02
- ❖ Neighborhood Policing Initiative, D21-04
- ❖ The Community Policing Office Special Order, S02-03
- ❖ Crime Victim Assistance Special Order, S02-01-03
- ❖ CPD's Community Policing Advisory Panel (CPAP) Quarterly Report Standard Operating Procedure
- ❖ District Advisory Committee, S02-03-14
- ❖ Bridging the Divide Special Order, S02-03-12
- ❖ Officer Friendly Program Special Order, S02-03-11
- ❖ Community Policing Business Public-Safety Initiative, S02-03-13
- ❖ Social Media Outlet: Twitter Special Order, S02-03-10
- ❖ Trespass Affidavit Special Order, S02-03-09
- ❖ Gun Turn-In Special Order, S02-03-08
- ❖ G.R.E.A.T. Program Special Order, S02-03-07
- ❖ D.A.R.E. Program Special Order, S02-03-06
- ❖ Ride Along Program Special order, S02-03-04
- ❖ Community Concerns, S02-03-03
- ❖ Beat Community Meetings, S02-03-01
- ❖ Preliminary Investigations, G04-01
- ❖ Processing of Juveniles and Minors Under Department Control, S06-04

---

[20] Many of the CPD policies are available in the CPD's online Department Directives System. *See Department Directives System*, Chicago Police Department, https://home.chicagopolice.org/inside-cpd/department-directives-system-dds/.

## Impartial Policing

- ❖ Prohibitions of Sexual Misconduct, G08-06
- ❖ Complaint Initiation and Log Number Investigation Assignment, G08-01-02
- ❖ Community Engagement in Policy Development – Pilot Program,D22-08; G01-03-01
- ❖ Search Warrant Community Resources and Referrals Pilot Program, D22-07
- ❖ Community Partnerships, S03-02-16
- ❖ Religious Interactions, G02-01-05
- ❖ First Amendment Rights, G02-02
- ❖ Crime Victim and Witness Assistance, E02-04
- ❖ Positive Community Interactions, S02-03-15
- ❖ Prohibition Regarding Racial Profiling and Other Bias Based Policing, G02-04
- ❖ Protection of Human Rights, G02-01
- ❖ Interactions with Transgender, Intersex, and Gender-Nonconforming Individuals (TGIN) Policy, G02-01-03
- ❖ Hate Crimes and Related Incidents
- ❖ Motivated by Bias or Hate, G04-06
- ❖ Prohibition on Retaliation, G08-05
- ❖ Use of Social Media Outlets, G09-01-06

## Crisis Intervention:

- ❖ OEMC – Mental Health Event Audit Policy – Update
- ❖ Crisis Intervention Team Program – Update, S05-14
- ❖ Finalized S04-20 Policy Suite, S04-20
- ❖ CIT Policy Change eLearning Module, S11-201
- ❖ Recruit Training, S11-10-01
- ❖ Pre-Service Training, S11-10-02
- ❖ In-Service Training, S11-10-03
- ❖ Annual Crisis Intervention Team Policy Review, CIU S.O. 21-02
- ❖ Crisis Intervention Team Program, S05-14
- ❖ OEMC - Crisis Intervention Program Policy, TNG 21-004
- ❖ OEMC - Mental Health Training Policy, TNG 21-005
- ❖ OEMC - Mental Health Event Audit Policy
- ❖ OEMC - 9-8-8 Calls for Crisis Hotline, TNG 22-005
- ❖ Recognizing and Responding to Individuals in Crisis, S04-20
- ❖ Persons not Under Arrest but Subject to Involuntary or Voluntary Admission, S04-20-02
- ❖ Persons on Unauthorized Absence from a State-Operated Mental Health Center, S04-20-03
- ❖ Mental Health Transport and Related Duties Matrix, S04-20-04
- ❖ Persons Under Arrest in Need of Mental Health Treatment, S04-20-05

## Use of Force

- ❖ De-escalation, Response to Resistance, and Use of Force, G03-02
- ❖ Response to Resistance and Force Options, G03-02-01
- ❖ *Incidents Requiring the Completion of a Tactical Response Report*, G03-02-02
- ❖ Firearms Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures, G03-02-03
- ❖ Taser Use Incidents, G03-02-04
- ❖ Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incident, G03-02-05
- ❖ *Canine Use Incidents,* G03-02-06

- ❖ *Baton Use Incidents*, G03-02-07
- ❖ *Department Review of Use of Force*, G03-02-08
- ❖ Issuance and Replacement of First Aid Kits, U04-04
- ❖ Annual Prescribed Weapon Qualification Program and Taser Recertification, S11-03-01
- ❖ Individual First Aid Kit (IFAK) and Mini First Aid Kit (MFAK), U06-02-15
- ❖ The First Amendment and Police Actions, G02-02
- ❖ Foot Pursuits, G03-07
- ❖ Emergency Use of Department Vehicles G03-03
- ❖ *First Aid Kit Order, Law Enforcement Medical and Rescue Training (LEMART) Policy*, U06-02-23
- ❖ *Department Approved Weapons and Ammunition*, U04-02
- ❖ *Firearm Discharge and Officer-Involved Death Incident Response and Investigations*, G03-06
- ❖ *Prohibition on Retaliation*, G08-05
- ❖ *Reporting the Response to Crowds, Protests, and Civil Disturbances*, D20-08
- ❖ *Control Devices and Instruments*, U04-02-02
- ❖ *Department Vehicles*, U02-01
- ❖ *Firearm Pointing Incidents*, D19-01

## Recruitment

- ❖ City Interagency Policy, CPD Sworn Member Recruitment and Hiring, IAP 07-01
- ❖ *City Interagency Policy, CPD Sworn Member Promotions*, IAP 07-02
- ❖ *Department Recruitment, Selection, and Hiring Plan*, E05-34
- ❖ *Revision, Assessment, and Publication of Class Specifications for CPD Sworn & Civilian Class Titles*, HR CPCD INCS01
- ❖ *Police Promotions Committee*, HR CPCD INPC01
- ❖ *Sergeant and Lieutenant Expert Assessment Standard Operating Procedure*, SOP 03-02

## Training

- ❖ *Field Training and Evaluation Program*, S11-02
- ❖ *Field Training and Evaluation Review Board*, S11-02-01
- ❖ *Application for Police Officer Assigned as FTO*, E05-08

## Supervision

- ❖ *Officer Support System (OSS) – Pilot Program*, D20-04
- ❖ *Performance Evaluation System – Pilot Program*, D21-09
- ❖ *Unity of Command and Span of Control Schedule – Pilot Program*, D20-02
- ❖ *Supervisory Responsibilities*, G01-09

## Officer Wellness and Support

- ❖ *OPSA Inventory Audit Policy*
- ❖ *2022 Communications Strategy*
- ❖ *Professional Counseling Division (PCD) 2022 Communications Strategy*
- ❖ *Suicide Prevention Initiative*
- ❖ *Chaplains Unit Standard Operating Procedure*, 20-01
- ❖ *Traumatic Incident Stress Management Program (TISMP) Directives*, E06-03
- ❖ *Professional Counseling Division (PCD) Policy*, E06-01
- ❖ *Professional Counseling Division (PCD) Standard Operating Procedure*, 19-01

❖ *Officer Support Plan*
❖ *Firearms Owner's Identification Card (FOID) Standard Operating Procedure*, 19-01; E01-17

## Accountability and Transparency
## CPD Policies

❖ Conflict of Interest General Order, G08-01-03
❖ Non-Disciplinary Intervention Special Order, S08-01-08
❖ Cannabis Enforcement Special Order, S04-32
❖ Live Lineups, Photo Lineups, and Showups Special Order, S06-02
❖ Extended-Hours Vehicle Use, U02-01-07
❖ Nameplates and Unit Designators, U06-01-24
❖ Uniform - Bicycle Patrol, U06-03-04
❖ Complaint and Disciplinary System General Order, G08-01
❖ Department Directives System General Order, G01-03
❖ Protection of Human Rights General Order, G02-01
❖ First Amendment Rights General Order, G02-02
❖ Complaint Initiation and Log Number Investigation Assignment, G08-01-02
❖ Prohibition of Retaliation, G08-05
❖ Complaint and Disciplinary Investigators and Investigation, S08-01
❖ Log Number Case Management System, S08-01-01
❖ Investigation Timelines and Benchmarks, S08-01-02
❖ Communication Procedures and Timelines, S08-01-03
❖ Initial Investigatory Responsibilities in Log Number Investigations, S08-01-04
❖ Conducting Log Number Investigations, S08-01-05
❖ BIA Supervisor Responsibilities in Log Number Investigations, S08-01-06
❖ Command Channel Review, S08-01-07
❖ Post-Investigation Log Number Procedures, S08-01-08
❖ Requirements of a Complete Log Number Investigative File, S08-01-09
❖ Complaint and Disciplinary System, G08-01
❖ Complaint and Disciplinary Definitions, G08-01-01
❖ Complaint Initiation and Log Number Investigation Assignment, G08-01-02
❖ Conflict of Interest, G08-01-03
❖ Prohibitions on Sexual Misconduct, G08-06

## Accountability and Transparency
## COPA Written Guidance and Policies

❖ Investigative File Maintenance, 3.1.9
❖ Major Incident Responses – Officer-Involved Shooting or Officer-Involved Death, 3.1.10
❖ Timeliness Benchmarks and Appendix, 3.3.2
❖ CLEAR and Column CMS Systems, 3.1.6
❖ COPA Interviews – Chicago Police Department Members, 3.1.2.b
❖ Final Summary Report, 3.1.3
❖ Conflict of Interest and Recusal, 1.1.3
❖ Quality Assurance, 3.3.1
❖ Transparency Initiatives - Release of Video and Related Materials, 2.1.2
❖ Intake Policy, 3.1.1
❖ Fact Gathering & Investigative Process, 3.1.2
❖ COPA Equipment and Apparel, 3.1.8
❖ Disciplinary and Remedial Recommendations, 3.2.1

- Candidates for COPA Employment – Current or Former Chicago Police Department Members
- Recommendation Regarding Department Members Duties, Powers, 3.2.2
- Sexual Misconduct Investigations
- Compelled Statements, 3.4.4
- COPA Sexual Assault MOU w/BIA
- Civil and Criminal Complaint Review
- Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement
- COPA Guidance COLUMN CMS Administration
- COPA Guidance Investigative Correspondence
- COPA Guidance Processing Anonymous Complaints
- COPA Guidance Publishing and Distribution of Final Summary Reports
- COPA Guidance Referral for Mediation
- COPA Guidance Contacts with Non-Department Member Witnesses and Complainants and Confirmation of Representation
- COPA Guidance Accessibility – People with Disabilities, Language Services, and Incarcerated Individuals
- COPA Guidance Misconduct Complaints Identified or Initiated by COPA
- COPA Guidance Tracking Complaints of Sexual Misconduct
- COPA Guidance Request for Authorization to Investigate or Re-Open an Incident Over Five Years Old

## Accountability and Transparency: Police Board Policies

- Policy Regarding Training of Police Board Members and Hearing Officers
- Police Board Hearing Officer Selection Criteria, 2.1.1
- Police Board Policy Regarding Community Input Received at Police Board Public Meetings

## Data Collection, Analysis, and Management

- Department Approved Weapons and Ammunition, U04-02
- Control Devices and Instruments, U04-02-02
- Use of Force, G03-02
- Force Options, G03-02-01
- Incidents Requiring the Completion of a Tactical Response Report, G03-02-02
- Firearms Discharge Incidents Involving Department Members, G03-02-03
- Taser Use Incidents, G03-02-04
- Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents, G03-02-05
- Canine Use Incidents, G03-02-06
- Baton Use Incidents, G03-02-07
- Department Review of Use of Force, G03-02-08
- Prohibition on Retaliation, G08-05
- Foot Pursuit Reviews Standard Operating Procedure, 2020-001
- Performance Recognition System, E05-02
- Audit Division Standard Operating Procedures
- Force Review Board (FRB), Standard Operating Procedure, 2020-003
- Information Systems Development Group Policy, S09-01-01
- Officer Support System (OSS) – Pilot Program, D20-04
- Forms Management System, S09-03-02

As also reflected below, through eight reporting periods, the City and the CPD have developed or updated training materials to incorporate requirements across the Consent Decree.

Executive Summary Figure 3:
Sample of New or Revised Trainings Materials
between March 1, 2019, and June 30, 2023[21]

## Community Policing Section

- ❖ Community and Affinity Liaisons Training
- ❖ School Resource Officer Community Group Training
- ❖ Community Policing In-Service Training
- ❖ In-Service Two-day De-escalation, Response to Resistance Training
- ❖ Use of Force Training
- ❖ School Resource Officer Refresher Training (2021–2022)
- ❖ Strategies for Youth Training (Policing the Teen Brain)
- ❖ Neighborhood Policing Initiative Training
- ❖ School Resource Officer Initial Training (2019–2020)

## Impartial Policing

- ❖ Crime Victims' Assistance Training
- ❖ Juvenile Processing Training
- ❖ De-Escalation, Response to Resistance, and Use of Force Training
- ❖ Active Bystandership for Law Enforcement (ABLE) Training
- ❖ Prohibition on Retaliation eLearning
- ❖ Custody Arrest, Booking, and Detention (Recruit BLE) Training
- ❖ Community Policing Training
- ❖ Fair and Impartial Policing Training
- ❖ First Amendment eLearning
- ❖ S11-10, Department Training
- ❖ S11-10-03, In-Service Training
- ❖ G04-06, Hate Crimes eLearning
- ❖ Gender-Based Violence In-Service Training
- ❖ Non-Bias Training
- ❖ Procedural Justice 3 Training Materials
- ❖ Sexual Assault Training and Knowledge Test

## Crisis Intervention

- ❖ OEMC Crisis Intervention Team Refresher Training
- ❖ Crisis Intervention Team Basic Training
- ❖ Crisis Intervention Team Refresher Training
- ❖ Crisis Intervention Team Advanced Youth Training
- ❖ Crisis Intervention Team Recruit Concepts Training

---

[21] Some of these trainings may not have been provided to 95% of personnel at the time of this report.

## Use of Force

- ❖ First Amendment eLearning
- ❖ Foot Pursuit eLearning
- ❖ Foot Pursuit Training for Lieutenants
- ❖ 2022 CIT In-Service Training
- ❖ Active Bystandership for Law Enforcement Training
- ❖ Impact Weapon Test
- ❖ Recruit Use of Force Training
- ❖ Constitutional Policing Course
- ❖ Emergency Vehicle Operations Course In-Service 4-Hour Training
- ❖ Annual Prescribed Weapon Qualification, Taser Re-Certification and VirTra Simulation Exercise Training
- ❖ TRR Supervisory Debriefing Dashboard Training Bulletin
- ❖ Annual ICAT Training
- ❖ In-Service Supervisors Training
- ❖ Emergency Vehicle Operations Course In-Service 4-Hour Training
- ❖ Annual Carbine Training
- ❖ Foot Pursuit Training Bulletin
- ❖ In-Service Use of Force 2020
- ❖ Custodial Escort and Custody Training
- ❖ Positional Asphyxia Training Bulletin, ETB 20-01
- ❖ Foot Pursuits Review training
- ❖ Force Review Unit Firearm Pointing Incident Review training
- ❖ Weapons Discipline Training Bulletin (Firearms Pointing Incidents Training Bulletin)

## Supervision

- ❖ Emotional Intelligence for Supervisors Pre-Service Training
- ❖ Performance Evaluation System Pilot Training
- ❖ Performance Evaluation System eLearning
- ❖ Pre-Service Promotional Training
- ❖ In-Service Supervisors Training
- ❖ Officer Support System Training for Supervisors

## Officer Wellness

- ❖ Individualized Critical Incident Overview Training
- ❖ 2023 ABLE Refresher Training
- ❖ 2023 Officer Wellness and Support Training
- ❖ 2023 ABLE Refresher Training
- ❖ 2023 Annual Use of Force – ICAT Training
- ❖ 2021 Officer Wellness In-Service Training
- ❖ 2022 In-Service Crisis Intervention Training (CIT)
- ❖ 2021 De-Escalation, Response to Resistance, and Use of Force In-Service Training
- ❖ EAP Recruit Training
- ❖ Traumatic Incident Stress Management Program (TISMP) eLearning
- ❖ Active Bystandership for Law Enforcement Training
- ❖ Firearms Owner's Identification Card (FOID) Training
- ❖ EAP Pre-Service Promotional Training
- ❖ Chaplains Unit Training Deck: Overview of SOP 20-01

- ❖ Peer Support Program Training (40 Hours)
- ❖ 2021 In-Service Wellness Training
- ❖ Peer Support 8 Hour Refresher
- ❖ EAP Recruit Training
- ❖ Peer Support for Public Safety Summary of Training Subjects
- ❖ Peer Support Training and Consultation Program Synopsis
- ❖ Training Experts Materials
- ❖ Stress Management & Resilience Course
- ❖ EAP Training

## Accountability and Transparency: CPD Trainings under Development

- ❖ Automated Log Investigation
- ❖ Command Staff Training
- ❖ COPA Familiarization Training
- ❖ Complaint Log Number Investigation
- ❖ Civilian Ethics/Do the Right Thing
- ❖ Ethics Recruit Training
- ❖ BIA Investigator Log Number Investigator Training
- ❖ Complaint Log Investigation Clear
- ❖ Log Number Investigation/Call Out Procedures
- ❖ BIA Lieutenant Training
- ❖ BIA Field Training Officer Training
- ❖ BIA Sergeant Training
- ❖ BIA Recruit Training
- ❖ Rules/Regulations for Crossing Guards
- ❖ Firearm Discharge
- ❖ Police Impersonator Detective
- ❖ Log Number Investigation
- ❖ Rules and Regs Detention Aids
- ❖ Records/Summary Punishment Action Request (SPAR) Training
- ❖ Log Number Process
- ❖ BIA Investigators Formal Statement Standards
- ❖ BIA In-Service Training Plan
- ❖ BIA Investigator and Accountability Sergeant Basic Training Schedule
- ❖ BIA/Accountability Sergeant Training Plan
- ❖ BIA Investigator Accountability Onboarding Training Schedule
- ❖ BIA Rules and Regulations
- ❖ SPAR
- ❖ BIA Ethics Training
- ❖ BIA Policies and Techniques On Boarding Annual Training
- ❖ Case Management System Case Investigative Console Conducting Investigations
- ❖ Complaint Initiation Process In-Service
- ❖ Advocate Section Overview
- ❖ Findings Recommendations & Effective Log Closings
- ❖ Intake & Case Assignment In Service/On Boarding
- ❖ Interviews, Questions & Answer Techniques
- ❖ Investigative Practices Annual Training
- ❖ Legal Update/Due Process
- ❖ Conducting Log Investigations On-Boarding
- ❖ Policies and Procedures
- ❖ Procedural Justice & Log Number Investigations

- ❖ Training Scenarios
- ❖ CCR Exempt Staff for Training Manual/2020
- ❖ BIA Training COPA Municipal Code 2020
- ❖ BIA Training Strategy, Implementation and Execution Plan
- ❖ CMS Updates & Enhancements Training In-service
- ❖ CMS Log Number Intake Training In-Service Lesson Plan/PowerPoint
- ❖ CPD BIA eLearning
- ❖ CPD BIA Onboard Training
- ❖ CPD BIA Recorder Training
- ❖ CPD BIA Initial Training – Modules 1–5

## Accountability and Transparency:
## COPA Training

- ❖ COPA Intake
- ❖ COPA Training on CPD Directives
- ❖ Implicit Bias
- ❖ Procedural Justice
- ❖ CMS Overview of Policy and Procedures
- ❖ CMS Case Management System
- ❖ Collective Bargaining Agreement
- ❖ Consent Decree Overview
- ❖ Consent Decree Policies
- ❖ CPD Lockup Procedures
- ❖ CPD Rules and Directives
- ❖ Domestic Violence
- ❖ Evidence Collection
- ❖ Fourth Amendment
- ❖ Intro to OIS/OID Investigation
- ❖ Jurisdiction
- ❖ Lead Homicide Investigations
- ❖ Sexual Assault
- ❖ Use of Force
- ❖ Witness Reliability in Police Use of Force
- ❖ Investigations
- ❖ Legal Concepts Overview
- ❖ Complainant and Civilian Witness Interview
- ❖ Science of Justice Understanding the Role of Bias
- ❖ in Investigations
- ❖ Transparency and Confidentiality
- ❖ Quality Management
- ❖ Case and Time Management
- ❖ Civilian Oversight of Policing
- ❖ COPA Ordinance Mission Rules
- ❖ Disciplinary Process
- ❖ Bureau of Support Services
- ❖ Photo Array Procedures
- ❖ Parallel Civil and Criminal Litigation
- ❖ Personnel Rules and COPA Policies
- ❖ Approaching, Managing, Securing and Preserving the Scene
- ❖ Leading v. Non-leading Questions
- ❖ The Role of Evidence Specialist

- ❖ Core Values
- ❖ Chicago Police Board
- ❖ Ill. Notary Public Act
- ❖ OEMC Reports and Resources
- ❖ COPA Authority, Procedures, Rules, and Jurisdiction
- ❖ Understanding Cultural Differences
- ❖ Value Clarification Exercise
- ❖ Witness Reliability in Police Misconduct Cases
- ❖ Canvassing
- ❖ Civil, Criminal and Administrative Discovery
- ❖ FETI
- ❖ Welcome to COPA Academy Systems Training
- ❖ Digital Forensic Analyst
- ❖ Investigative Process Interview
- ❖ OEMC Records Portal
- ❖ Procedural Justice and Police Legitimacy
- ❖ Unnamed Graphs
- ❖ Professionalism in Service
- ❖ Intro to Training Academy
- ❖ Miranda and the Right to Counsel
- ❖ Forensic Podiatry
- ❖ Child Interviews
- ❖ Trauma Informed Care
- ❖ Intro to Use of Force
- ❖ CPD BIA
- ❖ COPA Policies Part III Professionalism
- ❖ Flex Fleet Training
- ❖ CPD Reports
- ❖ Fourth Amendment in Police Misconduct Cases
- ❖ Major Case Investigation Protocols
- ❖ CCSAO USAO Presentation
- ❖ CLEAR Training
- ❖ Lock Up Procedures
- ❖ Recorder
- ❖ Community Engagement
- ❖ Public Engagement
- ❖ COPA Academy CCSAO Presentation
- ❖ Investigative Process
- ❖ COPA Policies Part 1
- ❖ Public Policy in Police Accountability
- ❖ COPA Academy Cook County State's Attorney's
- ❖ Office, US Attorney's Office CCSAO Garrity
- ❖ 2022 Disciplinary and Remedial Recommendations In-Service Training
- ❖ Officer Interviews Training
- ❖ Final Summary Reports & Standards of Proof
- ❖ Fact Gathering-Evidence Collection
- ❖ Major Case Incident Response
- ❖ Case Management System: Overview of Policy and Procedures
- ❖ Conflict of Interest
- ❖ Complaint Register
- ❖ COPA People's Academy

In addition to new policies and training courses, in accordance with the Consent Decree, the City and the CPD also provide new and ongoing public data sources. While additional work is necessary, these developments provide significant increases in transparency.

