# EXHIBIT A

# Accountability and Transparency Compliance Assessments, by Paragraph

| | | | |
|---|---|---|---|
| ¶424 | ¶460 | ¶495 | ¶532 |
| ¶425 | ¶461 | ¶496 | ¶533 |
| ¶426 | ¶462 | ¶497 | ¶534 |
| ¶427 | ¶463 | ¶498 | ¶535 |
| ¶428 | ¶464 | ¶499 | ¶536 |
| ¶429 | ¶465 | ¶500 | ¶537 |
| ¶430 | ¶466 | ¶501 | ¶538 |
| ¶431 | ¶467 | ¶502 | ¶539 |
| ¶432 | ¶468 | ¶503 | ¶540 |
| ¶433 | ¶469 | ¶504 | ¶541 |
| ¶434 | ¶470 | ¶505 | ¶542 |
| ¶435 | ¶471 | ¶506 | ¶543 |
| ¶436 | ¶472 | ¶507 | ¶544 |
| ¶437 | ¶473 | ¶508 | ¶545 |
| ¶438 | ¶474 | ¶509 | ¶546 |
| ¶439 | ¶475 | ¶511 | ¶547 |
| ¶440 | ¶476 | ¶512 | ¶548 |
| ¶441 | ¶477 | ¶513 | ¶549 |
| ¶442 | ¶478 | ¶514 | ¶550 |
| ¶443 | ¶479 | ¶515 | ¶551 |
| ¶444 | ¶480 | ¶516 | ¶552 |
| ¶445 | ¶481 | ¶517 | ¶553 |
| ¶446 | ¶482 | ¶518 | ¶554 |
| ¶447 | ¶483 | ¶519 | ¶555 |
| ¶448 | ¶484 | ¶521 | ¶556 |
| ¶449 | ¶485 | ¶522 | ¶557 |
| ¶450 | ¶486 | ¶523 | ¶558 |
| ¶451 | ¶487 | ¶524 | ¶559 |
| ¶452 | ¶488 | ¶525 | ¶560 |
| ¶453 | ¶489 | ¶526 | ¶561 |
| ¶454 | ¶490 | ¶527 | ¶562 |
| ¶455 | ¶491 | ¶528 | ¶563 |
| ¶456 | ¶492 | ¶529 | ¶564 |
| ¶457 | ¶493 | ¶530 | ¶565 |
| ¶459 | ¶494 | ¶531 | |

## Accountability and Transparency: ¶424

*424. When members of the public submit complaints to the City ("complainants"), those complaints must be courteously received, properly classified, and efficiently investigated. Throughout a non-criminal investigation of the actions of a member (an "administrative investigation"), complainants should be able to track the status of their complaints and receive current, accurate information.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[1] |
| CPD | *In Compliance* (FIFTH REPORTING PERIOD) |
| COPA | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| CPD | *Not in Compliance* |
| COPA | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| CPD | *Not Yet Assessed* |
| COPA | *Under Assessment* (NEW: LOST COMPLIANCE) |

In the eighth reporting period, COPA did not maintain Full compliance with ¶424 and is under assessment. The CPD made efforts toward but did not ultimately reach Secondary compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶424, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[2] To evaluate Secondary compliance with

---

[1]    As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[2]    The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for the Civilian Office of Police Accountability (COPA), Illinois v. Chicago*, Case No. 17-cv-6260 (January 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for._.pdf. The review process in the Stipulation mirrors the review process under ¶¶626–

this paragraph, we reviewed the CPD's and COPA's training development, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we evaluated whether the entities have implemented their policies and trainings such that complaints are courteously received, properly classified, and efficiently investigated, and community members are able to track the status of investigations into their complaint.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD and its Bureau of Internal Affairs (BIA) provided draft Unit Directives relating to ¶424 but had not finalized those directives. In the fifth reporting period, the CPD BIA compiled and provided drafts of various directives that were relevant to the requirements of ¶424, specifically General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. CPD reached Preliminary compliance in the fifth reporting period due to the finalization of the General Order. In the seventh reporting period, BIA provided a first draft of its eLearning relevant to ¶424 but it remained in the drafting phase at the end of the reporting period. Also in the seventh reporting period, the CPD produced a revised draft of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, and the IMT submitted a no-objection notice to G08-01-02. Additionally, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022, for review with numerous paragraphs, however it remained under development by the end of the seventh reporting period.

In previous reporting periods, COPA finalized 3.1.1, *Intake*, as well as 3.1.2, *Fact Gathering & Investigative Process*, which propelled COPA to reach Preliminary compliance. In the fifth reporting period, COPA reached Secondary compliance by revising its *Intake Unit: Overview of Policies and Procedures In-Service Training* and submitting evidence that 99% of its personnel completed this training during the fifth reporting period. In the sixth reporting period, COPA provided evidence that COPA is fulfilling the requirements of ¶424, and therefore, COPA reached Full compliance. In the seventh reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶424. However, COPA maintained Full compliance with the IMT's review of COPA's website, which clearly directs all complainants to the CPD portal, which allows complainants to track the status of their complaints and receive current, accurate information. We explained that, in order to maintain Full compliance, COPA should provide evidence each reporting period demonstrating that COPA continues to follow policies and trainings such that community members' complaints are being courteously received and that complainants are able to track the status of investigations into their complaint.

---

41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶424. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions as about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including for review with ¶424. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶424.

\*\*\*

The CPD did not yet reach Secondary compliance. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

COPA lost Full compliance with ¶424 and is under assessment. For COPA, we will continue to look for evidence demonstrating that COPA continues to follow policies and trainings such that community members' complaints are being courteously received and that complainants are able to track the status of investigations into their complaint. To regain Full compliance, early in the ninth reporting period, we expect COPA to demonstrate that the various methods by which COPA receives complaints are courteous. To regain and maintain Full compliance, we must receive such materials in each future reporting period.

## Paragraph 424 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD |
|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

## Accountability and Transparency: ¶¶425–26

*425. The City, CPD, and COPA will ensure individuals are allowed to submit complaints in multiple ways, including: in person to COPA or at a CPD district station, by telephone, online, anonymously, and through third party representatives. To ensure broad and easy access to its complaint system, within 90 days of the Effective Date: a. the City, CPD, and COPA will make the process for filing a complaint widely available to the public, including in-person, by telephone, and online; b. the City, CPD, and COPA will make the process for filing a complaint available electronically; c. the City, CPD, and COPA will make information on filing a complaint and accompanying instructions accessible to people who speak languages other than English and will provide telephonic language interpretation services consistent with the City's and CPD's existing limited English proficiency policies and this Agreement; d. the City, CPD, and COPA will ensure individuals may submit allegations of misconduct, regardless of whether the individual is a member or perceived member of an identifiable group, based upon, but not limited to: race, ethnicity, color, national origin, ancestry, religion, disability status, gender, gender identity, sexual orientation, marital status, parental status, military discharge status, financial status, or lawful source of income; e. the City, CPD, and COPA will continue to ensure that members of the public may make complaints via telephone using free 24-hour services, including by calling 311 and being given the option to leave a voicemail for COPA or speak to a CPD supervisor, and will clearly display this information on their respective websites and other appropriate City and CPD printed materials; f. the City, CPD, and COPA will ensure that instructions for submitting complaints are available via telephone, on-line, and in-person; and g. the City and CPD will ensure that complaint filing information is prominently displayed on CPD website's homepage, including by linking to COPA's online complaint form.*

*426. As part of the COPA's system for processing non-confidential complaints and administrative notifications (the "intake process"), each complaint and administrative notification will be assigned a unique tracking number. This unique tracking number will be linked with all phases of the investigation and disciplinary process, through the final disposition.*

| Compliance Progress | | ¶425 | ¶426 |
|---|---|---|---|
| (Reporting Period: January 1, 2023, through June 30, 2023) | | | |
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD) | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* | *In Compliance* (NEW) |
| | **CPD** | *Not in Compliance* | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* | *Not Yet Assessed* |
| | **COPA** | *Under Assessment* (NEW: LOST COMPLIANCE) | *Under Assessment* (NEW: LOST COMPLIANCE) |

In the eighth reporting period, the CPD maintained Preliminary compliance with ¶425 and reached Secondary compliance with ¶426. With this, the City and the CPD reached Secondary compliance with ¶426. COPA did not maintain Full compliance and is under assessment for these paragraphs. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance with ¶425.

To evaluate Preliminary compliance with ¶¶425–26, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance with these paragraphs, we reviewed the entities' training development, materials, implementation, and evaluation.[3] To evaluate Full compliance with these paragraphs, we reviewed various data sources including but not limited to training materials, demonstrations, complaint submission systems, and website features to determine whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶425–26's mandates.

---

[3]    The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for the Civilian Office of Police Accountability (COPA), Illinois v. Chicago,* Case No. 17-cv-6260 (January 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD and BIA were in the process of creating and finalizing policies that spoke to the requirements of ¶¶425–26. The CPD submitted a consultation draft of its *Case Management System* Unit Directive in the fourth reporting period, but this Unit Directive remained in the collaborative review and revision process at the end of the fifth reporting period. Also in the fifth reporting period, the CPD and BIA finalized General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, and General Order G08-01, *Complaint and Disciplinary System*. Through these efforts, the CPD reached Preliminary compliance in the fifth reporting period. In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning which is relevant to ¶425(d) and ¶426. Additionally, the CPD provided a revised version of Special Order S08-01-01, *Log Number Case Management System*, for review.

In the seventh reporting period, the CPD provided further revised BIA eLearning materials, however those materials addressed only the requirements of ¶425(a), (b), and (d). € revised BIA eLearning materials also addressed ¶426 and its requirements. By the end of the seventh reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of its personnel, not just its sworn personnel. Additionally, the CPD produced a revised draft of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which addressed the requirements of ¶425(a), (c), (d), (e), (f), and (g). Lastly, the CPD produced a draft of its five-day BIA Onboard Training for review in July, not including ¶425–26, but did produce a draft for review in December, including ¶425 but not ¶26. By the end of the reporting period, the training was still under development.

In the fourth reporting period, COPA finalized Policy 3.1.1, *Intake*, which met the requirements for Preliminary compliance for ¶425 and ¶426. In the fifth reporting period, COPA provided materials for its training *Intake Unit: Overview of Policies and Procedures In-Service* and 99% of COPA personnel completed this training in the fifth reporting period, bringing COPA into Secondary compliance with both paragraphs. In the sixth reporting period, COPA provided materials for its training: *Case Management System: Overview of Policy and Procedures*, which trained on the requirements of ¶425 in the main paragraph, as well as ¶425(a) and (e) regarding how COPA will accept complaints. Additionally, COPA's website and information it submitted demonstrated that COPA continues to make available to the public several means through which a community member can file a complaint, and that the public is aware of these options, which allowed COPA to reach Full compliance with ¶425. Lastly, COPA provided documentation demonstrating how the Log Number assigned at intake follows the investigation through all phases of the investigation and disciplinary process to its final disposition, including the findings and discipline imposed, per the requirements of ¶426, moving COPA into Full

compliance. In the seventh reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶425–26. We explained that, to maintain Full compliance, we expect COPA to provide evidence of continued Full compliance each reporting period.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. However, as the IMT has stated previously, the training only addresses the requirements of ¶425(a), (b), and (d) and does not address the remaining subparagraphs. On the other hand, the eLearning does address the requirements of ¶426 and the CPD demonstrated that more than 95% of its sworn and civilian personnel completed the training. With this, the CPD moved into Secondary compliance for ¶426 but remains in Preliminary compliance with ¶425.

However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶425 but not ¶426. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, not including ¶¶425–26. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the eighth reporting period, the CPD produced 5 modules of instruction for review,

including for review with ¶¶425–26. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶¶425–26.

\*\*\*

Moving forward, for ¶425, we anticipate that the CPD will revise the BIA eLearning to address the requirements of ¶425 for review. To assess Full compliance for ¶426, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank.

Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For Full compliance, we will also look for documentation that the CPD and its employees are acting in accordance with ¶426's mandates.

For COPA, we will look for evidence of Full compliance with ¶425–26's mandates. To regain Full compliance, we expect to receive such materials in the ninth reporting period and in each following reporting period.

## Paragraph 425 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

## Paragraph 426 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶427

> *427. The City and CPD will ensure all complaints are accepted, documented, submitted to COPA, and investigated in accordance with this Agreement and the applicable collective bargaining agreement, whether submitted: by a CPD member or a member of the public; verbally or in writing; in person, by telephone, online, or by a complainant anonymously; or by a third-party representative.*

### Compliance Progress     (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[4] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |

In the eighth reporting period, the City and the CPD reached Secondary compliance with ¶427. COPA maintained Full compliance with ¶427.

To evaluate Preliminary compliance with ¶427, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[5] To evaluate Secondary compliance with this paragraph, we reviewed the CPD's and COPA's training development, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶427's mandates.

---

[4] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[5] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

Throughout previous reporting periods, the CPD worked to draft, revise, and finalize General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*.[6] By the end of the fifth reporting period, the CPD finalized this policy and reached Preliminary compliance. In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning relevant to ¶427, however it was still in draft state by the end of the reporting period. In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which addressed ¶427 and its requirements. By the end of the reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of all its personnel, not just its sworn personnel. Additionally, the CPD produced a revised draft of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which addressed the requirements of ¶427. Lastly, the CPD produced a draft of its five-day BIA Onboard Training for review in July, not including ¶427, but did produce a draft for review in December, including ¶427. By the end of the reporting period, the training was still under development.

COPA reached Preliminary compliance with this paragraph in the fourth reporting period by finalizing its Policy 3.1.1, *Intake*. In the fifth reporting period, COPA provided the IMT with documents for its *Intake Unit: Overview of Policies and Procedures In-Service* training materials, which related to the requirements of ¶427 and provided evidence that 99% of its personnel completed the training. Through these efforts, COPA reached Secondary compliance. In the sixth reporting period, COPA did not produce any evidence related to Full compliance efforts under ¶427. In the seventh reporting period, COPA submitted a case management system memorandum that demonstrated that all complaints are received, including the methods of the receipt of the complaint, with information regarding the complaint, per the requirements of ¶427. This moved COPA into Full compliance.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶427. With this, the CPD moved into Secondary compliance for ¶427. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for

---

[6] The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶427. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, not including ¶427. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including ¶427. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶427.

*** 

To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For Full compliance, we

will also look for documentation that the CPD and its employees are acting in accordance with ¶427's mandates.

For COPA, we will look for continued evidence of efforts related to maintaining Full compliance. We expect to receive documentation of efforts towards maintaining Full compliance every reporting period.

### Paragraph 427 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶428

> ***428.*** *When a CPD member becomes aware of an individual who wants to make a complaint regarding a CPD member's conduct, he or she will promptly provide the individual with COPA's contact information and notify a supervisor of the complaint received in the field. CPD will also ensure that, in response to complaints about CPD members, supervisors respond to the scene, document the complaint, and submit it to COPA. If the supervisor allegedly authorized, engaged in conduct that led to, witnessed, or otherwise allegedly participated in the incident complained of, the supervisor will contact his or her immediate supervisor, who will assign another supervisor to immediately document the complaint and submit it to COPA.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Secondary compliance with ¶428.

To evaluate Preliminary compliance with ¶428, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed the CPD's training development, implementation, and evaluation (¶286).

*Progress before the Eighth Reporting Period*

The City and the CPD reached Preliminary compliance with ¶428 in the fifth reporting period. The CPD had worked to revise its General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which addressed the requirements of ¶428. In the fifth reporting period, we submitted a no-objection notice to the revised G08-01-02 and the CPD posted G08-01-02 for public comment for 15 days.[7] The CPD finalized the General Order, reaching Preliminary compliance with ¶428. In the sixth reporting period, the CPD and BIA provided a first

---

[7]    Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on

draft of its eLearning relevant to ¶428, but it remained in draft state at the end of the reporting period.

In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which addressed ¶428 and its requirements. By the end of the reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of all its personnel, not just its sworn personnel. Additionally, the CPD produced a revised draft of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which addressed the requirements of ¶428. Lastly, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶428, but also produced a draft for review in December, not including ¶428. By the end of the reporting period, the training was still under development.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶428. With this, the CPD moved into Secondary compliance for ¶428. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, not including ¶428. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the

---

the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, not including ¶428. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including ¶428. For further discussion of the BIA Onboard Training, see ¶526–27.

***

To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For Full compliance, we will also look for documentation that the CPD and its employees are acting in accordance with ¶428's mandates.

### Paragraph 428 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶429

> ***429.*** *The City will continue to ensure that a website is made available to CPD members to anonymously report officer misconduct ("anonymous reporting website") and will internally disseminate information regarding the anonymous reporting website to all CPD members. Reports made on the anonymous reporting website will not relieve CPD members of their duties under CPD Rules of Conduct 21 and 22.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Secondary compliance with ¶429.

To evaluate Preliminary compliance with ¶429, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed the CPD's training development, implementation, and evaluation (¶286).

*Progress before the Eighth Reporting Period*

In previous reporting periods, the Office of the Inspector General continued to host a website for CPD members to anonymously report officer misconduct. The CPD worked to revise and finalize General Order G08-01, *Complaint and Disciplinary System*, a portion of which was directed to the requirements of ¶429. The CPD finalized the G08-01 on the last day of the fifth reporting period. Additionally, Section IX of the Office of the Inspector General (OIG) Online Complaint Form addressed ¶429. Although the policy covered the requirements of the paragraph—and the CPD therefore reached Preliminary compliance—we reiterated concerns expressed in the fourth reporting period that while the policy addresses the language of ¶429, the policy may leave members uncertain of the extent to which members who make anonymous reports are able to keep their identity unknown in the process. We encouraged the CPD to consider how it might take a step beyond the requirements of ¶429 to not only comply with this paragraph, but to provide additional clarity and protection to members reporting misconduct via the Office of the Inspector General website. In the sixth reporting period, the CPD provided a first draft of its eLearning relevant to ¶429 but the materials remained in draft state and not in final, presentation form.

In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which addressed ¶429 and its requirements. By the end of the reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of all its personnel, not just its sworn personnel. Additionally, the CPD produced a revised draft of G08-01, *Complaint and Disciplinary System*, which addressed the requirements of ¶429. Lastly, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶429, and also produced a draft for review in December. The training did not address the requirements of ¶429, and by the end of the reporting period, the training was still under development.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶429. With this, the CPD moved into Secondary compliance for ¶429. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶429. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, not including ¶429. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with

producing individual blocks of instruction. On June 29, 2023, at the end of the re-porting period, the CPD produced 5 modules of instruction for review, including ¶429. For further discussion of the BIA Onboard Training, see ¶526–27.

∗∗∗

To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is re-quired of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For Full compliance, we will also look for documentation that the CPD and its employees are acting in ac-cordance with ¶429's mandates.

<h3 style="text-align:center">Paragraph 429 Compliance Progress History</h3>

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶430

**430.** *COPA will ensure that individuals who submit electronic complaints receive a copy of the information contained in the complaint via electronic mail, if an electronic mail address is provided, upon submission.*

## Compliance Progress      (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Under Assessment* (NEW: LOST COMPLIANCE) |

In the eighth reporting period, COPA did not maintain Full compliance and is under assessment for ¶430.

To evaluate Preliminary compliance with ¶430, the IMT reviewed the COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[8] To assess Secondary compliance with this paragraph, we reviewed COPA's training development, implementation, and evaluation (¶286).[9] To evaluate Full compliance with this paragraph, we reviewed various data sources including but not limited to training materials, presentations, demonstrations, and case files to determine whether COPA has implemented its policies and trainings such that it is acting in accordance with ¶430's mandates.

*Progress before the Eighth Reporting Period*

In previous reporting periods, COPA met Preliminary compliance by finalizing its *Intake Policy*, which requires that an electronic copy of the complaint be provided to a complainant who files an online compliant via email. In the fifth reporting period, COPA moved into Secondary compliance with its *Intake Unit: Overview of Policies and Procedures In-Service* training. This training touches on the requirements of ¶430 and COPA's 3.1.1 *Intake* policy. COPA provided evidence that the training was completed by 99% of its personnel. In the sixth reporting period, COPA continued to develop and provide training that speaks to the requirements of

---

[8]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[9]   The IMT evaluates training materials using as our standard the "ADDIE" model of curriculum development and implementation. This model typically incorporates the following elements: training needs assessment' curriculum design and development; training implementations (or delivery); and training evaluation.

¶430. For example, COPA provided materials for its training *Case Management System: Overview of Policy and Procedures*, however they did not provide training records prior to the end of the sixth reporting period. Additionally, COPA provided two case files along with an IMT review of the website that demonstrates that COPA had continued to actualize the requirements of ¶430 and therefore reached Full compliance.

In the seventh reporting period, COPA did not produce any information related to compliance with ¶430. Although COPA provided documentation of evidence that 100% of employees completed *the Case Management System: Overview of Policy and Procedures* training, ¶430 was not designated in the production. Additionally, COPA did not submit documentation evidencing that individuals who submit electronic complaints continue to receive a receipt or acknowledgement that the complaint was received. The IMT noted that we expect to receive documentation demonstrating ongoing efforts related to maintaining Full compliance with this paragraph in each reporting period.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, COPA did not produce any information related to compliance with ¶430. As stated in the seventh reporting period, to maintain Full compliance, the IMT expects to receive documentation demonstrating ongoing efforts related to maintaining Full compliance with this paragraph in each reporting period.

*** 

Moving forward, we expect COPA to provide evidence early in the ninth reporting that at least 95% of its personnel received its *Case Management System: Overview of Policy and Procedures* training and that COPA employees are acting in accordance with ¶430's mandates. Additionally, we will look for documentation evidencing that individuals who submit electronic complaints continue to receive a receipt or acknowledgement that the complaint was received. To regain and maintain Full compliance moving forward, we will expect to receive documentation related to this paragraph in each reporting period.

## Paragraph 430 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Full |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Secondary | |

# Accountability and Transparency: ¶431

> **431.** *The City and CPD will undertake best efforts to ensure that the absence of a signed complainant affidavit alone will not preclude an administrative investigation.*

## Compliance Progress

(Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FOURTH REPORTING PERIOD)[10] |
| | **CPD** | *In Compliance* (FOURTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |

The CPD made efforts toward but did not ultimately reach Secondary compliance with this paragraph. COPA maintained Full compliance with ¶431. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶431, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[11] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶431's mandates.

---

[10] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[11] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

The CPD and COPA reached Preliminary compliance in the fourth reporting period. The CPD revised General Order G08-01, *Complaint and Disciplinary Procedures,* which addresses the affidavit-override process and exceptions to the affidavit requirement. In the fifth reporting period, we submitted a no-objection notice to G08-01.[12] The CPD finalized the policy on the last day of the reporting period after receiving public comment. In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶431. In the seventh reporting period, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶431, and also produced a draft for review in December. The training did not address the requirements of ¶431, and by the end of the reporting period, the training was still under development.

COPA reached Preliminary compliance by finalizing 3.1.1. *Intake* policy, which was finalized in the fourth reporting period. The *Intake* policy addresses ¶431 by noting that a sworn affidavit is not required for a preliminary investigation to begin. In the fifth reporting period, COPA compiled and submitted for review materials for a training titled *COPA Intake Unit: Overview of Policies and Procedures*. The IMT submitted a no-objection notice and COPA demonstrated that the training was completed by 99% of its personnel. This moved COPA into Secondary compliance. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶431. In the seventh reporting period, COPA provided a memorandum with documentation that provides specific information regarding the affidavit override and override request. With this, COPA reached Full compliance in the seventh reporting period.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶431. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous ver-

---

[12]   Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

sion, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including for review with ¶431. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶431.

***

Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For COPA, we will look for evidence that COPA undertakes best efforts to ensure that the absence of a signed complainant affidavit alone will not preclude an administrative investigation, pursuant to the requirements of ¶431. We expect to receive documentation of efforts towards maintaining Full compliance every reporting period.

### Paragraph 431 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

## Accountability and Transparency: ¶432

> **432.** *The City and CPD will require that complaints about any CPD member are accepted, documented, submitted to COPA, and investigated even if the complainant could not identify the CPD member's name or other employee-identifying number, including star or badge number.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[13] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Under Assessment* (NEW: LOST COMPLIANCE) |

In the eighth reporting period, the City and the CPD reached Secondary compliance with this paragraph. COPA did not maintain Full compliance and is under assessment for ¶432.

To evaluate Preliminary compliance with ¶432, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[14] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance with this paragraph, we reviewed various data sources including but not limited to documentation related to case intakes and up-to-date lists of complaint cases to determine whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶432's mandates.

---

[13] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[14] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD worked to revise General Order G08-01-02[15] to instruct compliance with ¶432. In the fifth reporting period, the CPD continued revising G08-01-02. We provided a no-objection notice to G08-01-02.[16] Thereafter, the CPD posted the policy for public comment and finalized the policy on the last day of the fifth reporting period. In the sixth reporting period, the CPD and BIA provided a draft of its eLearning, however it remained in draft state at the end of the reporting period.

In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which addressed ¶432 and its requirements. By the end of the reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of all its personnel, not just its sworn personnel. Additionally, the CPD produced a revised draft of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which addressed the requirements of ¶432. Lastly, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶432, and also produced a draft for review in December. By the end of the reporting period, the training was still under development.

COPA reached Preliminary compliance in the fourth reporting period by finalizing Policy 3.1.1 *Intake*, which mandates compliance with ¶432's requirements. In the fifth reporting period, COPA moved into Secondary compliance with its *Intake Unit: Overview of Policies and Procedures In-Service* training. After we submitted a no-objection notice, COPA demonstrated that the training was completed by 99% of its personnel. In the sixth reporting period, COPA reached Full compliance by providing various examples of case intakes and additional detail regarding multiple 2021 and 2022 complaint cases, which demonstrated COPA's adherence to the requirements of ¶432. In the previous reporting period, COPA did not produce any information related to compliance with ¶432. The IMT noted that we will expect

---

[15] The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[16] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

to receive documentation demonstrating ongoing efforts related to maintaining Full compliance with this paragraph in each reporting period.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶432. With this, the CPD moved into Secondary compliance for ¶432. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶432. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, not including ¶432. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including ¶432. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶432.

***

To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For Full compliance, we will also look for documentation that the CPD and its employees are acting in accordance with ¶432's mandates.

For COPA, we will look for evidence early in the ninth reporting period that COPA and its employees are acting in accordance with ¶432's mandates. Additionally, we will look for documentation evidencing that individuals who submit electronic complaints continue to receive a receipt or acknowledgement that the complaint was received. To regain and maintain Full compliance moving forward, we expect to receive documentation related to this paragraph in each reporting period.

### Paragraph 432 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶433

*433. CPD will require that officers provide their name and star number, or in the case of non-sworn members other employee-identifying number, to any member of the public, upon request.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

**Preliminary:**    *In Compliance* (SIXTH REPORTING PERIOD)
**Secondary:**    *In Compliance* (NEW)
**Full:**    *Not Yet Assessed*

This reporting period, the CPD reached Secondary compliance with ¶433.

To evaluate Preliminary compliance with ¶433, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed CPD's training development, implementation, and evaluation.

### Progress before the Eighth Reporting Period

In previous reporting periods, the CPD worked to finalize a policy that requires CPD officers to provide their star number and name or other employee-identifying number to public members upon request. Toward the end of the fourth reporting period, the CPD provided a draft of its General Order G02-01, *Protection of Human Rights*. We reviewed this draft at the start of the fifth reporting period. By the end of the fifth reporting period, the draft General Order remained in the collaborative review and revision process. In the sixth reporting period, the CPD provided a revised version of G02-01, which addressed the requirements of ¶433. CPD posted the policy for public comment and finalized the policy, which propelled CPD into Preliminary compliance. Additionally, CPD and BIA provided a first draft of its eLearning relevant to ¶433 but it remained in draft state at the end of the reporting period. In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which addressed ¶433 and its requirements. By the end of the reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of all its personnel, not just its sworn personnel.

### Progress in the Eighth Reporting Period

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶433. With this, the CPD moved into Secondary compliance for ¶433. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to

train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

\*\*\*

Moving forward, we will look for documentation that the CPD and its employees are acting in accordance with ¶433's mandates.

### Paragraph 433 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

EIGHTH REPORTING PERIOD
JANUARY 1, 2023 – JUNE 30, 2023
COMPLIANCE PROGRESS:
Secondary

# Accountability and Transparency: ¶434

> ***434.*** *When CPD responds to or investigates incidents involving allegations of officer involved domestic violence, CPD will ensure that COPA is provided an administrative notification. COPA will initiate the intake process and investigate all such allegations in accordance with this Agreement.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |

The City and the CPD reached Secondary compliance with ¶434 in the eighth reporting period. COPA maintained Full compliance with ¶434.

To evaluate Preliminary compliance with ¶434, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[17] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance with this paragraph, we reviewed various data sources to determine whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶434's mandates. To meet Full compliance, the City, the CPD, and COPA will need to demonstrate that the corresponding policies and training materials are implemented into practice. For COPA, this means providing case-specific information regarding intake and investigations that demonstrates the requirements of this paragraph.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the City as a whole did not reach Preliminary compliance because the CPD had not finalized a policy mandating compliance with

---

[17]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

¶434's requirements. In the fifth reporting period, the CPD worked to revise General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. Although the CPD revised G08-01-02 and received a no-objection notice from the IMT, the policy fell short of the requirements set out in ¶434, which requires the CPD to ensure that COPA is notified "when CPD responds to or investigates incidents involving allegations of officer-involved domestic violence."[18] We noted that while the CPD did finalize the policy, minor revisions were necessary to move into Preliminary compliance.

In the sixth reporting period, we continued to encourage the CPD to revise G08-01-02 to further instruct compliance with the requirements of ¶434 because it remained in a state that fell short of the requirements set out in ¶434, which requires the CPD to ensure that COPA is notified "when CPD responds to or investigates incidents involving allegations of officer-involved domestic violence." Additionally in the sixth reporting period, the CPD and BIA provided a draft eLearning relevant to ¶434 but it remained in draft state at the end of the reporting period.

In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which addressed ¶434 and its requirements. By the end of the reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of all its personnel, not just its sworn personnel. Additionally, the CPD produced a revised draft of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which addressed the requirements of ¶434. Lastly, the CPD provided a revised version of G08-01-01, *Complaint and Disciplinary Definitions*, which supported G08-01-02. With this, the City and the CPD reached Preliminary compliance.

COPA finalized Policy 3.1.1, *Intake*, in the fourth reporting period, which not only met the requirements of ¶434, but exceeded the mandates of ¶434. In the fifth reporting period, COPA undertook developing and providing training to its personnel. We reviewed COPA's *Intake Unit: Overview of Policies and Procedures In-Service* training, which instructed compliance with the requirements of ¶434, and COPA provided evidence that 99% of its personnel completed this training. Therefore, COPA moved into Secondary compliance in the fifth reporting period. In the

---

[18] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

sixth reporting period, COPA provided data in a chart illustrating the numbers and locations of occurrences in which CPD personnel were involved in domestic violence and sexual misconduct incidents from 2019 to 2022. The IMT requested that more case-specific information be provided, notably information regarding the intake and investigations detailing how the process was initiated and completed, to demonstrate Full compliance in future reporting periods. In the seventh reporting period, COPA provided a memorandum with supporting documentation regarding multiple domestic violence cases and the process COPA engaged that adheres to the requirements of ¶434. With this, COPA moved into Full compliance with this paragraph in the seventh reporting period.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶434. With this, the CPD moved into Secondary compliance for ¶434. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶434.

*** 

To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing to work with them collaboratively in the ninth reporting period. For Full compliance, we will also look for documentation that the CPD and its employees are acting in accordance with ¶434's mandates.

For COPA, we will continue to look for evidence that COPA continues to initiate the intake process and investigate all such allegations. We expect to receive documentation of efforts towards maintaining Full compliance every reporting period.

### Paragraph 434 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶435

> **435.** *The City, CPD, and COPA will require that complaints alleging that a CPD member refused to accept a complaint, discouraged the filing of a complaint, or provided false or misleading information about filing a complaint are accepted, documented, and submitted to COPA for investigation and, where appropriate, recommended for discipline.*

**Compliance Progress**       (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |

The City and the CPD reached Secondary compliance with ¶435 in the eighth reporting period. COPA maintained Full compliance.

To evaluate Preliminary compliance with ¶435, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[19] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶435's mandates.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD made progress toward Preliminary compliance with this paragraph through its drafting and revision efforts related to General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*. We also reviewed related training submitted by the CPD Bureau of Internal Affairs (BIA), *Complaint Initiation Process.* We submitted a no-objection notice to

---

[19]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

this training in April 2021. We did not, however, receive additional information related to this training. In the fifth reporting period, the CPD finalized G08-01-02, but this policy did not sufficiently address ¶435's requirement that subjects of such complaints be, where appropriate, recommended for discipline. In the sixth reporting period, we continued to encourage the CPD to revise G08-01-02 to further instruct compliance with the requirements of ¶435. Additionally in the sixth reporting period, the CPD and BIA provided a draft eLearning relevant to ¶435 but it remained in draft state at the end of the reporting period. In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which addressed ¶435 and its requirements. By the end of the reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of all its personnel, not just its sworn personnel. Additionally, the CPD produced a revised draft of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which addressed the requirements of ¶435.

COPA finalized Policy 3.1.1, *Intake*, in the fourth reporting period, which moved it into Preliminary compliance. In the fifth reporting period, COPA provided materials for its training *Intake Unit: Overview of Policies and Procedures In-Service*. COPA provided evidence that the training was completed by 99% of its personnel, which moved COPA into Secondary compliance. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶435.

In the seventh reporting period, COPA provided a spreadsheet detailing approximately 57 violations of failing to accept a complaint, discouraging the filing of a complaint, or providing false or misleading information about filing a complaint, therefore demonstrating COPA's investigations into such complaints. It appeared that COPA inherited most of these complaints from the Independent Police Review Authority (IPRA) from as far back as 2011 through 2017. COPA appeared to have concluded the investigations and recommended some form of discipline with many of the cases adjudicated. The IMT noted that several cases, which were several years old, appeared to be pending appeal or other administrative sanctions beyond COPA's jurisdiction. The IMT noted concerns that CPD or the City appeared unable to render a final disciplinary decision or make appeal decisions in a timely manner. Although COPA appeared to be conducting and closing investigations per the requirements of ¶435 more quickly, it was unclear how many ongoing open investigations COPA had. COPA reached Full compliance in the seventh reporting period.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶435. With this, the CPD moved into Secondary compliance for

¶435. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, not including ¶435. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including for review with ¶435. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶435.

***

To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures

included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For Full compliance, we will also look for documentation that the CPD and its employees are acting in accordance with ¶435's mandates.

For COPA, we will look for continued efforts demonstrating Full compliance. We expect to receive documentation of efforts towards maintaining Full compliance every reporting period.

### Paragraph 435 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Under Assessment | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶436

> **436.** *Within 90 days of the Effective Date, CPD will ensure that there are adequate policies and practices in place to encourage and protect CPD members who report potential misconduct by other CPD members. Such policies will provide, at a minimum: a. that CPD members promptly report any misconduct of which they are aware to a supervisor; b. that the supervisor document such alleged misconduct and promptly report it to COPA; and c. that all forms of retaliation, interference, intimidation, and coercion against a CPD member who reports misconduct or cooperates with an investigation of misconduct, are strictly prohibited.*

**Compliance Progress**     (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The CPD maintained Preliminary compliance with ¶436 in the eighth reporting period.

To evaluate Preliminary compliance with ¶436, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms." To evaluate Secondary compliance, we reviewed the CPD's training development, implementation, and evaluation.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD worked toward Preliminary compliance by providing various versions of General Orders, including but not limited to G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, and G08-05, *Prohibition on Retaliation*.[20] Although the CPD made significant progress toward Preliminary compliance in the third and fourth reporting periods, the policies remained in the revision stages of creating and finalizing policies that speak to the requirements of ¶436 at the beginning of the fifth reporting period. In the fifth reporting period, the CPD revised General Order G08-01, *Complaint and Discovery Procedures*, and General Order G08-01-02, *Complaint Initiation and Log Number*

---

[20] The name of this directive changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

*Investigation Assignment.*[21] We provided a no-objection notice to both policies and the CPD posted the General Orders for public comment.[22] On the last day of the fifth reporting period, the CPD finalized the policies. This moved the CPD into Preliminary compliance.

In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning relevant to ¶436, but the draft only addressed ¶436(b) and (c). The draft of the eLearning module did not seem to instruct compliance with the requirements of ¶436(a): "that CPD members promptly report any misconduct of which they are aware to a supervisor." At the end of the reporting period, the eLearning materials remained in a draft state. In the seventh reporting period, the CPD produced a revised version of G08-01, *Complaint and Disciplinary System*, which addressed ¶436(a) and ¶436(c). Additionally, the CPD produced a revised draft of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which addressed the requirements of ¶436(b). Lastly, the CPD produced a draft of its five-day BIA Onboard Training for review in July, not including ¶436, but did produce a draft for review in December, including ¶436. By the end of the reporting period, the training was still under development.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided a draft of its *Prohibition on Retaliation* eLearning, which addresses the requirements of ¶436 and its subparagraphs. Overall, the IMT finds the eLearning instruction to be much improved from previous eLearning instructions from CPD. We find the training to be more interactive for the students. Additionally, the CPD thoroughly referenced the city rules and regulations, as well as state laws regarding retaliation. The IMT submitted a no-objection notice on July 13, 2023, with feedback for the CPD to consider regarding numbering slides, estimating time for completion of the training, using human nar-

---

[21] The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[22] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

ration, and ensuring members know they are responsible for reading and understanding the corresponding policy, among others. By the end of the eighth reporting period, the eLearning remained under development.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶436. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, not including ¶436. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including ¶436. For further discussion of the BIA Onboard Training, see ¶526–27.

***

The CPD maintained Preliminary compliance with ¶436 in the eighth reporting period. Moving forward, we will look for the CPD to finalize the *Prohibition on Retaliation* eLearning. The CPD will then need to train on the eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. We also look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

## Paragraph 436 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶437

> ***437.*** *CPD will expressly prohibit all forms of retaliation, intimidation, coercion, or adverse action against any person who reports misconduct or cooperates with an administrative investigation.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

**Preliminary:**      *In Compliance (THIRD REPORTING PERIOD)*
**Secondary:**        *Not in Compliance*
**Full:**             *Not Yet Assessed*

The CPD made efforts toward but did not ultimately reach Secondary compliance with ¶437 in the eighth reporting period.

To evaluate Preliminary compliance with ¶437, the IMT reviewed the CPD's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms." To evaluate Secondary compliance with this paragraph, we reviewed, among other things, the CPD's training development, implementation, and evaluation (¶286).[23]

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD maintained Preliminary compliance with ¶437 due to the finalized General Order G08-05, *Prohibition on Retaliation*. In the fourth reporting period, the IMT reviewed BIA's *Complaint Initiation Process – BIA Investigators & Accountability Sergeants Annual Training*. However, we did not receive BIA's corresponding on-boarding training. Additionally, the CPD had produced related training—the *2020 Supervisor In-Service Refresher* training—but this training remained in the collaborative review and revision process at the end of the fourth reporting period. In the fifth reporting period, the CPD and BIA produced no new information pertaining to the requirements of ¶437. In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning relevant to ¶437. At the end of the reporting period, the eLearning materials remained in a draft state. In the seventh reporting period, the CPD produced a draft of its five-day BIA Onboard Training for review in July, not including ¶437, but did produce a draft for review in December, including ¶437. By the end of the reporting period, the training was still under development.

---

[23]   The IMT evaluates training materials using as our standard the "ADDIE" model of curriculum development and implementation. This model typically incorporates the following elements: training needs assessment' curriculum design and development; training implementations (or delivery); and training evaluation.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided a draft of its *Prohibition on Retaliation* eLearning, which addresses the requirements of ¶437. Overall, the IMT finds the eLearning instruction to be much improved from previous eLearning instructions from CPD. We find the training to be more interactive for the students. Additionally, the CPD thoroughly referenced the city rules and regulations, as well as state laws regarding retaliation. The IMT submitted a no-objection notice on July 13, 2023, with feedback for the CPD to consider regarding numbering slides, estimating time for completion of the training, using human narration, and ensuring members know they are responsible for reading and understanding the corresponding policy, among others. By the end of the eighth reporting period, the eLearning remained under development.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶437. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, not including ¶437. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including ¶437. For further discussion of the BIA Onboard Training, see ¶526–27.

***

The CPD maintained Preliminary compliance with ¶437 in the eighth reporting period. Moving forward, we will look for the CPD to finalize the *Prohibition on Retaliation* eLearning. The CPD will then need to train on the eLearning to meet the requirements of these paragraphs and subparagraphs and demonstrate that it has provided this training to at least 95% of its personnel. We also look forward to

continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

### Paragraph 437 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶438

> ***438.*** *OAG acknowledges that the City, CPD, and COPA are work-ing to create an electronic Case Management System ("CMS"). The City, CPD, and COPA will ensure that the CMS maintains ac-curate data regarding the number, classification, and status of all administrative investigations, from the intake process through the final disciplinary decision, if any, and through any grievance process, arbitration, Police Board proceeding, or ap-peal relating to the final disciplinary decision (the "final disposi-tion"). CMS will be maintained by appropriate personnel from the City, CPD, and COPA. The CMS will be fully operational by June 30, 2020.*

| Compliance Progress | | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Under Assessment* |

The City and the CPD maintained Preliminary compliance with ¶438 in the eighth reporting period. COPA remains under assessment for Full compliance with ¶438. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶438, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and pub-lic comment periods.[24] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and eval-

---

[24] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

uation (¶286). To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies, training, and a CMS system that fulfills the requirements of this paragraph.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD showed its commitment to compliance with ¶438 by conducting *Case Management System Investigative Console-Conducting/Investigations* training and developing its *Case Management System Updates and Enhancements Annual Training*. However, many of the requirements of ¶438 were not addressed. The CPD also developed a *Case Management System User Guide* for its BIA Investigators and Accountability Sergeants. In the fifth reporting period, the CPD and BIA provided drafts of Unit Directive, *Case Management System*, but it remained in the collaborative review and revision process at the end of the reporting period. Additionally, CPD drafted and revised Special Order S08-01-01, *Conducting Log Number Investigations*.[25] Although the Special Order addressed the requirements of ¶438, it also remained in the collaborative review and revision process at the end of the reporting period.

In the sixth reporting period, the CPD submitted a revised Special Order S08-01-01, *Log Number Case Management System*, for review, which speaks to ¶438's requirement that the Case Management System maintains accurate data from the intake process through the final disciplinary decision. We submitted a no-objection notice subject to additional revisions including adding language clarifying that the Log Number will follow the investigation from the intake process to the final disposition. Additionally, the CPD submitted Special Order S08-01-05, *Conducting Log Number Investigations*, for review.[26] This revised policy instructs compliance with the requirements of ¶438. Although the IMT provided comments to S08-01-05 and a no-objection notice to S08-01-01, additional revisions remained necessary before the CPD finalized the policies. In the previous reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. This policy completely addressed the requirements of ¶438. The CPD also produced S08-01-01, *Log Number Case Management System*, for review in the sixth reporting period, which addressed the requirements of ¶438. In the seventh reporting period, the CPD produced a final version of this policy. With this, the CPD reached Preliminary compliance in the previous reporting period.

COPA reached Preliminary compliance in the fourth reporting period due to the finalization of Policy 3.1.6, *Clear and Column Case Management System Systems*. In the fifth reporting period, COPA provided training materials for review—*Case*

---

[25]  This policy was renumbered to S08-01-05 in the sixth reporting period.

[26]  The *Conducting Log Number Investigations* policy was produced in previous reporting periods as S08-01-01. The policy was re-numbered as S08-01-05 when it was produced May 5, 2022. We refer to the policy in this report as S08-01-05 for clarity.

*Management System: Overview of Policy and Procedures*. The IMT submitted a no-objection notice to the training, but COPA did not provide the training by the end of the reporting period.[27] In the sixth reporting period, COPA provided the training but did not submit documentation that COPA provided its training to 95% of its staff. However, COPA did provide documentation demonstrating how the Log Number assigned at intake follows the investigation through to its final disposition, including the findings and discipline imposed, per the requirements of ¶438. In the seventh reporting period, COPA provided documentation that more than 95% of COPA employees attended the training *Case Management System: Overview of Policy and Procedures*. Additionally, COPA provided its *COPA Guidance Column CMS Administration*, which supported COPA's *Clear and Column CMS* policy, by placing the responsibility on COPA of maintaining accurate and reliable data regarding the number, classification, and status of all administrative investigations from intake to the final disposition in the CMS. Additionally, the IMT viewed CMS data and randomly reviewed cases during a site visit in the seventh reporting period. In the seventh reporting period, COPA remained under assessment for Full compliance as the Parties continued to have conversations concerning the evidence sufficient for Full compliance.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, not including ¶438. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual

---

[27] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶438. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including ¶438. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶438. In the eighth reporting period, COPA remains under assessment for Full compliance as the Parties continued to have conversations concerning the evidence sufficient for Full compliance.

*** 

The City and the CPD maintained Preliminary compliance. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. COPA remains under assessment for Full compliance.

### Paragraph 438 Compliance Progress History

| FIRST REPORTING PERIOD SEPTEMBER 1, 2019 – AUGUST 31, 2019 COMPLIANCE PROGRESS: Not Applicable | SECOND REPORTING PERIOD SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 COMPLIANCE PROGRESS: Not Applicable | THIRD REPORTING PERIOD MARCH 1, 2020 – DECEMBER 31, 2020 COMPLIANCE PROGRESS: Under Assessment |
| --- | --- | --- |
| FOURTH REPORTING PERIOD JANUARY 1, 2021 – JUNE 30, 2021 COMPLIANCE PROGRESS: None | FIFTH REPORTING PERIOD JULY 1, 2021 – DECEMBER 31, 2021 COMPLIANCE PROGRESS: None | SIXTH REPORTING PERIOD JANUARY 1, 2022 – JUNE 30, 2022 COMPLIANCE PROGRESS: None |
| SEVENTH REPORTING PERIOD JULY 1, 2022 – DECEMBER 31, 2022 COMPLIANCE PROGRESS: Preliminary | EIGHTH REPORTING PERIOD JANUARY 1, 2023 – JUNE 30, 2023 COMPLIANCE PROGRESS: Preliminary | |

# Accountability and Transparency: ¶439

> **439.** *The City and CPD will ensure that complainants and their representatives are able to track non-confidential unique tracking numbers from the intake process through final disposition via telephone and in person. By June 30, 2020, the City will also ensure complainants and their representatives are able to track the status of non-confidential unique tracking numbers from the intake process through final disposition online.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[28] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Under Assessment* (NEW: LOST COMPLIANCE) |

In the seventh reporting period, the City and the CPD maintained Preliminary compliance with ¶439. COPA lost Full compliance and remains under assessment. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶439, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[29] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and eval-

---

[28] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[29] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

uation (¶286). To evaluate Full compliance with this paragraph, we reviewed various data sources including but not limited to documentation and demonstration of complaint tracking systems to determine whether the CPD and COPA have sufficiently implemented their policies and trainings, as well as a Case Management System that fulfills the requirements of ¶439.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD worked on developing and revising G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, to fully address the requirements of ¶439.[30] In the fifth reporting period, the CPD submitted multiple revised drafts, and we ultimately submitted a no-objection notice in November 2021.[31] The finalization of this policy moved the CPD into Preliminary compliance. In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶439. In the seventh reporting period, the CPD produced a revised draft of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which addressed the requirements of ¶439.

COPA in past reporting periods finalized Policy 3.1.6, *Clear and Column Case Management System Systems*, developed an *Employee Agreement Regarding Use of CLEAR and Column Case Management System Systems* form, and at the end of the fourth reporting period submitted Policy 3.1.1, *Intake*, as evidence of compliance. In the fifth reporting period, COPA compiled and submitted for review materials for a training titled *Intake Unit: Overview of Policies and Procedures In-Service* and demonstrated that more than 95% of its personnel received the training. COPA also provided materials for its training *Case Management System: Overview of Policy and Procedures*, and the IMT understood that COPA would provide the training in January 2022. These efforts moved COPA into Secondary compliance in the fifth reporting period. In the sixth reporting period, COPA continued to develop and provide training that spoke to the requirements of ¶439. For example, COPA provided materials for its training *Case Management System: Overview of Policy and*

---

[30] The name of this directive changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[31] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

*Procedures*. Although COPA did not submit training records relevant to participation in trainings for the sixth reporting period, we anticipated receiving those records in the seventh reporting period showing more than 95% of its personnel participating.

Related to Full compliance in the sixth reporting period, COPA provided documentation demonstrating how the Log Number assigned at intake follows the investigation through to its final disposition, including the findings and discipline imposed, per the requirements of ¶439. COPA's website allows a complainant to input the Log Number and see where the complaint is in the investigation process. In the previous reporting period, COPA provided documentation demonstrating that 100% of employees completed *the Case Management System: Overview of Policy and Procedures* training, however ¶439 was not included in the production.

Additionally, COPA, in the seventh reporting period, provided its *COPA Guidance Column CMS Administration*, which supported COPA's *Clear and Column CMS* policy by placing the responsibility of ensuring that complainants are able to track their non-confidential unique tracking numbers from the intake process through final disposition online. With this, COPA maintained Full compliance in the seventh reporting period. However, the IMT noted to maintain Full compliance in the coming reporting periods, COPA must also demonstrate that complainants and their representatives are able to track non-confidential unique tracking numbers from the intake process through final disposition via telephone and in person, in addition to online.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶439.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶439. As noted in the previous reporting period, to maintain Full compliance, COPA must also demonstrate that complainants and their representatives are able to track non-confidential unique tracking numbers from the intake process through final disposition via telephone and in person, in addition to online. Because COPA did not send the requested documentation in the eighth reporting period, COPA did not maintain Full compliance and is under assessment.

***

Moving forward, we will continue to look for the CPD to develop training instructing compliance with its policies and ¶439. For COPA, we expect to receive a production including ¶439 early in the ninth reporting period that at least 95% of its

personnel received its *Case Management System: Overview of Policy and Procedures* training and that COPA employees are acting in accordance with ¶439's mandates. Further, as stated previously, to reach Full compliance again in coming reporting periods, we will look for evidence that complainants and their representatives are able to track non-confidential unique tracking numbers from the intake process through final disposition via telephone and in person, in addition to online. Until the IMT receives this information regularly, COPA will remain under assessment. We expect to receive materials demonstrating Full compliance in each reporting period.

### Paragraph 439 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

## Accountability and Transparency: ¶440

**440.** *The City, CPD, and COPA will ensure that all non-confidential complaints are processed by COPA as follows: a. all non-confidential complaints of alleged misconduct received by CPD, including BIA and CPD supervisors, are documented and submitted to COPA within 24 hours of receipt; b. all complaints of alleged misconduct submitted to the anonymous reporting website and all non-confidential complaints of alleged misconduct received by the OIG will be submitted to COPA by the end of the next business day after the complaint was received; c. upon receipt of a complaint, COPA will promptly assign the complaint a unique tracking number, make an initial determination of the classification(s) of the alleged misconduct, and will either retain the complaint for investigation or transfer the complaint to BIA for investigation; d. COPA, pursuant to its ordinance and this Agreement, will have the jurisdiction to conduct administrative investigations of all allegations of misconduct that involve: i. excessive force; ii. Domestic violence; iii. Improper search or seizure of individuals or property; iv. Coercion; v. verbal abuse as defined under Municipal Code of Chicago, § 2-78-100, including any unwelcome sexual advances or requests for sexual favors; or vi. Unlawful denial of access to counsel. E. COPA, pursuant to its ordinance and this Agreement, will receive immediate administrative notification of and have jurisdiction to conduct administrative investigations of all incidents, including those in which no allegation of misconduct has been made, involving: i. firearm discharges by CPD officers that could potentially strike an individual ("officer-involved shooting"); ii. Taser or stun gun discharges by CPD officers that result in death or serious bodily injury; iii. Any person who dies or sustains serious bodily injury while in CPD custody, or as a result of CPD actions; iv. "officer-involved deaths," as that term is defined in 50 ILCS 727/1-5; and v. other weapons discharges and other uses of CPD-issued equipment as a weapon that results in death or serious bodily injury, at the COPA Chief Administrator's discretion; f. the City, CPD, and COPA will ensure that all allegations are recorded and classified appropriately, even if the complainant does not accurately characterize the alleged misconduct; g. if BIA or district personnel conducting investigations into misconduct identify allegations of misconduct that are within COPA's administrative investigative jurisdiction as defined herein, the investigator will promptly notify COPA; and h. if a complaint contains multiple allegations of misconduct,*

> *one or more of which falls within COPA's administrative investigation jurisdiction as defined herein, COPA will have the right of first refusal to conduct an administrative investigation of the entire complaint.*

## Compliance Progress     (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not in Compliance* |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |

The City and the CPD maintained Preliminary compliance with ¶440. COPA maintained Secondary compliance. The Deputy PSIG maintained Full compliance with ¶440 in the eighth reporting period. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶440, the IMT reviewed the CPD's, COPA's, and the Deputy PSIG's policies following the policy process described in the Consent Decree (¶¶626–41).[32] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶440's mandates. Specific to determining whether the Deputy PSIG maintained Full compliance, we reviewed materials submitted by the Deputy PSIG, which included spreadsheets noting all COPA notifications made by the Office of the Inspector General and a memorandum detailing summary statistics relevant to ¶440's requirements.

---

[32] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD, COPA, and the Office of the Inspector General made progress toward compliance at different rates. The CPD previously produced General Order G08-01-02, *Complaint Initiation and Log Number Investigation*[33] and two BIA Unit Directives (*Initiation of Log Numbers in the Case Management* System and *Assignment of Administrative Log Number Investigations).* [34] These policies did not address all subparagraphs relevant to the CPD. In the fifth reporting period, the CPD worked to address ¶440(a), (e), (f), (g), and (h) as it revised G08-01-02, *Complaint Initiation and Log Number Investigation.* The IMT submitted a no-objection notice and the CPD finalized the General Order on the last day of the reporting period.[35] Additionally, the CPD provided revisions of Special Order S08-01-01, *Conducting Log Number Investigations*, but it remained in the collaborative review and revision process at the close of the fifth reporting period. Lastly, the CPD has provided several BIA Unit Directives relevant to the requirements of ¶440 such as *Initial Responsibilities in Assigned Log Number Investigations*, which speaks to ¶440(g) and (h), and *Initiation of Log Numbers in the Case Management System*, which addresses ¶440(f). These directives were not finalized by the end of the reporting period.

In the sixth reporting period, the CPD provided a first draft of its BIA eLearning, which was relevant only to ¶440(a), however it remained in draft state at the end of the reporting period. Additionally, the CPD provided drafts of Special Order S08-

---

[33] The name of this directive changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct.*

[34] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in the sixth reporting period, and it is ongoing.

[35] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

01-05, *Conducting Log Number Investigations*[36] and Special Order S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*[37] for review, relevant to ¶440(g). Both policies remained in the collaborative review and revision process at the end of the reporting period.

In the seventh reporting period, the CPD produced a revised draft of S08-01-05, *Conducting Log Number Investigations*, which addressed the requirements of ¶440(g). The City and CPD also provided a revised version of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*, which addressed the requirements of ¶440(g) and (h). Additionally, the City and CPD provided a revised version of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment,* which addressed the requirements of ¶440(a) and ¶440(f). With this, the CPD reached Preliminary compliance. Lastly, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶440, and also produced a draft for review in December. By the end of the reporting period, the training was still under development.

COPA submitted and finalized Policy 3.1.1, *Intake*, which addressed the requirements of ¶440(c), (e), (f), and (h). Additionally, COPA provided a draft ordinance 2-78-120 that aimed to address subparagraphs (d) and (e). In the fifth reporting period, COPA provided for review training materials for its training *Intake Unit: Overview of Policies and Procedures In Service 2021* and demonstrated that more than 95% of its personnel received the training. Additionally, COPA produced a revised draft ordnance 2-78-120. The IMT commended COPA for taking the lead to develop its own policies for the response and investigations of officer involved shootings and deaths, which were noted in COPA's draft policy, *Major Incident Responses – Officer-Involved Shooting or Officer-Involved Death*. In the sixth and seventh reporting periods, COPA did not produce any documentation that demonstrated efforts related to ¶440.

Finally, the Deputy PSIG reached Full compliance by providing a supplement to its *Investigations Manual*, which contained policies and training materials regarding the submission and process for submitting alleged misconduct to COPA. The Deputy PSIG also provided training records to help establish Full compliance. In the fifth reporting period, the Deputy PSIG provided a memorandum to the IMT and

---

[36] In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01; it is now S08-01-05, *Conducting Log Number Investigations*.

[37] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period and incorporated instruction previously included in the BIA *Initial Responsibilities in Assigned Log Number Investigations* Unit Directive (to which we submitted a no-objection in October 2021) into S08-01-04. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

the OAG that provided an update on its performance as it relates to the requirements of ¶440(b). In 2019, the Deputy PSIG reported 68.5% of complaints to COPA by the end of the next business day, but in 2021, this number jumped to 94.2%. In the sixth reporting period, the Deputy PSIG maintained Full compliance and provided a memorandum detailing its compliance with the requirements of ¶440(b). According to a May 2022 production, 91% of the time, the OIG reports complaints by the end of the next business day. In the seventh reporting period, the Deputy PSIG maintained Full compliance and provided a memorandum detailing its compliance with the requirements of ¶440(b). The documentation showed constant improvement of notifying COPA of complaints of alleged misconduct until the first half of 2022. PSIG believed this was partly due to a significant increase in complaints, but also was due to PSIG's complete overhaul of its Intake System. This overhaul included moving the Intake function from the Investigation section to the Legal section, therefore creating an entirely new Intake Unit staffed with new employees. This Unit is led by an experienced Intake Specialist. All new Intake Specialists were trained in PSIG's responsibilities under ¶440(b) and the IMT anticipated that the Deputy PSIG would see significant improvements in reporting complaints to COPA within the requirements of ¶440(b) during the eighth reporting period.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶440. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶440. Throughout June 2023, the IMT, the City, the OAG, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶440. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA provided multiple documents showing efforts related to ¶440. COPA's documentation demonstrate that all non-confidential complaints of alleged misconduct are documented when they are submitted to COPA within 24 hours, addressing ¶440(a). COPA addresses ¶440(b) through a screen shot of its Case Management System Intake Console showing that COPA initiated cases for each by the next business day. ¶440(c) is addressed by COPA's documentation demonstrating that COPA assigns the complaint a unique tracking number and determines if it will retain the investigation or transfer to BIA for investigation. COPA addresses all of ¶440(d) by providing not only the actual number of allegations but also the percentage of cases each misconduct allegation involves. ¶440(f) is addressed through the three case screenshots provided demonstrating that the category changes after initiating a preliminary investigation. COPA also addresses ¶440(g) by demonstrating that COPA is properly assigning cases to BIA and when BIA or the Accountability Sergeant recognizes a misconduct allegation under COPA's jurisdiction, the complaint is properly reassigned to COPA. ¶440(h) is addressed by demonstrating that COPA investigates multiple allegations of an entire complaint involving one or more allegations of misconduct. COPA did not adequately address the requirements of ¶440(e) because it does not specifically address the actual notification of the required Officer-Involved cases, which is required by this subparagraph.

The focus for the Deputy PSIG in the eighth reporting period was maintaining Full compliance. The Deputy PSIG provided a memorandum detailing its compliance with the requirements of ¶440(b), explaining current relevant information and historical information for context. The memorandum listed every complaint made to the anonymous reporting website, as well as the reporting status of when the report was made to COPA, which provides complete transparency. As noted in our last report, the Deputy PSIG completed an overhaul of its intake system. The Deputy PSIG's overhaul included moving the intake function from the Investigation section to the Legal section, while creating an entirely new intake unit staffed with new employees, led by an experienced intake specialist. This contributed to a 97% submission rate to COPA. In the memorandum, PSIG notes that one complainant is responsible for 482 complaints, while six complainants are responsible for 200 additional complaints. This creates a burden on the Deputy PSIG and COPA. The IMT anticipates that the Deputy PSIG and COPA will work to resolve the issues presented by the seven individuals noted to eliminate or reduce the workload for both agencies. Additionally, the IMT commends the Deputy PSIG for its work on improving its reporting of complaints in compliance with the requirements of ¶440(b).

\*\*\*

The City and the CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. Moving forward, we look forward to continuing our

close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

COPA maintained Secondary compliance. Moving forward, we will look forward to receiving information from COPA demonstrating that it is complying with ¶440 and its related policies, specifically ensuring they are complying with the requirements of ¶440(e).

In the eighth reporting period, the Deputy PSIG maintained Full compliance with ¶440 and completed its two-year Sustainment Period for this paragraph.

### Paragraph 440 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶441

**441.** *The City will undertake best efforts to ensure that COPA has jurisdiction to conduct administrative investigations of allegations of sexual misconduct, as defined by this Agreement.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2024* |

In the eighth reporting period, the City maintained Full compliance with ¶441, but moving forward, it must produce evidence to sustain compliance.

To evaluate Preliminary compliance with ¶441, the IMT reviewed COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods for a draft ordinance.[38] To evaluate Secondary compliance with this paragraph, we spoke with relevant City representatives and reviewed memoranda, city ordinances, and other relevant documentation regarding the City's efforts to ensure that COPA has jurisdiction to conduct administrative investigations of allegations of sexual misconduct. To evaluate Full compliance, we considered whether the City's efforts ensured that COPA had the requisite jurisdiction as contemplated by this paragraph and utilized best efforts toward this end.

*Progress before the Eighth Reporting Period*

In previous reporting periods, COPA provided a memorandum that included updates on its efforts to properly train investigative personnel in sexual-assault investigations, including trainings regarding interviewing victims of sexual assault. Additionally, a working group was developed with the goal of improving the investigative and notification process among all the agencies. The City also provided a draft City Ordinance change to 2-78-120 that included specific language consistent with the Consent Decree language on COPA's jurisdiction of sexual misconduct complaints. In the fifth reporting period, the City provided a revised draft Ordinance 2-78-120, which gives COPA the authority to investigate sexual misconduct allegations with language that closely aligns with the requirements of the Consent

---

[38]    The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

Decree. COPA also provided its *Sexual Misconduct* policy, which it finalized at the end of the reporting period. Through COPA's efforts, the City reached Preliminary compliance with ¶441. In the sixth reporting period, COPA provided a *Memorandum of Understanding: Joint Sexual Misconduct Investigations*, which addressed the requirements of ¶441. Additionally, the Municipal Code 2-78-100 and 2-78-120 give specific authority to COPA to investigate complaints of sexual misconduct. With this, the City reached Secondary compliance with ¶441.

Additionally, COPA submitted a memo regarding COPA's jurisdiction to investigate allegations of sexual misconduct, as well as the City Council's Journal of Proceedings regarding the City's ordinance amendments for COPA's jurisdiction of sexual misconduct investigations. These documents meet the City and COPA's obligations to ensure that COPA has jurisdiction to conduct administrative investigations of allegations of sexual misconduct. With this documentation and proof that the City has ensured that COPA has the requisite jurisdiction to conduct administrative investigations of allegations of sexual misconduct, the City reached Full compliance.

Lastly, COPA provided certification at the end of the sixth reporting period demonstrating that COPA provided its Forensic Experiential Trauma Interviews (FETI) Training to its investigative staff handling investigations of allegations of sexual misconduct.

In the seventh reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶441. Additionally, the CPD provided quarterly reports and an annual report that spoke to the requirements of this paragraph. The CPD's *BIA 2021 Quarter 3 Report*, BIA 2022 Quarters 1, 2, and 3 Reports, and *BIA 2021 Annual Report* explained the responsibilities of the CPD and COPA as provided by ¶441 and ¶443. We recommended that the City and the CPD consider how these reports may further efforts to meet the requirements of ¶441.

*Progress in the Eighth Reporting Period*

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶441.

The CPD, in the eighth reporting period, provided its *2022 Annual Report*, which also speaks to the requirements of this paragraph, but those requirements are not fully addressed. The *Report* explains the responsibilities of the CPD and COPA as provided by ¶441 and ¶443. As noted in the previous reporting period, we recommend that the City and the CPD consider how these reports may further efforts to meet the requirements of ¶441.

\*\*\*

We look forward to reviewing documentation demonstrating that the City remains in Full compliance in future reporting periods. To reach Full compliance and maintain moving forward, the City will need to provide evidence of compliance in each reporting period.

## Paragraph 441 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

## Accountability and Transparency: ¶442

> ***442.*** *The City will ensure COPA has appropriately trained and ex-perienced staff to conduct sexual misconduct investigations.*

### Compliance Progress     (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2024* |

In the eighth reporting period, the City maintained Full compliance with ¶442.

To evaluate Preliminary compliance with ¶442, the IMT reviewed COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and pub-lic comment periods.[39] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and eval-uation (¶286). To evaluate Full compliance with this paragraph, we reviewed COPA's relevant data and evidence regarding investigations into sexual misconduct to determine whether it is operating in accordance with the paragraph and related policy. Specifically, we evaluated whether it has implemented its policies and train-ing such that sexual misconduct investigations are conducted by trained and expe-rienced staff. We looked at sample data regarding who conducted the investiga-tions and evidence that the investigations were completed in compliance with pol-icy.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the City and COPA achieved Preliminary and Sec-ondary compliance by submitting a Training Plan and a memo regarding COPA's Special Victim Squad, as well as a comprehensive lesson plan and accompanying presentation, *Sexual Assault Training: Understanding the Neurobiology of Trauma and Applying Trauma Informed Investigative Techniques*. Additionally, COPA pro-duced its in-service training spreadsheet that detailed the trainings it provided (in-cluding the sexual assault training) and the list of attendees. In the fifth reporting period, the City and COPA provided a revised policy, *Sexual Misconduct Investiga-*

---

[39]     The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*tions*, for review. This policy addressed the requirements of ¶442 and COPA finalized the policy. Additionally, COPA produced the *Sexual Misconduct Best Efforts* letter that also addressed the requirements of ¶442.

In the sixth reporting period, COPA reached Full compliance by providing a *Memorandum of Understanding: Joint Sexual Misconduct Investigations*. The memorandum provided documentation showing that the City is utilizing best practices and ensuring that COPA has appropriately trained experienced staff to conduct sexual misconduct investigations. Additionally, COPA provided certification demonstrating that COPA provided its Forensic Experiential Trauma Interviews (FETI) Training to its investigative staff handling investigations of allegations of sexual misconduct. In the seventh reporting period, the City did not produce any documentation that demonstrated efforts related to ¶442.

*Progress in the Eighth Reporting Period*

This reporting period, COPA provided for review its *Sexual Misconduct and Domestic Violence* training. The training addresses the requirements of ¶442. The IMT commends COPA for its commitment to ensuring that their staff is appropriately trained and experienced to conduct sexual misconduct and domestic violence investigations involving CPD personnel.

\*\*\*

We look forward to COPA finalizing its *Sexual Misconduct and Domestic Violence* training and providing documentation that at least 95% of its employees took the training. We also look forward to reviewing documentation demonstrating that the City remains in Full compliance in future reporting periods. To maintain Full compliance, the City will need to continue providing evidence of compliance in each reporting period.

## Paragraph 442 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

## Accountability and Transparency: ¶443

> ***443.*** *Consistent with COPA's jurisdiction, after conferring about the details of a particular criminal sexual misconduct investigation involving a CPD member, COPA and BIA may jointly agree that BIA may conduct the administrative investigation into allegations of sexual misconduct when they jointly determine that doing so avoids unnecessary disruption to the complainant.*

**Compliance Progress**  (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |

The City and the CPD maintained Preliminary compliance with ¶443 in the eighth reporting period. COPA maintained Full compliance with ¶443. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶443, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[40] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286). To evaluate Full compliance, we reviewed various data sources to determine whether the entities sufficiently implemented their training and policies relevant to ¶443.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the City provided an unsigned draft *Memorandum of Understanding regarding Joint Sexual Misconduct Investigations*. By the end of

---

[40]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

the fourth reporting period, neither COPA nor the CPD had finalized corresponding written guidance following the Consent Decree process in ¶443. In the fifth reporting period, BIA provided a revised draft of General Order G08-06, *Prohibitions of Sexual Misconduct*, which addresses the requirements of ¶443 in Section VI.B.[41] At the end of the reporting period, the policy remained in the collaborative review and revision process. In the sixth reporting period, the City and the CPD provided a revised General Order G08-06, *Prohibitions of Sexual Misconduct*.[42] The revised policy addressed only some of the requirements of ¶443 and remained in the collaborative review and revision process at the end of the reporting period.

In the seventh reporting period, the CPD produced a revised draft of G08-06, *Prohibitions of Sexual Misconduct*, which addressed the requirements of ¶443.[43] Additionally, the City and the CPD provided a revised version of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which also addressed the requirements of ¶443. With this, the City and the CPD reached Preliminary compliance by finalizing G08-01-02. Additionally, the City and the CPD provided a draft of its five-day BIA Onboard Training for review in July, not including ¶443, but did produce a draft for review in December, including ¶443. By the end of the reporting period, the training was still under development. Lastly, the CPD also provided an Annual Report and quarterly reports that spoke to the requirements of this paragraph. The CPD's BIA 2021 Annual Report explained the responsibilities of the CPD and COPA as provided in ¶441 and ¶443 but did not fully address the requirements of ¶443. The BIA 2022 Quarters 1, 2, and 3 Reports referenced ¶441 and ¶443, but did not fully meet the requirements of these paragraphs.

COPA, in the fifth reporting period, submitted for review the *COPA Sexual Misconduct Investigations Policy*. COPA went beyond the requirements of ¶443 by describing factors that might be considered when making the determination that "BIA may conduct the administrative investigation." The IMT provided a no-objection notice to the policy, and COPA finalized the policy, which moved COPA into Preliminary compliance.[44] In the sixth reporting period, COPA provided a *Memo-*

---

[41] The CPD and BIA previously submitted this policy under the number G08-05.

[42] The CPD originally numbered this policy G08-05 but has numbered it G08-06 since the May 5, 2021 draft.

[43] The CPD originally numbered this policy G08-05 but has numbered it G08-06 since the May 5, 2021 draft.

[44] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice."

*randum of Understanding: Joint Sexual Misconduct Investigations*, which addressed the requirements of ¶443. This memorandum went further than the requirements of the Consent Decree by indicating that COPA, the Cook County State's Attorney's Office, and BIA have developed a Sexual Misconduct Working Group to develop protocols and best practices for investigating sexual misconduct and domestic violence cases involving CPD employees. Additionally, COPA submitted a memo regarding COPA's jurisdiction to investigate allegations of sexual misconduct, as well as the City Council's Journal of Proceedings regarding the City's ordinance amendments for COPA's jurisdiction of sexual misconduct investigations. Before the end of the reporting period, the City Board of Aldermen overwhelmingly passed the revised ordinance. Lastly, COPA provided certification at the end of the reporting period demonstrating that COPA provided its Forensic Experiential Trauma Interviews (FETI) Training to its investigative staff handling investigations of allegations of sexual misconduct. With these efforts, COPA moved into Full compliance in the sixth reporting period.

In the seventh reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶443. COPA maintained Full compliance, but the IMT noted that moving forward, we would expect to receive documentation demonstrating ongoing efforts related to maintaining Full compliance with this paragraph in each reporting period.

*Progress in the Eighth Reporting Period*

The CPD, in the eighth reporting period, provided its annual report that also speaks to the requirements of this paragraph, however it is not fully addressed. It explains the responsibilities of the CPD and COPA as provided by ¶441 and ¶443. As noted in the previous reporting period, we recommend that the City and the CPD consider how these reports may further efforts to meet the requirements of ¶443.

Additionally in the eighth reporting period, the City and CPD provided a revised version of G08-06, *Prohibitions of Sexual Misconduct*. This policy completely addresses the requirements of ¶443. On June 21, 2023, the CPD finalized and implemented the policy.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶443. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous ver-

---

Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

sion, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including for review with ¶443. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA provided for review its *Sexual Misconduct and Domestic Violence* Training. The training does not fully address the requirements of ¶443.

***

The City and the CPD maintained Preliminary compliance with ¶443 in the eighth reporting period. COPA maintained Full compliance with ¶443. We look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. We will look for COPA to provide documentation evidencing its continued willingness to cooperate with BIA regarding sexual misconduct complaints. Additionally, we look forward to COPA finalizing its *Sexual Misconduct and Domestic Violence* Training and providing documentation that at least 95% of its employees took the training. To maintain Full compliance, we will expect to receive documentation related to this paragraph in each reporting period.

## Paragraph 443 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Status Update

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Status Update

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
None

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

EIGHTH REPORTING PERIOD
JANUARY 1, 2023 – JUNE 30, 2023
COMPLIANCE PROGRESS:
Preliminary

## Accountability and Transparency: ¶444

*444. Within ten days of the final disciplinary decision of each complaint of sexual misconduct against a CPD member alleging conduct against a non-CPD member, the City will provide the Deputy PSIG with the complete administrative investigative file, subject to applicable law. The Deputy PSIG will review and analyze each administrative investigative file and, on an annual basis, the Deputy PSIG will publish a report: a. assessing the quality of the sexual misconduct administrative investigations reviewed; b. recommending changes in policies and practices to better prevent, detect, or investigate sexual misconduct; and c. providing aggregate data on the administrative investigations reviewed, including: i. the volume and nature of allegations investigated, broken down by investigating agency; ii. The percentage of investigations referred to the Cook County State's Attorney's Office ("CCSAO") for criminal review; iii. The percentage of investigations criminally prosecuted; iv. The percentage of investigations closed after the preliminary investigation; v. the percentage of investigations closed for lack of a signed complainant affidavit; and vi. The investigative findings and recommendations, including a summary breakdown of discipline recommended for investigations with sustained findings.*

---

### Compliance Progress
(Reporting Period: January 1, 2023, through June 30, 2023)

**Recurring Schedule:** Annually     ☑ **Not Yet Applicable**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance*[45] |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

---

[45] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

| | |
|---|---|
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |

In the eighth reporting period, the Deputy PSIG continued to maintain Full compliance with ¶444. The City and the CPD reached Preliminary compliance with this paragraph. COPA maintained Preliminary compliance but did not reach Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶444, the IMT reviewed the CPD's, COPA's, and the Office of the Inspector General's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms."[46] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286).[47] To evaluate Full compliance with this paragraph, we reviewed the Office of the Inspector General's policies to determine whether they have been sufficiently implemented and whether the Deputy PSIG's annual reports satisfy each subparagraph of ¶444. We also reviewed Office of the Inspector General's annual report on BIA's and COPA's sexual misconduct investigations.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the entities worked toward compliance at differing rates. While the Deputy PSIG met Full compliance, neither the CPD nor COPA achieved Preliminary compliance by the end of the fourth reporting period because they had not yet implemented policies that demonstrate compliance with ¶444.

The Deputy PSIG met Full compliance in the fourth reporting period because its *General Policy Manual* and *Annual Report* addressed the requirements of ¶444(c).

---

[46] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[47] The IMT evaluates training materials using as our standard the "ADDIE" model of curriculum development and implementation. This model typically incorporates the following elements: training needs assessment' curriculum design and development; training implementations (or delivery); and training evaluation.

The Deputy PSIG also provided training materials for review that addressed the requirements of ¶444—ultimately propelling it into Full compliance. In the fifth reporting period, the Deputy PSIG worked to maintain Full compliance. PSIG's *General Policy Manual* produced in the fifth reporting period continued to address the requirements of ¶444(a) and (b). Additionally, PSIG's *Report on Investigations of Sexual Misconduct Allegations Against Chicago Police Department Members* continued to address 444(c). PSIG's training materials submitted in the fourth reporting period continued to address the requirements of ¶444. Finally, the Deputy PSIG informally submitted a memorandum discussing its performance related to the requirements of ¶444(b). From 2019 through the first nine months of 2021, the Deputy PSIG had steadily improved its reporting to meet the requirements of ¶444(b). In the sixth reporting period, PSIG produced their *Report on Investigations of Sexual Misconduct Allegations Against CPD Members*, which continued to address the requirements of ¶444(a), (b), and (c).

In the fifth reporting period, the CPD and BIA did not produce any information pertaining to the requirements of ¶444. The responsibilities outlined by ¶444 require efforts on the part of the CPD. In the sixth reporting period, the CPD provided a revised General Order G08-06, *Prohibitions of Sexual Misconduct*.[48] The revised policy did not address the requirements of ¶444. The IMT provided comments to the CPD on May 11, 2022, stating that the CPD should revise the policy to better instruct compliance with ¶444, which requires that the administrative file must be provided to the PSIG within 10 days of the final disciplinary decision. At the end of the reporting period, the policy remained in the collaborative review and revision process. In the seventh reporting period, the CPD provided a revised version of G08-06, *Prohibitions of Sexual Misconduct*, which addressed the requirements of ¶444. By the end of the seventh reporting period, this policy remained in the collaborative review and revision process at the end of the seventh reporting period.

COPA, in the fifth reporting period, submitted for review the *COPA Sexual Misconduct Investigations Policy*. COPA finalized this policy after receiving a no-objection notice.[49] This moved COPA into Preliminary compliance with ¶444 in the fifth reporting period. Additionally, COPA provided a revision to the draft ordinance 2-78-

---

[48]  The CPD originally numbered this policy G08-05 but has numbered it G08-06 since the May 5, 2021 draft.

[49]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD

120, which provides direction and gives COPA the authority to investigate sexual misconduct allegations. This ordinance was not yet in effect by the end of the fifth reporting period. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶444. In the previous reporting period, COPA provided a guidance document related to tracking complaints of sexual misconduct. The documentation explained the reason for the procedures and provided an exact procedure that COPA personnel fulfill. This ensured that PSIG is provided with timely and accurate case file information. If a particular case was not forwarded, the guidance document denoted that this would be explicitly documented to the rank of Deputy Chief Administrator as to the reason the case was not forwarded. Although this document addressed COPA's responsibilities under ¶444, the IMT had not yet received information regarding COPA's training on its policy and the requirements of ¶444.

In the sixth reporting period, the City submitted a *Memorandum of Understanding: Joint Sexual Misconduct Investigations*. The memorandum addressed the requirements of ¶444 that requires COPA and BIA to provide the full administrative file to the PSIG within ten days of the final disciplinary decision. In the seventh reporting period, the Deputy PSIG did not produce any documentation related to ¶444. We noted we would expect to receive further documentation in the next reporting period.

*Progress in the Eighth Reporting Period*

This reporting period, the City and CPD provided a revised version of G08-06, *Prohibitions of Sexual Misconduct*. This policy completely addresses the requirements of ¶444, even though the CPD is not responsible for ¶444(a)-(c), which are the responsibility of the Deputy PSIG. We acknowledge that the CPD included this information to ensure that CPD employees know and understand the process for how data is transferred to the Deputy PSIG for audits and reporting. On June 21, 2023, the CPD finalized and implemented the policy. With this, the CPD reached Preliminary compliance. However, it is important to note that the CPD and BIA did not meet the reporting requirements of providing the Deputy PSIG with the complete investigative file within ten days of final disposition. To meet further levels of compliance, the CPD and BIA must meet the reporting requirements to the Deputy PSIG.

Also during this reporting period, COPA provided for review its *Sexual Misconduct and Domestic Violence* Training. The training addresses the requirements of ¶444 and its subparagraphs. However, it is important to note that COPA did not meet

---

posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

the reporting requirements of providing the Deputy PSIG with the complete investigative file within ten days of final disposition. To meet further levels of compliance, COPA must meet the reporting requirements to the Deputy PSIG.

This reporting period, the Deputy PSIG focused their efforts on maintaining Full compliance. The Deputy PSIG provided its *Report on Investigations of Sexual Misconduct Allegations Against CPD Members* (the "*Report*") In the *Report*, the Deputy PSIG reported that it reviewed a total of six qualifying sexual misconduct investigations in which BIA was the investigating authority and 27 sexual misconduct investigations conducted by COPA. While BIA and COPA committed to designing and implementing an automated system to notify the Deputy PSIG of closed cases, the notification system failed to capture all the required cases. The Deputy PSIG identified and reviewed all the sexual misconduct cases from BIA and COPA through its regular closed case review process.

Additionally, the *Report* provides specific information on each case the Deputy PSIG reviewed, including the allegation, the disposition, and any discipline determined as a result of the investigation, among other information. The IMT is concerned that many investigations involving serious allegations seem not to have been reported to the Deputy PSIG as required by ¶444. The *Report* also provides specific information on the number of cases referred to the Cook County State's Attorney's Office for criminal prosecution. Lastly, the *Report* provides specific information on the quality of case investigations and provides recommendations for BIA and COPA. The IMT expects that BIA and COPA will consider these recommendations for improvement and the IMT looks forward to improvement in the reporting and investigation of these most serious charges against CPD members. With this, the Deputy PSIG maintained Full compliance.

*** 

The CPD reached Preliminary compliance in the eighth reporting period. For the CPD, we will look to review training materials that instruct compliance with the requirements of this paragraph and the CPD's policies. The CPD also must work meet their reporting requirement to the Deputy PSIG. We look forward to COPA finalizing its *Sexual Misconduct and Domestic Violence* Training and providing documentation that at least 95% of its employees took the training, as well as working to meet their reporting requirement to the Deputy PSIG. In the eighth reporting period, the Deputy PSIG maintained Full compliance with ¶444 and completed its two-year Sustainment Period for this paragraph.

## Paragraph 444 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

## Accountability and Transparency: ¶445

> ***445.*** *The City will use best efforts to initiate and undertake a process with the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office to share information on at least a quarterly basis regarding any affirmative judicial findings made during the course of criminal proceedings that a CPD member was untruthful, including any findings made at suppression hearings. Upon receipt of information from the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office that may suggest misconduct COPA will initiate the intake process.*

### Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

**Recurring Schedule:**    Quarterly           ☐ **Met**   ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not in Compliance* |

The City and the CPD maintained Preliminary compliance with ¶445 in the eighth reporting period. COPA maintained Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶445, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[50] To evaluate Secondary compliance with ¶445, the IMT reviewed the CPD's and COPA's training development, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we considered

---

[50]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶445's mandates.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the City did not reach Preliminary compliance with ¶445 or the corresponding quarterly deadline to share information as stated in the Consent Decree. COPA submitted Policy 1.3.8, *Civil and Criminal Complaint Review*, and Policy 3.1.1, *Intake*, for evidence of compliance. Although COPA made efforts toward helping the City achieve Preliminary compliance, we stressed that it is crucial that the City take a more holistic approach toward compliance with this paragraph by making sure that ¶445's requirements are understood and mandated by the City, not just COPA.

In the seventh reporting period, the City provided a preliminary and non-final draft Memorandum of Understanding (MOU) between the City of Chicago, the Cook County State's Attorney's Office (CCSAO), the United States Attorney's Office, the Federal Defender's Office, and the Cook County Public Defender's Office, with preliminary edits from the US Attorney's office and CCSAO, for review with ¶445. This draft MOU related to the sharing of information with COPA regarding any affirmative judicial findings made during the course of criminal proceedings that a CPD member was untruthful, including any findings made at suppression hearings, per the requirements of ¶445. The IMT commended COPA for reaching out to the federal and state entities to develop this draft MOU and explained that we would look forward to receiving a final version executed by the relevant parties in the eighth reporting period.

In the fifth reporting period, COPA's finalized Policy 3.1.1, *Intake*, incorporated the requirements of ¶445. Additionally, COPA provided a training, *Intake Unit: Overview of Policies and Procedures: In Service 2021*, to which a portion of the training addressed the requirements of the paragraph. COPA provided evidence that at least 95% of its personnel received the training. With this, COPA reached Preliminary and Secondary compliance in the fifth reporting period. We continued to note that the City cannot fulfill the requirements of this paragraph through COPA's efforts alone, and that the City should ensure that BIA and COPA have a similar policy. In the sixth reporting period, COPA revised its policy, *Civil and Criminal Complaint Review*. The policy addressed COPA's responsibilities and expectations arising from ¶445 and provided instruction for how COPA employees are to fulfill the requirements of the policy and ¶445. In the seventh reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶445.

In previous reporting periods, the CPD did not produce any documentation that demonstrated efforts related to ¶445. In the seventh reporting period, the City and the CPD provided a revised version of G08-01-2, *Complaint Initiation and Log*

*Number Investigation Assignment*. This policy did not fully address the requirements of ¶445 as it did not instruct CPD supervisors or command on what to do if they learn that a CPD member was untruthful. The IMT submitted a no-objection notice to G08-01-02 in December 2022 noting the revision that was necessary for ¶445, and the CPD made the revision to the final version. With this, the CPD reached Preliminary compliance in the seventh reporting period.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶445.

This reporting period, the City and COPA provided the IMT with a proposed final version of the MOU, which requires the parties to the MOU to share information on at least a quarterly basis regarding any affirmative judicial findings made during a criminal proceeding where a CPD member was untruthful. While the MOU is a final draft, it has only been executed so far by the Federal Defender's Office. We look forward to reviewing a fully executed version of the MOU in the next reporting period.

***

The City and the CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph. For COPA, we will look for evidence that it has sufficiently implemented its policies and trainings. For the City, we will look for a final version of the Memorandum of Understanding that has been executed by all the relevant parties for Full Compliance.

### Paragraph 445 Compliance Progress History

| FIRST REPORTING PERIOD SEPTEMBER 1, 2019 – AUGUST 31, 2019 COMPLIANCE PROGRESS: Not Applicable | SECOND REPORTING PERIOD SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 COMPLIANCE PROGRESS: Status Update | THIRD REPORTING PERIOD MARCH 1, 2020 – DECEMBER 31, 2020 COMPLIANCE PROGRESS: None |
|---|---|---|
| FOURTH REPORTING PERIOD JANUARY 1, 2021 – JUNE 30, 2021 COMPLIANCE PROGRESS: None | FIFTH REPORTING PERIOD JULY 1, 2021 – DECEMBER 31, 2021 COMPLIANCE PROGRESS: None | SIXTH REPORTING PERIOD JANUARY 1, 2022 – JUNE 30, 2022 COMPLIANCE PROGRESS: None |
| SEVENTH REPORTING PERIOD JULY 1, 2022 – DECEMBER 31, 2022 COMPLIANCE PROGRESS: Preliminary | EIGHTH REPORTING PERIOD JANUARY 1, 2023 – JUNE 30, 2023 COMPLIANCE PROGRESS: Preliminary | |

# Accountability and Transparency: ¶446

*446. In the course of investigating a complaint, the City, CPD, and COPA will ensure: a. within five business days of receipt of a non-confidential complaint COPA or BIA will send non-anonymous complainants or their representatives a written notice of receipt. The notice will include the unique tracking number assigned to the complaint. The notice will advise the complainant or his or her representative whether BIA or COPA will be investigating the complaint, and how the complainant or his or her representative may inquire about the status of the investigation. The notice will not contain any language discouraging participation in the investigation. B. within 60 days of the final disciplinary decision the complainant will be provided a copy of the Administrative Summary Report.*

| Compliance Progress | | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[51] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |

In the eighth reporting period, the City and the CPD reached Secondary compliance with ¶446. COPA maintained Full compliance with ¶446. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Full compliance.

To evaluate Preliminary compliance with ¶446, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree

---

[51] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

(¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[52] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are providing sufficient notice pursuant to the requirements of this paragraph.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD provided a draft of General Order G08-01-02 and BIA provided a draft of its *Assignment of Administrative Log Number Investigations* Unit Directive.[53] In the fifth reporting period, the CPD revised General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which spoke to the requirements of ¶446(a). Additionally, BIA submitted a revised version of Special Order S08-01-04, *Post Investigation Log Number Procedures* that addressed ¶446(b).[54] The IMT provided a no-objection notice to both policies, and the CPD finalized the policies on the last day of the fifth reporting period.[55] BIA also submitted its *Administrative Summary Report* packet that pertains to the requirements of ¶446(b). With this, the CPD moved into Preliminary compliance in the fifth reporting period.

---

[52] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[53] The name of this directive changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.
The CPD and BIA previously named this Unit Directive "Assignment of Administrative Log Number Investigations. This Unit Directive is now named "Initial Responsibilities in Assigned Log Number Investigations.

[54] The CPD changed the name of this directive during the revision stage. It was previously known as *Documenting Log Number Investigations and Post Investigations Procedures*.

[55] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning relevant to ¶446(b), however it remained in draft state at the end of the reporting period. In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which appeared to address ¶446(a) and (b) and its requirements. However, the IMT noted that we would require review of the final eLearning to observe whether the folders in the slide refer to the paragraph's requirements for training. By the end of the seventh reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of all its personnel, not just its sworn personnel. Additionally, the CPD produced a revised draft of G08-01-02, *Complaint Initiation and Log Number Investigation Assignment*, which addressed the requirements of ¶446 (a) and (b). Lastly, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*.[56] This policy completely addressed the requirements of ¶446(b) by requiring that the Administrative Summary Report (ASR) be provided to the complainant within 60 days of the disciplinary decision.

COPA reached Preliminary compliance by finalizing Policy 3.2.2, *Timeliness Benchmarks* in previous reporting periods. In the fifth reporting period, COPA provided its training, *COPA Intake Unit: Overview of Policies and Procedures: In Service 2021*, which addressed ¶446, and provided evidence that at least 95% of its personnel received the training. With this, COPA moved into Secondary compliance in the fifth reporting period. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶446.

In the seventh reporting period, COPA provided guidance for review on the publishing and distribution of Final Summary Reports. This document fully addressed the requirements of ¶446(b). Additionally, COPA provided guidance on contacts with non-department member witnesses and complainants and confirmation of representation, which generally addressed the requirements of ¶446(a). This guidance supported and supplemented the COPA *Timeliness and Benchmarks* policy by explaining how the contacts will be documented within the Case Management System (CMS). Lastly, COPA provided a memorandum with examples of three COPA investigations portraying the process from the complaint intake through the final/administrative summary reports. This fully addressed the requirements of ¶446(a) and (b) and therefore moved COPA into Full compliance during the seventh reporting period.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶446. With this, the CPD moved into Secondary compliance for

---

[56]   This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

¶446. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶446.

\*\*\*

To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing to work with them collaboratively in the ninth reporting period. For Full compliance, we will also look for documentation that the CPD and its employees are acting in accordance with ¶446's mandates.

For COPA, we will look for information showing that COPA continues to implement its policies and training in accordance with ¶446. Specifically, we will look for information documenting that COPA is providing sufficient notice per the requirements of ¶446. We expect to receive documentation of efforts towards maintaining Full compliance every reporting period.

## Paragraph 446 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶447

**447.** *The City and CPD will require that all COPA and BIA personnel and Accountability Sergeants communicate with complainants and involved CPD members in a professional and respectful manner.*

**Compliance Progress**          (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[57] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Not in Compliance* |

In the eighth reporting period, COPA maintained Secondary compliance with ¶447, and the City and the CPD maintained Preliminary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶447, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[58] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they

---

[57]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[58]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

are requiring all COPA and BIA personnel and Accountability Sergeants to communicate with complainants and CPD members in a professional manner pursuant to the requirements of this paragraph.

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD reached Preliminary compliance. The CPD submitted a revised version of BIA's Unit Directive *Initial Responsibilities in Assigned Log Number Investigations*.[59] This Unit Directive did not address all requirements of ¶447 and was not finalized by the end of the reporting period. Additionally, the CPD revised Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which incorporated the requirements of ¶447. We submitted a no-objection notice and the CPD finalized the policy on the last day of the reporting period.[60] Finally, the CPD produced Special Order S08-01-01, *Conducting Log Number Investigations*, which fully addressed the requirements of ¶447. At the end of the fifth reporting period, it remained in the collaborative review and revision process. In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶447. In the seventh reporting period, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶447, and also produced a draft for review in December. By the end of the seventh reporting period, the training was still under development.

COPA finalized Policy 3.1.1, *Intake*, which propelled COPA to Preliminary compliance in the fourth reporting period. Building on this in the fifth reporting period, COPA provided training materials for its training *COPA Intake Unit: Overview of Policies and Procedures: In Service 2021* for review. COPA provided evidence that at least 95% of its personnel received the training, which moved COPA into Secondary compliance in the fifth reporting period. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶447. In the seventh reporting period, COPA produced documentation demonstrating that COPA communicated with every witness, accused, or complainant in a professional

---

[59] Previous drafts of this Unit Directive were titled *Conduct of Investigation: Initial Responsibilities.*

[60] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

and respectful manner. It was clear that COPA investigators perform as neutral investigators and conduct interviews in a methodical and professional manner, allowing those interviewed to give their versions of events and observations without feeling rushed or disrespected no matter their involvement in the incident.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶447. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶447. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶447. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶447.

\*\*\*

Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For COPA, we look forward to receiving additional information related to ¶447 to ensure COPA has sufficiently implemented its policies and training.

## Paragraph 447 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶448

**448.** *If COPA, BIA, or the district does not arrive at the investigative findings and recommendations within 180 days, COPA, BIA or an Accountability Sergeant will, thereafter, periodically, but not less than once every 60 days, attempt contact with the complainant or his or her representative to provide status updates until the investigative findings and recommendations are issued. Such contacts will be documented in the administrative investigative file. By 2020, this requirement will be satisfied by providing complainants and their representatives the ability to track the status of non-confidential unique tracking numbers from the intake process through final disposition online.*

## Compliance Progress        (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[61] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not Yet Assessed* |

In the eighth reporting period, the CPD maintained Preliminary compliance with ¶448 and COPA maintained Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶448, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[62] To evaluate Secondary compliance with this paragraph, we

---

[61] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[62] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

reviewed the entities' training development, materials, implementation, and evaluation (¶286), as well as systems for contacting the complainant or his or her representative pursuant to the requirements of this paragraph. To evaluate Full compliance, we reviewed the entities' various data sources to determine whether the entities have sufficiently implemented their training and policies relevant to ¶448.

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD revised S08-01, *Complaint and Disciplinary Investigators and Investigations*. Throughout the fifth reporting period, the CPD submitted three different revised versions to the IMT for review. The IMT provided a no-objection notice, and the CPD finalized the policy on the last day of the reporting period.[63] This moved the CPD into Preliminary compliance with ¶448. In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶448. In the seventh reporting period, the CPD produced a draft of its five-day BIA Onboard Training for review in July, not including ¶448, but did produce a draft for review in December, including ¶448. By the end of the reporting period, the training was still under development. The latest draft of this training did not adequately address the requirements of ¶448.

COPA reached Preliminary compliance in the fourth reporting period. COPA finalized Policy 3.2.2, *Timeliness Benchmarks*, which meets the requirements of ¶448 as it relates to COPA. In the fifth and sixth reporting periods, COPA did not submit evidence showing efforts toward Secondary compliance with ¶448, and therefore maintained Preliminary compliance. In the seventh reporting period, COPA provided guidance on *Investigative Correspondence*, which stated that the Case Management System (CMS) would automatically update case information for complainants to track their complaint. COPA's CMS will also auto-generated outreach to the complainant and others. Additionally, COPA's CMS generates an internal list of cases reaching each 180-day threshold for COPA Case Liaisons and Supervisors to review to ensure that investigations are progressing appropriately. COPA also provided a memorandum with documentation of three examples of letters to complainants showing that COPA is acting in accordance with the requirements of

---

[63] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

¶448. With this, COPA reached Secondary compliance in the seventh reporting period. Additionally, COPA provided its *COPA Guidance Column CMS Administration* for review with ¶448, but this Guidance did not appear to completely address the requirements of ¶448.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶448. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶448. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶448. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶448.

*** 

The CPD maintained Preliminary compliance with ¶448 in the eighth reporting period, while COPA maintained Secondary compliance. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For COPA, we will look for evidence that COPA has sufficiently implemented its policies, training, and notification systems to meet the requirements of this paragraph.

## Paragraph 448 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶449

*449. The City and CPD will notify the complainant in writing if an officer elects to file a labor grievance relating to any discipline imposed as a result of the complainant's complaint. Upon reaching the final disposition, the City and CPD will advise the complainant in writing of the final disposition.*

## Compliance Progress
(Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the eighth reporting period, the City and the CPD reached Secondary compliance with ¶449. To evaluate Preliminary compliance with ¶449, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286).

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD worked to revise and finalize Special Order S08-01-04, *Post Investigation Log Number Procedures*, a draft of which addressed the requirements of ¶449.[64] In the fifth reporting period, the CPD continued to revise S08-01-04. We provided a no-objection notice, and the CPD finalized the policy on the last day of the reporting period.[65] This moved the CPD into Preliminary compliance. In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning relevant to ¶449, however it remained in draft state at the end of the reporting period.

---

[64] This directive was previously submitted to the IMT as *Documenting Log Number Investigations and Post Investigations*.

[65] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which addressed ¶449 and its requirements. By the end of the reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of all its personnel, not just its sworn personnel. Additionally, the CPD produced a final version of S08-01-08, *Post-Investigation Log Number Procedures*,[66] which addressed the requirements of ¶449.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶449. With this, the CPD moved into Secondary compliance for ¶449. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

***

The City and the CPD reached Secondary compliance this reporting period. To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing to work with them collaboratively in the ninth reporting period. For Full compliance, we will also look for documentation that the CPD and its employees are acting in accordance with ¶449's mandates.

---

[66]   This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

## Paragraph 449 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶450

*450. CPD will develop and implement policies to ensure that a CPD member who is alleged to be involved in misconduct (the "involved member") receives notice that he or she is under administrative investigation. The policies will provide, at a minimum: a. CPD members under investigation will not receive such notice of confidential investigations, but will receive notice prior to being formally interviewed by COPA, BIA, or an Accountability Sergeant; b. such notice will comport with due process and the law, and will describe the nature of the complaint made against the involved member, and the involved member's rights, but will not contain any information that is part of a confidential investigation; and c. once a CPD member has been notified or otherwise becomes aware that he or she is the subject of an administrative investigation, the CPD member will not review the following documents and evidence related to an incident under administrative investigation, until notified by BIA that he or she is permitted to do so, or as may be required to testify as a witness in criminal or civil proceedings: i. any investigative files; ii. any reports (except for reports about the incident authored by the CPD member); or iii. any other evidence, from any source, including body and dashboard camera footage (except as permitted for purposes of completing incident reports or other documentation).*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance (SEVENTH REPORTING PERIOD)* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the eighth reporting period, the CPD maintained Preliminary compliance with ¶450.

To evaluate Preliminary compliance with ¶450, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed the CPD's training development, implementation, and evaluation.

*Progress before the Eighth Reporting Period*

In previous reporting periods, BIA worked to draft and revise policies that speak to the requirements of ¶450. BIA had previously submitted BIA's *Accountability Sergeant* Unit Directive that spoke to but did not fully address the requirements of ¶450. In addition, BIA submitted BIA's *Administrative Misconduct Investigations* Unit Directive, which addressed ¶450 and the subparagraphs. In the fifth reporting period, we provided a no-objection notice to BIA's revised Unit Directive, *Administrative Misconduct Investigations*.[67] However, the policy was not posted for public comment and was not finalized by the end of the reporting period.[68] The CPD and BIA also submitted a first draft of Special Order S08-01-01, *Conducting Log Number Investigations*, that addressed all requirements of ¶450 and its subparagraphs, but it also was not finalized by the end of the reporting period.

In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05, *Conducting Log Number Investigations*. At the end of the sixth reporting period, this policy remained in the collaborative review and revision process. In the seventh reporting period, the CPD produced multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, which addressed the requirements of ¶450(a), (b), and (c). With this, the CPD reached Preliminary compliance. Additionally, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶450, and also produced a draft for review in December. The training did not adequately address the requirements of ¶450(c). By the end of the reporting period, the training was still under development.

Also in the seventh reporting period, the IMT acknowledged that COPA makes its employees aware of the requirements of this paragraph in its *Officer Interviews In-Service* training, even though it is not a requirement of COPA.

---

[67] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[68] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in the sixth reporting period, and it is ongoing.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶450. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including for review with ¶450. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

*** 

The CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

### Paragraph 450 Compliance Progress History

| FIRST REPORTING PERIOD SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SECOND REPORTING PERIOD SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | THIRD REPORTING PERIOD MARCH 1, 2020 – DECEMBER 31, 2020 |
|---|---|---|
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD JANUARY 1, 2021 – JUNE 30, 2021 | FIFTH REPORTING PERIOD JULY 1, 2021 – DECEMBER 31, 2021 | SIXTH REPORTING PERIOD JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD JULY 1, 2022 – DECEMBER 31, 2022 | EIGHTH REPORTING PERIOD JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶451

> ***451.*** *A CPD member who reviews audio or video evidence for pur-poses of completing an incident report will document in writing that he or she reviewed the evidence in each relevant incident report.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | ***Not in Compliance*** |
| **Secondary:** | ***Not Yet Assessed*** |
| **Full:** | ***Not Yet Assessed*** |

In the eighth reporting period, the City and the CPD did not reach Preliminary compliance with ¶451.

To evaluate Preliminary compliance with ¶451, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms."

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD drafted and revised policies that speak to the requirements of ¶451. The CPD provided revised versions of Special Order S03-14, *Body Worn Cameras*, but it did not sufficiently address ¶451 because it did not require officers to document in an incident report whether they reviewed the evidence. In the fifth reporting period, the CPD and BIA produced no information pertaining to the requirements of ¶451. In the sixth reporting period, the CPD continued to work toward Preliminary compliance by submitting a revised Special Order S03-14, *Body-Worn Cameras*. This policy met the requirements of ¶451 by stating that "department members will . . . document the review of their [body-worn camera] recording of an incident in the narrative portion of any report they complete for the incident (e.g., incident case report, Arrest Report, Tactical Response Report)." At the end of the sixth reporting period, this policy remained in the collaborative review and revision process. In the seventh reporting period, the CPD provided a revised version of Special Order S03-14, *Body-Worn Cameras*, which we noted in the sixth reporting period met the requirements of ¶451. By the end of the seventh reporting period, this Special Order remained in the collaborative review and revision process and therefore was not finalized.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶451. We expect in the ninth reporting period that the CPD will produce a revised version of Special Order, S03-14, *Body Worn Cameras* for review with ¶451.

\*\*\*

We continue to look forward to working with the CPD to further revise S03-14 to instruct compliance with ¶451 in the ninth reporting period.

### Paragraph 451 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶452

> **452.** Consistent with the applicable collective bargaining agreements, CPD will require members to cooperate with administrative investigations, including appearing for an administrative interview when requested by COPA, BIA, or an Accountability Sergeant and will provide all requested documents and evidence under the CPD member's custody and control.

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the eighth reporting period, the City and the CPD reached Secondary compliance with ¶452.

To evaluate Preliminary compliance with ¶452, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286).

### Progress before the Eighth Reporting Period

In previous reporting periods, the CPD and BIA drafted and revised General Order G08-01, *Complaint and Disciplinary Procedures*, which is relevant to ¶452's requirements. In addition to this progress toward Preliminary compliance, BIA provided the *Log Number Investigations* training, which is relevant to ¶452. This training remained in the collaborative review and revision process at the end of the fourth reporting period. In the fifth reporting period, the CPD further revised General Order G08-01, *Complaint and Disciplinary System*.[69] After multiple revisions in the fifth reporting period, we submitted a no-objection notice and the CPD finalized the policy on the last day of the reporting period.[70] This propelled the CPD into Preliminary compliance.

---

[69] CPD previously submitted versions of G08-01 named *Complaint and Disciplinary Procedures*.

[70] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on

In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning relevant to ¶452, however it remained in draft state at the end of the reporting period. In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which addressed ¶452 and its requirements. By the end of the reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of all its personnel, not just its sworn personnel. Additionally, the CPD produced a revised version of G08-01, *Complaint and Disciplinary System*, which addressed the requirements of ¶452. Lastly, the CPD produced a draft of its five-day BIA Onboard Training for review in July, not including ¶452, but did produce a draft for review in December, including ¶452. The latest draft of the training did not adequately address the requirements of ¶452. By the end of the reporting period, the training was still under development.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶452. With this, the CPD moved into Secondary compliance for ¶452. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

\*\*\*

The City and the CPD reached Secondary compliance with ¶452 in the eighth reporting period. To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and

---

the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing to work with them collaboratively in the ninth reporting period. For Full compliance, we will also look for documentation that the CPD and its employees are acting in accordance with ¶452's mandates.

### Paragraph 452 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶453

> ***453.*** *If a criminal investigation of a CPD member's conduct has commenced, COPA, BIA, or the Accountability Sergeant will continue the administrative investigation, absent specific circumstances that would jeopardize the criminal investigation. In such circumstances, the determination to postpone the administrative investigation, along with the rationale for doing so, will be documented by COPA, BIA or the district in writing.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶453 in the eighth reporting period, and COPA maintained Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶453, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[71] To evaluate Secondary compliance with this paragraph, we reviewed the entities' training development, materials, implementation, and evaluation (¶286). To evaluate Full compliance, we reviewed various data sources to determine whether the entities sufficiently implemented their training and policies relevant to ¶453.

*Progress before the Eighth Reporting Period*

The CPD did not provide any evidence of efforts pertaining to ¶453 until the fifth reporting period. In the fifth reporting period, the CPD submitted submitting Special Order S08-01-01, *Conducting Log Number Investigations*, which addresses

---

[71] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

¶453. This policy goes beyond the requirements of ¶453, providing additional direction regarding documenting situations in writing, uploading the documentation into the Case Management System, and directing the BIA Investigator or Accountability Sergeant to notify their supervisor. The IMT provided comments on the draft, which remained in the collaborative review and revision process at the end of the fifth reporting period.

In the sixth reporting period, the CPD renumbered the Special Order previously labeled S08-01-01 to S08-01-05, *Conducting Log Number Investigations*. This revised policy instructed compliance with the requirements of ¶453, however it remained in the collaborative review and revision process at the end of the sixth reporting period. In the seventh reporting period, the CPD produced multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, which addressed the requirements of ¶453. With this, the CPD reached Preliminary compliance. Additionally, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶453, and also produced a draft for review in December. By the end of the reporting period, the training was still under development.

In the fifth reporting period, COPA submitted a revised version of COPA Policy, 3.1.2, *Fact Gathering and the Investigative Process*, which addresses the requirements of ¶453 verbatim. The policy went through the Community Policy Review Working Group and was finalized. This propelled COPA into Preliminary compliance. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶453. In the seventh reporting period, COPA provided its *Fact-Gathering Evidence Collection* training lesson plan, which addressed the requirements of ¶453. In December 2022, the IMT virtually attended the training given to COPA in-service staff. The instructor was clearly a subject matter expert and used personal experience to illustrate specific points of the lesson plan. The instructor was prepared for the presentation and appeared to have spent considerable time learning the lesson plan, which made for a seamless delivery, and was comfortable engaging the class in discussion. COPA continued to consistently demonstrate its ability to develop thorough, relevant training from its policies and procedures. Additionally, COPA submitted documentation demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶453. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some

of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶453. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶453. For further discussion of the BIA Onboard Training, see ¶¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶453.

*** 

The City and the CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

COPA maintained Secondary compliance. For COPA, we will look for documentation demonstrating that COPA has sufficiently implemented its policies and training.

### Paragraph 453 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶454

**454.** *COPA, BIA, and the districts will conduct objective, compre-hensive, and timely investigations of complaints.*

| Compliance Progress | | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Under Assessment* |

In the eighth reporting period, COPA maintained Secondary compliance with ¶454 while the CPD maintained Preliminary. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶454, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[72] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶454's mandates.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD continued to draft and revise policies that spoke to the requirements of ¶454. In the fifth reporting period, the CPD revised G08-01, *Complaint and Disciplinary System*.[73] Additionally, the CPD submitted a revised S08-01, *Complaint and Disciplinary Investigators and Investigations*, which also fully addresses the requirements of ¶454. We provided no-objection notices

---

[72] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[73] The CPD previously submitted this General Order as *Complaint and Disciplinary Procedures*.

and the CPD finalized the policies in the fifth reporting period.[74] This moved the CPD into Preliminary compliance. In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning relevant to ¶454, however it remained in draft state at the end of the sixth reporting period. In the seventh reporting period, the CPD provided a revised version of G08-01, *Complaint and Disciplinary System*, which addressed the requirements of ¶454.

In the fourth reporting period, COPA finalized two Policies, *Recommendations Regarding Department Member Duties and Power* and *Fact Gathering and the Investigative Process*; both address the requirements of ¶454, which moved COPA into Preliminary compliance. In the fifth reporting period, COPA compiled and submitted for review various documents, including 3.1.4, *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement*; 3.1.6, *Clear and Column Case Management System Systems*; 3.1.1, *Intake*; 2.1.2, *Transparency Issues – Release of Video and Related Materials*; *Candidates for COPA Employment*; and *Major Incident Responses*. These policies all addressed the requirements of ¶454. To demonstrate efforts toward Secondary compliance, COPA submitted materials for *COPA Intake Unit: Overview of Policies and Procedures: In Service 2021 Training*. COPA provided evidence that at least 95% of its personnel received the training. Additionally, COPA provided training materials for *Case Management System: Overview of Policy and Procedures* that addressed the principles of ¶454, and we understood that COPA planned to provide the training in January 2022. These efforts propelled COPA into Secondary compliance in the fifth reporting period. In the sixth reporting period, COPA provided a revised Policy 3.1.4, *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirements*, which addressed the requirements of ¶454. By the end of the sixth reporting period, COPA had not yet finalized the policy.

In the seventh reporting period, COPA provided a final version of its policy *Affidavits, Affidavit Overrides, Exception to Affidavit Requirement*, which addressed the requirements of ¶454. COPA also provided the following Guidance documents: *Accessibility-People with Disabilities, Language Services and Incarcerated Individuals*; *Processing Anonymous Complaints*; and *Misconduct Complaints Identified or Initiated by COPA*. However, these guidance documents did not address the requirements of this paragraph. Additionally, COPA provided evidence that more than

---

[74] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

95% of its employees attended and completed the *Case Management System: Overview of Policy and Procedures* and *Disciplinary and Remedial Recommendations* trainings. COPA also provided *Final Summary Reports & Standards of Proof (FSR)* training materials. These training materials met the requirements of ¶454. COPA additionally provided evidence that more than 95% of its employees attended and completed the *Final Summary Reports & Standards of Proof* training. Finally, COPA provided a screenshot of its closed case dashboard to provide proof that cases are investigated in a timely manner per the requirements of ¶454. COPA remained under assessment for Full compliance in the seventh reporting period as the Parties continued to have conversations concerning the evidence sufficient for Full compliance.

*Progress in the Eighth Reporting Period*

This reporting period, the City, the CPD, and COPA did not produce any documentation that demonstrated efforts related to ¶454.

\*\*\*

Moving forward, we look forward to reviewing the CPD's training materials that instruct compliance with the requirements of ¶454. We will also look for COPA to demonstrate that it has implemented its policies and trainings such that COPA personnel are acting in accordance with ¶454.

### Paragraph 454 Compliance Progress History

| FIRST REPORTING PERIOD<br>SEPTEMBER 1, 2019 − AUGUST 31, 2019<br>COMPLIANCE PROGRESS:<br>Not Applicable | SECOND REPORTING PERIOD<br>SEPTEMBER 1, 2019 − FEBRUARY 29, 2020<br>COMPLIANCE PROGRESS:<br>Not Applicable | THIRD REPORTING PERIOD<br>MARCH 1, 2020 − DECEMBER 31, 2020<br>COMPLIANCE PROGRESS:<br>Status Update |
| --- | --- | --- |
| FOURTH REPORTING PERIOD<br>JANUARY 1, 2021 − JUNE 30, 2021<br>COMPLIANCE PROGRESS:<br>None | FIFTH REPORTING PERIOD<br>JULY 1, 2021 − DECEMBER 31, 2021<br>COMPLIANCE PROGRESS:<br>Preliminary | SIXTH REPORTING PERIOD<br>JANUARY 1, 2022 − JUNE 30, 2022<br>COMPLIANCE PROGRESS:<br>Preliminary |
| SEVENTH REPORTING PERIOD<br>JULY 1, 2022 − DECEMBER 31, 2022<br>COMPLIANCE PROGRESS:<br>Preliminary | EIGHTH REPORTING PERIOD<br>JANUARY 1, 2023 − JUNE 30, 2023<br>COMPLIANCE PROGRESS:<br>Preliminary | |

# Accountability and Transparency: ¶455

**455.** *All investigative findings will be based on the appropriate standard of proof. This standard will be clearly delineated in COPA and BIA policies, training, and procedures.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[75] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Under Assessment* |

The City and the CPD maintained Preliminary compliance with ¶455. COPA remains under assessment for Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶455, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[76] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶455's mandates.

---

[75]  As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[76]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

In previous reporting periods, we reviewed several items relevant to the CPD's efforts toward compliance with ¶455, including draft G08-01, *Complaint and Disciplinary System*. Additionally, we reviewed *Findings, Recommendations and Effective Log Number Closings Training*, which addressed the requirements of ¶455, but the information from the training was not included in policy. In the fifth reporting period, the CPD revised G08-01, *Complaint and Disciplinary System.*[77] We provided a no-objection notice and the CPD finalized the policy on the last day of the reporting period. This moved the CPD into Preliminary compliance. In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning relevant to ¶455, however it remained in draft state at the end of the sixth reporting period. In the seventh reporting period, the CPD provided a revised version of G08-01, *Complaint and Disciplinary System*, which addressed the requirements of ¶455.

COPA met Preliminary compliance with ¶455 in the fourth reporting period by finalizing its Policy 3.1.3, COPA's *Final Summary Report*. In the fifth reporting period, COPA did not produce evidence of steps toward Secondary compliance with ¶455. In the sixth reporting period, COPA provided its *Disciplinary and Remedial Recommendations In-Service* lesson plan, which addressed the requirements of ¶455. By the end of the reporting period, COPA did not submit training records to demonstrate the extent of personnel who had completed the training for the sixth reporting period. In the seventh reporting period, COPA provided evidence that more than 95% of its personnel completed the *Disciplinary and Remedial Recommendations* training for both the COPA Academy and in-service training, which moved COPA into Secondary compliance. COPA also submitted the *Final Summary Reports & Standards of Proof* training materials, which addressed the requirements of ¶455. The IMT virtually attended the *Final Summary Reports & Standards of Proof* training delivered to COPA staff on November 29, 2022. The IMT noted that COPA continues to demonstrate its ability to develop thorough training relevant to its policies and procedures. At the end of the seventh reporting period, COPA provided documentation demonstrating that this training was provided to 100% of its in-service staff and 100% of its Academy class. With this, COPA reached Secondary compliance. COPA also provided, in the seventh reporting period, a memorandum that included examples of five Final Summary Reports (FSRs), which included the appropriate standard of proof in which the investigative findings were based per the requirements of ¶455. COPA remained under assessment for Full compliance in the seventh reporting period as the Parties continued to have conversations concerning the evidence sufficient for Full compliance.

---

[77]   The CPD previously submitted this General Order as *Complaint and Disciplinary Procedures*.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, not including ¶455. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶455. By the end of the eighth reporting period, COPA still remains under assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

***

The City and the CPD maintained Preliminary compliance in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. We look forward to COPA providing documentation demonstrating Full compliance with ¶455 in future reporting periods.

## Paragraph 455 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

## Accountability and Transparency: ¶456

> **456.** *The City will ensure that the disciplinary histories of current and former CPD members are reviewed prior to employment with COPA, or assignment within BIA or as an Accountability Sergeant.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[78] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the eighth reporting period, the City and the CPD maintained Preliminary compliance with ¶456. COPA reached Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶456, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[79] To evaluate Secondary compliance, the IMT reviewed the entities' guidance or written processes setting out who will be tasked with checking an individual's disciplinary history prior to employment or assignment, and how that information is presented to the appropriate individuals tasked with hiring or assignment.

---

[78] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[79] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeants* Unit Directive that included specific standards to disqualify candidates from serving as Accountability Sergeants.[80] The IMT continuously raised concerns regarding the low standards that had been set in the directive. In the fifth reporting period, the CPD revised Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. After a second round of revisions in the fifth reporting period, the policy addressed the requirements of ¶456. We provided a no-objection notice and the CPD finalized the policy on the last day of the reporting period.[81] This moved the CPD into Preliminary compliance. In the sixth reporting period, the CPD provided an audit to demonstrate that at that time, the vast majority of CPD Sergeants met the enhanced standards for BIA and Accountability Sergeant assignment. In the seventh reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶456.

COPA previously compiled a draft policy, *Candidates for COPA Employment – Current or Former Chicago Police Department Member*, which exceeded the requirements of ¶456 regarding the hiring process of former and current CPD employees. We provided a no-objection notice and COPA finalized the policy by the end of the fifth reporting period. This moved COPA into Preliminary compliance. In the sixth and seventh reporting periods, COPA did not produce any documentation that demonstrated efforts related to ¶456.

*Progress in the Eighth Reporting Period*

The CPD did not produce any documentation that demonstrated efforts related to ¶456 during the eighth reporting period.

---

[80] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in the sixth reporting period, and the process is ongoing.

[81] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

This reporting period, COPA provided materials for review of its *Conflicts of Interest* training. COPA addressed ¶456 in the training materials. The training lesson plan refers COPA employees to the *Candidates or COPA Employment* policy. The IMT virtually attended the training on June 14, 2023. The instructor was well prepared and did a great job of engaging with the class. While the participants did not ask the number of questions that are typically asked in COPA's training classes, the lesson plan was followed, and the instructor did a great job of answering the questions that were asked. COPA provided documentation showing that at least 95% of its employees attended the training. With this, COPA reached Secondary compliance.

***

As stated in previous reporting periods, we will look forward to receiving evidence that individuals responsible for hiring to BIA and COPA are aware of candidate requirements as set out by ¶456 and their respective policies, and that processes are developed to make clear who is tasked with checking disciplinary histories for employment or assignment candidates. The CPD and COPA will then need to provide proof that they are following their respective policies. We expect these materials to be produced in each reporting period. For COPA, we will look for documentation that COPA and its employees are acting in accordance with ¶456's mandates.

### Paragraph 456 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶457

*457. Within 90 days of the Effective Date, CPD will create a written policy regarding the circumstances under which BIA will retain and investigate complaints itself and under which BIA will transfer complaints to a CPD district for investigation. The policy will include as factors in that decision: consideration of the involved CPD member's complaint and disciplinary history and the seriousness of the alleged misconduct. It will be designed to ensure that all investigations are completed in a timely and thorough manner and in compliance with this Agreement.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

**Preliminary:**       *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**        *In Compliance* (NEW)
**Full:**              *Not Yet Assessed*

In the eighth reporting period, the City and the CPD reached Secondary compliance with ¶457.

To evaluate Preliminary compliance with ¶457, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD provided various policy and training documents for review, including Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations* policy and BIA's *Assignment of Administrative Log Number Investigations* Unit Directive. Additionally, the CPD provided BIA's *Intake and Case Assignment Process On-Boarding* training that partially addressed ¶457. The CPD revised and finalized S08-01 in the fifth reporting period. This moved the CPD into Preliminary compliance. Additionally, BIA provided a "finalized" version of the *BIA Accountability Sergeants* Unit Directive that provided an in-depth consideration of all requirements in ¶457, even adding considerations beyond what is required in this paragraph. However, that directive was not posted for public comment prior to the end of the fifth reporting period.[82]

---

[82]    In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and

In the sixth reporting period, the CPD and BIA provided a first draft of its eLearning relevant to ¶457, however it remained in draft state at the end of the sixth reporting period. In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which addressed ¶437 and its requirements. By the end of the reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of all its personnel, not just its sworn personnel. Additionally, the CPD produced a draft of its five-day BIA Onboard Training for review in July, not including ¶457, but did produce a draft for review in December, including ¶457. By the end of the reporting period, the training was still under development.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶457. With this, the CPD moved into Secondary compliance for ¶457. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶457. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, not including ¶457. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with

---

in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and it is ongoing.

producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶457. For further discussion of the BIA Onboard Training, see ¶526–27.

\*\*\*

To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For Full compliance, we will also look for documentation that the CPD and its employees are acting in accordance with ¶457's mandates.

### Paragraph 457 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶459

**459.** *Within 30 days of receiving an allegation: a. COPA and BIA will assess the allegation to determine whether the complainant has alleged potential misconduct; and b. if potential misconduct is alleged, COPA, BIA, or the district will initiate a preliminary investigation into the complaint.*

### Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Not in Compliance* |

The City and the CPD maintained Preliminary compliance with ¶459 in the eighth reporting period. COPA maintained Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶459, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[83] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance with this paragraph, we considered whether the entities have implemented their policies and trainings such that they are acting in accordance with ¶459's mandates.

### Progress before the Eighth Reporting Period

In previous reporting periods, the CPD provided BIA's *Complainant Communications and Timeliness* policy. The CPD provided also BIA's *Policies and Communica-*

---

[83]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*tions Techniques Onboard and Annual Training,* which oversimplified the requirements of ¶459 and required additional revisions. In the fifth reporting period, the CPD revised its policy, *Initial Responsibilities in Assigned Log Number Investigations*, but it was not posted for public comment before the end of the reporting period. The CPD also presented Special Order S08-01-01, *Conducting Log Number Investigations*, for review, but it remained in the collaborative review and revision process at the end of the fifth reporting period. In the sixth reporting period, the CPD began the process of incorporating Unit Directive information into General Orders and Special Orders. Special Order S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*, addressed the requirements of ¶459, but it remained in the collaborative review and revision process at the end of the sixth reporting period. In the seventh reporting period, the City and the CPD provided multiple revised versions of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*, which addressed the requirements of ¶459 and its subparagraphs. With this, the CPD reached Preliminary compliance in the seventh reporting period.

COPA, in the fourth reporting period, finalized its policy 3.2.2, *Timeliness Benchmarks Jurisdictional Decisions, Triage and Preliminary Investigation* which addressed the requirements of ¶459 and moved COPA into Preliminary compliance. In the fifth reporting period, COPA compiled and submitted for review materials for a training entitled *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021*. COPA provided evidence that at least 95% of its personnel received the training, which propelled it into Secondary compliance. In the sixth and seventh reporting periods, COPA did not produce any documentation that demonstrated efforts related to ¶459.

*Progress in the Eighth Reporting Period*

This reporting period, the City, the CPD, and COPA did not produce any documentation that demonstrated efforts related to ¶459.

\*\*\*

The City and the CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. As stated in the previous reporting period, we will look for the CPD to develop training relevant to the requirements of this paragraph. Additionally, as previously stated, we will look for evidence that COPA has sufficiently implemented and trained upon the requirements of ¶459 and related policies.

## Paragraph 459 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶460

*460. Preliminary investigations will take all reasonable steps to discover any and all objective verifiable evidence relevant to the complaint or administrative notification through the identification, retention, review, and analysis of all available evidence, including, but not limited to: all time-sensitive evidence, audio and video evidence, physical evidence, arrest reports, photographic evidence, GPS records, computer data, and witness interviews. All reasonable steps will be taken to preserve relevant evidence identified during the preliminary investigation.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶460 in the eighth reporting period, while COPA maintained Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶460, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[1] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, we reviewed various data sources to determine whether the entities sufficiently implemented their training and policies relevant to ¶460.

---

[1] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

Previously, in the fourth reporting period, the CPD submitted several policies for review that sought to address the requirements of ¶460, including BIA's *Conduct of Investigation: Sworn Affidavits and Sworn Affidavit Overrides*; *Complainant Communication Procedures and Timelines*; *Conduct of Investigations: Initial Responsibilities*; and *Intake Initiation of Log Number*. However, these policies were not finalized by the end of the fifth reporting period. In the sixth reporting period, the CPD submitted multiple revised versions of S08-01-05, *Conducting Log Number Investigations*.[2] The policy did not completely address ¶460, which requires that reasonable steps be taken to "preserve relevant evidence identified during the preliminary investigation" and that steps be taken to "discover any and all objective verifiable evidence relevant to the complaint." ¶460. Additionally, the CPD submitted multiple revised versions of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*.[3] This policy addressed the requirements of ¶460, however it remained in the collaborative review and revision process at the end of the sixth reporting period.

In the seventh reporting period, the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, which addressed the requirements of ¶460. Additionally, the City and the CPD provided a revised version of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*, which also addressed the requirements of ¶460. With this, the CPD reached Preliminary compliance. Lastly, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶460, and also produced a draft for review in December. The latest draft of this training did not adequately address the requirements of ¶460. By the end of the reporting period, the training was still under development.

COPA, in the fourth reporting period, finalized its Policy 3.1.2, *Fact Gathering and the Investigative Process*, which addressed the requirements of ¶460 and moved COPA into Preliminary compliance. In the fifth reporting period, COPA submitted materials for a training titled *Intake Unit: Overview of Policies and Procedures In-Service 2021*. This training partially addressed the requirements of ¶460, and COPA provided the training to its personnel. COPA made progress toward but had not reached Secondary compliance with ¶460 by the end of the fifth reporting period.

---

[2]  The *Conducting Log Number Investigations* policy was produced in previous reporting periods as S08-01-01. The policy was re-numbered as S08-01-05 when it was produced May 5, 2022.

[3]  In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Initial Responsibilities in Assigned Log Number Investigations* into S08-01-05. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶460.

During the seventh reporting period, COPA provided *Fact Gathering-Evidence Collection* training materials, which addressed the requirements of ¶460. The IMT virtually attended the *Fact Gathering-Evidence Collection* training delivered to COPA in-service staff on December 13, 2022. COPA also submitted documentation in the seventh reporting period demonstrating that this training was provided to at least 95% of its staff. With this, COPA reached Secondary compliance.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶460. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶460. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶460. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA provided documentation for review with ¶460, however the IMT is unclear where the requirements of this paragraph are addressed. The IMT suggests that the City and COPA provide explicit explanations regarding how their compliance materials address various paragraph requirements, as they have done in the past.

\*\*\*

The City and the CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. Moving forward, we look forward to continuing our

close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

COPA maintained Secondary compliance. For Full compliance, we will look for COPA to demonstrate that it has sufficiently implemented its policies and training.

## Paragraph 460 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶461

*¶461 Allegations of misconduct based on verbal abuse will be preliminarily investigated to determine whether it is appropriate to continue the investigation. Anonymously submitted misconduct allegations will be preliminarily investigated to determine whether it is appropriate to continue the investigation, in accordance with the applicable collective bargaining agreements in effect at the time of the allegation is made.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |

The City and the CPD maintained Preliminary compliance with ¶461 in the eighth reporting period, while COPA maintained Full compliance with ¶461. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶461, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[4] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, the IMT reviewed various sources to determine whether the City, the CPD, and COPA have sufficiently implemented their policies and training.

---

[4] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

Previously, the CPD produced BIA Unit Directives that partially addressed the requirements of ¶461, such as the *Assignment of Administrative Log Number Investigations* Unit Directive. In addition, the CPD produced S08-01-01, *Conducting Log Number Investigations* for review in the fifth reporting period. Neither the Unit Directives nor S08-01-01 were finalized by the end of the fifth reporting period. In the sixth reporting period, the CPD submitted multiple revised versions of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations.*[5] Sections III.C–D of the policy addressed the requirements of ¶461. This policy remained in the collaborative review and revision process at the end of the sixth reporting period. In the seventh reporting period, the CPD revised and finalized S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*, which addressed the requirements of ¶461. With this, the CPD reached Preliminary compliance.

In the fourth reporting period, COPA produced, revised, and finalized its *Intake* policy and *Fact Gathering and the Investigative Process* policy. This moved COPA into Preliminary compliance. In the fifth reporting period, COPA reached Secondary compliance by providing materials for its training *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021*. This lesson plan properly trained on the requirements set out in ¶461 and was presented to at least 95% of COPA's personnel. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶461. During the seventh reporting period, COPA provided screenshots of its data dashboard demonstrating the number of verbal abuse and anonymous complaints it received via Intake. The IMT noted that while this information is important and helpful to understand the numbers of these complaints received through Intake, it would be helpful to understand the numbers received specific to this current year to better understand all complaints received, investigated, and adjudicated. With this, COPA reached Full compliance.

*Progress in the Eighth Reporting Period*

This reporting period, the City, the CPD, and COPA did not produce any documentation that demonstrated efforts related to ¶461.

***

The City and the CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph.

---

[5] S08-01-04 includes information that was previously included in the BIA Directive *Initial Responsibilities in Assigned Log Number Investigations*, to which the IMT submitted a no-objection notice on October 14, 2021.

For COPA, we look forward to receiving additional information related to ¶461 efforts to ensure COPA sufficiently implemented its policies and training of policies that were completed in previous reporting periods. Specifically, we look forward to COPA revising their data dashboard to illustrate the number of complaints that are received and adjudicated year by year.

## Paragraph 461 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Status Update | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶462

**462.** *A signed complainant affidavit will not be required to conduct a preliminary investigation.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[6] |
| CPD | *In Compliance* (FIFTH REPORTING PERIOD) |
| COPA | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| CPD | *In Compliance* (NEW) |
| COPA | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| CPD | *Not Yet Assessed* |
| COPA | *In Compliance* (NEW) |

The City and the CPD reached Secondary compliance with this paragraph in the eighth reporting period. COPA reached Full compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Full compliance.

To evaluate Preliminary compliance with ¶462, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[7] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, the IMT reviewed various sources to determine whether the City, the CPD, and COPA have sufficiently implemented their policies and training.

---

[6] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[7] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD produced various draft policies relevant to ¶462. In the fifth reporting period, the CPD submitted Special Order S08-01-01, *Conducting Log Number Investigations*, which addressed the requirements of ¶462. S08-01-01 remained in the collaborative review process at the end of the fifth reporting period. In addition, the CPD revised and finalized General Order G08-01, *Complaint and Disciplinary System*.[8] This moved the CPD into Preliminary compliance. In the sixth reporting period, the CPD made dual efforts relevant to ¶462: drafting and revising S08-01-05 and providing draft BIA eLearning materials. In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which addressed ¶462 and its requirements. By the end of the reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of all its personnel, not just its sworn personnel. Additionally, the CPD produced a revised draft of G08-01, *Complaint and Disciplinary System*, which addressed the requirements of ¶462. Lastly, the CPD produced a draft of its five-day BIA Onboard Training for review in July, not including ¶462, but did produce a draft for review in December, including ¶462. By the end of the reporting period, the training was still under development.

COPA reached Preliminary compliance in the fourth reporting period by finalizing its Policy 3.1.1, *Intake*, which covers the requirements of ¶462. In the fifth reporting period, COPA submitted for review materials for a training titled *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021*. The lesson plan properly trained on the requirements in ¶462, and the training was administered to 99% of COPA's staff, allowing COPA to achieve Secondary compliance. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶462. In the seventh reporting period, COPA provided the *Complaint Register Training* for review which addressed the requirements of ¶462 by explaining a preliminary investigation.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶462. With this, the CPD moved into Secondary compliance for ¶462. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge

---

[8]  The CPD previously submitted this General Order as *Complaint and Disciplinary Procedures*.

the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶462. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions as about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including for review with ¶460. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA produced a number of documents for review with ¶462. COPA indicated that it made 144 Affidavit Overrides Requests from September 2017 through March 2023. Of the 144 requests made, BIA declined two and several were withdrawn by COPA. The documentation demonstrated that COPA consistently requests Affidavit Overrides from BIA for cases in which it is unable to contact victims, complainants, or witnesses. Additionally, COPA provided six letters or memorandums to BIA that articulated the reasons for requesting the Affidavit Override, which appeared to be based on reasonable reasons. With this, COPA reached Full compliance. However, as stated previously (see ¶460) the documentation was produced in a confusing manner. The IMT encourages COPA to ensure they are providing sufficient information in future reporting periods documenting where the requirements of Consent Decree paragraphs are addressed.

\*\*\*

To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached

Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For Full compliance, we will also look for documentation that the CPD and its employees are acting in accordance with ¶462's mandates.

For COPA, we will look for evidence of continued Full compliance with ¶462's mandates. To maintain Full compliance, we expect to receive documentation of efforts towards maintain Full compliance in each future reporting period.

### Paragraph 462 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶463

*463. The City, CPD, and COPA will ensure that, within 30 days of receiving a complaint, COPA, BIA, and Accountability Sergeants initiate and make reasonable attempts to secure a signed complainant affidavit, including in-person visits, phone calls, and other methods. Such attempts will reasonably accommodate the complainant's disability status, language proficiency, and incarceration status. a. If COPA, BIA, or the Accountability Sergeant is unable to obtain a signed complainant affidavit despite having made reasonable attempts to do so, COPA or BIA (for investigations conducted by both BIA and Accountability Sergeants) will assess whether the evidence collected in the preliminary investigation is sufficient to continue the investigation. b. If the preliminary investigation reveals objective verifiable evidence suggesting it is necessary and appropriate for the investigation to continue, BIA (for investigations conducted by BIA and Accountability Sergeants) will seek written approval for an override affidavit executed by the Chief Administrator of COPA, and COPA (for investigations conducted by COPA) will seek written approval for an override affidavit executed by the Chief of BIA. c. The Chief Administrator of COPA or the Chief of BIA will provide an override affidavit if there is objective verifiable evidence suggesting it is necessary and appropriate, and in the interests of justice, for the investigation to continue.*

## Compliance Progress     (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶463 in the eighth reporting period. COPA reached Secondary compliance this reporting period. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶463, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution,

workout, and public comment periods.[9] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD produced for review several draft policies that relate to ¶463's requirements. This included draft BIA Unit Directives: *Conduct of Investigation; Sworn Affidavits and Sworn Affidavit Overrides*, *Complainant Communication Procedures and Timelines* policy, the *Conduct of Investigations: Initial Responsibilities*, and *The Assignment of Log Number Investigations*. These policies were never finalized in accordance with the Consent Decree. In the fifth reporting period, the CPD produced Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addresses the main paragraph of ¶463 and subparagraphs (a) and (b). The CPD posted the Special Order for public comment and, on the last day of the reporting period, finalized the Special Order. In addition, the CPD produced S08-01-01, *Conducting Log Number Investigations*, which addresses the main paragraph of ¶463 and subparagraphs (a)–(c). This policy was not finalized by the end of the fifth reporting period. In the sixth reporting period, the CPD submitted multiple revised versions of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*, which provided instruction related to the main paragraph of ¶463 and subsections (a)–(b). Upon review, we suggested that the CPD include language relevant to ¶463's instruction that investigators will make reasonable attempts to secure a signed affidavit. In addition, the CPD submitted S08-01-05, *Conducting Log Number Investigations*,[10] which spoke to the requirements of ¶463(c). These policies remained in the collaborative review and revision process at the end of the sixth reporting period.

In the seventh reporting period, the City and the CPD provided a revised version of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*, which addressed the requirements of ¶463. The City and the CPD also provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, which addressed the requirements of ¶463(c). With this, the CPD reached Preliminary compliance in the seventh reporting period. The CPD also provided an Annual Report and quarterly reports that spoke to the requirements of this paragraph. The CPD's BIA 2021 Annual Report referred to the requirements of this paragraph and how the SAFE-T Act impacts the affidavit and affidavit override but did

---

[9]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[10]  In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05.

not fully address the requirements of ¶463(a) and (c). The BIA 2022 Quarters 1, 2, and 3 Reports referenced ¶463, but did not fully meet the requirements of this paragraph.

In the fifth reporting period, COPA submitted for review COPA 3.1.4, *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement*, which addresses the main paragraph of ¶463 and subparagraphs (a) and (c). However, the policy only partially addressed ¶463(b). The policy remained in the collaborative review and revision process at the end of the fifth reporting period. COPA also provided materials for its training titled *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021* lesson plan, which addressed all requirements of ¶463 and was presented to at least 95% of COPA's personnel. In the sixth reporting period, the City and COPA provided the IMT with a further revised version of the policy *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement*. COPA revised this policy such that it meets all requirements of ¶463 and its subparagraphs, however it had not been finalized by the end of the reporting period. In the seventh reporting period, COPA provided a revised version of its *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement*, which addressed the requirements of the main paragraph of ¶463 and its subparagraphs (a), (b), and (c). COPA provided a finalized version of this policy and reached Preliminary compliance. COPA also provided *Complaint Register* In-Service training materials, which addressed the requirements of the main paragraph of ¶463 and its subparagraphs (a), (b), and (c).

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided its Annual Report that speaks to the requirements of this paragraph. The report provides an explanation of the Sworn Affidavit Override Process, but it does not address the requirements of ¶463(a)-(c).

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, not including ¶463. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised ver-

sion of its five-day BIA Onboard Training as one all-encompassing training, including ¶463. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶463. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA provided documentation that 100% of its COPA Academy and 95% of its COPA employees attended the *Complaint Register* training. COPA also provided a revised version of the Training to address comments from the Illinois Office of Attorney General. Additionally, the IMT virtually attended COPA's *Complaint Register* training. The instructors engaged the class with questions and asked for input on training points throughout. With this, COPA reached Secondary compliance.

Also this reporting period, COPA produced a number of documents for review with ¶463. The documentation demonstrated that COPA meets the requirements of ¶463(b) and the main paragraph of ¶463 by requesting an Affidavit Override because they could not contact the complainant, witness, or involved person. The documentation did not address all requirements of the paragraph, and as stated previously (see ¶460) the documentation was produced in a confusing manner. The IMT encourages COPA to ensure they are providing sufficient information in future reporting periods documenting where the requirements of Consent Decree paragraphs are addressed.

***

The City and the CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For COPA, we will look for documentation that COPA and its employees are acting in accordance with ¶463's mandates.

## Paragraph 463 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶464

*464. In the course of conducting thorough and complete misconduct investigations, COPA, BIA, and the districts will: a. take all reasonable steps to promptly identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including officer-recorded audio or video taken with body-worn cameras or other recording devices; b. take all reasonable steps to locate and interview all witnesses as soon as feasible, including non-CPD member witnesses, and attempt to interview any complainant or witness in-person at a time and place that is convenient and accessible for the complainant or witness, when feasible; c. determine whether there are any other open administrative investigations involving the same involved member, and monitor or combine the investigation(s), as appropriate; d. audio record non-CPD member interviews subject to the interviewee's consent, or promptly prepare summaries of interviews when the interview is not recorded; e. take all reasonable steps to identify the involved and witness CPD member(s) if the complainant was unable do so; f. determine if there may have been additional misconduct beyond that initially alleged. COPA, BIA, or the district will take all reasonable steps to ensure that such identified misconduct is fully and fairly documented, classified, and investigated; g. as applicable, consider a CPD member's behavior based on the available training records and disciplinary history, including complaints in which allegations were not sustained, as permitted by law and any applicable collective bargaining agreement; and h. identify and take into account known relevant evidence gathered in parallel criminal investigation or criminal or civil litigation, if available.*

## Compliance Progress  (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶464 in the eighth reporting period, while COPA maintained Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶464, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[11] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, we reviewed various data sources to determine whether the entities sufficiently implemented their training and policies relevant to ¶464.

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD submitted, revised, and ultimately finalized S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addressed ¶464(a), (b), (c), (d), and (f). The CPD also submitted Special Order S08-01-01, *Conducting Log Number investigations*, which addressed all requirements of ¶464, but S08-01-01 was not finalized by the close of the fifth reporting period. The CPD had also produced various BIA Unit Directives relevant to this paragraph in previous reporting periods: BIA's draft *Administrative Misconduct Investigations* Unit Directive; the *Photo Room Operations* policy; and the *Conduct of Investigation: Initial Responsibilities* policy. These Unit Directives were not finalized as necessary to allow the CPD to reach compliance.

In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05, *Conducting Log Number Investigations*. The CPD continued to revise this policy throughout the sixth reporting period. This policy remained in the collaborative review and revision process at the end of the sixth reporting period. In the seventh reporting period, the CPD provided a revised version of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*, which addressed the requirements of ¶464(b) and (c). The City and the CPD also provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, which addressed the requirements of ¶464(a), (b), (d), (e), (f), (g), and (h). With this, the CPD reached Preliminary compliance. Lastly, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶¶464, and also produced a draft for review in December. The draft addressed the requirements of ¶464(a), but as written did not adequately address the other subparagraphs. By the end of the seventh reporting period, the training was still under development.

---

[11] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

COPA reached Preliminary compliance in the fifth reporting period by submitting, revising, and finalizing its Policies 3.1.2, *Fact Gathering and the Investigative Process*, which addressed most of ¶464 but did not address ¶464(g), and 3.2.1, *Disciplinary and Remedial Recommendations*, which addresses all of ¶464's requirements. In the sixth reporting period, COPA submitted its *Disciplinary and Remedial Recommendation* training materials, which trained on portions of ¶464 requirements. In the seventh reporting period, COPA provided *Fact Gathering-Evidence Collection* training materials, which addressed the requirements of ¶464 and all of its subparagraphs. The IMT virtually attended the *Fact Gathering-Evidence Collection* training delivered to COPA in-service staff on December 13, 2022. COPA submitted documentation demonstrating that this training was provided to at least 95% of its staff. With this, COPA reached Secondary compliance.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶464. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶464. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶464. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶464.

***

The City and the CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. Moving forward, we look forward to continuing our

close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

COPA maintained Secondary compliance. For Full compliance, we will look for COPA to demonstrate that it has sufficiently implemented its policies and training.

### Paragraph 464 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

## Accountability and Transparency: ¶465

*465. When conducting an administrative interview of any CPD member, COPA, BIA, and the districts will: a. ask the identity of other persons with whom he or she has communicated regarding the incident in question, and the date, time, place, and content of such communication, subject to any evidentiary privilege recognized under Illinois or federal law; b. ask whether he or she has reviewed any audio or video footage of the incident in question, and, if so, the date, time, and place the video or audio was reviewed; c. ask whether he or she is aware of any media or social media coverage of the incident in question, and, if so, the content and source of such known media coverage; d. note on the record of the interview anytime the CPD member seeks or obtains information from his or her legal or union representative, as well as the length of any "off the record" discussion between the CPD member and his or her legal or union representative and ensure that the CPD member's counsel or representative does nothing to disrupt or interfere with the interview; e. document, and make part of the investigative file, all requests made on behalf of a CPD member to reschedule an interview; and f. audio record all CPD member in-person interviews.*

### Compliance Progress     (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶465, while COPA maintained Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶465, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized,

and use clearly defined terms."[12] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, we reviewed various data sources to determine whether the entities sufficiently implemented their training and policies relevant to ¶465.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD provided BIA's draft *Administrative Misconduct Investigation* Unit Directive, which addressed the requirements of ¶465, but this Unit Directive was not posted for public comment and finalized. In the fifth reporting period, the CPD submitted a draft of Special Order S08-01-01, *Conducting Log Number Investigations*. This draft policy directs action in accordance with all of ¶465's requirements, but at the end of the fifth reporting period, this policy remained in the collaborative review and revision process. In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05, *Conducting Log Number Investigations*, which fully addressed the requirements of ¶465 and its subparagraphs. However, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

In the seventh reporting period, the CPD produced multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, which addressed the requirements of ¶465 and its subparagraphs. With this, the CPD reached Preliminary compliance. Additionally, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶465, and also produced a draft for review in December. By the end of the reporting period, the training was still under development. Lastly, the CPD also produced a first draft of *BIA Recorder Training*. This training was produced as a compliance record rather than for review per the requirements of ¶641. The training did not meet the requirements of ¶465 and it provided inconsistent and uncoordinated information between the lesson plan and the PowerPoint, which made the training materials confusing and difficult to follow. The Audio Recorder Training Records submitted with this production indicated that numerous BIA and Accountability Sergeants had already been trained on this material, which caused the IMT concern about the quality of the training received given the current state of the training materials. The IMT also was concerned that this training was provided before submitting the training materials to the IMT for review, per the requirements of ¶641 of the Consent Decree. The IMT noted that

---

[12] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

going forward, the IMT expects that such training materials will be provided to the IMT and the OAG for review prior to implementation.

In the fifth reporting period, COPA reached Preliminary compliance by submitting, revising, and finalizing Policy 3.1.2(b), *COPA Interviews-Chicago Police Department Members*, which addressed all parts of ¶465. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶465. In the seventh reporting period, COPA provided *Officer Interviews In-Service* training for review, which addressed the requirements of ¶465. During an IMT Site visit on September 29, 2022, the IMT attended and observed the *Officer Interviews In-Service Training*. COPA submitted documentation demonstrating that this training was provided to more than 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance. Additionally, on January 12, 2023, the City submitted a COPA memorandum for the seventh reporting period indicating that COPA produced several examples of interviews with complainants, witnesses, and officers in a variety of investigations. Upon review, the examples contained in these files, which reflected investigators' interviews and investigations, met the requirements ¶465 and its subparagraphs, except for subparagraph (e) (instructing COPA to "document, and make part of an investigative file, all requests made on behalf of a CPD member to reschedule an interview").

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided a revised and final version of *BIA Recorder Training.* The IMT has not submitted a no-objection notice to this training and as stated previously, we have concerns that this training was provided before submitting the training materials to the IMT for review, per the requirements of ¶641 of the Consent Decree. The IMT noted in the previous reporting period that going forward, the IMT expects that such training materials will be provided to the IMT and the OAG for review prior to implementation. Although the CPD provided a revised version this reporting period and noted they did not intend to produce it again, the IMT still did not provide a no-objection notice for the training. We continue to raise that the material provided was confusing as CPD submitted the version for Secondary compliance with ¶465 but the *BIA Recorder Training* only applies to ¶465(f). Additionally, the training still must be revised to properly address the requirements of ¶465(f) before the CPD can train on the topic under approved Consent Decree training.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶465. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some

of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶465. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶465. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶465.

***

The City and the CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. COPA maintained Secondary compliance. Moving forward, we will look for COPA to demonstrate that it has sufficiently implemented its policies and training.

### Paragraph 465 Compliance Progress History

| FIRST REPORTING PERIOD<br>SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SECOND REPORTING PERIOD<br>SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | THIRD REPORTING PERIOD<br>MARCH 1, 2020 – DECEMBER 31, 2020 |
|---|---|---|
| COMPLIANCE PROGRESS:<br>Not Applicable | COMPLIANCE PROGRESS:<br>Status Update | COMPLIANCE PROGRESS:<br>None |
| FOURTH REPORTING PERIOD<br>JANUARY 1, 2021 – JUNE 30, 2021 | FIFTH REPORTING PERIOD<br>JULY 1, 2021 – DECEMBER 31, 2021 | SIXTH REPORTING PERIOD<br>JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS:<br>None | COMPLIANCE PROGRESS:<br>None | COMPLIANCE PROGRESS:<br>None |
| SEVENTH REPORTING PERIOD<br>JULY 1, 2022 – DECEMBER 31, 2022 | EIGHTH REPORTING PERIOD<br>JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS:<br>Preliminary | COMPLIANCE PROGRESS:<br>Preliminary | |

# Accountability and Transparency: ¶466

*466. When assessing credibility, COPA, BIA, and the districts will: a. make credibility determinations of statements made by complainants, involved CPD members, and witnesses based on independent, unbiased, and credible evidence, taking into account any known record or final determination of deception or untruthfulness in legal proceedings, administrative investigations, or other investigations; and b. critically evaluate all statements, like any other evidence, giving no automatic preference to, or discounting, any statement solely due to its source, including statements made by CPD members.*

## Compliance Progress  (Reporting Period: January 1, 2022, through June 30, 2022)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |

The City and the CPD maintained Preliminary compliance with ¶466, while COPA maintained Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶466, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[13] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, the IMT reviewed various sources to determine whether the City, the CPD, and COPA have sufficiently implemented their policies and training.

---

[13] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD provided a draft of S08-01-01, *Conducting Log Number Investigations*, which spoke to the requirements of ¶466(a) and (b). This policy remained in the collaborative review and revision process at the end of the fifth reporting period. In addition, in past reporting periods, the CPD submitted BIA's *Administrative Misconduct Investigations* Unit Directive that sought to address the requirements of ¶466. We submitted a no-objection notice to BIA's *Administrative Misconduct Investigation* Unit Directive in July 2021.[14] However, the directive was not posted for public comment by the end of the reporting period. In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05, *Conducting Log Number Investigations*. The CPD submitted multiple revised drafts of S08-01-05, which completely addressed the requirements of ¶466. However, this policy remained in the collaborative review and revision process at the end of the sixth reporting period. In the seventh reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, which addressed the requirements of ¶466(a) and (b). With this, the CPD reached Preliminary compliance.

In the fourth reporting period, COPA provided its Policy 3.1.3 *Final Summary Report*, which addressed ¶¶466(a) and (b) in detail and exceeded the requirements of this paragraph. This allowed COPA to achieve Preliminary compliance. In the fifth reporting period, COPA provided materials for the *Witness Reliability: In Service Training*, which completely addressed ¶446. By presenting the *Witness Reliability: In Service Training* to at least 95% of its personnel, COPA reached Secondary compliance. In the sixth reporting period, COPA produced three sample Final Summary Reports (also known as FSRs) for review. In addition to providing these samples, COPA posted Final Summary Reports from 2017 through 2022 on its website. We reviewed the three samples provided by COPA and others on its website. These reports demonstrate that COPA is following the requirements of ¶466 and its related policies and training. Additionally, we commended COPA for publishing this information on its website—an action not required by the Consent Decree. This demonstrated COPA's continued commitment to transparency and improving

---

[14] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

community rapport and trust. In the seventh reporting period, COPA provided *Officer Interviews In-Service* training for review, which completely addresses the requirements of ¶466(a) and (b). During an IMT site visit on September 29, 2022, the IMT attended and observed the *Officer Interviews In-Service Training*. Additionally, COPA submitted documentation demonstrating that this training was provided to more than 95% of COPA's staff by the end of the seventh reporting period.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, not including ¶466. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including ¶466. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶466.

\*\*\*

The City and the CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

COPA maintained Full compliance. Moving forward we will look for evidence that COPA continues to make credibility determinations through thorough investigations per the requirements of ¶466. We expect to receive documentation of efforts towards maintaining Full compliance every reporting period.

### Paragraph 466 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 − DECEMBER 31, 2022 | JANUARY 1, 2023 − JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶467

> ***467.*** *For each allegation associated with a misconduct investigation, COPA, BIA, or the districts will explicitly identify and recommend one of the following findings: a. "Sustained," where it is determined the allegation is supported by a preponderance of the evidence; b. "Not Sustained," where it is determined there is insufficient evidence to prove the allegations by a preponderance of the evidence; c. "Unfounded," where it is determined, by clear and convincing evidence, that an allegation is false or not factual; or d. "Exonerated," where it is determined, by clear and convincing evidence, that the conduct described in the allegation occurred but is lawful and proper.*

## Compliance Progress        (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[15] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Under Assessment* |

The CPD maintained Preliminary compliance with ¶467 in the eighth reporting period. COPA maintained Secondary compliance and remains under assessment for Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶467, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[16] To evaluate Secondary compliance, the

---

[15]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[16]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and*

IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, we determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Eighth Reporting Period*

The CPD reached Preliminary compliance with ¶467 in the fifth reporting period, when it posted for public comment and finalized General Order G08-01, *Complaint and Disciplinary System.* G08-01 addresses all requirements of ¶467, including those enumerated in the subparagraphs. The CPD also provided in previous reporting periods BIA's draft *Administrative Summary Report* Unit Directive which spoke to the mandates of ¶467.[17] In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review, however these materials were still in draft state at the end of the sixth reporting period. In the seventh reporting period, the CPD produced a revised G08-01-01, *Complaint and Disciplinary Definitions*, which provided a more thorough definition for each of the findings that indicates a finding is assigned to each allegation and not a complaint. CPD also provided a revised G08-01, *Complaint and Disciplinary System*. Section IV.V.1.b–e addressed ¶467(a)–(d) by defining the findings that an investigation will determine. Lastly, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶467, and also produced a draft for review in December. By the end of the reporting period, the training was still under development.

COPA reached Preliminary compliance with ¶467 in the fourth reporting period when it finalized Policy 3.1.3, *Final Summary Report*. COPA had not provided evidence of efforts toward Secondary compliance with ¶467 by the end of the fifth reporting period. In the sixth reporting period, COPA provided samples of its Final Summary Reports (also known as FSRs), which can also be found on COPA's website. There readers can locate cases by log number and read about the allegations made, the investigation, and the disposition. In the seventh reporting period, COPA provided *Final Summary Reports and Standard of Proof* training materials, which addressed ¶467. The IMT virtually attended this training and the instructor appeared to be a subject matter expert in this area of the training. Additionally, COPA submitted documentation demonstrating that this training was provided to at least 95% of COPA's staff. With this, COPA reached Secondary compliance.

---

*Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[17]   In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

Also in the seventh reporting period, COPA provided a memorandum with documentation that included a breakdown of closed cases including the allegations, number and type of allegations, and findings, per the requirements of ¶467. COPA remained under assessment for Full compliance as the Parties continued to have conversations concerning the evidence sufficient for Full compliance.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶467. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶467.

*** 

The CPD maintained Preliminary compliance. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

COPA maintained Secondary compliance and remains under assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

## Paragraph 467 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶468

*468. COPA, BIA, and the districts will ensure that investigators do not: a. ask leading questions that suggest legal justifications for the CPD member's conduct during interviews of witnesses, complainants, or the involved CPD member; b. make statements that could discourage a CPD member or non-CPD member witness from providing a full account of the specific allegations; c. close an administrative investigation solely because of findings in a related criminal proceedings; d. consider findings in a related criminal investigation to solely determine whether a CPD member engaged in misconduct; e. disregard a witness's statement solely because the witness has some connection to either the complainant or the CPD member or because the witness or complainant has a criminal history; or f. close an investigation solely because the complainant seeks to withdraw the complaint or is unavailable, unwilling, or unable to cooperate with an administrative investigation. If the complainant is unable or unwilling to provide information beyond the initial complaint, the administrative investigation will continue based on the available evidence in accordance with this Agreement, applicable law, and any applicable collective bargaining agreements.*

## Compliance Progress     (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶468 in the eighth reporting period, while COPA maintained Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶468, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[18] To evaluate Secondary compliance, the

---

[18] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and*

IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, we reviewed various data sources to determine whether the entities sufficiently implemented their training and policies relevant to ¶468.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD provided BIA's *Administrative Misconduct Investigation* Unit Directive, which was thorough and instructed compliance with all of ¶468's requirements. However, this Unit Directive was never finalized as required to achieve Preliminary compliance.[19] In the fifth reporting period, the CPD submitted a draft of Special Order S08-01-01, *Conducting Log Number Investigations*. This draft Special Order addressed the requirements of ¶468 and all of its subparagraphs, but it remained in the collaborative review and revision process at the end of the fifth reporting period. In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05, *Conducting Log Number Investigations.* The CPD submitted multiple revised versions of S08-01-05 throughout this reporting period, which addressed ¶468 and its subparagraphs. However, this policy remained in the collaborative review and revision process at the end of the sixth reporting period. In the seventh reporting period, the City and the CPD provided multiple revised versions of and finalized S08-01-05, *Conducting Log Number Investigations*, which addressed the requirements of ¶468 and its subparagraphs. With this, the CPD reached Preliminary compliance.

COPA reached Preliminary compliance with ¶468 in the fifth reporting period, when it finalized two policies that together mandate compliance with the requirements ¶468: Policy 3.1.2, *Fact Gathering and the Investigative Process;* and Policy 3.1.2(b), *Interviews – Chicago Police Department Members*. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶468. In the seventh reporting period, COPA provided *Officer Interviews In-Service* training for review, which completely addressed the requirements of ¶468(a) and (b). During an IMT site visit on September 29, 2022, the IMT attended and observed the *Officer Interviews In-Service Training*.

Additionally, in the seventh reporting period, COPA provided *Fact Gathering-Evidence Collection* training materials, which addressed the requirements of ¶468.

---

*Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[19] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

The IMT virtually attended the *Fact Gathering-Evidence Collection* training delivered to COPA In-Service staff on December 13, 2022. COPA submitted documentation demonstrating that these trainings were provided to more than 95% of COPA's staff by the end of the seventh reporting period, thereby meeting Secondary compliance. Additionally, on January 12, 2023, the City submitted a COPA memorandum for the seventh reporting period which indicated that COPA produced several examples of interviews with complainants, witnesses, and officers in a variety of investigations. Upon review, the examples contained in these files, which reflected investigators' interviews and investigations, met the requirements of ¶468(a), (b), (d), and (e).

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, not including ¶468. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶468. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶468. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶468.

*** 

The City and the CPD maintained Preliminary compliance with ¶468 in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

COPA maintained Secondary compliance. Moving forward, we will look for COPA to demonstrate that it has sufficiently implemented its policies and training.

### Paragraph 468 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶469

***469.** The City, COPA, and CPD recognize the negative impact of actual bias or the appearance of bias on the legitimacy of administrative investigations. For that reason, conflicts of interest in administrative investigations will be identified and prohibited. The City, COPA, and CPD will ensure the following: a. COPA, BIA, and district personnel will not be assigned to conduct any investigation that could create a conflict of interest; b. an investigation may not be conducted by any supervisor or CPD member who allegedly authorized, engaged in conduct that led to, witnessed, or otherwise allegedly participated in the incident giving rise to the complaint, or who has a conflict of interest as defined by CPD policy or this Agreement. No such person may participate in making any disciplinary recommendations with respect to the investigation; c. no CPD member who has an external business relationship or close personal relationship with an involved CPD member or witness in an administrative investigation will conduct or review the administrative investigation. No such person may participate in making any disciplinary recommendations with respect to the misconduct investigation including in the determination of any applicable grievance or appeal arising from any discipline; and d. no CPD member will participate in making any disciplinary decisions or recommendations with respect to any person to whom he or she directly reports to in his or her chain of command. In cases where CPD is unable to meet this requirement, the investigation must be transferred to OIG.*

| Compliance Progress | (Reporting Period: January 1, 2022, through June 30, 2022) |
|---|---|
| **Preliminary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City, the CPD, and COPA reached Secondary compliance with ¶469 in the eighth reporting period.

To evaluate Preliminary compliance with ¶469, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution,

workout, and public comment periods.[20] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD produced a few draft policies that relate to the requirements of ¶469. In the fifth reporting period, the CPD provided a draft of BIA's Unit Directive, *Initial Responsibilities in Assigned Log Number Investigations*, and a draft of BIA's Unit Directive, *Conflicts of Interest*.[21] Together these draft Unit Directives addressed the requirements of this paragraph, but these Unit Directives were never posted for public comment and finalized as is required to achieve Preliminary compliance. In addition to these Unit Directives, the CPD submitted, revised, publicly posted, and finalized General Order G08-01-03, *Conflict of Interest*. The finalization of G08-01-03 did not move the CPD into Preliminary compliance though because, while it addressed the requirements of ¶469(a), (c), and (d), G08-01-03 did not cover the requirements of ¶469(b).

In the sixth reporting period, the CPD did not provide any additional policies related to ¶469. The IMT noted that the CPD would need to include ¶469(b)'s requirements in policy to reach Preliminary compliance with this paragraph. Although finalized policies did not yet cover all of ¶469's requirements, the CPD began working on developing training relevant to ¶469. The CPD submitted draft BIA eLearning materials which were still in draft state and not in final presentation form at the end of the reporting period. In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which addressed ¶469(a), (b), (c), and (d) and its requirements. By the end of the seventh reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of all its personnel, not just its sworn personnel.

Additionally, the CPD produced a revised version of G08-01-01, *Complaint and Disciplinary Definitions*, which addressed the requirements of ¶469. The City and the CPD also provided a revised version of G08-01-03, *Conflict of Interest*, which addressed the requirements of ¶469 and specifically addressed the requirements of

---

[20] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[21] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

¶469(b) and (d). With these efforts, the CPD reached Preliminary compliance. Lastly, the CPD produced a draft of its five-day BIA Onboard Training for review in July, not including ¶469, but did produce a draft for review in December, including ¶469. The latest draft of this training did not adequately address the requirements of this paragraph. By the end of the reporting period, the training was still under development.

COPA reached Preliminary compliance with ¶469 in the fifth reporting period by finalizing its *Conflict of Interest and Recusal* Policy, which addressed all requirements of ¶469. In the sixth and seventh reporting periods, COPA did not produce any documentation that demonstrated efforts related to ¶469.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶469 and its subparagraphs. With this, the CPD moved into Secondary compliance for ¶469. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶469. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, not including ¶469. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with

producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶469. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA provided materials for review of its *Conflicts of Interest* training. COPA only is responsible for addressing the main paragraph of ¶469 and ¶469(a), which are addressed in the training materials. The IMT virtually attended the training on June 14, 2023. The instructor was well prepared and did a great job of engaging with the class. While the participants did not ask the number of questions that are typically asked in COPA's training classes, the lesson plan was followed, and the instructor did a great job of answering the questions that were asked. COPA provided documentation that at least 95% of its employees attended the training. With this, COPA reached Secondary compliance.

$$* * *$$

The CPD reached Secondary compliance with this paragraph in the eighth reporting period. To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For Full compliance, we will also look for documentation that the CPD and its employees are acting in accordance with ¶469's mandates.

For COPA, we will look for documentation that COPA and its employees are acting in accordance with ¶469's mandates.

## Paragraph 469 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶470

> **470.** *The City will ensure that COPA arrives at the investigative findings and recommendations within 180 days of the initiation of the investigation. Any request for an extension of time must be approved in writing by the Chief Administrator of COPA, or his or her designee, who must provide a short explanation of the reason(s) for granting or denying the extension.*

## Compliance Progress  (Reporting Period: January 1, 2023, through June 30, 2023)

**Preliminary:**  *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:**  *In Compliance* (NEW)
**Full:**  *Not Yet Assessed*

In the eighth reporting period, the City and COPA reached Secondary compliance with ¶470.

To evaluate Preliminary compliance with ¶470, the IMT reviewed COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[22] To evaluate Secondary compliance, the IMT reviewed COPA's training development, implementation, and evaluation (¶286).

*Progress before the Eighth Reporting Period*

In the fourth reporting period, COPA produced for review and finalized Policy 3.2.2, *Timeliness Benchmarks*. This policy completely covers the requirements of ¶470 and brought COPA into Preliminary compliance. In the fifth, sixth, and seventh reporting periods, COPA did not produce any documentation that demonstrated efforts related to ¶470.

*Progress in the Eighth Reporting Period*

For the fourth reporting period in a row, COPA did not produce any documentation that demonstrated efforts related to ¶470. However, in the sixth reporting period, COPA provided its *Disciplinary and Remedial Recommendations In-Service* Training for review. The IMT previously did not include analysis of this training regarding the requirements of ¶470 because it was not included in the Lesson Plan text but

---

[22]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

rather only on one slide in the slide deck. Those training materials were sufficient to train the requirements of ¶470. Additionally, COPA previously provided evidence that more than 95% of its employees attended the training. With this, COPA reached Secondary compliance.

***

Moving forward, we will look for documentation that COPA and its employees are acting in accordance with ¶470's mandates. Additionally, we look to review data in the coming reporting periods that shows the number and percentage of cases for which COPA arrived at investigative findings and recommendations within 180 days of the initiation of the investigation, and the number and percentage of cases for which COPA missed the 180-day timeline. Additionally, we would like to see data indicating the number of extensions requested by COPA.

### Paragraph 470 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶471

**471.** *The City and CPD will ensure that BIA arrives at the investigative findings and recommendations within 180 days of the initiation of the investigation. Any request for an extension of time must be approved in writing by the Chief of BIA or his or her designee.*

## Compliance Progress (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD made efforts toward but did not ultimately reach Secondary compliance with ¶471 in the eighth reporting period.

To evaluate Preliminary compliance with ¶471, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD reached Preliminary compliance with ¶471 when it revised, submitted for public comment, and finalized Special Order S08-01, which fully addressed ¶471. The CPD also produced BIA's *2020 Audit* in the fifth reporting period, which recognized that the CPD was not yet in operational compliance with the requirements of ¶471. We appreciated the honest self-assessment present in the *2020 Audit* and overall believed the *2020 Audit* was well done. We noted, however, that the *2020 Audit* was produced several months too late and encouraged the CPD to compile and produce these audits in a timelier manner not only for purposes of demonstrating compliance, but also to allow the CPD to identify areas on which it needs to focus its efforts and attention.

In the sixth reporting period, the City and the CPD provided drafts of Special Order S08-01-02, *Investigation Timelines and Benchmarks*.[23] This policy addressed the

---

[23] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Investigative Timelines and Benchmarks* Unit Directive into S08-01-02. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

requirements of ¶471.[24] Thereafter, the City and the CPD provided a revised draft of S08-01-02 that removed important language from the policy, and we pointed this out. This policy remained in the collaborative review and revision process at the end of the sixth reporting period. The CPD also submitted Special Order S08-01-06, *Supervisor Responsibilities in Log Number Investigations*. But when this Special Order was submitted, the CPD indicated that this Special Order was not submitted "to demonstrate compliance with Consent Decree paragraphs, and the CPD is not seeking review of this policy at this time." Nonetheless, we reviewed the policy and provided comments on June 15, 2022, expressing our desire to receive a final draft of this policy for review under ¶627. We observed that Section IV.A.10 of the draft policy reinforces the principles of ¶471.

Beyond draft policies, the CPD also submitted draft BIA eLearning materials for review. These materials were still in draft state at the end of the sixth reporting period. In the seventh reporting period, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶471, and also produced a draft for review in December. The latest version of this training did not adequately address the requirements of this paragraph. By the end of the reporting period, the training was still under development.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶471. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the

---

[24]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶471. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶471. For further discussion of the BIA Onboard Training, see ¶526–27.

\*\*\*

Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. Additionally, we expect to review data in the coming reporting periods that shows the number and percentage of cases for which BIA arrived at investigative findings and recommendations within 180 days of the initiation of the investigation, and the number and percentage of cases for which BIA missed the 180-day timeline. Additionally, we would like to see data indicating the number of extensions requested by BIA.

### Paragraph 471 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶472

*472. The City and CPD will ensure that the districts arrive at the investigative findings and recommendations within 90 days of the initiation of an investigation. Any request for an extension of time must be approved in writing by the appropriate District Commander.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and CPD reached Secondary compliance with this paragraph in the eighth reporting period.

To evaluate Preliminary compliance with ¶472, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed the CPD's training development, implementation, and evaluation (¶286).

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD reached Preliminary compliance by revising, submitting for public comment, and finalizing Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which fully addressed ¶472.[25] The CPD also produced BIA's *2020 Audit*, in which the CPD recognized that CPD was not yet in a place to reach operational compliance because the Case Management System did not yet have a field for the appropriate District Commander to approve requests for extensions of time in writing. We appreciated the CPD's honest self-assessment and encouraged the CPD to continue to produce high-quality audits, but in a timelier manner, not only for purposes of demonstrating compliance, but also to allow the CPD to identify areas in which it needs to focus its efforts and attention.

---

[25]   In earlier reporting periods, the CPD had also produced a draft BIA Unit Directive, *Case Management System*. In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in the sixth reporting period. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

The IMT also reviewed BIA Unit Directive, *Case Management System*, but this directive only partially addressed the requirements of ¶472 and remained in the collaborative review and revision process at the end of the fourth reporting period. The CPD also submitted training materials toward Secondary compliance, but the training provided lacked detail and needed further revision. In the sixth reporting period, the CPD provided drafts of S08-01-02, *Investigation Timelines and Benchmarks*. However, at the end of the reporting period, the policy remained in the collaborative review and revision process. Additionally, the CPD submitted draft BIA eLearning materials for review in the sixth reporting period, but they remained in draft state at the end of the reporting period.

In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which addressed ¶472 and its requirements. By the end of the reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of all its personnel, not just its sworn personnel. Additionally, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶472, and also produced a draft for review in December. The latest draft of this training did not adequately address the requirements of this paragraph. By the end of the reporting period, the training was still under development.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶472. With this, the CPD moved into Secondary compliance for ¶472. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶472. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the

training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶472. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶472. For further discussion of the BIA Onboard Training, see ¶526–27.

***

To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

For Full compliance, we will also look for documentation that the CPD and its employees are acting in accordance with ¶472's mandates. Additionally, we look forward to reviewing data in the coming reporting periods that shows the number and percentage of cases for which Accountability Sergeants arrived at investigative findings and recommendations within 180 days of the initiation of the investigation, and the number and percentage of cases for which Accountability Sergeants missed the 180-day timeline. We would also like to see data indicating the number of extensions requested by Accountability Sergeants.

## Paragraph 472 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶473

***473.*** *The City will ensure that if COPA does not arrive at the investigative findings and recommendations within 180 days, the Chief Administrator of COPA, or his or her designee, will notify, within five days after the end of the 180-day period, the Mayor or his or her designee, the Superintendent, the Chairman of the City Council Committee on Public Safety, the complainant or his or her representative, and the involved CPD member, or his or her counsel (unless such notification would compromise the integrity of the investigation). Such notification will include the reasons the administrative investigation has not concluded within 180 days. COPA will update such notice every 180 days until the administrative investigation is completed.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and COPA maintained Secondary compliance with ¶473 in the eighth reporting period.

To evaluate Preliminary compliance with ¶473, the IMT reviewed COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[26] To evaluate Secondary compliance, the IMT reviewed COPA's training development, implementation, and evaluation (¶286), and the development of a notification system to make notifications to the persons and entities designated by this paragraph. To evaluate Full compliance, we reviewed various data sources to determine whether the entities sufficiently implemented their training and policies relevant to ¶473.

*Progress before the Eighth Reporting Period*

In the fourth reporting period, COPA provided for review Policy 3.2.2, *Timeliness Benchmarks*. This policy completely addressed the requirements for ¶473. This policy was finalized at the end of the previous reporting period, which allowed

---

[26] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

COPA to achieve Preliminary compliance. COPA did not produce evidence of steps toward Secondary compliance with ¶473 in the fifth reporting period. In the sixth reporting period, COPA again did not produce any information related to compliance. However, the IMT was aware that COPA was working toward producing its *Information Systems* standard operating procedure in the future to move COPA toward Secondary compliance. In the seventh reporting period, COPA provided guidance on *Investigative Correspondence*, which explained that COPA had designed its Case Management System (CMS) to automatically provide the appropriate notifications to the Mayor, the CPD Superintendents, the City Council Public Safety Chairman, the complainant, and the involved CPD member. The notifications included the reasons that COPA's investigation remains in an open status and occur automatically and consistently. The guidance document explained that the notifications are made via CMS to reduce the potential for human error.

*Progress in the Eighth Reporting Period*

This reporting period, COPA provided examples of the 180-day letters to complainants and to officers, as well as memorandums to the Major, Superintendent, and Chairman of the City Council Committee on Public Safety. The letters to complainants and officers provide notification of the case remaining open beyond the 180 days as required by ¶473, but the letters do not provide explanations of the reasons the investigation has not yet concluded. COPA provided additional documentation that included data on the total number of days the case was open, but COPA did not indicate the number of 180-day letters that were sent to the parties involved. The IMT encourages COPA to provide information on the number of 180-day letters sent to ensure they meet the requirements of the paragraph. Additionally, we suggest that COPA combine all three spreadsheets provided into one spreadsheet, which would allow the reader to gain a more accurate picture of the case situation, disposition, and closure.

In the sixth reporting period, COPA provided its *Disciplinary and Remedial Recommendations In-Service* Training for review. The IMT previously did not include analysis of this training regarding the requirements of ¶473 because that paragraph was not included in the Lesson Plan text but rather only on one slide in the slide deck. Those training materials were sufficient to train the requirements of ¶473. Additionally, COPA previously provided evidence that more than 95% of its employees attended the training.

Lastly, on May 11, 2023, COPA provided its Operational Guidance Tracker for ¶473, which showed that COPA's personnel had reviewed and understood COPA Guidance, *Investigative Correspondence*. This tracker, however, alone is not sufficient for Full compliance.

***

COPA maintained Secondary compliance with ¶473. Moving forward, we will look for evidence demonstrating that COPA has sufficiently implemented its notification system to comply with ¶473's mandates.

### Paragraph 473 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Accountability and Transparency: ¶474

**474.** *CPD will ensure that if BIA does not arrive at the investigative findings and recommendations within 180 days, or an Accountability Sergeant does not arrive at the investigative findings and recommendations within 90 days, BIA will notify, within five days of the end of the designated timeframe, the complainant or complainant representative, and the involved CPD member, or his or her counsel (unless such notification would compromise the integrity of the investigation). Such notification will include the reasons for the inability to complete the administrative investigation within the designated timeframe. BIA or the Accountability Sergeant will update such notice every 90 days until the administrative investigation is completed.*

## Compliance Progress     (Reporting Period: January 1, 2023, through June 30, 2023)

**Preliminary:**     *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**      *In Compliance* (NEW)
**Full:**           *Not Yet Assessed*

The City and the CPD reached Secondary compliance with this paragraph in the eighth reporting period.

To evaluate Preliminary compliance with ¶474, the IMT reviewed CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed the CPD's training development, implementation, and evaluation (¶286).

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD reached Preliminary compliance by finalizing Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addressed ¶474 in Sections V.2 and V.3. The CPD also produced BIA's *2020 Audit*, where the CPD acknowledged that additional work is necessary to reach Full compliance with ¶474. This audit was well done, but we noted that it was released several months too late. We explained that, moving forward, such audits need to be provided in a timelier manner not only for purposes of demonstrating compliance, but also to allow the CPD to identify areas in which it needs to focus its efforts and attention. In the sixth reporting period, the CPD provided revised versions of S08-01, *Complaint and Disciplinary Investigators and Investigations,* and S08-01-02, *Investigation Timelines and Benchmarks.* At the end of the reporting period, it remained in the collaborative review and revision process. Additionally, the CPD and BIA submitted BIA eLearning materials for review, but these materials

remained in draft state at the end of the sixth reporting period. In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which addressed ¶474 and its requirements. By the end of the reporting period, the CPD did not demonstrate that it had provided this training to at least 95% of its personnel, not just its sworn personnel.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶474. With this, the CPD moved into Secondary compliance for ¶474. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

***

To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing to work with them collaboratively in the ninth reporting period. For Full compliance, we will also look for documentation that the CPD and its employees are acting in accordance with ¶474's mandates.

## Paragraph 474 Compliance Progress History

| | | |
|---|---|---|
| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶475

> **475.** *The City and CPD will undertake best efforts to ensure that the identities of complainants are not revealed to the involved CPD member prior to the CPD member's interrogation.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[27] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not Yet Assessed* |

In the eighth reporting period, the CPD maintained Preliminary compliance with ¶475, while COPA maintained Secondary compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶475, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[28] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, we reviewed various data sources to determine whether the entities sufficiently implemented their training and policies relevant to ¶475.

---

[27]  As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[28]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD reached Preliminary compliance with ¶475 by providing revised drafts of Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addressed the requirements of ¶475. The IMT provided a no-objection notice in December 2021.[29] Thereafter, the CPD posted the S08-01 for public comment and, on the last day of the reporting period, finalized S08-01, moving the CPD into Preliminary compliance. In the sixth reporting period, the CPD did not provide evidence of efforts toward Secondary compliance with this paragraph. In the seventh reporting period, the CPD produced a draft of its five-day BIA Onboard Training for review in July, not including ¶475, but did produce a draft for review in December, including ¶475. By the end of the reporting period, the training was still under development.

COPA also reached Preliminary compliance with ¶475 in the fifth reporting period by finalizing its Policy 3.1.2(b) *COPA Interviews-Chicago Police Department Members*, which incorporated ¶475's mandate. In the sixth reporting period, COPA did not provide evidence of efforts toward Secondary compliance with this paragraph. In the seventh reporting period, COPA provided *Officer Interviews In-Service* training for review, which completely addressed the requirements of ¶475. During an IMT site visit on September 29, 2022, the IMT attended and observed the *Officer Interviews In-Service Training*. Additionally, COPA submitted documentation demonstrating that this training was provided to more than 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

*Progress in the Eighth Reporting Period*

This reporting period, the City, the CPD, and COPA did not produce any documentation that demonstrated efforts related to ¶475.

\*\*\*

Moving forward, we will continue to look for the CPD to provide training materials that include instruction and outline processes to ensure the requirements of ¶475

---

[29]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

are put into action. Specifically, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. The CPD will then need to provide their training to 95% of employees to reach Secondary compliance. For COPA, related to Full compliance, we will look for COPA to demonstrate that it has sufficiently implemented its policing and training.

## Paragraph 475 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶476

> **476.** *The City, CPD, and COPA will require that COPA and BIA supervisors regularly communicate with the investigators under their supervision, including Accountability Sergeants, to evaluate the progress of administrative investigations.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[30] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the eighth reporting period, the City and the CPD maintained Preliminary compliance with ¶476. COPA reached Secondary compliance with this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶476, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[31] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

---

[30]  As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[31]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

Through the efforts of the CPD and COPA, the City reached Preliminary compliance with ¶476 in the fifth reporting period. In the fifth reporting period, the CPD revised and finalized Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. This Special Order incorporates the expectations set out by ¶476. Therefore, when the CPD finalized S08-01, it moved into Preliminary compliance. In the sixth reporting period, the CPD produced additional draft policies that were relevant to the requirements of ¶476. Specifically, the City and the CPD provided S08-01-06, *Supervisor Responsibilities in Log Number Investigations*, where multiple sections of the policy addressed the requirements of this paragraph. In the seventh reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶476.

COPA had reached Preliminary compliance with this paragraph in the fourth reporting period by finalizing Policy 3.2.2, *Timeliness Benchmarks*. COPA maintained Preliminary compliance in the fifth, sixth, and seventh reporting periods but did not submit evidence of additional efforts toward Secondary compliance.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶476.

This reporting period, COPA provided materials for review of its *Conflicts of Interest* training. COPA addressed ¶476 in the training materials. The IMT virtually attended the training on June 14, 2023. The instructor was well prepared and did a great job of engaging with the class. While the participants did not ask the number of questions that are typically asked in COPA's training classes, the lesson plan was followed, and the instructor did a great job of answering the questions that were asked. COPA provided documentation that at least 95% of its employees attended the training. With this, COPA reached Secondary compliance.

\*\*\*

In future reporting periods, we will look for the CPD to provide draft training materials that instruct compliance with ¶476 and its relevant policies. For COPA, we will look for documentation that COPA and its employees are acting in accordance with ¶476's mandates.

## Paragraph 476 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶477

**477.** *The City and CPD will undertake best efforts to ensure that all complaints, including anonymous complaints, can be the subject of a misconduct investigation.*

## Compliance Progress                    (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FOURTH REPORTING PERIOD)[32] |
| | **CPD** | *In Compliance* (FOURTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Under Assessment* |

In the eighth reporting period, the City and the CPD maintained Preliminary compliance with ¶477, while COPA maintained Secondary compliance and remains under assessment for Full compliance.

To evaluate Preliminary compliance with ¶477, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[33] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

---

[32]  As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[33]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD finalized General Order G08-01-02, *Complaint Initiation and Log Number Investigation Assignment,* which codified the requirements of ¶477.[34] The CPD also submitted BIA Unit Directives relevant to ¶477: *Requirements of a Complete Investigative File*, and *Administrative Misconduct*.[35] These efforts brought the CPD into Preliminary compliance. In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶477. In the seventh reporting period, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶477, and also produced a draft for review in December. The latest draft of this training did not adequately address the requirements of this paragraph. By the end of the reporting period, the training was still under development.

In previous reporting periods, COPA provided for review *Anonymous Complaint Guidance*, which addressed the requirements of ¶477. COPA also finalized its Policy 3.1.2 *Fact Gathering and the Investigative Process*, which addressed the requirements of ¶477. These efforts brought COPA into Preliminary compliance with ¶477. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶477. In the seventh reporting period, COPA provided *COPA Guidance Processing Anonymous Complaints* that supported ¶477. Additionally, COPA's *Complaint Register Training* addressed the requirements of ¶477. Also in the seventh reporting period, COPA provided *Fact Gathering-Evidence Collection* training materials, which addressed the requirements of ¶477. The IMT virtually attended the *Fact Gathering-Evidence Collection* training delivered to COPA In-Service staff on December 13, 2022. COPA submitted documentation demonstrating that its *Fact Gathering-Evidence Collection* training was provided to at least 95% of COPA's staff. With this, COPA reached Secondary compliance. Lastly, COPA provided a screenshot of its closed case dashboard to provide proof that COPA requires that verbal abuse and anonymous complaints will be preliminarily investigated to determine whether a full investigation is warranted per the requirements of ¶477. The dashboard screenshots also provided the number of verbal abuse and anonymous complaints COPA received via intake. COPA remained under assessment for Full compliance as the Parties continued to have conversations concerning the evidence sufficient for Full compliance.

---

[34] The name of this directive has changed twice during the collaborative review and revision process. The first draft was titled *Specific Responsibilities Regarding Allegations of Misconduct*, and the second through the fourth drafts were titled *Initiation and Assignment of Investigations into Allegations of Misconduct*.

[35] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in the sixth reporting period and is ongoing.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶477. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including for review with ¶477. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA provided documentation that 100% of its COPA Academy and 95% of its COPA employees attended the *Complaint Register* training. Additionally, COPA provided a revised version of the training to address comments from the Illinois Office of Attorney General. the IMT virtually attended COPA's *Complaint Register* training. The instructors engaged the class with questions and asked for input on training points throughout.

*** 

Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

For COPA, we will look for COPA to demonstrate that it has sufficiently implemented its policies and training and its employees are acting in accordance with ¶477's mandates. In the eighth reporting period, COPA remains under assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

## Paragraph 477 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

## Accountability and Transparency: ¶478

*478. Within 120 days of the Effective Date, CPD and COPA will each review and revise its policies regarding Preliminary investigations, including Preliminary investigations of anonymous complaints, and the process for seeking an override affidavit in the absence of a signed complainant affidavit.*

### Compliance Progress
(Reporting Period: January 1, 2023, through June 30, 2023)

| Preliminary: | | |
|---|---|---|
| | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | CPD | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | COPA | *In Compliance* (FOURTH REPORTING PERIOD) |
| Secondary: | | *Not in Compliance* |
| | CPD | *Not Yet Assessed* |
| | COPA | *In Compliance* (NEW) |
| Full: | | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶478, and COPA reached Secondary compliance with ¶478 in the eighth reporting period.

To evaluate Preliminary compliance with ¶478, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[36] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD and BIA developed a collection of policies that relate to ¶478. The IMT reviewed all relevant policies and provided no-objection notices to several policies, but these policies were not finalized following the process outlined in the Consent Decree.[37] In the fifth reporting period, the CPD

---

[36] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[37] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the

provided revised drafts of Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which only partially addressed the requirements of ¶478. The IMT provided a no-objection notice in December 2021. The CPD posted S08-01 for public comment and, on the last day of the reporting period, finalized the Special Order. Also in the fifth reporting period, the CPD submitted a draft Special Order S08-01-01, *Conducting Log Number Investigations*, for review with paragraph ¶478, but this policy remained in the collaborative review and revision process at the end of the fifth reporting period. In the sixth reporting period, the CPD provided multiple revised versions of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations,* but the policy did not fully address the requirements of the paragraph. In the seventh reporting period, the City and the CPD provided multiple revised versions of S08-01-04, *Initial Investigatory Responsibilities in Log Number Investigations*, but it alone did not address all of the paragraph's requirements.

Also in the seventh reporting period, the CPD revised and finalized the G08 and S08 Accountability Suites of policies. These suites of policies direct preliminary complaints, preliminary investigations, anonymous complaints, and the process for seeking an override affidavit in the absence of an assigned complaint affidavit, and together addressed the requirements of ¶478. However, the IMT noted that the CPD had not provided a memorandum or official notification which specifically states that the General Orders and Special Orders, as a group, address the requirements of this paragraph, and instead referred to specific paragraphs within individual policies that did not alone completely address the requirements of ¶478. As the IMT has stated during conferences with the CPD and has noted when reviewing individual policies, the entire group of policies addressed the requirements of this paragraph. With this, the CPD reached Preliminary compliance in the seventh reporting period.

COPA reached Preliminary compliance with ¶478 in the fourth reporting period by developing, revising, and finalizing various policies that instruct compliance with ¶478, such as the *Intake* policy. In the sixth reporting period, COPA further revised its *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement* policy, but it remained in the collaborative review and revision process at the end of the reporting period. In the seventh reporting period, COPA provided *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement* Policy for review, which addressed the requirements of ¶478 and even provided additional direction not specified by the Consent Decree, including directing COPA to report the anonymous complaint

---

CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

to the Illinois Law Enforcement Training and Standards Board (ILETSB). Additionally, COPA provided Guidance, *Processing Anonymous Complaints*, which addressed the requirements of ¶478 by directing the intake and preliminary investigation of anonymous complaints.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, not including ¶478. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including for review with ¶478. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA provided documentation that 100% of its COPA Academy and 95% of its COPA employees attended the *Complaint Register* training. Additionally, COPA provided a revised version of the training to address comments from the Illinois Office of Attorney General. The IMT virtually attended COPA's *Complaint Register* training. The instructors engaged the class with questions and asked for input on training points throughout. With this, COPA reached Secondary compliance with ¶478.

***

The City and the CPD maintained Preliminary compliance, and COPA reached Secondary compliance in this reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise indi-

vidual blocks of instruction for the BIA initial in-service, initial Onboard, and re-fresher trainings. For COPA, we will look for documentation that COPA and its employees are acting in accordance with ¶478's mandates.

## Paragraph 478 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | Under Assessment |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶479

*479. Within 120 days of the Effective Date, CPD and COPA will each adopt or review and, to the extent necessary, revise its policy establishing investigative timelines, benchmarks, and goals by which the progress of investigations will be measured.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance (SEVENTH REPORTING PERIOD)* |
| **CPD** | *In Compliance (SEVENTH REPORTING PERIOD)* |
| **COPA** | *In Compliance (FOURTH REPORTING PERIOD)* |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the eighth reporting period, the City maintained Preliminary compliance with ¶479.

To evaluate Preliminary compliance with ¶479, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[38] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD finalized Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which partially addressed the requirements of ¶479. The CPD also submitted a draft Special Order S08-01-01, *Conducting Log Number Investigations*, which remained in the collaborative review and revision process at the end of the reporting period. Before the fifth reporting period, the CPD had also provided a draft BIA Unit Directive, *Investigative Timelines and Benchmarks*, which instructed compliance with ¶479. We submitted a no-objection notice to this Unit Directive, but the CPD and BIA did not finalize this

---

[38] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

Unit Directive by the end of the fifth reporting period.[39] In the sixth reporting period, the CPD submitted multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, as well as S08-01-02, *Investigation Timelines and Benchmarks.* Both policies remained in the collaborative review and revision process at the end of the sixth reporting period. In the seventh reporting period, the City and the CPD provided a revised S08-01-02, *Investigations Timelines and Benchmarks*, which addressed the requirements of ¶479. With this, the CPD reached Preliminary compliance.

In the fourth reporting period, COPA finalized its Policy 3.2.2, *Timeliness Benchmarks*, which addressed all requirements of ¶479. This allowed COPA to achieve Preliminary compliance. In the fifth, sixth, and seventh reporting periods, COPA did not produce evidence of steps toward Secondary compliance with ¶479.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, not including ¶479. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶479. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After

---

[39] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶479. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶479.

\*\*\*

The City and the CPD maintained Preliminary compliance with ¶479 in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For COPA, we will look for materials that train on the requirements of ¶479.

### Paragraph 479 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶480

> ***480.*** *Within 120 days of the Effective Date, the City, CPD, and COPA will each develop a policy establishing procedures for COPA, BIA, and Accountability Sergeant's review and consideration of evidence from civil and criminal litigation.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *Not in Compliance*[40] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

COPA maintained Preliminary compliance with ¶480 in the eighth reporting period. The CPD did not reach Preliminary compliance because it did not produce any documentation demonstrating efforts related to this paragraph. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶480, the IMT reviewed the development of the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[41] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD provided a letter from BIA indicating that work was "underway" related to addressing the requirements of ¶480 through a draft policy entitled "City Policy Regarding Procedures for COPA, BIA and the Ac-

---

[40]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[41]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

countability Sergeant's Review and Consideration of Evidence from Civil and Criminal Litigation." This information was provided in February 2020. We did not receive any additional information regarding the draft policy in the fifth reporting period. However, the CPD provided a draft Special Order S08-01-01, *Conducting Log Number Investigations*, which addressed ¶480. The IMT provided comments in September 2021, but S08-01-01 remained in the collaborative review and revision process at the end of the reporting period. In the sixth and seventh reporting periods, the CPD did not produce any documentation that demonstrated efforts related to ¶480.

In the fifth reporting period, COPA finalized 3.2.2 *Timeliness Benchmarks* Policy. This policy provides general timelines related to COPA accomplishing the requirements of ¶480. In addition to this guidance, COPA submitted a draft revised *Civil/Criminal Complaint Review* Policy, which details how COPA personnel are to comply ¶480. At the end of the reporting period, this policy remained in the collaborative review and revision process. In the sixth reporting period, COPA revised its policy relevant to ¶480: *Civil/Criminal Complaint Review* Policy. This policy detailed how COPA personnel are to comply ¶480. However, this policy remained in the collaborative review and revision process at the end of the sixth reporting period. In the seventh reporting period, COPA provided a final version of the *Civil and Criminal Complaint Review Policy* and related guidance, and also demonstrated community input. Additionally, the City provided a memorandum updating the status of the process by which the Department of Law notifies COPA of pending lawsuits. With this, COPA reached Preliminary compliance in the seventh reporting period.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶480.

This reporting period, COPA provided its Guidance for COPA's *Civil/Criminal Complaint Review* Policy, which addressed the requirements of ¶480 and provides specific procedures for review and consideration of evidence from civil and criminal litigation. Additionally, the City provided an updated memorandum of understanding, showing the City's agreement to the procedures outlined in ¶480.

***

COPA maintained Preliminary compliance with this paragraph in the eighth reporting period. Moving forward, we will look for COPA to develop training relevant to the requirements of this paragraph. We will look for CPD to develop a policy relevant to the requirements of this paragraph.

## Paragraph 480 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

## Accountability and Transparency: ¶481

> ***481.*** *The City, CPD, and COPA will ensure that if CPD, COPA, or the OIG requests the Superintendent's authorization to open an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the OIG became aware of the allegations, the Superintendent will respond within 30 days.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance*[42] (NEW) |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (NEW) |
| **OIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not Yet Assessed* |
| **OIG** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not Yet Assessed* |
| **OIG** | *In Compliance* (FOURTH REPORTING PERIOD) |

The City and COPA reached Preliminary compliance in the eighth reporting period. The CPD maintained Preliminary compliance, and the Deputy PSIG maintained Full compliance with ¶481. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶481, the IMT reviewed the CPD's, COPA's, and the Deputy PSIG's relevant policies and documents following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[43] For COPA

---

[42] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[43] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among

specifically, we looked for a policy that explains the process for requesting the Superintendent to authorize opening an investigation for incidents alleged to have occurred more than five years ago.

To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286), specifically including training on drafting a request to the Superintendent and monitoring for timely response and feedback from the CPD, COPA, and the Office of the Inspector General regarding the Superintendent's responses to requests to open an investigation older than five years. For Full compliance, we looked for evidence that the entities implemented their policies and trainings such that they receive responses form the Superintendent within 30 days.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD provided drafts of G08-01, *Complaint and Disciplinary Procedures* and BIA Unit Directive*, Incidents occurring Five Years Prior to Complaint and Reopening Investigations Five Years After Initiation*. These polices were not posted for public comment or finalized at the end of the fourth reporting period. In the fifth reporting period, the CPD finalized General Order G08-01, *Complaint and Disciplinary Procedures*, which addressed the requirements of ¶481. This brought the CPD into Preliminary compliance. Before this, in earlier reporting periods, the CPD also provided BIA Unit Directive*, Incidents occurring Five Years Prior to Complaint and Reopening Investigations Five Years After Initiation*.[44] This Unit Directive was never finalized. In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶481. In the seventh reporting period, the CPD produced a revised draft of G08-01, *Complaint and Disciplinary System*, which addressed the requirements of ¶481.

In past reporting periods, COPA contended that it has no responsibility for ¶481. The IMT suggested that COPA develop a policy which explains the process for requesting that the Superintendent authorize the opening of "an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the Office of the Inspector General became aware of the allegations," and explaining that the Superintendent, per the requirements of ¶481, must respond within 30 days. In the fifth reporting period, COPA continued to work toward Preliminary compliance by submitting a revised draft of its *Civil/Criminal Complaint Review* Policy that instructs compliance with ¶481. At the end of the

---

other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[44] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period and is ongoing.

reporting period, this policy remained in the collaborative review and revision process. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶442. The IMT continued to suggest that COPA develop a policy that instructed compliance with the requirements of ¶481.

The Deputy PSIG reached Full compliance in past reporting periods through its *Investigations Section Manual*, which explains the correct procedure for requesting the CPD Superintendent to reopen an investigation pursuant to ¶481. The Deputy PSIG has since maintained Full compliance through submission of its Five Year Letters that it submits to the Superintendent as well as information regarding the Superintendent's response.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶481.

This reporting period, COPA provided its *Request for Authorization to Investigate or Re-Open an Incident Over Five Years Old* Guidance document along with a sample letter. The Guidance addresses and acknowledges COPA's obligation to officially request the Superintendent's authorization to open an investigation involving incidents which occurred more than five years prior to the date of COPA's awareness of the allegation. Additionally, the Guidance provides detailed instruction to COPA employees regarding the exact procedure which should be followed to make the proper notification. The sample letter shows how the Guidance should be properly fulfilled. With this, COPA reached Preliminary compliance. Additionally, on May 11, 2023, COPA provided its Operational Guidance Tracker for ¶481, which acknowledged that COPA's personnel had read and understood the *Request for Authorization to Investigate or Re-Open an Incident Over Five Years Old* Guidance. However this is not sufficient for Secondary compliance.

This reporting period, the Deputy PSIG continued to maintain Full compliance by providing memoranda noting that their office made one request to the Superintendent in the previous reporting period to open an investigation which allegedly occurred more than five years before that date. The Superintendent's response was received within 30 days as required by ¶481.

\*\*\*

In the eighth reporting period, the City and COPA reached Preliminary compliance. The CPD maintained Preliminary compliance, and the Deputy PSIG maintained Full compliance, completing the Deputy PSIG's two-year Sustainment Period for this paragraph.

## Paragraph 481 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | Preliminary | |

# Accountability and Transparency: ¶482

**482.** *The City and CPD will ensure that BIA regularly conducts proactive investigations and integrity tests.*

**Compliance Progress**     (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance but did not reach Secondary compliance with ¶482 this reporting period.

To evaluate Preliminary compliance with ¶482, the IMT reviewed the CPD's relevant policies and documents following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286), looking specifically for proof that the appropriate BIA staff are trained to conduct investigations and integrity tests in line with policy, and implementation of a system by the City and the CPD to monitor and ensure BIA is completing investigations and tests as required.

*Progress before the Eighth Reporting Period*

The IMT assessed the City's compliance with ¶482 for the first time in the fifth reporting period. The CPD reached Preliminary compliance by finalizing its General Order G08-01, *Complaint and Disciplinary System*.[45] In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶482. In the seventh reporting period, the CPD produced a revised draft of G08-01, *Complaint and Disciplinary System*, which addressed ¶482.

*Progress in the Eighth Reporting Period*

This reporting period, the City and the CPD did not produce any documentation that demonstrated efforts related to ¶482.

\*\*\*

The City and the CPD maintained Preliminary compliance. Moving forward, we look forward to reviewing the CPD's training materials that demonstrate that personnel are properly trained to comply with the paragraph's requirements.

---

[45] The CPD previously submitted this General Order as *Complaint and Disciplinary Procedures*.

## Paragraph 482 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD |
|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Accountability and Transparency: ¶483

**483.** *The City and CPD will ensure there are regularly conducted satisfaction surveys relating to the complaint intake and investigation processes. The City and CPD will evaluate trends and training opportunities identified as a result of information received from such quality control surveys.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the eighth reporting period, the City and the CPD maintained Preliminary compliance with ¶483 but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶483, the IMT reviewed the CPD's relevant policies and documents following the policy process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed various sources to determine whether individuals responsible for conducting surveys are aware of expectations set by policy and are provided the means to conduct surveys and identify additional training needs.

*Progress before the Eighth Reporting Period*

The IMT assessed the City's compliance with ¶483 for first time in the fifth reporting period. The CPD reached Preliminary compliance by finalizing Special Order S08-01-04, *Post Investigation Log Number Procedures* for review, which addresses ¶483.[46] In the sixth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶483. In the seventh reporting period, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*,[47] which partially addressed the requirements of ¶483. The IMT noted the policy should include language defining the structure for the development of the satisfaction surveys, including but not limited to the timeline, the percentage of cases in the sample group, what is being sampled, and how it will be validated. Additionally, the CPD provided BIA's *Satisfaction Survey Administration Plan*, which did not meet the requirements of ¶483. The CPD had not developed a policy for this paragraph, which would dictate a timeline. Moreover, in this instance, a policy

---

[46]  The CPD previously submitted this Special Order under the title *Documenting Log Number Investigations and Post Investigations Procedures*.

[47]  This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

may also increase and improve participation. We also expressed concerns regarding the more than 12-month timeline for distributing, reviewing, and analyzing satisfaction surveys, and suggested shortening this timeline to allow for ongoing improvement of the survey process and regular review and consideration of officer and community feedback. Finally, we recommended including information about the BIA Satisfaction Surveys in the BIA's and the CPD's quarterly and annual reports.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided a response to the IMT's comments on the BIA's *Satisfaction Survey Administration Plan.* The IMT still notes that this does not meet Secondary compliance because it does not fully address the concerns the IMT noted in December 2022.

*** 

Moving forward, we will look for the CPD to develop training relevant to the requirements of ¶483, and to revise its survey process and plan to address the IMT's concerns provided to the CPD in December 2022.

### Paragraph 483 Compliance Progress History

| FIRST REPORTING PERIOD<br>SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SECOND REPORTING PERIOD<br>SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | THIRD REPORTING PERIOD<br>MARCH 1, 2020 − DECEMBER 31, 2020 |
|---|---|---|
| COMPLIANCE PROGRESS:<br>Not Applicable | COMPLIANCE PROGRESS:<br>Not Applicable | COMPLIANCE PROGRESS:<br>Not Applicable |
| FOURTH REPORTING PERIOD<br>JANUARY 1, 2021 − JUNE 30, 2021 | FIFTH REPORTING PERIOD<br>JULY 1, 2021 − DECEMBER 31, 2021 | SIXTH REPORTING PERIOD<br>JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS:<br>Not Applicable | COMPLIANCE PROGRESS:<br>Preliminary | COMPLIANCE PROGRESS:<br>Preliminary |
| SEVENTH REPORTING PERIOD<br>JULY 1, 2022 − DECEMBER 31, 2022 | EIGHTH REPORTING PERIOD<br>JANUARY 1, 2023 − JUNE 30, 2023 | |
| COMPLIANCE PROGRESS:<br>Preliminary | COMPLIANCE PROGRESS:<br>Preliminary | |

# Accountability and Transparency: ¶484

**484.** *If at any time during the intake or investigation of a complaint, COPA, BIA, or Accountability Sergeants find evidence indicating criminal conduct by any CPD member, the Chief Administrator of COPA or Chief of BIA will refer the investigation to the appropriate prosecuting agency.*

**Compliance Progress**    (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City, the CPD, and COPA maintained Preliminary compliance with ¶484.

To evaluate Preliminary compliance with ¶484, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[48] To evaluate Secondary compliance, we determined whether the entities have developed a means of tracking referrals to prosecuting agencies and developed written guidance guiding the referral and tracking process. To reach Secondary compliance, the entities must train on the developed guiding and tracking process.

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD provided draft Special Order S08-01-01, *Conducting Log Number Investigations* for review, which partially addressed the requirements of ¶484. The IMT provided comments in September 2021. At the end of the reporting period, this policy remained in the collaborative review and revision process. BIA also produced the Unit Directives *Investigative File Maintenance* and *Initiation of Log Numbers in the Case Management System*, which addressed

---

[48]    The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

¶484.[49] The Unit Directives were not finalized following the Consent Decree process by the end of the reporting period. In the sixth reporting period, the CPD submitted multiple revised versions of S08-01-05, however it remained in the collaborative review and revision process at the end of the reporting period. In the seventh reporting period, the CPD produced a revised draft of S08-01-05, *Conducting Log Number Investigations*, which addressed the requirements of ¶484. With this, the CPD reached Preliminary compliance. Additionally, the CPD produced a draft of its five-day BIA Onboard Training for review in July, not including ¶484, but did produce a draft for review in December, including ¶484. By the end of the reporting period, the training was still under development.

In the fourth reporting period, COPA finalized Policy 3.1.1, *Intake* and 3.1.2, *Fact Gathering and the Investigative Process*, which together addressed the requirements of ¶484 and brought COPA into Preliminary compliance. In the fifth reporting period, COPA provided its training titled *COPA Intake Unit: Overview of Policies and Procedures In-Service 2021*, which instructed compliance with the requirements of ¶484. COPA provided this training to more than 95% of its personnel. We explained that, to reach Secondary compliance, COPA should focus on developing written guidance and a means of directing and tracking referrals to prosecuting agencies, and that COPA would also need to train personnel on the policy and application of the referral tracking process. In the sixth and seventh reporting periods, COPA did not produce any documentation that demonstrated efforts related to ¶484.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶484. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the

---

[49]   In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive Initial Responsibilities in Assigned Log Number Investigations into S08-01-05. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶484. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶484. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶484.

*** 

The City and the CPD maintained Preliminary compliance with ¶484 in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

For COPA, we will look for training materials relevant to ¶484, including written guidance regarding making and tracking referrals to prosecuting agencies.

### Paragraph 484 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

## Accountability and Transparency: ¶485

**485.** *The City will continue to provide the Chief Administrator of COPA the discretion to direct COPA to review and investigate the facts of individual civil lawsuits and criminal proceedings involving alleged misconduct in order to identify and investigate incidents of misconduct.*

**Compliance Progress**     (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2024* |

In the eighth reporting period, the City maintained Full compliance with ¶485.

To evaluate Preliminary compliance with ¶485, the IMT reviewed the City's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[50] As a threshold matter, we looked for an ordinance that provides discretion to direct COPA reviews and investigations to the Chief Administrator of COPA. To evaluate Secondary compliance, we looked for evidence of intention to maintain the COPA Chief's discretion. For Full compliance, we looked for evidence to confirm whether the COPA Chief is to act within their discretion.

*Progress before the Eighth Reporting Period*

The IMT assessed compliance with ¶485 for the first time in the sixth reporting period. We noted that Chicago Municipal Code 2-78-120, which has been on the books for several years, grants the COPA Chief Administrator the ability to "review lawsuits and claims against the Department or one or more of its members, or against the City, alleging police misconduct that falls within COPA's jurisdiction." Beyond this, on December 23, 2021, COPA provided the IMT with a revised version of its *Civil and Criminal Complaint Review* policy. This policy was well written and thorough, and provided useful instruction for COPA employees to fulfill the requirements of ¶485. Included with the policy, COPA compiled *Civil and Criminal Complaint Review* Guidance that not only set out COPA's intention to comply with

---

[50]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

this paragraph but provided instruction in how COPA employees are to fulfill the requirements of the *Civil and Criminal Complaint Review* policy and this paragraph. Finally, through conversations with COPA, the IMT confirmed that the Chief Administrator of COPA has the ability to exercise the discretion granted with the position.

In the seventh reporting period, the City provided a memorandum which updated the status of the process by which Department of Law (DOL) notifies COPA of pending lawsuits, as well as a Memorandum of Understanding between DOL and COPA. The City's memorandum indicated that, beginning in December 2020, the DOL had provided information on lawsuits involving CPD members on a bi-weekly basis to review and investigate the facts of individual civil lawsuits and criminal proceedings involving alleged misconduct for COPA to investigate incidents of misconduct. The Memorandum of Understanding was foundational to formalizing the informal notification system that has been in place since December 2020 but was unsigned. The IMT noted we would look forward to receiving a final signed version of the Memorandum and to reviewing the bi-weekly memos regarding civil and criminal proceedings. Additionally, COPA provided a final *Civil and Criminal Complaint Review* policy and guidance related to this paragraph.

*Progress in the Eighth Reporting Period*

This reporting period, the City did not produce any documentation that demonstrated efforts related to ¶485.

\*\*\*

Moving forward we will continue to look for documentation demonstrating that the Chief Administrator of COPA is afforded discretion and able to act under that discretion as is called for by ¶485. We will also look forward to receiving a final signed version of the Memorandum of Understanding and to reviewing bi-weekly memos regarding civil and criminal proceedings. To maintain Full compliance with this paragraph, we expect to review materials demonstrating continued compliance in each reporting period.

## Paragraph 485 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Not Applicable

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Not Applicable

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Not Applicable

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Full

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Full

EIGHTH REPORTING PERIOD
JANUARY 1, 2023 – JUNE 30, 2023
COMPLIANCE PROGRESS:
Full

## Accountability and Transparency: ¶486

***486.*** *The City, CPD, and COPA will ensure that CPD and COPA maintain thorough and complete administrative investigative files. Such administrative investigative files will include: a. documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the alleged misconduct. In situations in which there are no known witnesses, the file will specifically state this fact. In situations in which witnesses were present but circumstances prevented the investigator from collecting information from those witnesses, the investigative file will state the reasons why. The investigative file also will include all available identifying information for anyone who refuses to provide a statement; b. documentation of each interview conducted and the recording of those interviews, if available; c. the names of all CPD members who have been identified as witnesses to the alleged misconduct; d. COPA's, BIA's, or the district's narrative description and evaluation of the alleged misconduct, based on its review of the evidence gathered, including a determination of whether the CPD member's actions appear to be within CPD policy, procedure, regulations, orders, or other standards of conduct required of CPD members; e. in cases where material inconsistencies exist between complainant, CPD member, and witness statements, explicit identification of the inconsistencies, including a description of the evidence reviewed and written credibility findings; f. if a CPD member deployed a weapon, documentation of whether the CPD member's certification and training for the weapon were current; g. all CPD member original statements, as well as any amendments or clarifications to the original statement, and any subsequent statements; and h. an explicit identification of each allegation and the recommended finding for each allegation of misconduct in an investigation.*

| Compliance Progress | | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

The City, the CPD, and COPA maintained Preliminary compliance with ¶486 in the eighth reporting period.

To evaluate Preliminary compliance with ¶486, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[51] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286).

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD provided draft Special Order S08-01-01, *Conducting Log Number Investigations*, for review with this paragraph. But S08-01-01 remained in the collaborative review and revision process at the end of the reporting period. Also, in earlier reporting periods, the CPD produced BIA's Unit Directive, *Requirements of a Complete Investigative File*, *Photo Room Operations*, and *Administrative Misconduct Investigation* under ¶486. But these policies were not finalized by the end of the fifth reporting period. In the sixth reporting period, the CPD provided S08-01-09, *Requirements of a Complete Log Number Investigative File*, for review with ¶486–87. The IMT provided feedback and a no-objection notice on June 3, 2022. We suggested that the CPD add "regulations, orders, or other standards of conduct required of CPD members" to the first paragraph of Section III.H to sufficiently address ¶486(d). However, at the end of the reporting period the policy remained in the collaborative review and revision process.

In the seventh reporting period, the CPD produced S08-01-09, *Requirements of a Complete Log Number Investigative File*, for review with ¶486–87. The IMT provided feedback and a no-objection notice on June 3, 2022. We suggested that the CPD add "regulations, orders, or other standards of conduct required of CPD members" to the first paragraph of Section III.H to sufficiently address ¶486(d). We

---

[51] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

noted in the sixth reporting period that if this revision was made, S08-01-09 would fully address the requirements of ¶486 and its subparagraphs. The City and the CPD produced the final S08-01-09 on January 12, 2023, in the seventh reporting period, and the final version of the policy incorporated the IMT's requested changes, thereby meeting the requirements of ¶486 and its subparagraphs. With this, the CPD reached Preliminary compliance. Additionally, the CPD produced a draft of its five-day BIA Onboard Training for review in July, including ¶486, and also produced a draft for review in December. By the end of the reporting period, the training was still under development. Lastly, the CPD produced a first draft of *BIA Recorder Training*. The training did not meet the requirements of ¶486. The Audio Recorder Training Records submitted with this production indicated that numerous BIA and Accountability Sergeants had already been trained on this material, which caused the IMT to be concerned about the quality of the training received given the current state of the training materials. The IMT was also concerned that this training was provided before submitting the training materials to the IMT for review, per the requirements of ¶641 of the Consent Decree. Going forward, the IMT expected that such training materials would be provided to the IMT and the OAG for review prior to implementation.

In the fifth reporting period, COPA provided drafts of COPA 3.1.9, *Investigative File Maintenance*, which addressed all subparagraphs of ¶486. The IMT provided a no-objection notice in late December 2021, but by the end of the reporting period the Policy had not been posted for public comment and finalized. In the sixth reporting period, COPA continued its efforts from the fifth reporting period related to its policy *Investigative File Maintenance*. This policy addressed the requirements of ¶486. With this, COPA moved into Preliminary compliance with ¶486 in the sixth reporting period. In the seventh reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶486.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided a revised and final version of *BIA Recorder Training.* The IMT has not submitted a no-objection notice to this training and as stated previously, we have concerns that this training was provided before submitting the training materials to the IMT for review, per the requirements of ¶641 of the Consent Decree. The IMT noted in the previous reporting period that going forward, the IMT expects that such training materials will be provided to the IMT and the OAG for review prior to implementation. Although the CPD provided a revised version this reporting period and noted they did not intend to produce it again, the IMT still did not provide a no-objection notice for the training. We continue to raise that the material provided was confusing as CPD submitted the version for Secondary compliance with ¶486 but the *BIA Recorder Training* only applies to ¶486(b). Additionally, the training still must be revised to properly address

the requirements of ¶486(b) before the CPD can train on the topic under approved Consent Decree training.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶486. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

*** 

The City, the CPD, and COPA maintained Preliminary compliance with this paragraph. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For COPA, we will look for them to develop training materials that instruct compliance with this paragraph and its related policies.

## Paragraph 486 Compliance Progress History

| | | |
|---|---|---|
| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶487

> ***487.*** *Investigators will consider all original statements, and any subsequent statements, including amended or modified statements, for purposes of determining whether a CPD member willfully made a false statement about a fact material to the incident under investigation.*

## Compliance Progress        (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Under Assessment* |

The City and the CPD maintained Preliminary compliance with ¶487 in the eighth reporting period. COPA maintained Secondary compliance with ¶487 and remains under assessment for Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance with ¶487.

To evaluate Preliminary compliance with ¶487, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[52] To evaluate Secondary compliance, the IMT reviewed the entities' development, implementation, and evaluation of training (¶286). To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD provided a first draft of Special Order S08-01-01, *Conducting Log Number Investigations*, which addressed the requirements of ¶487. However, the policy remained in the collaborative review and revision

---

[52] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

process at the end of the reporting period. In addition, the CPD submitted BIA's Unit Directive, *Requirements of a Complete Investigative File*, which also spoke to ¶487's requirements.[53] However, the Unit Directive was not posted for public comment. In the sixth reporting period, the CPD submitted multiple revised versions of S08-01-05, but the policy remained in the collaborative review and revision process at the end of the sixth reporting period. In the seventh reporting period, the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, which addressed the requirements of ¶487. The CPD also provided a final version of S08-01-09, *Requirements of a Complete Log Number Investigative File*, which addressed the requirements of ¶487. With these efforts, the CPD reached Preliminary compliance. Lastly, the CPD produced a draft of its five-day BIA Onboard Training for review in July, not including ¶487, but did produce a draft for review in December, including ¶487. By the end of the reporting period, the training was still under development.

In the fifth reporting period, COPA provided a finalized Policy 3.1.2 *Fact Gathering and the Investigative Process*, which addressed the requirements of ¶487. In the sixth reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶487. In the seventh reporting period, COPA provided *Fact Gathering-Evidence Collection* training materials, which addressed the requirements of ¶487. The IMT virtually attended the *Fact Gathering-Evidence Collection* training delivered to COPA In-Service staff on December 13, 2022. On January 12, 2023, the City and COPA submitted documentation demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. Additionally, COPA provided for review six Final Summary Reports of investigations involving CPD members who may have made false statements during an investigation, among other charges. The investigations showed that COPA Investigators conducted thorough follow up interviews, considered statements and evidence, and carefully considered all original statements and facts, as well as follow up statements. The documentation also provided evidence that COPA Investigators arrived at fair and accurate conclusions. The IMT noted that two of the cases were Independent Police Review Authority (IPRA) cases, with one being more than a decade old. COPA inherited this case and conducted a thorough investigation. COPA remained under assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

---

[53] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and efforts are ongoing.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶487. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶487. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶487. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶487.

\*\*\*

The City and the CPD maintained Preliminary compliance. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. COPA maintained Secondary compliance and remains under assessment for Full compliance. Moving forward, we will look for COPA to continue demonstrating that it has sufficiently implemented its policies and training.

## Paragraph 487 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

## Accountability and Transparency: ¶488

***488.*** *In addition to the general investigative requirements established in this Agreement, with respect to the investigation of officer-involved shootings and deaths, the City and CPD will ensure that: a. COPA investigators be provided the opportunity to participate in the preliminary assessment during the immediate aftermath of an officer-involved shooting or death to the same extent as any CPD member or any other law enforcement agency investigating the incident; b. the Chief Administrator of COPA, or his or her designee, is present for the first viewing by CPD of available video or audio material related to the incident and when any audio or video material is collected and preserved at or near the scene from CPD or third-party surveillance systems. i. the requirements of subparagraph (b), above, will not apply if: (1) the Chief Administrator of COPA, or his or her designee, has been informed of the incident and is not available; and (2) COPA is not on scene and there is a public safety need to review or listen to certain available audio or video prior to the COPA arrival on scene. c. there is written documentation identifying each CPD member who viewed video evidence or listened to audio evidence at the scene; d. within 30 days of the Effective Date, CPD issues a policy providing that: i. involved and witness CPD members do not discuss the facts relating to the incident with any witness until interviewed by COPA, except to the extent necessary to ensure public safety, as instructed by counsel in relation to civil or criminal proceedings, or participating in CPD officer wellness programs; ii. COPA may extend the prohibition on discussion to the extent necessary to preserve the integrity of the investigation; and iii. in no event may this prohibition extend beyond the final disciplinary decision, if any. e. involved and witness CPD members will be separated, transported separately from the scene, and monitored to avoid contact or communications relating to the incident until released by the responding supervisor at or above the rank of Commander; f. administrative interviews of involved and witness CPD members will be audio recorded and, where possible, video recorded, with COPA investigators present, except that a member may speak with his or her attorney or union representative in private; and g. investigators will not delay interviewing involved and witness CPD members, and will conduct such interviews as soon as feasible, consistent with any applicable collective bargaining agreement. Investigators will document, and make part of the administrative investigative file, all*

*requests made on behalf of involved or witness CPD members to reschedule an interview.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *Not in Compliance*[54] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

COPA maintained Secondary compliance with ¶488 in the eighth reporting period. The CPD did not yet reach Preliminary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance with ¶488.

To evaluate Preliminary compliance with ¶488, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[55] To evaluate Secondary compliance, the IMT reviewed the entities' development, implementation, and evaluation of training (¶286). To evaluate Full compliance, we reviewed various data sources to determine whether the entities sufficiently implemented their training and policies relevant to ¶488.

*Progress before the Eighth Reporting Period*

In past reporting periods, the City produced a number of items under ¶488, including a two-page Memorandum of Agreement (MOA) between COPA and the CPD and, in the fourth reporting period, the Illinois State Police, Division of Criminal Investigation, *CPD Officer Involved Death Investigation Proposal*, which related

---

[54] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[55] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

to the requirements of ¶488. Additionally, the CPD implemented G03-06, *Firearms Discharge and Officer Involved Death Incident Response and Investigation*. But G03-06 was only intended as a temporary, emergency policy, and it was not intended to—and does not—fully comply with the Consent Decree's requirements. The CPD did not produce any documents relevant to this paragraph in the fifth reporting period. In the sixth reporting period the City and the CPD provided a revised version of General Order G03-06, *Firearm Discharge and Officer-Involved Death Incident Response and Investigation*, for review with ¶¶488–91.[56] A previous version of this policy had been implemented but only as a temporary solution, and we noted that the temporary version and the revised version fell short of meeting Consent Decree requirements. In short, we noted previously that significant revisions were necessary for G03-06 to meet the requirements of ¶¶488–91. We encouraged the CPD to prioritize overhauling this policy and to rethink how to address the requirements of ¶¶488–91. In the seventh reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶488. The IMT continued to encourage the CPD to develop a policy that addressed the requirements of ¶488, specifically in how the CPD interacts with COPA on the scenes of OIS/OID, while the City determines how to address the statutory requirements regarding who will handle the criminal investigation and how the criminal investigation will be handled.

We noted in the fifth reporting period that, although many of the requirements of ¶488 apply to the CPD, COPA went above and beyond to include such requirements in its draft *Major Incident Responses* policy. We noted that this policy addresses every subparagraph of ¶488 and is a model policy for COPA. The IMT provided a no-objection notice, but by the end of the reporting period, the policy remained in the collaborative review and revision process. In the sixth reporting period, COPA finalized its *Major Incident Responses – Officer-Involved Shooting or Officer-Involved Death* policy, moving them into Preliminary compliance.

COPA, in the seventh reporting period, provided training materials for two trainings relevant to ¶488: *Major Case Incident Response Training* and *Officer Interviews Training.* The *Major Case Incident Response Training* addressed the requirements of ¶488 and its subparagraphs. The IMT virtually attended the *Major Case Incident Response Training* on December 14, 2022. On January 12, 2023, the City and COPA submitted documentation demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period.

---

[56] The City and the CPD first provided a draft of G03-06, *Officer Involved Death Investigations*, for review with ¶488–92 on July 19, 2019, and this policy then underwent multiple rounds of revision, review, and comment in connection with ¶488–92 and other paragraphs (often alongside the Use of Force policy suite); its title changed to *Firearm Discharge and Officer-Involved Death Incident Response and Investigations*; and the City and the CPD issued temporary versions of the policy pursuant to ¶631 (extraordinary circumstances).

With this, COPA reached Secondary compliance. Additionally, COPA's *Officer Interviews Training* addressed the requirements of ¶488(d), (f), and (g). During an IMT Site visit on September 29, 2022, the IMT attended and observed the *Officer Interviews In-Service Training*. COPA submitted documentation demonstrating that this training was provided to more than 95% of COPA's staff by the end of the seventh reporting period.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD produced General Order G03-06, *Firearm Discharge and Officer-Involved Death Incident,* for review. As written, it only addresses ¶488(b) and (c). The CPD also produced General Order G03-06-01, *Firearm Discharge and Officer-Involved Death Incident – Immediate Response,* for review. As written, it only addresses ¶488(d). iii and (e). Additionally, the CPD produced General Order G03-06-02, *Firearm Discharge and Officer-Involved Death Incident – Investigation,* for review. As written, it only addresses ¶488(b) and (c). The IMT provided comments to the CPD in July 2023 noting that all three policies require a significant amount of work to sufficiently address the requirements of ¶¶488-491. As written, G03-06-02 does not fully address the requirements of ¶488 and its subparagraphs. Additionally, we noted that the policy must be revised in various sections to emphasize the foundational role that COPA plays in investigations of firearm discharges, officer-involved shootings, and officer-involved deaths. The IMT continues to believe that there should not be any reason to deny COPA access to an investigative crime scene and continues to encourage the CPD to eliminate the possibility of arbitrary determinations from scene-to-scene and investigation-to-investigation.

This reporting period, COPA provided an updated *Major Case Incident Response* training, which continues to address the requirements of ¶488.

***

The City did not yet reach Preliminary compliance. COPA maintained Secondary compliance. The CPD has significant work ahead to reach Preliminary compliance. We hope that the CPD will continue to make consistent efforts to revise G03-06, G03-06-01, and G03-06-02 and work with the IMT and the OAG to do so throughout the ninth reporting period. For COPA, moving forward, we will look for evidence that it has sufficiently implemented its policies and training.

## Paragraph 488 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶489

> **489.** *The City recognizes that officer-involved shootings are traumatic incidents. The City and CPD are committed to treating all impacted with dignity and respect.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[57] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (NEW) |

COPA reached Full compliance with ¶489 in the eighth reporting period. The CPD did not yet meet Preliminary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance with ¶489.

To evaluate Preliminary compliance with ¶489, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[58] To evaluate Secondary compliance, the IMT reviewed the entities' development, implementation, and evaluation of training (¶286). To evaluate Full compliance, we reviewed various data sources to determine whether the entities sufficiently implemented their training and policies relevant to ¶489.

---

[57] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[58] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

In the fourth reporting period, the City produced an updated suite of directives. The suite was designed to more closely align with the requirements of ¶¶488–92, but the policies were not submitted in time to be implemented following the requisite Consent Decree process. In the fifth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶489. In the sixth reporting period, the City and the CPD provided a revised version of General Order G03-06, *Firearm Discharge and Officer-Involved Death Incident Response and Investigation*, for review with ¶¶488–91.[59] A previous version of this policy had been implemented but only as a temporary solution and we noted that the temporary version and the revised version fell short of meeting Consent Decree requirements. In short, we noted that significant revisions were necessary for G03-06 to meet the requirements of ¶¶488–91. We encouraged the CPD to prioritize overhauling this policy and to rethink how to address the requirements of ¶¶488–91.

The CPD did not produce any documentation that demonstrated efforts related to ¶489 in the seventh reporting period. The IMT noted the CPD continued to delay developing an internal policy to direct its response and involvement in officer-involved shootings and death incidents (OIS/OID). The IMT continued to encourage CPD to develop a policy that addresses the requirements of ¶489, specifically in how the CPD interacts with COPA on the scenes of OIS/OID, while the City determines how to address the statutory requirements regarding who will handle the criminal investigation and how the criminal investigation will be handled.

In the fifth reporting period, although COPA was not responsible for a majority of the requirements of ¶489, COPA produced a draft *Major Incident Responses* policy for review.[60] This policy remained in the collaborative review and revision process at the end of the fifth reporting period. In the sixth reporting period, COPA submitted its *Major Incident Responses – Officer-Involved Shooting or Officer-Involved Death* policy, which fully addressed the requirements of ¶489. This moved COPA into Preliminary compliance with this paragraph. COPA, in the seventh reporting period, provided training materials for *Major Case Incident Response Training*. The *Major Case Incident Response Training* addressed the requirements of ¶489 by teaching the exact process and procedure for officer-involved cases. On January 12, 2023, the City and COPA submitted documentation demonstrating that this

---

[59] The City and the CPD first provided a draft of G03-06, *Officer Involved Death Investigations*, for review with ¶488–92 on July 19, 2019, and this policy then underwent multiple rounds of revision, review, and comment in connection with ¶488–92 and other paragraphs (often alongside the Use of Force policy suite); its title changed to *Firearm Discharge and Officer-Involved Death Incident Response and Investigations*; and the City and the CPD issued temporary versions of the policy pursuant to ¶631 (extraordinary circumstances).

[60] Please refer to the discussion of ¶488 regarding COPA's *Major Incident Responses* Policy.

training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD produced General Order G03-06, *Firearm Discharge and Officer-Involved Death Incident,* for review. As written, it addresses ¶489. The CPD also produced General Order G03-06-02, *Firearm Discharge and Officer-Involved Death Incident – Investigation,* for review. As written, it does not address the requirements of ¶489. The IMT provided comments to the CPD in July 2023 noting that all three policies require a significant amount of work to sufficiently address the requirements of ¶¶488-491. Additionally, we noted that the policy must be revised in various sections to emphasize the foundational role that COPA plays in investigations of firearm discharges, officer-involved shootings, and officer-involved deaths. The IMT continues to believe that there should not be any reason to deny COPA access to an investigative crime scene and continues to encourage the CPD to eliminate the possibility of arbitrary determinations from scene-to-scene and investigation-to-investigation.

Also this reporting period, COPA provided a memorandum detailing its efforts in meeting those affected by, and involved in, officer-involved shootings. The memorandum describes how and where COPA meets with those involved, including in-person meetings at the COPA Office and via electronic video if so desired by the families. The memorandum also includes specific meetings with the families of deceased community members, including how and where the meetings were conducted. Additionally, COPA provided an updated *Major Case Incident Response* training, which continues to address the requirements of ¶489. With this, COPA reached Full compliance.

***

The City did not yet reach Preliminary compliance. COPA reached Full compliance. CPD has significant work ahead to reach Preliminary compliance. We hope that the CPD will continue to make consistent efforts to revise G03-06, G03-06-01, and G03-06-02 and work with the IMT and the OAG to do so throughout the ninth reporting period. For COPA, moving forward, we will look for documentation that COPA and its employees are acting in accordance with ¶489's mandates.

## Paragraph 489 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶490

***490.*** *The City and CPD are committed to ensuring their actions do not unreasonably impede access to information for families of the injured and deceased.*

## Compliance Progress (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[61] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (NEW) |

COPA reached Full compliance with ¶490 in the eighth reporting period. The CPD did not yet meet Preliminary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance with ¶490.

To evaluate Preliminary compliance with ¶490, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[62] To evaluate Secondary compliance, the IMT reviewed the entities' development, implementation, and evaluation of training (¶286). To evaluate Full compliance, we reviewed various data sources to determine whether the entities sufficiently implemented their training and policies relevant to ¶490.

---

[61] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[62] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

In the fourth reporting period, the City produced an updated suite of directives. The suite was designed to more closely align with the requirements of ¶¶488–92, but the policies were not submitted in time to be implemented following the requisite Consent Decree process. In the fifth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶490. In the sixth reporting period, the City and the CPD provided a revised version of General Order G03-06, *Firearm Discharge and Officer-Involved Death Incident Response and Investigation*, for review with ¶¶488–91.[63] A previous version of this policy had been implemented but only as a temporary solution and we noted that the temporary version and the revised version fell short of meeting Consent Decree requirements. In short, we noted that significant revisions were necessary for G03-06 to meet the requirements of ¶¶488–91. We encouraged the CPD to prioritize overhauling this policy and to rethink how to address the requirements of ¶¶488–91.

In the seventh reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶490. The IMT noted the CPD continued to delay developing an internal policy to direct its response and involvement in officer-involved shootings and death incidents (OIS/OID). The IMT continued to encourage CPD to develop a policy that addresses the requirements of ¶490, specifically in how the CPD interacts with COPA on the scenes of OIS/OID, while the City determines how to address the statutory requirements regarding who will handle the criminal investigation and how the criminal investigation will be handled.

In the fifth reporting period, although COPA was not responsible for a majority of the requirements of ¶490, COPA produced a draft *Major Incident Responses* policy for review.[64] This policy remained in the collaborative review and revision process at the end of the fifth reporting period. In the sixth reporting period, COPA submitted its *Major Incident Responses – Officer-Involved Shooting or Officer-Involved Death* policy, which fully addressed the requirements of ¶490. This moved COPA into Preliminary compliance with this paragraph. COPA, in the seventh reporting period, provided training materials for *Major Case Incident Response Training*. The *Major Case Incident Response Training* addressed the requirements of ¶490 by teaching the exact process and procedure for officer-involved cases. On January 12, 2023, the City and COPA submitted documentation for the seventh reporting period demonstrating that this training was provided to at least 95% of COPA's staff

---

[63] The City and the CPD first provided a draft of G03-06, *Officer Involved Death Investigations*, for review with ¶488–92 on July 19, 2019, and this policy then underwent multiple rounds of revision, review, and comment in connection with ¶488–92 and other paragraphs (often alongside the Use of Force policy suite); its title changed to *Firearm Discharge and Officer-Involved Death Incident Response and Investigations*; and the City and the CPD issued temporary versions of the policy pursuant to ¶631 (extraordinary circumstances).

[64] Please refer to the discussion of ¶488 regarding COPA's *Major Incident Responses* Policy.

by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD produced General Order G03-06, *Firearm Discharge and Officer-Involved Death Incident,* for review. As written, it addresses ¶490. The IMT provided comments to the CPD in July 2023 noting that all three policies require a significant amount of work to sufficiently address the requirements of ¶¶488-491. Additionally, we noted that the policy must be revised in various sections to emphasize the foundational role that COPA plays in investigations of firearm discharges, officer-involved shootings, and officer-involved deaths. The IMT continues to believe that there should not be any reason to deny COPA access to an investigative crime scene and continues to encourage the CPD to eliminate the possibility of arbitrary determinations from scene-to-scene and investigation-to-investigation.

Also this reporting period, COPA provided a memorandum detailing its efforts in meeting those affected by, and involved in, officer-involved shootings. The memorandum describes how and where COPA meets with those involved, including in-person meetings at the COPA Office and via electronic video if so desired by the families. The memorandum also includes specific meetings with the families of deceased community members, including how and where the meetings were conducted. Additionally, COPA provided an updated *Major Case Incident Response* training, which continues to address the requirements of ¶490. With this, COPA reached Full compliance.

\*\*\*

The City did not yet reach Preliminary compliance. COPA reached Full compliance. CPD has significant work ahead to reach Preliminary compliance. We hope that the CPD will continue to make consistent efforts to revise G03-06, G03-06-01, and G04-06-02 and work with the IMT and the OAG to do so throughout the ninth reporting period. For COPA, moving forward, we will look for documentation that COPA and its employees are acting in accordance with ¶490's mandates.

## Paragraph 490 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶491

> **491.** *In addition to the investigative requirements set forth in this Agreement, with respect to officer-involved shootings and officer-involved deaths, the City and CPD will ensure that CPD members act in a manner that is consistent with CPD's commitment to the principle of the sanctity of life, and will treat the deceased with respect, including the prompt screening from public view or covering of the deceased and, following timely evidence collection procedures, removal of the deceased.*

**Compliance Progress**          (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This reporting period, the City and the CPD did not reach Preliminary compliance with ¶491.

To evaluate Preliminary compliance with ¶491, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[65]

*Progress before the Eighth Reporting Period*

In the fourth reporting period, the City produced an updated suite of directives. The suite was designed to more closely align with the requirements of ¶¶488–92, but the policies were not submitted in time to be implemented following the requisite Consent Decree process. In the fifth reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶491. In the sixth reporting period, the City and the CPD provided a revised version of General Order G03-06, *Firearm Discharge and Officer-Involved Death Incident Response and Investigation*, for review with ¶¶488–91.[66] A previous version of this policy had been

---

[65]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[66]   The City and the CPD first provided a draft of G03-06, *Officer Involved Death Investigations*, for review with ¶488–92 on July 19, 2019, and this policy then underwent multiple rounds of revision, review, and comment in connection with ¶488–92 and other paragraphs (often alongside the Use of Force policy suite); its title changed to *Firearm Discharge and Officer-Involved*

implemented but only as a temporary solution and we noted that the temporary version and the revised version fell short of meeting Consent Decree requirements. In short, we noted that significant revisions were necessary for G03-06 to meet the requirements of ¶¶488–91. We encouraged the CPD to prioritize overhauling this policy and to rethink how to address the requirements of ¶¶488–91. In the previous reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶491. The IMT noted the CPD continued to delay developing an internal policy to direct its response and involvement in officer-involved shootings and death incidents (OIS/OID). The IMT continued to encourage CPD to develop a policy that addresses the requirements of ¶491, specifically in how the CPD interacts with COPA on the scenes of OIS/OID, while the City determines how to address the statutory requirements regarding who will handle the criminal investigation and how the criminal investigation will be handled.

Also in the fifth reporting period, COPA produced a draft *Major Incident Responses* policy for review.[67] This policy remained in the collaborative review and revision process at the end of the fifth reporting period. In the sixth reporting period, COPA submitted its *Major Incident Responses – Officer-Involved Shooting or Officer-Involved Death* policy, which fully addressed the requirements of ¶491.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD produced General Order G03-06, *Firearm Discharge and Officer-Involved Death Incident,* for review. As written, it only partially addresses ¶491, as it does not address screening the deceased or covering of the body, timely evidence collection procedures, and removal of the deceased. The CPD also produced General Order G03-06-01, *Firearm Discharge and Officer-Involved Death Incident – Immediate Response,* for review. As written, it only partially addresses ¶491, as it does not direct the removal of the deceased following timely evidence collection. The IMT provided comments to the CPD in July 2023 noting that all three policies require a significant amount of work to sufficiently address the requirements of ¶¶488-491. Additionally, we noted that the policy must be revised in various sections to emphasize the foundational role that COPA plays in investigations of firearm discharges, officer-involved shootings, and officer-involved deaths. The IMT continues to believe that there should not be any reason to deny COPA access to an investigative crime scene and continues to encourage the CPD to eliminate the possibility of arbitrary determinations from scene-to-scene and investigation-to-investigation.

***

---

*Death Incident Response and Investigations*; and the City and the CPD issued temporary versions of the policy pursuant to ¶631 (extraordinary circumstances).

[67] Please refer to the discussion of ¶488 regarding COPA's *Major Incident Responses* Policy.

The City did not yet reach Preliminary compliance with this paragraph. CPD has significant work ahead to reach Preliminary compliance. We hope that the CPD will continue to make consistent efforts to revise G03-06, G03-06-01, and G03-06-02 and work with the IMT and the OAG to do so throughout the ninth reporting period.

### Paragraph 491 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶492

*492. Criminal investigations into the actions of any CPD member relating to any "officer-involved death" will comply with the Police and Community Relations Improvement Act, 50 ILCS 727/1-1 et seq. ("PCRIA"). The City will use best efforts to ensure that a "law enforcement agency," as that term is defined under PCRIA, will conduct such investigations. The "law enforcement agency" conducting criminal investigations into the actions of any CPD member relating to any "officer-involved death" will have substantial experience and expertise in criminal homicide investigations.*

## Compliance Progress     (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶492 in the eighth reporting period because the CPD did not provide any documentation demonstrating efforts related to ¶492 during the reporting period.

To evaluate Preliminary compliance with ¶492, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Eighth Reporting Period*

In the fifth, sixth, and seventh reporting periods, the CPD did not produce any documentation related to efforts under ¶492. We noted that compliance with this paragraph will required enlisting the help of an outside agency, and that we hoped to work closely with the City and the CPD throughout this process.

*Progress in the Eighth Reporting Period*

This reporting period, the City and the CPD did not produce any documentation that demonstrated efforts related to ¶492. The City has not produced any documentation related to efforts for this paragraph to date.

\*\*\*

We look forward to the City and the CPD working toward developing a policy that instructs compliance with the requirements of ¶492 in future reporting periods.

## Paragraph 492 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶493

*493. OAG acknowledges that, in many districts, CPD has designated Accountability Sergeants whose responsibilities include receiving, processing, and investigating complaints made against CPD members, which are referred to the districts by BIA. Within 120 days of the Effective Date, CPD will develop a policy outlining the responsibilities of Accountability Sergeants, their respective Commanders, and the BIA Lieutenants responsible for supervising the Accountability Sergeant's investigations ("BIA Lieutenants"). The policy will provide, among other things, a process by which: a. within 72 hours of receiving a complaint from BIA for investigation, an immediate supervisor will be provided a summary of the complaint allegations concerning the involved CPD member; b. within seven days of the final disciplinary decision, the Commander and an immediate supervisor will be provided with the investigative findings, recommended discipline or corrective action, if any; and c. an immediate supervisor of the involved CPD member and the Accountability Sergeant will meet with the involved CPD member regarding the investigative findings, recommended discipline or corrective action, if any, unless the CPD member declines to meet.*

## Compliance Progress (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶493 in the eighth reporting period.

To evaluate Preliminary compliance with ¶493, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed the entities' development, implementation, and evaluation of training (¶286).

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD revised and ultimately finalized Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addresses the requirements of ¶493(a). The CPD also finalized Special Order S08-01-04, *Post Investigation Log Number Procedures*, which addresses ¶493(b) and (c),

on the final day of the fifth reporting period, moving the CPD into Preliminary compliance with ¶493. In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review, however these materials remained in draft state at the end of the reporting period. In the seventh reporting period, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*.[68] This policy completely addressed the requirements of ¶493(b).

Although the requirements of ¶493 do not apply to COPA, the IMT commended COPA in the seventh reporting period for providing its *Complaint Register* training that referred to this paragraph to ensure that COPA employees were aware of the responsibilities of Accountability Sergeants in the preliminary investigative process. This demonstrated COPA's commitment to providing complete instruction regarding the investigative process of not only COPA but also CPD's responsibilities.

*Progress in the Eighth Reporting Period*

This reporting period, the City and the CPD did not produce any documentation that demonstrated efforts related to ¶493.

\*\*\*

We look forward to reviewing further revised CPD materials in the coming reporting period.

### Paragraph 493 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

---

[68] This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

# Accountability and Transparency: ¶494

**494.** *CPD will require that: a. investigations completed by Ac-countability Sergeants are held to the same investigative stand-ards as those completed by BIA; b. beginning in 2020, and by January 31, 2022, each District Commander designates at least two Accountability Sergeants who will report to the District Com-mander, and whose primary responsibility is receiving, pro-cessing, and investigating complaints against CPD members; c. before a Sergeant is designated an Accountability Sergeant, his or her name will be provided by his or her District Commander to BIA for BIA's review; d. each Accountability Sergeant is provided with the name of and contact information for the BIA Lieutenant responsible for reviewing the Accountability Sergeant's work; e. BIA Lieutenants provide regular case-related and overall perfor-mance feedback to each of the Accountability Sergeants and his or her respective District Commander; f. BIA Lieutenants review and approve all of the Accountability Sergeant's proposed inves-tigative findings and disciplinary recommendations; g. all Ac-countability Sergeants and BIA Lieutenants have access to the PRS or any system replacing the PRS; h. all Accountability Ser-geants have access to BIA policies, directives, protocols, and training materials; and i. all Accountability Sergeants receive the initial and in-service training provided to BIA investigators as provided for in this Agreement.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the eighth reporting period, the City and CPD did not reach Preliminary compli-ance with ¶494.

To evaluate Preliminary compliance with ¶494, the IMT reviewed the CPD's rele-vant policies and documents following the process described in the Consent De-cree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD finalized S08-01, *Complaint and Disciplinary Investigations*, which addressed ¶494(a), (c), (d), (e), (f), (g), (h), and (i). The CPD also submitted for review BIA's Unit Directive, *Training Unit*, in the fifth reporting

period, which addressed ¶494(i). Before the fifth reporting period, the CPD had produced other BIA Unit Directives under ¶494 such as *Accountability Sergeants*, which addressed the requirements of ¶494. However, these Unit Directives were never posted for public comment and finalized.[69] Additionally, the CPD submitted for review the *Fiscal Year 2022 BIA Staffing and Equipment Needs Assessment Implementation Plan*. This plan included concerning information that seemed to indicate that, while ¶494(b) of the Consent Decree requires two Accountability Sergeants, BIA does not require both to be full time investigators. During site visits in the fall of 2021, we learned that the Accountability Sergeants were required to fill other supervisory responsibilities that often prevented them from being able to complete their investigations in a timely manner. We explained that we expected to have ongoing discussions related to this issue and urged the CPD to update the policy to ensure that two Accountability Sergeants are full time investigators, per the requirements of ¶494(b).

In the sixth reporting period, the City and the CPD provided Special Order S08-01-06, *Supervisor Responsibilities in Log Number Investigations*, but stated in its production letter that S08-01-06 was not submitted "to demonstrate compliance with Consent Decree paragraphs, and the CPD was not seeking review of this policy at this time." Nonetheless, we reviewed the draft S08-01-06 and submitted comments, noting our expectation that we would receive a final draft of this policy for review under ¶627. In the meantime, we suggested that the CPD consider changing the title of S08-01-06 to "BIA Supervisor Responsibilities in Log Number Investigations" for clarity, since the policy only addresses the responsibilities of BIA personnel. We observed that Sections IV.A.15 and IV.B.9 addressed the requirements of ¶494(i).

Although we encouraged the CPD to produce and revise S08-01-06 per the Consent Decree process, we noted that finalization of S08-01-06 as now written would not bring the CPD into compliance with ¶494 because subparagraph (b) is not adequately addressed. We encouraged the CPD to consider how this requirement can be incorporated into current policy, and then urged the CPD to assure that positions are adequately staffed to allow for compliance with subparagraph (b).

Also in the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. These materials were still in draft state and not in final presentation form at the end of the reporting period.

---

[69] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and the process is ongoing.

In the seventh reporting period, the City and the CPD did not produce any documentation for review with ¶494. During site visits in June 2022, the IMT met with several groups of BIA Investigators and Accountability Sergeants to discuss their experiences. Through these conversations, we learned about some of the realities on the ground and challenges Investigators and Accountability Sergeants face when performing their duties.

For example, ¶494(b) of the Consent Decree requires two Accountability Sergeants for each district and unit within CPD. However, we learned that the CPD consistently and uniformly does not adhere to this standard. We learned that most districts have allocated only one sergeant as the Accountability Sergeant and the district or unit may or may not have designated a "backup sergeant" for case assignment when the primary Accountability Sergeant is away from duty. The backup Accountability Sergeant performs other assignments in the district and only has cases assigned during the absence of the "Primary Accountability Sergeant." This creates a very high caseload for the one designated Accountability Sergeant and is not consistent with the requirements of this paragraph.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, not including ¶494. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, not including ¶494. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including ¶494. For further discussion of the BIA Onboard Training, see ¶526–27.

During site visits in April 2023, the IMT met with random individual Accountability Sergeants to discuss their experiences. Through these conversations, we continued to learn the harsh realities on the ground and challenges that BIA Investigators

and Accountability Sergeants face when performing their duties. Even though ¶494(b) requires two Accountability Sergeants to be assigned in each district, we have continued to learn this is not occurring in practice. As stated in previous reporting periods, most districts have allocated only one sergeant as the Accountability Sergeant and the district or unit may or may not have designated a "backup sergeant" for case assignment when the primary Accountability Sergeant is away from duty. The backup Accountability Sergeant performs other assignments in the district and only has cases assigned during the absence of the "Primary Accountability Sergeant." This continues to create a very high caseload for the one designated Accountability Sergeant and is not consistent with the requirements of this paragraph. One district the IMT visited, while it did have a Primary Accountability Sergeant when we visited, the Sergeant was working as the desk sergeant in the district. Another district visit showed a different example where the Primary Accountability Sergeant was assigned out in the field and had to come back to the district office to meet with us. We continue to encourage the CPD to designate two Accountability Sergeants with their **primary responsibility** as receiving, processing, and investigating complaints against CPD members, rather than other duties like serving as the desk sergeant or the field sergeant for the day.

*** 

As we previously stated, the CPD must focus its attention on incorporating into policy the requirements of ¶494(b) to move forward with compliance with this paragraph. We look forward to reviewing revised policy from the CPD in future reporting periods. Additionally, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

### Paragraph 494 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶495

***495.*** *Supervisory reviews of investigations will be conducted as follows: (a) Accountability Sergeants will forward the administrative investigative file through his or her chain of command to the BIA Lieutenant: (i) the Accountability Sergeant's chain of command will ensure that the proposed investigative findings and recommendations are complete, meet the requirements of law, CPD policy, and this Agreement, and that findings are supported by the appropriate standard of proof; (ii) BIA Lieutenants will review the proposed investigative findings and recommendations for accuracy and completeness, and will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings; and (iii) whenever a higher ranking officer orders additional investigation, it will be documented in writing. (b) all investigations conducted by COPA or BIA, once complete, will be forwarded through the investigator's chain of supervision/command to the Chief Administrator of COPA or the Chief of BIA, respectively: (i) COPA and BIA will each ensure that their respective administrative investigative files are complete, meet the requirements of law, COPA and CPD policy, and this Agreement; and that findings are supported by the appropriate standard of proof; (ii) the Chief Administrator or the Chief of BIA, or his or her designee, will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings; and (iii) whenever COPA and BIA orders additional investigation, the request and resulting investigation will be documented in writing.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Under Assessment* (SEVENTH REPORTING PERIOD) |

The City and the CPD maintained Preliminary compliance with ¶495 in the eighth reporting period. COPA remains under assessment for Full compliance with ¶495. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶495, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed COPA's training development, implementation, and evaluation (¶286). To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD produced for review several draft policies that relate to ¶495's requirements. This included S08-01, *Complaint and Disciplinary Investigators and Investigations* and BIA's Unit Directive, *Requirements of a Complete Investigative File*.[1] In the fifth reporting period, the CPD provided revised drafts of Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which addressed ¶495(a)(i) and (a)(iii) but did not fully address ¶495(a)(ii). We submitted a no-objection notice.[2] Thereafter, the CPD posted the

---

[1] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and efforts are ongoing.

[2] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice."

Special Order for public comment and, on the last day of the reporting period, finalized the Special Order. In addition, the CPD produced S08-01-01, *Conducting Log Number Investigations*, which partially addressed ¶495(a)(i) and fully addressed ¶495(a)(ii). However, this policy did not address ¶495(b), and at the end of the fifth reporting period, it remained in the collaborative review and revision process.

In the sixth reporting period, the City and the CPD provided S08-01-06, *Supervisor Responsibilities in Log Number Investigations*. But when this Special Order was submitted, the CPD indicated that this Special Order was not submitted "to demonstrate compliance with Consent Decree paragraphs, and the CPD was not seeking review of this policy at this time." Nonetheless, we reviewed the policy and provided comments on June 15, 2022, expressing our expectation that we would receive a final draft of this policy for review under ¶627. We observed that Section IV.A.8 of the draft policy addressed the requirements of ¶495(a)(i), and Section VI.A.9. addressed the requirements of ¶495(a)(ii). Additionally, the CPD submitted multiple revised versions of S08-01-05, *Conducting Log Number Investigations*.[3] We noted that the draft versions of this policy addressed the requirements of ¶495(a)(i), ¶495(a)(ii), and ¶495(b) by outlining the process by which supervisory reviews of investigations will be conducted. At the end of the sixth reporting period, the CPD submitted a further revised version of S08-01-05, and during the seventh reporting period, the City and the CPD provided multiple revised versions of this policy. That policy addressed the requirements of ¶495 and earned the City and the CPD preliminary compliance in the seventh reporting period.

COPA, in the fourth reporting period, provided Policy 3.1.3, *Final Summary Report*, which addressed ¶495. In the fifth reporting period, COPA continued to work toward Preliminary compliance, and eventually finalized Policy 3.1.3 *Final Summary Report*. We noted that this policy completely addresses ¶495(b). While COPA maintained Preliminary compliance with ¶495 in the sixth reporting period, COPA did not submit any materials to demonstrate Secondary compliance with ¶495 in the sixth reporting period. In the seventh reporting period, COPA provided *Final Summary Reports & Standards of Proof (FSR)* training materials, which addressed COPA's ¶495 requirements. The IMT virtually attended the *Final Summary Reports & Standards of Proof* training delivered to COPA staff on November 29, 2022. This training addressed the training requirement for ¶495, and with documentation demonstrating that this training was provided to at least 95% of COPA's staff by

---

Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[3] The *Conducting Log Number Investigations* policy was produced in previous reporting periods as S08-01-01. The policy was re-numbered as S08-01-05 when it was produced May 5, 2022.

the end of the seventh reporting period, COPA reached Secondary compliance. Also in the seventh reporting period, COPA provided documentation of case examples that appeared to address ¶495(b)(i) but did not appear to address ¶495(b)(ii)–(iii). At the end of the seventh reporting period, COPA was under assessment for Full compliance as the Parties continued to discuss the evidence sufficient for Full compliance.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the City, the CPD, and COPA did not produce any documentation that demonstrated efforts related to ¶495.

\*\*\*

The City and the CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph.

COPA remains under assessment for Full compliance as the Parties continue to discuss the evidence sufficient for Full compliance. We look forward to reviewing documentation of COPA's efforts toward Full compliance with this paragraph in the next reporting period.

### Paragraph 495 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶496

> **496.** *The City and CPD will ensure that interfering with an administrative investigation, including being untruthful in an investigation into misconduct or colluding with other individuals to undermine such an investigation, or intentionally withholding requested evidence or information from an investigator, will result in disciplinary action and/or criminal prosecution based on the seriousness of the conduct.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[4] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **CPD** | *In Compliance* (NEW) |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Under Assessment* (SEVENTH REPORTING PERIOD) |

The City and the CPD achieved Secondary compliance with ¶496 in the eighth reporting period. COPA remains under assessment for Full compliance.

To evaluate Preliminary compliance with ¶496, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[5] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

---

[4] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[5] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD revised and finalized General Order G08-01, *Complaint and Disciplinary Procedures*, which addressed ¶496. This brought the CPD into Preliminary compliance. In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review, which the CPD further revised in the seventh reporting period. The BIA eLearning materials addressed ¶496; the CPD, however, ultimately identified that only 93.94% of sworn and civilian staff had completed the training.[6] In the seventh reporting period, the CPD provided a revised draft of G08-01, *Complaint and Disciplinary System*, which addressed the requirements of ¶496.

In the fifth reporting period, COPA finalized Policy 3.1.2, *Fact Gathering and the Investigative Process*, which addressed ¶496 in the Quality Assurance section of the policy. With this, COPA achieved Preliminary compliance. In the seventh reporting period, COPA provided *Fact Gathering-Evidence Collection* training materials, which addressed ¶496. The IMT virtually attended the *Fact Gathering-Evidence Collection* training delivered to COPA In-Service staff, which addressed the training requirement for ¶496. Also in the seventh reporting period, COPA produced documentation demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period and therefore met Secondary compliance. COPA also provided a memorandum and documentation related to its Final Summary Reports (FSRs), and the IMT reviewed seven FSRs regarding investigations involving CPD officers allegedly making false statements, among other charges. Although these materials were produced for review with ¶495, the materials were relevant to ¶496. At the end of the seventh reporting period, COPA was under assessment for Full compliance as the Parties continued to have conversations concerning the evidence sufficient for Full compliance.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶496. With this, the CPD moved into Secondary compliance for ¶496. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

---

[6]  To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* personnel, not just its sworn personnel.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶496.

\*\*\*

The City and the CPD earned Secondary compliance with ¶496 in the eighth reporting period. To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For Full compliance, we will also look for documentation that the CPD and its employees are acting in accordance with ¶496's mandates.

COPA remains under assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

### Paragraph 496 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶497

> ***497.*** *COPA and CPD will review and revise, as necessary, the policies governing COPA and CPD to ensure the processes for prevention of CPD member collusion and witness contamination comply with the terms of this agreement.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[7] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶497 in the eighth reporting period. COPA maintained Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶497, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[8] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

---

[7]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[8]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD finalized General Order G08-01, *Complaint and Disciplinary Procedures*, which addressed ¶497. Additionally, the CPD provided various policies that contribute to setting the standards aimed to prevent CPD member collusion and witness contamination.[9] These efforts brought the CPD into Preliminary compliance. In the seventh reporting period, the CPD provided a revised draft of G08-01, which continued to address ¶497. The CPD also produced multiple versions of a five-day BIA Onboard Training for review with numerous paragraphs, including ¶497. At the end of the seventh reporting period, the CPD continued to develop and revise its BIA Onboard Training.

In the fifth reporting period, COPA finalized Policy 3.1.2, *Fact Gathering and the Investigative Process*, which addresses ¶497. With this, COPA achieved Preliminary compliance. In the seventh reporting period, COPA provided *Fact Gathering-Evidence Collection* training materials, which address the requirements of ¶497. The IMT virtually attended the *Fact Gathering-Evidence Collection* training delivered to COPA In-Service staff on December 13, 2022. Subsequently, COPA produced documentation demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

*Progress in the Eighth Reporting Period*

This reporting period, the City, the CPD, and COPA did not produce any documentation that demonstrated efforts related to ¶497. While the CPD produced additional versions of its BIA Onboard Training in the eighth reporting period, those versions were not submitted for compliance with ¶497.

***

The CPD maintained Preliminary compliance in the eighth reporting period. In the next reporting period, we will look for the CPD to further develop its training.

COPA maintained Secondary compliance with this paragraph in the eighth reporting period. Moving forward, we will look for COPA to demonstrate that it has sufficiently implemented its policies and training.

---

[9]    Policies referenced include G08-01-02, S08-01-01, and S08-01.

## Paragraph 497 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Status Update

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

EIGHTH REPORTING PERIOD
JANUARY 1, 2023 – JUNE 30, 2023
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶498

*498. The City and CPD will ensure that any command channel review conducted is complete within 30 days. Within 30 days of the Effective Date, CPD may draft a policy that provides, for the most serious administrative investigations, the circumstances under which up to 45 days will be provided for command channel review. The draft policy will be provided to the Monitor for review and approval.*

## Compliance Progress   (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Secondary compliance with ¶498 in the eighth reporting period.

To evaluate Preliminary compliance with ¶498, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, we consulted various data sources to ensure that the City and the CPD have sufficiently implemented their policies and training associated with ¶498. More specifically, the IMT sought out timelines of all command channel reviews to ensure they are conducted within 30 days and in a manner in accordance with ¶498.

*Progress before the Eighth Reporting Period*

In prior reporting periods, the IMT reviewed and approved the CPD's Special Order S08-01-03, *Command Channel Review (CCR)*, as well as BIA's related training materials—including lesson plans and slide decks—which were sufficient to demonstrate Preliminary and Secondary compliance with ¶498. In the fourth reporting period, BIA maintained Secondary compliance due to its policy and continued training of the appropriate CPD command staff and officers. To further strengthen the Command Channel Review process, the CPD produced BIA's S08-01, *Complaint and Disciplinary Investigators and Investigations*.

In the fifth reporting period, the CPD provided for review BIA's Unit Directive, *Advocate Section Command Channel Review Procedures*. This directive did not address ¶498 because it did not state that a Command Channel Review must be completed in 45 days, as required by the Consent Decree. We provided comments in

September 2021, but we did not receive further information regarding the posting of the Unit Directive for public comment and finalization.[10] The CPD also produced BIA's *2020 Audit*, in which the CPD stated that it was not in operational compliance with the requirements of ¶498. While this audit was well done, we received the *2020 Audit* on December 28, 2021—several months too late. We explained that, moving forward, such audits need to be provided in a timelier manner to demonstrate compliance and to allow the CPD to identify areas on which it needs to focus its efforts and attention.

In the sixth reporting period, the City and the CPD provided drafts of Special Order S08-01-07, *Command Channel Review*.[11] On June 30, 2022, the last day of the reporting period, the CPD submitted a further revised draft of S08-01-07. Therefore, this policy remained in the collaborative review and revision process at the end of the sixth reporting period. While the CPD did not specifically reference ¶498 in its submission of S08-01-07, a draft policy focused on the Command Channel Review process. We noted that Section III.B.3 of the draft policy appeared to partially, but not fully, address the requirements of ¶498. For example, we explained that the policy states that "any *two-level* Command Channel Review process will be concluded within thirty days," whereas ¶498 provides that "*any* command channel review conducted is complete within 30 days" (emphases added). Further, we noted that Section III.B.4 does not specify tracking or discipline for those command staff who do not fulfill their responsibilities in the Command Channel Review process. We explained that this is relevant because, as noted in the BIA 2020 Audit, nearly half of the Command Channel Review cases did not meet the thirty-day policy requirement.

Furthermore, we noted in the sixth reporting period that Section III.B.5 of S08-01-07 includes a fundamental requirement of ¶498—that more serious allegations will require a third level of Command Channel Review within forty-five days. We observed that the BIA 2020 Audit indicates that none of the 1,406 BIA cases closed

---

[10] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and the effort is ongoing.

[11] The IMT previously reviewed multiple drafts of S08-01-03, *Command Channel Review* (previously titled *Complaint Summary Reporting and Review Procedures*). The IMT also previously reviewed Unit Directives regarding Command Channel review procedures. In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Advocate Section Command Channel Review Procedures* (previously titled *Command Channel Review*) into S08-01-07. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

in 2020 underwent a third-level of review because the Case Management System was not able to identify those cases. We expressed our concern that command personnel may not be fully aware of the Command Channel Review directives or may not follow the policy. We explained that CPD commanders must follow these policies and procedures and meet the required deadlines to set the proper stand-ard for BIA investigators and Accountability Sergeants. Finally, we noted that with updated policy instructing compliance with ¶498, the CPD should revisit training relevant to the paragraph to determine whether updates are necessary. We also noted that the training related to ¶498 began being provided over a year ago, yet the CPD has not shown that it has implemented its training such that it is in Full compliance.

In the seventh reporting period, the City and the CPD provided a memorandum that documented that more than 95% of command staff have been trained in the Command Channel Review process and looked forward to confirming that the up-dates to S08-01-07, *Command Channel Review*, had been incorporated into this training.

*Progress in the Eighth Reporting Period*

This reporting period, the City and the CPD did not produce any documentation that demonstrated efforts related to ¶498.

***

The City and the CPD maintained Secondary compliance with ¶498 in the eighth reporting period. In the coming reporting periods, we look forward to receiving materials to determine whether the City and the CPD have sufficiently imple-mented their policies and training relevant to the requirements of ¶498, including the review of records from multiple sources reflecting timelines.

## Paragraph 498 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Secondary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Secondary | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Secondary | Secondary | |

# Accountability and Transparency: ¶499

> **499.** *When COPA, BIA, or the investigating district has arrived at the investigative findings and recommendations, it will promptly finalize a summary report ("Administrative Summary Report"). The Administrative Summary Report will include: a. a description of the CPD members and individuals involved in the alleged misconduct; b. the date, time, and location of the alleged misconduct; c. a description of the allegations and applicable policies; d. a narrative summary of the alleged misconduct; e. a narrative summary of the investigation; and f. the investigating body's findings and conclusions for each allegation of misconduct, including any discipline recommended.*

**Compliance Progress**          (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[12] |
| | CPD | *In Compliance* (FIFTH REPORTING PERIOD) |
| | COPA | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | CPD | *Not in Compliance* |
| | COPA | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | CPD | *Not Yet Assessed* |
| | COPA | *Under Assessment* (SEVENTH REPORTING PERIOD) |

The City and the CPD maintained Preliminary compliance with ¶499 in the eighth reporting period. COPA remains under assessment for Full compliance.

To evaluate Preliminary compliance with ¶499, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.[13] To evaluate Secondary compliance, the

---

[12]    As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[13]    The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Eighth Reporting Period*

The CPD reached Preliminary compliance with ¶499 in the fifth reporting period, when it posted for public comment and finalized Special Order S08-01-04, *Documenting Log Number Investigations and Post-Investigation Procedures*. The CPD also provided in previous reporting periods BIA's draft *Administrative Summary Report* Packet, which specifically addressed the requirements of ¶499. In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. These materials were still in draft state and not in final presentation form. The draft training materials addressed the requirements of ¶499 and its subparagraphs. In the seventh reporting period, the CPD provided a further finalized version of S08-01-08, *Post-Investigation Log Number Procedures*, which had previously been numbered and titled as S08-01-04, *Documenting Log Number Investigations and Post-Investigation Procedures*. This policy completely addressed the requirements of ¶499 and its subparagraphs.

Also in the seventh reporting period, the CPD provided further revised BIA eLearning materials that addressed the requirements of ¶499; however, the IMT learned that as of January 2023, only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[14] The CPD also produced a draft of its five-day BIA Onboard Training on July 28, 2022 for review with numerous paragraphs, including ¶499. As of the end of the seventh reporting period, the BIA Onboard Training remained under development, including instruction on Administrative Summary Reports for BIA investigators and Accountability Sergeants.

COPA reached Preliminary compliance with ¶499 in the fourth reporting period when it finalized Policy 3.1.3, *Final Summary Report (FSR)*, which addressed ¶499(a)–(f) in detail. COPA maintained Preliminary compliance but did not provide any documentation related to efforts under ¶499 in the fifth and sixth reporting periods. In the seventh reporting period, COPA provided *Final Summary Report & Standards of Proof (FSR)* training materials, which completely addressed the requirements of ¶499. The City and COPA subsequently submitted documentation demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. With this, COPA reached Secondary compliance.

COPA also provided a memorandum documenting five COPA Final Summary Reports (FSRs), along with a link to FSRs published on COPA's website. These FSRs

---

[14] To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

included all the information required by ¶499(a)–(f). At the end of the seventh reporting period, COPA remained under assessment for Full compliance as the Parties continued to have conversations concerning the evidence sufficient for Full compliance.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶499. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶499. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶499. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, the CPD also provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶499. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶499.

***

The City maintained Preliminary compliance with ¶499. To assess Secondary compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, BIA must also provide a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing to work with them collaboratively in the ninth reporting period.

COPA remains under assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

## Paragraph 499 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶500

**500.** *For all misconduct investigations, BIA or COPA will publish the Administrative Summary Report within 60 days of the final disciplinary decision.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[15] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Under Assessment* (SEVENTH REPORTING PERIOD) |

The City and the CPD achieved Secondary compliance with ¶500 in the eighth reporting period. COPA remains under assessment for Full compliance.

To evaluate Preliminary compliance with ¶500, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[16] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Eighth Reporting Period*

The CPD achieved Preliminary compliance with ¶500 in the fifth reporting period with the finalization of S08-01-04, *Post-Investigation Log Number Procedures*.[17]

---

[15]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[16]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[17]   In the sixth reporting period, we were informed that this finalized policy would be renumbered as Special Order S08-01-08, *Post-Investigation Log Number Procedures*.

Additionally, in the fifth reporting period, the CPD submitted BIA's *Administrative Summary Report Section* Unit Directive. We submitted a no-objection notice to this Unit Directive in January 2021.[18] However, the CPD did not submit this Unit Directive for public comment. Therefore, it was not finalized per the Consent Decree Review process. The CPD also produced BIA's *2020 Audit* in the fifth reporting period, in which the CPD acknowledged that, while there were 16 cases that received a final disciplinary decision in 2020, the BIA did not publish any Administrative Summary Reports for these cases within 60 days of the decisions. We appreciated the CPD's honest self-assessment and encouraged the CPD to continue to produce high-quality audits, but in a timelier manner. These audits will not only help in demonstrating compliance, but also to allow the CPD to identify areas on which it needs to focus its efforts and attention. In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. These materials were still in draft state and not in final presentation form. The draft training materials addressed the requirements of ¶500 and its subparagraphs.

In the seventh reporting period, the CPD provided a further finalized version of S08-01-08, *Post-Investigation Log Number Procedures*, which had previously been numbered and titled as S08-01-04, *Documenting Log Number Investigations and Post-Investigation Procedures*. This policy completely addressed the requirements of ¶500. Also in the seventh reporting period, the CPD provided further revised BIA eLearning materials that addressed the requirements of ¶500; however, the IMT learned that as of January 2023, only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[19]

COPA reached Preliminary compliance with ¶500 in the fourth reporting period by finalizing its Policy 3.1.3, *Final Summary Report*, which addresses all requirements of the paragraph. COPA maintained Preliminary compliance but did not provide evidence of additional efforts toward Secondary compliance in the fifth or sixth reporting periods. In the seventh reporting period, COPA provided *Final Summary Report & Standards of Proof (FSR)* training materials, which met the requirements

---

[18]   Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[19]   To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

of ¶500 that COPA publish the report "within 60 days of the final disciplinary decision." The City and COPA subsequently submitted documentation demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. COPA also provided Guidance, *Publishing and Distribution of Final Summary Reports*, which addresses how the Final Summary Report is published and identifies the COPA staff who are responsible for ensuring that the processes occur correctly and within the 60-day timeframe required by ¶500. With this, COPA reached Secondary compliance.

Also in the seventh reporting period, COPA provided documentation related to its Final Summary Reports (FSRs), including examples of FSRs. However, one of these examples appeared to be an FSR that was posted more than five months from the data the investigation closed, which did not meet the requirements of ¶500. At the end of the seventh reporting period, COPA remained under assessment for Full compliance as the Parties continued to have conversations concerning the evidence sufficient for Full compliance.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶500. With this, the CPD moved into Secondary compliance for ¶500. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

COPA produced an operational guidance tracker demonstrating that its employees had reviewed Guidance, *Publishing and Distribution of Final Summary Reports*. We appreciated the opportunity to review the operational guidance tracker, but the tracker is not sufficient to demonstrate Full compliance with ¶500.

\*\*\*

The CPD reached Secondary compliance with this paragraph in the eighth reporting period. To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning

course does not relieve BIA from the responsibility of providing a more compre-
hensive training specific to Internal Affairs including in-service and onboard train-
ing. The training that is required for most CPD members to understand the policies
and procedures included in the lesson plan is not and will not be as comprehensive
as what is required of members of BIA. We understand BIA is working on such
training that covers this subject, and we look forward to continuing to work with
them collaboratively in the ninth reporting period. For Full compliance, we will also
look for documentation that the CPD and its employees are acting in accordance
with ¶500's mandates.

COPA remains under assessment for Full compliance as the Parties continue to
have conversations concerning the evidence sufficient for Full compliance.

### Paragraph 500 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶501

**501.** *Within 60 days of the final disposition, the City will publish: the charges filed and the discipline recommended; the written decision(s), if any, related to the final disposition; and the discipline imposed. When available, the City will publish the date on which the discipline is scheduled to be imposed.*

## Compliance Progress      (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶501 in the eighth reporting period.

To evaluate Preliminary compliance with ¶501, we reviewed the City's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed the City's training development, implementation, and evaluation.

*Progress before the Eighth Reporting Period*

In the third reporting period, the City indicated that it would be directly responsible for policy creation related to ¶501 as well as corresponding compliance efforts with this paragraph. Although we had reviewed some COPA and BIA materials related to ¶501 in previous reporting periods, the City did not provide any evidence of efforts toward compliance with ¶501 until the seventh reporting period. While the City pointed to Police Board findings and decisions in the fifth reporting period, ¶501 calls for certain information to be posted "within 60 days of the final disposition." We noted that the scope of ¶501 is broader than dispositions arising from the Police Board only.

In the seventh reporting period, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*.[20] This policy addressed the requirements of ¶501 by requiring that, within 60 days of final disposition, the City will publish the charges filed and recommended discipline along with the dates the discipline is imposed. With this, the CPD reached Preliminary compliance.

---

[20] This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

*Progress in the Eighth Reporting Period*

This reporting period, the City did not produce any documentation that demonstrated efforts related to ¶501.

\*\*\*

Moving forward, we will look for the City to develop training relevant to the requirements of this paragraph.

## Paragraph 501 Compliance Progress History

| FIRST REPORTING PERIOD SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SECOND REPORTING PERIOD SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | THIRD REPORTING PERIOD MARCH 1, 2020 – DECEMBER 31, 2020 |
|---|---|---|
| COMPLIANCE PROGRESS: None | COMPLIANCE PROGRESS: Status Update | COMPLIANCE PROGRESS: Status Update |
| FOURTH REPORTING PERIOD JANUARY 1, 2021 – JUNE 30, 2021 | FIFTH REPORTING PERIOD JULY 1, 2021 – DECEMBER 31, 2021 | SIXTH REPORTING PERIOD JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: None | COMPLIANCE PROGRESS: None | COMPLIANCE PROGRESS: None |
| SEVENTH REPORTING PERIOD JULY 1, 2022 – DECEMBER 31, 2022 | EIGHTH REPORTING PERIOD JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: Preliminary | COMPLIANCE PROGRESS: Preliminary | |

# Accountability and Transparency: ¶502

*502. Information contained in the Administrative Summary Report that is legally exempt from disclosure for privacy or other purposes will be redacted prior to electronic publication.*

## Compliance Progress                    (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[21] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *In Compliance* (NEW) |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD reached Secondary compliance with ¶502 in the eighth reporting period. COPA maintained Secondary compliance.

To evaluate Preliminary compliance with ¶502, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[22] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we considered whether the entities have implemented measures to investigate allegations of misconduct involving multiple policy violations and obtain data to demonstrate that exoneration of the most serious allegations does not prevent other appropriate measures from being undertaken.

*Progress before the Eighth Reporting Period*

The City reached Preliminary compliance with ¶502 when all implicated City entities reached Preliminary compliance. The CPD reached Preliminary compliance in the fifth reporting period by finalizing Special Order S08-01-04, *Post-Investigation*

---

[21] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[22] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Log Number Procedures.*[23] In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. These materials were still in draft state and not in final presentation form. We noted that the draft training materials addressed ¶502's requirement that information contained in the Administrative Summary Report that is legally exempt from disclosure for privacy or other purposes will be redacted prior to electronic publication. In the seventh reporting period, the CPD provided a further finalized version of S08-01-08, *Post-Investigation Log Number Procedures*, which had previously been numbered and titled as S08-01-04, *Documenting Log Number Investigations and Post-Investigation Procedures*. This policy completely addressed the requirements of ¶502. Also in the seventh reporting period, the CPD provided further revised BIA eLearning materials that addressed the requirements of ¶502; however, the IMT learned that as of January 2023, only 93.94% of sworn and civilian staff had completed the BIA eLearning training.[24]

COPA reached Preliminary compliance with ¶502 in the fourth reporting period by finalizing Policy 3.1.3, *Final Summary Report*. COPA maintained Preliminary compliance with ¶502 in the fifth and sixth reporting periods but did not reach additional levels of compliance because it did not produce evidence that instructs compliance with this paragraph. In the seventh reporting period, COPA provided *Final Summary Report & Standards of Proof (FSR)* training materials, which address ¶502's requirement that information contained in the report "that is legally exempt from disclosure for privacy or other purposes will be redacted prior to electronic publication." The City and COPA subsequently submitted documentation demonstrating that this training was provided to at least 95% of COPA's staff by the end of the seventh reporting period. COPA also provided Guidance, *Publishing and Distribution of Final Summary Reports*, which addresses ¶502 by stating that COPA legal staff will ensure that redactions to the FSR are appropriate. Further, COPA submitted a memorandum documenting the process for making redactions prior to electronic publication. With this, COPA reached Secondary compliance. In our previous report, we noted that for Full compliance, COPA will need to demonstrate that it has implemented measures to investigate allegations of misconduct involving multiple policy violations and obtain data to demonstrate that exoneration of the most serious allegations does not prevent other appropriate measures from being undertaken.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. This training addresses the requirements of ¶502. With this, the CPD moved into Secondary compliance for

---

[23]  In the sixth reporting period, we were informed that this policy will be renumbered S08-01-08, *Post-Investigation Log Number Procedures*.

[24]  To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

¶502. However, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

COPA produced an operational guidance tracker demonstrating that its employees had reviewed Guidance, *Publishing and Distribution of Final Summary Reports*. We appreciated the opportunity to review the operational guidance tracker, but the tracker is not sufficient to demonstrate Full compliance with ¶502.

\*\*\*

The City and the CPD reached Secondary compliance in the eighth reporting period. To assess Full compliance, we first urge the CPD to ensure that the representation of members who have successfully completed the eLearning course includes 95% of civilians, and to strive for achieving 95% successful completion of the eLearning course across position and rank. Additionally, the fact that the CPD has reached Secondary compliance for this paragraph due to the BIA eLearning course does not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand the policies and procedures included in the lesson plan is not and will not be as comprehensive as what is required of members of BIA. We understand BIA is working on such training that covers this subject, and we look forward to continuing to work with them collaboratively in the ninth reporting period. For Full compliance, we will also look for documentation that the CPD and its employees are acting in accordance with ¶502's mandates.

COPA maintained Secondary compliance. Moving forward, we will look for COPA to demonstrate efforts related to maintaining Full compliance with this paragraph.

## Paragraph 502 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Secondary | |

# Accountability and Transparency: ¶503

> **503.** When an allegation of misconduct contains multiple separate potential policy violations, all applicable violations will be identified and investigated. Exoneration for the most serious allegations of misconduct will not preclude the recommendation of discipline, training, or other corrective measures for less serious misconduct stemming from the same set of allegations.

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Under Assessment* (SEVENTH REPORTING PERIOD) |

The City and the CPD maintained Preliminary compliance with ¶503 in the eighth reporting period. COPA remains under assessment for Full compliance.

We assessed compliance with ¶503 for the first time in the fifth reporting period. To evaluate Preliminary compliance with ¶503, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[25] To evaluate Secondary compliance, the IMT reviewed the entities' training development, implementation, and evaluation (¶286). To evaluate Full compliance, we determined whether the City, the CPD, and COPA have sufficiently implemented their policies and training.

*Progress before the Eighth Reporting Period*

The CPD made efforts related to ¶503 during the fifth reporting period but did not reach Preliminary compliance. In August 2021, the CPD submitted Special Order S08-01-01, *Conducting Log Number Investigations*. We provided comments in September 2021 but did not receive a revised draft. Nonetheless, we noted that the

---

[25]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

first draft of S08-01-01 addressed many requirements of the Consent Decree, including the mandates of ¶503. Additionally, we were encouraged by the fact that S08-01-01 went beyond specific Consent Decree requirements, which reflects an effort to revise and reform policy beyond the minimum mandates of the Consent Decree. In the sixth reporting period, the CPD submitted multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, which was previously numbered S08-01-01. This policy addressed ¶503, but it remained in the collaborative review and revision process at the close of the sixth reporting period.

In the seventh reporting period, the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. Ultimately, this policy was finalized and addressed the requirements of ¶503 by stating that exoneration of the most serious allegations will not preclude discipline for less serious misconduct allegations. With this, the CPD reached Preliminary compliance. Also in the seventh reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022, for review with numerous paragraphs, including ¶503. At the end of the seventh reporting period, the BIA Onboard Training was still under development.

In the fifth reporting period, COPA reached Preliminary compliance with ¶503 through its finalized Policy 3.2.1, *Disciplinary and Remedial Recommendations*. COPA submitted multiple drafts to the IMT and the OAG and made revisions based on that collaboration. After receiving a no-objection notice,[26] COPA received comments from the COPA Community Working Group, and thereafter finalized the policy.[27] Section I.B. of the policy incorporates the requirements of ¶503 verbatim. In

---

[26]   Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[27]   Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

the sixth reporting period, COPA submitted its *Disciplinary and Remedial Recommendations In-Service Lesson Plan*, which addressed ¶503 verbatim. Members of the IMT attended the *Disciplinary and Remedial Recommendations In-Service Training* class on June 22, 2022. COPA, in the seventh reporting period, provided documentation regarding its *Case Management System (CMS)* training and *Disciplinary and Remedial Recommendations Training* for both its COPA Academy and COPA in-service training for new and veteran staff members, which demonstrated that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. With this, COPA reached Secondary compliance with ¶503.

COPA also provided documentation regarding its Final Summary Reports (FSRs), which included a Summary Report of Investigation in which the officers involved in the incident were cleared of the most serious misconduct allegations but were found to have violated several lower-level policies based on the complaint. Both officers were disciplined for the lower-level violations of policy, and COPA recommended a suspension. This FSR served as an example of a case in which COPA exonerated the most serious allegation but sustained three separate lower-level violations of policy stemming from the same allegations, as contemplated by ¶503. At the end of the seventh reporting period, COPA remained under assessment for Full compliance as the Parties continued to have conversations concerning the evidence sufficient for Full compliance.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶503. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the

CPD produced 5 modules of instruction for review. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶503.

*** 

The City and the CPD maintained Preliminary compliance with ¶503 in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

COPA remains under assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

### Paragraph 503 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶504

> ***504.*** *As soon as feasible, but by no later than January 2020, upon arriving at the final disciplinary decision, CPD and COPA will ensure that the Administrative Summary Report is provided to the involved CPD member and the Department. CPD will ensure that the Administrative Summary Report is provided to the involved CPD member's District or Unit Commander and immediate supervisor.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[28] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City, the CPD, and COPA maintained Preliminary compliance with ¶504 in the eighth reporting period.

To evaluate Preliminary compliance with ¶504, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[29] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation, and systems for providing the Administrative Summary Report to the involved CPD member and the Department pursuant to the requirements of this paragraph.

*Progress before the Eighth Reporting Period*

The City reached Preliminary compliance with ¶504 when all implicated City entities reached Preliminary compliance. The CPD achieved Preliminary compliance

---

[28]    As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[29]    The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among

with ¶504 in the fifth reporting period by finalizing Special Order S08-01-04, *Post-Investigation Log Number Procedures*.[30] In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. These materials were still in draft state and not in final presentation form. We noted that the draft training materials addressed the requirements of ¶504. In the seventh reporting period, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*,[31] which addressed the requirements of ¶504 by requiring the Administrative Summary Report to be provided to the involved CPD member and the Department including the district or unit commander.

COPA reached Preliminary compliance with ¶504 in the fourth reporting period by finalizing Policy 3.2.2, *Timeliness Benchmarks.* COPA maintained Preliminary compliance in the fifth and sixth reporting periods but did not otherwise submit evidence of additional efforts under ¶504 that would bring COPA into Secondary compliance. In the seventh reporting period, COPA provided Guidance, *Publishing and Distribution of Final Summary Reports*, which addressed ¶504 by directing COPA to provide the Final Summary Report to the involved CPD members and the Department upon arriving at the final disciplinary decision and explains the process for doing so. However, this Guidance did not appear to indicate that the FSRs are automatically distributed to BIA upon the closure of a case. As written in section 1.B.1.a, the Guidance states that "[d]esignated legal staff will forward a copy of the FSR . . ." Additionally, COPA provided documentation regarding its Final Summary Reports (FSRs), including examples of FSRs, but that documentation did not demonstrate that the FSR was "provided to the involved CPD member and the Department" per the requirement of ¶504. We noted that to reach Secondary compliance, COPA would need to provide training materials related to the requirements of this paragraph and train 95% of its staff, or alternatively, revise its Guidance as needed to specify that FSRs are automatically distributed to "the involved CPD member and the Department." *See* ¶504.

*Progress in the Eighth Reporting Period*

This reporting period, the City and the CPD did not produce any documentation that demonstrated efforts related to ¶504.

COPA produced an operational guidance tracker demonstrating that its employees had reviewed Guidance, *Publishing and Distribution of Final Summary Reports*.

---

other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[30] In the sixth reporting period, this policy was renumbered S08-01-08, *Post-Investigation Log Number Procedures*.

[31] This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

This is not sufficient to demonstrate Secondary compliance with ¶500. As we previously explained, to reach Secondary compliance, COPA will need to provide training materials related to the requirements of this paragraph and train 95% of its staff, or alternatively, revise its Guidance as needed to specify that FSRs are automatically distributed to "the involved CPD member and the Department." *See* ¶504.

\*\*\*

The City, the CPD, and COPA maintained Preliminary compliance with ¶504 in the eighth reporting period. Moving forward, we will look for evidence that the CPD and COPA are developing sufficient training and systems to instruct compliance with the requirements of ¶504 and each entity's related policies.

## Paragraph 504 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶505

*505. The CMS will have the following capacities: a. maintain accurate and reliable data regarding the number, nature, and status of all complaints and administrative notifications, from the intake process to final disposition; b. identify the status of administrative investigations; c. identify caseloads for investigators; and d. maintain all documents and investigative materials—including audio and video—in a digital format, accessible via the CMS.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |

The City and the CPD maintained Preliminary compliance with ¶505 in the eighth reporting period. COPA maintained Full compliance with ¶505. Because all relevant City entities must reach levels of compliance to bring the City as a whole into compliance, the City has not yet reached Secondary or Full compliance.

To evaluate Preliminary compliance with ¶505, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[32] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we determined whether the City, the CPD, and COPA have sufficiently implemented their policies, training, and a CMS system that fulfills the requirements of this paragraph.

---

[32] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

The CPD made progress toward but did not reach Preliminary compliance in the fifth reporting period. While BIA's *Case Management System* (CMS) Unit Directive, which was originally submitted at the end of the fourth reporting period, touches on all ¶505 requirements, the CPD did not provide further revised drafts of this Unit Directive during the fifth reporting period.[33] The CPD made other efforts related to ¶505 in the fifth reporting period through its draft of S08-01-01, *Conducting Log Number Investigations*,[34] which was produced for review in August 2021. The IMT provided comments in September 2021. We noted in the fifth reporting period that we had not since received a revised draft of S08-01-01, but that in the initial draft of S08-01-01, all subparagraphs of ¶505 were addressed. In the sixth reporting period, the City and the CPD provided a new Special Order S08-01-01, *Log Number Case Management System*, for review with ¶505. The IMT submitted a no-objection notice with comments on June 3, 2022. We noted that this policy completely addresses ¶505 and its subparagraphs. However, this policy remained in the collaborative review and revision process at the end of the sixth reporting period. In the seventh reporting period, the CPD finalized this policy and reached Preliminary compliance.

COPA achieved Preliminary compliance with ¶505 in the fourth reporting period by finalizing its Policy 3.1.6, *Clear and Column Case Management Systems* (COPA 3.1.6), which addressed all requirements of ¶505. COPA maintained Preliminary compliance in the fifth reporting period and made efforts toward Secondary compliance. COPA submitted for review training materials for its training *Case Management System: Overview of Policy and Procedures*. We noted that these materials were well organized and provided instruction to mobilize efforts compliant with ¶505's mandates and COPA's policy. We submitted a no-objection notice to these training materials.[35] We noted our understanding that COPA hoped to provide this

---

[33] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Initial Responsibilities in Assigned Log Number Investigations* into S08-01-05. This process of incorporating Unit Directives into General Orders and Special Orders is on-going.

[34] In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01, and it is now S08-01-05, *Conducting Log Number Investigations*.

[35] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice."

training to its personnel in January 2022 and explained that it would need to provide this training to at least 95% of its staff to obtain Secondary compliance. COPA maintained Preliminary compliance with ¶505 in the sixth reporting period but did not submit any materials related to ¶505 for Secondary compliance. In the seventh reporting period, COPA provided documentation regarding its *Case Management System (CMS)* training and *Disciplinary and Remedial Recommendations* training for both its COPA Academy and COPA In-Service Training for new and veteran staff members, which demonstrated that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. With this, COPA reached Secondary compliance with ¶505.

COPA also provided Guidance, *COLUMN CMS Administration* for review with ¶505 during the seventh reporting period. While Section I.A of this Guidance stated that COPA's Information Systems Section is responsible for developing and managing COPA's information technology, this Guidance did not specifically address ¶505. Additionally, COPA provided documentation of its CMS capabilities, which demonstrated COPA's continued abilities to collect and maintain accurate and reliable data through the COPA CMS in accordance with the requirements of ¶505. With this, COPA reached Full compliance.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶505. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discus-

---

Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

sions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶505.

\*\*\*

The City and the CPD maintained Preliminary compliance with ¶505 in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

COPA maintained Full compliance with ¶505. For COPA, we will look for evidence of sustained efforts related to Full compliance with this paragraph. To maintain Full compliance, we expect to receive materials supporting continued Full compliance in each future reporting period.

### Paragraph 505 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶506

> **506.** *COPA, BIA, and the Accountability Sergeants will have access to the CMS as necessary to undertake their respective duties.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[36] |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not In Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |

The City and the CPD maintained Preliminary compliance with ¶506 in the eighth reporting period. COPA maintained Full compliance. Because all relevant City entities must reach levels of compliance to bring the City as a whole into compliance, the City has not yet reached Secondary or Full compliance.

To evaluate Preliminary compliance with ¶506, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[37] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training and a CMS system that fulfills the requirements of this paragraph.

---

[36]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[37]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD made efforts toward Preliminary compliance with ¶506 by drafting two policies that remained in the collaborative review and revision process at the end of the fourth reporting period: BIA's *Case Management System* Unit Directive, and the CPD's Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. The CPD reached Preliminary compliance with ¶506 in the fifth reporting period by finalizing Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. In the sixth reporting period, the City and the CPD provided S08-01-01, *Log Number Case Management System*,[38] for review. The IMT submitted a no-objection notice with comments on June 3, 2022. We noted that this policy addressed ¶506 and includes command staff and auditing and technology personnel as having permissions to access the Case Management System (CMS). We explained that this policy also provides the process for granting such permissions, and the process for conducting audits to ensure the integrity of the access to the system. This policy remained in the collaborative review and revision process at the end of the sixth reporting period. The CPD did not produce any additional materials for review regarding ¶506 in the seventh reporting period.

In the fourth reporting period, COPA reached Preliminary compliance with ¶506 through finalization of its Policy 3.1.6, *Clear and Column Case Management Systems*. COPA maintained Preliminary compliance in the fifth reporting period and made efforts toward Secondary compliance. COPA submitted for review training materials for its *Case Management System: Overview of Policy and Procedures*. We submitted a no-objection notice to these training materials in September 2021,[39] and we explained that COPA would need to provide this training to at least 95% of

---

[38]  In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Case Management System* into S08-01-01. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

[39]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

its staff to obtain Secondary compliance. In the sixth reporting period, COPA provided its *Case Management System: Overview of Policy and Procedures* training materials. We noted that these training materials address ¶506 by providing that COPA employees will have access to the CMS and the CLEAR System to undertake their duties. We commented that the lesson plan is very comprehensive and goes beyond the requirements of ¶506 by not only explaining that COPA investigators will have access to the CMS, but also by explaining the responsibility that comes with the CMS access. Further, the lesson plan explains who will issue credentials and how the systems may be audited to ensure no misuse occurs and explains that misuse or improper use is strictly prohibited and may be subject to misconduct investigations that may include disciplinary action to include discharge. On January 12, 2022, the IMT observed the two-hour mandatory *In-Service Case Management System* training. The lesson plan was presented as written, and the instructors were knowledgeable. The IMT provided suggestions regarding delivery of the instruction. We explained that, to achieve Secondary compliance, COPA would need to provide this training to at least 95% of its personnel.

In the seventh reporting period, COPA provided documentation regarding its *Case Management System (CMS)* training and *Disciplinary and Remedial Recommendations* training for both its COPA Academy and COPA in-service training for new and veteran staff members, which demonstrated that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. This documentation allowed COPA to reach Secondary compliance with ¶506. COPA also provided Guidance, *COLUMN CMS Administration*, which supported COPA's *CLEAR and Columns CMS Systems* policy by ensuring that the proper COPA employees have the credentials and training to access and operate within the CMS, per ¶506's requirement that COPA "will have access to the CMS as necessary to undertake their respective duties." Further, COPA provided a memorandum with supporting documentation that identified the COPA employees with access to the CMS and the parameters of their access. With this, COPA reached Full compliance with ¶506.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, not including ¶506. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, not including ¶506. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, including ¶506. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶506.

*** 

The City and the CPD maintained Preliminary compliance with ¶506 in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

COPA maintained Full compliance. For COPA, we will look for evidence demonstrating that it has maintained efforts related to the requirements of this paragraph. To maintain Full compliance, we expect to receive materials supporting continued Full compliance in each future reporting period.

### Paragraph 506 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶507

*507. Administrative investigative files will be electronically pre-served within the CMS.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[40] |
| CPD | *In Compliance* (FIFTH REPORTING PERIOD) |
| COPA | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| CPD | *Not in Compliance* |
| COPA | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| CPD | *Not Yet Assessed* |
| COPA | *In Compliance* (SEVENTH REPORTING PERIOD) |

The City and the CPD maintained Preliminary compliance with ¶507 in the eighth reporting period. COPA maintained Full compliance with ¶507 in the eighth reporting period.

To evaluate Preliminary compliance with ¶507, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[41] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training and a Case Management System (CMS) that fulfills the requirements of this paragraph.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD made efforts toward Preliminary compliance with ¶507 by drafting two policies that remained in the in the collaborative

---

[40] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[41] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

review and revision process at the end of the fourth reporting period: BIA's *Case Management System* Unit Directive and the CPD's Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. The CPD reached Preliminary compliance with ¶507 in the fifth reporting period by finalizing Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. In the sixth reporting period, the City and the CPD provided S08-01-01, *Log Number Case Management System*, for review.[42] The IMT submitted a no-objection notice with comments on June 3, 2022. We noted that Section IV.B of this policy completely addressed ¶507's requirement that administrative investigative files be electronically preserved within the CMS, although the CPD did not submit the policy under this paragraph. We encouraged the CPD to submit this policy for review with ¶507. This policy remained in the collaborative review and revision process at the end of the sixth reporting period. In the seventh reporting period, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*[43] for review with ¶507. This policy addressed the requirements of ¶507 by requiring that all administrative investigative files will be electronically preserved within the CMS.

In the fourth reporting period, COPA reached Preliminary compliance with ¶507 through finalization of its Policy 3.1.6, *Clear and Column Case Management Systems*. COPA maintained Preliminary compliance in the fifth reporting period and made efforts toward Secondary compliance. COPA submitted for review training materials for its training *Case Management System: Overview of Policy and Procedures*. We submitted a no-objection notice to these training materials in September 2021,[44] and explained that COPA would need to provide this training to at least 95% of its staff to obtain Secondary compliance. In the sixth reporting period, COPA provided its *Case Management System: Overview of Policy and Procedures*

---

[42] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Case Management System* into S08-01-01. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

[43] This policy was previously numbered S08-01-04 and was renumbered and retitled in the sixth reporting period.

[44] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

training materials. We noted that these training materials address ¶507. On January 12, 2022, the IMT observed the two-hour mandatory *In-Service Case Management System* training. The lesson plan was presented as written, and the instructors appeared knowledgeable. The IMT provided suggestions regarding delivery of the instruction, which COPA took into consideration for future trainings. We explained that, to achieve Secondary compliance, COPA would need to provide this training to at least 95% of its personnel.

In the seventh reporting period, COPA provided documentation of training for both its COPA Academy and COPA In-Service Training for new and veteran staff members, which demonstrated that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. This documentation allowed COPA to reach Secondary compliance with ¶507.

COPA also provided Guidance, *COLUMN CMS Administration*, in the seventh reporting period, which supported COPA's *CLEAR and Columns CMS Systems* policy by outlining the process and responsibilities of supporting the COPA System Developer to ensure proper data security for cloud storage for investigative file materials, per ¶507's requirement that "[a]dministrative investigative files will be electronically preserved within the CMS." Further, COPA provided a memorandum with supporting documentation that identifies the COPA staff members with access to the CMS and the parameters of their access and demonstrating that the requirements of ¶507 were met. With this, COPA reached Full compliance with ¶507.

*Progress in the Eighth Reporting Period*

This reporting period, the City, the CPD, and COPA did not produce any documentation that demonstrated efforts related to ¶507.

\*\*\*

The City and the CPD maintained Preliminary compliance with ¶507 in the eighth reporting period, and COPA maintained Full compliance. Moving forward, we look forward to the CPD developing training relevant to ¶507 and the CPD's related policies. For COPA, we will look for evidence of continued Full compliance with ¶507's mandates. To maintain Full compliance, we expect to receive materials supporting continued compliance in each future reporting period.

## Paragraph 507 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶508

*508. The City and CPD will undertake best efforts to ensure that all administrative investigation files, disciplinary history card entries, COPA and BIA disciplinary records, and any other disciplinary record or summary of such record, are retained electronically, and indefinitely, for purposes of historical trend analysis, non-disciplinary EIS, and public transparency.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| CPD | *In Compliance* (SEVENTH REPORTING PERIOD) |
| COPA | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| CPD | *Not in Compliance* |
| COPA | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶508 in the eighth reporting period. COPA maintained Secondary compliance with ¶508. Because all relevant City entities must reach levels of compliance to bring the City as a whole into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶508, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[45] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD made efforts toward Preliminary compliance by drafting and providing BIA's *Case Management System* Unit Directive. However, by the close of the fourth reporting period, this Unit Directive remained in the collaborative review and revision process. The draft Unit Directive submitted in the fourth reporting period spoke to the requirements of ¶508. We provided feedback on this Unit Directive in September 2021. We did not receive a further

---

[45] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

revised draft of this Unit Directive, and the CPD did not post this Unit Directive for public comment.[46] Therefore, the CPD did not made any additional steps toward compliance with ¶508 in the fifth reporting period. In the sixth reporting period, the City and the CPD provided S08-01-01, *Log Number Case Management System*, for review.[47] The IMT submitted a no-objection notice with comments on June 3, 2022. We noted that Section IV.C.1–3 of this policy addressed ¶508. However, this policy remained in the collaborative review and revision process at the end of the sixth reporting period. In the seventh reporting period, the CPD finalized this policy and reached Preliminary compliance.

COPA reached Preliminary compliance with ¶508 in the fourth reporting period by finalizing Policy 3.1.6, *Clear and Column Case Management Systems*. COPA maintained Preliminary compliance in the fifth reporting period and made efforts toward Secondary compliance. COPA submitted for review training materials for its training *Case Management System: Overview of Policy and Procedures*. We submitted a no-objection notice to these training materials,[48] and explained that COPA would need to provide this training to at least 95% of its staff to obtain Secondary compliance. In the sixth reporting period, COPA provided its *Case Management System: Overview of Policy and Procedures* training materials. We noted that these training materials provide instruction relevant to compliance with ¶508. On January 12, 2022, the IMT observed the two-hour mandatory *In-Service Case Management System* training. The lesson plan was presented as written, and the instructors were knowledgeable. The IMT provided suggestions regarding delivery of the instruction, which COPA took into consideration for future trainings. We explained that, to achieve Secondary compliance, COPA would need to provide this training to at least 95% of its personnel.

---

[46]    In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period.

[47]    The CPD incorporated instruction previously included in the BIA Directive *Case Management System* into S08-01-01.

[48]    Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

In the seventh reporting period, COPA provided documentation regarding its *Case Management System (CMS)* training for both its COPA Academy and COPA in-service training for new and veteran staff members, which demonstrated that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. This documentation allowed COPA to reach Secondary compliance with ¶508.

COPA also provided Guidance, *COLUMN CMS Administration*. Section I.A.4 of this Guidance partially addressed ¶508 and supported COPA's *CLEAR and Columns CMS Systems* policy by outlining the process and responsibilities of supporting the COPA System Developer to ensure proper data security for cloud storage for investigative file materials. Further, COPA provided a memorandum with supporting documentation that identifies the COPA staff members with access to the CMS and the parameters of their access.

*Progress in the Eighth Reporting Period*

This reporting period, the City, the CPD, and COPA did not produce any documentation that demonstrated efforts related to ¶508.

\*\*\*

The City and the CPD maintained Preliminary compliance with ¶508 in the eighth reporting period. COPA maintained Secondary compliance with ¶508. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph. For COPA, we will look for COPA to demonstrate that it has sufficiently implemented its policies and training.

### Paragraph 508 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶509

*509. For each complaint, the CMS will separately track, and have capacity to conduct searches and generate reports sufficient to identify and analyze trends relating to, at a minimum, the following: a. allegations of discriminatory policing based on an individual's membership or perceived membership in an identifiable group, based upon, but not limited to: race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age; b. allegations of unlawful stop, search, citation, or arrest practices; c. allegations of excessive force; d. allegations of misconduct arising during an interaction with individuals in crisis; e. allegations of retaliation against non-CPD members; f. allegations of conduct alleged to have occurred in retaliation for engaging in First Amendment protected activities, such as lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct; g. allegations of officer-involved gender-based violence, domestic violence, or sexual misconduct; h. allegations of CPD member substance and/or alcohol abuse; and i. the self-reported demographic information of complainants, including race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age.*

## Compliance Progress  (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶509 in the eighth reporting period. COPA maintained Secondary compliance with ¶509. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶509, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent

Decree (¶¶626–41).[49] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training and a Case Management System (CMS) that fulfills the requirements of this paragraph.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD made efforts toward Preliminary compliance by drafting BIA's *Case Management System* Unit Directive. However, by the close of the fourth reporting period, this Unit Directive was not finalized, preventing the CPD from reaching Preliminary compliance. In the fifth reporting period, the CPD provided a draft of Special Order S08-01-01, *Conducting Log Number Investigations*, which addressed all the requirements of ¶509.[50] We provided feedback on this policy in September 2021, but we did not receive a further revised draft of S08-01-01. We also did not receive a further revised draft of BIA's draft *Case Management System* Unit Directive, which we provided comments on in September 2021, by the end of the fifth reporting period. Because both S08-01-01 and the Unit Directive remained in the collaborative review and revision process, the CPD did not reach Preliminary compliance in the fifth reporting period.

In the sixth reporting period, the City and the CPD provided a new Special Order S08-01-01, *Log Number Case Management System*, for review.[51] The IMT submitted a no-objection notice with comments on June 3, 2022.[52] We noted that Section

---

[49]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[50]  In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01, and it is now S08-01-05, *Conducting Log Number Investigations*.

[51]  In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Case Management System* into S08-01-01. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

[52]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the

IV.E.1–9 of this policy addressed the requirements of ¶509(a)–(i) verbatim. How-ever, this policy remained in the collaborative review and revision process at the end of the sixth reporting period. In the seventh reporting period, the CPD final-ized this policy and earned Preliminary compliance.

COPA reached Preliminary compliance with ¶509 in the fourth reporting period by finalizing Policy 3.1.6, *Clear and Column Case Management System*. In the fifth reporting period, COPA submitted for review training materials for its training *Case Management System: Overview of Policy and Procedures*. We submitted a no-ob-jection notice to these training materials.[53] In the sixth reporting period, COPA provided its *Disciplinary and Remedial Recommendations In-Service Lesson Plan*. COPA also provided its *Case Management System: Overview of Policy and Proce-dures* training materials. We noted that these training materials completely ad-dressed ¶509 and its subparagraphs. Additionally, we noted that the training ma-terials provide information on the types of allegations to which a tracking number will be assigned. On January 12, 2022, the IMT observed the two-hour mandatory *In-Service Case Management System* training. The lesson plan was presented as written, and the instructors were knowledgeable. The IMT provided suggestions regarding delivery of the instruction, which COPA took into consideration for fu-ture trainings. We explained that, to achieve Secondary compliance, COPA would need to provide this training to at least 95% of its personnel.

In the seventh reporting period, COPA provided documentation regarding its *Case Management System (CMS)* training and *Disciplinary and Remedial Recommenda-tions* training for both its COPA Academy and COPA in-service training for new and veteran staff members, which completely addressed ¶509 and demonstrated that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. This documentation allowed COPA to reach Secondary compliance with ¶509.

COPA also provided Guidance, *COLUMN CMS Administration*. Section I.A.5 and I.A.5.a addressed ¶509 and supported COPA's *CLEAR and Columns CMS Systems*

---

City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[53]   Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to re-solve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

policy by outlining the process and responsibilities of ensuring that COPA staff can extract data, query, retrieve, and present information from CMS to recognize investigative trends. Further, COPA provided a memorandum with supporting documentation that identifies the COPA staff members with access to the CMS and the parameters of their access.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶509. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶509.

*** 

The City and the CPD maintained Preliminary compliance with ¶509 in the eighth reporting period. COPA maintained Secondary compliance with ¶509. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For COPA, we will look for COPA to demonstrate that it has sufficiently implemented its policies, training, and CMS that fulfills the requirements of this paragraph.

## Paragraph 509 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶511

*511. In order to develop a new mediation policy governing the resolution of disciplinary actions by the agreement of the CPD member and non-CPD member complainant, the City will solicit public input, through community engagement efforts, regarding the methods by which mediation will most effectively build trust between community members and police and foster mutual respect.*

## Compliance Progress     (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City maintained Secondary compliance with ¶511 in the eighth reporting period.

To assess Preliminary compliance with ¶511, we looked for a policy or plan that could be followed to actively engage the community input to inform a new mediation policy. To evaluate Secondary compliance, we looked for evidence that the City acted upon its plan and received significant community feedback relevant to the new mediation policy. To reach Full compliance, the City must demonstrate that it has incorporated this public input, as appropriate, in the development of the new mediation policy.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the City reached Secondary compliance with ¶511 after demonstrating that it engaged an outside expert to assist with community engagement efforts under ¶511. In addition to providing information about the engaged expert, the City provided notes regarding community feedback it received during two learning sessions.

At the end of the fifth reporting period, the City produced its *Interagency* Policy, IAP 11-01, *Community-Policy Mediation Pilot Program*. This document is better understood as an outline for a temporary program. We reviewed a *City Mediation* Policy in November 2020 and provided comments in January 2021. The December 30, 2022, version we received was the first time we had reviewed the policy in this new form.

In its production letter, the City indicated that after receiving comments from the IMT and the OAG regarding the mediation policy it produced in November of 2020,

"the City decided to rewrite its mediation pilot policy to better address these comments and concerns and to better incorporate community feedback." The City also specified that to incorporate the community feedback the City "reinforced themes of the community feedback, including transparency, accountability, timeliness, types of complaints, and member history, during its development discussions with COPA and BIA and has more clearly set forth and reiterated these themes throughout the policy."

We noted our appreciation of the City's efforts. However, because the *Interagency* Policy sets out a temporary, six-month pilot program, the City did not reach Full compliance in the fifth reporting period. We encouraged the City as it launches the pilot program to continue to gain community feedback to evaluate the pilot program on an ongoing basis. We noted that we looked forward to the City developing a mediation policy incorporating not only the feedback the City has received to date, but any additional community input it receives during the pilot program.

We explained that, since the City has chosen to undertake a pilot program related to the Consent Decree requirement that the City develop a Mediation Program, we hoped the City would utilize the six-month program as a means to obtain real-time feedback regarding the effectiveness of the proposed program. We noted our expectation that the City critically analyze this pilot program on an ongoing basis, and that the City provide the IMT with monthly updates regarding the progress of the pilot program during the sixth reporting period. We explained that such real-time assessment and responsive modification will allow the City to create a mediation program that is "a valuable tool for expending the resolution of complaints, building trust between community members and police, and fostering mutual respect." ¶510.

Early in the sixth reporting period, the City met with the IMT to describe its intentions to roll out the Mediation Pilot Program. At that time, we voiced concerns that the program appeared to be designed for evaluation only once the sixth-month pilot period was completed. We asked for regular updates on the progress of the program throughout the pilot, which the City agreed to provide. We also urged that the City continue to consider the real-time feedback it received regarding the Mediation Pilot Program. However, we received no updates regarding the Mediation Pilot Program in the sixth reporting period.

We explained that Secondary compliance with this paragraph requires demonstration that the City received significant community feedback relevant to the new mediation policy and is acting upon its plans in order to develop a community-informed mediation policy. Because we have received no updates regarding the extent to which the Mediation Pilot Program had been implemented, nor had we received any assurance that the City was capturing real-time feedback from the community regarding the Pilot Program, the City lost Secondary Compliance.

In the seventh reporting period, the City regained Secondary compliance. The City provided several materials related to its revised Community-Police Mediation Pilot Program, which began on October 1, 2022, including Department Notice D22-04, *Community-Police Mediation Pilot Program*, which still required further development. The IMT noted its encouragement at the launch of the pilot program, but also expressed concerns that we had not received any prior status updates from the City regarding the pilot program, which had initially been planned to launch on January 15, 2022. We requested to receive more regular updates going forward. In comments provided to the City, the IMT acknowledged the collaboration and efforts that took place to plan and facilitate the mediation pilot's implementation, including the consideration of community feedback in the development of the pilot program.

Additionally, COPA provided Guidance, *Referral for Mediation*, which outlines COPA's role in the mediation pilot program. The IMT submitted a no-objection notice to this Guidance on November 21, 2022.

At the end of the seventh reporting period, the IMT was encouraged by the launch of the Community-Police Mediation Pilot Program on October 1, 2022, which appeared to offer a meaningful opportunity to build trust and facilitate honest discussions between community members and CPD officers. The program appeared to be structured in a way that is appealing to both community members and CPD officers, with many officers who qualify for mediation willing to participate, and also includes methods for evaluation and feedback from participants. Given this progress so far, the IMT was concerned that the pilot program is only funded for six months, and therefore, may face operational challenges beyond the pilot period, which was scheduled to conclude at the end of March 2023. The IMT encouraged the City to continue this important program beyond the pilot program's end date, with the involvement of those who have worked to develop and implement this program, so that this program could continue improving and moving forward.

*Progress in the Eighth Reporting Period*

This reporting period, the City provided the IMT with a signed Memorandum of Understanding, dated April 1, 2023, that states that the City extended its Mediation Pilot Program through December 31, 2023. The City also produced documents demonstrating that the City entities had engaged in monthly meetings and decision-making regarding the mediation program.

***

With this, the City maintained Secondary compliance with ¶511 in the eighth reporting period. To maintain Secondary and reach additional levels of compliance, we will look for the CPD to further develop its policy and for the City to continue the mediation program.

## Paragraph 511 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Status Update

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Secondary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Secondary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Secondary

EIGHTH REPORTING PERIOD
JANUARY 1, 2023 – JUNE 30, 2023
COMPLIANCE PROGRESS:
Secondary

# Accountability and Transparency: ¶512

*512. The City will ensure that within 365 days of the Effective Date, COPA and BIA have developed parallel policies regarding the mediation of misconduct complaints by non-CPD members. The policies will govern mediation of misconduct complaints involving non-CPD member complainants. The policies will specify, at a minimum, (a) the criteria for determining incidents eligible for resolution through mediation; (b) the goals of mediation, including efficiency, transparency, procedural justice, restorative justice, and strengthening public trust; (c) the steps in the mediation process; and (d) methods of communication with complainants regarding the mediation process and the opportunity to participate. Items (a) through (d) above will be consistent between the CPD and COPA mediation policies.*

### Compliance Progress      (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[54] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD did not reach Preliminary compliance with ¶512 in the eighth reporting period. COPA maintained Preliminary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶512, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[55] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation.

---

[54] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[55] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among

*Progress before the Eighth Reporting Period*

In previous reporting periods, we reviewed BIA's *Community Mediation* Unit Directive and a draft of the City's Mediation Policy, *Complaints Against the CPD*. We received both of these in the third reporting period and provided multiple rounds of comments. By the end of the fourth reporting period, we did not receive additional revised drafts of these policies. We did not receive any documents or evidence of efforts toward compliance with ¶512 from COPA. In the fifth reporting period, neither the CPD nor COPA produced any documentation related to efforts under ¶512.

However, at the end of the fifth reporting period, the City provided its Interagency Policy, IAP 11-01, *Community-Police Mediation Pilot Program*. This document is better understood as an outline for a temporary program. We reviewed a *City Mediation Policy* in November 2020 and provided comments in January 2021. The City indicated that it rewrote the policy after receiving our comments and feedback from the community. The December 30, 2022 version we received was the first time we had reviewed the policy in this new form. Therefore, we explained in the fifth reporting period that we were not able to engage in collaborative review and revision. Notwithstanding this fact, the City indicated that all entities implicated by the Interagency Policy have signed onto the pilot program, and the City indicated that it will launch the six-month mediation pilot program on January 15, 2022.

We noted that the City's steps toward the development of the mediation program were positive; however, we expressed concerns with the pilot program policy. We explained that the pilot program lacked specificity in many areas and did not include methods to measure success of the program. Perhaps most concerning was an indication that the City would provide an assessment of the program 60 days after the six-month pilot program ended. We explained that a delayed assessment like this would not allow the City to make modifications to the pilot program during its six-month period to address concerns and test solutions. We urged the City to consider performing ongoing or regular assessments to more effectively and efficiently develop a mediation program under ¶511 and ¶512.

We noted in the fifth reporting period that the City's Interagency Policy did not fulfill ¶512's requirements for a variety of reasons. Most notably, we explained, it gave the City sole authority to revise or replace the Interagency Policy "in the event that the City determines the requirements are better accomplished by other

---

other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

means." With this, the City did not reach Preliminary compliance in the fifth reporting period. We noted that we would look for the CPD and COPA to provide draft policies related to ¶512's mandates in the sixth reporting period.

The City and the CPD did not provide any information related to the pilot mediation program in the sixth reporting period, as the City and the CPD had agreed to provide. The IMT expressed its continued concern that the pilot program lacked the necessary structure and support it needed to be an informative and beneficial pilot. Because the City did not provide a status update and because no documentation was provided to the IMT during the sixth reporting period, the City did not reach Preliminary compliance with ¶512.

Additionally in the sixth reporting period, the City and the CPD provided S08-01-06, *Supervisor Responsibilities in Log Number Investigations*. But when this Special Order was submitted, the CPD indicated that this Special Order was not submitted "to demonstrate compliance with Consent Decree paragraphs, and the CPD is not seeking review of this policy at this time." Nonetheless, we reviewed the policy and provided comments June 15, 2022, expressing our desire to receive a final draft of this policy for review under ¶627. We observed that Section IV.A.13 of the policy directed the BIA Chief to ensure that BIA is engaged in mediation practices. We explained that, while this direction is important, it does not include the specific requirements of ¶512(a)–(c).

In the seventh reporting period, the City provided several materials related to its revised Community-Police Mediation Pilot Program, which began on October 1, 2022, including Department Notice D22-04, *Community-Police Mediation Pilot Program*. The IMT noted its encouragement at the launch of the pilot program, but also expressed concerns that we had not received any prior status updates from the City regarding the pilot program, which had initially been planned to launch on January 15, 2022. We requested to receive more regular updates going forward. We did not receive further status updates in the seventh reporting period. In comments provided to the City, the IMT acknowledged the collaboration and efforts that took place to plan and facilitate the mediation pilot's implementation. Nonetheless, ¶512 requires that the City ensures that "COPA and BIA have developed parallel policies regarding the mediation of misconduct complaints by non-CPD members."

COPA did not submit materials related to ¶512 in the sixth reporting period. In the seventh reporting period, COPA provided Guidance, *Referral for Mediation*, which outlined COPA's role in the mediation pilot program. The IMT submitted a no-objection notice to this Guidance on November 21, 2022. However, the CPD's Department Notice D22-04, *Community-Police Mediation Pilot Program* did not appear to be a parallel policy. Whereas COPA Guidance, *Referral for Mediation*, outlined COPA's role in the mediation pilot program and provided specific details regarding

communication with complainants and managing the mediation process, the CPD's Department Notice D22-04 provided a general overview of the mediation pilot program. Department Notice D22-04 provided some information regarding "the criteria for determining incidents eligible for resolution through mediation" (*see* ¶512(a)) as related to community members. It was unclear, however, what criteria is used to determine the eligibility of CPD members for the mediation process. Further, D22-04 did not include the level of detail required by ¶512, such as "the goals of mediation, including efficiency, transparency, procedural justice, restorative justice, and strengthening public trust" (¶512(b)) and "the steps in the mediation process" (¶512(c)). We suggested that Department Notice D22-04 include more specific information to meet the requirements of ¶512 and to ensure that CPD members and community members understand the program.

The IMT was encouraged by the launch of the Community-Police Mediation Pilot Program, which appeared to offer a meaningful opportunity to build trust and facilitate honest discussions between community members and CPD officers. The program appeared to be structured in a way that appeals to both community members and CPD officers, with many officers who qualify for mediation willing to participate, and also included methods for evaluation and feedback from participants. Given this progress so far, the IMT was concerned that the pilot program is only funded for six months, and therefore, may face operational challenges beyond the pilot period, which is scheduled to conclude at the end of March 2023. The IMT encouraged the City to continue this important program beyond the pilot program's end date, with the involvement of those who have worked to develop and implement this program, so that this program could continue improving and moving forward.

*Progress in the Eighth Reporting Period*

This reporting period, the City provided the IMT with a signed Memorandum of Understanding, dated April 1, 2023, that states that the City extended its Mediation Pilot Program through December 31, 2023. The City also produced documents demonstrating that the City entities had engaged in monthly meetings and decision-making regarding the mediation program. These submissions were not sufficient to advance the City's and its entities' levels of compliance this reporting period.

\*\*\*

The City and the CPD did not reach Preliminary compliance with ¶512 in the eighth reporting period. COPA maintained Preliminary compliance. We will look for the CPD to provide a parallel draft policy that meets the requirements of ¶512 in the next reporting period. For COPA, we will look for evidence of training on its policy regarding the mediation of misconduct complaints by non-CPD members.

## Paragraph 512 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
None

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
None

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
None

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

EIGHTH REPORTING PERIOD
JANUARY 1, 2023 – JUNE 30, 2023
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶513

> **513.** *COPA will ensure that the recommended level of discipline for findings is consistently applied in a fair, thorough, and timely fashion, based on the nature of the misconduct. COPA and CPD will also ensure that mitigating and aggravating factors are identified, consistently applied, and documented.*

**Compliance Progress**          (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶513 in the eighth reporting period. COPA maintained Secondary compliance with ¶513. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶513, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[56] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD provided consultation drafts of BIA's *Advocate Section Command Channel Review Procedures* Unit Directive. This Unit Directive had not been finalized by the end of the fourth reporting period; therefore, the CPD did not reach Preliminary compliance. In the fifth reporting period, the

---

[56] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

CPD provided a draft of Special Order S08-01-01, *Conducting Log Number Investigations*, which addressed ¶513's requirements.[57] We provided feedback on this policy in September 2021. We did not receive a further revised draft of S08-01-01 by the end of the fifth reporting period. In addition, we provided consultation feedback to BIA's *Advocate Section Command Channel Review Procedures* Unit Directive. We noted that the latest version of the Unit Directive, which was provided in June 2021, demonstrated great improvement. We encouraged the CPD to provide a final draft of this Unit Directive for review under ¶627. We noted our anticipation in the fifth reporting period that the BIA would receive a no-objection notice from us with minimal additional revisions and then be able to post this Unit Directive for public comment.[58] Without finalizing any policy speaking to ¶513's requirements, the CPD did not reach Preliminary compliance in the fifth reporting period. In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 as S08-01-05. The CPD submitted multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. We noted that the draft version of this policy completely addressed the requirements of ¶513. The CPD submitted a further revised version of S08-01-05 on June 30, 2022, the last day of the reporting period. Therefore, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

The CPD also provided drafts of S08-01-07, *Command Channel Review* in the sixth reporting period.[59] On June 30, 2022, the last day of the reporting period, the CPD

---

[57] In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01; it is now S08-01-05, *Conducting Log Number Investigations*.

[58] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[59] The IMT previously reviewed multiple drafts of S08-01-03, *Command Channel Review* (previously titled *Complaint Summary Reporting and Review Procedures*). The IMT also previously reviewed Unit Directives regarding Command Channel review procedures. In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Advocate Section Command Channel Review Procedures* (previously titled *Command Channel Review*) into S08-01-07. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

submitted a further revised version. While this policy also addressed the requirements of ¶513, it remained in the collaborative review and revision process at the end of the sixth reporting period. In the seventh reporting period, the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, which ultimately addressed the requirements of ¶513. The CPD also provided multiple revised versions of S08-01-07, *Command Channel Review*, which also addressed the requirements of ¶513. The CPD finalized S08-01-07 and reached Preliminary compliance in the seventh reporting period.

In the fourth reporting period, COPA finalized its Policy 3.2.1, *Disciplinary and Remedial Recommendations*, which fulfilled the requirements of ¶513. This brought COPA into Preliminary compliance. COPA did not produce evidence of steps toward Secondary compliance with ¶513 in the fifth reporting period. In the sixth reporting period, COPA worked toward Secondary compliance by submitting its *Disciplinary and Remedial Recommendations In-Service Lesson Plan*, which fully addressed ¶513 and provided more depth than is required by the paragraph. Several members of the IMT attended the *Disciplinary and Remedial Recommendations In-Service Training* class on June 22, 2022. The class instructor covered the lesson plan material completely and appropriately, provided examples to illustrate the instruction material, and allowed for class interaction. In the seventh reporting period, COPA provided documentation regarding its *Disciplinary and Remedial Recommendations* training for both its COPA Academy and COPA in-service training for new and veteran staff members, which demonstrated that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. With this, COPA reached Secondary compliance with ¶513.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶513. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training.

Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶513.

*** 

The City and the CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. COPA maintained Secondary compliance with ¶513. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For COPA, we will look for evidence to demonstrate that it has sufficiently implemented its policies and training.

### Paragraph 513 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶514

> **514.** *The City, COPA, and CPD will use best efforts to ensure that the level of discipline recommended for sustained findings is applied consistently across CPD districts and without regard for the race of the complainant or the race of the involved CPD member.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶514 in the eighth reporting period. COPA maintained Secondary compliance with ¶514. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶514, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[60] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, the IMT determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Eighth Reporting Period*

In past reporting periods, the CPD's BIA provided onboarding and annual training scenarios, which related to ¶514, but as BIA acknowledged, additional efforts were necessary to comply with ¶514. The CPD did not provide records to demonstrate additional efforts toward compliance with ¶514 in the fifth reporting period. In the sixth reporting period, the CPD submitted multiple revised versions of Special Order S08-01-05, *Conducting Log Number Investigations*.[61] We noted that Section

---

[60]　The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[61]　The *Conducting Log Number Investigations* policy was produced in previous reporting periods as S08-01-01. The policy was re-numbered as S08-01-05 when it was produced May 5, 2022.

IV.B.6.a–b of the draft version of this policy completely addressed ¶514 and provided additional detail which guides the Advocate Section. The CPD submitted a further revised version of S08-01-05 on June 30, 2022, the last day of the reporting period. Therefore, this policy remained in the collaborative review and revision process at the end of the sixth reporting period.

The CPD also provided drafts of Special Order S08-01-07, *Command Channel Review*, in the sixth reporting period.[62] On June 30, 2022, the last day of the reporting period, the CPD submitted a further revised draft of this policy. Therefore, this policy remained in the collaborative review and revision process at the end of the sixth reporting period. We noted that Sections II.B and II.C.2.b of this draft policy completely addressed ¶514 by ensuring that every CPD investigation will be conducted consistently, with the level of discipline recommended for sustained findings applied regardless of the member's assignment or the race of the complainant or the accused member. In the seventh reporting period, the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, which addressed the requirements of ¶514. The CPD also provided multiple revised versions of S08-01-07, *Command Channel Review*, which also addressed the requirements of ¶514. The CPD finalized S08-01-07 and reached Preliminary compliance in the seventh reporting period.

In the fourth reporting period, COPA finalized its Policy 3.2.1, *Disciplinary and Remedial Recommendations*, which fulfilled the requirements of ¶514. This brought COPA into Preliminary compliance. COPA did not provide records to demonstrate additional efforts toward compliance with ¶514 in the fifth reporting period. In the sixth reporting period, COPA worked toward Secondary compliance with ¶514 by submitting its *Disciplinary and Remedial Recommendations In-Service Lesson Plan*, which addressed ¶514 verbatim. Members of the IMT attended the *Disciplinary and Remedial Recommendations In-Service Training* class on June 22, 2022. The class instructor covered the lesson plan materials completely and appropriately, provided examples to illustrate the instruction material, and allowed for class interaction. In the seventh reporting period, COPA provided documentation regarding its *Case Management System (CMS)* training and *Disciplinary and Remedial Recommendations* training for both its COPA Academy and COPA in-service

---

[62] The IMT previously reviewed multiple drafts of S08-01-03, *Command Channel Review* (previously titled *Complaint Summary Reporting and Review Procedures*). The IMT also previously reviewed Unit Directives regarding Command Channel review procedures. In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Advocate Section Command Channel Review Procedures* (previously titled *Command Channel Review*) into S08-01-07. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

training for new and veteran staff members, which demonstrated that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. With this, COPA reached Secondary compliance with ¶514.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶514. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶514.

*** 

The City and the CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. COPA maintained Secondary compliance with ¶514. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. For COPA, we will look for it to provide evidence to demonstrate that it has sufficiently implemented its policies and training.

## Paragraph 514 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶515

> **515.** *All disciplinary decisions and discipline imposed will be documented in writing, maintained in the administrative investigative file and the CPD member's disciplinary history, and reported within the CMS consistent with CPD policy and this Agreement.*

## Compliance Progress (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The CPD maintained Preliminary compliance with ¶515 in the eighth reporting period but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶515, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed the CPD's training development, implementation, and evaluation.

*Progress before the Eighth Reporting Period*

The CPD reached Preliminary compliance with ¶515 in the fifth reporting period by finalizing Special Order S08-01-04, *Post-Investigation Log Number Procedures*.[63] Section IX, *Records Retention*, of this Special Order completely addressed the requirements of ¶515. In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. These materials were still in draft state and not in final presentation form. We reviewed and provided the CPD feedback on the materials.

In the seventh reporting period, the CPD provided a final version of S08-01-08, *Post-Investigation Log Number Procedures*, which was renumbered and renamed from S08-01-04. That policy completely addressed the requirements of ¶515 by requiring that all disciplinary decisions and imposed discipline is documented and maintained in the Case Management System (CMS). Also in the seventh reporting period, the CPD produced a draft of its five-day BIA Onboard Training for review with numerous paragraphs, not including ¶515. As of the end of the seventh reporting period, the training was still under development.

---

[63] In the sixth reporting period, the CPD informed us that this policy will be renumbered S08-01-08, *Post-Investigation Log Number Procedures*.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶515. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

***

The CPD maintained Preliminary compliance with ¶515 in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

Paragraph 515 Compliance Progress History

| FIRST REPORTING PERIOD<br>SEPTEMBER 1, 2019 – AUGUST 31, 2019<br>COMPLIANCE PROGRESS:<br>Not Applicable | SECOND REPORTING PERIOD<br>SEPTEMBER 1, 2019 – FEBRUARY 29, 2020<br>COMPLIANCE PROGRESS:<br>Status Update | THIRD REPORTING PERIOD<br>MARCH 1, 2020 – DECEMBER 31, 2020<br>COMPLIANCE PROGRESS:<br>Status Update |
|---|---|---|
| FOURTH REPORTING PERIOD<br>JANUARY 1, 2021 – JUNE 30, 2021<br>COMPLIANCE PROGRESS:<br>None | FIFTH REPORTING PERIOD<br>JULY 1, 2021 – DECEMBER 31, 2021<br>COMPLIANCE PROGRESS:<br>Preliminary | SIXTH REPORTING PERIOD<br>JANUARY 1, 2022 – JUNE 30, 2022<br>COMPLIANCE PROGRESS:<br>Preliminary |
| SEVENTH REPORTING PERIOD<br>JULY 1, 2022 – DECEMBER 31, 2022<br>COMPLIANCE PROGRESS:<br>Preliminary | EIGHTH REPORTING PERIOD<br>JANUARY 1, 2023 – JUNE 30, 2023<br>COMPLIANCE PROGRESS:<br>Preliminary | |

# Accountability and Transparency: ¶516

> ***516.*** *Each sustained finding contained within a CPD member's disciplinary history will be considered for the purposes of recommending discipline for a subsequent sustained finding for a period of up to five years after the date of the incident or the date on which the violation is discovered, whichever is later.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Under Assessment* (SEVENTH REPORTING PERIOD) |

The City and the CPD maintained Preliminary compliance with ¶516 in the eighth reporting period. COPA remains under assessment for Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary or Full compliance.

To evaluate Preliminary compliance with ¶516, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[64] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we determined whether the City, the CPD, and COPA have sufficiently implemented their policies and training.

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD provided a draft of S08-01-01, *Conducting Log Number Investigations*. This draft policy addressed the requirements of ¶516 verbatim. We provided feedback on this policy in September 2021 but did not receive a further revised draft thereafter. Because S08-01-01 remained in the collaborative review and revision process at the close of the fifth reporting period, the

---

[64] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

CPD did not reach Preliminary compliance with ¶516. In the sixth reporting period, the CPD renumbered the Special Order previously labeled S08-01-01 to S08-01-05, *Conducting Log Number Investigations*. The CPD submitted multiple revised versions of Special Order S08-01-05, *Conducting Log Number Investigations* in the sixth reporting period. Section V.B of the draft version of the S08-01-05 addressed ¶516 and goes beyond the up-to-five-year period required by ¶516, which we commended. The CPD submitted a further revised version of S08-01-05 on June 30, 2022, the last day of the reporting period. In the seventh reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, which addressed the requirements of ¶516 by requiring disciplinary history to be considered when recommending discipline within a five-year time frame. With the finalization of this policy, the CPD reached Preliminary compliance.

COPA reached Preliminary compliance with ¶516 in the fourth reporting period by finalizing its Policy 3.2.1, *Disciplinary and Remedial Recommendations*, which completely addressed the requirements of ¶516. COPA did not produce evidence of steps toward Secondary compliance with ¶516 in the fifth reporting period. In the sixth reporting period, COPA worked toward Secondary compliance with ¶516 by submitting its *Disciplinary and Remedial Recommendations In-Service Lesson Plan*, which addressed ¶516 verbatim and provided additional detail and examples of the final summary report narrative to address the requirements of this paragraph. Members of the IMT attended the *Disciplinary and Remedial Recommendations In-Service Training* class on June 22, 2022. The class instructor covered the lesson plan material completely and appropriately, provided examples to illustrate the instruction material, and allowed for class interaction.

In the seventh reporting period, COPA provided documentation regarding its *Case Management System (CMS)* training and *Disciplinary and Remedial Recommendations* training for both its COPA Academy and COPA in-service training for new and veteran staff members, which demonstrated that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. With this, COPA reached Secondary compliance with ¶516. COPA also provided documentation demonstrating that officers' disciplinary histories were considered for purposes of recommending discipline, per the requirement of ¶516. At the end of the seventh reporting period, COPA remained under assessment for Full compliance as the Parties continued to have conversations concerning the evidence sufficient for Full compliance.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶516. The IMT provided extensive feedback on these training materials on February 13,

2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶516.

***

The City and the CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. COPA remains under assessment for Full compliance with ¶516 in the eighth reporting period as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

### Paragraph 516 Compliance Progress History

| FIRST REPORTING PERIOD<br>SEPTEMBER 1, 2019 – AUGUST 31, 2019<br>COMPLIANCE PROGRESS:<br>Not Applicable | SECOND REPORTING PERIOD<br>SEPTEMBER 1, 2019 – FEBRUARY 29, 2020<br>COMPLIANCE PROGRESS:<br>Status Update | THIRD REPORTING PERIOD<br>MARCH 1, 2020 – DECEMBER 31, 2020<br>COMPLIANCE PROGRESS:<br>Status Update |
|---|---|---|
| FOURTH REPORTING PERIOD<br>JANUARY 1, 2021 – JUNE 30, 2021<br>COMPLIANCE PROGRESS:<br>None | FIFTH REPORTING PERIOD<br>JULY 1, 2021 – DECEMBER 31, 2021<br>COMPLIANCE PROGRESS:<br>Preliminary | SIXTH REPORTING PERIOD<br>JANUARY 1, 2022 – JUNE 30, 2022<br>COMPLIANCE PROGRESS:<br>None |
| SEVENTH REPORTING PERIOD<br>JULY 1, 2022 – DECEMBER 31, 2022<br>COMPLIANCE PROGRESS:<br>Preliminary | EIGHTH REPORTING PERIOD<br>JANUARY 1, 2023 – JUNE 30, 2023<br>COMPLIANCE PROGRESS:<br>Preliminary | |

# Accountability and Transparency: ¶517

*517. The City, CPD, and COPA will ensure that findings of "Sustained – Violation Noted, No Disciplinary Action": a. may not be used in any investigation in which the conduct resulted in injury to any person; and b. will only be used for investigations that warrant a sustained finding, but were a result of unintentional violations of policy or law.*

## Compliance Progress        (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Under Assessment* (SEVENTH REPORTING PERIOD) |

The City and the CPD maintained Preliminary compliance with ¶517 in the eighth reporting period. COPA remains under assessment for Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary or Full compliance.

To evaluate Preliminary compliance with ¶517, we reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[65] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we determined whether the entities have sufficiently implemented their policies and training.

*Progress before the Eighth Reporting Period*

We assessed compliance with ¶517 for the first time in the fourth reporting period. That reporting period, the CPD did not produce evidence of efforts toward compliance with ¶517. However, in the fifth reporting period, the CPD provided a

---

[65]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

draft of S08-01-01, *Conducting Log Number Investigations*. This draft policy addressed the requirements of ¶517 verbatim. We provided feedback on this policy in September 2021. We did not receive a further revised draft of S08-01-01 thereafter. Because S08-01-01 remained in the collaborative review and revision process at the close of the fifth reporting period, the CPD did not reach Preliminary compliance with ¶517. In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05. The CPD submitted multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. Section V.C.1.a of the draft S08-01-05 attempted to address ¶517; however, Section V.C.1.c appeared to limit consideration of the sustained violations to only one year when making disciplinary determinations, which may be inconsistent with the requirements of ¶516 ("Each sustained finding contained within a CPD member's disciplinary history will be considered for the purposes of recommending discipline for a subsequent sustained finding *for a period of up to five years* after the date of the incident or the date on which the violation is discovered, whichever is later." (emphasis added)). We requested clarification of Section V.C.1.c. in our comments on June 29, 2022. At the end of the sixth reporting period and in the seventh reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, which completely addressed ¶517. With this, the CPD reached Preliminary compliance.

COPA reached Preliminary compliance with ¶517 in the fourth reporting period by finalizing its Policy 3.2.1, *Disciplinary and Remedial Recommendations*, which completely covers the requirements of ¶517. COPA did not produce evidence of steps toward Secondary compliance with ¶517 in the fifth reporting period. In the sixth reporting period, COPA worked toward Secondary compliance with ¶517 by submitting its *Disciplinary and Remedial Recommendations In-Service Lesson Plan*, which addressed the requirements ¶517. Several members of the IMT attended the *Disciplinary and Remedial Recommendations In-Service Training* class on June 22, 2022. The class instructor covered the lesson plan material completely and appropriately, provided examples to illustrate the instruction material, and allowed for class interaction.

In the seventh reporting period, provided documentation regarding its *Case Management System (CMS)* training and *Disciplinary and Remedial Recommendations* training for both its COPA Academy and COPA in-service training for new and veteran staff members, which demonstrated that more than 95% of COPA's staff attended the in-service training and 100% of its new staff attended the onboarding training. With this, COPA reached Secondary compliance with ¶517. COPA also produced three examples of Summary Report of Investigations, along with a memorandum documenting the three COPA cases as examples where sustained violations were noted for various policy violations and where CPD officers' conduct did not cause injury to any person involved. This documentation addressed the requirements of ¶517 and its subparagraphs. At the end of the seventh reporting

period, COPA remained under assessment for Full compliance as the Parties continued to have conversations concerning the evidence sufficient for Full compliance.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶517. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review. This production included 23 files of documentation and is still under review at this time. For further discussion of the BIA Onboard Training, see ¶526–27.

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶517.

*** 

The City and the CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings. COPA remains under assessment for Full compliance as the Parties continue to have conversations concerning the evidence sufficient for Full compliance.

## Paragraph 517 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶518

**518.** *CPD will provide the required notice regarding disciplinary matters to the Illinois Law Enforcement Training and Standards Board, including when an officer resigns while a misconduct investigation or disciplinary charges are pending.*

## Compliance Progress  (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶518 in the eighth reporting period but did not reach Secondary compliance.

To evaluate Preliminary compliance with ¶518, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, the IMT reviewed the CPD's training development, implementation, and evaluation (¶286).

*Progress before the Eighth Reporting Period*

In the fifth reporting period, the CPD finalized Special Order S08-01-04, *Post-Investigation Log Number Procedures*. Section VII, *Notification to the Illinois Law Enforcement Training Standards Board*, completely addressed the requirements of ¶518. With this, the CPD moved into Preliminary compliance. In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. At the time of our review, these materials were still in draft state and not in final presentation form. The draft training materials contained instruction relevant to ¶518. We reviewed and provided the CPD feedback on the materials. In the seventh reporting period, the CPD provided a further final version of S08-01-08, *Post-Investigation Log Number Procedures*, renumbered and renamed from S08-01-04. This policy addressed the requirements of ¶518.

Also in the seventh reporting period, the CPD produced multiple drafts of its five-day BIA Onboard Training on July 28, 2022, for review with numerous paragraphs, including ¶518. At the end of the seventh reporting period, this training was still under development.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶518. The IMT provided extensive feedback on these training materials on February 13,

2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶518. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶518. For further discussion of the BIA Onboard Training, see ¶526–27.

***

The CPD maintained Preliminary compliance with ¶518. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

### Paragraph 518 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶519

*519. The failure to complete an administrative investigation within the timeframes set forth in this Agreement will not invalidate, impair, or otherwise negatively impact CPD's ability to issue discipline for sustained findings.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The CPD maintained Preliminary compliance with ¶519 in the eighth reporting period.

To evaluate Preliminary compliance with ¶519, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, the IMT reviewed the CPD's training development, implementation, and evaluation (¶286).

*Progress before the Eighth Reporting Period*

In the fourth reporting period—the first reporting period that we assessed compliance with ¶519—the CPD did not produce evidence of efforts toward compliance with ¶519. However, in the fifth reporting period, the CPD provided a draft of S08-01-01, *Conducting Log Number Investigations*. We noted that this draft policy addressed the requirements of ¶519 verbatim. We provided feedback on this policy in September 2021. We did not receive a further revised draft of S08-01-01 thereafter. Because S08-01-01 remained in the collaborative review and revision process at the close of the fifth reporting period, the CPD did not reach Preliminary compliance with ¶519. In the sixth reporting period, the CPD renumbered the policy previously labeled S08-01-01 to S08-01-05. The CPD submitted multiple revised versions of S08-01-05, *Conducting Log Number Investigations*. Section V.D of this draft version of the policy addressed ¶519 verbatim. At the end of the sixth reporting period and during the seventh reporting period, the City and the CPD provided multiple revised versions of S08-01-05, *Conducting Log Number Investigations*, which addressed the requirements of ¶519. With this, the CPD reached Preliminary compliance.

Also in the seventh reporting period, the CPD produced multiple drafts of its five-day BIA Onboard Training for review with numerous paragraphs, including ¶519. At the end of the seventh reporting period, this training was still under development.

*Progress in the Eighth Reporting Period*

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022, for review with numerous paragraphs, including ¶519. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training, including ¶519. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review, not including ¶519. For further discussion of the BIA Onboard Training, see ¶526–27.

* * *

The CPD maintained Preliminary compliance with this paragraph in the eighth reporting period. Moving forward, we look forward to continuing our close collaboration with BIA as it works to develop and revise individual blocks of instruction for the BIA initial in-service, initial Onboard, and refresher trainings.

### Paragraph 519 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶521

**521.** *The City, CPD, and COPA will continue to build on these critical efforts by ensuring that BIA, COPA, the Police Board, and the Deputy PSIG have sufficient funding and an adequate number of qualified staff to fulfill their respective missions as required by law, each entity's policies, and this Agreement.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CITY** | *Under Assessment (SEVENTH REPORTING PERIOD)* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance (SEVENTH REPORTING PERIOD)* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

The CPD did not achieve Preliminary compliance with ¶521 in the eighth reporting period. COPA maintained Preliminary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶521 we reviewed various data sources to determine whether the City, the CPD, and COPA have reviewed and considered, as appropriate, staffing and needs assessments of BIA, COPA, the Police Board, and the Deputy PSIG to determine whether the entities have sufficient funding and staff to fulfill their obligations.

*Progress before the Eighth Reporting Period*

The IMT assessed compliance with ¶521 for the first time in the sixth reporting period. During site visits in June 2022, the IMT met with several groups of BIA Investigators and Accountability Sergeants to discuss their experiences. Through these conversations we learned about some of the realities on the ground and challenges Investigators and Accountability Sergeants face when performing their duties.

For example, ¶494(b) of the Consent Decree requires two Accountability Sergeants for each district and unit within CPD. However, we learned that the CPD consistently and uniformly does not adhere to this standard. We learned that most districts have allocated only one sergeant as the Accountability Sergeant, and the district or unit may or may not have designated a "backup sergeant" for case assignment when the primary Accountability Sergeant is away from duty. The backup Accountability Sergeant performs other assignments in the district and only has

cases assigned during the absence of the "Primary Accountability Sergeant." This creates a very high caseload for the one designated Accountability Sergeant.

Of additional concern, we learned that the primary Accountability Sergeants also fill other assignments, such as serving as the Administrative Sergeant for the district or the Unit, and therefore, are only able to conduct Administrative Investigations when other duties permit. We learned that the Accountability Sergeants are routinely assigned to cover patrol shifts due to shift supervisor's absences, which causes delays in investigations.

Further, we learned that Accountability Sergeants and BIA Investigators do not have the proper technology to allow them to fulfill their responsibilities. Accountability Sergeants share outdated desktop computers with other district personnel, which does not provide administrative investigative security or the ability to efficiently enter data and information into the Case Management System (CMS). We also learned that Accountability Sergeants do not have the proper locations to interview complainants, witness employees, or officers, which frequently requires them to schedule around office space that might become available.

The IMT explained in the sixth reporting period that we were greatly concerned that these factors, among others, are setting up Accountability Sergeants and BIA Investigators to violate the new directives that CPD would soon implement. It was also apparent that Accountability Sergeants and BIA Investigators had not been sufficiently informed of the upcoming Administrative Investigative directives and had not been consulted in policy development that directs their work. In conversations with Accountability Sergeants, many still referred to themselves as "CR Sergeants," which indicated that CPD leadership is not leading the cultural change necessary to reform the CPD.

We explained that, to comply with ¶521, it is imperative that the CPD honestly assess where it falls short in allotting necessary resources to ensure that Accountability Sergeants and BIA Investigators are properly equipped and supported to adequately perform their duties as required by the Consent Decree and the CPD's policies.

In the seventh reporting period, the CPD provided BIA's 2023 *Staffing and Equipment Needs Assessment Implementation Plan* (the "Plan") for review with ¶521–24. We provided comments on December 28, 2022, noting that the Plan was comprehensive and demonstrates notable improvements over versions from previous years. We noted that we particularly appreciated the CPD and BIA's detailed breakdown of equipment needs. Still, we expressed several concerns and also provided several recommendations, particularly related to staffing. For example, we encouraged the BIA to consider having non-sworn personnel fill needs such as those identified in the Plan's sections related to the BIA Accountability Sergeants Team and the BIA Consent Decree Compliance to allow sworn members to fill investigative

positions. We also inquired about the staffing requirement to maintain paper and digital files, and expressed the following strong concerns related to the Plan's recommendations regarding staffing for Accountability Sergeants.

As written, the Plan suggested that Accountability Sergeants are not expected to be full-time investigators and that "[s]taffing for accountability sergeants can be fluid" due to factors such as "temporary staffing shortages that require sergeants to perform multiple functions . . . ."

But ¶494(b) does not provide that Accountability Sergeants merely serve in this role on a part-time basis. Rather, ¶494(b) describes Accountability Sergeants' "*primary responsibility*" as "receiving, processing, and investigating complaints against CPD members." *See* ¶494(b) (emphasis added). Given the Accountability Sergeants' significant caseload and resulting challenges in completing cases in a timely manner per the timeline requirements set out by CPD policy, the IMT explained that it does not believe it is realistic to expect that this role can be adequately performed on a part-time basis, and the IMT recommended that the CPD consider Accountability Sergeants for other assignments only when their caseload of assigned investigations is current. Otherwise, the Accountability Sergeants would not be able to complete the investigations in a timely manner.

We also recommended including information in the Plan regarding the number of Accountability Sergeants that are not considered full-time, the number of cases that are open, and the number of open cases that are past the timelines stated in CPD policy. We encouraged the CPD and BIA to provide data that takes into consideration the caseload and duties and responsibilities of Accountability Sergeants to fully assess staffing needs and recommended including additional information in the Plan regarding the primary responsibility of Accountability Sergeants to complete investigations per the timeline requirements set out by CPD policy to fully assess staffing needs related to this responsibility.

COPA did not provide any materials related to ¶521 in the sixth reporting period. In the seventh reporting period, the City and COPA produced COPA's *Staffing and Equipment Plan*. The Plan was comprehensive and provided a thoughtful assessment of the staffing, equipment, and space needs COPA requires to fulfill its mission and responsibilities. The Plan provided details regarding COPA's 2022 staffing and organizational update, which COPA believes will provide additional focus on its investigative responsibilities and will provide more leadership and supervision. The Plan also forecasted COPA's operational space needs for when COPA is fully staffed. COPA indicated that it has already reached out to other City stakeholders to make them aware of COPA's future space needs. Finally, COPA provided an updated organizational chart with the Plan. The City places a high degree of responsibility on COPA for its investigations of cases involving CPD members, and the IMT

urged the City to fund COPA's personnel and associated equipment needs in the next budget cycle. With these efforts, COPA reached Preliminary compliance.

The Police Board, in a letter to the IMT dated April 14, 2022, indicated that the Police Board had adequate physical, equipment, and personnel resources to adequately perform its assigned duties. The IMT did not receive any documentation from the City regarding the Police Board in the seventh reporting period.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the City, the CPD, COPA, and the Police Board did not produce any documentation that demonstrated efforts related to ¶521. We expect to review the City entities' needs assessments, which are typically produced on an annual basis, for 2024 in the next reporting period.

***

The City did not achieve Preliminary compliance with ¶521 in the eighth reporting period, but COPA maintained Preliminary compliance. We look forward to reviewing City documents relevant to ¶521 in the next reporting period. We will also look for evidence demonstrating that the City is fulfilling the requirements of this paragraph.

### Paragraph 521 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶522

*522.* *Within 365 days of the Effective Date, COPA, the Deputy PSIG, and BIA will create separate staffing and equipment-needs plans. Such plans will include analyses setting forth the basis for the plans' staffing requirements and equipment needs assessments. CPD will implement the staffing and equipment-needs plans in accordance with the specified timeline for implementation.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[66] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |

In the eighth reporting period, the Deputy PSIG and COPA maintained Full compliance with ¶522. The CPD maintained Preliminary compliance with ¶522 but did not reach Secondary compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶522 we reviewed various data sources—including any plans developed under ¶522—to determine whether COPA, the Deputy PSIG, and BIA each created separate staffing and equipment needs plans. To assess Secondary compliance, we reviewed the produced plans to determine whether the plans were complete and sufficiently addressed the needs identified by the needs assessments. For Full compliance, we looked for evidence that COPA,

---

[66] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

the Deputy PSIG, and BIA communicated their needs plans to the appropriate entities. We also looked at whether the CPD implemented the staffing and equipment needs plans provided by BIA.

*Progress before the Eighth Reporting Period*

Paragraph 522 sets out a one-time obligation requiring the entities to submit sufficient staffing and equipment-needs plans. In past reporting periods, we reviewed the Deputy PSIG's *Staffing and Equipment Needs Assessment* and *OIG Budget Request FY2021*. We also reviewed COPA's *Staffing and Equipment Needs Plan* for 2020 and 2021. With these efforts, we found that COPA and the Deputy PSIG reached Full compliance. Given the one-time nature of this paragraph, these entities have since remained in Full compliance.

In the third reporting period, the CPD provided the *Staffing and Equipment Needs Plan Annual Assessment*, but it contained little detail regarding specific personnel and equipment needs. As a result, BIA did not reach Preliminary compliance. In the fifth reporting period, the CPD BIA provided its *Staffing and Equipment Needs Assessment and Implementation Plan for Fiscal Year 2022*. In developing this plan, BIA took into account feedback we provided to its plan for the previous year. We noted that BIA's 2022 plan was much improved because it included conclusions for staffing, technology, and equipment needs to allow BIA to adequately complete its responsibilities. We noted our belief that these requests would be bolstered by BIA's inclusion of additional data to support its requests. We encouraged BIA to consider what additional tasks non-sworn personnel can take on to allow sworn personnel to handle the investigative responsibilities for BIA. With this, the CPD and BIA reached Preliminary compliance with ¶522 in the fifth reporting period, but we encouraged BIA to build upon this plan in the future by including more data to support its requests. *See* ¶522 ("Such plans will include analyses setting forth the basis for the plans' staffing requirements and equipment needs assessments."). The CPD did not produce materials relevant to ¶522 in the sixth reporting period.

In the seventh reporting period, the CPD provided the BIA's 2023 *Staffing and Equipment Needs Assessment Implementation Plan* (the "Plan") for review with ¶521–24. We provided comments on December 28, 2022, noting that the Plan was comprehensive and demonstrates notable improvements over versions from previous years. We noted that we particularly appreciated the CPD and BIA's detailed breakdown of equipment needs. Still, we expressed several concerns and also provided several recommendations, particularly related to staffing. For example, we encouraged the BIA to consider having non-sworn personnel fill needs such as those identified in the Plan's sections related to the BIA Accountability Sergeants Team and the BIA Consent Decree Compliance to allow sworn members to fill investigative positions. We also inquired about the staffing requirement to maintain

paper and digital files, and expressed the following strong concerns related to the Plan's recommendations regarding staffing for Accountability Sergeants.

As written, the Plan suggested that accountability sergeants are not expected to be full-time investigators and that "[s]taffing for accountability sergeants can be fluid" due to factors such as "temporary staffing shortages that require sergeants to perform multiple functions . . . ."

But ¶494(b) does not provide that Accountability Sergeants merely serve in this role on a part-time basis. Rather, ¶494(b) describes Accountability Sergeants' "*primary responsibility*" as "receiving, processing, and investigating complaints against CPD members." *See* ¶494(b) (emphasis added). Given the Accountability Sergeants' significant caseload and resulting challenges in completing cases in a timely manner per the timeline requirements set out by CPD policy, the IMT explained that it does not believe it is realistic to expect that this role can be adequately performed on a part-time basis, and the IMT recommended that the CPD consider Accountability Sergeants for other assignments only when their caseload of assigned investigations is current. Otherwise, the Accountability Sergeants would not be able to complete the investigations in a timely manner.

We also recommended including information in the Plan regarding the number of Accountability Sergeants that are not considered full-time, the number of cases that are open, and the number of open cases that are past the timelines stated in CPD policy. We encouraged the CPD and BIA to provide data that takes into consideration the caseload and duties and responsibilities of Accountability Sergeants to fully assess staffing needs and recommended including additional information in the Plan regarding the primary responsibility of Accountability Sergeants to complete investigations per the timeline requirements set out by CPD policy to fully assess staffing needs related to this responsibility.

While COPA and the Deputy PSIG previously fully complied with ¶522 in the fifth reporting period, we highlighted their continued, relevant efforts. COPA provided its *2021-22 Staffing and Equipment Needs Plan*. We noted that COPA's plan followed a consistent format from previous years' plans which allows a reader to easily understand the report and compare changes in staffing levels from year to year. In addition to informing the reader about changes in positions, the plan also provides explanations for changes. This plan demonstrates that COPA has a detailed understanding of its operational needs. Additionally, the Deputy PSIG provided an update to its Staffing and Needs Assessment. Given the one-time nature of this paragraph, COPA and PSIG maintained Full compliance with ¶522 in past reporting periods. Nonetheless, in the seventh reporting period, the City and COPA produced COPA's *Staffing and Equipment Plan*. The Plan was comprehensive and provided a thoughtful assessment of the staffing, equipment, and space needs COPA

requires to fulfill its mission and responsibilities. The Plan provided details regarding COPA's 2022 staffing and organizational update, which COPA believes will provide additional focus on its investigative responsibilities and will provide more leadership and supervision. The Plan also forecasted COPA's operational space needs for when COPA is fully staffed. COPA indicated that it has already reached out to other City stakeholders to make them aware of COPA's future space needs. Finally, COPA provided an updated organizational chart with the Plan. The City places a high degree of responsibility on COPA for its investigations of cases involving CPD members, and the IMT urged the City to fund COPA's personnel and associated equipment needs in the next budget cycle.

*Progress in the Eighth Reporting Period*

This reporting period, the City did not produce any documentation that demonstrated efforts related to ¶522. As in past years, the IMT expects that the City will produce staffing and equipment needs plans for its relevant entities on an annual basis, typically during the second half of the calendar year. We look forward to reviewing those staffing and equipment needs plans early in the next reporting period.

\*\*\*

The Deputy PSIG and COPA maintained Full compliance with ¶522. The CPD maintained Preliminary compliance with ¶522 but did not reach Secondary compliance. We expect to receive an assessment that includes data-informed requests in the next reporting period.

### Paragraph 522 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶523

*523. On an annual basis, COPA, the Deputy PSIG, and BIA will review and revise, if needed, each entity's respective staffing and equipment-needs plans.*

## Compliance Progress

(Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Recurring Schedule:** | Annually ☑ **Not Yet Applicable** |
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD)[67] |
| **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (FOURTH REPORTING PERIOD) |

In the eighth reporting period, the City and the CPD maintained Preliminary compliance with ¶523. COPA and the Deputy PSIG maintained Full compliance with ¶523. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶523 we reviewed various data sources—including any plans developed under ¶523—to determine whether COPA, the Deputy PSIG, and BIA each created separate staffing and equipment needs assessments. To assess Secondary compliance, we reviewed the produced plans to determine whether the plans were complete and sufficiently addressed the needs identified by thorough needs assessments. For Full compliance, we looked for ev-

---

[67] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

idence that COPA, the Deputy PSIG, and BIA have developed processes for assessing their staffing and equipment needs on an annual basis, and after assessing needs, that they communicate those needs to the appropriate entity.

*Progress before the Eighth Reporting Period*

In past reporting periods, as required by ¶522, COPA, the Deputy PSIG, and the CPD submitted staffing and equipment-needs plans.

The Deputy PSIG not only provided a report but showed a recurring effort to revise its assessments and plans, allowing it to reach Full compliance in the fourth reporting period. The Deputy PSIG provided an update to its Staffing and Needs assessment, allowing the Deputy PSIG to maintain Full Compliance in the fifth reporting period. The Deputy PSIG, in the seventh reporting period, provided a memorandum detailing its 2023 City budget request and needs assessment. This documentation also provided information on how the Deputy PSIG's 2022 budget request and needs assessment were addressed by the City budget process. PSIG continues to provide detailed information, often with more detail than the Consent Decree requires. With this, PSIG maintained Full compliance.

In the fifth reporting period, COPA provided its *2021-22 Staffing and Equipment Needs Plan*. This plan demonstrated that COPA had a detailed understanding of its operational needs and has mechanisms in place to assess those needs on an annual basis. With this, COPA reached Full compliance. In the seventh reporting period, the City and COPA produced COPA's *Staffing and Equipment Plan*. The Plan was comprehensive and provided a thoughtful assessment of the staffing, equipment, and space needs COPA requires to fulfill its mission and responsibilities. The Plan provided details regarding COPA's 2022 staffing and organizational update, which COPA believes will provide additional focus on its investigative responsibilities and will provide more leadership and supervision. The Plan also forecasted COPA's operational space needs for when COPA is fully staffed. COPA indicated that it has already reached out to other City stakeholders to make them aware of COPA's future space needs. Finally, COPA provided an updated organizational chart with the Plan. The City places a high degree of responsibility on COPA for its investigations of cases involving CPD members, and the IMT urged the City to fund COPA's personnel and associated equipment needs in the next budget cycle. COPA maintained Full compliance in the seventh reporting period.

For the CPD, the fifth reporting period marked the first year it provided a staffing and equipment needs plan sufficient to reach Preliminary compliance. The CPD BIA provided its *Staffing and Equipment Needs Assessment and Implementation Plan for Fiscal Year 2022*. In developing this plan, BIA took into account feedback we provided to its plan for the previous year. We noted in the fifth reporting period that BIA's 2022 plan was much improved. It included conclusions for staffing, tech-

nology, and equipment needs to allow BIA to adequately complete its responsibilities. With this, BIA reached Preliminary compliance. We explained in the fifth reporting period that, to reach additional levels of compliance, BIA must have mechanisms in place to complete a review of its assessment and plan and make revisions as needed on an annual basis and must use feedback received on its plan to bolster future assessments and plans with data.

In the seventh reporting period, the CPD provided the BIA's 2023 *Staffing and Equipment Needs Assessment Implementation Plan* (the "Plan") for review with ¶521–24. We provided comments on December 28, 2022, noting that the Plan was comprehensive and demonstrates notable improvements over versions from previous years. We particularly appreciated the CPD and BIA's detailed breakdown of equipment needs. Still, we expressed several concerns and also provided several recommendations, particularly related to staffing. For example, we encouraged the BIA to consider having non-sworn personnel fill needs such as those identified in the Plan's sections related to the BIA Accountability Sergeants Team and the BIA Consent Decree Compliance to allow sworn members to fill investigative positions. We also inquired about the staffing requirement to maintain paper and digital files, and expressed the following strong concerns related to the Plan's recommendations regarding staffing for Accountability Sergeants.

As written, the Plan suggested that accountability sergeants are not expected to be full-time investigators and that "[s]taffing for accountability sergeants can be fluid" due to factors such as "temporary staffing shortages that require sergeants to perform multiple functions . . . ."

But ¶494(b) does not provide that Accountability Sergeants merely serve in this role on a part-time basis. Rather, ¶494(b) describes Accountability Sergeants' "*primary responsibility*" as "receiving, processing, and investigating complaints against CPD members." *See* ¶494(b) (emphasis added). Given the Accountability Sergeants' significant caseload and resulting challenges in completing cases in a timely manner per the timeline requirements set out by CPD policy, the IMT explained that it does not believe it is realistic to expect that this role can be adequately performed on a part-time basis, and the IMT recommended that the CPD consider Accountability Sergeants for other assignments only when their caseload of assigned investigations is current. Otherwise, the Accountability Sergeants would not be able to complete the investigations in a timely manner.

We also recommended including information in the Plan regarding the number of Accountability Sergeants that are not considered full-time, the number of cases that are open, and the number of open cases that are past the timelines stated in CPD policy. We encouraged the CPD and the BIA to provide data that takes into consideration the caseload and duties and responsibilities of Accountability Ser-

geants to fully assess staffing needs and recommended including additional information in the Plan regarding the primary responsibility of Accountability Sergeants to complete investigations per the timeline requirements set out by CPD policy to fully assess staffing needs related to this responsibility.

*Progress in the Eighth Reporting Period*

This reporting period, the City did not produce any documentation that demonstrated efforts related to ¶523. As in past years, the IMT expects that the City will produce staffing and equipment needs plans for its relevant entities on an annual basis, typically during the second half of the calendar year. We look forward to reviewing those staffing and equipment needs plans early in the next reporting period.

\*\*\*

In the eighth reporting period, the City and the CPD maintained Preliminary compliance with ¶523. COPA and the Deputy PSIG maintained Full compliance with ¶523.

In the coming reporting periods, we will look for COPA to provide evidence that it has reviewed and revised its staffing and equipment needs to demonstrate maintained compliance. For the City and the CPD to reach additional levels of compliance, we will need to see that BIA has mechanisms in place to complete a review of its assessment and to plan and make revisions as needed on an annual basis.

### Paragraph 523 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶524

> **524.** *BIA's staffing and equipment-needs plans will include the investigation staffing and equipment needs of the districts.*

**Compliance Progress**                    (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained compliance with ¶524 in the eighth reporting period but did not reach additional levels of compliance.

To evaluate Preliminary compliance with ¶524 we reviewed BIA's staffing and equipment-needs plan to determine whether it includes investigation staffing and equipment needs of the districts. To evaluate Secondary compliance, we assessed whether the plan sections addressing investigation staffing and equipment needs of the districts were complete and sufficient.

*Progress before the Eighth Reporting Period*

We assessed BIA's compliance with ¶524 for the first time in the fourth reporting period. The City and the CPD did not reach compliance at that time because BIA's *Staffing and Equipment Needs Plan Annual Assessment* (submitted in the third reporting period) did not include specific details about investigation staffing and equipment needs of the districts as required by the paragraph. In the fifth reporting period, BIA provided its *Staffing and Equipment Needs Assessment and Implementation Plan for Fiscal Year 2022*. This plan includes information relating to staffing and equipment needs for District and Unit Accountability Sergeants. With this, BIA reached Preliminary compliance.

However, in discussing the needs related to District and Unit Accountability Sergeants, the plan asserts that the two Accountability Sergeants are not "both expected to be full-time investigators." *See Staffing and Equipment Needs Assessment and Implementation Plan for Fiscal Year 2022* at 9. This is in conflict with the requirements of ¶494(b), which requires that "each District Commander designates at least two Accountability Sergeants who will report to the District Commander, and whose **primary responsibility** is receiving, processing, and investigating complaints against CPD members." (Emphasis added). We noted that this assertion is concerning given that, during site visits in the fifth reporting period, we learned that Accountability Sergeants are required to fill supervisory responsibilities that often prevent them from completing their investigations in a timely manner.

Because the *Staffing and Equipment Needs Assessment and Implementation Plan for Fiscal Year 2022* incorporated a misunderstanding of the requirements of ¶494(b) and did not seem to account for the difficulties experienced by the Accountability Sergeants, we noted that the plan did not yet sufficiently include investigation staffing and equipment needs of the districts.

The City and the CPD maintained compliance with ¶524 in the sixth reporting period but did not reach additional levels of compliance. Because the needs assessment plans are typically completed annually, the CPD did not submit materials related to ¶524 in the sixth reporting period, but we explained that we would expect materials to be submitted in the seventh reporting period. We also noted in the sixth reporting period that we would look forward to ongoing discussions regarding the designation of Accountability Sergeants in the districts and reviewing a plan that better addressed the requirements of the Consent Decree and the Districts' Accountability Sergeants.

In the seventh reporting period, the CPD provided the BIA's 2023 *Staffing and Equipment Needs Assessment Implementation Plan* (the "Plan") for review with ¶521–24. We provided comments on December 28, 2022, noting that the Plan was comprehensive and demonstrates notable improvements over versions from previous years. We particularly appreciated the CPD and BIA's detailed breakdown of equipment needs. Still, we expressed several concerns and also provided several recommendations, particularly related to staffing. For example, we encouraged the BIA to consider having non-sworn personnel fill needs such as those identified in the Plan's sections related to the BIA Accountability Sergeants Team and the BIA Consent Decree Compliance to allow sworn members to fill investigative positions. We also inquired about the staffing requirement to maintain paper and digital files, and expressed the following strong concerns related to the Plan's recommendations regarding staffing for Accountability Sergeants.

As written, the Plan suggested that accountability sergeants are not expected to be full-time investigators and that "[s]taffing for accountability sergeants can be fluid" due to factors such as "temporary staffing shortages that require sergeants to perform multiple functions . . . ."

But ¶494(b) does not provide that Accountability Sergeants merely serve in this role on a part-time basis. Rather, ¶494(b) describes Accountability Sergeants' "*primary responsibility*" as "receiving, processing, and investigating complaints against CPD members." *See* ¶494(b) (emphasis added). Given the Accountability Sergeants' significant caseload and resulting challenges in completing cases in a timely manner per the timeline requirements set out by CPD policy, the IMT explained that it does not believe it is realistic to expect that this role can be adequately performed on a part-time basis, and the IMT recommended that the CPD consider Accountability Sergeants for other assignments only when their caseload

of assigned investigations is current. Otherwise, the Accountability Sergeants would not be able to complete the investigations in a timely manner.

We also recommended including information in the Plan regarding the number of Accountability Sergeants that are not considered full-time, the number of cases that are open, and the number of open cases that are past the timelines stated in CPD policy. We encouraged the CPD and the BIA to provide data that takes into consideration the caseload and duties and responsibilities of Accountability Sergeants to fully assess staffing needs and recommended including additional information in the Plan regarding the primary responsibility of Accountability Sergeants to complete investigations per the timeline requirements set out by CPD policy to fully assess staffing needs related to this responsibility. Because the *Staffing and Equipment Needs Assessment Implementation Plan for Fiscal Year 2023* incorporated a misunderstanding of the requirements of ¶494(b) and did not seem to account for the difficulties experienced by the Accountability Sergeants, the Plan did not sufficiently include investigation staffing and equipment needs of the districts. With this, the CPD maintained Preliminary compliance with ¶524 in the seventh reporting period but did not reach Secondary compliance.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶524. As in past years, the IMT expects that the CPD will produce BIA's staffing and equipment needs plan on an annual basis, typically during the second half of the calendar year. We look forward to reviewing that staffing and equipment needs plan early in the next reporting period.

*** 

The City and the CPD maintained Preliminary compliance with ¶524 in the eighth reporting period but did not reach additional levels of compliance. We look forward to ongoing discussions regarding the designation of Accountability Sergeants in the districts and reviewing a plan that better addresses the requirements of the Consent Decree and the districts' Accountability Sergeants.

## Paragraph 524 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD |
|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary |

# Accountability and Transparency: ¶525

> **525.** *Within 60 days of the Effective Date, the City will propose a permanent method of selecting the Chief Administrator of COPA. In creating the permanent selection method for COPA's Chief Administrator, the City will consider the views and recommendations of community stakeholders.*

## Compliance Progress (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City maintained Preliminary compliance but did not reach Secondary compliance with ¶525 in the eighth reporting period.

To evaluate Preliminary compliance with ¶525, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance with ¶525, we considered a variety of data sources including documentation detailing the screening and hiring process that was used to fill the COPA Chief Administrator vacancy to determine whether the set method for selecting the Chief Administrator of COPA is understandable to those involved in the selection process.

### Progress before the Eighth Reporting Period

The City reached Preliminary compliance with ¶525 in the second reporting period based on its February 28, 2020, *Selection Method for Chief Administrator of COPA* memorandum. At that time, the City had informed us of its negotiations related to a proposed ordinance that would include a permanent process for selecting the COPA Chief Administrator. We reiterated that the City should ensure that opinions and recommendations of community stakeholders be incorporated into future changes of the temporary selection method. In the fourth reporting period, we noted that there was a vacancy for the COPA Chief Administrator, and we reiterated our understanding that the City would follow the *Selection Method* memorandum.

On December 9, 2021, the City submitted Chief Selection Materials related to the recent appointment of a new COPA Chief Administrator, including but not limited to community engagement materials, the COPA Chief Administrator Job Description, and selection committee materials. Upon review of the Selection Materials, we asked the City if it had a followed a more detailed process than what was outlined in the February 2020 memorandum. The City informed the IMT that a Standard Operating Procedure had been created. We received this Standard Operating

Procedure, *COPA Chief Administrator Selection Process*, on December 30, 2021. This Standard Operating Procedure raised some concerns, including questions as to whether this Standard Operating Procedure was created prior to the selection process for a COPA Chief Administrator occurred or after the appointment.

Having a clear appointment process is important for purposes of transparency and accountability. We noted that we would like to see improved clarity surrounding the appointment process in the future. The City recognized that the Standard Operating Procedure submitted December 9, 2021, is only a temporary solution, stating "[t]he City has recently codified a permanent selection method for selection of the Chief Administrator of COPA via City Council." We expressed our expectation that a more permanent selection process will be created and submitted to us for review as ¶525 calls for a *permanent* method for selecting the Chief Administrator of COPA.

Because the City did not have a more permanent selection method in place, it did not reach additional levels of compliance with ¶525 in the fifth reporting period. The City did not submit materials related to ¶525 in the sixth or seventh reporting periods.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the City produced an undated draft of the Community Commission for Public Safety and Accountability (CCPSA) COPA Chief Administrator Selection Procedures (the "Procedures"). The Procedures could benefit from additional detail and clarification, including regarding the role of community engagement in the selection process. For example, we recommend that community engagement surrounding the selection of a COPA Chief Administrator occur prior to that selection being made, and we recommend including details in the Procedure regarding who will conduct the community engagement (the CCPSA or a search firm) and the precise timing of any community engagement in the process. We also suggest that the City consider developing an anonymous survey process for CPD Members to include in the Procedures. That survey should be conducted anonymously and permit each CPD Member to respond no more than one time. Any such survey, if conducted legitimately and reliably, would increase CPD and community trust in the selection process.

\*\*\*

The City maintained Preliminary compliance with ¶525 in the eighth reporting period. In the next reporting period, we look forward to reviewing a revised version of the CCSPA Procedure.

## Paragraph 525 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶526

> ***526.*** *Within 180 days of being assigned to BIA or being hired by COPA, all new BIA personnel and COPA employees will receive initial on-boarding training that is adequate in quality, quantity, scope, and type. Within 120 days of the Effective Date, COPA and BIA will verify that all existing personnel received training that is consistent with this Agreement.*

## Compliance Progress        (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[68] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |

The City and the CPD did not reach Preliminary compliance with ¶526 in the eighth reporting period. COPA maintained Full compliance. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶526, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[69] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we reviewed various data sources to determine whether the entities have appropriate training and systems in place to ensure all new personnel

---

[68] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[69] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

and employees receive adequate on-boarding training within 180 days of assignment.

*Progress before the Eighth Reporting Period*

In earlier reporting periods, the CPD provided drafts of BIA's *Training* Unit Directive. Sections of this Unit Directive speak to the requirements of ¶526, but this Unit Directive remained in the collaborative review and revision process at the end of the fourth reporting period. In the fourth reporting period, we reviewed BIA's draft of its onboarding training materials. We provided feedback but did not receive revised materials by the end of the reporting period. Therefore, the CPD did not reach Preliminary compliance.

In the fifth reporting period, BIA did not provide any additional drafts of its *Training* Unit Directive or its onboarding training materials that had been provided in earlier reporting periods and to which we provided feedback. Instead, the CPD focused on revising Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. This Directive copied verbatim the requirements set out in ¶526. But as we discussed with CPD during the fifth reporting period, we noted that mere recitation of the requirements stated in ¶526 is not sufficient to reach Preliminary compliance. Instead, we explained that the CPD must show that it has a detailed, written plan for actually providing the training required by the paragraph. Because the CPD did not provide us evidence of a plan to develop and complete training in accordance with ¶526, the CPD did not reach Preliminary compliance in the fifth reporting period. The CPD did not submit materials related to ¶526 in the sixth reporting period.

In the seventh reporting period, the CPD produced a draft of its five-day BIA Onboard Training on July 28, 2022, for review with numerous paragraphs. The CPD and BIA began developing this training to address the Consent Decree requirements for training new BIA investigators and Accountability Sergeants in best practices for satisfactory administrative investigations. While the CPD produced these training materials for review under ¶528, not ¶526, the IMT assessed these materials under both of these paragraphs, because ¶526 sets out the requirement that "all new BIA personnel will receive initial on-boarding training that is adequate in quality, quantity, scope, and type," whereas ¶528 outlines the instructional content that the training must include. *See* ¶¶526 and 528. The IMT provided extensive feedback on these training materials and explained that the training still required a significant amount of revision to provide effective, consistent, and up-to-date instruction and to address the designated Consent Decree paragraphs. The CPD produced a revised version of the BIA Onboard Training on December 1, 2022, and this training was still in development at the end of the reporting period.

COPA met Preliminary compliance in the third reporting period by revising and ultimately receiving a no-objection notice on its Training Plan, which fully addressed

the requirements of ¶526.[70] In the fourth reporting period, COPA provided for re-view training academy attendance records for *New Hire Onboarding Orientations*, which showed that all 15 trainees attended and completed 29.5 hours of on-boarding training. This training included Implicit Bias, Procedural Justice training, and a variety of other topics. With this, COPA reached Secondary compliance.

COPA, in the fifth reporting period, provided records that tracked the provision and completion of training to and by COPA employees. We noted that this tracker showed that COPA was providing training in accordance with the *Training and Pro-fessional Development Department Training Plan*, which COPA provided in the third reporting period. These efforts demonstrated that the COPA has the neces-sary systems in place to meet the requirements of ¶526 and follow its own training plan. With this, COPA reached Full compliance with ¶526.

COPA did not submit materials related to ¶526 in the sixth reporting period; how-ever, we attended a training and were provided verbal updates regarding COPA's continued training efforts. With this, COPA maintained Full compliance in the sixth reporting period. COPA, in the seventh reporting period, provided training rosters for its *COPA Academy* and new-hire and in-service training which verify that COPA is providing consistent training that meets the requirements of the Consent De-cree. COPA has a training policy and comprehensive lesson plans that demonstrate best practices. COPA uses subject matter experts to develop and present the les-son plan material to ensure that COPA employees are completely trained. COPA provided documentation of in-service training demonstrating that more than 95% of its employees received at least eight hours of in-service training. With these efforts, COPA maintained Full compliance.

*Progress in the Eighth Reporting Period*

This reporting period, COPA did not produce any documentation that demon-strated efforts related to ¶526.

---

[70] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to re-solve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

The CPD continued to focus its efforts on its BIA Onboard Training. Throughout the reporting period, the IMT worked closely and collaboratively with BIA to review and provide comments on the BIA Onboard Training.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. The IMT raised concerns about the format of BIA's training. Specifically, BIA planned to offer one all-encompassing training, with relevant training topics woven throughout the multi-day training rather than offered in discrete blocks of instruction. The IMT's concerns about the format of the training also implicate ¶526 directly, which requires the initial on-boarding training to be "adequate in quality, quantity, scope, and type." We suggested that the training might be more effective if provided in subject-specific blocks of instruction, which would also provide the CPD with the opportunity of seeking and gaining compliance with various paragraphs on a rolling basis as it drafted and provided the training, rather than linking compliance with many Consent Decree paragraphs together such that the CPD could not obtain compliance until the entire BIA Onboard training was drafted, approved, and provided to new BIA personnel. Further, subject-specific blocks of instruction might also be used to satisfy the requirements of ¶527, which concerns in-service training, and ¶528, which sets forth subject-specific requirements for the onboarding and in-service trainings referenced in ¶526-27.

After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review. This production included 23 files of documentation and is still under review at this time.

Ultimately, the CPD has not yet drafted an initial on-boarding training that complies with ¶526. We anticipate continued close collaboration with the CPD and the OAG in the next reporting period on the initial on-boarding training.

\*\*\*

The City and the CPD did not reach Preliminary compliance with ¶526 in the eighth reporting period. COPA maintained Full compliance. In the coming reporting periods, we will look for the CPD to further develop its training materials. For COPA, we will look for evidence of continued Full compliance with ¶526's mandates. To maintain Full compliance, we expect to receive compliance materials in each future reporting period.

### Paragraph 526 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶527

> *527. Within 180 days of the Effective Date, COPA and BIA will begin providing all investigation staff members with at least eight hours of annual, comprehensive, in-service training.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[71] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |

The City made efforts toward but did not reach Preliminary compliance in the eighth reporting period. COPA maintained Full compliance.

To evaluate Preliminary compliance with ¶527, the IMT reviewed the CPD's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[72] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we reviewed various data sources to determine whether the entities have systems in place to ensure that staff members are provided with eight hours of comprehensive, in-service training on an annual basis.

---

[71]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[72]   The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

BIA did not reach Preliminary compliance with ¶527 in past reporting periods, though we reviewed numerous materials produced under this paragraph, including BIA's in-service training plan, BIA's *Training* Unit Directive, and BIA's annual training plan. In the fifth reporting period, BIA did not provide any additional drafts of its *Training* Unit Directive or revised training plans. Instead, the CPD focused on revising Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*. This Directive copied verbatim the requirements set out in ¶527. But as we discussed with CPD during the fifth reporting period, mere recitation of the requirements stated in ¶527 is not sufficient to reach Preliminary compliance. Instead, the CPD must show that it has a detailed, written plan for actually providing the training required by the paragraph. The CPD did not submit materials related to ¶527 in the sixth or seventh reporting periods, and therefore did not reach Preliminary compliance with ¶527. Late in the seventh reporting period, the CPD provided a *BIA Training Plan* for 2023 late in the seventh reporting period, but this *Training Plan* did not sufficiently address the requirements of ¶527.

COPA reached Preliminary compliance with ¶527 in the third reporting period by drafting and revising a comprehensive *Training Plan*. In the fifth reporting period, COPA provided records demonstrating that 99% of its personnel completed its 2021 In-Service Training which included instruction blocks on procedural justice, implicit bias, witness reliability, and intake. COPA provided all of these training materials to the IMT prior to delivering these trainings, and we ultimately provided no-objection notices to each. We commended COPA on developing comprehensive and professional trainings and for keeping such detailed and clear records, which not only allow COPA to demonstrate compliance but keep track of personnel training histories for its own records. With this, COPA reached Full compliance with ¶527.

COPA did not submit materials related to ¶527 in the sixth reporting period; however, we attended a training and were provided verbal updates regarding COPA's continued training efforts. COPA thus maintained Full compliance with ¶527. In the seventh reporting period, COPA provided training rosters for its *COPA Academy* and new-hire and in-service training, which verify that COPA is providing consistent training that meets the requirements of the Consent Decree. COPA also provided documentation of in-service training demonstrating that more than 95% of its employees received at least eight hours of in-service training. With these efforts, COPA maintained Full compliance.

*Progress in the Eighth Reporting Period*

This reporting period, COPA did not produce any documentation that demonstrated efforts related to ¶527.

The CPD continued to focus its efforts on its BIA Onboard Training. Throughout the reporting period, the IMT worked closely and collaboratively with BIA to review and provide comments on the BIA Onboard Training. While that training and those efforts primarily relate to ¶526, they also impact and are closely related to ¶527.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. The IMT raised concerns about the format of BIA's training. Specifically, BIA planned to offer one all-encompassing training, with relevant training topics woven throughout the multi-day training rather than offered in discrete blocks of instruction. The IMT's concerns about the format of the training also implicate ¶526 directly, which requires the initial on-boarding training to be "adequate in quality, quantity, scope, and type." We suggested that the training might be more effective if provided in subject-specific blocks of instruction, which would also provide the CPD with the opportunity of seeking and gaining compliance with various paragraphs on a rolling basis as it drafted and provided the training, rather than linking compliance with many Consent Decree paragraphs together such that the CPD could not obtain compliance until the entire BIA Onboard training was drafted, approved, and provided to new BIA personnel. Further, subject-specific blocks of instruction might also be used to satisfy the requirements of ¶527, which concerns in-service training, and ¶528, which sets forth subject-specific requirements for the onboarding and in-service trainings referenced in ¶526-27.

After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the OAG, the City, and the CPD engaged in numerous discussions about the most effective format of the training. After these discussions, the City and the CPD decided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review. This production included 23 files of documentation and is still under review at this time. Once finalized, it is possible that those modules of instruction would be applicable to ¶527's requirements as well as the requirements of ¶526.

Ultimately, the CPD has not yet drafted in-service training that complies with ¶527. We anticipate continued close collaboration with the CPD and the OAG in the next reporting period on the in-service training.

\*\*\*

The City did not reach any level of compliance in the eighth reporting period. COPA maintained Full compliance in the eighth reporting period. Moving forward, we will look for the CPD to further developing a plan that details how the CPD will comply with ¶527's training requirements. For COPA, we will look for COPA to continue to provide evidence that is it fully complying with ¶527's requirements.

### Paragraph 527 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶528

***528.*** *The initial and annual in-service training for COPA and BIA investigators will include instruction in: a. how to properly handle complaint intake, and the consequences for failing to take complaints; b. best practices in procedural justice, including techniques for communicating with complainants and members of the public; c. the collection of objective verifiable evidence; d. the process for seeking an override affidavit in the absence of a signed complainant affidavit; e. for COPA investigators, techniques for conducting impartial investigations of domestic violence and sexual misconduct; f. for BIA investigators, techniques for conducting impartial investigations of sexual misconduct; g. investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management; h. the challenges of law enforcement administrative investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation; i. properly weighing the credibility of witnesses against CPD members; j. using objective evidence to identify and resolve inconsistent statements; k. implicit bias; l. the proper application of the relevant standards of proof; m. relevant COPA and CPD rules, policies, and protocols including the requirements of this Agreement; n. relevant state and federal law; o. relevant CPD Rules of Conduct, including Rules 14, 21, and 22; p. the CMS; q. the applicable collective bargaining agreements; and r. how to access and use the PRS or information available on the PRS.*

## Compliance Progress     (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[73] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *Not in Compliance* |
| **Full:** | | *Not Yet Assessed* |

[73] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

The CPD did not reach Preliminary compliance with ¶528 in the eighth reporting period. COPA maintained Preliminary compliance with ¶528. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶528, the IMT reviewed the CPD's and COPA's relevant policies and training plans following the process described in the Consent Decree (¶¶626–41).[74] To evaluate Secondary compliance, we reviewed the entities' training development to determine whether COPA and BIA have sufficient initial and annual in-service training curriculum that meets the requirements of ¶528 and that they have trained at least 95% of employees necessary to achieve compliance. To evaluate Full compliance, we reviewed relevant training materials and consulted various data sources to determine whether COPA and BIA provided the training required by ¶528.

*Progress before the Eighth Reporting Period*

BIA did not reach Preliminary compliance with ¶528 in past reporting periods, though we reviewed numerous materials produced under this paragraph. We reviewed BIA's *Training* Unit Directive, BIA's *Accountability Sergeants* Unit Directive, BIA's *BIA Investigators* Unit Directive, and a variety of training materials that relate to the training requirements listed in ¶528. We urged BIA to address comments and suggestions that the IMT and the OAG provided BIA on the blocks of instructions submitted to further refine the trainings.

BIA did not provide revised training materials for any of its Unit Directives previously submitted under this paragraph in the fifth reporting period, nor did BIA post any of its Unit Directives related to ¶528 for public comment. Instead, during the fifth reporting period, the CPD focused on revising Special Order S08-01, *Complaint and Disciplinary Investigators and Investigations*, which spoke to ¶528. But as we discussed with CPD during the fifth reporting period, mere recitation of the requirements stated in ¶528 is not sufficient to reach Preliminary compliance. Instead, the CPD must show that it has a detailed, written plan for actually providing the training required by the paragraph. The CPD did not submit materials related to ¶528 in the sixth reporting period, and therefore did not reach Preliminary compliance.

---

[74] The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

In the seventh reporting period, the CPD produced drafts of its five-day BIA Onboard Training for review with numerous paragraphs, including ¶528. At the end of the seventh reporting period, this training was still under development.

COPA reached Preliminary compliance by compiling and revising its *Training and Professional Department Training Plan*. This Training Plan is comprehensive, meeting and exceeding all requirements listed in ¶528. In the third reporting period, COPA produced and the IMT submitted a no objection notice to COPA's Collective Bargaining Agreement training materials (¶528(q)). In the fourth reporting period, COPA produced a variety of training lesson plans relevant to the requirements of ¶528. This included the training regarding witness reliability (¶528(i)), procedural justice (¶528(b)), implicit bias (¶528(k)), and the CPD Rules and Directives (¶528(o)).

In the fifth reporting period, COPA provided its materials for its *Intake* in-service training. We submitted a no-objection notice to this training.[75] We noted that this well-presented and comprehensive training covers the requirements of ¶528(a). Toward the end of the reporting period, COPA provided training attendance records showing that 99% of its personnel completed the trainings related to intake (¶528(a)), procedural justice (¶528(b)), implicit bias (¶528(k)), and witness reliability (¶528(j)). We noted that this demonstrated great progress toward additional levels of compliance with ¶528. But because COPA had not yet provided training materials covering all listed topics, COPA did not reach Secondary compliance.

In the sixth reporting period, COPA provided its *Forensic Experiential Trauma Interviews* (FETI) Training. This training addresses the In-Service Training for conducting impartial investigations of sexual misconduct as directed by ¶528(e); proper interview and interrogation techniques and objectively analyzing evidence and data and case management as directed by ¶528(g); and identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation as directed by ¶528(h). COPA also provided certification for the FETI training that is provided to its investigators responsible for investigating sexual misconduct and domestic violence cases involving CPD members. This cer-

---

[75] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

tification demonstrates that COPA has provided the required training for its investigative staff to meet the requirements of ¶528(e). The IMT requested to audit the FETI Training to determine compliance levels and noted that it hoped to have the opportunity to observe the FETI Training in the seventh reporting period.

COPA also provided its *Case Management System: Overview of Policy and Procedures* training materials in the sixth reporting period. These training materials include instruction in the Case Management System (CMS), per the requirement of ¶528(p), and provide that COPA employees will have access to the CMS and the CLEAR system to undertake their duties. The lesson plan is very comprehensive and explains not only that COPA investigators will have access to the CMS, but also the responsibility that comes with the CMS access. We noted that the lesson plan explains who will issue credentials and how the systems may be audited to ensure no misuse occurs and explains that misuse or improper use is strictly prohibited and may be subject to misconduct investigations that may include disciplinary action to include discharge. On January 12, 2022, the IMT observed the two-hour mandatory *In-Service Case Management System Training*. The lesson plan was presented as written, and the instructors appeared knowledgeable. The IMT provided suggestions regarding delivery of the instruction, which COPA took into consideration for future trainings.

In the seventh reporting period, COPA provided training materials for four trainings relevant to ¶528: *Major Case Incident Response Training*; *Officer Interviews Training*; *Complaint Register Training*; and *Final Summary Reports & Standards of Proof*. These trainings satisfied Consent Decree requirements, and the City and COPA submitted documentation demonstrating that over 95% of COPA staff had received the *Major Case Incident Response Training*, *Officer Interviews Training*, and *Final Summary Reports & Standards of Proof Training* (¶528(l)).

Also in the seventh reporting period, the IMT observed the FETI training certification program. As we noted in Independent Monitoring Report 6, this certification demonstrated that COPA has provided the required training for its investigative staff to meet the requirements of ¶528(e).

*Progress in the Eighth Reporting Period*

This reporting period, COPA provided the IMT with its *Sexual Misconduct and Domestic Violence* training materials. While these training materials were extensive and met the requirements of ¶528(e), COPA did not submit them for review with that subparagraph. Even so, this training, in addition to the FETI training previously provided to COPA personnel, demonstrates COPA's commitment to ensuring that its staff is appropriately training its personnel to conduct sexual misconduct and domestic violence investigations involving CPD personnel.

COPA also provided the IMT with its *Fourth Amendment* training materials, which satisfy the requirements of ¶528(n) by addressing federal and state law, as well as CPD policy, as related to the Fourth Amendment in the context of administrative investigations. This training uses scenarios that explain officer-involved encounters and specific aspects of stop, search, and seizure. With this training, COPA has drafted (and the IMT has approved) the necessary curricula to satisfy the requirements of ¶528.

Also in the eighth reporting period, the IMT virtually attended COPA's *Complaint Register* training on March 22, 2023. COPA's instructors were well prepared and provided a good presentation, following the lesson plan. The instructors engaged the class by asking questions or soliciting input on the training points.

This reporting period, BIA continued to focus its efforts for ¶528 on its BIA Onboard Training. Throughout the reporting period, the IMT worked closely and collaboratively with BIA to review and provide comments on the BIA Onboard Training.

Last reporting period, the CPD produced a draft of its five-day BIA Onboard Training on December 1, 2022. The IMT provided extensive feedback on these training materials on February 13, 2023, and explained that the training was an improvement from the previous version, but still required a significant amount of revision to provide adequate instruction and to address the designated Consent Decree paragraphs. Additionally, some of the lesson plans appeared to relate to Consent Decree paragraphs that the CPD and BIA did not designate for review.

In April 2023, the IMT conducted site visit meetings, one of which specifically discussed BIA's Onboard Training. The IMT raised concerns about the format of BIA's training. Specifically, BIA planned to offer one all-encompassing training, with relevant training topics woven throughout the multi-day training rather than offered in discrete blocks of instruction. We suggested that the training might be more effective if provided in subject-specific blocks of instruction, which would also provide the CPD with the opportunity of seeking and gaining compliance with various paragraphs on a rolling basis as it drafted and provided the training, rather than linking compliance with many Consent Decree paragraphs together such that the CPD could not obtain compliance until the entire BIA Onboard training was drafted, approved, and provided to new BIA personnel. Further, subject-specific blocks of instruction might also be used to satisfy the requirements of both ¶526 and 527, which concern initial onboarding and in-service training, alongside ¶528.

After extensive discussions about the format of the training (one all-encompassing training rather than individual blocks of instruction), the parties decided that BIA would move forward with producing individual blocks of instruction. However, on May 18, 2023, the CPD produced a revised version of its five-day BIA Onboard Training as one all-encompassing training. Throughout June 2023, the IMT, the

OAG, the City, and the CPD engaged in numerous discussions about the most ef-fective format of the training. After these discussions, the City and the CPD de-cided again to move forward with producing individual blocks of instruction. On June 29, 2023, at the end of the reporting period, the CPD produced 5 modules of instruction for review. This production included 23 files of documentation and is still under review at this time.

\*\*\*

The City and the CPD made efforts toward but did not reach Preliminary compli-ance with ¶528 in the eighth reporting period. COPA maintained Preliminary com-pliance and continued to make progress toward Secondary compliance. To reach further levels of compliance, the CPD will need to provide training materials that cover all listed topics in ¶528 and its subparagraphs and COPA will need to show that it has trained its personnel on those topics.

We continue to recognize that many of the training topics required by ¶528 are complex and require significant time and resources to ensure that BIA Investiga-tors, COPA Investigators, and Accountability Sergeants have a comprehensive un-derstanding of the material. These topics largely involve new processes, proce-dures, directives, and technology. Additionally, many of the topics will require the CPD and COPA to engage with subject matter experts to sufficiently develop and deliver the trainings. We are encouraged by the CPD and COPA's progress and look forward to reviewing further trainings related to all the topics outlined in ¶528 and its subparagraphs.

### Paragraph 528 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶529

*529. Within 180 days of the Effective Date, CPD will begin providing training to all CPD members on the terms of this Agreement and COPA's and CPD's revised or new policies related to administrative investigations and discipline. To the extent appropriate and necessary based upon a CPD member's duties, and contact with members of the public and/or individuals in custody, this training will include instruction on: a. identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in an investigation; b. use of the City's anonymous reporting website; c. for CPD supervisors: i. the proper initiation of the intake process, including providing COPA's contact information and the consequences for failing to initiate the intake process; and ii. techniques for turning the initiation of a complaint into a positive police-community member interaction.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not reach Preliminary compliance with ¶529 in the eighth reporting period.

To evaluate Preliminary compliance with ¶529, the IMT reviewed the CPD's relevant policies and other data sources to determine whether the CPD is committed to training members as required by ¶529.

*Progress before the Eighth Reporting Period*

The CPD did not reach Preliminary compliance in past reporting periods. We reviewed a variety of materials related to this paragraph, including meeting agendas of the BIA Education and Training Division demonstrating that discussion of items related to ¶529 occurred, various BIA training materials, and BIA's *Training* Unit Directive. At the end of the fourth reporting period, we noted that the *Training* Unit Directive did not meet the requirements of ¶529 because it did not commit the entire CPD to training its members per ¶529.

We did not receive any revised or new materials related to ¶529 in the fifth reporting period. At that time, we expressed our discouragement that the CPD had not yet reached any level of compliance with ¶529. We stated that, moving forward,

we hoped to see a policy or other training commitment and timeline that demonstrates that the CPD will provide training as outlined in ¶529.

In the sixth reporting period, the CPD submitted draft BIA eLearning materials for review. These materials were still in draft state and not in final presentation form. We noted that the draft training materials begin to address the requirements of ¶529 and its subparagraphs by providing department-wide training regarding administrative investigations and discipline. However, as previously noted, we explained that this training was still in draft form and will require further revision for the IMT to review. This training addresses multiple directives that are new to the CPD. The IMT noted that this training should not replace or supplant the requirement that every CPD employee read, sign, and understand the information in each of the directives. The IMT explained that it looked forward to learning more about this training and how it will provide critical information regarding administrative investigations and discipline to the entire department in a consistent manner.

In the seventh reporting period, the CPD provided further revised BIA eLearning materials, which addressed the requirements of ¶529(a) and (c) but did not fully address the requirements of ¶529(b), which requires the training to include instruction on "use of the City's anonymous reporting website." *See* ¶529(b). At the end of the seventh reporting period, the CPD provided evidence that more than 95% of sworn department members had taken and passed the BIA eLearning, but that 95% of sworn and civilian staff had not yet completed the BIA eLearning training.[76]

*Progress in the Eighth Reporting Period*

This reporting period, the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning. As we noted in prior monitoring reports, this training addresses the requirements of ¶529(a) and (c) but does not address ¶529(b). Therefore, the eLearning was not sufficient to meet Preliminary compliance with this paragraph. Additionally, the IMT has concerns about the number of civilians that completed the eLearning course. Although Secondary compliance requires the CPD to train at least 95% of all CPD members, only 49% of civilian CPD employees completed the eLearning course. ¶743 defines CPD members as any sworn or civilian employees of the CPD. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urge the CPD to take a more holistic approach to training a true representation of 95% of all CPD members.

\*\*\*

---

[76] To reach Secondary compliance, the CPD must demonstrate that it has provided this training to at least 95% of *all* of its personnel, not just its sworn personnel.

The City and the CPD did not achieve Preliminary compliance with ¶529 in the eighth reporting period. We look forward to reviewing the CPD's training materials regarding ¶529(c) in future reporting periods.

### Paragraph 529 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶530

*530. Within 90 days of the Effective Date, COPA and BIA will cre-ate separate initial and in-service training plans.*

**Compliance Progress**           (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[77] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |

The City did not meet Preliminary compliance with ¶530 in the eighth reporting period. COPA maintained Secondary compliance with ¶530. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶530, we reviewed various data sources to determine whether the CPD and COPA allocated sufficient resources to create separate initial and in-service training plans. To evaluate Secondary compliance, we reviewed the entities' plans, where available, to determine whether the plans are sufficient. To evaluate Full compliance, we reviewed various data sources including training materials and attendance records to determine whether COPA and the CPD implemented their training plans.

*Progress before the Eighth Reporting Period*

COPA reached Preliminary and Secondary compliance in the third reporting period by providing and revising its *Training and Professional Development Training Plan*. COPA's *Training and Professional Development Training Plan* is a three-year plan. Therefore, we were not able to assess in the fifth reporting period whether COPA had fully implemented its plan. COPA remained in Secondary compliance in the fifth reporting period because it continued to provide training in accordance with

---

[77] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

its plans. COPA did not submit materials related to ¶530 in the sixth or seventh reporting periods.

The CPD reached Preliminary compliance in the third reporting period. We reviewed BIA's *In-Service Training Plan*, and *Investigator and Accountability Sergeant On-Boarding Training Schedule* and Course Description. We found that BIA reached Preliminary compliance by creating initial and in-service training plans. It demonstrated the CPD allocated sufficient resources to create separate initial and in-service training plans. By the end of the fourth reporting period, we were awaiting revisions to the *BIA Investigators' and Accountability Sergeant's Annual Training Plan*.

BIA did not provide any materials under ¶530 in the fifth or sixth reporting periods. With this, we noted that the last draft plan BIA provided related to training was in late 2020. BIA did not finalize a plan to address the requirements of ¶530 or the other training paragraphs (*i.e.*, ¶¶526–29). Because of this, we found that the CPD was no longer in Preliminary compliance with this paragraph in the fifth reporting period.

In the seventh reporting period, the CPD provided the *BIA 2023 Training Plan* for review with ¶530. The IMT noted that the 2023 Training Plan is comprehensive but expressed concern that the eight hours allotted for training in the draft Training Plan was insufficient to meaningfully address all the topics covered in the annual in-service training. We suggested that the BIA consider providing in-service training on these topics on a rotating year basis, rather than attempting to cover all the topics in eight hours. The CPD provided a revised version of the *BIA Training Plan* that changed from a one-year to a two-year cycle, but that revised plan was not realistic in that, even with the change to a two-year cycle, it envisioned covering at least 12 hours of material in an 8-hour timespan. The IMT suggested that the CPD would be better served by adjusting the timelines and material to be more achievable.

*Progress in the Eighth Reporting Period*

This reporting period, the City, the CPD, and COPA did not produce any documentation that demonstrated efforts related to ¶530.

∗∗∗

With this, the CPD did not meet Preliminary compliance with ¶530, and COPA maintained Secondary compliance in the eighth reporting period.

In the next reporting period, for CPD, we will look forward to reviewing lesson plans and observing instruction relevant to this paragraph. For COPA, we look forward to reviewing training materials and attendance records.

## Paragraph 530 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
None

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
None

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
None

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
None

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

EIGHTH REPORTING PERIOD
JANUARY 1, 2023 – JUNE 30, 2023
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶531

*531. In order to function effectively, CPD's accountability system must protect the due process rights of involved CPD members. In order to build public trust and credibility, CPD must provide opportunities for meaningful community engagement that extends beyond the complaint process. The Police Board strives to play the important dual roles of protecting CPD members' due process rights and providing a platform for regular community feedback. The City will ensure that the Police Board has adequate resources, training, and institutional support to fulfill its important duties.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | *Under Assessment* (SIXTH REPORTING PERIOD) | |
| **CPD** | *Under Assessment* (SIXTH REPORTING PERIOD) | |
| **Police Board** | *In Compliance* (SIXTH REPORTING PERIOD) | |
| **Secondary:** | *Not in Compliance* | |
| **CPD** | *Under Assessment* (SIXTH REPORTING PERIOD) | |
| **Police Board** | *In Compliance* (SIXTH REPORTING PERIOD) | |
| **Full:** | *Under Assessment* (SIXTH REPORTING PERIOD) | |
| **CPD** | *Under Assessment* (SIXTH REPORTING PERIOD) | |
| **Police Board** | *Under Assessment* (NEW: LOST COMPLIANCE) | |

The CPD's compliance with this paragraph remains under assessment because further discussion is required between the City, the CPD, the Police Board, the Office of the Illinois Attorney General, and the IMT. Notably, the Police Board lost Full compliance with ¶531 and is under assessment in the eighth reporting period.

To evaluate Preliminary compliance with ¶531, the IMT reviewed the CPD's and Police Board's policies and written guidance following the policy process described in the Consent Decree (¶¶626–41). Specific to the Police Board, we considered whether the Police Board regularly assesses its needs. For the CPD we looked for policies aimed (1) at maintaining an accountability system that protects members' due process rights and builds community trust and (2) creating opportunities for meaningful community engagement beyond the complaint process.

To evaluate Secondary compliance with ¶531, the IMT looked at whether the CPD provided training regarding the policies related to ¶531, and we looked at whether the Police Board was making its needs known to the City, requesting resources necessary to ensure it can fulfill its dual roles. To evaluate Full compliance, we looked for evidence that the CPD has implemented its policy and training such that its accountability system operates to protect officers' due process rights and build public trust, including through opportunities for community members to provide

feedback. Related to the Police Board, we seek to determine whether the Police Board has developed a system to continually assess and identify needs to the City and ultimately determine whether the Police Board is serving the dual roles of protecting CPD members' due process rights and providing a platform for community feedback.

We reviewed evidence that the City has a plan to provide the Police Board adequate resources to fulfill its duties, as identified by the Police Board. To evaluate Full compliance with ¶531, the IMT evaluated whether the Police Board has developed a system to continually assess and identify needs so the City can ensure that adequate resources are provided.

*Progress before the Eighth Reporting Period*

The Police Board achieved Full compliance with ¶531 in the sixth reporting period. In the sixth reporting period, the Police Board completed needs assessments and, in a letter to the IMT dated April 14, 2022, indicated that it had adequate physical, equipment, and personnel resources to adequately perform its assigned duties. The letter also stated that the City provides training to Police Board employees on a variety of topics that support the Police Board's efforts to fulfill its duties. The Police Board further explained that it provides an in-depth assessment of the Police Board's resources and needs on an annual basis as part of the City's annual budget process to ensure that the Police Board has sufficient resources for each upcoming year. The Police Board explained that this needs assessment would be provided to the IMT in the seventh reporting period. In addition to confirming that the City is providing the needs that the Police Board identifies after thoughtful assessment, the Police Board also provided ample evidence that it is serving its dual roles.

The Police Board strives to protect CPD's members' due process rights. The Police Board has a hearing officer preside over disciplinary hearings and ensures that all hearings are videotaped in full. *See* ¶534 assessment. The Police Board has developed strong *Rules of Procedure*, which among other things, requires that Police Board members are required to watch the entire evidentiary hearing recording and are provided a complete record for the case before the Police Board can take any vote following a disciplinary hearing. *See* ¶535 assessment. The Police Board also ensures that the CPD member involved in a Police Board case has access to the CPD member's complete discovery file and has the opportunity to enter relevant evidence therefrom into the record. *See* ¶536 assessment.

The Police Board also plays an important function by creating a platform for regular community feedback. The Police Board regularly holds meetings open to the public. Community members are afforded the opportunity to provide feedback and raise concerns. *See* ¶537 assessment. Furthermore, the Police Board has a policy and procedure for collecting, documenting, and responding to community

feedback it receives. *See* ¶538 assessment. With all of this, the Police Board achieved Full compliance with ¶531. In the seventh reporting period, the Police Board maintained Full compliance in the seventh reporting period. The IMT noted that moving forward, it would expect to receive documentation demonstrating on-going efforts related to maintaining Full compliance with this paragraph in each reporting period.

The CPD remained under assessment in the sixth and seventh reporting periods. We explained that additional conversations with the Parties were necessary to ascertain the measurable requirements set out by this paragraph and how the CPD should begin to move toward compliance.

*Progress in the Eighth Reporting Period*

This reporting period, the City, the CPD, and the Police Board did not produce any documentation that demonstrated efforts related to ¶531.

\*\*\*

The CPD remains under assessment. The Police Board dropped from Full compliance with ¶531 to under assessment in the eighth reporting period. For the Police Board, as we noted last reporting period, to maintain Full compliance, we must receive documentation pertaining to the requirements of ¶531 each reporting period, even if it is a memorandum noting that there are no updates to efforts regarding ¶531. Until we receive this documentation, the Police Board will remain under assessment.

### Paragraph 531 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Under Assessment |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Under Assessment | Under Assessment | |

# Accountability and Transparency: ¶532

*532. Within 180 days of the Effective Date, the City will draft se-lection criteria for Police Board members with the objective of identifying individuals who possess sufficient experience, judg-ment, and impartiality to perform the duties of members of the Police Board. Selection criteria may include prior work in law or law enforcement, and service with Chicago-based community and non-profit organizations. The draft selection criteria will be published on the Police Board's website for a period of 30 days for public review and comment. Following the 30-day public re-view and comment period, the City will provide the draft criteria to OAG for review and comment. The final selection criteria will be published and maintained on the Police Board's website. The City will ensure that the selection criteria are the basis for future selection of Police Board members.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City maintained Preliminary compliance with ¶532 but did not reach Second-ary compliance.

To evaluate Preliminary compliance with ¶532, the IMT reviewed the City's policies following the policy process described in the Consent Decree (¶¶626–41). To eval-uate Secondary compliance, we reviewed various data sources and plans to deter-mine whether the City developed a process for properly applying the selection cri-teria should a vacancy on the Police Board occur.

*Progress before the Eighth Reporting Period*

In the second reporting period, the City reached Preliminary compliance with its *Police Board Member Selection Criteria*. The City provided an initial draft and made subsequent revisions after receiving feedback from the IMT and the OAG. After revisions were made, we determined that the *Police Board Member Selection Cri-teria* allowed the City to move into Preliminary compliance. We did not receive additional evidence of compliance in the third or fourth reporting periods.

In the fifth reporting period, the City submitted the Mayor's Office's *Policy Gov-erning Police Board Member Selection* ("Selection Process") and supporting Police Board Candidate Screen Questions ("Screen Questions"). We provided feedback on these materials on December 29, 2021. We detailed our concern that the

Selection Process did not provide much guidance to "ensure that the selection criteria are the basis for future selection of Police Board members." *See* ¶532. Because the Selection Process did not sufficiently ensure that "the selection criteria are the basis for future selection of Police Board members," the City did not reach Secondary compliance with ¶532 in the fifth reporting period.

The City did not submit any materials related to ¶532 in the sixth or seventh reporting periods.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the City provided the IMT with a draft of the Community Commission for Public Safety and Accountability's (CCPSA) *Police Board Member Selection Procedures*. These procedures detail a thorough, robust, and fair selection process for Police Board members in the event of a vacancy. The City also provided several supporting documents and questionnaires that the CCPSA will use during the selection process, including (1) *The Police Board Conflict of Interest Questionnaire*, (2) *The Police Board Application Eligibility Form*, (3) a screenshot of the website, (4) *Application Rounds 1 and 2 Questions*, (5) a *Candidate Questionnaire*, (6) a *Candidate Assessment Form Round 2*, and (7) proposed *Interview Questions*. In connection with the City's efforts to achieved Secondary compliance, we suggest that the CCPSA finalize the procedures, including by dating the procedures and having at least one current member of the CCPSA Board sign the procedures, because the procedures and accompanying documents are likely to survive the current CCPSA Board. We also encourage the CCPSA and the City to ensure that the procedures are updated in the future according to the most current City policies and community expectations.

Further, we understand that there are currently vacancies on the Police Board. After finalizing the CCPSA's procedures, the City may have an opportunity in future reporting periods to demonstrate Full compliance by selecting new Police Board members consistent with those procedures and providing documentation of that process.

***

With this, the City maintained Preliminary compliance with ¶532 but did not reach Secondary compliance. Moving forward, we will look for the City to finalize the CCPSA *Police Board Member Selection Procedures* to ensure that "the selection criteria are the basis for future selection of Police Board members" as required by ¶532.

## Paragraph 532 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
None

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Preliminary

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Preliminary

EIGHTH REPORTING PERIOD
JANUARY 1, 2023 – JUNE 30, 2023
COMPLIANCE PROGRESS:
Preliminary

# Accountability and Transparency: ¶533

> *533. Within 180 days of the Effective Date, the Police Board will submit selection criteria for Police Board hearing officers to the Monitor and OAG for review and comment. The criteria will be drafted to help identify individuals who possess sufficient competence, impartiality, and legal expertise to serve as hearing officers. The selection criteria will be published on the Police Board's website. The City and the Police Board will ensure that the selection criteria are the basis for future selection of Police Board hearing officers.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The Police Board maintained Full compliance with ¶533 during the eighth reporting period.

To evaluate Preliminary compliance with ¶533 we reviewed Police Board's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance with ¶533, we considered whether the *Police Board Hearing Officer Selection Criteria*—which enabled the City and Police Board to reach Preliminary compliance with ¶533—had been sufficiently disseminated and explained to ensure that the Police Board Hearing Officer Selection Criteria would be appropriately followed. For Full compliance, we looked for evidence that the City and the Police Board follow the selection criteria set forth to assess Full compliance with ¶533.

*Progress before the Eighth Reporting Period*

In the second reporting period, the Police Board reached Preliminary compliance by submitting *Police Board Hearing Office Selection Criteria*. In the fourth reporting period, the Police Board reached Secondary and Full compliance by demonstrating that the *Police Board Hearing Officer Selection Criteria* had been disseminated and followed in the Police Board's search for and hiring of a new Police Board Hearing Officer. Throughout the hiring process, the Police Board provided updates that demonstrated an awareness of the *Police Board Hearing Officer Selection Criteria* and a commitment to following that guidance. In the fifth reporting period, there were no Police Board Hearing Officer vacancies. We requested that, if a vacancy occurs in future reporting periods, the Police Board notify the IMT and provide the

same level of detail and transparency into its search and hiring process in order to maintain Full compliance.

In the sixth and seventh reporting periods, the Police Board submitted letters indicating that the Police Board continued to follow the process for Hearing Officer selection and reporting that the Police Board had no vacant hearing officer positions and did not conduct a hearing officer search during the sixth or seventh reporting periods.

*Progress in the Eighth Reporting Period*

This reporting period, the Police Board produced a memorandum dated June 7, 2023, that confirms that the Police Board did not have a Hearing Officer vacancy during the eighth reporting period. The Police Board therefore has not had the need to conduct a Hearing Officer search or engage in that hiring process during this monitoring period.

\*\*\*

The Police Board maintained Full compliance with ¶533 during the eighth reporting period.

### Paragraph 533 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶534

*534. In any disciplinary action requiring the vote of the Police Board, the City will ensure: a. a hearing officer will preside over the disciplinary proceedings; and b. disciplinary hearings will be videotaped in their entirety.*

## Compliance Progress

(Reporting Period: January 1, 2023, through June 30, 2023)

**Preliminary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Secondary:** *In Compliance* (FOURTH REPORTING PERIOD)
**Full:** *In Compliance* (FOURTH REPORTING PERIOD)
**Sustainment Period Ends** *June 30, 2023*

The City and the Police Board maintained Full compliance with ¶534 in the eighth reporting period.

To assess Preliminary compliance, we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's development, implementation, and evaluation of training. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training.

*Progress before the Eighth Reporting Period*

In the fourth reporting period, the Police Board reached Full compliance with ¶534 after providing several documents for review: (1) Section 2-8-030 of the Municipal Code of Chicago, which authorizes hearing officers to preside over Police Board disciplinary hearings and requires the hearing officers to conduct disciplinary hearings in accordance with the provisions of the Code and the Board's Rules of Procedure; (2) the Police Board's *Rules of Procedure*, which among other things, requires each disciplinary case to be assigned to a hearing officer and mandates that the hearing be video recorded in its entirety; and (3) links to video recorded disciplinary hearings for the three most recent cases decided by the Police Board.

These documents demonstrated that the Police Board not only has policies in place to instruct compliance with ¶534, but that the Police Board follows those policies and procedures, putting the mandates of ¶534 into action.

In the fifth reporting period, the Police board provided links to recorded hearings that occurred via Zoom. In the sixth and seventh reporting periods, the Police Board provided transcripts and videos of recorded hearings. These recordings confirmed that the Police Board continued to have a hearing officer presiding over disciplinary hearings and that the hearings were video recorded in their entirety.

*Progress in the Eighth Reporting Period*

This reporting period, the Police Board provided the IMT with a memorandum dated June 7, 2023, that included hyperlinks to cases in which the Police Board was involved. Police Board Hearing Officers presided over these cases, the hearings for which were videotaped in their entirety. The evidence provided in this memorandum address the requirements of ¶534, including ¶534(a) and (b).

\*\*\*

The Police Board maintained Full compliance with ¶534 during the eighth reporting period.

### Paragraph 534 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶535

*535. Prior to any vote by the Police Board following any disciplinary hearing, the City will ensure: a. all Police Board members are required to watch and certify that they have watched the videotape of the entire evidentiary hearing; b. all Police Board members are provided copies of the complete record, including demonstrative exhibits; c. hearing officers will prepare a written report that sets forth evidence presented at the hearing: (i) in support of the charges filed; (ii) in defense or mitigation; and (iii) in rebuttal, including evidence and aggravation, if any; the hearing officer's report will also include information relating to witness credibility; d. the Police Board may, at its discretion, ask a hearing officer to additionally prepare a written report and recommendation that sets forth findings of fact and conclusions of law, including any findings relating to witness credibility; e. the parties before the Police Board will have 14 days to review the hearing officer's report, and recommendation, and file any written objections; and f. all Police Board members will review de novo the hearing officer's report and any recommendation, and the parties' written objections to the same.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The City and the Police Board maintained Full compliance with ¶535 in the eighth reporting period.

To assess Preliminary compliance with ¶535, we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training.

*Progress before the Eighth Reporting Period*

The Police Board reached Full compliance with ¶535 in the fourth reporting period. In May 2021, the Police Board provided us with its *Rules of Procedure*. These rules addressed the requirements of ¶535's subsections (a) and (c)–(f). The Police

Board also provided a written transcript that included exhibits which demonstrated that Police Board members receive complete records for review before a Police Board vote, as required by subsection (b). These documents demonstrated that the Police Board not only had policies and procedures in place instructing compliance with ¶535's requirements, but that the Police Board follows those policies and procedures. With this, the Police Board reached Full compliance.

In the fifth, sixth, and seventh reporting periods, the Police Board provided Police Board hearing transcripts and related case materials that demonstrated that Police Board members continued to comply with ¶535's requirements. The Police Board's actions included but were not limited to watching video recordings of evidentiary hearings, receiving and reviewing complete records from the hearings, and receiving and reviewing the hearing officers' written reports—all prior to any Police Board vote. With this evidence, the Police Board maintained Full compliance with ¶535 in the fifth, sixth, and seventh reporting periods.

*Progress in the Eighth Reporting Period*

This reporting period, the Police Board provided the IMT with documentation showing that (1) the Police Board and its Hearing Officers continue to certify that they have watched video recordings of evidentiary hearings, (2) all copies of the complete record are provided to Police Board members, (3) Hearing Officers prepare a written report of evidence presented at hearings and may prepare supplemental reports, (4) parties are informed that they have 14 days to review the Hearing Officer's report and object in writing, and (5) Police Board members may review the Hearing Officer's report and any written objections. This evidence demonstrates continued compliance with ¶535.

\*\*\*

The Police Board maintained Full compliance with ¶535 in the eighth reporting period.

### Paragraph 534 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶536

*536. As part of the Police Board proceedings, the parties to the Police Board case (the Superintendent and the involved CPD member) will be given access to the CPD member's complete disciplinary file and will have the opportunity to move for entry into the record of proceedings any relevant aspect of the CPD member's disciplinary file, as permitted by law and any applicable collective bargaining agreements.*

## Compliance Progress   (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| Sustainment Period Ends | *June 30, 2023* |

The City and the Police Board maintained Full compliance with ¶536 in the eighth reporting period.

To assess Preliminary compliance, we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training.

*Progress before the Eighth Reporting Period*

The Police Board reached Full compliance with ¶536 in the fourth reporting period. In May 2021, the Police Board provided us with its *Rules of Procedures.* The *Rules of Procedures* ensure that parties in a Police Board case are provided access to the CPD member's disciplinary files and are able to move to enter relevant aspects of a CPD member's disciplinary file into the proceeding records.

In the fifth, sixth, and seventh reporting periods, the Police Board provided materials from police disciplinary cases filed with the Board that showed that Police Board members, the Superintendent, and the involved CPD member were given access to the CPD member's complete disciplinary file. This demonstrated that the Police Board continued to follow its procedures, acting in accordance with ¶536. With this evidence, the Police Board maintained Full compliance with ¶536 in the fifth, sixth, and seventh reporting periods.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the Police Board provided the IMT with documentation of three cases for which the complete disciplinary file was made available to the involved CPD member who was the subject of the administrative charges. With this evidence, the Police Board maintained Full compliance with ¶536.

*** 

The Police Board maintained Full compliance with ¶536 in the eighth reporting period.

### Paragraph 536 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶537

**537.** *All regular meetings convened by the Police Board that are open to the public will be attended by the CPD Superintendent or his or her designee; the Chief Administrator of COPA or his or her designee; the Deputy PSIG or his or her designee; and the Chief of BIA or his or her designee.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

Through the efforts of the Police Board, the CPD Superintendent, the COPA Chief Administrator, the Deputy PSIG, and the BIA Chief, the City maintained Full compliance with ¶537 in the eighth reporting period.

To assess Preliminary compliance, we reviewed the City's relevant policies and records to determine whether information is provided to all entities implicated by ¶537 so that they may attend Police Board public regular meetings. To evaluate Secondary compliance, we reviewed records to show that all entities had sufficient personnel and have allocated sufficient resources to allow compliance with ¶537's mandate. To evaluate Full compliance, we reviewed data sources to show that all necessary entities attended Police Board meetings that are open to the public as required by ¶537.

*Progress before the Eighth Reporting Period*

The City reached Full compliance with ¶537 in the fourth reporting period. At that time, the IMT attended public Police Board meetings virtually. Each meeting was attended by the CPD Superintendent or designee, the COPA Chief Administrator or designee, the Deputy PSIG or designee, and the BIA Chief. In fact, in very few meetings were the respective heads not personally in attendance. Based on this, the City reached Full compliance.

In the fourth reporting period, we acknowledged the PSIG for its additional efforts ensuring compliance. The Office of Inspector General *Public Safety Section Policies Manual* includes a policy that ensures attendance of the PSIG at the Police Board meetings.

In the fifth reporting period, the Police Board submitted attendance records from its public meetings that demonstrated that the individuals (or their designees) required to attend these meetings under ¶537 attended all public meetings. With this, the City maintained Full compliance.

In the sixth and seventh reporting periods, the Police Board again submitted attendance records and meeting minutes from its public meetings that demonstrated that the individuals (or their designees) required to attend these meetings under ¶537 attended all public meetings. With this, the City maintained Full compliance with ¶537 in the sixth and seventh reporting periods.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the City provided a memorandum demonstrating, through Police Board meeting minutes (which include information about meeting attendees and relevant documents), that the required individuals or their designees regularly attended this reporting period's Police Board meetings. With this, the City maintained Full compliance with ¶537.

***

The City maintained Full compliance with ¶537 in the eighth reporting period.

### Paragraph 537 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶538

***538.*** *Within 90 days of the Effective Date, the City will create a policy for collecting, documenting, classifying, tracking, and responding to community input received during the Police Board's regular community meetings. The policy will outline the methods for: (a) directing community input to the appropriate responding entity, agency, or office; and (b) documenting and making public, all responses to community input.*

**Compliance Progress** (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The City and the Police Board maintained Full compliance with ¶538 in the eighth reporting period.

To assess Preliminary compliance, we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training.

*Progress before the Eighth Reporting Period*

In previous reporting periods, we found the Police Board in Full compliance with ¶538. The Police Board's adopted *Policy Regarding the Attendance of and Participation by the Public at Board Meetings* (Participation Policy) and *Response Policy,* which work together to create a framework that addresses the requirements of ¶538. The *Participation Policy* governs requirements for speakers who require some immediate action on the part of the CPD, COPA, or the Police Board, and the *Response Policy* directs the expectations of response from the CPD, COPA, or the Police Board. In addition to attending meetings where we saw the CPD, COPA, and Police Board representatives assume responsibility for concerns or issues raised, we also reviewed materials showing responses or actions resulting from these meetings (which is normally posted on the Police Board's website in accordance with the Response Policy). With these efforts, the Police Board reached Full compliance.

The City maintained Full compliance with ¶538 in the fifth, sixth, and seventh reporting periods by providing a variety of materials, including but not limited to video and transcripts of Police Board meetings and community input reports. These reports tracked community input and responses from each agency. These records showed that complaints and issues raised during meetings are followed up on in accordance with ¶538 and the policies created by the Police Board related to ¶538's requirements. Complaints and issues identified during each meeting are assigned to one of the four agencies for action and follow-up, and each issue is documented and made public on the Police Board website.

*Progress in the Eighth Reporting Period*

This reporting period, the City provided the IMT with the Police Board's Community Input Policy and transcripts and videos of Police Board meetings. The City also provided the IMT with community input reports, which track community input and responses from each agency. During each Police Board meeting, the Police Board addresses the IMT's observations regarding any complaints and issues from the community input reports. Those complaints and issues are identified during each Police Board meetings and then are assigned to one of the four agencies for action and follow-up. Each issue is documented and made public on the Police Board website.

***

With this, the City maintained Full compliance with ¶538 in the eighth reporting period.

### Paragraph 538 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶539

*539. The Police Board will make best efforts to streamline discovery efforts in all pending proceedings.*

## Compliance Progress  (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The City and the Police Board maintained Full compliance with ¶539 in the eighth reporting period.

To assess Preliminary compliance, we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training using "best efforts" as defined by ¶729.

*Progress before the Eighth Reporting Period*

In the fourth reporting period, the Police Board reached Full compliance by producing to the IMT the *Police Board Rules of Procedure*. Section II.A of the Police Board Rules of Procedures addresses ¶539 and includes additional information to further explain the process.

In the fifth reporting period, the Police Board maintained Full compliance by providing materials from three Police Board Hearings that demonstrated a streamlined discovery process. In addition, the Police Board provided a letter summarizing its efforts to streamline the discovery process. The letter indicated that the process had been changed to allow the Complaint Register file to be produced at the time of the initial status hearing or within a few days after. This had resulted in the accused officer's attorney receiving discovery materials about 30 days sooner than they would have under the previous process. This change allowed the parties to prepare for and schedule the discipline hearing more quickly.

In the sixth reporting period, the Police Board maintained Full compliance by providing materials from two Police Board Hearings that demonstrated a streamlined discovery process. In addition, the Police Board provided a letter summarizing its efforts to streamline the discovery process, which reiterated its efforts taken during the fifth reporting period. In the seventh reporting period, the Police Board

provided documentation that continued to demonstrate a streamlined discovery process, and therefore, again maintained Full compliance with ¶539.

*Progress in the Eighth Reporting Period*

This reporting period, the Police Board provided documentation of three Police Board cases that evidences a streamlined discovery process in Police Board Cases.

\*\*\*

With this, the Police Board maintained Full compliance with ¶539 in the eighth reporting period.

### Paragraph 539 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶540

*540. Within 180 days of the Effective Date, Police Board members and hearing officers will receive initial and annual training that is adequate in quality, quantity, scope, and type and will cover, at minimum, the following topics: a. constitutional and other relevant law on police-community encounters, including law on the use of force and stops, searches, and arrests; b. police tactics; c. investigations of police conduct; d. impartial policing; e. policing individuals in crisis; f. CPD policies, procedures, and disciplinary rules; g. procedural justice; and h. community outreach.*

## Compliance Progress       (Reporting Period: January 1, 2023, through June 30, 2023)

**Recurring Schedule:**     Annually             ☑ Not Yet Applicable

**Preliminary:**     *In Compliance (FIFTH REPORTING PERIOD)*
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

The City and the Police Board maintained Preliminary compliance with ¶540 in the eighth reporting period.

To evaluate Preliminary compliance with ¶540, the IMT reviewed training materials to determine if trainings were developed to sufficiently address requirements listed in ¶540. To evaluate Secondary compliance, we reviewed, among other things, the Police Board's training development, implementation, and evaluation.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the Police Board worked with a local law firm that agreed to provide training development to the Police Board at no cost. We commended the Police Board's decision to seek outside assistance in developing appropriate training because the Police Board does not have staff to help develop and deliver training. The Police Board provided training regarding Police Boards in other major U.S. cities and the Consent Decree. We noted that neither of these trainings covered the requirements of ¶540, but we recognized that these trainings were valuable.

At the end of the fourth reporting period, the Police Board produced a "training agenda" that detailed the training the Police Board hoped to accomplish. We reviewed the Police Board's training agenda in the fifth reporting period. These proposed trainings outlined all substantive topics of training required by ¶540. With this, the Police Board reached Preliminary compliance in the fifth reporting period.

During the fifth reporting period, Police Board members and hearing officers attended a one-hour block of training regarding responding to calls with a mental health component. This training was presented by NAMI Chicago and related to the requirements set out in ¶540(e). The Police Board also submitted training materials for its training *Policing First Amendment Activity*. We submitted a no-objection notice to this training.[1] The Police Board also provided other trainings beyond those required by ¶540.

We explained in the fifth reporting period that to reach Secondary compliance the Police Board would need to provide training materials and ultimately provide trainings that touched on all listed training topics for ¶540.

During the sixth reporting period, Police Board members and hearing officers attended the training *Policing First Amendment Activity*, which speaks to subsection ¶540(a)—though it does not complete satisfy ¶540(a). The IMT observed this training and found the training to be excellent in terms of its material, its instruction, and its presentation. The training was presented by attorneys from a local law firm, with each attorney providing instruction in specific areas of expertise and was both engaging and effective. The training concluded with a question-and-answer session, and the instructors were able to answer questions and provide additional context. With this, the City and the Police Board maintained Preliminary compliance with ¶540 in the sixth reporting period.

In the seventh reporting period, the City and the Police Board provided the Police Board's *Fourth Amendment Training* for review, which was comprehensive, presented in a logical and clear manner, and incorporated scenarios designed to promote discussion and participant engagement. The training materials covered topics that address the requirements of ¶540(a) ("constitutional and other relevant law on police-community encounters, including law on the use of force and stops, searches, and arrests"), ¶540(b) ("police tactics"), ¶540(e) ("policing individuals in crisis"), and ¶540(f) ("CPD policies, procedures, and disciplinary rules"). The Police Board also provided documentation demonstrating that 100% of the current Police Board members and hearing officers attended the training in-person or as a virtual recording. We explained that, to reach Secondary compliance, the Police

---

[1]   Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

Board would need to develop and provide training materials (and ultimately provide trainings) that also incorporate the topics in ¶¶540(c), (d), (g), and (h).

*Progress in the Eighth Reporting Period*

This reporting period, the Police Board provided slide decks for a Community Policing training that would be delivered by CPD personnel. The slide deck appears to be comprehensive, but the IMT was not provided with an accompanying lesson plan to understand the instruction that would accompany the slides. Further, it is not clear why a civilian member of the CPD would provide the training to the Police Board rather than a sworn CPD officer or commander. Finally, the Police Board did not indicate which portion(s) of ¶540 it believed the training would cover.

The Police Board also provided the IMT with a letter explaining that the Police Board and its hearing officers had not received any training during this reporting period, but that the Police Board intends to train its members and hearing officers on the previously mentioned Community Policing training during the next reporting period.

\*\*\*

With this, the Police Board maintained Preliminary compliance. Moving forward, the IMT will look for the Police Board to provide training materials on the topics outlined in ¶540(c) ("investigations of police conduct"), ¶540(d) ("impartial policing"), ¶540(g) ("procedural justice"), and ¶540(h) ("community outreach").

### Paragraph 540 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶541

*541. The trainings [referenced in ¶540] will be provided by sources both inside and outside of CPD, as needed, to provide high quality training on investigative techniques, and CPD policies, procedures, and disciplinary rules.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and Police Board maintained Preliminary compliance with ¶541 in the eighth reporting period.

To evaluate Preliminary compliance with ¶541, the IMT reviewed the Police Board's policies following the policy process described in the Consent Decree (¶¶626–41). Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the Police Board worked with a local law firm that agreed to provide training development to the Police Board at no cost. We commended the Police Board's decision to seek outside assistance in developing appropriate training. The Police Board also provided training regarding Police Boards in other major U.S. cities and training regarding the Consent Decree. We noted that neither of these trainings covered the requirements of ¶540 and ¶541 but recognized that these trainings were valuable.

At the end of the fourth reporting period, the Police Board produced a training agenda that detailed the training the Police Board hoped to accomplish. In the fifth reporting period, the Police Board provided members and hearing officers a one-hour training regarding responding to calls with a mental health component. This training was presented by NAMI Chicago and addressed the requirements of ¶540(e). The Police Board also provided trainings beyond that required in ¶540 and ¶541, such as *Reflecting on the Holocaust: Defining Moments for Police*. Although this and other trainings are beyond those mentioned in ¶540 (and referenced in ¶541), the Police Board leadership believed that providing such blocks of instruction were essential for the work they perform and would provide greater meaning and context to the trainings required by ¶540 and ¶541. Additionally, the Police Board provided some trainings in accordance with its training agenda and

demonstrated its willingness and ability to seek out and engage appropriate individuals to provide its trainings. With this, the Police Board reached Preliminary compliance in the fifth reporting period.

During the sixth reporting period, Police Board members and hearing officers attended the training *Policing First Amendment Activity*. The IMT observed this training and found the training to be excellent in terms of its material, its instruction, and its presentation. The training was presented by attorneys from a local law firm, with each attorney providing instruction in specific areas of expertise and was both engaging and effective. The training concluded with a question-and-answer session, and the instructors were able to answer questions and provide additional context.

Although we noted that this training alone does not fulfill the requirements of ¶541, it further demonstrates the Police Board's commitment to methodically addressing the requirements of ¶540 while not burdening the Police Board and staff with a great number of training blocks. This high quality, meaningful training was developed and delivered at no cost to the City. With this, the City and Police Board maintained Preliminary compliance with ¶541 in the sixth reporting period.

In the seventh reporting period, the City and the Police Board provided the Police Board's *Fourth Amendment Training* for review, which was comprehensive, presented in a logical and clear manner, and incorporated scenarios designed to promote discussion and participant engagement. The Police Board indicated that attorneys who have specific knowledge of regarding Fourth Amendment procedures would deliver the training. The training materials addressed the requirements of ¶541. The Police Board also provided documentation demonstrating that 100% of the current Police Board members and hearing officers attended the training in-person or as a virtual recording. We noted that the partnership between the Police Board and attorneys from a local law firm demonstrated the City's ability to establish and foster relationships with organizations to provide trainings and share expertise, per ¶541's requirement that trainings "will be provided by sources both inside and outside of CPD, as needed, to provide high quality training on investigative techniques, and CPD policies, procedures and disciplinary rules."

*Progress in the Eighth Reporting Period*

This reporting period, the Police Board provided slide decks for a Community Policing training that would be delivered by CPD personnel. The slide deck appears to be comprehensive, but the IMT was not provided with an accompanying lesson plan to understand the instruction that would accompany the slides. Further, it is not clear why a civilian member of the CPD would provide the training to the Police Board rather than a sworn CPD officer or commander. Finally, ¶541 refers to ¶540, and the Police Board did not indicate which portion(s) of ¶540 it believed the Community Policing training would cover.

The Police Board also provided the IMT with a letter explaining that the Police Board and its hearing officers had not received any training during this reporting period, but that the Police Board intends to train its members and hearing officers on the previously mentioned Community Policing training during the next report-ing period.

*** 

With this, the City and Police Board maintained Preliminary compliance with ¶541 in the eighth reporting period. Moving forward we will look for the Police Board to provide training materials relating to the topics set out in ¶541.

### Paragraph 541 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶542

*542. Within 90 days of the Effective Date, the City will create a training policy for Police Board members and hearing officers.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City maintained Preliminary compliance with ¶542 in the eighth reporting period.

To evaluate Preliminary compliance with ¶542, the IMT reviewed the Police Board's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the Police Board worked with a local law firm that agreed to provide training development to the Police Board at no cost. We commended the Police Board's decision to seek outside assistance in developing appropriate training since the Police Board does not have staff to help develop and deliver training. The Police Board provided training regarding Police Boards in other major U.S. cities and the Consent Decree. At the end of the fourth reporting period, the Police Board produced a training agenda that detailed the training the Police Board hoped to accomplish.

During the fifth reporting period, we reviewed the training agenda the Police Board provided us at the end of the fourth reporting period. We provided feedback regarding the planned and contemplated training blocks. The Police Board provided an updated training agenda in December 2021. This updated draft captured the training blocks the Police Board provided during the fifth reporting period, such as the *Policing Individuals in Crisis*, presented by NAMI Chicago. It demonstrated the trainings the Police Board intended to provide next, *Consideration for Policing of First Amendment Activity*, and other trainings under the Police Board.

We noted in the fifth reporting period that the training blocks of instruction already provided to Police Board members and hearing officers demonstrated adherence to this training plan. With this detailed training agenda that the Police Board had adhered to, the Police Board reached Preliminary compliance in the fifth reporting period.

The Police Board did not provide additional materials related to ¶542 in the sixth reporting period but maintained Preliminary compliance by continuing to develop its training materials. We explained that, moving forward, we would look for the Police Board to continue to adhere to and update its training agenda. We also explained that, for Full compliance, the Police Board will need to provide evidence that it has created a system to ensure continued training will be provided in the years to come.

The Police Board did not provide additional materials related to ¶542 in the seventh reporting period but maintained Preliminary compliance by continuing to develop its training materials.

*Progress in the Eighth Reporting Period*

The Police Board provided the IMT with a letter explaining that the Police Board and its Hearing Officers had not received any training during this reporting period, but that the Police Board intends to train its members and hearing officers on Community Policing during the next reporting period. The Police Board maintained Preliminary compliance by continuing to develop its training materials.

***

With this, the City maintained Preliminary compliance with ¶542 in the eighth reporting period. Moving forward, we will look for the Police Board to continue to adhere to and update its training agenda. For Full compliance, the Police Board will need to provide evidence that it has created a system to ensure continued training will be provided in the years to come.

### Paragraph 542 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Under Assessment | Preliminary | Preliminary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 − DECEMBER 31, 2022 | JANUARY 1, 2023 − JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶543

> **543.** *With regard to the promulgation or adoption of CPD rules and regulations, the Police Board's authority will be limited to issuing policy recommendations in the manner set forth in this Agreement.*

**Compliance Progress**  (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *December 31, 2024* |

The City maintained Full compliance with ¶543 in the eighth reporting period.

The fifth reporting period marked the first time the IMT assessed compliance with ¶543. During that reporting period, the Police Board raised that this paragraph could inadvertently be in tension with the municipal code. By the end of the fifth reporting period, the Parties remained in discussions regarding the objectives and intentions of ¶543. Therefore, compliance with ¶543 remained under assessment prior the seventh reporting period.

To evaluate Preliminary compliance in the sixth reporting period, the IMT considered whether the Police Board's proposed rule changes conflicted with the Consent Decree. To evaluate Secondary compliance, the IMT reviewed the Police Board's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. To evaluate Full compliance, the IMT considered whether the City and the Office of the Attorney General (OAG) reached an agreement that solidifies the requirements of this paragraph for the life of the Consent Decree.

*Progress before the Eighth Reporting Period*

During the sixth reporting period, the City and the CPD provided a draft *Policy on Adopting Chicago Police Department Rules and Regulations* for review with ¶543. The IMT submitted a no-objection notice on May 10, 2022.[2] On June 2, 2022, the

---

[2]  Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD

City and Police Board provided a revised draft of the policy. We submitted a second no-objection notice on June 15, 2022, and noted that the policy addresses the Police Board's authority regarding policy issuance and recommendations, which is relevant to the requirements of ¶543 by creating guidelines and processes for policy recommendations. Still, we recognized that while we appreciated the goals, format, and instruction of the *Policy on Adopting Chicago Police Department Rules and Regulations*, ¶543 is potentially in tension with the Police Board's authority under the municipal code, which is the subject of the policy, and that the City of Chicago and Office of the Illinois Attorney General would continue to work through this issue. During subsequent discussions between the Parties, the City agreed to revise the *Policy on Adopting Chicago Police Department Rules and Regulations* to provide the OAG and the IMT an opportunity to review and approve proposed rule changes before implementation in order to ensure compliance with ¶543. With these efforts, the City achieved Preliminary and Secondary compliance with this paragraph.

We explained that, to achieve Full compliance, the IMT will look for the City and the OAG to reach an agreement that solidifies the requirements of this paragraph for the life of the Consent Decree. Because the Parties remained in discussions about what such an agreement might look like, Full compliance with ¶543 remained under assessment.

In the seventh reporting period, the City and the OAG reached an agreement solidifying the requirements of ¶543.[3] With this, the City reached Full compliance with ¶543.

*Progress in the Eighth Reporting Period*

This reporting period, the Police Board provided the IMT with a letter stating that it had not taken any action regarding the adoption of new or revised CPD Rules and Regulations during the current monitoring period.

***

With this update, the Police Board maintained Full compliance with ¶543.

---

posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[3]  *See Stipulation Regarding the Review and Comment Process For the Chicago Police Board's Adoption and Revision of Rules and Regulations for the Chicago Police Department*, *Illinois v. Chicago*, Case No. 1:17-cv-06260.

## Paragraph 543 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Under Assessment | Secondary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶544

> **544.** *The City, CPD, and COPA recognize the importance of transparency to improving CPD-community relations, and the City, CPD, and COPA have taken important steps to increase transparency about their operations, including how they conduct investigations into CPD member misconduct. The City, CPD, and COPA will continue to take steps to increase transparency, including the implementation of the requirements set forth below.*

**Compliance Progress**  (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *Not in Compliance* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (NEW) |

The City and CPD did not reach Preliminary compliance with ¶544 in the eighth reporting period. COPA achieved Full compliance this reporting period. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶544, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods.[4] For Secondary compliance, we reviewed various data sources, including Quarterly and Annual Reports to determine if those reports comply with the policies aimed at promoting transparency, and determined whether the entities are engaging with the community related to their policies and directives. For Full compliance we sought to determine whether the entities continued to prioritize and take steps toward increasing transparency, including but not limited to continuing efforts to timely produce reports, providing information to the community, and identifying on their own means to increase transparency.

---

[4]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

*Progress before the Eighth Reporting Period*

The CPD has not yet provided materials related to ¶544.

In the fifth reporting period, COPA revised and finalized its *Transparency Initiatives – Release of Video and Related Materials* policy. This policy requires COPA to make public the results of its investigations, and complete and post quarterly and annual reports that summarize data including information on complaint intake and investigation resolutions. In addition, COPA's *Quality Assurance* policy, which was finalized in the fourth reporting period, further strengthens COPA's Preliminary compliance with ¶544 by requiring that COPA receive comments from its public working group regarding policies, post policies for public comment, and publish quarterly and annual reports on aggregate investigative data. With these policies, COPA reached Preliminary compliance.

We explained in the sixth reporting period that, as discussed in more detail in the assessment of ¶550 in Independent Monitoring Report 6, COPA has consistently produced timely quarterly and annual reports that provide agency background information, agency goals, information on policies and training, and extensive data regarding intake of complaint, investigation processes and timelines and investigation outcomes. In addition, COPA has consistently used its community working group to review and refine draft polices. Once policies are drafted and revised, COPA has consistently posted policies for further public comment. We noted that these efforts demonstrated a commitment to transparency and moved COPA into Secondary compliance.

In the seventh reporting period, COPA continued to produce timely and accurate quarterly reports within fifteen days of the end of the first three quarters of 2022. These reports provided details required by the Consent Decree and COPA's administrative activities, community engagement efforts, and specific investigations. COPA's quarterly reports continued to improve each quarter and provide the reader with transparent information about its operations and investigations, per the requirements of ¶544. COPA's 2022 quarterly reports and 2021 Annual Report allowed COPA to maintain Secondary compliance with ¶544 in the seventh reporting period.

*Progress in the Eighth Reporting Period*

This reporting period, the CPD did not produce any documentation that demonstrated efforts related to ¶544.

COPA developed, produced, and implemented a "COPA People's Academy" training (the "Academy") for members of the community this reporting period. The first cohort of the Academy began in March 2023 and consisted of one class session per week for six weeks. Each session was several hours long and involved a variety

of topics, all addressing the scope of COPA's responsibilities and roles. The IMT audited one session of the Academy in April 2023. For that session, the presenters were COPA subject matter experts. The class was interactive and included questions and debate among class members, which allowed the COPA presenters to hear community perspectives that they may otherwise not have heard. COPA conducted pre- and post-class surveys of the class participants to learn from the inaugural class and improve future sessions. We were impressed with the Academy and anticipate that COPA will continue this valuable community interaction. COPA continues to engage the community in a transparent and forward-looking manner to ensure that the community's confidence in the COPA process grows.

***

The City and CPD did not reach Preliminary compliance with ¶544 in the eighth reporting period. Moving forward, we will look for the CPD to develop policies that instruct compliance with the goals set out in ¶544.

COPA achieved Full compliance with this paragraph in the eighth reporting period. For COPA we will look for evidence that it continues to prioritize transparency by timely providing information to the public, and self-assessing how it can further improve transparency with the public. We expect to receive evidence of continued compliance in each reporting period to maintain Full compliance.

## Paragraph 544 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶545

> **545.** *To the extent permissible by law, within 60 days of its implementation, each CPD policy and directive, including those created pursuant to this Agreement, will be posted online and otherwise made publicly available. Any exception will be limited to documents that must remain confidential to protect public safety, and as approved by the Superintendent.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD made efforts toward but did not reach Preliminary compliance with ¶545 in the eighth reporting period.

To evaluate Preliminary compliance with ¶545, the IMT reviewed the City's, the CPD's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods.[5]

*Progress before the Eighth Reporting Period*

The City and the CPD did not reach any level of compliance with ¶545 in previous reporting periods. In the fourth reporting period, the CPD provided General Order G01-03, *Department Directives Systems*, which the CPD contended supports compliance with ¶545. We noted that the CPD did not consistently solicit, receive, or incorporate public comment into its various types of policies across units. While G01-03 directs the CPD to make some policies publicly available, G01-03 does not currently require the CPD to make each CPD policy and directive—including those created pursuant to the Consent Decree—publicly available. At the end of the fourth reporting period, the collaborative review and revision process remained ongoing.

In the fifth reporting period, General Order G01-03, *Department Directives System*, remained in the collaborative review and revision process. We provided written comments to this policy and had extensive conversations with the CPD regarding

---

[5]    The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

the policy. We noted our expectation that, per ¶545, each policy and directive, including but not limited to General Orders, Special Orders, Unit Directives, Standard Operating Procedures, or any other document or direction developed pursuant to the Consent Decree would be posted online and made public. We further stated our expectation that the CPD will develop a policy or directive that identifies the different policy and directive categories and specifies how each will be posted for public review to foster ongoing understanding of CPD operations. Because the CPD did not finalize such a policy, it did not reach Preliminary compliance with ¶545 in the fifth reporting period.

In the sixth reporting period, we noted that the CPD had 96 separate department directives listed on its website in a section titled "Draft Policy – Review and Comment." We commended the CPD for placing its directives on its website for public review and comment in accordance with ¶545. We explained that General Order G01-03, *Department Directives System*, directed the publishing of the policies and directives pursuant to the requirements of ¶545. However, while reviewing G01-03, the IMT observed that the policy was outdated in many areas and requires revisions to ensure that it reflects current practices. For example, we noted that G01-03 contained a section on Unit-Level directives—which are no longer used by the CPD—and did not include definitions for several levels of directives. While we noted that G01-03 addressed ¶545 by directing the publication of CPD policies and directives, we strongly encouraged the CPD to revise G01-03 in the seventh reporting period to bring the policy up-to-date. Furthermore, as we stated in the fifth reporting period, we noted our expectation that the CPD will develop a policy or directive that identifies the different policy and directive categories and specifies how each will be posted for public review to foster ongoing understanding of CPD operations.

The City and the CPD did not reach Preliminary compliance with ¶545 in the sixth reporting period. We explained that we would look for the CPD to further revise and finalize G01-03, *Department Directives System*, to address the requirements of ¶545.

The City and the CPD did not submit any materials related to ¶545 in the seventh reporting period and did not provide a revised G01-03, *Department Directives System*, policy.

The CPD received no-objection notices from the IMT for several General Orders and Special Orders during the seventh reporting period. The CPD decided to publish these policies as suites of directives, rather than individual policies, and therefore posted them online for public comment late in the reporting period and some during the holiday season. We noted that the number of policies and timing of their public posting is not conducive to proper community engagement, and that we were concerned that this timeline and approach may have limited the public's

opportunity to adequately review and comment on the policies. The City and the CPD then did not provide the finalized versions of the suites of policies to the IMT until January 12, 2023, at which point the IMT observed that a few of the policies had been changed *after receiving no-objection notices* from the IMT and the Office of the Illinois Attorney General (OAG) and after posting the policy for public comment. While many of these changes were minor, a few were significant, and required the IMT to review each policy in depth and to compare the policies to the earlier "final" drafts that had received no-objection notices.

The City and the CPD have developed a practice over multiple reporting periods of providing materials at the very end of the reporting period, and sometimes even the last day of the reporting period. The IMT has previously expressed concerns about this approach, particularly when the City and the CPD produce large numbers of documents at the very end of the reporting period.

Ultimately, we explained that the CPD would reach Preliminary compliance with ¶545 when it begins to provide policies and procedures for public comment in a timely manner and in a way that allows for meaningful public review of its policies prior to their finalization.

*Progress in the Eighth Reporting Period*

This reporting period, the City and the CPD did not produce any documentation that demonstrated efforts related to ¶545.

∗∗∗

The City and the CPD did not reach Preliminary compliance with ¶545 in the eighth reporting period. In the next reporting period, we will look for the CPD to further revise and finalize G01-03, *Department Directives System*, to address the requirements of ¶545. Moving forward, we also expect that the City and the CPD will post policies and directives for public comment in a timely and meaningful manner.

### Paragraph 545 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 − AUGUST 31, 2019 | SEPTEMBER 1, 2019 − FEBRUARY 29, 2020 | MARCH 1, 2020 − DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 − JUNE 30, 2021 | JULY 1, 2021 − DECEMBER 31, 2021 | JANUARY 1, 2022 − JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 − DECEMBER 31, 2022 | JANUARY 1, 2023 − JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶546

*546. Within 180 days following the expiration of each calendar year of the term of this Agreement, the City will produce and publish an annual report describing CPD activity during the previous calendar year ("CPD Annual Report"). The purpose of the CPD Annual Report will be to inform the public of the City's law enforcement achievements and challenges, as well as new programs and steps taken to address challenges and build on successes. The CPD Annual Report will further provide information regarding the City's implementation and status of this Agreement. The CPD Annual Report will not include any specific information or data by law that may not be disclosed. Subject to applicable law, the CPD Annual Report will provide data and program updates analyzing: a. community engagement and problem-solving policing efforts, identifying successes, challenges, and recommendations for future improvement; b. stop, search, and arrest data and any analysis of that data that was undertaken; c. use-of-force data and associated analyses; d. CPD responses to requests for service from individuals in crisis; e. initiatives that CPD has implemented for officer assistance and support; f. recruitment efforts, challenges, and successes; and g. in-service and supplemental recruit training.*

## Compliance Progress     (Reporting Period: January 1, 2023, through June 30, 2023)

**Recurring Schedule:**     Annually          ☑ **Not Yet Applicable**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not reach Preliminary compliance with ¶546 during the eighth reporting period.

To evaluate Preliminary compliance with ¶546 we reviewed various data sources to determine whether the City developed the annual report within 180 days following the expiration of each calendar year, and whether the CPD has developed a policy regarding the compilation and publication of an Annual Report.

*Progress before the Eighth Reporting Period*

The City and the CPD did not meet Preliminary compliance with ¶546 in previous reporting periods.

In the third reporting period, we reviewed the 2019 CPD Annual Report. This report included information about CPD's organizational command but did not include information about some of the units that may be most interesting to the community, including the Force Review Unit, BIA, training, and the Crisis Intervention Team (CIT). The Annual Report extensively reported various crime statistics across 35 pages, but only dedicated one page to the work that the CPD does in and with the community, as required by this paragraph.

At the end of the fourth reporting period, we noted that the City had until August 30, 2021, to produce its annual report. In the fifth reporting period, the CPD provided its Annual report in September 2021. Therefore, it missed the timeline set out by the paragraph and did not reach Preliminary compliance with ¶546 in the fifth reporting period. Additionally, we noted that the 2020 report was less robust than the 2019 Annual report, which we found to lack detail required by ¶546. We noted our concern and hope in the fifth reporting period that the CPD would build on previous efforts to not only finalize and publish a timely report but develop a report that improves upon previous reports.

The CPD did not produce its Annual Report for 2021 by the end of the sixth reporting period. Additionally, the CPD made no reference to the Annual Report in its discussions with the IMT during the sixth reporting period. We noted that the CPD must develop a directive that requires publishing its Annual Report in a timely manner and in accordance with ¶546 and its subparagraphs. We explained that, moving forward, we would expect the CPD to develop a policy regarding the compilation and publication of an Annual Report and to finalize and publish a detailed and timely Annual Report.

In the seventh reporting period, the CPD produced its Annual Report for 2021 on September 1, 2022. The IMT provided detailed feedback, noting that while we commended the CPD for its efforts and achievements in the areas of Community Trust, Professional Development, Operational Excellence, and Public Safety, the CPD must also include a discussion of challenges and an analysis of significant use-of-force trends to meet the requirements of ¶546 and ¶547 in future reports. To meet the requirements of ¶546, the CPD must better inform the public of challenges and the CPD's strategies to address these challenges. Because the Annual Report for 2021 was produced outside the 180 days required by ¶546 ("Within 180 days following the expiration of each calendar year of the terms of this Agreement, the City will produce and publish an annual report describing CPD activity during the previous calendar year . . . ."), the CPD did not meet the requirements of this paragraph in the seventh reporting period.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the CPD produced its 2022 Annual Report and met the requirement of ¶546 that the Report be produced and published within 180

days following the expiration of the calendar year. The CPD's Report is comprehensive and formatted similarly to previous annual reports, but with updated information. The Report appears to focus more on community engagement than previous reports did, and it provides sufficient information regarding the CPD's community policing and problem-solving activities for 2022. The Report also includes several pages of data regarding stops, searches, and arrests, with charts, graphs, and breakdowns by race, sex, and nationality of community members involved in those stops, searches, or arrests. The CPD also includes some analysis for this data.

The *Report* addresses Use of Force and responses to individuals in crises, primarily using narrative rather than data breakdowns. It also includes information regarding Officer Wellness and recruitment of new officers. Finally, the *Report* provides a detailed description of the in-service training that the CPD provided during 2022. Overall, subparagraphs ¶546(a)-(g) are covered in the *Report*.

While we commend the CPD for producing its *2022 Annual Report* during the timeframe required by ¶546, Preliminary compliance for this paragraph will require the development and publication of a written policy that incorporates the requirements of ¶546.

* * *

The City and the CPD did not reach Preliminary compliance with ¶546 in the eighth reporting period. Moving forward, we expect the CPD to develop a policy regarding the compilation and publication of an annual report and for the CPD to continue to finalize and publish detailed and timely annual reports that addresses the requirements of ¶546, including the CPD's challenges and strategies to address these challenges.

Paragraph 546 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶547

**547.** *CPD will regularly analyze the information it collects regarding reportable uses of force to identify significant trends. CPD will include information about any such trends in the CPD Annual Report.*

## Compliance Progress (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Recurring Schedule:** | Annually | ☑ **Not Yet Applicable** |

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not reach Preliminary compliance with ¶547 during the eighth reporting period.

To assess Preliminary compliance with ¶547, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

*Progress before the Eighth Reporting Period*

The CPD did not reach Preliminary compliance with ¶547 in previous reporting periods. In the fifth reporting period, the CPD provided its Annual report in September 2021, but the 2020 Report lacked the data required by ¶547.

As noted in ¶546, the CPD did not produce its Annual Report for 2021 by the end of the sixth reporting period. Therefore, the City and the CPD did not reach Preliminary compliance with ¶547, as no information was provided regarding trends in reportable uses of force. Additionally, the CPD made no reference to the Annual Report in its discussions with the IMT during this reporting period. We noted that the CPD must develop a directive that requires publishing its Annual Report in a timely manner and in accordance with ¶¶546–47.

In the seventh reporting period, the CPD produced its Annual Report for 2021. The IMT provided detailed feedback, noting that while we commended the CPD for its efforts and achievements in the areas of Community Trust, Professional Development, Operational Excellence, and Public Safety, the CPD must also include a discussion of challenges and an analysis of significant use-of-force trends to meet the requirements of ¶546 and ¶547 in future reports. To meet the requirements of ¶547, the CPD must include in its report an analysis of significant use-of-force trends. While the Annual Report for 2021 included a significant amount of use-of-

force data, it did not analyze the data to identify significant trends per the require-ments of ¶547 ("CPD will regularly analyze the information it collects regarding reportable uses of force to identify significant trends . . . .").

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the CPD produced its 2022 Annual Report. As in previous years, the Report includes information about Use of Force, but that infor-mation is not as robust as information included in other categories, such as stops, searches, and arrests. Moreover, the Use of Force information lacks sufficient de-tail to provide the CPD and the community with an understanding of how and when uses of force occur and what approaches or trainings can be implemented to reduce force. We continue to encourage the CPD to reported Use of Force data and information to better understand the types and levels of force used, the types of calls in which CPD officers were involved, any patterns regarding the times of day or days of the week that uses of force are likely to occur, and any operational changes or revisions to policies or trainings that the CPD could make as a result of this information. The Report is an opportunity for the CPD to set forth trends for uses of force, including in geography, officer demographics, and citizen de-mographics to empower the CPD and the public to understand how to reduce uses of force. As written, the Report only partially meets the requirements of ¶547.

***

The City and the CPD did not reach Preliminary compliance with ¶547 in the eighth reporting period. Moving forward, we expect the CPD to develop a policy regarding the compilation and publication of an annual report that meets the requirements of ¶547 and to include additional detailed analyses in future annual reports as required by ¶547, including analyses of use-of-force data to identify significant trends.

### Paragraph 547 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

## Accountability and Transparency: ¶548

*548. Within 180 days following the expiration of each calendar year of the term of this Agreement, the City will produce and publish an annual report describing certain legal activity involving CPD during the previous calendar year ("CPD Annual Litigation Report"). The CPD Annual Litigation Report will not include any specific information or data that may not be disclosed pursuant to applicable law. Subject to applicable law, the CPD Annual Litigation Report will address: a. a list of civil lawsuits in which the plaintiff(s) seek(s) to hold the City responsible for the conduct of one or more current or former CPD members and information that either (i) the lawsuit was concluded by final order and all opportunities for appellate review were exhausted, or (ii) any judgment was satisfied during the prior calendar year. This list will include civil lawsuits handled by the City's Department of Law's ("DOL's") Federal Civil Rights Division, as well as lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle pursuit, only. b. for each case identified in (a) above, the following information will be provided in spreadsheet or open-data format: i. case name; ii. case number; iii. the date the trial court entered the final order; iv. a list of the parties at the time the final order was entered; v. the nature of the order (e.g., dismissal with prejudice, summary judgment for plaintiff(s)/defendant(s), judgment of not liable, judgment of liable); vi. the amount of the compensatory and punitive damages awarded (if applicable); and vii. the amount of attorney's fees and costs awarded (if applicable). c. a list of civil lawsuits in which the plaintiff(s) seek(s) to hold the City responsible for the conduct of one or more current or former CPD members and a settlement was reached (including approval by City Council, if applicable) during the prior calendar year. This list will include civil lawsuits handled by DOL's Federal Civil Rights Division, as well as such lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle pursuit, only. d. for each case identified in (c) above, the following information will be provided in spreadsheet or open-data format: i. case name; ii. case number; iii. a list of the parties at the time the case was settled; iv. the amount of the settlement; and v. the amount of settlement allocated to attorney's fees and costs (if known). e. the amount of attorney's fees paid by the City during the prior calendar year to outside counsel engaged to defend the City and/or one or more current or former CPD members in civil lawsuits handled by DOL's Federal Civil Rights Division, as well as*

*such lawsuits handled by DOL's Tort's Division if the complaint seeks relief associated with a vehicle pursuit, only. This amount will be presented in the aggregate. f. for all individually named defendants in the cases identified in (a) and (c) above, the status (e.g., pending with BIA/COPA/OIG or charges sustained, not sustained, unfounded, or exonerated by BIA/COPA/OIG) of any administrative investigation(s) by BIA, COPA, or OIG at the time the trial court entered its final order or the settlement was reached. g. the disposition of any felony criminal prosecutions of current or former CPD members from the previous year. h. the number of pending civil lawsuits that seek to hold the City responsible for one or more current or former CPD members that the City is defending. This number will include civil lawsuits handled by the Department of Law's Federal Civil Rights Division, as well as lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle only.*

## Compliance Progress (Reporting Period: January 1, 2023, through June 30, 2023)

**Recurring Schedule:** Annually    ☐ **Met**  ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶548 in the eighth reporting period because it did not produce its Annual Litigation Report "within 180 days following the end of each calendar year of the term of this Agreement" as required by ¶548.

To evaluate Preliminary compliance, we considered whether the City and the CPD produced and published the annual report as required by ¶548. To assess Secondary compliance, we reviewed various data sources to determine whether the City and the CPD developed the annual report within 180 days following the expiration of the calendar year. We reviewed that report for sufficiency, accuracy, and completeness as required by ¶548. We also considered whether the City has allocated sufficient resources to submit an annual report that meets the requirements of this paragraph.

*Progress before the Eighth Reporting Period*

The City and the CPD met Preliminary compliance with ¶548 in the third reporting period by producing the City's 2019 Annual Litigation Report, which was thorough and comprehensive. In the fifth reporting period, on December 31, 2021, the City and the CPD provided the 2020 Litigation Report but failed to produce the report

within the time frame required by ¶548. Despite the timing issues, the 2020 Litigation Report was comprehensive and provided significant detail for the reader, including information such as the types of allegations against the CPD. This information is not only important for the City leaders and community members, but also an important source of data for CPD members. The 2020 Litigation Report covered all requirements of ¶548, but the report was produced late. We emphasized that, to achieve additional levels of compliance, the City must meet the deadlines required by ¶548.

The City did not produce this report by the end of the sixth reporting period. We noted that we would expect to receive it in the seventh reporting period. We emphasized that the City should make efforts to produce the 2021 Litigation Report early in the seventh reporting period to move closer to the 180-day timeframe required by ¶548.

In the seventh reporting period, the City lost compliance with ¶548. The City did not produce its annual litigation report "within 180 days following the end of each calendar year of the term of this Agreement" as required by ¶548. Despite these timing issues, the 2021 Litigation Report provided valuable and detailed, albeit concerning, information regarding the types of allegations against the CPD, and addresses ¶548's subparagraphs. This information is not only important for City leaders and community members, but also provides an important source of data for CPD members. The IMT urged to CPD to use this report to instill a sense of urgency for training officers, supervisors, and command staff. To assist in changing the culture of the department, we suggested that the CPD also consider making this report required reading for every member of CPD command staff and presenting the report to every CPD employee. To regain and maintain compliance with ¶548, we emphasized that the City must produce the 2022 Litigation Report and future litigation reports within the 180-day time frame set out by this paragraph.

*Progress in the Eighth Reporting Period*

The City did not produce its annual litigation report for 2022 "within 180 days following the end of each calendar year of the term of this Agreement" as required by ¶548. As of the end of the eighth reporting period, the IMT had not received any evidence of compliance with this paragraph from the City.

*** 

With this, the City did not reach Preliminary compliance with ¶548 in the eighth reporting period. Moving forward, we will look for the City to produce its annual litigation report earlier in each reporting period, per the requirements of ¶548.

## Paragraph 548 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

EIGHTH REPORTING PERIOD
JANUARY 1, 2023 – JUNE 30, 2023
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶549

**549.** *As part of the CPD Annual Litigation Report, the City will analyze the data and trends collected, and include a risk analysis and resulting recommendations.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

**Recurring Schedule:**    Annually    ✓ **Not Yet Applicable**

**Preliminary:**    *Not in Compliance*
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

The City did not reach Preliminary compliance with ¶549 in the eighth reporting period.

To evaluate Preliminary compliance, we considered whether the City and the CPD produced and published the annual report as required by ¶548. To assess Secondary compliance, we reviewed various data sources to determine whether the City has developed an annual report within 180 days following the expiration of each calendar year that includes data and trends collected and a risk analysis and resulting recommendations. We reviewed the litigation report for sufficiency, accuracy, and completeness as required by ¶548 and ¶549. We also considered whether the City has allocated sufficient resources to submit an annual report that meets the requirements of this paragraph.

*Progress before the Eighth Reporting Period*

The City and the CPD met Preliminary compliance with ¶548 in the third reporting period. The City and the CPD provided the City's 2019 Annual Litigation Report which was thorough and comprehensive. Because this report is to be published on an annual basis, the IMT did not receive or further assess compliance with ¶548 and ¶549 in the fourth reporting period.

In the fifth reporting period, on December 31, 2021, the City and the CPD provided the 2020 Litigation Report but failed to produce the report within the time frame required by ¶548 and ¶549. Despite the timing issues, we noted that the 2020 Litigation Report was comprehensive and provided significant detail for the reader and included a thorough Risk Analysis. Moving forward we encouraged the City to attempt to isolate and analyze data from cases arising in or after 2019, to the extent possible, in order to identify trends and make recommendations for training for the CPD.

We explained in the fifth reporting period that while the 2020 Litigation Report was an extensive and detailed report providing helpful information to the public, the report was produced late. We emphasized that, to achieve additional levels of compliance, the City must meet the deadlines required by ¶548 and ¶549.

The City did not produce an annual litigation report by the end of the sixth reporting period. We noted that we would expect to receive it in the seventh reporting period. We emphasized that the City should make efforts to produce the 2021 Litigation Report early in the seventh reporting period to move closer to the 180-day timeframe required by ¶548. We explained that, to achieve additional levels of compliance, the City must meet the deadlines required by ¶548.

In the seventh reporting period, the City did not produce its annual litigation report "within 180 days following the end of each calendar year of the term of this Agreement" as required by ¶548. Despite these timing issues, the 2021 Litigation Report provided detailed data and risk analysis. However, the report focused more on how the City is unable to recognize trends than on making recommendations for improvement. If more data and case information is necessary to provide an analysis of trends and to make conclusions and recommendations, this data should be provided to the City. We note that the 2019 and 2020 Litigation Reports included more detailed analysis, conclusions, and recommendations than the 2021 Litigation Report.

*Progress in the Eighth Reporting Period*

This reporting period, the City did not produce any documentation that demonstrated efforts related to ¶549.

***

With this, the City did not reach Preliminary compliance with ¶549 in the eighth reporting period. Moving forward, we will look for the City to produce its annual litigation report earlier in each reporting period, per the requirements of ¶548, and to analyze data and trends and provide a risk analysis and recommendations, per the requirements of ¶549.

## Paragraph 549 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

## Accountability and Transparency: ¶550

*550. By April 2020, CPD and COPA will electronically publish quarterly and annual reports that will include, at a minimum, the following: a. aggregate data on the classification of allegations, self-reported complainant demographic information, and complaints received from anonymous or third party complainants; b. aggregate data on complaints received from the public, specified by district or unit of assignment and subcategorized by classification of allegations; c. aggregate data on the processing of investigations, including: i. The average time from the receipt of the complaint by COPA, BIA, or the district to the next or initial contact with the complainant or his or her representative; ii. the average time from the investigative findings and recommendations to the final disciplinary decision; iii. the average time from the investigative findings and recommendations to a final disposition; and iv. the number of investigations closed based on the absence of a complainant affidavit, including the number of attempts (if any) to obtain an override affidavit in the absence of a signed complainant affidavit; d. aggregate data on the outcomes of administrative investigations, including the number of sustained, not sustained, exonerated, and unfounded allegations; the number of sustained allegations resulting in a non-disciplinary outcome; and the number resulting in disciplinary charges; e. aggregate data on discipline, including the number of investigations resulting in written reprimand, suspension, demotion, and termination; f. aggregate data on grievance proceedings arising from misconduct investigations, including: the number of cases grieved; the number of cases that proceeded before the Police Board; the number of cases that proceeded to arbitration; and the number of cases that were settled prior to a full evidentiary hearing, whether before the Police Board or in arbitration; g. aggregate data on outcomes of misconduct investigations by classification of allegations, broken down by self-reported race, gender, and age of the complainant and the CPD member; h. aggregate data on (i) the number of CPD members who have been the subject of more than two completed misconduct investigations in the previous 12 months, and (ii) the number of CPD members who have had more than one sustained allegation of misconduct in the previous 12 months, including the number of sustained allegations; i. aggregate data on CPD members who have been the subject, in the previous 12 months, of more than two complaints in the following classifications of allegations, regardless of the outcome of those complaint*

*investigations: i. allegations of discriminatory policing based on an individual's membership or perceived membership in an identifiable group, based upon, but not limited to: race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age; ii. allegations of excessive force; and iii. allegations of unlawful stops, searches and arrests; j. the disposition of misdemeanor criminal prosecutions of current CPD members.*

## Compliance Progress   (Reporting Period: January 1, 2023, through June 30, 2023)

| | | | | |
|---|---|---|---|---|
| **Recurring Schedule:** | Quarterly | ☐ Met | ✓ | Missed |
| **Recurring Schedule:** | Annually | ☐ Met | ✓ | Missed |

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (FIFTH REPORTING PERIOD)[6] |
| | **CPD** | *In Compliance* (FOURTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Secondary:** | | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (FIFTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **CPD** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| | **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) |
| **Sustainment Period Ends** | | *December 31, 2024* |

The City maintained Full compliance with ¶550 in the eighth reporting period.

To evaluate Preliminary compliance, we reviewed various data sources to determine whether the CPD and COPA developed quarterly and annual reports that are sufficient, accurate, and complete as required by ¶550. To evaluate Secondary compliance, we considered whether the CPD and COPA have allocated sufficient resources to submit quarterly and annual reports that meet the requirements of ¶550. To evaluate Full compliance, we considered whether CPD's and COPA's quarterly and annual reports sufficiently capture the requirements of this paragraph, including but not limited to the timeliness of such reports, and reviewed quarterly and annual reports for sufficiency, accuracy, and completeness for the requirements of this paragraph.

---

[6] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the Office of the Inspector General. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the CPD provided several quarterly reports which were easy to read and understandable. These reports demonstrate a commitment to transparency and building trust, internally and externally, in BIA's operations. Notably, the Third Quarter Report covered all requirements of ¶550 except subsection (c)(i). We reported that BIA, by the end of the fourth reporting period, was continuing to develop data related to this requirement and intended to include it in future reports. We found that BIA was in Preliminary compliance based on its second and third quarterly reports, with the understanding that BIA would develop and include information delineated in ¶550(c)(i) in its next reporting period.

In the fifth reporting period, BIA produced its Fourth Quarter Report for 2020. This report demonstrated continued improvement and standardization of quarterly reports. It provided the reader with a consistent and easy-to-follow format. This report addressed every subparagraph and requirement of ¶550. BIA also provided its Annual Report in December 2021. This report completely addressed the requirements of all of ¶550's subparagraphs. The annual report was a strong first attempt at an annual report, and we applauded BIA for these efforts. We noted, however, that detracting from the impressive report was the time that it took for BIA to produce the report. Moving forward, we noted our anticipation that BIA would produce the annual report more quickly after the close of year and explained that more timely production of these reports will be necessary for Full compliance.

In addition to the reports, the CPD finalized General Order G08-01, *Complaint and Disciplinary System*, in the fifth reporting period. Section VIII addressed ¶550 completely. We noted our belief that this section of G08-01 was of particular importance, and therefore, warranted a stand-alone directive to instruct completion of quarterly and annual reports. During the review and revision process, we voiced these concerns and the CPD appeared receptive to developing such a directive. We noted our anticipation that the CPD would develop this directive in the sixth reporting period.

In the sixth reporting period, the City and the CPD provided S08-01-01, *Log Number Case Management System*.[7] The IMT submitted a no-objection notice with

---

[7]    In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Case Management System* into S08-01-01. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

comments on June 3, 2022.[8] Section IV of this policy addressed ¶550 and its sub-paragraphs by listing the information that must be included in the CPD's quarterly and annual reports; however, the policy does not specifically direct the CPD to *publish* quarterly and annual reports as required by ¶550. We encouraged the CPD to make this revision. This policy remained in the collaborative review and revision process at the end of the sixth reporting period. While not required by the Consent Decree, the IMT noted its continued concern that the CPD and BIA do not include the demographic information of officers who are accused of misconduct in the report. We strongly recommended, as we have for the past three years, that the CPD develop a department directive that addresses the regular and timely publication of quarterly and annual reports with this information.

In the sixth reporting period, the CPD produced quarterly reports only for the first two quarterly reports of 2021 and had not produced its 2021 Annual Report. We noted that the first and second quarterly reports provided consistent data and addressed every subparagraph of ¶550 but did not address the requirements of ¶551. We explained that the CPD and BIA must begin finalizing and publishing their reports in a timelier manner to reach Full compliance.

In the seventh reporting period, the CPD made significant progress in producing quarterly and annual reports that addressed ¶550's requirements and began to finalize and publish these reports in a timely manner, allowing the CPD to reach Full compliance with this paragraph.

First, the CPD produced BIA quarterly reports for the second and third quarters of the 2021 calendar year. Although these reports were provided to the IMT six to nine months after the end of 2021, the reports provided consistent documentation that allowed the reader to quickly understand the data and statistics for disciplinary issues and investigations for which BIA is responsible. The CPD also produced BIA quarterly reports for the first and second quarters of the 2022 calendar year in the seventh reporting period. These reports were produced in a timelier manner than previous quarterly reports. Further, the CPD produced a BIA quarterly report for the third quarter of the 2022 calendar year in the seventh reporting period. This quarterly report was produced in a timely manner and continued to

---

[8]    Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

improve upon previous quarterly reports. This report addressed every subparagraph of ¶550 and the BIA made strides to address the requirements of ¶551.

The CPD also produced the BIA 2021 Annual Report. Although this report was provided to the IMT eight months after the end of the 2021 calendar year, the report was comprehensive and improved upon the BIA 2020 Annual Report. The report provided data and information to address nearly every subparagraph of ¶550 except for ¶550(j) ("the disposition of misdemeanor criminal prosecutions of current CPD members").[9] Additionally, the CPD provided a revised draft of G08-01, *Complaint and Disciplinary System*. Although this revised policy was not produced for review with ¶550, it is relevant to ¶550 because it requires the BIA to electronically publish annual and quarterly reports that address all of the requirements of ¶550. While this policy addressed the requirements of ¶550 and its subparagraphs, the IMT continued to strongly recommend that the CPD develop a standalone department policy that requires the regular and timely publication of quarterly and annual reports.

With respect to COPA, at the end of the fourth reporting period, we noted that COPA continued to develop, refine, and publish its quarterly and annual reports. However, COPA's reports did not address all requirements set forth in ¶550(a), (c)–(g), and (i)–(j). COPA's 2021 Second Quarter Report aimed to address these gaps but was not completed until after the close of the fourth reporting period. We recommended that COPA develop a policy directing continued publishing of quarterly and annual reports.

COPA, in the fifth reporting period, produced a timely and accurate report within 15 days of the close of the third quarter. The report included all data outlined by ¶550 that COPA is able to maintain. As COPA has explained, it does not house the data contemplated by subparagraphs (f) and (j). Instead, BIA has this information, and as noted above, BIA has reported this information. With this, COPA demonstrated in the fifth reporting period that it could provide the information available to it that is contemplated by the paragraph, and COPA established its ability to quickly and consistently publish reports required by ¶550. With this, BIA and COPA reached Secondary compliance with ¶550 in the fifth reporting period.

In the sixth reporting period, COPA continued to publish timely and accurate quarterly and annual reports on the COPA website within 15 days of the end of the reporting period. We noted that the First Quarter 2021 Report was consistent with previous COPA quarterly reports and included improved information on pending investigations and Consent Decree compliance and training, among other topics. We noted that the data was accurate and current and addressed every

---

9    BIA staff indicated that a section addressing ¶550(j) was inadvertently omitted from the Annual Report and assured the IMT that future Annual Reports will include the information required by ¶550(j).

subparagraph of ¶550 except ¶550(f) and (j) which include data that COPA does not house, but the BIA has this information and includes it in its reports. COPA produced its 2021 Annual Report on February 15, 2022, continuing COPA's commitment to providing its Annual Reports in a timely manner. We noted that the 2021 Annual Report builds upon the quarterly reports and includes relevant information regarding COPA leadership changes, agency goals, and COPA policy, training, and data.

In the seventh reporting period, COPA provided Guidance, *Contacts with Non-Department Member Witnesses and Complainants and Confirmation of Representation*. This Guidance specifically directs COPA to record the initial contact or attempt to contact the complainant or complainant representative to begin the investigation, per the requirements of ¶550(c)(i). Additionally, COPA provided Guidance, *COLUMN CMS Administration*, which addressed ¶550 by directing the COPA Information Systems section to provide timely data for the COPA quarterly and annual reports, and by setting specific expectations regarding when the data is expected to be available.

COPA continued to produce timely and accurate quarterly reports within fifteen days of the end of the first three quarters of 2022. These reports provide details required by the Consent Decree and COPA's administrative activities, community engagement efforts, and specific investigations. COPA's quarterly reports continued to improve each quarter and provide the reader with background information as well as specific data required by ¶550 and its subparagraphs.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the CPD produced its BIA Fourth Quarter 2022 Report on March 30, 2023. This Report was produced in a timely manner, and its format and information were improved from prior reports. The Report continues to include graphics that allow readers to easily follow the processes and information set forth within, and the Report addresses each subparagraph of ¶550. Further, BIA provided the IMT with documentation showing that its quarterly reports are posted publicly on the CPD BIA website. We recognize and appreciate BIA leadership's efforts to meet the timelines and responsibilities set forth in ¶550.

COPA did not submit any documentation relevant to ¶550 in the eighth reporting period. As we have previously explained, we expect to receive evidence of sustained compliance from the City for its relevant entities each reporting period, and the Consent Decree places on the City "the burden of demonstrating by a preponderance of the evidence full and effective compliance with the requirements of [the Consent Decree]." *See* ¶720. We look forward to receiving documentation related to ¶550 in the next reporting period; without this documentation, COPA will fall to under assessment.

***

The City, the CPD, and COPA maintained Full compliance with ¶550 in the eighth reporting period by producing timely reports that meet the requirements of this paragraph. Moving forward, we will look for BIA to continue to publish reports in a timely manner. We also strongly suggest that the CPD develop a department policy that directs the regular and timely publication of quarterly and annual reports. For COPA we will look for documentation of its Annual Report containing the information contemplated by ¶550.

### Paragraph 550 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Secondary | Secondary |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶551

> **551.** BIA's quarterly and annual reports will include data reflecting investigations conducted by the districts.

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | | | | |
|---|---|---|---|---|
| **Recurring Schedule:** | Quarterly | | ☐ Met | ☑ Missed |
| **Recurring Schedule:** | Annually | | ☐ Met | ☑ Missed |

**Preliminary:**   *In Compliance* (FIFTH REPORTING PERIOD)
**Secondary:**   *In Compliance* (NEW)
**Full:**   *Not Yet Assessed*

The City and the CPD reached Secondary compliance with ¶551 in the eighth reporting period.

To evaluate Preliminary compliance with ¶551, the IMT reviewed the CPD's policies following the policy process described in the Consent Decree (¶¶626–41). To assess Secondary compliance, we reviewed various data sources to determine whether the CPD has allocated resources to include data reflecting investigations conducted by the districts on a quarterly and annual basis.

*Progress before the Eighth Reporting Period*

In earlier reporting periods, BIA did not have means to track this information, making compliance with this paragraph not feasible. But in the fourth reporting period, BIA indicated that it had developed means to provide information required by ¶551.

In the fourth reporting period, we also reviewed the draft BIA Unit Directive, *Case Management System*, which addressed the requirements of ¶551. At the close of the fourth reporting period, this Unit Directive remained in the collaborative review process. We expressed our expectation that upon receiving a no-objection notice, BIA would post the directive for public comment and thereafter finalize the policy.[10]

In the fifth reporting period, the CPD made significant revisions to General Order G08-01, *Complaint and Disciplinary System*. After the CPD completed extensive

---

[10]   In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and the process is ongoing.

revisions, we submitted a no-objection notice to G08-01.[11] After posting the policy for public comment, the CPD finalized the policy on December 31, 2021. Section VIII.C codified the requirements of ¶551. We explained that while this is beneficial, BIA quarterly and annual reports did not yet comply with ¶551 or G08-01.

During the fifth reporting period, we received and reviewed BIA's Fourth Quarter 2020 Report. While this quarterly report included data regarding investigations conducted by the districts, the data was not broken out to reflect the number or type of investigations that occurred in the districts. We also received BIA's Annual Report for 2020. The 2020 Annual report partially addressed ¶551 in Table Four, by making it clear that the information presented represents investigations by BIA and the District Accountability Sergeants. Additionally, Table 11 in the report provided aggregate data for the districts but did not indicate which cases were conducted by Accountability Sergeants and BIA investigators. We noted that we understood that BIA was unable to extract the data as required by ¶551 and as required by G08-01 at that time. In the sixth reporting period, we reviewed BIA's First and Second Quarter 2021 Reports. These reports did not address ¶551's requirement that BIA's quarterly and annual reports will include data reflecting investigations conducted by the districts.

In the seventh reporting period, we reviewed BIA's Third Quarter 2021 Report, BIA's 2021 Annual Report, and BIA's First, Second, and Third Quarter 2022 Reports. These reports did not address ¶551's requirement that "BIA's quarterly and annual reports will include data reflecting investigations conducted by the districts." The IMT explained that the information required by this paragraph means that the CPD should report on the investigations conducted by each district or unit which is assigned to Accountability Sergeants. In the Third Quarter 2022 Report, BIA included new tables that provided aggregate data and an additional breakdown of how cases are assigned to BIA and Accountability Sergeants; however, ¶551 specifically requires data reflecting investigations "conducted by the districts." We suggested that the CPD consider requiring data regarding the assignment of cases to Accountability Sergeants for each district to determine whether districts are properly staffed with accountability sergeants and whether the Accountability Sergeants have sufficient time to conduct and conclude the investigations. The data

---

[11] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

presented indicated that Accountability Sergeants were consistently responsible for slightly less than half of the administrative investigations, which the CPD should emphasize for transparency and to make improvements.

Additionally, the CPD provided a revised draft of G08-01, *Complaint and Disciplinary System*. Although this revised policy was not produced for review with ¶551, it is relevant to ¶551 because the policy requires quarterly and annual reports to include data concerning Log Number investigations conducted by district Accountability Sergeants.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the CPD provided the IMT with BIA's Fourth Quarter 2022 Report on March 30, 2023. The Report included aggregate data regarding cases that are assigned to the districts but does not specify how many investigations each district, individually, conducts. With the understanding that the CPD is capable of further breaking this data down to identify cases assigned to particular districts or units, we recommend that the CPD do so and require this level of detail to be included in future reports. In particular, increased specificity in the data will allow the CPD to determine whether its districts are properly staffed with Accountability Sergeants and whether the Accountability Sergeants have sufficient time to conduct and conclude their investigations. As in previous reporting periods, the data shows that Accountability Sergeants are consistently responsible for slightly less than half of the CPD's administrative investigations, which we have previously recommended that the CPD emphasize for transparency and to make improvements.

Additionally in the eighth reporting period, the CPD provided the IMT with BIA's First Quarter 2023 Report on June 22, 2023. The report included additional data on investigations assigned to the individual districts and units for investigation. This marked the first report that BIA detailed the information required by ¶551, and BIA has indicated to the IMT that such data will continue to be reported in future quarterly and annual reports. Specifically, page 36 of the report indicates that the data will assist the CPD in determining whether the districts and units have the proper Accountability Sergeant staffing and whether the districts and units are providing the Accountability Sergeants with sufficient time and resources to adequately conduct investigations as required by CPD directives and the Consent Decree requirements. With this, the CPD reached Secondary compliance with ¶551.

***

The City and the CPD reached Secondary compliance with ¶551 in the eighth reporting period. In the coming reporting periods, we will look for BIA to continue

to provide quarterly and annual reports that comply with the requirements of ¶551.

### Paragraph 551 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | Preliminary | Preliminary |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶552

> **552.** *For non-disciplinary purposes, including historical trend analysis, CPD will track, for each CPD member, for every misconduct investigation: the nature of allegations, the outcome of the investigation, and the disposition of discipline.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶552 in the eighth reporting period.

To evaluate Preliminary compliance with ¶552, the IMT reviewed the CPD's policies following the policy process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed the CPD's training development, implementation, and evaluation.

*Progress before the Eighth Reporting Period*

In the fourth reporting period, we reviewed BIA's draft *Case Management System* Unit Directive, which partially addressed the requirements set out in ¶552. We stated our belief that the Case Management System provides the CPD with a path toward compliance with this paragraph, but the CPD would need a finalized directive directing compliance.

In the fourth and fifth reporting periods, we noted that BIA had a draft *Case Management System* Unit Directive that related to the requirements of ¶552, but additional edits were needed to better address the paragraph. 58his Unit Directive remained in the collaborative review and revision process at the end of the fifth reporting period.[12]

We also reviewed Department Notice, D20-04 *Operational Support System (OSS) Pilot Program* in the fifth reporting period. Section III.C.6 of D20-04 contributed to compliance with ¶552. However, since the program remained in the pilot status

---

[12] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and the process is ongoing.

and did not fully address the requirements of ¶552, the CPD did not reach Preliminary compliance in the fifth reporting period.

In the sixth reporting period, the City and the CPD provided S08-01-01, *Log Number Case Management System*. The IMT submitted a no-objection notice with comments on June 3, 2022. Section IV.D of this policy completely addresses the requirements of ¶552 by stating specifically that the CPD will track, for each CPD member, for every misconduct investigation: the nature of allegations, the outcome of the investigation, and the disposition of discipline. This policy remained in the collaborative review and revision process at the end of the sixth reporting period. In the seventh reporting period, the CPD finalized S08-01-01, and therefore, reached Preliminary compliance.

*Progress in the Eighth Reporting Period*

This reporting period, the City and the CPD did not produce any documentation that demonstrated efforts related to ¶552.

***

The City and the CPD maintained Preliminary compliance with ¶552. Moving forward, we will look for the CPD to develop training relevant to the requirements of this paragraph.

### Paragraph 552 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Status Update |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| None | None | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Preliminary | Preliminary | |

# Accountability and Transparency: ¶553

*553. Beginning in 2020, CPD will audit, on at least an annual basis, the investigation and disciplinary process involving complaints investigated by BIA and the districts to ensure that the investigations are conducted in accordance with BIA policies and this Agreement. The audits will include completed investigations and the recommendations of discipline. CPD will make public any of the audit findings, ensuring that any personally identifiable information is redacted.*

---

**Compliance Progress** (Reporting Period: January 1, 2023, through June 30, 2023)

**Recurring Schedule:** Annually ☑ **Not Yet Applicable**

**Preliminary:** *Not in Compliance*
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD did not reach Preliminary compliance with ¶553 in the eighth reporting period because the CPD did not provide an annual audit that meets the requirements of this paragraph.

To evaluate Preliminary compliance with ¶553, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).

*Progress before the Eighth Reporting Period*

The CPD met Preliminary compliance with ¶553 in the third reporting period because the CPD Audit Division completed its annual report, CD-553-2020, *Review of Data on Investigations Into Allegations Made Against Department Members* (2019).

In the fourth reporting period, we received a draft of BIA's *Case Management System* Unit Directive, which addressed the requirements of ¶553 but remained in the collaborative review and revision process at the end of the reporting period. Notwithstanding the status of the Unit Directive, we noted that the requirements of ¶553 should be addressed in a department-wide directive.

We also reviewed G08-01, *Complaint and Disciplinary System* in the fourth reporting period, which directed compliance with ¶553. Like the Unit Directive, this General Order remained in the review and revision process at the close of the fourth reporting period.

In the fifth reporting period, the CPD completed extensive revisions to General Order G08-01, *Complaint and Disciplinary System*. After those revisions, we submitted a no-objection notice to the directive.[13] Thereafter, the CPD published the directive for public comment and, on December 31, 2021, finalized the directive. With the finalization of G08-01, the City and the CPD maintained Preliminary compliance with ¶553 in the fifth reporting period. While this was sufficient to maintain Preliminary compliance, we encouraged the CPD to develop a standalone directive guiding audits and reporting.

We also received and reviewed the Audit Division's *Audit of 2020 Investigation Timeframe Requirements* in the fifth reporting period. We stated that this audit was well done. It noted many of the areas requiring significant additional work on the part of BIA to reach compliance with several Consent Decree paragraphs—namely those related to reporting through the Case Management System. We expressed concern that this audit was not released for over eleven months after the close of the year and stated our expectation that annual audits will be provided in a timelier manner in the future. Still, we noted our appreciation of the thorough audit, which provided the CPD with focus points for improvement. We stated our anticipation that CPD will begin providing regular reports on the status of correcting the deficiencies noted in the audit early in and throughout the sixth reporting period.

In the sixth reporting period, the City and the CPD provided S08-01-01, *Log Number Case Management System*.[14] The IMT submitted a no-objection notice with comments on June 3, 2022. Section IV.F.2 of this policy addressed ¶553, although the CPD did not document it as such. This policy remained in the collaborative review and revision process at the end of the sixth reporting period.

---

[13] Under the Consent Decree policy review process, the City and the CPD consult with the IMT and the OAG to develop or revise policies in accordance with Consent Decree requirements. *See* ¶¶626–37. The City and the CPD provide the policy for review at least 30 days before the policy is scheduled to go into effect, and the IMT and the OAG have 30 days to comment on the policy. *See* ¶¶627–28. The City, the CPD, the IMT, and the OAG then work together to resolve comments. The IMT and the OAG will, separately and in writing, notify the City and the CPD that they no longer have any comments, which is referred to as a "no-objection notice." Once the City and the CPD receive a no-objection notice from both the IMT and the OAG, the City and the CPD will begin the process of finalizing the policy. Typically, this includes the CPD posting the policy on its website for public comment for at least 15 days. The City and the CPD must then consider those comments and make additional changes, as appropriate. *See* ¶633.

[14] In the sixth reporting period, the CPD informed the IMT and the OAG that BIA would begin to move away from Unit Directives. Instead of Unit Directives, instruction will be provided in General Orders and Special Orders. This applies to the BIA Unit Directives that we reviewed, and in some instances provided no-objection notices to in previous reporting periods. The CPD began this process in sixth reporting period, and incorporated instruction previously included in the BIA Directive *Case Management System* into S08-01-01. This process of incorporating Unit Directives into General Orders and Special Orders is ongoing.

We noted in the sixth reporting period that, while this policy addressed the text of ¶553, the CPD has much work to do to ensure that it can fulfill the requirements of this paragraph operationally. We explained that, as we noted in Independent Monitoring Report 5, the BIA Audit Division's *Audit of 2020 Investigation Timeframe Requirements* indicates that BIA is not in operational compliance with many of the paragraphs which involve reporting requirements through the Case Management System. We explained that, to achieve greater levels of compliance, the CPD must have these reporting systems in place. We noted that the 2020 Audit indicated that command officers are either not aware of policies and procedures they must adhere to, or do not follow policy and procedure.

In the seventh reporting period, the CPD produced the BIA Audit Division's Follow-Up of Audit of 2020 BIA Investigation Timeframe Requirements. The Follow-Up of Audit of 2020 BIA Investigation Timeframe Requirements contained helpful information but did not itself meet the requirements of ¶553, which requires an annual audit. Additionally, it did not provide sufficient detail regarding what specific changes were implemented to address the audit's recommendations. The IMT also attended and reviewed a presentation by the Audit Division, which included completed projects and projects underway. This information was informative but did not meet the requirements of ¶553.

Additionally, the CPD provided a revised draft of G08-01, *Complaint and Disciplinary System*. Although this revised policy was not produced for review with ¶553, it was relevant to ¶553 because the policy requires the CPD Audit Section to conduct annual audits involving the BIA investigation and disciplinary process.

Because ¶553 requires that the CPD conduct an annual audit, the CPD lost compliance with this paragraph in the seventh reporting period.

*Progress in the Eighth Reporting Period*

This reporting period, the City and the CPD did not produce any documentation that demonstrated efforts related to ¶553.

\*\*\*

The City and the CPD did not reach Preliminary compliance with ¶553 in the eighth reporting period. Moving forward, we will look for the CPD to provide an annual audit per the requirements of this paragraph, and we will look for evidence that the audits are sufficient per the requirements of this paragraph. We also encourage the CPD to publish the next audit in a timely manner to not only inform its own effort toward reform but also to provide information for the public. Additionally, as we noted in Independent Monitoring Reports 5 and 6, we encourage the CPD to develop a standalone directive guiding audits and reporting.

## Paragraph 553 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Preliminary

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Preliminary

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Preliminary

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
None

EIGHTH REPORTING PERIOD
JANUARY 1, 2023 – JUNE 30, 2023
COMPLIANCE PROGRESS:
None

# Accountability and Transparency: ¶554

*554. OAG acknowledges that the City adopted a policy relating to the public release of video footage capturing weapons discharges and incidents involving death or serious bodily injury. Consistent with applicable law, the City will continue to ensure COPA publicly releases such video footage pursuant to the June 2016 Video Release Policy for the City of Chicago. The Video Release Policy will not supersede or otherwise limit the City's legal obligations pursuant to state and federal transparency laws, including the Illinois Freedom of Information Act, 5 ILCS 140/1 et seq.*

## Compliance Progress  (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The City and COPA maintained Full compliance with ¶554 in the eighth reporting period and completed the two-year Sustainment Period for this paragraph.

To evaluate Preliminary compliance with ¶554, we reviewed the City's and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41).[15] To evaluate Secondary compliance, we reviewed the entities' training development, implementation, and evaluation. To evaluate Full compliance, we reviewed data sources to determine whether the City and COPA have implemented their policy and training to mobilize compliance with ¶554.

*Progress before the Eighth Reporting Period*

We assessed the City's compliance with ¶554 for the first time in fourth reporting period and found that the City reached Full compliance with the paragraph. In the fifth reporting period, we reviewed a Video Release Policy submitted by the City in June 2021. The City also provided documentation on several CPD cases that have followed the policy. COPA also presented its Policy 2.1.2, *Transparency Initiatives-Release of Video and Related Materials*. This Policy completely and thoroughly addressed ¶554 and provided detail beyond that which is required by the Consent

---

[15]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

Decree, including how and when information will be released. With this the City and COPA maintained Full compliance with ¶554 in the fifth reporting period.

The City and COPA maintained Full compliance in the sixth reporting period by continuing to implement policy and training addressing the requirements of ¶554, including COPA's Policy 2.1.2., *Transparency Initiatives – Release of Video and Related Materials* and COPA's online Case Data Portal. The City and COPA did not produce any materials related to ¶554 in the seventh reporting period. The IMT continued to review publicly released video footage on COPA's online Case Data Portal.

*Progress in the Eighth Reporting Period*

This reporting period, the City and COPA did not produce any documentation that demonstrated efforts related to ¶554. We expect to receive documentation of efforts towards maintaining Full compliance every reporting period.

\*\*\*

The City and COPA maintained Full compliance with ¶554 in the eighth reporting period.

### Paragraph 554 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶555

*555. On an annual basis, the Police Board will track and publish case-specific and aggregate data about Police Board decisions. Such publications will contain and include, at minimum, the following: a. the date on which the investigating agency (COPA, BIA, district, or OIG) received the complaint or notification for investigation; b. the date of the Police Board hearing over which the hearing officer presided; c. the disciplinary recommendations and/or decisions (where applicable) made by COPA, BIA, the Superintendent, and the Police Board; d. the average time between the filing of disciplinary charges with the Police Board and the first day of hearing; e. the average time between the filing of disciplinary charges with the Police Board and the Police Board's decision; f. the average time between the date on which the investigating agency (COPA, BIA, district, or OIG) received the complaint for investigation and the Police Board's decision; g. the date of the alleged misconduct; h. the average time between the date of the alleged misconduct giving rise to the complaint or notification and the Police Board's decision; and i. whether any Police Board decision has been appealed to any state court and, if so, the court's final judgment.*

## Compliance Progress (Reporting Period: January 1, 2023, through June 30, 2023)

**Recurring Schedule:** Annually    ✓ Met    ☐ Missed

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FIFTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *December 31, 2023* |

The City and Police Board maintained Full compliance with ¶555 in the eighth reporting period.

To evaluate Preliminary compliance with ¶555, the IMT reviewed the Police Board's policies following the policy process described in the Consent Decree (¶¶626–41) and determined whether the Police Board tracked and annually published case-specific and aggregate data publications to meet the requirements of ¶555. To evaluate Secondary compliance, we considered whether the Police Board has allocated sufficient resources to develop and publish the case specific and aggregate data on an annual basis as required by ¶555. To evaluate Full compliance, we determined whether the Police Board's annual publications sufficiently captured case specific and aggregate data about Police Board decisions.

*Progress before the Eighth Reporting Period*

In past reporting periods, we found the Police Board reached Preliminary compliance based on our review of information provided on the Police Board's website and the Police Board's Annual Reports for years 2017 through 2019, which is responsive to all subparagraphs of ¶555.

In the fifth reporting period, the Police Board continued to provide complete, up-to-date information in an excel spreadsheet housed on the Police Board website. The discipline spreadsheet indicates the number of cases filed with the Police Board in 2021. The excel sheet contains information responsive to all subparagraphs of ¶555. With this, the Police Board demonstrated that it is able to continuously provide, in a timely manner, the information contemplated by ¶555. This moved the Police Board into Full compliance in the fifth reporting period.

In the sixth reporting period, the Police Board maintained Full compliance and continued to provide complete, up-to-date information in an excel spreadsheet housed on the Police Board website. The discipline spreadsheet indicated the number of cases filed with the Police Board in 2022. The excel sheet contained information responsive to all subparagraphs of ¶555. Additionally, we noted that the Police Board's website provides comprehensive information on the Police Discipline page, including Police Board decisions, reports, and data on Police Board cases; cases currently before the Police Board; and reviews of COPA and the CPD disagreements on discipline. In addition to this information, the Police Board submitted its *2021 Annual Report* in the sixth reporting period. The report reflected the information provided in the discipline spreadsheet and further provided comprehensive information regarding Police Board activities and disciplinary cases.

In the seventh reporting period, the Police Board maintained Full compliance and continued to provide complete, up-to-date information in an excel spreadsheet housed on the Police Board website. The discipline spreadsheet indicated the number of cases filed with the Police Board in the last six months of 2022. The excel sheet contained information responsive to all subparagraphs of ¶555. Additionally, we noted that the Police Board's website provides comprehensive information on the Police Discipline page, including Police Board decisions, reports, and data on Police Board cases; cases currently before the Police Board; and reviews of COPA and the CPD disagreements on discipline.

*Progress in the Eighth Reporting Period*

This reporting period, the Police Board provided the IMT with documentation that they continue to provide complete and up-to-date information regarding Police Board discipline by publishing case-specific and aggregate data on the Police Board website. The discipline spreadsheet shows the disciplinary cases that were filed with the Police Board in the first six months of 2023; this spreadsheet includes

categories that cover each of the subparagraphs of ¶555. The Police Board website also includes information about Police Board decisions, reports and data regarding Police Board cases, cases currently before the Police Board, and reviews of COPA and CPD disagreements on discipline. We also reviewed the Police Board's *2022 Annual Report*, which was published in March 2023. That *Report* reflects the information provided in the discipline spreadsheet and also contains comprehensive information regarding Police Board activities and disciplinary cases. With this, the Police Board maintained Full compliance with ¶555.

\*\*\*

Moving forward, we will look for the Police Board to continue these efforts and provide information to the IMT to maintain compliance with ¶555.

### Paragraph 555 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Full | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶556

*556. The Deputy PSIG will conduct periodic analysis and evalua-*
*tions, and perform audits and reviews as authorized by Munici-*
*pal Code of Chicago § 2-56-230.*

## Compliance Progress (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

In the eighth reporting period, the City and the Deputy PSIG maintained Full compliance with ¶556 and completed the two-year Sustainment Period for this paragraph.

To evaluate Preliminary compliance with ¶556 the IMT reviewed the PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed, among other things, the Deputy PSIG's training development, implementation, and evaluation of training. For Full compliance, we evaluated various data sources to determine whether the PSIG sufficiently implemented its policy and training. To confirm that the Deputy PSIG maintained compliance with ¶556, we reviewed a memorandum submitted by the Deputy PSIG that detailed the audits and reviews completed by the Deputy PSIG.

*Progress before the Eighth Reporting Period*

In previous reporting periods, the Deputy PSIG reached Full compliance with ¶556 by completing reviews and audits and detailing them in quarterly reports and the *Public Safety Section 2020 Annual Report.* We also reviewed the Deputy PSIG's *Public Safety Section Policies Manual*.

In November 2021, the Deputy PSIG provided a memorandum which provided evidence that the Deputy PSIG had continued to conduct periodic analysis and evaluations and perform audits and evaluations as authorized by the Municipal Code. With these efforts, the Deputy PSIG maintained Full compliance with ¶556 in the fifth reporting period.

In the sixth reporting period, the Deputy PSIG published its *2021 Annual Report*. This report showed the continued progress the Deputy PSIG has made in regard to the requirements of ¶556. The report was comprehensive, factual, and provided great detail to the community regarding the work PSIG conducted during 2021. Additionally, the report addressed specific analyses and evaluations that comply with the requirements of ¶556 and are authorized by *Municipal Code of Chicago*

*§ 2-56-230*. The report also provided an overview of the evaluations and reviews PSIG conducted during 2021 and provided encouragement for the community to seek the actual reports for each evaluation for more detailed information. In addition, the Deputy PSIG also provided the following reports: *Report on Race-and Ethnicity-Based Disparities in the Chicago Police Department's Use of Force*, *Fairness and Consistency in the Disciplinary Process for CPD Members*, and *Advisory on Background Checks on Members of the Public*. With this, the City and Deputy PSIG maintained Full compliance with ¶556 in the sixth reporting period.

In the seventh reporting period, the Deputy PSIG conducted evaluations per ¶556 and published several reports responsive to *Municipal Code of Chicago § 2-56-230*. These reports included the following: *Consecutive Days Worked by Chicago Police Department Members, April – May 2022* (Aug. 29, 2022); *Understanding the City of Chicago Police Department's Budget* (Sep. 27, 2022); *Use of Litigation Data in Risk Management Strategies for the Chicago Police Department* (Sep. 29, 2022); *The Chicago Police Department's Peer and Supervisory Wellness Support Strategies* (Nov. 2, 2022); and the *Public Safety Section 2021 Annual Report*. Each of these reports were posted on the Office of the Inspector General (OIG) website. The Deputy PSIG also updated several reports, audits, and dashboards from previous reporting periods consistent with its intention of maintaining ongoing oversight of the progress of the entities involved. With this, the City and Deputy PSIG maintained Full compliance with ¶556 in the seventh reporting period.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the Deputy PSIG conducted a number of evaluations required by ¶556 and published reports responsive to *Municipal Code of Chicago § 2-56-230*, including the following reports: (1) *Recommendations to Inform and Improve Body Worn Camera Storage and Labeling,* (2) *Enforcement of the CPD's Rule Against False Reports*, (3) *Recommendations to Inform and Improve Future Investigations Regarding Fatal Motor Vehicle Accidents Conducted by CPD and COPA*, and (4) the Deputy PSIG's *2022 Annual Report*, which was produced in June 2023. All of these reports were posted on the OIG website. The Deputy PSIG continues to update their reports, audits, and dashboards from prior reporting periods, consistent with their intention of maintaining ongoing oversight of the progress of the entities involved with the Consent Decree.

***

In the eighth reporting period, the City and the Deputy PSIG maintained Full compliance with ¶556 and completed its two-year Sustainment Period for this paragraph.

## Paragraph 556 Compliance Progress History

FIRST REPORTING PERIOD
SEPTEMBER 1, 2019 – AUGUST 31, 2019
COMPLIANCE PROGRESS:
Not Applicable

SECOND REPORTING PERIOD
SEPTEMBER 1, 2019 – FEBRUARY 29, 2020
COMPLIANCE PROGRESS:
Not Applicable

THIRD REPORTING PERIOD
MARCH 1, 2020 – DECEMBER 31, 2020
COMPLIANCE PROGRESS:
Preliminary

FOURTH REPORTING PERIOD
JANUARY 1, 2021 – JUNE 30, 2021
COMPLIANCE PROGRESS:
Full

FIFTH REPORTING PERIOD
JULY 1, 2021 – DECEMBER 31, 2021
COMPLIANCE PROGRESS:
Full

SIXTH REPORTING PERIOD
JANUARY 1, 2022 – JUNE 30, 2022
COMPLIANCE PROGRESS:
Full

SEVENTH REPORTING PERIOD
JULY 1, 2022 – DECEMBER 31, 2022
COMPLIANCE PROGRESS:
Full

EIGHTH REPORTING PERIOD
JANUARY 1, 2023 – JUNE 30, 2023
COMPLIANCE PROGRESS:
Full

# Accountability and Transparency: ¶557

> **557.** *The Deputy PSIG's audits and reviews will be conducted pursuant to the Association of Inspectors General Principles and Standards for Offices of Inspector General.*

## Compliance Progress     (Reporting Period: January 1, 2023, through June 30, 2023)

**Preliminary:**          *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**            *In Compliance* (FOURTH REPORTING PERIOD)
**Full:**                 *In Compliance* (FOURTH REPORTING PERIOD)
**Sustainment Period Ends**   *June 30, 2023*

In the eighth reporting period, the City and the Deputy PSIG maintained Full compliance with ¶557 and completed the two-year Sustainment Period for this paragraph.

To evaluate Preliminary compliance with ¶557 the IMT reviewed the PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed, among other things, the CPD's training development, implementation, and evaluation. For Full compliance, we evaluated various data sources to determine whether the Deputy PSIG sufficiently implemented its policy and training. To confirm that the Deputy PSIG maintained compliance with ¶557, we reviewed a memorandum detailing how audits and reviews completed by the Deputy PSIG conformed to the Association of Inspector General Principles and Standards for Offices of Inspector Generals.

*Progress before the Eighth Reporting Period*

In the fourth reporting period, the Deputy PSIG reached Full compliance. The City and Deputy PSIG provided the Deputy PSIG's staff training materials and class rosters which demonstrated that the staff was well-trained, and therefore, well-prepared to fulfill the requirements of ¶557. We also reviewed a letter from the Association of the Inspectors General that concluded that the Investigations and APR sections comply with the major standards set by the Association of Inspectors General (AIG) Principles and Standards for Offices of Inspector General (OIG) Green Book and Yellow Book.

During the fifth reporting period, there was no change in the manner in which the Deputy PSIG followed the major standards set out by the Association of Inspector General Principles and Standards for Office of Inspector General Green Book and Yellow Book. In November 2021, the Deputy PSIG provided a memorandum that explained that the next Associate of Inspectors General peer review process was expected to occur in summer 2022. The Deputy PSIG also provided titles and web

locations for six reports published since April 2021 that demonstrated the PSIG's continued adherence to the Green Book standards. With these efforts, the Deputy PSIG maintained Full compliance with ¶557 in the fifth reporting period.

In the sixth reporting period, the Deputy PSIG provided documentation that showed continued compliance with the requirements of ¶557. Additionally, PSIG submitted documentation regarding the standard, three-year peer review according to the AIG Principles and Standards for Offices of Inspector General. The peer review revealed that the Office of Inspector General and specifically PSIG adhere to the principles and standards of the Association of Inspector General Principles and that the peer review revealed no issues or problems.

In the seventh reporting period, the Deputy PSIG again provided documentation that showed continued compliance with the requirements of ¶557. Additionally, the Deputy PSIG published the following reports, which were produced in compliance with the Association of Inspectors General Principles and Standards for Office of Inspector General ("Green Book") standards: *Fairness and Consistency in the Disciplinary Process for CPD Members* (June 16, 2022); *Consecutive Days Worked by Chicago Police Department Members, April – May 2022* (Aug. 29, 2022); *Understanding the City of Chicago Police Department's Budget* (Sep. 27, 2022); *Use of Litigation Data in Risk Management Strategies for the Chicago Police Department* (Sep. 29, 2022); and *The Chicago Police Department's Peer and Supervisory Wellness Support Strategies* (Nov. 2, 2022). These reports are publicly available on the OIG website. The Deputy PSIG staff also attended several trainings relevant to ¶557 and compliance with Green Book standards, including a training institute presented by the AIG, the AIG 2022 Annual Training Conference, and the Illinois Chapter of the Association of Inspectors General Fall 2022 Training. With this, the City and Deputy PSIG maintained Full compliance with ¶557 in the seventh reporting period.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the Deputy PSIG submitted a memorandum that included evidence that it continues to conduct audits and reviews according to the Green Book standards. The Deputy PSIG published three reports during the eighth reporting period: (1) *Recommendations to Inform and Improve Body Worn Camera Storage and Labeling*, (2) *Enforcement of the Chicago Police Departments' Rule Against False Reports*, and (3) *Recommendations to Inform and Improve Future Investigations Regarding Fatal Motor Vehicle Accidents Conducted by CPD and COPA*. The IMT reviewed each of these reports, all of which are publicly available on the OIG website. Further, the Deputy PSIG reported that its staff attended the Illinois Chapter of the Association of Inspectors General Spring 2023 Training, held in May 2023. In addition, five PSIG employees are registered to attend a training institute given by the Association of Inspectors General in August 2023.

*** 

In the eighth reporting period, the Deputy PSIG maintained Full compliance with
¶557 and completed its two-year Sustainment Period for this paragraph.

## Paragraph 557 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶558

*558. Within 60 days of the Effective Date, the Deputy PSIG will develop policies for regularly, and at least annually, conducting data-driven reviews and audits to measure the effectiveness of the City and CPD's accountability practices. These reviews and audits will be designed to measure whether members of the community can readily make a complaint alleging misconduct and whether such complaints are investigated and adjudicated consistently with CPD policy, this Agreement, and the law. Reviews and audits will include: a. analysis of the number of complaints received, the disposition of complaints by complaint type, the timeliness and average length of administrative investigations, and disciplinary actions taken; b. analysis of complaint trends; c. analysis of CPD's enforcement of its Rule 14, Rule 21, and Rule 22; d. analysis of the thoroughness of administrative investigations, and of the justifications for terminating investigations before the investigative findings and recommendations; e. analysis of disciplinary grievance procedures and outcomes; and f. analysis of complainant-involved mediation.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

**Recurring Schedule:**     At Least Annually          ☑ **Met**     ☐ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

In the eighth reporting period, the City and the Deputy PSIG maintained Full compliance with ¶558 and completed the two-year Sustainment Period for this paragraph.

To evaluate Preliminary compliance with ¶558, the IMT reviewed the Deputy PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed, among other things, the CPD's training development, implementation, and evaluation. To evaluate Full compliance, we considered whether the Deputy PSIG completed the audits and reviews required by each subparagraph and performed these audits and reviews according to the Green Book, as well as whether the PSIG's policy manual reflects a requirement that the Deputy PSIG continues to do these audits and reviews at a frequency that complies with the paragraph and is consistent with its capabilities. Additionally, we evaluated whether the Deputy PSIG continued to track and provide data related to the requirements listed in ¶558 in its yearly

project plan. The Deputy PSIG met Full compliance in the fourth reporting period. In the fifth reporting period, we focused on confirming whether the Deputy PSIG maintained Full compliance. To do this, we reviewed a memorandum detailing PSIG's progress on reviews and audits contained in PSIG's policy related to the requirements of ¶558. We also reviewed the annual plan which includes discussion of plans for and status updates for work related to mobilizing ¶558 compliance.

*Progress before the Eighth Reporting Period*

The Deputy PSIG reached Full compliance in the fourth reporting period. As we explained in the fifth reporting period, the City of Chicago Office of Inspector General Public Safety Section *Policies Manual* directs that the Deputy PSIG will, among many other responsibilities, conduct data-driven review and audits of the City's and the CPD's accountability practices. Proposed reviews and audits include but are not limited to Service Call Response Times; Beat Integrity; Duty Restrictions for CPD Members; Compliance with Chicago's Welcoming Ordinance, Asset Forfeiture, Promotions, Inventory, Use and Impact of Military Grade Equipment; and Homicide Clearance Rates.

We received evidence, in the fourth reporting period, demonstrating that the Deputy PSIG engages the public in a variety of ways and on a variety of issues. PSIG seeks community input through a variety of means regarding each report or audit it conducts. Because PSIG demonstrated that it continued to track and provide data related to the requirements listed in ¶558 in its yearly project plan, the City and the Deputy PSIG met Full compliance with ¶558.

In the fifth reporting period, the Deputy PSIG maintained Full compliance and continued to meet and exceed the requirements set out in ¶558. The Deputy PSIG provides up-to-date reports and audits on its websites. Its work ensures that BIA and COPA cases are properly investigated. The 2020 annual report provided detailed responses to the subparagraph. We anticipated that the Deputy PSIG would release its 2021 report during the sixth reporting period.

In the sixth reporting period, the Deputy PSIG published its *Annual Report*, which was comprehensive, factual, and provided great detail to the community regarding the work PSIG conducted during 2021. The report specifically addressed analyses and evaluations that are directed by the requirements of ¶558. The report also provided an overview of the evaluations and reviews PSIG conducted during 2021 and provided encouragement for the community to seek the actual reports for each evaluation for more detailed information. Additionally, PSIG provided its *Public Safety Section Policies Manual* that fully addressed the requirements set forth in ¶558. We noted that the Deputy PSIG continues to meet and exceed the requirements set out in ¶558 and continues to provide up-to-date reports and audits on its website. With this, the City and Deputy PSIG maintained Full compliance with ¶558 in the sixth reporting period.

In the seventh reporting period, the Deputy PSIG produced a memorandum that provides specific documentation and references to materials that continue to address every requirement of ¶558 and its subparagraphs. Relevant to compliance with ¶558(a)–(b) and (d), the Deputy PSIG published its 2021 Annual Report, which includes a new and expanded data analysis of individual closed disciplinary investigations. Additionally, relevant to compliance with ¶558(c), the Deputy PSIG reported that its Public Safety section's projects on CPD's enforcement of Rules 14, 21, and 22 are underway and are expected to be completed in the eighth reporting period. Relevant to ¶558(e), PSIG reported that it was engaged in the investigative phase of a follow-up report on disciplinary grievance procedures and outcomes, which is expected to be completed in the eighth or ninth reporting periods. Relevant to ¶558(f), PSIG was involved in evaluating the City's mediation six-month pilot program. With these efforts, the Deputy PSIG maintained Full compliance with ¶558.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the Deputy PSIG produced its *2022 Annual Report*. As in past years and reporting periods, the *Annual Report* is comprehensive and provides detail regarding the work the PSIG conducted in the prior year. The *Report* addresses specific analyses and evaluations as required by ¶558 and authorized by Municipal Code, including (1) Closed Investigations and OIG Recommendations, (2) Investigation Initiation Processes, (3) Investigation Durations and Findings, (4) Disciplinary Recommendations, (5) Investigations with an Associated Civil Suit, (6) Video Footage in Investigations, (7) Firearm Discharge Investigations, and (8) Complainant Demographics. Each of these topics appears to have been comprehensively evaluated and includes specific data that is easy to understand.

The *Annual Report* provides an overview of the evaluations and reviews conducted during 2022 in such a way that encourages the reader to seek the actual report for more detailed information. New to the *2022 Annual Report* are highlighted Recommendation Banners and Key Take Away Banners for the various topic areas and reports. These Banners are useful and allow the reader to focus on specific identified issues.

The *2022 Annual Report* addresses the requirements of every subparagraph of ¶558. The Deputy PSIG continues to meet or exceed these requirements by providing up-to-date reports and audits on its websites, doing the necessary administrative and investigative work to ensure that BIA and COPA cases are properly investigated, and developing oversight reports and audits on many areas not addressed by the Consent Decree.

***

In the eighth reporting period, the Deputy PSIG maintained Full compliance with ¶558 and completed its two-year Sustainment Period for this paragraph.

### Paragraph 558 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Preliminary | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶559

*559. The Deputy PSIG will conduct reviews of individual closed COPA and CPD administrative investigative files for thoroughness, fairness, and objectivity, and will make recommendations based on those reviews, including the recommendation that an investigation be reopened upon a finding of a deficiency that materially affects the outcome of the investigation.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

In the eighth reporting period, the City and the Deputy PSIG maintained Full compliance with ¶558 and completed the two-year Sustainment Period for this paragraph.

To evaluate Preliminary compliance with ¶559, the IMT reviewed the Deputy PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed, among other things, the CPD's training development, implementation, and evaluation. To evaluate Full compliance, we reviewed various data sources including but not limited to PSIG's Policy Manual and observed PSIG's Virtual Case Intake Meeting to determine whether the Deputy PSIG sufficiently implemented its policy and training, including feedback the Deputy PSIG receives from its own personnel, CPD, and COPA regarding the processes for sampling, reviews, and recommendations.

The Deputy PSIG met Full compliance in the fourth reporting period. In the fifth reporting period, we focused on confirming whether the Deputy PSIG maintained Full compliance. To do this, the Deputy PSIG submits for review any recommendations to reopen investigation. We also reviewed a memorandum provided to us by the Deputy PSIG that provides summary statistics regarding PSIG's case review work.

*Progress before the Eighth Reporting Period*

In the fourth reporting period, the Deputy PSIG reached Full compliance with ¶559. The Deputy PSIG provided the revised City of Chicago Office of Inspector General Public Safety Section *Policies Manual* (*PSIG Policy Manual*), dated April 2021, that provides a complete review process for closed COPA and the CPD administrative investigative files. The review process includes reviews for completeness, objectivity, and fairness, including a detailed process for recommendations

that investigations be reopened by COPA or the CPD, per ¶559. The *PSIG Policy Manual* also requires Case Intake Meetings to include the specific PSIG members responsible for reviewing the closed case and supervisory PSIG personnel who discuss the cases and collectively determine whether a recommendation to reopen a case should be recommended to the CPD or COPA.

In the fourth reporting period, we also observed a PSIG Virtual Case Intake Meeting. All members required to attend per the *PSIG Policy Manual* were in attendance. This meeting was not unique but one of several such standing meetings. Beyond this, we also reviewed examples of administrative investigative files that reflected that the Deputy PSIG reviewed the administrative investigative files for thoroughness, fairness, and objectivity and made proper recommendations when necessary.

Because (1) the PSIG Policy Manual provided direction, (2) the Case Intake Meeting demonstrated that the policy is being followed, and (3) the provided administrative investigative file examples demonstrated that the policy and work sufficiently address the paragraph, we found the Deputy PSIG in Full compliance with ¶559 in the fourth reporting period.

Since reaching Full compliance, the Deputy PSIG has provided evidence that it continues to act in accordance with ¶559. Thus, the Deputy PSIG maintained Full compliance with ¶559 in the fifth, sixth, and seventh reporting periods.

In the sixth reporting period, the Deputy PSIG provided a memorandum containing statistics regarding its case review work. The Deputy PSIG demonstrated consistency in its case screening and reviews. Additionally, it demonstrated consistency in its recommendations to improve future disciplinary investigations and decisions. As a snapshot of its work, in the fourth quarter of 2021 and first quarter of 2022, the Deputy PSIG conducted 500 case screenings of closed BIA and COPA cases. It reopened 24 cases for further review. This information provided evidence that the Deputy PSIG continued ¶559 compliant actions and efforts throughout the sixth reporting period.

In the seventh reporting period, the Deputy PSIG produced a memorandum indicating that the Deputy PSIG conducted 662 case screenings and opened 25 cases for investigation during the Second and Third Quarters of 2022. This information was also included in PSIG's Quarter 2 and Quarter 3 reports. Additionally, PSIG provided a confidential appendix of its recommendations to reopen cases by Log Number and the responsible agency's response to PSIG's recommendations. PSIG continued to demonstrate consistency in its case screenings and review.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the Deputy PSIG produced a memorandum explaining that, in the Fourth Quarter of 2022[16] and the First Quarter of 2023, it screened a total of 542 closed cases from BIA and COPA. Of those cases, the Deputy PSIG opened 34 cases for further investigation, as is the Deputy PSIG's normal practice. The Deputy PSIG's Fourth Quarter 2022 and First Quarter 2023 Quarterly Reports also include this information. Further, the Deputy PSIG provided the IMT with a confidential index of recommendations to reopen cases, identified by Log Number, and the responsible agency's responses to those recommendations.

The Deputy PSIG reports that it made two programmatic recommendations to inform and improve future disciplinary investigations. The Deputy PSIG continues to demonstrate consistency in its case screenings and reviews.

\*\*\*

In the eighth reporting period, the Deputy PSIG maintained Full compliance with ¶559 and completed its two-year Sustainment Period for this paragraph.

### Paragraph 559 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

---

[16]   While the Fourth Quarter of 2022 fell within the seventh reporting period, the Deputy PSIG reported on this quarter during the eighth reporting period, as is its normal practice. It is typical that the Deputy PSIG reports for a six-month period that is always one quarter behind the timing of the IMT's reporting periods.

# Accountability and Transparency: ¶560

*560. The Deputy PSIG will have timely and full access to all information in the possession or control of COPA, CPD, the Police Board, and any other City departments or agencies in order to conduct any review or audit within the Deputy PSIG's jurisdiction.*

## Compliance Progress    (Reporting Period: January 1, 2023, through June 30, 2023)

| | | |
|---|---|---|
| **Preliminary:** | *In Compliance* (SIXTH REPORTING PERIOD) | |
| **CPD** | *In Compliance* (SIXTH REPORTING PERIOD) | |
| **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) | |
| **Police Board** | *In Compliance* (SIXTH REPORTING PERIOD) | |
| **Secondary:** | *In Compliance* (SIXTH REPORTING PERIOD) | |
| **CPD** | *In Compliance* (SIXTH REPORTING PERIOD) | |
| **COPA** | *In Compliance* (SIXTH REPORTING PERIOD) | |
| **Police Board** | *In Compliance* (SIXTH REPORTING PERIOD) | |
| **Full:** | *Not in Compliance* | |
| **CPD** | *Not in Compliance* | |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) | |
| **Police Board** | *Not in Compliance* | |

This reporting period, the CPD, COPA, and the Police Board maintained Secondary compliance with ¶560, allowing the City to maintain Secondary compliance. COPA maintained Full compliance. Because all relevant City entities must reach a particular level of compliance to bring the City, as a whole, into that level of compliance, the City has not yet reached Full compliance.

To evaluate Preliminary compliance with ¶560, the IMT reviewed data sources relevant to compliance with the requirements of the paragraph and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts. Specifically, the IMT looked for evidence that COPA, CPD, the Police Board, and any other City departments or agencies are aware of obligations to provide information to the Deputy PSIG and that they develop systems to share information and communicate with PSIG regarding their information needs. To evaluate Secondary compliance, the IMT reviewed data sources to demonstrate that COPA, CPD, the Police Board, and any other City departments or agencies will timely provide access to information to PSIG. To assess Full compliance, we looked at the entities' relevant policies and records following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods that instruct provisions of information to PSIG and looked for evidence of each entity following that policy.

*Progress before the Eighth Reporting Period*

The sixth reporting period marked the first time the IMT assessed compliance with ¶560. The Deputy PSIG provided a memorandum that indicated it developed a method for data requests from the entities. Additionally, PSIG organized a twice monthly meeting with the CPD to discuss specific production requests made to the CPD. The memorandum stated that, in the sixth reporting period, PSIG made three production/document requests to COPA which were fully responded to in a timely fashion. PSIG made twelve document requests to CPD with ten that were responded to and two that were being addressed in a timely fashion. Lastly, PSIG made one document request to the Police Board, which received a full and prompt response. All three entities were aware of their obligations to provide information to the Deputy PSIG and had developed systems to share the information and communicate with PSIG regarding their information needs. Additionally, all three entities demonstrated their ability to timely provide access to information to PSIG. With this, COPA, the CPD, and the Police Board reached Secondary compliance with ¶560 in the sixth reporting period.

In the seventh reporting period, the Deputy PSIG produced a memorandum detailing PSIG's ability to have timely access and full access to all information in the possession or control of COPA, CPD, the Police Board, and other City agencies in order to conduct any review or audit within the Deputy PSIG's jurisdiction. Additionally, PSIG reported that it has established a twice-monthly meeting with the CPD and a monthly meeting with COPA to discuss such requests and to provide clarification as needed. While these meetings are not required by the Consent Decree, the IMT noted that it appreciated that the Deputy PSIG, the CPD, and COPA are taking the initiative to hold these meetings to ensure the Deputy PSIG has full access to all information requested.

Additionally, COPA provided Guidance, *COLUMN CMS Administration*, which addressed ¶560 and supported COPA's CLEAR and Column CMS Systems policy by delegating responsibility to ensure the PSIG has timely and full access to information in COPA CMS in order to conduct reviews and audits within PSIG's jurisdiction. With this, COPA reached Full compliance with ¶560.

By the end of the seventh reporting period, the CPD and the Police Board had not reached Full compliance because they had not yet developed policies related to the requirements of ¶560.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the Deputy PSIG produced a memorandum that explained the Deputy PSIG's ability to fully and timely access all information in the possession or control of COPA, the CPD, the Police Board, and other City entities related to audits or reviews in the Deputy PSIG's jurisdiction. This reporting period,

the Deputy PSIG reported that it requested information from the CPD 17 times; the CPD responded fully and timely to 15 of those requests. Two such requests remain outstanding and the CPD is in the process of responding to those requests. Due to the complexity of the cases involved, the Deputy PSIG expressed no concern with the two outstanding requests that are in process. The Deputy PSIG made 10 requests for information from COPA; nine of those requests have been fulfilled and one case remains in process. As with the CPD, the Deputy PSIG expressed no concern with the outstanding request given the complexity of the case involved. Finally, the Deputy PSIG made one request for information from the Police Board and three requests for information from other City entities and reported that those requests were fulfilled in a full and timely manner.

The Deputy PSIG further reports that it continues to meet twice per month with the CPD and once per month with COPA, allowing those parties to discuss the Deputy PSIG's requests and provide clarification when necessary. As we have noted in previous reporting periods, these meetings are not required by the Consent Decree but indicate that the relevant entities are taking initiative to meet and comply with the requirements of ¶560.

The CPD and the Police Board remain in Secondary compliance for this paragraph because they have not yet developed policies that incorporate the requirements of this paragraph.

*** 

The City maintained Secondary compliance with ¶560, and COPA maintained Full compliance. Moving forward, we will look for the CPD and the Police Board to develop policies related to the requirements of this paragraph.

### Paragraph 560 Compliance Progress History

| FIRST REPORTING PERIOD SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SECOND REPORTING PERIOD SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | THIRD REPORTING PERIOD MARCH 1, 2020 – DECEMBER 31, 2020 |
|---|---|---|
| COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Not Applicable |
| FOURTH REPORTING PERIOD JANUARY 1, 2021 – JUNE 30, 2021 | FIFTH REPORTING PERIOD JULY 1, 2021 – DECEMBER 31, 2021 | SIXTH REPORTING PERIOD JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Not Applicable | COMPLIANCE PROGRESS: Secondary |
| SEVENTH REPORTING PERIOD JULY 1, 2022 – DECEMBER 31, 2022 | EIGHTH REPORTING PERIOD JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: Secondary | COMPLIANCE PROGRESS: Secondary | |

# Accountability and Transparency: ¶561

> **561.** *The Deputy PSIG will hire a full-time staff member responsible for diversity and inclusion issues, who will have specific authority to review CPD actions for potential bias, including racial bias, on any matter within the Deputy PSIG's statutory authority. The Deputy PSIG will regularly publish reports on diversity and inclusion issues, no less frequently than on an annual basis, which will contain findings and analysis.*

## Compliance Progress          (Reporting Period: January 1, 2023, through June 30, 2023)

**Recurring Schedule:**    At Least Annually        [✓] **Met**    [ ] **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

In the eighth reporting period, the City and the Deputy PSIG maintained Full compliance with ¶561 and completed the two-year Sustainment Period for this paragraph.

To evaluate Preliminary compliance with ¶561, the IMT reviewed the Deputy PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed data sources to determine if the Deputy PSIG had hired a member responsible for diversity and inclusion issues as described in ¶561, and we reviewed training materials to ensure the hired individual is properly trained to fulfill their obligations as outlined in ¶561. To evaluate Full compliance, we reviewed various data sources to determine whether the Deputy PSIG sufficiently implemented its policy and training, and we also confirmed that the required reports on diversity and inclusion issues are published as required by ¶561.

*Progress before the Eighth Reporting Period*

The Deputy PSIG reached Preliminary compliance with ¶561 in the second reporting period when it introduced a diversity, equity, and inclusion (DEI) framework across its various responsibilities. With this, the DEI officer provides DEI-anchored feedback in various areas of the Office of the Inspector General's work. In the third and fourth reporting periods, the Deputy PSIG hired a new DEI Director. The DEI Director quickly got to work conducting audits and reviews of reports focusing on issues of diversity, equity, and inclusion. We reviewed the *Evaluation of the Demographic Impacts of the Chicago Police Department's Hiring Process* draft report, which was an example of the DEI Director's work, in the fourth reporting period.

The report contained findings and recommendations regarding the demographic impacts during the stages of the CPD hiring process. After reviewing this and other data sources provided by the Deputy PSIG, we found it had reached Full compliance with ¶561 in the fourth reporting period.

In the fifth reporting period, we reviewed a memorandum provided by the Deputy PSIG that provided details regarding the DEI Director's ongoing work. During the fifth reporting period, the Deputy PSIG published the *Evaluation of the Demographic Impacts of the Chicago Police Department's Hiring Process*, the draft of which we had reviewed in the fourth reporting period. We found that this report satisfied ¶561's annual reporting requirement. The memorandum also detailed projects that are being led by the DEI Director that review the CPD's operations for potential bias. With this evidence, the Deputy PSIG maintained Full compliance with ¶561 in the fifth reporting period.

In the sixth reporting period, we reviewed a memorandum provided by the Deputy PSIG that detailed the ongoing involvement of the DEI Director in PSIG's general operations including training and other projects. We noted that the Director is involved in every aspect of PSIG's audits and reports to ensure that diversity, equity, and inclusion are considered. The memorandum also advised that the DEI Director is also involved in ongoing evaluations that do not specifically focus on DEI in order to discuss how DEI might be considered during the studies. Additionally, we noted that the DEI Director is involved in investigations involving CPD members who are being investigated for DEI related issues. The Deputy PSIG also provided its *Report on Race- and Ethnicity-Based Disparities in the Chicago Police Department's Use of Force*, which satisfied PSIG's annual reporting requirement related to ¶561. With this, the Deputy PSIG maintained Full compliance with ¶561 in the sixth reporting period.

In the seventh reporting period, we reviewed a memorandum provided by the Deputy PSIG that detailed the ongoing involvement of the DEI Director in PSIG's general operations including training and other projects. The memorandum highlighted the DEI Director's involvement in the production of reports including *The Chicago Police Department's Peer and Supervisory Wellness Support Strategies* (Nov. 2, 2022) and the PSIG Public Safety section's Annual Report for 2021. The PSIG memorandum also noted the DEI Director's involvement in leading several projects which review CPD's operations for potential bias and highlighted in-progress projects in which the DEI Director was involved, which included an inquiry into CPD's policies and practices relevant to rank promotions and an analysis of CPD's current Probationary Police Officer (PPO) applicant backlog. With these efforts, the Deputy PSIG maintained Full compliance with ¶561 in the seventh reporting period.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the Deputy PSIG produced a memorandum that set forth the following on-going projects with which the DEI Director was involved: (1) *CPD Promotions Processes: Analysis of Adverse Impact and Demographic Disparities* and (2) *Analysis of CPD's Current Probationary Police Officer Applicant Backlog*. The DEI Director also continues to ensure that diversity, equity, and inclusion are considered across the entire spectrum of the OIG's projects, including through continued involvement in ongoing evaluations that do not directly implicate diversity, equity, and inclusion to evaluate whether those issues should be given additional consideration. The DEI Director continues to participate in closed-case reviews and weekly screen meetings related to COPA's and BIA's investigations and review of CPD disciplinary investigations. In partnership with the OIG, the DEI Director continues to lead the OIG team that participates in the Mayor's Office Racial Equity Action Plan. Finally, the DEI Director provides support and advice to investigators and Assistant Inspectors General regarding diversity, equity, and inclusion concerns in investigative reports.

***

In the eighth reporting period, the Deputy PSIG maintained Full compliance with ¶561 and completed its two-year Sustainment Period for this paragraph.

### Paragraph 561 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Preliminary |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶562

*562. The Deputy PSIG will provide all staff members with comprehensive initial onboarding training and annual in-service training. The Deputy PSIG will create initial and in-service training plans and submit these plans to the Monitor and OAG for review and comment.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|

**Recurring Schedule:** Annually     ☑ **Met**    ☐ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

In the eighth reporting period, the City and the Deputy PSIG maintained Full compliance with ¶562 and completed the two-year Sustainment Period for this paragraph.

To evaluate Preliminary compliance with ¶562, the IMT reviewed the Deputy PSIG's relevant policies and documents following the process described in the Consent Decree (¶¶626–41). To evaluate Secondary compliance, we reviewed, among other things, the Deputy PSIG's training development, implementation, and evaluation. To evaluate Full compliance, we reviewed various data sources to determine whether the Deputy PSIG sufficiently implemented its policy and training, and provided the training called for by ¶562. In considering whether the Deputy PSIG maintained Full compliance, we reviewed a memorandum that details the Deputy PSIG's ongoing training efforts, along with training presentations that have been developed and attendance records of the trainings that have been provided.

*Progress before the Eighth Reporting Period*

The Deputy PSIG reached Full compliance with ¶562 in the fourth reporting period because it provided initial onboarding and annual in-service training to all staff members. The Deputy PSIG provided us training materials that were thorough and comprehensive. It also provided rosters showing the attendance of those trainings. This evidence demonstrated that the Deputy PSIG was undertaking actions consistent with ¶562's mandates.

In the fifth reporting period, the Deputy PSIG maintained Full compliance and provided a several-hundred-page memorandum that included details of ongoing training efforts: training materials, training presentations, and attendance rosters.

The Deputy PSIG provided this material for both onboarding and in-service trainings. The Deputy PSIG's training remained consistently appropriate and thorough.

In the sixth reporting period, the Deputy PSIG maintained Full compliance and provided training materials and information regarding all attendees for trainings provided. PSIG continued to demonstrate that it will provide relevant and timely training for its new employees, as well as veteran staff through onboarding training and in-service training. We commended PSIG's commitment to providing such trainings and acknowledged the comprehensive reporting regarding the specifics of each training throughout the reporting periods.

In the seventh reporting period, the Deputy PSIG maintained Full compliance and continued to provide staff members with comprehensive initial onboarding training and annual in-service training. PSIG staff attended a variety of external and internal in-service trainings (19 external trainings and 11 internal trainings total). In a memorandum to the IMT, the Deputy PSIG listed the trainings attended, identified the PSIG staff members who attended each training, and provided lessons plans and presentations for trainings and conferences attended during the reporting period. The Deputy PSIG continues to provide opportunities for its staff members to attend state and national conferences and training courses that are relevant to staff members' responsibilities. PSIG staff presented a training at the Association of Inspectors General (AIG) 2022 Annual Training Conference, and one PSIG staff member attended a five-day training institute presented by the Association of Inspectors General (AIG), the organization which promulgates the *Principles and Standards for Offices of Inspectors General* ("the Green Book") and received certification as a Certified Inspector General Inspector-Evaluator.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the Deputy PSIG provided its *PSIG Orientation* Training to new employees and conducted several in-service training sessions for employees, including *Report Writing*, *Working with Data*, *Statistics*, *Intro to City Government*, and *Fourth Amendment* Trainings. In addition, the Deputy PSIG made available to its employees various external in-service training sessions and conferences, which the Deputy PSIG reports were attended by a number of PSIG employees. The Deputy PSIG provided the IMT with documentation of attendance at each of its trainings and produced lesson plans and slide decks for those trainings and conferences as well. We understand that the Deputy PSIG invested heavily in developing, identifying, and sending the right employees to external trainings that are most relevant for those employees' particular job responsibilities. We commend the Deputy PSIG for its continued investment in training and continuing education.

***

In the eighth reporting period, the Deputy PSIG maintained Full compliance with ¶562 and completed its two-year Sustainment Period for this paragraph.

### Paragraph 562 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Status Update | Under Assessment |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

## Accountability and Transparency: ¶563

**563.** *At least 60 days prior to publishing its annual audit plan, the Deputy PSIG will provide the Monitor with a draft of its audit plan for review and comment.*

**Compliance Progress**    (Reporting Period: January 1, 2023, through June 30, 2023)

**Deadline:**    Annually (Moving)    ☑ **Met**    ☐ **Missed**

**Preliminary:**    *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Full:**    *In Compliance* (THIRD REPORTING PERIOD)
**Sustainment Period Ends**    *June 30, 2023*

In the eighth reporting period, the City and the Deputy PSIG maintained Full compliance with ¶563 and completed the two-year Sustainment Period for this paragraph.

To evaluate Preliminary compliance with ¶563, the IMT determined whether the Deputy PSIG provided the IMT with a draft of its audit plan. To evaluate Secondary compliance, we determined whether the Deputy PSIG provided an opportunity to receive IMT comments and appropriately responded. To evaluate Full compliance, we reviewed the Deputy PSIG's audit plan to ensure that it was complete and sufficient under ¶563. To determine whether the Deputy PSIG maintained Full compliance we have reviewed the draft annual audit plan and provided comments, where appropriate.

*Progress before the Eighth Reporting Period*

The Deputy PSIG reached Full compliance with ¶563 in the third reporting period. The Deputy PSIG provided the IMT with its draft *2021 Outlook on Police Oversight and Accountability* ("2021 Audit Plan") for review and comment 60 days before publishing the plan. This marked the second year in a row that the Deputy PSIG provided the IMT with its Audit Plan consistent with ¶563. With this, the Deputy PSIG reached Full compliance.

In the fifth reporting period, the Deputy PSIG maintained Full compliance and provided its *2022 Outlook on Police Oversight and Accountability* for review and comment. This draft was a comprehensive work and audit plan for 2022, and it was provided to us with plenty of time to allow the IMT to review and comment. This plan includes 22 potential projects, including some that were part of the 2021 Audit Plan that the Deputy PSIG was not able to address in 2021. We noted our appreciation that the Deputy PSIG did not simply drop the 2021-listed projects but moved them into the 2022 Audit Plan.

As required by ¶563, the Deputy PSIG publishes an annual audit plan. We explained in the sixth reporting period that, because the plan will be released in the seventh reporting period, the Deputy PSIG did not have materials to provide relevant to the requirements of ¶563. We noted our anticipation that we would receive the Audit Plan in the seventh reporting period at least 60 days prior to its publishing for review and comment.

In the seventh reporting period, the Deputy PSIG maintained Full compliance and published its annual audit plan, titled *2023 Outlook on Police Oversight and Accountability*. The audit plan provided detailed information on the OIG's and the Deputy PSIG's commitment to building upon previous audit plans and its continued efforts toward identifying issues and making recommendations to improve the work of the CPD, COPA, and the Police Board. Additionally, the 2023 audit plan provided detail regarding several projects that the Deputy PSIG was not able to launch in 2022, demonstrating the Deputy PSIG's commitment to potentially pursuing those projects in 2023. The Deputy PSIG provided the IMT with a draft of the audit plan on October 14, 2022, thereby meeting ¶563's requirement to provide a draft of its audit plan for review and comments "[a]t least 60 days prior to publishing its annual audit plan."

*Progress in the Eighth Reporting Period*

Because the Deputy PSIG published its annual audit plan in the seventh reporting period and satisfied the requirements of ¶563 at that time, the Deputy PSIG did not have additional materials to submit for ¶563 this reporting period. As in the past, we expect that the Deputy PSIG will continue to produce an audit plan on an annual basis. We anticipate that the Deputy PSIG's next annual audit plan will be published in the next reporting period, after the Deputy PSIG's Sustainment Period for this paragraph has concluded.

*** *

In the eighth reporting period, the Deputy PSIG maintained Full compliance with ¶563 and completed its two-year Sustainment Period for this paragraph.

## Paragraph 563 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Preliminary | Full |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |

# Accountability and Transparency: ¶564

> **564.** *The Deputy PSIG will exercise his or her discretionary and oversight responsibilities without interference from any person, group, or organization, including CPD, COPA, the Police Board, and City officials. Any person that knowingly interferes with the Deputy PSIG's performance of his or her duties will be subject to the penalties set forth in Municipal Code of Chicago Sections 2-56-140, 145, 270.*

| Compliance Progress | (Reporting Period: January 1, 2023, through June 30, 2023) |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (SEVENTH REPORTING PERIOD) |
| **Police Board** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *In Compliance* (NEW) |
| **Police Board** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The CPD and the Police Board did not reach Preliminary compliance with ¶564 in the eighth reporting period. COPA reached Secondary compliance with ¶564. Because all relevant City entities must reach levels of compliance to bring the City, as a whole, into compliance, the City has not yet reached Preliminary compliance.

To evaluate Preliminary compliance with ¶564, the IMT reviewed the CPD's, the Police Board's, and COPA's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. [17] These paragraphs delineate various requirements, such as requiring that policies be "plainly written, logically organized, and use clearly defined terms." To evaluate Secondary compliance with ¶564, the IMT determined whether the repercussions for interference with the Deputy PSIG's performance of its duties are made readily knowable to employees of the City, CPD, COPA, and the Police Board. To evaluate Full compliance, the IMT determined whether systems are in place to detect and report any

---

[17]  The OAG, the City, and the IMT agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See Stipulation Regarding the Policy and Training Review Process for the Civilian Office of Police Accountability (COPA), Illinois v. Chicago*, Case No. 17-cv-6260 (January 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for.._.pdf. The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

interference from the CPD, COPA, Police Board, or the City and to implement appropriate penalties.

*Progress before the Eighth Reporting Period*

The sixth reporting period marked the first time the IMT assessed compliance with ¶564. This paragraph sets a negative requirement for the CPD, COPA, Police Board, and City members: that they not interfere with the Deputy PSIG's exercise of discretion and oversight responsibility. The Deputy PSIG provided a memorandum stating that PSIG made requests to COPA, the Police Board, and the CPD, and the PSIG confirmed that the entities were responding appropriately. The memorandum did not suggest that the Deputy PSIG had faced any interference from these entities or other City officials.

We explained that, while we appreciate that the entities appear to have followed the mandates of ¶564 in the sixth reporting period, to reach Preliminary compliance, each entity must produce written guidance such as a policy that captures the requirement of this paragraph. We did not receive any policies from the entities on this point in the sixth reporting period. Therefore, the entities did not reach Preliminary compliance.

In the seventh reporting period, the Deputy PSIG provided a memorandum reporting that it is "unaware of any interference from any person, group, or organization—including CPD, COPA, the Police Board, and City officials—that has impaired or affected its ability to conduct its discretionary and oversight responsibilities."

COPA provided Guidance, *COLUMN CMS Administration*. Section I.A.7 of this Guidance addresses ¶564 by clearly stating that COPA staff will not interfere with the PSIG's discretionary and oversight responsibilities. This clear statement in COPA's guidance will ensure that all COPA staff are aware of this requirement. With this, COPA met Preliminary compliance with ¶564 in the seventh reporting period.

The CPD and the Police Board did not produce materials related to ¶564 in the seventh reporting period.

*Progress in the Eighth Reporting Period*

In the eighth reporting period, the Deputy PSIG provided a memorandum reporting that it is "unaware of any interference from any person, group, or organization—including CPD, COPA, the Police Board, and City officials—that has impaired or affected its ability to conduct its discretionary and oversight responsibilities."

This reporting period, the CPD and the Police Board did not produce any documentation that demonstrated efforts related to ¶564. COPA provided an Operational Guidance Tracker that demonstrated that 100% of its employees had read and

understood COPA's Guidance, *COLUMN CMS Administration*. This tracker demonstrated that COPA had made known to its personnel the repercussions for interference with the Deputy PSIG's performance of its duties, therefore establishing Secondary compliance for COPA.

\*\*\*

The City, the CPD, and the Police Board have not yet reached Preliminary compliance with ¶564, but COPA reached Secondary compliance in the eighth reporting period. Moving forward, we will look for the CPD and the Police Board to produce written guidance such as a policy that captures the requirements of this paragraph. For COPA, we will determine whether systems are in place to detect and report any interference from COPA and implement appropriate penalties.

### Paragraph 564 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | Not Applicable |
| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Not Applicable | Not Applicable | None |
| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| None | None | |

# Accountability and Transparency: ¶565

> **565.** *At least quarterly, COPA, the Deputy PSIG, and the President of the Police Board, or his or her designee, will meet to confer and share information regarding trends and analyses of data relating to CPD. They will jointly or separately provide any resulting recommendations for changes in CPD policy or rules, in writing, to the Superintendent. Thereafter: a. the Superintendent will respond to any such recommendation within 60 days of receipt; b. the Superintendent's response will include a description of the actions that the Superintendent has taken or plans to take with respect to the issues raised in the recommendations; and c. all policy recommendations and responses to the same will be published on a City website.*

## Compliance Progress  (Reporting Period: January 1, 2023, through June 30, 2023)

**Recurring Schedule:**   Quarterly        [✓] **Met**   [ ] **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Full:** | *In Compliance* (FOURTH REPORTING PERIOD) |
| **Sustainment Period Ends** | *June 30, 2023* |

The City maintained Full compliance with ¶565 in the eighth reporting period and completed the two-year Sustainment Period for this paragraph.

To evaluate Preliminary compliance with ¶565, the IMT determined whether the relevant representatives are meeting quarterly. To evaluate Secondary compliance, we determined whether the relevant entities have allocated sufficient resources to ensure that the meetings contemplated by ¶565 continue on a quarterly basis. To evaluate Full compliance, we determined whether the meetings sufficiently include the requisite coordination and whether any recommendations result from the process.

*Progress before the Eighth Reporting Period*

The City and its entities achieved Full compliance with the requirements of ¶565 during the fourth reporting period. In the third and fourth reporting periods, the COPA Chief, the Deputy Inspector General for Public Safety, and the Police Board President and Vice President met to discuss trends and share information regarding data analysis related to the CPD. We were pleased to learn that these meetings have proven a meaningful opportunity to discuss such issues, as intended by ¶565.

In the fifth reporting period, the Police Board President provided the IMT with documentation regarding the Quarterly meetings held during the first three quarters of 2021. The meeting minutes indicated that the entities met regularly and had substantive discussions regarding each agency's work within and outside of the Consent Decree. We noted that, to date, no joint recommendations had been made to the CPD. This evidence demonstrated continued Full compliance with ¶565.

In the sixth reporting period, the Police Board President provided the IMT with documentation regarding the Quarterly meetings held during the fourth quarter of 2021. The Police Board provided minutes of the March 2022 meeting of the Police Board, COPA, and Deputy PSIG Quarterly meeting. Representatives from each were documented as attending the meeting, and relevant topics appear to have been discussed in a meaningful way. The minutes indicated that COPA, the Deputy PSIG and the Police Board continued meeting on a regular basis and had substantive discussions regarding each agency's work within and beyond the scope of the Consent Decree. At this point in the sixth reporting period, no joint recommendations had been made to the CPD Superintendent.

In the seventh reporting period, the Police Board President provided the IMT with documentation and minutes from the quarterly meetings held during 2022. The minutes, which are recorded and approved at the following meeting, indicate that COPA, the Deputy PSIG and the Police Board continued meeting on a regular basis and had substantive discussions regarding each agency's work within and beyond the scope of the Consent Decree. At this point in the seventh reporting period, no joint recommendations have been made to the CPD Superintendent. With this, the City maintained Full compliance with ¶565.

*Progress in the Eighth Reporting Period*

This reporting period, the Police Board provided the IMT with documentation from the Police Board President and minutes of the Police Board's quarterly meetings from December 6, 2022, to March 3, 2023. These meeting minutes show that COPA, the Deputy PSIG, the Police Board, and now the Community Commission for Public Safety and Accountability (CCPSA) executive continue to meet on a regular basis and have substantive discussions about their agencies' work, both within and beyond the scope of the Consent Decree. Meeting minutes are taken at each meeting and approved at the following meeting. The agencies have not yet made any joint recommendations to the CPD Superintendent.

*** 

The City maintained Full compliance with ¶565 in the eighth reporting period and completed the two-year Sustainment Period for this paragraph.

## Paragraph 565 Compliance Progress History

| FIRST REPORTING PERIOD | SECOND REPORTING PERIOD | THIRD REPORTING PERIOD |
|---|---|---|
| SEPTEMBER 1, 2019 – AUGUST 31, 2019 | SEPTEMBER 1, 2019 – FEBRUARY 29, 2020 | MARCH 1, 2020 – DECEMBER 31, 2020 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Preliminary | Secondary | Secondary |

| FOURTH REPORTING PERIOD | FIFTH REPORTING PERIOD | SIXTH REPORTING PERIOD |
|---|---|---|
| JANUARY 1, 2021 – JUNE 30, 2021 | JULY 1, 2021 – DECEMBER 31, 2021 | JANUARY 1, 2022 – JUNE 30, 2022 |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: |
| Full | Full | Full |

| SEVENTH REPORTING PERIOD | EIGHTH REPORTING PERIOD | |
|---|---|---|
| JULY 1, 2022 – DECEMBER 31, 2022 | JANUARY 1, 2023 – JUNE 30, 2023 | |
| COMPLIANCE PROGRESS: | COMPLIANCE PROGRESS: | |
| Full | Full | |