UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS,<br><br>                Plaintiff,<br>v.<br><br>CITY OF CHICAGO,<br><br>                Defendant. | Case No. 17 CV 06260<br><br>Honorable Rebecca R. Pallmeyer |

**PLAINTIFF'S MOTION FOR JUDICIAL RESOLUTION
UNDER PARAGRAPH 630 OF THE CONSENT DECREE
REGARDING CPD'S BODY-WORN CAMERA POLICY**

After an officer shoots someone, Chicago Police Department ("CPD") policy directs the officer to turn off their body-worn camera while a supervisor questions the officer about victims, witnesses, other suspects, and injuries at the scene of the shooting. This policy is fundamentally inconsistent with the Consent Decree and the Illinois Officer-Worn Body Camera Act ("the Act")—both of which require officers to record their law enforcement-related activities to ensure transparency, accountability, and public safety. This motion asks the Court, in accordance with paragraph 630 of the Consent Decree, to order CPD to change this policy to comply with the Consent Decree and the Act.

Both the Consent Decree and the Act responded to a decades-long history of misconduct by CPD officers. For many years, that misconduct was too often concealed or papered over. But no amount of paper can conceal what a video shows. On October 20, 2014, a CPD officer shot 17-year-old Laquan McDonald. The witnessing officers gave the same story: McDonald was advancing on the officers and threatening them with a knife. But squad-car video showed something different: McDonald was moving away from officers when he was shot. The resulting

investigation of CPD by the United States Department of Justice ("DOJ") found a "code of silence" within CPD, where officers stay silent or collude on the details of their statements to prevent other officers from being held accountable for misconduct. U.S. Dep't of Just., *Investigation of the Chicago Police Department* 75 (2017). The DOJ recognized that "[a]llowing involved officers to engage in private, unrecorded conversations" with other officers in the aftermath of an officer-involved shooting enhanced the risk of officer collusion, or its appearance, and greatly impaired the investigation. *Id.* at 57. For these reasons, the DOJ recommended that CPD require recording of interviews of involved officers directly after a shooting. *Id.* at 152-153.

Even though the Consent Decree was meant to remedy the problems the DOJ identified, the most recent draft of CPD's Body-Worn Camera Policy (the "Policy"), S03-14, instructs officers to deactivate their body-worn cameras in the critical moments after they have shot someone. Ex. 1, § V.B.2. This provision invites just the sort of officer collusion that the Consent Decree and Illinois law are designed to protect against. In short, the Policy *requires* officers to *turn off* their body-worn cameras when a supervisor interviews them immediately after shooting someone. These interviews, which CPD calls "public safety investigations," consist of a series of questions designed to ensure public safety, preserve evidence, locate victims and witnesses, and apprehend and prosecute individuals who violated the law. These unrecorded, on-scene conversations provide an opportunity for the type of improper officer collusion that the Consent Decree is meant to stop.

The Consent Decree requires CPD to implement a body-worn camera policy that both complies with the Act and promotes transparency, accountability, and public trust. The Act requires CPD officers to record their law enforcement-related activities—including, specifically, arrests, searches, and *investigations*. The on-scene interviews that the Policy shields from recording are indisputably part of an "investigation," and so the Policy violates the Act and, by extension, the

2

Consent Decree. The Policy must change.

I.    **Procedural History and Relevant Factual Background**

On June 15, 2023, the City and CPD submitted the most recent draft of CPD's Body Worn Camera Policy, Special Order S03-14, for review and comment by the Office of the Illinois Attorney General ("Attorney General") and Independent Monitoring Team ("IMT").[1] Ex. 1, S03-14, Body Worn Cameras (version made effective on Dec. 29, 2023).

