UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CITY OF CHICAGO, ) <br> ) <br> Defendant. ) | Case No. 17-cv-6260 <br><br> Judge Rebecca Pallmeyer |

**THE CITY OF CHICAGO'S RESPONSE TO THE OFFICE OF ATTORNEY
GENERAL'S MOTION FOR JUDICIAL RESOLUTION REGARDING
CPD'S BODY-WORN CAMERA POLICY**

Defendant City of Chicago, by and through one of its attorneys, Jennifer K. Bagby, Deputy Corporation Counsel, respectfully submits the City of Chicago's (City) Response to the Office of Attorney General's (OAG) Motion for Judicial Resolution Regarding the Chicago Police Department's (CPD) Body-Worn Camera Policy. For the reasons set forth below, the City respectfully requests that this Court deny the OAG's request, uphold the Independent Monitor's proposed resolution, and allow CPD's policy to stand as implemented.

**INTRODUCTION**

CPD policies required by the Consent Decree must be submitted to the Independent Monitoring Team (Monitor) and OAG for "review, comment, and, subsequently, if necessary, objection" at least 30 days before the policy is implemented. (Consent Decree paragraph 627). If the Monitor and OAG fail to comment on a submitted policy within the 30-day time period, the policy "will be deemed to be non-objectionable" unless additional time for review is requested. (*Id.* at paragraph 628). "To the extent the Parties and the Monitor have unresolved disagreements regarding a particular policy or procedure after attempting to resolve them for at least 30 days, the

1

Monitor or OAG may provide [an objection notice]." (*Id.* at paragraph 629). "The Monitor or OAG may only object to a policy if it does not incorporate the requirements of the Consent Decree, is inconsistent with the goals and objectives of the Consent Decree, ***or is inconsistent with applicable law***. (*Id.*, *emphasis added*). "In the event the Monitor or OAG provides an objection notice, the Monitor will convene the Parties and attempt to resolve the identified objections" and then the Monitor will issue a proposed resolution of the remaining objections, in writing. (*Id.* at paragraph 630). If either the City or OAG disagree with the Monitor's proposed resolution of the objection, either Party may ask the Court to resolve the dispute. (*Id.*).

Before this Court is the sole unresolved issue related to CPD's Body Worn Camera Policy (S03-14) (BWC policy); specifically, whether the "public safety questions" posed by the on-scene supervisor to an involved officer following an officer involved shooting constitute a "law-enforcement related activity"[1] under the Illinois Officer – Worn Body Camera Act (50 ILCS 706/10) (Act) and therefore must be recorded. As argued below, the law is clear that the public safety questions and answers at issue do not constitute a "law enforcement-related activity" and are not required to be recorded. As such, the Monitor's resolution of the OAG's objection should be affirmed and the BWC policy should stand as implemented.

## POLICY REVIEW BACKGROUND[2]

The BWC policy was in the Consent Decree review and comment process for over three years. On November 25, 2020, the City and CPD produced the then current BWC Policy (S03-

---

[1] Inconsistencies exist in the hyphenation of the term "law enforcement related activity." The Act uses the following: "law enforcement – related encounters or activities." The Consent Decree uses both "law-enforcement related activities" and "law enforcement-related activities." CPD's BWC policy uses the following: "law-enforcement-related activities." The City will use "*law enforcement – related activity*" unless specifically quoting the Act, relevant Consent Decree paragraph, or policy.

[2] *See also* Monitor's Proposed Resolution, "Resolution," attached hereto as "Exhibit A" (EX A), for a detailed history of the policy review.

