# EXHIBIT A

**Independent Monitoring Team** | **Chicago Police Department Consent Decree**

| | |
|---|---|
| **TO:** | City of Chicago Law Department and Office of the Illinois Attorney General |
| **FROM:** | The Independent Monitoring Team |
| **RE:** | IMT Proposed Resolution – CPD S03-14, *Body Worn Cameras* |
| **DATE:** | November 29, 2023 |

Consistent with the procedure described in ¶630 of the Consent Decree, the Independent Monitoring Team issues this "proposed resolution of remaining objections" between the City of Chicago and the Office of the Illinois Attorney General (OAG)—the Parties to the Consent Decree—regarding the Chicago Police Department's (CPD's) *Body Worn Cameras* policy, S03-14.

As explained further below, the IMT proposes the following resolution, consisting of three connected recommendations:

1. **The CPD should implement the latest version of S03-14 as soon as possible—regardless of the status of the "public safety question" issue.**

2. **Because the Parties disagree on the interpretation of a state statute—which appears to raise a question of first impression with statewide significance—and the Parties' interpretations are both facially plausible, the IMT proposes that the CPD proceed under its interpretation of Illinois's Law Enforcement Officer-Worn Body Camera Act subject to the CPD's adherence to the transparency requirement below.[1]**

3. **If, in the interest of public safety, the City and the CPD continue to require officers to turn off body-worn cameras during "public safety questions," the Consent Decree requires the CPD to be transparent with Chicago's communities regarding its decisions.**

We welcome continuing discussions on this issue with the City, the CPD, and the OAG.

## Procedural History

The City and the CPD did not submit a body-worn-cameras policy for review under Section XII, C of the Consent Decree (Review of CPD Policies and Procedures) in 2019.

On November 25, 2020, the City and the CPD provided the existing policy, S03-14, *Body Worn Cameras* (dated April 30, 2018), to demonstrate compliance with ¶576. This version of the policy is still in effect.

---

[1] The Parties have not yet fully briefed the support for their positions, including any arguments regarding the policies and practices of other Illinois law enforcement agencies or whether *State of Illinois v. City of Chicago*, No. 17-cv-06260, is the appropriate vehicle for resolving the statutory interpretation question.

On April 28, 2021, the CPD provided a revised draft of S03-14 (dated March 29, 2021) for review with ¶¶58, 236–41, 451, and 576 of the Consent Decree. The IMT provided feedback on May 28, 2021.

About a year later, on May 19, 2022, the CPD provided a further revised draft of S03-14 along with revised draft forms CPD-21.130, *Body Worn Camera Video Review*, and CPD-21.131, *Body Worn Camera Videos Viewed*, (all dated May 5, 2022) for review with ¶¶236–41. We provided our comments on August 22, 2022. The CPD provided the forms and a further revised draft of S03-14 (dated November 16, 2022) for review on November 17, 2022. We provided our comments on December 31, 2022. On June 15, 2023, the CPD provided further revised drafts of the forms and S03-14 (all dated May 2023) for review with ¶¶236–41.

In an August 25, 2023 response letter, the City notified the IMT and the OAG that the CPD has provided "ongoing updates to its procedures related to body-worn cameras through legal and training updates," which included the following.

- Bureau of Patrol announcement on January 20, 2023:

    *Department Members will activate the BWC system to event mode at the beginning of an incident and will record the entire incident for all law enforcement related activities. Law enforcement related activities include but are not limited to: arrests, traffic stops, investigatory stops, any encounter with the public that becomes adversarial after initial contact, searches of people, items vehicles, buildings & places, and any other instances when enforcing the law. S03-14 III.A.2 has a non exhaustive list of incidents where Department Members will activate their BWC. Please refer to the entire Special Order 03-14 for additional guidance on this policy. To be read at roll call for seven (7) days.*

- Administrative Message Center (AMC) message on June 30, 2021:

    *This message informs Department members of selected revisions/additions to the Illinois Compiled Statutes. It only provides a brief synopsis (see attached) of the selected revisions/additions and does not provide statutory text. The effective date of the selected revisions/additions to the Illinois Compiled Statutes is 01 July 2021. For the actual statutory language, go to www.ilga.gov. If there are any questions, call the Legal Affairs Division at 312-745-6115 or PAX 0245. To be read at roll call for five (5) consecutive days.*

