# EXHIBIT 1



ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. MICHIGAN AVENUE
SUITE 600
CHICAGO, ILLINOIS 60601-7570
(312) 201-9740
FAX (312) 201-9760
WWW.ACLU-IL.ORG

March 13, 2024

*Via Email*

| | |
|---|---|
| Jennifer Bagby | Allan Slagel |
| Deputy Corporation Counsel | Counsel for the City of Chicago |
| City of Chicago Department of Law | Taft Stettinius & Hollister LLP |
| 121 North LaSalle St., Room 600 | 111 East Wacker, Suite 2800 |
| Chicago, IL 60602 | Chicago, IL 60601 |
| jennifer.bagby@cityofchicago.org | aslagel@taftlaw.com |
| | |
| Maggie Hickey | Christopher G. Wells |
| Independent Monitor | Chief, Public Interest Division |
| ArentFox Schiff | Office of the Illinois Attorney General |
| 233 South Wacker Drive, Suite 7100 | 100 W. Randolph Street, 12th Floor |
| Chicago, IL 60606 | Chicago, IL 60601 |
| maggie.hickey@afslaw.com | Christopher.Wells@ilag.gov |

Dear Counsel and Monitor Hickey:

     We write on behalf of the Coalition to raise serious deficiencies in the Chicago Police Department's ("CPD") draft Coordinated Multiple Arrest Policy Suite (Special Orders S06-06X-S06-06-03XX) (the "mass arrest policy" or the "policy"), and to provide notice of the Coalition's intent to initiate emergency enforcement proceedings pursuant to Consent Decree Paragraphs 695 and 709(a).

     The mass arrest policy, released to the public on February 9, 2024, governs CPD's "response to crowds, protests, and civil disturbances." S06-06X, Sec. I. It lays out a vast array of exceptions to the CPD policy requirements that apply during "regular Department operations." S06-06-03XX, Sec. VII.A. The policy authorizes CPD to declare that any crowd, protest, or civil disturbance constitutes a "Coordinated Multiple Arrest Incident" (a "CMA Incident"),[1] which then

---

[1] A "CMA Incident" is defined as "an incident where multiple arrests are anticipated or occurring, a continued police presence is required on the scene of the incident to ensure public safety, and individual arresting officers cannot effectively be removed immediately from the incident scene for arrestee processing." S06-06-01XX, Sec. II.A. The designated "incident commander" has the authority to declare a CMA Incident. The policy states that the incident commander must be "exempt-level," *i.e.*, above the rank of captain, but does not otherwise specify any minimum required rank. S06-06-01XX, Sec. III.A. Moreover, if no exempt-level incident commander has been designated, a CMA Incident may be declared by *whoever* is the "highest-ranking on-scene supervisory member." *Id.* Sec. III.A.1.

suspends CPD's regular policies and procedures, including policies regarding arrests and reporting use of force, for the duration of the CMA Incident.

The scope of this policy is extraordinarily broad. While we understand it is intended, in the near term, to address CPD's response to gatherings during the August 2024 Democratic National Convention ("DNC") in Chicago, the policy applies, by its own terms, to *any* "crowds, protests, and civil disturbances." And the policy's impact is immediate. CPD is training officers on the policy *this month* (March 2024) in preparation for the DNC.

The mass arrest policy violates numerous provisions of the Consent Decree and does not adequately protect First Amendment rights. As explained below, the policy violates the Consent Decree's mandates for use of force reporting and investigations (¶¶ 217-19, 228-35, 571(h), 574-75). *See* Part II. It fails to protect protesters' First Amendment rights and fails to comply with related Consent Decree provisions on impartial policing (¶¶ 50-51) and use of force (¶¶ 156, 163). *See* Parts III-IV. It fails to comply with statutory and Consent Decree requirements for providing disability and language accommodations (¶¶ 64, 68-69). *See* Part V. And CPD violated the Consent Decree's community engagement requirements applicable to this policy (¶ 633). *See* Part VI.

For these reasons, unless CPD takes immediate action to correct the policy deficiencies described below, the Coalition will file an emergency enforcement motion with the Court.

I.  **CPD's Abuse of Protesters in Summer 2020, Subsequent Coalition Enforcement Letter, and the Resulting First Amendment Policy.**

In May 2020, a little over one year after the Consent Decree went into effect, the world watched as George Floyd, a Black man, was killed by a Minneapolis police officer kneeling on his neck. The streets of Chicago erupted into protest against police violence and racism. Coalition members participated, leading many of the 2020 protests. CPD responded to Coalition members and other protesters with brutal force, systematically violating at least twelve provisions of the Consent Decree. Among other violations, CPD officers used unjustified lethal force against protesters in the form of headstrikes and retaliated against people recording officers' actions, including journalists and other bystanders.

