UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS,<br><br>        Plaintiff,<br><br>      v.<br><br>CITY OF CHICAGO,<br><br>        Defendant. | Case No. 17-cv-6260<br><br>Hon. Rebecca R. Pallmeyer |

**THE COALITION'S MOTION TO ENFORCE THE CONSENT DECREE
CONCERNING CPD'S MASS ARREST POLICY**

**INTRODUCTION**

After the Chicago Police Department's ("CPD") violent and unconstitutional response to the summer 2020 racial justice protests, the Coalition, the Illinois Attorney General's Office, and CPD negotiated—and this Court approved—a new First Amendment policy. This policy is intended to prevent abusive and unconstitutional policing and ensure compliance with the Consent Decree during future protests. The August Democratic National Convention ("DNC"), which is expected to attract major protests, is precisely the sort of event this First Amendment policy was designed for. Yet, in preparation for the DNC, CPD recently proposed a new policy that contradicts the negotiated policy, encourages unlawful mass arrests of protesters, and allows CPD officers to escape accountability for use of force violations by weakening the procedures for documenting and investigating officer violence against protesters.

The *Coordinated Multiple Arrest Policy Suite* (Special Orders S06-06X – S06-06-03XX) (the "mass arrest policy") **(Ex. A)** violates the Consent Decree and fails to protect protesters' First Amendment rights. *First*, the mass arrest policy eviscerates protections required by the First

Amendment, the Consent Decree (¶¶ 50-51, 156, 163), and CPD's existing First Amendment policy to protect people engaged in First Amendment expression and activity. *Infra* pp. 5-8. *Second*, the mass arrest policy violates the Consent Decree's mandates for use of force reporting and investigations (¶¶ 217-19, 228-35, 571(h), 574-75). *Infra* pp. 8-11. *Third*, the mass arrest policy fails to comply with the Consent Decree (¶¶ 64, 68-69) and federal civil rights laws' requirements for disability and language accommodations. *Infra* p. 11. *Fourth*, CPD violated the Decree's community engagement requirements (¶ 633) for this policy. *Infra* pp. 11-12.

For these reasons, on March 13, 2024, the Coalition filed a Notice of Intent to Initiate Enforcement Proceedings, supported by a thirteen-page letter (Dkt. 1156, Dkt. 1156-1) **(Ex. B)**, and requested to meet with the City within one week to resolve this matter without Court intervention. On March 21, 2024, the Court ordered the City to respond to the Coalition's Notice within thirty days. Dkt. 1157. As of this filing, the City has informed the Coalition that the earliest it will meet with the Coalition is the week of April 22, 2024—six weeks after the Coalition's Notice.

The urgent nature of the Consent Decree violations requires immediate action. CPD officers are *already being trained* on the infirm policy for the DNC. The mass arrest policy must be brought into compliance with the Consent Decree and the First Amendment with enough time to train thousands of CPD officers and supervisors by the August DNC. Due to these exigent circumstances, the Coalition moves to enforce the Consent Decree immediately. The Coalition respectfully requests that the Court find that the mass arrest policy violates the Consent Decree, order that CPD fully implement and train officers on the First Amendment policy, and order the additional remedies described below.

# BACKGROUND

**I. CPD's Abuse of Protesters in Summer 2020, Subsequent Coalition Enforcement Letter, and the Resulting First Amendment Policy.**

In the summer of 2020, when Chicagoans protested racist and abusive policing, CPD responded with brutal, violent, and unconstitutional tactics. As described in testimony from protesters and in extensive reports by the Independent Monitoring Team ("IMT"), Dkt. 964, and the City's Office of Inspector General ("OIG"),[1] CPD officers engaged in "indiscriminate uses of force" against protesters. OIG Rep. 37. Officers hit protesters with batons, fists, and other objects, pushed and shoved them, tackled them to the ground, and blanketed crowds with pepper spray. *Id.*; Dkt. 964 at 12-13. In addition, CPD failed to "fulfill its force reporting obligations," resulting in massive underreporting and "an inadequate record of severe and potentially out-of-policy uses of force." OIG Rep. 9. CPD also improperly exempted uses of force from being reviewed by the oversight unit now known as the Tactical Review and Evaluation Division ("TRED"). *Id.* at 110. CPD arrested 1,500 protesters in just one week at the height of the protests. OIG Rep. 8-9.

