## Index of Exhibits

| | |
|---|---|
| **A** | CPD's Coordinated Multiple Arrest Policy Suite (Special Orders S06-06X – S06-06-03XX) |
| **B** | Notice of the Coalition's Intent to Initiate Enforcement Proceedings (Dkt. 1156) and attached letter in support (Dkt. 1156-1) |
| **C** | CPD's First Amendment Policy (General Order G02-02) |
| **D** | Coordinated Multiple Arrest Report ("CMA Report"), CPD-11.433 (Rev. 1/24) |
| **E** | Tactical Response Report ("TRR"), CPD-11.377 (Rev. 12/20) |
| **F** | Coalition's March 6, 2024 FOIA Request and CPD's Four Extension Notices |

# **Exhibit A**

**Chicago Police Department**

**Special Order  S06-06X**

# RESPONSE TO CROWDS, PROTESTS, AND CIVIL DISTURBANCES

| | | | |
|---|---|---|---|
| **ISSUE DATE:** | 08 February 2024 | **EFFECTIVE DATE:** | |
| **RESCINDS:** | | | |
| **INDEX CATEGORY:** | 06 - Processing Persons | | |
| **CALEA:** | | | |

## I.      PURPOSE

This directive outlines the Department's response to crowds, protests, and civil disturbances.

## II.     DEFINITIONS

For the purpose of this directive and addenda, the following definitions apply:

A.    **Crowd dispersal order**—a lawful command given by a Department member for all persons to leave a designated area when three or more persons are committing acts of disorderly conduct that are likely to cause substantial harm in the immediate vicinity.

B.    **Field commander**—the on-scene Department supervisor, designated by the incident commander, responsible for a specific location or function, who reports directly to the overall incident commander and is responsible for the Department's on-scene response to the incident for their location or area of responsibility.

C.    **First Amendment assembly**—a gathering conducted for the purpose of persons expressing any opinion, idea, or belief.

D.    **Incident commander**—the designated Department member who is responsible for the Department's overall response to the incident.  The incident commander may be on the scene of the incident  or at a location that provides the ability to direct the Department's overall response to the incident. As appropriate, the incident commander is responsible for designating field commanders to specific locations or functions based on operational needs.

E.    **Officer line formation**—the formation of a squad or multiple squads into a line or lines that act as a static human barrier or can be mobile to move, channel, or disperse a crowd.

F.    **Platoon**—a group of squads, typically up to six squads, led by a lieutenant or above (Platoon Leader) and deployed together to an assignment, location, incident, or specific mission. The actions and responses of a platoon are coordinated efforts directed by the respective platoon leader, consistent with the strategies designated by the incident commander.

G.    **Public way**—any street, alley, or other parcel of land open to the outside air leading to a public street, which has been deeded, dedicated, or otherwise permanently appropriated to the public for public use, and which has a clear width and height of not less than 10 feet (410 ILCS 25/3).

H.    **Squad**—a group of Department members, typically up to ten police officers, led by a sergeant or above (Squad Leader) and deployed together to an assignment, location, incident, or specific mission. The actions and responses of a squad are coordinated efforts directed by the respective squad leader, consistent with the strategies designated by the incident commander.

## III.    POLICY

A.    A strong partnership with the public is essential for effective law enforcement. Inappropriate or excessive responses to crowds, protests, and civil disturbances can damage that partnership and diminish the public trust that is a cornerstone of policing in a free society. Department members will act:

    1.    with a high degree of ethics, professionalism, and respect for the public.

    2.    in a manner that promotes trust between the Department and the communities that it serves.

B.    The Department's highest priority is the sanctity of human life. The concept of the sanctity of human life is the belief that all human beings are to be perceived and treated as persons of inherent worth and dignity, regardless of race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military status, immigration status, homeless status, source of income, credit history, criminal record, criminal history, or incarceration status. Department members will act with the foremost regard for the preservation of human life and the safety of all persons involved.

C.    The Department recognizes that communication is an essential tool in crowd management and response to coordinated multiple arrest incidents.

    1.    Effective internal communication ensures unity of action among all Department members and that all Department members, including front line officers, front line supervisors, and Department leadership, understand one another.

    2.    Effective external communication can help the Department establish clear expectations and consequences for persons on the scene of an incident, and it can serve to defuse threatening situations.

D.    The Chicago Police Department recognizes that many people within a crowd will be engaged in lawful behavior while others within that same crowd might be engaged in unlawful activities. The Department's goal is to protect lawful behavior while identifying and isolating unlawful activities. During response to crowds, protests, or civil disturbances, Department members will maintain their duty to preserve order and protect life and property, with the understanding of the requirement to protect persons' First Amendment rights in accordance with the Department directive titled "First Amendment Rights."

E.    The Chicago Police Department seeks to gain the voluntary compliance of individual persons and crowds, when consistent with personal safety. The Department's response to crowds, protests, and civil disturbances will seek to:

    1.    obtain cooperation and voluntary compliance to lawful direction and orders with minimal Department response or enforcement actions.

    2.    isolate specific individuals engaged in unlawful activity for specific enforcement actions, such as citations or arrest for specific offenses, while separating those engaged in lawful behavior and activities, including a First Amendment assemblies, to allow those lawful activities to continue.

F.    Department members are reminded that their demeanor and the manner in which they act can serve to increase or reduce tensions during any response to crowds, protests, or civil disturbances. Therefore, it is important to develop the skills and abilities to display and exercise self-control and patience, especially under irritating or provoking conditions. All Department members will:

    1.    act in accordance with the Constitution of the United States of America, including the First and Fourth Amendments, and will comply with the law and Department policy.

    2.    treat all persons with the courtesy and dignity that is inherently due to every person and act, speak, and conduct themselves in a courteous, respectful, and professional manner, while also recognizing their obligation to safeguard life and property.

    3.    maintain neutrality and objectivity at all times.

4. use de-escalation techniques (e.g. continual communication, tactical positioning, and time as a tactic), consistent with the Department directive titled "De-escalation, Response to Resistance, and Use of Force" to prevent or reduce the need for force and to use minimum amount of force needed, unless doing so would place a person or a Department member in immediate risk of harm or de-escalation techniques would be clearly ineffective under the circumstances at the time.

G. The Department's response plan to crowds, protests, and civil disturbances will be consistent with the standardized National Incident Management System (NIMS), including the development of an Incident Action Plan (IAP) for preplanned events and the designation of an incident commander.

1. The incident commander has overall authority and responsibility to direct the Department's operations in response to crowds, protests, or civil disturbances, including the use of resources, development of strategies, and incident operations.

2. For a pre-planned event with an Incident Action Plan, the Department will be thoughtful in the assignment of Department members for these events. The Department will evaluate the roles and responsibilities that a Department member has for their regular duty assignment when considering their mission during a pre-planned event, including but not limited to evaluating Department members' areas of expertise or oversight responsibilities as part of their regular assignment.

3. For a pre-planned event with an Incident Action Plan, Department members will familiarize themselves with the Incident Action Plan identified in the published Special Event Notice that outlines the event information and delineates Department member tour-of-duty requirements, assignments, and deployment responsibilities.

4. For a pre-planned event or spontaneous response to a crowd, protest, or civil disturbance, Department members will be briefed on their assignment, responsibilities, and specific expectations for the incident by their immediate supervisor prior to being deployed.

H. The Chicago Police Department recognizes the importance of officer wellness before, during, and after an incident response, both with respect to Department members' well-being and the Department's ability to achieve its objectives. Therefore, Department supervisors and leadership will make strategic decisions with officer wellness in mind and that value Department members as the Department's most vital resource.

I. Any response by Department members to a First Amendment Assembly, including crowd management and crowd dispersal orders, will be consistent with the Department directive titled "First Amendment Rights."

J. Any physical response to crowds, protests, or civil disturbances by Department members, individually or as part of a group or formation, will be objectively reasonable, necessary, and proportional consistent with the Department directive titled "De-escalation, Response to Resistance, and Use of Force."

K. Department members will **not**:

1. use language or take action intended to taunt or denigrate an individual, or use any racist or otherwise derogatory language.

2. use force to punish, retaliate against, deter, or respond to the lawful expression of First Amendment rights (e.g., protected speech, lawful demonstrations, observing or filming police activity, or criticizing a Department member or conduct) consistent with the Department directive titled "First Amendment Rights."

L. Department members will remain unbiased and opinion neutral in any communication with individuals within the crowd while affirming that the First Amendment rights of lawful participants are protected.

1. Although Department members will not engage in demonstration-related verbal confrontations with participants, they are reminded that expressions of courtesy, politeness, and understanding can be a valuable tool for de-escalation or in maintaining peace.

2. For example, Department members may offer reassurance that their personal beliefs or opinions are not relevant or appropriate and will not play a role in or influence their actions in protecting lawful First Amendment activities.

3. However, if the crowd or individuals in the crowd become confrontational or adversarial—or if directed by a supervisor—Department members will not engage in any demonstration-related conversation or discussion with individuals in the crowd.

M. The Chicago Police Department recognizes that accurate and thorough documentation of incident response is critical to transparency, accountability, and continual improvement through after-action review.

1. Department members will document their actions during an incident response by adhering to Department directives on incident reporting and video recording requirements.

2. This includes, but is not limited to, compliance with the documentation and reporting procedures outlined in the Department directives titled:

   a. "Body Worn Cameras."

   b. "In-Car Video Systems."

   c. "Complaint and Disciplinary System."

   d. "Incidents Requiring the Completion of a Tactical Response Report."

N. If a person in the crowd is identified as being in crisis or poses a threat to their own safety, Department members will act in accordance with the Department directives titled "Recognizing and Responding to Individuals In Crisis " and "Crisis Intervention Team (CIT) Program," that include specific definitions, procedures, and responsibilities for responding to incidents involving individuals in crisis.

O. Whenever possible during the pre-planned response to large scale incidents involving crowds, protests, or civil disturbances, the Department will strategically organize responding members into squads and platoons for the purpose of achieving specific objectives related to maintaining public safety and protecting First Amendment rights. Success in achieving those objectives depends on squads and platoons maintaining discipline and working in concert with one another under the direction of unified supervision, rather than acting or working separately as individuals. The actions and responses of a squad are coordinated efforts directed by the respective squad leader, consistent with the strategies designated by the incident commander.

P. Department members responding to crowd, protest, or civil disturbance incidents often encounter circumstances that are tense, uncertain, and rapidly evolving. Therefore, Department member's decisions and actions in such circumstances will be judged based on the totality of the circumstances known by the member at the time, from the perspective of a reasonable Department member on the scene in the same or similar circumstances, with the same or similar information, and not with the benefit of 20/20 hindsight.

## IV. RESPONSE DOCUMENTATION

A. Whenever strategically organized into squads and platoons, the organized actions and efforts of a squad or platoon will be directed, coordinated, and documented by sworn Department supervisors designated as squad and platoon leaders.

B. Squad leaders will complete and submit a copy of an ICS-211 Incident Check-In (CPD-11.301) form to their designated platoon leader at the mobilization point. The ICS-211 Incident Check-In (CPD-11.301) form will contain the assigned Department members' information including name, star number, employee number, regular unit of assignment, and deployment assignment.

1. For pre-planned incidents (e.g., large planned protest), supervisors will complete their ICS-211 Incident Check-In form (CPD-11.301) at the beginning of their tour of duty, prior to being activated to a deployment location, incident, or specific assignment.

2. For spontaneous incidents (e.g., spontaneous protests such as; marches, property occupations, "sit ins," etc"), supervisors will complete their ICS-211 Incident Check-In form (CPD-11.301) prior to the end of their tours of duty, where appropriate.

C. Platoon leaders will:

1. ensure that each supervisor under their command completes and submits a copy of an ICS-211 Incident Check-In (CPD-11.301) form.

2. complete an ICS-211 Incident Check-In (CPD-11.301) form indicating:

   a. each supervisor under their command, their squad assignments, and deployment information.

   b. the designation of the assignment or responsibility of squads or individual members of the platoon (e.g., transport team, arrest team, relief resources).

3. forward a copy of their ICS-211 Incident Check-In form and copies of the ICS-211 Incident Check-In forms submitted by supervisors under their command to the incident commander, or an authorized designee, prior to:

   a. their deployment for pre-planned incidents (e.g., large planned protest), or

   b. the end of their tour of duty for spontaneous incidents (e.g., spontaneous protests such as; marches, property occupations, "sit ins," etc.), where appropriate.

D. **Case Reporting Responsibilities**

1. When a case report is determined by the incident commander to be necessary to adequately document the incident and the Department's response, the incident commander will designate one member to generate the case report for the incident with an associated event number and RD number. This case report will contain the following information for all incidents related to the incident, that do not require additional follow-up investigation:

   a. date and time of occurrence;

   b. the name of the incident commander who declared a coordinated multiple arrest incident, in the event one is declared;

   c. location of occurrence designated by the incident commander; and

   d. any other information as directed by the incident commander.

   **NOTE:**     As deemed appropriate by the incident commander, Supplementary Reports using the same RD number may be prepared for related incidents that are distinct from the original event in time or place.

2. The incident commander will designate a member or members to chronologically document significant events that occur during the incident response, including:

   a. assignment locations, arrival, and departure times for individual teams;

   b. significant orders issued to sworn members, who issued the orders, who the orders were issued to, when the orders were issued, and the location;

   c. significant orders or other warnings issued to a group of people on the scene of an incident (e.g., a crowd dispersal order), who issued the order or warning, who the order or warning was issued to, when the order or warning was issued, and the location;

d.   criminal conduct or other significant activity (e.g., movement of large crowds, groups of people changing clothes, people passing out items in a crowd, etc.);

e.   locations where multiple persons are taken into custody; and

f.   any other significant or notable events.

NOTE:   Examples of significant incidents include, but are not limited to large scale protests where groups of opposing viewpoints are represented, incidents requiring re-deployment of a significant number of Department personnel, looting, other newsworthy events, spontaneous large celebrations, incidents involving dignitaries, etc.

## V.   RESPONSIBILITIES

A.   **Incident Commander.**  The incident commander will be responsible for the Department's overall incident operations, deployment strategy, and response, including any communication efforts, the deployment of personnel, the management of resources, enforcement strategies, and the successful disengagement from the incident.

B.   **Field Commander.**  The field commander on the scene of the incident will:

1.   will make every effort to identify the leaders of gathered crowds, protests, and civil disturbances in an attempt to establish a rapport and constant communication if feasible.

2.   when appropriate, ensure a Department member communicates clear expectations and potential consequences to persons on the scene of an incident involving crowds, protests, or civil disturbances, including by utilizing persuasion, advice, and warning.

3.   not issue a crowd dispersal order during a First Amendment Assembly unless three or more persons are committing acts of disorderly conduct in the immediate vicinity and those acts are likely to cause substantial harm (MCC 8-4-010(d)), consistent with the Department directive titled, "First Amendment Rights."  Examples of behavior that may require a crowd dispersal order during a First Amendment assembly include, but are not limited to groups of individuals throwing objects, breaking windows, lighting fires, etc.

NOTE:   Department members will recognize a person as being compliant with a crowd dispersal order when they are no longer within sight or sound of the dispersal area and have otherwise complied with the specific directions provided in the dispersal order.

4.   where appropriate, safe, and feasible, make efforts to identify and distinguish between people in a crowd engaged in lawful behavior and those engaged in unlawful activities, and

a.   ensure Department members on scene are aware of this information;

b.   coordinate efforts to separate those engaged in unlawful activities from those engaged in lawful behavior;

c.   consider isolating specific individuals engaged in unlawful activity for specific enforcement actions, such as citations or arrest for specific offenses, while separating those engaged in lawful behavior and activities, including a First Amendment assemblies, to allow those lawful activities to continue; and

REMINDER:   Department members will avoid containment or corralling tactics known as "kettling" and will provide specific egress directions for safe crowd dispersal.

d.   coordinate and communicate a plan to address the unlawful activities (e.g., additional  warning, citation, or arrest).

5. when safe and feasible, promote officer wellness by coordinating efforts to ensure hydration of Department members and timely substitute officers on a line, including providing for breaks for rest and food and removing those who appear to be in mental or physical distress or have become a focus of distraction or attention of the crowd.

C. **All Department Members.** When on the scene of an incident involving crowds, protests, or civil disturbances, all Department members will:

1. ensure they know their assignment, responsibility, and who their immediate supervisor is for the incident.

2. if attired in uniform or casual dress, wear the prescribed star, name tag, unit designator, and rank insignia on their outer-most garment and in view to the public in accordance with the Department directive titled "Uniform and Appearance Standards."

   NOTE: Department members will not conceal, damage, or tamper with their prescribed star, name tag, unit designator, or rank insignia with the intention of preventing the member from being readily identified. Members are reminded they are required to verbally identify themselves upon request.

3. ensure authorized decals and the member's assigned star number are properly affixed to the member's prescribed Department helmet when worn, in accordance with the Department directive titled "Helmet - General Duty, Vehicular, and Ballistic."

4. activate their body-worn camera to event mode to record law-enforcement-related activities in accordance with the Department directive titled "Body Worn Cameras," including encounters with the public that become adversarial after initial contact and issuing dispersal orders or making arrests in response to crowds, protests, and civil disturbances.

   NOTE: If a Department member's body-worn camera battery is depleted or inoperable during the incident, the member will notify a supervisor as soon as safe and feasible.

5. utilize de-escalation techniques (e.g. continual communication, tactical positioning, and time as a tactic) as outlined in the Department directive titled "De-escalation, Response to Resistance, and Use of Force," to prevent or reduce the need for force, including providing warnings, exercising persuasion, or determining whether a situation may be stabilized through the use of time or additional resources, unless doing so would place a person or a Department member in immediate risk of harm, or de-escalation techniques would be clearly ineffective under the circumstances at the time.

6. be aware that persons who are deaf or hard of hearing, have speech or cognitive disabilities, or are blind or visually impared may not recognize or be able to immediately respond to law enforcement directions.

7. adhere to the Department's use of force policy, as outlined in the directive titled "De-escalation, Response to Resistance, and Use of Force," and only use force that is objectively reasonable, necessary, and proportional based on the totality of circumstances.

   a. Department member who directly observes a use of force and identifies the force as excessive or otherwise in violation of Department policy will act to intervene on the person's behalf. Such action may include, but is not limited to, verbally or physically intervening to try to stop the violation. Supervisors will issue a direct order to stop the violation.

   b. Consistent with the Department directive titled "Complaint and Disciplinary System," any Department member who observes misconduct or becomes aware of information alleging misconduct, including an identified excessive use of force, a reportable use of force incident that was not reported, or a use of force that is otherwise in violation of Department policy, will immediately notify his or her supervisor.

8. ensure medical attention is provided for persons who are injured, complain of injury, or request medical attention once the scene is safe and as soon as practical. Department members:

   a. will immediately request appropriate medical aid for the inured person, including contacting emergency medical services from the Chicago Fire Department via the Office of Emergency Management and Communications.

   b. must provide medical aid as soon as reasonably practical, consistent with their Department training, including Law Enforcement Medical and Rescue Training (LEMART), to injured persons until medical professionals arrive on scene.

D. **Department Supervisors.** When on the scene of an incident involving crowds, protests, or civil disturbances, Department supervisors will:

   1. ensure members assigned to their command adhere to the requirements listed in Item V-C of this directive, including ensuring Department members know their assignment, responsibility, and immediate supervisor.

   2. when appropriate, safe, and feasible, make efforts to identify and distinguish between people in a crowd engaged in lawful behavior and those engaged in unlawful activities, and:

      a. ensure Department members under their command and other supervisors in the immediate area are aware of this information.

      b. notify and coordinate with the incident commander or command post.

      c. help coordinate and communicate a plan to address the unlawful activities (e.g., additional warning, citation, or arrest).

      d. help coordinate efforts to separate those engaged in unlawful activities from those engaged in lawful behavior.

   3. ensure sworn members activate their body worn cameras (BWCs) to event mode to record law-enforcement-related activities in accordance with the Department directive titled "Body Worn Cameras," including encounters with the public that become adversarial after initial contact and issuing dispersal orders or making arrests in response to crowds, protests, and civil disturbances.

   4. monitor the battery charge status of radios and body-worn cameras assigned to members within their command, make efforts to replace or charge low or dead batteries when safe and feasible, and document any battery issues and efforts to address them, when applicable.

   5. ensure Department members or other persons on the scene of the incident receive appropriate medical attention when there is an apparent injury or claim of injury.

   6. monitor the presence of persons with news media credentials on the scene of an incident and:

      a. verify news media credentials in accordance with the Department directive titled "News Media Credentials."

      b. provide clear and respectful direction to persons with media credentials to maintain safety for all persons on scene and protect their First Amendment rights.

   7. when safe and feasible, promote officer wellness by ensuring hydration of Department members, providing breaks for rest and food, and making efforts to substitute officers on a line who appear to be in mental or physical distress or have become a focus of distraction or attention of the crowd.

8. ensure notification to the incident commander, field commander, or command post whenever they engage in or observe events that could be considered significant, events that may inform operational decisions, or events requiring documentation as outlined in Item IV-D of this directive.

> NOTE: Examples of significant incidents include, but are not limited to large scale protests where groups of opposing viewpoints are represented, incidents requiring re-deployment of a significant number of Department personnel, looting, other newsworthy events, spontaneous large celebrations, incidents involving dignitaries, etc.

E. Department supervisors who are made aware of a "doxing" incident or other threats against Department members will ensure that the appropriate reporting and security measures are taken, including, when necessary, the procedures delineated in the Department directive titled "Protection of Department Members."

## VI. AFTER-ACTION RESPONSIBILITIES

A. Following a response to a crowd, protest, or civil disturbance incident that involved a significant use of Department resources, the incident commander will ensure an After-Action Review (AAR) is completed consistent with the National Incident Management System (NIMS) principles. The AAR will:

1. take into account the observations or recommendations included in any Special Event Evaluation Report (CPD-11.466) submitted by a supervisor assigned to the incident. These reporting incidents include, but are not limited to;

    a. declared coordinated multiple arrest incidents where arrests are made.

    b. issued crowd dispersal orders during a First Amendment assembly consistent with the Department directive titled "First Amendment Rights."

2. include any approved recommendations resulting from the Tactical Review and Evaluation Division and Force Review Board review of any declared coordinated multiple arrest incident resulting in reportable uses of force, in accordance with the Department directive titled, "Alternative Tactical Response Reporting During Coordinated Multiple Arrest Incidents."

3. document any recommended actions or identified improvements to the Department's response for future incidents.

4. document any known Department video, including relevant Department body-worn camera video, that supports the need for any recommended actions or identified improvements.

5. be forwarded to the First Deputy Superintendent; the Chief of Staff; the Chief, Office of Constitutional Policing and Reform; the General Counsel to the Superintendent; and the Deputy Chief, Training and Support Group within sixty days of:

    a. Force Review Board (FRB) issuing recommendations for any declared coordinated multiple arrest incidents resulting in reportable uses of force, in accordance with the Department directive titled, "Alternative Tactical Response Reporting During Coordinated Multiple Arrest Incidents."

    b. a declared coordinated multiple arrest incident with NO reportable uses of force documented on a Coordinated Multiple Arrest Report.

B. After the response to an incident that involved a significant use of Department resources, any supervisor designated as a field commander will complete a Special Event Evaluation Report (CPD-11.466) to document any observations, evaluation, or recommendations to improve Department response to future incidents within 14 days after the conclusion of an incident.

C.  Any involved supervisor may complete a Special Event Evaluation Report (CPD-11.466) within 14 days after the conclusion of the incident to document any observations, evaluation, or recommendations to improve Department response to future incidents.

