**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 17-cv-6260 |
| v. | ) | |
| | ) | Judge Rebecca Pallmeyer |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**THE CITY OF CHICAGO'S RESPONSE TO THE COMMUNITY COALITION'S**
**NOTICE OF INTENT TO INITIATE ENFORCEMENT PROCEEDINGS**

Defendant City of Chicago, by and through one of its attorneys, Jennifer K. Bagby, Deputy Corporation Counsel, respectfully submits the City of Chicago's (City) Response to the Community Coalition (Coalition) Notice of Intent to Initiate Enforcement Proceedings.

**BACKGROUND**

In Consent Decree Reporting Period 9 (IMR-9), (July 1 to December 31, 2023) the City and the Chicago Police Department (CPD) began working collaboratively with the Independent Monitoring Team (IMT) and the Office of Illinois Attorney General (OAG) regarding CPD policies and trainings relating to preparations for the upcoming Democratic National Convention (DNC). Among the policies involved in this collaborative work is CPD's Coordinated Multiple Arrest (CMA) suite of orders and related forms for operations in the event that large scale multiple arrest events were necessary during the DNC. CPD initially began technical assistance work with members of the IMT under Consent Decree paragraph 656. Technical assistance was sought from the IMT, in part, because members of the IMT have extensive professional experience with managing law enforcement operations during other National Conventions and other large scale national events. Prior to beginning technical assistance, CPD did extensive research into best

practices and considered reports by the IMT, Office of Inspector General (OIG), and CPD on the civil unrest of 2020.[1]  This research informed the initial draft of the CMA suite that was initially provided to the IMT at the beginning of the technical assistance.  Following technical assistance work with the IMT, the City and CPD formally produced the draft policy suite to the IMT and OAG for their review and comment on September 20, 2023, initiating the required consent decree review process.  Thereafter, CPD had numerous collaborative discussions with the IMT and OAG to discuss the suite of policies and revisions made to the policy drafts based upon these discussions. In addition to these discussions, a demonstration of a CMA incident was conducted for the IMT and OAG to identify the practical operational issues involved in managing such incidents and to work collaboratively on solutions.  As a result of these efforts the City and CPD ultimately received formal no objection notices on the policy suite from the OAG on January 26, 2024, and from the IMT on January 29, 2024.

As required by Consent Decree paragraph 633, CPD posted the draft suite of policies for member and public comment on February 13, 2024.  On February 26, 2024, the Coalition requested that CPD extend the public posting for an additional two weeks to allow for "meaningful input." CPD agreed to this request and the posting was extended to March 13, 2024.  At the March 12,

---

[1] The following materials were part of CPD's best practices research and informed the initial draft:

Independent Monitoring Team Report – The City of Chicago's and the Chicago Police Department's Responses to Protests and Unrest Under the Consent Decree;
Chicago Office of the Inspector General Report - Chicago's Response to George Floyd Protests and Unrest;
Chicago Police Department After-Action Report-The Chicago Police Department's Response to Civil Unrest Between May 29, 2020 and June 12, 2020;
Charlotte, NC Police Department – DNC Operation Plan (2012);
Department of Homeland Security – Field Force Operations Instructor Guide;
Major City Chiefs (MCC) – Report on the 2020 Protests and Civil Unrest;
Philadelphia, PA Police Department policy – Demonstrations, Labor Disputes, and Civil Disturbances;
The Police Executive Research Forum (PERF) - The Police Response to Mass Demonstrations (2018);
U.S. Department of Justice, National Police Institute (NPI) – 21st Century Protest Response - Promoting Democracy and Advancing Community and Officer Safety (2022);
International Association of Chiefs of Police (IACP) – Crowd Management (2019)

2024, monthly status hearing before this Court, Coalition representatives expressed concerns with the policy suite. Many of the statements made by the Coalition representatives regarding the policy suite were inaccurate and misleading. At the same hearing, Coalition representatives indicated their intent to file a motion to enforce the Consent Decree regarding the draft policy suite. In the City's closing remarks, it was pointed out that any motion to enforce would not be proper under the circumstances described by the Coalition based upon the requirements of the Consent Decree.

