**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **STATE OF ILLINOIS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-cv-6260** |
| **CITY OF CHICAGO,** | **Judge Rebecca R. Pallmeyer** |
| **Defendant.** | |

<u>**INDEPENDENT MONITORING REPORT 9**</u>

The Independent Monitor Margaret A. Hickey and the Independent Monitoring Team submit the attached *Independent Monitoring Report 9*.

Dated May 23, 2024

/s/Margaret A. Hickey
Margaret A. Hickey
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
maggie.hickey@afslaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that, on May 23, 2024, she caused a true and correct copy of the foregoing ***Independent Monitoring Report 9*** to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

/s/Margaret A. Hickey
Margaret A. Hickey
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL  60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
maggie.hickey@afslaw.com



Independent Monitoring Team | Chicago Police Department Consent Decree

# INDEPENDENT MONITORING REPORT 9

*(Reporting Period July 1, 2023, through December 31, 2023)*

May 23, 2024

# Independent Monitoring Team | Chicago Police Department Consent Decree

This report, *Independent Monitoring Report 9*, provides our compliance assessments for efforts between July and December 2023. As detailed in this report, the City of Chicago (City) and the Chicago Police Department (CPD) increased compliance in various sections of the Consent Decree in those six months. Separate from the immediate compliance levels, however, the City and the CPD made earnest progress toward addressing issues that are instrumental to sustained compliance and long-term success. In our last report, we highlighted that there have been challenges that have caused disproportionate delays since the beginning of the Consent Decree. These challenges include delays developing a comprehensive, consistent, and transparent community policing strategy and a transparent and data-driven staffing study to best allocate and prioritize personnel and resources. In the ninth reporting period, the City and the CPD made incremental progress toward both. While these efforts are ongoing—and will take time to affect change—many of the outcomes intended by the Consent Decree cannot be efficiently achieved without them.



Monitor Maggie Hickey

In our last report, we also emphasized the need for the CPD and the then-new Superintendent to prioritize transparency. And in late 2023, the CPD released a long-awaited update to its *Body Worn Cameras* policy. While important aspects of this policy are being litigated between the City and the Office of the Illinois Attorney General (OAG), the City, the CPD, the OAG, and the Independent Monitoring Team (IMT) agree that the new policy is an improvement over the older, pre-Consent Decree version of the policy.

The new *Body Worn Cameras* policy should, among other things, help address lingering problems with officers failing to appropriately record interactions. In the latest CPD Tactical Review and Evaluation Division (TRED) Report, *2023 Midyear Report* (December 28, 2023), for example, TRED found that the most common issue warranting a debriefing continued to be body-worn-camera compliance, including late activation. The new policy—combined with new efforts for progressive discipline—should better ensure that interactions with police are appropriately recorded. This will greatly improve any subsequent reviews or investigations by detectives, supervisors, TRED, the Bureau of Internal Affairs (BIA), the Civilian Office of Police Accountability (COPA), the Inspector General, the IMT, and the public.

Further, since the beginning of the ninth reporting period, the City, the CPD, the OAG, and the IMT have worked to improve cooperation and streamline compliance efforts with critical Consent Decree requirements. In preparation for the 2024 Democratic National Convention, for example, the City, the CPD, the OAG, and the IMT have worked diligently to expedite updates to policies, reporting procedures, and training. This includes addressing lessons learned from the IMT's Special Report regarding the City's and the CPD's responses to protest and unrest in 2020, such as the need for significant improvements to on-scene communications, consistent supervision, improved use-of-force reporting, body-worn-camera compliance, and officer-wellness preparations. Currently, with guidance from the Court, the City, the CPD, the OAG, and the Coalition are working through relevant policies to ensure the CPD protects First Amendment rights and addresses other community concerns.



Chief Rodney Monroe, Ret.

Other recent events in 2024 underscore the need to build on progress made in the ninth reporting period. First, the City, the CPD, the OAG, and the Coalition worked throughout 2023 to improve the CPD's search-warrant policy and practices. While the Parties and the Coalition ultimately reached impasse on seven issues, they reached agreement on at least 13 issues, including changes to avoid, mitigate, and repair harm and to provide additional protections for children and other vulnerable people. This month, the Court ruled on the issues at impasse, and we hope that the CPD will implement the updated policy and provide corresponding training as soon as possible.

Second, in late 2023, the Court, the IMT, the City, the CPD, and the OAG heard from community members and stakeholders regarding whether traffic stops should be added to the Consent Decree. This year, in 2024, a traffic stop led to the shooting of a CPD officer, the fatal shooting of Dexter Reed, and national discussions regarding the appropriate role of traffic stops.[1] After the Superintendent made public statements in favor of adding traffic stops to the Consent Decree, we renewed our recommendation that the City and the OAG pursue an agreement on specific policy, training, and implementation requirements. As a result, they are seeking additional community input during a public hearing next month on what specific traffic-stop-related requirements should be added to the Consent Decree. We hope that the City, the CPD, and the OAG utilize this feedback—along with national best practices and expertise—to provide the oversight necessary to ensure that the CPD optimizes its policies and practices and, ultimately, improves community interactions, trust, and safety.

Finally, through all developments, delays, and lapses, Chicago officers continue to face dangers to their physical, psychological, and emotional health—before, during, and after their shifts. Every year, Chicago is reminded that officers are exposed "to significant danger, high stress, and a wide range of human tragedy" (Consent Decree ¶377). In April of this year, Officer Luis Huesca was tragically killed returning home from his shift in uniform.[2] Just a year ago, Officer Aréanah Preston was murdered in similar circumstances. In the last two months, Chicago has lost two officers to suicide.


Dr. Theron Bowman

In the coming months, Chicago will ask its officers to serve and protect during summer deployments in response to holidays and potential crime spikes, during First Amendment activities and other large gatherings, and during the Democratic National Convention. As we have previously reported, we often see the City lose or slow progress during significant summer demands. As the City and the CPD work to meet the unique challenges in 2024, we urge them to not lose focus on making deliberate progress on the Consent Decree, including the implementation of the Suicide Prevention Initiative and other critical efforts to ensure its officers are sufficiently equipped and supported to effectively and constitutionally protect and serve all Chicago communities.

---

[1] This incident also highlighted, for example, the City and the CPD's ongoing efforts to update its *Firearm Discharge Incidents - Authorized Use and Post-Discharge Administrative Procedures* policy (G03-06) to comply with the Consent Decree.

[2] Earlier this month, the CPD and the Cook County State's Attorney's Office announced first-degree murder charges.

# Monitoring Under the Consent Decree

In August 2017, the Office of the Illinois Attorney General (OAG) sued the City of Chicago (City) in federal court regarding civil rights abuses by the Chicago Police Department (CPD). The lawsuit led to a Consent Decree, effective March 1, 2019.[3] The same day, the federal court appointed Maggie Hickey as the Independent Monitor. Ms. Hickey leads the Independent Monitoring Team, which monitors the City of Chicago's progress in meeting the Consent Decree's requirements.

Paragraph 2 of the Consent Decree sets out its overall purpose, which has guided and will continue to guide our monitoring efforts:

> **2.** *The State, the City, and the Chicago Police Department . . . are committed to constitutional and effective law enforcement. In furtherance of this commitment, the Parties enter into this Agreement to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety. In addition, this Agreement seeks to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely. This Agreement requires changes in the areas of community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management.*[4]

---

[3]   For more information on the Consent Decree, see the Background section below. More information is also available on the Independent Monitoring Team's website (cpdmonitoringteam.com/) and on the Illinois Attorney General Office's Consent Decree website (chicagopoliceconsentdecree.org/about/).

[4]   We cite the relevant paragraphs of the Consent Decree throughout this Independent Monitoring Report. The Consent Decree is available on the Independent Monitoring Team's website: cpdmonitoringteam.com/wp-content/uploads/2020/08/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf. *See also Resources*, Chicago Police Consent Decree ("Consent Decree Approved by the Court on January 31, 2019"), chicagopoliceconsentdecree.org/resources/.

**Table of Contents**

Executive Summary ..................................................... 1

Roadmap ..................................................... 8

Background ..................................................... 9

Compliance Activities and Assessments .................................... 11

I.     Community Policing ..................................... 19

II.    Impartial Policing ..................................... 24

III.   Crisis Intervention ..................................... 28

IV.   Use of Force ..................................... 38

V.    Recruitment, Hiring & Promotions ........................... 44

VI.   Training ..................................... 47

VII.  Supervision ..................................... 50

VIII. Officer Wellness and Support ................................. 56

IX.   Accountability and Transparency .............................. 62

X.    Data Collection, Analysis & Management ................. 75

XI.   Investigatory Stops, Protective  Pat-Downs, and Enforcement of Loitering Ordinances ........................ 80

XII.  Implementation, Enforcement & Monitoring............. 84

Conclusion, Monitoring Plan for Year Six, and
Looking Ahead to Comprehensive Assessment Part II and
*Independent Monitoring Report 10* ........................... 91

***

Appendix 1 (Community Policing) ............................................. 97

Appendix 2 (Impartial Policing) ................................................ 98

Appendix 3 (Crisis Intervention) .............................................. 99

Appendix 4 (Use of Force) ..................................................... 100

Appendix 5 (Recruitment, Hiring, and Promotion) ................. 101

Appendix 6 (Training) ............................................................ 102

Appendix 7 (Supervision)....................................................... 103

Appendix 8 (Officer Wellness and Support)............................ 104

Appendix 9 (Accountability and Transparency) ...................... 105

Appendix 10 (Data Collection, Analysis, and  Management) ... 106

Appendix 11 (Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances)..................................... 107

Appendix 12 All Compliance Levels, By Paragraph ................. 108

***

Attachment A:
Office of the Illinois Attorney General Comments
(May 13, 2024) ......................................................................... 110

Attachment B: City of Chicago Comments
(May 13, 2024) ....................................................................... 116

# Executive Summary

As the Independent Monitoring Team (IMT), we assess the City of Chicago's (City's) compliance with the requirements of the Consent Decree. Specifically, we assess how relevant City entities—including the Chicago Police Department (CPD); the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General, the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC)—are complying with the Consent Decree.[5]

This is *Independent Monitoring Report 9*.[6] As in previous monitoring reports, this is an update to the Court and the public on compliance efforts during the ninth reporting period: from July 1, 2023, through December 31, 2023.[7] Among other things required by the Consent Decree, this report also includes the following:

- an updated compliance or status assessment from the previous reporting period;
- a summary of the principal achievements and challenges facing the City's compliance with the Consent Decree; and
- an updated projection of upcoming work for the City, the Office of the Illinois Attorney General (OAG), and the IMT. *See* ¶661.[8]

---

[5] As a party to the Consent Decree, the City is ultimately responsible for compliance. *See* ¶720. Unless otherwise specified, our references to the City typically include its relevant entities. *See* ¶736.

[6] We provided a draft of this report to the City and the OAG on January 30, 2024, as required by ¶¶661–65. The City and the OAG provided initial feedback on February 23 and February 20, respectively. We provided a second draft of the report on March 19, 2024, and subsequent revisions on April 30 and May 7. The City and the OAG provided the attached final comments on May 13, 2024.

[7] The Consent Decree generally prevents the IMT from making any public statements or issuing findings regarding any non-public information or materials outside of these reports (*see* ¶672). Because the Consent Decree will be in effect for a minimum of eight years, this is the ninth of at least 16 semiannual Independent Monitoring Reports. *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoring-team.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-War-rants-Consent-Decree-Timelin.._.pdf. Each year, we file a Monitoring Plan that sets out what we will assess during the year, and we file two semiannual Independent Monitoring Reports. The Independent Monitoring Plans and Reports are available on the IMT's website. *See Reports and Resources*, https://cpdmonitoringteam.com/reports-and-resources/.

[8] In August 2023, we filed the Monitoring Plan for Year Five, which outlined the projected monitoring efforts under the Consent Decree for Year Five (July 1, 2023, through June 30, 2024). The IMT's Monitoring Plan for Year Five is available on the IMT's website. *See Reports*, INDEPENDENT MONITORING TEAM (August 21, 2023), https://cpdmonitoringteam.com/wp-content/uploads/2023/08/2023.08.21-Monitoring-Plan-for-Year-5-filed.pdf. The Monitoring Plan for Year six is included in the Conclusion section of this report.

Per ¶661 of the Consent Decree, the IMT will issue semiannual reports until the Consent Decree ends—which is after the City has achieved full and effective compliance for each requirement for one to two years. *See* ¶¶693 and 714–15. With the agreement of the Parties, this report, *Independent Monitoring Report 9*, is an attempt to streamline the reporting process. The appendices for *Independent Monitoring Report 9* include only paragraphs where (1) the City has achieved additional levels of compliance, (2) the City has failed to maintain compliance, or (3) the IMT is highlighting particular progress or lack of progress toward full and effective compliance. We look forward to feedback from the public and the Parties about how to further refine our reporting processes.

This report represents a six-month assessment of the City's compliance efforts from July 1, 2023, through December 31, 2023. It does not reflect all the efforts of the City, the CPD, or the other relevant City entities to date. While we report on the compliance efforts within defined reporting periods (*see* ¶661), we stress that work is ongoing by the City, its relevant entities, the OAG, the IMT, and Chicago's communities. In many cases, relevant City entities have continued to develop policies and train personnel after December 31, 2023, and before the date we submit this report. In this report, we have not assessed efforts made after December 31, 2023. We will do so in the monitoring report for the tenth reporting period (January 1, 2024, through June 30, 2024).

Under the Consent Decree, the City, the CPD, or other relevant entities are not in compliance with any of the requirements of the Consent Decree until the IMT determines that the City provided sufficient proof that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement—which in some cases it has—the City still has the additional burden of providing sufficient proof of its efforts with sufficient time for the IMT and the OAG to review the information.

We assess compliance at three levels: (1) Preliminary, (2) Secondary, and (3) Full. The Consent Decree requires the City and its entities to reach Full compliance and maintain that compliance for one to two years. *See* ¶¶714–15. These compliance levels allow us to share our assessments of the City's progress throughout the duration of the Consent Decree. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the reform in practice. There are, however, many paragraphs that do not include policy or training elements. In those circumstances, the three levels may follow a different trajectory, such as (1) whether the City or its relevant entities have established the framework and resources to achieve the reform, (2) whether the City or its relevant entities have effectively communicated the reform to relevant personnel, and (3) whether the City or its relevant entities have appropriately implemented the reform. Because of the nuances of each Consent Decree requirement and each

level of compliance, the City and its relevant entities must—in a timely manner—provide the IMT with evidence, including access to personnel, records, facilities, and data to establish that they have achieved each level of compliance during the applicable reporting period.[9]

At the end of the ninth reporting period, we assessed 555 paragraphs and provided status updates for 37 additional paragraphs (589 paragraphs total).[10] The City and the CPD remain in Preliminary compliance with about 46% of monitorable paragraphs to date, in Secondary compliance with about 35%, and in Full compliance with about 7% (up from about 6% in the eighth reporting period). Overall, the City and the CPD have achieved some level of compliance with about 89% of monitorable paragraphs (up from about 85% in the eighth reporting period).

Consent Decree Compliance by December 31, 2023



- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

The current compliance level for each paragraph is reflected in Appendix 12 (All Compliance Levels, By Paragraph).

---

[9] Some requirements in the Consent Decree demand more effort to comply with than others. The number of requirements—and the amount of work necessary under each requirement—can vary substantially within each paragraph and topic area.

[10] In addition to the original monitorable paragraphs, this now includes three new paragraphs this reporting period from the Stipulation regarding Investigatory Stops, Protective Pat-Downs, and Enforcement of Loitering Ordinances.

For ease of comparison, the Compliance chart from *Independent Monitoring Report 8* is included below.



Consent Decree Compliance by June 30, 2023

## Major Developments and Principal Achievements and Challenges Impacting Compliance

In the Consent Decree, the City committed "to ensuring that police services are delivered to all of the people of Chicago in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of all of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety." The City also committed "to providing CPD members with the resources and support they need, including improved training, supervision, and wellness resources." ¶6.

Executive Summary Figure 1, below, provides a sample of principal achievements and challenges across the 10 topic areas of the Consent Decree.

Executive Summary Figure 1.    Sample of Principal Achievements & Challenges

| Section | Sample of Principal Achievements | Sample of Principal Challenges |
|---|---|---|
| Community Policing | • The City and the CPD updated *the School Resource Officers And Investigations At Chicago Public Schools* policy (S04-01-02) on October 27, 2023, to include revisions from the Illinois Law Enforcement Training and Standards Board (ILETSB) regarding the School Resource program and public comments. Additionally, language was added regarding community engagement and public response.<br>• The City and the CPD finalized *the Crime Victim And Witness Assistance* policy (S02-01-03) on November 7, 2023.<br>• The City and the CPD finalized the *Interactions with Youth and Children* policy (G02-05) on December 29, 2023. | • The City and the CPD have stalled in their efforts to expand the modalities of the public awareness campaign to ensure a larger audience sees the content and to assess campaign metrics to determine its effectiveness.<br>• The City and the CPD failed to conduct inspections on an annual basis to document, track, and verify the completion of annual inspections of required.<br>• The City and CPD struggle to show the effectiveness of training in reinforcing community policing concepts and further application of these concepts in CPD officer practices per ¶37. |
| Impartial Policing | • The City and the CPD began delivering the *Fair and Impartial Policing* training to CPD personnel.<br>• The City and the CPD expanded the Domestic Violence Assessment Pilot Program into the 10th District and revised the *Domestic Incident Notice* (G04-04-02) policy, which outlines the procedures to provide the Domestic Incident Notice to victims of domestic violence. The revision also included the introduction of check boxes to identify the information officers explain to victims. All relevant forms were updated and are available online in the Department Directives system in six languages. | • The City and the CPD have struggled to measure and document improvements in officers' street-level behavior and decision-making to prevent bias-based policing, which is a barrier to achieving Full compliance in most paragraphs under the Impartial Policing section.<br>• The City and the CPD continue to identify the universe of policies (¶53) and trainings (¶72) that must be reviewed and, as necessary, revised to ensure non-biased policing in all spontaneous and routine law enforcement decisions. The City and the CPD have not developed a plan to collect, manage, and analyze data based on these routine and spontaneous law enforcement decisions. |
| Crisis Intervention | • Both the CPD and the OEMC have significantly improved their policy review process, and the OEMC finalized its standard operating procedure 23-005, *Mental Health Training*.<br>• The CPD also produced comprehensive training records for crisis-intervention-related training for all officers and continued to provide its eight-hour *Crisis Intervention* training. | • Insufficient staffing in the Crisis Intervention Unit has undermined the CPD's ability to achieve and maintain compliance.<br>• The Chicago Council on Mental Health Equity (CCMHE) continues to face challenges regarding attendance and engagement. |
| Use of Force | • The CPD gained compliance with several requirements by continuing to review and implement key policy and training efforts and analyze data and ensure officers are adhering to policy.<br>• The CPD finalized the *Body Worn Cameras* policy (S03-14) on December 29, 2023. | • TRED's responsibilities continue to surpass its resources, which continues to negatively impact its operations and a significant backlog remains. More responsibility should be place in district- and unit-level supervisors. |

| Section | Sample of Principal Achievements | Sample of Principal Challenges |
|---|---|---|
| Recruitment, Hiring & Promotions | • The City and the CPD continues to maintain compliance levels with most paragraphs.<br>• The City and the CPD's efforts this reporting period focused on improving promotional processes, which will strengthen compliance with Consent Decree requirements | • The CPD must provide data sufficient to determine if they are collecting, tracking, and maintaining data about hiring and promotional exams, as required by ¶256. |
| Training | • The City and the CPD announced that additional Field Training Officers (FTO) positions would be allotted in 2024, thereby addressing the previous significant deficits of FTOs. | • The City and the CPD need to further develop and ensure that evaluations are optimally used and applied to improved training content, instruction, delivery, and outcomes. |
| Supervision | • The CPD expanded the Unity of Command and Span of Control Pilot Program to include three total districts under the staffing model established in January 2023. | • Staffing shortages prevented the Unity of Command and Span of Control Pilot Program district from consistently meeting the 10-to-1 officer-to-supervisor ratio required for all districts by ¶360. |
| Officer Wellness & Support | • The CPD held their annual Peer Support meeting, and provided refresher training for Peer Support members.<br>• The Audit Division produced the second annual Traumatic Incident Stress Management Program (TISMP) Audit.<br>• The CPD produced a draft policy, U05-02, *Department Equipment and Property Control System.* | • The CPD was unable to identify the entirety of the CPD members who are involved in traumatic incidents, appropriately refer them to the TISMP, and ensure completion of the TISMP before returning to duty.<br>• The CPD temporarily paused the Voluntary Annual Wellness Check-In program due to inadequate scheduling software, caseload management, and inability to externally refer.<br>• The CPD spent significant effort on the Needs Assessment and Officer Wellness Support Plan without ensuring their efforts met Consent Decree requirements. |
| Accountability & Transparency | • COPA's People's Academy conducted its second cohort of the Academy, which continued to be an effective and valuable means of interacting and increasing transparency.<br>• The Police Board continued to demonstrate commitment to compliance with Consent Decree requirements.<br>• The CPD developed, implemented, and trained 95% of BIA Personnel, BIA Investigators, and Accountability Sergeants on six Modules of training relevant to numerous Consent Decree paragraphs, significantly increasing compliance levels. | • Many Accountability Sergeants continue to have other responsibilities that significantly compete with their Accountability Sergeant duties, which should be their primary responsibility. |

| Section | Sample of Principal Achievements | Sample of Principal Challenges |
|---|---|---|
| Data Collection, Analysis & Management | • The City and the CPD have taken steps toward compliance by hiring an outside vendor to conduct a citywide and district-level data analysis of use of force (¶¶572–73). <br> • The CPD regained Preliminary and Secondary compliance with ¶581 by making data from the CPD's Use of Force Dashboard downloadable for the public again, allowing for any interested community member to access the dashboard's data and conduct independent analysis. <br> • The City and the CPD made substantial progress in their efforts to streamline data collection processes and ensure reliable data is collected. <br> • The City and the CPD provided a final assessment report (¶606) that will be used to inform the development of a Data Systems Plan (¶607). <br> • The CPD updated the process for receiving public comments on the use-of-force dashboard and assigning corresponding responsibilities within TRED. | • The City and the CPD lost levels of compliance with ¶570, which requires the Civilian Office of Police Accountability (COPA) to have access to CPD documents and reports when investigating misconduct complaints related to reportable use of force. <br> • The CPD has struggled to incorporate decision-point analysis into Force Review Board practices. |

# Roadmap

We wrote this report to be as accessible and readable as possible. This report is long because the compliance efforts in the ninth reporting period required significant attention, but we have endeavored to streamline the details of our compliance determinations; only paragraphs with requirements that have gained or lost levels of compliance are included in this report's appendices. All other paragraph requirements and compliance levels can be found on a detailed chart on our website. As the IMT continues to move forward with its monitoring efforts and as we assess the City's requirements with appropriate detail, the monitoring reports may also continue to grow in length. For this reason, we have provided the following roadmap to help readers understand what they can expect from each section of this report.

We begin this report with a **Background** section that provides some historical context about the Consent Decree and the IMT. This section will help those who have not read or would like to reacquaint themselves with the background information from our previous reports and Monitoring Plans.

The next section, **Compliance Activities and Assessments**, provides the following information regarding the ninth reporting period:

- ❖ An overview of the IMT's assessment process and priorities for the ninth reporting period, including deadlines and status updates;

- ❖ A summary of the IMT's activities; and

- ❖ A summary of relevant compliance efforts for each topic of the Consent Decree; and

Per ¶661, the appendices detail the IMT's compliance assessments for every monitorable paragraph for which the City gained compliance, the City lost compliance, or the IMT is highlighting for significant progress or lack of progress. (All original monitorable paragraphs were under review in the ninth reporting period and more information for each paragraph, including history and current compliance levels, are available in *Comprehensive Assessment Part I* (November 11, 2023).

Finally, the last section, **Conclusion, Monitoring Plan for Year Six, and Looking Ahead to *Comprehensive Assessment Part II* and *Independent Monitoring Report 10*** provides concluding remarks and a projection of the upcoming work in the tenth reporting period.

# Background

## The Chicago Police Consent Decree

In December 2015, the U.S. Attorney General launched a civil-rights investigation into the CPD's policing practices. The U.S. Department of Justice released the results of its investigation in January 2017, finding a longstanding, pervasive "pattern or practice" of civil rights abuses by the CPD. Two separate class-action lawsuits followed: *Campbell v. City of Chicago* and *Communities United v. City of Chicago*.[11]

In August 2017, the Office of the Illinois Attorney General (OAG) sued the City in federal court, seeking a Consent Decree that would address the DOJ's findings and recommendations. The case was assigned to federal Judge Robert M. Dow, Jr. The OAG then sought input from community members and Chicago police officers and negotiated the Consent Decree with the City.

In March 2018, the Parties to the Consent Decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')," which "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[12]

The OAG and the City then sought proposals for an independent monitoring team after posting a draft Consent Decree on the Chicago Police Consent Decree website. Judge Dow approved and signed a modified version of the Consent Decree on January 31, 2019. This Consent Decree provides a unique opportunity for feedback from Chicago communities and local stakeholders. The OAG oversees and enforces the Consent Decree. *See* ¶694. The Coalition has certain enforcement rights and meets with the independent monitoring team at least quarterly. *See* ¶¶709(a) and ¶669, respectively.[13]

The Consent Decree requires action by the CPD and many other City entities. On March 1, 2019, the effective date of the Consent Decree, and after a competitive selection process, Judge Dow appointed Maggie Hickey, a partner at ArentFox

---

[11]   *See Campbell v. Chicago*, N.D. Ill. Case No. 17-cv-4467 (June 14, 2017), and *Communities United v. Chicago*, N.D. Ill. Case No. 17-cv-7151 (October 4, 2017).

[12]   *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

[13]   *See also Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs*, ¶9 (March 20, 2018), http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

Schiff LLP, as the Independent Monitor.[14] On October 11, 2022, Chief US District Judge of the District Court for the Northern District of Illinois Rebecca R. Pallmeyer became the presiding judge over the Consent Decree. As the Independent Monitor, Ms. Hickey oversees the Independent Monitoring Team (IMT) and reports directly to Chief Judge Pallmeyer.

As the IMT, we (1) monitor the City's, the CPD's, and other relevant City entities' progress in meeting the Consent Decree's requirements and (2) offer assistance to the City, the CPD, and other relevant City entities to implement the changes that the Consent Decree requires.

Independent Monitor Maggie Hickey and Deputy Monitor Chief Rodney Monroe, Ret., lead the IMT. The IMT's ten Associate Monitors, in turn, oversee the 11 topic areas of the Consent Decree. Our legal team, analysts, subject matter experts, Community Engagement Team, and community survey staff provide support in several ways: by reaching out to and engaging with Chicago communities; by providing general administrative support; and by collecting and analyzing policies, procedures, laws, and data, including conducting observations and interviews, and drafting reports.

***

More information about the Independent Monitoring Team is available on our website: www.cpdmonitoringteam.com. Community members can reach out to the entire IMT via email: contact@cpdmonitoringteam.com.[15] Community members can also contact individual members of our Community Engagement Team:

- Joe Hoereth (Joe.Hoereth@cpdmonitoringteam.com), and
- Laura McElroy (Laura.McElroy@cpdmonitoringteam.com)
- Steve Rickman (Stephen.Rickman@cpdmonitoringteam.com)
- Denise Rodriguez (Denise.Rodriguez@cpdmonitoringteam.com)

---

[14] Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he will "help facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree." About, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/about/. As the special master, Judge Coar also reports directly to Judge Pallmeyer.

[15] Learn more at the Contact Us page on our website (https://cpdmonitoringteam.com/contact-us/).

# Compliance Activities and Assessments

This section provides an overview of compliance efforts for the ninth reporting period. We begin by explaining our priorities for the ninth reporting period that we described in our Monitoring Plan for Year Five. We include an overview of the assessment process and the deadlines within the ninth reporting period. We then provide summaries for the period, including summaries of our activities and of the City's achievements and challenges. Finally, we summarize the relevant compliance efforts for each topic area of the Consent Decree; provide a more specific analysis for Consent Decree paragraphs that have either gained or lost levels of compliance; and summarize status updates for other paragraphs.

## The IMT's Methodologies during the Reporting Period

While most of this report addresses the City's efforts to meet the Consent Decree's requirements, the following subsection details the IMT's methodologies and activities in the ninth reporting period (July 1, 2023, through December 31, 2023).

In the ninth reporting period, we continued to meet regularly with representatives from the City, the City's relevant entities, the OAG, and members of Chicago's communities, including members of the Coalition (*see* ¶669). This included regular meetings with the CPD and the Superintendent (*see* ¶668), settlement conferences, public status hearings, and site visits (*see* ¶681).

At the beginning of the Consent Decree process, the City; the CPD; COPA; the Chicago Police Board; the City Office of Inspector General, including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC) worked to create open lines of communications.

