UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF CHICAGO, <br><br> Defendant. | Case No. 17-cv-6260 <br><br> Hon. Rebecca R. Pallmeyer |

**THE COALITION'S STATUS REPORT ON ITS
ENFORCEMENT MOTION CONCERNING CPD'S MASS ARREST POLICY**

The Coalition files this Status Report to update the Court on the status of its enforcement action concerning the Chicago Police Department's ("CPD") *Response to Crowds and Coordinated Multiple Arrest* policy suite (Special Orders S06-06X – S06-06-03XX) (the "mass arrest policy"), which governs CPD's "response to crowds, First Amendment assemblies, and civil disturbances." S06-06X, Sec. I.A.[1] This Status Report identifies the improvements to the mass arrest policy as a result of the Coalition's enforcement motion and the subsequent negotiations with CPD that this Court ordered.

While these policy changes—with sufficient officer training, on-the-ground supervision, and accountability—provide better First Amendment protections for people protesting at the upcoming Democratic National Convention ("DNC"), the Coalition does not endorse the mass arrest policy and continues to have serious concerns about how it will be enforced. Mass arrests

---

[1] Unless otherwise noted, citations to the mass arrest policy are to the revised draft of the policy that CPD posted for public comment on June 10, 2024. *See* CPD, *Response to Crowds and Coordinated Multiple Arrests – UPDATED* (June 10, 2024), https://home.chicagopolice.org/draft_policy/response-to-crowds-and-coordinated-multiple-arrests-updated/.

1

should never be the first-line police response to protests. CPD's over-emphasis on mass arrests as a response to large groups of people exercising their First Amendment rights demonstrates that it has failed to learn from and operationalize the lessons that the Department should have implemented after its violent and unlawful response to the protests of summer 2020.[2] As further explained below, even with the negotiated revisions, the mass arrest policy deviates from First Amendment law and best practices in ways that increase the likelihood of police violence, needless and potentially retaliatory arrests, and other harms during protests at the DNC and elsewhere in Chicago. The Coalition sets out its detailed concerns below (*infra* Part C) to ensure that the public record is clear on these issues of crucial importance to the people of Chicago, and with the hope of encouraging CPD to do more to protect First Amendment rights.

A.  **The Coalition's Enforcement Motion and Resulting Negotiations.**

CPD developed the mass arrest policy in anticipation of the 2024 DNC, which will take place in Chicago from August 19 to August 22. The DNC is expected to draw approximately 50,000 people to Chicago, including "huge" protests.[3] On February 9, 2024, CPD released the original draft mass arrest policy for public comment, without any advanced discussions or notice to the Coalition. On March 13, 2024, the Coalition filed a Notice of Intent to Initiate Enforcement Proceedings, supported by a thirteen-page letter. Doc. 1156, Doc. 1156-1 ("Enforcement Notice"). As explained in the Coalition's Enforcement Notice, the mass arrest policy violated numerous provisions of the Consent Decree and failed to sufficiently protect First Amendment rights. *Id.*

---

[2] *See* Coalition's Letter in Support of its Notice of Intent to Initiate Enforcement Proceedings, Doc. 1156-1, at 2-3 (describing CPD's violent and harmful response to the summer 2020 protests, including the Independent Monitoring Team's and Office of Inspector General's findings).

[3] John Miller et al., *Secret Service and Chicago Police Ramp Up Preparations for Democratic Convention as Protests Loom*, CNN (June 8, 2024), https://www.cnn.com/2024/06/08/politics/democratic-convention-security-protests/index.html.

After CPD failed to remedy these deficiencies, the Coalition filed a Motion to Enforce the Consent Decree on April 12, 2024. Doc. 1159 ("Enforcement Motion" or "Mot."). The Coalition's Enforcement Motion demonstrated that the mass arrest policy violated the Consent Decree's protections for protesters (¶¶ 50-51, 156, 163), and also eviscerated many of the provisions in CPD's First Amendment policy, which CPD and the Coalition negotiated in the wake of CPD's violent and unlawful 2020 protest response. *See* Mot. 3-8. The mass arrest policy also violated the Consent Decree's mandates for use of force reporting and investigations (¶¶ 217-19, 228-35, 571(h), 574-75). Mot. 8-11. It further failed to comply with the Consent Decree (¶¶ 64, 68-69) and federal civil rights laws' requirements for disability and language accommodations. Mot. 11. Finally, CPD violated the Consent Decree by developing this policy without the requisite community engagement (¶ 633). Mot. 11-12.

