**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **STATE OF ILLINOIS,** | | |
| | **Plaintiff,** | **Case No.: 17-cv-06260** |
| **v.** | | |
| | | **Judge Rebecca R. Pallmeyer** |
| **CITY OF CHICAGO,** | | |
| | **Defendant.** | |

**ORDER REGARDING THE CHICAGO POLICE DEPARTMENT'S**
**BODY WORN CAMERAS POLICY AND PUBLIC SAFETY INVESTIGATIONS**

The City of Chicago ("the City") and the State of Illinois (represented by the Office of the Illinois Attorney General ("OAG"))—collectively, "the Parties"—entered into a consent decree ("the Consent Decree"), which this Court adopted as an order on January 31, 2019, to be effective March 1, 2019. *See* Consent Decree, ECF 703. The Consent Decree requires, among other things, that the Chicago Police Department ("CPD") comply with the Illinois Law Enforcement Officer-Worn Body Camera Act, 50 ILCS 706/10 ("the Act"), *see, e.g.*, Consent Decree ¶ 238. The Decree also directs that the CPD establish and maintain policies that are "plainly written, logically organized and use clearly defined terms." Consent Decree ¶ 626.

Since January 1, 2022, the Act has required CPD officers to use their body-worn cameras ("BWCs") to record law-enforcement-related encounters or activities while on duty, including "investigations." 50 ILCS 706/10-20(a)(3). The Act does not require officers to activate their cameras when the officer is "only in the presence of another law enforcement officer." 50 ILCS 706/10-10 (definitions).

The Parties dispute whether this language requires that BWCs be operating during "public safety investigations," a process that CPD officers engage in after an incident in which an officer has either discharged a firearm or has been involved in someone's death. The public safety investigation process calls for supervising officers to pose an enumerated set of questions to

officers involved in such incidents. Since before the effective date of the Consent Decree, the CPD's Body Worn Cameras policy, Special Order S03-14, has explicitly **prohibited** officers from recording these "public safety investigations."[1] The OAG argues that in prohibiting the use of BWCs during these "public safety investigations," the CPD is violating the Consent Decree and the Act. The City, however, asserts that the CPD's policy does not violate the Consent Decree or the Act because "public safety investigations" are not "investigations" at all; if they were, the City argues, officers would be entitled to be represented by counsel, a right that could generate delay.[2] Further, the City emphasizes that the Act does not require officers to record activities that occur only in the presence of other law enforcement officers.

As more fully explained in the Discussion section below, the Court concludes that, at a minimum, CPD's Body Worn Cameras policy, S03-14, does not sufficiently distinguish between "public safety investigations," which the City contends are not subject to the BWC requirement, and other "investigations," which are. *See* Attachment 1 (S03-14). CPD urges that there is a distinction, but its policy is, at best, unclear. The expression "public safety investigations" signals to officers and the public that what officers are engaged in, in the aftermath of discharge of a weapon or an individual's death, is indeed an *investigation*. Notably, the City argues that policies in other police departments reflect "best practices" and do not require recording of these interviews.[3] Thus, as the City explains in its response, other cited police departments in Illinois "permit, but do not require, officers to de-activate their cameras prior to any public safety

---

[1]      In its Response, the City refers to "public safety investigations" as "public safety questions." Def.'s Resp., ECF 1148. Because the CPD policy in question—along with other relevant CPD policies—and the printed public safety investigation form itself refer to the practice as "public safety investigations," this Order uses that terminology throughout.

[2]      *See, e.g.*, CPD General Order G08-01-05, Department Member Bill of Rights (effective June 30, 2022) (referring to Administrative Proceeding Rights for CPD personnel of different collective bargaining units).

[3]      Def.'s Resp. 13–15.

questions." Def.'s Resp. 14 (citing Ex. A at 8–9). But the policies the City cites do not refer to the relevant practices as "investigations." In this context, the terminology matters—and so does the substance of these post-event interviews. Moreover, the City of Chicago's policy goes further than the other cited Illinois police departments in that Chicago's policy states that officers who have just been involved in a shooting **must** de-activate their cameras, and could be subject to discipline or corrective action for recording their own responses to questions regarding public safety.

