

July 26, 2024

Dear Illinois Attorney General Kwame Raoul and Chicago Community Commission for Public Safety and Accountability,

We write to you today as the Free2Move Coalition, an alliance of community and advocacy organizations working to create a safer and more racially equitable traffic safety system in Chicago.

Over the last three years, Free2Move has been working to address the Chicago Police Department's (CPD) excessive, ineffective, and racially disparate traffic stops practices. Nearly one year ago we began calling on the Community Commission for Public Safety and Accountability (CCPSA) to use its policymaking power to create a traffic stops policy that would help address the serious and urgent issues with CPD's traffic stops strategy. Since then, we have continually asserted the position that CCPSA is well positioned to take on this issue. Earlier this summer, when the parties to the CPD Consent Decree announced the possibility of traffic stops being incorporated into the Consent Decree, which would bar CCPSA from addressing it through policy, we maintained our position. At the June 11, 2024, hearing on the matter, Free2Move members testified before Chief Judge Pallmeyer to share our concerns about traffic stops being incorporated into the Consent Decree and our desire for CCPSA to retain policymaking responsibilities as an important community representative in police oversight.

After the June 11 hearing, Free2Move renewed its year-long request that the CCPSA hold a traffic stop hearing to hear from community members and experts and to initiate their policy development process. Yesterday, on July 25, 2024, Free2Move submitted over 2,400 signatures from Chicagoans demanding a hearing on pretextual traffic stops in front of the CCPSA. That hearing has now been scheduled for August 27, 2024. However, we have been informed that the CCPSA does not wish to use its power to develop a traffic stops policy alone. Instead, it wishes to have a robust role within the Consent Decree to draft and negotiate a policy collaboratively.

In light of this sequence of events, the Free2Move Coalition does not stand in opposition to traffic stops being incorporated into the Consent Decree. We appreciate the steadfast commitment from the Office of the Attorney General (OAG) to address this problem and the ongoing communication with your office. We will hold the OAG to their commitment to fight for transformational change in traffic stops on behalf of Chicagoans and to ensure that change happens with the urgency that this problem demands and the meaningful community engagement that Chicagoans deserve. We hope that once a policy is developed, the OAG holds CPD accountable for effective and swift implementation. To communicate our demands with respect to that policy and process, we have developed the attached *Key Components to a Chicago Police Department Pretextual Stops Policy* memorandum.

Even if the CCPSA does not draft the provisions in the Consent Decree or the ultimate policy, they should nonetheless represent community interests regarding traffic stops. The CCPSA was created to give Chicagoans a meaningful new role in oversight. We hope that the CCPSA lives up to this foundational charge by seeking community feedback and asserting our interests throughout this process.

We as the Free2Move Coalition stand ready and eager to see meaningful action on traffic stops move forward, and we hope to be an ally as the OAG and CCPSA strive toward that goal through the Consent Decree process.

Sincerely,

Free2Move Coalition



# KEY COMPONENTS TO A CHICAGO POLICE DEPARTMENT
# PRETEXTUAL STOPS POLICY
*Free2Move Coalition*

For the last three years, the Free2Move Coalition has been raising alarms about the Chicago Police Department (CPD's) use of excessive, ineffective, and racially disparate traffic stops and advocating for a three-part policy to address this urgent problem. The proposed policy would help Chicago reduce racial disparities in traffic stops and curtail CPD's use of pretextual policing, which does not keep our communities or roads safer.

In order to add greater detail to the proposed policy platform and to recommend elements necessary to operationalize the ultimate policy, we developed this Key Components document. These Key Components will help ensure that any CPD pretextual stops policy is robust, effective, timely, and community driven.

**SUBSTANCE**[1]

a. **Purpose**. The policy must include a purpose statement explaining the intention behind the policy. For a policy that ends pretextual stops, the intention is to reduce racially disparate traffic stops and searches, reduce harms that can result from traffic stops, and ensure that the traffic code stops officers make are focused on traffic safety.

b. **Three core policy provisions.** A policy to address CPD's pretextual stops must be robust in order to be effective. Lessons from other jurisdictions indicate that when a policy limiting traffic stops is too narrow in scope, police practices merely shift and adapt to recreate the same activity using new pretexts. These provisions are designed to have broad yet targeted coverage. By focusing on the purpose of the stops (pretext), the most common minor justifications for stops (low-level offenses with no impact on traffic safety), and an incentive for conducting stops within criminal suspicion (fishing for criminal activity through consent searches), this approach focuses on both the ability to and incentive to conduct discriminatory and unnecessary pretextual stops while still allowing police to address actual public safety or traffic safety threats.

