## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **STATE OF ILLINOIS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-cv-6260** |
| **CITY OF CHICAGO,** | **Judge Rebecca R. Pallmeyer** |
| **Defendant.** | |

## COMPREHENSIVE ASSESSMENT, PART II (AMENDED)

The Independent Monitor Margaret A. Hickey and the Independent Monitoring Team submit the attached *Comprehensive Assessment, Part II* (amended). This is an amended version of the original filing, which removes the word "draft" from the header of the report.

Dated October 11, 2024

/s/Margaret A. Hickey
Margaret A. Hickey
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
maggie.hickey@afslaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that, on October 11, 2024, she caused a true and correct copy of the foregoing ***Comprehensive Assessment, Part II*** **(amended)** to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

/s/Margaret A. Hickey
Margaret A. Hickey
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL  60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
maggie.hickey@afslaw.com

**INDEPENDENT MONITORING TEAM**
**Comprehensive Assessment, Part II**

Report Date: October 11, 2024

**Table of Contents**

Introduction ................................................................ 1

Summary of the Independent Monitoring Team's
Recommended Consent Decree Updates .................................... 7

Section I.
Whether the Outcomes Intended by the Consent Decree
Are Being Achieved ................................................... 8

Section II.
Strategies for Accelerating Full and Effective Compliance ......... 26

Section III.
Proposed Modifications to the Consent Decree ....................... 31

Conclusion ........................................................... 60

# Introduction

As the Independent Monitoring Team (IMT), we assess the City of Chicago's (City's) compliance with the requirements of the Consent Decree. Specifically, we assess how relevant City entities—including the Chicago Police Department (CPD); the Civilian Office of Police Accountability (COPA); the Chicago Police Board; and the Office of Emergency Management and Communications (OEMC)—are complying with the Consent Decree.[1]

The Consent Decree requires the IMT to conduct a comprehensive assessment of progress under the Consent Decree.[2] We filed *Comprehensive Assessment, Part I* on November 1, 2023, as part of *Independent Monitoring Report 8*.[3] *Part I* addressed "whether and to what extent the City and CPD are in compliance" with the Consent Decree, including "areas of greatest progress and achievement, and the requirements that appear to have contributed to these achievements, as well as areas of greatest concern." ¶¶657–58.

This report, *Comprehensive Assessment, Part II*, includes

- whether the outcomes intended by the Consent Decree are being achieved; and

- whether any modifications to the Consent Decree are necessary "in light of changed circumstances or unanticipated impact (or lack of impact) of the requirements," including strategies for accelerating full and effective compliance.[4]

While this report includes our recommended modifications, the IMT may not unilaterally modify the Consent Decree. *See, e.g.*, ¶696. That authority rests with the

---

[1] As a party to the Consent Decree, the City is ultimately responsible for compliance. *See* ¶720. Unless otherwise specified, our references to the City typically include its relevant entities. *See* ¶736. The Office of the Inspector General and the Deputy Public Safety Inspector General (PSIG) achieved Full compliance with all relevant Consent Decree requirements in the fourth reporting period and maintained compliance for the required two years.

[2] *See* ¶¶657–59. *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2024/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timeline.pdf.

[3] As in previous monitoring reports, *Independent Monitoring Report 8* provided details to the Court and the public on compliance efforts through June 30, 2023. *See Independent Monitoring Report 8 and Comprehensive Assessment, Part I*, INDEPENDENT MONITORING TEAM (November 1, 2023), https://live-chicago-imt.pantheonsite.io/wp-content/uploads/2024/09/2023.11.01-Independent-Monitoring-Report-8-and-Comprehensive-Assessment-Part-I-website.pdf.

[4] The IMT provided the Parties with earlier drafts of this report in December 2023, June 2024, September 2024, and October 2024.

Parties to the Consent Decree—the City and the Office of the Illinois Attorney General (OAG)—subject to the approval of the Court. And in response to our assessment, the Parties may move for the Court to modify the Consent Decree. *See* ¶659.

Introduction, Figure 1.
The Consent Decree's Comprehensive Assessment Process (¶¶657–59)



We have separated *Comprehensive Assessment, Part II* into three sections to address the remaining requirements of ¶¶657–59:

Section I.     Whether the Outcomes Intended by the Consent Decree Are Being Achieved

Section II.    Strategies for Accelerating Full and Effective Compliance; and

Section III.   Proposed Modifications to the Consent Decree.

Specifically, in Section I, we summarize the events leading up to the Consent Decree and metrics for whether the CPD is achieving the outcomes intended by the Consent Decree, including indicators of community sentiments. Unlike our monitoring reports, which each focus on six-month intervals, this comprehensive assessment considers all compliance efforts and feedback to date, including efforts from previous administrations and leadership.

To conduct our comprehensive assessment and develop recommended changes to the Consent Decree, we considered all compliance efforts under all sections of the Consent Decree to date. We also considered feedback from community members and stakeholders since the beginning of the Consent Decree. Specifically, we considered feedback—often conflicting—from the City, the OAG, the Court, collective bargaining units, CPD officers and personnel, and other community members and stakeholders during site visits, meetings, and individual conversations. During recent public hearings in 2023, for example, the Court, the City, the OAG,

and the IMT heard feedback from community members related to the comprehensive assessment.[5]

In sum, and as demonstrated by our monitoring reports, the existing terms of the Consent Decree require the City and the CPD to do more to achieve the outcomes intended by the Consent Decree.[6]

In Section II, we provide strategies for accelerating full and effective compliance with the existing Consent Decree language: (1) increased communications, including technical assistance and improved review procedures for policies, trainings, and plans; (2) increased, unobstructed access to City and CPD policies, practices, data, and personnel; and (3) expedited procedures for methodologies and achieving compliance.[7]

In Section III, we summarize the areas of greatest concern and provide our proposed recommended modifications to the Consent Decree to facilitate compliance with both the terms and spirit of the Consent Decree.

The Consent Decree is a product of years of discussion, effort, and lessons learned from engaged community members and dedicated personnel from the City, the CPD, other City entities, the OAG, and the Court. In negotiating the Consent Decree, for example, the Parties "consulted with community leaders, community members, police officers, police officer unions, civilian CPD members, advocates, and other concerned individuals who offered meaningful insights and recommendations for change." ¶7. As a result, the Consent Decree "reflects the broad input received by the Parties from the diverse communities that make up the City of Chicago." *Id*.

**For these reasons, we have not recommended changes to expand, shrink, or otherwise significantly alter the original intentions of the Consent Decree.** Instead, all of our recommendations are intended to

(1) accelerate full and effective compliance with existing requirements and

(2) achieve and sustain the *intended results* with the original terms of the Consent Decree. *See* ¶¶657–59.

---

[5]    Once available, the Court permits the IMT to post transcripts of public hearings on the IMT's website: https://cpdmonitoringteam.com/reports-information/.

[6]    Our monitoring reports are also available on our website: https://cpdmonitoringteam.com/reports-information/.

[7]    Paragraph 682, for example, provides the following requirements regarding IMT access: "682. The Monitor will have access to all individuals, facilities, trainings, meetings, disciplinary proceedings, reviews, and incident scenes that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement. The City will ensure that it facilitates the Monitor's *access in a prompt, cooperative, and unobstructive manner*." Emphasis added.

To develop our recommendations, we collected comments and recommendations from all sources, including from the City, the City's entities, the OAG, the Coalition, and other community stakeholders and individual members of the public. The IMT then considered the potential recommendations with all IMT Associate Monitors and members to identify recommendations that (1) are consistent across sections to facilitate full and effective compliance and (2) provide Chicago with the policing reforms and outcomes intended by the Consent Decree. The IMT considered internal and external feedback on the merits of each comment and recommendation. There were a few close calls on whether to recommend certain changes, and in general, tough decisions were decided in favor of keeping the original Consent Decree language agreed to by the City, the CPD, and the OAG and approved by the Court.

The IMT understands that the City, the OAG, and community members may disagree with some of the IMT's recommendations—including decisions not to make additional recommendations. Importantly, this report does not include any recommended improvements that do not relate to Consent Decree modifications. As many community members and City and CPD personnel have identified, the Consent Decree reflects the minimum requirements for police reform in Chicago. The City, the CPD, and Chicago's communities may pursue paths and partnerships toward improvements that are outside the scope of the Consent Decree.

For example, in 2019—the same year as the start of the Consent Decree—the Police Executive Research Forum (PERF) made various observations and recommendations related to the CPD's homicide investigation process.[8] Since then, the CPD has undertaken efforts to address those recommendations. The CPD's homicide investigation process is related to Consent Decree requirements, including the CPD's need to ensure that its "community policing philosophy[, including trust, legitimacy, and collaboration,] is a core component of its provision of police services [and] crime reduction strategies." ¶10. But there is another oversight body that monitors the CPD's progress, and the CPD has committed to increasing transparency on these reform efforts and releasing progress reports without any modification to the Consent Decree. As a result, we do not believe that it is necessary to incorporate the 2019 PERF recommendations into the Consent Decree.

Ultimately, the recommendations in this report are those that we support the Parties incorporating into the Consent Decree. Specifically, we divided our recommended modifications to the Consent Decree into two categories: (1) updates and (2) clarifications.

---

[8]   See *Review of the Chicago Police Department's Homicide Investigation Process*, POLICE EXECUTIVE RESEARCH FORUM (October 2019), https://home.chicagopolice.org/homicideclearancereport2019/.

*Recommended updates* include substantive changes to requirements that the IMT believes will accelerate full and effective compliance *and* help achieve and sustain the original intended results of the Consent Decree.

To determine the "intended results" of the Consent Decree, the IMT looked to the Consent Decree's "guiding principles," which were "intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements of this Agreement and the overall goals for each section" of the Consent Decree. *See* ¶757.

The recommended updates also include ways to better address areas of greatest concern, including potential discriminatory practices related to uses of force and traffic stops. The recommended updates also include adding procedures for ongoing reforms that are occurring without sufficient transparency, awareness, or trust-building processes. We have provided a table summarizing our recommended updates below. *See* Introduction, Figure 1. IMT's Recommended Consent Decree Updates.

*Recommended clarifications*, in comparison, are intended to clarify existing requirements (including incorporating requirements and processes described in subsequent Stipulations to the Consent Decree); remove redundancies; avoid existing, recurring, or future disagreements on interpretation; and improve clarity and transparency. These include, for example, clarifying existing requirements or adding specific and tangible paths toward compliance, such as updating terms and responsibilities for new divisions and entities (*e.g.*, the CPD's Tactical Response and Evaluation Division (TRED) and the City's Community Commission for Public Safety and Accountability (CCPSA)).

In our view, the substance underlying the recommended clarifications are already included in the Consent Decree. Even if these recommendations are not adopted, we believe that going through the process of considering and discussing these recommended modifications will inevitably help the Parties and the IMT have a better common understanding of current requirements.

Our assessment efforts and this report have aimed to focus on meaningful modifications to the Consent Decree that facilitate compliance. There are likely multiple ways to incorporate those changes, such as removing, adding, or revising language. Our rough estimate is that if the Parties sought to incorporate all our recommendations into the 11 substantive sections of the Consent Decree, the Parties would modify about 125 paragraphs, including updates to about 30 paragraphs and clarifications to about 100 paragraphs (with some paragraphs having both). We believe that such modifications can and should be done in a way that ensures the number of monitorable paragraphs remains at or near the existing number (629).

The City and the OAG may choose to incorporate all, some, or none of our recommendations. Subject to the approval of the Court, they may also choose to incorporate separate or unrelated modifications to the Consent Decree at any time. *See* ¶696 ("OAG and the City may jointly agree to make changes, modifications, and amendments to this Agreement, which will be effective if approved by the Court. Such changes, modifications, and amendments to this Agreement will be encouraged when the Parties agree, or where the Monitor's reviews or audits demonstrate that an Agreement provision as drafted is not furthering the purpose of this Agreement or that there is a preferable alternative that will achieve the same purpose.").

Ultimately, we will work to ensure that any modifications made to the Consent Decree will serve the best interest of Chicago's communities and promote more efficient paths toward full and effective compliance.

