**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **STATE OF ILLINOIS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-cv-6260** |
| **CITY OF CHICAGO,** | **Judge Rebecca R. Pallmeyer** |
| **Defendant.** | |

## INDEPENDENT MONITORING REPORT 10

The Independent Monitor Margaret A. Hickey and the Independent Monitoring Team submit the attached *Independent Monitoring Report 10*.

Dated November 19, 2024

/s/Margaret A. Hickey
Margaret A. Hickey
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
maggie.hickey@afslaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that, on November 19, 2024, she caused a true and correct copy of the foregoing *Independent Monitoring Report 10* to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

<div style="margin-left:40%">

/s/Margaret A. Hickey
Margaret A. Hickey
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL  60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
maggie.hickey@afslaw.com

</div>



# INDEPENDENT MONITORING REPORT 10

*(Reporting Period: January 1, 2024, through June 30, 2024)*

Report Date: November 19, 2024

Independent | Chicago Police
Monitoring Team | Department
Consent Decree



This report, *Independent Monitoring Report 10*, provides our compliance assessments for efforts between January and June 2024. As detailed in this report, the City of Chicago (City) and the Chicago Police Department (CPD) continued to increase their levels of compliance in various sections of the Consent Decree in those six months.

Some of the most significant progress in the tenth reporting period is not, however, immediately reflected in compliance levels. Most notably, the City and the CPD's investment in policy development, training, community engagement, and officer support paid significant dividends for the 2024 Democratic National Convention (DNC). Much of that preparation occurred in the tenth reporting period, but because the DNC did not occur until the eleventh reporting period, some of those efforts are not reflected in this report.[1]

Monitor Maggie Hickey

As we discussed in the September public hearing, this event demonstrated that the tireless and ongoing Consent Decree efforts by members of the City, the CPD, the Office of the Illinois Attorney General (OAG), and Chicago's communities are making a difference: the City and the CPD was better prepared for the DNC than they would have been before the Consent Decree.

Leading up to the convention, the City and the CPD worked closely with the OAG and other members of Chicago communities and stakeholders to ensure that the CPD's efforts would align with the Consent Decree and effective practices. Despite various internal and external perspectives and significant disagreements, the CPD incorporated meaningful feedback into its policies, trainings, and practices, including recommendations from our 2021 Special Report regarding the City's and the CPD's responses to protests and unrest in 2020.[2] This included, for example, updating, training on, and continuing to review its policies related to use of force—including the use of OC spray and batons—the First Amendment, body-worn cameras, supervision, and coordinated responses to large gatherings, including arrests and use-of-force reporting.

This also included employing more long term compliance efforts. For example, since the start of the Consent Decree, and after several challenges, the CPD has developed and continued improving the infrastructure to provide annual training. The CPD used this infrastructure to prepare officers for large gatherings, First Amendment activity, and the DNC. As a result, the CPD has trained an entire tier of officers on how to effectively protect and serve Chicago's communities—consistent with the Constitution and the Consent Decree—for one of the nation's largest political events.



Properly supported, these investments can continue to benefit Chicago not just for other large pre-planned events but in response to spontaneous challenges and everyday policing.

Chief Rodney Monroe, Ret.

---

[1] We will report more fully on how the City's and the CPD's DNC-related efforts demonstrated compliance in *Independent Monitoring Report 11*.

[2] *See Special Report: The City of Chicago's and the Chicago Police Department's Responses to Protests and Unrest under the Consent Decree (May 2020 – November 2020)*, INDEPENDENT MONITORING TEAM (July 20, 2021) https://cpdmonitoringteam.com/wp-content/uploads/2024/03/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.



Dr. Theron Bowman

Unfortunately, the City is currently reporting a budget crisis, and there have been discussions and proposals that include cutting a significant portion of positions that are key to Consent Decree compliance.

Cutting these positions could end up costing Chicago more in the long-term while immediately stalling progress with the required Consent Decree reform efforts. A series of significant events led to the Consent Decree, and it will take more than one successful—albeit historic—convention to rebuild community trust. By design, full and effective compliance with the Consent Decree will take sustained effort and results. As evidenced above, some of the City and the CPD's compliance efforts are just starting to be felt.

Cuts to policy development, training, officer support, and community policing not only risk slowing the already-behind pace of reform—the cuts risk undoing the progress the City and the CPD have made to date. At only about 9% Full compliance with the original Consent Decree, the City should be accelerating the pace of compliance, not just fighting to maintain it.[3]

The Consent Decree requires the City to provide "necessary and reasonable financial resources necessary through steps or processes that can include the budget process to fulfill its obligations under this Agreement." Consent Decree ¶700.[4] Cities and police departments often choose to sacrifice much-needed comprehensive and sustainable reforms for short-term priorities. Under the Consent Decree, the City does not have that option: The City and the CPD are not permitted to police Chicago's communities without sufficient resources required to implement Consent Decree requirements, including those related to constitutional, effective, community, and impartial policing. And the City must provide the officer and personnel resources and support systems that are needed to perform at their best and to meet these high yet reasonable expectations.

Finally, we must acknowledge that officers continue to face "significant danger, high stress, and a wide spectrum of human tragedy" (Consent Decree ¶377). While we witnessed high officer morale during and after the DNC, the toll of everyday policing continues to be heavy. Earlier this month, Chicago was devastated by the tragic killing of Officer Enrique Martinez. Earlier this year, in April, Chicago lost Officer Luis Huesca to gunfire. In the CPD's latest annual report, the CPD identified 68 documented instances of an officer being shot or shot at in 2023, including the killing of Officer Andrés Vásquez Lasso in March 2023 and Officer Aréanah Preston in May 2023.[5] Persistent gun violence in Chicago raises the risks of police interactions for all involved. The challenge of policing in Chicago is also evident by the continued high level of officers who die by suicide.

As the City, the CPD, OAG, and the Court consider our recommended changes to the Consent Decree from our *Comprehensive Assessment*, we will work to ensure that the process continues to be guided by the fundamental Consent Decree goals and promise of promoting community and officer safety.[6]

---

[3] On June 27, 2023, in response to a Motion from the Parties, the Court added additional requirements to the Consent Decree regarding investigatory stops, protective pat downs, and enforcement of loitering ordinances.

[4] *See also* Consent Decree ¶706 ("The City is responsible for providing necessary support and resources to CPD to enable CPD to fulfill its obligations under this Agreement.").

[5] *See 2023 Chicago Police Department Annual Report*, CHICAGO POLICE DEPARTMENT (2024) at 180, https://www.chicagopolice.org/wp-content/uploads/2023-Annual-Report.pdf. The CPD reported 56 incidents of officers shot or shot at in 2022, 74 instances in 2021, and 79 instances in 2020. *Id*.

[6] *See Comprehensive Assessment, Part II*, INDEPENDENT MONITORING TEAM (October 11, 2024), https://live-chicago-imt.pantheonsite.io/wp-content/uploads/2024/10/2024.10.11-Independent-Monitoring-Team-Comprehensive-Assessment-Part-II-amended-and-filed.pdf.

# Monitoring Under the Consent Decree

In August 2017, the Office of the Illinois Attorney General (OAG) sued the City of Chicago (City) in federal court regarding civil rights abuses by the Chicago Police Department (CPD). The lawsuit led to a Consent Decree, effective March 1, 2019.[7] The same day, the federal court appointed Maggie Hickey as the Independent Monitor. Ms. Hickey leads the Independent Monitoring Team, which monitors the City of Chicago's progress in meeting the Consent Decree's requirements.

Paragraph 2 of the Consent Decree sets out its overall purpose, which has guided and will continue to guide our monitoring efforts:

> **2.** *The State, the City, and the Chicago Police Department . . . are committed to constitutional and effective law enforcement. In furtherance of this commitment, the Parties enter into this Agreement to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety. In addition, this Agreement seeks to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely. This Agreement requires changes in the areas of community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management.*[8]

---

[7]   For more information on the Consent Decree, see the Background section below. More information is also available on the Independent Monitoring Team's website (cpdmonitoringteam.com/) and on the Illinois Attorney General Office's Consent Decree website (chicagopoliceconsentdecree.org/about/).

[8]   We cite the relevant paragraphs of the Consent Decree throughout this Independent Monitoring Report. The Consent Decree is available on the Independent Monitoring Team's website: cpdmonitoringteam.com/wp-content/uploads/2024/02/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf. *See also Resources*, CHICAGO POLICE CONSENT DECREE ("Consent Decree Approved by the Court on January 31, 2019"), chicagopoliceconsentdecree.org/resources/.

**Table of Contents**

Executive Summary ................................................................. 1

Roadmap ............................................................................... 9

Background ........................................................................... 10

Compliance Activities and Assessments .................................. 12

    I. Community Policing ....................................................... 19

    II. Impartial Policing ............................................................ 24

    III. Crisis Intervention .......................................................... 28

    IV. Use of Force ................................................................. 42

    V. Recruitment, Hiring & Promotion ................................... 47

    VI. Training ....................................................................... 50

    VII. Supervision ................................................................ 53

    VIII. Officer Wellness & Support .......................................... 60

    IX. Accountability & Transparency ...................................... 66

    X. Data Collection, Analysis & Management ........................ 77

    XI. Investigatory Stops, Protective Pat-Downs &
    Enforcement of Loitering Ordinances ................................. 82

    XII. Implementation, Enforcement & Monitoring ................. 86

Conclusion,
Looking Ahead to *Independent Monitoring Report 11* ............... 94

Appendix 1 All Compliance Levels, By Paragraph ..................... 99

\*\*\*

Attachment A: Office of the Illinois Attorney General Comments
(November 6, 2024) ................................................................. 101

Attachment B: City of Chicago Comments
(November 13, 2024) ............................................................... 106

# Executive Summary

As the Independent Monitoring Team (IMT), we assess the City of Chicago's (City's) compliance with the requirements of the Consent Decree. Specifically, we assess how relevant City entities—including the Chicago Police Department (CPD); the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General, the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC)—are complying with the Consent Decree.[9]

This is *Independent Monitoring Report 10*. As in previous monitoring reports, this is an update to the Court and the public on compliance efforts during the tenth reporting period: from January 1, 2024, through June 30, 2024.[10] Among other things required by the Consent Decree, this report also includes the following:

- an updated compliance or status assessment from the previous reporting period;
- a summary of the principal achievements and challenges facing the City's compliance with the Consent Decree; and
- an updated projection of upcoming work for the City, the Office of the Illinois Attorney General (OAG), and the IMT. *See* ¶661.[11]

Per ¶661 of the Consent Decree, the IMT will issue semiannual reports until the Consent Decree ends—which is after the City has achieved full and effective compliance for each requirement for one to two years. *See* ¶¶693 and 714–15. With

---

[9]   As a party to the Consent Decree, the City is ultimately responsible for compliance. *See* ¶720. Unless otherwise specified, our references to the City typically include its relevant entities. *See* ¶736.

[10]   The Consent Decree generally prevents the IMT from making any public statements or issuing findings regarding any non-public information or materials outside of these reports (*see* ¶672). Because the Consent Decree will be in effect for a minimum of eight years, this is the tenth of at least 16 semiannual Independent Monitoring Reports. *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoring-team.com/wp-content/uploads/2024/03/2022.03.25-Stipulation-Regarding-Search-War-rants-Consent-Decree-Timeline.pdf. Each year, we file a Monitoring Plan that sets out what we will assess during the year, and we file two semiannual Independent Monitoring Reports. The Independent Monitoring Plans and Reports are available on the IMT's website. *See Reports and Information*, https://cpdmonitoringteam.com/reports-information/.

[11]   In August 2023, we filed the Monitoring Plan for Year Five, which outlined the projected monitoring efforts under the Consent Decree for Year Five (July 1, 2023, through June 30, 2024). The IMT's Monitoring Plan for Year Five is available on the IMT's website. *See Reports and Information*, Independent Monitoring Team (August 21, 2023), https://cpdmonitoring-team.com/wp-content/uploads/2024/04/2023.08.21-Monitoring-Plan-for-Year-5-filed.pdf. The Monitoring Plan for Year Six is included in the Conclusion section of *Independent Monitoring Report 9*.

the agreement of the Parties, this report, *Independent Monitoring Report 10*, is a continued attempt to streamline the reporting process. We now link to paragraph assessments for paragraphs where (1) the City has achieved additional levels of compliance, (2) the City has failed to maintain levels of compliance, or (3) the IMT is highlighting particular progress or lack of progress toward full and effective compliance. We look forward to feedback from the public and the Parties about how to further refine our reporting processes.

This report represents a six-month assessment of the City's compliance efforts from January 1, 2024, through June 30, 2024. It does not reflect all the efforts of the City, the CPD, or the other relevant City entities to date. While we report on the compliance efforts within defined reporting periods (*see* ¶661), we stress that work is ongoing by the City, its relevant entities, the OAG, the IMT, and Chicago's communities. In many cases, relevant City entities have continued to develop policies and train personnel after June 30, 2024, and before the date we submit this report. Importantly, we have not assessed efforts made after June 30, 2024, in this report. We will do so in the monitoring report for the eleventh reporting period (July 1, 2024, through December 31, 2024).

Under the Consent Decree, the City, the CPD, or other relevant entities are not in compliance with any of the requirements of the Consent Decree until the IMT determines that the City provided sufficient proof that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement—which in some cases it has—the City still has the additional burden of providing sufficient proof of its efforts with sufficient time for the IMT and the OAG to review the information.

We assess compliance at three levels: (1) Preliminary, (2) Secondary, and (3) Full. The Consent Decree requires the City and its entities to reach Full compliance and maintain that compliance for one to two years. *See* ¶¶714–15. These compliance levels allow us to share our assessments of the City's progress throughout the duration of the Consent Decree. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the reform in practice.[12] Because of the nuances of each Consent Decree requirement and each level of compliance, the City and its relevant entities must—in a timely manner— provide the IMT with evidence, including access to personnel, records, facilities,

---

[12] There are, however, many paragraphs that do not include policy or training elements. In those circumstances, the three levels may follow a different trajectory, such as (1) whether the City or its relevant entities have established the framework and resources to achieve the reform, (2) whether the City or its relevant entities have effectively communicated the reform to relevant personnel, and (3) whether the City or its relevant entities have appropriately implemented the reform.

and data to establish that they have achieved each level of compliance during the applicable reporting period.[13]



The current compliance level for each original monitorable paragraph is reflected in Appendix 1 (All Compliance Levels, By Paragraph). For the original monitorable paragraphs (552), the City has achieved at least Preliminary compliance with 504 paragraphs (or about 91%). Specifically, the City has achieved Preliminary compliance 249 paragraphs (about 45%), Secondary compliance with 203 paragraphs (about 37%), and Full compliance with 52 paragraphs (about 9%)–leaving 48 paragraphs with no levels of compliance (about 9%). Of those, the City is under assessment for Preliminary compliance with eight paragraphs.

Consent Decree Compliance with
Original Consent Decree Paragraphs
by June 30, 2024



- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

---

[13] Some requirements in the Consent Decree demand more effort to comply with than others. The number of requirements—and the amount of work necessary under each requirement—can vary substantially within each paragraph and topic area.

As reflected below, in the tenth reporting period, the IMT continued to assess new monitorable paragraphs in the recently added Investigatory Stops, Protective Pat-Downs, and Enforcement of Loitering Ordinances section of the Consent Decree. Specifically, as reflected below, the IMT assessed the City's compliance with 36 of these paragraphs in the tenth reporting period. By June 30, 2024, the City has Preliminary compliance with six paragraphs (¶¶834, 841, 857, 858, 859, and 873), Secondary compliance for four paragraph (¶¶835, 838, 854, and 856), and Full compliance with one paragraph (¶868). As a result, the City does not have compliance with the remaining 25 paragraphs under review to date. Of those, the City is under assessment for Preliminary compliance with all 25 paragraphs. In the coming reporting periods, the IMT will continue to assess additional monitorable paragraphs in this section until all 69 monitorable paragraphs are under review.

### Investigatory Stops, Pat Downs, and Loitering Compliance Progress by June 30, 2024



- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

Overall, including all monitorable paragraphs in the tenth reporting period, the City has achieved Preliminary compliance with 255 paragraphs (43%), Secondary compliance with 207 paragraphs (35%), and Full compliance with 53 paragraphs (9%)–leaving 73 paragraphs with no levels of compliance (12%).

## Major Developments and Principal Achievements and Challenges Impacting Compliance

In the Consent Decree, the City committed "to ensuring that police services are delivered to all of the people of Chicago in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of all of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety." The City also committed "to providing CPD members with the resources and support they need, including improved training, supervision, and wellness resources." ¶6.

Executive Summary Figure 1, below, provides a sample of principal achievements and challenges across the 10 topic areas of the Consent Decree.

Executive Summary Figure 1.    Sample of Principal Achievements & Challenges

| Section | Sample of Principal Achievements | Sample of Principal Challenges |
|---|---|---|
| Community Policing | • The CPD initiated changes in leadership at the Office of Community Policing and partially re-staffed positions and curtailed detailing staff to other assignments during this reporting period. This resulted in enhanced capacity by this Office in addressing Community Policing compliance requirements. <br><br> • The City—through the Department of Family and Support Services; the Mayor's Office of Community Safety; and the CPD—developed a plan to implement a year-long pilot project designed to provide meaningful alternatives to arrest for youth, including a more robust service delivery network and enhanced tracking of delivery of those recommended services. The CPD also continued to refine its Youth Intervention Policy for the citywide pilot. <br><br> • The CPD initiated the development of templates to document and track district-level partnerships. The draft templates represent a major step forward in identifying and tracking partnership activity at the district level as required by the Consent Decree. | • The CPD's updated community engagement strategy requires significant improvement to ensure a more comprehensive strategy for citywide community activities. <br><br> • The CPD continues to rely on Chicago Alternative Policing Strategy officers and District Coordination officers in some districts to engage in community outreach and problem-solving. <br><br> • The CPD Neighborhood Policing Initiative, an effort to expand problem-solving activities at the district level, is still limited to 10 police districts. <br><br> • The CPD should clarify its role in supporting school safety in light of the Chicago Board of Education's vote to remove all school resource officers. |
| Impartial Policing | • The City and the CPD produced and published the *2023 Annual Hate Crimes Report*. <br><br> • The City delivered trainings in support of compliance with several paragraphs within this section, including its *2024 Annual In-Service Supervisor Training*. <br><br> • The CPD produced its "Equity Framework," which established a foundation for ensuring fair and equitable policing throughout the CPD. | • The CPD still have not achieved a level of compliance with five paragraphs in the Impartial Policing section (62, 68, 69, 79, and 80). <br><br> • The CPD has not yet finalized General Order G01-03-01, *Community Engagement in Policy*,. |
| Crisis Intervention | • The CPD has significantly improved its training across the board (e.g., *Crisis Intervention Team (CIT) Recruit Concepts* and *Annual In-Service* trainings). | • Staffing levels in the Crisis Intervention Unit remain low. <br><br> • The CPD must establish a plan for implementing the Bureau of Internal Affair's (BIA's) review of voluntary Certified CIT officer eligibility data. <br><br> • OEMC must revise the *CIT and Mental Health Awareness* training. |

| Section | Sample of Principal Achievements | Sample of Principal Challenges |
|---|---|---|
| Use of Force | • The CPD provided analyses of patterns and trends in both the *2023 Annual Use of Force Report* and Tactical Review and Evaluation Division's (TRED's) *2023 Year-End Report*. Both reports included the CPD's actions to address emerging patterns and trends.<br><br>• The CPD revised and adapted policies, trainings, and reporting processes in preparation for the Democratic National Convention. | • The CPD has not revised D19-01, its Firearm Pointing directive in accordance with the two-year review and Court Order on Search Warrants that impacts the policy.<br><br>• TRED continues to fall behind in their efforts to reduce the backlog—despite attempts to hire officers and civilians to the unit—as the CPD continues to give TRED additional responsibilities.<br><br>• The CPD must revise and clarify its *Body Worn Cameras* policy, S03-14, consistent with the July 1, 2024 Court Order. |
| Recruitment, Hiring & Promotions | • The City and the CPD advanced compliance with requirements to evaluate Recruitment, Hiring, and Promotion processes by deploying and convening multidisciplinary internal committees. | • The CPD still struggles with staffing to meet the requirements of the Consent Decree. *See* ¶706. |
| Training | • The CPD successfully completed training for core CPD personnel deploying to the Democratic National Convention.<br><br>• The CPD advocated for and achieved approval to increase the cadre of Field Training Officers (FTOs).<br><br>• The CPD successfully trained several FTOs to participate in classroom training instruction. | • The CPD failed to achieve any significant compliance improvements in paragraphs related to evaluations.<br><br>• The CPD were unable to timely deploy the *2025 Training Plan* to allow review, approval, and adoption in coordination with the fiscal calendar. |
| Supervision | • The CPD produced "CPD & Me" newsletters for July 2023 through April 2024.<br><br>• The CPD produced the contents of the Tableau staffing dashboard, assignment sheets, transfer orders, and detail records. | • Staffing shortages prevented the Unity of Command and Span of Control Pilot Program districts from consistently meeting the 10-to-1 officer-to-supervisor ratio required for all districts by ¶360. |
| Officer Wellness & Support | • The CPD produced the combined *2023–2024 Annual Report to the Superintendent*.<br><br>• The CPD submitted their first wellness training curriculum for civilian members.<br><br>• The CPD began producing additional data (*i.e.,* referral data of several Professional Counseling Division groups) required by the Consent Decree to achieve further levels of compliance. | • The CPD still does not have a technology-based system to retain, track, and analyze key data points relevant to several paragraphs in this section and is still manually collecting this data.<br><br>• The CPD has not produced its Suicide Prevention Strategy.<br><br>• The Professional Counseling Division continue to face challenges documenting their respective groups' caseloads and wait times members face when requesting and receiving services. |

| Section | Sample of Principal Achievements | Sample of Principal Challenges |
|---|---|---|
| Accountability & Transparency | • The CPD made significant progress toward finalizing its Officer-Involved Shooting and Officer-Involved Death Incident policy series (G03-06, G03-06-01, and G03-06-02).<br><br>• COPA's People's Academy conducted its third cohort of the Academy, which continued to be an effective and valuable means of interacting and increasing transparency.<br><br>• The Police Board developed and finalized two policies and continued to demonstrate commitment to compliance with Consent Decree requirements.<br><br>• The Community Commission for Public Safety and Accountability (CCPSA) followed the established selection process and criteria to fill vacant positions on the Police Board.<br><br>• The City worked to hire a Director of Mediation within COPA to focus on staffing the mediation program and community engagement. | • Due to competing demands, no BIA trainings were provided in the tenth reporting period, and therefore, the CPD did not reach further levels of compliance for numerous paragraphs.<br><br>• Many Accountability Sergeants continue to have other responsibilities that significantly compete with their Accountability Sergeant duties, which should be their primary responsibility. *See* ¶494.<br><br>• COPA continues to work to collect and analyze evaluation data regarding its training and instructors to ensure quality training moving forward.<br><br>• Due to pending litigation between a police union and the City regarding arbitration of serious police discipline cases, the Police Board only heard cases in which the officer consented to the Police Board's procedures. |
| Data Collection, Analysis & Management | • The City and the CPD regained Preliminary and Secondary compliance with ¶570, which requires COPA to have access to CPD data systems as part of their investigations into use-of-force events.<br><br>• The City and the CPD achieved Preliminary compliance with ¶573 by providing a proposed methodology for conducting a citywide and district-level data analysis of use of force as required by ¶572.<br><br>• The City and the CPD achieved Full compliance with ¶577 through the Force Review Board's review of applicable reportable uses of force.<br><br>• The City and the CPD have made appreciable progress in developing the CPD's early intervention system (¶¶583–605).<br><br>• The CPD's Audit Division conducted an audit of 10,377 report narratives to evaluate the validity of use-of-force data. | • The CPD should develop a policy memorializing COPA's access to CPD data systems to ensure ongoing access and to maintain future compliance.<br><br>• The CPD has continued to struggle to incorporate decision-point analysis into Force Review Board practices. |

| Section | Sample of Principal Achievements | Sample of Principal Challenges |
|---|---|---|
| Investigatory Stop Reports, Protective Pat Downs, & Enforcement of Loitering Ordinances | • The City and the CPD submitted draft policies and forms for investigatory stops, protective pat downs, and enforcement of loitering ordinances that received no-objection notices.<br><br>• The CPD made significant progress on their needs assessment on the reporting and data collection mechanisms and system for investigatory stops, protective pat downs, and enforcement of the Loitering Ordinances. | • The City and the CPD continue working through some challenges with their data collection for Investigatory Stop Reports (ISRs) and navigating the use of systems that are not integrated with each other.<br><br>• The CPD needs to develop an effective community engagement strategy that allows for consistent community collaboration to receive direct community feedback. |

# Roadmap

We begin this report with a **Background** section that provides some historical context about the Consent Decree and the IMT. This section will help those who have not read or would like to reacquaint themselves with the background information from our previous reports and Monitoring Plans.

The next section, **Compliance Activities and Assessments**, provides the following information regarding the tenth reporting period:

❖ An overview of the IMT's assessment process and priorities for the tenth reporting period, including deadlines and status updates;

❖ A summary of the IMT's activities; and

❖ A summary of relevant compliance efforts for each topic of the Consent Decree.

Per ¶661, the links to specific paragraph assessments detail the IMT's compliance assessments for every monitorable paragraph for which the City gained compliance, the City lost compliance, or the IMT is highlighting for significant progress or lack of progress. (All original monitorable paragraphs were under review in the tenth reporting period and more information for each paragraph, including history and current compliance levels, are available in *Comprehensive Assessment Part I* (November 11, 2023)).

Finally, the last section, **Conclusion and Looking Ahead to *Independent Monitoring Report 11*** provides concluding remarks and a projection of the upcoming work in the eleventh reporting period.

# Background

## The Chicago Police Consent Decree

In December 2015, the U.S. Attorney General launched a civil-rights investigation into the CPD's policing practices. The U.S. Department of Justice released the results of its investigation in January 2017, finding a longstanding, pervasive "pattern or practice" of civil rights abuses by the CPD. Two separate class-action lawsuits followed: *Campbell v. City of Chicago* and *Communities United v. City of Chicago*.[14]

In August 2017, the OAG sued the City in federal court, seeking a Consent Decree that would address the DOJ's findings and recommendations. The case was assigned to federal Judge Robert M. Dow, Jr. The OAG then sought input from community members and Chicago police officers and negotiated the Consent Decree with the City.

