UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS,<br><br>              Plaintiff,<br><br>    v.<br><br>CITY OF CHICAGO,<br><br>              Defendant. | Case No. 17-cv-6260<br><br>Hon. Rebecca R. Pallmeyer |

**COALITION'S RESPONSE TO CONSENT DECREE COMPREHENSIVE ASSESSMENT, PART II, AND REQUEST FOR STATUS CONFERENCE**

The Coalition respectfully submits this response to the Independent Monitoring Team's ("IMT") Comprehensive Assessment, Part II ("Comprehensive Assessment," Dkt. 1226) and requests a status conference with the Court to address a framework for making necessary changes to the Consent Decree to ensure that it is working to remedy CPD's pattern and practice of systemic civil rights violations, including incorporating the Coalition's and the community's views on how to best achieve lawful, safe, effective, fair, and non-discriminatory policing in Chicago.

The Comprehensive Assessment process offers a critical opportunity to assess whether the Consent Decree is working to fulfill its purposes and to adjust the Decree if needed to "accelerat[e] full and effective compliance." *See id.;* Consent Decree ¶¶ 657-59. The first section of the Comprehensive Assessment (Dkt. 1226 at 10-22) demonstrates that the Consent Decree has not begun to achieve its intended outcomes, namely, "to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety." Consent Decree ¶ 2. The

1

City has complied with less than 10% of the Consent Decree's requirements after more than five years, and by all metrics—community survey results, data showing uses of force, data demonstrating racial disparities in stops and arrests, and more—it is evident that CPD has not measurably improved its compliance with civil rights laws or its treatment of community members since the Consent Decree was entered.

As a result, the Monitor recognizes that changes must be made to "accelerat[e] full and effective compliance." The Coalition has previously recommended several ways in which the Consent Decree should be changed to define metrics for success and to promote community and Coalition input that is crucial if the Decree is to eliminate the civil rights violations on the streets of Chicago that prompted entry of the Decree in 2019. *See* Dkt. Nos. 1121, 1125. Unfortunately, none of the Coalition's recommended substantive changes are included in the Comprehensive Assessment, and neither are other meaningful changes to how this Decree operates.

The Coalition agrees with the Monitor that our role in the Consent Decree process should be clarified. Dkt. 1226 at 36-37 (calling for "Specifying Procedures for the Coalition," and recommending that "a more structured Consent Decree process" for the Coalition's participation "could serve all involved."). Below (Section I) we reiterate some of our suggestions for making the Coalition's role more effective and efficient. There are additional modifications needed, however, to ensure that the Decree incorporates community voice and achieves its objectives, which we address in Section II.

The Coalition urges the Court to convene the IMT, the Parties and the Coalition to discuss implementing the Coalition's recommendations regarding its role as well as other ways in which the Consent Decree process should be changed to achieve its aims of transforming CPD and remedying the abuses that continue despite the Decree's oversight.

**I.      The Decree Should Be Modified to Enhance the Coalition's Role, Consistent with the Coalition's October 2023 Recommendations**

We begin by addressing the Monitor's fourth recommendation: "specifying procedures for the Coalition." Dkt. 1226 at 36. The Coalition is made up of fourteen organizations focused on justice, civil rights, and community safety, which collectively represent tens of thousands of diverse Chicago residents with extensive personal and subject matter expertise with CPD's discriminatory and violent practices. After forgoing their separate lawsuits challenging CPD's long history of discrimination unlawful violence, the Coalition signed a Memorandum of Agreement ("MOA") with the Parties. That MOA provides the Coalition the right to enforce any consent decree entered by this Court. See ¶¶ 669, 709. The Coalition's members and the communities it represents—many of whom are Black and brown Chicagoans and people with disabilities—have been harmed by CPD's brutal, unjust, and ineffective policing. Since the inception of the Consent Decree, the Coalition has worked diligently through the Decree processes to bring oversight and accountability to CPD's practices, because the changes required by the Decree are far overdue.

To that end, the Coalition has filed or noticed its intention to file three enforcement motions that significantly improved polices for how CPD treats people during protests and when executing search warrants.

