# Exhibit 1

| Chicago Police Department | General Order G03-08 |
|---|---|
| **POLICE ENCOUNTERS AND THE FOURTH AMENDMENT** | |

| ISSUE DATE: | 31 December 2024 | EFFECTIVE DATE: | TO BE DETERMINED |
|---|---|---|---|
| RESCINDS: | | | |
| INDEX CATEGORY: | 04 - Preliminary Investigations | | |
| CALEA: | | | |

## I. PURPOSE

This parent directive provides a general overview regarding the rights guaranteed by the Constitution and laws of the United States and the State of Illinois during Temporary Detentions, including definitions, types of police encounters, and types of searches. It is informational in nature and does not provide procedural guidance on how to perform Temporary Detentions, Protective Pat Downs, or other searches. Please refer to the Department directive titled "Investigatory Stops" for procedures, requirements, and prohibitions regarding the performance of lawful Temporary Detentions, Protective Pat Downs, and other searches.

## II. THE FOURTH AMENDMENT, UNITED STATES CONSTITUTION

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath and affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

## III. POLICY

A.  It is the policy of the Chicago Police Department to ensure that all interactions with the public are conducted in an unbiased, fair, and respectful manner and in accordance with the rights secured and protected by the United States Constitution, the Illinois Constitution, and state and federal laws.

B.  Department members are responsible for ensuring public safety by deterring and responding to crime. Members are also responsible for conducting police encounters, including Temporary Detentions and Protective Pat Downs, in a manner consistent with the United States Constitution, the State of Illinois Constitution, the law, and this directive and its addenda.

C.  Safeguarding the liberties of the public and preventing crime are not mutually exclusive; each can be achieved by fostering trust and confidence between Department members and the public. Department members will comport with the policy and procedures of this directive and its addenda to ensure appropriate conduct when interacting with members of the public.

D.  In conducting police encounters, including Investigatory Stops and Protective Pat Downs, Department members will interact with all members of the public without bias and will treat all persons with the courtesy and dignity which is inherently due every person as a human being without reference to stereotypes based on race, color, ethnicity, religion, homeless status, national origin, immigration status, gender identity or expression, sexual orientation, socio-economic class, age, disability, incarceration status, or criminal history.

E.  Department members interacting with the public will use Procedural Justice and Legitimacy principles to strengthen the police-community relationship through these contacts, with the goal of improving officer safety while reducing crime and disorder, consistent with the Department directive titled "Protection of Human Rights."

F.  Department members will not engage in racial profiling or other bias-based policing when conducting investigatory stops as delineated in the Department directive titled "Prohibition Regarding Racial Profiling And Other Bias Based Policing."

1. In making routine and spontaneous law enforcement decisions, such as Investigatory Stops and Protective Pat Downs, Department members will interact with all members of the public without bias and will treat all persons with the courtesy and dignity that is inherently due every person as a human being without reference to stereotypes based on race, ethnicity, age, color, national origin, ancestry, religion, disability, gender, gender identity or expression, sexual orientation, socio-economic class, incarceration status, criminal history, immigration status, homeless status, marital status, parental status, military discharge status, financial status, or lawful source of income to any degree, except that Department members may rely on the listed characteristics as part of a reliable, trustworthy, and detailed description of a specific suspect or suspects in any criminal investigation.

2. Department members may rely on age as a factor only when the individual's age is an element of the specific crime or ordinance that the individual is suspected of violating, such as curfew, school absenteeism, and underage consumption of alcohol.

G. Protective Pat Downs and other searches will be conducted by a Department member who is the same gender as the person that is the subject of the Temporary Detention.

1. Department members will not endanger themselves or the public to comply with this requirement if a Department member of the same gender is not immediately available, officer and public safety is compromised, and it is imperative that an immediate pat down or search be conducted.

2. Department members will exercise extraordinary caution when patting down outer garments of persons who are not the same gender as the member conducting the Protective Pat Down.

3. Department members will follow the guidelines consistent with the Department directive titled "Interactions with Transgender, Intersex, and Gender Nonconforming (TIGN) Individuals" when determining the appropriate gender for the purposes of a Protective Pat Down or other search.

H. Any Department member who fails to comply with this directive and its addenda is subject to progressive discipline, training, or other corrective action according to current Department policies, including the Department directives titled "Complaint and Disciplinary System" and "Summary Punishment." Department members are reminded that discipline may be administered for any misconduct or violations of Department rules or policy.

I. To ensure transparency and accountability when conducting law-enforcement-related activities such as Temporary Detentions, sworn Department members must initiate body-worn camera and in-car video system recordings as required by the Department directives titled "Body Worn Cameras" and "In-Car Video Systems."

## IV. DEFINITIONS

For the purposes of this directive, the following definitions apply:

A. **Consensual Encounter**—A voluntary contact between an officer and a person during which the person must feel free to walk away or leave the officer's presence at any time during the encounter.

B. **Custodial Arrest**—A seizure of a person that exceeds the permissible limits of a temporary detention in scope or duration, and the person's freedom of movement is deprived in a significant way. The person is considered to be in police custody and the seizure must be supported with Probable Cause that the individual has committed or is committing a criminal offense.

C. **Investigatory Stop**—A temporary detention of a person in the vicinity where the person was stopped based on Reasonable Articulable Suspicion that the person is committing, is about to commit, or has committed a criminal offense.

D. **Probable Cause Stop**—A temporary detention of a person in the vicinity where the person was stopped based on Probable Cause that the person is committing or has committed a criminal offense.

E. **Temporary Detention (Stop)**—A temporary, limited seizure or detention of a person conducted for a specific, lawful purpose that lasts no longer than reasonably necessary to carry out the purpose of the seizure. A Temporary Detention is not a voluntary contact; therefore, a person is not free to leave during a Temporary Detention. Temporary Detentions are not limited to pedestrians; occupants of vehicles and individuals on bicycles may be the subjects of Temporary Detentions. Temporary Detentions must be supported with Reasonable Articulable Suspicion or Probable Cause. There are two types of Temporary Detentions: Investigatory Stop and Probable Cause Stop. A Temporary Detention is referred to as Stop in the electronic Temporary Detention (Stop) Application.

F. **Plain Touch Doctrine**—In the course of conducting a lawful Protective Pat Down of a person's outer clothing for weapons, an officer touches an object and, based upon his or her training and experience, and without manipulating the object, immediately determines that object to be contraband. The officer may seize the item without a warrant.

G. **Probable Cause**—Probable Cause exists when an officer has knowledge of facts and circumstances based on reasonably trustworthy information that is sufficient to warrant a reasonable officer to believe that a crime has occurred or is occurring and that an individual has committed it. A determination of Probable Cause requires stronger evidence and greater certainty than Reasonable Articulable Suspicion. The totality of the circumstances establishes Probable Cause.

H. **Protective Pat Down**—A limited search during a Temporary Detention in which the officer, for the protection of the officer and others nearby, conducts a pat down of the outer clothing of a person for weapons. A Protective Pat Down is not a general exploratory search for evidence of criminal activity and requires Reasonable Articulable Suspicion. An officer must possess specific and articulable facts, combined with rational inferences from these facts, that the person is armed and dangerous to the officer or others nearby.

I. **Public Place**—any place to which the public or a substantial group of the public has access and includes, but is not limited to, streets, highways, parks, and the common areas of schools, hospitals, apartment buildings, office buildings, transport facilities, and stores.

J. **Reasonable Articulable Suspicion**—An objective legal standard that is less than Probable Cause but more substantial than a hunch or general suspicion. To have Reasonable Articulable Suspicion to conduct a temporary detention, an officer must possess specific and articulable facts that, combined with rational inferences from those facts, create a suspicion that the person is committing, is about to commit, or has committed a criminal offense. To have Reasonable Articulable Suspicion to conduct a Protective Pat Down during a Temporary Detention, the officer must possess specific and articulable facts that, combined with rational inferences from those facts, create a suspicion that the person is armed and dangerous to the officer or others nearby. Reasonable Articulable Suspicion depends on the totality of the circumstances that the officer observes and the rational inferences that are drawn based on the officer's training and experience. Reasonable Articulable Suspicion can result from a combination of particular facts that may appear innocuous in and of themselves but, taken together, amount to Reasonable Articulable Suspicion.

## V. TYPES OF POLICE ENCOUNTERS

A. Consensual Encounters

1. A consensual encounter is a voluntary contact between an officer and a person.

2. During a consensual encounter, the person must be free to leave at any time.

3. An encounter is NOT consensual when the circumstances do not communicate to a reasonable person that he or she is at liberty to ignore the police presence and go about their business.

4. Even an encounter that begins "consensual" may evolve so that a reasonable person does not believe they are free to leave. When this occurs, the officer cannot continue the encounter without (1) Reasonable Articulable Suspicion that the person is engaged in criminal activity or (2) Probable Cause.

