**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

STATE OF ILLINOIS,

Plaintiff,

v.

CITY OF CHICAGO,

Defendant.

Case No. 1:17-cv-06260

Judge Rebecca R. Pallmeyer

## CITY OF CHICAGO'S POSITION STATEMENT ON
## CHICAGO POLICE DEPARTMENT PUBLIC SAFETY BRIEFING

Defendant City of Chicago ("City"), by and through its undersigned counsel, respectfully submits its Position Statement on Chicago Police Department ("CPD") Public Safety Briefing.

**I.      Introduction**

The City and the CPD submit this position statement in response to the Court's directive to address CPD's Body-Worn Cameras ("BWC") draft policy (S03-14) and Firearm Discharge and Officer-Involved Death Incident directives (G03-06, G03-06-01 and G03-06-02) (collectively "the Policies").[1] Specifically, the Court has asked whether CPD's deactivation of BWC during the on-scene "Public Safety Briefing" (S03-14 §V.B.2; G03-06-01 §III.A.2) and Walk-Through ("Walk-Through") (S03-14 §V.B.3; G03-06-02 §III.B.2) immediately following an officer firearm discharge incident comply with the Consent Decree, Illinois law, *Garrity*, and officers' collective bargaining rights.

These policy provisions are lawful, necessary, and firmly grounded in the governing legal framework. They comply with the Illinois BWC Act, 50 ILCS 706/10-1 *et seq.*, the Consent Decree

---

[1] The current drafts of each of the proposed policies (S03-14, G03-06, G03-06-01 and G03-06-02) are attached as **Exhibits A**, **B**, **C** and **D**, respectively.

(Dkt. 703-1), and applicable collective bargaining agreement("CBAs") provisions (CBA, Sec. 6.1; Sec. 6.2).[2] They also safeguard officers' constitutional rights under *Garrity v. New Jersey*, 385 U.S. 493 (1967), while addressing compelling operational needs: protecting the public, ensuring officer safety, and preserving the integrity of immediate post-incident coordination.

The temporary deactivation is narrow in scope, well defined, and subject to strict procedural safeguards. Each deactivation must be documented (S03-14 §V.B.5), is reviewable after the fact (G03-06-02 §III.B.3), and is overseen to prevent misuse. The Policies are the product of years of iterative revision and legal review, and informed by direct engagement with the Court, the Independent Monitoring Team ("IMT"), and the Office of the Attorney General ("OAG").

The Policies establish that the Public Safety Briefing is confined to urgent safety and operational information necessary to protect the public and responding officers (G03-06-01 §III.A.2), while the Walk-Through is strictly to clarify that information in a controlled environment (G03-06-02 §III.B.2). Moreover, G03-06-02(B) guarantees that the Civilian Office of Police Accountability ("COPA") receives immediate, unimpeded access to information necessary for its investigation, ensuring that accountability and transparency are not impeded.

The challenge to these provisions rests on a flawed premise that any pause in BWC recording is inherently suspect. The record proves otherwise. The deactivation is brief, circumscribed, and essential to fulfilling CPD's fundamental and life-and-safety obligations without infringing required officer protections or compromising safety. The deactivation is also documented, reviewable, and overseen. The Consent Decree demands both transparency and operational effectiveness; these policies deliver both. To suggest they are otherwise is to disregard

---

[2] Attached as **Exhibit E** is the Collective Bargaining Agreement between City and Fraternal Order of Police ("FOP").

the plain text of the BWC Act, the negotiated collective bargaining agreement, and the Court-approved policy development process that produced them.

## II.    Background

Since the approval of the Consent Decree, CPD has undertaken a comprehensive transformation of policies, training, and accountability systems to increase transparency and public trust. The evolution of the Policies is reflective of this broader reform effort.[3]

The provisions at issue—temporary BWC deactivation during the on-scene Public Safety Briefing and Walk-Through—are the product of nearly a decade of development. In 2016, CPD's original BWC policy contained no framework for either procedure. By 2021, following early Consent Decree implementation processes, CPD amended its directives to introduce structured procedures, but without the detailed safeguards now in place. From 2022 to 2024, in response to repeated feedback from the Court, IMT, OAG, and other stakeholders, CPD further refined these policies. The process has been extensive and collaborative.

