# EXHIBIT H

**AWARD OF ARBITRATOR**

<table>
<tr>
<td>

In the Matter of Arbitration

    between

City of Chicago

    and

Fraternal Order of Police,
Chicago Lodge No. 7

</td>
<td>

Opinion and Award
by
Arbitrator
Peter Feuille
in
Grv. Nos. 129-10-033/341
(Greg Bella) and
129-10-031/339
(Aaron Carranza)
Roundtable grievance

</td>
</tr>
</table>

Date of Award:  March 25, 2011

**APPEARANCES**

For the City:

    Mr. David A. Johnson, Franczek Radelet, Attorney
    Ms. Ilana B.R. Rosenzweig, Chief Administrator, IPRA
    Cmdr. Donald J. O'Neill, Commander, MLAS

For the Lodge:

    Mr. Paul D. Geiger, Attorney
    P.O. Greg Bella, Third Vice President and Grievant
    P.O. Richard Aguilar, Financial Secretary
    P.O. Bill Dougherty, First Vice President

**INTRODUCTION**

The Fraternal Order of Police, Chicago Lodge No. 7 ("Lodge," "Union") and the City of Chicago ("Employer," "City") have taken the grievance specified below to arbitration (Joint Exhibits 1, 2, 3 ("JXs 1, 2, 3")).  By mutual agreement the parties held an arbitration hearing on December 10 and 17, 2010 in Chicago, IL. At this hearing both sides were able to present all the evidence they deemed appropriate.  All testimony was taken under oath. The hearing was stenographically recorded and a transcript produced.  The parties waived oral closing arguments and filed post-hearing briefs.  With the Arbitrator's final receipt of

these briefs on February 1, 2011 the record in this matter was closed. The parties generously and graciously agreed to provide me with as much as 60 days to prepare and submit this Award, and I am most grateful for their courtesy.

## THE ISSUE

At the hearing the parties stipulated that the issue presented for resolution is:

> Did the City violate Section 6.2 of the collective bargaining agreement by the manner in which the Independent Police Review Authority conducts investigations into officer-involved shootings, beginning in summer 2010 and continuing through the present? If so, what is the appropriate remedy? (Transcript, page 21 ("Tr. 21").

The parties also stipulated that this matter is properly at arbitration (Tr. 22).

## BACKGROUND

The City's administrative structure includes several departments, one of which is the Department of Police ("Department," "CPD"). The Lodge is the exclusive collective bargaining representative for a bargaining unit of all sworn officers in the Department below the rank of sergeant (JX 1). The Lodge and the City ("the parties") have been engaged in a collective bargaining relationship since 1981 (Employer Exhibit 1F ("EX 1F")), they have had a continuous series of collective bargaining agreements since then (EXs 1A-1F), and they are parties to a current collective bargaining agreement ("CBA") covering the period July 1, 2007 through June 30, 2012 (JX 1).

Law enforcement officers are different from the rest of us. Most notably, they have the authority to use force, including deadly force, against other people in the performance of their duties. The most violent and stark form of this deadly force occurs when an officer uses his or her weapon to shoot someone. These "officer-involved shootings" is the term for occasions when a Department sworn member, whether on duty or off duty, discharges his or her weapon and another person is struck by one or more bullets fired by that officer. As this suggests, officer-involved shootings do not include situations where an officer discharges her firearm and does not strike another person (Tr. 10-12). Officer-involved shootings are not everyday occurrences, but neither are they rare. The Lodge stated it has been involved in 1,419 officer-involved shootings since December 1985 (Tr. 28, 76-77). That means there has been, on average, slightly more than one officer-involved shooting per week during the past 25 years (1,419 divided by 25 years times 52 weeks per year, or 1,419 shootings divided by 1,300 weeks).

The City takes very seriously all firearm discharges by its police officers, and it takes extremely seriously all officer-involved shootings. When an officer discharges his weapon, he must immediately report it to his superiors (JX 4). It is undisputed that each officer-involved shooting triggers an almost instantaneous and intensive investigation into the shooting incident. This is a three-pronged investigation, which functionally is three separate though overlapping investigations, into the criminal, public safety, and administrative dimensions

of the shooting situation (Employer Brief, pages 2-4 ("Er.Br. 2-4")).

The investigation of the criminal dimension of the shooting incident is handled by the Department's detectives, and their focus is determining if there are grounds to pursue criminal charges against the offender(s) involved in the shooting incident (Tr. 77-78). The shooting officer is required to cooperate with the investigating detectives at the scene and afterward in their criminal investigation (Tr. 198-200).

The public safety investigation involves the shooting officer providing an account of what happened to the ranking Department member on the scene, with no witnesses present. Formerly this was an Assistant Deputy Superintendent (or "ADS"), which title has now been changed to the On-Call Incident Commander (or "OCIC"). This "one on one" encounter, as it is known, calls for the shooting officer to provide the OCIC with an overview of what happened during the incident, and the officer's account regularly includes a "walk-through" of the incident with the OCIC (the shooting officer also may do a walk-through with the investigating detectives). In turn, this information enables the OCIC to determine if there are other individuals who need to be located, if there were bullets fired in another direction, and so on (Tr. 40-41, 79-80).

The third prong is the administrative investigation, and the instant matter is focused upon this administrative investigation. The purpose of the administrative investigation is to determine if the officer complied with Department policy and procedures

during the incident (Tr. 80, 82). This administrative investigation for decades was conducted by the Department's Office of Professional Standards (or "OPS"). OPS was a unit within the Department, and it reported to the Superintendent. On September 5, 2007 this locus of administrative investigative authority changed, for this is the date when the Independent Police Review Authority (or "IPRA") officially came into existence and replaced OPS (EX 4). As the first word in IPRA's name suggests, IPRA is a separate City department that exists independently of the CPD (Tr. 246-247). The section of the City's Municipal Code that established IPRA specifies that IPRA's "powers and duties" include, among other things, the responsibility to "conduct investigations into all cases in which a department member discharges his or her firearm . . . in a manner which potentially could strike an individual" (EX 4, Sec. 2-57-040(c)). IPRA's "charter" also includes a provision that requires IPRA to "conduct investigations in a manner consistent with . . . the rules and regulations established by the police board, and all department operating procedures, general orders, *collective bargaining agreements*, and other applicable laws and regulations (EX 4, Sec. 2-57-040(g), emphasis added). It is IPRA's conduct of the administrative investigation into officer-involved shootings that is the centerpiece of the instant dispute.

There is no dispute that the scene of an officer-involved shooting incident quickly becomes populated by a large number of people. They includes detectives, the shooting officer's

superiors, the OCIC, forensic service technicians, IPRA investigators, representatives from the Cook County State's Attorney's office, and the officer's Lodge representative(s). As noted above, at the scene the shooting officer conducted a "one-on-one", including a "walk-through," with the OCIC to explain what happened. In addition, the on-scene detectives interviewed the officer.

After the on-scene activities were concluded, the participants usually would relocate to the relevant Area facility (the Department's 25 districts are organized into five geographic Areas, and each Area has its own administrative building).[1] Prior to August 2010 (i.e., during the "roundtable era"), at the Area building the participants gathered in a room and conducted a meeting that came to be known as "the Round Table" ("roundtable" in this Award).[2] It is not clear how or exactly when this term came into existence, but it was used for many years to describe this meeting. For instance, Department General Order 02-09, Addendum 1, includes specific reference to the "Round Table Panel Session" in Section II (JX 4, "GO 02-09-01"), which order was

---

1. Since the current CBA has been implemented, at the Area facility the Internal Affairs Division ("IAD") administers mandatory drug and alcohol testing of the shooting officer (Tr. 211).

2. Roundtables were convened in the vast majority of officer-involved shootings, but were not convened after each and every shooting incident, with the decision to convene or not convene a roundtable made by the ADS/OCIC (Tr. 89).

issued on 25 September 2002.[3]  The participants at the roundtable
generally included the shooting officer's superior officers, the
OCIC, an Assistant State's Attorney, detectives, and IPRA/OPS
investigators (see also JX 4, Sec. II.B).  After witnesses and
detectives reported to the panel what they had seen, the shooting
officer would appear before the panel, accompanied by his or her
Lodge representative, and would give a statement and answer
questions (Tr. 43-44).[4]

Vice President Bella testified that, before the officer made
any statement, the officer's Lodge representative asked the panel
if a "CR" had been obtained against the shooting officer, or if
there was any intention of initiating a "CR" against the officer,
as a result of the shooting incident (Tr. 48-49).  A "CR" is
Department shorthand for "Complaint Register," which is the
process used to officially initiate and then complete a formal
disciplinary investigation into an officer's alleged misconduct.
If the answer was yes, Bella testified that the officer's right
to counsel would apply and he would not have to give any
statement to the panel (Tr. 49).  However, if the answer was no,
which was almost always the case (Tr. 48-50), the shooting

---

3. Lodge Third Vice President Gregory Bella testified that he
   joined the Department in 1985, and roundtables were being
   used at that time (Tr. 37, 87).  Lodge Counsel Thomas
   Pleines testified that he worked as an OPS investigator
   during the 1979-1983 period, that meetings very similar to
   roundtables were held immediately after officer-involved
   shooting incidents during that period, though they were not
   called roundtables at that time (Tr. 168-174).

4. During the 2007-2010 period, testimony indicates that the
   roundtable convened anywhere from six to ten hours after
   the actual shooting incident (Tr. 283-284).

officer then provided an oral statement to, and answered questions from, roundtable panel members (Tr. 48-49, 90, 102-103).

Although all panel members could ask questions, typically the lead detective (the detective in charge of the investigation) asked the lion's share of them (Tr. 113). Most relevant for our purposes in this matter, the roundtable was OPS/IPRA's first opportunity to hear the officer's account of the shooting incident directly from the officer and ask questions of the officer (Tr. 93, 277-280).

The evidence indicates shooting officers not facing a CR investigation were obligated to give a statement to the roundtable, and their statements were not preceded by the reading of Administrative Rights (Tr. 91-92, 129-130, 174, 182). The Administrative Rights statement consists of an admonition to the officer that s/he is under an obligation to respond to questions and to respond truthfully, that if the officer refuses to respond to questions the City will seek his or her discharge, and that the officer's statements cannot be used against him or her in any subsequent criminal proceeding (CX 7).

The latter element of the officer's rights is characterized as *Garrity* protection, and is named after the U.S. Supreme Court's decision in *Garrity v. New Jersey*, 385 U.S. 493 (1967). In this decision the Court held that the Fifth and Fourteenth Amendments to the U.S. Constitution against government-obtained coerced statements prohibited the use of such statements in subsequent criminal proceedings against officers when such

statements were taken under threat of removal from office. (As will be seen below, the presence or absence of *Garrity* protection when taking statements from shooting officers has played a significant role in this matter.)

