# EXHIBIT I

**BEFORE**
**DISPUTE RESOLUTION BOARD**

Edwin H. Benn **(Neutral Chair)**
Mark P. Donahue **(Lodge Appointee)**
David A. Johnson **(City Appointee)**

---

In the Matter of the Arbitration

between

The City of Chicago

and

Fraternal Order of Police,
Chicago Lodge No. 7

---

**CASE NO.:**   Arb. Ref. 09.281
(Interest Arbitration
2007 Agreement)

## OPINION AND AWARD

APPEARANCES:

    For the City:       David A. Johnson, Esq.
                         James C. Franczek, Jr., Esq.
                         Stephanie B. Donovan, Esq.
                         Jennifer A. Dunn, Esq.

    For the Lodge:      Mark P. Donahue, President
                         Joel A. D'Alba, Esq.
                         Thomas J. Pleines, Esq.

Dated:  April 16, 2010

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 2

**CONTENTS**

I. BACKGROUND .................................................................................. 3
II. PREVIOUSLY DECIDED ISSUES ................................................. 5
III. REMAINING ISSUES IN DISPUTE ........................................... 7
IV. THE STATUTORY FACTORS ...................................................... 7
V. THE ECONOMY .............................................................................. 8
    1. The National Level ...................................................................... 9
    2. The State Level .......................................................................... 12
    3. The Local Level ......................................................................... 13
VI. RESOLUTION OF THE DISPUTED ISSUES ........................... 19
    1. Duration ...................................................................................... 19
    2. Wages .......................................................................................... 25
        A. The Offers ............................................................................. 25
        B. The Use Of Comparables .................................................... 25
        C. The Cost-Of-Living And Inflation ...................................... 29
            1. Why The Parties' Offers Are Not Appropriate .......................... 30
                (a). The Lodge's Wage Offer ................................................. 31
                (b). The City's Wage Offer .................................................... 34
            2. The Appropriate Wage Rate ....................................................... 36
                 (a). July - December 2007 (Pre-Crash) ................................. 37
                (b). January - December 2008 (Pre- and Post-Crash) .......... 38
                (c). January - December 2009 (Post-Crash) ........................ 40
                (d). January 2010 - June 30, 2012 (Post-Crash) ................. 42
        D. The Lodge's View Of The City's Financial Condition .................... 45
        E. The Impact Of The Wage Increases ............................................ 48
    3. Duty Availability Allowance ................................................... 59
    4. Uniform Allowance .................................................................. 62
    5. Field Training Officers ............................................................ 65
    6. Physical Fitness Incentive ...................................................... 67
    7. Health Fair Remittance .......................................................... 70
    8. Active Health Care Program ................................................... 71
    9. Life Insurance ........................................................................... 75
    10. Injury On Duty And Recurrence Claims ............................ 77
    11. Disciplinary Investigations ................................................... 79
    12. Drug And Alcohol Testing ...................................................... 81
        A. The Reason For The Change .............................................. 82
        B. The Testing Program .......................................................... 83
VII. INTEREST ON RETROACTIVE PAYMENTS ........................ 86
VIII. UNCONTESTED AND AGREED UPON ITEMS ................... 87
IX. OTHER ITEMS AND RETAINED JURISDICTION ................ 87
X. SUMMARY OF RESOLVED ISSUES .......................................... 88
XI. APPENDICES ................................................................................ 91
    APPENDIX 1 — SALARY SCHEDULES .................................. 91
    APPENDIX 2 — DRUG AND ALCOHOL TESTING ................. 94
    APPENDIX 3 — UNCONTESTED AND AGREED UPON ITEMS ............... 98

## I. BACKGROUND

Fraternal Order of Police, Chicago Lodge No. 7 ("Lodge") is the collective bargaining representative for over 11,300 sworn police officers below the rank of sergeant employed by the City of Chicago ("City").[1] The parties' most recent collective bargaining agreement covered the period July 1, 2003 through June 30, 2007 and was the product of an interest arbitration award dated February 28, 2005 ("*2003-2007 Award*") with the same members of the Dispute Resolution Board ("Board") sitting in this matter.[2]

For well over two years, the parties have engaged in extensive collective bargaining in an effort to reach a new Agreement.[3] The parties have come to terms on many issues — several of which are quite significant, including extending City-paid health care benefits now provided to officers who retire on or after age 60 to officers who retire on or after age 55 and new work schedules for most members of the bargaining unit.[4] However, while coming to terms on many issues, the parties have been unable to reach agreement on all items for the new Agreement and remain at impasse over many issues.[5]

This is an interest arbitration. The purpose of this proceeding is to resolve the remaining disputed issues between the parties and establish the

---

[1]   2003-2007 Agreement at Article 2. As of the filing of the parties' pre-hearing submissions in this matter, the City placed the number of officers in the bargaining unit at 11,470. City Exhs. 11, 12; City Brief at 8. The Lodge contends that as of December 31, 2009, there were 11,395 officers in the bargaining unit. Lodge Exh. 39(B); Lodge Brief at 14-15.

[2]   Agreement at Section 28.1; City Appendix of Authority, Exh. C; Lodge Exh. 6.

[3]   According to the City, "[s]ince the [initial] June 6, 2007 [bargaining] session, the parties have met in full session or in subcommittees on at least 74 occasions and have exchanged approximately 1,083 proposals." City Brief at 12.

[4]   City Exhs. 17-18, 20-22; Tr. 13-14.

[5]   Uncontested and agreed upon items are incorporated into this award *infra* at VIII, XI, Appendix 3.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 4

terms and conditions for the new Agreement pursuant to the requirements of the parties' impasse resolution procedure established in the Agreement and the relevant statutory factors provided in the Illinois Public Labor Relations Act ("IPLRA").[6]

Similar to the prior proceeding leading to the 2003-2007 Agreement, upon my involvement in this matter, a procedure was established for identifying disputed issues, submitting offers, submitting briefs and evidence in support of the parties' respective offers, mediation and hearing.[7] The parties have fulfilled those requirements and voluminous briefs and evidence have been submitted and considered. Pre-hearing rulings on certain issues were also made by me.[8] Hearings were held on February 24 and March 4, 2010 on limited issues where further evidence and arguments were presented. The pre-hearing submissions of evidence and briefs have allowed for an expedited resolution of this case.[9] My task now is to resolve the impasses over the remaining issues in dispute and to finally set the terms for the new Agreement.

---

[6] *See* Agreement at Section 28.3; IPLRA, 5 ILCS 315/14. Section 28.3(B) of the Agreement provides for the establishment of a three member Dispute Resolution Board — one member appointed by the City, one member appointed by the Lodge and one impartial member. I was selected as the impartial member. The parties have waived the three member Board and have agreed that I act as the sole arbitrator. As I interpret Section 28.3(B) of the Agreement and the corresponding provisions of Section 14 of the IPLRA — and as is so often done in these kinds of proceedings — the parties have the authority to waive the three member Board and have done so.

[7] Orders of December 17, 2009 and January 14, 2010; Lodge Exh. 1.

[8] Order dated December 30, 2009; Lodge Exh. 1.

[9] That pre-hearing submission procedure allowed me to resolve many of the issues prior to hearing and thus expedite final issuance of this award. *See* Order dated December 30, 2009. *See also, infra* at II.

*City of Chicago and FOP Lodge No. 7*
*Interest Arbitration — 2007 Agreement*
*Page 5*

## II. PREVIOUSLY DECIDED ISSUES

As earlier noted, as part of the process for expediting the resolution of this lengthy and complex dispute — and to the extent issues were not previously agreed upon by the parties — pre-hearing rulings were made by me on December 30, 2009 on a number of issues which were in dispute at that time.[10] Those issues ruled upon by me during the pre-hearing process were as follows:

- Section 26.1 – Wage Increases (Retroactivity) (Lodge proposal)

- Section 26.3 – Work Out of Grade (Major Accident, SWAT, etc.) (Lodge proposal)

- Article 24 – Education Reimbursement (Lodge proposal)

- Article 22 – Indemnification (Punitive Damages) (Lodge proposal)

- Section 6.13 – Review Procedure for Discipline Recommendations (City proposal)

- Section 8.5 – Direct Appeal to Superintendent (Lodge and City proposals)

- Section 8.5(A) – Discipline Abeyance (Lodge proposal)

- Section 9.3 – Arbitration of Standard Grievances; supervisory responses; time for providing CR files (City proposal)

- Section 9.1 - (Separation Cases) (Lodge proposal)

- Section 9.3(B) – Expedited Arbitration Rules (Summary Opinion Process) (City proposal)

- Section 9.6 – Discipline Grievances and Appeals (City proposal)

- Appendix M – Expedited Arbitration (City proposal)

- Appendix Q – Discipline Screening Program (City proposal)

---

[10] Order dated December 30, 2009.

- Article 12 – Promotions (Codifies provisions of Shakman decree; Same day testing and grading; Detective merit promotions to be reduced from 20% to 16%; Eligibility for police tech examination) (Lodge proposal)

- Section 20.7 – Change of Schedule (City proposal)[11]

- Section 20.9 – Day Off Change (City proposal)

- Section 23.8 – Filling Recognized Vacancies (City proposal)

- Section 23.11 – Limits on details out of assigned Districts (Lodge proposal)

- Appendix T – Mandatory Physical Fitness (City proposal)

The rulings were made by me on the above issues using the standard applied for interest arbitrations, which will be applied throughout this award — *i.e.*, that "[t]he burden for changing an existing benefit rests with the party seeking the change ... [and] ... in order for me to impose a change, the burden is on the party seeking the change to demonstrate that the existing system is broken."[12]

As shown by the burdens placed on the parties to obtain changes to existing collective bargaining agreements, interest arbitration is a *very* conservative process. It would be presumptuous of me to believe that I could come up with a resolution satisfactory to the parties on these issues when the parties with their sophisticated negotiators could not do so, particularly after years of bargaining. For these issues, at best, the parties' proposed changes were good ideas from their perspectives. However, it is not the function of an interest arbitrator to make changes to terms of existing collective bargaining agreements based only on good ideas. That is why the party seeking the change must show that the existing condition is broken and therefore in need of change. That was

---

[11] Denied in part.

[12] *2003-2007 Award* at 46, 73.

not done by the parties for the changes sought on these issues, therefore requiring that their requested changes be denied.[13]

## III. REMAINING ISSUES IN DISPUTE

The parties identified the remaining issues in dispute as follows:[14]

1.    Duration
2.    Wages
3.    Duty Availability Allowance
4.    Uniform Allowance
5.    Field Training Officers
6.    Physical Fitness Incentive
7.    Health Fair Remittance
8.    Active Health Care Program
9.    Life Insurance
10.    Injury on Duty and Recurrence Claims
11.    Disciplinary Investigations
12.    Drug and Alcohol Testing

## IV. THE STATUTORY FACTORS

Section 14(h) of the IPLRA lists the following factors for consideration in interest arbitrations:

> (h) Where there is no agreement between the parties, ... the arbitration panel shall base its findings, opinions and order upon the following factors, as applicable:
>
> (1) The lawful authority of the employer.
>
> (2) Stipulations of the parties.
>
> (3) The interests and welfare of the public and the financial ability of the unit of government to meet those costs.
>
> (4) Comparison of the wages, hours and conditions of employment of the employees involved in the arbitration proceeding with the

---

[13] The pre-hearing rulings have no precedential value with respect to future negotiations and interest arbitrations between these parties. *See* Order dated December 30, 2009 at 8:
> ... [N]one of the above rulings will prejudice either party's positions in future negotiations or interest arbitrations should they choose to raise any of the issues ruled upon or otherwise disposed. The above rulings and dispositions have been made only for purposes of this particular proceeding.

[14] *See* the parties' pre-hearing briefs.

wages, hours and conditions of employment of other employees per-
forming similar services and with other employees generally:

    (A) In public employment in comparable communities.

    (B) In private employment in comparable communities.

    (5) The average consumer prices for goods and services, com-
monly known as the cost of living.

    (6) The overall compensation presently received by the employees,
including direct wage compensation, vacations, holidays and other
excused time, insurance and pensions, medical and hospitalization
benefits, the continuity and stability of employment and all other
benefits received.

    (7) Changes in any of the foregoing circumstances during the
pendency of the arbitration proceedings.

    (8) Such other factors, not confined to the foregoing, which are
normally or traditionally taken into consideration in determination of
wages, hours and conditions of employment through voluntary collec-
tive bargaining, mediation, fact-finding, arbitration or otherwise be-
tween the parties, in the public service or in private employment.

## V. THE ECONOMY

Before getting into a detailed discussion and resolution of the remaining
issues in this case, the overshadowing cloud which first must be discussed is
the economy. Slightly more than a year after the 2003-2007 Agreement ex-
pired and as the parties were deep into their efforts to negotiate their new
Agreement, the economy literally crashed. Relevant to this discussion is the
question of how interest arbitrators can rationally formulate terms for multi-
year collective bargaining agreements with an economy that has taken such a
hard hit and at this time shows no real signs of substantial recovery? *See* my
award in *County of Boone and Boone County Sheriff and Illinois Fraternal Order
of Police Labor Council*, S-MA-08-010 (March 23, 2009) ("*Boone County*") at 13-
14 which issued at the height of the economic downturn:

    ... With an economy in free-fall, unemployment marching steadily up-
    ward, credit markets frozen, businesses laying off or closing, revenue
    streams diminishing, government intervention programs of massive pro-
    portions seeking to prevent further harm and not knowing whether,
    when or to what degree those programs will succeed in stopping the
    blood-letting, how am I as an interest arbitrator rationally supposed to
    set the economic terms of a multi-year collective bargaining agreement

which the parties unsuccessfully attempted to reach before the economy crashed ...?

And there is no question that since at least the fall of 2008, the economy at the national, state and local levels (as well as globally) has taken a brutal hit.

### 1. The National Level

The Lodge points out that there have been other deep recessions aside from the one we are now going through.[15] However, the current recession has been characterized as the greatest recession experienced by this country since the Great Depression of 1929.[16] Douglas Elmendorf, Director of the Congressional Budget Office, gave testimony before the Committee on the Budget, U.S. House of Representatives (January 27, 2009) observing the following:[17]

> The economy is currently enduring a recession that started more than a year ago. The Congressional Budget Office (CBO) projects that, in the absence of any changes in fiscal policy, economic activity will contract more sharply in 2009 than it did in 2008 and the economy will grow at only a moderate pace in 2010. Under that projection, the shortfall in the nation's output relative to its potential would be the largest — in terms of both length and depth — since the Depression of the 1930s. Lost output would represent nearly 7 percent of the estimated potential output in both 2009 and 2010 — amounting to about $1 trillion in each year — and almost 5 percent of the potential in 2011 .... Payroll employment declined by 2-1/2 million jobs last year, and CBO projects that, without further policy actions, even more jobs will be lost this year. The unemployment rate increased by more than 2 percentage points last year, reaching 7.2 percent, and is projected to peak at above 9 percent early next year.

---

[15] Tr. 56-57; Lodge Exhs. 48(b); 54.

[16] Willis, "U.S. Recession Worst Since Great Depression, Revised Data Show", Bloomberg.com (August 1, 2009). http://www.bloomberg.com/apps/news?pid=20601087&sid=aNivTjr852TI. According to Treasury Secretary Timothy Geithner in an interview on April 1, 2010 "...[T]his was the worst economic crisis since the Great Depression ... [with a] huge amount of damage done to businesses and families across the country ... and we're going to be living with that damage for some time, it's just going to take us a while to heal that damage." http://today.msnbc.msn.com/id/26184891#36130394. *See also*, The Los Angeles Times (April 1, 2010) reported at http://latimesblogs.latimes.com/dcnow/2010/04/geithner-says-unemployment-likely-to-remain-unacceptably-high-for-a-long-time.html.

[17] http://www.cbo.gov/ftpdocs/99xx/doc9967/01-27-StateofEconomy_Testimony.pdf.

Although predicting in January 2009 that "[t]he unemployment rate ... is projected to peak at above 9 percent early next year [2010]", by October 2009 — a mere nine months after Director Elmendorf's testimony — a Bureau of Labor Statistics ("BLS") News Release dated November 6, 2009, showed that "[t]he unemployment rate rose ... to 10.2 percent, the highest rate since April 1983."[18]  Compared to October 2008, the national unemployment rate for October 2009 increased by almost four points from 6.5%.[19]

As high as those unemployment percentages are, in reality they are lower than what is truly reflective of the current unemployment situation.  Those numbers do not reflect the "underemployed" — *i.e.*, those individuals who have had to take part-time positions because they lost their full-time positions or simply have given up looking for work.  As of April 2, 2010, the BLS reports that, at the national level, the underemployment rate is at 17.5%.[20]

With its March 5, 2010 News Release, the BLS reported February 2010 unemployment at the national level at 9.7%.[21]  That is the same rate reported for January 2010.[22]  With its April 2, 2010 News Release, the BLS reported March 2010 unemployment at the national level again remained at 9.7%.[23] The predictions are now coming that the "Jobless Rate Holds Steady, Raising

---

[18]  http://www.bls.gov/news.release/archives/empsit_11062009.pdf.

[19]  http://www.bls.gov/news.release/archives/empsit_11072008.pdf.

[20]  http://www.bls.gov/news.release/archives/empsit_04022010.pdf.  The seasonally adjusted figure for March 2010 is 16.9%.  *Id*.  The BLS reports those individuals in this category as "[t]otal unemployed, plus all persons marginally attached to the labor force, plus total employed part time for economic reasons, as a percent of the civilian labor force plus all persons marginally attached to the labor force."  *Id*.

[21]  http://www.bls.gov/news.release/archives/empsit_03052010.pdf.

[22]  http://www.bls.gov/news.release/archives/empsit_02052010.pdf.

[23]  http://www.bls.gov/news.release/archives/empsit_04022010.pdf.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 11

Hopes of Recovery."[24]   After the April 2, 2010 BLS News Release also showed that 162,000 jobs were created in March 2010, President Obama stated that "[t]he worst of the storm is over."[25]   Hopefully these positive assessments are all correct and the economy will now begin to make a meaningful recovery.

Relying upon that hoped for recovery, at the hearing, the Lodge argued that "… the economy is improving" and produced the "Chicago Fed National Activity Index" dated February 22, 2010 from the Federal Reserve Bank of Chicago, which stated "… economic activity increased sharply in January [2010] … [l]ed by improvements in production- and employment-related indicators, the Chicago Fed National Activity Index in January was slightly positive for the second time in the past three months."[26]   However, only one month later, the March 22, 2010 release from the Federal Reserve Bank of Chicago stated the "[i]ndex shows economic activity *slowed* in February … [l]ed by declines in pro-

---

[24]   Goodman and Hernandez, New York Times, (March 5, 2010) reported at http://www.nytimes.com/2010/03/06/business/economy/06jobs.html?scp=1&sq=Flat+jobless+rate&st=nyt.

[25]   http://www.bls.gov/news.release/archives/empsit_04022010.pdf;  The Los Angeles Times, (April 2, 2010) reported at http://latimesblogs.latimes.com/dcnow/2010/04/obama-on-the-economy-the-worst-of-the-storm-is-over-.html.  *See also*, Rampell and Hernandez, "Signaling Jobs Recovery, Payrolls Surged in March", New York Times (April 3, 2010) reported at http://www.nytimes.com/2010/04/03/business/economy/03jobs.html?ref=todayspaper:

> The clouds have parted.
>
> After losing eight million jobs since the recession began in December 2007, payrolls finally surged in March, the Labor Department reported on Friday. Employers added 162,000 nonfarm jobs last month. Nationwide, the unemployment rate held steady at 9.7 percent.
>
> "We are beginning to turn the corner," said President Obama, speaking in Charlotte, N.C., calling it "the best news we've seen on the job front in more than two years." …

[26]   Tr. 24-25, 54-59; Lodge Exh. 48(b)-1; Tr. 5; Lodge Brief at 39.  *See also*, Lodge Exhibits 48(d) (Murray and Matthews "Factories Gear Up to Hire", Wall Street Journal (February 17, 2010)); 48(e) ("Indicators Point to an Economy in Early Recovery", The Conference Board (January 21, 2010)).

duction-related indicators, the Chicago Fed National Activity Index decreased to -0.64 in February, down from –0.04 in January."[27]

The point here is that notwithstanding expert predictions and mixed reports from various indicators reflective of whether the economy is, in fact, on the road back, we just don't know precisely what is going to happen with the economy or when it is going to happen. Yet, the task here is to construct a multi-year collective bargaining agreement which must reflect the current and future conditions of the economy.

### 2. The State Level

Turning to the conditions facing the State of Illinois, as shown by Governor Pat Quinn's Budget Address of March 10, 2010, "[i]n Illinois, we are facing a record $13 billion deficit for fiscal years 2010 and 2011."[28] "The budget deficit in Illinois is almost as big as the one facing California, a financially beleaguered state that has triple Illinois' population ...."[29] Nothing more really needs to be said about the extraordinary financial problems now facing the State.

With respect to unemployment, Illinois has been hit harder than the impact of the recession at the national level. While the national unemployment rate is currently at 9.7%, according to the Illinois Department of Employment

---

[27] http://www.chicagofed.org/digital_assets/publications/cfnai/2010/cfnai_march2010.pdf [emphasis added].

[28] www.state.il.us/budget/FY2011/FY2011_Operating_Budget.pdf. In March 2009, Governor Pat Quinn reported that "[i]n Illinois, we are facing an $11.5 billion deficit for fiscal years 2009 and 2010." www.state.il.us/budget/FY2010/FY2010_Operating_Budget.pdf.

[29] http://www.chicagotribune.com/news/local/ct-met-state-budget-mess-20100223,0,7172195.story.

Security ("IDES") News Release dated April 15, 2010, the current unemployment rate in Illinois based on March 2010 data is 11.5%.[30]

Given Illinois' higher unemployment rate than the national rate, the underemployment rate sends the real unemployment rate in Illinois into even higher territory than the 17.5% national underemployment rate.

### 3. The Local Level

Moving to the local level, the economic conditions are bleak. According to the IDES, unemployment in Chicago was at 12.3% (based on January 2010 data) and now is at 11.9% (based on February 2010 data).[31] It has been reported that the Chicago Public Schools face up to a $1 billion budget deficit for next year — the result being a potential layoff of 4,000 to 5,000 teachers.[32] On February 7, 2010, the Chicago Transit Authority laid off over 1,000 employees in the face of a $95.6 million budget deficit which could not be closed through concession bargaining or outside funding, resulting in corresponding cuts in bus service by 18% and rail service by 9%.[33]

As the term of the 2003-2007 Agreement came to an end and in the years following that expiration, the City's fiscal problems grew. "On July 31, 2006, the City announced a preliminary shortfall in the corporate fund of $64.5

---

[30] Currently reported at http://www.ides.state.il.us/economy/cps.pdf. Some metropolitan areas in Illinois are over the 20% unemployment level. For example, the Rockford metropolitan area is currently reported to have a 20.7% unemployment rate (not seasonally adjusted). *See* http://lmi.ides.state.il.us/download/LAUS_YTD_CITY.pdf.

[31] Currently reported at http://lmi.ides.state.il.us/download/LAUS_YTD_CITY.pdf. These percentages are not seasonally adjusted.

[32] http://www.chicagotribune.com/news/education/ct-met-chicago-school-cuts-20100225,0,5046378.story; Tr. 157-158.

[33] *See* my award in *Chicago Transit Authority and Locals 241 and 308, Amalgamated Transit Union*, Grv. Nos. 1209-04, etc. (2010 Layoffs) (February 3, 2010), http://www.atu241chicago.org/site/files/635/42087/328812/451620/CTA_2010_Layoffs_Award.pdf; *Daily Labor Report* (BNA, February 5, 2010); City Exh. 24.

million for 2007 ... [o]n July 30, 2007, the City announced a preliminary short-fall in its corporate fund of $217.7 million for 2008 ... [o]n August 14, 2008, the City announced a preliminary shortfall in its corporate fund of $420.0 million for 2009 ..." and on July 30, 2009, the City announced that "[f]or fiscal year 2010, the Office of Budget and Management anticipates a shortfall of $519.7 million in the corporate fund."[34]

According to the City's Chief Financial Officer, Gene Saffold, City operations are funded and financed through the City's corporate fund.[35] Saffold explained that for 2008, 2009 and 2010, several large revenue streams flowing into the corporate fund from utility, sales, transaction and income taxes along with non-tax revenues fell far below budgeted expectations for the totality of those years:[36]

| Source | 2008 | | | 2009 | | | 2010 | |
|---|---|---|---|---|---|---|---|---|
| | 2008 Budget | Year-End Actuals | Variance from 2008 Budget | 2009 Budget | Year-End Estimate | Variance from 2009 Budget | 2010 Budget | Variance from 2009 Year-End Estimate |
| Utility Tax | 500.1 | 524.8 | 24.7 | 523.3 | 491.9 | (31.4) | 479.8 | (12.1) |
| Sales Tax | 570.6 | 518.1 | (52.5) | 547.5 | 485.4 | (62.1) | 460.4 | (25.0) |
| Transaction Tax | 332.9 | 245.1 | (87.8) | 257.3 | 175.1 | (82.2) | 172.7 | (2.4) |
| Income Tax | 390.8 | 378.5 | (12.3) | 362.0 | 277.1 | (84.9) | 210.3 | (66.8) |
| Non-Tax Revenue | 898.8 | 814.0 | (84.8) | 888.9 | 773.2 | (115.7) | 773.7 | 0.5 |

---

[34] City Exhs. 28 at 8, 29 at 8, 27 at 8 (City Budgets); City Exh. 38 at 1 (Office of Budget and Management report of balance sheet summary).

[35] Tr. 169.

[36] City Exh. 2 at p. 18 (in millions); Tr. 171-178.

As described in its brief, the City responded to the fiscal crisis it faced with a series of expansive cost-cutting and revenue raising moves.[37]

During 2007, the City suspended new hiring across all non-public safety departments, implemented a 2% reduction in non-personnel spending, required one to two non-paid furlough days for non-represented employees (depending on their salaries), suspended all non-emergency overtime not directly related to public safety and imposed further restrictions on travel.[38]  In the 2007 budget, the City forecasted a 3.1% increase in revenue, but the year end actuals turned out to be a 0.3% decrease from the prior year.[39]

During 2008, the City raised property taxes, imposed a higher "911 surcharge", increased taxes on alcohol, imposed a tax on bottled water, increased the lease transaction tax and imposed a new planned development review fee. The City also restructured debt and interest rate transactions, renegotiated contracts, eliminated wage increases for non-represented employees, implemented a 3% reduction in non-personnel spending, accelerated enforcement and debt collection plans, consolidated departments, eliminated vacancies in non-critical positions, closed tax loopholes, optimized the sale of City-owned property, transferred in money from non-recurring revenue sources (mostly borrowing from the reserves established with asset lease proceeds), froze hiring and cut positions.[40]  The City also implemented further cost cutting efforts, required two to three non-paid furlough days for non-represented employees (again, depending on their salaries) and implemented six government shutdown

---

[37] City Brief at 13-29.

[38] City Exh. 31 at 1-2, 8.

[39] City Exh. 32.

[40] City Exhs. 2 at 18-19;  27 at 8, 11; 31 at 1-2 ,10, 65; 33, 34.

days (beginning in 2008 and continuing into 2009) for all employees in non-public safety positions.[41] AFSCME represents the largest unit of civilian personnel (approximately 4,000 employees) and the Coalition of Unionized Public Employees ("COUPE") represents the City's 26 trades unions (approximately 7,200 employees).[42] COUPE, AFSCME and other civilian bargaining units agreed to the shutdown days as a way of limiting layoffs in those units and, as a result, many employees were required to take six unpaid days and still, 433 employees were laid off.[43]

In 2009 and as the brunt of the recession set in, the City took further steps to meet its increasing deficits. The City again borrowed from reserves generated by asset lease proceeds, there were more management initiatives and revenue increases (debt restructuring, reorganization and consolidation of departments, curtailment of police hiring, line item reductions in non-personnel spending, further acceleration of debt collections, increased parking and amusement taxes, increased user and permit fees, cuts of positions) and the previously announced government shutdown days.[44]

As 2009 moved into 2010, more management initiatives were implemented (debt restructuring and interest rate transactions, fuel cost budgeting, spending reductions, renegotiation and auditing of contracts and unemployment insurance savings and borrowing from reserves).[45] Further, in addition to the government shutdown days, 3,600 non-represented employees were re-

---

[41] City Exhs. 34, 35.

[42] City Exh. 11.

[43] City Exhs. 34, 36, 37.

[44] City Exhs. 2 at 18, 20; 9 at 65; 27 at 2, 8-13; 35; 36; 39; 40; 49.