Executive Summary Figure 4.
Examples of New Transparent CPD Data Sources



Executive Summary Figure 5.
Sample of Public Reporting Requirements

| Reporting Entity | Consent Decree Requirement | Examples of Public Reporting |
|---|---|---|
| CPD | CPD will, with the assistance of the Office of Community Policing, institute a public awareness campaign to inform the public, at least once a year, about policies such as use of force. *See* ¶28. | Know Your Rights Campaign |
| CPD | CPD will also have such victim assistance information readily available on its public website and at all district stations. *See* ¶29. | CPD Crime Victim Services Webpage |
| CPD | CPD will publish an annual report summarizing reported hate crimes and non-criminal incidents motivated by hate during the previous calendar year ("CPD Hate Crime Report"). *See* ¶78. | 2022 Hate Crimes Annual Report |
| Deputy Public Safety Inspector General (PSIG) | Deputy PSIG will annually publish a report about complaints of sexual misconduct against CPD members. *See* ¶444. | 2022 Report on Investigations of Sexual Misconduct Allegations Against Chicago Police Department Members |
| CPD | Each CPD policy and directive, including those created pursuant to this Agreement, will be posted online and otherwise made publicly available. *See* ¶545. | CPD Directives System |
| City of Chicago | The City will produce and publish an annual report describing CPD activity during the previous calendar year ("CPD Annual Report"). *See* ¶¶546–47. | 2022 Chicago Police Department Annual Report |
| City of Chicago | The City will produce and publish an annual report describing certain legal activity involving CPD during the previous calendar year ("CPD Annual Litigation Report"). *See* ¶¶548–49. | City of Chicago's Report on Chicago Police Department 2021 Litigation |
| CPD & Civilian Office of Police Accountability (COPA) | CPD and COPA will electronically publish quarterly and annual reports regarding complaints and allegations against CPD members. *See* ¶¶550–01. | CPD BIA Reports<br><br>COPA Reports |
| PSIG | The Deputy PSIG will regularly publish reports on diversity and inclusion issues, no less frequently than on an annual basis, which will contain findings and analysis. *See* ¶561. | PSIG 2021 Report |
| CPD | CPD will publish on at least a monthly basis aggregated and incident-level data, excluding personal identifying information (e.g., name, address, contact information), regarding reportable use of force incidents via a publicly accessible, web-based data platform. *See* ¶¶581–82. | Use of Force Dashboard |
| City | Beginning with the Monitor's first report filed with the Court, and for each subsequent semiannual report by the Monitor, the City agrees to file a status report one month before each of the Monitor's reports is due for the duration of this Agreement. *See* ¶680. | CPD Status Reports |
| CPD | CPD will establish and maintain clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies. *See* ¶160. | CPD Policy Review webpage |

## Compliance Assessments and Deadlines

At the end of the eighth reporting period, we assessed 552 paragraphs and provided status updates for 37 additional paragraphs (589 paragraphs total).[22]

Of course, some requirements in the Consent Decree demand more effort to comply with than others. The number of requirements—and the amount of work necessary under each requirement—can vary substantially within each paragraph and topic area.

When negotiating the Consent Decree, the City and the OAG agreed to specific deadlines to ensure that the City was making significant efforts to comply with the Consent Decree in a timely manner. As we complete Year Four of the Consent Decree, however, our focus will naturally shift from preliminary deadlines to measurements of effective and sustained practices. The deadlines in this reporting period and moving forward comprise recurring timelines, such as regular policy review, training, and reporting requirements including annual reports.[23] As we have done since the sixth reporting period, each of our reports continue to assess the City's efforts to comply with *all* requirements and monitorable paragraphs of the Consent Decree.

Executive Summary Figure 3 and Figure 4, respectively, show the City's compliance and deadline status through eight reporting periods. As a result of our focus on underlying efforts, we must also track and report on areas where the City or the CPD have lost levels of compliance. *See* Executive Summary Figure 5.

---

[22] While interrelated with the requirements of ¶¶79 and 80, ¶82 does not contain a substantive requirement for the City, and ¶81 contains conditional requirements that may never apply and did not apply this reporting period. For the purpose of this report, we have provided status updates for these paragraphs.

[23] *See, e.g.*, ¶¶78, 546, and 550.

# Consent Decree Compliance by June 30, 2023

## Executive Summary Figure 6:  Compliance Status through Eight Reporting Periods



**First Reporting Period**
Paragraphs w/ Any Level of Compliance (15)
Paragraphs Not in Compliance (52)
(*including under assessment*)
Total: 67

**Second Reporting Period**
Paragraphs w, Any Level of Compliance (48)
Paragraphs w/ Deadlines Not in Compliance (81)
(*including under assessment*)
Foundational Paragraphs Under Assessment (88)
Total: 216

**Third Reporting Period**
Paragraphs w/ Any Level of Compliance (154)
Paragraphs Not in Compliance (120)
Paragraphs under Assessment for Preliminary Comp. (41)
Total: 315

**Fourth Reporting Period**
Paragraphs w/ Any Level of Compliance (266)
Paragraphs Not in Compliance (215)
Paragraphs under Assessment for Preliminary Comp. (26)
Total: 507

**Fifth Reporting Period**
Paragraphs w/ Any Level of Compliance (380)
Paragraphs Not in Compliance (123)
Paragraphs under Assessment for Preliminary Comp. (20)
Total: 523

**Sixth Reporting Period**
Paragraphs w/ Any Level of Compliance (433)
Paragraphs Not in Compliance (105)
Paragraphs under Assessment for Preliminary Comp. (14)
Total: 552*

**Seventh Reporting Period**
Paragraphs w/ Any Level of Compliance (460)
Paragraphs Not in Compliance (79)
Paragraphs under Assessment for Preliminary Comp. (13)
Total: 552*

**Eighth Reporting Period**
Paragraphs w/ Any Level of Compliance (472)
Paragraphs Not in Compliance (74 )
Paragraphs under Assessment for Preliminary Comp. (6)
Total: 552*

**Executive Summary Figure 7:**      **Consent Decree Deadlines before June 30, 2023**[24]



---

[24] These deadlines do not include "recurring deadlines." *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timelin.._.pdf.

Executive Summary Figure 8:
Overall Compliance with the Consent Decree by June 30, 2023



# Roadmap

We wrote this report to be as accessible and readable as possible. This report is long because the compliance efforts in the eighth reporting period required significant attention. As the IMT continues to move forward with its monitoring efforts and as we assess the City's requirements with appropriate detail, the monitoring reports may also continue to grow in length. For this reason, we have provided the following roadmap to help readers understand what they can expect from each section of this report.

We begin this report with a **Background** section that provides some historical context about the Consent Decree and the IMT. This section will help those who have not read or would like to reacquaint themselves with the background information from our previous reports and Monitoring Plans.

The next section, **Compliance Activities and Assessments**, provides the following information regarding the eighth reporting period:

❖ An overview of the IMT's assessment process and priorities for the eighth reporting period, including deadlines and status updates;

❖ A summary of the IMT's activities;

❖ A summary of the City's achievements and challenges; and

❖ For each topic of the Consent Decree, a summary of relevant compliance efforts, a more specific analysis for each Consent Decree paragraph with a deadline before December 31, 2022, and if applicable, a summary of efforts regarding the corresponding paragraphs that do not have specific deadlines.

❖ Finally, per ¶661, Appendix 11 details the IMT's compliance assessments for each and every monitorable paragraph, all of which were under review in the eighth reporting period.

Finally, the last section, **Conclusion and Looking Ahead to *Comprehensive Assessment Part II* and Independent Monitoring Report 9**, provides concluding remarks and a projection of the upcoming work in the ninth reporting period.

# Background

This is the IMT's eighth semiannual I*ndependent Monitoring Report and Comprehensive Assessment Part I*.[25] The report provides the IMT's monitoring activities and findings for the eighth reporting period—from January 1, 2023, through June 30, 2023.[26]

Specifically, consistent with the requirements of the Consent Decree (¶661), we address the following information throughout the sections of this report:

❖ The IMT's efforts during the reporting period;

❖ A description of each Consent Decree requirement that applied during the reporting period;

❖ The IMT's compliance findings for each corresponding requirement;

❖ A summary of the City's principal achievements and the challenges facing the City's ability to achieve complete compliance with the Consent Decree;

❖ The IMT's corresponding recommendations regarding the City's future efforts to achieve compliance; and

❖ A projection of the IMT's, the OAG's, and the City's upcoming work during the next reporting period (July 1, 2022, through December 31, 2022).

Per ¶661 of the Consent Decree, the IMT will continue to issue semiannual reports until the Consent Decree ends—which is after the City has reached full and effective compliance for each requirement for one to two years. *See* ¶¶693 and 714–15. With the agreement of the Parties, however, we will endeavor to streamline the reporting process in future reporting periods. Specifically, in accordance with

---

[25] We provided a draft of this report to the City and the OAG on July 30, 2023, as required by ¶¶661–65. Per ¶663, the OAG and the City then provided written responses on August 22, 2023, and August 28, 2023, respectively. The Consent Decree requires a Comprehensive Assessment in ¶¶657–59.

[26] The IMT's Monitoring Plan for Year Four is available on the IMT's website. *See Reports and Resources*, INDEPENDENT MONITORING TEAM (November 2, 2022), https://cpdmonitoring-team.com/wp-content/uploads/2022/11/2022.11.02-Monitoring-Plan-for-Year-Four-filed.pdf. The City filed its eighth status report (¶680) with the Court on September 29, 2023. *See Chicago Police Department Reform Progress Update, Independent Monitoring Period No. 8*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/wp-content/uploads/DKT-001114-23-09-29-Notice-and-CPD-Reform-Progress-Update-Independent-Monitoring-Period-No.-8.pdf.

¶672, the IMT will seek to provide more information on our website to meet the requirements of ¶661 on a more regular basis and issue more digestible reports.

This report also includes *Comprehensive Assessment Part I*. Specifically, this report includes "whether and to what extent the City and CPD are in compliance with this Agreement," including "areas of greatest progress and achievement, and the requirements that appear to have contributed to these achievements, as well as areas of greatest concern." ¶¶657–58.

In the coming months, we will provide a standalone report, *Comprehensive Assessment Part II*, which will include "whether the outcomes intended by [the Consent Decree] are being achieved[;] whether any modifications to [the Consent Decree] are necessary in light of changed circumstances or unanticipated impact (or lack of impact) of the requirements including strategies for accelerating full and effective compliance; as well as "strategies for accelerating full and effective compliance."

## The Chicago Police Consent Decree

In December 2015, the U.S. Attorney General launched a civil-rights investigation into the CPD's policing practices. The U.S. Department of Justice released the results of its investigation in January 2017, finding a longstanding, pervasive "pattern or practice" of civil rights abuses by the CPD. Two separate class-action lawsuits followed: *Campbell v. City of Chicago* and *Communities United v. City of Chicago*.[27]

In August 2017, the Office of the Illinois Attorney General (OAG) sued the City in federal court, seeking a Consent Decree that would address the DOJ's findings and recommendations. The case was assigned to federal Judge Robert M. Dow, Jr. The OAG then sought input from community members and Chicago police officers and negotiated the Consent Decree with the City.

In March 2018, the Parties to the Consent Decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')," which "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[28]

---

[27] *See Campbell v. Chicago*, N.D. Ill. Case No. 17-cv-4467 (June 14, 2017), and *Communities United v. Chicago*, N.D. Ill. Case No. 17-cv-7151 (October 4, 2017).

[28] *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

The OAG and the City then sought proposals for an independent monitoring team after posting a draft Consent Decree on the Chicago Police Consent Decree website. Judge Dow approved and signed a modified version of the Consent Decree on January 31, 2019. This Consent Decree provides a unique opportunity for feedback from Chicago communities and local stakeholders. The OAG oversees and enforces the Consent Decree. *See* ¶694. The Coalition has certain enforcement rights and meets with the independent monitoring team at least quarterly. *See* ¶¶709(a) and ¶669, respectively.[29]

The Consent Decree requires action by the CPD and many other City entities. On March 1, 2019, the effective date of the Consent Decree, and after a competitive selection process, Judge Dow appointed Maggie Hickey, a partner at ArentFox Schiff LLP, as the Independent Monitor.[30] On October 11, 2022, Chief US District Judge of the District Court for the Northern District of Illinois Rebecca R. Pallmeyer became the presiding judge over the Consent Decree. As the Independent Monitor, Ms. Hickey oversees the Independent Monitoring Team (IMT) and reports directly to Chief Judge Pallmeyer.

As the IMT, we (1) monitor the City's, the CPD's, and other relevant City entities' progress in meeting the Consent Decree's requirements and (2) offer assistance to the City, the CPD, and other relevant City entities to implement the changes that the Consent Decree requires.

Independent Monitor Maggie Hickey and Deputy Monitor Chief Rodney Monroe, Ret., lead the IMT. The IMT's nine Associate Monitors, in turn, oversee the 10 topic areas of the Consent Decree. Our legal team, analysts, subject matter experts, Community Engagement Team, and community survey staff provide support in several ways: by reaching out to and engaging with Chicago communities; by providing general administrative support; and by collecting and analyzing policies, procedures, laws, and data, including conducting observations and interviews, and drafting reports.

Our full organizational chart is in Appendix 11, Figure 1, and our team structure is in Appendix 11, Figure 2.

---

[29] *See also Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs*, ¶9 (March 20, 2018), *available at* http://chicagopolicecon-sentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

[30] Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he will "help facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree." About, CHICAGO POLICE CONSENT DECREE, http://chica-gopoliceconsentdecree.org/about/. As the special master, Judge Coar also reports directly to Judge Pallmeyer.

# Compliance Activities and Assessments

This section provides an overview of compliance efforts for the eighth reporting period. We begin by explaining our priorities for the eighth reporting period that we described in our Monitoring Plan for Year Four. We include an overview of the assessment process and the deadlines within the eighth reporting period. We then provide summaries for the period, including summaries of our activities and of the City's achievements and challenges. Finally, we summarize the relevant compliance efforts for each topic area of the Consent Decree; provide a more specific analysis for each Consent Decree paragraph with a deadline before June 30, 2023; and summarize status updates for other paragraphs.

## The IMT's Methodologies during the Reporting Period

While most of this report addresses the City's efforts to meet the Consent Decree's requirements, the following subsection details the IMT's methodologies and activities in the eighth reporting period (January 1, 2023, through June 30, 2023).

In the eighth reporting period, we continued to meet regularly with representatives from the City, the City's relevant entities, the OAG, and members of Chicago's communities, including members of the Coalition (*see* ¶669). This included regular meetings with the CPD and the Superintendent (*see* ¶668), settlement conferences, and site visits (*see* ¶681).

At the beginning of the Consent Decree process, the City; the CPD; COPA; the Chicago Police Board; the City Office of Inspector General, including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC) worked to create open lines of communications.

Building on the efforts made in the previous reporting periods, these communications continued throughout the eighth reporting period. This included regularly scheduled meetings (*see, e.g.*, ¶¶668, 669), including regular meetings for each Consent Decree topic area. Specifically, we met consistently with, among others, members of the CPD, COPA, the City Office of Inspector General, the Police Board, and the OEMC, and reviewed thousands of City documents.[31]

A significant portion of our conversations involved discussing our methodologies for assessing the City's compliance with the Consent Decree. *See, e.g.*, ¶655. For the IMT, these discussions highlighted the importance of maintaining flexibility in our methodologies throughout the monitoring process. This flexibility ensures that

---

[31]    The OAG has engaged in much of the same work and provided separate feedback to the City and the CPD.

our monitoring efforts continue to meet the letter and spirit of the Consent Decree, as the Parties and the IMT develop necessary information, learn from previous efforts, and identify unanticipated hurdles. *See, e.g.*, ¶717. Changed circumstances may require the IMT to consider fewer, more, or alternative sources of information. As a result, our methodologies may adjust based on ongoing consultation with the Parties, as we continue to identify and consider new information and data that is relevant to the Consent Decree. We endeavor to supplement our methodologies with additional specificity throughout this report. During this reporting period, like all prior reporting periods, the IMT discussed the methodologies with the Parties before implementation and prior to conducting its audits and reviews for this report, acknowledging their concerns, and making adjustments for clarity.

Finally, in addition to making these efforts, the IMT continued to adhere to several specific and ongoing requirements of the Consent Decree. Background Figure 7, below, summarizes our compliance with the Consent Decree's deadlines for the IMT in the eighth reporting period.

Background Figure 7:                        IMT Deadlines in the Eighth Reporting Period

| ¶s | Requirement | Deadline | Eighth Reporting Period Deadlines |
|---|---|---|---|
| 627–37 | Review of CPD Policies and Procedures | Various, Ongoing | Corresponds with policy deadlines |
| 638–41 | Review of Implementation Plans and Training Materials | Various, Ongoing | Corresponds with plan and training deadlines |
| 642–44 | Compliance Reviews and Audits | Various, Ongoing | Occur during each reporting period |
| 652–55 | Review Methodologies | 45 Days prior (and every reporting period) | May 17, 2023 |
| 656 | Technical Assistance and Recommendations | Ongoing | Ongoing |
| 668 | Maintain Regular Contact with the Parties | Ongoing | Monthly |
| 669 | Monitor will Participate in Meetings with the Coalition | Quarterly | Quarterly |
| 670–71 | Communication with the Parties, Collective Bargaining Representatives, and the Public | Ongoing | Ongoing |

## IMT's Community Engagement Activities

The IMT's Community Engagement Team plays a critical role by monitoring levels of trust and sentiment among the stakeholders to the Consent Decree—the members of Chicago's communities. The IMT's Community Engagement Team includes experienced Chicago community organizers, community researchers, experts in police-community relations, and academic scholars. These team members work together to meaningfully engage Chicago's communities and ensure that community members participate throughout the monitoring process. The Community Engagement Team also works closely with the Monitor, the Deputy Monitor, and the Associate Monitors to assess the community components of compliance with the Consent Decree.

The IMT's Community Engagement Team's work is vital to measure compliance with specific policy, training, and procedural changes required by the Consent Decree. The City and the CPD do not function effectively when they lack trust from the communities they serve.[30]

Effective policing requires both procedural and cultural change and improved relationships between the City and the CPD and the communities they serve. The Community Engagement Team encourages improved relationships based on respect, trust, and partnership and emphasizes how relationships may be strengthened by transparency and accountability.

The IMT's Community Engagement Team performs two key tasks regarding the Consent Decree monitoring process: (1) gathering input from Chicagoans about their concerns regarding CPD policies and practices, and (2) providing information to the Chicago community about the IMT's activities and findings.

We sought to hear sentiments from a broad range of Chicagoans during the eighth reporting period. For example, Judge Rebecca Pallmeyer held a virtual public hearing on June 2, 2023. The judge heard from Chicagoans who voiced their concerns, observations, and ideas about Chicago Police Department reform.

We also held a Virtual Listening Sessions in June 2023 in partnership with HANA Center and Apna Ghar, focused on impartial policing. Chicagoans shared their thoughts and concerns about impartial policing with Independent Monitor Maggie Hickey, Associate Monitor for Impartial Policing Denise Rodriguez, and members of the IMT's Community Engagement Team.

Figure 3. IMT Virtual Listening Session Flyer (June 22, 2023)



We also issued periodic newsletters, emails, and press releases to update community stakeholders on our monitoring activities, and importantly, we filed our second citywide community survey report.[32]

---

[32] *Community Survey Report (October 2021 – May 2022)*, INDEPENDENT MONITORING REPORT (MAY 30, 2023), https://cpdmonitoringteam.com/wp-content/uploads/2023/05/2023.05.30-IMT-Community-Survey-Report-October-2021-May-2022-filed._-2.pdf.

Figure 4. IMT Newsletter (May 30, 2023)



Also during the eighth reporting period, the Parties filed a stipulation with the Court to add provisions regarding investigatory stops and pat downs to the Consent Decree. The stipulation was subsequently amended and entered by the court on June 27, 2023.[33] As a result of the stipulation, a separate agreement between the City, the CPD, and the American Civil Liberties Union of Illinois (ACLU-IL)[34] ended and the progress made under the Investigatory Stop and Protective Pat Down Settlement Agreement (ACLU Agreement) will continue under the Consent Decree.

Going forward, the IMT will continue to assist the City and the CPD in their pursuit of improved policies, reporting mechanisms, and training on investigatory stops and pat downs, and will publicly report on their progress. Requirements specific to community engagement are contained within ¶¶862–65 of the stipulation.

---

[33] The stipulation is available at https://cpdmonitoringteam.com/wp-content/uploads/2023/08/2023.06.27-Amended-Stipulation-regarding-Investigation-Stops-Protective-Pat-Downs-and-Enforcement-of-Loitering-Ordinances.pdf. The Court held a public hearing regarding the stipulation on August 9, 2023.

[34] A copy of the *Investigatory Stop and Protective Pat Down Settlement Agreement* between the City, the CPD, and the ACLU of Illinois is available as Appendix A to the *Consultant Report: Progress Update and Data Analysis of Chicago Police Department Stops between 2018 and 2020*, Consultant Team (June 14, 2023), *available at* https://cpdmonitoringteam.com/wp-content/uploads/2023/06/2023.06.14-Consultant-Report.pdf.

Paragraph 865 states as follows: "The Parties recognize that the City, ACLU-IL, and the ACLU Agreement Consultant have developed a promising model for thoughtful community engagement through the creation of a Request for Proposals which sought community organizations to co-design and lead a citywide process to engage individuals and stakeholders to develop recommendations regarding CPD's investigatory stop and protective pat down practices. Within 180 days of the release of these recommendations, the Monitor will publicly report on these recommendations and CPD's response and will further make recommendations as to CPD's ability to adapt elements of this model for community engagement. CPD will consider the results of the Monitor's report in developing future community engagement processes."

An October 3, 2023 report included the recommendations developed through the community engagement, along with the CPD's response. The report, *Consultant Report: Community Engagement Results*, also details the community engagement process.[35]

We recommend the following as to the CPD's "ability to adapt elements of this model for community engagement," in accordance with ¶865 recommendations:

1. While private funding can be a challenge, participant compensation was critical.

2. Partnerships could allow the CPD to connect with existing networks and meet community members where they are.

3. Meeting with community members in an open dialogue is important to promoting mutual understanding and problem-solving.

4. The community recommendations demonstrate an interest in providing resources and building connection with the CPD, which the CPD should respond to in tangible ways.

5. The CPD should ensure that it meaningfully responds to all input and recommendations.

6. In responding to community input and recommendations, the CPD should identify specific plans and ongoing actions.

---

[35] Available at https://cpdmonitoringteam.com/wp-content/uploads/2023/10/2023.10.03-Consultant-Report_-Community-Engagement-Results.pdf.

# Eighth Reporting Period Priorities

We set out our priorities for the eighth reporting period in our Monitoring Plan for Year Four.[36] Through the eighth reporting period, we were monitoring compliance with those paragraphs to match the pace of the five-year goal described in the Consent Decree. As explained above, in the sixth reporting period, the Parties entered a stipulation, which extends the pace of the Consent Decree to eight years.[37]

# Assessing Compliance

As reflected above, and in accordance with ¶¶661–62 and 642, the IMT assesses how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: **(1) Preliminary compliance**, **(2) Secondary compliance**, and **(3) Full compliance**. The CPD and other City entities will not be "in compliance" with a requirement until they reach Full compliance for the requisite length of time required by the Consent Decree—either one or two years. *See* ¶714. We will assess the City's compliance on all appropriate levels for the paragraphs presented in this report.

❖ **Preliminary compliance** typically refers to the development of acceptable policies and procedures that conform to best practices (as defined in ¶730) and to the incorporation of requirements into policy (¶642). The IMT will assess the development of policies, procedures, rules, and regulations reasonably designed to achieve compliance. To attain Preliminary compliance, the City must have policies and procedures designed to guide officers, City employees, supervisors, and managers performing the tasks outlined in the Consent Decree. These policies and procedures must include appropriate enforcement and accountability mechanisms, reflect the Consent Decree's requirements, comply with best practices for effective policing policy, and demonstrate the City and its relevant entities' ability to build effective training and compliance.

❖ **Secondary compliance** typically refers to the development and implementation of acceptable and professional training strategies (¶642). Those strategies must convey the changes in policies and procedures that were established

---

[36] The IMT's Monitoring Plan for Year Four is available on the IMT's website. *See Reports and Resources*, Independent Monitoring Team (November 2, 2022), https://cpdmonitoring-team.com/wp-content/uploads/2022/11/2022.11.02-Monitoring-Plan-for-Year-Four-filed.pdf. Given the varying workloads of separate departments and personnel, the City and its relevant entities may make compliance efforts earlier than anticipated. When appropriate, we may also assess those efforts in our monitoring reports earlier than anticipated.