On July 26, 2023, in its written comments on the Policy, the Attorney General requested that CPD delete the provision that requires officers to deactivate their body-worn cameras when responding to questions during a public safety investigation for incidents in which an officer has either discharged a firearm or been involved in someone's death. Ex. 1, § V.B.2. In nearly all other situations, the Policy prohibits officers from deactivating their body-worn cameras until "the entire incident has been recorded and the member is no longer engaged in a law enforcement-related activity." *Id.* at § V.B.1. The only other exceptions to this requirement are when deactivation is requested by a victim of a crime, witness of a crime, or community member who wishes to report a crime, or when the officer is interacting with a confidential informant. *Id.*

After any officer-involved shooting or death, involved officers must immediately notify the Office of Emergency Management and Communications (OEMC) and a supervisor must go immediately to the scene. Ex. 2, G03-06, Firearm Discharge and Officer-Involved Death Incident

---

[1] CPD first submitted S03-14 on April 28, 2021. The Attorney General and the IMT provided comments on May 26, 2021 and May 28, 2021, respectively. CPD submitted a second version of S03-14 on May 19, 2022, to which the Attorney General and IMT provided comments on June 16, 2022 and August 22, 2022, respectively. CPD submitted a third version on November 17, 2022, to which the Attorney General and IMT provided comments on December 9, 2022 and December 31, 2022, respectively. CPD submitted a fourth version on June 15, 2023. The Attorney General and IMT provided comments on July 26, 2023, and August 6, 2023. CPD posted its most recent version for public comment on December 1, 2023. On December 29, 2023, CPD made the most recent version effective. The language in the Policy the Attorney General challenges through this motion is identical to the language in CPD's June 15, 2023 draft.

Response and Investigation, §§ V, VI.A & VI.C.² Upon arriving, the responding supervisor conducts a public safety investigation at the scene. *Id.* at § VI.C; Ex. 3, G04-01, Preliminary Investigations, § VI. As part of the public safety investigation, the assigned supervisor must ask the officer a specific list of questions intended to "ensure public safety, preserve evidence, or secure the incident scene," including questions to identify and locate injured people, the number of rounds fired, any subjects at large, victims or witnesses, and vehicles involved. Ex. 4, CPD-11.921, Public Safety Investigation Instructions. It is this exchange—questions from a responding, on-scene supervisor and responses from the shooting officer—that the challenged Policy would keep off camera.

The parties and the IMT met on September 12, 2023, to discuss the Policy. After collaborative discussions, the parties and the IMT were able to resolve all other remaining comments or objections regarding the Policy except the one at issue here. Accordingly, on October 6, 2023, the Attorney General sent the City a no-objection notice, conditioned on the CPD removing the language requiring officers to turn off their body-worn cameras during public safety investigations. Ex. 5, OAG's No-Objection Notice.

In response, the City sent a letter on October 13, 2023 to the Attorney General and IMT explaining that it construed the conditional no-objection notice as an objection notice, and asking the IMT to resolve the dispute regarding this objection under Paragraph 630 of the Consent Decree. Paragraph 630 requires the Monitor to convene the parties and attempt to resolve objections within 30 days of the City's receipt of an objection notice. The Parties agree that their September 12, 2023 meeting satisfies this requirement. Ex. 6, City's Response to Conditional No Objection Notices.

---

² CPD's Firearm Discharge and Officer-Involved Death Incident Response and Investigation policy, G03-06, requires revision to comply with Paragraphs 488–491 of the Consent Decree. The Attorney General and IMT are in the process of reviewing and commenting on CPD's most recent draft of G03-06 under Paragraph 627.

As the Parties did not resolve their disagreement, Paragraph 630 required the IMT to issue a proposed resolution.

The IMT issued its proposed resolution of this objection on November 29, 2023, in which it made three recommendations:

1. The CPD should implement the latest version of S03-14 as soon as possible—regardless of the status of the "public safety question" issue.
2. Because the Parties disagree on the interpretation of a state statute—which appears to raise a question of first impression with statewide significance—and the Parties' interpretations are both facially plausible, the IMT proposes that the CPD proceed under its interpretation of Illinois's Law Enforcement Officer-Worn Body Camera Act subject to the CPD's adherence to the transparency requirement below.
3. If, in the interest of public safety, the City and the CPD continue to require officers to turn off body-worn cameras during "public safety questions," the Consent Decree requires the CPD to be transparent with Chicago's communities regarding its decisions.

IMT's November 29, 2023 Proposed Resolution. Ex. 7.

Following the IMT's proposed resolution, CPD posted the Policy for public comment on its website, with the contested language. On December 29, 2023, CPD made the Policy effective. Ex. 1; *S03-14, Body Worn Cameras*, Chicago Police Department (Dec. 29, 2023), https://directives.chicagopolice.org/#directive/public/6120?f=body-worn%20camera.