14, April 2018 version) to the Monitor and OAG towards compliance with certain Consent Decree paragraphs. On April 28, 2021, the City produced a revised draft of the BWC Policy to the Monitor and OAG for review and comment or a no objection notice and received comments from the OAG and Monitor on May 26, 2021, and May 28, 2021, respectively. On May 19, 2022, the City produced another revised draft of the BWC Policy, including responses to the previous comments, to the Monitor and OAG for review and comment or a no objection notice and received additional comments from the OAG and Monitor on June 16, 2022, and August 22, 2022, respectively. On November 17, 2022, CPD produced a further revised draft of the BWC Policy, including responses to the previous comments, to the Monitor and OAG for review and comment or a no objection notice and received comments from the Monitor and OAG on December 9, 2022, and December 31, 2022, respectively. On June 15, 2023, the City again produced a revised draft of the BWC Policy, including responses to previous comments, to the Monitor and OAG for review and comment or no objection notice. Both the OAG and Monitor provided comments and requested a meeting with the City and CPD regarding the outstanding issues on the policy on July 26, 2023, and August 6, 2023, respectively. The OAG's comments concerned their position that the "public safety questions" must be recorded to comply with the Act and that CPD's policy requiring de-activation of the cameras before the questions are answered violated the law. The City responded to the Monitor and OAG comments in writing on August 25, 2023, including its position on whether CPD's policy violated the Act and disputing the assertions that CPD had done nothing regarding its BWC policies and procedures since 2018. The parties met to discuss the policy on September 12, 2023, during the Monitor's site visit to Chicago. This meeting included a lengthy presentation by CPD's subject matter experts on the specifics of the "public safety questions" and discussion with the Monitor law enforcement experts and representatives of the OAG.

On October 5, 2023, the Monitor provided a "no objection with comments" which recommended that CPD publish the draft BWC policy for public comment and implement the policy. On October 6, 2023, the OAG provided a response letter which continued to object to the policy language regarding the de-activation of the BWCs during the "public safety questions." On October 13, 2023, the City requested that the Monitor recommend a resolution to the remaining issue as required by Consent Decree paragraph 630. On November 16, 2023, at the parties' monthly conference with the Court, the parties informed the Court that they were awaiting the Monitor's proposed resolution on this issue. The parties agreed that whichever party disagreed with the Monitor's proposed resolution would file any request for review with the Court within 7 – 10 days of receiving the Monitor's resolution. On November 29, 2023, the Monitor provided a written proposed resolution. After the 10-day period agreed upon by the parties, the OAG raised the issue of objecting to the Monitor's resolution and subsequently requested a briefing schedule with the Court. On December 29, 2023, after public posting, CPD published and implemented its BWC policy. (*See* S03-14, Body Worn Cameras, attached hereto as "Exhibit B" (EX B)).

The Monitor's proposed resolution included three recommendations: (1) that CPD should implement the latest version of the BWC policy as soon as possible "regardless of the status of the 'public safety question issue;'" (2) that CPD proceed under its interpretation of the Act; and (3) that CPD be transparent with Chicago's communities about the "public safety questions. (*See* EX A, *Resolution*, at pg. 1). The Monitor, whose team includes numerous law enforcement subject matter experts and former law enforcement leaders from across the country, included a discussion on the importance of the information collected from the "public safety questions" in the written proposed resolution. (*Id.* at pg. 10; *see* below for further discussion).

The Monitor's proposed resolution also points to policies from other law enforcement agencies both within Illinois and across the country. (*Id*. at 8 - 9). Within Illinois, the Monitor notes the policies of the Springfield Police Department, Peoria Police Department, and Rockford Police Department, all of which highlight that this issue is one of first impression in Illinois. (*Id*. at 9). The Springfield and Peoria policies both ***permit*** the de-activation of BWC for their equivalent of the "public safety questions" but do not ***require*** de-activation. (*Id*., *emphasis added*). More instructive are the citations to the Los Angeles Police Department and the San Francisco Policy Department policies, both of which resemble CPD's policy. (*Id*. at 9). These policies support why CPD's policy is consistent with law enforcement best practices, discussed in more detail below.

## **ARGUMENT**

The Consent Decree is a negotiated settlement agreement that sets forth certain specific requirements that the City, through its relevant agencies, must implement, typically through policy, training, and data collection and analysis. At issue in this motion is CPD's BWC policy and the requirements of Consent Decree, most specifically paragraphs 237 and 238. Consent Decree paragraph 237 requires that all officers assigned to patrol duties wear BWC and microphones which record "law-enforcement related activities" as defined by the Act. Consent Decree paragraph 238 requires CPD to have a policy regarding BWCs and sets forth the minimum requirements of the policy, including the requirement that officers activate their cameras when responding to calls for service and during all law enforcement -related activities. (*See* Consent Decree paragraph 238(b)).