- Another AMC message on June 30, 2021, regarding "the changes to BWC policy and procedures based upon the SAFE-T Act, which was effective July 1, 2021":

    *Department members are informed that Public Act 101-0652 titled the SAFE-T Act (Safety, Accountability, Fairness and Equity – Today), provides for a number of changes to the criminal justice systems in Illinois. Additionally, Public Act 102-0028*

> *revised the SAFE-T Act and delays a number of the provisions that will be implemented over a number of years. However, the Department has identified specific topics that require immediate revisions to Department policy beginning 01 July 2021. Department members and supervisors will ensure compliance with the provisions of the law. The attached Update: R&D is a summary of the revisions required to Department policies based on the 01 July 2021 implementation of the SAFE-T Act. Revised directives in the Department Directives System will be forthcoming. \*\*\* NOTE: As a result of these changes, the Body Worn Camera Program eLearning that many members were recently enrolled in will need to be updated to conform with the new law. Therefore, the eLearning will be temporarily unavailable. Any portions of the eLearning viewed by Department members that conflict with the attached document or the SAFE-T ACT should be disregarded. \*\*\* To be posted in the C.O. book and read at roll call for seven consecutive days.*

- AMC message on February 23, 2023 (including a link to the Law Enforcement Officer-Body Camera Act (50 ILCS 706):

    > *In accordance with Special Order S03-14, Department members will securely attach their Body Worn Cameras (BWC) to the front of their person consistent with training and ensure the BWC is on buffering mode prior to leaving the station. Department members must ensure their BWC remains on and in buffering mode throughout the entirety of their tour of duty except for appearances at court or hearings (S03-14 IV.A.3). Per the Law Enforcement Officer-Worn Body Camera Act (50 ILCS 706/10-20.a.3), "Cameras must be turned on at all times when the officer is in uniform and is responding to calls for service or engaged in any law enforcement-related encounter or activity that occurs while the officer is on duty." Knowingly and intentionally failing to activate your BWC may result in Class 3 Felony charges[.] Please refer to Special Order S03-14 and 50 ILCS 706 for further guidance. To be read at roll call for seven (7) days.*

- AMC message on April 7, 2023:

    > *Members should re-familiarize themselves with the notification requirements found in General Orders 03-01-01 (Radio Communications) and 04-01 (Preliminary Investigations). Proper notifications to dispatch are necessary to ensure officer safety and accountability when responding to calls or incidents. Proper notifications also allow OEMC to assign the appropriate Event number to responding officers, which is critical for ensuring that captured BWC footage is properly tagged to an Event. Mislabeling or failing to properly tag BWC video to an Event may jeopardize investigations and prosecutions, as well as prevent members and the Department from preserving necessary evidence and records. Use these tips to help ensure videos will be matched with the proper event: Activate your BWC when assigned to a call, as required by Special Order S03-14. If you are assisting on a call notify dispatch that you are providing back up and have them place you on the*

> *event. If there is a change in your beat number or car number, ensure the A&A's are changed to reflect the correct information. If more than one beat is assigned to the same car (i.e. Tact), then all beats need to be assigned to each event. For self-initiated activity, obtain an event number from OEMC. \*\*TO BE READ AT ROLL CALL FOR 7 CONSECUTIVE DAYS\*\**

These updates were not provided to the IMT and the OAG for Consent Decree review and are not included in the effective version S03-14 (April 30, 2018).

In response to the March 29, 2021, May 19, 2022, and November 17, 2022 drafts, we noted that the CPD had not engaged with Chicago's communities regarding the *Body Worn Cameras* policy per ¶160 and the CPD's obligation to "establish and maintain clear channels through which community members can provide input" regarding this policy. Evidence of compliance with ¶160 is a prerequisite to gaining Preliminary compliance with most, if not all, of the paragraphs identified by the CPD (¶¶236–41). To date, the CPD has not provided evidence of community engagement alongside the revised policy and forms. During a site-visit meeting on September 12, 2023, CPD representatives indicated a willingness to incorporate S03-14 into its maintained channels for community input regarding Use of Force policies.