On July 23, 2020, the Coalition notified the City and CPD of the Coalition's intent to file an enforcement action if they failed to take immediate steps to ensure compliance with the Consent Decree and protect protesters' First Amendment rights and safety. Dkt. 855; Dkt. 855-1 ("Enforcement Letter"). They did not immediately engage with the Coalition and, instead, on August 27, 2020, CPD issued a Special Order that allowed police officers to further escape accountability for protest-related abuses by eliminating certain reporting requirements for uses of force during protests and seemingly permitting the use of lethal force against protesters. *Response to Crowds and Civil Disturbances*, Special Order S03-022.

The facts animating the Coalition's Enforcement Letter were substantiated by a series of investigative reports on CPD's 2020 protest response from the Independent Monitoring Team ("IMT"), the City's Office of Inspector General, and even CPD itself.

In July 2021, the IMT issued a 464-page report (Dkt. 964) addressing CPD's failed response to the 2020 protests. *Id.* at 1. The report provided first-hand accounts of protesters who

2

described how CPD officers physically and verbally abused them. Officers hit protesters with batons, fists, and other objects, pushed and shoved them, tackled them to the ground, caused head injuries, and sprayed them indiscriminately with pepper spray. *Id.* at 12-13. The IMT found that officers engaged in inherently escalatory behavior and "various levels of misconduct and excessive force." *Id.* at 15, 129-30.

The Office of Inspector General ("OIG") released a similarly damning report on CPD's response to the summer 2020 protests.[2] OIG found that CPD made more than 1,500 protest-related arrests between May 29 and June 7, 2020. *Id.* at 8-9. "[P]rotesters reported seeing and experiencing apparently indiscriminate uses of force by CPD members. They described seeing CPD members tackle, punch and use batons to strike peaceful protesters in the head and neck." *Id.* at 37. OIG found that CPD failed to "fulfill its force reporting obligations" and failed to "provide clear and consistent guidance to officers on reporting obligations." *Id.* at 9. As a result, OIG concluded, "CPD underreported uses of baton strikes and manual strikes, further resulting in an inadequate record of severe and potentially out-of-policy uses of force." *Id.* In addition, CPD exempted uses of force from being reviewed by the Force Review Division (now known as the Tactical Review and Evaluation Division ("TRED")) and other accountability mechanisms. *Id.* at 110.

After the Coalition filed its Enforcement Letter, the City/CPD, the Coalition, and the Illinois Attorney General's Office engaged in structured settlement negotiations, supervised by the Court and the IMT. These negotiations resulted in a new CPD First Amendment policy (Gen. Order G02-02). The negotiated policy contains provisions explicitly crafted to prevent another 2020. Among other things, the First Amendment policy prohibits officers from making arrests when a protester poses no threat to the safety of the community or danger to property, and requires officers to ensure that people have an opportunity to comply with commands prior to taking enforcement action.

As explained in detail below, CPD's proposed mass arrest policy would undo many of the key negotiated remedies that the Coalition obtained and that this Court approved. The mass arrest policy does far too little to prevent a repeat of violent and systemic First and Fourth Amendment violations and Consent Decree violations during CPD's response to protests around the 2024 DNC and beyond.

II. **The Mass Arrest Policy Violates the Consent Decree's Mandates for Reporting Use of Force.**

The policy relaxes the procedures for reporting officer use of force whenever a CMA Incident is declared, instituting "alternate tactical response reporting procedures" that apply throughout the incident. S06-06-03XX, Sec. IV.A. These alternate procedures "take precedence" over "any other Department directive" to the extent there is "any perceived conflict." *Id.* Sec. IV.B.

The alternate procedures violate the Consent Decree in at least two ways. *First*, the policy allows CPD to use a watered-down mass arrest form instead of the Decree-mandated Tactical Response Report ("TRR") to document certain uses of force against community members. *Second*,

---

[2] City of Chicago, Office of Inspector General, *Report on Chicago's Response to George Floyd Protests and Unrest* (Feb. 18, 2021), https://igchicago.org/wp-content/uploads/2023/08/OIG-Report-on-Chicagos-Response-to-George-Floyd-Protests-and-Unrest.pdf.

the policy extends the time period an officer has to complete a TRR beyond the Decree-mandated deadline (the end of an officer's tour of duty) without even setting an outer limit on the extension. Given CPD's widespread, brutal use of excessive force during the summer 2020 protests—and officers' widespread failure to report uses of force during those protests—CPD should be *strengthening* its procedures for documenting, investigating, and publicly disclosing officer violence against protesters. This policy does the opposite.