In July 2020, after witnessing CPD's systematic brutality and Consent Decree violations, the Coalition notified the City of its intent to file an enforcement action if the City failed to immediately ensure compliance with the Decree and protect First Amendment rights. Dkt. 855; Dkt. 855-1. The City, the Coalition, and the Illinois Attorney General's Office then engaged in settlement negotiations, supervised by the Court and the IMT. These negotiations resulted in a new CPD First Amendment policy (Gen. Order G02-02) **(Ex. C)**, which has provisions crafted to prevent another 2020.

---

[1] City of Chicago, Office of Inspector General, *Report on Chicago's Response to George Floyd Protests and Unrest* (Feb. 18, 2021), https://igchicago.org/wp-content/uploads/2023/08/OIG-Report-on-Chicagos-Response-to-George-Floyd-Protests-and-Unrest.pdf [hereinafter "OIG Rep."].

3

**II.     CPD's Mass Arrest Policy.**

On February 9, 2024, CPD released the mass arrest policy for public comment. During the policy's development, CPD never shared a draft or even informed the Coalition of the policy, despite our joint First Amendment negotiations.

As the City explained at the March 12, 2024 public hearing, the mass arrest policy is intended to govern CPD's response to gatherings during the DNC. But the policy sweeps much more broadly. It governs CPD's response to *any* "crowds, protests, and civil disturbances." S06-06X, Sec. I. Specifically, the policy authorizes CPD to declare that any crowd, protest, or civil disturbance constitutes a "Coordinated Multiple Arrest Incident" (a "CMA Incident"),[2] which then suspends CPD's regular policies and procedures, including policies regarding arrests and reporting use of force, for the duration of the CMA Incident. The policy states that it "will take precedence" over "any other" CPD policy, including the approved First Amendment policy, if there is "any perceived conflict." S06-06-02XX, Sec. III.B.; S06-06-03XX, Sec. IV.B.

The policy's impact is immediate. As the City and IMT stated at the March 12 hearing, CPD began training officers on the mass arrest policy *last month* (March 2024) for the DNC.[3]

---

[2] A "CMA Incident" is defined as "an incident where multiple arrests are anticipated or occurring, a continued police presence is required on the scene of the incident to ensure public safety, and individual arresting officers cannot effectively be removed immediately from the incident scene for arrestee processing." S06-06-01XX, Sec. II.A.

[3] In addition, on April 4, 2024, CPD participated in the first of multiple training exercises with other City and federal agencies on "how to handle protesters" at the DNC. *See* Melody Mercado, *Top Security Agencies Plan For Safety Ahead Of Democratic National Convention*, Block Club Chicago (Apr. 8, 2024), https://blockclubchicago.org/2024/04/08/top-security-agencies-plan-for-safety-ahead-of-democratic-national-convention/.

## ARGUMENT

**I.    The Policy Eviscerates Protections Required by the First Amendment, the Consent Decree, and CPD's First Amendment Policy to Protect People Engaged in First Amendment Activity.**

The mass arrest policy risks rampant violations of First Amendment rights during the DNC.

**A.    The Policy Fails to Distinguish Between First Amendment-Protected Protests and Other Gatherings.**

The policy is flawed from the inception because it treats "crowds, protests, and civil disturbances" as a unitary category, without explaining that certain types of gatherings trigger First Amendment protection while others do not. The policy then compounds the likelihood that officers will violate protesters' First Amendment rights by wrongly suggesting that only *some* protests qualify as protected "First Amendment assemblies." See S06-06X, Sec. III.E.2., Sec. III.I. Additionally, the policy makes no distinction between protests occurring on public sidewalks, streets, or parks (traditional public forums) and those on private property. This omission is deeply concerning, as the former is protected by the First Amendment whereas the latter generally is not. See *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). This failure sets the stage for the additional deficiencies described in detail below.