D.  Potential Cost Recovery Incidents—City of Chicago

Department members who are assigned to investigate an incident associated with a crowd, protest, or civil disturbance will respond consistent with the Department directive titled "Potential Cost Recovery Incidents - City of Chicago."

Larry Snelling
Superintendent of Police

20-076  GJD

**Chicago Police Department**

**Special Order   S06-06-01XX**

# DECLARATION OF A COORDINATED MULTIPLE ARREST INCIDENT

| | | | |
|---|---|---|---|
| **ISSUE DATE:** | 08 February 2024 | **EFFECTIVE DATE:** | |
| **RESCINDS:** | | | |
| **INDEX CATEGORY:** | 06 - Processing Persons | | |
| **CALEA:** | | | |

## I.   PURPOSE

This directive:

A.   defines and classifies coordinated multiple arrest incidents.

B.   assigns responsibility for declaring incident levels and making the required notifications.

## II.   DEFINITIONS

A.   A **Coordinated Multiple Arrest Incident (CMA Incident)** is an incident where multiple arrests are anticipated or occurring, a continued police presence is required on the scene of the incident to ensure public safety, and individual arresting officers cannot effectively be removed immediately from the incident scene for arrestee processing.

When declaring a coordinated multiple arrest incident, the incident commander will consider the following factors:

1.   the availability of Department resources, including on-scene of the incident and for arrest processing as the designated detention facility;

2.   if a continued police presence is necessary at the scene of the incident to ensure public safety;

3.   the ability to promptly form coordinated multiple arrest teams with defined responsibilities and designated areas of assignment;

4.   the total number of arrestees or potential arrestees;

> **NOTE:** The incident commander should consider the number of specific individuals engaged in unlawful activity and the specific enforcement actions.

5.   the probable charges to be placed against the arrestees;

> **NOTE:** Department members will continue to determine specific individual charges for specific individual arrestees and arrest circumstances during the coordinated multiple arrest incident.

6.   the capacity of the detention facilities;

7.   the physical condition, gender, and age of the arrestees; and

8.   the nature of the situation and circumstances surrounding the incident.

B.   **Classification levels of coordinated multiple arrest incidents:**

1. **Level One**—Arrestees will be transported to and processed at the district of arrest. The coordinated multiple arrest incident commander will identify the appropriate additional support resources including personnel from within the district of occurrence (tactical team and administrative personnel), area and citywide units, and Incident Control Teams from other districts, as needed.

   NOTE: The majority of Level One occurrences will be managed with district-level resources in the district where the Level One coordinated multiple arrest incident has been declared.

2. **Level Two**—Arrestees will be taken to the designated detention facility as determined by the incident commander. During a coordinated multiple arrest incident, arrestees will be transported to and processed at the designated detention facility.

3. **Level Three**—When the number of arrestees exceeds the Level Two capacities or coordinated multiple arrests are occurring in several locations of the city. Utilization of the criminal court facilities or other designated detention facilities will be determined by the First Deputy Superintendent; Chief, Bureau of Patrol; or the incident commander.

   NOTE: Level Two and Level Three occurrences require Department resources beyond what can be provided by the district of occurrence and will be supported as outlined in this directive.

C. **Flexible Cuffs** are plastic, single-use physical restraints used in place of the prescribed metal handcuffs that cannot be reused and must be cut to be removed from the person restrained.

D. A **Coordinated Multiple Arrest (CMA) Kit** is a kit containing flexible cuffs, Coordinated Multiple Arrest Reports, identification wristbands, and other items required to complete an arrest during a declared coordinated multiple arrest incident.

## III. DECLARATION OF A COORDINATED MULTIPLE ARREST INCIDENT

A. The designated exempt-level incident commander of a preplanned or spontaneous event has authority to declare a coordinated multiple arrest incident and implement the associated procedures when deemed appropriate.

1. Absent the designation of an exempt-level incident commander, the highest-ranking on-scene supervisory member will have the authority to declare a coordinated multiple arrest incident.

2. When the designated exempt-level incident commander of a preplanned event determines the declaration of a coordinated multiple arrest incident is probable, to the extent known, the procedures, personnel assignments, and processing locations for implementing a coordinated multiple arrest incident will be predetermined in the Incident Action Plan (IAP). During this operational period, arrests related to this event will be processed as determined by the incident commander.

B. Arrestees who are transported to a designated detention facility for arrest processing and booking, **prior to** a coordinated multiple arrest "declaration" and **after** a coordinated multiple arrest disengagement, will be processed by the individual arresting officers at the district of arrest consistent with the Department directive titled "Processing Persons Under Department Control."

C. However, nothing precludes the incident commander from directing individual arresting officers to transport, document, and process an arrest at the district of arrest consistent with the Department directive titled "Processing Persons Under Department Control" during a declared coordinated multiple arrest incident.

   NOTE: The incident commander will ensure that the Office of Emergency Management and Communications (OEMC) dispatcher and the member's supervisor are notified of this determination and that it is recorded in the coordinated multiple arrest incident documentation.

D.   Additionally, the incident commander may direct the on-scene citing of offenses and release of violators consistent with the Department directives titled "Municipal Administrative Hearings" for violations of the Municipal Code of Chicago (MCC) via Administrative Notice of Ordinance Violations (ANOVs) or "Ordinance Complaint Form" for violations of the Illinois Compiled Statutes (ILCS) via the Ordinance Complaint Form.

## IV.   NOTIFICATIONS

A.   After assessing the situation and the declaration of a coordinated multiple arrest incident, the incident commander will immediately notify the Office of Emergency Management and Communications (OEMC) dispatcher and the Department's Crime Prevention and Information Center (CPIC) and command post (if not located within CPIC) of the incident, the declaration of a coordinated multiple arrest incident, and specific circumstances of the incident (e.g., location, size of crowd and estimated potential arrests, Department personnel on-scene and the need for additional resources).

NOTE:          The incident commander will ensure a simulcast OEMC radio transmission is sent clearly articulating that the coordinated multiple arrest incident has been declared.

B.   Upon notification of any coordinated multiple arrest declaration, CPIC will notify the:

1.   watch operations lieutenant of the district of occurrence;

2.   appropriate district commander;

3.   the Street Deputy or designated on-scene exempt-level supervisor; and

4.   appropriate area detention facility watch operations lieutenant.

C.   During the declaration of **a Level Two or Level Three coordinated multiple arrest declaration**, CPIC will notify the additional Department members and support resources consistent with the CPIC standard operations for coordinated multiple arrest incidents.

## V.   RESPONSIBILITIES AND PROCEDURES

A.   After the coordinated multiple arrest declaration, based on the information at the time, the incident commander will evaluate the number of personnel and resources reasonably necessary to gain or maintain control of the coordinated multiple arrest incident and rapidly deploy sufficient personnel to ensure:

1.   the safety of Department members, the public, and the arrestees; and

2.   the safe and efficient transporting and processing of arrestees.

B.   After assessing the situation, or as outlined in the Incident Action Plan for pre-planned events, the incident commander will immediately:

1.   ensure a command post, staging area(s), and arrest processing area(s) are established for the coordinated multiple arrest incident when appropriate.

NOTE:          For certain circumstances, the incident commander may determine the most effective command post to be a district police station.

2.   assign the following personnel or teams:

a.   field commanders to specific functions or locations, who are responsible for the Department's on-scene response for their area of responsibility (e.g., coordinated multiple arrest location, on-scene arrest processing area).

      **REMINDER:**    Field commanders are the designated on-scene Department supervisor, responsible for a specific location or function, who reports directly to the overall incident commander and is responsible for the Department's on-scene response to the incident for their location or area of responsibility.

    b.    arrest teams to make custodial arrests at the scene of the coordinated multiple arrest incident.

    c.    for each arrestee transportation vehicle designed for transporting multiple arrestees (e.g., squadrol, van or other similar vehicle):

      (1)    an individual sworn Department supervisor to oversee the on-scene processing of arrestees prior to transport.

      **NOTE:**    The supervisor assigned to the transport vehicle will announce by OEMC radio transmission what transportation vehicle they are supervising and remain with the transportation vehicle for the duration of the coordinated multiple arrest incident including accompanying the transportation vehicle to the designated detention facility.

      (2)    a transport team to receive and transport arrestees

    d.    detention facility processing teams, including a supervisor, to oversee the processing of arrestees at the designated detention facility.

      **NOTE:**    During Level Two and Level Three coordinated multiple arrest incidents, the Chief, Bureau of Detectives, will designate a supervisor to oversee the processing of arrestees at the designated detention facility.

    **NOTE:**    The incident commander will ensure Department members on scene of the coordinated multiple arrest incident and members assigned to the designated detention facilities for the processing of arrestees have the necessary equipment and supplies, including coordinated multiple arrest (CMA) kit supplies.

  3.    identify the perimeter and specific resource needs of the staging area(s) and arrest processing area(s) for the coordinated multiple arrest incident and assign personnel to:

    a.    provide for the safety and security for Department members, other persons, Department and City assets, and other property in the area of the coordinated multiple arrest incident; and

    b.    control and limit ingress to and egress from these secured areas of the coordinated multiple arrest incident scene.

  4.    identify a perimeter for the coordinated multiple arrest incident and assign personnel for perimeter protection to:

    a.    when safe, feasible, and appropriate, provide for the safety and security for pedestrian and vehicular traffic not involved in the coordinated multiple arrest incident.

    b.    facilitate the appropriate movement of pedestrian and vehicular traffic at and away from the coordinated multiple arrest incident.

C.    The watch operations lieutenant of the designated detention facility will ensure that appropriate security is established for the interior and exterior of the detention facility.

D.  Upon declaration of a coordinated multiple arrest incident, the incident commander will obtain an event number and RD number for the coordinated multiple arrest incident.

   1.  This event and RD number combination will be:

       a.  documented on the incident case report, along with the name of the incident commander who declared a coordinated multiple arrest incident.

       b.  used to document all incidents that do not require a follow-up investigation.

           NOTE:  If an occurrence related to the coordinated multiple arrest incident requires a follow-up investigation, the incident will be documented as a separate incident with the appropriate classification and RD number. For example, incidents where a Department member is a victim of a battery or when a Department member becomes involved in an officer involved shooting will be documented with a separate RD number. These incidents will be cross-referenced with the RD number for the coordinated multiple arrest incident.

       c.  used to complete Supplementary Reports prepared for related incidents, when deemed appropriated by the incident commander, that are distinct from the original event in time or place.

   2.  The incident commander overseeing a coordinated multiple arrest incident may obtain multiple RD numbers for separate incidents or for one incident when the time interval between the events and the distance between the locations where they occurred are deemed significant by the incident commander.

           NOTE:  Normally, the incidents that have occurred during an unbroken time duration and at the same or adjoining location(s) will be classified as one incident. However, single incidents can, by their nature, involve continuing activity by the same individuals at different times and places, as long as the incident commander deems the activity to constitute a single continuous incident and ensures documentation of the circumstances in the narrative of the case report.

   3.  At the discretion of the incident commander, additional reporting and follow-up investigations can be deferred to a later time or date (e.g., aggravated battery to police officer, felony charge upgrades).

       a.  This determination will be based on the scale of the incident, number of arrestees requiring follow-up investigation, or availability of personnel to complete follow up investigations.

       b.  In such instances, arrestees should be charged with the appropriate lesser offense (e.g., misdemeanor battery) until the investigation can be completed to substantiate additional or upgraded charges.

E.  Department members on the scene of an incident declared as a coordinated multiple arrest incident will follow the direction of their assigned supervisor for duties and responsibilities that were pre-determined in an Incident Action Plan or were modified during the development of the incident, unless specifically designated as a support team for the processing of arrestees.

## VI.  ASSIGNMENT OF ADDITIONAL PERSONNEL

A.  The Chief, Bureau of Patrol, will ensure:

   1.  a sufficient number of teams are assigned to the incident scene for transport and for each designated arrest processing or detention facility; and

2.    assigned members will report to the designated supervisor in charge of the transport or detention facility processing teams.

   NOTE:    For additional transport vehicles that are requested to respond to a designated coordinated multiple arrest incident, each transport team will respond with a corresponding supervisor from the district or unit.

B.   The Chief, Bureau of Detectives, will ensure:

   1.    a videographer is assigned to report to the incident commander for assignment, including the video documentation of the incident or specifically identified actions of the crowd and Department responses.

   2.    at least one evidence technician is assigned to report to the incident commander for assignment.

      NOTE:    The evidence technician will provide assistance to assigned Department supervisors with the collection, photography, and inventory of evidence identified and recovered during the course of the coordinated multiple arrest incident consistent with the Department directive titled "Processing Property Under Department Control."

   3.    on-duty Bureau of Detectives personnel are assigned to detention facility processing teams for the processing of transported arrestees to designated detention facilities for each of the three watches; and

      NOTE:    Only at the direction of the incident commander will arresting officer(s) relocate to the designated detention facility to assist processing officers in documenting the circumstances of the arrest.

C.   The Chief, Bureau of Internal Affairs (BIA), will ensure a sufficient number of BIA sworn supervisory members are assigned to observe:

   1.    the location of each transport vehicle and the subsequent transports; and

   2.    the coordinated multiple arrest procedures at the designated detention facilities for the duration of the incident.

      a.    The BIA sworn supervisory members will be available for consultation at the scenes of the transport vehicles and at the designated detention facilities.

      b.    When appropriate, the BIA sworn supervisory member will obtain Log Numbers for alleged policy violations when observing a Department member engaged in misconduct, knowing of an allegation of misconduct, receiving an allegation of misconduct, or becoming aware that a member of the public wants to submit a complaint, consistent with the Department directive titled "Complaint Initiation and Log Number Investigation Assignment."

D.   The General Counsel to the Superintendent, Legal Affairs Division (LAD), will ensure a sufficient number of LAD sworn supervisory members are assigned to provide legal guidance to the designated detention facility processing teams for the duration of the incident.

E.   The Incident Action Plan for a pre-planned event will identify the above-listed preassigned roles and the designated Department members' tour of duty requirements, assignments, and deployment responsibilities.  For spontaneous events, the incident commander will ensure the above-listed roles and resources are identified and notified.

## VII.    DISENGAGEMENT FROM A COORDINATED MULTIPLE ARREST INCIDENT

A.   At the conclusion of a coordinated multiple arrest incident, the incident commander, or their designee, will:

1. ensure notification is made to the Office of Emergency Management and Communications (OEMC) and the Crime Prevention and Information Center (CPIC) of the disengagement from the coordinated multiple arrest incident.

   **NOTE:** The incident commander will ensure a simulcast radio message is sent clearly articulating that the coordinated multiple arrest incident has concluded.

2. make certain all Department and external resources and personnel are released from the coordinated multiple arrest incident when it is safe and feasible to do so upon the incident's conclusion.

3. ensure arresting officers proceed to the designated detention facility only when required for completion of additional arrestee processing (e.g., member is the victim of an aggravated battery) or when directed by the incident commander or a supervisor.

B. At the conclusion of a coordinated multiple arrest incident, Department members will return to normal operational, reporting, and arrest procedures, including as outlined in the Department directive titled "Processing Persons Under Department Control."

## VIII. DETENTION FACILITY LOCATIONS AND MAXIMUM EMERGENCY CAPACITIES

A. The detention facility station supervisor will be responsible for notifying CPIC when the facility is approaching its emergency arrestee capacity.

B. In addition to Department facilities, the Cook County Sheriff's lock-up facilities adjoining area detention facilities may be utilized upon direction from the First Deputy Superintendent.

C. Maximum Emergency Capacities of Detention Facilities

1. 1718 South State Street

   a. Maximum Emergency Capacity of Designated Male Detention Facility: 720

   b. Maximum Emergency Capacity of Designated Female Detention Facility: 320

2. 5101 South Wentworth Avenue

   a. Maximum Emergency Capacity of Designated Male Detention Facility: 225

   b. Maximum Emergency Capacity of Designated Female Detention Facility: 100

3. 727 East 111th Street

   a. Maximum Emergency Capacity of Designated Male Detention Facility: 335

   b. Maximum Emergency Capacity of Designated Female Detention Facility: 145

4. 2452 West Belmont Avenue

   a. Maximum Emergency Capacity of Designated Male Detention Facility: 230

   b. Maximum Emergency Capacity of Designated Female Detention Facility: 120

5. 3151 West Harrison Street

   a. Maximum Emergency Capacity of Designated Male Detention Facility: 160

   b. Maximum Emergency Capacity of Designated Female Detention Facility: 120

6. 5555 West Grand Avenue

   a. Maximum Emergency Capacity of Designated Male Detention Facility: 340

   b. Maximum Emergency Capacity of Designated Female Detention Facility: 120

Larry Snelling
Superintendent of Police

20-076 GJD

Chicago Police Department

**Special Order  S06-06-02XX**

**ALTERNATE ARREST PROCEDURES DURING COORDINATED MULTIPLE ARREST INCIDENTS**

| ISSUE DATE: | 08 February 2024 | EFFECTIVE DATE: | |
|---|---|---|---|
| RESCINDS: | | | |
| INDEX CATEGORY: | 06 - Processing Persons | | |
| CALEA: | | | |

## I. PURPOSE

This directive:

A. specifies procedures for transporting and processing arrested persons.

B. prescribes special procedures applicable in coordinated multiple arrest incidents.

C. introduces a revised:

1. Coordinated Multiple Arrest Report [CPD-11.433 (Rev. 1/24)], which replaces the Rev. 9/18 version.

2. Coordinated Multiple Arrest—Transport Roster form [CPD-11.300 (Rev. 1/24)], which replaces the Rev. 7/20 version.

## II. DEFINITIONS

A. **Arrest Team**—a team of officers that are assigned to make custodial arrests at the scene of a coordinated multiple arrest incident under the direction of an on-scene supervisor.

B. **Designated Detention Facility**—the location designated to complete the arrest processing and booking for people arrested during a coordinated multiple arrest incident, usually a location other than the district of arrest.

C. **Detention Facility Processing Team**—a team of officers with, at minimum, one supervisor assigned to complete the arrest processing and booking for people arrested during a coordinated multiple arrest incident at the designated detention facility.

D. **Field Commander**—the on-scene Department supervisor, designated by the incident commander, responsible for a specific location or function, who reports directly to the overall incident commander and is responsible for the Department's on-scene response to the incident for their location or area of responsibility.

E. **Incident Commander**—the designated Department member who is responsible for the Department's overall response to the incident.  The incident commander may be on the scene of the incident or at a location that provides the ability to direct the Department's overall response to the incident.

F. **On-Scene Processing Supervisor**—a sworn supervisory Department member assigned to the on-scene processing location of the coordinated multiple arrest incident to oversee the on-scene processing of and maintain accountability for the people arrested, including the review and maintenance of the completed documentation and transportation to the designated detention facility. An individual sworn supervisor will be responsible for each individual transportation vehicle designed for transporting multiple arrestees (e.g., squadrol, van, or other similar vehicle).

G. **Transportation Team**—under the direction of the on-scene processing supervisor assigned to the transportation vehicle, a team of, at minimum, two officers that are assigned to:

1.      receive people arrested during a coordinated multiple arrest incident, are responsible for their safety and security, and will transport them to the designated detention facility, and

2.      provide for the safety and security of the on-scene arrest processing area and the transport vehicle, at the scene as well as during the transport to the designated detention facility.

## III.   DECLARATION OF A COORDINATED MULTIPLE ARREST INCIDENT AND ALTERNATE ARREST PROCEDURES

A.     After the declaration of a coordinated multiple arrest incident, the alternate arrest processing procedures outlined in this directive will apply.

B.     If there is any perceived conflict between a procedure in this directive and any other Department directive, including the Department directive titled "Processing Persons Under Department Control," this directive will take precedence.

C.     During active coordinated multiple arrest incidents, supervisors who experience a continued dispute during an incident will promptly seek a resolution from raking Department members in their chain of command.  For disputes that cannot be resolved in this manner the incident commander, or their on-scene designee, will make the final determination for dispute resolution occurring at any time during the active coordinated multiple arrest incident.

> **NOTE:**      After the coordinated multiple arrest incident, the supervisor resolving the conflict will provide a written summary of the conflict and resolution to the Chief, Office of Constitutional Policing and Reform (OCPR).  The Chief, OCPR, will determine if any modifications to policy, training, or operational planning are necessary and ensure notification is made to the appropriate unit for resolution.

D.     At the conclusion of a coordinated multiple arrest incident, Department members will return to normal operational, reporting, and arrest procedures, including as outlined in the Department directive titled "Processing Persons Under Department Control."

E.     Nothing in this policy requires members to take the actions as outlined in this directive, or fail to take these actions, that unreasonably endanger themselves or others during the response to a coordinated multiple arrest incident.

## IV.   COORDINATED MULTIPLE ARRESTS

During a declared coordinated multiple arrest incident:

A.     the determination to begin large scale enforcement action, including physical arrests beyond the individual isolated incidents or individual offenses occurring, will be made by the field commander and will be clearly communicated to the Department members and members of the public on the scene.

> **NOTE:**      The communication to Department members will also include other pertinent information such as the location of the on-scene processing areas, transportation vehicles, and additional necessary supplies (e.g., coordinated multiple arrest kits).

B.     on-scene supervisors will ensure the members under their command are notified of their respective assigned responsibilities and the decisions of the incident or field commander, including to begin large scale enforcement actions.

C.     arresting officers/arrest teams will:

1.      follow the instructions of their supervisor when taking enforcement actions.

2.      engage their BWC to event mode to ensure any arrest interactions are properly recorded consistent with the Department directive titled "Body Worn Cameras."

3.      identify and document the specific facts that support the probable cause for each person being arrested.

NOTE: Normally, no single arresting officer will arrest more than fifteen persons in a coordinated multiple arrest; however, the arrest team supervisor may make an exception should circumstances warrant. An OEMC event number will be obtained to document this exception.

4. utilize the contents of a coordinated multiple arrest kit (e.g., flexible handcuffs) to secure the person taken into custody, unless the kits are unavailable.

5. utilize unique, sequentially numbered QR code stickers to link arrestees to their corresponding Coordinated Multiple Arrest Report(s) (CPD-11.433), arrestee property, evidence, and arresting officer(s), as outlined in item V-A-4 of this directive.

6. be responsible for the safety and security of the person taken into custody until released to the assigned transport team.

7. when safe and feasible to do so, perform a protective pat down of the person in custody for weapons or other objects that may be used for weapons or to physically harm Department members or others.

8. maintain custody of the arrestee, escort the arrestee from the immediate scene of the arrest, and relocate to the secured on-scene processing location of the coordinated multiple arrest incident.

D. When questioning or interrogating arrestees during a coordinated multiple arrest incident, Department members will adhere to the procedures outlined in the Department directive titled "Custodial Interrogations."

## V.   PROCESSING ARRESTEES ON SCENE

A. At the on-scene processing location, the arresting officers will:

1. ensure their body worn cameras (BWCs) are activated to event mode during the arrest incident and on-scene processing.  In addition, when safe and feasible, arresting officer(s) will capture specific BWCs images and information prior to assisting the arrestee(s) into the transportation vehicle, including:

a. announcing their name, star number, and beat number.

b. recording the name and facial images of the arrestee.

c. recording and describing:

(1) the actions of the arrestee supporting probable cause for arrest.

(2) evidence or contraband recovered.

(3) arrestee's personal property, including bulk property recovered.

(4) any physical injury to the arrestee.

d. recording the Coordinated Multiple Arrest Report number.