On March 13, 2024, the Coalition filed a Notice of Intent to Initiate Enforcement Proceedings (Notice) and a letter detailing the Coalition's concerns with the draft policy suite. (*See* ECF Dkt. No. 1156 and 1156-1). The Coalition's letter also demanded a response from the City and CPD within seven days. On March 21, 2024, this Court entered an order directing the City to respond to the Coalition's Notice and letter within 30 days, making the City's response due April 20, 2024. (*See* ECF Dkt. No. 1157). Subsequently, without waiting for the City to file its response in the time allotted by this Court, the Coalition filed a Motion to Enforce (MTE). (*See* ECF Dkt. No. 1159). Below, the City provides its responses to the issues raised in the initial Notice. This does not constitute the City's response to the subsequently filed MTE. The City will respond to the MTE in a separate filing at the direction of this Court.

## ENFORCEMENT OF THE CONSENT DECREE

The Coalition's enforcements rights are set forth in Consent Decree paragraph 709(a) which states:

> Notwithstanding any other provision of this Consent Decree, the Consent Decree is enforceable by the Court upon a motion by the Coalition subject to the conditions in subparagraphs (a) through (b) herein. Prior to filing any enforcement motion the Coalition will (i) meet and confer in good faith with the Parties to attempt to resolve issues identified by the Coalition without the need for intervention by the Court, and (ii) follow the prerequisites for filing enforcement motions required of the State set forth above.

Based upon the plain language of 709(a), the Coalition must meet and confer with the Parties and must follow the same procedural steps required for any enforcement action by the OAG, which are set forth in Consent Decree paragraph 695.   Among other things, Paragraph 695 requires that the City be given notice in writing of the Consent Decree provisions for which Court enforcement will be sought prior to the initiation of any enforcement proceedings.  While the Notice and letter filed by the Coalition on March 13, 2024, has arguably provided the necessary written notice to the City required by paragraph 695, the fact that it was filed on the Court docket appears to push the bounds of paragraph 695 by seeking Court involvement before providing the required notice to the City. Moreover, the remainder of the provisions have been ignored by the Coalition. Regardless of the Coalition's failure to comply with the requirements of paragraph 695, the City provides responses to the Coalition's concerns below.

### RESPONSE TO COALITION CONCERNS

The draft suite of policies at issue involves CPD's processes and procedures for coordinated multiple arrest (CMA) events.  This suite of policies will collectively be referred to as the "CMA suite" and contains the following individual policies:  (1) S06-06X – Response to Crowds, Protests, and Civil Disturbances; (2) S06-06-01XX – Declaration of a Coordinated Multiple Arrest Incident; (3) S06-06-02XX – Alternate Arrest Procedures During Coordinated Multiple Arrest Incidents; and (4) S06-06-03XX – Alternate Tactical Response Reporting During Coordinated Multiple Arrest Incidents.  The CMA suite that was posted for public comment is attached to this Response as Exhibit A.  The Coalition's concerns regarding the CMA suite fall into four general categories: (1) First Amendment rights and CPD's existing First Amendment policy; (2) CPD's use of force reporting and review; (3) providing legally required disability and

language accommodations; and (4) community engagement. The City's response to these concerns are as follows:

### 1. *First Amendment Concerns*

The City and CPD disagree with the Coalition's over-arching comment that the draft policy "eviscerates protections required by the First Amendment, the Consent Decree, and CPD's existing First Amendment policy." To the contrary, the draft CMA suite is linked to the existing First Amendment policy (G02-02) and contains language throughout which was taken directly from the First Amendment policy[2]. Regarding S06-06X – Response to Crowds, Protests, and Civil Disturbances, the City and CPD point to the following portions of the S06-06X draft for express references and citations to the First Amendment policy:

> ***III-D***: *The Chicago Police Department recognizes that many people within a crowd will be engaged in lawful behavior while others within that same crowd might be engaged in unlawful activities. The Department's goal is to protect lawful behavior while identifying and isolating unlawful activities. During response to crowds, protests, or civil disturbances, Department members will maintain their duty to preserve order and protect life and property, with the understanding of the requirement to protect persons' First Amendment rights in accordance with the* ***Department directive titled "First Amendment Rights."***

> ***III-E***: *The Chicago Police Department seeks to gain the voluntary compliance of individual persons and crowds, when consistent with personal safety. The Department's response to crowds, protests, and civil disturbances will seek to:*
>
> > ***1***. *obtain cooperation and voluntary compliance to lawful direction and orders with minimal Department response or enforcement actions.*
> >
> > ***2***. *isolate specific individuals engaged in unlawful activity for specific enforcement actions, such as citations or arrest for specific offenses, while separating those engaged in lawful behavior and activities, including a First Amendment assemblies, to allow those lawful activities to continue.*

> ***III-I***: *Any response by Department members to a First Amendment Assembly, including crowd management and crowd dispersal orders, will be consistent with the* ***Department directive titled "First Amendment Rights."***

> ***III-K***: *Department members will not:*

---

[2] A copy of the First Amendment Policy is attached to this Response for reference as Exhibit B.