Building on the efforts made in the previous reporting periods, communications continued throughout the ninth reporting period. This included regularly scheduled meetings (*see, e.g.*, ¶¶668–69), including regular meetings for each Consent Decree topic area. Specifically, we met consistently with, among others, members of the CPD, COPA, the Police Board, and the OEMC, and reviewed thousands of City documents.[16]

Some of our conversations involved discussing our methodologies for assessing the City's compliance with the Consent Decree. *See, e.g.*, ¶655. For the IMT, these discussions highlighted the importance of maintaining flexibility in our methodol-

---

[16] The OAG has engaged in much of the same work and provided separate feedback to the City and the CPD.

ogies throughout the monitoring process. This flexibility ensures that our monitoring efforts continue to meet the letter and spirit of the Consent Decree, as the Parties and the IMT develop necessary information, learn from previous efforts, and identify unanticipated hurdles. *See, e.g.*, ¶717. Changed circumstances may require the IMT to consider fewer, more, or alternative sources of information. As a result, our methodologies may adjust based on ongoing consultation with the Parties, as we continue to identify and consider new information and data that is relevant to the Consent Decree. We endeavor to supplement our methodologies with additional specificity throughout this report. During this reporting period, like all prior reporting periods, the IMT discussed the methodologies with the Parties before implementation and prior to conducting its audits and reviews for this report, acknowledging their concerns, and making adjustments for clarity.

Finally, in addition to making these efforts, the IMT continued to adhere to several specific and ongoing requirements of the Consent Decree. Background Figure 1, below, summarizes our compliance with the Consent Decree's deadlines for the IMT in the ninth reporting period.

Background Figure 1:          IMT Deadlines in the Ninth Reporting Period

| ¶s | Requirement | Deadline | Ninth Reporting Period Deadlines |
|---|---|---|---|
| 627–37 | Review of CPD Policies and Procedures | Various, Ongoing | Corresponds with policy deadlines |
| 638–41 | Review of Implementation Plans and Training Materials | Various, Ongoing | Corresponds with plan and training deadlines |
| 642–44 | Compliance Reviews and Audits | Various, Ongoing | Occur during each reporting period |
| 652–55 | Review Methodologies | 45 Days prior (and every reporting period) | November 16, 2023 |
| 656 | Technical Assistance and Recommendations | Ongoing | Ongoing |
| 668 | Maintain Regular Contact with the Parties | Ongoing | Monthly |
| 669 | Monitor will Participate in Meetings with the Coalition | Quarterly | Quarterly |
| 670–71 | Communication with the Parties, Collective Bargaining Representatives, and the Public | Ongoing | Ongoing |

## IMT's Community Engagement Activities

The IMT's Community Engagement Team plays a critical role by monitoring levels of trust and sentiment among the stakeholders to the Consent Decree—the members of Chicago's communities. The IMT's Community Engagement Team includes experienced Chicago community organizers, community researchers, experts in police-community relations, and academic scholars. These team members work together to meaningfully engage Chicago's communities and ensure that community members participate throughout the monitoring process. The Community Engagement Team also works closely with the Monitor, the Deputy Monitor, and the Associate Monitors to assess the community components of compliance with the Consent Decree.

The IMT's Community Engagement Team's work is vital to measure compliance with specific policy, training, and procedural changes required by the Consent Decree. The City and the CPD do not function effectively when they lack trust from the communities they serve.[30]

Effective policing requires both procedural and cultural change and improved relationships between the City and the CPD and the communities they serve. The Community Engagement Team encourages improved relationships based on respect, trust, and partnership and emphasizes how relationships may be strengthened by transparency and accountability.

The IMT's Community Engagement Team performs two key tasks regarding the Consent Decree monitoring process: (1) gathering input from Chicagoans about their concerns regarding CPD policies and practices and (2) providing information to the Chicago community about the IMT's activities and findings.

We sought to hear sentiments from a broad range of Chicagoans during the ninth reporting period. For example, Judge Rebecca Pallmeyer held virtual public hearings on August 9, 2023, October 16, 2023, November 16, 2023, and December 14, 2023. The judge heard from Chicagoans who voiced their concerns, observations, and ideas about Chicago Police Department reform. Moving forward, Judge Pallmeyer will hold public hearings monthly; the schedule of hearings for 2024 may be found on the IMT's website.

We also held a Virtual Listening Session on September 21, 2023, in partnership with the North River Commission, focused on the Comprehensive Assessment (*see* ¶¶657–59). Chicagoans shared their thoughts and concerns about Chicago policing with Independent Monitor Maggie Hickey, Deputy Monitor Rodney Monroe, and members of the IMT's Community Engagement Team. We also held an in-person Community Listening Session on December 6, 2023, in partnership with the

Peace and Justice Center at Build Chicago, also focused on the Comprehensive Assessment. We appreciated Build's generous hospitality and look forward to more opportunities to connect with Chicagoans in person.

Figure 3.                                    IMT Virtual Listening Session Flyers
                                    (September 21 and December 6, 2023)




We also issued periodic newsletters, emails, and news releases to update community stakeholders on our monitoring activities.

Figure 4.
Examples of IMT Newsletters sent between July 1, 2023, and December 31, 2023






## Ninth Reporting Period Priorities

We set out our priorities for the ninth reporting period in our Monitoring Plan for Year Five.[17] Through the ninth reporting period, we monitored compliance with those paragraphs to match the pace of the five-year goal described in the Consent Decree. As explained above, in the sixth reporting period, the Parties entered a stipulation, which extends the timeline of the Consent Decree to eight years.[18]

## Assessing Compliance

As reflected above, and in accordance with ¶¶661–62 and 642, the IMT assesses how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: **(1) Preliminary compliance**, **(2) Secondary compliance**, and **(3) Full compliance**. The CPD and other City entities will not be "in compliance" with a requirement until they reach Full compliance for the requisite length of time required by the Consent Decree—either one or two years. *See* ¶714. We will assess the City's compliance on all appropriate levels for the paragraphs presented in this report.



- ❖ **Preliminary compliance** typically refers to the development of acceptable policies and procedures that conform to best practices (as defined in ¶730) and to the incorporation of requirements into policy (¶642). The IMT will assess

---

[17]  The IMT's Monitoring Plan for Year Five is available on the IMT's website. *See Reports and Resources*, INDEPENDENT MONITORING TEAM (November 2, 2022). Given the varying workloads of separate departments and personnel, the City and its relevant entities may make compliance efforts earlier than anticipated. When appropriate, we may also assess those efforts in our monitoring reports earlier than anticipated.

[18]  *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2022/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timelin.._.pdf.

the development of policies, procedures, rules, and regulations reasonably designed to achieve compliance. To attain Preliminary compliance, the City must have policies and procedures designed to guide officers, City employees, supervisors, and managers performing the tasks outlined in the Consent Decree. These policies and procedures must include appropriate enforcement and accountability mechanisms, reflect the Consent Decree's requirements, comply with best practices for effective policing policy, and demonstrate the City and its relevant entities' ability to build effective training and compliance.

- ❖ **Secondary compliance** typically refers to the development and implementation of acceptable and professional training strategies (¶642). Those strategies must convey the changes in policies and procedures that were established when we determined Preliminary compliance. Secondary compliance also refers to creating effective supervisory, managerial, and executive practices designed to implement policies and procedures as written (¶730). The IMT will review and assess the City's documentation—including reports, disciplinary records, remands to retraining, follow-up, and revisions to policies, as necessary—to ensure that the policies developed in the first stage of compliance are known to, are understood by, and are important to line, supervisory, and managerial levels of the City and the CPD. The IMT will be guided by the ADDIE model (Analysis, Design, Development, Implementation, and Evaluation) of curriculum development to assess training and will consider whether there are training, supervision, audit, and inspection procedures and protocols designed to achieve, maintain, and monitor the performances required by the Consent Decree.

- ❖ **Full compliance** refers to adherence to policies and training within day-to-day operations (¶642). Full compliance requires that personnel, including sergeants, lieutenants, captains, command staff, and relevant City personnel routinely hold each other accountable for compliance. In other words, the City must "own" and enforce its policies and training and hold officers accountable for misconduct through a disciplinary system that is fair, timely, and consistent. The IMT will assess whether the City's day-to-day operations follow directives, policies, and training requirements. When measuring Full compliance, we will note whether supervisors notice, correct, and supervise officer behavior and whether appropriate corrections occur in the routine course of business. In this phase, we will review whether compliance is reflected in routine business documents, demonstrating that reforms are being institutionalized. In addition, we will determine whether all levels of the chain of command ensure consistent and transparent compliance.

These levels typically correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and

(3) successfully implemented the policy reform in practice. Still, the three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training rather than to create a policy. Likewise, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate. In other circumstances, levels of compliance may include implementing effective pilot programs before rolling out reforms across the entire CPD.

Throughout this report, we provide our compliance assessments and descriptions of the status of current compliance based on efforts within the ninth reporting period. Under the Consent Decree, the City, the CPD, and other relevant City entities are not in any level of compliance until we find that they comply. As a result, a finding that the City is not in compliance with a requirement does not mean that the City has not made efforts—even significant efforts—to achieve compliance toward that requirement.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are complying. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its actions.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the ninth reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the City's evidence, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the City's evidence, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the City's evidence, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance, or the City has not met a lower level of compliance.

# I. Community Policing

## Guiding Principles

The IMT assessed whether the City complied with applicable Community Policing paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **8.** *Strong community partnerships and frequent positive interactions between police and members of the public make policing safer and more effective, and increase public confidence in law enforcement. Moreover, these partnerships allow police to effectively engage with the public in problem-solving techniques, which include the proactive identification and analysis of issues in order to develop solutions and evaluate outcomes.*

> **9.** *To build and promote public trust and confidence in CPD and ensure constitutional and effective policing, officer and public safety, and sustainability of reforms, the City and CPD will integrate a community policing philosophy into CPD operations that promotes organizational strategies that support the systematic use of community partnerships and problem-solving techniques.*

> **10.** *CPD will ensure that its community policing philosophy is a core component of its provision of police services, crime reduction strategies and tactics, training, management, resource deployment, and accountability systems. All CPD members will be responsible for furthering this philosophy and employing the principles of community policing, which include trust and legitimacy; community engagement; community partnerships; problem-solving; and the collaboration of CPD, City agencies, and members of the community to promote public safety.*

> **11.** *The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest.*

## Summary of Compliance Efforts and Assessments

### Community Policing Progress in the Ninth Reporting Period

In the ninth reporting period, the IMT assessed compliance with the Community Policing paragraph requirements by reviewing relevant policies, training curricula, and records, particularly those focused on the CPD's processing of juvenile arrestees. We also participated in a range of meetings with the CPD's leadership and Office of Community Policing, providing updates and addressing challenges to implementing paragraph requirements. During a site visit in October 2023, the IMT conducted group interviews with School Resource Officers (SROs), District Coordination Officers (DCOs), and Chicago Alternative Policing Strategy (CAPS) officers,

as well as field interviews of patrol officers. Additionally, the IMT attended a community conversation where residents were developing their district strategic plan.

The following bullet points highlight relevant developments in the ninth reporting period:

- After experiencing significant staffing reductions during the past year, our understanding is that in this reporting period the Office of Community Policing has been approved for additional positions in the new fiscal year budget—most of which are civilian roles. The next step for the City and the CPD is to complete hiring processes in a timely manner and curtail the practice of detailing this staff to other assignments.

- We remain concerned about the slow adoption of community policing as a *philosophy*, as required by ¶10. The Consent Decree requires "all CPD members" to be "responsible for furthering this philosophy." In nearly five years of the Consent Decree process, we have seen little evidence that the Bureau of Patrol and patrol officers are "employing the principles of community policing" in their daily activities.

- The CPD began to develop and put in place meaningful data capture and tracking systems to monitor performance and assess the efficacy of its programs and strategies through the Community Engagement Management System (CEMS). While we appreciate the CEMS as a solid starting place, we have concerns about reliability and reporting, and figuring out what the data means and how to apply data to guide program improvements and overall CPD field operations.

- The CPD continues to implement a well-refined and strategic development process in each of its 22 districts to produce crime prevention and community engagement approaches with some community input.

- The CPD demonstrated minimal improvement in improving documentation identifying their community partnerships (¶16) and how they are leveraging these partnerships to improve performance, build community trust, and achieve overall community safety goals. The CPD did not adequately address concerns about community input in the policy development process for key and impactful policies. While the CPD made some progress in enhancing community engagement, this remains an area of need and one where the IMT intends to provide technical assistance in the tenth reporting period.

- After an initial Neighborhood Policing Initiative (NPI) expansion to 10 police districts, further implementation has stalled over the last several reporting periods. In those districts implementing NPI, ongoing details of staff to other assignments has hampered their ability to perform their community outreach

and problem-solving roles. The IMT remains concerned about the future of this programming, and how the department will pursue its community policing goals, practices, and overall philosophy (*see* ¶9).

- In this reporting period, the CPD failed to provide the required community policing in-service training requirements (¶37) for CPD officers regarding community policing principles and practices by neglecting to include all required training elements (*see* ¶37(a)–(e)).

## Community Policing Progress through Nine Reporting Periods

Overall, the IMT assessed the City's compliance with 35 Community Policing paragraphs in the ninth reporting period (¶¶13–20 and 22–48). The City and the CPD maintained Preliminary compliance for 13 paragraphs (¶¶16, 19, 22–25, 27, 31, 37, and 45–48), met Preliminary compliance with one paragraph (¶32), maintained Secondary compliance for 13 paragraphs (¶¶15, 17–18, 26, 29, 34–36, 39–40, and 42–43), met Secondary compliance for five paragraphs (¶¶13, 14, 20, 28, and 41), maintained Full compliance with two paragraphs (¶¶30 and 44). *See* Community Policing Figure 1 below. The City did not reach Preliminary compliance with one paragraph (¶33) and lost Secondary compliance with one paragraph (¶37). *See* Community Policing Figure 2 below.

Community Policing Figure 1:     Compliance Progress for Community Policing Paragraphs at the End of the Ninth Reporting Period (December 31, 2023)



Community Policing
Compliance Progress by December 31, 2023

**Community Policing Figure 2:**
**Lost Levels of Compliance in the Community Policing Section**



## Looking Ahead to the Tenth Reporting Period

Looking ahead to the tenth reporting period, the IMT is hopeful that the CPD will accelerate efforts to achieve compliance in the Community Policing section of the Consent Decree by devoting more resources to establishing supervisory and tracking mechanisms to ensure effective implementation of newly enacted or revised CPD policies. The IMT expects the CPD to make significant progress in its overall community policing strategy, expanding effective initiatives to more police districts and articulating a comprehensive plan. The IMT also expects that the CPD will better define and improve their community engagement processes. The IMT will pay particular attention to how the CPD works with and coordinates the activities of the District Advisory Committees and the recently formed City of Chicago District Councils.[19]

As referenced above, the City and the CPD have made progress in this section by developing new or revised policies and training materials. The Consent Decree requires, however, additional policy changes. For example, at the end of the ninth reporting period, the City and the CPD continued developing the following policies:

- ❖ *CompStat and Command Engagement*          G01-08

- ❖ *Youth District Advisory Council*          S02-03-15

- ❖ *Field Arrest Procedures General Order*          G06-01-01

---

[19]  More information about the City's elected District Councils, which are a part of the Community Commission for Public Safety and Accountability may be found on the City's website: https://www.chicago.gov/city/en/depts/ccpsa/supp_info/district-councils.html.

The Consent Decree also requires additional training development, and at the end of the ninth reporting period, the City and the CPD continued developing the following new or revised training materials:

- ❖ Basic Law Enforcement Recruit Training on Custody Arrest Booking
- ❖ Integration Training Curriculum for DCO's and Community Policing Members, Parts 1–5
- ❖ Crime Victim Assistance eLearning Lesson Plan/Training Curriculum
- ❖ Recruit Curriculum on Victim Services
- ❖ Training Curriculum (Recruit, In-Service & Pre-Service) covering "Arrestee and In-Custody Communication"
- ❖ 2023 Youth Interactions In-Service Training
- ❖ Roll Call Training related to Diversion Program Roll-Out
- ❖ Pre-Service Training on Youth Diversion
- ❖ Recruit Training on Youth Diversion
- ❖ SRO Annual Refresher Training

We look forward to reporting on these finalized materials, as well as evidence that the City and the CPD have implemented reforms into practice.

The IMT strongly recommends that the City and the CPD expand and improve upon their partnerships and community engagement efforts in the tenth reporting period and beyond. Adequate resources and prioritization of community policing requirements by the City and the CPD are necessary for this to occur. Moving forward, we are hopeful that the City and the CPD can provide sufficient resources toward reforms related to the Community Policing section, including developing and implementing related policies, training, supervision mechanisms, and evaluation processes.

\*\*\*

Specific compliance assessments, by paragraph, for the Community Policing section are included in Appendix 1.

# II. Impartial Policing

## Guiding Principles

The IMT assessed compliance with applicable Impartial Policing paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **49.** The Parties agree that policing fairly, with courtesy and dignity, and without bias is central to promoting broad community engagement, fostering public confidence in CPD, and building partnerships between law enforcement and members of the Chicago community that support the effective delivery of police services.
>
> **50.** In conducting its activities, CPD will provide police services to all members of the public without bias and will treat all persons with the courtesy and dignity which is inherently due every person as a human being without reference to stereotype based on race, color, ethnicity, religion, homeless status, national origin, immigration status, gender identity or expression, sexual orientation, socio-economic class, age, disability, incarceration status, or criminal history.
>
> **51.** CPD will ensure its members have clear policy, training, and supervisory direction in order to provide police services in a manner that promotes community trust of its policing efforts and ensures equal protection of the law to all individuals.

## Summary of Compliance Efforts and Assessments

### Impartial Policing in the Ninth Reporting Period

In the ninth reporting period, the City and the CPD continued to struggle to make progress toward compliance with these important requirements. The City and the CPD produced various policies and training materials for IMT review. These included S02-01-05, *Communicating in a Police Environment eLearning*, *Interactions with Persons with Limited English Proficiency*, *Juvenile Processing Training (Recruits)* and the *Prohibition on Retaliation eLearning*. While the IMT submitted comments for some of these productions, we also issued no objection notices for others. Our review of these materials advanced the CPD's compliance.

During this reporting period, the City and the CPD delivered several trainings related to impartial policing, including the *Fair and Impartial Policing*; *Integrating Communications, Assessment, and Tactics (ICAT)*; *Constitutional Policing In-Service, Prohibition of Retaliation*; and *Hate Crimes* trainings. The IMT reviewed the

CPD's delivery of the *Constitutional Policing In-Service Training* along with documentation demonstrating that 95% of its officers had received this training. As a result of those efforts, the City and the CPD achieved Secondary compliance for ¶¶58 and 71. The City and the CPD also submitted supporting documentation demonstrating that 95% of its relevant personnel completed the *Fair and Impartial Policing* training. As a result, the City and the CPD similarly achieved secondary compliance with ¶¶54–56 and 59.

Further, the IMT reviewed the CPD's *Community Policing Annual Report* and the *2024 Training Plan* and issued no objection notices for both. While these documents are important to demonstrate that the City and CPD include concepts of impartial policing in its training plans from year to year, a more strategic approach is necessary to address the requirements of ¶¶53 and 72. The IMT has continued the discussion around these crucial requirements and has shared examples of similar strategic plans for incorporating impartial policing into department policies, training, and operations with the City and CPD. The IMT looks forward to continued discussions and to working with the CPD as it develops these strategic plans.

During a site visit in October 2023, the IMT learned of the CPD's efforts to increase staffing in the Office of Community Policing and the addition of several supporting positions—including a director to support the development of an Equity Office—by including these staffing changes in the budget request process. The IMT also discussed several other topics during its site visit, including changes to the *Community Engagement in Policy Development* pilot program (D22-08), updates on the status of Language Line and its availability to officers in the field, and the efforts that the ADA Coordinator has made over the past six months.

In short, while the City and the CPD's progress in the ninth reporting period has mostly stalled, the CPD continued to further develop related policies (i.e., S02-01-01 *People with Disabilities*, S02-01-05 *Limited English Proficiency*) and engaged the community on these policies. The City and CPD also delivered the *Communications in a Police Environment* eLearning during this reporting period. This eLearning, along with the policies and additional training related to Social Media Outlets, will be further assessed as part of compliance with ¶57 in future reports.[20]

The IMT looks forward to continuing to review progress on related policies, most importantly those related to interactions with people with disabilities and limited

---

[20]    In the City of Chicago's Comments to a draft of this report, the City purports that the CPD's Constitutional Policing and Communications in the Police Environment trainings cover addressed all of ¶57. Since then, the CPD has confirmed that these trainings do not address all requirements in ¶57, and the CPD is working on a standalone training to address the entirety of ¶57. This training has not yet been produced to the IMT for review. In addition to training, the Secondary compliance methodology for ¶57 also requires community engagement, such as a feedback loop with certain community organizations. *See* Consent Decree ¶52.

English proficiency as well as the CPD's efforts to engage the community in this process.

## Impartial Policing Progress through Nine Reporting Periods

In the ninth reporting period, we assessed the City's compliance with 31 Impartial Policing paragraphs (¶¶52–82)—with two of those paragraphs containing conditional requirements that do not apply (¶¶81–82).[21] The City maintained Preliminary compliance for eight paragraphs (¶¶52, 57, 60–61, 63, 65–66, and 70), maintained Secondary compliance for six paragraphs (¶¶67, 73–74, and 76–78), and met Secondary compliance for six paragraphs (¶¶54–56, 58–59, and 71). The City is under assessment for Preliminary compliance for one paragraph (¶75) and failed to reach Preliminary compliance with the remaining eight paragraphs assessed (¶¶53, 62, 64, 68–69, 72, and 79–80). *See* Impartial Policing Figure 1 below.

Impartial Policing Figure 1:      Compliance Progress for Impartial Policing Paragraphs at the End of the Ninth Reporting Period (December 31, 2023)



Impartial Policing
Compliance Progress by December 31, 2023



- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

## Looking Ahead to the Tenth Reporting Period

In the ninth reporting period, the City and the CPD continued to struggle to make significant progress with the Impartial Policing section of the Consent Decree. As noted above, the City and the CPD have not made any progress since the inception

---

[21]   Specifically, because ¶¶79–82 are interrelated, we assessed their compliance together. Paragraph 82, however, does not contain a substantive requirement for the City. Likewise, ¶81 contains conditional requirements that may never apply and, at the time of this report, do not apply.

of the Consent Decree with eight paragraphs in the Impartial Policing section. Moving forward, we urge the City and the CPD to provide sufficient resources toward reforms related to the Impartial Policing section.

The City and the CPD have, however, been developing new and revised policies, written guidance, and training to make some progress in this section. At the end of the ninth reporting period, the City and the CPD continued developing, for example, the following new or revised policies:

- ❖ Search Warrants        S04-09
- ❖ Limited English Proficiency Policy        S02-01-05
- ❖ Interactions with People with Disabilities        S02-01-01
- ❖ Community Engagement in Policy Development        D22-08

At the end of the ninth reporting period, the City and the CPD continued developing, for example, the following new or revised trainings:

- ❖ TASER 10 Initial Training Curriculum
- ❖ OEMC Diversity Awareness Training

We look forward to reporting on these materials, as well as evidence that the City and the CPD have implemented reforms into practice.

***

Specific compliance assessments, by paragraph, for the Impartial Policing section are included in Appendix 2.

# III. Crisis Intervention

## Guiding Principles

The IMT assessed compliance with applicable Crisis Intervention paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **83.** *CPD officers often serve as first responders to individuals experiencing a behavioral or mental health crisis. These individuals may exhibit symptoms of known, suspected, or perceived behavioral or mental health conditions, including, but not limited to, mental illness, intellectual or developmental disabilities, or co-occurring conditions such as substance use disorders. The Parties acknowledge that having a mental illness, an intellectual or developmental disability, or co-occurring condition does not mean an individual necessarily is in crisis, or that having a behavioral or mental health condition would necessarily be the reason for any crisis that requires police involvement. However, it may need to be considered or warrant heightened sensitivity to ensure an appropriate response. Therefore, individuals in the groups listed above will be collectively referred to as "individuals in crisis" for the purposes of this Agreement.*

> **84.** *A person may be a suspected individual in crisis based on a number of factors, including, but not limited to, self-reporting; information provided by witnesses, family members, or individuals requesting service; CPD's previous knowledge of the individual; or an officer's direct observation.*

> **85.** *CPD officers will interact with individuals in crisis with dignity and respect. The use of trauma-informed crisis intervention techniques to respond appropriately to individuals in crisis will help CPD officers reduce the need to use force, improve safety in police interactions with individuals in crisis, promote the connection of individuals in crisis to the healthcare and available community-based service systems, and decrease unnecessary criminal justice involvement for individuals in crisis. CPD will allow officers sufficient time and resources to use appropriate crisis intervention techniques, including de-escalation techniques, to respond to and resolve incidents involving individuals in crisis. To achieve these outcomes, the City and CPD will implement the requirements set out below.*

> **86.** *The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest for individuals in crisis.*

# Summary of Compliance Efforts and Assessments

## Crisis Intervention in the Ninth Reporting Period

During the ninth reporting period, the CPD, the Office of Emergency Management and Communications (OEMC), and the Chicago Council on Mental Health Equity (also referred to as the CCMHE) continued to work to address the requirements in the Crisis Intervention section of the Consent Decree related to policy, training, operational practices, and community engagement. While there are some notable improvements, progress in this section has generally stalled and, in certain areas, regressed.

Still, through nine reporting periods, the CPD has made significant progress in annually reviewing Crisis Intervention-related policies and standard operating procedures, and actively solicited input from both the Chicago Council on Mental Health Equity and the public. While there is room for improvement, we very much appreciate the CPD's efforts in this area. The CPD has also made great strides in equipping all officers in best practices related to crisis response and de-escalation through significantly enhanced annual in-service training.

The OEMC has also made strides this reporting period producing training attendance records with significantly more detail, as well as complete training evaluations.[22] Additionally, the OEMC produced drafts of updated policies incorporating notable changes related to mental-health response.

The IMT continued to participate in monthly calls with the City, the OEMC, and the CPD, as well as observe the quarterly Chicago Council on Mental Health Equity meetings. The IMT also conducted in-person and virtual site visits and reviewed policy, training, and data throughout the ninth reporting period to assess compliance with the Consent Decree. For example, the IMT met with CIT data analysts, conducted interviews with several current and former members of the Chicago Council on Mental Health Equity, and met with representatives from the Mayor's Office.

### The Chicago Police Department (CPD)

The IMT's main concern continues to be that the CPD's Crisis Intervention Unit (CIU) remains severely understaffed, now comprising about half the number of

---

[22] The City and the CPD incorporated required reforms from the Crisis Intervention section into various policies and written guidance. We encourage the City and the CPD to identify a clear process and timeline for the required annual review and revision of policies and training courses based on issue dates. Moving forward, the City and the CPD must provide the IMT with evidence of how and when they are accomplishing the required annual review and revisions.

members compared with 2021. *See* ¶89.[23] The Crisis Intervention Unit consists of people who are dedicated to the unit's mission and passionate about the role and purpose of the CIT Program. But the current staffing levels are wholly insufficient to fulfill Consent Decree requirements. Without sufficient, qualified, and strategically assigned staff, the CIT unit supervisor and remaining CIU personnel are simply unable to accomplish the mission of the Crisis Intervention Team program.

Crisis Intervention Figure 1:
Crisis Intervention Unit Staffing over Several Reporting Periods

| Reporting Period | Commander | Lieutenants | Sergeants | Officers | Community Outreach Coordinator | Data Analyst | Totals |
|---|---|---|---|---|---|---|---|
| IMR-4 | 1 | 1 | 7 | 46 | 1 | 0 | 56 |
| IMR-5 | 0 | 1 | 7 | 39 | 1 | 0 | 48 |
| IMR-6 | 0 | 1 | 7 | 38 | 0 | 1 | 47 |
| IMR-7 | 0 | 1 | 4 | 24 | 0 | 1 | 30 |
| IMR-8 | 0 | 1 | 5 | 22 | 0 | 1 | 29 |
| IMR-9 | 0 | 1 | 5 | 20 | 1 | 1 | 28 |

For example, the CIT District, Operations and Community Support (DOCS) unit—which the CPD has been attempting to use as a dedicated, proactive outreach to high-frequency utilizers of 911—has been too understaffed and under-resourced to meet its objectives. *See*¶91. The CIT DOCS personnel have confirmed that staffing constraints prevent them from conducting the required crisis-call follow-up activities that are essential to a successful diversion program. These CIT DOCS members are also unable to adequately respond to CIT Reports and build community partnerships while capturing the necessary data that supports the important work of the CIT DOCS unit. The CIT DOCS unit presently has 11 officers covering the entire city of Chicago.