In response to the Coalition's Motion, on April 23, 2024, this Court ordered the Coalition and the City to "make a good-faith attempt to resolve issues without intervention from the Court" and to identify any "unresolved issues" for a settlement conference. Doc. 1161. Pursuant to the Court's order, the Coalition, Office of Attorney General, and CPD conducted expedited negotiations with the Independent Monitoring Team on May 8 and 20, 2024, participated in a settlement conference with the Court on May 14, 2024, and exchanged multiple written proposals. In light of the agreements reached during these negotiations—and the Coalition's concerns about time constraints, with the DNC quickly approaching—the Coalition decided not to submit any issues to the Court for resolution. These timing constraints were the product of CPD's failure to engage with the Coalition when this policy was first being developed many months ago.

B. <u>**Key Improvements to the Mass Arrest Policy.**</u>

On June 10, 2024, CPD released a revised draft of the mass arrest policy for public comment. This version of the mass arrest policy contains substantive revisions, including the following:

- Clarifies that the mass arrest policy "expands upon but does not replace the procedures and protections outlined in the Department directive titled 'First Amendment Rights' for First Amendment assemblies." S06-06X, Sec. I.B.

- Clarifies that CPD's declaration of a "coordinated multiple arrest incident" does not itself "authorize the arrest of any individual or group," nor does it "authorize the use of force against any individual or group." Instead, officers must "continue to determine whether probable cause exists to charge specific persons with specific crimes," and must "continue to use force only when it is objectively reasonable, necessary, and proportional." S06-06-01, Sec. II.A.Note; S06-06-03, Sec. IV.A.1.Note.

- Prohibits CPD officers from arresting people engaged in First Amendment conduct for minor offenses unless they "pose an immediate threat to the safety of the community" or to individuals or of causing property damage, or are not complying with a lawful crowd dispersal order as prescribed under CPD's First Amendment Rights policy. S06-06X, Sec. III.I.3.a.

- Directs that CPD officers must, when safe and feasible, provide a warning prior to making an arrest and prior to using force, and allow people to voluntarily comply with commands. S06-06-03, Sec. II.C.3.

- "Prohibits any and all forms of retaliation against any member of the public for engaging in protected lawful exercise of First Amendment rights." S06-06X, Sec. III.K.

- Requires that, prior to issuing a crowd dispersal order, a field commander must consider "if there are and attempt any available less intrusive options to stop the unlawful behavior necessitating the issuance of the crowd dispersal order." S06-06X, Sec. V.B.3.a.

- Instructs CPD officers that, after issuing a crowd dispersal order, officers will consider a person to be compliant with the order when the person has taken "meaningful actions to comply with the specific directions provided in the dispersal order, such as walking away from the dispersal area or entering an open public transit station." S06-06X, Sec. V.B.3.Note.

- Provides that, after issuing a crowd dispersal order, CPD officers will only take enforcement action after first providing "a reasonable amount of time" for people to comply with the order. S06-06X, Sec. III.I.3.b.

4

- Instructs CPD officers that, "when encountering noncompliance to lawful verbal direction, Department members will consider, to the extent feasible, if the noncompliance may be due to limited English proficiency or other language barriers, a medical condition, or disability." S06-06X, Sec. V.B.3.Reminder.

- Contains an explicit prohibition against "kettling" and other similar crowd containment tactics. S06-06X, Sec. V.B.4.c.Reminder.

- Limits the definition of "civil disturbance" to an assemblage that "poses an immediate threat to the safety of the community" or to individuals or of causing property damage, or that results in injury to a person. S06-06X, Sec. II.A.

- Instructs CPD officers that "intentionally striking a person's head or neck" with a baton is considered deadly force. S06-06-03, Sec. III.B.2.b.

- Places a presumptive 48-hour limit on any delayed use of force reporting and a limitation on when such delayed reporting can be implemented in the first place: Only "in specific limited circumstances that impose a significant strain on Department personnel resources, consistent with the considerations identified above. Examples of such circumstances include situations where the Department responds to large-scale incidents for an extended operational period, including multiple, consecutive-day deployments, national political conventions, or international events." S06-06-03, Sec. VII.C.Note; *id.* Sec. VII.D.1.a.

- Requires CPD's Force Review Board to "evaluate the effectiveness and efficiency of any alternate tactical response reporting procedures utilized during the incident, including any delayed reporting, if applicable." S06-06-03, Sec. VIII.B.2.b.

- Provides that information about each reportable use of force during a "coordinated multiple arrest incident" will be tracked and aggregated, and incident-level data will be publicly disclosed on CPD's online use of force dashboard. S06-06-03, Sec. IX.

C.  **The Coalition's Continued Concerns.**

Despite the improvements listed above, serious deficiencies remain. In addition, two of CPD's unilateral revisions to the June 10 version of the policy—made without discussion with the Coalition—introduce new concerns.