The Court is not satisfied that the Consent Decree and the Act permit the CPD to allow— let alone to require—officers to turn off their BWCs for public safety. Before the Court will consider approving such a policy, the City and the CPD must, at minimum, clarify in clear policy language how these post-event interviews are genuinely and universally distinct from "investigations."[4] If, for example, the questions are intended to address immediate public safety concerns, rather than fulfill ordinary investigative or law-enforcement purposes, the Court would expect the policy to

- better define how long before or after an incident—and how close or far away from the scene—these questions can be asked without recording;

- clarify the circumstances in which officers on the scene are prohibited from or permitted to keep their cameras on during or after the incident (and how that is defined) (*compare* Consent Decree ¶ 238(b)); and

- explain the relationship between its revised policy and language of relevant collective bargaining agreements, including terms prohibiting officers from recording "post-incident conversations," and how the policy and relevant agreements are consistent with the Act. (*See* Consent Decree ¶ 711).

---

[4] The CPD's policies and instructions direct officers to "deactivate their body-worn cameras and in-car camera systems before providing a response to the public safety investigations for incidents involving a firearms discharge and/or officer-involved death." *See* CPD 11.921 (Def.'s Resp. Ex. C, ECF 1148-3); Special Order S03-14, Body Worn Cameras (Pl.'s Mot. Ex. 1 § V.B.2, ECF 1144-1; Def.'s Resp. Ex. B § V.B.2, ECF 1148-2); General Order G03-06, Firearm Discharge and Officer-Involved Death Incident Response and Investigation (Pl.'s Mot. Ex. 2 § VI.B.6, ECF 1144-2). The Act includes instances in its definition of "law enforcement-related encounters and activities" in which cameras must be turned on (with a few exceptions noted). The Act also lists circumstances in which cameras must be turned off, subject to exceptions, such as at the request of a victim of a crime, witness of a crime, or community member who wishes to report a crime. *See* 50 ILCS 706/10-20(a)(4). "Public safety investigations" of the type at issue here do not appear on either of these lists.

The Court cautions that even if CPD satisfies these requirements, it is not clear that any revised policy that permits or requires officer to turn off their cameras during "public safety questions" will comply with the Act. For these reasons, the Court orders the City and the CPD to provide the OAG and the Independent Monitoring Team ("IMT") with a revised Body Worn Cameras policy—and other relevant policies—within 60 days (by August 30, 2024) and, thereafter, follow the Consent Decree process for policy review, revision, and implementation. *See e.g.*, Consent Decree ¶¶ 626–37.

## BACKGROUND

As required by the Consent Decree, the City and the CPD must comply with the Illinois Law Enforcement Officer-Worn Body Camera Act, 50 ILCS 706/10. The Parties disagree on whether the CPD's longstanding practice of prohibiting officers from recording "public safety investigations" with BWCs is consistent with the Consent Decree and that Act.

The CPD implemented the most recent version of S03-14 on December 29, 2023, but the Parties were unable to reach consensus on this single disputed issue. The CPD requirement that officers turn off their BWCs during "public safety investigations" pre-dates the latest version of the policy and the Consent Decree itself. As further described below, apart from this disputed issue, the Parties and the IMT agreed that the CPD would adopt the latest version of S03-14, thus complying with other legal and Consent Decree requirements—*see, e.g.*, 50 ILCS 706/10-20(a)(6) (limiting access to BWC footage before officers complete incident reports) and Consent Decree ¶¶ 239–41 (detailing various BWC requirements)—and make additional efforts to ensure that underlying incidents—including officer-involved shootings and deaths—are recorded.