   1. **End Pretextual Stops.**
      Any policy seeking to prohibit pretextual stops must do just that—prohibit pretextual stops. CPD officers must be barred from making pretextual traffic stops of motor vehicles, bicycles, or pedestrians. "Pretextual Stops" should be defined as:

---

[1] The Illinois Constitution gives home rule units like Chicago broad authority to regulate matters of local concern unless the legislature has specifically limited or denied that power. *See* Ill. Const. 1970, art. VII, § 6(a), (i); *Palm v. 2800 Lake Shore Drive Condo. Ass'n*, 2013 IL 110505, 988 N.E.2d 75. The Illinois General Assembly has not limited or denied home rule units' ability to regulate traffic and vehicles within their jurisdictions, except with respect to moving offenses contained in Illinois Vehicle Code Chapter 11 and a narrow range of vehicle window offenses. *See* 625 ILCS 5/11–207, 11–208.1, 11–208.2; 625 ILCS 5/12-503. This proposed policy avoids those potential limitations. Therefore, Chicago would be within its home rule authority to enact this policy and regulate Chicago Police Department enforcement activity in this way. While the policy would not prevent evidence that was obtained from a stop made in violation of this policy from being used to prosecute a driver or passenger, that issue could be addressed through a state law change or a complementary policy from the Cook County State's Attorney.



> *A pretextual traffic stop occurs when an officer conducts a stop based on an Illinois Vehicle Code violation or Traffic Code of Chicago violation as an excuse for investigating whether the person or persons stopped are engaged in a non-traffic crime unrelated to that traffic violation for which they lack reasonable articulable suspicion or probable cause.*

2. **Limit Low-Level Traffic Stops.**
   The policy must provide that CPD officers shall not stop, arrest, or detain the operator of a motor vehicle solely for a list of low-level traffic violations (alone or in combination) that generally do not present traffic dangers but nonetheless are common justifications for pretext. Under this policy, officers would be permitted to enforce provisions within the list of low-level violations where the violation is coupled with a traffic violation that is not listed or where the stop is also based on reasonable suspicion and/or probable cause of criminal activity. The list of offenses should include, at a minimum:
   - **625 ILCS 5/3-413(a) / Chi. Mun. Code § 9-76-160(a)(1)** – Failure to have two registration plates properly displayed, where at least one plate is displayed;
   - **625 ILCS 5/3-413(b) / Chi. Mun. Code § 9-76-160(a)(4)** – Improper registration plate fastening and positioning, where the registration plate is otherwise clearly displayed;
   - **625 ILCS 5/3-413(f) / Chi. Mun. Code § 9-76-160(b)** – Expired registration plate or registration stickers, where the vehicle has been properly registered within the previous six months;
   - **625 ILCS 5/12-201(b) / Chi. Mun. Code § 9-76-050(b) / Chi. Mun. Code § 9-76-210(a)** – Having headlights that are not functioning or properly illuminated during the applicable time period and conditions, where at least one headlight is on and operable;
   - **625 ILCS 5/12-201(b) / Chi. Mun. Code § 9-76-050(c) / Chi. Mun. Code § 9-76-210(a)** – Having tail lights that are not functioning or properly illuminated during the applicable time period and conditions, where at least one tail light is on and operable;
   - **625 ILCS 5/12-201(c) / Chi. Mun. Code § 9-76-050(d) / Chi. Mun. Code § 9-76-210(a)** – Failure to have an illuminated registration plate;
   - **625 ILCS 5/12-203 / Chi. Mun. Code § 9-76-090** – Failure to have illuminated and dimmed vehicle lamps while parked on an unlit roadway during the applicable time period;
   - **625 ILCS 5/12-208 / Chi. Mun. Code § 9-76-210(a)** – Having brake lights that are not functioning or properly illuminated, where at least one brake light is on and operable;
   - **625 ILCS 5/12-603.1 / Chi. Mun. Code § 9-76-180(a)** – Failure of a driver or passenger to wear a safety belt, where that driver or passenger is over 16 years old;
   - **625 ILCS 5.0/12-611 / Chi. Mun. Code § 8-32-070** – Operating a vehicle with a loud sound system;
   - **Chi. Mun. Code § 9-76-140(B)** – Emitting excessive smoke or fumes from a motor vehicle, unless such emission is significant enough to pose a substantial risk of injury or death to the driver, passengers, or another person;