# Introduction Figure 1: IMT's Recommended Consent Decree Updates

## Global

- Add requirements related to probable cause traffic stops (*See* Guiding Principles ¶¶8 – 10, 49–51, 83–85, 265–68, 342–46, 377, 379, 419–23, 566)
- Specify procedures to ensure consistent, progressive discipline (*See* Guiding Principles ¶¶51, 250, 267, 345–46, 377, 419–23)
- Incorporating the CCPSA into the Consent Decree. *See, e.g.*, ¶¶525, 532 – 33, 565. (*See* Guiding Principles ¶¶422)
- Specify path for compliance with the Police and Community Relations Improvement Act (PCRIA), 50 ILCS 727/1-1 (*See* Guiding Principles ¶¶419–23)
- Specify Coalition procedures *See* ¶709.
- Provide community members with access to observe CPD trainings (*See* Guiding Principles ¶¶10, 51, 268)

## Impartial Policing

- Provide guidance and ensure that the Impartial Policing paragraphs are understood to be written to avoid conflict with the CCPSA's jurisdiction (*See* Guiding Principles ¶¶49–50)
- Reflect that the CPD has its own permanent Language Access Coordinator position (Special Order S02-03). *See* ¶65. (*See* Guiding Principles ¶¶49–50)

## Use of Force

- Create realistic expectations for CPD reporting and supervision requirements in responses to crowds and extraordinary circumstances. (*See* Objectives ¶¶153, 155–56)
- Require (1) supervisors to review the firearm pointing officer's body-worn-camera footage and address any deficiencies before the end of the tour of duty, and (2) unit commanders to review firearm pointing data to address any patterns and trends. (*See* Objectives ¶¶153, 155–56)
- Revise the descriptions of Level 1 and Level 2 uses of force to ensure consistent and accurate reporting. *See* ¶218. (*See* Objective ¶156)
- Revise the timeline for Force Review Board meetings to ensure that the CPD has sufficient information and attendance for holistic reviews, discussions, and when appropriate, recommendations for improvement. *See* ¶580. (*See* Objectives ¶¶155–57)

## Accountability and Transparency

- Shorten the timeframe for initiating and making reasonable attempts to secure a signed complainant affidavit, including in-person visits, phone calls, and other methods. *See* ¶463. (*See* Guiding Principle ¶423)
- Ensure that Accountability Sergeants can meet their responsibilities for receiving, processing, and investigating complaints against CPD members by making it their *only* responsibility. (*See* Guiding Principle ¶423)
- Ensure investigatory and disciplinary records are actually retained electronically and that discipline recommended for sustained findings is applied consistently. *See* ¶¶508 and 514 (*See* Guiding Principle ¶423)
- Require Bureau of Internal Affairs (BIA) to send the staffing and equipment-needs plans to the Superintendent and District Commander. *See* ¶524. (*See* Guiding Principles ¶423)
- Require BIA, COPA, and the Police Board to periodically utilize external auditors and accreditors to independently demonstrate consistency and fairness. (*See* Guiding Principles ¶423)

## Community Policing

- Develop a plan to release complete, accurate, and timely reports on the Community Policing Advisory Panel (CPAP) recommendations. (*See* Guiding Principles ¶¶8–10)
- Ensure efficient coordination between the CPD, the Districts Advisory Councils, and the District Councils. (*See* Guiding Principle ¶10)
- Reflect changes to the City's use of School Resource Officers (and ensure that all CPD officers—regardless of unit—are sufficiently trained to interact with youth consistent with Consent Decree requirements, best practices, and CPD and community expectations). (*See* Guiding Principle ¶¶8, 10–11 )

## Crisis Intervention

- Add a clear path for the City and the OEMC to define "timely response" for the purpose of responding to calls for service identified as involving individuals in crisis. *See* ¶107. (*See* Guiding Principles ¶¶85–86)
- Publish Crisis Intervention data—regarding the number and types of incidents involving individuals in crisis and responses of CPD officers. *See* ¶120. (*See* Guiding Principles ¶¶83, 85)
- Consider revisions to Consent Decree requirements, with input from the Chicago Council on Mental Health Equity (CCMHE), to ensure the CCMHE can consistently and efficiently serve the purposes intended by the Consent Decree. (*See* Guiding Principles ¶¶85–86)
- Clarify the role of the City's Crisis Assistance Response and Engagement (CARE) team or similar responses or programs. *See, e.g.*, ¶131, 139. (*See* Guiding Principles ¶¶85–86)
- Change the definition of "tele-communicators" to include *all* tele-communicators. *See* ¶789. (*See* Guiding Principle ¶85)

## Training

- Update workflow responsibilities for the Training Division and the Training Oversight Committee. *See* ¶275–76. (*See* Guiding Principle ¶266)

## Data Collection, Analysis, and Management

- Update ¶570 to reflect current best practices related to data sharing between the CPD and COPA. (*See* Guiding Principles ¶¶566–67)
- Require a regular audit of the CPD's electronic system to ensure that it is valid and reliable. (*See* Guiding Principles ¶¶566–67)
- Include specific criteria for the automated electronic system for the early intervention system. (*See* Guiding Principles ¶¶566–67)
- Require regular meetings with relevant personnel across City entities to facilitate the necessary coordination to identify and implement paths toward compliance. (*See* Guiding Principles ¶¶566–67)

# Section I.
# Whether the Outcomes Intended by the Consent Decree Are Being Achieved

In October 2014, Chicago Police Officer Jason Van Dyke shot and killed Laquan McDonald. In April 2015, the Chicago City Council approved a $5 million settlement to McDonald's family. In May 2015, a local journalist filed a Freedom of Information Act (FOIA) request seeking video from the night McDonald was killed. After three extensions, the CPD denied the request for the video in August 2015. In November 2015, a Cook County judge ordered the City to release the CPD's dashboard camera video. Police Officer Van Dyke was charged with first-degree murder hours before the City released some video on November 24, 2015.

In December 2015, shortly after Mayor Rahm Emmanuel fired police Superintendent Garry McCarthy, the U.S. Attorney General launched a civil-rights investigation into the CPD's policing practices. The U.S. Department of Justice (DOJ) released the results of its investigation in January 2017, finding a longstanding, pervasive "pattern or practice" of civil rights abuses by the CPD. Two separate class-action lawsuits followed: *Campbell v. City of Chicago* and *Communities United v. City of Chicago*.[9] Also in December 2015, CPD Police Officer Jason Van Dyke was indicted on six counts of first-degree murder.

In August 2017, the OAG sued the City in federal court, seeking a Consent Decree that would address the DOJ's findings and recommendations. The case was assigned to federal Judge Robert M. Dow, Jr. The OAG then sought input from community members and Chicago police officers and negotiated the Consent Decree with the City.

In March 2018, the Parties to the Consent Decree entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')," which "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[10] In October 2018, CPD Police Officer Van Dyke was found guilty of second-degree murder and 16 counts of aggravated battery and sentenced in January 2019.

---

9   *See Campbell v. Chicago*, N.D. Ill. Case No. 17-cv-4467 (June 14, 2017), and *Communities United v. Chicago*, N.D. Ill. Case No. 17-cv-7151 (October 4, 2017).

10  *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), https://www.chicagopoliceconsentdecree.org/Page-Attachments/CPCD/Resources/Memorandum/Executed_MOA.pdf.

Judge Dow approved and signed a modified version of the Consent Decree on January 31, 2019.[11] Paragraph 2 of the Consent Decree sets out its overall purpose (which has guided and will continue to guide our monitoring efforts):

> *2. The State, the City, and the Chicago Police Department . . . are committed to constitutional and effective law enforcement. In furtherance of this commitment, the Parties enter into this Agreement to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety. In addition, this Agreement seeks to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely. This Agreement requires changes in the areas of community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management.*[12]

On March 1, 2019, the effective date of the Consent Decree, and after a competitive selection process, Judge Dow appointed Maggie Hickey, a partner at ArentFox Schiff LLP, as the Independent Monitor.[13] On October 11, 2022, Chief U.S. District Judge of the District Court for the Northern District of Illinois Rebecca R. Pallmeyer became the presiding judge over the Consent Decree.

The Consent Decree requires action by the CPD and many other City entities. As the Independent Monitor, Ms. Hickey oversees the Independent Monitoring Team

---

[11] The long road to the Consent Decree may have been initiated after the murder of Laquan McDonald, but members of Chicago's communities have indicated that they have been calling for police reform for decades. Some community members have, for example, pointed to documented torture of Black suspects by Commander Jon Burge, the "Marquette 10" police officers who accepted bribes from drug dealers in the 1980s, the "Austin 7" police officers who extorted money from an undercover FBI agent in the 1990s, and the scandal involving the Special Operations Section (SOS) of the CPD in the early 2000s in which CPD officers were convicted of kidnapping, theft, burglary, home invasion, and false arrest.

[12] The Consent Decree is available on the Independent Monitoring Team's website: https://cpd-monitoringteam.com/wp-content/uploads/2024/02/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf. *See also Resources*, CHICAGO POLICE CONSENT DECREE ("Consent Decree Approved by the Court on January 31, 2019"), chicagopoliceconsentdecree.org/resources/.

[13] Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he will "help facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree." About, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/about/.

(IMT) and reports directly to Chief Judge Pallmeyer.[14] The OAG oversees and enforces the Consent Decree. *See* ¶694.[15]

Below, we discuss the City and the CPD's progress with (1) status of existing Consent Decree requirements, (2) indicators of Chicago community sentiments, and (3) additional metrics.

## Status of Existing Consent Decree Requirements

One obvious measure for whether the Consent Decree is achieving its intended outcomes is whether the City and its entities are achieving compliance with its requirements. As reflected in our latest monitoring report, *Independent Monitoring Report 9* (July 1, 2023–December 31, 2023), the City has made progress related to most original requirements in the Consent Decree.[16]

The Parties negotiated "Guiding Principles" that "provide the Court, the monitor, and the public with the context for . . . substantive requirements of [the Consent Decree] and the overall goals for each section." ¶757. These paragraphs provide significant insight into the intended outcomes of the Consent Decree and are essentially the "spirit" of the Consent Decree. With only 7% of paragraphs in Full compliance, however, it is not likely that either of the Parties would argue that these principles have been sufficiently demonstrated.

The City will have to significantly increase its rate of compliance to reach full and effective compliance within eight years—a goal that was extended from five years due to COVID-19.[17]

---

[14] As the IMT, we (1) monitor the City's, the CPD's, and other relevant City entities' progress in meeting the Consent Decree's requirements and (2) offer assistance to the City, the CPD, and other relevant City entities to implement the changes that the Consent Decree requires. Independent Monitor Maggie Hickey and Deputy Monitor Chief Rodney Monroe, Ret., lead the IMT. The IMT's Associate Monitors, in turn, oversee the 11 topic areas of the Consent Decree. Our legal team, analysts, subject matter experts, Community Engagement Team, and community survey staff provide support in several ways: by reaching out to and engaging with Chicago communities; by providing general administrative support; and by collecting and analyzing policies, procedures, laws, and data, including conducting observations and interviews and drafting reports.

[15] The Coalition also has certain enforcement rights and meets with the IMT at least quarterly. *See* ¶¶709(a) and ¶669, respectively.

[16] The IMT provided the Parties with its first draft of *Independent Monitoring Report 10* on July 30, 2024. The IMT anticipates also filing *Independent Monitoring Report 10* in or before November 2024.

[17] *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2024/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timeline.pdf.

Section I, Figure 1. Consent Decree Compliance by December 31, 2023



Consent Decree requirements vary in number and scope across the sections of the Consent Decree. Likewise, the City's ability to reach compliance has varied across sections. The City has achieved at least Preliminary compliance with 88% of monitorable paragraphs. This reflects significant efforts to reform policies and procedures across each section of the Consent Decree, as reflected in Figure 2, below.

Section I, Figure 2:  Percent of Monitorable Paragraphs by Section with at least Preliminary Compliance by December 31, 2023[18]

| Community Policing | 97% |
|---|---|
| Impartial Policing | 69% |
| Crisis Intervention | 83% |
| Use of Force | 95% |
| Recruitment, Hiring, and Promotions | 100% |
| Training | 88% |
| Supervision | 86% |
| Officer Wellness and Support | 97% |
| Accountability and Transparency | 88% |
| Data Collection, Analysis, and Management | 83% |

The section with the lowest rate of at least Preliminary compliance is the Impartial Policing section, at about 69%. This section is at the core of what led to the Consent Decree and what many requirements across sections of the Consent Decree

---

[18]  This figure does not include the City's current progress with the Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances section, because that section does not yet have all monitorable paragraphs under review.

are meant to address. While the Impartial Policing section is among the smaller sections, with fewer than 30 monitorable paragraphs, the requirements are extensive and require the City to ensure and demonstrate that all policing practices occur without prohibited discrimination or bias. This has required significant policy and training reviews and revisions and will continue to require community engagement to identify blind spots and opportunities for improvement. The City and the CPD must also make significant efforts to capture and assess relevant data regarding law-enforcement decisions and continuously identify areas of success and areas in need of correction and implement necessary changes.

In many sections of the Consent Decree, Full compliance often relies on compliance in other sections of the Consent Decree. As referenced above, for example, the City's and the CPD's ability to demonstrate impartial policing across its law enforcement decisions will inevitably rely on its ability to implement requirements in the Data Collection, Analysis, and Management section.

Likewise, the City and the CPD—as well as the OAG and the IMT—have focused significantly on meeting requirements in the Use of Force section. For example, one of the CPD's most significant accomplishments so far is the implementation of the Tactical Review and Evaluation Division (TRED). Since its creation, TRED has evolved, adapted, and taken on additional responsibilities to review whether CPD tactics are aligning with best practices and the high expectations of CPD officers.[19]

Despite significant efforts and progress, and as referenced above, the City and the CPD have reached Full compliance with about 7% of monitorable paragraphs. This is, in part, because the City's ability to sufficiently demonstrate, for example, that they prohibit and mitigate excessive force in practice—and not just in policy and training—relies on reform efforts in the Supervision, Accountability and Transparency, and Data Collection, Analysis, and Management sections: The City and the CPD must collect, share, analyze, and respond to corresponding data, have sufficient supervision systems that consistently reflect CPD expectations, and follow accountability systems that are reliable and transparent to hold officers accountable for excessive force.

In short, the City must improve its data systems to meet its burden of proof with the requirements of the Consent Decree (¶720). And the Consent Decree will not end until the "Court finds that the City has achieved full and effective compliance with this Agreement and maintained such compliance for no less than two consecutive years." ¶693. *See also* ¶¶714–15.

---

[19]    In response to these new responsibilities, the CPD continues to balance staffing concerns to address backlogs and the inefficiencies caused by delayed reviews.

To even come close to reaching the existing eight-year expectation, the CPD will need to significantly increase its rate of Full compliance by the end of 2024.

Section I, Figure 4:
Percent of Monitorable Paragraphs with Full Compliance by December 31, 2023[20]

| | |
|---|---|
| Community Policing | 6% |
| Impartial Policing | 0% |
| Crisis Intervention | 0% |
| Use of Force | 11% |
| Recruitment, Hiring, and Promotions | 9% |
| Training | 0% |
| Supervision | 0% |
| Officer Wellness and Support | 0% |
| Accountability and Transparency | 17% |
| Data Collection, Analysis, and Management | 7% |

The Accountability and Transparency section is the largest section in the Consent Decree and has the highest rate of paragraphs in Full compliance at 17%. In large part, this reflects the significant coordination and efforts from the Office of the Inspector General, the Deputy Inspector General for Public Safety, and the Police Board.