In March 2018, the Parties to the Consent Decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')," which "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[15]

The OAG and the City then sought proposals for an independent monitoring team after posting a draft Consent Decree on the Chicago Police Consent Decree website. Judge Dow approved and signed a modified version of the Consent Decree on January 31, 2019. This Consent Decree provides a unique opportunity for feedback from Chicago communities and local stakeholders. The OAG oversees and enforces the Consent Decree. *See* ¶694. The Coalition has certain enforcement rights and meets with the independent monitoring team at least quarterly. *See* ¶¶709(a) and ¶669, respectively.

The Consent Decree requires action by the CPD and many other City entities. On March 1, 2019, the effective date of the Consent Decree, and after a competitive selection process, Judge Dow appointed Maggie Hickey, a partner at ArentFox Schiff LLP, as the Independent Monitor.[16] On October 11, 2022, Chief US District

---

[14]   *See Campbell v. Chicago*, N.D. Ill. Case No. 17-cv-4467 (June 14, 2017), and *Communities United v. Chicago*, N.D. Ill. Case No. 17-cv-7151 (October 4, 2017).

[15]   *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and Campbell v. City of Chicago Plaintiffs and Communities United v. City of Chicago Plaintiffs* (March 20, 2018), https://cpdmonitoringteam.com/wp-content/uploads/2024/02/executed_moa.pdf.

[16]   Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he will "help facilitate dialogue and assist the

Judge of the District Court for the Northern District of Illinois Rebecca R. Pallmeyer became the presiding judge over the Consent Decree. As the Independent Monitor, Ms. Hickey oversees the Independent Monitoring Team (IMT) and reports directly to Chief Judge Pallmeyer.

As the IMT, we (1) monitor the City's, the CPD's, and other relevant City entities' progress in meeting the Consent Decree's requirements and (2) offer assistance to the City, the CPD, and other relevant City entities to implement the changes that the Consent Decree requires.

Independent Monitor Maggie Hickey and Deputy Monitor Chief Rodney Monroe, Ret., lead the IMT. The IMT's 10 Associate Monitors, in turn, oversee the 11 topic areas of the Consent Decree. Our legal team, analysts, subject-matter experts, Community Engagement Team, and community survey staff provide support. This includes reaching out to and engaging with Chicago communities; providing administrative support; drafting reports, and collecting and analyzing policies, procedures, laws, and data, such conducting observations and interviews.

***

More information about the IMT is available on our website: https://cpdmonitoringteam.com/. Community members can reach out to the IMT via email: contact@cpdmonitoringteam.com.[17]

---

[OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree." About, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/about/. As the special master, Judge Coar also reports directly to Judge Pallmeyer.

[17] Learn more at the Contact Us page on our website (https://cpdmonitoringteam.com/contact/). Community members can also contact individual members of our Community Engagement Team: Joe Hoereth (Joe.Hoereth@cpdmonitoringteam.com), Norma Ramos (Norma.Ramos@cpdmonitoringteam.com), Laura McElroy (Laura.McElroy@cpdmonitoringteam.com), Steve Rickman (Stephen.Rickman@cpdmonitoringteam.com), and Denise Rodriguez (Denise.Rodriguez@cpdmonitoringteam.com)

# Compliance Activities and Assessments

This section provides an overview of compliance efforts for the tenth reporting period. This includes summaries of our activities during the reporting period, including community engagement activities; an explanation of compliance assessments; and summaries of compliance and compliance efforts for each topic area of the Consent Decree.

## Summary of IMT Activities in the Reporting Period

In the tenth reporting period, we continued to meet regularly with representatives from the City, the City's relevant entities, the OAG, and members of Chicago's communities, including members of the Coalition (*see* ¶669). This included regular meetings with the CPD and the Superintendent (*see* ¶668), settlement conferences, public status hearings, and site visits (*see* ¶681).

As with previous reporting periods, the IMT discussed the methodologies with the Parties before implementation and prior to conducting its audits and reviews for this report, acknowledging their concerns, and making adjustments for clarity.[18]

We also continued to adhere to several specific and ongoing requirements of the Consent Decree. Background Figure 1, below, summarizes our compliance with the Consent Decree's deadlines for the IMT in the tenth reporting period.

---

[18] For the IMT, these discussions often highlight the importance of maintaining flexibility in our methodologies throughout the monitoring process. This flexibility ensures that our monitoring efforts continue to meet the letter and spirit of the Consent Decree, as the Parties and the IMT develop necessary information, learn from previous efforts, and identify unanticipated hurdles. *See, e.g.*, ¶717. Changed circumstances, for example, may require the IMT to consider fewer, more, or alternative sources of information.

Background Figure 1:                    IMT Deadlines in the Tenth Reporting Period

| ¶s | Requirement | Deadline | Tenth Reporting Period Deadlines |
|---|---|---|---|
| 627–37 | Review of CPD Policies and Procedures | Various, Ongoing | Corresponds with policy deadlines |
| 638–41 | Review of Implementation Plans and Training Materials | Various, Ongoing | Corresponds with plan and training deadlines |
| 642–44 | Compliance Reviews and Audits | Various, Ongoing | Occur during each reporting period |
| 652–55 | Review Methodologies | 45 Days prior (and every reporting period) | May 16, 2024 |
| 656 | Technical Assistance and Recommendations | Ongoing | Ongoing |
| 668 | Maintain Regular Contact with the Parties | Ongoing | Monthly |
| 669 | Monitor will Participate in Meetings with the Coalition | Quarterly | Quarterly |
| 670–71 | Communication with the Parties, Collective Bargaining Representatives, and the Public | Ongoing | Ongoing |

## IMT's Community Engagement Activities

The IMT's Community Engagement Team plays a critical role by monitoring levels of trust and sentiment among members of Chicago's communities. The IMT's Community Engagement Team includes experienced Chicago community organizers, community researchers, experts in police-community relations, and academic scholars. Community Engagement Team meaningfully engages with Chicago's communities and ensure that community members participate throughout the monitoring process. The Community Engagement Team also works closely with the Monitor, the Deputy Monitor, and the Associate Monitors to assess the community components of compliance with the Consent Decree.

The IMT's Community Engagement Team performs two key tasks regarding the Consent Decree monitoring process: (1) gathering input from Chicagoans about their concerns regarding CPD policies and practices and (2) providing information to the Chicago community about the IMT's activities and findings.

The IMT's Community Engagement Team's work is vital to measure compliance with specific policy, training, and procedural changes required by the Consent Decree. The Community Engagement Team encourages improved relationships

based on respect, trust, and partnership and emphasizes how relationships may be strengthened by transparency and accountability.

In the tenth reporting period, we also sought to hear sentiments from a broad range of Chicagoans. Judge Rebecca Pallmeyer also held public hearings on March 12, 2024, featuring public comments regarding their concerns, observations, and ideas about CPD reform, and June 11, 2024, featuring public comments regarding traffic stops.

We also hosted a Virtual Listening Session on March 19, 2024, in partnership with the Center on Halsted. Chicagoans shared their thoughts and concerns about Chicago policing with Independent Monitor Maggie Hickey, Deputy Monitor Rodney Monroe, and members of the IMT's Community Engagement Team. We also hosted an in-person Community Listening Session on June 25, 2024, in partnership with the Coalition for a Better Chinese American Community (CBCAC).[19]

Figure 3. IMT Listening Session Flyers (March 19 and June 25, 2024)

 

The IMT also attended and presented an overview of the Consent Decree at several District Council meetings throughout this reporting period. We visited District 20 on July 8, 2024; District 15 on May 9, 2024; District 9 on April 24, 2024; and a combined meeting of Districts 17, 19, 20, and 24 on February 28, 2024.

We also issued periodic newsletters, emails, and news releases to update community stakeholders on our monitoring activities.

---

[19]    We greatly appreciate our partners' generous hospitality.

Figure 4.
Examples of IMT Newsletters sent between January 1, 2024 and June 30, 2024







## Compliance Assessments

As reflected above, and in accordance with ¶¶661–62 and 642, the IMT assesses how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: **(1) Preliminary compliance**,[20] **(2) Secondary compliance**,[21] and **(3) Full compliance[22]**. The CPD and other City entities will not be "in compliance" with a requirement until they reach Full compliance for the requisite length of time required by the Consent Decree—either one or two years. *See* ¶714.

These levels typically correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice.

---

[20]  Preliminary compliance typically refers to the development of acceptable policies and procedures that conform to best practices (as defined in ¶730) and to the incorporation of requirements into policy (¶642). The IMT will assess the development of policies, procedures, rules, and regulations reasonably designed to achieve compliance. To attain Preliminary compliance, the City must have policies and procedures designed to guide officers, City employees, supervisors, and managers performing the tasks outlined in the Consent Decree. These policies and procedures must include appropriate enforcement and accountability mechanisms, reflect the Consent Decree's requirements, comply with best practices for effective policing policy, and demonstrate the City and its relevant entities' ability to build effective training and compliance.

[21]  Secondary compliance typically refers to the development and implementation of acceptable and professional training strategies (¶642). Those strategies must convey the changes in policies and procedures that were established when we determined Preliminary compliance. Secondary compliance also refers to creating effective supervisory, managerial, and executive practices designed to implement policies and procedures as written (¶730). The IMT will review and assess the City's documentation—including reports, disciplinary records, remands to retraining, follow-up, and revisions to policies, as necessary—to ensure that the policies developed in the first stage of compliance are known to, are understood by, and are important to line, supervisory, and managerial levels of the City and the CPD. The IMT will be guided by the ADDIE model (Analysis, Design, Development, Implementation, and Evaluation) of curriculum development to assess training and will consider whether there are training, supervision, audit, and inspection procedures and protocols designed to achieve, maintain, and monitor the performances required by the Consent Decree.

[22]  Full compliance refers to adherence to policies and training within day-to-day operations (¶642). Full compliance requires that personnel, including sergeants, lieutenants, captains, command staff, and relevant City personnel routinely hold each other accountable for compliance. In other words, the City must "own" and enforce its policies and training and hold officers accountable for misconduct through a disciplinary system that is fair, timely, and consistent. The IMT will assess whether the City's day-to-day operations follow directives, policies, and training requirements. When measuring Full compliance, we will note whether supervisors notice, correct, and supervise officer behavior and whether appropriate corrections occur in the routine course of business. In this phase, we will review whether compliance is reflected in routine business documents, demonstrating that reforms are being institutionalized. In addition, we will determine whether all levels of the chain of command ensure consistent and transparent compliance.



Still, the three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training rather than to create a policy. Likewise, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate. In other circumstances, levels of compliance may include implementing effective pilot programs before rolling out reforms across the entire CPD.

Throughout this report, we provide our compliance assessments and descriptions of the status of current compliance based on efforts within the tenth reporting period.[23] Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are complying. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its actions.[24]

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the tenth reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

---

[23] We set out our priorities for the tenth reporting period in our Monitoring Plan for Year Five. *See Reports and Information*, INDEPENDENT MONITORING TEAM, https://cpdmonitoring-team.com/reports-information/.

[24] In other words, the City, the CPD, and other relevant City entities are not in any level of compliance until we find that they comply. As a result, a finding that the City is not in compliance with a requirement does not mean that the City has not made efforts—even significant efforts—to achieve compliance toward that requirement.

- **In Compliance.** Based on the City's evidence, the City has achieved a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the City's evidence, the IMT is still assessing whether the City has achieved a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the City's evidence, the City has not achieved a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance, or the City has not achieved a lower level of compliance.

The following subsections include our summaries of compliance assessments within each section of the Consent Decree.

- ❖ Community Policing

- ❖ Impartial Policing

- ❖ Crisis Intervention

- ❖ Use of Force

- ❖ Recruitment, Hiring & Promotion

- ❖ Training

- ❖ Supervision

- ❖ Officer Wellness and Support

- ❖ Accountability and Transparency

- ❖ Data Collection, Analysis & Management

- ❖ Investigatory Stops, Protective Pad-Downs, and Enforcement of Loitering Ordinances

- ❖ Implementation, Enforcement & Monitoring

# I. Community Policing

## Guiding Principles

The IMT assessed whether the City complied with applicable Community Policing paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **8.** *Strong community partnerships and frequent positive interactions between police and members of the public make policing safer and more effective, and increase public confidence in law enforcement. Moreover, these partnerships allow police to effectively engage with the public in problem-solving techniques, which include the proactive identification and analysis of issues in order to develop solutions and evaluate outcomes.*

> **9.** *To build and promote public trust and confidence in CPD and ensure constitutional and effective policing, officer and public safety, and sustainability of reforms, the City and CPD will integrate a community policing philosophy into CPD operations that promotes organizational strategies that support the systematic use of community partnerships and problem-solving techniques.*

> **10.** *CPD will ensure that its community policing philosophy is a core component of its provision of police services, crime reduction strategies and tactics, training, management, resource deployment, and accountability systems. All CPD members will be responsible for furthering this philosophy and employing the principles of community policing, which include trust and legitimacy; community engagement; community partnerships; problem-solving; and the collaboration of CPD, City agencies, and members of the community to promote public safety.*

> **11.** *The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest.*

## Summary of Compliance Efforts and Assessments

### Community Policing Progress in the Tenth Reporting Period

In the tenth reporting period, IMT assessed compliance with the Community Policing paragraph requirements by reviewing relevant policies, training curricula and attendance records, a sampling of arrest records, relevant CPD reports, and materials provided by the CPD during regularly scheduled monthly briefings. During an April site visit and follow-up meetings the IMT visited several police districts interviewing District commanders and their leadership staff, Chicago Alternative Policing Strategy (CAPS) officers, and District Coordination Officers. The IMT also interviewed a panel of District Advisory Committee (DAC) chairs, discussed a pilot youth

intervention services initiative as alternatives to arrest, and observed a Mayor's Public Safety Cabinet meeting.

Significant developments in the tenth reporting period are highlighted below:

- The CPD initiated changes in leadership at the Office of Community Policing and partially re-staffed positions. Additionally, the CPD curtailed detailing staff to other assignments, resulting in enhanced capacity by this office in addressing Community Policing compliance requirements.

- The CPD continued to develop their districtwide strategy development processes by now including a quarterly review process to assess progress in achieving districtwide goals and identifying and addressing challenges. The CPD districtwide strategic development process is an important achievement in advancing community input that identifies enforcement priorities and community engagement activities at the district level.

- The CPD continued to refine its *Youth Intervention* policy by developing a plan to implement a year-long pilot project designed to provide meaningful alternatives to arrest for youth, including a more robust service delivery network and enhanced tracking of delivery of those recommended services. The pilot project is guided by a new *Youth Intervention Services* directive submitted for review at the end of this reporting period.

- The CPD initiated the development of templates to document and track district level partnerships as well as Beat and DAC meetings. Although not finalized in this reporting period, the draft templates represent a major step forward in identifying and tracking partnership activity at the district level as required by the Consent Decree.

- The CPD provided the IMT with an updated community engagement strategy that represented improvements form previously submitted versions. The IMT believes that the strategy needs to be more comprehensive to include engagement all city-wide, and district and neighborhood activities involving community input, information sharing, and community feedback on CPD policing operations and practices. The Consent Decree mandates community engagement, and the CPD should expand its engagement strategies and planning to encompass all the touch points with community members.

- The CPD continues to struggle with implementing the Consent Decree's community policing guiding principles requiring all CPD members to be responsible for employing its community policing philosophy in daily operations. Currently, the CPD relies on CAPS officers and District Coordination officers (DCOs) in some districts to engage in community outreach and problem-solving activi-

ties. The CPD is initiating a workforce analysis and the IMT hopes that the results of the analysis guide CPD's planning to make significant changes in officer-time allocation and seeking ways to further engage in proactive non-enforcement activities by CPD officers.

- On February 22, 2024, the Chicago Board of Education voted to eliminate all school Resource officers (SROs) by the end of the next academic year and create a new "holistic" school safety policy. As a result of this resolution, SROs will be removed from the 39 high schools where they are currently deployed. It is important to note that these SRO requirements are solely dependent upon the City, CPD, and Chicago Public Schools (CPS) agreeing to implement an SRO program. The CPD indicates that they are working on a new directive to support school safety and any future roles for the currently assigned SROs. We look forward to reviewing that directive in future reporting periods.

## Community Policing Progress through Ten Reporting Periods

Overall, the IMT assessed the City's compliance with 35 Community Policing paragraphs in the tenth reporting period (¶¶13–20 and 22–48). The City and the CPD maintained Preliminary compliance for 11 paragraphs (¶¶16, 19, 22–25, 27, 32, 37, 45, and 47), achieved Preliminary compliance with one paragraph (¶33), maintained Secondary compliance for 18 paragraphs (¶¶13-15, 17–18, 20, 26, 28-29, 34–36, and 38–43), achieved Secondary compliance for three paragraphs (¶¶31, 46, and 48), and maintained Full compliance with two paragraphs (¶¶30 and 44). *See* Community Policing Figure 1 below.

Community Policing Figure 1: Compliance Progress for Community Policing Paragraphs at the End of the Tenth Reporting Period (June 30, 2024)



### Community Policing Compliance Progress by June 30, 2024

- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

## Looking Ahead to the Eleventh Reporting Period

In the eleventh reporting period, the IMT is hopeful that the CPD will complete many of the tasks initiated in the tenth reporting period. These include finalizing processes to identify, track, assess, and when applicable expand community partnerships. The IMT also looks forward to the CPD completing its digitized resource directory, continuing its efforts to better document and track DACs and Beat meeting activities, and fully implementing its internal review processes for its districtwide strategies. Although it made progress in the tenth reporting period, the CPD needs to better articulate its community engagement strategies in a much more comprehensive manner, recognizing the various levels of engagement and related requirements found throughout the Consent Decree. The IMT stands ready to assist the CPD in accomplishing this goal.

The CPD continues to struggle with finding ways to engage in community policing practices department wide. Currently, community outreach, problem solving, and partnership building is often siloed in Community Alternative Policing Services (CAPS) in each district with minimal involvement by patrol officers. The CPD Neighborhood Initiative (NPI), an effort to expand problem-solving activities at the district level, is still limited to 10 police districts. Moreover, the CPD has not taken action to respond to the shortcomings revealed in a 2023 study of NPI.[25]

The CPD is seeking assistance in finding solutions to this challenge, including a workforce analysis to hopefully lead to better utilization of officer time and allowing for more proactive non-enforcement community policing and problem-solving activities.

Finally, it is important that the CPD clarify its role in supporting school safety and the future roles, if any, of the current cadre of School Resource Officers.

Additional policies or revisions for the eleventh reporting period may include:

- Finalizing the *Youth Intervention Services* policy,
- Revisions to partnership to align with proposed changes in documentation and tracking, and
- New or revised school-safety-related policies.

---

[25] *See* Center for Neighborhood Engaged Research & Science (CORNERS), *The Chicago Neighborhood Policing Initiative: Research and Evaluation Report, 2019-2023*, Institute for Policy Research Rapid Research Report (April 20, 2023), https://uploads-ssl.webflow.com/630fc70085c3ed55d3d41d54/6462577e91593b350aea8bae_CORNERS%202023%20CNPI%20Report%20(1).pdf.

The Consent Decree also requires additional training development. At the end of the tenth reporting period, the City and the CPD continued developing the following training materials:

- An in-service COPS training addressing all ¶37 requirements,
- An eLearning for Community Partnerships, and
- An eLearning for implementing and using community resource directory

We look forward to reporting on these finalized materials, as well as evidence that the City and the CPD have implemented reforms into practice in the next reporting period.

<div align="center">***</div>

Specific compliance assessments, by paragraph, for the Community Policing section are available here: https://cpdmonitoringteam.com/tenth-semi-annual-independent-monitoring-report/.

This includes paragraphs where the City gained or lost compliance in the tenth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Community Policing section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2024/06/IMR8-Appendix-1-Community-Policing-2023.11.01.pdf.

# II. Impartial Policing

## Guiding Principles

The IMT assessed compliance with applicable Impartial Policing paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **49.** The Parties agree that policing fairly, with courtesy and dignity, and without bias is central to promoting broad community engagement, fostering public confidence in CPD, and building partnerships between law enforcement and members of the Chicago community that support the effective delivery of police services.
>
> **50.** In conducting its activities, CPD will provide police services to all members of the public without bias and will treat all persons with the courtesy and dignity which is inherently due every person as a human being without reference to stereotype based on race, color, ethnicity, religion, homeless status, national origin, immigration status, gender identity or expression, sexual orientation, socio-economic class, age, disability, incarceration status, or criminal history.
>
> **51.** CPD will ensure its members have clear policy, training, and supervisory direction in order to provide police services in a manner that promotes community trust of its policing efforts and ensures equal protection of the law to all individuals.

## Summary of Compliance Efforts and Assessments

### Impartial Policing in the Tenth Reporting Period

In the tenth reporting period, the City's and the CPD's progress toward compliance with these important requirements remained largely unchanged from the previous reporting period. The City and the CPD produced various policies and training materials for review. These included the following CPD policies: *Interaction with Persons with Limited English Proficiency* (S02-01-05); *Interactions with Persons with Disabilities* (S02-07); *Interactions with Persons Who are Deaf, Hard of Hearing, or Deaf-Blind* (S-02-07-00XX); *Gender-Based Violence Incidents* (G04-XX); and the Search Warrants Policy Suite. The CPD has continued to further develop related policies and begin related community engagement.

During this reporting period, the City and the CPD delivered two trainings in support of compliance with various paragraphs within this section, these included *2024 Annual In-service Supervisors Training*, and *ABLE* (Active Bystander for Law Enforcement) refresher training for 2024.

Further, the IMT reviewed the CPD's *Equity Framework*, which incorporated the requirements set forth in ¶¶53 and 72 and helped the City and the CPD achieve Preliminary compliance with these paragraphs. The *Framework* outlines the specific policies and training that refer to impartial policing as outlined in this paragraph. These policies and trainings are meant to serve as the primary foundation for ensuring fair and equitable policing throughout the CPD.

The City and the CPD also produced the *2023 Annual Hate Crimes Annual Report* during the tenth reporting period. The production and publication of this, along with the CPD's consistent productions of prior annual reports, is sufficient to achieve Full compliance with ¶78.

During a site visit in April 2024, the IMT learned of the CPD's efforts to secure a contract with an organization for multilingual officers, updates on the use of Language Line, and recent activities of the ADA Liaison and her staff. We also discussed the CPD's efforts around the establishment of the Equity Office and development of the related plan and strategy. We also discussed the approach for developing a CPD-wide community engagement plan, as well and next steps to assess Full compliance with various paragraphs currently in Secondary compliance.

The IMT looks forward to continuing to review progress on related policies and trainings, including those related to interactions with people with disabilities and gender-based violence. This must include sufficient demonstration of the CPD's efforts to engage the community in this process and in qualifications for its multilingual officers. We also look forward to the CPD's continued efforts to establish its Equity Office and finalize its community engagement plan.

## Impartial Policing Progress through Ten Reporting Periods

In the tenth reporting period, we assessed the City's compliance with 31 Impartial Policing paragraphs (¶¶52–82)—with two of those paragraphs containing conditional requirements that do not apply (¶¶81–82). The City maintained Preliminary compliance for eight paragraphs (¶¶52, 57 60–61, 63, 65–66, and 70), met Preliminary compliance for three paragraphs (¶¶53, 64, and 72), maintained Secondary compliance for 11 paragraphs (¶¶54–56, 58–59, 67, 71, 73–74, 76-77), and achieved Full compliance for one paragraph (¶78). The City is under assessment for Preliminary compliance for one paragraph (¶75) and failed to reach Preliminary compliance with the remaining five paragraphs assessed (¶¶62, 68–69, and 79–80). *See* Impartial Policing Figure 1 below.

Impartial Policing Figure 1:          Compliance Progress for Impartial Policing
                    Paragraphs at the End of the Tenth Reporting Period (June 30, 2024)



Impartial Policing
Compliance Progress by June 30, 2024

- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

## Looking Ahead to the Eleventh Reporting Period

As noted above, the City and the CPD have not reached any level of compliance with five paragraphs in the Impartial Policing section, which is concerning. Moving forward, we urge the City and the CPD to provide sufficient resources toward reforms related to the Impartial Policing section (as required by ¶706) and to continue its work in establishing the Equity Office. It is our hope that these efforts will assist the City and the CPD in propelling compliance with this section in several areas.

The City and the CPD have, however, been developing new and revised policies, written guidance, and training to make some progress in this section. At the end of the tenth reporting period, the City and the CPD continued developing, for example, the following new or revised policies:

- *Search Warrants*;
- *Interactions with People with Disabilities*;
- *Community Engagement Plan*; and
- *Gender-Based Violence* Policy Suite.

At the end of the tenth reporting period, the City and the CPD continued developing, for example, the following new or revised trainings:

- *Sexual Misconduct* Training Curriculum;
- *Language Line Training Bulletin*; and
- *Hate Crimes Refresher eLearning*.

We look forward to reporting on these materials in the eleventh reporting period, as well as evidence that the City and the CPD have implemented reforms into practice.

\*\*\*

Specific compliance assessments, by paragraph, for the Impartial Policing section are available here: https://cpdmonitoringteam.com/tenth-semi-annual-independent-monitoring-report/.

This includes paragraphs where the City gained or lost compliance in the tenth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Impartial Policing section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2024/06/IMR8-Appendix-2-Impartial-Policing-2023.11.01.pdf.

# III. Crisis Intervention

## Guiding Principles

The IMT assessed compliance with applicable Crisis Intervention paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **83.** *CPD officers often serve as first responders to individuals experiencing a behavioral or mental health crisis. These individuals may exhibit symptoms of known, suspected, or perceived behavioral or mental health conditions, including, but not limited to, mental illness, intellectual or developmental disabilities, or co-occurring conditions such as substance use disorders. The Parties acknowledge that having a mental illness, an intellectual or developmental disability, or co-occurring condition does not mean an individual necessarily is in crisis, or that having a behavioral or mental health condition would necessarily be the reason for any crisis that requires police involvement. However, it may need to be considered or warrant heightened sensitivity to ensure an appropriate response. Therefore, individuals in the groups listed above will be collectively referred to as "individuals in crisis" for the purposes of this Agreement.*

> **84.** *A person may be a suspected individual in crisis based on a number of factors, including, but not limited to, self-reporting; information provided by witnesses, family members, or individuals requesting service; CPD's previous knowledge of the individual; or an officer's direct observation.*

> **85.** *CPD officers will interact with individuals in crisis with dignity and respect. The use of trauma-informed crisis intervention techniques to respond appropriately to individuals in crisis will help CPD officers reduce the need to use force, improve safety in police interactions with individuals in crisis, promote the connection of individuals in crisis to the healthcare and available community-based service systems, and decrease unnecessary criminal justice involvement for individuals in crisis. CPD will allow officers sufficient time and resources to use appropriate crisis intervention techniques, including de-escalation techniques, to respond to and resolve incidents involving individuals in crisis. To achieve these outcomes, the City and CPD will implement the requirements set out below.*

> **86.** *The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest for individuals in crisis.*

# Summary of Compliance Efforts and Assessments

## Crisis Intervention in the Tenth Reporting Period

During the tenth reporting period, the CPD, the Office of Emergency Management and Communications (OEMC), and the Chicago Council on Mental Health Equity continued to work to address the requirements in the Crisis Intervention section of the Consent Decree related to policy, training, practices, and community engagement. While notable improvements have occurred this reporting period, particularly with respect to the CPD, progress in this section has generally stalled.