(a) After CPD's unconstitutional response to people protesting George Floyd's death and police brutality in the summer of 2020, we served a notice of intended enforcement, which resulted in the Coalition negotiating with CPD a legally-compliant First Amendment Rights Policy;

(b) The Coalition served a notice of intended enforcement regarding CPD's practice of brutal and discriminatory home raids, mostly targeting Black and brown Chicagoans,

3

which resulted in the Coalition negotiating with CPD better search warrant policies and data collection;

(c) Leading up to the Democratic National Convention in spring 2024, the Coalition filed an enforcement motion regarding CPD's draft mass arrest policy and obtained important improvements to that policy requiring CPD to respect the First Amendment rights of protesters and better document any uses of force. *See* Coalition's Status Reports, Dkts. 1189 and 1201.

Many of the Coalition's members also served hundreds of unpaid hours on the Use of Force Working Group to develop policy and training recommendations. Further, the Coalition developed and disseminated a proposal to create a structured Working Group process in order to increase collaboration and information sharing between the City and the Coalition. The Coalition has submitted detailed and substantive recommendations on nearly every policy that CPD has released for public comments through the process set forth in ¶ 633 of the Consent Decree. The Coalition's comments are based on extensive research into law and best practices, as well as community input and consultation. The topics of our policy comments and subsequent negotiations with CPD have included the enforcement motions listed above, as well as many other CPD draft policies, such as:

- Use of force;
- Use of Tasers and OC (pepper) spray; firearm-pointing incidents; and foot pursuits;
- Human rights and biased policing;
- Fourth Amendment compliance ("stop and frisk"), loitering ordinance enforcement and CPD's discriminatory gang databases;
- Police interactions with youth, people with disabilities, people with limited English proficiency, and people who are religiously observant;

4

- Crisis intervention team and crisis response;
- Accountability issues such as investigating CPD officers accused of sexual misconduct; Bureau of Internal Affairs investigations; officers' use of body-worn cameras; mediation of civilian complaints against CPD officers; and CPD's cooperation in the process for authorizing visas for victims of crime and human trafficking.

The IMT acknowledged these contributions in its Comprehensive Assessment, stating: "…the Coalition has played an active role by filing motions to enforce the Consent Decree and seeking to actively participate in, for example, policy review processes. Coalition members and attorneys have spent hundreds of hours voicing concerns about policies as members of the Use of Force Working Group and during meetings with the Parties and the IMT…Many of these discussions have led to better understanding of differing positions, as well as improved policy language." Dkt. 1226 at 37.

Having credited the extensive time and effort Coalition members have poured into attempting to improve CPD's policies and practices and build CPD's relationship with the community, the IMT's next comment was surprising: "These processes, however, have taken significant resources for periods that have extended beyond what any group intended." *Id.* Although apparently not meant as a critique, this sentence could be read to suggest that the Coalition's involvement has delayed CPD's compliance with the Consent Decree. Nothing could be further from the truth. The Coalition and its many volunteer members have worked diligently in their role enforcing the Decree. Building the community's trust in this Department by directly engaging community in the Decree's work is a central goal of the Decree (*see* ¶ 2) (one that CPD still fails to meet today, according to the Comprehensive Assessment, *see* Dkt. 1226 at 16-22) and

5

the Coalition's perspective, along with other community perspectives, are crucial to CPD's ability to earn trust. The Coalition's goal is to *speed* CPD's achievement of full compliance by raising the perspective of under-served communities in Chicago, as well as constitutional, statutory and operational concerns that otherwise have been neglected by CPD. Without engaging the Coalition's recommendations for improvement, CPD is unlikely to provide unbiased and safe policing, not to mention achieve full compliance with the Decree.

Indeed, the Coalition's attempts to engage with and provide input to CPD have been, at times, frustratingly slow. But any delays are not attributable to dilatory behavior by the Coalition. As shown in Monitoring Report 10, filed November 19, 2024, the City now stands at only 9% full compliance, with 73 paragraphs of the Decree showing no level of compliance. This is a minimal increase of only two percentage points during the first six months of 2024, compared to the City's full compliance rate of 7% as of December 2023. *See* Dkt. 1226 at 10-11; Dkt. 1233 at 3-4.

Anticipating the IMT's recommendation that the Consent Decree should be modified to streamline the Coalition's role, the *Communities United* and *Campbell* parties proposed such modifications in October 2023. *See* Dkt. 1121 and 1125. Disappointingly, the Comprehensive Assessment did not respond to or adopt these recommendations. Nevertheless, our recommendations bear repeating because strengthening the Coalition's role will reset the process, increase transparency, and accelerate CPD's meaningful and lasting compliance with the Decree.