5. Throughout a consensual encounter, officers should strive to ensure that their actions and requests are not perceived by individuals as a restraint on their freedom to leave.

6. The following are some facts relevant in the determination whether a police encounter with a person is consensual:

    a. Threatening presence of several officers;

    b. Display of a weapon by an officer;

    c. Use of language or tone of voice indicating that compliance with the officer's request might be compelled;

    d. Officer blocks a person's path;

    e. Use of emergency-roof lights or sirens;

    f. Choice to end the encounter is not available to the person;

    g. The subjective belief of the person in the encounter;

    h. The officer's physical contact with the person;

    i. Whether the officer affirmatively informed the person that he or she is free to leave;

    j. Whether the officer is readily identifiable as a police officer;

    k. Whether the encounter occurred in a public or private place;

    l. Whether the person consented or refused to speak to police;

    m. Whether the officer removed the person to another area;

    n. Whether the person eventually departs the area without hindrance; or

    o. Any other facts or circumstances that would lead a reasonable person in the same situation to believe the person is not free to leave.

7. Officer interactions with victims and witnesses of a crime are consensual encounters only if the circumstances would communicate to a reasonable person that he or she is at liberty to leave. Otherwise, an officer must have Reasonable Articulable Suspicion or Probable Cause of criminal activity to support a Probable Cause Stop, an Investigatory Stop, or an arrest. If a person does not respond to questioning, the encounter may no longer be considered consensual. If a person attempts to walk, drive, or cycle away, the person is trying to end the encounter, and the officer cannot detain the person without the Reasonable Articulable Suspicion required for an Investigatory Stop or the Probable Cause needed for a Probable Cause Stop.

8. The refusal of a person to identify themselves or cooperate during a consensual encounter does not form the basis for Reasonable Articulable Suspicion; the refusal of a person to identify themselves or cooperate does not, in and of itself, form the basis for turning a consensual encounter into an Investigatory Stop or arrest.

B. Temporary Detentions

    1. Investigatory Stop

        a. An Investigatory Stop is a temporary detention of a person in the vicinity where the person was stopped based on Reasonable Articulable Suspicion that the person is committing, is about to commit, or has committed a criminal offense.

      b.    The person may be detained only for the length of time necessary to confirm or dispel the officer's Reasonable Articulable Suspicion that the person is committing, has committed, or is about to commit a crime. The detention and questioning may only be for a reasonable length of time and should take place in the vicinity of the stop.

      c.    An Investigatory Stop is a seizure of a person which implicates a Fourth Amendment analysis and a standard of reasonableness.

      d.    An officer must have Reasonable Articulable Suspicion when conducting an Investigatory Stop.

2.    Probable Cause Stop

      a.    A Probable Cause Stop is a temporary detention of a person in the vicinity where the person was stopped based on Probable Cause that the person is committing or has committed a criminal offense.

      b.    Probable Cause Stops are not limited to pedestrians. Various individuals such as occupants of vehicles and individuals on bicycles may be the subjects of Probable Cause Stops.

      c.    A person is not free to leave during a Probable Cause Stop. Unless the stop leads to a custodial arrest, the person may only be detained for a reasonable time period sufficient to allow an officer to issue a citation or a warning, conduct a name check, or, if applicable, run a computer check on a vehicle's registration.

**NOTE:**    A Temporary Detention can be fluid, and its status may change as the encounter evolves. For instance, a Probable Cause Stop may be extended as an Investigatory Stop if information not related to the reason for the initial stop is developed that leads to an additional investigation. For example, a Probable Cause Stop for an observed traffic offense that leads to a theft investigation because the driver matches the description used in a flash message. When this happens, Department members must document both the Probable Cause for the initial stop and the Reasonable Articulable Suspicion for extending the encounter into an Investigatory Stop.

3.    Control of Occupants of a Vehicle

      a.    Officers may order a driver and passenger(s) out of a vehicle during a lawful vehicular stop.

      b.    Occupant(s) of a lawfully stopped vehicle are subjected to the control of the officers and are not free to leave, even though the officer may not have individualized suspicion of criminal behavior by the occupant(s).

C.    Custodial Arrests

1.    A Custodial Arrest is a seizure of a person that exceeds the permissible limits of a Temporary Detention such as a Probable Cause Stop or an Investigatory Stop in scope or duration, and must be supported with Probable Cause or an arrest warrant. The following facts may be considered to determine if an Investigatory Stop has elevated to a Custodial Arrest:

      a.    Duration of the encounter;

      b.    Extent of the restraint on the person (e.g., use of handcuffs);

      c.    Location of the questioning;

      d.    Transportation of a person against his or her will; or

      e.    Choice to end the encounter is not available to the person.

2. A Custodial Arrest must be based on Probable Cause. Probable Cause exists when an officer has knowledge of facts and circumstances based on reasonably trustworthy information that is sufficient to warrant a reasonable officer to believe that a crime has occurred or is occurring and that an individual has committed it. The totality of the circumstances establishes Probable Cause.

3. Circumstances that may justify a Custodial Arrest:

   a. A crime committed in the presence of the officer (on view).

      **NOTE:** When an officer observes a person commit a traffic or municipal offense, the person is briefly detained at the scene in order for the officer to address the violation. Generally, this seizure based solely on Probable Cause does not rise to the level of a Custodial Arrest due to its temporary nature. The issuance of a traffic citation or Administrative Notice of Ordinance Violation (ANOV) to a person out in the field is considered a Temporary Detention.

   b. A credible complainant (victim) willing to sign complaints.

   c. Admissions or confessions made to the officer as to the commission of a crime.

   d. Reasonable grounds to believe a person is wanted on a valid warrant.

   e. Probable cause that establishes the stopped person is committing or has committed a violation of the law.

## VI. TYPES OF SEARCHES

A. Protective Pat Down

1. Pursuant to Terry v. Ohio, authority to perform a Protective Pat Down is limited to the following:

   a. When an officer has detained a person based upon Reasonable Articulable Suspicion that criminal activity is afoot and, during that detention, develops additional Reasonable Articulable Suspicion that the person is armed and dangerous to the officer or others nearby, the officer may conduct a Protective Pat Down of the outer clothing of the person for hard objects that could be used as weapons. The Protective Pat Down is only for the purpose of safety; it is not to search for evidence.

      **NOTE:** The courts have ruled that a Protective Pat Down may be performed on a person who is lawfully detained based on Probable Cause (e.g., an officer stops a person based on an observed violation), if the officer develops Reasonable Articulable Suspicion that the person may be 'armed and dangerous' to the officer or others nearby.

   b. A Protective Pat Down is a strictly limited search during a Temporary Detention in which an officer, for the protection of the officer or others nearby, conducts a pat down of the outer clothing of a person for hard objects that could be weapons. During a Protective Pat Down of the outer clothing of the person, the officer may not go into the pockets of the person or reach underneath the outer surface of the garments. If during the Protective Pat Down of the outer clothing, the officer touches a hard object that the officer believes is a weapon, the officer may reach into that area of the clothing and retrieve the object.

      **REMINDER:** A Protective Pat Down is not a general exploratory search for evidence of criminal activity.

2. An officer has the right to perform a Protective Pat Down of a person for weapons when:

    a.   the person is lawfully stopped based on Reasonable Articulable Suspicion or Probable Cause; **and**

    b.   the officer has Reasonable Articulable Suspicion that the person is "armed and dangerous" to the officer or others nearby.

    **NOTE:**     Officers are prohibited from conducting a protective pat down based solely on officer safety without having reasonable articulable suspicion that the person is armed and dangerous.

3.   During the Protective Pat Down, an officer will feel only the outer clothing of the person using his or her hands, but without further manipulation with the officer's fingers. An officer will not place his or her hands in pockets unless he or she feels a hard object that could reasonably be a weapon.

4.   If an officer touches a hard object of reasonable size and scope to be a weapon, the officer can retrieve the object.

5.   Plain Touch Doctrine. Pursuant to Minnesota v. Dickerson and People v. Mitchell, the Plain Touch Doctrine allows officers to seize contraband during a Protective Pat Down after satisfying the following requirements:

    a.   When conducting a lawful Investigatory Stop and performing a lawful Protective Pat Down, if the officer touches an object without manipulation and, based upon that officer's training and experience, immediately determines that object to be contraband, the officer may seize that item without a warrant and may lawfully charge the person with subsequent crimes.

    b.   During a lawful Protective Pat Down, if an object could not reasonably be believed to be a weapon due to it not being a hard object or based on its size, the officer must move on, unless it is immediately apparent without manipulation, based on his or her training and experience, that the item is contraband, the item can be recovered.

    c.   The Plain Touch Doctrine requires officers to satisfy the following three-part test:

      (1)   a lawful Temporary Detention, **and**

      (2)   a lawful Protective Pat Down, **and**

      (3)   the officer by touch must be able to immediately recognize the item to be contraband without any manipulation of the item.