On January 11, 2024, the Court ordered the parties to follow an agreed briefing schedule related to the BWC policy (Dkt. 1143). The OAG filed its Motion for Judicial Resolution under Paragraph 630 of the Consent Decree on January 22, 2024 (Dkt. 1144). The City filed its response on February 16, 2024 (Dkt. 1148). On July 1, 2024, the Court directed CPD to provide revised drafts of S03-14 and related policies to the OAG and IMT by August 30, 2024, and thereafter follow the review and comment process outlined in Consent Decree Paragraphs 626–637 (Dkt. 1190). That process has now been completed.

---

[3] The evolution of the Policies is detailed in **Exhibit F** entitled, "Firearm Discharge and Office Involved Death Incidents Policy Evolution."

Despite these efforts, the parties have reached an impasse on several issues: whether BWC recording may be temporarily deactivated during the Public Safety Briefing and Walk-Through, and whether any statements made by involved officers during those activities should be recorded and documented. While the parties agree that BWC recording may be deactivated during the COPA Walk-Through, the Court requested further briefing on that provision as well.

In this submission, the City and CPD do not restate the arguments and issues previously presented in the submissions referenced above, but incorporate them by reference and, to avoid burdening the Court with duplicative briefing, generally confine this filing to expounding upon the City's and CPD's arguments on the issues that remain for judicial resolution and providing further factual and legal context to assist the Court's consideration.

The Policies are the product of a deliberate, transparent, and collaborative process. It reflects years of policy refinement, direct engagement with the Court, IMT, OAG and other stakeholders and subject matter experts, and incorporation of safeguards that meet or exceed legal requirements. They balance transparency, public and officer safety, investigative integrity, and collectively bargained protections in a manner consistent with state law, the Consent Decree, and applicable collective bargaining agreements. Therefore the Policies should be approved by the Court.

## III. The Public Safety Briefing and Walk-Through Comply with the BWC Act, the Consent Decree, and Contractual Protections, and Promote Transparency and are Subject to Independent Oversight

The Policies authorize a brief and prescribed pause in recording during two discrete, post-incident procedures: the Public Safety Briefing, conducted by the on-scene supervisor to address any ongoing life-safety threats and secure the scene, and the Walk-Through, conducted by the Street Deputy—only when necessary—after reviewing available video and scene information to clarify operational details. Neither procedure solicits testimonial evidence. Both occur after the

precipitating event—the discharge or death—has already happened. Both take place outside the presence of civilians. And both are circumscribed by contemporaneous documentation and supervisory review.

The BWC Act, the Consent Decree, and CBAs all permit such a pause where narrowly defined and subject to oversight. the Policies do more: they limit scope and duration, require real-time documentation of each deactivation, and guarantee early independent oversight safeguards.

## A.     The Scene Stabilization Phase Is Distinct from the "Incident"

The OAG's premise—that because the Public Safety Briefing occurs before a formal determination the scene is safe and secure, remains part of the "incident" and must be continuously recorded—rests on a flawed interpretation of two sequential phases of a critical incident response: (1) the incident itself, and (2) the operational or scene stabilization phase that follows.

In standard police practice, and under the framework of both the BWC Act and the Consent Decree, the "incident" refers to the critical precipitating event, such as the discharge of a firearm or a fatal use of force, that triggers the emergency police response. It ends when the immediate threat to the safety of persons has been neutralized: when shots are no longer being fired, when the suspect is in custody or otherwise incapacitated, or when the involved officer's direct engagement has ceased. *See* 50 ILCS 706/10-10; Consent Decree ¶ 237 (Dkt. 703-1).

When the Public Safety Briefing begins, the use of force by the involved officer has ended, he or she has been separated from active involvement, and no investigative questioning has commenced. CPD draws this distinction expressly: *"The purpose of the Public Safety Briefing is not to investigate the incident or any associated actions of criminal activity but to direct the immediate actions of Department members with the foremost regard for the preservation of human life and the safety of all persons involved"* (G03-06-01 §IV-A, *see also* S03-14 §II-B). The OAG's

interpretation reverses this logic. The fact that the scene has not yet been declared "safe and secure" at the time of the briefing is precisely why the briefing occurs, to determine whether it can be declared secure. It is operational, not investigative.