As noted, the shooting officer's statements at the roundtable were not protected by Administrative Rights, and thus these roundtable statements arguably were not *Garrity* protected. Additionally, the practice was that these roundtable statements by shooting officers were not transcribed (Tr. 159-161; EX 2, pp. 79-81). These statements were considered to be "voluntary" statements, even though the shooting officers were required to give them and faced discipline including discharge if they refused.

At the conclusion of the roundtable meeting, the shooting officer was released to go home. Department policy and practice called for the shooting officer to be relieved of his or her normal duties for three days after the shooting incident so that he or she could obtain counseling to cope with any trauma that he or she may have experienced as a result of the shooting (Tr. 193). At the conclusion of that three-day period the officer normally resumes her or his regular duties, particularly if there are no allegations of misconduct against the officer (Tr. 194-196).

When the roundtable participants concluded their questioning, the meeting ended, but the administrative investigation into the shooting incident did not. These investigations went forward as either CR investigations or, far

more likely, "U" investigations.  CR investigations were defined
above; the "U" designation refers to "unusual," and involves an
event that does not present any misconduct violations, but is
sufficiently out of the ordinary that it needs to be formally
investigated.  Two "U" examples are shooting incidents and the
death of a prisoner while in police custody (Tr. 70).  In a U
case investigation, an officer was called into OPS/IPRA to give a
formal statement.  This means the officer was asked a series of
questions by the investigator, and these questions and the
officer's answers are transcribed.  This Q & A in a U
investigation was not preceded by providing Administrative Rights
to the officer, as the officer was not facing any misconduct
allegations.  Among other things, this meant that their formal
statements arguably were not *Garrity* protected.

When OPS was handling these investigations, normally many
months, sometimes as much as a year, elapsed from the date of the
shooting incident until the officer was called in to give a
statement (Tr. 70-71, 287).  When IPRA first came into existence,
this multi-month time lapse still existed (Tr. 161).  But by the
summer of 2010 IPRA had reduced this time gap (from shooting
incident to statement giving) down to one to two weeks after the
date of the incident (Tr. 70-71, 287).  After IPRA concluded a U
case investigation into a shooting incident, it would issue a
summary report about the shooting (EXs 8, 9).

The parties' CBA says nothing about roundtables and U case
investigations.  However, the CBA is quite detailed about an
officer's rights during a disciplinary investigation.  CBA

Article 6 is titled "Bill of Rights" (JX 1). For our purposes, there are two relevant sections in Article 6. If the officer is accused of misconduct and is therefore the subject of a disciplinary investigation, Section 6.1, titled "Conduct of Disciplinary Investigation," applies. If the officer is a witness in a disciplinary investigation or a witness in a police-related shooting investigation, Section 6.2, titled "Witness Officer's Statements in Disciplinary Investigations," applies. Section 6.1 specifies, among other protections, how the "interrogation" of each accused officer must be conducted. To ensure that these protections are properly administered, the Department has developed a variety of written forms that are routinely provided to accused officers (EXs 5, 6, 7). In particular, each accused officer is given an "Administrative Proceedings Rights" form which advises the officer of several things, including the officer's right to counsel, that the officer has no right to remain silent, that if the officer refuses to answer questions the Department will seek his/her discharge, and that the officer's statements during this interrogation cannot be used against him or her in a subsequent criminal proceeding (EX 7).

Section 6.2, in its opening sentence, refers to officers required to give a statement in the capacity of a "witness in a disciplinary investigation . . . or as a witness in a police-related shooting investigation . . . ." Section 6.2 specifies how the "interview" of the witness officer will be conducted. In

contrast to Section 6.1, Section 6.2 makes no reference to giving witness officers Administrative Rights (JX 1).

Vice President Bella testified that by 2010 the Department wanted to eliminate roundtables (Tr. 50-55). During the summer of 2010 meetings were held to discuss how this roundtable procedure would be discarded and what would take its place. Bella testified about a meeting he scheduled with Department and Lodge representatives in late spring or early summer 2010 (Tr. 54-55). He testified that Department representatives indicated at this meeting that the State's Attorney's office no longer wanted to participate in the roundtables (Tr. 55). No agreement was reached at this meeting about the fate of the roundtable, but the Lodge and Department representatives agreed to meet again (Tr. 55).

Bella testified about a second meeting at which Lodge and Department representatives again discussed eliminating the roundtables (Tr. 55-57). The parties did not reach agreement on how this would be done, but they agreed to meet again with more participants present (Tr. 57). No IPRA representative attended either of these meetings.

Another meeting was held at the Lodge on July 20, 2010 (the City says this final meeting was the second meeting ("Er.Br. 13-14")), the Lodge says it was the third meeting (Lodge Brief, pages 8-9 ("L.Br. 8-9")); see also Tr. 59. The precise number of these meetings has no bearing on the appropriate resolution of this matter.). Present at this meeting were representatives from the Department, IPRA, the Lodge, and the labor organizations

representing superior officers' bargaining units (the Sergeants, Lieutenants, and Captains; Tr. 57-58). As noted above, the Department wanted to do away with roundtables. The more difficult aspect of this elimination was finding an acceptable replacement procedure to take the place of the roundtables. Toward this end, Bella testified that at this meeting the Department proposed doing two walk-throughs after each shooting incident: the first would be the officer's walk-through with the OCIC, and the second would be the OCIC conducting a walk-through with the IPRA investigators, without the shooting officer, with the OCIC explaining to the IPRA investigators what the shooting officer had said about the shooting incident (Tr. 56-57, 59).

At this July 20, 2010 meeting IPRA Chief Administrator Ilana Rosenzweig strongly objected to the Department's double walk-through proposal (Tr. 59-60, 281-282). She insisted that IPRA had a right to require a statement directly from the shooting officer in that officer's capacity as a "witness officer" to his or her own shooting pursuant to Section 6.2 of the CBA (Tr. 300). She also noted that under Section 6.2.E witness interviews in shooting cases cannot be postponed for more than two hours from the time of the request for the interview, which meant that IPRA could take a statement from a shooting officer as a witness to his or her own shooting within a very short time of the shooting incident (Tr. 289-290, 297). Bella testified that Rosenzweig's view of IPRA's investigative rights in shooting incidents evoked strong verbal objections from the Lodge, and that the Lodge indicated it would not cooperate with this procedure (Tr. 60-62,

67). As this suggests, this meeting ended with no agreement among the organizations present about how the administrative investigation into officer-involved shootings would take after roundtables had been eliminated.

The Department eliminated the roundtable proceedings in or about August 2010 (Tr. 310). In the period since roundtables have no longer been held (the "post-roundtable era"), IPRA has insisted that shooting officers give statements to IPRA investigators very shortly after the shooting incident. Rosenzweig testified that the two-hour interview provision in the final sentence of Section 6.2.E does not mean that IPRA interviews the shooting officer within two hours of the shooting incident. She explained that IPRA waits, usually for several hours, until after the detectives and the OCIC have talked with the officer at the shooting scene, after the OCIC has talked with IPRA at the scene and taken the IPRA investigators on a walk-through, and after the participants have relocated from the scene to the Area facility and the officer has talked again with the detectives, and after representatives of the State's Attorney's office have completed their questioning of the shooting officer, before it interviews the shooting officer (Tr. 290-291).

At some point during these events, IPRA requests and the OCIC orders the shooting officer to give a statement to IPRA within two hours, IPRA interviews the shooting officer at the Area facility, and most of the time the officer is accompanied by his or her attorney or Lodge representative (Tr. 291). Rosenzweig testified that these IPRA interviews typically are 30-

50 minutes duration (Tr. 292). The City submitted two
transcripts of IPRA interviews of shooting officers taken on 15
August 2010 during the 2:00 a.m. – 3:00 a.m. period about a
shooting that had occurred the night before (on August 14, 2010),
with one interview lasting 13 minutes (EX 10) and the other
interview lasting 15 minutes (EX 11). Both officers were
represented by Lodge-provided counsel during these interviews
(EXs 10, 11).[5]

Rosenzweig testified that during the post-roundtable era
there has been an increase in the number of shooting officers who
have gone to the hospital immediately/shortly after the shooting
incident compared to the roundtable era (i.e., after August 2010
compared to prior to August 2010), and these officers often are
on medication (Tr. 295). Rosenzweig additionally testified that
IPRA has always taken the approach, before and after August 2010,
that if an officer is not able to give a statement, is too upset
to give a statement, the officer need not give the statement at
that time (Tr. 295). She testified that IPRA has always taken
these claims at face value, and the taking of the officer's
statement is delayed as a result (Tr. 319-320).

The Lodge presented a different perspective on the post-
roundtable era IPRA formal interviews in the administrative
investigations of these shooting cases. Lodge witnesses Bella,
Financial Secretary Richard Aguilar, and First Vice President
Bill Dougherty testified about three officer-involved shootings

---

5. Both shooting officers apparently were involved in the same
   shooting incident, and their statements were given to IPRA
   on the same night as the shootings (EXs 10, 11; Tr. 294).

during the August– November 2010 period at which they represented the shooting officers. Bella testified he was present at an IPRA interview of a shooting officer (P.O. Samuel Rawls) conducted at 7:00 p.m. on the day following the shooting, which had occurred at 11:30 p.m. on 28 August 2010 the night before (Tr. 64). He testified the officer had had no sleep between the shooting incident and the IPRA interview, that he was on medication, and that the officer was falling asleep during the interview (Tr. 64). Bella filed one of the two instant grievances protesting IPRA's interview as a contract violation (JX 3).

Aguilar testified about P.O. Aaron Carranza, who shot and killed an intruder in his (Carranza's) own residence about 12 noon on 20 August 2010. Aguilar testified that after the shooting Carranza was very upset, he was taken to Northwestern Hospital, he was given medication for anxiety and given a prescription, and he left the hospital at about 5:00 p.m. and went to the Area One facility. At Area One Aguilar explained to the IPRA investigator that Carranza was on medication and did not want to give a statement. After Aguilar discussed the matter with IPRA, Carranza gave his statement the next day (Tr. 118– 124). Aguilar filed one of the two instant grievances protesting IPRA's interview as a contract violation (JX 2).[6] These two grievances were consolidated in the instant arbitration.