[45] City Exhs. 9 at 6; 28 at 32; 38; 39; 31; 42; 45; 46; 47.

quired to take seven unpaid furlough days (for all employees earning $35,000 or more), unpaid holidays from May 7, 2009 forward and compensatory time in lieu of overtime compensation.[46]  For 2009, non-represented employees were required to take 15 unpaid days amounting to an approximate 6-10% wage cut.[47]

The effects of the recession and the City's budget deficits caused represented employee bargaining units into concession bargaining and layoff positions.  In July 2009, all COUPE units (excluding Teamsters Local 726) received a no layoff guarantee from the City through July 2011 in exchange for the wavier of all paid holiday provisions in their contracts (except for Labor Day), reduction of the regular work week by two hours (which resulted in approximately 25 unpaid days for that approximate two year period) and compensatory time in lieu of overtime compensation, which all amounted to an approximate pay cut of 51 days, or 9% of their wages.[48]  Public Safety Unit II (which includes employees represented by SEIU Local 73 and IBEW Local 21) also reached an agreement with the City on concessions.  AFSCME and Teamsters Local 726 did not agree to concessions to their contracts.  As a result, on July 18, 2009, 290 AFSCME represented employees were laid off, and 141 Teamsters were "returned to the pool."[49]

For 2010, the City borrowed more money from its reserves, cut further vacancies from the budget, engaged in further debt restructuring, reduced non-personnel costs and contracted services and closed certain soon-to-expire Tax

---

[46] City Exhs. 39, 48.

[47] *Id*.

[48] City Exhs. 9 at 6; 40; 48.

[49] City Exh. 9 at 2, 6, 76.

Increment Financing ("TIF") districts.[50]  Further, non-represented employees forfeited wage increases.[51]  During 2010, non-represented employees will be required to take 12 unpaid furlough days and 12 unpaid holidays.[52]  Finally, for 2010, in an effort to avoid further economic hardship on the citizens of the City, there are no scheduled property tax increases or new tax, fine, or fee increases.[53]

Notwithstanding all of the above (and for obvious reasons requiring the maintenance of safety and protection of the public), public safety employees — *i.e.,* police and fire — have *not* been impacted in terms of the kinds of concessionary cuts and layoffs experienced by other represented and non-represented employees.  The contractual benefits for police and fire employees remain in place as negotiated in their collective bargaining agreements.

With all of the above, the parties are expected to negotiate a complex, multi-year collective bargaining agreement covering so many employees, having so many cost ramifications and still satisfy the desires of all of those who are covered by the Agreement and all of those who must pay for the benefits imposed by the Agreement (who themselves, are feeling the effects of the recession).  And the parties are expected to do so in these kinds of conditions when their negotiations began before the economic crash and continued into such unpredictable times during such a hard-hitting recession.  To any objective observer, that is a remarkably daunting task — perhaps an impossible one.

---

[50]  City Exhs. 2 at 21-22; 9 at 2-4, 6; 38 at 1, 6.

[51]  City Exhs. 2 at 21; 9 at 6.

[52]  City Exh. 53.

[53]  City Exhs. 2 at 21; 9 at 1.

However, it is against this backdrop of a crashed economy struggling to regain its footing that this award must be decided.

## VI. RESOLUTION OF THE DISPUTED ISSUES

### 1. Duration

The parties agree that the new Agreement shall commence on July 1, 2007. However, the Lodge seeks a four year term while the City seeks a five year term.[54]

The Lodge asserts that "... this is not the time for a five year collective bargaining agreement and that is because this is a very dynamic economy."[55] The Lodge also points to several of my previous awards issued as the recession reared its head and my stated desired approach expressed in those awards for setting shorter lengths for contracts in this stressed economic period.[56] *See State of Illinois Department of Central Management Services (Illinois State Police) and IBT Local 726*, S-MA-08-262 (January 27, 2009) ("ISP" or *"Illinois State Police"*); *Boone County, supra; North Maine Fire Protection District and North Maine Firefighters Association* (September 8, 2009) ("*North Maine*"); and *State of Illinois Department of Central Management Services (Department of Revenue Illinois Racing Board) and AFSCME,* Arb. No. 5637, 6263-0104-09, (372986) (September 14, 2009) ("*Racing Board").*

The Lodge's reading of those awards is correct. For reasons stated in those awards issued after the economy went sour in September 2008 and due

---

[54]  Lodge Offer at 1-2; Lodge Brief at 21-27; City Offer at Tab A (p. 1), Tab B (p. 1); City Brief at 29-31.

[55]  Tr. 8.

[56]  Lodge Brief at 21-22.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 20

to the uncertainties of present and future economic conditions, my personal preference in these cases is to opt for shorter term contracts or to impose re-openers in the out years. *See Boone County, supra* at 14-16:

> From a bargaining standpoint, it would seem that a rational way for employers and unions to approach these uncertain times is something I discussed in my award in *ISP* at 21 [footnote omitted]:
>
>> Perhaps a cautious and practical way to approach negotiations and interest arbitrations in these uncertain and changing times is for parties to negotiate reopeners on economic items or to tie reopeners to triggers in the out years of agreements — *i.e.*, if changes in the cost-of-living or insurance costs occur, the parties have the option to reopen agreed upon provisions mid-term during the period of a contract. With negotiated reopeners, the parties can then assess the situation as the economy changes rather than project years out into the future with fixed obligations having no idea what the economic conditions will be. ....
>
> * * *
>
> In ordinary times, especially where, as here, the parties have engaged in extensive bargaining and ended up in interest arbitration, I have usually opted for longer contracts. The rationale behind that has been simple. First, by the time the interest award issues, a shorter contract would only have the parties back at the table — often in very short order — and the shorter contract only serves to perpetuate a failed experience at negotiating a contract which resulted in the impasse and interest arbitration. The parties typically need some breathing room. Second, the parties often negotiate operational changes (*e.g.*, changes in scheduling, selection procedures, hours of work, grievance procedures, etc.) and longer contracts allow those changes to be implemented and for the parties to see if the changes operate as they anticipated.
>
> But here, the longer duration sought by the Employer will not work. The predecessor Agreement (2004-2007) was for three years. The establishment of a shorter contract as sought by the FOP is particularly warranted given the uncertainty of the current volatile economic conditions. It seems in this case to make more sense for the parties to get back to the bargaining table sooner rather than later so that they can address their constituents' needs which certainly cannot be predicted at this precarious time. While this may not explicitly be the reopener approach to deal with the current economic conditions I suggested in *ISP* at 21, the effect of terminating the Agreement in 2010 as urged by the FOP rather than 2011 as urged by the Employer may well have the same effect. With a 2010 expiration, the parties will have to sit down next year and see where they and the economy are at. Therefore, as urged by the FOP, the Agreement shall be for three years for a term from December 1, 2007 through November 30, 2010.

*See also*, *Racing Board* at 18-19:

> I could not impose reopeners in *Illinois State Police, Boone County and North Maine*. Section 14(g) of the IPLRA limited me in each case to selection of one of the parties' final offers — and reopeners were not on the plate. But I do *not* have that restriction in this case. And given the discussion above, the ability to reopen is mutually beneficial to the parties to allow them to assess the ... [Racing Board]'s fiscal situation and the realities of the economy at some point in the not too distant future.

The City argues that if a four year Agreement is imposed as sought by the Lodge, the effect will be that "... the parties will have engaged in negotiations for nearly three years by the time the award is presented to City Council for ratification ... [and u]nder the Lodge's proposal [for a four year term], the parties will hastily return to the bargaining table in less than one year ...."[57]

For reasons stated in my prior awards quoted above and to deal with the uncertainty of the economic landscape, my personal preference remains for short term agreements or reopeners in the out years. In the context of this case, if I imposed my personal preferences on the parties, I would have either terminated this Agreement in 2010 (with a resulting three year contract), or I would have imposed wage and benefit reopeners for years after 2010 (more likely, the latter). With that result and consistent with my prior discussions about setting terms of contracts in uncertain times, the parties could then be in negotiations with a better view of what the economy actually looks like and what the City's financial condition actually is at that future time.

But it is not my function to impose my personal preferences on the parties for what I think is best for them. The parties know the dynamics of their relationship far better than I do.

Here, the parties have *both* structured their proposals for what I consider to be a lengthy contract in these uncertain economic times — four years as

---

[57] City Brief at 30.

proposed by the Lodge (ending June 30, 2011) and five years as proposed by the City (ending June 30, 2012).  And, as discussed immediately *infra* at VI(2), in their proposals and notwithstanding the uncertain economic situation, both parties seek fixed wage rates for the out years of the Agreement and do not seek reopeners.  What this shows me is that the parties have a mutual understanding that they have a very complex relationship with a lengthy negotiating process for achieving new contracts.  That is understandable given the number of employees involved and the types of issues which present themselves in an organization as large, complex and diverse as the Chicago Police Department.[58] To me and given the parties' complex relationship with its lengthy negotiating process, this all translates into an agreement between the parties that my personal preferences for short term agreements or reopeners in the out years just will not work for these parties and this relationship.  That being the case, I cannot impose my personal preferences for shorter contracts or reopeners in the out years on these parties.  Section 14(h)(2) of the IPLRA provides that "[s]tipulations of the parties" be considered by interest arbitrators.  The parties'

---

[58]  Just looking back at the process leading to the 2003-2007 Agreement makes that point. The predecessor Agreement to that contract expired June 30, 2003.  The *2003-2007 Award* setting the terms for the 2003-2007 Agreement issued February 28, 2005.  After the *2003-2007 Award* issued on February 28, 2005, on March 9, 2005, the City Council was presented the terms of the 2003-2007 Agreement as established by the *2003-2007 Award*.  *See* http://egov.cityofchicago.org:80/city/webportal/portalDeptCategoryAction.do?deptMainCategoryOID=-536882045&deptCategoryOID=-536892814&entityName=Mayors+Office&topChannelName=Dept&contentType=COC_EDITORIAL&Failed_Reason=Session+not+found&com.broadvision.session.new=Yes&Failed_Page=%2fwebportal%2fportalDeptCategoryAction.do (for the proceedings of the March 9, 2005 meeting) and http://egov.cityofchicago.org:80/webportal/COCWebPortal/COC_EDITORIAL/FOPCBAord.ht (for the introduction of the 2003-2007 Agreement as an ordinance).   Therefore, the negotiation, arbitration and City Council ratification process for the 2003-2007 Agreement lasted  over 21 months after the predecessor Agreement expired on June 30, 2003.  *See also*, Lodge Brief at 23 (showing a table of durations of prior Agreements).  And when the terms of the 2003-2007 were negotiated, arbitrated and passed upon by the City Council, the economy was nowhere near the dire conditions now facing the parties as they attempted to formulate this Agreement.

mutual position that a multi-year agreement with fixed increases extending out at least through June 2011 (under the Lodge's proposal) is, for all purposes a "stipulation". In this case, I will therefore defer to that stipulation.

Given the parties' desires for something other than a short term Agreement or one with reopeners in the out years, the City's position that the term of the Agreement should be for five years makes the most sense. The 2003-2007 Agreement expired June 30, 2007. By the time the City Council gets to consider the terms of this Agreement, the process of finally setting the terms for this Agreement will have extended out approximately three years past the expiration of the 2003-2007 Agreement. Given the complexity of this relationship, if the Agreement expires on June 30, 2011 as the Lodge proposes, the parties will have to soon thereafter return to the bargaining table to begin discussing the many issues between them at a time relatively shortly after the Agreement is passed upon by the City Council.[59] Given the complexity of the parties' relationship and the length of time it takes to negotiate contracts between these parties, I agree with the City that the parties will need some breathing space. A longer contract term as requested by the City should not result in that great a degree of sending the parties into a no-man's land with respect to the uncertain economy (which had been the underlying rationale for my preference for

---

[59] Tr. 265:

> MR. FRANCZEK: ... Under the speediest of schedules, getting this finished and in place any sooner than June or July or August of this year would be nothing short of herculean. That gives you two years to go on this collective bargaining agreement.
>
> Under our agreement negotiations would begin in February of the year, so we are talking February 2012 of having negotiations begin. Basically an 18, 19 month period of time. To accelerate that as the Lodge proposes from February or March of 2012 to February or March of 2011, a mere year -- less then a year away from right now ... [is] going to lead to more instability, it's going to lead to more friction and more problems.

shorter contracts or reopeners in the out years). Even with a five year Agreement as requested by the City, by the time the Agreement passes scrutiny by the City Council and given the July 1, 2007 effective date of the Agreement, 60% of the Agreement will have run its course by the time it is ratified. A five year term as requested by the City is therefore in order.

The Lodge argues that a five year Agreement is unprecedented between the parties.[60] The Lodge is correct. As the Lodge points out, the longest contract period between the parties has been for four years.[61] But while a five year Agreement may be unprecedented between the parties, these are unprecedented economic times compared to the years the parties have had contracts (beginning in 1981).[62] Balanced against the above reasoning leading to a conclusion that a five year Agreement is appropriate, the unprecedented length of the Agreement does not change the result. However, because of the unique times facing the parties, the fact that a five year Agreement has been found appropriate in this case cannot be used for precedential value in future negotiations or interest arbitrations *per se* and must be considered in the context of the rationale set forth in this award.

The City's proposal on duration is accepted. The Agreement will therefore be for the period July 1, 2007 through June 30, 2012.

---

[60] Lodge Brief at 21.

[61] Lodge Brief at 23 (1995-1999; 1999-2003; and 2003-2007). The shortest Agreement was for 18 months (the parties' first Agreement). *Id.*

[62] *Id.*

### 2. Wages

#### A. The Offers

For wages, the parties made the following offers:[63]

| Effective Date | Lodge Offer | City Offer |
|:---:|:---:|:---:|
| 7/1/07 | 3.00% | 1.00% |
| 1/1/08 | 4.25% | 1.00% |
| 1/1/09 | 4.00% | 0.00% |
| 1/1/10 | 4.00% | 0.00% |
| 1/1/11 | 4.00% | 1.00% |
| 1/1/12 | | 2.00% |
| Total | 19.25% | 5.00% |

#### B. The Use Of Comparables

For establishing terms and conditions of collective bargaining agreements, Section 14(h) of the IPLRA lists eight factors for consideration by interest arbitrators. Although there are eight statutory factors with no factors receiving more weight from the language of the statute, prior to 2009, parties in interest arbitrations and interest arbitrators — including the undersigned — typically placed great weight on the comparability factor found in Section 14(h)(4) of the IPLRA.[64] And prior to 2009, that is how the majority of these

---

[63] Lodge Offer at 2; Lodge Brief at 28-38; City Offer at Tab A (p. 1), Tab B (p. 2); City Brief at 31-41.

[64] *See* Benn, "A Practical Approach to Selecting Comparable Communities in Interest Arbitrations under the Illinois Public Labor Relations Act," Illinois Public Employee Relations Report, Vol. 15, No. 4 (Autumn 1998) at 6, note 4 [emphasis added]:
    ... The parties in these proceedings often choose to give comparability the most attention. *See* Peter Feuille, "Compulsory Interest Arbitration Comes to Illinois," Illinois Public Employee Relations Report, Spring, 1986 at 2 ("Based on what has happened in other states, most of the parties' supporting evidence will fall under the comparability, ability to pay, and cost of living criteria. ... *[o]f these three, comparability usually is the most important*.").

cases were litigated, with most attention — and sometimes all of the arguments — focused on comparability.

"Wisdom too often never comes, and so one ought not to reject it merely because it comes late."[65]  It is fair to conclude that prior to 2009, few in this area of practice — public administrators, union officials, advocates and neutrals — could have foreseen the drastic economic downturn we are now going through and then try to reconcile those conditions with the way parties present interest arbitrations and how neutrals decide those cases based wholly or partially on the comparability factor.  That became readily apparent to me when I was asked to use comparable communities as a driving factor in cases decided after the economy crashed, but where the contracts in the comparable communities had been negotiated prior to the crash.  I found that I just could not give the same weight to comparables as I had in the past.  Given the drastic change in the economy, looking at those comparable comparisons became "apples to oranges" comparisons.  *See North Maine, supra* at 12-13:

> Citation is not necessary to observe that, in the public sector, the battered economy has caused loss of revenue streams to public employers resulting from loss of tax revenues as consumers cut back on spending or purchasing homes and there are layoffs, mid-term concession bargaining and give backs (such as unpaid furlough days which are effective wage decreases).  But the point here is that it still just does not make sense at this time to make wage and benefit determinations in this economy by giving great weight to comparisons with collective bargaining agreements which were negotiated in other fire protection districts at a time when the economy was in much better condition than it is now. There is no doubt that comparability will regain its importance as other contracts are negotiated (or terms are imposed through the interest arbitration process) in the period after the drastic economic downturn again allowing for "apples to apples" comparisons.  And it may well be that comparability will return with a vengeance as some public employers make it through this period with higher wage rates which push other employee groups further behind in the comparisons, leaving open the

---

[65]  *Henslee v. Union Planters National Bank & Trust Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, dissenting).

> possibility of very high catch up wage and benefit increases down the line. But although the recovery will hopefully come sooner than later, that time has not yet arrived. Therefore, at present, I just cannot give comparability the kind of weight that it has received in past years.

> Instead of relying upon comparables, in *ISP* and *Boone County*, I focused on what I considered more relevant considerations reflective of the present state of the economy as allowed by Section 14(h) of the Act — specifically, the cost of living (Section 14(h)(5)) as shown by the Consumer Price Index ("CPI").

For the same reasons, I cannot give determinative weight to the comparables identified by the Lodge. Many of the contracts from other large cities which the Lodge asks me to consider were negotiated by those parties or were implemented through arbitrations prior to or just after the economy began its substantial downward spiral in late 2008 and at the beginning of 2009.[66] Specifically, according to the Lodge's exhibits, it appears that Detroit, Houston, New York, Phoenix, San Antonio and San Diego reached agreement or had conditions imposed prior to late 2008 when the economy began to crash.[67] Los Angeles and Philadelphia had some changed conditions in those agreements in October and December 2009, respectively.[68]

In ordinary times, examination of the police contracts in those cities would be appropriate. However, based on when the contractual terms were formulated for most of those cites, clearly, there is not yet a sufficient baseline formed by enough contracts negotiated after the downturn in the economy for me to make relevant "apples to apples" comparisons. I have no doubt that

---

[66] *See* Lodge Exh. 27(a)(1); Tr. 28-29, 39-40; Lodge Brief at 34-35.

[67] Lodge Exh. 27(a)(1).

[68] *Id.* Dallas was also listed as a comparable by the Lodge. However, according to the Lodge, there was a 5% increase in the Dallas contract for 2009, but that "... represents a restructuring, basically a position upgrade for the ten year officers and that was done after September of 2008." Tr. 40. That restructuring for a limited amount of officers does not change the conclusion that, overall, the comparables I have been asked to look at still yield "apples to oranges" comparisons.

comparability will return as a relevant factor in these types of proceedings. But for now, in my opinion, the more relevant factors to be considered are those that are reflective of today's economic conditions.

But before leaving comparability, one final finding must be made. My conclusion in this case — *i.e.*, that comparisons to comparable communities are not appropriate for the reasons set forth above — is without prejudice to either party's ability to advance comparability arguments in future negotiations and interest arbitration proceedings. For example, during the next round of negotiations or any interest arbitration, the Lodge retains the right to argue that its members are entitled to above average or "catch up" wage increases to restore whatever differentials or rankings it believes have been compromised by this award or that the then current wage rates should be not considered the *status quo* given the unique circumstances of this case. Likewise, the City retains the right to argue that above average or "catch up" wage increases are not appropriate based on comparability or other relevant factors. For me, and for the time being, this economic downturn has merely caused a hiatus in the use of the comparability factor. That is how I believe comparability should be approached for the present and that is how I have ruled in other awards decided in this recession. *See ISP, supra* at 22:

> My selection of the ISP's offer for the 2008-2012 Agreement is without prejudice to the Union's ability to make similar comparability arguments in future interest arbitration proceedings. I have not addressed the merits of the Union's comparability arguments in this case. I have neither rejected or accepted the Union's positions. I have only found that even assuming the Union's comparability arguments are strong, the other factors relied upon by me dictated by the economy outweigh the Union's arguments in this most extraordinary set of circumstances and uncertain economic times. The rank differential percentages imposed in this case are therefore not the *status quo* for future interest arbitration proceedings. Should the Union choose, it is free to make the same comparability arguments in some future proceeding and not have the fact that those

> arguments did not carry the day in this proceeding used against it in any fashion.

And again, *see North Maine, supra* at 13 ("[a]nd it may well be that comparability will return with a vengeance as some public employers make it through this period with higher wage rates which push other employee groups further behind in the comparisons, leaving open the possibility of very high catch up wage and benefit increases down the line."). In future negotiations, these parties will be able to freely argue the role comparability has or does not have in their relationship. However, until the economic waters calm once again allowing for realistic comparisons to be made with other large cities, no party in this proceeding should be prejudiced in the future by the outcome of this proceeding.

### C. The Cost-Of-Living And Inflation

Under Section 14(h)(5) of the IPLRA, one of the factors interest arbitrators should consider is "[t]he average consumer prices for goods and services, commonly known as the cost of living." The BLS defines the Consumer Price Index ("CPI") as "... a measure of the average change in prices over time of goods and services purchased by households."[69]

So what has happened to the CPI since the 2003-2007 Agreement expired? According to the BLS, since July 2007 (when this Agreement takes effect) up through March 2010, the changes in the CPI-U (not seasonally adjusted) are as follows:[70]

---

[69] http://www.bls.gov/news.release/archives/cpi_04142010.pdf at p. 5.

[70] http://data.bls.gov/cgi-bin/surveymost?cu. By accessing that website for the BLS data bases, the latest CPI comparisons can be accessed through designation of year ranges for U.S. All items, 1982-84=100, retrieving the data and then, if further specificity is desired, by using the link to "more formatting options" and again retrieving the data.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 30

**CPI From 2007 To The Present**

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 2007 | 202.416 | 203.499 | 205.352 | 206.686 | 207.949 | 208.352 | 208.299 | 207.917 | 208.490 | 208.936 | 210.177 | 210.036 |
| 2008 | 211.080 | 211.693 | 213.528 | 214.823 | 216.632 | 218.815 | 219.964 | 219.086 | 218.783 | 216.573 | 212.425 | 210.228 |
| 2009 | 211.143 | 212.193 | 212.709 | 213.240 | 213.856 | 215.693 | 215.351 | 215.834 | 215.969 | 216.177 | 216.330 | 215.949 |
| 2010 | 216.687 | 216.741 | 217.631 | | | | | | | | | |

**CPI Month-To-Month Percentage Change 2007 To The Present**

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 2007 | 0.3 | 0.5 | 0.9 | 0.6 | 0.6 | 0.2 | 0.0 | -0.2 | 0.3 | 0.2 | 0.6 | -0.1 |
| 2008 | 0.5 | 0.3 | 0.9 | 0.6 | 0.8 | 1.0 | 0.5 | -0.4 | -0.1 | -1.0 | -1.9 | -1.0 |
| 2009 | 0.4 | 0.5 | 0.2 | 0.2 | 0.3 | 0.9 | -0.2 | 0.2 | 0.1 | 0.1 | 0.1 | -0.2 |
| 2010 | 0.3 | 0.0 | 0.4 | | | | | | | | | |

## 1. Why The Parties' Offers Are Not Appropriate

Based on the above data from the BLS, since the 2003-2007 Agreement expired on June 30, 2007 and through March 2010, the cost-of-living has increased 4.48%.[71] Further, since January 2009 (with the exception of July and December 2009), there has been a steady increase in the month-to-month comparisons. If that pattern continues, the City's offer for a 5% increase from July 1, 2007 through June 30, 2012 will be consumed by the cost-of-living increases in the very near future. On the other hand, the Lodge's offer of 19.25% (which only goes through June 30, 2011) far outpaces the modest increases in the cost-of-living as the economy begins to show what now appears to be indications of a sluggish recovery. For these reasons alone, both offers must be rejected because they bear no rational relationship to the cost-of-living increases we are now seeing.

---

[71] According to the BLS and as shown by the tables, in July 2007, the CPI-U stood at 208.299. As of the April 14, 2010 release of data by the BLS quoted above which reported data as of March 2010, the CPI-U stood at 217.631 — a 4.48% increase (217.631 - 208.299 = 9.332. 9.332 ÷ 208.299 = 4.48%).

However, aside from those general observations, the parties' offers need more detailed scrutiny for my conclusion that the wage package offers from both sides are not appropriate.

### (a). The Lodge's Wage Offer

The Lodge's wage offer is 19.25% for four years (and not for a five year period as found appropriate).

When looking at wage increases, the flat percentage number for a wage increase is not the real number.

First, wage increases compound. The percentage increase for a designated year is applied to an existing wage rate and then the next percentage increase is then applied to the result of the former increase. Thus, and using Grade 1, Step 4 on the salary schedule as a random example, taking the Lodge's proposed 19.25% wage increase, Grade 1, Step 4 pay will not just increase by 19.25% — it will increase by 20.79%:[72]

**Grade 1**

| | | 3% | 4.25% | 4% | 4% | 4% | | |
|---|---|---|---|---|---|---|---|---|
| Step/Date | 6/30/07 | 7/1/07 | 1/1/08 | 1/1/09 | 1/1/10 | 1/1/11 | Total Inc. | % Inc. |
| 4 After 30 Mos | 61,932 | 63,790 | 66,501 | 69,161 | 71,928 | 74,805 | 12,873 | 20.79% |

Because the same percentage increases are to be applied to all grades and steps across the salary schedule, that 20.79% compounded increase is uniform for the entire bargaining unit's wage structure.

Second, over the life of the Agreement, the vast majority of the bargaining unit will realize a much *greater* increase than even the compounded rate. That is because of the built in step movements in the salary schedule which move

---

[72] The salary schedule from the 2003-2007 Agreement is found at Appendix A of that Agreement (beginning at p. 96). The rates in effect when the 2003-2007 Agreement expired on June 30, 2007 are found at p. 99 — *i.e.*, those resulting from the January 1, 2007 wage increase.

officers into higher paying salary steps based on length of service. Each step movement in-and-of itself results in a wage increase of varying percentages over the lower step. When an officer makes a step movement, the wage increase ultimately found appropriate in this case is also added to the increase resulting from the most recent step movement. The only officers who do not receive step increases are those officers at the highest step level who prior to the effective date of an Agreement have maxed out on the salary schedule — *i.e.,* those officers at Step 10 who have reached 25 years.[73]

As a specific example, under the Lodge's proposal for a four year wage increase of 19.25%, Grade 1, Steps 4-7 will look as follows:

**Grade 1**

|  |  | 3% | 4.25% | 4% | 4% | 4% |  |  |
|---|---|---|---|---|---|---|---|---|
| Step/Date | 6/30/07 | 7/1/07 | 1/1/08 | 1/1/09 | 1/1/10 | 1/1/11 | Total Inc. | % Inc. |
| 4 After 30 Mos | 61,932 | 63,790 | 66,501 | 69,161 | 71,928 | 74,805 | 12,873 | 20.79% |
| 5 After 42 Mos | 64,992 | 66,942 | 69,787 | 72,578 | 75,481 | 78,501 | 13,509 | 20.79% |
| 6 After 54 Mos | 68,262 | 70,310 | 73,298 | 76,230 | 79,279 | 82,450 | 14,188 | 20.79% |
| 7 After 10 Yrs | 70,656 | 72,776 | 75,869 | 78,903 | 82,060 | 85,342 | 14,686 | 20.79% |

An officer at Grade 1, Step 4 will generally make two step movements over the life of the Lodge's proposed four year increases as follows:

**Grade 1 (Moving Through Steps)**

|  | Step |  | 3% | 4.25% | 4% | 4% | 4% | Total |  |
|---|---|---|---|---|---|---|---|---|---|
| Step | Moves | 6/30/07 | 7/1/07 | 1/1/08 | 1/1/09 | 1/1/10 | 1/1/11 | Inc. | % Inc. |
| 4 | 2 | 61,932 | 63,790 | 69,787 | 76,230 | 79,279 | 82,450 | 20,518 | 33.13% |

Thus, under the Lodge's proposal for a 19.25% increase, in just four years there is a compounding effect raising that salary for Grade 1, Step 4 by

---

[73] The salary schedule now has 10 steps reached after 25 years, which was compressed from 11 steps after 30 years effective January 1, 2006 as a result of the *2003-2007 Award*. *Id*. at 28-30.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 33

20.79% and, for this officer experiencing only two moves on the salary sched-
ule, those step movements result in an actual 33.13% increase — again, in just
four years.  That kind of increase in this economy with the City facing the fiscal
hardships discussed *supra* at V(3) which have caused other represented and
non-represented employees to take significant pay cuts (or layoffs) and where
inflation is projected to be minimal in the next few years (*see* discussion *infra*
at VI(2)(C)(1)(b)) just cannot be justified.