[37] *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Re-garding-Search-Warrants-Consent-Decree-Timelin.._.pdf.

when we determined Preliminary compliance. Secondary compliance also refers to creating effective supervisory, managerial, and executive practices designed to implement policies and procedures as written (¶730). The IMT will review and assess the City's documentation—including reports, disciplinary records, remands to retraining, follow-up, and revisions to policies, as necessary—to ensure that the policies developed in the first stage of compliance are known to, are understood by, and are important to line, supervisory, and managerial levels of the City and the CPD. The IMT will be guided by the ADDIE model (Analysis, Design, Development, Implementation, and Evaluation) of curriculum development to assess training and will consider whether there are training, supervision, audit, and inspection procedures and protocols designed to achieve, maintain, and monitor the performances required by the Consent Decree.

❖ **Full compliance** refers to adherence to policies and training within day-to-day operations (¶642). Full compliance requires that personnel, including sergeants, lieutenants, captains, command staff, and relevant City personnel routinely hold each other accountable for compliance. In other words, the City must "own" and enforce its policies and training and hold officers accountable for misconduct through a disciplinary system that is fair, timely, and consistent. The IMT will assess whether the City's day-to-day operations follow directives, policies, and training requirements. When measuring Full compliance, we will note whether supervisors notice, correct, and supervise officer behavior and whether appropriate corrections occur in the routine course of business. In this phase, we will review whether compliance is reflected in routine business documents, demonstrating that reforms are being institutionalized. In addition, we will determine whether all levels of the chain of command ensure consistent and transparent compliance.

These levels typically correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. Still, the three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training rather than to create a policy. Likewise, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate. In other circumstances, levels of compliance may include implementing effective pilot programs before rolling out reforms across the entire CPD.

Throughout this report, we provide our compliance assessments and descriptions of the status of current compliance based on efforts within the eighth reporting period. Under the Consent Decree, the City, the CPD, and other relevant City entities are not in any level of compliance until we find that they comply. As a result,

a finding that the City is not in compliance with a requirement does not mean that the City has not made efforts—even significant efforts—to achieve compliance toward that requirement.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are complying. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its actions.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the eighth reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the City's evidence, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the City's evidence, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the City's evidence, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance, or the City has not met a lower level of compliance.

# I. Community Policing

## Guiding Principles

The IMT assessed whether the City complied with applicable Community Policing paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **8.** *Strong community partnerships and frequent positive interactions between police and members of the public make policing safer and more effective, and increase public confidence in law enforcement. Moreover, these partnerships allow police to effectively engage with the public in problem-solving techniques, which include the proactive identification and analysis of issues in order to develop solutions and evaluate outcomes.*

> **9.** *To build and promote public trust and confidence in CPD and ensure constitutional and effective policing, officer and public safety, and sustainability of reforms, the City and CPD will integrate a community policing philosophy into CPD operations that promotes organizational strategies that support the systematic use of community partnerships and problem-solving techniques.*

> **10.** *CPD will ensure that its community policing philosophy is a core component of its provision of police services, crime reduction strategies and tactics, training, management, resource deployment, and accountability systems. All CPD members will be responsible for furthering this philosophy and employing the principles of community policing, which include trust and legitimacy; community engagement; community partnerships; problem-solving; and the collaboration of CPD, City agencies, and members of the community to promote public safety.*

> **11.** *The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest.*

## Summary of Compliance Efforts and Assessments for the Eight Reporting Period

In the eighth reporting period, the IMT assessed compliance with the Community Policing paragraph requirements by reviewing relevant policies, including two-year

reviews of G06-01 and G06-01-04, *Arrestee and In-Custody Communications,* reviewing training curricula and records primarily involving the processing of juvenile arrestees, and participating in a range of meetings with the CPD's leadership and Office of Community Policing, covering updates and challenges to implementing paragraph requirements. During a site visit, the IMT participated in group interviews with SRO officers, District Coordination Officers (DCOs), and Chicago Alternative Policing Strategy (CAPS) officers. The IMT also observed a community meeting at the Chicago Hearing Society and participated in a tour of the CPD's new training facility.

Overall, the City's and the CPD's compliance efforts continue to lag and, after several reporting periods of minimal progress, bring into question the City's and the CPD's commitment to implementing reforms in community policing practices as required by the Consent Decree. The Office of Community Policing has experienced significant reductions in its number of staff over the last several years and those who remain are often pulled away to cover other assignments. The result of these actions is missed deadlines; inadequate outreach efforts; failures to identify, develop, and expand meaningful partnerships with community stakeholders and community-based organizations; and delays in developing and implementing policies and programs to fundamentally change the way the CPD members interact with youth. After four years of operating under the Consent Decree, and consistently receiving such recommendations, the CPD has yet to develop and put in place meaningful data capture and tracking systems to monitor performance and assess the efficacy of its programs and strategies.

After an initial Neighborhood Policing Initiative (NPI) expansion to 10 police districts, further implementation has stalled over the last several reporting periods. In those districts implementing NPI, ongoing details of staff to other assignments has hampered their ability to perform their community outreach and problem-solving roles. We are now concerned that NPI will not expand, in the manner intended, but that it is being stripped away from the districts where it once had a presence. Moreover, in the eighth reporting period, an evaluation of the CPD's Neighborhood Policing Initiative (NPI) found that this initiative has neither built trust nor reduced crime, so we encourage the CPD to think through its overall community policing strategy.[38]

Another foundational element of community policing and community engagement involves the District Advisory Committees (DACs) comprised of volunteers who serve in each district to provide community input and feedback on policing strategies and practices. Over the past several years, the CPD have made efforts to

---

[38] Center for Neighborhood Engaged Research & Science (CORNERS), *The Chicago Neighborhood Policing Initiative: Research and Evaluation Report, 2019-2023,* INSTITUTE FOR POLICY RESEARCH RAPID RESEARCH REPORT (April 20, 2023), https://uploads-ssl.webflow.com/630fc70085c3ed55d3d41d54/6462577e91593b350aea8bae_CORNERS%202023%20CNPI%20Report%20(1).pdf.

improve the functioning of the DACs, but the CPD often struggles to provide meeting agendas, minutes, and documentation of their decision-making processes. Once again, staffing shortfalls were cited for not meeting this requirement. The CPD has indicated that they are seeking ways to improve the coordination between the DACs and the recently elected City of Chicago District Council members that share a similar mission.

The IMT is encouraged by the City and the CPD's focus on a community safety model as evidenced in recent cabinet meetings regarding public safety. For this approach to work, the roles for the CPD officers—especially those involved in community outreach and problem solving—must be better integrated. The City and the CPD also successfully completed another cycle of the district strategic planning process for each district, but improvements are needed.

The City, the CPD, and the Chicago Public Schools (CPS) were, however, able to sustain progress made in earlier reporting periods regarding the screening, placement and training of SRO officers.

## Community Policing Progress through Eight Reporting Periods

Overall, the IMT assessed the City's compliance with 35 Community Policing paragraphs in the eighth reporting period (¶¶13–20 and 22–48). The City and the CPD maintained Preliminary compliance for 17 paragraphs (¶¶13, 14, 16, 19–20, 22–25, 27–28, 31, 41, and 45–48), maintained Secondary compliance for 10 paragraphs (¶¶15, 17–18, 26, 37–40, 42, and 43), met Secondary compliance for four paragraphs (¶¶29, 34–35, and 36), maintained Full compliance with one paragraph (¶44), and achieved Full compliance with another (¶30). *See* Community Policing Figure 1 below. The City did not reach Preliminary compliance in the two paragraphs (¶¶32–33) and lost a Secondary compliance with four paragraphs (¶¶13–14, 28, and 41). *See* Community Policing Figure 2 below.

Community Policing Figure 1:         Compliance Progress for Community Policing Paragraphs at the End of the Eighth Reporting Period (June 30, 2023)



**Community Policing**
**Compliance Progress by June 30, 2023**

- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

Community Policing Figure 2:
Lost Levels of Compliance in the Community Policing Section



| | Seventh Reporting Period (July 1, 2022 – December 31, 2022) | Eighth Reporting Period (January 1, 2023 – June 30, 2023) |
|---|---|---|
| **Paragraph** | **Previous Compliance** | **Current Compliance** |
| ¶13 | Secondary → | Preliminary |
| ¶14 | Secondary → | Preliminary |
| ¶28 | Secondary → | Preliminary |
| ¶41 | Secondary → | Preliminary |

## Looking Ahead to the Ninth Reporting Period

Looking ahead to the ninth reporting period, the IMT is hopeful that the CPD will accelerate efforts to achieve compliance in the Community Policing section of the Consent Decree by devoting more resources to establishing supervisory and track-ing mechanisms to ensure effective implementation of newly enacted or revised

CPD policies. The IMT expects the CPD to make significant progress in its community policing strategy, expanding effective initiatives to more police districts. The IMT also expects that the CPD will better define and improve their community engagement processes. The IMT will be paying particular attention to how the CPD works with and coordinates the activities of the District Advisory Committees and the recently formed City of Chicago District Councils.[39] The IMT is encouraged by the CPD's recent progress in formulating a new policy governing interaction with youth and expects the CPD to finalize this policy in the ninth reporting period.

As referenced above, the City and the CPD have made progress in this section by developing new or revised policies and training materials. The Consent Decree requires, however, additional policy changes. For example, at the end of the eighth reporting period, the City and the CPD continued developing the following policies:

- ❖ *CompStat and Command Engagement*        G01-08

- ❖ *Youth District Advisory Council*        S02-03-15

- ❖ *Field Arrest Procedures General Order*        G06-01-01

The Consent Decree also requires additional training development, and at the end of the eighth reporting period, the City and the CPD continued developing the following new or revised training materials:

- ❖ Basic Law Enforcement Recruit Training on Custody Arrest Booking
- ❖ Integration Training Curriculum for DCO's and Community Policing Members, Parts 1–5
- ❖ Crime Victim Assistance eLearning Lesson Plan/Training Curriculum
- ❖ Recruit Curriculum on Victim Services
- ❖ Training Curriculum (Recruit, In-Service & Pre-Service) covering "Arrestee and In-Custody Communication"
- ❖ 2023 Youth Interactions In-Service Training
- ❖ Roll Call Training related to Diversion Program Roll-Out
- ❖ Pre-Service Training on Youth Diversion
- ❖ Recruit Training on Youth Diversion
- ❖ SRO Annual Refresher Training

---

[39] More information about the City's elected District Councils, which are a part of the Community Commission for Public Safety and Accountability may be found on the City's website: https://www.chicago.gov/city/en/depts/ccpsa/supp_info/district-councils.html.

We look forward to reporting on these finalized materials, as well as evidence that the City and the CPD have implemented reforms into practice.

The IMT strongly recommends that the City and the CPD expand and improve upon their partnerships and community engagement efforts in the ninth reporting period and beyond. Adequate resources and prioritization of community policing requirements by the City and the CPD are necessary for this to occur. Moving forward, we are hopeful that the City and the CPD can provide sufficient resources toward reforms related to the Community Policing section, including developing and implementing related policies, training, supervision mechanisms, and evaluation processes.

\*\*\*

Specific compliance assessments, by paragraph, for the Community Policing section are included in Appendix 1.

# II. Impartial Policing

## Guiding Principles

The IMT assessed compliance with applicable Impartial Policing paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **49.** *The Parties agree that policing fairly, with courtesy and dignity, and without bias is central to promoting broad community engagement, fostering public confidence in CPD, and building partnerships between law enforcement and members of the Chicago community that support the effective delivery of police services.*

> **50.** *In conducting its activities, CPD will provide police services to all members of the public without bias and will treat all persons with the courtesy and dignity which is inherently due every person as a human being without reference to stereotype based on race, color, ethnicity, religion, homeless status, national origin, immigration status, gender identity or expression, sexual orientation, socio-economic class, age, disability, incarceration status, or criminal history.*

> **51.** *CPD will ensure its members have clear policy, training, and supervisory direction in order to provide police services in a manner that promotes community trust of its policing efforts and ensures equal protection of the law to all individuals.*

## Summary of Compliance Efforts and Assessments

### Impartial Policing in the Eighth Reporting Period

In the eighth reporting period, the City and the CPD revised several policies related to the Impartial Policing section of the Consent Decree. The CPD, for example, finalized *Prohibitions of Sexual Misconduct* (G08-06). The CPD also developed related training materials, such as training related to prohibition on retaliation and fair and impartial policing. The City and the CPD also implemented several training courses—including *Fair and Impartial Training*; *BIA eLearning*; *Crime Victim Assistance eLearning*; *De-escalation, Response to Resistance, and Use of Force*; and *Gender-Based Violence*—and integrated concepts of impartial policing in several its in-service training courses during the reporting period.

Further, the IMT also reviewed and provided a no objection notice on the City and OEMC's revisions to the *Diversity Awareness Training*. However, to date, the OEMC and by extension the City has not responded to nor adequately explained why it has not responded to comments related to these materials that were submitted by the OAG on September 19, 2022, and subsequently resent on July 27, 2023. soliciting questions from the City. To the extent the City does not believe the OEMC has an obligation respond to comments from the OAG, the IMT disagrees and notes this does not further the spirit of collaboration or the spirit of furthering impartial policing principles.

Separately, the CPD has begun the implementation of the pilot of the *Community Engagement in Policy*, G01-03-01. The IMT looks forward to reviewing the evaluation and outcomes of the pilot and any revisions to that policy.

The CPD also began implementation of the Search Warrant Community Resources Pilot (D22-07) and, as with D22-08, the IMT looks forward to reviewing the evaluation and outcomes of the pilot.

During this reporting period, the City, the CPD, the OAG, and the IMT had collaborative discussions regarding the requirements of ¶¶53–55, and how to best track the CPD's broad impartial-policing requirements contemplated by these paragraphs. As a result of these discussions, methodologies employed to assess Preliminary, Secondary, and Full compliance for these paragraphs were revised. In turn, the CPD achieved Preliminary compliance with ¶¶54 and 55. Preliminary compliance with paragraphs 53 and 72 are contingent on CPD's development of related strategic plans that outline how the concepts of Impartial Policing will be integrated and measured. In addition, as the CPD moves into Secondary compliance and starts working on achieving Full compliance, the CPD will need to identify the data, reports, and auditing mechanisms to demonstrate implementation.

The City and the CPD also made some progress in the Impartial Policing section during this reporting period. As reflected in the Community Policing section above, and noted in previous reporting periods, we believe that the delays in progress relate to staffing issues and changing priorities—often changing away from compliance with the requirements of these sections. We continue to stress the impact of limited personnel resources, for example, within the Office of Community Policing on its efforts to be responsive to the Consent Decree and requirements of the paragraphs within Impartial Policing. Staff shortages have presented continued delays, for example, in the production of revised policies, development of related training, reviews of plans, and documentation of annual reports. In light of these staffing shortages, the IMT stresses the importance for the Office of Community Policing to prioritize activities and develop a strategic plan to comply with this section of the Consent Decree.

Further, although not specifically mandated by the Consent Decree, the IMT recommends that the City and the CPD consider creating a position within the CPD that focuses on the integration of the concepts of diversity, inclusion, equity, and impartial policing into all aspects of the CPD, including policy, training development, and operations. A Chief Equity Officer, or DEI Coordinator, could spearhead and accelerate the CPD's efforts to comply with the requirements of ¶¶53, 54, 72, and others within this section.

## Impartial Policing Progress through Eight Reporting Periods

In the eighth reporting period, we assessed the City's compliance with 31 Impartial Policing paragraphs (¶¶52–82)—with two of those paragraphs containing conditional requirements that do not apply (¶81–82).[40] The City maintained Preliminary compliance for 11 paragraphs (¶¶52, 56–61, and 65–71), moved into Preliminary compliance for three paragraphs (¶¶54, 55, and 63), maintained Secondary compliance for five paragraphs (¶¶67, 73, and 76–78), and moved into Secondary compliance for one paragraphs (¶74). The City is under Assessment for one paragraph (¶75) and failed to reach Preliminary compliance for the remaining five paragraphs assessed (¶¶68–69, 72, and 79–80). *See* Impartial Policing Figure 1 below.



Impartial Policing Figure 1:  Compliance Progress for Impartial Policing Paragraphs at the End of the Eighth Reporting Period (June 30, 2023)



Impartial Policing
Compliance Progress by June 30, 2023

- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

---

[40]  Specifically, because ¶¶79–82 are interrelated, we assessed their compliance together. Paragraph 82, however, does not contain a substantive requirement for the City. Likewise, ¶81 contains conditional requirements that may never apply and, at the time of this report, do not apply.

## Looking Ahead to the Ninth Reporting Period

In the eighth reporting period, the City and the CPD continued to struggle to make significant progress with the Impartial Policing section of the Consent Decree. Moving forward, we are hopeful that the City and the CPD can provide sufficient resources toward reforms related to the Community Policing and the Impartial Policing sections.

The City and the CPD have, however, been developing new and revised policies, written guidance, and training to make progress in this section. At the end of the eighth reporting period, the City and the CPD continued developing, for example, the following new or revised policies:

- ❖ Search Warrants                                          S04-09
- ❖ Limited English Proficiency Policy                       S02-01-05
- ❖ Interactions with TIGN                                   G02-01-03
- ❖ Interactions with People with Disabilities               S02-01-01

We look forward to reporting on these materials, as well as evidence that the City and the CPD have implemented reforms into practice.

***

Specific compliance assessments, by paragraph, for the Impartial Policing section are included in Appendix 2.

# III. Crisis Intervention

## Guiding Principles

The IMT assessed compliance with applicable Crisis Intervention paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **83.** *CPD officers often serve as first responders to individuals experiencing a behavioral or mental health crisis. These individuals may exhibit symptoms of known, suspected, or perceived behavioral or mental health conditions, including, but not limited to, mental illness, intellectual or developmental disabilities, or co-occurring conditions such as substance use disorders. The Parties acknowledge that having a mental illness, an intellectual or developmental disability, or co-occurring condition does not mean an individual necessarily is in crisis, or that having a behavioral or mental health condition would necessarily be the reason for any crisis that requires police involvement. However, it may need to be considered or warrant heightened sensitivity to ensure an appropriate response. Therefore, individuals in the groups listed above will be collectively referred to as "individuals in crisis" for the purposes of this Agreement.*

> **84.** *A person may be a suspected individual in crisis based on a number of factors, including, but not limited to, self-reporting; information provided by witnesses, family members, or individuals requesting service; CPD's previous knowledge of the individual; or an officer's direct observation.*

> **85.** *CPD officers will interact with individuals in crisis with dignity and respect. The use of trauma-informed crisis intervention techniques to respond appropriately to individuals in crisis will help CPD officers reduce the need to use force, improve safety in police interactions with individuals in crisis, promote the connection of individuals in crisis to the healthcare and available community-based service systems, and decrease unnecessary criminal justice involvement for individuals in crisis. CPD will allow officers sufficient time and resources to use appropriate crisis intervention techniques, including de-escalation techniques, to respond to and resolve incidents involving individuals in crisis. To*

*achieve these outcomes, the City and CPD will implement the requirements set out below.*

*86. The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest for individuals in crisis.*

# Summary of Compliance Efforts and Assessments

## Crisis Intervention in the Eighth Reporting Period

During the eighth reporting period, the CPD, the OEMC, and the Chicago Council on Mental Health Equity (CCMHE) continued to work to address the requirements in the Crisis Intervention section of the Consent Decree related to policy, training, operational practices, and community engagement. However, progress has stalled in certain areas related to the Crisis Intervention section.

For example, the Crisis Intervention Unit remains severely understaffed, now comprising half the number of members compared to 2021. This is unsustainable to meet Consent Decree requirements. The CCMHE quarterly meeting on April 25, 2023, was canceled, a co-chair position for the CCMHE is currently vacant, and, despite being discussed for several reporting periods, there has been no discernible progress on revising the CCMHE's structure. Moreover, while the OEMC partially produced training evaluations related to the Crisis Intervention section, the CPD produced none.

As outlined throughout this report, we recommend that the CPD revise its approach so that it is consistent with best practice, including how the CPD defines and calculates its response ratios; which eligibility standards will apply to Designated CIT officers; and prompt removal of officers who do not meet these eligibility standards.[41]

---

[41] In the seventh reporting period, the CPD revised its officer designations related to CIT. Throughout this report, the IMT has mirrored the CPD's updated language to avoid confusion. The term "Certified Crisis Intervention Team (CIT) Officers" is used throughout the Consent Decree. *See* ¶92. The CPD has moved away from a strictly voluntary CIT model to one that is a hybrid voluntary/mandatory CIT model, in which all officers are required to take the 40-hour Basic CIT training. *Certified* CIT officers are now being identified as "Designated CIT officers" by the CPD. Designated CIT officers are those officers who voluntarily request to be Crisis Intervention Team members and prioritized to calls for service involving a mental health component. Mandatorily assigned officers who do not select to be identified as a Designated CIT officer at the end of the 40-hour CIT training are now identified as "CIT Trained officers." The OEMC prioritizes CIT Trained officers, secondary to a Designated CIT officer for dispatch to mental health calls for service. Last, officers who have not yet been through the 40-hour CIT training are simply identified as Untrained.

The IMT continued to participate in monthly calls with the City, the OEMC, and the CPD, as well as observe the quarterly Chicago Council on Mental Health Equity meetings. The IMT also conducted site visits and reviewed data throughout the eighth reporting period to assess compliance under the Consent Decree. For example, the IMT met with Crisis Intervention Team patrol officers, completed ride alongs in the 18th and 19th districts, met with the Crisis Intervention Team District Operations and Community Support team (CIT DOCS), the Crisis Intervention Team training division (also known as CITTS), the CIT Coordinator, the CIT data analyst, the Chicago Council on Mental Health Equity, Coalition members, members of the Crisis Assistance Response and Engagement (CARE) team, and the OEMC policy analyst.

Despite significant challenges in the eighth reporting period, the City and the CPD have demonstrated progress toward achieving compliance for several paragraphs in the Crisis Intervention section. The CPD improved in responding to public feedback on its Crisis Intervention Policy suite. We appreciate the CPD's thorough response, as it helps promote public trust and confidence. The CPD also included in policy its responsibility to complete an annual *Crisis Intervention Plan* and *Officer Implementation Plan*.

In addition, the CPD demonstrated that 95% of all CPD officers completed the eight-hour *Crisis Intervention* training, an important accomplishment which covers key components of signs, symptoms, and best-practice responses to individuals in crisis. The CPD also required all officers to attend the *Integrating Communications Assessments and Tactics* (ICAT) training, which is a nationally recognized training focused on communication and de-escalation skills. At the site visit this reporting period, the IMT observed part of the ICAT training, as well as the *Active Bystander for Law Enforcement* (ABLE) training and scenario-based exercises related to the annual De-escalation, Response to Resistance, and Use of Force training.

We appreciate the CPD taking important steps toward training all officers on response to individuals in crisis, with emphasis on de-escalation strategies. To continue its progress towards further compliance under the Consent Decree, the IMT encourages the CPD to produce training evaluations in the next reporting period, and each reporting period thereafter. We also recommend that they facilitate the Chicago Council on Mental Health Equity in training observations, which is required under the Consent Decree. To date, there has been little evidence of training observation and feedback.

The eighth reporting period reinforced that the Crisis Intervention Unit remains severely understaffed. *Compare* ¶89.[42] The Crisis Intervention Unit consists of individuals who are dedicated to the unit's mission and passionate about the role and purpose of the CIT Program. However, the CPD simply needs to hire additional staff for the Crisis Intervention Unit, as the CPD lost compliance with several paragraphs this reporting period due to inadequate staffing resources. The CPD's Crisis Intervention Unit's dedicated staffing was at its peak in 2021 during the fourth reporting period, when it was staffed with 56 people. As of the eighth reporting period, staffing was at its lowest, with 29 people.