The Attorney General respectfully disagrees with the IMT's proposed resolution because it does not require CPD to delete the contested language requiring officers to turn off their body-worn cameras in the immediate aftermath of a police shooting. While the Attorney General has worked collaboratively to resolve all other objections to S03-14, the Attorney General believes that the provision at issue violates the Act and the letter and spirit of the Consent Decree. Under Paragraph 630 of the Consent Decree, this Court may resolve a dispute between the parties if a Party disagrees with the IMT's proposed resolution of an objection. Consent Decree ("CD,") ¶ 630. Accordingly, the Attorney General respectfully asks this Court to order that CPD comply with

the Consent Decree by amending its Body-Worn Camera Policy to require officers to keep their body-worn cameras active during public safety investigations.

## II.     Governing Law & Consent Decree Provisions

### A.     Legal Standards

A consent decree is "essentially a contract for purposes of construction," so principles of state contract law apply in a dispute over its terms. *Holmes v. Godinez*, 991 F.3d 775, 780 (7th Cir. 2021). Under Illinois law, the "primary objective in construing a contract is to give effect to the intent of the parties, which is best shown by the language of the contract itself." *Sterling Nat'l Bank v. Block*, 984 F.3d 1210, 1217 (7th Cir. 2021) (cleaned up). "All portions of a contract should be construed as a whole, viewing each part in light of the others." *Id*. (cleaned up). Accordingly, courts should "give meaning to every provision of the contract and avoid rendering any provisions superfluous." *Id*. Courts should also "construe contracts to avoid absurd results." *Stonegate Ins. Co. v. Smith*, 2022 IL (1st) 210931 ¶ 37; *Vill. Of Kirkland v. Kirkland Props. Holdings Co.*, 2022 IL App (2d) 200780, ¶ 28 (same).

When interpreting a statute, "a court's primary goal is to ascertain the intent of the legislature." *Land v. Bd. Of Educ.*, 202 Ill. 2d 414, 421-22 (2002). The best evidence of the legislature's intent is the statute's language, which is given its plain and ordinary meaning. *Id*. Courts should view all the provisions of a statute together and construe words and phrases in light of other relevant statutory provisions. *People v. Gutman*, 2011 IL 110338, ¶ 12. When a statute is "susceptible to more than one equally reasonable interpretation, the court may look to additional sources to determine the legislature's intent." *Brucker v. Mercola*, 227 Ill. 2d 502, 513-14 (2007). Finally, courts presume that the legislature did not intend to create absurd results. *People v. Gutman*, 2011 IL 110338 ¶ 12; *People v. Collins*, 2020 IL App (1st) 181746 (holding that the Act did not create a hearsay exception because that would cause absurd results).

B.     **Relevant Consent Decree & Statutory Provisions**

Paragraphs 236–242 of the Consent Decree set out the requirements that the CPD's body-worn camera policy must meet. CD, ¶¶ 236–242. Paragraph 236 requires CPD to maintain a body-worn camera policy that is "designed to increase officer accountability" and "improve trust and CPD legitimacy in the community." CD, ¶ 236. And Paragraph 238 requires that the CPD's body-worn camera policy comply with the Illinois Law Enforcement Officer Body-Worn Camera Act. CD, ¶ 238.

The Act requires that officers' body-worn "cameras must be turned on at all times when the officer is in uniform and is responding to calls for service or engaged in any law enforcement-related encounter or activity that occurs while the officer is on duty." 50 ILCS 706/10-20(a)(3). The Act defines law enforcement-related encounters or activities to include investigations and any other instance where an officer is enforcing the law:

> "Law enforcement-related encounters or activities" include, but are not limited to, traffic stops, pedestrian stops, arrests, searches, interrogations, investigations, pursuits, crowd control, traffic control, non-community caretaking interactions with an individual while on patrol, or any other instance in which the officer is enforcing the laws of the municipality, county, or State. "Law enforcement-related encounter or activities" does not include when the officer is completing paperwork alone, is participating in training in a classroom setting, or is only in the presence of another law enforcement officer. *Id.* at 706/10-10.