The BWC policy, implemented after the Monitor's resolution, states that "Department members will ensure their BWC is deactivated . . . before providing an oral response to the public safety investigations for incidents involving a firearms discharge and / or officer-involved death."

5

(EX B, S03-14, at V-B-2). It is this provision that the OAG objects to and which this Court must resolve. CPD's policy, including the language above, complies with the requirements of the Consent Decree and applicable law, including the Act. If it did not the Monitor would not have issued its no objection with comments and encouraged CPD to post the policy for public comment and implement the policy. The OAG's continuing objection that the "public safety questions" must be recorded is not supported by the law and is inconsistent with "best practices." (*See* Consent Decree paragraph 730). Accordingly, this Court must uphold the Monitor's resolution and allow the policy to stand.

### *Public Safety Questions*

The disputed issue before this court is limited to the "public safety questions" and whether they must be recorded. The "public safety questions" are limited questions asked by the on-scene supervisor of an involved officer following an officer-involved shooting. The public safety questions, as set out in CPD policy, are as follows:

1. Are you injured? If so, what are your injuries?
2. Is anyone else injured? If so, what are their injuries and where are they located?
3. Did you fire your firearm? If so, where were you located when you fired and approximately how many rounds?
4. Did any subject fire a firearm? If so, in what direction and approximately how many rounds?
5. Are any subjects at-large? If so:
   a. How many subjects are wanted?
   b. What are their descriptions (including any vehicle information) and their method of flight?
   c. What was their direction of travel?
   d. How long ago did they flee?
   e. For what crimes are they wanted?
   f. Were they armed? If so, what type of weapon(s) did you observe?
6. Do you know of any evidence? If so, what is the evidence and where is it located?

6

7. Do you know of any victims or witnesses? If so, where are they located?
8. Are there any involved vehicles, including damage to vehicles or vehicle-related safety concerns?
9. Is there anything else that I need to know to ensure public safety, preserve evidence, or secure the incident scene?

(*See* CPD – 11.921, https://directives.chicagopolice.org/forms/CPD-11.921.pdf; Exhibit 1 to Declaration of Lt. Patrick Kinney, "*Kinney Declaration*," attached hereto as "Exhibit C" (EX C)).

As CPD-11.921 states, as CPD's law enforcement experts repeatedly explained to the Monitor and OAG during the September 2023 meeting, and as the attached Declaration from Lt. Kinney makes clear, "[t]he purpose of the Public Safety Statement is to make an immediate assessment following an incident to ensure public safety, preserve evidence, and secure the incident scene." (EX C, *Kinney Declaration*). In other words, the purpose of these questions is to identify the scene and make sure it is safe for the public and officers before an investigation into the officer-involved shooting begins. CPD's policy, directing that BWC be de-activated before the above questions are asked and answered, is consistent with the Consent Decree, applicable law, and best practices.

### *Legal Requirements*

Under the Consent Decree and the Act, CPD policy must require officers to record all law-enforcement related activities. (*See* Consent Decree paragraphs 237 and 238; *see also* 50 ILCS 706/20(a)(3)). The Act defines a "law enforcement-related encounter or activity" as including "traffic stops, pedestrian stops, arrests, searches, interrogations, investigations, pursuits, crowd control, traffic control, non-community caretaking interactions with an individual while on patrol, or any other instance in which the officer is enforcing the laws of the municipality, county, or State." (50 ILCS 706/10). The Act further specifies that "law enforcement-related encounter or activities" "does not include when the officer is completing paperwork alone, is participating in

7

training in a classroom setting, *or is only in the presence of another law enforcement officer*." (*Id*. (emphasis added)).