Based on this discussion, on October 5, 2023, the IMT provided a no-objection notice to the CPD with the following conditions (which the IMT understood to be consistent with the September 12, 2023 discussion):

1. *The CPD implements the revised S03-14 with a new Summary Punishment Action Request (SPAR) code specific to compliance with the revised S03-14.*

2. *The CPD incorporates S03-14 into the sustained community input channels required by ¶160.*

3. *The CPD provide[s] the public comments that the CPD received in response to the public posting of S03-14 from November 18 to December 15, 2022 (as well as those comments it receives in future postings).*

4. *The City, the CPD, and the OAG continue to resolve current disagreements regarding public-safety questions and compliance with Illinois law and best practices. (To clarify, because these disagreements exist regardless of the implementation of the revised S03-14, we do not believe that the CPD needs to wait for these disagreements to be resolved before implementing the revised S03-14.)*

5. *The City, the CPD, the OAG, and the IMT continue to collaborate on ways to efficiently in-corporate all relevant Consent Decree paragraphs into CPD policy, such as ¶576.*

On October 6, 2023, the OAG provided a no-objection notice for S03-14, which included the following description and condition:

> *Given that the OAG's primary objection is limited to Section V.B.2 of the policy, there is merit in an approach that allows the CPD to implement the policy and allows the parties' disagreements to be resolved at a later date. Accordingly, the OAG provides this no-objection notice, conditioned on the parties bringing their disagreements before Judge Pallmeyer for judicial resolution at the November 16, 2023 status hearing.*

The OAG had previously requested removal or revision of the section of the policy "related to deactivation of recording equipment for the public safety questions"—Section V.B.2 of the latest version of S03-14—in its comments dated June 16, 2022, December 9, 2022, and July 26, 2023.

The City provided a response on October 13, 2023, which included the following:

> *Neither "Conditional No Objection Notice" resolved the outstanding issues raised by the IMT and OAG and the City's written responses. One of the conditions raised by the IMT was that the City continue to work with the OAG to resolve the outstanding issue related to the "Public Safety Questions." One of the conditions raised by the OAG was that the City present the "Public Safety Question" issue to the Court at the scheduled November status hearing. Based upon these conditions, the City believes that outstanding objections exist regarding the policy that require resolution by the IMT under the Consent Decree. . . . At this time, the City and CPD request that the IMT issue a proposed resolution of the remaining objections as dictated by paragraph 630.*

The IMT since asked the CPD to provide additional clarification regarding various questions, including when and why the CPD changed its policy to prohibit the recording of public safety questions. The IMT and the City met on Thursday, November 9, 2023, and the IMT asked whether the City or the CPD were aware of other practices related to "public safety questions" in Illinois under the SAFE-T Act, and the City and the CPD said they would follow up with us.

On Thursday, November 16, 2023, the City, the OAG, and the IMT met with Chief Judge Rebecca Pallmeyer during a settlement conference to discuss, among other things, the status of S03-14. Later that day, during a monthly meeting with the IMT and the OAG regarding the Use of Force section, the City and the CPD indicated that they had no further information to provide.

# Issues Before the Monitor:
# Public Safety Questions and
# the Illinois Law Enforcement Officer-Worn Body Camera Act

Based on the procedural history and the discussions with the City, the CPD, and the OAG to date, the IMT believes that the City, the CPD, and the OAG agree that the latest draft of S03-14 (dated

May 30, 2023) contains critical improvements over the existing version of S03-14 (dated April 30, 2018), including updates that are necessary to comply with state law. This includes new prohibitions on when an officer may access or review body-worn camera recordings.

The City and the OAG disagree on the following:

- whether Illinois state law and the Consent Decree require the CPD to turn cameras on during "public safety questions," currently referred to as the "public safety investigation" in CPD policy.

- whether, assuming Illinois state law does not require the CPD to record "public safety questions," the CPD should require officers to turn off body-worn cameras during "public safety questions." *See* S03-14, Section III.B.2. (April 30, 2018) and Section V.B.2 (May 30, 2023) ("Department members will ensure their BWC [(body-worn camera)] is deactivated, consistent with this directive, before providing an oral response to the public safety investigations for incidents involving a firearms discharge and/or officer-involved death.").