### A. The Mass Arrest Policy Violates Consent Decree Requirements for Documenting and Investigating All Reportable Uses of Force.

Under Consent Decree Paragraph 219, CPD officers "*must* complete a TRR" or "similar form of documentation" "*[w]henever* a CPD member engages in a reportable use of force." (Emphasis added). The Consent Decree defines "reportable use of force" broadly to include "any force by a CPD member to overcome the active resistance of a subject." ¶ 218(a). This includes any "force that is reasonably expected to cause pain or an injury, but does not result in injury or complaint of injury," such as "pressure point compliance techniques; joint manipulation techniques; wristlocks; armbars; and any leg sweep, weaponless defense techniques, or takedown that does not result in injury or complaint of injury." *Id.*

In contrast, the mass arrest policy states that during a CMA Incident, officers need to complete a TRR for only the following limited types of use of force: "deadly force," "weapon discharge," "impact weapon strikes," "canines as a force option," "Long Range Acoustic Device (LRAD) acoustic transmission to cause discomfort as a compliance technique," and "force that *results in* a non-fatal *major* injury," where "major injury" is defined as a "visible injury requiring immediate medical attention." S06-06-03XX, Sec. V.C. (emphasis added). This means that uses of force that are "reasonably expected to cause pain or an injury" but do not result in a "major injury"—for example, an officer who hits or kicks an individual but causes no "major injury" or at least not any that is immediately observable—will *not* be reported in a TRR. Under the Consent Decree, there is no circumstance in which policies or procedures about reporting officers' use of force may be contingent on whether the officer reports a resulting injury.

In lieu of a TRR, the mass arrest policy allows officers to submit a much less extensive form, known as a Coordinated Multiple Arrest Report, CPD-11.433 (Rev. 1/24) (a "CMA Report"). *See* S06-06-03XX, Sec. V.B.-C. The CMA Report is not an adequate substitute for a TRR. For at least three reasons, it does not qualify as a "similar form of documentation [to a TRR]," as needed to pass muster under Consent Decree Paragraph 219.

***First***, the CMA Report form, which is less than half the length of a TRR form, requires officers to provide far less information than is required in a TRR. One of the missing fields—"the subject's mental health or medical condition, use of drugs or alcohol, ability to understand verbal commands, or disability, as perceived by the CPD member(s) at the time force was used"—is specifically required by the Consent Decree (¶ 571(h)). In addition, the truncated "narrative summary" section of the CMA Report form conveys to officers that detailed facts are not needed. Unlike the TRR form, which asks officers to "describe with specificity (1) the use of force incident, (2) the subject's actions or other circumstances necessitating the force used, and (3) the involved member's response, including force mitigation efforts and specific types and amount of force used," the CMA Report form merely instructs officers to provide: a "concise summary of [the]

4

person's actions and member's response." The information that will inevitably *not* be captured on the CMA Report form will impair CPD's, the Civilian Office of Police Accountability's ("COPA"), and the public's ability to identify and hold officers accountable for improper uses of force, and to track and address use of force patterns.

**Second**, unlike a TRR, a CMA Report is not subject to the two forms of oversight that the Consent Decree mandates for reportable uses of force: district-level supervisory investigation (¶¶ 228-35) and independent review by the Tactical Review and Evaluation Division ("TRED") (¶¶ 574-75). These mandatory layers of review ensure that officers' use of force is thoroughly evaluated to identify possible violations of law or policy, that any such violations are referred to COPA, and that officers receive any necessary corrective action such as retraining.

While the mass arrest policy states that a copy of each CMA Report will be forwarded to TRED, S06-06-02-XX, Sec. VI.D.4., the policy makes clear that TRED's review of CMA Reports does not comply with the Consent Decree's requirements for assessing uses of force. The Consent Decree requires TRED to conduct an in-depth evaluation of the individual officer's use of force, assessing each particular use of force incident. ¶ 574. In contrast, the mass arrest policy states that TRED will conduct only a high-level review of the CMA Incident *as a whole i.e.*, assessing CPD's response to an *entire* protest. S06-06-03XX, Sec. VIII.B.1.

**Third**, unlike a TRR, it is not clear whether a CMA Report will be included in the use of force data that CPD is obligated to publicly report. Consent Decree Paragraph 581 requires CPD to regularly publish on its website aggregated and incident-level data about *all* reportable uses of force.[3] However, CPD's online "Use of Force Dashboard" currently reports only TRRs, leaving uncertain whether reportable uses of force that are documented only in a CMA Report (and not in a TRR) will be included in CPD's online dashboard. The Coalition understands based on a conversation with the Monitoring Team that CPD intends to include data from CMA Reports on its Use of Force Dashboard, but this is reflected nowhere in CPD's policies.