**B.    The Policy Fails to Provide Sufficient Guidance Regarding When CPD Can Issue a Dispersal Order During a Protest.**

The existing First Amendment policy provides that before CPD can make mass arrests of protesters, it must first issue a dispersal order. G02-02, Sec. IX.E.2.c. The First Amendment policy further requires that before "issuing a crowd dispersal order, the field commander must consider if there are and attempt any available less intrusive options to stop the unlawful behavior necessitating the issuance of the crowd dispersal order." G02-02, Sec. IX.D.

The mass arrest policy—which supersedes "any other Department directive" to the

contrary—does not contain this requirement to consider less intrusive options. S06-06-02XX, Sec. III.B. Instead, it states that CPD can issue crowd dispersal orders whenever three or more people commit acts of disorderly conduct "likely to cause substantial harm." S06-06X, Sec. V.B.3.

This omission in the mass arrest policy risks unraveling one of the most important protections in the First Amendment policy. The language in the First Amendment policy was crafted to ensure that CPD refrains from interfering with protected expression whenever possible while also permitting CPD to take enforcement action when needed to prevent substantial harm to people or property. CPD's long history of responding to protests with overbroad, unjustified mass arrests demonstrates the importance of limiting the use of dispersal orders and subsequent arrests for noncompliance. The mass arrest policy must therefore explicitly incorporate the First Amendment policy's pre-dispersal "less intrusive options" requirement.

### C. Contrary to the Constitution and the First Amendment Policy, the Mass Arrest Policy Permits Officers to Engage in Unlawful Arrests.

The First Amendment policy prohibits arresting protesters unless they pose an "immediate threat to the safety of the community, or others, or of causing property damage." G02-02, Sec. IV.B.6.b. In addition, a person engaged in First Amendment conduct cannot be arrested for "minor or petty offenses, including traffic or business offenses." *Id.* Sec. IV.B.6.a. This language follows Supreme Court precedent that an officer's decision to arrest a protester for a minor offense can be unlawful and retaliatory even if probable cause for the arrest exists. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019). The mass arrest policy eliminates this critical First Amendment protection by stating that it "will take precedence" over "any other" policy to the contrary. S06-06-02XX, Sec. III.B.

Worse, the mass arrest policy authorizes field commanders to initiate "large scale enforcement action[s], including physical arrests beyond the individual isolated incidents or

6

individual offenses occurring," *id.* Sec. IV.A, and it authorizes officers to use their batons to "'rake' persons toward arrest teams." S06-06-03XX, Sec. III.B.NOTE. Such "large scale" arrests are precisely what the First Amendment policy prohibits by requiring officers to make an individualized determination that a specific demonstrator poses an "immediate threat" before arrest is authorized. G02-02, Sec. IV.B.6.b.

The mass arrest policy also ignores Seventh Circuit precedent holding that arrests of protesters on public property for failure to obey a dispersal order is permitted only if "immediate danger to speakers and protesters exists . . . [and] dispersal [i]s a necessary means of averting danger and damage." *Bell v. Keating*, 697 F.3d 445, 457-58 (7th Cir. 2012); *see also Vodak v. City of Chicago*, 639 F.3d 738, 746 (7th Cir. 2011) (holding CPD could not arrest protesters who "were not threatening to the safety of the police or other people . . . [and] who the police had no good reason to believe knew they were violating a police order.") And unlike the First Amendment policy, the mass arrest policy does not state that officers must give protesters "sufficient time" to comply with dispersal orders before arresting them. G02-02, Sec. IX.E.1.b.; *id.* Sec. IX.E.2.c.