2. conduct a custodial search of the person in custody for weapons, other objects that may be used for weapons or to physically harm Department members or others, or contraband and other evidence of the crime.

3. complete a numbered Coordinated Multiple Arrest Report for each arrestee with the arresting officer's name and star number clearly written on the report.

4. secure the arrestee's unique QR code sticker to:

a. the "Original" copy of the completed Coordinated Multiple Arrest Report (CPD-11.433);

NOTE: If there are multiple Coordinated Multiple Arrest Reports (CPD-11.433) for a single arrestee, the arrestee's unique QR code sticker will be placed on the "Original" copy of each of the reports.

b. the flex cuff attached to the wrist of the arrestee;

c. the identification wristband attached to the arrestee's right wrist, when safe and feasible;

d. all property inventory bags associated with the arrestee, if applicable;

e. all bulk personal property associated with the arrestee, if applicable; and

f. all evidence recovery bags associated with the arrestee, if applicable.

5. present the completed Coordinated Multiple Arrest Report to the on-scene processing supervisor for review and approval. Upon receiving approval from the on-scene arrest processing supervisor assigned to the transportation vehicle, the arresting officers will:

a. provide the transporting officer any evidence, contraband, or personal property recovered during the arrest.

b. turn custody of the arrestee over to transporting personnel.

c. retain the Reporting Officer's copy and provide the original and remaining copies of the completed Coordinated Multiple Arrest Report to the on-scene arrest processing supervisor assigned to the transporting vehicle.

6. return to their duty assignment, unless directed otherwise by the field commander, until released by the incident commander.

NOTE: Arresting officers will **NOT** be released from their duty assignment at the coordinated multiple arrest incident until verbally released or reassigned by the designated field commander.

7. only if directed by the coordinated multiple arrest field commander or a supervisor (e.g., member is the victim of an aggravated battery), proceed to the designated detention facility for completion of arrestee processing.

NOTE: Arresting officers will **NOT** be released from the detention facility until verbally released by the detention facility processing team supervisor.

B. The on-scene arrest processing supervisor assigned to the transport vehicle will:

1. ensure that a numbered Coordinated Multiple Arrest Report is completed for each arrestee. The on-scene arrest processing supervisor will:

a. ensure arresting officers secure the arrestee's unique QR code sticker to the items as identified in Item V-A-4 of this directive.

b. ensure the arresting officer's name and star number are clearly written on the report.

c. be the recipient of the numbered Coordinated Multiple Arrest Reports and will be accountable for the reports until provided with the arrestee to the processing facility supervisor.

d. review and, if approved, place their signature in the Supervisor's Section of the Coordinated Multiple Arrest Report, confirming the report's completeness and sufficiency.

2. complete the required information on the Coordinated Multiple Arrest—Transport Roster (CPD-11.300) form using the information provided on the numbered Coordinated Multiple Arrest Report (CPD-11.433).

EXAMPLE: The Coordinate Multiple Arrest—Transport Roster form will document the transport vehicle beat number, the outside number of the transport vehicle, the date and time of arrival at the processing facility, and relevant information obtained from the Coordinated Multiple Arrest Report (CPD-11.433).

3. direct the transport team personnel to take custody of the arrestee.

4. after custody of the arrestee has been securely transferred to transport team personnel, direct the arresting officers to report back to their immediate supervisor for their next assignment, unless directed otherwise by the field commander.

5. ensure juvenile arrestees are transported separately from adult arrestees in accordance with the Department directive titled "Processing of Juveniles and Minors Under Department Control."

6. ensure any arrestee requiring use of a wheelchair is transported in accordance with the Department directive titled "Transportation of Arrestees Requiring Wheelchairs."

7. remain with the transport vehicle, including during the transport to the designated detention facility through the completion of the booking process for the arrestees, unless directed by the incident commander.

C. If at any time during the incident, the on-scene arrest processing supervisor encounters circumstances where a Coordinated Multiple Arrest Report is not discovered for an arrestee at the transportation vehicle or if the Coordinated Multiple Arrest Report is missing vital information such as the name of the arrestee or the name of the arresting officer, the on-scene arrest processing supervisor will make reasonable attempts to reconcile the Coordinated Multiple Arrest Report issues.

1. If the attempts to reconcile are resolved (e.g., additional information provided, Coordinated Multiple Arrest Report located), the arrest will be processed according to the procedures outlined in Item V-B of this directive.

2. If reconciliation attempts have failed, the on-scene arrest processing supervisor has the ability to release the arrestee without charging or further processing. If the arrestee is released on scene without charging or further processing due to a missing Coordinated Multiple Arrest Report or insufficient information on the report, the supervisor will ensure:

a. that any Coordinated Multiple Arrest Report received for the arrestee indicates the release and is retained, in addition to other Coordinated Multiple Arrest Reports that were completed for the purpose of documenting any reportable use of force or officer battery for the arrest incident.

b. an Investigatory Stop Report is completed for the temporary detention with detailed documentation of the circumstances of the detention and the release.

c. the person that was detained is released and escorted from the secured on-scene processing area.

EXCEPTION: In the event reconciliation attempts have failed, and the arrestee is a juvenile with no family member on scene, the on-scene arrest processing supervisor will ensure the juvenile is transported to the designated detention facility for processing and release to a family member or other authorized party, in accordance with the Department directives titled, "Abused, Neglected, Dependent or Abandoned Children Coming Under Department Control" and "Processing of Juveniles and Minors Under Department Control."

3.    All Investigatory Stop Reports completed for unsuccessful reconciliation attempts and the on-scene release of a person detained will be forwarded to the 4th Amendment Street Stop Review Unit for review, consistent with the Department directive titled "Investigatory Stop System."

D.    Evidence technicians assigned to the scene of a coordinated multiple arrest incident will process evidence that may be relevant to the investigation at the direction of the incident commander or on-scene arrest processing supervisor.

E.    Transporting Team officers will:

1.    accept custody of all arrestees with their completed and approved numbered Coordinated Multiple Arrest Report.

NOTE:    Transporting officers will verify that the arrestee's unique QR code sticker is affixed to the fully completed Coordinated Multiple Arrest Report (CPD-11.433) prior to transporting the arrestee to the processing facility and, again, upon arrival at the processing facility.

2.    take a photograph of the arrestee with the arresting Department member with a Department issued cellular telephone camera.

3.    conduct a custodial search for contraband and weapons.

REMINDER:    Pat-downs or searches of persons who are part of a coordinated multiple arrest incident will be conducted in accordance with the Department directives titled "Processing Persons Under Department Control" and "Interactions with Transgender, Intersex, and Gender Nonconforming (TIGN) Individuals."

4.    secure weapons, any contraband, or other items of evidentiary value in an evidence bag, record the arrestee's name on the bag, and ensure the corresponding arrestee's unique QR code sticker is placed on the bag.

5.    secure any electronic communications devices and other arrestee's property in a property bag, record the arrestee's name on the bag, and ensure the corresponding arrestee's unique QR code sticker is placed on the bag.

6.    ensure body worn cameras (BWCs) are activated during the on-scene arrest processing, search of the arrestee, and the completion of the transportation process. In addition, when safe and feasible, transporting officer(s) will capture specific BWC images and information prior to assisting the arrestee(s) into the transportation vehicle, including:

a.    announcing their name, star number, and beat number.

b.    recording the name and facial images of the arrestee and the arresting/escorting officer.

c.    recording the Coordinated Multiple Arrest Report number.

7.    secure the arrestee in the transport vehicle and transport the arrestee to the designated detention facility.

NOTE:    Juvenile arrestees will be transported separately from adult arrestees in accordance with the Department directive titled "Processing of Juveniles and Minors Under Department Control."

F.    The on-scene arrest processing supervisor assigned to the transport vehicle will accompany the transport of the arrestees to the designated detention facility and will:

1.    provide the completed Coordinated Multiple Arrest Reports (CPD-11.433) and Coordinated Multiple Arrest—Transport Roster (CPD-11.300) form to the designated detention facility supervisor.

2.  remain at the designated detention facility until the successful transfer of custody of the arrestees to the designated detention facility personnel.

3.  unless released or reassigned by the incident commander or designated detention facility watch operations lieutenant, remain at the designated detention facility until all of the accompanied transported arrestees are booked at the designated detention facility.

4.  upon release from the designated detention facility, return with the transporting officers to their duty assignment.

## VI. PROCESSING ARRESTEES AT DETENTION FACILITIES

A.  Upon the arrestee's arrival at the designated detention facility, the designated detention facility processing supervisor will:

1.  confirm each arrestee received is listed on the Coordinated Multiple Arrest—Transport Roster (CPD-11.300) form and a Coordinated Multiple Arrest Report is received for each arrestee from the on-scene arrest processing supervisor.

2.  oversee the arrest processing at their designated detention facility consistent with the procedures outlined in this directive and the Department directive titled "Processing Persons Under Department Control," including but not limited providing for arrestee phone calls, medical attention, required medication, and release from custody.

B.  Upon the arrestee's arrival at the designated detention facility, arrest processing officers will:

1.  identify each arrestee with the arresting officer by matching the arrestee's unique QR code sticker affixed to the completed Coordinated Multiple Arrest Report (CPD-11.433) with the unique QR code sticker attached to:

    a.  the arrestee's flex cuff; or

    b.  the wristband attached to the arrestee's right wrist.

    **NOTE:**        If the arrestee's unique QR code sticker is missing or removed from any items, the processing officer will document those circumstances in the Arrest Report.

2.  determine and verify the proper charge(s).

3.  complete the Arrest Report consistent with the Department directive titled "CLEAR Automated Arrest System."  The processing officer will:

    a.  select the "Coordinated Multiple Arrest" designation in the CLEAR Automated Arrest System under "Associated Incidents" in the "Major Incident Category" and ensure the unique Coordinated Multiple Arrest Report number is incorporated in the Arrest Report narrative.

    b.  ensure a scanned copy of the numbered Coordinated Multiple Arrest Report is attached to matching Arrest Report in the Automated Arrest Application.

    c.  ensure all available digital media including photographs of the arrestee and associated BWC video is referenced, and when possible uploaded, in the reporting application.

    d.  be recorded as the attesting officer and the Department member listed on the Coordinated Multiple Arrest Report will be listed as the arresting officer.

        **NOTE:**        Processing officer(s) will **NOT** input their name on the Arrest Report as the arresting officer.

4. sign the complaints with the arresting officer's name along with processing officer's initials and star number. If the incident commander or the highest-ranking on-scene member of the Bureau of Patrol has designated a member to sign complaints, that member will complete and sign complaints for all arrestees for whom they have personal knowledge of the circumstances substantiating probable cause for arrest.

   **EXCEPTION:** Arrest processing officers will not sign complaints for instances requiring follow-up investigations or any offense involving a citizen complainant.

5. notify the designated detention facility processing supervisor that the Arrest Report for the arrestee is ready for review and initial approval of probable cause.

6. present the completed Arrest Report, the corresponding numbered Coordinated Multiple Arrest Report (CPD-11.433), with the arrestee's unique QR code sticker attached, and related documents to the watch operations lieutenant in charge of the designated detention facility for approval of probable cause.

C. The booking member will:

1. fingerprint and take identification photograph of all arrestees, consistent with the Department directives titled "Processing Persons Under Department Control" and "Processing of Juveniles and Minors Under Department Control."

2. after the completion of each step of the booking process, ensure that the appropriate fields in the Automated Arrest Application are completed.

D. District station supervisors in the designated detention facility of a coordinated multiple arrest incident will ensure:

1. a scanned copy of the numbered Coordinated Multiple Arrest Report is attached to the matching Arrest Report in the Automated Arrest Application.

2. the "Court Copy" copy of the numbered Coordinated Multiple Arrest Report is attached to the "Court Copy" of the Arrest Report and forwarded to the appropriate court with the required court documents.

   **NOTE:** If appropriate, arrest processing officers will cite the arrestee with an Administrative Notice of Ordinance Violation (ANOV) citation at the designated detention facility consistent with the Department directive titled "Municipal Administrative Hearings." Department members will attach the "Court Copy" copy of the numbered Coordinated Multiple Arrest Report to the "Department of Administrative Hearing Copy" of the citation.

3. the "Original" copy of the numbered Coordinated Multiple Arrest Report (CPD-11.433) and Coordinated Multiple Arrest—Transport Roster form (CPD-11.300) are forwarded to Bureau of Detectives, Administration Unit 180, and a copy of the Coordinated Multiple Arrest—Transport Roster form (CPD-11.300) is emailed to 180notification@chicagopolice.org.

   **NOTE:** The forms will be retained by the Bureau of Detectives consistent with the existing records-retention requirements.

4. the "Review" copy of the numbered Coordinated Multiple Arrest Report (CPD-11.433) will be forwarded to the Tactical Review and Evaluation Division (TRED) for review in accordance with the Department directive titled "Alternate Tactical Response Reporting For Coordinated Multiple Arrest Incidents."

5. the proper RD number is recorded on all documents submitted for review.

   a. Incidents not requiring follow-up investigation will be recorded under the designated coordinated multiple arrest RD number.

b. Offenses related to the coordinated multiple arrest incident that require follow-up investigation (e.g., any felony offense including aggravated battery to police officer and aggravated assault to police officer) will be documented with a separate RD number noting the appropriate classification for that specific offense, consistent with the Incident Reporting Guide (CPD-63.451). This report will cross-reference the RD number designated for the coordinated multiple arrest incident. At the discretion of the incident commander, additional reporting and follow up investigations can occur at a later time or date.

> NOTE: Arresting officers will only proceed to the designated detention facility for follow-up investigations after a coordinated multiple arrest incident is concluded at the direction of the incident or field commander.

E. The designated watch operations lieutenant (WOL) in the detention facility will:

1. ensure their designated detention facility has the adequate resources and personnel to complete arrestee processing in an efficient and timely manner.

2. review the submitted arrest reports for sufficiency and, when appropriate, indicate the initial approval of probable cause for the charges for arrestees processed in their designated detention facility.

3. approve final charges and approve the release of the arrestees processed at their assigned detention facility.

> NOTE: The incident commander may designate additional sworn supervisory Department members, the rank of lieutenant or above, to the designated detention facility to serve as a coordinated multiple arrest incident WOL. The incident commander may designate the coordinated multiple arrest incident WOL to approve arrest reports and Tactical Response Reports (TRRs) associated with the coordinated multiple arrest incident, as well as otherwise assist in ensuring arrestee processing is completed in an efficient and timely manner.

## VII. ADDITIONAL PROCESSING PROCEDURES FOR JUVENILE ARESTEES DURING COORDINATED MULTIPLE ARREST INCIDENTS

A. In addition to the procedures outlined in Item VI of this directive, when processing a juvenile arrestee during a coordinated multiple arrest incident, the designated processing officers will:

1. record the names of all juveniles taken into custody during a coordinated multiple arrest incident and the names of arresting officers on the dedicated Daily Log(s) of Juveniles Taken Into Custody (CPD-24.518).

2. as soon as possible, make every reasonable effort to contact the parent/legal guardian or a responsible adult with whom the juvenile resides to notify the person that the juvenile is in custody and provide information of where the juvenile is being held.

> NOTE: Arresting and processing officers will work with the assigned area Bureau of Detective personnel to ensure the parent/legal guardian or a responsible adult residing with the juvenile arrestee is notified and is en route to the designated detention facility.

3. ensure the Juvenile Miranda Warning is given to juvenile arrestees under 18 years of age prior to any custodial interrogation consistent with the Department directive titled "Processing of Juveniles and Minors Under Department Control"

4. after the initial approval of the probable cause, escort the juvenile into the district lockup for fingerprinting and photographing consistent with the Department directive titled "Processing of Juveniles and Minors Under Department Control."

5.  maintain custody of the juvenile arrestee until custody is released to the member of the Bureau of Detectives processing the juvenile arrest.

> NOTE: The Bureau of Detectives supervisor assigned to the coordinated multiple arrest incident will release the designated processing officer from retaining control of a juvenile arrestee when considered appropriate.

B.  The designated Bureau of Detective member assigned to the coordinated multiple arrest incident will process and release the juvenile arrestee consistent with the Department directive titled "Processing of Juveniles and Minors Under Department Control."

## VIII. ARRESTS MADE BY OTHER LAW ENFORCEMENT AGENCIES

A.  Arrests made by other law enforcement agencies will be handed over to a Transportation Team for processing consistent with this directive. Officers from outside agencies will:

1.  document on the numbered Coordinated Multiple Arrest Report (CPD-11.433), all identifying information of outside law enforcement agency personnel (e.g., name, rank, star number, unit address, and telephone number), as well as the probable cause for arrest and any force used by the outside law enforcement agency personnel during the arrest.

2.  escort the arrestee to the Transportation Team and provide a completed and signed Coordinated Multiple Arrest Report to the On-Scene Processing Supervisor for review.

3.  be listed as witnesses unless the officer is determined to be the victim associated with the arrest.

4.  remain with the On-Scene Processing Supervisor until the successful transfer of custody of the arrestee to the Transportation Team

B.  Department members will:

1.  document the acceptance of the arrestee from outside law enforcement agency personnel on the numbered Coordinated Multiple Arrest Report (CPD-11.433).

2.  document all identifying information of outside law enforcement agency personnel (e.g., name, rank, star number, unit address, and telephone number), as well as any force used by the outside law enforcement agency personnel during the arrest on the arrest report, and any other applicable report.

3.  list Department Members from the Transportation Team as the arresting officers and the officers from the outside agency as witnesses (unless the outside agency officers are victims associated with the arrest).

> NOTE: When circumstances permit, arresting officer(s) from outside agencies should proceed to the designated detention facility and assist the Department members processing the arrest to accurately document probable cause, the appropriate charges, and the circumstances of the arrest.

C.  When arrests involving other law enforcement agencies require a follow-up investigation, the involved outside law enforcement personnel will return to the designated detention facility for arrestee processing and criminal charging at the conclusion of the coordinated multiple arrest incident.

## IX. DETENTION OF CIVILIANS BY NATIONAL GUARD

A.  A National Guard member will not arrest, apprehend, or detain civilians absent unique circumstances that may dictate temporary detention. National Guard personnel will defer to law enforcement's authority for arrest and detention.

1.  If circumstances dictate temporary detention, National Guard personnel will contact Department personnel, describe the incident, and turn over custody of the detainee to the Department member.

2.   National Guard members will be listed as witnesses unless the National Guard Member is determined to be the victim associated with the detainee.

3.   The National Guard member will, when possible, accompany the Department members transporting the arrestee to the appropriate detention facility. In incidents where the National Guard member is not immediately available, the Department members will instruct the National Guard member to go to the appropriate detention facility as soon as practicable. The National Guard member will provide information to the Department members assigned to process arrests concerning the circumstances which led to the arrest; furnish identification data (name, rank, unit address, and telephone number); and sign the appropriate court complaint form.

B.   Department members will document all identifying information of the National Guard member(s) (e.g., name, rank, unit address, and telephone number), as well as any force used during the detention on the Department arrest report and any other applicable report.

C.   When arrests involving a National Guard member(s) require a follow-up investigation, the involved National Guard personnel will return to the processing/detention facility for arrestee processing and criminal charging after the coordinated multiple arrest incident is suspended.

D.   For circumstances where determining charges is unclear, the incident commander, or designee, will make the final determination of appropriate charges to be placed.

## X.   PROCEDURES FOR RELEASE, BONDING, AND REFFERAL TO COURT

A.   Arrestees charged and processed at the designated detention facilities will be released from custody or referred to court and taken before a judge of the Circuit Court of Cook County for the purpose of resolving any preliminary matters and further detention consistent with the Department directives titled "Processing Persons Under Department Control," "Pretrial Fairness Act Arrest Processing Procedures," and "Bond Procedures."

B.   All juveniles arrested during a coordinated multiple arrest incident, when the charges are not to be adjusted at the designated detention facility consistent with the Department directive titled "Processing of Juveniles and Minors Under Department Control," will be transported to the Circuit Court of Cook County, Juvenile Division, or another court facility as dictated by the presiding judge, for the purpose of holding detention hearings.

Larry Snelling
Superintendent of Police

20-076  GJD

Chicago Police Department

**Special Order  S06-06-03XX**

**ALTERNATE TACTICAL RESPONSE REPORTING DURING COORDINATED MULTIPLE ARREST INCIDENTS**

| | | | |
|---|---|---|---|
| **ISSUE DATE:** | 08 February 2024 | **EFFECTIVE DATE:** | |
| **RESCINDS:** | | | |
| **INDEX CATEGORY:** | 06 - Processing Persons | | |
| **CALEA:** | | | |

## I.    PURPOSE

This directive:

A.    outlines the reporting requirements for the Department's tactical response to crowds, protests, and civil disturbances.

B.    describes alternate tactical response reporting procedures during coordinated multiple arrest incidents.

C.    continues the:

1.    ICS-211 Incident Check-In (CPD-11.301) form.

2.    ICS-211 Incident Response (CPD-11.302) form.

3.    Coordinated Multiple Arrest Report (CPD-11.433).

## II.    DE-ESCALATION AND USE OF FORCE

Department members will continue to respond to resistance or use force in accordance with G03-02, "De-escalation, Response to Resistance, and Use of Force," including:

A.    **Sanctity of Human Life.** The Department's highest priority is the sanctity of human life. The concept of the sanctity of human life is the belief that all human beings are to be perceived and treated as persons of inherent worth and dignity, regardless of race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military status, immigration status, homeless status, source of income, credit history, criminal record, criminal history, or incarceration status. Department members will act with the foremost regard for the preservation of human life and the safety of all persons involved. A member's decision to use force will be made in accordance with G03-02, "De-escalation, Response to Resistance, and Use of Force."

B.    **De-Escalation.** Department members are required to use de-escalation techniques to prevent or reduce the need for force, unless doing so would place a person or a Department member in immediate risk of harm, or de-escalation techniques would be clearly ineffective under the circumstances at the time in accordance with G03-02, "De-escalation, Response to Resistance, and Use of Force." Department members will continually assess the situation and modify the use of force as circumstances change and in ways that are consistent with officer safety, including stopping the use of force when it is no longer necessary.

C.    **Response to Resistance and Use of Force.** As defined in G03-02, "De-escalation, Response to Resistance, and Use of Force":

1.    Department members' use of force must be objectively reasonable, necessary, and proportional under the totality of the circumstances, including using the minimum amount of force needed under the circumstances.

2.    Department members will continually assess the necessity of the use of force and whether alternatives may be employed, including the use of de-escalation techniques, other response options, and the availability of other resources.

## III.    REPORTING SQUAD ACTIONS AND RESPONSES

A.    During incidents involving crowds, protests, or civil disturbances Department members formed into squads will follow the direction of the squad supervisor. When Department members formed into a squad physically respond to a crowd's actions or inactions in response to verbal directions and make physical contact with a person or persons in the crowd, the squad supervisor will document the squad's coordinated actions on the Incident Response (CPD-11.302) form. The completed report will include:

1.    the original location of the incident;

2.    the approximate time of the incident;

3.    the approximate size of the crowd on scene;

4.    the approximate number of subjects involved in the incident;

5.    the approximate number of squads assigned to the incident;

6.    whether verbal warnings were given to the crowd, including the number of warnings and the content;

7.    whether the Department members were wearing body worn cameras;

8.    whether the assigned supervisor or another supervisor directed the response during the incidents involving a crowd, protest, or civil disturbance;

9.    whether any injuries to subjects were observed;

10.    any observed crowd actions;

11.    any squad responses including, but not limited to, verbal direction, tactical positioning, any push or port arms push, stunning, or rake maneuvers;

12.    the number of TRRs required as a result of any reportable use of force by squad members; and

13.    a brief narrative of the incident, describing with specificity any additional circumstances leading to or subjects' actions necessitating response, the specific squad response (including force mitigation efforts), injuries observed, and any medical attention requested or provided.