> **1.** use language or take action intended to taunt or denigrate an individual, or use any racist or otherwise derogatory language.
>
> **2.** use force to punish, retaliate against, deter, or respond to the lawful expression of First Amendment rights (e.g., protected speech, lawful demonstrations, observing or filming police activity, or criticizing a Department member or conduct) consistent with the **Department directive titled "First Amendment Rights."**

*V-B.* *Field Commander.* The field commander on the scene of the incident will:

> **1.** will make every effort to identify the leaders of gathered crowds, protests, and civil disturbances in an attempt to establish a rapport and constant communication if feasible.
>
> **2.** when appropriate, ensure a Department member communicates clear expectations and potential consequences to persons on the scene of an incident involving crowds, protests, or civil disturbances, including by utilizing persuasion, advice, and warning.
>
> **3.** not issue a crowd dispersal order during a First Amendment Assembly unless three or more persons are committing acts of disorderly conduct in the immediate vicinity and those acts are likely to cause substantial harm (MCC 8-4-010(d)), consistent with the **Department directive titled, "First Amendment Rights."** Examples of behavior that may require a crowd dispersal order during a First Amendment assembly include, but are not limited to groups of individuals throwing objects, breaking windows, lighting fires, etc.

**NOTE:** *Department members will recognize a person as being compliant with a crowd dispersal order when they are no longer within sight or sound of the dispersal area and have otherwise complied with the specific directions provided in the dispersal order.*

> **4.** where appropriate, safe, and feasible, make efforts to identify and distinguish between people in a crowd engaged in lawful behavior and those engaged in unlawful activities, and:
>
> > **a.** ensure Department members on scene are aware of this information;
> >
> > **b.** coordinate efforts to separate those engaged in unlawful activities from those engaged in lawful behavior;
> >
> > **c.** consider isolating specific individuals engaged in unlawful activity for specific enforcement actions, such as citations or arrest for specific offenses, while separating those engaged in lawful behavior and activities, including a First Amendment assemblies, to allow those lawful activities to continue; and

**REMINDER:** *Department members will avoid containment or corralling tactics known as "kettling" and will provide specific egress directions for safe crowd dispersal.*

> ***d.** coordinate and communicate a plan to address the unlawful activities (e.g., additional warning, citation, or arrest).*

Beyond this broad accusation, the Coalition makes the following more specific claims related to the CMA suite and the First Amendment with which the City and CPD also disagree.

> ***(a.) The policy fails to make clear that protests trigger First Amendment protection and fails to distinguish between crowds, protests, and civil disturbances. (See ECF Dkt. No. 1156-1 at page 6)***

Contrary to the Coalition's assertions, CPD's CMA policy contains the above direct references to the existing First Amendment policy (G02-02). Additionally, Department members must follow the requirements of the First Amendment policy when carrying out the CMA policy, which makes clear the protections afforded under the First Amendment. Finally, the use of "crowds, protests, and civil disturbances" is consistent between the draft CMA policy suite and the existing First Amendment policy, which the Coalition was involved in developing.

Moreover, the Coalition's argument that the CMA suite modifies existing policies, such as the First Amendment policy, is incorrect. CPD sworn member are required to comply with all Department policies. CPD General Order G08-01 "Complaint and Disciplinary System," states:

> *All members will comply with the Rules and Regulations of the Chicago Police Department, directives, and orders. Members who fail to comply hinder the effective performance of the Department's functions. This failure to comply will be considered just cause for disciplinary action. Sworn members will be held strictly accountable for properly exercising the authority they have been given to protect the rights, lives, and property of all individuals.*

(G08-01 "Complaint and Disciplinary System," IV-C). Additionally, the City of Chicago Police Board Rules of Conduct mandate that officers must follow Department policies. (*See* Rules 3 and 6).

However, in consideration of the Coalition's purported concern about activities on the public way, CPD is evaluating additional or revised language to section III- I of S06-06X to ensure

that there is consistency between the First Amendment policy and the CMA policy regarding actions on the public way.