At the outset of the Consent Decree, the CPD promoted a Voluntary CIT model. During the fourth reporting period, the CPD shifted to a mandatory CIT model, which required all officers to receive the 40-hour Basic CIT training. During the ninth reporting period, the CPD announced that it is reverting to a voluntary "Memphis Model" CIT program.[24] While there are benefits and challenges with

---

[23] Paragraph 89 requires "a qualified, centralized staff, including supervisors, officers, and civilian employees, who is necessary to oversee the department-wide operation of the CIT Program, carry out the overall mission of the CIT Program, and perform the objectives and functions of the CIT Program."

[24] In the seventh reporting period, the CPD revised its officer designations related to CIT. The IMT mirrored the CPD's updated language to avoid confusion. The term "Certified Crisis Intervention Team (CIT) Officers" is used throughout the Consent Decree. *See* ¶92. The CPD moved away from a strictly voluntary CIT model to one that is a hybrid voluntary/mandatory CIT

both models, this change will require the OEMC and the CPD to make updates to policy, training, and operational practices, which may delay additional levels of compliance. For example, early this reporting period, the IMT approved the CPD's directive S05-14, *Crisis Intervention Team (CIT) Program*, which would have allowed the City and the CPD to achieve Preliminary compliance with several paragraphs. However, the CPD now needs to revise this expansive directive. The IMT anticipates that the CPD will be able to implement the new S05-14 in the tenth reporting period.[25]

The CPD model of response to crisis calls needs substantial attention, particularly considering the size of Chicago. Currently, the CPD focuses largely on non-dedicated patrol response by a majority of officers who have not received specialized training since before the Consent Decree: about 20% of all current Certified CIT officers were trained over 10 years ago (2004–2012) without refresher training; and about a third of all Certified CIT officers were trained more than seven years ago (2004–2015) with no refresher training; and nearly half (46.51%) of Certified CIT officers were trained six or more years ago (2004–2016) without refresher training.

Such deficiencies in training protocols not only deviate from recognized best practices but also fall short of the standard requisite for a voluntary, specialized model. Under the Memphis (voluntary) model, these officers should establish that they

---

model, in which all officers are required to take the 40-hour Basic CIT training. *Certified* CIT officers are now being identified as "Designated CIT officers" by the CPD. Designated CIT officers are those officers who voluntarily request to be Crisis Intervention Team members and prioritized to calls for service involving a mental health component. Mandatorily assigned officers who do not select to be identified as a Designated CIT officer at the end of the 40-hour Basic CIT training are now identified as "CIT Trained officers." The OEMC prioritized CIT Trained officers, secondary to a Designated CIT officer for dispatch to mental health calls for service. Officers who have not yet been through the 40-hour Basic CIT training are simply identified as Untrained. In the ninth reporting period, the CPD announced that it was returning to the original "Memphis Model" of CIT, and therefore, the language is reverting to previous language. To mirror the CPD's language, the IMT will revert to the term "Certified Crisis Intervention Team (CIT) Officers" as used throughout the Consent Decree. *See* ¶92.

[25] Relatedly, during this reporting period, the CPD informed the IMT that the CPD receives between one and eight voluntary CIT applications per month, an important consideration with the reversion back to the voluntary CIT model. The CPD still has not completed the full eligibility review of those officers that should, according to the CPD's eligibility standards, qualify as "Certified CIT officers" (*see* ¶¶108–110). Without this eligibility review, the CPD will be unable to demonstrate sufficient response ratios. Currently, if an officer has ever received the 40-hour Basic CIT training, then that officer is considered a "Certified CIT officer." The CPD should revise this eligibility standard in the next reporting period. There are department members who received training as far back as 2004, and who have received no refresher training since, that are being identified as Certified CIT officers. We recommend that the CPD un-designate in CLEAR previously certified officers who received their training before April 30, 2021, when the IMT approved the current CIT Basic training. The CPD should then complete its eligibility review process before establishing the required cadence of CIT Refresher training every three years.

---

desire to remain voluntary certified CIT officers before enrollment in the 40-hour Basic CIT Training. Once these officers have retaken the Basic 40-hour CIT training, they should then fall into the required refresher training cadence of every three years. *See* ¶95.

Further, the CIT Training Unit presently consists of six officers and two sergeants, down from 13 officers and three sergeants in April of 2020. This unit is charged with teaching the 40-hour Basic CIT training, the CIT Refresher training, and the Advanced Youth and Advanced Veteran trainings. These training courses are taught nearly every week, rotating between the weeklong Basic CIT class (17 classes in 2023); the Refresher Courses (23 classes in 2023), and the Advanced Classes (five classes in 2023). Despite being understaffed, the CIT Training Unit continues to provide the Basic CIT Training and CIT Refresher training all year. The CIT Training Unit has, however, had to cancel its Advanced CIT Youth and Advanced CIT Veterans training deliveries due to staffing shortages, which is crucial for training School Resource Officers (SROs) and for providing opportunities to expand knowledge and skills for the Crisis Intervention Unit and patrol-based CIT officers.[26]

***

Still, despite significant challenges in the ninth reporting period, the City and the CPD have demonstrated progress toward achieving compliance for several paragraphs in the Crisis Intervention section. For example, the CPD produced comprehensive training records indicating 95% compliance with required crisis intervention related training for all officers. The eight-hour *Crisis Intervention* training, new in 2023, covered key components of signs, symptoms, and best-practice responses to individuals in crisis, which is an important accomplishment.

In addition to the eight-hour *Crisis Intervention Training*, the CPD required all officers in 2023 to attend the *Integrating Communications Assessments and Tactics* (ICAT) training, which is a nationally recognized training focused on communication and de-escalation skills.

---

[26] The CIU trainers also require sufficient administrative support to ensure their attention is directed towards fulfilling a rigorous training regimen, and on crucial components of the training such as scenario-based exercises. Currently, the CIU trainers must devote time and energy to administrative tasks in addition to a stringent teaching rotation. Some of the administrative tasks that trainers are completing include reviewing CIT applications, scheduling trainings, obtaining supplies, administering training evaluations, catering, scheduling, and completing background checks.

The CPD has also incorporated a *CIT Recruit Concepts* training into its Recruit Academy. This training is well done and incorporates some of the requirements of ¶127.[27]

The CPD has also incorporated increased training on de-escalation strategies into its annual *De-escalation, Response to Resistance, and Use of Force* training, which together is bringing the CPD much more aligned with best practices. Newly promoted Sergeants, Lieutenants, and Field Training Officers are also receiving *CIT Basic* training per ¶102.

We appreciate the CPD taking important steps toward training all officers on response to individuals in crisis, with an emphasis on de-escalation strategies. To advance compliance with the Consent Decree, the IMT urges the CPD to produce training evaluations in subsequent reporting periods, a task unfulfilled in the last several reporting periods. We also recommend that the CPD enhance effort to involve the Chicago Council on Mental Health Equity in training observations, as required under the Consent Decree.[28]

### City of Chicago Collaboration

The priorities of expanding non-criminal justice responses to persons in crisis and complying with the guiding principles of the CIT program requires close collaboration among City entities alongside the CPD. The OEMC, for example, plays crucial role in the requirements of the Crisis Intervention section of the Consent Decree.[29]

As identified by the Consent Decree (¶¶87(d), 130–31), the leadership of the CPD, Chicago Fire Department (CFD), the OEMC, and Department of Public Health (DPH) must work together to forge a best practice model of crisis response, as well as re-engage the Advisory Committee.[30]

---

[27] The CPD indicated that is has developed two additional training courses—*Mental Health Awareness and Response* and *Neurobiology of Trauma and PTSD*—that may address the remaining subjects, but these two training courses have not yet been produced to the IMT for review.

[28] To date, there has been little evidence of such oversight. The CPD, if appropriate, may want to consider whether it is feasible to utilize the established TCAC for CIT policy and training review, given its representation from notable organizations also involved in Chicago Council on Mental Health Equity, like NAMI, Ignite Chicago, Access Living, ARC, Thresholds, and Bobby Wright Comprehensive Behavioral Health Center.

[29] The OEMC made substantial progress this reporting period producing training records, training evaluations, and revisions to three of the four Crisis Intervention related policies. While we appreciate these efforts, the IMT seeks clarity from the OEMC about why some content was removed from these policies.

[30] The following are a few examples of the current challenges in this area: First, several paragraphs in the Crisis Intervention section (and other sections) require "timely" response. At nearly five years into the Consent Decree, the CPD and OEMC still have not defined "timely,"

The *Crisis Assistance Response Engagement* (CARE) pilot program is one example of this kind of partnership.[31] Despite progress under this pilot, the City has been reluctant to provide policies, training, and data related to this alternate response program. The CARE program aims to divert people in crisis away from the criminal justice system, a model of diversion and deflection as noted by ¶¶11 and 86.[32]

Crisis Intervention Figure 2: CARE Pilot Program – Types of Responses

| CARE Pilot Program's Three Types of Responses | |
|---|---|
| **Pre-response** | Staffs mental-health professionals in the City's 911 Call Center to provide support to callers, call takers, dispatchers, and response teams. |
| **Alternate Response** | The 911 Call Center will dispatch mental-health professionals with first responders to respond to people in crisis. |
| **Post-response** | Links residents with appropriate community-based services and uses alternate drop-off sites for people in behavioral health crisis. |

which undermines the City's ability to set and meet expectations, assess response ratios, and track trends. The CPD, CFD, and OEMC should utilize CPD and CFD response time data for all calls for service, by priority level and national best practices, to define what qualifies as a "timely" response. Second, at this time, the OEMC is only able to track at the point of dispatch, not the point of arrival on-scene. Therefore, it is unknown if there is a "timely" response by a CIT officer. As we understand it, the new CAD system with GPS that is due to be implemented soon should help address this. Third, the IMT continues to have concerns about the CPD and the OEMC using the term "mental" as the event code associated with mental health-related calls for service. They have indicated this is difficult to change with the current CAD system. "Mental" is not a respectful term nor is it industry recognized. *Compare* ¶¶135, 152.

[31] The CARE program includes three types of responses: (1) pre-response, which staffs mental-health professionals in the City's 911 Call Center to provide support to callers, call takers, dispatchers, and response teams; (2) alternate response, where the 911 Call Center will dispatch mental-health professionals with first responders to respond to people in crisis; and (3) post-response, which links residents with appropriate community-based services and uses alternate drop-off sites for people in behavioral health crisis.

[32] The City has largely resisted IMT efforts to obtain relevant information about the CARE Program and has indicated that it considers the CARE Program to be separate and apart from the Consent Decree. The IMT strongly encourages the City to re-evaluate this position in light of the Consent Decree requirements. Moreover, the CARE Program is an excellent example of a successful, proactive diversion program that provides an alternative to arresting individuals in crisis. The City should be commended for these successful efforts, and the IMT believes that increased transparency will only increase public support for the program.

Relatedly, the City and the CPD still have not yet completed the required *Crisis Intervention Team Officer Implementation Plan* nor the required *Crisis Intervention Plan*. (*See* ¶¶108 and 122). Although required annually, the last report was submitted in 2020. While the IMT appreciates delaying these reports until they are supported by more robust strategies and reliable data, the City should at minimum produce an annual report demonstrating any progress toward producing the report, as well as the barriers that continue to cause the delay and the plans to overcome them.

### The Chicago Council on Mental Health Equity (CCMHE)

The Chicago Council on Mental Health Equity is composed of talented, dedicated experts and people with lived experience who are eager to provide crucial feedback to the City. During the ninth reporting period, the Chicago Council on Mental Health Equity appears to face significant challenges, potentially marking its most challenging phase to date. The quarterly meeting on July 31, 2023, marked the Chicago Council on Mental Health Equity's return to in-person meetings following the pandemic and attendance was exceptionally low. IMT interviews with long-term members of the Chicago Council on Mental Health Equity during this reporting period have revealed disengagement and frustration with the lack of meaningful utilization of expertise and progress. The quarterly meeting on November 6, 2023, also had low attendance, again not meeting quorum.[33] Members have also repeatedly offered recommendations to the OEMC related to triage questions and strategies for children and youth. These recommendations have not received responses.

## Crisis Intervention Progress through Nine Reporting Periods

During this reporting period, the IMT assessed the City's compliance with 66 Crisis Intervention paragraphs: ¶¶87–152. The City maintained Preliminary compliance with 38 paragraphs (¶¶87–95, 98, 100–05, 114–15, 117, 119–21, 124–25, 127–32, 136, 141–45, 147, and 150), met Preliminary compliance with one paragraph (¶151), and maintained Secondary compliance with 16 paragraphs (¶¶96–97, 99, 106, 113, 116, 118, 126, 133–35, 138–40, 146, and 152). At the end of the ninth reporting period, the City did not have any compliance levels with 11 paragraphs

---

[33] Moreover, the IMT remains concerned about the Chicago Council on Mental Health Equity's transparency for all Chicagoans. Regarding transparency and wider public engagement, the Chicago Council on Mental Health Equity's bylaws, which were implemented in 2022, require a standard that limits public engagement (requires questions to be submitted within 48-hours of the meeting while not having access to the presentations that will be discussed). There have been no comments or questions from the public in over a year.

(¶¶107–12, 122–23, 137, and 148–49). These figures reflect that in the ninth re-porting period, the City lost Secondary compliance with four paragraphs (¶¶92, 132, and 142–43) and lost Full compliance with two paragraphs (¶¶142–43).

Crisis Intervention Figure 2:     Compliance Progress for Crisis Intervention
Paragraphs at the End of the Ninth Reporting Period (December 31, 2023)



Crisis Intervention Figure 3:
Lost Levels of Compliance in the Crisis Intervention Section



## Looking Ahead to the Tenth Reporting Period

In the tenth reporting period, the City and the CPD should re-evaluate its Crisis Response Model to build a more robust program capable of meeting Consent Decree requirements and aligning with best practices. In addition to key crisis response components, the CPD should consider dedicated district CIT patrol units that are solely responsible for response to live mental-health-related calls for service. Presently, the CPD has a minimalist model that struggles to meet both Consent Decree requirements and the mission of the CIT program.

In the tenth monitoring period, the IMT hopes to receive a finalized S05-14 *Crisis Intervention Team* policy, CIT officer eligibility data, CPD training evaluations, updates on the new CAD system, evidence of revised or supplemental trainings that fully meet ¶127's requirements, and a training plan to prioritize officers who received the 40-hour CIT training before the Consent Decree to reestablish their voluntary status and recertify in the updated 40-hour training.

Finally, the IMT looks forward to consideration of a standardized measurement tool for the required review of body worn camera footage at the end of each watch and encourages the CPD to consider requiring at least one of the Consent Decree mandated body-worn-camera reviews by supervisors at the end of each shift (*see* S03-14, *Body Worn Cameras*, Section VIII.G; *see also* ¶576) be a mental-health call for service (z-coded by the CPD).

***

Specific compliance assessments, by paragraph, for the Crisis Intervention section are included in Appendix 3.

# IV. Use of Force

## Objectives[34]

The IMT assessed compliance with applicable Use of Force paragraphs in accordance with the Consent Decree's corresponding objectives:

> **153.** CPD's use of force policies, as well as its training, supervision, and accountability systems, must ensure that: CPD officers use force in accordance with federal law, state law, and the requirements of this Agreement; CPD officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; when using force, CPD officers only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and any use of unreasonable or unnecessary force is promptly identified and responded to appropriately.
>
> &#42;&#42;&#42;
>
> **155.** CPD officers have the authority to use force, but that authority is limited by the law and Department policy. The provisions of this Agreement seek to facilitate compliance with the law and Department policy regarding the use of force to reduce the circumstances in which using force is necessary, and to ensure accountability when CPD officers use force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances.

## Summary of Compliance Efforts and Assessments

### Use of Force in the Ninth Reporting Period

In the ninth reporting period, the City and the CPD largely maintained the same levels of compliance that they achieved in previous reporting periods and achieved several new levels of compliance for paragraphs in the Use of Force section, including achieving Full compliance for a few paragraphs.

In the ninth reporting period, the City and the CPD achieved Secondary compliance with several paragraphs based on their training on the CPD's use-of-force policies, which were revised as part of the CPD's efforts to engage the community. We stated in *Independent Monitoring Report 7* that to regain Preliminary and Secondary compliance, the CPD needed to implement and provide training on the revisions to its policies that it agreed to with the Coalition. Since then, the CPD has implemented these long-contemplated changes in the eighth reporting period and completed training on them in the ninth reporting period.

---

[34] The Use of Force section of the Consent Decree includes "objectives" rather than "guiding principles."

At the end of this reporting period, the CPD finalized and put into effect its updated *Body Worn Cameras* policy, S03-14. The CPD posted the latest version of S03-14, *Body Worn Cameras*, on December 1, 2023, for public comments, which closed on December 17, 2023. On December 29, 2023, the CPD issued the *Body Worn Cameras* policy. The CPD also indicated that evidence of community engagement will be submitted to the IMT in the tenth reporting period. The IMT looks forward to reviewing CPD's efforts to meaningfully engage the community regarding this policy.

Furthermore, the latest collective bargaining agreement between the Fraternal Order of Police and the City may require adjustments to the policy. In particular, the issues of body worn cameras not being used to record conversations with union representatives and conversations in which officers are not engaged with the public may impact public safety questions.[35]

The OAG and Coalition have continued to express concerns with the policy. In December 2023, the Coalition raised concerns regarding body-worn cameras, such as early deactivation of cameras, supervisors reviewing only one body-worn camera per shift, supervisors' failures to review footage to ensure probable cause for police actions, and potential conflicts between the CPD's policy and the contract with the Fraternal Order of Police. Similarly, the OAG raised concerns about the deactivation of cameras during public safety questioning. Despite numerous discussions on the recording of public safety questions and the body worn cameras policy, an agreement in this matter has not been reached. The OAG submitted a motion for judicial resolution on this issue after the end of the reporting period.

This reporting period, the IMT reviewed several new or revised policies and training intended to address the Consent Decree's requirements regarding the Use of Force section. For example, we reviewed and commented on draft training materials for the *Taser 10* course and *Law Enforcement Medical and Rescue (LEMART) and Officer Wellness* training. In addition, several important draft policies were created or revised, including the following: *Response to Crowds, Protests, and Civil Disturbances*; *Declaration of a Coordinated Multiple Arrest Incident*; and *Alternative Arrest Procedures During Coordinated Multiple Arrest Incidents*.

We met regularly with the City, the CPD, and the OAG to address the Use of Force requirements in the Consent Decree, including ongoing productions from the City and the CPD.

We also continued to review reports published by the Tactical Review and Evaluation Division (TRED, formerly known as the Force Review Division (FRD) or the Force Review Unit (FRU)). We remain impressed with TRED's professionalism and

---

[35] Collective Bargaining Agreement, City of Chicago (December 7, 2023) at 10, https://s3.documentcloud.org/documents/24223649/chicago-fop-contract.pdf.

its efforts to observe, address, and publicly report on patterns and trends relating to uses of force, foot pursuits, and firearm pointing incidents—even with inadequate resources for its responsibilities.

TRED fell behind on its reviews during the fifth reporting period because of insufficient staffing, and the backlog grew in the sixth and seventh reporting periods. In previous reporting periods, attempts to address the backlog included 20 officers being detailed to TRED for 90 days, with an extension on that detail for officers to remain with the unit. There have also been attempts to hire civilians part-time, as well as hiring additional officers to the TRED unit. In this reporting period, TRED continues to review all foot pursuits. Meanwhile, the CPD continues to assign TRED new and important responsibilities regarding the observation and analysis of patterns and trends in the CPD's practices. We recommended in the eighth reporting period–and continue to recommend–that district- and unit-level supervisors take on some of the firearm pointing review responsibilities currently shouldered by TRED.

At the end of the ninth reporting period, therefore, more work was necessary. The City and the CPD's data issues have continued to hamper the CPD's ability to evaluate its use-of-force policies, training, and operations. *See* ¶¶572–73 and 606. Additionally, trust is critical in a police department's efforts to achieve community policing and the goals of the Consent Decree. Until the City and the CPD adequately prioritize their data issues, their progress in the Use of Force section (among others) will stall. This will require the City and the CPD to, among other things, consistently devote sufficient resources to address its data and supervision efforts, including adequately staffing TRED.

## Use of Force Progress through Nine Reporting Periods

During this reporting period, the IMT assessed the City's compliance with 96 Use of Force paragraphs. At the end of the ninth reporting period, the City maintained Preliminary compliance for 11 paragraphs (¶¶153, 157–59, 174, 193, 206, 214–15, 217, and 228). The City achieved Preliminary compliance with five paragraphs (¶155–56, and 239–41). The City maintained Secondary compliance for 55 paragraphs (¶¶154, 161–66, 168–69, 172–73, 175–79, 182–84, 186–87, 189–92, 196, 200, 202–03, 205, 207–12, 216, 218–27, 229–35, and 247) and achieved Secondary compliance for nine paragraphs (¶¶167, 171, 198–99, 201, 204, 213, and 243–44). The City maintained Full compliance for five paragraphs (¶¶170, 180, 188, and 194–95) and achieved Full compliance with six paragraphs (¶¶181, 185, 197, 245–46, and 248). The City's Preliminary compliance for five paragraphs remained under assessment at the end of the ninth reporting period (¶¶160, 236–38, and 242).

Use of Force Figure 1:                      Compliance Progress for Use of Force
Paragraphs at the End of the Ninth Reporting Period (December 31, 2023)



The CPD has made significant progress with its use-of-force policies, training, and analysis of data since the start of the Consent Decree. Through nine reporting periods, for example, the City and the CPD have incorporated required reforms from the Use of Force section into various policies and written guidance. In preparation for the Democratic National Convention, for instance, the CPD is in the process of revising and adapting the use of force reporting and other related polices. While we have had and continue to have concerns with the CPD's corresponding community engagement efforts and strategies, the CPD has made and continues to make meaningful efforts toward improving its corresponding community engagement and efforts to receive community input.

Through nine reporting periods, the City and the CPD have also developed or updated training materials to incorporate requirements across the Use of Force section. For example, because of the Consent Decree, the CPD has developed and delivers use-of-force in-service training *every year*, which includes training on de-escalation and force mitigation. The CPD is also streamlining their weapons qualifications training to incorporate carbine, firearms, and Tasers.

The CPD has also increased the workload carried by the Tactical Review and Evaluation Division (also known as TRED, and formerly known as the Force Review Division or Force Review Unit) in the time since the Consent Decree became effective. TRED reviews use-of-force incidents, firearm-pointing incidents, and all foot pursuits to identify and allow the CPD to address patterns and trends. It is also our understanding that TRED's responsibilities will soon be expanded to include search

warrant reviews.[36] Attempts are being made to increase TRED personnel, but more progress remains to be seen.

Furthermore, the CPD began using the new Incident Debrief Report (IDR) that TRED was developing in the seventh reporting period and was implemented in the ninth reporting period. The Incident Debrief Report streamlines TRED's review and identification of de-briefing points for incidents involving multiple reportable events (uses of force, firearm pointing, and foot pursuits).

Finally, while significant challenges remain, the CPD has continued to make progress in its public reporting of use-of-force data. For example, the CPD makes relevant data available to the public via its Use of Force Dashboard.[37] TRED also publishes semiannual and yearly reports that contain analysis of and conclusions about the CPD's use-of-force data, including data collected via Tactical Response Reports (TRRs), firearm-pointing incidents, and foot pursuits.

## Looking Ahead to the Tenth Reporting Period

In the ninth reporting period, the City and the CPD continued making progress toward compliance with the Use of Force requirements of the Consent Decree, particularly related to policy and training requirements. Community engagement, data, and staffing challenges continue to present significant hurdles to further levels of compliances.

Nonetheless, at the end of the ninth reporting period, the City and the CPD were also continuing to develop new and revised policies, written guidance, and training materials to make progress in this section.

For example, by the end of the ninth reporting period, the CPD was continuing to review its revised *Body Worn Cameras* policy pending conversations with the IMT and OAG. The CPD's policy did not take effect until December 29, 2023, days before the end of the ninth reporting period, and we look forward to monitoring the CPD's progress regarding officers' body-worn camera use and reporting on progress in our next report.

---

[36] "It should be noted that the annual and quarterly reports were previously produced by the Force Review Unit (FRU). Moving forward these reports will be generated by the Tactical Review and Evaluation Division (TRED). The new name change more accurately reflects TRED's focus on new and future responsibilities which include search warrant, foot chase and investigative stop reviews." *TRED 2022 Q1 Report*, CPD TRED (August 16, 2022), https://home.chicagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf.

[37] *See Use of Force Dashboard*, CHICAGO POLICE DEPARTMENT (2015 to present), https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

Likewise, the CPD demonstrated its *Tactical Response Report Supervisory Dashboard* for the IMT during the seventh reporting period, which we hope will enhance front-line supervision and promote accountability for Department supervisors over those they supervise and their training needs. The CPD in this reporting period submitted attendance records for the TRR Supervisory Dashboard Training Bulletin. While the training includes the benefits to supervisors, the primary focus continues to be how to use the dashboard. We look forward to reviewing evidence of supervisors utilizing the TRR dashboard.

In the ninth reporting period, the City and the CPD continued to dedicate significant efforts to identifying and addressing data issues, particularly regarding foot pursuits. As we noted in previous reporting periods, until the CPD can appropriately collect, manage, and analyze data related to the Use of Force section, among others, the City and the CPD cannot sufficiently demonstrate whether the CPD's practices have improved. This will, in turn, prevent the City and the CPD from becoming a true learning agency, capable of reviewing and revising policies and training in a way that is data driven and specific to the needs of Chicago's communities and CPD officers. While TRED's *2023 Mid-Year Report* provides data on foot pursuit reviews, we hope to provide additional context with the publication of their year-end report.

***

Specific compliance assessments, by paragraph, for the Use of Force section are included in Appendix 4.

# V. Recruitment, Hiring & Promotions

## Guiding Principles

The IMT assessed compliance with the Recruitment, Hiring, and Promotions paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **249.** *Having a department that recruits, hires, and promotes officers who are qualified to meet the increasingly complex needs of law enforcement and that reflects a broad cross section of the Chicago community in which it serves is critical to accomplishing the following goals: running a professional police force; building community trust and confidence; increasing legitimacy and acceptance of CPD's supervision and accountability systems; and reducing perceptions of bias.*

> **250.** *The provisions of this Agreement are designed to ensure that CPD attracts, hires, retains, and promotes individuals who are equipped to perform their jobs safely, effectively, and in accordance with the law, CPD policy, and the terms of this Agreement. Further, this Agreement is designed to ensure that CPD promotes individuals who are capable of: providing effective supervision; guiding officers under their command on lawful, safe, and effective policing; and holding officers accountable for misconduct.*

> **251.** *The City and CPD's recruitment, hiring, and promotions policies and practices will show a commitment to attracting, hiring, and promoting qualified candidates at all ranks that reflect a broad cross section of the Chicago community the Department serves.*

> **252.** *The Parties acknowledge that the City and CPD are currently subject to the City of Chicago Police Department Hiring Plan for Sworn Titles ("Hiring Plan"), dated May 14, 2014, which may be subject to change in the future.*

## Summary of Compliance Efforts and Assessments

### Recruitment, Hiring, and Promotions in the Ninth Reporting Period

In the ninth reporting period, the City and the CPD did not achieve additional compliance with the requirements of the Consent Decree but demonstrated continued progress towards implementation of the Consent Decree requirements. This reporting period, the City and the CPD maintained compliance levels with most paragraphs this reporting period.

The City and the CPD's current efforts this period focused on improving promotional processes. Outcomes from these efforts are consistent with their steady pro-

gressive approach and will strengthen compliance with Consent Decree requirements. Sustained robust recruitment and hiring processes are required to lift the CPD out of the acute staffing shortages it currently faces.

## Recruitment, Hiring, and Promotions Progress through Eight Reporting Periods

Overall, the City and the CPD maintained Preliminary compliance for seven paragraphs (¶¶253–54, 256, 260, 262, and 264), maintained Secondary compliance for four paragraphs (¶¶255, 258–59, and 261), achieved Secondary compliance for one paragraph (¶263), and maintained Full compliance for one paragraph (¶257)). *See* Recruitment Figure 1 below.

Recruitment Figure 1: Compliance Progress for Recruitment, Hiring & Promotions Paragraphs at the End of the Ninth Reporting Period (December 31, 2023)





Recruitment, Hiring, and Promotions
Compliance Progress by December 31, 2023

- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

## Looking Ahead to the Tenth Reporting Period

Looking ahead to the tenth reporting period, the IMT hopes to see the City and the CPD allocate and focus appropriate attention and resources to the Recruitment, Hiring, and Promotions section of the Consent Decree. Meaningful progress towards further levels of compliance should aid in addressing the CPD's ongoing staffing shortage and the corresponding challenges that staffing shortage has caused. Indeed, while this is the smallest section of the Consent Decree, the City's and the CPD's efforts directed at recruitment, hiring, and promotions are critical to every other Consent Decree section and the short and long-term success of Chicago's policing efforts.

***

Specific compliance assessments, by paragraph, for the Recruitment, Hiring, and Promotions section are included in Appendix 5.