*First*, the mass arrest policy still fails to sufficiently distinguish between a First Amendment assembly and a crowd engaged in unlawful activity that is not covered by the First Amendment (*e.g.*, widescale looting). Relatedly, the mass arrest policy fails to distinguish between unlawful but nonviolent civil disobedience (*e.g.*, sit-ins and other nonviolent tactics frequently

5

used during the Civil Rights Movement) and unlawful actions that could result in physical harm to people or property.

*Second*, the mass arrest policy fails to sufficiently instruct officers that in the First Amendment context, CPD must use the least intrusive enforcement options consistent with public safety. Dispersing, arresting, using force, or otherwise taking action against large groups of people engaged in lawful protest due to the unlawful actions of a few, as CPD did during the summer 2020 protests, will exacerbate police/protester tensions. The City's Office of Inspector General ("OIG") recently echoed this concern. In its analysis of CPD's original draft mass arrest policy, the OIG found that CPD's policy "allows for the use of crowd control tactics which have, both in Chicago and other cities, been used indiscriminately, without distinguishing between peaceful demonstrators and individuals conducting criminal acts. . . . By both generalizing mass event participants' capacity for violence while also teaching tactics that may be used indiscriminately against demonstrators and those committing criminal acts alike, CPD's guidance may contribute to risks of escalating tensions and violations of constitutional rights."[4]

The changes CPD has made in the revised version of the mass arrest policy do not adequately address this concern. While CPD did import the "less intrusive options" requirement from the First Amendment policy's provisions on crowd dispersal orders, this language is insufficient due to the serious risk that arrests pose to the First Amendment rights and safety of protesters, including in circumstances where a dispersal order may not be given. The mass arrest policy should therefore contain an additional overarching statement, as suggested in the Coalition's Enforcement Notice, instructing officers that they may not arrest people engaged in First

---

[4] City of Chicago Office of Inspector General, *Follow-up Inquiry on the Chicago Police Department's Preparedness for Mass Gatherings* (May 30, 2024), https://igchicago.org/wp-content/uploads/2024/05/Follow-up-Inquiry-on-CPDs-Preparedness-for-Mass-Gatherings.pdf.

6

Amendment activity unless all other reasonably available options for restoring public safety have been exhausted, and officers should be trained accordingly. *See* Doc. 1156-1, at 7.

*Third*, the mass arrest policy still seeks to permit police officers to arrest people engaged in First Amendment conduct for mere misdemeanors that pose no threat to anyone's physical safety or property, even though CPD's First Amendment policy negotiated with the Coalition and approved by the Court prohibits such arrests.

*Fourth*, the mass arrest policy's delayed use of force reporting provisions are counterproductive and frustrate accountability. History has shown that CPD officers lose their tempers and engage in excessive force during encounters with protesters. By disregarding the Consent Decree's requirement that all reportable uses of force be reported before the end of the officer's shift (¶ 219), CPD encourages out-of-policy force and conflicts with best practice. The International Association of Chiefs of Police provides a relevant recommendation, which CPD could implement in lieu of the delayed reporting provisions: "A member(s) of the agency's designated managerial personnel trained and equipped to investigate use-of-force incidents should be assigned to the command post of the [incident commander] during a declared civil disturbance [or First Amendment assembly] to coordinate and record force-related information and complaints. This individual, or his or her equivalent, should be prepared to deploy quickly to a serious use-of-force incident and should complete a comprehensive use-of-force after-action report."[5]

*Fifth*, neither the mass arrest policy nor the First Amendment policy contain sufficient restrictions on officers' use of pepper ("OC") spray against protesters. Officers never should use pepper spray on nonviolent protesters, such as people conducting a peaceful sit-in. Officers should

---

[5] International Association of Chiefs of Police, *Crowd Management* (Apr. 2019), at 10 theiacp.org/sites/default/files/2020-08/Crowd Management FULL - 08062020.pdf.

7

never use OC spray indiscriminately at a group if it would endanger individuals who are not committing serious offenses. Consistent with the OIG's recent findings and the Coalition's repeated demands to CPD on CPD's OC policy, we urge CPD to adopt the following restrictions:

- Officers may not use OC or other chemical agents against a person engaged only in passive resistance or who merely attempts to flee. OC or other chemical agents may be used only when the person resisting, obstructing, or attempting to flee presents an immediate threat of bodily harm to another person or has just committed a violent felony or a misdemeanor offense that disregards or endangers the bodily safety of others.

- Officers shall not use OC or other chemical agents against a person whenever doing so would pose a significant threat to others nearby.

- Officers shall not use OC devices or other chemical agents against a person unless they have: (1) exhausted all required de-escalation tactics; (2) exhausted available lesser measures that could eliminate the need for the use of OC devices or chemical agents; and (3) ensured that the use of OC or other chemical agents is the least amount of force necessary under the circumstances.