Negotiations concerning the CPD's policy and procedures for BWCs began in 2020, when the City, the CPD, the OAG, and the IMT began reviewing and discussing the earlier version of S03-14. That version, which has been in place since April 30, 2018, remained in effect until December 29, 2023. That earlier version of S03-14, as noted, includes the requirement that

4

officers ensure their BWC is deactivated before responding to "public safety investigations." On November 25, 2020, the City and the CPD produced the then-existing S03-14 to the OAG and the IMT as evidence of compliance with certain Consent Decree requirements. On April 28, 2021, in response to feedback, the City and the CPD produced a revised draft of S03-14 to the OAG and the IMT for review in connection with various Consent Decree paragraphs.[5] Then about one year later, on May 19, 2022, the City and the CPD produced another revised draft of S03-14 for review with a subset of the paragraphs identified in the April 2021 production.[6] A further revised version followed several months later, on November 17, 2022,[7] and the CPD produced the most recent draft on June 15, 2023. The OAG and the IMT provided comments to that draft on July 26, 2023, and August 6, 2023, respectively. Pl.'s Mot. 3, n.1, ECF 1144; Def.'s Resp. 3, ECF 1148. In its written comments, the OAG argued that Section V.B.2 is inconsistent with state law, and requested that the CPD delete that Section, which reads as follows:

> Department members will ensure their BWC is deactivated, consistent with this directive, before providing an oral response to the public safety investigations for incidents involving a firearms discharge and/or officer-involved death, consistent with the Department directive titled "Firearm Discharge and Officer-Involved Death Incident Response and Investigation."

*See* Pl.'s Mot. 3; Ex. 1 § V.B.2, ECF 1144-1.

The City responded to the OAG and the IMT in writing on August 25, 2023, and the Parties and the IMT met on September 12, 2023, to further discuss the policy. Def.'s Resp. 3; Pl.'s Mot. 4. CPD supervisors with experience and expertise regarding the "public safety investigations" also attended this meeting, and after collaborative discussions, the Parties and the IMT were able to

---

[5]    The OAG and the IMT provided comments on May 26, 2021, and May 28, 2021, respectively.

[6]    The OAG and the IMT provided comments on June 16, 2022, and August 22, 2022, respectively.

[7]    The OAG and the IMT provided comments on December 9, 2022, and December 31, 2022, respectively.

resolve all remaining comments or objections regarding the policy except for the disagreement regarding Section V.B.2.  Def.'s Resp. 3; Pl.'s Mot. 4.

The negotiations were, thus, successful in significant ways.  The Parties and the IMT agreed that the revised draft policy contained critical improvements to reflect Consent Decree requirements and recent changes in Illinois law.  On October 5, 2023, the IMT sent the City a no-objection notice with five conditions intended to memorialize the September 12, 2023 discussion, including a recommendation that the CPD implement the revised BWCs policy while continuing to resolve the Parties' disagreement regarding Section V.B.2.  Def.'s Resp. 4.

On October 6, 2023, the OAG also issued a no-objection notice, conditioned on "the parties bringing their disagreements before Judge Pallmeyer" regarding Section V.B.2 of the policy.  The OAG's notice also confirmed support for "an approach that allows the CPD to implement the policy and allows the parties' disagreements to be resolved at a later date."  Pl.'s Mot. 4, Ex. 5, ECF 1144-5; Def.'s Resp. 4.  The City responded in an October 13, 2023 letter, stating that the City construed the OAG's conditional no-objection notice as an "objection notice" and asking the IMT to recommend a resolution to the dispute between the City and the OAG regarding the OAG's objection pursuant to ¶ 630 of the Consent Decree.  Pl.'s Mot. 4; Def.'s Resp. 4.

The IMT has done so.  On November 29, 2023, the IMT issued a proposed resolution, in which it made three recommendations:

1. The CPD should implement the latest version of S03-14 as soon as possible—regardless of the status of the "public safety question" issue.

2. Because the Parties disagree on the interpretation of a state statute—which appears to raise a question of first impression with statewide significance—and the Parties' interpretations are both facially plausible, the IMT proposes that the CPD proceed under its interpretation of Illinois's Law Enforcement Officer-Worn Body Camera Act subject to the CPD's adherence to the transparency requirement below.

3. If, in the interest of public safety, the City and the CPD continue to require officers to turn off body-worn cameras during "public safety questions," the

Consent Decree requires the CPD to be transparent with Chicago's communities regarding its decisions.