3. **Limit Consent Searches During Traffic Stops.**
   The policy must provide that CPD officers shall not ask for consent to search from motor vehicle drivers, motor vehicle occupants, bicyclists, or pedestrians who have been stopped solely on the basis of a violation of the state or local traffic code without first having separate legal justification



    to do so. Before requesting consent to search under these circumstances, CPD officers must articulate their separate legal basis for the search on their body worn camera.

  c. **Data collection.** A crucial component to monitoring the implementation and effectiveness of this policy will be data collection. The CPD already has a directive and system for collecting and reporting traffic stop data as part of the annual Illinois Traffic and Pedestrian Stop Study (ITPSS). However, we and others have raised concerns with how fully and accurately CPD's stops are being reported under the current system. For example, the number of traffic stops recorded each year by the Office of Emergency Management and Communications (OEMC) far exceeds the number of traffic stops reported by CPD to ITPSS. Further, contraband recovery from traffic stops reported to the ITPSS appears to be a significant undercount when compared to other sources of data. To ensure stops are being recorded fully and correctly, CPD directives must ultimately provide for accurate and robust data collection with consequences for failures to do so.

## REVIEW AND AUDITING

To ensure that policy is being followed and to assess whether it is having a measurable impact on reduced racial disparities, there must be procedures for supervisor-level, district-level, department-level, and independent review and analysis of traffic stops. Those could include, but are not limited to:

a. Supervisor review procedures to ensure CPD supervisors are regularly reviewing footage, reports, and relevant documentation from traffic stops to detect policy violations
b. Audit procedures to ensure CPD administrators within each police district review traffic stops associated with reportable uses of force as well as a sample of other traffic stops to ensure proper implementation
c. Annual, independent, third-party analysis of traffic stop data to:
- Ensure officers are accurately reporting all traffic stops as part of the Illinois Traffic and Pedestrian Stop Study, including comparing CPD traffic stops data to other related datasets including Office of Emergency Management and Communications (OEMC) recorded traffic stops and CPD arrest records
- Determine whether the data demonstrates that this policy is being followed, and if not, specific districts or units that are the source of implementation failures
- Investigate whether the policy is producing the intended outcomes of reduced police stops and racial disparities
- Detect trends indicating whether CPD has shifted its pretextual strategy into a different but similarly racially disparate and ineffective policing strategy

## TRAINING

A strong policy can only go far if it is not communicated effectively to officers. Any policy must be complemented with training requirements so that officers are trained on the updated policy and understand the philosophy change that this policy represents.

## COMMUNITY ENGAGEMENT

Traffic stops are the most common way that most Americans interact with law enforcement. We believe that the people most impacted by the problem should lead the development of solutions and be the source of determining whether the solution has been effective. Therefore, any process to address traffic stops must include requirements for ongoing meaningful opportunities for community members to provide input on the policy's development, implementation, and impact. At a minimum, we expect community members to be given an opportunity to



provide feedback on both the proposed terms of the consent decree as well as the first draft of the traffic stops policy. That feedback should be released publicly along with the explanation for how the feedback was incorporated or the reasoning for why it was not incorporated. We also expect the community to be consulted as implementation moves forward.

## **TIMELINESS**

For years now, CPD has continued its escalation of its traffic stops strategy that targets Black and Brown drivers in the city. Chicago cannot wait any longer for this practice to end. Therefore, we demand that incorporation of traffic stops into the Consent Decree moves swiftly and that it includes requirements for a timely policy development and implementation process. Specifically, we expect:

- The traffic stops provisions of the Consent Decree to be negotiated, drafted, and released for public comment by October 2024.
- The traffic stops provisions of the Consent Decree to be filed for court approval by December 2024.
- The first draft of the traffic stops policy to be drafted and issued for public comment by January 2025.
- The final draft of the traffic stops policy to be completed and in effect by March 2025.

## **ACCOUNTABILITY**

Any effort to change traffic stops must include mechanisms to hold CPD accountable for slow or poor implementation. For example, in the Consent Decree context, we would like commitments from the OAG and Independent Monitor to seek sanctions against CPD for patterned failures to comply with the policy or its reporting requirements.