The remaining gaps in compliance require significant reforms and coordination across many City entities, including the CPD, the Civilian Office of Police Accountability (COPA), the Police Board, and the newer Community Commission for Public Safety and Accountability (CCPSA). In many ways, these entities operate independently, by design, but the City must ensure that these entities are sufficiently aligned to demonstrate a system that is reliable, trustworthy, transparent, and fair.

Finally, some of the gaps in compliance reflect the fact that many requirements are long-term goals. And the Consent Decree acknowledges that some requirements will take years to accomplish. Figure 5, below, provides a snapshot of compliance levels as of December 31, 2023.[21]

The City and the CPD serve a critical function to the safety and wellbeing of Chicago and Chicago's communities, and there will always be competing concerns—

---

[20] This figure does not include the City's current progress with the Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances section, because that section does not yet have all monitorable paragraphs under review.

[21] The figure does not include the new Investigative Stops, Protective Pat Downs, and the Enforcement of Loitering Ordinances section. We assessed the City's compliance with requirements in this section for the first time in the ninth reporting period, and as a result, the compliance levels do not yet reflect the requirements of the entire section.

and often crises—to address. But the City and the CPD must make meaningful efforts now to accomplish those long-terms goals to achieve full and effective compliance with the Consent Decree.[22]

---

[22] We have continued to raise, for example, that the City will continue to struggle to reach Full compliance across each section of the Consent Decree until there are transparent plans to address community policing and engagement; supervision and staffing; and data collection, management, and analysis. This includes implementing a comprehensive, consistent, and transparent community policing strategy; allocating personnel and resources based on a data-driven and transparent staffing study; and improving the scope, accuracy, and efficiency of its data collection and reporting systems.

Section I, Figure 5.     Consent Decree Compliance through December 31, 2023



## Indicators of Chicago Community Sentiments

The Consent Decree is one of the largest and most comprehensive of its kind, and the intended outcomes of the Consent Decree are multifaceted. The opinions of Chicago's communities are paramount to whether the outcomes intended by the Consent Decree are being met. We have endeavored to hear the voices of Chicagoans throughout the monitoring process through a variety of methods, including (1) citywide surveys, (2) focus groups, and (3) regular community engagement through public meetings and public court hearings, as well as individual meetings and conversations.[23] By most indications, many Chicagoans are not feeling many of the changes that have been made by the City and the CPD so far.

Critically, the Consent Decree requires the IMT to conduct reliable, representative, and comprehensive surveys of a broad, cross-section of members of the Chicago community regarding the CPD and must focus on "perceptions of CPD's services, trustworthiness, community engagement, effectiveness, responsiveness, handling of misconduct complaints and investigations, and interactions with members of the Chicago community." ¶¶645–46. Designed to meet the requirements of the Consent Decree, our surveys are one important way to have resident opinions represented in the monitoring process.[24] Because these surveys are representative of Chicago, they are an important quantitative tool to understand how opinions about the CPD shift over time.



We conducted our first survey between November 2019 and February 2020, before several major events, including the COVID-19 pandemic, the ensuing economic crisis, the hiring of a new Chicago Police Superintendent, and the national protests and unrest that followed the murder of George Floyd in Minneapolis, Minnesota. Because data collection ended before those events could influence public opinion, the first survey findings provided a baseline from which to examine the state of police-community relations in Chicago.

---

[23] The CPD also provides a *Chicago Police Sentiment Dashboard* on its website, which is based on online surveys: https://home.chicagopolice.org/statistics-data/data-dashboards/sentiment-dashboard/.

[24] The IMT provides several ways for community members to provide input available on the IMT website: https://cpdmonitoringteam.com/.

The data for the second survey was collected between October 2021 and May 2022. For an effective comparison, we used the exact questions and survey instrument from the first community survey in 2019–2020. While it is possible that national and international events may have influenced public opinion of the police broadly, the survey questions did not refer to such events. This allowed us to do an "apples-to-apples" comparison of the results between the two surveys.

In 2022, the differing perceptions and experiences based on race and ethnicity documented in the first community survey report persisted with slight changes. White Chicagoans still had the highest proportion of positive responses overall, but that positivity in responses was lower than White Chicagoans had in the 2020 Survey. The gap in the perceptions of police between Latino and Black Chicagoans narrowed in 2022 compared to two years ago when Latino Chicagoans had higher positive ratings than Black Chicagoans. As in the 2020 Survey, Black Chicagoans still gave the least positive and most negative ratings in 2022, though there were fewer negative ratings than compared to 2020. The positive perceptions of this group, however, did not change and Black Chicagoans were instead more likely to select the middle (neutral) response.

The gap between Young Black Men and the average Chicagoan persisted. Young Black Men had, by far, the least positive and most negative perceptions of police compared to other groups, including Black Chicagoans in the general sample. Black Chicagoans in the general sample answered questions more similarly to Latino Chicagoans than to Young Black Men. Young Black Men in 2022 answered most of the questions similarly to their counterparts in 2020, with a few exceptions where Young Black Men were more likely to favor a middle (neutral) response option. A notable difference between the Young Black Men samples of 2020 and 2022 was the reduced rate of experiencing gun-pointing by a police officer. In 2022, slightly over a tenth of Young Black Men respondents had experienced gun-pointing by the CPD compared to 19% in 2020, but this rate was still much higher than that of the average Chicagoan (by more than six-and-a-half times) and the average Black Chicagoan (by more than three times).

We provide more specific results from the surveys below:

- **Overall:** Race and ethnicity were strongly associated with Chicagoans' perceptions of and experiences with the CPD, which was consistent with responses from the 2020 Survey. Young Black Men, ages 18 to 25, gave the CPD the lowest ratings, followed by Black Chicagoans, Latino Chicagoans, and White Chicagoans, who were most positive but considerably less so relative to 2020. In 2022, White and Latino Chicagoans had worse perceptions of police than they did in 2020. Black Chicagoans still had the most negative responses when compared to other groups, but rated the CPD better than they did in 2020, with fewer negative and more neutral responses. The CPD received a combined positive

rating by over 50% of Chicagoans on only 11 of the 54 (20%) ratings questions, which was a decrease from the 2020 Survey where 20 of the 54 (37%) ratings questions received an overall positive rating.

- **Overall Police Services:** Compared to the 2020 responses of the All Chicagoans sample, a lower proportion of Chicagoans said the CPD was doing a "good" or "very good" job in both their neighborhood (dropped to 43.6% from 52.2%) and citywide (dropped to 28.2% from 34.4%), while a higher proportion said that the police were doing a "poor" or "very poor" job in the city as a whole (grew to 42.7% from 30.2%).

- **Effectiveness:** Chicagoans rated the CPD both less positively and more negatively on all Effectiveness questions as compared with the 2020 Survey results. The proportion of those who gave "good" or "very good" responses dropped by at least 10 percentage points on five out of the seven Effectiveness questions.

- **Community Engagement and Responsiveness:** In the 2022 Survey, a lower proportion of Chicagoans gave the CPD positive ratings on seven of the nine questions about Community Engagement and Responsiveness compared to 2020.

- **General Trustworthiness and Procedural Justice:** Compared to the 2020 Survey results, Chicagoans in 2022 rated police less positively for considering the views of people involved when deciding what to do (36.7% in 2020 and 28.6% in 2022) and acting ethically (47.6% in 2020 and 42.4% in 2022). Additionally, respect for police officers in Chicagoans' neighborhoods declined by 4% from 2020.

- **Contact with the CPD in the Previous 12 Months:** In 2022, a lower proportion of Chicagoans reported having been in an accident where police came to the scene (10.4% vs. 13.3%) or having been stopped by police compared to 2020 (14.3% vs. 19.1%). However, a higher proportion reported having been interrogated (4.7% vs. 2.6%) or arrested (5.4% vs. 3.3%) over the past 12 months compared to 2020.[25]

---

[25] Black Chicagoans were also four times more likely than White Chicagoans to have reported being stopped in a vehicle (27.5% vs. 6.7%) or while walking or standing on the street (12.4% vs. 2.8%) over the last 12 months. Thirteen percent of Black Chicagoans reported having been arrested in the last 12 months as compared to less than one percent of White Chicagoans (0.3%) and nearly six percent of Latino Chicagoans (5.5%). None of the White Chicagoans reported experiencing gun-pointing by a police officer over the past 12 months. However, 3% of Black Chicagoans and 2% of Latino Chicagoans reported having had a gun pointed at them by the CPD in the past year. Eleven percent of Young Black Men reported having had a gun pointed

- **Trustworthiness and Procedural Justice Based on Contact:** A majority of Chicagoans rated police "good" or "very good" on six of the 10 questions about trustworthiness and procedural justice based on recent contact. Specifically, Chicagoans said that police officers did a "good" or "very good" job at remaining calm (62.6%), treating them with respect and dignity (61.7%), treating them fairly (60.4%), and answering all of their questions (56.7%). A majority of Chicagoans also indicated that they were "satisfied" or "very satisfied" with the information police provided during their most recent encounter. However, for these 10 questions, four showed decreases of 5% or more in positive responses compared with the 2020 Survey, although only one item (related to fair treatment during the most recent interaction) was statistically significant. By contrast, of the Young Black Men who answered questions about their most recent contact, over half (52.5%) rated the CPD "poor" or "very poor" on providing a valid reason for stopping them. More than half (54%) also said police did a "poor" or "very poor" job expressing concern about their feelings during the encounter. Half of Young Black Men (49.4%) also said CPD officers did a "poor" or "very poor" job explaining why they had stopped or questioned them in a clear way. Similar to result for the All-Chicagoans sample, four of the items in this category showed decreases of 5% or more in positive responses compared with the 2020 Survey, although changes were statistically significant for only two of the items (providing a valid reason for the stop and remaining calm).

- **Misconduct Complaints and Investigations:** In 2022, Chicagoans were more concerned about harassment as a result of making a complaint against the CPD. The percentage who indicated they would be "very worried" or "extremely worried" about harassment or other consequences when making a complaint increased from 18.9% in 2020 to 24.2% in 2022.

- **Interactions with Members of the Community:** Sixteen percent of Chicagoans thought police were doing a "poor" or "very poor" job treating people from their neighborhoods fairly. The difference in responses to this question by race was stark: Black Chicagoans were 3.5 times more likely to give the CPD a "poor" or "very poor" rating (28.3%) on this question than White Chicagoans (8.7%). The majority of Chicagoans (52.2%) said the CPD are doing a "poor" or "very poor" job at treating members of the Black community fairly. Two out of five Chicagoans surveyed also rated the CPD "poor" or "very poor" at treating Latino Chicagoans fairly and treating people experiencing homelessness fairly.

---

at them by a Chicago police officer over the past 12 months, over five times the rate of Chicagoans overall (under 2%). Ten percent of Young Black Men reported experiencing a use of force (other than handcuffing) by a CPD officer, a rate six times greater than all Chicago adults during this time period.

- **Confidence in Reform:** Overall, more Chicagoans in 2022 were "doubtful" or "very doubtful" that police reform would have a lasting and positive effect compared to 2020 (43.2% vs. 33.1%). For White Chicagoans, the difference between 2022 and 2020 was a 20.9% increase for those who indicated "doubtful" or "very doubtful" on this question (increasing from 28% in 2020 to 49% in 2022). Black Chicagoans had a similar response pattern for both surveys with 44% indicating "doubtful" or "very doubtful" in 2022 and 45.6% in 2020. Young Black Men also responded similarly to the other groups: 47% expressed low confidence in the potential for lasting and positive changes within the CPD. This percentage was about the same in 2020 as well.

Section I, Figure 6.

Comparison of positive CPD ratings in the two IMT citywide community surveys



Because it is crucial to hear community voices consistently throughout the monitoring process, we have also conducted separate, special studies of Chicago's communities during years we are not conducting the citywide, representative community surveys. Specifically, building on some of the key findings from our citywide surveys, and per Consent Decree ¶665, we conducted a series of focus groups with Black and Latino men in Chicago ages 18–35 between December 2020 and June 2021, and conducted a series of focus groups with Black and Latina women in Chicago ages 18-49 between November 2021 and February 2023.[26]

---

[26] *See Special Report: Focus Groups with Black and Latino Men, Ages 18–35 (Conducted December 2020 – June 2021)*, Independent Monitoring Team (September 1, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2024/04/2022.09.01-IMT-Special-Report-Focus-Groups-with-Black-and-Latino-Men-._.pdf. *See also Independent Monitoring Report 7*, Independent Monitoring Team (June 29, 2023) at 30 ("Focus Groups with Black and Latina Women

The focus groups served as a qualitative complement to some of the key findings from our first citywide, representative survey, which reflected that young Black and Latino men in Chicago reported having the highest frequency of contact with police, the most negative perception of police, and lowest levels of trust in police. The information from the focus groups went beyond the *2020 IMT Community Survey* by providing a clearer sense of why members of these populations have more negative perceptions of police and lower levels of trust in police.

Overall, participants from the focus groups generally indicated strong negative perceptions of police, a lack of trust in their ability to carry out their expected roles while respecting individuals' rights, and a sense that officers treat people differently based on their race or the neighborhood they live in.