Over the last two years, the CPD has made significant improvements training all officers in best practices related to crisis response and de-escalation via its revised *Annual In-Service* training and its recruit training. By the end of this reporting period, the CPD produced the *Mental Health Awareness and Response* training and the *Neurobiology of Trauma and PTSD* training. All recruits receive both trainings in addition to the 8-hour *CIT Recruit Concepts* training. .

The IMT reviewed and observed the first half of the *Mental Health Awareness and Response* training, which was well done and covers all of the topics in ¶126 (*e.g.*, history of the mental health system, identifying signs and symptoms of mental health conditions, techniques to safely de-escalate a crisis situation). This training, in combination with the *CIT Recruits Concepts* training, provides all recruits with a firm foundation in crisis intervention. The IMT has also reviewed, but has not yet observed, the *Neurobiology of Trauma and PTSD* training.

The IMT continued to participate monthly calls with the City, the OEMC, and the CPD, as well as observe the quarterly Chicago Council on Mental Health Equity meetings. The IMT conducted in-person and virtual site visits and reviewed policy, training, and data throughout the tenth reporting period to assess compliance with the Consent Decree. For example, the IMT met with Crisis Intervention Team (CIT) data analysts, Crisis Intervention Unit (CIU) personnel, participated in ride alongs, interviewed several current and former members of the Chicago Council on Mental Health Equity, and met with representatives from the Mayor's Office.

In contrast to the CPD, the IMT did not receive much information from the OEMC in the tenth reporting period. The IMT looks forward to a more productive and engaged collaboration with the OEMC in the eleventh reporting period.

### The Chicago Police Department (CPD)

The IMT's primary concern continues to be that the CPD's Crisis Intervention Unit (CIU) remains severely understaffed, comprising about half the number of mem-

bers compared with 2021. *See* ¶89.[26] The Crisis Intervention Unit consists of people who are dedicated to the unit's mission and are passionate about the role and purpose of the CIT Program.

But the current staffing levels are wholly insufficient to fulfill Consent Decree requirements. Without sufficient, qualified, and strategically assigned staff, the remaining CIU personnel are simply unable to accomplish the mission of the Crisis Intervention Team program. Since 2021, the IMT has made plain its concerns about the CPD's inadequate staffing levels, and to date, we have seen no actionable change. The CPD notes that it issued two Notice of Job Opportunities (NOJOs) this reporting period, but staffing remained unchanged. A cadre of additional staff is necessary for the CPD's ability to achieve compliance under the Consent Decree requirements.

CIU personnel have consistently informed the IMT for several reporting periods that they feel unsupported and concerned about the severe staffing shortage, which has been discouraging to the entire unit. Simply put, the Unit appears overworked and demoralized. Further, at the end of this reporting period, the CPD informed the IMT that the Lieutenant who has overseen the CIU for the last several years was leaving his position of CIT Coordinator in June 2024. This recent change in leadership, combined with a new Deputy Chief—also appointed this reporting period—with no change in staffing, reinforces the IMT's concerns that the Crisis Intervention Program may continue to regress.

Crisis Intervention Figure 1:
Crisis Intervention Unit Staffing over Several Reporting Periods

| Reporting Period | Commander | Lieutenants | Sergeants | Officers | Community Outreach Coordinator | Data Analyst | Totals |
|---|---|---|---|---|---|---|---|
| IMR-4 | 1 | 1 | 7 | 46 | 1 | 0 | 56 |
| IMR-5 | 0 | 1 | 7 | 39 | 1 | 0 | 48 |
| IMR-6 | 0 | 1 | 7 | 38 | 0 | 1 | 47 |
| IMR-7 | 0 | 1 | 4 | 24 | 0 | 1 | 30 |
| IMR-8 | 0 | 1 | 5 | 22 | 0 | 1 | 29 |
| IMR-9 | 0 | 1 | 5 | 20 | 1 | 1 | 28 |
| IMR-10 | 0 | 1 | 5 | 20 | 1 | 1 | 28 |

At the outset of the Consent Decree, the CPD promoted a voluntary CIT model. During the fourth reporting period, the CPD shifted to a mandatory CIT model, which required all officers to receive the 40-hour *Basic CIT* training. During the ninth reporting period, the CPD announced that it was reverting to a voluntary

---

[26]  Paragraph 89 requires "a qualified, centralized staff, including supervisors, officers, and civilian employees, who is necessary to oversee the department-wide operation of the CIT Program, carry out the overall mission of the CIT Program, and perform the objectives and functions of the CIT Program."

"Memphis Model" CIT program.[27] While there are benefits and challenges with both models, this change has required the OEMC and the CPD to make updates to policy, training, and operational practices, which have delayed additional levels of compliance.

During the tenth reporting period, the CPD made important strides towards completing the eligibility review of its voluntary CIT officers, as required under Special Order S05-14, *Crisis Intervention Team (CIT) Program*. We expect this review to be completed during the next reporting period, at which time voluntary CIT officers will be aligned with the required disciplinary and performance history outlined in the S05-14 directive. Additionally, the CPD intends to circulate a survey to determine which of the "mandatory" CIT trained officers would like to be considered as a voluntary CIT officer. These two steps will help facilitate the accurate calculation of the required response ratios to calls for service involving a mental-health component by a voluntary CIT officer. We understand that the CPD's data analysts are waiting for this process to be completed so that they can incorporate the resulting data into the CIT dashboard. The completion of this process should allow the City and the CPD to achieve compliance with a number of paragraphs.

The CPD model of response to crisis calls needs substantial attention, particularly considering the size of Chicago. Currently, the CPD focuses largely on non-dedicated patrol response by a majority of officers who have not received specialized training since before the Consent Decree. Such deficiencies in training protocols not only deviate from recognized best practices but also fall short of the standard required for a voluntary, specialized model.

Currently, if an officer has ever received the 40-hour *Basic CIT* training, then that officer is considered a "Certified CIT officer," despite receiving no refresher training until 2021. The Consent Decree does not consider these officers who received the training many years ago (as far back as 2004) to be considered specialized officers

---

[27] In the seventh reporting period, the CPD revised its officer designations related to CIT. The IMT mirrored the CPD's updated language to avoid confusion. The term "Certified Crisis Intervention Team (CIT) Officers" is used throughout the Consent Decree. *See* ¶92. The CPD moved away from a strictly voluntary CIT model to one that is a hybrid voluntary/mandatory CIT model, in which all officers are required to take the 40-hour Basic CIT training. *Certified* CIT officers are now being identified as "Designated CIT officers" by the CPD. Designated CIT officers are those officers who voluntarily request to be Crisis Intervention Team members and prioritized to calls for service involving a mental health component. Mandatorily assigned officers who do not select to be identified as a Designated CIT officer at the end of the 40-hour Basic CIT training are now identified as "CIT Trained officers." The OEMC prioritized CIT Trained officers, secondary to a Designated CIT officer for dispatch to mental health calls for service. Officers who have not yet been through the 40-hour Basic CIT training are simply identified as Untrained. In the ninth reporting period, the CPD announced that it was returning to the original "Memphis Model" of CIT, and therefore, the language is reverting to previous language. To mirror the CPD's language, the IMT will revert to the term "Certified Crisis Intervention Team (CIT) Officers" as used throughout the Consent Decree. *See* ¶92.

without re-taking the 40-hour *Basic CIT* training, and then falling into a regularly scheduled refresher training. The Consent Decree itself identifies a best practice of providing *Refresher CIT* training every three years. Presently, approximately 20% of all Certified CIT officers were trained over 10 years ago (between 2004 and 2012) without regular refresher training; about a third of all Certified CIT officers were trained more than seven years ago (between 2004 and 2015); and nearly half (46.51%) of Certified CIT officers were trained six or more years ago (between 2004 and 2016) without any regular refresher training.

The Consent Decree does not explicitly require officers who received the 40-hour *Basic CIT* training years ago, before the Consent Decree approved training, to re-take the 40-hour *Basic CIT* training and then fall into the Consent Decree required refresher training every three year. However, such an approach is more aligned with best practice and, therefore, the IMT has been encouraging the CPD to implement this practice.

Additionally, the IMT has consistently recommended that the CPD revise the *CIT Refresher* training to increase content relative to the identification of and response to persons in mental and behavioral health crisis. Presently, a significant portion of the *CIT Refresher* training is dedicated to officer wellness. While topics concerning officer wellness are crucial, they should be moved to another training topic for all officers. Moreover, a significant amount of training time is dedicated to CIT troubleshooting. This topic is also important, but there are more pressing topics that could be discussed in the *CIT Refresher* training. Given the number of officers who received the 40-hour *Basic CIT* training many years ago, it is essential that a robust *CIT Refresher* training focus more on core topics.

The IMT strongly encourages the CPD to develop a strategic training plan that addresses those officers trained in the 40-hour *Basic CIT* many years ago. Such a plan could prioritize specialized training to reflect current subject-matter expertise and resources more aligned with best practice. The IMT additionally recommends that the City and the CPD revised the *CIT Refresher* training and provide it to the IMT for review.

The CIU's Crisis Intervention Team Training Section (CITTS) is currently teaching almost every week of the year. This unit is charged with teaching the 40-hour *Basic CIT* training, the *CIT Refresher* training, and the *Advanced CIT (Youth)* and *Advanced CIT (Veterans)* trainings. The CITTS has been forced to cancel its *Advanced CIT (Youth)* and *Advanced CIT (Veterans)* training for the last three years due to

staffing shortages. These trainings were crucial for training School Resource Officers (SROs) and are crucial for providing opportunities to expand knowledge and skills for the CIU and patrol-based CIT officers.[28]

There continues to be only five training officers and one training sergeant assigned to the CITTS. This level of staffing is insufficient. If the training section loses any additional staff, the CIU leadership stated that it may need to halt the *CIT Refresher* training, which will have significant downward consequences. The CIU has already been borrowing CIT District, Operations, and Community Support (CIT DOCS) personnel and CIT administrative personnel to fill staffing gaps. For the last three reporting periods, the CIU has had to cancel trainings due to staffing. Further, with the tentative 2024 training cadence, the CPD has indicated that it may lack sufficient staff to maintain the 2024 training schedule.

Below is the projected training schedule for the 8-hour *CIT Refresher* training:

| Year | Officers to Train | Classes Required |
|---|---|---|
| 2024 (April - Dec) | 924 | 49 |
| 2025 | 1509 | 62 |
| 2026 | 1296 | 52 |

Considering the increased number of officers requiring *CIT Refresher* training to meet Consent Decree requirements, delivering the above refresher classes with five training officers is unrealistic. The City and the CPD risk losing compliance on several paragraphs if they cannot sustain training deliverables.

Additionally, there are only thirteen CIT DOCS personnel responsible for many of ¶91's requirements. These thirteen CIT DOCS personnel cover all of the City's twenty-two districts by themselves. CIT personnel routinely face additional staffing challenges, including covering for officers on furlough. As a result, CIU members cannot accomplish the important responsibilities outlined in their job descriptions. This staffing crisis has continued, unchanged, for the last three years. The CIU produced to the IMT this reporting period a *Crisis Intervention Unit Staffing Plan,* which highlights the alarming trends.

---

[28]   The CIU trainers also require sufficient administrative support to ensure their attention is directed towards fulfilling a rigorous training regimen, and on crucial components of the training such as scenario-based exercises. Currently, the CIU trainers must devote time and energy to administrative tasks in addition to a stringent teaching rotation. Some of the administrative tasks that trainers are completing include reviewing CIT applications, scheduling trainings, obtaining supplies, administering training evaluations, catering, scheduling, and completing background checks.

In short, the roles and responsibilities of the CIU, as outlined in S05-14, cannot be accomplished under the present staffing level thereby hindering the City and the CPD from achieving additional levels of compliance.

Still, despite significant challenges in the tenth reporting period, the City and the CPD have demonstrated progress toward achieving compliance for several paragraphs in the Crisis Intervention section. For example, the CPD produced some training evaluations, which have not been produced in several reporting periods. The CPD also produced partial training evaluations over a six-week period in March and April 2024. The format of the produced evaluations is user friendly. However, there was only one 40-Hour *Basic CIT* course evaluation in the production, where the CIU training plan shows that seven *Basic CIT* trainings were completed between January and April 2024. The evaluations we did receive were, overall, very strong.

Moreover, across both the 40-hour *Basic CIT* training and *Refresher CIT* training, there were evaluation responses by as few as two participants, others, nine, eleven, and fifteen participants. Most classes (both the 40-hour *Basic CIT* training and the *CIT Refresher* training) have approximately twenty-five participants each. We understand that participants are not required to complete training evaluations. The CPD should consider changing this to make evaluations required, as they will be necessary to demonstrate Full compliance.

This reporting period, the CPD produced for the first time the *CIT Documentation and Response Evaluation Dashboard* SOP, which the CPD will need to finalize, implement, and train on to reach Secondary compliance with ¶¶114–15. However, producing this document is an important step in the right direction, and the CPD has put significant thought into how Consent Decree requirements will be evaluated.

Finally, the CPD produced a *CIT Certification Summary Data Report* containing very useful data. However, the CPD will need to clarify some of the data contained in this report to regain Secondary compliance. For example, the report lists the date that several members were "trained in Basic" and "trained in Refresher" but those same members are marked as "absent" with a reason for their absence. The CPD has indicated that it will revise and reproduce the report to the IMT. We also encourage the CPD to incorporate additional formulas into the report. For example, the CPD should consider incorporating a formula to demonstrate that 95% of all officers who received *Basic CIT* training before 2019 who have now completed the *CIT Refresher* training. This will permit easier compliance review based on paragraph requirements.

We appreciate the CPD taking important steps toward training all officers on response to individuals in crisis, with an emphasis on de-escalation strategies. To advance compliance with the Consent Decree, the IMT urges the CPD to reliably

produce full training evaluations each reporting period. The CPD should also prioritize setting a regular cadence for annual review and revision of CIT policies and training. The CPD should revise the *CIT Refresher* training to better align with best practice, and it should complete the eligibility review of voluntary CIT officers. We also recommend that the CPD significantly increase its staffing of the CIU, and enhance efforts to involve the Chicago Council on Mental Health Equity in training observations, as required under the Consent Decree.[29]

### City of Chicago Collaboration

The priorities of expanding non-criminal justice responses to persons in crisis and complying with the guiding principles of the CIT Program requires close collaboration between City entities and the CPD. The OEMC, for example, plays a crucial role in the requirements of the Crisis Intervention section of the Consent Decree

As identified by the Consent Decree (¶¶87(d), 130–31), the leadership of the CPD, Chicago Fire Department (CFD), the OEMC, and Department of Public Health (DPH) must work together to forge a best practice model of crisis response, as well as re-engage the Advisory Committee.[30]

The *Crisis Assistance Response Engagement* (CARE) pilot program is one example of this kind of partnership.[31] Despite progress under this pilot, the City has been

---

[29]  To date, there has been little evidence of such oversight. The CPD, if appropriate, may want to consider whether it is feasible to utilize the established Training Community Advisory Committee (TCAC) for CIT policy and training review, given its representation from notable organizations also involved in Chicago Council on Mental Health Equity, like NAMI, Ignite Chicago, Access Living, ARC, Thresholds, and Bobby Wright Comprehensive Behavioral Health Center.

[30]  The following are a few examples of the current challenges in this area: First, several paragraphs in the Crisis Intervention section (and other sections) require "timely" response. At nearly five years into the Consent Decree, the CPD and the OEMC still have not defined "timely," which undermines the City's ability to set and meet expectations, assess response ratios, and track trends. The CPD, CFD, and OEMC should utilize CPD and CFD response time data for all calls for service, by priority level and national best practices, to define what qualifies as a "timely" response. Second, at this time, the OEMC is only able to track at the point of dispatch, not the point of arrival on-scene. Therefore, it is unknown if there is a "timely" response by a CIT officer. As we understand it, the new CAD system with GPS that is due to be implemented soon should help address this. Third, the IMT continues to have concerns about the CPD and the OEMC using the term "mental" as the event code associated with mental health-related calls for service. They have indicated this is difficult to change with the current CAD system. "Mental" is not a respectful term nor is it industry recognized. *Compare* ¶¶135, 152.

[31]  The CARE program includes three types of responses: (1) pre-response, which staffs mental-health professionals in the City's 911 Call Center to provide support to callers, call takers, dispatchers, and response teams; (2) alternate response, where the 911 Call Center will dispatch mental-health professionals with first responders to respond to people in crisis; and (3) post-response, which links residents with appropriate community-based services and uses alternate drop-off sites for people in behavioral health crisis.

reluctant to provide policies, training, and data related to this alternate response program. The CARE program aims to divert people in crisis away from the criminal justice system, a model of diversion and deflection as noted by ¶¶11 and 86.[32]

Crisis Intervention Figure 2: CARE Pilot Program – Types of Responses

| CARE Pilot Program's Three Types of Responses | |
|---|---|
| **Pre-response** | Staffs mental-health professionals in the City's 911 Call Center to provide support to callers, call takers, dispatchers, and response teams. |
| **Alternate Response** | The 911 Call Center will dispatch mental-health professionals with first responders to respond to people in crisis. |
| **Post-response** | Links residents with appropriate community-based services and uses alternate drop-off sites for people in behavioral health crisis. |

The Mayor's office has recently informed the Chicago Council on Mental Health Equity that CIT officers, who have historically joined the CARE Alternate Response Teams, will now be placed back on patrol. This will result in a fully non-law enforcement response. While there is significant value in this approach, the City should identify a plan for mental health calls for service that *do* require police presence. This is national best practice, and there are many models to accomplish this.

Relatedly, the City and the CPD still have not yet completed the required *Crisis Intervention Team Officer Implementation Plan* nor the required *Crisis Intervention Plan*. (*See* ¶¶108 and 122). Although required annually, the last report was submitted in 2020. While the IMT appreciates delaying these reports until they are supported by more robust strategies and reliable data, the City should at minimum produce an annual report demonstrating any progress toward producing the report, as well as the barriers that continue to cause the delay and the plans to overcome them.

---

[32] The City has largely resisted IMT efforts to obtain relevant information about the CARE Program and has indicated that it considers the CARE Program to be separate and apart from the Consent Decree. The IMT strongly encourages the City to re-evaluate this position in light of the Consent Decree requirements. Moreover, the CARE Program is an excellent example of a successful, proactive diversion program that provides an alternative to arresting individuals in crisis. The City should be commended for these successful efforts, and the IMT believes that increased transparency will only increase public support for the program.

### The Chicago Council on Mental Health Equity

The Chicago Council on Mental Health Equity is composed of talented, dedicated experts and people with lived experience who are eager to provide crucial feedback to the City. On February 26, 2024, the IMT observed a very encouraging quarterly meeting, which demonstrated impressive participation and leadership. The Chicago Council on Mental Healthy Equity presented a revised structure for itself that was welcomed by the committee's members. Newly identified co-chairs were also introduced during this meeting. However, the subcommittees did not meet during the reporting period, and the required quarterly meeting on May 22, 2024, was cancelled. There was an attempt to re-schedule the meeting, and while the meeting held on June 27, 2024, was quite productive—with a substantially useful report given by the CPD—there was again no quorum and no agenda posted 48 hours in advance as required under bylaws.

This reporting period, the IMT met with Chicago Council on Mental Health Equity's leadership during a site visit. We continue to be encouraged by the expertise and resources provided by the committee's members. In addition, meeting agendas, participant attendance, and meeting minutes for the last reporting period were produced this reporting period, including complete records for the meeting held on July 31, 2023, partial records (only meeting minutes) for the meeting held on November 6, 2023, and only the agenda was produced for the February 26, 2024 meeting held during this reporting period. We appreciate these efforts and look forward to complete records being produced reliably each reporting period.

The IMT continues to be concerned about the low representation and the inadequate participation of members of the community and those with lived experience on the Chicago Council of Mental Health Equity. Various committee members have shared similar concerns with the IMT. Active participation continues to be low, and the City should consider additional ways to improve participation of people with lived experience and the prescribed representation outlined in ¶132. There are numerous professionals serving on this committee who would be an excellent resource to assist with recruitment. We also recommend that the Chicago Council on Mental Health Equity produce a list of all active members and the self-identified category they represent as required under ¶132.

We appreciate the hard work that has gone into developing the Chicago Council on Mental Health Equity. We encourage the City to take additional steps to operationalize this hard work.

### The Office of Emergency Management and Communications (OEMC)

Last reporting period, the OEMC produced complete and thorough training records. While the format and information is useful for future compliance, these records revealed that a significant number of telecommunicators received the *CIT and*

*Mental Health Awareness* training as far back as 2016, before the Consent Decree approved training in 2020.[33] Because the IMT learned that the OEMC is using a previous training to demonstrate compliance, which may not meet Consent Decree requirements, the City and the OEMC lost Secondary and Full compliance with ¶¶142–43 last reporting period.[34]

There is no doubt that the OEMC provided telecommunicators with mental-health and CIT-awareness training before the Consent Decree. In fact, the Consent Decree acknowledges the possibility that such pre-Consent Decree training could satisfy Consent Decree requirements. *See* ¶145. However, if the OEMC intends to use its previous training towards compliance with ¶¶142–45, then the OEMC must demonstrate that the 2016 training complies with ¶¶142–44's requirements.[35] The OEMC had not yet attempted to do so with the 2016 training by the end of the tenth reporting period.

It is important for the OEMC to demonstrate that all telecommunicators have received training consistent with the Consent Decree. The OEMC's *Mental Health and CIT Awareness* training is essential to a telecommunicator's ability to perform their role, as evidenced by the fact that all OEMC telecommunicators must receive this training before they are allowed to answer calls independently. *See* ¶142. Indeed, members of the public interacting with OEMC telecommunicators are often urgently seeking the OEMC's and the CPD's help in the midst of crisis. Whether a telecommunicator is adequately trained in mental health and CIT awareness can be a matter of life or death. A study by the nonprofit Treatment Advocacy Center notes that people with untreated mental health conditions are sixteen times more likely to be killed by the police than other civilians stopped by law enforcement and around one in four fatal police encounters result in the death of a person with

---

[33] The OEMC's 2023 training records show that 304 telecommunicators out of 459 total (66%) received the *CIT and Mental Health Awareness* training before 2020. The OEMC's 2019 training records appear to be inconsistent with the 2023 training records, showing, for example, that 432 telecommunicators received the training in 2016, whereas the 2023 training records show that 272 telecommunicators received the training in 2016.

[34] While the City and the OEMC did produce a pre-Consent Decree training, that training was from 2018, not 2016—when the majority of telecommunicators received the training. Additionally, that 2018 pre-Consent Decree training that the City produced did not satisfy the requirements of Paragraphs 142-45 because almost all of the topics listed in Paragraph 144 (*e.g.*, telephonic suicide prevention, scenario-based training exercises, the established policy for dispatching a Certified CIT officer) are not covered in the 2018 training.

[35] Any such training must adequately address the topics identified in ¶144. The IMT has received and reviewed the OEMC's 2018 training. To date, the IMT has neither received nor reviewed the OEMC's 2016, 2017, or 2019 training.

severe mental illness.[36] Telecommunicators are the front line for triaging and dispatching the appropriate response.[37]

Finally, the IMT cannot assess the OEMC's compliance with numerous paragraphs without reviewing evidence of program changes (*e.g.*, 988; the Crisis Assistance Response and Engagement pilot program, new coding including "Certified CIT officer" and "ALT Response," audit outcomes, and Chicago Council on Mental Health Equity observation and feedback of policies and training). The OEMC must also produce completed audit sheets (*e.g.*, "CIT Employee Review"; "CIT Reviewed Events"; and "CIT Quality Assurance Report") to support training revisions and to maintain compliance.

In the tenth reporting period, the OEMC did not produce evidence that the 8-hour *Mental Health and CIT Awareness* training or the *CIT Refresher* training had been revised to guide call-takers and dispatchers on new protocols responsive to ¶¶138–39. The regular cadence of annual policy and training revisions required under the Consent Decree is meant to assist in addressing the fluidity of program improvements and is required annually with Chicago Council on Mental Healthy Equity feedback. Additionally, the OEMC did not produce validated data supporting dispatch priorities.

The IMT encourages the OEMC to recalibrate and promote a plan to demonstrate all telecommunicators have received the *Mental Health and CIT Awareness* training covering the requirements of ¶¶142–145. Additionally, the OEMC did not produce any new material and did not report any substantive updates this reporting period. The IMT has offered to establish monthly meetings with the OEMC, similar to the monthly meetings we have already established with the CPD. We believe the OEMC would greatly benefit by agreeing to these meetings with the IMT, as these meetings have built rapport and have promoted more candid, informal dialogue between the IMT and the CPD. These meetings have also allowed the CPD to efficiently clarify what is required for under specific paragraphs and to proactively identify unforeseen barriers to compliance.

## Crisis Intervention Progress through Tenth Reporting Periods

During this reporting period, the IMT assessed the City's compliance with 66 Crisis Intervention paragraphs: ¶¶87–152. The City maintained Preliminary compliance with 38 paragraphs (¶¶87–95, 98, 100–05, 114–15, 117, 119–21, 124–25, 127–32,

---

[36] *See Overlooked in the Undercounted: The Role of Mental Illness in Fatal Law Enforcement Encounters*, TREATMENT ADVOCACY CENTER (December 2015), available at https://www.treatmentad-vocacycenter.org/reports_publications/overlooked-in-the-undercounted-the-role-of-mental-illness-in-fatal-law-enforcement-encounters/

[37] This is another reason why the IMT strongly recommends that the definition of "telecommunicators," as outlined in the Consent Decree, *see* ¶789, should be expanded to all telecommunicators, not just those answering police calls for service.