As a non-exhaustive summary, the Decree should be amended to:

- Require the City to provide the Coalition with early policy and training drafts before they are released for public comment so that the Coalition can provide input during the formative stages. Engaging the Coalition earlier in the process would promote efficiency because the City could incorporate input from IMT, OAG and the Coalition at once. The

City's current refusal to engage with the Coalition prior to the time it publicizes a policy creates significant inefficiencies in the Consent Decree process. The Coalition's priorities include the following areas: use of force, community policing, impartial policing, crisis intervention, supervision, and accountability and transparency. *See* Dkt. 1121 at 9-10; Decree ¶ 627.

- Allow the Coalition to observe and provide feedback on CPD's training programs – a change IMT endorsed for "community members" but not specifically for the Coalition. *See* Comprehensive Assessment at 38.

- Require the use of Community Working Groups on select topics, in the interest of transparent, community-informed, efficient and evidence-based policy development. *See* Dkt. 1121 at 12; Dkt. 1125 at 12-13.

- Allow the Coalition to give input and participate in negotiations regarding any substantive changes to the Consent Decree, including the addition of new topics. *See* Dkt. 1121 at 9.

- Provide the Coalition with the opportunity to give feedback and raise objections to the IMT's methodologies for assessing operational compliance before those methodologies are employed. *See* Dkt. 1121 at 10; Consent Decree ¶ 655.

- Allow the Coalition to obtain discovery from CPD, including any discovery necessary to determine whether CPD is complying with the Decree. *See* Dkt. 1121 at 10.

### II. The Coalition's Substantive Recommendations for Improving the Decree's Achievement of its Objectives Should Be Considered

The Coalition's October 2023 filings also recommended numerous substantive changes to ensure that the Consent Decree achieves its goals expeditiously. Primary among those recommendations was the addition of outcome metrics that will determine CPD's operational compliance with the Consent Decree. Dkt. 1121 at 7-8; Dkt. 1127 at 4. The Coalition also

7

recommended specific changes that would strengthen requirements for impartial policing and de-escalation; expand diversion and deflection of low-level offenses; impose restrictions on gun pointing and expand reporting requirements; bring the stop-and-frisk portion of the Decree into compliance with the Constitution and federal and state law; and provide protections for survivors of police violence and their families, among other changes. Dkt. 1121 at 2-7; Dkt. 1127 at 2-11. We urge the Parties and the IMT to engage with the Coalition on these subjects, which are crucial to transforming CPD's culture of discrimination and violence – the ultimate aim of the Consent Decree.

## **CONCLUSION**

The Coalition's knowledge, expertise, and position as both drivers and beneficiaries of transformative change to policing in Chicago are essential to the integrity of the Consent Decree. We respectfully request that the Court schedule a status conference to establish a timeline and framework for the Coalition, the Parties and IMT to negotiate needed changes to the Decree, including but not limited to a clearer and more robust role for the Coalition, commencing with the proposals that the Coalition outlined above and in our October 2023 statements regarding the Comprehensive Assessment.

DATED: December 10, 2024　　　　　　　　Respectfully Submitted,

**Counsel for the Coalition**

　　　　　　　　　　　　　　　　　　　　*/s/ Alexandra K. Block*

Amanda Antholt　　　　　　　　　　　　Alexandra K. Block (ablock@aclu-il.org)
(amanda@equipforequality.org)　　　　　Michelle T. García (mgarcia@aclu-il.org)
Jessica Gingold　　　　　　　　　　　　Imani S. Thornton (ithornton@aclu-il.org)
(jessicag@equipforequality.org)　　　　　Joseph P. DiCola (jdicola@aclu-il.org)
Equip for Equality　　　　　　　　　　　Roger Baldwin Foundation of ACLU, Inc.
20 N. Michigan Ave., Suite 300　　　　　150 N. Michigan Ave., Suite 600
Chicago, IL 60602　　　　　　　　　　　Chicago, IL 60601
(312) 341-0022　　　　　　　　　　　　(312) 201-9740

Craig B. Futterman　　　　　　　　　　Sheila A. Bedi (sheila.bedi@law.northwestern.edu)
(futterman@uchicago.edu)　　　　　　　Community Justice and Civil Rights Clinic
Mandel Legal Aid Clinic　　　　　　　　Northwestern Pritzker School of Law
University of Chicago Law School　　　　375 East Chicago Avenue
6020 S. University Ave.　　　　　　　　Chicago, IL 60611-3609
Chicago, IL 60637　　　　　　　　　　　312-503-2492
(773) 702-9611