B.   Custodial Search and Searches Incident to an Arrest

When an officer effects a lawful, custodial arrest of a person, the officer may search the person arrested and the area within the arrested person's immediate presence.

1.   The purpose of a custodial search is to:

    a.   protect the officer from attack;

    b.   prevent the person from escaping;

    c.   discover the fruits of the crime; and

    d.   discover any instruments, articles, or things that may have been used in the commission of, or constitute evidence of, an offense.

2.   A custodial search of a person requires a custodial arrest.

NOTE: When an officer observes a person commit a traffic or municipal offense, the person is briefly detained at the scene in order for the officer to address the violation. Generally, this seizure based solely on Probable Cause does not rise to the level of a Custodial Arrest due to its temporary nature. The issuance of a Personal Service Citation or an Administrative Notice of Ordinance Violation (ANOV) to a person in the field is considered a temporary detention; therefore, a custodial search of the person would not be justified.

C. Consent Searches

1. During an investigatory stop, CPD officers may conduct a search of a person upon consent if officers have reasonable articulable suspicion that the person is involved in a crime or possesses evidence of the crime.

NOTE: When requesting consent to conduct a search during an Investigatory Stop, officers will record the entire interaction on a body-worn camera (BWC).

2. To be valid, a consent to search must be voluntarily given based on the totality of the circumstances.

3. Officers are prohibited from obtaining consent searches using force, threats of force, promises, misrepresentation, intimidation, or exertion of authority.

4. It is the officer's burden to prove that consent to search was given voluntarily.

5. The consenter can restrict the place(s) to be searched and revoke consent to search at any time during the search.

D. Vehicle Searches

1. Plain View Doctrine

During a lawful vehicular stop, contraband in plain view may be lawfully seized. A seizure of the item based on the Plain View Doctrine requires:

a. a lawfully stopped vehicle, **and**

b. it must be immediately apparent to the officer, without manipulation of other objects, that the item is contraband prior to the seizure of that item.

2. Protective Search of a Vehicle

a. Pursuant to a lawful vehicle stop and a lawful Protective Pat Down of any recent occupant of that vehicle, a warrantless protective search of the vehicle may be performed for weapons.

b. The search is limited to the passenger area of the vehicle, including a locked glove box and any container that can reasonably contain a weapon.

c. The search does not include the trunk area, unless it is reasonable to suspect the trunk area could be accessed from the passenger area of the vehicle.

3. Search Incident to an Arrest

Pursuant to a lawful custodial arrest of a recent occupant of a vehicle, the passenger compartment and any containers therein can be searched for weapons or evidence **only if**:

a. the arrestee is within reaching distance of the vehicle; or

b. it is reasonable to believe the vehicle contains evidence of the offense of the arrest.

4. Probable Cause Search

> a.    A warrantless search of a vehicle is allowed when the officer possesses Probable Cause that the vehicle contains evidence of criminal activity and there are exigent circumstances that make the search necessary to preserve evidence pertaining to a vehicle that could be driven out of the jurisdiction quickly.
>
> b.    During a lawful vehicular stop, probable cause can be established when weapons or contraband are discovered in plain view or during a previous search (i.e., Protective Pat Down of a recent occupant of a vehicle; a protective search of the vehicle; search incident to an arrest; consent) and the officer can articulate reasonable grounds to believe more of the same could be in the vehicle.
>
> c.    The search should be conducted only in areas for which Probable Cause exists. The container to be searched must be large enough to hold the object of the search.

5.    Plain Smell Doctrine

> a.    In *People v. Redmond* (2024), the Supreme Court of the State of Illinois held that the odor of burnt cannabis, alone, is insufficient to provide probable cause for police officers to perform a warrantless search of a vehicle. However, a warrantless vehicle search may be conducted when an officer, based on his or her training and experience, detects the odor of burnt cannabis emitting from a vehicle and uses this in conjunction with other facts to establish probable cause to search the vehicle.
>
> b.    In *People v. Molina* (2024), the Supreme Court of the State of Illinois held that the odor of raw cannabis coming from a vehicle being operated on an Illinois highway, alone, is sufficient to provide police officers, who are trained and experienced in distinguishing between burnt and raw cannabis, with probable cause to perform a warrantless search of a vehicle.

## VII.    POLICY REVIEW AND COMMUNITY ENGAGEMENT

A.    The Department will periodically review and, to the extent necessary, revise its directives on Investigatory Stops and Protective Pat Downs to ensure they:

> 1.    are consistent with the Department's vision, mission, core values, objectives, and practices;
>
> 2.    provide clear and effective guidance to Department members;
>
> 3.    are consistent with applicable law;
>
> 4.    meet the requirements of the consent decree (pursuant to State of Illinois v. City of Chicago, Case No. 17-cv-6260); and
>
> 5.    are consistent with the Department directives on the enforcement of the loitering ordinances, including the Department directive titled "<u>Gang and Narcotics-Related Loitering</u>."

B.    The Department will:

> 1.    establish and maintain clear channels through which community and Department members can provide input regarding the Department's Investigatory Stop policies and forms and propose revisions or additions to those policies and forms.
>
> 2.    in developing or revising policies and training on Investigatory Stops, Protective Pat Downs, and the enforcement of the gang and narcotics-related ordinances, seek input from members of the community and community-based organizations with relevant knowledge and experience through community-engagement efforts.

C.    The Department will regularly conduct a community-engagement process through which community members, reflecting a broad section of the Chicago community the Department serves, can provide feedback on the Department's policy for Investigatory Stops, Protective Pat Downs, and the enforcement of the gang and narcotics-related ordinances.

1.  At a minimum, the Department will conduct this community-engagement process every two years and will consider the recommendations during the biennial policy review process.

2.  A summary of the Department's policy review and community-engagement efforts will be shared with the community organizations and community members that participated in the community-engagement process.

## VIII. TRAINING

A.  The Department will train its members, including supervisors, how to conduct Investigatory Stops and Protective Pat Downs consistent with Department policies and all applicable laws. This training will:

1.  be consistent with the Department's commitment to procedural justice, de-escalation, impartial policing, and community policing.

2.  incorporate scenario-based elements.

3.  instruct Department members, including supervisors, with respect to the documentation required for Investigatory Stops and Protective Pat Downs, including Stop Reports and Stop Receipts, any applicable electronic applications, and their responsibilities to record the specific and articulable facts for each Investigatory Stop and Protective Pat Down.

4.  instruct supervisors on how to review Stop Reports and how to discuss the results of the supervisory review of these reports and officers' practices with officers.

5.  instruct Department members that:

    a.  Investigatory Stops are conducted only where there is reasonable articulable suspicion that a crime has been, is being, or is about to be committed;

    b.  if it is safe, reasonable, and practical to do so, members will notify the person(s) encountered that they are being lawfully detained temporarily, indicate that they will be free to leave at the conclusion of the investigatory stop (absent establishing probable cause for arrest) and, if asking the individual questions, inform the individual that they are not required to answer;

    c.  Protective Pat Downs are performed only where there is Reasonable Articulable Suspicion that the person stopped is armed and dangerous;

    d.  an individual subject to an Investigatory Stop conducted by a Department member is not required to answer any questions asked by the member; and

    e.  consent to conduct a search of an individual must be voluntarily given based on the totality of the circumstances, including that consent cannot be obtained by using force, threats of force, promises, misrepresentation, intimidation, or exertion of authority, and the individual may revoke consent at any time.

B.  The Deputy Chief, Training and Support Group, will ensure:

1.  the Department training specific to conducting Investigatory Stops and Protective Pat Downs is reviewed and, to the extent necessary, revised so that the training is sufficient in quantity, quality, type, and scope to prepare Department members to comply with the Department directives consistently, effectively, and in accordance with the law, best practices, and the consent decree (pursuant to State of Illinois v. City of Chicago, Case No. 17-cv-6260).

2.  the Department determines any additional development and administration of training related to Investigatory Stops and Protective Pat Downs as part of the Department's annual Training Needs Assessment, under the supervision of the Training Oversight Committee.

## IX. ASSOCIATED POLICIES

A.  General Order G02-01, Protection of Human Rights

B.  General Order G02-04, <u>Prohibitions Regarding Racial Profiling And Other Bias-Based Policing</u>

C.  General Order G02-01-03, <u>Interactions with Transgender, Intersex, and Gender Nonconforming (TIGN) Individuals</u>

D.  Special Order S03-05, <u>In-Car Video Systems</u>

E.  Special Order S03-14, <u>Body Worn Cameras</u>

F.  Special Order S04-14-09, <u>Illinois Traffic and Pedestrian Stop Statistical Study</u>.

Larry Snelling
Superintendent of Police

23-069 DK

| Chicago Police Department | | General Order G03-08-01 | |
|---|---|---|---|
| **INVESTIGATORY STOPS** | | | |

| ISSUE DATE: | 31 December 2024 | EFFECTIVE DATE: | TO BE DETERMINED |
|---|---|---|---|
| RESCINDS: | 10 July 2017 Version of S04-13-09 titled "Investigatory Stop System" | | |
| INDEX CATEGORY: | 04 - Preliminary Investigations | | |
| CALEA: | | | |

## I. PURPOSE

This directive:

A. continues to ensure compliance with the rights guaranteed to the public under the United States Constitution, the State of Illinois Constitution, and the law.