The same is true of the Walk-Through. Under G03-06-02, Section II-A, it takes place only after the Street Deputy has reviewed available video and scene information, and only if operational clarification is needed to finalize the on-scene safety response and evidence preservation. It is a review of the physical scene, conducted solely among sworn personnel, and only when necessary.

Combining these phases into the "incident" erases the operational and investigative distinction set out in CPD policy, expands the applicable language beyond its intended scope, and creates unsafe incentives to delay safety coordination until after cameras are de-activated, increasing the risk to both officers and the public.

### B. The BWC Act Authorizes Temporary Deactivation in These Circumstances

The BWC Act requires recording only during "law enforcement-related encounters or activities," a defined term that covers arrests, searches, interrogations, crowd control, and other enforcement actions involving the public. 50 ILCS 706/10-10. It explicitly excludes situations where an officer "is only in the presence of another law enforcement officer". 50 ILCS 706/10-10 (definitions).

The Public Safety Briefing and Walk-Through fit squarely within these statutory provisions: they are conducted exclusively among sworn personnel, occur after the precipitating event has ended, and address immediate scene safety or operational clarification. Illinois law requires that when statutory language is clear, it must be applied as written. *People v. Pullen*, 192 Ill. 2d 36, 42 (2000); *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008).

C.     **The Consent Decree Incorporates the Act's Framework and Permits CPD's Exceptions**

Paragraphs 237–238 of the Consent Decree expressly tie CPD's BWC requirements to those in the BWC Act, mandating recording of "law enforcement-related activities as outlined in" the Act and permitting "limited exceptions specified in writing" (Dkt. 703-1). Nothing in the Consent Decree requires continuous recording from dispatch to final scene clearance. To the contrary, its reference to the Act incorporates the statute's substantive definitions and exceptions.

When this Court directed CPD to "clarify in clear policy language" that any deactivation is "genuinely and universally distinct from 'investigations'" (Dkt. 1190 at 6), CPD responded by:

- Narrowing definitions of the Public Safety Briefing and Walk-Through;

- Prohibiting investigative questioning during either exchange;

- Limiting the scope to operational safety and post-video operational clarification; and

- Building in contemporaneous documentation, supervisory review, and early COPA access.

*See* G03-06, §§III & IV, G03-0601, §IV, G03-06-02, §II-A.

These changes meet the Court's directive and preserve the operational flexibility the Consent Decree was intended to allow.

D.     **The Consent Decree, Collective Bargaining Agreements, and *Garrity* Implications Compel Temporary Deactivation During Public Safety Briefings and Walk-Throughs**

Paragraph 711 of the Consent Decree expressly preserves "all rights guaranteed under the CBAs," and makes clear that "[n]othing in the Consent Decree is intended to (a) alter any of the CBAs between the City and the Unions; or (b) impair or conflict with the collective bargaining rights of employees." (Consent Decree ¶ 711, Dkt. 703-1). Those agreements—most notably the

Fraternal Order of Police ("FOP") CBA—provide binding procedural safeguards to officers involved in serious use-of-force incidents, including:

- Twenty-four hours' notice before any compelled administrative interview (FOP CBA § 6.1(M));

- The right to legal counsel or union representation during such interviews (§ 6.1(E)); and

- The full suite of Administrative Proceedings Rights (CPD-44.105,).[4]

In addition to the CBA, the *Roundtable* arbitration award prohibits requiring an officer to give a post-shooting statement within 24 hours of a use of force incident and outside the hours of 6:00 a.m. to 6:00 p.m., unless the officer voluntarily agrees.[5] The Department anticipates that the FOP will make a strong argument that this award has become an enforceable past practice and would apply to any statement that is deemed part of a disciplinary investigation. (*Roundtable* at pages 44-45) (holding that it is extremely well-settled in arbitral jurisprudence that a practice that has existed between contracting parties may become a binding, and therefore enforceable, part of the CBA. Requiring that the Public Safety Briefing and Walk-Through be recorded transforms these limited events from operational to the sort of investigative event that an arbitrator or the Labor Board would likely deem entitle the shooting officer to union representation or a lawyer.