---

6. JX 2 was filed on 23 August 2010 by Aguilar on behalf of shooting officer P.O. Aaron Carranza. JX 3 was filed on 31 August 2010 by Bella on behalf of shooting officer P.O. Samuel Rawls (JX 3). Both grievances protested, among other things, IPRA's insistence on taking statements from the shooting officers while they were still under the

Dougherty testified about two officers (Officers Collis
Underwood and Kevin Stevens) in an officer-involved shooting that
occurred during the evening of November 24, 2010, which was the
Wednesday immediately before Thanksgiving.  After the shooting,
both officers went to a hospital and were each given a sedative.
Dougherty talked with the IPRA investigator, who wanted to take
the officers' statements the next day.  Dougherty pointed out
that the next day was Thanksgiving, and there was no reason why
these statements could not wait until Friday morning.  Dougherty
testified the IPRA investigator persisted in wanting to take
their statements on Thanksgiving, and Dougherty persisted in
arguing that this could be done on Friday.  Dougherty testified
that eventually the OCIC ordered the officers to give compelled
statements to IPRA at a time and place to be arranged by IPRA and
the Lodge.  Dougherty additionally testified that as of December
17, 2010, the second day of the instant arbitration hearing,
these officers' statements had not been taken by IPRA (Tr. 209-
216).


## APPLICABLE CONTRACT PROVISIONS (JX 1)

### ARTICLE 4
### MANAGEMENT'S RIGHTS
(text in **bold** indicates language adopted in the 2007-2012 CBA)

The Employer has and will continue to retain the right to
operate and manage its affairs in each and every respect.  The
rights reserved to the sole discretion of the Employer shall
include, but not be limited to, rights:
. . .
D.   to direct the officers of the Department of Police, . . .
. . .

---

influence of medication prescribed very shortly after each
incident.

J.   to add, delete or alter methods of operations, equipment or facilities;

. . .

L.   to establish, implement and maintain an effective internal control program;

. . .

N.   to add, delete or alter policies, procedures, rules and regulations.

. . .

Inherent managerial functions, prerogatives and policymaking rights, whether listed above or not, which the Employer has not expressly restricted by a specific provision of this Agreement are not in any way, directly or indirectly, subject to the grievance and arbitration procedures contained herein, provided that no right is exercised contrary to or inconsistent with other terms of this Agreement.


## ARTICLE 6
## BILL OF RIGHTS

**Section 6.1 – Conduct of Disciplinary Investigation.**

. . .

Whenever an officer covered by this Agreement is the subject of a disciplinary investigation other than Summary Punishment, the interrogation will be conducted in the following manner:

. . .

H.   An officer under investigation will be provided with a copy of any **and all statements he or she has made that are audio recorded or in writing within seventy-two (72) hours of the time the statement was made.  In the event a re-interrogation of the officer is required within the seventy-two- (72-) hour period following the initial interrogation, the officer will be provided with a copy of any prior statements before the subsequent interrogation.**

. . .

J.   An officer under interrogation shall have the right to be represented by counsel of his or her own choice and to have that counsel present at all times during the interrogation, an/or at the request of the officer under interrogation, he or she shall have the right to be represented by a representative of the Lodge, who shall be either a police officer on leave to work for the Lodge or a retired police officer working for the Lodge.  The interrogation shall be suspended for a reasonable time until representation can be obtained.

K.   **The provisions of this Agreement shall be deemed to authorize the Independent Police Review Authority and the Internal Affairs Division to require officers under interrogation to provide audio recorded statements, provided that the provisions in Section 6.1 are satisfied.**

**L.    If an officer provides a statement during the investigation conducted promptly following a shooting incident and then is later interrogated by the Independent Police Review Authority or the Internal Affairs Division as part of an investigation related to such incident, the officer shall be provide [sic] with a copy of the portion of any official report that purportedly summarizes his or her prior statement before the interrogation.**

**Section 6.2 – Witness Officer's Statements in Disciplinary Investigations.**

**When an officer covered by this Agreement is required to give a statement, in the presence of an observer, as a witness in a disciplinary investigation other than Summary Punishment, or as a witness in a police-related shooting investigation, at the request of the officer the interview shall be conducted in the following manner:**

. . .

D.    The officer will be provided with a copy of any **and all** statements he or she has made **that are audio recorded or in writing** within **seventy-two (72)** hours of the time the statement was made.  **In the event a re-interview of an officer is required within the seventy-two (72-) hour period following the initial interview, the officer will be provided with a copy of such statements before the subsequent interview.**

E.    An officer being interviewed subsequent to this section shall, upon his or her request, have the right to be represented by counsel of his or her own choice and to have that counsel present at all times during the interview, or at the request of the officer being interviewed, he or she shall have the right to be represented by a representative of the Lodge who shall be either a police officer on leave to work for the Lodge or a retired police officer working for the Lodge.  For purposes of this paragraph, "represented" shall mean that the officer's counsel and/or representative shall only advise the officer but shall not in any way interfere with the interview.  The interview shall be postponed for a reasonable time, but in no case more than forty-eight (48) hours from the time the officer is informed of the request for an interview and the general subject matter thereof and his or her counsel or representative can be present; provided that, in any event, interviews in shooting cases may be postponed for no more than two hours.

. . .

H.    **The provision of this Agreement shall be deemed to authorize the Independent Police Review Authority and the Internal Affairs Division to require officers being interviewed to provide audio recorded statements, provided that the provisions in Section 6.2 are satisfied.**

I.    If an officer provides a statement during the investigation
      conducted promptly following a shooting incident and then
      is later interviewed by the Independent Police Review
      Authority or the Internal Affairs Division as part of an
      investigation related to such incident, the officer shall
      be provided with a copy of the portion of any official
      report that purportedly summarizes his or her prior
      statement before the interview.


              APPLICABLE DEPARTMENT GENERAL ORDER (JX 4)
                          G.O. 02-09-01
           TITLE:   FIREARM DISCHARGE IN INCIDENTS OTHER THAN
                     THE DESTRUCTION OF ANIMALS

. . .
II.   ROUND TABLE PANEL SESSION

      A. The Round Table Panel Session is a preliminary fact-
         finding session used to provide a forum for the interview
         of witnesses and a review of the available facts relevant
         to a police-related firearm discharge incident.

      B. The Round Table Panel Session will include the following
         personnel:

         1. an Assistant Deputy Superintendent (ADS), Operations
            Command;
         2. the area commander of the affected Detective Division
            area;
         3. the watch commander of the district of occurrence;
         4. the Detective Division police shooting coordinator for
            the affected area;
         5. other assigned Detective Division Personnel;
         6. an Assistant State's Attorney;
         7. Office of Professional Standards Personnel, and;
         8. law enforcement representatives as deemed necessary by
            the ADS for the completion of the investigation.
            . . .

      D. Conduct of the Round Table Panel Session

         1. The area commander of the affected Detective Division
            area will be the member responsible for convening the
            Round Table Panel Session with the approval of the ADS,
            Operations Command.
            . . .
         4. The interviewer will introduce the members of the Round
            Table Panel Session to the Department member being
            interviewed and identify the person in charge of the
            investigation.
            . . .

E. Member's Right to Counsel and Representation

   1. Union members have the right to be represented by counsel or a representative of their union as authorized by their collective bargaining agreement.
. . .

F. Allegations of Misconduct Against a Member

In any instance in which an allegation of misconduct has been made against a member or when an allegation has been made in which criminal prosecution is probable, the member will be:

   1. informed in writing of the nature of the allegations before any interview begins.
   2. given statutory administrative proceeding rights, or if the allegation indicates that criminal prosecution is probable against the member, constitutional rights concerning self-incrimination prior to the commencement of the interview.
   3. interviewed in a manner following the "Conduct of Investigation" procedures outlined in the Department directive entitled "Complaint and Disciplinary Procedures."
   4. provided with a copy of any written statement made by the member without any unnecessary delay.
   5. allowed reasonable periods of time for personal necessities, meals, telephone calls, and rest.

## III. MEMBER'S RESPONSIBILITIES IN FIREARM DISCHARGE INCIDENTS
. . .

B. In any instance where a member has discharged a firearm or has had gunfire directed at his or her person, the member, if physically capable, will:

   1. notify the Office of Emergency Management and Communications (OEMC) immediately and provide all relevant information.
   . . .
   3. provide Department members conducting the investigation with information required to effect arrests and fulfill immediate law enforcement necessities.
   4. inform the desk sergeant of the district of occurrence.
   . . .
   9. attend the Round Table Panel Session as directed by supervisory personnel.
   . . .

E. Member's Statements and Interviews

   1. A member who is involved in a firearm discharge incident will provide an oral report to the person responsible for conducting the investigation without

        delay and outside the presence of any other
        individuals.

2. When a member who has discharged a firearm is notified
    that he or she must give a written statement or an oral
    statement in the presence of an observer, the interview
    may be postponed by the officer for a period of time
    not to exceed two hours.

. . .

## POSITION OF THE LODGE

The Lodge says the City has violated, and is continuing to violate, officers' rights by insisting that IPRA can interview shooting officers, under CBA Section 6.2, as witnesses to their own shootings.

<u>Past Practice</u>.  The Lodge emphasizes that its witnesses have many years of experience representing shooting officers, and that its witnesses testified that prior to August 2010 no shooting officer has ever been questioned as a witness to his or her own shooting.

Lodge Third Vice President Greg Bella testified he has worked full time for the Lodge as Third Vice President since 2002 (Tr. 37).  He testified that he was involved in a shooting incident in 1988 as the shooting officer (Tr. 40-45).  He testified that, following his own shooting, OPS did not require him to sit down at the roundtable or shortly after the roundtable and submit to a written interrogation (Tr. 47).  He also testified that he was unaware of any such interrogations occurring until August 2010 (Tr. 47).  He testified that, instead, many months or even a year elapsed between the shooting incident and the date when OPS/IPRA called the officer to come in

and give a statement, though this time span narrowed down to about three to four weeks by the end of this period (Tr. 70-71).

Lodge Financial Secretary Richard Aguilar testified that he has worked full time for the Lodge as a Field Representative since 2008 (Tr. 108). He testified that he handled 15 or 16 shooting incidents prior to August 2010, and during those events he had no difficulties with IPRA at the shooting scene or at the roundtables (Tr. 112). He also testified that the Lodge never made any agreement with the Department or IPRA to allow IPRA to participate in a walk-through, nor did the Lodge ever agree to allow them to interrogate a shooting officer within a couple of hours after the shooting incident (Tr. 115).

The Lodge notes that Thomas Pleines worked for OPS during the period 1979-1983, and he has performed legal work for the Lodge since 1983, first as outside counsel (1983-1993) and then as an in-house Lodge attorney since 1993 (Tr. 151-152). He testified that Section 6.2 first appeared in the parties' CBA in 1984 (Tr. 156; see also EX 1E). Pleines testified that Section 6.2 has existed in essentially the same form from its inception through the present (Tr. 156).