Further, this example is for an officer with two step movements over the
life of the four year Agreement requested by the Lodge.  However, officers can
experience more than two step movements in four years, therefore raising their
actual percentage increases even higher than 33.13%.  For example, even un-
der the Lodge's offer for a four year term, there is also the potential for an offi-
cer to make three step movements during that four year period.  Specifically,
an officer at Grade 1, Step 2 when the Agreement expired on June 30, 2007
could experience three step movements under the Lodge's four year proposal.
For that officer, the step movements result in the following:

**Grade 1**

| Step/Date | 6/30/07 | 3%<br>7/1/07 | 4.25%<br>1/1/08 | 4%<br>1/1/09 | 4%<br>1/1/10 | 4%<br>1/1/11 | Total Inc. | % Inc. |
|---|---|---|---|---|---|---|---|---|
| 2 After 12 Mos | 55,728 | 57,400 | 59,839 | 62,233 | 64,722 | 67,311 | 11,583 | 20.79% |
| 3 After 18 Mos | 58,896 | 60,663 | 63,241 | 65,771 | 68,402 | 71,138 | 12,242 | 20.79% |
| 4 After 30 Mos | 61,932 | 63,790 | 66,501 | 69,161 | 71,928 | 74,805 | 12,873 | 20.79% |
| 5 After 42 Mos | 64,992 | 66,942 | 69,787 | 72,578 | 75,481 | 78,501 | 13,509 | 20.79% |

**Grade 1 (Moving Through Steps)**

| Step | Step<br>Moves | 6/30/07 | 3%<br>7/1/07 | 4.25%<br>1/1/08 | 4%<br>1/1/09 | 4%<br>1/1/10 | 4%<br>1/1/11 | Total<br>Inc. | % Inc. |
|---|---|---|---|---|---|---|---|---|---|
| 2 | 3 | 55,728 | 57,400 | 63,241 | 69,161 | 75,481 | 78,501 | 22,773 | 40.86% |

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 34

Again, the conclusion is obvious. In this economy with other City employees taking unpaid furlough days, waived benefits, eliminated wage increases or layoffs and the City making other significant cuts due to the large decreases in its revenue streams, there is no justification for the Lodge's wage offer, which is an offer that increases the wages of an officer who experiences three step movements during the life of the Lodge's four year proposed period to an actual 40.86% wage increase.[74]

### (b). The City's Wage Offer

The City's wage offer also does not work.

As the City recognizes, "[n]ational forecasts are reliable indicators of the local economy ...."[75] According to the City's 2010 Budget:[76]

> ### ECONOMIC DIVERSITY
>
> Chicago's economy is well-diversified, based on data from the U. S. Census Bureau. This helps the City avoid extreme boom-bust cycles that can occur in areas of the country dependent on fewer, cyclical industries. In fact, of the major industry categories, Chicago is within 2.0 percent of the national share of every one except retail trade, where Chicago is 3.0 percent below, and professional and business services, where Chicago is 4.0 percent above. *This also means that, with suitable caution, it is reasonable to look at the directions of national economic forecasts and project then onto the local situation.*

---

[74] The salary schedule provides for a six month stay at Step 2 before an officer moves to Step 3 as compared to the 12 month difference in the other early steps on the salary schedule. Taken to its extreme, a hypothetical officer at Grade 1, Step 2 when the 2003-2007 Agreement expired who has a January 2006 hire date would experience *four* step movements over the life the Lodge's four year wage proposal. That officer would be at Step 2 in January 2007; at Step 3 in July 2007 (the six month step); at Step 4 in July 2008; at Step 5 in July 2009; and at Step 6 in July 2010 — *i.e.*, four step moves during the term of the Lodge's four year proposal (from Steps 2 to 6). That officer's salary would move from $55,728 at the end of the 2003-2007 Agreement to $82,450 by June 30, 2011 — an increase of *47.95%* While taken to the extreme, this example certainly demonstrates what could happen under the Lodge's proposal. That kind of result simply cannot be justified in this City in the present economy.

[75] City Brief at 27, note 28.

[76] City Exh. 9 at 35 [emphasis added].

Christina D. Romer, Chair of the President's Council of Economic Advisors, stated the following in "The Economic Assumptions Underlying the Fiscal 2011 Budget" (February 1, 2010):[77]

> Finally, for the inflation rate (measured using the GDP price index), we project that inflation will be 1 percent over the four quarters of 2010, 1.4 percent over 2011, and 1.7 percent over 2012. These projections are lower than those of some forecasters and higher than others. The low levels of projected inflation reflect the effects of continued high levels of slack in the economy. Under these conditions, *we see little risk of noticeably increased inflation*. At the same time, inflationary expectations appear to be well anchored, and so we do not project rapid declines in inflation or deflation. The Administration anticipates that inflation will level off at 1.8 percent, squarely within the Federal Reserve's long-run projection range of 1.7 to 2 percent.

The Federal Reserve echoes that forecast for little risk of inflation in the next few years. According to the Federal Reserve's press release dated March 16, 2010, with "… longer-term inflation expectations stable, inflation is likely to be subdued for some time."[78]

The City's wage offer first fails because of its proposals for 2009 and 2010 that officers take wage freezes — 0% in both years (a proposal over which the Lodge expressed great offense).[79] According to the Lodge and with respect to the 0% offers made by the City for 2009 and 2010, "… the zero number that the City is proposing … is totally out of line with respect to … inflation."[80] The Lodge is correct.

Looking to what has happened at the national level (which the City concedes should be reflective of the local level), as shown by the CPI data set forth *supra* at VI(2)(C), even though in a recession, in 2009, the CPI went from

---

[77] http://www.whitehouse.gov/sites/default/files/microsites/20100201-cea-statement-economic-assumptions-underlying-fiscal-2011-budget.pdf [emphasis added].

[78] http://www.federalreserve.gov/newsevents/press/monetary/20100316a.htm.

[79] Tr. 16-19.

[80] Tr. 21.

211.143 in January 2009 to 215.949 in December 2009 — an increase of 2.28%. And, based on Chair Romer's predictions for the President's Council of Economic Advisors quoted above that "… we project that inflation will be 1 percent over the four quarters of 2010 …" (which is consistent with the Federal Reserve's general position), the City's proposed wage freezes for 2009 and 2010 run contrary to the City's recognition that "[n]ational forecasts are reliable indicators of the local economy …."[81]

The second reason the City's wage proposal fails is, as noted above, by the time this award is implemented, there will be some two years yet to run on the Agreement. Since the expiration of the 2003-2007 Agreement, the cost-of-living has increased 4.48%. The City's offer for a 5% increase over five years through June 30, 2012 will be consumed by the cost-of-living increases in the very near future. As a result, the wage increases will ultimately fall behind the cost-of-living. Under this analysis, the City's offer is too low.

## 2. The Appropriate Wage Rate

With neither party's wage offer being found appropriate, the question now is what wage rate should be established? I return to the focus on the cost-of-living and the City's appropriate recognition that "[n]ational forecasts are reliable indicators of the local economy …."[82]

The Lodge correctly argues that there are several periods involved in this case — pre-crash and post-crash.[83] That distinction made by the Lodge is reflected in the cost-of-living data. With the exception of minor negative blips in

---

[81] City Brief at 27, note 28.

[82] *Id.*

[83] *See* Lodge Brief at 34. *See also*, Tr. 42.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 37

August and December 2007, from July 2007 (the commencement of this Agreement) through July 2008, the CPI showed steady upward movement.[84] Thereafter, reflecting the downturn in the economy, the CPI plummeted from August 2008 through December 2008 as the country reeled from the crash.[85] From August 1, 2008 to November 20, 2008, the Dow Jones Industrial Index dropped from 11,326 to 7,502 — a decrease of 33.3%.[86] As the recession set in, there was even a fear of "deflation":[87]

> As dozens of countries slip deeper into financial distress, a new threat may be gathering force within the American economy — the prospect that goods will pile up waiting for buyers and prices will fall, suffocating fresh investment and worsening joblessness for months or even years. The word for this is deflation, or declining prices, a term that gives economists chills. ...

Then commencing in January 2009, the CPI showed overall steady (but small) upward movement.[88]

Because of the downturn in the economy which occurred during the relevant periods in this case, it therefore makes sense as the Lodge argues to establish wage rates on a year by year basis, with the further distinctions for pre- and post-crash periods.

### (a). July - December 2007 (Pre-Crash)

The CPI changes from the first contract wage period of July - December 2007 are as follows:

---

[84] *See* CPI tables, *supra* at VI(C)(2).

[85] *Id.*

[86] http://finance.yahoo.com/echarts?s=%5EDJI#chart1:symbol=^dji;range=2y;indicator=volume;charttype=line;crosshair=on;ohlcvalues=0;logscale=on;source=undefined. The DJI eventually hit 6,547 on March 9, 2009 — a decline of 42.1% from August 1, 2008.

[87] Goodman, "Fear of Deflation Lurks as Global Demand Drops", New York Times (October 31, 2008); http://www.nytimes.com/2008/11/01/business/economy/01deflation.html.

[88] *See* CPI tables, *supra* at VI(2)(C).

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 38

**July - December 2007 CPI (Pre-Crash)**

| Jul | Aug | Sep | Oct | Nov | Dec |
|-----|-----|-----|-----|-----|-----|
| 208.299 | 207.917 | 208.490 | 208.936 | 210.177 | 210.036 |



For the period July through December 2007, the CPI increased from 208.299 to 210.036 — approximately 1%. For the first contract wage period of July - December 2007, the CPI change is therefore (and consistent with the City's wage offer for that period) a 1% increase. That 1% increase shall be selected for this period.

### (b). January - December 2008 (Pre- and Post-Crash)

The second contract wage period is for January through December 2008. This contract wage period covers both pre- and post-crash periods as shown by the CPI data:

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 39

**January - December 2008 CPI (Pre- and Post-Crash)**

| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 211.080 | 211.693 | 213.528 | 214.823 | 216.632 | 218.815 | 219.964 | 219.086 | 218.783 | 216.573 | 212.425 | 210.228 |



The crash really begins to reflect in the CPI data beginning in October 2008 when the CPI dipped from 216.573 in October to 212.425 in November (and then in December 2008 down to 210.228). If the entire year is examined, then the CPI went into negative territory (going from 211.080 in January 2008 to 210.228 in December 2008). In my opinion, that is not an appropriate way to look at the data. The reality is that for nine months from January through September 2008 — *i.e.*, most of the year — while there was a beginning of a slight downward movement in the CPI commencing in August 2008, the real downward movement reflecting the crash did not begin until the drop in October when the CPI for September 2008 went from 218.783 to 216.573 in October (and then ultimately spiraled downward to 210.228 in December). To me, because of its duration, that nine month period is the relevant period that

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 40

should be given more weight for determining the appropriate wage increase for 2008. Thus, for the first nine months of 2008, the officers faced an inflationary growth in the CPI going from 211.080 in January 2008 to 218.783 in September 2008 — a 3.6% increase.

But the period from October to December 2008 when the CPI moved downward from 216.573 to 210.228 cannot be ignored. That is a 3% decline. However, that decline was only for three months. Balancing the increase which occurred in the CPI over the first nine months of 2008 of 3.6% against the subsequent decline in the last three months leads me to a finding that the appropriate wage increase for 2008 should be 3.0%.

### (c). January - December 2009 (Post-Crash)

The third contract wage period is for January through December 2009. This contract wage period is post-crash. The CPI during this period is as follows:

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 41

**January - December 2009 CPI (Post-Crash)**

| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 211.143 | 212.193 | 212.709 | 213.240 | 213.856 | 215.693 | 215.351 | 215.834 | 215.969 | 216.177 | 216.330 | 215.949 |



What appears evident is that, although not at a significant rate, there is an inflationary upward movement beginning in January 2009 and continuing through the end of the 2009. From the above, it would appear that a 2.28% wage increase would be appropriate to reflect the CPI movement from 211.143 to 215.949. However, this is obviously not an exact science, but an effort to come to a reasonable decision on the formulation of a wage rate based upon sometimes imprecise figures and projections. I return to the discussion *supra* at V(3) concerning the overall financial difficulties now facing the City. In 2009, the City really began to feel the impact of the recession as revenue streams suffered overall remarkable decreases — which is reflected by a projected $107.5 million negative variance from the budgeted forecast for 2009.[89]

---

[89] City Exh. 2 at p. 18 (summarizing the revenues in the City's corporate fund).

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 42

2009 was also the year of the layoffs and concessions granted by other unions, the continued imposition of unpaid furlough days on non-represented employees and shutdowns. Balancing the financial difficulties facing the City in 2009 against what appears to be a small inflationary upward movement reflected in the CPI, a wage increase for 2009 should not match the CPI changes, but should be lower. For those reasons, the wage increase for 2009 shall be 2.0%

### (d). January 2010 - June 30, 2012 (Post-Crash)

As of this writing, the only cost-of-living data available is for the very beginning of 2010. Because the Agreement will extend out until June 30, 2012, at this point, the analysis becomes somewhat speculative as projections are needed. These kinds of projections are difficult to make in a stable economy. Given the uncertainty of the economy and the hoped for recovery, the making of projections out for over two years into the future becomes all the more difficult to accomplish.

However, there is a somewhat reliable source to look to for making the projections — again, the federal government as it is so actively trying its best to turn this recession around and through the forecasting of the President's Council of Economic Advisors.

According to the President's Council of Economic Advisors in "The Economic Assumptions Underlying the Fiscal 2011 Budget", *supra*, "... we project that inflation will be 1 percent over the four quarters of 2010, 1.4 percent over 2011, and 1.7 percent over 2012."[90]  Applying those projections for 2010, 2011

---

[90]  http://www.whitehouse.gov/sites/default/files/microsites/20100201-cea-statement-economic-assumptions-underlying-fiscal-2011-budget.pdf.

and the first half of 2012 (until the Agreement expires) yields the following inflationary projections for those periods:[91]

| Period | Council of Economic Advisors Inflation Forecast |
| --- | --- |
| January - December 2010 | 1.00% |
| January - December 2011 | 1.40% |
| January - June 2012 | 0.85% |

We are already into 2010 and have seen an upward movement of the CPI in March 2010 from January 2010 of 0.4%.[92] Noting that February 2010 showed no increase over January 2010, the federal government's forecast for inflation to be in the 1% area by the end of 2010 appears to be generally on track (particularly since there was no change in the monthly increase from January to February 2010).[93] The forecasted 1% increase in 2010 is therefore, in my opinion, sufficiently reliable to conclude that a 1% wage increase is appropriate for 2010.

For 2011, the Council of Economic Advisors forecasts a 1.4% increase in inflation. As we get further out into the future, no one can really expect that type of pinpoint accuracy for the end of 2011 (a time approximately one and three-quarters years from now) — even from the Council of Economic Advisors. That lack of pinpoint accuracy in forecasting is a fair conclusion particularly given the current state of the economy as it struggles with fits and starts to regain its footing. Even Chair Romer appears to acknowledge that there is some room for error in her predictions as she notes that "... [t]hese projections are

---

[91] For 2012, the table only goes through June because the Agreement will expire as of June 30, 2012. Therefore, the projected percentage for inflation would be half of the 1.7% projected rate for the year, or .85%

[92] *See* CPI tables *supra* at VI(2)(C) (The CPI for January 2010 was 216.687 and March 2010 was 217.631. 217.631 - 216.687 = 0.944. 0.944 ÷ 216.687 = 0.43%).

[93] *Id.*

lower than those of some forecasters and higher than others" and make reference to tying the forecast to "… the Federal Reserve's long-run projection range of 1.7 to 2 percent."[94]  Given that room for error with the acknowledgement that other forecasters are looking higher than the Council of Economic Advisors and further given an acknowledgement by Chair Romer that the Federal Reserve is looking long term at a possible 2% inflation rate, it appears that a reasonable setting of a wage rate for 2011 should be at the 2% level.

For the six month period in 2012 until the Agreement expires on June 30, 2012, the Council of Economic Advisors' year end prediction for 2012 of 1.7% inflation becomes .85%.[95]  By January 2012 and as they move into negotiations for the successor Agreement to this Agreement, the parties will be in a better position to assess the strength of the economy overall and that of the City in particular.  Given the half year covered in 2012, utilizing the federal forecast for that six month period as a valid indicator is reasonable.  Effective January 2012, the wage rate shall therefore increase by 1%.

In sum, the wages for the Agreement shall be as follows:

| **Effective Date** | **Increase** |
| --- | --- |
| 7/1/07 | 1% |
| 1/1/08 | 3% |
| 1/1/09 | 2% |
| 1/1/10 | 1% |
| 1/1/11 | 2% |
| 1/1/12 | 1% |
| **Total** | **10%** |

---

[94]  "The Economic Assumptions Underlying the Fiscal 2011 Budget", *supra*.

[95]  I note that the City proposed a 2% wage increase effective January 1, 2012, which is higher than the forecasted inflation rate for that year.  However, that proposal by the City came after earlier proposing a two year freeze on wages for 2009 and 2010, which was rejected with the finding that 2% and 1% increases are appropriate for those years.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 45

### D. The Lodge's View Of The City's Financial Condition

The Lodge concedes that "[t]here is no question revenues are stretched, there is no question that the economy has had a serious problem ...."[96] However, the Lodge contends that notwithstanding the state of the economy, the City has the ability to pay for the increased wages and benefits sought by the Lodge on behalf of the officers.[97] Through meticulous and detailed research, the Lodge points to a number of factors to make its argument that notwithstanding a very troubled economy, the City has a "financial cushion" of $730 million in the reserve funds created with asset lease proceeds; has realized savings through a "virtual layoff of over 304 bargaining unit members since June 30, 2007" due to the City's failure to fill vacancies and replace officers who have left the ranks (*e.g.*, through retirements) not only through saved wages but also through saved health care expenses; may realize further revenues based on the estimate that an additional 1,000 officers will be retiring; could generate revenue by leasing Midway Airport  savings from reduced personnel costs based on the salary schedule showing the number of officers by pay grade has reduced by 1.0%; savings due to layoffs in other bargaining units and cutting of other positions; future savings resulting from the agreement allowing officers to retire at age 55 with health care; and revenues that could be obtained by declaring surpluses in TIF accounts or closing TIF districts.

There is no question the City has a "financial cushion" of $730 million in reserves as the Lodge contends. As shown by Lodge's cross-examination of the City's Chief Financial Officer Saffold, as of December 2009, the balance in the

---

[96] Tr. 126.

[97] Lodge Brief at 12-21. *See also*, Tr. 12 ("... they have a sizeable financial cushion ... a financial cushion that almost no other city in America has.").

City's reserve funds totaled approximately 24% of the City's expenditures, when 5% to 15% is a "prudent" figure.[98]  As brought out by the Lodge, according to Saffold, that reserve figure percentage is the third or fourth highest in the nation amongst the largest cities.[99]  However, that financing and the Lodge's arguments do not change the approach or the result for setting the wage rates.

Section 14(h)(3) of the IPLRA lists the factor of "… the financial ability of the unit of government to meet those costs."  This is where the Lodge's argument has its root.  Based on its extensive research of the City's finances just discussed, the Lodge asserts that the "City Has Ability to Pay".[100]

However, the City has not claimed an *inability* to pay.  Instead, in this case and due to declining revenue streams and the current state of the economy, the City has claimed an *unwillingness* to pay what the Lodge has requested for wages for the financial, budgetary and public policy reasons articulated by the City in its pre-hearing brief and through the testimony at the hearing.  Although not justifying the amounts offered by the City, I have found considerations geared towards the cost-of-living and the economy to be persuasive for establishing the wage rates in this case.  For reasons discussed *supra* at VI(2)(B), in these unprecedented times, I have not looked to other statutory factors such as comparability.  Indeed, if I did look to comparables, then, for this bargaining unit, I would not only have to consider external comparables, but I would have to look internally — *i.e.*, what has happened to other City employ-

---

[98]  Tr. 191.

[99]  Tr. 192.

[100]  Lodge Brief at 12.  *See also*, Tr. 15 ("We don't think … [the City] has a credible case to make that it has an inability to pay.").

ees over the past few years. The City recognizes that other City employees who have granted concessions or who have had those concessions imposed on them are not "internal comparables" to police officers as that phrase is used in interest arbitrations.[101] But I agree with the City that under the present economic circumstances, "[e]ven though the City's civilian units are not comparables in the traditional arbitral sense, the Board should undoubtedly consider the repercussions of its award through the lens of the City's civilian workforce."[102] And there is no question that other City employees have had wage concessions through waived benefits like holidays, overtime pay, furloughs, shutdown days and wage freezes as well as layoffs, either negotiated or imposed. No similar concessions have been requested by the City or imposed on the officers in this case. As now discussed, the factors I have focused on concerning the cost-of-living (Section 14(h)(5) of the IPLRA), the economy (encompassed by "other factors" in Section 14(h)(8)) along with the overall compensation presently received (Section 14(h)(6)) to establish the wage rates generate significant wage increases for the police officers and at the same time allow the City breathing room for the ability to increase its revenue streams over the next several years as the economy hopefully recovers. I therefore choose to concentrate on those statutory factors found relevant for this particular case and I find that the ability to pay factor as argued by the Lodge is not a determining factor.

---

[101] City Brief at 38 ("Given the unique nature of law enforcement, the wages of the City's civilian bargaining units have limited utility in determining the appropriate wage increases for FOP members, particularly because the latter receive many additional forms of compensation than the former.")

[102] *Id*. at 39.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 48

### E. The Impact Of The Wage Increases

The parties must understand the impact of this particular 10% increase as it is structured over the five year Agreement. As discussed *supra* at VI(2)(C)(1)(a), by itself, the number "10%" does *not* reveal the true impact of the wage increase found appropriate. That is because of the compounding of wage rates and real dollar increases to individual officers resulting from their step movements on the salary schedule.

With respect to the compounding effect of the wage increase, at Grade 2A, Step 10 on the salary schedule, a 10% wage increase has the following effect:

#### Grade 2A

| | | 1% | 3% | 2% | 1% | 2% | 1% | | |
|---|---|---|---|---|---|---|---|---|---|
| Step/Date | 6/30/07 | 7/1/07 | 1/1/08 | 1/1/09 | 1/1/10 | 1/1/11 | 1/1/12 | Total Inc. | % Inc. |
| 10 After 25 Yrs | 84,402 | 85,246 | 87,803 | 89,559 | 90,455 | 92,264 | 93,187 | 8,785 | 10.41 |

Therefore, the 10% wage increase is, in reality, a 10.41% wage increase. And that 10.41% wage increase ripples across the entire bargaining unit.[103]

With respect to step movements (and again using officers who were at Grade 1 Step 4 at the expiration of the 2003-2007 Agreement), the relevant portion of the wage schedule will be as follows:

---

[103] That percentage is computed by applying the wage increase percentages to the prior year's wage rate and then doing the same for each succeeding year. Here, for Grade 2A, Step 10, the total increase from the wage rate at the expiration of the 2003-2007 Agreement ($84,402) as each year's increase is applied yields a final salary of $93,187 as of the final increase under the Agreement effective January 1, 2012, or an increase of $8,785 over the life of the Agreement ($93,187 - $84,402 = $8,785). That computes to a 10.41% compounded wage increase ($8,785 ÷ $84,402 = 10.41%). Because the same percentages are being applied to each step at the same intervals, the 10.41% will be uniform across all of the respective steps within each of the three grades.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 49

**Grade 1**

|  | 1% | 3% | 2% | 1% | 2% | 1% |  |  |
|---|---|---|---|---|---|---|---|---|
| Step/Date | 6/30/07 | 7/1/07 | 1/1/08 | 1/1/09 | 1/1/10 | 1/1/11 | 1/1/12 | Total Inc. | % Inc. |
| 4 After 30 Mos | 61,932 | 62,551 | 64,428 | 65,716 | 66,374 | 67,701 | 68,378 | 6,446 | 10.41 |
| 5 After 42 Mos | 64,992 | 65,642 | 67,611 | 68,963 | 69,653 | 71,046 | 71,757 | 6,765 | 10.41 |
| 6 After 54 Mos | 68,262 | 68,945 | 71,013 | 72,433 | 73,158 | 74,621 | 75,367 | 7,105 | 10.41 |
| 7 After 10 Yrs | 70,656 | 71,363 | 73,503 | 74,974 | 75,723 | 77,238 | 78,010 | 7,354 | 10.41 |

As before, because of the 12 month service requirements to move to higher steps at Steps 4 through 6, officers at Grade 1, Step 4 at the expiration of the 2003-2007 Agreement will typically achieve two step movements over the life of this Agreement going from Step 4 to Step 6.[104]  In terms of real dollars for those officers, because of the step movements built into the salary schedule, the 10% wage increase found appropriate in this case will translate into an increased salary of $13,435, which amounts to a 21.69% wage increase shown as follows:[105]

**Grade 1 (Moving Through Steps)**

|  |  |  | 1% | 3% | 2% | 1% | 2% | 1% |  |  |
|---|---|---|---|---|---|---|---|---|---|---|
| Step | Step Moves | 6/30/07 | 7/1/07 | 1/1/08 | 1/1/09 | 1/1/10 | 1/1/11 | 1/1/12 | Total Inc. | % Inc. |
| 4 | 2 | 61,932 | 62,551 | 67,611 | 72,433 | 73,158 | 74,621 | 75,367 | 13.435 | 21.69 |

For the entire bargaining unit, the *actual* real dollar and real percentage increases will be dependent upon an individual officer's grade and step placement as well as anniversary date.  Over the five year period of this Agreement, the number of step movements can range from 0 step movements (for those of-

---

[104] Given that the next step movement to Grade 1, Step 7 is at the 10 year level, it will not be possible for an officer starting at Step 4 to reach Step 7 during the life of this Agreement. Thus, this group of officers will achieve two step movements during the life of this Agreement.

[105] For discussion purposes only, this example assumes an officer who moved into Step 4 on April 1, 2007.  This hypothetical officer will therefore move from Step 4 to Step 5 on April 1, 2008 and from Step 5 to Step 6 on April 1, 2009.  There will be no further step movements for that officer because the next step movement is after 10 years — which, for this officer, will occur after the expiration of the Agreement.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 50

ficers at the top step (Step 10) when the Agreement commenced) to as many as 5 step movements (for those officers who were at Step 1 when the Agreement commenced) and the actual number of officers who will receive step movements (and therefore in excess of the compounded 10.41% wage increase) is significant.[106]

All officers who were in Steps 1 through 9 at the commencement of the Agreement on July 1, 2007 should receive *at least* one step movement during the life of the Agreement — and some will receive as many as five. And for those officers who do not receive step movements (*i.e.*, those at Step 10 who have maxed out on the salary schedule), they will receive the largest dollar increases in their grade because they are the highest earners in their grade. Therefore, a 10% wage increase over this five year Agreement might at first

---

[106] According to the City, the following census of officers exists at Grade 1 as of January 1, 2010 (City Exh. 67; Tr. 269):

| Grade D-1 | Number of Officers |
|---|---|
| Step 1 | 255 |
| Step 2 | 157 |
| Step 3 | 604 |
| Step 4 | 595 |
| Step 5 | 449 |
| Step 6 | 2,782 |
| Step 7 | 2,472 |
| Step 8 | 1,352 |
| Step 9 | 775 |
| Step 10 | 323 |

Given the structure of the salary schedule with the time frames for step movements, as a general rule (depending upon anniversary dates) from the commencement of the Agreement on July 1, 2007, officers in the various steps will receive the following number of step movements over the life of the Agreement:

| Step | Number of Step Moves |
|---|---|
| 1 | 5 |
| 2 | 4 |
| 3 | 3 |
| 4-5 | 2 |
| 6-9 | 1 |
| 10 | 0 |

seem small to some.  But in reality, *just in terms of numbers*, given the step movements built into the salary schedule that most officers will receive over the life of the Agreement, the increases under this Agreement are still significant.

Third, at the same time, the cost-of-living has only increased by 4.48% since July 2007 (based on the March 2010 data from the BLS).  While this recession has certainly taught us that no one can predict with precision what will happen, it is a safe guess (and again returning to the economic forecasts of the Council of Economic Advisors and the Federal Reserve) that by June 30, 2012 when the Agreement expires, the cost-of-living will not have increased to exceed the 10.41% actual compounded wage increase for that small percentage of the bargaining unit who experience no step movements during the life of the Agreement and certainly will be more unlikely to exceed the actual percentage increases received by the vast majority of the bargaining unit who experience one or multiple step movements during the life of the Agreement.