Crisis Intervention Figure 1:
Crisis Intervention Unit Staffing over Several Reporting Periods

| Reporting Period | Commander | Lieutenants | Sergeants | Officers | Community Outreach Coordinator | Data Analyst | Totals |
|---|---|---|---|---|---|---|---|
| IMR-4 | 1 | 1 | 7 | 46 | 1 | 0 | 56 |
| IMR-5 | 0 | 1 | 7 | 39 | 1 | 0 | 48 |
| IMR-6 | 0 | 1 | 7 | 38 | 0 | 1 | 47 |
| IMR-7 | 0 | 1 | 4 | 24 | 0 | 1 | 30 |
| IMR-8 | 0 | 1 | 5 | 22 | 0 | 1 | 29 |

The IMT site visit in the eighth reporting period showed each of the previous challenges associated with reduced staffing have remained unchanged. For example, the CIT District, Operations and Community Support (DOCS) personnel have confirmed that staffing constraints prevent them from conducting the crisis-call follow up activities that CIT DOCS are not only are required to do but also are essential to a successful diversion program. These CIT DOCS members are also unable to adequately respond to CIT Reports and build community partnerships while capturing the necessary data that supports the important work of the CIT DOCS.

Moreover, the CIT Training Unit presently consists of six officers and two sergeants, down from 13 officers and three sergeants in April of 2020. This unit is charged with teaching the 40-hour Basic CIT training, the CIT Refresher, and the Advanced Youth and Advanced Veteran trainings. These trainings are taught nearly every week of the year, rotating between the weeklong Basic CIT class (17 classes in 2023); the Refresher Courses (23 classes in 2023), and the Advanced Classes (5 classes in 2023).

The CIU trainers also require sufficient administrative support so that they can focus on crucial components of the training, such as scenario-based exercises. Cur-

---

[42]  Paragraph 89 requires "a qualified, centralized staff, including supervisors, officers, and civilian employees, that is necessary to oversee the department-wide operation of the CIT Program, carry out the overall mission of the CIT Program, and perform the objectives and functions of the CIT Program."

rently, the CIU trainers are forced to devote too much time and energy to administrative tasks in addition to a rigorous teaching rotation. Some of the administrative tasks that trainers are completing include reviewing CIT applications, scheduling trainings, obtaining supplies, administering training evaluations, billing, catering, scheduling, and completing background checks. The IMT site visit again this reporting period shows exhausted CPD CIU trainers who appear demoralized. They need targeted additions to their staffing with members who have a passion to teach these important classes, time to promote community engagement, administrative support, and sufficient training supplies.

As mentioned previously, the City and the CPD have moved to a hybrid CIT-training model in which all sworn officers are now required to receive the 40-hour Basic CIT training, while prioritizing attendance by those who volunteer for the role. Consistent with other Departments throughout the country, which maintain variations of this model, the CPD must define its philosophy and then ensure its philosophy is aligned with best practice. The CPD must commit itself to maintaining a specialized response unit composed of volunteer officers with a demonstrated interest and skillset in responding to individuals in crisis. Just because an officer is trained in CIT does not mean he or she has a demonstrated interest or requisite skillset. While the CPD has engaged in meaningful discussion about this important topic, the IMT has not received sufficient evidence demonstrating how the CPD will operationalize the concept. The IMT understands that the CPD is developing dispatch priorities based on the levels of training (Designated Voluntary CIT officer, Mandated CIT officer, and Untrained officer), but the IMT has not received sufficient evidence of CPD and OEMC policy, training, or operational procedures that reflect the City and the CPD's change to a mandated model.

Importantly, the CPD informed the IMT that during the eighth reporting period, the CPD receives only about one voluntary CIT application per month. Further, the CPD has still not completed the full eligibility review of those officers that should, according to the CPD's eligibility standards, qualify as "Designated CIT officers," and therefore count toward the CPD's response ratios. Without this, the CPD will be unable to demonstrate sufficient response ratios.[43]

As indicated in this and previous reports, the City and the CPD's data collection and related analysis continue to be inadequate. The CPD's data reporting and analysis appears stagnated, rather than increasingly reliable. For example, CIT Reports

---

[43] Currently, if an officer has ever received the 40-hour CIT training, then that officer is considered a "Designated CIT officer." The CPD should revise this eligibility standard in the next reporting period. There are department members who received training as far back as 2004, and who have received no refresher training since, that are being identified as Designated CIT officers. We recommend that the CPD un-designate in CLEAR previously certified officers who received their training before April 30, 2021, when the IMT approved the current CIT Basic training. The CPD should then complete its eligibility review process before establishing the required cadence of CIT Refresher training every three years.

are required under Consent Decree for every call for service involving a mental health component, but to date, the IMT has not seen any data related to completed CIT reports. The assigned data analyst hopes to have data validated in the ninth reporting period.[44]

Relatedly, the City and the CPD still have not completed the required *Crisis Intervention Team Officer Implementation Plan* or the required *Crisis Intervention Plan*. *See* ¶¶108 and 122. Although required annually, the last report was submitted in the third reporting period (2020). While the IMT appreciates delaying these reports until they are supported by more robust strategies and reliable data, the City and the CPD's progress will continue to be delayed without them.

The IMT appreciates the CPD's investment in its two-day *Crisis Intervention Team Refresher Training*, which is designed to refresh skills learned in *Basic Crisis Intervention Team* training. This refresher training is critical because a significant number of current Designated CIT officers have not received any refresher training since receiving their *Basic Crisis Intervention Team* training, which for many officers was several years ago.[45] The City has gone to great lengths to develop the tiers of CIT-trained officers through the CIT Program, and it is crucial that the officers who will represent that program and the CPD as a whole be properly trained.

The City has also continued to launch portions of its *Crisis Assistance Response Engagement* (CARE) program. This is an alternative response pilot program designed to reduce the need for a criminal-justice response to individuals experiencing a mental-health crisis. The CARE program includes three types of responses:

(1) pre-response, which staffs mental-health professionals in the City's 911 Call Center to provide support to callers, call takers, dispatchers, and response teams;

(2) alternate response, where the 911 Call Center will dispatch mental-health professionals with first responders to respond to people in crisis; and

(3) post-response, which links residents with appropriate community-based services and uses alternate drop-off sites for people in behavioral health crisis.

This program aims to divert people in crisis away from the criminal justice system. *See* ¶86. These efforts are highly commendable, and should the City determine

---

[44] Most recently, she learned the same CPD Star number can be used by more than one officer which caused a data-validity issue.

[45] For example, in the last data produced to the IMT, 20.36% of all current certified CIT officers were trained over 10 years ago with no refresher since (2004–2012). One-third of all certified CIT officers were trained seven or more years ago (2004–2015), and nearly half (46.51%) of certified CIT officers were trained six or more years ago with no refresher since (2004–2016). As outlined throughout this report, these figures fail to meet best-practice standards for a specialized model. Moreover, the CPD should revise its current practice of counting these officers toward the CPD's specialized CIT-officer response ratios.

this program should be considered in future compliance assessments, we look forward to seeing continued progress, as well as data supporting its strategic expansion. As of the writing of this report, the CARE program has potential, but most dispatches are from officers already on the scene requesting an alternate response, rather than from the 911 Call Center, which supports the intended purpose of reducing law enforcement on scene. To increase the effectiveness and satisfy the intended purpose of this program, the City should strengthen the CARE Program's alternate response dispatch process from the 911 Call Center. The City should dedicate additional attention to communicating with the public about these programs, specifically key advocacy and treatment communities and people with lived experience. The City deserves credit for these efforts, and the community deserves to know about them.[46]

Regarding community engagement, important improvements have been made by both the CPD and the OEMC in its communication with the Chicago Council on Mental Health Equity and the public. Both the CPD and the OEMC have improved their policy review process, however, the OEMC should, but has not yet, posted its policies and standard operating procedures for public comment. While the CPD has improved its public comment period, both the CPD and the OEMC should standardize this process for all policies and standard operating procedures and commit to a timeline that supports responsiveness to public comment inclusive of identifying what feedback has been incorporated or not incorporated and why. *See* ¶131.

Both the CPD and the OEMC must also improve their training observation and feedback. It is insufficient to merely invite the Chicago Council on Mental Health Equity to review a policy or to observe a training. Rather, a more strategic and effective manner of gaining thoughtful community-based feedback is needed. The Chicago Council on Mental Health Equity is composed of talented, dedicated experts and people with lived experience who are eager to provide crucial feedback. The CPD and OEMC must increase their efforts to seek and respond to public feedback on policies, training, and operational practices.

---

[46] The City has largely resisted IMT efforts to obtain relevant information about the CARE Program and has indicated that it considers the CARE Program to be separate and apart from the Consent Decree. The IMT strongly encourages the City to re-evaluate this position for two reasons. First, the CARE Program is an excellent example of a successful, proactive diversion program that provides an alternative to arresting individuals in crisis. The City should be commended for these successful efforts, and the IMT believes that increased transparency will only increase public support for the program. Second, the City's position that the CARE Program is not covered by the Consent Decree appears to contradict its public-facing behavior to the community when discussing the CARE Program's role in the Consent Decree. But the City cannot have it both ways, and if the City continues to impede the IMT's access to information concerning the CARE Program, then the City risks losing compliance for several paragraphs in the next and in future reporting periods.

### Crisis Intervention Progress through Eight Reporting Periods

During this reporting period, the IMT assessed the City's compliance with 66 Crisis Intervention paragraphs: ¶¶87–152. The City maintained Preliminary compliance for 28 paragraphs (¶¶87–88, 90–91, 93–95, 98, 100–02, 105, 114–15, 117, 119–21, 124–25, 127-31 136, 147, and 150) , maintained Secondary compliance for 13 paragraphs (¶¶92, 96–97, 99, 113, 116, 118, 132, 138–40, 146, and 152), moved into Secondary compliance for five paragraphs (¶¶106, 126, and 133-35) and maintained Full compliance for two paragraphs (¶¶142–43). The City lost compliance levels with four paragraphs (¶¶89, 144–45, and 148), is under assessment for three paragraphs (¶¶103–04, 141) and failed to reach Preliminary compliance in the remaining eleven paragraphs assessed during the eighth reporting period (¶¶107–12, 122–23, 137, 149, and 151). *See* Crisis Intervention Figure 2.

Crisis Intervention Figure 2:      Compliance Progress for Crisis Intervention Paragraphs at the End of the Eighth Reporting Period (June 30, 2023)



Crisis Intervention
Compliance Progress by June 30, 2023

- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

**Crisis Intervention Figure 3:**
**Lost Levels of Compliance in the Crisis Intervention Section**



Progress in the eighth reporting period stagnated and, in some instances, regressed, resulting in the City and the CPD losing compliance for several paragraphs. Notably, the Crisis Intervention Unit is half the size it was in 2021. The IMT has been highlighting serious staffing concerns for the last several reporting periods.

Still, through eight reporting periods, the CPD has made significant progress towards annually reviewing Crisis Intervention-related policies and standard operating procedures and seeking input from the Chicago Council on Mental Health Equity and the public. While there is room for improvement, we very much appreciate the CPD's efforts.

The OEMC has also made strides this reporting period producing training attendance records with significantly more detail, as well as partial training evaluations. It also identified and provided to the IMT all OEMC crisis intervention related policies that have been rescinded, enacted, or recently developed. This was an important step toward aligning policy, training, and operational practice. The OEMC identified four policies governing its crisis intervention related responsibilities, two that are finalized and two that are in draft form. During this reporting period, the IMT provided detailed feedback on each of the four OEMC policies. Going forward, we expect the OEMC will now be better prepared to complete its necessary policy review on an annual basis, while also seeking the Chicago Council on Mental Health Equity's input on these crisis intervention policies and standard operating procedures. We encourage the OEMC to update these policies considering program changes, as well as memorialize into policy the Consent Decree requirements. Because the 911 call center is such a crucial part of overall Crisis Response,

the Chicago Council on Mental Health Equity and the public must be actively included in all policy review, not merely select portions. The OEMC's transparency regarding how 911 calls are taken and dispatched is crucial for stakeholders and promotes public trust.

The City and the CPD have incorporated required reforms from the Crisis Intervention section into various policies and written guidance. The City and the CPD is encouraged to identify a clear process and timeline for the required annual review and revision of policies and training courses based on issue dates. Moving forward, the City and the CPD must demonstrate evidence of how and when they are accomplishing the required annual review and revisions.

## Looking Ahead to the Ninth Reporting Period

Various paragraphs in the Crisis Intervention section relate to the CPD's capacity to have Certified Crisis Intervention Team Officers who can provide a "timely response" to calls for services identified as involving individuals in crisis. *See, e.g.*, ¶¶108–09 and 120. The word "timely," however, remains undefined in relevant CPD policies, which will inhibit the CPD's ability to evaluate resources, performance, or success. As in so many Crisis Intervention paragraphs, the OEMC plays an important role in this function, as the time between 911 call intake and dispatch matters as it relates to timely response.

As with other sections of the Consent Decree, the City and the CPD need comprehensive and reliable data to best inform policy, training, strategy, and operational success. Data has been and continues to be a significant challenge for the CPD and its efforts in the Crisis Intervention section, among others. The CPD operated without a data analyst for the Crisis Intervention-related efforts during the fourth and fifth reporting periods.[47] While the CPD hired a new data analyst in January 2022, the CPD has yet to produce reliable evidence demonstrating the scope and nature of the analyst's skills. Key requirements (*e.g.*, data captured by the new Crisis Intervention Team report, reliably tracking Crisis Intervention Team Officers' response ratios by designation or reliably tracking CIT officer training) cannot be accomplished without additional resources, a functional data platform, and reliable outputs that can be validated.

Significant program changes have occurred over the last several monitoring periods, including, but not limited to, revised CIT officer designations, the CARE program, clinicians inside 911, and the National 988 system. The OEMC has been slow to respond to these changes in policy and training. The four OEMC policies still do not account for the new CIT officer designations, which were implemented in the

---

[47]  The previous analyst resigned shortly after she started but was making good progress in setting up foundational systems to build reliable data reports.

fifth monitoring period. The OEMC plays a crucial role in transferring 911 calls to 988 yet the TNG 22-005, *9-8-8 Calls for Crisis Hotline* policy has yet to be produced to the IMT or enacted despite the 988 system being operational now for over a year (July 2022). The IMT has also yet to receive any information from the OEMC about how they are identifying and dispatching calls eligible for the CARE team. Policies governing these programs must be produced and finalized in the next reporting period with updates to training reflecting this.

As we enter the Consent Decree's fifth year, the City's compliance under the Crisis Intervention section increasingly relies on interdepartmental collaboration. As such, the IMT must evaluate these entities' compliance efforts. For example, the Chicago Fire Department (CFD) is explicitly named in ¶131 and also qualifies as a "city agenc[y]" with responsibility "to assist in developing and expanding current strategies for responding to individuals in crisis, including reducing the need for police-involved responses to individuals in crisis and developing municipal and community resources such as pre and post arrest diversion resources and alternative response options." *See* ¶¶87(d) and 130. To date, the CFD has not been assessed for compliance under the Consent Decree and, going forward, this must change.

In the next reporting period, we hope to report on increased levels of compliance related to policy, training, and operations.

***

Specific compliance assessments, by paragraph, for the Crisis Intervention section are included in Appendix 3.

# IV. Use of Force

## Objectives[48]

The IMT assessed compliance with applicable Use of Force paragraphs in accordance with the Consent Decree's corresponding objectives:

> **153.** *CPD's use of force policies, as well as its training, supervision, and accountability systems, must ensure that: CPD officers use force in accordance with federal law, state law, and the requirements of this Agreement; CPD officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; when using force, CPD officers only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and any use of unreasonable or unnecessary force is promptly identified and responded to appropriately.*

> \*\*\*

> **155.** *CPD officers have the authority to use force, but that authority is limited by the law and Department policy. The provisions of this Agreement seek to facilitate compliance with the law and Department policy regarding the use of force to reduce the circumstances in which using force is necessary, and to ensure accountability when CPD officers use force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances.*

## Summary of Compliance Efforts and Assessments

### Use of Force in the Eighth Reporting Period

In the eighth reporting period, the City and the CPD largely maintained the same levels of compliance in the Use of Force section that they achieved in previous reporting periods, achieving new levels of compliance for some paragraphs under review but losing compliance in another.

In our report on the seventh reporting period, we found the City and the CPD to be in Preliminary and Secondary compliance with several paragraphs based on

---

[48] The Use of Force section of the Consent Decree includes "objectives" rather than "guiding principles."

their continued their efforts to engage the community in revising the CPD's use-of-force policies. We stated in *Independent Monitoring Report 6* that to maintain Preliminary and Secondary compliance, the CPD needed to implement and provide training on the revisions to its policies that it agreed to with the Coalition. Since then, the CPD has implemented and begun training on these long-contemplated changes in the eighth reporting period. At the end of this reporting period, the CPD had also provided a further revised version of its *Use of Force* policy suite that has gone into effect.

This reporting period, the IMT reviewed several new or revised policies and training intended to address the Consent Decree's requirements regarding the Use of Force section. For example, we reviewed and commented on draft training materials for the *Constitutional Policing* course and *TRR Supervisory Dashboard Training Bulletin*. In addition, several important policies were made effective and are being trained on in the eighth reporting period: the permanent *De-Escalation, Response to Resistance, and Use of Force* policy, *Department Review of Use of Force*, the CPD's permanent *Foot Pursuits* policy, and several others became effective days before the end of the reporting period. On the other hand, while we reviewed another revised draft of the CPD's *Body Worn Camera* policy, we continue to note that progress on that policy is long overdue; the effective version is from 2018, before the Consent Decree went into effect.

We met regularly with the City, the CPD, and the OAG to address the Use of Force requirements in the Consent Decree, including ongoing record productions from the City and the CPD.

We also continued to review reports published by the Tactical Review and Evaluation Division (TRED, and formerly known as the Force Review Division (FRD) or the Force Review Unit (FRU), as well as reports by the Research and Development Division (R&D). We remain impressed by TRED's professionalism and its efforts to observe, address, and publicly report on patterns and trends relating to uses of force, foot pursuits, and firearm pointing incidents—even with inadequate resources. We are similarly impressed with R&D's continued improvements in transparency on force-related issues, as well as their analysis of CPD's training needs as dictated by data on force incidents. Unfortunately, however, TRED's lack of adequate resources continues to negatively impact its operations. TRED fell behind on its reviews during the fifth reporting period because of insufficient staffing, and the backlog grew in the sixth and seventh reporting periods. Attempts to address the backlog have resulted in 20 officers being detailed to TRED for 90 days, with an extension on that detail for officers to remain with the unit. In this reporting period, however, TRED began reviewing all foot pursuits, increasing their responsibilities. The CPD continues to give TRED new and important responsibilities regarding the observation and analysis of patterns and trends in the CPD's practices.

While the CPD has reduced the extent to which TRED personnel are deployed into the field, TRED's continued deployment remains a cause for concern. As we have previously noted, this practice is troubling and runs contrary to the lessons learned and recommendations from our *Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*.[49] In addition to undermining the City and the CPD's efforts to demonstrate reform, identify trends, improve practices, and increase transparency and accountability, deploying TRED personnel creates significant concerns regarding supervision and force review. As we noted since the fifth reporting period, it is imperative that the City and the CPD address its staffing issues to allow its existing and developing processes to best serve the CPD, its officers, and Chicago's communities.

At the end of the eighth reporting period, therefore, more work was necessary. The City and the CPD's data issues have continued to hamper the CPD's ability to evaluate its use-of-force policies, training, and operations in general and its recent focus on foot pursuits in particular. *See* ¶¶572–73 and 606. Additionally, trust is critical in a police department's efforts to achieve community policing and the goals of the Consent Decree. The IMT's second Community Survey and CPD's surveys indicate the CPD must continue to work towards establishing trust. Until the City and the CPD adequately prioritize their data issues, their progress in the Use of Force section (among others) will stall. This will require the City and the CPD to, among other things, consistently devote sufficient resources to address its data and supervision efforts, including adequately staffing TRED.

## Use of Force Progress through Eight Reporting Periods

During this reporting period, the IMT assessed the City's compliance with 96 Use of Force paragraphs. At the end of the eighth reporting period, the City maintained Preliminary compliance for 15 paragraphs (¶¶153, 157–59, 167, 171, 193, 206, 213–15, 217, 228, and 243–44). The City achieved Preliminary compliance with four paragraphs (¶198–99, 201, and 204). The City maintained Secondary compliance for 53 paragraphs (¶¶154, 161–66, 168–69, 172–73, 175–79, 181–87, 190, 192, 196–97, 200, 202–03, 208–12, 218–27, 229–35, and 246) and achieved Secondary compliance for eight paragraphs (¶¶174, 191, 205, 207, 216, 245, and 247–48). The City maintained Full compliance for four paragraphs (¶¶170, 188, and 194–95) and achieved Full compliance with one paragraph (¶¶180 and 189). The City's Preliminary compliance for four paragraphs remained under assessment at the end of the eighth reporting period (¶¶155–56, 160, and 242), and the City

---

[49] *See Special Report: The City of Chicago's and the Chicago Police Department's Responses to Protests and Unrest under the Consent Decree (May 2020 – November 2020)*, INDEPENDENT MONITORING TEAM (July 10, 2021), https://cpdmonitoringteam.com/overview/reports-and-resources/imt-special-report-responses-to-protests-and-unrest/.

failed to reach any level of compliance with the remaining six paragraphs (¶¶236–241).

Use of Force Figure 1:    Compliance Progress for Use of Force Paragraphs at the End of the Eighth Reporting Period (June 30, 2023)

Use of Force
Compliance Progress by June 30, 2023



- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

The CPD has made significant progress with its use-of-force policies, training, and analysis of data since the start of the Consent Decree. Through eight reporting periods, for example, the City and the CPD have incorporated required reforms from the Use of Force section into various policies and written guidance. While we have had and continue to have concerns with the CPD's corresponding community engagement efforts and strategies, the CPD has made and continues to make meaningful efforts toward improving its corresponding community engagement and efforts to receive input. *See* ¶160.

Through eight reporting periods, the City and the CPD have also developed or updated training materials to incorporate requirements across the Use of Force section. For example, because of the Consent Decree, the CPD now develops and delivers use-of-force in-service training *every year*, which includes training on de-escalation and force mitigation. The CPD has also increased the workload carried by the Tactical Review and Evaluation Division (also known as TRED, and formerly known as the Force Review Division or Force Review Unit) in the time since the Consent Decree became effective. TRED now reviews use-of-force incidents, fire-

arm-pointing incidents, and all foot pursuits to identify and allow the CPD to address patterns and trends. It is also our understanding that TRED's responsibilities will soon be expanded to include search warrant reviews.[50]

Furthermore, the CPD began using the new Incident Debrief Report (IDR) that TRED was developing in the seventh reporting period. The Incident Debrief Report streamlines TRED's review and identification of de-briefing points for incidents involving multiple reportable events (uses of force, firearm pointing, and foot pursuits).

Finally, while significant challenges remain, the CPD has continued to make progress in its public reporting of use-of-force data. For example, the CPD makes relevant data available to the public via its Use of Force Dashboard.[51] TRED also publishes semiannual and yearly reports that contain analysis of and conclusions about the CPD's use-of-force data, including data collected via Tactical Response Reports (TRRs). TRED also analyzes and reports on firearm-pointing incidents and foot pursuits.

## Looking Ahead to the Ninth Reporting Period

In the eighth reporting period, the City and the CPD continued making progress toward compliance with the Use of Force section of the Consent Decree, particularly related to policy and training requirements. Community engagement, data, and staffing challenges continue to present significant hurdles to further levels of compliances.