III.    **Argument**

Both the Act and the Consent Decree require officers to keep their body-worn cameras on and recording during public safety investigations. The Act's plain language prohibits officers from deactivating cameras during law enforcement-related activities, which explicitly include "investigations." 50 ILCS 706/10-10. The Act speaks directly to why the General Assembly requires officers to record these activities: to collect "impartial evidence and documentation to settle disputes and allegations of officer misconduct," with the broader goal of ensuring

7

"transparency," "accountability," and greater "public trust." *Id.* § 10/5. Questions about "officer misconduct" are at their apex when an officer has just shot someone. Of all the types of "investigations" police conduct, the need for "impartial evidence" could not be greater than during the "investigation" of an officer-involved shooting. *Id.* §§ 10/5, 10/10. The plain text and purpose of the Act make clear that an officer who has just shot someone should keep their camera recording while the "investigation" of that shooting commences.

CPD's contrary reading of the Act leads to absurd results that are directly at odds with the Act's purpose. The Act contains a narrow set of exceptions for when an officer can turn off their body-worn camera, such as for police activities that do not involve community interaction or accountability—like completing paperwork "alone," participating in training, or when an officer is "only in the presence of another law enforcement officer." 50 ILCS 706/10-10. CPD attempts to convert this last, narrow exception into a gaping loophole that would undermine the Act's express purpose of collecting evidence to address allegations of police misconduct. But this narrow exemption for mundane situations—like partners sitting in a squad car in between calls for service—does not and cannot impart a limitation into what "investigations" must be recorded under the Act. If the General Assembly truly intended the "investigations" with the greatest potential to give rise to allegations of "officer misconduct" to be excluded from the recording requirement, it would have said so directly. CPD's strained interpretation of the Act must be rejected in this context.

Requiring officers to deactivate their body-worn cameras during a public safety investigation also contradicts the plain language and core purpose of the Consent Decree. Paragraph 238 of the Consent Decree requires "officers … to activate their cameras when responding to calls for service and during all law enforcement-related activities that occur while

8

on duty, and to continue recording until the conclusion of the incident(s)." CD, ¶ 238(b). The overall goals and objectives of transparency, building community trust, and preventing officer collusion support the Attorney General's position: CPD should not require officers who have just shot someone to turn off their cameras when answering questions from their on-scene supervisors.

      **A.**    **The Act requires officers to record law enforcement-related activities, including "public safety investigations" following a police shooting.**

CPD's current Policy conflicts with the plain language of the Act. The Act requires that an officer's body-worn camera be turned on anytime the officer is "engaged in any law enforcement-related encounter or activity that occurs while the officer is on duty." 50 ILCS 706/10-20(a)(3). The Act's definition of law enforcement-related activities specifically includes "investigations" and any other instance in which an officer is enforcing the law.

Law enforcement-related activities include an officer's oral response during public safety investigations, both because they are investigations and because they are activities in which the officer is enforcing the laws of the municipality or State. Officers that conduct these interviews are enforcing the law because many of the public safety questions aim to apprehend and collect evidence against individuals suspected of a crime. See, e.g., *Hudson v. City of Chi.*, 378 Ill. App. 3d 373, 392-93 (2007) (apprehending a suspect is enforcing the law); *Jackson v. Kane Cty.*, 2021 IL App (2d) 210153, ¶ 13 (officers enforce the law when engaging in an investigation in order to enforce the laws); *Fitzpatrick v. Chi.*, 112 Ill. 2d 211, 221-223 (1986) (same) (enforcing the law means engaging "in a course of conduct designed to carry out or put into effect any law"); *Agwomoh v. Vill. Of Dolton*, 2022 IL App (1st) 210892 ¶¶ 63–66 (officer enforced the law by accompanying DUI arrestee to hospital to obtain blood sample as evidence).