To resolve this legal issue the Court is asked to interpret the Act and determine whether the asking and answering of these questions constitutes a "law enforcement-related activity" thereby requiring that they be recorded. The law is clear that when a court is interpreting a statute, the "inquiry must always begin with the language of the statute, which is the surest and most reliable indicator of legislative intent. The language of the statute must be given its plain and ordinary meaning, and where the statutory language is clear and unambiguous, [the court has] no occasion to resort to aids of construction." *People v. Pullen*, 192 Ill.2d 36, 42 (2000); *see also United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008). The court must "'assume that the legislative purpose [of the statute] is expressed by the ordinary meaning of the words used.' Absent [a] clearly expressed [legislative] intent to the contrary, the plain language should be conclusive.'" *Berkos*, 543 F.3d at 396 (*quoting Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982)). "The best indicator of the legislative intent is the language in the statute, which must be given its plain and ordinary meaning." *Dynak v. Board of Education of Wood Dale School District 7*, 164 N.E. 3d 1226, 1231 (Ill. S.Ct. 2020) (*citing Corbett v. County of Lake*, 104 N.E.3d 389).

The plain language of the Act establishes that the asking and answering of the "public safety questions" does not constitute a law enforcement-related activity. The questions are asked by the on-scene supervisor to the single involved officer. (*See* EX C, *Kinney Declaration*). Further, these questions do not constitute an investigation; rather, they are necessary to establish where the crime scene is and if it is safe for community members and for the police to begin an investigation into the shooting. (*See Id*.). Additionally, the officer is advised at the time that the questions are asked that they are not investigatory in nature and are only asked "related to public

8

safety, preserving evidence, and securing the scene *See* CPD 11.921 (Exhibit 1 to EX C, *Kinney Declaration)*). Therefore, the Act, does not require that these questions and answers be recorded. The Monitor's resolution must be upheld and the policy must stand as implemented.

In addition to arguing that the policy violates the Act by not recording the "public safety questions," the OAG also attempts to argue that the failure to record the asking and answering of the "public safety questions" violates the goals and objectives of the Consent Decree by permitting "officers to engage in post-shooting, private, unrecorded conversations." (*See* OAG Motion, ECF Dkt No. 1144, at pg. 13). This argument is misplaced in the context of these questions and answers. The "public safety questions" are the predetermined questions outlined above. The asking of these questions does not constitute an interview of the involved officer or a statement by the officer. The plain language of the questions demonstrates that they are asked for a public safety purpose only. It is clear that there are no questions about the incident that led up to any shooting and no questions about any shooting beyond asking the officer if they fired their weapon, if the subject(s) fired a weapon, and the location of any physical evidence. (*See* CPD 11.921 (Exhibit 1 to EX C, *Kinney Declaration)*).

Moreover, as noted above, the officer is specifically advised at the time the questions are asked that the questions are not investigatory in nature. If the interaction at issue between the officer and supervisor were an interview or statement, the protections of the collective bargaining agreement would apply. Consent Decree paragraph 711 makes clear that "[n]othing in the Consent Decree is intended to (a) alter any of the CBAs between the City and the Unions; or (b) impair or conflict with the collective bargaining rights of employees." (*See* Consent Decree paragraph 711). Under the applicable collective bargaining agreements, officers involved in a shooting are afforded certain rights related to when they can be interviewed or questioned about the shooting.

9

Additionally, if an officer were to be interviewed or questioned about the shooting, any questioning would require the administration of the Administrative Proceedings Rights:

> The law provides that you are to be advised of the following:
>
> 1. Any admission or statement made by you in the course of this hearing, interrogation or examination may be used as the basis for your suspension or as the basis for charges seeking your removal or discharge or suspension in excess of 30 days.
>
> 2. You have the right to counsel of your choosing to be present with you to advise you at this hearing, interrogation or examination and you may consult with counsel as you desire.
>
> 3. You have a right to be given a reasonable time to obtain counsel of your own choosing.
>
> 4. You have no right to remain silent. You have an obligation to truthfully answer questions put to you. You are advised that your statements or responses constitute an official police report.
>
> 5. If you refuse to answer questions put to you, you will be ordered by a superior officer to answer the questions.

(*See* CPD-44.105; https://directives.chicagopolice.org/forms/CPD-44.105.pdf, attached hereto as "Exhibit D" (EX D)).