As noted above, CPD policy currently requires deactivation of cameras "before providing oral responses to the public safety questions" posed by a supervisor during the "public safety investigation" following an officer-involved shooting or death. *See* VI.B.6 of G03-06, *Firearm Discharge and Officer-Involved Death Incident Response and Investigation*. The stated purpose of the public safety investigation is "to ensure public safety, preserve evidence, and secure the incident scene." *Id.*

Involved officers are required to "cooperate with the public safety investigation conducted by a supervisor" by responding to the questions, which "will consist of general safety questions concerning" the following:

   a. any injuries sustained by the member or other individuals.
   b. whether weapons were discharged, either by Department members or other individuals, what type of weapons, and the direction of the discharges.
   c. whether subjects are still at large, their descriptions, direction of travel, and alleged criminal offense(s).
   d. the identification and location of any victims, offenders, witnesses, or evidence.
   e. information about any involved vehicles, including damage to vehicles or vehicle-related safety concerns.
   f. any officer-wellness related matters.

*Id.* The OAG contends that the required deactivation is prohibited by Illinois's Law Enforcement Officer-Worn Body Camera Act (the Act) because "[c]ameras must be turned on at all times when the officer is in uniform and . . . engaged in any law enforcement-related encounter or activity that occurs while the officer is on duty." 50 ILCS 706/10-20.

The City and the CPD contend that deactivation is permitted because "'Law enforcement-related encounter or activities' does not include when the officer is completing paperwork alone, is participating in training in a classroom setting, or is only in the presence of another law enforcement officer.'" 50 ILCS 706/10-10.

The OAG also objects that the required deactivation violates ¶238(b) of the Consent Decree, which states that the CPD's body-worn camera policy will "require officers, subject to limited exceptions specified in writing, to activate their cameras when responding to calls for service and during all law enforcement-related activities that occur while on duty, and to continue recording until the conclusion of the incident(s)."

It does not appear that any court has considered or decided this question of statutory interpretation under the Act. Because ¶238(b) uses nearly identical language to the Act—and ¶¶237–38 reference the Act and its exceptions—if the deactivation is permitted by the statute, we assume it does not violate ¶238(b). Of course, even if the City and the CPD's statutory interpretation is correct, the statute would *permit* but not *require* that cameras be turned off for the oral response to the public safety questions.

## IMT's Proposed Resolution

1. **The CPD should implement the latest version of S03-14 as soon as possible—regardless of the status of the "public safety question" issue.**

As reflected above—and apart from this issue—the City, the CPD, the OAG, and the IMT agree that the CPD's current version of S03-14 (April 30, 2018) does not comply with state law. In the latest no-objection notices, the IMT and the OAG indicated that the May 2023 version of S03-14 should be implemented because the above disagreements continue to exist regardless of the implementation of the revised S03-14.

In response to the City's request for a proposed resolution from the IMT, we renew this recommendation to ensure that the CPD's *Body Worn Cameras* policy is, in the least, compliant with the City's interpretation of the Consent Decree and state law:

We understand that the City and the CPD would prefer to not implement a new policy if there is a risk that a provision within the policy will be found invalid and need to change. But the process to determine the correct interpretation of the statute may take significant time, and there is an urgent and overdue need to update S03-14 and the related forms to reflect recent changes in Illinois law and Consent Decree requirements.

For example, we believe it is critical for the CPD to implement the new S03-14 policy to be compliant with the law where the Parties agree. As noted above, the latest version of S03-14 reflects new statutory prohibitions on when an officer may access or review body-worn camera recordings.

We also believe that it is critical for the CPD to implement the new S03-14 policy to better ensure that *incidents themselves* are appropriately captured by body-worn camera. For example, with the new policy, the CPD intends to implement a new Summary Punishment Action Request (SPAR) code specific to compliance with the revised S03-14, which was a condition to our no-objection notice and will allow the CPD to comply with ¶239's requirement that the CPD "impose progressive discipline, training, or other remedial action on officers who do not comply with the body-worn camera policy."

These and other improvements should not be further delayed.