### B. The Mass Arrest Policy Delays Use of Force Reporting, in Violation of the Consent Decree.

The Consent Decree mandates prompt completion of a TRR after any officer commits a reportable use of force. Specifically, "[w]henever a CPD member engages in a reportable use of force, the member *must complete a TRR*, or any similar form of documentation CPD may implement, *prior to the end of his or her tour of duty*." ¶ 219 (emphases added). The Consent Decree provides only one narrow exception to this timing requirement, allowing a reasonable extension if an officer "requir[es] medical attention." *Id.* The Consent Decree makes no exceptions for "mass arrests," protests, large demonstrations, or the like.

In violation of the Decree's mandate that TRRs be completed before the end of an officer's tour of duty, the policy authorizes an incident commander to "institute delayed Tactical Response Reporting procedures," which enables officers to "complete any TRR *after the members' tour of duty*." S06-06-03XX, Sec. VII.C., Sec. VII.H.2. (emphasis added). The policy provides no clear

---

[3] Chicago Police Department, Use of Force Dashboard, https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

5

standard dictating what specific circumstances would warrant instituting "delayed Tactical Response Reporting procedures." *See* Sec. VII.C. (listing eight open-ended "factors for consideration"). In addition, the policy places no constraints on the delayed (post-tour of duty) timeline for submitting a TRR. The policy leaves the designation of the new, delayed timeline up to the sole discretion of each incident commander. If an incident commander wanted to give officers six months to submit TRRs, nothing in this policy would prohibit it, even though the Consent Decree clearly does.

The policy's delayed use of force reporting introduces serious risks that officers will submit TRRs days, weeks, or even months after engaging in physical violence against community members—after recollections have faded and evidence is no longer available, and after officers have had time to collude and coordinate on their version of events surrounding the use of force. The unlimited timeline for delayed reporting also increases the risk that officers will *never* submit a TRR, and that instances of nonreporting will be difficult or impossible to identify. In sum, the policy's delayed TRR procedures violate Paragraph 219 of the Consent Decree and undermine the Decree's accountability mechanisms for officer violence in the very context—police response to protesters—in which CPD has demonstrated a heightened need for ensuring accountability.

### III. The Policy Fails to Adequately Protect First Amendment Rights.

#### A. The Policy Fails to Make Clear that Protests Trigger First Amendment Protection.

The policy states that it controls CPD's "response to crowds, protests, and civil disturbances," but fails to make clear that "protests" (as well as demonstrations, parades, and other expressive gatherings) trigger First Amendment protections not applicable to "crowds" and "civil disturbances." S06-06X, Sec. I. The policy provides no definitions of the terms "crowds," "protests," or "civil disturbances," nor does it tell officers how to distinguish between these three different types of activity. Instead, the policy treats the three as a single category. By lumping "protests" together with "crowds" and "civil disturbances," the policy fails to make clear to officers that community members who participate in protests are protected by the First Amendment, and thus require different police responses than "crowds" and "civil disturbances," which may not be entitled to First Amendment protection. The policy further increases the likelihood that officers will violate protesters' First Amendment rights by suggesting that only *some* protests qualify as protected "First Amendment assemblies," without explaining this distinction. *See* S06-06X, Sec. III.E.2., Sec. III.I.

Additionally, the policy makes no distinction between protests occurring on public sidewalks, streets, or parks (considered a "traditional public forum" under the First Amendment) and those in which protesters are located on private property.[4] This omission is deeply concerning, as the former is protected by the First Amendment whereas the latter generally is not. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). This omission is especially concerning given that this policy is intended to govern CPD's response to the DNC, where there are likely to be some protests on public sidewalks, streets, and parks and other protests

---

[4] The policy includes a definition of "public way" in the Definitions section, S06-06X Sec. II.G., but the term appears nowhere in the operative provisions of the policy.

6

that may be taking place on private property, such as in the United Center where the convention is being held.

### B. The Policy Fails to Limit Mass Arrests of Protesters to the Narrow Circumstances Permitted under the First Amendment.

The policy fails to provide constitutionally adequate direction to incident commanders on when and under what circumstances they may declare a CMA Incident. Even though the entire purpose of declaring a CMA Incident is to facilitate large-scale arrests of protesters for failure to comply with a crowd dispersal order, the First Amendment standards that govern such arrests are mentioned nowhere in the policy.