      **D.**    **The Mass Arrest Policy Fails to Adequately Prohibit Retaliation.**

The First Amendment policy prohibits officers from "us[ing] force to punish, retaliate against, deter, or respond to the lawful expression of First Amendment rights." *Id.* Sec. IV.B.3. This restriction is required by Decree Paragraph 163 and the First Amendment. *Nieves*, 139 S. Ct. at 1722.

The mass arrest policy contradicts these requirements. While the parent policy recites a correct standard, S06-06X, Sec. III.K.2., the sub-policy on "alternate tactical response reporting" authorizes officers to "physically respond to a crowd's actions or inactions in response to verbal

7

directions and make physical contact with a person or persons in the crowd." S06-06-03XX, Sec. III.A. It also enumerates various types of force, including deadly force and weapon discharge, that an officer may "become[] involved in." *Id.* Sec. V.C.1.-6. This policy—which states that it supersedes "any other Department directive" to the contrary—makes no mention of the Constitution's, Consent Decree's, and First Amendment policy's prohibition on using force in retaliation for First Amendment-protected expression.[4] *Id.* Sec. IV.B.

### E. The Mass Arrest Policy Fails to Prohibit "Kettling."

Finally, the mass arrest policy undermines the First Amendment policy by stating that officers "will *avoid* containment or corralling tactics known as 'kettling' and will provide specific egress directions for safe crowd dispersal." S06-06X, Sec. V.B.4.c.REMINDER (emphasis added). The First Amendment policy, Sec. IX.E.1.a.(2)-(3), prohibits "kettling" under all circumstances. The mass arrest policy's "avoid" terminology weakens this bright-line rule.

## II. The Mass Arrest Policy Violates the Consent Decree's Mandates for Reporting Officer Use of Force.

The mass arrest policy suspends CPD's typical procedures for reporting officer use of force. The policy institutes "alternate tactical response reporting procedures" whenever a CMA Incident is declared, which "take precedence" over "any other Department directive." S06-06-03XX, Sec. IV.A., Sec. IV.B. The alternate procedures violate the Consent Decree's requirements for both *how* and *when* officers must report the use of force.

---

[4] By enumerating "canines" as a "force option," S06-06-03XX, Sec. V.C.4., the mass arrest policy also contradicts CPD's policy *Canine Teams*, Special Order S03-04-01, Sec. IV.A, which—for obvious reasons—forbids unleashing dogs on protesters.

8

### A. The Mass Arrest Policy Violates Consent Decree Requirements for Documenting and Investigating All Reportable Uses of Force.

In violation of the Consent Decree, the policy allows officers to use a watered-down form instead of a Tactical Response Report ("TRR") to document certain uses of force. Under Consent Decree Paragraph 219, CPD officers "*must* complete a TRR" or "similar form of documentation" "*[w]henever* a CPD member engages in a reportable use of force." (Emphasis added). The Decree defines "reportable use of force" broadly: "any force by a CPD member to overcome the active resistance of a subject." ¶ 218(a). This includes any "force that is reasonably expected to cause pain or an injury, but does not result in injury or complaint of injury." *Id.*

The mass arrest policy violates this reporting requirement. The policy states that during a CMA Incident, officers need to complete a TRR for only the following uses of force: "deadly force," "weapon discharge," "impact weapon strikes," "canines as a force option," "Long Range Acoustic Device (LRAD) acoustic transmission to cause discomfort as a compliance technique," and "force that *results in* a non-fatal *major* injury," where "major injury" is defined as a "visible injury requiring immediate medical attention." S06-06-03XX, Sec. V.C. (emphasis added). This means that uses of force that are "reasonably expected to cause pain or an injury" but do not result in an immediately observable "major injury" will *not* be reported in a TRR. For example, if an officer hits or kicks a protester but does not observe an injury, the officer does not have to complete a TRR. Under the Decree, there is no circumstance where officers are excused from submitting a TRR because they do not believe—or admit—that they caused injury. CPD cannot carve out exceptions to accountability mandates in this way when CPD's use of force is subject to ongoing oversight by this Court.