B.    When a Department member becomes involved in an individual reportable use of force incident with a subject during a coordinated multiple arrest incident, the member will document the incident in accordance with Item V of this directive. An individual reportable use of force is any reportable use of force as outlined in the Department directive titled "Incidents Requiring the Completion of a Tactical Response Report" and which extends beyond a squad's coordinated physical response to crowd actions or inactions in response to verbal direction. Examples of individual reportable uses of force include, but are not limited to:

1.    weapon discharges.

2.    impact weapon strikes.

     **NOTE:**    A squad's coordinated use of batons held at "port arms" to push persons back or "rake" persons toward arrest teams will be reported on the Incident Response (CPD-11.302), and will not require the completion of a Tactical Response Report as long as the impact weapon is not used to apply mechanical impact to a person to disable elements of his or her musculoskeletal structure.

3.    takedowns.

4.      pressure point compliance, joint manipulation, wristlocks, armbars, and other firm grips in response to active resistance of a person.

C.      At the conclusion of the event, the incident commander will ensure the ICS-211 Incident Check-In (CPD-11.301) forms and ICS-211 Incident Response (CPD-11.302) forms are properly completed and:

1.      the originals are forwarded to the Special Events Section via the Police Document Section and emailed to special.events@chicagopolice.org.

2.      emailed to the Tactical Review and Evaluation Division (TRED) at force.review@chicagopolice.org within 48 hours of the date of occurrence.

## IV.      DECLARATION OF COORDINATED MULTIPLE ARREST AND ALTERNATE TACTICAL RESPONSE REPORTING

A.      After the declaration of a coordinated multiple arrest incident, the alternate tactical response reporting procedures outlined in this directive will apply.

B.      If there is any perceived conflict between a procedure in this directive and any other Department directive, including the Department directive titled "Incidents Requiring the Completion of a Tactical Response Report," this directive will take precedence.

C.      Where discretionary time permits, any continued dispute will be resolved through the party's respective chain of command.

NOTE:           After the coordinated multiple arrest incident, the supervisor resolving the conflict will provide a written summary of the conflict and resolution to the Chief, Office of Constitutional Policing and Reform (OCPR). The Chief, OCPR, will determine if any modifications to policy, training, or operational planning are necessary and ensure notification is made to the appropriate unit for resolution.

D.      At the conclusion of a coordinated multiple arrest incident, Department members assigned to the incident will return to normal arrest processing and tactical reporting procedures, including as outlined in the Department directives titled "Processing Persons Under Department Control" and "Incidents Requiring the Completion of a Tactical Response Report."

E.      Nothing in this policy requires members to take the actions as outlined in this directive, or fail to take these actions, that unreasonably endanger themselves or others during the response to a coordinated multiple arrest incident or precludes the legally mandated oversight or assessment of a Department member's use of force consistent with the procedures established in this policy.

## V.      ALTERNATE TACTICAL RESPONSE REPORTING PROCEDURES

A.      Any sworn member who is the victim of an assault or battery during a coordinated multiple arrest incident will complete a numbered Coordinated Multiple Arrest Report (CPD-11.433) and will document the subject's actions. Department members will document any assault or battery on a numbered Coordinated Multiple Arrest Report (CPD-11.433), regardless of whether the subject is taken into custody. These incidents committed against a sworn Department member include, but are not limited to:

1.      a thrown object;

2.      a verbal threat directed at the sworn Department member that places the member in reasonable fear of receiving a battery;

3.      an ambush;

4.      a physical push; and

5.      use of hands or feet against the member.

NOTE:  When multiple unknown assailants commit an assault or battery against a Department member, the Department member will indicate "multiple unknown subjects" on the numbered Coordinated Multiple Arrest Report (CPD-11.433). Department member injuries will continue to be documented on an Injury on Duty Report consistent with the Department directive titled "Sworn Medical Roll-Injury on Duty Status."

B.  Any sworn Department member who becomes involved in an individual reportable use of force with a subject during a coordinated multiple arrest incident will document the subject's actions and member's response, including force used, on a numbered Coordinated Multiple Arrest Report (CPD-11.433).

NOTE:  Department members are reminded that they are required to report any reportable force utilized against a person who is fully restrained and controlled (e.g. both hands secured together) with handcuffs or other restraining devices (e.g., flexible restraining devices). This includes a handcuffed person who is actively resisting, and a Department member utilizes a firm grip to prevent escape. Department members should be aware of the distinction between a person who is actively resisting (e.g. attempting to pull or break away from a Department member) and a person who is passively resisting (e.g. presenting dead weight and needs to be carried). Any holding, compliance, or control instrument techniques utilized to control a passive resister as outlined in the Department directive titled "Response to Resistance and Force Options" (including to control a handcuffed passive resister) is not considered a reportable use of force.

C.  Any sworn Department member who becomes involved in an individual reportable use of force during a coordinated multiple arrest incident will complete a Tactical Response Report (TRR) (CPD-11-433), in addition to a numbered Coordinated Multiple Arrest Report (CPD-11.433), for the following types of force:

1.  Deadly force as defined in the Department directive titled "De-escalation, Response to Resistance, and Use of Force";

2.  Weapon discharge (i.e., firearm, Taser, OC spray, impact munitions);

3.  Impact weapon strikes;

NOTE:  Department members are reminded that using an impact weapon to intentionally strike a person's head or neck is considered deadly force.

4.  Canines as a force option;

NOTE:  Department members are reminded that canine teams will NOT be used in response to crowds, protests, or civil disturbances, in adherence with the Department directive titled, "Canine Teams."

5.  Long Range Acoustic Device (LRAD) acoustic transmission to cause discomfort as a compliance technique; or

6.  Any force that results in a non-fatal major injury.

NOTE:  During a coordinated Multiple Arrest Incident, a non-fatal major injury is considered to be any visible injury requiring immediate medical attention.

D.  When a sworn Department member is involved in an incident described in Items V-A, B, or C of this directive during a declared coordinated multiple arrest incident, the member will complete a numbered Coordinated Multiple Arrest Report (CPD-11.433) consistent with the Department directive titled "Alternate Arrest Procedures During Coordinated Multiple Arrest Incidents" and:

1. when safe and feasible to do so, notify their on-scene supervisor that they engaged in a reportable use of force incident;

2. document the incident, the person's actions, and the member's response;

   **NOTE:** When a Department member is the victim of assault or battery by multiple unknown subjects, the member will indicate "multiple unknown subjects" on the Coordinated Multiple Arrest Report.

3. complete a concise narrative of the incident, including any use of force, assault, or battery, if applicable;

4. provide the on-scene arrest processing supervisor the Coordinated Multiple Arrest Report for review;

5. if applicable, accompany the arrestee to the transporting vehicle; and

6. transfer custody of an arrestee to transport team personnel **only** with the approval of the on-scene arrest processing supervisor.

E. Department members involved in an incident described in Items V-A, B, or C of this directive during a declared coordinated multiple arrest incident will complete a numbered Coordinated Multiple Arrest Report (CPD-11.433), even if the member is not identified as the arresting officer. In this circumstance, the reporting member will:

1. only complete the Coordinated Multiple Arrest Report to document the person's actions, reportable use of force, and, if applicable, an officer battery.

2. affix the arrestee's unique QR code sticker to the "Original" copy of the completed Coordinated Mulitiple Arrest Report (CPD-11.433).

   **NOTE:** If there are multiple Coordinated Multiple Arrest Reports (CPD-11.433) for a single arrestee, the arrestee's unique QR code sticker will be placed on the "Original" copy of each of the reports.

3. will not complete the "Incident Information" section (e.g., summary of probable cause for arrest) of the Coordinated Multiple Arrest Report.

F. The on-scene arrest processing supervisor will:

1. ensure that a Coordinated Multiple Arrest Report (CPD-11.433) is completed for each arrestee and the arrestee's unique QR code sticker is affixed to each report, consistent with the Department directive titled "Alternate Arrest Procedures During Coordinated Multiple Arrest Incidents";

2. review the person's actions, member's response, and officer battery section of the Coordinated Multiple Arrest Report to verify the incident complies with the requirements outlined in Items V-A, B, and C of this directive;

3. review the person's actions and member's response section of the Coordinated Multiple Arrest Report to verify the member's reported response complies with the Department directive titled "Response to Resistance and Force Options";

4. perform a visual inspection of the person to identify any visible injuries;

5. complete the supervisor section of the Coordinated Multiple Arrest Report, including a signature indicating review and approval;

   **NOTE:** A supervisor who used or ordered the use of reportable force requiring the completion of a TRR will not review or approve the corresponding Coordinated Multiple Arrest Report.

6. direct transport team personnel to take custody of the arrestee;

7.  after custody of the arrestee has been securely transferred to transporting personnel, direct the arresting officers as follows:

    a.  If a TRR is required as outlined in Item V-C of this directive, the supervisor will direct the involved member to the processing area unless directed otherwise by the field commander.

    b.  If no TRR is required, the supervisor will instruct the involved member to report back to their immediate supervisor for their next assignment, unless directed otherwise by the field commander; and

8.  ensure all completed Coordinated Multiple Arrest Reports for an individual arrestee accompany the arrestee to the designated processing facility.

G.  Only if directed by the incident commander or a supervisor, Department members who completed a number Coordinated Multiple Arrest Report will relocate to the designated detention facility for completion of any additional reporting or processing.

> **NOTE:** Arresting officers **ARE NOT** released from the designated detention facility until verbally released by the detention facility processing team supervisor.

## VI. OLEORESIN CAPSICUM (OC) DEVICES USED DURING COORDINATED MULTIPLE ARREST INCIDENTS

A.  Consistent with the Department directive titled "Oleoresin Capsicum (OC) Devices And Other Chemical Agent Use Incidents":

1.  personal OC devices or special weapons that dispense Capsaicin II powder agents are an authorized force option against **assailants**, when the person is using or threatening to use force which is likely to cause physical injury.

2.  a personal OC device is an authorized force option against **active resisters**. If an active resister is part of a group or crowd, a Personal OC device is authorized only after obtaining approval from the Superintendent or his or her designee.

3.  a personal OC device **will not** be used against **passive resisters** that are part of noncompliant groups, crowds, or an individual taking part in a group or crowd **unless** authorization has been obtained from the Superintendent or his or her designee.

4.  special weapons that dispense the Capsaicin II powder agent **will not** be used against **active and passive resisters** that are part of noncompliant groups, crowds, or an individual taking part in a group or crowd **unless:**

    a.  authorization has been obtained from the Superintendent or his or her designee, **AND**

    b.  the Capsaicin II powder agent is used for **area saturation only (e.g., the deployment against a fixed object or the ground to disperse the Capsaicin II powder agent within a specific area, without specifically targeting or deploying at an individual).**

    > **NOTE:** The use of special weapons that dispense Capsaicin II powder agent is only authorized for units that have received appropriate training. Any unit that has not received the appropriate training does not have access to special weapons that dispense Capsaicin II powder agents.

5.  Department members will attempt to minimize incidental exposure to uninvolved persons or persons lawfully engaged in exercising their First Amendment rights by taking precautions prior to the discharge, such as identifying the appropriate person or person(s) prior to discharge, assessing the scene of the discharge, and considering the location and the position of the person or persons and other people within the immediate area.

6. prior to discharging a personal OC devices or special weapons that dispense Capsaicin II powder agents, Department members will ensure the verbal direction is heard, and repeated if necessary, to allow compliance with the verbal direction, unless providing such time and space would unduly place the member or another person at risk of death or great bodily harm.

   REMINDER: Department members should be mindful that some persons may be physically or mentally less able to respond to verbal direction or verbal control techniques due to a variety of circumstances, including, but not limited to, the influence of alcohol or drugs, mental health or medical conditions, language barriers, or vision, hearing, or neurological impairment.

7. except in extraordinary circumstances, sworn Department members will be directed to wear appropriate protective gear (e.g., gas masks) prior to dispensing Capsaicin II powder agents to disperse crowds.

8. immediately upon gaining control of the incident, request the appropriate medical aid including contacting emergency medical services (EMS) from the Chicago Fire Department for a person who appears to be in any physical distress or complains of injury or aggravation of a known pre-existing medical condition which would be consistent with their Department training, including Law Enforcement Medical and Rescue Training (LEMART).

B. **The Superintendent, or authorized designee, will only authorize** the use of OC devices or special weapons that dispense Capsaicin II powder agents during a coordinated multiple arrest incident if there is a threat or attack against Department members, the public, or property.

   1. Threats or attacks against Department members, the public, or property may include, but are not limited to, throwing objects at Department members, members of the public, or at storefront windows causing windows to break, or threatening to harm Department members or members of the public by driving erratically near or on designated protestor routes.

   2. The Superintendent may authorize a designee for the entire coordinated multiple arrest incident, per individual incident locations, or prior to the incident as identified in the incident action plan.

   3. The Superintendent's designee will comply with the same authorization criteria as outlined in Item VI-B and VI-B-1 of this directive.

C. **Reporting Deployments of Oleoresin Capsicum (OC) Devices**. An initial application of a personal OC device or special weapon that dispenses Capsaicin II powder agents and each subsequent application must be documented on the Tactical Response Report (TRR) and individually justified as a separate use of force.

   1. When special weapons that dispense the Capsaicin II powder agent are discharged in response to:

      a. **active and passive resisters** that are part of noncompliant groups, crowds, or an individual taking part in a group or crowd, the deploying member will complete only one Tactical Response Report (TRR) for the area saturation discharge.

      b. **assailants** that are part of a noncompliant group or crowd, the deploying member will complete one Tactical Response Report (TRR) for the discharge.

      NOTE: The deploying member will indicate on the TRR by indicating "multiple unknown subjects" when being deployed in response to a coordinated multiple arrest incident for area saturation or against a group of assailants.

   2. Additional Tactical Response Reports (TRR) will be completed by the deploying member for separate discharges that are significantly distinct from the original discharge in time or place.

**VII. ALTERNATE TACTICAL RESPONSE REPORTING PROCEDURES FOR USE OF FORCE INCIDENTS REQUIRING THE COMPLETION OF A TACTICAL RESPONSE REPORT**

A. During regular Department operations, uses of force requiring the completion of a TRR as outlined in Item V-C of this directive, including deployments of Oleoresin Capsicum (OC) Devices, will be documented on the TRR and individually justified as a separate use of force.

B. However, in circumstances involving Department members' use of reportable force during on-going, widespread civil disturbances or unrest, the Department may have to consider the need for the continued police presence at the scene of the incident for public order and public safety reasons, including the involved Department member's presence in the field, and the need for the timely documentation of reportable uses of force.

C. In these specific limited circumstances, the incident commander may institute delayed Tactical Response Reporting procedures for uses of force requiring the completion of a TRR, including the application of a personal OC device or special weapons that dispense Capsaicin II powder agents. When instituting delayed Tactical Response Reporting procedures for reportable uses of force, factors for consideration may include, but are not limited to:

    1. the number of persons engaged in unlawful activities.

    2. the level of threat to public safety.

    3. the number and requisite training of Department members reasonably expected to restore peace.

    4. the number of Department members with the requisite training currently in the field or on standby.

    5. the reasonably expected timeline for restoring peace.

    6. the length of time Department members have been in the field.

    7. the amount of rest Department members have had or will reasonably need to maintain public safety and officer wellness.

    8. the frequency and scope of Department members' use of force.

D. When instituting delayed Tactical Response Reporting procedures, the incident commander will:

    1. identify the specific Department members (e.g., SWAT or a specific squad or platoon) subject to delayed reporting procedures;

    2. notify OEMC and include the specific designated personnel or teams; and

    3. ensure a notification of these procedures is made to the:

        a. the appropriate field commander;

        b. the watch operations lieutenant of the designated detention facilities;

            **NOTE:** The incident commander may designate additional sworn supervisory Department members, the rank of lieutenant or above, to the designated detention facility to serve as a coordinated multiple arrest incident watch operations lieutenant (WOL) and assist in ensuring that arrestee processing is completed in an efficient and timely manner.

        c. Commander, Tactical Review and Evaluation Division (TRED).

E. Upon receiving a notification that the incident commander is instituting delayed Tactical Response Reporting procedures, the field commander will ensure notification to the specific platoon leader(s), squad leader(s), and squad member(s) subject to delayed reporting procedures.

F. When instituting delayed Tactical Response Reporting procedures, the incident commander will, through the affected Department members' chain of command, ensure affected members complete a numbered Coordinated Multiple Arrest Report (CPD-11.433) as soon as safe and feasible, but before the end of the involved members' tour of duty,

G. When delayed Tactical Response Reporting procedures have been instituted and an arrest is made by a Department member subject to delayed Tactical Response Reporting, the incident commander will ensure a designated WOL for the coordinated multiple arrest detention facility conducts a visual inspection and attempts to interview the subject as outlined in G03-02-02, "Incidents Requiring the Completion of a Tactical Response Report," Item VI-B. This process will be documented as follows:

   1. The designated WOL for the coordinate multiple arrest detention facility will document any results of a visual inspection and attempted interview in the "Watch Commander Comments" section of the CLEAR Arrest Report application.

   2. The WOL later assigned to approve the delayed TRR will refer to the "Watch Commander Comments" section of the CLEAR Arrest Report application during their investigation and attach a copy of the arrest report to the TRR record.

H. When the incident commander designates delayed Tactical Response Reporting procedures, the incident commander will ensure written documentation of the delayed reporting designation, including but not limited to:

   1. the reason for the delayed reporting designation;

   2. personnel designated for delayed reporting (i.e., the specific Department members who may complete any TRR after the members' tour of duty), time of designation, and the time they were notified;

      **REMINDER:** Designated personnel will still complete a numbered Coordinated Multiple Arrest Report (CPD-11.433) as soon as safe and feasible, but before the end of the involved members' tour of duty,

   3. the designated TRR completion, review, and investigation procedures and timeline (i.e., when the TRR must be completed and when it must be reviewed, investigated, and approved); and

   4. any other relevant and important information regarding the delayed Tactical Response Reporting procedure designation.

I. The incident commander who designates delayed Tactical Response Reporting procedures will, through the affected member's chain of command, ensure affected members complete:

   1. any required numbered Coordinated Multiple Arrest Report (CPD-11.433) before the end of the member's tour of duty.

   2. any required TRR within the designated timeline.

J. The Tactical Review and Evaluation Division will be responsible for reviewing all TRRs designated for delayed reporting to ensure involved Department members and supervisors adhered to the reporting, review, and investigation timeline as designated by the incident commander. Where appropriate, the Tactical Review and Evaluation Division will make recommendations regarding the Department's alternate tactical response reporting procedures during a coordinated multiple arrest incident as part of their after-action review of the incident.

## VIII. REPORTED TACTICAL RESPONSES DURING A COORDINATE MULTIPLE ARREST INCIDENT

A. Any tactical response reporting for individual:

   1. officer assault or battery incidents as described in Item V-A of this directive and documented on a Coordinated Multiple Arrest Report will be entered into the CLEARNET Tactical Response Report (C-TRR) application by the detention facility processing team during the processing of associated arrests.

2.    reportable use of force incidents as described in Item V-B of this directive and documented on a Coordinated Multiple Arrest Report will be entered into the CLEARNET Tactical Response Report (C-TRR) application by the detention facility processing team during the processing of associated arrests.

3.    reportable use of force incidents requiring the completion of a TRR, as described in Item V-C of this directive, will be entered into the CLEARNET Tactical Response Report (C-TRR) application by the reporting officer consistent with the Department directive titled "Incidents Requiring the Completion of a Tactical Response Report."

B.    Department-level Review

1.    The Tactical Review and Evaluation Division (TRED) will conduct an incident-level review of all declared coordinated multiple arrest incidents where reportable uses of force were documented on Coordinated Multiple Arrest Reports. TRED will:

a.    review documentation and information collected during the coordinated multiple arrest incident, including relevant Department body-worn camera video, to the extent that the TRED review provides a representative summary of the coordinated multiple arrest incident and the actions taken by the Department and Department members.

b.    within 30 days of the coordinated multiple arrest incident, provide the Force Review Board (FRB) with an incident summary report that includes:

(1)    a summary of the coordinated multiple arrest incident;

(2)    the identification of any tactical, equipment, or policy concerns, including the use of de-escalation techniques to prevent or reduce the need for force;

(3)    any recommendations for additional training or policy modification; and

(4)    references to any known Department video, including relevant Department body-worn camera video, that supports any concerns, recommendations, or positive examples identified by TRED during the review.

NOTE:    When appropriate, the Commander, TRED, will request an extension to complete incident summary report to the Chief, Office of Constitutional Policing and Reform.

c.    conduct an incident briefing of the facts and review of the TRED incident summary report for the coordinated multiple arrest incident to the Force Review Board.

2.    The Force Review Board (FRB) will:

a.    evaluate if the Department's response and the actions of Department members during the incident were tactically sound and consistent with Department training.

b.    if applicable, identify specific modifications to existing policy, training, tactics, or equipment that could improve the Department's response to future incidents and minimize the risk of harm to Department members and the public.

3.    Within thirty days after the review of an incident, the FRB will issue recommendations, if appropriate, to the Superintendent or an authorized designee, regarding any need for additional training or modifications to policies, tactics, equipment, or Department practices.

4.    Upon review and approval by the Superintendent or an authorized designee, the FRB will assign each approved recommendation to the appropriate exempt command staff member for prompt implementation.

5.    The incident commander for a coordinated multiple arrest incident will ensure an After-Action Review (AAR) is completed in accordance with the Department directive titled "Response to Crowds, Protests, and Civil Disturbances." The incident commander will

a.     review any recommendations from the FRB and ensure those recommendations are included in the AAR Report; and

b.     within sixty days of the FRB issuing recommendations, forward the AAR to the First Deputy Superintendent; the Chief of Staff; the Chief, Office of Constitutional Policing and Reform; the General Counsel to the Superintendent; and the Deputy Chief, Training and Support Group.

Larry Snelling
Superintendent of Police

20-076   GJD

# **Exhibit B**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, | |
| Plaintiff, | Case No. 17-cv-6260 |
| v. | Hon.. Rebecca R. Pallmeyer |
| CITY OF CHICAGO, | |
| Defendant. | |

**NOTICE OF THE COALITION'S INTENT TO**
**<u>INITIATE ENFORCEMENT PROCEEDINGS</u>**

In anticipation of the upcoming Democratic National Convention ("DNC") in August 2024, the Chicago Police Department has released a draft Coordinated Multiple Arrest Policy Suite (Special Orders S06-06X – S06-06-03XX) (the "mass arrest policy"), which governs CPD's "response to crowds, protests, and civil disturbances." S06-06X, Sec. I. CPD's mass arrest policy violates numerous provisions of the Consent Decree and insufficiently protects protesters' First Amendment rights.

Specifically, the mass arrest policy violates the provisions of the Consent Decree (¶¶ 217-19, 228-35, 571(h), 574-75) regarding use of force reporting and investigations. It fails to comply with Consent Decree provisions on impartial policing (¶¶ 50-51) and sanctity of life (¶¶ 156, 163). It fails to comply with statutory and Consent Decree requirements for providing disability and language accommodations (¶¶ 64, 68-69). Further, CPD violated the Consent Decree's community engagement requirements applicable to this policy (¶ 633).