> **(b.) The policy fails to limit mass arrests of protesters to the narrow circumstances permitted under the First Amendment and contradicts CPD's First Amendment policy restrictions on arresting protesters. (See ECF Dkt No. 1156-1 at page 7 (IIIB) and 8 (IVA)** [3]

Contrary to the Coalition's assertions, and as demonstrated above, the CMA policy and the existing First Amendment policy are consistent, and the CMA policy provides specific references to the First Amendment policy as noted above. Additionally, the CMA policy makes clear that Department members must follow the requirements of the First Amendment policy. (*See* S06-06X III-D and III-I). Finally, in addition to all of the direct references to the First Amendment policy that are contained in the CMA policy, CPD is reviewing and evaluating potential revised or additional language for section III- I of S06-06X to ensure consistency between the two directives in terms of CPD enforcement actions.

> **(c.) The policy conflicts with provisions of CPD's First Amendment Policy that are essential for ensuring CPD's compliance with the Consent Decree and Constitution. (See ECF Dkt. No.1156-1 at page 7).**

In response to the Coalition's assertion that the CMA policy is in conflict with the requirements of Consent Decree paragraph 50, the City points to the following language in S06-06X – Response to Crowds, Protests, and Civil Disturbances, which more than addresses the guiding principle set out in Consent Decree paragraph 50:

> **III-A.** *A strong partnership with the public is essential for effective law enforcement. Inappropriate or excessive responses to crowds, protests, and civil disturbances can damage that partnership and diminish the public trust that is a cornerstone of policing in a free society. Department members will act:*
>
> > **1.** *with a high degree of ethics, professionalism, and respect for the public.*

---

[3] The Coalition has repeated the assertion regarding the arrest of protesters. These claims have been combined for purposes of the City's response.

    **2.** *in a manner that promotes trust between the Department and the communities that it serves."*

**III-F.** **Department** *members are reminded that their demeanor and the manner in which they act can serve to increase or reduce tensions during any response to crowds, protests, or civil disturbances. Therefore, it is important to develop the skills and abilities to display and exercise self-control and patience, especially under irritating or provoking conditions. All Department members will:*

    **1.** *act in accordance with the Constitution of the United States of America, including the First and Fourth Amendments, and will comply with the law and Department policy.*

    **2.** *treat all persons with the courtesy and dignity that is inherently due to every person and act, speak, and conduct themselves in a courteous, respectful, and professional manner, while also recognizing their obligation to safeguard life and property.*

    **3.** *maintain neutrality and objectivity at all times.*

    **4.** *use de-escalation techniques (e.g. continual communication, tactical positioning, and time as a tactic), consistent with the Department directive titled "<u>De-escalation, Response to Resistance, and Use of Force</u>" to prevent or reduce the need for force and to use minimum amount of force needed, unless doing so would place a person or a Department member in immediate risk of harm or de-escalation techniques would be clearly ineffective under the circumstances at the time."*

In response to the Coalition's assertion that the CMA policy is in violation of Consent Decree paragraph 163, which prohibits the use of force in retaliation for First Amendment activity, the City also disagrees and points to the language below from S06-06X – Response to Crowds, Protests, and Civil Disturbances:

**III-K.** *Department members will **not**:*

    **1.** *use language or take action intended to taunt or denigrate an individual, or use any racist or otherwise derogatory language.*

    **2.** *use force to punish, retaliate against, deter, or respond to the lawful expression of First Amendment rights (e.g., protected speech, lawful demonstrations, observing or filming police activity, or criticizing a Department member or conduct) consistent with the Department directive titled "<u>First Amendment Rights</u>."*

In response to the assertion that the CMA policy is in violation of Consent Decree paragraph 213, that prohibits the use of impact weapons to strike individuals in the head or neck

except where deadly force is justified, the City also disagrees with the Coalition's assertion. The draft CMA policy suite contains language and numerous hyperlinks referencing existing Response to Resistance and Use of Force polices. Additionally, the City points to the language below from S06-06-03X – Alternate Tactical Response Reporting During Coordinated Multiple Arrest Incidents:

> **II.** *DE-ESCALATION AND USE OF FORCE Department members will continue to respond to resistance or use force in accordance with G03-02, "De-escalation, Response to Resistance, and Use of Force," including:*
>
> > **A.** *Sanctity of Human Life. The Department's highest priority is the sanctity of human life. The concept of the sanctity of human life is the belief that all human beings are to be perceived and treated as persons of inherent worth and dignity, regardless of race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military status, immigration status, homeless status, source of income, credit history, criminal record, criminal history, or incarceration status. Department members will act with the foremost regard for the preservation of human life and the safety of all persons involved. A member's decision to use force will be made in accordance with G03-02, "De-escalation, Response to Resistance, and Use of Force."*
> >
> > **B.** *De-Escalation. Department members are required to use de-escalation techniques to prevent or reduce the need for force, unless doing so would place a person or a Department member in immediate risk of harm, or de-escalation techniques would be clearly ineffective under the circumstances at the time in accordance with G03-02, "De-escalation, Response to Resistance, and Use of Force." Department members will continually assess the situation and modify the use of force as circumstances change and in ways that are consistent with officer safety, including stopping the use of force when it is no longer necessary.*
> >
> > **C.** *Response to Resistance and Use of Force. As defined in G03-02, "De-escalation, Response to Resistance, and Use of Force":*
> >
> > > **1.** *Department members' use of force must be objectively reasonable, necessary, and proportional under the totality of the circumstances, including using the minimum amount of force needed under the circumstances.*
> > >
> > > **2.** *Department members will continually assess the necessity of the use of force and whether alternatives may be employed, including the use of de-escalation techniques, other response options, and the availability of other resources."*