# VI. Training

## Guiding Principles

The IMT assessed compliance with the Training paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **265.** CPD will enhance its recruit training, field training, in-service training, and preservice promotional training so that they are sufficient in duration and scope to prepare officers to comply with CPD directives consistently, effectively, and in accordance with the law, CPD policy, best practices, and this Agreement.
>
> **266.** CPD training will reflect its commitment to procedural justice, de-escalation, impartial policing, and community policing.
>
> **267.** CPD training will convey CPD's expectations that officers perform their jobs diligently and safely, and have an understanding of, and commitment to, the constitutional rights of the individuals they encounter.
>
> **268.** The training required under this Agreement is set out in this section and, for specific topic areas, in the Community Policing, Impartial Policing, Crisis Intervention, Use of Force, Officer Wellness and Support, and Accountability and Transparency sections.

## Summary of Compliance Efforts and Assessments

### Training in the Ninth Reporting Period

In the ninth reporting period, the CPD continued to make progress in many areas of training, as required by the Consent Decree. The Training Oversight Committee (TOC) and its subcommittees continue to meet and deliberate on critical details needed to make informed decisions on training standards, content, and quality. The IMT appreciates the CPD's notable improvements to the new public safety training center.

After experiencing significant deficits of Field Training Officers (FTO) last reporting period, the CPD announced that additional FTO positions would be allotted in 2024, to ensure that there would be an adequate number of FTOs available to train new probationary police officers. We look forward to seeing the implementation efforts of the CPD in expanding FTO recruitment, training, and supervision efforts. In addition to having the appropriate number of FTOs, the City and the CPD must also ensure the Training Academy receives the human and technical resources required to effectively schedule and execute Academy and other training.

This reporting period, the IMT emphasized the CPD's need to further develop and ensure that evaluations are optimally used and applied to improve training content, instruction, delivery, and outcomes. The IMT anticipates that the CPD will develop a policy that details the evaluation process of trainings and instructors. The development of the evaluation process is integral to assessing the effectiveness of existing training and how to improve the quality and consistency of future instruction and curriculum.

## Updated Compliance Levels through Nine Reporting Periods

Independent Monitoring Report 9 provides compliance assessments of 68 paragraphs. During this reporting period, the City and the CPD achieved or maintained at least Preliminary compliance with 60 of these paragraphs. Specifically, in the ninth reporting period, the City and the CPD maintained Preliminary compliance for 49 paragraphs (¶¶273–82, 284–85, 289, 292, 295–304, 306–19, 324, 326–29, 331-32, 334–35, and 338), achieved Secondary compliance for one paragraph (¶272), and maintained Secondary compliance with eight paragraphs (¶¶270–71, 283, 305, 320-23, 337, and 340). The City failed to reach Preliminary compliance for eight paragraphs (¶¶286–88, 290–91, 294, 336, and 339). *See* Training Figure 1 below.

Training Figure 1: Compliance Progress for Training
Paragraphs at the End of the Ninth Reporting Period (December 31, 2023)



Training
Compliance Progress by December 31, 2023

- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

### Training Progress through Nine Reporting Periods and Looking Ahead to the Tenth Reporting Period

Through nine reporting periods, the City and the CPD have incorporated requirements of the Training section into policies and written guidance. The City and the CPD have developed or updated many training materials to incorporate requirements across the Consent Decree sections. Many of these trainings are reflected in the corresponding sections of this report.

Looking ahead to the next reporting period, the IMT anticipates enhanced and more substantive compliance reviews in several areas based on the progress the City and the CPD have made in meeting and maintaining compliance levels. Such enhanced compliance reviews include recruit academy and field training, TOC oversight and training evaluations, training staffing, in-service training, and eLearning. Further progress is also expected on instructor selection and development, training and instructor evaluations, and attendance documentation to demonstrate that the required training is being received.

*****

Specific compliance assessments, by paragraph, for the Training section are included in Appendix 6.

# VII. Supervision

## Guiding Principles

The IMT assessed compliance with the Supervision paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **341.** Effective supervisors, who lead by example and actively engage with the subordinates under their direct command, play a critical role in ensuring lawful, safe, effective, and community-centered policing. To achieve this outcome, the Parties agree to the requirements set out below.

> **342.** The provisions of this Agreement are designed to ensure that CPD supervisors provide the effective supervision necessary for members to perform their duties lawfully, safely, and effectively and for members to improve and grow professionally. Further, the provisions of this Agreement are designed to allow supervisors to spend time monitoring and training members under their direct command so as to provide adequate opportunities to prevent, promptly identify, and promptly correct adverse officer behavior. This meaningful supervision will facilitate the establishment and re-enforcement of a culture of community policing, community and officer safety, and accountability throughout the Department.

> **343.** CPD should have the staffing necessary to promote lawful, safe, effective, and community-centered policing; provide effective supervision; ensure officer safety and accountability; and implement the terms of this Agreement.

> **344.** Immediate supervisors of all ranks are responsible for supervising, managing, and overseeing, as appropriate, the day-to-day work activities of members under their direct command.

> **345.** Supervisors of all ranks are accountable for the performance of subordinate members directly observed or under their direct command.

> **346.** Effective supervisors will: a. engage in activities and conduct that support the mission and goals of the Department, including those set forth in this Agreement; b. model appropriate conduct, including abiding by high standards of integrity and adhering to the United States Constitution and other laws, CPD policy, and the terms of this Agreement; and c. consistently demonstrate professionalism, courtesy, and respect towards all people with whom they interact.

# Summary of Compliance Efforts and Assessments

## Supervision in the Ninth Reporting Period

Many of the City's and the CPD's efforts in the Supervision section of the Consent Decree rely on the concepts of unity of command and span of control. Unity of command requires that the same sergeant supervise the same group of police officers. *See* ¶358. Span of control limits the number of officers any one sergeant can supervise daily. *See* ¶358. The goal of span of control is to create a consistent ratio of 10 officers to 1 sergeant to encourage effective supervision. This is a fundamental change from the current model of shift (watch) scheduling and is a requirement of the Consent Decree.

The Unity of Command and Span of Control Pilot Program was launched to implement these concepts to enable more effective and efficient supervision, mentoring, officer support, and policing. Through the pilot program, the City and the CPD implemented a pod supervision structure (primary, secondary, and tertiary role for supervisors). The *Unity of Command and Span of Control Pilot Program* began in the 6th District during the second reporting period. In the fourth reporting period, the CPD expanded the pilot into the 4th and 7th districts. Ultimately, however, the CPD decided that implementing the Unity of Command and Span of Control Pilot Program in three districts was not feasible, so they chose to focus efforts on refining the program within the 6th District.

Despite the CPD's continued efforts to implement the *Unity of Command and Span of Control Pilot Program,* the CPD has faced various challenges with the implementation, as explained in previous IMT reports. The CPD continues to face staffing shortages that prevented the pilot districts from consistently meeting the 10-to-1 officer-to-supervisor ratio required by ¶360. We learned that officers were not being consistently overseen by the same supervisors, as envisioned by the pilot program. We also heard frustrations from officers regarding the staffing shortages, which not only hampered compliance with the program, but also created situations in which understaffing could have reduced officer safety.

In April 2022, the City and the CPD requested technical assistance from the IMT regarding the *Unity of Command and Span of Control Pilot Program*. During the sixth and seventh reporting periods, we had in-depth discussions with command staff, officers, and supervisors about the strengths and shortcomings of the pilot program. We were informed that the pod supervision structure did not consistently result in unity of command as envisioned. Therefore, in late June 2022, during the first technical assistance meeting, the City and the CPD shared their plans to develop a new staffing model to address several the shortcomings of the pod model. The new model, implemented in the ninth reporting period, focuses on

three tenets: (1) geographic familiarity, (2) high-quality supervision, and (3) resource flexibility.

During the ninth reporting period, the IMT closely observed the rollout of the *Unity of Command and Span of Control Pilot Program* based on the new staffing model in the 6th District. The City and CPD again began planning for expansion of the pilot programs into other districts. The pilots were implemented in the 4th district in October 2023 and will be implemented in the 7th district beginning in January 2024.

During monthly calls, the City and the CPD shared information about the progress of the pilot program. Since the launch of the new staffing model in the ninth reporting period, compliance rates with span of control and unity of command have fluctuated in the 6th District (the primary pilot district). This variation has also been seen with respect to the frequency with which sergeants work in their assigned sectors and officers work with sergeants who complete their performance evaluations. The IMT acknowledges the CPD's efforts but looks forward to these numbers stabilizing across all periods and shifts.

Additionally, the CPD has continued to provide updates on the staffing dashboard's management tools for making staffing and operational decisions, which the IMT believes would enhance unity of command and span of control. We look forward to these percentages of time increasing and remaining stable over time. In the IMT's opinion, the CPD members in the 4th and 6th Districts and in the patrol chain of command are dedicated to achieving compliance in this area, not only because it is required by the Consent Decree, but because they understand that these requirements are fundamental pieces of the structure and accountability required to be able to effectively and constitutionally police Chicago.

The CPD originally chose to also begin implementing the pilots for the Performance Evaluation System and Officer Support System in the same districts as the *Unity of Command and Span of Control Pilot Program*. However, this reporting period, the CPD shared their plans to halt the Officer Support System pilot and instead work to combine the system with the legacy officer intervention systems. The IMT is supportive of this more streamlined approach and have accepted the CPD's request to provide technical assistance for this effort. We believe that it makes sense to continue to pilot the Performance Evaluation System and *Unity of Command and Span of Control Pilot Program* together, because they both rely on effective supervision. As a result, however, the difficulties in fulfilling the requirements with the *Unity of Command and Span of Control Pilot Program* will also cause difficulties in achieving the goals of the other pilot program.

Finally, the CPD has also convened a *Unity of Command and Span of Control Pilot Program* Evaluation Committee, which is to meet at least quarterly to discuss implementation progress and share feedback from CPD personnel. This committee

has the potential to play an important role in the programs' effective implementation. The CPD has recently added similar tasks to this committee for the Performance Evaluation System and Officer Support System pilot programs. The IMT hopes that the committee will work to anticipate and address some of the possible challenges to ensure a smoother implementation process. However, from the IMT's perspective, these meetings are structured as briefings to members rather than an opportunity for members to engage in robust, constructive conversations. The duties of the Evaluation Committee are clearly described in D20-02, *Unity of Command and Span of Control Pilot Program*, and it is not apparent to the IMT that those responsibilities are currently being fulfilled.

The IMT believes that programs required by the Supervision section of the Consent Decree are being thoughtfully developed and implemented by the City and the CPD as a pilot. To test and develop strategies to implement Unity of Command and Span of Control, the Performance Evaluation System, and the Officer Support System pilot programs in all CPD districts, the 6th District became the central location and focus of the IMT and the Parties as the pilot district. We recognize the aforementioned progress that has been made and the pilot in the 6th District was used to assess and grant Preliminary compliance, as policies and processes have been developed and are at various stages of implementation. However, the Consent Decree requires that many of the paragraphs within the Supervision section be implemented and measured for compliance in all 22 CPD police districts. Therefore, while Preliminary compliance was achieved in the 6th District, further levels of compliance cannot be achieved until the pilot continues to expand and is able to be replicated and implemented in other districts. The IMT may be able to consider these levels of compliance once evidence of successful implementation is observable and measurable in multiple districts with unique challenges. The IMT looks forward to continuing to work with the City and the CPD toward the goal of broadening the impact of implementing an effective supervision structure in all 22 districts.

As the CPD is strategically staggering implementation, there are supervision pilot programs in various stages of completion. Table 1 shows the progress of the pilots in active districts. Those districts in the "Expansion Planned" phase are actively receiving training and undergoing preparatory operational changes. Districts in the "Implementation Underway" phase have begun operating under the model and are tracking compliance with the pre-determined success metrics. Districts in the "Implementation Complete" phase have achieved and maintained compliance with pre-determined success metrics.

*Table 1. Progress of Supervision Pilot Programs*

| CPD District | Unity of Command/ Span of Control | Performance Evaluation System |
|---|---|---|
| 006 – Gresham | Implementation Underway | Implementation Underway |
| 004 – South Chicago | Implementation Underway | Implementation Underway |
| 007 – Englewood | Expansion Planned | Expansion Planned |

## Supervision Progress through Nine Reporting Periods

Overall, we assessed the City's compliance with 29 Supervision paragraphs during the ninth reporting period (¶¶347–57 and 359–76). In the ninth reporting period, the City and the CPD maintained Preliminary compliance for 25 paragraphs (¶¶347–55, 359–64, and 367–76). The City and the CPD did not reach any level of compliance with four paragraphs (¶¶356–57 and 365–66).

Supervision Figure 1: Compliance Progress for Supervision Paragraphs at the End of the Ninth Reporting Period (December 31, 2023)



Supervision
Compliance Progress by December 31, 2023



- ■ Preliminary Compliance
- ■ Secondary Compliance
- ■ Full Compliance
- ■ Not in Compliance

## Looking Ahead to the Tenth Reporting Period

In the tenth reporting period, the IMT will review data relevant to the *Unity of Command and Span of Control Pilot Program* such as assignment sheets, transfer orders, and other relevant records. The IMT also looks forward to receiving access to the Watch Application Sheet and Unity of Command and Span of Control Tableau Dashboard. While the numbers and staffing are important, the IMT would also like to see discussions related to the pilot shift to include the guiding concepts.

We hope to work more collaboratively with the City and the CPD to identify and, if necessary, help develop data sources which accurately capture supervisory activities and show evidence of supervisors' ability to provide appropriate support and accountability. The IMT will continue conducting interviews and focus groups with members of the three pilot districts. The IMT also anticipates observing any pilot program, pre-service supervisors, and in-service supervisors training along with evaluations of that training. Further, we plan to observe future evaluation committee meetings and hope to see a shift from a briefing model to a more collaborative and conversational structure.[38]

***

Specific compliance assessments, by paragraph, for the Supervision section are included in Appendix 7.

---

[38] In the City's comments to a draft of this report, the CPD argues that the IMT gives improper weight to the Unity of Command and Span of Control program as outlined by ¶¶357, 359–368. The CPD notes that "[t]he requirements of the other paragraphs listed (348–355) outline supervision requirements for all supervisors," rather than those just in the pilot districts. The IMT reiterates that it assesses ¶¶347–356 separately from ¶¶357, 359–368 in accordance with the methodologies specific to ¶¶347–356. The IMT has requested—and has recently begun to receive—data relating to compliance for ¶¶347–356. The IMT looks forward to continuing to receive data relating to ¶¶347–356 as it assesses compliance for those paragraphs.

# VIII. Officer Wellness and Support

## Guiding Principles

The IMT assessed compliance with applicable Officer Wellness and Support paragraphs in accordance with the Consent Decree's "Guiding Principles." These guidelines "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **377.** *In fulfilling their duties, CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy. There is growing recognition that psychological and emotional wellness are critical to officers' health, relationships, job performance, and safety. The City and the CPD have an obligation to help CPD members cope with the consequences that come from their service to the public.*

> **378.** *The City and the CPD's obligation to CPD members includes providing adequate support systems to treat members experiencing mental health, substance abuse, and other emotional challenges.*

> **379.** *The City and the CPD's obligation to CPD members also includes equipping them in a manner that enables them to do their jobs as safely as reasonably possible. CPD will ensure that the safety of its members is not jeopardized by equipment and technology that is outdated, broken, or in need of repair or replacement.*

> **380.** *The City and the CPD will implement the following requirements in order to achieve a healthy, effective, and constitutionally compliant police force.*

## Summary of Compliance Efforts and Assessments

### Officer Wellness and Support in the Ninth Reporting Period

During the ninth reporting period, the City and the CPD took several steps forward toward Full compliance, by establishing new partnerships. For example, the IMT learned of the CPD's development of a Peer Support video in partnership with the International Association of Chief's of Police and the Bureau of Justice Assistance VALOR program called the *Roadmap to Resilience*, which will be available in Spring 2024. The IMT appreciates the CPD's efforts to create external partnerships resulting in a video that will be shared not only with CPD membership to emphasize the department's focus on wellness, but also on a national level. The IMT also appreciates the City and the CPD for working with other external partners to support the mission of wellness, such as their partnership with the Hartgrove Hospital, which has provided training on stress management.

While the City and CPD are taking actionable steps forward, there is still more work to do in line with the guiding principles of the Consent Decree to support member wellness and support.

We remain quite concerned, for example, that the required *Suicide Prevention Initiative* has not yet been completed or implemented (*see* ¶388). We urge the CPD to prioritize this important deliverable.

As stated in the guiding principles for this section (*see* ¶377–80), CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy. The City and the CPD have an obligation to help CPD officers and civilian personnel cope with the consequences that come from their service to the public. This includes providing adequate support systems to treat CPD personnel experiencing mental health, substance-use disorder, and emotional challenges.

The City and the CPD continued to face challenges related to several areas in this reporting period. Obstacles to advancing toward further compliance include the following:

- Well-intended yet inadequate efforts to achieve further compliance;

- Inadequate or nonexistent data collection to analyze and evaluate wellness efforts;

- Challenges to fill vacant positions required to service the agency and ensuring current staff are certified as required; and

- Failure to remedy issues identified in concurrent annual Traumatic Incident Stress Management Program audits.

In the ninth reporting period, the City and the CPD showed some improvement with data collection efforts. The IMT reviewed some reports that included data analysis to demonstrate some improvement in the way the CPD has begun to capture data and report specific activity reflective of the wellness work of the CPD. For example, the City and the CPD regularly share updates on the delivery and deployment of the wellness application pertaining to member utilization data, and the numbers continue to increase along with the amount and types of content shared through the app. This technology appears to be a useful tool for the CPD personnel.

The IMT appreciates the City and the CPD's efforts to build efficiency and effectiveness in delivering wellness services, and we encourage them to continue to develop systems to assess how well its efforts are working. Specifically, as the CPD collects wellness-related data, the IMT encourages the CPD to take the time to

intentionally analyze them to ensure that they are producing the necessary analytics that can accurately measure both output (the quantity) and the outcome (quality) of their work.

Still, inadequate data collection and analysis efforts hinder progress toward compliance with several paragraphs of the Officer Wellness and Support section (see ¶¶388, 391–92, 394–95, and 398–99). For example, the City and the CPD had launched a Voluntary Wellness Check-In program (*see* E07-07) encouraging members to prioritize their wellness. However, due to the program's popularity and the City and the CPD's informal mechanism for scheduling wellness check-ins (via email), the program quickly overburdened the clinicians in the Professional Counseling Division (PCD) and was placed on a temporary pause, with the intention to re-launch in 2024 and acquire a scheduling tool.

Moreover, caseload identification and management continue to be a struggle for the PCD, and the IMT has continually stressed the importance of a staffing analysis to determine the appropriate number of clients per clinician and alcohol and drug use counselors. In the instance of the cancellation of the Voluntary Annual Wellness Check-Ins, the City and the CPD could have considered options noted in ¶391 and ¶394—external referrals to counseling services and/or hiring contract employees, but they chose the pause the program.

Complicating this issue further, the City and the CPD have not filled their remaining three clinician positions while adjusting the pay levels for the clinicians to be in line with the new pay status offered for the police clinical therapist positions. Thus, the informal scheduling mechanism, inability to fill the remaining open positions, and lack of an established caseload continue to negatively impact members and their ability to receive wellness services.

During the ninth reporting period, the City and the CPD also produced several significant deliverables, including the *2023 Officer Wellness Needs Assessment* and the *2023 Officer Wellness Support Plan*. While these reports are an important step toward compliance, the IMT and the OAG encouraged the City and the CPD to reassess their methods for conducting the Needs Assessment. For example, the *Needs Assessment* will require a considerable overhaul for the City and the CPD to capture a more in-depth analysis of the wellness services provided to the CPD membership. The *Needs Assessment* should serve as a portal for determining how services and programs are utilized, which could support future budgetary needs, as intended by ¶¶382–83. However, the cadence of this report should be intentional, alongside other deliverables required by the Consent Decree, to include the *Officer Wellness and Support Plan*, the *Suicide Prevention Initiative* (¶388), and the *Annual Report to the Superintendent* (¶389).

The IMT supports sound scheduling that establishes both a solid foundation for setting and attaining realistic goals and expectations for both the organization and the membership. These refined efforts help to establish reliability, trust building, and value in the work that is being done to support organizational wellness for all employees of the CPD.

Finally, in the ninth reporting period, the Audit Division produced the second annual *Traumatic Incident Stress Management Program* (TISMP) audit (*see* ¶411). The IMT appreciates the production of this required annual audit. The latest audit identified some of the same concerns that existed in the previous audit. For example, ¶407 requires the City and the CPD to ensure counseling follows a duty-related traumatic incident. The documentation is required before the individual returns to full duty unless they are medically unable to do so. The timing requirement of these post-incident events is within seven days. As with the 2022 TISMP Audit, the 2023 TISMP Audit identified individuals who should have met the TISMP requirements but did not. There are numerous reasons this could have occurred:

> (1) Events are not always clear-cut and may not always neatly fall within a particular criterion noted in policy E06–03 *Traumatic Incident Stress Management Program*. Correspondingly, the IMT recommends that policy E06-03 be further reviewed to determine whether there are additional criteria for incidences/circumstances that qualify to be listed. Recognizing that not every circumstance could be noted, it is further recommended that the policy be reviewed to consider an amended statement to include the potential for events foreseen and unforeseen.

> (2) The analysis does not capture all incidents that could be declared traumatic.

> (3) Supervisory staff are unable to refer individuals based on lack of necessary knowledge pertaining to the TISMP. During the scope of audit, seven watch operations lieutenants were interviewed to further assess their understanding of serious injuries and what warranted a TISMP referral, and three of the seven were unable to confirm the circumstances when the referrals were required.

The IMT remains concerned about personnel who are not referred to the TISMP, continue to work, and are further exposed to potential cumulative-related trauma issues without being cleared to return to duty. The CPD and the City remain unable to fully identify those who were referred, counseled, completed the program, and released. The implication of this gap could prove detrimental to the CPD members who need this mandatory step, to the organization, and to the public. We urge the

City and the CPD to rectify these processes in the next reporting period – through revisiting policy, emphasizing supervisor training, and refining auditing functions.

## Officer Wellness and Support Progress through Nine Reporting Periods

Overall, the IMT assessed the City's compliance with 36 Officer Wellness and Support paragraphs in the ninth reporting period (¶¶381–402, 404 and 406–18). The City and the CPD maintained Preliminary compliance with 17 paragraphs (¶¶384, 388, 394–95, 398–400, 402, 407–414, and 418), achieved Preliminary compliance with three paragraphs (¶¶415–17), maintained Secondary compliance with 12 paragraphs (¶¶381–83, 385–87, 390–93, 401, and 406), achieved Secondary compliance with three paragraphs (¶¶396–97 and 404), and is under assessment for Preliminary compliance with one paragraph (¶389).

Officer Wellness Figure 1:  Compliance Progress for Officer Wellness Paragraphs at the End of the Ninth Reporting Period (December 31, 2023)



### Officer Wellness and Support
### Compliance Progress by December 31, 2023

- ■ Preliminary Compliance
- ■ Secondary Compliance
- ■ Full Compliance
- ■ Not in Compliance

## Looking Ahead to the Tenth Reporting Period

The City's and the CPD's obligation to its members cannot be met without remedying the aforementioned issues related to data collection and analysis, staffing, and overarching remedies and responses to the *2022 and 2023 TISMP* audits. At the end of the ninth reporting period, the City and the CPD continued to face significant barriers to their reform efforts, lacking data collection to inform its initiatives as the driving factor. For the City and the CPD to advance to further levels of compliance, or in some instances maintain its current levels of compliance, the

IMT expects to see data demonstrating what level of services have been provided by the current staffing of the Professional Counseling Division, including anonymized information of the clients, services provided, caseload, volume of client, and related demands.

The IMT also expects to see significant efforts put into remedying the issues identified in the TISMP audits. Ensuring all CPD members have a proper awareness and understanding of these initiatives will help them to implement these initiatives in the manner for which they are intended.

We look forward to working with the City and the CPD in the tenth reporting period to further build out the process for an intentional *Needs Assessment* and *Officer Wellness Support Plan* and learning how the City and the CPD plan to prioritize and schedule the reports required by the Consent Decree.

***

Specific compliance assessments, by paragraph, for the Officer Wellness and Support section are included in Appendix 8.

# IX. Accountability and Transparency

## Guiding Principles

The IMT assessed compliance with applicable Accountability and Transparency paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **419.** *Holding public servants accountable when they violate law or policy is essential to ensuring legitimacy and community confidence.*

> **420.** *A robust and well-functioning accountability system in which CPD members are held to the highest standards of integrity is critical to CPD's legitimacy and is a priority of CPD. A culture of accountability also promotes employee safety and morale, and improves the effectiveness of CPD operations. Organizational justice also plays an important role in ensuring that CPD members have confidence in the legitimacy of the system that holds them accountable.*

> **421.** *In order to foster public trust and receive critically important community feedback, and promote confidence in CPD, the City and CPD will ensure the process for submitting and pursuing complaints that allege violations of CPD policy or the law by CPD members is open and accessible for all individuals who wish to file complaints.*

> **422.** *Meaningful community involvement is imperative to CPD accountability and transparency. Nothing in this Agreement should be construed as limiting or impeding community participation in CPD's accountability system, including the creation and participation of a community safety oversight board. OAG and the City acknowledge the significant work many of Chicago's community organizations have undertaken and are continuing to undertake, including work alongside CPD, in the area of police reform and accountability, and OAG and the City know this critical work will continue.*

> **423.** *The City, CPD, and COPA will ensure that all complaints of misconduct, whether from internal or external sources, are thoroughly, fairly, timely, and efficiently investigated in accordance with this Agreement; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all CPD members who commit misconduct are held accountable pursuant to a disciplinary system that is fair, timely and consistent, and provides due process.*

# Summary of Compliance Efforts and Assessments

## Accountability and Transparency in the Ninth Reporting Period

The Accountability and Transparency section of the Consent Decree requires reform efforts from many City entities. The reach of the section is vast—involving several City entities—and is motivated by the guiding principles at the outset of the Section, as shown above (¶¶419–23).

The Accountability and Transparency section of the Consent Decree explicitly sets obligations for the following City entities: the Chicago Police Department (CPD) and the CPD's Bureau of Internal Affairs (BIA), the Office of the Inspector General's (OIG) Deputy Inspector General for Public Safety (Deputy PSIG), the Civilian Office of Police Accountability (COPA), the Police Board, and most recently, the Community Commission for Public Safety and Accountability (CCPSA). In addition, some of the requirements of the Accountability and Transparency section call for action by the City of Chicago. All of these moving parts make up a complex Accountability system in the City of Chicago.

While the CPD, COPA, the Deputy PSIG, and the Police Board are working toward the common goal of increased accountability and transparency, these entities work toward this goal in different manners as appropriate for each entity and as required by the Consent Decree. These entities have each found success in complying with the requirements set out in the Accountability and Transparency section at different paces and with varying degrees. The Deputy PSIG, for example, achieved Full compliance with all requirements pertaining to its office in the fourth reporting period and maintained that Full compliance during subsequent reporting periods. In the previous reporting period, the Deputy PSIG successfully completed its Sustainment Period, marking two full years that it had maintained Full compliance with all requirements pertaining to its office. Therefore, in the ninth reporting period, the Parties moved to release OIG and PSIG from its Consent Decree requirements because it successfully completed the required two-year sustainment period, which was granted by the court.

Additionally, COPA and the Police Board have developed and followed plans that have allowed them to consistently gain compliance with various requirements of this section in the past few reporting periods. Specifically, in the ninth reporting period, COPA achieved Full compliance with numerous paragraphs.

The CPD had been following a less methodical path toward compliance with the Accountability and Transparency requirements, which caused them to fall behind in complying with Accountability and Transparency requirements. However, in the eighth and ninth reporting periods, the CPD has started to make notable progress.

The CPD focused its efforts on developing policies to implement its Consent Decree requirements in the first four years and in recent reporting periods has turned its efforts toward developing specific Bureau of Internal Affairs (BIA) trainings, which helped to achieve Secondary compliance with numerous paragraphs in the ninth reporting period.

Adding to the complex nature of the City of Chicago's accountability system, during the ninth reporting period, there was a sharp decline in collaboration between the CPD and COPA with regard to report access, data access, and regularly occurring collaborative conversations that have been nearly obsolete in recent months. As we have noted, the City's accountability system is complex and requires consistent communication and collaboration among all entities.