*Sixth*, in the revised draft of the policy, CPD unilaterally added a concerning definition of "crowd management:"

> [T]echniques used to manage crowds and lawful assemblies before, during, and after the event, including efforts such as observing the crowd to assess any potential safety concerns, engaging in voluntary communication with crowd members, or supporting and protecting persons engaged in lawful First Amendment activities on a public way. Maintaining *lawful status* throughout the event may be achieved with advanced planning, pre-event contact with event organizers, issuance of permits when applicable, information gathering, personnel training, and continuing communication with all involved parties.

S06-06X, Sec. II.D. (emphasis added). This definition, which appeared for the first time in the updated policy, should be revised because the term "lawful status" (in reference to First Amendment assemblies) is vague. The current language gives officers seemingly unlimited discretion to decide when there has been sufficient "advanced planning," "pre-event contact with event organizers," or "issuance of permits." But the First Amendment allows people to engage in "spontaneous" protests without permits or advanced planning, and Chicago has a long history of

8

people engaging in such lawful protests. *See Vodak v. City of Chicago*, 639 F.3d 738, 749 (7th Cir. 2011) ("[A] very long period of advance notice with no exception for spontaneous demonstrations unreasonably limits free speech." (internal quotation and citation omitted)).

*Seventh*, in the updated draft, CPD revised the definition of "non-fatal major injury" in the section on alternate use of force reporting in a way that impairs accountability for officer use of force:

> [A] non-fatal major injury is considered to be any visible injury requiring immediate transportation to a hospital or medical facility to receive medical attention for an injury not able to be treated on the scene of the incident.

S06-06-03, Sec. V.C.6.Note. The definition of "non-fatal major injury" is significant because, under the policy's alternate use of force reporting procedures, uses of force that result in a "non-fatal major injury" must be reported on a full Tactical Response Report ("TRR"), whereas uses of force that do not cause a "major injury" only need to be reported on the truncated CMA report form. CPD's revision will result in more frequent, and more serious, harms to protesters that will be recorded only on abbreviated CMA report forms.[6] Consequently, it will be more difficult for reviewing supervisors and COPA to hold officers accountable for improper and unlawful violence against community members.

*Finally, and of critical importance*, the mass arrest policy remains marred by CPD's failure to engage the Coalition and other impacted community representatives months ago when CPD began developing the policy. *See* Mot. 11-12. The Coalition's enforcement process and the

---

[6] Because the mass arrest policy's alternate force reporting terms vary from Consent Decree Paragraph 219, which requires officers to report all uses of force by the end of their shift, the Coalition has requested that the City and the State file a document on the record indicating their reasons for agreeing to an exception to Consent Decree Paragraph 219 in this instance. The Coalition further urged CPD to engage in an after-action review following the DNC to evaluate whether the alternate force reporting provisions in the mass arrest policy are sufficient to hold officers accountable for any out-of-policy uses of force during DNC.

subsequent court-ordered negotiations resulted in improvements to the original version of the policy, but this is no substitute for deep and sustained engagement with impacted communities on the front end of major changes to CPD policy and the Consent Decree. This engagement is a requirement of the Consent Decree, and it is imperative going forward to ensure CPD policies reflect best practices and community priorities, and to avoid last-minute negotiations in advance of major events or deadlines like the DNC.

**D.      Conclusion.**

Due to the Coalition's Enforcement Motion and the Court-ordered negotiations that followed, some of the most glaring defects in the original mass arrest policy have been mitigated. But serious concerns remain. The Coalition urges CPD to immediately address these concerns and train officers on the improved policy in preparation for the DNC. More broadly, the Coalition urges CPD to publicly commit (1) to protect the First Amendment rights of people to engage in protest at the DNC and beyond; (2) that mass arrests will be a last-resort option at the DNC; and (3) that officers will not use unnecessary violence or retaliate against protesters. Community members who are planning to exercise their First Amendment rights at the DNC must be able to do so without fear that CPD will repeat the grievous harm it committed in the summer of 2020.

DATED: June 27, 2024						Respectfully submitted,

/s/ Joshua M. Levin
Alexandra K. Block (ablock@aclu-il.org)
Michelle T. García (mgarcia@aclu-il.org)
Joshua M. Levin (jlevin@aclu-il.org)
Roger Baldwin Foundation of ACLU, Inc.
150 N. Michigan Ave., Suite 600
Chicago, IL 60601
(312) 201-9740

Amanda Antholt (amanda@equipforequality.org)
Equip for Equality
20 N. Michigan Ave., Suite 300
Chicago, IL 60602
(312) 341-0022

Sheila A. Bedi (sheila.bedi@law.northwestern.edu)
Community Justice and Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611-3609
(312) 503-2492

Craig B. Futterman (futterman@uchicago.edu)
Mandel Legal Aid Clinic
University of Chicago Law School
6020 S. University Ave.
Chicago, IL 60637
(773) 702-9611

**Counsel for the Coalition**

11