Pl.'s Mot. 5, Ex. 7, ECF 1144-7; Def.'s Resp. 4, Ex. A, ECF 1148-1.

On December 29, 2023, after public posting, the CPD published and implemented the policy. Pl.'s Mot. 5; Def.'s Resp. 4. This policy retains the language contested by the OAG requiring officers to deactivate their BWCs during "public safety investigations." Pl.'s Mot. 5. On January 22, 2024, the OAG filed a motion for judicial resolution under ¶ 630 of the Consent Decree, asking the Court to require the City and the CPD to strike the language at issue in Section V.B.2 of S03-14.[8] The City filed a response to the OAG's Motion on February 16, 2024. The OAG then filed a reply in support of its Motion on March 1, 2024.

## DISCUSSION

The OAG and the City have asked the Court to determine whether Section V.B.2 of the CPD's Body Worn Cameras policy, S03-14, is consistent with (1) the specific BWC requirements of the Consent Decree and (2) the Illinois Law Enforcement Officer-Worn Body Camera Act, 50 ILCS 706/10 ("the Act"). For the reasons explained below, the Court concludes that the City and the CPD must revise S03-14—and related policies—to comply with relevant provisions of the Consent Decree and with the Consent Decree requirement of compliance with the Act.

For the purposes of construction and interpretation, a consent decree is "essentially a contract," so principles of state contract law apply in a dispute over its terms. *Holmes v. Godinez*, 991 F.3d 775, 780 (7th Cir. 2021). Under Illinois law, the "primary objective in construing a contract is to give effect to the intent of the parties, which is best shown by the language of the contract itself." *Sterling Nat'l Bank v. Block*, 984 F.3d 1210, 1217 (7th Cir. 2021). "If the words in

---

[8]     Paragraph 630 of the Consent Decree states, in part:
In the event the Monitor or OAG provides an objection notice, the Monitor will convene the Parties and attempt to resolve the identified objections within 30 days of the objection notice being received by the City ("workout period"). The Monitor will issue a proposed resolution of remaining objections in writing at the conclusion of the workout period. If either Party disagrees with the Monitor's resolution of an objection, either Party may ask the Court to resolve such dispute.

the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Id.* "All portions of a contract should be construed as a whole, viewing each part in light of the others." *Id.* Accordingly, courts "try to give meaning to every provision of the contract and avoid rendering any provisions superfluous." *Id.* Courts also "construe contracts to avoid absurd results." *Stonegate Ins. Co. v. Smith*, 2022 IL (1st) 210931 ¶ 37.

**<u>Consent Decree's Specific Body Worn Camera Requirements</u>**

Consent Decree ¶¶ 236–42 include specific requirements for the CPD's BWC policy. The OAG contends that the purpose, spirit, and language of these paragraphs confirm that "public safety investigations" should be recorded. Indeed, if "public safety investigations" occur before the end of an incident, CPD officers are required by law and the Consent Decree provisions to record them. If "public safety investigations" occur after the incident, recording may be prohibited by terms of the collective bargaining agreement with CPD officers. In the Court's view, S03-14 is not sufficiently clear regarding whether "public safety investigations" occur before the end of an incident, or after it. A key requirement of the Consent Decree is that the City and CPD adopt clear policies. *See, e.g.*, Consent Decree ¶¶ 626 ("CPD will ensure that its policies and procedures are plainly written, logically organized, and use clearly defined terms."). Thus, the City and the CPD must, at a minimum, clarify S03-14 and related policies.

In imposing this direction, the Court reviews the Parties' competing interpretations. Arguing that the Consent Decree confirms that "public safety investigations" must be recorded, the OAG cites the following sections of the Consent Decree:

- CPD must maintain a body-worn-camera policy that is "designed to increase officer accountability" and "improve trust and CPD legitimacy in the community" Consent Decree ¶ 236.

- CPD's body-worn-camera policy must "require officers, subject to limited exceptions specified in writing, to activate their cameras during all law enforcement-related activities that occur on duty, and to continue recording until the conclusion of the incident(s)." Consent Decree ¶ 238(b).