Although rare, some participants in the focus group with men provided positive accounts of interactions with police. More participants, however—including participants who gave positive feedback—gave accounts of experiencing and observing frequent negative interactions with police.[27]

According to feedback from these participants, the cumulative effect of repeated negative personal experiences with officers significantly hinders trust building. Some participants described that communities need police, but distrust was among the strongest theme in terms of the forcefulness and frequency of responses from focus-group participants. Some participants recounted situations in which they believed the police were ineffective, failed to act, arrived too late to be helpful, or did not respond at all. Participants who described these situations often felt that the CPD was unresponsive to the community.

Still, many participants reported having repeated, frequent, involuntary contact with police, and some participants indicated having up to 30 involuntary interactions with police in the past year. Many participants described incidents that involved a similar pattern: a traffic stop of a young adult man in a vehicle for a minor non-moving violation—such as a hanging air freshener or the degree of a window tint—followed by a perceived improper search of the vehicle, and after the search does not turn up anything, there is no citation for the initial infraction.

---

(November 2021 – February 2023)"), https://live-chicago-imt.pantheonsite.io/wp-content/uploads/2024/09/2023.06.29-Independent-Monitoring-Report-7-filed.pdf. *See also* Elucd, *Chicago Police Sentiment Dashboard*, CHICAGO POLICE DEPARTMENT (last visited June 21, 2024), https://home.chicagopolice.org/statistics-data/data-dashboards/sentiment-dashboard/.

[27] One participant, for example, described witnessing an officer save a gunshot victim's life, but also described witnessing officers "beat" his brother while his brother was in handcuffs. In fact, many focus-group participants described that most interactions they have had with the CPD are negative, even when the interactions end without law-enforcement actions.

Moreover, consistent with the *2020 IMT Community Survey*, many participants of the focus group with men reported that officers frequently take out and point guns at them during interactions. Some participants said that they believe officers take out or point guns because officers feel afraid of a real or perceived threat or because officers want to force compliance, demonstrate authority, or instill fear. Likewise, many participants described that they avoid officers out of fear and that they believe there is mutual fear between police and young Black and Latino men, which can create dangerous consequences during involuntary interactions and impede building mutual trust.

Overall, women focus-group participants shared mostly neutral to negative sentiments toward the CPD. Participants rarely raised positive, friendly interactions between officers and community members. During their recent interactions with police, women reported less physical force from the CPD towards women than they perceived for men, and unlike for women focus-group participants did not report experiencing gun-pointing by CPD officers. Additionally, many participants stated that the CPD is too tough, too physical, and too aggressive in their interactions with fellow community members.

The majority of women participants based their perceptions on general sentiments towards the CPD in their neighborhoods and on their experiences with inadequate police response. Many participants expressed the sense that CPD officers did not put adequate efforts into solving crime and helping community members who reached out to the police. Participants reported other concerning police behavior, such as ignoring women for long periods of time without providing information and minimizing harm or the threat of harm that women reported to the police.

The IMT's third citywide survey is currently under review, and the IMT will file the report with the Court and post it on our website in 2024.

## Additional Considerations

One key goal of the Consent Decree process is for the CPD to become self-regulated and accountable by proactively identifying and addressing potential problems in accordance with federal, State, City, CPD, and community requirements and expectations.

The toll of ineffective policing and police misconduct can be enduring and widespread, impacting the overall health of Chicago and Chicago's communities and officers. While the true weight of undermining the trust and confidence in policing may be impossible to quantify, the monetary cost of settlements and court awards related to police misconduct have been massive.

Paragraph 548 of the Consent Decree requires the City to produce annual reports on CPD litigation.[28] As reflected in Section I, Figure 7, below, these reports demonstrate that the known costs are enough to warrant reform and ongoing improvement.

Section I, Figure 7.   Annual City Payouts for Chicago Police Department Litigation

| Year | Settlements | Court Awards | Totals |
|------|-------------|--------------|--------|
| 2019 | $20,751,500 | $26,034,100 | $46,785,600 |
| 2020 | $20,673,840 | $19,786,586 | $40,460,426 |
| 2021 | $50,102,651 | $73,096,734 | $123,199,385 |
| 2022 | $81,332,845 | $4,956,858 | $86,289,703 |
| 2023 | $55,477,599 | $25,976,310 | $81,453,909 |

It is important to note that these costs are also imperfect estimates of the true costs related to police-misconduct-related allegations. For example, putting aside the fact that not all misconduct is reported, court awards and settlements are still often approximations by courts, statute, legislators, and attorneys. Settlements, for example, are often compromises that must consider risk mitigation and the baseline cost of litigation—while acknowledging that a trial would likely lead to a different result.

Moreover, the payouts often do not correspond to the years that any misconduct occurred, because the process often take years from the time of an incident to reach settlement or court award. In the *City Of Chicago's 2023 Report On Chicago Police Department Litigation Report*, its latest, the City provided additional details that demonstrate the fact that even the cost of old allegations remain uncertain, as about 63% of these costs (or about $51.5 million) related to reversed convictions—rather than allegations of more recent misconduct. *See* Section I, Figure 8, below.

---

[28]   The litigation reports are available on the City of Chicago's website: https://www.chicago.gov/city/en/depts/dol/supp_info/CPDAnnLitReports.html

Section I, Figure 8.    2023 City Payouts for Chicago Police Department Litigation[29]

| Type | Type | Total Amount | % of Total Payout |
|---|---|---|---|
| Reversed Conviction | 4 | $51,500,000 | 63.2% |
| Use of Force | 22 | $14,014,399 | 17.2% |
| Vehicle Pursuit | 9 | $5,973,750 | 7.3% |
| Other | 3 | $5,087,500 | 6.2% |
| Unlawful Pretrial Detention | 14 | $2,573,310.20 | 3.2% |
| Unlawful Search and Seizure | 14 | $1,263,200 | 1.6% |
| False Arrest | 17 | $936,750 | 1.2% |
| Malicious Prosecution | 1 | $75,000 | .09% |
| Total | 84 | $81,423,909.20 | 100% |

As a result, this means that any recent reforms and improvements may not be reflected in these costs. But it also means that ongoing delay toward reform or improvements may continue to have substantial costs for the City for years to come. In other words, the recent annual payouts for Chicago may not accurately reflect the CPD's current practices, but the litigation costs will emerge in the years to come. We hope that, through implemented reforms, the City, the CPD, and Chicago's communities find reason to have increased confidence in the CPD's policies, training, and practices, and that as a result, these costs *substantially* and *sustainably* decrease.

The Consent Decree requires the Chicago Police Department to police our communities constitutionally and within the laws of our city, state, and nation. These payouts reflect the stark reality that the City and the CPD have a long history and need to accelerate efforts to achieve the constitutional policing our neighbors deserve and that the Consent Decree requires.

Over the years, there have been many calls on the Court and the OAG to push for additional sanctions toward the City and the CPD for failures to reach compliance with the Consent Decree. Ultimately, the City remains "responsible for providing necessary and reasonable financial resources . . . to fulfill its obligations under this Agreement." ¶700. This means providing resources to support and demonstrate constitutional and effective policing, including resources toward staffing, recruitment, equipment, training, supports, community engagement, and data collection

---

[29]    *City of Chicago's 2023 Report on Chicago Police Department Litigation*, City of Chicago Department of Law (June 2024) at 8, https://www.chicago.gov/content/dam/city/depts/dol/CPDLitigationReports/City%20of%20Chicago%20Report%20on%202023%20CPD%20Litigation.pdf.

and analysis. Fortunately, the costs of these reforms are nowhere near as costly as settlements and court awards associated with police misconduct.

In the following sections, we offer strategies and recommended changes to the Consent Decree to expedite reform.

# Section II.
# Strategies for Accelerating Full and Effective Compliance

While the City denied the claims in the OAG's Complaint that led to the Consent Decree, the City entered the Consent Decree "because the City is committed to continual improvement in the delivery of police services, and in order to avoid protracted and expensive litigation." In agreeing to the significant and extensive requirements in the Consent Decree, the City and the OAG made significant strides toward improving police services in Chicago. Since then, the City and the OAG have often worked collaboratively to meaningfully effectuate those reforms. Through such collaboration—often through difficult conversations with significant disagreement—the Parties have frequently reached resolutions that both sides agree are improvements over the previous status quo.

On the other hand, there have also been many instances where the process has more closely resembled slow and costly litigation. But this is not litigation, and we believe the recent emphasis on collaboration has been necessary, should continue, and should be made permanent. This includes an increased ease of access to City and CPD personnel, records, data, plans, and candor regarding internal and external challenges. While the Consent Decree currently requires this access, we believe that some changes to Consent Decree processes can help facilitate cooperation while removing some unnecessary processes, including some that were necessary at the beginning of the Consent Decree but have since served their purpose.

Specifically, since starting his position in September 2023, CPD Superintendent Larry Snelling increased collaboration, which paid clear dividends in the CPD's ability to implement its new policies, training, and plan for the 2024 Democratic National Convention. We hope that this collaboration continues and demonstrates improvements across the board. To ensure that this progress continues—and survives any changes in personnel or positions within the City, the CPD, the OAG, the IMT, or the Court—we have recommended revising Consent Decree processes to incorporate strategies for increased and permanent collaboration. Many of these recommendations are simply clarifications of what is already working. Other recommendations, however, are an attempt to expand what is working and replace processes that are slowing progress.

In addition to the updates and clarifications across each section, described in Section III below, we a summarize the following strategies for **increased collaboration** below:

- Increased communications, including technical assistance, streamlined responses to data requests, and improved review procedures for policies, trainings, and plans;

- Increased, unobstructed access to City and CPD policies, practices, data, and personnel (*see* ¶682); and

- Expedited procedures for methodologies and achieving compliance.

## Increased communications, including technical assistance, streamlined responses to data requests, and improved review procedures for policy, trainings, and plans

The Parties and the IMT have met on different cadences since the beginning of the Consent Decree. In the first few years of the Consent Decree, for example, the CPD attempted to meet with the OAG and the IMT at least twice a month for each section of the Consent Decree. This eventually changed to once a month for each section of the Consent Decree—except for the Data Collection, Analysis, and Management section, where meetings were even less frequent. These meetings have tended to include long agenda items, static presentations, and a lot of participants. For this reason, these meetings often do not lend themselves well to open and candid dialogue. As a result, many sections make more efficient progress through separate, ad hoc meetings with smaller agendas and fewer attendees.

We believe that the larger monthly meetings continue to serve an opportunity to reach internal and external consensus. In late 2023, we recommended, for example, including recurring agenda items that address the status of all outstanding requests for data and information—with the expectation that the requests will be responded to by the following monthly meeting. The old request and response process relied too heavily on people who are separated from the purpose of the request and the custodians of the data or information. There were several occasions, for example, where CPD members would agree to send information in response to a request from the IMT, but sometimes weeks or months after the request, the IMT will receive a response that the information is unavailable, that the request is unclear, or that the information is "confidential."[30] Likewise, adding requests to an already long list of responsibilities for City and CPD personnel can

---

[30] As referenced above, the Consent Decree process is not litigation, and the IMT is a representative of the Court. Confidentiality is not a reason to withhold information during the Consent Decree process. *See* ¶¶684 ("The City and CPD will ensure that the Monitor has prompt access to all City and CPD documents and data related to the Agreement that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement, except any communications, documents, or data to which access is limited or precluded by court order, or protected by the work product doctrine or the attorney-client privilege (collectively,

have diminishing returns. Direct discussion regarding requests and productions during these meetings have allowed and hopefully will continue to allow for a direct dialogue regarding the prioritization and fulfillment of each request.

We also recommended changes to ensure that smaller meetings occur regularly across each section of the Consent Decree. This includes, for example, increasing opportunities for technical assistance and collaboration.

Smaller meetings also permit the Parties to streamline the review processes for policies, training materials, and plans. Currently, those processes are structured based on written, often lengthy feedback processes, which often delay discussion and agreement. For this reason, we have recommended emphasizing the consultation process—which is required by Consent Decree paragraphs ¶¶627, 632–33, 639, and 641—to ensure that the final draft submitted by the City is less likely to receive objections from the IMT or the OAG—or at least include a narrower set of issues that are more easily resolved.

To this end, and as described in more detail in the next section, we have recommended moving away from one-size-fits-all timelines to assist with a more collaborative approach, where review periods are based on mutual priorities and more explicit expectations for how materials fit into the City and the CPD's overall policy and training schedules. When timelines are necessary, the Parties and the IMT can set schedules with mutual expectations that prioritize substance.

If concerns about delay occur, the Parties and the IMT will be able to more readily raise timing issues during the more regular meetings with the Court. In fact, in late 2023, the Parties, the IMT, and the Court began to have monthly meetings, where such issues can be raised and efficiently addressed.

We believe that these new processes have been effective and could be reflected in the Consent Decree. Further, given the successful coordination with the City, the CPD, the OAG, the IMT, and the Court, the IMT recommends that other City entities mirror those processes. This could include the Parties resolving the longstanding disagreement regarding the review procedures for other City entities, such as the

---

'privilege'") and 685 ("685. Privilege may not be used to prevent the Monitor from observing training sessions, disciplinary hearings, or other CPD, COPA, or Police Board activities or proceedings that do not involve the provision or receipt of legal advice. The City is not required to provide the Monitor with access to documents or data that is privileged. Should the City or CPD decline to provide the Monitor with access to communications, documents, or data based on privilege, the City or CPD will inform the Monitor and OAG that documents or data are being withheld on the basis of privilege which may, but need not be, in the form of a privilege log. If the Monitor or OAG objects to an assertion of privilege, the Monitor or OAG may challenge the propriety of the privilege assertion before the Court."). Although no Consent Decree change is necessary, the IMT also has recommendations for streamlining the process for productions for City entities.

OEMC. It is our hope that all City entities under the Consent Decree will benefit from the new process and that the compliance gains will be self-evident.