136, 141–45, 147, and 150–51), met Preliminary compliance with one paragraph (¶137), maintained Secondary compliance with 16 paragraphs (¶¶96–97, 99, 106, 113, 116, 118, 126, 133–35, 138–40, 146, and 152), and achieved Secondary compliance with one paragraph (¶98). At the end of the tenth reporting period, the City did not have any compliance levels with 10 paragraphs (¶¶107–12, 122–23, and 148–49).

Crisis Intervention Figure 2: Compliance Progress for Crisis Intervention Paragraphs at the End of the Tenth Reporting Period (June 30, 2024)





## Looking Ahead to the Eleventh Reporting Period

In the eleventh reporting period, the City and the CPD should re-evaluate its Crisis Response Model to build a more robust program capable of meeting Consent Decree requirements and aligning with best practices. In addition to key crisis response components, the CPD should consider dedicated district CIT patrol units that are solely responsible for response to live mental-health-related calls for service. Presently, the CPD has a minimalist model that struggles to meet both Consent Decree requirements and the mission of the CIT program.

In the eleventh monitoring period, the IMT hopes to receive a finalized S05-14 *Crisis Intervention Team* policy, CIT officer eligibility data, complete CPD training evaluations, updates on the new CAD system, evidence of revised or supplemental trainings that fully meet ¶127's requirements, and a training plan to prioritize officers who received the 40-hour *CIT Basic* training before the Consent Decree to reestablish their voluntary status and recertify in the updated 40-hour training.

\*\*\*

Specific compliance assessments, by paragraph, for the Crisis Intervention section are available here: https://cpdmonitoringteam.com/tenth-semi-annual-independent-monitoring-report/.

This includes paragraphs where the City gained or lost compliance in the tenth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Crisis intervention section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2024/06/IMR8-Appendix-3-Crisis-Intervention-2023.11.01.pdf.

# IV. Use of Force

## Objectives[38]

The IMT assessed compliance with applicable Use of Force paragraphs in accordance with the Consent Decree's corresponding objectives:

> **153.** CPD's use of force policies, as well as its training, supervision, and accountability systems, must ensure that: CPD officers use force in accordance with federal law, state law, and the requirements of this Agreement; CPD officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; when using force, CPD officers only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and any use of unreasonable or unnecessary force is promptly identified and responded to appropriately.

> **155.** CPD officers have the authority to use force, but that authority is limited by the law and Department policy. The provisions of this Agreement seek to facilitate compliance with the law and Department policy regarding the use of force to reduce the circumstances in which using force is necessary, and to ensure accountability when CPD officers use force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances.

## Summary of Compliance Efforts and Assessments

### Use of Force in the Tenth Reporting Period

In the tenth reporting period, the City and the CPD achieved several new levels of compliance for paragraphs in the Use of Force section, including achieving Full compliance for two paragraphs, while maintaining the same levels of compliance that they achieved in previous reporting periods. Specifically, the City and the CPD achieved Secondary compliance with several paragraphs based on the analyses of patterns and trends reported in the CPD's *2023 Annual Use of Force Report* and TRED's *2023 Year-End Report* and the CPD's actions to address those patterns and trends, such as training on handcuffing.

We met regularly with the City, the CPD, and the OAG to address the Use of Force requirements in the Consent Decree, including ongoing productions from the City and the CPD.

After the end of this reporting period, the Court issued an order directing the CPD to clarify its *Body Worn Cameras* policy, S03-14, specifically the requirement that

---

[38] The Use of Force section of the Consent Decree includes "objectives" rather than "guiding principles."

cameras be deactivated for recording of public safety "investigations." We look forward to reviewing the required revisions to the CPD's *Body Worn Cameras* policy in the next reporting period, and to reviewing CPD's efforts to meaningfully engage the community regarding this policy.

This reporting period, the IMT continued to review and comment on drafts of the CPD's S06-06 suite of policies and forms in preparation for the Democratic National Convention (DNC), which include the following policies: S06-06, *Response to Crowds, First Amendment Assemblies, and Civil Disturbances*; S06-06-01, *Declaration of a Coordinated Multiple Arrest Incident*; S06-06-02, *Alternative Arrest Procedures During Coordinated Multiple Arrest Incidents*, and S06-06-03, *Alternate Tactical Response Reporting During Coordinated Multiple Arrest Incidents*. We also observed the City and the CPD's negotiations with the Coalition regarding the S06-06 suite of policies and forms.

The CPD incorporated training on the draft S06-06 suite into its 2024 eight-hour annual use-of-force training. We reviewed and provided a no-objection notice for the in-service training materials, and we observed sessions of the annual use-of-force and other DNC-related courses this reporting period.

We also continued to review the CPD's *Annual Use of Force Report*, along with reports published by the Tactical Review and Evaluation Division (TRED, formerly known as the Force Review Division (FRD) or the Force Review Unit (FRU)). We remain impressed with TRED's professionalism and its efforts to observe, address, and publicly report on patterns and trends relating to uses of force, foot pursuits, and firearm pointing incidents—even with inadequate resources for its responsibilities.

TRED fell behind on its reviews during the fifth reporting period because of insufficient staffing, and the backlog grew in the sixth and seventh reporting periods. In previous reporting periods, attempts to address the backlog included 20 officers being detailed to TRED for 90 days, with an extension on that detail for officers to remain with the unit. There have also been attempts to hire civilians part-time, as well as hiring additional officers to the TRED unit. In this reporting period, TRED continues to review all foot pursuits. Meanwhile, the CPD continues to assign TRED new and important responsibilities regarding the observation and analysis of patterns and trends in the CPD's practices. We recommended in the eighth and ninth reporting periods—and continue to recommend—that district- and unit-level supervisors take on firearm pointing review responsibilities currently shouldered by TRED.

At the end of the tenth reporting period, therefore, more work was necessary for further levels of compliance.

### Use of Force Progress through Ten Reporting Periods

During this reporting period, the IMT assessed the City's compliance with 96 Use of Force paragraphs. At the end of the tenth reporting period, the City maintained Preliminary compliance for 10 paragraphs (¶¶153, 156, 158–59, 174, 193, 217, 228, and 239–40). The City did not achieve Preliminary compliance with any additional paragraphs. The City maintained Secondary compliance for 62 paragraphs (¶¶154, 161–69, 171–73, 175–79, 182–84, 186–87, 189–92, 196, 198–200, 202–05, 207–13, 216, 218–27, 229–34, 243–44, and 247) and achieved Secondary compliance for five paragraphs (¶¶155, 157, 214–15, and 241). The City maintained Full compliance for 11 paragraphs (¶¶170, 180–81, 185, 188, 194–95, 197, 245–46, and 248) and achieved Full compliance with three paragraphs (¶¶201, 206, and 235). The City's Preliminary compliance for five paragraphs remained under assessment at the end of the tenth reporting period (¶¶160, 236–38, and 242).

Use of Force Figure 1: Compliance Progress for Use of Force Paragraphs at the End of the Tenth Reporting Period (June 30, 2024)



## Use of Force
## Compliance Progress by June 30, 2024



- ■ Preliminary Compliance
- ■ Secondary Compliance
- ■ Full Compliance
- ■ Not in Compliance

The CPD has made significant progress with its use-of-force policies, training, and analysis of data since the start of the Consent Decree. Through ten reporting periods, for example, the City and the CPD have incorporated required reforms from the Use of Force section into various policies and written guidance. In preparation for the Democratic National Convention, for instance, the CPD revised and adapted the use of force reporting and other related polices. While we have had and continue to have concerns with the CPD's corresponding community engagement efforts and strategies, the CPD has made and continues to make meaningful efforts toward improving its corresponding community engagement and efforts to receive community input.

Through 10 reporting periods, the City and the CPD have also developed or updated training materials to incorporate requirements across the Use of Force section. For example, because of the Consent Decree, the CPD has developed and delivers use-of-force in-service training *every year*, which includes training on de-escalation and force mitigation. The CPD is also streamlining their weapons qualifications training to incorporate carbine, firearms, and Tasers.

The CPD has also increased the workload carried by the Tactical Review and Evaluation Division (also known as TRED, and formerly known as the Force Review Division or Force Review Unit) in the time since the Consent Decree became effective. TRED reviews use-of-force incidents, firearm-pointing incidents, and all foot pursuits to identify and allow the CPD to address patterns and trends. TRED's responsibilities have also been expanded to include search warrant reviews.[39] TRED's resources have not been expanded accordingly, however, and the City and the CPD have not yet implemented our recommendation to shift responsibilities for firearm pointing reviews to district- and unit- level supervisors.

Furthermore, the CPD began using the new Incident Debrief Report (IDR) that TRED was developing in the seventh reporting period and was implemented in the ninth reporting period. The Incident Debrief Report streamlines TRED's review and identification of de-briefing points for incidents involving multiple reportable events (uses of force, firearm pointing, and foot pursuits).

Finally, while significant challenges remain, the CPD has continued to make progress in its public reporting of use-of-force data. For example, the CPD makes relevant data available to the public via its Use of Force Dashboard.[40] TRED also publishes semiannual and yearly reports that contain analysis of and conclusions about the CPD's use-of-force data, including data collected via Tactical Response Reports (TRRs), firearm-pointing incidents, and foot pursuits. The CPD's *Annual Use of Force Report*, now in its third iteration, continues to improve and is another publicly-available source of data and trend analysis.

## Looking Ahead to the Eleventh Reporting Period

In the tenth reporting period, the City and the CPD continued making progress toward compliance with the Use of Force requirements of the Consent Decree,

---

[39] "It should be noted that the annual and quarterly reports were previously produced by the Force Review Unit (FRU). Moving forward these reports will be generated by the Tactical Review and Evaluation Division (TRED). The new name change more accurately reflects TRED's focus on new and future responsibilities which include search warrant, foot chase and investigative stop reviews." *TRED 2022 Q1 Report*, CPD TRED (August 16, 2022), https://home.chicagopolice.org/wp-content/uploads/Q1-2022-16Aug22-FINAL.pdf.

[40] *See Use of Force Dashboard*, CHICAGO POLICE DEPARTMENT (2015 to present), https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

particularly related to policy and training requirements. Community engagement and use of body-worn cameras—particularly timely activation—continue to present significant hurdles to further levels of compliances.

Nonetheless, at the end of the tenth reporting period, the City and the CPD were also continuing to develop new and revised policies, written guidance, and training materials to make progress in this section.

For example, by the end of the tenth reporting period, the CPD was continuing to review its policies for alternate use-of-force reporting during coordinated multiple arrest incidents, while simultaneously training on the new policies in preparation for the Democratic National Convention.

In the tenth reporting period, the City and the CPD continued to dedicate significant efforts to identifying and addressing data issues, particularly regarding foot pursuits. As we noted in previous reporting periods, until the CPD can appropriately collect, manage, and analyze data related to the Use of Force section, among others, the City and the CPD cannot sufficiently demonstrate whether the CPD's practices have improved. This will, in turn, prevent the City and the CPD from becoming a true learning agency, capable of reviewing and revising policies and training in a way that is data driven and specific to the needs of Chicago's communities and CPD officers. We saw evidence of CPD putting its findings into practice in both the *2023 Annual Use of Force Report* and TRED's *2023 Year-End Report* this reporting period, and we look forward to monitoring additional progress in the eleventh reporting period.

<div align="center">***</div>

Specific compliance assessments, by paragraph, for the Use of Force section are available here: https://cpdmonitoringteam.com/tenth-semi-annual-independent-monitoring-report/.

This includes paragraphs where the City gained or lost compliance in the tenth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each monitorable paragraph in the Use of Force section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2024/06/IMR8-Appendix-4-Use-of-Force-2023.11.01.pdf.

# V. Recruitment, Hiring & Promotion

## Guiding Principles

The IMT assessed compliance with the Recruitment, Hiring, and Promotion paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **249.** *Having a department that recruits, hires, and promotes officers who are qualified to meet the increasingly complex needs of law enforcement and that reflects a broad cross section of the Chicago community in which it serves is critical to accomplishing the following goals: running a professional police force; building community trust and confidence; increasing legitimacy and acceptance of CPD's supervision and accountability systems; and reducing perceptions of bias.*

> **250.** *The provisions of this Agreement are designed to ensure that CPD attracts, hires, retains, and promotes individuals who are equipped to perform their jobs safely, effectively, and in accordance with the law, CPD policy, and the terms of this Agreement. Further, this Agreement is designed to ensure that CPD promotes individuals who are capable of: providing effective supervision; guiding officers under their command on lawful, safe, and effective policing; and holding officers accountable for misconduct.*

> **251.** *The City and CPD's recruitment, hiring, and promotions policies and practices will show a commitment to attracting, hiring, and promoting qualified candidates at all ranks that reflect a broad cross section of the Chicago community the Department serves.*

> **252.** *The Parties acknowledge that the City and CPD are currently subject to the City of Chicago Police Department Hiring Plan for Sworn Titles ("Hiring Plan"), dated May 14, 2014, which may be subject to change in the future.*

## Summary of Compliance Efforts and Assessments

### Recruitment, Hiring, and Promotion in the Tenth Reporting Period

In the tenth reporting period, the City and the CPD achieved additional compliance with the requirements of the Consent Decree for one paragraph (¶261) and demonstrated continued progress towards implementation of the Consent Decree requirements by maintaining compliance levels achieved in previous reporting periods for all other paragraphs.

During this reporting period, the City and the CPD provided an independent expert's (DCI Consulting Group's) assessment of the City's and the CPD's promotions processes for the ranks of Sergeant and Lieutenant to ensure that its policies and

practices comply with the law, are transparent, and are consistent with the Consent Decree. Further efforts focused on establishing a Recruitment and Hiring Committee as a process of regularly assisting its promotions processes as specified in relevant policies. As stated by the Recruitment and Hiring Committee, "the committee's formation aims to ensure that the CPD's recruitment and hiring practices are lawful, transparent, and consistent with the principles of the Consent Decree. These practices are evaluated at least every three years to maintain compliance and to implement necessary improvements." The committee is comprised of representatives from various CPD bureaus, units, and other City department leaders. The committee's governance structure is laid out in the Office of Public Safety Administration IAP 07-01, the Recruitment and Hiring Committee Human Resources Office of Public Administration Standard Operating Procedure, and the Consent Decree. Outcomes from these efforts are consistent with their steady progressive approach and will strengthen compliance with Consent Decree requirements. Sustained robust recruitment and hiring processes are required to lift the CPD out of the acute staffing shortages it continues to face.

## Recruitment, Hiring, and Promotion Progress through Ten Reporting Periods

Overall, the City and the CPD maintained Preliminary compliance for six paragraphs (¶¶253–54, 256, 260, 262, and 264), maintained Secondary compliance for four paragraphs (¶¶255, 258–59, and 263), achieved Full compliance for one paragraph (¶261), and maintained Full compliance for one paragraph (¶257)). *See* Recruitment Figure 1 below.

Recruitment Figure 1: Compliance Progress for Recruitment, Hiring & Promotion Paragraphs at the End of the Tenth Reporting Period (June 30, 2024)



Recruitment, Hiring, and Promotions
Compliance Progress by June 30, 2024

## Looking Ahead to the Eleventh Reporting Period

Looking ahead to the eleventh reporting period, the IMT hopes to see the City and the CPD allocate and focus appropriate attention and resources to the Recruitment, Hiring, and Promotion section of the Consent Decree (*see* ¶706). Meaningful progress towards further levels of compliance should aid in addressing the CPD's ongoing staffing shortage and the corresponding challenges that staffing shortage has caused. Indeed, while this is the smallest section of the Consent Decree, the City's and the CPD's efforts directed at recruitment, hiring, and promotions are critical to every other Consent Decree section and the short and long-term success of Chicago's policing efforts.

\*\*\*

Specific compliance assessments, by paragraph, for the Recruitment, Hiring, and Promotion section are available here: https://cpdmonitoringteam.com/tenth-semi-annual-independent-monitoring-report/.

This includes paragraphs where the City gained or lost compliance in the tenth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Recruitment, Hiring, and Promotion section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoring-team.com/wp-content/uploads/2024/06/IMR8-Appendix-5-Recruitment-Hiring-and-Promotions-2023.11.01-1.pdf.

# VI. Training

## Guiding Principles

The IMT assessed compliance with the Training paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **265.** CPD will enhance its recruit training, field training, in-service training, and preservice promotional training so that they are sufficient in duration and scope to prepare officers to comply with CPD directives consistently, effectively, and in accordance with the law, CPD policy, best practices, and this Agreement.

> **266.** CPD training will reflect its commitment to procedural justice, de-escalation, impartial policing, and community policing.

> **267.** CPD training will convey CPD's expectations that officers perform their jobs diligently and safely, and have an understanding of, and commitment to, the constitutional rights of the individuals they encounter.

> **268.** The training required under this Agreement is set out in this section and, for specific topic areas, in the Community Policing, Impartial Policing, Crisis Intervention, Use of Force, Officer Wellness and Support, and Accountability and Transparency sections.

## Summary of Compliance Efforts and Assessments

### Training in the Tenth Reporting Period

In the tenth reporting period, the CPD continued to make progress in many areas of training, as required by the Consent Decree. Notably, the CPD has made significant in the Field Training and Evaluation Program. As the CPD expanded recruitment efforts to address the CPD's significant staffing shortages, this placed strains on the Field Training Officer (FTO) program, which is tasked with providing Probationary Police Officers (PPO) with sufficient field training before becoming field qualified and receiving field assignments as Chicago Police Officer.

During this reporting period, the CPD expanded the Field Training Officer (FTO) budget allocation to support up to 450 Field Training Officers and conducted new exams and training for new FTOs. While additional FTO exams are scheduled for the remainder of 2024, this expansion has allowed the CPD to end the use of ACT-Ups to supplement the FTO cadre, while still maintaining the requisite one-to-one FTO-PPO ratio for each of the PPOs' three field training cycles.

This reporting period, the CPD began implementation of the *2024 Training Plan*, which included a minimum of 40 hours of In-Service Training based on the previously published *2024 Needs Assessment*. The CPD has made significant strides to progress towards the 95% completion rates required by the Consent Decree early in the year, so as to meet the training needs of the CPD ahead of the 2024 Democratic National Convention in Chicago.

## Updated Compliance Levels through Ten Reporting Periods

Independent Monitoring Report 10 provides compliance assessments for 68 paragraphs. During this reporting period, the City and the CPD achieved or maintained at least Preliminary compliance with 63 of these paragraphs. Specifically, in the tenth reporting period, the City and the CPD maintained Preliminary compliance for 46 paragraphs (¶¶273–85, 289, 295–300, 303-04, 307–19, 324, 326–29, 331–35, and 338), achieved Preliminary compliance for two paragraphs (¶¶291 and 336), lost Secondary compliance for one paragraph (¶283), maintained Secondary compliance with 10 paragraphs (¶¶270, 272, 292, 305, 320–23, 337, and 340), achieved Secondary compliance with four paragraphs (¶301–02, 306, and 339), and achieved Full compliance for one paragraph (¶271). The City and CPD failed to reach Preliminary compliance for five paragraphs (¶¶286–88, 290, and 294). *See* Training Figure 1 below.

Training Figure 1: Compliance Progress for Training
Paragraphs at the End of the Tenth Reporting Period (June 30, 2024)



Training
Compliance Progress by June 30, 2024

- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

## Training Progress through Ten Reporting Periods and Looking Ahead to the Eleventh Reporting Period

Through 10 reporting periods, the City and the CPD have developed or updated many training materials to incorporate requirements across the Consent Decree sections. Many of these trainings are reflected in the corresponding sections of this report.

Looking ahead to the next reporting period, the IMT anticipates enhanced and more substantive compliance reviews in several areas based on the progress the City and the CPD have made in meeting and maintaining compliance levels. The IMT anticipates that the CPD will make progress towards the development of policy and practices guiding quality instructor selection, training delivery, instruction, and evaluation of participant outcomes. As noted in prior reporting periods, the development of the evaluation process is crucial to assessing the effectiveness of existing training and how to improve the quality and consistency of future instruction and curriculum.

***

Specific compliance assessments, by paragraph, for the Training section are available here: https://cpdmonitoringteam.com/tenth-semi-annual-independent-monitoring-report/.

This includes paragraphs where the City gained or lost compliance in the tenth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Training section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2024/06/IMR8-Appendix-6-Training-2023.11.01.pdf.

# VII. Supervision

## Guiding Principles

The IMT assessed compliance with the Supervision paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **341.** Effective supervisors, who lead by example and actively engage with the subordinates under their direct command, play a critical role in ensuring lawful, safe, effective, and community-centered policing. To achieve this outcome, the Parties agree to the requirements set out below.

> **342.** The provisions of this Agreement are designed to ensure that CPD supervisors provide the effective supervision necessary for members to perform their duties lawfully, safely, and effectively and for members to improve and grow professionally. Further, the provisions of this Agreement are designed to allow supervisors to spend time monitoring and training members under their direct command so as to provide adequate opportunities to prevent, promptly identify, and promptly correct adverse officer behavior. This meaningful supervision will facilitate the establishment and re-enforcement of a culture of community policing, community and officer safety, and accountability throughout the Department.

> **343.** CPD should have the staffing necessary to promote lawful, safe, effective, and community-centered policing; provide effective supervision; ensure officer safety and accountability; and implement the terms of this Agreement.

> **344.** Immediate supervisors of all ranks are responsible for supervising, managing, and overseeing, as appropriate, the day-to-day work activities of members under their direct command.

> **345.** Supervisors of all ranks are accountable for the performance of subordinate members directly observed or under their direct command.

> **346.** Effective supervisors will: a. engage in activities and conduct that support the mission and goals of the Department, including those set forth in this Agreement; b. model appropriate conduct, including abiding by high standards of integrity and adhering to the United States Constitution and other laws, CPD policy, and the terms of this Agreement; and c. consistently demonstrate professionalism, courtesy, and respect towards all people with whom they interact.

# Summary of Compliance Efforts and Assessments

## Supervision in the Tenth Reporting Period

Many of the City's and the CPD's efforts in the Supervision section of the Consent Decree rely on the concepts of unity of command and span of control. Unity of command requires that the same sergeant supervise the same group of police officers. *See* ¶358. Span of control limits the number of officers any one sergeant can supervise daily. *See* ¶358. The goal of span of control is to create a consistent ratio of 10 officers to one sergeant to encourage effective supervision.

The Unity of Command and Span of Control Pilot Program was launched to implement these concepts to enable more effective and efficient supervision, mentoring, officer support, and policing. Through the pilot program, the City and the CPD implemented a pod supervision structure (primary, secondary, and tertiary role for supervisors). The *Unity of Command and Span of Control Pilot Program* began in the 6th District during the second reporting period. In the fourth reporting period, the CPD expanded the pilot into the 4th and 7th districts. Ultimately, however, the CPD decided that implementing the Unity of Command and Span of Control Pilot Program in three districts was not feasible, so they chose to focus efforts on refining the program within the 6th District.

Despite the CPD's continued efforts to implement the *Unity of Command and Span of Control Pilot Program,* the CPD has faced various challenges with the implementation, as explained in previous IMT reports. The CPD continues to face staffing shortages that prevented the pilot districts from consistently meeting the 10-to-1 officer-to-supervisor ratio required by ¶360. We learned that officers were not being consistently overseen by the same supervisors, as envisioned by the pilot program. We also heard frustrations from officers regarding the staffing shortages, which not only hampered compliance with the program, but also created situations in which understaffing could have reduced officer safety.

In April 2022, the City and the CPD requested technical assistance from the IMT regarding the *Unity of Command and Span of Control Pilot Program*. During the sixth and seventh reporting periods, we had in-depth discussions with command staff, officers, and supervisors about the strengths and shortcomings of the pilot program. We were informed that the pod supervision structure did not consistently result in unity of command as envisioned. Therefore, in late June 2022, during the first technical assistance meeting, the City and the CPD shared their plans to develop a new staffing model to address several the shortcomings of the pod model. The new model, implemented in the ninth reporting period, focuses on three tenets: (1) geographic familiarity, (2) high-quality supervision, and (3) resource flexibility.

During the ninth reporting period, the IMT closely observed the rollout of the *Unity of Command and Span of Control Pilot Program* based on the new staffing model in the 6th District. The City and CPD expanded the pilot programs into other districts in the ninth and tenth reporting periods. The pilots were implemented in the 4th district in October 2023 and implemented in the 7th district in January 2024.

As the CPD strategically staggered implementation, the supervision pilot programs are in various stages of completion. Table 1 shows the progress of the pilots in active districts. Districts in the "Implementation Underway" phase have begun operating under the model and are tracking compliance with the pre-determined success metrics. Districts in the "Implementation Complete" phase have achieved and maintained compliance with pre-determined success metrics.

*Table 1. Progress of Supervision Pilot Programs*

| CPD District *(in order of implementation)* | Unity of Command/ Span of Control | Performance Evaluation System |
|---|---|---|
| 006 – Gresham | Implementation Underway | Implementation Underway |
| 004 – South Chicago | Implementation Underway | Implementation Underway |
| 007 – Englewood | Implementation Underway | Implementation Underway |

During monthly calls, the City and the CPD shared information about the progress of the pilot program. The CPD-determined target goal for Span of Control, or the frequency with which CPD is meeting the 10:1 ratio of members compared to sergeant working within a sector/watch is 70%.[41] The CPD-determined target goal for the Unity of Command by sector, or the frequency with which a member is working within their assigned sector is also 70%. The CPD-determined target goal for Unity of Command by reviewer, or the frequency with which a member is working with the supervisor assigned to complete their performance review is 50%. Since the launch of the new staffing model in the ninth reporting period, compliance rates with the CPD-determined target goals have fluctuated and this has continued in the tenth reporting period. The IMT acknowledges the CPD's efforts but looks forward to these numbers stabilizing across all periods and shifts.

*Table 2. Compliance with CPD-Determined Target Goals in the Tenth Reporting Period*

| CPD District *(in order of implementation)* | Span of Control *(% Range)* | Unity of Command by Sector *(% Range)* | Unity of Command by Reviewer *(% Range)* |
|---|---|---|---|
| 006 – Gresham | 64 – 81% | 76 – 80% | 24 – 27% |
| 004 – South Chicago | 67 – 81% | 72 – 80% | 33 – 39% |
| 007 – Englewood | 80 – 89% | 77 – 84% | 18 – 31% |

---

[41] In previous reporting periods, the CPD-determined target goal was 80%.