B. continues to delineate the authority and circumstances necessary for conducting Temporary Detentions.

## II. GUIDELINES FOR TEMPORARY DETENTIONS

A. Sworn members who conduct Temporary Detentions and Protective Pat Downs are required to complete a Stop Report (CPD-11.910), consistent with the Department directive titled "Reporting Temporary Detentions."

B. The Department will not:

1. consider the number of Investigatory Stops or Protective Pat Downs by a Department member as part of any bonus, incentive, or promotional process for any Department member, or

2. implement any form of quota relating to the number of Investigatory Stops or Protective Pat Downs.

C. A Department member may conduct an Investigatory Stop if it is based on specific and articulable facts which, combined with rational inferences from these facts, give rise to Reasonable Articulable Suspicion that criminal activity is afoot. The sole purpose of the temporary detention is to prove or disprove those suspicions.

D. An Investigatory Stop and a Protective Pat Down are two distinct actions—both require independent justification.

> **EXAMPLE:** An Investigatory Stop requires Reasonable Articulable Suspicion of specific criminal activity to stop or detain a person; however, to perform a Protective Pat Down of that person, there must be Reasonable Articulable Suspicion that the person is armed and dangerous.

E. Sworn Department members must use reliable, credible, and reasonably trustworthy information in establishing Reasonable Articulable Suspicion or Probable Cause to detain or search a person.

F. Sworn Department members must be clearly identified as Chicago Police Department officers when conducting Temporary Detentions. Uniformed officers must ensure their name plates and unit designators, along with their assigned star numbers, are clearly visible on their uniforms. If not in uniform, sworn Department members must announce their identities and display their Department identifying credentials, such as a star and nameplate attached to an outer garment or Department identification. Examples of when Department members are readily identifiable as Chicago Police Officers include, but are not limited to:

1. being attired in a Class A, B, or C uniform; or

2.    being attired in casual dress with an overshirt carrier that displays the star and nameplate (including embroidered insignia) or working in a marked Department vehicle.

G.    During an Investigatory Stop, the sworn Department member may only temporarily restrict a person's freedom of movement as long as reasonably necessary to dispel or confirm the member's Reasonable Articulable Suspicion of criminal activity. The person cannot continue to be detained solely for the purpose of obtaining the results of a name check of the person or for the completion of required documentation when Reasonable Articulable Suspicion no longer exists. Unnecessarily prolonging an Investigatory Stop could make the temporary detention unlawful if probable cause does not exist for an arrest.

H.    During an investigatory stop, persons may be asked to identify themselves and to provide an explanation for their actions; however, a failure to do so is not, in and of itself, an arrestable offense or grounds for further detention, and a person may choose not to answer any of the sworn Department member's questions.

I.    Sworn Department members are not required to give Miranda warnings during an Investigatory Stop unless the person has been taken into custody or has otherwise been deprived of his or her freedom of action in any significant way. During Investigatory Stops, members should restrict their questions to those concerning the person's identity and other inquiries necessary to resolve the members' suspicions.

J.    If it is safe, reasonable, and practical to do so, sworn Department members conducting an Investigatory Stop will notify the person(s) encountered that they are being lawfully detained temporarily, indicating that they will be free to leave at the conclusion of the Investigatory Stop (absent establishing probable cause for arrest) and, if asking the individual questions, informing the individual they are not required to answer.

K.    At the conclusion of an Investigatory Stop, sworn members will provide the person with a Stop Receipt consistent with the Department directive titled "Reporting Temporary Detentions."

L.    All of the facts that support Reasonable Articulable Suspicion or Probable Cause to temporarily detain an individual and, if applicable, all of the facts that support Reasonable Articulable Suspicion to perform a Protective Pat Down of a person will be documented on a Stop Report in the Temporary Detention (Stop) Application, consistent with the Department directive titled "Reporting Temporary Detentions."

M.    Department members will document on the Stop Report any Department video viewed prior to the completion of the report, including body-worn camera (BWC) or in-car video system (ICVS) footage.

N.    **Authority to Perform a Protective Pat Down During a Temporary Detention.** Consistent with the guidelines outlined in the Department directive titled "Police Encounters and the Fourth Amendment," a Department member may conduct a Protective Pat Down of the outer clothing of the person for hard objects that could be used as weapons only when the member has detained a person based upon Reasonable Articulable Suspicion that criminal activity is afoot and, during that detention, develops additional Reasonable Articulable Suspicion that the person is armed and dangerous to the member or others nearby.

        **REMINDER:**    During a Protective Pat Down of the outer clothing of the person, sworn Department members may not go into the pockets of the person or reach underneath the outer surface of the garments. If during the Protective Pat Down of the outer clothing, the sworn Department member touches a hard object that they believe is a weapon, the member may reach into that area of the clothing and retrieve the object.

O.    **Stop Reports Involving Persons in a Group.** There must be independent, individualized Reasonable Articulable Suspicion for each member of a group that is subjected to an Investigatory Stop.

P. **Off-Duty Temporary Detentions.** Members who conduct an Investigatory Stop when off-duty will request that an on-duty Department member from the district of occurrence respond to the scene. Members will not detain persons longer than reasonably necessary to investigate their suspicions or to wait for the arrival of a responding Department member.

NOTE: The responding Department member will request a supervisor, who will respond to the scene and ensure the off-duty member completes a Stop Report and the person stopped is issued a Stop Receipt if the person is still on the scene.

## III. PROHIBITIONS

A. Department members are prohibited from:

1. performing Investigatory Stops unless they have Reasonable Articulable Suspicion based on specific and articulable facts that an individual has committed, is committing, or is about to commit a crime;

2. unreasonably extending an Investigatory Stop lawfully made based on Reasonable Articulable Suspicion or Probable Cause to conduct an investigation into other criminal activity unless they have Reasonable Articulable Suspicion based on specific and articulable facts that a person has committed, is committing, or is about to commit another crime;

3. relying on information known to the officer at the time to be materially false to establish Reasonable Articulable Suspicion for an Investigatory Stop or Protective Pat Down;

4. conducting an Investigatory Stop or search of a person based solely on an officer smelling cannabis/marijuana without any other specific and articulable facts of criminal activity.

EXCEPTION: In *People v. Molina* (2024), the Supreme Court of the State of Illinois held that the odor of raw cannabis coming from a vehicle being operated on an Illinois highway, alone, is sufficient to provide police officers, who are trained and experienced in distinguishing between burnt and raw cannabis, with probable cause to perform a warrantless search of a vehicle.

5. justifying an Investigatory Stop solely by describing a person's behavior as "suspicious," without further articulating specific facts that the person has committed, is committing, or is about to commit a crime.

6. obtaining consent for a search using force, threats of force, promises, misrepresentation, intimidation, or exertion of authority.

B. Sworn Department members are prohibited from conducting Investigatory Stops or Protective Pat Downs based solely on:

1. a person's geographic location, such as presence in a high-crime area or proximity to the scene of suspected or reported crimes, without any other Reasonable Articulable Suspicion that the person is, has, or is about to be engaged in criminal activity;

2. a person's response to the presence of police officers, such as a person's attempt to avoid contact with an officer (e.g., walking away, declining to talk, running away, or crossing the street to avoid contact), without any other reasonable articulable suspicion that the person is, has, or is about to be engaged in criminal activity;

3. a person's presence in the company of others suspected of criminal activity without any other Reasonable Articulable Suspicion that the person is, has, or is about to be engaged in criminal activity;

4. a person's race, ethnicity, color, national origin, religion, disability, gender, gender identity, sexual orientation, immigration status, homeless status, marital status, parental status, military discharge status, financial status, or lawful source of income, without any other specific and articulable facts that the person is, has, or is about to be engaged in criminal activity.

> **EXCEPTION:** Department members may rely on the listed characteristics when part of a specific suspect description.

> **REMINDER:** Sworn Department members may conduct an Investigatory Stop if it is based on specific and articulable facts which, combined with rational inferences from these facts, give rise to Reasonable Articulable Suspicion that the person has committed, is committing, or is about to commit a crime. Accordingly, sworn Department members may consider a combination of the above-listed facts, in conjunction with other facts, that may appear innocuous in and of themselves but, taken together, amount to Reasonable Articulable Suspicion.