Notably, *Roundtable* discusses what was formerly called the public safety investigation and at the time was also called the "one-on-one". *Roundtable* at page 4. This encounter was described as the shooting officer providing the ranking Department member on the scene an account of what happened, with no witnesses present. The shooting officer provided the ranking member - the on-call incident commander – an overview of what happened during the incident and

---

[4] Attached as **Exhibit G** is Administrative Proceedings Rights Form.

[5] The *Roundtable* arbitration decisions are attached, collectively, as **Exhibit H**.

regularly included a walk-through of the incident. The shooting officer may also do a walk-through with the investigating detectives. The purpose of this one-on-one was to provide the OCIC with information in order to determine if there are other individuals who need to be located, if bullets were fired in another direction, and other information of an immediate, public safety nature. *Id.* at page 4. Neither the City, IPRA, nor the Lodge advanced an argument that the "one-on-one" or Walkthrough should be recorded.

1. **Recording Would Risk Triggering CBA and Arbitration Protections, Causing Operational Delays**

The Public Safety Briefing and Walk-Through are designed to be operational, and not investigative exchanges. The Public Safety Briefing allows on-scene supervisors to learn time-critical facts to address active threats (*e.g.*, "the suspect is armed"), locate injured persons (*e.g.*, "one of the victims is behind the house"), and secure evidence (*e.g.*, "the suspect's firearm is on the roof of the garage"). The Walk-Through, conducted under G03-06-02 §II.A.4(b) ("Before conducting the walk-through, the Street Deputy will order the involved Department member(s) to participate…,"), provides scene securitization to allow for a thorough on-scene investigation. The Walk-Through is not merely procedural – it is essential. By securing the scene and requiring direct participation by the involved Department member, it enables a full and accurate understanding of the event's context, dynamics, and implications. This process fosters transparency, reinforces Departmental integrity, and ensures that essential information is gathered regarding what transpired.

If either exchange is recorded or transcribed, the sworn member's unions will almost certainly argue, via grievance or unfair labor practice charge, that the statement is now part of a disciplinary investigation, triggering:

- the CBA's 24-hour and counsel requirements; and

- the Roundtable award's daytime-hour restriction.

That would cause critical delays, undermining the very purpose of the Public Safety Briefing and Walk-Through. The City's position on this matter is that, based on historical precedent, it is reasonable to expect the unions to argue that such a change invokes the procedural protections tied to that designation. Indeed, the City had to bargain in 2010 to obtain authority to audio record Bureau of Internal Affairs/COPA statements, and this situation is closely analogous. (*In the Matter of the Arbitration between the City of Chicago and Fraternal Order of Police Lodge No. 7*, Arb. Ref. 09.281 (Interest Arbitration 2007 Agreement) at page 79).[6]

### 2. *Garrity* Considerations, and Why Recording Creates Real Legal and Practical Risk

The *Garrity* doctrine prohibits the use in criminal proceedings of statements obtained under threat of job loss. *Garrity v. New Jersey*, 385 U.S. 493, 497–99 (1967). *Garrity* protections typically attach during an investigation and only when a statement is compelled. The current Walk-Through, in its limited operational form, is not treated as a *Garrity*-protected event. However, recording or transcribing it risks changing that status in three ways:

a. Perception of Investigatory Character – Recording lends the exchange an "investigatory air" that increases the likelihood a court, arbitrator, or oversight agency would view it as part of an investigation rather than purely operational coordination.

b. Officer Invocation of Rights – Once recording occurs, officers are more likely to decline voluntary participation, forcing the Street Deputy to "order" participation— which is the precise circumstance where *Garrity* concerns arise.

c. Impact on COPA Investigations – If recording is deemed compelled under *Garrity*, the statement could not be used in criminal proceedings and could complicate COPA's later administrative investigation.

---

[6] The Interest Arbitration 2007 Agreement is attached as **Exhibit I**.

Even if recording would not be a facial *Garrity* violation, it would require administration of *Garrity* warnings, risk officer refusals, and delay the exchange while counsel is obtained—all of which frustrate the core purpose of the Public Safety Briefing and Walk-Through: immediate safety coordination. Notably, these risks were identified during Consent Decree negotiations. Limitations on the scope of the Public Safety Statement were intentionally included to keep it outside the bounds of *Garrity*. Recording would erode those boundaries.