Pleines additionally testified that, in his experience as an OPS investigator and as a Lodge attorney, he has never encountered a situation where a shooting officer was questioned as a witness to his or her own shooting incident (Tr. 165). Similarly, he testified that the CBA had never been interpreted in that manner (Tr. 165). Further, he testified that IPRA must adhere to the relevant provisions in the Lodge-City CBA, for the

Municipal Code states that IPRA must follow the CBA (Tr. 166).
Moreover, he testified that no one from the Department has ever
approached him and said they wanted to be able to take a formal Q
and A from a shooting officer in the hours after the shooting
(Tr. 167).

Lodge First Vice President Bill Dougherty testified that he
has worked full time for the Lodge as a Vice President and Field
Representative since 2002 (Tr. 207-208). He has handled many
shooting incidents for the Lodge (Tr. 208). He testified he was
not aware, prior to August 2010, of any shooting officer being
questioned by OPS or IPRA in the hours immediately following a
shooting (Tr. 208-209). He also testified that during the 2002-
August 2010 period no Chicago police officer had been questioned
as a witness to a shooting when the officer was the shooting
officer (Tr. 217).

The Lodge argues that the testimony of its witnesses
establishes that there is a clear and binding past practice
between the City and the Lodge over the meaning and application
of Section 6.2. Under Section 6.2, the parties established a
binding and enforceable past practice regarding how Section 6.2
would be applied during the conduct of investigations into
officer-involved shootings during the period 1985 to 2010. The
testimony of Lodge witnesses, particularly Tom Pleines, clearly
establishes that the parties never used any procedure by OPS and
more recently by IPRA that allowed OPS/IPRA to interview and take
a formal statement from a shooting officer in the capacity of a
"witness officer" as that term is used in Section 6.2. The Lodge

says the evidence clearly indicates that the shooting officer gave a statement at the roundtable, and then some time later (days, weeks, or months) was called in to give a formal statement to OPS and more recently to IPRA. Most important, the officer gave both statements as the shooting officer, not in the guise of something else such as a witness officer to his or her own shooting. This consistent practice, which was followed during more than 1,400 investigations into officer-involved shootings over a 25-year period, stands as highly visible and eloquent proof of the mutual acceptance of the parties' handling of shooting investigations. In turn, the parties' mutual acceptance has long since ripened into a binding past practice under Section 6.2.

In short, during the 25 years prior to August 2010, the City never proposed questioning the shooting officer in the capacity as a witness officer in the hours immediately after the shooting. Notably, this includes IPRA under Ilana Rosenzweig's leadership during the period September 2007 to August 2010. If any doubt remains about the binding nature of the past practice described above, the Lodge says it is dispelled by the fact that IPRA operated for almost three full years consistent with this past practice. Then, after almost three years in her role as IPRA Chief Administrator, Rosenzweig somehow discovered and asserted this new right to question shooting officers as witnesses to their own shooting under Section 6.2, and to question them within two hours of the shooting incident (Tr. 164-165, 312, 318-319).

Negotiating History.  As noted above, Lodge Counsel Pleines testified that Section 6.2 was first was written into the CBA in 1984, and that it has continued in essentially the same form since then in subsequent CBAs (Tr. 156).  He also testified that he participated in the negotiations for the current CBA (JX 1), that Ilana Rosenzweig also participated in some of these negotiation sessions, and that the topic of taking a formal statement from a shooting officer was not raised by the City during these negotiations (Tr. 165).  In particular, he testified that no one from the City, including IPRA, proposed that IPRA be allowed to take a statement from a shooting officer within two hours of the shooting incident (Tr. 164-165).

Pleines testified that some changes were made in Section 6.2 during the most recent contract negotiations and the interest arbitration that followed them.  In particular, he testified that interest Arbitrator Edwin Benn agreed with and adopted the Lodge's position that it was highly unfair for a shooting officer called in for an interview, months after a roundtable at which that shooting officer had made a statement, to not be given a copy of the earlier statement before the officer participated in the subsequent interview.  In the interest arbitration the Lodge proposed that the officer be given access to his earlier statement prior to the subsequent formal interview, and Arbitrator Benn adopted the Lodge's proposal (Tr. 159-162; EX 2).  The result was the inclusion of a new Subsection 6.2.I in Section 6.2 requiring that such earlier roundtable statement shortly

after a shooting incident be provided to the officer prior to the
interview (Tr. 162–164; JX 1).

In addition to the just-described change, Pleines testified
that in this same interest arbitration Arbitrator Benn also
adopted a City proposal that allowed IPRA and IAD to obtain
audio-recorded statements from officers during interrogations and
interviews (Tr. 158–159; EX 2).

Lodge Financial Secretary Aguilar testified that he
participated in the negotiations for the current contract. He
testified that during these negotiations no one from the city,
including Rosenzweig, ever raised the issue of IPRA taking formal
statements from shooting officers who had just shot someone (Tr.
116).

The Lodge emphasizes that the binding past practice
identified above is reinforced by the parties' negotiating
history. In particular, the City never proposed in the most
recent negotiations and interest arbitration that OPS and now
IPRA would have the ability to require formal statements from
shooting officers in the capacity as witness officers to their
own shooting, and require that these statements be given in the
hours immediately after the shooting incident. As a result,
there were no changes in Section 6.2 that could conceivably be
used to allow IPRA's current practice of taking required
statements from shooting officers as witnesses to their own
shootings very shortly after the shooting incident.

Voluntary v. Compelled? The Lodge notes that IPRA has
repeatedly expressed a strong preference for taking voluntary

(rather than compelled) statements from shooting officers a few hours after the shooting incident. Chief Administrator Rosenzweig testified that voluntary statements are preferable to compelled statements because voluntary statements are not preceded by Administrative Rights and are not *Garrity* protected. As a result, these statements can be turned over to the State's Attorney's office, who can investigate the legality of the shooting and, if warranted, prosecute the officer criminally (Tr. 302-305).

The Lodge vigorously asserts that all statements by shooting officers given to IPRA are not voluntary, but compelled. The Lodge points out that GO 02-09-01 clearly states that when "a member who has discharged a firearm is notified that he or she must give a written statement or oral statement in the presence of an observer, . . ." (JX 4). This General Order language does not call for a voluntary statement. Instead, it refers to situations when a shooting officer *must* give a statement. This General Order language indicates that any such statements are compelled.

The Lodge notes that IPRA's desire to take voluntary statements would lead to a very disconcerting result. Any shooting officer suspected or accused of misconduct in connection with the shooting incident is entitled to Administrative Rights protections, including *Garrity* protection, when they give a statement to IPRA. This means that officer cannot have anything he or she said in that statement used against them in any subsequent criminal proceeding. However, an officer who is not

suspected of any misconduct would give a voluntary statement to IPRA that is not *Garrity* protected, pursuant to Rosenzweig's preferred method of taking these statements. In other words, the officer facing misconduct allegations is protected against criminal prosecution based on anything they say in their statement, but the officer not suspected of any wrongdoing would give a statement to IPRA at his or her peril. This approach is completely illogical, but it is exactly what IPRA seeks to do under Rosenzweig's interpretation of how IPRA's investigative rights are carried out consistent with her new interpretation of CBA Section 6.2.

For these reasons, the Lodge says that the City has violated Section 6.2 of the CBA by the manner in which IPRA has been conducting investigations into officer-involved shootings since August 2010. In turn, the Lodge asks that this grievance be sustained. In its proposed remedy, the Lodge seeks a directive that (1) states that all statements given to IPRA by a shooting officer are compelled statements, (2) orders IPRA to give all shooting officers a *Garrity* warning prior to submitting to a Q and A session with IPRA, and (3) orders the City to allow shooting officers the right to postpone any formal statement for a minimum of 48 hours.

If the Arbitrator is not inclined to issue the above proposed remedy, the Lodge proposes in the alternative that the Lodge and the City be ordered to immediately negotiate their own mutually acceptable remedy. This should be done by requiring both parties to exchange proposals regarding how the City will

administratively investigate shooting officers going forward. These discussions could result in a mutually agreed upon method for handling these investigations, with the agreed upon method devised by the people who have the most experience and expertise in this subject matter. If this alternative approach is adopted, the Lodge also asks that the Arbitrator retain jurisdiction for the purpose of issuing a remedy if the parties cannot adopt their own agreed-upon remedy within a reasonable time frame.

## POSITION OF THE CITY

The City says that no contract violations have been committed by IPRA during its investigations into officer-involved shootings in the wake of the roundtables' disappearance in August 2010.

This is a contract interpretation case, and it is well-established that it is the Lodge's burden to prove by a preponderance of the evidence that the City has violated a specific provision of the CBA. The evidence indicates that the Lodge has failed to do this.

It is apparent that the Lodge views CBA Section 6.2 as the sole source of authority for IPRA to conduct any interviews with Lodge-represented bargaining unit members on the night of the shooting (in U cases where no misconduct is alleged). It is also apparent that the Lodge believes that IPRA has adopted a willfully distorted view of Section 6.2.E in its effort to obtain statements from unit members on an unjustifiably fast-track basis

even when shooting officers are not in a condition to give statements.

However, the City argues that the Lodge misconstrues what collective bargaining is all about. Section 6.2.E is not a grant of authority to the City, rather it is a limitation on the City's right to conduct investigations into officer conduct in any manner it sees fit. In short, it is not the City's obligation to prove that Section 6.2.E gives IPRA a right it would not otherwise possess to require a statement from a shooting officer on the night of the shooting. Instead, it is the Lodge's burden to show that Section 6.2.E was intended to limit IPRA's authority to require such a statement within the time frame specified in Section 6.2.E. If the shooting officer is a witness to his own shooting, then IPRA did not violate this provision. If the shooting officer is not a witness to his own shooting, this provision has no applicability to the instant case. If this provision is not applicable, IPRA cannot possibly have violated it.

The City emphasizes that IPRA has the right to prescribe a shooting officer's obligations during its investigation of an officer-involved shooting incident. In the City-Lodge relationship, the parties' CBA contains a vigorously worded management rights provision in Article 4. This article begins by stating that "the Employer has and will continue to retain the right to operate and manage its affairs in each and every respect" (JX 1). Many specific rights are enumerated, including the right to "add, delete or alter methods of operation,

equipment or facilities," "establish, implement and maintain an effective internal control program," and "add, delete or alter policies, procedures, rules and regulations" (JX 1). The City notes that Arbitrator Elliott Goldstein, in a prior award between these parties, concluded that, pursuant to Article 4, the City has wide latitude to implement new policies (citing *City of Chicago and Fraternal Order of Police,* Gr. No. 129-89-035, Goldstein, Arb., 1990). Under this management rights language, the City asserts there is no question that IPRA possesses the right to demand that the shooting officer provide a timely account of the shooting incident directly to IPRA, and that this account be provided not through an intermediary and not days or weeks later.