Fourth, this discussion has focused on the actual percentage and dollar increases officers will realize from the wage increases found appropriate with the cost-of-living, inflation and the economy as the driving forces for those determinations.  The BLS maintains an "Inflation Calculator" at its website — http://data.bls.gov/cgi-bin/cpicalc.pl — where a calculation is made by entering a dollar amount and a year and then having the calculator compute what the "buying power" the entered amount has in 2010.  This discussion has addressed simple percentage increases, compounding increases and the effects of step movements.  The individual officers will be able to determine where they were on the salary schedule when the 2003-2007 Agreement expired and they can find out precisely what inflation has done to their wages.  Using that calcu-

lator on some of the examples used in this analysis shows the following (as of the time of this writing):[107]

| Grade/Step | Salary at End Of 2003-2007 Agreement (6/30/07) | Inflation Calculator for Grade/Step as of 2010 | Salary as of 1/1/10 under this award |
|---|---|---|---|
| 1-2 | 55,728 | 58,493 | 59,725 |
| 1-4 | 61,932 | 65,005 | 66,374 |
| 2A-10 | 84,402 | 88,590 | 90,455 |

What should be obvious is that, at least thus far — approximately two and one-half years into the Agreement — the wage rates established by this award have outpaced increases in the cost-of-living — and that is without consideration of any step movements an officer may have received since July 1, 2007.

Fifth, as discussed *infra* at VI(3), (6) and (9), there are additional monetary benefits established by this award (increases in the duty availability allowance, physical fitness incentive and life insurance). Section 14(h)(6) of the IPLRA provides consideration of "[t]he overall compensation presently received by the employees ...." Those additional monetary benefits discussed *infra* support a finding that higher wage increases than those found appropriate are not warranted and that the wage rates established by this award are appropriate.

Sixth, heath care premiums are based on a percentage of an officer's base salary.[108] Although higher health care premiums will be paid by officers as a result of their increased wages, through June 30, 2012 there will be *no* in-

---

[107] The Inflation Calculator's computation changes with adjustments made to the CPI as reported by the BLS. Therefore, as the CPI changes in the coming months and years, the results from the Inflation Calculator will also change.

[108] *See* Appendix G of the 2003-2007 Agreement.

creased expenses for health care caused by this Agreement as a result of plan changes:[109]

> MR. FRANCZEK: ... [T]he City of Chicago is not proposing any increases in health care for the members of the Lodge. We are not asking you to increase your co-pays, we are not asking you to increase the amount that you contribute by virtue of premiums to health care, we are not asking you to make any increases in health care contributions for the Lodge. We have made no proposals in this regard to the Lodge to increase, reduce, eliminate benefits. None. ...

Again, Section 14(h)(6) of the IPLRA provides for consideration of "[t]he overall compensation presently received by the employees ...." The City's proposal for health care as specified in the Agreement to be at *status quo* as the conditions existed in the 2003-2007 Agreement further supports a finding that higher wage increases than those found appropriate are not warranted.

Seventh, it must be remembered that in this bargaining unit, there have been no unpaid furlough days, returned vacation days, giving up of overtime pay, or other cost cutting concessions as have been experienced by so many of the other City employees — both represented and non-represented. Those cost cutting concessions negotiated or imposed on other City employees amount to wage decreases. That has not happened here — and for good reason.

For non-public safety employees, the City can control how its services are dispensed and how its staffing can be reduced or reallocated to meet cuts made necessary by the fiscal problems now facing the City. The City cannot do the same for public safety employees like police officers. The City may delay trimming trees or filling potholes, but cannot delay its response to calls for emergency services.

---

[109] Tr. 261.

Police response to criminal activity and calls for police services are not something that can be scheduled as the City can do for the work of non-public safety employees. Therefore, it must be understood that because Chicago police officers are indispensible and may well be called upon to perform even more services, although other City employees have taken substantial wage reductions from their negotiated or established wage levels, the officers under the Agreement are thus receiving what amount to significant wage increases although we are still in a battered economy.

Eighth, as the parties were going through their lengthy negotiating process and before the full impact of the recession hit the City's finances, there was a 16% wage offer made by the City which the Lodge did not accept and the City then withdrew.[110] Obviously, that withdrawn offer is higher than the wage increases imposed by this award.

To me, for purposes of this award, what happened before it became necessary to bring in an arbitrator is of no consequence. What matters for deciding this case is the offers the parties make and attempt to support at the time of my involvement.

However, putting aside that hindsight is always 20/20, for those who may have questioned the wisdom of turning down the City's 16% offer when it was made, the evidence shows that at the time the 16% wage offer was on the table, the parties were still grappling with the complicated questions concern-

---

[110] Tr. 267:
> MR. FRANCZEK: ... After the economy cratered at the end of 2008 the City withdrew this offer. ... We characterized it as being forced to adapt to the circumstances. The world changed at the end of 2008.

ing the change of work schedules and the health care for officers retiring at age 55:[111]

> MR. D'ALBA: ... We had a lot of things to deal with. We had a work schedule problem that was festering and needed to be solved. We had MOU 55 on the table. We had a full plate, and they wanted to buy off and if we would have taken it the department would have not been better off. It would not have saved over $30,000,000 for several years if people left early at 55, it would have not have solved this incredibly difficult problem involving work schedules.

Thus, had the Lodge accepted the 16% offer and completed the Agreement at the time that wage offer was made, the other important issues to the Lodge involving the work schedule and health care for officers retiring at age 55 would not have been resolved. According to the record, the parties had been negotiating over a new work schedule "... for well over a decade, at least 15 years" and the last time there was an agreement to change the work schedule it was not implemented because ratification by the Lodge membership was "... an exact tie, four thousand something versus four thousand something."[112] Instead, the parties continued on in their negotiations and, although the 16% offer was pulled off the table by the City because of the downturn in the economy, the other important benefits finally obtained by the Lodge were accomplished through the continued bargaining process. With respect to the negotiated change in work schedules between the parties, "... [t]his results in 17 fewer workdays" for the officers.[113] The obvious benefit to the officers from the continued negotiations resulting in the health care agreement for officers retiring at age 55 is the extension of the savings of premium costs to those retiring at 55 instead of having to wait until age 60. In the end, this award implements

---

[111] Tr. 34.

[112] Tr. 257.

[113] Tr. 259.

6% less (over 5 years) than what the City offered before the downturn in the economy. However, although not a *quid pro quo*, by not accepting the 16% when it was offered, the Lodge eventually obtained two quite remarkable benefits for the officers — benefits which they would *not* have obtained through the interest arbitration process. Remember the burden in interest arbitrations — *i.e.*, that the party seeking the change must demonstrate that the existing system is broken and in need of change and good ideas are not enough to meet that burden. The parties negotiated two new "good ideas" — the schedule change and the health care benefits provisions for officers retiring at age 55. Those two accomplishments would *not* have been achieved through the interest arbitration process.

Further, the reality is that had the 16% offer been accepted when presented, the continuing downturn in the economy and its adverse impact on the City would more likely than not have placed the Lodge and officers in the very uncomfortable position of having to address mid-term concession bargaining with the City and, if concessions were not agreed to, to have to face a further uncomfortable position of supporting the maintenance of wage increases that became very much out of line with the economic conditions that evolved. If concessions were not agreed to by the Lodge, further deeper cuts would have been imposed on other City employees beyond the significant cuts they have already taken so that the officers in this bargaining unit could keep wage increases which were, as the recession set in hard, simply incompatible with the economic conditions on the ground.

So perhaps 20/20 hindsight really shows that by not accepting the 16% offer that was on the table, in the end, the officers were better off through what

they ultimately obtained in this proceeding along with the negotiated benefits for work schedules and age 55 retirements.

Ninth, from the City's perspective, the wage portion of this award has been structured to address the needs of the City as the full impact of the recession set in and the economy now moves to get back on its feet. In setting the wage rates, a distinction has been made between pre- and post-crash periods. Smaller percentage increases have been imposed for periods coming after the recession hit the City the hardest. In the 18 months prior to the full impact of the crash setting in (July 2007 through December 2008), the wage rate has been increased by a total of 4% — again, reflective of the CPI during that period. After the crash set in, beginning in January 2009 and for the remaining three and one-half years of the Agreement, the increases have slowed down, with the remaining 6% spread throughout that longer period. This slowing down of the wage increases in the post-crash period should allow the City relief from the severe beating its revenue streams have taken and give it the opportunity to allow for increased revenues from an economic recovery.

And, as pointed out by the Lodge, although the City will have to pay increased wages resulting from this award, the City may also realize substantial cost savings from the parties' agreement concerning City-paid health care benefits provided to officers who retire on or after age 55.[114] Indeed, the Superintendent estimates that 1,000 officers will be eligible to retire and many will do so upon issuance of this award.[115] Those officers retiring are at the top

---

[114] Lodge Brief at 15. *See also,* Lodge Exh. 54(b). The Lodge estimates that as a result of the parties' agreement concerning health care benefits for officers retiring on or after age 55, the City will save $32 million, Lodge Brief at 15.

[115] "There's conceivably 1,000 officers who could leave ...", according to Superintendent Jody Weis, quoted in Spielman, "Top cop 'nervous' about likely retirement surge", Chicago Sun
*[footnote continued]*

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 58

end of the salary schedule and, as reflected by the salary schedule, new hires come in at slightly under one-half the salary of those at the top end, with less vacation time, overtime, monetary consequences and other benefits tied to salary.

Given the drastic impact this recession has had on City finances, but further acknowledging the invaluable services performed by police officers for the citizens of the City, in my opinion, a 10% wage increase at the times specified above with the condition that the methodology used to come to that wage rate shall not be prejudicial to the parties in future similar proceedings — particularly for comparison purposes, either externally or internally — strikes the proper balance needed by all to get through this chaotic and uncertain period. To be clear, through this award, the arguments the parties made about external and internal treatment of other employee groups (*e.g.*, perceived "... erosion of the pay differentials ..." as made by the Lodge) are not prejudiced by this award — the methodology for resolving the disputes and the results in this case apply *only* to this case and not to future cases.[116]

---

*[continuation of footnote]*

Times (November 7, 2009); http://www.suntimes.com/news/cityhall/1870507,CST-NWS-retire07.article#.

[116] Tr. 29-31. The Lodge stressed its concern over a breakdown of what it considered historical differentials between employee groups pointing out that with the City's offer, a police officer and a truck driver would go from having a 15.93% differential in pay to a 3% differential. Tr. 35-36. Putting aside the non-precedential value of this award which will allow the Lodge to make that argument in a future proceeding, the Lodge's computations and arguments were based on the City's 5% offer. This award implements a wage rate double that figure — 10%. Further, the fact that the truck drivers' bargaining unit was hit with layoffs for not granting concessions just cannot be ignored. Employees in that unit were laid off. Employees in this unit gave no concessions, obtained a significant wage increase on a real dollar basis, got other economic benefits discussed *infra* and were not laid off.

### 3. Duty Availability Allowance

Section 20.13(A) of the 2003-2007 Agreement provides that each officer be paid a duty availability allowance of $730 per quarter. The Lodge seeks to increase that allowance to $780 per quarter effective January 1, 2008 with a further increase to $830 per quarter effective January 1, 2010.[117] The City proposes no monetary increases for the duration of the Agreement and also proposes to amend Section 20.13(C) to prorate the allowance for probationary officers once they complete twelve months of the probationary period:[118]

> C.     Entitlement to duty availability pay is not dependent on an officer being present for duty for an entire pay period.  A probationary officer who completes the first twelve (12) months of the probationary period shall be eligible for duty availability pay on a prorated basis.

Pursuant to Section 20.13(B) of the Agreement "[i]n accord with applicable law, the Employer shall treat duty availability allowance payments as pensionable." For all purposes, the parties therefore treat the duty availably allowance as a component of wages.

In the *2003-2007 Award*, the driving factor behind the increases implemented in the duty availability allowance was the cost-of-living ("I really need go no further than the cost-of-living factor in the IPLRA to resolve this issue").[119] That same reasoning applies here.

Because the parties treat the duty availability allowance like wages, the City's offer for no increase over the life of the five year Agreement is, in effect, a

---

[117] Lodge Offer at 4; Lodge Brief at 40-42.

[118] City Offer at Tab A (p. 1), Tab B (p. 3) [added language underscored]; City Brief at 31-41.

[119] *2003-2007 Award* at 67.

0% offer for the life of the Agreement for this component of wages.  For the same reasons discussed *supra* at VI(2)(C)(1)(b) where the City's proposal to freeze wages for 2009 and 2010 was rejected due to an upward movement in the cost-of-living during that period, the City's proposal for a 0% increase in the duty availably allowance over the life of the entire Agreement must also fail.  Again, as of now, since the Agreement expired on June 30, 2007, the CPI has increased 4.48%.  The City's 0% offer over the life of the Agreement for the duty availability allowance does not square with the cost-of-living factor.

The Lodge's offer to increase the duty availability allowance to $780 per quarter effective January 1, 2008 with a further increase to $830 per quarter effective January 1, 2010 also does not square with the cost-of-living factor.  When the Agreement expired on June 30, 2007, the duty availability allowance was $730 per quarter.  If the Lodge's offer is accepted, as of January 1, 2010, the duty availability allowance will have increased to $830 per quarter — a $100 increase per quarter, for an increase of 13.7%.[120]  However, for the period from the expiration of the 2003-2007 Agreement through December 2009 (just before the Lodge's proposed final increase takes effect), the cost-of-living increased 3.67%.[121]  For the same reasons discussed *supra* at VI(2)(C)(1)(a) just as the Lodge's 19.25% wage increase proposal did not square with the cost-of-living, neither does its 13.7% proposed increase in the duty availability allowance.

---

[120] $830 - $730 = $100,  $100 ÷ $730 = 13.698%.

[121] As shown by the CPI tables, *supra* at VI(2)(C), on July 1, 2007, the CPI stood at 208.299 and the December 2009 CPI stood at 215.949.  That is a 3.67% increase in the CPI (215.949 - 208.299 = 7.65.  7.65 ÷ 208.299 = 3.67%.

Because the duty availability allowance is treated like wages and to be consistent with the wage increases implemented by this award, by the end of the Agreement, the increase in duty availability allowance should be in the 10% range. Also, to be consistent with the manner in which the wage increases were implemented, because of the fiscal problems facing the City due to the recession and the dramatic decreases in the City's revenue streams, the increases should be phased in later in the Agreement rather than earlier so as to allow the City needed time to increase those revenue streams. I find that the following schedule will accomplish those goals:

| Effective Date | Increase | Benefit Per Quarter |
|---|---|---|
| 1/1/11 | $25 | $755 |
| 1/1/12 | $50 | $805 |

Therefore, as of January 1, 2012, the duty availability allowance will have increased $75 per quarter going from $730 to $805 per quarter. That is a 10.27% increase over the life of the Agreement.[122] That increase is consistent with the 10% wage increase and is phased in at the end of the Agreement to again give the City relief from further monetary obligations prior to the beginning of the hoped for recovery.

With respect to the City's request to prorate the duty availability allowance for probationary officers who complete the first 12 months of the probationary period, that requested change is denied. As discussed in the *2003-2007 Award*, "[t]he burden for changing an existing benefit rests with the party seeking the change."[123] While I do find reason for changing the amount of this

---

[122] $805 - $730 = $75 per quarter. $75 ÷ $730 = 10.27%.

[123] *2003-2007 Award* at 46.

benefit, I see no reason to change the structure of the benefit so as to treat probationary officers who complete the first 12 months of the probationary period different from the way they had been treated under the 2003-2007 Agreement or different from the rest of the bargaining unit.

### 4. Uniform Allowance

Under Section 21.3 of the 2003-2007 Agreement, officers received "... a uniform allowance of $1,800 per year, payable in three (3) installments ...." The Lodge seeks to increase that allowance to $2,000 per year, effective July 1, 2007 and $2,200 per year, effective January 1, 2010.[124] The City proposes no increases in the uniform allowance.[125]

The Lodge's offer to increase the uniform allowance from $1,800 per year under the 2003-2007 Agreement to $2,200 per year as of January 1, 2010 is a 22.22% increase.[126] As discussed *supra* at VI(3) concerning the duty availability allowance, during that same period, the cost-of-living has only increased by 3.67%. The Lodge's offer does not square with the cost-of-living and is rejected.

Using the same analysis shows that the City's offer of no increases in the uniform allowance could be seen as a freeze in the benefit and contrary to the fact that the cost-of-living is moving upward.

However, for the uniform allowance benefit, the analysis used for the duty availability allowance is really not appropriate. Because duty availability allowance is pensionable by statute, the duty availability allowance is a com-

---

[124] Lodge Offer at 4-5; Lodge Brief at 42-44.

[125] City Offer at Tab A (p. 1), Tab B (p. 4); City Brief at 31-41.

[126] $2,200 - $1,800 = $400. $400 ÷ $1,800 - 22.22%.

ponent of wages. As such, it was treated in the analysis discussed *supra* at VI(3) like wages. While the Lodge asserts that "The Uniform Allowance Is an Important Wage *Supplement*",[127] the fact remains that the duty availability allowance is different from the uniform allowance because the former is pensionable while the latter is not.[128] In short, the duty availability allowance is more directly a part of wages, while the uniform allowance is not. That being the case, for analysis purposes, the two benefits really should not be treated the same.

Again, "[t]he burden for changing an existing benefit rests with the party seeking the change."[129] There has been no showing in this case that, in fact, officers have had to pay increased amounts to maintain their uniforms at a level that could justify an increase in the uniform allowance.

But the Lodge deserves the benefit of the doubt. If I looked at the cost-of-living in analyzing this benefit, the result would be the same. As an example, take an officer who makes no step movements between July 1, 2007 and January 1, 2010 when the Lodge's offer for the increased uniform benefit reaches its maximum. An officer in Grade 2A, Step 10 could fall into that category. At the end of the 2003-2007 Agreement, such an officer was earning $84,402. Due to the wage increases implemented by this award, as of January 1, 2010, that officer's salary will increase to $90,455.[130] Using the BLS Infla-

---

[127] Lodge Brief at 42 [emphasis added].

[128] The Lodge took that position at the hearing as well concerning the uniform allowance — "[i]t's a pay supplement ..." Tr. 47. The Lodge also acknowledged — in agreement with the City — that "Chicago unquestionably has the highest uniform allowance in the country." Tr. 47, 164.

[129] *2003-2007 Award* at 46.

[130] *See* the salary schedule attached to this award as Appendix 1.

tion Calculator found at http://data.bls.gov/cgi-bin/cpicalc.pl, as of this writing, that officer's 2007 salary has a buying power of $88,590. However, by virtue of the increases imposed by this award, that officer's actual salary is $90,455 — again, well ahead of the actual impact of the cost-of-living (by 2.1%).[131] Even assuming that there has been some increase in the costs of maintaining uniforms, that cost-of-living analysis shows why no increase is justified in the uniform allowance. The officers' wages — even those officers who will have no step movements during the life of the Agreement — are, as of now, well ahead of increases in the cost-of-living.

For those substantial numbers of officers who will experience step movements over the life of the Agreement, the added increases caused by the step movements on top of the wage increases implemented by this award puts those officers even further ahead of the cost-of-living and additionally underscores why, in this economy and particularly with the City facing the kinds of financial problems it has to deal with, there is simply no basis to increase the uniform allowance. One last example makes that point. I earlier used the Grade 1, Step 4 officer who experiences two step movements over the life of the Agreement to show the real dollar impact of the wage offers implemented by this award.[132] As shown in that example, at the expiration of the Agreement on June 30, 2007, that officer earned $61,932 and as of January 1, 2010, with the two step movements and the wage increases under this award, that officer's salary rose to $73,158. Use of the BLS Inflation Calculator puts the buying power of $61,932 from 2007 at $65,005 in 2010. The officer who was at that

---

[131] $90,455 - $88,590 = $1,855. $2,227 ÷ 88,590 = 2.1%.

[132] *See discussion supra* at VI(2)(E).

grade and step who now earns $73,158 cannot justify additional compensation in the form of added uniform allowance. And, for those officers who make more step movements than two, the justification for an increase in the uniform allowance benefit becomes even far less supportable.

The City's proposal for no change in the uniform allowance is therefore adopted.

### 5. Field Training Officers

The Lodge seeks to amend Sections 26.1(D) and 23.8 of the 2003-2007 Agreement concerning compensation and work locations of Field Training Officers ("FTOs") as follows:[133]

**ARTICLE 26**

**WAGES**

* * *

**Section 26.1 — Salary Schedule.**

* * *

D.    Officers covered by this Agreement who are assigned as a Field Training Officer shall continue to be allowed to work up to an additional ~~one-half (1/2)~~ <u>three-quarter (3/4)</u> hour per day prior to or at the conclusion of his or her tour of duty which time is to be compensated in accord with Article 20-Overtime.

* * *

**ARTICLE 23**

**SENIORITY**

* * *

**Section 23.8 — Filling Recognized Vacancies**

[Add the following language]: <u>Field Training Officers assignments shall be available in each of the department's districts covered by this Section.</u>

---

[133] Lodge Offer at 3; Lodge Brief at 61-62.

* * *

The City proposes no changes to these sections of the Agreement.[134]

The monetary increase sought by the Lodge for FTOs is based on comparability arguments.[135] However, as discussed *supra* at VI(2)(B), for this award, comparability arguments are not determinative in this case. Given the other monetary increases implemented by this award, there is no demonstrated reason why FTOs should receive an additional one-quarter hour of overtime as requested by the Lodge.

With respect to where FTOs work, "[t]he Department currently assigns FTOs to one of six Districts."[136] The Lodge's argument concerning where FTOs should be allowed to work is that because there are 25 police districts that are part of District Law Enforcement, FTOs should be allowed to select units of assignments by bid as do other officers under Section 23.8 because the purpose of that section "... was to allow officers to select units of assignment by exercising seniority base bidding in order to be closer to home, places where the[y] socialize, units in which their friends work or for any number of other reasons."[137] The City asserts that "[t]he Department selected these six Districts because they are ideal training grounds for new recruits given their higher calls for service and representative crime patterns ... [and a]s a result of the Lodge's proposal, the Department would be required to assign FTOs to Districts where it never intends to send recruits ... [and] would create logistical problems in

---

[134] City Offer at Tab A (p. 1), Tab B (p. 5); City Brief at 41-42.
[135] Lodge Brief at 61-62.
[136] City Brief at 42.
[137] Lodge Brief at 62.

terms of accommodating FTOs' furloughs and other absences without disrupting the training schedule."[138]

Putting aside the question raised by the City over whether I even have jurisdiction to consider the issue because the City characterizes this issue as a manning issue[139], the question returns to the burden which is on the Lodge to show why the change is needed. For a change such as the one proposed by the Lodge, to meet that burden "… in order for me to impose a change, the burden is on the party seeking the change to demonstrate that the existing system is broken."[140] The Lodge's proposal may be a good idea, but because of the reasons asserted by the City, there is a rational managerial basis for its limitation on where FTOs can work. The Lodge has not met its burden.

The City's proposal for no changes concerning FTOs is adopted.[141]

### 6. Physical Fitness Incentive

The parties have a letter of understanding concerning physical fitness which provides:[142]

* * *

---

[138] City Brief at 42.

[139] *Id.*, citing Section 14(i) of the IPLRA.

[140] *2003-2007 Award* at 73.

[141] According to the City, there is a pending unfair labor practice proceeding before the Illinois Labor Relations Board ("ILRB") concerning the September 2008 reduction of training districts from 18 to six. City Brief at 42, note 45. I note that in *Fraternal Order of Police, Lodge 7 and City of Chicago, Police Department*, L-CA-09-009 (March 25, 2010), an ILRB administrative law judge issued an order requiring the Department to rescind all the changes made in the FTO program after the Department's September 2008 change of the training districts which required all FTOs assigned to other districts to either transfer to the new training districts, or resign their FTO position and give up the corresponding D-2 pay. The undersigned will retain jurisdiction over this issue in the event the ILRB affirms the decision of the administrative law judge.

[142] 2003-2007 Agreement at p. 149.

- Successful completion of the physical fitness test will result in payment of a physical fitness premium of $250, payable December 1 of the year the officer successfully completes the test.

\* \* \*

The Lodge seeks to increase the physical fitness premium from $250 as follows:[143]

| Effective Date | Increase |
|----------------|----------|
| 7/1/07 | $500 |
| 7/1/08 | $650 |
| 7/1/09 | $750 |
| 7/1/10 | $800 |
| 7/1/11 | $850 |

The City proposes no change.[144]

This benefit must be increased.

First, as the Lodge points out[145], the City's contract with the Chicago Fire Fighters Union contains a $350 physical fitness incentive.[146]

Second, the $250 benefit was added to the Agreement in 1999 and has remained unchanged since that time.[147]  By agreeing to a monetary incentive to promote physical fitness, the parties were therefore in agreement that incentive compensation is one of the ways to achieve better physical fitness for the officers.  The City argues against increasing the incentive with the following rationale:[148]

... Based on numbers alone, this incentive has failed to produce a critical mass of officers who are motivated to improve their physical agility and then demonstrate their capabilities in exchange for a stipend.  To illustrate, of the 4,850 officers who participated in the test this past year, only 3,167 or 65% received passing grades, and the City paid out

---

[143] Lodge Offer at 15; Lodge Brief at 68-69.

[144] City Offer at Tab A (p. 1), Tab B (p. 6); City Brief at 42-43.

[145] Lodge Brief at 69.

[146] Fire Fighters' Agreement at p. 130; Lodge Exh. 51(a).

[147] Lodge Brief at 69.

[148] City Brief at 43 [footnote omitted].

$791,750 in physical fitness premiums. In short, the City simply has not received "much bang for its buck." ....

But what this really means is that the previously agreed upon physical fitness incentive program is not working. The physical fitness incentive is not a benefit that officers receive for doing nothing. The physical fitness incentive is only paid if an officer passes certain tests with minimum established physical fitness standards ("… based on the State of Illinois P.O.W.E.R test.").[149] If the agreed upon method for encouraging physical fitness through a physical fitness incentive is admittedly not working and fire fighters receive more than officers covered by the Agreement, then the Lodge has met its burden to show that a change to the benefit should be made. It therefore makes sense to increase the benefit.

Third, political cartoons aside[150], the following point made by the Lodge also makes sense:[151]

> … A premium is necessary to encourage officers to develop a level of fitness and stamina to meet the demands and stresses of the job, but the reality is that many of them literally eat meals on the run that are not sufficiently nutritious and simply contribute to excess weight and officers who are not in good physical shape. A generous premium would in the opinion of the Lodge encourage officers to undertake the necessary regimens and protocols to change their diet, exercise and eat in a healthy manner. …

Further, as pointed out by the Lodge:[152]

> MR. D'ALBA: … But more to the point is the issue of a physical fitness program to encourage officers to stay in good shape. …
>
> We have officers who are on the street eight hours a day basically eating their meals on the fly without appropriate nutritional guidance

---

[149] 2003-2007 Agreement at p. 149-150 ("The performance requirement for each test is based on the State of Illinois P.O.W.E.R. test. Officers must pass every test and meet the minimum standards listed below to qualify for the physical fitness premium:" [specific standards omitted]").

[150] Lodge Exh. 51(b).

[151] Lodge Brief at 69.

[152] Tr. 96-97.

> and counseling, without appropriate physical fitness facilities the way
> the firefighters have physical fitness facilities in the [fire] house, and
> therefore we have a difference with the department over how to deal with
> this question and we think a more generous premium would help take
> care of this problem.

The problem articulated by the Lodge is now treated as one of national importance.[153]

Taking into account the economic conditions now facing the City and balancing those against the above reasons for a needed change in the physical fitness incentive, I find that an increase in the benefit is warranted in the amount of $100. The physical fitness benefit shall be increased from $250 to $350 effective upon ratification.

### 7. Health Fair Remittance

By letter of understanding dated March 7, 2005, the parties agreed that the City would remit $75,000 per year to the Lodge for the years 2003-2007 "… for the purpose of supporting Lodge-sponsored health fairs for its members."[154]

The Lodge proposes that the City continue that contribution retroactive to January 1, 2008 not only for "… its members", but for "… bargaining unit and fraternal members."[155]

The City agrees to "… continue the annual remittance for years 2008 through 2012."[156] According to the City:[157]

> Pursuant to the parties' current side letter, the City has remitted yearly
> funds to the Lodge for the purpose of supporting its health fairs for its

---

[153] Michelle Obama, Newsweek (March 14, 2010) ("… we know the risks to their health and to our economy — the billions of dollars we spend each year treating obesity-related conditions like heart disease, diabetes, and cancer") posted at http://www.newsweek.com/id/234885.

[154] 2003-2007 Agreement at p. 173.

[155] Lodge Offer at 16.

[156] City Offer at Tab A (p. 1), Tab B (p. 7); City Brief at 42-43.

[157] City Brief at 42-43.

> members during the years 2003 through 2006. Future financial com-
> mitments were expressly contingent upon the City's and the Lodge's
> agreement that these health fairs were beneficial to officers and designed
> to reduce the City's health care costs. Acceding credit where it is rightly
> due, the Lodge has successfully hosted a series of health fairs through-
> out the years, and the program has expanded over time. For these rea-
> sons, the City will agree to continue this targeted financial support as
> part of its overall health and wellness platform for the years 2008
> through 2012.