Nonetheless, at the end of the eighth reporting period, the City and the CPD were also continuing to develop new and revised policies, written guidance, and training materials to make progress in this section.

For example, by the end of the sixth reporting period, the CPD was preparing to train on and implement its new, permanent *Foot Pursuits* policy, which went into effect on August 29, 2022, in the seventh reporting period. The CPD's related policy, *Department Review of Foot Pursuits*, G03-07-01 did not take effect until January 1, 2023, in the eighth reporting period, and we look forward to monitoring the

---

[50]  "It should be noted that the annual and quarterly reports were previously produced by the Force Review Unit (FRU). Moving forward these reports will be generated by the Tactical Review and Evaluation Division (TRED). The new name change more accurately reflects TRED's focus on new and future responsibilities which include search warrant, foot chase and investigative stop reviews." *TRED 2022 Q1 Report*, CPD TRED (August 16, 2022), https://home.chicagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf.

[51]  *See Use of Force Dashboard*, CHICAGO POLICE DEPARTMENT (2015 to present), https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

CPD's progress regarding foot pursuits and reporting on progress in our next report.

Likewise, the CPD demonstrated its *Tactical Response Report Supervisory Dashboard* for the IMT during the seventh reporting period, which we hope will enhance front-line supervision and promote accountability for Department supervisors over those they supervise and their training needs. The CPD in this reporting period submitted revised TRR Supervisory Dashboard Training Bulletin and provided the accompanying eLearning. While both trainings include the benefits to supervisors, the primary focus was on how to use the dashboard. Because the trainings were created prior to the revised CPD policy, however, neither training noted that Watch Operations Lieutenants are required to review that dashboard. We look forward to reviewing evidence of the updated training provided to supervisors.

There are other policy and training requirements related to the Use of Force section, however, where progress has stalled. For example, the CPD must implement a revised *Body Worn Camera* policy as the current version pre-dates the Consent Decree. The City and the CPD must also continue to address many of the unresolved reporting, planning, data, and training issues identified in our *Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*.[52]

In the eighth reporting period, the City and the CPD dedicated—and continue to dedicate—significant efforts to identifying and addressing data issues, particularly regarding foot pursuits. As we noted in previous reporting periods, until the CPD can appropriately collect, manage, and analyze data related to the Use of Force section, among others, the City and the CPD cannot sufficiently demonstrate whether the CPD's practices have improved. This will, in turn, prevent the City and the CPD from becoming a true learning agency, capable of reviewing and revising policies and training in a way that is data driven and specific to the needs of Chicago's communities and CPD officers. To be effective, such efforts must continue past the ninth reporting period, but we hope to be able to provide positive updates in our next monitoring report.

\*\*\*

Specific compliance assessments, by paragraph, for the Use of Force section are included in Appendix 4.

---

[52] See *Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

# V. Recruitment, Hiring & Promotions

## Guiding Principles

The IMT assessed compliance with the Recruitment, Hiring, and Promotions paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

*249. Having a department that recruits, hires, and promotes officers who are qualified to meet the increasingly complex needs of law enforcement and that reflects a broad cross section of the Chicago community in which it serves is critical to accomplishing the following goals: running a professional police force; building community trust and confidence; increasing legitimacy and acceptance of CPD's supervision and accountability systems; and reducing perceptions of bias.*

*250. The provisions of this Agreement are designed to ensure that CPD attracts, hires, retains, and promotes individuals who are equipped to perform their jobs safely, effectively, and in accordance with the law, CPD policy, and the terms of this Agreement. Further, this Agreement is designed to ensure that CPD promotes individuals who are capable of: providing effective supervision; guiding officers under their command on lawful, safe, and effective policing; and holding officers accountable for misconduct.*

*251. The City and CPD's recruitment, hiring, and promotions policies and practices will show a commitment to attracting, hiring, and promoting qualified candidates at all ranks that reflect a broad cross section of the Chicago community the Department serves.*

*252. The Parties acknowledge that the City and CPD are currently subject to the City of Chicago Police Department Hiring Plan for Sworn Titles ("Hiring Plan"), dated May 14, 2014, which may be subject to change in the future.*

# Summary of Compliance Efforts and Assessments

## Recruitment, Hiring, and Promotions in the Eighth Reporting Period

In the eighth reporting period, the City and the CPD made some significant progress toward additional compliance with the requirements of the Consent Decree. The City and the CPD either maintained or gained compliance levels this reporting period.

The City and the CPD improved compliance toward requirements in several Recruitment, Hiring, and Promotions paragraphs. Most notably, Secondary compliance was achieved in ¶¶258 and 259 after delays that spanned across multiple reporting periods.

Concerns regarding staffing shortages have continued from previous reporting periods, following the reassignment of the recruitment function to the BIA Chief during the sixth reporting period. Sustained robust recruitment and hiring processes are required to lift the CPD out of the acute staffing shortages it currently faces.

## Recruitment, Hiring, and Promotions Progress through Eight Reporting Periods

Overall, the City and the CPD maintained Preliminary compliance for seven paragraphs (¶¶253–54, 256, 260, and 262–64), maintained Secondary compliance for two paragraphs (¶¶255 and 261), moved into Secondary compliance for two paragraphs (¶¶258–59), and moved into Full compliance with one paragraph (¶257). *See* Recruitment Figure 1 below.

Recruitment Figure 1: Compliance Progress for Recruitment, Hiring & Promotions Paragraphs at the End of the Eighth Reporting Period (June 30, 2023)

### Recruitment, Hiring, and Promotions Compliance Progress by June 30, 2023



- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

## Looking Ahead to the Ninth Reporting Period

Looking forward to the ninth reporting period, the IMT hopes to see the City and the CPD allocate and focus appropriate attention and resources to the Recruitment, Hiring, and Promotions section of the Consent Decree. Meaningful progress towards further levels of compliance should aid in addressing the CPD's ongoing staffing shortage and the corresponding challenges that staffing shortage has caused. Indeed, while this is the smallest section of the Consent Decree, the City's and the CPD's efforts directed at recruitment, hiring, and promotions are critical to every other Consent Decree section and the short and long-term success of Chicago's policing efforts.

\*\*\*

Specific compliance assessments, by paragraph, for the Recruitment, Hiring, and Promotions section are included in Appendix 5.

# VI. Training

## Guiding Principles

The IMT assessed compliance with the Training paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **265.** *CPD will enhance its recruit training, field training, in-service training, and preservice promotional training so that they are sufficient in duration and scope to prepare officers to comply with CPD directives consistently, effectively, and in accordance with the law, CPD policy, best practices, and this Agreement.*

> **266.** *CPD training will reflect its commitment to procedural justice, de-escalation, impartial policing, and community policing.*

> **267.** *CPD training will convey CPD's expectations that officers perform their jobs diligently and safely, and have an understanding of, and commitment to, the constitutional rights of the individuals they encounter.*

> **268.** *The training required under this Agreement is set out in this section and, for specific topic areas, in the Community Policing, Impartial Policing, Crisis Intervention, Use of Force, Officer Wellness and Support, and Accountability and Transparency sections.*

## Summary of Compliance Efforts and Assessments

### Training in the Eighth Reporting Period

In the eighth reporting period, the CPD made progress in ensuring that training efforts are coordinated, well-planned, and follow the articulated development process outlined by the Consent Decree. The CPD restructured the Training Oversight Committee (TOC) during this reporting period, resulting in more actionable and in-depth participation by TOC members. The IMT commends the CPD for this change and looks forward to seeing meaningful oversight and involvement in training moving forward. The City and the CPD also opened the new Joint Public Safety Training Facility during this reporting period with limited training operations. The

CPD launched the scenario-based training arena for recruit and in-service training during April 2023. The IMT observed multiple training classes this reporting period, which were generally well prepared and presented.

The CPD continued to face chronic staffing issues in the Training Support Group. Staffing needs analyses indicate there is currently and a projected continuing deficit in staff, instructor, and Field Training resources. This is especially concerning considering the mixed messages of the CPD's decision to terminate the contract of an authorized external cadre of contract instructors (PLET Group). This action, after having the entire instructor cadre ILETSB approved, raises additional concerns about standards applied to not just qualify but also disqualify outside instructors. The City and the CPD should develop, approve, and adhere to an objective and transparent professional standard in qualifying and disqualifying experts and guest speakers to develop and instruct courses.

The CPD reported experiencing significant deficits of FTOs during this reporting period. As a result, the CPD held a Field Training Officer (FTO) exam in February 2023, FTO classes in March and appointed multiple "Act Ups" to assure the requisite 1:1 FTO/PPO ratios were maintained. The CPD also created Community Service options for some recruits during the initial weeks after the Academy to gain community policing experience. The CPD was transparent about the deficits and addressed their efforts to resolve the deficits during the monthly Training Group meetings with the IMT and OAG. Additional FTO exams were scheduled for later this year.

While FTO deficits are undesirable, the CPD does deserve credit for anticipating the shortages and creating alternatives to address them. The CPD should examine incentives and other opportunities to ensure adequate program staffing.

## Updated Compliance Levels through Eight Reporting Periods

Independent Monitoring Report 8 provides compliance assessments of 68 paragraphs. During this reporting period, the City and the CPD were able to achieve or maintain at least Preliminary compliance with 58 of these paragraphs. Specifically, in the eighth reporting period, the City and the CPD maintained Preliminary compliance for 46 paragraphs (¶¶272–82, 284–85, 289, 295–300, 302–04, 306–14, 316–17, 319, 324, 326–29, 331–35, and 338), achieved Preliminary compliance for three paragraph (¶¶301, 315, and 318), maintained Secondary compliance with seven paragraphs (¶¶270–71, 283, 305, 322, 337, and 340), and achieved Secondary compliance for four paragraphs (¶¶292, 320–21, and 323). The City failed to reach Preliminary compliance for seven paragraphs (¶¶286–88, 290, 294, 336, and 339). The City and the CPD lost Preliminary compliance for one paragraph (¶291). *See* Training Figure 1 below.



Training Figure 1:                 Compliance Progress for Training Paragraphs at the End of the Eighth Reporting Period (June 30, 2023)

### Training
### Compliance Progress by June 30, 2023



- ■ Preliminary Compliance
- ■ Secondary Compliance
- ■ Full Compliance
- ■ Not in Compliance

## Training Progress through Eight Reporting Periods and Looking Ahead to the Ninth Reporting Period

Through eight reporting periods, the City and the CPD have incorporated requirements of the Training section into policies and written guidance. Through eight reporting periods, the City and the CPD have developed or updated many training materials to incorporate requirements across the Consent Decree sections. Many of these trainings are reflected in the corresponding sections of this report.

In the eighth reporting period, the City and the CPD continued making progress toward compliance with the Training section of the Consent Decree. Looking forward to the next reporting period, the IMT anticipates enhanced and more substantive compliance reviews in several areas based on the progress the City and the CPD have made in meeting preliminary or maintaining preliminary compliance in most, but not all, sections. Such enhanced compliance reviews include recruit academy and field training, TOC oversight and training evaluations, training staffing, in-service training, and eLearning. Further progress is also expected on instructor selection and development, training and instructor evaluations, and attendance documentation to demonstrate that the required training is being received.

***

Specific compliance assessments, by paragraph, for the Training section are included in Appendix 6.

# VII. Supervision

## Guiding Principles

The IMT assessed compliance with the Supervision paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **341.** *Effective supervisors, who lead by example and actively engage with the subordinates under their direct command, play a critical role in ensuring lawful, safe, effective, and community-centered policing. To achieve this outcome, the Parties agree to the requirements set out below.*

> **342.** *The provisions of this Agreement are designed to ensure that CPD supervisors provide the effective supervision necessary for members to perform their duties lawfully, safely, and effectively and for members to improve and grow professionally. Further, the provisions of this Agreement are designed to allow supervisors to spend time monitoring and training members under their direct command so as to provide adequate opportunities to prevent, promptly identify, and promptly correct adverse officer behavior. This meaningful supervision will facilitate the establishment and re-enforcement of a culture of community policing, community and officer safety, and accountability throughout the Department.*

> **343.** *CPD should have the staffing necessary to promote lawful, safe, effective, and community-centered policing; provide effective supervision; ensure officer safety and accountability; and implement the terms of this Agreement.*

> **344.** *Immediate supervisors of all ranks are responsible for supervising, managing, and overseeing, as appropriate, the day-to-day work activities of members under their direct command.*

> **345.** *Supervisors of all ranks are accountable for the performance of subordinate members directly observed or under their direct command.*

> **346.** *Effective supervisors will: a. engage in activities and conduct that support the mission and goals of the Department, including those set forth in this Agreement; b. model appropriate*

*conduct, including abiding by high standards of integrity and adhering to the United States Constitution and other laws, CPD policy, and the terms of this Agreement; and c. consistently demonstrate professionalism, courtesy, and respect towards all people with whom they interact.*

# Summary of Compliance Efforts and Assessments

## Supervision in the Eighth Reporting Period

Many of the City's and the CPD's efforts in the Supervision section of the Consent Decree rely on the concepts of unity of command and span of control. Unity of command requires that the same sergeant supervise the same group of police officers. *See* ¶358. Span of control limits the number of officers any one sergeant can supervise daily. *See* ¶358. The goal of span of control is to create a consistent ratio of 10 officers to 1 sergeant to encourage effective supervision. This is a fundamental change from the current model of shift (watch) scheduling and is a requirement of the Consent Decree.

The Unity of Command and Span of Control Pilot Program was launched to implement these concepts to enable more effective and efficient supervision, mentoring, officer support, and policing. Through the pilot program, the City and the CPD implemented a pod supervision structure (primary, secondary, and tertiary role for supervisors). The Unity of Command and Span of Control Pilot Program began in the 6th District during the second reporting period. In the fourth reporting period, the CPD expanded the pilot into the 4th and 7th districts. Ultimately, however, the CPD decided that implementing the Unity of Command and Span of Control Pilot Program in three districts was not feasible, so they chose to focus efforts on refining the program within the 6th District.

Despite the CPD's continued efforts to implement the Unity of Command and Span of Control Pilot Program, the CPD has faced various challenges with the implementation, as explained in previous IMT reports. The CPD continues to face staffing shortages that prevented the pilot districts from consistently meeting the 10-to-1 officer-to-supervisor ratio required by ¶360. We learned that officers were not being consistently overseen by the same supervisors, as envisioned by the pilot program. We also heard frustrations from officers regarding the staffing shortages, which not only hampered compliance with the program, but also created situations in which understaffing could have reduced officer safety.

In April 2022, the City and the CPD requested technical assistance from the IMT regarding the Unity of Command and Span of Control Pilot Program. During the sixth and seventh reporting periods, we had in-depth discussions with command staff, officers, and supervisors about the strengths and shortcomings of the pilot

program. We were informed that the pod supervision structure did not consistently result in unity of command as envisioned. Therefore, in late June 2022, during the first technical assistance meeting, the City and the CPD shared their plans to develop a new staffing model to address several the shortcomings of the pod model. This new model will focus on three tenets: (1) geographic familiarity, (2) high-quality supervision, and (3) resource flexibility.

During the eighth reporting period, the CPD implemented the Unity of Command and Span of Control Pilot Program based on the new staffing model in the 6th District. During monthly calls, the City and the CPD shared information about the progress of the pilot program. Since the launch of the new staffing model this reporting period, the 6th District (the primary pilot district) maintained a compliance rate between 68% and 74% for span of control, meaning the 6th District was able to maintain a 10-to-1 officer-to-supervisor ratio between 68% and 74% of the time.

With respect to unity of command principles, between 78% and 83% of officers and between 68% and 80% of sergeants worked within their assigned sector. As a result, officers worked with the sergeant who will complete their performance evaluation about half of the time (between 45% and 57% of the time). These ratios show significant improvement from the prior staffing model, and the IMT applauds the CPD's efforts.

Additionally, the CPD has provided updates on the staffing dashboard's management tools for making staffing and operational decisions, which the IMT believes would enhance unity of command and span of control. We look forward to these percentages of time increasing and remaining stable over time. In the IMT's opinion, the CPD members in the 6th District and in the patrol chain of command are dedicated to achieving compliance in this area, not only because it is required by the Consent Decree, but because they understand that these requirements are fundamental pieces of the structure and accountability required to be able to effectively and justly police the city.

The CPD has chosen to also begin implementing the pilots for the Performance Evaluation System and Officer Support System in the same districts as the Unity of Command and Span of Control Pilot Program. We believe that it makes sense to think of these pilots and efforts together, because they all rely on effective supervision. As a result, however, the difficulties in fulfilling the requirements with the Unity of Command and Span of Control Pilot Program will also cause difficulties in achieving the goals of the other two pilot programs.

Finally, the CPD has also convened a Unity of Command and Span of Control Pilot Program Evaluation Committee, which is to meet at least quarterly to discuss implementation progress and share feedback from CPD personnel. The IMT observed one of the quarterly evaluation committee meetings during the sixth reporting pe-

riod. This committee will play an important role in the programs' effective implementation. The CPD has also recently added similar tasks to this committee for the Performance Evaluation System and Officer Support System pilot programs. The IMT hopes that the committee will work to anticipate and address some of the possible challenges to ensure a smoother implementation process.

The IMT believes that programs required by the Supervision section of the Consent Decree are being thoughtfully developed and implemented by the City and the CPD as a pilot. To test and develop strategies to implement Unity of Command and Span of Control, the Performance Evaluation System, and the Officer Support System pilot programs in all CPD districts, the 6th District became the central location and focus of the IMT and the Parties as the pilot district. We recognize the aforementioned progress that has been made and the pilot in the 6th District was used to assess and grant Preliminary compliance, as policies and processes have been developed and are at various stages of implementation. However, the Consent Decree requires that all the paragraphs within the Supervision area be implemented and measured for compliance in all 22 CPD police districts. Therefore, while Preliminary compliance was achieved in the 6th District, further levels of compliance cannot be achieved until the pilot moves beyond the 6th District and is able to be replicated and implemented in other districts. The IMT may be able to consider these levels of compliance once evidence of successful implementation is observable and measurable beyond the 6th District. The IMT stands ready to continue to work with the City and the CPD toward the goal of broadening the impact of implementing an effective supervision structure in all 22 districts.

## Supervision Progress through Eight Reporting Periods

Overall, we assessed the City's compliance with 29 Supervision paragraphs during the seventh reporting period (¶¶347–57 and 359–76). In the seventh reporting period, the City and the CPD maintained Preliminary compliance for 25 paragraphs (¶¶347–55, 359–64, and 367–76). The City and the CPD did not reach any level of compliance with four paragraphs (¶¶356–57 and 365–66).



Supervision Figure 1:                    Compliance Progress for Supervision
               Paragraphs at the End of the Eighth Reporting Period (June 30, 2023)

## Supervision
## Compliance Progress by June 30, 2023



■ Preliminary Compliance
■ Secondary Compliance
■ Full Compliance
■ Not in Compliance

## Looking Ahead to the Ninth Reporting Period

In the ninth reporting period, the IMT will look forward to reviewing data relevant to the Unity of Command and Span of Control Pilot Program such as the contents of the staffing dashboard, assignment sheets, transfer orders, and other relevant records. Additionally, we hope to conduct further interviews and focus groups with members of the pilot district. We look forward to reviewing how additional assigned supervisors to the 6th District have impacted the pilot programs. The IMT also anticipates observing training related to the Unity of Command and Span of Control Pilot Program along with evaluations of that training. Further, we plan to observe future evaluation committee meetings and hope to see a shift from a briefing model to a more collaborative and conversational structure.

*** 

Specific compliance assessments, by paragraph, for the Supervision section are included in Appendix 7.

# VIII. Officer Wellness and Support

## Guiding Principles

The IMT assessed compliance with applicable Officer Wellness and Support paragraphs in accordance with the Consent Decree's "Guiding Principles." These guidelines "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **377.** In fulfilling their duties, CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy. There is growing recognition that psychological and emotional wellness are critical to officers' health, relationships, job performance, and safety. The City and the CPD have an obligation to help CPD members cope with the consequences that come from their service to the public.

> **378.** The City and the CPD's obligation to CPD members includes providing adequate support systems to treat members experiencing mental health, substance abuse, and other emotional challenges.

> **379.** The City and the CPD's obligation to CPD members also includes equipping them in a manner that enables them to do their jobs as safely as reasonably possible. CPD will ensure that the safety of its members is not jeopardized by equipment and technology that is outdated, broken, or in need of repair or replacement.

> **380.** The City and the CPD will implement the following requirements in order to achieve a healthy, effective, and constitutionally compliant police force.

## Summary of Compliance Efforts and Assessments

### Officer Wellness and Support in the Eighth Reporting Period

During the eighth reporting period, the City, the CPD, and Chicago lost officers on and off duty. We offer our deepest and most heartfelt condolences to the CPD and their families as they navigate through these difficult times. In these pivotal moments, the IMT continues to encourage the City and the CPD to work with the CPD members while optimizing wellness services rendered to the CPD membership and their families. The City and the CPD should take the necessary holistic and

post-ventive measures to identify methods, partnerships, resources, and opportunities that truly promote holistic, healthy, and recoverable life experiences, which may reduce the occurrences of agency member suicide and mitigate the levels of trauma that CPD members are exposed to.

As stated in the guiding principles for this section (*see* ¶377–80), CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy. The City and the CPD have an obligation to help CPD officers and civilian personnel cope with the consequences that come from their service to the public. This includes providing adequate support systems to treat CPD personnel experiencing mental health, substance-use disorder, and emotional challenges.

The City and the CPD continued to face significant challenges in this reporting period. Obstacles to advancing towards further compliance include the following:

- Inadequate or nonexistent data collection to analyze and evaluate wellness efforts

- Challenges to fill vacant positions required to service the agency

- Lacking effective internal communications related to wellness and initiatives

- Excluding civilian agency membership from wellness initiatives

- Overdue or drawn-out reimbursement processes for required trainings

- Inadequate implementation of an officer support system that is data informed, which would afford a comprehensive learning opportunity for the evaluator supervisor and the employee being evaluated.

- Not having adequate or appropriately designated space for counseling services, which impacts the quality-of-service delivery for both the counselor and the client.

- Delayed implementation schedule for "quiet rooms"

While the City and the CPD are facing several obstacles, the lack of data collection and analysis hinders almost every area of the City's and the CPD's compliance in this section. For several reporting periods, the IMT has requested statistical data showing the level of services that have been provided by the Professional Counseling Division, including anonymized client data, services provided, caseload, and other related service demands. The IMT has also routinely requested, but has yet to receive, evidence of contact results through training, roll calls, counseling sessions, open houses, no cop-out sessions, retreats, or other events demonstrating the impact of the Professional Counseling Division's outreach efforts.

During the prior reporting period, the CPD piloted and began using the iCarol software system. However, the CPD halted the use of iCarol in the eighth reporting period due to the underlying contract's failure to comply with City and CPD policies. The iCarol system, as explained by the Professional Counseling Division staff, would allow the clinicians to enter data and notes that reflect the counseling sessions. This would allow the CPD to assess real-time data, reflecting caseloads, hours worked, and the ratio of clinicians to clients. At the end of the eighth reporting period, the CPD advised the IMT that the City's attorneys were revising the contract, and the iCarol system is expected to be functional in the ninth reporting period. However, in the meantime, the Professional Counseling Division has yet to produce any anonymized data that could help determine quality, efficiency, or quality of services provided, as required by the Consent Decree.