Statutes must also be read as a whole and in light of their legislative purpose—which leaves no doubt that the Attorney General's position is correct. Here, the Illinois General Assembly

articulated its intent within the statute. 50 ILCS 706/10-5. In that section, the legislature declared that its intent was to further the goals of improving transparency, accountability, and public trust:

> … [O]fficer-worn body cameras may provide impartial evidence and documentation to settle disputes and allegations of officer misconduct. Ultimately, the uses of officer-worn body cameras will help collect evidence while improving transparency and accountability, and strengthening public trust. The General Assembly creates these standardized protocols and procedures for the use of officer-worn body cameras to ensure that this technology is used in furtherance of these goals …. *Id.*

These purposes favor the Attorney General's reading of the phrase "law enforcement-related encounters or activities." The need for transparency and accountability is greatest after an officer-involved shooting. Body-worn camera footage of the aftermath of an officer-involved shooting or death will ensure transparency to the community and accountability. When cameras are activated during this investigation, the recordings will help collect impartial evidence to settle any allegations of officer misconduct (including collusion) while improving transparency and accountability—consistent with the express legislative purpose of the Act.

In contrast, CPD's proposed exemption for the most high-profile and sensitive law enforcement "investigations" does the opposite. CPD's position is that "public safety questions by one officer to another do not meet the definition of law enforcement-related encounters or activities…" Ex. 8, City's Response to Comments Regarding CPD BWC Policy, at 3. This interpretation purports to rely on the last sentence of the definition of law enforcement-related activity in the Act:

> "Law enforcement-related encounter or activities" does not include when the officer is completing paperwork alone, is participating in training in a classroom setting, or is only in the presence of another law enforcement officer. 50 ILCS 706/10-10.

According to CPD's position to date, the "only in the presence of another law enforcement officer" clause excludes all instances where two officers are alone together, no matter how proximate in

10

time or connected to one of the statutorily listed "law enforcement-related activities." Adopting this interpretation, however, would contradict the legislature's intent in situations where transparency and accountability are paramount: officer-involved shootings.

Requiring that officers deactivate their body-worn cameras when being questioned after a shooting directly contradicts the legislature's intent to provide "impartial evidence and documentation to settle disputes and allegations of officer misconduct." 50 ILCS 706/10-5. In the wake of an officer involved shooting, the absence of such documentation can fuel additional concerns about officer misconduct, namely that officers may collude to fabricate a false narrative that absolves the shooting officer of blame.

Adopting CPD's position would also lead to absurd results in other contexts, which cuts against CPD's interpretation. *Gutman*, 2011 IL 110338 ¶ 12. Under CPD's reading, all the activities that the statute lists as being law enforcement-activities would cease to be so if they occurred when two officers were alone together. This could include investigations and searches—activities the statute defines as law enforcement-related activities. Under CPD's proposed interpretation, one officer arresting another officer for a homicide would not have to record the arrest as long as no one else was present. That absurd result cannot be what the General Assembly intended.

The Attorney General's interpretation of the Act is most consistent with its plain text and purpose. Of all the "investigations" that officers should record, an investigation of an officer-involved shooting ranks foremost among them. CPD's contrary position undermines the Act's express purpose of facilitating collection of "impartial evidence" relevant to allegations of "officer misconduct," and should be rejected.

      **B.    Requiring officers to deactivate their body-worn cameras after an officer-involved shooting violates the plain language and purpose of the Consent Decree.**

CPD's proposed exemption for post-shooting officer interviews violates the Consent Decree's specific requirements about body-worn cameras and is contrary to the overall goals and objectives of the decree. First, the Consent Decree dedicates paragraphs 236 through 242 to CPD's use of body-worn cameras. Specifically, Paragraphs 236 and 238 require compliance with the Law Enforcement Officer-Worn Body Camera Act and its goals. Thus, to the extent that the CPD policy at issue conflicts with the Act, it also conflicts with the Consent Decree.

The challenged language in CPD's policy also directly conflicts with Paragraph 238(b) of the Consent Decree, which provides that CPD policy must require officers "to activate their cameras during all law enforcement-related activities that occur on duty, and to continue recording until the conclusion of the incident(s)." CPD's policy elsewhere makes clear that in all other circumstances involving an officer-involved death, firearm discharge, or any other use of force incident, officers are not permitted to deactivate their cameras until "the highest-ranking on-scene Bureau of Patrol supervisor has determined that the scene is secured," including determining that "all offenders are in custody or otherwise not in the area." Ex. 1, § V.B.1. Because the public safety questions are intended specifically to secure the scene and locate any subjects still at large, deactivating an officer's camera before the public safety interview necessarily means doing so before the scene is secured and the incident is concluded. Paragraph 238(b) of the Consent Decree does not permit such an exception to the requirement that officers continue recording until the conclusion of the incident.