Requiring the initial on-scene supervisor to provide the rights above in the midst of an officer involved shooting, prior to identifying the scene and ensuring that the scene is safe for members of the community and officers, would defeat the purpose of the "public safety questions" which is to gather the necessary public safety information as quickly as possible, to identify the scene and make the scene safe for the public and officers in order to begin the investigation into the officer involved shooting.

Additionally, the disputed provision of the policy only concerns the recording of the "public safety questions" posed by the initial on-scene supervisor and answered by the involved officer. The disputed provision of the policy does not direct other officers on scene to de-activate

their cameras at that time if any investigation is continuing. A separate section of CPD's policy, which has not been objected to by the OAG[3] and which was not part of the Monitor's resolution, sets forth when a deactivation of a recording is required for all other officers on the scene as follows:

>    (4) The highest-ranking on-scene Bureau of Patrol supervisor has determined that the scene is secured in circumstances involving an officer-involved death investigation, firearm discharge, or any other use of force incident.
>
>    (a) The scene may be considered secure when all of the following conditions are met: all offenders are in custody or otherwise not in the area, medical aid has been requested / administered or the Chicago Fire Department (CFD) is on the scene, the involved officers have been identified, and the crime scene has been established.
>
>    (b) The Bureau of Patrol supervisor determining that the scene is secured will announce the determination via the Office of Emergency Management and Communications (OEMC) dispatcher.

(*See* EX B, S03-14 at V-B). The "public safety questions" at issue before this Court are necessary to establish the scene, ensure it is safe, and to secure the scene. While the "public safety questions" between the single supervisor and officer are not recorded under CPD's policy, until the conditions above have been met, all other BWCs on scene will continue to record and would capture officers' actions and conversations. Accordingly, the de-activation of BWC for the "public safety questions" is not contrary to the Consent Decree and this argument by the OAG must fail.

---

[3] The City and CPD response is limited to the sole issue resolved by the Monitor – whether the "public safety questions" must be recorded. To the extent the OAG attempts to raise other issues related to the policy, the City objects as beyond the scope of the Monitor's proposed resolution and would request the right to reply.

*Best Practices*

The OAG does not cite to any law enforcement authority or subject matter expert in their position that the failure to record the "public safety questions" is a violation of the law and Consent Decree. In fact, the OAG cannot point to any law enforcement authority or subject matter expert to support their position because CPD's policy is consistent with other law enforcement agencies and law enforcement best practices.

The Consent Decree defines "Best practices" as "any guidelines, standards, policies, procedures, or methods that are consistent with the requirements and goals of this Agreement, and are either supported by research or empirical evidence or are accepted by industry-recognized professionals, agencies, or organizations in the relevant subject area." (Consent Decree paragraph 730). The Consent Decree further specifies that "[i]n the case of any conflict or inconsistency between industry-recognized professionals, agencies, or organizations regarding a best practice, CPD is entitled to adopt the practice it prefers, provided that the practice is consistent with the requirements and goals of this Agreement." (*Id*.).

The Monitor, whose team includes numerous law enforcement subject matter experts and former law enforcement leaders from across the country, noted in the written proposed resolution that, "[i]n the IMT's experience, public safety questions can provide critical public safety information and, in some instances, may save lives. For this reason, the CPD should rigorously consider whether any policy or practice may infringe upon the CPD's ability to acquire such public safety information." (EX A, *Resolution*, at pg. 10). The Monitor's subject matter experts recognize the importance of the information gathered by these questions. Additionally, as noted above, the Monitor's proposed resolution makes reference to other law enforcement policies in

Illinois and nationally which indicate that CPD's policy is consistent with best practices and the Act.