The Consent Decree does not present policy revision as a one and done process. At a minimum, the CPD is required to review and update its use of force policies biennially (*see* ¶159). We recommend that the CPD review and update S03-14 on a more accelerated timeline as part of its effort to comply with ¶160's community engagement requirements.

Moreover, because the CPD has already trained its officers on the intervening changes to state law, it is on balance more confusing to leave the existing policy in place than to update it in alignment with the CPD's training pending one discreet issue.[2]

The CPD should post the latest version of S03-14 for public comment as soon as practicable. We recommend early December or January so members of the public are not required to review the policy over the holidays. Otherwise, the City, the CPD, the IMT, and the OAG should agree to a specific timeline.

2. **Because the Parties disagree on the interpretation of a state statute—which appears to raise a question of first impression—and the Parties' interpretations are both facially plausible, the IMT proposes that the CPD proceed under its interpretation of Illinois's Law Enforcement Officer-Worn Body Camera Act subject to the CPD's adherence to the transparency requirement described in No. 3 below.**

The Parties have not yet fully briefed the support for their positions, including any arguments about whether *State of Illinois v. City of Chicago*, No. 17-cv-06260, is the appropriate vehicle for resolving the statutory interpretation question and issues regarding the application to and practices of other law enforcement agencies in Illinois. Still, the Parties' competing interpretations of the statute are both facially plausible. The statutory interpretation question appears to be one of first impression, and the question has statewide significance: some law enforcement agencies in Illinois are required to comply with the requirements of the Act now, and others, including the Illinois State Police, will be subject to these requirements by January 1, 2025.[3]

In preparing this proposed resolution, the IMT reviewed the policies of other law enforcement agencies in Illinois that are currently subject to the Act. The policies vary but appear to permit—

---

[2] The IMT also continues to stand by the other conditions in its no-objection notice, which the IMT understands the CPD still intends to implement.
[3] *See* 50 ILCS 706/10-15 for the statute's applicability schedule.

but not require—officers to turn off recording for their versions of public safety questions. Specifically, the policy of the Springfield Police Department simply restates the statutory definition of "law enforcement related encounter or activities."[4] The Peoria Police Department's policy states that "officers may disengage Event Mode or use the Mute Mode when on scene of an incident but performing administrative duties not directly related to an investigation such as speaking with a supervisor or making a phone call not directly related to a criminal investigation."[5] The Peoria Police Department also provides a *Garrity* warning before obtaining "preliminary factual information" in a compelled statement following a critical incident.[6] The Rockford Police Department's policy states that "[t]he initial supervisor or his/her designee responsible for operations at the critical incident site, but not directly involved in the actual incident, shall take physical custody of the body worn camera(s) that may have captured the incident."[7]

Because both Parties' interpretations are facially plausible, we believe it is appropriate for the CPD to continue with its interpretation of the statute until the statutory interpretation question is resolved.

---

[4] Springfield Police Department, *Body Worn Camera Program*, 20-062 (August 14, 2020), https://www.springfield.il.us/Departments/PoliceDepartment/Documents/Transparency/BodyWornCameraProgram.pdf.

[5] Peoria Police Department, *Body Worn Camera Program*, 400.38 (May 22, 2023), https://public.powerdms.com/PEORIAIL/tree/documents/954066.