Under the First Amendment, arrests of protesters on public property for failure to obey a dispersal order is permitted only if "immediate danger to speakers and protesters exists . . . [and] dispersal [i]s a necessary means of averting danger and damage." *Bell v. Keating*, 697 F.3d 445, 457-58 (7th Cir. 2012) (upholding in part and invalidating in part the City of Chicago's disorderly conduct ordinance, Mun. Code Sec. 8-4-010(d)). But the policy fails to instruct officers that mass arrests are only appropriate in those limited circumstances. The policy instead lists a number of vague "factors" that the incident commander must consider when declaring a CMA Incident, including: "the availability of Department resources," whether "continued police presence is necessary" to ensure public safety," "the total number of arrestees," "the probable charges," and the "capacity of the detention facilities." S06-06-01XX, Sec. II.A.1.-8. These factors make no reference to the First Amendment standard that dictates whether protesters may be arrested *in the first place*.

The policy should be revised to make clear that mass arrests of protesters should be used only as a last resort—when "necessary" to "avert[] danger and damage." *Bell*, 697 F.3d at 457-58. In addition, the policy should be revised to make clear that mass arrests of protesters should not be conducted unless all other reasonably available options for restoring public safety have been exhausted. For example, CPD's First Amendment Policy (discussed further below) requires the field commander, before issuing a crowd dispersal order, to "consider if there are and attempt any available less intrusive options to stop the unlawful behavior necessitating the issuance of the crowd dispersal order." G02-02, Sec. IX.D. Similar language must be added to the mass arrest policy to instruct officers that mass arrests are not permitted unless other available, less intrusive options have failed.

### IV. The Mass Arrest Policy Conflicts with Provisions of CPD's First Amendment Policy that are Essential for Ensuring CPD's Compliance with the Consent Decree and Constitution.

CPD's First Amendment Rights policy contains a number of important restrictions on officers' treatment of protesters, which safeguard protesters' First Amendment rights consistent with *Bell*. The First Amendment policy, as described above (Part I), was the result of intensive negotiation between CPD, OAG, and the Coalition—supervised by this Court—to remedy CPD's abusive and unlawful treatment of protesters during the racial justice protests of summer 2020. These negotiations were specifically intended to create policy provisions that would prevent CPD's

7

widespread violation of numerous Consent Decree requirements documented in the Coalition's July 2020 Enforcement Letter. The relevant Consent Decree provisions include:

- Paragraph 50: Requiring CPD to "provide police services to all members of the public without bias and [to] treat all persons with the courtesy and dignity which is inherently due every person as a human being";
- Paragraph 163: Prohibiting CPD officers from "using force as punishment or retaliation, such as using force to punish or retaliate against a person for . . . engaging in protected First Amendment activity (e.g., lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct)"; and
- Paragraph 213: Prohibiting CPD officers from using impact weapons such as batons "to intentionally strike a subject in the head or neck, except when deadly force is justified."

The First Amendment policy is crucial to ensuring that officers comply with the above Decree requirements, respect protesters' First Amendment rights, and do not repeat the brutal, violent, and unconstitutional tactics that were clearly intended to silence protesters during the summer of 2020 (*see* Dkt. 855-1). Yet the mass arrest policy, as explained below, appears to override, or at least significantly weaken, key provisions of the First Amendment policy whenever a CMA Incident is declared.

### A. The Mass Arrest Policy Contradicts the First Amendment Policy's Restrictions on Arresting Protesters.

The First Amendment policy places tight restrictions on officers' ability to arrest protesters. Specifically, officers are prohibited from arresting any person "engaged in First Amendment conduct" unless that person poses an "immediate threat to the safety of the community, or others, or of causing property damage." G02-02, Sec. IV.B.6. This restriction continues to apply even after a protester has disobeyed a "crowd dispersal order." *Id.* Sec. IX.E.2. In addition, a person engaged in First Amendment conduct cannot be arrested for "minor or petty offenses, including traffic or business offenses." *Id.* Sec. IV.B.6.

These restrictions were specifically negotiated and approved by the Court to safeguard protesters' First Amendment rights and to ensure CPD's compliance with Consent Decree requirements. *See* ¶ 50 (requiring CPD to "provide police services to all members of the public without bias"); ¶ 51 (requiring CPD to "provide police services in a manner that promotes community trust of its policing efforts and ensures equal protection of the law to all individuals"). Moreover, the restrictions on arrest were aimed at preventing CPD officers from unconstitutionally targeting protesters with retaliatory arrests, as they did in large numbers during the 2020 racial justice protests.[5]

The mass arrest policy appears to do away with these critical protections by suspending the First Amendment policy's restrictions on arrest during any CMA Incident—precisely when