In lieu of a TRR, the mass arrest policy allows officers to submit a much less extensive form, a Coordinated Multiple Arrest Report, CPD-11.433 (Rev. 1/24) (a "CMA Report") **(Ex. D)**.

9

*See* S06-06-03XX, Sec. V.B.-C. But the CMA Report is not a "similar form of documentation [to a TRR]," under Consent Decree Paragraph 219 and is not sufficient for needed oversight. *First*, the CMA Report, which is less than half the length of a TRR **(Ex. E)**, requires officers to provide far less information than a TRR, impairing efforts to hold officers accountable for improper uses of force, and to track and address use of force patterns. *Second*, unlike a TRR, a CMA Report is not subject to the Consent Decree's oversight mandates for reportable uses of force: district-level supervisory investigation (¶¶ 228-35) and independent review by the Tactical Review and Evaluation Division ("TRED") (¶¶ 574-75).[5] These mandatory layers of review ensure that officers' use of force is thoroughly evaluated for violations of law or policy, that any such violations are referred to the Civilian Office of Police Accountability ("COPA"), and that officers receive any necessary corrective action such as retraining. Given CPD's widespread use of excessive force—and officers' widespread failure to report uses of force—during the summer 2020 protests, CPD should be *strengthening* procedures for documenting and investigating officer violence against protesters. This policy does the opposite.

     **B.    The Mass Arrest Policy Violates the Consent Decree by Delaying Use of Force Reporting.**

The Consent Decree mandates that "[w]henever" an officer commits a reportable use of force, the officer "must" complete a TRR "*prior to the end of his or her tour of duty.*" ¶ 219 (emphasis added). The Consent Decree makes no exceptions for "mass arrests." In violation of this requirement, the policy authorizes an incident commander to "institute delayed Tactical

---

[5] While the mass arrest policy states that a copy of each CMA Report will be forwarded to TRED, S06-06-02-XX, Sec. VI.D.4., the policy makes clear that TRED's review of CMA Reports does not comply with the Consent Decree's requirements for assessing uses of force. The Decree requires TRED to conduct an in-depth evaluation of the officer's use of force, assessing each particular use of force incident. ¶ 574. In contrast, the mass arrest policy states that TRED will conduct only a high-level review of the CMA Incident *as a whole*, *i.e.*, assessing CPD's response to an *entire* protest. S06-06-03XX, Sec. VIII.B.1.

Response Reporting procedures," which enables officers to "complete any TRR *after the members' tour of duty*." S06-06-03XX, Sec. VII.C., Sec. VII.H.2. (emphasis added). The policy places no constraints on the post-tour-of-duty timeline for submitting a TRR. It merely requires that CMA Reports (not TRRs) be submitted by the end of an officer's tour of duty. The policy's delayed use of force reporting undermines accountability in the very context—police response to protests—in which CPD has demonstrated a heightened need for ensuring accountability.

### III. The Mass Arrest Policy Fails to Comply with Consent Decree and Federal Statutory Requirements for Providing Disability and Language Accommodations.

The Consent Decree requires that CPD make reasonable accommodations for people with disabilities (¶¶ 68-69) and people who have limited English proficiency ("LEP") (¶ 64), to ensure "effective communication" and "meaningful access" to police services. These requirements reflect the mandates of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

The mass arrest policy fails to comply with these requirements. It informs officers that disabilities and "language barriers" may be a reason why a person "may not recognize or be able to immediately respond to law enforcement directions." S06-06X, Sec. V.C.6.; S06-06-03XX, Sec. VI.A.6.REMINDER. But it omits that officers must *affirmatively provide* alternative communication methods if needed to ensure effective communication with individuals with disabilities and LEP individuals. Therefore, the policy does not adequately protect people with disabilities and limited English proficiency, as required by the Decree and federal law.