Equally concerning, the mass arrest policy eviscerates protections required by the First Amendment, the Consent Decree, and CPD's existing First Amendment policy to protect people

1

engaged in First Amendment expression and activity. It fails to, *inter alia*, (1) provide adequate guidance regarding when CPD can declare a "coordinated multiple arrest" incident directed toward protesters; (2) prohibit officers from arresting protesters unless they pose an immediate danger to other people or to property; (3) prohibit retaliatory arrests; (4) prohibit "kettling" and use of canines against protesters in all circumstances; and (5) require individualized probable cause before authorizing mass arrests.

For these reasons, pursuant to ¶ 709 of the Consent Decree, the Coalition, the group of organizations that represents Chicago's communities most affected by abusive policing, has requested by letter dated today that the City engage in expedited settlement talks to revise the mass arrest policy and ensure compliance with the U.S. Constitution, the Consent Decree, CPD's First Amendment policy, and best practices. Ex. 1. Should the City refuse, the Coalition will file an emergency enforcement action.

The urgency of this matter cannot be overstated. CPD's failures during the summer of 2020 protests are well documented, including through a report submitted by the the Independent Monitoring Team in this case (Doc. 964). In 2020, CPD officers consistently targeted protesters with unlawful, retaliatory, and lethal force. Officers' animus against protesters was unmistakable. They regularly referred to protesters with terms that are vile, misogynistic, and anti-gay. CPD's abusive, unlawful response to the 2020 protests—including its practices of striking people in the head when unprovoked and in an indiscriminate manner and using chemical restraints (*i.e.*, tear gas and pepper spray) on peaceful crowds—places DNC protesters at great risk of serious injury and even death in August 2024.

Consent Decree ¶ 695 provides that, under normal circumstances, the Coalition cannot initiate enforcement proceedings until the expiration of a 90-day cure period. Given the serious

threat that CPD's mass arrest policy poses to protesters—and the need to train officers in advance of the DNC—this policy cannot remain unchallenged for 90 days.

Ideally, the Coalition and the City will work collaboratively to redress the serious deficiencies in the mass arrest policy. But should efforts at a mutually amicable resolution fail, the Coalition will be forced to request emergency relief from this Court.

DATED: March 13, 2024

Respectfully Submitted,

*/s/ Joshua M. Levin*
Alexandra K. Block (ablock@aclu-il.org)
Michelle T. García (mgarcia@aclu-il.org)
Joshua M. Levin (jlevin@aclu-il.org)
Roger Baldwin Foundation of ACLU, Inc.
150 N. Michigan Ave., Suite 600
Chicago, IL 60601
(312) 201-9740

Amanda Antholt (amanda@equipforequality.org)
Ruben Bautista (ruben@equipforequality.org)
Equip for Equality
20 N. Michigan Ave., Suite 300
Chicago, IL 60602
(312) 341-0022

Sheila A. Bedi (sheila.bedi@law.northwestern.edu)
Community Justice and Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611-3609
312-503-2492

Craig B. Futterman (futterman@uchicago.edu)
Mandel Legal Aid Clinic
University of Chicago Law School
6020 S. University Ave.
Chicago, IL 60637
(773) 702-9611

**Counsel for the Coalition**

3

# EXHIBIT 1



**ROGER BALDWIN FOUNDATION OF ACLU, INC.**

Illinois

**ROGER BALDWIN FOUNDATION OF
ACLU, INC.**
150 N. MICHIGAN AVENUE
SUITE 600
CHICAGO, ILLINOIS 60601-7570
(312) 201-9740
FAX (312) 201-9760
WWW.ACLU-IL.ORG

March 13, 2024

*Via Email*

Jennifer Bagby
Deputy Corporation Counsel
City of Chicago Department of Law
121 North LaSalle St., Room 600
Chicago, IL 60602
jennifer.bagby@cityofchicago.org

Allan Slagel
Counsel for the City of Chicago
Taft Stettinius & Hollister LLP
111 East Wacker, Suite 2800
Chicago, IL 60601
aslagel@taftlaw.com

Maggie Hickey
Independent Monitor
ArentFox Schiff
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
maggie.hickey@afslaw.com

Christopher G. Wells
Chief, Public Interest Division
Office of the Illinois Attorney General
100 W. Randolph Street, 12th Floor
Chicago, IL 60601
Christopher.Wells@ilag.gov

Dear Counsel and Monitor Hickey:

We write on behalf of the Coalition to raise serious deficiencies in the Chicago Police Department's ("CPD") draft Coordinated Multiple Arrest Policy Suite (Special Orders S06-06X-S06-06-03XX) (the "mass arrest policy" or the "policy"), and to provide notice of the Coalition's intent to initiate emergency enforcement proceedings pursuant to Consent Decree Paragraphs 695 and 709(a).

The mass arrest policy, released to the public on February 9, 2024, governs CPD's "response to crowds, protests, and civil disturbances." S06-06X, Sec. I. It lays out a vast array of exceptions to the CPD policy requirements that apply during "regular Department operations." S06-06-03XX, Sec. VII.A. The policy authorizes CPD to declare that any crowd, protest, or civil disturbance constitutes a "Coordinated Multiple Arrest Incident" (a "CMA Incident"),[1] which then

---

[1] A "CMA Incident" is defined as "an incident where multiple arrests are anticipated or occurring, a continued police presence is required on the scene of the incident to ensure public safety, and individual arresting officers cannot effectively be removed immediately from the incident scene for arrestee processing." S06-06-01XX, Sec. II.A. The designated "incident commander" has the authority to declare a CMA Incident. The policy states that the incident commander must be "exempt-level," *i.e.*, above the rank of captain, but does not otherwise specify any minimum required rank. S06-06-01XX, Sec. III.A. Moreover, if no exempt-level incident commander has been designated, a CMA Incident may be declared by *whoever* is the "highest-ranking on-scene supervisory member." *Id.* Sec. III.A.1.

1

suspends CPD's regular policies and procedures, including policies regarding arrests and reporting use of force, for the duration of the CMA Incident.

The scope of this policy is extraordinarily broad. While we understand it is intended, in the near term, to address CPD's response to gatherings during the August 2024 Democratic National Convention ("DNC") in Chicago, the policy applies, by its own terms, to *any* "crowds, protests, and civil disturbances." And the policy's impact is immediate. CPD is training officers on the policy *this month* (March 2024) in preparation for the DNC.

The mass arrest policy violates numerous provisions of the Consent Decree and does not adequately protect First Amendment rights. As explained below, the policy violates the Consent Decree's mandates for use of force reporting and investigations (¶¶ 217-19, 228-35, 571(h), 574-75). *See* Part II. It fails to protect protesters' First Amendment rights and fails to comply with related Consent Decree provisions on impartial policing (¶¶ 50-51) and use of force (¶¶ 156, 163). *See* Parts III-IV. It fails to comply with statutory and Consent Decree requirements for providing disability and language accommodations (¶¶ 64, 68-69). *See* Part V. And CPD violated the Consent Decree's community engagement requirements applicable to this policy (¶ 633). *See* Part VI.

For these reasons, unless CPD takes immediate action to correct the policy deficiencies described below, the Coalition will file an emergency enforcement motion with the Court.

## I.    CPD's Abuse of Protesters in Summer 2020, Subsequent Coalition Enforcement Letter, and the Resulting First Amendment Policy.

In May 2020, a little over one year after the Consent Decree went into effect, the world watched as George Floyd, a Black man, was killed by a Minneapolis police officer kneeling on his neck. The streets of Chicago erupted into protest against police violence and racism. Coalition members participated, leading many of the 2020 protests. CPD responded to Coalition members and other protesters with brutal force, systematically violating at least twelve provisions of the Consent Decree. Among other violations, CPD officers used unjustified lethal force against protesters in the form of headstrikes and retaliated against people recording officers' actions, including journalists and other bystanders.

On July 23, 2020, the Coalition notified the City and CPD of the Coalition's intent to file an enforcement action if they failed to take immediate steps to ensure compliance with the Consent Decree and protect protesters' First Amendment rights and safety. Dkt. 855; Dkt. 855-1 ("Enforcement Letter"). They did not immediately engage with the Coalition and, instead, on August 27, 2020, CPD issued a Special Order that allowed police officers to further escape accountability for protest-related abuses by eliminating certain reporting requirements for uses of force during protests and seemingly permitting the use of lethal force against protesters. *Response to Crowds and Civil Disturbances*, Special Order S03-022.

The facts animating the Coalition's Enforcement Letter were substantiated by a series of investigative reports on CPD's 2020 protest response from the Independent Monitoring Team ("IMT"), the City's Office of Inspector General, and even CPD itself.

In July 2021, the IMT issued a 464-page report (Dkt. 964) addressing CPD's failed response to the 2020 protests. *Id.* at 1. The report provided first-hand accounts of protesters who

described how CPD officers physically and verbally abused them. Officers hit protesters with batons, fists, and other objects, pushed and shoved them, tackled them to the ground, caused head injuries, and sprayed them indiscriminately with pepper spray. *Id.* at 12-13. The IMT found that officers engaged in inherently escalatory behavior and "various levels of misconduct and excessive force." *Id.* at 15, 129-30.

The Office of Inspector General ("OIG") released a similarly damning report on CPD's response to the summer 2020 protests.[2] OIG found that CPD made more than 1,500 protest-related arrests between May 29 and June 7, 2020. *Id.* at 8-9. "[P]rotesters reported seeing and experiencing apparently indiscriminate uses of force by CPD members. They described seeing CPD members tackle, punch and use batons to strike peaceful protesters in the head and neck." *Id.* at 37. OIG found that CPD failed to "fulfill its force reporting obligations" and failed to "provide clear and consistent guidance to officers on reporting obligations." *Id.* at 9. As a result, OIG concluded, "CPD underreported uses of baton strikes and manual strikes, further resulting in an inadequate record of severe and potentially out-of-policy uses of force." *Id.* In addition, CPD exempted uses of force from being reviewed by the Force Review Division (now known as the Tactical Review and Evaluation Division ("TRED")) and other accountability mechanisms. *Id.* at 110.

After the Coalition filed its Enforcement Letter, the City/CPD, the Coalition, and the Illinois Attorney General's Office engaged in structured settlement negotiations, supervised by the Court and the IMT. These negotiations resulted in a new CPD First Amendment policy (Gen. Order G02-02). The negotiated policy contains provisions explicitly crafted to prevent another 2020. Among other things, the First Amendment policy prohibits officers from making arrests when a protester poses no threat to the safety of the community or danger to property, and requires officers to ensure that people have an opportunity to comply with commands prior to taking enforcement action.

As explained in detail below, CPD's proposed mass arrest policy would undo many of the key negotiated remedies that the Coalition obtained and that this Court approved. The mass arrest policy does far too little to prevent a repeat of violent and systemic First and Fourth Amendment violations and Consent Decree violations during CPD's response to protests around the 2024 DNC and beyond.

## II.     The Mass Arrest Policy Violates the Consent Decree's Mandates for Reporting Use of Force.

The policy relaxes the procedures for reporting officer use of force whenever a CMA Incident is declared, instituting "alternate tactical response reporting procedures" that apply throughout the incident. S06-06-03XX, Sec. IV.A. These alternate procedures "take precedence" over "any other Department directive" to the extent there is "any perceived conflict." *Id.* Sec. IV.B.

The alternate procedures violate the Consent Decree in at least two ways. *First*, the policy allows CPD to use a watered-down mass arrest form instead of the Decree-mandated Tactical Response Report ("TRR") to document certain uses of force against community members. *Second*,

---

[2] City of Chicago, Office of Inspector General, *Report on Chicago's Response to George Floyd Protests and Unrest* (Feb. 18, 2021), https://igchicago.org/wp-content/uploads/2023/08/OIG-Report-on-Chicagos-Response-to-George-Floyd-Protests-and-Unrest.pdf.

the policy extends the time period an officer has to complete a TRR beyond the Decree-mandated deadline (the end of an officer's tour of duty) without even setting an outer limit on the extension. Given CPD's widespread, brutal use of excessive force during the summer 2020 protests—and officers' widespread failure to report uses of force during those protests—CPD should be *strengthening* its procedures for documenting, investigating, and publicly disclosing officer violence against protesters. This policy does the opposite.

A.      **The Mass Arrest Policy Violates Consent Decree Requirements for Documenting and Investigating All Reportable Uses of Force.**

Under Consent Decree Paragraph 219, CPD officers "*must* complete a TRR" or "similar form of documentation" "*[w]henever* a CPD member engages in a reportable use of force." (Emphasis added). The Consent Decree defines "reportable use of force" broadly to include "any force by a CPD member to overcome the active resistance of a subject." ¶ 218(a). This includes any "force that is reasonably expected to cause pain or an injury, but does not result in injury or complaint of injury," such as "pressure point compliance techniques; joint manipulation techniques; wristlocks; armbars; and any leg sweep, weaponless defense techniques, or takedown that does not result in injury or complaint of injury." *Id.*

In contrast, the mass arrest policy states that during a CMA Incident, officers need to complete a TRR for only the following limited types of use of force: "deadly force," "weapon discharge," "impact weapon strikes," "canines as a force option," "Long Range Acoustic Device (LRAD) acoustic transmission to cause discomfort as a compliance technique," and "force that *results in* a non-fatal *major* injury," where "major injury" is defined as a "visible injury requiring immediate medical attention." S06-06-03XX, Sec. V.C. (emphasis added). This means that uses of force that are "reasonably expected to cause pain or an injury" but do not result in a "major injury"—for example, an officer who hits or kicks an individual but causes no "major injury" or at least not any that is immediately observable—will *not* be reported in a TRR. Under the Consent Decree, there is no circumstance in which policies or procedures about reporting officers' use of force may be contingent on whether the officer reports a resulting injury.

In lieu of a TRR, the mass arrest policy allows officers to submit a much less extensive form, known as a Coordinated Multiple Arrest Report, CPD-11.433 (Rev. 1/24) (a "CMA Report"). *See* S06-06-03XX, Sec. V.B.-C. The CMA Report is not an adequate substitute for a TRR. For at least three reasons, it does not qualify as a "similar form of documentation [to a TRR]," as needed to pass muster under Consent Decree Paragraph 219.

*First*, the CMA Report form, which is less than half the length of a TRR form, requires officers to provide far less information than is required in a TRR. One of the missing fields—"the subject's mental health or medical condition, use of drugs or alcohol, ability to understand verbal commands, or disability, as perceived by the CPD member(s) at the time force was used"—is specifically required by the Consent Decree (¶ 571(h)). In addition, the truncated "narrative summary" section of the CMA Report form conveys to officers that detailed facts are not needed. Unlike the TRR form, which asks officers to "describe with specificity (1) the use of force incident, (2) the subject's actions or other circumstances necessitating the force used, and (3) the involved member's response, including force mitigation efforts and specific types and amount of force used," the CMA Report form merely instructs officers to provide: a "concise summary of [the]

4

person's actions and member's response." The information that will inevitably *not* be captured on the CMA Report form will impair CPD's, the Civilian Office of Police Accountability's ("COPA"), and the public's ability to identify and hold officers accountable for improper uses of force, and to track and address use of force patterns.

**Second**, unlike a TRR, a CMA Report is not subject to the two forms of oversight that the Consent Decree mandates for reportable uses of force: district-level supervisory investigation (¶¶ 228-35) and independent review by the Tactical Review and Evaluation Division ("TRED") (¶¶ 574-75). These mandatory layers of review ensure that officers' use of force is thoroughly evaluated to identify possible violations of law or policy, that any such violations are referred to COPA, and that officers receive any necessary corrective action such as retraining.

While the mass arrest policy states that a copy of each CMA Report will be forwarded to TRED, S06-06-02-XX, Sec. VI.D.4., the policy makes clear that TRED's review of CMA Reports does not comply with the Consent Decree's requirements for assessing uses of force. The Consent Decree requires TRED to conduct an in-depth evaluation of the individual officer's use of force, assessing each particular use of force incident. ¶ 574. In contrast, the mass arrest policy states that TRED will conduct only a high-level review of the CMA Incident *as a whole i.e.*, assessing CPD's response to an *entire* protest. S06-06-03XX, Sec. VIII.B.1.

**Third**, unlike a TRR, it is not clear whether a CMA Report will be included in the use of force data that CPD is obligated to publicly report. Consent Decree Paragraph 581 requires CPD to regularly publish on its website aggregated and incident-level data about *all* reportable uses of force.[3] However, CPD's online "Use of Force Dashboard" currently reports only TRRs, leaving uncertain whether reportable uses of force that are documented only in a CMA Report (and not in a TRR) will be included in CPD's online dashboard. The Coalition understands based on a conversation with the Monitoring Team that CPD intends to include data from CMA Reports on its Use of Force Dashboard, but this is reflected nowhere in CPD's policies.

B.    **The Mass Arrest Policy Delays Use of Force Reporting, in Violation of the Consent Decree.**

The Consent Decree mandates prompt completion of a TRR after any officer commits a reportable use of force. Specifically, "[w]henever a CPD member engages in a reportable use of force, the member *must complete a TRR*, or any similar form of documentation CPD may implement, *prior to the end of his or her tour of duty*." ¶ 219 (emphases added). The Consent Decree provides only one narrow exception to this timing requirement, allowing a reasonable extension if an officer "requir[es] medical attention." *Id.* The Consent Decree makes no exceptions for "mass arrests," protests, large demonstrations, or the like.

In violation of the Decree's mandate that TRRs be completed before the end of an officer's tour of duty, the policy authorizes an incident commander to "institute delayed Tactical Response Reporting procedures," which enables officers to "complete any TRR *after the members' tour of duty*." S06-06-03XX, Sec. VII.C., Sec. VII.H.2. (emphasis added). The policy provides no clear

---

[3] Chicago Police Department, Use of Force Dashboard, https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

standard dictating what specific circumstances would warrant instituting "delayed Tactical Response Reporting procedures." *See* Sec. VII.C. (listing eight open-ended "factors for consideration"). In addition, the policy places no constraints on the delayed (post-tour of duty) timeline for submitting a TRR. The policy leaves the designation of the new, delayed timeline up to the sole discretion of each incident commander. If an incident commander wanted to give officers six months to submit TRRs, nothing in this policy would prohibit it, even though the Consent Decree clearly does.

The policy's delayed use of force reporting introduces serious risks that officers will submit TRRs days, weeks, or even months after engaging in physical violence against community members—after recollections have faded and evidence is no longer available, and after officers have had time to collude and coordinate on their version of events surrounding the use of force. The unlimited timeline for delayed reporting also increases the risk that officers will *never* submit a TRR, and that instances of nonreporting will be difficult or impossible to identify. In sum, the policy's delayed TRR procedures violate Paragraph 219 of the Consent Decree and undermine the Decree's accountability mechanisms for officer violence in the very context—police response to protesters—in which CPD has demonstrated a heightened need for ensuring accountability.

## III.    The Policy Fails to Adequately Protect First Amendment Rights.

### A.    The Policy Fails to Make Clear that Protests Trigger First Amendment Protection.

The policy states that it controls CPD's "response to crowds, protests, and civil disturbances," but fails to make clear that "protests" (as well as demonstrations, parades, and other expressive gatherings) trigger First Amendment protections not applicable to "crowds" and "civil disturbances." S06-06X, Sec. I. The policy provides no definitions of the terms "crowds," "protests," or "civil disturbances," nor does it tell officers how to distinguish between these three different types of activity. Instead, the policy treats the three as a single category. By lumping "protests" together with "crowds" and "civil disturbances," the policy fails to make clear to officers that community members who participate in protests are protected by the First Amendment, and thus require different police responses than "crowds" and "civil disturbances," which may not be entitled to First Amendment protection. The policy further increases the likelihood that officers will violate protesters' First Amendment rights by suggesting that only *some* protests qualify as protected "First Amendment assemblies," without explaining this distinction. *See* S06-06X, Sec. III.E.2., Sec. III.I.

Additionally, the policy makes no distinction between protests occurring on public sidewalks, streets, or parks (considered a "traditional public forum" under the First Amendment) and those in which protesters are located on private property.[4] This omission is deeply concerning, as the former is protected by the First Amendment whereas the latter generally is not. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). This omission is especially concerning given that this policy is intended to govern CPD's response to the DNC, where there are likely to be some protests on public sidewalks, streets, and parks and other protests

---

[4] The policy includes a definition of "public way" in the Definitions section, S06-06X Sec. II.G., but the term appears nowhere in the operative provisions of the policy.

that may be taking place on private property, such as in the United Center where the convention is being held.

**B.** **The Policy Fails to Limit Mass Arrests of Protesters to the Narrow Circumstances Permitted under the First Amendment.**

The policy fails to provide constitutionally adequate direction to incident commanders on when and under what circumstances they may declare a CMA Incident. Even though the entire purpose of declaring a CMA Incident is to facilitate large-scale arrests of protesters for failure to comply with a crowd dispersal order, the First Amendment standards that govern such arrests are mentioned nowhere in the policy.

Under the First Amendment, arrests of protesters on public property for failure to obey a dispersal order is permitted only if "immediate danger to speakers and protesters exists . . . [and] dispersal [i]s a necessary means of averting danger and damage." *Bell v. Keating*, 697 F.3d 445, 457-58 (7th Cir. 2012) (upholding in part and invalidating in part the City of Chicago's disorderly conduct ordinance, Mun. Code Sec. 8-4-010(d)). But the policy fails to instruct officers that mass arrests are only appropriate in those limited circumstances. The policy instead lists a number of vague "factors" that the incident commander must consider when declaring a CMA Incident, including: "the availability of Department resources," whether "continued police presence is necessary" to ensure public safety," "the total number of arrestees," "the probable charges," and the "capacity of the detention facilities." S06-06-01XX, Sec. II.A.1.-8. These factors make no reference to the First Amendment standard that dictates whether protesters may be arrested *in the first place*.

The policy should be revised to make clear that mass arrests of protesters should be used only as a last resort—when "necessary" to "avert[] danger and damage." *Bell*, 697 F.3d at 457-58. In addition, the policy should be revised to make clear that mass arrests of protesters should not be conducted unless all other reasonably available options for restoring public safety have been exhausted. For example, CPD's First Amendment Policy (discussed further below) requires the field commander, before issuing a crowd dispersal order, to "consider if there are and attempt any available less intrusive options to stop the unlawful behavior necessitating the issuance of the crowd dispersal order." G02-02, Sec. IX.D. Similar language must be added to the mass arrest policy to instruct officers that mass arrests are not permitted unless other available, less intrusive options have failed.

**IV.** **The Mass Arrest Policy Conflicts with Provisions of CPD's First Amendment Policy that are Essential for Ensuring CPD's Compliance with the Consent Decree and Constitution.**

CPD's First Amendment Rights policy contains a number of important restrictions on officers' treatment of protesters, which safeguard protesters' First Amendment rights consistent with *Bell*. The First Amendment policy, as described above (Part I), was the result of intensive negotiation between CPD, OAG, and the Coalition—supervised by this Court—to remedy CPD's abusive and unlawful treatment of protesters during the racial justice protests of summer 2020. These negotiations were specifically intended to create policy provisions that would prevent CPD's

widespread violation of numerous Consent Decree requirements documented in the Coalition's July 2020 Enforcement Letter. The relevant Consent Decree provisions include:

- Paragraph 50: Requiring CPD to "provide police services to all members of the public without bias and [to] treat all persons with the courtesy and dignity which is inherently due every person as a human being";
- Paragraph 163: Prohibiting CPD officers from "using force as punishment or retaliation, such as using force to punish or retaliate against a person for . . . engaging in protected First Amendment activity (e.g., lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct)"; and
- Paragraph 213: Prohibiting CPD officers from using impact weapons such as batons "to intentionally strike a subject in the head or neck, except when deadly force is justified."