Further, S06-06-03X – Alternate Tactical Response Reporting During Coordinated Multiple Arrest Incidents contains the following language regarding the utilization of a baton as an impact weapon:

> **II-B 2.** "*impact weapon strikes*
>
> **NOTE**: *A squad's coordinated use of batons held at "port arms" to push persons back or "rake" persons toward arrest teams will be reported on the Incident Response (CPD-11.302), and will not require the completion of a Tactical Response Report as long as the impact weapon is not used to apply mechanical impact to a person to disable elements of his or her musculoskeletal structure.*
>
> **V-C**
>
> *Any sworn Department member who becomes involved in an individual reportable use of force during a coordinated multiple arrest incident will complete a Tactical Response Report (TRR) (CPD-11-377), in addition to a numbered Coordinated Multiple Arrest Report (CPD-11.433), for the following types of force:*
>
> *V-C-3.* "*impact weapon strikes*"
>
> *NOTE: Department members are reminded that using an impact weapon to intentionally strike a person's head or neck is considered deadly force.*

Finally, in addition to all of the above language, CPD is reviewing the policy draft and evaluating whether additional or revised language to II-B-2 of S06-06-03X is necessary to ensure that there is consistency between all of the directives regarding baton use and the prohibition of impact strikes to the head or neck absent a justification for the use of deadly force.

> **(d.) The policy fails to protect protesters from unconstitutional or otherwise prohibited uses of force and fails to adequately prohibit retaliatory uses of force against protesters. (See ECF Dkt. No. 1156-1 at page 9).**

As was discussed above regarding consistency with Consent Decree paragraph 163 and 213, the CMA policy contains numerous references and hyperlinks to CPD's existing Use of Force policies. Additionally, the CMA policy contains the following express prohibition on retaliatory use of force:

> *use force to punish, retaliate against, deter, or respond to the lawful expression of First Amendment rights (e.g., protected speech, lawful demonstrations, observing or filming*

police activity, or criticizing a Department member or conduct) consistent with the Department directive titled "*First Amendment Rights*.

(*See* S06-06X – Response to Crowds, Protests, and Civil Disturbances, III-K(2)).

**(e.) The policy fails to adequately prohibit officers from unleashing canines against protestors. (See ECF Dkt. No. 1156-1 at page 10).**

The City disagrees with the Coalition's assertion and points to the following language from

S06-06-03X – Alternate Tactical Response Reporting During Multiple Arrest Incidents:

**V-C-4.** *Canines as a force option;*

> *NOTE: Department members are reminded that canine teams will **NOT** be used in response to crowds, protests, or civil disturbances, in adherence with the Department directive titled, "Canine Teams."*

The CMA policy is clear that canines are not to be used in response to crowds, protests, or civil disturbances and directs Department members to other relevant Department policy. The language that the Coalition complains of does not permit the use of a canine as a force option. Rather, it provides a necessary reporting mechanism if a canine is unintentionally involved in an incident.

**(f.) The policy fails to prohibit kettling. (ECF Dkt. No. 1156-1 at page 11).**

The City disagrees with the Coalition's assertion. As has repeatedly been stated, the First Amendment policy must be followed and contains the language cited by the Coalition as a prohibition on "kettling." Additionally, the City points to the following language from S06-06X – Response to Crowds, Protests, and Civil Disturbances:

*The Field Commander on the scene of the incident will*

**V-B-4.** *where appropriate, safe, and feasible, make efforts to identify and distinguish between people in a crowd engaged in lawful behavior and those engaged in unlawful activities, and:*

> ***a.*** *ensure Department members on scene are aware of this information;*
>
> ***b.*** *coordinate efforts to separate those engaged in unlawful activities from those engaged in lawful behavior;*

       c.    *consider isolating specific individuals engaged in unlawful activity for specific enforcement actions, such as citations or arrest for specific offenses, while separating those engaged in lawful behavior and activities, including a First Amendment assemblies, to allow those lawful activities to continue; and*

      ***REMINDER:*** *Department members will avoid containment or corralling tactics known as* ***"kettling"*** *and will provide specific egress directions for safe crowd dispersal.*

Contrary to the Coalition's comments, the CMA policy contains express language on "kettling."