## Accountability and Transparency Progress through Nine Reporting Periods

Overall, the IMT assessed the City's compliance with 139 Accountability and Transparency paragraphs. With the combined efforts of all the City entities noted in this section, the City maintained Preliminary compliance with 46 paragraphs (¶¶–439, 444–45, 448, 453–56, 459–61, 463–68, 471, 475–76, 479, 481–84, 486, 487, 493, 495, 497, 499, 501, 503–04, 516–19, 522–25, 532, and 540–42) and met Preliminary compliance with seven paragraphs in the ninth reporting period (¶¶480, 526–27, 530–31, 544, and 564). The City also maintained Secondary compliance with 24 paragraphs (¶¶426–29, 432–35, 446, 449, 452, 457, 462, 469, 470, 472,474, 496, 498, 500, 502, 511, 551, and 560) and met Secondary compliance with 21 paragraphs (¶¶424–25, 431, 436-38, 440, 443, 447, 450, 477–78, 505–09, 513–15, and 552). The City also maintained Full compliance with 22 paragraphs (¶¶441–42, 485, 533–39, 543, 550, 554–59, 561–63, and 565) and met Full compliance with 2 paragraphs (¶¶430 and 473). The City did not reach any level of compliance with 17 paragraphs (¶¶451, 488–92, 494, 512, 521, 528–29, 545–49, and 553).

Accountability Figure 1:    Compliance Progress for Accountability & Transparency Paragraphs at the End of the Ninth Reporting Period (December 31, 2023)



Accountability & Transparency
Compliance Progress by December 31, 2023

Given the variable nature of the Accountability and Transparency Section requirements for each City entity, we provide a summary of each entity's efforts separately.

### The Chicago Police Department (CPD)

We have monitored the CPD's progress in a variety of ways, including attending frequent meetings with BIA and the CPD's Research and Development Division to obtain updates on efforts and ask questions, reviewing draft policies and training materials, observing training sessions, and conducting site visits to gain insight from Accountability Sergeants and BIA investigators.

During the ninth reporting period, the CPD continued to make significant progress by reaching Secondary compliance with numerous paragraphs through the finalization and delivery of various BIA in-service trainings. Although the CPD achieved Secondary compliance this reporting period with numerous paragraphs because they delivered various BIA in-service trainings, the CPD must ensure that future training records are provided through clear documentation as to who attended the training, as well as who was required to attend. Additionally, the IMT received training records clarifications in January 2024, and we expect these records to be produced formally early in the tenth reporting period. We still acknowledge the CPD's training efforts and encourage the CPD to continue making progress to reach additional levels of compliance in the coming reporting periods.

We also appreciate the continued improvement in quality of the CPD's annual and quarterly BIA reports, as well as its openness to ongoing improvements to the reports. The CPD also began producing materials early in the ninth reporting period and maintained a regular cadence throughout. In past reporting periods, we have raised concerns about the CPD producing a large number of documents at the end of a reporting period. However, in the ninth reporting period, the CPD only produced seven submissions in the last month, which allowed for more collaborative discussions throughout the entirety of the reporting period.

Additionally, in previous reporting periods, we have raised concerns that the CPD continued to meet once per month with the IMT. However, in the ninth reporting period, BIA met individually with the IMT many times per month, typically weekly. These ongoing discussions were beneficial to the progress the CPD made this reporting period, and we look forward to continuing those discussions in the tenth reporting period.

Although the CPD developed, finalized, and delivered various BIA in-service modules, many CPD trainings still remain in development. Specifically, the CPD worked with the IMT during the seventh and eighth reporting periods to develop and revise the CPD's *BIA Onboard Training*. In the eighth reporting period, the CPD continued to focus its efforts on its *BIA Onboard Training*. Throughout the reporting period, the IMT worked closely and collaboratively with BIA to review and provide comments on the *BIA Onboard Training*. Despite these efforts, the CPD was not able to achieve additional levels of compliance with ¶¶526–28 in the eighth reporting period. Toward the end of the previous reporting period, after many discussions about the format and purpose of the *BIA Onboard Training* (including how that training could be repurposed to satisfy ¶¶526–28), the CPD began to move away from structuring the training as one all-encompassing training, with relevant training topics woven throughout the multi-day training and toward structuring the training as subject-specific blocks of instruction. We suggested that this change in structure would improve the quality and efficacy of the training, and would also provide the CPD with the opportunity of seeking and gaining compliance with various paragraphs on a rolling basis as it drafted and provided the training, rather than linking compliance with many Consent Decree paragraphs together such that the CPD could not obtain compliance until the entire *BIA Onboard Training* was drafted, approved, and provided to new BIA personnel.

In the ninth reporting period, the CPD developed and finalized BIA in-service training. Throughout November and December 2023, the CPD began training on the following topics:

- Complaint Management System and Complete Investigative Files
- Initiation of Complaints
- Sexual Misconduct Initiation and Trauma Informed Response to Sexual Assault (TIRSA) Review
- Consent Decree and Law Review
- SharePoint, Summary Punishment Administrative Reports (SPARS), and Performance Recognition System (PRS)
- Procedural Justice, Implicit Bias, and Conflicts of Interest

However, the training attendance records provided to the IMT confirming that at least 95% of the required personnel completed the training sessions were not produced formally. We expect the CPD to produce these records formally early in the tenth reporting period. Meanwhile, the CPD continues to have multiple other modules in draft stage and is working collaboratively with the IMT and OAG. We look forward to its continued focus on training in the tenth reporting period.

At the same time, we have several concerns regarding the CPD's processes during this reporting period. For example, in the previous reporting period, the IMT noted that the CPD provided evidence that more than 95% of all CPD members had taken and passed the BIA eLearning, which enabled the CPD to achieve Secondary compliance with several Accountability and Transparency paragraphs. The IMT, however, noted concerns about the number of civilians who completed the eLearning course. Although Secondary compliance requires only that the CPD train at least 95% of all CPD members (which means any sworn or civilian employees of the CPD, *see* ¶743), only 49% of civilian CPD employees had completed the eLearning course in the eighth reporting period. Additionally, there were multiple positions or ranks for which less than 50% of the employees completed the eLearning course. We urged the CPD to take a more holistic approach to training a true representation of 95% of all CPD members and that the IMT will consider this in connection with the CPD's efforts to reach Full compliance with those paragraphs. Further, we noted that the BIA eLearning course did not relieve BIA from the responsibility of providing a more comprehensive training specific to Internal Affairs including in-service and onboard training. The training that is required for most CPD members to understand certain policies and procedures of the CPD is not and will not be as comprehensive as what is required of members of BIA.

During the ninth reporting period, we learned that BIA is working on training materials that cover certain requirements of these subjects, as well as updating and re-delivering its BIA eLearning during the 2024 calendar year. We look forward to

continuing to work with BIA collaboratively in the tenth reporting period in developing, finalizing, and delivering various trainings.

Additionally, during the ninth reporting period, the CPD revised *BIA's Prohibition on Retaliation eLearning*, which helped the CPD achieve Secondary compliance with two paragraphs. However, the IMT raised a concern regarding the timing of the completion of the training because it appeared that the CPD began the training before receiving a no-objection notice from the OAG, as required by ¶641. The CPD provided a written explanation for the error and indicated its plans to provide a supplemental eLearning in the tenth reporting period. Although the eLearning began before the OAG provided a no-objection notice—contrary to ¶641—the City and the CPD achieved Secondary compliance for this training in the ninth reporting period. We hope, to avoid this issue in the future, the City and the CPD will ensure they receive no-objection notices from both the IMT and the OAG before enrolling participants in training.

During site visits in August 2023, the IMT met with BIA leadership, as well as individuals developing training. These meetings were very helpful for the IMT to learn more about the progress and priorities of BIA.

Additionally, as we have noted in the past, we have gained insight into the day-to-day responsibilities and experiences of Accountability Sergeants and BIA Investigators. As stated in the past few reporting periods, some of the information the IMT continues to learn about the day-to-day responsibilities and experiences of Accountability Sergeants and BIA Investigators are cause for great concern.

For example, we continue to remain concerned that Accountability Sergeants do not have designated areas in the district where they can conduct interviews, review videos confidentially, and complete their investigations. Some Accountability Sergeants have indicated that they have access to a private office only because they serve in some other role, such as an Administrative Sergeant, and most others must attempt to locate private space subject to availability, such as a Commander's office or a conference room that may or may not be in use. We also learned in past reporting periods that Accountability Sergeants are not properly equipped to efficiently conduct investigations or utilize the Case Management System and are often using old technology with outdated and slow processing systems that cannot keep up with the Case Management System.

When the IMT suggested in a previous reporting period that Accountability Sergeants could be equipped with laptop computers to use for completing investigations, many were hopeful that this would occur due to the need for improved technology to adequately perform their duties. At the same time, others shared concerns that, with laptops, the CPD would then require them to complete the investigations at home on their personal time because they do not have time to com-

plete the investigations during the workday as a result of their conflicting responsibilities. Many BIA investigators shared the same thoughts and concerns and described BIA computer workstations with old technology and outdated computers that cannot keep up with the Case Management System sometimes cause them to wait hours for a case file to upload into the Case Management System.

In the sixth reporting period, the IMT raised concerns that Accountability Sergeants would not be able to comply with Special Order S08-01-05, *Conducting Log Number Investigations*, because this policy requires Accountability Sergeants to audio-record interviews and upload the interviews into the Case Management System. Based on the information we learned in conversations during past site visits with Accountability Sergeants, we were very concerned that Accountability Sergeants were not properly equipped to comply with this policy and would be in violation of the policy once it was implemented for reasons outside their control. The IMT provided comments to the CPD in the sixth reporting period noting that, for this policy to be followed once it becomes effective, Accountability Sergeants must be properly equipped. This included, at a minimum, having recording devices; quiet, private spaces in which to conduct interviews; and the ability to upload recordings into the Case Management System. During the seventh reporting period, the IMT was encouraged to learn that the CPD purchased audio recording devices for their Accountability Sergeants. Accountability Sergeants also received training in how to use the recorders. However, the IMT only received the CPD's *BIA Recorder Training* after the training was implemented. We explained, as we have in previous reporting periods, that individuals who received the unapproved training will need to attend the new training once approved by the IMT and the OAG. Throughout the ninth reporting period, the CPD worked with the IMT and the OAG to revise CPD's *BIA Recorder Training*, which remained in the collaborate review and revision process at the end of the reporting period.

Additionally, the IMT continues to be concerned about the lack of reform of the Accountability and Disciplinary process. During site visits in previous reporting periods, the IMT met with random individual Accountability Sergeants to discuss their experiences. Through these conversations, we continued to learn the harsh realities on the ground and challenges that BIA Investigators and Accountability Sergeants face when performing their duties. Even though ¶494(b) requires two Accountability Sergeants to be assigned in each district, we have continued to learn this is not occurring in practice. As stated in previous reporting periods, most districts have allocated only one sergeant as the Accountability Sergeant and the district or unit may or may not have designated a "backup sergeant" for case assignment when the primary Accountability Sergeant is away from duty. The backup Accountability Sergeant performs other assignments in the district and only has cases assigned during the absence of the "Primary Accountability Sergeant." This continues to create a very high caseload for the one designated Accountability Ser-

geant. One district the IMT previously visited had a Primary Accountability Sergeant, but when we visited, that Sergeant was working as the desk sergeant in the district. In another district, the Primary Accountability Sergeant was assigned out in the field and had to come back to the District Office to meet with us. This is not a new issue. We have noted this issue going back to at least the sixth reporting period. We continue to encourage the CPD to designate two Accountability Sergeants with their **primary responsibility** being receiving, processing, and investigating complaints against CPD members rather than other duties like serving as the desk sergeant or the field sergeant for the day.

Finally, the CPD has not yet finalized its Officer-Involved Shooting and Officer-Involved Death Incident policy, which is arguably one of the most important requirements of the Consent Decree. Over the past five years, the IMT and OAG have seen major stalls in development of this important policy. The IMT continues to believe that the current version of these policies (G03-06, G03-06-01, and G03-06-02) require significant changes to sufficiently address the requirements of the Consent Decree (*see* ¶¶488–91). While the CPD clarified various issues for the IMT and OAG in its response during the ninth reporting period, the underlying concerns or ambiguities remain in the policies. Additionally, the IMT remains concerned that this policy has been in the revision phase for many years, and we still believe it requires significant work to be finalized. We again suggest that the CPD work closely with the IMT and the OAG to work through the draft before the next draft is sent for review in the tenth reporting period.

Further, as we have noted previously, the IMT continues to believe that this policy must be revised in various sections to emphasize the foundational role that the Civilian Office of Police Accountability (COPA) plays in investigations of firearm discharges, officer-involved shootings, and officer-involved deaths. *See* ¶488. Some sections still appear to limit COPA's access to crime scenes. The IMT continues to believe that there should be no reason to deny COPA access to an investigative crime scene (*see* ¶488) and encourages the CPD to eliminate the possibility of arbitrary determinations from scene-to-scene and investigation-to-investigation.

Moving forward, we will look for the CPD to be more consistent by developing and finalizing policies in a focused and timely manner, and continuing to develop and revise training related to the policies it has developed and implemented under the Consent Decree thus far. [39] We continue to encourage the CPD to produce materials for IMT and OAG review early in the reporting periods and in a regular cadence.

---

[39] In the City of Chicago's Comments to a draft of this report, the City and the CPD purported that policy is the only requirement for Preliminary compliance and that a BIA Quarterly report is the only requirement for Secondary compliance for ¶529. This is mistaken. Preliminary compliance methodology for ¶529 has remained the same since the fifth reporting period, and the

These materials should be produced in a manner that allows for meaningful review and comment from the public. This will allow the IMT and OAG to engage in substantive conversations with the CPD during the development of policies and training. We look forward to continuing to work with the CPD as it continues to develop and finalize its policies, as well as develop and deliver its training.

### Civilian Office of Police Accountability (COPA)

In the ninth reporting period, COPA continued making efforts toward compliance with Accountability and Transparency requirements. The IMT continued to meet with COPA monthly and each meeting was deliberate and demonstrated COPA's commitment to not only fulfilling the requirements of the Consent Decree but recognizing the opportunity to improve their operational capacity and quality of their operations. Additionally, COPA worked diligently to develop and deliver the missing requirements for many paragraphs for Full compliance. The IMT appreciates the opportunity for continued conversations to discuss what measures are necessary for Full compliance. We also appreciate COPA's perspective regarding ongoing discussions with the IMT. We look forward to continuing positive collaboration in future reporting periods.

One of COPA's principal achievements of the previous reporting period was its People's Academy training (the "Academy"). COPA developed the Academy for members of the community and began offering it in the eighth reporting period. The first cohort of the Academy began in March 2023 and consisted of one class session per week for six weeks. Each session was several hours long and involved a variety of topics, all addressing the scope of COPA's responsibilities and roles. The IMT audited one session of the Academy in April 2023. We were impressed with the Academy and anticipated that COPA would continue this valuable community interaction. In the ninth reporting period, COPA offered its second cohort of the Academy, which began in October 2023. The IMT audited many of the sessions of the Academy throughout the six-weeks and remain impressed by COPA's continued engagement with the community in a transparent and forward-looking manner to ensure that the community's confidence in the COPA process grows. We look forward to the continuation of COPA's People's Academy in future reporting periods.

In the previous reporting period, for many paragraphs for which COPA had previously achieved Full compliance, COPA failed to provide the IMT with evidence of continued compliance. In some instances, this resulted in COPA losing compliance with paragraphs and instead dropping to Under Assessment with those paragraphs. We emphasized that, to maintain Full compliance, it is necessary for the

---

Secondary compliance methodology for ¶529 has remained the same since the fourth reporting period. Likewise, the changes that occurred then were only after thorough discussions with the Parties and ongoing opportunities for further input.

City and its entities to provide us with an update on those paragraphs each reporting period. In addition, in many instances COPA did not designate its productions for review with all the paragraphs that were implicated in those productions. Throughout the ninth reporting period, COPA made a concerted effort to not only produce the majority of the material that had previously been omitted for Full compliance, but also worked to address many of the Full compliance concerns of the IMT and the OAG in previous reporting periods. The IMT is encouraged by the amount of work put forth in the ninth reporting period to regain Full compliance for some paragraphs and reach Full compliance with others. We look forward to working collaboratively with COPA and the OAG in the tenth reporting period to discuss methodologies for sustained Full compliance.

Further demonstrating COPA's efforts toward accountability and transparency, COPA continued working with the COPA Community Policy Review Working group.[40] This working group consists of volunteers from across the Chicago community who are dedicated to working with COPA to produce exemplary and community-experience informed products. The group reviews COPA policies and documents related to efforts under the Consent Decree. COPA ensures that the group is involved throughout the development of the policy and not just at the end of the revision process. By regularly engaging this group, COPA has produced policies and procedures that provide detailed direction to its personnel and important information about COPA's practices to the community.

We acknowledge COPA's continued progress and encourage COPA to continue these efforts in future reporting periods to maintain and reach additional levels of compliance.

## The Chicago Police Board

In the ninth reporting period the Police Board continued making progress toward fulfilling Accountability and Transparency section requirements. Throughout the ninth reporting period, we continued to meet with the Police Board on a monthly basis. These meetings are invaluable as the Police Board ensures that the Police Board leadership attends to share information with the IMT and OAG regarding their efforts. Beyond taking the steps necessary to achieve compliance levels, the

---

[40] The OAG, the City, and the IMT have agreed to a stipulation that mandates that COPA will solicit feedback on the draft policies relevant to the Consent Decree from a working group that consists of community stakeholders and thereby approved by the IMT. See Stipulation Regarding the Policy and Training Review Process for the Civilian Office of Police Accountability (COPA), Illinois v. Chicago, Case No. 17-cv-6260 (January 30, 2020), https://cpdmonitoring-team.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for._.pdf. The IMT has approved the members from COPA's Community Policy Review Working Group.

Police Board has continued to show a dedication to the spirit of the Consent Decree, taking reform, accountability, and transparency seriously.

In past reporting periods, the Police Board achieved Full compliance with eight paragraphs—the Police Board maintained this Full compliance with all these paragraphs and achieved an additional level of compliance in the ninth reporting period reaching Full compliance with ¶531.

The Police Board has not yet achieved Full compliance with all relevant Consent Decree paragraphs, but it continues to make thoughtful and methodical efforts toward compliance with these paragraphs. For example, the Police Board has continued to work toward meeting training requirements. *See* ¶¶540–42. The Police Board has sought the help of outside entities on a *pro bono* basis to provide relevant and thorough training on topics required by the Consent Decree, and the trainings provided to date has been appropriate and helpful. In the eighth reporting period, the Police Board provided materials for a *Community Policing Training* to the IMT and explained that it planned to provide this training to its members in the ninth reporting period. Although the Police Board provided a memorandum discussing that it completed the training, we did not receive attendance records. The IMT looks forward to the Police Board's attendance records, as well as development and implementation of additional training in the coming reporting periods.

Moving into the tenth reporting period, we anticipate that the Police Board will continue to work toward Full compliance with relevant Consent Decree requirements. We commend the Police Board for its continued efforts and progress to date.

### The Community Commission for Public Safety and Accountability (CCPSA)

In 2021, the City of Chicago developed the new Community Commission for Public Safety and Accountability (CCPSA), therefore creating a new entity for police oversight, accountability, and public safety. The CCPSA now is responsible for ¶¶525, 532, and 565. In the previous reporting period, the City provided the IMT with the CCPSA procedures for selection of new Police Board members. There were vacancies on the Police Board at the time. We noted previous, that should the City finalize those procedures and demonstrate that it follows the procedures in selecting new Police Board members, it faced an opportunity to achieve both Secondary and Full compliance in the ninth reporting period. In the ninth reporting period, the City produced documentation to demonstrate CCPSA's compliance with the requirements of ¶532. However, the documentation revealed that the CCPSA did not follow the established and approved selection process and criteria previously developed by the Police Board and the City, therefore failing to maintain Preliminary compliance. Until the CCPSA adopts the procedures developed by the Police Board

or develops a new selection process that meets the requirements of ¶532, the City will not achieve compliance with this paragraph.

## Deputy Inspector General of Public Safety (Deputy PSIG)

The Deputy PSIG achieved Full compliance with all Consent Decree requirements relevant to the Deputy PSIG in the fourth reporting period. The Deputy PSIG made consistent efforts to maintain Full compliance in subsequent reporting periods. As we noted in the fifth reporting period, the Deputy PSIG developed a plan to maintain Full compliance. It followed that plan through the end of the eighth reporting period, which marked the end of its two-year Sustainment Period. As stated above, in the ninth reporting period, the Parties moved to release OIG and PSIG from its Consent Decree requirements because it successfully completed the required two-year sustainment period, which was granted by the court. Therefore, the IMT will no longer monitor the Deputy PSIG going forward.

## Other City Entities

As noted above, the City of Chicago often works toward and accomplishes compliance through the efforts of COPA, the Deputy PSIG, the CPD, the Police Board, and the CCPSA. However, other City entities occasionally undertake efforts relevant to compliance with Accountability and Transparency section paragraphs.

In the eighth reporting period, the City provided materials explaining that it had extended its revised Community-Police Mediation Pilot Program, which offers a meaningful opportunity to build trust and facilitate honest discussions between community members and CPD officers, to run through December 31, 2023. Throughout the ninth reporting period, we met with the Mayor's Office to receive updates on the program, but these meetings did not occur monthly as scheduled and were often cancelled. We have previously requested more regular updates going forward and are eager for more information about the progress of the pilot program.

***

Specific assessments, by paragraph, for the Accountability and Transparency section are included in Appendix 9.

# X. Data Collection, Analysis & Management

## Guiding Principles

The IMT assessed compliance with applicable Data Collection, Analysis, and Management paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *566. Data can empower CPD to engage in the type of critical self-examination essential to instilling and maintaining constitutional policing. CPD can leverage data to ensure constitutional policing by: systematically collecting enough data to have a broad-based understanding of officers' interactions with the public; auditing the data to ensure it accurately reflects those interactions; analyzing the data to identify trends or areas of concern; developing tailored support and interventions to address behavior that is or may become problematic; and assessing the effectiveness of attempts to modify officers' behavior.*

> *567. In addition to enhancing CPD's capacity for internal accountability, CPD can use data to promote accountability to the public by regularly publishing data it collects.*

## Summary of Compliance Efforts and Assessments

### Data Collection, Analysis, and Management in the Ninth Reporting Period

During the ninth reporting period, the CPD made progress on several reforms required by the Data Collection, Analysis, and Management section. For example, the CPD is required to conduct an analysis of its use-of-force data to identify any potential disparities in use of force based on "specific demographic categories, including race or ethnicity, gender, age, or perceived or known disability status" (¶572). During the ninth reporting period, the CPD contracted with an outside vendor to conduct the assessment, which is presently in the process of developing its methodology consistent with "published, peer-reviewed methodologies" (¶573).

Additionally, the CPD re-achieved Preliminary Compliance and Secondary Compliance with paragraphs requiring it to provide "aggregated and incident-level data . . . regarding reportable use of force incidents via a publicly accessible, web-based data platform" (¶581). Through the CPD's Use of Force Dashboard, this data is now downloadable again for the public, allowing for any interested community member to access the dashboard's data and conduct independent analysis (in addition to the range of analyses provided by the CPD on the dashboard itself).

During the ninth reporting period, the City and the CPD also made substantial progress on their efforts to streamline data collection processes and ensure reliable data is collected to demonstrate compliance with each section of the Consent Decree. As reported in our last assessment, the City and the CPD reached out to each Consent Decree section's Associate Monitor to identify the data necessary to comply with their section, representing a collaborative process between the IMT and City to ensure that data collection systems and processes are reliably captured and mapped. During this reporting period, the City and CPD provided a final assessment report for ¶606 that will now be used to inform the development of a *Data Systems Plan* (*see* ¶607). We continue to emphasize the importance of the City and the CPD having effective data systems and data collection processes and look forward to working with the City and the CPD to develop the *Data Systems Plan*.

We also note recent changes in the CPD's approach for a significant portion of paragraphs that pertain to the need for the CPD to create an early intervention system (EIS) (¶¶583–605). Previously, the CPD has conducted two pilot tests of its *Officer Support System* (OSS), which was designed to meet the intent of these paragraphs. As noted in prior monitoring reports, the CPD first conducted a pilot test in the 5th District, though the IMT identified several concerns with this pilot, primarily that no training was conducted with incoming supervisors, leading to a drop in participation over time. The CPD then conducted a pilot in the 6th District but to-date, the IMT has not been provided with a complete evaluation of the pilot. We therefore were unable to determine the success of this pilot with any degree of confidence. Upon completion of the pilot in the 6th District, the CPD considered comments and feedback from pilot participants and collective bargaining unit (CBU) leadership. In part, the CPD received feedback that other non-disciplinary, intervention-based systems were already active within the department, leading to questions about how the OSS differed from these systems (the IMT heard similar comments during our listening sessions with 6th District members and discussions with CBU representatives).

As a result, the CPD is reassessing its current approach to EIS and moving to combine each of its systems for officer intervention into a single system. This system will include a variety of ways for identifying officers who are demonstrating potentially problematic behavior. For instance, the new EIS will continue to use predictive models developed for the OSS to flag officers who have a statistically higher likelihood of having a future sustained excessive force complaint, a future Department suspension, a future off-duty complaint, or a future domestic abuse or substance abuse complaint. In addition to this, the CPD plans to include a peer-comparison component, allowing supervisors to create an alert when an officer is considered an outlier on one or more indicators. Finally, alerts may be created when officers reach pre-set thresholds of behavior (*e.g.*, having a specific number of force events in a specific time period). The CPD discussed its plans with the IMT

and requested technical assistance in developing the system, which we are currently providing to the CPD as it develops policy and training. We share the CPD's enthusiasm for updating its EIS and believe that, if properly implemented, the EIS could become a model for other agencies.

In contrast to the positive steps taken by the City and the CPD during the ninth reporting period, they failed to maintain both Preliminary compliance and Secondary compliance with ¶570, which requires COPA access to CPD documents and reports when investigating misconduct complaints related to reportable use of force. During this reporting period, COPA informed us that they no longer have direct access to all documents and that requests for such documents do not receive timely or responsive resolutions. This includes documents such as TRRs, incident reports, and other documents and data warehouses necessary to conduct a full and complete administrative investigation. To address this, the CPD and COPA will need to identify mutually agreeable resolutions and return COPA's access to a point where COPA believes it is able to conduct its investigations without undue burden or delay.

Finally, during this reporting period the CPD provided the IMT with a presentation template used during Force Review Board (FRB) meetings and documentation of FRB training recommendations implemented in 2023. The IMT appreciates this template as it aids in standardizing the FRB process. However, we note that the template does not solicit any discussion related to identifying potential areas of improvement, which is a central component of the FRB's purpose. The several FRB meetings observed by the IMT were brief and continued to demonstrate a lack of critical review of incidents, with limited time allotted to conduct the decision-point analysis reflected in SOP 2020-03. We did not observe fulsome discussion evaluating tactical soundness of various officer actions, nor whether clarifications or modifications to existing policy or training would be helpful department-wide. The FRB process must include deeper analysis, discussion, and reflection to fulfill its goal of identifying tactics, training, and policy that may improve future outcomes. The IMT looks forward to continuing to observe the FRB meetings and encourages the CPD's FRB to devote sufficient time to conduct the analysis and reflection contemplated by SOP 2020-003 and required by the Consent Decree. To achieve Full compliance with the requirements of ¶¶577–78 and ¶580, the CPD must demonstrate that the FRB is consistently engaging in a critical review of the incidents and making a decision-point analysis that enhances the CPD.

## Data Collection, Analysis, and Management Progress through Nine Reporting Periods

Overall, the IMT assessed the City's compliance with 42 Data Collection, Analysis, and Management paragraphs. At the end of the ninth reporting period, the City

achieved Preliminary compliance with one paragraph (¶572), maintained Preliminary compliance for 25 paragraphs (¶¶568–69, 574, and 583–604), achieved Secondary compliance with two paragraphs (¶¶581-82), maintained Secondary compliance with five paragraphs (¶¶571, 577–78, 580, and 608), achieved Full compliance with three paragraphs (¶¶579, 606 and 609), and failed to reach any level of compliance with five paragraphs (¶¶573, 575–76, and 605, 607). Additionally, the City lost compliance levels with one paragraph (¶570). *See* Data Figure 1 below.

Data Figure 1: Compliance Progress for Data Collection, Analysis & Management Paragraphs at the end of the Ninth Reporting Period (December 31, 2023)



Data Figure 2: Lost Levels of Compliance in the Data Collection, Analysis, and Management Section



## Looking Ahead to the Tenth Reporting Period

Moving forward, the CPD must work collaboratively and consistently to address the Data Collection, Analysis, and Management section of the Consent Decree. We look forward to continuing to provide technical assistance to the CPD as it develops its EIS system and accompanying policy and training.

To regain compliance with ¶570, the City, the CPD, and COPA will need to identify mutually agreeable resolutions and return COPA's access to a point where COPA believes it is able to conduct its investigations without undue burden or delay. COPA must be able to access CPD documents and reports when investigating misconduct complaints related to reportable uses of force.

We look forward to continuing to monitor the City and the CPD's progress in meeting the requirements of the Consent Decree in the next reporting period.

***

Specific assessments, by paragraph, for the Data Collection, Analysis & Management section are included in Appendix 10.