The CPD's policy violates the goals of these paragraphs, the OAG argues, including the goal that officers be "held accountable . . . for use[s] of force that [are] not objectively reasonable . . . or that otherwise violate[] law or policy" and that officers "act in a manner that promotes trust between CPD and the communities it serves." Consent Decree ¶ 156(j) and (k). Finally, the OAG asserts that failure to record "public safety investigations" conflicts with the Consent Decree's overall goals and objectives of transparency, accountability, and prevention of collusion, set forth in Consent Decree ¶¶ 59 and 419–23.

The City challenges this interpretation. The City contends, first, that interpreting the Consent Decree to require recording of the public safety investigations would require the City to violate its collective bargaining agreement with the Fraternal Order of Police—a violation prohibited by ¶ 711 of the Consent Decree. That paragraph states that "[n]othing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate (i) the terms of the CBAs . . . unless such terms violate the U.S. Constitution, Illinois law or public policy . . . ." In the City's view, characterizing the "public safety investigation" protocol as an "investigation" would trigger certain collectively-bargained rights, including the officers' right to decline to participate and to be represented by counsel. Def.'s Resp. 9–10 ("[u]nder the applicable collective bargaining agreements, officers involved in a shooting are afforded certain rights related to when they can be interviewed or questioned about the shooting[, and] if an officer were to be interviewed or questioned about the shooting, any questioning would require the administration of the Administrative Proceedings Rights.").[9]

---

[9]     CPD-44.105 outlines officers' Administrative Proceedings Rights as follows:
1. Any admission or statement made by you in the course of this hearing, interrogation or examination may be used as the basis for your suspension or as the basis for charges seeking your removal or discharge or suspension in excess of 30 days.
2. You have the right to counsel of your choosing to be present with you to advise you at this hearing, interrogation or examination and you may consult with counsel as you desire.

As the City understands the "public safety investigation" protocol, it should not trigger these protections because the "public safety investigation" is not an "investigation" at all and instead includes specific, enumerated questions that are not "investigatory in nature." Specifically, the City argues that despite the use of the term "investigation," "the purpose of these questions is to identify the scene and make sure it is safe for the public and officers before an investigation into the officer-involved shooting begins." Def.'s Resp. 7. In support of this position, the City cites the CPD form named "Public Safety Investigation Instructions" (CPD-11.921), which includes the complete set of permitted questions.[10] Def.'s Resp. 9–10. Characterizing the

---

3. You have a right to be given a reasonable time to obtain counsel of your own choosing.

4. You have no right to remain silent. You have an obligation to truthfully answer questions put to you. You are advised that your statements or responses constitute an official police report.

5. If you refuse to answer questions put to you, you will be ordered by a superior officer to answer the questions.

6. If you persist in your refusal after the order has been given to you, you are advised that such refusal constitutes a violation of the Rules and Regulations of the Chicago Police Department and will serve as a basis for which your discharge will be sought.

7. You are further advised that by law any admission or statement made by you during the course of this hearing, interrogation or examination and the fruits thereof cannot be used against you in a subsequent criminal proceeding. Def.'s Resp. Ex. D, ECF 1148-4.

[10]      The list of permitted questions in CPD-11.921 are as follows:

1. Are you injured? If so, what are your injuries?

2. Is anyone else injured? If so, what are their injuries and where are they located?

3. Did you fire your firearm? If so, where were you located when you fired and approximately how many rounds?

4. Did any subject fire a firearm? If so, in what direction and approximately how many rounds?

5. Are any subjects at-large? If so:
   a. How many subjects are wanted?
   b. What are their descriptions (including any vehicle information) and their method of flight?
   c. What was their direction of travel?
   d. How long ago did they flee?
   e. For what crimes are they wanted?
   f. Were they armed? If so, what type of weapon(s) did you observe?

6. Do you know of any evidence? If so, what is the evidence and where is it located?

protocol as an investigation would make it subject to "Administrative Proceeding" regulations, the City urges. And implementation of officers' Administrative Proceeding Rights would cause significant enough delay to undermine the purpose and ability of conducting any "public safety investigation."