## Increased, Unobstructed Access to City and CPD Policies, Practices, Data, and Personnel

For increased coordination to work, the City must work to streamline access to enhance our understanding of personnel, processes, and operations. Since the Consent Decree began, the IMT has enjoyed considerable access—as required by ¶¶681–89—but far too often, the IMT and the OAG have received undue obstruction to City information.

Recently, we have seen significant improvement from the City and the CPD regarding access to information. And in May 2024, the City and the OAG filed an amended confidentiality order, which we hope further aids the OAG's access to information.

It is our hope that this progress will continue, accelerating the City and the CPD's path toward demonstrating full and effective compliance. *See* ¶¶715–17. We must, however, acknowledge the challenges that exist to work toward preventing those challenges from repeating themselves and to continue efforts where there is still room for improvement.

For example, the IMT, the OAG, and the public continue to work toward resolving barriers to access. While the IMT has seen marked improvement over access issues in the past year, any remaining or future issues must be quickly resolved.[31] The City and the CPD simply cannot accelerate compliance efforts—or reach full and effective compliance—without ongoing and increased levels of access, candor, and transparency.

## Expedited procedures for methodologies and achieving compliance

We have made several recommendations to revamp the reporting processes for the IMT and the City. In addition to monthly public status reports with Judge Pallmeyer, the IMT recommends that the City's status report include reachable priorities for the coming reporting period. The IMT will then respond to those priorities in the IMT's monitoring reports, and the Court, the IMT, and the Parties can discuss the City's efforts to meet those priorities at a select status hearing.

---

[31] Moreover, we have experienced hindered access when requesting data, visiting CPD facilities throughout Chicago to talk with City and CPD personnel or unnecessarily redacted files. For example, the IMT is often escorted or accompanied by City or CPD personnel, who observe the IMT as we endeavor to observe the CPD.

Based on ongoing conversations with the Parties regarding expectations and demonstrated compliance efforts, the IMT also intends to provide more timely updates of methodologies and compliance levels, which will permit the Parties and the IMT to publicly discuss compliance levels on a timelier basis. If the City and the CPD reach compliance with a paragraph, for example, the IMT would be able to publicly update compliance levels without needing to wait for the end of each six-month reporting period.

This should also help facilitate compliance efforts by removing any built-in incentives for the City and the CPD to produce as many documents as possible at the end of the reporting period. While six-month timelines can also encourage progress, it can also create circumstances where more long-term efforts receive less attention and where document productions near the end of the reporting period can create artificial gridlock in workflows at the City, the CPD, the OAG, and the IMT.

Likewise, if assessments occur on a rolling basis—with agreed upon timelines for review, dialogue, and assessment—the City and the CPD will also be able to address missed or lost compliance levels before the end of each reporting period and before each monitoring report.

Finally, the IMT has recently launched a revamped website and will continue to roll out updates for ease of access to the most up to date information on compliance efforts.

# Section III.
# Proposed Modifications
# to the Consent Decree

As referenced above, to recommend changes to the Consent Decree, we considered feedback, often conflicting, regarding potential changes to the Consent Decree. In some cases, we made tough and sometimes close decisions based on internal and external discussions. While many requests are not included, we suspect that additional modifications may still be in consideration for one or both of the Parties.

We further expect that the City, the City's relevant entities, the OAG, the Court, and Chicago's communities will have additional considerations in response to our assessment and recommendations. We look forward to continuing discussions with the Parties and to continued community feedback and input. We do not have pride of authorship and will work to ensure that any modifications made to the Consent Decree will be in the best interest of Chicago's communities and to an efficient path toward full and effective compliance.

In negotiating the Consent Decree, the Parties "consulted with community leaders, community members, police officers, police officer unions, civilian CPD members, advocates, and other concerned individuals who offered meaningful insights and recommendations for change." ¶7. As a result, the Consent Decree "reflects the broad input received by the Parties from the diverse communities that make up the City of Chicago." *Id*.

For this reason, we have given deference to the original terms and intended outcomes of the original Consent Decree. We have not recommended changes to expand, shrink, or otherwise significantly alter the original intentions of the Consent Decree. Instead, all of our recommendations are intended to

(1) accelerate full and effective compliance with existing requirements and

(2) achieve and sustain the *intended results* with the original terms of the Consent Decree. *See* ¶¶657–59.

Specifically, for each section of the Consent Decree, we divided our recommendations into two types: (1) updates and (2) clarifications. *Recommended updates include substantive changes* to City requirements, because the IMT believes that

these recommendations will accelerate full and effective compliance *and* help achieve and sustain intended results of the Consent Decree. [32]

In comparison, *recommended clarifications include clarifications on existing requirements*, such as updating terminology or specifying existing procedures or paths toward compliance. These recommendations are intended to specify existing requirements (including incorporating requirements and processes described in subsequent Stipulations to the Consent Decree); remove redundances; avoid existing, recurring, or future disagreements on interpretation; and improve clarity, readability, and transparency. In our view, the recommended clarifications are already included in the Consent Decree, and the clarifications are not required. Even if these recommendations are not adopted, however, we believe that going through the process of considering and discussing these recommended modifications will inevitably help the Parties and the IMT have a better common understanding of current requirements.

As summarized above, within the 11 substantive sections of the Consent Decree, we have recommended changes to about 140 paragraphs, including substantive updates to about 40 paragraphs and clarifications to about 100 paragraphs. This includes adding about eight monitorable paragraphs and removing one monitorable paragraph, which if adopted, would modify the existing monitorable paragraphs from 622 paragraphs to 629 paragraphs or about 1%. The City and the OAG, however, may choose to incorporate all, some, or none of the IMT's recommendations.

We have summarized our recommendations for each section below. The Parties will ultimately decide what changes, if any, are incorporated into the Consent Decree. To the extent we can assist with such negotiations, we have provided potential redlines to the Parties that correspond with our recommendations.

---

[32] To determine the "intended results" of the Consent Decree, the IMT looked to the Consent Decree's "guiding principles," which were "intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements of this Agreement and the overall goals for each section" of the Consent Decree. *See* ¶757.

## Recommended Changes:
### Global Changes and Areas of Greatest Concern

We begin our list with global recommendations and reflect areas of greatest concern that that do not necessarily fall with any one section.

## Updates

We have recommended updating the Consent Decree to substantively address the following six areas of greatest concern:

- Applying Consent Decree Requirements and Principles to Traffic Stops

- Specifying Changes to Comply with the Illinois Police and Community Relations Improvement Act (PCRIA)

- Providing for Consistent and Progressive Discipline

- Specifying Procedures for the Coalition

- Incorporating the Community Commission for Public Safety and Accountability (CCPSA)

- Providing Regular Opportunities for Community Members to Observe CPD Training

1. CONSISTENTLY APPLYING CONSENT DECREE REQUIREMENTS AND PRINCIPLES TO ALL TRAFFIC STOPS
   (*See* GUIDING PRINCIPLES ¶¶8 – 10, 49–51, 83–85, 265–68, 342–46, 377, 379, 419–23, 566)

The IMT has long been concerned about the CPD's use of traffic stops and how they affect trust between the CPD and Chicago's communities. The original Consent Decree implicates all traffic stops (*see, e.g.*, ¶¶9, 17, 53, and 609), and the recent addition of investigatory stops explicitly includes such investigatory stops of vehicles. The Consent Decree could be revised, however, to more explicitly ensure Consent Decree requirements apply appropriately to all traffic stops, including consistent reporting, oversight, and prohibitions on discriminatory policing.

Traffic stops are a critical policing function and reflect a significant percentage of the interactions between the CPD and Chicagoans. For the Consent Decree's outcomes to be achieved, such interactions must be in accordance with the law, procedural justice, and community and officer safety. This will require improved and streamlined efforts in data collection, analysis, transparency, and community engagement.

In recent public hearings, the City, the OAG, the IMT, and the Court heard from various community members about whether and how traffic stops should be incorporated into the Consent Decree. We heard from many community members who wanted traffic stops in the Consent Decree and many others who did not, including community members who believed that the Community Commission for Public Safety and Accountability should provide the necessary oversight.

Section III, Figure 1. Public hearing flyers advertising opportunities for input about traffic stops on October 16, 2023, and June 11, 2024.





We believe that the Consent Decree should be modified to include all traffic stops to ensure consistency with existing related requirements and intended outcomes. Consistent with our recommendation below, we believe that the new CCPSA should also be explicitly incorporated into the Consent Decree, including a corresponding role with any new traffic-stop-related modifications to the Consent Decree.

### 2. Specifying Path for Complying with PCRIA
(*See* Guiding Principles ¶¶419–23)

Paragraph 492 requires the City to comply with the State of Illinois' Police and Community Relations Improvement Act (PCRIA), 50 ILCS 727/1-1 et seq. PCRIA requires that an external law enforcement agency investigate all officer-involved deaths, including those resulting from officer-involved shootings. Since the Consent Decree began in 2019, the City has not been compliant.

The IMT sees at least three potential solutions for the City's non-compliance with PCRIA, which include:

1. The Illinois State Police conducts all investigations of CPD officer-involved deaths.

2. The creation of a regional task force—possibly made up of officers from neighboring law enforcement agencies—to conduct all investigations of CPD officer-involved deaths.

3. Seek an exemption for COPA, the CPD, and the City of Chicago from PCRIA.

Finding a solution to this continued and complex problem is necessary to both bring the City into compliance with state law and to achieve Consent Decree compliance. The IMT stands ready to facilitate discussions to identify the best path forward and invites conversation among the Parties and other relevant stakeholder entities.

### 3. Providing for Consistent and Progressive Discipline
(*See* Guiding Principles ¶¶51, 250, 267, 345–46, 377, 419–23)

"Holding public servants accountable when they violate law or policy is essential to ensuring legitimacy and community confidence." ¶419. Several paragraphs of the Consent Decree require progressive discipline. *See* ¶¶238–39 and 643. The ability and willingness to identify repeat offenders and impose training and progressive discipline, when warranted, is necessary for the CPD to reliably and continuously improve.

Consent Decree ¶423 expands on accountability principles:

> *CPD members who commit misconduct are held accountable pursuant to a disciplinary system that is fair, timely and consistent, and provides due process.*[33]

In June 2022, the City of Chicago Office of Inspector General released *Fairness and Consistency in the Disciplinary Process for Chicago Police Department Members*, which found that the "policies and procedures used by BIA, COPA, and the Police Board for determining discipline are insufficient to ensure consistency and fairness."[34]

The IMT remains concerned with the current accountability system in the City of Chicago, including consistency and constructive feedback to officers from the first level of accountability: front-line supervisors. To date, there has been challenges implementing a clear disciplinary matrix, but regardless of the specific method, we urge the City, the CPD, and COPA to revise the accountability and disciplinary systems to ensure fairness, transparency, and consistency (*see* ¶¶423, 513).[35]

### 4. Specifying Procedures for the Coalition

Consent Decree ¶669 defines the Coalition as "certain community organizations that have established a broad-based community coalition ("Coalition") committed to monitoring, enforcing, and educating the community about this Agreement."

---

[33] *See also* ¶420: "A robust and well-functioning accountability system in which CPD members are held to the highest standards of integrity is critical to CPD's legitimacy and is a priority of CPD. A culture of accountability also promotes employee safety and morale, and improves the effectiveness of CPD operations. Organizational justice also plays an important role in ensuring that CPD members have confidence in the legitimacy of the system that holds them accountable.

[34] *See Fairness and Consistency in the Disciplinary Process for Chicago Police Department Members*, City of Chicago Inspector General (June 2022), https://igchicago.org/wp-content/uploads/2023/08/Fairness-and-Consistency-in-the-Disciplinary-Process-for-Chicago-Police-Department-Members.pdf.

[35] We note that any changes must be consistent with ¶711 ("Nothing in this Consent Decree is intended to (a) alter any of the CBAs between the City and the Unions; or (b) impair or conflict with the collective bargaining rights of employees in those units under the IPLRA. Nothing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate (i) the terms of the CBAs, including any Successor CBAs resulting from the negotiation process (including Statutory Impasse Resolution Procedures) mandated by the IPLRA with respect to the subject of wages, hours and terms and conditions of employment unless such terms violate the U.S. Constitution, Illinois law or public policy, or (ii) any bargaining obligations under the IPLRA, and/or waive any rights or obligations thereunder. In negotiating Successor CBAs and during any Statutory Resolution Impasse Procedures, the City shall use its best efforts to secure modifications to the CBAs consistent with the terms of this Consent Decree, or to the extent necessary to provide for the effective implementation of the provisions of this Consent Decree.").

Specifically, the Coalition comprises the plaintiff organizations in the *Campbell* lawsuit and the plaintiffs in the *Communities United* lawsuit. It also notes that the Parties "have entered into a Memorandum of Agreement ("MOA")" with the Coalition. Further, ¶709 notes that "the Parties have conferred certain rights on the Coalition relating to the enforcement of this Agreement."

Throughout the Consent Decree monitoring process, the Coalition has played an active role by filing motions to enforce the Consent Decree and seeking to actively participate in, for example, policy review processes. The Coalition members and attorneys have spent hundreds of hours voicing concerns about policies as members of the Use of Force Working Group and during meetings with the Parties and the IMT regarding G02-02, *First Amendment Rights*, and S04-19, *Search Warrants*.[36] *See* ¶¶627–37.

Many of these discussions have led to better understanding of differing positions, as well as improved policy language. These processes, however, have taken significant resources for periods that have extended beyond what any group intended.

The IMT believes that a more structured Consent Decree process could serve all involved.

5. INCORPORATING THE COMMUNITY COMMISSION FOR PUBLIC SAFETY AND ACCOUNTABILITY (CCPSA)

In July 2021, the Chicago City Council passed an ordinance creating a new entity for police oversight in Chicago. The ordinance created two entities: a citywide Community Commission for Public Safety and Accountability (CCPSA) and the District Councils, comprised of community members elected in each police district. Interim Commissioners were appointed in August 2022 and the District Council members were elected in February 2023.