Additionally, the CPD has continued to provide updates on the staffing dashboard's management tools for making staffing and operational decisions, which the IMT believes would enhance unity of command and span of control. We look forward to these percentages of time increasing and remaining stable over time. In the IMT's opinion, the CPD members in the pilot districts and in the patrol chain of command are dedicated to achieving compliance in this area, not only because it is required by the Consent Decree, but because they understand that these requirements are fundamental pieces of the structure and accountability required to be able to effectively and constitutionally police Chicago.

The CPD originally chose to also begin implementing the pilots for the Performance Evaluation System (PES) and Officer Support System in the same districts as the *Unity of Command and Span of Control Pilot Program*. However, in the ninth reporting period, the CPD shared their plans to halt the Officer Support System pilot and instead work to combine the system with the legacy officer intervention systems. The IMT is supportive of this more streamlined approach and have accepted the CPD's request to provide technical assistance for this effort. In the tenth reporting period, the City and CPD produced D20-04, *Early Intervention and Support System (EISS) – Pilot Program*, to which the IMT provided a conditional no-objection notice.[42] The City and CPD are moving forward with developing other aspects of the EISS, including the development of the EISS application and corresponding training. The IMT urges the CPD to maintain (and expand) efforts to engage with collective bargaining units, officers, supervisors, and subject matter experts to ensure that the EISS results in officers receiving appropriate interventions to avoid future adverse events.

We believe that it makes sense to continue to pilot the PES and *Unity of Command and Span of Control Pilot Program* together, because they both rely on effective supervision. The PES currently requires that supervisors meet with supervisees for a goal setting session at the beginning of the year, input thirteen portfolio notes (one every CPD period) about a member's performance throughout the year, and conduct an annual performance evaluation at the end of the year. In the tenth reporting period, we continued to monitor the progress of the PES program rollout. In focus group conversations with members of various ranks, the IMT heard about an operational disconnect in the assignment of staff to supervisors in the PES due to movement within districts that City human resources staff would not have been immediately aware of. To CPD's credit, they were able to remedy this issue by providing administrative access to district leadership. CPD members also shared that there was inconsistency in communication about the requirements of and variation in the quality of inputs into the PES. In the case of the 7th

---

[42] As part of our no-objection notice, the IMT noted that final approval for the policy would be provided once the CPD developed other elements of the EISS program (*e.g.*, the EISS app, training material, unit SOPs).

district, delays in the rollout of the PES led to a seven-month period between training and implementation which likely impacted members' familiarity with and understanding of the system. The IMT has recommended refresher training be conducted to ensure that all CPD members (sworn and non-sworn) understand the purpose of the PES and can use it effectively. The City and CPD are planning to share results of an internally-conducted evaluation of the PES, which the IMT readily looks forward to.

The CPD has also convened a *Unity of Command and Span of Control Pilot Program* Evaluation Committee, which is to meet at least quarterly to discuss implementation progress and share feedback from CPD personnel. This committee has the potential to play an important role in the programs' effective implementation. The CPD also added similar tasks to this committee for the Performance Evaluation System and Early Intervention and Support System pilot programs. The IMT believes that this committee can work to anticipate and address some of the possible challenges to ensure a smoother implementation process. However, in the past, these meetings had been structured as briefings to members rather than an opportunity for members to engage in robust, constructive conversations, leading the IMT to have doubts about whether the committee was fulfilling its' responsibilities. However, in the tenth reporting period's committee meeting, members were much more vocal about pilot implementation successes and challenges. Conversations during the meeting led to the institution of monthly meetings of the pilot districts to review metrics.

Finally, the City and the CPD are in the process of initiating a Work Force Allocation Study, which will allow the City and the CPD to evaluate the CPD's current staffing and organizational structure and implement recommendations to bring the CPD in line with best staffing practices and further compliance with the Consent Decree. During the tenth reporting period the IMT provided written and oral feedback on a draft scope of work for the forthcoming Work Force Allocation Study. The IMT will evaluate compliance with the relevant paragraphs upon receipt of an executed scope of work, which the CPD plans to provide during the eleventh reporting period. The IMT believes that programs required by the Supervision section of the Consent Decree are being thoughtfully developed and implemented by the City and the CPD as a pilot. To test and develop strategies to implement Unity of Command and Span of Control, the PES, and the Officer Support System pilot programs in all CPD districts, the 6th District became the central location and focus of the IMT and the Parties as the pilot district. We recognize the aforementioned progress that has been made and the pilot in the 6th District was used to assess and grant Preliminary compliance, as policies and processes have been developed and are at various stages of implementation. However, the Consent Decree requires that many of the paragraphs within the Supervision section be implemented and measured for compliance in all 22 CPD police districts. Therefore, while Prelimi-

nary compliance was achieved in the 6th District, further levels of compliance cannot be achieved until the pilot continues to expand and is able to be successfully replicated and implemented in other districts. The IMT may be able to consider these levels of compliance once evidence of successful implementation is observable and measurable in multiple districts with unique challenges. The IMT looks forward to continuing to work with the City and the CPD toward the goal of broadening the impact of implementing an effective supervision structure in all 22 districts.

## Supervision Progress through Ten Reporting Periods

Overall, we assessed the City's compliance with 29 Supervision paragraphs during the tenth reporting period (¶¶347–57 and 359–76). In the tenth reporting period, the City and the CPD maintained Preliminary compliance for 23 paragraphs (¶¶347–349, 351–55, 359–64, 367, and 369–76) and reached Secondary Compliance for two paragraphs (¶¶350 and 368). The City and the CPD did not reach any level of compliance with four paragraphs (¶¶356–57 and 365–66).

Supervision Figure 1: Compliance Progress for Supervision Paragraphs at the End of the Tenth Reporting Period (June 30, 2024)



Supervision
Compliance Progress by June 30, 2024

- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

## Looking Ahead to the Eleventh Reporting Period

In the eleventh reporting period, the IMT will review data relevant to the *Unity of Command and Span of Control Pilot Program* such as assignment sheets, transfer orders, and other relevant records. The IMT also looks forward to receiving access to the Watch Application Sheet and Unity of Command and Span of Control Tab-

leau Dashboard. While the numbers and staffing are important, the IMT emphasizes the importance of seeing discussions related to the pilot shift to include the guiding concepts.

We hope to work more collaboratively with the City and the CPD to identify and, if necessary, help develop data sources which accurately capture supervisory activities and show evidence of supervisors' ability to provide appropriate support and accountability. The IMT will continue conducting interviews and focus groups with members of the three pilot districts. The IMT also anticipates observing any pilot program, pre-service supervisors, and in-service supervisors training along with evaluations of that training. The IMT notes that the CPD has stated that it plans to conduct training for non-sworn supervisors during the eleventh reporting period. The IMT looks forward to observing this training and notes that all references to training in this section refer to the training of all applicable supervisors, both sworn and non-sworn. Further, we plan to observe future evaluation committee meetings and hope to see a shift from a briefing model to a more collaborative and conversational structure.

*** 

Specific compliance assessments, by paragraph, for the Supervision section are available here: https://cpdmonitoringteam.com/tenth-semi-annual-independent-monitoring-report/.

This includes paragraphs where the City gained or lost compliance in the tenth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Supervision section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2024/06/IMR8-Appendix-7-Supervision-2023.11.01.pdf.

# VIII. Officer Wellness and Support

## Guiding Principles

The IMT assessed compliance with applicable Officer Wellness and Support paragraphs in accordance with the Consent Decree's "Guiding Principles." These guidelines "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **377.** *In fulfilling their duties, CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy. There is growing recognition that psychological and emotional wellness are critical to officers' health, relationships, job performance, and safety. The City and the CPD have an obligation to help CPD members cope with the consequences that come from their service to the public.*

> **378.** *The City and the CPD's obligation to CPD members includes providing adequate support systems to treat members experiencing mental health, substance abuse, and other emotional challenges.*

> **379.** *The City and the CPD's obligation to CPD members also includes equipping them in a manner that enables them to do their jobs as safely as reasonably possible. CPD will ensure that the safety of its members is not jeopardized by equipment and technology that is outdated, broken, or in need of repair or replacement.*

> **380.** *The City and the CPD will implement the following requirements in order to achieve a healthy, effective, and constitutionally compliant police force.*

## Summary of Compliance Efforts and Assessments

### Officer Wellness and Support in the Tenth Reporting Period

During the tenth reporting period, the City and the CPD made notable progress towards compliance in several areas of the Consent Decree. For example, the CPD resumed the Annual Wellness Check-ins after re-evaluating their intake and scheduling process; continued a partnership with the University of Chicago to design the needs assessment (*see* ¶383); partnered with several technology vendors to develop the tools necessary to establish a technology-based system to support their data collection; produced data being collected manually which is required by the Consent Decree (*see* ¶392 and 394); made necessary policy changes to the Directive E06-03, *Traumatic Incident Stress Management Program* (TISMP); and began to prioritize civilian wellness training.

While the City and the CPD are taking actionable steps forward, there is still more work to do in line with the guiding principles of the Consent Decree to support member wellness.

As stated in the guiding principles for this section (*see* ¶377–80), CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy. The City and the CPD have an obligation to help CPD officers and civilian members cope with the consequences that come from their service to the public. This includes providing adequate support systems to treat CPD members experiencing mental health, substance use disorder, and emotional challenges.

The City and the CPD continued to face challenges related to several areas in this reporting period. Obstacles to advancing toward further compliance include the following:

- Inability to determine timeframes for members' receipt of services, as required by the Consent Decree (*see* ¶¶383, 389, 395, and 407);

- Reliance on manual data collection as opposed to establishing a technology-based system (*see* ¶¶381–382); and

- Failure to demonstrate fully functional necessary systems to maintain its equipment and technology; ensure that it has the necessary resources in place to conduct an audit; or establish an audit schedule to inform the plan within the designated 90 days to address the stipulated findings, recommendations, and next steps (*see* ¶¶415–417).

As in prior reporting periods, during the tenth reporting period, data collection continued to be a challenging issue for the City and the CPD. While the CPD is currently manually collecting data which has afforded them certain levels of compliance, to reach Full compliance in several paragraphs, the CPD must implement a reliable, technology-based, and data driven system to retain, track, and analyze key data points relevant to specific paragraph requirements.

Currently, the Professional Counseling Division (PCD) captures data relating to officer wellness by completing handwritten forms. The forms are then submitted to an administrator, who manually inputs the data into a computer. The PCD is reevaluating this process to allow the PCD to automatically capture key data points relating to officer wellness at an aggregate level while maintaining client anonymity.

Notably, the PCD uses a manual process to track the times of requests for services, offers of appointments, and the actual times scheduled for appointments. The IMT strongly recommends that the PCD use a computerized system to automatically record these touchpoints. Such a computerized system would allow the PCD to

reliably measure response times to requests for service, which will help the CPD achieve further compliance with several paragraphs (*e.g.,* ¶¶ 381, 383, 389, and 395).

In addition to assessing response times, the CPD continues to face challenges assessing the caseloads of the PCD. The IMT recognizes and appreciates the continued increase in mental-health clinicians since the inception of the Consent Decree. The CPD has informed the IMT that the PCD is "almost fully staffed," with 21 mental health clinicians currently employed. However, preliminary data from quarterly reports indicated that the caseloads were nearly double the numbers that the PCD had previously verbally reported. The IMT looks forward to seeing further data regarding staffing, workload, and current and future capacity.[43] Furthermore, the CPD must demonstrate that the data-driven results and analyses of the forthcoming needs assessment and *Officer Support Systems Plan* inform the CPD on future staffing levels. These systems and processes will help to ensure that the PCD has sufficient staff to meet the wellness needs of all members (*see* ¶¶390, 391, 395, and 399).

The City and the CPD have recently begun collecting data on referrals to external clinicians. The IMT and the PCD have had robust discussions about which referral metrics the PCD should capture. The PCD's effort to develop a database should help the CPD reach further compliance in several paragraphs (*see, e.g.,* ¶¶394, 399, 404, and 406).

The IMT also recognizes the continued progress that CPD and the City made toward compliance with the *Traumatic Incident Stress Management Program* (TISMP) (*see* ¶¶ 407, 408, and 410). During the tenth reporting period, the City and the CPD produced the *Traumatic Incident Stress Management Program eLearning* training materials. The IMT reviewed these materials and awaits attendance records in future reporting periods.[44]

During the tenth reporting period, the CPD continued to make progress toward developing an improved needs assessment (¶383), *Officer Support Systems Plan*

---

[43]    The IMT notes that the PCD will be reviewed under the forthcoming Workforce Allocation Study.

[44]    The IMT notes that, in addition to training their members on the TISMP, the CPD must ensure they have a mechanism in place to systematically identify members who are required to attend (or have already attended) the TISMP as defined by Directive E06-03, *Traumatic Incident Stress Management Program* (TISMP). While training all members on the TISMP is a necessary step toward compliance with ¶¶ 407, 408, and 410, the IMT is concerned that without a reliable, automated mechanism to identify applicable members, the CPD will continue to fail to enroll in the TISMP all members who have experienced potentially traumatic incidents, as noted by the *2023 TISMP Audit*. Furthermore, the IMT strongly encourages the CPD to communicate the importance of the TISMP referral requirements to all members (and particularly those with referral responsibilities, like Watch Operations Lieutenants), possibly during roll calls.

(¶384), communication strategy (¶¶385–86), and *Suicide Prevention Initiative* (¶388). The CPD has informed the IMT that they are collaborating with the University of Chicago to develop the next needs assessment, which will be the basis for a future *Officer Support Systems Plan*, communications strategy, and *Suicide Prevention Initiative*. The IMT encourages the CPD to create a robust internal communication strategy regarding the upcoming needs assessment to help ensure increased participation in the needs assessment survey (*see* ¶383(f)). Finally, the IMT encourages the PCD to collaborate with the Office of Public Safety Administration (OPSA) on the *Suicide Prevention Initiative* because OPSA maintains data on member suicides.

The IMT also continues to engage with the OPSA regarding fitness for duty, as OPSA is responsible for managing and overseeing the fitness for duty evaluation process (*see* ¶397). During the ninth reporting period, the OPSA provided the IMT with an informal production of a flowchart explaining the fitness for duty evaluation process. The IMT anticipates that the OPSA will formally produce this flowchart, along with a fitness-for-duty policy during the eleventh reporting period. The IMT notes that it has observed a confusion regarding the fitness for duty process among CPD members and hopes that the fitness for duty policy and flowchart will reduce this confusion.

During the tenth reporting period, the CPD prioritized training sworn members in advance of the Democratic National Convention (which was held in Chicago in August 2024). To that end, the CPD produced several training suites or training enhancements, including annual use-of-force training, in-service supervisor training, recruit training, and enhancements to the *Wellness and Law Enforcement Medical and Rescue Training* (WELMART). The IMT notes that these training suites were comprehensive and included training on a wide variety of wellness topics, including the role biometrics has in capturing the physiological impact of stress, financial wellness, yoga practices, and nutritional information.

While the CPD prioritized training of sworn members during the tenth reporting period, the CPD did make some progress toward civilian wellness training. The CPD produced a civilian wellness curriculum and anticipates that it will provide this training during the eleventh reporting period. The IMT stresses the importance of providing wellness training to all members, sworn and non-sworn, and looks forward to observing the upcoming civilian wellness training.

During future reporting periods, the IMT looks forward to learning about the process by which the CPD identifies and consults subject matter experts in the creation of wellness training (*see* ¶¶ 412–13). The IMT understands that the CPD currently develops certain wellness training curricula in cooperation with subject mat-

ter experts, but the IMT is currently unaware of the process by which the CPD selects those subject-matter experts. *Compare* ¶¶282–286. The IMT looks forward to further discussion on this process.

## Officer Wellness and Support Progress through Ten Reporting Periods

Overall, the IMT assessed the City's compliance with 36 Officer Wellness and Support paragraphs in the tenth reporting period (¶¶381–402, 404 and 406–18). The City and the CPD maintained Preliminary compliance with 18 paragraphs (¶¶384, 388, 395, 398, 399, 402, and 407–18), achieved Preliminary compliance with one paragraph (¶389), maintained Secondary compliance with 12 paragraphs (¶¶381–83, 385–86, 390–91, 393, 397, 401, 404, and 406), achieved Secondary compliance with two paragraphs (¶¶394 and 400), and achieved Full compliance with three paragraphs (¶¶387, 392, and 396).



Officer Wellness Figure 1: Compliance Progress for Officer Wellness Paragraphs at the End of the Tenth Reporting Period (June 30, 2024)

Officer Wellness and Support
Compliance Progress by June 30, 2024



- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

## Looking Ahead to the Eleventh Reporting Period

Moving forward, the City and the CPD should focus on (1) improving its data collection and analysis, (2) ensuring that it identifies and tracks all members who qualify for referral to the TISMP referral program, and (3) developing a comprehensive needs assessment, which will inform the next *Officer Support Systems Plan*, communications strategy, and *Suicide Prevention Initiative*.

The IMT also expects to see significant efforts put into remedying the issues identified in the TISMP audits. It is crucial that all members—particularly members responsible for making referrals—understand the referral requirements for the TISMP. It is also crucial that the CPD have an automated system to identify and track members who qualify for referral to the TISMP.

\*\*\*

Specific compliance assessments, by paragraph, for the Officer Wellness and Support section are available here: https://cpdmonitoringteam.com/tenth-semi-annual-independent-monitoring-report/.

This includes paragraphs where the City gained or lost compliance in the tenth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Officer Wellness and Support section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2024/06/IMR8-Appendix-8-Officer-Wellness-and-Support-2023.11.01.pdf.

# IX. Accountability and Transparency

## Guiding Principles

The IMT assessed compliance with applicable Accountability and Transparency paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **419.** *Holding public servants accountable when they violate law or policy is essential to ensuring legitimacy and community confidence.*

> **420.** *A robust and well-functioning accountability system in which CPD members are held to the highest standards of integrity is critical to CPD's legitimacy and is a priority of CPD. A culture of accountability also promotes employee safety and morale, and improves the effectiveness of CPD operations. Organizational justice also plays an important role in ensuring that CPD members have confidence in the legitimacy of the system that holds them accountable.*

> **421.** *In order to foster public trust and receive critically important community feedback, and promote confidence in CPD, the City and CPD will ensure the process for submitting and pursuing complaints that allege violations of CPD policy or the law by CPD members is open and accessible for all individuals who wish to file complaints.*

> **422.** *Meaningful community involvement is imperative to CPD accountability and transparency. Nothing in this Agreement should be construed as limiting or impeding community participation in CPD's accountability system, including the creation and participation of a community safety oversight board. OAG and the City acknowledge the significant work many of Chicago's community organizations have undertaken and are continuing to undertake, including work alongside CPD, in the area of police reform and accountability, and OAG and the City know this critical work will continue.*

> **423.** *The City, CPD, and COPA will ensure that all complaints of misconduct, whether from internal or external sources, are thoroughly, fairly, timely, and efficiently investigated in accordance with this Agreement; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all CPD members who commit misconduct are held accountable pursuant to a disciplinary system that is fair, timely and consistent, and provides due process.*

# Summary of Compliance Efforts and Assessments

## Accountability and Transparency in the Tenth Reporting Period

The Accountability and Transparency section of the Consent Decree requires reform efforts from many City entities. The reach of the section is vast—involving several City entities—and is motivated by the guiding principles at the outset of the Section, as shown above (¶¶419–23).

The Accountability and Transparency section of the Consent Decree explicitly sets obligations for the following City entities: the Chicago Police Department (CPD) and the CPD's Bureau of Internal Affairs (BIA), the Office of the Inspector General's (OIG) Deputy Inspector General for Public Safety (Deputy PSIG), the Civilian Office of Police Accountability (COPA), and the Police Board. Since some requirements previously assigned to other entities have now been assumed by the Community Commission for Public Safety and Accountability (CCPSA), the IMT also interacts with that entity. In addition, some of the requirements of the Accountability and Transparency section call for action by the City. All of these moving parts make up a complex accountability system in the City of Chicago.

While the CPD, COPA, the Deputy PSIG, and the Police Board are working toward the common goal of increased accountability and transparency, these entities work toward this goal in different manners as appropriate for each entity and as required by the Consent Decree. These entities have each found success in complying with the requirements set out in the Accountability and Transparency section at different paces and with varying degrees. The Deputy PSIG, for example, achieved Full compliance with all requirements pertaining to its office in the fourth reporting period and maintained that Full compliance during subsequent reporting periods. In the eighth reporting period, the Deputy PSIG successfully completed its two-year sustainment period, marking two years that it had maintained Full compliance with all requirements pertaining to its office. Therefore, in the ninth reporting period, the Parties moved to release the OIG and the Deputy PSIG from its Consent Decree requirements, which was granted by the Court.

In the past few reporting periods, COPA and the Police Board had developed and followed plans that allowed them to consistently achieve compliance with various requirements of this section.

The CPD, on the other hand, had been following a less methodical path toward compliance, which slowed its progress in complying with Accountability and Transparency requirements. In the eighth and ninth reporting periods, the CPD started to make notable progress toward compliance by developing specific BIA trainings.

However, the CPD did not make much progress toward compliance with requirements because no trainings were delivered to BIA personnel during the tenth reporting period.

The City's complex accountability system requires consistent communication and collaboration among all entities. As noted in our last report, there was a sharp decline in collaboration between the CPD and COPA in the ninth reporting period with regard to report access, data access, and regularly occurring conversations. However, in the tenth reporting period, the entities appeared to improve their collaborative relationship, and COPA reported improved access to data. Although COPA still does not have access to the CPD's digital system for personnel photos or the CPD's Member Disciplinary Histories for the entire length of employment, the IMT is encouraged by the important improvements.[45] We hope to see continued efforts to improve consistent communications between the entities.

For the past several reporting periods, the CPD, COPA, and the Police Board have conducted regular meetings with the IMT and the OAG. In the eighth reporting period, the CCPSA began conducting monthly meetings as well, but the vast majority of these meetings were canceled by the City. In an effort to foster a more collaborative process, in addition to these monthly meetings, the IMT began to regularly meet individually with the City entities and the OAG. The increased individual meetings and direct communications allowed the IMT to hear challenges and concerns, to explain compliance methodologies, and to provide technical assistance (*see* ¶656). Moving forward, we feel the enhanced, less-rigid communications will further assist the City in achieving and maintaining compliance with the Consent Decree.

## Accountability and Transparency Progress through Ten Reporting Periods

Overall, the IMT assessed the City's compliance with 139 Accountability and Transparency paragraphs. With the combined efforts of all the City entities noted in this section, the City maintained Preliminary compliance with 50 paragraphs (¶¶439, 444–45, 448, 453–56, 459–61, 463–68, 471, 475–76, 479–84, 486–87, 493, 495, 497, 499, 501, 503–04, 516–19, 522–24, 526–27, 530–31, 540–42, and 544) and met Preliminary compliance with four paragraphs in the tenth reporting period (¶¶528, 548–49, and 564). The City also maintained Secondary compliance with 44 paragraphs (¶¶424–29, 431–38, 440, 443, 446–47, 449–50, 452, 457, 462, 469,

---

[45] We noted in the ninth reporting period that the City, the CPD, and COPA had participated in collaborative conversations due to changes in state law, which removed the five-year requirement stated in ¶516. We understand that COPA still does not have access to this documentation. COPA provided a memorandum at the end of the tenth reporting period noting that BIA had declined to provide the disciplinary records for CPD members for their entire length of employment until the Office of Legal Affairs approved.

470, 472, 474, 477–78, 496, 498, 500, 502, 505–09, 511, 513–15, 552, and 560) and met Secondary compliance with 2 paragraphs (¶¶525 and 532). The City also maintained Full compliance with 24 paragraphs (¶¶430, 441–42, 473, 485, 533–39, 543, 550, 554–59, 561–63, and 565) and met Full compliance with one paragraph (¶551). The City did not reach any level of compliance with 14 paragraphs (¶¶451, 488–92, 494, 512, 521, 529, 545–47, and 553), two of which are under assessment for Preliminary compliance (¶¶546–47).

Accountability Figure 1:    Compliance Progress for Accountability & Transparency Paragraphs at the End of the Tenth Reporting Period (June 30, 2024)



Given the variable nature of the Accountability and Transparency Section requirements for each City entity, we provide a summary of each entity's efforts separately.

### The Chicago Police Department (CPD)

In the tenth reporting period, the CPD continued making efforts toward compliance with Accountability and Transparency requirements.[46] For example, the CPD made significant progress toward finalizing its *Officer-Involved Shooting and Officer-Involved Death Incident* policy series (G03-06, G03-06-01, and G03-06-02), which is arguably one of the most important requirements of the Consent Decree. The CPD worked closely with the IMT and the OAG in the tenth reporting period

---

[46]   The City takes the position that ¶445 does not apply to the CPD. However, the IMT has consistently monitored both the CPD and COPA throughout the past reporting periods on the requirements of this paragraph. Because the paragraph says COPA will "initiate the intake process" does not exclude CPD from its requirements for leadership to know the process when a CPD member is untruthful, including any findings made at suppression hearings. The IMT will continue to monitor the City's compliance looking at both the CPD and COPA.

to discuss and revise the policy series. The CPD also conducted a simulated officer-involved shooting walkthrough for the Court, the IMT, and the OAG to demonstrate how the policy series works in practice. The walkthrough provided helpful insight into the intent of the provisions in the policy series and fostered further discussions. The IMT provided a no-objection notice to the policy series on June 13, 2024. However, the CPD must address the OAG's additional comments before implementing the policy series. Additionally, the CPD must revise the policy series to comply with the Court's July 1, 2024 Order Regarding the CPD's Body Worn Camera Policy and Public Safety Investigations.

In the seventh and eighth reporting periods, the CPD focused its efforts on creating a *BIA Onboard Training*. Toward the end of the eighth reporting period, after many discussions about the format and purpose of the *BIA Onboard Training* (including how that training could be repurposed to satisfy ¶¶526–28), the CPD restructured this training as subject-specific blocks of instruction. We suggested that this change in structure would improve the quality and efficacy of the training and would provide the CPD with the opportunity of seeking and gaining compliance with various paragraphs on a rolling basis as training modules are drafted and provided.