C. Department members are prohibited from conducting a Protective Pat Down:

1. with or without consent, except where officers have Reasonable Articulable Suspicion based on specific and articulable facts that a person is armed and dangerous;

2. based solely on "officer safety" without having reasonable articulable suspicion, based on specific and articulable facts, that the person is armed and dangerous.

## IV. PROCEDURES

A. When conducting an Investigatory Stop, sworn Department members will:

1. communicate with persons regarding the specific basis for an Investigatory Stop, consistent with the principles of procedural justice, by:

    a. identifying themselves by name and rank as soon as it is safe, reasonable, and practical to do so;

    b. stating the reason for the Investigatory Stop as soon as it is safe, reasonable, and practicable to do so;

2. ensure that the duration of an Investigatory Stop is no longer than reasonably necessary to confirm or dispel Reasonable Articulable Suspicion and to take the appropriate enforcement actions, if any.

3. act with professionalism and courtesy throughout the duration of the Investigatory Stop interaction.

4. when equipped with a properly functioning body-worn camera (BWC) activated to record the incident, inform the person that the encounter is being recorded on a BWC.

5. if it is safe, reasonable, and practical to do so, notify the person(s) encountered that they are being lawfully detained temporarily, indicating that they will be free to leave at the conclusion of the Investigatory Stop (absent establishing probable cause for arrest) and, if asking the individual questions, informing the individual they are not required to answer.

6. at the conclusion of an Investigatory Stop, provide the person with a Stop Receipt consistent with the Department directive titled "Reporting Temporary Detentions."

B. **Consent Searches**

1. During an Investigatory Stop, sworn Department members may conduct a search of a person upon consent if they have Reasonable Articulable Suspicion that the person is involved in a crime or possesses evidence of a crime.

2.      When requesting consent for a search of a person during an Investigatory Stop, sworn Department members will:

      a.      specifically ask the person for consent to search;

      b.      document on the Stop Report the request for consent, the person's response, and whether a search was conducted by consent; and

           **NOTE:**      If a person gives consent to search, the sworn Department member must inform the person that they may revoke consent at any time.

      c.      record the entire interaction on a body-worn camera.

3.      Sworn Department members must establish and communicate the scope of the consensual search and end the search upon the person revoking consent.

4.      When a search by consent is conducted, sworn Department members must indicate on the Stop Receipt that a consent search was conducted.

C.      Sworn Department members who conduct Investigatory Stops and Protective Pat Downs will document the Investigatory Stop on a Stop Report (CPD-11.910) in the Temporary Detention (Stop) Application, consistent with the Department directive titled "Reporting Temporary Detentions."

      **REMINDER:**      All of the facts that support Reasonable Articulable Suspicion for the Investigatory Stop and, if applicable, all of the facts that support Reasonable Articulable Suspicion to perform a Protective Pat Down of a person will be documented on a Stop Report in the Temporary Detention (Stop) Application, consistent with the Department directive titled "Reporting Temporary Detentions."

Larry Snelling
Superintendent of Police

23-069 DK



| Chicago Police Department | General Order G03-08-03 |
|---|---|
| **REPORTING TEMPORARY DETENTIONS** | |

| ISSUE DATE: | 31 December 2024 | EFFECTIVE DATE: | TO BE DETERMINED |
|---|---|---|---|
| RESCINDS: | 10 July 2017 Version of S04-13-09 titled "Investigatory Stop System" | | |
| INDEX CATEGORY: | 04 - Preliminary Investigations | | |
| CALEA: | | | |

## I. PURPOSE

This directive:

A. introduces the:

    1. Stop Report (CPD-11.910), which discontinues the Investigatory Stop Report, to report and document Temporary Detentions.

    2. Temporary Detention (Stop) Application, which discontinues the Investigatory Stop System, as the electronic application to enter, manage, and maintain Temporary Detention data and information.

    3. Stop Receipt (CPD-11.912), which discontinues the Investigatory Stop Receipt.

        **NOTE:** The Stop Receipt contains instructions on how to obtain a copy of a Stop Report from the Department through an Illinois Freedom of Information Act request.

B. complies with the Illinois Traffic and Pedestrian Stop Statistical Study's data collection procedures.

## II. GUIDELINES

A. The Temporary Detention (Stop) Application is one of the ways the Chicago Police Department ensures that it protects the public, preserves the rights of all members of the community, and enforces the law impartially. Adherence to this policy allows the Department to serve all people equally with fairness, dignity, and respect, and to uphold its pledge to not use racial profiling and other bias-based policing.

B. Sworn members who conduct Temporary Detentions and Protective Pat Downs are required to complete a Stop Report (CPD-11.910) within the Temporary Detention (Stop) Application.

    1. The completion of a Stop Report satisfies the requirements data collection requirements of Illinois state statute 625 ILCS 5/11-212 titled "Illinois Traffic and Pedestrian Stop Statistical Study."

    2. Department members will continue to follow the Department directive titled "Illinois Traffic and Pedestrian Stop Statistical Study" to ensure full compliance with the law.

C. The Temporary Detention (Stop) Application and the completion of a Stop Report will ensure:

    1. sworn members document the facts and circumstances of:

        a. a Probable Cause Stop;

        b. an Investigatory Stop, including a statement of the facts establishing Reasonable Articulable Suspicion to stop a person;

        c. a Protective Pat Down, including a statement of the facts establishing Reasonable Articulable Suspicion that a person is armed and dangerous to pat down an individual for potential weapons; and

d. any search other than a Protective Pat Down conducted during a Temporary Detention, including a statement providing the basis, facts, and circumstances of the search.

2. appropriate information from the Investigatory Stop, Probable Cause Stop, Protective Pat Down, or search other than a Protective Pat Down is entered and retained within the application; and

3. supervisors review the facts and circumstances of Investigatory Stops, Probable Cause Stops, Protective Pat Downs, or searches other than a Protective Pat Down.

D. All of the facts that support Reasonable Articulable Suspicion or Probable Cause to temporarily detain an individual and, if applicable, all of the facts that support reasonable articulable suspicion to perform a protective pat down of a person will be documented on a Stop Report within the Temporary Detention (Stop) Application.

1. A Temporary Detention can be fluid, and its status may change as the encounter evolves. For instance, a Probable Cause Stop may be extended as an Investigatory Stop if information not related to the reason for the initial stop is developed that leads to an additional investigation. For example, a Probable Cause Stop for an observed traffic offense that leads to a theft investigation because the driver matches the description used in a flash message. When this happens, Department members must document both the Probable Cause for the initial stop and the Reasonable Articulable Suspicion for extending the encounter into an Investigatory Stop.

2. Sworn Department members will not justify an investigatory stop solely by describing an individual's behavior as "suspicious" without further articulating specific facts that the individual has committed, is committing, or is about to commit a crime.

E. Members will document on the Stop Report any body-worn camera footage viewed prior to completion of the report.

## III. THE TEMPORARY DETENTION (STOP) APPLICATION

A. The Temporary Detention (Stop) Application is an investigative tool consisting of information obtained in the field, documented on a Stop Report, and entered into the electronic application.

1. The Temporary Detention (Stop) Application will only be used to document:

a. Investigatory Stops, Probable Cause Stops, Protective Pat Downs, or searches other than a Protective Pat Down during Temporary Detentions;

b. enforcement of the Gang and Narcotics-Related Loitering Ordinances consistent with the Department directive titled "Gang and Narcotics-Related Loitering;" and

c. statistical information for the Illinois Traffic and Pedestrian Stop Statistical Study.

2. The Temporary Detention (Stop) Application contains:

a. information concerning persons and, when appropriate, vehicles temporarily detained for Investigatory Stops and Probable Cause Stops.

b. narrative sections for sworn Department members to document Reasonable Articulable Suspicion for their Investigatory Stops and Protective Pat Downs, the facts on which the suspicion is based, and other information from an investigatory stop or protective pat down.

NOTE: A Probable Cause Stop that does not require further investigation (e.g., a sworn Department member observes a violation of the Illinois Vehicle Code) will not require the completion of the narrative section.

      c.     Sworn members are required to complete the applicable narrative fields in the Temporary Detention (Stop) Application using specific and clear language that does not rely solely on standardized or boilerplate terms.

    3.    Sworn members will complete hard copy Stop Reports only when the electronic Temporary Detention (Stop) Application is unavailable and after approval is obtained by their immediate supervisor.

    4.    Sworn members are responsible for entering all Stop Reports created during their tours of duty into the electronic application as soon as possible but no later than the end of their tours of duty.

    5.    Supervisors will review all Stop Reports, electronic and hard copy, created by subordinates and either approve it, return it for correction, or take other appropriate action before the end of their tours of duty consistent with the Department directive titled "<u>Department Review of Temporary Detentions</u>."

**B.**    **Access to the Temporary Detention (Stop) Application**

    1.    All Temporary Detention (Stop) Application information will be accessible to any sworn Department member and select civilian members for one year after the initial Stop Report was generated.