### 3. The Practical Consequences

The OAG's interpretation would force CPD into a needless dilemma:

- Record and trigger CBA, arbitration award, and possible *Garrity* complications—delaying critical safety information by hours; or

- Proceed without recording—preserving the ability to act immediately but drawing criticism for limited BWC coverage.

From a labor-relations perspective, recording without bargaining would almost certainly lead to an unfair labor practice finding, given the 2010 precedent requiring bargaining over recording investigative statements. From an operational perspective, it would slow the process at exactly the wrong moment. From a legal perspective, it risks creating new *Garrity* and CBA triggering issues where none currently exist.

### E. A Written Record of the Public Safety Briefing or Walk-Through Would Improperly Convert an Operational Exchange into an Investigative Statement

Requiring the written record of an officer's statements during a Public Safety Briefing or Walk-Through creates distinct legal and operational risks not present when no record is made at all. Once an exchange is captured in writing, it takes on the form of an official investigative document, changing how both officers and investigators must treat it.

Under Section 6.1 of the FOP CBA, a written statement made in connection with a disciplinary matter almost certainly triggers the CBA's procedural protections: a guaranteed

24-hour waiting period before any compelled interview, the right to counsel or union representation, and issuance of the Administrative Proceedings Rights form. Those protections, while important in the investigative context, would impede the Street Deputy's ability to timely obtain critical safety information in the field.

Written documentation also increases the likelihood that *Garrity* protections will attach. Officers, aware that a *verbatim* written account may be used in subsequent proceedings, are more likely to decline voluntary participation absent a formal order, which in turn requires *Garrity* warnings and counsel. Even if ultimately inadmissible in a criminal prosecution, such a compelled written statement would complicate parallel administrative investigations. A *verbatim* written account would be included in COPA's investigative file, where it could be used in administrative proceedings against the officer.

These consequences are unique to written memorialization. Unlike unwritten operational exchanges, a written account is inherently fixed, discoverable, and transmittable—making it indistinguishable from a formal investigative statement. The Court should reject a requirement for CPD to create such records, as they would undermine the safety-driven purpose of the Public Safety Briefing and Walk-Through, delay the exchange of time-critical information, and erode contractual protections preserved under the Consent Decree and CBAs.

F.    **Real-World Consequences**

The consequences of recording the Public Safety Briefing or Walk-Through are not hypothetical. They are foreseeable, recurring, and arise in chaotic, high-stakes situations that the Public Safety Briefing and Walk-Through were designed to address. These scenarios demand immediate, unfiltered communication between the involved officer and the on-scene supervisor— communication that cannot wait for the formalities of a recorded investigative interview without jeopardizing lives and the preservation of evidence.

Consider the following examples drawn directly from actual CPD officer-involved shooting incidents:

**Incident 1**

On August 18, 2024, two officers were responding to an unrelated call when they observed two armed offenders firing at a vehicle in the area of 18th Street and Loomis Avenue. After discharging their weapons at the vehicle, the offenders fled on foot to a nearby grocery store parking lot. The officers also entered the parking lot. At that time, one of the offenders turned toward the officers' squad car, raised his firearm, and pointed it in their direction. One of the officers discharged his weapon, striking the offender. The second officer fired at the other offender but did not strike him. That offender fled the scene and was able to escape.

Both officers exited their vehicle, placed the wounded offender into custody, and recovered his firearm. As they did so, a hostile crowd began to approach and attempted to interfere with the arrest. One individual pushed an officer, causing him to fall backward and strike the pavement. Additional officers arrived, dispersed the crowd, and secured the scene.

A supervisor responded, separated the involved officers, and conducted the Public Safety Briefing with each of them. During these briefings, the supervisor learned that the officers had first observed the offenders firing at an occupied vehicle and that multiple people inside had been struck by the offenders' gunfire. One victim later succumbed to his injuries, while another was treated at the scene by responding CPD personnel and transported to the hospital for further care. The Public Safety Briefing also revealed that one of the officers had missed the second offender. The supervisor sent officers to canvass the path of the officer's rounds and discovered that one of his rounds had entered a nearby home, damaging a window and property. The residents were inside at the time but were uninjured. The information gathered during the Public Safety Briefing allowed for rapid deployment of resources to aid injured victims, secure multiple crime scenes, and check for potential additional victims in the path of stray rounds.