The City argues that IPRA has properly interpreted Section 6.2.E as supporting its right to take a statement from a shooting officer in the capacity as a "witness officer" to his or her own shooting. The City notes that the Lodge has characterized this interpretation as absurd. In contrast, the City notes that this provision is clearly connected to General Orders governing the investigation of shooting incidents (JX 4; EXs 3A, 3B). For instance, in Section II.3.E.2 of GO 02-09-01, the Department mandates that when a member who has discharged a firearm is notified that he or she must give a written or oral statement in the presence of an observer, the interview may be postponed by the officer for not more than two hours (JX 4, p. 5). Similarly, CBA Section 6.2.E says that interviews in shooting cases may be postponed for no more than two hours from the time the officer is

informed of the request of the interview (JX 1). In other words, Section 6.2.E is best viewed as a direct outgrowth of, or echo of, the shooting officer's obligation to timely give a statement that the shooting officer has always had under the relevant General Orders (JX 4; EX 3).

Relying on this language, the City vigorously criticizes as incorrect the Lodge's characterization of IPRA's position as one requiring the shooting officer to give a statement within two hours of the shooting incident (Tr. 164-165). The City emphatically notes that this is not what CBA Section 6.2.E. calls for, nor is it what GO 02-09-01 calls for, nor is it what IPRA has done in practice in the months since the disappearance of the roundtables (Tr. 291, 295-296). Instead, IPRA has sought to conduct interviews of shooting officers within two hours of IPRA's request for an interview, which request Rosenzweig testified is made several hours after the shooting incident (Tr. 290-291).

Why are shooting officers required to give a statement under Section 6.2 and not Section 6.1? The City notes that Section 6.1 applies only to disciplinary investigations. The evidence shows that investigations into shooting incidents overwhelmingly are "U" investigations where the shooting officer has not been accused of misconduct and does not anticipate being accused of misconduct. In other words, shooting officers are not officers facing "disciplinary investigations." As a result, Section 6.1 clearly does not apply to statements taken by IPRA from shooting officers. Rather, IPRA has chosen to treat shooting officers in

much the same way as witness officers in disciplinary investigations, in that the shooting officer is obligated to provide a truthful statement in a timely manner. It is hardly surprising for the City to require an officer who has discharged his or her weapon and struck – and perhaps killed – another human being to provide his or her statement on an expedited basis in the wake of the disappearance of the roundtables and the shooting officer's statement that was provided at these roundtables on the night of the shooting.

After the Department eliminated roundtables in August 2010, and IPRA stated its intention to require shooting officers to give timely statements to IPRA under CBA Section 6.2.E, the Lodge announced it would instruct its members to refuse to provide voluntary statements (Tr. 60–61, 69, 290). As a result of this Lodge development, IPRA reasonably relied upon its investigatory authority to insist upon taking compelled statements from shooting officers (EX 4; Tr. 290). Further, the evidence clearly indicates that IPRA's statements from shooting officers have been taken on a reasonable basis. The City points to EX 10, an audio-recorded and transcribed statement taken by IPRA from Officer Kevin Deeren at Area Four on 15 August 2010. The City notes that this interview lasted 13 minutes, Officer Deeren was accompanied by Lodge-provided counsel, and the questions he was asked about the shooting incident in which he had been involved were reasonable (EX 10). The City also points to EX 11, an audio-recorded and transcribed statement taken by IPRA from Officer Anthony Ceja at Area Four on 15 August 2010. The City notes that

this interview lasted 15 minutes, Officer Ceja was accompanied by Lodge-provided counsel, and the questions he was asked about the shooting incident in which he had been involved were reasonable (EX 11). More generally, Rosenzweig testified that most of its interviews with shooting officers are completed within 30 to 50 minutes (Tr. 292). In short, the evidence indicates that IPRA has exercised its investigative authority in officer-involved shootings in a fully reasonable manner.

The City says that officer-involved shooting incidents are extraordinarily serious events that must be thoroughly, accurately, and timely investigated to ensure the citizens of Chicago are being properly served and protected by Department members. Officers have a clear obligation to cooperate in such investigations, and IPRA clearly has the authority to investigate shooting incidents in a manner that elicits thorough and accurate information about the incident on a timely basis while at the same time treating the shooting officer in an equitable manner. The evidence shows that IPRA has been conducting its shooting investigations in just such a manner, and in the process it has not violated any provision of the CBA.

As a result, the City asks that this grievance be denied in its entirety. In the unlikely event the Arbitrator determines that any part of the grievance should be sustained, the City asks that no remedy be imposed, and instead the parties be given the opportunity to fashion their own remedy tailored to fit the specific circumstances in this matter.

## ANALYSIS AND OPINION

The City is correct that the Lodge has the burden of proving, by a preponderance of the evidence, that the City has violated the CBA by the manner in which IPRA has conducted administrative investigations into officer-involved shootings since the disappearance of the roundtables in August 2010. The City asserts that the Lodge has not met this burden.

The record is clear that during 2010 the Department, IPRA, and the Lodge discussed eliminating the roundtable element of the administrative investigation into shooting incidents (Tr. 54-60). The record also is clear that it was the Department that eliminated the roundtable in August 2010 (Tr. 310). Further, this roundtable elimination was not a totally unexpected development. For instance, Financial Secretary Aguilar testified about two face-to-face discussions he had with Superintendent Jody Weis at two shooting scenes in 2008 during which the Superintendent said to Aguilar that he "was working on" getting rid of the roundtables (Tr. 109-111). In addition, Chief Administrator Rosenzweig testified that she had talked with the Department "for several years" about getting rid of roundtables (Tr. 310).

In contrast, the record is rather murky about why the Department wanted to eliminate the roundtable. For instance, Vice President Bella testified that by the summer of 2010 the Department and the Lodge agreed that the roundtable "had outlived its usefulness" (Tr. 55). However, he offered no testimony about

the reasons why either organization had come to that conclusion. Chief Administrator Rosenzweig testified that "there were positives to the roundtable, and there were negatives, and it was not ideal. But given any number of other things going on, it worked as well as it could . . ." (Tr. 313). As a result, the reader, or at least this reader, will search the record in vain for a clearly expressed set of reasons why roundtables were eliminated. Expressed another way, the record does not reveal any crippling shortcomings that caused the roundtables' demise. Instead, as the City correctly notes, "the Round Table's August 2010 death came from a thousand cuts" (Er.Br. 22).

However, our concern is not about the reasons why the roundtable was eliminated. Instead, our concern focuses on what replaced the roundtable in the administrative investigation process after the roundtables ceased being held in August 2010, and whether this roundtable replacement process did or did not violate the parties' CBA.

For decades, up until September 2007, OPS conducted the administrative investigations into officer-involved shootings. IPRA was created in September 2007, and one of IPRA's key responsibilities was the investigation of officer-involved shootings (EX 4; IPRA has other investigative responsibilities as well, though these other responsibilities do not concern us here, EX 4). The evidence shows that IPRA was one of the parties at the shooting scene, was one of the parties at the roundtable that immediately followed the investigative activity at the shooting scene, and that IPRA investigators were present when the shooting

officer made his or her statement to the roundtable and also could ask questions of that officer (Tr. 275-285).

After a roundtable concluded and the officer was released to go home, the officer later came into OPS prior to September 2007 and to IPRA after September 2007 to give a formal statement about the shooting incident. The evidence shows that during at least part of OPS's tenure and during most of the first three years of IPRA's tenure, typically many months, sometimes as much as a year, elapsed between the shooting incident/roundtable occurrence and the shooting officer's giving of the formal statement to OPS/IPRA (Tr. 287). During the summer of 2010, while the roundtables still existed, IPRA started the practice of substantially shortening the time between the roundtable and the date when the shooting officer would come to IPRA and give a statement. Rosenzweig testified that this time gap was reduced from many months to one or two weeks (Tr. 287). She also testified that the "feedback we received was everyone liked it because it was much fresher in the officer's mind, and they could get it behind them" (Tr. 287). She testified that the Lodge filed no grievances on this large reduction in the time gap (Tr. 287).

So, by the July 2010 period, shooting officers gave a brief statement to the roundtable at the pertinent Area building shortly after the investigation at the shooting scene had concluded. Then, the officer came into IPRA and gave a formal and more detailed statement a week or two later (Tr. 287-288). Since July 2010 these statements have been audio recorded and

transcribed pursuant to the interest arbitration award issued by
Arbitrator Benn (Tr. 269; EXs 10, 11). At these interviews the
shooting officer may or may not be represented by counsel during
this statement, depending on the officer's choice (Tr. 270). IPRA
handled these shooting officer administrative investigations as U
cases, meaning that the officer was not accused of misconduct and
was not facing a CR investigation (Tr. 264-265).

The shooting officer is not given Administrative Rights
before giving this statement, even though during the post-
roundtable era this IPRA interview is compelled (Tr. 270). If
the officer declines to come in and give a statement, or refuses
to respond to questions during the interview, the officer faces
the prospect of losing his or her job (EXs 10, 11).

When the Department announced at the July 20, 2010 meeting
at the Lodge that it would eliminate the roundtables, and the
roundtables stopped being held, IPRA and the other roundtable
participants were deprived of the opportunity to hear a statement
from the shooting officer at the roundtable meeting. At this
point, IPRA presented its plan to take statements from the
shooting officers in their capacity as witnesses to their own
shooting pursuant to Section 6.2, and further that IPRA would
take these statements within two hours of the request for the
interview of the shooting officer pursuant to the two-hour period
specified in the final sentence in Section 6.2.E. The evidence
indicates that the first time Rosenzweig presented this plan to
the Lodge and the Department was at the July 20, 2010 meeting
described above.

At the instant hearing, Rosenzweig testified that shooting officers are not interviewed pursuant to Section 6.1 because they are not officers accused of misconduct, and therefore Section 6.1 does not apply to them. Instead, Section 6.2 applies to witness officers, so IPRA interviews shooting officers pursuant to that section of the contract (Tr. 297-298).

Bella testified that both the Lodge and the Department were opposed to IPRA's plan for taking statements from shooting officers in this manner when Rosenzweig first presented it in July 2010 (Tr. 59-61). Moreover, at the conclusion of the instant hearing on December 17, 2010, the parties stipulated as follows:

> "IPRA's implementation of compelled statements from shooting officers constitutes IPRA's interpretation of its prerogatives under the collective bargaining agreement, and it should not be inferred from this that the Chicago Police Department has taken a position with respect to whether this is or is not within IPRA's prerogatives" (Tr. 344-345).

In plain English, this stipulation means the Department is sitting on the fence regarding the propriety of IPRA's current method of taking statements from shooting officers pursuant to CBA Section 6.2.