With that agreement, there no longer is an issue in dispute with respect to the yearly payment from the City to the Lodge for health fairs retroactive to January 1, 2008. However, the Lodge's request to expand the coverage from "members" to "... bargaining unit and fraternal members" is denied. The Lodge has not demonstrated as its burden requires why the expanded coverage as requested should be implemented.

### 8. Active Health Care Program

Section 25.2 of the 2003-2007 Agreement addresses medical and dental benefits.

The Lodge seeks a number of changes to Section 25.2, such as childcare expenses added to flexible spending accounts; coverage for disability; contribution levels and conditions for retirees; treatment of refunds, rebates, subsidies and return of monies from health care providers; added provisions for competitive bidding, wellness, additional health benefits (speech therapy, hearing aides, self-inflicted wounds, orthodontia, benefits during an act of war, terrorism health insurance, orthotics and prescribed birth control devices); unlimited lifetime maximum benefit; equalization of in-network and out-of-network co-payments for the dental PPO plan as exists for the PPO plan for medical benefits, with a maximum benefit per year of $2,400; changes to the vision benefit; modification of health care contributions for imposing a maximum base salary upon which computations can be made; reduction in the brand formulary costs

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 72

for prescription drugs at Tier 2; and a prohibition against requiring additional payments for drugs in the event they are removed from the formulary list during the term of the Agreement.[158]

The City proposes no changes to the health care program; that the Lodge become a signatory member of the Chicago Labor-Management Trust ("LMCC"); that upon doing so, the Lodge will be guaranteed three trustees on the LMCC; and that there should be a reopener to allow the parties to negotiate changes in the health care program under certain conditions, which would be subject to interest arbitration.[159]

In the *2003-2007* Award at 14, I discussed the problems related to bargaining over health insurance:

> ... as I have unfortunately had to observe before, in the current economic climate collective bargaining between employers and unions on health care issues is most difficult. "Insurance costs are skyrocketing which makes bargaining on this issue border on the impossible."

> The national trend underscores the reality that employer health care costs are soaring at alarming rates and are being shifted to employees.

*See also*, my awards in *County of Effingham and AFSCME Council 31*, S-MA-03-264 (2004) at 18 ("[p]resently, because of spiraling costs, insurance is simply a nightmare and at a crisis level for employers, employees and unions") and *Village of Lansing and Illinois FOP Labor Council*, S-MA-04-240 (2007) at 23-24 (citing articles and studies on the insurance crisis).[160]

---

[158] Lodge Offer at 6-11; Lodge Brief at 44-55.

[159] City Offer at Tab A (p. 1), Tab B (pp. 8-9); City Brief at 44-47.

[160] *See also*, Abelson, "The Cost of Doing Nothing on Health Care" ("The unrelenting rise in medical costs is likely to wreak havoc within the system and beyond it, and pretty much everyone will be affected, directly or indirectly."). New York Times (February 26, 2010) posted at http://www.nytimes.com/2010/02/28/weekinreview/28abelson.html?scp=1&sq=The%20unrelenting%20rise%20in%20medical%20costs&st=cse.

According to the City, the City's annual net costs for employee health in-
surance for 2007 and 2008 continue to rise on a yearly basis (a pattern which
has existed since 1995) to $341,537,420 in 2008, or $9,253 per employee.[161]
And yet, even with those increasing costs, the City proposes no changes to the
health care contributions or plan design through this process.  The Lodge on
the other hand, proposes a series of increasing benefits, which will obviously
cause the City to incur more costs at a time when the City is facing immense
economic difficulties.  Under the present stressed economic conditions, there is
no justification for increasing costs to the City for health care — particularly
because the City proposes no increases in contributions and employee costs or
reduction of benefits:[162]

> In the context of both a fiscal and health care crisis, one would rightfully
> assume that the City would propose to increase employee costs signifi-
> cantly and decrease benefits substantially.  Again, the City has not ten-
> dered such a proposal ...."

Another reason for not making changes to insurance is the uncertainty of
the impact of the recently enacted health care overhaul legislation of March
2010.  The Lodge has therefore not justified its position that increased benefits
should be imposed.

Turning to the LMCC, the City proposes that the Lodge become a signa-
tory with the guarantee of three trustees on the committee.

The City explains the LMCC and what it has accomplished as follows:[163]

> [LMCC] ... is a labor-management committee empowered to implement
> mid-term changes in the active health care program, develop new value-
> based models for the plan and leverage city-wide buying power with ven-

---

[161] City Brief at 44; City Exh. 75.

[162] City Brief at 44-45.  *See also*, Tr. 261 quoted *supra* at VI(2)(E) where the City reiterates
that position.

[163] City Brief at 45-46 [footnotes omitted].

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 74

dors. (City Ex. 76). More pointedly, the LMCC provides the parties with the ability to resolve health care issues arising in the short-term and respond to unexpected market trends, and the traditional bargaining model is simply not suited for addressing these challenges. Finally, the LMCC operates under very strict decision-making protocols that require a supermajority vote of the trustees for certain plan modifications and that authorize such modifications only when they are designed to achieve significant cost containment. (City Ex. 76).

The City's confidence in the LMCC is not theoretical. For nearly two years, the LMCC—including representatives from the City, AFSCME and COUPE and now the Captains and the Lieutenants—has met regularly to review plan data, evaluate costs, consider benefit enhancements and explore the avenues available for intergovernmental collaboration. To date, the LMCC has successfully implemented the following initiatives:

√ Increasing the lifetime maximum benefit from $1.5 million to $2.5 million.

√ A pilot program for diabetes management that provides participants with reduced co-payments for their medications.

√ Incentives for employees to use the mail order prescription plan.

√ Requiring certain transplant and bariatric surgeries to be performed at recognized Centers of Distinction.

√ Eliminating the plan exclusion for charges related to an intentionally self-inflicted injury or illness while sane or insane.

√ Expanding outpatient speech and occupational therapy coverage to include the services necessary for the acquisition of a function.

√ A review program and pre-certification requirement for radiological scans to ensure that such scans are medically appropriate.

√ Expanding the Flexible Spending Account plan to include a benefit for qualified unreimbursed dependent care expenses.

√ Communications regarding the benefits of using urgent care facilities or walk-in clinics as opposed to emergency rooms.

√ A new maternity management program.

√ A smoking cessation program in conjunction with the Health Department.

(City Ex. 77). Ironically, if the Lodge had joined the LMCC at the outset, its members would be receiving many of the benefits it seeks through these proceedings. Finally, in terms of the future, the LMCC will soon engage in an in-depth analysis of the data that has been compiled by a third-party consultant regarding expenses, utilization and gaps in cover-

age and will otherwise continue to develop plan design changes and an-
cillary programs to increase the quality of care while decreasing its costs.

As discussed, there will be no changes to health care as proposed by the Lodge. However, given the success of the LMCC and the uncertainty of health care in the near future, it makes sense to allow the Lodge the option to join the LMCC with three trustees sitting on that committee as proposed by the City. And should the Lodge exercise that option, the benefits set forth above imple- mented through the LMCC process shall be extended to the officers in this bar- gaining unit. Should the Lodge choose not to join the LMCC, health care re- mains at *status quo* under the 2003-2007 Agreement.[164]

### 9. Life Insurance

Section 25.1 of the 2003-2007 Agreement provides that "[t]he Employer agrees to provide a $25,000 life insurance benefit at no cost to the officer …."

The Lodge seeks to increase that benefit to $75,000 or one (1) year of salary at the step 10 level, whichever is greater …", while the City seeks no change.[165]

According to the Lodge, the $25,000 life insurance benefit has not changed since 1999.[166] Further, according to the Lodge, in the past, the par- ties have increased the life insurance benefit as follows:[167]

---

[164] The Lodge takes the position that entry into the LMCC ".. in the opinion of the Lodge is a non-mandatory subject of bargaining, and the arbitrator does not have jurisdiction to order the Lodge to participate in the LMCC." Lodge Offer at 7. The City takes the position that the es- tablishment of a committee like the LMCC "... is well within the province of the Arbitrator." City Brief at 45, note 50. Whether the topic is a mandatory subject of bargaining is up the ILRB to decide and not me. However, in any event, there is no "... order [for] the Lodge to par- ticipate in the LMCC" as objected to by the Lodge. The Lodge's participation is optional.

[165] Lodge Offer at 5-6; Lodge Brief at 60-61; City Offer at Tab A (p. 2), Tab B (p. 10); City Brief at 45, note 49.

[166] Lodge Brief at 60-61.

[167] *Id.*

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 76

| Year | Increase |
|------|----------|
| 1987 | $2,500 to $15,000 |
| 1995 | $15,000 to $20,000 |
| 1999 | $20,000 to $25,000 |

While the details of the group rates over the years are not before me (and recognizing that individual life insurance premiums can vary depending upon age and whether the insured is a smoker), available surveys show that, in general, from 1999 (when the present level of the benefit was implemented) to 2007 (when this Agreement takes effect), term life insurance premiums have decreased.[168] At the same time, during the period 1999-2007, the CPI increased by 23.2%.[169]

Therefore, from 1987 to 1999, the parties increased the life insurance benefit by a factor of 10 (from $2,500 to $25,000); for the period 1999-2007, insurance premiums have, for many, decreased; and during that same period, inflation has increased by 23.2%. Given those factors and weighing those against the fact that there has been no increase in the benefit since 1999, I am satisfied the Lodge has demonstrated that an increase in the life insurance benefit is warranted and to the specific dollar amount requested by the Lodge ($75,000).

---

[168] http://www.term4sale.com/ratehistory.html. For the period 1997-2007, this survey for a "History of Term Life Insurance Premiums" examined "... the month to month average premiums for the 6 least expensive term policies for 15 different scenarios, over a period of 120 months." http://www.term4sale.com/ratehistoryexplanation.html. For example, for preferred non-smokers, the individual policy rates dropped approximately 27% during that eight year period. According to the survey, preferred non-smokers at age 40 had a rate of approximately $375 per year for a $500,000 policy in January 1999, which dropped to approximately $275 per year in January 2007 — a decrease of approximately 27%. The decreases varied for other categories of individuals.

[169] According to the BLS website used *supra*, in January 1999, the CPI stood at 164.3. In January 2007, the CPI stood at 202.416. 202.416 - 164.3 = 38.116. 38.116 ÷ 164.3 = 23.2%.

However, the Lodge's request that the benefit be increased in the alternative "... to $75,000 or one (1) year of salary at the step 10 level, whichever is greater ..." is rejected. While Section 25.1 of the 2003-2007 Agreement allows an officer to purchase optional insurance in $1,000 multiples "... up to an amount equal to their annual salary rounded up to the next multiple of $1,000", the parties' current method of providing that portion of the benefit for which the City pays does not correspond to the salary schedule in the alternative fashion proposed by the Lodge. To grant the Lodge's alternative request would be a change in the manner of paying this benefit and the Lodge has not demonstrated why such an alternative approach is warranted. An officer's ability to purchase additional insurance remains as provided in Section 25.1, but the City's obligation is only to provide $75,000 as a life insurance benefit level.

The increase to $75,000 for the life insurance benefit shall be effective upon ratification.

### 10. Injury On Duty And Recurrence Claims

The City seeks to modify Appendix N to provide that an officer may only claim a recurrence of an injury on duty ("IOD") if the IOD occurred less than 10 years from the date of the recurrence claim, unless the officer's IOD required surgery or medical treatment beyond any initial emergency room treatment.[170] The Lodge opposes any such change.[171]

The City's argument for seeking the change is:[172]

---

[170] City Offer at Tab A (p. 2), Tab B (p. 11); City Brief at 47-48.

[171] Lodge Offer at 17.

[172] City Brief at 47-48 [footnote omitted].

> ... the Department continues to receive patently questionable IOD recurrence claims and has no choice but to allow these suspect claims to proceed through the referral physician process set forth in Appendix N. To correct this situation, the City reasonably proposes that an officer be permitted to claim an IOD recurrence only if the IOD recurred within the ten-year period prior to the date of the recurrence claim, unless the officer's IOD required surgery or medical treatment beyond any initial emergency room treatment. By its terms, this provision will establish a proper temporal connection between the IOD and claimed recurrence with a safeguard provision for serious IODs outside of this timeframe.

In further support of its argument, the City expresses dissatisfaction with the outcome of an arbitration which allowed referral through the IOD recurrence process for an officer who experienced leg pain that he also experienced 30 years before returning to work following an on-duty accident.[173]

The burden here is on the City to demonstrate that the current system is broken. The fact that it did not prevail in an arbitration does not meet that burden. Further, why 10 years as a limit? What rational basis does that time period have to the procedures for IOD recurrence claims in Appendix N? The Lodge produced medical studies showing that there is a wide range of years for recurrences from injuries. *See e.g.*, Weiss etc., "Total Knee Arthroplasty in Patients with a Prior Fracture of the Tibial Plateau", The Journal of Bone & Joint Surgery, Vol. 85-A, Number 2 (February 2003) at 219 ("The mean interval between the fracture and the knee arthroplasty was 13.6 years, but the intervals varied greatly (range six months to thirty-six years.").[174] The selection of a 10 year time period as a limitation without an adequate explanation is not enough to justify the imposition of such a limit. The City also asserts that the Captains

---

[173] City Brief at 47, note 52, citing *City of Chicago and Fraternal Order of Police (Abbate)*, Grv. No. 123-01-094/434 (2003).

[174] Lodge Exh. 37.

and Lieutenants agreed to a similar provision.[175]  However, without more, there is no justification for the modification sought by the City.

The change to Appendix N sought by the City is rejected.

### 11. Disciplinary Investigations

The City seeks to give the Independent Police Review Authority ("IPRA") and the Internal Affairs Division ("IAD") the ability to obtain audio-recorded statements of officers during interrogations and interviews and to increase the deadline for providing officers with copies of statements made during interrogations and interviews from 24 hours as provided in Section 6.2(D) of the 2003-2007 Agreement to 72 hours.[176]  The Lodge opposes any such change.[177]

The City's request to allow IPRA and IAD the ability to obtain audio-recorded statements meets the burden to allow the change requested.  As the City states, "... by audio recording statements, the accuracy of those statements is enhanced as is the efficiency and integrity of the investigation."[178]  Further, too often in the past, in cases where I have been called upon to determine the existence of just cause for the disciplinary actions of officers under this Agreement, I have had to consider written statements taken during investigations, which statements were sometimes lacking in detail or were confusing.  An audio recording of the investigations would have been more helpful in deciding many cases.  The recording of the investigations will do what the City asserts — "the accuracy of those statements is enhanced as is the efficiency

---

[175] City Brief at 48.

[176] City Offer at Tab A (p. 2), Tab B (p. 13-15); City Brief at 48-50.

[177] Lodge Offer at 17; Lodge Brief at 69-71.

[178] City Brief at 49.

and integrity of the investigation." Further, the officer under investigation will be protected because, as guaranteed by the City, "… [c]onsistent with the City's proposal, the officer's statement will be audio recorded and later verified by the officer consistent with current policy."[179]

With respect to the City's proposal to increase the deadline for providing officers with copies of statements made during interrogations and interviews from 24 hours to 72 hours, the City's reasons for the change are:[180]

> … As investigations have become even more thorough and complex, the current twenty-four-hour deadline at times results in the premature release of statements, particularly when the investigation involves multiple officers. By expanding the deadline, the City will ensure that any subsequent statements obtained during the investigation are untainted. … [B]y virtue of audio recording and the resulting *verbatim* transcript, the officer's ability to verify the accuracy of the statement will not in any way be compromised

The City's proposal again makes sense in terms of meeting its burden to demonstrate the need for a change. However, to further ensure the integrity and fairness of the investigation, there must be a condition placed on the City's proposal. In the event a re-interview of an officer is required within the 72 hour period, the officer must first be given a copy of the statement before the additional questioning takes place. Further, at the hearing, the Lodge presented evidence of specific concerns arising out of shooting investigations, where the officer involved in the incident will provide a statement to investigators shortly after the incident. That statement from the officer may then be summarized in an official report from the investigators, but is not otherwise available to the officer. Some months later — and possibly many months later according to the evidence — the same officer may be required to provide a for-

---

[179] *Id.*

[180] *Id.* at 50.

mal statement to an investigating agency (IPRA or IAD) about the same incident. Consistent with the provision regarding access to statements provided during the 72 hour period, to the extent that there exists an official report purporting to summarize the previous statement of the officer, that officer shall be provided with access to that portion of the report summarizing his or her previous statement.

This change shall be effective upon ratification.

### 12. Drug And Alcohol Testing

The City proposes modifications to its drug and alcohol testing procedures for officers while on duty; officers assigned to the Gang Enforcement Section and Gang Investigation Section will be included in the pool of officers who are subject to accelerated random testing; a modernization of the panel of substances for which the Department tests; establishment of a procedure for mid-term modifications to the panel of substances; that officers be subject to drug and alcohol testing following the discharge of a weapon whether on or off duty; and that officers are prohibited from consuming alcohol within the four-hour period prior to the start of their shifts.[181] The Lodge opposes any such changes.[182]

---

[181] City Offer at Tab A (p. 2), Tab B (pp. 16-19); City Brief at 51-53. The City's specific language proposal is found at City Offer at Tab B, pp. 16-19.

[182] Lodge Offer at 17; Lodge Brief at 63-68.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 82

### A. The Reason For The Change

The City has carried its burden to show the requested change is necessary.[183]

The Lodge correctly points out that in the 2003-2007 Award, I rejected the City's effort to impose random alcohol testing.[184]

Unfortunately, in the recent past, the City, the Department and, most importantly, the thousands of officers in the bargaining unit, have been tarnished and dishonored by the behavior of a few rogue, off-duty officers whose intoxicated actions against citizens have, as the City correctly states, caused "... pervasive and viral media reports of alcohol-induced criminal or quasi-criminal conduct ..." by police officers.[185]   The City correctly further observes "[g]iven the public's high expectations of those who serve and protect them, any incident involving an impaired officer jeopardizes the public's trust and confidence in its police force, and the public rightfully or wrongfully does not discriminate between on duty or off duty conduct."[186]

It is absolutely crucial that the public's confidence in the Department and the officers be at the highest level.  After these highly publicized and unfortunate incidents, for the public to know that there is an active and effective

---

[183]   According to the Lodge, "... the department has had random drug testing and the Lodge never really opposed random testing, but it's the alcohol question that is really troublesome ...." Tr. 87.

[184] Lodge Brief at 64-65, citing *2003-2007 Award* at 82-83.

[185]   City Brief at 51, note 56; City Exh. 82 (a collection of newspaper articles).

[186]   City Brief at 51.  According to the City (Tr. 236):

> MS. DONOVAN: ... And while the officers who engage in misconduct are very small in number, the noise created by their action can be deafening and their conduct or misconducts, while isolated, tarnishes the reputation of those with whom they serve and reverberate through the public mindset for years to come.

drug and alcohol testing program in place is of paramount importance. Further, the officers must be confident that other officers with whom they work — often when they may be placed in harm's way — are not impaired. Split second decisions could mean the difference between life and death. The highest level of awareness and ability to properly react must be guaranteed. I find that modifications to the drug and alcohol testing procedures utilized by the City are therefore necessary.

### B. The Testing Program

The City proposed detailed language for the changed procedures.[187] The basic language for those procedures is set forth in Appendix 2 to this award. To underscore the need for accuracy and reliability in the testing, that language along with the following modifications will constitute the new testing program (which language shall be finalized by the parties subsequent to the issuance of this award).

First, the major change is to now allow for random alcohol testing of officers while on duty.[188] To reasonably allow for the necessary procedures to be put in place, this change for random alcohol testing shall be effective January 1, 2012 and not January 1, 2011 as proposed by the City.

Second, with the respect to the four hour rule which prohibits an officer from consuming alcohol within the four hour period preceding the start of a previously scheduled shift or after receiving notice to report for duty, discipline cannot be imposed for violation of the four hour rule unless a test is adminis-

---

[187] City Offer at Tab (B), pp. 16-19.

[188] The City made it clear that the changes mainly focus on random alcohol testing for officers while on duty (Tr. 239):

> MS. DONOVAN: … The City has proposed random alcohol testing while on duty.
>
> Let me repeat that, while on duty. ….

tered and is positive under the standards and protocols set forth in the procedure. The following exchange makes that condition necessary:[189]

> MR. D'ALBA:
>
> Q. For instance, an officer is observed having a beer prior to the start of the shift and then the proverbial drop of the dime and the phone call is to the commander that says I just saw Officer Jones have a beer and I know he on his way to work. Does that constitute an independent basis for taking disciplinary action?
>
> We are talking about no random test having been issued, no testing of the officer at all.
>
> [MS. DONOVAN]: Well, by its terms that would be in violation of the rule. ...
>
> * * *
>
> Q. Well, suppose the officer tests negative for alcohol below the 0.02 standard. ... Would the officer be subject to discipline?
>
> A. Under the terms of this policy that would be a possibility.
>
> MR. D'ALBA: Well, that's a serious, in our opinion, problem with the proposal, Mr. Arbitrator, and that's why we wanted you to understand that there should be something higher or more rigorous with respect to the four hour rule.
>
> Somebody could have a beer four hours before the start of the shift or alleged to have a beer without a definitive test being made as to the level of consumption of alcohol in the officer. So that's a major impediment with respect to that portion of their proposal.
>
> ARBITRATOR BENN: Understood.

The Lodge is correct. There must be something more than a mere report of an officer's consumption of alcohol in violation of the four hour rule. Otherwise, if an erroneous or false report is made that an officer was *observed* consuming alcohol within four hours of a previously scheduled shift, but a test administered is not positive for the presence of alcohol as specified in the procedure, then an alleged violation of the four hour would be the basis for discipline. Without a safeguard, erroneous and false reports could be filed against officers for alleged violation of the four hour rule which could lead to discipline, when there is no independent substantiation through the testing procedure

---

[189] Tr. 251-253.

that the officer had consumed alcohol at levels in violation of the rule. To prevent an erroneous or false report of consumption of alcohol alone from being the basis for discipline, violation of the four hour rule must be verified through a positive test as set forth in the procedures.

Third, to ensure accuracy and prevent false positive test results, initial and confirmatory test levels will be consistent with the federal regulations promulgated by the U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration for those substances covered by such regulations.

Fourth, as a further assurance of the accuracy of test results, the Department will conduct its drug and alcohol testing program in accordance with the regulations promulgated by the Illinois State Police set forth in Title 20, Part 1286, of the Illinois Administrative Code.[190]

Fifth, if an officer has discharged his or her weapon while off duty and a test reveals the presence of alcohol, the Department shall not discipline the of-

---

[190] The Lodge's request for compliance with the Illinois State Police procedures was as follows (Tr. 95):

> MR. PLEINES: ... If, Mr. Arbitrator, you see fit to give them this, then they must follow the procedures, the qualifications of operators, the selection of testing devices and the sufficiency and accuracy of the results that are set forth in the Illinois administrative code as promulgated by the Illinois State Police.

The City apparently does not take issue with use of those standards deemed necessary by the Lodge. *See* Tr. 240, where the City expressed its "... commitment to follow the Illinois administrative code drug and alcohol testing procedures ...." As requested by the Lodge, those requirements will therefore be included.

At the hearing, the Lodge also raised a question about the City's potential use of an "ETG" test which "... can detect a biomarker for alcohol for up to 80 hours after the subject's last drink" and objected to the Department's potential use of such a test. Tr. 88. The City assured the Lodge that such a test will not be used (Tr. 249-250):

> MS. DONOVAN: ... the City has never proposed to use an ETG test. ...
>
> * * *
>
> MR. FRANCZEK: ... [F]or purposes of making the record as clear as possible, we have not proposed, we will not propose, we will not use the ETG test in connection with any alcohol related testing of a Chicago police officer.

ficer based solely on the results of the alcohol test when the officer's actions are consistent with the Department's use of force guidelines.

## VII. INTEREST ON RETROACTIVE PAYMENTS

The Lodge seeks to add the following for retroactive payments under Section 26.1 of the Agreement:[191]

### Section 26.1(F) – Interest On Retroactive Salary Payments

- Interest on wage increases including salary, duty availability pay, uniform allowances or other economic payments shall accrue at the rate of three percent (3%) compounded quarterly within 120 days after execution of this Agreement or 120 days after the date of an interest arbitration award, whichever is earlier, to the date of actual payment.

- Interest accrued pursuant to this paragraph shall be paid to officers covered by this Agreement only if the amount of interest to an officer exceeds five dollars ($5.00).

- Each officer will receive his or her retroactive payment and a payout sheet showing how his or her payment was calculated.

In the 2003-2007 Award, I addressed a similar request by the Lodge and ruled as follows:[192]

Because the prior Agreement expired June 30, 2003, a number of the provisions have been made retroactive and effective on varying dates prior to issuance this award (*e.g.*, wages, duty availability allowance and uniform allowance). Given the complexity of the calculations caused by the varying dates for implementation, changed circumstances (*e.g.*, different monetary entitlements due to movement of individual officers through the salary schedule to higher steps since expiration of the prior Agreement), individual circumstances (*e.g.*, due to factoring in overtime worked during that same period) and the number of officers who will be entitled to retroactive payments (again, approximately 11,600 individuals), calculation of the retroactive payments to the individual officers will no doubt be quite complex and time consuming. I further recognize that the terms of the Agreement resulting from this award must go through City Council approval, thereby delaying the effective date of implementation of the terms of this award.

---

[191] Lodge Offer at 3.

[192] *2003-2007 Award* at 84-85.

> Given the complexity of the calculations, the Lodge has not demonstrated why an automatic interest requirement should be imposed and also why such a requirement should be made part of the Agreement. However, in order to prevent undue delay in getting the retroactive payments to the officers, upon issuance of this award the City and the responsible departments are directed to immediately begin working on the calculations for the required retroactive payments. Within 120 days after the date of this award, the City shall make the retroactive payments. Each officer will receive his or her retroactive payment and a payout sheet showing how his payment was calculated. In the event that the payments or the payout sheets are not received within this period, the Lodge may request that I consider imposing interest.

The same conditions for computing and paying retroactive payments which existed under the *2003-2007 Award* shall exist for this award. Therefore, those same requirements and conditions will be ordered for retroactive payments due officers under this award.

## VIII. UNCONTESTED AND AGREED UPON ITEMS

Uncontested and agreed upon items are attached to this award as Appendix 3.[193]

## IX. OTHER ITEMS AND RETAINED JURISDICTION

Any issues not specifically addressed in this award (either through pre-hearing rulings, specific discussion in this award, or as agreed upon items) but which may have arisen between the parties during the negotiation process and this arbitration procedure shall remain without change as provided in the 2003-2007 Agreement.

The dispute is now remanded to the parties for the drafting of language consistent with this award. The undersigned will retain jurisdiction for disputes, if any, which may arise in that language drafting process.

---

[193] City Joint Exh. 2 as supplemented.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 88

## X. SUMMARY OF RESOLVED ISSUES

The disputed issues are resolved as discussed *supra* at VI of this award.

In summary, those issues are resolved as follows:

1. Duration:

   Five years — July 1, 2007 through June 30, 2012.

2. Wages:

| Effective Date | Increase |
|:---:|:---:|
| 7/1/07 | 1% |
| 1/1/08 | 3% |
| 1/1/09 | 2% |
| 1/1/10 | 1% |
| 1/1/11 | 2% |
| 1/1/12 | 1% |
| **Total** | **10%** |

3. Duty Availability Allowance:

| Effective Date | Increase | Benefit Per Quarter |
|:---:|:---:|:---:|
| 1/1/11 | $25 | $755 |
| 1/1/12 | $50 | $805 |

4. Uniform Allowance:

   No change.

5. Field Training Officers:

   No change.

6. Physical Fitness Incentive:

   Increase from $250 to $350 effective upon ratification.

7. Health Fair Remittance:

   The City will continue the annual remittance of $75,000 to the Lodge for years 2008 through 2012.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 89

8.    Active Health Care Program:

The Lodge shall have the option to join the Chicago Labor-Management Trust ("LMCC") with three trustees sitting on that committee.  Should the Lodge exercise that option, the benefits already implemented through the LMCC process shall be extended to the officers in the bargaining unit.  Should the Lodge choose not to join the LMCC, health care remains at *status quo* under the 2003-2007 Agreement.

9.    Life Insurance:

Increase from $25,000 to $75,000 effective upon ratification.

10.    Injury on Duty and Recurrence Claims:

No change.

11.    Disciplinary Investigations:

Effective upon ratification (1) audiotaped statements will be permitted; (2) the time limit for the City to provide an officer with a copy of the officer's statement is extended from 24 to 72 hours; provided that if the officer is reinterviewed within 72 hours of giving the statement, the officer shall be given a copy of the statement prior to any such interview; and (3) consistent with the provision regarding access to statements provided during the 72 hour period, to the extent that there exists an official report purporting to summarize the previous statement of the officer, that officer shall be provided with access to that portion of the report summarizing his or her previous statement.  This change shall be effective upon ratification.