In the eighth reporting period, the CPD and the Professional Counseling Division produced the 2022 Annual Report to the Superintendent, which featured 2021 data. However, the report failed to accurately capture significant milestones during 2022. As an example, the report referenced bringing iCarol online when in fact, the iCarol system had already been launched, and the pilot phase had been extended and later completed. Additionally, the report lacked the necessary anonymized data required by the Consent Decree. In response to the IMT's comment on the failure to include the necessary data, the CPD stated: "As an alternative to capturing data, supervisors monitor caseloads weekly and are subject to regular group supervision, where cases are reviewed for challenges, successes, trends, and more. The number of caseloads a clinician or counselor manages is based on their role, responsibilities, and time on the job." The IMT sought clarification on the CPD's response because it does not appear to be consistent with ¶¶381, 389, 394, 401, and 404. However, the CPD did not provide any clarification by the end of the eighth reporting period. Currently, the Annual Report to the Superintendent is not produced or delivered annually. The IMT looks forward to its delivery in the next reporting period.

As illustrated through various focus groups and on-site meetings with CPD members throughout the eighth reporting period, the CPD also faces challenges related to its internal communication surrounding wellness initiatives. Misperceptions were apparent among several groups, which was most likely due to the lack of information, resulting in a lack of clarity and understanding of key operational programs. For example, the CPD directed each district to create a quiet room. However, those tasked with creating quiet rooms were unclear about where they are to be located and how they are to be set up (i.e., providing a specifically designated space versus allowing staff to simply cull out a corner). As another example, the IMT heard misperceptions and a lack of clarity in understanding how the Of-

ficer Support System Pilot Program works, what to do with the data that is collected, and how to explain the results. Some members of the focus groups did not appear to understand how the supervisors' input produces findings that may result in recommendations for an officer, such as counseling or additional training.

The CPD hired a Public Relations Coordinator this reporting period. The IMT looks forward to learning how the newly hired Public Relations Coordinator will help to address these deficiencies in internal communications.

The CPD also recently hired a Director of Wellness. We commend the CPD on taking this proactive stance towards wellness. Additionally, in efforts to mitigate the difficulties hiring clinicians, the Professional Counseling Division worked with the City's Department of Human Resources to re-classify the clinical therapist positions to police clinical therapist positions, and also created three police clinical therapist supervisor positions. Again, the Professional Counseling Division should be commended for continuing to work to address the challenges to promptly providing services to CPD membership. However, without adequate data analyses of caseloads, referrals, duration of counseling sessions, TISMP mandates and follow-up, the CPD cannot adequately determine if it has ample staff to efficiently and effectively manage the work it has been tasked to do.

While on-site in the eighth reporting period, the IMT observed a Training Oversight Committee (TOC) meeting, during which the topic of civilian wellness training for supervisors arose. The committee noted that, while the CPD provided the 2023 Officer Wellness and Support Training to much of the sworn CPD members, the CPD only began providing the training to non-sworn CPD members at the end of the reporting period. The 2023 Officer Wellness and Support training touches upon topics such as nutrition, resilience, performance, and sleep, which is applicable to both sworn and non-sworn members. The IMT also learned that non-sworn members may not have had access to any mental health trainings for several years. Additionally, the overall wellness topical areas (currently and those taught in the past) are applicable to the civilian personnel, which also includes mental wellness; yoga, meditation and mindfulness; physical wellness; and financial wellness.

Finally, the IMT applauds the CPD and the Professional Counseling Division for the development of the *Voluntary Annual Wellness Check-In Policy* (E07-07), issued in the eighth reporting period. Again, with the potential for additional requests coming to the clinicians in the Professional Counseling Division, understanding the demands on their staff with robust data is of utmost importance. Each of the units within the Professional Counseling Division referenced their belief that their respective client caseloads have increased within the last year. Without understand-

ing the volume of these caseload increases, the CPD stands to create the unintentional consequence of counselor burnout, which will ultimately minimize the effectiveness of the teams designated to provide services to those who seek their professional services. Thus, it is imperative for the Professional Counseling Division to be both data driven and data informed.

## Officer Wellness and Support Progress through Eight Reporting Periods

Overall, the IMT assessed the City's compliance with 36 Officer Wellness and Support paragraphs in the seventh reporting period (¶¶381–402, 404, and 406–18). The City and the CPD maintained Preliminary compliance with 20 paragraphs (¶¶384, 388, 394–400, 402, 404, 407–414, and 418), maintained Secondary compliance with 12 paragraphs (¶¶381–83, 385–87, 390–93, 401, and 406), and failed to reach Preliminary compliance with four paragraphs (¶¶389 and 415–17). This includes the fact that the CPD lost levels of compliance with one paragraph (¶384).

Officer Wellness Figure 1: Compliance Progress for Officer Wellness Paragraphs at the End of the Eighth Reporting Period (June 30, 2023)



Officer Wellness and Support
Compliance Progress by June 30, 2023

- ■ Preliminary Compliance
- ■ Secondary Compliance
- ■ Full Compliance
- ■ Not in Compliance

Officer Wellness Figure 2:
Lost Levels of Compliance in the Officer Wellness Section



## Looking Ahead to the Ninth Reporting Period

The City's and the CPD's obligation to its members cannot be met without remedying the aforementioned issues related to data collection and analysis, staffing, and internal communications. At the end of the eighth reporting period, the City and the CPD continued to face these significant barriers to their reform efforts. For the City and the CPD to achieve further levels of compliance, or some instances maintain its current levels of compliance, the IMT expects to see data demonstrating what level of services have been provided by the current staffing of the Professional Counseling Division, including anonymized information of the clients, services provided, caseload, volume of client, and related demands.

The IMT also expects to see more effective communications about wellness initiatives, specifically related to the Officer Support System (OSS) Pilot Program and the quiet rooms. Ensuring agency members have a proper awareness and understanding of these initiatives will help them to implement these in the manner for which they are intended.

We also look forward to meeting with the City and the CPD in the ninth reporting period to further understand the processes for data collection around member suicide, to meet again with sworn and non-sworn members of the CPD to hear their perceptions of the wellness initiatives, and to receiving updates on the continued furnishing of the quiet rooms.

\*\*\*

Specific compliance assessments, by paragraph, for the Officer Wellness and Support section are included in Appendix 8.

# IX. Accountability and Transparency

## Guiding Principles

The IMT assessed compliance with applicable Accountability and Transparency paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *419. Holding public servants accountable when they violate law or policy is essential to ensuring legitimacy and community confidence.*

> *420. A robust and well-functioning accountability system in which CPD members are held to the highest standards of integrity is critical to CPD's legitimacy and is a priority of CPD. A culture of accountability also promotes employee safety and morale, and improves the effectiveness of CPD operations. Organizational justice also plays an important role in ensuring that CPD members have confidence in the legitimacy of the system that holds them accountable.*

> *421. In order to foster public trust and receive critically important community feedback, and promote confidence in CPD, the City and CPD will ensure the process for submitting and pursuing complaints that allege violations of CPD policy or the law by CPD members is open and accessible for all individuals who wish to file complaints.*

> *422. Meaningful community involvement is imperative to CPD accountability and transparency. Nothing in this Agreement should be construed as limiting or impeding community participation in CPD's accountability system, including the creation and participation of a community safety oversight board. OAG and the City acknowledge the significant work many of Chicago's community organizations have undertaken and are continuing to undertake, including work alongside CPD, in the area of police reform and accountability, and OAG and the City know this critical work will continue.*

> *423. The City, CPD, and COPA will ensure that all complaints of misconduct, whether from internal or external sources, are thoroughly, fairly, timely, and efficiently investigated in accordance*

*with this Agreement; that all investigative findings are sup-
ported by the appropriate standard of proof and documented in
writing; and that all CPD members who commit misconduct are
held accountable pursuant to a disciplinary system that is fair,
timely and consistent, and provides due process.*

# Summary of Compliance Efforts and Assessments

## Accountability and Transparency in the Eighth Reporting Period

The Accountability and Transparency section of the Consent Decree requires re-
form efforts from many City entities. The reach of the section is vast—involving
several City entities—and is motivated by the guiding principles at the outset of
the Section, as noted above (¶¶419–23).

The Accountability and Transparency section of the Consent Decree explicitly sets
obligations for the following City entities: the Chicago Police Department (CPD)
and the CPD's Bureau of Internal Affairs (BIA), the Office of the Inspector General's
(OIG) Deputy Inspector General for Public Safety (Deputy PSIG), the Civilian Office
of Police Accountability (COPA), and the Police Board. In addition, some of the re-
quirements of the Accountability and Transparency section call for action by the
City of Chicago.

While the CPD, COPA, the Deputy PSIG, and the Police Board are working toward
the common goal of increased accountability and transparency, these entities
work toward this goal in different manners as appropriate for each entity and as
required by the Consent Decree. These entities have each found success in com-
plying with the requirements set out in the Accountability and Transparency sec-
tion at different paces and with varying degrees. The Deputy PSIG, for example,
achieved Full compliance with all requirements pertaining to its office in the fourth
reporting period and has maintained that Full compliance during subsequent re-
porting periods. This reporting period, the Deputy PSIG successfully completed its
Sustainment Period, marking two full years that it has maintained Full compliance
with all requirements pertaining to its office. COPA and the Police Board have de-
veloped and followed plans that have allowed them to consistently gain compli-
ance with various requirements of this section in the past few reporting periods.
The CPD has followed a less methodical path toward compliance with the Account-
ability and Transparency requirements, and because of this, has fallen behind in
complying with Accountability and Transparency requirements, but has started to
make progress. The CPD focused its efforts on developing policies to implement its
Consent Decree requirements in the first four years and now has turned its efforts
toward developing specific Bureau of Internal Affairs (BIA) trainings.

## Accountability and Transparency Progress through Eight Reporting Periods

Overall, the IMT assessed the City's compliance with 139 Accountability and Transparency paragraphs. With the combined efforts of all the City entities noted in this section, the City maintained Preliminary compliance with 68 paragraphs (¶¶424–25, 431, 433, 436–40, 443–45, 447–48, 450, 453–56, 459–61, 463–68, 471, 475–79, 482–84, 486–87, 493, 495, 497, 499, 501, 503–09, 513–19, 522–25, 532, 540–42, and 552) and moved into Preliminary compliance with two paragraphs in the seventh reporting period (¶¶444 and 481). The City also maintained Secondary compliance with five paragraphs (¶¶430, 473, 498, 511, and 560) and moved into Secondary compliance with 20 paragraphs (¶¶426–29, 432, 434–46, 449, 462, 457, 462, 469–70, 472–74, 496, 500, 502, and 551). The City also maintained Full compliance with 22 paragraphs (¶¶441–42, 485, 533–39, 543, 550, 554–59, 561–63, and 565). The City did not reach any level of compliance with 23 paragraphs (¶¶451, 480, 488–92, 494, 512, 521, 526–30, 544–49, 553, and 564). The City remained under assessment for Preliminary compliance with one paragraph (¶531) and lost levels of compliance with three paragraphs (¶¶430).

Accountability Figure 1:    Compliance Progress for Accountability & Transparency Paragraphs at the End of the Eighth Reporting Period (June 30, 2023)

### Accountability & Transparency Compliance Progress by June 30, 2023




- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

Accountability and Transparency Figure 2:
Lost Levels of Compliance in the Accountability and Transparency Section



Given the variable nature of the Accountability and Transparency Section requirements for each City entity, we provide a summary of each entity's efforts separately.

## The Chicago Police Department (CPD)

We have monitored the CPD's progress in a variety of ways, including attending frequent meetings with BIA and the CPD's Research and Development Division to obtain updates on efforts and ask questions, reviewing draft policies and training materials, observing training sessions, and conducting site visits to gain insight from Accountability Sergeants and BIA investigators.

During the eighth reporting period, the CPD made significant progress by reaching Secondary compliance with numerous paragraphs through the finalization of its BIA eLearning. We acknowledge the CPD's efforts and encourage the CPD to continue making progress to reach additional levels of compliance in the coming reporting periods. We also appreciate the continued improvement in quality of the CPD's annual and quarterly BIA reports.

At the same time, we have several concerns regarding the CPD's processes during this reporting period which we note throughout the corresponding paragraph assessments in this report.

Further, the CPD continued to meet once per month with the IMT, despite our recommendation in the sixth reporting period for more frequent meetings. The IMT continues to encourage the CPD to reinstate biweekly meetings in the eighth reporting period for all months to ensure continued and efficient progress.

During this reporting period, the CPD continued to draft and revise policies to comply with the requirements of the Consent Decree. These efforts included drafting, revising, and finalizing a suite of policies aimed at codifying numerous Accountability and Transparency Section requirements in Department-wide General Orders and Special Orders.

Many CPD trainings remain in development. Specifically, the CPD worked with the IMT during the seventh and eighth reporting periods to develop and revise the CPD's *BIA Onboard Training*. In the eighth reporting period, the CPD continued to focus its efforts on its *BIA Onboard Training*. Throughout the reporting period, the IMT worked closely and collaboratively with BIA to review and provide comments on the *BIA Onboard Training*. Despite these efforts, the CPD was not able to achieve additional levels of compliance with ¶¶526–28. Toward the end of the reporting period, after many discussions about the format and purpose of the *BIA Onboard Training* (including how that training could be repurposed to satisfy ¶¶527–28 in addition to ¶526), the CPD began to move away from structuring the training as one all-encompassing training, with relevant training topics woven throughout the multi-day training and toward structuring the training as subject-specific blocks of instruction. We suggested that this change in structure would improve the quality and efficacy of the training, and would also provide the CPD with the opportunity of seeking and gaining compliance with various paragraphs on a rolling basis as it drafted and provided the training, rather than linking compliance with many Consent Decree paragraphs together such that the CPD could not obtain compliance until the entire *BIA Onboard Training* was drafted, approved, and provided to new BIA personnel. Ultimately, at the end of the eighth reporting period, the CPD produced 5 modules of instruction for review as a replacement to the prior drafts of the BIA Onboard Training. This production included 23 files of documentation and is still under review at this time. We encourage the CPD to continue to work on addressing the requirements specifically in ¶¶526–28 early in the ninth reporting period in collaboration with the IMT and the OAG.

In addition, in the eighth reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training enabled the CPD to achieve Secondary compliance with several Accountability and Transparency paragraphs. The IMT, however, has concerns about the number of civilians who completed the eLearning course. Although Secondary compliance requires only that the CPD train at least 95% of all CPD members (which means any sworn or civilian employees of the CPD, *see* ¶743), only 49% of civilian CPD employees completed the eLearning course. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members and will consider this in connection with the CPD's efforts to reach Full compliance with those paragraphs. Further, the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand certain policies and procedures of the CPD is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on

training materials that cover certain of these subjects, and we look forward to continuing to work with BIA collaboratively in the ninth reporting period.

During site visits in April 2023, the IMT met with several Accountability Sergeants and BIA Investigators. These meetings were very helpful for the IMT to learn more about the day-to-day responsibilities and experiences of Accountability Sergeants and BIA Investigators. As stated in the previous reporting period, some of the information the IMT continues to learn about the day-to-day responsibilities and experiences of Accountability Sergeants and BIA Investigators during these meetings are cause for great concern.

For example, we continue to remain concerned that Accountability Sergeants do not have designated areas in the district where they can conduct interviews, review videos confidentially, and complete their investigations. Some Accountability Sergeants indicated that they have access to a private office only because they serve in some other role, such as an Administrative Sergeant, and most others must attempt to locate private space subject to availability, such as a Commander's office or a conference room that may or may not be in use. We also learned that Accountability Sergeants are not properly equipped to efficiently conduct investigations or utilize the Case Management System and are often using old technology with outdated and slow processing systems that cannot keep up with the Case Management System.

When the IMT suggested that Accountability Sergeants could be equipped with laptop computers to use for completing investigations, many were hopeful that this would occur due to the need for improved technology to adequately perform their duties. At the same time, others shared concerns that, with laptops, the CPD would then require them to complete the investigations at home on their personal time, since they do not have time to complete the investigations during the workday as a result of their conflicting responsibilities. Many BIA investigators shared the same thoughts and concerns and described BIA computer workstations with old technology and outdated computers that cannot keep up with the Case Management System sometimes cause them to wait hours for a case file to upload into the Case Management System.

In the sixth reporting period, the IMT raised concerns that Accountability Sergeants would not be able to comply with Special Order S08-01-05, *Conducting Log Number Investigations*, because this policy requires Accountability Sergeants to audio-record interviews and upload the interviews into the Case Management System. Based on the information we learned in conversations during past site visits with Accountability Sergeants, we were very concerned that Accountability Sergeants were not properly equipped to comply with this policy and would be in violation of the policy once it was implemented for reasons outside their control. The IMT provided comments to the CPD in the sixth reporting period noting that,

for this policy to be followed once it becomes effective, Accountability Sergeants must be properly equipped. This included, at a minimum, having recording devices; quiet, private spaces in which to conduct interviews; and the ability to upload recordings into the Case Management System. During the seventh reporting period, the IMT was encouraged to learn that the CPD purchased audio recording devices for their Accountability Sergeants. Accountability Sergeants also received training in how to use the recorders. However, the IMT only received the CPD's *BIA Recorder Training* after the training was implemented. We explained, as we have in previous reporting periods, that individuals who received the unapproved training will need to attend the new training once approved by the IMT and the OAG.

Finally, the IMT continues to be concerned about the lack of reform of the Accountability and Disciplinary process. During site visits in April 2023, the IMT met with random individual Accountability Sergeants to discuss their experiences Through these conversations, we continued to learn the harsh realities on the ground and challenges that BIA Investigators and Accountability Sergeants face when performing their duties. Even though ¶494(b) requires two Accountability Sergeants to be assigned in each district, we have continued to learn this is not occurring in practice. As stated in previous reporting periods, most districts have allocated only one sergeant as the Accountability Sergeant and the district or unit may or may not have designated a "backup sergeant" for case assignment when the primary Accountability Sergeant is away from duty. The backup Accountability Sergeant performs other assignments in the district and only has cases assigned during the absence of the "Primary Accountability Sergeant." This continues to create a very high caseload for the one designated Accountability Sergeant. One district the IMT visited had a Primary Accountability Sergeant, but when we visited, that Sergeant was working as the desk sergeant in the district. In another district, the Primary Accountability Sergeant was assigned out in the field and had to come back to the District Office to meet with us. This is not a new issue. We have noted this issue going back to at least the sixth reporting period. We continue to encourage the CPD to designate two Accountability Sergeants with their **primary responsibility** being receiving, processing, and investigating complaints against CPD members rather than other duties like serving as the desk sergeant or the field sergeant for the day.

Moving forward, we will look for the CPD to develop and finalize policies in a focused and timely manner, and to continue developing and revising training related to the policies it has developed and implemented under the Consent Decree thus far. We continue to encourage the CPD to begin producing materials for IMT and OAG review early in future reporting periods and in a regular cadence. These materials should be produced in a manner that allows for meaningful review and comment from the public. This will allow the IMT and OAG to engage in substantive conversations with the CPD during the development of policies and training.

We look forward to continuing to work with the CPD as it continues to develop its policies and training.

Civilian Office of Police Accountability (COPA)

In the eighth reporting period, COPA continued making efforts toward compliance with Accountability and Transparency requirements. The IMT continued to meet with COPA monthly and each meeting was deliberate and demonstrated COPA's commitment to not only fulfilling the requirements of the Consent Decree but recognizing the opportunity to improve their operational capacity and quality of their operations.

One of COPA's great achievements of the eighth reporting period was its People's Academy training (the "Academy"). COPA developed the Academy for members of the community and began offering it this reporting period. The first cohort of the Academy began in March 2023 and consisted of one class session per week for six weeks. Each session was several hours long and involved a variety of topics, all addressing the scope of COPA's responsibilities and roles. The IMT audited one session of the Academy in April 2023. We were impressed with the Academy and anticipate that COPA will continue this valuable community interaction. COPA continues to engage the community in a transparent and forward-looking manner to ensure that the community's confidence in the COPA process grows.

Despite its successes, COPA also faced challenges in the eighth reporting period. For many paragraphs for which COPA had previously achieved Full compliance, COPA failed to provide the IMT with evidence of continued compliance. In some instances, this resulted in COPA losing compliance with paragraphs and instead dropping to Under Assessment with those paragraphs. We emphasize that, to maintain Full compliance, it is necessary for the City and its entities to provide us with an update on those paragraphs each reporting period. In addition, in many instances COPA did not designate its productions for review with all the paragraphs that were implicated in those productions. Throughout the reporting period, we attempted to note for COPA where they might consider resubmitting a policy or training for compliance consideration for additional paragraphs, but ultimately the burden is on the City and COPA to determine which materials they submit for compliance with various paragraphs. We encourage COPA to consider submitting its materials for compliance with a greater number of paragraphs, where applicable, in the future.

During the eighth reporting period, COPA continued to revise policies and written guidance to be compliant with the Consent Decree. Further demonstrating COPA's efforts toward accountability and transparency, COPA continued working with the

COPA Community Policy Review Working group.[53] This working group consists of volunteers from across the Chicago community who are dedicated to working with COPA to produce exemplary and community-experience informed products. The group reviews COPA policies and documents related to efforts under the Consent Decree. COPA ensures that the group is involved throughout the development of the policy and not just at the end of the revision process. By regularly engaging this group, COPA has produced policies and procedures that provide detailed direction to its personnel and important information about COPA's practices to the community.

We acknowledge COPA's continued progress and encourage COPA to continue these efforts in future reporting periods to maintain and reach additional levels of compliance.

### The Chicago Police Board

In the eighth reporting period the Police Board continued making progress toward fulfilling Accountability and Transparency section requirements. Throughout the eighth reporting period, we continued to meet with the Police Board on a monthly basis. These meetings are invaluable as the Police Board ensures that the Police Board leadership attends to share information with the IMT and OAG regarding their efforts. Beyond taking the steps necessary to achieve compliance levels, the Police Board has continued to show a dedication to the spirit of the Consent Decree, taking reform, accountability, and transparency seriously.

Also in the eighth reporting period, the City provided the IMT with the Community Commission for Public Safety and Accountability (CCPSA) procedures for selection of new Police Board members. There are currently vacancies on the Police Board. Should the City finalize those procedures and demonstrate that it follows the procedures in selecting new Police Board members, it faces an opportunity to achieve both Secondary and Full compliance in the ninth reporting period.

In past reporting periods, the Police Board achieved Full compliance with 11 paragraphs—the Police Board maintained this Full compliance with all these paragraphs and achieved additional levels of compliance in the seventh reporting period.

---

[53]   The OAG, the City, and the IMT have agreed to a stipulation that mandates that COPA will solicit feedback on the draft policies relevant to the Consent Decree from a working group that consists of community stakeholders and thereby approved by the IMT. See Stipulation Regarding the Policy and Training Review Process for the Civilian Office of Police Accountability (COPA), Illinois v. Chicago, Case No. 17-cv-6260 (January 30, 2020), https://cpdmonitoring-team.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for._.pdf. The IMT has approved the members from COPA's Community Policy Review Working Group.

The Police Board has not yet achieved Full compliance with all relevant Consent Decree paragraphs, but it continues to make thoughtful and methodical efforts toward compliance with these paragraphs. For example, the Police Board has continued to work toward meeting training requirements. *See* ¶¶540–42. The Police Board has sought the help of outside entities on a *pro bono* basis to provide relevant and thorough training on topics required by the Consent Decree, and the trainings provided to date has been appropriate and helpful. In the eighth reporting period, the Police Board provided materials for a *Community Policing Training* to the IMT and explained that it planned to provide this training to its members in the ninth reporting period. The IMT looks forward to the Police Board's development and implementation of additional training in the coming reporting periods.

Moving into the ninth reporting period, we anticipate that the Police Board will continue to work toward Full compliance with relevant Consent Decree requirements. We commend the Police Board for its continued efforts and progress to date.

## Deputy Inspector General of Public Safety (Deputy PSIG)

The Deputy PSIG achieved Full compliance with all Consent Decree requirements relevant to the Deputy PSIG in the fourth reporting period. The Deputy PSIG has made consistent efforts to maintain Full compliance in subsequent reporting periods. As we noted in the fifth reporting period, the Deputy PSIG developed a plan to maintain Full compliance. It has since followed that plan through the end of the eighth reporting period, which marks the end of its two-year Sustainment Period.