Furthermore, the policy language at issue violates the goals and objectives of the Consent Decree. The Consent Decree's use of force section includes the provisions about body-worn cameras. Paragraph 156 lists the goals that CPD's policies in this section must meet. CD, ¶ 156.

These goals include ensuring that officers "are held accountable … for uses of force that [are] not objectively reasonable … or that otherwise violate[] law or policy," and that officers "act in a manner that promotes trust between CPD and the communities it serves." CD, ¶ 156(j)&(k). Additionally, an exception to the standard body-worn camera requirements only for the aftermath of an officer-involved shooting or death conflicts with the consent decree's overall goals and objectives of transparency, accountability, and prevention of collusion. CD, ¶¶ 59, 419–423.

The DOJ's report specifically identified officers engaging in "private unrecorded conversations" with supervisors as an obstacle to officer accountability. *Investigation of the Chicago Police Department* at 57. To address this finding, the DOJ recommended that CPD monitor the relevant officers' conversations with others until they are interviewed by investigators, and suggested that those interviews be recorded. *Id.* at 152-153. Indeed, the Consent Decree includes provisions to address this issue in its Accountability section. CD, ¶¶ 488–492. For example, Paragraph 488 requires that "involved and witness CPD members do not discuss the facts relating to the incident with any witness until interviewed by COPA, except to the extent necessary to ensure public safety, as instructed by counsel in relation to civil or criminal proceedings, or participating in CPD officer wellness programs." CD, ¶ 488 (d). Accordingly, the goals and objectives of the Consent Decree do not permit officers to engage in post-shooting, private, unrecorded conversations because those types of conversations jeopardize public trust and create opportunity for collusion.

By obscuring events after an officer-involved shooting, CPD's Policy undermines the public's trust and the Department's legitimacy. The murder of Laquan McDonald, and the officer collusion that immediately followed, demonstrated why video evidence is critical for accountability. Concealing the aftermath of an officer-involved shooting weakens the community's

trust in CPD and creates conditions that allow the code of silence to persist. In letter and spirit, the Consent Decree requires something different: Officers should only be permitted to turn off their cameras once the entire incident has been recorded and the officer is no longer engaged in a law enforcement-related activity.

**IV.    Conclusion**

The Policy language at issue violates both the Act and the Consent Decree. By its very nature, a public safety investigation is an investigation, and investigations are law enforcement-related activities. The Act requires that public safety investigations be recorded. To read the Act as excepting all instances where two officers are alone from its recording requirement contradicts the legislature's intent and invites absurdity.

Moreover, the Policy violates the Consent Decree, which requires that CPD design its body-worn camera policy to increase officer accountability, improve trust, and bolster CPD legitimacy in the community. The Policy creates an opening allowing for exactly the kind of "private unrecorded conversations" about incidents similar to the ones that led to the Consent Decree. This will only further decrease officer accountability and harm the relationship between the CPD and the community it serves. By obscuring events after an officer-involved shooting, CPD undermines the public's trust and its own legitimacy—in direct contradiction of the Consent Decree's objectives.

Accordingly, the OAG respectfully requests that the Court order CPD to delete the language in Section V.B.2 of S03-14, Body-Worn Cameras, requiring officers to deactivate their body-worn cameras before providing an oral response to the public safety investigations for incidents involving a firearms discharge and/or officer-involved death.

Dated: January 22, 2023Respectfully submitted,

KWAME RAOUL
Attorney General for the State of Illinois

By: /s/ *Samuel Kennedy*
Assistant Attorney General

Christopher G. Wells
*Chief, Public Interest Division*
Karyn L. Bass Ehler
*Assistant Chief Deputy Attorney General*
Amy Meek
*Chief, Civil Rights Bureau*
Mary Grieb
*Deputy Chief, Civil Rights Bureau*
Office of the Illinois Attorney General
115 S. La Salle St.
Chicago, Illinois 60603