The Monitor cites to the policies from both the Los Angeles and San Francisco Police Departments and acknowledges that both policies resemble CPD's policy. (*Id.* at pg 9, fn 6). The language in the Los Angeles policy is consistent with CPD's policy requirement to de-activate the cameras prior to the "public safety questions," and includes the following: "Officers shall stop recording of their Body-Worn Video (BWV) and Digital In-Car Video (DICV) prior to giving a [Public Safety Statement (PSS)]." (*See* Los Angeles Police Department, Administrative Manual Volume IV, Administrative Order No. 21, 2020, (LAPD Policy, attached hereto as Exhibit E (EX E)); https://lapdonlinestrgeacc.blob.core.usgovcloudapi.net/lapdonlinemedia/2021/09/AO-21-2020_OBTAINING-A-PUBLIC-SAFETY-STATEMENT.pdf). The Los Angeles policy also makes clear that the statement is compelled, and an officer is required to answer without representation. (*Id*. *See also* The Community Oriented Policing Services (COPS) U.S. Department of Justice guidance titled: *Officer-Involved Shootings A Guide for Law Enforcement Leaders*, for additional guidance on the limited scope of the "public safety questions" and the compelled nature of "public safety questions." https://portal.cops.usdoj.gov/resourcecenter/content.ashx/cops-p350-pub.pdf at pg. 11-12).

The language in the San Francisco policy also supports CPD's position on the purpose of the "public safety questions" and the fact that the asking and answering of the questions should not be recorded on camera. The Department Notice, re-issued on April 4, 2022, includes the following:

> A Public Safety Statement is information obtained by a supervisor using questions intended to determine existing threats to public safety and identify transitory evidence that must be preserved. The scope of this statement is limited to the collection of such critical and fleeting information in the immediate aftermath of these critical incidents. Due to the exigent nature of this information, the statement may be taken from the officer without the

13

> benefit of representation, and the Public Safety Statement is considered a compelled statement. This task should be handled by an uninvolved supervisor, barring exigent circumstances.
>
> The strict purpose of the Public Safety Statement—which is compelled without representation and taken under duress—is only to gather time-sensitive information. It is not the responsibility of the field supervisor to conduct a comprehensive interview of the involved officer. SFPD Form 544 (attached to this bulletin) is a blue, pocket-sized card that provides guidelines for field supervisors in the collection of a Public Safety Statement at the scene of an Officer-Involved Shooting (OTS) or Officer-Involved Discharge (OID).
>
> Before taking a Public Safety Statement, the involved officer shall be separated from other members by the field supervisor. The field supervisor shall turn off and seize the involved officer's Body Worn Camera (BWC) as evidence, and the field supervisor's BWC shall be deactivated during the Public Safety Statement. The supervisor will turn over the involved officer 's BWC to SFPD criminal investigators after their arrival on scene. Supervisors shall write a statement regarding the chain of custody of the B WC's. If there are multiple involved officers, the field supervisor should obtain Public Safety Statements from each officer separately, if feasible.

(San Francisco Police Department, Department Notice 22-031, attached hereto as "Exhibit F" (EX F)).

https://www.sanfranciscopolice.org/sites/default/files/202210/SFPDObtainingAPublicSafetyStatementBulletins20221011.pdf).

San Francisco's policy makes clear that the "public safety questions" are limited in order to gather time sensitive public safety information and that they should not be recorded on camera. (*Id*.). Both the Los Angeles and San Francisco policies are evidence that CPD's policy regarding the "public safety questions" are consistent with national best practices.

The Monitor also noted that within Illinois, the Springfield and Peoria Police Department policies permit, but do not require, officers to de-activate their cameras prior to any public safety questions. (EX A, *Resolution*, at pg. 8-9). These policies support CPD's position that the Act does not require the recording of the "public safety questions" and defeats the OAG's position on this issue. If the Act required the recording of the "public safety questions" the policies in other

14

municipalities within Illinois would not allow the de-activation of the recordings. While the Springfield and Peoria policies supports the City's position and defeats the OAG's argument on the issue, the best practice for a large metropolitan police department is not to merely allow for the de-activation of the cameras but require it. The purpose of the BWC policy is to establish consistency in the application of the BWC and the investigative process and to eliminate discretion during a high stress event. The language in the Los Angeles and San Francisco policies follow this guideline in their policy language by setting clear guidance on when the cameras should be turned off.

## **CONCLUSION**

For the reasons set forth above, the City of Chicago respectfully requests that this Court deny the OAG's motion, uphold the Monitor's proposed resolution, and allow CPD's policy to stand as implemented.

RESPECTFULLY SUBMITTED

*/s/ Jennifer K. Bagby*
Jennifer K. Bagby
Deputy Corporation Counsel
City of Chicago Department of Law