[6] Peoria Police Department, *Deadly Force Response Procedures*, 400.36 (February 27, 2023), https://public.powerdms.com/PEORIAIL/tree/documents/954043. *See also Collective Bargaining Agreement between the City of Peoria, Illinois, and Peoria Police Benevolent Association* (January 1, 2022) at 54, https://www.peoriagov.org/DocumentCenter/View/4007/Peoria-Police-Benevolent-Association-PPBA-Agreement---2022-to-2024?bidId=.
Related policies from police departments outside of Illinois reveal a varied approach to whether public safety statements following a critical incident are compelled or recorded. For instance, San Francisco Police Department's policy resembles the CPD's, with cameras turned off prior to the public safety statement, and the policy noting that the statement is "compelled without representation and taken under duress." San Francisco Police Department, *Obtaining a Public Safety Statement at an OIS or OID*, Department Notice 22-031 (April 4, 2022), https://www.sanfranciscopolice.org/sites/default/files/2022-10/SFPDObtainingAPublicSafetyStatementBulletins20221011.pdf. The policy of the Los Angeles Police Department also resembles the CPD's but specifies that the officer "do[es] not have the right to wait for representation to answer these limited questions." *See* Los Angeles Police Department, *Administrative Order No. 21* (November 16, 2020), https://lapdonlinestrgeacc.blob.core.usgovcloudapi.net/lapdonlinemedia/2021/09/AO-21-2020_OBTAINING-A-PUBLIC-SAFETY-STATEMENT.pdf. In the Portland Police Bureau, a supervisor will only require an involved member to provide a public safety statement if the supervisor "is unable to obtain the necessary public safety information from witness members, initial observations, and/or other sources," and does not appear to require or prohibit recording the public safety statements. *See* Portland Police Bureau, *Deadly Force and In-Custody Death Reporting and Investigation Procedures*, PPB-1010.10 (September 27, 2017), https://www.portland.gov/policies/police-directives/weapons-ammunition-equipment-1000/101010-deadly-force-and-custody-death.

[7] Rockford Police Department, *Body Worn Cameras*, 2.56 (August 24, 2021), https://www.rockfordil.gov/DocumentCenter/View/294/Body-Worn-Camera-Policy-101321-PDF.

3.  **If, in the interest of public safety, the City and the CPD continue to require officers to turn off body-worn cameras during "public safety questions," the Consent Decree requires the CPD to be transparent with Chicago's communities regarding its decisions.**

The City and the CPD have indicated that responses to the "public safety questions" are necessary for obtaining information essential to provide for and secure public safety, such as quickly identifying potential victims, injuries, and dangers. The City and the CPD have argued that the CPD will not receive this information from officers unless body-worn cameras are turned off.

In the IMT's experience, public safety questions can provide critical public safety information and, in some instances, may save lives. For this reason, the CPD should rigorously consider whether any policy or practice may infringe upon the CPD's ability to acquire such public safety information.

The Consent Decree requires, however, the CPD to promote trust and be transparent regarding its policies and practices. *See, e.g.*, ¶¶2, 544–45, and 633. This is especially true regarding policies and practices related to uses of force and the recording—or lack of recording—of information after officer-involved-shootings or deaths. *See, e.g.*, ¶¶155–57, 158 ("CPD's use of force policies must comply with applicable law and this Agreement, reflect the objectives described above, and promote trust between CPD and the communities that it serves.") and 160. *See also*, 50 ILCS 706/10-5 (providing that the purpose of body-worn-camera use is "improving transparency and accountability, and strengthening public trust").

If the CPD continues to require officers to turn off their cameras for "public safety questions," the CPD must explain the basis for that policy to its officers, the public, and the other City entities involved in investigating such incidents.[8] We suggest that the CPD provide such an explanation upon implementation of the latest version of S03-14, along with an explanation of the changes from the 2018 version of S03-14 that address recent changes to the law, enhancements to accountability, and address any other community concerns. As we have repeatedly stated, the CPD will not achieve compliance with many of the relevant Consent Decree paragraphs until it "establish[es] and maintain[s] clear channels through which community members can provide input" regarding S03-14, as required by ¶160, and the CPD should engage with the community's concerns about deactivating body-worn cameras along with other input about the policy.[9]

\*\*\*

---

[8] We note that, as explained above, S03-14 is not the only policy that indicates body-worn cameras will be turned off for the public safety question responses. We will continue to work with the CPD on the language in S03-14 and G03-06—about which we continue to have significant concerns—to ensure the public safety question process is clearly described and explained and that the questions posed are limited and specific to ensuring immediate public safety concerns, such as identification of injured persons, locating and securing critical pieces of evidence before destruction or removal, identifying and securing additional crime scenes, and other critical factors.

[9] While the CPD has not yet produced to us the comments it received when it posted a version of S03-14 for public comment a year ago, the Coalition raised concerns to the City and the CPD about deactivation of body-worn cameras in its December 23, 2022 letter about the draft policy.

If you have any questions or concerns, please contact the Independent Monitor Maggie Hickey at maggie.hickey@afslaw.com or 312.258.5572.