---

[5] David Eads, Josh McGhee, Matt Chapman, *Chicago Police Arrested More People for Protesting Than for Looting in Early Days of Unrest, Contradicting Original Claims*, The Chicago Reporter (June 16, 2020), https://www.chicagoreporter.com/chicago-police-arrested-more-people-for-protesting-than-for-looting-in-early-days-of-unrest-contradicting-original-claims/.

protections for protesters are most needed. The mass arrest policy expressly states that it supersedes any other CPD policy to the contrary, which would include the First Amendment policy. Specifically, the policy within the CMA suite that sets forth "alternate arrest procedures during coordinated multiple arrest incidents" states that "[i]f there is *any perceived conflict* between a procedure in this directive and *any other* Department directive, including the Department directive titled 'Processing Persons Under Department Control,' *this directive will take precedence*." S06-06-02XX, Sec. III.B. (emphasis added). That same policy then expressly authorizes field commanders to initiate "large scale enforcement action[s], including physical arrests beyond the individual isolated incidents or individual offenses occurring." *Id.* Sec. IV.A. The policy contemplates each officer arresting as many as fifteen people in a single CMA Incident, *id.* Sec. IV.C.3.NOTE, and authorizes officers to use their batons to "'rake' persons toward arrest teams." S06-06-03XX, Sec. III.B.NOTE. Such "large scale" arrests "beyond . . . individual offenses" are precisely what the First Amendment policy aims to prohibit by requiring officers to make an individualized determination that a would-be arrestee poses an "immediate threat to the safety of the community, or others, or of causing property damage." G02-02, Sec. IV.B.6.

Officers and supervisors are particularly likely to believe that the mass arrest policy conflicts with and supersedes the First Amendment policy's arrest restrictions because the mass arrest policy provides extensive procedures regarding arrest but omits any mention of the First Amendment policy's restrictions. Indeed, this omission appears to be intentional, as there are other provisions of the First Amendment policy that the mass arrest policy *does* incorporate. *E.g.*, S06-06X, Sec. III.I.; Sec. V.B.3. (requirements for crowd dispersal orders); Sec. III.K.2. (prohibition on retaliatory use of force). While the mass arrest policy states that "[a]ny response by Department members to a First Amendment Assembly, including crowd management and crowd dispersal orders, will be consistent with [the First Amendment policy]," S06-06X, Sec. III.I., it also *expressly overrides "any other" conflicting policies* and specifically calls for "large scale" arrests "beyond . . . individual offenses." S06-06-03XX, Sec. IV.B.; S06-06-02XX, Sec. IV.A.

The mass arrest policy must be revised to make clear that the First Amendment policy's restrictions on arrest govern *all* police encounters with anyone engaged in First Amendment activity, including in a CMA Incident. The First Amendment policy's specific restrictions on arrest should also be incorporated into the mass arrest policy. Additionally, the CMA Report form, which is used to document any arrest during a CMA Incident, should be modified to require the arresting officer to record not only the probable cause for arrest but also the "immediate threat to the safety of the community, or others, or of causing property damage" that justifies the arrest pursuant to the First Amendment policy (G02-02, Sec. IV.B.6.).

### B. The Mass Arrest Policy Fails to Protect Protesters from Unconstitutional or Otherwise Prohibited Uses of Force.

#### 1. The Mass Arrest Policy Fails to Adequately Prohibit Retaliatory Uses of Force Against Protesters.

Consent Decree Paragraph 163, as noted above, prohibits CPD officers from "using force to punish or retaliate against a person for . . . engaging in protected First Amendment activity," including "lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct)." This Consent Decree provision reflects the basic

9

First Amendment prohibition against government officials "subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quotations omitted).

During the summer 2020 protests, CPD officers committed numerous egregious acts of unjustified, retaliatory force against protesters and individuals recording the police, in violation of the Consent Decree and First Amendment, as documented in the Coalition's July 2020 Notice of Intent to Initiate Enforcement Proceedings. *See* Dkt. 855; Dkt. 855-1 at 2-6. In the wake of these flagrant violations, the Coalition and CPD negotiated specific provisions of CPD's First Amendment policy to prevent CPD from engaging in unlawful retaliatory use of force in future protests. Specifically, the First Amendment policy prohibits CPD officers from "us[ing] force to punish, retaliate against, deter, or respond to the lawful expression of First Amendment rights." G02-02, Sec. IV.B.3.