### IV. CPD Violated the Consent Decree's Community Engagement Requirements.

The Consent Decree mandates that CPD provide the public with "a meaningful opportunity to review and comment on" proposed changes to CPD policies and procedures related to Decree requirements. ¶ 633. The Decree further requires CPD to "consider," in response to any public

11

comments, "whether any further revisions to the proposed policy or procedure are appropriate." *Id.* CPD failed to comply with these requirements for the mass arrest policy.

The timing of CPD's training on this policy makes clear the public never had a "meaningful opportunity" to give input. As the City and IMT stated at the March 12 public hearing, CPD developed and began training on this policy *before* the public comment period even closed on March 13. The public could not possibly have had a "meaningful opportunity" to give input on the policy when CPD considered it finalized and ready for training before the comment period ended. CPD clearly aimed to ram this policy through without engaging with the community's concerns, in violation of Paragraph 633.

**V.     Exigent Circumstances Necessitate Immediate Intervention by the Court.**

The Court should exercise its discretionary power because time is running out. The City is already training officers on the mass arrest policy and the DNC is only four months away, yet the City will not meet with the Coalition until late April. The Coalition filed its Notice of Intent to Initiate Enforcement Proceedings on March 13, 2024, which started the Decree's 90-day "cure period." ¶¶ 695, 709(a). The Notice requested that the City inform the Coalition by March 20, 2024 whether it "is interested in resolving these matters immediately and without Court intervention." Ex. B, Dkt. 1156-1 at 13. The Notice also requested all training materials for the policy and an opportunity to observe the training. The Coalition sought to "work collaboratively" with the City through "expedited settlement talks" to "redress the serious deficiencies in the mass arrest policy" and to avoid this enforcement action. Ex. B, Dkt. 1156 at 2-3.

The City has not agreed to expeditiously fix the mass arrest policy or even engage in expedited discussions. After receiving no response to the March 13 Notice, the Coalition asked the City to discuss the mass arrest policy during the week of April 8. But the City responded that the

earliest it would meet is the week of April 22, some six weeks after the Coalition's Notice. While the Court ordered the City to respond to the Coalition's March 13 Notice, there is no guarantee that the City will provide a substantive response or, as its counsel indicated at the March 12 public hearing, will simply try to delay until June by invoking the cure period. In addition, CPD has blocked the Coalition's access to training materials on the mass arrest policy, which the Coalition requested under the Illinois Freedom of Information Act. **(Ex. F.)** Instead of responding, CPD declared itself entitled to multiple "extensions," *id.*, which are not authorized by the law. *See* 5 ILCS 140/3(f). While the Coalition hopes to meet with the City this month, exigent circumstances necessitate that the Court hear this enforcement motion and order relief before the end of the cure period (June 11, 2024).

        **A.**    **The Court Has Discretion To Hear This Enforcement Motion Early.**

When, as here, a federal court is faced with violations of a consent decree under its supervision, the court "is vested with broad discretionary power" to craft appropriate remedies. *Duran v. Elrod*, 713 F.2d 292, 297-98 (7th Cir. 1983). The court's "broad" "judicial discretion" includes granting "equitable remedies which exceed the confines of the consent judgment," provided that they "are reasonably imposed in order to secure compliance of the parties." *E.E.O.C. v. Loc. 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice-Journeyman Educ. Fund*, 925 F.2d 588, 593 (2d Cir. 1991). In addition, "[a] court of equity has the power to modify a consent decree to adapt for changed circumstances." *S. Suburban Hous. Ctr. v. Berry*, 186 F.3d 851, 855 n.1 (7th Cir. 1999).

Here, the Court's broad equitable powers allow it to hear the Coalition's enforcement motion before June 11 because doing so will ensure CPD's compliance with the Consent Decree. If the Court were to wait, any enforcement proceedings would not begin until mid-June and could conclude weeks or even days before the DNC. At that point, it will be too late for the Court to

13

issue effective relief. Absent immediate action, the mass arrest policy may evade the Court's review until after it has been applied against—and likely harmed—scores of protesters at the DNC. This would defeat the Court's enforcement power under Paragraph 695.