The First Amendment policy is crucial to ensuring that officers comply with the above Decree requirements, respect protesters' First Amendment rights, and do not repeat the brutal, violent, and unconstitutional tactics that were clearly intended to silence protesters during the summer of 2020 (*see* Dkt. 855-1). Yet the mass arrest policy, as explained below, appears to override, or at least significantly weaken, key provisions of the First Amendment policy whenever a CMA Incident is declared.

### A. The Mass Arrest Policy Contradicts the First Amendment Policy's Restrictions on Arresting Protesters.

The First Amendment policy places tight restrictions on officers' ability to arrest protesters. Specifically, officers are prohibited from arresting any person "engaged in First Amendment conduct" unless that person poses an "immediate threat to the safety of the community, or others, or of causing property damage." G02-02, Sec. IV.B.6. This restriction continues to apply even after a protester has disobeyed a "crowd dispersal order." *Id.* Sec. IX.E.2. In addition, a person engaged in First Amendment conduct cannot be arrested for "minor or petty offenses, including traffic or business offenses." *Id.* Sec. IV.B.6.

These restrictions were specifically negotiated and approved by the Court to safeguard protesters' First Amendment rights and to ensure CPD's compliance with Consent Decree requirements. *See* ¶ 50 (requiring CPD to "provide police services to all members of the public without bias"); ¶ 51 (requiring CPD to "provide police services in a manner that promotes community trust of its policing efforts and ensures equal protection of the law to all individuals"). Moreover, the restrictions on arrest were aimed at preventing CPD officers from unconstitutionally targeting protesters with retaliatory arrests, as they did in large numbers during the 2020 racial justice protests.[5]

The mass arrest policy appears to do away with these critical protections by suspending the First Amendment policy's restrictions on arrest during any CMA Incident—precisely when

---

[5] David Eads, Josh McGhee, Matt Chapman, *Chicago Police Arrested More People for Protesting Than for Looting in Early Days of Unrest, Contradicting Original Claims*, The Chicago Reporter (June 16, 2020), https://www.chicagoreporter.com/chicago-police-arrested-more-people-for-protesting-than-for-looting-in-early-days-of-unrest-contradicting-original-claims/.

protections for protesters are most needed. The mass arrest policy expressly states that it supersedes any other CPD policy to the contrary, which would include the First Amendment policy. Specifically, the policy within the CMA suite that sets forth "alternate arrest procedures during coordinated multiple arrest incidents" states that "[i]f there is *any perceived conflict* between a procedure in this directive and *any other* Department directive, including the Department directive titled 'Processing Persons Under Department Control,' *this directive will take precedence*." S06-06-02XX, Sec. III.B. (emphasis added). That same policy then expressly authorizes field commanders to initiate "large scale enforcement action[s], including physical arrests beyond the individual isolated incidents or individual offenses occurring." *Id.* Sec. IV.A. The policy contemplates each officer arresting as many as fifteen people in a single CMA Incident, *id.* Sec. IV.C.3.NOTE, and authorizes officers to use their batons to "'rake' persons toward arrest teams." S06-06-03XX, Sec. III.B.NOTE. Such "large scale" arrests "beyond . . . individual offenses" are precisely what the First Amendment policy aims to prohibit by requiring officers to make an individualized determination that a would-be arrestee poses an "immediate threat to the safety of the community, or others, or of causing property damage." G02-02, Sec. IV.B.6.

Officers and supervisors are particularly likely to believe that the mass arrest policy conflicts with and supersedes the First Amendment policy's arrest restrictions because the mass arrest policy provides extensive procedures regarding arrest but omits any mention of the First Amendment policy's restrictions. Indeed, this omission appears to be intentional, as there are other provisions of the First Amendment policy that the mass arrest policy *does* incorporate. *E.g.*, S06-06X, Sec. III.I.; Sec. V.B.3. (requirements for crowd dispersal orders); Sec. III.K.2. (prohibition on retaliatory use of force). While the mass arrest policy states that "[a]ny response by Department members to a First Amendment Assembly, including crowd management and crowd dispersal orders, will be consistent with [the First Amendment policy]," S06-06X, Sec. III.I., it also *expressly overrides "any other" conflicting policies* and specifically calls for "large scale" arrests "beyond . . . individual offenses." S06-06-03XX, Sec. IV.B.; S06-06-02XX, Sec. IV.A.

The mass arrest policy must be revised to make clear that the First Amendment policy's restrictions on arrest govern *all* police encounters with anyone engaged in First Amendment activity, including in a CMA Incident. The First Amendment policy's specific restrictions on arrest should also be incorporated into the mass arrest policy. Additionally, the CMA Report form, which is used to document any arrest during a CMA Incident, should be modified to require the arresting officer to record not only the probable cause for arrest but also the "immediate threat to the safety of the community, or others, or of causing property damage" that justifies the arrest pursuant to the First Amendment policy (G02-02, Sec. IV.B.6.).

### B. The Mass Arrest Policy Fails to Protect Protesters from Unconstitutional or Otherwise Prohibited Uses of Force.

#### 1. The Mass Arrest Policy Fails to Adequately Prohibit Retaliatory Uses of Force Against Protesters.

Consent Decree Paragraph 163, as noted above, prohibits CPD officers from "using force to punish or retaliate against a person for . . . engaging in protected First Amendment activity," including "lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct)." This Consent Decree provision reflects the basic

First Amendment prohibition against government officials "subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quotations omitted).

During the summer 2020 protests, CPD officers committed numerous egregious acts of unjustified, retaliatory force against protesters and individuals recording the police, in violation of the Consent Decree and First Amendment, as documented in the Coalition's July 2020 Notice of Intent to Initiate Enforcement Proceedings. *See* Dkt. 855; Dkt. 855-1 at 2-6. In the wake of these flagrant violations, the Coalition and CPD negotiated specific provisions of CPD's First Amendment policy to prevent CPD from engaging in unlawful retaliatory use of force in future protests. Specifically, the First Amendment policy prohibits CPD officers from "us[ing] force to punish, retaliate against, deter, or respond to the lawful expression of First Amendment rights." G02-02, Sec. IV.B.3.

The mass arrest policy fails to comply with this prohibition on using force against protesters and people recording the police. While the parent policy of the mass arrest suite correctly informs officers that they shall "not use force to punish, retaliate against, deter, or respond to the lawful expression of First Amendment rights," S06-06X, Sec. III.K.2., the specific policy on "alternate tactical response reporting" (S06-06-03XX) sends a different message. It authorizes officers to "physically respond to a crowd's actions or inactions in response to verbal directions and make physical contact with a person or persons in the crowd." S06-06-03XX, Sec. III.A. It also enumerates various types force, including deadly force and weapon discharge, that an officer may "become[] involved in . . . during a coordinated multiple arrest incident." *Id.* Sec. V.C.1.-6. This policy—which states that it supersedes "any other Department directive" to the contrary— makes no mention of the Constitution's, Consent Decree's, and First Amendment policy's prohibition on using force in reaction to First Amendment-protected expression. The policy on "alternate tactical response reporting" must therefore be revised to make clear that any such physical response is forbidden by law and CPD policy.

## 2. The Mass Arrest Policy Fails to Adequately Prohibit Officers from Unleashing Canines Against Protesters.

The prospect of police unleashing dogs on protesters evokes some of the most horrific chapters of police abuse in our nation's history and clearly would not comply with the Consent Decree, including the fundamental mandates of treating all persons with dignity and respecting the sanctity of human life. *See* ¶ 50 (requiring that CPD "treat all persons with the courtesy and dignity which is inherently due every person as a human being[.]"); ¶ 156 (requiring that CPD officers "act at all times in a manner consistent with the sanctity of human life," "act at all times with a high degree of ethics, professionalism, and respect for the public," and "use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible"). Unleashing dogs on peaceful protesters would also almost certainly violate the First and Fourth Amendments. To ensure CPD's compliance with the Consent Decree and the Constitution, CPD policy categorically prohibits officers from using canine teams "in response to crowds, protests, or civil disturbances." *Canine Teams*, Special Order S03-04-01, Sec. IV.A.

Despite this clear prohibition, the mass arrest policy contains confusing, self-contradictory language regarding the use of canines during protests, which could lead officers to incorrectly

believe that canines are a permitted force option against protesters. Specifically, Section V.C. of S06-06-03XX lists "canines as a force option" among the types of force that are required to be reported on a Tactical Response Report during a CMA Incident, even though the policy also notes that officers are prohibited from using canine teams in response to crowds, protests, or civil disturbances.

The mass arrest policy must be revised to remove "canines" from the list of potential "force option[s]," S06-06-03XX, Sec. V.C., and the policy must state unequivocally that officers cannot use canines in response to protests.

### C. The Mass Arrest Policy Fails to Prohibit "Kettling."

When CPD has made a determination "to disperse a crowd and give a dispersal order," the First Amendment policy requires the field commander to "clearly identify the designated and available dispersal routes" and provide "attainable" dispersal instructions. G02-02, Sec. IX.E.1.a.(2)-(3). These provisions, stated as mandatory requirements with no exceptions, were intended to ban the dangerous police practice known as "kettling," where officers contain protesters in a confined area for an extended period of time by surrounding them and not permitting them to leave, as CPD officers did during the 2020 protests. The First Amendment policy's ban on this inherently cruel, degrading, and escalatory practice ensures CPD's compliance with numerous Consent Decree requirements. *See, e.g.*, ¶ 156 (requiring that CPD officers "act at all times in a manner consistent with the sanctity of human life," "act at all times with a high degree of ethics, professionalism, and respect for the public," and "use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible").

Despite the First Amendment policy's prohibition and the underlying Consent Decree requirements, the mass arrest policy fails to categorically rule out kettling. It confusingly states that officers "will *avoid* containment or corralling tactics known as 'kettling' and will provide specific egress directions for safe crowd dispersal." S06-06X, Sec. V.B.4.c.REMINDER (emphasis added). This incorrectly suggests to officers that kettling remains a permissible tactic in certain situations. The policy should be revised to categorically prohibit kettling and similarly dangerous crowd containment tactics, consistent with the First Amendment policy and the Consent Decree.

### V. The Mass Arrest Policy Fails to Comply with Legal Requirements for Providing Disability and Language Accommodations.

The Consent Decree requires that CPD make reasonable accommodations for people with disabilities (¶¶ 68-69) and people who have limited English proficiency ("LEP") (¶ 64), including accommodations needed to ensure "effective communication" and "meaningful access" to police services. These Decree requirements reflect and enforce the federal statutory mandates of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

The policy fails to comport with these requirements. It merely informs officers that disabilities and "language barriers" may be a reason why a person "may not recognize or be able to immediately respond to law enforcement directions." S06-06X, Sec. V.C.6.; S06-06-03XX, Sec. VI.A.6. The policy omits that officers must *affirmatively provide* alternative methods of

communication if needed to ensure effective communication with individuals with disabilities and LEP individuals. The policy must be revised to provide specific instructions regarding the alternate methods of communication that may be needed, and should refer officers to the relevant sections of the First Amendment policy. *See* G02-02, Sec. VIII.B.4. ("Multiple methods of communication may include a device to amplify sound, qualified language interpreters, visual aids (e.g. gestures, writings, or posted written communications), and digital messaging (e.g., social media, electronic notification services).").

## VI.    CPD Violated the Consent Decree's Community Engagement Requirements.

The Consent Decree mandates that CPD provide members of the public with "a meaningful opportunity to review and comment on" proposed changes to CPD policies and procedures that relate to the Decree's requirements. ¶ 633. The Consent Decree further requires CPD to "consider," in response to any public comments, "whether any further revisions to the proposed policy or procedure are appropriate." *Id.* This process must take place "prior to . . . implementation" of the proposed policy. *Id.* CPD has failed to comply with these requirements for the mass arrest policy.

*First*, the timing of CPD's training on this policy makes clear that the public never had a "meaningful opportunity" to provide input on the policy. CPD apparently developed and began delivering its training course for this policy *before* the period for public comment even closed. The public could not possibly have had a "meaningful opportunity" to provide input on the policy when CPD considers it finalized and ready for training before the comment period has ended.

*Second*, the time period CPD allotted for public comment did not enable a "meaningful opportunity" for public input. CPD originally posted the policy on its website for only 20 days, later extended to 34 days at the Coalition's urging. Neither the original nor extended timeframe allows members of the public—many of whom work full-time jobs and have myriad other demands on their time—sufficient time to read, digest, and provide substantive comments on a 40-page set of four policies that introduce a vast array of new policing procedures. Moreover, CPD provided no advanced notice so that the Coalition, community members, subject-matter experts, organizations, and other stakeholders could plan in advance for the comment period. Nor did CPD provide any plain-language summary or guide to assist lay community members in understanding how and why this policy changes CPD practices.

For years, the Coalition has raised these recurring community engagement deficiencies with CPD and suggested corrective measures. *See, e.g.*, Communities United Parties' Statement Regarding Comprehensive Assessment of the Consent Decree, Dkt. 1121, at 11; *Campbell* Plaintiffs' Position Statement on Required Modifications to the Consent Decree, Dkt. 1125, at 12. The Independent Monitor has too. *See, e.g.*, Independent Monitoring Report 7, Dkt. 1097, at 6; Independent Monitoring Report 8 Appx. 2, at 1-4, https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-2-Impartial-Policing-2023.11.01.pdf. Rather than correct its longstanding deficiencies for this policy suite, which is of utmost importance to the public, CPD doubled down on a sham public comment process that violates Paragraph 633 and precludes the community from having a real opportunity to shape the policies that will govern officers' treatment of untold numbers of community members seeking to exercise their First Amendment rights.

## VII.   Exigent Circumstances Necessitate Emergency Relief.

The legal deficiencies in the mass arrest policy must be corrected immediately. CPD officers are being trained on the policy *this month*, in preparation for the August DNC. Any delay in remedying the policy's defects will result in officers being trained on an unlawful policy, likely resulting in widespread on-the-ground violations as soon as officers begin executing the policy.

Given the exigent circumstances, the Consent Decree's ordinary requirement of a 90-day "cure period" (¶ 695) between this notice and the filing of an enforcement motion is not tenable. Absent immediate enforcement proceedings, the mass arrest policy may evade the Court's review until after it has been applied against—and likely harmed—scores of protesters at the DNC. This would vitiate the Coalition's enforcement rights under Paragraph 709(a) and defeat the Court's enforcement power under Paragraph 695.

Moreover, this is not a new issue for CPD and the Coalition. Since the Coalition filed its July 2020 Notice of Intent to Initiate Enforcement Proceedings (Dkt. 855; Dkt. 855-1), CPD has been aware that the rights of people engaged in First Amendment activity are of paramount importance to the Coalition. CPD could have involved the Coalition at an earlier stage of this policy's development and worked collaboratively with the Coalition to resolve our concerns and avoid the need for emergency enforcement proceedings. It chose not to. The exigency here is of CPD's own making.

If CPD is interested in resolving these matters immediately and without Court intervention, please inform us no later than March 20, 2024. In addition, please provide us with a copy of all training materials related to the mass arrest policy, and we request an opportunity to attend and observe the trainings.

Sincerely,

Amanda Antholt
Ruben Bautista
Sheila Bedi
Alexandra Block
Kara Crutcher
Vanessa del Valle
Craig Futterman
Michelle García
Joshua Levin

*Attorneys for the Coalition*

Cc:

Karyn Bass-Ehler
Mary Grieb
Amy Meek
Anthony-Ray Sepúlveda

13

# Exhibit C

| Chicago Police Department | General Order G02-02 |
|---|---|
| **FIRST AMENDMENT RIGHTS** | |

| ISSUE DATE: | 19 December 2022 | EFFECTIVE DATE: | 19 December 2022 |
|---|---|---|---|
| RESCINDS: | 13 April 2021 Version | | |
| INDEX CATEGORY: | 02 - Human Rights and Community Partnerships | | |
| CALEA: | | | |

## I. PURPOSE

This directive:

A. establishes the Department policy related to the First Amendment and members of the public engaged in First Amendment conduct.

B. describes the First Amendment and the rights of members of the public upon the public way.

C. outlines the responsibilities when responding to First Amendment activities, including managing crowds and issuing crowd dispersal orders.

D. informs members of their obligations to protect the First Amendment rights of law-abiding individuals who encounter a hostile audience threatening to create public disorder, as described in the judgment order entered in Nelson v. Streeter, et.al., No. 88 C 5434.

## II. DEFINITIONS

A. **First Amendment assembly** - a gathering conducted for the purpose of persons expressing any opinion, idea, or belief.

B. **Speech peddling** - when licensed peddler sells or exchanges for value anything containing words, printing, or pictures that predominantly communicates a non-commercial message (MCC 4-244-141).

C. **Field commander** - the highest ranking on-scene Department member who reports directly to the overall incident commander and is responsible for the Department's on-scene response to the incident.

D. **Incident commander** - the designated Department member who is responsible for the Department's overall response to the incident.

E. **Crowd dispersal order** - a lawful command given by a Department member for all persons to leave a designated area when three or more persons are committing acts of disorderly conduct that are likely to cause substantial harm in the immediate vicinity.

F. ***Public way*** - *any street, alley, or other parcel of land open to the outside air leading to a public street, which has been deeded, dedicated, or otherwise permanently appropriated to the public for public use, and which has a clear width and height of not less than 10 feet (410 ILCS 25/3).*

## III. THE FIRST AMENDMENT

A. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

B. First Amendment conduct means speech or activity related to the freedom of speech, free exercise of religion, freedom of the press, the right to assemble, and the right to petition the government. The First Amendment protects, but is not limited to, the following rights:

1. The right to hold any opinion, idea, or belief.

2.    The right to communicate or receive opinions, ideas, beliefs, or information.

3.    The right to associate and to assemble with others for the purpose of expressing, receiving, or exchanging ideas, beliefs, or information.

4.    The right to advocate for ideas or beliefs, including the right to advocate for an alternative system of government and to advocate for "the use of force or of law violation," except where such advocacy is directed to inciting or producing imminent lawless conduct and is likely to incite or produce such action.

5.    The right to petition the government or governmental officials for redress of grievances.

6.    The right to associate for the purpose of seeking and giving legal advice as well as advancing litigation.

7.    The right to observe and record events, including approaching individuals to ask questions for news gathering purposes, and disseminating information.

C.    First Amendment rights exercised in a public forum may be subject to reasonable time, place, and manner restrictions, which means content-neutral time, place, and manner restrictions that are narrowly tailored to serve a significant governmental interest and leave open alternative communication channels.

## IV.    DEPARTMENT POLICY

A.    All Department members will treat all persons with the courtesy and dignity which is inherently due every person and will act, speak, and conduct themselves in a courteous, respectful, and professional manner. The Department and all Department members will act in accordance with the Constitution of the United States of America, including the First Amendment, and will comply with the law and Department policy.

B.    Department members **will not**:

1.    disrupt, intimidate, harass, or discriminate against, or arrest any persons engaged in First Amendment conduct *for any unlawful purpose*, including for the purpose of preventing the person from lawfully exercising their First Amendment rights.

2.    make comments about the views expressed by persons exercising their First Amendment rights.

3.    use force to punish, retaliate against, *deter*, or respond to the lawful expression of First Amendment rights.

4.    hinder or prevent members of the public from recording Department members who are in the performance of their law enforcement duties in a public place or when the member has no reasonable expectation of privacy consistent with the Illinois Compiled Statutes (720 ILCS 5/14-2(e)).

NOTE:    Department members may take reasonable action to maintain safety and control, secure crime scenes and accident sites, protect the integrity and confidentiality of investigations, and protect the public safety and order (ILCS 720 ILCS 5/14-2(e)).

5.    interrogate or otherwise question participants concerning their views unless essential to an investigation of an apparent violation of law or as part of an authorized investigation directed toward First-Amendment-related information consistent with the Department directive titled "Investigations Directed at First Amendment-Related Information."

6.    *arrest any persons engaged in First Amendment conduct:*

a.    *for minor or petty offenses, including traffic or business offenses, or*

b. _that pose no immediate threat to the safety of the community, or others, or of causing property damage._

C. Consistent with the Department directive titled "Vision, Mission Statement, and Core Values," the Department protects the lives, rights, and property of all people in Chicago, including protecting public health, safety, welfare, property, and the interest of persons not participating in a First Amendment assembly to use the streets, sidewalks, and other public ways to travel to their intended destinations and use the parks for recreational purposes.

D. Department members will only use force _that is objectively reasonable, necessary, and proportional_ consistent with the Department directive titled "De-escalation, Response to Resistance, and Use of Force," including _using the minimum amount of force needed based on the totality of the circumstances._

    1. _Prior to the use of physical force, Department members will provide a warning and allow persons to voluntarily comply with lawful verbal direction prior to the use of physical force, when it is safe and feasible to do so, consistent with the Department directive titled "Response to Resistance and Force Options."_

    2. _Consistent with the Department directive titled "Baton Use Incidents," batons may not be used to intentionally strike a subject in the head or neck except when deadly force is justified._

    3. _Consistent with the Department directive titled "Oleoresin Capsicum (OC) Devices And Other Chemical Agent Use Incidents":_

        a. _a personal OC device is an authorized force option against passive resisters that are part of noncompliant groups, crowds, or an individual taking part in a group or crowd only after obtaining authorization from the Superintendent or his or her designee._

        b. _a personal OC device is an authorized force option against active resisters as described in Department directive_ **Oleoresin Capsicum (OC) Devices And Other Chemical Agent Use Incidents** . _If an active resister is part of a group or crowd, a Personal OC device is authorized only after obtaining approval from the Superintendent or his or her designee._

        c. _special weapons that dispense the Capsaicin II powder agent or larger volumes of chemical agents are authorized force options against active and passive resisters that are part of noncompliant groups, crowds, or an individual taking part in a group or crowd only under the following conditions:_

            (1) _when the chemical agent is used only for area saturation, and_

            (2) _only after obtaining authorization from the Superintendent or his or her designee._

            **NOTE:** _The use of special weapons that dispense Capsaicin II powder agent or larger volumes of chemical agents is only authorized for units that have received appropriate training. Any unit that has not received the appropriate training does not have access to special weapons that dispense Capsaicin II powder agent or larger volumes of chemical agents._

    4. _The Superintendent will only authorize the use of oleoresin capsicum (OC) devices and other chemical agents during a First Amendment assembly if there is a threat or attack against Department members, the public, or property._

EXAMPLE:  *Threats or attacks against Department members, the public, or property may include, but are not limited to, throwing objects at Department members, members of the public, or at storefront windows causing windows to break, or threatening to harm Department members or members of the public by driving erratically near or on designated protestor routes.*

5.  *Department members will document reportable uses of force consistent with the Department directive titled "Incidents Requiring the Completion of a Tactical Response Report."*

E.  *Consistent with the Department directive titled "Prohibition of Retaliation," the Department prohibits any and all forms of retaliation, including arrest, against any member of the public for engaging in protected lawful exercise of First Amendment rights. (e.g., protected speech, lawful demonstrations, observing or filming police activity, or criticizing the Department, a Department member, or a member's conduct).*

F.  *Consistent with the Department directive titled "Body Worn Cameras," Department members equipped with a body worn camera (BWC) will activate the camera at the beginning of all law-enforcement-related activities, such as issuing a dispersal order or making an arrest.*

G.  *Any allegations of misconduct or policy violations will be reported, initiated, and investigated consistent with the Department directive titled "Complaint and Disciplinary Procedures." In response to allegations of misconduct or policy violations, the Superintendent of Police retains the discretion to take action to restrict the duties of an active duty sworn Department member.*

## V. FIRST AMENDMENT RIGHTS UPON THE PUBLIC WAY

A.  The public way generally includes public property held open to the public such as sidewalks, parks, and public plazas such as Federal Plaza.