### 2. *Use of Force Reporting and Review*

The Coalition claims that the CMA suite, specifically S06-06-03XX – Alternate Tactical Response Reporting During Coordinated Multiple Arrest Incidents, (1) violates the Consent Decree requirements for reporting and investigating reportable uses of force and (2) delays use of force reporting. Both assertions are baseless and inaccurate.

The CMA policy does not violate the Consent Decree requirements for reporting uses of force. The Consent Decree paragraph 219 requires that "[w]henever a CPD member engages in a reportable use of force, the member must complete a TRR, ***or a similar form of documentation CPD may implement***, prior to the end of his or her tour of duty . . . ***CPD may allow supervisors to complete the TRR for members*** who are unable to complete the report due to injury or ***in other extraordinary circumstances.***" (*See* Consent Decree paragraph 219, emphasis added). Paragraph 219 clearly allows for CPD to implement a form of documentation other than the TRR where necessary. CPD collaborated with the experienced IMT members through continued discussions and demonstrations of a CMA incident to confirm the unique and extraordinary circumstances that would be present when a coordinated multiple arrest is declared. As a result of this collaboration, CPD has drafted a Coordinated Multiple Arrest (CMA) Report to be used to document reportable uses of force in those limited and extraordinary circumstances.

Contrary to the Coalition's assertions, the CMA form includes a section on "condition" with check boxes that correspond to the TRR. This section allows CPD to collect the condition of the individual if they are suffering from a crisis, medical health issue, or use of alcohol as required by Consent Decree paragraph 571(h). Additionally, contrary to the Coalition's assertions, the "concise summary" requirement will not impair the ability of CPD or COPA to investigate and hold officers accountable for unjustified uses of force because the incidents will be captured on video which would be the best evidence in any investigation rather than a summary in a report. In fact, the CMA policy requires that the Tactical Review and Evaluation Division (TRED) conduct an incident-level review of all coordinated multiple arrest incidents where reportable uses of force were documented on CMA Reports. This Department level review under S06-06-03XX – Alternate Tactical Response Reporting During Coordinated Multiple Arrest Incidents, requires the following:

> ***VIII-B.*** *Department-level Review*
>
> > ***1.*** *The Tactical Review and Evaluation Division (TRED) will conduct an incident-level review of all declared coordinated multiple arrest incidents where reportable uses of force were documented on Coordinated Multiple Arrest Reports. TRED will:*
> >
> > > ***a.*** *review documentation and information collected during the coordinated multiple arrest incident, including relevant Department body-worn camera video, to the extent that the TRED review provides a representative summary of the coordinated multiple arrest incident and the actions taken by the Department and Department members.*
> > >
> > > ***b.*** *within 30 days of the coordinated multiple arrest incident, provide the Force Review Board (FRB) with an incident summary report that includes:*
> > >
> > > > ***(1)*** *a summary of the coordinated multiple arrest incident;*
> > > >
> > > > ***(2)*** *the identification of any tactical, equipment, or policy concerns, including the use of de-escalation techniques to prevent or reduce the need for force;*

       *(3)*    *any recommendations for additional training or policy modification; and*

       *(4)*    *references to any known Department video, including relevant Department body-worn camera video, that supports any concerns, recommendations, or positive examples identified by TRED during the review.*

***NOTE:*** *When appropriate, the Commander, TRED, will request an extension to complete incident summary report to the Chief, Office of Constitutional Policing and Reform.*

    ***c.***    *conduct an incident briefing of the facts and review of the TRED incident summary report for the coordinated multiple arrest incident to the Force Review Board.*

  ***2.***    *The Force Review Board (FRB) will:*

    ***a.***    *evaluate if the Department's response and the actions of Department members during the incident were tactically sound and consistent with Department training.*

    ***b.***    *if applicable, identify specific modifications to existing policy, training, tactics, or equipment that could improve the Department's response to future incidents and minimize the risk of harm to Department members and the public.*

  ***3.***    *Within thirty days after the review of an incident, the FRB will issue recommendations, if appropriate, to the Superintendent or an authorized designee, regarding any need for additional training or modifications to policies, tactics, equipment, or Department practices.*