# XI. Investigatory Stops, Protective Pat-Downs, and Enforcement of Loitering Ordinances

## Guiding Principles

The IMT will assess compliance with the Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **800.** The Parties agree that the Consent Decree will be expanded to include obligations by CPD to monitor, report, review, train, and implement accountability measures with respect to investigatory stops, protective pat downs, and enforcement of the Loitering Ordinances. Enforcement of the Loitering Ordinances will include initial dispersal orders and, where appropriate, may include investigatory stops, protective pat downs, and arrests. These measures will ensure that CPD's investigatory stops, protective pat downs, and enforcement of the Loitering Ordinances are conducted in a manner that comply with the Constitution and laws of the United States and the State of Illinois and are in accordance with best practices, as defined in Paragraph 730 of the Consent Decree.

> **801.** In conducting investigatory stops and protective pat downs and enforcing the Loitering Ordinances, CPD will interact with all members of the public without bias and will treat all persons with the courtesy and dignity which is inherently due every person as a human being without reference to stereotypes based on race, color, ethnicity, religion, homeless status, national origin, immigration status, gender identity or expression, sexual orientation, socioeconomic class, age, disability, incarceration status, or criminal history.

> **802.** The Parties agree that in achieving the goals of this Stipulation, CPD will encourage officers, through training and supervision, to employ a less intrusive response when enforcing the Loitering Ordinances when appropriate and reasonable under the circumstances.

# Summary of Compliance Efforts and Assessments

## Investigatory Stops, Protective Pat-Downs, and Enforcement of Loitering Ordinances in the Ninth Reporting Period

On June 27, 2023, the Court entered the Amended Stipulation, adding Investigatory Stops, Protective Pat Downs, and the Enforcement of the City's Loitering Ordinances into the existing Consent Decree (¶¶800–877). The Investigatory Stops section is led by Associate Monitor Kerr Putney and supported by attorney Meredith DeCarlo and analyst Amada Bond. Although the majority of the paragraphs in this new section are not yet being monitored, the City and the CPD have been in communication with the IMT in finalizing the monitoring period timelines, the paragraph methodologies, and progress toward the paragraph requirements.

During this reporting period, the City and the CPD have produced their most recently developed drafts of CPD policies and reports related to investigatory stops, protective pat downs, and the enforcement of the Loitering Ordinances. The IMT is currently assessing CPD's meaningful engagement with the IMT and OAG in the subsequent review and comment process.

Through the development of draft policies and reports related to investigatory stops, protective pat downs, and the enforcement of the Loitering Ordinances, the City and the CPD achieved Preliminary compliance with ¶868 specifically. Additionally, the City and CPD remained under assessment for Secondary compliance while the IMT and OAG continue the review and comment process, as well as the CPD's incorporation of community input when appropriate. For the requirements of ¶854, the City and the CPD achieved Preliminary and Secondary compliance in the ninth reporting period. The IMT reviewed email templates, S04-13-09, *Investigatory Stop System*, and an email notification from the Office of the Superintendent. Additionally, the IMT reviewed a memo with data on ISRs from January 1, 2021 – June 27, 2023. Finally, the City and the CPD did not achieve any level of compliance with ¶866 as the initial brochure received for the Know Your Rights Campaign did not sufficiently address the requirements of the paragraph.

During the ninth reporting period, the City and the CPD continued the community engagement effort that started before investigatory stops, pat downs, and loitering ordinance enforcement were added to the Consent Decree. In 2023, under a now-terminated agreement with the American Civil Liberties Union of Illinois, community organizations developed a set of recommendations for stops, pat downs, and searches, to which the City and the CPD responded, as detailed in the

October 3, 2023 *Consultant Report: Community Engagement Results*.[41] Interim Superintendent Fred Waller met with representatives for the community organizations on July 14, 2023, regarding the recommendations, and a follow-up meeting with Superintendent Larry Snelling was held December 18, 2023. In addition, the IMT made several recommendations regarding the CPD's "ability to adapt elements of this model for community engagement" in our Eighth Monitoring Report, which was filed November 1, 2023, in accordance with the requirements of ¶865.[42]

ISR Stipulation Figure 1:
Compliance Progress for Investigatory Stops, Protective Pat-Downs, and Enforcement of Loitering Ordinances Paragraphs at the end of the Ninth Reporting Period (December 31, 2023)

### Investigatory Stops, Pat Downs, and Loitering Compliance Progress by December 31, 2023



- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

## Looking Ahead to the Tenth Reporting Period

The IMT did not provide compliance progress updates, but rather provided compliance status updates for ¶¶855, 865, and 875.

In the next reporting period, we look forward to assessing additional paragraphs (see the Monitoring Plan chart below) and reviewing data supporting compliance for each.

---

[41] This report is available at the following link: https://cpdmonitoringteam.com/wp-content/uploads/2023/10/2023.10.03-Consultant-Report_-Community-Engagement-Results.pdf.
[42] *Id.*

ISR Stipulation Figure 2.
Investigatory Stops, Protective Pat-Downs, and
Enforcement of Loitering Ordinances Monitoring Plan

| Monitoring Period | Paragraphs |
|---|---|
| Ninth Reporting Period (July 1, 2023 – December 31, 2023) | ¶¶854, 866, 868 **(Total = 3)** |
| Tenth Reporting Period (January 1, 2024 – June 30, 2024) | ¶¶803–821, 834–838, 841, 852–853, 856–859, 861–864, 873 **+36 paragraphs (Total = 39)** |
| Eleventh Reporting Period (July 1, 2024 – December 31, 2024) | ¶¶822–833, 835, 839–840, 860, 869–870, 872 **+18 paragraphs (Total = 57)** |
| Twelfth Reporting Period (January 1, 2025 – June 30, 2025) | None **+0 paragraphs (Total = 57)** |
| Thirteenth Reporting Monitoring (July 1, 2025 – December 31, 2025) | ¶¶844–851 **+8 paragraphs (Total = 65)** |

Looking forward to the tenth reporting period, the IMT hopes to see the City and the CPD focus on formalizing their policies, and incorporating investigatory stops, protective pat downs, and the enforcement of loitering ordinances into their public awareness campaign. The IMT will continue to work with CPD to clarify language in their policies for better understanding by all affected parties and implementation by sworn personnel. Indeed, while this is the newest section of the Consent Decree, the City's and the CPD's efforts directed at investigatory stops and enforcement of loitering ordinances are critical to every section of the Consent Decree and the short and long-term success of Chicago's policing efforts overall.

\*\*\*

Specific compliance assessments, by paragraph, for the Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances section are included in Appendix 11.

# XII. Implementation, Enforcement & Monitoring

As we identified in previous monitoring plans, the City has many obligations that fall outside the 11 topic areas. While these paragraphs do not fall within the specific topic areas discussed above, these obligations are critical to the success of the reform efforts across all 11 topic areas of the Consent Decree. These requirements are included in the Implementation, Enforcement, and Monitoring section of the Consent Decree: ¶¶626–27, 629–43, 677–80, 682–87, 699–701, 704–06, 711, 714, and 720–21.

## Review and Monitoring Processes (¶¶626–27, 629–42, 679–80, 687, 711)

The Consent Decree outlines the policy review process in ¶¶626–37, the plan review process in ¶¶638–40, and the training review process in ¶641. Paragraph 633 requires the CPD to "ensure that its officers and the public have a meaningful opportunity to review and comment on material changes to CPD policies and procedures required by this Agreement." *See also*, ¶¶52 and 160. Further, as the City and the CPD develop and revise policies throughout the Consent Decree process, they must consult with the IMT and the OAG to develop the necessary policy or revision. The City and the CPD must then provide the IMT with the new or revised policy at least 30 days before the policy is scheduled to go into effect (¶¶627–28). The IMT and the OAG then have 30 days to comment, with a possible 15-day extension (¶¶627–28). The City, the CPD, the OAG, and the IMT then have at least 30 days to resolve comments. If we are unable to come to a timely agreement, an entity may submit a formal objection, which triggers a "workout period" (¶630). The entities then have an additional 30 days to resolve the issue before one of the Parties brings the issue to the Court to resolve (¶630). On the other hand, when the IMT and the OAG provide a "no objection" notice, then when applicable, the City and the CPD will post the new or revised policy for public comment for a minimum of 15 days (¶633). The entities will then review and consider the public comments and agree to any changes before the City and the CPD finalize the policy (¶633).

Overall, we have been satisfied with the City's and the CPD's willingness to collaborate with the IMT and the OAG regarding their policies. In fact, the City, the CPD, the IMT, and the OAG utilized the consultation process for policy and training development for several policies and training materials to great effect in the ninth reporting period.

As we note below, the City and the CPD must continue to improve their community engagement processes around policy creation and revision. The review processes have not always been without complications since the inception of the Consent

Decree, but we continue to work through disagreements in a largely collaborative fashion.

The City is also obligated by ¶679 to "collect and maintain all data and records necessary to document compliance with this agreement." The City and the CPD have recently taken significant steps in the right direction. During the ninth reporting period, the City and the CPD also made substantial progress on its efforts to streamline data collection processes and ensure reliable data is collected to demonstrate compliance with each section of the Consent Decree: As reported in our last assessment, the City and the CPD reached out to each Consent Decree section's Associate Monitor to identify the data necessary to comply with their section, representing a collaborative process between the IMT and the City to ensure that data collection systems and processes are reliably captured and mapped. And during the ninth reporting period, the City and the CPD provided a final assessment report for ¶606 that will now be used to inform the development of a *Data Systems Plan*. *See* ¶607.

Separately, ¶680 requires the City to "file a status report one month before each of the Monitor's reports is due for the duration of this Agreement. The City's status report will delineate the steps taken by CPD during the reporting period to comply with this Agreement, and CPD's assessment of the status of its progress implementing this Agreement." In the ninth reporting period, the City filed this required report on time for the first time since the start of the Consent Decree. The IMT greatly appreciates this effort from the City, and we hope that this status report will develop into a key tool for expediting full and effective compliance with the Consent Decree.

## Collective Bargaining (¶711)

It is important to note that the Consent Decree, and all review and monitoring processes exist alongside the City's collective bargaining relationships. As explained in our previous reports, the City is a party to collective bargaining relationships with four labor unions representing sworn police officers:

- The Fraternal Order of Police, Chicago Lodge No. 7 (FOP);

- The Policemen's Benevolent & Protective Association of Illinois (PBPA), Unit 156 – Sergeants;

- PBPA of Illinois, Unit 156 – Lieutenants; and

- PBPA of Illinois, Unit 156 – Captains (collectively, the "Unions").

Paragraph 711 of the Consent Decree harmonizes the City's statutory bargaining obligations with the Unions with the City's Consent Decree, adopting the following key tenets:

- As a threshold matter, the Consent Decree is not intended to alter the City's collective bargaining agreements or otherwise to impair or conflict with the officers' statutory rights to engage in collective bargaining through their chosen representatives (the Unions);

- Likewise, the Consent Decree does not obligate the City (or the Unions) to violate the terms of their collective bargaining agreements, or to violate or waive any bargaining rights or obligations;

- Nevertheless, in recognition of the fact that the City's labor agreements can and will directly impact its compliance with various provisions in the Consent Decree, the Consent Decree obligates the City to "use its best efforts" in the collective bargaining process "to secure modifications" to its collective bargaining agreements covering sworn officers that are consistent with the terms of the Consent Decree or to the extent necessary to implement the provisions of the Consent Decree.

To monitor ¶711, the City, the IMT, and the OAG met on a regular basis throughout each of the reporting periods, including the most-recent ninth reporting period, to discuss updates on the City's progress in bargaining successor labor agreements with the Unions and the status of related pending litigation. During these meetings, the City provided access to members of its bargaining committee.

During the ninth reporting period, the City reached agreement on a new contract with the FOP; the City Council approved the contract on December 13, 2023. The contract includes 5% pay raises for officers in 2024 and 2025, and cost-of-living increases tied to inflation—from a minimum of 3% to a maximum of 5%—in 2026 and 2027. It also includes a one-time $2,500 retention bonus for all officers. In addition, the contract makes changes to the process of assigning officers to transit detail and homicide investigation teams.

### IMT and OAG Access Issues (¶¶682–86)

To effectively monitor the City, the CPD, and the City's entities' compliance with the requirements of the Consent Decree, the IMT and the OAG (in their role as the plaintiff) must have access to tremendous amounts of documents, data, and most importantly people and places. The IMT believes that to accelerate compliance through Technical Assistance, the City must streamline access to facilitate efficient compliance efforts and determinations. Since the Consent Decree began, the IMT

has enjoyed considerable access to the CPD – but at times has found access challenging that is needed to determine compliance (¶¶681–86).

For example, the IMT has continually struggled with access to data and data systems, including Evidence.com, which houses the CPD's body-worn camera footage, and the system that houses Tactical Response Reports (TRRs), which detail CPD officers' uses of force.

Independent Monitoring Teams in other cities enjoy much fuller access, such as immediate and streamlined access to body-worn-camera footage and monitors carrying click-cards that access all City buildings at all times to ensure access for unannounced or "drop in" visits to facilities. The IMT must have broader, unencumbered, and cooperative access to get a true sense of the impact of Consent Decree reforms on the ground, as well as how the organization functions. Receiving this access will become increasingly important for reaching Full compliance with requirements across the Consent Decree.

### Accountability Processes (¶¶643, 683, 699, 704)

Throughout the Consent Decree process, the IMT has noted many challenges with the CPD's accountability processes. In fact, the lack of accountability for CPD officers engaging in misconduct was among the major findings of the U.S. Department of Justice's investigation into the CPD for civil rights violations, which ultimately resulted in the Consent Decree.

The City's and the CPD's accountability processes are complex, involving many entities with overlapping roles and responsibilities, including the CPD's Bureau of Internal Affairs (BIA), the Chicago Police Board, the Civilian Office of Police Accountability (COPA), the four police unions (see ¶711), the City's Department of Law, and the Office of the Inspector General's Public Safety Section (PSIG). Moreover, the City recently implemented a new police oversight entity, the Community Commission for Public Safety and Accountability, which is embedded into the fabric of the City of Chicago's complex police accountability system.

The IMT acknowledges that holding officers who "violate policies, procedures, orders, or directives that are required by this Agreement" accountable for their actions is sometimes complicated. The IMT has consistently emphasized that officer accountability – and public transparency about accountability processes – must be a shared responsibility among all leaders in the CPD, from sergeants to the Superintendent.

We note, for example, that while several paragraphs of the Consent Decree require progressive discipline (see ¶¶238–39 in addition to ¶643), we have seen no evidence of a functional progressive discipline policy or process. Further, as we have noted for many reporting periods, the CPD is not implementing the district-level

Accountability Sergeants—the first line of accountability in the agency—as required by ¶¶493–95.

Moreover, the Consent Decree notes that the "City agrees to require compliance with this Agreement by its officers, officials, employees, agents, agencies, assigns, or successors" and that the Consent Decree is "binding on all Parties hereto, by and through their officials, employees, agents, representatives, agencies, assigns, and successors." We urge the City and the CPD to take appropriate action to comply with these important and long overdue accountability requirements.

## Staffing and Resource Issues (¶¶677–78, 700, 706)

While the City and the Chicago Police Department (CPD) continue to implement the requirements of the Consent Decree, we remain concerned about the lack of consistent staffing and retention levels. The City and the CPD have designated the following entities to be responsible for the following provisions of ¶678:

- 678(a): the CPD's Reform Management Group and the City's Department of Law;

- 678(b) and (c): the CPD's Office of Legal Affairs and the City's Department of Law; and

- 678(d): the CPD's Reform Management Group.

Overall, personnel from the City, the CPD, and other relevant City entities continue to assist the IMT by providing information, updates, and evidence of compliance efforts. These representatives frequently arrange communications and help the IMT navigate the complexity of the City entities.

As with previous reporting periods, we have had some specific concerns about the lack of consistent staffing and retention levels in the Reform Management Group and the high level of turnover in the five years since the Consent Decree began. The Reform Management Group is located within the CPD's Office of Constitutional Policing and Reform and works closely with the CPD's Office of Legal Affairs and the City's Department of Law. We have mentioned in previous reports our concern about the turnover in Executive Directors in the CPD's Office of Constitutional Policing and Reform – three people have held that position in 3.5 years. Additionally, as of the end of the ninth reporting period, the Executive Director position remains vacant. Consistent leadership is of the utmost importance for reform to be sustainably implemented.

The personnel in these groups have many of the "knowledge, skills, and abilities necessary to facilitate compliance with this Agreement," as ¶677 requires. The City's Department of Law provides many of the project management functions for

the relevant city entities—the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General (OIG), including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC). The Reform Management Group provides many of these project management functions for the CPD.

We also have concerns about the staffing of the CPD's Audit Division, which is critical to the sustainability of the reform effort. The Audit Division's mission is as follows:

> *The mission of the Audit Division is to provide quality, independent and objective assessments of the operations, processes, and internal controls in support of the Chicago Police Department ('Department'), including but not limited to work related to the strategic plan and consent decree. During internal audits and other reviews in which areas for improvement are identified, recommendations will be made to enhance Department operations. The Audit Division promotes accountability by proactively working with officials across all the Department to identify risks, evaluate controls, and make recommendations intended to promote constitutional policing and the effective delivery of police services. The Department is committed to the use of audits and other reviews to assess adherence to its stated orders, policies, and procedures—as well as to demonstrate consistency with the strategic plan and compliance with the consent decree into which the Department entered with the Attorney General of the State of Illinois. All audits and reviews are intended to provide objective information to inform decision-making and to help improve the internal transparency and accountability of the Department's operations.*

The chronic understaffing of this unit is short-sighted for the future of sustainable reform at the CPD. The City and the CPD must continue to make efforts to maintain staffing at appropriate levels at all times in the following key departments: the Research and Development Division, the Tactical Review and Evaluation Division (or TRED, an umbrella under which the Force Review Unit, the Firearm Pointing Review Unit, the Foot Pursuit Review Unit, the Search Warrant Review Unit, and the Fourth Amendment Stop Review Unit reside), the Education and Training Division, the Crisis Intervention Team, the Audit Division, the Office of Community Policing, the Bureau of Internal Affairs (BIA), and the Reform Management Group. All have experienced consistent understaffing.

Many of the City's and the CPD's efforts and achievements in the first eight reporting periods continued into the ninth reporting period. The City's Department of Law, the CPD's Office of Constitutional Policing and Reform, the Legal Affairs Division, and the Research and Development Division (¶¶677–78) continued to be fully engaged in the monitoring process. The City and the CPD also maintained regular channels of communication with the IMT and the OAG and continued dialogue, problem-solving, and brainstorming about requirements and challenges regarding the paragraphs of the Consent Decree.

The City is "responsible for providing necessary and reasonable financial resources necessary through steps or processes that can include the budget process to fulfill its obligations under this Agreement, subject to the terms and conditions set forth herein" per ¶700 and that it is "responsible for providing necessary support and resources to CPD to enable CPD to fulfill its obligations under this Agreement" per ¶706. At this point in the Consent Decree implementation process—nearly five years and only 8% complete—we urge the City to take immediate actions to rectify its lack of resources and staffing to move compliance forward.

### Reform and Sustainability Processes (¶¶705, 714, 720–21)

While the City and the CPD have a long way to go to achieve "full and effective compliance" with the Consent Decree (*see* ¶717), we encourage them to begin thinking about how they will sustain the reforms they achieve over the course of this process.

The City bears the burden of providing evidence of its achievements to the IMT (per ¶720) and has been focused on achieving compliance with the Consent Decree's requirements (per ¶714 the original goal for completely implementing all requirements was five years, but it has since been extended by the Court to eight years), we must also be mindful of sustaining the reforms beyond the Consent Decree monitoring process. Paragraph 721 requires the City and the CPD to "develop a plan, in consultation with the Monitor and OAG, to conduct compliance reviews, audits, and community surveys deemed necessary and appropriate following the termination of the Consent Decree."

It is not too early to begin thinking about how the City's resources and accountability systems—including but not limited to the CPD's own Audit Division, TRED, the OIG, the PSIG, COPA, the Police Board, the CCPSA, and the most important accountability mechanisms of all, front-line CPD supervisors—should be harnessed to maintain sustained compliance with reforms, identify shortcomings and rectify them quickly well into the future.

One of the Consent Decree's overarching goals is for the CPD to become a learning and self-correcting organization. We are hopeful that the CPD will begin to think forward to a long-term plan for not only reaching full and effective compliance, but also how it can sustain these reformed practices well after the Consent Decree is terminated. Constitutional policing practices must be ingrained into the CPD's policies, practices, and culture. We believe it is crucially important that CPD begin to develop the plan required by ¶721, and we remind the City that the Consent Decree does not "limit the City's right to adopt future measures that exceed or surpass the obligations contained herein, as long as the terms of this Agreement are satisfied" (¶705).

# Conclusion,
# Monitoring Plan for Year Six, and
# Looking Ahead to
# Comprehensive Assessment Part II &
# *Independent Monitoring Report 10*

We have concluded our monitoring efforts for the ninth reporting period (July 1, 2023, through December 31, 2023). We appreciate the reform efforts made by many hard-working City personnel, including the compliance progress made by the City; the CPD; COPA; the Chicago Police Board; the OIG, including the Deputy PSIG; and the OEMC.

The IMT's next semiannual report, *Independent Monitoring Report 10*, will cover the reporting period from January 1, 2024, through June 30, 2024. As with previous reports, we will continue to work with the City and the OAG to implement all the Consent Decree's requirements. We will also continue to engage with Chicagoans to determine whether these reforms are being felt in their communities.

Moving forward, in the eleventh and twelfth reporting periods, we will continue to assess the City's compliance with *all paragraphs with requirements* in the Consent Decree or "monitorable paragraphs."[43]

The number of monitorable paragraphs may change as the City and its relevant entities begin to achieve full and effective compliance by sustaining Full compliance for the requisite periods.[44] In those cases, the IMT will stop assessing those requirements and paragraphs for compliance unless we derive information or evidence "showing that compliance with such requirements has materially lapsed." ¶716.

---

[43]    Our previous Monitoring Plans are available on our website. *See Reports*, INDEPENDENT MONITORING TEAM, https://cpdmonitoringteam.com/reports/.

[44]    To achieve full and effective compliance with Consent Decree requirements, the City and its relevant entities must maintain Full compliance for either one or two years, depending on the section of the Consent Decree. *See* ¶714.

Conclusion Figure 1. Reporting Periods for Years One through Six

| Monitoring Plan for Year One | |
|---|---|
| 1st Reporting Period | March 1, 2019 – August 31, 2019<br>(*See* Independent Monitoring Report 1) |
| 2nd Reporting Period | September 1, 2019 – February 29, 2020<br>(*See* Independent Monitoring Report 2) |
| **Monitoring Plan for Year Two** | |
| 3rd Reporting Period | March 1, 2020 – December 31, 2020[45]<br>(*See* Independent Monitoring Report 3) |
| 4th Reporting Period | January 1, 2021 – June 30, 2021<br>(*See* Independent Monitoring Report 4) |
| **Monitoring Plan for Year Three** | |
| 5th Reporting Period | July 1, 2021 – December 31, 2021<br>(*See* Independent Monitoring Report 5) |
| 6th Reporting Period | January 1, 2022 – June 30, 2022<br>(*See* Independent Monitoring Report 6) |
| **Monitoring Plan for Year Four** | |
| 7th Reporting Period | July 1, 2022 – December 31, 2022<br>(*See* Independent Monitoring Report 7) |
| 8th Reporting Period | January 1, 2023 – June 30, 2023<br>(*See* Independent Monitoring Report 8) |
| **Monitoring Plan for Year Five** | |
| 9th Reporting Period | July 1, 2023 – December 31, 2023<br>(Independent Monitoring Report 9, Spring 2024) |
| 10th Reporting Period | January 1, 2024 – June 30, 2024<br>(Independent Monitoring Report 10, Autumn 2024) |
| **Monitoring Plan for Year Six** | |
| 11th Reporting Period | July 1, 2024 – December 31, 2024<br>(Independent Monitoring Report 11, Spring 2025) |
| 12th Reporting Period | January 1, 2025 – June 30, 2025<br>(Independent Monitoring Report 12, Autumn 2025) |

Figure 2 on the following page reflects all monitorable paragraphs – including the new Investigatory Stops section – in the Consent Decree, which the IMT will continue to monitor in Year Six.

---

[45] Because of the shutdowns in response to the COVID-19 pandemic, the City and the Office of the Illinois Attorney General extended the third reporting period to December 31, 2020. *See Order Regarding the Extension of Consent Decree Obligation Deadlines* (March 27, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/04/2020_03_27-Order-Regarding-the-Extension-of-Consent-Decree-Obligation-De....pdf.

## Conclusion Figure 2. Monitoring Plan for Year Six Paragraphs

| Topic Area | Year Six Monitoring |
|---|---|
| Community Policing | 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48 **(Total = 35)** |
| Impartial Policing | 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82 **(Total = 31)** |
| Crisis Intervention | 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152 **(Total = 66)** |
| Use of Force | 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 247, 248 **(Total = 96)** |
| Recruitment, Hiring, and Promotion | 253, 254, 255, 256, 257, 258, 259, 260, 261, 262, 263, 264 **(Total = 12)** |
| Training | 270, 271, 272, 273, 274, 275, 276, 277, 278, 279, 280, 281, 282, 283, 284, 285, 286, 287, 288, 289, 290, 291, 292, 294, 295, 296, 297, 298, 299, 300, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 324, 326, 327, 328, 329, 331, 332, 333, 334, 335, 336, 337, 338, 339, 340 **(Total = 68)** |
| Supervision | 347, 348, 349, 350, 351, 352, 353, 354, 355, 356, 357, 359, 360, 361, 362, 363, 364, 365, 366, 367, 368, 369, 370, 371, 372, 373, 374, 375, 376 **(Total = 29)** |
| Officer Wellness and Support | 381, 382, 383, 384, 385, 386, 387, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401, 402, 404, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418 **(Total = 36)** |
| Accountability and Transparency | 424, 425, 426, 427, 428, 429, 430, 431, 432, 433, 434, 435, 436, 437, 438, 439, 440, 441, 442, 443, 444, 445, 446, 447, 448, 449, 450, 451, 452, 453, 454, 455, 456, 457, 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469, 470, 471, 472, 473, 474, 475, 476, 477, 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488, 489, 490, 491, 492, 493, 494, 495, 496, 497, 498, 499, 500, 501, 502, 503, 504, 505, 506, 507, 508, 509, 511, 512, 513, 514, 515, 516, 517, 518, 519, 521, 522, 523, 524, 525, 526, 527, 528, 529, 530, 531, 532, 533, 534, 535, 536, 537, 538, 539, 540, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 554, 555, 556, 557, 558, 559, 560, 561, 562, 563, 564, 565 **(Total = 139)** |
| Data Collection, Analysis, and Management | 568, 569, 570, 571, 572, 573, 574, 575, 576, 577, 578, 579, 580, 581, 582, 583, 584, 585, 586, 587, 588, 589, 590, 591, 592, 593, 594, 595, 596, 598, 597, 599, 600, 601, 602, 603, 604, 605, 606, 607, 608, 609 **(Total = 42)** |
| Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances | 803, 804, 805, 806, 807, 808, 809, 810, 811, 812, 813, 814, 815, 816, 817, 818, 819, 820, 821, 822, 823, 824, 825, 826, 827, 834, 835, 836, 837, 839, 840, 841, 852, 853, 854, 855, 856, 858, 859, 860, 865, 861, 862, 863, 864, 866, 868, 869, 870, 873 **(Total = 57)** |
| **TOTAL** | **611** |

In the first five years of the Consent Decree process, the City and the CPD have made significant progress revising, developing, and implementing policies and training. The City and the CPD have struggled, however, with community policing and community engagement; reliable data collection, analysis, and management; staffing and resource shortages and management; training; supervision; accountability and full implementation of the Consent Decree. In Year Six, we look forward to monitoring the City's and the CPD's efforts to continue to bridge these gaps and continue demonstrating compliance with the Consent Decree.

In future years, our priorities may shift as the City and the CPD make progress with the requirements of the Consent Decree. The monitoring plans for subsequent years will reflect those shifts.

There are, however, several elements of the IMT's work that will remain consistent over time. The IMT's Community Engagement Team will remain involved with local community-based groups invested in police reform in Chicago. We will disseminate information to community members about the City's and the CPD's progress and collect important information from Chicago residents. Likewise, the IMT will continue to implement and assess community surveys and research and solicit input from CPD members.

We will also continue to prioritize transparent community engagement and participation; independent reviews of police policies and practices; and regular communication with the OAG, the City, the CPD, the Chicago Police Board, the Civilian Office of Police Accountability, other relevant City entities, members of the Coalition (¶669), and members of Chicago communities.

Finally, we must note the limits of this Monitoring Plan. Any plan is subject to change, and that is especially true of a plan developed to address a project as complex and comprehensive as the Consent Decree. As a result, we expect that we may need to add to, subtract from, or otherwise modify various aspects of this Monitoring Plan. Nonetheless, this is our best estimate of what we expect to monitor during Year Six, and we will publicly report and explain any major changes.