Delay may be a valid concern, but the City has not adequately explained the connection between Administrative Proceedings Rights and the question of recording. That is, the City has not explained how the need to provide Administrative Proceedings Rights depends on whether the specific enumerated questions and answers are recorded. Without more information, the Court is unable to determine whether there is any genuine nexus between recording the "public safety investigation" and the officers' entitlement to any Administrative Proceeding protections.

That said, the Court recognizes another potential conflict arising from the OAG's interpretation. The OAG's interpretation may in fact conflict in another way with the Collective Bargaining Agreement between the Fraternal Order of Police and the City of Chicago ("the Agreement"), adopted by the Chicago City Council and the Mayor on December 7, 2023: the Agreement specifies that BWCs "shall not be used" during "post-incident conversations with any Department members or supervisors."[11] If "public safety investigations" constitute "post-incident

---

7. Do you know of any victims or witnesses? If so, where are they located?
8. Are there any involved vehicles, including damage to vehicles or vehicle-related safety concerns?
9. Is there anything else that I need to know to ensure public safety, preserve evidence, or secure the incident scene?

*Id*.

[11]     Section 8 of the Agreement also includes the following:
a) BWCs shall not be intentionally activated to record conversations with other employees with or without their knowledge during routine, non-law enforcement activities[.] 'Law enforcement activities' are those as defined in the Law Enforcement Officer-Worn Body Camera Act, 50 ILCS 706, including but not limited to surreptitious recordings of conversations with other members; [and]
b) *BWCs shall not be* used in places where, or at times when, a member has a reasonable expectation of privacy, such as locker rooms and restrooms, or other facilities in which private activities of Officers occur, and post-incident conversations with any Department members or supervisors[.]

conversations," then requiring officers to have their cameras turned on during "public safety investigations" may violate the terms of the Agreement and may therefore be inconsistent with the requirements of Consent Decree ¶ 711. Alternatively, if the "public safety investigation" is not "post-incident," then the Consent Decree may require the CPD to record the "public safety investigation," "subject to limited exceptions specified in writing." Consent Decree ¶ 238(b).[12] Before the Court can reach a final determination, the CPD must address this ambiguity by revising S03-14 to clarify whether and how "public safety investigations" occur during or after an incident (and how that is defined).

The Court cautions, further, that appropriate deference to collective bargaining agreements, important as it is, remains subject to limitation: The Consent Decree must be interpreted to avoid a conflict "*unless such terms violate the U.S. Constitution, Illinois law or public policy*." Consent Decree ¶ 711 (emphasis added). As a result, the Court must still interpret whether the Act requires officers to record "public safety investigations," and addresses that issue below.

**Consent Decree Requirement for CPD Policy to Comply**
**with the Law Enforcement Officer-Worn Body Camera Act**

Consent Decree ¶ 238(b) requires the CPD to, among other things, comply with the Act: officers must wear BWCs and microphones to record law-enforcement-related activities "as outlined in the Illinois Law Enforcement Officer-Worn Body Camera Act." Consent Decree ¶ 237. The Act's stated purpose is to ensure that BWCs are used to "collect evidence while improving

---

Chicago Ordinance O2023-0006332, passed December 13, 2023, authorizing the Collective Bargaining Agreement Between the Fraternal Order of Police and the City of Chicago, including a Memorandum of Understanding regarding Body Worn Cameras, available at https://chicago.councilmatic.org/legislation/o2023-0006332/.

[12] Based on the OAG's interpretation of the Consent Decree, the OAG may argue that the City was obligated to object to inclusion in the collective bargaining agreement of this "post-incident conversation" language. *See* Consent Decree ¶ 711. The Court does not comment on any such argument for now, but observes that the current collective bargaining agreement does include this language.

transparency and accountability, and strengthening public trust" and "protecting individual privacy and providing consistency in its use across the State." 50 ILCS 706/10-5. To achieve this purpose, section 10-20(a)(3) of the Act directs that "[c]ameras be turned on at all times when the officer is in uniform and is responding to calls for service or engaged in any law enforcement-related encounter or activity that occurs while the officer is on duty." 50 ILCS 706/10-20(a)(3). Section 10-10 of the Act does not define "law enforcement-related encounters or activities" but provides a non-exhaustive list of included conduct:

- traffic stops,
- pedestrian stops,
- arrests,
- searches,
- interrogations,
- investigations,
- pursuits,
- crowd control,
- traffic control,
- non-community caretaking interactions with an individual while on patrol, or
- any other instance in which the officer is enforcing the laws of the municipality, county, or State.