Since the IMT (temporarily) and the CCPSA oversee the Chicago Police Department, it is important to clearly delineate roles and responsibilities. The CCPSA's ordinance includes some language that aims to clarify, at least in part, the roles in its "definitions" section:

> *"Policy" means any Department general order, COPA policy, or Police Board policy, to the extent that any said policy is not covered by or in the jurisdiction of the Consent Decree or otherwise identified by the U.S. District Court as falling within the scope of the Independent Monitor's mandate.[37]*

---

[36] The CPD ended its relationship with the Use of Force Working Group in 2024.
[37] Section 2-80-010 Definitions.

We welcome the addition of the CCPSA to Chicago's complex police accountability landscape. We recognize and look forward to a future of police accountability that—without the IMT—is led by the City, the CPD, COPA, the Public Safety Inspector General, the CCPSA, and Chicago's communities who will work together to identify, prioritize, and address police reform issues. Until the City and the CPD reach full and effective compliance with the Consent Decree, however, we are committed to working collaboratively alongside the CCPSA and independently monitoring Chicago's reform efforts and accountability systems.

As detailed further below, we have offered a few specific recommendations to the Consent Decree regarding CCPSA to enshrine its new responsibilities (selection of the CPD Superintendent and the nomination and criteria for selecting Police Board members, for example) and clarify the roles of Chicago's oversight agencies. This includes a process for the Parties and the IMT to enumerate Consent Decree policies during the life of the Consent Decree.

6. PROVIDING REGULAR OPPORTUNITIES FOR COMMUNITY MEMBERS TO OBSERVE CPD TRAINING
(SEE GUIDING PRINCIPLES ¶¶10, 51, 268)

Finally, the IMT recommends including a process for the CPD to provide community members access to observe and comment on CPD trainings. The City and the CPD may have concerns about maintaining appropriate confidentiality over some public safety information. To address such concerns, we recommend that the CPD control the process for access while simultaneously ensuring that the CPD consistently provides such access.

Thus, additional language could look something like the following:

> *Consistent with the purposes of this Agreement, subject to reasonable security precautions and protection of law-enforcement-sensitive information, the CPD will select and post opportunities for community members to observe and provide feedback on a wide cross-section of CPD training related to all sections of this Agreement. The CPD will consider community feedback in its ongoing efforts to evaluate and improve its training.*

The CPD's training should "reflect its commitment to procedural justice, de-escalation, impartial policing, and community policing" (¶266) and "convey CPD's expectations that officers perform their jobs diligently and safely, and have an understanding of, and commitment to, the constitutional rights of the individuals they encounter" (¶267). As a result, there is inherent value in Chicago's communities receiving access to CPD training that provides CPD officers and personnel with the realities and expectations of effective policing in Chicago. But such access—and opportunities for feedback—will also build "trust between officers and the communities they serve" and promote "community and officer safety." ¶2.

## Clarifications

In addition to the clarifications across each section of the Consent Decree, the IMT recommends the following global revisions to better reflect existing expectations, practices, and requirements:

- The IMT recommends that the parties consider separating some paragraphs to simplify and streamline requirements. Many paragraphs in the Consent Decree contain multiple subsections and independent requirements of multiple entities. Revising the language of some of these paragraphs, would allow the Parties and the IMT to measure requirements independently. We note, however, that these changes would create the artificial appearance of increasing the number of Consent Decree requirements, and any changes would have to be paired with corresponding public explanation of the changes.

- The IMT recommends that the Parties conspicuously identify paragraphs that are not monitorable. For example, non-monitorable paragraphs could start with "The Parties acknowledge…" or "The Parties agree…" This will help new readers identify which paragraphs include requirements on the City and which reflect existing agreement between the Parties. This will also help avoid future disagreements regarding interpretation of non-monitorable versus monitorable paragraphs.

## Recommended Changes: Introduction

## Clarifications

The IMT recommends clarifying the Introduction section to better reflect existing expectations, practices, and requirements:

- The IMT recommends updating the Introduction section to reflect all changes and stipulations since the start of the Consent Decree, such as the addition of the investigatory stops, protective pat downs, and enforcement of loitering ordinances section.

## Recommended Changes: Community Policing

### Updates

The IMT recommends updating the Community Policing section to include the following:

- A specific plan to publicly and timely release complete, accurate, and timely reports on the Community Policing Advisory Panel (CPAP) recommendations, as well as publicly release the report on a timely basis. *See* ¶13. (*See Guiding Principles ¶¶8–10*)

- Efficient coordination between the CPD, the District Advisory Councils, and the new District Councils. *See, e.g.*, ¶25. (*See Guiding Principle ¶8*)

- Updating language to reflect the changes to the City's use of School Resource Officers (ensuring that all CPD officers—regardless of unit—are sufficiently trained to interact with youth consistent with Consent Decree requirements, best practices, and CPD and community expectations). (*See Guiding Principles ¶¶8, 10–11*).

### Clarifications

The IMT recommends clarifying the Community Policing section to better reflect existing expectations, practices, and requirements:

- For ¶15, the IMT recommends clarifying that CPD personnel will review crime-reduction strategies implemented under their command *at least annually* to ensure the strategies "incorporate problem-solving techniques and are consistent with the principles of community policing."

- For ¶16, the IMT recommends clarifying that CPD Bureau of Patrol Area Deputy Chiefs and District Commanders *at least annually* review "district strategies for building community partnerships and using problem-solving techniques."

- For ¶37, the CPD should detail how each of the subparts of Paragraph 37 are incorporated into annual in-service training.

- Subject to any global changes regarding School Resource Officers, the CPD has attempted to finish its existing evaluation within 60 days of each school year, which has not been shown to be enough time to meaningfully evaluate and revise its policies and practices. The IMT recommends clarifying that the CPD may begin and finish this process earlier. *See* ¶¶41 and 43 (The IMT also recommends merging ¶¶41 and 43).

- The IMT recommends clarifying that the definition of "diversion" to include both "pre-arrest diversion" (sometimes referred to as "deflection) and post-arrest diversion. *See* Section XIII ("Definitions and Abbreviations").

---

## Recommended Changes: Impartial Policing

### Updates

The IMT recommends updating the Impartial Policing section to include the following:

- Procedures for distinguishing policies covered under the Consent Decree and currently with the Community Commission for Public Safety and Accountability's (CCPSA's). This will, among other things, avoid overburdening the CPD's Research and Development Division. For example, to help the CPD develop a roadmap to compliance with the Impartial Policing section, the IMT recommends that the Parties and the Monitor explicitly agree to the universe of policies that must be reviewed and, as necessary, revised to ensure non-biased policing in all spontaneous and routine law enforcement decisions. *See* ¶¶55–56. (*See* Guiding Principles ¶¶49–50)

- Reflect that the CPD has its own permanent Language Access Coordinator position (Special Order S02-03). *See* ¶65. (*See* Guiding Principles ¶¶49–50)

### Clarifications

The IMT recommends clarifying the Impartial Policing section to better reflect existing expectations, practices, and requirements:

- The IMT recommends adding the language regarding search warrants from the March 25, 2022 *Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance"* ("Search Warrant Stipulation).[38]

- The IMT recommends updating ¶53 consistent with changes to City Ordinance 6-10-100 and amendments that have taken place since the start of the Consent Decree.

---

[38] This stipulation is available on the IMT website: https://cpdmonitoringteam.com/wp-content/uploads/2024/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timeline.pdf.

- The IMT recommends clarifying that ¶81 no longer applies because the requirements were added to the Consent Decree in the June 2023 *Amended Stipulation regarding Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances* ("Investigatory Stop Stipulation").[39]

<br>

## Recommended Changes: Crisis Intervention

### Updates

The IMT recommends updating the Crisis Intervention section to include the following:

- Adding a clear path for the City and the OEMC to define "timely response" for the purpose of responding to calls for service identified as involving individuals in crisis. *See* ¶107. (*See* Guiding Principles ¶¶85–86)

- Publicly release Crisis Intervention data regarding the number and types of incidents involving individuals in crisis and responses of CPD officers. *See* ¶120. (*See* Guiding Principles ¶¶83, 85)

- The IMT recommends that the Parties—in consultation with the Chicago Council on Mental Health Equity (CCMHE) members—potentially revise corresponding requirements to ensure that the CCMHE is able to consistently and efficiently serve the purposes intended by the Consent Decree. The IMT recommends, for example, updating ¶128 to ensure consistent transparency and access to CCMHE meetings. (*See* Guiding Principles ¶¶85–86)

- The IMT recommends updating the Consent Decree to clarify the role of the City's Crisis Assistance Response and Engagement (CARE) team or similar responses or programs. *See, e.g.*, ¶131, 139. (*See* Guiding Principles ¶¶85–86)

- Changing the definition of "tele-communicators" to include *all* tele-communicators. This will help ensure that all tele-communicators are sufficiently trained to address calls involving individuals in crisis. *See* ¶789. (*See* Guiding Principles ¶¶85)

---

[39] The Investigatory Stop Stipulation is available on the IMT website: https://cpdmonitoring-team.com/wp-content/uploads/2024/03/2023.06.27-Amended-Stipulation-regarding-Investigation-Stops-Protective-Pat-Downs-and-Enforcement-of-Loitering-Ordinances.pdf.

## Clarifications

The IMT recommends clarifying the Crisis Intervention section to better reflect existing expectations, practices, and requirements:

- As workflows are currently allocated, various City entities have responsibilities in the Crisis Intervention section, including the CPD, the OEMC, the Chicago Fire Department, and the Department of Public Health. The Consent Decree broadly defines the City as "the City of Chicago, an Illinois municipal corporation, and any agent, agency, officer, employee, assignee, or successor thereof." ¶736. To avoid confusion and further delay—and to help streamline coordination—the IMT recommends that the Parties seek to clarify entity responsibilities, where possible. *See, e.g.*, ¶¶87, 130–32, 139.

- The IMT recommends clarifying the training cadence the CPD will utilize to ensure CIT officers remain current with best practices and CPD expectations. *See, e.g.*, ¶101.

- The IMT recommends clarifying training requirements for CIT Coordinators. *See* ¶116.

- Consistent with the above recommendation regarding workflows and responsibilities, the IMT recommends clarifying the review procedure for the OEMC's portion of the Crisis Intervention Plan. *See* ¶125.

- As referenced for the Community Policing section, the IMT recommends clarifying that the definition of "diversion" to include both "pre-arrest diversion" and "post-arrest diversion." *See* Section XIII ("Definitions and Abbreviations").

## Recommended Changes: Use of Force

## Updates

The IMT recommends updating the Use of Force section to include the following:

- Adding a paragraph, consistent with ongoing discussions, that creates realistic expectations and transparency for CPD reporting and supervision requirements in responses to crowds, including instances involving coordinated multiple arrests, and extraordinary circumstances. (*SEE* OBJECTIVES ¶¶153, 155–56)

- For firearm pointing incidents, (1) requiring supervisors to review the pointing officer's body-worn-camera footage and address any deficiencies before the

end of the tour of duty and (2) requiring unit commanders to, on a monthly basis, review firearm pointing data to address any patterns and trends. The IMT strongly believes that supervisors must be more involved in the review of firearm-pointing incidents, and the CPD must ensure that frontline supervisors play an immediate role in reviewing body-worn-camera footage of firearm pointing incidents. *See* ¶191. While the IMT agrees that supervisors have competing responsibilities, there are few priorities more important than investigating force and pointing incidents. In addition, requiring supervisors to review firearm pointing data—perhaps by adding such data to the Supervisory TRR Dashboard, as we recommended in *Independent Monitoring Report 8*—addresses patterns and trends.[40] (*SEE* OBJECTIVES ¶¶153, 155–56)

- Revising the definitions for levels of reportable uses of force to ensure accurate reporting, reviews, transparency, and appropriate accountability. *See* ¶218.[41] For example, as written, applying all Level 1s to handcuffed prisoners can be interpreted in a way that is overly broad and actually result in underreporting.

---

[40] Frontline supervisors must play a greater role before reducing the Tactical Review and Evaluation Division's (TRED's) involvement. TRED should continue to analyze and report on data collected from all firearm pointing incidents, but reducing the number of incidents that TRED reviews would alleviate the backlog issues that TRED operates under and still provide effective analysis of CPD operations. It is the IMT's understanding that the separate Firearm Pointing Dashboard is not accessible to districts/units at the present time. It has valuable information that should be utilized. The CPD's firearm pointing incidents policy has been in place for four years. The districts with the most pointings are the 7th District with 1,125 pointing incidents, the 6th District with 1,032 pointing incidents, and the 11th with 953 pointing incidents. A June 2020 Philadelphia Police Advisory Commission report that surveyed 13 major departments on reporting practices for firearm-pointing incidents identified 10 agencies that conducted reviews, and nine that conducted chain of command reviews (*e.g.*, incidents are reviewed by chain of command; some agencies only require immediate supervisor, whereas others mandate chain of command up to Captain). The CPD is the only agency with an investigative team reviewing (TRED). The IMT believes that a supervisor's review is more impactful to officers than a review that is more exhaustive but is provided 30 days after the fact and does not contain the complete context.

The CPD has committed to creating a pilot program that would implement such supervisor reviews of firearm pointing by the end of 2024. We appreciate this effort and believe that this practice will decrease the CPD's review backlog and will greatly improve firearm pointing reviews and supervision.