During the ninth and tenth reporting periods, the CPD continued to make significant progress by developing numerous BIA in-service training modules. By the end of the tenth reporting period, the CPD developed lesson plans for each subparagraph of ¶528 and many additional Accountability and Transparency paragraphs, thereby achieving Preliminary compliance with ¶528. Several of the trainings were provided in the ninth reporting period. However, due to other demands, no BIA trainings were provided in the tenth reporting period and have been scheduled for delivery in the eleventh reporting period. The IMT understands that the CPD plans to deliver the following trainings in the eleventh reporting period:

- BIA's *Accountability Supplemental eLearning*
- BIA's *New Intake Personnel*
- BIA's In-Service Trainings: *Module 3, Credibility, Standards of Proof, and Disciplinary Decision Making; Module 8, Audio Recording Interview Guidelines; Module 9, Interviewing Department Members; Module 10, Mistakes and Updates; Collection of Evidence and Interviews with Non-Department Members;* and *Investigation Assignment and Timelines*.

We look forward to the delivery of the trainings next reporting period, along with documentation of training records (*see* ¶¶282–89).

The CPD also produced its *2023 BIA Annual Report*[47] and its *2024 BIA Quarter 1 Report*[48] during the tenth reporting period. The reports include all necessary aggregate data regarding investigations conducted by BIA and Accountability Sergeants, as required by ¶¶550–51.[49] The IMT appreciates the CPD's effort to create and publish the reports in a timely manner. The reports demonstrate a commitment to transparency and building trust in BIA's operations.

During site visits in March 2024, the IMT met with Accountability Sergeants in multiple districts. As we have noted in previous reporting periods, we continue to have concerns about Accountability Sergeants and BIA Investigators' day-to-day responsibilities and experiences. For example, although some Accountability Sergeants do have designated areas in the district where they can conduct interviews, review videos confidentially, and complete their investigations, many others do not. Each Accountability Sergeant interviewed this reporting period had department-provided recording devices to record interviews, but this does not resolve the issue that not all Accountability Sergeants have the ability to conduct these recorded interviews in quiet, private spaces.

Additionally, the IMT continues to be concerned about the lack of reform of the accountability and disciplinary process. We continue to learn the harsh realities on the ground and challenges that BIA Investigators and Accountability Sergeants face when performing their duties. Even though ¶494(b) requires two Accountability Sergeants to be assigned in each district, we have continued to learn this is not occurring in practice. Although most districts have now allocated more than one sergeant as an Accountability Sergeant, the majority of the districts still classify them as a "primary" and a "backup." In many districts, the backup Accountability Sergeant performs other assignments in the district and only has cases assigned during the absence of the Primary Accountability Sergeant. This continues to create a very high caseload for the one designated Accountability Sergeant. One district had a Primary Accountability Sergeant, but when we visited in a previous reporting period, that sergeant was working as the desk sergeant in the district. In another district, the Primary Accountability Sergeant was assigned out in the field and had to come back to the district office to meet with us. This is not a new issue. We have noted this issue going back to at least the sixth reporting period. We continue to encourage the CPD to designate two Accountability Sergeants with their

---

[47]   *See 2023 BIA Annual Report*, https://home.chicagopolice.org/wp-content/uploads/BIA-2023-Annual-Report.pdf.

[48]   *See 2024 BIA Quarter 1 Report*, https://home.chicagopolice.org/wp-content/uploads/BIA-Quarter-Q1-2024-Report.pdf.

[49]   The *2023 BIA Annual Report* was also produced for Full compliance review with ¶¶456, 462, 476, 526–28, and 530, and the *2024 BIA Quarter 1 Report* was also produced for Full compliance review with ¶¶456, 462, 476, and 526–27. However, the reports alone are insufficient for Full compliance with those paragraphs. To reach Full compliance with those paragraphs, the CPD must produce the underlying data relevant to those paragraphs rather than a summary of that data.

**primary responsibility** being receiving, processing, and investigating complaints against CPD members (as required by ¶¶493-494) rather than other duties like serving as the desk sergeant or the field sergeant for the day.

This reporting period, we learned of confusion among Accountability Sergeants on investigative timelines, particularly when cases have been re-assigned multiple times to different Accountability Sergeants (*see* ¶471–72). Lastly, we learned that BIA does not conduct formal performance evaluations of the Accountability Sergeants in the district, although they primarily oversee the duties of their work. We encourage the CPD to consider how BIA can play a role in this process formally moving forward.

Although Accountability Sergeants' caseloads have begun to trend in the right direction with lower caseloads, we continue to note that the numbers may not continue to improve until personnel are primarily dedicated to investigating cases in the districts. We strongly encourage BIA to continue holding informal sessions with Accountability Sergeants, and one-on-ones to continue the momentum with district investigations moving forward.

Throughout the tenth reporting period, the IMT met with the CPD on a regular basis to provide technical assistance to the CPD as it continues to develop and finalize its policies, as well as develop and deliver its trainings. We look forward to continued conversations as the CPD works towards compliance.

## Civilian Office of Police Accountability (COPA)

In the tenth reporting period, COPA proceeded to make efforts toward compliance with Accountability and Transparency requirements. In addition to the monthly COPA meetings, the IMT began having more regular direct communications with COPA in the tenth reporting period. COPA continued to demonstrate its commitment to not only fulfilling the requirements of the Consent Decree but recognizing the opportunity to improve their operational capacity and quality of their organization.

This reporting period, the IMT attended and observed multiple COPA In-Service trainings:

- *Complaint Register*;
- *Rules and Directives*;
- *Officer Interviews*;
- *Fact Gathering – Evidence Collection*;
- *Witness Reliability*.[50]

---

[50]   The IMT did not attend and observe COPA's *Civil and Criminal Complaint Review* Training this reporting period.

Overall, the IMT met with COPA training staff throughout the reporting period to discuss various improvements we would like to see addressed in future reporting periods. Moving forward, the IMT would like to see all instructors teaching in alignment with the lesson plans, which ensures consistency across training sessions and instructors. Additionally, we hope to see more engagement from the training attendees by COPA utilizing adult-learning techniques throughout each training session (*see* ¶284). The IMT would also like to see COPA improve its post-test engagement by discussing the answers to each question with the attendees to ensure comprehension of training materials (*see* ¶272(g)). Per previous discussions, COPA must send these records for all trainings each reporting period moving forward.[51]

To assess the effectiveness of the trainings, COPA surveyed the training attendees to evaluate the courses and to provide feedback (*see* ¶287). However, on average, only 24% of attendees provided an evaluation. In future reporting periods, we hope to see COPA improve its response rate to ensure feedback is being received from the majority of attendees. COPA should also expand its evaluation component to include collection of data on the instructors. Lastly, we hope to see a mechanism in place to ensure that feedback is received, analyzed, and reviewed and that training is improved in future iterations.

This reporting period, COPA produced its *2023 Annual Report*[52] and its *2024 First Quarter Report*[53]. The reports include all necessary aggregate data regarding investigations conducted by COPA, as required by ¶550. The reports also demonstrate COPA's commitment to transparency in its operations.

We acknowledge COPA's continued progress and encourage COPA to continue these efforts in future reporting periods to maintain and achieve additional levels of compliance. The IMT appreciates the opportunity for continued conversations to discuss what documentation is necessary for Full and Effective compliance. We look forward to continuing positive collaboration in future reporting periods.

### The Chicago Police Board

In the tenth reporting period, the Police Board continued to make thoughtful and methodical efforts toward compliance with Accountability and Transparency section requirements under new leadership. For example, the Police Board drafted policies related to its Consent Decree requirements during this reporting period.

---

[51] The IMT did not receive training evaluation records (*see* ¶287) by the end of the reporting period for COPA's *Investigative File Maintenance* Training and its *Disciplinary and Remedial Recommendations* Training.

[52] *See 2023 COPA Annual Report*, https://www.chicagocopa.org/wp-content/uploads/2024/05/2023-Annual-Report_.pdf.

[53] *See 2024 COPA Q1 Report*, https://www.chicagocopa.org/wp-content/uploads/2024/04/COPA-2024-Q1-Final-1.pdf.

Additionally, the Police Board continued to work toward meeting training requirements (*see* ¶¶540–42). To meet its training requirements, the Police Board has sought the help of outside entities on a *pro bono* basis to provide relevant and thorough training on topics required by the Consent Decree.

Throughout the tenth reporting period, the IMT met with the Police Board on a monthly basis. During these meetings, the Police Board provided various updates on its compliance efforts and also provided updates regarding pending litigation between a police union and the City regarding arbitration of serious police discipline cases.[54] That litigation is currently pending appeal, and pursuant to the court's decision, the Police Board only heard cases in which the officer consented to the Police Board's procedures in the tenth reporting period.[55]

Beyond taking the steps necessary to achieve compliance levels, the Police Board has continued to demonstrate a dedication to the spirit of the Consent Decree, taking reform, accountability, and transparency seriously. We commend the Police Board for its continued efforts and progress to date.

### The Community Commission for Public Safety and Accountability (CCPSA)

In 2021, the City of Chicago created the Community Commission for Public Safety and Accountability (CCPSA), a new entity for police oversight, accountability, and public safety. The CCPSA is now responsible for selecting a COPA Chief Administrator and Police Board members when vacancies occur (*see* ¶¶525 and 532).

The CCPSA was first tasked with filling vacant Police Board positions in the ninth reporting period. We expressed concerns that the CCPSA did not follow the established selection process and criteria previously developed by the Police Board and the City. However, in the tenth reporting period, the CCPSA again had the opportunity to select additional Police Board members, and resolved our concerns by following the established selection process and criteria in filling the additional vacant positions. The IMT appreciates the CCPSA's efforts to closely follow the process despite challenges related to gaining interest from qualified applicants.

Additionally, in the tenth reporting period, the CCPSA produced draft surveys seeking responses from CPD and COPA personnel regarding the qualities needed of a COPA Chief Administrator, as well as responses from CPD members regarding the qualities needed of a Police Board member. The materials submitted also indicated that the CCPSA plans to hold public hearings regarding the same. We appreciate

---

[54] *See Chicago John Dineen Lodge #7 v. City of Chicago, et al.*, Case No. 2024-CH-00093 (Circuit Court of Cook County, Illinois County Department, Chancery Division).

[55] As of the time of this report, the IMT understands this litigation is still pending appeal.

the CCPSA's community outreach efforts and look forward to seeing the results of those efforts in future reporting periods.

### Deputy Inspector General of Public Safety (Deputy PSIG)

The Deputy PSIG achieved Full compliance with all Consent Decree requirements relevant to the Deputy PSIG in the fourth reporting period. The Deputy PSIG made consistent efforts to maintain Full compliance in subsequent reporting periods. As we noted in the fifth reporting period, the Deputy PSIG developed a plan to maintain Full compliance. It followed that plan through the end of the eighth reporting period, which marked the end of its two-year sustainment period. As stated above, in the ninth reporting period, the Parties moved to release the OIG and the Deputy PSIG from its Consent Decree requirements because it successfully completed the required two-year sustainment period, which was granted by the Court. Therefore, the IMT ceased monitoring the Deputy PSIG in the ninth reporting period.

### Other City Entities

As noted above, the City of Chicago often works toward and accomplishes compliance through the efforts of the CPD, COPA, the Deputy PSIG, the Police Board, and the CCPSA. However, other City entities occasionally undertake efforts relevant to compliance with Accountability and Transparency section paragraphs.

On October 1, 2022, the City launched its Community-Police Mediation Pilot Program, which offers a meaningful opportunity to build trust and facilitate honest discussions between community members and CPD officers. In the eighth reporting period, the City provided materials explaining that it had extended its revised Community-Police Mediation Pilot Program to run through December 31, 2023. Throughout the ninth and tenth reporting periods, we met with the Mayor's Office to receive updates on the program, but these meetings did not occur monthly as scheduled and were often cancelled. We have previously requested more regular updates going forward and are eager for more information about the progress of the pilot program.

In the tenth reporting period, the City produced reports regarding the Community-Police Mediation Pilot Program. During the first two pilot phases, even though there were a small number of cases that were mediated, the participants were overall satisfied with the program. However, some challenges remained such as scheduling issues and the lack of a virtual option. During this reporting period, the City and COPA created a new Director of Mediation position that will be housed within COPA. This new position will focus on staffing the program and on community engagement. While the City worked to hire the Director of Mediation, the City also begun reviewing its policy to make required changes and working on community engagement. In July 2024, the IMT learned that COPA had filled the Director

of Mediation position and that person would begin employment very soon. [56] The IMT looks forward to updates on the program in the eleventh reporting period.

Additionally, this reporting period, the City produced its *2023 Report on Chicago Police Department Litigation*. The report was timely published within 180 days following the end of the 2023 calendar year and contained all relevant data, as required by ¶¶548–49. The IMT appreciates the City's effort to create and publish the report in a timely manner.

Finally, the City produced a memorandum and supporting documentation detailing its efforts to comply with the Police and Community Relations Improvement Act, 50 ILCS 727/1-1 *et seq.* (PCRIA), which sets forth the requirements with regard to the criminal investigation of officer-involved death incidents. Specifically, PCRIA requires, among other things, that "[n]o investigator involved in the investigation may be employed by the law enforcement agency that employs the officer involved in the officer-involved death . . . ." 50 ILCS 727/1-10(b). Therefore, as the memorandum explains, the City began discussions in 2020 to potentially contract the Illinois State Police's services to investigate CPD officer-involved death incidents. The City's discussions with the Illinois State Police stalled in July 2021. In September 2023, the City resumed discussions with the Illinois State Police, and those discussions remain ongoing. We look forward to additional updates next reporting period.

* * *

Specific assessments, by paragraph, for the Accountability and Transparency section are available here: https://cpdmonitoringteam.com/tenth-semi-annual-independent-monitoring-report/.

This includes paragraphs where the City gained or lost compliance in the tenth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraph in the Accountability and Transparency section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoringteam.com/wp-content/uploads/2024/06/IMR8-Appendix-9-Accountability-and-Transparency-2023.11.01.pdf.

---

[56]  As of the time of this report, the IMT understands that COPA's Director of Mediation position was filled by a prior Mayor's Office employee who has already begun working on the program.

# X. Data Collection, Analysis & Management

## Guiding Principles

The IMT assessed compliance with applicable Data Collection, Analysis, and Management paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *566. Data can empower CPD to engage in the type of critical self-examination essential to instilling and maintaining constitutional policing. CPD can leverage data to ensure constitutional policing by: systematically collecting enough data to have a broad-based understanding of officers' interactions with the public; auditing the data to ensure it accurately reflects those interactions; analyzing the data to identify trends or areas of concern; developing tailored support and interventions to address behavior that is or may become problematic; and assessing the effectiveness of attempts to modify officers' behavior.*

> *567. In addition to enhancing CPD's capacity for internal accountability, CPD can use data to promote accountability to the public by regularly publishing data it collects.*

## Summary of Compliance Efforts and Assessments

### Data Collection, Analysis, and Management in the Tenth Reporting Period

During the tenth reporting period, the City and CPD continued to make progress on several reforms required by the Data Collection, Analysis, and Management section. These efforts allowed the City and CPD to regain Preliminary and Secondary compliance with ¶570, achieve Preliminary compliance with ¶573, achieve Full compliance ¶577, and make appreciable progress in both developing the Department's early intervention system (¶¶583–605) and conducting an audit to ensure the validity of the Department's use of force data (¶¶568, 571, 581, and 582).

During this reporting period, the City regained Preliminary and Secondary compliance with the requirements of ¶570, which provides that COPA shall have access to CPD data systems as part of their investigations into use-of-force events. During the ninth reporting period, the City had lost all levels of compliance due to COPA's restricted access into various CPD data systems and that such access restrictions impacted COPA's ability to conduct their investigations. During the tenth reporting period, COPA's access was restored for all pertinent systems required by ¶570 ("reasonably available documents related to reportable uses of force"), resulting

in regained compliance levels.[57] However, as with prior reports, we continue to require the CPD develop a policy memorializing COPA's access, which we note may have prevented lost compliance in the first place.

Additionally, during this reporting period the CPD's Audit Division conducted an audit of 10,377 report narratives to evaluate the validity of use-of-force data, related to ¶¶568, 571, 581, and 582. In conducting their assessment, the Audit Division identified common narrative terms and criminal charges associated with use of force. The Audit Division then reviewed reports that included such terms and charges to determine whether a TRR should have been completed but was not. In all, the audit found a total of 30 incidents (with a total of 75 members) involving force that were previously unreported, representing 0.3% of the narratives reviewed. The audit also found that force may be overreported in that WOLs interviewed as part of the audit indicated they approved TRRs that they do not believe are required under G03-02-02 (*Incidents Requiring the Completion of a Tactical Response Report*). We have requested TRED data regarding the extent of potential overreporting though note that the findings of the audit largely indicate that the CPD's use of force data is a valid reflection of use of force events.

The CPD also made progress this reporting period in ¶572's requirement to conduct an assessment of the "relative frequency and type of force used by CPD members against persons in specific demographic categories, including race or ethnicity, gender, age, or perceived or known disability status" (¶572). During this reporting period, the CPD provided the IMT with a draft methodology for conducting the required analysis (as required by ¶573), which was developed by research partners from the University of Texas San Antonio and the University of Pennsylvania. In reviewing the draft methodology, we found it to overall reflect an assessment approach that is consistent with current standards in use-of-force analyses. Late in the tenth reporting period, the IMT met with the research partners to discuss the methodology, raise questions, and provide comments. While the IMT did not provide approval for the methodology during the tenth reporting period, the methodology provided for our initial review demonstrates commendable progress on this paragraph and resulted in Preliminary compliance with ¶573.

Finally, during this reporting period, the CPD and City continued to make progress in revising and restructuring their early intervention system (EIS), previously referred to as the Officer Support System (OSS). As noted in our prior report, the CPD is in the process of revising the CPD's current approach to EIS (now referred to as the Early Intervention and Support System, or EISS), merging the predictive components of the OSS with systems the CPD has previously used that will incorporate threshold and peer-comparison metrics into the EIS. As part of its efforts during

---

[57]  While we find that COPA currently has access to documents with respect to ¶570, we reference concerns with COPA's overall access as described in the Accountability and Transparency section, above.

this reporting period, the CPD formally produced Directive D20-04 (*Early Intervention and Support System – Pilot Program*) to which the IMT provided a conditional no-objection notice.[58]

As the CPD's progress in developing the EISS continues, we note the importance of ensuring that the system is carefully implemented and is supported by a robust evaluation framework. In particular, we point to the history of EISs in Chicago as a cautionary tale for the present approach. The CPD is incorporating legacy systems into the EISS though those systems were previously allowed to be under-utilized. The CPD has also previously used the Performance Recognition System, a "first-generation attempt[]...to develop early intervention systems to identify and address at-risk conduct by officers" (¶599), though this too has largely been neglected during the IMT's tenure.

As a result of the Consent Decree, the CPD conducted a pilot of the OSS in two districts though neither included empirical measures of success, limiting the utility of the pilots. As a result of this history, officers may be skeptical to immediately trust the validity and legitimacy of the new EISS. Accordingly, we urge the CPD to maintain (and expand) efforts to engage with collective bargaining units, officers, supervisors, and subject matter experts to ensure that the EISS results in officers receiving appropriate interventions to avoid future adverse events. We continue to stress the importance of a strong and wide-ranging evaluation framework for evaluating the success of the EISS. By doing so, the CPD can ensure that each EISS alert is supported by the data, that officers are taking advantage of the interventions offered, and that EISS supports are resulting in positive behavioral changes for officers.

## Data Collection, Analysis, and Management Progress through Ten Reporting Periods

Overall, the IMT assessed the City's compliance with 42 Data Collection, Analysis, and Management paragraphs. At the end of the tenth reporting period, the City achieved Preliminary compliance with one paragraph (¶573), maintained Preliminary compliance for 26 paragraphs (¶¶568–69, 572, 574, and 583–604), regained Secondary compliance with one paragraph (¶570), maintained Secondary compliance with six paragraphs (¶¶571, 578, 580, 581–82, and 608), achieved Full compliance with one paragraph (¶577), maintained Full compliance with three paragraphs (¶¶579, 606, and 609), and failed to reach any level of compliance with four paragraphs (¶¶575–76, 605, and 607). *See* Data Figure 1 below.

---

[58]  As part of our no-objection notice, the IMT noted that final approval for the policy would be provided once the CPD developed other elements of the EISS program (*e.g.*, the EISS app, training material, unit SOPs).

Data Figure 1: Compliance Progress for Data Collection, Analysis & Management Paragraphs at the end of the Tenth Reporting Period (June 30, 2024)



Data Collection, Analysis, and Management Compliance Progress by June 30, 2024

- Preliminary Compliance
- Secondary Compliance
- Full Compliance
- Not in Compliance

## Looking Ahead to the Eleventh Reporting Period

Moving forward, the CPD should continue to work collaboratively and consistently to address the Data Collection, Analysis, and Management section of the Consent Decree. We look forward to the CPD continuing to make progress as it develops its EIS system and accompanying policy and training. We also look forward to the CPD finalizing the proposed methodology required by ¶573 and conducting the use of force assessment required by ¶572 in the coming reporting periods.

To maintain Secondary compliance with ¶570, which was regained in the tenth reporting period, we expect the CPD to develop a policy that memorializes the City and the CPD's responsibility for ensuring COPA has access to reasonably available documents related to reportable uses of force in CPD systems.

We look forward to continuing to monitor the City and the CPD's progress in meeting the requirements of the Consent Decree in the next reporting period.

\*\*\*

Specific assessments, by paragraph, for the Data Collection, Analysis & Management section are available here: https://cpdmonitoringteam.com/tenth-semi-annual-independent-monitoring-report/.

This includes paragraphs where the City gained or lost compliance in the tenth reporting period, as well as paragraphs with significant developments toward or away from compliance.

A fuller description of the history of compliance efforts, methodologies, compliance determinations for each original monitorable paragraphs in the Data Collection, Analysis, and Management section is available in *Comprehensive Assessment Part I* (which included *Independent Monitoring Report 8*): https://cpdmonitoring-team.com/wp-content/uploads/2024/06/IMR8-Appendix-10-Data-Collection-Analysis-and-Management-2023.11.01.pdf.

# XI. Investigatory Stops, Protective Pat-Downs, and Enforcement of Loitering Ordinances

## Guiding Principles

The IMT will assess compliance with the Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **800.** The Parties agree that the Consent Decree will be expanded to include obligations by CPD to monitor, report, review, train, and implement accountability measures with respect to investigatory stops, protective pat downs, and enforcement of the Loitering Ordinances. Enforcement of the Loitering Ordinances will include initial dispersal orders and, where appropriate, may include investigatory stops, protective pat downs, and arrests. These measures will ensure that CPD's investigatory stops, protective pat downs, and enforcement of the Loitering Ordinances are conducted in a manner that comply with the Constitution and laws of the United States and the State of Illinois and are in accordance with best practices, as defined in Paragraph 730 of the Consent Decree.

> **801.** In conducting investigatory stops and protective pat downs and enforcing the Loitering Ordinances, CPD will interact with all members of the public without bias and will treat all persons with the courtesy and dignity which is inherently due every person as a human being without reference to stereotypes based on race, color, ethnicity, religion, homeless status, national origin, immigration status, gender identity or expression, sexual orientation, socioeconomic class, age, disability, incarceration status, or criminal history.

> **802.** The Parties agree that in achieving the goals of this Stipulation, CPD will encourage officers, through training and supervision, to employ a less intrusive response when enforcing the Loitering Ordinances when appropriate and reasonable under the circumstances.

# Summary of Compliance Efforts and Assessments

## Investigatory Stops, Protective Pat-Downs, and Enforcement of Loitering Ordinances in the Tenth Reporting Period

During this reporting period, the City and the CPD made progress toward compliance by producing updated drafts of CPD policies and reports related to investigatory stops, protective pat downs, and the enforcement of the Loitering Ordinances. The CPD had meaningful engagement with the IMT and OAG in the subsequent review and comment process.

Through the development of draft policies and forms related to investigatory stops, protective pat downs, and the enforcement of the Loitering Ordinances, the City and the CPD achieved Full compliance with ¶868. The City and CPD remained under assessment for Preliminary compliance for ¶¶803–821 while the IMT assesses the CPD's efforts to seek community feedback and their incorporation of community input when appropriate. The City and the CPD are also under assessment for Preliminary compliance for ¶¶862–864 because, while their policies include language regarding community engagement and input, there is not an infrastructure in place for implementation. Additionally, the City and the CPD are under assessment for Preliminary compliance with ¶¶852–853.

For the requirements of ¶834, the City and the CPD achieved Preliminary compliance in the tenth reporting period. The IMT reviewed de-identified investigatory stop data that was submitted, as well as the City and CPD's draft G03-XX suite policies and forms. For the requirements of ¶835, the City and CPD achieved Secondary compliance. The IMT reviewed the CPD's draft *Needs Assessment – Investigatory Stops* and provided the Fourth Amendment Stop Review Unit (4ASRU) with comments and suggestions in the form of technical assistance. The *Needs Assessment* was also reviewed for other paragraph requirements as well, including ¶¶838, 841, and 853. For the requirements of ¶¶841, 852, 857–859, and 873, the City and CPD achieved Preliminary compliance. The IMT reviewed the City and the CPD's draft G03-XX policies and forms, as well as the *Tactical Review and Evaluation Division (TRED) 2023 Year End Report* and *Notice of Job Opportunity (NOJO) for TRED/4ASRU (*¶¶852–853). The City and CPD achieved Secondary compliance with ¶856 with the submission of the *TRED 2023 Year End Report*.

## Investigatory Stops, Protective Pat-Downs, and Enforcement of Loitering Ordinances Progress in the Tenth Reporting Periods

During this reporting period, the IMT assessed the City's compliance with 36 paragraphs in the Investigatory Stops, Protective Pat-Downs, and Enforcement of Loitering Ordinances section of the Consent Decree. At the end of the tenth reporting

period, the City achieved Preliminary compliance for six paragraphs (¶¶834, 841, 857–59, and 873). The City maintained Secondary compliance for one paragraph (¶854) and achieved Secondary compliance for three paragraphs (¶¶835, 838, and 856). The City achieved Full compliance with one paragraph (¶868). The City's Preliminary compliance for 25 paragraphs remained under assessment at the end of the tenth reporting period (¶¶803–821, 852–53, 862–64, and 866).