    2.    Pursuant to supervisory approval, personnel assigned to the following bureaus will be allowed access to Temporary Detention (Stop) Application information for three years based upon reasonable, articulated investigative need:

        a.     Bureau of Detectives,

        b.     Bureau of Counterterrorism, and

        c.     Bureau of Internal Affairs.

        **NOTE:**     The bureau chiefs will establish appropriate record keeping relevant to access and approval. Bureau chiefs that have members who have access to the Temporary Detention (Stop) Application beyond one year will ensure access is consistent with articulated investigative need and that supervisory authorization for access is maintained within unit files.

    3.    Other Department members who require access beyond this policy will submit a To-From-Subject Report through the chain of command to the Director, Information Services, Office of Public Safety Administration (OPSA), articulating the investigative need for access. If necessary, the Director, Information Services, OPSA, will consult with the Legal Affairs Division regarding the requested access.

    4.    After three years, personal identification data contained within the Temporary Detention (Stop) Application will be deleted pursuant to Information Services, Office of Public Safety Administration (OPSA), practice and record-retention requirements, statutory or judicial. Thereafter, no member will have access to personally identifying data from those Stop Reports.

        **NOTE:**     The aggregate data from a Temporary Detention event, such as the date, time, and address of occurrence, in addition to the descriptive racial and demographic data, will be retained by Information Services, Office of Public Safety Administration (OPSA).

## IV.   PROCEDURES

    A.    Sworn members who conduct an Investigatory Stop, Probable Cause Stop, and, if applicable, a Protective Pat Down or any search other than a Protective Pat Down during the stop in a public place are required to complete a Stop Report within the Temporary Detention (Stop) Application as soon as possible but no later than by the end of their tour of duty.

B.   The Stop Report will document all of the facts that support or establish:

   1.   Probable Cause for a Probable Cause Stop;

   2.   Reasonable Articulable Suspicion for an Investigatory Stop;

   3.   Reasonable Articulable Suspicion to perform a Protective Pat Down; and

   4.   justification for any searches other than a Protective Pat Down during the stop.

C.   The justifications for the Temporary Detention will be documented on the Stop Report. Additionally, the justifications for an Investigatory Stop, Protective Pat Down, and any search other than a Protective Pat Down must be documented separately in the designated narrative fields of the application.

D.   In addition, Stop Reports will be submitted for all Investigatory Stops, Probable Cause Stops, Protective Pat Downs, and any search other than a Protective Pat Down that lead to an arrest, Personal Service Citation, Administrative Notice of Violation (ANOV), Curfew Violation Report, School Absentee Report, or other reporting or enforcement action.

E.   Upon the completion of an Investigatory Stop or a Probable Cause Stop, sworn members are required to provide the person stopped a completed Stop Receipt.

   1.   The Stop Receipt will include the Office of Emergency Management and Communications Police computer-aided dispatch (PCAD) event number, the reason for the stop, the sworn member's name and star number, and whether a consent search was conducted.

   2.   If a required Stop Receipt was not provided to or received by the person, the Department member will articulate in the Stop Report the reasons why the receipt was not provided or received by the person stopped.

      EXCEPTION:   A Stop Receipt will not be provided if the person stopped is arrested and transported to a Department facility, or the Temporary Detention ends in the issuance of a citation and release from the scene under the Illinois Pre-Trial Fairness Act.

F.   If an arrest is made based on a Probable Cause Stop or an Investigatory Stop, a Stop Report will be completed in addition to the Arrest Report. Members will indicate in the Stop Report that an arrest is related to a Probable Cause Stop or an Investigatory Stop by checking the appropriate box.

G.   If, at the conclusion of an Investigatory Stop, the individual is unable or refuses to provide identification and there is no Probable Cause to arrest, the sworn member will:

   1.   enter "John Doe" or "Jane Doe," as appropriate, in the name field;

   2.   provide as much of the stop information as possible;

   3.   indicate the refusal in the narrative field; and

   4.   describe the reason and circumstances for the stop in as much detail as possible, including a description of unusual clothing, manner, or behavior.

H.   If a vehicle with multiple occupants is stopped for a traffic violation, a Stop Report will be completed only for the operator of the vehicle, unless an act of furtherance (such as a name check or an order to remain) is made to detain another occupant of the vehicle.

I.   When Stop Reports are submitted for more than one person in a group, sworn Department members will cross-reference the reports for each person within the Temporary Detention (Stop) Application.

## V.   EXAMPLES OF REPORTING STOPS

The following examples illustrate instances when Stop Reports, Stop Receipts, and other Department reports are required and are intended to serve as guidelines that can be applied in various circumstances.

A. **Investigatory Stop**

An officer receives a flash message of a person wanted for theft of a watch from a jewelry store that just occurred. The flash message provides a description of the offender as a male white approximately six feet tall, 180 to 200 pounds, and wearing a red hat, white t-shirt, blue jeans, and white gym shoes. The officer, who happens to be traveling in the immediate area of the jewelry store, starts touring the area for a person fitting the description of the wanted offender. A few blocks away from the jewelry store, the officer spots a person fitting the description provided in the flash message. The officer detains the person to conduct an investigation into the theft. Shortly after, the jewelry store clerk arrives on the scene and informs the officer that the person stopped was not the theft offender. Upon receiving that information, the officer tells the detained person that he is free to leave and provides him with a Stop Receipt. The officer then completes the applicable sections of the Stop Report to document the facts that support Reasonable Articulable Suspicion for the stop, including the description provided in the flash message and how the person stopped matched that description.

B. **Probable Cause Stops**

1. An officer performs a traffic stop on a vehicle after observing the vehicle disregard a stop sign. The officer issues the driver a Personal Service Citation for failure to stop at a stop sign. The officer completes the applicable sections of a Stop Report to document the Probable Cause Stop. In addition, the officer completes a Stop Receipt and provides the completed Stop Receipt to the driver.

2. An officer performs a traffic stop on a vehicle after observing the vehicle disregard a stop sign. The officer issues the driver a verbal warning to the driver for failure to stop at a stop sign. The officer completes the applicable sections of the Stop Report to document the Probable Cause Stop. In addition, the officer completes a Stop Receipt and provides the completed Stop Receipt to the driver.

3. An officer observes a man smoking a cigarette on a Chicago Transit Authority platform. The officer detains the individual and obtains his identification for the purpose of issuing an Administrative Notice of Ordinance Violation (ANOV). During the detention, it is learned that the man just lost a family member. The officer decides to issue a verbal warning to the individual. The officer completes the applicable sections of the Stop Report to document the Probable Cause Stop. In addition, the officer completes a Stop Receipt and provides the completed Stop Receipt to the stopped person.

4. An officer performs a traffic stop on a vehicle after observing the vehicle disregard a stop sign. During the stop, the officer receives a flash message that provides a description of a wanted offender and vehicle for a theft that just occurred in the area of the traffic stop. The driver and the vehicle match the description. The officer conducts an investigation for the theft by questioning the driver regarding his whereabouts at the time of the theft. The officer determines that he does not have probable cause to arrest. The officer issues the driver a Personal Service Citation for failure to stop at a stop sign. The officer completes the applicable sections of the Stop Report to document the Probable Cause Stop and the circumstances, including the Reasonable Articulable Suspicion pertaining to the Investigatory Stop. In addition, the officer completes a Stop Receipt and provides the completed Stop Receipt to the driver.

C. **Probable Cause Stop with a Search**

An officer performs a traffic stop on a vehicle after observing the vehicle disregard a stop sign. During the traffic stop, the officer observes various facts that develop Reasonable Articulable Suspicion that the driver may be "armed and dangerous." The officer conducts a Protective Pat Down on the driver and searches the vehicle for weapons. No weapons are discovered. The officer issues the driver a Personal Service Citation for failure to stop at a stop sign. The officer completes the applicable sections of the Stop Report to document the Probable Cause Stop and the circumstances, including the Reasonable Articulable Suspicion pertaining to the Protective Pat Down. In addition, the officer completes a Stop Receipt and provides the completed Stop Receipt to the driver.

D.    **Consensual Encounter**

An officer responds to a call of shots fired. Upon the officer's arrival on the scene, the officer observes several people in the area. The officer approaches and asks people in the area as to whether or not they heard or saw anything pertaining to the shots-fired call. Some people respond "no" and walked away from the officer. Others do not respond at all while walking away from the officer. The officer did not detain any of the individuals and after further investigation by the officer, the officer determines the incident is not bona fide. A Stop Report will not be completed.

VI.    **TEMPORARY DETENTION (STOP) APPLICATION DATA ENTRY**

A.    Sworn members will enter the Stop Report into the Temporary Detention (Stop) Application and submit an electronic Stop Report as soon as possible but no later than the end of their tours of duty.