**Incident 2**

On February 2, 2025, 10th District officers responded to a burglary in progress at 1822 S. Central Park Avenue. Upon arrival, officers observed the offender exit the front door of the building and flee on foot. Responding officers initiated both foot and vehicle pursuits. During the foot pursuit, officers observed the offender armed with a handgun. The offender ran to the 1600 block of South Lawndale Avenue, where one officer approached on foot and issued verbal commands to show his hands. The offender turned and fired in that officer's direction. Two additional officers were also in the line of fire during this initial attack.

Following this exchange, the offender fled to the intersection of 18th Street and Lawndale Avenue, where another squad car arrived. Both officers in that vehicle exited and issued verbal commands. The offender again fired at them. Both officers returned fire but did not strike the offender. The offender then fled south through an alley, taking cover behind a vehicle, and fired at another responding squad car. He then fled west to the next street, engaging in a running gun battle with three additional officers. Eventually, the offender was struck by gunfire and fell to the ground. Officers rendered medical aid, and an ambulance was requested. The offender was transported but succumbed to his injuries.

Supervisors responded to the scene and, once it was determined safe and secure, separated the five discharging officers and conducted Public Safety Briefings (with each of them. During the PSBs, supervisors obtained critical information, including, the location where each officer discharged their weapon; the direction of each officer's fire; potential locations of physical evidence; and the positions from which the offender fired.

This incident spanned several city blocks and contained multiple evidence locations. Not all rounds fired by the officers or the offender struck their intended target, creating the potential for stray rounds to have entered nearby residences and injured community members. The Public Safety Briefing provided supervisors with an initial understanding of the scene, allowing them to quickly identify areas to search for additional victims and recover physical evidence.

These are not outlier situations—they are predictable features of the world in which CPD operates. The BWC Act expressly authorizes deactivation in such moments to address an "immediate public safety concern" (50 ILCS 706/10-20(b)(4)), and the CBAs and Consent Decree preserve the operational flexibility to obtain this information without triggering procedural delays. This statutory and contractual framework exists for a reason: to ensure that time-sensitive, life-and-death safety coordination is not subordinated to rigid recording formalities that the law itself does not require.

### G. The Present CPD Forecloses Collusion and Addresses Transparency Concerns

The theory that even a brief deactivation during a one-on-one safety exchange creates a "gap" for collusion overlooks the existing multi-layered oversight structure—specifically designed to prevent precisely that risk. Moreover, it fails to acknowledge the safeguards implemented by

CPD over the past decade to prevent collusion and enhance accountability and transparency. CPD's current management of officer firearm discharge and death investigations bears little resemblance to the circumstances that prompted the entry of the Consent Decree.

Today, CPD's investigative and oversight process is fundamentally different from the one examined by DOJ in 2016. Multiple safeguards are in operation:

1. Independent Civilian Oversight Embedded from the Outset – COPA has immediate scene access once secured, participates equally in preliminary evidence review, and since 2021 has primary investigative responsibility for officer conduct in firearm discharges and officer-involved deaths. *See* G03-06-01 §II-D; G03-06-02 §II-A.

2. Mandatory Internal–External Coordination – The Investigative Response Team must share all reports, video, and third-party evidence with COPA, notify COPA of all interviews, and record or summarize interviews COPA cannot attend. *See* G03-06-02 §II-C; S03-14 §V-A.

3. Structural and Physical Separation of Involved Officers – Current and draft directives require immediate removal of involved officers from the scene, prohibit them from speaking to each other about the incident, and limit briefings/walkthroughs to one-on-one exchanges. *See* G03-06-01 §IV-C.

4. Redundant Policy Framework – Separate directives govern immediate response, investigative process, and BWC use, creating overlapping safeguards against misconduct and ensuring uninvolved officers continue recording at all times. *See* S03-14 §II-C; G03-06-01 §IV-D.