As a result, in spite of the Lodge's vigorous opposition to IPRA's interpretation and use of Section 6.2, and in spite of the Department's lack of an official endorsement of IPRA's investigative process, IPRA has adopted and used Rosenzweig's proposal since August 2010. After the shooting scene investigation is completed (which routinely requires several hours), and after the participants have relocated to the Area building and the officer has talked with the detectives and the

State's Attorney's office, IPRA has asked the OCIC to order the shooting officer to give a statement to IPRA within two hours, and the OCIC does so (Tr. 289-291). Rosenzweig testified that IPRA takes the shooting officers' statements within that time frame at the Area building (Tr. 290-291; EXs 10, 11). Officers who are hospitalized, or on medication, or otherwise not able to give a statement on the night of the shooting are interviewed later by IPRA (Tr. 290). Rosenzweig testified that the statements taken by IPRA from shooting officers since August 2010 have been compelled statements (Tr. 270, 290).

We noted above that during the early summer of 2010 (near the end of the roundtable era) IPRA drastically reduced the time gap between the officer's brief statement at the roundtable and his or her formal statement at IPRA from several months to one or two weeks. Rosenzweig's testimony that this change was favorably received was not refuted. Nor was her testimony that the Lodge did not object to this change by grieving it through the contractual grievance procedure (Tr. 287).

Now that the roundtable era is over, IPRA has instituted a procedure that allows it to take statements from shooting officers on an even faster timetable. Instead of waiting one or two weeks from the shooting incident to the taking of the shooting officer's statement, IPRA now takes the shooting officer's statement on the night of the shooting (unless the officer is unable to give a statement at that time, Tr. 295). Note that this statement-to-IPRA does not occur within two hours of the shooting incident as the Lodge has claimed, but within two

hours of IPRA's request for an interview after the shooting officer has finished being questioned by and talking with detectives, the OCIC, the State's Attorney's office, and others (Tr. 290-291).

Is IPRA's taking of formal statements from shooting officers in their capacity as witness officers to their own shooting consistent with IPRA's claim of its investigative authority under Section 6.2 of the collective bargaining agreement?  The evidence indicates that it is not, for the following reasons.

Looking first at the relevant contract language, the Lodge and the City bargained for and agreed upon contractual protections for officers during investigations, and adopted these protections in Article 6.  Section 6.1 protects officers facing disciplinary investigations.  Section 6.2 protects officers in their capacity as witnesses in disciplinary investigations and as witnesses in police-related shooting investigations.  IPRA and IAD can take statements from these witness officers, but they must do so consistent with the protections the parties have adopted in Section 6.2.  I find that, consistent with the arbitral practice of giving preference to specific contractual provisions than to general provisions when both apply, management's general Article 4 right to "manage its affairs in each and every respect" must yield to the specific restrictions placed upon the City's investigatory authority in Section 6.2.[7]

---

7. Frank Elkouri and Edna Elkouri, *How Arbitration Works,* Alan Miles Ruben, ed., 6th ed.  Washington, D.C.: BNA, 2003, pp. 469-470.

In the absence of explicit language in Section 6.2 referring
to "shooting officers," we turn to the parties' practice of
questioning officers as witnesses under Section 6.2 for guidance
in determining what the parties intended in this section.

How has the City exercised its authority to question
witnesses under Section 6.2? Section 6.2 was first adopted in
the parties' 1984-1985 contract (EX 1E). Testimony from Lodge
witnesses, particularly Tom Pleines, is that shooting officers
have never been required to give statements as witness officers
to their own shootings pursuant to Section 6.2 prior to IPRA's
assertion of the right to take statements from them in this
capacity in August 2010 (Tr. 165). Pleines' testimony on this
point was not refuted.

Pleines' testimony about this practice deserves significant
weight, for he has worked as a Lodge attorney, either as outside
counsel or as in-house counsel, continuously since 1983 (Tr. 151-
152). His testimony about this practice is supported by Vice
President Dougherty, who has worked for the Lodge since 2002, and
who testified that during the 2002-2010 period no shooting
officer was directed to give a statement under Section 6.2 as a
witness to his or her own shooting (Tr. 217).

Their testimony supports a conclusion that the parties did
not view the shooting officer as a witness to his or her own
shooting within the meaning of Section 6.2.

The past practice evidence indicates that more than 1,400
officer-involved shootings occurred during the 25 years prior to
IPRA's 2010 assertion of its right to question shooting officers

as witnesses to their own shootings (Tr. 76-77). Pleines'
testimony indicates that none of these 1,400-plus shooting
officers during this 25-year period were called to give
statements to OPS and then to IPRA as witnesses to their own
shooting. This is an extremely long-lived practice, and it is a
practice that was repeated over and over and over again during
this lengthy period. Both the Lodge and the City were aware of
this practice and continued its existence year after year after
year, until August 2010.

Based on this evidence, I find that the City and Lodge
mutually intended that Section 6.2 would not be used, and was not
used, as a contractual provision that required shooting officers
to give formal statements to OPS/IPRA in the capacity of
witnesses to their own shootings. If the parties had intended to
allow Section 6.2 to be used in this manner (the manner devised
by IPRA in August 2010), there would be some evidence to that
effect. The record contains no such evidence. Notably, not even
IPRA advanced such an interpretation of Section 6.2 during the
first three years' of IPRA's existence.

It is extremely well settled in arbitral jurisprudence that
a practice that has existed between the contracting parties may
become binding and thereby enforceable as a part of the CBA. As
noted in the most widely used labor arbitration reference work:

> "When it is asserted that a past practice constitutes
> an implied term of a contract, strong proof of its existence
> ordinarily will be required. Indeed, many arbitrators have
> recognized that 'In the absence of a written agreement,
> 'past practice', to be binding on both Parties, must be (1)
> unequivocal; (2) clearly enunciated and acted upon; (3)

readily ascertainable over a reasonable period of time as a fixed, and established practice accepted by both Parties.'"[8] Section 6.2 has existed in the parties' contract for 25 years, during that time hundreds and hundreds of officer-involved shootings occurred, and the record fails to reveal a single instance during this lengthy period of a shooting officer being directed to come to OPS and more recently to IPRA and give a formal statement in the capacity of a witness to his own shooting pursuant to Section 6.2. I find that this substantial body of evidence creates the "strong proof" required to demonstrate that the parties created a past practice that Section 6.2 would not be used in this manner. Further, this substantial body of evidence indicates that this practice ripened into a binding and thereby enforceable past practice.

But what about the 2010 elimination of roundtables and IPRA's subsequent inability to hear a statement from the shooting officer on the night of the shooting? Isn't that a legitimate reason for allowing this past practice to be changed or eliminated? After all, arbitrators "have recognized that an otherwise binding practice may be modified or eliminated where the underlying basis for the practice has changed."[9]

During the roundtable era, the evidence shows that IPRA (1) gathered significant evidence from the OCIC, the forensic technicians, and others about the shooting at the scene, (2) heard the shooting officer's statement to the roundtable, (3)

---

8. Elkouri and Elkouri, pp. 607-608.

9. Elkouri and Elkouri, p. 618.

believed, in Rosenzweig's words, that the shooting officers'
roundtable statements were "relatively superficial . . [and] . .
a brief overview of the event" (Tr. 287), and (4) weeks or months
later took formal statements from shooting officers in their
capacity as shooting officers even though IPRA had heard their
initial statements at the roundtable on the night of the
shooting. IPRA took these formal statements because the agency
needed more detailed information from the shooters about the
shooting incident than they had obtained earlier.

This same need for detailed information from the shooters
continues to exist after the elimination of the roundtables. In
other words, the elimination of the shooter's "relatively
superficial . [and] . . brief overview of the event" statement at
the roundtable did not change IPRA's need for a formal statement
from the shooting officer (Tr. 287-288). Expressed another way,
the elimination of the roundtables on the night of the shooting
did not change IPRA's underlying need for a full and complete
statement from the shooting officer.

In other words, during the roundtable era, in spite of the
shortcomings of the shooting officer's roundtable statement, IPRA
saw no need to take a full and formal statement from the shooting
officer until several months, and then one to two weeks, had
elapsed. Further, during the roundtable era, IPRA saw no need to
question shooting officers as witnesses to their own shooting.
Moreover, IPRA substantially reduced the time gap between
shooting incident/roundtable to statement-taking from many months

to one or two weeks, and there is no evidence that IPRA relied upon Section 6.2 to implement this change.

Now that roundtables have been eliminated, does the evidence show that IPRA needs to take formal statements from shooting officers in the capacity as witnesses to their own shooting pursuant to Section 6.2? No. IPRA certainly needs to take formal statements from shooting officers – just as they always have, but IPRA needs this information from these officers as in their capacity as the shooters in officer-involved shooting incidents, not in the guise of witnesses to their own shooting. Further, Rosenzweig offered no explanation for why the elimination of roundtables and specifically the elimination of the shooting officers' superficial and brief statements at the roundtables created a need to question the shooters in the capacity as witnesses to their own shooting. In sum, there is no persuasive evidence that the elimination of the roundtables created a need for IPRA to question shooting officers in the capacity of witnesses to their own shooting pursuant to Section 6.2.

Moving on, the pertinent negotiating history evidence from the negotiations for the current 2007-2012 CBA under which these grievances were filed provides no support for the practice of requiring shooting officers to give formal statements in the capacity of witnesses to their own shooting. In particular, Pleines testified that Section 6.2 was first was written into the CBA in 1984, and that it has continued in the parties' contracts in essentially the same form since then (Tr. 156). He also

testified that he participated in the negotiations for the current CBA, that Ilana Rosenzweig also participated in some of the negotiation sessions for the current contract, and that the topic of taking a formal statement from a shooting officer was not raised by the City during these negotiations (Tr. 165). He also testified that during these negotiations no one from the City, including IPRA, proposed that IPRA be allowed to take a statement from a shooting officer within two hours of the shooting incident (Tr. 164-165).

Pleines' testimony about the negotiations for the current contract was not refuted. His testimony allows us to conclude that the parties did not intend that the long-established interpretation of, and enforceable past practice under, Section 6.2 would be changed in the current CBA such that shooting officers would be directed to give a formal statement to IPRA in the capacity of a witness officer within the meaning of Section 6.2.

In short, the combined contract language, past practice, and negotiating history evidence shows that IPRA, although acting in good faith in the wake of the demise of the roundtables, violated Section 6.2 by requiring shooting officers to give formal statements in the capacity of witness officers to their own shooting pursuant to Section 6.2, beginning in August 2010 and continuing through the present. This conclusion is based primarily on the evidence about the parties' mutual intent of how Section 6.2 would be used as reflected in their mutually accepted and very lengthy binding past practice under it.