12.    Drug and Alcohol Testing:

Drug and alcohol testing procedures modified (*see* Appendix 2), with random alcohol testing effective January 1, 2012; alleged violations of the rule prohibiting consumption of alcohol four hours or less prior to a scheduled shift or after receiving notice to report for duty cannot result in discipline unless a test conducted pursuant to the Agreement's testing procedures is positive; initial and confirmatory test levels will be consistent with the federal regulations promulgated by the U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration; the Department will continue to conduct its drug and alcohol testing program in accordance with the regulations promulgated by the Illinois State Police, for those substances covered by such regulations; and if an officer has discharged his/her

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 90

weapon off duty and a test reveals the presence of alcohol, the
Department shall not discipline the officer based solely on the re-
sults of the alcohol test when the officer's actions are consistent
with the Department's use of force guidelines.


Edwin H. Benn
Arbitrator


Dated:  April 16, 2010

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 91

## XI. APPENDICES

### APPENDIX 1 — SALARY SCHEDULES

The following salary schedules are for purposes of illustration only. The final salary schedules to be included in the Agreement will be prepared and approved by the parties and may contain slight adjustments to the figures set forth below.

**1% INCREASE EFFECTIVE JULY 1, 2007**

| GRADE | | FIRST 12 MOS STEP 1 | AFTER 12 MOS STEP 2 | AFTER 18 MOS STEP 3 | AFTER 30 MOS STEP 4 | AFTER 42 MOS STEP 5 | AFTER 54 MOS STEP 6 | AFTER 10 YRS STEP 7 | AFTER 15 YRS STEP 8 | AFTER 20 YRS STEP 9 | AFTER 25 YRS STEP 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ANNUAL | 43,535 | 56,285 | 59,485 | 62,551 | 65,642 | 68,945 | 71,363 | 73,847 | 76,574 | 78,786 |
| | MONTHLY | 3,628 | 4,690 | 4,957 | 5,213 | 5,470 | 5,745 | 5,947 | 6,154 | 6,381 | 6,566 |
| 2 | ANNUAL | 56,285 | 59,485 | 62,551 | 65,642 | 68,945 | 72,417 | 74,920 | 77,532 | 80,428 | 82,828 |
| | MONTHLY | 4,690 | 4,957 | 5,213 | 5,470 | 5,745 | 6,035 | 6,243 | 6,461 | 6,702 | 6,902 |
| 2A | ANNUAL | 58,218 | 61,515 | 64,624 | 67,763 | 71,157 | 74,708 | 77,210 | 79,925 | 82,828 | 85,246 |
| | MONTHLY | 4,852 | 5,126 | 5,385 | 5,647 | 5,930 | 6,226 | 6,434 | 6,660 | 6,902 | 7,104 |

**3% INCREASE EFFECTIVE JANUARY 1, 2008**

| GRADE | | FIRST 12 MOS STEP 1 | AFTER 12 MOS STEP 2 | AFTER 18 MOS STEP 3 | AFTER 30 MOS STEP 4 | AFTER 42 MOS STEP 5 | AFTER 54 MOS STEP 6 | AFTER 10 YRS STEP 7 | AFTER 15 YRS STEP 8 | AFTER 20 YRS STEP 9 | AFTER 25 YRS STEP 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ANNUAL | 44,841 | 57,974 | 61,270 | 64,428 | 67,611 | 71,013 | 73,503 | 76,063 | 78,871 | 81,150 |
| | MONTHLY | 3,737 | 4,831 | 5,106 | 5,369 | 5,634 | 5,918 | 6,125 | 6,339 | 6,573 | 6,762 |
| 2 | ANNUAL | 57,974 | 61,270 | 64,428 | 67,611 | 71,013 | 74,590 | 77,167 | 79,858 | 82,841 | 85,313 |
| | MONTHLY | 4,831 | 5,106 | 5,369 | 5,634 | 5,918 | 6,216 | 6,431 | 6,655 | 6,903 | 7,109 |
| 2A | ANNUAL | 59,965 | 63,361 | 66,563 | 69,796 | 73,291 | 76,949 | 79,527 | 82,323 | 85,313 | 87,803 |
| | MONTHLY | 4,997 | 5,280 | 5,547 | 5,816 | 6,108 | 6,412 | 6,627 | 6,860 | 7,109 | 7,317 |

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 92

**2% INCREASE EFFECTIVE JANUARY 1, 2009**

| GRADE | | FIRST 12 MOS STEP 1 | AFTER 12 MOS STEP 2 | AFTER 18 MOS STEP 3 | AFTER 30 MOS STEP 4 | AFTER 42 MOS STEP 5 | AFTER 54 MOS STEP 6 | AFTER 10 YRS STEP 7 | AFTER 15 YRS STEP 8 | AFTER 20 YRS STEP 9 | AFTER 25 YRS STEP 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ANNUAL | 45,738 | 59,133 | 62,495 | 65,716 | 68,963 | 72,433 | 74,974 | 77,584 | 80,449 | 82,773 |
| | MONTHLY | 3,811 | 4,928 | 5,208 | 5,476 | 5,747 | 6,036 | 6,248 | 6,465 | 6,704 | 6,898 |
| 2 | ANNUAL | 59,133 | 62,495 | 65,716 | 68,963 | 72,433 | 76,081 | 78,711 | 81,455 | 84,498 | 87,019 |
| | MONTHLY | 4,928 | 5,208 | 5,476 | 5,747 | 6,036 | 6,340 | 6,559 | 6,788 | 7,041 | 7,252 |
| 2A | ANNUAL | 61,164 | 64,628 | 67,894 | 71,192 | 74,757 | 78,488 | 81,117 | 83,970 | 87,019 | 89,559 |
| | MONTHLY | 5,097 | 5,386 | 5,658 | 5,933 | 6,230 | 6,541 | 6,760 | 6,997 | 7,252 | 7,463 |

**1% INCREASE EFFECTIVE JANUARY 1, 2010**

| GRADE | | FIRST 12 MOS STEP 1 | AFTER 12 MOS STEP 2 | AFTER 18 MOS STEP 3 | AFTER 30 MOS STEP 4 | AFTER 42 MOS STEP 5 | AFTER 54 MOS STEP 6 | AFTER 10 YRS STEP 7 | AFTER 15 YRS STEP 8 | AFTER 20 YRS STEP 9 | AFTER 25 YRS STEP 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ANNUAL | 46,195 | 59,725 | 63,120 | 66,374 | 69,653 | 73,158 | 75,723 | 78,360 | 81,253 | 83,600 |
| | MONTHLY | 3,850 | 4,977 | 5,260 | 5,531 | 5,804 | 6,096 | 6,310 | 6,530 | 6,771 | 6,967 |
| 2 | ANNUAL | 59,725 | 63,120 | 66,374 | 69,653 | 73,158 | 76,842 | 79,498 | 82,269 | 85,343 | 87,889 |
| | MONTHLY | 4,977 | 5,260 | 5,531 | 5,804 | 6,096 | 6,404 | 6,625 | 6,856 | 7,112 | 7,324 |
| 2A | ANNUAL | 61,776 | 65,274 | 68,573 | 71,904 | 75,505 | 79,273 | 81,928 | 84,809 | 87,889 | 90,455 |
| | MONTHLY | 5,148 | 5,439 | 5,714 | 5,992 | 6,292 | 6,606 | 6,827 | 7,067 | 7,324 | 7,538 |

**2% INCREASE EFFECTIVE JANUARY 1, 2011**

| GRADE | | FIRST 12 MOS STEP 1 | AFTER 12 MOS STEP 2 | AFTER 18 MOS STEP 3 | AFTER 30 MOS STEP 4 | AFTER 42 MOS STEP 5 | AFTER 54 MOS STEP 6 | AFTER 10 YRS STEP 7 | AFTER 15 YRS STEP 8 | AFTER 20 YRS STEP 9 | AFTER 25 YRS STEP 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ANNUAL | 47,119 | 60,919 | 64,382 | 67,701 | 71,046 | 74,621 | 77,238 | 79,927 | 82,878 | 85,272 |
| | MONTHLY | 3,927 | 5,077 | 5,365 | 5,642 | 5,921 | 6,218 | 6,436 | 6,661 | 6,907 | 7,106 |
| 2 | ANNUAL | 60,919 | 64,382 | 67,701 | 71,046 | 74,621 | 78,379 | 81,088 | 83,915 | 87,050 | 89,647 |
| | MONTHLY | 5,077 | 5,365 | 5,642 | 5,921 | 6,218 | 6,532 | 6,757 | 6,993 | 7,254 | 7,471 |
| 2A | ANNUAL | 63,011 | 66,579 | 69,944 | 73,342 | 77,015 | 80,858 | 83,567 | 86,505 | 89,647 | 92,264 |
| | MONTHLY | 5,251 | 5,548 | 5,829 | 6,112 | 6,418 | 6,738 | 6,964 | 7,209 | 7,471 | 7,689 |

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 93

**1% INCREASE EFFECTIVE JANUARY 1, 2012**

| GRADE | | FIRST 12 MOS STEP 1 | AFTER 12 MOS STEP 2 | AFTER 18 MOS STEP 3 | AFTER 30 MOS STEP 4 | AFTER 42 MOS STEP 5 | AFTER 54 MOS STEP 6 | AFTER 10 YRS STEP 7 | AFTER 15 YRS STEP 8 | AFTER 20 YRS STEP 9 | AFTER 25 YRS STEP 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ANNUAL | 47,590 | 61,528 | 65,026 | 68,378 | 71,757 | 75,367 | 78,010 | 80,726 | 83,707 | 86,125 |
|   | MONTHLY | 3,966 | 5,127 | 5,419 | 5,698 | 5,980 | 6,281 | 6,501 | 6,727 | 6,976 | 7,177 |
| 2 | ANNUAL | 61,528 | 65,026 | 68,378 | 71,757 | 75,367 | 79,163 | 81,899 | 84,754 | 87,920 | 90,544 |
|   | MONTHLY | 5,127 | 5,419 | 5,698 | 5,980 | 6,281 | 6,597 | 6,825 | 7,063 | 7,327 | 7,545 |
| 2A | ANNUAL | 63,642 | 67,245 | 70,644 | 74,075 | 77,785 | 81,667 | 84,403 | 87,370 | 90,544 | 93,187 |
|   | MONTHLY | 5,303 | 5,604 | 5,887 | 6,173 | 6,482 | 6,806 | 7,034 | 7,281 | 7,545 | 7,766 |

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 94

## APPENDIX 2 — DRUG AND ALCOHOL TESTING

A.     The Department's existing policies and orders regarding random drug testing shall be revised to include the following components:

    1.    Testing for the presence of alcohol while on duty.

        a.    Officers selected for random drug testing shall also be tested for alcohol.

        b.    Upon notification to submit to random testing, Officers shall continue to report to the Random Drug Testing Unit for the collection of urine specimens.

        c.    The Department may use urine specimens to test for the presence of both drugs specified in this agreement and alcohol.  The Department may also test for alcohol using a breath alcohol test administered by a qualified tester using a certified and calibrated Breathalyzer.

        d.    The initial and confirmatory test levels for a positive presence of alcohol shall be a breath alcohol level of .021 or its urine concentration equivalent, unless a different standard is required by paragraph (e) below.

        e.    If the test reveals a breath alcohol level of .021 through .039 or their urine concentration equivalents, the Officer shall be relieved from duty without compensation until the next duty day and shall submit to drug and alcohol testing prior to his/her return to duty.  If the return-to-duty test reveals an alcohol level of .00, the Officer may return to duty and shall not be subject to discipline based on the initial test result; however, during the six- (6-) month period following the date of the initial test, the Officer will be selected for random drug and alcohol testing from an eligibility pool consisting of similarly situated Officers.

*City of Chicago and FOP Lodge No. 7*
*Interest Arbitration — 2007 Agreement*
*Page 95*

If the return-to-duty test or any test administered within the six- (6-) month period described above reveals any presence of alcohol, the Officer shall be relieved from duty without compensation until ordered to return to duty, and the Random Drug Testing Unit will refer the matter to the Internal Affairs Division.

If the test reveals a breath alcohol level equal to or greater than .04 or its urine concentration equivalent, the Officer shall be relieved from duty without compensation until ordered to return to duty, and the Random Drug Testing Unit will refer the matter to the Internal Affairs Division. In the event discipline is recommended, the Internal Affairs Division shall consider whether to agree to hold the discipline in abeyance in exchange for the Officer's agreement to participate in a rehabilitation program, remain drug and alcohol free for a defined period and comply with other appropriate terms and conditions (i.e., a "last chance" agreement).

An Officer who is relieved from duty without compensation in accordance with this subsection may utilize accrued elective time during the unpaid period of absence.

    f.    The above changes shall be implemented effective January 1, 2011 or thereafter.

2.    Bidders and/or applicants for assignments in the Narcotics Section, Gang Enforcement Section, Gang Investigation Section and Vice Control Section in the Organized Crime Division and the Intelligence Section in the Counterterrorism and Intelligence Division shall be required to submit to a drug and alcohol test prior to appointment. Thereafter, all Officers assigned to these Units shall be selected for random drug and alcohol testing from an eligibility pool consisting solely of Officers assigned to such Units.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 96

B.    The procedures applicable to drug testing conducted by the Department, regardless of whether the basis for the testing is random, for cause or any other basis, shall be amended to include the following:

   1.    Ecstasy (MDA/MDMA) and steroids shall be added to the panel of substances for which the Department tests, and Methaqualone shall be removed from such panel.  The modernized panel shall thus read as follows:

| SUBSTANCE | INITIAL TEST LEVEL (ng/mL) | CONFIRMATORY TEST LEVEL (ng/mL) |
|---|---|---|
| Anabolic Steroids | Any Presence | Any Presence |
| Amphetamines | 1000 | 500 |
| Barbiturates | 300 | 200 |
| Benzodiazepines | 300 | 200 |
| Cocaine Metabolites | 300 | 150 |
| Marijuana Metabolites | 50 | 15 |
| MDA/MDMA | 250 | 200 |
| Methadone | 300 | 200 |
| Opiates | 2000 | 2000 |
| Phencyclidine | 25 | 25 |
| Propoxyphene | 300 | 200 |

   2.    Initial and confirmatory test levels will be consistent with the federal regulations promulgated by the U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration ("SAMHSA") for those substances covered by such regulations.

   3.    During the term of this Agreement, the Department may add or remove additional substances to the panel referred to above when it has reasonable grounds to do so (such as when new drugs are developed or changes occur in patterns of consumption of dangerous or illegal drugs), provided that it shall provide Lodge 7 with thirty (30) days' advance written notice and, upon request, meet with Lodge 7 to negotiate the addition or removal of a substance to or from the panel.  If the parties are unable to agree on the addition or removal of a substance from the panel, the dispute shall be resolved through the binding grievance arbitration procedure set forth in Article 9.  The sole issue before the Arbitrator shall be whether the Department has a reasonable basis for adding or removing the substance to or from the panel and for the initial and confirmatory test levels.

   4.    If a test reveals a positive presence of a substance on the above panel or the abuse of prescription drugs, the Random Drug Testing

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 97

Unit will continue to refer the matter to the Internal Affairs Division.

C.     Effective upon ratification, in any instance where an Officer discharges his/her weapon, whether on or off duty, the Officer shall submit to drug and alcohol testing at the direction of the Internal Affairs Division or any superior authority.  If the Officer has discharged his/her weapon off duty and the test reveals the presence of alcohol, the Department shall not discipline the Officer based solely on the results of the alcohol test when the Officer's actions are consistent with the Department's use of force guidelines.

D.     The Department's existing policies and orders regarding drug and alcohol use shall be amended to state that an Officer is prohibited from consuming alcohol within the four- (4-) hour period preceding the start of a previously scheduled shift or after receiving notice to report for duty.

E.     The Department will continue to conduct its drug and alcohol testing program in accordance with the regulations promulgated by the Illinois State Police set forth in Title 20, Part 1286, of the Illinois Administrative Code.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 98

## APPENDIX 3 — UNCONTESTED AND AGREED UPON ITEMS

**Section 6.1 — Conduct of Disciplinary Investigation.**

. . . .

B.  The interrogation, depending upon the allegation, will normally take place at ~~either~~ the officer's Unit of assignment, the ~~Office of Professional Standards~~ <u>Independent Police Review Authority</u>, the Internal Affairs Division or other appropriate location.

. . . .

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 99

**Section 6.2 — Witness Officer's Statements in Disciplinary Investigations.**

. . . .

    B.    The interview, depending on the nature of the investigation, will normally take place at ~~either~~ the officer's Unit of assignment, the ~~Office of Professional Standards~~ <u>Independent Police Review Authority</u>, the Internal Affairs Division or other appropriate location.

. . . .

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 100

**Section 6.12 — Mediation.**

At any time during an investigation, prior to an accused officer giving a statement, the parties may agree to mediate the resolution of the Complaint Register investigation. The "parties" shall mean the officer, with or without his or her Lodge representative, and a representative of IAD or ~~OPS~~ IPRA, as appropriate. The IAD/~~OPS~~IPRA investigator assigned to the case will not be present at the mediation.

Prior to the mediation session, IAD/~~OPS~~IPRA shall cause the accused officer to be served with a Notice of Administrative Rights and a Notice of Charges and Allegations, which will include the rule violation and the factual basis therefore. Neither party is required to meet.

The representatives at the meeting shall discuss the allegations and ~~the Department's~~ IAD's/IPRA's position regarding the finding of the case. The parties shall discuss whether they can reach accord as to a disposition. By accepting the discipline, the accused officer is waiving his or her right to grieve or appeal the decision, and the accused officer is not required to submit any ~~written~~ statement or response. If the accused officer does not agree with ~~the Department's~~ IAD's/IPRA's position, the disciplinary process will continue as designated.

Statements made and information relayed at the mediation which are not included in the file will not be used against the officer or included in the file at any later date.

If ~~the Department~~ IAD/IPRA and the accused officer agree on a penalty less than separation, it is binding on both parties. However, the Superintendent retains the right to seek the separation of an officer.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 101

**Section 8.4 — Use and Destruction of File Material.**

　　All disciplinary investigation files, disciplinary history card entries, ~~OPS and IAD~~ Independent Police Review Authority and Internal Affairs Division disciplinary records, and any other disciplinary record or summary of such record other than records related to Police Board cases, will be destroyed five (5) years after the date of the incident or the date upon which the violation is discovered, whichever is longer, except that not sustained files alleging criminal conduct or excessive force shall be retained for a period of seven (7) years after the date of the incident or the date upon which the violation is discovered, whichever is longer, and thereafter, cannot be used against the officer in any future proceedings in any other forum, except as specified below, unless the investigation relates to a matter which has been subject to either civil or criminal court litigation or arbitration prior to the expiration of the five- (5-) year period. In such instances, the Complaint Register case files normally will be destroyed immediately after the date of the final arbitration award or the final court adjudication, unless a pattern of sustained infractions exists.

. . . .

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 102

**Section 9.3 — Arbitration of Standard Grievances.**

If either party proceeds to arbitration, the following procedure shall apply:

. . . .

B.   The Employer or the Lodge, by mutual agreement, may submit the matter to expedited arbitration under rules to be determined by the parties.  Discipline cases may be processed under Expedited Arbitration Rules agreed upon by the parties and subject to the jurisdictional and procedural limitations of the parties' Expedited Arbitration Rules.

Whenever discipline cases are processed pursuant to the parties' Expedited Arbitration Rules, the parties shall submit the cases to a screening process, known as the Summary Opinion Process, and the Arbitrator designated by the parties for the process shall issue a Summary Opinion.  This report shall be submitted to the parties and reviewed by them each month.  The parties shall meet and discuss the recommendations contained in the Summary Opinion for a minimum of two days each month.  In the event the cases are not resolved based upon discussions of the parties, the Arbitrator's summary recommendations will not be binding upon the parties.  Any cases not resolved by the Summary Opinion Process shall be submitted to arbitration under the parties' Expedited Arbitration Rules.  The Arbitrator shall issue a minimum of ten (10) Summary Opinions each month.

~~In all discipline cases, Department Complaint Register files shall be provided to the Lodge promptly after request by the Lodge, or Lodge representatives who are sworn members of the Department shall be allowed to use Department copying equipment to copy the requested Complaint Register files, with appropriate supervision.~~  **When an officer exercises his or her right to contest a disciplinary recommendation, Complaint Register files shall be provided to the Lodge promptly upon request.**

. . . .

***The parties agree to strike the side letter currently located at page 168 of the Agreement captioned "Access to Disciplinary Files" and not include it in the successor agreement.***

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 103

**Section 9.7 — Authority of the Arbitrator.**

. . . .

B.    In the case of a sustained finding that is subject to the par-
ties' grievance procedure, the Arbitrator has the authority to
review whether ~~the Department~~ IPRA or IAD made a good
faith effort to secure an affidavit from the complainant and
whether the affidavit of the head of ~~OPS~~ IPRA or IAD was
based upon objective evidence of the type specified in Ap-
pendix L, in addition to the issues of just cause and the ap-
propriateness of the penalty in determining whether to grant
the grievance.

. . . .

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 104

**Section 16.2 — Special Employment.**

~~The special employment program is a voluntary program which allows officers covered by this Agreement to work on their off days for the Chicago Housing Authority or the Chicago Transit Authority. Participation in this program is subject to the provisions listed below.~~

~~Nothing in this Agreement affects the ability of the command and supervisory personnel assigned to the Special Functions Group to disqualify officers for future assignments based on their performance while working the special employment program.~~

~~A.~~ ~~An officer serving suspension, serving summary punishment, on the medical roll or on limited duty is prohibited from participating in the program.~~

~~B.~~ ~~An officer must maintain a performance rating of 76 or better to be considered for the program.~~

~~C.~~ ~~An officer with three (3) sustained Complaint Register Numbers and/or SPARs within a six (6) month period will not be considered for the program.~~

~~D.~~ ~~An officer with five (5) or more days on the medical roll (not including I.O.D.) in a police period will not be allowed to work special employment for the remainder of the police period.~~

~~E.~~ ~~An officer will not be considered for the special employment program if the Employer has just cause to suspend the officer from the special employment program.~~

~~If the discipline that formed the basis for the disqualification is subsequently overturned by an arbitrator, the grievant will be entitled to the compensation the grievant would have earned had the grievant been otherwise qualified to participate in the program. This reimbursement applies only to officers who participate in the special employment program.~~

A.    <u>The special employment program is a voluntary program that allows non-probationary full-duty officers to work on their days off for the Chicago Housing Authority, the Chicago Transit Authority, Chicago Midway Airport or Chicago O'Hare International Airport, subject to the terms and conditions set forth below.</u>

B.    <u>An officer's eligibility for special employment is governed by the following terms and conditions:</u>

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 105

1.   An officer is not eligible to work any special employment assignment under the following circumstances:

   a.   The officer's most recent overall performance rating was ~~below seventy-six (76), less than "meets expectations" or their equivalents~~ "requires improvement" or "unacceptable" ~~under the applicable performance evaluation rubric.~~[194]

   b.   The officer is serving a suspension or has been relieved from regular duty as a result of summary punishment.

   c.   The officer is on the medical roll or has been released from the medical roll for furlough.

   d.   During the ~~previous thirty (30) calendar days~~ thirty- (30-) day period prior to the date of the officer's application, the officer was absent from duty for five (5) or more days as a result of a non-duty-related injury or illness.

   e.   The officer's disciplinary record contains three (3) or more summary punishment actions within the prior twelve- (12-) month period.

   f.   The officer has been disqualified from participating in the program based on his or her performance while working a special employment or Department-procured outside employment assignment.

2.   An officer ~~is not eligible to work any~~ will be suspended from working a special employment assignment for a period of thirty (30) calendar days if the officer was scheduled for a special employment assignment and failed to work such assignment without reasonable cause for such absence acceptable to the Employer (e.g., a death in the family, an injury on duty or a change in the officer's regular duty schedule).

3.   An officer ~~is not eligible to work any~~ will be suspended from working a special employment assignment for a period of ninety (90) calendar days if the officer was scheduled for a special employment assignment and failed to work such assignment without ~~any~~ advance notice to the Employer of his or her absence (i.e., a "no call/no show").

---

[194] The Department agrees to modify Administrative Special Order 09-02 (Evaluation of Members Below the Rank of Sergeant) issued on March 31, 2009 and effective on April 1, 2009 as follows: (1) to clarify the meaning of the phrase "special assignments" in terms of ineligibility for such assignments following a rating of "requires improvement" or "unacceptable," (2) adding a reference to "Department-procured outside employment" in terms of ineligibility for such employment following a rating of "requires improvement" or "unacceptable" and (3) requiring the Department to review officers who are rated "requires improvement" or "unacceptable" within the six-month period following such rating.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 106

C.  If an officer believes that he or she has been wrongfully declared ineligible to work special employment, the officer shall submit a "To-From-Subject Report" to the coordinator of the special employment program no later than four (4) calendar days following his or her receipt of notification of ineligibility.  If the program coordinator's response is unsatisfactory to the officer, then the officer may initiate a grievance at Step One of the grievance procedure set forth in Section 9.2 no later than seven (7) of the officer's working days following his or her receipt of such response.

~~C~~D.  The Employer shall assign special employment opportunities to eligible officers based on seniority.

~~D~~E.  The Employer ~~retains the right to limit~~ shall publish any limitations it establishes on the number of hours, tours or assignments that may be worked by officers in the program.

~~E~~F.  The exclusive remedy for any incorrect assignment of special employment shall be the assignment of future special employment opportunities in a manner that corrects the error in assignment (e.g., the opportunity to work an additional special employment assignment) or the grant of four (4) hours of compensation or compensatory time off at the officer's election.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 107

**Section 19.1 — Death in Family.**

The Employer agrees to provide to officers leave without loss of pay~~, as the result of death in the family,~~ not to exceed three (3) consecutive days ~~(except for brother-in-law and sister-in-law which shall be for the day of the funeral only), including regularly-scheduled days off,~~ <u>any time within the seven (7) calendar days</u> immediately following the death of a member of the immediate family<u>, except for the death of a brother-in-law or sister-in-law which shall be for the day of the funeral only</u>.

. . . .

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 108

**Section 19.2 — Definition of Family.**

. . . .

In the event of the death of a domestic partner, the employee shall be granted three (3) consecutive days of leave~~, including regularly scheduled days off,~~ <u>any time within the seven (7) calendar days</u> immediately following the death, provided that the employee has registered the name of the employee's domestic partner with the Department of Personnel.

. . . .

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 109

**Section 20.7 — Change of Schedule.**

The Employer's right to assign officers for duty at any time and at different times during each <u>twenty-eight- (28-)</u> day police period remains unrestricted and unchallenged. Watch assignments and designated starting times shall be established and posted for each police period. Watch assignments and designated starting times shall remain in effect for the duration of the <u>twenty-eight- (28-)</u> day police period, except for <u>the following reasons</u>:

A.    in-service training (including individualized training) with a maximum of six (6) programs per year for a maximum of eighteen (18) days per year and with seven (7) days' notice to the officer;

B.    elective training (elective training is a job-related program the Department makes available to officers and in which officers elect to participate);

C.    mandatory proficiency training for employees receiving D-2 or D-2A pay or otherwise receiving specialist or premium pay because of the position or assignment held, with a maximum of six (6) programs per year, for a maximum of thirty (30) days per year and with seven (7) days' notice to the officer;

D.    pre-service training for promotions;

E.    court appearances in excess of two (2) consecutive days; or

F.    initial assignment when detailed to the Alternate Response Section.

However, starting times may be adjusted by the Employer (1) plus or minus two (2) hours from the designated starting times or (2) for up to seven (7) hours within an officer's assigned watch for circumstances not known to the Department forty-eight (48) hours prior to the start of the police period. Provided that where an officer who has been scheduled to attend in-service training and does not attend because of circumstances beyond the reasonable control of the Employer, the Employer may reschedule said officer for said in-service training without payment of premium time hereunder.

Any adjustment inconsistent with the above provision, made after the start of the <u>twenty-eight- (28-)</u> day police period, will result in payment in accordance with Section 20.2 for the hours worked outside of the officer's tour of duty scheduled at the beginning of the officer's <u>twenty-eight- (28-)</u> day police period for that period. Shift changes during a police period made voluntarily at the request of an officer and upon approval of the Employer shall not require additional compensation.