We met with the Deputy PSIG regularly during the eighth reporting period to discuss developments related to continued compliance and discuss what additional evidence, if any, was needed to assess continued compliance. The Deputy PSIG remains transparent and responsive in its Consent Decree compliance. The methodical and forthcoming approach adopted by the Deputy PSIG early in the Consent Decree has continued through the eighth reporting period and, with this, the OIG and the Deputy PSIG maintained Full compliance with all relevant paragraphs.

## Other City Entities

As noted above, the City of Chicago often works toward and accomplishes compliance through the efforts of COPA, the Deputy PSIG, the CPD, and the Police Board. However, other City entities occasionally undertake efforts relevant to compliance with Accountability and Transparency section paragraphs.

In the eighth reporting period, the City provided materials explaining that it had extended its revised Community-Police Mediation Pilot Program, which offers a meaningful opportunity to build trust and facilitate honest discussions between

community members and CPD officers, to run through December 31, 2023. We have previously requested more regular updates going forward and are eager for more information about the progress of the Pilot Program.

*** 

Specific assessments, by paragraph, for the Accountability and Transparency section are included in Appendix 9.

# X. Data Collection, Analysis & Management

## Guiding Principles

The IMT assessed compliance with applicable Data Collection, Analysis, and Management paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *566. Data can empower CPD to engage in the type of critical self-examination essential to instilling and maintaining constitutional policing. CPD can leverage data to ensure constitutional policing by: systematically collecting enough data to have a broad-based understanding of officers' interactions with the public; auditing the data to ensure it accurately reflects those interactions; analyzing the data to identify trends or areas of concern; developing tailored support and interventions to address behavior that is or may become problematic; and assessing the effectiveness of attempts to modify officers' behavior.*

> *567. In addition to enhancing CPD's capacity for internal accountability, CPD can use data to promote accountability to the public by regularly publishing data it collects.*

## Summary of Compliance Efforts and Assessments

### Data Collection, Analysis, and Management in the Eighth Reporting Period

In the eighth reporting period, the City and the CPD continued to experience a mix of accomplishments and setbacks for the reforms required by the Data Collection, Analysis, and Management section. For example, during this reporting period, the CPD continued its efforts to roll out the Officer Support System (also known as the OSS) which will be used to proactively identify officers with a heightened risk for future adverse events and provide interventions to minimize such risks. However, the CPD has yet to address underlying issues that were identified in its initial pilot test and still has not provided a full evaluation for the OSS pilot program.

Similarly, this reporting period the CPD provided each Associate Monitor with a list of the data the CPD believes is necessary to comply with each respective section as part of its efforts to systematically evaluate data systems and the current scope

of collected data (see ¶606). The IMT appreciates the CPD's sincere effort to summarize this data. Still, in reviewing the list, the IMT identified additional data points (including qualitative and quantitative data) that the CPD either does not collect or does not meaningfully collect. The CPD's effort to provide this data demonstrates the CPD's commitment to using its data efficiently and effectively. While this has moved the CPD in the right direction toward Full compliance, the CPD must address additional elements of ¶606 requirements before analysis can be conducted. To satisfy other requirements for Full compliance, the CPD will also need to incorporate the IMT's comments on its list of data into a final assessment report that will inform the data systems plan (see ¶607).

In other areas, however, we found limited progress and, in some cases, a failure to regain compliance. For instance, in the sixth monitoring period, the CPD failed to maintain compliance with two paragraphs involving the Tactical Review and Evaluation Division (TRED) (¶¶574–75), resulting in loss of compliance due to inadequate staffing and resources, which resulted in a backlog of TRED reviews. However, during the seventh and eighth monitoring periods these concerns were not addressed, so TRED continues to operate well under the budgeted personnel and with a sizable backlog. Despite these challenges, the IMT acknowledges that the TRED provides meaningful feedback for the CPD.

We also continue to see no effort on the part of the City or the CPD to conduct a citywide and district-level data analysis of use of force (¶¶572–73). The CPD has continued to fail to provide us with a methodology or take any meaningful steps toward conducting the necessary analysis. The analysis is designed to allow the CPD to assess parity (or disparity) among demographic categories in the CPD's use of force, a primary component of the investigation and findings that led to the Consent Decree. At this point, we are left to conclude that the City and the CPD have no immediate intention of conducting this important analysis.

Further, the CPD lost levels of compliance with ¶¶581–82 due to its failure to respond to community comments from the community feedback form on its use-of-force data dashboard. To regain compliance, the CPD will need to demonstrate that community members are capable of downloading incident-level data from the dashboard and that the CPD is responding to community comments.

## Data Collection, Analysis, and Management Progress through Eight Reporting Periods

Overall, the IMT assessed the City's compliance with 42 Data Collection, Analysis, and Management paragraphs. At the end of the eighth reporting period, the City maintained Preliminary compliance for 25 paragraphs (¶¶568–69, 574, and 583–604), maintained Secondary compliance with nine paragraphs (¶¶570–71, 577–

80, 606, and 608–09), and failed to reach any level of compliance with seven paragraphs (¶¶572–73, 575–76, and 605–07). Additionally, the City lost levels of compliance with two paragraphs (¶581–82). *See* Data Figure 1 below.

Data Figure 1:   Compliance Progress for Data Collection, Analysis & Management Paragraphs at the End of the Eighth Reporting Period (June 30, 2023)



Data Collection, Analysis, and Management
Compliance Progress by June 30. 2023

- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

Data Figure 2:
Lost Levels of Compliance in the
Data Collection, Analysis, and Management Section



| Paragraphs | Seventh Reporting Period<br>(July 1, 2022 – December 31, 2022)<br>Previous Compliance | | Eighth Reporting Period<br>(January 1, 2023 – June 30, 2023)<br>Current Compliance |
|---|---|---|---|
| ¶581 | Secondary | → | Not in Compliance |
| ¶582 | Secondary | → | Preliminary Compliance |

## Looking Ahead to the Ninth Reporting Period

Moving forward, the CPD must work more collaboratively and consistently to address the Data Collection, Analysis, and Management section of the Consent Decree. For instance, the OSS implementation has occurred without the CPD and the City utilizing the full extent of the IMT's recommendations and is in danger of repeating the same mistakes that occurred with the first pilot attempt. The analysis

of force statistics by demographics has been ignored, despite repeated and ongoing encouragement by the IMT that such an analysis is needed to inform many other reforms that the CPD is attempting to implement (*e.g.*, informed community engagement, force management, and supervision).

While the CPD has made efforts to conduct a comprehensive assessment of the City and CPD data systems and we appreciate the City and the CPD providing a list of data to the IMT during the eighth reporting period that the CPD believes is necessary to comply with the Consent Decree, moving forward the CPD will need to incorporate the IMT's comments on its list of data into a final assessment report that will inform the data systems plan. Given the turnover in personnel that has occurred with this assessment, there should be focused effort for incoming personnel to work with the IMT to ensure the final assessment is comprehensive and in line with the expectations set from the initial planning phases.

Finally, we expect the CPD to demonstrate in the coming reporting period that community members are capable of downloading incident-level data from its use-of-force data dashboard and that the CPD is responding to community comments.

***

Specific assessments, by paragraph, for the Data Collection, Analysis & Management section are included in Appendix 10.

# XI. Implementation, Enforcement & Monitoring

This is the last section of the Independent Monitoring Team's (IMT's) eighth semi-annual Independent Monitoring Report. It includes our status updates for the City of Chicago's (City's) and its relevant entities' efforts from January 1, 2023, through June 30, 2023, regarding the implementation, enforcement, and monitoring obligations of the Consent Decree.

As we identified in previous monitoring plans, the City has many obligations that fall outside the 10 topic areas. While these paragraphs do not fall within the specific topic areas discussed above, these obligations are critical to the success of the reform efforts across all 10 topic areas of the Consent Decree. For this reason, the IMT is providing updates on the City's efforts under the following paragraphs: ¶¶626–27, 629–43, 677–80, 682–87, 699–701, 704–06, 711, 714, and 720–21.

Specific compliance status updates, by paragraph, for the Implementation, Enforcement, and Monitoring section are included in Appendix 11.

# Conclusion and Looking Ahead to Comprehensive Assessment Part II & Independent Monitoring Report 9

We have concluded our monitoring efforts for the eighth reporting period (January 1, 2023, through June 30, 2023). We appreciate the reform efforts made by many hard-working City personnel, including the compliance progress made by the City; the CPD; COPA; the Chicago Police Board; the OIG, including the Deputy PSIG; and the OEMC.

The IMT's next semiannual report, Independent Monitoring Report 9, will cover the reporting period from July 1, 2023, through December 30, 2023. As with previous reports, we will continue to work with the City and the OAG to implement all the Consent Decree's requirements. We will also continue to engage with Chicagoans to determine whether these reforms are being felt in their communities.

| Comprehensive Assessment | State of Illinois and City of Chicago | Judge Rebecca Pallmeyer |
|---|---|---|
| IMT assesses City's progress and recommends changes to the Consent Decree | The Parties discuss recommended changes; once in agreement, seek Court's ruling | The federal judge rules, possibly resulting in an amended Consent Decree |

In addition to Independent Monitoring Report 9, the IMT is also at work on *Comprehensive Assessment, Part II*, which requires the IMT to consider (a) whether the outcomes of the Consent Decree are being achieved and (b) whether any modifications are needed to the Consent Decree.[54]

It is important to note that the IMT cannot unilaterally make changes to the Consent Decree; only the Parties and the Judge can make changes.[55] The IMT will make

---

[54] This report comprises *Comprehensive Assessment, Part I,* as it addresses the first requirement of ¶657 to "determine whether and to what extent the City and the CPD are in compliance with this Agreement." The other two requirements will be addressed in *Comprehensive Assessment, Part II.*

[55] ¶696 notes that "OAG and the City may jointly agree to make changes, modifications, and amendments to this Agreement, which will be effective if approved by the Court."

recommendations for change in our upcoming *Comprehensive Assessment, Part II,* but per ¶659, the Parties must then consider our changes before seeking the Court's ruling to change the Consent Decree.

# Appendix 1
# (Community Policing)

Community Policing

Specific compliance assessments, by paragraph, for the Community Policing section are available here: https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-1-Community-Policing-2023.11.01.pdf.

# Appendix 2
# (Impartial Policing)

Specific compliance assessments, by paragraph, for the Impartial Policing section are available here: https://cpdmonitoringteam.com/wp-content/up-loads/2023/11/IMR8-Appendix-2-Impartial-Policing-2023.11.01.pdf.

# Appendix 3
# (Crisis Intervention)

Specific compliance assessments, by paragraph, for the Crisis Intervention section are available here: https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-3-Crisis-Intervention-2023.11.01.pdf.

# Appendix 4
# (Use of Force)

Specific compliance assessments, by paragraph, for the Use of Force section are available here: https://cpdmonitoringteam.com/wp-content/up-loads/2023/11/IMR8-Appendix-4-Use-of-Force-2023.11.01.pdf.

# Appendix 5
# (Recruitment, Hiring, and Promotions)

Specific compliance assessments, by paragraph, for the Recruitment, Hiring, and Promotions section are available here: https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-5-Recruitment-Hiring-and-Promotions-2023.11.01.pdf.

# Appendix 6
# (Training)

Specific compliance assessments, by paragraph, for the Training section are available here: https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-6-Training-2023.11.01.pdf.

# Appendix 7
# (Supervision)

Specific compliance assessments, by paragraph, for the Supervision section are available here: https://cpdmonitoringteam.com/wp-content/up-loads/2023/11/IMR8-Appendix-7-Supervision-2023.11.01.pdf.

# Appendix 8
# (Officer Wellness and Support)

Specific compliance assessments, by paragraph, for the Officer Wellness and Support section are available here: https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-8-Officer-Wellness-and-Support-2023.11.01.pdf.

# Appendix 9
# (Accountability and Transparency)

Specific compliance assessments, by paragraph, for the Accountability and Transparency section are available here: https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-9-Accountability-and-Transparency-2023.11.01.pdf.

# Appendix 10
# (Data Collection, Analysis, and Management)

Specific compliance assessments, by paragraph, for the Data Collection, Analysis, and Management section are available here: https://cpdmonitoring-team.com/wp-content/uploads/2023/11/IMR8-Appendix-10-Data-Collection-Analysis-and-Management-2023.11.01.pdf.

# Appendix 11
# Implementation, Enforcement, and Monitoring

Specific status updates, by paragraph, for the Implementation section are available here: https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-11-Implementation-Enforcement-and-Monitoring-2023.11.01.pdf.

Background on the Consent Decree and the Independent Monitoring Team is available below.

# The Consent Decree and
# the Independent Monitoring Team

In December 2015, the U.S. Attorney General launched a civil-rights investigation into the CPD's policing practices. The U.S. Department of Justice released the results of its investigation in January 2017, finding a longstanding, pervasive "pattern or practice" of civil rights abuses by the CPD. Two separate class-action lawsuits followed: *Campbell v. City of Chicago* and *Communities United v. City of Chicago*.[56]

In August 2017, the Office of the Illinois Attorney General (OAG) sued the City in federal court, seeking a Consent Decree that would address the DOJ's findings and recommendations. The case was assigned to federal Judge Robert M. Dow, Jr. The OAG then sought input from community members and Chicago police officers and negotiated the Consent Decree with the City.

In March 2018, the Parties to the Consent Decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')," which "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[57]

The OAG and the City then sought proposals for an independent monitoring team after posting a draft Consent Decree on the Chicago Police Consent Decree website. Judge Dow approved and signed a modified version of the Consent Decree on

---

[56] *See Campbell v. Chicago*, N.D. Ill. Case No. 17-cv-4467 (June 14, 2017), and *Communities United v. Chicago*, N.D. Ill. Case No. 17-cv-7151 (October 4, 2017).

[57] *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

January 31, 2019. This Consent Decree provides a unique opportunity for feedback from Chicago communities and local stakeholders. The OAG oversees and enforces the Consent Decree. *See* ¶694. The Coalition has certain enforcement rights and meets with the independent monitoring team at least quarterly. *See* ¶¶709(a) and ¶669, respectively.[58]

The Consent Decree requires action by the CPD and many other City entities. On March 1, 2019, the effective date of the Consent Decree, and after a competitive selection process, Judge Dow appointed Maggie Hickey, a partner at ArentFox Schiff LLP, as the Independent Monitor.[59] On October 11, 2022, Chief US District Judge of the District Court for the Northern District of Illinois Rebecca R. Pallmeyer became the presiding judge over the Consent Decree. As the Independent Monitor, Ms. Hickey oversees the Independent Monitoring Team (IMT) and reports directly to Chief Judge Pallmeyer.

As the IMT, we (1) monitor the City's, the CPD's, and other relevant City entities' progress in meeting the Consent Decree's requirements and (2) offer assistance to the City, the CPD, and other relevant City entities to implement the changes that the Consent Decree requires.

Monitor Maggie Hickey and Deputy Monitor Chief Rodney Monroe, Ret., lead the IMT. The IMT's nine Associate Monitors, in turn, oversee the 10 topic areas of the Consent Decree. Our legal team, analysts, subject matter experts, Community Engagement Team, and community survey staff provide support in several ways: by reaching out to and engaging with Chicago communities; by providing general administrative support; and by collecting and analyzing policies, procedures, laws, and data, including conducting observations and interviews, and drafting reports.

Our full organizational chart is in Appendix 11, Figure 1 on the next page, and our team structure is in Appendix 11, Figure 2 on the following page.

---

[58] *See also Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs*, ¶9 (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

[59] Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he will "help facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree." About, Chicago Police Consent Decree, http://chicagopoliceconsentdecree.org/about/. As the special master, Judge Coar also reports directly to Judge Pallmeyer.

Appendix B, Figure 1. Independent Monitoring Team Organizational Chart



## Appendix B, Figure 2. Independent Monitoring Team Members

| Monitoring Team Leadership | | |
|---|---|---|
| Independent Monitor | | Maggie Hickey |
| Deputy Monitor | | Rodney Monroe |

| Associate Monitors | | |
|---|---|---|
| Community Policing | | Stephen Rickman |
| Impartial Policing | | Denise Rodriguez |
| Crisis Intervention | | Julie Solomon |
| Use of Force | | Paul Evans |
| Training; Recruitment, Hiring Promotion | | Theron Bowman |
| Supervision | | Hassan Aden |
| Officer Wellness & Support | | Cassandra Deck-Brown |
| Accountability & Transparency | | Harold Medlock |
| Data Collection, Analysis & Management | | Tom Christoff |

| Community Engagement Team | | |
|---|---|---|
| Member and Community Surveys | | Joe Hoereth & Other Experts |
| Member | | Laura McElroy |
| Member | | Elena Quintana |
| Member (and Associate Monitor for Community Policing) | | Stephen Rickman |
| Member (and Associate Monitor for Impartial Policing) | | Denise Rodriguez |

| Subject Matter Experts and Legal Team | | |
|---|---|---|
| Project Director | | Laura Kunard |
| Lead Attorney | | Anthony-Ray Sepulveda |
| Attorney, Recruitment, Hiring, & Promotions; Training | | Stella Oyalabu |
| Attorney | | Derek Barella |
| Attorney, Accountability & Transparency | | Alex Becker |
| Attorney, Use of Force; Data Collection, Analysis & Management | | Meredith DeCarlo |
| Attorney, Community Policing; Impartial Policing | | Kaila Clark |
| Attorney, Crisis Intervention | | Brian Hamilton |
| Attorney, Officer Wellness and Support; Supervision | | Sarah Oligmueller |

| Monitoring Team Support | | |
|---|---|---|
| Project Manager, Analyst for Accountability & Transparency | | Bridgette Bryson |
| Analyst for Officer Wellness & Support | | Jessica Dockstader |
| Analyst for Use of Force | | Heleana Melendez |
| Analyst for Community Policing | | Tammy Felix |
| Analyst for Supervision | | Monique Jenkins |
| Analyst, Crisis Intervention | | Lindsey Clancey |
| Analyst for Recruitment, Hiring & Promotions | | Amada Bond |
| Analyst for Training | | Valerie Schmitt |
| Analyst for Data Collection, Analysis & Management | | Melissa Gutierrez |
| Analyst for Impartial Policing | | Christopher Sun |

# Frequently Asked Questions from the Community

Throughout the first reporting period, the IMT received many questions from the community. We list the most frequently asked questions and our corresponding answers below.

## What is a Consent Decree?

A Consent Decree is a court-approved settlement that resolves a legal dispute between parties. This Consent Decree requires the CPD and the City to reform training, policies, and practices in many important areas, such as use of force, community policing, impartial policing, training, accountability, officer wellness, and data and information systems. The goal is to ensure that the CPD performs constitutional and effective policing that keeps both community members and officers safe and restores the community's trust in the CPD (¶2).[60] Federal judge Robert M. Dow, Jr. was appointed to oversee the Consent Decree, and he chose the Independent Monitor. On October 11, 2022, Chief US District Judge of the District Court for the Northern District of Illinois Rebecca R. Pallmeyer became the presiding judge over the Consent Decree. Under the federal judge, the Independent Monitoring Team assesses the CPD's and the City's compliance with the Consent Decree. The Consent Decree will be in effect for at least eight years so that the CPD can develop, implement, and sustain the training, policies, and practices that the Consent Decree requires.[61]

## How Can I Get Involved?

The Community Engagement Team works to connect with neighborhoods, community groups, religious organizations, activists, advocates, and residents across the city. The Community Engagement Team encourages community members to participate in meetings and to promote these sessions through their social and other networks. We regularly update the Community Involvement section of the IMT website with details on upcoming community meetings and events. If your neighborhood or community group would like to invite a Community Engagement Team member to a meeting, please email us at contact@cpdmonitoringteam.com or fill out a feedback form on our website (https://cpdmonitoringteam.com/feedback-form/).

We encourage community members to provide input on CPD policies. When the CPD modifies or creates applicable policies, it will post them on its website so that

---

[60] The final Consent Decree is available on the Chicago Police Consent Decree Website. *See Consent Decree* (January 31, 2019), http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf.

[61] To learn more about the Consent Decree, visit the Office of the Attorney General's Consent Decree website: http://chicagopoliceconsentdecree.org/.

community members can provide input: https://home.chicagopolice.org/reform/policy-review/.

Community members may also participate in the monitoring process in the following ways:

- Attend our public meetings listed on our website;
- Complete an input form on our website; and
- Reach out to the IMT or members of our Community Engagement Team (see below).

## How can I contact the IMT?

Community members can reach out to the entire IMT via email:

contact@cpdmonitoringteam.com.

Community members can also contact individual members of our Community Engagement Team:

- Elena Quintana (Elena.Quintana@cpdmonitoringteam.com)
- Joe Hoereth (Joe.Hoereth@cpdmonitoringteam.com), and
- Laura McElroy (Laura.McElroy@cpdmonitoringteam.com)
- Steve Rickman (Stephen.Rickman@cpdmonitoringteam.com)
- Denise Rodriguez (Denise.Rodriguez@cpdmonitoringteam.com)

Learn more at the Contact Us page on our website (https://cpdmonitoringteam.com/contact-us/).

Community members can also use the Feedback Form on our website to provide input (https://cpdmonitoringteam.com/feedback-form/).

# Attachment A:
# Office of the Illinois Attorney General
# Comments
# 2023



**OFFICE OF THE ATTORNEY GENERAL**
STATE OF ILLINOIS

**KWAME RAOUL**
ATTORNEY GENERAL

October 26, 2023

<u>**SENT VIA EMAIL**</u>

Margaret A. Hickey
Independent Monitor
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Maggie.Hickey@afslaw.com

**Re:     OAG Comments on the Eighth Independent Monitoring Report**
**Consent Decree, *Illinois v. Chicago*, 17-cv-6260 (N.D. Ill.)**

Dear Ms. Hickey:

The Consent Decree gives the Office of the Illinois Attorney General (OAG) an opportunity to comment on the Eighth Monitoring Report (Report) before the Independent Monitoring Team (IMT) files it with the Court. The Report covers January 1, 2023 through June 30, 2023, a period in which the City of Chicago and the Chicago Police Department (CPD) failed to make significant progress implementing reforms mandated by the Consent Decree. While the City and CPD are now in preliminary compliance with over 80% of monitorable paragraphs, they are in full compliance with only 6%. This comports with what the parties and the Court continue to hear from members of the community at every public input hearing – CPD's new and revised written policies have not yet translated into community members' improved experiences with CPD officers.

The City and CPD have recently welcomed a new mayor and Superintendent. At the same time, the Independent Monitoring Team is engaged in its comprehensive assessment, which requires it to identify strategies to accelerate full and effective compliance with the Consent Decree.[1] These events present an opportunity for the City and CPD to recommit to reform. In the

---

[1] *See* Consent Decree, ¶658.

coming months, OAG recommends that CPD prioritize critically important policies and transform its staffing allocation decisions, as discussed in more detail below.

## Critical Policies Remain Overdue

In recent months, CPD has made progress tackling important policies that OAG has emphasized in prior monitoring periods. Nevertheless, several policies essential to CPD's reform efforts remain outstanding. These include:

- CPD's policy ensuring meaningful access to police services for individuals with limited English proficiency;
- CPD's policy ensuring meaningful access to police services for individuals with disabilities; and
- CPD's policies governing investigations of officer-involved shootings and deaths in compliance with the Consent Decree and Illinois law.

CPD's delayed adoption and implementation of these policies affects Chicagoans every day, as officers continue to operate under outdated guidance. Furthermore, even after these policies are finalized, the Department must undertake the large task of training its officers on the new policies before their effects are likely to be felt by community members interacting with CPD officers. As such, OAG urges CPD to prioritize the finalization of these critical policies in the coming months.