The mass arrest policy fails to comply with this prohibition on using force against protesters and people recording the police. While the parent policy of the mass arrest suite correctly informs officers that they shall "not use force to punish, retaliate against, deter, or respond to the lawful expression of First Amendment rights," S06-06X, Sec. III.K.2., the specific policy on "alternate tactical response reporting" (S06-06-03XX) sends a different message. It authorizes officers to "physically respond to a crowd's actions or inactions in response to verbal directions and make physical contact with a person or persons in the crowd." S06-06-03XX, Sec. III.A. It also enumerates various types force, including deadly force and weapon discharge, that an officer may "become[] involved in . . . during a coordinated multiple arrest incident." *Id.* Sec. V.C.1.-6. This policy—which states that it supersedes "any other Department directive" to the contrary—makes no mention of the Constitution's, Consent Decree's, and First Amendment policy's prohibition on using force in reaction to First Amendment-protected expression. The policy on "alternate tactical response reporting" must therefore be revised to make clear that any such physical response is forbidden by law and CPD policy.

### 2. The Mass Arrest Policy Fails to Adequately Prohibit Officers from Unleashing Canines Against Protesters.

The prospect of police unleashing dogs on protesters evokes some of the most horrific chapters of police abuse in our nation's history and clearly would not comply with the Consent Decree, including the fundamental mandates of treating all persons with dignity and respecting the sanctity of human life. *See* ¶ 50 (requiring that CPD "treat all persons with the courtesy and dignity which is inherently due every person as a human being[.]"); ¶ 156 (requiring that CPD officers "act at all times in a manner consistent with the sanctity of human life," "act at all times with a high degree of ethics, professionalism, and respect for the public," and "use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible"). Unleashing dogs on peaceful protesters would also almost certainly violate the First and Fourth Amendments. To ensure CPD's compliance with the Consent Decree and the Constitution, CPD policy categorically prohibits officers from using canine teams "in response to crowds, protests, or civil disturbances." *Canine Teams*, Special Order S03-04-01, Sec. IV.A.

Despite this clear prohibition, the mass arrest policy contains confusing, self-contradictory language regarding the use of canines during protests, which could lead officers to incorrectly

believe that canines are a permitted force option against protesters. Specifically, Section V.C. of S06-06-03XX lists "canines as a force option" among the types of force that are required to be reported on a Tactical Response Report during a CMA Incident, even though the policy also notes that officers are prohibited from using canine teams in response to crowds, protests, or civil disturbances.

The mass arrest policy must be revised to remove "canines" from the list of potential "force option[s]," S06-06-03XX, Sec. V.C., and the policy must state unequivocally that officers cannot use canines in response to protests.

### C. The Mass Arrest Policy Fails to Prohibit "Kettling."

When CPD has made a determination "to disperse a crowd and give a dispersal order," the First Amendment policy requires the field commander to "clearly identify the designated and available dispersal routes" and provide "attainable" dispersal instructions. G02-02, Sec. IX.E.1.a.(2)-(3). These provisions, stated as mandatory requirements with no exceptions, were intended to ban the dangerous police practice known as "kettling," where officers contain protesters in a confined area for an extended period of time by surrounding them and not permitting them to leave, as CPD officers did during the 2020 protests. The First Amendment policy's ban on this inherently cruel, degrading, and escalatory practice ensures CPD's compliance with numerous Consent Decree requirements. *See, e.g.*, ¶ 156 (requiring that CPD officers "act at all times in a manner consistent with the sanctity of human life," "act at all times with a high degree of ethics, professionalism, and respect for the public," and "use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible").

Despite the First Amendment policy's prohibition and the underlying Consent Decree requirements, the mass arrest policy fails to categorically rule out kettling. It confusingly states that officers "will *avoid* containment or corralling tactics known as 'kettling' and will provide specific egress directions for safe crowd dispersal." S06-06X, Sec. V.B.4.c.REMINDER (emphasis added). This incorrectly suggests to officers that kettling remains a permissible tactic in certain situations. The policy should be revised to categorically prohibit kettling and similarly dangerous crowd containment tactics, consistent with the First Amendment policy and the Consent Decree.

### V. The Mass Arrest Policy Fails to Comply with Legal Requirements for Providing Disability and Language Accommodations.

The Consent Decree requires that CPD make reasonable accommodations for people with disabilities (¶¶ 68-69) and people who have limited English proficiency ("LEP") (¶ 64), including accommodations needed to ensure "effective communication" and "meaningful access" to police services. These Decree requirements reflect and enforce the federal statutory mandates of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

The policy fails to comport with these requirements. It merely informs officers that disabilities and "language barriers" may be a reason why a person "may not recognize or be able to immediately respond to law enforcement directions." S06-06X, Sec. V.C.6.; S06-06-03XX, Sec. VI.A.6. The policy omits that officers must *affirmatively provide* alternative methods of

communication if needed to ensure effective communication with individuals with disabilities and LEP individuals. The policy must be revised to provide specific instructions regarding the alternate methods of communication that may be needed, and should refer officers to the relevant sections of the First Amendment policy. *See* G02-02, Sec. VIII.B.4. ("Multiple methods of communication may include a device to amplify sound, qualified language interpreters, visual aids (e.g. gestures, writings, or posted written communications), and digital messaging (e.g., social media, electronic notification services).").