The Court need not apply the 90-day period when it would produce such a patently unreasonable result. "From the standpoint of interpretation a consent decree is a contract," *Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999), and "[c]ontractual language can be bent when necessary to avoid absurd or even just commercially unreasonable results." *In re Comdisco, Inc.*, 434 F.3d 963, 967 (7th Cir. 2006). As the Seventh Circuit has held, a district court may exercise its "equitable powers" to decline to apply, or even to modify, terms of a consent decree if they are unreasonable, contrary to public policy, or would not "serve the ultimate goals" of the decree. *See, e.g.*, *S. Suburban Hous. Ctr.*, 186 F.3d at 855 n.1, 856 (affirming district court's refusal to apply "remedy specifically provided for in the Consent Decree" where it was disproportionately punitive, and affirming district court's modification of decree "to account for the changed circumstances" (quotation marks omitted)); *United States v. Alshabkhoun*, 277 F.3d 930, 934 (7th Cir. 2002) (consent decree provision is unenforceable if it constitutes "unreasonable penalty or is void as a matter of public policy.").

Here, the equities weigh in favor of immediate enforcement proceedings. The compliance interests—ensuring CPD's policy and training for policing protests at the DNC complies with the Consent Decree and First Amendment—far outweigh waiting until the end of the 90-day period, particularly when the City has shown no willingness to cure the deficiencies. Moreover, this is not a new issue for the City and the Coalition. Since the Coalition filed its July 2020 Notice of Intent to Initiate Enforcement Proceedings (Dkt. 855; Dkt. 855-1), the City has known that the Coalition is deeply concerned with CPD's use of force against and failure to protect the First Amendment

rights of protestors. The City could have involved the Coalition earlier, or collaborated with the Coalition to resolve the problems in the Coalition's Notice. It chose not to. The exigency here is of CPD's own making, which underscores the equities favoring immediate enforcement. *See Precision Inst. Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945) ("[H]e who comes into equity must come with clean hands.").

### B. The Court Should Grant Relief To Ensure Consent Decree Compliance.

The Coalition therefore requests that the Court grant relief to cure the deficiencies described above, including finding that the mass arrest policy violates the Consent Decree and ordering CPD to fully implement and train officers on the First Amendment policy. These remedies are well within the Court's "broad discretionary power" to craft relief needed to ensure compliance with a consent decree. *See Duran*, 713 F.2d at 297-98 (holding that district court did not abuse its discretion by selecting the remedial "means" by which "to assure effective compliance" with consent decree requirements, including remedies beyond the decree's text).

### CONCLUSION

For the reasons stated above and in the Coalition's Notice, the Coalition respectfully requests that the Court:

(1) Find that the mass arrest policy violates the Consent Decree.

(2) Order that CPD suspend any training on the mass arrest policy.

(3) Order that CPD fully implement and train CPD officers on the negotiated First Amendment policy.

(4) Produce the training materials on the mass arrest policy and the First Amendment policy.

(5) Permit Coalition members and counsel to attend the First Amendment policy training.

DATED: April 12, 2024          Respectfully Submitted,

*/s/ Joshua M. Levin*
Alexandra K. Block (ablock@aclu-il.org)
Michelle T. García (mgarcia@aclu-il.org)
Joshua M. Levin (jlevin@aclu-il.org)
Roger Baldwin Foundation of ACLU, Inc.
150 N. Michigan Ave., Suite 600
Chicago, IL 60601
(312) 201-9740

Amanda Antholt (amanda@equipforequality.org)
Ruben Bautista (ruben@equipforequality.org)
Equip for Equality
20 N. Michigan Ave., Suite 300
Chicago, IL 60602
(312) 341-0022

Sheila A. Bedi (sheila.bedi@law.northwestern.edu)
Community Justice and Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611-3609
(312) 503-2492

Craig B. Futterman (futterman@uchicago.edu)
Mandel Legal Aid Clinic
University of Chicago Law School
6020 S. University Ave.
Chicago, IL 60637
(773) 702-9611

**Counsel for the Coalition**