B.  Persons on the public way have a right to:

1.  express their views through any form of communication, including distribution or sale of newspapers, magazines, handbills, or other printed matter; and

2.  solicit financial contributions.

C.  Persons on the public way may freely distribute, without charge to others, material or messages containing First Amendment protected ideas.

NOTE:  Generally, persons giving away items containing First Amendment protected messages are not considered peddlers or itinerant merchants and ordinances applicable to itinerant merchants and peddlers do not apply to persons freely distributing First Amendment protected messages. For example, campaign literature.

## VI. LIMITS ON FIRST AMENDMENT ACTIVITIES

A.  The rights protected by the First Amendment and exercised on the public way are not absolute and are subject to time, place, and manner restrictions, as well as other applicable laws.

EXAMPLE:  Persons expressing views protected by the First Amendment on the public way are required to comply with laws prohibiting physical obstruction of the movement of persons and vehicles on the public way or place and damage to public or private property.

B.  Speech Peddling

1.  *Speech Peddling is defined by the Municipal Code of Chicago as a licensed peddler that sells or exchanges for value anything containing words, printing, or pictures that predominantly communicates a non-commercial message (MCC 4-244-141(b)).*

2. Persons engaged in Speech Peddling are subject to geographic restrictions and permit requirements contained in the Municipal Code of Chicago (MCC 4-244-141(b)). (E.g., No person shall be allowed to engage in speech peddling within the Central District without a speech peddling permit.)

> **NOTE:** *Speech peddling does not include individuals freely distributing materials or messages containing First Amendment protected messages as outlined in Item V-C of this directive.*

C. *After a reasonable amount of time after the issuance of a crowd dispersal order, participants in a First Amendment assembly who disobey a lawful crowd dispersal order issued as prescribed in this directive are subject to Department enforcement actions that may include the issuance of a citation or arrest for MCC 8-4-010(d).*

## VII. PROTECTIONS OF FIRST AMENDMENT RIGHTS IN A HOSTILE AUDIENCE ENVIRONMENT (CASE 88C5434)

A. [Judgment Order 88 C 5434](#), Nelson v. Streeter, et al., relates to Department members' responsibilities at public exhibitions of ideas that may result in hostile reactions from those viewing or hearing the exhibition.

B. Department members will protect the free speech rights of all persons, no matter what the particular message, position, or philosophy espoused, and even if other people are offended by it, as long as the person expressing that message, position, or philosophy is not violating the law and has abided by any reasonable time, place, and manner restrictions placed on the expression of such ideas.

C. If an incident where a hostile audience threatens a speaker, artist, exhibitor, or artwork or there is a danger of harm to persons or property, Department members will:

1. if artwork or other expressive material is involved, attempt to ascertain who owns or has right of custody of the material;

2. advise the speaker, artist, or exhibitor, if present, of the right to continue the expression at the current site;

3. begin or continue police protection so as to allow the speaker, artist, or exhibitor to continue the expression of speech or art; and

4. request that a supervisor respond to the scene.

D. When an expression of speech or art is threatened by a hostile audience, the incident commander will determine if the assignment of additional police personnel will allow for the continuation of the expression.

E. If it is determined that the expression cannot continue at the original site due to the activities of persons hostile to the expression, the on-scene the incident commander will consider if:

1. all police resources reasonably available have been deployed to maintain the peace and allow the expression to take place;

2. police efforts to take direct action against those violating the law have not been successful; and

3. there remains a threat of imminent violence that police personnel are unable to control.

> **NOTE:** If reasonably possible, members should consult with the Legal Affairs Division or City of Chicago legal advisors prior to taking action to discontinue a public expression of speech or art.

F. The expression may be discontinued at the original site when the field commander determines that:

1. order can be restored:

        a.      only by taking the expressive material into custody, or

        b.      otherwise discontinuing the expression.

   2.     available alternatives of continuing private custody have been considered but cannot be deployed.

   3.     when expression is discontinued, it should be permitted to resume as soon as the incident commander determines that order has been restored and can be maintained if the expression resumes.

G.     Any expressive material taken into protective custody will be inventoried according to existing inventory procedures. The owner of the material will be advised of the right to immediately reclaim the material at the unit of inventory.

## VIII.   CROWD MANAGEMENT DURING FIRST AMENDMENT ASSEMBLIES

A.     The primary objectives of crowd management are to:

   1.     support *and protect* lawful First Amendment activity, including the public's right to free speech and of free speech expression;

   2.     observe the crowd and assess for potential safety concerns;

   3.     communicate with the crowd and its leaders; and

   4.     obtain voluntary compliance to lawful direction and orders with minimal Department response or enforcement actions.

B.     Department communications with the crowd should convey law enforcement expectations and support of lawful First Amendment activity. The field commander will:

   1.     ensure on-scene communications, instructions, or warnings given to the crowd are clear, understandable, and attainable;

   2.     attempt to give instructions and warning to the leaders or spokesperson of the crowd or the other participants in regards to potentially unlawful actions or about any observed unlawful conduct;

   3.     allow sufficient time for individuals and the crowd to receive and comply with the communications, to the extent feasible; and

      **REMINDER:**    *When encountering noncompliance to lawful verbal direction, Department members will consider, to the extent feasible, if the noncompliance may be due to limited English proficiency or other language barriers, a medical condition, or disability.*

   4.     use multiple methods of communication to provide effective communication with the crowd, including people with disabilities, to extent feasible.

      **EXAMPLE:**    Multiple methods of communication may include a device to amplify sound, qualified language interpreters, visual aids (e.g. gestures, writings, or posted written communications), *and digital messaging (e.g., social media, electronic notification services).*

C.     In managing the crowd, the field commander must consider the following:

   1.     establishing contact with crowd leaders to assess their intentions and developing a mutually acceptable plan for the lawful expression of the First Amendment rights as well as cooperation of the crowd in identifying specific individuals suspected of undermining the lawful expression of the message of the First Amendment assembly.

2. isolating specific *individuals engaged in unlawful activity* for enforcement actions, such as citations or arrest for specific offenses, while allowing the First Amendment assembly to continue.

3. the potential positive and negative impact of a significant display of a law enforcement presence including officer line formations, vehicles, bicycle units, and the Mounted Patrol and combinations thereof.

D. Department *members* will attempt to avoid arrest of members of the news media who are credentialed consistent with the Department directive titled "News Media Credentials" by giving verbal direction before taking enforcement action.

## IX. CROWD DISPERSAL ORDERS DURING FIRST AMENDMENT ASSEMBLIES

A. During a First Amendment assembly, crowd dispersal orders **will not** be issued unless three or more persons are committing acts of disorderly conduct in the immediate vicinity and those acts are likely to cause substantial harm (MCC 8-4-010(d)).

B. The primary objectives of crowd dispersal orders are to:

1. provide lawful orders to the crowd and its leaders;

2. attempt to gain voluntary compliance with lawful direction and orders; and

3. clearly identify the designated and available dispersal routes.

C. During a First Amendment assembly, the field commander is the issuing authority for a crowd dispersal order.

D. Before issuing a crowd dispersal order, the field commander must consider if there are and attempt any available less intrusive options to stop the unlawful behavior necessitating the issuance of the crowd dispersal order. In considering whether a less intrusive option is available, the field commander will consider whether attempting such option would result in an immediate risk of physical harm to a person or property or would be clearly ineffective under the circumstances at the time.

E. When a determination has been made to disperse a crowd and give a dispersal order, the guidelines listed below will be followed:

1. The field commander will:

a. issue, or direct a supervisor to issue, the crowd dispersal order. The crowd dispersal order will:

(1) include a lawful order for the crowd to disperse by order of the Chicago Police Department;

(2) be clearly audible, understandable, and contain attainable instructions;

(3) clearly identify the designated and available dispersal routes;

(4) provide clear direction that the crowd is expected to immediately disperse and leave the area; and

(5) be given multiple times, except where there is imminent danger of personal injury or substantial harm to property.

b. allow sufficient time for individuals and the crowd to receive and comply with the dispersal order, to the extent feasible.

REMINDER: *When encountering noncompliance to lawful verbal direction, Department members will consider, to the extent feasible, if the noncompliance may be due to limited English proficiency or other language barriers, a medical condition, or disability.*

c. use multiple methods of communication to provide effective communication with the crowd, including people with disabilities, to extent feasible.

> **EXAMPLE:** Multiple methods of communication may include a device to amplify sound, qualified language interpreters, visual aids (e.g. gestures, writings, or posted written communications), *and digital messaging (e.g., social media, electronic notification services).*

d. document the crowd dispersal order with Department-authorized video and audio recording devices, if available.

e. provide notification to the Office of Emergency Management and Communications (OEMC) of the dispersal order to be documented on the incident *Police Computer-Aided Dispatch* (PCAD) event, including, but not limited to:

(1) the location of the crowd being dispersed;

(2) the size of the crowd;

(3) the time of *the* initial dispersal order; and

(4) if multiple dispersal orders were given, the number of dispersal orders issued and the time the additional orders were given.

f. prior to arresting individuals for failure to disperse (MCC 8-4-010(d)), provide a reasonable amount of time after issuing the crowd dispersal order and seek to ensure that the individual has heard and understood the dispersal order.

2. *After the issuance of a dispersal order, nothing in this Directive, except as provided in Items Sections IV-B-1, IV-B-6, and IV-E, restricts the ability of the Department members to take appropriate enforcement action against any member of the public who:*

a. *commits a Class A misdemeanor offense that involves a threat to a personal's physical safety or property, or a more serious criminal offense;*

b. *poses an immediate threat to the safety of the community, or others, or of causing property damage; or*

c. *fails to comply with dispersal order after being given the opportunity to do so.*

F. Members of the news media who are credentialed consistent with the Department directive titled "News Media Credentials" and who display or tender their credential will not be required to disperse following the issuance of a crowd dispersal order issued during a First Amendment assembly.

## X. REPORTING REQUIREMENTS FOR CROWD DISPERSAL ORDERS

A. Following any crowd dispersal order issued during a First Amendment assembly, the incident commander will ensure that the circumstances leading to the issuance of the crowd dispersal order are documented in an incident case report with the offense code of 5015, which is unique to crowd dispersal orders issued during First Amendment assemblies. This report will include:

1. an articulation of the acts likely to cause substantial harm;

2. the consideration of less intrusive options that were available to stop the unlawful behavior necessitating the issuance of the crowd dispersal order;

3. a description of less intrusive options that were attempted and any other available less intrusive options that were considered; and

4. the content of the crowd dispersal order, including the dispersal routes.

B.   When Department members formed into squads physically respond to a crowd's actions or inactions in response to verbal directions, squad supervisors will document the issuance of the crowd dispersal order on the Incident Response (CPD-11.302) form consistent with the Department directive titled "Reporting the Response to Crowds, Protests, and Civil Disturbances."

C.   Any supervisor assigned to an event may complete a Special Event Evaluation Report (CPD-11.466) documenting any observations, evaluation, or recommendations to improve Department response to future incidents.

D.   *Following a crowd dispersal order issued during a First Amendment assembly, the incident commander will ensure an After-Action Review (AAR) is completed consistent with the National Incident Management System (NIMS) principles. The AAR will:*

   1.   *document any recommended actions or identified improvements to the Department's response for future incidents.*

   2.   *be forwarded to the First Deputy Superintendent and the Deputy Chief, Training and Support Group.*

(Items indicated by *italics/double underline* were added or revised)


                                                    David O. Brown
                                                    Superintendent of Police

20-049 JJR/MWK/TSS/ASH


**ADDENDA:**

   1.   G02-02-01 - Investigations Directed at First Amendment-Related Information

# **Exhibit D**

# COORDINATED MULTIPLE ARREST

CHICAGO POLICE DEPARTMENT CPD-11.433 (REV. 1/19/24)

DISTRIBUTION: (ORIGINAL) – PROCESSING TEAM
(PINK) – COURT PACKET
(YELLOW) – TRED REVIEW
(WHITE CARD) – REPORTING OFFICER

**ARREST CARD NUMBER**

0000001011010

| DATE | TIME | LOCATION OF ARREST/INCIDENT (ADDRESS) | RELATED NUMBER(S): |
|---|---|---|---|

| ARRESTEE'S NAME (Last, First, M.I.) | ☐ REFUSED ☐ UNKNOWN ☐ JUVENILE | D.O.B.(EST AGE) | GENDER | RACE |
|---|---|---|---|---|

IS REPORT **ONLY** TO DOCUMENT AN OFFICER BATTERY OR ASSISTING OFFICER'S REPORTABLE USE OF FORCE?
☐ NO. **IF NO, COMPLETE SECTION 2 "INCIDENT INFORMATION"**
☐ YES. **IF YES, SKIP TO SECTION 3 AND DO NOT COMPLETE SECTION 2 "INCIDENT INFORMATION"**

## 2. INCIDENT INFORMATION

| HEIGHT | WEIGHT | OUTER GARMENT | SHIRT | PANTS | SCARS/MARKS/TATTOOS |
|---|---|---|---|---|---|

| PERSON ARMED? ☐ NO ☐ YES (SPECIFY): | PERSON INJURED? ☐ NO/NONE APPARENT ☐ YES (SPECIFY): | CONDITION? ☐ APP. NORMAL ☐ OTHER (SPECIFY): | MEDICAL TREATMENT? ☐ OFFERED/EMS REQUESTED ☐ PERFORMED BY MEMBER ☐ PERFORMED BY CFD EMS | ☐ REFUSED MEDICAL AID ☐ TAKEN TO HOSPITAL ☐ OTHER:_____ | RESISTED ARREST? ☐ NO ☐ YES (IF YES, COMPLETE PERSON'S ACTIONS SECTION) |
|---|---|---|---|---|---|

NARRATIVE SUMMARY OF PROBABLE CAUSE FOR ARREST:

## 3. TACTICAL RESPONSE REPORTING (ONLY FOR OFFICER BATTERY/REPORTABLE USE OF FORCE INCIDENTS) (CHECK ALL THAT APPLY)

**PERSON'S ACTIONS**

☐ DID NOT FOLLOW VERBAL DIRECTION
☐ STIFFENED (DEAD WEIGHT)
☐ FLED
☐ PULLED AWAY
☐ OTHER:

☐ VERBAL THREATS
☐ IMMINENT THREAT OF BATTERY - NO WEAPON
☐ IMMINENT THREAT OF BATTERY - WITH WEAPON
☐ PHYSICAL OBSTRUCTION
☐ THROWN OBJECT
☐ PUSH/SHOVE/PULL

☐ HAND/ARM/ELBOW STRIKE
☐ KNEE/LEG STRIKE
☐ MOUTH/TEETH/SPIT
☐ GRAB/HOLD/DETAIN
☐ WRESTLE/GRAPPLE
☐ PHYSICAL ATTACK WITH WEAPON

DID THE SUBJECT COMMIT AN ASSAULT OR BATTERY AGAINST THE REPORTING MEMBER PERFORMING A POLICE FUNCTION? ☐ NO ☐ YES

**MEMBER'S RESPONSE TO RESISTANCE**

DID REPORTING MEMBER'S RESPONSE INVOLVE ANY OF THE FOLLOWING? ☐ NO ☐ YES: TACTICAL RESPONSE REPORT IS REQUIRED
☐ CAUSED MAJOR INJURY ☐ IMPACT WEAPON STRIKE ☐ WEAPON DISCHARGE (E.G., OC, TASER) ☐ LRAD ☐ DEADLY FORCE

### FORCE MITIGATION EFFORTS (CHECK ALL THAT APPLY)

| | | | INVOLVED IN A PURSUIT? |
|---|---|---|---|
| ☐ MEMBER PRESENCE | ☐ ZONE OF SAFETY | ☐ MOVEMENT TO AVOID ATTACK | ☐ NO ☐ FOOT |
| ☐ VERBAL DIRECTION/CONTROL TECHNIQUES | ☐ TACTICAL POSITIONING | ☐ ADDITIONAL UNIT MEMBERS | ☐ OTHER |
| ☐ SPECIALIZED UNITS | ☐ NONE | ☐ OTHER:_____ | |

### CONTROL TACTICS/MEMBER'S RESPONSE (CHECK ALL THAT APPLY)

WAS ANY REPORT. FORCE USED WHILE PERSON HANDCUFFED OR RESTRAINED? ☐ NO ☐ YES

☐ ESCORT HOLDS
☐ PRESSURE SENSITIVE AREAS
☐ PUSH/PHYSICAL REDIRECTION
☐ WRIST LOCK

☐ CONTROL INSTRUMENT
☐ HANDCUFF/PHYSICAL RESTR.
☐ ARMBAR
☐ FIRM GRIP

☐ OPEN HAND STRIKE
☐ CLOSED HAND STRIKE/PUNCH
☐ TAKE DOWN
☐ OTHER:_____

☐ ELBOW STRIKE
☐ KICKS
☐ KNEE STRIKE

CONCISE SUMMARY OF PERSON'S ACTIONS AND MEMBER'S RESPONSE:

| REPORTING MEMBER'S NAME (PRINT) | STAR NO | MEMBER INJURED? ☐ NO ☐ YES (SPECIFY): | ☐ CPD QR CODE ☐ OUTSIDE AGENCY INFO: |
|---|---|---|---|

| BEAT NO. | PC NO. | CRT. KEY | SIGNATURE | |
|---|---|---|---|---|

| SUPERVISOR'S NAME (PRINT) | STAR NO | TRR REQUIRED? ☐ NO ☐ YES | MEMBER NOTIFIED TO PERSONALLY COMPLETE THE ARREST PROCESS? ☐ NO ☐ YES: ☐ TRR ☐ VICTIM OF AN OFFENSE ☐ ADD. INVESTIGATION ☐ OTHER: |
|---|---|---|---|

| RELEASED FROM SCENE? ☐ NO ☐ YES: ☐ ISR COMPLETED ☐ CITATION ISSUED | TIME: | COMMENTS: | SIGNATURE |
|---|---|---|---|

| TRANSPORT OFFICER'S NAME (PRINT) | STAR NO | TR. VEH. NO. | DET. FAC. | TIME REC. | SIGNATURE |
|---|---|---|---|---|---|

# Exhibit E

# TACTICAL RESPONSE REPORT/Chicago Police Department

TRR TRACKING NO.

## INCIDENT

| DATE OF INCIDENT | TIME | ADDRESS OF OCCURRENCE | | LOCATION CODE | BEAT/OCCUR. | VIDEO RECORDED INCIDENT |
|---|---|---|---|---|---|---|
| | | | | | | ☐ BWC   ☐ IN-CAR VIDEO ☐ OTHER VIDEO |

| BUSINESS NAME | ☐ DNA | EXACT AREA WITHIN LOCATION (E.G., BASEMENT, STAIRWAY, BEDROOM) | ASSIGNMENT TYPE |
|---|---|---|---|
| | | | ☐ ON-VIEW   ☐ OTHER _____ ☐ SUPERVISOR DIRECTED  ☐ CALL FOR SERVICE |

| EVENT NO. | RD NO. | IUCR CODE | IR NO. | CB NO. |
|---|---|---|---|---|
| | | | | |

| LIGHTING | WEATHER | PATROL TYPE? | MEMBER WAS? | ASSIST UNITS ON SCENE? | INCIDENT |
|---|---|---|---|---|---|
| ☐ DAYLIGHT  ☐ DUSK ☐ DARKNESS  ☐ DAWN | ☐ CLEAR  ☐ RAIN ☐ CLOUDY  ☐ SNOW/ICE ☐ ARTIFICIAL  ☐ FOG | ☐ POLICE CAR ☐ FOOT  ☐ BICYCLE ☐ MOTORCYCLE/PAPV  ☐ SQUADROL  ☐ SQUAD/PLATOON ☐ VAN/BUS Other: | ☐ ALONE ☐ WITH PARTNER | ☐ YES  ☐ NO | ☐ INDOOR ☐ OUTDOOR |

## INVOLVED MEMBER

| RANK | LAST NAME | FIRST NAME | | EMPLOYEE NO. | WATCH | SEX ☐ M ☐ F | RACE | AGE | HT. | WT. |
|---|---|---|---|---|---|---|---|---|---|---|

| DATE OF APPT. | UNIT & BEAT OF ASSIGN. | DUTY STATUS ☐ ON  ☐ OFF | IN UNIFORM? ☐ YES  ☐ NO | TYPE OF MEMBER INJURY ☐ None / None Apparent ☐ Minor Swelling  ☐ Minor Contusion/Laceration ☐ Complaint of Substantial Pain ☐ Significant Contusion | ☐ Laceration Requiring Sutures ☐ Broken/Fractured Bone(s) ☐ Heart Attack/Stroke/Aneurysm | ☐ Gun Shot ☐ Fatal ☐ Other (Explain) |
|---|---|---|---|---|---|---|

## SUBJECT INFORMATION

☐ DNA

| LAST NAME | FIRST NAME | M.I. | SEX ☐ M ☐ F | RACE | D.O.B. | HT. | WT. |
|---|---|---|---|---|---|---|---|

| ADDRESS | TELEPHONE NO. | CONDITION  ☐ UNK ☐ Apparently Normal ☐ Injured by Member | ☐ Injured Not by the Member's Force ☐ Alleges Injury by Member ☐ Under Influence of Alcohol | ☐ Under Influence of Drugs ☐ Mental Illness / Emotional Disorder | ☐ Other (Specify) | ☐ Disability (Describe) |
|---|---|---|---|---|---|---|

| MEDICAL TREATMENT? ☐ Refused Medical Aid | ☐ Performed by Member ☐ Offered/EMS Requested | ☐ Taken to Hospital (Specify) ☐ Performed by CFD EMS | ☐ OTHER (Specify) | SUBJECT INJURY BY MEMBER'S USE OF FORCE? ☐ None/Non Apparent  ☐ Non-Fatal - Minor Injury  ☐ UNK ☐ Subject Alleged Injury  ☐ Non-Fatal - Major Injury  ☐ Fatal |
|---|---|---|---|---|

## SUBJECT'S ACTIONS (Check all that apply)

☐ DNA
☐ UNK

| | | | WAS SUBJECT ARMED WITH WEAPON? ☐ NO  ☐ YES, DESCRIBE BELOW: |
|---|---|---|---|
| ☐ DID NOT FOLLOW VERBAL DIRECTION ☐ UNABLE TO UNDERSTAND VERBAL DIRECTION ☐ VERBAL THREATS ☐ STIFFENED (DEAD WEIGHT) ☐ PULLED AWAY ☐ FLED ☐ IMMINENT THREAT OF BATTERY - NO WEAPON ☐ PHYSICAL OBSTRUCTION | ☐ PHYSICAL ATTACK WITHOUT WEAPON. (SPECIFY) ☐ HAND/ARM/ELBOW STRIKE ☐ KNEE/LEG STRIKE ☐ MOUTH/TEETH/SPIT ☐ PUSH/SHOVE/PULL ☐ GRAB/HOLD/RESTRAIN ☐ WRESTLE/GRAPPLE ☐ OTHER (DESCRIBE) | ☐ THROWN OBJECT (DESCRIBE) ☐ IMMINENT THREAT OF BATTERY WITH WEAPON ☐ ATTEMPT TO OBTAIN MEMBER'S WEAPON ☐ PHYSICAL ATTACK  WITH WEAPON ☐ USED FORCE LIKELY TO CAUSE DEATH OR GREAT BODILY HARM ☐ OTHER (DESCRIBE) | ☐ BLUNT OBJECT (DESCRIBE)  ☐ KNIFE/CUTTING INSTRUMENT ☐ CHEMICAL WEAPON  ☐ SEMI-AUTO PISTOL  ☐ SHOTGUN ☐ TASER/STUN GUN  ☐ REVOLVER  ☐ EXPLOSIVE DEVICE ☐ VEHICLE  ☐ RIFLE  ☐ OTHER (DESCRIBE) |