  ***4.***    *Upon review and approval by the Superintendent or an authorized designee, the FRB will assign each approved recommendation to the appropriate exempt command staff member for prompt implementation.*

  ***5.***    *The incident commander for a coordinated multiple arrest incident will ensure an After-Action Review (AAR) is completed in accordance with the Department directive titled "<u>Response to Crowds, Protests, and Civil Disturbances</u>." The incident commander will:*

    ***a.***    *review any recommendations from the FRB and ensure those recommendations are included in the AAR Report; and*

    ***b.***    *within sixty days of the FRB issuing recommendations, forward the AAR to the First Deputy Superintendent; the Chief of Staff; the Chief, Office of Constitutional Policing and Reform; the General Counsel to the Superintendent; and the Deputy Chief, Training and Support Group."*

Additionally, contrary to the Coalition's assertions, the CMA policy, specifically S06-06-03XX – Alternate Tactical Response Reporting During Coordinated Multiple Arrest Incidents,

does not eliminate the two levels of oversight that exist with the TRR. In a Coordinated Multiple Arrest event, the first line of accountability and review is the responsibility of the "transport supervisor." The CMA Report contains a narrative box to document the probable cause for arrest and a section for the transport supervisor's review of the CMA Report and signature. As described above, TRED is required to conduct an after-action review of all coordinated multiple arrest incidents where reportable uses of force were documented on CMA Reports. TRED's after-action review as required under the CMA policy meets the requirements of Consent Decree paragraph 574 in that TRED will review the documented probable cause, identify any tactical, equipment, or policy concerns (including the use of de-escalation techniques to prevent or reduce the need for force,) identify any video, including BWC video of the incident, and any recommendations for additional training or policy modification.

Further, regarding the Coalition's concern that the CMA Report data would not be included in the use of force data that CPD publicly reports, the Tactical Response section of the CMA Report mirrors the select fields and data points contained in the corresponding sections of the current TRR and that data will be entered into the electronic TRR data application. This will allow for consistent data collection of these data points and allow for consistent presentation of the data via written reports and dashboard displays. CPD continues to evaluate its processes to ensure reportable force used during a CMA incident complies with the reporting requirements as prescribed in Paragraph 581. CPD recognizes the importance of the data that is reported under paragraph 581 and is continuing to review the draft policy and consider modifications to ensure that the data in the CMA policy is reported consistent with the requirements of the Consent Decree.

Finally, regarding any delay in the reporting of a use of force during a coordinated mass arrest, CPD has drafted this limited exception to the "tour of duty" language recognizing the unique

16

and extraordinary circumstances that would be present in declaring a coordinated multiple arrest event. CPD had extensive discussions with the IMT and OAG on this portion of the policy and as a result of this collaboration, including a demonstration of CMA as provided for the draft directives, the City and CPD received "no objection" notices from both the IMT and OAG. As part of this collaboration the IMT, OAG, the City and CPD took into consideration the extraordinary circumstances and events of 2020. During the summer of 2020, Department members worked long extended hours, often in tumultuous conditions. The multiple "mass arrest" occurrences during the riots of 2020 necessitated that CPD be prepared to for situations where officers would be required to work extended hours and would not be able to complete the required TRRs within their "tours of duty" as required under paragraph 219.

Accordingly, the IMT, OAG, City and CPD agreed to a very narrow and limited exception to that requirement. The exception only applies in the extraordinary circumstances of a coordinated multiple arrest event where additional extraordinary circumstances arise. These very limited circumstances for delayed TRR reporting are set forth in S06-06-03XX – Alternate Tactical Response Reporting During Coordinated Multiple Arrest Incidents. Specifically, CPD has included thoughtful and clear explanatory language which provide guidelines for any unforeseen circumstances that would require Department members to work extended periods of time and subsequently require a delay in the completion of the TRR. This language provides specific criteria for a thoughtful, well-informed decision by the Incident Commander:

> **VII-B**. *However, in circumstances involving Department members' use of reportable force during on-going, widespread civil disturbances or unrest, the Department may have to consider the need for the continued police presence at the scene of the incident for public order and public safety reasons, including the involved Department member's presence in the field, and the need for the timely documentation of reportable uses of force.*
>
> **VII-C**. *In these specific limited circumstances, the incident commander may institute delayed Tactical Response Reporting procedures for uses of force requiring the*