In addition to our semiannual reports, the IMT is also at work on *Comprehensive Assessment, Part II*, which requires the IMT to consider (a) whether the outcomes of the Consent Decree are being achieved and (b) whether any modifications are needed to the Consent Decree.[46]

---

[46] *Independent Monitoring Report 8* included *Comprehensive Assessment, Part I,* which addressed the first requirement of ¶657 to "determine whether and to what extent the City and the CPD are in compliance with this Agreement." The other two requirements will be addressed in *Comprehensive Assessment, Part II*, which we anticipate filing soon as a standalone report.

It is important to note that the IMT cannot unilaterally make changes to the Consent Decree; only the Parties and the Judge can make changes.[47] The IMT will make recommendations for change in our upcoming *Comprehensive Assessment, Part II,* but per ¶659, the Parties must then consider our changes before seeking the Court's ruling to change the Consent Decree. The IMT intends to file *Comprehensive Assessment Part II* soon.

Conclusion Figure 3. Comprehensive Report Process per ¶¶657-659



In ¶6 of the Introduction section of the Consent Decree, the City made commitments that help frame many of the issues facing reform efforts today:

> In this [Consent Decree], the City commits to ensuring that police services are delivered to all of the people of Chicago in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, [in a manner that] respects the rights of all of the people of Chicago, [in a manner that] builds trust between officers and the communities they serve, and [in a manner that] promotes community and officer safety.
>
> The City also commits to providing CPD members with the resources and support they need, including improved training, supervision, and wellness resources.

The CPD is—along with police departments across the nation—continuing to face significant challenges with meeting such commitments. Staffing and resource issues, for example, continue to negatively affect the City's and the CPD's progress toward simultaneously and sufficiently providing supervision, officer-wellness, and support. This, in turn, has undermined the City's and the CPD's ability to demonstrate effective policing practices that respect the rights of all of the people

---

[47] Paragraph 696 notes that "OAG and the City may jointly agree to make changes, modifications, and amendments to this Agreement, which will be effective if approved by the Court."

of Chicago; build trust between officers and the communities they serve; and promote community and officer safety.

# Appendix 1
# (Community Policing)

Compliance-assessment updates for the Community Policing section are available here:

https://cpdmonitoringteam.com/wp-content/uploads/2024/05/IMR9-Appendix-1-Community-Policing.pdf.

This includes paragraphs where the City gained or lost compliance in the ninth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Community Policing section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-1-Community-Policing-2023.11.01.pdf.

# Appendix 2
# (Impartial Policing)

Compliance-assessment updates for the Impartial Policing section are available here:

https://cpdmonitoringteam.com/wp-content/uploads/2024/05/IMR9-Appendix-2-Impartial-Policing.pdf.

This includes paragraphs where the City gained or lost compliance in the ninth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Impartial Policing section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-2-Impartial-Policing-2023.11.01.pdf.

# Appendix 3
# (Crisis Intervention)

Compliance-assessment updates for the Crisis Intervention section are available here:

https://cpdmonitoringteam.com/wp-content/uploads/2024/05/IMR9-Appendix-3-Crisis-Intervention.pdf.

This includes paragraphs where the City gained or lost compliance in the ninth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Crisis intervention section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-3-Crisis-Intervention-2023.11.01.pdf.

# Appendix 4
# (Use of Force)

Compliance-assessment updates for the Use of Force section are available here:

https://cpdmonitoringteam.com/wp-content/uploads/2024/05/IMR9-Appendix-4-Use-of-Force.pdf.

This includes paragraphs where the City gained or lost compliance in the ninth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each monitorable paragraph in the Use of Force section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-4-Use-of-Force-2023.11.01.pdf.

# Appendix 5
# (Recruitment, Hiring, and Promotion)

Compliance-assessment updates for the Recruitment, Hiring, and Promotion section are available here:

https://cpdmonitoringteam.com/wp-content/uploads/2024/05/IMR9-Appendix-5-Recruitment-Hiring-and-Promotions.pdf.

This includes paragraphs where the City gained or lost compliance in the ninth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Recruitment, Hiring, and Promotion section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-5-Recruitment-Hiring-and-Promotions-2023.11.01.pdf.

# Appendix 6
# (Training)

Compliance-assessment updates for the Training section are available here:

https://cpdmonitoringteam.com/wp-content/uploads/2024/05/IMR9-Appendix-6-Training.pdf.

This includes paragraphs where the City gained or lost compliance in the ninth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Training section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-6-Training-2023.11.01.pdf.

# Appendix 7
# (Supervision)

There are no compliance-assessment updates for the Supervision section in the ninth reporting period (*i.e.*, where the City gained or lost compliance in the ninth reporting period or paragraphs with significant developments toward or away from compliance).

A description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Supervision section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/up-loads/2023/11/IMR8-Appendix-7-Supervision-2023.11.01.pdf.

# Appendix 8
# (Officer Wellness and Support)

Compliance-assessment updates for the Officer Wellness and Support section are available here:

https://cpdmonitoringteam.com/wp-content/uploads/2024/05/IMR9-Appendix-8-Officer-Wellness-and-Support.pdf.

This includes paragraphs where the City gained or lost compliance in the ninth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Officer Wellness and Support section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-8-Officer-Wellness-and-Support-2023.11.01.pdf.

# Appendix 9
# (Accountability and Transparency)

Compliance-assessment updates for the Accountability and Transparency section are available here:

https://cpdmonitoringteam.com/wp-content/uploads/2024/05/IMR9-Appendix-9-Accountability-and-Transparency.pdf.

This includes paragraphs where the City gained or lost compliance in the ninth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Accountability and Transparency section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoring-team.com/wp-content/uploads/2023/11/IMR8-Appendix-9-Accountability-and-Transparency-2023.11.01.pdf.

# Appendix 10
# (Data Collection, Analysis, and Management)

Compliance-assessment updates for the Data Collection, Analysis, and Management section are available here:

https://cpdmonitoringteam.com/wp-content/uploads/2024/05/IMR9-Appendix-10-Data-Collection-Analysis-and-Management.pdf.

This includes paragraphs where the City gained or lost compliance in the ninth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Data Collection, Analysis, and Management section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-10-Data-Collection-Analysis-and-Management-2023.11.01.pdf.

# Appendix 11
# (Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances)

Compliance-assessment updates for the Data Collection, Analysis, and Management section are available here:

https://cpdmonitoringteam.com/wp-content/uploads/2024/05/IMR9-Appendix-11-ISR-Pat-Down-and-Loitering-Enforcement.pdf.

This includes paragraphs where the City gained or lost compliance in the ninth reporting period, as well as paragraphs with significant developments toward or away from compliance.

# Appendix 12
# All Compliance Levels, By Paragraph

See chart on the following page.



# Attachment A:
# Office of the Illinois Attorney General Comments (May 13, 2024)



**OFFICE OF THE ATTORNEY GENERAL**
STATE OF ILLINOIS

**KWAME RAOUL**
ATTORNEY GENERAL

May 13, 2024

Margaret A. Hickey
Independent Monitor
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Maggie.Hickey@afslaw.com

**Re:    OAG Comments on the Ninth Independent Monitoring Report
Consent Decree, Illinois v. Chicago, 17-cv-6260 (N.D. Ill.)**

Dear Ms. Hickey:

The Consent Decree gives the Office of the Illinois Attorney General (OAG) an opportunity to comment on the ninth Monitoring Report (Report) before the Independent Monitoring Team (IMT) files it with the Court. The Report covers July 1, 2023 through December 31, 2023, a period in which the City of Chicago and the Chicago Police Department (CPD) continued to make incremental progress implementing reforms mandated by the consent decree. While the City and CPD have reached the first level of compliance with over 85% of monitorable paragraphs, the path to operational compliance remains long as only 7% of consent decree requirements have been fully achieved.

The Report covers a period in which a new CPD Superintendent expressed commitment to reform and collaboration with the OAG and IMT. OAG is hopeful that this commitment ultimately results in a reform-oriented culture throughout CPD, and we appreciate the dedication of the Department members and City personnel who work on implementing the consent decree every day.

The filing of the Report comes at a heavy moment for Chicagoans and CPD. Many questions remain about the fatal police shooting of Dexter Reed earlier this spring after a traffic

stop that also left one CPD officer wounded. Even as Chicagoans were reeling from the footage of Reed's death, CPD Officer Luis Huesca was killed on his way home following a late-night shift.

These tragedies come at a time when CPD is already under significant pressure as Chicago prepares to host the Democratic National Convention (DNC) in August. As the Department is fully aware, the eyes of the world will be on Chicago—and CPD—this summer. OAG encourages CPD to rise to the challenge of this moment by putting the core principles of the consent decree into practice by using de-escalation techniques, incorporating a community policing philosophy into crime fighting strategies, consistently supervising front-line officers, and prioritizing sufficient resources to achieve reform.

As in the past five years, this summer will no doubt challenge the City and CPD to ensure public safety while also maintaining the critical work of reform. Even without the DNC, summers in Chicago tend to bring increased violence and exhausted officers stretched thin from unrelenting deployments. With the DNC in August, the Department's job this summer will have an especially high degree of difficulty. We urge the Department to continue its progress on the consent decree because lasting improvements to public safety ultimately depend on a foundation of community trust.

### Critical Policies Remain Overdue

CPD has made progress tackling important policies that OAG has emphasized in prior monitoring periods. Nonetheless, several policies essential to CPD's reform efforts remain outstanding. These include:

- CPD's policy ensuring meaningful access to police services for individuals with limited English proficiency;
- CPD's policy ensuring meaningful access to police services for individuals with disabilities; and
- CPD's policy governing investigations of officer-involved shootings and deaths in compliance with the Consent Decree and Illinois law.

CPD's delayed implementation of these policies impacts Chicagoans every day, as officers continue to operate under outdated guidance. Furthermore, even after CPD finalizes these policies, the Department must undertake the large task of training its officers on them, before their effects are likely to be felt on the street. Additionally, while CPD has been conducting some community engagement to inform these policies, we continue to hear calls for the Department to involve community members, especially Black and brown people with lived experience, people with disabilities, and young people, earlier in the policy development process and to listen and respond to their concerns and recommendations. We encourage CPD to work towards obtaining this input and prioritize finalizing these critical policies which may affect thousands of Chicagoans.

### CPD's and the City's Staffing Allocation Choices Have Hindered Reform

As in prior monitoring periods, nearly every section of the Report emphasizes the staffing shortages experienced by those divisions of CPD tasked with the nuts and bolts of police reform.

The Office of Community Policing, the Crisis Intervention Unit, the Tactical Review and Evaluation Division (TRED), the Training and Support Group, and Reform Management are all critically understaffed. Furthermore, among the already inadequate staff in these divisions, staff members are frequently deployed out to other tasks. The Bureau of Internal Affairs is also critically understaffed and accountability sergeants in the districts struggle with competing patrol responsibilities.

All these units perform critical reform functions, and inadequate staffing hinders progress towards compliance. The Crisis Intervention Unit has 50% of the staff it had just two years ago. As the Monitor notes, the CIT District, Operations and Community Support unit "has been too understaffed and under-resourced to meet its objectives." (Report, p. 33). The shortage in CIT DOCS personnel (11 officers cover the entire city) prevents them from "conducting the required crisis-call follow-up activities that are essential to a successful diversion program" and from adequately responding to CIT reports and building community partnerships. *Id*. As another example, TRED continues to experience staffing shortfalls and backlogs that hinder its ability to drive reform. In the sixth monitoring period, TRED's backlog caused CPD to lose compliance with paragraphs 574 and 575, and due to inadequate staffing and continued backlogs, CPD has still not regained compliance with paragraph 575. While CPD has recently taken steps to increase TRED's staffing levels and made progress towards decreasing the backlog, the increased public safety demands of summer threaten that progress. Finally, if the City and CPD wish to accelerate their efforts towards operational compliance with many requirements across sections, data is critical. The City must adequately staff CPD's Audit Division in addition to providing personnel with data analysis expertise where needed.

In February, a City Council committee approved an ordinance requiring CPD to conduct a staffing analysis[1], which is also a requirement of the consent decree. OAG is hopeful that the results of this study assist the City and CPD in responding more quickly to 911 calls and provide necessary data to adequately staff the units performing critical reform work.

### Progress in the Ninth Monitoring Period

The City and CPD made progress towards certain requirements in the ninth monitoring period, some of which is highlighted below.

- The Office of the Inspector General and the Deputy Inspector General for Public Safety achieved full and effective compliance with their consent decree obligations.
- The Civilian Office of Police Accountability (COPA) continued to make progress toward secondary and operational compliance with its responsibilities under the consent decree.

---

[1] Fran Spielman and Tom Schuba, *City Council Committee OKs Study on How Best to Deploy Chicago Police as Resources Shrink, Some Crimes Spike*, CHICAGO SUN TIMES (February 5, 2024), available at City Council committee OKs study on how best to deploy Chicago police as resources shrink, some crimes spike - Chicago Sun-Times (suntimes.com).

- CPD finalized the Interactions with Youth and Children policy and the Body-Worn Camera policy.
- CPD held its annual Peer Support meeting and provided refresher training for Peer Support members.
- The City and the CPD provided a final assessment report of its current data systems and technology that will be used to inform the development of a Data Systems Plan.
- CPD developed, implemented, and trained 95% of Bureau of Internal Affairs (BIA) Personnel, BIA Investigators, and Accountability Sergeants on six modules of training about numerous Consent Decree requirements.

As COPA approaches full compliance with many of its consent decree obligations, and CPD has put many of the Use of Force requirements into its policies and training, the IMT will be required to develop appropriate methodologies for assessing whether COPA and CPD have adopted these requirements in practice. Assessing full compliance for many reform efforts will require, in part, a comprehensive audit or other statistically sufficient review of a random sample of investigative files and use of force incidents. OAG looks forward to working with the IMT and City to develop a methodology and timeline for these reviews to ensure that full compliance determinations are based on adequate data, including a qualitative analysis of a broad range of investigations and use of force incidents. In developing appropriate methodologies, OAG encourages the IMT to collaborate with the City's Office of the Inspector General and Deputy Inspector General for Public Safety, who have experience and subject-matter expertise in conducting similar audits. Measuring whether the City has put individual requirements into practice may be challenging, but is a vital final step in the reform process.

### Conclusion

Finally, we acknowledge that CPD and the City have been working hard for months to prepare for the DNC in August. A fundamental component of safeguarding the DNC is protecting the exercise of First Amendment rights, and we appreciate the Department's focus on developing training about how to respect First Amendment freedoms amid an event of this magnitude. In the ninth monitoring period, CPD relied on the expertise of the Monitoring Team for technical assistance and appears committed to implementing important policy and training changes adopted after the summer of 2020. We continue to encourage CPD to ensure that its efforts to protect public safety and First Amendment freedoms are transparent and consistent with the philosophy of community policing.

OAG appreciates the Monitoring Team's efforts to streamline the report in response to community feedback. OAG is hopeful that the more digestible report and monthly public status hearings provide more timely, transparent information to the public about the progress of reform. In the coming months, OAG encourages the City and the Department to ensure that reform efforts do not stall. We remain committed to partnering with the City and CPD in this critical work.

Respectfully,

KWAME RAOUL
Attorney General of the State of Illinois

s/Mary J. Grieb
Mary J. Grieb
Deputy Chief, Civil Rights Bureau
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, Illinois 60615
773.590.7959
Mary.Grieb@ilag.gov

cc: Jennifer Bagby, Allan Slagel, Counsel for the City of Chicago (via email)

# Attachment B:
# City of Chicago
# Comments (May 13, 2024)



**City of Chicago**
**Brandon Johnson, Mayor**

**Department of Law**
Mary Richardson - Lowry
Corporation Counsel

**121 North LaSalle Street**
**Suite 600**
**Chicago, Illinois 60602**
**(312) 744-0220**
**(312) 744-5185 fax**

www.cityofchicago.org

May 13, 2024

Independent Monitoring Team
c/o Maggie Hickey, Independent Monitor
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Maggie.Hickey@afslaw.com

Dear Ms. Hickey:

The City of Chicago provides its comments to the Independent Monitoring Team's final draft report for the reporting period July 1, 2023, through December 31, 2023, 2023 (IMR 9). The City looks forward to continued compliance progress in the current monitoring period (January 1, 2024 – June 30, 2024).

## City of Chicago's Comments on the
## Ninth Independent Monitoring Report

Pursuant to Consent Decree Paragraph 663, the City of Chicago ("City") provides the following response to the Independent Monitoring Team's ("IMT") final draft Independent Monitoring Report 9 ("IMR9 Report"). The City's response includes an attached chart of specific paragraph concerns by CPD and a written response from COPA.

### Summary of the City's Continued Increased Compliance

By the close of the ninth reporting period, the City has achieved some level of compliance with approximately 88% of the monitorable paragraphs assessed by the IMT in IMR 9. This represents a continued steady increase in the City's overall compliance.

The City's consistently increasing rates of compliance are significant but represent only a portion of the work done throughout the reporting period. The City appreciates the IMT's acknowledgement that "this report represents a sixth-month assessment of the City's compliance efforts from July 1, 2023, through December 31, 2023 . . .It does not reflect all the efforts of the City, the

CPD, or the other relevant City entities to date." (*See* IMR 9 Report – Executive Summary, pg. 2). The City further appreciates that the IMT's Executive Summary for IMR 9 includes major achievements by CPD and other relevant City agencies in addition to highlighting principal challenges. (*See* IMR 9 Report – Executive Summary, *Major Developments and Principal Achievements and Challenges Impacting Compliance*, pg. 5 – 8). The acknowledgement of the efforts being made for future progress along with the additional information recognizes the building nature of the City's reform efforts while still noting the areas where the City has more work to do.

Some of the notable achievements in the Ninth Monitoring Period include:

- The completion / implementation of numerous CPD policies and policy suites after review by the IMT and OAG, including: CPD's Interactions with Youth and Children policy (G02-05); Recognizing and Responding to Individuals in Crisis" (S04-20); Body Worn Camera (BWC) policy (S03-14); Complaint and Disciplinary Systems (G08-01); Complaint, Disciplinary Investigators and Investigations (S08-01); Preliminary Investigations (G04-01); Conducting Log Number Investigations (S08-01-05)

- CPD achieved the required 95% of Department members completing 40-hours of annual in-service training for calendar year 2023. The 40-hours of training included the following courses:
  - o  Constitutional Policing,
  - o  Officer Wellness,
  - o  2023 Use of Force Training, and
  - o  Fair and Impartial Policing.

- CPD contracted with the University of Texas - San Antonio to complete the Use of Force data analysis project required by paragraphs 572 and 573.

- CPD increased the consistency of the Force Review Board meetings by creating a template to ensure effective presentations that address all Consent Decree and SOP requirements.

- The delivery of eight hours of the approved training to BIA investigators.

- Prohibition on Retaliation eLearning by training over 95% of relevant department members.

- CPD completed an assessment of its information mechanisms consistent with paragraph 606 that touched on all sections of the Consent Decree.

- COPA reached full compliance with approximately 80% of all of its assessable paragraphs.

**IMT Reporting Process**

The Monitor's current report, Report 9, documents the City's compliance efforts for July 1, 2023 – December 31, 2023. In previous reporting periods, the City repeatedly requested that the IMT find a way to make the reports shorter and more user friendly, to both expedite the process of getting the report published and to create a document that was accessible to members of the public. For the draft IMR-9 Report, the IMT appears to have tried to make the report shorter, but actually made the process of reviewing the report more time consuming and cumbersome and in the process also created a document that does not reflect all of the work and efforts of the City during the period. The IMT's new report format only addresses paragraphs where the levels of compliance changed. Unfortunately, this means that paragraphs where the City (and CPD) produced materials towards compliance with paragraphs during the reporting period but the IMT did not modify the level of compliance are not addressed and no reasoning for why compliance was not awarded in the reporting period is provided by the IMT. As the City and CPD discussed with the IMT, this approach might work if the IMT's review and response to the CPD's submissions included clear guidance of whether compliance had been achieved. Instead, the IMT continues to issue "no objection" notices in response to certain policies and trainings but then fails to award compliance when the policy or training is implemented. The IMT, the City and CPD have had numerous discussions about this issue throughout IMR 10 and hopefully moving forward the IMT's responses to CPD's submissions will address the paragraphs for which CPD is seeking compliance and the IMR 10 report will address all paragraphs for which the City and CPD have made submissions seeking increased levels of compliance in IMR 10.

**Methodologies**

Consent Decree Paragraph 655 provides that the IMT will develop and share with the City and the OAG a proposed methodology for its compliance reviews. Paragraph 655 allows for the parties to submit comments regarding the methodology, which both the City and the OAG consistently submitted during earlier monitoring periods. However, the City has refrained from providing comments in more recent periods due to the IMT's unwillingness to substantively

address the City's concerns, many of which are noted in the comments below. Additionally, the OAG has also refrained from providing comments in recent periods.

The City recognizes the complexity and difficulty of developing distinct methodologies for several hundred Consent Decree requirements spanning numerous topics and appreciates the IMT's efforts to do so in a thorough manner. The City, however, believes that many of the methodologies delineated by the IMT add substantive requirements beyond the legal requirements stated in the Consent Decree. Other methodologies do not provide adequate detail about the data sources and analysis methods that will be used to assess compliance.

Consent Decree Paragraph 624 provides that the IMT's review will determine whether the City has substantially complied with the Consent Decree. This paragraph further notes that "Compliance with a requirement means that the City and CPD: (a) have incorporated the requirement into policy; (b) have trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) are carrying out the requirement in actual practice." Based on this paragraph, the IMT assesses whether the City and its entities are in preliminary, secondary, or full compliance—each of these levels typically mirrors the three subparts of ¶ 642.[1]

As noted below, many of the City's disagreements with the IMT's current report involve methodology descriptions that vary from the methodologies described above or that fail to give the appropriate credit for materials developed and submitted for compliance. The City is concerned that the IMT often conflates the requirements for full compliance when assessing secondary compliance. Additionally, often the IMT's methodologies do not provide sufficient actionable detail to allow the City to understand what will be required to achieve the next level of compliance. The IMT reports used to provide some specific guidance, which the City found immensely helpful in planning their future compliance efforts. The format of the IMR9 report however abandons that structure leaving the City uncertain as to the path for achieving compliance. Accordingly, where guidance is unclear or based upon a methodology beyond what is contained in the Consent Decree, it may delay the City's compliance efforts and may present a misleading picture to the public regarding the extent to which the City is undertaking the steps required to achieve compliance.

---

[1] For certain Consent Decree requirements, this three-pronged analysis is less suitable. In those situations, the Monitor develops alternate methodologies for assessing compliance.

Some concerns related to specific section or paragraph assessments are addressed below, and further concerns are contained in CPD's attached paragraph chart and have been addressed in prior correspondence and conversations between the parties and the IMT. The City looks forward to future discussions with the IMT and OAG about methodologies as part of the Comprehensive Assessment. The City believes that clearly delineated methodologies allows the City to plan for compliance. Additionally, the City maintains that clearly established methodologies are essential for the public to understand the work being done and how compliance is being assessed.

## SPECIFIC COMMENTS

The City provides the following responses to the IMT's comments related to various Consent Decree sections / specific Consent Decree paragraphs / or involved City Agencies. These comments are specific to CPD unless otherwise noted:

## Community Policing:

Paragraphs 22, 24, 25, 46 (Clarification sought): The City and CPD produced a Beat and DAC Follow-Up Report on December 7, 2023, for secondary compliance with these paragraphs. Additional clarification is necessary to explain why these materials did not achieve secondary compliance for these paragraphs. Based upon the IMT's new report format, no mention is made in the report about the compliance sought by CPD and why secondary compliance was not achieved.

*See* CPD's attached paragraph chart for additional comments related to Community Policing.

## Impartial Policing:

Paragraph 57 (Methodology): The City and CPD disagree with the IMT's compliance assessment for this paragraph. Consent Decree paragraph 57 requires that "CPD will continue to prohibit CPD members from posting, displaying, or transmitting content that is disparaging to a person or group based on race, religion, sexual orientation, or other protected class on personal social media accounts." The City and CPD maintain that secondary compliance with this paragraph was achieved through the Constitutional Policing and Communications in the Police Environment trainings that were delivered to over 95% of required members by the end of IMR 9. The Communications in the Police Environment training also achieved secondary compliance with

paragraphs 54 and 56. The Constitutional Policing course also achieved secondary compliance with paragraph 58. Accordingly, these training courses should have achieved secondary compliance with paragraph 57.

See CPD's attached paragraph chart for additional comments related to Impartial Policing.

**Crisis Intervention:**

The City has raised concerns through the past few reporting periods about the methodologies and assessment of this section of the Consent Decree. The IMT often appears to conflate the requirements of paragraphs within this section, often appears to impose requirements that have no connection to individual paragraphs and has removed levels of compliance using methodologies that are inconsistent with the methodology used to award the compliance in the first place. Below are concerns specific to CPD and OEMC.

- ***OEMC – Paragraphs 142, 143***
  - o **Paragraph 142:**

The City and OEMC disagree with the IMT's removal of both secondary and full compliance with paragraph 142. The IMT's assessment and comments on paragraph 142 in the IMR 9 report are an example of the ongoing issues that the City has repeatedly raised with the IMT regarding the monitoring of the Crisis Intervention section and methodologies generally. The City continues to request that the IMT establish clear and consistent methodologies tied to the requirements of the paragraphs. Even now, five years into the Consent Decree, the IMT's methodology for awarding compliance with this paragraph is unclear. The IMT's bases for withdrawing both secondary and full compliance with paragraph 142 appear twofold: (1) because it only learned in IMR 9 that many OEMC telecommunicators had received the necessary training as far back as 2016, before the current training was approved in 2020 and (2) because it has never received or reviewed the contents of the pre-2020 training. (IMR 9 comments on paragraph 142). Both bases are inaccurate and inconsistent with the methodology that was apparently used to award both secondary and full compliance with this paragraph.

OEMC achieved preliminary and secondary compliance with paragraph 142 in the first reporting period (March 1, 2019 – August 30, 2019). At that time, in awarding both preliminary and secondary compliance, the IMT wrote that they had "reviewed training documents provided by the OEMC and has determined that nearly all current, active telecommunicators have received mental-health awareness and Crisis Intervention Team (CIT) training. The documentation

provided by the OEMC indicates that 464 call takers and telecommunicators have been trained in CIT and Mental Health Awareness between February 21, 2016, and June 24, 2018." (*See* IMR 1 Report, page 55). Thus, in IMR 1 the IMT was aware that 464 call takers and telecommunicators had been trained prior to 2020. Additionally, by the IMT's then methodologies, the fact that the call takers and telecommunicators had received CIT and Mental Health Awareness training was sufficient to award secondary compliance in August of 2019.

OEMC achieved full compliance with paragraph 142 in IMR 4, where the IMT wrote that "[t]he City and the OEMC achieved Preliminary and Secondary compliance with the requirements of ¶142 based on its demonstration that all current active telecommunicators have received mental-health and CIT awareness training. The OEMC has also memorialized this requirement into a policy, which clearly states the requirement for all telecommunicators to receive the mental health and CIT awareness training. The efforts by the OEMC to ensure policy, training, and operational compliance for this paragraph are commendable. Moving forward, the IMT will continue to audit OEMC member training records to ensure that the requirements of ¶142 continue to be fulfilled." (IMR 4 Report, page 255). OEMC maintained full compliance with paragraph 142 in IMR 5 and IMR 6, where the IMT noted that full compliance was assessed by confirming that 95% of required employees had received the required training. In IMR 7, the IMT again found OEMC to be in full compliance with paragraph 142 but stated that in order to maintain full compliance with paragraph 142, OEMC would also need to train the fire dispatchers, despite the plain language of the Consent Decree which only sets requirements on police call takers and dispatchers. In IMR 8, the IMT again found OEMC to be in full compliance with paragraph 142 and appeared to accept that the requirements of the Consent Decree only apply to the police call takers and dispatchers.

In the IMR 9 Report, the IMT states that OEMC lost both secondary and full compliance with paragraph 142 because OEMC appears to be relying upon the pre-2020 training, which the IMT has never reviewed to confirm that it meets the requirements of the Consent Decree. (*See* IMR 9, IMT comments on paragraph 142). The IMT maintains that the only pre-2020 materials related to mental health training that they received from the City and OEMC were "Roll Call Training – Self Care"; "Roll Call Training – PTSD"; and "CIT Evaluation Forms." This is incorrect. On August 12, 2019, the IMT requested "Copies of the curriculum, including the names of the presenters, credentials of the presenters, topics covered, length of each module, and pre and post evaluations for required Dispatcher/Communications Training regarding Crisis Intervention for all telecommunications (Mental Health CIT Awareness Training)". On August 30, 2019, the

City produced the roll call training materials and evaluations that the IMT notes (*see* MONITOR 12335 – 12493 and 12616 – 12493) and also produced the "Mental Health Crisis Awareness" training materials (*see* MONITOR 12494 – 12615). Additionally, the City supplemented the August 30, 2019, production on September 11, 2019, by providing the "Lesson Plan for the 8-hour Mental Health Crisis Awareness training" (*see* MONITOR16146-16155). This formal written response to IMR 9 is now the fourth time since February 2024 that the City has pointed this out to the IMT; however, the IMT continues to ignore the production of these materials in 2019 and to claim that the only thing that they ever received were the roll call trainings.