The Act also specifies that "law enforcement-related encounters or activities" do not include the following:

1. When an officer "is completing paperwork alone." 50 ILCS 706/10-10.

2. When an officer "is participating in training in a classroom setting." *Id.*

3. When an officer "is only in the presence of another law enforcement officer." *Id.*

4. "Community caretaking functions," which are tasks "undertaken by a law enforcement officer in which the officer is performing an articulable act unrelated to the investigation of a crime." *Id.* [13]

---

[13] These functions include "participating in town halls or other community outreach, helping a child find his or her parents, providing death notifications, and performing in-home or hospital well-being checks on the sick, elderly, or persons presumed missing." *Id.* "Cameras may be turned off when the officer is engaged in community caretaking functions[, unless] the officer has reason to believe that the person on whose behalf the officer is performing a community caretaking function has committed or is in the process of committing a crime." 50 ILCS 706/10-20(a)(4.5).

The Court's consideration of the Act's application in the context of "public safety investigation" begins with the plain language of the Act.  When interpreting a statute, "a court's primary goal is to ascertain the intent of the legislature."  *Land v. Bd. of Educ. of City of Chicago*, 202 Ill. 2d 414, 421 (2002).  "The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning."  *Id.*  "When the plain language of the statute is clear and unambiguous, the legislative intent that is discernable from this language must prevail, and no resort to other tools of statutory construction is necessary."  *Id.* at 421–22; *see also People v. Pullen*, 192 Ill. 2d 36, 42, 733 N.E.2d 1235, 1238 (2000) ("The language of the statute must be given its plain and ordinary meaning, and where the statutory language is clear and unambiguous, we have no occasion to resort to aids of construction.").

Statutory terms "cannot be considered in isolation but must be read in context to determine their meaning."  *Dynak v. Bd. of Educ. of Wood Dale Sch. Dist. 7*, 2020 IL 125062 ¶ 16, 164 N.E.3d 1226, 1231; *see also People v. Gutman*, 2011 IL 110338, ¶ 12, 959 N.E.2d 621, 624 (Courts "view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation.").  "If the statutory language is ambiguous, however, the court may look to various tools of statutory interpretation, such as legislative history.  A statute is ambiguous if it is subject to more than one reasonable interpretation."  *Dynak*, 2020 IL 125062 ¶ 16, 164 N.E.3d 1226, 1231.  In interpreting statutory language, courts "may consider the consequences that would result from construing the statute one way or the other" and "presume that the legislature did not intend absurdity, inconvenience, or injustice."  *Id.*

The OAG contends that the CPD's "public safety investigations" must be recorded because "public safety investigations" are either included in the definition of "law enforcement-related encounters or activities" as (1) "investigations" or as (2) "any other instance in which the officer is enforcing the laws of the municipality, county, or State."  The OAG further contends that the purpose, history, and spirit of the Act—*i.e.*, to promote collection of relevant evidence while improving transparency and accountability, and strengthening public trust (50 ILCS 706/10-5)—

also favor the OAG's interpretation. The City reads the language differently, contending that the CPD's "public safety investigations" are explicitly exempt from the Act's BWC requirement because they occur "only in the presence of another law enforcement officer." The Parties identify other significant disagreements as well—differing interpretations of such language as "investigations," "enforcing the laws," and "only in the presence of another law enforcement officer." The Court concludes that S03-14 and related policies are, at best, unclear on whether "public safety investigations" are "investigations" subject to recording requirements–troublesome because the Consent Decree mandates that policies be clearly stated and readily understood. *See, e.g.*, Consent Decree ¶¶ 626 and 637 ("CPD will make any necessary updates to its policies and training based on changes in the law that are relevant to CPD's law enforcement activities and will promptly communicate to its members such changes in the law and related policies.").