[41] The IMT recognizes that staffing is an issue in the CPD but the unavailability of supervisors to respond to Level 2 use of force scenes is a concern that impacts a number of requirements (for instance, identifying witnesses). In 2022, there was no immediate supervisory response to 27.6% of level 2 incidents, and in the first half of 2023, 36.78% of incidents did not have an immediate response. The CPD reports on these force incidents before the end of the tour of duty but are unable to quantify how quickly the supervisors respond. The IMT is concerned about whether districts with crime and force workload issues are provided with additional supervisory personnel. In addition, the IMT is concerned whether the CPD has identified supervisors' priorities and determined which issues require their immediate response.

The IMT recommends the Parties negotiate clear language that better ensures proper reporting and review. (*See* Objective ¶156)

- Revising the timeline for Force Review Board meetings to ensure that the CPD has sufficient information and attendance for holistic reviews, discussions, and when appropriate, recommendations "regarding any need for additional training or modifications to policies, tactics, equipment, or Department practice." ¶580. (*See* Objectives ¶¶155–57)

## Clarifications

The IMT recommends clarifying the Use of Force section to better reflect existing expectations, practices, and requirements:

- The IMT recommends updating ¶172 to reflect the CPD's adoption and implementation of a foot-pursuit policy.

- The IMT recommends updating ¶¶173 and 175 consistent with Illinois law.

- The IMT recommends updating ¶176 to reflect that CPD policy requires officers to report another officer's use of excessive force to a supervisor before the end of a tour of duty.

- The IMT recommends that the Parties revise ¶202 consistent with Illinois law. As it is required by Illinois law, the IMT believes that securing body-worn cameras should be a priority. The process of not viewing body-worn-camera footage before submitting a report must also be addressed.

- The IMT recommends updating terminology in the Use of Force section to reflect the CPD's use of that terminology. Specifically, the IMT recommends revising "responding supervisor" to "reviewing supervisor" and revising "reviewing supervisor" with "investigating supervisor" to match the terminology used in CPD policy. *See e.g.*, ¶¶ 222–26, 230–35. The IMT also recommends revising "supervisory review" to "supervisory investigation" to match the CPD duties. *See* ¶238.

- The IMT recommends further clarifying ¶234: TRED has done a good job of providing data on Tactical Response Reports (TRRs), but the IMT has not seen action plans from districts and units. The Supervisory TRR Dashboard provides an opportunity to address this, but data must be utilized at the district level.

- The IMT recommends moving use-of-force related paragraphs from the Data Collection, Analysis, and Management section to the Use of Force section for consistency and clarity. *See* ¶¶577–82.

## Recommended Changes:
### Recruitment, Hiring, and Promotion

### Clarifications

The IMT recommends clarifying the Recruitment, Hiring, and Promotion section to better reflect existing expectations, practices, and requirements:

- The IMT recommends that the Parties consider (1) revising the recurring deadlines within the Recruitment, Hiring, and Promotion section and (2) how the City and the CPD can create more specificity regarding disciplinary history for Sergeant and Lieutenant promotions. *See* ¶261.[42]

## Recommended Changes:
### Training

### Updates

The IMT recommends updating the Training section to include the following:

- Updating workflow responsibilities for the Training Division and the Training Oversight Committee ("TOC"). *See* ¶275–76. (*See* Guiding Principle ¶266)

---

[42] We note that any changes must be consistent with ¶711 ("Nothing in this Consent Decree is intended to (a) alter any of the CBAs between the City and the Unions; or (b) impair or conflict with the collective bargaining rights of employees in those units under the IPLRA. Nothing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate (i) the terms of the CBAs, including any Successor CBAs resulting from the negotiation process (including Statutory Impasse Resolution Procedures) mandated by the IPLRA with respect to the subject of wages, hours and terms and conditions of employment unless such terms violate the U.S. Constitution, Illinois law or public policy, or (ii) any bargaining obligations under the IPLRA, and/or waive any rights or obligations thereunder. In negotiating Successor CBAs and during any Statutory Resolution Impasse Procedures, the City shall use its best efforts to secure modifications to the CBAs consistent with the terms of this Consent Decree, or to the extent necessary to provide for the effective implementation of the provisions of this Consent Decree.").

## Clarifications

The IMT recommends clarifying the Training section to better reflect existing expectations, practices, and requirements:

- The IMT recommends revising "Education and Training Division" to "Training Division" to reflect the CPD's current terminology. *See, e.g.*, ¶¶271–72, 274–77, 280, 284, 287, 290–92, 304, 314–15, 322, and 325–26.

- The IMT recommends separating the requirements in ¶279 into two paragraphs so that the requirements can be tracked separately (disseminating training materials and displaying training materials at CPD facilities).

- For ¶284, the IMT recommends clarifying language to reflect that the Illinois Law Enforcement Training and Standards Board (ILETSB) provides instructor approval letters for ILETSB certified courses.

- Consistent with other Consent Decree requirements, ¶296 should reflect that the CPD should ensure that the Academy is sufficiently staffed for all requisite training.

## Recommended Changes: Supervision

## Clarifications

The IMT recommends clarifying the Supervision section to better reflect existing expectations, practices, and requirements:

- The IMT recommends that the Parties consider adding language to incorporate the CPD's supervision pilots, including a focus on the tracking of substantive supervision responsibilities. *See* ¶365. The requirements of the Supervision section are foundational to achieving and sustaining meaningful reform. The importance of effective, fair, and consistent supervision to the Consent Decree cannot be overstated. After the start of the Consent Decree, the City and the CPD identified the need to pilot supervision reforms, including the mechanism for ensuring a 10 to 1 supervision ratio. We believe that it could be helpful to modify the Supervision section to include the need for this pilot, as well as identifying incremental goals toward citywide implementation, such as tracking progress within particular districts. We believe, however, that any revisions should reflect that the pilot and the CPD's corresponding efforts cannot just aim for a ratio and must, instead, focus on measuring the substantive metrics for effective supervision.

- The requirements of the Supervision section are foundational to achieving and sustaining meaningful reform. The importance of effective, fair, and consistent supervision to the Consent Decree cannot be overstated. After the start of the Consent Decree, the City and the CPD identified the need to pilot supervision reforms, including the mechanism for ensuring a 10 to 1 supervision ratio. We believe that it could be helpful to modify the Supervision section to include the need for this pilot, as well as identifying incremental goals toward citywide implementation. We believe, however, that the pilot and the CPD's corresponding efforts cannot just aim for a ratio and must, instead, focus on measuring the substantive metrics for effective supervision.

- The IMT recommends revising ¶348 to reflect ongoing reviews of supervision policies and "to ensure that such policies set out clear responsibilities for supervisors to comply with the requirements" of the Consent Decree.

## Recommended Changes: Officer Wellness and Support

### Clarifications

The IMT recommends clarifying the Officer Wellness and Support section to better reflect existing expectations, practices, and requirements:

- The IMT recommends revising the title of the section to reflect that requirements also address wellness and support for non-sworn personnel and others directly and indirectly impacted by police duties. The IMT also recommends revising several paragraphs in this section to provide inclusive language for non-sworn, active, and retired CPD personnel and their families. *See, e.g.*, ¶¶377–79, 385, and 403.

- The IMT recommends updating ¶382 to reflect the appropriate cadence of the needs assessment to determine what resources are necessary to ensure the support services available to CPD personnel comport with best practices and mental-health-professional standards.

- The IMT recommends revising ¶384 to clarify the process for modifying the Officer Wellness Support Plan, along with clarifying a more regular cadence.

- The IMT recommends revising ¶386 to clarify when handouts with contact information for support services will be provided to CPD personnel.

- The IMT recommends revising ¶388 to reflect CPD timelines for the needs assessment, officer systems support plan, annual report to the superintendent, and the suicide prevention initiative.

- The IMT recommends making ¶390 a non-monitorable paragraph and merging the monitorable language into ¶391. The IMT also recommends revising this paragraph in accordance with the revised paragraphs above.

- The IMT recommends adding guidance within ¶394 to ensure CPD personnel have access to specialized counseling.

- The IMT recommends updating ¶397 to reflect City responsibilities.

- The IMT recommends making ¶398 a non-monitorable paragraph and merging the monitorable language into ¶399.

- The IMT recommends revising ¶409 to provide greater clarity regarding the CPD's existing practices.

- The IMT recommends moving paragraphs in this section related to CPD equipment and technology to the Data Collection, Analysis, and Management section and reflecting that change in the title of the section. *See* ¶415–17.

## Recommended Changes: Accountability and Transparency

### Updates

The IMT recommends updating the Accountability and Transparency section to include the following:

- Shortening the timeframe for initiating and making reasonable attempts to secure a signed complainant affidavit (including in-person visits, phone calls, and other methods) from 30 days to 15 days. *See* ¶463. (*See* Guiding Principle ¶423)

- Ensuring that Accountability Sergeants are situated to meet their responsibilities of receiving, processing, and investigating complaints against CPD members by revising ¶494 to ensure Accountability Sergeants' *only* responsibility is "receiving, processing, and investigating complaints against CPD members." (*See* Guiding Principle ¶423)

- Removing "undertake best efforts" in ¶¶508 and 514 to ensure investigatory and disciplinary records are retained electronically and that discipline recommended for sustained findings are applied consistently and without regard for the race of the complainant or the race of the involved CPD member. (SEE GUIDING PRINCIPLE ¶423)

- Require BIA to send the staffing and equipment-needs plans to the Superintendent and District Commander to ensure awareness of BIA needs. *See* ¶524. (SEE GUIDING PRINCIPLE ¶423)

- Require BIA, COPA, and the Police Board to periodically utilize external auditors and accreditors to independently demonstrate consistency and fairness. (SEE GUIDING PRINCIPLE ¶423)

## Clarifications

The IMT recommends clarifying the Accountability and Transparency section to better reflect existing expectations, practices, and requirements:

- The IMT recommends revising ¶429 to resolve confusion regarding officers' reporting responsibilities and the anonymous reporting website.

- COPA must communicate with complainants both electronically and via mail, if necessary. The IMT recommends revising ¶430 to ensure that if a complainant does not provide an email address and instead provides a mailing address, COPA will communicate through that communication method.

- The IMT recommends updating terminology to reflects the change in names for City Council Committees. *See* ¶473.

- The IMT recommends moving ¶635 from the Implementation section into the Accountability and Transparency section: "CPD will provide a mechanism to electronically access approved and published department-wide directives in a usable, organized, and searchable format."

- The IMT recommends moving ¶643 from the Implementation section into the Accountability and Transparency section: "CPD members who violate policies, procedures, orders, or directives that are required by this Agreement or that implement its provisions will be held accountable by CPD and the City, including through CPD's progressive discipline process."

- The IMT recommends revising this section to reflect current City entity responsibilities, including the addition of the CCPSA. *See, e.g.*, ¶¶525, 532–33, 565.

- Paragraph 545 required that the City, with limited and enumerated exceptions, make "each CPD policy and directive" publicly available" by mid-2019. To monitor compliance with this paragraph, it is crucial that that the IMT and the OAG receive a list of policies that the CPD believes to be exempt from public posting, to ensure opportunities to address disagreement. To ensure that this process begins as soon as possible, the IMT recommends that the Parties add a specific process to ensure that policies and directives are made public, as appropriate.

## Recommended Changes:
### Data Collection, Analysis, and Management

### Updates

The IMT recommends updating the Data Collection, Analysis, and Management section to include the following:

- Updating ¶570 to reflect current best practices related to data sharing between the CPD and COPA. (*See* Guiding Principles ¶¶566–67)

- Adding a regular audit of the CPD's electronic system to ensure that it is valid and reliable. (*See* Guiding Principles ¶¶566–67)

- Revising ¶588 to include specific criteria for the automated electronic system for the early intervention system: "The criteria *shall* be based on *(1)* a single indicator, such as the number of misconduct complaints against an officer, *(2)* a combination of multiple indicators *across similarly situated officers, and (3)* an algorithmic scoring model *that statistically and reliably identifies patterns indicating at-risk behavior*. CPD will adjust the criteria as necessary based on data and experience to ensure interventions and support are optimally targeted." (Recommended language in italics). (*See* Guiding Principles ¶¶566–67)

- Requiring regular meetings with relevant personnel across City entities will facilitate the necessary coordination to identify and implement paths toward compliance. The IMT has often received conflicting information from City entities regarding data collection, verification, and assessment responsibilities. Because these responsibilities are ultimately City requirements, the IMT believes that more regular meetings with relevant personnel across City entities will facilitate the necessary coordination to identify and implement paths toward compliance. With this paragraph, the IMT does not intend to create an arbitrary meeting requirement. Instead, the purpose of these meetings is to ensure that there is an understanding across the City entities, the Parties, the IMT, the Court, and public regarding the City's path toward providing police

services that are data-driven and self-regulating. (*See* Guiding Principles ¶¶566–67)

## Clarifications

The IMT recommends clarifying the Data Collection, Analysis, and Management section to better reflect existing expectations, practices, and requirements:

- The IMT recommends updating "Force Review Unit" to "Tactical Review and Evaluation Division" (TRED) to match the current name. *See, e.g.*, ¶¶575.

- The IMT recommends revising ¶576 regarding random audits of body-worn and in-car camera recordings of incidents to including language to create review procedures related to the Crisis Intervention Section.

- The IMT recommends that ¶586 more explicitly identify circumstances for early identification: "A primary goal of the automated electronic system will be to facilitate early identification of *(1)* officers at elevated risk of being involved in certain types of events*, (2) officers who meaningfully and statistically differ from other officers on performance-related metrics (e.g., use of force or complaints), or (3) officers that demonstrate behavior indicating a need for supervisory intervention,* so that the officers can receive tailored interventions intended to reduce such risk. . . ."

- The IMT recommends clarifying that the CPD's required "regular" review of citywide and district-level data regarding reportable uses of force occur, at least, annually. Likewise, the IMT recommends clarifying that the results of the review will be made public. *See* ¶¶572–73.