ISR Stipulation Figure 1:
Compliance Progress for Investigatory Stops, Protective Pat-Downs, and Enforcement of Loitering Ordinances Paragraphs
at the end of the Tenth Reporting Period (ending June 30, 2024)



### Investigatory Stops, Pat Downs, and Loitering Compliance Progress by June 30, 2024

- ■ Preliminary Compliance
- ■ Secondary Compliance
- ■ Full Compliance
- ■ Not in Compliance

## Looking Ahead to the Eleventh Reporting Period

In the next reporting period, we look forward to assessing additional paragraphs and reviewing documentation supporting compliance for each. Of note, there were three paragraphs previously slated for the tenth reporting period that were not monitorable due to contingencies on other paragraphs.[59] We have updated the Monitoring Plan chart from *Independent Monitoring Report 9* to reflect ¶¶836,

---

[59] On December 28, 2023, the IMT received an extension request from the City and CPD for ¶835. The City and CPD requested an extension to April 30, 2024. On January 13, 2024, the IMT submitted a response to this request approving the extension. As a result of this extension and ¶836 requiring that the CPD submit a data plan *within 180 days of completion of the needs assessment* provided for in Paragraph 835 of this Stipulation, the deadline for ¶836 became October 27, 2024—falling under the eleventh reporting period. For paragraph requirements for ¶861, the IMT recognizes that ¶860 is not being monitored until the eleventh reporting period, and since ¶861 is contingent upon ¶860, it would not be possible to monitor in the tenth reporting period.

837, and 861 being moved to the eleventh reporting period (see *ISR Stipulation Figure 2*).

ISR Stipulation Figure 2.
Investigatory Stops, Protective Pat-Downs, and
Enforcement of Loitering Ordinances Updated Monitoring Plan

| Monitoring Period | Paragraphs |
|---|---|
| Ninth Reporting Period (July 1, 2023 – December 31, 2023) | ¶¶854, 866, 868 <br><br> **(Total = 3)** |
| Tenth Reporting Period (January 1, 2024 – June 30, 2024) | ¶¶803–821, 834–835, 838, 841, 852–853, 856–859, 862–864, 873 <br><br> **+33 paragraphs (Total = 36)** |
| Eleventh Reporting Period (July 1, 2024 – December 31, 2024) | ¶¶822–833, 836–37, 839–840, 860–61, 869–870, 872 <br><br> **+21 paragraphs (Total = 57)** |
| Twelfth Reporting Period (January 1, 2025 – June 30, 2025) | None <br><br> **+0 paragraphs (Total = 57)** |
| Thirteenth Reporting Monitoring (July 1, 2025 – December 31, 2025) | ¶¶844–851 <br><br> **+8 paragraphs (Total = 65)** |

Looking forward to the eleventh reporting period, the IMT hopes to see the City and the CPD focus on finalizing their policies, and incorporating investigatory stops, protective pat downs, and the enforcement of loitering ordinances into their public awareness campaign. The IMT also hopes to see the City and the CPD focus on finalizing their *Needs Assessment* so that operations are streamlined and any gaps that were identified are addressed. Indeed, while this is the newest section of the Consent Decree, the City's and the CPD's efforts directed at investigatory stops and enforcement of loitering ordinances are critical to every section of the Consent Decree and the short and long-term success of Chicago's policing efforts overall.

\*\*\*

Specific compliance assessments, by paragraph, for the Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances section are available here: https://cpdmonitoringteam.com/tenth-semi-annual-independent-monitoring-report/.

This includes paragraphs where the City gained or lost compliance in the tenth reporting period, as well as paragraphs with significant developments toward or away from compliance.

# XII. Implementation, Enforcement & Monitoring

As we identified in previous monitoring plans and reports, the City has many obligations that fall outside the 11 topic areas. While these paragraphs do not fall within the specific topic areas discussed above, these obligations are critical to the success of the reform efforts across all 11 topic areas of the Consent Decree. These requirements are included in the Implementation, Enforcement, and Monitoring section of the Consent Decree: ¶¶626–27, 629–43, 677–80, 682–87, 699–701, 704–06, 711, 714, and 720–21.

## Review and Monitoring Processes (¶¶626–27, 629–42, 679–80, 687, 711)

The Consent Decree outlines the policy review process in ¶¶626–37, the plan review process in ¶¶638–40, and the training review process in ¶641. Paragraph 633 requires the CPD to "ensure that its officers and the public have a meaningful opportunity to review and comment on material changes to CPD policies and procedures required by this Agreement." *See also*, ¶¶52 and 160. Further, as the City and the CPD develop and revise policies throughout the Consent Decree process, they must consult with the IMT and the OAG to develop the necessary policy or revision. The City and the CPD must then provide the IMT with the new or revised policy at least 30 days before the policy is scheduled to go into effect (¶¶627–28). The IMT and the OAG then have 30 days to comment, with a possible 15-day extension (¶¶627–28). The City, the CPD, the OAG, and the IMT then have at least 30 days to resolve comments. If we are unable to come to a timely agreement, an entity may submit a formal objection, which triggers a "workout period" (¶630). The entities then have an additional 30 days to resolve the issue before one of the Parties brings the issue to the Court to resolve (¶630). On the other hand, when the IMT and the OAG provide a "no objection" notice, then when applicable, the City and the CPD must post the new or revised policy for public comment for a minimum of 15 days (¶633). The entities must then review and consider the public comments and agree to any changes before the City and the CPD finalize the policy (¶633).

Overall, we have been satisfied with the City's and the CPD's willingness to collaborate with the IMT and the OAG regarding their policies. In recent months, however, the City has implemented several policies outside of the required ¶¶626–37 process. Recently, the City, the CPD, and the IMT have had productive conversations regarding strategies to ensure that these procedures are better implemented moving forward. Moreover, during the tenth reporting period, the City, the CPD, the IMT, and the OAG also engaged in the consultation process for policy and training development for several policies and training materials to great effect.

As we note below, the City and the CPD must continue to improve their community engagement processes around policy creation and revision. The review processes have not always been without complications since the inception of the Consent Decree, but we continue to work through disagreements in a largely collaborative fashion.

The City is also obligated by ¶679 to "collect and maintain all data and records necessary to document compliance with this agreement." The City and the CPD continue to take steps in the right direction. During the tenth reporting period, the City and the CPD continued to make progress on its efforts to streamline data collection processes and ensure reliable data is collected to demonstrate compliance with each section of the Consent Decree. As reported in our last assessment, the City and the CPD reached out to each Consent Decree section's Associate Monitor to identify the data necessary to comply with their section, representing a collaborative process between the IMT and the City to ensure that data collection systems and processes are reliably captured and mapped. And during the ninth reporting period, the City and the CPD provided a final assessment report for ¶606 that will now be used to inform the development of a *Data Systems Plan*. *See* ¶607.

Separately, ¶680 requires the City to "file a status report one month before each of the Monitor's reports is due for the duration of this Agreement. The City's status report will delineate the steps taken by CPD during the reporting period to comply with this Agreement, and CPD's assessment of the status of its progress implementing this Agreement." In the tenth reporting period, the City filed this required report on time. We remain hopeful that this status report will develop into an accurate tool for expediting full and effective compliance with the Consent Decree in future reporting periods.[60]

### Collective Bargaining (¶711)

It is important to note that the Consent Decree, and all review and monitoring processes exist alongside the City's collective-bargaining relationships. As explained in our previous reports, the City is a party to collective bargaining relationships with four labor unions representing sworn police officers:

- The Fraternal Order of Police, Chicago Lodge No. 7 (FOP);

- The Policemen's Benevolent & Protective Association of Illinois (PBPA), Unit 156 – Sergeants;

---

[60] We note that some aspects of the status report appear to conflict with recent conversations with members of the CPD regarding their progress. For the purposes of this report, where there is an apparent conflict, we have relied on the more recent conversations.

- PBPA of Illinois, Unit 156 – Lieutenants; and

- PBPA of Illinois, Unit 156 – Captains (collectively, the "Unions").

Paragraph 711 of the Consent Decree harmonizes the City's statutory bargaining obligations with the Unions with the City's Consent Decree, adopting the following key tenets:

- As a threshold matter, the Consent Decree is not intended to alter the City's collective bargaining agreements or otherwise to impair or conflict with the officers' statutory rights to engage in collective bargaining through their chosen representatives (the Unions);

- Likewise, the Consent Decree does not obligate the City (or the Unions) to violate the terms of their collective bargaining agreements, or to violate or waive any bargaining rights or obligations;

- Nevertheless, in recognition of the fact that the City's labor agreements can and will directly impact its compliance with various provisions in the Consent Decree, the Consent Decree obligates the City to "use its best efforts" in the collective bargaining process "to secure modifications" to its collective bargaining agreements covering sworn officers that are consistent with the terms of the Consent Decree or to the extent necessary to implement the provisions of the Consent Decree.

To monitor ¶711, the City, the IMT, and the OAG have met on a monthly basis during earlier reporting periods. During the most-recent tenth reporting period, the City, the IMT, and the OAG met once, on April 25, 2024, to discuss updates on the City's progress in bargaining successor labor agreements with the Unions and the status of related pending litigation. During this meeting, the City provided access to members of its bargaining committee. In future reporting periods, the IMT intends to return to a monthly meeting cadence.

During the tenth reporting period, the City produced a Final Opinion and Award of the Dispute Resolution Board, dated October 19, 2023, in which the Dispute Resolution Board ordered the FOP and the City to include in their new agreement a provision stating that grievances protesting disciplinary actions in excess of 365 days and separations (dismissals) issued to police officers may be heard and decided in final and binding arbitration rather than by the Police Board. The City also produced various documents relating to an Amended Verified Complaint filed on February 1, 2024 in the Circuit Court of Cook County, Chancery Division (the Court), by the FOP to confirm the Dispute Resolution Board's October 19, 2023 Final Opinion and Award. The documents indicate that, on January 31, 2024, the Court issued an Agreed Order staying Police Board proceedings through February 25, 2024. The FOP and the City filed cross-Motions for Summary Judgment, and

the Court heard oral argument on those motions on March 20, 2024. During the April 25, 2024 meeting between the City, the IMT, and the OAG, the IMT learned that the Court issued a ruling on March 21, 2024. The City has not produced a copy of that ruling to the IMT. The IMT understands that the ruling permits disciplinary actions in excess of 365 days and separations (dismissals) to be heard in arbitration, but the arbitration must be public and the accused officers may be suspended without pay while the arbitration case is pending. In April 2024, the FOP filed a notice of appeal of the Court's decision.

### IMT and OAG Access (¶¶682–86)

To effectively monitor the City, the CPD, and the City's entities' compliance with the requirements of the Consent Decree, the IMT and the OAG (in their role as the plaintiff) must have access to tremendous amounts of documents, data, and most importantly people and places. The IMT believes that to accelerate compliance through Technical Assistance, the City must streamline access to facilitate efficient compliance efforts and determinations. Since the Consent Decree began, the IMT has enjoyed considerable access to the CPD – but at times has found access challenging that is needed to determine compliance (¶¶681–86).

The IMT must broader, unencumbered, and cooperative access to get a true sense of the impact of Consent Decree reforms on the ground, as well as how the organization functions. Receiving the access required by the Consent Decree consistently will become increasingly important for reaching Full compliance with requirements across the Consent Decree. The City, the CPD, and the IMT have been working to ensure that such access is provided in the eleventh reporting period, including preparation for the Democratic National Convention. We will report on that progress in the report for the eleventh monitoring report.

Additionally, as noted in many of our monitoring reports, we continue to have challenges regarding document and data productions, as a large number of materials tend to be produced tend to be produced near the end of the reporting period. This challenge impacts the IMT's ability to have substantive discussions with the City regarding compliance assessments. Although we have seen this issue improve over the last few reporting periods, we note that in the tenth reporting period, over 50% of the productions for the entire period were submitted in the last two months of the reporting period. We continue to urge the City to take a more holistic approach to their submissions to ensure they are submitted in a manner that allows sufficient time for collaboration and discussion with the IMT and OAG. We also made recommendations in Part II of our comprehensive assessment to facilitate more efficient demonstrations of compliance and corresponding public reporting.

### Accountability Processes (¶¶643, 683, 699, 704)

Throughout the Consent Decree process, the IMT has noted many challenges with the CPD's accountability processes. In fact, the lack of accountability for CPD officers engaging in misconduct was among the major findings of the U.S. Department of Justice's investigation into the CPD for civil rights violations, which ultimately resulted in the Consent Decree.

The City's and the CPD's accountability processes are complex, involving many entities with overlapping roles and responsibilities, including the CPD's Bureau of Internal Affairs (BIA), the Chicago Police Board, the Civilian Office of Police Accountability (COPA), the four police unions (see ¶711), the City's Department of Law, and the Office of the Inspector General's Public Safety Section (PSIG). Moreover, the City recently implemented a new police oversight entity, the Community Commission for Public Safety and Accountability (CCPSA), which is embedded into the fabric of the City of Chicago's complex police accountability system.

The IMT acknowledges that holding officers who "violate policies, procedures, orders, or directives that are required by this Agreement" accountable for their actions is sometimes complicated. The IMT has consistently emphasized that officer accountability – and public transparency about accountability processes – must be a shared responsibility among all leaders in the CPD, from sergeants to the Superintendent.

We note, for example, that while several paragraphs of the Consent Decree require progressive discipline (*see* ¶¶238–39 in addition to ¶643), we have seen limited to no evidence of a functional progressive discipline policy or process over five years into the Consent Decree process. Further, as we have noted over many reporting periods, the CPD is not implementing the district-level Accountability Sergeants—the first line of accountability in the agency—as required by ¶¶493–95. The CPD must implement the Accountability Sergeant function as it is described in and required by the Consent Decree.

Moreover, the Consent Decree notes that the "City agrees to require compliance with this Agreement by its officers, officials, employees, agents, agencies, assigns, or successors" and that the Consent Decree is "binding on all Parties hereto, by and through their officials, employees, agents, representatives, agencies, assigns, and successors." We urge the City and the CPD to take appropriate action to comply with these important and long overdue accountability requirements.

### Staffing and Resource Issues (¶¶677–78, 700, 706)

While the City and the Chicago Police Department (CPD) continue to implement the requirements of the Consent Decree, we remain concerned about the lack of

consistent staffing and retention levels. The City and the CPD have designated the following entities to be responsible for the following provisions of ¶678:

- 678(a): the CPD's Reform Management Group and the City's Department of Law;

- 678(b) and (c): the CPD's Office of Legal Affairs and the City's Department of Law; and

- 678(d): the CPD's Reform Management Group.

Overall, personnel from the City, the CPD, and other relevant City entities continue to assist the IMT by providing information, updates, and evidence of compliance efforts. These representatives frequently arrange communications and help the IMT navigate the complexity of the City entities.

As with previous reporting periods, we have had some specific concerns about the lack of consistent staffing and retention levels in the Reform Management Group and the high level of turnover in the over five years since the Consent Decree began. The Reform Management Group is located within the CPD's Office of Constitutional Policing and Reform and works closely with the CPD's Office of Legal Affairs and the City's Department of Law. We have mentioned in previous reports our concern about the turnover in Executive Directors in the CPD's Office of Constitutional Policing and Reform – three people have held that position in 3.5 years. Additionally, as of the end of the tenth reporting period, the Executive Director position remains vacant. Consistent leadership is of the utmost importance for reform to be sustainably implemented. We also note that the City and the CPD have not provided the IMT with an updated CPD organizational chart since September 2023; therefore, we have only dated information about some of the staffing levels and organizational structure of some key components for implementing and sustaining Consent Decree requirements, such as the Audit Division.

The personnel in these groups have many of the "knowledge, skills, and abilities necessary to facilitate compliance with this Agreement," as ¶677 requires. The City's Department of Law provides many of the project management functions for the relevant city entities—the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General (OIG), including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC). The Reform Management Group provides many of these project management functions for the CPD.

We also have concerns about the staffing of the CPD's Audit Division, which is critical to the sustainability of the reform effort. The Audit Division's mission is as follows:

*The mission of the Audit Division is to provide quality, independent and objective assessments of the operations, processes, and internal controls in support of the Chicago Police Department ('Department'), including but not limited to work related to the strategic plan and consent decree. During internal audits and other reviews in which areas for improvement are identified, recommendations will be made to enhance Department operations. The Audit Division promotes accountability by proactively working with officials across all the Department to identify risks, evaluate controls, and make recommendations intended to promote constitutional policing and the effective delivery of police services. The Department is committed to the use of audits and other reviews to assess adherence to its stated orders, policies, and procedures—as well as to demonstrate consistency with the strategic plan and compliance with the consent decree into which the Department entered with the Attorney General of the State of Illinois. All audits and reviews are intended to provide objective information to inform decision-making and to help improve the internal transparency and accountability of the Department's operations.*

The chronic understaffing of this unit is short-sighted for the future of sustainable reform at the CPD. The City and the CPD must continue to make efforts to maintain staffing at appropriate levels at all times in the following key departments: the Research and Development Division, the Tactical Review and Evaluation Division (or TRED, an umbrella under which the Force Review Unit, the Firearm Pointing Review Unit, the Foot Pursuit Review Unit, the Search Warrant Review Unit, and the Fourth Amendment Stop Review Unit reside), the Education and Training Division, the Crisis Intervention Team, the Audit Division, the Office of Community Policing, the Bureau of Internal Affairs (BIA), and the Reform Management Group. All have experienced consistent understaffing, and we believe that understaffing continues.

Many of the City's and the CPD's efforts and achievements in the first nine reporting periods continued into the tenth reporting period. The City's Department of Law, the CPD's Office of Constitutional Policing and Reform, the Legal Affairs Division, and the Research and Development Division (¶¶677–78) continued to be fully engaged in the monitoring process. The City and the CPD also maintained regular channels of communication with the IMT and the OAG and continued dialogue, problem-solving, and brainstorming about requirements and challenges regarding the paragraphs of the Consent Decree.

The City is "responsible for providing necessary and reasonable financial resources necessary through steps or processes that can include the budget process to fulfill its obligations under this Agreement, subject to the terms and conditions set forth herein" per ¶700 and that it is "responsible for providing necessary support and resources to CPD to enable CPD to fulfill its obligations under this Agreement" per ¶706.

### Reform and Sustainability Processes (¶¶705, 714, 720–21)

While the City and the CPD have a long way to go to achieve "full and effective compliance" with the Consent Decree (*see* ¶717), we encourage them to begin thinking about how they will sustain the reforms they achieve over the course of this process.

The City bears the burden of providing evidence of its achievements to the IMT (per ¶720) and has been focused on achieving compliance with the Consent Decree's requirements (per ¶714 the original goal for completely implementing all requirements was five years, but it has since been extended by the Court to eight years), we must also be mindful of sustaining the reforms beyond the Consent Decree monitoring process.[61] Paragraph 721 requires the City and the CPD to "develop a plan, in consultation with the Monitor and OAG, to conduct compliance reviews, audits, and community surveys deemed necessary and appropriate following the termination of the Consent Decree."

It is not too early to begin thinking about how the City's resources and accountability systems—including but not limited to the CPD's own Audit Division, TRED, the OIG, the PSIG, COPA, the Police Board, the CCPSA, and the most important accountability mechanisms of all, front-line CPD supervisors—should be harnessed to maintain sustained compliance with reforms, identify shortcomings and rectify them quickly well into the future.

One of the Consent Decree's overarching goals is for the CPD to become a learning and self-correcting organization. We are hopeful that the CPD will begin to think forward to a long-term plan for not only reaching full and effective compliance, but also how it can sustain these reformed practices well after the Consent Decree is terminated. Constitutional policing practices must be ingrained into the CPD's policies, practices, and culture. We believe it is crucially important that CPD begin to develop the plan required by ¶721, and we remind the City that the Consent Decree does not "limit the City's right to adopt future measures that exceed or surpass the obligations contained herein, as long as the terms of this Agreement are satisfied" (¶705).

---

[61] *See Stipulation Regarding Search Warrants, Consent Decree Timelines, and the Procedure for "Full and Effective Compliance," Illinois v. Chicago*, Case No. 17-cv-6260 (March 25, 2022), https://cpdmonitoringteam.com/wp-content/uploads/2024/03/2022.03.25-Stipulation-Regarding-Search-Warrants-Consent-Decree-Timeline.pdf.

# Conclusion,
# Looking Ahead to
# *Independent Monitoring Report 11*

We have concluded our monitoring efforts for the tenth reporting period (January 1, 2024, through June 30, 2024). We appreciate the reform efforts made by many hard-working City personnel, including the compliance progress made by the City; the CPD; COPA; the Chicago Police Board; and the OEMC.

The IMT's next semiannual report, *Independent Monitoring Report 11*, will cover the reporting period from July 1, 2024, through December 31, 2024. As with previous reports, we will continue to work with the City and the OAG to implement all the Consent Decree's requirements. We will also continue to engage with Chicagoans to determine whether these reforms are being felt in their communities.

Moving forward, in the twelfth and thirteenth reporting periods, we will continue to assess the City's compliance with *all paragraphs with requirements* in the Consent Decree or "monitorable paragraphs."[62]

The number of monitorable paragraphs may change as the City and its relevant entities begin to achieve full and effective compliance by sustaining Full compliance for the requisite periods.[63] In those cases, the IMT will stop assessing those requirements and paragraphs for compliance unless we derive information or evidence "showing that compliance with such requirements has materially lapsed." ¶716.

---

[62] Our previous Monitoring Plans are available on our website. *See Reports*, INDEPENDENT MONITORING TEAM, https://cpdmonitoringteam.com/reports-information/.

[63] To achieve full and effective compliance with Consent Decree requirements, the City and its relevant entities must maintain Full compliance for either one or two years, depending on the section of the Consent Decree. *See* ¶714.

Conclusion Figure 1. Reporting Periods for Years One through Six

| Monitoring Plan for Year One | |
|---|---|
| 1st Reporting Period | March 1, 2019 – August 31, 2019<br>(*See* Independent Monitoring Report 1) |
| 2nd Reporting Period | September 1, 2019 – February 29, 2020<br>(*See* Independent Monitoring Report 2) |
| **Monitoring Plan for Year Two** | |
| 3rd Reporting Period | March 1, 2020 – December 31, 2020[64]<br>(*See* Independent Monitoring Report 3) |
| 4th Reporting Period | January 1, 2021 – June 30, 2021<br>(*See* Independent Monitoring Report 4) |
| **Monitoring Plan for Year Three** | |
| 5th Reporting Period | July 1, 2021 – December 31, 2021<br>(*See* Independent Monitoring Report 5) |
| 6th Reporting Period | January 1, 2022 – June 30, 2022<br>(*See* Independent Monitoring Report 6) |
| **Monitoring Plan for Year Four** | |
| 7th Reporting Period | July 1, 2022 – December 31, 2022<br>(*See* Independent Monitoring Report 7) |
| 8th Reporting Period | January 1, 2023 – June 30, 2023<br>(*See* Independent Monitoring Report 8) |
| **Monitoring Plan for Year Five** | |
| 9th Reporting Period | July 1, 2023 – December 31, 2023<br>(Independent Monitoring Report 9, Spring 2024) |
| 10th Reporting Period | January 1, 2024 – June 30, 2024<br>(Independent Monitoring Report 10, Autumn 2024) |
| **Monitoring Plan for Year Six** | |
| 11th Reporting Period | July 1, 2024 – December 31, 2024<br>(Independent Monitoring Report 11, Spring 2025) |
| 12th Reporting Period | January 1, 2025 – June 30, 2025<br>(Independent Monitoring Report 12, Autumn 2025) |

Figure 2 on the following page reflects all monitorable paragraphs – including the new Investigatory Stops section – in the Consent Decree, which the IMT will continue to monitor in Year Six.

---

[64] Because of the shutdowns in response to the COVID-19 pandemic, the City and the Office of the Illinois Attorney General extended the third reporting period to December 31, 2020. *See Order Regarding the Extension of Consent Decree Obligation Deadlines* (March 27, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2024/04/2020_03_27-Order-Regarding-the-Extension-of-Consent-Decree-Obligation-De.pdf.

Conclusion Figure 2. Monitoring Plan for Year Six Paragraphs

| Topic Area | Year Six Monitoring |
|---|---|
| Community Policing | 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48 **(Total = 35)** |
| Impartial Policing | 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80 **(Total = 29)** |
| Crisis Intervention | 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152 **(Total = 66)** |
| Use of Force | 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 247, 248 **(Total = 96)** |
| Recruitment, Hiring, and Promotion | 253, 254, 255, 256, 257, 258, 259, 260, 261, 262, 263, 264 **(Total = 12)** |
| Training | 270, 271, 272, 273, 274, 275, 276, 277, 278, 279, 280, 281, 282, 283, 284, 285, 286, 287, 288, 289, 290, 291, 292, 294, 295, 296, 297, 298, 299, 300, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 324, 326, 327, 328, 329, 331, 332, 333, 334, 335, 336, 337, 338, 339, 340 **(Total = 68)** |
| Supervision | 347, 348, 349, 350, 351, 352, 353, 354, 355, 356, 357, 359, 360, 361, 362, 363, 364, 365, 366, 367, 368, 369, 370, 371, 372, 373, 374, 375, 376 **(Total = 29)** |
| Officer Wellness and Support | 381, 382, 383, 384, 385, 386, 387, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401, 402, 404, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418 **(Total = 36)** |
| Accountability and Transparency | 424, 425, 426, 427, 428, 429, 430, 431, 432, 433, 434, 435, 436, 437, 438, 439, 440, 441, 442, 443, 444, 445, 446, 447, 448, 449, 450, 451, 452, 453, 454, 455, 456, 457, 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469, 470, 471, 472, 473, 474, 475, 476, 477, 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488, 489, 490, 491, 492, 493, 494, 495, 496, 497, 498, 499, 500, 501, 502, 503, 504, 505, 506, 507, 508, 509, 511, 512, 513, 514, 515, 516, 517, 518, 519, 521, 522, 523, 524, 525, 526, 527, 528, 529, 530, 531, 532, 533, 534, 535, 536, 537, 538, 539, 540, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 554, 555, 556, 557, 558, 559, 560, 561, 562, 563, 564, 565 **(Total = 139)** |
| Data Collection, Analysis, and Management | 568, 569, 570, 571, 572, 573, 574, 575, 576, 577, 578, 579, 580, 581, 582, 583, 584, 585, 586, 587, 588, 589, 590, 591, 592, 593, 594, 595, 596, 598, 597, 599, 600, 601, 602, 603, 604, 605, 606, 607, 608, 609 **(Total = 42)** |
| Investigatory Stops, Protective Pat Downs, and Enforcement of Loitering Ordinances | 803, 804, 805, 806, 807, 808, 809, 810, 811, 812, 813, 814, 815, 816, 817, 818, 819, 820, 821, 822, 823, 824, 825, 826, 827, 834, 835, 836, 837, 839, 840, 841, 852, 853, 854, 855, 856, 858, 859, 860, 865, 861, 862, 863, 864, 866, 868, 869, 870, 873 **(Total = 57)** |
| **TOTAL** | **609** |

In the first five and a half years of the Consent Decree process, the City and the CPD have made significant progress revising, developing, and implementing policies and training. The City and the CPD have struggled, however, with community policing and community engagement; reliable data collection, analysis, and management; staffing and resource shortages and management; supervision; accountability and full implementation of the Consent Decree. In Year Six, we look forward to monitoring the City's and the CPD's efforts to continue to bridge these gaps and continue demonstrating compliance with the Consent Decree.