B.    If electronic access to the Temporary Detention (Stop) Application is not available, after receiving approval from a supervisor, sworn members will complete the hard copy Stop Report.

1.    If electronic access to the Temporary Detention (Stop) Application becomes available before the end of their tour of duty, the reporting Department member will:

a.    accurately enter the information from the hard copy Stop Report into the Temporary Detention (Stop) Application.

NOTE:    **The information entered into the Temporary Detention (Stop) Application must directly correspond with the information initially documented on the hard copy Stop Report.**

b.    select "yes" in the Temporary Detention (Stop) Application that a hard copy Stop Report was completed.

c.    record the Stop Report number generated by the Temporary Detention (Stop) Application onto the hard copy Stop Report.

d.    forward the completed, hard copy Stop Report to their supervisor for approval.

2.    If electronic access to the Temporary Detention (Stop) Application continues to be unavailable and is restored after the sworn member's tour of duty has ended, unit executive officers will determine the method of data entry and ensure that the Stop Report is entered into the Temporary Detention (Stop) Application within a reasonable period of time.

NOTE:    For units without executive officers, the unit commanding officer will designate a unit supervisor the rank of lieutenant or above to perform these duties.

VII.    **OTHER RESPONSIBILITIES**

A.    **District and Department-Level Review.**  Supervisors will review and approve Stop Reports consistent with the Department directive titled "<u>Department Review of Temporary Detentions</u>."

B.    The Department will collect the data and records related to Investigatory Stops and Protective Pat Downs necessary to:

1.    accurately evaluate the Department's practices concerning Investigatory Stops and Protective Pat Downs, and

2.    post de-identified Investigatory Stop data derived from Stop Reports on its website as provided for in Item IX of this directive.

C.    The Office of Public Safety Administration, Information Technology:

1.    is responsible for the maintenance and integrity of the Temporary Detention (Stop) Application.

2.  will maintain and preserve all electronic versions of any Stop Reports submitted or re-submitted by Department members.

3.  maintain the data and records related to Investigatory Stops and Protective Pat Downs necessary to:

    a.  accurately evaluate the Department's practices concerning Investigatory Stops and Protective Pat Downs, and

    b.  facilitate the Department posting de-identified Investigatory Stop data derived from Stop Reports on its website as provided for in Item IX of this directive.

D.  The commanding officer, Tactical Review and Evaluation Division (TRED), will ensure the 4th Amendment Stop Unit (4ASRU) conducts random reviews and audits of Stop Reports within the Temporary Detention (Stop) Application on a continual basis, consistent with the Department directive titled "Department Review of Temporary Detentions."

E.  Bureau chiefs that have members who have access to the Temporary Detention (Stop) Application beyond one year will ensure access is consistent with articulated investigative need and that supervisory authorization for access is maintained within unit files.

## VIII.    RETENTION

A.  Pursuant to 705 ILCS 405/1-7, titled "Confidentiality of Law Enforcement Records," juvenile Stop Reports will be filed and retained separately from adult Stop Reports.

B.  The Director, Administrative Support Division, will:

1.  ensure that hard copy Investigatory Stop Reports are destroyed and that information in the Temporary Detention (Stop) Application is purged consistent with this directive and Local Records Commission requirements.

2.  dispose of both electronic and hard copy Stop Reports consistent with this and other applicable Department directives, court orders, the Local Records Act, and other applicable laws.

C.  All Stop Reports, electronic and hard copy, will be retained for a period of six months after the completion of the Illinois Traffic and Pedestrian Stop Statistical Study (TPSSS).

1.  Six months after the completion of the TPSSS:

    a.  all hard copy Stop Reports three years and older will be purged.

    b.  all personal identifying information entered into the electronic application three years and older will be purged.

2.  All hard copy Stop Reports and personal identifying information contained within the application generated after the TPSSS retention period and beyond will be retained for a period of three years from the date the Stop Report was generated.

NOTE:   Pursuant to a court order entered in Hall, et al. v. City of Chicago, et al., 12 C 6834, the Chicago Police Department and its members are ordered to preserve all data in the Temporary Detention (Stop) Application and to preserve ALL hard copies of Stop Reports until further notice.

## IX.    PUBLIC ACCESS TO STOP REPORT DATA

To facilitate transparency and accountability regarding Investigatory Stops, the Department will continue to post de-identified Investigatory Stop data derived from Stop Reports on its website (currently, **https://home.chicagopolice.org/statistics-data/isr-data/**) on an annual basis, including fields for which information is collected on the Stop Report. The Department will also post on its website a data dictionary for Stop Report data.

Larry Snelling
Superintendent of Police

23-069 DK



| Chicago Police Department | | General Order G03-08-04 | |
|---|---|---|---|
| **DEPARTMENT REVIEW OF TEMPORARY DETENTIONS** | | | |
| **ISSUE DATE:** | 31 December 2024 | **EFFECTIVE DATE:** | **TO BE DETERMINED** |
| **RESCINDS:** | | | |
| **INDEX CATEGORY:** | 04 - Preliminary Investigations | | |
| **CALEA:** | | | |

## I. PURPOSE

This directive:

A.  establishes a process for the Department review of Investigatory Stops, Protective Pat Downs, and searches other than a Protective Pat Down that occur during Investigatory Stops.

B.  revises the:

1.  Deficiency Rejection Report (CPD-11.914) to include the identification of misspellings, typographical errors, grammatical errors, punctuation errors, or incomplete or improperly completed fields in reviewed Stop Reports, in addition to lack of documenting facts or justifications for the circumstances of the stop.

    **NOTE:** The revised Deficiency Rejection Report discontinues the use of the comments section of the Investigatory Stop Report application to reject reports for misspellings, typographical errors, grammatical errors, punctuation errors, or incomplete or improperly completed fields.

2.  Stop Report – Unit Monthly Audit form (CPD-11.918).

## II. THE DEFICIENCY REJECTION REPORT

A.  The Deficiency Rejection Report documents the rejection of a Stop Report by the initial reviewing supervisor. Depending on the reasons for the supervisory rejection, the Stop Report will either be returned to the reporting sworn Department member for revision and resubmission or sent directly to the 4th Amendment Stop Review Unit (4ASRU) for appropriate action. The Stop Report will be:

1.  returned to the reporting sworn Department member for the following reasons: misspellings, typographical errors, grammatical errors, punctuation errors, or incomplete or improperly completed fields; lack or omission of some facts of the totality of the circumstances that support Reasonable Articulable Suspicion to conduct the Investigatory Stop, Protective Pat Down, or other search; failure to document a valid reason a receipt was not issued; or failure to match the hard copy with the submitted electronic version.

2.  sent directly to the 4th Amendment Stop Review Unit for the following reasons: interview with the preparing officer reveals that the totality of the circumstances does not support Reasonable Articulable Suspicion to conduct the Investigatory Stop, Protective Pat Down, or other search; after revision, a continued lack of the documentation of some facts of the totality of the circumstances that support Reasonable Articulable Suspicion to conduct the Investigatory Stop, Protective Pat Down, or other search; failure to issue a receipt without a valid reason; the Stop Report is being rejected a second time; a Stop Report is not required; or the Stop Report is a duplicate.

B.  If a supervisor determines that a Stop Report should be rejected for a reason not identified in Item II-A, a Deficiency Rejection Report will be completed and forwarded directly to the 4th Amendment Stop Review Unit with a detailed explanation for the rejection.

C. Supervisors must document the reasons for a Stop Report rejection in a straightforward, easily understood manner. Under no circumstances will supervisors use nonsensical symbols, such as punctuation marks or a string of letters, or give vague instructions such as "see me" or "elaborate." The supervisor will document in writing the reason for the rejection, such as requesting that a sworn Department member amend a Stop Report for lack of sufficient description of Reasonable Articulable Suspicion.

D. Sworn Department members are prohibited from submitting multiple revised versions of a Stop Report, or further revising a Stop Report once a revised version has been submitted. If a report resubmitted by a reporting member still has deficiencies, the reviewing supervisor will send it directly to the 4th Amendment Stop Review Unit for appropriate action.

E. The same supervisor that reviewed and rejected the initial submission of a Stop Report must review the resubmitted report and either approve it or send it to the 4th Amendment Stop Review Unit. The supervisor will be able to view the original Stop Report, his or her reasons for rejecting the report, and the resubmitted report.

> **NOTE:** The watch operations lieutenant or executive officer can reassign a Deficiency Rejection Report if the initial reviewing supervisor is unable to review the resubmitted Stop Report in a timely manner.

## III. DISTRICT-LEVEL REVIEW OF INVESTIGATORY STOPS

A. Supervisors of sworn Department members who submit Stop Reports completed for Investigatory Stops and, if performed, Protective Pat Downs or other searches, will review the reports and ensure they are properly completed and conform to Department policy. Supervisors are responsible for ensuring that sworn Department members properly document in the applicable sections of all (electronic or hard copy) Stop Reports:

1. the Investigatory Stop information, including a description of the person stopped, stop location, and vehicle, if applicable.