These reforms, codified in successive revisions of G03-06 from 2016 to the present, foreclose the possibility of undetected collusion. *See* **Exhibit F** *Firearm Discharge and Office Involved Death Incidents Policy Evolution.* What is described as a vulnerability is, in reality, a narrow, controlled operational window under active supervision with multiple redundancies ensuring transparency.

## IV. The Parties Agree the COPA Walk-Through should not be recorded.

The parties have been requested to address whether the COPA Walk-Through should be recorded. The COPA Walk-Through occurs after the Public Safety Briefing and Walk-Through. Upon arrival of COPA personnel, the Street Deputy "will ensure that as soon as the scene is safe

and secure, COPA investigators will be provided the opportunity to participate in the preliminary assessment during the immediate aftermath of a firearm-discharge or officer-involved death incident to the same extent as any Department member or any other law enforcement agency investigating the incident." (G03-06-02 section B) The Street Deputy "will provide a briefing of the incident to the COPA investigators based on the information available at that time, without redaction or editing of known information, including but not limited to:

     a.    walking through the incident scene.

     b.    providing information obtained from the Public Safety Briefing conducted with the involved member(s).

     c.    providing information obtained from any walk-through of the incident conducted by the Street Deputy and involved member(s).

     d.    the identification of the immediate investigative steps taken and currently in progress.

     e.    the deployment of personnel and the actions tasked in support of the investigation.

     f.    disclosing any and all evidence and witnesses identified by Department personnel.

     g.    the Investigative Response Team and Bureau of Detectives investigative strategy and actions taken, currently in progress, and planned to be taken in the next 24 to 48 hours."

The COPA Walk-Through is not investigative in nature, nor is it a law enforcement-related encounter or activity, and is completed by the Street Deputy and COPA personnel. The Act defines a "law enforcement-related encounter or activity" as including "traffic stops, pedestrian stops, arrests, searches, interrogations, investigations, pursuits, crowd control, traffic control, non-community caretaking interactions with an individual while on patrol, or any other instance in which the officer is enforcing the laws of the municipality, county, or State." (50 ILCS 706/10). Therefore, under the Act the COPA Walk-Through is not required to be recorded.

## V.    Conclusion

In moments when seconds decide lives, the Policies ensure that urgent, public and officer safety information can be shared instantly, without sacrificing the protections guaranteed to every officer. The law allows no less, and common sense demands no more. These narrowly tailored procedures respect the boundaries set by the BWC Act, the Consent Decree, *Garrity*, and the CBAs, while delivering the transparency, oversight, and accountability that policing requires. The Policies reflect not a retreat from reform, but the maturity of it. The Policies are operationally sound and legally compliant, designed to protect the public, safeguard officers, and preserve the integrity of the investigative process. According, the City and CPD request the Court approve the Policies as submitted.

Dated:  August 22, 2025                      Respectfully submitted,

                                             **CITY OF CHICAGO**

                                     By:  /s/ Allan T. Slagel

Jackie Thompson                          Allan Slagel
Deputy Corporation Counsel               TAFT STETTINIUS & HOLLISTER LLP
City of Chicago Department of Law        111 East Wacker Drive
Public Safety Reform Division            Suite 2600
121 North LaSalle Street                 Chicago, Illinois 60601
Chicago, Illinois 60602                  (312) 527-4000
(312) 744-0214                           aslagel@taftlaw.com
Jackie.Thompson@cityofchicago.org

175878926v2

17

# LIST OF EXHIBITS

Exhibit A      S03-14, Body Worn Cameras

Exhibit B      G03-06, Firearm Discharge and Officer-Involved Death Incident – Policy

Exhibit C      G03-06-01, Firearm Discharge and Officer-Involved Death Incident – Immediate Response

Exhibit D      G03-06-02, Firearm Discharge and Officer-Involved Death Incident – Investigation

Exhibit E      Collective Bargaining Agreement between City and Fraternal Order of Police

Exhibit F      Firearm Discharge and Office Involved Death Incidents Policy Evolution

Exhibit G      Administrative Proceedings Rights Form

Exhibit H      *Roundtable* arbitration award

Exhibit I      *In the Matter of the Arbitration between the City of Chicago and Fraternal Order of Police Lodge No. 7*, Arb. Ref. 09.281