At the same time, the Lodge has over-reached in its interpretation of Section 6.2 and specifically the remedy that it seeks in this matter. The Lodge's proposed remedy seeks an arbitral directive stating (1) that shooting officer statements to IPRA are compelled and not voluntary statements, (2) IPRA be ordered to provide a *Garrity* warning to each shooting officer prior to the taking of any statement, and (3) the City be ordered to allow shooting officers the right to postpone any formal statement for a minimum of 48 hours. The state of the record does not warrant my unilateral imposition of such a far-reaching remedy.

As a result, this grievance is sustained in part and denied in part.

We turn to the appropriate remedy.

Remedy Considerations

As we turn to the issue of the appropriate remedy, we should note two important dimensions of this matter. First, absolutely nothing in this Award states, means, or implies that shooting officers somehow can escape their obligation to give truthful and complete statements to IPRA *on a timely basis* during IPRA's administrative investigation into a shooting incident. In particular, I note that there is nothing in the CBA, or nothing in the parties' past practice under the CBA, that creates an explicit time period during which shooting officers are shielded from or protected from giving a formal statement about the shooting incident to IPRA.

Second, the parties need to move beyond the fiction that these statements by shooting officers are or should be "voluntary." It is clear that shooting officers are required to give these statements to IPRA, and their refusal to do so subjects them to possible discharge. Rather, these statements are functionally compelled, and they should be officially treated as such. Indeed, IPRA admits that during the post-roundtable era it has been taking compelled statements from shooting officers (Tr. 270, 290).

Third, Rosenzweig testified that IPRA has been accepting at face value situations where a shooting officers is hospitalized, or is taking prescription medication, and therefore is unable to give a statement on the same night as the shooting (Tr. 295, 319-320). She testified that there has been a notable increase in the number of shooting officers advancing these unable-to-give-a-statement-now claims since August 2010 compared to the pre-August 2010 period (Tr. 295-296). Her testimony was not refuted. At the same time, there is no evidence in the record that any individual instance of shooting officer hospitalization or taking of medication was fraudulent in any respect. Most important for our purposes, what this evidence suggests is that all parties are better served by the promulgation of clear, equitable, and reasonable parameters for the taking of formal statements from shooting officers in these investigations.

I highlight these factors because an appropriate and effective remedy will address them in a constructive manner.

Remedy Process

Turning to the specific remedy process to be used in this dispute, the record is crystal clear that the subject matter in this dispute is complicated and involves exceptionally important elements of the delivery of law enforcement services to the citizens of Chicago. Because of this, the appropriate remedy in this matter is best devised and implemented by the people with the expertise and experience to effectively balance and merge (1) the City's need for accountability from its police officers when they discharge their firearms and shoot someone; (2) IPRA's need to timely, accurately, and thoroughly investigate officer-involved shooting incidents; (3) the Department's need to ensure that its officers are adhering to the policies, procedures, rules, and protocols the Department has established regulating firearm use; and (4) the shooting officers' need for fair and equitable treatment during the investigations of their firearm use.

Accordingly, the remedy process will move forward as follows. First, the current investigative status quo will continue unchanged during the remedy formulation process. Second, during that period, the Lodge and the City – including the Department and IPRA – will attempt to devise an agreed-upon method for taking formal statements from shooting officers in officer-involved shooting incidents. This method must address the particulars of how this process will be conducted. If the parties can agree upon this method, it will be implemented as

soon as possible after agreement has been reached. A mutually agreed upon remedy is the strongly preferred outcome to this matter.

Third, in the unfortunate situation that the parties are not able or not willing to agree by April 22, 2011 on how this part of IPRA's investigative process will be handled, the Lodge and the City each will submit to me its best and most reasonable proposal for handling this taking-statements-from-shooting-officers process. I emphasize that the most important words in the preceding sentence are "most reasonable." Such proposals will be submitted to me, in writing, on or before the close of business on May 6, 2011. Each party also may submit a memo, not to exceed four pages and also due on May 6, 2011, to me explaining why their proposal should be selected.

Fourth, I will then select, without alteration, the proposal that I believe is most reasonable, which is defined as meeting the City's needs, the Department's needs, IPRA's needs, and the Lodge's and bargaining unit members' needs, as described above. In short, the party that does the best job of proposing how to address and implement the needs of all the constituencies affected by this Award will see its remedy proposal selected and implemented.

Fifth, I will render my final offer remedy selection decision on or before May 20, 2011, and that remedy will be implemented forthwith.

Finally, I will retain jurisdiction for the limited purpose of resolving any remedy implementation problems that may arise.

**AWARD**

For the reasons expressed above, the grievances are sustained in part and denied in part. I find that the City has violated Section 6.2 of the collective bargaining agreement by the manner in which the Independent Police Review Authority has conducted investigations into officer-involved shootings beginning in the summer 2010 and continuing through the present. However, I also find that the Lodge's requested remedy is not warranted.

Because of the extraordinarily serious subject matter involved in this grievance, the remedy in this matter should be formulated, agreed upon, and implemented by the Lodge and the City, including the Department and IPRA, following the timetable presented in the immediately preceding "remedy process" section. However, if the parties are not able to devise and agree upon a remedy, they will follow the remedy proposal submission process specified in the immediately preceding pages, and I will select the most reasonable proposed remedy.

I will retain jurisdiction for the limited purpose of resolving any remedy implementation disputes that may arise.

CBA Section 9.8 says that "The fee and expenses of the Arbitrator shall be borne by the party whose position is not sustained by the Arbitrator. The Arbitrator in the event of a decision not wholly sustaining the position of either party, shall determine the appropriate allocation of his or her fees and expenses." In this matter I have not wholly sustained the position of either party. Accordingly and consistent with the

mandate in Section 9.8, I have determined that my fee and expenses should be shared equally by the City and the Lodge.

Respectfully submitted,

*Peter Feuille*

_____
Peter Feuille
Arbitrator

Champaign, Illinois
March 25, 2011

**REMEDY AWARD OF ARBITRATOR**

|  |  |
|---|---|
| In the Matter of Arbitration<br><br>    between<br><br>City of Chicago<br><br>    and<br><br>Fraternal Order of Police,<br>Chicago Lodge No. 7 | Remedy<br>by<br>Arbitrator<br>Peter Feuille<br>in<br>Grv. Nos. 129-10-033/341<br>(Greg Bella) and<br>129-10-031/339<br>(Aaron Carranza)<br>roundtable grievance |

Date of Remedy Award:  June 23, 2011

**APPEARANCES**

For the City:

    Mr. David A. Johnson, Franczek Radelet, Attorney
    Ms. Ilana B.R. Rosenzweig, Chief Administrator, IPRA
    Cmdr. Donald J. O'Neill, Commander, MLAS

For the Lodge:

    Mr. Paul D. Geiger, Attorney
    P.O. Greg Bella, Third Vice President and Grievant
    P.O. Richard Aguilar, Financial Secretary
    P.O. Bill Dougherty, First Vice President

**INTRODUCTION**

In August 2010 the City's Independent Police Review
Authority ("IPRA") adopted a new procedure for taking statements
from "shooting officers" – those Department sworn members who
have been involved in "officer-involved shooting incidents."
These are incidents when a Department sworn member, whether on or
off duty, discharges his or her weapon and another person is
struck by one or more bullets filed by that officer.  In August
2010 the Lodge filed the two grievances listed in the above
caption challenging IPRA's new procedure (JXs 2, 3).  The parties

consolidated these grievances into one proceeding and held arbitration hearings in December 2010.

On March 25, 2011, I issued my "Award of Arbitrator" ("Award," "initial Award") to resolve the above grievances (generally referred to as the "roundtable grievance") between these parties. In that Award I sustained the grievance in part and denied it in part. However, I did not issue my own remedy. Instead, given "that the subject matter in this dispute is complicated and involves exceptionally important elements of the delivery of law enforcement services to the citizens of Chicago" (Award, 51), and following the explicit mutual requests of the City and the Lodge (Employer Brief, page 23 ("Er.Br. 23"); Lodge Brief, page 33 ("L.Br. 33")), I specified the following remedy process.

## REMEDY PROCESS

First, I directed the parties to meet, discuss, and agree upon the appropriate remedy. Second, in the event the parties could not agree upon a remedy, I specified a process by which each party would submit to me its own proposed remedy, accompanied by a brief argument on behalf of its proposed remedy, and I stated I would select the remedy proposal that I believed was most reasonable.

In the weeks that followed the issuance of the Award, the parties exerted their best efforts to agree by engaging in extensive and intensive discussions about the appropriate remedy,

and during these discussions the distance between their initial positions narrowed substantially.

Ultimately, however, an agreed-upon remedy remained elusive, with the key sticking point being the duration of the timeline when the shooting officer would be required to give her or his statement. As a result, and consistent with the next step in the initial Award's remedy process, on June 3, 2011 each party submitted to me its proposed remedy. The most noteworthy aspect of their remedy proposals is that they are more similar than different, which is testimony to the quality of their remedy discussions. These proposals can be summarized as follows:

Lodge proposal. The Lodge proposes that the shooting officer (1) shall not be required to give a statement to IPRA earlier than 24 hours from the time of the shooting incident (i.e., the time of the shooting incident will trigger the statement-giving timeline), and (2) such statements will be given only between the period 0600 hours to 1800 hours. When these two timeline elements are combined, some shooting officers may have more than 24 hours between incident and statement-giving. For instance, an officer involved in a shooting incident at 1700 hours on Monday can be required to give a statement to IPRA at 1700 hours on Tuesday (the next day). However, an officer involved in a shooting incident at 1900 hours on Monday cannot be required to give a statement until 0600 hours on Wednesday (the day after the day after the shooting).

Statutory Administrative Proceedings Rights shall be presented in writing to the shooting officer, and the officer

4

shall have the right to legal counsel, prior to the beginning of any statement.

The parties may agree that the officer can give his/her statement at a time earlier than 24 hours after the shooting.

City proposal. The City proposes that the time of the shooting incident is the time when the statement-taking clock starts running. The City also proposes (1) a 24-hour timeline, in that the shooting officer must give her statement to IPRA no later than 24 hours after the shooting incident, and (2) such statements shall be given at any time between 0600 hours and 2300 hours. For example, if an officer shoots someone at 1900 hours on Wednesday, she must give her statement no later than 1900 hours on Thursday (the next day). However, if an officer shoots someone at 2330 hours on Wednesday, he has until 0600 hours on Friday to give his statement (the day after the day after the shooting).