~~This Section does not apply to a condition where the Superintendent of Police and the Mayor have determined in writing that a serious emergency condition exists or to officers assigned to duties which by their very nature require changes in starting times, including: personnel working in the Office of the Superintendent, working in the Patrol Division who are assigned to District Tacti-~~

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 110

~~cal Teams, First and Eighteenth District Foot Patrol units, Patrol Division Administration, the Detail Unit, the Labor Relations Section, the Mounted Unit and the Special Operations Section, Internal Affairs Division, Bureau of Staff Services, Personnel Division Personnel Investigations Section, Summer Mobile Force, Organized Crime Division, Special Events Unit, Detached Services Unit, Operational Services Administration, Youth Division Special Investigations Unit, Auto Theft Special Investigative and Stripping Teams, Central Investigation Unit, Detective Division Mission Teams and officers assigned to dignitary protection duties as part of their regular duties, or temporary replacements therefore, excluding officers assigned to visiting dignitaries; and up to two officers assigned to the immediate staff of exempt commanding officers. Due to the particular scheduling requirements for officers assigned to the School Patrol Unit, no additional compensation shall be paid to any such officer who is reassigned (including reassignment to a different watch) during any police period which includes the end of the school year or the start of the school year.~~

This Section does not apply in the following situations:

A.  The Superintendent and the Mayor have determined in writing that a serious emergency condition exists;

B.  When officers are assigned to duties that by their very nature require changes in starting times, including personnel assigned to the following Offices, Bureaus, Divisions or Units:

  1.  Office of the Superintendent (Administration, Office of Legal Affairs, Management and Labor Affairs Section, News Affairs, CAPS Implementation Office, CAPS Project Office, Special Events and Liaison Section, Preventive Programs and Neighborhood Relations);

  2.  Office of the Assistant Superintendent (Administration and Detached Services Unit);

  3.  Bureau of Professional Standards (Administration, Inspections Division, Internal Affairs Division, Education and Training Division, Office of Management Accountability);

  4.  Bureau of Patrol (Administration, First and Eighteenth District Foot Patrol Units, District Tactical and Gang Teams, Community Policing Office, Detail Unit, Troubled Building Section and Area Deputy Chief Office);

  5.  Bureau of Strategic Deployment (Administration, Mounted Patrol Unit, Special Functions Section, Marine ~~Unit~~ and Helicopter Unit);

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 111

6. Bureau of Administrative Services (Administration, ~~Personnel Division~~ Personnel Investigators in Human Resources Division, Information Services Division, Finance Division and Reproduction and Graphic Arts Division);

7. Bureau of Investigative Services [Administration, Organized Crime Division, Counterterrorism and Intelligence Division (Excluding Bomb and Arson, Public Transportation and Airport Law Enforcement Sections), Special Investigations Unit, Central Investigations Unit, and Detective Division ~~and~~ Mission Teams);

8. Officers assigned to dignitary protection as part of their regular duties, including temporary replacements; and

9. No more than two (2) members of the immediate staff of each exempt Commanding Officer.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 112

**Section 23.1 — Definition and Application.**

A.    Seniority shall be defined as an officer's continuous length of service <u>from the date of last hire as a police officer, subject to subsection (B) below.</u>

The seniority of an officer retained beyond the ~~twelve month~~ <u>eighteen- (18-) month</u> probationary period shall date back to the last date of hire as a police officer and be subject t<u>o the deductions provided in subsection (B).</u>

In the event two <u>(2)</u> or more officers have the same seniority date, the older officer, as determined by referring to the officers' date<u>s</u> of birth as recorded on their employment application<u>s</u>, shall receive the higher seniority status.

~~B.~~    There shall be only one seniority for officers covered by this Agreement and that seniority shall control for the purpose of determining rights, benefits, and other conditions of employment affected by seniority under this Agreement<u>,</u> ~~subject to the following~~<u>.</u>:

    ~~1.~~    ~~Suspensions occurring before July 1, 1981 shall be deducted in computing continuous length of service for purposes of determining advancement within the salary schedule, amount of furlough, and seniority for other purposes covered by this Agreement.~~

    ~~2~~<u>B</u>.    All absence from the ~~Employer's~~ <u>Department's</u> service without pay as a result of leaves for more than thirty (30) days (other than military, duty, occupational or ordinary disability)<u>, suspensions of more than thirty (30) days</u> and all unexcused absences shall be deducted in computing continuous length of service for purposes of determining advancement within the salary schedule, amount of furlough, and seniority for other purposes covered by this Agreement.[195]

    ~~3.~~    ~~Effective January 1, 1984 only the days absent in excess of a thirty (30) day leave from the Employer's service without pay (other than military or duty disability) shall be deducted in computing continuous length of service for purposes of determining advancement within the salary schedule, amount of furlough, and seniority for other purposes covered by this Agreement.~~

~~C.~~    ~~The seniority for officers who resigned after August 18, 1981, applied for reinstatement within one (1) year, and were subsequently rehired prior to January 1, 1984 shall be computed by deducting time lost due to resignation and as provided for in subsection B.~~

---

[195] The Lodge has committed to preparing a side letter regarding these changes.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 113

~~D~~C. The seniority of an officer and the employment relationship shall be terminated in the following circumstances:

1. Resignation;

2. Separation (discharge);

3. Retirement;

4. Unauthorized absence for four (4) consecutive working days without notice to the Employer;

5. If laid off, failure to report fit for duty within seven (7) days of delivery of written notification of recall to the officer's last known address which notification shall be simultaneously provided to the Lodge;

6. Failure to report fit for duty upon termination of an authorized leave of absence; and

7. Laid off for a period of time as set forth in the City of Chicago Personnel Rules as in effect on December 31, 1983.

**Section 23.8 — Filling Recognized Vacancies.**

This Section shall apply only to the ~~following~~ Public Transportation Section including the Public Transportation Canine Unit, Public Housing Sections North and South, the Special Activity Section, Traffic Section/Detail Unit, Traffic Enforcement Unit, Traffic Court/Records Unit, Traffic Safety & Training Unit, Major Accident Investigation Unit, Loop Traffic, District Law Enforcement, Airport Law Enforcement North and South, Mounted Unit, Marine Unit, Gun Registration Section, Records Inquiry Section, Field Inquiry Section, Evidence and Recovered Property Section, Police Document Services Section, Central Detention Section, Auto Pound Section (D-1 Officers), Electronics and Motor Maintenance Division (D-1 Officers), Office of Emergency Communications (excluding the Alternate Response Section), Area Criminal Investigations, Missing Persons Section, Juvenile Court Liaison Section, Youth Investigation Group Areas (excluding Youth Investigation Group Special Investigation Unit and Youth Investigation Group Administration), Auto Theft Section, Bomb and Arson Section (except bomb technicians), excluding the immediate staff of each exempt Commanding Officer not to exceed two (2) staff members.

A vacancy for purposes of this Section ("recognized vacancy") exists when an officer is transferred, resigns, retires, dies, is discharged, when there are new Units created, or when the Department increases the number of employees in a Unit, except for details for not more than three (3) months <u>and the Summer Lakefront Bike Detail</u>~~, provided that, in any event, this Section 23.8 shall not apply to (1) the Summer Mobile Force detail from the last change day before Memorial Day to the first change day after Labor Day, and (2) the Auto Snow Tow detail from the last change day before December 1 to the first change day after April 1~~.  The Employer shall determine at any time before said vacancy is filled whether or not a recognized vacancy shall be filled.  If and when the Employer determines to fill a recognized vacancy, this Section shall apply.

In order to avoid the inefficiency of chain-effect bidding, the vacancy created by the reassignment of a successful bidder shall be a recognized vacancy herein; however, subsequent vacancies created thereby shall be filled within the Department's discretion.  Further, there is no recognized vacancy created as a result of emergencies or when an officer is removed for disciplinary reasons for up to thirty (30) days.  When an officer is removed for disciplinary reasons for more than thirty (30) days, a recognized vacancy is created.

The Employer shall post a list of recognized vacancies, if any, stating the requirements needed to fill the opening, at least fourteen (14) days before the start of the twenty-eight- (28-) day police period.  A copy of such posting shall be given to the Lodge.  Non-probationary office**rs** within the same D-1 salary grade or D-2 job classification, within seventy-two (72) hours of the time the list has been posted, may bid on a recognized vacancy in writing on a form to be supplied by the Employer.  One copy of the bid shall be presented to the Employer; one copy shall be forwarded to the Lodge; and one copy shall be re-

tained by the officer.  Bidding under this Section may only be for a recognized vacancy in a specific Unit without regard to shift, day off, Unit duty assignments, etc.  The Employer shall respond to the successful bidder and the Lodge no later than three (3) days prior to the change day for the new twenty-eight-(28-) day police period.  During the bidding and selection process, the Employer may temporarily fill a recognized vacancy by assigning an officer to said vacancy until the recognized vacancy is filled.

An eligible bidder shall be an officer who is able to perform in the recognized vacancy to the satisfaction of the Employer after orientation without further training.  The Employer shall select the most senior qualified bidder when the qualifications of the officers involved are equal.  In determining qualifications, the Employer shall not be arbitrary or capricious, but shall consider training, education, experience, skills, ability, demeanor and performance, except that the parties recognize that the unique operational needs of the Employer require flexibility in the delivery of public service and to meet this need the Employer may fill twenty percent (20%) of the recognized vacancies within its discretion, provided that, if the Employer does not utilize any or all of its twenty percent (20%) exception in any personnel order, the remainder of the unused exception may be carried forward and used to fill future recognized vacancies within a twelve- (12-) month period.

Upon the effective date of this Agreement, an exception to the above paragraph will apply to Airport Law Enforcement North and South and the Traffic Section/Detail Unit; ~~thirty-three percent (33%)~~ fifty percent (50%) of all recognized vacancies in each of these Units occurring after the ratification of the Agreement shall be filled by bid.  ~~For purposes of bidding to these Units, the Employer may disregard seniority if and to the extent necessary to achieve the balance of experience and qualifications the Employer determines to be desirable in each of these Units.~~

Bidding procedures will be done in conformance with the Memorandum of Understanding in this Agreement.  The successful bidder may not bid for another recognized vacancy for one (1) year, unless reassigned by the Employer during that year.  A successful bidder may not be reassigned except for (1) emergencies for the duration of the emergency, (2) for just cause or (3) where the Superintendent determines that the officer's continued assignment would interfere with the officer's effectiveness in that assignment.  When there are no qualified bidders, the Employer may fill the recognized vacancy within its discretion.

**Section 23.9 — Filling Unit Duty Assignments.**

This Section shall apply only to the following jobs within the Units set forth in Section 23.8: Warrant Clerk, Summary Investigation Detective, Review Investigation Detective, Review Officer, Detective Division Administrative Desk Duty Assignment, ~~Area Youth Investigations Administrative Desk Assignments (limited to one bid position each for the second and third watch in each area); and~~ District Desk, District Watch Relief and Lockup only as specifically set forth below. The Employer agrees not to eliminate any Unit duty assignments listed in this Section for the duration of this Agreement.

An opening in a Unit duty assignment for purposes of this Section ("recognized opening") exists when an officer performing the above Unit duty assignments is to be transferred, resigns, retires, dies, is discharged, when there are new Unit duty assignments created, or when the Department increases the number of employees in a Unit, except for details for not more than three (3) months. <u>A recognized opening will be created when an officer is voluntarily detailed and remains absent from his or her Unit duty assignment for more than three (3) months.</u> An officer's assignment to a detail shall not be rolled over solely for the purpose of avoiding the effect of this Section. The Employer shall determine at any time before said opening is filled whether or not a recognized opening shall be filled. If the Employer decides to fill a recognized opening utilizing Section 18.4, the Employer must provide the Lodge with the name of the limited duty officer within ten (10) days of filling the recognized opening. If and when the Employer determines to fill a recognized opening other than utilizing Section 18.4, this Section shall apply. Further, there is no recognized opening created as a result of emergencies or when an officer is removed for disciplinary reasons for up to thirty (30) days. When an officer is removed for disciplinary reasons for more than thirty (30) days or when an officer is relieved of his or her police powers for more than ninety (90) days for reasons other than placement on the medical roll, a recognized opening is created.

In the event a recognized opening is to be bid under this Section, the Employer shall post within the Unit on the first Wednesday of the next police period a list of recognized openings therein, if any, stating the requirements needed to fill the opening. This list will remain posted for seven (7) calendar days. A copy of such posting shall be given to the Lodge at the time of the bid posting. Non-probationary officers within the same Unit and within the same D-1, D-2 or D-2A job classification, may bid on a recognized opening in writing on a form to be supplied by the Employer. One copy of the bid shall be presented to the Employer, one copy shall be forwarded to the Lodge, and one copy shall be retained by the officer. The Employer shall respond to the successful bidder and the Lodge no later than three (3) days prior to the change day for the new twenty-eight- (28-) day police period. During the bidding and selection process, the Employer may temporarily fill a recognized opening by assigning an officer to said opening until the recognized opening is filled by bid; however, the Employer may not assign officers to a vacated position to avoid bidding the recognized opening.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 117

An eligible bidder shall be an officer who is able to perform in the recognized opening to the satisfaction of the Employer after orientation. The Employer shall select the most senior qualified bidder when the qualifications of the officers involved are equal. In determining qualifications, the Employer shall not be arbitrary or capricious, but shall consider training, education, experience, skills, ability, demeanor and performance.

The successful bidder may not bid for another recognized Unit duty assignment opening for one (1) police period year. A successful bidder may not be reassigned except for (1) emergencies for the duration of the emergency, (2) for just cause, (3) where the Superintendent determines that the officer's continued assignment would interfere with the officer's effectiveness in that assignment or (4) temporary Unit duty assignments for operational needs, provided the Employer shall not fill the vacated Unit duty assignment. When there are no qualified bidders, the Employer may fill the recognized opening within its discretion. Unit duty assignments in District Desk, District Watch Relief or Lockup shall be treated in accordance with this Section 23.9 in all respects, except ~~the following: (1)~~ only non-probationary officers within the same watch and within the same D-1 salary grade shall be eligible to bid for recognized openings in such assignments.

The District Watch Secretary position may be filled at the Employer's discretion. These positions are limited to one (1) position per watch in each District. If the Employer decides to fill the District Watch Secretary position, the daily Unit duty assignment sheets will identify the officer assigned to the District Watch Secretary position. The duties and responsibilities of the District Watch Secretary are to be determined by the Employer provided that the Lockup, the Review and the Desk Officer bid positions as set forth in the Agreement shall be filled by either the bid officer or District Watch Relief personnel prior to filling these positions with the District Watch Secretary.

If the Employer violates this Section by improperly filling a recognized opening by not placing the opening up for bid, the affected officer(s) will be compensated at the rate of time and one-half in quarter hour increments until the violation is remedied. The Employer is granted the ability to remedy the violation without waiting until the next police period.

If the Employer violates this Section by improperly selecting a bidder or improperly determining qualifications for a recognized opening, the affected officer(s) will be compensated at the rate of time and one-half in quarter hour increments up to a maximum of fifty (50) hours of compensatory time.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 118

**Section 23.12 — Reassignment of Duties.**

~~Any other provision of this Agreement to the contrary notwithstanding, nothing~~ No provision in this Agreement shall be deemed to prohibit the Employer from hiring or assigning any non-bargaining unit personnel to perform any unit duties as described in Appendix B and/or C, provided that no officer covered by this Agreement shall be laid off either as a result thereof or if his or her non-bargaining unit replacement, if any, has not been laid off.

Any officer who is to be displaced by a non-bargaining unit person shall be given 60 days' prior notice of said displacement. The Employer shall designate the positions and duties to which displaced officers shall be assigned. Displaced officers may be assigned to other job duties within the same unit without regard to Section 23.8 and 23.9. If the Employer decides to assign displaced officers to different units, such displaced officers shall be permitted to bid for such assignments which the Employer decides to fill with such officers on the basis of seniority and qualifications in accordance with Section 23.8. If officers other than those displaced are permitted by the Employer to bid for such assignments, then all the displaced officers shall be deemed to be more senior than all of the non-displaced bidders for purposes of said bid.

An officer who has been given a limited duty assignment pursuant to Section 18.3 shall not be displaced from limited duty under Section 23.12 for the duration of his or her eligibility for limited duty.

**Section 25.2 — Medical, ~~and~~ Dental and Flexible Spending Account Plans.**

The ~~officers' and dependents'~~ <u>Employer's</u> medical, dental and prescription drug plans are ~~hereby~~ incorporated ~~in~~ <u>by reference into</u> this Agreement. All newly hired employees shall be required to participate in the PPO plan for the first eighteen (18) months of their employment. These employees shall be eligible to participate in the first open enrollment period following the eighteen- (18-) month anniversary of their dates of hire.

<u>~~Effective January 1, 2006, the City will amend its Section 125 plan to implement~~ The Employer shall provide officers with the opportunity to enroll in</u> a Flexible Spending Account ("FSA") <u>plan</u>, which will permit officers to fund, on a pre-tax basis, an individual account that the officer may use to pay for qualified unreimbursed medical expenses, as provided under Section 213 of the Internal Revenue Code. Subject to IRS regulations, the FSA will allow participants to pay the following qualified expenses on a pre-tax basis: dental expenses; vision expenses; health plan contributions, deductibles and co-payments; prescription drug co-payments~~,~~ <u>and payments for</u> over-the-counter drugs<u>;</u> and other unreimbursed medical expenses. Participation is voluntary, and participants may contribute up to $5,000 annually on a pre-tax basis, which will be deducted pro-rata each payroll period. Officers may enroll in the FSA plan or change the amount of their election once per year during open enrollment or when they have a change in family status. As mandated by the Internal Revenue Code, a "use it or lose it" rule applies to Section 125 plans. Any amount that remains in the participant's account at the end of the year will be forfeited. <u>During open enrollment, the parties will engage in a joint educational campaign to inform officers of the benefits of the FSA plan and otherwise increase employee participation in such plan.</u>

The Employer shall make available to officers covered under this Agreement and their eligible dependents ~~copies of the Summary of Medical and Dental Plan Benefits booklets~~ <u>summaries of the benefits provided by the Employer's health care plan either electronically or in print</u> ~~with the cost of any printing to be borne by the Employer~~. The cost of such coverage to be borne by the Employer.

The plans for medical, dental and prescription drug benefits, including the provisions on eligibility and self-contribution rules in effect as of the date of this Agreement, may not be changed by the Employer without the agreement of the Lodge.

The medical plan (health insurance plan) shall consist of three (3) separate alternative coverages—a PPO plan ("PPO")~~; a PPO Plan with a Health Reimbursement Account ("PPO/HRA");~~ and two (2) HMO plans ("HMO"). ~~If the Employer decides that the PPO/HRA alternative lacks sufficient employee enrollment or is cost prohibitive, it may discontinue that alternative, provided that the Employer provides reasonable prior notice to the Lodge and an oppor-~~

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 120

~~tunity for those enrolled in the PPO/HRA to enroll in another plan.  For this~~
~~purpose, "reasonable notice" shall be defined as notification in writing of the~~
~~Employer's intent to discontinue the plan at least ninety (90) days prior to the~~
~~proposed discontinuation where circumstances are within the Employer's con-~~
~~trol.  In all other cases, the Employer will provide the maximum notice as is~~
~~practicable under the circumstances.~~  In ~~addition, in~~ the event that a new
health care plan becomes available to the Employer during a plan year, the
Employer shall have the right to include that new plan in the plan alternatives
upon reasonable prior notice to and discussion with the Lodge.

The Employer ~~also~~ agrees to make available to the following other per-
sons the above-described hospitalization and medical program and the dental
plan:  officers covered by this Agreement who retire on or after age sixty (60)
and their eligible dependents; <u>the</u> surviving spouse and children of officers cov-
ered by this Agreement killed in the line of duty; officers covered by this
Agreement on a leave of absence for disability (both duty and occupational) and
their eligible dependents; <u>and the</u> surviving spouse and children of deceased
officers covered by this Agreement who were formerly on pension disability
(both duty and occupational).  The Employer will contribute the full cost of cov-
erage for any of the above-enumerated officers covered by this Agreement who
elect coverage under any plan or plans.  However, coverage under a plan for of-
ficers covered by this Agreement shall terminate when an officer covered by
this Agreement either reaches the age for full Medicare eligibility under federal
law or ceases to be a dependent as defined in a plan, whichever occurs first.
After an officer covered by this Agreement reaches the age for full Medicare eli-
gibility, that officer shall be covered under the medical program for annuitants,
provided the person pays the applicable contributions.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 121

**Section 26.1 — Salary Schedule.**

. . . .

    E.    Officers covered by this Agreement who are assigned as Explosive Technician I̶, Firearms Identification Technician I̶, Legal Officer I, Police Forensic Investigator I, ~~Police Laboratory Technician II~~, Security Specialist, or Supervising Substance Abuse Counselor shall receive D-3 pay as base salary.

. . . .

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 122

**Section 26.3 — Work Out of Grade.**

A.      Any officer covered by this Agreement being paid D-1 salary who is directed to perform substantially all the duties and assumes substantially all the responsibilities of a ~~Patrol Specialist, Auto Pound Supervisor and/or Garage Supervisor,~~ Field Training Officer for two (2) or more hours within a single eight- (8-) hour tour of duty shall be paid at a D-2 rate consistent with his or her own tenure for an eight- (8-) hour tour of duty or for the time spent, whichever is greater.

Any officer covered by this Agreement being paid D-1 or D-2 salary who is directed to perform substantially all the duties and assumes substantially all the responsibilities of a Sergeant (other than in the Internal Affairs Division, Training Division or Research and Development Division) or a ~~Police Laboratory Technician II~~ Forensic Investigator for more than two (2) hours within a single eight- (8-) hour tour of duty shall be paid at a D-3 rate consistent with his or her own tenure for an eight- (8-) hour tour of duty or for the time spent, whichever is greater.

. . . .

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 123

**Section 31.1— Implementation.**

A.  1.  Districts and Units in which assigned officers have selected a steady watch will continue to select a steady watch each year. These Units include <u>the following</u>:

   . . . .

   ~~Area Youth~~

   . . . .

   ~~Electronics and Motor Maintenance~~

   . . . .

   ~~Public Housing~~

   . . . .

. . . .

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 124

### APPENDIX B

. . . .

~~Assistant Desk Officer (one such job per watch per District shall continue to be subject to bid under Section 23.9)~~

. . . .

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 125

## APPENDIX L
## AFFIDAVITS IN DISCIPLINARY INVESTIGATIONS

1.    No affidavit will be required in support of anonymous complaints of criminal conduct.  ~~The Department~~ IPRA and IAD shall continue ~~its~~ the current and past practice with respect to classifying allegations as either criminal or excessive force.  Allegations of excessive force shall not be classified as criminal for purposes of avoiding the affidavit requirement.

      . . . .

6.    In all other cases, ~~the Department~~ IPRA and IAD will make a good faith effort to obtain an appropriate affidavit from the complainant within a reasonable time.  An "appropriate affidavit" in the case of a citizen complaint is one where the complainant affirms under oath that the allegation(s) and statement(s) made by the complainant are true.

7.    When an appropriate affidavit cannot be obtained from a citizen complainant, the head of either ~~OPS~~ IPRA or IAD may sign an appropriate affidavit according to the following procedure.  An "appropriate affidavit" in the case of the head of either ~~OPS~~ IPRA or IAD is an affidavit wherein the agency head states he or she has reviewed objective verifiable evidence of the type listed below, the affidavit will specify what evidence has been reviewed and in reliance upon that evidence, the agency head affirms that it is necessary and appropriate for the investigation to continue.

      . . . .

9.    In the case of an investigation of the type normally conducted by ~~OPS~~ IPRA, the head of IAD will execute the affidavit described above, if the head of IAD believes execution of the required affidavit is appropriate under the facts of the case based upon the evidence received at that time.  In the case of an investigation of the type normally conducted by IAD, the head of ~~OPS~~ IPRA will execute the affidavit described above if the head of ~~OPS~~ IPRA believes the required affidavit is appropriate under the facts of the case based upon the evidence received at that time.

      . . . .

11.   Upon the receipt of a complaint which requires an affidavit, ~~the Department~~ IPRA or IAD may conduct a preliminary investigation into those allegations, but no Complaint Register (CR) number will be issued unless and until the required affidavit is obtained.  The parties acknowledge that ~~the Department is~~ IPRA and IAD are currently unable to track these preliminary investigations, but will begin to do so as soon as the computer application is functional.  Until ~~the Department is~~ IPRA and IAD are able to begin tracking the preliminary investigations, a CR number will be used to track these investigations.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 126

## APPENDIX Q
## DISCIPLINE SCREENING PROGRAM

. . . .

3.     When the member requests the Screening Program option, he or she will
be notified of the date the Screening Committee will meet and of the right
to review the investigative file prior to the screening date.  The member
will appear at either the ~~Office of Professional Standards~~ Independent Po-
lice Review Authority or the Internal Affairs Division to review the inves-
tigative file.  The member may make written or audiotape recorded notes,
but may not remove or make copies of any part of the investigative file.

4.     At the Screening Committee Meeting, a representative of the Lodge and a
representative of the Department will meet and review the selected files
and attempt to reach an agreement on the findings and/or the recom-
mendations for discipline.  If an agreement is reached, the representative
of the Department will submit the agreed-upon disposition to the Assis-
tant Deputy Superintendent, Internal Affairs Division, or the Chief Ad-
ministrator, ~~Office of Professional Standards~~ Independent Police Review
Authority, for approval.  If approved, the representative of the Lodge shall
contact the member for his or her agreement and approval of the agreed-
upon disposition.

. . . .

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 127

## MEMORANDUM OF UNDERSTANDING
## REGARDING DISTRICT UNIT BID ASSIGNMENTS

The Lodge and the Employer agree that Lodge members who have successfully bid for the position of District Desk or District Lockup Keeper will continue to function in that position for the duration of this contract unless removed in accordance with the provisions of Section 23.9.

The Lodge and the Employer further agree to open for bid in accordance with the provisions of Section 23.9 the position of District Watch Relief in each of the Patrol Division's 25 Districts. The member bidding for the position of District Watch Relief must be able to perform to the satisfaction of the Employer the functions of a Desk Officer, Lockup Keeper and District Review Officer after a period of orientation. Successful District bid members will be utilized in bid assignments before full duty non-bid members. When not required to function as District watch relief; the member will be assigned to District patrol duties.

The Employer shall select the most senior qualified bidder for the position of District Watch Relief. If there are not sufficient bidders to fill a District Watch Relief position declared vacant by the Employer, the Employer shall fill such vacancy within its discretion.

The following are the number of District Desk, District Lockup, and District Watch Relief positions subject to bid under the provisions of Section 23.9:

| Dist | Desk | Lockup | W/Relief | Dist | Desk | Lockup | W/Relief |
|------|------|--------|----------|------|------|--------|----------|
| 001 | 6 | 0 | 9 | 014 | ~~3~~6 | 3 | 9 |
| 002 | ~~3~~6 | 6 | 12 | 015 | ~~3~~6 | 3 | 9 |
| 003 | ~~3~~6 | 3 | 9 | 016 | ~~3~~6 | 3 | 9 |
| 004 | ~~3~~6 | 3 | 9 | 017 | ~~3~~6 | 3 | 9 |
| 005 | ~~3~~6 | 6 | 12 | 018 | 6 | 3 | ~~6~~9 |
| 006 | ~~3~~6 | 3 | 9 | 019 | 6 | 6 | ~~9~~12 |
| 007 | 6 | 3 | 9 | 020 | ~~3~~6 | 3 | 9 |
| 008 | ~~3~~6 | 3 | 9 | 021 | ~~3~~6 | 3 | 9 |
| 009 | 6 | 3 | 9 | 022 | ~~3~~6 | ~~0~~3 | 9 |
| 010 | ~~3~~6 | 3 | 9 | 023 | ~~3~~6 | 3 | 9 |
| 011 | ~~3~~6 | 6 | 12 | 024 | ~~3~~6 | 3 | 9 |
| 012 | ~~3~~6 | 3 | 9 | 025 | ~~4~~6 | 6 | ~~11~~12 |
| 013 | ~~3~~6 | 3 | 9 | | | | |

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 128

**<u>MEMORANDUM OF UNDERSTANDING
BETWEEN THE
CITY OF CHICAGO
AND THE
FRATERNAL ORDER OF POLICE, CHICAGO LODGE NO. 7
REGARDING
DEPARTMENT-PROCURED OUTSIDE EMPLOYMENT</u>**

The parties agree to implement a Department-procured outside employment program, subject to the following terms and conditions:

A. The Department-procured outside employment program is a voluntary program that allows non-probationary full-duty officers to work on their days off for non-governmental employers, subject to the terms and conditions set forth below.

B. The Department will ~~facilitate the procurement of the~~ procure outside employment opportunities; however, officers who participate in the program will work directly for the non-governmental employer for a pre-determined uniform rate of pay established exclusively by the Employer, and the non-governmental employer shall be solely responsible for paying each officer and otherwise accounting for the officer's compensation.