## CPD's and the City's Staffing Allocation Choices Have Hindered Reform

As in prior monitoring periods, nearly every section of the Report emphasizes the staffing shortages experienced by those divisions of CPD tasked with the nuts and bolts of reform. The Office of Community Policing, the Crisis Intervention Unit, the Tactical Review and Evaluation Division (TRED), the Training and Support Group, and Reform Management are all critically understaffed. Furthermore, among the already inadequate staff in these divisions, staff members are frequently deployed out to other tasks.

In recent months, deployment has been a particularly acute problem in the Office of Community Policing, significantly hindering progress in the Community Policing and Impartial Policing sections of the Consent Decree. As noted in the Community Policing section of the Report, "compliance efforts continue to lag and, after several reporting periods of minimal progress, bring into question the City's and the CPD's commitment to implementing reforms in community policing practices."[2] The City's and CPD's staffing allocation decisions continue to demonstrate a perceived tension between the Department's crime-fighting function and its commitment to community policing. This is in sharp contrast to CPD's responsibility to ensure that "its community policing philosophy is a core component of its provision of police services, crime reduction strategies and tactics."[3] Crime reduction efforts and a commitment to community policing should not be viewed as mutually exclusive. Rather, they are critical and mutually reinforcing components of the City's responsibility to protect the public.

---

[2] Report at 41.
[3] Consent Decree, ¶10.

In addition, as we noted in our remarks before the Court on October 16, 2023, TRED continues to experience staffing shortfalls and backlogs that hinder its ability to drive reform. In the sixth monitoring period, TRED's backlog caused CPD to lose levels of compliance with Consent Decree paragraphs 574 and 575 and, due to inadequate staffing and continued backlogs, CPD has still not regained compliance with those paragraphs. While CPD has recently taken steps to increase TRED's staffing levels, some TRED staff have continued to be deployed out of the division to other tasks. In addition, the scope of TRED's already significant responsibilities has continued to increase. TRED now reviews use of force incidents, firearm pointing incidents, and foot pursuits, and will soon review investigatory stops and execution of search warrants. TRED is a division that is core to the work of Consent Decree implementation, and it has the potential to help CPD become a learning department that identifies and responds to trends. Thus, it is vital that TRED's staffing levels keep pace with its increasing responsibilities. CPD must prioritize staffing levels in both TRED and the Office of Community Policing if it hopes to increase compliance with the Consent Decree.

**Progress in the Eighth Monitoring Period**

Despite CPD's overall compliance challenges, the City and CPD made some progress in the eighth monitoring period, some of which is highlighted below.

- The Office of the Inspector General and the Deputy Inspector General for Public Safety maintained full compliance with their Consent Decree obligations.
- The Civilian Office of Police Accountability (COPA) continued to make progress toward secondary and operational compliance with its responsibilities under the Consent Decree.
- CPD finalized and implemented its long-overdue policy defining and prohibiting sexual misconduct, which became effective on June 21, 2023.
- CPD actively collaborated with the Coalition to revise its search warrant policies and practices.
- CPD worked with OAG and the IMT to revise its policy mandating the use of body-worn cameras in compliance with the Consent Decree and state law.
- CPD made significant progress toward finalizing its policy governing interactions with youth, posting its policy for public comment, and undertaking additional revisions in response to comments it received.

Just as with the outstanding policies discussed earlier, significant effort will be required to train Department members on these new and revised policies. As such, OAG encourages CPD to continue its efforts to fully implement and train on these important policies.

**Conclusion**

OAG is hopeful that the City's new Mayor and the Department's new Superintendent are poised to make critical decisions that can accelerate the pace of reform. We encourage the City and the Department to prioritize finalizing critical policies and training Department members on them, as well as overhauling their staffing allocation decisions, including prioritizing staffing in

the Office of Community Policing and TRED. We remain committed to partnering with the City and CPD in this critical work.

Respectfully,

KWAME RAOUL
Attorney General of the State of Illinois

By: /s/ *Katherine Pannella*
Katherine Pannella
Assistant Attorney General
Civil Rights Bureau
Office of the Illinois Attorney General
100 W. Randolph St., 11th Floor
Chicago, Illinois 60601
312.590.7083
Katherine.Pannella@ilag.gov

cc: Jennifer Bagby, Danielle Clayton, Max Frazier, Arthur Haynes, and Allan Slagel, Counsel for the City of Chicago; Scott Spears, Acting General Counsel for the Chicago Police Department (via email)

# Attachment B:
# City of Chicago Comments
# 2023



October 31, 2023

Independent Monitoring Team
c/o Maggie Hickey, Independent Monitor
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Maggie.Hickey@afslaw.com

**City of Chicago**
**Brandon Johnson, Mayor**

**Department of Law**
Mary Richardson - Lowry
Corporation Counsel

**121 North LaSalle Street**
**Suite 600**
**Chicago, Illinois 60602**
**(312) 744-0220**
**(312) 744-5185 fax**

www.cityofchicago.org

Dear Ms. Hickey:

The City of Chicago provides its comments to the Independent Monitoring Team's draft report for the reporting period January 1, 2023, through June 30, 2023 (IMR 8). The City looks forward to continued compliance progress in the current monitoring period (July 1, 2023 – December 31, 2023).

**City of Chicago's Comments on the**
**Eighth Independent Monitoring Report**

Pursuant to Consent Decree Paragraph 663, the City of Chicago ("City") provides the following comments on the Independent Monitoring Team's ("IMT") October 2023, draft Independent Monitoring Report 8 ("IMR8 Report").

**Summary of the City's Continued Increased Compliance**

By the close of the eighth reporting period, more than four years into the Consent Decree, the City has achieved some level of compliance with over 84% of the monitorable paragraphs assessed by the IMT in IMR 8. This represents a continued increase in the City's overall compliance over the past three reporting periods.

The City's consistently increasing rates of compliance are significant but represent only a portion of the work done throughout the reporting period. The City appreciates the IMT's acknowledgement that "this report represents a sixth-month assessment of the City's compliance efforts from January 1, 2023,

2

through June 30, 2023 . . . [and] does not reflect all [of] the efforts of the City, the CPD, or the other relevant City entities to date." (*See* IMR 8 Report – Executive

Summary, pg. 3).  The City further appreciates that in the IMT's Executive Summary for IMR 8, it added the achievements by CPD and other relevant City agencies in its section "*Major Developments and Principal Achievements and Challenges Impacting Compliance*." (*See* IMR 8 Report – Executive Summary, pg. 5 – 8). The acknowledgement of the efforts being made for future progress along with the additional information more appropriately recognizes the building nature of the City's reform efforts.

The City also appreciates that the IMT has highlighted all of the policies and trainings developed and administered as part of the compliance efforts with the Consent Decree.  (See IMR 8. Report – Executive Summary, pg. 9-18).  The City maintains that highlighting the methodologies involved in achieving compliance with the Consent Decree is essential to accurately portray the overarching work being done by the Chicago Police Department (CPD), the Office of Emergency Management Communication (OEMC), the Civilian Office of Police Accountability (COPA), the Police Board, the Office of Inspector General (OIG), Department of Human Resources (DHR), Public Safety Administration (PSA), and the other City entities involved in the work of reform.  The policies and trainings required to achieve preliminary and secondary compliance are essential to ensure that CPD members and other City entities have the tools necessary to deliver services to the people of Chicago.  These policies and trainings are also the essential building blocks to achieving and sustaining full compliance with the Consent Decree.

Some of the notable achievements in the Eighth Monitoring Period include:

- The completion / implementation of numerous CPD policies and policy suites after review by the IMT and OAG and community engagement, including: CPD's Use of Force Policy Suite and CPD's Prohibition of Sexual Misconduct Policy.
- Ongoing training by CPD as part of its mandatory 40-hour Annual In-Service Training for 2023.  This includes the following in-person courses:
    - Constitutional Policing
    - Use of Force
    - Officer Wellness
    - Fair and Impartial Policing

3

- Completion of the stipulation by the City and OAG adding pedestrian investigatory stops to the Consent Decree.
- Collaborative Community Engagement opportunities between the Office of the Mayor and CPD's Search Warrant Policy revisions.
- Completion of the full compliance sustainment period by the Office of the Inspector General.

**IMT Reporting Process**

The Monitor's current report, Report 8, documents the City's compliance efforts for January 1, 2023 – June 30, 2023. The current draft of the IMT's Report 8 is over 1700 pages long and will be published more than four months after the end of the reporting period at issue. While the City acknowledges that this is sooner than the publication of the previous report, and appreciates the amount of work that has gone into this evolving document, the City continues to request that the IMT reconsider the format of its reports in order to reduce the length of the report and to complete and file the report much closer in time to the completion of the reporting period documented in the report. The City has previously recommended that the IMT explore ways to archive the historical portions of the report and focus its semi-annual reports on the work completed in the reporting period as well as what is required to achieve further compliance in future reporting periods. In making these suggestions, the City has noted that these changes will lead to more focused reports, allow the parties to complete the review and publication in a timely manner, and make the report more readable to the public, all of which will increase transparency and provide timely feedback to the City as it continues the work of reform. The City understands that the IMT is considering modifications to the process to meet these concerns as well as the concerns of the public, who have also noted the difficulty in reading such a lengthy report. The City looks forward to any changes that will streamline the reporting process so that the public is aware of the work being done and the City has the insight necessary to continue to build its ongoing compliance efforts.

**Methodologies**

Consent Decree Paragraph 655 provides that the IMT will develop and share with the City and the OAG a proposed methodology for its compliance reviews. Paragraph 655 allows for the

4

parties to submit comments regarding the methodology, which both the City and the OAG have consistently submitted.

The City recognizes the complexity and difficulty of developing distinct methodologies for several hundred Consent Decree requirements spanning numerous topics and appreciates the IMT's efforts to do so in a thorough manner. The City, however, believes that many of the methodologies delineated by the IMT add substantive requirements beyond the legal requirements stated in the Consent Decree. Other methodologies do not provide adequate detail about the data sources and analysis methods that will be used to assess compliance.

Consent Decree Paragraph 624 provides that the IMT's review will determine whether the City has substantially complied with the Consent Decree. This paragraph further notes that "Compliance with a requirement means that the City and CPD: (a) have incorporated the requirement into policy; (b) have trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) are carrying out the requirement in actual practice." Based on this paragraph, the IMT assesses whether the City and its entities are in preliminary, secondary, or full compliance—each of these levels typically mirrors the three subparts of ¶ 642.[1]

As noted below, many of the City's disagreements with the IMT's current report involve methodology descriptions that vary from the methodologies described above or that fail to give the appropriate credit for materials developed and submitted for compliance. The City is concerned that the IMT often conflates the requirements for full compliance when assessing secondary compliance. Additionally, often the IMT's methodologies do not provide sufficient actionable detail to allow the City to understand what will be required to achieve the next level of compliance. The IMT reports frequently provide specific guidance, which the City finds immensely helpful in planning their future compliance efforts. However, where the guidance is unclear or based upon a methodology beyond what is contained in the Consent Decree, it could cause a delay in the City's compliance efforts and may present a misleading picture to the public regarding the extent to which the City is undertaking the steps required to achieve compliance.

Some concerns related to specific section or paragraph assessments are addressed below, and further concerns have been addressed in prior correspondence and conversations between the

---

[1] For certain Consent Decree requirements, this three-pronged analysis is less suitable. In those situations, the Monitor develops alternate methodologies for assessing compliance.

5

parties and the IMT. The City looks forward to future discussions with the IMT and OAG about methodologies as part of the Comprehensive Assessment. The City believes that clearly delineated methodologies allows the City to plan for compliance. Additionally, the City maintains that clearly established methodologies are essential for the public to understand the work being done and how compliance is being assessed.

**Specific Comments**

The City provides the following comments in response to the IMT's comments related to various Consent Decree sections / specific Consent Decree paragraphs / or involved City Agencies. These comments are specific to CPD unless otherwise noted:

- **Community Policing:**

  o Paragraph 41 (Methodology): The SRO Annual Report is due 60 days after the end of the school year and therefore was not bound by the 30JUL deadline for IMR-8. This reporting cadence should be assessed during the IMR at the end of every calendar year.

  o Paragraph 43 (Methodology): All of the requirements of this paragraph have occurred and therefore, should be in full compliance. The annualized review process is assessed through paragraph 41.

- **Impartial Policing:**

  o Paragraph 72 (Methodology): S11-10 Department Training and S11-10-03 In-Service Training received no objections as to both policies and both policies codify the requirements of paragraph 72 to be concepts integrated in training. Accordingly, CPD maintains that they should have achieved preliminary compliance.

  o Paragraph 73 (Methodology): The Procedural Justice Class is complete. This paragraph should be in full compliance. Paragraph 74 provides the requirement for ongoing PJ concepts in training.

- **Use of Force:**

  o Paragraph 155 (Inconsistent Narrative): The IMT appears to be withholding or not assessing secondary compliance with this paragraph in IMR 8 because CPD has not yet trained on the 2023 Use of Force Policy Update; however, the IMT acknowledges that they received proof of 95% training of 2022 De-Escalation, Response to Resistance and Use of Force Training.

  o Paragraphs 157 and 158 (Methodology): The Annual Use of Force training should constitute secondary compliance with these paragraphs.

6

- o Paragraph 165 (Methodology): CPD should at least be under assessment for full compliance with this paragraph based upon the Annual Use of Force Report, TRED Year End Report, and Annual Report.

- o Paragraph 167 (Factually Inaccurate): The City and CPD maintain that the necessary and responsive materials have been provided to the IMT (MONITOR1546).

- o Paragraph 172 (Methodology): The requirements of 172 are complete and any future and ongoing assessment is achieved through paragraphs 168 and 169.

- o Paragraph 190 (Methodology): TRED's report includes the required data collection, reviews, and analysis for the requirements for this paragraph for full compliance.

- o Paragraph 200 (Methodology): CPD has produced the 2022 Annual Use of Force Report, the 2022 TRED Year End Report, and a list of TRED debriefing points; additionally, CPD and has added "verbal warnings" as a debriefing point. Based upon these submissions, CPD should be under assessment for full compliance.

- o Paragraph 223 (Methodology): IMT is withholding/not assessing full compliance due to concerns with numbers regarding TRED debriefing points. CPD has submitted the Annual TRED report, the requested TRED debriefing points, and 2022 In-Service Supervisor Training. The IMT shouldn't diminish CPDs efforts to reduce number of debriefings conducted.

- o Paragraph 235 (Methodology): The IMT acknowledges the TRED Report and receipt of proof of 95% In Service Supervisor Training; accordingly, CPD should be at least under assessment for full compliance.

- **Training:**
  - o Paragraph 291 (Factually Inaccurate): CPD has been consistently providing proof of 40hrs in-service training completed each year; therefore, a process is already in place.

- **Officer Wellness:**
  - o Paragraph 384 (Methodology): ¶384 calls for a plan for implementation to meet members' wellness needs, an Officer Wellness Support Plan. In the third reporting period, CPD produced a thoughtful Officer Wellness Support plan based on its establishment of "a framework for iterative review and reassessment of CPD's ability to meet the wellness needs of its members." In the Second Semi-annual Independent Monitoring Report, the Monitoring Team also cites the Officer Wellness Support Plan's "ability to prioritize and address the needs identified by the assessment," as reasons for gaining preliminary and secondary compliance. Furthermore, the Report goes on to cite "technology... to schedule, track, and report on the Division's activities" as a requirement for full compliance. In the

Independent Monitoring Report 8 (Draft), CPD lost secondary compliance for ¶384. The Independent Monitoring Report 8 (Draft) cites "data" and/or a "technological solution" as the reason for loss of secondary compliance. CPD would like to highlight that during IMR-3, data was not a requirement for gaining or maintaining secondary compliance. It is understandable that CPD did not gain full compliance during the eighth reporting period as it was previously made clear that a technological solution is required to gain full compliance. However, CPD finds it objectionable for the IMT to change its methodology for evaluation concerning this paragraph without discussion prior to doing so. Accordingly, CPD requests to maintain secondary compliance with ¶384 as the requirements for secondary compliance set forth in the third reporting period remain satisfied.

o Paragraph 389 (Methodology): XI-A of E06-01 was drafted to address the requirements of this paragraph.

o Paragraphs 408 and 409 (Methodology): TISMP eLearning 95% Compliance Report was produced on September 22, 2022, and should have established secondary compliance.

- **Accountability (CPD):**

  o Paragraphs 488 – 491 (Methodology): CPD received approval to publish G03-06 (as a temporary policy, while procedures are still being reviewed). The requirements of paragraph 488-491 are codified in the currently published G03-06 from 2020 and should establish preliminary compliance with these paragraphs.

  o Paragraph 528 (Factually Inaccurate and Methodology): The requirements for training as they pertain to paragraph 528 are codified in S08-01, Complaint and Disciplinary Investigators and Investigations, and should establish preliminary compliance. The standard and methodology for achieving preliminary compliance is to have the requirements of the paragraph codified in Department policy. A detailed written training plan for the required training that is outlined in policy is going beyond the scope of preliminary compliance and should be necessary for secondary compliance.

  o Paragraph 530 (Methodology): The policy establishes preliminary compliance and the training plan establishes secondary compliance.

  o Paragraph 553 (Methodology): Preliminary compliance is established by G08-01 which codifies the requirements of this paragraph.

- **Accountability (COPA):**

  o Paragraph 481: COPA respectfully requests reconsideration for secondary compliance. Request for Authorization to Investigate or Re-Open an Incident Over Five Years Old Guidance and sample letter were provided. Also, the training tracker showing staff certifications that Guidance was reviewed. As discussed on monthly calls, this review and certification was most appropriate for staff

8

awareness for the requirements for this paragraph and not full staff training (*see e.g.* para 564).

o Paragraphs 438 and 508: COPA respectfully requests reconsideration for full compliance based on 2 site visits/testing in the spring/IMR8 by IMT Data Monitor of COPA. These visits and demonstrations showed the capabilities of CMS to fulfill these paragraphs.

- **Data:**

  o Paragraph 581 (Factually Inaccurate): The City and CPD maintain that the data on the dashboard was never downloadable. The City and CPD will continue to discuss and work with the IMT ensuring that the data requirements for this paragraph are being met.

- **OEMC:**

OEMC has provided the attached detailed response to the IMT Report, specifically requesting that the IMT restore the previously awarded compliance for paragraphs 144, 145, 148, and 151. The City and OEMC believe that OEMC has historically produced the necessary evidence to support compliance with these paragraphs and has sufficiently demonstrated its compliance efforts throughout the eighth reporting period.

Additionally, the City has requested that the IMT's assessment of OEMC in the area of CIT be re-focused to OEMC's role in dispatching police services and not expanded to topics and areas not covered by the Consent Decree.

<u>Comprehensive Assessment</u>

The City looks forward to working with the IMT and OAG on the Comprehensive Assessment and on ways to make the Consent Decree work more efficiently. This includes the reporting process discussed above, as well as the way in which compliance materials are reviewed and approved by the IMT and OAG. The City believes that improving efficiencies will improve the process for the IMT, OAG, and the City, and, more importantly, will allow the public to see the work being done and allow the community see and feel the reforms that are occurring under the Consent Decree.

Thank you for the opportunity to provide this response.

Sincerely,

*/s/ Jennifer K. Bagby*
Deputy Corporation Counsel
City of Chicago Department of Law
Public Safety Reform Division
121 NORTH LASALLE STREET * SUITE 600
CHICAGO, ILLINOIS 60602
312.742.6408 · Jennifer.Bagby@CityofChicago.org

9

Cc:    Christopher Wells, Office of the Attorney General
          Scott Spears, Acting General Counsel, CPD
          Allan Slagel, Taft Law



From:   Mac Kawaters
        Policy Analyst

Date:   17OCT2023, 1444 hours

**OEMC's Response to the OAG/IMT's *Revised Draft IMR8 Report.***

---

**Independent Monitoring Report 8, Overview:**

Enclosed please find the response from the City of Chicago's Office of Emergency Management and Communications (OEMC) to the *Independent Monitoring Report 8* drafted by the Independent Monitoring Team. OEMC appreciates the IMT's revision, which achieves greater clarity in its narrative. However, the IMT's assessments in this report do not appear to consistently apply to the requirements of individual paragraphs assessed; or, in some cases, to appropriately apply those assessments to OEMC. Such issues in the IMR-8 report seem to have negatively affected OEMC's compliance levels, as detailed below.

Therefore, OEMC respectfully requests that the IMT restore its compliance for paragraphs 144, 145, 148 and 151. OEMC believes it has historically produced the necessary evidence to support compliance for these paragraphs and sufficiently demonstrated effort to support compliance during the eighth reporting period.

**Regarding ¶144:**

OEMC has faithfully produced relevant training records annually, which reflect the requirements for CIT training at OEMC are fulfilled. OEMC believes it remains in secondary compliance with this paragraph, where paragraph 144 specifically details the minimum required topics for CIT training. The IMT previously observed OEMC's training classes and the IMT received evidence of training policy that includes minimum requirements and their applicability. The IMT further received evidence these minimum training requirements and corresponding policy were reviewed with appropriate partners in consultation.

Additionally, the IMT's assessment includes discussion of paragraphs 138-140, 142, but fails to demonstrate why those assessments are mixed in its discussion of paragraph 144.

Further, the IMT's assessment under paragraph 144 references significant program changes, and the IMT specifically describes the Chicago Police Department's updated terminology for CIT officer designations. While the IMT writes these changes have occurred "over the last several monitoring periods," CPD's revised SO 5-14 was published September 2022 (during IMR-7). The IMT assessed "OEMC has been slow to respond to such changes…" In fact, OEMC engaged its annual policy review just a quarter later; a review process that included policy clarification from CPD in IMR-8, for which OEMC used to initiate revision of its policies and training. As was communicated previously, OEMC believes it produced sufficient evidence to support program development under the consent decree, including during IMR-8. OEMC respectfully requests the IMT allow OEMC to follow through on its established processes in a reasonable time frame and not revoke compliance before the annual requirement is expired.

**Regarding ¶145:**
Under paragraph 145, the IMT appears to revoke compliance, in part due to insufficient training records. As was previously discussed, the consent decree specifically defines "telecommunicators" as:

*Tele-communicators means the Police Communication supervisors, call-takers, and dispatchers employed by OEMC.* (¶789)

Further, discussion of CIT training between 2016-2021 is irrelevant, as OEMC has demonstrated in IMR-8 it trained 95% or more of relevant active telecommunicators. OEMC believes it has fulfilled the requirements of paragraph 145 both literally and in the spirit of the consent decree.

**Regarding ¶148:**
Whereas the IMT's assessment under paragraph 148 discusses the City's effort to publish annually its CIT plan, the requirements of the paragraph assessed specifically address OEMC's requirements related to the City's CIT plan reporting, which OEMC believes it currently is in compliance with and OEMC has produced evidence to support (e.g. its May 2023 *coc_cit_mnthly* data report, where OEMC demonstrated system operability related to, "Y attribute" dispatch[1]).

**Regarding ¶151:**
The assessment under paragraph 151 acknowledges OEMC has produced evidence of its annual policy review, yet the assessment level is recorded as, "None" and "Not yet applicable." OEMC requests clarification, as OEMC has provided evidence of annual policy review in previous years and described its policy review effort in multiple presentations to the IMT.

**Conclusion:**
OEMC has not demonstrated any critical failure or negligence during IMR-8, but actually demonstrated regular effort toward compliance support and progress under the consent decree. Evidence has been consistently produced that OEMC has established viable structures for effort associated with the above paragraphs and demonstrated their utilization. Therefore, OEMC respectfully requests the IMT: a) restore its compliance levels, and b) allow proper workout periods for discussion, verification and program development.

---

[1] Please note, this report was formally produced during IMR-8 (ref. IMT's assessment under paragraph 138).

Independent | Chicago Police
Monitoring Team | Department
Consent Decree