## VI. CPD Violated the Consent Decree's Community Engagement Requirements.

The Consent Decree mandates that CPD provide members of the public with "a meaningful opportunity to review and comment on" proposed changes to CPD policies and procedures that relate to the Decree's requirements. ¶ 633. The Consent Decree further requires CPD to "consider," in response to any public comments, "whether any further revisions to the proposed policy or procedure are appropriate." *Id.* This process must take place "prior to . . . implementation" of the proposed policy. *Id.* CPD has failed to comply with these requirements for the mass arrest policy.

***First***, the timing of CPD's training on this policy makes clear that the public never had a "meaningful opportunity" to provide input on the policy. CPD apparently developed and began delivering its training course for this policy *before* the period for public comment even closed. The public could not possibly have had a "meaningful opportunity" to provide input on the policy when CPD considers it finalized and ready for training before the comment period has ended.

***Second***, the time period CPD allotted for public comment did not enable a "meaningful opportunity" for public input. CPD originally posted the policy on its website for only 20 days, later extended to 34 days at the Coalition's urging. Neither the original nor extended timeframe allows members of the public—many of whom work full-time jobs and have myriad other demands on their time—sufficient time to read, digest, and provide substantive comments on a 40-page set of four policies that introduce a vast array of new policing procedures. Moreover, CPD provided no advanced notice so that the Coalition, community members, subject-matter experts, organizations, and other stakeholders could plan in advance for the comment period. Nor did CPD provide any plain-language summary or guide to assist lay community members in understanding how and why this policy changes CPD practices.

For years, the Coalition has raised these recurring community engagement deficiencies with CPD and suggested corrective measures. *See, e.g.*, Communities United Parties' Statement Regarding Comprehensive Assessment of the Consent Decree, Dkt. 1121, at 11; *Campbell* Plaintiffs' Position Statement on Required Modifications to the Consent Decree, Dkt. 1125, at 12. The Independent Monitor has too. *See, e.g.*, Independent Monitoring Report 7, Dkt. 1097, at 6; Independent Monitoring Report 8 Appx. 2, at 1-4, https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-2-Impartial-Policing-2023.11.01.pdf. Rather than correct its longstanding deficiencies for this policy suite, which is of utmost importance to the public, CPD doubled down on a sham public comment process that violates Paragraph 633 and precludes the community from having a real opportunity to shape the policies that will govern officers' treatment of untold numbers of community members seeking to exercise their First Amendment rights.

12

VII. **Exigent Circumstances Necessitate Emergency Relief.**

The legal deficiencies in the mass arrest policy must be corrected immediately. CPD officers are being trained on the policy *this month*, in preparation for the August DNC. Any delay in remedying the policy's defects will result in officers being trained on an unlawful policy, likely resulting in widespread on-the-ground violations as soon as officers begin executing the policy.

Given the exigent circumstances, the Consent Decree's ordinary requirement of a 90-day "cure period" (¶ 695) between this notice and the filing of an enforcement motion is not tenable. Absent immediate enforcement proceedings, the mass arrest policy may evade the Court's review until after it has been applied against—and likely harmed—scores of protesters at the DNC. This would vitiate the Coalition's enforcement rights under Paragraph 709(a) and defeat the Court's enforcement power under Paragraph 695.

Moreover, this is not a new issue for CPD and the Coalition. Since the Coalition filed its July 2020 Notice of Intent to Initiate Enforcement Proceedings (Dkt. 855; Dkt. 855-1), CPD has been aware that the rights of people engaged in First Amendment activity are of paramount importance to the Coalition. CPD could have involved the Coalition at an earlier stage of this policy's development and worked collaboratively with the Coalition to resolve our concerns and avoid the need for emergency enforcement proceedings. It chose not to. The exigency here is of CPD's own making.

If CPD is interested in resolving these matters immediately and without Court intervention, please inform us no later than March 20, 2024. In addition, please provide us with a copy of all training materials related to the mass arrest policy, and we request an opportunity to attend and observe the trainings.

Sincerely,

Amanda Antholt
Ruben Bautista
Sheila Bedi
Alexandra Block
Kara Crutcher
Vanessa del Valle
Craig Futterman
Michelle García
Joshua Levin

*Attorneys for the Coalition*

Cc:
Karyn Bass-Ehler
Mary Grieb
Amy Meek
Anthony-Ray Sepúlveda

13