WEAPON/OBJECT PERCEIVED AS: _____

| WEAPON USE: |
|---|
| ☐ DNA  ☐ Used - Attempt to Attack Member  ☐ Obtained Member's Weapon ☐ Possessed  ☐ Used - Attacked Member  ☐ Member at Gunpoint ☐ Displayed, Not Used  ☐ Member Shot/Shot At |

| DID THE SUBJECT COMMIT AN ASSAULT OR BATTERY AGAINST THE INVOLVED MEMBER PERFORMING A POLICE FUNCTION?  ☐ NO  ☐ YES | SUBJECT ACTIVITY Drug-Related? ☐ YES  ☐ NO | Gang-Related? ☐ YES  ☐ NO |
|---|---|---|

| TYPE OF ACTIVITY ☐ Ambush - No Warning  ☐ Disturbance - Domestic  ☐ Person with a Gun  ☐ Disturbance - Riot/Mob Action/Civil Disorder  ☐ Disturbance - Other  ☐ Processing/Transporting/Guarding Arrestee ☐ Traffic Stop  ☐ Investigatory Stop  ☐ Mental Health Related Incident  ☐ Other - Describe in Narrative  ☐ Pursuing/Arresting Subject |
|---|

## MEMBER 'S RESPONSE (Check all that apply)

☐ DNA
☐ UNK

| REASON FOR RESPONSE? ☐ Defense of Self ☐ Defense of Department Member | ☐ Defense of Member of Public ☐ Overcome Resistance or Aggression ☐ Stop Self-Inflicted Harm | ☐ Fleeing Subject ☐ Subject Armed with Weapon ☐ Unintentional | ☐ Other (Describe) | ☐ Ordered by Supervisor Name _____ Star No. _____ |
|---|---|---|---|---|

| FORCE MITIGATION EFFORTS | CONTROL TACTICS |
|---|---|
| ☐ MEMBER PRESENCE  ☐ ZONE OF SAFETY  ☐ MOVEMENT TO AVOID ATTACK  ☐ TACTICAL POSITIONING  ☐ NONE ☐ VERBAL DIRECTION/ CONTROL TECHNIQUES  ☐ SPECIALIZED UNITS  ☐ ADDITIONAL UNIT MEMBERS  ☐ OTHER | ☐ ESCORT HOLDS  ☐ CONTROL INSTRUMENT  ☐ HANDCUFFS/PHYSICAL RESTRAINTS ☐ WRISTLOCK  ☐ PRESSURE SENSITIVE AREAS ☐ ARMBAR |

| RESPONSE WITHOUT WEAPONS | RESPONSE WITH WEAPON USE |
|---|---|
| ☐ OPEN HAND STRIKE  ☐ KICKS ☐ TAKE DOWN  ☐ PUSH/PHYSICAL REDIRECTION ☐ ELBOW STRIKE  ☐ OTHER ☐ CLOSED HAND STRIKE/ PUNCH ☐ KNEE STRIKE | ☐ OC/CHEMICAL WEAPON  ☐ TASER  ☐ LESS LETHAL SHOTGUN (DESCRIBE BELOW)  ☐ REVOLVER  ☐ SEMI-AUTO PISTOL ☐ OC/CHEMICAL WEAPON W/ AUTHORIZATION*  ☐ CANINE  ☐ RIFLE  ☐ SHOTGUN ☐ LRAD W/ AUTHORIZATION*  ☐ BATON/EXPANDABLE BATON  ☐ OTHER IMPACT MUNITIONS (DESCRIBE BELOW)  ☐ OTHER *AUTHORIZED BY (NAME) _____ RANK _____ STAR NO. _____ UNIT NO. _____ |

| WAS ANY REPORTABLE FORCE USED AGAINST THE SUBJECT WHILE HANDCUFFED OR OTHERWISE IN PHYSICAL RESTRAINTS? ☐ NO  ☐ YES  IF YES, DESCRIBE SUBJECT'S ACTIONS AND MEMBER'S RESPONSE IN THE NARRATIVE SECTION. | INVOLVED IN A PURSUIT? ☐ NO  ☐ FOOT ☐ VEHICLE  ☐ OTHER |
|---|---|

## WEAPON USE

☐ DNA

| WEAPON TYPE: ☐ CHEMICAL WEAPON  ☐ SEMI-AUTO PISTOL  ☐ SHOTGUN ☐ TASER  ☐ REVOLVER  ☐ OTHER ☐ RIFLE | NO. OF DISCHARGES OF THE WEAPON. | WEAPON SERIAL NO. | WEAPON CERT. NO. |
|---|---|---|---|

| DID THIS WEAPON CONTRIBUTE TO A SUBJECT INJURY? ☐ YES  ☐ NO  ☐ UNK | DID THE DISCHARGE RESULT IN A SELF-INFLICTED INJURY? ☐ NO  ☐ YES-SUBJECT  ☐ YES-MEMBER | WAS SUBJECT VEHICLE USE AS A WEAPON? ☐ NO  ☐ YES - AGAINST MEMBER  ☐ YES - AGAINST OTHER PERSON |
|---|---|---|

| WAS DISCHARGE ONLY TO DESTROY/DETER AN ANIMAL? ☐ YES  ☐ NO | WAS THIS AN UNINTENTIONAL DISCHARGE DURING A NON-CRIMINAL INCIDENT? ☐ YES  ☐ NO | PERSON/OBJECT(S) STRUCK BY THE DISCHARGE OF MEMBER'S WEAPON (CHECK ALL THAT APPLY): ☐ SUBJECT  ☐ DEPARTMENT MEMBER  ☐ ANIMAL  ☐ NONE  ☐ OTHER OBJECT ☐ OTHER PERSON  ☐ VEHICLE  ☐ UNKNOWN |
|---|---|---|

| TASER USE ONLY | TASER CARTRIDGE ID NO.(S) | PROPERTY INVENTORY NO. | CARTRIDGES DISCHARGED ☐ 1  ☐ 2  ☐ DNA ☐ OTHER | ADDITIONAL ENERGY CYCLES ☐ TRIGGER  ☐ OTHER ☐ ARC  ☐ OTHER | CONTACT STUN ☐ 1  ☐ 2  ☐ DNA ☐ OTHER | SPARK DISPLAY ☐ 1  ☐ 2  ☐ DNA ☐ OTHER |
|---|---|---|---|---|---|---|

| FIRAM DISCHARGE ONLY | WHO FIRED FIRST SHOT? ☐ MEMBER  ☐ OTHER (Specify) ☐ OFFENDER | TOTAL NO. OF SHOTS MEMBER FIRED | WAS FIREARM RELOADED DURING INCIDENT? ☐ YES  ☐ NO | MAKE/ MANUFACTURER | MODEL | DID MEMBER FIRE AT A VEHICLE? ☐ NO  ☐ YES |
|---|---|---|---|---|---|---|

## NOTIFICATIONS AND NARRATIVE

**NOTIFICATIONS (ALL INCIDENTS):** ☐ IMMEDIATE SUPERVISOR ☐ DISTRICT OF OCCURRENCE **NOTIFICATIONS (WEAPONS DISCHARGE AND DEADLY FORCE):** ☐ OEMC ☐ CPIC

VIEWED BEFORE COMPLETING REPORT: ☐ BWC ☐ IN-CAR VIDEO ☐ OTHER ☐ NONE

**NARRATIVE** (DESCRIBE WITH SPECIFICITY, (1) THE USE OF FORCE INCIDENT, (2) THE SUBJECT'S ACTIONS OR OTHER CIRCUMSTANCES NECESSITATING THE FORCE USED, AND (3) THE INVOLVED MEMBER'S RESPONSE, INCLUDING FORCE MITIGATION EFFORTS AND SPECIFIC TYPES AND AMOUNT OF FORCE USED. THE INVOLVED MEMBER **WILL NOT COMPLETE THE NARRATIVE SECTION** FOR ANY FIREARM DISCHARGE INCIDENTS (WITH OR WITHOUT INJURY) OR IN ANY USE OF FORCE INCIDENTS RESULTING IN DEATH.)

| REPORTING MEMBER (Print Name) | RANK/TITLE CODE | STAR/EMPLOYEE NO. | SIGNATURE |
|---|---|---|---|
| | | | |

## REVIEWING SUPERVISOR

**TYPE OF SUBJECT INJURY**
☐ None / None Apparent
☐ Minor Swelling
☐ Minor Contusion
☐ Minor Laceration/Abrasion
☐ Complaint of Substantial Pain
☐ Significant Contusion
☐ Laceration Requiring Sutures
☐ Broken/Fractured Bone(s)
☐ Potential Life-Threatening
☐ Gun Shot ☐ Other (Explain)
☐ Fatal

**INJURY LOCATION**
☐ Leg: ☐ Left ☐ Right
☐ Arm: ☐ Left ☐ Right
☐ Head/Neck
☐ Torso
☐ Back
☐ Other (Describe)

**WITNESSES** ☐ UNK

| | LAST NAME | FIRST NAME | M.I. | SEX ☐ M ☐ F | RACE | DATE OF BIRTH |
|---|---|---|---|---|---|---|
| | ADDRESS | | TELEPHONE NO. | WITNESS INTERVIEW ☐ INTERVIEWED ☐ NOT AVAILABLE ☐ REFUSED | ☐ OTHER (Specify) | |
| | WITNESS STATEMENT | | | | ☐ ADDITIONAL WITNESSES | |

**REVIEWING SUPERVISOR: COMMENTS** (DOCUMENT ANY OTHER INCIDENT INFORMATION, OBSERVATIONS OR OTHER ACTIONS TAKEN, INCLUDING EFFORTS AND NEGATIVE RESULTS TO IDENTIFY AND INTERVIEW WITNESSES, THAT ARE NOT ALREADY CAPTURED IN TRR FIELDS.)

SUPERVISOR ON-SCENE RESPONSE? ☐ NO ☐ YES   EVIDENCE TECHNICIAN? ☐ NOTIFIED ☐ RESPONDED ☐ DNA

**ATTACHMENTS:** ☐ CASE REPORT ☐ ARREST REPORT ☐ SUPPLEMENTARY REPORT ☐ INVENTORY ☐ IOD REPORT ☐ TASER DOWNLOAD ☐ OTHER

**REVIEWING SUPERVISOR:**
☐ I HAVE COMPLIED WITH THE DUTIES OUTLINED IN G03-02-02.
☐ I DID NOT USE REPORTABLE FORCE OR ORDER THE USE OF REPORTABLE FORCE DURING THIS INCIDENT.
☐ LOG NUMBER OBTAINED FROM THE CIVILIAN OFFICE OF POLICE ACCOUNTABILITY (COPA).   **LOG NO. OBTAINED.**

☐ I HAVE REVIEWED THIS TACTICAL RESPONSE REPORT AND AFFIRM THAT THE REPORT IS LEGIBLE AND COMPLETE.

| REVIEWING SUPERVISOR NAME (Print) | RANK/TITLE CODE | STAR NO. | SIGNATURE | DATE/TIME COMPLETED |
|---|---|---|---|---|
| | | | | |

**DISTRIBUTION OF TRR:** IF A PAPER TRR WAS COMPLETED DUE TO AN UNAVAILABILITY OF THE AUTOMATED TACTICAL RESPONSE REPORT APPLICATION:
1. THE ORIGINAL TRR WILL BE FORWARDED TO DIRECTOR, ADMINISTRATIVE SUPPORT DIVISION - TO BE INCLUDED WITH THE CORRESPONDING CASE FILE.
2. A COPY OF THE PAPER TRR AND THE ATTACHMENTS WILL BE FORWARDED TO:
   A. THE INVESTIGATING SUPERVISOR RESPONSIBLE FOR THE INVESTIGATION,
   B. CIVILIAN OFFICE OF POLICE ACCOUNTABILITY (COPA), and
   C. DEPUTY CHIEF, STRATEGIC INITIATIVES DIVISION, TO ENSURE DATA ENTRY AND ATTACHMENT SCANNING INTO THE AUTOMATED TACTICAL RESPONSE REPORT (A-TRR) APPLICATION.

# **Exhibit F**



**ROGER BALDWIN FOUNDATION OF ACLU, INC.**
150 N. MICHIGAN AVENUE
SUITE 600
CHICAGO, ILLINOIS 60601-7570
(312) 201-9740
FAX (312) 201-9760
WWW.ACLU-IL.ORG

March 6, 2024

<u>***Via Email***</u>

Chicago Police Department
Attn: Freedom of Information Officer
Records Division, Unit 163
3510 S. Michigan Ave.
Chicago, IL 60653
FOIA@ChicagoPolice.org

**Re:     FOIA Request for CPD Training Materials**

Dear Freedom of Information Officer:

This is a request under the Illinois Freedom of Information Act to the Chicago Police Department (CPD).  For the period **2020-present**, please provide:

1. All **training materials** covering or relating to **coordinated multiple arrests** and CPD's policy titled **"Response to Crowds, Protests, and Civil Disturbances" (Special Order S06-06).**  This includes but is not limited to training curricula, lesson plans, scripts, slides, PowerPoint presentations, handouts, videos, and any other documents contained in the training modules.

Please email the requested materials to ablock@aclu-il.org or mail them to: Alexandra K. Block, Roger Baldwin Foundation of ACLU, Inc., 150 N. Michigan Ave., Ste. 600, Chicago, IL 60601.

As you know, the Illinois FOIA requires that you make available for inspection and copying all public records, except certain exempt records, within five business days of receipt of a written request.

If you determine that portions of the requested records are exempt from the Act, we expect that you will delete such exempted material and send copies of the remaining non-exempt material within five working days. Also, if all or any part of this request is denied, please provide in writing the specific exemption(s) under the Act on which you rely to withhold the records, and provide the name, title, and address of the individual to whom we may appeal this determination.

We request that documents be provided in electronic format if at all possible to eliminate the need to copy the materials. If necessary, we are prepared to pay reasonable copying costs for reproducing the requested materials, but request that you waive any such fees under the

provision of FOIA that authorizes you to waive copying fees when release of requested information is "in the public interest." In compliance with section 6(c) of the amended FOIA, I represent to you that the documents are sought to determine information concerning the legal rights of the general public and this request is not for the purpose of personal or commercial benefit. Accordingly, a waiver of fees is in the public interest as defined by section 6(c).

If you deny the request for waiver, please notify me before compiling records for which the copying charge will exceed $50.00 so that we can discuss narrowing the request to cover only the information I seek.

Please contact me at (312) 201-9740, ext. 340, or via email at ablock@aclu-il.org if you have any questions regarding this request. Thank you for your prompt attention.

Sincerely,

*/s/ Alexandra K. Block*

Alexandra K. Block
Director, Criminal Legal System & Policing Project

| | |
|---|---|
| **From:** | Chicago Public Safety <chicagops@govqa.us> |
| **Sent:** | Thursday, March 14, 2024 9:53 AM |
| **To:** | Alexandra Block |
| **Subject:** | Non-Commercial Police FOIA Request :: P925674-030624 |

--- ---



### CHICAGO POLICE DEPARTMENT
CITY OF CHICAGO

03/14/2024

Senior Supervising Attorney Alexandra K. Block
ABlock@aclu-il.org

RE: FOIA REQUEST of March 06, 2024, Reference # P925674-030624

Dear Alexandra K.:

The Chicago Police Department is in receipt of your Freedom of Information Act (FOIA) request. On March 06, 2024, the following request was received.

*This is a request under the Illinois Freedom of Information Act to the Chicago Police Department (CPD). For the period 2020-present, please provide:*
*1. All training materials covering or relating to coordinated multiple arrests and CPD's policy titled "Response to Crowds, Protests, and Civil Disturbances" (Special Order S06-06). This includes but is not limited to training curricula, lesson plans, scripts, slides, PowerPoint presentations, handouts, videos, and any other documents contained in the training modules.*

Under the Freedom of Information Act, a public body may extend the time to respond to a FOIA request by up to 5 business days for a limited number of reasons. 5 ILCS 140/3(e). We are extending the time to respond to your request by 5 business days for the following reason(s):

The requested records, if any exist, may require examination and evaluation by personnel having the necessary competence and discretion to determine if they are exempt from disclosure under Section 7 of the Freedom of Information Act or should be
The request for records cannot be complied with by the public body within the time limits prescribed by paragraph (c) of this Section without unduly burdening or interfering with the operations of the public body;

If you have any questions, please contact our office at 312-745-5308 or at the following address:

Chicago Police Department
Attention: Freedom of Information Officer
Office of Legal Affairs, Unit 114
3510 S. Michigan Ave.
Chicago, IL 60653

Sincerely,

**S. Haynes**
Freedom of Information Officer
Chicago Police Department

| | |
|---|---|
| **From:** | Chicago Public Safety <chicagops@govqa.us> |
| **Sent:** | Thursday, March 21, 2024 2:00 PM |
| **To:** | Alexandra Block |
| **Subject:** | Non-Commercial Police FOIA Request :: P925674-030624 |

--- ---



CHICAGO POLICE DEPARTMENT
CITY OF CHICAGO

03/21/2024

Senior Supervising Attorney Alexandra K. Block
ABlock@aclu-il.org

RE: FOIA REQUEST of March 06, 2024, Reference # P925674-030624

Dear Alexandra K.:

The Chicago Police Department is in receipt of your Freedom of Information Act (FOIA) request. On March 06, 2024, the following request was received.

*This is a request under the Illinois Freedom of Information Act to the Chicago Police Department (CPD). For the period 2020-present, please provide:*
*1. All training materials covering or relating to coordinated multiple arrests and CPD's policy titled "Response to Crowds, Protests, and Civil Disturbances" (Special Order S06-06). This includes but is not limited to training curricula, lesson plans, scripts, slides, PowerPoint presentations, handouts, videos, and any other documents contained in the training modules.*

Under the Freedom of Information Act, a public body may extend the time to respond to a FOIA request by up to 5 business days for a limited number of reasons. 5 ILCS 140/3(e). We are extending the time to respond to your request by 5 business days for the following reason(s):

The requested records, if any exist, may require examination and evaluation by personnel having the necessary competence and discretion to determine if they are exempt from disclosure under Section 7 of the Freedom of Information Act or should be
The request for records cannot be complied with by the public body within the time limits prescribed by paragraph (c) of this Section without unduly burdening or interfering with the operations of the public body;

If you have any questions, please contact our office at 312-745-5308 or at the following address:

Chicago Police Department
Attention: Freedom of Information Officer
Office of Legal Affairs, Unit 114
3510 S. Michigan Ave.
Chicago, IL 60653

Sincerely,

**S. Haynes**
Freedom of Information Officer
Chicago Police Department

---

**From:** Chicago Public Safety <chicagops@govqa.us>
**Sent:** Thursday, March 28, 2024 1:01 PM
**To:** Alexandra Block
**Subject:** Non-Commercial Police FOIA Request :: P925674-030624

--- ---



## CHICAGO POLICE DEPARTMENT
### CITY OF CHICAGO

03/28/2024

Senior Supervising Attorney Alexandra K. Block
ABlock@aclu-il.org

RE: FOIA REQUEST of March 06, 2024, Reference # P925674-030624

Dear Alexandra K.:

The Chicago Police Department is in receipt of your Freedom of Information Act (FOIA) request. On March 06, 2024, the following request was received.

*This is a request under the Illinois Freedom of Information Act to the Chicago Police Department (CPD). For the period 2020-present, please provide:*
*1. All training materials covering or relating to coordinated multiple arrests and CPD's policy titled "Response to Crowds, Protests, and Civil Disturbances" (Special Order S06-06). This includes but is not limited to training curricula, lesson plans, scripts, slides, PowerPoint presentations, handouts, videos, and any other documents contained in the training modules.*

Under the Freedom of Information Act, a public body may extend the time to respond to a FOIA request by up to 5 business days for a limited number of reasons. 5 ILCS 140/3(e). We are extending the time to respond to your request by 5 business days for the following reason(s):

The requested records, if any exist, may require examination and evaluation by personnel having the necessary competence and discretion to determine if they are exempt from disclosure under Section 7 of the Freedom of Information Act or should be
The request for records cannot be complied with by the public body within the time limits prescribed by

paragraph (c) of this Section without unduly burdening or interfering with the operations of the public body;

**There is need for consultation, which shall be concluded with all practicable speed, with another public body or among two or more components of a public body having a substantial interest in the determination or in the subject matter of the request.**

If you have any questions, please contact our office at 312-745-5308 or at the following address:

Chicago Police Department
Attention: Freedom of Information Officer
Office of Legal Affairs, Unit 114
3510 S. Michigan Ave.
Chicago, IL 60653

Sincerely,

**S. Haynes**
Freedom of Information Officer
Chicago Police Department

---

**Brandon Johnson**
Mayor

**Department of Police · City of Chicago**
3510 S. Michigan Avenue · Chicago, Illinois 60653

**Larry Snelling**
Superintendent of Police

April 8, 2024

**Alexandra K. Block**
**ABlock@aclu-il.org**

RE:     **NOTICE OF RESPONSE TO FOIA REQUEST**
          **FOIA FILE NO.:  P925674**

Dear Alexandra K. Block,

The Chicago Police Department (CPD) is in receipt of your Freedom of Information Act (FOIA) request for the following:

> This is a request under the Illinois Freedom of Information Act to the Chicago Police
> Department (CPD). For the period 2020-present, please provide:
> 1. All training materials covering or relating to coordinated multiple arrests and
> CPD's policy titled "Response to Crowds, Protests, and Civil Disturbances"
> (Special Order S06-06). This includes but is not limited to training curricula, lesson
> plans, scripts, slides, PowerPoint presentations, handouts, videos, and any other
> documents contained in the training modules.

It is necessary to extend the time for response as permitted by 5 ILCS 140/3(e). Responsive records consisting of three discs have been located; the records go through a process of review, redaction, and internal approval. Therefore, **a response or an update** will be sent to you on or before 5 business days from the date of this letter.

We are extending the time to respond or update your request by 5 business days for the following reasons:

- In order to determine whether the requested records are exempt under Section 7 of FOIA or must be redacted in part before they are disclosed, we must have the documents reviewed by the internal review personnel.
- We cannot comply with the request for records within the 5 business day time limit without unduly burdening or interfering with our operations.
- **There is need for consultation, which shall be concluded with all practicable speed, with another public body or among two or more components of a public body having a substantial interest in the determination or in the subject matter of the request**.

The public body asserts the following facts in support of the above reasons for an extension of time:
Responsive records consist of three discs, and these records go through a process of review, redaction, and internal approval.

We will respond or update your request by April 15, 2024.

Please feel free to contact me should you have any questions or concerns. I can be reached at 312-745-5308, or by replying to the email you received this letter, and at the following address: Chicago Police Department Attention: Freedom of Information Office of Legal Affairs, Unit 114, 3510 S. Michigan Avenue, Chicago, IL 60653, foia@chicagopolice.org.

Sincerely,

S. Haynes
Freedom of Information Officer
Chicago Police Department
Office of Legal Affairs, Unit 114