*completion of a TRR, including the application of a personal OC device or special weapons that dispense Capsaicin II powder agents. When instituting delayed Tactical Response Reporting procedures for reportable uses of force, factors for consideration may include, but are not limited to:*

    *1.    the number of persons engaged in unlawful activities.*

    *2.    the level of threat to public safety.*

    *3.    the number and requisite training of Department members reasonably expected to restore peace.*

    *4.    the number of Department members with the requisite training currently in the field or on standby.*

    *5.    the reasonably expected timeline for restoring peace.*

    *6.    the length of time Department members have been in the field.*

    *7.    the amount of rest Department members have had or will reasonably need to maintain public safety and officer wellness.*

    *8.    the frequency and scope of Department members' use of force*

***VII-H.***    *When the incident commander designates delayed Tactical Response Reporting procedures, the incident commander will ensure written documentation of the delayed reporting designation, including but not limited to:*

    *1.    the reason for the delayed reporting designation;*

    *2.    personnel designated for delayed reporting (i.e., the specific Department members who may complete any TRR after the members' tour of duty), time of designation, and the time they were notified;*

    ***REMINDER***: *Designated personnel will still complete a numbered Coordinated Multiple Arrest Report (CPD-11.433) as soon as safe and feasible, but before the end of the involved members' tour of duty,*

    *3.    the designated TRR completion, review, and investigation procedures and timeline (i.e., when the TRR must be completed and when it must be reviewed, investigated, and approved); and*

    *4.    any other relevant and important information regarding the delayed Tactical Response Reporting procedure designation.*

***VII-I.***    *The incident commander who designates delayed Tactical Response Reporting procedures will, through the affected member's chain of command, ensure affected members complete:*

    *1.    any required numbered Coordinated Multiple Arrest Report (CPD-11.433) before the end of the member's tour of duty.*

    *2.    any required TRR within the designated timeline.*"

The very limited exception set forth in the draft S06-06-03XX – Alternate Tactical Response Reporting During Coordinated Multiple Arrest Incidents, is a necessary exception to the

Consent Decree in very narrow and limited circumstances. Both the IMT and OAG agreed with the necessity for the delayed reporting process in these very narrow and limited circumstances and provided "no objection" notices to this policy. The Coalition's objections are insufficient to outweigh the practical experiences of 2020, the collaborative efforts of the IMT, OAG, City and CPD, and the thorough review and evaluation of the draft CMA Report and policies by the IMT and OAG.

### 3. *Disability and Language Accommodations*

As has been repeatedly stated above, the CMA policy requires that Department members follow the already existing First Amendment Policy. (*See* S06-06X III-D and III-I). The First Amendment Policy (G02-02) requires the following:

> ***VIII-B-3.*** *allow sufficient time for individuals and the crowd to receive and comply with the communications, to the extent feasible; and*
>
> ***REMINDER:*** *When encountering noncompliance to lawful verbal direction, Department members will consider, to the extent feasible, if the noncompliance may be due to limited English proficiency or other language barriers, a medical condition, or disability."*
>
> ***VIII-B-4.*** *use multiple methods of communication to provide effective communication with the crowd, including people with disabilities, to extent feasible.*
>
> ***EXAMPLE:*** *Multiple methods of communication may include a device to amplify sound, qualified language interpreters, visual aids (e.g. gestures, writings, or posted written communications), and digital messaging (e.g., social media, electronic notification services).*

(EX B, G02-02 – First Amendment Rights).

### 4. *Community Engagement*

The development of the CMA suite was informed by the experiences and after-action reports from the events of 2020, including reports from the IMT and the Office of Inspector General (OIG), which included significant representations from community voices. Additionally, the development of this suite of policies followed the Consent Decree requirements in paragraph 627 of review and comment, by both the IMT and the OAG, receiving "no objection" notices from

both following extensive discussions.  Following the "no objection" notices, CPD followed the requirements Consent Decree paragraph 633, and posted the policies for public comment for a minimum of fifteen (15) days, with the initial posting scheduled for twenty (20) days.  At the request of the Coalition, that posting was extended by fourteen (14) days and the CMA suite was ultimately posted for thirty-four (34) days.  Accordingly, CPD has met the public comment requirements of the Consent Decree as it relates to this policy suite.

Accordingly, the Notice of Intent to Initiate Enforcement by the Coalition fails to establish sufficient grounds for the City and CPD to delay completion, issuance, and implementation of the CMA policy suite.

**RESPECTFULLY SUBMITTED**

*/s/ Jennifer K. Bagby*
Jennifer K. Bagby
Deputy Corporation Counsel
City of Chicago Department of Law