Finally, in addition to receiving the materials for the pre-2020 training, the IMT attended the training in IMR 1. In awarding preliminary compliance with paragraph 143 in IMR 4, the IMT wrote: "[i]n the first monitoring period, members of the IMT observed the OEMC's delivery of the eight-hour training. The OEMC staff and external instructors (including mental-health clinicians and advocates) were well qualified to deliver their presentations. The external instructors included representatives from the National Alliance on Mental Illness and from people with lived experience." (*See* IMR 1 Report, page 55).

All of the above demonstrate the inconsistent methodologies which the IMT has applied to OEMC and these paragraphs since IMR 1 and why the City and OEMC maintain that the withdrawal of both full and secondary compliance with paragraph 142 in IMR 9 is contrary to the evidence of proof of compliance. At a minimum, the IMT's methodologies for the original finding of secondary compliance would still stand and OEMC should maintain secondary compliance with paragraph 142.

    o  **Paragraph 143**

The City and OEMC disagree with the IMT's removal of both secondary and full compliance with paragraph 143. As with paragraph 142, the IMT has withdrawn compliance using different methodologies than it used to award compliance and has conflated the requirements of other paragraphs in its reasoning. OEMC achieved both preliminary and secondary compliance with paragraph 143 in IMR 4. At that time, the IMT wrote that "OEMC finalized their *Mental Health Training* directive, which clearly states the requirements of ¶143. In the first monitoring period, members of the IMT observed the OEMC's delivery of the eight-hour training. The OEMC staff and external instructors (including mental-health clinicians and advocates) were well qualified to deliver their presentations. The external instructors included representatives from the National Alliance on Mental Illness and from people with lived experience." (*See* IMR 4 Report,

page 256). By the IMT's methodologies, secondary compliance was awarded based upon the policy which set forth the requirements of paragraph 143. Therefore, the IMT's withdrawal of secondary compliance is inconsistent with the methodologies used to award it and OEMC should maintain secondary compliance with paragraph 143.

OEMC achieved full compliance with paragraph 143 in IMR 5. (*See* IMR 5 Report, page 139 - 140). At that time, the IMT wrote that OEMC achieved full compliance by producing evidence of those individuals who attended the 8-hour training since the last submission. (*See Id.*) OEMC maintained full compliance with paragraph 143 in IMR 6 by producing records of training attendance. (*See* IMR 6 Report, page 149). IMR 6 also saw the beginning of increased requirements from the IMT for OEMC to maintain full compliance. (*See* Id. at 149 – 151). In IMR 7, OEMC maintained full compliance by producing training attendance records; however, the IMT commented that it would begin considering OEMC's engagement with CCMHE in assessing full compliance, despite the plain language of the paragraph which does not involve OEMC's relationship with CCMHE. (*See* IMR 7 Report, page 188 – 191). In IMR 8, OEMC again maintained full compliance with paragraph 143 by producing training attendance records. (*See* IMR 8 Report, Appendix 3, pages 75 – 76). Again, the IMT commented that it would consider OEMC's engagement with CCMHE in assessing full compliance. (*See Id.*). The IMT then went on to cite a number of paragraphs and requirements inapplicable to OEMC. (*See* IMR 8 Report at page 75, "Full compliance was assessed in the fifth reporting period by evaluating records of attendance, and ongoing Full compliance will also assess the City's and the OEMC's efforts to engage with the community, including the CCMHE, regarding requisite policy, training, and operations development and implementation as referenced in the Consent Decree (¶¶10, 12, 49, 52, 115, 129, 511, 531, and 633)).

Despite its prior reports referenced above the IMT comments on paragraph 143, for IMR9 state that preliminary compliance was assessed based upon OEMC's policy setting forth the requirements of paragraph 143. (*See* IMR 9 Report, Appendix 3, comments on paragraph 143). The IMT further report in IMR9 that secondary compliance was assessed "by determining whether the City and the OEMC have qualified personnel fulfilling the responsibilities to achieve the goals of the Consent Decree and the requirements of ¶143, along with reviewing training curricula." (Id.). It is unclear from this methodology how OEMC has lost secondary compliance with this paragraph. The IMT includes the same claims about the pre-2020 training curriculum. As detailed above, the IMT's description of events is inconsistent with its prior reports.

The IMT's IMR 9 comments on paragraph 143 go on to state that "[t]he IMT assessed Full compliance by evaluating training attendance records, and by considering the City's and the OEMC's efforts to engage with the community, including the Chicago Council on Mental Health Equity (CCMHE), regarding requisite policy, training, and operations development and implementation as referenced in the Consent Decree (*see* ¶¶10, 12, 49, 52, 115, 129, 511, 531, and 633). This described methodology has no connection to the plain language of Consent Decree paragraph 143 which states that "[t]he OEMC training will be at least an eight-hour course taught jointly by qualified OEMC staff and a mental health clinician or advocate." Additionally, the IMT's citation to paragraphs 10, 12, 49, 52, 115, 129, 511, 531, and 633 have nothing to do with OEMC and the requirements of paragraph 143.

As stated above, the City and OEMC disagree with the IMT's withdrawal of secondary and full compliance with paragraph 143. At a minimum, the IMT's own stated methodologies would require a finding that OEMC maintain secondary compliance with this paragraph.

- **CPD - <u>Paragraph 92</u>:**

The City and CPD disagree with the IMT's removal of secondary compliance with this paragraph. Paragraph 92 states that "[c]ertified CIT Officers are officers who receive specialized training in responding to individuals in crisis. Certified CIT officers retain their standard assignment and duties but may also take on specialized crisis intervention duties and are prioritized to respond to calls in the field identified as involving individuals in crisis, as assigned." In withdrawing secondary compliance with this paragraph, the IMT appears to cite staffing issues even though the plain language of the paragraph is not tied to staffing levels. CIT staffing levels are covered in paragraphs 93 and 95. If the IMT wishes to withdraw compliance due to staffing issues it should be done in paragraphs 93 and 95 not paragraph 92.

Additionally, the IMT attempts to require that CPD re-enroll officers in the Basic 40-hour training by citing "best practices" without citing any actual authority while ignoring the fact that best practices already control the content and the process by which officer become certified CIT officers, which is controlled by the Illinois Law Enforcement Training and Standards Board (ILETSB). Paragraph 95 makes clear that "[c]ertified CIT Officers, at a minimum, must complete the specialized 40-hour Basic CIT Training ("Basic CIT Training") and receive CIT certification by the Illinois Law Enforcement Training and Standards Board before being identified as a "Certified CIT Officer." To maintain the Certified CIT Officer designation, officers must receive

a minimum of eight hours of CIT refresher training ("CIT Refresher Training") every three years and maintain the eligibility requirements established by the CIT Program."

**Use of Force:**

Paragraphs 236, 237, 238 (Methodology): The City and CPD disagree with the IMT's compliance assessment for these paragraphs. In IMR-9, CPD finalized and implemented S03-14: Body Worn Camera policy. The City maintains that the implementation of this policy should have achieved preliminary compliance with 236, 237, and 238 rather than the "under assessment" awarded by the IMT. This policy achieved preliminary compliance with paragraphs 239, 240, and 241 and likewise should have achieved preliminary compliance with paragraphs 236, 237, and 238.

*See* CPD's attached paragraph chart for additional comments related to Use of Force.

**Recruitment, Hiring, and Promotions**

*See* CPD's attached paragraph chart for comments related to RHP.

**Training**

*See* CPD's attached paragraph chart for comments related to Training.

**Supervision**

*See* CPD's attached paragraph chart for comments related to Supervision.

**Officer Wellness**

*See* CPD's attached paragraph chart for comments related to Officer Wellness.

**Accountability**

- **City – Paragraph 445**

The City disagrees with the IMT's assessment of paragraph 445 and believes the City should be in full compliance with this paragraph. Paragraph 445 requires that the City "use best efforts to initiate and undertake a process with the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office to share information on at least a quarterly basis regarding any affirmative judicial findings made during the course of

criminal proceedings that a CPD member was untruthful, including any findings made at suppression hearings.  Upon receipt of information from the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office that may suggest misconduct COPA will initiate the intake process."  As the IMT has noted, the City and COPA entered into an MOU to obtain the required information regarding judicial findings of untruthfulness.  Additionally, COPA developed a policy to initiate the intake process and conduct any necessary investigation.  The IMT continues to claim some requirement on CPD's part in this process and is withholding full compliance because it believes that CPD also has an obligation. Paragraph 445, however, provides that the responsible parties are the City and COPA, who has jurisdiction to investigate any claims of untruthfulness under Rule 14.  Accordingly, the City as a whole should be in full compliance with this paragraph.  If the IMT continues to maintain some responsibility on CPD to achieve full compliance with this paragraph it is necessary that the IMT articulate CPD's obligation under this paragraph.

- **CPD Paragraphs 521, 528, 529, 530**

The City and CPD disagree with the IMT's compliance assessment with these paragraphs. CPD reopened G08-01, Complaint and Disciplinary Systems, to ensure the requirements of this paragraph were codified consistent with the methodology for achieving preliminary compliance with these paragraphs.

*See* CPD's attached paragraph chart for additional comments related to Accountability.

### Data

*See* CPD's attached paragraph chart for comments related to the Data section.

### ISRs

*See* CPD's attached paragraph chart for comments related to ISRs.

### COPA

As COPA looks ahead to the next reporting period, it believes it can realistically target full compliance with every one of its required Consent Decree paragraphs. COPA looks forward to working with the IMT - and the Office of the Illinois Attorney General (OAG) – to provide timely feedback and technical assistance on what is required to demonstrate operational compliance.  The

City has repeatedly informed the IMT that clarity around these requirements has been a challenge for COPA's staff in the most recent reporting periods. While COPA appreciates the timely review and comment by both the IMT and OAG on the first two levels of compliance – policy and training – COPA is often uninformed about what is required to achieve full compliance until after the reporting period ends, if at all. Hopefully, recent conversations between the IMT and COPA in the current reporting period will lead to improvement in the next report.

Thank you for the opportunity to provide this response.

Sincerely,

*/s/ Jennifer K. Bagby*
Deputy Corporation Counsel
City of Chicago Department of Law
Public Safety Reform Division

Cc:     Christopher Wells, Office of the Attorney General
        Scott Spears, Acting General Counsel, CPD
        Allan Slagel, Taft Law
        Ryan Nelligan, General Counsel and Deputy Director of Labor and Legal Affairs, OEMC
        Robin Murphy, General Counsel, COPA

| Para Number | CPD Concern | Location in Report | Compliance in IMR 9 Draft | Compliance CPD is Seeking | CPD Comment |
|---|---|---|---|---|---|
| 6 II. COMMUNITY POLICING |
| 22 | Needs Clarification | p. 22 (IMR 8) | Preliminary | Secondary | CPD produced A Beat and DAC Follow-Up Report on 07 Dec 2023 for Secondary compliance and appreciates greater feedback regarding the review of this material |
| 24 | Needs Clarification | p. 27 (IMR 8) | Preliminary | Secondary | CPD produced A Beat and DAC Follow-Up Report on 07 Dec 2023 for Secondary compliance and appreciates greater feedback regarding the review of this material |
| 25 | Needs Clarification | p. 29 (IMR 8) | Preliminary | Secondary | CPD produced A Beat and DAC Follow-Up Report on 07 Dec 2023 for Secondary compliance and appreciates greater feedback regarding the review of this material |
| 32 | Methodology | | No Compliance | Preliminary | CPD submitted the policy G02-05 "Interactions with Youth" through the 627 review and approval process in IMR-9. CPD codified the requirements of this paragraph the policy and received No Objections from the IMT and OAG in IMR-9. The policy was finalized and published. CPD should achieve preliminary compliance for this paragraph. |
| 41 | Needs Clarification | p. 14 (IMR 8) p. 63 (IMR 8) | Secondary | Secondary | CPD produced the SRO Evaluation Committee Meeting materials on 21 Dec 2023 for secondary compliance and appreciates greater feedback regarding the review of this material |
| 46 | Needs Clarification | p. 74 (IMR 8) | Preliminary | Secondary | CPD produced A Beat and DAC Follow-Up Report on 07 Dec 2023 for Secondary compliance and appreciates greater feedback regarding the review of this material |

| Para Number | CPD Concern | Location in Report | Compliance in IMR 9 Draft | Compliance CPD is Seeking | CPD Comment |
|---|---|---|---|---|---|
| 6 III. IMPARTIAL POLICING |
| 57 | Methodology | p. 17 (IMR 8) | Preliminary | Secondary | In IMR-9 CPD completed the Communication in Police Environment eLearning and produced the 95% Compliance Report on 12 October 2023 (MONITOR1732). CPD should achieve secondary compliance for ¶57. |

| Para Number | CPD Concern | Location in Report | Compliance in IMR 9 Draft | Compliance CPD is Seeking | CPD Comment |
|---|---|---|---|---|---|
| 6 IV. CIT |
| 92 | Methodology | p. 1 (IMR 9) p. 16 (IMR 8) | Preliminary - Lost Secondary | Secondary - Maintained | The 40-hour Crisis Intervention certification course has never been completely revamped.  Rather, modifications and updates have been made to the original curriculum and are included in the refresher training (and will continue to do so in future iterations as is the intent of the refresher training requirements in para. 95, 97, 99-101).  All certified CIT officers must complete the refresher training in the 3-year timeline to remain certified for deployment purposes.  ILETSB has at no time required any certified officers to be re-enrolled in the 40-hour certification curriculum.  The report is requiring CPD to address staffing reductions in the CIU, however this paragraph does not relate to ensuring adequate staffing.  That is addressed and subsequently assessed for compliance in Para 90 and 91 and eligibility requirements are assessed in para 93 and 95.  Consequently, consistent with the methodology, secondary compliance should not be withheld. |

| Para Number | CPD Concern | Location in Report | Compliance in IMR 9 Draft | Compliance CPD is Seeking | CPD Comment |
|---|---|---|---|---|---|
| 6 V. USE OF FORCE |
| 167 | Factually Inaccurate | p. 10 | Secondary (New) | N/A | IMT states preliminary compliance was obtained in IMR-2 with G03-03-01: Emergency Vehicle Operations – Eluding and Pursuing, however the policy submitted for preliminary compliance by R&D/CPD was U02-01: Department Vehicles (MONITOR235) |
| 197 | Factually Inaccurate | p. 22 | Operational (New) | N/A | IMT continues recommending CPD to implement a database to track all officers who are certified Taser users, the date of their certification, length of their certification, and requirements of their certification, searchable by reporting period. · On 15 DEC 23 during the monthly call, CPD presented to the IMT/OAG that the recommendations are already in place via the CLEAR application |
| 201 | Methodology | p. 32 | Secondary (New) | Full | IMT states Taser use in schools should be documented somewhere in addition to the TRED report. In 2023, CPD produced the 2022-2023 Annual SRO Report and tagged paragraph 201 (MONITOR1777). |
| 204 | Methodology | p. 34 (IMR 8) | Secondary (New) | Full | Assessment of full compliance moving forward is being based on review of COPA cases involving Taser use. This full compliance review differs from the methodology and assessment sources included in the previously provided IMT methodology spreadsheet. |

| Para Number | CPD Concern | Location in Report | Compliance in IMR 9 Draft | Compliance CPD is Seeking | CPD Comment |
|---|---|---|---|---|---|
| 236 | Methodology | p. 37 (IMR 9) p. 232 (IMR 8) | Under Assessment | Preliminary | Inconsistent methodology as S03-14: Body Worn Camera (MONITOR1584) policy was submitted for preliminary compliance with this paragraph and not granted, however it was awarded to Par 239 (p. 45), Par 240 (p. 48), and Par 241 (p. 50).<br><br>CPD completed extensive conversations and collaboration with the IMT and OAG regarding the BWC policies and received NOL from the IMT 05 Oct 2023 and a conditional NOL from the OAG 06 Oct 2023. CPD further received the IMT Proposed Resolution on 29 November 2023 stating to implement the latest policy version regardless of the public safety question issue. Following this direction, CPD publicly posted S03-14 for public comments in December 2023 and finalized and published the policy to achieve preliminary compliance. |
| 237 | Methodology | p. 40 (IMR 9) p. 235 (IMR 8) | Under Assessment | Preliminary | Inconsistent methodology as S03-14: Body Worn Camera (MONITOR1584) policy was submitted for preliminary compliance with this paragraph and not granted, however it was awarded to Par 239 (p. 45), Par 240 (p. 48), and Par 241 (p. 50).<br><br>CPD completed extensive conversations and collaboration with the IMT and OAG regarding the BWC policies and received NOL from the IMT 05 Oct 2023 and a conditional NOL from the OAG 06 Oct 2023. CPD further received the IMT Proposed Resolution on 29 November 2023 stating to implement the latest policy version regardless of the public safety question issue. Following this direction, CPD publicly posted S03-14 for public comments in December 2023 and finalized and published the policy to achieve preliminary compliance. |
| 238 | Methodology | p. 42 (IMR 9) p. 237 (IMR 8) | Under Assessment | Preliminary | Inconsistent methodology as S03-14: Body Worn Camera (MONITOR1584) policy was submitted for preliminary compliance with this paragraph and not granted, however it was awarded to Par 239 (p. 45), Par 240 (p. 48), and Par 241 (p. 50).<br><br>CPD completed extensive conversations and collaboration with the IMT and OAG regarding the BWC policies and received NOL from the IMT 05 Oct 2023 and a conditional NOL from the OAG 06 Oct 2023. CPD further received the IMT Proposed Resolution on 29 November 2023 stating to implement the latest policy version regardless of the public safety question issue. Following this direction, CPD publicly posted S03-14 for public comments in December 2023 and finalized and published the policy to achieve preliminary compliance. |
| **VI. RECRUITMENT, HIRING AND PROMOTION** | | | | | |
| Para Number | CPD Concern | Location in Report | Compliance in IMR 9 Draft | Compliance CPD is Seeking | CPD Comment |
| 261 | Factually Inaccurate | | Secondary | Secondary | During the site visit on August 21, 2023, the City and CPD presented the procurement process it went through to select an Expert, in compliance with IAP 07-02. At this same visit, the City and CPD declared its engagement with DCI Consulting as the Expert. On December 7, 2023, the City and CPD substantiated this procurement and documented compliance with its own policy via submission to the IMT under (MONITOR00319708 – MONITOR00319737). This submission also included the slides presented on this very topic to the IMT and OAG on August 21, 2023. As Paragraph 261 requires an assessment to be done every three years and the first one was conducted in 2020, DCI Consulting was procured to conduct an assessment in 2023. The City formally submitted the assessment on January 18, 2024 |
| 263 | Factually Inaccurate | | Preliminary | Secondary | The City and CPD demonstrated that job descriptions and eligibility criteria are published internally and externally via MONITOR1839. Within this folder are the job descriptions for Captain and Commander and the guides to how to access said job descriptions both internally within CPD and externally by the public (MONITOR00320054 - MONITOR00320085). These guides also remind the IMT and OAG of the letter submitted by Chief Novalez (MONITOR00305249) with the link to the external posting of the job description, at the beginning of IMR-9. |
| **VII. TRAINING** | | | | | |
| Para Number | CPD Concern | Location in Report | Compliance in IMR 9 Draft | Compliance CPD is Seeking | CPD Comment |
| 323 | Needs Clarification | p. 3 (IMR 9) p. 145 (IMR 8) | Lost Secondary | Secondary - Maintained | CPD had produced evidence of 95% completion of the required 40-hour curriculum formally at the beginning on 2024 as has historically been done and informally in December when 95% was achieved in all courses. Consequently, secondary compliance should be retained. |
| **VIII. SUPERVISION** | | | | | |
| Para Number | CPD Concern | Location in Report | Compliance in IMR 9 Draft | Compliance CPD is Seeking | CPD Comment |

| Para Number | CPD Concern | Location in Report | Compliance in IMR 9 Draft | Compliance CPD is Seeking | CPD Comment |
|---|---|---|---|---|---|
| 348-355 | Needs Clarification | p. 4-p. 29 (IMR 8) | Preliminary | | All the paragraphs of the Supervision Section are not solely tied to the Unity of Command and Span of Control Program addressed and specifically assessed through para. 357, 359-368. The requirements of the other paragraphs listed (348-355) outline supervision requirements for all supervisors, including ones assigned outside of the pilot districts and are reflected in Department policies and addressed in pre-service and annual supervisory trainings. |

**IX. OFFICER WELLNESS**

| Para Number | CPD Concern | Location in Report | Compliance in IMR 9 Draft | Compliance CPD is Seeking | CPD Comment |
|---|---|---|---|---|---|
| 389 | Methodology | p. 25 (IMR 8) | No Compliance | Preliminary | Should have preliminary compliance based on Item XI-A of E06-01; Professional Counseling Division. Item XI-A was drafted to address the paragraph. This section codifies the requirement that the Director of the Professional Counseling Division provides annually a written report to the Superintendent consistent with the methodology to have incorporated paragraph requirements into policy. The annual report will be produced this reporting period for secondary compliance. |
| 391 | Needs Clarification | p. 30 (IMR 8) | Secondary | Full | CPD produced the EAP licensing renewal on 21 December 2023 to provide evidence….. |
| 394 | Methodology | p. 37 (IMR 8) | Preliminary | Secondary | CPD produced the Weekly PCD Tracking Report for all of PCD services. CPD worked to develop a digital mechanism to provide this data to the IMT as stated was required for secondary compliance in the IMR 8 report. It stated CPD had not provided data that reporting period and the collection and providing of such data was needed to achieve secondary compliance. CPD provided the weekly reports to achieve secondary compliance. |
| 406 | Methodology | p. 59 (IMR 8) | Secondary | Full | CPD produced the Weekly Chaplains Tracking Report as indicated as a requirement in the IMR 8 report to provide data reflecting the work of the Chaplains Unit. This data was provided and consequently should achieve full compliance. |
| 412 | Methodology | p.74 (IMR 8) | Preliminary | Secondary | CPD produced the 2023 Wellness In-Service Curriculum and 95% completion to achieve secondary compliance consistent with the training methodology. The emotional resilience component was developed by C. Gabrielle Salfati, PhD, Investigative Psychology Research Unit, John Jay College of Criminal Justice, CUNY, and also CPD partnered with Yoga for First Responders for the stress management training. |
| 413 | Methodology | p. 76 (IMR 8) | Preliminary | Secondary | CPD produced the 2023 Wellness In-Service Curriculum and 95% completion to achieve secondary compliance consistent with the training methodology. The emotional resilience component was developed by C. Gabrielle Salfati, PhD, Investigative Psychology Research Unit, John Jay College of Criminal Justice, CUNY, and also CPD partnered with Yoga for First Responders for the stress management training. |
| 414 | Methodology | p. 78 (IMR 8) | Preliminary | Secondary | CPD produced the 2023 Wellness In-Service Curriculum and 95% completion to achieve secondary compliance consistent with the training methodology. |

**X. ACCOUNTABILITY**

| Para Number | CPD Concern | Location in Report | Compliance in IMR 9 Draft | Compliance CPD is Seeking | CPD Comment |
|---|---|---|---|---|---|
| 446 | Needs Clarification | p. 83 (IMR 8) | Secondary | Full | CPD produced the BIA Audit of Investigative Timeframes for full compliance and appreciates greater feedback regarding the review of this material |
| 469 | Typo | p. 66-68 | Preliminary/Secondary | Secondary | On page 66 of the appendix, the status for paragraph 469 for CPD is Secondary. On page 68, the paragraph status says Preliminary. BIA believes the status should be Secondary for this paragraph and was an error on page 68 of the report. (Pg. 68 should match pg. 66.) |
| 498 | Needs Clarification | p. 11 (IMR 8) | Secondary | Full | CPD produced the BIA Audit of Investigative Timeframes for full compliance and appreciates greater feedback regarding the review of this material |
| 500 | Needs Clarification | p. 103 ( IMR 9) p. 18 (IMR 8) | Secondary | Full | CPD produced the BIA Audit of Investigative Timeframes for full compliance and appreciates greater feedback regarding the review of this material |
| 521 | Methodology | p. 130 (IMR 9) p. 85 (IMR 8) | No Compliance | Preliminary | CPD reopened G08-01 Complaint and Disciplinary Systems to ensure the requirements of this paragraph were codified consistent with the methodology for achieving preliminary compliance. |
| 528 | Methodology | p. 113 (IMR 8) | No Compliance | Preliminary | CPD reopened G08-01 Complaint and Disciplinary Systems to ensure the requirements of this paragraph were codified consistent with the methodology for achieving preliminary compliance. |
| 529 | Methodology | p. 119 (IMR 8) | No Compliance | Preliminary | CPD reopened G08-01 Complaint and Disciplinary Systems to ensure the requirements of this paragraph were codified consistent with the methodology for achieving preliminary compliance. CPD produced BIA Quarter 2 Report that includes data reflecting investigations conducted by the districts to achieve secondary compliance. |

| 530 | Methodology | p. 123 (IMR 8) | No Compliance | Preliminary | CPD reopened G08-01 Complaint and Disciplinary Systems to ensure the requirements of this paragraph were codified consistent with the methodology for achieving preliminary compliance. |
| 551 | Needs Clarification | p. 54 (IMR 8) | Secondary | Secondary | The "missed" box is checked and that is not accurate. CPD made timely productions of quarterly and annual reports. This should reflect "Met." CPD produced BIA Quarter 2 Report that includes data reflecting investigations conducted by the districts to achieve secondary compliance. |

| XI. DATA | | | | | |
|---|---|---|---|---|---|
| Para Number | CPD Concern | Location in Report | Compliance in IMR 9 Draft | Compliance CPD is Seeking | CPD Comment |
| 577 | Methodology | p. 26 (IMR 8) | Secondary | Full | CPD has submitted the FRB PPT Template – Critical Review of Incidents (MONITOR1787). This production demonstrates CPD is consistent with their critical incident reviews and can conduct a decision-point analysis to enhance the Department. · CPD has submitted a response to RFI IMT 435 (MONITOR1760) which includes a breakdown of all FRB findings from the eighth reporting period and status of recommendations. This submission indicates policy and training are implemented department-wide and organizational change is taking place. · The above productions should be sufficient to demonstrate CPD has achieved full compliance.<br><br>CPD produced the new template for the critical review of incidents as it was indicated in the IMR 8 report that the FRB must consistently engage in a critical review of the incidents and make decision-point analysis that enhances CPD and is consistent with the TRED FRB SOP. FRB implemented this template in IMT 9 and continued its use presently. |
| 578 | Methodology | p. 29 (IMR 8) | Secondary | Full | CPD produced the new template for the critical review of incidents as it was indicated in the IMR 8 report that the FRB must consistently engage in a critical review of the incidents and make decision-point analysis that enhances CPD and is consistent with the TRED FRB SOP. FRB implemented this template in IMT 9 and continued its use presently. |
| 580 | Methodology | p. 34 (IMR 8) | Secondary | Full | CPD produced the new template for the critical review of incidents as it was indicated in the IMR 8 report that the FRB must consistently engage in a critical review of the incidents and make decision-point analysis that enhances CPD and is consistent with the TRED FRB SOP. FRB implemented this template in IMT 9 and continued its use presently. |

| XVI. ISR | | | | | |
|---|---|---|---|---|---|
| Para Number | CPD Concern | Location in Report | Compliance in IMR 9 Draft | Compliance CPD is Seeking | CPD Comment |
| 854 | Needs Clarification | 1 | Secondary | | ISR-A's programming logic did not allow the ISR-A application to calculate the 5% · When the result of the daily hand tabulation was .5 or higher, the reviewer rounded up to the next whole number, resulting in 4ASRU conducting 1,396 reviews · As of 25 March 2024, 500 (96%) of the 521 registered author/approver have completed the e-Learning. · As of 25 March 2024, 21 (4%) follow-up emails were sent to the affected author/approver (emails CC to Unit Commander and Unit Admin) who have not completed the e-Learning. |
| 855 | Needs Clarification | 1 | Secondary | | ISR-A's programming logic did not allow the ISR-A application to calculate the 5% · When the result of the daily hand tabulation was .5 or higher, the reviewer rounded up to the next whole number, resulting in 4ASRU conducting 1,396 reviews · As of 25 March 2024, 500 (96%) of the 521 registered author/approver have completed the e-Learning. · As of 25 March 2024, 21 (4%) follow-up emails were sent to the affected author/approver (emails CC to Unit Commander and Unit Admin) who have not completed the e-Learning. |

Independent | Chicago Police
Monitoring Team | Department
Consent Decree