Language in the Act also does not readily resolve this dispute. The Act's plain language specifically includes "investigations" in its definition of "law enforcement-related encounters or activities," but the Act does not define "investigations," and as noted, the Parties disagree on the scope of this term. The OAG insists that "public safety investigations" are "investigations" that must therefore be recorded as "law enforcement-related encounters or activities." Pl.'s Mot. 7–9. The City characterizes "public safety investigations" as not investigations at all, but instead "public safety questions" that have the purpose of securing the scene after an officer-involved shooting and are asked *before* an investigation begins. Def.'s Resp. 7. These "public safety questions," the City states in its Response, are "necessary to establish where the crime scene is and if it is safe for community members and for the police to begin an investigation into the shooting." Def.'s Resp. 8. Without commenting on whether that explanation requires the conclusion that the questions should not be recorded, the Court notes that this clarification is not reflected in the CPD's policies. And the phrase "public safety questions" does not appear in S03-14. Instead, officers and the public are explicitly told that these questions are part of an "investigation."

In short, the Court is not satisfied at this stage that the processes labeled by the CPD itself as "public safety investigations" are exempt from the recording requirement. In this regard, the Court notes that the City's proposed interpretation—in which there is an exception to the recording requirements where an officer is only in the presence of another law enforcement officer—would excuse officers from recording conduct even where recording is explicitly required in the statute, such as "searches" of a residence that occur without occupants present. And, as the OAG notes, the City's interpretation could mean that "one officer arresting another officer for a homicide would not have to record the arrest as long as no one else was present." Pl.'s Mot. 11. Such an interpretation is obviously inconsistent with the goals of the Consent Decree.

Nor is the Court certain that the OAG is correct in interpreting the terms "investigation" or "enforcing the laws" broadly enough to encompass any conversation between officers about a case or incident. For example, the OAG's interpretation of "law enforcement-related encounter or activity" might require an officer to record investigative activities while alone at her desk, such as making phone calls or reviewing evidence. Such an expansive interpretation could create a host of logistic concerns and potential absurd result.

While the purpose of the Act likely favors a broad definition of "law enforcement-related encounters or activities," it is not clear whether the legislature intended "law enforcement-related encounters or activities" as expansively as the OAG's interpretation or as narrowly as the City's interpretation. Instead, by defining "law enforcement-related encounters or activities" with a non-exhaustive list, the Act requires consideration of certain practices on a near case-by-case basis. For now, however, any final determination on this issue, before development of a clearly defined policy, is premature. The CPD's current policy S03-14 is, on its face, not sufficiently distinct from an "investigation" to comply with the Act.

For these reasons, if the Consent Decree and the Act permit the CPD to allow—or even require—officers to turn off their BWCs for the public's safety, the City and the CPD must clarify in policy how these questions are distinct from "investigations" or other law enforcement. If "public

safety investigations" are not actually investigations, as the City argues, the CPD must revise its policies and instructions to exclude the use of the term "investigations," better define the purpose and scope of the "public safety questions," and explain why recording of these questions would be inimical to the purpose for which they are asked. Specifically, the CPD's policies and instructions must provide greater clarity regarding when "public safety questions" end and when investigations and "enforcing the law" begin. This should include the time constraints under which the questions are asked, the proximity to the scene, whether the incident (as defined) can be ongoing, and the relationship to other officers on the scene who may be engaged in law-enforcement-related encounters or activities.

Finally, the Court again cautions that it is uncertain that any revision of the policy that requires—or even permits—officers to turn off their BWCs during "public safety questions" will comply with the Act.

<u>**CONCLUSION**</u>

For the reasons above, the Court orders the City and the CPD to provide the OAG and the IMT with a revised draft of S03-14—*and other relevant policies*—within 60 days (by August 30, 2024) and, thereafter, follow the Consent Decree process for policy review, revision, and implementation. *See e.g.*, Consent Decree ¶¶ 626–37.

ENTER:

Dated: July 1, 2024

_____
REBECCA R. PALLMEYER
United States District Judge`

**Attachment 1**