- The IMT recommends specifying a cadence for soliciting input and feedback from collective bargaining units during the development and implementation of the early intervention system. *See* ¶601.

- The IMT recommends moving use-of-force related paragraphs from the Data Collection, Analysis, and Management section to the Use of Force section for consistency and clarity. *See* ¶¶577–82.

- The IMT recommends moving paragraphs related to equipment and technology from the Officer Wellness and Support section the Data Collection, Analysis, and Management section and reflecting that change in the title of the section. *See* ¶415–17.

## Recommended Changes:
### Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances

### Clarifications

The IMT recommends clarifying the Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances section to better reflect existing expectations, practices, and requirements:

- The IMT agrees with the community feedback that recommended removing the word "solely" from ¶806, which otherwise risks a significant misunderstanding of what is required for the City and the CPD.

- Consistent with other stipulations, the IMT recommends moving this section into the Consent Decree between the Data Collection, Analysis, and Management section and the Implementation, Enforcement, and Monitoring section. This will ensure that these requirements are easily accessible and referenced along with other requirements. (This will also require moving applicable definition paragraphs to the definition section for clarity and ease of access. *See* ¶¶876–77.)

## Recommended Changes:
### Implementation, Enforcement, and Monitoring; and Definitions and Abbreviations Sections

Based on lessons learned since the start of the Consent Decree, the IMT has made several recommended changes to Consent Decree processes to facilitate coordination, efficiency, and full and effective compliance. As a result, unlike other recommendations, most of the recommendations in this section will only work if there is universal buy-in with the IMT, the City, and the OAG. Many of these changes could occur now with agreement between the Parties and without a change of Consent Decree language.

### Clarifications

- The IMT recommends clarifying the procedures for ensuring reasonable fees and costs. *See* ¶¶617–18. Monitor has provided the Court with budget information during various meetings. To ensure clarity, the IMT will provide the Court and the City with written budgets. Moreover, early on, the IMT struggled to operate during this monitoring project due to considerable lags in payment. Recently, the City Department of Law has set up an electronic system to ensure

a consistent payment schedule. The IMT recommends clarifying a payment schedule and memorializing it in the Consent Decree the IMT's current process of posting paid invoices on its website. *See* ¶¶617–19, 621.

- The IMT recommends revising ¶620 to reflect that the Monitor may not need resources such as office space and reasonable office support.

- The IMT recommends revising ¶622 to reflect that the Parties may raise feedback with the Monitor, each other, and the Court at any time.

- The IMT recommends streamlining the Consent Decree's policy review process:

  ○ Identifying all policies, procedures, and written guidance subject to the Consent Decree and identifying policies, procedures, and written guidance subject to CCPSA oversight.

  ○ Emphasizing and clarifying the preliminary development and review process for policies, procedures, and written guidance to emphasis consultation with the community, the OAG, and the IMT.

  ○ Creating a review process that is less bureaucratic and permits the Parties and the IMT to provide feedback in both written and oral responses. More consistent opportunities for collaboration will help to ensure that the stages of the review process—and which entity is next to provide a response—are clear. This could include, for example, developing processes to clearly distinguish between consultation drafts, "final" drafts, and previously approved drafts, which will follow different procedures and timelines to optimize development, review, and implementation timelines.

  ○ Providing clear guidance on how the City and the CPD may expedite review procedures by requesting reasonable review timelines that the City and the CPD will also follow. The IMT's recommendations are intended to make review procedures more efficient, and the Parties and the IMT should continue to have the option to raise timing concerns to the Court at any time. In fact, as the Parties have scheduled monthly settlement conferences with the Court, any timing concerns may be easily raised on a regular basis.

  ○ Clarifying the public comment period to maximize opportunities for feedback and engagement. This should include, for example, (1) a specific feedback loop to the Consent Decree review process, (2) clarifying a process for identifying policies and procedures that are exempt from the public review process (*see* ¶¶634–36), (2) specifying the CPD's mechanism for recurring

and ongoing community review and input, and (4) accounting for City holidays when posting policies for public comment by extending the review period accordingly.

o Updating the language regarding internal policy review procedures to reflect the use of existing mechanisms for ongoing feedback and improvement. For the CPD, for example, utilizes IMT surveys, TRED data, public feedback, audits, Force Review Board assessments, training evaluation.

o Clarifying that the exceptions to the review process are intended to be temporary. As a result, "temporary policies" should be fast tracked into standard review process to implement a policy through the formal process. *See* ¶631 (extraordinary circumstances exception).

- The IMT also recommends editing the policy review and training procedures under the Consent Decree for all relevant City entities, including COPA and the OEMC. As a result, edits to this section will also replace the January *2020 Stipulation Regarding the Policy and Training Review Process for the Civilian Office of Police Accountability (COPA)*.[43] These changes would not impact Consent Decree progress to date.

- Consistent with the above changes to the policy review process, the IMT recommends making similar changes to the training review process.

o Reflecting existing Consent Decree requirements regarding community consultation in one place. This should include community feedback for the Impartial Policing section (¶52) and from the Training Advisory committee and decentralized community engagement efforts. It should also include reference to COPA's working group of community stakeholders.

- Consistent with the above changes to the policy and training review processes, the IMT recommends making similar changes to the review process for implementation plans. This should include updating language to reflect when non-CPD entities are responsible for Implementation Plan. *See* ¶638–40.

- The IMT recommends clarifying that the IMT may determine that certain monitorable paragraphs do not require policy, training, and implementation metrics. For example, the IMT has recommended merging several paragraphs that separate these requirements, but if those revisions are not addressed, this paragraph will permit the IMT to close such paragraphs. This will increase clarity

---

[43] This stipulation is available on the IMT website: https://cpdmonitoringteam.com/wp-content/uploads/2024/03/2020.01.30-Stipulation-Regarding-the-Policy-and-Training-Review-Process.pdf.

and transparency by allowing the City, the OAG, and the public to focus on remaining substantive reform efforts. *See* ¶642.

- The IMT recommends merging the required annual Monitoring Plan into the semiannual monitoring reports. *See* ¶652.

- The IMT recommends changes to the Consent Decree methodology and compliance review process to improve clarity, efficiency, timeliness, and transparency. The IMT submitted proposed methodologies for the review or audit of every original monitorable paragraph of this Agreement to the Parties for several consecutive monitoring periods. We will remain open to discuss the methodologies and may make reasonable modifications to the methodologies so that the City and its entities may continue to move toward full and effective compliance with the Consent Decree as efficiently as possible. Moving forward, we recommend something like the following process:

  - If we determine that changes to the methodologies are required and that those changes require the City to produce more evidence of compliance than previously identified for a particular compliance level, we will provide at least one reporting period notice before removing any level of compliance. *See* ¶655.

  - We recommend that when the City provides evidence of compliance, the City will identify how the production demonstrates compliance with the requirement consistent with our existing methodologies. The City may propose a modification to our methodologies, explaining the reason for the methodology change and how the modification still demonstrates that the City has incorporated the City requirement into Consent Decree policy, training materials, and practice.

  - If we determine that the City has demonstrated a level of compliance with a requirement, we will provide written notice to the City and the OAG of what level of compliance the City has demonstrated and for which Consent Decree paragraphs and requirements. The City and the OAG may raise any concerns regarding our assessment and determination within 30 days, and the City, the OAG, and the IMT will meet to discuss those concerns. If we agrees to retract the determination, we will provide written notice to the City and the OAG. Otherwise, we may immediately publicly release our compliance assessment and determination, including on our website, during meetings with the community, in public reports, and during public hearings in federal court.

  - The City, the OAG, and the IMT will maintain communications to avoid any ambiguity, to identify next steps, and to efficiently identify plans toward compliance.

- ○ Likewise, if we determine that the City has lost a level of compliance with a requirement, the IMT will provide written notice to the City and the OAG of what level of compliance the City has lost, for which Consent Decree paragraphs, and the reason compliance levels were lost. The City or the OAG may raise any concerns regarding the IMT's determination within 30 days, and the City, the OAG, and the IMT will meet to discuss those concerns. If the IMT agrees to retract the determination, the IMT will provide written notice to the City and the OAG. Otherwise, the IMT will provide the City with at least 60 days from the original notice to demonstrate compliance. If the City does not do so, the IMT may publicly release the IMT's compliance assessment and determination, including on its website, during meetings with the community, in public reports, and during public hearings in federal court.

- With a reemphasis on coordination, the IMT anticipates that there may be increased requests for technical assistance. To set clear expectations, the IMT recommends providing more detail and clarity regarding how that process should work. *See* ¶656.

- The IMT recommends clarifying that the Consent Decree could terminate before the next Comprehensive Assessment. *See* ¶660.

- The IMT recommends updating the Consent Decree consistent with previous discussions to streamline the IMT reports, including an anticipated cadence for IMT reports. *See* ¶¶661–63.

- Now that the Office of Inspector General (OIG) and Deputy Public Safety Inspector General (PSIG) have reached full and effective compliance, the IMT recommends adding ongoing coordination meetings and adding a process to provide the OIG or PSIG with alternative review, assessment, or auditing functions. *See* ¶667.

- The IMT recommends clarifying access requirements to ensure that the City and relevant City entity personnel maintain consistent channels for communication and coordination. This could include language similar to the following: "To facilitate effective and timely communication, and consistent with the access requirements in the Consent Decree, the Monitor may schedule specific meetings with specific individuals, including with those with the authority to make decisions, and limit the number of people in attendance to ensure open and productive discussion. In general, the City, the CPD, and other City entities will make a select group of decision-makers available to the monitoring team as needed—in addition to larger group meetings—for open and cooperative discussion."

- The IMT recommends explicitly adding the public hearing schedule to the Consent Decree. This could include language similar to the following: "The Court, the Monitor, and the Parties will endeavor to have monthly status hearings to provide the Court and the public with updates on ongoing compliance plans and efforts. The Court, the Monitor, and the Parties will also endeavor to permit public comment at these hearings on at least one hearing per quarter. The Monitor will provide information on how to sign up for such public comments on the Monitor's website. The Court, the Monitor, and the Parties will work to provide a schedule and corresponding topics for these public status hearings well in advance of each hearing. At least twice a year, the Parties and the Monitor will present on the City's ability to meet the City's priorities (from the previous status report) and the Monitor's priorities (from the previous monitoring report). The Court and the Monitor may also add or change topics for the status hearings at any time, including the addition of standing agenda items."

- The IMT recommends clarifying that collective bargaining representatives may choose not to meet with the IMT. *See* ¶671. The IMT, however, will continue to meet regularly with CPD officers and continue to make ourselves available to collective bargaining representatives.

- The IMT recommends revising the City's Status Report to reflect priorities for the next reporting period. *See* ¶680. Specifically, the IMT recommends that the status report include

  (1) the reform efforts taken by City entities during the reporting period;

  (2) City entities' assessment of the status of their progress implementing this Agreement;

  (3) the City's priorities for the upcoming reporting period, including compliance efforts that the City intends to achieve and a plan to achieve those priorities; and

  (4) whether the City achieved the City's priorities (from the previous status report) and the IMT's priorities (from the previous monitoring report) for the current reporting period, including the reasons priorities were not met and the plans to achieve them.

  At least one of the monthly status hearings in the following reporting period with the Court should address the City's status report.

- The IMT recommends clarifying that ¶686 relates to OAG access (IMT access is addressed separately).

- The IMT recommends streamlining the process for receiving requested data and information under the Consent Decree. The IMT believes that this process would also benefit by being made a consistent agenda item during monthly section meetings. *See* ¶687.

- The IMT recommends providing additional details regarding the enforcement proceeding process. *See* ¶695. For example: "the cure period shall be 30 days if the OAG determines that the City and CPD have failed to comply with the City or Monitor's priorities (as set out in the City's status report and the Monitor's monitoring report)."

- The IMT recommends removing ¶712 as it was incorporated into the Investigative Stop Stipulation.

- The IMT recommends updating language per the stipulation that extended the intended end date of the Consent Decree and the stipulation that added investigatory stops, protective pat downs, and enforcement of loitering ordinances to the Consent Decree.[44] *See* ¶¶714–15.

- The IMT recommends clarifying that aspects of ¶721 apply to the City and other relevant City entities besides the CPD: "721. Prior to termination of this Agreement, *the City, the* CPD*, and the City's other relevant entities* will develop a plan, in consultation with the Monitor and OAG, to conduct compliance reviews, audits, and community surveys deemed necessary and appropriate following the termination of the Consent Decree. CPD will publish the plan for continuing assessments on CPD's website."

---

[44] These stipulations—along with all other stipulations—are available on the IMT website: https://cpdmonitoringteam.com/reports-information/.

# Conclusion

The Consent Decree is a product of years of discussion, effort, and lessons learned. Through dedicated personnel and engaged community members, the City, the CPD, and other City entities have made meaningful changes to the Chicago Police Department.

This report concludes the IMT's comprehensive assessment of the Consent Decree to date. All of our previous reports demonstrate that there is much work to be done. It is our hope that our recommended changes to the Consent Decree will expedite tangible reform for the betterment of our city, its public servants, and its communities. And we look forward to monitoring any of the changes the City and the OAG choose to make.

Conclusion, Figure 1.
The Consent Decree's Comprehensive Assessment Process (¶¶657–59)



| Comprehensive Assessment | State of Illinois and City of Chicago | Judge Rebecca Pallmeyer |
|---|---|---|
| IMT assesses City's progress and recommends changes to the Consent Decree | The Parties discuss recommended changes; once in agreement, seek Court's ruling | The federal judge rules, possibly resulting in an amended Consent Decree |

Independent | Chicago Police
Monitoring Team | Department
Consent Decree