In future years, our priorities may shift as the City and the CPD make progress with the requirements of the Consent Decree. The monitoring plans for subsequent years will reflect those shifts.

There are, however, several elements of the IMT's work that will remain consistent over time. The IMT's Community Engagement Team will remain involved with local community-based groups invested in police reform in Chicago. We will disseminate information to community members about the City's and the CPD's progress and collect important information from Chicago residents. Likewise, the IMT will continue to implement and assess community surveys and research and solicit input from CPD members.

We will also continue to prioritize transparent community engagement and participation; independent reviews of police policies and practices; and regular communication with the OAG, the City, the CPD, the Chicago Police Board, the Civilian Office of Police Accountability, other relevant City entities, members of the Coalition (¶669), and members of Chicago communities.

In ¶6 of the Introduction section of the Consent Decree, the City made commitments that help frame many of the issues facing reform efforts today:

> *In this [Consent Decree], the City commits to ensuring that police services are delivered to all of the people of Chicago in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, [in a manner that] respects the rights of all of the people of Chicago, [in a manner that] builds trust between officers and the communities they serve, and [in a manner that] promotes community and officer safety.*
>
> *The City also commits to providing CPD members with the resources and support they need, including improved training, supervision, and wellness resources.*

The CPD is—along with police departments across the nation—continuing to face significant challenges with meeting such commitments. Staffing and resource issues, for example, continue to negatively affect the City's and the CPD's progress

toward simultaneously and sufficiently providing supervision, officer-wellness, and support. This, in turn, has undermined the City's and the CPD's ability to demonstrate effective policing practices that respect the rights of all of the people of Chicago; build trust between officers and the communities they serve; and promote community and officer safety. The City must accelerate its efforts to comply with the Consent Decree.

# Appendix 1
# All Compliance Levels, By Paragraph

See chart on the following page.



# Attachment A:
# Office of the Illinois Attorney General
# Comments
# (November 6, 2024)



**OFFICE OF THE ATTORNEY GENERAL**
STATE OF ILLINOIS

**KWAME RAOUL**
ATTORNEY GENERAL

November 6, 2024

Margaret A. Hickey
Independent Monitor
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Maggie.Hickey@afslaw.com

**Re:    OAG Comments on the Tenth Independent Monitoring Report**
**Consent Decree, Illinois v. Chicago, 17-cv-6260 (N.D. Ill.)**

Dear Ms. Hickey:

The Consent Decree gives the Office of the Illinois Attorney General (OAG) an opportunity to comment on the tenth Monitoring Report (Report) before the Independent Monitoring Team (IMT) files it with the Court. The Report covers January 1, 2024 through June 30, 2024, a period in which the City of Chicago and the Chicago Police Department (CPD) showed promise with its preparations for the Democratic National Convention and continued to make slow progress towards overall implementation of the consent decree. As in prior reporting periods, however, the City and CPD again faced challenges with staffing and resource allocation, and community engagement.

### Progress Towards Finalizing Remaining Critical Policies

As the Report explains, the first step towards compliance with the consent decree is usually creating or revising a policy incorporating the reform requirements. For the last several reporting periods, OAG urged CPD to prioritize putting all remaining consent decree requirements into policy. During this reporting period, CPD continued to make slow, but steady, progress on these critical policies. For example, OAG and IMT sent "no-objection" letters on CPD's policy ensuring meaningful access to police services for individuals with limited English proficiency and CPD is continuing to discuss that policy with the Coalition.

500 SOUTH SECOND STREET, SPRINGFIELD, ILLINOIS 62706 • (217) 782-1090 • TTY: (217) 785 -2771 • FAX: (217) 782-7046
100 WEST RANDOLPH STREET, CHICAGO, ILLINOIS 60601 • (312) 814-3000 • TTY: (312) 814-3374 • FAX: (312) 814-3806
1001 EAST MAIN, CARBONDALE, ILLINOIS 62901 • (618) 529-6400 • TTY: (618) 529-6403 • FAX: (618) 529-6416

OAG provides brief updates on several critical policies that remain outstanding below:

- CPD has been developing a draft of a suite of policies to ensure meaningful access to police services for individuals with disabilities. OAG, IMT, the Coalition, and community members and organizations provided significant input on that draft policy suite during the reporting period and more recently. OAG encourages CPD to incorporate this input into the draft policies to ensure that CPD's practices meet legal requirements and reflect the input of individuals with lived experience.

- The OAG has provided extensive comments on CPD's draft revised policy suite governing investigations of officer-involved shootings and deaths in compliance with the consent decree and Illinois law. The OAG and CPD met several times to discuss the draft policy suite and OAG continues to work collaboratively with CPD so that CPD can finalize this policy suite and post it for public comment.

- After Judge Pallmeyer issued court decisions regarding search warrant practices and the OAG's motion for a judicial resolution of the Body-Worn Camera policy, on May 14, 2024, and July 2, 2024, respectively, CPD provided revised versions of those policies to the IMT and OAG for review and comment. OAG looks forward to CPD finalizing these critical policies consistent with those court decisions as soon as possible.

### CPD's and the City's Staffing Allocation Choices Have Hindered Reform

As in prior monitoring periods, nearly every section of the Report emphasizes the staffing shortages experienced by those divisions of CPD tasked with the nuts and bolts of police reform. The Office of Community Policing, the Crisis Intervention Unit, the Tactical Review and Evaluation Division (TRED), the Training and Support Group, and Reform Management are all understaffed. The Bureau of Internal Affairs is also understaffed and accountability sergeants in the districts struggle with competing patrol responsibilities. Lack of resource allocation also impacts CPD's efforts to implement sweeping reforms to its supervision structure. As the IMT identified, "staffing shortages prevented the Unity of Command and Span of Control Pilot Program districts from consistently meeting the 10-1 officer-to-supervisor ratio required for all districts" by the consent decree.[1]

In February, a City Council committee approved an ordinance requiring CPD to conduct a staffing analysis,[2] which is also a requirement of the consent decree. The City, the OAG, and the IMT provided updates on the progress so far during the October monthly public hearing. While

---

[1] Report, p. 7.
[2] Fran Spielman and Tom Schuba, *City Council Committee OKs Study on How Best to Deploy Chicago Police as Resources Shrink, Some Crimes Spike*, CHICAGO SUN TIMES (February 5, 2024), available at City Council committee OKs study on how best to deploy Chicago police as resources shrink, some crimes spike - Chicago Sun-Times (suntimes.com).

OAG is hopeful that the results of this study assist the City and CPD in responding more quickly to 911 calls and provide necessary data to adequately staff the units performing critical reform functions, OAG is deeply concerned about the recent reporting about the City's proposed cuts to the City and CPD's budgets for these units in 2025.[3] The City and CPD must meet the consent decree's requirements to put sufficient financial and staffing resources towards reform. Decreasing the number of personnel carrying out the daily work of reform, such as the Training and Support Group and the Office of Community Policing, may substantially reverse the incremental progress made so far.

### CPD Must Keep Up Progress Towards Sharing Information with the Public and Developing Trainings

The second step in implementing a reform is often training the relevant officers and civilians on changes to policy or procedure. CPD continues to develop Department-wide training on a variety of new or revised policies while also providing specialized training for supervisors and field training officers. In the monitoring period, CPD trained relevant officers on policies and tactics related to protecting public safety during the DNC while also respecting the First Amendment rights of protesters and reporting force in a transparent way. Moving forward, OAG encourages CPD to prioritize developing a system to evaluate training courses and instructors to ensure that its training is high-quality, consistent, and effective.

Additionally, one of the overarching goals of the consent decree is for the City and CPD to increase its transparency with the public. To that end, the City and CPD published annual reports during this monitoring period to share information with the public, including the following: the 2023 Annual Hate Crimes Report; the 2023 Use of Force Report, the 2023 Tactical Review and Evaluation Division Year-End Report, the Bureau of Internal Affairs 2023 Annual Report, the City's 2023 Report on CPD Litigation, and the officer wellness report to the Superintendent. While the City and CPD have a long way to go towards efficient, accurate data collection, analysis, and management across the consent decree, OAG is encouraged by these public reports. Finally, the City, OAG, and IMT provide progress updates during monthly public hearings on the status of various reforms.

### Conclusion

As we near the end of 2024, we encourage the City and CPD to accelerate its progress towards implementing the reform requirements of the consent decree in 2025 so that Chicagoans begin to feel change in practice. We remain committed to working with the City, the CPD, IMT, the Coalition, and community members and organizations who work towards changing policing in Chicago every day.

---

[3] Alice Yin and A.D. Quig, *Mayor Brandon Johnson's CPD Budget Plan Cuts Constitutional Policing, Other Reform Offices: 'It's a Gutting,'* CHICAGO TRIBUNE (November 1, 2024), available at Mayor Brandon Johnson's CPD budget plan cuts constitutional policing (chicagotribune.com)

Respectfully,

KWAME RAOUL
Attorney General of the State of Illinois

s/Mary J. Grieb
Mary J. Grieb
Deputy Chief, Civil Rights Bureau
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, Illinois 60615
773.590.7959
Mary.Grieb@ilag.gov

cc: Jennifer Bagby, Allan Slagel, Counsel for the City of Chicago (via email)

# Attachment B:
# City of Chicago
# Comments
# (November 13, 2024)



November 13, 2024

Independent Monitoring Team
c/o Maggie Hickey, Independent Monitor
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Maggie.Hickey@afslaw.com

**City of Chicago**
**Brandon Johnson, Mayor**

**Department of Law**
Mary Richardson - Lowry
Corporation Counsel

**121 North LaSalle Street**
**Suite 600**
**Chicago, Illinois 60602**
**(312) 744-0220**
**(312) 744-5185 fax**

www.cityofchicago.org

Dear Ms. Hickey:

The City of Chicago provides its comments to the Independent Monitoring Team's final draft report for the reporting period January 1, 2024, through June 30, 2024, (IMR 10). The City looks forward to continued compliance progress in the current monitoring period (July 1, 2024 – December 31, 2024).

<div align="center">

**City of Chicago's Comments on the**
**<u>Tenth Independent Monitoring Report</u>**

</div>

Pursuant to Consent Decree Paragraph 663, the City of Chicago ("City") provides the following response to the Independent Monitoring Team's ("IMT") final draft Independent Monitoring Report 10 ("IMR 10 Report").

<u>**Summary of the City's Continued Increased Compliance**</u>

IMR-10 includes 36 additional monitorable paragraphs in the Investigatory Stop, Protective Pat Down, and Enforcement of the Loitering Ordinance section of the Consent Decree. Preliminary compliance with most of these additional paragraphs is tied to the finalization of Chicago Police Department's (CPD) suite of policies, which were involved in the paragraph 627 review and comment process with the IMT and Office of Illinois Attorney General (OAG) throughout IMR 10. Of these 36 additional paragraphs, 25 are "under assessment" for preliminary compliance at the end of IMR 10, due in part to the extensive work by CPD during IMR 10. Even with the addition of these paragraphs, the City maintained some level of compliance with approximately 88% of the monitorable paragraphs assessed by the IMT in IMR

10.   Without considering these additional paragraphs, as of the end of IMR 10, the City has achieved some level of compliance with at least 92% of the pre-existing monitorable paragraphs and continued to demonstrate an increase in the level of secondary compliance.   The achievement of preliminary compliance of substantially all of the pre-existing monitor paragraphs and increasing secondary (training) compliance the City and CPD believe create the basis to achieving the guiding principles of the Consent Decree.

The City's consistently increasing rates of compliance are significant but represent only a portion of the work done throughout the reporting period.   The City appreciates the IMT's acknowledgement that "[t]his report represents a six-month assessment of the City's compliance efforts from January 1, 2024, through June 30, 2024. It does not reflect all the efforts of the City, the CPD, or the other relevant City entities to date." (S*ee* IMR 10 Report – Executive Summary, pg. 2).  The City further appreciates that the IMT's Executive Summary for IMR 10 includes major achievements by CPD and other relevant City agencies in addition to highlighting principal challenges.   (*See* IMR 10 Report – Executive Summary, *Major Developments and Principal Achievements and Challenges Impacting Compliance*, pg. 5 – 8). The acknowledgement of the efforts being made for future progress along with the additional information recognizes the building nature of the City's reform efforts while still noting the areas where the City has more work to do.

Some of the notable achievements in the Tenth Monitoring Period include:

- Collaboration between CPD, the IMT and OAG to finalize the Coordinated Multiple Arrest (CMA) policy suite as well as the corresponding training.  The subject matter expertise of members of the IMT has been invaluable to CPD in the development of this suite of policies which were essential for CPD to meet the public safety needs posed by large scale gatherings, including the Democratic National Convention that was held in Chicago in early IMR 11.  This collaboration demonstrated how the Consent Decree process can work effectively to achieve policy and training reforms.

- Increased direct interactions between the Associate Monitors on the IMT and CPD's subject matter experts.  These interactions fostered a more collaborative process, an understanding of the IMT's expectations on compliance issues, and a level of technical assistance for CPD.  These interactions will provide both short- and long-term increases

in CPD's compliance. Additionally, the efforts of the Deputy Monitor and the Senior Monitor in fostering the communication of clear expectations and specific actionable feedback have been invaluable to CPD.

- The completion of numerous CPD reports and plans after review by the IMT and OAG, including: CPAP Quarterly Report, Annual Community Policing Report, Racial Equity Plan, District Strategic Plans, Hate Crimes Report, CIT Coordinator Summary Report, CIT Refresher Training Plan, TRED Year End Report, Annual Use of Force Report, Recruitment – Hiring Annual Report, Workforce Allocation Scope of Work, Professional Counseling Division Annual Report to the Superintendent, Employee Assistance Program Summary Report, BIA Annual Report, and BIA Quarter 1 Report.

- The completion / implementation of numerous CPD policies and policy suites after review by the IMT and OAG, including: CPD's Department Awards policy (S01-01), Peer Support Program Suite, and Revised TISMP policy (E06-03).

- Ongoing delivery of trainings that will achieve secondary compliance when delivered to 95% of required members and contribute to the required 40-hours of annual in-service training by the end of 2024, including:
  - Annual Use of Force training;
  - Field Force Operations
  - Public Order / Public Safety
  - Annual In-service Supervisor Training
  - Ongoing delivery of approved Crisis Intervention trainings

- Methodology development for paragraph 572 – 573 Use of Force data analysis project by University of Texas – San Antonio.

- COPA reached full compliance with over 85% of its assessable paragraphs, demonstrating continued increased compliance.

**IMT Reporting Process**

The Monitor's current report, Report 10, documents the City's compliance efforts for January 1, 2024 – June 30, 2024. The City and public have repeatedly requested that the IMT find a way to make the reports shorter, more user friendly, and more timely. The IMT has taken steps to make the report shorter but it still required a great deal of time to review and ensure that

the levels of compliance for all paragraphs was accurate and consistent, often requiring a review of past reports. Now that all parties are in agreement with the status of each monitorable paragraph, the City looks forward to continued collaboration to find a reporting mechanism that can be completed within 90 days of the end of a reporting period and provide information that is useful to the parties and public.

## Methodologies

Consent Decree Paragraph 655 provides that the IMT will develop and share with the City and the OAG a proposed methodology for its compliance reviews. Paragraph 655 allows for the parties to submit comments regarding the methodology, which both the City and the OAG consistently submitted during earlier monitoring periods. However, the City has refrained from providing comments in more recent periods due to the IMT's unwillingness to substantively address the City's concerns, many of which are noted in the comments below. Additionally, the OAG has also refrained from providing comments in recent periods.

The City recognizes the complexity and difficulty of developing distinct methodologies for several hundred Consent Decree requirements spanning numerous topics and appreciates the IMT's efforts to do so in a thorough manner. The City, however, believes that many of the methodologies delineated by the IMT add substantive requirements beyond the legal requirements stated in the Consent Decree. Other methodologies do not provide adequate detail about the data sources and analysis methods that will be used to assess compliance.

Consent Decree Paragraph 624 provides that the IMT's review will determine whether the City has substantially complied with the Consent Decree. This paragraph further notes that "Compliance with a requirement means that the City and CPD: (a) have incorporated the requirement into policy; (b) have trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) are carrying out the requirement in actual practice." Based on this paragraph, the IMT assesses whether the City and its entities are in preliminary, secondary, or full compliance—each of these levels typically mirrors the three subparts of ¶ 642.[1]

---

[1] For certain Consent Decree requirements, this three-pronged analysis is less suitable. In those situations, the Monitor develops alternate methodologies for assessing compliance.

The City hopes that through increased collaboration with the Associate Monitors on the IMT as well as a more streamlined reporting process, all parties will have a shared understanding of the methodologies at the start of each reporting period as well as a shared understanding of the deliverables that will achieve compliance throughout the six-month reporting period.

## SPECIFIC COMMENTS

The City provides the following responses to the IMT's comments related to various Consent Decree sections / specific Consent Decree paragraphs / or involved City Agencies. These comments are specific to CPD unless otherwise noted:

## Impartial Policing:

Paragraph 75 (Compliance Assessment) : The City and OEMC continue to disagree with the "Under Assessment" designation for both preliminary and secondary compliance with this paragraph. OEMC has developed and implemented an SOP and has provided written responses to OAG feedback on the SOP. The Associate Monitor for Impartial Policing, the subject matter expert in the area, has given a "no objection" to OEMC's policy. Additionally, OEMC has regularly provided the required Diversity Awareness training to all required personnel. Accordingly, OEMC should be in at least preliminary compliance with this paragraph with the implementation of the policy. The City and OEMC look forward to discussions with the IMT and OAG in IMR 12 to reach resolution with this paragraph and to achieve full compliance.

## Crisis Intervention:

The City continues to raise concerns about the IMT's comments related to the purpose of the Crisis Intervention section of the Consent Decree. The purpose of the Consent Decree overall is to ensure the following:

(1)     that CPD delivers services to all people in a manner that complies with the Constitution and state and federal law, respects the rights of all, builds trust between officers and the communities they serve, and promotes community and officer safety; and

(2)     that CPD officers receive the training, resources, and support needed to do their jobs professionally and safely; and

(3)      that the City builds a foundation of trust through increased transparency and public input; improved accountability and oversight; and systems that collect, analyze and share data.

Accordingly, the purpose of the Crisis Intervention Section is to ensure that when CPD sworn members respond to an individual in crisis as defined by the Consent Decree, the response is appropriate.  While certainly an important topic, the Consent Decree does not address the question of **whether** the police should respond to individuals in crisis and does not set forth requirements on what types of alternate response programs the City should have beyond the guiding principle set forth in paragraph 86 that the City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest for individuals in crisis.  Therefore, the IMT's continuing comments on the "priorities of expanding non-criminal justice responses to persons in crisis and complying with the guiding principles of the CIT Program" is a misrepresentation and attempted expansion in an Independent Monitoring Report of what this section of the Consent Decree requires.

Second, the City has concerns related to the IMT's comments regarding the CARE program which misstate actual Consent Decree requirements, misrepresent the City's willingness to share information with the IMT on this program, specifically in IMR-10, and fails to accurately report on the program and its place in the City's overall mental health response.  The IMT's comment that "the City has been reluctant to provide policies, training, and data related to this alternate response program" does not represent any City efforts in IMR-10.  Moreover, the IMT wrongly concludes that these programs are presently covered by the requirements of the Consent Decree versus the IMT's desire for them to be included as reflected in its Comprehensive Assessment. The IMT last made a formal request for information related to CARE in November 2022, in IMR-7, and the City provided a written response in February 2023, in IMR – 8.  In the City's response, the IMT was directed to publicly available data and information.  Specifically, in IMR-10, the City arranged for a one-on-one meeting between the Associate Monitor and Matt Richard of the Department of Public Health for the specific purpose of providing updates and answering questions related to CARE and Matt Richard presented at the February 2024 CCMHE meeting in IMR-10. Finally, the City's current Mental Health expansion has been a transparent process, culminating in a publicly available report.  *See* City of Chicago, **People's Vision for Mental and Behavior Health**.  This expansion makes clear that CARE is not a "diversion"[2] program but rather a

---

[2] *See* IMR 10 Report – October 24, 2024 Draft page 37 - 38 generally and in fn 23.

2 NORTH LASALLE STREET ° SUITE 420
CHICAGO, ILLINOIS 60602
312.742.6408 · Jennifer.Bagby@CityofChicago.org

standalone resource to ensure that Chicagoans in mental health and behavioral crisis receive the most appropriate resource in their time of need and also includes the transition from CARE teams that include a CPD member to eliminating CPD as a core element of the program so that CPD can focus on primary purpose work.

Finally, the City and CPD believe that CPD should have achieved secondary compliance with paragraphs 92 and 95 based upon the training records showing delivery of the 40-Hour Basic Training (MONITOR 2049).

**Use of Force:**

The City and CPD disagree with the IMT's comments related to paragraph 157 where the IMT states that in order to maintain ***secondary*** compliance, CPD must have a system to help with BWC issues as this continues to be an ongoing deficiency. The City and CPD believe that the IMT's comments address full compliance, not secondary compliance with this paragraph. Additionally, the City and CPD believe that the production of the BOP Taser Reconciliation TFSR and Report (MONITOR2115) and the 2023 Citywide Taser Quarterly Inspections (MONITOR2020) in IMR-10 should have achieved full compliance with paragraph 206 as these materials demonstrated consistent inspection and maintenance of Tasers.

**Training**

The City and CPD believe that CPD should have achieved secondary compliance with paragraphs 299 and 303 based upon the production of the FTO Initial Training Curriculum (MONITOR1890) and FTO Initial Training Compliance Report (MONITOR 2063). CPD received No Objections on the curriculum from the OAG (February 20, 2024) and the IMT (April 5, 2024) and produced evidence of delivery of this training to 95% of required members.

The City and CPD believe that CPD should have achieved secondary compliance with paragraphs 313, 314, and 315 based upon the production of the FTO and PPO Quarterly Surveys on May 30, 2024 (MONITOR2036) and August 29, 2024 (MONITOR2161).

**Supervision**

The City and CPD believe that CPD should have achieved secondary compliance with paragraphs 348 and 349 based upon the IMR-10 production of the In-Service Supervisor Training on February 29, 2024 (MONITOR1916) and the TRR Supervisory Debriefing Point Dashboard

eLearning-Revised with new IDR on May 16, 2024 (MONITOR2012). The City and CPD also believe that the production of the TRR Supervisory Debriefing Point Dashboard eLearning-Revised with new IDR should have achieved secondary compliance with paragraph 351.

**Officer Wellness**

The City and CPD continue to disagree with the IMT's efforts to expand any requirements related to the Fitness for Duty program.[3] The plain language of the Consent Decree makes clear that the only issue surrounding Fitness for Duty is to ensure that Professional Counseling Division counselors are not conducting the evaluations. City and CPD productions have clearly established this limited requirement.

**Accountability - COPA**

The draft of IMR10 fails to mention ¶470 or ¶488 and lacks sufficient feedback for ¶479 and ¶486. COPA submitted numerous materials for full compliance on these paragraphs in IMR10, and previewed these submissions on monthly calls, seeking feedback. The absence of meaningful feedback impacts COPA's ability to refine its compliance submissions and results in significant time spent submitting materials by staff without feedback. COPA looks forward to increased collaboration with the IMT and technical assistance in IMR 12 to achieve increased compliance with the remaining paragraphs.

**¶470: Investigative Findings within 180 Days**

COPA has been working to ensure that investigative findings are reached within 180 days, with extensions approved and justified. In IMR9, COPA addressed the issue of 180-day letters lacking explanations, indicating that this paragraph was "under assessment" for COPA to provide evidence of completing cases within 180 days as well as data on the cases for which COPA missed this deadline. In IMR10, COPA provided a supplemental response with detailed data on case durations, including start and close dates for all COPA logs since its inception. Despite this, COPA received no feedback on this paragraph in the second IMR10 draft.

---

[3] See IMR 10 Report – October 24, 2024 Draft, pg. 66.

### ¶479: Investigative Timelines, Benchmarks, and Goals

Paragraph 479 requires that 120 days of the Effective Date, CPD and COPA must revise policies establishing investigative timelines, benchmarks, and goals. For IMR10, COPA provided a comprehensive explanation of its timeliness policy and initiatives, including data on case closures, reports, meetings, templates, and processes. IMT placed COPA "under assessment" for Full compliance but mentioned only that training evaluations were not received on time

### ¶486: Maintenance of Investigative Files

Paragraph 486 lists the documentation required for COPA to maintain in its investigative files. In IMR10, COPA produced reports for 5 randomly selected cases, detailing compliance with every subparagraph of ¶486. IMR10 states that while this documentation partially addresses ¶486 for Full compliance, the IMT plans to conduct a more in-depth review of completed investigations. Even within the current reporting, IMT has not specified the materials needed for this review. COPA maintains that its summary reports, attachment reports, and notes evidence Full compliance with ¶486. If not, COPA the IMT should provide what additional evidence is required to establish Full compliance.

### ¶488: Officer Involved Shootings

For IMR10, COPA provided voluminous documentation on officer-involved shootings, including data for the past five years, 82 scene response letters, supervisory directions, interviews, summary reports, and notes for 16 officer-involved shootings from 2019 to 2024. COPA also provided randomly selected cases, noting compliance with each subparagraph of ¶488. IMT provided no feedback on this paragraph, and it remains absent from the second IMR10 draft.

Thank you for the opportunity to provide this response.

Sincerely,

*/s/ Jennifer K. Bagby*
Deputy Corporation Counsel
City of Chicago Department of Law
Public Safety Reform Division


Cc:    Christopher Wells, Office of the Attorney General
       Scott Spears, General Counsel, CPD
       Allan Slagel, Taft Law
       Ryan Nelligan, General Counsel and Deputy Director of Labor and Legal Affairs, OEMC
       Robin Murphy, General Counsel, COPA

Independent | Chicago Police
Monitoring Team | Department
| Consent Decree