2. the Reasonable Articulable Suspicion that justified the Investigatory Stop.

3. if performed, the Reasonable Articulable Suspicion that justified a Protective Pat Down during the stop.

4. if applicable, the basis and reasons that led to any search other than a Protective Pat Down of a person or his or her effects during the stop.

5. if applicable, the request for consent to perform a pat down or other search, the Reasonable Articulable Suspicion that the person is involved in a crime or possesses evidence of a crime that justified the request for consent search, whether consent was given, and if a pat down or other search was conducted by consent.

6. the disposition of the stop.

B. Reviewing supervisors will:

1. approve or reject all submitted Stop Reports and related Arrest Reports by the end of their tours of duty.

> **NOTE:** Arrest Reports will be reviewed and approved or rejected consistent with the Department directive titled "Field Arrest Procedures."

2. for properly prepared Stop Reports, indicate approval in the electronic Temporary Detention (Stop) Application or by signing the hard copy Stop Report in the appropriate field.

3. for rejected Stop Reports requiring a Deficiency Rejection Report:

a. personally inform the reporting sworn Department member of the rejection and the reason for the rejection;

> **NOTE:** The supervisor will complete the appropriate fields in the Deficiency Rejection Report indicating the date and time of the consultation.

    b.    complete a Deficiency Rejection Report consistent with the criteria established in Item II-A of this directive;

    c.    take the appropriate action, such as after-action support recommendations, to address any rejected reports and deviations from Department policy related to the report or the conduct described in the report.

> **NOTE:** The after-action support recommendations may include, but are not limited to, individual debriefing with a supervisor, reviewing Department policy with the Department member, reviewing BWC footage from the stop with the Department member, mandatory re-training, formal counseling, enhanced supervision, or initiating progressive discipline. The appropriate after-action support will be documented within the Deficiency Rejection Report.

    d.    if the facts permit, instruct the reporting sworn Department member to address the error and resubmit the Stop Report by the conclusion of the member's tour of duty; and

> **NOTE:** Only one revised version of a Stop Report can be submitted upon a supervisor's review and rejection of the originally submitted Stop Report.

    e.    verify resubmission of the Stop Report and either approve the report or forward it to the 4th Amendment Stop Review Unit.

4.    when directed by a 4th Amendment Stop Review Unit after-action support recommendation, review the BWC footage from the identified Investigatory Stop or Protective Pat Down with the involved officer(s) and document the viewing of the BWC footage and the results of the after-action support in the appropriate supervisory reports.

5.    for rejected Stop Reports that are required to be sent to the 4th Amendment Stop Review Unit:

    a.    inform the preparing sworn Department member of the rejection and the reasons for the rejection; and

> **NOTE:** The supervisor will complete the appropriate fields in the Deficiency Rejection Report indicating the date and time of the consultation.

    b.    forward the rejected Stop Report to the 4th Amendment Stop Unit consistent with Item II-B of this directive.

        (1)    The Deficiency Rejection Report will automatically be forwarded along with the rejected Stop Report.

        (2)    The preparing supervisor will take the appropriate action, such as after-action support recommendations, to address the deficiency.

> **NOTE:** The after-action support recommendations may include, but are not limited to, individual debriefing with a supervisor, reviewing Department policy with the Department member, reviewing BWC footage from the stop with the Department member, mandatory re-training, formal counseling, enhanced supervision, or initiating progressive discipline. The appropriate after-action support will be documented within the Deficiency Rejection Report.

6. forward all hard copy Stop Reports to the district review officer or Department member designated by the unit commanding officer for records retention.

C. District review officers or Department members designated by unit commanding officers will, on a daily basis, forward all hard copy Stop Reports, via the Police Documents Section, to the Records Inquiry Section (Unit 163), Administrative Support Division, for records retention.

D. Executive officers will:

1. monitor the submission of Stop Reports into the electronic Temporary Detention (Stop) Application and ensure:

   a. supervisors are properly reviewing and approving or rejecting all submitted Stop Reports and, when rejecting a Stop Report, properly completing a Deficiency Rejection Report.

   b. that the review process is timely as outlined in this directive.

2. ensure all approved hard copy Stop Reports are forwarded, via the Police Documents Section, to the Records Inquiry Section (Unit 163), Administrative Support Division, for records retention.

3. for each calendar month, conduct a random audit of 10% of Stop Reports completed for Investigatory Stops in approved status submitted by members of their unit from the previous month.

   a. The audit findings will be reported using the Stop Report – Unit Monthly Audit form (CPD-11.918) and submitted to the unit commanding officer.

   b. If less than 10 Stop Reports are completed for any calendar month, the executive officer will submit a negative report.

4. take appropriate action if any deficiencies are noted.

   a. If supervisory approvals do not conform to Department policy, the executive officer will indicate the after-action support recommendations taken to address the deficiency, including but not limited to individual debriefing with the supervisor; reviewing the policy with the member; recommending training; formal counseling; or initiating progressive discipline.

   b. Additionally, the executive officer will document the action taken in a To-From-Subject Report to the commanding officer, Tactical Review and Evaluation Division (TRED).

5. be accountable for the proper implementation of this directive.

E. **Unit Commanding Officers**

1. Unit commanding officers will ensure that monthly audit and negative reports are forwarded to the commanding officer, Tactical Review and Evaluation Division, through the chain of command no later than the 10th of every month.

2. In units without executive officers, the unit's exempt-rank commanding officer will designate a supervisor the rank of lieutenant or above to perform the duties outlined in Item III-D of this directive.

   **NOTE:** These duties do not apply to administrative units.

## IV. DEPARTMENT-LEVEL REVIEW OF INVESTIGATORY STOPS

A.     The 4th Amendment Stop Review Unit is tasked with conducting Department-level reviews of a representative sample of Stop Reports completed for Investigatory Stops, including a representative sample of those completed for the enforcement of the loitering ordinances, submitted by sworn Department members.

B.     The 4th Amendment Stop Review Unit (4ASRU) will:

1.     perform regular Department-level reviews of the Stop Reports outlined in Item IV-A sufficient to reach relevant and reliable observations on:

   a.     whether sworn Department members completely and thoroughly reported all facts that established the reasonable articulable suspicion to justify the investigatory stop;

   b.     whether sworn Department members completely and thoroughly reported all facts that established the reasonable articulable suspicion to justify the protective pat down;

   c.     whether sworn Department members completely and thoroughly completed the report and complied with Department policy; and

   d.     whether supervisory review was timely, thorough, complete, objective, and consistent with Department policies.

2.     ensure that the subset of Investigatory Stops and Protective Pat Downs reviewed pursuant to Item IV-A of this directive is demographically and geographically representative of community members stopped by sworn Department members throughout Chicago.

3.     conduct reviews of Stop Reports completed for Investigatory Stops, including the Deficiency Rejection Reports forwarded to 4ASRU, for the Department to ensure compliance with the applicable law, Department requirements, and other oversight.

   NOTE:     4ASRU will recommend an involved officer(s) and their supervisor review the BWC footage for the identified Investigatory Stop or Protective Pat Down conducted by the involved officer(s) after the involved officer has submitted five Stop Reports within a 90-day period that have resulted in a recommendation for after-action support to resolve a lack of sufficient description of reasonable articulable suspicion.

C.     The commanding officer, TRED:

1.     is the final authority for the 4th Amendment Stop Review Unit and is responsible for directing its workflow.

2.     will evaluate recommended actions to correct a deficiency related to Temporary Detentions conducted by Department members.

3.     will maintain and update unit-level procedures that establish efficient and consistent review of Stop Reports.

D.     On a semi-annual basis, TRED will report on the Stop Reports reviewed beginning with the time period ending 31 December 2023, including those completed for the enforcement of the loitering ordinances, and identify:

1.     the total number of Stop Reports reviewed by TRED;

2.     any trends or patterns relating to Investigatory Stops, Protective Pat Downs, and enforcement of the loitering ordinances identified through the TRED reviews;

3.     the number of Stop Reports rejected by supervisors and categories of reason for rejection;

4.     the number of Department members who had multiple Stop Reports rejected;

5.   the number of Department members who had multiple Stop Reports rejected for a lack of sufficient description of Reasonable Articulable Suspicion; and

6.   any equipment, training, or policy concerns and recommendations regarding modifications to equipment, training, or policy as necessary to address those concerns.

## V.   REVIEW OF STOP REPORT DATA

The Department will:

A.   collect and maintain the data and records necessary to accurately review and analyze Stop Reports completed by sworn Department members.

B.   conduct an annual Stop Report analysis to identify any patterns, trends, or emerging concerns relative to Department Investigatory Stops.

Larry Snelling
Superintendent of Police

23-069 DK