The City acknowledges that there may be individual instances when shooting officers are so physically harmed or so emotionally/psychologically disturbed that they cannot give their statements within this 24-hour timeframe. But these cases will be the unusual exceptions to the 24-hour rule, IPRA will continue its practice of dealing with these situations on an individual-by-individual basis, and IPRA will continue to accept at face value good faith claims of an inability to provide a statement within the 24-hour period.

The City proposes that the shooting officer's statement will be a compelled statement, but the City proposes that the parties

devise an appropriate form to be used when IPRA takes such statements and says that the existing Statutory Administrative Proceeding Rights form as it currently exists (CX 7) not be used when IPRA takes statements from shooting officers.

The parties may agree that the shooting officer can give his/her statement at a time earlier than 24 hours after the shooting.

## REMEDY

Remedy.  The following remedy is based upon my view of the reasonableness of each party's proposal and the persuasiveness of each party's supporting arguments for the selection of their proposal.  The elements of the remedy are presented in the numbered items below.  The rationale for this remedy is presented in the text that follows the numbered items.

1.  This remedy applies only to the administrative investigation into an officer-involved shooting incident conducted by the Independent Police Review Authority, and not to any of the other investigations into these incidents conducted by the Department or State's Attorney's Office.

2.  The time of the shooting incident will be the time when the statement-taking clock begins to run.  The time of the shooting incident will be established by the Department based on pertinent communications by and among Department members during the immediate reporting and aftermath of the incident.

3.  The shooting officer will be required to give his/her statement to IPRA at the IPRA offices, or any other mutually agreed upon location, no earlier than 24 hours after the shooting incident, and

4.  Statements may be given any time between 0600 hours and 1800 hours. When item 4 is combined with item 3, this means that some shooting officers will have more than 24 hours, depending upon the time of the shooting incident, to provide their statements to IPRA. For instance, the shooting officer in an incident that occurred at 2100 hours on Monday cannot be required to give his statement to IPRA prior to 0600 hours on Wednesday. However, the shooting officer in an incident that occurred at 1750 hours on Monday can be required to give her statement at 1750 hours on Tuesday.[1]

5.  Nothing in the timeline specified in items 3 and 4 above shall prevent a shooting officer, her legal counsel, and IPRA from voluntarily agreeing to give her statement to IPRA sooner than 24 hours after the incident.

6.  Similarly, nothing in the timeline specified in items 3 and 4 above shall prevent IPRA, at its sole and exclusive discretion, from deciding to postpone the taking of a statement from a shooting officer until a time more than 24 hours after the time of the shooting incident.

7.  IPRA shall provide each shooting officer with a written form, to be timely devised and adopted by the parties, indicating that the shooting officer's statement is a

---

1. This statement-taking period specified in items 3 and 4 essentially means that daytime shooting officers (officers involved in a shooting prior to 1800 hours) must give their statements to IPRA within 24 hours, while nighttime shooting officers (officers involved in a shooting after 1800 hours) may have up to 36 hours after the shooting incident to give their statement.

> compelled statement prior to the commencement of the
> officer giving a statement.[2]

8. The shooting officer shall have the right to have legal
counsel and/or a Lodge representative present during
the statement-giving process.

9. When a shooting officer advances a claim that he or she
is unable to provide a statement within the time period
specified in items 3 and 4 above, IPRA will continue
its practice of dealing with these claims on an
individual basis, of making a reasonable inquiry into
the reasons for the officer's claim, and accepting at
face value all good faith claims of an officer's
inability to provide a statement.

10. This remedy will take effect on June 24, 2011, the day
after this Remedy Award is issued, and will replace the
"investigative status quo" that was used by IPRA since
August 2010 during the pendency of this grievance will
cease.

Remedy rationale. The parties agree that the two key
elements of the statement-giving timeline are (1) a 24-hour
period commencing (2) at the time of the shooting incident. I

---

2. The Lodge proposes that the shooting officer be given the
Statutory Administrative Proceeding Rights form that is given
to officers in CR investigations (CX 7). The City demurs and
says this particular form should not be adopted in its current
form for use in the taking of statements from shooting
officers. For instance, this form contains the phrases "Given
to Accused" and "Name of Accused" pre-printed at the top of
the form (CX 7). The City emphasizes that shooting officers,
with rare exceptions, are not "accused" officers when they
appear before IPRA to give their statements, for IPRA
investigations into shooting incidents are conducted as U
investigations rather than CR investigations (Award, 9-10). I
find that the City's point is valid and highly persuasive.
Accordingly, the parties are directed to timely devise and
adopt an appropriate form informing the shooting officer that
his/her statement is a compelled statement and specifying the
concomitant obligations on the shooting officer to provide
such a statement.

find that both elements are eminently sensible and reasonable, and therefore I have adopted them. I strongly agree that the shooting incident is clearly the most logical, and easily the most ascertainable, time for the statement-taking clock to start ticking (I am using the terms "statement-giving" and "statement-taking" interchangeably).

Each party has presented a modification to the 24-hour rule, and I find that both modifications are reasonable. At the same time, I find that the Lodge's modification is more reasonable than the City's modification. There are three reasons for this. First, I note that the evidence strongly suggests that the majority of officer-involved shootings occur at night.[3]

Second, there is ample testimony that the shooting officer must participate in the investigations that commence at the shooting scene immediately after the incident, with these investigations conducted first at the scene and then at the relevant Area building covering the location of the shooting scene. As Ilana Rosenzweig testified, the shooting officer will be questioned at the scene by the investigating detectives, the OCIC, and others, and additional questioning may occur at the relevant Area building (Tr. 275-279). Rosenzweig testified that

---

3. The parties agree there have been 1,400-plus officer-involved shootings since 1985 (Tr. 28, 76-77; Er.Br. 2). There is no evidence in the record specifying the exact time during the 24-hour day when these hundreds of shootings occurred. However, the testimony in this matter, and particularly Rosenzweig's testimony, is replete with references to "the night of the shooting" or words to that effect (Tr. 64, 134, 171, 176-177, 283-285, 289-290, 293, 319). Additionally, the Employer makes frequent reference to the "night of the shooting" or words to that effect in its brief (Er.Br. 13, 16, 19, 21).

the officer's participation in these immediately-after-the-incident investigations may last for as long as six to ten hours (Tr. 282-284).[4]  In short, the shooting officer is not free to go home immediately after the incident, but instead is required to submit to post-incident questioning by numerous investigators, which questioning can require several hours to complete (Tr. 275-284).  Only when this immediate post-incident questioning is completed is the officer allowed to depart and go home.  This means that a significant part of the time between the shooting incident and the giving of a statement to IPRA is not unconstrained time that the officer may use as he/she wishes.

A specific example will be helpful.  Let's assume a shooting incident occurs at 2230 hours (10:30 p.m.).  The shooting officer may not be released to go home until 0300-0600 hours.  Under the City's proposal, the officer could be required to come to the IPRA office and give a statement at 2230 hours that night – 24 hours after the incident.  This means the amount of time the officer has to decompress and obtain a "sleep cycle" may be 17-20 hours.  That amount of time is not unreasonable.  However, I find that it is not as reasonable as the amount of decompression and sleep cycle time available to nighttime shooting officers under the Lodge's proposal.

---

4. This time gap is based on Rosezweig's testimony about the amount of time that elapsed between the shooting incident and the convening of the roundtable during the roundtable era. Roundtables are no longer used, but Rosenzweig testified that during the post-roundtable era the shooting officer is still questioned at the scene by the investigating detectives, the OCIC, and perhaps others, and then back at the Area building the shooting officer may be questioned further, including by the State's Attorney's Office (Tr. 289-293).

Third, the parties note that there is in place between them a longstanding custom, a custom not codified in the CBA or elsewhere, of taking statements in all CR investigations and in all administrative investigations, whether conducted by OPS/IPRA, IAD, or an officer's unit of assignment, during the period 0600 hours to 1800 hours (Lodge Remedy Argument, second and third pages ("L.R.A 2-3"); City Remedy Argument, page 3 ("C.R.A. 3")). The Lodge says this custom has existed for at least 25 years (L.R.A. 3).

The Lodge also points out that CBA Sections 6.1 and 6.2 provide that statements taken from accused officers and witness officers "shall be scheduled at a reasonable time, preferably while the officer is on duty, or if feasible, during daylight hours" (JX 1). I find that requiring statements to be given during the same 0600 - 1800 hours period in which accused and witness officer statements are given under Sections 6.1 and 6.2 is more reasonable than the statement-taking time period proposed by the City. Using this same time period allows everyone involved in the officer-involved shooting statement-taking process to use the same statement-taking time period used in other investigations. In other words, the parties have long been using the 0600-1800 hours statement-taking time period as the period that meets the "scheduled at a reasonable time" standard specified for accused and witness officers being interrogated or interviewed pursuant to Sections 6.1 and 6.2. In turn, I find that this time period provides more consistent and equitable treatment to shooting officers than does requiring shooting

officers and their representatives to be interviewed late at night. Therefore, I find that this same time period should be used as the time period when IPRA takes statements from shooting officers.

Moving on, and consistent with the evidence that emerged at the hearing, I find that the parties should depart from the notion that shooting officer statements are or should be voluntary (Award, 50). It is clear that shooting officers are required to give these statements to IPRA, and their refusal to do so subjects them to possible discharge. Rather, these statements are functionally compelled (Tr. 270, 290), and they should be officially treated as such. As a result, the above remedy requires IPRA to treat all statements from shooting officers as compelled statements, which in turn means that IPRA must provide each shooting officer with an appropriately-worded form prior to the start of its questioning of the officer (as discussed in item 7 and footnote 2 above).

Finally, I will retain jurisdiction for the limited purpose of resolving any remedy implementation disputes that may arise.

**AWARD**

For the reasons expressed in the initial Award, the grievances are sustained in part and denied in part. I find that the City has violated Section 6.2 of the collective bargaining agreement by the manner in which the Independent Police Review Authority has conducted investigations into officer-involved shootings beginning in the summer 2010 and continuing through the present. However, I also find that the Lodge's initially requested remedy is not warranted.

The parties are directed to implement the remedy specified in items 1-10 in the "remedy" section of this Remedy Award.

I will retain jurisdiction for the limited purpose of resolving any remedy implementation disputes that may arise.

CBA Section 9.8 says that "The fee and expenses of the Arbitrator shall be borne by the party whose position is not sustained by the Arbitrator. The Arbitrator in the event of a decision not wholly sustaining the position of either party, shall determine the appropriate allocation of his or her fees and expenses." In this matter I have not wholly sustained the position of either party. Accordingly and consistent with the mandate in Section 9.8, I have determined that my fee and expenses should be shared equally by the City and the Lodge.

Respectfully submitted,

*Peter Feuille*

_____

Champaign, Illinois
June 23, 2011

Peter Feuille
Arbitrator