C. An officer's eligibility for Department-procured outside employment is governed by the following terms and conditions:

1. An officer is not eligible to work any Department-procured outside employment assignment under the following circumstances:

a. The officer's most recent overall performance rating was ~~below seventy-six (76), less than "meets expectations" or their equivalents~~ "requires improvement" or "unacceptable" ~~under the applicable performance evaluation rubric~~.

b. The officer is serving a suspension or has been relieved from regular duty as a result of summary punishment.

c. The officer is on the medical roll or has been released from the medical roll for furlough.

d. During the ~~previous thirty (30) calendar days~~ thirty- (30-) day period prior to the date of the officer's application, the officer was absent from duty for five (5) or more days as a result of a non-duty-related injury or illness.

e. The officer's disciplinary record contains three (3) or more summary punishment actions within the prior twelve- (12-) month period.

      f.     The officer has been disqualified from participating in the program based on his or her performance while working a special employment or Department-procured outside employment assignment.

2.     An officer is not eligible to work any will be suspended from working a Department-procured outside employment assignment for a period of thirty (30) calendar days if the officer was scheduled for a Department-procured outside employment assignment and failed to work such assignment without reasonable cause for such absence acceptable to the Employer (e.g., a death in the family, an injury on duty or a change in the officer's regular duty schedule).

3.     An officer is not eligible to work any will be suspended from working a Department-procured outside employment assignment for a period of ninety (90) calendar days if the officer was scheduled for a Department-procured outside employment assignment and failed to work such assignment without any advance notice to the Employer of his or her absence (i.e., a "no call/no show").

D.    If an officer believes that he or she has been wrongfully declared ineligible to work Department-procured outside employment, the officer shall submit a "To-From-Subject Report" to the coordinator of the Department-procured outside employment program no later than four (4) calendar days following his or her receipt of notification of ineligibility. If the program coordinator's response is unsatisfactory to the officer, then the officer may initiate a grievance at Step One of the grievance procedure set forth in Section 9.2 no later than seven (7) of the officer's working days following his or her receipt of such response.

CE.    The Employer shall assign Department-procured outside employment opportunities to eligible officers by seniority on a rotating basis.

DF.    The Employer retains the right to limit shall publish any limitations it establishes on the number of hours, tours or assignments that may be worked by officers in the program or and may restrict participation in the program to officers who are assigned to certain Units or who have specialized knowledge, skills or abilities.

EG.    The exclusive remedy for any incorrect assignment of Department-procured outside employment shall be the assignment of future Department-procured outside employment opportunities in a manner that corrects the error in assignment.

H.    The parties recognize that the Department-procured outside employment program is a new initiative for the Department. Therefore, the parties agree to establish a labor-management committee to facilitate its implementation and administration. The labor-management committee will be composed of equal representation from the Department and the Lodge

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 130

and will be charged with the following responsibilities: monitoring and evaluating the implementation and administration of the program; attempting to resolve any disputes arising out of the program prior to invoking the formal grievance procedure; and attempting to develop joint recommendations regarding the program's modification, continuation, expansion or discontinuation. Any joint recommendation by the committee to modify, continue, expand or discontinue the program is subject to the approval of the Department and the Lodge.

I.  Notwithstanding any recommendation by the committee, the Department may discontinue the program at its discretion. If the Department intends to discontinue the program, the Department will timely provide the Lodge with written notice of its intent and upon request will promptly meet with the Lodge to discuss its rationale.

J.  This ~~memorandum of understanding is subject to the ratification process designated by the Lodge in accordance with its Constitution, By-Laws and other governing procedures. If this memorandum of understanding is ratified through such process, the Lodge shall promptly notify the Employer in writing of such ratification, and this~~ memorandum of understanding shall be implemented as expeditiously as possible following its execution. ~~If this memorandum of understanding is not ratified through such process, its terms and conditions shall be considered null and void, but may be the subject of continued negotiations between the parties~~.


Chicago Police Department

Fraternal Order of Police,
Chicago Lodge No. 7


_____
Jody Weis
Superintendent of Police

_____
Mark P. Donahue
President


Dated: _____

Dated _____



## FRANCZEK RADELET

*Attorneys and Counselors*

300 South Wacker Drive   Suite 3400   Chicago, IL 60606
Phone 312.986.0300   Fax 312.986.9192   franczek.com

JAMES C. FRANCZEK, JR.
312.786.6110
jcf@franczek.com

July 9, 2009

Mr. Joel A. D'Alba
Asher, Gittler, Greenfield & D'Alba, Ltd.
200 West Jackson Boulevard, Suite 1900
Chicago, Illinois  60606

Re:   Vocational Training Program

Dear Mr. D'Alba:

This letter confirms the parties' agreement that the Employer will continue to offer an appropriate vocational training program for officers who receive duty or occupational disability benefits and who desire to avail themselves of such program. The continuation of the program is subject to the monies appropriated for such program, which shall be at least $120,000.00 for 2010 and 2011.

Your acknowledgment and agreement is appreciated in the space provided below.

Very truly yours,

James C. Franczek, Jr.

AGREED:

Joel A. D'Alba

408217.1

July 17, 2009

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
CITY OF CHICAGO
AND THE
FRATERNAL ORDER OF POLICE, CHICAGO LODGE NO. 7
REGARDING
RETIREE HEALTH CARE BENEFITS

The parties agree that the health care benefit provided to officers who retire on or after age sixty (60) pursuant to Section 25.2 of the parties' collective bargaining agreement ("the Agreement") shall be extended to officers who retire on or after age fifty-five (55), subject to the following terms and conditions:

**A.     Applicability**

This memorandum of understanding applies only to any officer who retires on or after age fifty-five (55) with a retirement date on or after November 1, 2009 and who intends to avail himself/herself of the health care benefit provided to officers who retire on or after age sixty (60) by Section 25.2 of the Agreement.

**B.     Health Care Benefits Upon Retirement**

**1.     Officers Who Retire on or After Age Sixty (60)**

Officers who retire on or after age sixty (60) shall continue to receive the health care benefit set forth in Section 25.2 of the Agreement and may elect to have their final compensation paid in accordance with Section (C). Any officer who intends to exercise this option shall notify the Employer of his/her intent in writing at the time he/she files for retirement and shall otherwise comply with any administrative procedures established by the Employer to implement this provision. After an officer files for retirement, he/she may only rescind his/her election prior to the effective date of retirement or by any administrative deadline established by the Employer, whichever date is earlier.  Upon retirement, the officer's election becomes irrevocable.

**2.     Officers Who Retire on or After Age Fifty-Five (55) and Before Age Sixty (60)**

Officers who retire on or after age fifty-five (55) and before age sixty (60) shall be eligible for the health care benefit set forth in Section 25.2 of the Agreement, provided that

1

409994.4

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 133

July 17, 2009

the required number of eligible officers file for retirement in accordance with the following schedule:

| Required Number of Officers | Filing Deadline | Effective Date of Retirement (must be age 55 through 59) |
|---|---|---|
| 160 | 10/01/2009 | 11/01/2009 through 03/31/2010 |
| 130 | 01/01/2010 | 04/01/2010 through 12/31/2010 |
| 100 | 10/01/2010 | 01/01/2011 through 12/31/2011 |
| 100 | 10/01/2011 and each 10/01 thereafter | 01/01/2012 through 12/31/2012 and each 01/01 through 12/31 thereafter |

At least thirty (30) calendar days prior to each filing deadline, the Employer shall send notice to the Lodge of the number of retirement applications filed to date and the name of each applicant and shall send notice to each applicant of the number of retirement applications filed to date. If the requirement set forth in this subsection is not satisfied, the Employer shall send notice to the Lodge and each applicant that the minimum threshold was not met within three (3) business days of the filing deadline, and such applicants shall have the right to withdraw their filings for retirement within fifteen (15) business days from the date of such notice.

C.    Payment of Final Compensation Upon Retirement

1.    Legally Required Final Compensation

Upon retirement, the Employer shall pay to each eligible officer or his/her estate if necessary any compensation owed to such officer in the form of wages earned, unused compensatory time granted pursuant to the federal Fair Labor Standards Act ("FLSA"), unused elective time provided by the Agreement (e.g., furlough days, Baby Furlough Days and personal days) and any other final compensation that may be legally owed to such officer, except as provided by subsection (C)(2). Any wage increases that are implemented as a result of negotiations, mediation or interest arbitration for a successor collective bargaining agreement and that are effective prior to the officer's date of retirement shall be applied retroactively to his/her legally required final compensation paid pursuant to this subsection.

2

*July 17, 2009*

2.      Non-FLSA Compensatory Time

Upon retirement, the Employer shall calculate the value of each officer's accumulated non-FLSA compensatory time (if any) based on the officer's rate of pay in effect at the time of retirement. Any wage increases that are implemented as a result of negotiations, mediation or interest arbitration for a successor collective bargaining agreement and that are effective prior to the officer's date of retirement shall be applied retroactively to the value of his/her non-FLSA compensatory time paid pursuant to this subsection.

As part of the officer's legally required final compensation, the Employer will pay to the officer or his/her estate the value of his/her non-FLSA compensatory time up to yet not exceeding $10,000.00.

On or before March 1 of the first calendar year following the date of the officer's retirement, the Employer shall pay to the officer or his/her estate the value of his/her remaining non-FLSA compensatory time up to yet not exceeding $15,000.00. If a remainder exists, the Employer shall also pay to the officer or his/her estate one-third of the value of the remainder.

On or before March 1 of the second calendar year following the date of the officer's retirement, the Employer shall pay to the officer or his/her estate the value of his/her remaining non-FLSA compensatory time up to yet not exceeding $20,000.00. If a remainder exists, the Employer shall also pay to the officer or his/her estate one-half of the value of the remainder.

On or before March 1 of the third calendar year following the date of the officer's retirement, the Employer shall pay to the officer or his/her estate the value of any and all remaining non-FLSA compensatory time.

D.      Term of Memorandum of Understanding

The terms and conditions of this memorandum of understanding shall be subject to renegotiation by the parties on or after June 30, 2012.

E.      Ratification of Memorandum of Understanding

This memorandum of understanding is subject to the ratification process designated by the Lodge in accordance with its Constitution, By-Laws and other governing procedures.

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 135

*July 17, 2009*

If this memorandum of understanding is ratified through such process, the Lodge shall promptly notify the Employer in writing of such ratification, and this memorandum of understanding shall be implemented as expeditiously as possible. Thereafter, neither this memorandum of understanding nor any of its terms and conditions shall be submitted as part of any ratification process for a successor collective bargaining agreement or as a disputed issue during any interest arbitration. This memorandum of understanding may, however, be introduced as evidence by either party during any interest arbitration consistent with the parties' letter of understanding regarding such issue.

If this memorandum of understanding is not ratified through such process, its terms and conditions shall be considered null and void, but may be the subject of continued negotiations between the parties.

_____          _____
James C. Franczek, Jr.                   Joel A. D'Alba
On Behalf of the City of Chicago      On Behalf of the Fraternal Order of Police,
                                                       Chicago Lodge No. 7

4

403594.4



**FRANCZEK RADELET**
*Attorneys and Counselors*

300 South Wacker Drive   Suite 3400   Chicago, IL 60606
Phone 312.986.0300 ! Fax 312.986.9192 ! franczek.com

JAMES C. FRANCZEK, JR.
312.786.6110
jcf@franczek.com

July 17, 2009

Mr. Joel A. D'Alba
Asher, Gittler, Greenfield & D'Alba, Ltd.
200 West Jackson Boulevard, Suite 1900
Chicago, Illinois 60606

Re:   Joint Pension Legislation Council

Dear Mr. D'Alba:

This letter confirms the agreement between the City of Chicago and the Fraternal Order of Police, Chicago Lodge No. 7, to establish a Joint Pension Legislation Council. As we have discussed, the Joint Pension Legislation Council will be responsible for reviewing, researching and developing recommendations if appropriate regarding any and all legislation impacting or otherwise related to the *Policemen's Annuity and Benefit Fund of Chicago, Illinois*. The parties have already explored the issues of membership, legislative review procedures and scheduling and agree to continue to discuss and ultimately decide upon the necessary features of the Joint Pension Legislation Council. Finally, this letter confirms the parties' intent that the Joint Pension Legislation Council be established and fully operational prior to the 2010 spring session of the 96th General Assembly.

Your acknowledgment and agreement is appreciated in the space provided below.

Very truly yours,

James C. Franczek, Jr.

AGREED:

Joel A. D'Alba          7/17/09

:0B668.1

2007 NEGOTIATIONS
BETWEEN THE
CITY OF CHICAGO
AND THE
FRATERNAL ORDER OF POLICE, CHICAGO LODGE NO. 7

## MEMORANDUM OF UNDERSTANDING
## FOR WORK DAY SCHEDULES

*As Amended By the Parties on November 13, 2009*

*Amendments To Be Effective Operationally on January 10, 2010*

With respect to (I) the Work Day Schedule; (II) Impasse Resolution and Ratification Procedures for the Work Day Schedule and its implementation; and (III) the modification of certain provisions of the collective bargaining agreement in order to facilitate and implement the Work Day Schedule, the parties hereby agree as follows:

1.  The Work Day Schedule

    A.  Ten (10) Hour Work Day Schedule for District Rapid Response Cars.

        1.  The parties agree to pilot a ten (10) hour work schedule in Districts 3, 7, 10, and 15 for officers assigned or detailed to the third watch Rapid Response cars. This will result in a fifth watch. This schedule will be the same as the previously piloted CHA Rotating schedule, except as specifically modified herein.

        2.  The starting time for the Rapid Response Cars on the fifth watch will be 1600.

        3.  Each participating District shall have at least fifteen (15) Rapid Response car positions which will be filled by the eighty percent (80%)/twenty percent (20%) bidding process.

        4.  This pilot program will be discontinued at the end of the 2009 thirteenth police period.

FINAL 4164586

B.  Ten (10) Hour Work Schedule in Detective Division Area Two (2) and Juvenile Intervention and Support Center.

    1.  The parties agree to pilot a ten (10) hour work schedule in Detective Division Area Two (2) and for Detectives assigned or detailed to the Juvenile Intervention and Support Center. The schedule will be the same as the pilot schedule currently in effect at the time of this amendment.

    2.  The ten (10) hour schedule will not apply to Summary Investigation Detectives, Review Investigation Detectives, Detectives assigned or detailed to Administrative Desk Duty Assignments or Detectives assigned or detailed to fixed day off groups.

    3.  The starting times for the ten (10) hour schedule will be 0800; 1800; and 2200.

    4.  This pilot program will remain in effect through the 2010 thirteenth police period and may thereafter be discontinued collectively or individually by the Department in accordance with the procedure set forth in Paragraph II(F) and (G).

C.  Ten (10) Hour Work Day Schedule in Districts 5 and 20.

    1.  The parties agree to pilot a ten (10) hour work schedule for officers assigned or detailed to Districts 5 and 20. The schedule will be the same as the pilot schedule currently in effect at the time of this amendment.

    2.  The ten (10) hour schedule will not apply to officers assigned or detailed to the District Commander's administrative staff, Community Policing, CAPS, school duties, officers on authorized foot posts, and Review Officer positions.

    3.  The starting times for the ten (10) hour schedule will be 0700; 1600; and 2130.

    4.  Officers who hold Desk, Lockup, and Watch Relief positions on the First Watch will be considered successful bidders to a 1930 start time, which falls within the plus or minus two (2) hour adjustment period from the regularly designated 2130 starting time in accordance with Section 20.7 of the Agreement, unless the officers elect to opt out of their current position. Officers who successfully bid to Desk, Lockup,

and Watch Relief positions on the First Watch will ordinarily, but subject to the Department's discretion, be assigned field duties between 1930 and 0130.

5. This pilot program will remain in effect through the 2010 thirteenth police period and may thereafter be discontinued collectively or individually by the Department in accordance with the procedure set forth in Paragraph II(F) and (G).

D. Ten (10) Hour Work Day Schedule for Officers Assigned or Detailed to the Targeted Response Unit, Mobile Strike Force and the Special Functions Group.

1. The parties agree to pilot a ten (10) hour work schedule for officers assigned or detailed to field duties in the Targeted Response Unit or Mobile Strike Force and mutually agreed upon field functions within the Special Functions Group. The schedule will, at the Department's option, have either fixed or rotating consecutive days off. In the event the Department selects fixed days off, at least one of the fixed consecutive days off shall be either a Saturday or a Sunday.

2. This pilot program will remain in effect through the 2010 thirteenth police period and may thereafter be discontinued collectively or individually by the Department in accordance with the procedure set forth in Paragraph II(F) and (G).

E. Six-Three Eight and One Half (8 1/2) Hour Schedule in Districts 8 and 13.

1. The parties agree to pilot a six-three eight and one half (8 1/2) hour work schedule for officers assigned or detailed to Districts 8 and 13. This schedule will have three rotating days off.

2. The eight and one half (8 1/2) hour schedule will not apply to officers assigned or detailed to the District Commander's administrative staff, Community Policing, CAPS, school duties, authorized foot posts or fixed day off groups.

3. The starting times for the six-three eight and one half (8 1/2) hour schedule will be 0700; 1500; and 2200.

4. This pilot program will remain in effect through the 2010 thirteenth police period and may thereafter be discontinued collectively or

FINAL 416418.6

individually by the Department in accordance with the procedure set forth in Paragraph II(F) and (G).

F.  Four-Two Eight and One Half (8 1/2) Hour Schedule in Districts 1, 2, 3, 4, 6, 7, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 21, 22, 23, 24 and 25.

    1.  The parties agree to implement a four-two eight and one half (8 1/2) hour work schedule for officers assigned or detailed to Districts 1, 2, 3, 4, 6, 7, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 21, 22, 23, 24 and 25. This schedule will have two rotating days off.

    2.  The eight and one half (8 1/2) hour schedule will not apply to officers assigned or detailed to the District Commander's administrative staff, Community Policing, CAPS, school duties, fixed posts at the filtration plant or fixed day off groups.

    3.  The starting times for the four-two eight and one half (8 and 1/2) hour schedule will be 0700; 1500; and 2200.

    4.  This work schedule will remain in effect through the thirteenth police period of the calendar year in which the parties' successor labor agreement to the 2003-2007 current labor agreement expires [e.g., if the successor labor agreement expires on June 30, 2012, then the work schedule will remain in effect through the 2012 thirteenth police period] and is subject to renegotiation upon such expiration with any changes effective no earlier than the first police period of the calendar year following such expiration [e.g., if the successor labor agreement expires on June 30, 2012, then the work schedule is subject to renegotiation beginning July 1, 2012, and any changes to the work schedule will become effective no earlier than the 2013 first police period].

G.  Four-Two Eight-and-One-Half Hour Schedule for Detectives Assigned or Detailed to Areas 1, 3, 4 and 5.

    1.  The parties agree to pilot a four-two eight-and-one-half hour work schedule for Detectives assigned or detailed to Areas 1, 3, 4 and 5. This schedule will have two rotating days off.

    2.  The four-two eight-and-one-half hour schedule will not apply to Summary Investigation Detectives, Review Investigation Detectives, Detectives assigned or detailed to Administrative Desk Duty Assignments or Detectives assigned or detailed to fixed day off groups.

     FINAL 416418.6

3. The starting times for the four-two eight-and-one-half hour schedule will be 0830; 1700; and 0001.

4. This pilot program will remain in effect through the 2010 thirteenth police period and may thereafter be discontinued collectively or individually by the Department in accordance with the procedure set forth in Paragraph II(F) and (G).

H. All starting times may be adjusted plus or minus two (2) hours from the designated starting times in accordance with Section 20.7 of the Agreement.

I. Officers will initially select their watches and be assigned day off groups. Officers will then select their furloughs.

J. Furloughs will be selected by unit for the calendar years beginning January 1, 2010 and each January thereafter in accordance with Section 23.2 of the Agreement.

II. Ratification, Implementation and Dispute Resolution

A. The implementation or continuation of the pilot programs or work schedules described in Paragraph I is contingent upon the approval of such programs by Unit 156A-Sergeants.

B. If approved, the Department will immediately announce the anticipated implementation or continuation of the pilot programs or work schedules described in Paragraph I, which will provide a sufficient period for affected officers to bid into or out of the affected units. Officers will bid to the ten (10) hour shifts and eight and one half (8 1/2) hour shifts pursuant to Article 31. Officers assigned to the ten (10) and eight and one half (8 1/2) hour shifts will be subject to the reverse seniority provisions of Sections 31.5 and 31.6.

C. A Joint Labor Management Committee shall continue to meet monthly for the purpose of monitoring, reviewing, ascertaining and making recommendations regarding the pilot programs and work schedules and promptly addressing errors and omissions in the pilot programs and work schedules. The Committee will continue to consist of the Commanding Officer of the Management and Labor Affairs Section and the Lodges' Grievance Committee Chairman (or their designees) and additional persons designated by each party up to a maximum of five (5) persons for each party. At the end of each police period, reports will continue to be presented by

both the City and the Lodge to this Committee for the purpose of monitoring and reviewing the pilot programs and work schedules.

D.   The goals of the pilot schedules are to attempt to boost employee productivity, reduce employee stress, reduce medical and IOD absences, reduce automobile accidents, reduce overtime assignments, reduce response time between radio assignments, reduce radio assignments pending, reduce crime, reduce citizen complaints, improve service to the community, and boost employee morale. The parties recognize that implementation of the pilot schedules might not result in measurable improvements in each of these goals.

E.   The Joint Labor Management Committee will meet promptly upon the request of either party in order to make recommendations and attempt to reach agreement by negotiations in good faith regarding the pilot schedules' continuation, expansion, modification, or discontinuation. The Committee shall have the authority to continue, modify, expand or terminate any of the pilot schedules by mutual agreement. Any mutual decision to continue, expand, modify, or discontinue pilot schedules by the Committee shall be binding upon the parties, subject to ratification by the parties.

F.   The pilot programs that are approved and implemented shall remain in effect through the 2010 thirteenth police period and may thereafter be continued either collectively or individually at the discretion of the Department. If the Department intends to discontinue one (1) or more pilot programs, the Department will provide the Lodge with written notice of its intent no later than July 1, 2010 and upon request shall promptly meet with the Lodge to discuss the rationale for its decision.

G.   In the event the Lodge disagrees with the rationale for the Department's decision and believes one (1) or more of the pilot programs identified by the Department for discontinuation should be continued beyond the 2010 thirteenth police period, the dispute shall not be submitted to interest arbitration and may only be resolved through the following dispute resolution procedure:

   1.   Within five (5) business days of the meeting required by subsection (F), the Lodge shall submit a demand for arbitral review to the Management and Labor Affairs Section. In the event that two (2) or more bargaining units file a demand for arbitral review, the actions shall be consolidated into the same proceeding. In the event that the arbitrator believes he/she could not award complete relief among the parties because a particular bargaining unit is not a party to the

proceedings, the arbitrator shall have the authority to order such other bargaining unit to join the proceedings as either an involuntary grievant or respondent.

2.  Within thirty (30) calendar days of the execution of this memorandum of understanding, the parties shall mutually select an arbitrator and pre schedule such arbitrator for a hearing beginning on or about August 1, 2010.

3.  The issue before the arbitrator shall be whether the Department was unreasonable in deciding to discontinue a pilot program.

4.  The arbitrator shall issue an abbreviated written decision and order within ten (10) business days of the close of the hearing and shall issue a full written decision and order thereafter.

5.  The arbitrator's written decisions and orders shall be binding on both the Department and the Lodge, provided that the arbitrator does not exceed his/her authority as defined in this memorandum of understanding.

6.  The parties shall share equally the fees and expenses of the arbitrator and any other arbitration costs that are common to both parties. Each party shall be responsible for compensating its own attorneys and representatives.

7.  The established time limits in this dispute resolution procedure may only be extended by mutual written agreement.

8.  During the parties' discussions and the impasse procedures, the pilot programs shall continue in effect.

H.  In the event a dispute arises out of the implementation or administration of the work schedules described in Paragraph I, the parties may mutually agree to attempt to resolve the dispute through mediation, or either party may invoke the grievance and arbitration procedure set forth in the parties' labor agreement.

III.    Contract Modifications and Understandings Regarding the Implementation of the Pilot Programs

Notwithstanding any other provision of the current collective bargaining agreement or the successor collective bargaining agreement for the duration of the pilot programs and work schedules, the following provisions and understandings shall be in effect:

A.    The normal tour for the ten (10) hour shift will be ten and one half (10 1/2) hours, which includes a one half (1/2) hour uncompensated lunch period. The normal tour for the eight and one half (8 1/2) hour shift will be nine (9) hours, which includes a one half (1/2) hour uncompensated lunch period. The parties agree and understand that if an officer is required to perform work during the one half (1/2) hour meal period, the officer will receive overtime compensation in accordance with the terms of this Agreement.

B.    For officers working the ten (10) and eight and one half (8 1/2) hour schedules, the Lodge waives the overtime provisions of Section 20.1 of the Agreement insofar as that section requires payment of overtime for all hours worked in excess of the normal work day of eight (8) hours. Overtime in excess of the normal tour of duty will be compensated at the overtime rate.

C.    Officers with straight day furloughs will be given the same number of straight furlough days in the ten (10) and eight and one half (8 1/2) hour schedules. Officers with working day furloughs will have any remaining days converted to hours. Where the conversion of working day furloughs to hours results in a remainder of hours that is lower than the eight and one half (8 1/2) hour tour of duty, officers may utilize compensatory time to attain a complete tour of duty or, in the alternative, will forfeit the remainder hours.

D.    Compensation for Designated Holidays is granted as follows:

1.    Officers on the ten (10) hour shift will receive ten (10) hours of holiday compensation for holidays occurring on their days off and will receive ten (10) hours of compensation and five (5) hours of holiday compensation when officers are required to work a ten (10) hour shift on a holiday.

Officers on the eight and one half (8 1/2) hour shift will receive eight and one half (8 1/2) hours of holiday compensation for holidays occurring on their days off and will receive eight and one half (8 1/2) hours of compensation and four and one quarter (4 1/4) hours of holiday compensation when officers are required to work an eight and one half (8 1/2) hour shift on a holiday.

FINAL 416418.6

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 145

2. Officers on the ten (10) hour shift whose regular day off coincides with an established holiday, and who are required to work a regular tour of duty ten (10) hours on that holiday, will be credited with twenty-five (25) hours of compensatory time and five (5) hours of compensatory time or additional pay, as the officer elects.

Officers on the eight and one half (8 1/2) hour shift whose regular day off coincides with an established holiday, and who are required to work a regular tour of duty eight and one half (8 1/2) hours on that holiday, will be credited with twenty-one and one quarter (21 1/4) hours of compensatory time and four and one quarter (4 1/4) hours of compensatory time or additional pay, as the officer elects.

3. In the event that an officer covered by this agreement is required to attend court on his or her regular day off and that day that is also a holiday, the officer will be compensated at a rate of double-time for the minimum set forth in 20.5 or double-time for the actual hours worked, whichever is greater, plus compensatory time or additional pay in an amount equal to the normal tour of duty, as the officer elects.

E. For those officers working a ten (10) hour schedule, a personal day, if used, will be worth a tour of duty, ten (10) hours, and baby furlough days will be worth eight (8) hours each. An officer assigned to the ten (10) hour schedule who wishes to use a baby furlough day will be required to use an additional two (2) hours of compensatory time.

For those officers working an eight and one half (8 1/2) hour schedule, a personal day, if used, will be worth a tour of duty, eight and one half (8 1/2) hours, and baby furlough days will be worth eight (8) hours each. An officer assigned to the eight and one half (8 1/2) hour schedule who wishes to use a baby furlough day will be required to use an additional one half (1/2) hour of compensatory time.

F. For officers working a ten (10) hour schedule, an officer who is directed to perform substantially all the duties and assumes substantially all the responsibilities of a Desk Sergeant for more than four (4) hours within a single ten (10) hour tour of duty shall be paid at a D-3 rate consistent with his or her own tenure for a ten (10) hour tour of duty, or for the time spent, which ever is greater. An officer who is directed to perform substantially all the duties and assumes substantially all the responsibilities of a Desk Sergeant

FINAL 4164186

City of Chicago and FOP Lodge No. 7
Interest Arbitration — 2007 Agreement
Page 146

for four (4) hours or less shall be paid at a D-3 rate consistent with his or her own tenure for the actual hours worked.

G. The number of District Desk, District Lockup, and District Watch Relief positions that will be subject to bid in Districts 5 and 20 shall be as follows:

| District | Desk | Lockup | Watch Relief |
|----------|------|--------|--------------|
| 005 | 3 | 6 | 12 |
| 020 | 3 | 3 | 9 |

Chicago Police Department

Jody Weis
Superintendent of Police

Dated: 16 Nov 07

Fraternal Order of Police,
Chicago Lodge No. 7

Mark P. Donahue
President

Dated: 16 Nov 07

FO4AL 416418.6